**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:20-cv-00691-D |
| Plaintiff, | |
| v. | |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, and JAMES G. REYNOLDS, | |
| Defendants. | |

**LEAD PLAINTIFFS' INSUR SHAMGUNOV AND ELENA SHAMGUNOVA
AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.     NATURE OF THE ACTION ..................................................................................1

II.    JURISDICTION AND VENUE ............................................................................6

III.   PARTIES AND RELEVANT NON-PARTIES ....................................................6

    A.    Parties ........................................................................................................6

IV.    BACKGROUND ................................................................................................10

    A.    Background Of Exela .................................................................................10

        1.    SourceHOV is Exela's largest subsidiary ..................................11

        2.    Novitex is Exela's second largest subsidiary .............................13

    B.    Background of The Business Combination .............................................13

    C.    The Appraisal Action ...............................................................................16

        1.    Facts prompting the Appraisal Action ......................................16

        2.    Appraisal Action Reveals A Culture Of Deceit .........................17

        3.    Appraisal Action Reveals Improper Addbacks To Adjusted EBITDA ......................................................................................19

        4.    What the Appraisal Action revealed: Par Chadha told investors one thing, but told the Court of Chancery another .............................24

    D.    Following the Merger the Company Discusses Its Progress In Implementing Its Strategy to Grow Revenue and EBITDA ...........................................24

V.     SUMMARY OF THE FRAUD ...........................................................................27

    A.    Defendants attempt to frame ordinary operating expenses as non-routine and likely to decline in the future within Exela's Adjusted EBITDA metrics ...................................................................................................................27

    B.    Defendants Claim Exela Has Predictable Revenue And That Margins Will Expand As They Implement BPA .............................................................30

        1.    Exela Touts Revenue Visibility To Instill Confidence In Guidance .........30

        2.    Defendants Told Investors Margins And EBITDA Would Grow As They Automated Existing Low Margin Customers Acquired From Novitex And Other Acquisitions ...............................................31

    C.    The Truth Begins To Emerge ...................................................................33

1.     Exela Lowers its 2018 Adjusted EBITDA Guidance By ~$18 Million Due In Part To The Exit Of A Low Margin Contract..................33

2.     Exela Reports 2018 Results And Expresses Confidence In 2019 Guidance Due to Revenue Visibility ......................................36

3.     Exela Misses 1Q'19 Revenue Expectations And Its Liquidity Plummets Resulting In A Moody's Downgrade.........................38

4.     Exela Revises Guidance Down Citing Unpredictable Postage Revenue And Exit From Low Margin Contract in 2Q'19 .......................42

5.     Exela Reduces 2019 Guidance Again Due To Unpredictable Postage Revenue And Low Margin Client Exit In 3Q'18......................................43

6.     Testimony from the Appraisal Litigation Detailed Additional and Previously Unknown Issues about SourceHOV .......................47

7.     Exela Announces Delay Of Form 2019 10-K Filing And Restatement..........................................................................50

8.     Post-Class Period Disclosures...............................................51

VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...........................................56

A.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K ..........................................56

B.     Defendants' False and Misleading Statements and Omissions Relating To Its April 13, 2018  Secondary Offering ..................................58

C.     Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results...........................................59

D.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results........................................61

E.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results........................................64

F.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results.........68

G.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results........................................73

G.     Defendants' False And Misleading Statements And Omissions Regarding ITS 2Q'19 Financial Results..........................................76

H.     Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results..........................................78

VII.   LOSS CAUSATION..........................................................80

VIII.    ADDITIONAL SCIENTER ALLEGATIONS ..................................................84

    A.    Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA ................................................84

    B.    Implementing Digitization And Automation In Existing Customers Was a Core Operation ................................................86

    C.    Defendants Failed to Break Out Postage Revenue ................................................89

IX.    CORPORATE SCIENTER ALLEGATIONS ..................................................90

X.    CLASS ACTION ALLEGATIONS ..................................................90

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE) ................................................92

XII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ................................................94

XIII.    CLAIMS ..................................................94

XIV.    PRAYER FOR RELIEF ..................................................96

XV.    JURY TRIAL DEMANDED ..................................................99

**Introduction**

Lead Plaintiffs Insur Shamgunov and Elena Shamgunova ("Plaintiffs"), by their undersigned attorneys, hereby bring this Amended Class Action Complaint ("Complaint") against Exela Technologies, Inc. ("Exela" or the "Company"), Ronald Cogburn ("Cogburn") and James G. Reynolds ("Reynolds") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Exela; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former Exela employees; and other publicly available information concerning Exela.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

**I.      NATURE OF THE ACTION**

1.      This is a federal securities class action on behalf of persons or entities who or which purchased or acquired Exela securities between March 16, 2018 and March 16, 2020, inclusive (the "Class Period") and who were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Exela is a location-agnostic global business process automation ("BPA") provider combining industry-specific and multi-industry enterprise software and solutions worldwide.  Exela is a Delaware corporation and its principal executive offices are located at 2701 E. Grauwyler Rd, Irving, TX 75601.  Exela's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "XELA."   It was formed by the merger of

SourceHOV and Novitex, which was arranged by special purposes acquisition company Quinpario Acquisition Corp. 2. in July 2017, making Exela a major player in the business processing industry.

3.     The Company planned to combine SourceHOV's back-off capabilities with Novitex's front-end solutions to drive revenue and margin growth by expanding its scope within its existing base of customers, winning larger contracts given its increased scale, leveraging BPA across both its on-site and offsite employees, and realizing cost saving from merger synergies.

4.     Exela also aimed to reduce its leverage, while continuing to make tuck-in acquisitions that would allow it to expand its existing customer base.  Management also told investors that its adjusted EBITDA, which added back one-time and non-cash charges to EBITDA, would converge with EBITDA as the Company realized cost savings from the merger by consolidating operations.

5.     The Company told investors that it had 90% visibility into its revenue because it was recurring in nature due to long-term or auto-renewal customer contracts.  With approximately 6,000 employees that worked on-site with its customers, Exela assured that it was deeply embedded and by cross-selling and upselling its automation and digital transformation solutions, branded as DigitalNow, it would further expand its "broad and sticky" revenue base.  Furthermore, Exela assured that while implementing these solutions involved initial cost outlays, particularly with respect to headcount, once they were in place headcount would decline and margins would expand.

6.     In its opinion from litigation spanning from 2017 through 2020, the Delaware Court of Chancery found that Defendant's Chairman, Par Chadha, "lacked credibility"; that its' chairman was "simply not believable" and "not at all forthright"; and—because of his refusal to admit to his "scheme" to backdate a valuation of one of his company's shares—that all of his testimony was "taint[ed]."  The individual the court describes is Par Chadha, and he runs Defendant Exela.  Before running Exela, Chadha ran SourceHOV, an entity "whose governance structure was not a model for best practices," according to the Court of Chancery.

7.     The deceit here is multi-faceted.  In short, Exela misled investors about the predictability of its revenue, often stating that 90% of its revenue was predictable when Defendants

later admitted that approximately 20% of their revenue was unpredictable, nonrecurring, low margin postage revenue.  In addition, Exela misled investors about its ability to increase its revenue and margins by implementing automation and digital transformation in its existing customers, particularly those acquired through its acquisitions of Novitex and later Asterion.  Many of the customers it had acquired had low margins and no path to automation or digital transformation, resulting in a material amount of unpredictable, nonrecurring, low margin revenue with no opportunity to improve those margins.  In addition, exiting these low margin contracts resulted in stranded costs related to contract terminations, headcount, and facilities consolidation, that would further negatively impact margins.

8.      In effort to mask it's disappointing financial performance, the Company engaged in fraudulent accounting.  Throughout the Class Period, the Company failed to account for liability associated with an Appraisal Litigation arising out of a dispute amongst shareholders of legacy SourceHOV about the fair value of their shares which should have been recorded in 2017 at the fair value of the shares tendered.

9.      The Company also misled investors throughout the Class Period by repeatedly reporting and emphasizing the importance of a misleading Non-GAAP metric called adjusted EBITDA.  The Appraisal Litigation also saw testimony from Exela's current SVP of Finance, Anubhav Verma ("Verma"), who testified that Exela predecessor, SourceHOV, calculated adjusted EBITDA by "add[ing] back certain expenses which are considered one-time and nonrecurring in nature; for example, business optimization and fees and expenses incurred in connection with transactions."  Making such addbacks of one-time or non-recurring expenses is customary for investors.  It helps them determine what a steady-state, or normalized period of operations would look like absent such nonrecurring expenses.  Even SourceHOV's expert witness commented that such a practice is "ubiquitous" among financial professionals.

10.     But that wasn't what Exela did. Exela added back the expense of optimization and restructuring to adjusted EBITDA, even though such expenses recurred every single quarter that Exela has released it.  Exela's predecessor SourceHOV did the same thing, and their own expert

witness (a financial expert) testified on June 6, 2020, that SourcHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring." More specifically, he testified that "And they're supposed to be nonrecurring expenses, and I don't know. I seem to see the same expenses year after year after year. So I -- my impression was, jeez, they don't look to be so nonrecurring."

11.     The same practice that SoureHOV engaged in was repeated by Exela. The reason Exela would do so is because, by adding back that expense, it shows higher profits. Verma testified to about SourceHOV, "it's basically in the company's interest to show an add-back." The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing." The fraudulent accounting allowed the Company to achieve its 2017 and 2018 annual guidance, and masked the true state of its financial operations throughout the Class Period.

12.     On November 8, 2018, the Company lowered its 2018 adjusted EBITDA guidance by approximately $18 million due in large part to the exit of a low margin contract, partially revealing that a portion of its existing customers had not path to automation or digital transformation. On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2018 damaging investors.

13.     On March 18, 2019, the Company announced that its optimization and restructuring expenses would continue and only "gradually" decline, despite seven straight quarters of incurring such costs. Following this news, Exela's stock fell $0. 21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors. The stock continued to fall on the following day and fell by an additional $0.23 per share, or 6.2% to close at $3.50 on March 20, 2019.

14.     On May 9, 2019, the Company announced that it had missed its revenue guidance for the first quarter of 2019, and that its net debt stood at $1.46 billion, putting its leverage ratio at 5.06x and that it's liquidity had dwindled down to $58 million. The Company also revealed that

its headcount had increased by nearly 1,000 employees as it ramped a new contract, calling into question the narrative that margins would improve as it removed headcount throughout the year. Then on May 22, 2019, Moody's issued a press release announcing that it had downgraded the Company's debt rating from Caa1 from B3.  These announcements partially revealed that the Company's was struggling to generate cash flow and needed to significantly improve its margins to pay down its debt and make interest payments.  Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

15.     On August 9, 2019, the Company reduced its 2019 guidance citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, partially revealing that the Company had a substantial amount of unpredictable nonrecurring low margin revenue, and the extent to which stranded costs from exiting these contracts would impact margins. Following this news, Exela's stock fell $0.05 per share, or 27.1%, to close at $0.15 per share on March 18, 2020 on heavy volume.

16.     On November 12, 2019, the Company further reduced its 2019 guidance again noting the unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, revealing more fully the extent to which the Company's revenue consisted of unpredictable low margin revenue, and the continued impact of stranded costs from exiting these contracts on the Company's margins.  Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

17.     Finally on March 16, 2020, the Company announced that it would be delaying the filing of its 2019 annual report on Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019.  On March 17, 2020, the Company issued a press release announcing various accounting errors that had been made, including most significantly failing to record liability for the shares at issue in the Appraisal Litigation since 2017, revealing that the Company had misrepresented its financial condition.  Following this news, Exela's stock fell $0.05 per share, or 27.1%, to close at $0.15 per share on March 18, 2020 on heavy volume.

18.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.     JURISDICTION AND VENUE

19.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

20.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

21.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

22.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities markets.

## III.     PARTIES AND RELEVANT NON-PARTIES

### A.     Parties

23.     Lead Plaintiff Insur Shamgunov, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

24.     Lead Plaintiff Elena Shamgunova, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities

during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25.     Defendant Exela purports to operate as a location-agnostic global business process automation ("BPA") provider combining industry-specific and multi-industry enterprise software and solutions worldwide. Exela is a Delaware corporation and its principal executive offices are located at 2701 E. Grauwyler Rd, Irving, TX 75601.  Exela's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "XELA."

26.     Throughout the Class Period, Exela, through its officers and directors, published periodic filings with the SEC, and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

27.     Defendant Ronald Cogburn ("Cogburn"), served as the Chief Executive Officer ("CEO") of Exela and on its Board of Directors throughout the Class Period.  Cogburn was the CEO of SourceHOV from 2013 until the closing of the Novitext Business Combination.  Cogburn was also part of companies that were predecessors to SourceHOV since 1993, and has extensive experience in executive management, construction claims consulting, litigation support, program management project management, cost estimating, damages assessment and general building construction.  In addition, Cogburn has been a principal of HandsOn Global Management, LLC ("HGM") since 2003.  Cogburn has a BSCE in Structural Design/Construction Management from Texas A&M University and is a registered Professional Engineer.

28.     Throughout the Class Period, Cogburn frequently spoke to investors and analysts on conference calls and investor conferences.  Cogburn possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Cogburn signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, Amendment No. 1 to its Annual Report on Form 10-K/A for the year 2017, its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters

ended March 31, 2018 and March 31, 2019.[1]

29.     Defendant James G. Reynolds ("Reynolds") was the Company's Chief Financial Officer ("CFO") since the closing of the Novitex Business Combination in 2017 and served in that role throughout the Class Period.  Reynolds previously served as the Co-Chairman of SourceHOV from 2014 until the closing of the Novitex Business Combination.  Reynolds is also the Chief Operating Officer and Partner at HMG.  Prior to HGM Mr. Reynolds held numerous executive management or senior advisory positions at SourceHOV and its related subsidiaries and predecessor companies, including serving as Chief Financial Officer for HOV Services, LLC from 2007 to 2011 and Vice President and Corporate Controller for Lason from 2001 to 2006. Mr. Reynolds was a Senior Manager in the Business Advisory Services Practice at PricewaterhouseCoopers from 1990 to 2001. Mr. Reynolds is a C.P.A. and holds a B.S. in Accounting from Michigan State University.

30.     Throughout the Class Period, Reynolds frequently spoke to investors and analysts on conference calls and investor conferences.  Reynolds possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Reynolds signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, certified the accuracy of Amendment No. 1 to its Annual Report on Form 10-K/A for the year 2017, and signed or authorized the signing of and certified the accuracy of its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters ended March 31, 2018 and March 31, 2019.

31.     Defendant Par Chadha is the Chairman of the Board of Directors for Exela and is the founder, Chief Executive Officer and Chief Investment Officer of HandsOn Global Management ("HGM"), formed in 2001, and the principal stockholder of SourceHOV immediately prior to the Business Combination on July 12, 2017.  Chadha also served as Chairman of SourceHOV from 2011 until the closing of the Business Combination.  Chadha has 40 years of

---

[1] References to Exela's fiscal years and quarters are referenced herein as "FY" and "1Q," "2Q," "3Q," or "4Q" respectively, and are followed by the corresponding year.

experience in building businesses in the Americas, Europe and Asia, including execution of mergers and acquisitions, integration of businesses and public offerings. Mr. Chadha is co-founder and owner of Rule 14, LLC,  a portfolio company of HGM formed in 2011 a data mining and automation company that provided marketing to SourceHOV.

32.     Chadha founded or co-founded other technology companies in the fields of metro optical networks, systems-on-silicon and communications.   Through HGM, Chadha previously participated in director and executive roles in joint ventures with major financial and investment institutions, including Apollo, as well as other portfolio companies of HGM, and currently holds and manages investments in evolving financial technology, health technology and communications industries. Since 2005, Chadha has served as a Director of HOV Services Limited, a company listed on the National Stock exchange of India, acting as its Chairman from 2009 to 2011. Chadha holds a B.S. in electrical engineering from Punjab Engineering College, India.

33.     Throughout the Class Period, Chadha controlled Exela through beneficial ownership of more than 50% of its shares and as Chairman.  At the start of the Class Period, Chadha had the beneficial ownership of 55.8% of the Company's shares.  The Company's filed proxy statement on April 30, 2019 which indicated that Chadha was the beneficial owner of 52.9% of the Company's shares.  According to the Form 10-K/A filed by the Company on June 15, 2020, as of June 5, 2020 Chadha was the beneficial owner of 49.3% of the Company's shares; however, the amount likely exceeded 50% throughout the Class Period, as Ex-Sigma 2, an entity controlled by Chadha, distributed all of its shares during 1Q'20 and is no longer a shareholder of Exela.

34.     Throughout the Class Period, Chadha possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Chadha signed or authorized the signing of Exela's Annual Reports on Form 10-K for the years 2017 and 2018.

35.     Defendants Cogburn, Reynolds, and Chadha are collectively referred to hereinafter as the "Individual Defendants."  Exela and the Individual Defendants are collectively referred to as "Defendants".

36.     The Individual Defendants, because of their positions with the Company, possessed

the power and authority to control the content of Exela's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.   BACKGROUND

### A.   Background Of Exela

37.   Exela was formed in 2017 by a three-way merger ("the Business Combination") involving three entities: (1) SourceHOV; (2) Novitex; and (3) Quinpario Acquisition Corp. 2 ("Quinpario"), wherein SourceHOV and Novitex merged into Quinpario which became Exela. The Business Combination is discussed more fully below.

38.   Since the Business Combination, Exela has grown through additional merger activity, so it has several operating companies under its corporate structure.  The largest of these operating companies is SourceHOV, which was formed in 2011 after the merger of two outsourcing service providers owned by Chadha and HGM.

39.   Today, Exela is made up of three reporting segments: (1) Information and Transaction Processing Solutions (ITPS); (2) Healthcare Solutions (HS); and (3) Legal & Loss Prevention Services (LLPS).  By revenue and headcount, ITPS is the largest segment, comprising just under 80% of annual revenue on average during the class period.  ITPS offers industry-specific services for banking and financial services, mobile banking platforms, and property casualty insurance.  It also serves customers looking for records management, payment processing, and

electronic storage of data (regardless of which industry that customer may fall into).  HS provides automated services in the healthcare field including claims processing, prescription management, enrollment processing, medical coding, and medical records management.  LLPS serves the legal industry with things like class action settlement administration, collection and distribution of settlement funds, etc.  LLPS is the smallest contributing segment to Exela's revenue. Each segment is discussed more fully below.

### 1.    SourceHOV Is Exela's Largest Subsidiary

40.    Before becoming part of Exela, SourceHOV was a Delaware corporation with its principal place of business in Irving, Texas.  It was formed in 2011 by the merger of two outsourcing service providers owned by Chadha and his investment group, HGM.

41.    SourceHOV provides process outsourcing and financial technology solutions, with a focus on digital solutions.  For instance, it might help a company automate its loan origination process.  More specifically, SourceHOV purports to "combine and classify documents from different sources and in multiple media into a single, navigable structured data package that is then integrated into the wide variety of internal systems used by SourceHOV's clients."  In other words, it performs back office support for banks and mortgage originators, including by processing payments in a faster and more efficient way through the use of automation technology.

42.    One way SourceHOV might improve its customer's process includes software installation that essentially routes documents to the appropriate departments or personnel.

43.    Another way might be to help companies manage an overwhelming amount of paperwork.  For instance, in its 2018 Coverage Initiation of Exela, Morgan Stanley provides the example of a casual dining chain that had over 200,000 paper invoices.  According to Morgan Stanley, Exela lowered the dining chain' costs by 40% and increased accountability for its accounts payable and reporting process through the use of one of SourceHOV's digital solutions.

44.    SourceHOV performs similar services for healthcare entities, such as automating back office functions at a healthcare provider's office, or by processing claims, presenting an explanation of benefits (both print and digital) and helping the healthcare business manage its

revenue cycle.  SourceHOV even purports to assist with identity verification, entitlement qualification determination, and "adjudicating claims" to decide which claimants should be paid, and in which amount.

45.     On top of financial services, SourceHOV serves law firms with offerings ranging from claims processing and administration, to assistance with discovery and legal collections.  As above, most of these services are back-office in nature with some software component.

46.     Outside the private sector, SourceHOV also serves the public sector, through its Public Sector Solutions group by facilitating various processes and back-office functions for public agencies, such as tax return processing for a state's Department of Revenue.  SourceHOV also assists with so-called front-office functions for a public agency by, among other things, managing the front-end tax processing operation, including the online tax submission portal, physical and electronic mailroom, document preparation, data capture, and similar services.

47.     Functionally, SourceHOV's digital solutions range from providing software, big data analytics and data management.  For instance, its digital solutions could either package and route documents, or create real time monitoring dashboards.

48.     Before becoming Exela's largest operating group, SourceHOV grew through M&A activity, so it also had several operating companies under its corporate structure.  For instance, its financial solutions division resulted from a November 2014 acquisition of BancTec and its remittance processing division resulted from a 2016 acquisition of TransCentra Inc.

49.     Before becoming part of Exela, SourceHOV was a private company and lacked access to the public equity markets.  Accordingly, SourceHOV's growth by merger strategy was often financed by taking on debt.

50.     SourceHOV did a lot of deals before becoming Exela.  For example, by 2017, SourceHOV had 117 operating facilities throughout the world, and employed about 16,000 employees.  Its annual revenue for the full year preceding the Business Combination was $790 million.

51.     To get that big, SourceHOV had to borrow a lot of money.  By 2017, SourceHOV

had around $1.1 billion of debt–most of which was long-term in nature–and just $963.7 million of assets.  This debt level and the debt covenants that came with it led SourceHOV to consider strategic alternatives and, eventually, the Business Combination (discussed more fully below).

### 2.   Novitex Is Exela's Second Largest Subsidiary

52.     Before becoming subsumed as part of Exela, Novitex Holding Inc., ("Novitex") was, like SourceHOV, a standalone entity focused on back office support.  Unlike SourceHOV however, Novitex focused more on analog (or paper-based) support services.  For instance, it provides document management services like mailroom outsourcing, document scanning, and printing and indexing of documents for corporate customers.  Novitex traces its roots to Pitney Bowes, the mail services entity which was owned by the same private equity firm that owned Novitex (before it was sold to Exela).  At the time of the Business Combination, Novitex was majority owned by the private equity firm Apollo Global Management LLC.

53.     Relative to SourceHOV, Novitex is smaller.  With roughly 7,250 employees at the time of the Business Combination and $543 million in annual revenue for the year preceding the Business Combination, Novitex was the smaller entity from a headcount and financial standpoint.

54.     Novitex purports to provide its customers a suite of Document Logistics and Digital Services offerings that support the "Integrated Document Lifecycle" within the document outsourcing space.  Novitex's services are sometimes provided onsite with its client, and sometimes on Novitex's premises (or a combination of both).

55.     Since becoming part of Exela, Novitex rolled up into Novitex Enterprise Solutions, which is currently part of  Exela's ITPS segment, together with SourceHOV.

### B.     Background Of The Business Combination

56.     The reason for the Business Combination is straightforward: SourceHOV was teetering on insolvency and close to tripping a debt covenant.  SourceHOV's highly levered capital structure meant that it needed to keep the ratio of its total net debt divided by its earnings below the limits set by its debt covenants.  To stay under those limits, SourceHOV sought to de-lever its balance sheet through a merger.

57.     A leverage ratio can be calculated in different ways, but the general principle is some ratio between (a) debt minus cash in the numerator, and earnings is the denominator.  So a company can lower its leverage by either decreasing the debt minus cash in the numerator, or increasing the earnings in the denominator.

58.     Generally speaking, a merger can lower a company's leverage ratio by boosting the combined company's earnings more than it boosts its debt.  To illustrate, suppose that company A has $100 of debt, and $20 of earnings. Its leverage ratio is 5.0x.  Suppose further that company A mergers with company B, who also has $100 of debt, but has earnings of $30.  The combined company (A+B) will have $200 of debt, and $50 of earnings, or just 4.0x leverage.  In other words, the merger of A + B translated into a 20% leverage reduction for Company A, but an increase in leverage for company B.  The drop in leverage becomes even more pronounced if company B had zero debt.

59.     Another way a company can lower its leverage ratio is by merging with any company that has more cash than it does debt (lower the denominator).  So if Company A merges with Company C, a company that has only cash, no debt and no earnings, the leverage ratio of A + C would also decrease.

60.     An obvious question becomes why would Company C want to merge with Company A, particularly if Company A was in dire financial straights, as SourceHOV was?  The answer: if Company C faces a binary choice of deploying its capital, or returning it and shutting down, it might take its chances with Company A.  Here, Company C is Quinpario.

61.     Before SourceHOV and Quinpario came together, Exela first sought to reduce its leverage ratio because SourceHOV and Novitex both has such high debt levels.  So some additional equity was needed to get SourceHOV's balance sheet in a more manageable state before consummating the Business Combination.

62.     As a result, in September 2016 SourceHOV approached a few existing investors including Manichaean Capital, LLC ("Manichaean"), HGM, and others.  This small investor group eventually contributed $23 million of equity capital.

63.     At the time of the Business Combination, Quinpario was a NASDAQ-listed special purposes acquisition company (a SPAC).  SPACs are publicly traded companies formed for a particular purpose.  As was the case for Quinpario, most commonly SPACs are formed to acquire another company (or multiple companies).

64.     Generally speaking, in a SPAC transaction, a shell company goes public and trades on a listed exchange.  The cash raised from the IPO goes into the SPAC's trust, where it earns interest until the SPAC completes a merger with an operating company.  Most SPACs issue shares at $10.00 per share, as did Qunipario when it went public on January 22, 2015.

65.     If a SPAC doesn't complete a deal before its deadline (typically within two years after an IPO), the trust is liquidated and the proceeds are returned to investors.  But if a deal is proposed before the deadline, SPAC investors are given detailed information about the proposed transaction, and have the right to vote on the deal.  If the investors don't go for the deal, they have the right to require the SPAC to redeem their shares.

66.     Quinpario was formed on July 15, 2014 and went public several months later in January 2015, raising $350 million in a public offering.  So by late 2016, after two years had gone by and no deal had been made, Quinpario still had its nearly $350 million war-chest to invest, but only a few months left to spend it.  That's because Quninpario was set to expire on January 22, 2017—right around the time that SourceHOV was looking for a financial lifeline.

67.     Put differently, SourceHOV was burning cash and teetering on the brink of insolvency, while Quinpario had so much dry powder that it was burning a whole in its pocket.  Eventually those seemingly complimentary forces moved the two companies to began discussions to see if there was a mutual benefit in combining.

68.     After a January 13, 2017 letter of intent, Quinpario, SourceHOV, Novitex and related parties executed a Business Combination Agreement formalizing a three way merger.

69.     The Business Combination was considered a reverse merger where SourceHOV as determined to be the acquirer of Novitex.  SourceHOV bought 100% of Novitex's equity for $676.7 million and issued debt of about $1.4 billion which was used to refinance the then-existing debt of

SourceHOV and Novitex. Quinpario would contributed $200 million and both SourceHOV and Novitex would merge into Quinpario subsidiaries.

70.     The formal structure of the Business Combination is as follows. A SourceHOV Merger Sub merged with and into SourceHOV, with SourceHOV surviving that merger to become an indirect subsidiary of Quinpario Acquisition Corp. 2; and Quinpario Merger Sub II, Inc. merged with and into Novitex, with Novitex surviving that merger to become an indirect subsidiary of Quinpario. The effect of the preliminary merger and the business combination was for Quinpario to become the parent company of both SourceHOV and Novitex. Quinpario was later renamed Exela in July, 2017. Because Quinpario had already been a public company since January 2015, once the Business Combination closed on July 12, 2017, what used to be Quinpario's shares then became Exela's shares.

### C.     The Appraisal Action

#### 1.     Facts Prompting The Appraisal Action

71.     As noted above, the combined or "pro forma" structure of SourceHOV and Novitex before the Business Combination was highly leveraged, and needed yet another equity infusion to cure its leverage requirements under its then existing credit agreement.

72.     One provider of the equity cure was Manichaean, who became a minority interest holder of SourceHOV stock.[2] Manichaean owned about 3,574 shares of SourceHOV equity before the Business Combination and in order to prevent its equity stake from becoming further diluted upon SourceHOV's additional equity capital raise, Manichaean invested an additional $1.5 million at a price of $1,600 per SourceHOV share.

73.     But upon consummation of the Business Combination, Manichaean felt that it

---

[2]  While the details of the various transactions prompting the Appraisal Action are complex, only some of those facts are relevant to the litigation here. Thus, Plaintiffs incorporate by reference all of the factual findings made by the Court of Chancery, which may be found at *Manichaean Capital, LLC v. SourceHOV Holdings, Inc*., 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, (Del. Ch. 2020).

received inadequate consideration for its minority interest.  As a result, Manichaean petitioned the Court of Chancery for an appraisal determination under 8 *Del. C.* § 262 ("the Appraisal Action") in September 2017.[3]

74.    The Appraisal Action revealed that early on, Manichaean was disappointed by the "poor governance and communication" that it received by SourceHOV.  The quoted language stems from in court statements made on June 5, 2019 by Manichaean managing partner, Chad Cascarilla, during the appraisal litigation.  In an email dated September 21, 2016, Cascarilla wrote to Matt Canstantino, who was then a SourceHOV Board of Director member, to complain about a lack of communication and disclosure by CFO Jim Reynolds (then SourceHOV CFO, later Exela CFO) and SourceHOV Chairman (then SourceHOV Chairman, later and currently Exela Chairman), Chadha.  Cascarilla writes, "It's hard to think of a company this size ([1.3 billion] EV) with such poor governance and communication."

75.    Ultimately, the Court of Chancery agreed with Cascarilla's contention, concluding that SourceHOV's "governance structure was not a model for best practices."

76.    Even with Cascarrilla's early reservations about SourceHOV's governance and transparency, Manichaean invested.

**2.    Appraisal Action Details A Culture Of Deceit**

77.    Procedurally, the Appraisal Action was filed in September 2017, but trial testimony was not until June 2019.  In other words, in between those two dates, Exela investors received little of the information that would ultimately be revealed by the June 2019 trial testimony and the January 2020 opinion by the Delaware Court of Chancery.

78.    The Appraisal Action revealed much about SourceHOV's pervasive culture of deceptive practices.  For example, in issuing its opinion related to the Appraisal Litigation, the

---

[3]  *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, (Del. Ch. 2020).

Delaware Court of Chancery found that Exela "*lacked credibility*" in part because "Chadha, one of Respondent's key witnesses, *was not at all forthright* in explaining the circumstances surrounding the creation of the Backdated valuation" and because Exela "disagreed with its own expert over which revenue projections to use in the DCF analysis and ultimately separated from its expert with respect to SourceHOV's fair value."

79.     The Appraisal Action opinion also found that Exela Chairman Chadha was "*simply not believable*."   More specifically, the court found that Chadha's litigation-driven effort to persuade Rothschild to create the Backdated Valuation to appear as if it had been prepared before the Business Combination was bad enough.  His failure even to acknowledge that scheme, when it was finally exposed in discovery, "*taints all of his testimony*."

80.     Just because SourceHOV merged with Novitex and Qunipario, does not mean that its leadership suddenly adopted ethical business practices.  Quite the contrary—the same deception that the Court of Chancery observed coming out of SourceHOV, likewise permeated Exela during the Class Period.  That reason is simple: SourceHOV is Exela.  The same executives who ran SourceHOV ran Exela, and Chadha controlled both as Chairman, before during and after the Class Period.

81.     For instance, Chadha was Chairman of both SourceHOV before the merger, and then stayed on to become Chairman of Exela.  He–and the entity he owns and controls, HGM–was SourceHOV's largest shareholder at the time of the Business Combination.  As of March 26, 2020, he had beneficial interest in 74,393,234 shares (or 50%) of Exela common stock.  There is no single person with a greater financial interest in Exela's ultimate success or failure.

82.     On top of Chadha, Verma likewise continued at Exela.  Verma reported to Chadha at HGM from 2013 – 2015.  He reported to Chadha at SourceHOV from 2015 through 2017, and he still works under Chadha's direction currently at Exela, nearly seven years later where he is the Senior Vice President of Finance.  Verma created the financial models and projections at SourceHOV.  He does the same at Exela. Verma was still listed on HGM's website as an active

employee up to and through the Appraisal Action, just was less than a year ago and also during the Class Period.

83.    Along with Chadha and Verma, Jim Reynolds began working at SourceHOV predecessor entities beginning 2001.  He was Exela's CFO from its inception until his termination on May 21, 2020 when he was replaced by Shrikant Sortur.  Reynolds, like Verma and Chadha also held senior positions at HGM, Chadha's investment entity.

84.    On top of Chadha, Verma and Reynolds, Shrikant Sortur was previously SVP of finance at SourceHOV where he worked for the better part of his career: from 2002 through 2017. He is currently Exela's CFO.

85.    In addition to Chadha, Verma, Reynolds and Sortur, Cogburn was the CEO at SourceHOV since 2013.  Like Sortur, Cogburn also spent much of his career at SourceHOV: from 1993 until SourceHOV became Exela. And like Verma, Cogburn also reported to Chadha at HGM (since 2003).

### 3.    Appraisal Action Details Improper Addbacks To Adjusted EBITDA

86.    The Appraisal Action clarified several points relevant to Exela's investors.  The first is what SourceHOV's own expert witness, Greg Jarrell, expressed "serious reservations" about: management's "aggressive accounting practices."

87.    One such practice was SourceHOV's use of improper addbacks to its adjusted EBITDA.

88.    Some context about the difference between EBITDA and adjusted EBITDA, and what an addback is. EBITDA is a GAAP metric. It stands for Earnings Before Interest Taxes Depreciation and Amortization. Some investors use GAAP EBITDA as an approximation for cash flow available to a business before creditors are paid (before interest) and before the government is paid (before taxes). Depreciation and Amortization are non-cash expenses, which is why certain investors use EBITDA as an approximation of cash flow from operations—because non cash expenses such as Depreciation and Amortization do not reduce the cash available to a business, even if they reduce the earnings.

89.     Adjusted EBITDA differs from GAAP EBITDA.  Adjusted EBITDA is a non-GAAP metric, so it does allow for more managerial discretion than its GAAP counterpart, but it is still a term of art to investors, so that discretion has limitations.  Adjusted EBITDA is understood by investors to be an approximation of the normalized earnings power of a business excluding non-cash expenses and excluding, or adding back, ***non-recurring*** cash (or non-cash) expenses.[4]

90.     The idea behind adjusted EBITDA is that investors rely on adjusted EBITDA to get an understanding of how a company operates under a "steady state" of affairs.  For an example, suppose Company X generated $100 of GAAP EBITDA in a given quarter.  But, during this particular quarter, Company X's GAAP EBITDA was depressed by $10 because an unexpected hurricane struck the corporate headquarters in Chicago, and hurricanes don't typically hit Chicago.  As a result, when discounting future cash flows, an investor would likely conclude that the "normalized" or "steady state" approximation of cash flow for Company X is closer to $110 than it is $100.  In other words, the non-recurring hurricane expense of $10 could be properly "added back" to GAAP EBITDA of $100 to generate an adjusted EBITDA of $110 because, under most circumstances, $110 is likely to be closer to what the future would bring than $100 would be fore company X.

91.     To be clear, what is aberrant to one company, may not be to another. For instance, the risk of a hurricane hitting a widget factory in Chicago would  aberrant, but the expense incurred by an insurance company—that is *in the business of insuring against hurricanes*—would just be a normal operating expense.

92.     The point is, when a company gives an adjusted EBITDA figure to investors, that figure is a term of art and carries with it an implied meaning.  The inference investors will draw regarding addbacks categorized by management as non-recurring, or non-routine, are exactly that—they are not costs associated with the very business that entity is in.

---

[4] Saying that EBITDA is "excluding an expense" from earnings is the same thing as saying that one is "including an add back."  It's just a different way of saying the same thing.  The important point is whether the Adjustment keeps an expense within reported earnings, or tries to ignore it.

93.     It also means that if a company says that GAAP EBITDA and adjusted EBITDA will converge, or should be the same, that statement implies that the company does not to foresee anymore hurricanes coming to Chicago anytime soon.

94.     The above is not a controversial categorization, in fact it is one largely shared by Exela.  For example, during his testimony at the Appraisal Action, current Exela SVP Verma testified on June 5, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses *which are considered one-time and nonrecurring in nature*; for example, business optimization and fees and expenses incurred in connection with transactions."

Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement.  And what that means is every cost that was *not part of the business as usual* has to be added back.  There -- there's no black and white about it.  So -- because you have to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

95.     During the same testimony, Verma even went so far as to testify that "the EBITDA definition *has to be held sacrosanct*.  And what I mean by that is *every charges which are not a usual course of business* are added back to the EBITDA."

96.     Verma also testified to the importance that investors place on management's discretion in how they categorize EBITDA, stating, "And obviously, financial performance is a very important metric. EBITDA is a very important metric that is looked upon by all investors."

97.     But Verma's testimony that only nonrecurring charges are added back to adjusted EBITDA was not supported by the testimony of SourceHOV's own financial expert witness, Gregg Jarrell.

98.     Jarrell questioned the way SourceHOV categorized its addbacks.  For instance, on June 6, 2019, Jarrell testified that SourcHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring."  More specifically, he testified that "And they're supposed to be nonrecurring expenses, and I don't know.  I seem to see the same expenses year after year after year.  So I -- my

impression was, jeez, they don't look to be so nonrecurring.  But I understand what they're doing.  It's a -- it's done a lot.  It's not consistent with GAAP, but financial people do this."

99.    Jarrell acknowledged that "financial people do this."  He testified that "It struck me [as] an important negative -- negative checkmark of reliability is the fact that ***there seemed to be a more-than-normal amount of add-backs***.  And it's just -- it's a consideration, it's a factor, and it's a negative."

100.    The following exchange between the Court of Chancery and SourceHOV's expert clarifies what Jarrell meant.

> THE COURT: So was it within the realm of discretion, for you to do a proper evaluation, for you to have made adjustments to those projections to account for that before you began your analysis?
>
> THE WITNESS: No. No. I don't – I wouldn't go that far, because this -- this practice of adding back ***nonrecurring*** expenses is ubiquitous in the financial community. And public companies, you know, you see it all the time.
>
> They refer to this is a non-GAAP number. That's what they mean. They mean that we've taken a real number and we've added things back, because when we go to project, this should improve our -- our ability to project, because, you know, we've taken out things that will *not recur*. If you really did take out things that did not recur, that's a good thing to do, in terms of trying to create better projections. That's a good thing. **If you overdo that, for whatever reason – who knows what motive, but if you overdo that, then that's a bad thing**.

101.    Verma's Appraisal Action testimony makes clear one motive: "it's basically in the company's interest to show an add-back."  The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing."

102.    SourceHOV's expert witness was not the only one expressing reservations about SourceHOV's use of Adjusted EBITDA.  Jerrell noted that "there was some reaction from professionals that were sort of consistent with mine, my reaction when I saw that.  You know, ***'inflated with less than credible adjustments'*** is a comment from a Morgan Stanley person in

February. News story that circulated within Morgan Stanley."

103.    The comment Jarrell refers to is his reading in open court of a June 30, 2017 email by Morgan Stanley investment bankers who, in the same email, also described SourceHOV's adjusted EBITDA figures as being "egregious," stating, "When you see so many adjustments, it just starts getting egregious. We just put our pencils down."

104.    The Appraisal Action revealed for the first time publicly that Morgan Stanley was not the only investment bank to question SourceHOV's categorization of adjusted EBITDA addbacks. Wall Street titan, Goldman Sachs, also keyed in on the same thing. For example, on October 27, 2016, Whit Graham at Goldman Sachs & Co. Inc. ("Goldman") emailed several SourceHov executives and concluded that, based on the trading levels of SourceHOV's debt, that its equity value was "zero."

105.    Goldman's conclusion that SourceHOV's valuation was so low was informed by its assessment that SourceHOV was "adversely impacted by historical perceptions around revenue growth **and EBITDA add-backs**, a concentrated investor base and a lack of public information, among [others] ...." (emphasis added).

106.    And the reason that such information was not already known to Exela investors until the above Appraisal Action testimony in June 2019 is because public market investors, such as those in Exela, lack access to the same confidential financials that investment bankers at Morgan Stanley and Goldman Sachs would[5] receive ahead of a contemplated transaction such as the Business Combination. And when the investment bankers from the two most prestigious investment banks on Wall Street conclude—after reviewing non-public information about SourceHOV—that SourceHOV's adjusted EBITDA addbacks are "egregious" and that SourceHOV's equity value was considered "zero" before the Business Combination, such opinions about SourceHOV's adjusted EBITDA addbacks is new material information.

---

[5] Indeed, Cascarilla testified in part at the Appraisal Action that part of the reason that "gave [him] investing in SourceHOV was because Apollo, a different but also "very sophisticated" financial entity "had access to information that [he] didn't have" and "had done extensive due diligence."

107.    In sum, the Appraisal Action revealed for the first time to Exela investors that SourceHOV, under substantially the same leadership that runs Exela, improperly used the term of art of adjusted EBITDA to mislead investors by including addbacks that weren't really addbacks: they were really just operating expenses, portrayed as nonrecurring addbacks.

### 4.    Appraisal Action Describes How Chadha Misled Investors

108.    Of all the surprising testimony that came from the Appraisal Action, there is likely nothing more surprising than to hear that Chadha told the Court of Chancery, under oath, that he believed that SourceHOV's equity was worthless as of the time of the Business Combination. Such was his testimony when he was asked what Manichean's minority investment should have been valued at.  Chadha also testified that he never told SourceHOV's auditors that he felt the company was worth zero at that time.

109.    For the first time publicly, Chadha testified that "quality revenue, profitable revenue" was "already at a point where revenue is declining," before the Business Combination, according to Chadha's testimony.  This was so even though public market investors in Exela were told to expect revenue growth in the future.

110.    For the first time publicly, Verma's testimony revealed that "on an actual apples-to-apples comparison" SourceHOV's revenue went down from 2014 to 2015 and from 2015 to 2016. Verma further testified that SourceHOV frequently had trouble hitting its own internal budget projections and that it's future projections were based on its "best case" scenario.  For instance, even as revenue was in decline back in 2017, SourceHOV still kept its projected "best case" growth rate at 5%, according to Verma's trial testimony.  To hit those figures, "everything would really have to fall into place."

### D.    Following The Merger The Company Discusses Its Progress In Implementing Its Strategy To Grow Revenue And EBITDA

111.    On August 9, 2017, the Company held its first earnings call following the merger to discuss its financial results for the second quarter of 2017 (the "August 2017 Call").   Cogburn stated that "[c]ombined, these two businesses create a leading global provider of single-source end-

to-end enterprise in formation management and transaction processing solutions… [W]e believe we have meaningfully expanded our combined companies' addressable market opportunity…. Exela is positioned well to benefit from significant white space opportunity, which will enable us to cross-sell and to upsell our combined solutions and services into our existing client base."

112.    On the August 2017 Call, Reynolds noted the Company's long-term guidance of revenue of 3% to 4% and EBITDA growth of 4% to 5%, which was driven in part by the healthcare and financial services industries which "have nice tailwinds associated with them."  Reynolds also noted that underutilized Novitex MegaCenters would "help us drive incremental revenue" and assured that "margins will expand as we deliver on the combination savings."

113.    On November 9, 2017, the Company held an earnings call to discuss its third quarter financial results (the "November 2017 Call").  Reynolds detailed the Company's plans to expand the margins in Novitex contracts:

> So, if you think about it, when we ramp-up these large customer contracts, there's a lot of costs that are duplicate associated with training people, getting individuals up to speed, doing test runs, a lot of that we have to expense. So, when you have large ramp-ups, typically you get lower volumes in the beginning or no volume. And then over the life of the contract, as you get to full volume, you start to see the incremental margins and the expansion. And if you remember, a number of these Novitex contracts, while their margins were good, they were smaller than legacy Source HOV, because they have to use technology from third-parties. So, as we continue to put our proprietary software and systems into these contracts, we'll pull out that incremental cost and we'll get margin expansion.

114.    Reynolds further elaborated on the November 2017 Call, "typically [it] takes six months to nine months to start to improve, as we take out the duplicate people and migrate systems. So I think you'll start to see the margins change in 2018.  We've identified obviously a significant amount of synergies that we're working - the team is working hard on to drive the margins above what they were when we acquired Novitex."

115.    On March 15, 2018, Exela held an earnings call to discuss its full year and fourth quarter 2017 financial results (the "March 2018 Call").  Cogburn detailed the Company's success in implementing automation to drive revenue, stating "[0]ur business process automation platforms, or BPA, continue to drive value with a nearly 20% increase in the revenue per FTE from $56,000

to $66,000 all while we decreased our employee base by 6% to 22,000." Cogburn added "[w]ith the acquisition of Novitex we gain the opportunity to expand our presence into the front office and apply our technology enabled suite of services there. We are actively pursuing and offering our automation technology to the customers and locations that came with that business combination."

116.    An analyst requested "an update on your cross-selling progress" and Cogburn indicated that the Company had reached out to the entire Novitex customer base about automation:

> Number one, we picked up about 1,100 customer sites with the acquisition of Novitex, an additional 400 customers are located there. And as we begin to roll out our business process automation we are helping to transform that existing business into a more automated process.
>
> * * *
>
> Because now we are able to do things in a more automated way, a more efficient way with fewer errors and it creates what I would call a ***more sticky relationship*** with those customers.
>
> So, we have rolled out that thesis across all of those customers we picked up with that acquisition as well as our existing customer base. We are not waiting for renewals. We have an active -- we are actively engaged with all of our largest customers, sharing with them the proposition of business process automation, what it can do for their business and what we can do for them. So it's a very exciting time for us and we are seeing some early adoption.

117.    Nevertheless, the Company reported that further adjusted EBITDA and adjusted EBITDA margins had declined in 2017 compared to the prior year.  Reynolds stated, "the dilution of the margins in 2017 compared to 2016 was primarily due to the acquisition of a lower margin business.  The strategic vision of Exela is to transform the acquired business with BPA over the next 12 to 24 months."

118.    Exela issued aggressive guidance for 2018 of $1.51B-$1.54B in revenue (4-6% growth), and adjusted EBITDA of $290-310M (20-28% growth), exceeding their longer-term financial objectives.  Cantor Fitzgerald analyst Mike Reid asked, "[c]ould you tell us what's given you the confidence in giving this year's guidance above your longer-term financial objectives?" Reynolds answered, "[o]ur revenue guidance is based on a bottoms up analysis. We have ***over 90% visibility in revenue*** and have incorporated our total contracted revenue since January of -- January 1. So ***we feel really good with our visibility***."  A December 5, 2017 Cantor Fitzgerald analyst report

similarly noted that "BPO business relationships are characterized by multi-year contracts **with predictable annual revenue**."

## V.   SUMMARY OF THE FRAUD

### A.   Defendants Inflate Adjusted EBITDA With Ordinary Operating Expenses Claiming Thy Are Non-routine Will Decline

119.   Throughout the Class Period, Defendants repeatedly made misleading statements about their adjusted EBITDA.  While there are several variants in which they did so, all relate to the general idea that Exela mislead investors into believing that expense addbacks made to Exela's adjusted EBITDA were only going to be temporary.  Most commonly the expense addback at issue was the optimization and restructuring expense.

120.   The reason duration of these expenses is so important is because the truth later reveals that optimization and restructuring expenses were not in fact temporary.  Rather, they continued to recur—**in every single quarter since Exela went pubic**—and as a result, these expenses should never have been portrayed to investors as being temporary, or "non-routine" as they were described in Exela's EBITDA reconciliation table.   Business optimization and restructuring expenses were in reality run of the mill operating expenses that should never have been added back to adjusted EBITDA—particularly when the addbacks were accompanied by various explanations that they would be only temporary.

121.   One way Defendants gave the impression that adjusted EBITDA addbacks were not a regular and ongoing business expense was by suggesting that optimization and restructuring expenses would decline over time.  For example, on March 15, 2018, Exela reported its 4Q 2017 and FY 2017 results.  In its Investor Presentation, Exela stated the following about optimization and restructuring expenses:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, **we exclude these charges since we do not believe they truly reflect our past, current or future operating performance**.

122. On its earnings call following the same reporting period, Defendant Cogburn reiterated that theme when he stated to investors that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly *in the convergence of adjusted EBITDA and EBITDA*."

123. The following quarter, in its May 10, 2018 investor presentation, Exela again represented to investors that:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.

124. On its 2Q 2018 earnings call on August 8, 2018, Defendants continued to assure investors that adjusted EBITDA will converge with GAAP EBITDA, again suggesting that adjusted EBITDA expense addbacks will eventually decline, but after six consecutive quarters worth of expenses that management claimed would be "non-routine", investors begin to wonder what management means by "one-time" expenses.

125. For example, Jim Reynolds was asked by a Cantor Fitzgerald equity analyst which expenses from the 2Q 2018 quarter were one-time in nature. In response, Reynolds does admit that Exela will continue to have some "biz-op and restructuring on a go-forward basis" but still argued that Defendants "have done a good job minimizing the amount of adjustments as we convert the savings into GAAP." The exchange went as follows:

> JOSEPH DEAN FORESI, ANALYST, CANTOR FITZGERALD & CO., RESEARCH DIVISION: I wonder if we could start talking about what might have been onetime in the cost structure this quarter, particularly in the gross margins. I know that you had a slide in there that showed your sort of puts and takes, but what can we consider to be, I guess, onetime in nature in 2Q?
>
> JAMES G. REYNOLDS: So hey, Joe, thanks for your call. I think that if you take a look at kind of a onetime impact during 02, it was the capitalization we had done historically before 606 and some of the duplicate ramp cost that impacted us from a cost of sales perspective. *In addition, during the quarter, we*

*had incremental biz op, we don't break that between SG&A and cost of sales at this point in time*. Really, as a public company, we're really focusing on driving the EBITDA margins and *converting, really, adjustments -- or adjusted EBITDA to GAAP EBITDA.*

JOSEPH DEAN FORESI: Got it. And so about how much -- what -- can you wrap a number around those onetime charges in the quarter? *And I assume you expect them to fall off in 3Q?*

JAMES G. REYNOLDS: *Yes*. The onetime charges, we will continue to have some of the biz op and restructuring on a go-forward basis. We -- as long as we don't do any tuck-in acquisitions, transaction cost should be minimal to none. The noncash charges will continue with respect to the restricted stock units that vest over the next year. Those will be the major buckets on a go-forward basis. I think that we've done a good job of minimizing the amount of adjustments as we convert the savings into GAAP

126. While Reynolds admits that "biz-op and restructuring" addbacks will continue, Exela's investor presentation filed on the same day tells a different story: "Optimization and restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the Business Combination. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance."

127. The August 8, 2018 press release also frames optimization and restructuring expenses as being "non-routine." For instance, in its non-GAAP disclosure statement, management states that "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the Business Combination, asset base (such as depreciation and amortization) *and other similar non-routine items* outside the control of our management team."

128. Also on the 2Q'18 earnings call, Reynolds assured investors that "our job is to minimize the adjustments" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will – and the percentage of adjustments *will shrink in the future*."

129. That Exela's messaging led investors to believe that its adjusted EBITDA addbacks

were not going to be recurring is apparent from, among other places, Morgan Stanley's October 10, 2018 research coverage initiation.  In that 34-page analysis, Morgan Stanley points to adjusted EBITDA converging towards free cash flow as one of its three key areas supporting the investment bank's Overweight (i.e. buy) rating on Exela's stock.  Specifically, Morgan Stanley notes Exela's 2017 adjusted EBITDA was lowered by "***one-time charges*** related to the company's business transformation efforts, including ***$48 million of restructuring expenses*** and $99 million of transaction related costs" which it expects to moderate moving forward.

  **B.** **Defendants Claim Exela Has Predictable Revenue And That Margins Will Expand As They Implement BPA**

   **1.** **Exela Touts Revenue Visibility To Instill Confidence In Guidance**

  130. Throughout the Class Period, Defendants repeatedly assured investors that the had over 90% visibility in revenue.  The Company's Annual Report for the year ended December 31, 2017 filed on Form 10-K on March 16, 2018 (the "2017 10-K") noted that "approximately 90% is recurring in nature and supported by long-term customer contracts."

  131. On May 10, 2018, the Company held an earnings call where it discussed its 1Q'18 financial results (the "May 2018 Call") and raised FY'2018 revenue guidance and increased the low end of adjusted EBITDA guidance.  Cogburn stated, "We have a high degree of revenue visibility.… The level of visibility gives us confidence in our ability to accurately forecast the trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95%..."

  132. Reynolds further elaborated in response to a Cantor Fitzgerald analyst's question about what gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?
>
> REYNOLDS: …If you think about our business and our contracts, they're long-term in nature, right? They're typically three to five years, and we have ***over 95% renewal rates. So we have good visibility into our revenue, typically just over 90% at any point in time***. If you look at the numbers we delivered in the first quarter, we're very pleased with the

results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

133.    A Credit Suisse analyst noted that while revenue grew, gross profit had declined and inquired about the impact of postage revenue.  Postage revenue has no margin and a substantial amount of postage revenue would have the impact of inflating revenues, while compressing margins, and Reynolds provided no indication that postage revenue had any impact on the Company's revenues or margins:

> ARUN A. SESHADRI: …First, I just wanted to understand, obviously nice revenue growth in the quarter, but it looked like gross profit actually declined. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, what was the impact of postage in the numbers?

> REYNOLDS: So if you take a look, we don't really look at it on a gross margin basis because we have a lot of business optimization cost flowing through. We focus on an EBITDA perspective. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take, runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage, ***we don't really break out postage separately***. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

134.    On the Company's August 9, 2018 2Q'18 earnings call (the "August 2018 Call"), Cogburn again expressed confidence in top line revenue growth, stating "[w]ith our quarterly results, strong backlog and high renewal rate, we are confident in the top line trajectory of the business going forward.

### 2.    Defendants Told Investors Margins And EBITDA Would Grow As They Automated Existing Low Margin Customers Acquired From Novitex And Other Acquisitions

135.    The Company's 2017 10-K filed at the start of the Class Period laid out its strategy to bring automation and digital transformation to existing customers, stating:

> We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base. With an installed base of over 3,500 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for

our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher-margin bundled solutions.

136.   On April 10, 2018, Exela issued a press release announcing its acquisition of Asterion International Group ("Asterion"), indicating that the acquisition allowed the Company to expand its European presence and grown revenue by automating Asterion's customers:

…The acquisition expands Exela's European business to over $200 million in annual revenue and will enable Asterion's customers to access Exela's full suite of BPA solutions….

…The acquisition, which comes with minimal customer overlap, is also highly complementary to the business of Exela's document-management focused subsidiary, Exela Enterprise Solutions, Inc. (formerly known as Novitex Enterprise Solutions), which provides a similar set of solutions to customers in North America.

"With this acquisition we are poised to enhance Asterion's current customer offering with our BPA solutions, including front, middle and back office automation," said Ron Cogburn, CEO of Exela Technologies.

137.   The Company discussed Asterion on a May 10, 2018 earnings call, noting that "Asterion used to be a part of Novitex."  Cogburn assured, "it's a business we feel ***we have a good knowledge*** of and a proven plan to transform the business unit. Essentially, we truly believe it was an extended execution of our strategy to integrate similar businesses and to increase the opportunities for both revenue and EBITDA transformation."

138.   Reynolds discussed the Company's progress on its strategy to increase revenue and margins by automating existing customers on the May 2018 Call, stating, "We are continuing down the path to transform our lower margin business, Exela Enterprise Solutions, which we acquired in July of 2017. We are making good progress, and we expect this transformation to take about **12 to 15 months**."  Reynolds added, "[w]e see, as we move through the year, that our margins will expand. You can get to it through our guidance of adjusted EBITDA margins for an increase of 220 to 320 bps. And then, we have Novitex. And as we put in BPA, you're going to start to see that expansion."

139.    On the August 2018 Call, Cogburn discussed the strategy to implement BPA with existing customers:

> Using the power of our technology and recognizing the potential with BPA, many of our existing customers are now reanalyzing their on-site BPO business. The interest from customers has broadened, and this also includes interest in our platforms like print shop, digital mailroom, front-office automation and digital lockers.
>
> ... This essentially demonstrates that we are able to grow the revenue faster with a much lower -- or slower variable cost increase. Put in other words, the growth in the revenue exceeds the growth in the variable cost in the form of headcount needed to service the revenue....

140.    The Credit Suisse analyst on the call noted that while revenue had grown, profit had declined, and asked what the impact of Asterion was on margin.  Reynolds indicated that Asterion margins were low, but assured the Company's margins would expand:

> ARUN A. SESHADRI: ...And then I just wanted to understand, as far as the sequential progression goes, your revenue kind of grew nicely on a sequential basis between $93 million to $410 million. But it looks like both gross profit and, I guess, cash EBITDA both declined sequentially. Just wanted to understand, is there any way you could parse sort of why that's happening and what the impact of the Asterion business was on a margin basis?
>
> REYNOLDS: Yes. So we haven't really broken it down between Asterion but, obviously, with the amount we paid, ***Asterion did not have a significant margin***, if you know what I mean. But it was really strategic to us to bring that back and expand our European operations.... Because we had great success last year and into this year, we had a large amount of revenue come through at very little margin. So as we ramp up, you're going to continue to see the revenue grow, those costs come out, and we will expand. Usually, revenue comes first and then -- on these large contracts, and then the margins will expand over time. We're very pleased though with the top line growth.

**C.    The Truth Begins To Emerge**

> **1.    Exela Lowers Its 2018 Adjusted EBITDA Guidance By ~$18 Million Due In Part To The Exit Of A Low Margin Contract**

141.    On November 8, 2018 Exela reported its quarterly results for the third quarter of 2018 (the "November 2018 Call").  Exela reported $383 million in quarterly revenue and $69 million of adjusted EBITDA.  On adjusted EBITDA, contrary to Exela's earlier representations that adjusted EBITDA would converge on GAAP EBITDA, Exela's 3Q 2018 included an 85.4% increase in Optimization and Restructuring addbacks as compared to the prior quarter.

142.   Cogburn said that adjusted EBITDA was "impacted by 2 main factors totaling about [$7 million], which were lower project revenue in our LLPS segment and the exit of a low-margin contract."   Nevertheless Cogburn assured "the increased market receptiveness to our DigitalNow strategy has exceeded all of our expectations, and therefore, we have accelerated our investments for future profitable growth."   Cogburn explained that the strategy would "have a short-term impact on our adjusted EBITDA" and revised 2018 revenue guidance upward to between $1.58 billion and $1.59 billion, with a growth of 8.5% to 9% year-over-year and reduced adjusted EBITDA to be between $280 million to $290 million.  Cogburn noted that the Company's pipeline was "almost double" and stated that "[o]ur strategy to grow within our good existing customers is working…. The results of this strategy is a broad and sticky revenue base."

143.   Reynolds attempted to reassure investors that such business optimization expenses would decline, stating, "In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense. A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. We expect these costs to decline as we implement our transformational model."

144.   Despite such reassurance, investors began to more assertively question Exela management about whether its EBITDA addbacks were truly nonrecurring.  For example, Morgan Stanley equity analyst Brian Lee Essex asked:

> BRIAN LEE ESSEX: I don't know if it was just addressed, but I guess on a guide up in revenue, the guide down in EBITDA margins, could you help us -- maybe walk me through some of the puts and takes you have, what I would assume the better margin digital business, exiting a low-margin contract. I would assume that'll give you a lift to margins, but you're investing back in the business. Any sense for us to get a sense for in terms of both gross margin and EBITDA margin, *how one time-ish are these investments or impact items*, and how do we think about expansion from here on out?
>
> REYNOLDS: Sure. So if you take a look at the 2 items I mentioned, the LLPS and the on-site, that was a $7 million impact. And with the LLPS, those contracts in the on-site, it's gone. So it's not going to come back into Q4. So it has a carry-on effect. With respect to other incremental revenue, it's coming through, we have some high margin revenue that we're anticipating coming in, in the fourth quarter related to our Saas sales. It's happened historically. Through 2018, we feel good that we'll get some incremental flow through margin, but I think that a range of $280 million to $290 million is something we feel good

about as we're exiting 2018.

145.    Reynolds continued to assure investors on the November 2018 Call that "we have 90% visibility into our revenue.  These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts."

146.    An analyst from RBC on the November 2018 Call asked if Exela had additional low-margin contracts that they planned to exit and Reynolds indicated to the contrary, noting that they were looking to change the margin profile of low margin contracts acquired from Novitex Enterprise Solutions:

> MATTHEW VAN ROSWELL: First question is, if I look at your revenue guidance for the year, it seems to imply that the fourth quarter is going to have slowing revenue growth as well. Could you walk through sort of what's driving that? And as part of that, ***do you have additional low-margin contracts that you're looking at getting out of?***
>
> REYNOLDS: So I think that we gave the guidance of $1.580 billion to $1.590 billion, which is up over last quarter, that equates to $395 million to $405 million. Within our business, I think we've discussed before is, when we acquired Enterprise Solutions, they still had some low-margin business, but as we put in our technology and automation, we're looking to change that margin profile. This was an opportunity to get out of a contract that has shifted on us, and it was the right thing to do. So we are a public company and we prefer to have profitable contracts versus contracts that goes the other way.

147.    The RBC analyst also asked if Exela had seen "any change in client demand either for your products or sort of in the industry in general" and Cogburn touted the pipeline growth and interest from Novitex customers:

> Well, so that's the right question to ask about the demand from the customers. And so we have to measure that in a couple of ways, but the biggest way is the growth of our pipeline.… So as we came into this year, we saw our pipeline begin to build at a very accelerated rate. As we sit here today for these types of digital services, it's literally twice what it was last year. So what we found is we went to our existing customers, when we went to our Top 150 customers, when we went to a -- what we call the Enterprise Solution customers, which is the old Novitex, it was well received, lots of interest, and so that's where you begin to see like this enterprise deal that I talked about. This is a $100 million contract spread over 3 years. It starts at the beginning of '19. We didn't have those types of opportunities before we started, I guess, broadcasting and sharing the vision for the DigitalNow. So we're very excited about where this is going.

148.    Analysts' reaction to the results were mixed.  Cantor Fitzgerald issued a report on November 9, 2018 stating, "[q]uarterly top-line results were above our expectations, and 2018

revenue guidance was raised. …Adjusted EBITDA margins expanded 250bps to 18.0%, below our estimate of 20.8%. Margins were hurt by lower revenue in LLPS and by exiting a low-margin contract…. Management lowered adjusted EBITDA guidance to $280-290 mn from $295-310 mn, or -18% margin, due to more opportunities to reinvest in the business. We now expect $285 mn in adjusted EBITDA in 2018, down from our previous estimate of $302 mn."

149.    Morgan Stanley issued a report the same day, noting, "[s]trong growth drove a revenue beat as adoption remains robust on XELA's platform. The company guided for lower EBITDA in FY18 but, with the guide partly due to investment, we continue to see healthy growth and margin expansion ahead with XELA a share gainer in its markets."

150.    On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2019 damaging investors.

### 2.    Exela Reports 2018 Results And Expresses Confidence In 2019 Guidance Due to Revenue Visibility

151.    On March 19, 2019, Exela held an earnings call to discuss its full year and fourth quarter 2018 financial results and issue its 2019 revenue guidance (the "March 2019 Call"). The Company announced that it achieved its revenue and adjusted EBITDA guidance for 2018 and provided 2019 guidance of revenue between $1.66 billion to $1.7 billion (5-7% growth) and adjusted EBITDA between $305 million to $225 million (7-18% growth).

152.    Dan Dolev, an analyst with Nomura Securities, stated "your guidance is very, very strong. I feel like it's above our numbers [] -- for 2019… Can you maybe give us a sort of the level of confidence you have in achieving that guidance?"  Reynolds replied, ***"[a]s we've discussed historically, we typically have about 90% visibility into the next 12 months***."

153.    Reynolds stated on the call, "[o]ur strategy to grow within our existing customers is resonating as they're seeking solutions to drive change, realizing the benefits of digital transformation…. We have a broad and sticky revenue base."

154.    An analyst asked why the Company's growth rate was consistent year-over-year

given that the pipeline had doubled and Reynolds assured the Company was being "somewhat

conservative:"

> JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the
> growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort
> of the conversion rate? Is it an element of conservatism on the top line and expectations for
> next year? Have conversion rates changed? ***Is there anything in the top line we should
> know about?***
>
> REYNOLDS: …I mean, we feel good about our conversion rate*s*. I think the size of the
> pipeline is strong. And just like this year, for the full year, we actually hit our revised -
> upward revised revenue guidance. So ***we have great visibility into the revenue*** and feel
> pretty good. I think, as we're still a new public company, 18 months or so, and we're ***trying
> to be somewhat conservative*** as we look at the potential for Digital Now, which is gaining
> traction in our front office. So we'd rather come out feeling good with that ***90% visibility***
> on the top line.

155.   Reynolds addressed an analyst's question about margin guidance:

> JOSEPH DEAN FORESI: …And then on the margin guidance, I think it's $305 million to
> $335 million. What puts you at the top end versus the low end on the margin side?
>
> REYNOLDS: So what gets us there is really the flow-through on our savings. That's one
> of the things we've been working on since we launched the transaction. We feel good about
> it, so it's a combination of that. And then the type of deals that we close and how quickly
> we can achieve the margin. ***There is still costs we need to take out on some of these tuck-
> in acquisitions, and we're looking to change that margin profile as we implement our
> suite of technology***.

156.   On Optimization and Restructuring expenses, Cogburn continued to maintain that

eventually they would decline. Reynolds stated, "[w]e believe 2018 ***represented the high

watermark in terms of optimization and restructuring expenses***. And in time, we expect these

costs to *gradually* decline as we implement our transformational model."

157.   After seven straight quarters with such expenses, analysts tried to get a clean

EBITDA number out of management, meaning one that could not be manipulated by an improper

expense addback. Management refused:

> CAROLINE JOYCE: This is Caroline Joyce on for Arun today. Just a few. First, how do
> you expect the <u>GAAP EBITDA</u> range to be in 2019?
>
> JAMES G. REYNOLDS: So we haven't given out any guidance on a GAAP perspective.
> What I will tell you is with the range that we've given for 2019, ***we still expect some
> business optimization costs to occur***. As we transition our existing customers and the new

contracts, we'll have similar amount of noncash charges, which is primarily related to our stock option plan and our RSUs that have been granted. So that's kind of how it looks.

CAROLINE JOYCE: Okay, great. And then, I guess, on that same line, could you outline at all what you expect for transaction and integration and then optimization and restructuring expenses for 2019?

JAMES G. REYNOLDS: We have not given guidance to that number. What I will tell you is we're still going to be incurring these as we have continued to take on tuck-in acquisitions. There's still work to be done there. And as we roll out our technology, we're still incurring a duplicate cost associated with this rollout.

158.    On March 19, 2019, Cantor Fitzgerald issued a report noting, "Exela has realized cost synergies as a result of the merger between SourceHOV and Novitex (now known as Enterprise Solutions) that formed the company, and the synergies are expected to continue to flow through the model in 2019. The net result should be margin and multiple expansion."  It also stated, "Adjusted EBITDA margins expanded 260bps to 18.8%, below our estimate of 19.3%. The pipeline remains strong, almost doubling y/y. Management believes the company is well-positioned for long-term sustainable growth beyond 2019, and it added 62 customers generating over $1M in 2018. Exela noted retention was 98%, ***and it typically has 90% visibility into revenue growth for the next 12 months.***"  However it cautioned, "Exela employs significant amounts of financial leverage…. The debt represented 76% of total assets and 258% of tangible assets. Indebtedness could decrease its ability to obtain additional financing for working capital, capital expenditures, general corporate or other purposes; limit flexibility to make acquisitions; or increase cash requirements to support the payment of interest."

### 3.    Exela Misses 1Q'19 Revenue Expectations And Its Liquidity Plummets Resulting In A Moody's Downgrade.

159.    On May 9, 2019, the Company issued  a press release attached as Exhibit 99.1 to a Form 8-K detailing its 1Q'19 financial results wherein it reported a loss of $0.21 per share (GAAP) on revenue of $404.8 million versus a loss of $0.16 a share (GAAP) on revenue of $393.2 million. Both fell short of expectations for a loss of $0.06 per share on revenue of $410 million.  The Company also reported that its net debt stood at $1.46 billion, putting its leverage ratio at a

concerning 5.06x. In addition, the Company's liquidity had declined from $124 million at the end of 3Q'18, to $58 million at the end of 1Q'19.

160.     Furthermore, despite previously assuring that cost synergies from headcount reductions would be realized in 2019, the Company reported that its employees had increased by nearly 1,000 in 1Q'19 to handle new business.  On an earnings call held the same day, Cogburn said acceleration in costs "should reverse in the back half of the year."

161.     Answering the question put to Reynolds on the 3Q'18 earnings call regarding whether the Company had additional low margin contracts it was looking to exit (*see supra* ¶**Error! Reference source not found.**), Cogburn revealed that, "*[Exela] continue[s] to exit low margin contracts where customers do not have a path going forward towards automation*."

162.     The Company met its adjusted EBITDA guidance and Cogburn reaffirmed the outlook for 2019 "based on our current pipeline," and noted "[w]ith high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers."  Despite acknowledging that the Company was exiting lower margin contracts with no path to automation, Cogburn stated, "[t]he improvement in margins validates the path that we are traveling to transform businesses through our automation as we get the benefits of executing our remaining cost savings initiatives."

163.     Despite stating that 2018 represented the "high-water mark" of business and optimization addbacks to adjusted EBITDA, the first quarter of 2019 showed a new high for that expense.  Reynolds revealed that optimization and restructuring charges were not limited to just the Business Combination or M&A activity, but rather suggests that they are more akin to operating costs:

> I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. The primary variance between the 2 are optimization and restructuring charges. This adjustment relates to investments we have made to achieve cost savings and a majority relates to headcount. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're

incurring additional upfront cost *__for a few large projects__*. We expect this trend to continue in 2019,  but decline in the year -- later quarters.

164.     Cogburn's response to Jefferies analyst, Todd Morgan, further revealed the nature of the purportedly "non-routine" expense that is added back to adjusted EBITDA every single quarter:

> TODD CRANSTON MORGAN: …I was hoping you could talk a little bit more about restructuring and optimization costs that you have here. *__I mean they've been persistently high__*. I guess you've defined those as being the salary and benefits for folks that are -- at this part of that optimization process, but is there any -- can you give us any kind of understanding of what kinds of people those are, what those kinds of expenses are and how the those might trend as we look forward?

> COGBURN: I think the second question related to the optimization and restructuring. Optimization and restructuring charges are primarily headcount-related charges. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

165.     Analysts' reaction to the news was mixed.  Despite management's admissions about EBITDA adjustments, Cantor Fitzgerald issued a report the following day that highlighted what it considered remaining bright spots for Exela, noting "The pipeline remains strong, management noting it has doubled y/y, helped by its new Digital Now product. Management believes the company is well-positioned for long-term sustainable growth beyond 2019. *__Exela noted retention was 98%, and it typically has 90% visibility into revenue growth for the next 12 months__*."

166.     On the same day, Morgan Stanley issued a report and was not as forgiving, noting, "[w]e continue to look for signs of progress, but *__lack of disclosure adds to the complexity of the story__*."  It went on to note liquidity concerns and that business optimization costs were expected to continue:

> Adjusted EBITDA of $74.1 mm fell shy of our $77.4 mm estimate due to incremental headcount, but was ahead of the Street's $67.3nnnn. While the company reiterated its FY19

guidance, it warned that it will be 2H-loaded, with 2Q19 expected to be sequentially flat. We recognize the company is taking steps to improve as it continues to make progress on cost savings, but we still view the story as a complex one. As we wait for additional signs of scalability, ongoing liquidity concerns keep us Equal-weight.

\*\*\*

**Business optimization costs expected to continue**. XELA had previously outlined long-term adjusted EBITDA in the range of 22% to 23%, and has yet to update this target. Our call-back with management implied that *optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved*.

\*\*\*

Liquidity still an issue, while buyback program remains in effect. XELA did not repurchase any additional shares in 1Q19, although the buyback program launched in FY17 remains in effect. The company continues to be opportunistic, and we believe incremental buybacks will likely stretch liquidity further. As we've noted previously (see: "Downgrading to EW, Liquidity Presents Headwind" as part of our 2019 IT Services Outlook), *liquidity remains a primary concern* for the stock with little visibility around how the company may address it.

167.    Then on May 22, 2019, Moody's downgraded the Company's debt from Caa1 from B3 based on the 1Q'19 revelations.  Moody's lead analyst Harold Steiner was quoted as saying, "Exela's restructuring charges consist mostly of headcount that it expects to cut as it transitions to more technology-based BPA service offerings… *We believe these are normal operating expenses necessary to provide its service*, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation."  The press release also stated:

Moody's downgraded the liquidity rating to SGL-4 because of persistent negative free cash flow including a use of approximately $50 million in the first quarter. Moody's projects EBITDA of approximately $200 million after deducting restructuring and optimization charges will barely cover the company's sizeable fixed charges, which consist of $155 million of debt service and $40 million of capital spending needs.

\* \* \*

Exela's Caa1 CFR reflects the company's limited scale in an intensely competitive industry, its persistently poor earnings quality, high leverage and weak liquidity….  As such, Moody's expects revenue and earnings growth to remain limited to the low-single digits in 2019. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default.

168.    Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

### 4.    Exela Revises Guidance Down Citing Unpredictable Postage Revenue And Exit From Low Margin Contract in 2Q'19

169.    On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results.  Cogburn reported:

> Our revenue, excluding the postage and postage handling and low-margin contract exit, grew by 4% in the first half of 2019. This underlines the stability in our revenue, which, combined with a robust pipeline provides a healthy base to build upon. While we are excited about the new wins this year, some of this revenue, or ACV, will be delivered next year.
>
> Based on the items I've just mentioned and considering *the unpredictable nature of our postage revenue*, we are updating our 2019 revenue guidance to $1.59 billion to $1.61 billion and 2019 adjusted EBITDA guidance to $290 million to $300 million. We have *strong visibility under this revenue*, which, in turn, will help us to prioritize our operations and focus on liquidity and cash generation.

170.    An analyst on the call asked if the Company reported revenue ex-postage in the prior quarter and Reynolds replied, "No, we did not. We wanted to discuss it this quarter. We thought it was important that we show what the true margins look like. Obviously, we're being penalized by pass-through of *revenue with little or no margin*."

171.    Reynolds noted on the call that, "[r]evenue for ITPS segment was $309.2 million, a decrease of 6.3% year-over-year from $330.1 million. This decrease was driven by the impact of the low-margin contract exit we discussed in the third quarter of 2018, offset by growth from acquisitions and existing customers."  He elaborated, "[a] good chunk of that [~$20 million revenue decline], approximately $12 million related to the lower margin contract that we exited."

172.    Cogburn presented a chart which he claimed "represent[s] the business broken down by their respective gross margin profiles as they stand today" and stated:

> 45% to 50% of our business is already around 35% gross margin levels, which is 8 points higher than the consolidated gross margin. This represents the process transformation and operation improvements that we have made and been executing in the last decade. The second column represents 35% to 40% of the business. Now *this business is at the lowest gross margin of the 3 and is still approximately 15%* with the transformation span just over the last couple of years. Finally, the third bar from the left represents 15% to 20% of

the revenue at approximately 30% gross margins with a span of at – for over the last 5 years. Now our focus is on this second bar and replicating our successful strategy to implement technology and process transformations, which bring up the gross margins to that same 35% level for the – as similar in the longer-tenured businesses. This represents a tremendous opportunity to expand the gross profit dollars. However, I want to highlight the fact that these are heavy lifting improvements that will fundamentally transform COGS and they require an investment and time.

In summary, over 60% to 70% of our revenue is already at a 30% gross margin or higher. The company is focused on improving the gross profit profile for the remaining business as we deploy our technology and transform that business to capture additional profits.

173.     Cogburn further detailed the low margin business and assured the Company would be able to improve margins through automation:

I think from the beginning of the formation of Exela, we talked about part of our business that was ripe for digital transformation and that's really what we've talked about. The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, those gross margins were lower…And you can see with the benefit of automation and transformation, we brought those margins up to around 30%. ***We're going to be able to put automation where there is no automation***.

174.     Cogburn further indicated that the "transformation efforts are working and it'll take another 12 to 18 months to complete," despite Reynolds having previously stated in May 2018 that the transformation would take 12 to 15 months from the deal close, which would have been no later than October 2018. (*see supra* ¶138).

175.     On August 9, 2019, RBC issued a report stating, "With the exiting of a low-margined contract, the effects of pass-through revenue, and new contracts not ramping until next year, XELA reported a 5% y/y decline in revenue and management reduced the midpoint of FY19 revenue guidance by $80M. The focus remains on liquidity and free cash flow generation, which makes equity valuation difficult and we expect the stock to trade in line with the company's bonds."

176.     Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

**5.     Exela Reduces 2019 Guidance Yet Again Due To Unpredictable Postage Revenue And Low Margin Client Exit In 3Q'18**

177.     On a November 12, 2019 earnings call, Cogburn noted, "[o]ur revenue, excluding

postage and postage handling and our previously announced low-margin client exit, grew by 2.4% in the third quarter and is up 3.2% year-to-date…"  Minimizing the impact of other low margin contracts the Company claimed to be exiting, Reynolds reported, "[r]evenue for our ITPS segment was $292 million, a decrease of 5% year-over-year from $307.3 million. ***This decrease was driven primarily by the impact of the low-margin contract exit we had discussed in the third quarter of 2018***, along with a few customer contracts that got pushed to start later in this year."

178.    Reynolds announced the Company was lowering its 2019 guidance due to this unpredictable revenue:

> Taking into account our consolidated third quarter results, the ***continued <u>unpredictable nature</u> of our revenue from postage***, a slower ramp of certain new projects and longer-than-expected sales cycles, we are updating our 2019 full year guidance. We now expect 2019 revenue of $1.55 billion to $1.56 billion and adjusted EBITDA of $255 million to $265 million.

179.    The Nuveen analyst on the call was dumb-founded by the Company's margin miss and EBITDA guidance reduction given that the postage revenue is 0 margin and the low margin contract was a known quantity:

> TRENT PORTER: …I find myself scratching my head again. The postage, I think, is 0 margin, and then the exit of the -- from the low-margin customer ***was expected an unknown quantity.*** So can you expand a little bit on kind of the major buckets of what's driving the margin miss versus your expectations? And then sort of tie into that, the margin decline year-over-year because I would think that the sort of the mix impact of exiting a low-margin account, all other things being equal, would have a positive impact on margin? And then just sort of a follow-up to that same question, can you talk about just what's behind the slower ramp of projects in the longer sales cycle?

> REYNOLDS: …The first question is really about the postage and pass-through costs. It is low-margin business. ***<u>It's just really not predictable for us</u>.*** And when that postage comes through, it will fluctuate significantly between quarters. ***That's something we haven't been very good at predicting historically***, so we're working on improving that. But in one day, you can find out a month later that you're going to have a large job that requires to be delivered, which will show a lot of incremental revenue and no corresponding profit. So that's one aspect of the question. With respect to the low-margin contract we exited, we made -- we discussed it at length on our Q3 call, I think, again, in our Q4 call, that contract was a profitable contract for us. And as a result of us rebidding the contract, they were looking for -- we presented a digital solution which would have reduced our overall revenue but increased our margins from where they were. The customer was looking for more of an analog solution with a digital price. *So when we talk about the exit of the low-*

*margin contract, it was profitable. But if we were to continue with that, we would have lost money under the contract*. And since we are for profit, we did not go forward with losing money on that contract, so we walked away from that contract. It had been with us for a period of time. And as we have contracts that have been with us longer, we put a lot of our technology, we've increased our productivity so it comes through at a higher margin.

With respect to the comment about the customers maybe not ramping fully, we're -- these are complex solutions. We have *decent visibility* into when they're going to hit based on our discussions with our ops people. But you're relying on multiple constituents from the customer that requires sign-offs, and those sign-offs take time. You're using your IT resources and others. So while the contracts are there, *it's not always easy to predict the exact time the contract will fully ramp*. We've been ramping new contracts throughout the year, but as a result of certain delays, some of them have not fully ramped.

TRENT PORTER: I understand. I think I'm having a hard time articulating my question. So my question is more -- I get it on the postage, it's almost -- it's very difficult to anticipate. It's going to be lumpy. But as I understand it, if you thought you're going to have $1 million and you've got $500 million, it's 0 margin, it's passthrough. So it's 0 margin business, so it shouldn't impact your EBITDA margin -- the EBITDA margin. It will impact the revenue, but not the margin that you had anticipated as a management team. And then the -- in addition, the loss of the customer or the exit from the customer business -- *I understand, I'm with you on that. It's just that, that was a known quantity to you*. So the -- that said, the miss on the earnings side is what I'm -- on the EBITDA margin side relative to your expectations is what I'm having a hard time completely understanding. And maybe we can take it offline, but that's -- it's hard to articulate, I get it, but...

REYNOLDS: No, no, I hear you. I think that, also, we talked about one-time cost that impacted our SG&A. During the quarter, we had some unfavorable costs associated with legal and professional fees.

TRENT PORTER: *Weren't those an add back?*

REYNOLDS: So those things are one-time in nature that we didn't necessarily predict.

TRENT PORTER: Okay. I mean, were those not added back to EBITDA?

REYNOLDS: They were in the add backs, yes. I'm saying from a GAAP perspective.

TRENT PORTER: Right. Right. And so I guess, I mean, that there is -- for example, your EBITDA guidance for the year, it went down last quarter. And I'm not -- I hate to be a pain, it's just -- I want to make sure that I understand. The EBITDA guidance has gone down. And so -- and the EBITDA margin is down year-over-year. So I just want to better

understand what's driving -- what was unfavorable? What is the unfavorable variance versus your budget, specifically on the EBITDA margin side?

REYNOLDS: So I think that's another thing we discussed on the call, and maybe it was missed, is that in Q3, we have Europe, which we have incremental cost where we're adding staff. Now 18% of our business overall in Europe -- is in Europe. And in the month of August, a lot of that business slows down, but we don't terminate people, obviously, we keep them on the payroll, and we have to hire incremental staff and temp help to get work done. So there was some of that, that we were not able to predict. But I appreciate the question and be more than happy to follow up offline.

180.    Cantor Fitzgerald issued a report on November 13, 2019 stating, "Quarterly top-line and bottom -line results reported below expectations. 2019 revenue guidance was lowered. The focus on the quarter was on the newly announced debt paydown and liquidity initiative with the goal of increasing liquidity $125-150 mn. The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time."

181.    Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

182.    Shortly after, on November 19, 2019, Moody's issued a press release announcing it "downgraded Exela Intermediate LLC's (Exela) ratings, including its Corporate Family Rating to Caa3 from Caa1, Probability of Default Rating to Caa3-PD from Caa1-PD, and the instrument ratings on the company's senior secured first lien credit facilities and senior secured first lien notes to Caa3 from Caa1."  It elaborated:

For nine months ending September 30, 2019, Exela's *optimization and restructuring charges increased to $59 million from $35 million for the same period last year*, and have been a consistent drag on cash flow from operations. Despite substantial restructuring spend, the company has been unable to stabilize free cash flow declines and gain much needed momentum in profitable growth since the close of the Novitex merger in July 2017. Exela reported a 1.9% decline in 3Q 2019 revenue on a constant revenue basis from 3Q 2018 and lowered its 2019 full-year revenue and 2019 EBITDA guidance by roughly 3% and 12%, respectively, citing slower ramp on new projects, longer than expected sales cycles and *unpredictable postage revenue*. Exela also took a $99.7 million non-cash goodwill and trade-name impairment charge, reflecting lower anticipated future earnings from its core business.

In the third quarter 2019, Exela initiated a two-year debt reduction and liquidity improvement initiative aiming to increase liquidity through asset sales to approximately $125 to $150 million from $50 million currently. The company's focus on improving liquidity is credit positive because it will provide additional resources for debt reduction and investment. But the plan will take up to two years to execute and the amount of earnings disposed is not clear, and *the plan does not fully address the fundamental competitive challenge of turning around operations that have been demonstrating weak organic growth rates, declining profitability and negative free cash flows*.

* * *

The acceleration of the company's organic revenue declines and growing restructuring and optimization charges reflect continued operating pressures, which the company will be challenged to address given its negative free cash flow. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default. Proactively and cost-effectively addressing the expiration of the revolver in 2022 and the term loan and notes in 2023 will be difficult without an operational turnaround, and the step up in required term loan amortization to $20 million in 2020 will put additional strain on liquidity.

### 6. Appraisal Litigation Testimony Detailed Additional and Previously Unknown Issues about SourceHOV

163.    On June 4th through 6th, 2019, Exela executives testified at the SourceHOV Appraisal Action. As discussed above, such testimony demonstrated SourceHOV's improper inclusion of expenses within SourceHOV's adjusted EBITDA.

a.    <u>**June 4, 2019: Day one of Appraisal Action Testimony.**</u> On June 4th**,** the first day of testimony in the Appraisal Action, Exela SVP Verma testified that to properly include business and optimization expenses within adjusted EBITDA, such expenses were supposed to be "one-time" in nature.  More specifically he stated "and then, as you walk down below, the credit agreement lets you add back certain expenses *which are considered one-time and nonrecurring in nature*; for example, business optimization and fees and expenses incurred in connection with transactions."

i.    Verma continued, "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement. And what that means is every cost that was *not part of the business as usual* has to be added back. There -- there's no black and white about it. So -- because you have to show an

47

EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

      ii.    During the same testimony, Verma even went so far as to testify that "the EBITDA definition **has to be held sacrosanct**. And what I mean by that is **every charges which are not a usual course of business** are added back to the EBITDA."  Verma also testified to the importance that investors place on management's discretion in how they categorize EBITDA, stating, "And obviously, financial performance is a very important metric." He concluded that "EBITDA is a very important metric that is looked upon by all investors."

      iii.    Verma further testified that SourceHov had a motive to include optimization and restructuring addbacks because "it's basically in the company's interest to show an add-back."  The reason it was in SourceHov's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- **which doesn't help the company**, from a -- from the perspective it was in, because it was in the market to raise the debt financing."

      b.    <u>**June 5, 2019: Day two of Appraisal Action Testimony**</u>. On the second day of Testimony in the Appraisal Action, it was revealed for the first time publicly that Wall Street titan, Goldman Sachs, also keyed in on problematic adjusted EBITDA addback practices at SourceHOV.  For example, on October 27, 2016, Whit Graham at Goldman Sachs & Co. Inc. ("Goldman") emailed several SourceHOV executives and concluded that, based on the trading levels of SourceHOV's debt, that SourceHOV's equity value was "zero."

      i.    Goldman's conclusion that SourceHOV's valuation was so low was informed by its assessment that SourceHOV was "adversely impacted by historical perceptions around revenue growth **and EBITDA add-backs**, a concentrated investor base and a lack of public information, among [others] ...." (emphasis added).

      ii.    In addition to Goldman concluding that SourceHOV's equity was assessed to be worthless as recently as late 2016, Chadha testified on June 5th that he felt SourceHOV equity was worthless at the time leading up to the Business Combination.

iii.     Chadha also described the situation facing SourceHOV as "dire", in part because in late 2016 "most of our large customers, banks and insurance companies, were not really willing to give us new business, and were considering whether they should take some of the business back and give it to others."

c.     **June 6, 2019: Day Three of the Appraisal Action testimony**. On the third day of the Appraisal Action, SourceHOV's expert witness, Greg Jarrell. Jarrell testified that the way SourceHOV categorized its adjusted EBITDA addbacks was a "negative checkmark of reliability" because "that ***there seemed to be a more-than-normal amount of add-backs***."

d.     Jarrell further testified that SourceHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring." More specifically, he testified that "And they're supposed to be nonrecurring expenses, and I don't know. I seem to see the same expenses year after year after year. So I -- my impression was, jeez, they don't look to be so nonrecurring. But I understand what they're doing. It's a -- it's done a lot. It's not consistent with GAAP, but financial people do this."

i.     Jarrell acknowledged that "financial people do this", He testified that "It struck me [as] an important negative -- negative checkmark of reliability is the fact that ***there seemed to be a more-than-normal amount of add-backs***. And it's just -- it's a consideration, it's a factor, and it's a negative."

ii.     The following exchange between the Court of Chancery and SourceHOV's expert clarifies what Jarrell meant:

> THE COURT: So was it within the realm of discretion, for you to do a proper evaluation, for you to have made adjustments to those projections to account for that before you began your analysis?
>
> THE WITNESS: No. No. I don't – I wouldn't go that far, because this -- this practice of adding back ***nonrecurring*** expenses is ubiquitous in the financial community. And public companies, you know, you see it all the time.
>
> They refer to this is a non-GAAP number. That's what they mean. They mean that we've taken a real number and we've

added things back, because when we go to project, this should improve our -- our ability to project, because, you know, we've taken out things that will *not recur*. If you really did take out things that did not recur, that's a good thing to do, in terms of trying to create better projections. That's a good thing. ***If you overdo that, for whatever reason – who knows what motive, but if you overdo that, then that's a bad thing***.

183.    In addition to SourceHOV's own expert witness taking issue with the addbacks being added to SourceHOV's adjusted EBITDA, the Court of Chancery also heard that "there was some reaction from professionals that were sort of consistent with [Jarrell's] reaction." "You know, **'*inflated with less than credible adjustments*'** is a comment from a Morgan Stanley person in February. News story that circulated within Morgan Stanley."

184.    The Morgan Stanley criticism of SourceHOV's adjusted EBITDA addback practices refers to a June 30, 2017 email by Morgan Stanley investment bankers who, in the same email, also described SourceHOV's adjusted EBITDA figures as being "egregious," stating, "When you see so many adjustments, it just starts getting egregious. We just put our pencils down."

**7.     Exela Announces Delay Of Form 2019 10-K Filing And Restatement**

185.    On March 16, 2020, Exela issued a press release announcing that it had "postponed its earnings release and conference call due to the delayed filing of its Form 10-K for the year-ended December 31, 2019, and the need to restate certain of its historical financial statements."

186.    On March 17, 2020, the Company filed a Form 8-K which noted that on January 30, 2020 the Delaware Chancery of Court had ruled in the Appraisal litigation finding that "the fair value of SourceHOV as of the Closing Date was $4,591 per share" and SourceHOV's motion for reconsideration was denied on March 11, 2020.

187.    The Form 8-K also revealed:

After evaluating the current and historical accounting treatment of the Appraisal Action with the Company's independent registered public accounting firm, KPMG, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. ***The liability should have been recorded in 2017*** at the fair value of the shares tendered. Additionally, during the second half of 2019, we reimbursed approximately $4.5 million with respect to professional fees

and expenses for secondary offerings by a related party pursuant to the terms of the Consent, Waiver and Amendment dated June 15, 2017, amending the Business Combination Agreement, dated February 21, 2017.  Approximately $2.4 million of these expenses should have been recorded in 2018. During the second half of 2019, the Company made payments of $4.6 million on behalf of certain employees that were holders of Restricted Stock Units in Ex-Sigma 2, LLC for which the Company incurred compensation expense and paid $5.7 million in the fourth quarter on behalf of a related party associated with the PIPE Financing (as defined in the Consent, Waiver and Amendment).  We are still evaluating the purpose and nature of the PIPE Financing related payments, their legal significance, the appropriate accounting treatment, and whether any obligation with respect to those payments should have been recorded in a prior period.

*As such, we will restate our financial statements for the years ended December 31, 2017 and 2018 and the interim periods through September 30, 2019 (which will be addressed in our Form 10-K for the year ended December 31, 2019), to record liabilities ranging from $36 to $43 million as of December 31, 2017, and accruing interest thereon at a rate set by the Delaware Court of Chancery from time to time, associated with its potential obligations related to the Appraisal Action.* Additionally, the proposed accounting will reduce the number of shares outstanding by 4,568,862 shares for purposes of the weighted average shares outstanding used to calculate basic and diluted loss per share during the respective periods. Accordingly, the aforementioned financial statements should not be relied upon. Independent of the preceding, we also determined that the operating cash flows were understated and financing cash flows overstated in the statement of cash flows by $35 million for the year ended December 31, 2017, as a result of the misapplication of a new accounting standard on a retrospective basis within our 2018 Form 10-K.

While these revelations provided further insight into the Company's balance sheet, the market had already partially accounted for the Company's liquidity and cash flow issues.  Exela's stock fell $0.05 per share, or 27.1%, to close at $0.15 per share on March 18, 2020 on heavy volume.

### 8.      Post-Class Period Disclosures

188.    On June 9, 2020,  Exela filed its Form 10-K for 2019 containing the restated financial results.  The restatement impacted several areas of Exela's financial statements including (a) its balance sheets for the periods ending December 31, 2017 and 2018, respectively; (b) its MD&A for the same periods; (c) it's Selected Financial Data for the same periods; and (d) its quarterly results for the first three quarters of 2019.

189.    The restatement corrects several errors that had been presented in Exela's prior financial statements.  These errors include the understatement of a liability related to the Appraisal

Action of $43.1 million, $40.6 million, and $37.8 million, for the periods ending December 31, 2019, December 31, 2018, and December 31, 2017, respectively. The difference between the years has to do with the accrued interest associated with the appraisal award.

190.    That accrued but not expensed interest associated with the liability, also had the effect of overstating Exela's income (or understating the loss) by $2.4 million, $2.9 million, and $1.2 million, during the years ended December 31, 2019, December 31, 2018, and December 31, 2017, respectively.

191.    Apart from the liability related to the Appraisal Action, management also restated its income statement to reflect that the prior financial statements had also overstated Exela's income (or understated its loss) by $5.3 million for the nine months ended September 30, 2019 due to Exela's improper capitalization of costs. In other words, Exela capitalized $5.3 million in unrecorded related party expenses, which should have been expensed in the first instance. And had these costs been properly expensed at the outset, Exela's income would have declined more than it reported for the nine months ended September 30, 2019.

192.    For the period ended December 31, 2018, Exela corrected a $3.2 million overstatement of loss.

193.    The restatement also revealed that Exela understated its loss by $4.8 million for the year ended 2017 due to its improperly recognizing revenue of $6.4 million (and improperly expensing $1.6 million associated with that revenue) related to "a multiple element arrangement that included a software license where vendor specific objective evidence (VSOE) of fair value was not established for the undelivered elements of the arrangement."

194.    The restated results revealed that had the Company's accounting been correct, it would not have met its adjusted EBITDA guidance for fiscal year 2017 or 2018. While the Company did not provide quarterly guidance, it had missed the street consensus for adjusted EBITDA in 2Q'19 and 3Q'19, as well as, estimates of several analysts for 1Q'19.[6]

_____

6

| | 2017 Guidance | 2017 Reported | 2017 Restated | 2018 Guidance | 2018 Reported | 2018 Restated |
|---|---|---|---|---|---|---|
| Adjusted EBITDA[7] | $245M - $260M | $245.2M | $203.99M | $280M - $290M | $283.8M | $276.18M |
| O&R[7] Expense | Not provided | $42.5M | $42.5M | Not provided | $68.2M | $54.2M |
| Adjusted EBITDA ex. O&R addback | Not provided | $202.7M | $158.5M | Not provided | $215.6M | $221.9M |
| Percentage change in Adj. EBITDA Ex. O&R addback | Not measurable | -17.3% | -22.3% | Not measurable | -24.0% | -19.6% |

195.    The Company also revealed its revenues attributable to postage and postage handling and the LMCE for 2019 and 2018, which together accounted for $338.1 million and $277.4 million respectively.  These revenues, which the Company described as unpredictable, amounted to more that 21% of the Company's restated 2018 revenue, and approximately 18% of its 2019 revenue, refuting the Company's assertions throughout the Class Period that it had visibility into over 90% of its revenue.

196.    The 2019 10-K indicated that revenue had declined 23.9 million of 1.5% for the year and stated that "[t]his decrease is primarily related to a decrease in our ITPS segment revenues of $39.4 million and LLPS segment revenue of $13.2 million….ITPS—Revenues decreased $39.4 million, or 3.1%, to $1,234.3 million for the year ended December 31, 2019 compared to $1,273.6 million for the year ended December 31, 2018. *The decrease was primarily attributable to the low margin contract exit in the third quarter of 2018* and adverse currency impact that was offset partially by the revenue from acquisitions completed in 2018."

197.    The Company held an earnings call the same day where the Company's newly appointed CFO, Shrikant Sortur ("Sortur"), stated, "we are increasing our focus in 2020 on *exiting certain underperforming contracts with a little or no margin contribution*."

_____

[7] O&R refers to business optimization and restructuring charges.

198.     Weeks later on June 30, 2020 the Company held an earnings call to discuss its 1Q'20 financial results.  Cogburn stated, "Our first quarter revenue performance mainly reflects our exit from certain customer contracts and statements of work which are not strategic to the fit for Exela's vision."  Cogburn revealed that as of January 1, 2020 the Company had $150 million of "transition revenue" which referred to these low margin contracts with unpredictable nonrecurring revenue and no path to digital transformation or automation:

> *[W]e're aligning ourselves away from unpredictable nonrecurring revenue that is unlikely to achieve our long-term margin targets.* During 2020, we will continue to exit certain contracts and statements of work with little or no margin contribution and ***no opportunity to improve their contribution through digital transformation and automation. We refer to revenues from these contracts as transition revenue. As of January 1, we had approximately $150 million of annual transition revenue that we will exit over the course of this year.*** And as such, we will continue to absorb this transition in our top line growth metrics. However, it's important to note that declining transition revenue is also expected to have a positive impact on our gross margin profile.

199.     Sortur noted on the June 2020 Call that ITPS revenue had declined 12.6% "was primarily driven by our transition revenue as we exited contracts and statements of work that were nonstrategic to our long-term vision, are unlikely to achieve our long-term target margins."

200.     Sortur also revealed that the Company would continue to be impacted in subsequent quarters due to "stranded costs associated with the transition revenue."  An analyst on the call asked to "drill a little bit further on the stranded cost" and Sortur answered:

> I will give you a directional answer here. As you know, there's a timing element involved, right, as the revenue trends drop off, the cost comes off later. And one of the reasons we call this stranded cost is not only there's 100% of the variable costs do not go out in line with the revenue decline, number two, there's a fixed cost element involved, right? That's one key thing to keep in mind.
>
> If I were to give you a direct answer, we estimate -- internal estimates are anywhere from 2% to 3% of stranded costs that are still in the system. The way I look at it if you look at Q1 versus -- Q1 '20 versus Q1 '19, 23% margins versus 20% margins, granted revenue was down, we should have adjusted cost down as well. It's not happened quick enough. So simple terms, 2% to 3% of stranded costs in the quarter are still in there. Broader terms, ***we need to do a lot more to get the margins back up*** to where it was historically.

201.     An analyst inquired "what [are] the actual services [] within transactional revenue?... What is the stranded cost opportunity associated with that or what is the EBITDA contribution from those transitional revenues?"  Sortur replied:

What we kind of want to look at more closely is the ***unpredictable, nonrecurring or any customer return or margin*** -- customer margins that's unlikely to achieve our long-term margins, right? That's why I kind of pivoted it back to a couple of things that we have talked about in the recent past.

Take out our LMCE revenue -- postage LMCE revenue, actually, we have revenue growth. Impact of low margin on our business is continuing to create a margin compression, and we need to reverse that, right? So that's -- so when I kind of summarize this, transition revenue is nothing but we -- us looking at customers -- customer margins or areas where we need to start pushing for more margin improvement. If it doesn't make sense for the business, it's better that we exit it, focus on the margins, focus on the margin dollars. So if you ask me what industry, what bucket, what customer, I don't think we have that kind of a categorization as such to talk about, at least not on this call.

Stranded cost, again, it's more of a term that we are using here to indicate that when there is a revenue decline, the variable cost is not 100% relatable to it in the same month, same quarter. It comes off, but slower than the revenue drop, number one. Number two, we also have an element of fixed cost that has to come out eventually, whether we call it facility consolidations, looking at the way we work, managing capacity, it's a much bigger exercise.

* * *

It's really headcount and capacity management.

202.   After repeatedly touting its visibility into its predictable recurring revenues, and its ability to automate its existing customer base and increase margins, the Company finally admitted that for a substantial portion of these existing customers there was "no opportunity to improve their contribution through digital transformation and automation." These revelations revealed the true extent to which the Company had been obscuring its margins and organic revenue growth.

203.   On August 10, 2020, the Company filed a Form 10-Q for 2Q'20, revealing the ongoing impact of unpredictable, nonrecurring low margin transition revenue on the Company's performance:

For the three months ended June 30, 2020, revenue attributable to our ITPS segment decreased by $66.8 million, or 21.6% compared to the same period in the prior year. The majority of this revenue decline is attributable to exiting contracts and statements of work in late 2019 from certain customers with revenue that we believe was unpredictable, non-recurring and were not a strategic fit to Company's long-term success or unlikely to achieve the Company's long-term target margins ("transition revenue") in addition to lower transaction volumes as a result of COVID-19.

* * *

For the six months ended June 30, 2020, revenue attributable to our ITPS segment decreased by $107.9 million, or 17.0% compared to the same period in the prior year. The majority of this revenue decline is attributable to exiting contracts and statements of work

in late 2019 from certain customers with revenue that we believe was unpredictable, non-recurring and were not a strategic fit to Company's long-term success or unlikely to achieve the Company's long-term target margins ("transition revenue") in addition to lower transaction volumes during the three months ended June 30, 2019 as a result of COVID-19.

## VI.   DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.   Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K

204.   On March 16, 2018, Exela filed a Form 10-K for the year ending December 31, 2017. The Company reported:

*Revenue*

Our revenue increased $362.4 million, or 45.9%, to $1,152.3 million for the year ended December 31, 2017 compared to $789.9 million for the year ended December 31, 2016. This increase is primarily related to an increase in our ITPS segment revenues of $387.2 million, which was primarily attributable to the acquisition of TransCentra in 2016 and Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $14.2 million and $10.6 million, respectively. Our ITPS, HS, and LLPS segments constituted 71.8%, 20.3%, and 7.9% of our total revenue, respectively, for the year ended December 31, 2017, compared to 55.7%, 31.4%, and 12.9%, respectively, for the year ended December 31, 2016.

* * *

*EBITDA and Adjusted EBITDA*

EBITDA was $(37.2) million for the year ended December 31, 2017 compared to $129.2 million for the year ended December 31, 2016. Adjusted EBITDA was $208.8 million for the year ended December 31, 2017 compared to $173.2 million for the year ended December 31, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the year ended December 31, 2017 resulting from an increase in selling, general and administrative expenses, related party expense, and loss on extinguishment of debt compared to the year ended December 31, 2016. The increase in Adjusted EBITDA was primarily due higher overall gross profit for the year ended December 31, 2017 compared to the year ended December 31, 2016, along with lower recurring expenses as part of on-going operations.

205.   The 2017 10-K stated:

**Other Financial Information (Non-GAAP Financial Measures)**

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integration costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

We present EBITDA and Adjusted EBITDA because we believe they provide useful information regarding the factors and trends affecting our business in addition to measures calculated under GAAP. Additionally, our credit agreement requires us to comply with certain EBITDA related metrics. Refer to "—Liquidity and Capital Resources—Indebtedness."

*Note Regarding Non-GAAP Financial Measures*

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. These non-GAAP financial measures are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP. Because EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

206. The statements in ¶¶204-205 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the following reasons: (i) the Company's failure to account for liability for the Appraisal litigation and other fraudulent accounting that was revealed by the Restatement resulted in Exela overstating adjusted EBITDA (*see supra* ¶¶188-195) and which was – even absent the Restatement - not indicative of Exela's normalized, or steady-state earnings; (ii) the Company's adjusted EBITDA did not just add back "non routine" one-time costs, but rather Exela excluded (or added back) routine operating costs from its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.

207. The 2017 10-K stated, "With the increased scale resulting from our Business Combination in July 2017, we are poised to expand relationships with existing customers and realize substantial synergies."

208. The 2017 10-K stated, "For the fiscal year ended December 31, 2017, we generated $1,152.3 million of revenue of which approximately 90% is recurring in nature and supported by long-term customer contracts."

209. The 2017 10-K also stated:

We serve over 3,500 customers across a variety of industries, including over 60% of the Fortune® 100. We believe our customers are among the leading players in their respective industries, and many of them are recurring customers that have maintained long-term

relationships with us and our predecessor companies.

***We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins***. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our ***stable base of customers and sticky, long-term relationships lead to highly predictable revenues***.

\* \* \*

We maintain a strong mix of diversified customers with low customer concentration. No customer accounts for more than 10% of 2017 revenue. The diversity of our customer base has contributed to the stability and predictability of our revenue streams and cash flows. We have been able to effectively balance our customer mix and reduce dependency on any single customer or vertical by penetrating a diverse set of end markets.

210.    The 2017 10-K stated:

In July 2017, we completed the Business Combination. SourceHOV was deemed to be the accounting acquirer, and is a leading provider of platform-based enterprise information management and transaction processing solutions primarily for the healthcare, banking and financial services, commercial, public sector and legal industries. Through the acquisition of SourceHOV and Novitex, we expect to realize revenue synergies, leverage brand awareness, strengthen margins, generate greater free cash flow, expand the existing Novitex sales channels, and increase utilization of the existing workforce. We anticipate opportunities for growth through the ability to leverage additional future services and capabilities.

211.    The statements in ¶¶207-210 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, because: (i) a substantial portion of the existing customers had no path to digital transformation or automation; (ii) approximately 20% of the Company's revenue and was not predictable or recurring; (iii) exiting these contracts resulted in stranded costs that would further compress margins; and (iv) obscured the Company's actual and potential margin and revenue growth. (*see supra* Section V.C.8)

### B.    Defendants' False and Misleading Statements and Omissions Relating To Its April 13, 2018  Secondary Offering

212.    On April, 13 2018, Exela filed a Prospectus Supplement to its Prospectus dated October 2, 2017 wherein Exela offered equity securities on behalf of Ex-Sigma 2, LLC for 7 million shares of Exela common stock.  The Prospectus stated, "we generated $1,152.3 million of revenue of which approximately 90% is recurring in nature and supported by long-term customer

contracts."

213.    The Prospectus Supplement also stated, "We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing customer relationships, pursuing new customer opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise."

214.    The statements in ¶¶212-213 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

### C.    Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results

215.    On May 11, 2018, Exela filed a form 8-K, signed by Reynolds that included as Exhibit 99, a press release dated May 11, 2018. The May 11, 2018 press release reported adjusted EBITDA of $69.6 million. The press release further stated:

> Adjusted EBITDA: Adjusted EBITDA was $69.6 million, an increase of 10.9% when compared to pro forma Adjusted EBITDA of $62.7 million in the first quarter of 2017. The increase in first quarter 2018 Adjusted EBITDA was primarily driven by revenue growth and the impact of the Company's cost savings initiatives, partially offset by ramp-up costs associated with new ITPS client contracts, investments in the Company's revenue growth initiatives, and higher public company costs.

216.    Additionally, the press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine* items outside the control of our management team."

217.    The description of adjusted EBITDA within the press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.

218.    The statements in ¶¶215-217 were materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

219.    On its earnings call following the same reporting period, Defendant Cogburn stated, "Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA."

220.    This statement in ¶219 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

221.    Cogburn similarly stated on the call, "We have a high degree of revenue visibility…. The level of visibility gives us confidence in our ability to accurately forecast the trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95%..."

222.    Reynolds stated that 90% visibility and 95% renewal rates gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?
>
> REYNOLDS: …If you think about our business and our contracts, they're long-term in nature, right? They're typically three to five years, and we have over 95% renewal rates. So we have good visibility into our revenue, typically just over 90% at any point in time. If you look at the numbers we delivered in the first quarter, we're very pleased with the results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

223.    Reynolds told an analyst the integration and conversion would be completed by October 2018:

> BRAD ELLIOTT: And then, Jim, in your prepared remarks, you said that the full integration and the conversion was about 12 to 15 months. Is that from the deal closing in July, or is that kind of where you stand now?
>
> REYNOLDS: I would say from that perspective, it's from when the deal closed. We're working hard on the back half of this year, and there'll be incremental work to do into

2019. But if you remember, some of these we're dealing with large customers that we have to work with their IT departments, their CTOs when we start to move around some of the technology. So we're ready to move as quick as it makes sense with our customers. So those are the types of things, things like headcount, vendor saves, those move a lot quicker, obviously.

224.   A Credit Suisse analyst inquired whether postage revenue was responsible in part for the disconnect between revenues and margins:

ARUN A. SESHADRI: …First, I just wanted to understand, obviously nice revenue growth in the quarter, but it looked like gross profit actually declined. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, what was the impact of postage in the numbers?

REYNOLDS: So if you take a look, we don't really look at it on a gross margin basis because we have a lot of business optimization cost flowing through. We focus on an EBITDA perspective. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take, runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage, we don't really break out postage separately. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

225.   The statements in ¶¶221-224 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

### D.   Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results

226.   On August 10, 2018, Exela filed a form 8-F, signed by Reynolds.  Attached as Exhibit 99 to the same was a press release dated August 9, 2018 wherein Exela reported its 2Q 2018 results.

227.   In the August 9, 2018 press release, Exela reported adjusted EBITDA of $70.1 million.  The press release further stated:

Adjusted EBITDA: Adjusted EBITDA was $70.1 million, an increase of 9.0% when compared to pro forma Adjusted EBITDA of $64.3 million in the second quarter of 2017. The increase in second quarter 2018 Adjusted EBITDA was primarily driven by revenue

growth and the impact of the Company's cost savings initiatives, partially offset by investments in the Company's revenue growth initiatives, and higher public company costs

228.    Additionally, the press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and ***other similar non-routine*** items outside the control of our management team." It also contained the same language as that referred to in ¶216 above, referring to optimization & restructuring not reflecting "past, current or future operating performance."

229.    Also on the 2Q 2018 earnings call, Reynolds assured investors that "our job is to minimize the adjustments" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will – and the percentage of adjustments will shrink in the future."

230.    The statements in ¶¶226-229 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not for the reasons stated in ¶206.

231.    Also on the August 9, 2018 earnings call, Cogburn indicated that interest in digitization and automation from existing customers was increasing and resulting a strong backlog, which would lead increased margin and revenue growth, expressing confidence in the Company's revenue projections:

> With our customer interest increasing and the expanded white space opportunities, our contracted backlog is increasing as well and the mix is favorable, changing in line with the execution of our business strategy. We have a high renewal rate, which further demonstrates our effectiveness in taking our customers on their digital and business transformational journey. With our quarterly results, strong backlog and high renewal rate, we are confident in the top line trajectory of the business going forward…. Our strategy, which is to provide business process automation services to all of our customers, positions us for long-term growth.
>
> * * *
>
> Using the power of our technology and recognizing the potential with BPA, many of our existing customers are now reanalyzing their on-site BPO business. The interest from customers has broadened, and this also includes interest in our platforms like print shop, digital mailroom, front-office automation and digital lockers.

The results of this strategy puts us in a unique position amongst our peer group. This essentially demonstrates that we are able to grow the revenue faster with a much lower -- or slower variable cost increase. Put in other words, the growth in the revenue exceeds the growth in the variable cost in the form of headcount needed to service the revenue. As a direct result, we expect our revenue per FTE to continue to climb. The strategy drives the growth in revenue per FTE from about $18,000 per FTE a decade ago to over $70,000 per FTE currently.

232.    Reynolds stated on the August 2018 Call:

[O]ur Q2 and half-year performance, we have ramped up a few big deals won late in 2017 and early this year, which is evident in our top line growth. We are expecting the big deals will migrate towards normal margins in the next few quarters along with the savings actions being executed in parallel. This will give us the gross margin lift that, in turn, will translate into higher EBITDA.

*  *  *

We reported operating income of $11.9 million, an increase of $1.9 million on a year-over-year basis. Our operating income results were driven by revenue growth offset by higher cost of revenue, which was driven by the impact of ramp-ups of large contracts offset by flow-through cost savings initiatives and lower SG&A.

233.    The Credit Suisse analyst on the call noted that while revenue had grown, profit had declined, and asked what the impact of Asterion was on margin.  Reynolds indicated that Asterion margins were low, but assured the Company's margins would expand:

ARUN A. SESHADRI: …And then I just wanted to understand, as far as the sequential progression goes, your revenue kind of grew nicely on a sequential basis between $93 million to $410 million. But it looks like both gross profit and, I guess, cash EBITDA both declined sequentially. Just wanted to understand, is there any way you could parse sort of why that's happening and what the impact of the Asterion business was on a margin basis?

REYNOLDS: Yes. So we haven't really broken it down between Asterion but, obviously, with the amount we paid, ***Asterion did not have a significant margin***, if you know what I mean. But it was really strategic to us to bring that back and expand our European operations.… Because we had great success last year and into this year, we had a large amount of revenue come through at very little margin. So as we ramp up, you're going to continue to see the revenue grow, those costs come out, and we will expand. Usually, revenue comes first and then -- on these large contracts, and then the margins will expand over time. We're very pleased though with the top line growth.

234.    Reynolds addressed an analyst question about anticipated margin growth:

JOSEPH DEAN FORESI: Got it. And maybe you could talk about what the next 2 quarters look like because, with your annual guidance, that would imply a considerable ramp in the margins over the next 2 quarters. So what do those look like from, I guess, a restructuring

perspective? And how should we expect those margins to improve? What are your levers there?

REYNOLDS: Yes. So if you look, Joe, we've ramped some large customer contracts which incur significant costs and sometimes duplicate costs. As we move further out into the contracts, the ramp becomes steady-state, so those margins will improve over time. For the second half of the year, if you look at where we are year-to-date on an adjusted EBITDA, we're going to have a significant increase to hit our guidance, which we're very comfortable with.

235.   The statements in ¶¶231-234 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

236.   Reynolds also stated:

We continue to convert our savings actions over the quarter into EBITDA. Our adjusted EBITDA increased by 9% to $70.1 million in Q2 of 2018 compared with $64.3 million in 02 of 2017. This increase in EBITDA was partially offset by duplicate ramp costs incurred that we are no longer able to capitalize in 2018 under ASC 606. This makes our margin to appear weaker during the initial phase of ramp. This decrease is also reflected in our CapEx comparisons year-over-year as there is approximately $2 million more of expense in the P&L in 022018, which would have been historically capitalized.

* * *

Looking at the adjustments to EBITDA. We had a decrease of $6.5 million in transaction-related expenses in 02 2018 compared to 02 2017. These costs were incurred as a result of the business combination in July of 2017. Optimization and restructuring expenses were up $2.8 million in Q2 2018 and are part of our plan in delivering $40 million to $45 million in flow-through P&L benefits in 2018. We will continue to identify and invest in achieving these savings.

The total optimization and restructuring expenses have not changed. Year-to-date, we have already incurred $27.5 million. The second half of 2018 and future quarter amounts will depend on the rate of conversion of these savings.

237.   The statements in ¶236 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

**E.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results**

238.   On November 8, 2018, Exela filed a Form 8-K, which was signed by Reynolds. Attached to the 8-K was Ex. 99, a press release with the same date, which reported adjusted

EBITDA of $69 million.  The press release further stated:

> Adjusted EBITDA: Adjusted EBITDA for the third quarter of 2018 was $68.9 million a margin of 18% and increased 23.6% when compared to pro forma Adjusted EBITDA of $55.5 million and a margin of 16% in the third quarter of 2017. The increase in third quarter 2018 Adjusted EBITDA was primarily driven by revenue growth, the Company's cost savings initiatives, and partially offset by investments the Company made for growth.

239.    Within Exela's adjusted $68.9 million EBITDA figure, the Company reported $19.4 million of optimization and restructuring expenses, or 28.1% of the third quarter's adjusted EBITDA.

240.    Additionally, the press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine* items outside the control of our management team." It also contained the same language as that referred to in ¶216 above, referring to optimization & restructuring not reflecting "past, current or future operating performance."

241.    The statements in ¶¶238-240 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

242.    Cogburn stated on the November 2018 Call:

> We reported strong top line results with third quarter revenue of $383 million, an increase of 7% on a year-over-year basis. Revenue grew at a double-digit rate on a year-to-date basis, coming in at 11 %. Our revenue per FTE, a metric we closely track, has seen an 8% increase to $72,000 per FTE, up from $66,000 at the end of 2017. This growth is a direct result of our DigitalNow strategy, converting the lower automation BPO revenue into higher automation BPO revenue.
>
> * * *
>
> [T]he increased market receptiveness to our DigitalNow strategy has exceeded all of our expectations, and therefore, we have accelerated our investments for future profitable growth. This key strategic initiative, when coupled with other factors I've just mentioned, will have a short-term impact on our adjusted EBITDA.
>
> * * *
>
> Our strategy to grow within our good existing customers is working. We seek to build on our successful engagements to increase the number of statements of work and master service agreements. The results of this strategy is a broad and sticky revenue base.

* * *

Additionally, I'm pleased to share with you that the investments we have made in our customer-facing organization have resulted in substantial increase to our pipeline, which is almost double from what it was last year. Consistent with our DigitalNow strategy, we are seeing an increasing proportion of pipeline from higher automation deals and we're adding additional work streams and revenue streams with existing customers.

* * *

DigitalNow enabled additional streams of revenue within our existing customers. We transform our customers' operations over time using our proprietary BPA solutions for both on-site as well as offsite. This creates the opportunity for Exela to do more as our platform enables us to provide additional services and generate incremental revenue and profits.

243.   Reynolds stated on the November 2018 Call:

We are on track this year to book-and-bill more than 2x our initial revenue growth rate of 3% to 4%. We are also very pleased seeing how our pipeline has transformed in size and increased in the number of high automation deals, which is consistent with our business strategy.

244.   Cogburn detailed the Company's DigitalNow strategy to a Cantor Fitzgerald analyst:

DREW KOOTMAN: I was hoping you could discuss the opportunity with DigitalNow and how you expect this to impact growth moving forward?

COGBURN: So when you think about what we've done with our strategy to add higher automation work to lower automation BPO, as we started the year, we talked about business process automation, So if we take our business process automation, the digital transformation, and now, we use DigitalNow as sort of the descriptor for all of those things, as we go out to the market, the clear indicator to us of the interest in the market is how our pipeline has grown. So literally, from now -- from the last year until now, we have seen the pipeline more than double with these types of opportunities. And as you recall, I've mentioned in previous quarters, we found early acceptance in 04 of last year with the interest in the pilots that begin to generate. So as we've come through this year, we're beginning to see some of those pilots turn into contracts and awards for us.

245.   Reynolds noted the Company's visibility into revenue and contracts:

DREW KOOTMAN: And then -- so with the lower forecast of adjusted EBITDA -- and I know you guys aren't talking about 2019, but I was wondering, if you can give any high-level -- just looking out at how you guys are viewing adjusted EBITDA margins?

REYNOLDS: So with respect to 2019, I think our message, we're finishing 2018 very well. If you look at the past year, we had initial guidance on the top line of 3% to 4%. And because of the acceptance of DigitalNow and the opportunities, we're going to finish the year very strong between 8.5% and 9%. If you're looking at EBITDA margins, we're looking at that, but if you look back at the past 4 quarters, our range and adjusted EBITDA has clearly been between 18% to 19%. We finished this quarter just at 18%. Our business,

as you know, we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts.

246.    Reynolds expressed confidence in the Company's lowered EBITDA guidance and indicated the exit of the low margin contract was a one time event and the impact would be short term in nature:

> DAN DOLEV: And I think you're raising at the mid -- you are lowering EBITDA by, I think $17 million, $18 million and you also per my estimates, you do much better on the run rate of the savings, if you get $48 million days versus the $40 million to $45 million. So why take it down by debt margin, is it just debt or is there something else?

> REYNOLDS: Yes I think within *the 2 items that impacted us, those are short-term in nature*, but will continue to flow through in the fourth quarter. So that being said, we'll be able to make up some of that and we will continue to drive through the synergies. But I think we feel good with the range of $280 million to $290 million.

247.    Cogburn touted the demand for DigitalNow among existing Enterprise Solutions customers:

> MATTHEW VAN ROSWELL: And then, on a bigger picture, have you noticed in the last, call it, 6 months or so any change in client demand either for your products or sort of in the industry in general?

> COGBURN: Well, so that's the right question to ask about the demand from the customers. And so we have to measure that in a couple of ways, but the biggest way is the growth of our pipeline. …So as we came into this year, we saw our pipeline begin to build at a very accelerated rate. As we sit here today for these types of digital services, it's literally twice what it was last year. So what we found is we went to our existing customers, when we went to our Top 150 customers, when *we went to a --what we call the Enterprise Solution customers, which is the old Novitex, it was well received, lots of interest*, and so that's where you begin to see like this enterprise deal that I talked about.

248.    Reynolds touted the Company's revenue growth and noted the Company's long term contracts and renewal rates in response to a Credit Suisse analyst's question about 2019 growth and margins:

> ARUN A. SESHADRI: And then, could you make a comment about growth and margins in '19?

> REYNOLDS: ...We said we were going to go 3% to 4%, we're finishing the year 8.5% to 9%. And these contracts are long-term in nature. We have great renewal rates on our top

line. So revenue based on what we have, the large contract we've sold, the size of our pipeline, we feel very good about 2019 as we're exiting '18.

249.    The statements in ¶¶242-248 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

250.    Reynolds stated on the November 2018 Call:

Looking at the bridge from EBITDA to adjusted EBITDA. Overall, adjustments are down. Walking through the bridge in the third quarter of 2017, we incurred $132 million in onetime charges, tied to the business combination to create Exela. The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. As part of our 2018 guidance, we committed to deliver between $40 million to $45 million in savings. To date, we have achieved, approximately $48 million. In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense. A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. We expect these costs to decline as we implement our transformational model. The last part of the box in the walk is Other, which primarily includes non-cash charges incurred on employee restricted stock units and the term loan debt reprice costs incurred.

251.    The statements in ¶250 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

**F.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results**

252.    On March 18, 2019, the Company held an earnings call to discuss its fourth quarter and full year 2018 financial results. Cogburn touted the Company's margin and revenue 2018 growth and indicated that growth would continue into 2019 as it implemented its DigitalNow strategy with more existing customers:

We had a solid 2018 and achieved our revised guidance for both revenue and adjusted EBITDA. Our continued investment in developing industry-specific and departmental solutions as well as increased customer awareness are showing good results. Digital Now made the difference. In 2018, we achieved full year revenue growth of approximately $130 million and a 9% increase in revenue per FTE to $72,000. These investments and our increased customer awareness have helped achieve a growth rate of 14% on our top 200 customers. With low customer concentration and a high customer retention rate of 98%,

our goal for 2019 and beyond is to replicate the success we had with our top 200 customers. We believe the large and growing addressable market we operate in provides us with substantial runway for growth and expansion with a focus on our existing customers. We are also committed to sensibly pursuing growth while deleveraging our balance sheet over time.

We reported a strong top line results for the year of $1.586 billion, an increase of 8.9% on a year-over-year basis, ahead of the industry growth rates. We recorded 15.7% growth in adjusted EBITDA to $283.8 million, and our continued focus on margins resulted in an increase of 110 basis points compared to 2017, reaching a 17.9% adjusted EBITDA margin. In addition to growing our top line and adjusted EBITDA, during the year, we executed on our savings initiatives, an important part of our ongoing strategy. During 2018, we achieved $64 million in savings, exceeding our initial goal of $40 million to $45 million. And here's an important fact: through a combination of the top line growth and achieving savings offset by investments we've made to drive growth and increased awareness, we successfully drove improvement on a year-over-year basis in our adjusted EBITDA margin. In response to the strong demand for Digital Now, we invested in converting pipeline into revenue. We see a meaningful opportunity or white space to expand our set of solutions we're providing to our customers as we reach new customer segments during 2019.

Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA.

Looking ahead to 2019 and beyond, we are well positioned to generate long-term sustainable growth.

253.    The statements in ¶252 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

254.    Reynolds stated:

Based on its review of the company's disclosure and control procedures, the company's management expects to conclude that the company's disclosure controls and procedures were not effective. Notwithstanding such weaknesses, the company's management expects to conclude that the consolidated financial statements to be included in the Form 10-K will present fairly, in all material respects, the company's financial position, results of operations and cash flows for the periods to be presented in the Form 10-K in conformity with GAAP.

255.    The statements in ¶254 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because

Defendants improper accounting as disclosed in the 2019 10-K, which restated the Company's 2018 10-K materially misrepresented the Company's financial position, results of operations, and cash flows.

256.    Reynolds stated:

Looking at the bridge from EBITDA to adjusted EBITDA. The first box in the bridge is other, which includes noncash charges of $49.2 million and $122.5 million on debt extinguishment cost and impairment of the LLPS business in 2018 and 2017. The remainder of these costs relate to employee stock option expense and asset disposal costs.

The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter. The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $O.8 million in facility cost. We believe 2018 represented the high watermark in terms of optimization and restructuring expenses. And in time, we expect these costs to gradually decline as we implement our transformational model. The final adjustment is the transaction integration costs, which are -- were incurred to create Exela in the third quarter of 2017.

To summarize, the gap between EBITDA and adjusted EBITDA narrowed by $142.5 million in 2018. This is consistent with our goal to have adjusted EBITDA and EBITDA to converge over time.

* * *

On December 31, 2018, total liquidity was $116 million, and net debt was $1 402 billion. We had cash of $44 million, excluding restricted cash per our credit agreement, and an undrawn $100 million revolving credit facility, of which, $20.6 million was set aside for standby letters of credit.

257.    The statements in ¶256 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.  The statements were additionally materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because Reynolds represented that 2018 would be the "high watermark" for business and optimization expenses, but these expenses increased by 36% when comparing full year 2019 results to full year 2018 (restated) results.

258.    Reynolds also touted revenue visibility in expressing confidence in the Company's 2019 guidance:

DAN DOLEV: … So I mean, your guidance is very, very strong. I feel like it's above our numbers for next -- for 2019, and it looks like, as you said, it's accelerating on an organic basis. And also EBITDA, the EBITDA guidance seems above our numbers. Can you maybe give us a sort of the level of confidence you have in achieving that guidance?

REYNOLDS: Sure. Thanks, Dan. As we've discussed historically, we typically have about 90% visibility into the next 12 months. With respect to the revenue, if you remember, we have somewhat of a wide range, but back in the fall, we announced the transaction with a large bank. That contract ramped up at the beginning of the year, so we're very pleased with that. In addition, at the end of December, we closed a health care acquisition that will also help drive the results for 2019.

259.    An analyst inquired if there was anything in top line revenue they should know about, since Exela's revenue growth guidance was the same as 2018, despite the pipeline doubling. Reynolds again noted revenue visibility in expressing confidence in the Company's guidance and assured that the Company was just trying to be conservative.

JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort of the conversion rate? Is it an element of conservatism on the top line and expectations for next year? Have conversion rates changed? *Is there anything in the top line we should know about?*

REYNOLDS: …I mean, we feel good about our conversion rates. I think the size of the pipeline is strong. And just like this year, for the full year, we actually hit our revised -- upward revised revenue guidance. So we have great visibility into the revenue and feel pretty good. I think, as we're still a new public company, 18 months or so, and we're trying to be somewhat conservative as we look at the potential for Digital Now, which is gaining traction in our front office. So we'd rather come out feeling good with that 90% visibility on the top line.

260.    Reynolds indicated that the Company would need to implement BPA for existing customers and take out costs to improve margins in order to achieve its margin guidance:

JOSEPH DEAN FORESI: Got it. And then on the margin guidance, I think it's $305 million to $335 million. What puts you at the top end versus the low end on the margin side?

REYNOLDS: So what gets us there is really the flow-through on our savings. That's one of the things we've been working on since we launched the transaction. We feel good about it, so it's a combination of that. And then the type of deals that we close and how quickly we can achieve the margin. There is still costs we need to take out on some of these tuck-in acquisitions, and we're looking to change that margin profile as we implement our suite of technology.

261.    The statements in ¶¶258-260 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

262.    On March 20, 2019 the Company filed its Form 10-K for the year ending December 31, 2018 (the "2018 10-K"), which was signed Cogburn, Reynolds, and Chadha and certified by Cogburn (Ex. 31.1); Reynolds (31.2); .  The 2018 10-K stated:

> We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our stable base of customers and sticky, long-term relationships lead to highly predictable revenues.
>
> * * *
>
> We maintain a strong mix of diversified customers with low customer concentration. No customer accounts for more than 10% of 2018 revenue. The diversity of our customer base has contributed to the stability and predictability of our revenue streams and cash flows.

263.    The 2018 10-K also stated:

> **Expand relationships with existing customers.** We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base. With an installed base of over 4,000 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher-margin bundled solutions. As an example, we now offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

264.    The statements in ¶¶262-263 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

265.    The 2018 10-K stated:

> EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA.
>
> * * *
>
> **Year Ended December 31, 2018 compared to the Year Ended December 31, 2017**
>
> *EBITDA and Adjusted EBITDA*

EBITDA was $144.5 million for the year ended December 31, 2018 compared to $(37.2) million for the year ended December 31, 2017. Adjusted EBITDA was $283.8 million for the year ended December 31, 2018 compared to $208.8 million for the year ended December 31, 2017. The increase in EBITDA was primarily due to a lower net loss amount for the year ended December 31, 2018 resulting from an increase in revenue, decrease in selling, general and administrative expenses, decrease in related party expense, and decrease in loss on extinguishment of debt compared to the year ended December 31, 2017. The increase in Adjusted EBITDA was primarily due to lower transaction and integration costs for the year ended December 31, 2018 compared to the year ended December 31, 2017, along with lower impairment charges incurred in 2018 compared to 2017.

266.    The statements in ¶265 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206, specifically: (i) 2018 reported adjusted EBITDA was $283.2 million, but the restated figure fell by $7 million to $276.2 million; (ii) 2018 annual adjusted EBITDA was improperly inflated by the improper adding back of $68.1 million of optimization and restructuring expenses ($54.2 million in the case of the restated adjusted EBITDA); and (iii) had Exela properly classified optimization and restructuring expenses as operating costs (and thus not added them back to adjusted EBITDA), it would have fallen well short of even its reduced 2018 guidance.

### G.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results

267.    On May 9, 2019, Exela filed a form 8-K, signed by Reynolds that included as Exhibit 99.1 a press release dated May 9, 2019. The May 9, 2019 press release reported adjusted EBITDA of $74.1 million. The press release further stated:

**Adjusted EBITDA:** Adjusted EBITDA for the first quarter of 2019 was $74.1 million, an increase of 6.5% as compared to Adjusted EBITDA of $69.6 million in the first quarter of 2018. Adjusted EBITDA margin for the first quarter of 2019 was 18.3%, an increase of 60 basis points as compared to an Adjusted EBITDA margin of 17.7% in the first quarter of 2018. The increase in first quarter 2019 Adjusted EBITDA and Adjusted EBITDA margin was primarily driven by revenue growth and by the continued realization of savings flow-through, partially offset by investments the Company made for growth.

268.    The statements in ¶267 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

269.    Also on May 9, 2019, Exela held an earnings call to discuss its financial results for 1Q'19.  Cogburn stated:

On a constant currency basis, our revenue of $410 million grew 4% year-over-year, and adjusted EBITDA of $75 million grew 8% year-over-year. Our first quarter adjusted EBITDA margin was 18.3%, an increase of 60 basis points from 17.7% in Q1 of 2018. The improvement in margins validates the path that we are traveling to transform businesses through our automation as we get the benefits of executing our remaining cost savings initiatives.

Growth was backed by our growing and profitable pipeline and the continued ramp of our existing customers. Our Digital Now strategy continues to win business by leveraging our best-in-class technology and support services. Our goal is to continue to accelerate the digital transformation of our customers through expanding engagements across multiple layers and to be their technology and business process automation partner.

As we continue to grow and service our new and existing customers, we have seen an acceleration in our initial costs associated with these wins. As a result, we have added to our employee base and have seen an increased use of working capital. These trends should reverse in the back half of the year. Further, we continue to exit low margin contracts where customers do not have a path going forward towards automation. On a sequential basis, we expect revenue to be similar to Q1 and improve materially in the third and fourth quarter. Accordingly, based on our current pipeline, we are reaffirming our 2019 outlook.

\* \* \*

In executing our strategy of working to accelerate the digital transformation of our customers, we're making significant progress on our savings initiatives that we've identified throughout the organization. We expect to execute on a material portion of our remaining $56.4 million in identified savings during the remainder of 2019, which is detailed in our fact sheet. Digital transformation and execution of our initiatives will drive the future convergence of adjusted EBITDA to EBITDA.

\* \* \*

With high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers.

270.    Cogburn told a Cantor Fitzgerald analyst that DigitalNow was resulting in a higher conversion rate of its pipeline:

DREW KOOTMAN: … You guys mentioned the pipeline remains strong. I was just curious, are you seeing an increase in the pipeline due to Digital Now? Or maybe you could just touch on how Digital Now is sort of changing the pipeline? Or what you're seeing through that?

COGBURN: Drew, that's the right question, and that is the conclusion. I think I've mentioned last quarter the growth in our pipeline year-over-year is almost double what we have seen previously before all opportunities related to Digital Now.… So we're very excited to see how that plays out because we believe we have a higher opportunity or a better opportunity for a higher conversion rate of that pipeline.

271.    Cogburn answered a Morgan Stanley analyst's question about penetrating existing customers:

> BRIAN LEE ESSEX: I was wondering if maybe you could talk a little bit about some of the relationships with existing customers. I know that recently you guys had, in particular, a pretty large lockbox win with a big bank. How much new business are you able to penetrate existing customers with? And how much of that pipeline does that account for within your visibility for the year?

> COGBURN: …So when you think about how we've grown historically, it has been through our existing customer base, and it has to do with the ability to land and expand.... So when we look at our pipeline, which is the question, we see lots of opportunities like this that are similar where we've had a great relationship with a large existing customer….

272.    The statements in ¶¶269-271 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

273.    Reynolds stated on the call:

> Our adjusted EBITDA for the quarter totaled $74.1 million, an increase of 6.5%, and a (sic) [our] margin in the first quarter was 18.3%, an increase from 17.7% in the first quarter of 2018. The improvement in adjusted EBITDA margins was mainly driven by revenue growth and by continued realizations of savings flow-through but were partially offset by investments the company made for growth.

> I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. **The primary variance between the 2 are optimization and restructuring charges**. This adjustment relates to investments we have made to achieve cost savings and a majority relates to headcount. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're incurring additional upfront cost for a few large projects. We expect this trend to continue in 2019, but decline in the year -- later quarters.

274.    Cogburn discussed optimization and restructuring charges:

> Optimization and restructuring charges are primarily headcount-related charges. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

275.    These statements in ¶¶273-274 was materially false and/or misleading when made

and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

276.    Reynolds assured an analyst that margins would continue to expand through the year despite the drastic increase in employees:

> DAVID LAWRENCE PHIPPS: [I]f we look at some of the margin progression, you've made some nice margin progression in the past 5 quarters. And would you expect to continue to make margin progression in the June quarter even though revenues will be roughly flat?
>
> REYNOLDS: So we don't give out specific quarterly guidance, but what I would tell you is, as the saving initiatives flow through the P&L, a majority of those run through our cost of goods sold. As we put our technology in and take out people and headcount, you'll start to see the gross margin turn, which we expect.
>
> DAVID LAWRENCE PHIPPS: Okay. Because you added about 1,000 employees during the quarter so that would suggest that you're set up for new business or you're going to have a little bit of extra costs. Maybe you can talk through that a little bit because if we're flat but we have more cost to more employees, it seems like that you're going to have little bit of margin pressure unless you have some cost savings to offset that.
>
> REYNOLDS: Yes, absolutely. We've added, like Ron said, about 929 employees which almost all in the production in the cost area. And as we ramp these contracts, our revenue hits steady state and we put in our technology and start to see the benefit in margin expansion. So we're well underway with respect to these contracts.

277.    This statement in ¶276 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

### G.    Defendants' False And Misleading Statements And Omissions Regarding ITS 2Q'19 Financial Results

278.    On August 8, 2019, Exela filed a form 8-K, signed by Reynolds that included as Exhibit 99, a press release dated August 8, 2019. The August 8, 2019 press release reported adjusted EBITDA of $69.4 million. The press release further stated:

> Adjusted EBITDA: Adjusted EBITDA for the second quarter of 2019 was $69.4 million, a decline of 1.0% as compared to Adjusted EBITDA of $70.1 million in the second quarter of 2018. Adjusted EBITDA margin for the second quarter of 2019 was 17.8%, an increase of 70 basis points as compared to an Adjusted EBITDA margin of 17.1% in the second quarter of 2018. The small decrease in second quarter 2019 Adjusted EBITDA was

primarily driven by the low margin contract exit reported during the third quarter of 2018, offset by revenue growth and the continued realization of savings flow-through.

279.    This statement in ¶278 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

280.    On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results. Cogburn stated:

> As we look at our business, excluding these 2 items, this is an important part of our story as well as a clear indication that our transformation efforts are working and it'll take another 12 to 18 months to complete. On an adjusted EBITDA margin basis, the story is very positive. Net of postage and the previously announced contract exit, adjusted EBITDA margins were 22%. Now this is the margin level that has been our target since the inception of Exela in July of 2019.

281.    The statements in ¶280 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶206, 211.

282.    Cogburn expressed confidence in bringing up Novitex customer margins:

> STEVEN PAUL HALPER: This is Steven coming on for Joe. I just have -- you've talked about the business transformation when you are looking at [] 35% to 40% of your revenue trying to expand that gross margin. Can you provide some color on what makes up that part of 35% to 40% of revenue? ….

> COGBURN: Yes. And so the way you look at the business, and I think from the beginning of the formation of Exela, we talked about part of our business that was ***ripe for digital transformation*** and that's really what we've talked about.

> The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, those gross margins were lower, and I think we've always stated that. So for us, and we look at what we had done historically for the last 10 years, our gross margins being 35%, ***we know that over time, we're going to be able to transform this. We're going to be able to put automation where there is no automation***. The grouping on the far, I guess, the third bucket that has to do with more of our European footprint that we picked up about 5 years ago. And you can see with the benefit of automation and transformation, we brought those margins up to around 30%. So when we look at this bucket, this 35% to 40% of revenue, there is a great opportunity to be able to transform and lift those margins to the goal of being around 35% like we have for the rest of the business.

283.    The statements in ¶282 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

284.    Reynolds also stated:

During the second quarter of 2019, optimization and restructuring expenses totaled $18.7 million compared to $8.9 million in the second quarter of 2018. Of the $18.7 million, $17.6 million related to cost associated with process transformation. The remaining $1.1 million is related to M&A transformation. Customer transformation was less than $50,000 in the second quarter. We expect the level of optimization and restructuring expense related to process transformation to decline towards the back half of 2019 as the automation initiatives continued to get executed and realized into the P&L. We still have a lot of work to do as approximately 35% to 40% of our net revenue and its gross margins at approximately 15%.

* * *

Another large bucket within our adjustments are noncash and other charges. This bucket includes costs associated with cash severance and onetime debt extinguishment cost and customer exit costs.

285.    The statements in ¶284 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

## H.    Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results

286.    On November 12, 2019, Exela filed a form 8-K, signed by Reynolds that included as Exhibit 99, a press release dated November 12, 2019. The November 12, 2019 press release reported adjusted EBITDA of $58.5 million. The press release further stated:

**Adjusted EBITDA:** Adjusted EBITDA for the third quarter of 2019 was $58.5 million, a decline of 15.1% as compared to Adjusted EBITDA of $68.9 million in the third quarter of 2018. Adjusted EBITDA margin for the third quarter of 2019 was 15.7% compared to Adjusted EBITDA margin of 18.0% in the third quarter of 2018. The decrease in third quarter 2019 Adjusted EBITDA was mainly driven by lower revenue in the ITPS segment along with higher SG&A spend and foreign currency losses offset by continued realization of savings flow-through.

Adjusted EBITDA margin, based on revenue excluding the LMCE and pass through revenue, was 18.9% in the third quarter of 2019 and 21.1% in the first nine months of 2019, compared with 22.8% and 22.4% in the comparable prior year periods.

287.    The statements in ¶286 were materially misleading when made and/or omitted to

state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

288.    On November 12, 2019, the Company held an earnings call to discuss its 3Q'19 financial results. Cogburn stated:

> …15% to 20% of our revenue and generates approximately 21% gross margin after 5 years in transformation. By continuing to execute our technology and process transformation initiatives, we believe the businesses in the second and third column from the left have the ***potential to generate margins approaching 35%*** as represented in the first column. This implies significant opportunity to expand our gross profit margin and does not include any expected impact from noncore asset sales as part of our debt reduction initiative. Now as a reminder, while we remain confident that the ongoing improvements we are making will fundamentally transform our COGS, they require both investment and time.

289.    The statements in ¶288 were materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

290.    On adjusted EBITDA and liquidity Reynolds stated:

> Adjusted EBITDA for the quarter totaled $58.5 million, a decrease of 15.1% on a year-over-year basis. Adjusted EBITDA margin for the third quarter was 15.7% compared with 18% in the third quarter of 2018. … Liquidity at the end of the third quarter was $50.4 million. Our total net debt was $1.485 billion.

291.    Reynolds then answered a Nuveen analyst's question regarding EBITDA guidance:

> TRENT PORTER: …The EBITDA guidance has gone down. And so -- and the EBITDA margin is down year-over-year. So I just want to better understand what's driving -- what was unfavorable? What is the unfavorable variance versus your budget, specifically on the EBITDA margin side?
>
> JAMES G. REYNOLDS: So I think that's another thing we discussed on the call, and maybe it was missed, is that in Q3, we have Europe, which we have incremental cost where we're adding staff. Now 18% of our business overall in Europe -- is in Europe. And in the month of August, a lot of that business slows down, but we don't terminate people, obviously, we keep them on the payroll, and we have to hire incremental staff and temp help to get work done. So there was some of that, that we were not able to predict. But I appreciate the question and be more than happy to follow up offline.

292.    The statements in ¶¶290-291 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

## VII.   LOSS CAUSATION

293.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.

294.    During the Class Period, Plaintiffs and the Class purchased Exela's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

295.    Artificial inflation in Exela's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on November 8, 2018, March 18, 2019 May 22, 2019, August 8, 2019, November 12, 2019 and March 16, 2020.  As a direct result of these partial disclosures, the price of Exela's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

296.    On November 8, 2018, the Company reduced its 2018 adjusted EBITDA guidance by approximately $18 million due in large part to the exit of a low margin Enterpise Solutions contract.  These announcements revealed in part that a material portion the Company's revenues was derived from low margin customers who had no path to digital transformation or automation, and that exiting these contracts would have a negatively impact revenue growth and stranded costs associated would negatively impact margins.

297.    On the same day, Exela reported a substantial increase in business and optimization expense, which partially revealed that such expenses are not nonrecurring or nonroutine (they are regular and recurring).  Morgan Stanley analyst Brian Lee Essex asked management on the earnings call about "how one time-ish" Exela's "impact items" were going to be—demonstrating the growing skepticism among analysts about Exela's representations that its adjusted EBITDA really did just add back nonroutine expenses, or if it was also adding back traditional operating expenses.

298.     Moreover, the growth in optimization and restructuring expense from the prior quarter also demonstrated to investors that recurring expense addbacks were increasingly making up a larger percentage of Exela's reported adjusted EBITDA. This means that the EBITDA guide down was problematic for two reasons: (1) the earnings were falling; and (2) what was actually making up the earnings, i.e., the quality of the earnings itself, was deteriorating.

299.     On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2019 damaging investors.

300.     On March 18, 2019, the Company announced that it met its 2018 revenue and adjusted EBITDA guidance. However, the Company also indicated that its optimization and restructuring expenses would only "gradually" decline but would continue. More specifically, he noted:

301.     On the earnings call, Reynolds stated:

The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter. The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $0.8 million in facility cost. We believe 2018 represented the high watermark in terms of optimization and restructuring expenses. And in time, **we expect these costs to *gradually* decline** as we implement our transformational model.

302.     After seven straight quarters of incurring such costs, analysts sought a cleaner GAAP number, but management refused to provide one, however management did acknowledge that optimization and restructuring expenses would continue. (*See supra at* § V.C.3).

303.     Management's partial recognition that optimization and restructuring expenses were not in fact non-routine, gave investors pause. For instance, the following day, Morgan Stanley published a report noting:

Reconciliation of business optimization costs vs. progress toward long-term profitability goals. XELA had previously outlined long-term adjusted EBITDA in the range of 22% to 23%, though we have yet to see this target updated. As the company is still expected to incur business optimization costs in FY19, we lack guidance around timing to reconcile when such profitability may be achieved.

304.     Following this news, Exela's stock fell $0. 21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors. The stock followed through on the following day and fell by an additional $0.23 per share, or 6.2% to close at $3.50 on March 20.

305.     On May 9, 2019, the Company revealed that it missed its revenue guidance for 1Q'19 and that its net debt stood at $1.46 billion, putting its leverage ratio at a concerning 5.06x. In addition, the Company's liquidity had declined from  $124 million at the end of 3Q'18 to $58 million at the end of 1Q'19.  In addition, contrary to the Company's prior assurances that margins would increase as headcount dropped, the Company increased its headcount by nearly 1,000 employees to ramp new contracts, making its 2019 guidance less credible as upfront costs associated with layoffs would be incurred before savings would be realized.  Furthermore, the Company disclosed that it was continuing to exit additional low margin contracts.

306.     Also on the May 9 earnings call, for the first time, Exela appears to admit that optimization and restructuring charges are not limited to just the Business Combination or M&A activity.  Rather, Reynolds suggests that optimization and restructuring are in fact more akin to operating costs, when he details that such costs are associated with large projects.

307.     Investors begin to sense that—despite what they have been led to believe about the nonrecurring nature of optimization and restructuring expenses—such costs will persist.  On the earnings call, a Jefferies LLC equity analyst takes management to task by saying "hoping you could talk a little bit more about restructuring and optimization costs that you have here."  He continues, I mean they've been persistently high."

308.     On May 10, 2019 Morgan Stanley issued a report noting that "liquidity remains a primary concern for the stock with little visibility around how the company may address it."  It also stated, "Our call-back with management implied that optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved."

309.   As demonstrated by the Morgan Stanley analysis, investors began to doubt whether business optimization expenses would ever end and began to price in the reality that such expenses, despite management's representations that they were "non-routine," actually did reflect the current and future operations of Exela.

310.   On this news, Exela's stock fell $0.17 per share, or 5.0%, to close at $3.21 per share on May 10, 2019.

311.   On August 8, 2019, the Company reduced its 2019 guidance citing unpredictable postage revenue and the continued impact of exiting the low margin contract in 3Q'18.  These announcements partially revealed that the Company's visibility into revenues was not 90%, that its revenue was comprised of a material amount of unpredictable, non-recurring, low margin, revenue, and that stranded costs associated with the exit of these low margin contracts would continue to impact margins.

312.   On August 9, 2019 RBC issued a report stating, "we estimate that the company generated -$17M in free cash flow during the quarter, but is still free cash flow negative year to date. If we assume that the company's adjustments to EBITDA are cash outlays, then there was little, if any, free cash flow in the quarter, in our estimation."  It noted that it was lowering it price target, stating, "Given the focus on liquidity and free cash flow, we believe that the equity will generally trade almost as a stub, or option, relative to the bonds. This makes valuing the shares quite difficult. Given the situation, we are reducing our target price to $4 from $7..."

313.   Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

314.   On November 12, 2019, Exela further reduced its 2019 guidance as a result of the continued impact of exiting a low margin contract in 3Q'18 and unpredictable postage revenue. These announcements further revealed that the Company had a substantial amount of unpredictable, nonrecurring, low margin revenue, and the extent to which stranded costs from exiting these contracts would impact margins.

315.    On November 13, 2019, Cantor Fitzgerald issued a report noting the 2019 guidance reduction and stating, "The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time…. We decrease our EPS estimate to -$1.48 from -$0.51, due to a heavy miss in 3Q19 and revenue and margin guide downs from management."

316.     Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

317.    Finally on March 16, 2020, Exela announced that it would be delaying the filing of its 2019 Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019.

318.    Following this news, Exela's stock fell $0.05 per share, or 27.1%, to close at $0.15 per share on March 18, 2020 on heavy volume.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.    Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA

319.    The proceedings before the Delaware Court of Chancery make clear that Exela, led by Chadha, maintains a culture that adopts pervasive misrepresentation. The Court of Chancery noted that, among other things, SourceHOV—Exela's largest subsidiary: (1) sought and received a backdated a valuation model to gain an advantage in litigation; (2) when confronted about the same, denied doing so; (3) "lacked credibility"; (4) [Chadha] was "simply not believable" and "not at all forthright"; and (5) all of his testimony was "tainted."

320.    While these findings were made in different litigation, that litigation concerned SourceHOV's financial statements, which ultimately roll up into Exela's.  The court's factual and legal findings were based in part on testimony from current Exela executives, including Exela's current SVP of Finance, and Exela's current Chairman.

321.    Testimony from that litigation demonstrates that Exela knew, or should have known, that its addbacks to adjusted EBITDA during the class period were improper.  For example,

testimony from Exela SVP of Finance, Verma, stated on June 5, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses *which are considered one-time and nonrecurring in nature*; for example, business optimization and fees and expenses incurred in connection with transactions."  Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement.  And what that means is every cost that was *not part of the business as usual* has to be added back.  There -- there's no black and white about it. So -- because you have to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

322.    During the same testimony, Verma even went so far as to testify that "the EBITDA definition has to be held sacrosanct.  And what I mean by that is every charges which are not a usual course of business are added back to the EBITDA."

323.    Verma also revealed the motive that SourceHOV had for including these expenses: : "*it's basically in the company's interest to show an add-back.*"  The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is *-- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing*."

324.    And just as SourceHOV was raising debt and equity capital before the Business Combination, similarly, during the class period, Exela was motivated to keep its equity value high for equity and debt capital raises.

325.    Moreover, because Appraisal Action testimony reveals that bankers from Morgan Stanley, Goldman Sachs, and even SourceHOV's own expert witness communicated to SourceHOV executives, who are know Exela executives, that SourceHOV's adjusted EBITDA addbacks were problematic.  Importantly, SourceHOV's expert witness who expressed concern  about its addbacks would have likely been given access to the full suite of accounting and financial information unavailable to the public.  Thus, after all of the above financial experts conveyed concerns over Exela's practice of

adding back recurring expenses to its adjusted EBITDA, Exela likewise knew or should have known that its practice was improper.  And as discussed herein, by excluding such expenses, it allowed Exela to meet is own guidance during the periods identified above.  Absent the adding back of optimization and restructuring expenses, Exela would not have met its own adjusted EBITDA guidance.

**B.**     **Implementing Digitization And Automation In Existing Customers Was a Core Operation**

326.    The fraud alleged herein relating to concealing the true state of affairs with respect to the Company's efforts to increase revenue and margins by implementing automation and digital transformation to its existing customers, all involved Exela's core operation, and knowledge of the fraud may therefore be imputed to Defendants Cogburn, Reynolds, and Chadha.

327.    On an August 9, 2017 earnings call, shortly after the merger closed, Cogburn stated, "Exela is positioned well to benefit from significant white space opportunity, which will enable us to cross-sell and to upsell our combined solutions and services into our existing client base." Cogburn further detailed the Company's strategy, noting that the Company had already identified merger cost savings synergies and indicated that the Company was deeply embedded with its clients:

> First, we will focus on delivering against our ***identified merger cost savings synergies*** and we will continue to seek additional opportunities for cost efficiencies. As a part of this strategy, ***we will leverage SourceHOV's proprietary in-house technologies and platforms to displace a large portion of Novitex third party vendors, which we expect will drive sustainable cost efficiencies***.

> Second, we will focus on leveraging our ***deeply embedded relationship*** as trusted partners with our clients to cross-sell our solutions throughout our global footprint. We see this as a significant growth opportunity. In fact, we already are witnessing this growth potential in our pipeline as multiple clients started asking SourceHOV and Novitex to bid as Exela prior to the close.

328.    On the Company's November 9, 2017 earnings call, Cogburn stated "we have significant traction in our go-to-market strategy as new opportunities emerge from our global client base, as a result of the combination."  Cogburn added that "[a]nother important aspect of our strategy across all the industries that we serve is our focus on digital transformation from the front

office to the back office.… This priority fits well with Exela's capabilities, which help our clients drive digital transformation across their mission-critical processes."

329.   The Company's 2017 10-K filed at the start of the Class Period also discussed this strategy, noting that the Company had ~6,000 employees working on-site with its customers and its strategy to increase demand by bringing automation and digital transformation to its existing customers:

**Key Business Strategies**

The key elements of our growth strategy are described below:

*Pursue meaningful revenue synergy opportunities.*   We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing customer relationships, pursuing new customer opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise.

• *Leverage BPA suite across on-site services*.   *Approximately 6,000 of our employees currently work at customers in an on-site capacity*. We believe this on-site presence is a competitive differentiator and a valuable asset as we pursue future growth opportunities. We aim to deploy our BPA software across these customer locations, and we believe that by offering our customers enhanced productivity and quality through our onsite employees, we will create additional opportunities to expand our footprint and wallet share across the organization. For example, in customers where we provide underwriting support and claims processing, we can enable our onsite employees to accelerate the aggregation and analysis of datasets while also increasing accuracy and automatically flagging deficiencies. By enhancing the productivity and quality of our onsite employees, *we believe we will increase the demand from our customers* to replicate our processes across the organization, bolstering our cross-sell/up-sell initiatives. By having our BPA suite already approved and deployed within existing onsite engagements, we believe our ability to expand into new lines of business will be streamlined and accelerated.

• *Expand relationships with existing customers*.   *We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base*. With an installed base of over 3,500 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher-margin bundled solutions. As an example, we now offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

330.   The 2017 10-K further noted that this strategy would result in margin expansion, stating, "we intend to further improve our margins through increased focus on operational best practices and cost efficiency through further process standardization, increasing use of automation, and increased focus on quality.  Our strategy is that over time this will result in margin expansion and enhanced productivity."

331.    On the Company's March 15, 2018 earnings call, Cogburn told an analyst the strategy had been rolled out to all the customers acquired from Novitex, as well as existing customers (referring to SourceHOV customers):

> BRYAN BERGIN: Okay. And just last one here for me. Can you give us an update on your cross-selling progress and particularly as you are aiming to drive more awareness of your offering across the client base?
>
> RON COGBURN: …Part of the strategy was to be able to take the message two fold. Number one, we picked up about 1,100 customer sites with the acquisition of Novitex, an additional 400 customers are located there. And as we begin to roll out our business process automation we are helping to transform that existing business into a more automated process.
> …So to be able to add automation, whether it's business process automation along with RPA or just pure business process automation, it creates a different conversation with those customers. Because now we are able to do things in a more automated way, a more efficient way with fewer errors and it creates what I would call a more sticky relationship with those customers.
>
> So, **_we have rolled out that thesis across all of those customers we picked up with that acquisition as well as our existing customer base_**.

332.    On the Company's August 9, 2018 earnings call, Cogburn stated, "Our strategy, which is to provide business process automation services to **_all of our customers_**, positions us for long-term growth."

333.    While Defendants did not reveal how low the margins were for these Novitex customers or that some had no margin at all, or that they had no path to automation or digital transformation, or what portion of Exela's revenue these customers accounted for, Defendants were aware of the low margins Novitex customers and repeatedly assured that they would be able to improve margins through automation and digital transformation. Reynolds stated on the November 9, 2017 earnings call, "a number of these Novitex contracts, while their margins were good, they were smaller than legacy Source HOV, because they have to use technology from third-parties. So, as we continue to put our proprietary software and systems into these contracts, we'll pull out that incremental cost and we'll get margin expansion."

334.    Cogburn similarly indicated on the August 2019 Call, stating:

COGBURN: …And so the way you look at the business, and I think from the beginning of the formation of Exela, we talked about  part of our business that was ripe for digital transformation and that's really what we've talked about.

The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, ***those gross margins were lower,*** and I think we've always stated that. So for us, and we look at what we had done historically for the last 10 years, our gross margins being 35%, we know that over time, we're going to be able to transform this. We're going to be able to put automation where there is no automation.

335.    Defendants also repeatedly discussed the timeline for implementing this strategy and continued to extend the timeline for when the strategy would be complete, indicating that the Company had analyzed its customer base and knew of customers that had no path towards automation or digital transformation.  For example, on the May 10, 2018 earnings call, Reynolds stated, "We are continuing down the path to transform our lower margin business, Exela Enterprise Solutions, which we acquired in July of 2017. We are making good progress, and we expect this transformation to take about 12 to 15 months."  On the same call, Reynolds confirmed that the time frame began in July 2017 when the merger deal closed (*see supra* ¶223), indicating that the transformation would be completed no later than October 2018.  Later on the August 9, 2019 earnings call, Cogburn stated "our transformation efforts are working and it'll take another 12 to 18 months to complete."

336.    Given that increasing revenue and margins through implementation automation and digital transformation to existing customers was a key strategy, and that Exela was embedded with these customers and aware of the margins derived from these revenues, Defendants knew or should have known that these low margin customers had no path to automation or digital transformation.

### C.    Defendants Failed to Break Out Postage Revenue

337.    Defendants failure to break out or disclose the material amount of unpredictable no margin postage revenue until August 2019 is indicative of scienter.  Indeed, Defendants were asked about the impact of postage revenue on margins on the May 2018 call and Reynolds made no mention of the substantial amount of unpredictable no margin postage revenue, merely responding "we don't really break out postage separately." (*see supra* ¶133).

338.    On June 9, 2020, when the Defendants issued its restated financial results, it was revealed that unpredictable no margin postage revenue for 2018 was $310.1 million or approximately 20% of Exela's revenue, and 273.5 million for 2019 or approximately 18% of revenue.  Low margin contracts further worsened the Company's visibility into revenue. (*see supra* ¶¶195, 198).  These figures revealed not only that Defendants' did not have 90% visibility into revenue as they claimed; but also, that postage revenue was even higher in 2018 than 2019, indicating that Defendants were intentionally obscuring the true state of the Company's revenues and margins.

## IX.    CORPORATE SCIENTER ALLEGATIONS

339.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

340.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

## X.    CLASS ACTION ALLEGATIONS

341.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Exela shares between March 16, 2018 and March 16, 2020, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

342.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Exela's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be

ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Exela shares were traded publicly during the Class Period on the NASDAQ. As of November 5, 2018, Exela had 151,648,643 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Exela or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

343. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

344. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

345. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Exela;

c.    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.    whether the price of Exela securities were artificially inflated because of Defendants' conduct complained of herein; and

e.    to what extent the members of the Class have sustained damages and the proper measure of damages.

346. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein.  Moreover, there will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE)

347.   The market for Exela's shares was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Exela's securities traded at artificially inflated prices during the Class Period.  On September 19, 2018 the Company's shares closed at a Class Period high of $7.30 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Exela's shares and market information relating to Exela, and have been damaged thereby.

348.   During the Class Period, the artificial inflation of Exela's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Exela's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Exela and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

349.   At all relevant times, the market for Exela's shares was an efficient market for the following reasons, among others:

      a.     Exela stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

      b.     As a regulated issuer, Exela filed periodic public reports with the SEC and/or the NASDAQ;

      c.     Exela regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

      d.     Exela was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace; and/or

      e.     The average daily trading volume for Exela securities during the Class Period was approximately 332,000 shares, with more than 151,648,643 shares outstanding as of November 5, 2018, and a market capitalization reaching almost $1.1 billion during the Class Period.

    350.    As a result of the foregoing, the market for Exela's shares promptly digested current information regarding Exela from all publicly available sources and reflected such information in Exela's stock price. Under these circumstances, all purchasers of Exela's shares during the Class Period suffered similar injury through their purchase of Exela's securities at artificially inflated prices and a presumption of reliance applies.

    351.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. U.S.*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to

recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII.  INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

352.    The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

353.    The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

354.    In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Exela who knew that the statement was false when made.

## XIII.  CLAIMS

### FIRST CLAIM
**Violations of Section 10(b) of the Exchange Act and
Rule 10b-5 Promulgated Thereunder
<u>Against All Defendants</u>**

355.    Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

356.    This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

357.    During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Exela's shares at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

358.    The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Exela's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All the Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

359.    The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Exela's financial well-being and prospects, as specified herein.

360.    The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Exela's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Exela and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

361.    Each of the Individual Defendants' primary liability, and controlling person liability,

arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Such other and further relief as the Court may deem just and proper.

362.     The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.  The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Exela's financial well-being and prospects from the investing

public and supporting the artificially inflated price of its securities.  As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

363.    Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Exela's shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiffs and the other members of the Class acquired Exela's shares during the Class Period at artificially high prices, and were damaged thereby.

364.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Exela shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

365.    Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

366.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Exela securities during the Class Period.

## SECOND CLAIM
## Violations of Section 20(a) of the Exchange Act
## <u>Against the Individual Defendants</u>

367.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

368.   This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

369.   The Individual Defendants acted as controlling persons of Exela within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

370.   In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

371.   As set forth above, Exela and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Exela's primary Exchange Act Section 10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the

Class Period.

## XV.   JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: August 11, 2020                    Respectfully submitted,

                                          */s/ Joe Kendall*
                                          Joe Kendall
                                          Texas Bar No. 11260700
                                          **KENDALL LAW GROUP, PLLC**
                                          3811 Turtle Creek Blvd., Suite 1450
                                          Dallas, Texas 75219
                                          Telephone: 214-744-3000
                                          Facsimile: 214-744-3015
                                          Email: jkendall@kendalllawgroup.com

                                          *Local Counsel for Lead Plaintiffs Insur Shamgunov*
                                          *and Elena Shamgunova*


                                          **GLANCY PRONGAY & MURRAY LLP**


                                          By:  *s/ Lionel Z. Glancy*
                                          Lionel Z. Glancy
                                          Raymond D. Sulentic
                                          Christopher R. Fallon
                                          1925 Century Park East, Suite 2100
                                          Los Angeles, California 90067
                                          Telephone: (310) 201-9150
                                          Facsimile:  (310) 201-9160
                                          Email: info@glancylaw.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was served on all counsel of record on August 11, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*/s/ Joe Kendall*
JOE KENDALL