# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| BO SHEN, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | Civil Action No. 3:20-cv-00691-D |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, JAMES G. REYNOLDS AND PAR CHADHA, | § § § | |
| Defendants. | § § § | |

## DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS ................................... 3

ARGUMENT AND AUTHORITIES ..................................................................... 15

I.    PLAINTIFFS HAVE NOT PLED PARTICULARIZED FACTS SHOWING AN ACTIONABLE MISSTATEMENT OR SUPPORTING A STRONG INFERENCE OF SCIENTER ........................................................................ 15

    A.    The Appraisal Action Does Not Support a Section 10(B) Claim ....................... 18

    B.    The Adjusted EBITDA Argument Is Completely Meritless ............................... 20

    C.    The Projections, Estimates, Opinions and "Visibility" Statements Were Not False or Fraudulent ..................................................................... 20

    D.    The Restatement Allegations Do Not Support a Claim ..................................... 24

II.    THE SECTION 20 CONTROL PERSON CLAIMS ALSO FAIL ............................... 25

CONCLUSION AND PRAYER FOR RELIEF ......................................................... 25

# TABLE OF AUTHORITIES

## Cases

*Braun v. Eagle Rock Energy Partners, L.P.*,
   223 F. Supp. 3d 644 (S.D. Tex. 2016) ..................................................................... 23

*ABC Arbitrage v. Tchuruk*,
   291 F.3d 336 (5th Cir. 2002) ............................................................................... 22

*Abrams v. Baker Hughes Inc.*,
   292 F.3d 424 (5th Cir. 2002) .......................................................................... 17, 24

*Alaska Elec. Pension Fund v. Asar*,
   768 F. App'x 175 (5th Cir. 2019) ................................................................ 1, 24, 25

*Alaska Elec. Pension Fund v. Flotek Indus., Inc.*,
   915 F.3d 975 (5th Cir. 2019) ................................................................................. 1

*Axar Master Fund, Ltd. v. Bedford*,
   308 F. Supp. 3d 743 (S.D.N.Y. 2018).................................................................... 19

*Bartesch v. Cook*,
   941 F. Supp. 2d 501 (D. Del. 2013)....................................................................... 25

*Basic Inc. v. Levinson*,
   485 U.S. 224 (1988)............................................................................................ 16

*Building Trades United Pension Trust Fund v. Kenexa Corp.*,
   No. 09-2642, 2010 WL 3749459 (E.D. Pa. Sept. 27, 2010)...................................... 22

*Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*,
   497 F.3d 546 (5th Cir. 2007) .......................................................................... 21, 24

*Coates v. Heartland Wireless Communications, Inc.*,
   100 F. Supp. 2d 417 (N.D. Tex. 2000) .................................................................... 2

*DSAM Global Value Fund v. Altris Software, Inc.*,
   288 F.3d 385 (9th Cir. 2002) ............................................................................... 25

*Employees' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*,
   935 F.3d 424 (5th Cir. 2019) ................................................................................. 1

*Eshelman v. Orthoclear Holdings, Inc.*,
   2009 WL 506864 (N.D. Cal. Feb. 27, 2009) .......................................................... 19

*Fine v. Am. Solar King Corp.*,
   919 F.2d 290 (5th Cir. 1990) ............................................................................... 25

*Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*,
   565 F.3d 200 (5th Cir. 2009) ............................................................................ 1

*Gamboa v. Citizens, Inc.*,
   2018 WL 2107205 (W.D. Tex. May 7, 2018) .................................................... 18, 19

*Gillis v. QRX Pharma Ltd.*,
   197 F. Supp. 3d 557 (S.D.N.Y. 2016).............................................................. 17

*Goldstein v. MCI Worldcom*,
   340 F.3d 238 (5th Cir. 2003) ............................................................................ 25

*Hall v. Johnson & Johnson*,
   2019 WL 7207491 (D.N.J. Dec. 27, 2019).......................................................... 19

*Heinze v. Tesco Corp.*,
   971 F.3d 475 (5th Cir. 2020) ............................................................................ 22, 23

*Hess v. Am. Phys. Cap., Inc.*,
   No. 5:04-CV-31, 2005 WL 459638 (W.D. Mich. Jan. 11, 2005)............................ 22

*Ho v. Flotek, Indus., Inc.*,
   248 F. Supp. 3d 847 (S.D.T.X. 2017) .............................................................. 18, 19

*In re Alamosa Holdings, Inc.*,
   382 F. Supp. 2d 832 (N.D. Tex. 2005) .............................................................. 16, 22

*In re Anheuser-Busch Inbev SA/NV Secs. Litig.*,
   No. 19 Civ. 5854 (AKH), 2020 WL 5819558 (S.D.N.Y. Sept. 29, 2020).............. 22

*In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.*,
   2012 WL 1353523 (S.D.N.Y. Apr. 12, 2012)...................................................... 19

*In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*,
   830 F. Supp. 361 (S.D. Tex. 1993) .................................................................... 19

*In re Centerline Holdings Co. Sec. Litig.*,
   613 F. Supp. 2d 394 (S.D.N.Y. 2009)................................................................ 18, 19

*In re Fairway Grp. Holdings Corp. Sec. Litig.*,
   No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357 (S.D.N.Y. Aug. 19, 2015) ........ 23

*In re GeoPharma, Inc. Sec. Litig.*,
   411 F. Supp. 2d 434 (S.D.N.Y. 2006)................................................................ 18, 19

*In re SeaChange Intern., Inc.*,
   2004 WL 240317 (D. Mass. Feb. 6, 2004) ........................................................ 19

*Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*,
    537 F.3d 527 (5th Cir. 2008). ....................................................................... 16, 21

*Iron Workers Benefit & Pension Fund – Iron Workers Dist. Council Philadelphia & Vicinity v.*
    *Anadarko Petroleum Corp.*,
    788 F. App'x 268 (5th Cir. 2019) ...................................................................... 1, 17

*Kakkar v. Bellicum Pharms., Inc.*,
    2020 WL 2845279 (S.D. Tex. May 29, 2020) ................................................... 16, 20

*Kalnit v. Eichler*,
    264 F.3d 131 (2d Cir. 2001)............................................................................... 18, 19

*Kurtzman v. Compaq Computer Corp.*,
    No. 99–779, 2000 WL 34292632
    (S.D.Tex. Dec. 12, 2000) ....................................................................................... 23

*Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*,
    2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067
    (Del. Ch. Mar. 11, 2020)...................................................................................... 4, 5

*McCloskey v. Match Group, Inc.*,
    2018 WL 4053362 (N.D. Tex. Aug. 24, 2018) ....................................................... 3

*Milano v. Perot Systems Corp.*,
    No. 3:02-CV-1269-D, 2006 WL 929325 (N.D. Tex. Mar. 31, 2006)........................ 2

*Miller v. Cadence Bancorporation*,
    2020 WL 4581736 (S.D. Tex. Aug. 7, 2020) ....................................................... 17

*Mortensen v. Americredit Corp.*,
    123 F. Supp. 2d 1015 (N.D. Tex. 1999) ................................................................ 2

*N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*,
    936 F. Supp. 2d 722 (N.D. Tex. 2013) .................................................................. 23

*North Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*,
    No. 15 Civ. 6034 (RJS), 2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016)............................ 6, 20

*Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*,
    951 F. Supp. 2d 479 (S.D.N.Y. 2013)..................................................................... 25

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
    575 U.S. 175 (2015).......................................................................................... 16, 23

*Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*,
    2007 WL 2720074 (S.D. Tex. Sept. 18, 2007) ...................................................... 17

*Owens v. Jastrow*,
    789 F.3d 529 (5th Cir. 2015) ................................................................. 1, 21, 24, 25

*Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*,
    153 F. Supp. 3d 628 (S.D.N.Y. 2015) .......................................................... 17

*Phillips v. Harvest Nat. Res, Inc.*,
    2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) ........................................ 15, 24, 25

*Pier 1 Imports, Inc.*,
    325 F. Supp. 3d 728 (N.D. Tex. 2018) ........................................................... 21

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*,
    777 F. App'x 726 (5th Cir. 2019) .................................................................... 1

*RGB Eye Associates, P.A. v. Physicians-Resource Group, Inc.*,
    No. Civ.A 3:98-CV-1715-D, 1999 WL 980801 (N.D. Tex. Oct. 27, 1999) ............................. 2

*Rosenzweig v. Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) .................................................................. 17, 18

*S. Cherry St., LLC v. Hennessee Grp., LLC*,
    573 F.3d 98 (2d Cir. 2009) ....................................................................... 18

*Sanders v. AVEO Pharm., Inc.*,
    2015 WL 1276824 (D. Mass. Mar. 20, 2015) ................................................... 18, 20

*Smallen v. Western Union Co.*,
    2019 WL 1382823 (D. Colo. Mar. 27, 2018) ...................................................... 19

*Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*,
    365 F.3d 353 (5th Cir. 2004) ................................................................... 1, 17

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
    551 U.S. 308 (2007) ................................................................................ 3

*Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*,
    273 F. Supp. 3d 650 (N.D. Tex. 2017) ...................................................... 1, 16, 17

*Wilbush v. Ambac Financial Grp*,
    271 F. Supp. 3d 473 (S.D.N.Y. 2017) ............................................................ 23

**Statutes**

15 U.S.C. § 78u-5 .................................................................................... 23

**Rules**

Fed. R. Civ. P. 12(b)(6) .............................................................................. 1

Fed. R. Civ. P. 9(b) ..................................................................................................................... 1

Defendants Exela Technologies, Inc. ("Exela"), Ronald Cogburn, James G. Reynolds and Par Chadha ("Defendants") move to dismiss the Amended Complaint ("Complaint") under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform Act ("PSLRA").

## <u>INTRODUCTION</u>

Under the PSLRA, a Section 10(b) securities fraud complaint must be dismissed unless the complaint:  (i) identifies specific actionable material misstatements and shows that they are false; and (ii) pleads particularized facts supporting a strong, cogent, and compelling inference that the individual who actually made each challenged statement personally acted with fraudulent intent or severe recklessness in making it.[1]  The Fifth Circuit has vigorously enforced these requirements, affirming or granting dismissals even in cases involving major environmental disasters, regulatory violations and significant financial restatements.[2]  This Court has been similarly vigilant.[3]

---

[1] *See Flaherty & Crumrine Preferred Income Fund, Inc. v. TXU Corp.*, 565 F.3d 200, 208 (5th Cir. 2009) (plaintiff must establish intent of individual who made the alleged misstatement and may not rely on purported "collective" knowledge); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366, 383 (5th Cir. 2004) (same).

[2] *See Iron Workers Benefit & Pension Fund – Iron Workers Dist. Council Philadelphia & Vicinity v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269-70 (5th Cir. 2019) (affirming dismissal of securities class action against Anadarko arising from fatal explosion in Colorado despite alleged regulatory violations); *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline, L.P.*, 777 F. App'x 726, 728-730 (5th Cir. 2019) (affirming dismissal arising from 2015 oil spill *that resulted in criminal charges*); *Employees' Ret. Sys. of Mich. v. Pier 1 Imports, Inc.*, 935 F.3d 424, 432-33 (5th Cir. 2019) (affirming dismissal of securities action against Pier 1 despite allegations showing that officers knew of inventory backlog that preceded significant price markdowns); *Alaska Elec. Pension Fund v. Asar*, 768 F. App'x 175, 180-89 (5th Cir. 2019) (affirming dismissal *despite $87 million restatement and Audit Committee conclusion that former CFO engaged in inappropriate accounting practices*); *Alaska Elec. Pension Fund v. Flotek Indus., Inc.*, 915 F.3d 975, 980 (5th Cir. 2019) (affirming dismissal despite CEO's overstatement of well data by 40–50%); *Owens v. Jastrow*, 789 F.3d 529, 538, 541 (5th Cir. 2015) (affirming dismissal even though bank *had to write down entire $1.62 billion portfolio*).

[3] *See, e.g.*, *Town of Davie Police Pension Plan v. Pier 1 Imports, Inc.*, 273 F. Supp. 3d 650, 667 (N.D. Tex. 2017) (Fitzwater, J.) (holding that the allegations did not support a strong inference that Pier 1 concealed a buildup of unsold inventory and the need for future markdowns); *Milano v. Perot Systems Corp.*, No. 3:02-CV-1269-D, 2006 WL 929325, at *14-15 (N.D. Tex. Mar. 31, 2006) (Fitzwater, J.) (dismissing Rule 10b-5 claim and holding that failure to disclose alleged

This case comes nowhere close to meeting these requirements. Instead, Plaintiffs' Complaint is simply a 98-page mishmash of conclusory allegations that Exela had an adverse judgment rendered against it in a Delaware appraisal action (which is currently on appeal), purportedly acted fraudulently by adding "optimization and restructuring charges" to its "Adjusted EBITDA" metric, missed or reduced certain financial projections, and announced a restatement.

Plaintiffs fail to identify any statements rendered fraudulent by these issues. Exela expressly disclosed the appraisal litigation in its quarterly SEC filings and made clear an adverse judgment could occur. The "Adjusted EBITDA" claim is groundless, as Exela expressly disclosed each quarter that it was adding optimization and restructuring charges to Adjusted EBITDA and specifically identified the amount of optimization and restructuring charges that were incurred. Bare allegations that a company did not perform as well as anticipated have long been rejected as insufficient to state a securities fraud claim. Plaintiffs plead no particularized facts showing that the restatement resulted from fraud and cannot overcome the numerous Fifth Circuit precedents rejecting accounting-related claims with far more detailed and serious allegations than those here. The Complaint also lacks particularized allegations supporting a strong, cogent and compelling inference that the three individual named Defendants – Ronald Cogburn, James G. Reynolds and Par Chadha – personally made false statements with scienter. This suit should be dismissed.

---

participation in unlawful transactions was not shown to be severely reckless); *Coates v. Heartland Wireless Communications, Inc.*, 100 F. Supp. 2d 417, 428 (N.D. Tex. 2000) (Fitzwater, J.) (dismissing Rule 10b-5 claim where plaintiffs failed to plead specific facts showing that individual defendants knew doubtful receivables were uncollectible); *Mortensen v. Americredit Corp.*, 123 F. Supp. 2d 1015, 1018 (N.D. Tex. 1999) (Fitzwater, J.) (dismissing Rule 10b-5 claim and rejecting scienter allegations against individual defendants as conclusory) and *RGB Eye Associates, P.A. v. Physicians-Resource Group, Inc.,* No. Civ.A 3:98-CV-1715-D, 1999 WL 980801, at *7-9 (N.D. Tex. Oct. 27, 1999) (Fitzwater, J.) (dismissing Rule 10b-5 complaint where scienter allegations not particularized as to each defendant and involved generalized motive allegations).

## SUMMARY OF PLAINTIFFS' FACTUAL ALLEGATIONS[4]

Exela is an Irving-based global business process automation ("BPA") provider that offers industry-specific and multi-industry enterprise software and solutions for businesses worldwide. (Compl. ¶ 2.)  It was formed by the July 2017 combination of SourceHOV Holdings, Inc., Novitex Holdings, Inc. and special purpose acquisition company Quinpario Acquisition Corp. 2.[5]  While Plaintiffs make no allegation that Exela misrepresented SourceHOV's financial situation to investors, Plaintiffs allege that SourceHOV agreed to the merger because it was "teetering on insolvency and close to tripping a debt covenant."  (*Id.* ¶¶ 56, 67.)  Exela's business operations currently consist of three segments: Information and Transaction Processing Solutions (ITPS), Healthcare Solutions (HS) and Legal & Loss Prevention Services (LLPS).  (*Id.* ¶ 39.)  During the alleged class period, ITPS comprised just under 80% of Exela's average annual revenue.  (*Id.*)

Defendants Ronald Cogburn and James Reynolds served as CEO and CFO of Exela throughout the alleged class period.  (*Id.* ¶¶ 27-30.)  Defendant Par Chadha served as Chairman of Exela's Board of Directors and was previously Co-Chairman of the Board and principal stockholder of SourceHOV before the merger.  (*Id.* ¶¶ 31-34.)

### *The Appraisal Action*

After the July 2017 merger, a minority stockholder of SourceHOV (Manichaean Capital, LLC) ("Manichaean") filed a statutory appraisal petition in the Delaware Court of Chancery (the

---

[4] In addition to the Complaint, Defendants rely on the various SEC filings, earnings transcripts and press releases cited in the Complaint, which are attached to the accompanying Declaration of Peter Stokes ("Stokes Decl.").  Defendants respectfully request that the Court take judicial notice of these documents and consider them in deciding the motion to dismiss.  *See Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007) (courts must consider judicially noticeable documents when evaluating motions to dismiss in securities cases); *McCloskey v. Match Group, Inc.*, 2018 WL 4053362, at *3 (N.D. Tex. Aug. 24, 2018) (same).

[5] *Id.* ¶ 37.

"Appraisal Action"), asserting that it did not receive sufficient consideration in the merger for its SourceHOV equity interest (notwithstanding Plaintiffs' own repeated assertions that SourceHOV was nearly insolvent).  (*Id.* ¶¶ 73-76.)  Exela disclosed the Appraisal Action in the Legal Proceedings and Commitments and Contingencies sections of its quarterly and annual SEC filings throughout the class period, which runs from March 16, 2018 to March 16, 2020, and made clear it could not rule out the possibility of an adverse judgment.[6]  Plaintiffs do not allege with particularity that these cautious, customary litigation disclosures were false, let alone fraudulent.

In January 2020, following trial on the merits, the Delaware Court of Chancery ruled in favor of Manichaean, holding that the fair value of SourceHOV's stock at the time of the merger was $4,591 per share (an amount 12% higher than the value of the merger consideration at the time of the transaction, but lower than what Manichaean had sought).[7]  The case is on appeal.

Plaintiffs primarily assert that Exela must have defrauded investors because the Chancery Court criticized the "credibility" of testimony provided by Mr. Chadha during the Appraisal Action regarding the origin of a purportedly "backdated" valuation by SourceHOV's financial advisor that had been produced in discovery as part of that litigation.[8]  While Defendants disagree with the

---

[6] *See, e.g.*, App. 39, Ex. 1, Mar. 16, 2018 Form 10-K at 33 (disclosing claim and making standard litigation disclosure that "[a]t this stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action"); App. 172, Ex. 2, May 5, 2018 Form 10-Q at 19 (same); App. 232, Ex. 4, Aug. 9, 2018 Form 10-Q at 20 (same); App. 301, Ex. 6, Nov. 8, 2018 Form 10-Q at 21 (same); App. 400, Ex. 9, Mar. 20, 2019 Form 10-K at 40 (same); App. 526, Ex. 11, May 10, 2019 Form 10-Q at 18 (same); App. 569-570, Ex. 12, Aug. 8, 2019 Form 10-Q at 19-20 (same); App. 634, Ex. 14, Nov. 12, 2019 Form 10-Q at 21 (same).  The Appraisal Action is captioned *Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc*., C.A. No. 2017-0673-JRS (Del. Ch.).

[7] *See Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606, at *2 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020).  The case is currently on appeal.

[8] *See* Compl. ¶¶ 78-79; *Manichaean*, 2020 WL 496606, at *20-21.  The Complaint does not cite any specific excerpts from Mr. Chadha's testimony.

Chancery Court's characterization of Mr. Chadha's testimony and the circumstances surrounding this valuation, the Complaint fails in any event to allege particularized facts showing that Defendants made fraudulent statements *to Exela's investors* regarding this (or any) issue, or even that SourceHOV relied on this valuation at trial.   The Chancery Court considered multiple valuations of SourceHOV, including some that were below the transaction price and some above, and noted it was common for experts in appraisal litigation to offer widely divergent views on valuation.[9]   Indeed, Plaintiffs here assert that SourceHOV was "on the brink of insolvency."[10]   The mere fact that a court ultimately disagrees with a company's litigation position, or that the court does not credit the testimony of a company witness, does not mean that the company defrauded investors.   Plaintiffs do not identify any fraudulent statements by Exela to investors regarding the purportedly "backdated" valuation.   Further, while Plaintiffs note that the Chancery Court criticized SourceHOV's governance practices before the class period, Plaintiffs fail to plead particularized facts showing that Defendants made false disclosures *to Exela's investors* regarding SourceHOV's previous governance practices or financial condition (or about any other issue).[11]

### The Adjusted EBITDA Disclosures

Throughout the alleged class period, Exela disclosed standard GAAP (generally accepted accounting principles) financial metrics such as total revenue and net profits or losses, as well as non-GAAP financial metrics that included EBITDA (earnings before interest, taxes, depreciation and amortization) and "Adjusted EBITDA."[12]   As courts have recognized, "EBITDA is a non-

---

[9] *See Manichaean*, 2020 WL 496606, at *19 (listing five valuations); *1 (noting court's "now familiar position of grappling with expert-generated valuation conclusions that are solar systems apart . . . . ").

[10] Compl. ¶ 67.

[11] *See* Compl. ¶¶ 74-76.

[12] *See* Compl. ¶9; App. 54-55, Ex. 1, Mar. 16, 2018 Form 10-K at 47-48.

GAAP metric 'for which there is no "right" formula because, unlike GAAP metrics, they have no uniform definition.'"[13]  "The fact that a plaintiff may 'take issue with the way [a company] ch[ooses] to calculate these metrics . . . is of no moment,' because '[i]t is not fraudulent for a reporting entity to calculate metrics that,' like EBITDA, 'are not defined under GAAP,' nor is it fraudulent for the company to 'tak[e] (or not tak[e]) into account whatever factors the reporting entity thinks appropriate – as long as the public is told exactly what the company is doing.'"[14]

Plaintiffs assertion that Exela misled investors because it "added back the expense of optimization and restructuring to [A]djusted EBITDA" (Compl. ¶ 10) thus has no merit.  Exela expressly disclosed that optimization and restructuring expenses were added back to Adjusted EBITDA and disclosed the precise amounts of these expenses each quarter.[15]  Exela also cautioned investors that EBITDA and Adjusted EBITDA "should not be considered as alternatives to the most directly comparable GAAP financial measure," have "important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial metrics," "are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP," and that

---

[13] *See North Collier Fire Control and Rescue Dist. Firefighter Pension Plan v. MDC Partners, Inc.*, No. 15 Civ. 6034 (RJS), 2016 WL 5794774, at *12 (S.D.N.Y. Sept. 30, 2016) (quoting *Ironworkers Local 580 – Joint Funds v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014)).

[14] *See MDC*, 2016 WL 5794774, at *12 (quoting *Linn Energy*, 29 F. Supp. 3d at 426) (dismissing complaint where plaintiffs were "unable to identify a single instance in which [defendants'] disclosures of how it calculated" Adjusted EBITDA "were incorrect").

[15] *See, e.g.*, App. 54-55, Ex. 1, Mar. 16, 2018 Form 10-K at 47-48; App. 185-86, Ex. 2, May 5, 2018 Form 10-Q at 32-33 (same); App. 248-49, Ex. 4, Aug. 9, 2018 Form 10-Q at 36-37 (same); App. 318-19, Ex. 6, Nov. 8, 2018 Form 10-Q at 38-39 (same); App. 416-17, Ex. 9, Mar. 20, 2019 Form 10-K at 56-57 (same); App. 539, Ex. 11, May 10, 2019 Form 10-Q at 31 (same); App. 580-81, Ex. 12, Aug. 8, 2019 Form 10-Q at 30-31 (same); App. 645-46, Ex. 14, Nov. 12, 2019 Form 10-Q at 32-33 (same).

"[b]ecause EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility."[16]

Exela's disclosures and Plaintiffs' own allegations also refute Plaintiffs' assertion that, by adding optimization and restructuring expenses back to Adjusted EBITDA, Exela was conveying a misleading impression that these expenses were "non-recurring."  (*See* Compl. ¶¶ 10, 89-107.) Plaintiffs fail to identify any instance in which Exela represented to investors that these expenses would not recur in subsequent quarters.  To the contrary, Plaintiffs admit that Exela told investors it excluded optimization and restructuring expenses not because they would never recur, but instead due to their "significant variability."  (*See* Compl. ¶¶ 123, 126.)  Plaintiffs also admit that Exela told analysts that these expenses would continue "on a go-forward basis." (*See* Compl. ¶ 125.)  Indeed, Exela consistently told investors during 2018 and 2019 that it expected optimization and restructuring costs to continue.[17]  Plaintiffs admit that Defendant Cogburn told investors that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline," which "will result increasingly in the convergence of adjusted EBITDA and EDITDA."[18]  Telling investors that "we

---

[16] *See id.*

[17] *See, e.g.*, App. 208, Ex. 3, May 10, 2018 Earnings Tr. at 14 ("I think that obviously, with the acquisition of Asterion, we're going to have some more [optimization and restructuring costs]. I think we're working through that at this point in time."); App. 268, Ex. 5, Aug. 9, 2018 Earnings Tr. at 9 ("we will continue to have some of the biz op and restructuring on a go-forward basis"); App. 334, Ex. 7, Nov. 8, 2018 Earnings Tr. at 6 ("As part of the increased concentration of higher automation deals, we are incurring business optimization costs. We expect these costs to decline as we implement our transformational model.").

[18] *See* Compl. ¶ 122; *see also id.* ¶ 128 ("[A]s we continue to convert the savings, our GAAP EDITDA will expand and adjusted EBITDA – and the percentage of adjustments will shrink in the future").

believe" optimization and restructuring expenses "will gradually decline" over time and "will shrink in the future" is vastly different from telling investors that such expenses would not recur.

Plaintiffs also assert that the testimony during the Appraisal Action regarding SourceHOV's calculation of Adjusted EBITDA somehow renders Exela's disclosures misleading. (*See* Compl. ¶¶ 94-107.)  It does not.  The fact that experts and witnesses disagreed as to what metrics and expenses were most relevant from a valuation standpoint (as opposing parties and experts commonly do in appraisal cases) does not show that Exela misrepresented anything to investors about how Adjusted EBITDA was calculated.  Again, Exela expressly disclosed how Adjusted EBITDA was calculated, made clear that optimization and restructuring expenses would continue to occur in future quarters, and stated that Exela's calculation of Adjusted EBITDA "may not be comparable to similarly-titled measures of other companies."  (*See supra* at 5-6.)

### *Exela's Forward-Looking Revenue Guidance and "Visibility"*

Plaintiffs also fault Exela for not achieving all of its financial projections, but plead no particularized facts showing that Exela knew in advance that it would not perform as well as expected.  The Complaint alleges that "Exela issued aggressive guidance for 2018 of $1.51B-$1.54B in revenue" and misled investors by stating that "[w]e have over 90% visibility in revenue" given that much of Exela's revenue came from long-term customer contracts with a high rate of renewal.  (*See* Compl. ¶¶ 5, 118, 130-32.)  Even taking into account the restatement, however, Exela actually ***exceeded*** its 2018 revenue guidance, earning $1,586,222 in revenue for the year.[19] Plaintiffs further allege no facts disputing Exela's statements that the vast majority of its revenue during 2018 and 2019 came from long-term customer contracts with a high renewal rate.

---

[19] *See* App. 727, Ex. 16, June 9, 2020 Form 10-K at 50; *see also* Compl. ¶ 151.

On March 19, 2019, Exela provided 2019 revenue guidance of $1.66 billion to $1.7 billion and stated that "historically, we typically have about 90% visibility into the next 12 months." (Compl. ¶ 151.)  Plaintiffs allege no facts showing that Exela did not in fact "historically" have 90% visibility in prior years, including in 2018 when revenue guidance was fully achieved.

On May 9, 2019, Exela disclosed first quarter revenue of $404.8 million, which was fully consistent with a full-year revenue expectation of $1.66 billion or more.  (*See* Compl. ¶ 159.) Exela also disclosed that it "continue[s] to exit low margin contracts where customers do not have a path going forward towards automation."  (*See* Compl. ¶ 161.)  There is no allegation that Exela's stock price declined after this announcement.  As Plaintiffs admit, Exela previously warned in November 2018 that it had low margin contracts that it would try to exit (including one that Exela had exited during the third quarter of 2018).  (*See* Compl. ¶¶ 142, 146) (disclosing that Exela "still had some low-margin business, but as we put in our technology and automation, we're looking to change that margin profile.  This was an opportunity to get out of a contract that has shifted on us, and it was the right thing to do.  So we are a public company and we prefer to have profitable contracts versus contracts that [go] the other way.")  Exela never represented that all of its contracts were profitable or high-margin, and instead made clear that reducing its reliance on lower-margin contracts was part of its strategy.  Exela likewise never guaranteed it would be successful in migrating all of its lower-margin customers to higher-margin business arrangements, stating only that it intended "to aggressively pursue cross-sell and up-sell opportunities"  (Compl. ¶ 135.)

On August 8, 2019, Exela reduced its 2019 revenue guidance to $1.59 billion to $1.61 billion, advising investors that it was continuing to exit low margin contracts and would not receive some of the anticipated revenue from new business until next year.  (*See* Compl. ¶ 169.)  Plaintiffs plead no facts showing that Exela already knew in March or May 2019 that it would ultimately

need to reduce its full-year revenue guidance in August.  Exela further reduced its 2019 revenue

guidance on November 12, 2019 to a range of $1.55 billion to $1.56 billion.  (*See* Compl. ¶ 178.)

Again, Plaintiffs allege no facts that Defendants already knew in August that it would later reduce

its revenue guidance in November.  Exela ultimately realized $1.56 billion in revenue for 2019.[20]

Plaintiffs allege that Exela misled investors about the inclusion of pass-through "postage"

revenue in its total revenue metric and the "predictability" of this revenue stream.  (*E.g.,* Compl.

¶¶ 7, 179.)  Exela, however, disclosed from the outset that it "includes reimbursements from

customers, such as postage costs, in revenue, while the related costs are included in cost of revenue

. . . ."[21]  Exela moreover ***succeeded*** in predicting its 2018 revenue (including postage revenue),

thus confirming that Exela did indeed have considerable "visibility" over such revenue throughout

2018.[22]  In March 2019, Exela reiterated that "***historically***, we ***typically*** have about 90% visibility

into the next 12 months," a demonstrably true statement based on Exela's prior success.[23]  In

August 2019, following a decline in postage revenue, Exela promptly disclosed the impact on

revenue, reduced its guidance and warned investors that postage revenue was less predictable.[24]

Exela reduced its guidance again in November 2019 as facts continued to evolve, but ultimately

---

[20] *See* App. 727, Ex. 16, June 9, 2020 Form 10-K at 50.

[21] *See* App. 81,  Ex. 1, Mar. 16, 2018 Form 10-K at 74

[22] *See* App. 727, Ex. 16, June 9, 2020 Form 10-K at 50; *see also* Compl. ¶ 151.  The fact that Exela had $77.2 million in postage and LMCE (low margin customer exit) revenue during the fourth quarter of 2018 – ***almost exactly 25% of Exela's total 2018 postage/LMCE revenue of $310.1 million*** – is likewise consistent with postage/LMCE revenue being stable and visible during 2018. *See* App. 863-64, Ex. 17, June 9, 2020 Form 8-K, Press Release.

[23] *See* Compl. ¶ 152.

[24] *See* Ex. 13, Aug. 9, 2019 Earnings Tr. at 5, 9.  Exela also disclosed the amount of 2019 first-half revenue net of postage and the growth in such revenue versus the first half of 2018 (allowing investors to calculate the amount of postage/LMCE revenue for those periods).  *See id.* at 5.

achieved 93.9% of its original low-end 2019 guidance of $1.66 billion.[25]   Exela's actual performance is thus fully consistent with a company that derives the vast majority of its revenue from predictable contracts.  Exela moreover did not say that 100% of its postage revenue was completely unpredictable.  The only inference from these facts is that Exela legitimately believed it had 90% visibility into revenue and promptly disclosed changes as they occurred.

Plaintiffs also note that Moody's downgraded Exela's credit rating in May 2019.  (*See* Compl. ¶ 159.)  The Complaint, however, does not dispute that Exela accurately disclosed its debt obligations and pleads no particularized facts showing how the downgrade resulted from fraud.

### Exela's Forward-Looking EBITDA Guidance and Cautionary Statements

Plaintiffs also assail Exela's forward-looking EBITDA estimates and assert in conclusory fashion that Exela misled investors about the cost, margin and debt components of its business. Exela, however, warned throughout the class period that it had no crystal ball with respect to costs. In addition to the cautionary disclosures about Exela's desire to exit low-margin contracts (*see supra* at 9), Exela also warned in its March 16, 2018 Form 10-K that "[o]ur future profitability and ability to sustain positive cash flow is uncertain," that it has "significant and continuing fixed costs relating to the maintenance of our assets and business, including debt service requirements"; that its profitability "can be negatively affected by many factors, including but not limited to our inability to convince new customers to use our services or existing customers to renew their contracts or use additional services; the lengthening of our sales cycles and implementation periods; changes in our customer mix; a decision by any of our existing customers to cease or reduce using our services"; that "[w]e anticipate that we will incur increased sales and marketing and general and administrative expenses as we continue to diversify our business into new

---

[25] *See* App. 727, Ex. 16, June 9, 2020 Form 10-K at 50.

industries and geographic markets"; that "we may encounter unforeseen expenses, difficulties, complications, delays and other unknown events that cause our costs to exceed our expectations"; that many of its contracts "impose substantial costs on us" due to complex bidding and contractual requirements and increasing customer service expectations; that profitability depended on its ability to "improve its cost structure"; that "[w]e, from time to time, engage in restructuring actions to reduce our cost structure.  If we are unable to continue to maintain our cost base at or below the current level and maintain process and systems changes resulting from prior restructuring actions or to realize the expected cost reductions in the ongoing strategic transformation program, it could materially adversely affect our results of operations and financial condition."[26]

Exela made similar disclosures in its March 20, 2019 Form 10-K, which also warned investors that "[e]levated levels of leverage may harm our financial condition and results of operations"; that "we may face challenges in integrating any acquired business" and "achieving cost reductions"; that "[w]e may not always offset increased costs with increased fees under long-term contracts"; that "[o]ur business process automation solutions often require long selling cycles and long implementation periods that may result in significant upfront expenses that may not be recovered"; that its "industry is characterized by rapid technological change"; that "[t]he process of developing new services and solutions is inherently complex and uncertain"; and that "[w]e must make long-term investments and commit significant resources before knowing whether these investments will . . . generate the revenues required to provide desired returns." [27]

Exela subsequently disclosed throughout the class period that it anticipated significant costs associated with its post-merger restructuring and integration efforts, and that while it hoped

---

[26] *See* App. 31-33, Ex. 1, Mar. 16, 2018 Form 10-K at 25-27.

[27] *See* App. 387-389, Ex. 9, Mar. 20, 2019 Form 10-K at 27-29.

to achieve future savings, the timetable or likelihood of achieving such savings was unpredictable. (*See, e.g.,* Compl. ¶¶ 217 (describing optimization and restructuring expenses as "variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs"); 219 (stating that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses ***will gradually decline***" – thus indicating to investors that Exela expected such costs to continue into 2019 and only gradually decline thereafter); 233 (disclosing that "[u]sually, revenue comes first and then – on these large contracts, and then the margins will expand ***over time***"); 234 ("[W]e've ramped some large customer contracts which incur significant costs and sometimes duplicate costs"); 238 (disclosing that Adjusted EBITDA was "partially offset by investments the Company made for growth"); 250 (disclosing in November 2018 that "[a]s part of the increased concentration of higher automation deals, we are incurring business optimization costs.  We expect these costs to decline as we implement our transformational model"); 256 (discussing significant headcount, vendor and facility costs during 2018); 260 (disclosing in March 2019 that "[t]here is still costs we need to take out on some of these tuck-in acquisitions, and we're looking to change that margin profile as we implement our suite of technology"); 269 (disclosing on May 9, 2019 that "[a]s we continue to grow and service our new and existing customers, we have seen an acceleration in our initial costs associated with these wins.  As a result, we have added to our employee base and have seen an increased use of working capital"); 276 (disclosing additional headcount and costs incurred with larger new contracts); 280 (discussing in August 2019 Exela's plan to transform lower-margin portions of the business "over time" with technology); 288 (disclosing on November 12, 2019 that "while we remain confident that the ongoing improvements we are making will fundamentally transform our COGS, they require both investment and time").

In short, Exela's disclosures accurately depicted a company making significant investments with the hope of achieving future improvements in margins.  As with all companies in competitive, rapidly-evolving high-tech industries, however, there was never any guarantee that Exela's investments would ultimately pay off, let alone within any predetermined time frame. Exela also made clear that it had significant indebtedness and low-margin revenue streams.

### The Financial Restatement

Plaintiffs lastly assert that Exela must have defrauded investors because it ultimately had to restate its financials.  Exela announced on March 16 and 17, 2020 that it would "need to restate certain of its historical financial statements," that "the obligation to pay the fair market value of the former stockholders' shares" should have been recorded as "an obligation as of the date the Appraisal Action was submitted in September 2017," and that Exela would restate its financial statements for 2017, 2018 and the interim periods through September 30, 2019 to record liabilities from $36 to $43 million as of December 31, 2017, and accruing interest on this amount at the rate set by the Court of Chancery.  (*See* Compl. ¶¶ 186-87.)  Exela also disclosed that approximately $2.4 million in professional fees and expenses that Exela had reimbursed for secondary offerings by a related party should have been recorded in 2018, and that Exela was evaluating whether certain compensation expense payments incurred during the second half of 2019 should have been recorded in a prior period.  (*See id.* ¶ 187.)

Exela completed the restatement on June 9, 2020, announcing that it was: (i) recording additional liability of $43.1 million, $40.6 million, and $37.8 million for 2019, 2018 and 2017, respectively, on account of the award and accrued interest in the Appraisal Action; (ii) reducing Exela's income by $2.4 million, $2.9 million, and $1.2 million during the same three periods, respectively, to reflect the expensing of the accrued interest on the appraisal award; (iii) reducing

Exela's 2019 income by $5.3 million for the nine months ended September 30, 2019 to reflect the expensing of related party costs that had previously been capitalized; (iv) correcting a $3.2 million overstatement of Exela's loss for 2018, which improved Exela's financial performance for that year as compared to the pre-restated version; and (v) adding $4.8 million to its loss for 2017 to correct the improper recognition of revenue from "a multiple element arrangement that included a software license where vendor specific objective evidence (VSOE) of fair value was not established for the undelivered elements of the arrangement." (*See* Compl. ¶¶ 188-93.)

Plaintiffs allege no facts supporting a strong inference that the restatement resulted from fraud. Indeed, other than citing the bare fact of the restatement and rehashing the testimony and court decision from the Appraisal Action, Plaintiffs plead no facts about the underlying accounting decisions that were later restated. There are no allegations of confidential witnesses or internal documents, for example, in which the individual Defendants were alerted in real time that Exela's accounting decisions were even remotely incorrect, let alone fraudulent. Plaintiffs do not allege what standards governed the pertinent accounting decisions. Nor are there any allegations that Exela's outside audit firm, KPMG LLP, had raised any prior concerns when it approved the numbers that were later restated.[28] The restatement allegations, even if true, do not show fraud.

## ARGUMENT AND AUTHORITIES

**I.    PLAINTIFFS HAVE NOT PLED PARTICULARIZED FACTS SHOWING AN ACTIONABLE MISSTATEMENT OR SUPPORTING A STRONG INFERENCE OF SCIENTER**

A Section 10(b) claim must be dismissed absent particularized facts:  (i) showing that a defendant's statements were materially false or misleading; and (ii) raising a "strong inference" of

---

[28] *See* Compl. ¶ 187) (identifying KPMG as Exela's auditor); *Phillips v. Harvest Nat. Res., Inc.*, 2016 WL 4523849, at *3 (S.D. Tex. Aug. 25, 2016) (fact that "major accounting firm approved the filings" that were later restated weighs against fraud).

scienter that is "cogent" and at least as compelling as the inference that no fraud occurred.[29]  As set forth above, the Fifth Circuit and this Court have granted or affirmed dismissals in cases with far more serious and particularized allegations than what Plaintiffs have furnished here.[30] Plaintiffs cannot rest on bare omissions and must identify specific affirmative statements that are rendered materially misleading by the purportedly omitted information.[31]  Nor may Plaintiffs rely on "puzzle-pled" allegations that do not connect purported allegations of fraudulent intent to specific statements by specific defendants and show why they are fraudulent.[32]

To plead a claim against Exela, Plaintiffs must plead a strong inference of scienter *personally* as to Cogburn, Reynolds and Chadha for statements that they made, and may not rely on group-pled allegations that lack specific details about specific reports or communications showing that the individual Defendants were personally aware that their statements were false.[33]

---

[29] *Indiana Elec. Workers' Pension Tr. Fund IBEW v. Shaw Group, Inc.*, 537 F.3d 527, 532–33 (5th Cir. 2008).

[30] *See supra* at 1-2, notes 1-3.

[31] *See Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."); *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 194 (2015) ("[Plaintiff] must identify particular (and material) facts . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context. . . .  That is no small task for an investor."); *Town of Davie*, 273 F. Supp. 3d at 685 ("'[I]t bears emphasis that § 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information.  Disclosure is required under these provisions only when necessary "to make. . . .statements made, in the light of the circumstances under which they were made, not misleading."'").

[32] *See In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 857-58 (N.D. Tex. 2005) (rejecting "puzzle pleading"); *Kakkar v. Bellicum Pharms., Inc.*, 2020 WL 2845279, at *4 n. 2 (S.D. Tex. May 29, 2020) ("Plaintiff has failed to tie any of the purported allegations of scienter to any specific misstatement, which weighs against a strong inference of scienter . . . .").

[33] *See Kakkar*, 2020 WL 2845279, at *4 ("Plaintiff must identify specific facts demonstrating scienter for each alleged misstatement made by each individual Defendant and not just describe what Defendants generally did or knew"); *Iron Workers Benefit and Pension Fund v. Anadarko Petroleum Corp.*, 788 F. App'x 268, 269-70 (5th Cir. 2019) (affirming dismissal despite evidence that "could have led [individual defendants] to conclude that Anadarko's Colorado operations weren't in compliance with Commission rules," where allegations did not support strong inference

That task is even more difficult here because Plaintiffs' sole allegation of "motive to defraud" is a conclusory assertion that "Exela was motivated to keep its equity value high for equity and debt capital raises," which is patently insufficient.[34] "A failure to show motive means that 'the strength of the circumstantial evidence of scienter must be correspondingly greater.'"[35]

Plaintiffs moreover cannot merely plead that a disclosure was arguably deficient, but must instead plead particularized facts showing that the challenged statements were so blatantly and inarguably misleading as to be fraudulent.[36] Scienter requires "an extreme departure from the

that "Walker and McBride were aware that Anadarko was, as a matter of law, in violation of Commission rules"); *Southland Sec. Corp. v. INSpire Ins. Sols., Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (a corporation is deemed to have scienter only if the individual who made the misrepresentation has scienter); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("Because Plaintiffs have failed to raise a strong inference of scienter as to the Individual Defendants, it has also failed to establish scienter as to Alamosa. . . . None of the confidential witness statements reported that Defendant Sharbutt was informed on any of these conference calls that there were fictitious subscriber accounts known to be uncollectible"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 868 (5th Cir. 2003) (dismissing claim where report "fail[ed] to identify exactly ***who supplied the information*** [that contradicted company's public disclosures] or ***when*** [management] knew the information"); *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 432 (5th Cir. 2002) (dismissing claim where plaintiffs "point[ed] to no specific internal or external report available [to the Defendants] at the time of the alleged misstatements that would contradict them"); *Pehlivanian v. China Gerui Advanced Materials Group, Ltd.*, 153 F. Supp. 3d 628, 653 (S.D.N.Y. 2015) ("To the extent that plaintiffs assert that defendants had access to contrary facts, ***the complaint must 'specifically identify the reports or statements containing this information'***" (internal citations omitted) (emphasis added)).

[34] *See* Compl. ¶ 324; *Abrams*, 292 F.3d at 434 (alleged motive to inflate stock price "to allow for successful stock offerings" insufficient to show scienter); *Miller v. Cadence Bancorporation*, 2020 WL 4581736, at *1, *4 (S.D. Tex. Aug. 7, 2020) (fact that company conducted stock offerings insufficient to show scienter); *Oppenheim Pramerica Asset Mgmt. S.A.R.L. v. Encysive Pharms., Inc.*, 2007 WL 2720074, at *5 (S.D. Tex. Sept. 18, 2007) (rejecting "stock offering" motive argument).

[35] *Pier 1 Imports*, 935 F.3d at 431 (quoting *Neiman v. Bulmahn*, 854 F.3d 741, 748 (5th Cir. 2017)); *Gillis v. QRX Pharma Ltd.*, 197 F. Supp. 3d 557, 600 (S.D.N.Y. 2016) ("Absent allegations of insider sales during the period of stock-price inflation, there would be no concrete benefit to defendants to justify [the] risks" that the alleged scheme "would be revealed[] in relatively short order" and would "likely have generated recriminations – or worse" for defendants).

[36] *See Ho v. Flotek*, *Indus., Inc.*, 248 F. Supp. 3d 847, 857 (S.D.T.X. 2017) ("Even if Flotek could have provided clearer disclosures . . . Flotek's actual disclosures are not so blatantly misleading as

standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it."[37]

## A.       The Appraisal Action Does Not Support a Section 10(B) Claim

Plaintiffs have failed to tie any of their copious allegations about the Appraisal Action to any specific actual purported misstatement by any Defendant.  Exela disclosed the Appraisal Action throughout the class period and made clear that Exela could not assure against the possibility of an adverse outcome in that action.  (*See supra* at 4, note 6.)  Courts routinely reject allegations that standard litigation disclosures like those made by Exela here are actionable or fraudulent.[38]  To the extent Plaintiffs assert that Exela was required to predict defeat in that action, it is well-settled that "the securities laws do not impose a general duty to disclose corporate

---

to be severely reckless."); *see also Gamboa v. Citizens, Inc.*, 2018 WL 2107205, at *3 (W.D. Tex. May 7, 2018) (plaintiff "must show more than that it is debatable whether the disclosures were adequate"); *Kalnit v. Eichler*, 264 F.3d 131, 143 (2d Cir. 2001) (claim fails where "the duty to disclose . . . was not so clear"); *In re Centerline Holdings Co. Sec. Litig.*, 613 F. Supp. 2d 394, 404 (S.D.N.Y. 2009) (scienter not pled "when it is arguable that [defendants] did not have a duty to disclose such information before they actually did"); *In re GeoPharma, Inc. Sec. Litig.*, 411 F. Supp. 2d 434, 448 (S.D.N.Y. 2006) ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders v. AVEO Pharm., Inc.*, 2015 WL 1276824, at *10 (D. Mass. Mar. 20, 2015) (no strong inference of scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable.").

[37] *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 866 (5th Cir. 2003).  Recklessness is "a state of mind *approximating actual intent, and not merely a heightened form of negligence*."  *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis added).

[38] *See In re SeaChange Intern., Inc.*, 2004 WL 240317, at *7 & *9 (D. Mass. Feb. 6, 2004) ("I find that, given the well understood vagaries of litigation, [the defendant's litigation disclosure] was not so incomplete as to mislead investors."); *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *19 (D.N.J. Dec. 27, 2019) ("Defendants' statements regarding the viability of the lawsuits against J&J clearly constitute opinions regarding the success of the litigation, rather than statements of fact."); *Axar Master Fund, Ltd. v. Bedford*, 308 F. Supp. 3d 743, 757 (S.D.N.Y. 2018) (statement that company believed claims were without merit not inconsistent with fact that company was pursuing settlement negotiations); *Eshelman v. Orthoclear Holdings, Inc.*, 2009 WL 506864, at *2 (N.D. Cal. Feb. 27, 2009) (rejecting fraud claims over litigation disclosure).

mismanagement or uncharged criminal conduct."[39]   Plaintiffs plead no particularized facts

showing that Defendants had a duty to "confess" that it was likely to lose the Appraisal Action,

which is still on appeal.  Further, given Plaintiffs' own allegations that SourceHOV was on the

"brink of insolvency," Plaintiffs can hardly assert that Defendants were reckless in believing that

SourceHOV was worth less than what Manichaean was claiming.[40]  At a minimum, the allegations

do not support a strong inference that the individual Defendants knew Exela's cautious litigation

disclosure was so blatantly and indefensibly misleading as to be fraudulent.[41]

Plaintiffs likewise fail to allege how the Chancery Court's criticism of Mr. Chadha's

testimony (or its criticism of SourceHOV's governance practices) renders any statements by Mr.

Chadha or Exela fraudulent.  The Complaint does not allege that Exela made misstatements to the

investing public regarding the "backdated" valuation, or that Exela relied on that valuation at trial.

---

[39] *See In re Browning-Ferris Indus., Inc. S'holder Deriv. Litig.*, 830 F. Supp. 361, 370 (S.D. Tex. 1993) (no duty "to confess guilt to uncharged crimes"); *Smallen v. Western Union Co.*, 2019 WL 1382823, at *13 (D. Colo. Mar. 27, 2018) (no duty for Western Union to disclose alleged regulatory noncompliance); *In re Bank of Am. Corp. Secs., Deriv. & ERISA Litig.*, 2012 WL 1353523, at *7 (S.D.N.Y. Apr. 12, 2012) ("[T]he Complaint's omission theory does not identify with particularity any statements that were rendered misleading by the omission of specific, then-unresolved investigations and litigation.").

[40] *See* Compl. ¶ 67.  As the Delaware Court observed, it is commonplace for adversaries to hold widely divergent views on valuation, and there is no allegation that the individual Defendants knew from day one that an adverse judgment was a foregone conclusion.

[41] *See Ho*, 248 F. Supp. 3d at 857 ("Even if Flotek could have provided clearer disclosures . . ., Flotek's actual disclosures are not so blatantly misleading as to be severely reckless."); *see also Gamboa*, 2018 WL 2107205, at *3 (plaintiff "must show more than that it is debatable whether the disclosures were adequate"); *Kalnit*, 264 F.3d at 143 (claim fails where "the duty to disclose . . . was not so clear"); *In re Centerline*, 613 F. Supp. 2d at 404 (scienter not pled "when it is arguable that [defendants] did not have a duty to disclose such information before they actually did"); *In re GeoPharma*, 411 F. Supp. 2d at 448 ("To infer scienter from an arguably material omission, in the face of allegations that cut against such an inference, and in the absence of valid motive allegations, would be to expand the anti-fraud provisions of the securities laws beyond their intended scope."); *Sanders*, 2015 WL 1276824, at *10 (no scienter even if statements are arguably misleading when sufficiency of disclosures is "at least debatable.").

Nor do Plaintiffs otherwise tie Mr. Chadha's testimony to any specific purported misstatements by Defendants to Exela's investors.[42]  Plaintiffs likewise fail to identify any specific instances where Exela made misrepresentations regarding SourceHOV's corporate governance practices, financial metrics or internal controls.  The allegations regarding the Appraisal Action fail to support a claim.

## B.      The Adjusted EBITDA Argument Is Completely Meritless

There is likewise no merit to Plaintiffs' argument that Exela misled investors regarding its calculation of Adjusted EBITDA, let alone with scienter.  Again, "[t]he fact that a plaintiff may 'take issue with the way [a company] ch[ooses] to calculate" a non-GAAP metric such as Adjusted EBITDA "is of no moment,' because '[i]t is not fraudulent for a reporting entity to calculate metrics that,' like EBITDA, 'are not defined under GAAP,' nor is it fraudulent for the company to 'tak[e] (or not tak[e]) into account whatever factors the reporting entity thinks appropriate – as long as the public is told exactly what the company is doing.'"[43]  Exela disclosed what the optimization and restructuring costs were, made clear they were added back to Adjusted EBITDA, and disclosed that such costs would continue for the foreseeable future.  (*See supra* at 5-8.)

## C.      The Projections, Estimates, Opinions and "Visibility" Statements Were Not False or Fraudulent

Plaintiffs have also failed to plead particularized facts showing that Exela's forward-looking estimates, statements of belief and opinions were fraudulent.  Even leaving aside the additional protections for forward-looking statements and opinions, Plaintiffs do not offer a single particularized factual allegation showing that Exela's financial projections and optimistic

---

[42] *See Kakkar*, 2020 WL 2845279, at *4 n. 2 (rejecting scienter allegation where scienter allegations not tied to any specific alleged misstatement).

[43] *See MDC*, 2016 WL 5794774, at *12 (quoting *Linn Energy*, 29 F. Supp. 3d at 426) (dismissing complaint where plaintifs were "unable to identify a single instance in which [defendants'] disclosures of how it calculated" Adjusted EBITDA "were incorrect").

statements regarding further revenue, margin and cost savings opportunities were knowingly, recklessly (or even negligently) false.  The allegations and disclosures instead depict a company that made acquisitions and investments with a sincere belief that they would bear fruit in future quarters.  Courts have rejected far stronger allegations that include significant missed projections, writedowns and detailed allegations from confidential witnesses that the individual defendants were apprised of facts contradicting their disclosures.[44]  Not a single such fact is alleged here.

Plaintiffs likewise do not plead particularized facts showing that Exela's statements about revenue "visibility" were fraudulent.[45]  As in *Kenexa*, Plaintiffs fail to plead particularized facts disputing Exela's statements about its high historical renewal rates and stable customer base, which are borne out by Exela's actual revenue performance.  Exela did not guarantee that all customers would renew in perpetuity and warned that some customers may discontinue.

Exela's statements are also protected by the PSLRA safe harbor, the bespeaks caution doctrine and the common law protections for statements of opinion.  Projections and guidance

---

[44] *See e.g., Owens*, 787 F.3d at 542-45 (allegations that a confidential witness sent an email directly to defendants detailing deficiencies in company's internal valuation models, and reiterated his or her concerns at meetings attended by defendants, did not give rise to strong inference of scienter despite company's resulting $1.62 billion impairment and subsequent bankruptcy); *Shaw Grp.*, 537 F.3d at 537-40 (affirming dismissal despite confidential witness allegations that one defendant was "informed, in great detail, . . . of all the problems associated with" the company's project-tracking software, that the company "improperly recognized millions of dollars of revenue on every single one of its EPC contracts," and that "the problems were widely known throughout the company"); *Cent. Laborers' Pension Fund v. Integrated Elec. Servs., Inc.*, 497 F.3d 546, 552 (5th Cir. 2007) (affirming dismissal despite allegations that the CEO told a confidential former executive that "he did not want to know the details of a revenue issue so that he would not be liable"); *Pier 1 Imports, Inc.*, 325 F. Supp. 3d 728, 744 (N.D. Tex. 2018) (rejecting allegations by "numerous confidential witnesses" that defendants "were personally aware of the excessive inventory and markdown risk").

[45] *See Building Trades United Pension Trust Fund v. Kenexa Corp.*, No. 09-2642, 2010 WL 3749459, at *13 (E.D. Pa. Sept. 27, 2010) ("Plaintiffs do not dispute that Kenexa's renewal rates were in the 90% range as stated during the Q2 conference call. . . ."); *id.* n. 26 ("The term 'highly visible' is frequently used in companies' quarterly reports to describe recurring revenue generated from regular clients and long-term contracts").

regarding Exela's future revenue, costs, EBITDA, business trends and other financial metrics, as well as statements about Exela's "visibility" regarding future events and the likelihood that future savings will materialize, are inherently forward-looking.[46]  Statements about the prospects of an adverse ruling in the Appraisal Action are likewise forward-looking.[47]  "'[P]rojections of future performance not worded as guarantees are generally not actionable under the federal securities laws.'"[48]  At a minimum, claims based on forward-looking statements must satisfy an "actual knowledge" standard that is more difficult than the already-rigorous severe recklessness standard.[49]  The PSLRA safe harbor and the "bespeaks caution" doctrine similarly precludes liability when, as here, the alleged misstatements are accompanied by adequate cautionary language.[50]  Many of Defendants' statements were also qualified with words like "I believe" or "I

---

[46] *See Heinze v. Tesco Corp.*, 971 F.3d 475, 484 (5th Cir. 2020) (applying safe harbor to financial projections); *In re Anheuser-Busch Inbev SA/NV Secs. Litig.*, No. 19 Civ. 5854 (AKH), 2020 WL 5819558, at * (S.D.N.Y. Sept. 29, 2020) (same).

[47] *See Hess v. Am. Phys. Cap., Inc.*, No. 5:04-CV-31, 2005 WL 459638, at *6-7 (W.D. Mich. Jan. 11, 2005) (statements about future loss reserves are forward-looking).

[48] *ABC Arbitrage v. Tchuruk*, 291 F.3d 336, 358-360 (5th Cir. 2002) (projections of "continued double-digit growth both in sales and orders for the full year" were inactionable); *In re Alamosa Holdings, Inc.*, 382 F. Supp. 2d 832, 858 (N.D. Tex. 2005) ("The setting of aggressive targets by management does not constitute securities fraud").

[49] *See* 15 U.S.C. § 78u-5(c)(1)(A), (B); *N. Port Firefighters' Pension-Local Option Plan v. Temple-Inland, Inc.*, 936 F. Supp. 2d 722, 758–59 (N.D. Tex. 2013) (granting dismissal based on safe harbor).  This is a higher standard than the "severe recklessness" standard applicable to Section 10(b) claims based on non-forward-looking statements.  *See Kurtzman v. Compaq Computer Corp.*, No. 99–779, 2000 WL 34292632, at *62 (S.D.Tex. Dec. 12, 2000) (observing that "actual knowledge" is "an even higher standard" than severe recklessness) (collecting cases).

[50] *See, e.g., Heinze*, 971 F.3d at 484 (affirming dismissal of claims over forward-looking projections accompanied by adequate cautionary language);  *Braun v. Eagle Rock Energy Partners, L.P.*, 223 F. Supp. 3d 644, 653-55 (S.D. Tex. 2016) (discussing bespeaks caution doctrine and dismissing claims); *In re Fairway Grp. Holdings Corp. Sec. Litig.*, No. 14 Civ. 0950(LAK)(AJP), 2015 WL 4931357, at *13–14 (S.D.N.Y. Aug. 19, 2015) (applying bespeaks caution doctrine where statements were "accompanied by meaningful cautionary language").

think," which signal that they are opinions.[51]  Plaintiffs must (but do not) identify "particular" omitted facts rendering opinion statements misleading, which "is no small task for an investor."[52]

Plaintiffs fail to allege particularized facts showing that any of the forward-looking statements were made with knowledge of falsity.  Further, as stated above, Exela provided extensive cautionary disclosures regarding the very risks that negatively impacted revenues and earnings: that Exela had low-margin customers that it wanted to convert to higher-margin contracts or to exit; that Exela may not succeed in convincing existing customers to "use additional services"; that Exela would continue to incur significant optimization and restructuring costs; and the risk that Exela may not achieve the anticipated benefits.  *See supra* at 7-14.

---

[51] *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183-84 (2015) (phrases "I believe" or "I think" "transforms" statement into opinion); *see, e.g.,* Compl. ¶¶ 111 ("[W]e believe we have meaningfully expanded our combined companies' addressable market opportunity"); 121 ("we do not believe [optimization and restructuring expenses" truly reflect our past, current or future operating performance"); 122 ("Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline"); 132 ("we continue to believe we're on the right trajectory"); 135 ("we believe we have meaningful opportunities"); 137 (Assertion is "a business we feel we have a good knowledge of . . ."); 156 ("[w]e believe 2018 represented the high watermark in terms of optimization and restructuring expenses.  And in time, we expect these costs to gradually decline . . . ."); 205 ("we believe [EBITDA and Adjusted EBITDA] provide useful information"); 213 ("We believe we have a number of meaningful revenue synergy opportunities"); 252 ("We believe the large and growing addressable market we operate in provides us with substantial runway for growth"); 270 ("we believe we have a higher opportunity or a better opportunity for a higher conversion rate of that pipeline"); 288 ("we believe the businesses in the second and third column from the left have the potential to generate margins approaching 35%").

[52] *See Omnicare*, 575 U.S. at 194 ("[Plaintiff] must identify particular (and material) facts . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context.  That is no small task for an investor"); *Wilbush v. Ambac Financial Grp*, 271 F. Supp. 3d 473, 491 (S.D.N.Y. 2017) (dismissing claim where complaint identified no facts showing inadequacy of loss reserves other than mere fact that reserves were later increased).

**D.     The Restatement Allegations Do Not Support a Claim**

Plaintiffs' bare allegations that Exela had to restate its financials in 2020 likewise do not support a strong inference of fraud.  The Fifth Circuit has consistently affirmed dismissal in accounting restatement cases involving far more particularized and serious allegations, holding that alleged accounting errors do not support a strong inference of scienter unless there are additional particularized allegations showing that the decisions were made with an intent to deceive.[53]  Not only are no such facts pled here, but the fact that Exela's own outside audit firm, KPMG, approved Exela's filings for the years that were later restated undercuts any inference that the accounting errors were so egregious as to support a strong inference that the individual Defendants knew they were inaccurate or were severely reckless.[54]   As courts repeatedly recognize, accounting decisions often involve significant degrees of complexity, subjectivity and

---

[53] *See Owens*, 789 F.3d at 538, 541 (affirming dismissal even though bank was required by bank regulators to write down entire $1.62 billion mortgage-backed securities portfolio); *Asar*, 768 F. App'x at 186-89 (affirming dismissal despite $87 million multi-year restatement and a publicly disclosed Audit Committee investigation that concluded the CFO had engaged in inappropriate accounting practices, fostered an inappropriate tone at the top and emphasized the achievement of financial targets that may have contributed to inappropriate accounting decisions); *Cent. Laborers*, 497 F.3d at 549-50 (holding that accounting errors leading to restatement of two-and-a-half years of public financial statements and internal control deficiencies were insufficient to support strong inference of fraud); *Abrams*., 292 F.3d at 431 (holding that $31 million overstatement of profit, multi-year financial restatement and internal control deficiencies did not support strong inference of fraud because these types of errors "can easily arise from negligence, oversight or simple mismanagement, none of which rise to the standard necessary to support a securities fraud action"); *see also Phillips*, 2016 WL 4523849, at *3 ("Publication of inaccurate accounting figures, a restatement, or a failure to follow generally accepted accounting principles do not alone support a finding of recklessness. . . .  ).

[54] *See Phillips*, 2016 WL 4523849, at *3 ("That a major accounting firm approved the filings shows that the errors were not so obvious that their publication demonstrates an intent to defraud investors . . . Corporations should be encouraged to revise and restate").

professional judgment.[55]  Even facts supporting a strong inference of "gross mismanagement" of the company's accounting function, or facts showing "gross negligence," are insufficient.[56]

## II.   THE SECTION 20 CONTROL PERSON CLAIMS ALSO FAIL

Plaintiffs' control person claim also fails, as there is no primary liability.[57]

## CONCLUSION AND PRAYER FOR RELIEF

This case sits firmly on the "dismissal" side of the PSLRA cut line.  For the reasons set forth above, the Court should dismiss this action in its entirety, with prejudice.

---

[55] *Owens*, 789 F.3d at 543 ("Applying GAAP often involves subjective determinations."); *Fine v. Am. Solar King Corp.*, 919 F.2d 290, 297 (5th Cir. 1990) ("GAAP tolerates a wide range of acceptable procedures . . . ."); *Bartesch v. Cook*, 941 F. Supp. 2d 501, 511 (D. Del. 2013) (impairment analysis inherently involved business judgment"); *Okla. Firefighters Pension & Ret. Sys. v. Student Loan Corp.*, 951 F. Supp. 2d 479, 497 (S.D.N.Y. 2013) (holding that loss reserve calculations reflect "management's opinion—based on a variety of subjective determinations—as to the likelihood and magnitude of future losses" and declining to infer scienter); *In re Crocs, Inc. Sec. Litig.*, 774 F. Supp. 2d 1122 (D. Colo. 2011) ("[T]here are too many subjective judgments regarding inventory valuation to consider Crocs' inventory figures false or misleading.").

[56] *See Goldstein v. MCI Worldcom*, 340 F.3d 238, 253-54 (5th Cir. 2003) ("gross mismanagement" of accounting compliance leading to large financial restatement fails to demonstrate strong inference of scienter); *DSAM Global Value Fund v. Altris Software, Inc.*, 288 F.3d 385, 391 (9th Cir. 2002) ("Negligence, even gross negligence, does not rise to the level of the nefarious mental state necessary to constitute securities fraud").

[57] *See Asar*, 768 F. App'x at 189 (no control person liability absent a viable primary claim).

- 25 -

Dated:  October 12, 2020

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

/s/ *Gerard G. Pecht*
Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:  (713) 651-5151

Ellen B. Sessions
State Bar No. 00796282
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7921
Telephone: (214) 855-7465

Peter A. Stokes
State Bar No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 474-5201

*Counsel for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on October 12, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

/s/ *Gerard G. Pecht*
Gerard G. Pecht

- 26 -