**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>                      Plaintiff,<br><br>     v.<br><br>EXELA TECHNOLOGIES, INC., et al.,<br><br>                  Defendants. | Case No. 3:20-cv-00691-D |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS'
MOTION TO DISMISS PLAINTIFF'S AMENDED CLASS ACTION COMPLAINT**

## **TABLE OF CONTENTS**

I.      STATEMENT OF FACTS ................................................................................. 2

        A.      Exela's Formation In A Business Combination Resulted In The Appraisal Action.... 2

        B.      Exela Omits Litigation Liability Relating to the Appraisal Action, Necessitating the Restatement of Three Years of Financial Statements ............................................. 3

        C.      Defendants Repeatedly Touted "90% Visibility" Into Exela's Revenues ............. 4

        D.      Defendants Touted An Inflated Adjusted EBITDA.............................................. 5

        E.      Exela Also Made Misleading Statements About Its Low Margin Contracts .......... 7

II.     APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION.......... 7

III.    EXELA'S OMISSION OF, AND MISREPRESENTATIONS RELATING TO, ITS KNOWN LITIGATION LIABILITY ARE ACTIONABLE ............................................. 9

IV.     DEFENDANTS' MISLEADING "VISIBILITY" STATEMENTS ARE ACTIONABLE ... 12

        A.      The "Visibility" Statements Were Materially Misleading.................................... 12

        B.      Plaintiffs' Sufficiently Allege Scienter As To The Visibility Claims ................. 15

V.      EXELA'S ADJUSTED EBITDA FIGURES WERE MATERIALLY MISLEADING .. 17

        A.      Defendants Misled Investors About Exela's O&R Costs Through Affirmative Misleading Statements And Omissions ............................................................... 17

                1.      Exela's Presentation of Its O&R Expenses, Which Were Normal Operating Expenses, Violates SEC Rules.................................................................. 18

                2.      Exela's Adjusted EBITDA Figures Were False and Misleading.............. 20

        B.      Plaintiffs Allege a Strong Inference of Scienter About Adjusted EBITDA ......... 22

        C.      Plaintiffs Allege Fraud Related To Exela's Low Margin Contracts ("LMCs") ... 24

VI.     CONTROL PERSON LIABILITY IS SUFFICIENTLY ALLEGED.............................. 25

VII.    CONCLUSION..................................................................................................... 25

## **TABLE OF AUTHORITIES**

## **CASES**

*Abrams v. Baker Hughes Inc.*,
  292 F.3d 424 (5th Cir. 2002) ............................................................................ 8, 10

*Barrie v. Intervoice-Brite*, Inc.,
  397 F.3d 249 (5th Cir. 2005) .................................................................................. 12

*Basic Inc. v. Levinson*,
  485 U.S. 224 (1988) ................................................................................................... 8

*Berger v. Compaq Computer Corp.*,
  1999 WL 33620108 (S.D. Tex. Dec. 22, 1999) ........................................................ 13

*Berson v. Applied Signal Tech.*,
  527 F.3d 982 (9th Cir. 2008) .................................................................................. 24

*Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*,
  2010 WL 3749459 (E.D. Pa. Sept. 27, 2010) ..................................................... 13, 14

*Carlton v. Cannon*,
  184 F. Supp. 3d 428 (S.D. Tex. 2016) ..................................................................... 12

*City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC*,
  423 F. Supp. 2d 348 (S.D.N.Y.2006) ....................................................................... 15

*Exch. Comm'n v. Longfin Corp.*,
  316 F. Supp. 3d 743 (S.D.N.Y. 2018) ...................................................................... 22

*Goldstein v. MCI Worldcom*,
  340 F.3d 238 (5th Cir. 2003) .................................................................................... 8

*Haack v. Max Internet Commc'ns, Inc.*,
  2002 WL 511514 (N.D. Tex. Apr. 2, 2002) .......................................................... 7, 10

*Ho v. Flotek Indus., Inc.*,
  248 F. Supp. 3d 847 (S.D. Tex. 2017) ..................................................................... 16

*In re ArthroCare Corp. Sec. Litig.*,
  726 F. Supp. 2d 696 (W.D. Tex. 2010) ............................................................ 9, 10, 16, 20

*In re Cabletron Sys., Inc.*,
  311 F.3d 11 (1st Cir. 2002) ...................................................................................... 23

*In re Cannavest Corp. Sec. Litig.*,
  307 F. Supp. 3d 222 (S.D.N.Y. 2018)................................................................ 11

*In re Cardinal Health Inc. Sec. Litig.*,
  426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................. 24

*In re Cylink Sec. Litig.*,
  178 F. Supp. 2d 1077 (N.D. Cal. 2001) ............................................................. 9

*In re Enron Corp. Sec. Derivative & ERISA Litig.*,
  762 F. Supp. 2d 942 (S.D. Tex. Dec. 8, 2010).............................................. 9, 20

*In re Fleming Co. Inc. Sec. & Derivative Litig.*,
  2004 WL 5278716 (E.D. Tex. June 16, 2004) ................................................. 15

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012).............................................................. 13

*In re New Oriental Educ. & Tech. Grp. Sec. Litig.*,
  988 F. Supp. 2d 406 (S.D.N.Y. 2013).............................................................. 10

*In re Paincare Holdings Sec. Litig.*,
  541 F. Supp. 2d 1283 (M.D. Fla. 2008) ........................................................... 16

*In re UICI Sec. Litig.*,
  2006 WL 7354417 (N.D. Tex. Sept. 29, 2006)...................................... 12, 17, 23

*In re Urban Outfitters, Inc. Sec. Litig.*,
  103 F. Supp. 3d 635 (E.D. Penn. 2015) ..................................................... 15, 23

*Investors Grp. v. Avaya, Inc.*,
  564 F.3d 242 (3d Cir.2009)............................................................................ 15

*Ironworkers Local v. Linn Energy, LLC*,
  29 F. Supp. 3d 400 (S.D.N.Y. 2014)........................................................... 21, 22

*Isquith for & on Behalf of Isquith v. Middle S. Util., Inc.*,
  847 F.2d 186 (5th Cir. 1988) ................................................................. 8, 18, 20

*Jones v. Cain*,
  600 F.3d 527 (5th Cir. 2010) ........................................................................... 8

*Lormand v. US Unwired, Inc.*,
  565 F.3d 228 (5th Cir. 2009) ................................................................. *passim*

*Manichaean Capital, LLC v. Sourcehov Holdings, Inc.*,
2020 WL 1511189 (Del.Ch. Mar. 26, 2020)........................................................... 4, 5

*Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*,
2020 WL 496606 (Del. Ch. Jan. 30, 2020) ............................................................... 1

*Milano v. Perot Sys. Corp.*,
2006 WL 929325 (N.D. Tex. Mar. 31, 2006) ......................................................... 25

*Zagami v. Nat. Health Trends Corp.*,
540 F. Supp. 2d (N.D. Tex. Mar. 26, 2008)..................................................... 17, 18

*Nathenson v. Zonagen*,
267 F.3d 400 (5th Cir. 2001) ................................................................................. 8

*North Collier Fire Control and Rescue District Firefighter Pension Plan
and Plymouth Cnty. Ret. Ass'n v. MDC Partners, Inc.*,
2016 WL 5794774 (S.D.N.Y. Sept. 30, 2016) ....................................................... 22

*Phillips v. Harvest Nat. Res., Inc.*,
2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) ....................................................... 10

*Ramirez v. Exxon Mobil Corp.*,
334 F. Supp. 3d 832 (N.D. Tex. 2018) ................................................... 7, 17, 18, 25

*Spitzberg v. Houston Am. Energy Corp.*,
758 F.3d 676 (5th Cir. 2014) ............................................................................ 8, 25

*Stratte-McClure v. Morgan Stanley*,
776 F.3d 94 (2d Cir. 2015).................................................................................... 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)............................................................................................... 8

*Trinity Wall St. v. Wal-Mart Stores, Inc.*,
792 F.3d 323 (3d Cir. 2015).................................................................................. 22

*Wu Winfred Huang v. EZCORP, Inc.*,
259 F. Supp. 3d 563 (W.D. Tex. 2017).................................................................... 9

## STATUTES

8 Del. C. § 262 ............................................................................................................. 3

## REGULATIONS

17 C.F.R. § 229.10(e)(1)(ii)(B)............................................................... 6, 17, 22

68 Fed. Reg. 4820-01 ............................................................................ 17, 19

## OTHER AUTHORITES

*Exch. Comm'n v. Safenet, Inc., et al., Civil Action No. 09-2117 (D.D.C. Nov. 12, 2009)*,
    S.E.C. Release No. 3068, 97 S.E.C. Docket 461 (Nov. 12, 2009) .................................... 18, 19

Insur Shamgunov and Elena Shamgunova ("Plaintiffs") hereby oppose Defendants' Motion to Dismiss (Dkt. 28, "Mot.") the Amended Class Action Complaint (Dkt. 26, "Complaint").[1]

## INTRODUCTION

Plaintiffs' Complaint details a multi-faceted deceit effected by Defendants that misled investors during the Class Period[2] in violation of § 10(b) in three primary ways.  First, Exela's financial statements for the annual periods ending 2017, 2018, and three quarterly statements in 2019, were admittedly materially false and misleading as a result of Defendants' omission of a known litigation liability.  That litigation liability arose out of the merger that created Exela, in which Exela paid inadequate consideration to one of its minority shareholders.  That minority shareholder invoked its appraisal rights in an action in the Delaware Court of Chancery in September 2017 (the "Appraisal Action").  In the Appraisal Action, the Chancery Court found that Exela's chair, Defendant Par Chadha, was "***not at all forthright***", "***simply not believable,***" and "***lack[ed] all credibility***"[3] and ruled that Exela owed  roughly $47.3 million to the minority holder. The falsity of the financial statements is established by Defendants' need to restate those results. Moreover, scienter is alleged where Defendants repeatedly told investors during the Class Period that they were unable to estimate Exela's appraisal liability—even after the Company's own expert witness in the Appraisal Action had, in fact, already estimated the liability.

---

[1] "Defendants" are Exela Technologies, Inc. ("Exela" or the "Company"); CEO, Ronald Cogburn ("Cogburn"); Chairman, Par Chadha ("Chadha"); and CFO, James G. Reynolds ("Reynolds"). Unless otherwise noted, all "¶__" citations are to the Complaint.

[2] The Class Period is March 16, 2018 to March 16, 2020, inclusive.  ¶1.

[3] *Manichaean Capital, LLC v. SourceHOV Holdings, Inc*., No. CV 2017-0673-JRS, 2020 WL 496606, at \*19, 21 (Del. Ch. Jan. 30, 2020), *reconsideration denied,* No. CV 2017-0673-JRS, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020) (hereinafter "Appraisal Op"). Unless otherwise noted, all emphasis is added and internal citations are omitted.

1

Second, Defendants falsely assured the market as to the predictability of Exela's revenue, stating that the Company had "90% visibility" due to recurring contracts.  In fact, Defendants never had such visibility because at least 20% of Exela's revenues came from unpredictable postage revenue, a fact Defendants knew but concealed throughout the Class Period.

Third, Defendants misleadingly touted "adjusted" EBITDA figures, engaging in accounting shenanigans that "added back" supposedly non-routine expenses.  In fact, the expenses were routine, recurring expenses, improperly added back into EBITDA with the effect of misleadingly showing higher profits—and Defendants knew it.  During the Appraisal Action, Exela's own expert witness described Exela's Adjusted EBITDA metric as "a negative checkmark of reliability."  Meanwhile, investment bankers at Morgan Stanley, who had access to nonpublic information that Exela's investors lacked, called Exela's Adjusted EBITDA addbacks "egregious."

All told, as the truth was revealed over a series of disclosures, Exela's stock took a beating: falling from $6.24 per share on the day before the first alleged Class Period drop on November 8, 2018, to just $0.15 per share on March 18, 2020, the day after the last day in the Class Period. ¶¶12-17 (detailing price drops).  In sum, the Complaint contains sufficient facts to allege Defendants' liability under §§ 10(b) and 20(a) of the Exchange Act.  The motion should be denied.

## I.    STATEMENT OF FACTS

### A.    Exela's Formation In A Business Combination Resulted In The Appraisal Action

Exela is a global business process automation provider formed by the July 2017 merger of three entities: SourceHOV, Novitex, and a Special Purpose Acquisition Corp ("SPAC") called Quinpario. ¶2.  This deal came to be known as "the Business Combination."  ¶37.  Preceding the Business Combination, SourceHov struggled with a heavy debt load and looming amortization payments on its then outstanding debt.  ¶51.  As a result, SourceHov sought and received an equity infusion from Manichaean Capital, LLC ("Manichaean").  ¶¶61-2, 72-74.  Contemporaneous with

the close of the Business Combination, SourceHov bought out Manichaean's minority interest. ¶72.  But Exela gave Manichaean inadequate consideration for its shares, so Manichaean petitioned the Court of Chancery for an appraisal determination in September 2017.  ¶73.

**B.      Exela Omits Litigation Liability Relating to the Appraisal Action, Necessitating the Restatement of Three Years of Financial Statements**

When the Appraisal Action began, Exela was required to record a liability for the difference between what it paid Manichaean and the fair market value of the tendered shares.  ¶187.  *See* 8 Del. C. § 262.  Indeed, Exela has admitted as much.  ¶187.  Rather than record the liability in 2017, however, Exela told investors throughout the Class Period that it was "unable to estimate" what its liability from the Appraisal Action could be.  *See* Defs. App. 471, 634.  This was untrue; by December 13, 2018, Exela had to submit its expert's report in the Appraisal Action[4] and that same expert testified at the appraisal action on June 5, 2019,[5] that Exela's appraisal liability was, at a minimum, $29 million.[6]  Still, Exela continued to claim that it was supposedly unable to value the Appraisal Action liability in its 2018 Form 10-K filed on March 20, 2019, and in its quarterly 10-Qs filed on May 10, 2019, August 8, 2019, and November 12, 2019.[7]

Moreover, during trial in the Appraisal Action, the Chancery Court found Chadha's testimony claiming Exela's appraisal liability was below that of the Company's own expert, "simply not credible."  Appraisal Op. at *18, 20-21.  On January 30, 2020, the court determined that the fair value of the shares was $4,591 per share, or about $47.3 million in total, before interest

---

[4] *See* Pls. App. 27-28. Ex. 4 (Delaware Court of Chancery Scheduling Order) ¶3.

[5] Exela's expert was deposed February 14, 2019 in the Appraisal Action.  Pls. App. 22-23, Ex. 3.

[6] *See* Appraisal Opinion at *1 showing Exela's expert's conclusion that $2,817 per share was owed, and at *2, showing Manichaean owned 10,304 shares. The product of the two represents the gross liability before interest, or $2,817 per share x 10,305 shares = $29,030,592 in gross liability.

[7] *See, e.g.*, Defs. Ex. 9 at App. 471; Defs. Ex. 11, at App. 526; and Defs. Ex. 14 at App. 634.

and other costs.[8]  In addition, Exela's auditor, KPMG, determined that "[t]he liability should have

been recorded in 2017 at the fair value of the shares tendered."  ¶187.  KPMG further concluded

that because Defendants failed to properly record the liability, Exela lacked effective control over

financial reporting for the period ending December 31, 2019.[9]

As a result, on March 16, 2020, Exela announced that it would postpone the release of its

2019 10-K and would need to restate its financial results for 2017, 2018, and the interim reporting

periods through September 30, 2019.  ¶¶185-187.  When Exela restated its financials on June 9,

2020, it disclosed that it had overstated income and failed to record previously undisclosed

liabilities of $43.1 million, $40.6 million, and $37.8 million for the periods ending December 31,

2019, 2018, and 2017, respectively  (the "Restatement").  ¶¶188-89.  The Restatement also

revealed that Exela had overstated its optimization and restructuring ("O&R") expenses (¶194),

enabling the Company to hit its Adjusted EBITDA forecasts.  *Id.*

### C.    Defendants Repeatedly Touted "90% Visibility" Into Exela's Revenues

Visibility was a key metric for Exela investors because one effect of the Business

Combination was that Exela became saddled with a heavy debt load (¶51),[10] leaving little margin

for error for the highly-leveraged Exela to execute its business plan.  Thus, investors were keenly

interested in visibility and predictability of Exela's revenue (¶158, 165) because they wanted to

know with some certainty that the Company could predictably generate revenue to pay its debts.

---

[8] On March 26, 2020, the court's final judgment awarded petitioners $57,698,426.  *Manichaean Capital, LLC v. Sourcehov Holdings, Inc*., 2020 WL 1511189 (Del.Ch. Mar. 26, 2020).

[9] *See* Defs. Ex. 16 at App. 751-753, 848-850.

[10] *See also*, Appraisal Opinion at *5-*6.

4

Throughout the Class Period, Defendants tried to engender investor confidence by repeatedly claiming that Exela had 90% revenue visibility.[11]  What Defendants failed to tell investors, however, is that a whopping _**20%**_ of Exela's revenue was attributable not to Exela's recurring revenue contracts, but to unpredictable, non-recurring, and low margin postage revenue. ¶¶16, 169, 178-79.  Moreover, after the Class Period, Defendants admitted that another $150 million in "transition revenue" (accounting for 9.6% of total FY 2019 revenue),[12] was also unpredictable and nonrecurring (¶198)—meaning around $425 million, or 27%, of Exela's 2018 revenue was unpredictable, and thus not highly visible.[13]  ¶¶198, 338.  Similarly, when adding $150 million of transition revenue to the $273.5 million of 2019 postage revenue, _**at least**_ 27% of Exela's 2019 revenue was unpredictable.  _Id._

### D. Defendants Touted An Inflated Adjusted EBITDA

Another key metric Exela emphasized to investors was Adjusted EBITDA.  ¶96.  Adjusted EBITDA is non-GAAP term used by investors to understand how a company performs during a normalized, or steady-state, of affairs.  ¶89.  For this reason, it is customary to exclude aberrant or unusual costs that are unlikely to appear during a normalized period.  ¶¶ 90-95.  The practice of excluding _non-recurring_ expenses from Adjusted EBITDA is, according to SourceHov's expert witness, "ubiquitous" within the financial community.  ¶¶100, 182-83.[14]  The SEC instructs that a non-GAAP measure such as Adjusted EBITDA cannot exclude, or add back, regular or recurring

---

[11] ¶¶5, 130-34, 152-54, 158, 165-66.

[12] _See_ ¶198 ($150 million/2019 revenue of $1.56 billion= 9.6%).

[13] On June 30, 2020 Exela disclosed that it had $150 million of unpredictable low-margin "annual transition revenue" that it was looking to exit over the course of the year January 1, 2020. ¶198.

[14] On p. 47 of the Complaint, Plaintiffs inadvertently mislabeled what should have been ¶183, as ¶163. The result is that there are two paragraphs 163: one on p. 39, and one on p. 47.  To avoid (more) confusion, the second ¶163 is referred to in this brief as "¶182-183".  Plaintiffs apologize to the Court and to the parties for any confusion.

expenses if such expenses are suggested to be aberrant, infrequent, or unusual if that expense is likely to occur more than once over a rolling two-year period. *See* 17 C.F.R. § 229.10(e)(1)(ii)(B). Exela described its Adjusted EBITDA metric as excluding certain "non-routine items," including O&R expenses. ¶¶127, 216, 228. But Exela's O&R expenses were not "non-routine": they recurred in every quarter. ¶120.[15] Indeed, when downgrading Exela's debt, Moody's cautioned investors that O&R expenses appeared to be, according to Moody's, "normal operating expenses." ¶167. Exela never stated that to investors.

Exela's presentation of Adjusted EBITDA misled Exela investors, and often led to confusion on conference calls about how "one timeish" some of Exela's adjustments really were. *See infra*, §V.A.2 (discussing specific analysts). Exela management has been doing this for years.

Before becoming Exela, SourceHov, led by Chadha, Cogburn, and Reynolds (¶¶80-85) did the same thing. ¶¶105-06.[16] Exela's practice of excluding normal operating costs from adjusted EBITDA was observed by SourceHov's expert (i.e., Exela's expert) witness at the Appraisal Action, where he testified that SourceHov's practice conveyed "a negative checkmark of reliability" because "there seemed to be a more than normal amount of addbacks." ¶¶ 99, 182-83(c). SourceHov's investment bankers communicated their concerns about this to SourceHov executives in 2016 (¶¶102-105, 182-183, with one investment banker calling SourceHov's adjusted EBITDA practice "egregious." ¶103. SourceHov executives knew then that only aberrant expenses should be added back. ¶94. At the Appraisal Action, SourceHov's SVP of finance testified that only "one-time and nonrecurring" expenses may be added back to SourceHov's Adjusted EBITDA. ¶94.

---

[15] For example, *see* ¶¶9,10,11,86-107,119-129,143-44,156-57,163-64,166-67, 182-83.

[16] *See also* Appraisal Op. at *2 (discussing SourceHov history); and *3 (discussing governance).

### E.       Exela Also Made Misleading Statements About Its Low Margin Contracts

Defendants also misleadingly touted Exela's supposed success in expanding customer margins by implementing automation and digital transformation.[17]   But on the May 9, 2019 earnings call, Cogburn admitted that Exela had been and would "continue to exit low margin contracts where customers do not have a path going forward towards automation"  ¶161.  After Reynolds resigned, on May 21, 2020, Exela's new CFO further revealed on June 30, 2020 that there was no chance to expand margins for a substantial number of Exela's customers (¶202)— and suggested that this had been the case for some time.[18]

## II.       APPLICABLE LEGAL STANDARDS DISFAVOR DEFENDANTS' MOTION

In the Fifth Circuit, "[m]otions to dismiss under Rule 12(b)(6) are viewed with disfavor and are rarely granted." *Lormand v. US Unwired, Inc*., 565 F.3d 228, 232 (5th Cir. 2009).  "In the securities context, Rule 12(b)(6) dismissals are difficult to obtain because the cause of action deals primarily with fact-specific inquiries." *Haack v. Max Internet Commc'ns, Inc.*, 2002 WL 511514, at *3 (N.D. Tex. Apr. 2, 2002).  The Court must "accept all factual allegations in the complaint as true" and "draw all reasonable inferences in the plaintiff's favor." *Lormand,* 565 F.3d 228, 232.

To state a claim under §10(b) and Rule 10b–5, a plaintiff must plead: "(1) a misstatement or omission; (2) of a material fact; (3) made with scienter; (4) on which the plaintiff relied; and (5) that proximately caused the plaintiff's injuries." *Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 852 (N.D. Tex. 2018).  Defendants do not dispute the falsity of the Class Period financial statements later corrected by the Restatement.  Nor do they dispute loss causation or damages, thus

---

[17] ¶¶115-116, 138-140, 142, 147, 153-155, 162, 172-174.

[18] Shrikant Sortur Exela's newly appointed CFO, stated on the June 30, 2020 earning call, "we are *increasing* our focus in 2020 on exiting certain underperforming contracts with little or no margin contribution," implying that these low margin contracts were not new in 2020. Thus, it can be inferred that Exela's unpredictable transition revenue was *at least* $150 million before 2020.

waiving their right to challenge those elements at the pleading stage.[19]

On falsity, a district court should not dismiss a complaint unless no reasonable investor could have been misled by the statement. *See Isquith for & on Behalf of Isquith v. Middle S. Util.*, *Inc.*, 847 F.2d 186, 208 (5th Cir. 1988) ("we will only remove the question from the jury if the disclosure is so obvious that reasonable minds cannot differ."). An omission is material if "it would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32, n.17 (1988).

To plead scienter, a complaint must state particularized facts supporting a strong inference that Defendants acted with either an "intent to deceive, manipulate, or defraud" or "severe recklessness." *Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 684 (5th Cir. 2014). An inference of scienter is "strong" if it is "at least as compelling" as any opposing inference. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). "[W]here there are competing inferences that establish or negate the scienter requirement, a tie favors the plaintiff." *Spitzberg*, 758 F.3d at 686.[20] The scienter inquiry is holistic: it is "whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Lormand*, at 251.

---

[19] *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010) ("Arguments raised for the first time in a reply brief are generally waived.").

[20] The court "consider[s] all the facts and circumstances alleged to determine whether they, i*n toto*, raise a requisite strong inference of scienter." *Goldstein v. MCI Worldcom*, 340 F.3d 238, at 246 (5th Cir. 2003) (citing *Abrams v. Baker Hughes Inc.*, 292 F.3d 424, 430 (5th Cir. 2002); *Nathenson v. Zonagen*, 267 F.3d 400, 410 (5th Cir. 2001)). It "consider[s] any evidence of scienter pleaded by the plaintiffs cumulatively." *Id.* at 247.

### III.   EXELA'S OMISSION OF, AND MISREPRESENTATIONS RELATING TO, ITS KNOWN LITIGATION LIABILITY ARE ACTIONABLE

The Restatement—which revealed that Exela overstated its income and adjusted EBITDA, and understated its liability during the Class Period (¶¶189-194)—constitutes an admission that the previously reported information is materially false or misleading.  *In re Enron Corp. Sec. Derivative & ERISA Litig.*, 762 F. Supp. 2d 942, 982 (S.D. Tex. Dec. 8, 2010); *In re Cylink Sec. Litig.*, 178 F. Supp. 2d 1077, 1084 (N.D. Cal. 2001) ("the mere fact that…statements were restated at all" shows falsity at pleading stage).  Thus, Defendants cannot contest that Exela's reported financial results for 2017, 2018, and the first three quarters of 2019 were materially false and misleading.  Thus, the only question is whether scienter is alleged.  *See Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 574 (W.D. Tex. 2017) (addressing only scienter where falsity conceded in restatements).  The Restatement itself, which spanned a period of more than two-and-a-half years (¶188), lends support to a strong inference of scienter.  *In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 721 (W.D. Tex. 2010) (restatement spanning several years supports scienter).

Moreover, contrary to Defendants' superficial argument that the Appraisal Action does not relate to Exela's investors (Mot. 5, 18-20), the Appraisal Action proceedings indeed reveal a plethora of facts that support scienter as to Defendants' misrepresentation and omission of Exela's known litigation liability during the Class Period.  Indeed, the Court of Chancery's findings show that Defendants knew about the litigation liability that prompted the Restatement ***well*** before that liability was belatedly disclosed to investors on March 17, 2020.  ***At the latest***, Defendants would have estimated Exela's litigation liability by the time it submitted its expert report in the Appraisal Action on December 13, 2018.  Exela's expert was deposed on February 14, 2019, and testified at trial on June 6, 2019 that Exela was liable for at least $29,030,592.  Pls. App. 22-23; n 5, *supra*.

Yet just months after its expert report in the Appraisal Action was due, Exela falsely represented to investors in its 2018 Form 10-K, filed on March 20, 2019, that "[t]he Company is unable to predict the outcome of the Appraisal Action *or estimate any loss or range of loss that may arise* from the Appraisal Action." *See* Defs. App. 471. Exela made substantially similar statements in interim filings for three quarters thereafter. *Id.* at 526, 545; Defs. Ex. 9, 11. Not only was Defendants' omission of the liability from Exela's financial statements reckless, their affirmative statements that they were unable to even estimate the liability were knowingly false and misleading: Exela *did* have a way to estimate the loss, and it had in fact already done so.

When Defendant Chadha testified in the Appraisal Action that he believed Exela actually owed less than its expert had estimated, the Court of Chancery dismissed his testimony as "simply not credible." Appraisal Op. at *20-21. The court found that "Chadha, one of Respondent's key witnesses, *was not at all forthright* in explaining the circumstances surrounding the creation of the Backdated Valuation" and was "*simply not believable*." *Id.* at *11, 19, 21. Moreover, rather than pay the Appraisal Action petitioners what they were owed in 2017 (and record it on Exela's books, as the Company was required to do), Chadha—driven by his "zeal to reach a desired litigation outcome"—contacted an investment banker and asked him to, essentially, misrepresent what Exela's liability really was. *Id.* at *20-*21. When confronted about that conduct before the court, Chadha was found to "lack all credibility." *Id.* These facts—including factual findings made by a judge, informed by evidence and expert testimony, after a three-day trial—are more than sufficient to allege a strong inference of scienter as to Defendants' omission of, and misrepresentations relating to, the Appraisal Action liability during the Class Period here.

Defendants rely on *Phillips v. Harvest Nat. Res., Inc.*, 2016 WL 4523849 (S.D. Tex. Aug. 25, 2016) for the proposition that Exela's reliance on the opinion of its auditor, KPMG, can weigh

against scienter.  Mot. at 15, n.28; 24, n.54.  But *Phillips* lacked a critical fact present here: Chadha testified under oath that he concealed material facts from Exela's auditor, including his belief that SourceHov's equity was essentially worthless at the time of the Business Combination.  ¶108. That alone renders any reliance on an auditor's opinion meaningless.  *See In re New Oriental Educ. & Tech. Grp. Sec. Litig.*, 988 F. Supp. 2d 406, 426 (S.D.N.Y. 2013) (a showing of full disclosure to auditors is needed to sustain a defense that a party acted in good faith reliance on them). Moreover, KPMG found material weaknesses in Exela's internal controls over financial reporting, including that its "internal control over financial reporting may not prevent or detect misstatements."  ¶¶187, 254, Defs.' App. 427-29.  This weighs *for scienter*, not against.  *In re Cannavest Corp. Sec. Litig.*, 307 F. Supp. 3d 222, 246 (S.D.N.Y. 2018) ("Poor internal controls over a sustained period of time" support scienter) (collecting cases).

Furthermore, Exela sought to preserve its own liquidity by amending a credit agreement months before disclosing the Appraisal liability to investors.  As of January 10, 2020, only weeks before the judgment was entered, and months before Exela disclosed its Appraisal liability to investors, Exela entered into a $160 million accounts receivable securitization facility with various lenders that referenced a $65 million liability regarding the Appraisal Action.  *See* Pls. Ex. 2., App. 115 (Article I, Section 1.01).[21]  In other words, Exela was able to estimate its liability  to obtain financing from a bank, but purportedly couldn't to comply with federal securities law.  Viewed holistically, the Complaint readily alleges a strong inference of scienter regarding Defendants' omission of, and material misrepresentations relating to, the Appraisal Action litigation liability.

---

[21] Article X, Section 10.01(u) ("If any of the following events (each and "Event of Default" shall occur: …(u) one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 (***or solely with respect to the Subject Appraisal Action, $65,000,000***).

## IV.     DEFENDANTS' MISLEADING "VISIBILITY" STATEMENTS ARE ACTIONABLE

### A.     The "Visibility" Statements Were Materially Misleading

During the Class Period, Defendants stated that Exela had 90% revenue visibility due to auto-renewing customer contracts. *E.g.*, ¶¶130, 155. In fact, at least 20% of Exela's revenue was derived from unpredictable and non-recurring postage charges. ¶¶169, 178-79. Defendants' cannot dispute those facts. Instead, Defendants' inaccurately recast a "visibility" statement made by Reynolds as supposedly relating only to the past. *See* Mot. 9, 10. Defendants quote Reynolds as saying, "***historically***, we typically have 90% visibility" (Defendants' emphasis) to imply that he was speaking only about the past. He wasn't. Reynolds's March 19, 2019 statement constituted a present tense assessment. The non-truncated statement reads: "*as we've discussed historically*, we typically have 90% visibility." ¶152. Read in context, the word "historically" establishes that the visibility issue had been *discussed* in the past, and, according to Reynolds, that visibility was continuing in the present. The statement does not mean—as Defendants argue—that visibility itself was a thing of the past. Moreover, Defendants' alternative factual interpretation is not properly resolved against Plaintiffs on a motion to dismiss; at best, it is a question for the trier of fact. *Barrie v. Intervoice-Brite*, Inc., 397 F.3d 249, 257 (5th Cir.), *opinion modified*, 409 F.3d 653 (5th Cir. 2005) ("We agree with the plaintiffs that the defendants' argument is fact-based and is therefore insufficient to support a motion to dismiss.").

Paradoxically, Defendants alternatively argue that the visibility statements were entirely forward-looking and thus insulated by the PSLRA safe harbor. Mot. 20-22. Putting aside the fact that the statements were devoid of any cautionary language, as is required to invoke safe harbor protection,[22] Reynolds' statements were not forward looking; they were present tense. *See* ¶132

---

[22] See *Lormand v. US Unwired, Inc*., 565 F.3d 228, 244 (5th Cir. 2009).

("we have good visibility into our revenue, just over 90% *at any point in time*").[23]  Defendants' own authority confirms that such statements are not subject to the safe harbor.[24]  And even if Exela's visibility statements were forward looking, the safe harbor does not apply to omissions. *See Berger v. Compaq Computer Corp.*, 1999 WL 33620108, at *14 (S.D. Tex. Dec. 22, 1999). Here, Defendants' omitted that highly unpredictable postage revenue made up about 20% of Exela's total revenue—a fact that they had a duty to disclose when assuring investors as to the "visibility" of Exela's revenue.  *In re Gen. Elec. Co. Sec. Litig.*, 857 F. Supp. 2d 367, 387 (S.D.N.Y. 2012) ("Once a company chooses to speak. . . it has a duty to disclose any additional material fact 'necessary to make the statements [already contained therein] not misleading.'").

Defendants also argue that it was *only before* March 2019 that Exela claimed to have  90% visibility.  Mot. 9-10.  Not so.  For example, during the same March 19, 2019 conference call, when an analyst asked if there was "an element of conservatism" in Exela's guidance, Reynolds responded that "we **have** great visibility into the revenue" and that the Company was "feeling good with that 90% visibility on the top line."  ¶154.  The same day, analyst firm Cantor Fitzgerald echoed Defendants' claims that Exela's visibility was continuing throughout 2019, reporting that Exela "*typically has 90% visibility into revenue growth for the next 12 months*."  *See* ¶158.

Defendants alternatively argue that Exela "disclosed from the outset" that it included postage in its revenue.  Mot. at 10.  That misses the point.  The fact is that Exela omitted that at least 20% of its revenue came from *unpredictable* postage, and that omission, had it been

---

[23] *See In re UICI Sec. Litig.*, 2006 WL 7354417, at *5 (N.D. Tex. Sept. 29, 2006) ("The statutory safe harbor provision does not protect misrepresentations made concerning historical/hard or current facts."); *Carlton v. Cannon*, 184 F. Supp. 3d 428, 494-95 (S.D. Tex. 2016) (same).

[24] *See Bldg. Trades United Pension Tr. Fund v. Kenexa Corp.*, 2010 WL 3749459, at *3 (E.D. Pa. Sept. 27, 2010) ("This Court finds the following statements . . . to **be non-forward looking**: (1)[]...(2)[]....(3) **our revenue continues to be highly visible** as a result of our diverse customer base, long-term contracts, renewal rates that continue to be in the 90%-plus range . . .").

disclosed, would have squarely contradicted Exela's repeated representations of 90% visibility.  It was not until August 8, 2019, that Exela revealed *the percentage* of its revenue that came from postage.  ¶¶169-70.  And it was not until Exela's November 12, 2019 earnings call that Defendants how unpredictable postage was as a component of revenue, claiming that it was "something we haven't been good at predicting historically" and that postage "will fluctuate quarterly."  ¶¶178-79.  The inference from that admission is that postage was actually *never* predictable.[25]

Defendants' contention that postage revenue somehow suddenly went from being predictable to unpredictable (Mot. 9-10) contradicts their own statements at the time and does not withstand scrutiny now.  Moreover, whereas Plaintiffs have sufficiently alleged that postage revenue was highly uncertain *throughout* the Class Period, Plaintiffs need not allege that Defendants knew they would have to reduce their 2020 guidance back in August 2019.  Mot. 8-9.  Rather, to allege the falsity of Defendants' "visibility" statements, Plaintiffs need only allege that Defendants misrepresented the level of revenue certainty, or predictability, of their revenue as reflected in the guidance.  *See Lormand*, 565 F.3d at 228.  Plaintiffs have done that.[26]

---

[25] Defendants reliance on *Kenexa Corp.*, 2010 WL 3749459 (Mot. at 21) is inapt because plaintiffs there never disputed the truth of defendant's 90% visibility statements, but that is exactly what is alleged (and admitted) here.  *Compare Kenexa* at *13 ("Because nothing in the Complaint demonstrates Kenxa's revenue was not highly visible as a general matter, this Court finds Defendants had no affirmative duty to disclose additional information to investors.") *with* ¶¶177-79, 181, 198, 201 (alleging Defendants claimed 90% revenue visibility, when 20% of revenue was actually "unpredictable" postage).

[26] Moreover, postage was not the only unpredictable revenue component that rendered Defendants' "visibility" claims misleading.  On June 30, 2020 Exela also disclosed that a significant amount of "transition" revenue was unpredictable.  ¶198.  When including $150 million of transition revenue with $310 million of 2018 postage revenue, as much as $460 million, or 29%, of Exela's 2018 revenue was unpredictable.  ¶¶198, 338.  And when adding $150 million of transition revenue to the $273.5 million of 2019 postage revenue, at least 27% of Exela's 2019 revenue was unpredictable, rendering the visibility claims misleading.  *Id*.

### B.    Plaintiffs' Sufficiently Allege Scienter As To The Visibility Claims

The content and context of Reynolds's statements evince scienter as he was asked directly about the effect of postage revenue on the Company's margins and gave evasive responses.  For example, on May 10, 2018 Reynolds was asked why revenue grew yet gross margin declined, and how postage influenced that.  ¶133.  Reynolds responded, "we don't really break out postage separately." *Id*.  This is strong evidence of scienter. *Inst. Investors Grp. v. Avaya, Inc*., 564 F.3d 242, 270 (3d Cir.2009); *In re Urban Outfitters, Inc. Sec. Litig.*, 103 F. Supp. 3d 635, 653 (E.D. Penn. 2015) ("maybe the most powerful evidence of scienter is the content and context" of statements "in response to analyst… questions").

Indeed, throughout the Class Period, Reynolds misleadingly and evasively fielded questions about Exela's purported 90% visibility.  For instance, on March 19, 2019, Reynolds was pointedly asked whether there was "anything in the top line we should know about" that gave Exela confidence in their guidance.  ¶¶152, 154.  In response, Reynolds cited the highly visible nature of Exela's revenue, which he reiterated was 90%.  ¶152, 154.  At that time, postage contributed 20% to Exela's full year 2018 revenue, a fact Reynolds, as CFO, knew – but investors did not until August 2019.  ¶170.  *See City of Sterling Heights Police & Fire Ret. Sys. v. Abbey Nat'l, PLC,* 423 F. Supp. 2d 348, 362 (S.D.N.Y.2006) (fact that a division was responsible for nearly a third of the company's total profit, supported scienter, and concluding that key officers should have been intimately informed with its operations).  Reynolds' November 12, 2019 admission that "we haven't been very good at predicting [postage] *historically*" (¶179) further shows Reynolds historically monitored postage revenue.[27]

---

[27] It also shows that Reynolds "had access to information suggesting that their public statements were not accurate," which can establish recklessness. *In re Fleming Co. Inc. Sec. & Derivative Litig.*, 2004 WL 5278716, at *11 (E.D. Tex. June 16, 2004) (citations omitted).

More indicia of Reynolds' scienter is that when he finally disclosed postage's contribution to revenue, he did so to try to claim that his strategy of improving margins on legacy Novitex contracts–by implementing digitization and automation–was working.  *See* ¶¶169, 172-75.  In other words, Reynolds concealed the extent of postage revenue and the impact it actually had on Exela's visibility when he thought that information did not look good for Exela (¶133, "we focus on EBITDA . . . we don't really break out postage") but disclosed it when he needed a scapegoat for Exela's deteriorating EBITDA margins (¶¶169-70, "it was important that we show what the true margins look like . . . we're being penalized by pass-through of [postage] revenue with little or no margin.").  Reynolds is a CPA with an extensive background in finance and accounting (¶¶29, 83)—his cagey responses to analyst inquiries, and his omission of postage revenue for one purpose, but disclosure of it for another, provide strong indicia of scienter.  *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) ("experience and accounting backgrounds" of CFO supported inference of scienter).[28]  Finally, Reynolds' May 21, 2020 Class Period resignation—occurring after 20 years  at the Company, but just a few months after the Restatement (¶83)—further shows scienter.  *See ArthroCare*, 726 F. Supp. 2d 696, 725 (where timing of CFO's resignation suggested it was related to the Restatement and supported scienter).

Scienter is sufficiently alleged as to Cogburn because he participated in many earnings calls throughout the Class Period, including the March 2019 earning call discussed above.  A "high-ranking company official cannot sit quietly at a conference with analysts, knowing that another official is making false statements and hope to escape liability for those statements."

---

[28] Reynolds's familiarity with revenue composition renders *Ho v. Flotek Indus., Inc*., 248 F. Supp. 3d 847 (S.D. Tex. 2017) (Mot. at 17-19) inapposite.  There, scienter was lacking where defendants "fail[ed] to plead any facts indicating any of the Defendants had an expertise in developing or testing [third party] software" that was the source of the alleged false data, or "that they had knowledge of any potential red flags about [that software's] accuracy."  *Id.* at 859.

*ArthroCare*, 726 F. Supp. 2d 696, 717.  But Cogburn did not just sit idly by, Cogburn himself touted Exela's "strong visibility" (¶¶156, 162) and because in Discovery Responses filed in the Appraisal Action, SourceHov admitted that Cogburn prepared projections and forecasts for the Company.  *See* Pls. App. 40, Ex. 5.

Finally, scienter is alleged as to all Defendants because the actions of Reynolds and Cogburn are attributable to the Company.[29]  And the desire of them all to access "desperately needed funds" is probative of scienter.[30]  Shortly before Exela admitted the unpredictable nature of its postage revenue, its liquidity had begun to evaporate and was, according to Morgan Stanley, of "primary concern" to investors.  ¶¶159, 166-67.[31]  When liquidity dries up and a company can barely cover debt service, predictability becomes paramount important to investors—providing even more motive for Exela to continue to misrepresent its purported "high visibility."

## V.    EXELA'S ADJUSTED EBITDA FIGURES WERE MATERIALLY MISLEADING

### A.    Defendants Misled Investors About Exela's O&R Costs Through Affirmative Misleading Statements And Omissions

Exela made a combination of misleading affirmative statements and omissions about its adjusted EBITDA that it had a duty to disclose under Regulation S-K Item 10(e)(1)(ii)(B)[32] and

---

[29] *See UICI Sec. Litig.*, 2006 WL 7354417, at *10 (N.D. Tex. Sept. 29, 2006); *Zagami v. Nat. Health Trends Corp.*, 540 F. Supp. 2d 705, at 714 (N.D. Tex. Mar. 26, 2008) (imputing scienter to corporation in Reg S-K case).

[30] *See Ramirez v. Exxon Mobil Corp.*, 334 F. Supp. 3d 832, 853 (N.D. Tex. 2018) ("While "[s]cienter in a particular case may not be footed solely on motives universal to corporate executives," the Fifth Circuit has recognized an exception when a company is particularly motivated to maintain or improve its credit rating to receive 'crucial' funds.").

[31] In its May 22, 2019 downgrade of Exela's debt, Moody's commented that "Liquidity will therefore remain weak while leverage will remain high, ***rendering the capital structure increasingly untenable and elevating the risk of default***." ¶167.

[32] 17 C.F.R. § 229.10(e)(1)(ii)(B) ("A registrant must not: Adjust a non–GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the

Regulation G.[33]  "Regulation G applies whenever a company subject to the periodic reporting requirements under Section 13(a) or 15(d) of the Exchange Act of 1934, or a person acting on the company's behalf, discloses publicly any material information that includes a 'non-GAAP financial measure.'"[34]  While the Fifth Circuit has not addressed whether Item 10(e)(1) or Reg G may serve as a 10(b) predicate, district courts within it have found similar rule violations to constitute actionable 10(b) claims.  *See, e.g.*, *Zagami*, 540 F. Supp. at 709 (Fitzwater, J.) (discussing violation of Item 404 of Regulation S-K); *Ramirez*., 334 F. Supp. 3d 832, 849 (noting that Item 303 may sustain affirmative duty to disclose).  The Fifth Circuit has also held that "the way in which information is disclosed" is "so important that we refused to accept the premise that prior disclosure in one communication will automatically excuse omissions in another." *Isquith*, 847 F.2d 186, 202 (5th Cir. 1988).  "***Emphasis and gloss***" can create liability under Rule 10b–5. *Id*. at 203.

### 1. Exela's Presentation of Its O&R Expenses, Which Were Normal Operating Expenses, Violates SEC Rules

In its press releases, Exela described O&R expenses as "non routine."  ¶¶120, 127, 216. Exela also said these charges "do not truly reflect [their] past, current or future operating performance." ¶121.  Finally, Defendants also said these costs were tied to particular transactions (i.e., discrete events)—implying that they were non-recurring.  *See* Mot. 7, n.17.  Defendants' example in note 17 of their Motion is salient.  By pointing to a particular transaction as the source of continued O&R expenses, investors were led to believe that these were not routine operating

---

nature of the charge or gain is such that it is reasonably likely to recur within two years ***or there was a similar charge or gain within the prior two years.***").

[33] *See* Sec. Act Release No. 33-8176, 68 Fed. Reg. 4820-01, 2003 WL 192073 (F.R.).

[34] *Sec. & Exch. Comm'n v. Safenet, Inc., et al., Civil Action No. 09-2117 (D.D.C. Nov. 12, 2009)*, S.E.C. Release No. 3068, 97 S.E.C. Docket 461 (Nov. 12, 2009).

expenses, but would instead arise only in connection with discrete deals—because routine operating expenses would persist *with or without* a transaction.  But Exela's O&R expenses were exactly that: *ordinary operating costs.  See, e.g.*, ¶167 where, after the truth was revealed, Moody's downgraded Exela's debt, in part because Moody's concluded that "restructuring charges" … **"are normal operating expenses necessary to provide its service**."

Defendants argue that Exela disclosed that Adjusted EBITDA may not be comparable to GAAP.  Mot. 6-7.  That's meaningless: the applicable rules concern *non-GAAP* compliance.  Indeed, the SEC provides issuers interpretive guidance on the point. *See* U.S. Securities and Exchange Commission, Compliance and Disclosure Interpretations: *Non-GAAP Financial Measures*, Question 100.01 (last updated May 17, 2016) ("the 2016 Interpretation").  The 2016 Interpretation gives the following example:[35]

> **Question**: Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?
>
> **Answer:** Yes. Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of the non-GAAP measure to be misleading. For example, presenting a performance measure **that excludes normal,** recurring, cash **operating expenses necessary to operate a registrant's business** could be misleading.

The SEC has secured judgments in enforcement actions for violations much like those here.

*See Sec. & Exch. Comm'n v. SafeNet, Inc., et al.,* No. 09-2117 (D.D.C. Nov. 12, 2009).  In *SafeNet*, the SEC brought an action under Reg G because the issuer "made, or caused others to make, improper accounting adjustments to various expenses including the **improper classification of ordinary operating expenses as non-recurring integration expenses** (costs incurred to integrate acquired companies into current operations)." *Id*. at *2.  More specifically, the CFO "represented

---

[35] Available at: https://www.sec.gov/divisions/corpfin/guidance/nongaapinterp.htm.

to investors that SafeNet's non-GAAP earnings results excluded certain nonrecurring expenses, when, in fact, SafeNet had misclassified and ***excluded a significant amount of recurring, operating expenses*** from its non-GAAP earnings results, in order to meet or exceed quarterly EPS targets." *Id*.  Exela did the same.  *See* ¶¶194, 325.

Finally, Plaintiffs quarrel is as much about what Exela didn't say as what it did: Exela never told investors that its O&R expenses were normal operating costs.  They needed to.  *Cf. Stratte-McClure v. Morgan Stanley*, 776 F.3d 94 (2d Cir. 2015) (A failure to make a required Item 303 disclosure  omission that can serve as the basis for a Section 10(b) securities fraud claim.").

### 2.     Exela's Adjusted EBITDA Figures Were False and Misleading

Exela falsely presented Adjusted EBITDA because after it restated its financials, the restatement revealed that Exela reduced O&R expenses, which had been improperly added back to Adjusted EBITDA.   ¶194. Thus, the restatement constitutes an admission that previously reported information was false or misleading.  *See Enron*, 762 F. Supp. 2d 942, 982, n. 25.

Exela's Adjusted EBITDA figures were also misleading.  Defendants create a straw man: they say Plaintiffs can't show an instance in which they incorrectly calculated Adjusted EBITDA. *See* Mot. 6, n.14, 43.  Even if that were true (it's not because, for example, there was a restatement), it doesn't matter whether Exela purportedly *calculated* its Adjusted EBITDA correctly.   The pertinent SEC rules do not concern accurate *calculation*, they concern misleading *presentation*. *See* the 2016 Interpretation ("For example, presenting a performance measure . . . can be misleading.").  The Fifth Circuit is in accord.  *See Isquith*, 847 F.2d 186, 202 (5th Cir. 1988) ("[***T]he way in which information is disclosed*** [is] so important that we refused to accept the premise that prior disclosure in one communication will automatically excuse omissions in another.).  Even literally accurate statements can be misleading.  *ArthroCare*, 726 F. Supp. 2d 696, 716 ("disclosure under Section 10(b) is measured not by literal truth, but by the ability of the

material to accurately inform rather than mislead prospective buyers."). As Defendants' authority states, "[o]f course, companies can also violate the securities laws by omitting to state something that is necessary to prevent a technically true statement in their disclosures from being "misleading." *Ironworkers Local v. Linn Energy, LLC*, 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014).

Here, investors were misled by Exela's Adjusted EBITDA presentation based on its violation of Reg G and Item 10(e). Morgan Stanley was misled. [36] Cantor Fitzgerald appeared misled.[37] Jefferies appeared misled.[38] The Fifth Circuit instructs that a motion to dismiss should be granted only if *no reasonable investor* could be misled, but here, several *sophisticated* investors, including Defendants' own expert,[39] were misled. Exela excluded O&R expenses so investors would think that they were not ordinary operating expenses. The investors and analysts above just had access to *public* information, so it took time for the truth to leak out: the longer O&R expenses persisted, the more apparent it became they were operating costs. By contrast, for those with access to *nonpublic* information, the deception was obvious. *See* ¶¶183-84 (Investment bankers calling addbacks "egregious" and "inflated with less than credible adjustments.").

It also matters not, as Defendants argue, whether investors may have been told that O&R would continue. Mot. 7-8. Item 10(e) states that "a registrant must not adjust a non–GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur within

---

[36] *See* ¶129 (noting that 2017 adjusted EBITDA lowered by "one-time charges" including $48 million of restructuring expenses) ¶144 (asking "how one time-ish are these investments") ¶166 (after truth revealed, writing that "**lack of disclosure** adds to the complexity of the story" and that "optimization expenses will continue to exist **despite [previously] expecting adjusted EBITDA and EBITDA to converge**.").

[37] ¶125-127 (asking whether one-time charges would "fall off in Q3," Reynolds saying, "Yes.").

[38] *See* ¶164 ("restructuring and optimization costs…they've been persistently high").

[39] Exela's expert witness testified under oath that SourceHov's adjusted EBITDA addbacks constituted "a negative checkmark of reliability" about SourceHov's financials. ¶163.

two years *or there was a similar charge or gain within the prior two years.*"    As a result, Defendants never should have adjusted its EBITDA in the way that it did—either by adding O&R costs back to earnings or by labeling such addbacks as "nonroutine" (¶120)—once it took its second charge in any given two-year period.    17 C.F.R. § 229.10(e)(1)(ii)(B).    Here that would have been the second quarter that Exela was public.    ¶120.

Finally, Defendants reliance on the nonbinding out-of-circuit cases of *MDC*[40] and *Linn Energy*[41] (Mot. at n. 13) are inapt because the 2016 Interpretation—to which this Court should show deference[42]—was not published until two years after *Linn* was decided.    Indeed, the court in *Linn* specifically noted that there was "neither guidance from the SEC nor any case law discussing Item 10(e)'s use of the [statement at issue]" at the time.    29 F. Supp. 3d 400, 431 (S.D.N.Y. 2014).    But here, the Court has the benefit of such guidance, and it is squarely on point.    *Linn* is also distinguishable on the facts because it concerns violation of Item 10(e)(1)(ii)(A) (relating to cash settlement) not 10(e)(1)(ii)(B) (relating to smoothing of purportedly infrequent charges). And while *MDC* was decided after the 2016 Interpretation was issued, it relied heavily on *Linn Energy* and failed to discuss the intervening interpretive guidance, which was published *after* the motion to dismiss in *MDC* was fully briefed.

### B.    Plaintiffs Allege a Strong Inference of Scienter About Adjusted EBITDA

As discussed above, the Appraisal Action testimony establishes actual knowledge as to Chadha and Reynolds about the impropriety of their Adjusted EBITDA calculations because

---

[40] No. 15 CIV. 6034 (RJS), 2016 WL 5794774, at *11 (S.D.N.Y. Sept. 30, 2016).

[41] 29 F. Supp. 3d 400, 426 (S.D.N.Y. 2014).

[42] *See Trinity Wall St. v. Wal-Mart Stores, Inc.*, 792 F.3d 323, 337, n.9 (3d Cir. 2015) ("Each of the SEC's interpretive releases was adopted after notice and comment and thus merits our deference.").    "This is true even if the agency's interpretation of its regulation was not promulgated through formal procedures prescribed by the APA, but, for example, is advanced in a legal brief." *Sec. & Exch. Comm'n v. Longfin Corp.*, 316 F. Supp. 3d 743, 762–63 (S.D.N.Y. 2018).

Exela's own expert witnesses testified to the issue (¶¶182-83) and Reynolds and Chadha were at trial on the same day, June 5, 2019. Moreover, deposition notices from the Appraisal Action show that Chada's deposition was taken on February 26, 2019 and SourceHov's expert was taken 12 days earlier. *See* Pls. App. 23, Ex. 3. Testimony from the Appraisal Action also establishes that Chadha was questioned about Adjusted EBITDA at his deposition. Pls. App. 52-53, Ex. 6. Thus, throughout the Class Period, Defendants knowingly presented misleading non-GAAP measures to investors. Exela only met its EBITDA guidance by adding back O&R expenses (¶¶194, 325), further supporting scienter. *See In re Cabletron Sys., Inc.*, 311 F.3d 11, 39 (1st Cir. 2002) ("Accounting shenanigans" are among the characteristic types of facts that may reveal scienter).

That SourceHov consistently received criticism about its Adjusted EBITDA and Chadha ran SourceHov, shows scienter as to him, and thus Exela. *See In re UICI Sec. Litig.*, 2006 WL 7354417, at *10 (N.D. Tex. Sept. 29, 2006) (where defendants' "other subsidiaries had histories of engaging in reckless accounting and business practices" contributed to a finding of scienter).

Chadha's desire to access "desperately needed funds" is also probative of scienter. An Exela SVP of Finance testified at the Appraisal Action how SourceHov needed funds and how Adjusted EBITDA adjustments helped obtain them.[43] On motive, nobody had a larger one than Chadha: he owns approximately 50% of Exela's stock. ¶81.

The Discovery Responses filed in the Appraisal Action, where SourceHov admitted that Chadha, Reynolds, and Cogburn prepare projections and forecasts for the Company are further evidence of scienter. *See* Pls. App. 40, Ex. 5. Cogburn also responded to analysts' questions about Adjusted EBITDA, rendering the content and context of his statements supportive of scienter. *See*

---

[43] ¶¶96, 101 ("if that was not to be added back, the EBITDA would have been lower, so which is -- which **doesn't help the company** . . . **because it was in the market to raise the debt financing**.").

*Urban Outfitters,* 103 F. Supp. 3d 635, 653.

Scienter is also shown for Cogburn and Reynolds because Adjusted EBITDA was the key metric investors focused on.   ¶96 ("EBITDA is a very important metric looked upon by all investors") ¶133 ("we focus on EBITDA").   *See In re Cardinal Health Inc. Sec. Litig.*, 426 F. Supp. 2d 688, 726 (S.D. Ohio 2006) (where Operating Revenues were analysts' and investors' "primary area of focus" "a strong inference of [ ] Defendants' scienter" was supported).

### C.    Plaintiffs Allege Fraud Related To Exela's Low Margin Contracts ("LMCs")

Cogburn and Reynolds repeatedly touted their success in expanding customer margins by implementing automation and digital transformation,[44] and therefore, undertook an obligation to fully disclose all facts necessary to make their statements not misleading.  Contrary to Defendants' claim that Exela warned in November 2018 that it had low margin contracts that it would exit (Mot. at 9), Reynolds maintained that the Company was still "looking to change that margin profile."  ¶146.  On the May 9, 2019 earnings call, the Company admitted for the first time that it had been and would "continue to exit low margin contracts where customers do not have a path going forward towards automation" (¶161), yet omitted that these customers comprised $150 million of its annual revenue (¶198) while insisting that its "transformation efforts were working." ¶174.  Such statements can allege securities fraud.[45]  Knowledge of the omitted fact undermines Defendants' rosy statements about its digital transformation solutions.

Exela was deeply embedded with its customers (¶327) and automation and digital transformation of them was a key Exela strategy[46] that Defendants said would be completed by

---

[44] ¶¶115-116, 138-140, 142, 147, 153-155, 162, 172-174.

[45] *See Berson v. Applied Signal Tech.,* 527 F.3d 982, 988 (9th Cir. 2008) ("Temporal proximity" of misleading statement and the later disclosure bolsters an inference of scienter).

[46] ¶¶113-114, 135-137, 153, 172-174.

October 2018.  ¶138.  Cogburn also said they were "actively engaged" with customers (¶116) and Cogburn and Reynolds touted the Company's success in expanding margins as a result of such process automation.[47]  Cogburn was aware of the lack of a path to automation because he tracked and reported the Company's progress in expanding margins.  ¶172.  Still, he omitted that many customers had no path to automation or digital transformation, which further supports scienter.

Even after Exela disclosed it was exiting low margin contracts, Cogburn continued to recklessly assure investors that "[w]e're going to be able to put automation where there is no automation" (¶173) and "transformation efforts are working and it'll take another 12 to 18 months to complete" (¶174), recklessly omitting that many had no path to transformation.[48]

## VI.    CONTROL PERSON LIABILITY IS SUFFICIENTLY ALLEGED

Defendants rest their control person defense on whether a primary violation has been established.  Mot. 25.  Because Plaintiffs have sufficiently alleged a primary violation, they have also alleged control person liability.  *Ramirez*, 334 F. Supp. 3d 832, 859 (N.D. Tex. 2018) ("Because Pension Fund sufficiently pleaded primary violations of the Securities Exchange Act, Pension Fund adequately pleaded Section 20(a) claims against all Defendants").

## VII.    CONCLUSION

For all these reasons, the Court should deny Defendants' entire motion. Alternatively, if the Court grants any part of the motion, Plaintiffs request leave to amend consistent with Rule 15 and this Court's practice.[49]

---

[47] ¶¶115-116, 138-140, 142, 147, 153-155, 162, 172-174.

[48] *See Spitzberg v Am. Energy Corp.,* 758 F.3d 676, 685 (5th Cir. 2014) (what defendants actually believed irrelevant to whether plaintiffs have alleged that statements were severely reckless).

[49] *Milano v. Perot Sys. Corp.*, No. CIV.A 3:02-CV-0031-D, 2006 WL 929325, at *20 (N.D. Tex. Mar. 31, 2006) (Fitzwater, J.) ("it is this court's practice to allow plaintiffs at least one opportunity to replead after the court has identified defects in a complaint to which the PSLRA applies").

Dated: December 11, 2020

Respectfully submitted,

*/s/ Joe Kendall*

Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: 214-744-3000
Facsimile: 214-744-3015
Email: jkendall@kendalllawgroup.com

*Local Counsel for Lead Plaintiffs Insur Shamgunov and Elena Shamgunova*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (*pro hac vice pending*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone:  (310) 201-9150
Facsimile:   (310) 201-9160

*Counsel for Lead Plaintiffs Insur Shamgunov and Elena Shamgunova and Lead Counsel for the Class*

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was served on all counsel of record

on December 11, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure.

*s/ Joe Kendall*
Joe Kendall