# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:20-cv-00691-D |
| Plaintiff, | |
| v. | |
| EXELA TECHNOLOGIES, INC., et al., | |
| Defendants. | |

## APPENDIX IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Lead Plaintiffs, Insur Shamgunov and Elena Shamgunova ("Plaintiffs") by and through undersigned counsel, respectfully submit this Appendix in support of their Opposition to Defendants' Motion to Dismiss.

## INDEX OF EXHIBITS

| EX. | DOCUMENT | DATE | APP. PAGE(S) |
|---|---|---|---|
| A | Declaration of Joe Kendall | 12/11/2020 | 1-3 |
| 1 | Exela's Form 8-K filed with the SEC on January 15, 2020 | 1/15/2020 | 4-9 |
| 2 | Excerpts of Exhibit 10.1 to Exela's Form 8-K filed with the SEC on January 15, 2020 | 1/10/2020 | 10-20 |
| 3 | Notice of Deposition of Respondent's Expert witness, Gregg A. Jarrell on February 14, 2019 at 9:00 am and Director, Respondent SourceHov Holdings, Inc., Parvindar Chadha, on February 26, 2019 at 10:00 am filed February 12, 2019 in the Appraisal Action | 2/12/2019 | 21-25 |

| EX. | DOCUMENT | DATE | APP. PAGE(S) |
|---|---|---|---|
| 4 | Granted (Stipulation and [Proposed] Order Governing Expert Discovery) in the Appraisal Action filed August 22, 2018 | 8/22/2018 | 26-32 |
| 5 | Respondent's (SourceHov) Responses and Objections to Petitioners' First Set of Interrogatories served on June 25, 2018 and attached as Exhibit 9 to Petitioners' Motion to Compel Depositions of Respondent's Officers and Directors Chadha, Reynolds and Cogburn and to Extend Discovery by 45 Days filed in the Appraisal Action August 2, 2018. | 6/25/2018 | 33-47 |
| 6 | Excerpts from the June 6, 2019 Trial Transcript - Volume III in the Appraisal Action | 6/6/2019 | 48-54 |

Dated:  December 11, 2020

Respectfully submitted,

*/s/ Joe Kendall*

JOE KENDALL
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
214-744-3000 / 214-744-3015 (Facsimile)
jkendall@kendalllawgroup.com

*Local Counsel for Lead Plaintiffs Insur*
*Shamgunov and Elena Shamgunova*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke ((*pro hac vice pending*)
Raymond D. Sulentic
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160

*Counsel for Lead Plaintiffs Insur Shamgunov*
*and Elena Shamgunova and Lead Counsel for*
*the Class*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on December 11, 2020, which caused an electronic copy of this document to be served on all counsel of record in this matter who have registered for ECF service.

*/s/ Joe Kendall*
JOE KENDALL

# EXHIBIT A

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:20-cv-00691-D |
| Plaintiff, | |
| v. | |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, and JAMES G. REYNOLDS, | |
| Defendants. | |

## DECLARATION OF JOE KENDALL

I, Joe Kendall, do hereby declare as follows:

1. I am an attorney licensed to practice law in the State of Texas. I am the owner of the Kendall Law Group, PLLC, and am local counsel for Lead Plaintiffs, Insur Shamgunov and Elena Shamgunova.

2. Exhibit 1 to this declaration is a true and correct copy of a Form 8-K filed with the U.S. Securities and Exchange Commission (the "SEC") by Exela on or about January 15, 2020, obtained from the SEC's public website.

3. Exhibit 2 to this declaration is a true and correct copy of excerpts of Exhibit 10.1 to the Form 8-K filed with the SEC by Exela on or about January 15, 2020, obtained from the SEC's public website.

4. Exhibit 3 to this declaration is a true and correct copy of the Notice of Deposition of Respondent's Expert witness, Gregg A. Jarrell on February 14, 2019 at 9:00 am and Director,

Respondent SourceHov Holdings, Inc., Parvindar Chadha, on February 26, 2019 at 10:00 am with Certificate of Service filed February 12, 2019 in the matter of *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, No. CV 2017-0673-JRS, 2020 WL 496606, (Del. Ch. Jan. 30, 2020), reconsideration denied, No. CV 2017-0673-JRS, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020) (the "Appraisal Action"), obtained from the Westlaw's website.

5.      Exhibit 4 to this declaration is a true and correct copy of the Granted (Stipulation and [Proposed] Order Governing Expert Discovery) filed in the Appraisal Action on August 22, 2018, obtained from the Westlaw's website.

6.       Exhibit 5 to this declaration is a true and correct copy of Respondent's (SourceHov) Responses and Objections to Petitioners' First Set of Interrogatories served on June 25, 2018 and filed in the Appraisal Action on August 2, 2018 as Exhibit 9 to Petitioners' Motion to Compel Depositions of Respondent's Officers and Directors Chadha, Reynolds and Cogburn and to Extend Discovery by 45 Days, obtained from the Westlaw's website.

7.      Exhibit 6 to this declaration is a true and correct copy of excerpts from the June 6, 2019 Trial Transcript - Volume III in the Appraisal Action, obtained from the Westlaw's website.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 11th day of December, 2020, at Dallas, Texas.

*/s/ Joe Kendall*_____
JOE KENDALL

# EXHIBIT 1

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 8-K**

**CURRENT REPORT**
**Pursuant to Section 13 or Section 15(d) of the Securities Exchange Act of 1934**

Date of Report (Date of earliest event reported): January 10, 2020

# EXELA TECHNOLOGIES, INC.

(Exact name of registrant as specified in its charter)

| Delaware | 001-36788 | 47-1347291 |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Commission File Number) | (I.R.S. Employer Identification Number) |

| **2701 E. Grauwyler Rd.** **Irving, TX** | **75061** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

Company's telephone number, including area code: **(844) 935-2832**

Securities registered pursuant to Section 12(b) of the Act:

| Title of Each Class | Trading Symbol | Name of Each Exchange on Which Registered |
|---|---|---|
| Common Stock, Par Value $0.0001 per share | XELA | The Nasdaq Stock Market LLC |

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation to the registrant under any of the following provisions:

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 or Rule 12b-2 of the Securities Exchange Act of 1934.

☐ Emerging growth company

☐ If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act.

**Item 1.01            Entry into a Material Definitive Agreement.**

On January 10, 2020 (the "Closing Date"), certain subsidiaries of Exela Technologies, Inc., a Delaware corporation (the "Company" or "us") entered into a $160 million accounts receivable securitization facility (the "A/R Facility") with a five year term. The Company used the proceeds of the initial borrowings to repay outstanding revolving borrowings under the Company's senior credit facility and to provide additional liquidity and funding for the ongoing business needs of the Company and its subsidiaries.

The documentation for the A/R Facility includes (i) a Loan and Security Agreement (the "Loan Agreement"), dated as of the Closing Date, by and among Exela Receivables 1, LLC (the "Borrower"), a wholly-owned indirect subsidiary of the Company, the lenders (each, a "Lender" and collectively the "Lenders"), TPG Specialty Lending, Inc., as administrative agent (the "Administrative Agent"), PNC Bank National Association, as LC Bank (the "LC Bank"), and the Company, as initial servicer, pursuant to which the Lenders will make loans to the Borrower to be used to purchase Receivables and related assets from the Parent SPE (ii) a First Tier Purchase and Sale Agreement (the "First Tier Purchase and Sale Agreement"), dated as of the Closing Date, by and among Exela Receivables Holdco, LLC (the "Parent SPE"), a wholly-owned indirect subsidiary of the Company, and sixteen other indirect, wholly-owned subsidiaries of the Company listed therein (collectively, the "Originators"), and the Company, as initial servicer, pursuant to which each Originator has sold or contributed and will sell or contribute to the Parent SPE certain Receivables and related assets in consideration for a combination of cash, equity in the Parent SPE and/or letters of credit issued by the LC Bank to the Originators. (iii) a Second Tier Purchase and Sale Agreement (the "Second Tier Purchase and Sale Agreement", and together with the First Tier Purchase and Sale Agreement, the "Purchase and Sale Agreements"), dated as of the Closing Date, by and among, the Borrower, the Parent SPE and the Company, as initial servicer, pursuant to which Parent SPE has sold or contributed and will sell or contribute to the Borrower certain Receivables and related assets in consideration for a combination of cash, equity in the Borrower and/or letters of credit issued by the LC Bank to the beneficiaries elected by Parent SPE (iv) the Sub-Servicing Agreement (the "Sub-Servicing Agreement"), dated as of the Closing Date, by and among the Company and each Originator, (v) the Guaranty (the "Guaranty"), dated as of the Closing Date, between the Parent SPE and the Administrative Agent, and (vi) the Performance Guaranty (the "Performance Guaranty"), dated as of the Closing Date, between the Company, as performance guarantor, and the Administrative Agent (and together with all other certificates, instruments, UCC financing statements, reports, notices, agreements and documents executed or delivered in connection with the Loan Agreement, the "Agreements").

- 2 -

The Borrower, the Company, the Parent SPE and the Originators provide customary representations and covenants under the Agreements. Receivables in the A/R Facility are subject to certain eligibility criteria, concentration limits and reserves. The Loan Agreement provides for certain events of default upon the occurrence of which the Administrative Agent may declare the facility's termination date to have occurred and declare the outstanding Loan and all other obligations of the Borrower to be immediately due and payable.

The Company and its affiliates are parties to (i) that certain First Lien Credit Agreement (the "Credit Agreement"), dated as of July 12, 2017, by and among Exela Intermediate Holdings LLC, a wholly-owned subsidiary of the Company, Exela Intermediate LLC, a wholly-owned indirect subsidiary of the Company, as the borrower, each "Subsidiary Loan Party" (as defined in the Credit Agreement) from time to time party thereto and Royal Bank of Canada, as administrative agent, (ii) that certain indenture (the "Notes Indenture") governing the 10.00% first-priority senior secured notes due 2023, dated as of July 12, 2017, among Exela Intermediate LLC and Exela Finance Inc., as issuers, and Wilmington Trust, National Association, as trustee, and (iii) that certain Collateral Agency and Security Agreement (First Lien), dated as of July 12, 2017, among Exela Intermediate LLC, the subsidiary borrowers party thereto, and Royal Bank of Canada, as collateral agent (the "Security Agreement" and together with the Credit Agreement, the Notes Indenture and any other "Credit Agreement Documents" and "Notes Indenture Documents" (each as defined in the Security Agreement), the "Existing Secured Debt Documents"). Pursuant to the Loan Agreement, each of Company, the Borrower, the Parent SPE and the Originators (the "Exela Parties") are prohibited from amending or modifying any Existing Secured Debt Documents if such amendment or modification could: (i) by its terms cause any Exela Party to be unable to perform its obligations under the Agreements, (ii) cause any inaccuracy or breach of any representation, warranty, or covenant of any Exela Party, (iii) could subject any existing or subsequently arising Collateral to an Adverse Claim (each as defined in the Loan Agreement), or (iv) adversely affect any rights or remedies of the Lenders, the LC Bank and the Administrative Agent under the Agreements.

The foregoing description of the A/R Facility does not purport to be complete and is qualified in its entirety by reference to the full text of the Loan Agreement, First Tier Purchase and Sale Agreement, Second Tier Purchase and Sale Agreement, the Sub-Servicing Agreement, the Guaranty, and the Performance Guaranty, copies of which are attached hereto as Exhibit 10.1, Exhibit 10.2, Exhibit 10.3, Exhibit 10.4, Exhibit 10.5 and Exhibit 10.6, respectively, and which are incorporated by reference herein.

### Item 2.03          Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.

The information set forth in Item 1.01 of this Current Report on Form 8-K is incorporated herein by reference.

**Item 9.01**      **Financial Statements and Exhibits.**

**(d) Exhibits**

| Exhibit No. | Description of Exhibit |
|---|---|
| 10.1 | Loan and Security Agreement, dated as of January 10, 2020, by and among Exela Receivables 1, LLC, as borrower, Exela Technologies, Inc., as initial servicer, TPG Specialty Lending, Inc., as administrative agent, PNC Bank, National Association, as LC Bank, and the lenders from time to time party thereto. |
| 10.2 | First Tier Purchase and Sale Agreement, dated as of January 10, 2020, by and among Exela Receivables Holdco, LLC, as purchaser, Exela Technologies, Inc., as initial servicer, and BancTec, Inc., Deliverex, LLC, Economic Research Services, Inc., Exela Enterprise Solutions, Inc., SourceHOV Healthcare, Inc., United Information Services, Inc., HOV Enterprise Services, Inc., HOV Services, Inc., HOV Services, LLC, J&B Software, Inc., Novitex Government Solutions, LLC, Regulus Group II LLC, Regulus Group LLC, Regulus Integrated Solutions LLC, SourceCorp BPS Inc. and Sourcecorp Management, Inc., as originators. |
| 10.3 | Second Tier Purchase and Sale Agreement, dated as of January 10, 2020, by and among Exela Receivables 1, LLC, Exela Receivables Holdco, LLC, and Exela Technologies, Inc. |
| 10.4 | Sub-Servicing Agreement, dated as of January 10, 2020, by and among Exela Technologies, Inc., as initial servicer, and BancTec, Inc., Deliverex, LLC, Economic Research Services, Inc., Exela Enterprise Solutions, Inc., SourceHOV Healthcare, Inc., United Information Services, Inc., HOV Enterprise Services, Inc., HOV Services, Inc., HOV Services, LLC, J&B Software, Inc., Novitex Government Solutions, LLC, Regulus Group II LLC, Regulus Group LLC, Regulus Integrated Solutions LLC, SourceCorp BPS Inc., Sourcecorp Management, Inc., as sub-servicers. |
| 10.5 | Guaranty, dated as of January 10, 2010, between Exela Receivables Holdco, LLC and TPG Specialty Lending, Inc. |
| 10.6 | Performance Guaranty, dated as of January 10, 2010, between Exela Technologies, Inc. and TPG Specialty Lending, Inc. |

- 4 -

**SIGNATURE**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Dated: January 15, 2020

EXELA TECHNOLOGIES, INC.

By: /s/ Erik L. Mengwall
    Name: Erik L. Mengwall
    Title: Secretary

- 5 -

# EXHIBIT 2

EX-10.1 2 tm203233d1_ex10-1.htm EXHIBIT 10.1

**Exhibit 10.1**

**EXECUTION VERSION**

### LOAN AND SECURITY AGREEMENT

Dated as of January 10, 2020

by and among

EXELA RECEIVABLES 1, LLC,
as Borrower,

THE PERSONS FROM TIME TO TIME PARTY HERETO,
as Lenders,

TPG SPECIALTY LENDING, INC.,
as Administrative Agent,

PNC BANK, NATIONAL ASSOCIATION,
as LC Bank and Syndication Agent

and

EXELA TECHNOLOGIES, INC.,
as Initial Servicer

(b)      If the Servicer ceases to be Initial Servicer or an Affiliate thereof, the Servicing Fee shall be the greater of: (i) the amount calculated pursuant to clause (a) above and (ii) an alternative amount specified by the Successor Servicer not to exceed 110% of the aggregate reasonable costs and expenses incurred by such Successor Servicer in connection with the performance of its obligations as Servicer hereunder.

SECTION 9.08.          Backup Servicer.

(a)      Within forty-five (45) days of the Closing Date, the Initial Servicer shall be delivering reporting reasonably satisfactory to the Backup Servicer for the Backup Servicer to perform the role of backup servicer with respect to the servicing, administration and collection of the Receivables. The Backup Servicer shall perform such roles and responsibilities set forth in the Backup Servicing Agreement. Each of the Initial Servicer and the Borrower hereby covenant and agree to perform each of the roles and responsibilities set forth therein to be performed by the Borrower and/or Initial Servicer.

(b)      Until the Backup Servicer or another Successor Servicer succeeds Initial Servicer as Servicer upon the occurrence of the Servicer Transfer Date, Initial Servicer shall continue to perform all servicing functions in accordance with the Transaction Documents, notwithstanding the appointment of the Backup Servicer. The Initial Servicer hereby covenants and agrees that the Initial Servicer shall provide the Backup Servicer with all necessary servicing files and records relating to the Contracts, Receivables and Related Security and the Initial Servicer shall provide to the Backup Servicer reasonable access to and use by the Backup Servicer of all licenses, software, hardware, equipment, telephone, personnel, servicing systems, employees, facilities or other accommodations necessary or desirable to perform the backup servicing functions as set forth in the Backup Servicing Agreement.

(c)      Notwithstanding anything to the contrary set forth in this Section 9.08, each of the Borrower and the Initial Servicer shall execute and deliver any and all additional papers, documents and other assurances, and shall do any and all acts and things reasonably necessary in connection with the appointment of a Backup Servicer and to enable the Backup Servicer to perform all of its duties and obligations under the Backup Servicing Agreement and to carry out the intent of the parties hereto.

## ARTICLE X

## EVENTS OF DEFAULT

SECTION 10.01.          Events of Default. If any of the following events (each an "Event of Default") shall occur:

112

(a)      Any of the following events:

(i)      any Exela Party shall fail to perform or observe any term, covenant or agreement as and when required hereunder or under any other Transaction Document (other than as referred to in clause (a)(ii) below) and such failure, solely to the extent capable of cure, shall remain unremedied for five (5) Business Days after the earlier of (x) written notice to such Exela Party (which may be by email) by the Administrative Agent and (y) actual knowledge of such Exela Party;

(ii)      any of the following shall occur: (A) any Exela Party shall fail to make any payment or deposit or transfer any monies to be made by it hereunder or under any other Transaction Document as and when due and, if such breach does not occur on the such failure shall remain unremedied for two (2) Business Days (provided, that (x) such grace period shall not apply with respect to amounts owing on the Revolving A Final Maturity Date or the Revolving B Final Maturity Date and (y) shall not be in addition to any otherwise applicable grace period for such payment), (B) the Borrower or the Servicer shall fail to deliver an Information Package or Interim Report pursuant to this Agreement or (C) the Borrower or Initial Servicer, as applicable, shall breach any provision of Sections 8.03, or any of Sections 8.04(e), 8.04(h), 8.06(a), 8.06(b), 8.06(c), 8.06(d), 8.06(i) or 8.06(j);

(b)      any representation or warranty set forth in any Transaction Document shall prove to have been false or incorrect when made or deemed to be made any Exela Party and such breach shall remain uncured (to the extent such breach may be cured) for a period of five (5) Business Days after the earlier of (x) written notice to such Exela Party (which may be by email) by the Administrative Agent, and (y) actual knowledge of such Exela Party;

(c)      (i) any event or condition occurs that (a) results in any Debt that is outstanding in an aggregate amount exceeding $25,000,000 to become due prior to its scheduled maturity (with all applicable grace periods having expired) or (b) enables or permits (with all applicable grace periods having expired) the holder or holders of any Debt that is outstanding in an aggregate amount exceeding $25,000,000 or any trustee or agent on its or their behalf to cause such debt to become due, or to require the prepayment, repurchase, redemption or defeasance thereof, prior to its scheduled maturity (whether acted upon or not), (ii) any Exela Party or any Subsidiary shall fail to pay the principal of any Debt that is outstanding in an aggregate amount exceeding $25,000,000 at the stated final maturity thereof or (iii) any "event of default" (or similar event) shall occur under the Credit Agreement; provided that this clause (c) shall not apply to any secured Debt that becomes due as a result of the voluntary sale or transfer of the property or assets securing such Debt if such sale or transfer is permitted hereunder and under the documents providing for such Debt;

(d)      an Event of Bankruptcy shall have occurred with respect to any Exela Party;

(e)      the occurrence of any litigation, arbitration proceedings or proceedings of any Governmental Authority (or in each case the occurrence of any development in respect thereof) which would reasonably be expected to result in fines, awards, assessments or damages (or the economic equivalent thereof) equal to or in excess of $10,000,000 (or solely with respect to the Borrower, $20,000) other than the Subject Appraisal Action;

113

(f)       the average of the Default Ratios for the three preceding Settlement Periods shall at any time exceed 7.00%;

(g)       the average of the Dilution Ratios for the three preceding Settlement Periods shall at any time exceed 7.25%;

(h)       the average of the Delinquency Ratios for the three preceding Settlement Periods shall at any time exceed 13.50%;

(i)       the Days' Sales Outstanding for any Settlement Period shall at any time be more than 75 days;

(j)       a Borrowing Base Deficit shall occur, and shall not have been cured within two (2) Business Days after the Borrower's knowledge or receipt of notice thereof;

(k)       a Change in Control shall occur not otherwise consented to by the Administrative Agent and the Required Lenders;

(l)       there shall have occurred any event which materially adversely affects the ability of any Originator or Pledgor to originate, or to transfer pursuant to the terms of any Purchase and Sale Agreement, Receivables of a credit quality which are at least of the credit quality of the Pool Receivables, with related Obligors that are similar to those included in the initial Credit Extension hereunder;

(m)       the Administrative Agent, for the benefit of the Secured Parties, fails at any time to have a first priority perfected security interest in all the Collateral or any Continuing Collection Account (other than such Collection Account Bank's right to set off or deduct from the Collection Accounts customary banking fees and charges pursuant to the Account Control Agreements), in each case, free and clear of any Adverse Claim;

(n)       any Letter of Credit is drawn upon and is not fully reimbursed by the Borrower within two (2) Business Days from the date of such draw;

(o)       either (i) the Internal Revenue Service shall file notice of a lien pursuant to Section 6323 of the Code with regard to any assets of any Exela Party and such lien shall not have been released within five (5) days, or (ii) the PBGC shall, or shall indicate its intention to, file notice of a lien pursuant to Section 303(k) or Section 4068 of ERISA with regard to any of the assets of any Exela Party or any of their ERISA Affiliates;

(p)       (i) the occurrence of a Reportable Event; (ii) the adoption of an amendment to a Pension Plan that would require the provision of security pursuant to Section 401(a)(29) of the Code; (iii) the failure to satisfy the minimum funding standard under Section 412 of the Code or Section 302 of ERISA with respect to any Pension Plan; (iv) the incurrence of any liability under Title IV of ERISA with respect to the termination of any Pension Plan or the withdrawal or partial withdrawal of any Exela Party or any of their respective ERISA Affiliates from any Multiemployer Plan; (v) the receipt by any of any Exela Party or any of their respective ERISA Affiliates from the PBGC or any plan administrator of any notice relating to the intention to terminate any Pension Plan or Multiemployer Plan or to appoint a trustee to administer any Pension Plan or Multiemployer Plan; (vi) the receipt by any Exela Party or any of their respective ERISA Affiliates of any notice concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent, within the meaning of Title IV of ERISA; (vii) the occurrence of a prohibited transaction with respect to any Exela Party or any of their respective ERISA Affiliates (pursuant to Section 4975 of the Code); or (viii) the occurrence or existence of any other similar event or condition with respect to a Pension Plan or a Multiemployer Plan;

114

(q)        (i) any Exela Party shall be required to register as an "investment company" within the meaning of the Investment Company Act or (ii) the Borrower becomes a "covered fund" under the Volcker Rule;

(r)        any Transaction Document shall cease to be the valid and binding obligation enforceable against any Exela Party;

(s)        any Bankruptcy Remote Entity shall fail (x) at any time (other than for ten (10) Business Days following notice of the death or resignation of any Independent Manager) to have an Independent Manager who satisfies each requirement and qualification specified in Section 8.03(c) of this Agreement for Independent Managers, (y) to timely notify the Administrative Agent of any replacement or appointment of any Person that is to serve as an Independent Manager for such Bankruptcy Remote Entity as required pursuant to Section 8.03(c) of this Agreement or (z) terminate any Independent Manager for any reason other than for cause;

(t)        the Borrower shall fail to pay in full all of its obligations to the Credit Parties hereunder and under each other Transaction Documents on or prior to (x) with respect to any Borrower Obligations (including, for the avoidance of doubt, fully funding the required amount of the LC Collateral Account) with respect to the Revolving A Commitments, the Revolving A Final Maturity Date, and (y) with respect to any Borrower Obligations with respect to the Revolving B Commitments, the Revolving B Final Maturity Date;

(u)        one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 (or solely with respect to the Subject Appraisal Action, $65,000,000) (other than judgments fully covered by insurance issued by an insurer that has irrevocably accepted coverage and has the ability to pay such judgments) shall be rendered against any Exela Party or any Subsidiary of any Exela Party or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Exela Party or any Subsidiary of any Exela Party to enforce any such judgment which is not effectively stayed for a period of ten (10) consecutive days;

115

(v)  one or more judgments shall be rendered against the Borrower;

(w)  a Material Adverse Effect shall occur with respect to any Exela Party;

(x)  (i) the occurrence of a Purchase and Sale Termination Event under any Purchase and Sale Agreement or (ii) Receivables cease being sold or contributed pursuant to any Purchase and Sale Agreement;

(y)  the Performance Guaranty is canceled, rescinded, amended, waived or otherwise modified without the prior written consent of the Required Lenders;

(z)  Liquidity shall fail to exceed $40,000,000 and such failure shall remain unremedied for three (3) consecutive Business Days and no Extension Failure has occurred and is continuing;

(aa)  any Exela Party shall terminate or modify any Sweep Instructions without the express written consent of the Administrative Agent and the Required Lenders;

(bb)  Collections in an amount exceeding the Targeted Interim Collection Account Deposit Amount at such time shall be deposited in any Interim Collection Account;

(cc)  any amount on deposit in an Interim Collection Account shall fail to be automatically transferred to a Continuing Collection Account pursuant to Sweep Instructions;

(dd)  any amount on deposit in an Interim Collection Account shall be withdrawn by any Person other than the Administrative Agent other than pursuant to the automatic transfer to a Continuing Collection Account pursuant to Sweep Instructions; or

(ee)  the incurrence of, or occurrence of any amendment or modification to, any Debt of Exela or any of its Affiliates, including (without limitation) any Existing Specified Secured Debt Documents, the effect of which could: (i) by its terms cause any Exela Party to be unable to perform its obligations under the Transaction Documents, (ii) cause any inaccuracy or breach of any representation, warranty or covenant of any Exela Party (iii) could subject any existing or subsequently arising Collateral to an Adverse Claim or (iv) adversely affect any rights or remedies of the Credit Parties under the Transaction Documents.

then, and in any such event, the Administrative Agent may (or, at the direction of the Required Lenders, shall) by notice to the Borrower (x) declare the Revolving Commitment Termination Date to have occurred (in which case the Revolving Commitment Termination Date shall be deemed to have occurred), (y) declare the Revolving A Final Maturity Date and Revolving B Final Maturity Date to have occurred (in which case each of the Revolving A Final Maturity Date and Revolving B Final Maturity Date shall be deemed to have occurred) and (z) declare the Loans, Early Commitment Termination Premium and all other Borrower Obligations to be immediately due and payable (in which case the Loans and all other Borrower Obligations shall be immediately due and payable); provided that, automatically upon the occurrence of any event (without any requirement for the giving of notice) described in subsection (d) of this Section 10.01 with respect to the Borrower, the Revolving Commitment Termination Date shall occur and the Loans, Early Commitment Termination Premium and all other Borrower Obligations shall be immediately due and payable. Upon any such declaration or designation or upon such automatic termination, the Administrative Agent and the other Secured Parties shall have, in addition to the rights and remedies which they may have under this Agreement and the other Transaction Documents, all other rights and remedies provided after default under the UCC and under other Applicable Law, which rights and remedies shall be cumulative. Any proceeds from liquidation of the Collateral shall be applied in the order of priority set forth in Section 4.01.

116

SECTION 14.21. <u>No Fiduciary Duty</u>. Each Affected Person may have economic interests that conflict with those of the Exela Parties and their Affiliates (collectively, solely for purposes of this paragraph, the "<u>Loan Parties</u>"). Each Affected Person and each Loan Party agrees that nothing in the Transaction Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty of any Affected Person and its Related Parties to any Loan Party and its Related Parties. Each Loan Party and each Affected Person acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Loan Party agrees that it will not claim that any Affected Person or their Related Parties has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Loan Party, in connection with such transaction or the process leading thereto. In addition, no Affected Person shall claim that Guggenheim Securities, LLC has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Affected Person in connection with such transaction or the process leading thereto. For purposes of this section, "<u>Related Parties</u>" means, with respect to any specified Person, such Person's Affiliates and the directors, officers, shareholders, partners, trustees, employees, agents, administrators, managers, representatives and advisors of such Person and of such Person's Affiliates.

**[Signature Pages Follow]**

142

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their respective officers thereunto duly authorized, as of the date first above written.

EXELA RECEIVABLES 1, LLC,
as the Borrower

By: /s/ James Reynolds
Name: James Reynolds
Title: Chief Financial Officer

EXELA TECHNOLOGIES, INC.,
as the Initial Servicer

By: /s/ James Reynolds
Name: James Reynolds
Title: Chief Financial Officer

S-1                                                *Loan and Security Agreement*

TPG SPECIALTY LENDING, INC.,
as Administrative Agent


By: /s/ Robert (Bo) Stanley
Name: Robert (Bo) Stanley
Title: President


TPG SPECIALTY LENDING, INC.,
as Administrative Agent


By: /s/ Robert (Bo) Stanley
Name: Robert (Bo) Stanley
Title: President


S-2                                        *Loan and Security Agreement*

PNC BANK, NATIONAL ASSOCIATION,
as LC Bank


By: /s/ Michael Brown
Name: Michael Brown
Title: Senior Vice President


PNC BANK, NATIONAL ASSOCIATION,
as a Lender


By: /s/ Michael Brown
Name: Michael Brown
Title: Senior Vice President


S-3                                          *Loan and Security Agreement*

# EXHIBIT 3

EFiled: Feb 12 2019 06:42PM EST
Transaction ID 62964127
Case No. 2017-0673-JRS

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

|  |  |  |
|---|---|---|
| MANICHAEAN CAPITAL, LLC; CHARLES CASCARILLA; EMIL KHAN WOODS; LGC FOUNDATION, INC.; IMAGO DEI FOUNDATION, INC., | : : : : : : | |
| Petitioners, | : : | |
| v. | : : | C.A. No. 2017-0673-JRS |
| SOURCEHOV HOLDINGS, INC. | : : | |
| Respondent. | : : | |

## NOTICE OF DEPOSITIONS

TO:   Brad Davey, Esq.
      Matthew Davis, Esq.
      Frank R. Martin, Esq.
      Tyson J. Prisbrey, Esq.
      Kody M. Sparks, Esq.
      Callan R. Jackson, Esq.
      Potter Anderson & Corroon LLP
      1313 North Market Street
      P.O. Box 951
      Wilmington, DE  19899-0951

PLEASE TAKE NOTICE that pursuant to Court of Chancery Rules 26 and

30, and the agreement of the parties as to deposition dates, Petitioners will depose

the following persons, one whom is Respondent's expert witness[1] and one whom is

---

[1] Furthermore, the Stipulation and Order Governing Expert Discovery, agreed to by the parties and entered by the Court on September 18, 2018 (Trans. ID 62463538) provides: "No subpoena for deposition or documents need be served on any Expert.

believed to be a person under the control of the respondent, respectively, at the locations indicated on the dates and times indicated, and will continue from day to day until completed.  The depositions will be conducted before a notary public or other person authorized to administer oaths, in conformity with Court of Chancery Rule 28(a)(1), and will be recorded by stenographic, audio, video and/or real-time transcription (*e.g.*, LiveNote) means.  Accordingly, this Notice of Depositions does not first require a commission.

All counsel of record are invited to attend and participate.

| **DEPONENT** | **LOCATION** | **DATE/TIME** |
|---|---|---|
| Gregg A. Jarrell (Respondent's Expert Witness, Forensic Economics, Inc.) | Clinton Square 75 South Clinton Ave., Suite 510 Rochester, NY 14604 | February 14, 2019 at 9:00 a.m. (EDT) |
| Par Chadha (Director, Respondent SourceHov Holdings, Inc.) | Sadis & Goldberg, LLP 551 Fifth Ave., 21st Floor, New York, NY 10176 | February 26, 2019 at 10:00 a.m. (EDT) |

---

Instead, the party who retained the Expert shall make the Expert available for a deposition at a time and place mutually agreeable to the parties."  *Id.* ¶ 9.

OF COUNSEL:

Samuel J. Lieberman
SADIS & GOLDBERG LLP
551 Fifth Avenue, 21st Floor
New York, NY 10176
(212) 573-8164


Dated: February 12, 2019

_/s/ Rudolf Koch_____
Rudolf Koch (#4947)
Matthew W. Murphy (#5938)
Anthony M. Calvano (#6265)
Richards, Layton & Finger, P.A.
One Rodney Square
920 North King Street
Wilmington, DE 19801
(302) 651-7700

*Attorneys for Petitioners*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 12th day of February 2019, a copy of the foregoing

was served by File & Serve*Xpress* upon the following counsel of record:

> Brad Davey, Esq.
> Matthew Davis, Esq.
> Frank R. Martin, Esq.
> Tyson J. Prisbrey, Esq.
> Kody M. Sparks, Esq.
> Callan R. Jackson, Esq.
> Potter Anderson & Corroon LLP
> 1313 North Market Street
> P.O. Box 951
> Wilmington, DE  19899-0951

*/s/ Matthew W. Murphy*
Matthew W. Murphy (#5938)

# EXHIBIT 4

EFiled: Aug 22 2018 04:39PM EDT
Transaction ID 62374410
Case No. 2017-0673-JRS

**GRANTED**

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANICHAEAN CAPITAL, LLC; | ) | |
| CHARLES CASCARILLA; EMIL KHAN | ) | |
| WOODS; LGC FOUNDATION INC.; | ) | |
| IMAGO DEI FOUNDATION INC., | ) | |
| | ) | |
| Petitioners, | ) | C.A. No. 2017-0673-JRS |
| v. | ) | |
| | ) | |
| SOURCEHOV HOLDINGS, INC., | ) | |
| | ) | |
| Respondent. | ) | |

## [PROPOSED] AMENDED STIPULATED SCHEDULING ORDER

**WHEREAS**, Petitioners filed their Verified Class Action Complaint on September 21, 2017; and

**WHEREAS**, on April 16, 2018, the parties submitted a [Proposed] Stipulated Scheduling Order, to govern litigation in this action until it would be trial-ready, with a trial date to be determined at a later date;

**WHEREAS**, on April 24, 2018, the Court granted the [Proposed] Stipulated Scheduling Order and set the action down for a three-day trial beginning on June 3, 2019;

**WHEREAS**, the parties have met and conferred and agreed upon this [Proposed] Amended Stipulated Scheduling Order to govern all pre-trial activities in advance of the trial;

**THEREFORE, IT IS HEREBY STIPULATED AND AGREED,** by the parties hereto, by and through their undersigned counsel and subject to the approval of the Court, as follows:

1.      Fact depositions shall occur between September 17 and October 31, 2018.

2.      Each party shall identify to the opposing party all experts on whose opinions the party intends to rely (other than experts called solely to rebut the opinions of an opposing party's expert), along with each such expert's CV, each subject matter on which the expert is expected to testify, and a brief summary of the nature of the opinions that the expert will offer, on or before November 9, 2018.

3.      The parties Opening Expert Reports shall be due December 13, 2018.

4.      The parties Rebuttal Expert Reports shall be due January 25, 2019.

5.      Expert depositions shall occur between February 4 and February 22, 2019.

6.      Petitioner and Respondent shall identify their respective trial witnesses (including adverse and third-party witnesses and experts, but not including witnesses to be called solely for purposes of rebuttal) on March 1, 2019.

7.      Between April 12 and April 17, 2019, Petitioners and Respondent shall work together to create a chronological list of Joint Exhibits, while reserving

- 2 -

all rights to supplement the Joint Exhibits at any time through trial in accordance with customary practice before the Court and the procedures set-forth in the pre-trial order.

8.      Simultaneous Pre-Trial Opening briefs shall be due April 18, 2019.

9.      Petitioner shall provide Respondent with a draft pre-trial order on or before May 3, 2019.

10.     The parties shall file any motions in limine on or before May 8, 2019. Any such motions shall be submitted in the form of a speaking motion, not to exceed 3,000 words in length.

11.     The parties shall file any responses to motions in limine on or before May 15, 2019.  Such response shall not exceed 3,000 words in length.

12.     Respondent shall provide Petitioner a mark-up of the draft pre-trial order on or before May 17, 2019.

13.     Pre-Trial Answering briefs shall be due on May 20, 2019.

14.     The parties shall submit a joint pre-trial order on or before May 22, 2019, which shall include a then-current list of Joint Exhibits.

15.     A pre-trial teleconference shall be held at 1:00 p.m. on May 28, 2019. Petitioners' counsel shall initiate the conference call.

16.     Trial shall be held on June 3-5, 2019 in Dover, Delaware, commencing each day at 9:30 a.m.

- 3 -

17.     The parties may modify the deadlines in paragraphs 1 through 7, 9 and 12 by agreement of the parties without leave of Court.  The dates and deadlines set forth in paragraphs 8, 10, 11, 13 through 16 may not be amended without further order of the Court.

18.     If a party identifies a witness for trial pursuant to paragraph 6 who has not previously been deposed in this action, that witness shall be made promptly available for deposition by the adverse party.  Following the identification of trial witnesses as set forth in paragraph 8, any party may designate additional witnesses for trial only upon agreement of the parties or leave of Court.

**RICHARDS, LAYTON & FINGER, P.A.**

*/s/ Matthew W. Murphy*
Rudolf Koch (#4947)
Matthew W. Murphy (#5938)
One Rodney Square
920 North King Street
Wilmington, DE, 19801
 (302) 651-7700

 OF COUNSEL:

 Samuel J. Lieberman
 SADIS & GOLDBERG LLP
 551 Fifth Avenue, 21st Floor
 New York, NY 10176
 (212) 573-8164

*Attorneys for Petitioners*

**POTTER ANDERSON & CORROON LLP**

 */s/ Matthew F. Davis*
 T. Brad Davey (# 5094)
 Matthew F. Davis (# 4696)
 Callan R. Jackson (#6292)
 Kody M. Sparks (#6464)
 Hercules Plaza, 6th Floor
 1313 N. Market Street
 Wilmington, DE  19801

 *Attorneys for Respondent*

IT IS SO ORDERED, this ___ day of _____, 2018

_____
                              Joseph E. Slights
                              Vice Chancellor

5899466

- 5 -

App. 031

This document constitutes a ruling of the court and should be treated as such.

|  |  |
|---|---|
| **Court:** | DE Court of Chancery Civil Action |
| **Judge:** | Joseph Slights |
| **File & Serve Transaction ID:** | 62369200 |
| **Current Date:** | Aug 22, 2018 |
| **Case Number:** | 2017-0673-JRS |
| **Case Name:** | CONF ORDER Manichaean Capital, LLC v. SourceHOV Holdings, Inc. |
| **Court Authorizer:** | Slights, Joseph |

**/s/ Judge Slights, Joseph**

# EXHIBIT 5

EFiled: Aug 02 2018 07:15PM EDT
Transaction ID 62303781
Case No. 2017-0673-JRS

# Exhibit 1

Exhibit 9

E-SERVICE
62173550
Jun 25 2018
11:50PM
File & ServeXpress

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| MANICHAEAN CAPITAL, LLC;<br>CHARLES CASCARILLA, EMIL KHAN<br>WOODS; LGC FOUNDATION INC.;<br>IMAGO DEI FOUNDATION INC., | )<br>)<br>)<br>) | |
| | ) | |
| Petitioners, | ) | C.A. No. 2017-0673-JRS |
| | ) | |
| v. | ) | |
| | ) | |
| SOURCEHOV HOLDINGS, INC., | ) | |
| | ) | |
| Respondent. | ) | |

**RESPONDENT'S RESPONSES AND OBJECTIONS TO
PETITIONERS' FIRST SET OF INTERROGATORIES**

Pursuant to Court of Chancery Rules 26 and 33, Respondent, SourceHOV Holdings, Inc. ("SourceHOV"), by and through its undersigned counsel, hereby responds and objects to Petitioners' First Set of Interrogatories (the "Interrogatories" and each an "Interrogatory").

**GENERAL OBJECTIONS**

SourceHOV asserts the following general objections to the Interrogatories, each of which shall have the same force and effect as if fully set forth in the response to each Interrogatory. Any specific objection to any individual Interrogatory shall not be construed as a waiver of any general objection.

-1-

1.      SourceHOV objects to the Interrogatories, including the definitions and instructions set forth therein, on the grounds that they seek information protected by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection against disclosure.

2.      SourceHOV's inadvertent production of any information or material protected from disclosure by the attorney-client privilege, the work product doctrine, or any other applicable privilege or protection is not intended to be and shall not be (i) a waiver of such privilege and/or protection in whole or in part or (ii) a waiver of the right to object to any use of such document or information in this or any other proceeding.

3.      The fact that SourceHOV has responded to a particular Interrogatory shall not be interpreted as implying that SourceHOV acknowledges the appropriateness of the Interrogatory or the relevance or admissibility of the information provided in response.

4.      SourceHOV's production of any document in response to these Interrogatories shall not constitute an admission as to its admissibility, relevance, or authenticity.  SourceHOV reserves the right to redact material that is irrelevant and non-responsive from any document otherwise to be produced.

5.      SourceHOV objects to the definition of "You," "Your," "SourceHOV," and the "Company" on the grounds that it includes individuals or

-2-

entities other than SourceHOV.   SourceHOV will interpret the terms "You,"
"Your," "SourceHOV," and the "Company" to mean SourceHOV Holdings, Inc.

6.    SourceHOV objects to the definition of "HGM Group" to the
extent that it includes individuals or entities other than Par Chadha, Ronald
Cogburn, and Jim Reynolds.  SourceHOV will interpret "HGM Group" to include
only these individuals.

7.    SourceHOV objects to the definition of "Novitex" on the
grounds that it includes individuals or entities other than Novitex.  SourceHOV
will interpret the term "Novitex" to mean Novitex Holdings, Inc., Novitex Parent,
L.P., and Quinpario Merger Sub II, Inc.

8.    SourceHOV objects to the definition of "Apollo" on the
grounds that it includes individuals or entities other than Apollo Global
Management, LLC.  SourceHOV will interpret the term "Apollo" to mean Apollo
Global Management, LLC.

9.    SourceHOV objects to the definition of "Exela" on the grounds
that it includes individuals or entities other than Exela Technologies, Inc.
SourceHOV will interpret the term "Exela" to mean Exela Technologies, Inc. and
its predecessor, Quinpario Acquisition Corp. 2.

10.    SourceHOV objects to the definition of "SourceHOV
Acquisition Proposal" as vague and ambiguous because it includes the phrase

"expression of interest."  SourceHOV will interpret the definition of "SourceHOV Acquisition Proposal" without that phrase.

11.     SourceHOV objects to the definition of "Document" on the grounds that it is overly broad and unduly burdensome.  SourceHOV will interpret the term "Document" consistent with the Rules of the Court of Chancery of the State of Delaware.  SourceHOV further objects to the definition of "Document" to the extent it seeks repeated production of identical versions of the same document and/or documents that differ from the original only cosmetically or by reason of the source in which they are located.

12.     SourceHOV objections to Instruction No. 19 on the grounds that it imposes requirements beyond those required by the Rules of the Court of Chancery to state a claim for privilege.  SourceHOV will produce a privilege log consistent with the Rules of the Court of Chancery and will negotiate the parameters for the form and content of privilege logs with counsel for Petitioners, including ways to potentially minimize the burden and expense for producing such a log.

13.     SourceHOV objects to the "Relevant Time Period" as overbroad and unduly burdensome.  Except as otherwise set forth below, SourceHOV will respond to the Interrogatories for the time period of July 1, 2016 to July 12, 2017.

-4-

## **RESPONSES**

INTERROGATORY NO. 1:    Identify   each   person   who   was responsible for making management projections and forecasts for the Company.

RESPONSE NO. 1:              Subject  to  and  without  waiving  its General Objections, SourceHOV responds that management projections were the product  of  a  collaborative  effort  among  the  Project  Komodo  Group,  but  that Shrikant  Sortur  and  Anubhav  Verma  were  primarily  responsible  for  creating projections and forecasts for the Company.   The members of the Project Komodo Group  were  Par  Chadha,  Jim  Reynolds,  Andrej  Jonovic,  Matt  Brown,  Anubhav Verma,  Scott  Blons,  Ron  Cogburn,  and  Shrikant  Sortur  (together,  the  "Project Komodo Group").

INTERROGATORY NO. 2:    Identify  each  person  who  had  final decision-making  authority  to  approve  and/or  issue  management  projections  and forecasts for the Company.

RESPONSE NO. 2:              Subject  to  and  without  waiving  its General Objections, SourceHOV responds that Par Chadha and Jim Reynolds had final  decision-making  authority  to  approve  and/or  issue  management  projections and forecasts for the Company.

INTERROGATORY NO. 3:    Identify   each   person   who   was responsible for communicating with the Company's financial adviser, Rothschild, Inc.  or  any  affiliate,  concerning  the  Merger,  the  BCA  Transactions,  or  any alternative SourceHOV Acquisition Proposal.

RESPONSE NO. 3:              Subject  to  and  without  waiving  its General Objections, SourceHOV responds that all members of the Project Komodo

Group communicated with Rothschild, but that Par Chadha, Jim Reynolds, Andrej Jonovic, Matt Brown, and Anubhav Verma were primarily responsible for communicating with Rothschild.

INTERROGATORY NO. 4:    Identify each employee of Rothschild, Inc. or any affiliate, who made a presentation, or otherwise provided advice, to the Company, Company management or the Company's Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal.

RESPONSE NO. 4:                Subject to and without waiving its General Objections, SourceHOV responds that the following employees of Rothschild made a presentation, or otherwise provided advice, to the Company, Company management, or the Company's Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal: Ken Surjadinata, Michael Lucas, and Robert Berger.   SourceHOV further responds that SourceHOV consulted Stephen Antinelli in connection with potential restructuring options.

INTERROGATORY NO. 5:    Identify each presentation made by Rothschild, Inc. or any affiliate, to the Company or the Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal, including identifying the meeting of the Company or Board of Directors at which such presentation was made and each person who attended such meeting.

RESPONSE NO. 5:                Subject to and without waiving its General Objections, SourceHOV responds that Rothschild made presentations concerning the Merger, the BCA Transactions, or any alternative SourceHOV

Acquisition Proposal in February and July of 2017. Members of the Project Komodo Group and Delos Capital attended the meetings at which the presentations were made.

INTERROGATORY NO. 6: Identify each person who was responsible for communicating with the Company's financial adviser, Morgan Stanley & Co., LLC, concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal.

RESPONSE NO. 6: Subject to and without waiving its General Objections, SourceHOV responds that all members of the Project Komodo Group communicated with Morgan Stanley, but that Par Chadha, Andrej Jonovic, Matt Brown, and Anubhav Verma were primarily responsible for communicating with Morgan Stanley.

INTERROGATORY NO. 7: Identify each employee of Morgan Stanley & Co., LLC or any affiliate, who made a presentation, or otherwise provided advice, to the Company, Company management or the Company's Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal.

RESPONSE NO. 7: Subject to and without waiving its General Objections, SourceHOV responds that the following employees of Morgan Stanley made a presentation, or otherwise provided advice, to the Company, Company management, or the Company's Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal: Bryce Facktor and Sandeep Sharma.

-7-

INTERROGATORY NO. 8:   Identify each presentation made by Morgan Stanley & Co., LLC or any affiliate, to the Company or the Board of Directors concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal, including identifying the meeting of the Company or Board of Directors at which such presentation was made and each person who attended such meeting.

RESPONSE NO. 8:            Subject to and without waiving its General Objections, SourceHOV responds that Morgan Stanley made presentations concerning the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal in November 2016 and January 2017.   Members of the Project Komodo Group attended the meetings at which the presentations were made.

INTERROGATORY NO. 9:   Identify each alternative SourceHOV Acquisition Proposal considered by the Company or its Board of Directors, other than the Merger and the BCA Transactions, and each person from the Company and the Board of Directors involved in considering such SourceHOV Acquisition Proposal.

RESPONSE NO. 9:            Subject to and without waiving its General Objections, SourceHOV responds that it did not seriously consider any alternative SourceHOV Acquisition Proposal other than the Merger and the BCA Transactions.

INTERROGATORY NO. 10:  Identify each person from the Company or its Board of Directors who was involved in negotiating the Merger, the BCA Transactions, or any alternative SourceHOV Acquisition Proposal.

-8-

RESPONSE NO. 10:            Subject to and without waiving its

General Objections, SourceHOV responds that Par Chadha and Jim Reynolds were

the negotiators of the Merger from SourceHOV's Board of Directors.

INTERROGATORY NO. 11: Identify each meeting of the
Company's Board of Directors, or action by written consent, in which the
Company or its Board of Directors (or any committee thereof) considered the
Merger, the BCA Transactions or any alternative SourceHOV Acquisition
Proposal, including the prior version of the BCA Transactions announced on
February 21, 2017, and identify all agendas for, all materials considered or
reviewed at, and all persons who attended, such meeting or action by written
consent.

RESPONSE NO. 11:            Subject to and without waiving its

General Objections, SourceHOV responds that SourceHOV's Board of Directors

acted by written consent regarding the Merger on February 21, 2017, June 15,

2017, and July 12, 2017.

INTERROGATORY NO. 11:  Identify any special committee or
similar committee of independent directors formed to consider, or involved in
considering, the Merger, the BCA Transactions, or any alternative SourceHOV
Acquisition Proposal, including identifying each member of such committee and
each meeting of such committee.

RESPONSE NO. 11:     Subject to and without waiving its General

Objections, SourceHOV responds that there were no special committees formed to

consider, or involved in considering, the Merger, the BCA Transactions, or any

alternative SourceHOV Acquisition Proposal.

INTERROGATORY NO. 12:  Identify each time within the past
seven years that the Company, the HGM Group, or any affiliate, retained
Rothschild, Inc. or any affiliate to provide any financial or financial advisory

-9-

services, including identifying the nature and date of the engagement and the total amounts paid to Rothschild, Inc. or its affiliate for such engagement.

RESPONSE NO. 12:          SourceHOV    objects    to    this

interrogatory as irrelevant because it does not concern the value of SourceHOV as

a standalone entity.  SourceHOV further objects to this interrogatory as overbroad

and unduly burdensome because it requests information from the "past seven

years."  SourceHOV will identify retentions of Rothschild in the past three years.

Subject to and without waiving its Specific Objections and General Objections,

SourceHOV responds that, besides in connection with the Merger, neither

SourceHOV nor HGM Group has retained Rothschild to provide any financial or

financial advisory services.  SourceHOV further responds that the fees paid to

Rothschild were approximately $10 million.

INTERROGATORY NO. 13:  Identify each time within the past seven years that the Company, the HGM Group, or any affiliate, retained Morgan Stanley & Co., LLC, or any affiliate to provide any financial or financial advisory services, including identifying the nature and date of the engagement and the total amounts paid to Morgan Stanley & Co., LLC, or its affiliate for such engagement.

RESPONSE NO. 13:          SourceHOV    objects    to    this

interrogatory as irrelevant because it does not concern the value of SourceHOV as

a standalone entity.  SourceHOV further objects to this interrogatory as overbroad

and unduly burdensome because it requests information from the "past seven

years."  SourceHOV will identify retentions of Morgan Stanley in the past three

years.   Subject  to  and  without  waiving  its  Specific  Objections  and  General

-10-

Objections, SourceHOV responds that, besides in connection with the Merger,

SourceHOV retained Morgan Stanley in connection with the BancTec merger and

prospective sales of Rust Consulting, Inc. and Lexicode.   SourceHOV further

responds that Morgan Stanley was engaged continuously over the previous three

years and that the fees paid to Morgan Stanley were approximately $40 million.

INTERROGATORY NO. 14: Identify, by production number and
document description, each document reflecting the answers to each of the
interrogatories above.

RESPONSE NO. 14:            SourceHOV     objects     to     this

Interrogatory as premature.   SourceHOV will produce documents in accordance

with the Stipulated Scheduling Order entered by the Court on April 24, 2018.

-11-

MORRIS, NICHOLS, ARSHT &
TUNNELL LLP


*/s/ Kevin M. Coen*
William M. Lafferty (#2755)
Kevin M. Coen (#4775)
Daniel T. Menken (#6309)
1201 N. Market Street
Wilmington, DE  19801
(302) 658-9200
   *Attorneys for Respondent*


June 25, 2018

-12-

# EXHIBIT 6

611

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

```
MANICHAEAN CAPITAL, LLC,              :
CHARLES CASCARILLA, EMIL KHAN         :
WOODS, LGC FOUNDATION, INC., and      :
IMAGO DEI FOUNDATION INC.,            :
                                      :
              Petitioners,            :
                                      :
      v                               :  Civil Action
                                      :  No. 2017-0673-JRS
SOURCEHOV HOLDINGS, INC.,             :
                                      :
              Respondent.             :
```

- - -

Chancery Courtroom No. 2
Kent County Courthouse
414 Federal Street
Dover, Delaware
Thursday, June 6, 2019
9:34 a.m.

- - -

BEFORE:  HON. JOSEPH R. SLIGHTS III, Vice Chancellor.

- - -

TRIAL TRANSCRIPT – VOLUME III

------------------------------------------------------
CHANCERY COURT REPORTERS
Leonard L. Williams Justice Center
500 North King Street – Suite 11400
Wilmington, Delaware 19801
(302) 255-0525

G. A. Jarrell – Direct                    762

1  are the most aggressive.  They have the highest

2  revenues and they have the highest adjusted EBITDA.

3              The bank case projections would be the

4  least aggressive.  That would be the gray towers.  And

5  then the lender projections, you can see, those are in

6  the middle.  And so that comes across.  You can see

7  the growth in both sets of projections, and the exact

8  numbers themselves, which become familiar after a

9  while.

10       Q.       Yeah.  You also have adjusted EBITDA

11  set forth here?

12       A.       Yes.  Yes.

13       Q.       Can you explain that?

14       A.       Yes.  Adjusted EBITDA is not cash.  I

15  have a –– Slide 13 from the report discussed this.

16  Adjusted EBITDA starts with cash EBITDA, you know,

17  what I call real EBITDA.  And then they add back

18  various things on the basis that they're nonrecurring.

19  And that can have a dramatic impact on the number.

20  For example, 2014 is a very unusual example, but let's

21  start there anyway.

22              The unadjusted EBITDA, the actual cash

23  EBITDA for 2014, was minus $122.4 million.  And the

24  margin is minus 18.8 percent.  So that's bad.

CHANCERY COURT REPORTERS

G. A. Jarrell - Direct

763

1           And then we add back all of these --
2   these actual, you know, things that happened, and
3   adjusted EBITDA goes from minus 122 million to
4   positive 118.1 million.  Now we have an 18 percent
5   margin.
6           And I've highlighted the rows at the
7   top, the unadjusted EBITDA, and the row at the bottom,
8   so you can sort of at a glance, quickly, you know,
9   look at the top and the bottom, and you can see how --
10  how different they are.  2014 is -- is dramatic.  But,
11  you know, there's big -- a $41 million addition in
12  2015, 44 million, 27 million.
13          And they're supposed to be
14  nonrecurring expenses, and I don't know.  I seem to
15  see the same expenses year after year after year.  So
16  I -- my impression was, jeez, they don't look to be so
17  nonrecurring.  But I understand what they're doing.
18  It's a -- it's done a lot.  It's not consistent with
19  GAAP, but financial people do this.
20          But my point is, is that all of these
21  EBITDAs that we're looking at on page 12, from all of
22  these projections, are based on these adjusted
23  EBITDAs.
24      Q.      Okay.

CHANCERY COURT REPORTERS

G. A. Jarrell – Direct                764

1        A.        With all these add-backs in there.

2        Q.        All right.  And I just want to make

3    sure I understand the last line on Slide 13.

4        A.        Yes.

5        Q.        The adjustment is percentage of

6    adjusted EBITDA.  So for 2015, '16, and the first half

7    of '17, that's essentially saying that -- that the

8    adjustments to EBITDA make up more than a quarter of

9    the adjusted EBITDA; is that right?

10       A.        Yes, yes.

11       Q.        And are you aware of anyone expressing

12   concern about these adjustments?

13       A.        Yes.  As I -- as I talked about in my

14   report, and I threw a couple of -- repeated a couple

15   of the things that I said in the report in quotes in

16   the report here on page 14.  You know, there was some

17   reaction from professionals that were sort of

18   consistent with mine, my reaction when I saw that.

19              You know, "inflated with less than

20   credible adjustments" is a comment from a Morgan

21   Stanley person in February.  News story that

22   circulated within Morgan Stanley.

23              And I underlined the sentences that

24   struck me.  You know, and the one that I thought was

CHANCERY COURT REPORTERS

G. A. Jarrell - Direct                    765

1    the most colorful was at the bottom.  June 30th, 2017,

2    email said that we have "Synergies on top of synergies

3    on top of cost savings.  Just too many."

4                    And "When you see so many adjustments,

5    it just starts getting egregious.  We just put our

6    pencils down."

7                    So other people noticed that there was

8    a big disconnect between the real EBITDA, the cash

9    EBITDA, and the adjusted EBITDA.

10                   Even Mr. Chadha, at his deposition, I

11   remember reading at one point, somebody questioned him

12   whether or not a particular number that he looked at

13   was -- was -- you know, said that's EBITDA.  And he

14   said no, that's adjusted EBITDA.

15                   And the examiner said, well, how do

16   you know?  And he says, I know, because it's a big

17   positive number.  He says if cash EBITDA had been that

18   big, we wouldn't be in this pickle, or some words to

19   that effect.  So --

20        Q.         So what's the big takeaway from this?

21        A.         The takeaway from this is that when

22   you go to evaluate the -- the, you know, realistic --

23   how realistic the projections are, how reasonable the

24   projections are, how aggressive the projections are, I

CHANCERY COURT REPORTERS

886

```
 1                        CERTIFICATE
 2              We, NEITH D. ECKER, JEANNE CAHILL,
 3   JULIANNE LABADIA, and DEBRA A. DONNELLY, Official
 4   Reporters for the Court of Chancery of the State of
 5   Delaware, do hereby certify that the foregoing pages
 6   numbered 3 through 884 contain a true and correct
 7   transcription of the proceedings as stenographically
 8   reported by us at the hearing in the above cause
 9   before the Vice Chancellor of the State of Delaware,
10   on the date therein indicated.
11              IN WITNESS WHEREOF we have hereunto
12   set our hands at Wilmington, this 6th day of June,
13   2019.
14
15                          /s/ Neith D. Ecker
                         -------------------------
16                        Official Court Reporter
17                          /s/ Jeanne Cahill
                         -------------------------
18                        Official Court Reporter
19                          /s/ Julianne LaBadia
                         -------------------------
20                        Official Court Reporter
21                          /s/ Debra A. Donnelly
                         -------------------------
22                        Official Court Reporter
23
24
```