**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, | Case No. 3:20-cv-00691-D |
| Plaintiff, | |
| v. | |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, and JAMES G. REYNOLDS, | |
| Defendants. | |

**LEAD PLAINTIFFS'**
**SECOND AMENDED CLASS ACTION COMPLAINT**

## TABLE OF CONTENTS

I.    NATURE OF THE ACTION .................................................................................1

II.   JURISDICTION AND VENUE .........................................................................9

III.  PARTIES AND RELEVANT NON-PARTIES .................................................9

IV.   BACKGROUND .................................................................................................13

    A.    Background Of Exela.................................................................................13

        1.    SourceHOV, Defendants' Predecessor Entity, Is Exela's Largest Subsidiary ..................................................................................14

        2.    Background of Novitex.................................................................15

    B.    Background Of The Merger .......................................................................16

    C.    The Appraisal Action ................................................................................19

        1.    Facts Prompting The Appraisal Action.......................................19

        2.    Appraisal Action Details Chadha's Central Involvement In The Creation Of SourceHOV Valuation Calculations, and Reveals His Position At The Helm Of A Culture Of Deceit...........................................20

        3.    The Appraisal Action Reveals That The Individual Defendants Were Aware Of SourceHOV's Range Of Liability In The Appraisal Action, And Also Reveals How Defendants Misled Exela Investors With Respect Thereto ...................................................24

        4.    Appraisal Action Details Improper Addbacks To Adjusted EBITDA ......................................................................................30

        5.    The Knowledge And Actions of SourceHOV, And Of The Individual Defendants While Employed By SourceHOV, Are Attributable To Defendants In This Case .................................39

V.    SUMMARY OF THE FRAUD .........................................................................44

    A.    Defendants Inflate Adjusted EBITDA With Ordinary Operating Expenses, Claiming They Are Non-Routine/Non-Recurring And Will Decline...................44

    B.    Defendants Claim Exela Has Predictable Revenue And Tout Revenue Visibility To Instill Investor Confidence In Guidance ...........................................49

    C.    Defendants Fail To Record Estimated Appraisal Liability And Misrepresent Their Ability To Even Estimate Exela's Potential Liability Associated With The Appraisal Action...................................................................................53

D. The Truth Begins To Emerge ...................................................55

 1. Exela Lowers Its 2018 Adjusted EBITDA Guidance By ~$18 Million.....................................................................................55

 2. Exela Reports 2018 Results, Further Partially Revealing The Extent Of Ongoing O&R Expenses; Still, Defendants Express Confidence In Strong 2019 Guidance Due to Revenue "Visibility"............................57

 3. Exela Misses 1Q'19 Revenue Expectations, Reveals Ongoing High O&R Addbacks That Corresponds With Increased Headcount................59

 4. Moody's Downgrade Challenges Exela's Adjusted EBITDA And Addbacks As "Normal Operating Expenses".............................61

 5. Exela Announces 2Q'19 Results And Revises 2019 Guidance Down, Disclosing For the First Time Impact Of "Unpredictable" Pass-Through Postage Revenue ..................................................62

 6. Exela Further Reduces 2019 Guidance, Again Citing, In Part, Unpredictable Postage Revenue ...........................................63

 7. Exela Announces Delay Of 2019 Form 10-K And The Need To Restate..............................................................................66

 8. Post-Class Period Disclosures ...............................................68

VI. DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD ...........................................70

A. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K ............................................70

B. Defendants' False and Misleading Statements and Omissions Relating To Exela's April 13, 2018  Secondary Offering ........................74

C. Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results...................................................74

D. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results.......................77

E. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results.......................80

F. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results.........84

G. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results.......................92

H. Defendants' False And Misleading Statements And Omissions Regarding Its 2Q'19 Financial Results...................................................95

ii

I.     Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results..........................................................................97

VII.    LOSS CAUSATION...................................................................................................99

VIII.   ADDITIONAL SCIENTER ALLEGATIONS.........................................................103

A.    Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA .............................................103

B.    Defendants Failed to Break Out Postage Revenue But Had Been Tracking It ...............................................................................................................................105

C.    Chadha Reaped Almost $33 Million In Proceeds From Class Period Stock Sales .........................................................................................................................106

D.    The Company Had Material Weaknesses Over Internal Controls In Areas That Directly Bear On The Fraud Here .............................................................108

IX.    CORPORATE SCIENTER ALLEGATIONS.........................................................109

X.     CLASS ACTION ALLEGATIONS .........................................................................109

XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE) .........................................................................................111

XII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ......................................................................113

XIII.  CLAIMS ..................................................................................................................114

XIV.  PRAYER FOR RELIEF .........................................................................................116

XV.   JURY TRIAL DEMANDED...................................................................................118

Lead Plaintiffs Insur Shamgunov and Elena Shamgunova ("Plaintiffs") hereby bring this Second Amended Class Action Complaint ("SAC") against Exela Technologies, Inc. ("Exela" or the "Company"), Ronald Cogburn ("Cogburn"), Parvinder Chadha ("Chadha") and James G. Reynolds ("Reynolds") (together, "Defendants").  The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Exela; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former Exela employees; and other publicly available information concerning Exela.  Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants.  Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.  On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I.        NATURE OF THE ACTION

1.        This is a federal securities class action on behalf of persons or entities who or which purchased or acquired Exela securities between March 16, 2018 and March 16, 2020, inclusive (the "Class Period") and who were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

2.        Exela is a location-agnostic global business process automation ("BPA") provider combining industry-specific and multi-industry enterprise software and solutions worldwide.  It was formed by the merger of SourceHOV and Novitex, which was arranged by special purpose acquisition company Quinpario Acquisition Corp. 2 in July 2017 (the "Merger").  The Merger was supposed to make Exela a major player in the business processing industry.  Following the Merger, SourceHOV was Exela's largest operating segment.

3.      The Individual Defendants in this action—Par Chadha, Ronald Cogburn, and Jim Reynolds—operated and controlled SourceHOV prior to and during the Merger, and they continued to operate and control SourceHOV as a subsidiary of Exela during the Class Period.  At both SourceHOV and at Exela during the Class Period, Chadha was Board Chair, Cogburn was CEO, and Reynolds was CFO.  Prior to SourceHOV, the Individual Defendants worked together at an entity called Hands On Global Management ("HGM"), an investment firm controlled by Chadha, of which Cogburn also was a principal and Reynolds was a partner and Chief Operating Officer.  Both Cogburn and Reynolds reported to Chadha at HGM, and continued to do so at SourceHOV, and later at Exela during the Class Period.

4.      As a result of the Merger, Defendants planned to combine SourceHOV's back-office capabilities with Novitex's front-end solutions to drive revenue and margin growth by expanding Exela's scope of services within its existing base of customers, winning larger contracts given its increased scale, leveraging BPA across both its on-site and offsite employees, and realizing cost saving from merger synergies. Exela also aimed to reduce its leverage, while continuing to make tuck-in acquisitions that would allow it to expand its customer base.

5.      During the Class Period, Exela reported a non-GAAP financial metric, adjusted EBITDA, which Defendants told investors was an "important indicator[] of performance" and would "provide useful information to investors in assessing our financial performance and results of operations."  Defendants told investors that Exela's adjusted EBITDA, which added back supposedly "non-routine" charges to EBITDA, would "converge" with EBITDA as the Company realized cost savings from the Merger by consolidating operations.  In other words, non-routine expenses associated with the Merger that were added back to EBITDA were supposed to go *down* after the Merger.

6.      When announcing its third quarter 2017 results on November 9, 2017, Exela included a reconciliation table between EBITDA and Adjusted EBITDA.  An explanation above that reconciliation table explained that "***Optimization & restructuring [O&R] expenses and merger adjustments are primarily related to the implementation of strategic actions and***

*initiatives related to the business combination completed on July 12th 2017*."  In the same press release, the Company also told investors that "*The integration of SourceHOV and Novitex is essentially complete*, and we are on track to achieve our merger synergy targets."

7.     Similarly, in announcing its first quarter 2018 results on May 11, 2018, Exela again included a reconciliation table between EBITDA and Adjusted EBITDA.  There, the explanation above the reconciliation noted, "Adjusted EBITDA and Further Adjusted EBITDA also *seek to remove the effects of integration* and related costs to achieve the savings, any expected reduction in *operating expenses due to the business combination*, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

8.     In short, since the formation of Exela, Defendants led investors to believe that O&R expense addbacks (which had the effect of increasing the Company's reported adjusted EBITDA figures) were non-routine and/or aberrant Merger-related expenses, that management could not control, *not* ongoing and/or routine operating expenses.

9.     Indeed, applicable accounting rules provide that certain one-time or non-recurring expenses can be added back to EBITDA to help investors assess earnings.  Making such addbacks of non-routine expenses is customary as it is intended to reflect what a steady-state, or normalized period of operations would look like absent such expenses.  But that wasn't what Exela did.  Exela added back so-called "optimization and restructuring" (or "O&R") expenses to adjusted EBITDA, even though such expenses continued every single quarter that Exela reported the metric during the Class Period and, as the Restatement ultimately revealed (*see ¶¶ 165, 233 infra*), misleadingly included substantial amounts of normal operating expenses that were improperly added back to adjusted EBITDA.  Moreover, this misleading accounting enabled Exela to achieve its 2018 annual guidance, and masked the true state of the Company's financial performance during the Class Period (*see infra*, ¶233).

10.    While adjusted EBITDA pertains to earnings, or the bottom line of the Income Statement, Defendants also made misrepresentations about revenue, or the top line of the Income Statement.  Defendants did so by telling investors that Exela had 90% visibility into its revenue

because it was recurring in nature due to long-term or auto-renewal customer contracts. This was misleading because approximately 20% of Exela's revenue came from billing customers for pass-through postage costs, which Defendants later admitted was inconsistent and highly unpredictable. In addition, shortly after the Merger, on September 21, 2017, a group of minority shareholders of SourceHOV sued to demand their appraisal rights under Delaware law in connection with the Merger. *Manichaean Capital, LLC et al. v. SourceHOV Holdings, Inc. et al.*, Case No. 2017-0673-JRS (Del. Chancery) (the "Appraisal Action"). The Appraisal Action revealed that, under the control and direction of Chadha, SourceHOV investors' shares were undervalued and the investors were underpaid in connection with the Merger.[1] In that action, the Delaware Court of Chancery found that Exela's Chair, Chadha—the former SourceHOV Chair—"lacked credibility", was "simply not believable" and "not at all forthright", and, because of his refusal to admit to his "scheme" to backdate the valuation of SourceHOV's shares, that all of his testimony was "taint[ed]." 2020 WL 496606, at *19, *21.

11. Following judgment in favor of the plaintiffs in the Appraisal Action, SourceHOV appealed and lost. Following the entry of final judgment in the Appraisal Action, SourceHOV/Exela refused to pay and the judgment remained unsatisfied, forcing the plaintiffs there—"[c]onfronted with the highly unusual circumstance where an appraisal judgment debtor cannot or will not pay"—to file yet another action to hold Exela accountable to pay the appraisal judgment. *See Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 699-700 (Del. Ch. 2021) (internal citations and quotations omitted) (the "Veil Piercing Action."). As of this filing, Plaintiffs are informed and believe that the judgment remains unsatisfied. The Delaware Court of Chancery in the Veil Piercing Action held that the plaintiffs alleged facts sufficient to show that "***Exela and SourceHOV Holdings operate as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them***." *Id.* at 707.

---

[1] *Manichaean Capital, LLC v. SourceHOV Holdings, Inc*., 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, 2020 WL 1511189 (Del. Ch. March 26, 2020).

12.    The deceit here is multi-faceted.  First, throughout the Class Period, Defendants failed to account for Exela's liability associated with the Appraisal Action, and later admitted that the liability should have been recorded in 2017 at the fair value of the shares tendered.  Second, Defendants misled investors throughout the Class Period by repeatedly reporting and emphasizing the importance of Exela's adjusted EBITDA, to which Defendants improperly added back routine or ordinary operating expenses to inflate the appearance of Exela's earnings.  They also misleadingly characterized the nature of the Adjusted EBITDA addbacks as being outside the control of management when, in fact, the largest component to the O&R addback was headcount – an expense squarely, if not solely, within the control of management.  And finally, Defendants misled investors about the predictability of Exela's revenue, often stating that 90% of the Company's revenue was predictable when Defendants later admitted that approximately 20% of its revenue was unpredictable, nonrecurring, low margin postage revenue – a fact Defendants knew because they reported the balance sheet line item "customer deposits," which included customer advances for postage, nearly every quarter during the Class Period.  However, it was not until August 8, 2019 that Defendants admitted this source of revenue was actually unpredictable.

13.    The truth of Defendants' misrepresentations was revealed, and/or the undisclosed risks materialized, in a series of partial disclosures during the Class Period.  Exela's stock price was hammered during the Class Period, wiping out nearly $1.0 billion in shareholder equity.  The Company's stock price of $5.41 per share on the first day of the Class Period climbed to reach its Class Period high of $7.30 per share on September 19, 2018 (for a market cap of approximately $1.1 billion), and dwindled down to a mere $0.15 per share by March 18, 2020 (resulting in a market cap of just $21.8 million).  After the Class Period, the share price never recovered and Exela did a reverse stock split in order to regain compliance with NASDAQ's $1 per share listing requirement.

14.    The first corrective disclosure came after market close on November 8, 2018, when Exela announced its third quarter 2018 results and lowered its 2018 adjusted EBITDA guidance by approximately $18 million.  Among other things, Defendants cited the exit of a low margin

contract customer and also disclosed that O&R addbacks had increased for the quarter by 49.2% over 2Q'18 (from $13 million to $19.4 million), thus partially revealing that Exela's O&R addbacks were not actually non-routine, one-time costs.[2]  On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2018, damaging investors.

15.    After market close on March 18, 2019, Exela announced its fourth quarter and fiscal year 2018 results and reported that it believed it hit its "high watermark" of O&R expenses in 2018, but that such costs would continue and only "gradually" decline, despite seven straight quarters of incurring such (supposedly non-routine) costs.  Defendants also disclosed that $14.2 million of the $21.2 million in fourth quarter 2018 O&R expenses related to headcount –revealing that Defendants prior categorization of such costs as being "outside the control of management" was patently false.  Defendants also revealed that "the Company's management expects to conclude that the Company's disclosure controls and procedures were not effective."  Following this news, Exela's stock fell $0.21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors.  The stock continued to fall on the following day by an additional $0.23 per share, or 6.2% to close at $3.50 per share on March 20, 2019.

16.    After market close on May 9, 2019, the Company announced quarterly revenue of $403.8 million for the first quarter of 2019, and that its net debt stood at $1.46 billion, putting its leverage ratio at 5.06x.  It also announced that its liquidity had dwindled down to $58 million.  The results revealed that O&R addbacks had increased for the quarter by 78% over 1Q'18 (from $14.5m to $25.8m), thus further partially revealing that Exela's O&R addbacks were not actually non-routine, one-time costs that would decline over time to enable Exela's adjusted EBITDA to converge with traditional EBITDA.  Following this news, Exela's stock fell $0.17 per share, or 5.0%, to close at $3.21 on May 10, 2019.

17.    On May 22, 2019, Moody's issued a press release announcing that it had downgraded Exela's debt rating from Caa1 from B3.  Moody's lead analyst Harold Steiner was

---

[2] Exela's subsequent Restatement would reveal that these reported adjusted EBITDA figures were misleadingly inflated.  *See* ¶¶165, 233 *infra*.

quoted as saying, "Exela's restructuring charges consist mostly of headcount that it expects to cut as it transitions to more technology-based BPA service offerings… ***We believe these are normal operating expenses necessary to provide its service***, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation."  In response to this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

18.    After market close on August 8, 2019, Exela reduced its 2019 revenue guidance citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, partially revealing that the Company had a substantial amount of unpredictable nonrecurring low margin revenue.  Following this news, Exela's stock fell $1.17 per share, or 48%, to close at $1.28 per share on August 9, 2019, on heavy volume, damaging investors.

19.    After market close on November 12, 2019, Exela further reduced its 2019 guidance, again citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, further revealing the extent to which the Company's revenue consisted of unpredictable low margin revenue, rather than revenue that was "recurring in nature and supported by long-term customer contracts."  Following this news, Exela's stock fell $0.25 per share, or about 42%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

20.    Finally on March 16, 2020, the Company announced that it would be delaying the filing of its 2019 annual report on Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019.  After market close on March 17, 2020, the Company issued a press release announcing various accounting errors that had been made, including most significantly failing to record liability for the shares at issue in the Appraisal Action since 2017, revealing that the Company had misrepresented its financial condition.  In response to this news, Exela's stock price fell $0.05 per share on heavy volume, to close at $0.15 per share on March 18, 2020.

21.     After the Class Period, on June 9, 2020, the Company issued its 10-K for the year ended 2019, wherein it admitted that the Appraisal Action liability should have been recorded in 2017:

> During the fourth quarter of fiscal 2019, the Company identified an error as a result of non-accrual of liability and interest thereon for the obligation to pay the fair market value of the shares of certain former stockholders of SourceHOV under the Appraisal Action.
>
> *        *        *
>
> After evaluating the historical accounting treatment applied to the Appraisal Action, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. ***The liability should have been recorded in 2017 at the estimated fair value of the shares tendered***. This error resulted in $43.1 million, $40.6 million and $37.8 million understatement of accrued liabilities and commensurate understatement of total stockholders' deficit, as at September 30, 2019, December 31, 2018 and 2017, respectively. Further, this error resulted in $2.4 million, $2.9 million and $1.2 million understatement of loss for the nine months ended September 30, 2019 and for the years ended December 31, 2018 and 2017, respectively, due to the unrecorded interest expense accrual associated with the Company's obligations related to the Appraisal Action. Interest should have been accrued in the relevant periods at the rate set by the Delaware Court of Chancery. The correction of this error also reduced the number of shares outstanding by 4,570,734 shares for purposes of the weighted average outstanding common shares computation used to calculate basic and diluted loss per share during the respective periods. These are the number of shares of our Common Stock issued at the Closing of the Novitex Business Combination to Ex-Sigma 2 in respect of the former stockholders' shares subject to the Appraisal Action that were returned to the Company during the first quarter of 2020.

22.     The 2019 10-K also revealed additional weaknesses over the Company's internal controls, including a lack of "oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting" as well as "deficiencies in the control environment also created deficiencies in the Company's risk assessment process." One such risk assessment process "failed to identify and assess risks of misstatement, ***including fraud risks***, to ensure controls were designed and implemented to respond to those risks."

23.     As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.  Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of the Exchange Act against each of the Individual Defendants.

## II.     JURISDICTION AND VENUE

24.     The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

25.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)).  Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

27.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities markets.

## III.     PARTIES AND RELEVANT NON-PARTIES

28.     Lead Plaintiff Insur Shamgunov, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.     Lead Plaintiff Elena Shamgunova, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

30.     Defendant Exela is a Delaware corporation and its principal executive offices are located at 2701 E. Grauwyler Rd, Irving, TX 75601.  Exela's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "XELA." Throughout the Class Period, Exela, through its officers and directors, published periodic filings

with the SEC, and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

31.     Defendant Ronald Cogburn ("Cogburn") served as the Chief Executive Officer ("CEO") of Exela and on its Board of Directors throughout the Class Period.  Cogburn was the CEO of SourceHOV from 2013 until the closing of the Merger.  Cogburn was also part of companies that were predecessors to SourceHOV since 1993, and has extensive experience in executive management, construction claims consulting, litigation support, program management, project management, cost estimating, damages assessment and general building construction.  In addition, Cogburn has been a principal of Chadha's investment entity HGM since 2003.  Cogburn has a BSCE in Structural Design/Construction Management from Texas A&M University and is a registered Professional Engineer.

32.     Throughout the Class Period, Cogburn frequently spoke to investors and analysts on conference calls and investor conferences.  Cogburn possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Cogburn signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, Amendment No. 1 to its Annual Report on Form 10-K/A for the year 2017, its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters ended March 31, 2018 and March 31, 2019.[3]

33.     Defendant James G. Reynolds ("Reynolds") was the Company's Chief Financial Officer ("CFO") since the closing of the Merger in 2017 and served in that role throughout the Class Period.  Reynolds previously served as the Co-Chair of SourceHOV from 2014 until the closing of the Merger.  Reynolds was also the Chief Operating Officer and Partner at HMG.  Prior to HGM Mr. Reynolds held numerous executive management or senior advisory positions at SourceHOV and its related subsidiaries and predecessor companies, including serving as Chief

---

[3] References to Exela's fiscal years and quarters are referenced herein as "FY" and "1Q," "2Q," "3Q," or "4Q" respectively, and are followed by the corresponding year.

Financial Officer for HOV Services, LLC from 2007 to 2011 and Vice President and Corporate Controller for Lason from 2001 to 2006. Mr. Reynolds was a Senior Manager in the Business Advisory Services Practice at PricewaterhouseCoopers from 1990 to 2001. Mr. Reynolds is a C.P.A. and holds a B.S. in Accounting from Michigan State University.

34.     Throughout the Class Period, Reynolds frequently spoke to investors and analysts on conference calls and investor conferences.  Reynolds possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Reynolds signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, certified the accuracy of Amendment No. 1 to its Annual Report on Form 10-K/A for the year 2017, and signed or authorized the signing of and certified the accuracy of its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters ended March 31, 2018 and March 31, 2019.

35.     Defendant Par Chadha is the Chair of the Board of Directors for Exela and is the founder, Chief Executive Officer and Chief Investment Officer of HandsOn Global Management, formed in 2001, and the principal stockholder of SourceHOV immediately prior to the Merger on July 12, 2017.  Chadha also served as Chair of SourceHOV from 2011 until the closing of the Merger.  Chadha has 40 years of experience in building businesses in the Americas, Europe and Asia, including execution of mergers and acquisitions, integration of businesses and public offerings.  Chadha is co-founder and owner of Rule 14, LLC, a portfolio company of HGM formed in 2011 that provides data mining and automation including marketing transaction to SourceHOV.

36.     Chadha founded or co-founded other technology companies in the fields of metro optical networks, systems-on-silicon and communications.  Through HGM, Chadha previously participated in director and executive roles in joint ventures with major financial and investment institutions, including Apollo, as well as other portfolio companies of HGM, and currently holds and manages investments in evolving financial technology, health technology and communications industries.  Since 2005, Chadha has served as a Director of HOV Services

Limited, a company listed on the National Stock exchange of India, acting as its Chair from 2009 to 2011.  Chadha holds a B.S. in electrical engineering from Punjab Engineering College, India.

37.     Throughout the Class Period, Chadha controlled Exela through beneficial ownership of more than 50% of its shares and as Chair.  At the start of the Class Period, Chadha had the beneficial ownership of 55.8% of the Company's shares.  The Company's filed proxy statement on April 30, 2019 indicated that Chadha was the beneficial owner of 52.9% of the Company's shares.  According to the Form 10-K/A filed by the Company on June 15, 2020, as of June 5, 2020 Chadha was the beneficial owner of 49.3% of the Company's shares; however, the amount likely exceeded 50% throughout the Class Period, as Ex-Sigma 2, an entity controlled by Chadha, distributed all of its shares during 1Q'20 and is no longer a shareholder of Exela.

38.     In its 2017 10-K, Exela disclosed that HGM has "significant influence" over its corporate governance and that "[a]s long as the HGM Group owns or controls a significant percentage of outstanding voting power, it will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets."   The 2017 10-K also disclosed that HGM was paid $23 million for "contract cancellation and advising fees"  — a related party transaction that Chadha's investment firm profited by.

39.     Throughout the Class Period, Chadha possessed the power and authority to control the contents of the Company's public filings with the SEC.  During the Class Period, Chadha signed or authorized the signing of Exela's Annual Reports on Form 10-K for the years 2017 and 2018.

40.     Defendants Cogburn, Reynolds, and Chadha are collectively referred to hereinafter as the "Individual Defendants."  Exela and the Individual Defendants are collectively referred to as "Defendants."

41.     The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Exela's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading.  The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.     BACKGROUND

### A.     Background Of Exela

42.     Exela was formed in 2017 by a three-way merger (the "Merger" or "Business Combination") involving three entities: (1) SourceHOV; (2) Novitex; and (3) a special purpose acquisition company called Quinpario Acquisition Corp. 2 ("Quinpario").   SourceHOV and Novitex merged into Quinpario which became Exela.

43.     Exela is made up of three reporting segments: (1) Information and Transaction Processing Solutions (ITPS); (2) Healthcare Solutions (HS); and (3) Legal & Loss Prevention Services (LLPS).  By revenue and headcount, ITPS is the largest segment, comprising just under 80% of annual revenue on average during the Class Period.  ITPS offers industry-specific services for banking and financial services, mobile banking platforms, and property casualty insurance.  It also serves customers looking for records management, payment processing, and electronic storage of data (regardless of which industry that customer may fall into).  HS provides automated services in the healthcare field including claims processing, prescription management, enrollment processing, medical coding, and medical records management.  LLPS serves the legal industry

with things like class action settlement administration, collection and distribution of settlement funds, etc. LLPS is the smallest contributing segment to Exela's revenue.

**1.  SourceHOV, Defendants' Predecessor Entity, Is Exela's Largest Subsidiary**

44.    Before becoming part of Exela, SourceHOV was a Delaware corporation with its principal place of business in Irving, Texas. It was formed in 2011 by the merger of two outsourcing service providers owned by Chadha and his investment group, HGM. Following the Merger, Exela owned 100% of SourceHOV, and the Individual Defendants controlled and operated it.

45.    SourceHOV provides process outsourcing and financial technology solutions, with a focus on digital solutions. For instance, it might help a company automate its loan origination process. More specifically, SourceHOV purports to "combine and classify documents from different sources and in multiple media into a single, navigable structured data package that is then integrated into the wide variety of internal systems used by SourceHOV's clients." In other words, it performs back office support for banks and mortgage originators, including by processing payments in a faster and more efficient way through the use of automation technology.

46.    SourceHOV performs similar services for healthcare entities, such as automating back office functions at a healthcare provider's office, or by processing claims, presenting an explanation of benefits (both print and digital) and helping the healthcare business manage its revenue cycle. SourceHOV also purports to assist with identity verification, entitlement qualification determination, and "adjudicating claims" to decide which claimants should be paid, and in which amount.

47.    In addition to financial services, SourceHOV serves law firms with offerings ranging from claims processing and administration, to assistance with discovery and legal collections. As above, most of these services are back-office in nature with some software component.

48.     SourceHOV also serves the public sector through its Public Sector Solutions group by facilitating various processes and back-office functions for public agencies, such as tax return processing for a state's Department of Revenue.  SourceHOV also assists with so-called front-office functions for a public agency by, among other things, managing the front-end tax processing operation, including the online tax submission portal, physical and electronic mailroom, document preparation, data capture, and similar services.

49.     Before becoming Exela's largest operating segment, SourceHOV grew through M&A activity, so it also had several operating companies under its corporate structure.  For instance, its financial solutions division resulted from a November 2014 acquisition of BancTec and its remittance processing division resulted from a 2016 acquisition of TransCentra Inc.

50.     Before becoming part of Exela, SourceHOV was a private company and lacked access to the public equity markets.  Accordingly, SourceHOV's growth by merger strategy was often financed by taking on debt.

51.     SourceHOV did a lot of deals before becoming Exela.  For example, by 2017, SourceHOV had 117 operating facilities throughout the world, and employed about 16,000 employees.  Its annual revenue for the full year preceding the Merger was $790 million.

52.     To get that big, SourceHOV had to borrow a lot of money.  By 2017, SourceHOV had around $1.1 billion of debt–most of which was long-term in nature–and just $963.7 million of assets.  This debt level and the debt covenants that came with it led SourceHOV to consider strategic alternatives and, eventually, the Merger (discussed more fully below).

**2.     Background of Novitex**

53.     Before becoming part of Exela, Novitex Holding Inc., ("Novitex") was, like SourceHOV, a standalone entity focused on back office support.  Unlike SourceHOV however, Novitex focused more on analog (or paper-based) support services.  For instance, it provides document management services like mailroom outsourcing, document scanning, and printing and indexing of documents for corporate customers.  Novitex traces its roots to Pitney Bowes, the mail services entity which was owned by the same private equity firm that owned Novitex prior to the

Merger.  At the time of the Merger, Novitex was majority owned by the private equity firm Apollo Global Management LLC.  Since becoming part of Exela, Novitex rolled up into Novitex Enterprise Solutions, which, together with SourceHOV, is currently part of Exela's ITPS segment.

54.     Relative to SourceHOV, Novitex is smaller.  With roughly 7,250 employees at the time of the Merger and $543 million in annual revenue for the year preceding the Merger, Novitex was the smaller entity from a headcount and financial standpoint.

### B.     Background Of The Merger

55.     The reason for the Merger is straightforward: SourceHOV's highly levered capital structure meant that it needed to keep the ratio of its total net debt divided by its earnings (a/k/a its "leverage ratio") below the limits set by its debt covenants.  To stay under those limits, SourceHOV sought to de-lever its balance sheet through a merger.

56.     A leverage ratio can be calculated in different ways, but the general principle is some ratio between debt minus cash in the numerator, and earnings in the denominator.  So a company can lower its leverage by either decreasing the debt minus cash in the numerator, or increasing the earnings in the denominator.

57.     Generally speaking, a merger can lower a company's leverage ratio by boosting the combined company's earnings more than it boosts its debt.  To illustrate, suppose that company A has $100 of debt, and $20 of earnings. Its leverage ratio is 5.0x.  Suppose further that company A mergers with company B, who also has $100 of debt, but has earnings of $30.  The combined company (A+B) will have $200 of debt, and $50 of earnings, or just 4.0x leverage.  In other words, the merger of A + B translated into a 20% leverage reduction for Company A, but an increase in leverage for company B.  The drop in leverage becomes even more pronounced if company B had zero debt.

58.     Another way a company can lower its leverage ratio is by merging with any company that has more cash than it does debt (lower the numerator).  So if Company A merges with Company C, a company that has only cash, no debt and no earnings, the leverage ratio of A + C would also decrease.

16

59.     An obvious question becomes why would Company C want to merge with Company A, particularly if Company A was in dire financial straights, as SourceHOV was?  The answer: if Company C faces a binary choice of deploying its capital, or returning it and shutting down, it might take its chances with Company A.  Here, Company C is Quinpario.

60.     Before SourceHOV and Quinpario came together, the executive team that would later run Exela (*i.e.*, the Individual Defendants here) first sought to reduce the pro forma company's leverage ratio because SourceHOV and Novitex both had such high debt levels.  So additional equity was needed to get SourceHOV's balance sheet in a more manageable state before consummating the Merger.

61.     As a result, in September 2016 SourceHOV approached a few existing investors including Manichaean Capital, LLC ("Manichaean"), Chadha-controlled HGM, and others.  This small investor group eventually contributed $23 million of equity capital.

62.     At the time of the Merger, Quinpario was a NASDAQ-listed special purpose acquisition company (a SPAC).  SPACs are publicly traded companies formed for a particular purpose.  As was the case for Quinpario, most SPACs are formed to acquire another company (or multiple companies).

63.     Generally speaking, in a SPAC transaction, a shell company goes public and trades on a listed exchange.  The cash raised from the IPO goes into the SPAC's trust, where it earns interest until the SPAC completes a merger with an operating company.  Most SPACs issue shares at $10.00 per share, as did Quinpario when it went public on January 22, 2015.

64.     If a SPAC doesn't complete a deal before its deadline (typically within two years after an IPO), the trust is liquidated and the proceeds are returned to investors.  But if a deal is proposed before the deadline, SPAC investors are given detailed information about the proposed transaction, and have the right to vote on the deal.  If the investors don't go for the deal, they have the right to require the SPAC to redeem their shares.

65.     Quinpario was formed on July 15, 2014 and went public several months later in January 2015, raising $350 million in a public offering.  So by late 2016, after two years had passed

and no deal had been made, Quinpario still had its nearly $350 million war-chest to invest, but only a few months left to spend it. That's because Quinpario was set to expire on January 22, 2017—right around the time that SourceHOV was looking for a financial lifeline.

66.     Put differently, SourceHOV was burning cash, while Quinpario had so much dry powder that it was burning a hole in its pocket. Eventually those seemingly complimentary forces moved the two companies to begin discussions to see if there was a mutual benefit in combining.

67.     After a January 13, 2017 letter of intent, Quinpario, SourceHOV, Novitex and related parties executed a Business Combination Agreement formalizing a three way merger.

68.     The Business Combination was considered a reverse merger where SourceHOV was determined to be the acquirer of Novitex. SourceHOV bought 100% of Novitex's equity for $676.7 million and issued debt of about $1.4 billion which was used to refinance the then-existing debt of SourceHOV and Novitex. Quinpario contributed $200 million and both SourceHOV and Novitex merged into Quinpario subsidiaries.

69.     One of the conditions to secure the financing for the Business Combination was that SourceHOV equity holders, including Chadha and Cogburn had to pledge their equity in SourceHOV to a facility called Ex-Sigma 2, LLC. Then, Ex-Sigma 2, LLC in turn served as collateral for certain financing incurred in connection with the Business Combination. This SourceHOV equity-backed loan – backed by shares of SourceHOV stock (100% of the shares) – was referred to as "the Margin Loan." Over its objection, Manichaean was compelled to pledge its shares as collateral towards the Margin Loan. It was compelled because Chadha and Reynolds acted on SourceHOV's behalf without an independent committee of SourceHOV directors.

70.     The formal structure of the Business Combination is as follows. A SourceHOV Merger Sub merged with and into SourceHOV, with SourceHOV surviving that merger to become an indirect subsidiary of Quinpario Acquisition Corp. 2; and Quinpario Merger Sub II, Inc. merged with and into Novitex, with Novitex surviving that merger to become an indirect subsidiary of Quinpario. The effect of the preliminary merger and the business combination was for Quinpario to become the parent company of both SourceHOV and Novitex. Quinpario was later renamed

Exela in July, 2017.  Because Quinpario had already been a public company since January 2015, once the Business Combination closed on July 12, 2017, what used to be Quinpario's shares then became Exela's shares.

71.    Because the Merger was so complex, the entities above retained investment bankers to assist with, among other things, estimating the equity value of SourceHOV and delivering such estimates to SourceHOV's Board of Directors (Chadha and Reynolds).

C.    **The Appraisal Action**[4]

1.    **Facts Prompting The Appraisal Action**

72.    As noted above, the combined or "pro forma" structure of SourceHOV and Novitex before the Merger was highly leveraged, and needed yet another equity infusion to cure its leverage requirements under SourceHov's then existing credit agreement.

73.    One provider of the equity cure was Manichaean, who became a minority interest holder of SourceHOV stock.  Manichaean owned about 3,574 shares of SourceHOV equity before the Merger and in order to prevent its equity stake from becoming further diluted upon SourceHOV's additional equity capital raise, Manichaean invested an additional $1.5 million at a price of $1,600 per SourceHOV share.  That brought Manichean's total holdings in SourceHOV to 10,304 shares.

74.    In connection with the Merger, Manichaean felt that SourceHOV was undervalued such that Manichaean would receive inadequate consideration for its minority interest were it to participate in the Merger.  As a result, Manichaean petitioned the Delaware Court of Chancery for an appraisal determination under 8 *Del. C*. § 262 (the "Appraisal Action") in September 2017.

75.    Manichean filed the Appraisal Action to answer a basic question: what was the fair value of its equity interest (its shares) in SourceHOV?  This is a basic question because Manichaean's equity value is calculated by multiplying (a) the number of shares that it held

---

[4] While relevant facts revealed in the context of the Appraisal Action are alleged herein, Plaintiffs further incorporate by reference the factual findings made by the Court of Chancery, *Manichaean Capital, LLC v. SourceHOV Holdings, Inc*., 2020 WL 496606 (Del. Ch. Jan. 30, 2020).

(10,304) times (b) the value of SourceHOV's price per share -- and Exela routinely calculated SourceHOV's equity value, including in its June 26, 2017 proxy statement (signed by Chadha and Reynolds) wherein it stated that the then existing equity value of SourceHOV was $644.8 million.

76.     The Appraisal Action revealed that early on, Manichaean was disappointed by the "poor governance and communication" of SourceHOV.  In an email dated September 21, 2016, Manichaean managing partner, Chad Cascarilla wrote to SourceHOV Director Matt Canstantino, to complain about the lack of communication and disclosure by SourceHOV CFO (subsequently Exela CFO) Jim Reynolds and SourceHOV Chair (subsequently Exela Chair) Par Chadha. Cascarilla wrote, "It's hard to think of a company this size ([1.3 billion] EV[5]) with such poor governance and communication."  Ultimately, the Court of Chancery agreed with Cascarilla's contention, concluding that SourceHOV's "governance structure was not a model for best practices."  2020 WL 496606, *3.

> **2.     Appraisal Action Details Chadha's Central Involvement In The Creation Of SourceHOV Valuation Calculations, and Reveals His Position At The Helm Of A Culture Of Deceit**

77.     Trial testimony in the Appraisal Action took place from June 4 to June 6, 2019. Only four company insiders of SourceHOV/Exela testified during trial in the Appraisal Action: SourceHOV and Exela Chair, Chadha; SourceHOV and Exela CFO, Reynolds; SourceHOV and Exela SVP of Finance, Anubhav Verma; and Chadha's son-in-law, Andrej Jonovic who worked for Exela but not SourceHOV.  And while SourceHOV/Exela CEO Cogburn did not testify at the trial, prior to trial, the plaintiffs in the Appraisal Action also noticed his deposition, in addition to Chadha, Reynolds, Verma, and Jonovic.  In other words, about five SourceHOV/Exela insiders were the closest to the facts at issue in the Appraisal Action, and SourceHOV/Exela's litigation of the Appraisal Action, and that small group included each of the Individual Defendants here, Exela's SVP of Finance, and Chadha's son-in-law (an Exela EVP).

---

[5] "EV" stands for enterprise value, which equals market cap + debt – cash.

78.     The Appraisal Action revealed much about SourceHOV's—and, in particular, Chadha's—pervasive culture of deceptive practices which also permeated through Exela as SourceHOV's successor entity.  For example, in the Appraisal Action, the Delaware Court of Chancery found that SourceHOV (now Exela) "***lacked credibility***" because "Chadha, one of Respondent's key witnesses, ***was not at all forthright*** in explaining the circumstances surrounding the creation of the Backdated Valuation" and because Exela "disagreed with its own expert over which revenue projections to use in the DCF [discounted cash flow] analysis and ultimately separated from its expert with respect to SourceHOV's fair value."  2020 WL 496606, *19.

79.     The "Backdated Valuation" referred to by the Court of Chancery pertains to the following:  Before the Business Combination, SourceHOV retained investment banking firms Rothschild and Morgan Stanley to advise on the potential deal.  In February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's Board of Directors—of which Chadha was Chair and Reynolds was Co-Chair[6]—about the value of SourceHOV's equity.  Rothschild originally delivered that fairness opinion as requested in February 2017.  Then, after Manichaean demanded its appraisal rights for its shares –four months into the Appraisal Action litigation in January 2018 – Chadha asked his son-in-law, Jonovic (an HGM/Exela executive), to request a "revised" valuation of SourceHOV's shares from Rothschild.  The "revised" valuation in January 2018 used assumptions based on then-current data (as of January 2018) that resulted in a lower equity valuation for SourceHOV.  Accordingly, Rothschild dated the valuation January 2018.  But a January 2018 valuation would not have helped SourceHOV in the Appraisal Action because the court was going to appraise the shares as of the Business Combination date in July 2017.  So, after receiving the "revised valuation" from Rothschild, Jonovic wrote to Rothschild, at the direction of

---

[6] The Court of Chancery noted that "Together, Chadha and Reynolds functionally comprised the SourceHOV board of directors (the 'SourceHOV Board')" and that SourceHOV's "Board appears to have comprised two members—Chadha and Reynolds—both of whom were nominated by HGM."  2020 WL 496606, at *2, *3.  Moreover, Exela EVP Verma testified that "Chadha and Reynolds were the SourceHOV Board members who reviewed management's projections."  *Id*. at *3 n.29.

Chadha, saying "the cover page says Jan 2018 ... Happy for it to simply say July 2017." When Rothschild "finally agreed to remove all references to 2018", Jonovic forwarded the Backdated Valuation to Chadha with a single word in his message: "Done." 2020 WL 496606, at *10, n.134.

80.     Chadha was deposed about SourceHOV's valuation in the Appraisal Action on October 5, 2018 and again on February 26, 2019, and also testified about SourceHOV's equity value during the Appraisal Action trial on June 4, 2019. The Court of Chancery determined that Chadha was "***simply not believable***" and that "Chadha's trial testimony was not credible." 2020 WL 496606, *20 & n.320 (finding "Chadha was not credible"). More specifically, the court found that Chadha's "litigation-driven effort to persuade Rothschild to create the Backdated Valuation to appear as if it had been prepared before the Business Combination was bad enough. His failure even to acknowledge that scheme, when it was finally exposed in discovery, ***taints all of his testimony***." *Id.* at *21.

81.     Some of Chadha's trial testimony about the Backdated Valuation includes the following exchange where Chadha was impeached after giving misleading responses relating to valuation estimates prepared for SourceHOV, of which Chadha was admittedly aware, in 2017 and 2018:

> Q. Okay. Now, sir, did there come a time after this litigation started when you reached out to Rothschild and you asked them to give you a new valuation of the company?
> A. No.
> Q. You don't?
> A. You said new.
> Q. You don't?
> A. No. You said new. I said no. If you had said did we ask them to give us the valuation as of the closing date, we did.
> Q. Okay.
> A. You said new, and that's incorrect.
> Q. All right. So you asked -- okay. You asked for a valuation of the company as of July 2017?
> A. That's correct.
> Q. And you asked for it in January 2018, four months after this litigation started?
> A. That's correct.
> Q. And you asked for a revised valuation?
> A. I don't remember that.

[Counsel for Petitioner presents an exhibit]

Q. "Par, this is the Rothschild valuation file that I could find. I don't recall there being another file but I could be wrong." Do you see that?
A. Correct.
Q. And you responded in the email just above that.
A. That's correct. I remember that.
Q. "We should ask them for the revised – because we did the deal at $8 etc."

                \*      \*      \*

[Counsel for Petitioner presents additional emails to authenticate and lay foundation]

Q. Do you see that?
A. Yes.
Q. So on January 5, 2018, you're asking Rothschild, after this litigation has begun, to give you an updated valuation presentation; isn't that correct?
A. Yes.
Q. And when you got it updated, you asked them to change the cover page and date of the document; isn't that correct?
A. That's correct.
Q. Okay. You asked them to change it from January 2018 to as of July 2017; isn't that correct?
A. That's correct.
Q. And also, the file date was changed. It originally said "update January 2018," and instead the file was changed to "final valuation structure"; isn't that correct?
A. I don't know that.

                \*      \*      \*

Q. Okay. And this is an email where Mr. Jonovic responds back to you and says, "Done."
A. Yes.
Q. Correct? And that was him getting you -- forwarding you an email after he had said to Rothschild -- he had asked Rothschild to change the date.
A. Yeah. We said as of July 12, 2018.
Q. Okay. You had the date changed?
A. Yes.

82.     Shortly after the above examination, Chadha admitted that not only did he ask for the revised valuation, but when that revised valuation was produced by Exela in discovery, it was produced separate and apart from the email it was attached to – to make it appear that the valuation was originally made at a different time than it was.  And, according to Manichean's counsel's in-court representation, Chadha's concealment of the "Backdated Valuation" was the reason that Chadha was deposed a second time.

Q. Now, your deposition's been taken twice in this case; isn't that correct, sir?

A. Yes, it is.

Q. Okay. And the second deposition was conducted specifically to ask you about the January 2018 presentation; isn't that correct?

A. I don't know. You asked me to appear for a deposition. I did.

Q. And isn't it correct, sir, that in your first deposition, you never disclosed that the -- as-of-July-2017 presentation was made, and it was actually made in January 2018; isn't that correct?

A. If you asked me and I did not answer, I would like to see that.

Q. Well, we asked you about the document, and you said you just didn't recognize it. Your deposition was taken October 2018.

A. Yes.

Q. And that was nine months after you had the document created.

A. Yes.

Q. And we asked you, and you said you didn't remember.

A. Okay.

Q. Nine months later, you didn't remember this document that you created in the middle of litigation?

A. No.

> **3.      The Appraisal Action Reveals That The Individual Defendants Were Aware Of SourceHOV's Range Of Liability In The Appraisal Action, And Also Reveals How Defendants Misled Exela Investors With Respect Thereto**

83.     During the Class Period, Defendants disclosed the existence of the Appraisal Action and assured Exela's investors that "[t]he Company intends to vigorously defend against the Appraisal Action."  2017 and 2018 Form 10-K.  Defendants also claimed that "the Company is unable to predict the outcome of the Appraisal Action *or estimate any loss or range of loss that may arise from the Appraisal Action*."  *Id.*

84.     But the ultimate liability Exela faced in the Appraisal Action was simple: it was merely the product of (a) Manichaean's equity interest in SourceHOV (its number of shares held) times (b) the equity value of SourceHOV (its share price) at the time of the Merger.  Manichaean's interest in SourceHOV, was always known: 10,304 shares.   That leaves just the value of SourceHOV's equity (i.e., the price per share) to be adjudicated – and that value was something Defendants had calculated long before the Class Period.

85.     Indeed, Exela's range of potential liability at the Appraisal Action was readily ascertainable.  One bookend, the maximum liability, was what the Petitioner (Manichaean) asked

the court to award.  That amount was estimated by Petitioner's expert, based on the Petitioner's valuation of SourceHOV's equity at the time of the Merger, and thus, what Manichean's interest in that equity was worth.  The sum total of that amount,  plus costs and statutory interest -- a known rate of interest that began accruing as of the close of the Merger -- represented the maximum liability to Exela.  Petitioner's expert turned over his report to Defendants on February 7, 2019.

86.    The other bookend, the minimum liability, was what Exela argued Manichaean's interest in SourceHOV's equity value was worth (plus costs and interest).  That amount was informed in part by Dr. Greg Jarrell, Exela's agent, who the Company retained to calculate the value.   Moreover, as Chadha's above-quoted testimony reveals, he was further aware of Rothschild's estimates of SourceHOV's equity value (both its initial valuation in 2017 and the "Backdated Valuation" in January 2018).

87.    Chadha testified regarding the valuation presentations made by SourceHOV's investment bankers in February 2017 and again in January 2018:

Q: And let's go the "Standalone SourceHOV Illustrative DCF." Do you see that, sir?
A. This is -- yes.
Q. And this is in the January 2018 presentation; isn't that correct?
A. Yes.
Q. Okay. And the implied equity value given in the 'Standalone SourceHOV Illustrative DCF,' what number is that? Isn't that 675 million?
A. Yes.
Q. Okay. And isn't it true the February 2017 presentation that was made pre-litigation had a $931 million implied equity valuation, sir?
A. I believe so.

88.    As demonstrated by their roles at HGM and SourceHOV, their direct involvement in the Merger, and their testimony in the Appraisal Action, the Individual Defendants in this case were intimately involved and familiar with the facts of the Appraisal Action as it was happening, including the core issue of the estimated valuation, or valuation ranges, of SourceHOV's equity at the time of the Merger.

89.    Also established by the Appraisal Action was that a lack of corporate formalities permeated Exela/SourceHOV and that both entities were merely an extension of Chadha, Cogburn, and Reynolds.

90.     As alleged above, Chadha and Reynolds were the entirety of SourceHOV's Board of Directors.  And testimony from the Appraisal Action further establishes that Chadha and Reynolds were intimately aware of SourceHOV's financial projections—which were used to estimate its equity value—and that Verma would go through such projections "line-by-line" with Chadha and Reynolds.  Verma testified that:

> Q: And with respect to preparing management forecasts and projections, your job was essentially to take historical actuals and then make reasonable estimates, after discussions with both the sales team and the operations team as to what they thought the business was going to do. Correct?
> A: Correct
>
> * * *
>
> Q: And as part of this process, after you had put together the model, you would go to Par Chadha and Jim Reynolds, who were members of the SourceHOV board, sit in a room, and walk through the assumptions line by line. Correct?
> A: Correct
> Q: And that was an iterative process, correct?
> A: Correct
> Q: And Mr. Chadha and Mr. Reynolds would ask questions about specific assumptions and other components of the model. Correct?
> A: Yes.
> Q: And sometimes Mr. Chadha or Mr. Reynolds would challenge an assumption in your model. Correct?
> A: Yes.

91.     Chadha was deposed in the Appraisal Action on or around October 5, 2018 and February 26, 2019,[7] and he testified in trial on June 4, 2019.  He testified on  matters relating directly to SourceHOV's valuation at the time of the Merger.  Shockingly—and utterly lacking in credibility—Chadha told the Court of Chancery, under oath, that he believed that SourceHOV's equity was worthless as of the time of the Merger in an obvious litigation-driven attempt to avoid liability to Manichaean:

> Q.     You said you thought it was worth zero?
> A.     Because I was unable to sell and raise any of the solutions that would have been available to me.
> Q.     Did you tell your auditors that you believed the company was worth zero, sir?
> A.     I did not tell the auditors the company was worth zero. I said the company is – has

---

[7] According to in-court representations made by Petitioner's counsel at the Appraisal Action, the second deposition was scheduled upon discovering the Backdated Valuation.

the ability to continue if we meet our budgets.

Q.     And did you tell the lenders in the business combination agreement that the company was worth zero?

A.     No, because you can see the Rothschild presentation.

Q.     Did you tell Rothschild the company was worth zero?

A.     They said this was the best solution for the company, so no.

Q.     Sorry. I just want to understand. You didn't tell them it was worth zero?

A.     No.

* * *

Q      … Did you tell Apollo the company was worth zero?

A.     No, I didn't go beating drums saying my company is worth zero. I went looking for a solution.

92.     Chadha further testified that SourceHOV's "quality revenue, profitable revenue" was "already at a point where revenue is declining," before the Merger.

93.     Chadha's purported view that SourceHOV was worth zero stands in stark contrast to what Chadha wrote about SourceHOV's equity value in the June 26th, 2017 Exela proxy statement —which both he and Reynolds signed — filed just two weeks before the Merger closed:

Q. Mr. Chadha, in the deal that ultimately took place, and in the final proxy for the deal, you wrote that the existing equity value of SourceHOV was 644.8 million. Isn't that correct?
A. I believe so.
Q. Okay. And could we get JX 265 up at page 78. Highlight that box over here. Here, you've got SourceHOV existing equity value, you have. And this is the final proxy. It says $645 million. Isn't that correct?
A. Yes.
Q. Okay. And this is a document filed with the SEC and subject to penalties if there are misrepresentations in the document. Isn't that correct?
A. I believe so.
Q. And this is what was filed June 26th, 2017, for the final deal, just two weeks before the final deal went through. Isn't that correct?
A. I believe so.

94.     Dr. Jarrell—who served as SourceHOV's valuation expert in the Appraisal Action—testified that he specifically discussed SourceHOV's valuation with Chadha:

Yes. This -- I do want to talk a minute about this, because I think it's important. Mr. Chadha testified, and I read his deposition testimony. I was here for his trial testimony. ***And I also talked about this issue with him on the phone when I was doing my work. I had a phone conversation with him*** about, you know, the reasonableness of these projections and their achievability. ***I was very concerned at the time*** -- for reasons I've already shown here, and also for other reasons -- that the capital expenditures seem to be very low relative to the

depreciation. And I was -- *so I called him up* and I -- and I said, look, you know, I don't understand these projections, because the capital expenditures are less than the depreciation. And that can't last forever. Depreciation has to reflect capital expenditures. Over a long period of time, those two numbers should cumulatively be the same. And we had a heck of a time conversing, because he kept -- he kept saying over and over again that the projections ignored *the – in his -- in my words, ignored the operative reality*.

95.     But SourceHOV's expert, Jarrell, did not agree with Chadha that SourceHOV was worthless.  To the contrary, on behalf of SourceHOV—and presumably as part of Exela's "vigorous[]" defense against the Appraisal Action—Jarrell submitted his report in the Appraisal Action in December 2018, estimating SourceHOV's valuation to be approximately $286.4 million (or $1,723 per share).  2020 WL 496606, *14.  Jarrell further provided testimony about SourceHOV's valuation during his deposition on February 14, 2019, wherein he amended his view "after making certain changes that drove his valuation 63% higher than his original assessment, to $468.1 million (or $2,817 per share)." *Id.*, n.189.  And Jarrell further testified at trial about SourceHOV's valuation on June 6, 2019, reiterating his opinion that SourceHOV's valuation at the time of the Merger was $2,817 per share or $29.0 million based on Manichean's ownership of 10,304 shares.

96.     Likewise, Manichean's expert, Dr. Timothy Meinhart, initially submitted his report in the Appraisal Action in December 2018, which was further revised and resubmitted on February 7, 2019.  Dr. Meinhart estimated that SourceHOV was worth $5,079 per share in his revised report dated February 7, 2019.

97.     Moreover, Chadha was aware, at a minimum, of Jarrell's (*i.e.*, the expert his own company had retained and acted as its agent to testify on its behalf) valuation estimates for SourceHOV—and, by extension, Exela's potential liability to the plaintiffs in the Appraisal Action—during the Appraisal Action.  In fact, Chadha testified that he received *several* estimates of SourceHOV's equity value, including one that that he specifically asked for in January 2018:

> Q. Just so you know, Mr. Chadha, this is the equity value comparisons of the various valuations of the company that have been provided. So respondent's position in the pretrial brief is an equity value of 271.4 million.
> A. Yes.
> Q. Your expert, Professor Jarrell, he's offered a fair valuation of the company of 468.1 million.

A. Yes.

Q. Okay. Then there's a Rothschild January 2018 presentation. We will talk about that one soon. Because that was prepared -- that's four months after litigation started. Is that correct?

A. Four months after litigation?

Q. Yes. Rothschild, you had them create a second presentation in January 2018. Do you recall that?

A. Yes.

Q. So they have a stand-alone equity value range of 46 to 940. Their illustrative DCF is 675 million. Their February 2000 (sic) stand-alone equity value range is 527 to 993 million. Petitioners' expert, Mr. Meinhart, has valued the company's equity at 798.7 million. And as we have shown, Rothschild, in its February 2017 stand-alone illustrative DCF, gave a valuation of 931 million.  Now, against all of that, your position, sir, is that the company had no equity

value?

98.    At a minimum, Chadha and Reynolds—the sum total of SourceHOV's Board of Directors—were presented with SourceHOV equity valuations in connection with the Merger on at least the following dates: in February 2017, when Rothschild prepared its initial valuation fairness opinion; in January 2018, when Chadha requested and received the "Backdated Valuation" from Rothschild in an attempt to lessen SourceHOV/Exela's potential liability; in December 2018, when Jarrell submitted his expert valuation report for SourceHOV in the Appraisal Action; and in February 2019, when Manichaean's expert submitted his expert valuation report in the Appraisal Action.  In short, Defendants had ample information from which to estimate the potential liability, or range of liability, that Exela faced in the Appraisal Action during the Class Period—and the facts indicate that rather than fairly disclose that to Exela's investors, Defendants misdirected the market as they tried to evade liability.

99.    Indeed, as the Delaware Court of Chancery in the Veil Piercing Action would later note:

Plaintiffs compellingly allege that fraud and injustice has resulted and will result from the diversion of funds from SourceHOV Holdings to Exela in an explicit attempt to avoid payment of the Appraisal Judgment. As mentioned, ***Exela knew that SourceHOV Holdings would be required to pay a judgment of some amount, at the latest, when Plaintiffs sent their appraisal demand in September 2017. The extent of that exposure became all too clear as the appraisal petitioners developed evidence, including expert valuation evidence, that the fair value of SourceHOV Holdings was exponentially greater than the price paid in the Merger***. This evidence was presented at trial in June 2019, summarized in post-trial oral arguments in October 2019, then relied upon in the

Court's post-trial decision issued on January 30, 2020. Yet, mere weeks before entry of the judgment, on January 10, 2020, Defendants entered into the A/R Facility.[8]

251 A.3d at 709.

100.    Despite all of the foregoing facts indicating Defendants' knowledge of the range of Exela's potential liability, Defendants repeatedly told Exela investors during the Class Period that they were unable to even *estimate* Exela's potential liability in connection with the Appraisal Action.  For example, both Exela's FY 2017 Form 10-K filed on March 16, 2018, and its  FY 2018 Form 10-K filed on March 20, 2019 stated: "The company is unable to predict the outcome of the appraisal Action *or estimate* any loss *or range of loss* that may arise from the Appraisal Action." Exela's 2017 and 2018 Form 10-Ks were signed by Cogburn, Reynolds, and Chadha, all of whom played central roles for SourceHOV/Exela in the Appraisal Action.

### 4.    Appraisal Action Details Improper Addbacks To Adjusted EBITDA

101.    EBITDA—or Earnings Before Interest Taxes Depreciation and Amortization—is an important accounting metric derived from GAAP elements and strictly controlled by Regulation G (17 C.F.R. §244.100) and Exchange Act Release No. 47226.  EBITDA provides an approximation of cash flow available to a business before creditors are paid (before interest) and before the government is paid (before taxes).  And Depreciation and Amortization are non-cash expenses that do not reduce the cash available to a business, even if they reduce earnings, such that measuring earnings *before* deduction of those non-cash expenses helps provide a better approximation of a company's available cash flow.

---

[8] The A/R Facility was a financing arrangement where Exela received access to $160 million in exchange for pledging certain accounts receivable as collateral. More specifically, Exela Receivables I LLC pledged certain "Collection Accounts" including sixteen "Interim Collection Accounts," as collateral.  The Collection Accounts serve as "security for the performance by the Borrower of all the terms, covenants and agreements on the part of the Borrower to be performed under this Agreement or any other Transaction Document, including the punctual payment when due of the principal amount of the Loans and all Interest in respect of the Loans and all other Borrower Obligations ..."  According to Manichean, the arrangement above enabled Exela to "circumvent" SourceHOV.

102.    Adjusted EBITDA differs from traditional EBITDA.  Adjusted EBITDA is a non-GAAP metric, so it does allow for more managerial discretion than traditional EBITDA, but adjusted EBITDA is still a term of art to investors, so that discretion has limitations.  Adjusted EBITDA is understood by investors to be an approximation of the normalized earnings power of a business excluding non-cash expenses and excluding, or adding back, ***non-recurring*** cash (or non-cash) expenses.[9]

103.    Regulation of adjusted EBITDA dates back to 2003, following the passage of the Sarbanes Oxley Act and the SEC's promulgation of Regulation G, the latter of which became effective on January 30, 2003.[10]  In the background discussion within the final rule implementing Reg G, the SEC noted that "Regulation G and the amendments to our rules are intended to ensure that investors and others are not misled by the use of non-GAAP financial measures."  It also instructed that "The prohibition on adjusting a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur will make clear that such an adjustment is prohibited only when (1) the nature of the charge or gain is such that it is reasonably likely to recur within two years, or (2) there was a similar charge or gain within the prior two years".[11]

104.    The background to Reg G also warned issuers that "we reminded companies in December 2001 that, under certain circumstances, non-GAAP financial measures could mislead investors if they obscure the company's GAAP results.  We continue to be of the view that some disclosures of non-GAAP financial measures could give rise to actions under Rule 10b-5."

---

[9] Saying that EBITDA is "excluding an expense" from earnings is the same thing as saying that one is "including an add back."  The important point is whether the adjustment keeps an expense within reported earnings, or tries to ignore it.

[10] See 68 FR 4820-01, 2003 WL 192073, Release No. 33-8176.

[11] Id. at 4821.

105.    Roughly 13 years after implementing Reg G, the SEC published additional interpretative guidance, including specific discussions on EBITDA addbacks, on May 17, 2016 ("the Interpretative Guidance") which provides in relevant part:

> **Question**: Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?

> **Answer:** Yes. Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of the non-GAAP measure to be misleading. For example, presenting a performance measure *that excludes normal, recurring,* cash *operating expenses necessary to operate a registrant's business* could be misleading.

106.    Following the May 2016 Guidance, the law firm of Morrison Foerster issued an October 2017 publication that discussed the May 2016 Guidance ("the October 2017 Publication"). The October 2017 Publication surveyed numerous SEC comment letters sent directly to issuers in response to Reg G related issues.  Those SEC comment letters provided more specific guidance to issuers about EBITDA addbacks and, according to the October 2017 Publication, certain adjustments that "the [SEC] Staff scrutinized include the following: . . .  (3) management fees, transaction fees and IPO 'readiness' costs excluded from adjusted EBITA, notwithstanding the historical occurrence of these costs that suggested these were integral in continuing operations of the company; (4) *restructuring, integration and deal costs,* new store openings . . . that all appeared to be *recurring and usual in the ordinary course of business* . . . (6) other charges and gains that appeared normal and recurring in the registrant's operations.

107.    The October 2017 Publication also explained that:

> In a number of cases, the Staff asked registrants not to refer to adjustments (for example, legal charges and credits, gain on sale of assets, operational improvement initiatives and acquisition-related costs) as being non-recurring unless these items met the two-year 'non-recurring, infrequent or unusual' criteria in item 10(e) of Regulation S-K.
> * * *
> The Staff also asked registrants whose operations included large, frequent and seemingly routine acquisitions of other businesses or entities why they were excluding the impact of acquisition-related expenses and the amortisation of intangible assets they acquired, given that the registrants appeared to grow through acquisitions and the acquisition of businesses appeared to be a critical strategy.

> * * *

In a few cases, the Staff asked registrants why certain expenses were designated non core even though they appeared to be normal, recurring, cash operating expenses that were directly attributable to the registrant's operations and lines of business

108.    The 2017 Publication concluded that:

However, as the SEC has highlighted, the presentation of non-GAAP financial measures is also prone to misuse and abuse. As shown in a number of cases, non-GAAP financial measures can become tools to distort the truth, conceal, fabricate or inflate the actual performance and financial condition of a given company, confuse investors, **and even perpetuate outright fraud**.[12]

109.    Exela's Class Period annual reports described the importance of EBITDA and adjusted EBITDA to the Company and its investors (*see* 2017, 2018, and 2019 Form 10-K):

**Other Financial Information (Non-GAAP Financial Measures)**

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integration costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

We present EBITDA and Adjusted EBITDA because we believe they provide useful information regarding the factors and trends affecting our business in addition to measures calculated under GAAP. Additionally, our credit agreement requires us to comply with certain EBITDA related metrics. Refer to—Liquidity and Capital Resources—Indebtedness.

*Note Regarding Non-GAAP Financial Measures*

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by

---

[12] In highlighting potential liability for issuers, the 2017 Publication also warned issuers that: "In addition, the SEC Releases point out that section 3(b) of SOX provides that a violation of SOX or the SEC's rules thereunder will be treated for all purposes as a violation of the Securities Exchange Act. Hence, if a registrant or any person acting on its behalf, fails to comply with Regulation G, the registrant and/or the person acting on its behalf could be subject to an SEC enforcement action alleging violations of Regulation G. Additionally, if the facts and circumstances warrant, the SEC could bring an action under both Regulation G *and* rule 10b-5."

removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. These non-GAAP financial measures are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP. Because EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

110.   The idea behind adjusted EBITDA is that investors rely on it to get an understanding of how a company operates under a "steady state" of affairs.  For an example, suppose Company X generated $100 of traditional EBITDA in a given quarter.  But, during this particular quarter, Company X's EBITDA was depressed by $10 because an unexpected hurricane struck the corporate headquarters in Chicago, and hurricanes don't typically hit Chicago.  As a result, when discounting future cash flows, an investor would likely conclude that the "normalized" or "steady state" approximation of cash flow for Company X is closer to $110 than it is $100.  In other words, the non-recurring hurricane expense of $10 could be properly "added back" to EBITDA of $100 to generate an adjusted EBITDA of $110— because, under most circumstances, $110 is likely to be closer to what the future would bring than $100 would be for Company X.

111.   To be clear, what is aberrant to one company, may not be to another.  For instance, the risk of a hurricane hitting a widget factory in Chicago would aberrant, but the expense incurred by an insurance company—that is *in the business of insuring against hurricanes*—would just be a normal operating expense.  And, as the 2017 Publication cautioned, companies in the business of acquiring other companies should not exclude (or add back) acquisition related expenses.

112.   Exela was in the business of acquiring other companies.  Before the Merger, SourceHOV had grown through a series of mergers – beginning with a company Called Liaison, which merged with Source.  That combined company would later become SourceHOV.

113.    In November 2014, SourceHOV also acquired a company called BancTec, followed by a September 28, 2016 acquisition of TransCentra -- both before the Merger.   In selecting acquisition targets, Defendants frequently partnered with private equity company Apollo, a leveraged buyout specialist, both before the Merger and in connection with it.

114.    Following the close of the Merger, Exela would continue making acquisitions— including its April 10, 2018 purchase of Asterion, a provider of business outsourcing and document management.

115.    Following the Asterion transaction, analysts at Cantor Fitzgerald issued a report on May 11, 2018 that noted "Exela has made significant acquisitions in the past and M&A remains part of the company's strategy."

116.    Based on the foregoing, it is reasonable to conclude that Exela is indeed in the business of acquiring companies, and thus, merger related activities are ordinary operating expenses that should not be added back to Adjusted EBITDA.

117.    When a company gives an adjusted EBITDA figure to investors, that figure is a term of art and carries with it an implied meaning.   The inference investors will draw regarding addbacks categorized by management as non-recurring, or non-routine, are exactly that—they are not costs associated with the very business that entity is in and that they are decidedly not operating expenses.

118.    It also means that if a company says that its EBITDA and adjusted EBITDA will converge, or should be the same, that statement implies that the company does not foresee any hurricanes coming to Chicago anytime soon.   In other words, the non-recurring expenses should, indeed, be non-recurring quarter-over-quarter.

119.    The above is not a controversial categorization, in fact it is one largely shared by Exela.   For example, during his testimony at the Appraisal Action, current Exela SVP Verma testified on June 4, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses which are considered one-time and nonrecurring in nature; for example, business optimization and fees and expenses incurred in connection with transactions."

120.    Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement. And what that means is every cost that was not part of the business as usual has to be added back. There – there's no black and white about it.  So -- because you have to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

121.    During the same testimony, Verma even went so far as to testify that "the EBITDA definition has to be held sacrosanct.  And what I mean by that is every charges which are not a usual course of business are added back to the EBITDA."

122.    Verma also testified to the importance that investors place on management's discretion in how they categorize EBITDA, stating, "And obviously, financial performance is a very important metric.  EBITDA is a very important metric that is looked upon by all investors."

123.    Verma further testified that SourceHov had a motive to include optimization and restructuring addbacks because "it's basically in the company's interest to show an add-back." The reason it was in SourceHOV best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing."

124.    But Verma's testimony that only nonrecurring charges are added back to adjusted EBITDA was not supported by the testimony of SourceHOV's own financial expert witness, Greg Jarrell.  Jarrell questioned the way SourceHOV categorized its addbacks.  For instance, on June 6, 2019, Jarrell testified that SourceHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring."  More specifically, he testified that "they're supposed to be nonrecurring expenses, and I don't know.  I seem to see the same expenses year after year after year.  So I – my impression was, jeez, they don't look to be so nonrecurring.  But I understand what they're doing.  It's a – it's done a lot.  It's not consistent with GAAP, but financial people do this."

125.     Jarrell further testified that "It struck me [as] an important negative – negative checkmark of reliability is the fact that *there seemed to be a more-than-normal amount of add-backs*.  And it's just – it's a consideration, it's a factor, and it's a negative."  Dr. Jarrell further expressed "serious reservations" about management's "aggressive" accounting practices.  2020 WL 496606, at *14.

126.     Dr. Jarrell also testified that Chadha was aware of the heavy use of EBITDA addbacks and their impact on the appearance of SourceHOV's performance:

> Q. So for 2015, '16, and the first half of '17, that's essentially saying that -- that the adjustments to EBITDA make up more than a quarter of the adjusted EBITDA; is that right?
> A. Yes, yes.
> Q. And are you aware of anyone expressing concern about these adjustments?
> A. Yes. As I -- as I talked about in my report, and I threw a couple of -- repeated a couple of the things that I said in the report in quotes in the report here on page 14. You know, there was some reaction from professionals that were sort of consistent with mine, my reaction when I saw that. You know, "inflated with less than credible adjustments" is a comment from a Morgan Stanley person in February. News story that circulated within Morgan Stanley. And I underlined the sentences that struck me. You know, and the one that I thought was the most colorful was at the bottom. June 30th, 2017, email said that we have 'Synergies on top of synergies on top of cost savings. Just too many.' And 'When you see so many adjustments, it just starts getting egregious. We just put our pencils down.' So other people noticed that there was a big disconnect between the real EBITDA, the cash EBITDA, and the adjusted EBITDA. *Even Mr. Chadha, at his deposition*, I remember reading at one point, somebody questioned him whether or not a particular number that he looked at was -- was -- you know, said that's EBITDA. *And he said no, that's adjusted EBITDA*. And the examiner said, well, how do you know? And he says, I know, *because it's a big positive number*. He says if cash EBITDA had been that big, we wouldn't be in this pickle, or some words to that effect.

127.     The following exchange between the Court of Chancery and SourceHOV's expert, Jarrell, clarifies his concern about the expense addbacks:

> THE COURT: So was it within the realm of discretion, for you to do a proper evaluation, for you to have made adjustments to those projections to account for that before you began your analysis?
>
> THE WITNESS: No. No. I don't – I wouldn't go that far, because this -- this practice of adding back *nonrecurring* expenses is ubiquitous in the financial community. And public companies, you know, you see it all the time.

They refer to this is a non-GAAP number. That's what they mean. They mean that we've taken a real number and we've added things back, because when we go to project, this should improve our -- our ability to project, because, you know, we've taken out things that will ***not recur***. If you really did take out things that did not recur, that's a good thing to do, in terms of trying to create better projections. That's a good thing. ***If you overdo that, for whatever reason – who knows what motive, but if you overdo that, then that's a bad thing***.

128.     The Court of Chancery observed the impact of SourceHOV's manipulated EBITDA addbacks in its opinion in the Appraisal Action, noting that SourceHOV's debt covenants required it to maintain a certain leverage ratio calculated as the company's net debt divided by adjusted EBITDA.  2020 WL 496606, *4 & n.37.  The court further noted that "SourceHOV would either have to increase its EBITDA, reduce its total debt or both to satisfy the Leverage Ratio covenant." *Id.*  Of course, inflating addbacks would increase adjusted EBITDA for purposes of improving the leverage ratio.

129.     SourceHOV's own expert witness Jarrell was not the only one to have expressed reservations about SourceHOV's use of excessive expense addbacks to its adjusted EBITDA. Rather, he testified that "there was some reaction from professionals that were sort of consistent with mine, my reaction when I saw that.  You know, '***inflated with less than credible adjustments***' is a comment from a Morgan Stanley person in February.  News story that circulated within Morgan Stanley."  Jarrell's testimony reflected his reading in open court of a June 30, 2017 internal email by Morgan Stanley investment bankers who, in the same email, described SourceHOV's adjusted EBITDA figures as being "egregious," stating, "When  you see so many adjustments, it just starts getting egregious.  We just put our pencils down."

130.     Documents obtained from the Appraisal Action further reveal that Morgan Stanley was not the only investment bank to question SourceHOV's categorization of adjusted EBITDA addbacks.  Wall Street titan, Goldman Sachs, also keyed in on the same thing.  For example, on October 27, 2016, Whit Graham at Goldman Sachs emailed several SourceHov executives warning that Goldman Sachs' assessment of SourceHOV's value was "adversely impacted by historical

perceptions around revenue growth *and EBITDA add-backs*, a concentrated investor base and a lack of public information, among [others] ...."

131.    In sum, the Appraisal Action established that SourceHOV, under the same leadership that runs Exela, improperly used adjusted EBITDA to mislead investors by including addback expenses that were not appropriate addbacks: they were really just recurring operating expenses, misleadingly portrayed as nonroutine expense addbacks to inflate EBITDA.

**5.    The Knowledge And Actions of SourceHOV, And Of The Individual Defendants While Employed By SourceHOV, Are Attributable To Defendants In This Case**

132.    Just because SourceHOV merged with Novitex and Quinpario does not mean that its leadership suddenly adopted ethical business practices.  Quite the contrary—the same deception that the Court of Chancery observed coming out of SourceHOV, likewise permeated Exela during the Class Period.  That reason is simple: SourceHOV is Exela.  The same executives who ran SourceHOV ran Exela during the Class Period, and Chadha controlled both as Chair.  Indeed, the Business Combination was designed such that "HGM retained majority control of any SourceHOV/Novitex combined entity," 2020 WL 496606 *4, n.47, as is confirmed by the Individual Defendants' continued control over SourceHOV and Exela after the Merger.  Chadha also ensured that he retained such control over Exela by stacking the Company's management with insiders and loyalists.

133.    Chadha was Chair of SourceHOV before the Merger, and then stayed on to become Chair of Exela.  He–and the entity he owns and controls, HGM–was SourceHOV's largest shareholder at the time of the Merger.  As of March 26, 2020, Chadha had beneficial interest in 74,393,234 shares (or 50%) of Exela common stock.  At all relevant times, there was no single person with a greater financial interest in Exela.

134.    Defendant Reynolds began working at SourceHOV predecessor entities beginning 2001.  At all relevant times, Reynolds served as SourceHOV's CFO and Co-Chair.  Following the Merger, he served as Exela's CFO from its inception until his termination on May 21, 2020—four days after Exela filed its Form 8-K announcing the Appraisal Action liability and that Exela would

need to restate its 2017, 2018, and Q1-Q3 2019 financial results—when he was replaced by Shrikant Sortur.  According to Exela's website, "Mr. Reynolds was also the Chief Operating Officer and a Partner at HGM."

135.    Cogburn began working for SourceHOV in 1993.  He served as SourceHOV's CEO since 2013, and he became Exela's CEO following the Merger.  According to Exela's website, "Mr. Cogburn has also been . . . a principal of HGM since 2003."

136.    SourceHOV's SVP of Finance, Verma, likewise continued at Exela.  Verma previously reported to Chadha at HGM from 2013 to 2015.  He reported to Chadha at SourceHOV from 2015 through 2017, and during the Class Period he continued to work under Chadha's direction at Exela, as a Senior Vice President of Finance.  Verma created financial models and projections of company performance, including of projections for Adjusted EBITDA and revenue, for Chadha, Reynolds, and Cogburn while at SourceHOV, and he continued to do that same type of work for Defendants at Exela.  Verma was still listed on HGM's website as an active employee up to June 4, 2019 when he testified at the Appraisal Action and was still listed as a Vice President at HGM as of the time of this filing.[13]

137.    In addition, Shrikant Sortur, who replaced Reynolds as CFO in May 2020, was previously a SVP of Finance at SourceHOV, where he worked for the better part of his career: from 2002 through 2017.

138.    Finally, Chadha's son-in-law, Andrej Jonovic, was an HGM managing director during the time period relevant to the Appraisal Action, orchestrated the Backdated Valuation for Chadha/SourceHOV, but was employed by Exela, as an Executive Vice President.

139.    Indeed, the Delaware Court of Chancery in the Veil Piercing Action found that "Plaintiffs make a compelling case in their Complaint that Exela and SourceHOV Holdings operate as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them."  251 A.3d at 707.  That finding was based on allegations including that

---

[13] Available at: https://hgmfund.com/ourTeam.html, last checked on July 28, 2021.

"SourceHOV Holdings and the SourceHOV Subsidiaries, have overlapping personnel and directors and share the same offices; many of the SourceHOV Subsidiaries do not have updated corporate registrations; the entities have failed to maintain accurate or complete corporate records; Exela must give its approval before SourceHOV Holdings can pay debts; and all Exela-related entities have been collectively referred to as one Exela-controlled enterprise in SEC filings." *Id.* at 716. The court made that finding against *Exela*, not *SourceHOV*.

140.    And before the court made that finding in the Veil Piercing Action, it first "emphasized that, just like with traditional veil-piercing, reverse veil-piercing should be sanctioned only in the most 'exceptional circumstances'" and that "[o]nly in cases alleging egregious facts, coupled with the lack of real and substantial prejudice to third parties, should the court even consider utilizing the reverse veil-piercing doctrine." 251 A.3d at 714.

141.    According to the court in the Veil Piercing Action, Exela's conduct with respect to the Appraisal Action was just such a case:

> I am satisfied this is one of those "exceptional circumstances" where a plaintiff has well pled a basis for reverse veil-piercing. It is at least reasonably conceivable that the SourceHOV Subsidiaries are alter egos of SourceHOV Holdings and that the subsidiaries have actively participated in a scheme to defraud or work an injustice against SourceHOV Holdings creditors, like Plaintiffs, by diverting funds that would normally flow to SourceHOV Holdings away from that entity to Exela. At this stage, from the well pled allegations in the Complaint, I see no innocent shareholders or creditors of the SourceHOV Subsidiaries that would be harmed by reverse veil-piercing, nor any potential alternative claims at law or in equity, as against the SourceHOV Subsidiaries or SourceHOV Holdings itself, that would for certain remedy the harm.  251 A.3d at 716.

142.    All of those facts operate here: SourceHOV and Exela acted as a single economic entity prior to and throughout the Class Period.

143.    SourceHOV is a holding company wholly-owned by Exela, with no direct operating assets.[14]   In discovery responses produced by Defendants in the Appraisal Action, Exela admitted that "SourceHOV does not have any accounts, and has not made any transfer or payment greater

---

[14]   In discovery responses connected to the Appraisal Action, SourceHOV confirmed this arrangement was still the case as of July 1, 2020.

than or equal to $250,000 from any bank account, checking account, savings account, money market account, or brokerage account of which SourceHOV is the or a record owner from January 1, 2020 to the present."  Respondents' Resp. to Pets.' Interrog. No. 3.

144.    Exela, SourceHOV and SourceHOV LLC all do business in Texas, are all headquartered in Texas and appear to all have the same corporate address: 2701 E. Grauwyler Road, Irving, TX 75061, USA.

145.    There is also evidence of significant overlap in personnel between Exela, SourceHOV and SourceHOV LLC, including that noted above.  For instance, based upon a review of Exela's SEC filings and discovery produced in the Appraisal Action, Chadha was the principal stockholder of SourceHOV immediately prior to the business combination and is now Exela's Executive Chair.  Ronald Cogburn is the Chief Operating Officer of Exela and an officer, director, general partner, or manager of SourceHOV LLC.  Jim Reynolds is a member of Exela's board of directors and treasurer of SourceHOV LLC.  Mark Fairchild is president of Exela Smart Office and president of SourceHOV LLC.  Shrikant Sortur is the Chief Financial Officer of Exela and an officer of SourceHOV LLC.  Eric Mengwall serves as secretary for both Exela and SourceHOV LLC.

146.    At the Appraisal Action, Chadha even got momentarily confused about which entity his own son-in-law worked for:

Q. And Mr. Jonovic isn't a member of SourceHOV management either, is he?
A. He is. He's a -- a member of – he was inducted in after January -- after July 2017 to be one of the people that in runs business affairs and M&A for SourceHOV -- I mean Exela.
Q. For Exela?
A. For Exela.

147.    The above also establishes that when Jonovic requested the Backdated Valuation, he was doing so on behalf of *Exela*, not *SourceHOV*.

148.    SourceHOV made representations to lenders on behalf of Exela.  At the Appraisal Action, Chadha testified that doing so was "usual procedure":

Q. Okay. Isn't it also correct that SourceHOV had to provide comfort letters to lenders in connection with the Exela notes offering? Isn't that correct?

A. It's a usual procedure. Yes.
Q. Okay. And there was a June 28, 2017, comfort letter, and then there was a July 12, 2017, comfort letter; isn't that correct?
A. I believe so.
Q. And these comfort letters confirm the financial soundness of the firm; isn't that correct?
A. **Both firms, yeah**.

149.    In its public filings Exela states explicitly that "we use the terms 'Company', 'we', 'us', or 'our' to refer to Exela Technologies, Inc. and its consolidated subsidiaries, and where applicable, our predecessors SourceHOV and Novitex prior to the closing of the Novitex Business Combination.  Exela thus fails to distinguish between itself and its subsidiaries within its filed financial reports, including its assessment of loss contingencies relating to the Appraisal Action, which is at issue here.

150.    Chadha testified at the Appraisal Action that SourceHOV **never had a board meeting** – not one – demonstrating a glaring lack of *any* corporate formalities that might distinguish SourceHOV from Exela given the overlap in management.  In showing such reckless abandon for the corporate form, along with the rights and responsibilities that go with it, Chadha and Reynolds surrendered any distinction between SourceHOV and Exela.

151.    In its 2019 10-K, Exela explicitly acknowledged such a single enterprise:

On March 26, 2020, the Delaware Court of Chancery entered a judgment against one of our subsidiaries in the amount of $57,698,426 inclusive of costs and interest arising out of the Appraisal Action, which judgment will continue to accrue interest, until paid, at the legal rate, compounded quarterly. On May 7, 2020, *we* filed a motion for new trial in relation to share count. Following the Court's decision on the motion for new trial, SourceHOV has the right to appeal the judgment. However, at present the judgment has not been stayed, and *we expect* the petitioners to seek to enforce the judgment. If *we* are forced to pay the judgment (or bond the judgment pending an appeal, which will likely require cash collateral), such action could have a material adverse effect *on our* liquidity and/or cause *our* lenders to take action adverse *to us*.

152.    And as correctly noted by the Court of Chancery in the Veil Piercing Action, Exela and SourceHOV were adequately alleged to have operated as a single economic enterprise there – and the above facts establish that the same is likewise true here and was likewise true at all relevant times during the Class Period.

## V.   SUMMARY OF THE FRAUD

### A.   Defendants Inflate Adjusted EBITDA With Ordinary Operating Expenses, Claiming They Are Non-Routine/Non-Recurring And Will Decline

153.   Throughout the Class Period, Defendants repeatedly made misleading statements about Exela's adjusted EBITDA.   Generally, Defendants misled Exela's investors into believing that expense addbacks made to Exela's adjusted EBITDA were non-routine and only going to be temporary (as they should be).   Most commonly, the expense addback at issue was so called optimization and restructuring ("O&R") expense.   Adding back recurring and/or ordinary expenses had the effect of misleadingly inflating Exela's reported adjusted EBITDA.

154.   For instance, in discussing its Q4 2017 and full year 2017 results, Defendants were asked about   various Adjusted EBITDA addbacks and were told that O&R was "down significantly" and that investors should "expect less of those charges."   In fact, the Company told investors to only expect between $20 to $25 million for the full year of 2018 in O&R expenses. The Company ended up reporting more than twice that amount.   Reynolds gave that guidance in response to an analyst's question about Exela's Adjusted EBITDA addbacks:

> ARUN SESHADRI: Understood. And then as far as the guidance for -- the adjusted EBITDA guidance for 2018, is there any way you could give us the breakout of the various -- of the add backs within that? So in other words, what would be the relevant numbers for I guess the optimization and restructuring expenses, what's the assumption as well as transaction? I mean I guess it shouldn't be much of transaction integration. And then finally just sort of the breakout in terms of like oversight management, new contract set up -- any additional color you can add on those add backs.

> JIM REYNOLDS: Sure. If you look at 04, obviously you saw our business op costs go down significantly from the third quarter. They were basically $11 million in 04 versus close to $21 million in 03. So as we look to 2018 we would expect less of those charges also for the year somewhere between $20 million to $25 million in biz op type charges. With respect to transaction fees, we had close to $97 million in 03 related to the transaction. There were only $2 million that came through in 04 of 2017. So we don't anticipate large add-backs from that area. And then with respect to the management fees, those all went away as part of the combined merger. So those will be de minimis on a go-forward basis as there are no more management fees being paid by either company. ***So we see the adjustments decreasing significantly***.

155.   Investors took Defendants at their word, and based their share price targets on the expectation that O&R were not ordinary operating expenses.   For instance, in an initiation report

dated April 18, 2018, rating Exela shares "Outperform" (which is equivalent to a "Buy" rating), RBC Capital Markets described its understanding of Exela's Adjusted EBITDA as follows:

> On its GAAP income statement, Exela generally reports three expense lines, cost of revenue (excluding D&A), SG&A expenses and depreciation & amortization. Certain quarters have also included one-time items such as the impairment of goodwill and related-party expenses. We note that the bulk of operating expenses (-73% of FY17 pro forma) are in the cost of revenue line and **believe that investors are generally focused on adjusted EBITDA** as well as 'further' adjusted EBITDA. **Adjusted EBITDA reflects traditional EBITDA adjusted for one-time and noncash charges**, while 'further' adjusted EBITDA reflects adjusted EBITDA plus stand-alone company merger adjustments (essentially the anticipated cost savings discussed previously). In FY18 and FY19, we are anticipating the gap between EBITDA, adjusted EBITDA and "further" adjusted EBITDA to narrow.

* * *

> As of year-end 2017, Exela had total debt of $1.4B and cash of $62M and management put its total liquidity at $141M. Its net debt to FY17 'further' adjusted EBITDA stood at 3.88x. 'further' adjusted EBITDA is a financial metric used by its banks that, in our estimation, equates to adjusted EBITDA **(i.e., traditional EBITDA adjusted for one-time and non-cash charges**) plus stand-alone company merger adjustments (essentially the anticipated cost savings discussed above). Management's target leverage is —3x, and we would note that (1) 'further' adjusted EBITDA and adjusted EBITDA should narrow significantly in FY18 and FY19, (2) our estimates include modest debt pay down, and (3) we would expect additional acquisitions.

156.   Investors later learned, however, that Exela's added-back O&R expenses largely were *not* non-recurring, aberrant, or temporary.  Rather, they continued to recur—**in every single quarter since Exela went pubic**—and as a result, these expenses should never have been portrayed to investors as being temporary, or "non-routine" as they were consistently described to investors in Exela's EBITDA reconciliation table.  Exela's so-called "O&R" expenses were in reality run of the mill operating expenses that should never have been added back to adjusted EBITDA—particularly when the addbacks were accompanied by various explanations that they would be only temporary and were "outside the control" of management.

157.   Defendants also repeatedly indicated that the O&R addbacks did not include "operating" expenses.  For example, on March 15, 2018, Exela reported its 4Q 2017 and FY 2017 results.  In its Investor Presentation, Exela stated the following about its O&R expenses:

> Optimization & restructuring expenses and merger adjustments are primarily related to the

implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

158.     Defendants repeated the claim that O&R expense addbacks did not reflect Exela's "past, current or future operating performance" in investor presentations on, at least, the following dates: March 16, 2018; May 11, 2018; August 10, 2018; November 8, 2018; March 18, 2019; March 19, 2019; May 9,  2019; August 8, 2019; November 12, 2019; November 12, 2019; and June 9, 2020.

159.     Defendants also repeatedly characterised addbacks to Adjusted EBITDA as being "outside the control of our management team" on all of the following dates[15:] March 16, 2018; May 11, 2018; August 10, 2018; November 8, 2018; March 18, 2019; March 19, 2019; May 9, 2019; August 8, 2019; November 12, 2019; November 12, 2019; and June 9, 2020—even though the largest contributor to O&R was headcount – something squarely within the control of management, but not clearly communicated to investors.

160.     On Exela's 2Q 2018 earnings call on August 9, 2018, Defendants continued to assure investors that adjusted EBITDA would converge with GAAP EBITDA, but after five consecutive quarters worth of expenses that management claimed would be "non-routine", analysts began to press what management meant by "one-time" expenses.  For example, Jim Reynolds was asked by a Cantor Fitzgerald equity analyst which expenses from the 2Q 2018 quarter were one-time in nature.  In response, Reynolds admitted that Exela will continue to have some "biz-op and restructuring on a go-forward basis" but still argued that Defendants "have done

---

[15] March 16, 2018 within Ex. 99.1 to an 8-K; May 11, 2018 within Ex. 99.1 to an 8-K/A; August 10, 2018 within Ex. 99.1 & Ex. 99.2 to an 8-K; November 8, 2018 within Ex. 99.1 to an 8-K; March 18, 2019 within Exela's 4Q 2018 Earnings Presentation (appearing on the Company's website); March 19, 2019 within Ex. 99.1 to an 8-K/A; May 9,  2019 within Ex. 99.1 to an 8-K; August 8, 2019 within Ex. 99.1 to an 8-K; November 12, 2019 within Ex. 99.1 to an 8-K; November 12, 2019 within Exela's 2Q 2019 Earnings Presentation (appearing on the Company's website); and June 9, 2020 within Exela's 4Q 2019 Earnings Presentation (appearing on the Company's website).

a good job minimizing the amount of adjustments as we convert the savings into GAAP."  The exchange went as follows:

> JOSEPH DEAN FORESI, ANALYST, CANTOR FITZGERALD & CO., RESEARCH DIVISION: I wonder if we could start talking about what might have been onetime in the cost structure this quarter, particularly in the gross margins. I know that you had a slide in there that showed your sort of puts and takes, *but what can we consider to be, I guess, one-time in nature in 2Q*?

> JAMES G. REYNOLDS: So hey, Joe, thanks for your call. I think that if you take a look at kind of a onetime impact during 02, it was the capitalization we had done historically before 606 and some of the duplicate ramp cost that impacted us from a cost of sales perspective. *In addition, during the quarter, we had incremental biz op, we don't break that between SG&A and cost of sales at this point in time*. Really, as a public company, we're really focusing on driving the EBITDA margins and *converting, really, adjustments -- or adjusted EBITDA to GAAP EBITDA.*

> JOSEPH DEAN FORESI: Got it. And so about how much -- what -- can you wrap a number around those onetime charges in the quarter? *And I assume you expect them to fall off in 3Q?*

> JAMES G. REYNOLDS: *Yes*. The onetime charges, we will continue to have some of the biz op and restructuring on a go-forward basis. We -- as long as we don't do any tuck-in acquisitions, transaction cost should be minimal to none. The noncash charges will continue with respect to the restricted stock units that vest over the next year. Those will be the major buckets on a go-forward basis. I think that we've done a good job of minimizing the amount of adjustments as we convert the savings into GAAP.

161.    Moreover, Defendants consistently presented the O&R addbacks as including only Merger-related and other "non-routine" expenses.  For example, Exela's August 9, 2018 press release stated that "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the Business Combination, asset base (such as depreciation and amortization) *and other similar non-routine items* outside the control of our management team."

162.    Moreover, on Exela's 2Q'18 earnings call held on the same day, August 9, 2019, Reynolds assured investors that "our job is to minimize the adjustments" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will – and the percentage of adjustments *will shrink in the future*."

163.    That Exela's messaging led investors to believe that its adjusted EBITDA addbacks were not going to be recurring is apparent from, among other places, Morgan Stanley's October 10, 2018 research coverage initiation.  In that 34-page analysis, Morgan Stanley pointed to adjusted EBITDA converging towards free cash flow as one of its three key areas supporting Morgan Stanley's Overweight (*i.e.* buy) rating on Exela's stock.  Specifically, Morgan Stanley noted that Exela's 2017 adjusted EBITDA was lowered by "***one-time charges*** related to the company's business transformation efforts, including ***$48 million of restructuring expenses*** and $99 million of transaction related costs."  Morgan Stanley also noted that Exela management indicated that they expected such costs to moderate moving forward.

164.    Another way Defendants maintained the impression that adjusted EBITDA addbacks were not a regular and ongoing business expense was by suggesting that the O&R expenses would decline over time.  For example, on Exela's Q4 2018 earnings call held on March 18, 2019, Defendant Cogburn stated that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA."

165.    The following chart reflects Exela's ongoing O&R addbacks to adjusted EBITDA as reported during the Class Period.  As reflected, O&R addbacks (*i.e.*, expenses added back to Exela's EBITDA) comprised a substantial percentage of total adjusted EBITDA reported during the Class Period:[16]

|  | FY 2017 | Q1'18 | Q2'18 | Q3'18 | Q4'18 | FY 2018 | Q1'19 | Q2'19 | Q3'19 |
|---|---|---|---|---|---|---|---|---|---|
| O&R addbacks ($ mm) | 47.9 | 14.5 | 13 | 19.4 | 21.2 | 68.2 | 23.7 | 18.7 | 16.8 |
| Adjusted EBITDA ($ mm) | 208.8 | 69.6 | 70.1 | 68.9 | 75.3 | 283.9 | 74.1 | 69.4 | 60.5 |

---

[16] Figures are expressed in millions of dollars. The chart set forth at ¶ 233 *infra*, reflects the impact of the Restatement on these originally-reported figures and demonstrates how inflated expense addbacks enabled Exela to reach its adjusted EBITDA guidance during the Class Period.

**B.      Defendants Claim Exela Has Predictable Revenue And Tout Revenue Visibility To Instill Investor Confidence In Guidance**

166.     Throughout the Class Period, Defendants repeatedly assured investors that the Company had over 90% visibility in revenue.  The Company's Annual Report for the year ended December 31, 2017 filed on Form 10-K on March 16, 2018 (the "2017 10-K") noted that "approximately 90% is recurring in nature and supported by long-term customer contracts."

167.     During Exela's March 15, 2018 earnings call, Defendants issued aggressive guidance for 2018 of $1.51B-$1.54B in revenue (4-6% growth), and adjusted EBITDA of $290-310 million (20-28% growth), exceeding the Company's longer-term financial objectives.  Cantor Fitzgerald analyst Mike Reid pressed, "[c]ould you tell us what's given you the confidence in giving this year's guidance above your longer-term financial objectives?"  Reynolds answered, "[o]ur revenue guidance is based on a bottoms up analysis. We have *over 90% visibility in revenue* and have incorporated our total contracted revenue since January of -- January 1. So *we feel really good with our visibility*."

168.     An earlier December 5, 2017 Cantor Fitzgerald analyst report similarly noted that "BPO business relationships are characterized by multi-year contracts *with predictable annual revenue*."  The same December 5, 2017 Cantor Fitzgerald report also noted that "Exela has 90% recurring revenue and 98% renewal rates."

169.     Similarly, on April 18, 2018, RBC Capital Markets initiated coverage of Exela with an Outperform (i.e. "buy") rating that also echoed Defendants statements from just over a month earlier, on March 16, 2018.  RBC specifically noted that  "Total contract value won in FY17 totaled $1.523B, more than FY17 total revenue, which enhances visibility in our opinion and led to FY18 revenue growth guidance above management's long-term guidance."  The RBC report continued that,  "In FY17, it generated $1.456B revenue of which approximately 90% is recurring in nature and supported by long-term or auto-renewal customer contracts."

170.    On May 10, 2018, the Company held an earnings call where it discussed its 1Q'18 financial results and raised FY'2018 revenue guidance and increased the low end of adjusted EBITDA guidance.  Cogburn stated, "We have a high degree of revenue visibility…. The level of visibility gives us confidence in our ability to accurately forecast the trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95% ..."

171.    Reynolds further elaborated in response to a Cantor Fitzgerald analyst's question about what gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?
>
> REYNOLDS: …If you think about our business and our contracts, they're long-term in nature, right? They're typically three to five years, and we have **over 95% renewal rates. So we have good visibility into our revenue, typically just over 90% at any point in time**. If you look at the numbers we delivered in the first quarter, we're very pleased with the results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

172.    On the same earnings call, a Credit Suisse analyst noted that while revenue grew, gross profit had declined and inquired about the impact of postage revenue.  Postage revenue has no margin and a substantial amount of postage revenue would have the impact of inflating revenues, while compressing margins, and Reynolds provided no indication that postage revenue had any impact on the Company's revenues or margins:

> ARUN A. SESHADRI: …First, I just wanted to understand, obviously nice revenue growth in the quarter, but it looked like gross profit actually declined. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, what was the impact of postage in the numbers?
>
> REYNOLDS: So if you take a look, we don't really look at it on a gross margin basis because we have a lot of business optimization cost flowing through. We focus on an EBITDA perspective. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take, runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage, **we don't**

*really break out postage separately*. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

173.    While Reynolds told investors that Defendants "don't really break out postage separately", his admission that the Company follows ASC 606 establishes that Defendants did track postage revenue at the time that he made the above statement because ASC 606 effectively requires as much.

174.    ASC 606, promulgated by the Financial Accounting Standards Board ("FASB"), states that "If the consideration promised in a contract includes a variable amount, an entity shall estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer."   ASC 606-10-32-5.   Similarly, according to a practice guide published in March 2017, by Deloitte:

> Regardless of the form of variability or its complexity, once variable consideration is identified, an entity is required under ASC 606-10-32-8 to estimate the amount of variable consideration to determine the transaction price in a contract with a customer by using either the "expected value" method or the "most likely amount" method, "depending on which method the entity expects to better predict the amount of consideration to which it will be entitled." As ASC 606-10-32-8 explains, the expected value is "the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics." ASC 606-10-32-8 further states that the most likely amount is "the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract).

175.    In its 10-K for the year ended 2018, Exela also explicitly admitted that it tracked postage revenue in accordance with ASC 606:

> **Revenue Recognition**
> We account for revenue in accordance with ASC 606. A performance obligation is a promise in a contract to transfer a distinct good or service to the customer, and is the unit of account in ASC 606. Revenue is measured as the amount of consideration we expect to receive in exchange for transferring goods or providing services. The contract transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. All of our material sources of revenue are derived from contracts with customers, primarily relating to the provision of business and transaction processing services within each of our segments. We do not have any significant extended payment terms, as payment is received shortly after goods are delivered or services are provided.

**Nature of Services**

Our primary performance obligations are to stand ready to provide various forms of business processing services, consisting of a series of distinct services that are substantially the same and have the same pattern of transfer over time, and accordingly are combined into a single performance obligation. Our promise to our customers is typically to perform an unknown or unspecified quantity of tasks and the consideration received is contingent upon the customers' use (i.e., number of transactions processed, requests fulfilled, etc.); as such, the total transaction price is variable. We allocate the variable fees to the single performance obligation charged to the distinct service period in which we have the contractual right to bill under the contract.

* * *

***Customer deposits consist primarily of amounts received from customers in advance for postage***. The majority of the amounts recorded as of December 31, 2017 were used to pay for postage with the corresponding postage revenue being recognized during the year ended December 31, 2018.

176.    And the line item "customer deposits" appears on Exela's balance sheet   -- including on every quarterly filing beginning in the third quarter of 2017 and in every 10-K (all signed by Cogburn, Chadha, and Reynolds) since Exela has been public.  Thus, by the Company's own admission – it was tracking postage by the third quarter of 2017 and every reporting period since.  The following chart reflects the Company's postage revenue during the Class Period:

| Reporting Period | Postage Revenue ($ millions) | Total Revenue ($ millions) | Postage contribution to total revenue (%) |
|---|---|---|---|
| 1H 2018 | 156 | 803.4 | 19.4 % |
| 3Q 2018 | 76.9 | 383.0 | 20.1 % |
| 4Q 2018 | 77.2 | 399.6 | 19.3 % |
| FY 2018 | 310.0 | 1,586.2 | 19.5 % |
| Q1 2019 | 75.5 | 404.4 | 19.0 % |
| Q2 2019 | 66.2 | 390.8 | 17.0 % |
| Q3 2019 | 63.6 | 372.9 | 17.1 % |
| Q4 2019 | 70.1 | 393.6 | 17.8 % |
| FY 2019 | 275.3 | 1,562.3 | 17.6 % |

177.    Even so, Defendants maintained their representation that Exela had 90% visibility into its revenue and, as time went on, analysts began to credit Defendants' statements about visibility and some saw it as a selling point for investing in the stock.  For instance an April 11, 2019 report by Cantor Fitzgerald noted:

**Growth moving forward**. The pipeline remains strong, almost doubling y/y. XELA added 62 customers generating over $1 mn in 2018. The company's top 200 customers account for about 76% of their business. XELA has a strong focus on the growth of these customers.

In 2018, their top 200 clients saw 14% organic growth. XELA has added strategic teams, with the goal of replicating their success with previous wins on new business. Management has taken action to implement a strategic team for the legal segment to help smooth results and enhance this segment of the company. Management reiterated their 98% retention and typical 90% visibility into revenue growth for the next 12 months. Revenue guidance for 2019 is set at 5-7%. (emphasis in original).

178.    About a month later, on May 10, 2019, the same analyst at Cantor Fitzgerald reiterated his view that Exela's "pipeline remains strong" based on Defendants' purported 90% visibility claims:

Foresi's Take. Adjusted EBITDA margins expanded 70 bps y/y to 18.4%, below our estimate of 18.6%. The pipeline remains strong, management noting it has doubled y/y, helped by its new Digital Now product. Management believes the company is well-positioned for long-term sustainable growth beyond 2019. Exela noted retention was 98%, and it typically has 90% visibility into revenue growth for the next 12 months. Management noted a pick up in their Smart Office offering. (emphasis in original).

179.    Ultimately investors would learn that Defendants revenue was not – and could not have been – as predictable as claimed because a material amount (roughly 20% depending on the time frame) of Exela's revenue was pass through revenue from postage, which Defendants later admitted was historically unpredictable.

### C.     Defendants Fail To Record Estimated Appraisal Liability And Misrepresent Their Ability To Even Estimate Exela's Potential Liability Associated With The Appraisal Action

180.    In its 2017 10-K, Exela acknowledged the existence of the Appraisal Action and promised to "vigorously defend" against it:

On September 21, 2017, former stockholders of SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Business Combination, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). The parties have commenced discovery. At this stage of the

litigation, ***the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action***. Pursuant to the terms of the Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our Common Stock issued to Ex-Sigma 2 LLC, our principal stockholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. ***The Company intends to vigorously defend against the Appraisal Action***.

181.    As did the Company's 2018 10-K:

On September 21, 2017, former stockholders of SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Novitex Business Combination, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Novitex Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). Discovery in the Appraisal Action is not yet complete. At this stage of the litigation, ***the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action***. Pursuant to the terms of the Novitex Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our Common Stock issued to Ex-Sigma 2 LLC, our principal stockholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. ***The Company intends to vigorously defend against the Appraisal Action***.

182.     Exela's 2017 and 2018 Form 10-Ks were signed by Cogburn, Chadha, and Reynolds, all of whom played central roles for SourceHOV/Exela in the Appraisal Action.

183.     However, as detailed in ¶¶ 83- 100, *supra*, Defendants were well aware of the range of Exela's potential liability by the time these annual reports were filed.

184.     Exela estimated its potential liability associated with the Appraisal Action again on January 10, 2020, to be approximately $65,000,000.  This time, Exela prepared the estimate of its liability for a several lenders including TPG Speciality Lending Inc., and PNC Bank in connection with obtaining a $160 million Accounts Receivable Securitization Facility ("the A/R Facility").

185.    The terms of the Loan and Security Agreement provide further evidence that Exela was fully aware of the extent of its liability in the Appraisal Action when the Appraisal Action was pending. The Loan and Security Agreement specifies that the Appraisal Action constitutes an Event of Default. *See* A/R Facility Excerpts, Loan and Security Agreement, Article I, Section 1.01, ("'Subject Appraisal Action' means that certain petition for appraisal pursuant to 8 Del. C. § 262 filed on September 21, 2017 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS."); Article X, Section 10.01(u) ("If any of the following events (each and "Event of Default" shall occur: ...(u) one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 ***(or solely with respect to the Subject Appraisal Action, $65,000,000)*** ... shall be rendered against any Exela Party or any Subsidiary of any Exela Party or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Exela Party or any Subsidiary of any Exela Party to enforce any such judgment which is not effectively stayed for a period of ten (10) consecutive days").

186.    These provisions confirm that Exela appreciated fully the extent of its liability to the plaintiffs in the Appraisal Action.  Exela evidently considered that a judgment of up to $65 million in favor of the Appraisal Action plaintiffs was possible and agreed to what it considered a high enough threshold to avoid triggering an Event of Default.  To arrive at that $65 million threshold, the cogent and compelling inference is that Defendants estimated it.

### D.    The Truth Begins To Emerge

#### 1.    Exela Lowers Its 2018 Adjusted EBITDA Guidance By ~$18 Million

187.    On November 8, 2018 Exela announced its quarterly results for the third quarter of 2018, reporting $383 million in quarterly revenue and adjusted EBITDA of $69 million.  On adjusted EBITDA, Exela's 3Q 2018 included a 49% increase in O&R addbacks as compared to the prior quarter ($19.4 million in O&R addbacks reported in 3Q'18 versus $13 million in O&R addbacks in 2Q'18).

188.     Despite the increase in O&R addbacks, Reynolds still tried to reassure investors that O&R expenses would decline, stating, "In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense. A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. We expect these costs to decline as we implement our transformational model."

189.     Despite his reassurance, analysts pressed Defendants on whether Exela's EBITDA addbacks were truly nonrecurring.  For example, Morgan Stanley analyst Brian Lee Essex asked:

> BRIAN LEE ESSEX: I don't know if it was just addressed, but I guess on a guide up in revenue, the guide down in EBITDA margins, could you help us -- maybe walk me through some of the puts and takes you have, what I would assume the better margin digital business, exiting a low-margin contract. I would assume that'll give you a lift to margins, but you're investing back in the business. Any sense for us to get a sense for in terms of both gross margin and EBITDA margin, *how one time-ish are these investments or impact items*, and how do we think about expansion from here on out?

> REYNOLDS: Sure. So if you take a look at the 2 items I mentioned, the LLPS and the on-site, that was a $7 million impact. And with the LLPS, those contracts in the on-site, it's gone. So it's not going to come back into Q4. So it has a carry-on effect. With respect to other incremental revenue, it's coming through, we have some high margin revenue that we're anticipating coming in, in the fourth quarter related to our Saas sales. It's happened historically. Through 2018, we feel good that we'll get some incremental flow through margin, but I think that a range of $280 million to $290 million is something we feel good about as we're exiting 2018.

190.     Reynolds also further assured investors on the November 8, 2018 earnings call that "we have 90% visibility into our revenue.  These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts."

191.     Analysts' reaction to Exela's third quarter results were mixed.  A November 9, 2018 Cantor Fitzgerald report stated, "[q]uarterly top-line results were above our expectations, and 2018 revenue guidance was raised. …Adjusted EBITDA margins expanded 250bps to 18.0%, below our estimate of 20.8%. Margins were hurt by lower revenue in LLPS and by exiting a low-margin contract…. Management lowered adjusted EBITDA guidance to $280-290 mn from $295-

310 mn, or -18% margin, due to more opportunities to reinvest in the business. We now expect $285 mn in adjusted EBITDA in 2018, down from our previous estimate of $302 mn."

192.     Morgan Stanley issued a report the same day, noting, "[s]trong growth drove a revenue beat as adoption remains robust on XELA's platform. The company guided for lower EBITDA in FY18 but, with the guide partly due to investment, we continue to see healthy growth and margin expansion ahead with XELA a share gainer in its markets."

193.     On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2018 damaging investors.

### 2.     Exela Reports 2018 Results, Further Partially Revealing The Extent Of Ongoing O&R Expenses; Still, Defendants Express Confidence In Strong 2019 Guidance Due to Revenue "Visibility"

194.     On March 18, 2019, Exela announced its full year and fourth quarter 2018 financial results and issued its 2019 revenue guidance, and Defendants held an earnings call the next day. The Company announced that it achieved its revenue and adjusted EBITDA guidance for 2018 and provided 2019 revenue guidance of between $1.66 and $1.7 billion (5-7% growth) and adjusted EBITDA guidance of between $305 million to $335 million (7-18% growth).

195.     During the earnings call held on March 18, 2019, Defendants further partially revealed that Exela's O&R addbacks were not necessarily one-time or non-recurring expenses, and that they would only "gradually" decline.  Reynolds stated, "[w]e believe *2018 represented the high watermark in terms of optimization and restructuring expenses*. And in time, we expect these costs to *gradually* decline as we implement our transformational model."  The Company also revealed that of the $21.2 million in O&R expenses for the fourth quarter of 2018, $14.2 or 66% came from "headcount cost."

196.     After seven straight quarters of Exela adding back O&R expenses, analysts tried to get a clean EBITDA number out of management, that was not manipulated by potentially improper expense addbacks.  Management refused:

> CAROLINE JOYCE: This is Caroline Joyce on for Arun today. Just a few. First, how do you expect the GAAP EBITDA range to be in 2019?

JAMES G. REYNOLDS: So we haven't given out any guidance on a GAAP perspective. What I will tell you is with the range that we've given for 2019, ***we still expect some business optimization costs to occur***. As we transition our existing customers and the new contracts, we'll have similar amount of noncash charges, which is primarily related to our stock option plan and our RSUs that have been granted. So that's kind of how it looks.

CAROLINE JOYCE: Okay, great. And then, I guess, on that same line, could you outline at all what you expect for transaction and integration and then optimization and restructuring expenses for 2019?

JAMES G. REYNOLDS: We have not given guidance to that number. What I will tell you is we're still going to be incurring these as we have continued to take on tuck-in acquisitions. There's still work to be done there. And as we roll out our technology, we're still incurring a duplicate cost associated with this rollout.

197.    Regarding Exela's 2019 guidance, Dan Dolev, an analyst with Nomura Securities, pressed "your guidance is very, very strong. I feel like it's above our numbers [] -- for 2019... Can you maybe give us a sort of the level of confidence you have in achieving that guidance?" Reynolds replied, ***"[a]s we've discussed historically, we typically have about 90% visibility into the next 12 months***."

198.    Reynolds also stated on the call that "[o]ur strategy to grow within our existing customers is resonating as they're seeking solutions to drive change, realizing the benefits of digital transformation…. ***We have a broad and sticky revenue base***."

199.    Another analyst asked why Exela's growth rate was consistent year-over-year given that the pipeline had doubled and Reynolds assured Defendants were being "conservative:"

JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort of the conversion rate? Is it an element of conservatism on the top line and expectations for next year? Have conversion rates changed? ***Is there anything in the top line we should know about?***

REYNOLDS: …I mean, we feel good about our conversion rate*s*. I think the size of the pipeline is strong. And just like this year, for the full year, we actually hit our revised - upward revised revenue guidance. So ***we have great visibility into the revenue*** and feel pretty good. I think, as we're still a new public company, 18 months or so, and we're ***trying to be somewhat conservative*** as we look at the potential for Digital Now, which is gaining traction in our front office. So we'd rather come out feeling good with that ***90% visibility*** on the top line.

200.    On March 19, 2019, Cantor Fitzgerald issued a report noting, "Exela has realized cost synergies as a result of the merger between SourceHOV and Novitex (now known as Enterprise Solutions) that formed the company, and the synergies are expected to continue to flow through the model in 2019. The net result should be margin and multiple expansion." It also stated, "Adjusted EBITDA margins expanded 260bps to 18.8%, below our estimate of 19.3%. The pipeline remains strong, almost doubling y/y. Management believes the company is well-positioned for long-term sustainable growth beyond 2019, and it added 62 customers generating over $1M in 2018. Exela noted retention was 98%, *and it typically has 90% visibility into revenue growth for the next 12 months.*" However it cautioned, "Exela employs significant amounts of financial leverage.... The debt represented 76% of total assets and 258% of tangible assets. Indebtedness could decrease its ability to obtain additional financing for working capital, capital expenditures, general corporate or other purposes; limit flexibility to make acquisitions; or increase cash requirements to support the payment of interest."

201.    Following this news, Exela's stock price dropped $0.21 per share (approximately 5.3%) to close at $3.73 per share on March 19, 2019, on heavy trading volume.  Exela's stock price dropped an additional 6.2%, or $0.23 per share, to close at $3.50 per share on March 20, 2019, on heavy trading volume.

### 3.    Exela Misses 1Q'19 Revenue Expectations, Reveals Ongoing High O&R Addbacks That Corresponds With Increased Headcount

202.    On May 9, 2019, the Company issued  a press release attached as Exhibit 99.1 to a Form 8-K detailing its 1Q'19 financial results wherein it reported a loss of $0.21 per share (GAAP) on revenue of $404.8 million versus a loss of $0.16 a share (GAAP) on revenue of $393.2 million. Both fell short of expectations for a loss of $0.06 per share on revenue of $410 million.  The Company also reported that its net debt stood at $1.46 billion, putting its leverage ratio at a concerning 5.06x. In addition, the Company's liquidity had declined from  $124 million at the end of 3Q'18, to $58 million at the end of 1Q'19.

203.    Moreover, despite Defendants' prior claim that 2018 represented the "high-water mark" of Exela's O&R addbacks to adjusted EBITDA, the first quarter of 2019 showed a new high for that expense at $25.8 million. The first quarter 2019 results also showed that O&R addbacks reached a new high during the same time that Exela's headcount rose by 929 full-time employees.

204.    Reynolds partially revealed that O&R charges were not limited to just the Merger or M&A activity:

> I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. **The primary variance between the 2 are optimization and restructuring charges**. This adjustment relates to investments we have made to achieve cost savings and **a majority relates to headcount**. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're incurring additional upfront cost for a few large projects. We expect this trend to continue in 2019, but decline in the year -- later quarters.

205.    Cogburn's response to Jefferies analyst, Todd Morgan, further partially revealed the nature of the purportedly "non-routine" expense that was added back to adjusted EBITDA every single quarter:

> TODD CRANSTON MORGAN: …I was hoping you could talk a little bit more about restructuring and optimization costs that you have here. **I mean they've been persistently high**. I guess you've defined those as being the salary and benefits for folks that are -- at this part of that optimization process, but is there any -- can you give us any kind of understanding of what kinds of people those are, what those kinds of expenses are and how the those might trend as we look forward?
>
> COGBURN: I think the second question related to the optimization and restructuring. **Optimization and restructuring charges are primarily headcount-related charges**. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

206.    Despite the disappointing news on revenue, debt, liquidity, and the partial disclosures relating to Exela's increased O&R expense, Exela met its adjusted EBITDA guidance and Cogburn reaffirmed the outlook for 2019 "based on our current pipeline," and noted "[w]ith

high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers."

207.    Analysts' reaction to the news was mixed.  Despite management's admissions about EBITDA adjustments, Cantor Fitzgerald issued a report the following day that highlighted what it considered remaining bright spots for Exela and parroted Exela's "90% visibility" claims, noting "The pipeline remains strong, management noting it has doubled y/y, helped by its new Digital Now product. Management believes the company is well-positioned for long-term sustainable growth beyond 2019. ***Exela noted retention was 98%, and it typically has 90% visibility into revenue growth for the next 12 months***."

208.    On the same day, Morgan Stanley issued a report and was not as forgiving, noting, "[w]e continue to look for signs of progress, but ***lack of disclosure adds to the complexity of the story***."  It went on to note liquidity concerns and that O&R addbacks were expected to continue:

> Adjusted EBITDA of $74.1 mm fell shy of our $77.4 mm estimate due to incremental headcount, but was ahead of the Street's $67.3nnnn. While the company reiterated its FY19 guidance, it warned that it will be 2H -loaded, with 2Q19 expected to be sequentially flat. We recognize the company is taking steps to improve as it continues to make progress on cost savings, but we still view the story as a complex one. As we wait for additional signs of scalability, ongoing liquidity concerns keep us Equal-weight.
>
> ***
>
> **Business optimization costs expected to continue**. XELA had previously outlined long-term adjusted EBITDA in the range of 22% to 23%, and has yet to update this target. Our call-back with management implied that ***optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved***.
>
> ***

209.    Following this news, Exela's stock price dropped $0.17 per share (5.0%), to close at $3.21 per share on May 10, 2019, on heavy trading volume.

### 4.    Moody's Downgrade Challenges Exela's Adjusted EBITDA And Addbacks As "Normal Operating Expenses"

210.    On May 22, 2019, Moody's downgraded the Company's debt from Caa1 from B3 based on the 1Q'19 revelations.  Moody's lead analyst Harold Steiner was quoted as saying, "Exela's restructuring charges ***consist mostly of headcount*** that it expects to cut as it transitions

to more technology-based BPA service offerings… *We believe these are normal operating expenses necessary to provide its service*, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation."

The press release also stated:

> Moody's downgraded the liquidity rating to SGL-4 because of persistent negative free cash flow including a use of approximately $50 million in the first quarter. Moody's projects EBITDA of approximately $200 million after deducting restructuring and optimization charges will barely cover the company's sizeable fixed charges, which consist of $155 million of debt service and $40 million of capital spending needs.
>
> * * *
>
> Exela's Caa1 CFR reflects the company's limited scale in an intensely competitive industry, its persistently poor earnings quality, high leverage and weak liquidity…. As such, Moody's expects revenue and earnings growth to remain limited to the low-single digits in 2019. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default.

211.    Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

### 5.    Exela Announces 2Q'19 Results And Revises 2019 Guidance Down, Disclosing For the First Time Impact Of "Unpredictable" Pass-Through Postage Revenue

212.    On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results.  Cogburn reported:

> Our revenue, excluding the postage and postage handling and low-margin contract exit, grew by 4% in the first half of 2019. This underlines the stability in our revenue, which, combined with a robust pipeline provides a healthy base to build upon. While we are excited about the new wins this year, some of this revenue, or ACV, will be delivered next year.
>
> Based on the items I've just mentioned and considering *the unpredictable nature of our postage revenue*, we are updating our 2019 revenue guidance to $1.59 billion to $1.61 billion and 2019 adjusted EBITDA guidance to $290 million to $300 million. We have *strong visibility under this revenue*, which, in turn, will help us to prioritize our operations and focus on liquidity and cash generation.

213.    An analyst on the call asked if the Company reported revenue ex-postage in the prior quarter and Reynolds replied, "No, we did not. We wanted to discuss it this quarter. We

thought it was important that we show what the true margins look like. Obviously, we're being penalized by pass-through of *revenue with little or no margin*."

214.    On August 9, 2019, RBC issued a report stating, "With the exiting of a low-margined contract, the effects of pass-through revenue, and new contracts not ramping until next year, XELA reported a 5% y/y decline in revenue and management reduced the midpoint of FY19 revenue guidance by $80M. The focus remains on liquidity and free cash flow generation, which makes equity valuation difficult and we expect the stock to trade in line with the company's bonds."

215.    Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

### 6.    Exela Further Reduces 2019 Guidance, Again Citing, In Part, Unpredictable Postage Revenue

216.    On a November 12, 2019 earnings call, Cogburn noted, "[o]ur revenue, *excluding postage and postage handling* and our previously announced low-margin client exit, grew by 2.4% in the third quarter and is up 3.2% year-to-date…"

217.    Reynolds announced the Company was lowering its 2019 guidance due to its unpredictable postage revenue:

> Taking into account our consolidated third quarter results, the *continued unpredictable nature of our revenue from postage*, a slower ramp of certain new projects and longer-than-expected sales cycles, we are updating our 2019 full year guidance. We now expect 2019 revenue of $1.55 billion to $1.56 billion and adjusted EBITDA of $255 million to $265 million.

218.    The Nuveen analyst on the call was dumb-founded by the Company's margin miss and EBITDA guidance reduction given that the postage revenue is 0 margin and the low margin contract was a known quantity:

> TRENT PORTER: …I find myself scratching my head again. The postage, I think, is 0 margin, and then the exit of the -- from the low-margin customer *was expected an unknown quantity.* So can you expand a little bit on kind of the major buckets of what's driving the margin miss versus your expectations? And then sort of tie into that, the margin decline year-over-year because I would think that the sort of the mix impact of exiting a low-margin account, all other things being equal, would have a positive impact on margin?

And then just sort of a follow-up to that same question, can you talk about just what's behind the slower ramp of projects in the longer sales cycle?

REYNOLDS: …The first question is really about the postage and pass-through costs. It is low-margin business*. It's just really not predictable for us*. And when that postage comes through, it will fluctuate significantly between quarters. ***That's something we haven't been very good at predicting historically***, so we're working on improving that. But in one day, you can find out a month later that you're going to have a large job that requires to be delivered, which will show a lot of incremental revenue and no corresponding profit. So that's one aspect of the question. With respect to the low-margin contract we exited, we made -- we discussed it at length on our Q3 call, I think, again, in our Q4 call, that contract was a profitable contract for us. And as a result of us rebidding the contract, they were looking for -- we presented a digital solution which would have reduced our overall revenue but increased our margins from where they were. The customer was looking for more of an analog solution with a digital price. *So when we talk about the exit of the low-margin contract, it was profitable. But if we were to continue with that, we would have lost money under the contract*. And since we are for profit, we did not go forward with losing money on that contract, so we walked away from that contract. It had been with us for a period of time. And as we have contracts that have been with us longer, we put a lot of our technology, we've increased our productivity so it comes through at a higher margin.

With respect to the comment about the customers maybe not ramping fully, we're -- these are complex solutions. We have ***decent visibility*** into when they're going to hit based on our discussions with our ops people. But you're relying on multiple constituents from the customer that requires sign-offs, and those sign-offs take time. You're using your IT resources and others. So while the contracts are there, ***it's not always easy to predict the exact time the contract will fully ramp***. We've been ramping new contracts throughout the year, but as a result of certain delays, some of them have not fully ramped.

TRENT PORTER: I understand. I think I'm having a hard time articulating my question. So my question is more -- I get it on the postage, it's almost -- it's very difficult to anticipate. It's going to be lumpy. But as I understand it, if you thought you're going to have $1 million and you've got $500 million, it's 0 margin, it's passthrough. So it's 0 margin business, so it shouldn't impact your EBITDA margin -- the EBITDA margin. It will impact the revenue, but not the margin that you had anticipated as a management team. And then the -- in addition, the loss of the customer or the exit from the customer business -- ***I understand, I'm with you on that. It's just that, that was a known quantity to you***. So the -- that said, the miss on the earnings side is what I'm -- on the EBITDA margin side relative to your

expectations is what I'm having a hard time completely understanding. And maybe we can take it offline, but that's -- it's hard to articulate, I get it, but...

REYNOLDS: No, no, I hear you. I think that, also, we talked about one-time cost that impacted our SG&A. During the quarter, we had some unfavorable costs associated with legal and professional fees.

TRENT PORTER: *Weren't those an add back?*

REYNOLDS: So those things are one-time in nature that we didn't necessarily predict.

TRENT PORTER: Okay. I mean, were those not added back to EBITDA?

REYNOLDS: They were in the add backs, yes. I'm saying from a GAAP perspective.

TRENT PORTER: Right. Right. And so I guess, I mean, that there is -- for example, your EBITDA guidance for the year, it went down last quarter. And I'm not -- I hate to be a pain, it's just -- I want to make sure that I understand. The EBITDA guidance has gone down. And so -- and the EBITDA margin is down year-over-year. So I just want to better understand what's driving -- what was unfavorable? What is the unfavorable variance versus your budget, specifically on the EBITDA margin side?

REYNOLDS: So I think that's another thing we discussed on the call, and maybe it was missed, is that in Q3, we have Europe, which we have incremental cost where we're adding staff. Now 18% of our business overall in Europe -- is in Europe. And in the month of August, a lot of that business slows down, but we don't terminate people, obviously, we keep them on the payroll, and we have to hire incremental staff and temp help to get work done. So there was some of that, that we were not able to predict. But I appreciate the question and be more than happy to follow up offline.

219.   Cantor Fitzgerald issued a report on November 13, 2019 stating, "Quarterly top-line and bottom-line results reported below expectations. 2019 revenue guidance was lowered. The focus on the quarter was on the newly announced debt paydown and liquidity initiative with the goal of increasing liquidity $125-150 mn. The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time."

220.   Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

221.   Shortly after, on November 19, 2019, Moody's issued a press release announcing it "downgraded Exela Intermediate LLC's (Exela) ratings, including its Corporate Family Rating

to Caa3 from Caa1, Probability of Default Rating to Caa3-PD from Caa1-PD, and the instrument ratings on the company's senior secured first lien credit facilities and senior secured first lien notes to Caa3 from Caa1." It elaborated:

> For nine months ending September 30, 2019, Exela's **optimization and restructuring charges increased to $59 million from $35 million for the same period last year**, and have been a consistent drag on cash flow from operations. Despite substantial restructuring spend, the company has been unable to stabilize free cash flow declines and gain much needed momentum in profitable growth since the close of the Novitex merger in July 2017. Exela reported a 1.9% decline in 3Q 2019 revenue on a constant revenue basis from 3Q 2018 and lowered its 2019 full-year revenue and 2019 EBITDA guidance by roughly 3% and 12%, respectively, citing slower ramp on new projects, longer than expected sales cycles and **unpredictable postage revenue**. Exela also took a $99.7 million non-cash goodwill and trade-name impairment charge, reflecting lower anticipated future earnings from its core business.
>
> In the third quarter 2019, Exela initiated a two-year debt reduction and liquidity improvement initiative aiming to increase liquidity through asset sales to approximately $125 to $150 million from $50 million currently. The company's focus on improving liquidity is credit positive because it will provide additional resources for debt reduction and investment. But the plan will take up to two years to execute and the amount of earnings disposed is not clear, and **the plan does not fully address the fundamental competitive challenge of turning around operations that have been demonstrating weak organic growth rates, declining profitability and negative free cash flows**.
>
> * * *
>
> The acceleration of the company's organic revenue declines and **growing restructuring and optimization charges reflect continued operating pressures**, which the company will be challenged to address given its negative free cash flow. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default. Proactively and cost-effectively addressing the expiration of the revolver in 2022 and the term loan and notes in 2023 will be difficult without an operational turnaround, and the step up in required term loan amortization to $20 million in 2020 will put additional strain on liquidity.

### 7.    Exela Announces Delay Of 2019 Form 10-K And The Need To Restate

222.    On March 16, 2020, Exela issued a press release announcing that it had "postponed its earnings release and conference call due to the delayed filing of its Form 10-K for the year-ended December 31, 2019, and the need to restate certain of its historical financial statements."

223.    On March 17, 2020, the Company filed a Form 8-K which noted that on January 30, 2020 the Delaware Chancery of Court had ruled in the Appraisal Action finding that "the fair

value of SourceHOV as of the Closing Date was $4,591 per share" and SourceHOV's motion for reconsideration was denied on March 11, 2020.

224.    The Form 8-K also revealed:

After evaluating the current and historical accounting treatment of the Appraisal Action with the Company's independent registered public accounting firm, KPMG, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. ***The liability should have been recorded in 2017*** at the fair value of the shares tendered. Additionally, during the second half of 2019, we reimbursed approximately $4.5 million with respect to professional fees and expenses for secondary offerings by a related party pursuant to the terms of the Consent, Waiver and Amendment dated June 15, 2017, amending the Business Combination Agreement, dated February 21, 2017.  Approximately $2.4 million of these expenses should have been recorded in 2018. During the second half of 2019, the Company made payments of $4.6 million on behalf of certain employees that were holders of Restricted Stock Units in Ex-Sigma 2, LLC for which the Company incurred compensation expense and paid $5.7 million in the fourth quarter on behalf of a related party associated with the PIPE Financing (as defined in the Consent, Waiver and Amendment).  We are still evaluating the purpose and nature of the PIPE Financing related payments, their legal significance, the appropriate accounting treatment, and whether any obligation with respect to those payments should have been recorded in a prior period.

***As such, we will restate our financial statements for the years ended December 31, 2017 and 2018 and the interim periods through September 30, 2019 (which will be addressed in our Form 10-K for the year ended December 31, 2019), to record liabilities ranging from $36 to $43 million as of December 31, 2017, and accruing interest thereon at a rate set by the Delaware Court of Chancery from time to time, associated with its potential obligations related to the Appraisal Action***. Additionally, the proposed accounting will reduce the number of shares outstanding by 4,568,862 shares for purposes of the weighted average shares outstanding used to calculate basic and diluted loss per share during the respective periods. Accordingly, the aforementioned financial statements should not be relied upon. Independent of the preceding, we also determined that the operating cash flows were understated and financing cash flows overstated in the statement of cash flows by $35 million for the year ended December 31, 2017, as a result of the misapplication of a new accounting standard on a retrospective basis within our 2018 Form 10-K.

225.    While these revelations provided further insight into the Company's balance sheet, the market had already partially accounted for the Company's liquidity and cash flow issues. Exela's stock fell $0.05 per share, or 23.0%, to close at $0.15 per share on March 18, 2020 on heavy volume.

### 8.      Post-Class Period Disclosures

226.    On April 3, 2020 Exela received a notice from NASDAQ that the Company was in violation of the NASDAQ rule requiring a $1.00 bid price for continued listing on the NASDAQ exchange.

227.    On June 9, 2020, Exela filed its Form 10-K for 2019 containing the restated financial results (the "Restatement").  The Restatement impacted several areas of Exela's financial statements including (a) its balance sheets for the periods ending December 31, 2017 and 2018, respectively; (b) its MD&A for the same periods; (c) it's Selected Financial Data for the same periods; and (d) its quarterly results for the first three quarters of 2019.

228.    The Restatement corrected several errors that had been presented in Exela's prior financial statements.  These errors include the understatement of a liability related to the Appraisal Action of $43.1 million, $40.6 million, and $37.8 million, for the periods ending December 31, 2019, December 31, 2018, and December 31, 2017, respectively.  The difference between the years has to do with the accrued interest associated with the appraisal award.

229.    That accrued but not expensed interest associated with the liability, also had the effect of overstating Exela's income (or understating the loss) by $2.4 million, $2.9 million, and $1.2 million, during the years ended December 31, 2019, December 31, 2018, and December 31, 2017, respectively.

230.    Apart from the liability related to the Appraisal Action, management also restated its income statement to reflect that the prior financial statements had also overstated Exela's income (or understated its loss) by $5.3 million for the nine months ended September 30, 2019 due to Exela's improper capitalization of costs.  In other words, Exela capitalized $5.3 million in unrecorded related party expenses, which should have been expensed in the first instance.  And had these costs been properly expensed at the outset, Exela's income would have declined more than it reported for the nine months ended September 30, 2019.

231.    For the period ended December 31, 2018, Exela corrected a $3.2 million overstatement of loss.

232.    The Restatement also revealed that Exela understated its loss by $4.8 million for the year ended 2017 due to its improperly recognizing revenue of $6.4 million (and improperly expensing $1.6 million associated with that revenue) related to "a multiple element arrangement that included a software license where vendor specific objective evidence (VSOE) of fair value was not established for the undelivered elements of the arrangement."

233.    The Restatement revealed that had the Company's accounting been correct, it would not have met its adjusted EBITDA guidance for fiscal year 2018.  While Exela did not provide quarterly guidance, it had missed the street consensus for adjusted EBITDA in 2Q'19 and 3Q'19, as well as, estimates of several analysts for 1Q'19.

|  | 2018 Guidance | 2018 Reported | 2018  Restated |
|---|---|---|---|
| **Adjusted EBITDA** | Initial range: 295 – 310 Reduced range: 280 — 290 | 283.8 | 276.2 |
| **O&R Expense** | 20 - 25[17] | $68.2 | $54.2 |
| **Adjusted EBITDA ex. O&R addback** | N/A | $215.6 | $221.9 |
| **Percentage change in Adj. EBITDA Ex. O&R addback** | N/A | -23.8% | -19.6% |

234.    The Company also revealed its revenues attributable to postage and postage handling and the LMCE for 2019 and 2018, which together accounted for $338.1 million and $277.4 million respectively.  These revenues, which the Company described as unpredictable, amounted to more that 21% of the Company's restated 2018 revenue, and approximately 18% of its 2019 revenue, refuting the Company's assertions throughout the Class Period that it had visibility into over 90% of its revenue.

235.    The 2019 10-K indicated that revenue had declined 23.9 million of 1.5% for the year and stated that "[t]his decrease is primarily related to a decrease in our ITPS segment revenues of $39.4 million and LLPS segment revenue of $13.2 million....ITPS—Revenues decreased $39.4 million, or 3.1%, to $1,234.3 million for the year ended December 31, 2019 compared to $1,273.6 million for the year ended December 31, 2018. The decrease was primarily attributable to the low

---

[17] Provided on March 15, 2018 during the Company's Q4 2017 earnings call.

margin contract exit in the third quarter of 2018 and adverse currency impact that was offset partially by the revenue from acquisitions completed in 2018."

236.    The 2019 10-K also revealed that the Company identified numerous additional internal control deficiencies including material weaknesses[18] such as insufficient "oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting'" and a "risk assessment process [that] failed to identify and assess risks of misstatement, including fraud risks, to ensure controls were designed and implemented to respond to those risks".

237.    On October 13, 2020, with its stock price still below $1.00 (hovering at around $0.40), Exela obtained an extension from NASDAQ to come into compliance with the $1.00 bid price listing requirement.

238.    Finally, on January 25, 2021, Exela announced a 1-for-3 reverse stock split of the Company's stock in order to regain compliance with NASDAQ's listing requirements.  As a result of the reverse split, each three shares of the Company's issued and outstanding common stock was automatically combined and converted into one issued and outstanding share of common stock.

## VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD

### A.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K

239.    On March 16, 2018, Exela filed its Form 10-K for the year ending December 31, 2017.  The Company reported:

*Revenue*

Our revenue increased $362.4 million, or 45.9%, to $1,152.3 million for the year ended December 31, 2017 compared to $789.9 million for the year ended December 31, 2016. This increase is primarily related to an increase in our ITPS segment revenues of

---

[18] According to the Company's own admission, a material weakness is "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis."

$387.2 million, which was primarily attributable to the acquisition of TransCentra in 2016 and Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $14.2 million and $10.6 million, respectively. Our ITPS, HS, and LLPS segments constituted 71.8%, 20.3%, and 7.9% of our total revenue, respectively, for the year ended December 31, 2017, compared to 55.7%, 31.4%, and 12.9%, respectively, for the year ended December 31, 2016.

* * *

### EBITDA and Adjusted EBITDA

EBITDA was $(37.2) million for the year ended December 31, 2017 compared to $129.2 million for the year ended December 31, 2016. Adjusted EBITDA was $208.8 million for the year ended December 31, 2017 compared to $173.2 million for the year ended December 31, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the year ended December 31, 2017 resulting from an increase in selling, general and administrative expenses, related party expense, and loss on extinguishment of debt compared to the year ended December 31, 2016. The increase in Adjusted EBITDA was primarily due higher overall gross profit for the year ended December 31, 2017 compared to the year ended December 31, 2016, along with lower recurring expenses as part of on-going operations.

240.   The 2017 Form 10-K was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading for the following reasons: (i) Exela failed to account for liability related to the Appraisal Action, which Defendants admitted should have been recorded at the amount of the fair value of the Manichean shares tendered when appraisal action was filed in 2017, and Defendants thus materially understated Exela's liability by $37.8 million in 2017 as a result; (ii) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's omission of the Appraisal Action liability as well as the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2017 Form 10-K.

241.   The 2017 10-K further stated, "For the fiscal year ended December 31, 2017, we generated $1,152.3 million of revenue of **which approximately 90% is recurring in nature and supported by long-term customer contracts**."

242.   The 2017 10-K also stated:

We serve over 3,500 customers across a variety of industries, including over 60% of the Fortune® 100. We believe our customers are among the leading players in their respective industries, and many of them are recurring customers that have maintained long-term relationships with us and our predecessor companies.

***We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins.*** Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our ***stable base of customers and sticky, long-term relationships lead to highly predictable revenues***.

243.    The statements in ¶¶ 239 - 241 were materially false and/or misleading when made and/or omitted  material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

244.    Regarding the Appraisal Action, the 2017 10-K also stated:

In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). The parties have commenced discovery. At this stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action ***or estimate any loss or range of loss that may arise from the Appraisal Action***.

245.    And regarding its loss contingencies, the 2017 10-K also stated:

**Loss Contingencies**
     The Company reviews the status of each significant matter, if any, and assess its potential financial exposure considering all available information including, but not limited to, the impact of negotiations, settlements, rulings, advice of legal counsel and other updated information and events pertaining to a particular matter. ***If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss***. Significant judgment is

required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Because of uncertainties related to loss contingencies, accruals are based only on the best information available at the time. As additional information becomes available, the Company reassesses the potential liability related to its pending claims and litigation, and may revise its estimates. These revisions in the estimates of the potential liabilities could have a material impact on the results of operations and financial position. The Company's liabilities exclude any estimates for legal costs not yet incurred associated with handling these matters.

246. The statement claiming that Exela was unable to "estimate any loss or range of loss" was false and misleading because prior to the filing of the 2017 Form 10-K on March 16, 2018, Exela had itself estimated the value of SourceHOV (and, thus, estimated Exela's potential liability) at the time of the Merger. For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was Chair and Reynolds was Co-Chair—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested back in February 2017. Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million. Finally, by January 2018, Chadha requested an updated (and "backdated") valuation of SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action. For substantially similar reasons, including that the Appraisal Action liability was probable and had already been reasonably estimated by the time that Exela issued its form 10-K for the year ended 2017. The Company's statements identified above related to Loss Contingencies are similarly false and/or misleading and/or failed to state material facts. In sum, prior to the filing of the 2017 Form 10-K, Defendants could, and did, estimate Exela's potential liability associated with the Appraisal Action, and they certainly had enough information from which they could estimate a range of Exela's potential liability.

247. In its Investor Presentation accompanying the Company's 4Q 2017 and FY 2017 results, Exela stated the following about its O&R expenses:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature

of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

248.   The foregoing statement about O&R expenses in the Investor Presentation was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA.

**B.   Defendants' False and Misleading Statements and Omissions Relating To Exela's April 13, 2018 Secondary Offering**

249.   On April, 13 2018, Exela filed a Prospectus Supplement to its Prospectus dated October 2, 2017 wherein Exela offered equity securities on behalf of Ex-Sigma 2, LLC for 7 million shares of Exela common stock.  The Prospectus stated, "we generated $1,152.3 million of revenue of which *approximately 90% is recurring in nature and supported by long-term customer contracts*."

250.   The foregoing statement was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**C.   Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results**

251.   On May 10, 2018, Exela issued a press release and filed a Form 8-K, signed by Reynolds, reporting Exela's 1Q 2018 financial results, including adjusted EBITDA of $69.6 million. The press release further stated:

Adjusted EBITDA: Adjusted EBITDA was $69.6 million, an increase of 10.9% when compared to pro forma Adjusted EBITDA of $62.7 million in the first quarter of 2017. The increase in first quarter 2018 Adjusted EBITDA was primarily driven by revenue growth and the impact of the Company's cost savings initiatives, partially offset by ramp-up costs

associated with new ITPS client contracts, investments in the Company's revenue growth initiatives, and higher public company costs.

252.    Additionally, the May 10, 2018 press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

253.    The description of adjusted EBITDA within the press release also read:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

254.    The statements in ¶¶ 251- 253 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

255.    On Exela's earnings call held on May 10, 2018, Defendant Cogburn stated, "We have a high degree of revenue visibility.… The level of visibility gives us confidence in our ability to accurately forecast the trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95%..."

256.     Similarly, Reynolds further stated that 90% visibility and 95% renewal rates gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?
>
> REYNOLDS: …***If you think about our business and our contracts, they're long-term in nature, right***? They're typically three to five years, and we have over 95% renewal rates. So ***we have good visibility into our revenue, typically just over 90% at any point in time***. If you look at the numbers we delivered in the first quarter, we're very pleased with the results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

257.     A Credit Suisse analyst specifically inquired whether postage revenue was responsible in part for the disconnect between revenues and margins:

> ARUN A. SESHADRI: …First, I just wanted to understand, ***obviously nice revenue growth in the quarter, but it looked like gross profit actually declined***. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, ***what was the impact of postage in the numbers***?
>
> REYNOLDS: So if you take a look, ***we don't really look at it on a gross margin basis*** because we have a lot of business optimization cost flowing through. ***We focus on an EBITDA perspective***. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take, runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage, we don't really break out postage separately. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

258.     The statements in ¶¶255-257 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which

misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**D.      Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results**

259.      On August 9, 2018, Exela reported its 2Q 2018 financial results.  In its press release announcing the results, it  stated:

> Adjusted EBITDA: Adjusted EBITDA was $70.1 million, an increase of 9.0% when compared to pro forma Adjusted EBITDA of $64.3 million in the second quarter of 2017. The increase in second quarter 2018 Adjusted EBITDA was primarily driven by revenue growth and the impact of the Company's cost savings initiatives, partially offset by investments in the Company's revenue growth initiatives, and higher public company costs

260.      Additionally, the August 9, 2018 press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and ***other similar non-routine items outside the control of our management team***."

261.      The description of adjusted EBITDA within the August 9, 2018 press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, ***we exclude these charges since we do not believe they truly reflect our past, current or future operating performance***.

262.      The statements in ¶¶259-261 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not

indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

263.    In an investor presentation, that was also published on Exela's website on August 9, 2018, the Company stated that:

> Exela's board of directors and management use EBITDA, Adjusted EBITDA, and Further Adjusted EBITDA, to assess Exela's financial performance, because it allows them to compare Exela's operating performance on a consistent basis across periods by removing the effects of Exela's capital structure (such as varying levels of debt and interest expense, as well as transaction costs resulting from the Business Combination and other such capital markets based activities. Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the Business Combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team.* . . . Optimization and restructuring expenses and merger adjustments *are primarily related to the implementation of strategic actions and initiatives related to the Business Combination*. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.*

264.    The statements in ¶ 263 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings and Reynolds represented that he was "highly confident" that Defendants could control the headcount expense in the conference call just one quarter prior.

265.     The same day, the Company held its 2Q 2018 earnings call wherein Reynolds stated the following about Exela's EBITDA, adjusted EBITDA, and O&R expense addbacks:

> We continue to convert our savings actions over the quarter into EBITDA. Our adjusted EBITDA increased by 9% to $70.1 million in Q2 of 2018 compared with $64.3 million in 02 of 2017. This increase in EBITDA was partially offset by duplicate ramp costs incurred that we are no longer able to capitalize in 2018 under ASC 606. This makes our margin to appear weaker during the initial phase of ramp. This decrease is also reflected in our CapEx comparisons year-over-year as there is approximately $2 million more of expense in the P&L in 022018, which would have been historically capitalized.
>
>                                        * * *
>
> Looking at the adjustments to EBITDA. We had a decrease of $6.5 million in transaction-related expenses in 02 2018 compared to 02 2017. These costs were incurred as a result of the business combination in July of 2017. Optimization and restructuring expenses were up $2.8 million in Q2 2018 and are part of our plan in delivering $40 million to $45 million in flow-through P&L benefits in 2018. We will continue to identify and invest in achieving these savings.
>
> The total optimization and restructuring expenses have not changed. Year-to-date, we have already incurred $27.5 million. The second half of 2018 and future quarter amounts will depend on the rate of conversion of these savings.

266.     Also on the 2Q 2018 earnings call, Reynolds assured investors that "***our job is to minimize the adjustments***" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will – and the percentage of adjustments will shrink in the future."

267.     Addressing an analyst question about Exela's next two quarters and the Company's 2019 guidance, Reynolds pointed to "adjusted EBITDA" to assure the market that Defendants were "very comfortable" with the Company's 2019 guidance:

> JOSEPH DEAN FORESI: Got it. And maybe you could talk about what the next 2 quarters look like because, with your annual guidance, that would imply a considerable ramp in the margins over the next 2 quarters. So what do those look like from, I guess, a restructuring perspective? And how should we expect those margins to improve? What are your levers there?
>
> REYNOLDS: Yes. So if you look, Joe, we've ramped some large customer contracts which incur significant costs and sometimes duplicate costs. As we move further out into the contracts, the ramp becomes steady-state, so those margins will improve over time. For the second half of the year, ***if you look at where we are year-to-date on an adjusted EBITDA, we're going to have a significant increase to hit our guidance, which we're very comfortable with***.

268.    On August 10, 2018, Exela filed a Form 8-K including the press release from the day before, signed by Reynolds, reporting Exela's 2Q 2018 results, which included adjusted EBITDA of $70.1 million.

269.    The statements in ¶¶265-268 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs and Defendants did not "minimize the adjustments" to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.  In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

### E.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results

270.    On November 8, 2018, Exela filed a Form 8-K and press release, signed by Reynolds, reporting Exela's 3Q'18 results, including adjusted EBITDA of $69 million.  The press release stated, in part:

> Adjusted EBITDA: Adjusted EBITDA for the third quarter of 2018 was $68.9 million a margin of 18% and increased 23.6% when compared to pro forma Adjusted EBITDA of $55.5 million and a margin of 16% in the third quarter of 2017. The increase in third quarter 2018 Adjusted EBITDA was primarily driven by revenue growth, the Company's cost savings initiatives, and partially offset by investments the Company made for growth.

271.    Within Exela's adjusted $68.9 million EBITDA figure, the Company reported $19.4 million of optimization and restructuring expense addbacks, which accounted for 28.1% of the third quarter's adjusted EBITDA.

272.    Additionally, the press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and ***other similar non-routine items outside the control of our management team***."

273.   On the same day, November 8, 2018, Exela published an investor presentation on its website.  The description of Adjusted EBITDA within November 8, 2018 investor presentation also read:

> Optimization and restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the Business Combination. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.*

274.   The statements in ¶¶270-273 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

275.   During Exela's 3Q'18 earnings call held on November 8, 2018, Defendant Reynolds stated the following about Exela's EBITDA and adjusted EBITDA:

> Looking at the bridge from EBITDA to adjusted EBITDA. Overall, adjustments are down. Walking through the bridge in the third quarter of 2017, *we incurred $132 million in onetime charges, tied to the business combination to create Exela. The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings.* As part of our 2018 guidance, we committed to deliver between $40 million to $45 million in savings. To date, we have achieved, approximately $48 million. *In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense.* A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. *We expect these costs to decline as we implement our transformational model.* The last part of the box in the walk is Other, which primarily includes non-cash charges incurred on employee restricted stock units and the term loan debt reprice costs incurred.

276.    Reynolds expressed confidence in Exela's EBITDA guidance and indicated the exit of the low margin contract was a one time event and the impact would be short term in nature:

> DAN DOLEV: And I think you're raising at the mid -- you are lowering EBITDA by, I think with $17 million, $18 million and you also per my estimates, you do much better on the run rate of the savings, if you get $48 million days versus the $40 million to $45 million. So why take it down by debt margin, is it just debt or is there something else?

> REYNOLDS: Yes I think within **the 2 items that impacted us, those are short-term in nature**, but will continue to flow through in the fourth quarter. So that being said, we'll be able to make up some of that and we will continue to drive through the synergies. But I think we feel good with the range of $280 million to $290 million.

277.    Reynolds also misled analysts when pressed on how "one time-ish" the O&R expense addbacks really were.  For example, in response to Morgan Stanley analyst Brian Lee Essex's direct question, Reynolds dodged, stating:

> BRIAN LEE ESSEX: I don't know if it was just addressed, but I guess on a guide up in revenue, the guide down in EBITDA margins, could you help us -- maybe walk me through some of the puts and takes you have, what I would assume the better margin digital business, exiting a low-margin contract. I would assume that'll give you a lift to margins, but you're investing back in the business. Any sense for us to get a sense for in terms of both gross margin and EBITDA margin, **how one time-ish are these investments or impact items**, and how do we think about expansion from here on out?

> REYNOLDS: Sure. So if you take a look at the 2 items I mentioned, the LLPS and the on-site, that was a $7 million impact. And with the LLPS, those contracts in the on-site, it's gone. So it's not going to come back into Q4. So it has a carry-on effect. With respect to other incremental revenue, it's coming through, we have some high margin revenue that we're anticipating coming in, in the fourth quarter related to our Saas sales. It's happened historically. Through 2018, we feel good that we'll get some incremental flow through margin, but I think that a range of $280 million to $290 million is something we feel good about as we're exiting 2018.

278.    The statements in ¶¶275-277 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.  In addition, the Restatement

demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

279.    Also during the 3Q'18 earnings call, in response to analyst inquiry about Exela's adjusted EBITDA and margins, Defendant Reynolds again highlighted the Company's visibility into revenue:

> DREW KOOTMAN: And then -- so with the lower forecast of adjusted EBITDA -- and I know you guys aren't talking about 2019, but I was wondering, if you can give any high-level -- just looking out at how you guys are viewing adjusted EBITDA margins?
>
> REYNOLDS: So with respect to 2019, I think our message, we're finishing 2018 very well. If you look at the past year, we had initial guidance on the top line of 3% to 4%. And because of the acceptance of DigitalNow and the opportunities, we're going to finish the year very strong between 8.5% and 9%. If you're looking at EBITDA margins, we're looking at that, but if you look back at the past 4 quarters, our range and adjusted EBITDA has clearly been between 18% to 19%. We finished this quarter just at 18%. ***Our business, as you know, we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts.***

280.    The statements in ¶279 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

281.    On the same day, November 8, 2018, the Company also issued its Form 10-Q for the third quarter ending September 30, 2018.  In it, Company repeated the false claim that it was "unable" to *"**estimate any loss or range of loss that may arise from the Appraisal Action**."*

282.    The claim that Exela was unable to "estimate any loss or range of loss" was false and misleading because prior to the filing of the 3Q 2018 Form 10-Q on November 8, 2018, Exela had itself estimated the value of SourceHOV (and, thus, estimated Exela's potential liability) at the time of the Merger.  For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was Chair and Reynolds

was Co-Chair—about the value of SourceHOV's equity.  Rothschild originally delivered that fairness opinion as requested back in February 2017.  Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million.  Finally, by January 2018, Chadha requested an updated (and "backdated") valuation of SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action which he received by April 2018.  Moreover, the Individual Defendants were aware of Exela's attempts to estimate SourceHOV's value (and thus Exela's potential liability) as of the time of the Merger: (i) no later than October 5, 2018, Defendant Chadha was deposed in the Appraisal Action[19], wherein he testified as to the estimated value of SourceHOV at the time of the Merger; (ii)  no later than October 12, 2018, Defendant Reynolds was deposed in the Appraisal Action; and (iii) no later than October 23, 2018, Defendant Cogburn was  deposed in the Appraisal Action.  Thus, by the time that the 3Q 2018 10-Q was filed on November 8, 2018 Defendants had in fact estimated the liability and/or a range of liability associated with the Appraisal Action.

### F.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results

283.     On March 18, 2019, the Company issued a press release reporting its fourth quarter and full year 2018 results.  In it, the Company stated:

Achieves revised full year guidance for Revenue and Adjusted EBITDA; Net Loss of $162.5 million; Expect 2019 revenue to be between $1.66 billion to $1.70 billion, and reduction of net leverage ratio by 5% - 7%.

* * *

Revenue of $399.6 million, representing 3.4% growth over Q4 2017
Adjusted EBITDA(2) of $75.3 million, representing 20.0% growth over Q4 2017

---

[19] While Chadha was deposed for a second time on February 26, 2019, according to in-court representations made by Petitioner's counsel at the Appraisal Action, the second deposition was scheduled for inquiry into Chadha's knowledge of and participation in the Backdated Valuation, which he had previously concealed and failed to disclose during discovery.

284.     Additionally, along with the press release, on March 18, 2019, the Company also published an investor presentation that included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and other similar non-routine items outside the control of our management team."

285.     The description of adjusted EBITDA within March 18, 2019 investor presentation also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

286.     The statements in ¶¶283-285 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings and without such addbacks would not have met its 2018 guidance.

287.     On March 18, 2019, the Company held an earnings call to discuss its fourth quarter and full year 2018 financial results.   Among other things, Defendant Cogburn touted the Company's adjusted EBITDA growth, stating, in relevant part:

We reported a strong top line results for the year of $1.586 billion, an increase of 8.9% on a year-over-year basis, ahead of the industry growth rates. ***We recorded 15.7% growth in adjusted EBITDA to $283.8 million, and our continued focus on margins resulted in an increase of 110 basis points compared to 2017, reaching a 17.9% adjusted EBITDA margin***. In addition to growing our top line and adjusted EBITDA, during the year, we executed on our savings initiatives, an important part of our ongoing strategy. During 2018, we achieved $64 million in savings, exceeding our initial goal of $40 million to $45 million. And here's an important fact***: through a combination of the top line growth and achieving savings offset by investments we've made to drive growth and increased awareness, we successfully drove improvement on a year-over-year basis in our adjusted EBITDA margin***. …

Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA.

288.    Reynolds further stated the following about EBITDA and adjusted EBITDA:

Looking at the bridge from EBITDA to adjusted EBITDA. The first box in the bridge is other, which includes noncash charges of $49.2 million and $122.5 million on debt extinguishment cost and impairment of the LLPS business in 2018 and 2017. The remainder of these costs relate to employee stock option expense and asset disposal costs.

***The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter.*** The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $O.8 million in facility cost. ***We believe 2018 represented the high watermark in terms of optimization and restructuring expenses.*** And in time, we expect these costs to gradually decline as we implement our transformational model. The final adjustment is the transaction integration costs, which are -- were incurred to create Exela in the third quarter of 2017.

To summarize, the gap between EBITDA and adjusted EBITDA narrowed by $142.5 million in 2018. This is consistent with our goal to have adjusted EBITDA and EBITDA to converge over time.

\* \* \*

On December 31, 2018, total liquidity was $116 million, and net debt was $1 402 billion. We had cash of $44 million, excluding restricted cash per our credit agreement, and an undrawn $100 million revolving credit facility, of which, $20.6 million was set aside for standby letters of credit.

289.    The statements in ¶¶287-288 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back

routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.  In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 2018 financial results.

290.    Reynolds also touted revenue visibility in expressing confidence in the Company's 2019 guidance:

> DAN DOLEV: … So I mean, ***your guidance is very, very strong***. I feel like it's above our numbers for next -- for 2019, and it looks like, as you said, it's accelerating on an organic basis. ***And also EBITDA, the EBITDA guidance seems above our numbers. Can you maybe give us a sort of the level of confidence you have in achieving that guidance?***

> REYNOLDS: Sure. Thanks, Dan. ***As we've discussed historically, we typically have about 90% visibility into the next 12 months.*** With respect to the revenue, if you remember, we have somewhat of a wide range, but back in the fall, we announced the transaction with a large bank. That contract ramped up at the beginning of the year, so we're very pleased with that. In addition, at the end of December, we closed a health care acquisition that will also help drive the results for 2019.

291.    In response to analyst inquiry questioning Exela's growth rate, Defendant Reynolds again cited "90% visibility on the top line" [*i.e.*, revenue] in expressing confidence in the Company's guidance and assured that the Company was being "conservative."

> JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort of the conversion rate? Is it an element of conservatism on the top line and expectations for next year? Have conversion rates changed? ***Is there anything in the top line we should know about?***

> REYNOLDS: …I mean, we feel good about our conversion rates. I think the size of the pipeline is strong. And just like this year, for the full year, we actually hit our revised -- upward revised revenue guidance. ***So we have great visibility into the revenue and feel pretty goo***d. I think, as we're still a new public company, 18 months or so, and we're trying to be somewhat conservative as we look at the potential for Digital Now, which is gaining traction in our front office. So we'd rather come out feeling good with ***that 90% visibility on the top line***.

292.    The statements in ¶¶ 290-291 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted,

approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

293.    Reynolds also assured investors that their financial statements were accurate, notwithstanding KPMG's finding that a lack of internal controls existed.  In response to an analyst question, Reynolds stated the following:

> DAVID LAWRENCE PHIPPS: Okay. And then final question. You delayed the 10-K, that's pretty standard, you have that out in the next 15 days. Could you talk a little bit about the controls and procedures language that you have there?

> JAMES G. REYNOLDS: I think all I would say is under the rules, this is our first year of SOX compliance, which is highly complicated when you put together companies through acquisitions to achieve and have enough time to actually test all the controls that are operating. So it's kind of it's either there or it's not. We feel good in our ability to address the control deficiencies. And I think, as I said, we feel good that, from a standard perspective, *we have no issues within our numbers*.

294.    The statements in ¶ 293 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because the Company did have nondisclosed issues within its numbers, including the material false statements identified throughout § IV.C.3 relating to Defendants' representations about (i) the Company's inability to estimate a range of liability for the Appraisal Action; (ii) the associated undisclosed liability and overstatements to earnings and cash flow arising from Exela's omission of the Appraisal Action liability; and (iii) Defendants' characterization of Adjusted EBITDA and the false and misleading addbacks included therein.

295.    On March 20, 2019 the Company filed its Form 10-K for the year ending December 31, 2018 (the "2018 10-K"), which was signed Cogburn, Reynolds, and Chadha and certified by Cogburn (Ex. 31.1) and Reynolds (Ex. 31.2).  The 2018 10-K reported the following financial results, in relevant part:

### *Revenue*

Our revenue increased $433.9 million, or 37.7%, to $1,586.2 million for the year ended December 31, 2018 compared to $1,152.3 million for the year ended December 31, 2017. This increase is primarily related to an increase in our ITPS segment revenues of $446.5 million, which was primarily attributable to the acquisition of Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $5.6 million and $7.1 million, respectively. Our ITPS, HS, and LLPS segments constituted 80.3%, 14.4%, and 5.3% of our total revenue, respectively, for the year ended December 31, 2018, compared to 71.8%, 20.3%, and 7.9%, respectively, for the year ended December 31, 2017.

**Year Ended December 31, 2018 compared to the Year Ended December 31, 2017**

\* \* \*

### *EBITDA and Adjusted EBITDA*

EBITDA was $144.5 million for the year ended December 31, 2018 compared to $(37.2) million for the year ended December 31, 2017. Adjusted EBITDA was $283.8 million for the year ended December 31, 2018 compared to $208.8 million for the year ended December 31, 2017. The increase in EBITDA was primarily due to a lower net loss amount for the year ended December 31, 2018 resulting from an increase in revenue, decrease in selling, general and administrative expenses, decrease in related party expense, and decrease in loss on extinguishment of debt compared to the year ended December 31, 2017. The increase in Adjusted EBITDA was primarily due to lower transaction and integration costs for the year ended December 31, 2018 compared to the year ended December 31, 2017, along with lower impairment charges incurred in 2018 compared to 2017.

\* \* \*

### Loss Contingencies

The Company reviews the status of each significant matter, if any, and assess its potential financial exposure considering all available information including, but not limited to, the impact of negotiations, settlements, rulings, advice of legal counsel and other updated information and events pertaining to a particular matter. ***If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss***. Significant judgment is required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Because of uncertainties related to loss contingencies, accruals are based only on the best information available at the time. As additional information becomes available, the Company reassesses the potential liability related to its pending claims and litigation, and may revise its estimates. These revisions in the estimates of the potential liabilities could have a material impact on the results of operations and financial position. The Company's liabilities exclude any estimates for legal costs not yet incurred associated with handling these matters.

296.    The 2018 Form 10-K was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading for the following reasons: (i) Exela failed to account for liability related to the Appraisal Action, which Defendants admitted should have been recorded at the amount of the fair value of the Manichean shares tendered when appraisal action was filed in 2017, and Defendants thus materially understated Exela's liability by $37.8 million in 2017 and $40.6 million in 2018 as a result; (ii) the Appraisal Action liability was probable and had already been reasonably estimated by the time that Exela issued its form 10-K for the year ended 2018, thus rendering its statements identified above related to Loss Contingencies false and/or misleading and/or failed to state material facts; and (iii) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's omission of the Appraisal Action liability as well as the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 Form 10-K.

297.    In addition, regarding the Appraisal Action, Exela's 2018 Form 10-K told investors that: "The company is unable to predict the outcome of the appraisal ***Action or estimate any loss or range of loss that may arise from the Appraisal Action***."

298.    The statement claiming that Exela was unable to "estimate any loss or range of loss" was false and misleading because long prior to the filing of the 2018 Form 10-K on March 20, 2019, Exela had itself estimated the value of SourceHOV (and, thus, Exela's potential liability) at the time of the Merger.  For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was Chair and Reynolds was Co-Chair—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested back in February 2017.  Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million.  And by January 2018, Chadha requested an updated (and "backdated") valuation of

SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action.  By December 2018, Exela's own expert, Dr. Jarrell, provided his official expert report estimating SourceHOV's value (and, thus, Exela's potential liability) at the time of the Merger.  Exela's expert provided additional information on SourceHOV's estimated value (and, thus, Exela's potential liability) in connection with his deposition on February 14, 2019.  Further, the Individual Defendants were aware of Exela's attempts to estimate SourceHOV's value (and thus Exela's potential liability) at the time of the Merger: (i) no later than October 5, 2018, Defendant Chadha was deposed in the Appraisal Action, wherein he testified as to the estimated value of SourceHOV at the time of the Merger; (ii) no later than October 12, 2018, Defendant Reynolds was deposed in the Appraisal Action; and (iii) no later than October 23, 2018, Defendant Cogburn was  deposed in the Appraisal Action. Moreover, no later than December 2018, Defendants were provided with the report of the expert for the plaintiff in the Appraisal Action, estimating the value of SourceHOV at the time of the Merger, which was revised on February 7, 2019.  In sum, prior to the filing of the 2018 Form 10-K, Defendants could, and did, estimate Exela's potential liability associated with the Appraisal Action, and they certainly had enough information from which they could estimate a range of Exela's potential liability.

299.    The 2018 10-K also touted the Company's purportedly predictable revenue:

**Customers**

We serve over 4,000 customers across a variety of industries, including over 60% of the Fortune® 100. Our customers are among the leading companies in their respective industries, and many of them are recurring customers that have maintained long-term relationships with us and our predecessor companies.

We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our stable base of customers and sticky, long-term relationships lead to highly predictable revenues.

300.    The statements in ¶ 299 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because a material percentage of

the Company's revenue was not "highly predictable" or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs through which the Company would have very little visibility; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**G.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results**

301.    On May 9, 2019, Exela filed a form 8-K and press release, signed by Reynolds, reporting the Company's 1Q'19 financial results, including adjusted EBITDA of $74.1 million. The press release stated:

> **Adjusted EBITDA:** Adjusted EBITDA for the first quarter of 2019 was $74.1 million, an increase of 6.5% as compared to Adjusted EBITDA of $69.6 million in the first quarter of 2018. Adjusted EBITDA margin for the first quarter of 2019 was 18.3%, an increase of 60 basis points as compared to an Adjusted EBITDA margin of 17.7% in the first quarter of 2018. The increase in first quarter 2019 Adjusted EBITDA and Adjusted EBITDA margin was primarily driven by revenue growth and by the continued realization of savings flow-through, partially offset by investments the Company made for growth.

302.    The press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

303.    The description of adjusted EBITDA within the May 9, 2019 press release read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

304.    The statements in ¶¶ 301-303 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and

ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.  In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures.

305.    Also on May 9, 2019, Exela held an earnings call to discuss its 1Q'19 financial results.  During the call, Defendant Cogburn reiterated the reported financial results:

> On a constant currency basis, our revenue of $410 million grew 4% year-over-year, and adjusted EBITDA of $75 million grew 8% year-over-year. Our first quarter adjusted EBITDA margin was 18.3%, an increase of 60 basis points from 17.7% in Q1 of 2018.

306.    Cogburn told a Cantor Fitzgerald analyst that DigitalNow was resulting in a higher conversion rate of its pipeline:

> DREW KOOTMAN: … You guys mentioned the pipeline remains strong. I was just curious, are you seeing an increase in the pipeline due to Digital Now? Or maybe you could just touch on how Digital Now is sort of changing the pipeline? Or what you're seeing through that?
>
> COGBURN: Drew, that's the right question, and that is the conclusion. I think I've mentioned last quarter the growth in our pipeline year-over-year is almost double what we have seen previously before all opportunities related to Digital Now.… So we're very excited to see how that plays out because we believe we have a higher opportunity or a better opportunity for a higher conversion rate of that pipeline.

307.    Cogburn answered a Morgan Stanley analyst's question about penetrating existing customers:

> BRIAN LEE ESSEX: I was wondering if maybe you could talk a little bit about some of the relationships with existing customers. I know that recently you guys had, in particular, a pretty large lockbox win with a big bank. How much new business are you able to penetrate existing customers with? And how much of that pipeline does that account for within your visibility for the year?
>
> COGBURN: …So when you think about how we've grown historically, it has been through our existing customer base, and it has to do with the ability to land and expand.... So when we look at our pipeline, which is the question, we see lots of opportunities like this that are similar where we've had a great relationship with a large existing customer….

308.    Reynolds further stated the following about adjusted EBITDA on the call:

Our adjusted EBITDA for the quarter totaled $74.1 million, an increase of 6.5%, and a (sic) [our] margin in the first quarter was 18.3%, an increase from 17.7% in the first quarter of 2018. The improvement in adjusted EBITDA margins was mainly driven by revenue growth and by continued realizations of savings flow-through but were partially offset by investments the company made for growth.

I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. ***The primary variance between the 2 are optimization and restructuring charges***. This adjustment relates to investments we have made to achieve cost savings and a majority relates to headcount. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're incurring additional upfront cost for a few large projects. We expect this trend to continue in 2019, but decline in the year -- later quarters.

309.    Cogburn discussed optimization and restructuring charges:

Optimization and restructuring charges are primarily headcount-related charges. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

310.    Reynolds assured an analyst that margins would continue to expand through the

year despite the drastic increase in employees:

DAVID LAWRENCE PHIPPS: [I]f we look at some of the margin progression, you've made some nice margin progression in the past 5 quarters. And would you expect to continue to make margin progression in the June quarter even though revenues will be roughly flat?

REYNOLDS: So we don't give out specific quarterly guidance, but what I would tell you is, as the saving initiatives flow through the P&L, a majority of those run through our cost of goods sold. As we put our technology in and take out people and headcount, you'll start to see the gross margin turn, which we expect.

DAVID LAWRENCE PHIPPS: Okay. Because you added about 1,000 employees during the quarter so that would suggest that you're set up for new business or you're going to have a little bit of extra costs. Maybe you can talk through that a little bit because if we're flat but we have more cost to more employees, it seems like that you're going to have little bit of margin pressure unless you have some cost savings to offset that.

REYNOLDS: Yes, absolutely. We've added, like Ron said, about 929 employees which almost all in the production in the cost area. And as we ramp these contracts, our revenue hits steady state and we put in our technology and start to see the benefit in margin expansion. So we're well underway with respect to these contracts.

311.    The statements in ¶¶ 305-310 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 1Q 2019 financial results.

### H.    Defendants' False And Misleading Statements And Omissions Regarding Its 2Q'19 Financial Results

312.    On August 8, 2019, Exela filed a form 8-K and press release, signed by Reynolds, reporting the Company's 2Q'19 financial results, including adjusted EBITDA of $69.4 million. The press release stated:

> Adjusted EBITDA: Adjusted EBITDA for the second quarter of 2019 was $69.4 million, a decline of 1.0% as compared to Adjusted EBITDA of $70.1 million in the second quarter of 2018. Adjusted EBITDA margin for the second quarter of 2019 was 17.8%, an increase of 70 basis points as compared to an Adjusted EBITDA margin of 17.1% in the second quarter of 2018. The small decrease in second quarter 2019 Adjusted EBITDA was primarily driven by the low margin contract exit reported during the third quarter of 2018, offset by revenue growth and the continued realization of savings flow-through.

313.    The press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

314.    The description of adjusted EBITDA within the August 8, 2019 press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination

completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

315.    The statements in ¶¶ 312-315 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.

316.    On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results. During the call, Defendant Reynolds reiterated the reported financial results:

During the second quarter of 2019, optimization and restructuring expenses totaled $18.7 million compared to $8.9 million in the second quarter of 2018. Of the $18.7 million, $17.6 million related to cost associated with process transformation. The remaining $1.1 million is related to M&A transformation. Customer transformation was less than $50,000 in the second quarter. We expect the level of optimization and restructuring expense related to process transformation to decline towards the back half of 2019 as the automation initiatives continued to get executed and realized into the P&L. We still have a lot of work to do as approximately 35% to 40% of our net revenue and its gross margins at approximately 15%.

* * *

Another large bucket within our adjustments are noncash and other charges. This bucket includes costs associated with cash severance and onetime debt extinguishment cost and customer exit costs.

317.    During the call, Cogburn further stated the following about adjusted EBITDA:

Based on the items I've just mentioned and considering the unpredictable nature of our postage revenue, we are updating our 2019 revenue guidance to $1.59 billion to $1.61 billion and 2019 adjusted EBITDA guidance to $290 million to $300 million. We have strong visibility under this revenue, which, in turn, will help us to prioritize our operations and focus on liquidity and cash generation.

* * *

This quarter, we wanted to show the impact of a couple of factors creating a drag on the growth rates of the consolidated business. The 2 items we are highlighting are pass-through revenue related to postage and postage handling and our continued exit from low-margin contracts.

\* \* \*

As we look at our business, excluding these 2 items, this is an important part of our story as well as a clear indication that our transformation efforts are working and it'll take another 12 to 18 months to complete. On an adjusted EBITDA margin basis, the story is very positive. Net of postage and the previously announced contract exit, adjusted EBITDA margins were 22%. Now this is the margin level that has been our target since the inception of Exela in July of 2019.

318.    The statements in ¶¶ 316-317 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings.   In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 2Q 2019 financial results.

### I.    Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results

319.    On November 12, 2019, Exela filed a form 8-K and press release, signed by Reynolds, reporting the Company's 3Q'19 financial results, including adjusted EBITDA of $58.5 million. The press release further stated:

**Adjusted EBITDA:** Adjusted EBITDA for the third quarter of 2019 was $58.5 million, a decline of 15.1% as compared to Adjusted EBITDA of $68.9 million in the third quarter of 2018. Adjusted EBITDA margin for the third quarter of 2019 was 15.7% compared to Adjusted EBITDA margin of 18.0% in the third quarter of 2018. The decrease in third quarter 2019 Adjusted EBITDA was mainly driven by lower revenue in the ITPS segment along with higher SG&A spend and foreign currency losses offset by continued realization of savings flow-through.

Adjusted EBITDA margin, based on revenue excluding the LMCE and pass through revenue, was 18.9% in the third quarter of 2019 and 21.1% in the first nine months of 2019, compared with 22.8% and 22.4% in the comparable prior year periods.

320.    The press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and ***other similar non-routine items outside the control of our management team***."

321.    The description of adjusted EBITDA within the November 12, 2019 press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, ***we exclude these charges since we do not believe they truly reflect our past, current or future operating performance***.

322.    The statements in ¶¶ 319 - 321 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.

323.    On November 12, 2019, the Company held an earnings call to discuss its 3Q'19 financial results. On adjusted EBITDA and liquidity, Reynolds stated:

> Adjusted EBITDA for the quarter totaled $58.5 million, a decrease of 15.1% on a year-over-year basis. Adjusted EBITDA margin for the third quarter was 15.7% compared with 18% in the third quarter of 2018. … Liquidity at the end of the third quarter was $50.4 million. Our total net debt was $1.485 billion.

324.    The statements in ¶ 323 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back

routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 3Q 2019 financial results.

## VII.   LOSS CAUSATION

325.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class.  During the Class Period, Plaintiffs and the Class purchased Exela's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

326.    Artificial inflation in Exela's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on November 8, 2018, March 18, 2019, May 9-10, 2019, May 22, 2019, August 8-9, 2019, November 12-13, 2019 and March 16, 2020.  As a direct result of these partial disclosures, the price of Exela's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

327.    On November 8, 2018, the Company reduced its 2018 adjusted EBITDA guidance by approximately $18 million and reported a substantial increase in O&R expense addbacks, which partially revealed that such expenses were not nonrecurring or nonroutine (rather, they were regular and recurring).  Morgan Stanley analyst Brian Lee Essex asked management on the earnings call about "how one time-ish" Exela's "impact items" were going to be—demonstrating the growing skepticism among analysts about Exela's representations that its adjusted EBITDA really did just add back nonroutine expenses, or if it was also adding back traditional operating expenses.

328.    Moreover, the growth in optimization and restructuring expense from the prior quarter also demonstrated to investors that recurring expense addbacks were increasingly making

up a larger percentage of Exela's reported adjusted EBITDA. This means that the EBITDA guide down was problematic for two reasons: (1) the earnings were falling; and (2) what was actually making up the earnings, i.e., the quality of the earnings itself, was deteriorating.

329.    Following this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 2018 damaging investors.

330.    On March 18, 2019, the Company announced that it met its 2018 revenue and adjusted EBITDA guidance. However, the Company also indicated that its optimization and restructuring expenses would only "gradually" decline but would continue. More specifically, he noted:

331.    On the earnings call, Reynolds stated:

The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter. The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $0.8 million in facility cost. We believe 2018 represented the high watermark in terms of optimization and restructuring expenses. And in time, **we expect these costs to *gradually* decline** as we implement our transformational model.

332.    Management's partial recognition that optimization and restructuring expenses were not in fact non-routine, gave investors pause. For instance, the following day, Morgan Stanley published a report noting:

Reconciliation of business optimization costs vs. progress toward long-term profitability goals. XELA had previously outlined long-term adjusted EBITDA in the range of 22% to 23%, though we have yet to see this target updated. As the company is still expected to incur business optimization costs in FY19, we lack guidance around timing to reconcile when such profitability may be achieved.

333.    Following this news, Exela's stock fell $0. 21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors. The stock continued to fall the following day by an additional $0.23 per share, or 6.2% to close at $3.50 on March 20, 2019.

334.    On May 9, 2019, the Company revealed that it missed its revenue guidance for 1Q'19 and that its net debt stood at $1.46 billion, putting its leverage ratio at a concerning 5.06x.

Also on the May 9 earnings call, for the first time, Exela appears to have admitted that optimization and restructuring charges are not limited to just the Business Combination or discrete M&A activity.  Rather, Reynolds suggested that optimization and restructuring are in fact more akin to operating costs, when he details that such costs are associated with large projects. Investors begin to sense that—despite what they have been led to believe about the supposedly "non-routine" nature of optimization and restructuring expenses—such costs will persist.  On the earnings call, a Jefferies LLC equity analyst took management to task by saying "hoping you could talk a little bit more about restructuring and optimization costs that you have here."  He continued, "I mean they've been persistently high."

335.    On May 10, 2019 Morgan Stanley issued a report noting that "liquidity remains a primary concern for the stock with little visibility around how the company may address it."  It also stated, "Our call-back with management implied that optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved."

336.    Following this news, Exela's stock fell $0.17 per share, or 5.0%, to close at $3.21 per share on May 10, 2019.

337.    On May On May 22, 2019, Moody's downgraded the Company's debt from Caa1 from B3 based on the 1Q'19 revelations.  Moody's lead analyst Harold Steiner was quoted as saying, "Exela's restructuring charges **consist mostly of headcount** that it expects to cut as it transitions to more technology-based BPA service offerings… **We believe these are normal operating expenses necessary to provide its service**, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation."

338.    Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

339.    On August 8, 2019, the Company reduced its 2019 guidance citing, in part, unpredictable postage revenue.  This partially revealed that the Company's visibility into revenues was not 90%, that its revenue was comprised of a material amount of unpredictable, non-recurring, low margin, revenue, and that stranded costs associated with the exit of these low margin contracts would continue to impact margins.

340.    On August 9, 2019 RBC issued a report stating, "we estimate that the company generated -$17M in free cash flow during the quarter, but is still free cash flow negative year to date. If we assume that the company's adjustments to EBITDA are cash outlays, then there was little, if any, free cash flow in the quarter, in our estimation."  It noted that it was lowering it price target, stating, "Given the focus on liquidity and free cash flow, we believe that the equity will generally trade almost as a stub, or option, relative to the bonds. This makes valuing the shares quite difficult. Given the situation, we are reducing our target price to $4 from $7..."

341.    Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

342.    On November 12, 2019, Exela further reduced its 2019 guidance as a result of the continued impact of exiting a low margin contract in 3Q'18 and unpredictable postage revenue. These announcements further revealed that the Company had a substantial amount of unpredictable, nonrecurring, low margin revenue, and the extent to which stranded costs from exiting these contracts would impact margins.

343.    On November 13, 2019, Cantor Fitzgerald issued a report noting the 2019 guidance reduction and stating, "The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time…. We decrease our EPS estimate to -$1.48 from -$0.51, due to a heavy miss in 3Q19 and revenue and margin guide downs from management."

344.    Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

345.    Finally on March 16, 2020, Exela announced that it would be delaying the filing of its 2019 Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019.  Following this news, Exela's stock fell $0.05 per share, or 23.0%, to close at $0.15 per share on March 18, 2020 on heavy volume.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

### A.    Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA

346.    The proceedings before the Delaware Court of Chancery make clear that Exela, led by Chadha, maintains a culture that adopts pervasive misrepresentation.  The Court of Chancery noted that, among other things, SourceHOV—Exela's largest subsidiary: (1) sought and received a backdated a valuation model to gain an advantage in litigation; (2) when confronted about the same, denied doing so; (3) "lacked credibility"; (4) [Chadha] was "simply not believable" and "not at all forthright"; and (5) all of his testimony was "tainted."

347.    While these findings were made in different litigation, that litigation concerned SourceHOV's financial statements, which ultimately roll up into Exela's.  The court's factual and legal findings were based in part on testimony from current Exela executives, including Exela's current SVP of Finance, and Exela's current Chair.

348.    Testimony from that litigation demonstrates that Exela knew, or should have known, that its addbacks to adjusted EBITDA during the class period were improper.  For example, testimony from Exela SVP of Finance, Verma, stated on June 5, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses ***which are considered one-time and nonrecurring in nature***; for example, business optimization and fees and expenses incurred in connection with transactions."   Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement.  And what that means is every cost that was ***not part of the business as usual*** has to be added back.  There -- there's no black and white about it. So -- because you have

to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

349.     During the same testimony, Verma even went so far as to testify that "the EBITDA definition has to be held sacrosanct.  And what I mean by that is every charges which are not a usual course of business are added back to the EBITDA."

350.     Verma also established the motive that SourceHOV had for including these expenses: "***it's basically in the company's interest to show an add-back.***"  The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is ***-- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing***."

351.     And just as SourceHOV was raising debt and equity capital before the Business Combination, similarly, during the class period, Exela was motivated to keep its equity value high for equity and debt capital raises.

352.     Moreover, because Appraisal Action testimony reveals that bankers from Morgan Stanley, Goldman Sachs, and even SourceHOV's own expert witness communicated to SourceHOV executives, who are know Exela executives, that SourceHOV's adjusted EBITDA addbacks were problematic.  Importantly, SourceHOV's expert witness who expressed concern about its addbacks would have likely been given access to the full suite of accounting and financial information unavailable to the public.  Thus, after all of the above financial experts conveyed concerns over Exela's practice of adding back recurring expenses to its adjusted EBITDA, Exela likewise knew or should have known that its practice was improper.  And as discussed herein, by excluding such expenses, it allowed Exela to meet is own guidance during the periods identified above.  Absent the adding back of optimization and restructuring expenses, Exela would not have met its own adjusted EBITDA guidance.

**B.      Defendants Failed to Break Out Postage Revenue But Had Been Tracking It**

353.    Defendants failure to break out or disclose the material amount of unpredictable no margin postage revenue until August 2019 is indicative of scienter.  Indeed, Defendants were asked about the impact of postage revenue on margins on the May 2018 call and Reynolds made no mention of the substantial amount of unpredictable no margin postage revenue, merely responding "we don't really break out postage separately." (*see supra* ¶172).   The above statement demonstrates a purposeful effort to conceal postage revenue because Defendants knew that they tracked postage as the balance sheet asset "customer deposits" – primarily reflected customer advances for postage— and appeared on the Company's balance sheet in every quarter since the third quarter 2017.

354.    On June 9, 2020, when the Defendants issued its restated financial results, it was revealed that unpredictable no margin postage revenue for 2018 was $310.1 million or approximately 20% of Exela's revenue, and 273.5 million for 2019 or approximately 18% of revenue.  Low margin contracts further worsened the Company's visibility into revenue. (*see supra* ¶¶234).  These figures revealed not only that Defendants' did not have 90% visibility into revenue as they claimed; but also, that postage revenue was even higher in 2018 than 2019, indicating that Defendants were intentionally obscuring the true state of the Company's revenues and margins.

355.    Moreover, in the 2018 10-K, the Company also disclosed that one of the material weaknesses over internal controls that it identified was "Ineffective control activities related to the following consolidated accounts:  . . . the completeness, existence and accuracy of revenue and deferred revenue transactions, including customer deposits and accounts receivable."   The customer deposits was the very line item on the balance sheet that Exela used to book an asset for postage advances received from customers.   Thus, Defendants either (a) knew the postage contribution to revenue because they were tracking it; or (b) were reckless in saying that 90% of its revenue was highly visible when 20% of said revenue came from postage after the Company had already identified that a material weakness existed related to their "completeness, existence

and accuracy of revenue and deferred revenue transactions, including customer deposits [i.e., advances for postage]."

### C. Chadha Reaped Almost $33 Million In Proceeds From Class Period Stock Sales

356.    On April 16, 2018, and shortly *after* Chadha requested the Backdated Valuation from Rothschild but *before* Defendants disclosed: (a) Exela's estimated liability in the Appraisal Action; (b) that ~ 20% of Exela's revenue was not in fact highly visible but rather was comprised of unpredictable postage revenue; (c) that it lacked internal controls including insufficient oversight and governance from the Board of Directors; and (d) that its Adjusted EBITDA addbacks included expenses that were routine operating expenses which management could control, Chadha sold seven million shares of stock at a price of $4.69 per share, generating proceeds of $32,830,000.  The price that Chadha sold his stock was 3,134% higher than the Class Period low of just $0.15 per share less than two years later, on March 18, 2020.  The timing and magnitude of Chadha's windfall contribute to a strong inference of scienter.

357.    This was Chadha's first and only stock sale made during the Class Period.

358.    Another motive for Defendants to misrepresent the appraisal liability arises because – had they paid Manichean what it was owed (when it was owed) – the Business Combination may not have transpired because a key condition to the lenders financing the Business Combination was collateral secured in part by Manichaean's shares.

359.    To obtain financing for the Business Combination, Chadha and Cogburn had to pledge their equity in SourceHOV to a facility called Ex-Sigma 2, LLC.  Ex-Sigma 2, LLC in turn served as collateral to secure certain financing incurred in connection with the Business Combination.  This loan – backed by shares of SourceHOV stock – was referred to as "the Margin Loan."  At the Appraisal Action, Chadha's was questioned about the Margin Loan as follows:

Q. What were the terms of that loan?
A. They were very onerous. It was -- they wanted security all of the 80.6 million shares that we were going to receive. They wanted that as collateral. They -- they also took collateral for all the shares we received for putting in the gap money -- so we were putting in 55 or 57 million -- and all the shares we would get -- it was about 8 or 9 million shares

-- they wanted that as collateral. And it was 13 percent interest rate and it had all kind of penalties.

Q. Now, I think the parties have been talking about this loan as the margin loan. Are you?

A. Yes.

Q. -- okay with that?

A. That's the same.

Q. Okay. And so the margin loan was secured by all of the consideration that SourceHOV was going to get in the transaction?

A. That's correct.

Q. And it was also secured by all of the shares that SourceHOV would obtain through the backstop financing.

A. That's correct.

Q. Did the lenders' demand for that security affect the structure of the business combination itself?

A. Of course. The original BCA had no contemplation of this.

\*   \*   \*

A. There was no Ex-Sigma in the original. It was simply merger with Quinpario.

Q. *So but for the margin loan, would this preliminary merger have occurred?*

A. *Without margin loan, no*.

Q. Okay. And can you just explain how the preliminary merger worked?

A. It meant that we create a -- a company called Ex-Sigma, which will hold all the shares so that the lenders of the full backstop could have all of the securities received from the Quinpario for the merger. So it became the holder post-closing of the 807.6 and the borrower of the backstop facility.

Q. And so then the result of the preliminary merger is that HGM and the other former SourceHOV stockholders hold an interest in Ex-Sigma.

A. Correct.

Q. And then Ex-Sigma is holding all the collateral from the transaction.

A. That's correct.

360.    Had Exela paid Manichean at the time of the Business Combination, it would have had fewer shares outstanding to secure the Margin Loan.  For instance, following the Appraisal Action, Exela's 10-K states that "As a result of the Appraisal Action, 4,570,734 shares of our Common Stock issued to Ex-Sigma 2, our principal stockholder at the Closing of the Novitex Business Combination, have been returned to the Company during the first quarter of 2020."  It further states that "These are the number of shares of our Common Stock issued at the Closing of the Novitex Business Combination to Ex-Sigma 2 in respect of the former stockholders' shares subject to the Appraisal Action that were returned to the Company during the first quarter of 2020."

### D.   The Company Had Material Weaknesses Over Internal Controls In Areas That Directly Bear On The Fraud Here

361.   In the 2019 10-K the Company admitted the following:

**Management's Report on Internal Control over Financial Reporting**
Management, under the supervision of the board of directors, is responsible for establishing and maintaining adequate "internal control over financial reporting," as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. . .

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2019 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013) (the "COSO 2013 Framework"). Based on its assessment, our management, including our CEO and CFO, has concluded that our internal control over financial reporting was not effective as of December 31, 2019 due to material weaknesses in our internal control over financial reporting described below.

The Company did not design, implement and operate effective process-level control activities related to order-to-cash (including revenue, customer deposits, accounts receivable, deferred revenue and cost to obtain a contract), procure-to-pay (including operating expenses, accounts payable, and accrued liabilities), hire-to-pay (including compensation expense and accrued liabilities), leases (including accounting for the adoption of the new lease standard, right-of-use asset and lease liability), goodwill, restricted cash, share based compensation, journal entries and preparation of the consolidated financial statements, and other financial reporting processes, as well as accounting for significant unusual transactions.

In addition, the Company did not design, implement and operate effective process-level control activities related to the approval, authorization and disclosure of related party transactions.

The Company did not design, implement, and operate effective general information technology controls (GITCs) over user and privileged access to information technology (IT) systems at multiple components in order to adequately restrict access to appropriate finance and IT personnel and enforce appropriate segregation of duties. As a result, process-level automated control activities and manual control activities that are dependent upon information derived from IT systems were also ineffective.

These deficiencies in process-level control activities and GITCs were largely caused by an ineffective control environment as follows:

- There was not sufficient oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting;

\* \* \*

The deficiencies in the control environment also created deficiencies in the Company's risk assessment process, information and communication and monitoring activities as follows:

- There was not sufficient oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting;

- Financial reporting objectives were not clearly specified to enable the identification and assessment of risks, including complying with applicable accounting standards;

- The risk assessment process failed to identify and assess risks of misstatement, including fraud risks, to ensure controls were designed and implemented to respond to those risks;

## IX.    CORPORATE SCIENTER ALLEGATIONS

362.    The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

363.    The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

## X.    CLASS ACTION ALLEGATIONS

364.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Exela shares between March 16, 2018 and March 16, 2020, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act.  Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

365.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Exela's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Millions of Exela shares were traded publicly during the Class Period on the NASDAQ.  As of November 5, 2018, Exela had 151,648,643 shares of common stock outstanding.  Record owners and other members of the Class may be identified from records maintained by Exela or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

366.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

367.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

368.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.    whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Exela;

c.    whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d.    whether the price of Exela securities were artificially inflated because of Defendants' conduct complained of herein; and

e.      to what extent the members of the Class have sustained damages and the proper measure of damages.

369.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein.  Moreover, there will be no difficulty in the management of this action as a class action.

## XI.    APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE)

370.    The market for Exela's shares was open, well-developed, and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, Exela's securities traded at artificially inflated prices during the Class Period.  On September 19, 2018 the Company's shares closed at a Class Period high of $7.30 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Exela's shares and market information relating to Exela, and have been damaged thereby.

371.    During the Class Period, the artificial inflation of Exela's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Exela's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of Exela and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares.  Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the

Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

372.   At all relevant times, the market for Exela's shares was an efficient market for the following reasons, among others:

a.   Exela stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

b.   As a regulated issuer, Exela filed periodic public reports with the SEC and/or the NASDAQ;

c.   Exela regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

d.   Exela was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports were publicly available and entered the public marketplace; and/or

e.   The average daily trading volume for Exela securities during the Class Period was approximately 332,000 shares, with more than 151,648,643 shares outstanding as of November 5, 2018, and a market capitalization reaching almost $1.1 billion during the Class Period.

373.   As a result of the foregoing, the market for Exela's shares promptly digested current information regarding Exela from all publicly available sources and reflected such information in Exela's stock price.  Under these circumstances, all purchasers of Exela's shares during the Class Period suffered similar injury through their purchase of Exela's securities at artificially inflated prices and a presumption of reliance applies.

374.   A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

375. The statutory safe harbor and/or bespeaks caution doctrine applicable to forward-looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

376. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

377. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Exela who knew that the statement was false when made.

## XIII.   CLAIMS

### FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### Against All Defendants

378.   Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

379.   This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

380.   During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Exela's shares at artificially inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

381.   The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Exela's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All the Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

382.   The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Exela's financial well-being and prospects, as specified herein.

383.   The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course

of conduct as alleged herein in an effort to assure investors of Exela's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Exela and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

384.    Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

**SECOND CLAIM**
**Violations of Section 20(a) of the Exchange Act**
**Against the Individual Defendants**

385.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

386.    This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

387.    The Individual Defendants acted as controlling persons of Exela within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

388.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

389.    As set forth above, Exela and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Exela's primary Exchange Act Section 10(b) violations.  As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the Class Period.

## XIV.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a)     A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

(b)     An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Such other and further relief as the Court may deem just and proper.

390.    The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Exela's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

391.    Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Exela's shares was artificially inflated during the Class Period.  In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiffs and the other members of the Class acquired Exela's shares during the Class Period at artificially high prices, and were damaged thereby.

392.    At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Exela shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

393.    Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

394.    As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Exela securities during the Class Period.

## XV.    JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.


Dated: August 5, 2021                          Respectfully submitted,
                                                             */s/ Joe Kendall*
                                                             Joe Kendall
                                                             Texas Bar No. 11260700
                                                             **KENDALL LAW GROUP, PLLC**
                                                             3811 Turtle Creek Blvd., Suite 1450
                                                             Dallas, Texas 75219
                                                             Telephone: 214-744-3000
                                                             Facsimile: 214-744-3015
                                                             Email: jkendall@kendalllawgroup.com

                                                             *Local Counsel for Lead Plaintiffs Insur Shamgunov*
                                                             *and Elena Shamgunova*

**GLANCY PRONGAY & MURRAY LLP**
Kara M. Wolke (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com
*Counsel for Lead Plaintiffs Insur Shamgunov and
Elena Shamgunova*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a copy of the foregoing document was filed with the Court's electronic

case filing (ECF) system on August 5, 2021, which caused an electronic copy of this document to

be served on all counsel of record in this matter who have registered for ECF service.


*/s/ Joe Kendall*
JOE KENDALL