**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| BO SHEN, Individually and On Behalf of All Others Similarly Situated, | § § § |
| Plaintiff, | § § |
| v. | § § |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN,  JAMES G. REYNOLDS AND PAR CHADHA, | § § § § |
| Defendants. | § § § |

Civil Action No. 3:20-cv-00691-D

**SUPPLEMENTAL APPENDIX OF EXHIBITS IN SUPPORT OF DEFENDANTS'
MOTION TO DISMISS**

Defendants Exela Technologies, Inc. ("Exela"), Ronald Cogburn, James G. Reynolds and

Par Chadha, by and through undersigned counsel, respectfully submit this Supplemental Appendix

in support of their Motion to Dismiss the Second Amended Complaint.

**INDEX OF EXHIBITS**

| EX. | DOCUMENT | DATE | SUPP. APP. PAGE(S) |
|---|---|---|---|
| | Declaration of Peter A. Stokes, Esq. | 09/01/2021 | 1-2 |
| 1 | Redline Comparison of Second Amended Complaint to Prior Complaint | 09/01/2021 | 3-213 |
| 2 | April 16, 2018 Schedule 13D | 04/16/2018 | 214-233 |
| 3 | April 11, 2018 Prospectus Supplement | 04/11/2018 | 234-300 |
| 4 | November 9, 2017 Press Release | 11/09/2017 | 301-306 |
| 5 | November 11, 2017 Earnings Call Transcript | 11/11/2017 | 307-332 |

| EX. | DOCUMENT | DATE | SUPP. APP. PAGE(S) |
|---|---|---|---|
| 6 | March 15, 2018 Earnings Call Transcript | 03/15/2018 | 333-354 |
| 7 | June 26, 2017 Schedule 14A | 06/26/2017 | 355-1060 |
| 8 | March 22, 2019 Moody's Press Release | 03/22/2019 | 1061-1063 |
| 9 | November 9, 2017 Form 10-Q | 11/09/2017 | 1064-1108 |

Dated: September 3, 2021

Respectfully submitted,

NORTON ROSE FULBRIGHT US LLP

/s/ *Peter A. Stokes*

Gerard G. Pecht (Attorney-in-Charge)
State Bar No. 15701800
1301 McKinney, Suite 5100
Houston, TX 77010-3095
Telephone:  (713) 651-5151

Ellen B. Sessions
State Bar No. 00796282
2200 Ross Avenue, Suite 3600
Dallas, Texas 75201-7921
Telephone: (214) 855-7465

Peter A. Stokes
State Bar No. 24028017
peter.stokes@nortonrosefulbright.com
98 San Jacinto Boulevard, Suite 1100
Austin, Texas 78701-4255
Telephone:  (512) 474-5201

*Counsel for Defendants*

Appendix Index ISO MTD.DOCX

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| BO SHEN, Individually and On Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § § | |
| v. | § § | |
| | § | Civil Action No. 3:20-cv-00691-D |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, JAMES G. REYNOLDS AND PAR CHADHA, | § § § § | |
| Defendants. | § § § | |

## SUPPLEMENTAL DECLARATION OF PETER A. STOKES

In accordance with the Federal Rules of Civil Procedure, I, Peter A. Stokes, do hereby declare as follows. My name is Peter Andrew Stokes. I am an attorney licensed to practice law in the State of Texas. I am an attorney at the law firm of Norton Rose Fulbright US LLP, attorneys of record for Defendants Exela Technologies, Inc. ("Exela"), Ronald Cogburn, James G. Reynolds and Par Chadha. The facts contained herein are true and correct based on my personal knowledge and investigation.

Exhibit 1 to this declaration is a true and correct copy of a redline comparison of the Second Amended Class Action Complaint against Plaintiff's prior Complaint, as created by me using a comparison software application.

Exhibit 2 to this declaration is a true and correct copy of a Schedule 13D bearing the name "Exela Technologies, Inc." dated April 16, 2018 and filed with the Securities and Exchange Commission ("SEC"), which I obtained from the SEC's public website.

Exhibit 3 to this declaration is a true and correct copy of a prospectus supplement for Exela Common Stock dated April 11, 2018 and filed with the SEC, which I obtained from the SEC's public website.

Exhibit 4 to this declaration is a true and correct copy of an Exela press release dated November 9, 2017 and filed with the SEC, which I obtained from the SEC's public website.

Exhibit 5 to this declaration is a true and correct copy of a transcript of an Exela earnings call dated November 11, 2017, as obtained by an employee of our firm at my direction.

Exhibit 6 to this declaration is a true and correct copy of a transcript of an Exela earnings call dated March 15, 2018, as obtained by an employee of our firm at my direction.

Exhibit 7 to this declaration is a true and correct copy of an Exela proxy statement dated June 26, 2017 and filed with the SEC, which I obtained from the SEC's public website.

Exhibit 8 to this declaration is a true and correct copy of a press release dated March 22, 2019 by Moody's Investors Service, which I obtained through an online search.

Exhibit 9 to this declaration is a true and correct copy of a Form 10-Q dated November 9, 2017 and filed by Exela with the SEC, which I obtained from the SEC's public website.

I declare under penalty of perjury under the laws of the United States of America that the foregoing facts are true and correct.

Executed this 3rd day of September, 2021 in Austin, Texas.

/s/ Peter A. Stokes
Peter A. Stokes

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  v.<br><br>EXELA TECHNOLOGIES, INC., RONALD COGBURN, and JAMES G. REYNOLDS,<br><br>     Defendants. | Case No. 3:20-cv-00691-D |

**LEAD PLAINTIFFS' ~~INSUR SHAMGUNOV AND ELENA SHAMGUNOVA~~**
**SECOND AMENDED CLASS ACTION COMPLAINT**

**TABLE OF CONTENTS**

I.    NATURE OF THE ACTION ........................................................................ 1

II.   JURISDICTION AND VENUE .................................................................. ~~6~~9

III.  PARTIES AND RELEVANT NON-PARTIES ........................................... ~~6~~9

      ~~A.  Parties~~ .................................................................................... ~~6~~

IV.  BACKGROUND ..................................................................................... ~~10~~13

      A.    Background Of Exela ....................................................... ~~10~~13

             1.     SourceHOV ~~is~~, Defendants' Predecessor Entity, Is Exela's ~~largest subsidiary~~ ..................................... ~~11~~Largest Subsidiary    14

             ~~2.  Novitex is Exela's second largest subsidiary~~ .................... ~~13~~

             2.     ~~B.~~Background of ~~The Business Combination~~ .......... ~~13~~Novitex    15

      B.    Background Of The Merger ............................................. 16

      C.    The Appraisal Action ..................................................... ~~16~~19

             1.     Facts ~~prompting the~~Prompting The Appraisal Action ........ ~~16~~19

             2.     Appraisal Action ~~Reveals~~Details Chadha's Central Involvement In The Creation Of SourceHOV Valuation Calculations, and Reveals His Position At The Helm Of A Culture Of Deceit ...................... ~~17~~20

             3.     The Appraisal Action Reveals That The Individual Defendants Were Aware Of SourceHOV's Range Of Liability In The Appraisal Action, And Also Reveals How Defendants Misled Exela Investors With Respect Thereto    24

             4.     Appraisal Action Details Improper Addbacks To Adjusted EBITDA ~~19~~ .........................................................................30

             ~~4.  What the Appraisal Action revealed: Par Chadhatold investors one thing, but told the Court of Chancery another~~ .......... ~~24~~

      ~~D.  Following the Merger the Company Discusses Its Progress In Implementing Its Strategy to Grow Revenue and EBITDA.~~ ...... ~~24~~

             5.     The Knowledge And Actions of SourceHOV, And Of The Individual Defendants While Employed By SourceHOV, Are Attributable To Defendants In This Case    39

V.   SUMMARY OF THE FRAUD ................................................................. ~~27~~44

      A.    Defendants ~~attempt to frame ordinary operating expenses as non-routine and~~

likely to decline in the future within Exela's Adjusted EBITDA metrics ........................................................................................................................27 Inflate Adjusted EBITDA With Ordinary Operating Expenses, Claiming They Are Non-Routine/Non-Recurring And Will Decline ........ 44

B.      Defendants Claim Exela Has Predictable Revenue And That Margins Will Expand As They Implement BPA301.Exela ToutsTout Revenue Visibility To Instill Investor Con

C.      2.Defendants Told Investors Margins And EBITDA Would Grow As They Automated Existing Low Margin Customers Acquired From Novitex And Other Acquisitions  31Fail To Record Estimated Appraisal Liability And Misrepresent Their Ability To Even Estimate Exela's Potential Liability Associated With The Appraisal Action        53

Supp.App. 0005

D.    ~~C.~~The Truth Begins To Emerge .......................................... ~~33~~55

    1.    Exela Lowers ~~its~~Its 2018 Adjusted EBITDA Guidance By ~$18 Million ~~Due In Part To The Exit Of A Low Margin Contract~~ ...... ~~33~~ 55

    2.    Exela Reports 2018 Results ~~And Expresses~~, Further Partially Revealing The Extent Of Ongoing O&R Expenses; Still, Defendants Express Confidence In Strong 2019 Guidance Due to Revenue "Visibility ~~36~~"_____ 57

    3.    Exela Misses 1Q'19 Revenue Expectations ~~And Its Liquidity Plummets Resulting In A Moody's Downgrade_____ 38~~, Reveals Ongoing High O&R Addbacks That Corresponds With Increased Headcount ____ 59

    4.    Moody's Downgrade Challenges Exela's Adjusted EBITDA And Addbacks As "Normal Operating Expenses" _____ 61

    5.    ~~4.~~Exela Announces 2Q'19 Results And Revises 2019 Guidance Down ~~Citing~~, Disclosing For the First Time Impact Of "Unpredictable" Pass-Through Postage Revenue ~~And Exit From Low Margin Contract in 2Q'19_____ 42~~ 62

    6.    ~~5.~~Exela Further Reduces 2019 Guidance, Again ~~Due To~~Citing, In Part, Unpredictable Postage Revenue ~~And Low Margin Client Exit In 3Q'18~~ ~~43~~ 63

    ~~6.Testimony from the Appraisal Litigation Detailed Additional and Previously Unknown Issues about SourceHOV~~ .......... 47

    7.    Exela Announces Delay Of 2019 Form ~~2019~~ 10-K ~~Filing And Restatement_____ 50And T~~

    8.    Post-Class Period Disclosures~~.~~ ...................... ~~51~~ 68

VI.    DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD  ~~56~~70

    A.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K ...................... ~~56~~70

    B.    Defendants' False and Misleading Statements and Omissions Relating To ~~Its~~Exela's April 13, 2018 Secondary Offering .......... ~~58~~74

    C.    Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results ____ ~~59~~74

    D.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results ................ ~~61~~77

    E.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results ................ ~~64~~80

    F.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results ...... ~~68~~84

    G.    Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results ................ ~~73~~92

Supp.App. 0006

H.      ~~G.~~Defendants' False And Misleading Statements And Omissions Regarding ~~ITS~~Its 2Q'19 Financial Results      ~~76~~95

Supp.App. 0007

I. ~~H.~~ Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results ............... ~~78~~ 97

VII. LOSS CAUSATION ............... ~~80~~ 99

VIII. ADDITIONAL SCIENTER ALLEGATIONS ............... ~~84~~ 103

    A. Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA ~~84~~ 103

    ~~B. Implementing Digitization And Automation In Existing Customers Was a Core Operation 86~~

    B. ~~C.~~ Defendants Failed to Break Out Postage Revenue ~~89~~ But Had Been Tracking It ............... 105

    C. Chadha Reaped Almost $33 Million In Proceeds From Class Period Stock Sales 106

    D. The Company Had Material Weaknesses Over Internal Controls In Areas That Directly Bear On The Fraud Here 108

IX. CORPORATE SCIENTER ALLEGATIONS ............... ~~90~~ 109

X. CLASS ACTION ALLEGATIONS ............... ~~90~~ 109

XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE- MARKET DOCTRINE) ~~92~~ 111

XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE ~~94~~ 113

XIII. CLAIMS ............... ~~94~~ 114

XIV. PRAYER FOR RELIEF ............... ~~96~~ 116

XV. JURY TRIAL DEMANDED ............... ~~99~~ 118

~~Introduction~~

Lead Plaintiffs Insur Shamgunov and Elena Shamgunova ("Plaintiffs")~~, by their undersigned attorneys,~~ hereby bring this <u>Second</u> Amended Class Action Complaint ("~~Complaint~~<u>SAC</u>") against Exela Technologies, Inc. ("Exela" or the "Company"), Ronald Cogburn ("Cogburn<u>"), Parvinder Chadha ("Chadha</u>") and James G. Reynolds ("Reynolds") (together, "Defendants"). The allegations herein are based on Plaintiffs' personal knowledge as to their own acts and on information and belief as to all other matters, such information and belief having been informed by the investigation conducted by and under the supervision of Lead Counsel, which includes a review of: U.S. Securities and Exchange Commission ("SEC") filings by Exela; securities analysts' reports and advisories about the Company; press releases and other public statements issued by the Company; media reports about the Company; interviews with former Exela employees; and other publicly available information concerning Exela. Lead Counsel's investigation into the matters alleged herein is ongoing and many relevant facts are known only to, or are exclusively within the custody or control of, the Defendants. Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery. On behalf of themselves and the class they seek to represent, Plaintiffs allege as follows:

## I. NATURE OF THE ACTION

1. This is a federal securities class action on behalf of persons or entities who or which purchased or acquired Exela securities between March 16, 2018 and March 16, 2020, inclusive (the "Class Period") and who were damaged thereby, seeking to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

Exela is a location-agnostic global business process automation ("BPA") provider combining industry-specific and multi-industry enterprise software and solutions worldwide. ~~Exela is a Delaware corporation and its principal executive offices are located at 2701 E. Grauwyler Rd, Irving, TX 75601. Exela's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "XELA."~~ It was formed by the merger of SourceHOV and Novitex, which was arranged by special ~~purposes~~<u>purpose</u> acquisition company Quinpario Acquisition Corp. ~~2.~~<u>2</u> in July ~~2017, making~~<u>2017 (the "Merger"). The Merger was supposed to make</u> Exela a major player in the business processing industry. <u>Following the Merger, SourceHOV was Exela's largest operating segment.</u>

2. The ~~Company~~ Individual Defendants in this action—Par Chadha, Ronald Cogburn, and Jim Reynolds—operated and controlled SourceHOV prior to and during the Merger, and they continued to operate and control SourceHOV as a subsidiary of Exela during the Class Period. At both SourceHOV and at Exela during the Class Period, Chadha was Board Chair, Cogburn was CEO, and Reynolds was CFO. Prior to SourceHOV, the Individual Defendants worked together at an entity called Hands On Global Management ("HGM"), an investment firm controlled by Chadha, of which Cogburn also was a principal and Reynolds was a partner and Chief Operating Officer. Both Cogburn and Reynolds reported to Chadha at HGM, and continued to do so at SourceHOV, and later at Exela during the Class Period.

3. As a result of the Merger, Defendants planned to combine SourceHOV's back-~~off~~ office capabilities with Novitex's front-end solutions to drive revenue and margin growth by expanding ~~its~~ Exela's scope of services within its existing base of customers, winning larger contracts given its increased scale, leveraging BPA across both its on-site and offsite employees, and realizing cost saving from merger synergies. ~~4.~~ Exela also aimed to reduce its leverage, while continuing to make tuck-in acquisitions that would allow it to expand its ~~existing customer base. Management also told investors that its~~ customer base.

4. During the Class Period, Exela reported a non-GAAP financial metric, adjusted EBITDA, which Defendants told investors was an "important indicator[] of performance" and would "provide useful information to investors in assessing our financial performance and results of operations." Defendants told investors that Exela's adjusted EBITDA, which added back ~~one-time and~~ supposedly "non-~~cash~~routine" charges to EBITDA, would "converge" with EBITDA as the Company realized cost savings from the ~~merger~~Merger by consolidating operations. In other words, non-routine expenses associated with the Merger that were added back to EBITDA were supposed to go *down* after the Merger.

~~5. The Company told investors that it had 90% visibility into its revenue because it was recurring in nature due to long-term or auto-renewal customer contracts. With approximately 6,000 employees that worked on-site with its customers, Exela assured that it was deeply embedded and by cross-selling and upselling its automation and digital transformation solutions,~~

branded as DigitalNow, it would further expand its "broad and sticky" revenue base. Furthermore, Exela assured that while implementing these solutions involved initial cost outlays, particularly with respect to headcount, once they were in place headcount would decline and margins would expand.

5. When announcing its third quarter 2017 results on November 9, 2017, Exela included a reconciliation table between EBITDA and Adjusted EBITDA. An explanation above that reconciliation table explained that "*Optimization & restructuring [O&R] expenses and merger adjustments are primarily related to the implementation of strategic actions and*

*initiatives related to the business combination completed on July 12th 2017.*" In the same press release, the Company also told investors that "*The integration of SourceHOV and Novitex is essentially complete,* and we are on track to achieve our merger synergy targets."

6. Similarly, in announcing its first quarter 2018 results on May 11, 2018, Exela again included a reconciliation table between EBITDA and Adjusted EBITDA. There, the explanation above the reconciliation noted, "Adjusted EBITDA and Further Adjusted EBITDA also *seek to remove the effects of integration* and related costs to achieve the savings, any expected reduction in *operating expenses due to the business combination,* asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team.*"

7. In short, since the formation of Exela, Defendants led investors to believe that O&R expense addbacks (which had the effect of increasing the Company's reported adjusted EBITDA figures) were non-routine and/or aberrant Merger-related expenses, that management could not control, *not* ongoing and/or routine operating expenses.

8. Indeed, applicable accounting rules provide that certain one-time or non-recurring expenses can be added back to EBITDA to help investors assess earnings. Making such addbacks of non-routine expenses is customary as it is intended to reflect what a steady-state, or normalized period of operations would look like absent such expenses. But that wasn't what Exela did. Exela added back so-called "optimization and restructuring" (or "O&R") expenses to adjusted EBITDA, even though such expenses continued every single quarter that Exela reported the metric during the Class Period and, as the Restatement ultimately revealed (*see ¶¶ 165, 233 infra*), misleadingly included substantial amounts of normal operating expenses that were improperly added back to adjusted EBITDA. Moreover, this misleading accounting enabled Exela to achieve its 2018 annual guidance, and masked the true state of the Company's financial performance during the Class Period (*see infra,* ¶233).

9. While adjusted EBITDA pertains to earnings, or the bottom line of the Income Statement, Defendants also made misrepresentations about revenue, or the top line of the Income Statement. Defendants did so by telling investors that Exela had 90% visibility into its revenue

6. In its opinion from litigation spanning from 2017 through 2020, because it was recurring in nature due to long-term or auto-renewal customer contracts. This was misleading because approximately 20% of Exela's revenue came from billing customers for pass- through postage costs, which Defendants later admitted was inconsistent and highly unpredictable. In addition, shortly after the Merger, on September 21, 2017, a group of minority shareholders of SourceHOV sued to demand their appraisal rights under Delaware law in connection with the Merger. *Manichaean Capital, LLC et al. v. SourceHOV Holdings, Inc. et al.*, Case No. 2017-0673- JRS (Del. Chancery) (the "Appraisal Action"). The Appraisal Action revealed that, under the control and direction of Chadha, SourceHOV investors' shares were undervalued and the investors were underpaid in connection with the Merger.[1] In that action, the Delaware Court of Chancery found that ~~Defendant~~Exela's ~~Chairman, Par~~Chair, Chadha~~,~~ —the former SourceHOV Chair—"lacked credibility"~~; that its' chairman~~, was "simply not believable" and "not at all forthright"~~;~~, and ~~—~~, because of his refusal to admit to his "scheme" to backdate ~~a~~the valuation of ~~one of his company~~SourceHOV's shares ~~—~~, that all of his testimony was "taint[ed]." ~~The individual the court describes is Par Chadha, and he runs Defendant Exela. Before running Exela, Chadha ran SourceHOV, an entity "whose governance structure was not a model for best practices," according to the Court of Chancery.~~ 2020 WL 496606, at *19, *21.

10.     Following judgment in favor of the plaintiffs in the Appraisal Action, SourceHOV appealed and lost. Following the entry of final judgment in the Appraisal Action, SourceHOV/Exela refused to pay and the judgment remained unsatisfied, forcing the plaintiffs there—"[c]onfronted with the highly unusual circumstance where an appraisal judgment debtor cannot or will not pay"—to file yet another action to hold Exela accountable to pay the appraisal judgment. *See Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 699-700 (Del. Ch. 2021) (internal citations and quotations omitted) (the "Veil Piercing Action."). As of this filing, Plaintiffs are informed and believe that the judgment remains unsatisfied. The Delaware Court of Chancery in the Veil Piercing Action held that the plaintiffs alleged facts sufficient to show that

---

[1] *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, 2020 WL 1511189 (Del. Ch. March 26, 2020).

"*Exela and SourceHOV Holdings operate as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them.*" *Id.* at 707.

Supp.App. 0014

11.     7.The deceit here is multi-faceted. In short, Exela misled investors about the predictability of its revenue, often stating that 90% of its revenue was predictable when Defendants

later admitted that approximately 20% of their revenue was unpredictable, nonrecurring, low margin postage revenue. In addition, Exela misled investors about its ability to increase its revenue and margins by implementing automation and digital transformation in its existing customers, particularly those acquired through its acquisitions of Novitex and later Asterion. Many of the customers it had acquired had low margins and no path to automation or digital transformation, resulting in a material amount of unpredictable, nonrecurring, low margin revenue with no opportunity to improve those margins. In addition, exiting these low margin contracts resulted in stranded costs related to contract terminations, headcount, and facilities consolidation, that would further negatively impact margins.8.In effort to mask it's disappointing financial performance, the Company engaged in fraudulent accounting. Throughout the Class Period, the Company failed to account for liability associated with an Appraisal Litigation arising out of a dispute amongst shareholders of legacy SourceHOV about the fair value of their shares which should have been recorded in 2017 at the fair value of the shares tendered.9.The Company also misled investors throughout the Class Period by repeatedly reporting and emphasizing the importance of a misleading Non-GAAP metric called adjusted EBITDA. The Appraisal Litigation also saw testimony from Exela's current SVP of Finance, Anubhav Verma ("Verma"), who testified that Exela predecessor, SourceHOV, calculated adjusted EBITDA by "add[ing] back certain expenses which are considered one-time and nonrecurring in nature; for example, business optimization and fees and expenses incurred in connection with transactions." Making such addbacks of one-time or non-recurring expenses is customary for investors. It helps them determine what a steady-state, or normalized period of operations would look like absent such nonrecurring expenses. Even SourceHOV's expert witness commented that such a practice is "ubiquitous" among financial professionals.First, throughout the Class Period, Defendants failed to account for Exela's liability associated with the Appraisal Action, and later admitted

that the liability should have been recorded in 2017 at the fair value of the shares tendered. Second, Defendants misled investors throughout the Class Period by repeatedly reporting and emphasizing the importance of Exela's adjusted EBITDA, to which Defendants improperly added back routine or ordinary operating expenses to inflate the appearance of Exela's earnings. They also misleadingly characterized the nature of the Adjusted EBITDA addbacks as being outside the control of management when, in fact, the largest component to the O&R addback was headcount

10. But that wasn't what Exela did. Exela added back the expense of optimization and restructuring to adjusted EBITDA, even though such expenses recurred every single quarter that Exela has released it. Exela's predecessor SourceHOV did the same thing, and their own expert witness (a financial expert) testified on June 6, 2020, that SourcHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring." More specifically, he testified that "And they're supposed to be nonrecurring expenses, and I don't know. I seem to see the same expenses year after year after year. So I -- my impression was, jeez, they don't look to be so nonrecurring.

11. The same practice that SoureHOV engaged in was repeated by Exela. The reason Exela would do so is because, by adding back that expense, it shows higher profits. Verma testified to about SourceHOV, "it's basically in the company's interest to show an add-back." The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing." The fraudulent accounting allowed the Company to achieve its 2017 and 2018 annual guidance, and masked the true state of its financial operations throughout the Class Period.

an expense squarely, if not solely, within the control of management. And finally, Defendants misled investors about the predictability of Exela's revenue, often stating that 90% of the Company's revenue was predictable when Defendants later admitted that approximately 20% of its revenue was unpredictable, nonrecurring, low margin postage revenue – a fact Defendants knew because they reported the balance sheet line item "customer deposits," which included

customer advances for postage, nearly every quarter during the Class Period. However, it was not until August 8, 2019 that Defendants admitted this source of revenue was actually unpredictable.

12. The truth of Defendants' misrepresentations was revealed, and/or the undisclosed risks materialized, in a series of partial disclosures during the Class Period. Exela's stock price was hammered during the Class Period, wiping out nearly $1.0 billion in shareholder equity. The Company's stock price of $5.41 per share on the first day of the Class Period climbed to reach its Class Period high of $7.30 per share on September 19, 2018 (for a market cap of approximately $1.1 billion), and dwindled down to a mere $0.15 per share by March 18, 2020 (resulting in a market cap of just $21.8 million). After the Class Period, the share price never recovered and Exela did a reverse stock split in order to regain compliance with NASDAQ's $1 per share listing requirement.

13. 12. On The first corrective disclosure came after market close on November 8, 2018, the Company when Exela announced its third quarter 2018 results and lowered its 2018 adjusted EBITDA guidance by approximately $18 million due in large part to. Among other things, Defendants cited the exit of a low margin contract,

contract customer and also disclosed that O&R addbacks had increased for the quarter by 49.2% over 2Q'18 (from $13 million to $19.4 million), thus partially revealing that ~~a portion of its existing customers had not path to automation or digital transformation.~~Exela's O&R addbacks were not actually non-routine, one-time costs.[2] On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, ~~2018~~2018, damaging investors.

14.     ~~13.On~~After market close on March 18, 2019, ~~the Company announced that its optimization and restructuring~~Exela announced its fourth quarter and fiscal year 2018 results and reported that it believed it hit its "high watermark" of O&R expenses in 2018, but that such costs would continue and only "gradually" decline, despite seven straight quarters of incurring such ~~costs.~~(supposedly non-routine) costs. Defendants also disclosed that $14.2 million of the $21.2 million in fourth quarter 2018 O&R expenses related to headcount –revealing that Defendants prior categorization of such costs as being "outside the control of management" was patently false. Defendants also revealed that "the Company's management expects to conclude that the Company's disclosure controls and procedures were not effective." Following this news, Exela's stock fell $~~0. 21~~0.21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors. The stock continued to fall on the following day ~~and fell~~by an additional $0.23 per share, or 6.2% to close at $3.50 per share on March 20, 2019.

15.     ~~14.On~~After market close on May 9, 2019, the Company announced ~~that it had missed its~~quarterly revenue ~~guidance~~of $403.8 million for the first quarter of 2019, and that its net debt stood at $1.46 billion, putting its leverage ratio at 5.06x ~~and~~. It also announced that ~~it's~~its liquidity had dwindled down to $58 million. The ~~Company also~~results revealed that O&R addbacks had increased for the quarter by 78% over 1Q'18 (from $14.5m to $25.8m), thus further partially revealing that Exela's O&R addbacks were not actually non-routine, one-time costs that would decline over time to enable Exela's adjusted EBITDA to converge with traditional EBITDA. Following this news, Exela's stock fell $0.17 per share, or 5.0%, to close at $3.21 on May 10, 2019.

16.     ~~its headcount had increased by nearly 1,000 employees as it ramped a new contract, calling into question the narrative that margins would improve as it removed headcount~~

---

[2] Exela's subsequent Restatement would reveal that these reported adjusted EBITDA figures were misleadingly inflated. *See* ¶¶165, 233 *infra.*

~~throughout the year. Then on~~<u>On</u> May 22, 2019, Moody's issued a press release announcing that it had downgraded ~~the Company~~<u>Exela</u>'s debt rating from Caa1 from B3. ~~These announcements partially revealed that the Company's was struggling to generate cash flow and needed to significantly improve its margins to pay down its debt and make interest payments. Following~~<u>Moody's lead analyst Harold Steiner was</u>

quoted as saying, "Exela's restructuring charges consist mostly of headcount that it expects to cut as it transitions to more technology-based BPA service offerings… *We believe these are normal operating expenses necessary to provide its service*, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation." In response to this news, Exela's stock fell $1.03 per share, or 35%, to close at

$1.91 per share on May 23, 2019 on heavy volume, damaging investors.

17.    15. On After market close on August 9, 8, 2019, the Company Exela reduced its 2019 revenue guidance citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, partially revealing that the Company had a substantial amount of unpredictable nonrecurring low margin revenue, and the extent to which stranded costs from exiting these contracts would impact margins. Following this news, Exela's stock fell $0.05 1.17 per share, or 27.1 48%, to close at $0.15 1.28 per share on March 18, 2020 August 9, 2019, on heavy volume, damaging investors.

18.    16. On After market close on November 12, 2019, the Company Exela further reduced its 2019 guidance, again noting the citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, further revealing more fully the extent to which the Company's revenue consisted of unpredictable low margin revenue, and the continued impact of stranded costs from exiting these contracts on the Company's margins rather than revenue that was "recurring in nature and supported by long-term customer contracts." Following this news, Exela's stock fell $0.25 per share, or about 41.7 42%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

19.    17. Finally on March 16, 2020, the Company announced that it would be delaying the filing of its 2019 annual report on Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019. On After market close on March 17, 2020, the Company issued a press release announcing various accounting errors that had been made, including most significantly failing to record liability for the shares at issue in the Appraisal Litigation Action since 2017, revealing that the Company had misrepresented its financial

condition. ~~Following~~In response to this news, Exela's stock price fell $0.05 per share~~, or 27.1%~~ on heavy volume, to close at $0.15 per share on March 18, ~~2020 on heavy volume.~~2020.

Supp.App. 0021

20. After the Class Period, on June 9, 2020, the Company issued its 10-K for the year ended 2019, wherein it admitted that the Appraisal Action liability should have been recorded in 2017:

> During the fourth quarter of fiscal 2019, the Company identified an error as a result of non-accrual of liability and interest thereon for the obligation to pay the fair market value of the shares of certain former stockholders of SourceHOV under the Appraisal Action.

> \* \* \*

> After evaluating the historical accounting treatment applied to the Appraisal Action, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. ***The liability should have been recorded in 2017 at the estimated fair value of the shares tendered***. This error resulted in $43.1 million, $40.6 million and $37.8 million understatement of accrued liabilities and commensurate understatement of total stockholders' deficit, as at September 30, 2019, December 31, 2018 and 2017, respectively. Further, this error resulted in $2.4 million, $2.9 million and $1.2 million understatement of loss for the nine months ended September 30, 2019 and for the years ended December 31, 2018 and 2017, respectively, due to the unrecorded interest expense accrual associated with the Company's obligations related to the Appraisal Action. Interest should have been accrued in the relevant periods at the rate set by the Delaware Court of Chancery. The correction of this error also reduced the number of shares outstanding by 4,570,734 shares for purposes of the weighted average outstanding common shares computation used to calculate basic and diluted loss per share during the respective periods. These are the number of shares of our Common Stock issued at the Closing of the Novitex Business Combination to Ex-Sigma 2 in respect of the former stockholders' shares subject to the Appraisal Action that were returned to the Company during the first quarter of 2020.

21. The 2019 10-K also revealed additional weaknesses over the Company's internal controls, including a lack of "oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting" as well as "deficiencies in the control environment also created deficiencies in the Company's risk assessment process." One such risk assessment process "failed to identify and assess risks of misstatement, ***including fraud risks***, to ensure controls were designed and implemented to respond to those risks."

22. 18. As a result of Defendants' wrongful acts and omissions, and the significant decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages. Accordingly, Plaintiffs seek to pursue securities fraud claims under Section 10(b) of the Exchange Act against Defendants and under Section 20(a) of

the Exchange Act against each of the Individual Defendants.

Supp.App. 0023

## II.     JURISDICTION AND VENUE

24.     ~~19.~~The claims asserted herein arise under Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) & 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

§ 240.10b-5).

25.     ~~20.~~This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

26.     ~~21.~~Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and Section 27 of the Exchange Act (15 U.S.C. §78aa(c)). Substantial acts in furtherance of the alleged securities law violations, and/or the effects of the violations, occurred in this Judicial District. Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.

27.     ~~22.~~In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the

U.S. mail, interstate telephone communications, and the facilities of a national securities markets.

## III.     PARTIES AND RELEVANT NON-PARTIES

A.        **Parties**

28.     ~~23.~~Lead Plaintiff Insur Shamgunov, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

~~24.~~Lead Plaintiff Elena Shamgunova, as set forth in their previously-filed certification filed with the Court, incorporated by reference herein (Dkt. No. 9-2), purchased Exela securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

29.     ~~25.~~Defendant ~~Exela purports to operate as a location-agnostic global business process automation ("BPA") provider combining industry-specific and multi-industry enterprise~~

~~software and solutions worldwide.~~ Exela is a Delaware corporation and its principal executive offices are located at 2701 E. Grauwyler Rd, Irving, TX 75601. Exela's securities trade in an efficient market on the NASDAQ Global Select Market (the "NASDAQ") under the ticker symbol "XELA." ~~26.~~ Throughout the Class Period, Exela, through its officers and directors, published periodic filings

with the SEC, and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's shares.

30. 27.Defendant Ronald Cogburn ("Cogburn"), served as the Chief Executive Officer ("CEO") of Exela and on its Board of Directors throughout the Class Period. Cogburn was the CEO of SourceHOV from 2013 until the closing of the ~~Novitext Business Combination~~Merger. Cogburn was also part of companies that were predecessors to SourceHOV since 1993, and has extensive experience in executive management, construction claims consulting, litigation support, program management, project management, cost estimating, damages assessment and general building construction. In addition, Cogburn has been a principal of ~~HandsOn Global Management, LLC ("HGM")~~Chadha's investment entity HGM since 2003. Cogburn has a BSCE in Structural Design/Construction Management from Texas A&M University and is a registered Professional Engineer.

28.Throughout the Class Period, Cogburn frequently spoke to investors and analysts on conference calls and investor conferences. Cogburn possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Cogburn signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, Amendment No. 1 to its Annual Report on Form 10- K/A for the year 2017, its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters ended March 31, 2018 and March 31, ~~2019.¹~~2019.[3]

31. 29.Defendant James G. Reynolds ("Reynolds") was the Company's Chief Financial Officer ("CFO") since the closing of the ~~Novitex Business Combination~~Merger in 2017 and served in that role throughout the Class Period. Reynolds previously served as the Co-~~Chairman~~Chair of SourceHOV from 2014 until the closing of the ~~Novitex Business Combination~~Merger. Reynolds ~~is~~was also the Chief Operating Officer and Partner at HMG. Prior to HGM Mr. Reynolds held numerous executive management or senior advisory positions at SourceHOV and its related subsidiaries and predecessor companies, including serving as Chief

---

[~~1~~3] References to Exela's fiscal years and quarters are referenced herein as "FY" and "1Q," "2Q," "3Q," or "4Q" respectively, and are followed by the corresponding year.

Financial Officer for HOV Services, LLC from 2007 to 2011 and Vice President and Corporate Controller for Lason from 2001 to 2006. Mr. Reynolds was a Senior Manager in the Business Advisory Services Practice at PricewaterhouseCoopers from 1990 to 2001. Mr. Reynolds is a C.P.A.

C.P.A. and holds a B.S. in Accounting from Michigan State University.

32. 30.Throughout the Class Period, Reynolds frequently spoke to investors and analysts on conference calls and investor conferences. Reynolds possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Reynolds signed or authorized the signing of and certified the accuracy of Exela's Annual Reports on Form 10-K for the years 2017 and 2018, as well as, certified the accuracy of Amendment No. 1 to its Annual Report on Form 10-K/A for the year 2017, and signed or authorized the signing of and certified the accuracy of its Quarterly Reports on Form 10-Q for each quarterly period ended March 31, 2018 through September 30, 2019, and its Amendment No. 1 on Form 10-Q/A for the quarters ended March 31, 2018 and March 31, 2019.

31.Defendant Par Chadha is the ChairmanChair of the Board of Directors for Exela and is the founder, Chief Executive Officer and Chief Investment Officer of HandsOn Global Management ("HGM"), formed in 2001, and the principal stockholder of SourceHOV immediately prior to the Business CombinationMerger on July 12, 2017. Chadha also served as ChairmanChair of SourceHOV from 2011 until the closing of the Business CombinationMerger. Chadha has 40 years of experience in building businesses in the Americas, Europe and Asia, including execution of mergers and acquisitions, integration of businesses and public offerings. Mr. Chadha is co-founder and owner of Rule 14, LLC, a portfolio company of HGM formed in 2011 athat provides data mining and automation company that providedincluding marketing transaction to SourceHOV.

33. 32.Chadha founded or co-founded other technology companies in the fields of metro optical networks, systems-on-silicon and communications. Through HGM, Chadha previously participated in director and executive roles in joint ventures with major financial and investment institutions, including Apollo, as well as other portfolio companies of HGM, and currently holds and manages investments in evolving financial technology, health technology and communications industries. Since 2005, Chadha has served as a Director of HOV Services

Limited, a company listed on the National Stock exchange of India, acting as its ~~Chairman~~Chair from 2009 to 2011. Chadha holds a B.S. in electrical engineering from Punjab Engineering College, India.

34. ~~33.~~Throughout the Class Period, Chadha controlled Exela through beneficial ownership of more than 50% of its shares and as ~~Chairman~~Chair. At the start of the Class Period, Chadha had the beneficial ownership of 55.8% of the Company's shares. The Company's filed proxy statement on April 30, 2019 ~~which~~ indicated that Chadha was the beneficial owner of 52.9% of the Company's shares. According to the Form 10-K/A filed by the Company on June 15, 2020, as of June 5, 2020 Chadha was the beneficial owner of 49.3% of the Company's shares; however, the amount likely exceeded 50% throughout the Class Period, as Ex-Sigma 2, an entity controlled by Chadha, distributed all of its shares during 1Q'20 and is no longer a shareholder of Exela.

35. In its 2017 10-K, Exela disclosed that HGM has "significant influence" over its corporate governance and that "[a]s long as the HGM Group owns or controls a significant percentage of outstanding voting power, it will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets." The 2017 10-K also disclosed that HGM was paid $23 million for "contract cancellation and advising fees" — a related party transaction that Chadha's investment firm profited by.

36. ~~34.~~Throughout the Class Period, Chadha possessed the power and authority to control the contents of the Company's public filings with the SEC. During the Class Period, Chadha signed or authorized the signing of Exela's Annual Reports on Form 10-K for the years 2017 and 2018.

37. ~~35.~~Defendants Cogburn, Reynolds, and Chadha are collectively referred to hereinafter as the "Individual Defendants." Exela and the Individual Defendants are collectively

referred to as "Defendants".

The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the content of Exela's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market. Each defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, each of these defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public and that the positive representations which were being made were then materially false and/or misleading. The Individual Defendants are liable for the false statements, pleaded herein, as those statements were each "group-published" information, the result of the collective actions of the Individual Defendants.

## IV.    BACKGROUND

### A.    Background Of Exela

38.    Exela was formed in 2017 by a three-way merger ("the "Merger" or "Business Combination") involving three entities: (1) SourceHOV; (2) Novitex; and (3) a special purpose acquisition company called Quinpario Acquisition Corp. 2 ("Quinpario"). SourceHOV and Novitex merged into Quinpario which became Exela. ~~The Business Combination is discussed more fully below.~~

~~38.Since the Business Combination, Exela has grown through additional merger activity, so it has several operating companies under its corporate structure. The largest of these operating companies is SourceHOV, which was formed in 2011 after the merger of two outsourcing service providers owned by Chadha and HGM.~~

Exela is made up of three reporting segments: (1) Information and Transaction Processing Solutions (ITPS); (2) Healthcare Solutions (HS); and (3) Legal & Loss Prevention Services (LLPS). By revenue and headcount, ITPS is the largest segment, comprising just under 80% of annual revenue on average during the Class Period. ITPS offers industry-specific services for banking and financial services, mobile banking platforms, and property casualty insurance. It also serves customers looking for records management, payment processing, and electronic storage of data (regardless of which industry that customer may fall into). HS provides automated services in the healthcare field including claims processing, prescription management, enrollment processing, medical coding, and medical records management. LLPS serves the legal industry

with things like class action settlement administration, collection and distribution of settlement funds, etc. LLPS is the smallest contributing segment to Exela's revenue. Each segment is discussed more fully below.

### 1. SourceHOV, Defendants' Predecessor Entity, Is Exela's Largest Subsidiary

39. Before becoming part of Exela, SourceHOV was a Delaware corporation with its principal place of business in Irving, Texas. It was formed in 2011 by the merger of two outsourcing service providers owned by Chadha and his investment group, HGM. Following the Merger, Exela owned 100% of SourceHOV, and the Individual Defendants controlled and operated it.

40. SourceHOV provides process outsourcing and financial technology solutions, with a focus on digital solutions. For instance, it might help a company automate its loan origination process. More specifically, SourceHOV purports to "combine and classify documents from different sources and in multiple media into a single, navigable structured data package that is then integrated into the wide variety of internal systems used by SourceHOV's clients." In other words, it performs back office support for banks and mortgage originators, including by processing payments in a faster and more efficient way through the use of automation technology.

42. One way SourceHOV might improve its customer's process includes software installation that essentially routes documents to the appropriate departments or personnel.

43. Another way might be to help companies manage an overwhelming amount of paperwork. For instance, in its 2018 Coverage Initiation of Exela, Morgan Stanley provides the example of a casual dining chain that had over 200,000 paper invoices. According to Morgan Stanley, Exela lowered the dining chain' costs by 40% and increased accountability for its accounts payable and reporting process through the use of one of SourceHOV's digital solutions.

44. SourceHOV performs similar services for healthcare entities, such as automating back office functions at a healthcare provider's office, or by processing claims, presenting an explanation of benefits (both print and digital) and helping the healthcare business manage its revenue cycle. SourceHOV also purports to assist with identity verification, entitlement qualification determination, and "adjudicating claims" to decide which claimants should be paid, and in which amount.

41. ~~45.On top of~~ <u>In addition to</u> financial services, SourceHOV serves law firms with offerings ranging from claims processing and administration, to assistance with discovery and legal collections. As above, most of these services are back-office in nature with some software component.

Supp.App. 0032

42. 46.Outside the private sector, SourceHOV also serves the public sector, through its Public Sector Solutions group by facilitating various processes and back-office functions for public agencies, such as tax return processing for a state's Department of Revenue. SourceHOV also assists with so-called front- office functions for a public agency by, among other things, managing the front-end tax processing operation, including the online tax submission portal, physical and electronic mailroom, document preparation, data capture, and similar services.

47.Functionally, SourceHOV's digital solutions range from providing software, big data analytics and data management. For instance, its digital solutions could either package and route documents, or create real time monitoring dashboards.

43. 48.Before becoming Exela's largest operating groupsegment, SourceHOV grew through M&A activity, so it also had several operating companies under its corporate structure. For instance, its financial solutions division resulted from a November 2014 acquisition of BancTec and its remittance processing division resulted from a 2016 acquisition of TransCentra Inc.

44. 49.Before becoming part of Exela, SourceHOV was a private company and lacked access to the public equity markets. Accordingly, SourceHOV's growth by merger strategy was often financed by taking on debt.

45. 50.SourceHOV did a lot of deals before becoming Exela. For example, by 2017, SourceHOV had 117 operating facilities throughout the world, and employed about 16,000 employees. Its annual revenue for the full year preceding the Business CombinationMerger was $790 million.

51.To get that big, SourceHOV had to borrow a lot of money. By 2017, SourceHOV had around $1.1 billion of debt–most of which was long-term in nature–and just $963.7 million of assets. This debt level and the debt covenants that came with it led SourceHOV to consider strategic alternatives and, eventually, the Business CombinationMerger (discussed more fully below).

**2. Background of Novitex Is Exela's Second Largest Subsidiary**

46. 52.Before becoming subsumed as part of Exela, Novitex Holding Inc., ("Novitex") was, like SourceHOV, a standalone entity focused on back office support. Unlike SourceHOV however, Novitex focused more on analog (or paper-based) support services. For instance, it provides document management services like mailroom outsourcing, document scanning, and

printing and indexing of documents for corporate customers. Novitex traces its roots to Pitney Bowes, the mail services entity which was owned by the same private equity firm that owned Novitex (before it was soldprior to Exela)the

Merger. At the time of the ~~Business Combination~~Merger, Novitex was majority owned by the private equity firm Apollo Global Management LLC. Since becoming part of Exela, Novitex rolled up into Novitex Enterprise Solutions, which, together with SourceHOV, is currently part of Exela's ITPS segment.

47. ~~53.~~Relative to SourceHOV, Novitex is smaller. With roughly 7,250 employees at the time of the ~~Business Combination~~Merger and $543 million in annual revenue for the year preceding the ~~Business Combination~~Merger, Novitex was the smaller entity from a headcount and financial standpoint.

~~54.Novitex purports to provide its customers a suite of Document Logistics and Digital Services offerings that support the "Integrated Document Lifecycle" within the document outsourcing space. Novitex's services are sometimes provided onsite with its client, and sometimes on Novitex's premises (or a combination of both).~~

~~55.Since becoming part of Exela, Novitex rolled up into Novitex Enterprise Solutions, which is currently part of Exela's ITPS segment, together with SourceHOV.~~

**B.      Background Of The ~~Business Combination~~Merger**

~~56.~~The reason for the ~~Business Combination~~Merger is straightforward: SourceHOV ~~was teetering on insolvency and close to tripping a debt covenant. SourceHOV~~'s highly levered capital structure meant that it needed to keep the ratio of its total net debt divided by its earnings (a/k/a its "leverage ratio") below the limits set by its debt covenants. To stay under those limits, SourceHOV sought to de-lever its balance sheet through a merger.

48. ~~57.~~A leverage ratio can be calculated in different ways, but the general principle is some ratio between ~~(a)~~ debt minus cash in the numerator, and earnings ~~is~~in the denominator. So a company can lower its leverage by either decreasing the debt minus cash in the numerator, or increasing the earnings in the denominator.

49. ~~58.~~Generally speaking, a merger can lower a company's leverage ratio by boosting the combined company's earnings more than it boosts its debt. To illustrate, suppose that company A has $100 of debt, and $20 of earnings. Its leverage ratio is 5.0x. Suppose further that company A mergers with company B, who also has $100 of debt, but has earnings of $30. The combined company (A+B) will have $200 of debt, and $50 of earnings, or just 4.0x leverage. In other words, the merger of A + B translated into a 20% leverage reduction for Company A, but an increase in leverage for company B. The drop in leverage becomes even more pronounced if

company B had zero debt.

50. 59. Another way a company can lower its leverage ratio is by merging with any company that has more cash than it does debt (lower the ~~denominator~~ numerator). So if Company A merges with Company C, a company that has only cash, no debt and no earnings, the leverage ratio of A

+ C would also decrease.

51. ~~60.~~An obvious question becomes why would Company C want to merge with Company A, particularly if Company A was in dire financial straights, as SourceHOV was? The answer: if Company C faces a binary choice of deploying its capital, or returning it and shutting down, it might take its chances with Company A. Here, Company C is Quinpario.

52. ~~61.~~Before SourceHOV and Quinpario came together, ~~Exela~~the executive team that would later run Exela (*i.e., the Individual Defendants here*) first sought to reduce ~~its~~the pro forma company's leverage ratio because SourceHOV and Novitex both ~~has~~had such high debt levels. So ~~some~~ additional equity was needed to get SourceHOV's balance sheet in a more manageable state before consummating the ~~Business Combination~~Merger.

~~62.~~As a result, in September 2016 SourceHOV approached a few existing investors including Manichaean Capital, LLC ("Manichaean"), Chadha-controlled HGM, and others. This small investor group eventually contributed $23 million of equity capital.

53. ~~63.~~At the time of the ~~Business Combination~~Merger, Quinpario was a NASDAQ-listed special ~~purposes~~purpose acquisition company (a SPAC). SPACs are publicly traded companies formed for a particular purpose. As was the case for Quinpario, most ~~commonly~~ SPACs are formed to acquire another company (or multiple companies).

54. ~~64.~~Generally speaking, in a SPAC transaction, a shell company goes public and trades on a listed exchange. The cash raised from the IPO goes into the SPAC's trust, where it earns interest until the SPAC completes a merger with an operating company. Most SPACs issue shares at $10.00 per share, as did ~~Qunipario~~Quinpario when it went public on January 22, 2015.

55. ~~65.~~If a SPAC doesn't complete a deal before its deadline (typically within two years after an IPO), the trust is liquidated and the proceeds are returned to investors. But if a deal is proposed before the deadline, SPAC investors are given detailed information about the proposed transaction, and have the right to vote on the deal. If the investors don't go for the deal, they have the right to require the SPAC to redeem their shares.

56. ~~66.~~Quinpario was formed on July 15, 2014 and went public several months later in January 2015, raising $350 million in a public offering. So by late 2016, after two years had ~~gone by~~ passed

and no deal had been made, Quinpario still had its nearly $350 million war-chest to invest, but only a few months left to spend it. That's because ~~Quninpario~~Quinpario was set to expire on January 22, 2017—right around the time that SourceHOV was looking for a financial lifeline.

57. ~~67~~Put differently, SourceHOV was burning cash ~~and teetering on the brink of insolvency~~, while Quinpario had so much dry powder that it was burning a ~~whole~~hole in its pocket. Eventually those seemingly complimentary forces moved the two companies to ~~began~~begin discussions to see if there was a mutual benefit in combining.

58. ~~68~~After a January 13, 2017 letter of intent, Quinpario, SourceHOV, Novitex and related parties executed a Business Combination Agreement formalizing a three way merger.

59. ~~69~~The Business Combination was considered a reverse merger where SourceHOV ~~as~~was determined to be the acquirer of Novitex. SourceHOV bought 100% of Novitex's equity for

$676.7 million and issued debt of about $1.4 billion which was used to refinance the then-existing debt of SourceHOV and Novitex. Quinpario ~~would~~ contributed $200 million and both SourceHOV and Novitex ~~would merge~~merged into Quinpario subsidiaries.

60. One of the conditions to secure the financing for the Business Combination was that SourceHOV equity holders, including Chadha and Cogburn had to pledge their equity in SourceHOV to a facility called Ex-Sigma 2, LLC. Then, Ex-Sigma 2, LLC in turn served as collateral for certain financing incurred in connection with the Business Combination. This SourceHOV equity-backed loan – backed by shares of SourceHOV stock (100% of the shares) – was referred to as "the Margin Loan." Over its objection, Manichaean was compelled to pledge its shares as collateral towards the Margin Loan. It was compelled because Chadha and Reynolds acted on SourceHOV's behalf without an independent committee of SourceHOV directors.

61. The formal structure of the Business Combination is as follows. A SourceHOV Merger Sub merged with and into SourceHOV, with SourceHOV surviving that merger to become an indirect subsidiary of Quinpario Acquisition Corp. 2; and Quinpario Merger Sub II, Inc. merged with and into Novitex, with Novitex surviving that merger to become an indirect subsidiary of Quinpario. The effect of the preliminary merger and the business combination was for Quinpario to become the parent company of both SourceHOV and Novitex. Quinpario was

later renamed

Exela in July, 2017. Because Quinpario had already been a public company since January 2015, once the Business Combination closed on July 12, 2017, what used to be Quinpario's shares then became Exela's shares.

62.     Because the Merger was so complex, the entities above retained investment bankers to assist with, among other things, estimating the equity value of SourceHOV and delivering such estimates to SourceHOV's Board of Directors (Chadha and Reynolds).

**C.     The Appraisal Action[4]**

**1.     Facts Prompting The Appraisal Action**

72.     71.As noted above, the combined or "pro forma" structure of SourceHOV and Novitex before the Business CombinationMerger was highly leveraged, and needed yet another equity infusion to cure its leverage requirements under itsSourceHov's then existing credit agreement.

73.     72.One provider of the equity cure was Manichaean, who became a minority interest holder of SourceHOV stock.[2] Manichaean owned about 3,574 shares of SourceHOV equity before the Business CombinationMerger and in order to prevent its equity stake from becoming further diluted upon SourceHOV's additional equity capital raise, Manichaean invested an additional $1.5 million at a price of $1,600 per SourceHOV share. That brought Manichean's total holdings in SourceHOV to 10,304 shares.

73.But upon consummation of the Business CombinationIn connection with the Merger, Manichaean felt that itreceivedSourceHOV was undervalued such that Manichaean would receive inadequate consideration for its minority interest were it to participate in the Merger. As a result, Manichaean petitioned the Delaware Court of Chancery for an appraisal determination under 8 *Del. C.* § 262 (the "the Appraisal Action") in September 2017.[3]2017.

---

[4] While relevant facts revealed in the context of the Appraisal Action are alleged herein, Plaintiffs further incorporate by reference the factual findings made by the Court of Chancery, *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606 (Del. Ch. Jan. 30, 2020).

[2] While the details of the various transactions prompting the Appraisal Action are complex, only some of those facts are relevant to the litigation here. Thus, Plaintiffs incorporate by reference all of the factual findings made by the Court of Chancery, which may be found at *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, (Del. Ch. 2020).

[3] *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*, 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, (Del. Ch. 2020).

74. Manichean filed the Appraisal Action to answer a basic question: what was the fair value of its equity interest (its shares) in SourceHOV? This is a basic question because Manichaean's equity value is calculated by multiplying (a) the number of shares that it held

(10,304) times (b) the value of SourceHOV's price per share -- and Exela routinely calculated SourceHOV's equity value, including in its June 26, 2017 proxy statement (signed by Chadha and Reynolds) wherein it stated that the then existing equity value of SourceHOV was $644.8 million.

75. ~~74.~~The Appraisal Action revealed that early on, Manichaean was disappointed by the "poor governance and communication" ~~that it received by SourceHOV. The quoted language stems from in court statements made on June 5, 2019 by Manichaean managing partner, Chad Cascarilla, during the appraisal litigation~~of SourceHOV. In an email dated September 21, 2016, Manichaean managing partner, Chad Cascarilla wrote to SourceHOV Director Matt Canstantino, ~~who was then a SourceHOV Board of Director member,~~ to complain about ~~a~~the lack of communication and disclosure by ~~CFO~~SourceHOV CFO (subsequently Exela CFO) Jim Reynolds ~~(then SourceHOV CFO, later Exela CFO) and SourceHOV Chairman (then SourceHOV Chairman, later and currently Exela Chairman),~~and SourceHOV Chair (subsequently Exela Chair) Par Chadha. Cascarilla ~~writes~~wrote, "It's hard to think of a company this size ([1.3 billion] EV[5]) with such poor governance and communication."~~75~~" Ultimately, the Court of Chancery agreed with Cascarilla's contention, concluding that SourceHOV's "governance structure was not a model for best practices." 2020 WL 496606, *3.

~~76.Even with Cascarrilla's early reservations about SourceHOV's governance and transparency, Manichaean invested.~~

### 2. ~~Appraisal Action Details~~ Chadha's Central Involvement In The Creation Of SourceHOV Valuation Calculations, and Reveals His Position At The Helm Of A Culture Of Deceit

76. ~~Procedurally, the Appraisal Action was filed in September 2017, but trial testimony was not until June 2019. In other words, in between those two dates, Exela investors received little of the information that would ultimately be revealed by the June 2019 trial testimony and the January 2020 opinion by the Delaware Court of Chancery.~~Trial testimony in the Appraisal Action took place from June 4 to June 6, 2019. Only four company insiders of SourceHOV/Exela testified during trial in the Appraisal Action: SourceHOV and Exela Chair, Chadha; SourceHOV and Exela CFO, Reynolds; SourceHOV and Exela SVP of Finance,

[5] "EV" stands for enterprise value, which equals market cap + debt – cash.

Anubhav Verma; and Chadha's son-in-law, Andrej Jonovic who worked for Exela but not SourceHOV. And while SourceHOV/Exela CEO Cogburn did not testify at the trial, prior to trial, the plaintiffs in the Appraisal Action also noticed his deposition, in addition to Chadha, Reynolds, Verma, and Jonovic. In other words, about five SourceHOV/Exela insiders were the closest to the facts at issue in the Appraisal Action, and SourceHOV/Exela's litigation of the Appraisal Action, and that small group included each of the Individual Defendants here, Exela's SVP of Finance, and Chadha's son-in-law (an Exela EVP).

The Appraisal Action revealed much about SourceHOV's —and, in particular, Chadha's—pervasive culture of deceptive practices which also permeated through Exela as SourceHOV's successor entity. For example, in issuing its opinion related to the Appraisal LitigationAction, the Delaware Court of Chancery found that SourceHOV (now Exela) "*lacked credibility*" in part because "Chadha, one of Respondent's key witnesses, *was not at all forthright* in explaining the circumstances surrounding the creation of the Backdated valuationValuation" and because Exela "disagreed with its own expert over which revenue projections to use in the DCF [discounted cash flow] analysis and ultimately separated from its expert with respect to SourceHOV's fair value." 2020 WL 496606, *19.

77.     The Appraisal Action opinion also found that Exela Chairman Chadhawas "*simply not believable*." More specifically, the court found that Chadha's litigation-driven effort to persuade Rothschild to create the Backdated Valuation to appear as if it had been prepared before the Business Combination was bad enough. His failure even to acknowledge that scheme, when it was finally exposed in discovery, "*taints all of his testimony*." "Backdated Valuation" referred to by the Court of Chancery pertains to the following: Before the Business Combination, SourceHOV retained investment banking firms Rothschild and Morgan Stanley to advise on the potential deal. In February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's Board of Directors—of which Chadha was Chair and Reynolds was Co-Chair[6]—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested in February 2017. Then, after Manichaean demanded its appraisal rights for its shares –four months into the Appraisal Action litigation in January 2018 – Chadha asked his son-in-law, Jonovic (an HGM/Exela executive), to request a "revised" valuation of SourceHOV's shares from Rothschild. The "revised" valuation in January 2018 used assumptions based on then-current data (as of January 2018) that resulted in a lower equity valuation for SourceHOV. Accordingly, Rothschild dated the valuation January 2018. But a January 2018 valuation would not have helped SourceHOV in the Appraisal Action because the court was going to appraise the shares as of the Business Combination date in July 2017. So, after receiving the "revised valuation" from Rothschild, Jonovic wrote to Rothschild, at the

---

[6] The Court of Chancery noted that "Together, Chadha and Reynolds functionally comprised the SourceHOV board of directors (the 'SourceHOV Board')" and that SourceHOV's "Board appears to have comprised two members—Chadha and Reynolds—both of whom were nominated by HGM." 2020 WL 496606, at *2, *3. Moreover, Exela EVP Verma testified that "Chadha and Reynolds were the SourceHOV Board members who reviewed management's projections." *Id*. at *3 n.29.

Supp.App. 0045

Chadha, saying "the cover page says Jan 2018 ... Happy for it to simply say July 2017." When Rothschild "finally agreed to remove all references to 2018", Jonovic forwarded the Backdated Valuation to Chadha with a single word in his message: "Done." 2020 WL 496606, at *10, n.134.

78. Chadha was deposed about SourceHOV's valuation in the Appraisal Action on October 5, 2018 and again on February 26, 2019, and also testified about SourceHOV's equity value during the Appraisal Action trial on June 4, 2019. The Court of Chancery determined that Chadha was "*simply not believable*" and that "Chadha's trial testimony was not credible." 2020 WL 496606, *20 & n.320 (finding "Chadha was not credible"). More specifically, the court found that Chadha's "litigation-driven effort to persuade Rothschild to create the Backdated Valuation to appear as if it had been prepared before the Business Combination was bad enough. His failure even to acknowledge that scheme, when it was finally exposed in discovery, *taints all of his testimony*." *Id.* at *21.

79. Some of Chadha's trial testimony about the Backdated Valuation includes the following exchange where Chadha was impeached after giving misleading responses relating to valuation estimates prepared for SourceHOV, of which Chadha was admittedly aware, in 2017 and 2018:

> Q. Okay. Now, sir, did there come a time after this litigation started when you reached out to Rothschild and you asked them to give you a new valuation of the company?
> A. No.
> Q. You don't?
> A. You said new.
> Q. You don't?
> A. No. You said new. I said no. If you had said did we ask them to give us the valuation as of the closing date, we did.
> Q. Okay.
> A. You said new, and that's incorrect.
> Q. All right. So you asked -- okay. You asked for a valuation of the company as of July 2017?
> A. That's correct.
> Q. And you asked for it in January 2018, four months after this litigation started?
> A. That's correct.
> Q. And you asked for a revised valuation?
> A. I don't remember that.

[Counsel for Petitioner presents an exhibit]

Q.    "Par, this is the Rothschild valuation file that I could find. I don't recall there being another file but I could be wrong." Do you see that?
A.    Correct.
Q.    And you responded in the email just above that.
A.    That's correct. I remember that.
Q.    "We should ask them for the revised – because we did the deal at $8 etc." *          *  * [Counsel for Petitioner presents additional emails to authenticate and lay foundation]

Q.    Do you see that?
A.    Yes.
Q.    So on January 5, 2018, you're asking Rothschild, after this litigation has begun, to give you an updated valuation presentation; isn't that correct?
A.    Yes.
Q.    And when you got it updated, you asked them to change the cover page and date of the document; isn't that correct?
A.    That's correct.
Q.    Okay. You asked them to change it from January 2018 to as of July 2017; isn't that correct?
A.    That's correct.
Q.    And also, the file date was changed. It originally said "update January 2018," and instead the file was changed to "final valuation structure"; isn't that correct?
A.    I don't know that.

*          *          *

Q.    Okay. And this is an email where Mr. Jonovic responds back to you and says, "Done."
A.    Yes.
Q.    Correct? And that was him getting you -- forwarding you an email after he had said to Rothschild -- he had asked Rothschild to change the date.
A.    Yeah. We said as of July 12, 2018.
Q.    Okay. You had the date changed?
A.    Yes.

80.    Shortly after the above examination, Chadha admitted that not only did he ask for the revised valuation, but when that revised valuation was produced by Exela in discovery, it was produced separate and apart from the email it was attached to – to make it appear that the valuation was originally made at a different time than it was. And, according to Manichean's counsel's in- court representation, Chadha's concealment of the "Backdated Valuation" was the reason that Chadha was deposed a second time.

Supp.App. 0047

Q.     Now, your deposition's been taken twice in this case; isn't that correct, sir?
A.     Yes, it is.
Q.     Okay. And the second deposition was conducted specifically to ask you about the January 2018 presentation; isn't that correct?
A.     I don't know. You asked me to appear for a deposition. I did.
Q.     And isn't it correct, sir, that in your first deposition, you never disclosed that the -- as- of-July-2017 presentation was made, and it was actually made in January 2018; isn't that correct?
A.     If you asked me and I did not answer, I would like to see that.
Q.     Well, we asked you about the document, and you said you just didn't recognize it. Your deposition was taken October 2018.
A.     Yes.
Q.     And that was nine months after you had the document created.
A.     Yes.
Q.     And we asked you, and you said you didn't remember.
A.     Okay.
Q.     Nine months later, you didn't remember this document that you created in the middle of litigation?
A.     No.

### **3.     The Appraisal Action Reveals That The Individual Defendants Were Aware Of SourceHOV's Range Of Liability In The Appraisal Action, And Also Reveals How Defendants Misled Exela Investors With Respect Thereto**

81.     During the Class Period, Defendants disclosed the existence of the Appraisal Action and assured Exela's investors that "[t]he Company intends to vigorously defend against the Appraisal Action." 2017 and 2018 Form 10-K. Defendants also claimed that "the Company is unable to predict the outcome of the Appraisal Action *or estimate any loss or range of loss that may arise from the Appraisal Action*." *Id*.

82.     But the ultimate liability Exela faced in the Appraisal Action was simple: it was merely the product of (a) Manichaean's equity interest in SourceHOV (its number of shares held) times (b) the equity value of SourceHOV (its share price) at the time of the Merger. Manichaean's interest in SourceHOV, was always known: 10,304 shares. That leaves just the value of SourceHOV's equity (i.e., the price per share) to be adjudicated – and that value was something Defendants had calculated long before the Class Period.

83.     Indeed, Exela's range of potential liability at the Appraisal Action was readily ascertainable. One bookend, the maximum liability, was what the Petitioner (Manichaean) asked

the court to award. That amount was estimated by Petitioner's expert, based on the Petitioner's valuation of SourceHOV's equity at the time of the Merger, and thus, what Manichean's interest in that equity was worth. The sum total of that amount, plus costs and statutory interest -- a known rate of interest that began accruing as of the close of the Merger -- represented the maximum liability to Exela. Petitioner's expert turned over his report to Defendants on February 7, 2019.

84. The other bookend, the minimum liability, was what Exela argued Manichaean's interest in SourceHOV's equity value was worth (plus costs and interest). That amount was informed in part by Dr. Greg Jarrell, Exela's agent, who the Company retained to calculate the value. Moreover, as Chadha's above-quoted testimony reveals, he was further aware of Rothschild's estimates of SourceHOV's equity value (both its initial valuation in 2017 and the "Backdated Valuation" in January 2018).

85. Chadha testified regarding the valuation presentations made by SourceHOV's investment bankers in February 2017 and again in January 2018:

> Q: And let's go the "Standalone SourceHOV Illustrative DCF." Do you see that, sir?
> A.   This is -- yes.
> Q.   And this is in the January 2018 presentation; isn't that correct?
> A.   Yes.
> Q.   Okay. And the implied equity value given in the 'Standalone SourceHOV Illustrative DCF,' what number is that? Isn't that 675 million?
> A.   Yes.
> Q.   Okay. And isn't it true the February 2017 presentation that was made pre-litigation had a $931 million implied equity valuation, sir?
> A.   I believe so.

86. As demonstrated by their roles at HGM and SourceHOV, their direct involvement in the Merger, and their testimony in the Appraisal Action, the Individual Defendants in this case were intimately involved and familiar with the facts of the Appraisal Action as it was happening, including the core issue of the estimated valuation, or valuation ranges, of SourceHOV's equity at the time of the Merger.

87. Also established by the Appraisal Action was that a lack of corporate formalities permeated Exela/SourceHOV and that both entities were merely an extension of Chadha, Cogburn, and Reynolds.

88.     As alleged above, Chadha and Reynolds were the entirety of SourceHOV's Board of Directors. And testimony from the Appraisal Action further establishes that Chadha and Reynolds were intimately aware of SourceHOV's financial projections—which were used to estimate its equity value—and that Verma would go through such projections "line-by-line" with Chadha and Reynolds. Verma testified that:

> Q: And with respect to preparing management forecasts and projections, your job was essentially to take historical actuals and then make reasonable estimates, after discussions with both the sales team and the operations team as to what they thought the business was going to do. Correct? A: Correct * * * Q: And as part of this process, after you had put together the model, you would go to Par Chadha and Jim Reynolds, who were members of the SourceHOV board, sit in a room, and walk through the assumptions line by line. Correct? A: Correct
> Q: And that was an iterative process, correct?
> A: Correct
> Q: And Mr. Chadha and Mr. Reynolds would ask questions about specific assumptions and other components of the model. Correct? A: Yes.
> Q: And sometimes Mr. Chadha or Mr. Reynolds would challenge an assumption in your model. Correct? A: Yes.

89.     Chadha was deposed in the Appraisal Action on or around October 5, 2018 and February 26, 2019,[7] and he testified in trial on June 4, 2019. He testified on matters relating directly to SourceHOV's valuation at the time of the Merger. Shockingly—and utterly lacking in credibility—Chadha told the Court of Chancery, under oath, that he believed that SourceHOV's equity was worthless as of the time of the Merger in an obvious litigation-driven attempt to avoid liability to Manichaean:

> Q.     You said you thought it was worth zero?
> A.     Because I was unable to sell and raise any of the solutions that would have been available to me.
> Q.     Did you tell your auditors that you believed the company was worth zero, sir?
> A.     I did not tell the auditors the company was worth zero. I said the company is – has

---

[7] According to in-court representations made by Petitioner's counsel at the Appraisal Action, the second deposition was scheduled upon discovering the Backdated Valuation.

> the ability to continue if we meet our budgets.
>
> Q.    And did you tell the lenders in the business combination agreement that the company was worth zero?
>
> A.    No, because you can see the Rothschild presentation.
>
> Q.    Did you tell Rothschild the company was worth zero?
>
> A.    They said this was the best solution for the company, so no.
>
> Q.    Sorry. I just want to understand. You didn't tell them it was worth zero?
>
> A.    No.
>
>             * * * Q … Did you tell Apollo the company was worth zero?
>
> A.    No, I didn't go beating drums saying my company is worth zero. I went looking for a solution.

90.    Chadha further testified that SourceHOV's "quality revenue, profitable revenue" was "already at a point where revenue is declining," before the Merger.

91.    Chadha's purported view that SourceHOV was worth zero stands in stark contrast to what Chadha wrote about SourceHOV's equity value in the June 26th, 2017 Exela proxy statement —which both he and Reynolds signed — filed just two weeks before the Merger closed:

> Q.    Mr. Chadha, in the deal that ultimately took place, and in the final proxy for the deal, you wrote that the existing equity value of SourceHOV was 644.8 million. Isn't that correct?
>
> A.    I believe so.
>
> Q.    Okay. And could we get JX 265 up at page 78. Highlight that box over here. Here, you've got SourceHOV existing equity value, you have. And this is the final proxy. It says $645 million. Isn't that correct?
>
> A.    Yes.
>
> Q.    Okay. And this is a document filed with the SEC and subject to penalties if there are misrepresentations in the document. Isn't that correct?
>
> A.    I believe so.
>
> Q.    And this is what was filed June 26th, 2017, for the final deal, just two weeks before the final deal went through. Isn't that correct?
>
> A.    I believe so.

92.    Dr. Jarrell—who served as SourceHOV's valuation expert in the Appraisal Action—testified that he specifically discussed SourceHOV's valuation with Chadha:

> Yes. This -- I do want to talk a minute about this, because I think it's important. Mr. Chadha testified, and I read his deposition testimony. I was here for his trial testimony. ***And I also talked about this issue with him on the phone when I was doing my work. I had a phone conversation with him*** about, you know, the reasonableness of these projections and their achievability. ***I was very concerned at the time*** -- for reasons I've already shown here, and also for other reasons -- that the capital expenditures seem to be very low relative to the

depreciation. And I was -- *so I called him up* and I -- and I said, look, you know, I don't understand these projections, because the capital expenditures are less than the depreciation. And that can't last forever. Depreciation has to reflect capital expenditures. Over a long period of time, those two numbers should cumulatively be the same. And we had a heck of a time conversing, because he kept -- he kept saying over and over again that the projections ignored *the – in his -- in my words, ignored the operative reality*.

93.     But SourceHOV's expert, Jarrell, did not agree with Chadha that SourceHOV was worthless. To the contrary, on behalf of SourceHOV—and presumably as part of Exela's "vigorous[]" defense against the Appraisal Action—Jarrell submitted his report in the Appraisal Action in December 2018, estimating SourceHOV's valuation to be approximately $286.4 million (or $1,723 per share). 2020 WL 496606, *14. Jarrell further provided testimony about SourceHOV's valuation during his deposition on February 14, 2019, wherein he amended his view "after making certain changes that drove his valuation 63% higher than his original assessment, to $468.1 million (or

$2,817 per share)." *Id.*, n.189. And Jarrell further testified at trial about SourceHOV's valuation on June 6, 2019, reiterating his opinion that SourceHOV's valuation at the time of the Merger was $2,817 per share or $29.0 million based on Manichean's ownership of 10,304 shares.

94.     Likewise, Manichean's expert, Dr. Timothy Meinhart, initially submitted his report in the Appraisal Action in December 2018, which was further revised and resubmitted on February 7, 2019. Dr. Meinhart estimated that SourceHOV was worth $5,079 per share in his revised report dated February 7, 2019.

95.     Moreover, Chadha was aware, at a minimum, of Jarrell's (*i.e.*, the expert his own company had retained and acted as its agent to testify on its behalf) valuation estimates for SourceHOV—and, by extension, Exela's potential liability to the plaintiffs in the Appraisal Action—during the Appraisal Action. In fact, Chadha testified that he received *several* estimates of SourceHOV's equity value, including one that that he specifically asked for in January 2018:

Q.     ~~80~~Just ~~because SourceHOV merged with Novitex and Quinpario, does not mean that its leadership suddenly adopted ethical business practices. Quite the contrary - the same deception that the Court of Chancery observed coming out of SourceHOV, likewise permeated Exela during the Class Period. That reason is simple: SourceHOV is Exela. The same executives who ran SourceHOV ran Exela, and Chadha controlled both as Chairman, before during and after the Class Period.~~so you know, Mr. Chadha, this is the equity value comparisons of the various valuations of the company that have been

provided. So respondent's position in the pretrial brief is an equity value of 271.4 million.

81. For instance, Chadha was Chairman of both SourceHOV before the merger, and then stayed on to become Chairman of Exela. He and the entity he owns and controls, HGM was SourceHOV's largest shareholder at the time of the Business Combination. As of March 26, 2020, he had beneficial interest in 74,393,234 shares (or 50%) of Exela common stock. There is no single person with a greater financial interest in Exela's ultimate success or failure.

82. On top of Chadha, Verma likewise continued at Exela. Verma reported to Chadha at HGM from 2013 – 2015. He reported to Chadha at SourceHOV from 2015 through 2017, and he still works under Chadha's direction currently at Exela, nearly seven years later where he is the Senior Vice President of Finance. Verma created the financial models and projections at SourceHOV. He does the same at Exela. Verma was still listed on HGM's website as an active

A.   Yes.

Q.   Your expert, Professor Jarrell, he's offered a fair valuation of the company of 468.1 million.

A.    Yes.

Q.    Okay. Then there's a Rothschild January 2018 presentation. We will talk about that one soon. Because that was prepared -- that's four months after litigation started. Is that correct?

A.    Four months after litigation?

Q.    Yes. Rothschild, you had them create a second presentation in January 2018. Do you recall that?

A.    Yes.

Q.    So they have a stand-alone equity value range of 46 to 940. Their illustrative DCF is 675 million. Their February 2000 (sic) stand-alone equity value range is 527 to 993 million. Petitioners' expert, Mr. Meinhart, has valued the company's equity at 798.7 million. And as we have shown, Rothschild, in its February 2017 stand-alone illustrative DCF, gave a valuation of 931 million. Now, against all of that, your position, sir, is that the company had no equity value?

96.    At a minimum, Chadha and Reynolds—the sum total of SourceHOV's Board of Directors—were presented with SourceHOV equity valuations in connection with the Merger on at least the following dates: in February 2017, when Rothschild prepared its initial valuation fairness opinion; in January 2018, when Chadha requested and received the "Backdated Valuation" from Rothschild in an attempt to lessen SourceHOV/Exela's potential liability; in December 2018, when Jarrell submitted his expert valuation report for SourceHOV in the Appraisal Action; and in February 2019, when Manichaean's expert submitted his expert valuation report in the Appraisal Action. In short, Defendants had ample information from which to estimate the potential liability, or range of liability, that Exela faced in the Appraisal Action during the Class Period—and the facts indicate that rather than fairly disclose that to Exela's investors, Defendants misdirected the market as they tried to evade liability.

97.    Indeed, as the Delaware Court of Chancery in the Veil Piercing Action would later note:

Plaintiffs compellingly allege that fraud and injustice has resulted and will result from the diversion of funds from SourceHOV Holdings to Exela in an explicit attempt to avoid payment of the Appraisal Judgment. As mentioned, *Exela knew that SourceHOV Holdings would be required to pay a judgment of some amount, at the latest, when Plaintiffs sent their appraisal demand in September 2017. The extent of that exposure became all too clear as the appraisal petitioners developed evidence, including expert valuation evidence, that the fair value of SourceHOV Holdings was exponentially greater than the price paid in the Merger*. This evidence was presented at trial in June 2019, summarized in post-trial oral arguments in October 2019, then relied upon in the

Court's post-trial decision issued on January 30, 2020. Yet, mere weeks before entry of the judgment, on January 10, 2020, Defendants entered into the A/R Facility.[8]

251 A.3d at 709.

employee up to and through the Appraisal Action, just was less than a year ago and also during the Class Period.

83. Along with Chadha and Verma, Jim Reynolds began working at SourceHOV predecessor entities beginning 2001. He was Exela's CFO from its inception until his termination on May 21, 2020 when he was replaced by Shrikant Sortur. Reynolds, like Verma and Chadha also held senior positions at HGM, Chadha's investment entity.

84. On top of Chadha, Verma and Reynolds, Shrikant Sortur was previously SVP of finance at SourceHOV where he worked for the better part of his career: from 2002 through 2017. He is currently Exela's CFO.

85. In addition to Chadha, Verma, Reynolds and Sortur, Cogburn was the CEO at SourceHOV since 2013. Like Sortur, Cogburn also spent much of his career at SourceHOV: from 1993 until SourceHOV became Exela. And like Verma, Cogburn also reported to Chadha at HGM (since 2003).

98. Despite all of the foregoing facts indicating Defendants' knowledge of the range of Exela's potential liability, Defendants repeatedly told Exela investors during the Class Period that they were unable to even *estimate* Exela's potential liability in connection with the Appraisal Action. For example, both Exela's FY 2017 Form 10-K filed on March 16, 2018, and its FY 2018 Form 10-K filed on March 20, 2019 stated: "The company is unable to predict the outcome of the appraisal Action **or estimate** any loss **or range of loss** that may arise from the Appraisal Action." Exela's 2017 and 2018 Form 10-Ks were signed by Cogburn, Reynolds, and

---

[8] The A/R Facility was a financing arrangement where Exela received access to $160 million in exchange for pledging certain accounts receivable as collateral. More specifically, Exela Receivables I LLC pledged certain "Collection Accounts" including sixteen "Interim Collection Accounts," as collateral. The Collection Accounts serve as "security for the performance by the Borrower of all the terms, covenants and agreements on the part of the Borrower to be performed under this Agreement or any other Transaction Document, including the punctual payment when due of the principal amount of the Loans and all Interest in respect of the Loans and all other Borrower Obligations ..." According to Manichean, the arrangement above enabled Exela to "circumvent" SourceHOV.

Chadha, all of whom played central roles for SourceHOV/Exela in the Appraisal Action.

### 4. ~~3.~~ Appraisal Action Details Improper Addbacks To Adjusted EBITDA

~~86.The Appraisal Action clarified several points relevant to Exela's investors. The first is what SourceHOV's own expert witness, Greg Jarrell, expressed "serious reservations" about: management's "aggressive accounting practices."~~

~~87.One such practice was SourceHOV's use of improper addbacks to its adjusted EBITDA.~~

99. ~~88.Some context about the difference between EBITDA and adjusted EBITDA, and what an addback is. EBITDA is a GAAP metric. It stands for~~EBITDA—or Earnings Before Interest Taxes Depreciation and Amortization. ~~Some investors use GAAP EBITDA as an approximation for~~—is an important accounting metric derived from GAAP elements and strictly controlled by Regulation G (17 C.F.R. §244.100) and Exchange Act Release No. 47226. EBITDA provides an approximation of cash flow available to a business before creditors are paid (before interest) and before the government is paid (before taxes). And Depreciation and Amortization are non-cash expenses~~, which is why certain investors use EBITDA as an approximation of cash flow from operations—because non-cash expenses such as Depreciation and Amortization~~ that do not reduce the cash available to a business, even if they reduce ~~the~~ earnings, such that measuring earnings *before* deduction of those non-cash expenses helps provide a better approximation of a company's available cash flow.

100.   89.Adjusted EBITDA differs from ~~GAAP~~traditional EBITDA. Adjusted EBITDA is a non- GAAP metric, so it does allow for more managerial discretion than ~~its GAAP counterpart~~traditional EBITDA, but ~~it~~adjusted EBITDA is still a term of art to investors, so that discretion has limitations. Adjusted EBITDA is understood by investors to be an approximation of the normalized earnings power of a business excluding non- cash expenses and excluding, or adding back, **non-recurring** cash (or non-cash) expenses.[49]

101.   Regulation of adjusted EBITDA dates back to 2003, following the passage of the Sarbanes Oxley Act and the SEC's promulgation of Regulation G, the latter of which became effective on January 30, 2003.[10] In the background discussion within the final rule implementing Reg G, the SEC noted that "Regulation G and the amendments to our rules are intended to ensure that investors and others are not misled by the use of non-GAAP financial measures." It also instructed that "The prohibition on adjusting a non-GAAP performance measure to eliminate or smooth items identified as non-recurring, infrequent or unusual, when the nature of the charge or gain is such that it is reasonably likely to recur will make clear that such an adjustment is prohibited only when (1) the nature of the charge or gain is such that it is reasonably likely to recur within two years, or (2) there was a similar charge or gain within the prior two years".[11]

102.   The background to Reg G also warned issuers that "we reminded companies in December 2001 that, under certain circumstances, non-GAAP financial measures could mislead investors if they obscure the company's GAAP results. We continue to be of the view that some disclosures of non-GAAP financial measures could give rise to actions under Rule 10b-5."

---

[49] Saying that EBITDA is "excluding an expense" from earnings is the same thing as saying that one is "including an add back." ~~It's just a different way of saying the same thing.~~ The important point is whether the ~~Adjustment~~adjustment keeps an expense within reported earnings, or tries to ignore it.

[10] See 68 FR 4820-01, 2003 WL 192073, Release No. 33-8176.

[11] Id. at 4821.

103. Roughly 13 years after implementing Reg G, the SEC published additional interpretative guidance, including specific discussions on EBITDA addbacks, on May 17, 2016 ("the Interpretative Guidance") which provides in relevant part:

> **Question**: Can certain adjustments, although not explicitly prohibited, result in a non-GAAP measure that is misleading?
>
> **Answer:** Yes. Certain adjustments may violate Rule 100(b) of Regulation G because they cause the presentation of the non-GAAP measure to be misleading. For example, presenting a performance measure *that excludes normal, recurring,* cash *operating expenses necessary to operate a registrant's business* could be misleading.

104. Following the May 2016 Guidance, the law firm of Morrison Foerster issued an October 2017 publication that discussed the May 2016 Guidance ("the October 2017 Publication"). The October 2017 Publication surveyed numerous SEC comment letters sent directly to issuers in response to Reg G related issues. Those SEC comment letters provided more specific guidance to issuers about EBITDA addbacks and, according to the October 2017 Publication, certain adjustments that "the [SEC] Staff scrutinized include the following: . . . (3) management fees, transaction fees and IPO 'readiness' costs excluded from adjusted EBITA, notwithstanding the historical occurrence of these costs that suggested these were integral in continuing operations of the company; (4) *restructuring, integration and deal costs,* new store openings . . . that all appeared to be *recurring and usual in the ordinary course of business* . . . (6) other charges and gains that appeared normal and recurring in the registrant's operations.

105. The October 2017 Publication also explained that:

> In a number of cases, the Staff asked registrants not to refer to adjustments (for example, legal charges and credits, gain on sale of assets, operational improvement initiatives and acquisition-related costs) as being non-recurring unless these items met the two-year 'non-recurring, infrequent or unusual' criteria in item 10(e) of Regulation S-K. * * * The Staff also asked registrants whose operations included large, frequent and seemingly routine acquisitions of other businesses or entities why they were excluding the impact of acquisition-related expenses and the amortisation of intangible assets they acquired, given that the registrants appeared to grow through acquisitions and the acquisition of businesses appeared to be a critical strategy.

* * *

In a few cases, the Staff asked registrants why certain expenses were designated non core even though they appeared to be normal, recurring, cash operating expenses that were directly attributable to the registrant's operations and lines of business

106. The 2017 Publication concluded that:

However, as the SEC has highlighted, the presentation of non-GAAP financial measures is also prone to misuse and abuse. As shown in a number of cases, non-GAAP financial measures can become tools to distort the truth, conceal, fabricate or inflate the actual performance and financial condition of a given company, confuse investors, *and even perpetuate outright fraud*.[12]

107. Exela's Class Period annual reports described the importance of EBITDA and adjusted EBITDA to the Company and its investors (*see* 2017, 2018, and 2019 Form 10-K):

Other Financial **Information (Non-GAAP Financial Measures)**

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integration costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

We present EBITDA and Adjusted EBITDA because we believe they provide useful information regarding the factors and trends affecting our business in addition to measures calculated under GAAP. Additionally, our credit agreement requires us to comply with certain EBITDA related metrics. Refer to—Liquidity and Capital Resources—Indebtedness.

*Note Regarding Non-GAAP Financial Measures*

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by

---

[12] In highlighting potential liability for issuers, the 2017 Publication also warned issuers that: "In addition, the SEC Releases point out that section 3(b) of SOX provides that a violation of SOX or the SEC's rules thereunder will be treated for all purposes as a violation of the Securities Exchange Act. Hence, if a registrant or any person acting on its behalf, fails to comply with Regulation G, the registrant and/or the person acting on its behalf could be subject to an SEC enforcement action alleging violations of Regulation G. Additionally, if the facts and circumstances warrant, the SEC could bring an action under both Regulation G *and* rule 10b-5."

removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. These non-GAAP financial measures are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP. Because EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

108. 90.The idea behind adjusted EBITDA is that investors rely on ~~adjusted EBITDA~~it to get an understanding of how a company operates under a "steady state" of affairs. For an example, suppose Company X generated $100 of ~~GAAP~~traditional EBITDA in a given quarter. But, during this particular quarter, Company X's ~~GAAP~~ EBITDA was depressed by $10 because an unexpected hurricane struck the corporate headquarters in Chicago, and hurricanes don't typically hit Chicago. As a result, when discounting future cash flows, an investor would likely conclude that the "normalized" or "steady state" approximation of cash flow for Company X is closer to $110 than it is $100. In other words, the non-recurring hurricane expense of $10 could be properly "added back" to ~~GAAP~~ EBITDA of $100 to generate an adjusted EBITDA of $110 — because, under most circumstances, $110 is likely to be closer to what the future would bring than $100 would be ~~fore company~~for Company X.

109. 91.To be clear, what is aberrant to one company, may not be to another. For instance, the risk of a hurricane hitting a widget factory in Chicago would aberrant, but the expense incurred by an insurance company—that is *in the business of insuring against hurricanes*—would just be a normal operating expense. And, as the 2017 Publication cautioned, companies in the business of acquiring other companies should not exclude (or add back) acquisition related expenses.

110. Exela was in the business of acquiring other companies. Before the Merger, SourceHOV had grown through a series of mergers – beginning with a company Called Liaison, which merged with Source. That combined company would later become SourceHOV.

111. In November 2014, SourceHOV also acquired a company called BancTec, followed by a September 28, 2016 acquisition of TransCentra -- both before the Merger. In selecting acquisition targets, Defendants frequently partnered with private equity company Apollo, a leveraged buyout specialist, both before the Merger and in connection with it.

112. Following the close of the Merger, Exela would continue making acquisitions— including its April 10, 2018 purchase of Asterion, a provider of business outsourcing and document management.

113. Following the Asterion transaction, analysts at Cantor Fitzgerald issued a report on May 11, 2018 that noted "Exela has made significant acquisitions in the past and M&A remains part of the company's strategy."

114. Based on the foregoing, it is reasonable to conclude that Exela is indeed in the business of acquiring companies, and thus, merger related activities are ordinary operating expenses that should not be added back to Adjusted EBITDA.

92.The point is, whenWhen a company gives an adjusted EBITDA figure to investors, that figure is a term of art and carries with it an implied meaning. The inference investors will draw regarding addbacks categorized by management as non-recurring, or non-routine, are exactly that— they are not costs associated with the very business that entity is in and that they are decidedly not operating expenses.

115. 93.It also means that if a company says that GAAPits EBITDA and adjusted EBITDA will converge, or should be the same, that statement implies that the company does not to foresee anymoreany hurricanes coming to Chicago anytime soon. In other words, the non-recurring expenses should, indeed, be non-recurring quarter-over-quarter.

116. 94.The above is not a controversial categorization, in fact it is one largely shared by Exela. For example, during his testimony at the Appraisal Action, current Exela SVP Verma testified on June 5,4, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses which are considered one-time and nonrecurring in nature; for example, business optimization and fees and expenses incurred in connection with transactions."

117. Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement. And what that means is every cost that was not part of the business as usual has to be added back. There -- there's no black and white about it. So -- because you have to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

118. During the same testimony, Verma even went so far as to testify that "the EBITDA definition has to be held sacrosanct. And what I mean by that is every charges which are not a usual course of business are added back to the EBITDA."

119. Verma also testified to the importance that investors place on management's discretion in how they categorize EBITDA, stating, "And obviously, financial performance is a very important metric. EBITDA is a very important metric that is looked upon by all investors."

120. Verma further testified that SourceHov had a motive to include optimization and restructuring addbacks because "it's basically in the company's interest to show an add-back." The reason it was in SourceHOV best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing."

But Verma's testimony that only nonrecurring charges are added back to adjusted EBITDA was not supported by the testimony of SourceHOV's own financial expert witness, Greg Jarrell. Jarrell questioned the way SourceHOV categorized its addbacks. For instance, on June 6, 2019, Jarrell testified that SourceHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring." More specifically, he testified that "they're supposed to be nonrecurring expenses, and I don't know. I seem to see the same expenses year after year after year. So I -- my impression was, jeez, they don't look to be so nonrecurring. But I understand what they're doing. It's a -- it's done a lot. It's not consistent with GAAP, but financial people do this."

121. Jarrell further testified that "It struck me [as] an important negative — negative checkmark of reliability is the fact that *there seemed to be a more-than-normal amount of add- backs*. And it's just — it's a consideration, it's a factor, and it's a negative." Dr. Jarrell further expressed "serious reservations" about management's "aggressive" accounting practices. 2020 WL 496606, at *14.

122. Dr. Jarrell also testified that Chadha was aware of the heavy use of EBITDA addbacks and their impact on the appearance of SourceHOV's performance:

Q. So for 2015, '16, and the first half of '17, that's essentially saying that -- that the adjustments to EBITDA make up more than a quarter of the adjusted EBITDA; is that right?
A. Yes, yes.
Q. And are you aware of anyone expressing concern about these adjustments?
A. Yes. As I -- as I talked about in my report, and I threw a couple of -- repeated a couple of the things that I said in the report in quotes in the report here on page 14. You know, there was some reaction from professionals that were sort of consistent with mine, my reaction when I saw that. You know, "inflated with less than credible adjustments" is a comment from a Morgan Stanley person in February. News story that circulated within Morgan Stanley. And I underlined the sentences that struck me. You know, and the one that I thought was the most colorful was at the bottom. June 30th, 2017, email said that we have 'Synergies on top of synergies on top of cost savings. Just too many.' And 'When you see so many adjustments, it just starts getting egregious. We just put our pencils down.' So other people noticed that there was a big disconnect between the real EBITDA, the cash EBITDA, and the adjusted EBITDA. *Even Mr. Chadha, at his deposition,* I remember reading at one point, somebody questioned him whether or not a particular number that he looked at was -- was -- you know, said that's EBITDA. *And he said no, that's adjusted EBITDA.* And the examiner said, well, how do you know? And he says, I know, *because it's a big positive number.* He says if cash EBITDA had been that big, we wouldn't be in this pickle, or some words to that effect.

123. The following exchange between the Court of Chancery and SourceHOV's expert, Jarrell, clarifies his concern about the expense addbacks:

THE COURT: So was it within the realm of discretion, for you to do a proper evaluation, for you to have made adjustments to those projections to account for that before you began your analysis?

THE WITNESS: No. No. I don't – I wouldn't go that far, because this -- this practice of adding back *nonrecurring* expenses is ubiquitous in the financial community. And public companies, you know, you see it all the time.

They refer to this is a non-GAAP number. That's what they mean. They mean that we've taken a real number and we've added things back, because when we go to project, this should improve our -- our ability to project, because, you know, we've taken out things that will *not recur*. If you really did take out things that did not recur, that's a good thing to do, in terms of trying to create better projections. That's a good thing. *If you overdo that, for whatever reason – who knows what motive, but if you overdo that, then that's a bad thing*.

101.Verma's Appraisal Action testimony makes clear one motive: "it's basically in the company's interest to show an add-back." The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is — which doesn't help the company, from a — from the perspective it was in, because it was in the market to raise the debt financing."

124.    The Court of Chancery observed the impact of SourceHOV's manipulated EBITDA addbacks in its opinion in the Appraisal Action, noting that SourceHOV's debt covenants required it to maintain a certain leverage ratio calculated as the company's net debt divided by adjusted EBITDA. 2020 WL 496606, *4 & n.37. The court further noted that "SourceHOV would either have to increase its EBITDA, reduce its total debt or both to satisfy the Leverage Ratio covenant." *Id.* Of course, inflating addbacks would increase adjusted EBITDA for purposes of improving the leverage ratio.

102.SourceHOV's own expert witness Jarrell was not the only one expressingto have expressed reservations about SourceHOV's use of Adjustedexcessive expense addbacks to its adjusted EBITDA. Jerrell notedRather, he testified that "there was some reaction from professionals that were sort of consistent with mine, my reaction when I saw that. You know, *'inflated with less than credible adjustments'* is a comment from a Morgan Stanley person in February. News story that circulated within Morgan Stanley."103.The comment Jarrell refers to is's testimony reflected his reading in open court of a June 30, 2017 internal email by Morgan Stanley investment bankers who, in the same email, also described SourceHOV's adjusted EBITDA figures as being "egregious," stating, "When you see so many adjustments, it just starts getting egregious. We just put our pencils down."

125.    104.TheDocuments obtained from the Appraisal Action revealed for the first time publiclyfurther reveal that Morgan Stanley was not the only investment bank to question SourceHOV's categorization of adjusted EBITDA addbacks. Wall Street titan, Goldman Sachs, also keyed in on the same thing. For example, on October 27, 2016, Whit Graham at Goldman Sachs & Co. Inc. ("Goldman") emailed several SourceHov executives and concluded that, based

on the trading levels warning that Goldman Sachs' assessment of SourceHOV's debt, that its equity value was "zero." 105.Goldman's conclusion that SourceHOV's valuation was so low was informed by its assessment that SourceHOV was "adversely impacted by historical

Supp.App. 0065

perceptions around revenue growth ***and EBITDA add-backs***, a concentrated investor base and a lack of public information, among [others] ...." (emphasis added)."

106. And the reason that such information was not already known to Exela investors until the above Appraisal Action testimony in June 2019 is because public market investors, such as those in Exela, lack access to the same confidential financials that investment bankers at Morgan Stanley and Goldman Sachs would[5] receive ahead of a contemplated transaction such as the Business Combination. And when the investment bankers from the two most prestigious investment banks on Wall Street conclude—after reviewing non-public information about SourceHOV—that SourceHOV's adjusted EBITDA addbacks are "egregious" and that SourceHOV's equity value was considered "zero" before the Business Combination, such opinions about SourceHOV's adjusted EBITDA addbacks is new material information.

126. 107. In sum, the Appraisal Action revealed for the first time to Exela investors established that SourceHOV, under substantially the same leadership that runs Exela, improperly used the term of art of adjusted EBITDA to mislead investors by including addbacks addback expenses that weren't really were not appropriate addbacks: they were really just recurring operating expenses, misleadingly portrayed as nonrecurring nonroutine expense addbacks to inflate EBITDA.

#### 4. Appraisal Action Describes How Chadha Misled Investors

108. Of all the surprising testimony that came from the Appraisal Action, there is likely nothing more surprising than to hear that Chadha told the Court of Chancery, under oath, that he believed that SourceHOV's equity was worthless as of the time of the Business Combination. Such was his testimony when he was asked what Manichean's minority investment should have been valued at. Chadha also testified that he never told SourceHOV's auditors that he felt the company was worth zero at that time.

109. For the first time publicly, Chadha testified that "quality revenue, profitable revenue" was "already at a point where revenue is declining," before the Business Combination, according to Chadha's testimony. This was so even though public market investors in Exela were told to expect revenue growth in the future.

110. For the first time publicly, Verma's testimony revealed that "on an actual apples-to-apples comparison" SourceHOV's revenue went down from 2014 to 2015 and from 2015 to

---

[5] Indeed, Cascarilla testified in part at the Appraisal Action that part of the reason that "gave [him] investing in SourceHOV was because Apollo, a different but also "very sophisticated" financial entity "had access to information that [he] didn't have" and "had done extensive due diligence."

2016. Verma further testified that SourceHOV frequently had trouble hitting its own internal budget projections and that it's future projections were based on its "best case" scenario. For instance, even as revenue was in decline back in 2017, SourceHOV still kept its projected "best case" growth rate at 5%, according to Verma's trial testimony. To hit those figures, "everything would really have to fall into place."

**D.** **Following The Merger The Company Discusses Its Progress In Implementing Its Strategy To Grow Revenue And EBITDA**

111. On August 9, 2017, the Company held its first earnings call following the merger to discuss its financial results for the second quarter of 2017 (the "August 2017 Call"). Cogburn stated that "[c]ombined, these two businesses create a leading global provider of single-source end-

### 5. The Knowledge And Actions of SourceHOV, And Of The Individual Defendants While Employed By SourceHOV, Are Attributable To Defendants In This Case

127. Just because SourceHOV merged with Novitex and Quinpario does not mean that its leadership suddenly adopted ethical business practices. Quite the contrary—the same deception that the Court of Chancery observed coming out of SourceHOV, likewise permeated Exela during the Class Period. That reason is simple: SourceHOV is Exela. The same executives who ran SourceHOV ran Exela during the Class Period, and Chadha controlled both as Chair. Indeed, the Business Combination was designed such that "HGM retained majority control of any SourceHOV/Novitex combined entity," 2020 WL 496606 *4, n.47, as is confirmed by the Individual Defendants' continued control over SourceHOV and Exela after the Merger. Chadha also ensured that he retained such control over Exela by stacking the Company's management with insiders and loyalists.

128. Chadha was Chair of SourceHOV before the Merger, and then stayed on to become Chair of Exela. He–and the entity he owns and controls, HGM–was SourceHOV's largest shareholder at the time of the Merger. As of March 26, 2020, Chadha had beneficial interest in 74,393,234 shares (or 50%) of Exela common stock. At all relevant times, there was no single person with a greater financial interest in Exela.

129. Defendant Reynolds began working at SourceHOV predecessor entities beginning 2001. At all relevant times, Reynolds served as SourceHOV's CFO and Co-Chair. Following the

Merger, he served as Exela's CFO from its inception until his termination on May 21, 2020—four days after Exela filed its Form 8-K announcing the Appraisal Action liability and that Exela would

need to restate its 2017, 2018, and Q1-Q3 2019 financial results—when he was replaced by Shrikant Sortur. According to Exela's website, "Mr. Reynolds was also the Chief Operating Officer and a Partner at HGM."

130. Cogburn began working for SourceHOV in 1993. He served as SourceHOV's CEO since 2013, and he became Exela's CEO following the Merger. According to Exela's website, "Mr. Cogburn has also been . . . a principal of HGM since 2003."

131. SourceHOV's SVP of Finance, Verma, likewise continued at Exela. Verma previously reported to Chadha at HGM from 2013 to 2015. He reported to Chadha at SourceHOV from 2015 through 2017, and during the Class Period he continued to work under Chadha's direction at Exela, as a Senior Vice President of Finance. Verma created financial models and projections of company performance, including of projections for Adjusted EBITDA and revenue, for Chadha, Reynolds, and Cogburn while at SourceHOV, and he continued to do that same type of work for Defendants at Exela. Verma was still listed on HGM's website as an active employee up to June 4, 2019 when he testified at the Appraisal Action and was still listed as a Vice President at HGM as of the time of this filing.13

132. In addition, Shrikant Sortur, who replaced Reynolds as CFO in May 2020, was previously a SVP of Finance at SourceHOV, where he worked for the better part of his career: from 2002 through 2017.

133. Finally, Chadha's son-in-law, Andrej Jonovic, was an HGM managing director during the time period relevant to the Appraisal Action, orchestrated the Backdated Valuation for Chadha/SourceHOV, but was employed by Exela, as an Executive Vice President.

134. Indeed, the Delaware Court of Chancery in the Veil Piercing Action found that "Plaintiffs make a compelling case in their Complaint that Exela and SourceHOV Holdings operate as a single economic entity such that it would be inequitable for this Court to uphold a legal distinction between them." 251 A.3d at 707. That finding was based on allegations including that

to-end enterprise in formation management and transaction processing solutions… [W]e believe we have meaningfully expanded our combined companies' addressable market opportunity….

Exela is positioned well to benefit from significant white space opportunity, which will enable us to cross-sell and to upsell our combined solutions and services into our existing client base."

112. On the August 2017 Call, Reynolds noted the Company's long-term guidance of revenue of 3% to 4% and EBITDA growth of 4% to 5%, which was driven in part by the healthcare and financial services industries which "have nice tailwinds associated with them." Reynolds also noted that underutilized Novitex MegaCenters would "help us drive incremental revenue" and assured that "margins will expand as we deliver on the combination savings."

113. On November 9, 2017, the Company held an earnings call to discuss its third quarter financial results (the "November 2017 Call"). Reynolds detailed the Company's plans to expand the margins in Novitex contracts:

> So, if you think about it, when we ramp-up these large customer contracts, there's a lot of costs that are duplicate associated with training people, getting individuals up to speed, doing test runs, a lot of that we have to expense. So, when you have large ramp-ups, typically you get lower volumes in the beginning or no volume. And then over the life of the contract, as you get to full volume, you start to see the incremental margins and the expansion. And if you remember, a number of these Novitex contracts, while their margins were good, they were smaller than legacy Source HOV, because they have to use technology from third-parties. So, as we continue to put our proprietary software and systems into these contracts, we'll pull out that incremental cost and we'll get margin expansion.

114. Reynolds further elaborated on the November 2017 Call, "typically [it] takes six months to nine months to start to improve, as we take out the duplicate people and migrate systems. So I think you'll start to see the margins change in 2018. We've identified obviously a significant amount of synergies that we're working – the team is working hard on to drive the margins above what they were when we acquired Novitex."

115. On March 15, 2018, Exela held an earnings call to discuss its full year and fourth quarter 2017 financial results (the "March 2018 Call"). Cogburn detailed the Company's success in implementing automation to drive revenue, stating "[O]ur business process automation platforms, or BPA, continue to drive value with a nearly 20% increase in the revenue per FTE from $56,000

[13] Available at: https://hgmfund.com/ourTeam.html, last checked on July 28, 2021.

to $66,000 all while we decreased our employee base by 6% to 22,000." Cogburn added "[w]ith the acquisition of Novitex we gain the opportunity to expand our presence into the front office and apply our technology enabled suite of services there. We are actively pursuing and offering our automation technology to the customers and locations that came with that business combination."

116.An analyst requested "an update on your cross-selling progress" and Cogburn indicated that the Company had reached out to the entire Novitex customer base about automation:

Number one, we picked up about 1,100 customer sites with the acquisition of Novitex, an additional 400 customers are located there. And as we begin to roll out our business process automation we are helping to transform that existing business into a more automated process.

* * *

Because now we are able to do things in a more automated way, a more efficient way with fewer errors and it creates what I would call a ***more sticky relationship*** with those customers.

"SourceHOV Holdings and the SourceHOV Subsidiaries, have overlapping personnel and directors and share the same offices; many of the SourceHOV Subsidiaries do not have updated corporate registrations; the entities have failed to maintain accurate or complete corporate records; Exela must give its approval before SourceHOV Holdings can pay debts; and all Exela-related entities have been collectively referred to as one Exela-controlled enterprise in SEC filings." *Id.* at 716. The court made that finding against *Exela*, not *SourceHOV*.

135.    And before the court made that finding in the Veil Piercing Action, it first "emphasized that, just like with traditional veil-piercing, reverse veil-piercing should be sanctioned only in the most 'exceptional circumstances'" and that "[o]nly in cases alleging egregious facts, coupled with the lack of real and substantial prejudice to third parties, should the court even consider utilizing the reverse veil-piercing doctrine." 251 A.3d at 714.

136.    According to the court in the Veil Piercing Action, Exela's conduct with respect to the Appraisal Action was just such a case:

I am satisfied this is one of those "exceptional circumstances" where a plaintiff has well pled a basis for reverse veil-piercing. It is at least reasonably conceivable that the SourceHOV Subsidiaries are alter egos of SourceHOV Holdings and that the subsidiaries have actively participated in a scheme to defraud or work an injustice

against SourceHOV Holdings creditors, like Plaintiffs, by diverting funds that would normally flow to SourceHOV Holdings away from that entity to Exela. At this stage, from the well pled allegations in the Complaint, I see no innocent shareholders or creditors of the SourceHOV Subsidiaries that would be harmed by reverse veil-piercing, nor any potential alternative claims at law or in equity, as against the SourceHOV Subsidiaries or SourceHOV Holdings itself, that would for certain remedy the harm. 251 A.3d at 716.

So, we have rolled out that thesis across all of those customers we picked up with that acquisition as well as our existing customer base. We are not waiting for renewals. We have an active -- we are actively engaged with all of our largest customers, sharing with them the proposition of business process automation, what it can do for their business and what we can do for them. So it's a very exciting time for us and we are seeing some early adoption.

137. All of those facts operate here: SourceHOV and Exela acted as a single economic entity prior to and throughout the Class Period.

138. SourceHOV is a holding company wholly-owned by Exela, with no direct operating assets.[14] In discovery responses produced by Defendants in the Appraisal Action, Exela admitted that "SourceHOV does not have any accounts, and has not made any transfer or payment greater

117 Nevertheless, the Company reported that further adjusted EBITDA and adjusted EBITDA margins had declined in 2017 compared to the prior year. Reynolds stated, "the dilution of the margins in 2017 compared to 2016 was primarily due to the acquisition of a lower margin business. The strategic vision of Exela is to transform the acquired business with BPA over the next 12 to 24 months."

118 Exela issued aggressive guidance for 2018 of $1.51B-$1.54B in revenue (4-6% growth), and adjusted EBITDA of $290-310M (20-28% growth), exceeding their longer-term financial objectives. Cantor Fitzgerald analyst Mike Reid asked, "[c]ould you tell us what's given you the confidence in giving this year's guidance above your longer-term financial objectives?" Reynolds answered, "[o]ur revenue guidance is based on a bottoms up analysis. We have *over 90% visibility in revenue* and have incorporated our total contracted revenue since January of -- January 1. So *we feel really good with our visibility*." A December 5, 2017 Cantor Fitzgerald analyst report

---

[14] In discovery responses connected to the Appraisal Action, SourceHOV confirmed this arrangement was still the case as of July 1, 2020.

than or equal to $250,000 from any bank account, checking account, savings account, money market account, or brokerage account of which SourceHOV is the or a record owner from January 1, 2020 to the present." Respondents' Resp. to Pets.' Interrog. No. 3.

139. Exela, SourceHOV and SourceHOV LLC all do business in Texas, are all headquartered in Texas and appear to all have the same corporate address: 2701 E. Grauwyler Road, Irving, TX 75061, USA.

140. There is also evidence of significant overlap in personnel between Exela, SourceHOV and SourceHOV LLC, including that noted above. For instance, based upon a review of Exela's SEC filings and discovery produced in the Appraisal Action, Chadha was the principal stockholder of SourceHOV immediately prior to the business combination and is now Exela's Executive Chair. Ronald Cogburn is the Chief Operating Officer of Exela and an officer, director, general partner, or manager of SourceHOV LLC. Jim Reynolds is a member of Exela's board of directors and treasurer of SourceHOV LLC. Mark Fairchild is president of Exela Smart Office and president of SourceHOV LLC. Shrikant Sortur is the Chief Financial Officer of Exela and an officer of SourceHOV LLC. Eric Mengwall serves as secretary for both Exela and SourceHOV LLC.

141. At the Appraisal Action, Chadha even got momentarily confused about which entity his own son-in-law worked for:

> Q. And Mr. Jonovic isn't a member of SourceHOV management either, is he?
> A. He is. He's a -- a member of – he was inducted in after January -- after July 2017 to be one of the people that in runs business affairs and M&A for SourceHOV -- I mean Exela.
> Q. For Exela?
> A. For Exela.

142. The above also establishes that when Jonovic requested the Backdated Valuation, he was doing so on behalf of *Exela*, not *SourceHOV*.

143. SourceHOV made representations to lenders on behalf of Exela. At the Appraisal Action, Chadha testified that doing so was "usual procedure":

> Q. Okay. Isn't it also correct that SourceHOV had to provide comfort letters to lenders in connection with the Exela notes offering? Isn't that correct?

A.     It's a usual procedure. Yes.

Q.     Okay. And there was a June 28, 2017, comfort letter, and then there was a July 12, 2017, comfort letter; isn't that correct?

A.     I believe so.

Q.     And these comfort letters confirm the financial soundness of the firm; isn't that correct?

A.     ***Both firms, yeah.***

144.    In its public filings Exela states explicitly that "we use the terms 'Company', 'we', 'us', or 'our' to refer to Exela Technologies, Inc. and its consolidated subsidiaries, and where applicable, our predecessors SourceHOV and Novitex prior to the closing of the Novitex Business Combination. Exela thus fails to distinguish between itself and its subsidiaries within its filed financial reports, including its assessment of loss contingencies relating to the Appraisal Action, which is at issue here.

145.    Chadha testified at the Appraisal Action that SourceHOV ***never had a board meeting*** – not one – demonstrating a glaring lack of *any* corporate formalities that might distinguish SourceHOV from Exela given the overlap in management. In showing such reckless abandon for the corporate form, along with the rights and responsibilities that go with it, Chadha and Reynolds surrendered any distinction between SourceHOV and Exela.

146.    In its 2019 10-K, Exela explicitly acknowledged such a single enterprise:

On March 26, 2020, the Delaware Court of Chancery entered a judgment against one of our subsidiaries in the amount of $57,698,426 inclusive of costs and interest arising out of the Appraisal Action, which judgment will continue to accrue interest, until paid, at the legal rate, compounded quarterly. On May 7, 2020, *we* filed a motion for new trial in relation to share count. Following the Court's decision on the motion for new trial, SourceHOV has the right to appeal the judgment. However, at present the judgment has not been stayed, and ***we expect*** the petitioners to seek to enforce the judgment. If ***we*** are forced to pay the judgment (or bond the judgment pending an appeal, which will likely require cash collateral), such action could have a material adverse effect ***on our*** liquidity and/or cause ***our*** lenders to take action adverse ***to us***.

147.    And as correctly noted by the Court of Chancery in the Veil Piercing Action, Exela and SourceHOV were adequately alleged to have operated as a single economic enterprise there – and the above facts establish that the same is likewise true here and was likewise true at all relevant times during the Class Period.

similarly noted that "BPO business relationships are characterized by multi-year contracts ~~with predictable annual revenue~~."

## V.     SUMMARY OF THE FRAUD

### A.     Defendants Inflate Adjusted EBITDA With Ordinary Operating Expenses, Claiming ~~Thy~~They Are Non-~~routine~~Routine/Non-Recurring And Will Decline

148.     ~~119.~~Throughout the Class Period, Defendants repeatedly made misleading statements about ~~their~~Exela's adjusted EBITDA. ~~While there are several variants in which they did so, all relate to the general idea that Exela mislead~~Generally, Defendants misled Exela's investors into believing that expense addbacks made to Exela's adjusted EBITDA were non-routine and only going to be temporary (as they should be). Most commonly, the expense addback at issue was ~~the~~so called optimization and restructuring ~~expense.~~("O&R") expense. Adding back recurring and/or ordinary expenses had the effect of misleadingly inflating Exela's reported adjusted EBITDA.

149.     For instance, in discussing its Q4 2017 and full year 2017 results, Defendants were asked about various Adjusted EBITDA addbacks and were told that O&R was "down significantly" and that investors should "expect less of those charges." In fact, the Company told investors to only expect between $20 to $25 million for the full year of 2018 in O&R expenses. The Company ended up reporting more than twice that amount. Reynolds gave that guidance in response to an analyst's question about Exela's Adjusted EBITDA addbacks:

> ARUN SESHADRI: Understood. And then as far as the guidance for -- the adjusted EBITDA guidance for 2018, is there any way you could give us the breakout of the various -- of the add backs within that? So in other words, what would be the relevant numbers for I guess the optimization and restructuring expenses, what's the assumption as well as transaction? I mean I guess it shouldn't be much of transaction integration. And then finally just sort of the breakout in terms of like oversight management, new contract set up -- any additional color you can add on those add backs.

> JIM REYNOLDS: Sure. If you look at 04, obviously you saw our business op costs go down significantly from the third quarter. They were basically $11 million in 04 versus close to $21 million in 03. So as we look to 2018 we would expect less of those charges also for the year somewhere between $20 million to $25 million in biz op type charges. With respect to transaction fees, we had close to $97 million in 03 related to the transaction. There were only $2 million that came through in 04 of 2017. So we don't anticipate large add-backs from that area. And then with respect to the management fees, those all went away as part of the combined merger. So those will be de minimis on a

go-forward basis as there are no more management fees being paid by either company. *So we see the adjustments decreasing significantly.*

150.    Investors took Defendants at their word, and based their share price targets on the expectation that O&R were not ordinary operating expenses. For instance, in an initiation report

dated April 18, 2018, rating Exela shares "Outperform" (which is equivalent to a "Buy" rating), RBC Capital Markets described its understanding of Exela's Adjusted EBITDA as follows:

> On its GAAP income statement, Exela generally reports three expense lines, cost of revenue (excluding D&A), SG&A expenses and depreciation & amortization. Certain quarters have also included one-time items such as the impairment of goodwill and related- party expenses. We note that the bulk of operating expenses (-73% of FY17 pro forma) are in the cost of revenue line and *believe that investors are generally focused on adjusted EBITDA* as well as 'further' adjusted EBITDA. *Adjusted EBITDA reflects traditional EBITDA adjusted for one-time and noncash charges*, while 'further' adjusted EBITDA reflects adjusted EBITDA plus stand-alone company merger adjustments (essentially the anticipated cost savings discussed previously). In FY18 and FY19, we are anticipating the gap between EBITDA, adjusted EBITDA and "further" adjusted EBITDA to narrow.

> \* \* \*

> As of year-end 2017, Exela had total debt of $1.4B and cash of $62M and management put its total liquidity at $141M. Its net debt to FY17 'further' adjusted EBITDA stood at 3.88x. 'further' adjusted EBITDA is a financial metric used by its banks that, in our estimation, equates to adjusted EBITDA *(i.e., traditional EBITDA adjusted for one-time and non- cash charges*) plus stand-alone company merger adjustments (essentially the anticipated cost savings discussed above). Management's target leverage is —3x, and we would note that (1) 'further' adjusted EBITDA and adjusted EBITDA should narrow significantly in FY18 and FY19, (2) our estimates include modest debt pay down, and (3) we would expect additional acquisitions.

151. ~~120.The reason~~ duration ~~of these expenses is so important is because the truth later reveals that optimization and restructuring~~ Investors later learned, however, that Exela's added-back O&R expenses largely were *not* ~~in fact~~ non-recurring, aberrant, or temporary. Rather, they continued to recur—*in every single quarter since Exela went pubic*—and as a result, these expenses should never have been portrayed to investors as being temporary, or "non-routine" as they were consistently described to investors in Exela's EBITDA reconciliation table. ~~Business optimization and restructuring~~ Exela's so-called "O&R" expenses were in reality run of the mill operating expenses that should never have been added back to adjusted EBITDA— particularly when the addbacks were accompanied by various explanations that they would be only temporary and were "outside the control" of management.

152. ~~121.One~~ way Defendants gave ~~the impression that adjusted EBITDA addbacks were not a regular and ongoing business expense was by suggesting that optimization and restructuring expenses would decline over time~~ Defendants also repeatedly indicated that the

O&R addbacks did not include "operating" expenses. For example, on March 15, 2018, Exela reported its 4Q 2017 and FY 2017 results. In its Investor Presentation, Exela stated the following about optimization and its O&R expenses:

> Optimization & restructuring expenses: Optimization & restructuring expenses and merger adjustments are primarily related to the

implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

122. On its earnings call following the same reporting period, Defendant Cogburn reiterated that theme when he stated to investors that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly *in the convergence of adjusted EBITDA and EBITDA*."

123. The following quarter, in its May 10, 2018 investor presentation, Exela again represented to investors that:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.

153. Defendants repeated the claim that O&R expense addbacks did not reflect Exela's "past, current or future operating performance" in investor presentations on, at least, the following dates: March 16, 2018; May 11, 2018; August 10, 2018; November 8, 2018; March 18, 2019; March 19, 2019; May 9, 2019; August 8, 2019; November 12, 2019; November 12, 2019; and June 9, 2020.

154. Defendants also repeatedly characterised addbacks to Adjusted EBITDA as being "outside the control of our management team" on all of the following dates[15]: March 16, 2018; May 11, 2018; August 10, 2018; November 8, 2018; March 18, 2019; March 19, 2019; May 9, 2019; August 8, 2019; November 12, 2019; November 12, 2019; and June 9, 2020—even though the largest contributor to O&R was headcount – something squarely within the control of management, but not clearly communicated to investors.

155. 124. On its Exela's 2Q 2018 earnings call on August 8, 9, 2018, Defendants

continued to assure investors that adjusted EBITDA ~~will~~would converge with GAAP EBITDA, ~~again suggesting that adjusted EBITDA expense addbacks will eventually decline,~~ but after ~~six~~five consecutive quarters worth of expenses that management claimed would be "non-routine", ~~investors begin to wonder~~analysts began to press what management ~~means~~meant by "one-time" expenses.~~125.~~ For example, Jim Reynolds was asked by a Cantor Fitzgerald equity analyst which expenses from the 2Q 2018 quarter were one-time in nature. In response, Reynolds ~~does admit~~admitted that Exela will continue to have some "biz-op and restructuring on a go-forward basis" but still argued that Defendants "have done

---

[15] March 16, 2018 within Ex. 99.1 to an 8-K; May 11, 2018 within Ex. 99.1 to an 8-K/A; August 10, 2018 within Ex. 99.1 & Ex. 99.2 to an 8-K; November 8, 2018 within Ex. 99.1 to an 8-K; March 18, 2019 within Exela's 4Q 2018 Earnings Presentation (appearing on the Company's website); March 19, 2019 within Ex. 99.1 to an 8-K/A; May 9, 2019 within Ex. 99.1 to an 8-K; August 8, 2019 within Ex. 99.1 to an 8-K; November 12, 2019 within Ex. 99.1 to an 8-K; November 12, 2019 within Exela's 2Q 2019 Earnings Presentation (appearing on the Company's website); and June 9, 2020 within Exela's 4Q 2019 Earnings Presentation (appearing on the Company's website).

a good job minimizing the amount of adjustments as we convert the savings into GAAP." The

exchange went as follows:

> JOSEPH DEAN FORESI, ANALYST, CANTOR FITZGERALD & CO., RESEARCH DIVISION: I wonder if we could start talking about what might have been onetime in the cost structure this quarter, particularly in the gross margins. I know that you had a slide in there that showed your sort of puts and takes, *but what can we consider to be, I guess, onetimeone-time in nature in 2Q*?

JAMES G. REYNOLDS: So hey, Joe, thanks for your call. I think that if you take a look at kind of a onetime impact during 02, it was the capitalization we had done historically before 606 and some of the duplicate ramp cost that impacted us from a cost of sales perspective. *In addition, during the quarter, we had incremental biz op, we don't break that between SG&A and cost of sales at this point in time*. Really, as a public company, we're really focusing on driving the EBITDA margins and *converting, really, adjustments -- or adjusted EBITDA to GAAP EBITDA.*

> JOSEPH DEAN FORESI: Got it. And so about how much -- what -- can you wrap a number around those onetime charges in the quarter? *And I assume you expect them to fall off in 3Q?*

> JAMES G. REYNOLDS: *Yes*. The onetime charges, we will continue to have some of the biz op and restructuring on a go-forward basis. We -- as long as we don't do any tuck-in acquisitions, transaction cost should be minimal to none. The noncash charges will continue with respect to the restricted stock units that vest over the next year. Those will be the major buckets on a go-forward basis. I think that we've done a good job of minimizing the amount of adjustments as we convert the savings into GAAP.

126. While Reynolds admits that "biz-op and restructuring" addbacks will continue, Exela's investor presentation filed on the same day tells a different story: "Optimization and restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the Business Combination. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance."

156. 127.The August 8,Moreover, Defendants consistently presented the O&R addbacks as including only Merger-related and other "non-routine" expenses. For example, Exela's August 9, 2018 press release also frames optimization and restructuring expenses as being "non-routine." For instance, in its non-GAAP disclosure statement, management statesstated that "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the

effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the Business Combination, asset base (such as depreciation and amortization) *and other similar non-routine items* outside the control of our management team."

157. 128.AlsoMoreover, on theExela's 2Q'18 earnings call, held on the same day, August 9, 2019, Reynolds assured investors that "our job is to minimize the adjustments" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will—

and the percentage of adjustments *will shrink in the future*."

129. That Exela's messaging led investors to believe that its adjusted EBITDA addbacks were not going to be recurring is apparent from, among other places, Morgan Stanley's October 10, 2018 research coverage initiation. In that 34-page analysis, Morgan Stanley ~~points~~pointed to adjusted EBITDA converging towards free cash flow as one of its three key areas supporting ~~the investment bank~~Morgan Stanley's Overweight (*i.e.* buy) rating on Exela's stock. Specifically, Morgan Stanley ~~notes~~noted that Exela's 2017 adjusted EBITDA was lowered by "***one-time charges*** related to the company's business transformation efforts, including ***$48 million of restructuring expenses*** and $99 million of transaction related costs~~" which it expects~~." Morgan Stanley also noted that Exela management indicated that they expected such costs to moderate moving forward.

158. Another way Defendants maintained the impression that adjusted EBITDA addbacks were not a regular and ongoing business expense was by suggesting that the O&R expenses would decline over time. For example, on Exela's Q4 2018 earnings call held on March 18, 2019, Defendant Cogburn stated that "[b]eyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA."

159. The following chart reflects Exela's ongoing O&R addbacks to adjusted EBITDA as reported during the Class Period. As reflected, O&R addbacks (*i.e.*, expenses added back to Exela's EBITDA) comprised a substantial percentage of total adjusted EBITDA reported during the Class Period:[16]

| | FY 2017 | Q1'18 | Q2'18 | Q3'18 | Q4'18 | FY 2018 | Q1'19 | Q2'19 | Q3'19 |
|---|---|---|---|---|---|---|---|---|---|
| O&R addbacks ($ mm) | 47.9 | 14.5 | 13 | 19.4 | 21.2 | 68.2 | 23.7 | 18.7 | 16.8 |
| Adjusted EBITDA ($ mm) | 208.8 | 69.6 | 70.1 | 68.9 | 75.3 | 283.9 | 74.1 | 69.4 | 60.5 |

[16] Figures are expressed in millions of dollars. The chart set forth at ¶ 233 *infra*, reflects the impact of the Restatement on these originally-reported figures and demonstrates how inflated expense addbacks enabled Exela to reach its adjusted EBITDA guidance during the Class Period.

B.      **Defendants Claim Exela Has Predictable Revenue And** ~~That Margins Will Expand As They Implement BPA1.Exela Touts~~Tout **Revenue Visibility To Instill** Investor **Confidence In Guidance**

160.    ~~130.~~Throughout the Class Period, Defendants repeatedly assured investors that the Company had over 90% visibility in revenue. The Company's Annual Report for the year ended December 31, 2017 filed on Form 10-K on March 16, 2018 (the "2017 10-K") noted that "approximately 90% is recurring in nature and supported by long-term customer contracts."

161.    During Exela's March 15, 2018 earnings call, Defendants issued aggressive guidance for 2018 of $1.51B-$1.54B in revenue (4-6% growth), and adjusted EBITDA of $290-310 million (20-28% growth), exceeding the Company's longer-term financial objectives. Cantor Fitzgerald analyst Mike Reid pressed, "[c]ould you tell us what's given you the confidence in giving this year's guidance above your longer-term financial objectives?" Reynolds answered, "[o]ur revenue guidance is based on a bottoms up analysis. We have *over 90% visibility in revenue* and have incorporated our total contracted revenue since January of -- January 1. So *we feel really good with our visibility*."

162.    An earlier December 5, 2017 Cantor Fitzgerald analyst report similarly noted that "BPO business relationships are characterized by multi-year contracts *with predictable annual revenue*." The same December 5, 2017 Cantor Fitzgerald report also noted that "Exela has 90% recurring revenue and 98% renewal rates."

163.    Similarly, on April 18, 2018, RBC Capital Markets initiated coverage of Exela with an Outperform (i.e. "buy") rating that also echoed Defendants statements from just over a month earlier, on March 16, 2018. RBC specifically noted that "Total contract value won in FY17 totaled

$1.523B, more than FY17 total revenue, which enhances visibility in our opinion and led to FY18 revenue growth guidance above management's long-term guidance." The RBC report continued that, "In FY17, it generated $1.456B revenue of which approximately 90% is recurring in nature and supported by long-term or auto-renewal customer contracts."

164. 131. On May 10, 2018, the Company held an earnings call where it discussed its 1Q'18 financial results (the "May 2018 Call") and raised FY'2018 revenue guidance and increased the low end of adjusted EBITDA guidance. Cogburn stated, "We have a high degree of revenue visibility.… The level of visibility gives us confidence in our ability to accurately forecast the trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95% ..."

165. 132. Reynolds further elaborated in response to a Cantor Fitzgerald analyst's question about what gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?

REYNOLDS: …If you think about our business and our contracts, they're long-term in nature, right? They're typically three to five years, and we have *over 95% renewal rates. So we have good visibility into our revenue, typically just over 90% at any point in time*. If you look at the numbers we delivered in the first quarter, we're very pleased with the results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

166. 133. A On the same earnings call, a Credit Suisse analyst noted that while revenue grew, gross profit had declined and inquired about the impact of postage revenue. Postage revenue has no margin and a substantial amount of postage revenue would have the impact of inflating revenues, while compressing margins, and Reynolds provided no indication that postage revenue had any impact on the Company's revenues or margins:

> ARUN A. SESHADRI: …First, I just wanted to understand, obviously nice revenue growth in the quarter, but it looked like gross profit actually declined. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, what was the impact of postage in the numbers?
>
> REYNOLDS: So if you take a look, we don't really look at it on a gross margin basis because we have a lot of business optimization cost flowing through. We focus on an EBITDA perspective. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take, runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage,

*we don't*

*really break out postage separately*. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

134.On the Company's August 9, 2018 2Q'18 earnings call (the "August 2018 Call"), Cogburn again expressed confidence in top line revenue growth, stating "[w]ith our quarterly results, strong backlog and high renewal rate, we are confident in the top line trajectory of the business going forward.

### 2. Defendants Told Investors Margins And EBITDA Would Grow As They Automated Existing Low Margin Customers Acquired From Novitex And Other Acquisitions

167.    While Reynolds told investors that Defendants "don't really break out postage separately", his admission that the Company follows ASC 606 establishes that Defendants did track postage revenue at the time that he made the above statement because ASC 606 effectively requires as much.

168.    ASC 606, promulgated by the Financial Accounting Standards Board ("FASB"), states that "If the consideration promised in a contract includes a variable amount, an entity shall estimate the amount of consideration to which the entity will be entitled in exchange for transferring the promised goods or services to a customer." ASC 606-10-32-5. Similarly, according to a practice guide published in March 2017, by Deloitte:

> Regardless of the form of variability or its complexity, once variable consideration is identified, an entity is required under ASC 606-10-32-8 to estimate the amount of variable consideration to determine the transaction price in a contract with a customer by using either the "expected value" method or the "most likely amount" method, "depending on which method the entity expects to better predict the amount of consideration to which it will be entitled." As ASC 606-10-32-8 explains, the expected value is "the sum of probability-weighted amounts in a range of possible consideration amounts. An expected value may be an appropriate estimate of the amount of variable consideration if an entity has a large number of contracts with similar characteristics." ASC 606-10-32-8 further states that the most likely amount is "the single most likely amount in a range of possible consideration amounts (that is, the single most likely outcome of the contract).

135.The Company's 2017 10-K filed at the start of the Class Period laid out its strategy to bring automation and digital transformation to existing customers, stating:

> We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base. With an installed base of over 3,500 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for

169.    In its 10-K for the year ended 2018, Exela also explicitly admitted that it tracked postage revenue in accordance with ASC 606:

> **Revenue Recognition**
>
> We account for revenue in accordance with ASC 606. A performance obligation is a promise in a contract to transfer a distinct good or service to the customer, and is the unit of account in ASC 606. Revenue is measured as the amount of consideration we expect to receive in exchange for transferring goods or providing services. The contract transaction price is allocated to each distinct performance obligation and recognized as revenue when, or as, the performance obligation is satisfied. All of our material sources of revenue are derived from contracts with customers, primarily relating to the provision of business and transaction processing services within each of our segments. We do not have any significant extended payment terms, as payment is received shortly after goods are delivered or services are provided.

~~our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher margin bundled solutions.~~

~~136. On April 10, 2018, Exela issued a press release announcing its acquisition of Asterion International Group ("Asterion"), indicating that the acquisition allowed the Company to expand its European presence and grown revenue by automating Asterion's customers:~~

~~…The acquisition expands Exela's European business to over $200 million in annual revenue and will enable Asterion's customers to access Exela's full suite of BPA solutions….~~

**Nature of Services**

_Our primary performance obligations are to stand ready to provide various forms of business processing services, consisting of a series of distinct services that are substantially the same and have the same pattern of transfer over time, and accordingly are combined into a single performance obligation. Our promise to our customers is typically to perform an unknown or unspecified quantity of tasks and the consideration received is contingent upon the customers' use (i.e., number of transactions processed, requests fulfilled, etc.); as such, the total transaction price is variable. We allocate the variable fees to the single performance obligation charged to the distinct service period in which we have the contractual right to bill under the contract._

~~…The acquisition, which comes with minimal customer overlap, is also highly complementary to the business of Exela's document management focused subsidiary, Exela Enterprise Solutions, Inc. (formerly known as Novitex Enterprise Solutions), which provides a similar set of solutions to customers in North America.~~

**\* \* \***

~~"With this acquisition we are poised to enhance Asterion's current customer offering with our BPA solutions, including front, middle and back office automation," said Ron Cogburn, CEO of Exela Technologies.~~

_**Customer deposits consist primarily of amounts received from customers in advance for postage**. The majority of the amounts recorded as of December 31, 2017 were used to pay for postage with the corresponding postage revenue being recognized during the year ended December 31, 2018._

~~137. The Company discussed Asterion on a May 10, 2018 earnings call, noting that "Asterion used to be a part of Novitex." Cogburn assured, "it's a business we feel **we have a good knowledge** of and a proven plan to transform the business unit. Essentially, we truly believe it was an extended execution of our strategy to integrate similar businesses and to increase the opportunities for both revenue and EBITDA transformation."~~

~~138. Reynolds discussed the Company's progress on its strategy to increase revenue and~~

~~margins by automating existing customers on the May 2018 Call, stating, "We are continuing down the path to transform our lower margin business, Exela Enterprise Solutions, which we acquired in July of 2017. We are making good progress, and we expect this transformation to take about **12 to 15 months**." Reynolds added, "[w]e see, as we move through the year, that our margins will expand. You can get to it through our guidance of adjusted EBITDA margins for an increase of 220 to 320 bps. And then, we have Novitex. And as we put in BPA, you're going to start to see that expansion."~~

170.    And the line item "customer deposits" appears on Exela's balance sheet -- including on every quarterly filing beginning in the third quarter of 2017 and in every 10-K (all signed by Cogburn, Chadha, and Reynolds) since Exela has been public. Thus, by the Company's own admission – it was tracking postage by the third quarter of 2017 and every reporting period since. The following chart reflects the Company's postage revenue during the Class Period:

| Reporting Period | Postage Revenue ($ millions) | Total Revenue ($ millions) | Postage contribution to total revenue (%) |
|---|---|---|---|
| 1H 2018 | 156 | 803.4 | 19.4 % |
| 3Q 2018 | 76.9 | 383.0 | 20.1 % |
| 4Q 2018 | 77.2 | 399.6 | 19.3 % |
| FY 2018 | 310.0 | 1,586.2 | 19.5 % |
| Q1 2019 | 75.5 | 404.4 | 19.0 % |
| Q2 2019 | 66.2 | 390.8 | 17.0 % |
| Q3 2019 | 63.6 | 372.9 | 17.1 % |
| Q4 2019 | 70.1 | 393.6 | 17.8 % |
| FY 2019 | 275.3 | 1,562.3 | 17.6 % |

171.    Even so, Defendants maintained their representation that Exela had 90% visibility into its revenue and, as time went on, analysts began to credit Defendants' statements about visibility and some saw it as a selling point for investing in the stock. For instance an April 11, 2019 report by Cantor Fitzgerald noted:

**Growth moving forward**. The pipeline remains strong, almost doubling y/y. XELA added 62 customers generating over $1 mn in 2018. The company's top 200 customers account for about 76% of their business. XELA has a strong focus on the growth of these customers.

In 2018, their top 200 clients saw 14% organic growth. XELA has added strategic teams, with the goal of replicating their success with previous wins on new business. Management has taken action to implement a strategic team for the legal segment to help smooth results and enhance this segment of the company. Management reiterated their 98% retention and typical 90% visibility into revenue growth for the next 12 months. Revenue guidance for 2019 is set at 5-7%. (emphasis in original).

172.    About a month later, on May 10, 2019, the same analyst at Cantor Fitzgerald reiterated his view that Exela's "pipeline remains strong" based on Defendants' purported 90% visibility claims:

**Foresi's Take.** Adjusted EBITDA margins expanded 70 bps y/y to 18.4%, below our estimate of 18.6%. The pipeline remains strong, management noting it has doubled y/y, helped by its new Digital Now product. Management believes the company is well-positioned for long-term sustainable growth beyond 2019. Exela noted retention was 98%, and it typically has 90% visibility into revenue growth for the next 12 months. Management noted a pick up in their Smart Office offering. (emphasis in original).

173.    Ultimately investors would learn that Defendants revenue was not – and could not have been – as predictable as claimed because a material amount (roughly 20% depending on the time frame) of Exela's revenue was pass through revenue from postage, which Defendants later admitted was historically unpredictable.

### C.    Defendants Fail To Record Estimated Appraisal Liability And Misrepresent Their Ability To Even Estimate Exela's Potential Liability Associated With The Appraisal Action

174.    In its 2017 10-K, Exela acknowledged the existence of the Appraisal Action and promised to "vigorously defend" against it:

On September 21, 2017, former stockholders of SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Business Combination, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

 On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). The parties have commenced discovery. At this stage of the

litigation, *the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action*. Pursuant to the terms of the Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our Common Stock issued to Ex-Sigma 2 LLC, our principal stockholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. *The Company intends to vigorously defend against the Appraisal Action*.

175.    As did the Company's 2018 10-K:

On September 21, 2017, former stockholders of SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Novitex Business Combination, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Novitex Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

139. On the August 2018 Call, Cogburn discussed the strategy to implement BPA with existing customers:

Using the power of our technology and recognizing the potential with BPA, many of our existing customers are now reanalyzing their on-site BPO business. The interest from customers has broadened, and this also includes interest in our platforms like print shop, digital mailroom, front-office automation and digital lockers.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). Discovery in the Appraisal Action is not yet complete. At this stage of the litigation, *the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action*. Pursuant to the terms of the Novitex Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our Common Stock issued to Ex-Sigma 2 LLC, our principal stockholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. *The Company intends to vigorously defend against the Appraisal Action*.

176.    Exela's 2017 and 2018 Form 10-Ks were signed by Cogburn, Chadha, and Reynolds, all of whom played central roles for SourceHOV/Exela in the Appraisal Action. This essentially demonstrates that we are able to grow the revenue faster with a much lower -- or slower variable cost increase. Put in other words, the growth in the revenue exceeds the growth in the variable cost in the form of headcount needed to service the revenue....

177. However, as detailed in ¶¶ 83- 100, *supra*, Defendants were well aware of the range of Exela's potential liability by the time these annual reports were filed.

178. Exela estimated its potential liability associated with the Appraisal Action again on January 10, 2020, to be approximately $65,000,000. This time, Exela prepared the estimate of its liability for a several lenders including TPG Speciality Lending Inc., and PNC Bank in connection with obtaining a $160 million Accounts Receivable Securitization Facility ("the A/R Facility").

179.

140. The Credit Suisse analyst on the call noted that while revenue had grown, profit had declined, and asked what the impact of Asterion was on margin. Reynolds indicated that Asterion margins were low, but assured the Company's margins would expand:

> ARUN A. SESHADRI: …And then I just wanted to understand, as far as the sequential progression goes, your revenue kind of grew nicely on a sequential basis between $93 million to $410 million. But it looks like both gross profit and, I guess, cash EBITDA both declined sequentially. Just wanted to understand, is there any way you could parse sort of why that's happening and what the impact of the Asterion business was on a margin basis?

REYNOLDS: Yes. So we haven't really broken it down between Asterion but, obviously, with the amount we paid, *Asterion did not have a significant margin*, if you know what I mean. But it was really strategic to us to bring that back and expand our European operations…. Because we had great success last year and into this year, we had a large amount of revenue come through at very little margin. So as we ramp up, you're going to continue to see the revenue grow, those costs come out, and we will expand. Usually, revenue comes first and then ─ on these large contracts, and then the margins will expand over time. We're very pleased though with the top line growth.

180.     The terms of the Loan and Security Agreement provide further evidence that Exela was fully aware of the extent of its liability in the Appraisal Action when the Appraisal Action was pending. The Loan and Security Agreement specifies that the Appraisal Action constitutes an Event of Default. *See* A/R Facility Excerpts, Loan and Security Agreement, Article I, Section 1.01, ("'Subject Appraisal Action' means that certain petition for appraisal pursuant to 8 Del. C. § 262 filed on September 21, 2017 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS."); Article X, Section 10.01(u) ("If any of the following events (each and "Event of Default" shall occur: ...(u) one or more judgments for the payment of money in an aggregate amount in excess of $20,000,000 *(or solely with respect to the Subject Appraisal Action, $65,000,000)* ... shall be rendered against any Exela Party or any Subsidiary of any Exela Party or any combination thereof and the same shall remain undischarged for a period of thirty (30) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of any Exela Party or any Subsidiary of any Exela Party to enforce any such judgment which is not effectively stayed for a period of ten (10) consecutive days").

181.     These provisions confirm that Exela appreciated fully the extent of its liability to the plaintiffs in the Appraisal Action. Exela evidently considered that a judgment of up to $65 million in favor of the Appraisal Action plaintiffs was possible and agreed to what it considered a high enough threshold to avoid triggering an Event of Default. To arrive at that $65 million threshold, the cogent and compelling inference is that Defendants estimated it.

**D.**     ~~C.~~The Truth Begins To Emerge

1.     **Exela Lowers Its 2018 Adjusted EBITDA Guidance By ~$18 Million** ~~Due In Part To The Exit Of A Low Margin Contract~~

187. ~~141.~~On November 8, 2018 Exela ~~reported~~<u>announced</u> its quarterly results for the third quarter of ~~2018 (the "November 2018 Call"). Exela reported~~<u>2018, reporting</u> $383 million in quarterly revenue and ~~$69 million of~~ adjusted EBITDA <u>of $69 million</u>. On adjusted EBITDA, ~~contrary to Exela's earlier representations that adjusted EBITDA would converge on GAAP EBITDA,~~ Exela's 3Q 2018 included ~~an 85.4~~<u>a 49</u>% increase in ~~Optimization and Restructuring~~<u>O&R</u> addbacks as compared to the prior quarter <u>($19.4 million in O&R addbacks reported in 3Q'18 versus $13 million in O&R addbacks in 2Q'18)</u>.

142.Cogburn said that adjusted EBITDA was "impacted by 2 main factors totaling about [$7 million], which were lower project revenue in our LLPS segment and the exit of a low-margin contract." Nevertheless Cogburn assured "the increased market receptiveness to our DigitalNow strategy has exceeded all of our expectations, and therefore, we have accelerated our investments for future profitable growth." Cogburn explained that the strategy would "have a short-term impact on our adjusted EBITDA" and revised 2018 revenue guidance upward to between $1.58 billion and $1.59 billion, with a growth of 8.5% to 9% year-over-year and reduced adjusted EBITDA to be between $280 million to $290 million. Cogburn noted that the Company's pipeline was "almost double" and stated that "[o]ur strategy to grow within our good existing customers is working…. The results of this strategy is a broad and sticky revenue base."

188. 143.Despite the increase in O&R addbacks, Reynolds attemptedstill tried to reassure investors that such business optimizationO&R expenses would decline, stating, "In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense. A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. We expect these costs to decline as we implement our transformational model."

189. 144.Despite suchhis reassurance, investors began to more assertively question Exela management about whether itsanalysts pressed Defendants on whether Exela's EBITDA addbacks were truly nonrecurring. For example, Morgan Stanley equity analyst Brian Lee Essex asked:

> BRIAN LEE ESSEX: I don't know if it was just addressed, but I guess on a guide up in revenue, the guide down in EBITDA margins, could you help us -- maybe walk me through some of the puts and takes you have, what I would assume the better margin digital business, exiting a low-margin contract. I would assume that'll give you a lift to margins, but you're investing back in the business. Any sense for us to get a sense for in terms of both gross margin and EBITDA margin, *how one time-ish are these investments or impact items*, and how do we think about expansion from here on out?

REYNOLDS: Sure. So if you take a look at the 2 items I mentioned, the LLPS and the on-site, that was a $7 million impact. And with the LLPS, those contracts in the on-site, it's gone. So it's not going to come back into Q4. So it has a carry-on effect. With respect to other incremental revenue, it's coming through, we have some high margin revenue that we're anticipating coming in, in the fourth quarter related to our Saas sales. It's happened historically. Through 2018, we feel good that we'll get some incremental flow through margin, but I think that a range of $280 million to $290

million is something we feel good about as we're exiting 2018.

190. 145.Reynolds continued to assurealso further assured investors on the November 8, 2018 Callearnings call that "we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts."

146.An analyst from RBC on the November 2018 Call asked if Exela had additional low-margin contracts that they planned to exit and Reynolds indicated to the contrary, noting that they were looking to change the margin profile of low margin contracts acquired from Novitex Enterprise Solutions:

MATTHEW VAN ROSWELL: First question is, if I look at your revenue guidance for the year, it seems to imply that the fourth quarter is going to have slowing revenue growth as well. Could you walk through sort of what's driving that? And as part of that, *do you have additional low-margin contracts that you're looking at getting out of*?

REYNOLDS: So I think that we gave the guidance of $1.580 billion to $1.590 billion, which is up over last quarter, that equates to $395 million to $405 million. Within our business, I think we've discussed before is, when we acquired Enterprise Solutions, they still had some low-margin business, but as we put in our technology and automation, we're looking to change that margin profile. This was an opportunity to get out of a contract that has shifted on us, and it was the right thing to do. So we are a public company and we prefer to have profitable contracts versus contracts that goes the other way.

147.The RBC analyst also asked if Exela had seen "any change in client demand either for your products or sort of in the industry in general" and Cogburn touted the pipeline growth and interest from Novitex customers:

Well, so that's the right question to ask about the demand from the customers. And so we have to measure that in a couple of ways, but the biggest way is the growth of our pipeline…. So as we came into this year, we saw our pipeline begin to build at a very accelerated rate. As we sit here today for these types of digital services, it's literally twice what it was last year. So what we found is we went to our existing customers, when we went to our Top 150 customers, when we went to a — what we call the Enterprise Solution customers, which is the old Novitex, it was well received, lots of interest, and so that's where you begin to see like this enterprise deal that I talked about. This is a $100 million contract spread over 3 years. It starts at the beginning of '19. We didn't have those types of opportunities before we started, I guess, broadcasting and sharing the vision for the DigitalNow. So we're very excited about where this is going.

148.Analysts' reaction to theExela's third quarter results were mixed. A November 9, 2018 Cantor Fitzgerald issued a report on November 9, 2018 statingstated, "[q]uarterly top-line results were above our expectations, and 2018 revenue guidance was raised. …Adjusted EBITDA margins expanded 250bps to 18.0%, below our estimate of 20.8%. Margins were hurt by lower revenue in LLPS and by exiting a low- margin contract…. Management lowered adjusted EBITDA guidance to $280-290 mn from $295-

310 mn, or -18% margin, due to more opportunities to reinvest in the business. We now expect $285 mn in adjusted EBITDA in 2018, down from our previous estimate of $302 mn."

191. ~~149.~~Morgan Stanley issued a report the same day, noting, "[s]trong growth drove a revenue beat as adoption remains robust on XELA~~'~~"s platform. The company guided for lower EBITDA in FY18 but, with the guide partly due to investment, we continue to see healthy growth and margin expansion ahead with XELA a share gainer in its markets."

192. ~~150.~~On this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, ~~2019~~2018 damaging investors.

**2. Exela Reports 2018 Results ~~And Expresses~~, Further Partially Revealing The Extent Of Ongoing O&R Expenses; Still, Defendants Express Confidence In Strong 2019 Guidance Due to Revenue "Visibility"**

193. ~~151.~~On March ~~19,~~18, 2019, Exela ~~held an earnings call to discuss~~announced its full year and fourth quarter 2018 financial results and ~~issue~~issued its 2019 revenue guidance ~~(the "March 2019 Call")~~, and Defendants held an earnings call the next day. The Company announced that it achieved its revenue and adjusted EBITDA guidance for 2018 and provided 2019 revenue guidance of ~~revenue~~ between $1.66 ~~billion to~~and $1.7 billion (5-7% growth) and adjusted EBITDA guidance of between $305 million to $~~225~~335 million (7-18% growth).

194. During the earnings call held on March 18, 2019, Defendants further partially revealed that Exela's O&R addbacks were not necessarily one-time or non-recurring expenses, and that they would only "gradually" decline. Reynolds stated, "[w]e believe *2018 represented the high watermark in terms of optimization and restructuring expenses*. And in time, we expect these costs to *gradually* decline as we implement our transformational model." The Company also revealed that of the $21.2 million in O&R expenses for the fourth quarter of 2018, $14.2 or 66% came from "headcount cost."

195. After seven straight quarters of Exela adding back O&R expenses, analysts tried to get a clean EBITDA number out of management, that was not manipulated by potentially improper expense addbacks. Management refused:

CAROLINE JOYCE: This is Caroline Joyce on for Arun today. Just a few. First, how do you expect the GAAP EBITDA range to be in 2019?

JAMES G. REYNOLDS: So we haven't given out any guidance on a GAAP perspective. What I will tell you is with the range that we've given for 2019, *we still expect some business optimization costs to occur*. As we transition our existing customers and the new contracts, we'll have similar amount of noncash charges, which is primarily related to our stock option plan and our RSUs that have been granted. So that's kind of how it looks.

CAROLINE JOYCE: Okay, great. And then, I guess, on that same line, could you outline at all what you expect for transaction and integration and then optimization and restructuring expenses for 2019?

JAMES G. REYNOLDS: We have not given guidance to that number. What I will tell you is we're still going to be incurring these as we have continued to take on tuck-in acquisitions. There's still work to be done there. And as we roll out our technology, we're still incurring a duplicate cost associated with this rollout.

196. ~~152.~~Regarding Exela's 2019 guidance, Dan Dolev, an analyst with Nomura Securities, ~~stated~~pressed "your guidance is very, very strong. I feel like it's above our numbers [] -- for 2019… Can you maybe give us a sort of the level of confidence you have in achieving that guidance?" Reynolds replied, *"[a]s we've discussed historically, we typically have about 90% visibility into the next 12 months*."

197. ~~153.~~Reynolds also stated on the call, that "[o]ur strategy to grow within our existing customers is resonating as they're seeking solutions to drive change, realizing the benefits of digital transformation…. *We have a broad and sticky revenue base*."

~~154.An~~Another analyst asked why ~~the Company~~Exela's growth rate was consistent year-over-year given that the pipeline had doubled and Reynolds assured ~~the Company was~~Defendants were being "~~somewhat~~ conservative:"

JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort of the conversion rate? Is it an element of conservatism on the top line and expectations for next year? Have conversion rates changed? *Is there anything in the top line we should know about?*

REYNOLDS: …I mean, we feel good about our conversion rate. I think the size of the pipeline is strong. And just like this year, for the full year, we actually hit our revised - upward revised revenue guidance. So *we have great visibility into the revenue* and feel pretty good. I think, as we're still a new public company, 18 months or so, and we're *trying to be somewhat conservative* as we look at the potential for Digital Now, which is gaining traction in our front office. So we'd rather come out feeling good with that *90% visibility* on the top line.

~~155.Reynolds addressed an analyst's question about margin guidance:~~

JOSEPH DEAN FORESI: …And then on the margin guidance, I think it's $305 million to $335 million. What puts you at the top end versus the low end on the margin side?

REYNOLDS: So what gets us there is really the flow-through on our savings. That's one of the things we've been working on since we launched the transaction. We feel good about it, so it's a combination of that. And then the type of deals that we close and how quickly we can achieve the margin. *There is still costs we need to take out on some of these tuck- in acquisitions, and we're looking to change that margin profile as we implement our suite of technology*.

156. On Optimization and Restructuring expenses, Cogburn continued to maintain that eventually they would decline. Reynolds stated, "[w]e believe 2018 *represented the high watermark in terms of optimization and restructuring expenses*. And in time, we expect these costs to *gradually* decline as we implement our transformational model."

157. After seven straight quarters with such expenses, analysts tried to get a clean EBITDA number out of management, meaning one that could not be manipulated by an improper expense addback. Management refused:

CAROLINE JOYCE: This is Caroline Joyce on for Arun today. Just a few. First, how do you expect the GAAP EBITDA range to be in 2019?

JAMES G. REYNOLDS: So we haven't given out any guidance on a GAAP perspective. What I will tell you is with the range that we've given for 2019, *we still expect some business optimization costs to occur*. As we transition our existing customers and the new

~~contracts, we'll have similar amount of noncash charges, which is primarily related to our stock option plan and our RSUs that have been granted. So that's kind of how it looks.~~

~~CAROLINE JOYCE: Okay, great. And then, I guess, on that same line, could you outline at all what you expect for transaction and integration and then optimization and restructuring expenses for 2019?~~

~~JAMES G. REYNOLDS: We have not given guidance to that number. What I will tell you is we're still going to be incurring these as we have continued to take on tuck-in acquisitions. There's still work to be done there. And as we roll out our technology, we're still incurring a duplicate cost associated with this rollout.~~

198.    ~~158.~~On March 19, 2019, Cantor Fitzgerald issued a report noting, "Exela has realized cost synergies as a result of the merger between SourceHOV and Novitex (now known as Enterprise Solutions) that formed the company, and the synergies are expected to continue to flow through the model in 2019. The net result should be margin and multiple expansion." It also stated, "Adjusted EBITDA margins expanded 260bps to 18.8%, below our estimate of 19.3%. The pipeline remains strong, almost doubling y/y. Management believes the company is well-positioned for long-term sustainable growth beyond 2019, and it added 62 customers generating over $1M in 2018. Exela noted retention was 98%, ***and it typically has 90% visibility into revenue growth for the next 12 months.***" However it cautioned, "Exela employs significant amounts of financial leverage…. The debt represented 76% of total assets and 258% of tangible assets. Indebtedness could decrease its ability to obtain additional financing for working capital, capital expenditures, general corporate or other purposes; limit flexibility to make acquisitions; or increase cash requirements to support the payment of interest."

199.    Following this news, Exela's stock price dropped $0.21 per share (approximately 5.3%) to close at $3.73 per share on March 19, 2019, on heavy trading volume. Exela's stock price dropped an additional 6.2%, or $0.23 per share, to close at $3.50 per share on March 20, 2019, on heavy trading volume.

        **3.      Exela Misses 1Q'19 Revenue Expectations ~~And Its Liquidity Plummets Resulting In A Moody's Downgrade.~~, Reveals Ongoing High O&R Addbacks That Corresponds With Increased Headcount**

~~159.~~On May 9, 2019, the Company issued a press release attached as Exhibit 99.1 to a Form 8-K detailing its 1Q'19 financial results wherein it reported a loss of $0.21 per share (GAAP) on revenue of $404.8 million versus a loss of $0.16 a share (GAAP) on revenue of $393.2 million.

Both fell short of expectations for a loss of $0.06 per share on revenue of $410 million. The Company also reported that its net debt stood at $1.46 billion, putting its leverage ratio at a concerning 5.06x. In addition, the Company's liquidity had declined from $124 million at the end of 3Q'18, to $58 million at the end of 1Q'19.

160. Furthermore, despite previously assuring that cost synergies from headcount reductions would be realized in 2019, the Company reported that its employees had increased by nearly 1,000 in 1Q'19 to handle new business. On an earnings call held the same day, Cogburn said acceleration in costs "should reverse in the back half of the year."

161. Answering the question put to Reynolds on the 3Q'18 earnings call regarding whether the Company had additional low margin contracts it was looking to exit (*see supra* ¶**Error! Reference source not found.**), Cogburn revealed that, "*[Exela] continue[s] to exit low margin contracts where customers do not have a path going forward towards automation*."

162. The Company met its adjusted EBITDA guidance and Cogburn reaffirmed the outlook for 2019 "based on our current pipeline," and noted "[w]ith high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers." Despite acknowledging that the Company was exiting lower margin contracts with no path to automation, Cogburn stated, "[t]he improvement in margins validates the path that we are traveling to transform businesses through our automation as we get the benefits of executing our remaining cost savings initiatives."

200. 163.Despite statingMoreover, despite Defendants' prior claim that 2018 represented the "high-water mark" of business and optimizationExela's O&R addbacks to adjusted EBITDA, the first quarter of 2019 showed a new high for that expense. at $25.8 million. The first quarter 2019 results also showed that O&R addbacks reached a new high during the same time that Exela's headcount rose by 929 full-time employees.

201. Reynolds partially revealed that optimization and restructuringO&R charges were not limited to just the Business CombinationMerger or M&A activity, but rather suggests that they are more akin to operating costs:

I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. ***The primary variance between the 2 are optimization and restructuring charges***. This adjustment relates to investments we have made to achieve cost savings and ***a majority relates to headcount***. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're incurring additional upfront cost for a few large projects. We expect this trend to continue in 2019, but decline in the year -- later quarters.

202. 164.Cogburn's response to Jefferies analyst, Todd Morgan, further partially revealed the nature of the purportedly "non-routine" expense that iswas added back to adjusted EBITDA every single quarter:

TODD CRANSTON MORGAN: …I was hoping you could talk a little bit more about restructuring and optimization costs that you have here. ***I mean they've been persistently high***. I guess you've defined those as being the salary and benefits for folks that are -- at this part of that optimization process, but is there any -- can you give us any kind of understanding of what kinds of people those are, what those kinds of expenses are and how the those might trend as we look forward?

COGBURN: I think the second question related to the optimization and restructuring. ***Optimization and restructuring charges are primarily headcount-related charges***. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

203. Despite the disappointing news on revenue, debt, liquidity, and the partial disclosures relating to Exela's increased O&R expense, Exela met its adjusted EBITDA guidance and Cogburn reaffirmed the outlook for 2019 "based on our current pipeline," and

Supp.App. 0104

high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers."

204. 165.Analysts' reaction to the news was mixed. Despite management's admissions about EBITDA adjustments, Cantor Fitzgerald issued a report the following day that highlighted what it considered remaining bright spots for Exela and parroted Exela's "90% visibility" claims, noting "The pipeline remains strong, management noting it has doubled y/y, helped by its new Digital Now product. Management believes the company is well-positioned for long-term sustainable growth beyond 2019. *Exela noted retention was 98%, and it typically has 90% visibility into revenue growth for the next 12 months*."

205. 166.On the same day, Morgan Stanley issued a report and was not as forgiving, noting, "[w]e continue to look for signs of progress, but *lack of disclosure adds to the complexity of the story*." It went on to note liquidity concerns and that ~~business optimization costs~~O&R addbacks were expected to continue:

Adjusted EBITDA of $74.1 mm fell shy of our $77.4 mm estimate due to incremental headcount, but was ahead of the Street's $67.3nnnn. While the company reiterated its FY19 guidance, it warned that it will be 2H -loaded, with 2Q19 expected to be sequentially flat. We recognize the company is taking steps to improve as it continues to make progress on cost savings, but we still view the story as a complex one. As we wait for additional signs of scalability, ongoing liquidity concerns keep us Equal-weight.

*** **Business optimization costs expected to continue**. XELA had previously outlined long- term adjusted EBITDA in the range of 22% to 23%, and has yet to update this target. Our call-back with management implied that *optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved*.
***

206. ~~Liquidity still an issue, while buyback program remains in effect. XELA did not repurchase any additional shares in 1Q19, although the buyback program launched in FY17 remains in effect. The company continues to be opportunistic, and we believe incremental buybacks will likely stretch liquidity further. As we've noted previously (see: "Downgrading to EW, Liquidity Presents Headwind" as part of our 2019 IT Services Outlook), *liquidity remains a primary concern* for the stock with little visibility around how the company may address it.~~Following this news, Exela's stock price dropped $0.17 per share (5.0%), to close at $3.21 per share on May 10, 2019, on heavy trading volume.

#### 4. Moody's Downgrade Challenges Exela's Adjusted EBITDA And Addbacks As "Normal Operating Expenses"

207. 167.Then onOn May 22, 2019, Moody's downgraded the Company's debt from Caa1 from B3 based on the 1Q'19 revelations. Moody's lead analyst Harold Steiner was quoted as saying, "Exela's restructuring charges *consist mostly of headcount* that it expects to cut as it transitions

Supp.App. 0106

to more technology-based BPA service offerings… *We believe these are normal operating expenses necessary to provide its service*, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation." The press release also stated:

> Moody's downgraded the liquidity rating to SGL-4 because of persistent negative free cash flow including a use of approximately $50 million in the first quarter. Moody's projects EBITDA of approximately $200 million after deducting restructuring and optimization charges will barely cover the company's sizeable fixed charges, which consist of $155 million of debt service and $40 million of capital spending needs.

\* \* \* Exela's Caa1 CFR reflects the company's limited scale in an intensely competitive industry, its persistently poor earnings quality, high leverage and weak liquidity…. As such, Moody's expects revenue and earnings growth to remain limited to the low-single digits in 2019. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default.

208. 168. Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

### 5. 4. Exela Announces 2Q'19 Results And Revises 2019 Guidance Down Citing , Disclosing For the First Time Impact Of "Unpredictable" Pass- Through Postage Revenue And Exit From Low Margin Contract in 2Q'19

209. 169. On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results. Cogburn reported:

> Our revenue, excluding the postage and postage handling and low-margin contract exit, grew by 4% in the first half of 2019. This underlines the stability in our revenue, which, combined with a robust pipeline provides a healthy base to build upon. While we are excited about the new wins this year, some of this revenue, or ACV, will be delivered next year.

> Based on the items I've just mentioned and considering *the unpredictable nature of our postage revenue*, we are updating our 2019 revenue guidance to $1.59 billion to $1.61 billion and 2019 adjusted EBITDA guidance to $290 million to $300 million. We have *strong visibility under this revenue*, which, in turn, will help us to prioritize our operations and focus on liquidity and cash generation.

210. 170. An analyst on the call asked if the Company reported revenue ex-postage in the prior quarter and Reynolds replied, "No, we did not. We wanted to discuss it this quarter. We

thought it was important that we show what the true margins look like. Obviously, we're being penalized by pass-through of *revenue with little or no margin*."

171. Reynolds noted on the call that, "[r]evenue for ITPS segment was $309.2 million, a decrease of 6.3% year-over-year from $330.1 million. This decrease was driven by the impact of the low-margin contract exit we discussed in the third quarter of 2018, offset by growth from acquisitions and existing customers." He elaborated, "[a] good chunk of that [~$20 million revenue decline], approximately $12 million related to the lower margin contract that we exited."

172. Cogburn presented a chart which he claimed "represent[s] the business broken down by their respective gross margin profiles as they stand today" and stated:

45% to 50% of our business is already around 35% gross margin levels, which is 8 points higher than the consolidated gross margin. This represents the process transformation and operation improvements that we have made and been executing in the last decade. The second column represents 35% to 40% of the business. Now *this business is at the lowest gross margin of the 3 and is still approximately 15%* with the transformation span just over the last couple of years. Finally, the third bar from the left represents 15% to 20% of

the revenue at approximately 30% gross margins with a span of at for over the last 5 years. Now our focus is on this second bar and replicating our successful strategy to implement technology and process transformations, which bring up the gross margins to that same 35% level for the as similar in the longer-tenured businesses. This represents a tremendous opportunity to expand the gross profit dollars. However, I want to highlight the fact that these are heavy lifting improvements that will fundamentally transform COGS and they require an investment and time.

In summary, over 60% to 70% of our revenue is already at a 30% gross margin or higher. The company is focused on improving the gross profit profile for the remaining business as we deploy our technology and transform that business to capture additional profits.

173. Cogburn further detailed the low margin business and assured the Company would be able to improve margins through automation:

I think from the beginning of the formation of Exela, we talked about part of our business that was ripe for digital transformation and that's really what we've talked about. The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, those gross margins were lower…And you can see with the benefit of automation and transformation, we brought those margins up to around 30%. *We're going to be able to put automation where there is no automation*.

174. Cogburn further indicated that the "transformation efforts are working and it'll take

Supp.App. 0108

another 12 to 18 months to complete," despite Reynolds having previously stated in May 2018 that the transformation would take 12 to 15 months from the deal close, which would have been no later than October 2018. (*see supra* ¶138).

211. 175.On August 9, 2019, RBC issued a report stating, "With the exiting of a low-margined contract, the effects of pass-through revenue, and new contracts not ramping until next year, XELA reported a 5% y/y decline in revenue and management reduced the midpoint of FY19 revenue guidance by $80M. The focus remains on liquidity and free cash flow generation, which makes equity valuation difficult and we expect the stock to trade in line with the company's bonds."

212. 176.Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

### 6. 5. Exela Further Reduces 2019 Guidance Yet, Again Due ToCiting, In Part, Unpredictable Postage Revenue And Low Margin Client Exit In 3Q'18

177.On a November 12, 2019 earnings call, Cogburn noted, "[o]ur revenue, *excluding postage and postage handling* and our previously announced low-margin client exit, grew by 2.4% in the third quarter and is up 3.2% year-to-date…" Minimizing the impact of other low margin contracts the Company claimed to be exiting, Reynolds reported, "[r]evenue for our ITPS segment was $292 million, a decrease of 5% year-over-year from $307.3 million. *This decrease was driven primarily by the impact of the low-margin contract exit we had discussed in the third quarter of 2018,* along with a few customer contracts that got pushed to start later in this year."

213. 178.Reynolds announced the Company was lowering its 2019 guidance due to thisits unpredictable postage revenue:

> Taking into account our consolidated third quarter results, the *continued unpredictable nature of our revenue from postage*, a slower ramp of certain new projects and longer-than-expected sales cycles, we are updating our 2019 full year guidance. We now expect 2019 revenue of $1.55 billion to $1.56 billion and adjusted EBITDA of $255 million to $265 million.

214. 179.The Nuveen analyst on the call was dumb-founded by the Company's margin miss and EBITDA guidance reduction given that the postage revenue is 0 margin and the low margin contract was a known quantity:

> TRENT PORTER: …I find myself scratching my head again. The postage, I think, is 0 margin, and then the exit of the -- from the low-margin customer *was expected an unknown quantity.* So can you expand a little bit on kind of the major buckets of what's driving the margin miss versus your expectations? And then sort of tie into that, the margin decline year-over-year because I would think that the sort of the mix impact of exiting a low-margin account, all other things being equal, would have a positive impact on margin?

And then just sort of a follow-up to that same question, can you talk about just what's behind the slower ramp of projects in the longer sales cycle?

REYNOLDS: …The first question is really about the postage and pass-through costs. It is low-margin business*. It's just really not predictable for us*. And when that postage comes through, it will fluctuate significantly between quarters. *That's something we haven't been very good at predicting historically*, so we're working on improving that. But in one day, you can find out a month later that you're going to have a large job that requires to be delivered, which will show a lot of incremental revenue and no corresponding profit. So that's one aspect of the question. With respect to the low-margin contract we exited, we made -- we discussed it at length on our Q3 call, I think, again, in our Q4 call, that contract was a profitable contract for us. And as a result of us rebidding the contract, they were looking for -- we presented a digital solution which would have reduced our overall revenue but increased our margins from where they were. The customer was looking for more of an analog solution with a digital price. *So when we talk about the exit of the low- margin contract, it was profitable. But if we were to continue with that, we would have lost money under the contract*. And since we are for profit, we did not go forward with losing money on that contract, so we walked away from that contract. It had been with us for a period of time. And as we have contracts that have been with us longer, we put a lot of our technology, we've increased our productivity so it comes through at a higher margin.

With respect to the comment about the customers maybe not ramping fully, we're -- these are complex solutions. We have *decent visibility* into when they're going to hit based on our discussions with our ops people. But you're relying on multiple constituents from the customer that requires sign-offs, and those sign-offs take time. You're using your IT resources and others. So while the contracts are there, *it's not always easy to predict the exact time the contract will fully ramp*. We've been ramping new contracts throughout the year, but as a result of certain delays, some of them have not fully ramped.

TRENT PORTER: I understand. I think I'm having a hard time articulating my question. So my question is more -- I get it on the postage, it's almost -- it's very difficult to anticipate. It's going to be lumpy. But as I understand it, if you thought you're going to have $1 million and you've got $500 million, it's 0 margin, it's passthrough. So it's 0 margin business, so it shouldn't impact your EBITDA margin -- the EBITDA margin. It will impact the revenue, but not the margin that you had anticipated as a management team. And then the -- in addition, the loss of the customer or the exit from the customer business -- *I understand, I'm with you on that. It's just that, that was a known quantity to you*. So the -- that said, the miss on the earnings side is what I'm -- on the EBITDA margin side relative to your

Supp.App. 0110

expectations is what I'm having a hard time completely understanding. And maybe we can take it offline, but that's -- it's hard to articulate, I get it, but...

REYNOLDS: No, no, I hear you. I think that, also, we talked about one-time cost that impacted our SG&A. During the quarter, we had some unfavorable costs associated with legal and professional fees.

TRENT PORTER: *Weren't those an add back?*

REYNOLDS: So those things are one-time in nature that we didn't necessarily predict.

TRENT PORTER: Okay. I mean, were those not added back to EBITDA?

REYNOLDS: They were in the add backs, yes. I'm saying from a GAAP perspective.

TRENT PORTER: Right. Right. And so I guess, I mean, that there is -- for example, your EBITDA guidance for the year, it went down last quarter. And I'm not -- I hate to be a pain, it's just -- I want to make sure that I understand. The EBITDA guidance has gone down. And so -- and the EBITDA margin is down year-over-year. So I just want to better understand what's driving -- what was unfavorable? What is the unfavorable variance versus your budget, specifically on the EBITDA margin side?

REYNOLDS: So I think that's another thing we discussed on the call, and maybe it was missed, is that in Q3, we have Europe, which we have incremental cost where we're adding staff. Now 18% of our business overall in Europe -- is in Europe. And in the month of August, a lot of that business slows down, but we don't terminate people, obviously, we keep them on the payroll, and we have to hire incremental staff and temp help to get work done. So there was some of that, that we were not able to predict. But I appreciate the question and be more than happy to follow up offline.

215. 180. Cantor Fitzgerald issued a report on November 13, 2019 stating, "Quarterly top- line and bottom -line results reported below expectations. 2019 revenue guidance was lowered. The focus on the quarter was on the newly announced debt paydown and liquidity initiative with the goal of increasing liquidity $125-150 mn. The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time."

216. 181. Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at

$0.35 per share on November 13, 2019 on heavy volume, damaging investors.

217. 182. Shortly after, on November 19, 2019, Moody's issued a press release announcing it "downgraded Exela Intermediate LLC's (Exela) ratings, including its Corporate

Supp.App. 0111

Family Rating

to Caa3 from Caa1, Probability of Default Rating to Caa3-PD from Caa1-PD, and the instrument ratings on the company's senior secured first lien credit facilities and senior secured first lien notes to Caa3 from Caa1." It elaborated:

For nine months ending September 30, 2019, Exela's *optimization and restructuring charges increased to $59 million from $35 million for the same period last year*, and have been a consistent drag on cash flow from operations. Despite substantial restructuring spend, the company has been unable to stabilize free cash flow declines and gain much needed momentum in profitable growth since the close of the Novitex merger in July 2017. Exela reported a 1.9% decline in 3Q 2019 revenue on a constant revenue basis from 3Q 2018 and lowered its 2019 full-year revenue and 2019 EBITDA guidance by roughly 3% and 12%, respectively, citing slower ramp on new projects, longer than expected sales cycles and *unpredictable postage revenue*. Exela also took a $99.7 million non-cash goodwill and trade-name impairment charge, reflecting lower anticipated future earnings from its core business.

> In the third quarter 2019, Exela initiated a two-year debt reduction and liquidity improvement initiative aiming to increase liquidity through asset sales to approximately $125 to $150 million from $50 million currently. The company's focus on improving liquidity is credit positive because it will provide additional resources for debt reduction and investment. But the plan will take up to two years to execute and the amount of earnings disposed is not clear, and *the plan does not fully address the fundamental competitive challenge of turning around operations that have been demonstrating weak organic growth rates, declining profitability and negative free cash flows*.
> * * * The acceleration of the company's organic revenue declines and *growing restructuring and optimization charges reflect continued operating pressures*, which the company will be challenged to address given its negative free cash flow. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default. Proactively and cost- effectively addressing the expiration of the revolver in 2022 and the term loan and notes in 2023 will be difficult without an operational turnaround, and the step up in required term loan amortization to $20 million in 2020 will put additional strain on liquidity.

### 6. Appraisal Litigation Testimony Detailed Additional and Previously Unknown Issues about SourceHOV

163. On June 4th through 6th, 2019, Exela executives testified at the SourceHOV Appraisal Action. As discussed above, such testimony demonstrated SourceHOV's improper inclusion of expenses within SourceHOV's adjusted EBITDA.

a. **June 4, 2019: Day one of Appraisal Action Testimony.** On June 4th, the first day of testimony in the Appraisal Action, Exela SVP Verma testified that to properly include business and optimization expenses within adjusted EBITDA, such expenses were supposed to

be "one-time" in nature. More specifically he stated "and then, as you walk down below, the credit agreement lets you add back certain expenses *which are considered one-time and nonrecurring in nature*; for example, business optimization and fees and expenses incurred in connection with transactions."

i.Verma continued, "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement. And what that means is every cost that was *not part of the business as usual* has to be added back. There -- there's no black and white about it. So -- because you have to show an

EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

ii.During the same testimony, Verma even went so far as to testify that "the EBITDA definition *has to be held sacrosanct*. And what I mean by that is *every charges which are not a usual course of business* are added back to the EBITDA." Verma also testified to the importance that investors place on management's discretion in how they categorize EBITDA, stating, "And obviously, financial performance is a very important metric." He concluded that "EBITDA is a very important metric that is looked upon by all investors."

iii.Verma further testified that SourceHov had a motive to include optimization and restructuring addbacks because "it's basically in the company's interest to show an add-back." The reason it was in SourceHov's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is -- *which doesn't help the company*, from a -- from the perspective it was in, because it was in the market to raise the debt financing."

§.**June 5, 2019: Day two of Appraisal Action Testimony**. On the second day of Testimony in the Appraisal Action, it was revealed for the first time publicly that Wall Street titan, Goldman Sachs, also keyed in on problematic adjusted EBITDA addback practices at SourceHOV. For example, on October 27, 2016, Whit Graham at Goldman Sachs & Co. Inc. ("Goldman") emailed several SourceHOV executives and concluded that, based on the trading levels of SourceHOV's debt, that SourceHOV's equity value was "zero."

i. Goldman's conclusion that SourceHOV's valuation was so low was informed by its assessment that SourceHOV was "adversely impacted by historical perceptions around revenue growth *and EBITDA add-backs*, a concentrated investor base and a lack of public information, among [others] ...." (emphasis added).

ii. In addition to Goldman concluding that SourceHOV's equity was assessed to be worthless as recently as late 2016, Chadha testified on June 5th that he felt SourceHOV equity was worthless at the time leading up to the Business Combination.

iii. Chadha also described the situation facing SourceHOV as "dire", in part because in late 2016 "most of our large customers, banks and insurance companies, were not really willing to give us new business, and were considering whether they should take some of the business back and give it to others."

y. **June 6, 2019: Day Three of the Appraisal Action testimony**. On the third day of the Appraisal Action, SourceHOV's expert witness, Greg Jarrell. Jarrell testified that the way SourceHOV categorized its adjusted EBITDA addbacks was a "negative checkmark of reliability" because "that *there seemed to be a more-than-normal amount of add-backs*."

i. Jarrell further testified that SourceHOV's adjusted EBITDA adjustments "don't look to be so nonrecurring." More specifically, he testified that "And they're supposed to be nonrecurring expenses, and I don't know. I seem to see the same expenses year after year after year. So I -- my impression was, jeez, they don't look to be so nonrecurring. But I understand what they're doing. It's a -- it's done a lot. It's not consistent with GAAP, but financial people do this."

i. Jarrell acknowledged that "financial people do this", He testified that "It struck me [as] an important negative -- negative checkmark of reliability is the fact that *there seemed to be a more-than-normal amount of add-backs*. And it's just -- it's a consideration, it's a factor, and it's a negative."

ii. The following exchange between the Court of Chancery and SourceHOV's expert clarifies what Jarrell meant:

THE COURT: So was it within the realm of discretion, for

you to do a proper evaluation, for you to have made adjustments to those projections to account for that before you began your analysis?

THE WITNESS: No. No. I don't -- I wouldn't go that far, because this -- this practice of adding back *nonrecurring* expenses is ubiquitous in the financial community. And public companies, you know, you see it all the time.

They refer to this is a non-GAAP number. That's what they mean. They mean that we've taken a real number and we've

added things back, because when we go to project, this should improve our -- our ability to project, because, you know, we've taken out things that will *not recur*. If you really did take out things that did not recur, that's a good thing to do, in terms of trying to create better projections. That's a good thing. *If you overdo that, for whatever reason -- who knows what motive, but if you overdo that, then that's a bad thing*.

183. In addition to SourceHOV's own expert witness taking issue with the addbacks being added to SourceHOV's adjusted EBITDA, the Court of Chancery also heard that "there was some reaction from professionals that were sort of consistent with [Jarrell's] reaction." "You know, *'inflated with less than credible adjustments'* is a comment from a Morgan Stanley person in February. News story that circulated within Morgan Stanley."

184. The Morgan Stanley criticism of SourceHOV's adjusted EBITDA addback practices refers to a June 30, 2017 email by Morgan Stanley investment bankers who, in the same email, also described SourceHOV's adjusted EBITDA figures as being "egregious," stating, "When you see so many adjustments, it just starts getting egregious. We just put our pencils down."

### 7. Exela Announces Delay Of 2019 Form 2019 10-K Filing And RestatementThe Need To Restate

218. 185. On March 16, 2020, Exela issued a press release announcing that it had "postponed its earnings release and conference call due to the delayed filing of its Form 10-K for the year- ended December 31, 2019, and the need to restate certain of its historical financial statements."

219. 186. On March 17, 2020, the Company filed a Form 8-K which noted that on

January 30, 2020 the Delaware Chancery of Court had ruled in the Appraisal ~~litigation~~Action

finding that "the fair

value of SourceHOV as of the Closing Date was $4,591 per share" and SourceHOV's motion for reconsideration was denied on March 11, 2020.

220.    187. The Form 8-K also revealed:

After evaluating the current and historical accounting treatment of the Appraisal Action with the Company's independent registered public accounting firm, KPMG, the Company has determined that its historical accounting was in error and the obligation to pay the fair market value of the former stockholders' shares represented an obligation as of the date the Appraisal Action was submitted in September 2017. ***The liability should have been recorded in 2017*** at the fair value of the shares tendered. Additionally, during the second half of 2019, we reimbursed approximately $4.5 million with respect to professional fees and expenses for secondary offerings by a related party pursuant to the terms of the Consent, Waiver and Amendment dated June 15, 2017, amending the Business Combination Agreement, dated February 21, 2017. Approximately $2.4 million of these expenses should have been recorded in 2018. During the second half of 2019, the Company made payments of $4.6 million on behalf of certain employees that were holders of Restricted Stock Units in Ex-Sigma 2, LLC for which the Company incurred compensation expense and paid $5.7 million in the fourth quarter on behalf of a related party associated with the PIPE Financing (as defined in the Consent, Waiver and Amendment). We are still evaluating the purpose and nature of the PIPE Financing related payments, their legal significance, the appropriate accounting treatment, and whether any obligation with respect to those payments should have been recorded in a prior period.

> ***As such, we will restate our financial statements for the years ended December 31, 2017 and 2018 and the interim periods through September 30, 2019 (which will be addressed in our Form 10-K for the year ended December 31, 2019), to record liabilities ranging from $36 to $43 million as of December 31, 2017, and accruing interest thereon at a rate set by the Delaware Court of Chancery from time to time, associated with its potential obligations related to the Appraisal Action***. Additionally, the proposed accounting will reduce the number of shares outstanding by 4,568,862 shares for purposes of the weighted average shares outstanding used to calculate basic and diluted loss per share during the respective periods. Accordingly, the aforementioned financial statements should not be relied upon. Independent of the preceding, we also determined that the operating cash flows were understated and financing cash flows overstated in the statement of cash flows by $35 million for the year ended December 31, 2017, as a result of the misapplication of a new accounting standard on a retrospective basis within our 2018 Form 10-K.

221.    While these revelations provided further insight into the Company's balance sheet, the market had already partially accounted for the Company's liquidity and cash flow issues. Exela's stock fell $0.05 per share, or 27.1 23.0%, to close at $0.15 per share on March 18, 2020 on heavy volume.

### 8. Post-Class Period Disclosures

222. On April 3, 2020 Exela received a notice from NASDAQ that the Company was in violation of the NASDAQ rule requiring a $1.00 bid price for continued listing on the NASDAQ exchange.

223. 188. On June 9, 2020, Exela filed its Form 10-K for 2019 containing the restated financial results (the "Restatement"). The restatement Restatement impacted several areas of Exela's financial statements including (a) its balance sheets for the periods ending December 31, 2017 and 2018, respectively; (b) its MD&A for the same periods; (c) it's Selected Financial Data for the same periods; and (d) its quarterly results for the first three quarters of 2019.

189. The restatement corrects Restatement corrected several errors that had been presented in Exela's prior financial statements. These errors include the understatement of a liability related to the Appraisal Action of $43.1 million, $40.6 million, and $37.8 million, for the periods ending December 31, 2019, December 31, 2018, and December 31, 2017, respectively. The difference between the years has to do with the accrued interest associated with the appraisal award.

224. 190. That accrued but not expensed interest associated with the liability, also had the effect of overstating Exela's income (or understating the loss) by $2.4 million, $2.9 million, and $1.2 million, during the years ended December 31, 2019, December 31, 2018, and December 31, 2017, respectively.

225. 191. Apart from the liability related to the Appraisal Action, management also restated its income statement to reflect that the prior financial statements had also overstated Exela's income (or understated its loss) by $5.3 million for the nine months ended September 30, 2019 due to Exela's improper capitalization of costs. In other words, Exela capitalized $5.3 million in unrecorded related party expenses, which should have been expensed in the first instance. And had these costs been properly expensed at the outset, Exela's income would have declined more than it reported for the nine months ended September 30, 2019.

226. 192. For the period ended December 31, 2018, Exela corrected a $3.2 million overstatement of loss.

227.   193. The restatement Restatement also revealed that Exela understated its loss by $4.8 million for the year ended 2017 due to its improperly recognizing revenue of $6.4 million (and improperly expensing $1.6 million associated with that revenue) related to "a multiple element arrangement that included a software license where vendor specific objective evidence (VSOE) of fair value was not established for the undelivered elements of the arrangement."

228.   194. The restated results Restatement revealed that had the Company's accounting been correct, it would not have met its adjusted EBITDA guidance for fiscal year 2017 or 2018. While the Company Exela did not provide quarterly guidance, it had missed the street consensus for adjusted EBITDA in 2Q'19 and 3Q'19, as well as, estimates of several analysts for 1Q'19.⁶ 19.

| | 2017 Guidance | 2017 Reported | 2017 Restated | 2018 Guidance | 2018 Reported | 2018 Restated |
|---|---|---|---|---|---|---|
| **Adjusted EBITDA** | $245M–$260M | $245.2M | $203.99M | $280M – $Initial range: 295 – 310 Reduced range: 280 – 290M | $283.8M | $276.18M 276.2 |
| **O&R Expense** | Not provided | $42.5M | $42.5M | Not provided 20 - 25¹⁷ | $68.2M | $54.2M |
| **Adjusted EBITDA ex. O&R addback** EBITDA ex. O&R addback | Not provided | $202.7M | $158.5M | Not N/A | $215.6M | $221.9M |

| Percentage change in Adj. EBITDA Ex. O&R addback | ~~Not~~ | ~~-17.3%~~ | ~~-22.3%~~ | ~~Not~~N/A | ~~-24.0~~23.8% | -19.6% |
|---|---|---|---|---|---|---|
| ~~change in~~ | | ~~measurable~~ | | | | |
| ~~Adj.~~ | | | | | | |
| ~~EBITDA~~ | | | | | | |
| ~~Ex. O&R~~ | | | | | | |
| ~~addback~~ | | | | | | |

229. ~~195.~~The Company also revealed its revenues attributable to postage and postage handling and the LMCE for 2019 and 2018, which together accounted for $338.1 million and $277.4 million respectively. These revenues, which the Company described as unpredictable, amounted to more that 21% of the Company's restated 2018 revenue, and approximately 18% of its 2019 revenue, refuting the Company's assertions throughout the Class Period that it had visibility into over 90% of its revenue.

230. ~~196.~~The 2019 10-K indicated that revenue had declined 23.9 million of 1.5% for the year and stated that "[t]his decrease is primarily related to a decrease in our ITPS segment revenues of $39.4 million and LLPS segment revenue of $13.2 million….ITPS—Revenues decreased $39.4 million, or 3.1%, to $1,234.3 million for the year ended December 31, 2019 compared to $1,273.6 million for the year ended December 31, 2018. The decrease was primarily attributable to the low

---

[17] Provided on March 15, 2018 during the Company's Q4 2017 earnings call.

margin contract exit in the third quarter of 2018 and adverse currency impact that was offset partially by the revenue from acquisitions completed in 2018."

231. ~~197.~~The ~~Company held an earnings call the same day where the Company's newly appointed CFO, Shrikant Sortur ("Sortur"), stated, "we are increasing our focus in 2020 on *exiting certain underperforming contracts with a little or no margin contribution*."~~2019 10-K also revealed that the Company identified numerous additional internal control deficiencies including material weaknesses[18] such as insufficient "oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting'" and a "risk assessment process [that] failed to identify and assess risks of misstatement, including fraud risks, to ensure controls were designed and implemented to respond to those risks".

~~[7] O&R refers to business optimization and restructuring charges.~~

~~198.Weeks later on June 30, 2020 the Company held an earnings call to discuss its 1Q'20 financial results. Cogburn stated, "Our first quarter revenue performance mainly reflects our exit from certain customer contracts and statements of work which are not strategic to the fit for Exela's vision." Cogburn revealed that as of January 1, 2020 the Company had $150 million of "transition revenue" which referred to these low margin contracts with unpredictable nonrecurring revenue and no path to digital transformation or automation:~~

> ~~*[W]e're aligning ourselves away from unpredictable nonrecurring revenue that is unlikely to achieve our long-term margin targets.* During 2020, we will continue to exit certain contracts and statements of work with little or no margin contribution and *no opportunity to improve their contribution through digital transformation and automation. We refer to revenues from these contracts as transition revenue. As of January 1, we had approximately $150 million of annual transition revenue that we will exit over the course of this year.* And as such, we will continue to absorb this transition in our top line growth metrics. However, it's important to note that declining~~

---

[18] According to the Company's own admission, a material weakness is "a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis."

transition revenue is also expected to have a positive impact on our gross margin profile.

199. Sortur noted on the June 2020 Call that ITPS revenue had declined 12.6% "was primarily driven by our transition revenue as we exited contracts and statements of work that were nonstrategic to our long-term vision, are unlikely to achieve our long-term target margins."

200. Sortur also revealed that the Company would continue to be impacted in subsequent quarters due to "stranded costs associated with the transition revenue." An analyst on the call asked to "drill a little bit further on the stranded cost" and Sortur answered:

> I will give you a directional answer here. As you know, there's a timing element involved, right, as the revenue trends drop off, the cost comes off later. And one of the reasons we call this stranded cost is not only there's 100% of the variable costs do not go out in line with the revenue decline, number two, there's a fixed cost element involved, right? That's one key thing to keep in mind.

> If I were to give you a direct answer, we estimate -- internal estimates are anywhere from 2% to 3% of stranded costs that are still in the system. The way I look at it if you look at Q1 versus -- Q1 '20 versus Q1 '19, 23% margins versus 20% margins, granted revenue was down, we should have adjusted cost down as well. It's not happened quick enough. So simple terms, 2% to 3% of stranded costs in the quarter are still in there. Broader terms, ***we need to do a lot more to get the margins back up*** to where it was historically.

201. An analyst inquired "what [are] the actual services [] within transactional revenue?... What is the stranded cost opportunity associated with that or what is the EBITDA contribution from those transitional revenues?" Sortur replied:

> What we kind of want to look at more closely is the ***unpredictable, nonrecurring or any customer return or margin*** -- customer margins that's unlikely to achieve our long-term margins, right? That's why I kind of pivoted it back to a couple of things that we have talked about in the recent past.

> Take out our LMCE revenue -- postage LMCE revenue, actually, we have revenue growth. Impact of low margin on our business is continuing to create a margin compression, and we need to reverse that, right? So that's -- so when I kind of summarize this, transition revenue is nothing but we -- us looking at customers -- customer margins or areas where we need to start pushing for more margin improvement. If it doesn't make sense for the business, it's better that we exit it, focus on the margins, focus on the margin dollars. So if you ask me what industry, what bucket, what customer, I don't think we have that kind of a categorization as such to talk about, at least not on this call.

> Stranded cost, again, it's more of a term that we are using here to indicate that when there is a revenue decline, the variable cost is not 100% relatable to it in the same month, same quarter. It comes off, but slower than the revenue drop, number one. Number two, we also have an element of fixed cost that has to come out eventually,

whether we call it facility consolidations, looking at the way we work, managing capacity, it's a much bigger exercise.

* * *

* It's really headcount and capacity management.

202. After repeatedly touting its visibility into its predictable recurring revenues, and its ability to automate its existing customer base and increase margins, the Company finally admitted that for a substantial portion of these existing customers there was "no opportunity to improve their contribution through digital transformation and automation." These revelations revealed the true extent to which the Company had been obscuring its margins and organic revenue growth.

203. On August 10, 2020, the Company filed a Form 10-Q for 2Q'20, revealing the ongoing impact of unpredictable, nonrecurring low margin transition revenue on the Company's performance:

> For the three months ended June 30, 2020, revenue attributable to our ITPS segment decreased by $66.8 million, or 21.6% compared to the same period in the prior year. The majority of this revenue decline is attributable to exiting contracts and statements of work in late 2019 from certain customers with revenue that we believe was unpredictable, non-recurring and were not a strategic fit to Company's long-term success or unlikely to achieve the Company's long-term target margins ("transition revenue") in addition to lower transaction volumes as a result of COVID-19.
> * * * For the six months ended June 30, 2020, revenue attributable to our ITPS segment decreased by $107.9 million, or 17.0% compared to the same period in the prior year. The majority of this revenue decline is attributable to exiting contracts and statements of work

> in late 2019 from certain customers with revenue that we believe was unpredictable, non-recurring and were not a strategic fit to Company's long-term success or unlikely to achieve the Company's long-term target margins ("transition revenue") in addition to lower transaction volumes during the three months ended June 30, 2019 as a result of COVID-19.

232. On October 13, 2020, with its stock price still below $1.00 (hovering at around $0.40), Exela obtained an extension from NASDAQ to come into compliance with the $1.00 bid price listing requirement.

233. Finally, on January 25, 2021, Exela announced a 1-for-3 reverse stock split of the Company's stock in order to regain compliance with NASDAQ's listing requirements. As a result of the reverse split, each three shares of the Company's issued and outstanding common stock was automatically combined and converted into one issued and outstanding share of

common stock.

VI. **DEFENDANTS' MATERIALLY FALSE AND/OR MISLEADING STATEMENTS ISSUED DURING THE CLASS PERIOD**

A. **Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2017 10-K**

234.    ~~204.~~On March 16, 2018, Exela filed ~~a~~its Form 10-K for the year ending December 31, 2017. The Company reported:

*Revenue*

Our revenue increased $362.4 million, or 45.9%, to $1,152.3 million for the year ended December 31, 2017 compared to $789.9 million for the year ended December 31, 2016. This increase is primarily related to an increase in our ITPS segment revenues of

$387.2 million, which was primarily attributable to the acquisition of TransCentra in 2016 and Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $14.2 million and $10.6 million, respectively. Our ITPS, HS, and LLPS segments constituted 71.8%, 20.3%, and 7.9% of our total revenue, respectively, for the year ended December 31, 2017, compared to 55.7%, 31.4%, and 12.9%, respectively, for the year ended December 31, 2016.

* * *

### EBITDA and Adjusted EBITDA

EBITDA was $(37.2) million for the year ended December 31, 2017 compared to $129.2 million for the year ended December 31, 2016. Adjusted EBITDA was $208.8 million for the year ended December 31, 2017 compared to $173.2 million for the year ended December 31, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the year ended December 31, 2017 resulting from an increase in selling, general and administrative expenses, related party expense, and loss on extinguishment of debt compared to the year ended December 31, 2016. The increase in Adjusted EBITDA was primarily due higher overall gross profit for the year ended December 31, 2017 compared to the year ended December 31, 2016, along with lower recurring expenses as part of on-going operations.

235. 205. The 2017 10-K stated:

**Other Financial Information (Non-GAAP Financial Measures)**

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integration costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

We present EBITDA and Adjusted EBITDA because we believe they provide useful information regarding the factors and trends affecting our business in addition to measures calculated under GAAP. Additionally, our credit agreement requires us to comply with certain EBITDA related metrics. Refer to "— Liquidity and Capital Resources — Indebtedness."

*Note Regarding Non-GAAP Financial Measures*

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. These non-GAAP financial measures are not required to be uniformly applied, are not audited and should not be considered in isolation or as substitutes for results prepared in accordance with GAAP. Because EBITDA and Adjusted

EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility. 206. The statements in ¶¶204-205 were Form 10-K was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the following reasons: (i) the Company's failure Exela failed to account for liability for the Appraisal litigation and other fraudulent accounting that was revealed by the Restatement resulted in Exela overstating adjusted EBITDA (*see supra* ¶¶188-195) and which was - even absent the Restatement - not indicative of Exela's normalized, or steady-state earnings; (ii) the Company related to the Appraisal Action, which Defendants admitted should have been recorded at the amount of the fair value of the Manichean shares tendered when appraisal action was filed in 2017, and Defendants thus materially understated Exela's liability by $37.8 million in 2017 as a result; (ii) Exela's adjusted EBITDA did not just add back "non-routine" one-time costs, but rather Exela excluded (or added back) routine and ongoing operating costs from to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's omission of the Appraisal Action liability as well as the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2017 Form 10-K.

207. The 2017 10-K stated, "With the increased scale resulting from our Business Combination in July 2017, we are poised to expand relationships with existing customers and realize substantial synergies."

236. 208. The 2017 10-K further stated, "For the fiscal year ended December 31, 2017, we generated $1,152.3 million of revenue of *which approximately 90% is recurring in nature and supported by long-term customer contracts*."

237. 209. The 2017 10-K also stated:

We serve over 3,500 customers across a variety of industries, including over 60% of the Fortune® 100. We believe our customers are among the leading players in their respective industries, and many of them are recurring customers that have maintained long-term relationships with us and our predecessor companies.

> ***We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins***. Customers are increasingly turning to us due to a demonstrated ability to work on large- scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our ***stable base of customers and sticky, long-term relationships lead to highly predictable revenues***.
>
> \* \* \*
>
> ~~We maintain a strong mix of diversified customers with low customer concentration. No customer accounts for more than 10% of 2017 revenue. The diversity of our customer base has contributed to the stability and predictability of our revenue streams and cash flows. We have been able to effectively balance our customer mix and reduce dependency on any single customer or vertical by penetrating a diverse set of end markets.~~

~~210.~~ ~~The 2017 10-K stated:~~

~~In July 2017, we completed~~ the Business Combination. ~~SourceHOV was deemed to be the accounting acquirer, and is a leading provider of platform-based enterprise information management and transaction processing solutions primarily for the healthcare, banking and financial services, commercial, public sector and legal industries. Through the acquisition of SourceHOV and Novitex, we expect to realize revenue synergies, leverage brand awareness, strengthen margins, generate greater free cash flow, expand the existing Novitex sales channels, and increase utilization of the existing workforce. We anticipate opportunities for growth through the ability to leverage additional future services and capabilities.~~

238. ~~211.~~ The statements in ¶¶~~207-210~~ 239 - 241 were materially false and/or misleading when made and/or omitted ~~to state~~ material facts necessary to make the statement not misleading, because: (i) ~~a substantial portion of the existing customers had no path to digital transformation or automation;(ii)~~ approximately ~~20~~90% of the Company's revenue ~~and~~ was not predictable or recurring; ~~(iii) exiting these contracts resulted in stranded costs that would further compress margins; and (iv) obscured the~~rather, as Defendants admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.~~ (see supra Section V.C.8)~~

239.    Regarding the Appraisal Action, the 2017 10-K also stated:

In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). The parties have commenced discovery. At this stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action *or estimate any loss or range of loss that may arise from the Appraisal Action*.

240.    And regarding its loss contingencies, the 2017 10-K also stated:

**Loss Contingencies**
        The Company reviews the status of each significant matter, if any, and assess its potential financial exposure considering all available information including, but not limited to, the impact of negotiations, settlements, rulings, advice of legal counsel and other updated information and events pertaining to a particular matter. *If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss.* Significant judgment is

required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Because of uncertainties related to loss contingencies, accruals are based only on the best information available at the time. As additional information becomes available, the Company reassesses the potential liability related to its pending claims and litigation, and may revise its estimates. These revisions in the estimates of the potential liabilities could have a material impact on the results of operations and financial position. The Company's liabilities exclude any estimates for legal costs not yet incurred associated with handling these matters.

241.     The statement claiming that Exela was unable to "estimate any loss or range of loss" was false and misleading because prior to the filing of the 2017 Form 10-K on March 16, 2018, Exela had itself estimated the value of SourceHOV (and, thus, estimated Exela's potential liability) at the time of the Merger. For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was Chair and Reynolds was Co-Chair—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested back in February 2017. Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million. Finally, by January 2018, Chadha requested an updated (and "backdated") valuation of SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action. For substantially similar reasons, including that the Appraisal Action liability was probable and had already been reasonably estimated by the time that Exela issued its form 10-K for the year ended 2017. The Company's statements identified above related to Loss Contingencies are similarly false and/or misleading and/or failed to state material facts. In sum, prior to the filing of the 2017 Form 10-K, Defendants could, and did, estimate Exela's potential liability associated with the Appraisal Action, and they certainly had enough information from which they could estimate a range of Exela's potential liability.

242.     In its Investor Presentation accompanying the Company's 4Q 2017 and FY 2017 results, Exela stated the following about its O&R expenses:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature

of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

243. The foregoing statement about O&R expenses in the Investor Presentation was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA.

**B. Defendants' False and Misleading Statements and Omissions Relating To ~~Its~~Exela's April 13, 2018 Secondary Offering**

~~212.~~On April, 13 2018, Exela filed a Prospectus Supplement to its Prospectus dated October 2, 2017 wherein Exela offered equity securities on behalf of Ex-Sigma 2, LLC for 7 million shares of Exela common stock. The Prospectus stated, "we generated $1,152.3 million of revenue of which *approximately 90% is recurring in nature and supported by long-term customer contracts*."

244. ~~213.~~The ~~Prospectus Supplement also stated, "We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing customer relationships, pursuing new customer opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise."~~ ~~214.~~The ~~statements in ¶¶212-213 were~~foregoing statement was materially false and/or misleading ~~when made~~ and/or omitted ~~to state~~ material facts necessary to make the statement not misleading ~~for the reasons stated in ¶211.~~, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**C. Defendants' False and Misleading Statements and Omissions Relating To Its 1Q'18 Financial Results**

245. ~~215.~~On May ~~11,~~10, 2018, Exela issued a press release and filed a ~~form~~Form 8-K, signed by Reynolds ~~that included as Exhibit 99, a press release dated May 11, 2018. The May 11, 2018 press release reported~~, reporting Exela's 1Q 2018 financial results, including adjusted EBITDA of $69.6 million. The press release further stated:

Adjusted EBITDA: Adjusted EBITDA was $69.6 million, an increase of 10.9% when compared to pro forma Adjusted EBITDA of $62.7 million in the first quarter of 2017.

The increase in first quarter 2018 Adjusted EBITDA was primarily driven by revenue growth and the impact of the Company's cost savings initiatives, partially offset by ramp-up costs

associated with new ITPS client contracts, investments in the Company's revenue growth initiatives, and higher public company costs.

246. 216. Additionally, the May 10, 2018 press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

247. 217. The description of adjusted EBITDA within the press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

218. The statements in ¶¶215-217 251- 253 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206. material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

248. 219. On its Exela's earnings call following the same reporting period, held on May 10, 2018, Defendant Cogburn stated, "Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA."

220. This statement in ¶219 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206. 221. Cogburn similarly stated on the call, "We have a high degree of revenue visibility.… The level of visibility gives us confidence in our ability to accurately forecast the

trajectory of our business, going forward. We also have a high renewal rate on strategic accounts, over 95%...”

Supp.App. 0134

249. 222.Similarly, Reynolds further stated that 90% visibility and 95% renewal rates gave them confidence to raise guidance:

> JOSEPH DEAN FORESI: I wanted to ask about obviously the raise in guidance on the top line. Maybe you can just talk about the drivers and what is giving you the confidence to raise that guidance. And are there any onetime projects that are taking off or you're starting to get a boost from in the numbers, and how does that flow through the year?

> REYNOLDS: …*If you think about our business and our contracts, they're long-term in nature, right*? They're typically three to five years, and we have over 95% renewal rates. So *we have good visibility into our revenue, typically just over 90% at any point in time*. If you look at the numbers we delivered in the first quarter, we're very pleased with the results, and we continue to believe we're on the right trajectory. Ron talked about the large contract on the last call, which is starting to ramp up. So we feel really good from a top line perspective, and thought it made sense to increase the guidance, given that fact.

> 223.Reynolds told an analyst the integration and conversion would be completed by October 2018:

> > BRAD ELLIOTT: And then, Jim, in your prepared remarks, you said that the full integration and the conversion was about 12 to 15 months. Is that from the deal closing in July, or is that kind of where you stand now?

> > REYNOLDS: I would say from that perspective, it's from when the deal closed. We're working hard on the back half of this year, and there'll be incremental work to do into

> > 2019. But if you remember, some of these we're dealing with large customers that we have to work with their IT departments, their CTOs when we start to move around some of the technology. So we're ready to move as quick as it makes sense with our customers. So those are the types of things, things like headcount, vendor saves, those move a lot quicker, obviously.

250. 224.A Credit Suisse analyst specifically inquired whether postage revenue was responsible in part for the disconnect between revenues and margins:

> ARUN A. SESHADRI: …First, I just wanted to understand, *obviously nice revenue growth in the quarter, but it looked like gross profit actually declined*. I just wanted to understand how that happened, whether there were any ramp-up costs, et cetera. And then also, *what was the impact of postage in the numbers*?

> REYNOLDS: So if you take a look, *we don't really look at it on a gross margin basis* because we have a lot of business optimization cost flowing through. *We focus on an EBITDA perspective*. It's a better measure at this point in time. We incurred $14.5 million in optimization, of which I would say somewhere about 75%, 80%, give or take,

runs through cost of sales. So that's kind of the overall breakout. We were pleased with the SG&A decrease. We're going to continue to work on these cost savings, and as you can see, what we're looking at doing, we feel highly confident things we control with a majority within the headcount area. And then with respect to your comment on postage, we don't really break out postage separately. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue.

251. 225. The statements in ¶¶221-224 255-257 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211., because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which

Supp.App. 0136

misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**D. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 2Q'18 Financial Results**

252. ~~226.~~On August ~~10, 2018, Exela filed a form 8-F, signed by Reynolds. Attached as Exhibit 99 to the same was a press release dated August 9, 2018 wherein~~ 9, 2018, Exela reported its 2Q 2018 financial results.~~227.In the August 9, 2018 press release, Exela reported adjusted EBITDA of $70.1 million. The press release further stated:~~ In its press release announcing the results, it stated:

Adjusted EBITDA: Adjusted EBITDA was $70.1 million, an increase of 9.0% when compared to pro forma Adjusted EBITDA of $64.3 million in the second quarter of 2017. The increase in second quarter 2018 Adjusted EBITDA was primarily driven by revenue growth and the impact of the Company's cost savings initiatives, partially offset by investments in the Company's revenue growth initiatives, and higher public company costs

253. ~~228.~~Additionally, the August 9, 2018 press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*." ~~It also contained the same language as that referred to in ¶216 above, referring to optimization & restructuring not reflecting "~~

254. The description of adjusted EBITDA within the August 9, 2018 press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combina tion completed on July 12, 2017. All of these costs are variable and dependent up on the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclud e these charges since we do not believe they truly reflect our* past, cur rent or future operating performance."
>
> ~~229.Also on the 2Q 2018 earnings call, Reynolds assured investors that "our job is~~

to mi ni mize the adjustments" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will — and the percentage of adjustments will shrink in the future."

255. 230. The statements in ¶¶226-229 259-261 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not for the reasons stated in misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not ¶206.

231. Also on the August 9, 2018 earnings call, Cogburn indicated that interest in digitization and automation from existing customers was increasing and resulting a strong backlog, which would lead increased margin and revenue growth, expressing confidence in the Company's revenue projections:

With our customer interest increasing and the expanded white space opportunities, our contracted backlog is increasing as well and the mix is favorable, changing in line with the execution of our business strategy. We have a high renewal rate, which further demonstrates our effectiveness in taking our customers on their digital and business transformational journey. With our quarterly results, strong backlog and high renewal rate, we are confident in the top line trajectory of the business going forward…. Our strategy, which is to provide business process automation services to all of our customers, positions us for long-term growth.

* * *

Using the power of our technology and recognizing the potential with BPA, many of our existing customers are now reanalyzing their on-site BPO business. The interest from customers has broadened, and this also includes interest in our platforms like print shop, digital mailroom, front-office automation and digital lockers.

The results of this strategy puts us in a unique position amongst our peer group. This essentially demonstrates that we are able to grow the revenue faster with a much lower — or slower variable cost increase. Put in other words, the growth in the revenue exceeds the growth in the variable cost in the form of headcount needed to service the revenue. As a direct result, we expect our revenue per FTE to continue to climb. The strategy drives the growth in revenue per FTE from about $18,000 per FTE a decade ago to over $70,000 per FTE currently.

232. Reynolds stated on the August 2018 Call:

[O]ur Q2 and half-year performance, we have ramped up a few big deals won late in 2017 and early this year, which is evident in our top line growth. We are expecting the big deals will migrate towards normal margins in the next few quarters along with the savings actions being executed in parallel. This will give us the gross margin lift that, in turn, will translate into higher EBITDA.

\* \* \*

We reported operating income of $11.9 million, an increase of $1.9 million on a year-over- year basis. Our operating income results were driven by revenue growth offset by higher cost of revenue, which was driven by the impact of ramp-ups of large contracts offset by flow-through cost savings initiatives and lower SG&A.

233. The Credit Suisse analyst on the call noted that while revenue had grown, profit had declined, and asked what the impact of Asterion was on margin. Reynolds indicated that Asterion margins were low, but assured the Company's margins would expand:

ARUN A. SESHADRI: …And then I just wanted to understand, as far as the sequential progression goes, your revenue kind of grew nicely on a sequential basis between $93 million to $410 million. But it looks like both gross profit and, I guess, cash EBITDA both declined sequentially. Just wanted to understand, is there any way you could parse sort of why that's happening and what the impact of the Asterion business was on a margin basis?

REYNOLDS: Yes. So we haven't really broken it down between Asterion but, obviously, with the amount we paid, **_Asterion did not have a significant margin_**, if you know what I mean. But it was really strategic to us to bring that back and expand our European operations.… Because we had great success last year and into this year, we had a large amount of revenue come through at very little margin. So as we ramp up, you're going to continue to see the revenue grow, those costs come out, and we will expand. Usually, revenue comes first and then -- on these large contracts, and then the margins will expand over time. We're very pleased though with the top line growth.

indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

256. In an investor presentation, that was also published on Exela's website on August

9, 2018, the Company stated that:

> Exela's board of directors and management use EBITDA, Adjusted EBITDA, and Further Adjusted EBITDA, to assess Exela's financial performance, because it allows them to compare Exela's operating performance on a consistent basis across periods by removing the effects of Exela's capital structure (such as varying levels of debt and interest expense, as well as transaction costs resulting from the Business Combination and other such capital markets based activities. Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the Business Combination, asset base (such as depreciation and amortization) and ***other similar non-routine items outside the control of our management team.*** . . . Optimization and restructuring expenses and merger adjustments ***are primarily related to the implementation of strategic actions and initiatives related to the Business Combination***. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, ***we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.***

> **234.** Reynolds addressed an analyst question about anticipated margin growth:

> JOSEPH DEAN FORESI: Got it. And maybe you could talk about what the next 2 quarters look like because, with your annual guidance, that would imply a considerable ramp in the margins over the next 2 quarters. So what do those look like from, I guess, a restructuring

> 257.     The statements in ¶ 263 were materially false and/or misleading and/or omitted

material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and

(iii)    the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings and Reynolds represented that he was "highly confident" that Defendants could control the headcount expense in the conference call just one quarter prior.

perspective? And how should we expect those margins to improve? What are your levers there?

REYNOLDS: Yes. So if you look, Joe, we've ramped some large customer contracts which incur significant costs and sometimes duplicate costs. As we move further out into the contracts, the ramp becomes steady-state, so those margins will improve over time. For the second half of the year, if you look at where we are year-to-date on an adjusted EBITDA, we're going to have a significant increase to hit our guidance, which we're very comfortable with.

235. The statements in ¶¶231-234 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

236. Reynolds also stated:

258. The same day, the Company held its 2Q 2018 earnings call wherein Reynolds stated the following about Exela's EBITDA, adjusted EBITDA, and O&R expense addbacks:

> We continue to convert our savings actions over the quarter into EBITDA. Our adjusted EBITDA increased by 9% to $70.1 million in Q2 of 2018 compared with $64.3 million in 02 of 2017. This increase in EBITDA was partially offset by duplicate ramp costs incurred that we are no longer able to capitalize in 2018 under ASC 606. This makes our margin to appear weaker during the initial phase of ramp. This decrease is also reflected in our CapEx comparisons year-over-year as there is approximately $2 million more of expense in the P&L in 022018, which would have been historically capitalized.
>
> * * *
>
> Looking at the adjustments to EBITDA. We had a decrease of $6.5 million in transaction- related expenses in 02 2018 compared to 02 2017. These costs were incurred as a result of the business combination in July of 2017. Optimization and restructuring expenses were up $2.8 million in Q2 2018 and are part of our plan in delivering $40 million to $45 million in flow-through P&L benefits in 2018. We will continue to identify and invest in achieving these savings.
>
> The total optimization and restructuring expenses have not changed. Year-to-date, we have already incurred $27.5 million. The second half of 2018 and future quarter amounts will depend on the rate of conversion of these savings.

259. Also on the 2Q 2018 earnings call, Reynolds assured investors that "***our job is to minimize the adjustments***" and further noted that "as we continue to convert the savings, our GAAP EBITDA will expand and adjusted EBITDA will – and the percentage of adjustments will shrink in the future."

260. Addressing an analyst question about Exela's next two quarters and the Company's 2019 guidance, Reynolds pointed to "adjusted EBITDA" to assure the market that

Defendants were "very comfortable" with the Company's 2019 guidance:

> JOSEPH DEAN FORESI: Got it. And maybe you could talk about what the next 2 quarters look like because, with your annual guidance, that would imply a considerable ramp in the margins over the next 2 quarters. So what do those look like from, I guess, a restructuring perspective? And how should we expect those margins to improve? What are your levers there?

> REYNOLDS: Yes. So if you look, Joe, we've ramped some large customer contracts which incur significant costs and sometimes duplicate costs. As we move further out into the contracts, the ramp becomes steady-state, so those margins will improve over time. For the second half of the year, *if you look at where we are year-to-date on an adjusted EBITDA, we're going to have a significant increase to hit our guidance, which we're very comfortable with*.

261. On August 10, 2018, Exela filed a Form 8-K including the press release from the day before, signed by Reynolds, reporting Exela's 2Q 2018 results, which included adjusted EBITDA of $70.1 million.

262. 237.The statements in ¶236 above was¶¶265-268 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs and Defendants did not "minimize the adjustments" to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

### E. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 3Q'18 Financial Results

238.On November 8, 2018, Exela filed a Form 8-K and press release, which was signed by Reynolds. Attached to the 8-K was Ex. 99, a press release with the same date, which reported, reporting Exela's 3Q'18 results, including adjusted EBITDA of $69 million. The press release further stated, in part:

> Adjusted EBITDA: Adjusted EBITDA for the third quarter of 2018 was $68.9 million a margin of 18% and increased 23.6% when compared to pro forma Adjusted EBITDA of $55.5 million and a margin of 16% in the third quarter of 2017. The increase in third quarter 2018 Adjusted EBITDA was primarily driven by revenue growth, the Company's cost savings initiatives, and partially offset by investments the Company made for growth.

263. 239.Within Exela's adjusted $68.9 million EBITDA figure, the Company reported $19.4 million of optimization and restructuring expenses, orexpense addbacks, which accounted for 28.1% of the third quarter's adjusted EBITDA.

264. 240.Additionally, the press release included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*." It also contained the same language as that referred to in ¶216 above, referring to

optimization & restructuring not reflecting "past, current or future operating performance."

Supp.App. 0144

265. On the same day, November 8, 2018, Exela published an investor presentation on its website. The description of Adjusted EBITDA within November 8, 2018 investor presentation also read:

Optimization and restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the Business Combination. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.*

266. ~~241.~~The statements in ¶¶~~238–240~~270-273 were materially false and/or misleading ~~when made~~ and/or omitted ~~to state~~ material facts necessary to make the statement not misleading, ~~for the reasons stated in ¶206.~~ because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

~~242.Cogburn stated on the November 2018 Call:~~

~~We reported strong top line results with third quarter revenue of $383 million, an increase of 7% on a year-over-year basis. Revenue grew at a double-digit rate on a year-to-date basis, coming in at 11 %. Our revenue per FTE, a metric we closely track, has seen an 8% increase to $72,000 per FTE, up from $66,000 at the end of 2017. This growth is a direct result of our DigitalNow strategy, converting the lower automation BPO revenue into higher automation BPO revenue.~~

~~* * *~~

~~[T]he increased market receptiveness to our DigitalNow strategy has exceeded all of our expectations, and therefore, we have accelerated our investments for future profitable growth. This key strategic initiative, when coupled with other factors I've just mentioned, will have a short-term impact on our adjusted EBITDA.~~

~~* * *~~

~~Our strategy to grow within our good existing customers is working. We seek to build on our successful engagements to increase the number of statements of work and master service agreements. The results of this strategy is a broad and sticky revenue base.~~

* * *

Additionally, I'm pleased to share with you that the investments we have made in our customer-facing organization have resulted in substantial increase to our pipeline, which is almost double from what it was last year. Consistent with our DigitalNow strategy, we are seeing an increasing proportion of pipeline from higher automation deals and we're adding additional work streams and revenue streams with existing customers.

* * *

DigitalNow enabled additional streams of revenue within our existing customers. We transform our customers' operations over time using our proprietary BPA solutions for both on-site as well as offsite. This creates the opportunity for Exela to do more as our platform enables us to provide additional services and generate incremental revenue and profits.

243. Reynolds stated on the November 2018 Call:

We are on track this year to book-and-bill more than 2x our initial revenue growth rate of 3% to 4%. We are also very pleased seeing how our pipeline has transformed in size and increased in the number of high automation deals, which is consistent with our business strategy.

244. Cogburn detailed the Company's DigitalNow strategy to a Cantor Fitzgerald analyst:

DREW KOOTMAN: I was hoping you could discuss the opportunity with DigitalNow and how you expect this to impact growth moving forward?

COGBURN: So when you think about what we've done with our strategy to add higher automation work to lower automation BPO, as we started the year, we talked about business process automation, So if we take our business process automation, the digital transformation, and now, we use DigitalNow as sort of the descriptor for all of those things, as we go out to the market, the clear indicator to us of the interest in the market is how our pipeline has grown. So literally, from now -- from the last year until now, we have seen the pipeline more than double with these types of opportunities. And as you recall, I've mentioned in previous quarters, we found early acceptance in Q4 of last year with the interest in the pilots that begin to generate. So as we've come through this year, we're beginning to see some of those pilots turn into contracts and awards for us.

245. Reynolds noted the Company's visibility into revenue and contracts:

DREW KOOTMAN: And then -- so with the lower forecast of adjusted EBITDA -- and I know you guys aren't talking about 2019, but I was wondering, if you can give any high-level -- just looking out at how you guys are viewing adjusted EBITDA margins?

REYNOLDS: So with respect to 2019, I think our message, we're finishing 2018 very well. If you look at the past year, we had initial guidance on the top line of 3% to 4%. And because of the acceptance of DigitalNow and the opportunities, we're going to finish the year very strong between 8.5% and 9%. If you're looking at EBITDA margins, we're looking at that, but if you look back at the past 4 quarters, our range and adjusted EBITDA has clearly been between 18% to 19%. We finished this quarter just at 18%. Our business,

as you know, we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts.

246. Reynolds expressed confidence in the Company's lowered EBITDA guidance and indicated the exit of the low margin contract was a one time event and the impact would be short term in nature:

DAN DOLEV: And I think you're raising at the mid -- you are lowering EBITDA by, I think with $17 million, $18 million and you also per my estimates, you do much better on the run rate of the savings, if you get $48 million days versus the $40 million to $45 million. So why take it down by debt margin, is it just debt or is there something else?

REYNOLDS: Yes I think within *the 2 items that impacted us, those are short-term in nature*, but will continue to flow through in the fourth quarter. So that being said, we'll be able to make up some of that and we will continue to drive through the synergies. But I think we feel good with the range of $280 million to $290 million.

247. Cogburn touted the demand for DigitalNow among existing Enterprise Solutions customers:

MATTHEW VAN ROSWELL: And then, on a bigger picture, have you noticed in the last, call it, 6 months or so any change in client demand either for your products or sort of in the industry in general?

COGBURN: Well, so that's the right question to ask about the demand from the customers. And so we have to measure that in a couple of ways, but the biggest way is the growth of our pipeline. …So as we came into this year, we saw our pipeline begin to build at a very accelerated rate. As we sit here today for these types of digital services, it's literally twice what it was last year. So what we found is we went to our existing customers, when we went to our Top 150 customers, when *we went to a --what we call the Enterprise Solution customers, which is the old Novitex, it was well received, lots of interest*, and so that's where you begin to see like this enterprise deal that I talked about.

248. Reynolds touted the Company's revenue growth and noted the Company's long term contracts and renewal rates in response to a Credit Suisse analyst's question about 2019 growth and margins:

ARUN A. SESHADRI: And then, could you make a comment about growth and margins in '19?

REYNOLDS: ...We said we were going to go 3% to 4%, we're finishing the year 8.5% to 9%. And these contracts are long-term in nature. We have great renewal rates on our top

line. So revenue based on what we have, the large contract we've sold, the size of our

pipeline, we feel very good about 2019 as we're exiting '18.

249. The statements in ¶¶242-248 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

267.    250. During Exela's 3Q'18 earnings call held on November 8, 2018, Defendant Reynolds stated on the November 2018 Call the following about Exela's EBITDA and adjusted EBITDA:

> Looking at the bridge from EBITDA to adjusted EBITDA. Overall, adjustments are down. Walking through the bridge in the third quarter of 2017, *we incurred $132 million in onetime charges, tied to the business combination to create Exela. The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings.* As part of our 2018 guidance, we committed to deliver between $40 million to $45 million in savings. To date, we have achieved, approximately $48 million. *In the third quarter of 2018, Exela incurred approximately $19 million in business optimization expense.* A majority of these expenses impacted cost of sales. As part of the increased concentration of higher automation deals, we are incurring business optimization costs. *We expect these costs to decline as we implement our transformational model.* The last part of the box in the walk is Other, which primarily includes non-cash charges incurred on employee restricted stock units and the term loan debt reprice costs incurred.

268. Reynolds expressed confidence in Exela's EBITDA guidance and indicated the exit of the low margin contract was a one time event and the impact would be short term in nature:

DAN DOLEV: And I think you're raising at the mid -- you are lowering EBITDA by, I think with $17 million, $18 million and you also per my estimates, you do much better on the run rate of the savings, if you get $48 million days versus the $40 million to $45 million. So why take it down by debt margin, is it just debt or is there something else?

REYNOLDS: Yes I think within **_the 2 items that impacted us, those are short-term in nature_**, but will continue to flow through in the fourth quarter. So that being said, we'll be able to make up some of that and we will continue to drive through the synergies. But I think we feel good with the range of $280 million to $290 million.

269. Reynolds also misled analysts when pressed on how "one time-ish" the O&R expense addbacks really were. For example, in response to Morgan Stanley analyst Brian Lee Essex's direct question, Reynolds dodged, stating:

BRIAN LEE ESSEX: I don't know if it was just addressed, but I guess on a guide up in revenue, the guide down in EBITDA margins, could you help us -- maybe walk me through some of the puts and takes you have, what I would assume the better margin digital business, exiting a low-margin contract. I would assume that'll give you a lift to margins, but you're investing back in the business. Any sense for us to get a sense for in terms of both gross margin and EBITDA margin, **_how one time-ish are these investments or impact items_**, and how do we think about expansion from here on out?

REYNOLDS: Sure. So if you take a look at the 2 items I mentioned, the LLPS and the on- site, that was a $7 million impact. And with the LLPS, those contracts in the on-site, it's gone. So it's not going to come back into Q4. So it has a carry-on effect. With respect to other incremental revenue, it's coming through, we have some high margin revenue that we're anticipating coming in, in the fourth quarter related to our Saas sales. It's happened historically. Through 2018, we feel good that we'll get some incremental flow through margin, but I think that a range of $280 million to $290 million is something we feel good about as we're exiting 2018.

270. The statements in ¶¶275-277 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement

demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings.

271. Also during the 3Q'18 earnings call, in response to analyst inquiry about Exela's adjusted EBITDA and margins, Defendant Reynolds again highlighted the Company's visibility into revenue:

> DREW KOOTMAN: And then -- so with the lower forecast of adjusted EBITDA -- and I know you guys aren't talking about 2019, but I was wondering, if you can give any high-level -- just looking out at how you guys are viewing adjusted EBITDA margins?

> REYNOLDS: So with respect to 2019, I think our message, we're finishing 2018 very well. If you look at the past year, we had initial guidance on the top line of 3% to 4%. And because of the acceptance of DigitalNow and the opportunities, we're going to finish the year very strong between 8.5% and 9%. If you're looking at EBITDA margins, we're looking at that, but if you look back at the past 4 quarters, our range and adjusted EBITDA has clearly been between 18% to 19%. We finished this quarter just at 18%. *Our business,* *as you know, we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts.*

272. The statements in ¶279 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

273. On the same day, November 8, 2018, the Company also issued its Form 10-Q for the third quarter ending September 30, 2018. In it, Company repeated the false claim that it was "unable" to *"estimate any loss or range of loss that may arise from the Appraisal Action*."

274. The claim that Exela was unable to "estimate any loss or range of loss" was false and misleading because prior to the filing of the 3Q 2018 Form 10-Q on November 8, 2018, Exela had itself estimated the value of SourceHOV (and, thus, estimated Exela's potential liability) at the time of the Merger. For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was

Supp.App. 0151

~~251.~~ ~~The statements in ¶250 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.~~

was Co-Chair—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested back in February 2017. Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million. Finally, by January 2018, Chadha requested an updated (and "backdated") valuation of SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action which he received by April 2018. Moreover, the Individual Defendants were aware of Exela's attempts to estimate SourceHOV's value (and thus Exela's potential liability) as of the time of the Merger: (i) no later than October 5, 2018, Defendant Chadha was deposed in the Appraisal Action[19], wherein he testified as to the estimated value of SourceHOV at the time of the Merger; (ii) no later than October 12, 2018, Defendant Reynolds was deposed in the Appraisal Action; and (iii) no later than October 23, 2018, Defendant Cogburn was deposed in the Appraisal Action. Thus, by the time that the 3Q 2018 10-Q was filed on November 8, 2018 Defendants had in fact estimated the liability and/or a range of liability associated with the Appraisal Action.

**F.     Defendants' False And Misleading Statements And Omissions In And Relating To Exela's Fourth Quarter And Full Year 2018 Financial Results**

275.    On March 18, 2019, the Company issued a press release reporting its fourth quarter and full year 2018 results. In it, the Company stated:

> Achieves revised full year guidance for Revenue and Adjusted EBITDA; Net Loss of $162.5 million; Expect 2019 revenue to be between $1.66 billion to $1.70 billion, and reduction of net leverage ratio by 5% - 7%.

> * * * Revenue of $399.6 million, representing 3.4% growth over Q4 2017 Adjusted EBITDA(2) of $75.3 million, representing 20.0% growth over Q4 2017

---

[19] While Chadha was deposed for a second time on February 26, 2019, according to in-court representations made by Petitioner's counsel at the Appraisal Action, the second deposition was scheduled for inquiry into Chadha's knowledge of and participation in the Backdated Valuation, which he had previously concealed and failed to disclose during discovery.

Supp.App. 0153

276.     Additionally, along with the press release, on March 18, 2019, the Company also published an investor presentation that included a description of adjusted EBITDA that read in part, "Adjusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and other similar non-routine items outside the control of our management team."

277.     The description of adjusted EBITDA within March 18, 2019 investor presentation also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, ***we exclude these charges since we do not believe they truly reflect our past, current or future operating performance***.

278.     The statements in ¶¶283-285 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and

(iii)     the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 financial filings and without such addbacks would not have met its 2018 guidance.

279.     ~~252.~~ On March 18, 2019, the Company held an earnings call to discuss its fourth quarter and full year 2018 financial results. Among other things, Defendant Cogburn touted the Company's ~~margin and revenue 2018 growth and indicated that growth would continue into 2019 as it implemented its DigitalNow strategy with more existing customers~~ adjusted EBITDA

growth, stating, in relevant part:

We had a solid 2018 and achieved our revised guidance for both revenue and adjusted EBITDA. Our continued investment in developing industry-specific and departmental solutions as well as increased customer awareness are showing good results. Digital Now made the difference. In 2018, we achieved full year revenue growth of approximately $130 million and a 9% increase in revenue per FTE to $72,000. These investments and our increased customer awareness have helped achieve a growth rate of 14% on our top 200 customers. With low customer concentration and a high customer retention rate of 98%,

Supp.App. 0155

our goal for 2019 and beyond is to replicate the success we had with our top 200 customers. We believe the large and growing addressable market we operate in provides us with substantial runway for growth and expansion with a focus on our existing customers. We are also committed to sensibly pursuing growth while deleveraging our balance sheet over time.

We reported a strong top line results for the year of $1.586 billion, an increase of 8.9% on a year-over-year basis, ahead of the industry growth rates. *We recorded 15.7% growth in adjusted EBITDA to $283.8 million, and our continued focus on margins resulted in an increase of 110 basis points compared to 2017, reaching a 17.9% adjusted EBITDA margin*. In addition to growing our top line and adjusted EBITDA, during the year, we executed on our savings initiatives, an important part of our ongoing strategy. During 2018, we achieved $64 million in savings, exceeding our initial goal of $40 million to $45 million. And here's an important fact*: through a combination of the top line growth and achieving savings offset by investments we've made to drive growth and increased awareness, we successfully drove improvement on a year-over-year basis in our adjusted EBITDA margin*. In response to the strong demand for Digital Now, we invested in converting pipeline into revenue. We see a meaningful opportunity or white space to expand our set of solutions we're providing to our customers as we reach new customer segments during 2019. …

Beyond 2019, we believe the majority of our current remaining savings will be achieved, and our optimization and restructuring expenses will gradually decline. This result -- this will result increasingly in the convergence of adjusted EBITDA and EBITDA.

Looking ahead to 2019 and beyond, we are well positioned to generate long-term sustainable growth.

253. The statements in ¶252 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.

254. Reynolds stated:

Based on its review of the company's disclosure and control procedures, the company's management expects to conclude that the company's disclosure controls and procedures were not effective. Notwithstanding such weaknesses, the company's management expects to conclude that the consolidated financial statements to be included in the Form 10-K will present fairly, in all material respects, the company's financial position, results of operations and cash flows for the periods to be presented in the Form 10-K in conformity with GAAP.

255. The statements in ¶254 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because

Defendants improper accounting as disclosed in the 2019 10-K, which restated the Company's 2018 10-K materially misrepresented the Company's financial position, results of operations, and cash flows.

280. Reynolds further stated the following about EBITDA and adjusted EBITDA:

Looking at the bridge from EBITDA to adjusted EBITDA. The first box in the bridge is other, which includes noncash charges of $49.2 million and $122.5 million on debt extinguishment cost and impairment of the LLPS business in 2018 and 2017. The remainder of these costs relate to employee stock option expense and asset disposal costs.

*The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter.* The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $O.8 million in facility cost. *We believe 2018 represented the high watermark in terms of optimization and restructuring expenses.* And in time, we expect these costs to gradually decline as we implement our transformational model. The final adjustment is the transaction integration costs, which are -- were incurred to create Exela in the third quarter of 2017.

To summarize, the gap between EBITDA and adjusted EBITDA narrowed by $142.5 million in 2018. This is consistent with our goal to have adjusted EBITDA and EBITDA to converge over time.
* * * On December 31, 2018, total liquidity was $116 million, and net debt was $1 402 billion. We had cash of $44 million, excluding restricted cash per our credit agreement, and an undrawn $100 million revolving credit facility, of which, $20.6 million was set aside for standby letters of credit.

281. 257. The statements in ¶256 above was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206. The statements were additionally ¶¶287-288 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading because Reynolds represented that 2018 would be the "high watermark" for business and optimization expenses, but these expenses increased by 36% when comparing full year 2019 results to full year 2018 (restated) results. Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back

routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 2018 financial results.

258.Reynolds also touted revenue visibility in expressing confidence in the Company's 2019 guidance:

> DAN DOLEV: … So I mean, ***your guidance is very, very strong***. I feel like it's above our numbers for next -- for 2019, and it looks like, as you said, it's accelerating on an organic basis. ***And also EBITDA, the EBITDA guidance seems above our numbers. Can you maybe give us a sort of the level of confidence you have in achieving that guidance?***

> REYNOLDS: Sure. Thanks, Dan. ***As we've discussed historically, we typically have about 90% visibility into the next 12 months.*** With respect to the revenue, if you remember, we have somewhat of a wide range, but back in the fall, we announced the transaction with a large bank. That contract ramped up at the beginning of the year, so we're very pleased with that. In addition, at the end of December, we closed a health care acquisition that will also help drive the results for 2019.

282. 259.An analyst inquired if there was anything in top line revenue they should know about, since Exela's revenue growth guidance was the same as 2018, despite the pipeline doubling.In response to analyst inquiry questioning Exela's growth rate, Defendant Reynolds again noted revenuecited "90%" visibility on the top line" [*i.e.*, revenue] in expressing confidence in the Company's guidance and assured that the Company was just trying to be being "conservative."

> JOSEPH DEAN FORESI: …Anyways, you mentioned the pipeline doubling, but the growth rate kind of year-over-year is fairly consistent. So what can you tell us about sort of the conversion rate? Is it an element of conservatism on the top line and expectations for next year? Have conversion rates changed? ***Is there anything in the top line we should know about?***

> REYNOLDS: …I mean, we feel good about our conversion rates. I think the size of the pipeline is strong. And just like this year, for the full year, we actually hit our revised -- upward revised revenue guidance. ***So we have great visibility into the revenue and feel pretty goo***d. I think, as we're still a new public company, 18 months or so, and we're trying to be somewhat conservative as we look at the potential for Digital Now, which is gaining traction in our front office. So we'd rather come out feeling good with ***that 90% visibility on the top line***.

> 260.Reynolds indicated that the Company would need to implement BPA for existing customers and take out costs to improve margins in order to achieve its margin guidance:

JOSEPH DEAN FORESI: Got it. And then on the margin guidance, I think it's $305 million to $335 million. What puts you at the top end versus the low end on the margin side?

REYNOLDS: So what gets us there is really the flow through on our savings. That's one of the things we've been working on since we launched the transaction. We feel good about it, so it's a combination of that. And then the type of deals that we close and how quickly we can achieve the margin. There is still costs we need to take out on some of these tuck- in acquisitions, and we're looking to change that margin profile as we implement our suite of technology.

283.    The statements in ¶¶ 290-291 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of the Company's revenue was not predictable or recurring; rather, as Defendants later admitted,

approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

284. Reynolds also assured investors that their financial statements were accurate, notwithstanding KPMG's finding that a lack of internal controls existed. In response to an analyst question, Reynolds stated the following:

DAVID LAWRENCE PHIPPS: Okay. And then final question. You delayed the 10-K, that's pretty standard, you have that out in the next 15 days. Could you talk a little bit about the controls and procedures language that you have there?

JAMES G. REYNOLDS: I think all I would say is under the rules, this is our first year of SOX compliance, which is highly complicated when you put together companies through acquisitions to achieve and have enough time to actually test all the controls that are operating. So it's kind of it's either there or it's not. We feel good in our ability to address the control deficiencies. And I think, as I said, we feel good that, from a standard perspective, *we have no issues within our numbers*.

285. 261. The statements in ¶¶258-260 was ¶ 293 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211. because the Company did have nondisclosed issues within its numbers, including the material false statements identified throughout § IV.C.3 relating to Defendants' representations about (i) the Company's inability to estimate a range of liability for the Appraisal Action; (ii) the associated undisclosed liability and overstatements to earnings and cash flow arising from Exela's omission of the Appraisal Action liability; and (iii) Defendants' characterization of Adjusted EBITDA and the false and misleading addbacks included therein.

286. 262. On March 20, 2019 the Company filed its Form 10-K for the year ending December 31, 2018 (the "2018 10-K"), which was signed Cogburn, Reynolds, and Chadha and certified by Cogburn (Ex. 31.1); and Reynolds (Ex. 31.2);. The 2018 10-K stated reported the following financial results, in relevant part:

We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result,

our stable base of customers and sticky, long-term relationships lead to highly predictable revenues.

\* \* \*

We maintain a strong mix of diversified customers with low customer concentration. No customer accounts for more than 10% of 2018 revenue. The diversity of our customer base has contributed to the stability and predictability of our revenue streams and cash flows.

### *Revenue*

263. The 2018 10-K also stated:

**Expand relationships with existing customers.** We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base. With an installed base of over 4,000 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher margin bundled solutions. As an example, we now offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

Our revenue increased $433.9 million, or 37.7%, to $1,586.2 million for the year ended December 31, 2018 compared to $1,152.3 million for the year ended December 31, 2017. This increase is primarily related to an increase in our ITPS segment revenues of $446.5 million, which was primarily attributable to the acquisition of Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $5.6 million and $7.1 million, respectively. Our ITPS, HS, and LLPS segments constituted 80.3%, 14.4%, and 5.3% of our total revenue, respectively, for the year ended December 31, 2018, compared to 71.8%, 20.3%, and 7.9%, respectively, for the year ended December 31, 2017.

264. The statements in ¶¶262-263 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

265. The 2018 10-K stated:

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our operating performance on a consistent basis across periods by removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA.

\* \* \*

**Year Ended December 31, 2018 compared to the Year Ended December 31, 2017**

\* \* \*

*EBITDA and Adjusted EBITDA*

EBITDA was $144.5 million for the year ended December 31, 2018 compared to $(37.2) million for the year ended December 31, 2017. Adjusted EBITDA was $283.8 million for the year ended December 31, 2018 compared to $208.8 million for the year ended December 31, 2017. The increase in EBITDA was primarily due to a lower net loss amount for the year ended December 31, 2018 resulting from an increase in revenue, decrease in selling, general and administrative expenses, decrease in related party expense,

and decrease in loss on extinguishment of debt compared to the year ended December 31, 2017. The increase in Adjusted EBITDA was primarily due to lower transaction and integration costs for the year ended December 31, 2018 compared to the year ended December 31, 2017, along with lower impairment charges incurred in 2018 compared to 2017.

* * *

**Loss Contingencies**

266. The ~~statements in ¶265 above were~~ materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading ~~for the reasons stated in ¶206, specifically: (i) 2018 reported adjusted EBITDA was $283.2 million, but the restated figure fell by $7 million to $276.2 million; (ii) 2018 annual adjusted EBITDA was improperly inflated by the improper adding back of $68.1 million of optimization and restructuring expenses ($54.2 million in the case of the restated adjusted EBITDA); and (iii) had Exela properly classified optimization and restructuring expenses as operating costs (and thus not added them back to adjusted EBITDA), it would have fallen well short of even its reduced 2018 guidance.~~Company reviews the status of each significant matter, if any, and assess its potential financial exposure considering all available information including, but not limited to, the impact of negotiations, settlements, rulings, advice of legal counsel and other updated information and events pertaining to a particular matter. ***If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss***. Significant judgment is required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Because of uncertainties related to loss contingencies, accruals are based only on the best information available at the time. As additional information becomes available, the Company reassesses the potential liability related to its pending claims and litigation, and may revise its estimates. These revisions in the estimates of the potential liabilities could have a material impact on the results of operations and financial position. The Company's liabilities exclude any estimates for legal costs not yet incurred associated with handling these matters.

287. The 2018 Form 10-K was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading for the following reasons: (i) Exela failed to account for liability related to the Appraisal Action, which Defendants admitted should have been recorded at the amount of the fair value of the Manichean shares tendered when appraisal action was filed in 2017, and Defendants thus materially understated Exela's liability by

$37.8 million in 2017 and $40.6 million in 2018 as a result; (ii) the Appraisal Action liability was probable and had already been reasonably estimated by the time that Exela issued its form 10-K for the year ended 2018, thus rendering its statements identified above related to Loss Contingencies false and/or misleading and/or failed to state material facts; and (iii) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's omission of the Appraisal Action liability as well as the falsity of Exela's reported adjusted EBITDA figures, among other financial metrics, in the Company's 2018 Form 10-K.

288. In addition, regarding the Appraisal Action, Exela's 2018 Form 10-K told investors that: "The company is unable to predict the outcome of the appraisal *Action or estimate any loss or range of loss that may arise from the Appraisal Action*."

289. The statement claiming that Exela was unable to "estimate any loss or range of loss" was false and misleading because long prior to the filing of the 2018 Form 10-K on March 20, 2019, Exela had itself estimated the value of SourceHOV (and, thus, Exela's potential liability) at the time of the Merger. For example, by January February 2017, Rothschild was asked to deliver a fairness opinion to SourceHOV's board of directors of which Chadha was Chair and Reynolds was Co-Chair—about the value of SourceHOV's equity. Rothschild originally delivered that fairness opinion as requested back in February 2017. Moreover, by June 26, 2017, Exela filed its proxy statement wherein it stated that the then existing equity value of SourceHOV was $644.8 million. And by January 2018, Chadha requested an updated (and

SourceHOV from Rothschild – for the specific purpose of supporting Exela's estimation of SourceHOV's equity value in connection with the Appraisal Action. By December 2018, Exela's own expert, Dr. Jarrell, provided his official expert report estimating SourceHOV's value (and, thus, Exela's potential liability) at the time of the Merger. Exela's expert provided additional information on SourceHOV's estimated value (and, thus, Exela's potential liability) in connection with his deposition on February 14, 2019. Further, the Individual Defendants were aware of Exela's attempts to estimate SourceHOV's value (and thus Exela's potential liability) at the time of the Merger: (i) no later than October 5, 2018, Defendant Chadha was deposed in the Appraisal Action, wherein he testified as to the estimated value of SourceHOV at the time of the Merger; (ii) no later than October 12, 2018, Defendant Reynolds was deposed in the Appraisal Action; and (iii) no later than October 23, 2018, Defendant Cogburn was deposed in the Appraisal Action. Moreover, no later than December 2018, Defendants were provided with the report of the expert for the plaintiff in the Appraisal Action, estimating the value of SourceHOV at the time of the Merger, which was revised on February 7, 2019. In sum, prior to the filing of the 2018 Form 10- K, Defendants could, and did, estimate Exela's potential liability associated with the Appraisal Action, and they certainly had enough information from which they could estimate a range of Exela's potential liability.

290.    The 2018 10-K also touted the Company's purportedly predictable revenue:

**Customers**

We serve over 4,000 customers across a variety of industries, including over 60% of the Fortune® 100. Our customers are among the leading companies in their respective industries, and many of them are recurring customers that have maintained long-term relationships with us and our predecessor companies.

We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our stable base of customers and sticky, long-term relationships lead to highly predictable revenues.

291.    The statements in ¶ 299 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because a material percentage of

the Company's revenue was not "highly predictable" or recurring; rather, as Defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs through which the Company would have very little visibility; and (ii) the concealment of which misrepresented the stability of Company's revenue sources, as well as its actual and potential margin and revenue growth.

**G. Defendants' False And Misleading Statements And Omissions In And Relating To Exela's 1Q'19 Financial Results**

292. ~~267.~~On May 9, 2019, Exela filed a form 8-K and press release, signed by Reynolds ~~that included as Exhibit99.1        a press release dated May 9, 2019. The May 9, 2019 press release reported~~, reporting the Company's 1Q'19 financial results, including adjusted EBITDA of $74.1 million. The press release ~~further~~ stated:

> **Adjusted EBITDA:** Adjusted EBITDA for the first quarter of 2019 was $74.1 million, an increase of 6.5% as compared to Adjusted EBITDA of $69.6 million in the first quarter of 2018. Adjusted EBITDA margin for the first quarter of 2019 was 18.3%, an increase of 60 basis points as compared to an Adjusted EBITDA margin of 17.7% in the first quarter of 2018. The increase in first quarter 2019 Adjusted EBITDA and Adjusted EBITDA margin was primarily driven by revenue growth and by the continued realization of savings flow- through, partially offset by investments the Company made for growth.

293. ~~268.~~The ~~statements in ¶267 above were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206.~~press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team.*"

294. The description of adjusted EBITDA within the May 9, 2019 press release read:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.*

295. The statements in ¶¶ 301-303 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and

Supp.App. 0168

ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and

(iii)   the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures.

269. Also on May 9, 2019, Exela held an earnings call to discuss its 1Q'19 financial results for 1Q'19.. During the call, Defendant Cogburn stated reiterated the reported financial results:

On a constant currency basis, our revenue of $410 million grew 4% year-over-year, and adjusted EBITDA of $75 million grew 8% year-over-year. Our first quarter adjusted EBITDA margin was 18.3%, an increase of 60 basis points from 17.7% in Q1 of 2018. The improvement in margins validates the path that we are traveling to transform businesses through our automation as we get the benefits of executing our remaining cost savings initiatives.

Growth was backed by our growing and profitable pipeline and the continued ramp of our existing customers. Our Digital Now strategy continues to win business by leveraging our best-in-class technology and support services. Our goal is to continue to accelerate the digital transformation of our customers through expanding engagements across multiple layers and to be their technology and business process automation partner.

As we continue to grow and service our new and existing customers, we have seen an acceleration in our initial costs associated with these wins. As a result, we have added to our employee base and have seen an increased use of working capital. These trends should reverse in the back half of the year. Further, we continue to exit low margin contracts where customers do not have a path going forward towards automation. On a sequential basis, we expect revenue to be similar to Q1 and improve materially in the third and fourth quarter. Accordingly, based on our current pipeline, we are reaffirming our 2019 outlook.

* * *

In executing our strategy of working to accelerate the digital transformation of our customers, we're making significant progress on our savings initiatives that we've identified throughout the organization. We expect to execute on a material portion of our remaining $56.4 million in identified savings during the remainder of 2019, which is detailed in our fact sheet. Digital transformation and execution of our initiatives will drive the future convergence of adjusted EBITDA to EBITDA.

* * *

With high customer retention, our diverse revenue base provides us with top line visibility as well as significant opportunity to add additional statements of work to existing customers.

296.   270. Cogburn told a Cantor Fitzgerald analyst that DigitalNow was resulting in a

higher conversion rate of its pipeline:

> DREW KOOTMAN: … You guys mentioned the pipeline remains strong. I was just curious, are you seeing an increase in the pipeline due to Digital Now? Or maybe you could just touch on how Digital Now is sort of changing the pipeline? Or what you're seeing through that?

COGBURN: Drew, that's the right question, and that is the conclusion. I think I've mentioned last quarter the growth in our pipeline year-over-year is almost double what we have seen previously before all opportunities related to Digital Now.… So we're very excited to see how that plays out because we believe we have a higher opportunity or a better opportunity for a higher conversion rate of that pipeline.

297. 271. Cogburn answered a Morgan Stanley analyst's question about penetrating

existing customers:

> BRIAN LEE ESSEX: I was wondering if maybe you could talk a little bit about some of the relationships with existing customers. I know that recently you guys had, in particular, a pretty large lockbox win with a big bank. How much new business are you able to penetrate existing customers with? And how much of that pipeline does that account for within your visibility for the year?

> COGBURN: …So when you think about how we've grown historically, it has been through our existing customer base, and it has to do with the ability to land and expand.... So when we look at our pipeline, which is the question, we see lots of opportunities like this that are similar where we've had a great relationship with a large existing customer….

~~272.The statements in ¶¶269-271 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.~~

298.    ~~273.~~Reynolds further stated the following about adjusted EBITDA on the call:

Our adjusted EBITDA for the quarter totaled $74.1 million, an increase of 6.5%, and a (sic) [our] margin in the first quarter was 18.3%, an increase from 17.7% in the first quarter of 2018. The improvement in adjusted EBITDA margins was mainly driven by revenue growth and by continued realizations of savings flow-through but were partially offset by investments the company made for growth.

I want to discuss in greater detail the differences between EBITDA and adjusted EBITDA. *The primary variance between the 2 are optimization and restructuring charges*. This adjustment relates to investments we have made to achieve cost savings and a majority relates to headcount. During the first quarter, optimization and restructuring expenses totaled $25.8 million. This increased over Q1 of 2018 as we're incurring additional upfront cost for a few large projects. We expect this trend to continue in 2019, but decline in the year -- later quarters.

299.    ~~274.~~Cogburn discussed optimization and restructuring charges:

Optimization and restructuring charges are primarily headcount-related charges. As we transition for a more managed analog-type solution to a digital solution, we need time, and we have people doing non -- probably not-as-productive services. And as you put in the technology, you start to have the ability to take out headcount. In addition, in a lot of these clients, there's third-party technology that's being used. And part of Exela's suite and putting in our technology, we're able to reduce the overall cost to perform that services. So if you look at optimization, we feel good as we have some of these large projects, it will take us a little time to work through, but we expect optimization to trend down over the quarters.

~~275.These statements in ¶¶273-274 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.~~

300.    ~~276.~~Reynolds assured an analyst that margins would continue to expand through the year despite the drastic increase in employees:

DAVID LAWRENCE PHIPPS: [I]f we look at some of the margin progression, you've made some nice margin progression in the past 5 quarters. And would you expect to continue to make margin progression in the June quarter even though revenues will be roughly flat?

REYNOLDS: So we don't give out specific quarterly guidance, but what I would tell you is, as the saving initiatives flow through the P&L, a majority of those run through our

cost of goods sold. As we put our technology in and take out people and headcount, you'll start to see the gross margin turn, which we expect.

DAVID LAWRENCE PHIPPS: Okay. Because you added about 1,000 employees during the quarter so that would suggest that you're set up for new business or you're going to have a little bit of extra costs. Maybe you can talk through that a little bit because if we're flat but we have more cost to more employees, it seems like that you're going to have little bit of margin pressure unless you have some cost savings to offset that.

REYNOLDS: Yes, absolutely. We've added, like Ron said, about 929 employees which almost all in the production in the cost area. And as we ramp these contracts, our revenue hits steady state and we put in our technology and start to see the benefit in margin expansion. So we're well underway with respect to these contracts.

301. 277.This statement in ¶276 wasThe statements in ¶¶ 305-310 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 1Q 2019 financial results.

**H.** ~~G.~~**Defendants' False And Misleading Statements And Omissions Regarding ~~ITS~~Its 2Q'19 Financial Results**

302. 278.On August 8, 2019, Exela filed a form 8-K and press release, signed by Reynolds that included as Exhibit 99, a press release dated August 8, 2019. The August 8, 2019 press release reported, reporting the Company's 2Q'19 financial results, including adjusted EBITDA of $69.4 million. The press release further stated:

Adjusted EBITDA: Adjusted EBITDA for the second quarter of 2019 was $69.4 million, a decline of 1.0% as compared to Adjusted EBITDA of $70.1 million in the second quarter of 2018. Adjusted EBITDA margin for the second quarter of 2019 was 17.8%, an increase of 70 basis points as compared to an Adjusted EBITDA margin of 17.1% in the second quarter of 2018. The small decrease in second quarter 2019 Adjusted EBITDA was primarily driven by the low margin contract exit reported during the third quarter of 2018, offset by revenue growth and the continued realization of savings flow-through.

279.This statement in ¶278 was materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206.

303. The press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine*

*items outside the control of our management team.*"

304.    The description of adjusted EBITDA within the August 8, 2019 press release also read:

Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination

completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

305.     The statements in ¶¶ 312-315 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; and

(iii)     the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.

306.     280. On August 8, 2019, Exela held an earnings call to discuss its 2Q'19 financial results. ~~Cogburn stated~~During the call, Defendant Reynolds reiterated the reported financial results:

> ~~As we look at our business, excluding these 2 items, this is an important part of our story as well as a clear indication that our transformation efforts are working and it'll take another 12 to 18 months to complete. On an adjusted EBITDA margin basis, the story is very positive. Net of postage and the previously announced contract exit, adjusted EBITDA margins were 22%. Now this is the margin level that has been our target since the inception of Exela in July of 2019.~~

~~281. The statements in ¶280 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶¶206, 211.~~

> ~~282. Cogburn expressed confidence in bringing up Novitex customer margins:~~

> ~~STEVEN PAUL HALPER: This is Steven coming on for Joe. I just have -- you've talked about the business transformation when you are looking at [] 35% to 40% of your revenue trying to expand that gross margin. Can you provide some color on what makes up that part of 35% to 40% of revenue? ….~~

> ~~COGBURN: Yes. And so the way you look at the business, and I think from the beginning of the formation of Exela, we talked about part of our business that was *ripe for digital transformation* and that's really what we've talked about.~~

The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, those gross margins were lower, and I think we've always stated that. So for us, and we look at what we had done historically for the last 10 years, our gross margins being 35%, *we know that over time, we're going to be able to transform this. We're going to be able to put automation where there is no automation*. The grouping on the far, I guess, the third bucket that has to do with more of our European footprint that we picked up about 5 years ago. And you can see with the benefit of automation and transformation, we brought those margins up to around 30%. So when we look at this bucket, this 35% to 40% of revenue, there is a great opportunity to be able to transform and lift those margins to the goal of being around 35% like we have for the rest of the business.

283. The statements in ¶282 was materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211.

284. Reynolds also stated:

During the second quarter of 2019, optimization and restructuring expenses totaled $18.7 million compared to $8.9 million in the second quarter of 2018. Of the $18.7 million, $17.6 million related to cost associated with process transformation. The remaining $1.1 million is related to M&A transformation. Customer transformation was less than $50,000 in the second quarter. We expect the level of optimization and restructuring expense related to process transformation to decline towards the back half of 2019 as the automation initiatives continued to get executed and realized into the P&L. We still have a lot of work to do as approximately 35% to 40% of our net revenue and its gross margins at approximately 15%.

* * * Another large bucket within our adjustments are noncash and other charges. This bucket includes costs associated with cash severance and onetime debt extinguishment cost and customer exit costs.

307. During the call, Cogburn further stated the following about adjusted EBITDA:

Based on the items I've just mentioned and considering the unpredictable nature of our postage revenue, we are updating our 2019 revenue guidance to $1.59 billion to $1.61 billion and 2019 adjusted EBITDA guidance to $290 million to $300 million. We have strong visibility under this revenue, which, in turn, will help us to prioritize our operations and focus on liquidity and cash generation.

* * *

This quarter, we wanted to show the impact of a couple of factors creating a drag on the growth rates of the consolidated business. The 2 items we are highlighting are pass-through revenue related to postage and postage handling and our continued exit from low-margin contracts.

* * *

As we look at our business, excluding these 2 items, this is an important part of our story as well as a clear indication that our transformation efforts are working and it'll take another 12 to 18 months to complete. On an adjusted EBITDA margin basis, the story is very positive. Net of postage and the previously announced contract exit, adjusted EBITDA margins were 22%. Now this is the margin level that has been our target since the inception of Exela in July of 2019.

308. 285.The statements in ¶284 ¶¶ 316-317 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading, for the reasons stated in ¶206. because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 2Q 2019 financial results.

**I.** **II.Defendants' False And Misleading Statements And Omissions Regarding Exela's 3Q'19 Financial Results**

309. 286.On November 12, 2019, Exela filed a form 8-K and press release, signed by Reynolds that included as Exhibit 99, a press release dated November 12, 2019. The November 12, 2019 press release reported, reporting the Company's 3Q'19 financial results, including adjusted EBITDA of $58.5 million. The press release further stated:

> **Adjusted EBITDA:** Adjusted EBITDA for the third quarter of 2019 was $58.5 million, a decline of 15.1% as compared to Adjusted EBITDA of $68.9 million in the third quarter of 2018. Adjusted EBITDA margin for the third quarter of 2019 was 15.7% compared to Adjusted EBITDA margin of 18.0% in the third quarter of 2018. The decrease in third quarter 2019 Adjusted EBITDA was mainly driven by lower revenue in the ITPS segment along with higher SG&A spend and foreign currency losses offset by continued realization of savings flow-through.

> Adjusted EBITDA margin, based on revenue excluding the LMCE and pass through revenue, was 18.9% in the third quarter of 2019 and 21.1% in the first nine months of 2019, compared with 22.8% and 22.4% in the comparable prior year periods.

310.    The press release also included a description of adjusted EBITDA that read in part, "Adjusted EBITDA also seeks to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and *other similar non-routine items outside the control of our management team*."

311.    The description of adjusted EBITDA within the November 12, 2019 press release also read:

> Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12, 2017. All of these costs are variable and dependent upon the nature of the actions being implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, *we exclude these charges since we do not believe they truly reflect our past, current or future operating performance*.

287. The statements in ¶286 ¶¶ 319 - 321 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶206. because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs, but rather Exela added back routine and ongoing operating costs to its adjusted EBITDA, (ii) Exela's EBITDA addbacks were not outside the control of management, as Defendants later admitted, a large portion of EBITDA addbacks came from headcount-related expenses, which is squarely within the control of management; (iii) the foregoing resulted in the overstatement of adjusted EBITDA to report a metric that was not indicative of Exela's normalized, or steady-state earnings.

312.    288. On November 12, 2019, the Company held an earnings call to discuss its 3Q'19 financial results. Cogburn stated:

> …15% to 20% of our revenue and generates approximately 21% gross margin after 5 years in transformation. By continuing to execute our technology and process transformation initiatives, we believe the businesses in the second and third column from the left have the *potential to generate margins approaching 35%* as represented in the first column. This implies significant opportunity to expand our gross profit margin and does not include any expected impact from noncore asset sales as part of our debt reduction initiative. Now as a reminder, while we remain confident that the ongoing improvements we are making will fundamentally transform our COGS, they require both investment and time.

289. The statements in ¶288 were materially misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211. 290. On adjusted EBITDA and liquidity, Reynolds stated:

> Adjusted EBITDA for the quarter totaled $58.5 million, a decrease of 15.1% on a year-over-year basis. Adjusted EBITDA margin for the third quarter was 15.7% compared with 18% in the third quarter of 2018. … Liquidity at the end of the third quarter was

$50.4 million. Our total net debt was $1.485 billion.

291. Reynolds then answered a Nuveen analyst's question regarding EBITDA guidance:

TRENT PORTER: …The EBITDA guidance has gone down. And so -- and the EBITDA margin is down year-over-year. So I just want to better understand what's driving -- what was unfavorable? What is the unfavorable variance versus your budget, specifically on the EBITDA margin side?

JAMES G. REYNOLDS: So I think that's another thing we discussed on the call, and maybe it was missed, is that in Q3, we have Europe, which we have incremental cost where we're adding staff. Now 18% of our business overall in Europe -- is in Europe. And in the month of August, a lot of that business slows down, but we don't terminate people, obviously, we keep them on the payroll, and we have to hire incremental staff and temp help to get work done. So there was some of that, that we were not able to predict. But I appreciate the question and be more than happy to follow up offline.

313. 292. The statements in ¶¶290-291 ¶ 323 were materially false and/or misleading when made and/or omitted to state material facts necessary to make the statement not misleading for the reasons stated in ¶211. because (i) Exela's adjusted EBITDA did not just add back "non-routine" costs to EBITDA, but rather Exela added back

Supp.App. 0179

routine and ongoing operating costs to its adjusted EBITDA, (ii) resulting in an overstated metric that was not indicative of Exela's normalized, or steady-state earnings. In addition, the Restatement demonstrates the falsity of Exela's reported adjusted EBITDA figures and liabilities, among other financial metrics, in the Company's 3Q 2019 financial results.

## VII.   LOSS CAUSATION

314.   293. Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and the Class. 294. During the Class Period, Plaintiffs and the Class purchased Exela's securities at artificially inflated prices and were damaged thereby. The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed or materialized, causing investors' losses.

315.   295. Artificial inflation in Exela's stock price was removed when concealed risks partially materialized and/or the truth about the material misrepresentations and omissions was partially revealed to the public on November 8, 2018, March 18, 2019 2019, May 9-10, 2019, May 22, 2019, August 8, 8-9, 2019, November 12, 12-13, 2019 and March 16, 2020. As a direct result of these partial disclosures, the price of Exela's publicly traded securities declined precipitously on heavy trading volume, causing economic injury to Plaintiffs and other members of the Class.

296. On November 8, 2018, the Company reduced its 2018 adjusted EBITDA guidance by approximately $18 million due in large part to the exit of a low margin Enterpise Solutions contract. These announcements revealed in part that a material portion the Company's revenues was derived from low margin customers who had no path to digital transformation or automation, and that exiting these contracts would have a negatively impact revenue growth and stranded costs associated would negatively impact margins. 297. On the same day, Exela and reported a substantial increase in business and optimization O&R expense addbacks, which partially revealed that such expenses are were not nonrecurring or nonroutine (rather, they are were regular and recurring). Morgan Stanley analyst Brian Lee Essex asked management on the earnings call about "how one time-ish" Exela's "impact items" were going to be—demonstrating the growing skepticism among analysts about Exela's representations that its adjusted EBITDA really did just add back nonroutine expenses, or if it was also adding back traditional operating expenses.

316.   298. Moreover, the growth in optimization and restructuring expense from the prior quarter also demonstrated to investors that recurring expense addbacks were increasingly

making

up a larger percentage of Exela's reported adjusted EBITDA. This means that the EBITDA guide down was problematic for two reasons: (1) the earnings were falling; and (2) what was actually making up the earnings, i.e., the quality of the earnings itself, was deteriorating.

317. 299.OnFollowing this news, Exela's stock fell $0.96 per share, or approximately 15.4%, to close at $5.28 on November 9, 20192018 damaging investors.

318. 300.On March 18, 2019, the Company announced that it met its 2018 revenue and adjusted EBITDA guidance. However, the Company also indicated that its optimization and restructuring expenses would only "gradually" decline but would continue. More specifically, he noted:

319. 301.On the earnings call, Reynolds stated:

> The next adjustment in our walk is the optimization and restructuring charges. This item relates to our investments made to achieve cost savings. During 2018, optimization and restructuring expense totaled $68.2 million for the year and $21.2 million in the fourth quarter. The breakout of the fourth quarter consisted of $14.2 million in headcount cost, $6.2 million in vendor-related cost and $0.8 million in facility cost. We believe 2018 represented the high watermark in terms of optimization and restructuring expenses. And in time, **we expect these costs to *gradually* decline** as we implement our transformational model.

302.After seven straight quarters of incurring such costs, analysts sought a cleaner GAAP number, but management refused to provide one, however management did acknowledge that optimization and restructuring expenses would continue. (*See supra at* § V.C.3).

320. 303.Management's partial recognition that optimization and restructuring expenses were not in fact non-routine, gave investors pause. For instance, the following day, Morgan Stanley published a report noting:

> Reconciliation of business optimization costs vs. progress toward long-term profitability goals. XELA had previously outlined long-term adjusted EBITDA in the range of 22% to 23%, though we have yet to see this target updated. As the company is still expected to incur business optimization costs in FY19, we lack guidance around timing to reconcile when such profitability may be achieved.

321. 304.Following this news, Exela's stock fell $0. 21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume, damaging investors. The stock followed through oncontinued to fall the following day and fell by an additional $0.23 per share, or 6.2%

to close at $3.50 on March ~~20.~~20, 2019.

322.    ~~305.~~On May 9, 2019, the Company revealed that it missed its revenue guidance for 1Q'19 and that its net debt stood at $1.46 billion, putting its leverage ratio at a concerning 5.06x. ~~In addition, the Company's liquidity had declined from $124 million at the end of 3Q'18 to $58 million at the end of 1Q'19. In addition, contrary to the Company's prior assurances that margins would increase as headcount dropped, the Company increased its headcount by nearly 1,000 employees to ramp new contracts, making its 2019 guidance less credible as upfront costs associated with layoffs would be incurred before savings would be realized. Furthermore, the Company disclosed that it was continuing to exit additional low margin contracts.~~

**306.**Also on the May 9 earnings call, for the first time, Exela appears to ~~admit~~have admitted that optimization and restructuring charges are not limited to just the Business Combination or discrete M&A activity. Rather, Reynolds ~~suggests~~suggested that optimization and restructuring are in fact more akin to operating costs, when he details that such costs are associated with large projects.**307.** Investors begin to sense that—despite what they have been led to believe about the ~~nonrecurring~~supposedly "non-routine" nature of optimization and restructuring expenses—such costs will persist. On the earnings call, a Jefferies LLC equity analyst ~~takes~~took management to task by saying "hoping you could talk a little bit more about restructuring and optimization costs that you have here.~~"~~" He ~~continues~~continued, "I mean they've been persistently high."

323. ~~308.~~On May 10, 2019 Morgan Stanley issued a report noting that "liquidity remains a primary concern for the stock with little visibility around how the company may address it." It also stated, "Our call-back with management implied that optimization expenses will continue to exist despite expecting adjusted EBITDA and EBITDA metrics to converge. As such, we expect the company to incur business optimization costs until we receive guidance on timing around when such profitability goals may be achieved."

~~**309.**As demonstrated by the Morgan Stanley analysis, investors began to doubt whether business optimization expenses would ever end and began to price in the reality that such expenses, despite management's representations that they were "non-routine," actually did reflect the current and future operations of Exela.~~

324. ~~310.On~~Following this news, Exela's stock fell $0.17 per share, or 5.0%, to close at $3.21 per share on May 10, 2019.

325. On May On May 22, 2019, Moody's downgraded the Company's debt from Caa1 from B3 based on the 1Q'19 revelations. Moody's lead analyst Harold Steiner was quoted as saying, "Exela's restructuring charges ***consist mostly of headcount*** that it expects to cut as it transitions to more technology-based BPA service offerings… ***We believe these are normal operating expenses necessary to provide its service***, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology

implementation."

326. Following this news, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019 on heavy volume, damaging investors.

327. 311.On August 8, 2019, the Company reduced its 2019 guidance citing, in part, unpredictable postage revenue and the continued impact of exiting the low margin contract in 3Q'18. These announcements. This partially revealed that the Company's visibility into revenues was not 90%, that its revenue was comprised of a material amount of unpredictable, non-recurring, low margin, revenue, and that stranded costs associated with the exit of these low margin contracts would continue to impact margins.

328. 312.On August 9, 2019 RBC issued a report stating, "we estimate that the company generated -$17M in free cash flow during the quarter, but is still free cash flow negative year to date. If we assume that the company's adjustments to EBITDA are cash outlays, then there was little, if any, free cash flow in the quarter, in our estimation." It noted that it was lowering it price target, stating, "Given the focus on liquidity and free cash flow, we believe that the equity will generally trade almost as a stub, or option, relative to the bonds. This makes valuing the shares quite difficult. Given the situation, we are reducing our target price to $4 from $7..."

329. 313.Following this news, Exela's stock fell $1.17 per share, or 47.8%, to close at $1.28 per share on August 9, 2019 on heavy volume, damaging investors.

314.On November 12, 2019, Exela further reduced its 2019 guidance as a result of the continued impact of exiting a low margin contract in 3Q'18 and unpredictable postage revenue. These announcements further revealed that the Company had a substantial amount of unpredictable, nonrecurring, low margin revenue, and the extent to which stranded costs from exiting these contracts would impact margins.

330. 315.On November 13, 2019, Cantor Fitzgerald issued a report noting the 2019 guidance reduction and stating, "The focus for the company remains on improving its leverage ratio in the short term. We expect the company to deliver slight revenue growth with margin expansion over time…. We decrease our EPS estimate to -$1.48 from -$0.51, due to a heavy miss in 3Q19 and revenue and margin guide downs from management."

331. 316.Following this news, Exela's stock fell $0.25 per share, or about 41.7%, to close at $0.35 per share on November 13, 2019 on heavy volume, damaging investors.

332. ~~317.~~Finally on March 16, 2020, Exela announced that it would be delaying the filing of its 2019 Form 10-K and restating its financial results for 2017, 2018, and the first three quarters of 2019.~~318.~~ Following this news, Exela's stock fell $0.05 per share, or ~~27.1~~23.0%, to close at $0.15 per share on March 18, 2020 on heavy volume.

## VIII.   ADDITIONAL SCIENTER ALLEGATIONS

**A.      Exela Had A Pervasive Culture Of Misrepresentation And Knew or Should Have Known That It Was Improper To Addback Optimization and Restructuring Expenses To Its Adjusted EBITDA**

333. ~~319.~~The proceedings before the Delaware Court of Chancery make clear that Exela, led by Chadha, maintains a culture that adopts pervasive misrepresentation. The Court of Chancery noted that, among other things, SourceHOV—Exela's largest subsidiary: (1) sought and received a backdated a valuation model to gain an advantage in litigation; (2) when confronted about the same, denied doing so; (3) "lacked credibility"; (4) [Chadha] was "simply not believable" and "not at all forthright"; and (5) all of his testimony was "tainted."

334. ~~320.~~While these findings were made in different litigation, that litigation concerned SourceHOV's financial statements, which ultimately roll up into Exela's. The court's factual and legal findings were based in part on testimony from current Exela executives, including Exela's current SVP of Finance, and Exela's current ~~Chairman~~Chair.

~~321.~~Testimony from that litigation demonstrates that Exela knew, or should have known, that its addbacks to adjusted EBITDA during the class period were improper. For example, testimony from Exela SVP of Finance, Verma, stated on June 5, 2019 that "and then, as you walk down below, the credit agreement lets you add back certain expenses *which are considered one- time and nonrecurring in nature*; for example, business optimization and fees and expenses incurred in connection with transactions." Verma continued to testify "Again, like I said, the company has a very rigorous process, because there is no -- like I said, because we have to comply with the credit agreement. And what that means is every cost that was *not part of the business as usual* has to be added back. There -- there's no black and white about it. So -- because you have

to show an EBITDA which truly represents the cash availability of the business if these things were to not happen in the usual course."

335. 322.During the same testimony, Verma even went so far as to testify that "the EBITDA definition has to be held sacrosanct. And what I mean by that is every charges which are not a usual course of business are added back to the EBITDA."

336. 323.Verma also revealedestablished the motive that SourceHOV had for including these expenses:. "*it's basically in the company's interest to show an add-back.*" The reason it was in SourceHOV's best interest, according to Verma's testimony, is because "you can also imagine that, you know, if that was not to be added back, the EBITDA would have been lower, so which is *-- which doesn't help the company, from a -- from the perspective it was in, because it was in the market to raise the debt financing*."

337. 324.And just as SourceHOV was raising debt and equity capital before the Business Combination, similarly, during the class period, Exela was motivated to keep its equity value high for equity and debt capital raises.

338. 325.Moreover, because Appraisal Action testimony reveals that bankers from Morgan Stanley, Goldman Sachs, and even SourceHOV's own expert witness communicated to SourceHOV executives, who are know Exela executives, that SourceHOV's adjusted EBITDA addbacks were problematic. Importantly, SourceHOV's expert witness who expressed concern about its addbacks would have likely been given access to the full suite of accounting and financial information unavailable to the public. Thus, after all of the above financial experts conveyed concerns over Exela's practice of adding back recurring expenses to its adjusted EBITDA, Exela likewise knew or should have known that its practice was improper. And as discussed herein, by excluding such expenses, it allowed Exela to meet is own guidance during the periods identified above. Absent the adding back of optimization and restructuring expenses, Exela would not have met its own adjusted EBITDA guidance.

adding back recurring expenses to its adjusted EBITDA, Exela likewise knew or should have known that its practice was improper. And as discussed herein, by excluding such expenses, it allowed Exela to meet is own guidance during the periods identified above. Absent the adding back of optimization and restructuring expenses, Exela would not have met its own adjusted EBITDA guidance.

### B. Implementing Digitization And Automation In Existing Customers Was a Core Operation

326. The fraud alleged herein relating to concealing the true state of affairs with respect to the Company's efforts to increase revenue and margins by implementing automation and digital transformation to its existing customers, all involved Exela's core operation, and knowledge of the fraud may therefore be imputed to Defendants Cogburn, Reynolds, and Chadha.

327. On an August 9, 2017 earnings call, shortly after the merger closed, Cogburn stated, "Exela is positioned well to benefit from significant white space opportunity, which will enable us to cross-sell and to upsell our combined solutions and services into our existing client base." Cogburn further detailed the Company's strategy, noting that the Company had already identified merger cost savings synergies and indicated that the Company was deeply embedded with its clients:

> First, we will focus on delivering against our *identified merger cost savings synergies* and we will continue to seek additional opportunities for cost efficiencies. As a part of this strategy, *we will leverage SourceHOV's proprietary in-house technologies and platforms to displace a large portion of Novitex third party vendors, which we expect will drive sustainable cost efficiencies*.

> Second, we will focus on leveraging our *deeply embedded relationship* as trusted partners with our clients to cross-sell our solutions throughout our global footprint. We see this as a significant growth opportunity. In fact, we already are witnessing this growth potential in our pipeline as multiple clients started asking SourceHOV and Novitex to bid as Exela prior to the close.

328. On the Company's November 9, 2017 earnings call, Cogburn stated "we have significant traction in our go-to-market strategy as new opportunities emerge from our global client base, as a result of the combination." Cogburn added that "[a]nother important aspect of our strategy across all the industries that we serve is our focus on digital transformation from the front

office to the back office.… This priority fits well with Exela's capabilities, which help our clients drive digital transformation across their mission-critical processes."

329. The Company's 2017 10-K filed at the start of the Class Period also discussed this strategy, noting that the Company had ~6,000 employees working on-site with its customers and its strategy to increase demand by bringing automation and digital transformation to its existing customers:

**Key Business Strategies**

The key elements of our growth strategy are described below:

***Pursue meaningful revenue synergy opportunities.*** We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing customer relationships, pursuing new customer opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise.

• *Leverage BPA suite across on-site services.* ***Approximately 6,000 of our employees currently work at customers in an on-site capacity***. We believe this on-site presence is a competitive differentiator and a valuable asset as we pursue future growth opportunities. We aim to deploy our BPA software across these customer locations, and we believe that by offering our customers enhanced productivity and quality through our onsite employees, we will create additional opportunities to expand our footprint and wallet share across the organization. For example, in customers where we provide underwriting support and claims processing, we can enable our onsite employees to accelerate the aggregation and analysis of datasets while also increasing accuracy and automatically flagging deficiencies. By enhancing the productivity and quality of our onsite employees, ***we believe we will increase the demand from our customers*** to replicate our processes across the organization, bolstering our cross-sell/up-sell initiatives. By having our BPA suite already approved and deployed within existing onsite engagements, we believe our ability to expand into new lines of business will be streamlined and accelerated.

• *Expand relationships with existing customers.* ***We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base***. With an installed base of over 3,500 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher-margin bundled solutions. As an example, we now offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

330. The 2017 10-K further noted that this strategy would result in margin expansion, stating, "we intend to further improve our margins through increased focus on operational best practices and cost efficiency through further process standardization, increasing use of automation, and increased focus on quality. Our strategy is that over time this will result in margin expansion and enhanced productivity."

331. On the Company's March 15, 2018 earnings call, Cogburn told an analyst the strategy had been rolled out to all the customers acquired from Novitex, as well as existing customers (referring to SourceHOV customers):

> BRYAN BERGIN: Okay. And just last one here for me. Can you give us an update on your cross-selling progress and particularly as you are aiming to drive more awareness of your offering across the client base?

> RON COGBURN: …Part of the strategy was to be able to take the message two fold. Number one, we picked up about 1,100 customer sites with the acquisition of Novitex, an additional 400 customers are located there. And as we begin to roll out our business process automation we are helping to transform that existing business into a more automated process.
> …So to be able to add automation, whether it's business process automation along with RPA or just pure business process automation, it creates a different conversation with those customers. Because now we are able to do things in a more automated way, a more efficient way with fewer errors and it creates what I would call a more sticky relationship with those customers.

> So, ***we have rolled out that thesis across all of those customers we picked up with that acquisition as well as our existing customer base***.

332. On the Company's August 9, 2018 earnings call, Cogburn stated, "Our strategy, which is to provide business process automation services to ***all of our customers***, positions us for long-term growth."

333. While Defendants did not reveal how low the margins were for these Novitex customers or that some had no margin at all, or that they had no path to automation or digital transformation, or what portion of Exela's revenue these customers accounted for, Defendants were aware of the low margins Novitex customers and repeatedly assured that they would be able to improve margins through automation and digital transformation. Reynolds stated on the November 9, 2017 earnings call, "a number of these Novitex contracts, while their margins were good, they were smaller than legacy Source HOV, because they have to use technology from third-parties. So, as we continue to put our proprietary software and systems into these contracts, we'll pull out that incremental cost and we'll get margin expansion."

334. Cogburn similarly indicated on the August 2019 Call, stating:

> COGBURN: …And so the way you look at the business, and I think from the beginning of the formation of Exela, we talked about part of our business that was ripe for digital transformation and that's really what we've talked about.

~~The former Novitex group was really made up of a couple of big buckets. You had mail room, mail room logistics, you had print reprographics. And as we indicate here, *those gross margins were lower,* and I think we've always stated that. So for us, and we look at what we had done historically for the last 10 years, our gross margins being 35%, we know that over time, we're going to be able to transform this. We're going to be able to put automation where there is no automation.~~

~~335. Defendants also repeatedly discussed the timeline for implementing this strategy and continued to extend the timeline for when the strategy would be complete, indicating that the Company had analyzed its customer base and knew of customers that had no path towards automation or digital transformation. For example, on the May 10, 2018 earnings call, Reynolds stated, "We are continuing down the path to transform our lower margin business, Exela Enterprise Solutions, which we acquired in July of 2017. We are making good progress, and we expect this transformation to take about 12 to 15 months." On the same call, Reynolds confirmed that the time frame began in July 2017 when the merger deal closed (*see supra* ¶223), indicating that the transformation would be completed no later than October 2018. Later on the August 9, 2019 earnings call, Cogburn stated "our transformation efforts are working and it'll take another 12 to 18 months to complete."~~

~~336. Given that increasing revenue and margins through implementation automation and digital transformation to existing customers was a key strategy, and that Exela was embedded with these customers and aware of the margins derived from these revenues, Defendants knew or should have known that these low margin customers had no path to automation or digital transformation.~~

**B.** ~~C.~~**Defendants Failed to Break Out Postage Revenue But Had Been Tracking It**

~~337.~~Defendants failure to break out or disclose the material amount of unpredictable no margin postage revenue until August 2019 is indicative of scienter. Indeed, Defendants were asked about the impact of postage revenue on margins on the May 2018 call and Reynolds made no mention of the substantial amount of unpredictable no margin postage revenue, merely responding "we don't really break out postage separately." (*see supra* ¶~~133).~~172). The above statement demonstrates a purposeful effort to conceal postage revenue because Defendants knew that they tracked postage as the balance sheet asset "customer deposits" – primarily reflected customer advances for postage— and appeared on the Company's balance sheet in every quarter since the third quarter 2017.

339. ~~338.~~On June 9, 2020, when the Defendants issued its restated financial results, it was revealed that unpredictable no margin postage revenue for 2018 was $310.1 million or approximately 20% of Exela's revenue, and 273.5 million for 2019 or approximately 18% of revenue. Low margin contracts further worsened the Company's visibility into revenue. (*see supra*

¶¶195, 198234). These figures revealed not only that Defendants' did not have 90% visibility into revenue as they claimed; but also, that postage revenue was even higher in 2018 than 2019, indicating that Defendants were intentionally obscuring the true state of the Company's revenues and margins.

340.    Moreover, in the 2018 10-K, the Company also disclosed that one of the material weaknesses over internal controls that it identified was "Ineffective control activities related to the following consolidated accounts: . . . the completeness, existence and accuracy of revenue and deferred revenue transactions, including customer deposits and accounts receivable." The customer deposits was the very line item on the balance sheet that Exela used to book an asset for postage advances received from customers. Thus, Defendants either (a) knew the postage contribution to revenue because they were tracking it; or (b) were reckless in saying that 90% of its revenue was highly visible when 20% of said revenue came from postage after the Company had already identified that a material weakness existed related to their "completeness, existence

and accuracy of revenue and deferred revenue transactions, including customer deposits [i.e., advances for postage].”

    **C.    Chadha Reaped Almost $33 Million In Proceeds From Class Period Stock Sales**

341.    On April 16, 2018, and shortly *after* Chadha requested the Backdated Valuation from Rothschild but *before* Defendants disclosed: (a) Exela's estimated liability in the Appraisal Action; (b) that ~ 20% of Exela's revenue was not in fact highly visible but rather was comprised of unpredictable postage revenue; (c) that it lacked internal controls including insufficient oversight and governance from the Board of Directors; and (d) that its Adjusted EBITDA addbacks included expenses that were routine operating expenses which management could control, Chadha sold seven million shares of stock at a price of $4.69 per share, generating proceeds of

$32,830,000. The price that Chadha sold his stock was 3,134% higher than the Class Period low of just $0.15 per share less than two years later, on March 18, 2020. The timing and magnitude of Chadha's windfall contribute to a strong inference of scienter.

342.    This was Chadha's first and only stock sale made during the Class Period.

343.    Another motive for Defendants to misrepresent the appraisal liability arises because

had they paid Manichean what it was owed (when it was owed) – the Business Combination may not have transpired because a key condition to the lenders financing the Business Combination was collateral secured in part by Manichaean's shares.

344.    To obtain financing for the Business Combination, Chadha and Cogburn had to pledge their equity in SourceHOV to a facility called Ex-Sigma 2, LLC. Ex-Sigma 2, LLC in turn served as collateral to secure certain financing incurred in connection with the Business Combination. This loan – backed by shares of SourceHOV stock – was referred to as "the Margin Loan." At the Appraisal Action, Chadha's was questioned about the Margin Loan as follows:

Q.    What were the terms of that loan?
A.    They were very onerous. It was -- they wanted security all of the 80.6 million shares that we were going to receive. They wanted that as collateral. They -- they also

took collateral for all the shares we received for putting in the gap money -- so we were putting in 55 or 57 million -- and all the shares we would get -- it was about 8 or 9 million shares

-- they wanted that as collateral. And it was 13 percent interest rate and it had all kind of penalties.

Q.    Now, I think the parties have been talking about this loan as the margin loan. Are you?

A.    Yes.

Q.    -- okay with that?

A.    That's the same.

Q.    Okay. And so the margin loan was secured by all of the consideration that SourceHOV was going to get in the transaction?

A.    That's correct.

Q.    And it was also secured by all of the shares that SourceHOV would obtain through the backstop financing.

A.    That's correct.

Q.    Did the lenders' demand for that security affect the structure of the business combination itself?

A.    Of course. The original BCA had no contemplation of this.

*    *    *

A.    There was no Ex-Sigma in the original. It was simply merger with Quinpario.

**Q.    *So but for the margin loan, would this preliminary merger have occurred?***

**A.    *Without margin loan, no.***

Q.    Okay. And can you just explain how the preliminary merger worked?

A.    It meant that we create a -- a company called Ex-Sigma, which will hold all the shares so that the lenders of the full backstop could have all of the securities received from the Quinpario for the merger. So it became the holder post-closing of the 807.6 and the borrower of the backstop facility.

Q.    And so then the result of the preliminary merger is that HGM and the other former SourceHOV stockholders hold an interest in Ex-Sigma.

A.    Correct.

Q.    And then Ex-Sigma is holding all the collateral from the transaction.

A.    That's correct.

345.    Had Exela paid Manichean at the time of the Business Combination, it would have had fewer shares outstanding to secure the Margin Loan. For instance, following the Appraisal Action, Exela's 10-K states that "As a result of the Appraisal Action, 4,570,734 shares of our Common Stock issued to Ex-Sigma 2, our principal stockholder at the Closing of the Novitex Business Combination, have been returned to the Company during the first quarter of 2020." It further states that "These are the number of shares of our Common Stock issued at the Closing of the Novitex Business Combination to Ex-Sigma 2 in respect of the former stockholders' shares subject to the Appraisal Action that were returned to the Company during the first quarter of 2020."

**D.      The Company Had Material Weaknesses Over Internal Controls In Areas That Directly Bear On The Fraud Here**

346.    In the 2019 10-K the Company admitted the following:

**Management's Report on Internal Control over Financial Reporting**
Management, under the supervision of the board of directors, is responsible for establishing and maintaining adequate "internal control over financial reporting," as defined in Rules 13a-15(f) and 15d-15(f) under the Exchange Act. . .

A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of annual or interim financial statements will not be prevented or detected on a timely basis.

Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2019 using the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission in Internal Control-Integrated Framework (2013) (the "COSO 2013 Framework"). Based on its assessment, our management, including our CEO and CFO, has concluded that our internal control over financial reporting was not effective as of December 31, 2019 due to material weaknesses in our internal control over financial reporting described below.

The Company did not design, implement and operate effective process-level control activities related to order-to-cash (including revenue, customer deposits, accounts receivable, deferred revenue and cost to obtain a contract), procure-to-pay (including operating expenses, accounts payable, and accrued liabilities), hire-to-pay (including compensation expense and accrued liabilities), leases (including accounting for the adoption of the new lease standard, right-of-use asset and lease liability), goodwill, restricted cash, share based compensation, journal entries and preparation of the consolidated financial statements, and other financial reporting processes, as well as accounting for significant unusual transactions.

In addition, the Company did not design, implement and operate effective process-level control activities related to the approval, authorization and disclosure of related party transactions.

The Company did not design, implement, and operate effective general information technology controls (GITCs) over user and privileged access to information technology (IT) systems at multiple components in order to adequately restrict access to appropriate finance and IT personnel and enforce appropriate segregation of duties. As a result, process-level automated control activities and manual control activities that are dependent upon information derived from IT systems were also ineffective.

These deficiencies in process-level control activities and GITCs were largely caused by an ineffective control environment as follows:

          □   There was not sufficient oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting;

          \* \* \* The deficiencies in the control environment also created deficiencies in the Company's risk assessment process, information and communication and monitoring activities as follows:

          □   There was not sufficient oversight and governance from the Board of Directors in the design, implementation and execution of internal control over financial reporting;

          □   Financial reporting objectives were not clearly specified to enable the identification and assessment of risks, including complying with applicable accounting standards;

          □   The risk assessment process failed to identify and assess risks of misstatement, including fraud risks, to ensure controls were designed and implemented to respond to those risks;

## IX.    CORPORATE SCIENTER ALLEGATIONS

347. ~~339.~~ The Company is liable for the acts of the Individual Defendants and its other employees and agents under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment and/or agency.

348. ~~340.~~ The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under the corporate scienter doctrine, *respondeat superior*, and agency principles.

## X.    CLASS ACTION ALLEGATIONS

349. ~~341.~~ Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of the Class, consisting of all individuals and entities that purchased or acquired Exela shares between March 16, 2018 and March 16, 2020, inclusive, seeking remedies under Sections 10(b) and 20(a) of the Exchange Act. Excluded from the Class are Defendants, the officers and directors of the Company (at all relevant times), members of their immediate families and their legal representatives, heirs, successors or assigns, and any entity in which Defendants have or had a controlling interest.

342. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Exela's shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of Exela shares were traded publicly during the Class Period on the NASDAQ. As of November 5, 2018, Exela had 151,648,643 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by Exela or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

350. 343. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

351. 344. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

352. 345. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a. whether the federal securities laws were violated by Defendants' acts as alleged herein;

b. whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of Exela;

c. whether Defendants knew or deliberately disregarded that their statements were false and misleading;

d. whether the price of Exela securities were artificially inflated because of Defendants' conduct complained of herein; and

e. to what extent the members of the Class have sustained damages and the

proper measure of damages.

346. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs complained of herein. Moreover, there will be no difficulty in the management of this action as a class action.

## XI. APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD- ON-THE-MARKET DOCTRINE)

353. 347. The market for Exela's shares was open, well-developed, and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Exela's securities traded at artificially inflated prices during the Class Period. On September 19, 2018 the Company's shares closed at a Class Period high of $7.30 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's shares relying upon the integrity of the market price of Exela's shares and market information relating to Exela, and have been damaged thereby.

354. 348. During the Class Period, the artificial inflation of Exela's stock was caused by the material misrepresentations and/or omissions particularized in this Complaint, which in turn caused the damages sustained by Plaintiffs and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements and/or omissions about Exela's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Exela and its business, operations, and prospects, thus causing the price of the Company's shares to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements and/or omissions during the Class Period resulted in Plaintiffs and other members of the Class purchasing the

Company's shares at such artificially inflated prices, and each of them has been damaged as a result.

349. At all relevant times, the market for Exela's shares was an efficient market for the following reasons, among others:

    a.    Exela stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

    b.    As a regulated issuer, Exela filed periodic public reports with the SEC and/or the NASDAQ;

    c.    Exela regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

    d.    Exela was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports were publicly available and entered the public marketplace; and/or

    e.    The average daily trading volume for Exela securities during the Class Period was approximately 332,000 shares, with more than 151,648,643 shares outstanding as of November 5, 2018, and a market capitalization reaching almost $1.1 billion during the Class Period.

355. 350. As a result of the foregoing, the market for Exela's shares promptly digested current information regarding Exela from all publicly available sources and reflected such information in Exela's stock price. Under these circumstances, all purchasers of Exela's shares during the Class Period suffered similar injury through their purchase of Exela's securities at artificially inflated prices and a presumption of reliance applies.

356. 351. A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in Affiliated Ute Citizens of Utah v. U.S., 406 U.S. 128 (1972), because

the Class's claims are, in large part, grounded on Defendants' material misrepresentations and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## XII. INAPPLICABILITY OF THE STATUTORY SAFE HARBOR AND BESPEAKS CAUTION DOCTRINE

357. ~~352.~~The statutory safe harbor and/or bespeaks caution doctrine applicable to forward- looking statements under certain circumstances do not apply to any of the allegedly false statements pleaded in this Complaint.

358. ~~353.~~The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

359. ~~354.~~In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward- looking statements because at the time of each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Exela who knew that the statement was false when made.

Supp.App. 0202

## XIII. CLAIMS

### FIRST CLAIM
### Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants

Plaintiffs repeat and re-allege each allegation contained above as if fully set forth herein.

360. 355. 361. 356. This claim is asserted against all Defendants and is based on Section 10(b) of the Exchange Act.

362. 357. During the Class Period, the Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; and (ii) cause Plaintiffs and other members of the Class to purchase Exela's shares at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Defendants took the actions set forth herein.

363. 358. The Defendants (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares in an effort to maintain artificially high market prices for Exela's shares in violation of Section 10(b) of the Exchange Act and Rule 10b-5. All the Defendants were either primary participants in the wrongful and illegal conduct charged herein or were controlling persons as alleged below.

364. 359. The Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about Exela's financial well-being and prospects, as specified herein.

365. 360. The Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a

course

Supp.App. 0204

of conduct as alleged herein in an effort to assure investors of Exela's value and performance and continued growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about Exela and its business operations and prospects, in light of the circumstances under which they were made, not misleading, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's shares during the Class Period.

361.Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of the Individual Defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of the Individual Defendants enjoyed significant personal contact and familiarity with the other Individual Defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, and operations at all relevant times; and (iv) each of the Individual Defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

## SECOND CLAIM Violations of Section 20(a) of the Exchange Act Against the Individual Defendants

366.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

367.    This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

368. The Individual Defendants acted as controlling persons of Exela within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

369. In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.

370. As set forth above, Exela and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Exela's primary Exchange Act Section 10(b) violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the Class Period.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

(a) A determination that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

Supp.App. 0206

(b)     An award of compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained due to Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)     An award to Plaintiffs and the Class of their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

(d)     Such other and further relief as the Court may deem just and proper.

362. The Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. The Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Exela's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities. As demonstrated by the Defendants' overstatements and/or misstatements of the Company's business, operations, financial well-being, and prospects throughout the Class Period, the Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

371. 363. Because of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of Exela's shares was artificially inflated during the Class Period. In ignorance of the fact that the market price of the Company's shares was artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the shares traded, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, and not disclosed in public during the Class Period, Plaintiffs and the other members of the Class acquired Exela's shares during the Class Period at artificially high prices, and were damaged thereby.

372. 364. At the time of said misrepresentations and/or omissions, Plaintiffs and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiffs and the other members of the Class and the marketplace known the truth regarding the Company's misrepresentations, which were not disclosed by the Defendants, Plaintiffs and other members of the Class would not have purchased or otherwise acquired their Exela shares, or, if they had acquired such shares during the Class Period, they would not have done so at the artificially inflated prices which they paid.

373. 365. Because of the foregoing, the Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

374. 366. As a direct and proximate result of the Section 10(b) Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases and acquisitions of Exela securities during the Class Period.

**SECOND CLAIM Violations of Section 20(a) of the Exchange Act Against the Individual Defendants**

367. Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

368. This claim is asserted against the Individual Defendants and is based on Section 20(a) of the Exchange Act.

369. The Individual Defendants acted as controlling persons of Exela within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings and other

~~statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.~~

~~**370.** In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular statements giving rise to the securities law violations as alleged herein and exercised the same.~~

~~**371.** As set forth above, Exela and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint. Because of their positions as controlling persons, the Individual Defendants are thus liable pursuant to Section 20(a) of the Exchange Act for Exela's primary Exchange Act Section 10(b) violations. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's Shares during the~~

~~Class Period.~~

## XV.  JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: August ~~11, 2020~~5, 2021

Respectfully submitted,

*/s/ Joe Kendall*_____
Joe Kendall
Texas Bar No. 11260700
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450 Dallas, Texas
75219 Telephone: 214-744-3000 Facsimile:
214-744-3015 Email:
jkendall@kendalllawgroup.com

*Local Counsel for Lead Plaintiffs Insur Shamgunov
and Elena Shamgunova*

**GLANCY PRONGAY & MURRAY LLP**


By: s/ Lionel Z. Glancy
Lionel Z. GlancyKara M. Wolke
(*pro hac vice*) Raymond D. Sulentic
Christopher R. Fallon(*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com
*Counsel for Lead Plaintiffs Insur Shamgunov and Elena Shamgunova*

Supp.App. 0210

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed with the Court's electronic case filing (ECF) system on August 5, 2021, which caused an electronic copy of this document to be served on all counsel of record on August 11, 2020 via CM/ECF, in accordance with the Federal Rules of Civil Procedure in this matter who have registered for ECF service.

/s/ Joe Kendall
JOE KENDALL

Document comparison by Workshare Professional on Thursday, August 5, 2021
5:24:57 PM

| Input: | |
|---|---|
| Document 1 ID | file://C:\Users\ps09996\Documents\Exela-amended-complaint.pdf |
| Description | Exela-amended-complaint |
| Document 2 ID | file://C:\Users\ps09996\Documents\Exela-Shen-Second-Amended-Complaint.pdf |
| Description | Exela-Shen-Second-Amended-Complaint |
| Rendering set | Standard |

| Legend: | |
|---|---|
| Insertion | |
| Deletion | |
| Moved from | |
| Moved to | |
| Style change | |
| Format change | |
| Moved deletion | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | |
|---|---|
| | Count |
| Insertions | 2152 |
| Deletions | 1319 |
| Moved from | 91 |
| Moved to | 91 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 3653 |

Supp.App. 0212

Supp.App. 0213

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 216 of 1110   PageID 1837

SC 13D/A 1 a18-11076_1sc13da.htm SC 13D/A

CUSIP No. 30162V102

SCHEDULE 13D

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

## SCHEDULE 13D

**Under the Securities Exchange Act of 1934**
**(Amendment No. 1)**

# Exela Technologies, Inc.

(Name of Issuer)

**Common Stock, par value $0.0001 per share**

(Title of Class of Securities)

**30162V102**

(CUSIP Number)

**Andrej Jonovic**
**HandsOn Global Management**
**8550 West Desert Inn Road, Suite 102-452**
**Las Vegas, Nevada 89117**
**424-268-8900**

**With a copy to:**
**Maurice M. Lefkort**
**Willkie Farr & Gallagher LLP**
**787 Seventh Avenue**
**New York, New York 10019**
**212-728-8000**

(Name, Address and Telephone Number of Person
Authorized to Receive Notices and Communications)

**April 16, 2018**

(Date of Event Which Requires Filing of this Statement)

If the filing person has previously filed a statement on Schedule 13G to report the acquisition which is the subject of this statement on Schedule 13D (this "Schedule 13D"), and is filing this schedule 13D because of Rule 13d-1(e), 13d-1(f) or 13d-1(g), check the following box. ☐

**Note**: Schedules filed in paper format shall include a signed original and five copies of the schedule, including all exhibits. See Rule 13d-7 for other parties to whom copies are to be sent.

\* The remainder of this cover page shall be filled out for a reporting person's initial filing on this form with respect to the subject class of securities, and for any subsequent amendment containing information which would alter disclosures provided in a prior cover page.

The information required on the remainder of this cover page shall not be deemed to be "filed" for the purpose of Section 18 of the Securities Exchange Act of 1934 (the "Act") or otherwise subject to the liabilities of that section of the Act but shall be subject to all other provisions of the Act (however, see the Notes).

Supp.App. 0214

CUSIP No. 30162V102

## SCHEDULE 13D

| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HOVS LLC |

| 2 | Check the Appropriate Box if a Member of a Group |

(a)   ☐

(b)   ☐

| 3 | SEC Use Only |

| 4 | Source of Funds<br>OO |

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)   ☐ |

| 6 | Citizenship or Place of Organization<br>Delaware |

Number of Shares Beneficially Owned by Each Reporting Person With

| 7 | Sole Voting Power<br>0 |

| 8 | Shared Voting Power<br>81,175,973 |

| 9 | Sole Dispositive Power<br>0 |

| 10 | Shared Dispositive Power<br>81,175,973 |

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person |

Supp.App. 0215

81,175,973

| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |

| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |

| 14 | Type of Reporting Person<br>OO |

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

2

CUSIP No. 30162V102

## SCHEDULE 13D

| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HandsOn Fund 4 I LLC |

| 2 | Check the Appropriate Box if a Member of a Group |
| | (a) ☐ |
| | (b) ☐ |

| 3 | SEC Use Only |

| 4 | Source of Funds<br>OO |

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e) ☐ |

| 6 | Citizenship or Place of Organization<br>Nevada |

Supp.App. 0216

| | | |
|---|---|---|
| | 7 | Sole Voting Power<br>0 |
| Number of Shares Beneficially Owned by Each Reporting Person With | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |
| | 10 | Shared Dispositive Power<br>81,175,973 |

| | |
|---|---|
| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 |
| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)  ☐ |
| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |
| 14 | Type of Reporting Person<br>OO |

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

3

CUSIP No. 30162V102

**SCHEDULE 13D**

| | |
|---|---|
| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HOV Capital III LLC |

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 220 of 1110    PageID 1841

2    Check the Appropriate Box If a Member of a Group

(a)    ☐

(b)    ☐

3    SEC Use Only

4    Source of Funds
OO

5    Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)    ☐

6    Citizenship or Place of Organization
Nevada

| | | |
|---|---|---|
| | 7 | Sole Voting Power<br>0 |
| Number of Shares Beneficially Owned by Each Reporting Person With | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |
| | 10 | Shared Dispositive Power<br>81,175,973 |

11    Aggregate Amount Beneficially Owned by Each Reporting Person
81,175,973

12    Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)    ☐

13    Percent of Class Represented by Amount in Row (11)
52.1% (1)

14    Type of Reporting Person
OO

Supp.App. 0218

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

<div align="center">4</div>

CUSIP No. 30162V102

<div align="center">**SCHEDULE 13D**</div>

| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HOV Services Ltd |
|---|---|

| 2 | Check the Appropriate Box if a Member of a Group |
|---|---|
| | (a) ☐ |
| | (b) ☐ |

| 3 | SEC Use Only |
|---|---|

| 4 | Source of Funds<br>OO |
|---|---|

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)  ☐ |
|---|---|

| 6 | Citizenship or Place of Organization<br>India |
|---|---|

| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power<br>0 |
|---|---|---|
| | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |

| | |
|---|---|
| 10 | Shared Dispositive Power<br>81,175,973 |

| | |
|---|---|
| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 |

| | |
|---|---|
| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |

| | |
|---|---|
| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |

| | |
|---|---|
| 14 | Type of Reporting Person<br>OO |

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

5

CUSIP No. 30162V102

**SCHEDULE 13D**

| | |
|---|---|
| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>Adesi 234 LLC |

| | | |
|---|---|---|
| 2 | Check the Appropriate Box if a Member of a Group | |
| | (a) | ☐ |
| | (b) | ☐ |

| | |
|---|---|
| 3 | SEC Use Only |

| | |
|---|---|
| 4 | Source of Funds<br>OO |

Supp.App. 0220

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e) ☐ |
|---|---|

| 6 | Citizenship or Place of Organization<br>Nevada |
|---|---|

| | 7 | Sole Voting Power<br>0 |
|---|---|---|
| Number of Shares Beneficially Owned by Each Reporting Person With | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |
| | 10 | Shared Dispositive Power<br>81,175,973 |

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 |
|---|---|

| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐ |
|---|---|

| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |
|---|---|

| 14 | Type of Reporting Person<br>OO |
|---|---|

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

6

CUSIP No. 30162V102

Supp.App. 0221

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 224 of 1110    PageID 1845

**SCHEDULE 13D**

| | | |
|---|---|---|
| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HOF 2 LLC | |
| 2 | Check the Appropriate Box if a Member of a Group | |
| | (a) | ☐ |
| | (b) | ☐ |
| 3 | SEC Use Only | |
| 4 | Source of Funds<br>OO | |
| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)    ☐ | |
| 6 | Citizenship or Place of Organization<br>Nevada | |

| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power<br>0 |
|---|---|---|
| | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |
| | 10 | Shared Dispositive Power<br>81,175,973 |

| | | |
|---|---|---|
| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 | |
| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)    ☐ | |

Supp.App. 0222

| 13 | Percent of Class Represented by Amount in Row (11) |
|---|---|
|    | 52.1% (1) |

| 14 | Type of Reporting Person |
|---|---|
|    | OO |

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

7

CUSIP No. 30162V102

**SCHEDULE 13D**

| 1 | Name of Reporting Persons |
|---|---|
|   | I.R.S. Identification Nos. of Above Persons (Entities Only) |
|   | Ex-Sigma 2 LLC |

| 2 | Check the Appropriate Box if a Member of a Group |
|---|---|
|   | (a)  ☐ |
|   | (b)  ☐ |

| 3 | SEC Use Only |
|---|---|

| 4 | Source of Funds |
|---|---|
|   | OO |

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)  ☐ |
|---|---|

| 6 | Citizenship or Place of Organization |
|---|---|
|   | Delaware |

| Number of Shares Beneficially | 7 | Sole Voting Power |
|---|---|---|
|   |   | 0 |

Supp.App. 0223

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 226 of 1110    PageID 1847

Owned by
Each
Reporting
Person With

| 8 | Shared Voting Power<br>81,175,973 |
|---|---|

| 9 | Sole Dispositive Power<br>0 |
|---|---|

| 10 | Shared Dispositive Power<br>81,175,973 |
|---|---|

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 |
|---|---|

| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)  ☐ |
|---|---|

| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |
|---|---|

| 14 | Type of Reporting Person<br>OO |
|---|---|

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

8

CUSIP No. 30162V102

**SCHEDULE 13D**

| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>Ex-Sigma LLC |
|---|---|

| 2 | Check the Appropriate Box if a Member of a Group |
|---|---|

| | (a) | ☐ |
|---|---|---|

Supp.App. 0224

(b) ☐

| 3 | SEC Use Only |
|---|---|

| 4 | Source of Funds<br>OO |
|---|---|

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)  ☐ |
|---|---|

| 6 | Citizenship or Place of Organization<br>Delaware |
|---|---|

| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power<br>0 |
|---|---|---|
| | 8 | Shared Voting Power<br>81,175,973 |
| | 9 | Sole Dispositive Power<br>0 |
| | 10 | Shared Dispositive Power<br>81,175,973 |

| 11 | Aggregate Amount Beneficially Owned by Each Reporting Person<br>81,175,973 |
|---|---|

| 12 | Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)  ☐ |
|---|---|

| 13 | Percent of Class Represented by Amount in Row (11)<br>52.1% (1) |
|---|---|

| 14 | Type of Reporting Person<br>OO |
|---|---|

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 228 of 1110    PageID 1849

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

9

CUSIP No. 30162V102

**SCHEDULE 13D**

| 1 | Name of Reporting Persons<br>I.R.S. Identification Nos. of Above Persons (Entities Only)<br>HandsOn Global Management LLC |
|---|---|

| 2 | Check the Appropriate Box if a Member of a Group |
|---|---|
| | (a) ☐ |
| | (b) ☐ |

| 3 | SEC Use Only |
|---|---|

| 4 | Source of Funds<br>OO |
|---|---|

| 5 | Check Box if Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e)    ☐ |
|---|---|

| 6 | Citizenship or Place of Organization<br>Delaware |
|---|---|

| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power<br>0 |
|---|---|---|
| | 8 | Shared Voting Power<br>82,425,973 |
| | 9 | Sole Dispositive Power<br>0 |

Supp.App. 0226

10    Shared Dispositive Power
82,425,973

11    Aggregate Amount Beneficially Owned by Each Reporting Person
82,425,973

12    Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions)    ☐

13    Percent of Class Represented by Amount in Row (11)
52.9% (1)

14    Type of Reporting Person
OO

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC.

10

CUSIP No. 30162V102

**SCHEDULE 13D**

1    Name of Reporting Persons
I.R.S. Identification Nos. of Above Persons (Entities Only)
Par Chadha

2    Check the Appropriate Box if a Member of a Group

(a)    ☐

(b)    ☐

3    SEC Use Only

4    Source of Funds
OO

Supp.App. 0227

5 Check Box If Disclosure of Legal Proceedings Is Required Pursuant to Item 2(d) or 2(e) ☐

6 Citizenship or Place of Organization
United States of America

| | | |
|---|---|---|
| Number of Shares Beneficially Owned by Each Reporting Person With | 7 | Sole Voting Power 62,846 |
| | 8 | Shared Voting Power 82,425,973 |
| | 9 | Sole Dispositive Power 62,846 |
| | 10 | Shared Dispositive Power 82,425,973 |

11 Aggregate Amount Beneficially Owned by Each Reporting Person
82,488,819

12 Check Box if the Aggregate Amount in Row (11) Excludes Certain Shares (See Instructions) ☐

13 Percent of Class Represented by Amount in Row (11)
52.9% (1)

14 Type of Reporting Person
IN

_____

(1) Calculations are based upon 152,565,218 shares of Common Stock of the Issuer outstanding, as of April 5, 2018, as reported in the Issuer's Prospectus Supplement, plus 3,263,473 shares of Common Stock issuable upon conversion of Preferred Stock of the Issuer held by Ex-Sigma 2, LLC, plus 62,846 shares of Common Stock issuable upon the vesting of Restricted Stock Units awarded to Mr. Chadha.

11

CUSIP No. 30162V102

Supp.App. 0228

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 231 of 1110     PageID 1852

The information in this Amendment No. 1 to Schedule 13D (this "First Amendment" or this "13D/A") amends the Schedule 13D (the "Schedule 13D") filed with the U.S. Securities and Exchange Commission (the "SEC") by Mr. Par Chadha, HandsOn Global Management, LLC, a Delaware limited liability company ("HGM"), Ex-Sigma 2 LLC, a Delaware limited liability company ("Ex-Sigma 2"), Ex-Sigma LLC, a Delaware limited liability company ("Ex-Sigma"), HOVS LLC, a Delaware limited liability company ("HOVS"), HandsOn Fund 4 I, LLC, a Nevada limited liability company ("HOF 4"), HOV Capital III, LLC, a Nevada limited liability company ("HOV 3"), HOV Services Ltd., an Indian limited company ("HOV Services"), Adesi 234 LLC, a Nevada limited liability company ("Adesi"), HOF 2 LLC, a Nevada limited liability company ("HOF 2" and together with Mr. Chadha, Ex-Sigma, Ex-Sigma 2, HGM, HOVS, HOV Services, HOF 4, HOV 3, and Adesi, the "Reporting Persons") on July 24, 2017, relating to the common stock, par value $0.0001 per share (the "Common Stock"), of Exela Technologies, Inc. (the "Issuer").

This First Amendment is filed to reflect that on April 16, 2018, Ex-Sigma 2 sold 7,000,000 shares of Common Stock of the Issuer in an underwritten public offering.

**Item 2. Identity and Background.**

Item 2 of the Schedule 13D is hereby amended as follows:

Ex-Sigma 2 directly owns 77,912,500 Shares of the Issuer and 2,669,233 shares of Series A Perpetual Convertible Preferred Stock (the "Preferred Stock") of the Issuer.

Ex-Sigma is the sole equityholder of Ex-Sigma 2. HOVS, HOF 4, and HOV 3 each directly own equity interests in Ex-Sigma. HOVS is a wholly-owned subsidiary of HOV Services. Adesi and HOF 2 together are promoters of HOV Services. Adesi and HOF 2 together own a majority of HOF 4. Adesi, and HOF 2 together own a majority of the equity interests of HOV 3.

HGM directly owns 1,250,000 shares of Common Stock. Mr. Par Chadha may be deemed to control HGM and the other Reporting Persons.

**Item 3. Source and Amount of Funds or Other Consideration**

Item 3 of the Schedule 13D is hereby supplemented as follows:

On April 2, 2018, pursuant to the terms and conditions of the Director Compensation Policy and 2018 Stock Incentive Plan, Mr. Chadha was granted 25,878 Restricted Stock Units, each of which will vest in full immediately prior to the 2018 annual meetings of the stockholders of the Issuer, and 36,968 Restricted Stock Units, which will vest in three equal installments immediately prior to the 2018, 2019, and 2020 annual meetings of the stockholders of the Issuer.  Each Restricted Stock Unit represents the right to receive, following vesting, one share of Common Stock.

**Item 5. Interest in Securities of the Issuer.**

Item 5 of the Schedule 13D is hereby amended and restated as follows:

Ex-Sigma 2 directly owns 77,912,500 shares of Common Stock and 2,669,233 shares of Preferred Stock (convertible into 3,263,473 shares of Common Stock), representing beneficial ownership of 52.1% of the Common Stock. Ex-Sigma owns all of the outstanding equity interests in Ex-Sigma 2, and thus may be deemed to share beneficial ownership of such Common Stock. Each of the other Reporting Persons (other than HGM) are direct or indirect equityholders of Ex-Sigma and may be deemed to share beneficial ownership of such Common Stock. HGM directly owns an additional 1,250,000 shares of Common stock, and thus may be deemed to beneficially own 82,425,973 shares of Common Stock representing 52.9% of the Common Stock.  Mr. Chadha directly has been granted 62,846 Restricted Stock Units, each of which represents the right to receive, following vesting, one share of Common Stock, and thus may be deemed to beneficially own 82,464,174 shares of Common Stock representing 52.9% of the Common Stock.

Percentages in this Schedule 13D for all Reporting Persons other than Mr. Chadha are calculated based on the quotient obtained by dividing (i) the aggregate number of shares of Common Stock (x) beneficially owned by the applicable Reporting Person, and (y) issuable upon conversion of Preferred Stock held by the Reporting Person, whether or not the Preferred Stock is presently convertible, and assuming a conversion rate of 1.2226 shares of Common Stock for each share of Preferred Stock, by

12

Supp.App. 0229

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 232 of 1110 PageID 1853

(ii) the sum of (x) 152,565,218 shares of Common Stock outstanding as of April 5, 2018 as reported in the Issuer's Prospectus Supplement and (y) the amount set forth in clause (i)(y).

Percentages in this Schedule 13D for Mr. Chadha are calculated based on the quotient obtained by dividing (i) the aggregate number of shares of Common Stock (x) beneficially owned by Mr. Chadha, (y) issuable upon conversion of Preferred Stock held by the Reporting Person, whether or not the Preferred Stock is presently convertible, and assuming a conversion rate of 1.2226 shares of Common Stock for each share of Preferred Stock, and (z) issuable upon vesting of Restricted Stock Units owned by the Reporting Person whether or not such vesting is to occur within 60 days, by (ii) the sum of (x) 152,565,218 shares of Common Stock outstanding as of April 5, 2018 as reported in the Issuer's Prospectus Supplement, and (y) the amount set forth in clause (i)(y), and (z).

The Reporting Persons are reporting beneficial ownership over the Common Stock issuable upon conversion of the Preferred Stock and vesting of the Restricted Stock Units, even though such conversion and vesting may not occur within 60 days of the date hereof. Other than for purposes of this Report, the Reporting Persons expressly disclaim such beneficial ownership, and nothing herein shall be deemed to be an admission by any Reporting Person as to the beneficial ownership of such shares. To the Reporting Persons' knowledge, no Shares are beneficially owned by any Scheduled Person other than Mr. Chadha..

(c) On April 16, 2018, Ex-Sigma 2 sold 7,000,000 shares of Common Stock of the Issuer in an underwritten public offering. Ex-Sigma 2 used the net proceeds of the sale to partially repay amounts outstanding under the Loan Agreement. Mr. Chadha was also granted Restricted Stock Units, see Item 3 above.

(d) Except as set forth in Item 3, no person is known to have the right to receive or the power to direct the receipt of dividends from, or the proceeds from the sale of, the Shares that may be deemed to be beneficially owned by the Reporting Persons.

(e) Not applicable.

**Item 6. Contracts, Arrangements, Understandings or Relationships with Respect to Securities of the Issuer**

Item 6 of Schedule 13D is supplemented as follows:

**Underwriting Agreement**

On April 11, 2018, the Issuer, Ex-Sigma 2 and Morgan Stanley & Co. LLC and RBC Capital Markets, LLC (collectively, the "Underwriters") entered into an underwriting agreement (the "Underwriting Agreement") relating to an underwritten public offering of 7,000,000 shares at a purchase price of $5.00 per share (the "Firm Shares"), with an option of the Underwriters for an additional 1,050,000 shares (the "Additional Shares") to be sold by Ex-Sigma 2.

The Issuer and Ex-Sigma 2 made certain representations, warranties and covenants in the Underwriting Agreement and also agreed to indemnify the Underwriters against certain liabilities, including liabilities under the Securities Act of 1933, as amended.

The Underwriters and their affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. The Underwriters and their affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they may receive customary fees and expenses, and may currently be, or may in the future be, lenders to us under facilities that we have entered into or may in the future enter into from time to time.

**Lock-up Agreement**

In connection with the offering, Ex-Sigma 2 entered into a Lock-Up Agreement (the "Lock-Up Agreement") with the Underwriters related to shares owned by Ex-Sigma 2. Pursuant to the Lock-Up Agreement, Ex-Sigma 2 agreed that for the period beginning on April 11, 2018, and ending on and including 90 days after the date of the final prospectus relating to the underwritten public offering (the "Restricted Period"), except with the prior written consent of the Underwriters, it would not, among other things and subject to certain exceptions, (1) offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend, or otherwise transfer or dispose of, directly or indirectly, any shares of Common Stock beneficially owned (as such term is used in Rule 13d-3 of the Act), by the undersigned or any other securities so owned convertible into or exercisable or exchangeable for Common Stock or (2) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of

13

ownership of the Common Stock, whether any such transaction described in clause (1) or (2) above is to be settled by delivery of Common Stock or such other securities, in cash or otherwise; provided, however, the Restricted Period shall immediately cease if Ex-Sigma 2 ceases to hold 5% or more of the equity securities of the Company.  Among the exceptions to the lockup are sales to satisfy certain obligations pursuant to the Loan Agreement, transfers of shares of Common Stock or any security convertible into Common Stock as a bona fide gift, or distributions of shares of Common Stock or any security convertible into Common Stock to limited partners or stockholders, such exceptions being subject to certain exceptions.

**Amended Registration Rights Agreement**

On April 10, 2018, the Issuer entered into Amendment No. 1 to Amended & Restated Registration Rights Agreement (the "Amendment"), by and among the Issuer, Apollo Novitex Holdings, L.P. and Ex-Sigma 2.  The Amendment modifies certain piggyback registration rights of the holders party to the Amended & Restated Registration Rights Agreement, dated as of July 12, 2017, by and among the Company and the holders party thereto.

**Item 7. Material to be Filed as Exhibits**

Exhibit 10.1: Underwriting Agreement, dated April 11, 2018, by and among Exela Technologies, Inc., Ex-Sigma 2 LLC and the several Underwriters named in Schedule II thereto (incorporated herein by reference to Exhibit 1.1 to the Issuer's Current Report on Form 8-K dated April 12, 2018)

Exhibit 10.2: Amendment No. 1 to Amended & Restated Registration Rights Agreement, dated April 10, 2018 (incorporated herein by reference to Exhibit 10.1 to the Issuer's Current Report on Form 8-K dated April 10, 2018)

Exhibit 10.3: Form of Lock-Up Agreement dated April 10, 2018, by and among Ex-Sigma 2 and Morgan Stanley & Co. LLC

14

---

CUSIP No. 30162V102

---

**SIGNATURES**

After reasonable inquiry and to the best of my knowledge and belief, the undersigned certifies that the information set forth in this Schedule 13D is true, complete and correct.

Dated: April 18, 2018

**HANDSON GLOBAL MANAGEMENT, LLC**

By:　/s/ Par Chadha
　　　Name: Par Chadha
　　　Title: Manager

**HOVS LLC**

By:　/s/ Jim Reynolds
　　　Name: Jim Reynolds
　　　Title: Manager

**HANDSON FUND 4 I LLC**

Supp.App. 0231

By:  /s/ Par Chadha
     Name: Par Chadha
     Title: Manager

<div align="center">15</div>

---

<div align="center">

**HOV CAPITAL III LLC**

</div>

By:  /s/ Par Chadha
     Name: Par Chadha
     Title: Manager

**HOV SERVICES LTD**

By:  /s/ Vik Negi
     Name: Vik Negi
     Title: Director

<div align="center">

**ADESI 234 LLC**

</div>

By:  /s/ Par Chadha
     Name: Par Chadha
     Title: Manager

**HOF 2 LLC**

By:  /s/ Par Chadha
     Name: Par Chadha
     Title: Manager

<div align="center">16</div>

---

<div align="center">

**EX-SIGMA 2 LLC**

</div>

By:  /s/ Jim Reynolds
     Name: Jim Reynolds
     Title: President

<div align="center">

**EX-SIGMA LLC**

</div>

By:  /s/ Jim Reynolds
     Name: Jim Reynolds
     Title: President

/s/ Par Chadha
**Par Chadha**

Supp.App. 0232

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 235 of 1110    PageID 1856

17

Supp.App. 0233

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 236 of 1110    PageID 1857

424B3 1 a2235299z424b3.htm 424B3

Table of Contents

Filed Pursuant to Rule 424(b)(3)
Registration No. 333-219494

*PROSPECTUS SUPPLEMENT*
*(To Prospectus dated October 2, 2017)*

## 7,000,000 Shares



*Common Stock*

**Ex-Sigma 2, LLC, referred to in this prospectus supplement as the selling stockholder, is offering 7,000,000 shares of common stock of Exela Technologies, Inc. The selling stockholder will receive all net proceeds from the sale of our common stock sold pursuant to this prospectus supplement.**

**Our common stock is listed on The NASDAQ Capital Market ("Nasdaq") under the symbol "XELA." On April 9, 2018, the last reported sale price of our common stock on the Nasdaq was $5.75 per share.**

**You should carefully read this prospectus supplement and the accompanying prospectus before you invest in our common stock.**

**Investing in our common stock involves risks. See "Risk Factors" on page S-11 and in the documents incorporated by reference in this prospectus supplement and accompanying prospectus for a discussion of the factors you should carefully consider before deciding to purchase shares of our common stock.**

| | PER SHARE | TOTAL |
|---|---|---|
| Public offering price | $5.00 | $35,000,000 |
| Underwriting discounts and commissions[(1)] | $0.30621124 | $2,143,478.68 |
| Proceeds, before expenses, to selling stockholder | $4.69378876 | $32,856,541.32 |

*We refer you to "Underwriting (Conflict of Interest)" beginning on page S-26 of this prospectus supplement for additional information regarding total underwriting compensation.*

*The above summary of offering proceeds to the selling stockholder (before expenses) does not give effect to the option the selling stockholder has granted the underwriters for a period of 30 days to purchase up to 1,050,000 additional shares of our common stock. If the underwriters exercise the option in full, the total underwriting discounts and commissions payable by the selling stockholder will be $2,465,000.48, and the total proceeds to the selling stockholder, before expenses, will be $37,784,999.52.*

*Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus supplement or the accompanying prospectus. Any representation to the contrary is a criminal offense.*

*The underwriters expect to deliver the shares of common stock to purchasers on or about April 16, 2018.*

*Morgan Stanley*                                                    *RBC Capital Markets*

Supp.App. 0234

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 237 of 1110    PageID 1858

*Cantor*                                                                              *Nomura*

*The date of this prospectus supplement is April 11, 2018*

Supp.App. 0235

## TABLE OF CONTENTS

| | |
|---|---|
| SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS | S-ii |
| SUMMARY | S-1 |
| EXELA TECHNOLOGIES | S-1 |
| THE OFFERING | S-9 |
| RISK FACTORS | S-11 |
| USE OF PROCEEDS | S-15 |
| DIVIDEND POLICY | S-16 |
| DESCRIPTION OF CAPITAL STOCK | S-17 |
| SELLING SHAREHOLDERS | S-21 |
| MATERIAL U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK | S-22 |
| UNDERWRITERS (CONFLICT OF INTEREST) | S-26 |
| LEGAL MATTERS | S-32 |
| EXPERTS | S-32 |
| WHERE YOU CAN FIND MORE INFORMATION | S-33 |
| INCORPORATION BY REFERENCE | S-33 |

**PROSPECTUS DATED OCTOBER 2, 2017**

| | |
|---|---|
| ABOUT THIS PROSPECTUS | i |
| INCORPORATION OF CERTAIN INFORMATION BY REFERENCE | i |
| FORWARD-LOOKING STATEMENTS | iii |
| PROSPECTUS SUMMARY | 1 |
| RISK FACTORS | 2 |
| USE OF PROCEEDS | 3 |
| SELLING STOCKHOLDERS | 4 |
| DESCRIPTION OF CAPITAL STOCK | 8 |
| PLAN OF DISTRIBUTION | 12 |
| LEGAL MATTERS | 15 |
| EXPERTS | 15 |
| WHERE YOU CAN FIND MORE INFORMATION | 15 |

S-i

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 239 of 1110    PageID 1860

## ABOUT THIS PROSPECTUS SUPPLEMENT AND PROSPECTUS

This prospectus supplement updates information in the prospectus dated October 2, 2017. You should read this prospectus supplement in conjunction with the prospectus. This prospectus supplement is not complete without, and may not be delivered or used except in conjunction with, the prospectus, including any amendments or supplements to it. This prospectus supplement is qualified by reference to the prospectus, except to the extent that the information provided by this prospectus supplement supersedes information contained in the prospectus.

This prospectus supplement incorporates by reference important information. You should read the information incorporated by reference before deciding to invest in our common stock, and you may obtain this information incorporated by reference without charge by following the instructions under "Where You Can Find More Information" appearing below. Unless the context otherwise indicates, references in this prospectus supplement to "Exela," the "Company," "we," "our" and "us" refer, collectively, to Exela Technologies, Inc., a Delaware corporation, and its consolidated subsidiaries.

We, the selling stockholder and the underwriters have not authorized anyone to provide you with any information other than that contained or incorporated by reference in this prospectus supplement. We, the selling stockholder and the underwriters take no responsibility for, and can provide no assurance as to the reliability of, any other information that others may give to you. The selling stockholder is offering to sell, and seeking offers to buy, common stock only in jurisdictions where offers and sales are permitted. The information contained or incorporated by reference in this prospectus supplement is accurate only as of its date. Our business, financial condition, results of operations and prospects may have changed since that date.

## SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS

Certain statements included in this prospectus supplement are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under The Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "may", "should", "would", "plan", "intend", "anticipate", "believe", "estimate", "predict", "potential", "seem", "seek", "continue", "future", "will", "expect", "outlook" or other similar words, phrases or expressions. These forward-looking statements include statements regarding our industry, future events, the estimated or anticipated future results and benefits of the Business Combination, future opportunities for the combined company, and other statements that are not historical facts. These statements are based on the current expectations of Exela management and are not predictions of actual performance. These statements are subject to a number of risks and uncertainties regarding Exela's businesses, and actual results may differ materially. The factors that may affect our results include, among others: the impact of political and economic conditions on the demand for our services; the impact of a data or security breach; the impact of competition or alternatives to our services on our business pricing and other actions by competitors; our ability to address technological development and change in order to keep pace with our industry and the industries of our customers; the impact of terrorism, natural disasters or similar events on our business; the effect of legislative and regulatory actions in the United States and internationally; the impact of operational failure due to the unavailability or failure of third-party services on which we rely; the effect of intellectual property infringement; and other factors discussed in this prospectus supplement and our Annual Report on Form 10-K for the year ended December 31, 2017 (our "Annual Report") under the heading "Risk Factors" and otherwise identified or discussed in this prospectus supplement. You should consider these factors carefully in evaluating forward-looking statements and are cautioned not to place undue reliance on such statements, which speak only as of the date of this prospectus supplement. It is impossible for us to predict new events or circumstances that may arise in the future or how they may affect us. We undertake no obligation to update forward-looking statements to reflect events or circumstances occurring after the date of this prospectus supplement. We are not including the information provided on the websites referenced herein as part of, or incorporating such information by reference into,

S-ii

Supp.App. 0237

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 240 of 1110    PageID 1861

Table of Contents

this prospectus supplement. In addition, forward-looking statements provide Exela's expectations, plans or forecasts of future events and views as of the date of this prospectus supplement. Exela anticipates that subsequent events and developments will cause Exela's assessments to change. These forward-looking statements should not be relied upon as representing Exela's assessments as of any date subsequent to the date of this prospectus supplement.

S-iii

Supp.App. 0238

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 241 of 1110    PageID 1862

# SUMMARY

*The following summary highlights information contained elsewhere or incorporated by reference into this prospectus supplement. It may not contain all the information that may be important to you. You should read this entire prospectus supplement carefully, including the section titled "Risk Factors" and our historical consolidated financial statements and related notes incorporated by reference from our Annual Report and other filings we have made with the SEC.*

# EXELA TECHNOLOGIES

Exela Technologies, Inc. ("Exela") is a global business process automation leader combining industry-specific and industry-agnostic enterprise software and solutions (deployed on premise or on the cloud) with decades of experience. We enable our customers' organizations to more efficiently and effectively execute transactions, make decisions, drive revenue and profitability, and communicate critical information to their employees, customers, partners, and vendors. We serve over 60% of the Fortune® 100 and our solutions are deployed in banking, healthcare, insurance and other industries to support mission-critical environments. With the increased scale resulting from our Business Combination in July 2017, we are poised to expand relationships with existing customers and realize substantial synergies.

As part of the broader business process outsourcing ("BPO") industry, our technology-enabled solutions allow global organizations to address the challenges resulting from the massive amounts of data obtained and created through their daily operations. That data, and the supporting technology architecture, have become increasingly complex to manage as the volume, velocity, and variety continue to increase, requiring aggregation and integration across disparate parts of our customers' organizations. To effectively execute transactions and manage mission-critical processes, decisions need to be executed accurately, with rapid turn-around time, and often subject to various regulatory and compliance requirements. We believe our process expertise, information technology capabilities and operational insights enable our customers' organizations to more efficiently and effectively execute transactions, make decisions, drive revenue and profitability, and communicate critical information to their employees, customers, partners, and vendors. With solutions focused on enhancing the user experience, quality, and efficiency of our customers' most critical processes, we believe our value proposition positions us to be a core operations and technology partner to our customers.

We have approximately 22,000 employees as of December 31, 2017 that provide solutions and services to over 3,500 customers worldwide. For the fiscal year ended December 31, 2017, we generated $1,152.3 million of revenue of which approximately 90% is recurring in nature and supported by long-term customer contracts.

Our solutions address the life cycle of transaction processing and enterprise information management, from enabling multi-channel payment gateways and digital mailrooms with data exchanges across siloed systems, to matching inputs against contracts and handling exceptions, to ultimately depositing payments and distributing communications. As a leader in complex information processing, we specialize in transactions that require multiple layers of validation, supporting documentation processing, and reconciliation. Our suite of offerings combines platform modules across information management, payments, finance & accounting, legal & loss prevention, and unified communication services to provide both industry specific solutions, and solutions which span across multiple industries.

At the foundation of our industry-specific solution offerings, we use a combination of data-driven processes, technology, and human capital, delivered through integrated enterprise information management ("EIM") and transaction processing solutions ("TPS") platforms:

- our proprietary EIM platforms facilitate the exchange, consolidation, organization, and analysis of large amounts of structured and unstructured data that are crucial to an enterprise's ability to effectively manage decisions, and enable the presentment of critical information through our

S-1

Supp.App. 0239

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 242 of 1110    PageID 1863

Supp.App. 0240

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 243 of 1110　　PageID 1864

unified communication solutions. These platforms can be hosted on customer premises, within our data centers, and/or in a cloud hosting and computing environment.

- our TPS offerings then use the structured data output from our EIM platforms and apply industry and customer specific rules-based data validation, management of exceptions, business automation, and outcome resolutions to complete transactions, customer interactions, and other operational processes.

- our model is to provide integrated EIM and TPS platforms as industry-specific solutions, with reliable information workflows through data aggregation, seamless connectivity, and automated processes that significantly reduce cycle times and improve quality. As a result, we believe we can execute a wide range of business processes, across multiple industries that are deeply embedded in, and essential to, our customers' most critical organizational workflows.



We seek to develop long-term relationships with organizations that are information-intensive and require specialized processing or subject matter expertise. We offer solutions to highly regulated and information sensitive industries such as healthcare, banking and financial services, insurance, public, legal, and commercial sectors.

We believe that our global presence benefits our customers with a balance of proximity, solutions, and cost to meet their needs. We use a global delivery model to serve multi-national customers in approximately 50 countries, where we provide solutions from a network of approximately 1,100 onsite customer facilities and 150 delivery centers, strategically located throughout the Americas, Europe, and Asia. We believe our global delivery model uniquely positions us to offer multi-lingual capabilities, optimize logistical requirements, access a large employee pool, and provide a flexible "right-shoring" solution for our customers.

### Overview of Revenues

Our business consists of the following three reportable segments:

*Information and Transaction Processing Solutions ("ITPS")*.　　The ITPS segment is our largest segment, with $827.1 million of revenues for the fiscal year ended December 31, 2017, representing 72% of our revenues. ITPS provides industry-specific solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering,

Supp.App. 0241

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 244 of 1110    PageID 1865

sanctions, and cross-border settlement; property and casualty insurance solutions for enrollments, claims processing, and communications; public sector solutions for income tax processing, benefits administration, and records management; industry-agnostic solutions for payment processing and reconciliation, integrated receivable and payables management, document logistics and location services, records management, and electronic storage of data/documents; and software, hardware, and maintenance related to information and transaction processing automation, among others. We generate ITPS revenues primarily from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services.

*Healthcare Solutions ("HS").*    The HS segment generated $233.6 million of revenues for the fiscal year ended December 31, 2017, representing 20% of our revenues. Our HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Our payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Our provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management. As a leader in complex claims processing, we specialize in transactions that require multiple layers of validation, supporting documentation processing, reconciliation, and management of exceptions. We generate HS revenues primarily from a transaction-based pricing model for the various types of volumes processed for healthcare payers and providers.

*Legal & Loss Prevention Services ("LLPS").*    The LLPS segment generated $91.6 million of revenues for the fiscal year ended December 31, 2017, representing 8% of our revenues. Our LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification, and outreach to claimants; and collection, analysis, and distribution of settlement funds. Additionally, we provide data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable. We generate LLPS revenues primarily based on time and materials pricing as well as through transactional services priced on a per item basis.

Additional financial information for our three business segments is included in Note 17 within our consolidated financial statements in our Annual Report.

We provide services to our customers on a global basis. In 2017, our revenues by geography were as follows: $1,001.8 million in the United States (86.9% of total revenues), $135.6 million in Europe (11.8% of total revenues), and $15.0 million from the rest of the world (1.3% of total revenues). We present additional geographical financial information in Note 17 within our consolidated financial statements in our Annual Report.

Our revenues can be affected by various factors such as our customers' demand pattern for our services. These factors have historically resulted in higher revenues and profits in the fourth quarter. Backlog is not a metric that we use to measure our business.

**History and Development of Our Company**

Exela is a Delaware corporation that was formed through the strategic combination (the "Business Combination") of SourceHOV Holdings, Inc. ("SourceHOV") a leading global transaction processing company, and Novitex Holding, Inc. ("Novitex"), a cloud-based document outsourcing company, pursuant to a business combination agreement dated February 21, 2017. Formerly known as Quinpario Acquisition Corp. 2 ("Quinpario"), Exela was originally formed as a blank check company on July 15, 2014 and completed its initial public offering on January 22, 2015. In conjunction with the completion of the Business Combination in July 2017, Quinpario was renamed "Exela Technologies, Inc." Exela began trading under the ticker "XELA" on the Nasdaq stock market on July 13, 2017.

S-3

Supp.App. 0242

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 245 of 1110     PageID 1866

The Business Combination was accounted for as a reverse merger for which SourceHOV was determined to be the accounting acquirer. The acquisition of Novitex was accounted for using the acquisition method. As a result, the financial information presented in our Annual Report is not pro forma (unless labeled as such); it includes the financial information and activities for SourceHOV for the entire year ending December 31, 2017, but only reflects the financial information and activities of Novitex for the period following the Business Combination from July 13, 2017 to December 31, 2017.

**Key Business Strategies**

The key elements of our growth strategy are described below:

*Pursue meaningful revenue synergy opportunities.*     We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing customer relationships, pursuing new customer opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise.

- *Leverage BPA suite across on-site services.*   Approximately 6,000 of our employees currently work at customers in an on-site capacity. We believe this on-site presence is a competitive differentiator and a valuable asset as we pursue future growth opportunities. We aim to deploy our BPA software across these customer locations, and we believe that by offering our customers enhanced productivity and quality through our onsite employees, we will create additional opportunities to expand our footprint and wallet share across the organization. For example, in customers where we provide underwriting support and claims processing, we can enable our onsite employees to accelerate the aggregation and analysis of datasets while also increasing accuracy and automatically flagging deficiencies. By enhancing the productivity and quality of our onsite employees, we believe we will increase the demand from our customers to replicate our processes across the organization, bolstering our cross-sell/up-sell initiatives. By having our BPA suite already approved and deployed within existing onsite engagements, we believe our ability to expand into new lines of business will be streamlined and accelerated.

- *Expand relationships with existing customers.*   We intend to aggressively pursue cross-sell and up-sell opportunities within our existing customer base. With an installed base of over 3,500 customers, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our customers' information and transaction processing needs. Our sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our customers across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across our bases while also driving higher-margin bundled solutions. As an example, we now offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

- *Pursue new customer opportunities.*   We plan to continue to develop new long-term, strategic customer relationships, especially where we have an opportunity to deliver a wide range of our capabilities and can have a meaningful impact on our customers' business outcomes. For example, we plan to dedicate resources within the legal industry in order to pursue opportunities in e-discovery and contract management services.

- *Develop additional process capabilities and industry expertise.*   We will focus on developing additional process capabilities and market expertise for our core industries. We will continue to invest in technology and innovation that will accelerate the build-out of our portfolio of next-generation solutions, such as platform-based descriptive and predictive analytics services for processing flows of "Big Data" to help customers gain better insight into their processes and businesses. As an example, on behalf of our customers, we are deploying Big Data automation platforms to analyze individual consumer behavior and interaction patterns to identify opportunities for revenue enhancement and loss prevention, and configure optimal outreach campaigns to drive sales, loyalty, and profitability.

S-4

Supp.App. 0243

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 246 of 1110    PageID 1867

*Pursue meaningful cost synergy opportunities and accelerate long-term profitability.* We have identified significant cost synergies that may result from the closing of the Business Combination. Due to similar operating infrastructures between SourceHOV and Novitex, we continue to believe we have opportunities across information technology, operations, facilities, and corporate functions to achieve cost savings executable over the course of 2 years from the closing of the Business Combination. We believe these cost savings are in the following categories:

- *Information Technology.* We have opportunities for consolidation of Information Technology ("IT") management, insourcing of third-party vendors, and savings related to consolidation of IT services and software license replacement with in-house platforms.

- *Operations.* We have opportunities for data entry offshoring, regional management rationalization, and broader implementation and adoption of our own technology across our organization to replace vendor spend.

- *Facilities.* We have opportunities for lease and headcount savings resulting from facilities consolidation.

- *Corporate and Shared Services.* We have opportunities for cost savings primarily across shared services, including the finance, accounting, legal, and human resources departments, in addition to vendor savings from consolidation of costs such as audit and tax, insurance, and enterprise resource planning.

Additionally, we intend to further improve our margins through increased focus on operational best practices and cost efficiency through further process standardization, increasing use of automation, and increased focus on quality. Our strategy is that over time this will result in margin expansion and enhanced productivity.

*Capitalize on our enhanced scale and operating capacity.* We intend to utilize our increased global scale and brand recognition to strengthen our ability to bid on new opportunities. We plan to dedicate more resources to pursue whitespace coverage to expand our range of service offerings and pursue additional cross-selling opportunities. We will also look to use our increased scale and operations expertise to improve utilization of our assets. As an example, we will pursue a strategy of consolidating smaller regional document processing centers to our two Tier-III document processing and outsourcing centers in Windsor, Connecticut, and Austin, Texas that we call "MegaCenters," which will increase efficiency through economies of scale. By driving utilization up from the current levels of the MegaCenters, we will benefit from high flow through margins from increased revenues with minimal incremental investment.

**Customers**

We serve over 3,500 customers across a variety of industries, including over 60% of the Fortune® 100. We believe our customers are among the leading players in their respective industries, and many of them are recurring customers that have maintained long-term relationships with us and our predecessor companies.

We have successfully leveraged our relationships with customers to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Customers are increasingly turning to us due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, our stable base of customers and sticky, long-term relationships lead to highly predictable revenues.

S-5

*Customer and Industry Highlights*



We maintain a strong mix of diversified customers with low customer concentration. No customer accounts for more than 10% of 2017 revenue. The diversity of our customer base has contributed to the stability and predictability of our revenue streams and cash flows. We have been able to effectively balance our customer mix and reduce dependency on any single customer or vertical by penetrating a diverse set of end markets.

## Research and Development

Our ability to continue to compete successfully depends heavily upon our ability to ensure a timely flow of competitive products, services and technologies to the marketplace while also leveraging our domain expertise to demonstrate our understanding in implementing solutions across the industries we serve. Through regular and sustained investment, licensing of intellectual property and acquisition of third-party businesses and technology, we continue to develop new knowledge platforms, applications and supporting service bundles that enhance and expand our existing suite of services. Additional financial information regarding our research and development expense is included in Note 2 within our consolidated financial statements in our Annual Report.

## Intellectual Property

We deploy a combination of internally-developed proprietary knowledge platforms, applications and generally available third-party licensed software as part of our scalable and flexible solutions and services. Our intellectual property is our competitive strength.

Our platforms aim to enhance information management and workflow processes through automation and process optimization to minimize labor requirements or improve labor performance. Our decisioning engines have been built with years of deep domain expertise, incorporating hundreds of thousands of customer and industry specific rules which enable the most efficient and lowest cost preparation and decisioning of transactions. Our business processes and implementation methodologies are confidential and proprietary and include trade secrets that are important to our business. We own a variety of trademarks and patents, which are registered or in the application process.

We regularly enter into nondisclosure agreements with customers, business partners, employees, and contractors that require confidential treatment of our information to establish, maintain and enforce our intellectual property rights. Our licensed intellectual properties are generally governed by written agreements of varying durations, including some with fixed terms that are subject to renewal based on mutual agreement. Generally, each agreement may be further extended and we have historically been able to renew existing agreements before they expire. We expect these and other similar agreements to be extended so long as it is mutually advantageous to both parties at the time of renewal.

## Competition

We believe that the principal competitive factors in providing our solutions include proprietary platforms, industry specific knowledge, quality, reliability and security of service, and price. We are differentiated competitively given our scale of operations, reputation as a trusted partner with deep domain expertise, innovative solutions, and highly integrated technology platforms that provide customers with end-to-end services addressing many aspects of their mission-critical operational processes. We

Supp.App. 0245

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 248 of 1110    PageID 1869

Table of Contents

continue to integrate best practice delivery processes into our service-delivery capabilities to improve its quality and service levels and to increase operational efficiencies. The markets in which we serve are competitive with both large and small businesses, as well as global companies:

- Multi-national companies that provide EIM and TPS services, such as Fiserv, Jack Henry, First Data, FIS, Black Knight Financial, Open Text, Broadridge Financial Solutions, Computershare, DST Systems and Iron Mountain;

- Multi-shore BPO companies, such as Genpact, Capita, Cognizant, Exlservice, Conduent, Wipro, and WNS; and

- Smaller, niche service providers in specific verticals or geographic markets.

**Regulation and Compliance**

We handle, directly or indirectly through customer contracts and business associate agreements, a significant amount of information, including personal and health-related information, which results in our being subject to federal, state and local privacy laws, including the Gramm-Leach-Bliley Act, Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and Health Information Technology for Economic and Clinical Health Act, enacted under Title XIII of the American Recovery and Reinvestment Act of 2009. Further, we are subject to the local rules and regulations in the other countries in which we operate, including those relating to the handling of information. In addition, services in our LLPS segment, though not directly regulated, must be provided in a manner consistent with the relevant legal framework. For example, our bankruptcy claims administration services must be provided in accordance with the requirements and deadlines of the United States Bankruptcy Code and Federal Rules of Civil Procedure. In addition, some of our customers are subject to regulatory oversight, which may result in our being reviewed from time to time by such oversight bodies. Further, as a government contractor, we are subject to associated regulations and requirements.

Other laws apply to our processing of individually identifiable information. These laws have been subject to frequent changes, and new legislation in this area may be enacted at any time. Changes to existing laws, introduction of new laws in this area, or failure to comply with existing laws that are applicable to us may subject us to, among other things, additional costs or changes to our business practices, liability for monetary damages, fines and/or criminal prosecution, unfavorable publicity, restrictions on our ability to obtain and process information and allegations by our customers and customers that we have not performed our contractual obligations, any of which may have a material adverse effect on profitability and cash flow.

*Privacy and Information Security Regulations*

The processing and transfer of personal information is required to provide certain of our services. Data privacy laws and regulations in the U.S. and foreign countries apply to the access, collection, transfer, use, storage, and destruction of personal information. In the U.S., our financial institution customers are required to comply with privacy regulations imposed under the Gramm-Leach-Bliley Act, in addition to other regulations. As a processor of personal information in our role as a provider of services to financial institutions, we are required to comply with privacy regulations and are bound by similar limitations on disclosure of the information received from our customers as apply to the financial institutions themselves. We also perform services for healthcare companies and are, therefore, subject to compliance with laws and regulations regarding healthcare information, including in the U.S., HIPAA. We also perform credit-related services and agree to comply with payment card standards, including the Payment Card Industry Data Security Standard. In addition, federal and state privacy and information security laws, and consumer protection laws, which apply to businesses that collect or process personal information, also apply to our businesses.

S-7

Supp.App. 0246

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 249 of 1110     PageID 1870

Privacy laws and regulations may require notification to affected individuals, federal and state regulators, and consumer reporting agencies in the event of a security breach that results in unauthorized access to, or disclosure of, certain personal information. Privacy laws outside the U.S. may be more restrictive and may require different compliance requirements than U.S. laws and regulations, and may impose additional duties on us in the performance of our services.

There has been increased public attention regarding the use of personal information and data transfer, accompanied by legislation and regulations intended to strengthen data protection, information security and consumer and personal privacy. The law in these areas continues to develop and the changing nature of privacy laws in the U.S., the European Union and elsewhere could impact our processing of personal information of our employees and on behalf of our customers. The European Union adopted a comprehensive General Data Privacy Regulation (the "GDPR") in May 2016 that will replace the current EU Data Protection Directive and related country-specific legislation. The GDPR will become fully effective in May 2018. While we believe that we are compliant with its regulatory responsibilities, information security threats continue to evolve resulting in increased risk and exposure. In addition, legislation, regulation, litigation, court rulings, or other events could expose us to increased costs, liability, and possible damage to our reputation.

## Employees

The continued success of our business is driven by our people. Our senior leadership team has extensive experience within the larger BPO as well as the BPA industry. As we were formed through a series of acquisitions, we have retained an experienced and cohesive leadership team. The combination of our employees with our technology is the backbone of our ability to provide customers with holistic solutions designed to meet the rapidly evolving needs of our customers.

As of December 31, 2017, we had approximately 22,000 total employees, which included approximately 20,700 full-time and 1,300 part-time employees. We have a global workforce with a majority of our employees located in the United States, and the remainder located in Europe, India, the Philippines, Mexico, and China. Our employee count fluctuates from time to time based upon the timing and duration of our engagements. We consider our relationship with our employees to be good.

We locate our operation centers in areas where the value proposition it offers is attractive to the employees in the area relative to other local opportunities, resulting in an engaged workforce that is able to make a meaningful global contribution from their local marketplace. To supplement the skills available in certain markets, we offer our employees a focused set of training programs to increase their skills and leadership capabilities with the goal of creating a long-term funnel of talent to support the Company's continued growth. Additionally, our proprietary platforms enable rapid learning and facilitate knowledge transfer among employees, reducing training time.

## Available Information

Our website address is www.exelatech.com. We are not including the information provided on our website as a part of, or incorporating it by reference into, this prospectus supplement. We make available free of charge (other than an investor's own internet access charges) through our website our annual reports on Form 10-K, quarterly reports on Form 10-Q, current reports on Form 8-K, and amendments to these reports, as soon as reasonably practicable after we electronically file such material with, or furnish such material to, the Securities and Exchange Commission (the "SEC"). In addition, we make available our code of ethics entitled "Global Code of Ethics and Business Conduct" free of charge through our website. We intend to post on our website all disclosures that are required by law or Nasdaq listing standards concerning any amendments to, or waivers from, any provision of our code of ethics.

The public may read and copy any materials filed by us with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Room 1580, Washington, DC 20549. The public may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC maintains an internet site that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC at www.sec.gov. The information contained on the websites referenced in this prospectus supplement is not incorporated by reference into this filing.

S-8

Supp.App. 0247

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 250 of 1110    PageID 1871

## THE OFFERING

*The following summary of the offering contains basic information about the offering and our common stock and is not intended to be complete. It does not contain all the information that may be important to you. For a more complete understanding of our common stock, please refer to the section "Description of Capital Stock" of this prospectus supplement.*

| | |
|---|---|
| Common stock offered by the selling stockholder | 7,000,000 shares. The selling stockholder has granted the underwriters an option for a period of 30 days to purchase up to 1,050,000 additional shares of our common stock. |
| Common stock outstanding before and after this offering | 152,565,218 shares. The total shares of common stock outstanding immediately after this offering will not change if the underwriters exercise their option to purchase 1,050,000 additional shares. |
| Use of proceeds | We will not receive any proceeds from the sale of shares being sold pursuant to this prospectus supplement. The selling stockholder will receive all of the net proceeds from the sale of our common stock pursuant to this prospectus supplement. We will bear a portion of the expenses of the offering of the common stock by the selling stockholder, except that the selling stockholder will pay any applicable underwriting fees, discounts or commissions and certain transfer taxes and legal expenses on the sale of the common stock by the selling stockholder. See "Use of Proceeds" and "Selling Stockholder." |
| Dividend policy | We have not paid any cash dividends on shares of our common stock to date and do not intend to pay cash dividends in the foreseeable future. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition. The payment of any dividends will be within the discretion of the then board of directors. See "Dividend Policy." |
| Risk factors | You should read the "Risk Factors" beginning on page S-10 of this prospectus supplement and in our filings with the SEC incorporated by reference in this prospectus supplement or the accompanying prospectus for a discussion of factors that you should consider carefully before deciding to invest in our common stock. |

S-9

Supp.App. 0248

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 251 of 1110    PageID 1872

| | |
|---|---|
| Conflict of Interest | An affiliate of Morgan Stanley & Co. LLC will receive certain of the proceeds to the selling stockholder in this offering in connection with the repayment by the selling stockholder of certain loans extended to the selling stockholder by such affiliate. As such, Morgan Stanley & Co. LLC and/or their affiliates will be receiving more than 5% of the net offering proceeds resulting in a "conflict of interest" pursuant to the Financial Industry Regulatory Authority, Inc. ("FINRA") Rule 5121(f)(5)(C). Therefore, this offering will be conducted in accordance with FINRA Rule 5121, which requires that Morgan Stanley & Co. LLC, who has a conflict of interest, not make sales to discretionary accounts without the prior written consent of the account holder and that a qualified independent underwriter ("QIU"), as defined in Rule 5121, participates in the preparation of the registration statement of which this prospectus forms a part and performs its usual standard of due diligence with respect thereto. RBC Capital Markets, LLC has agreed to act as QIU for this offering. |
| Nasdaq symbol | "XELA" |

Unless otherwise indicated, the number of shares of our common stock presented in this prospectus supplement is based on our common stock outstanding on April 5, 2018 and excludes shares of common stock issuable upon conversion of our Series A Convertible Preferred Stock, shares issuable upon exercise of out-of-the money warrants and shares issuable upon vesting of outstanding equity awards.

S-10

Supp.App. 0249

## RISK FACTORS

*Investing in our common stock involves a high degree of risk. You should consider carefully the risks and uncertainties described below, together with all of the other information included or incorporated by reference in this prospectus supplement, including the risks and uncertainties contained elsewhere in the prospectus supplement, under the heading "Risk Factors" in the accompanying prospectus and under the headings "Risk Factors" and "Management's Discussion and Analysis of Financial Condition and Results of Operations" in our Annual Report and our audited and unaudited consolidated financial statements and related notes incorporated by reference in this prospectus supplement and the accompanying prospectus, before you decide whether to purchase our common stock. If any of the following risks actually occur, our business, financial position, results of operations, or cash flows could be materially adversely affected. In these circumstances, the market price of our common stock could decline, and you may lose all or part of your investment. The risks described below are not the only ones we face. The occurrence of any of the following risks or future or additional risks and uncertainties not presently known to us or that we currently believe to be immaterial could materially and adversely affect our business, financial position, results of operations, or cash flows.*

***Our stock price may decline significantly following the offering regardless of our operating performance, and you may not be able to resell your shares of our common stock at or above the price you paid or at all, and you could lose all or part of your investment as a result.***

The trading price of our common stock may be adversely affected due to a number of factors, most of which we cannot control, including:

- results of operations that vary from the expectations of securities analysts and investors;

- results of operations that vary from those of our competitors;

- changes in expectations as to our or our industry's future financial performance, including financial estimates and investment recommendations by securities analysts and investors, and the publication of research reports regarding the same;

- declines in the market prices of stocks, trading volumes and company valuations generally, particularly those of transaction processing solutions and enterprise management companies;

- strategic actions by us or our competitors;

- changes in preferences of our customers;

- announcements by us or our competitors of significant contracts, new products, acquisitions, joint marketing relationships, joint ventures, other strategic relationships, or capital commitments;

- changes in general economic or market conditions or trends in our industry or markets;

- changes in business or regulatory conditions;

- future sales of our common stock or other securities;

- investor perceptions or the investment opportunity associated with our common stock relative to other investment alternatives;

- a default on our indebtedness or a downgrade in our or our competitors' credit ratings;

- the public's response to press releases or other public announcements by us or third parties, including our filings with the SEC;

- changes in senior management or key personnel;

- announcements relating to litigation;

Supp.App. 0250

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 253 of 1110    PageID 1874

S-11

Supp.App. 0251

- guidance, if any, that we provide to the public, any changes in this guidance, or our failure to meet this guidance;

- the sustainability of an active trading market for our stock;

- changes in accounting principles; and

- other events or factors, including those resulting from natural disasters, war, or acts of terrorism, or responses to these events.

These broad market and industry fluctuations may adversely affect the market price of our common stock, regardless of our actual operating performance. In addition, price volatility may be greater if the public float and trading volume of our common stock is low.

Following periods of market volatility, stockholders sometimes institute securities class action litigation. If we were involved in securities litigation, it could have a substantial cost and divert resources and the attention of executive management from our business regardless of the outcome of such litigation.

*A market for our common stock may not continue, which would adversely affect the liquidity and price of our common stock.*

Following this offering, the price of our common stock may fluctuate significantly due to the market's reaction to the offering and general market and economic conditions. An active trading market for our common stock may not be sustained. In addition, the price of our common stock after this offering can vary due to general economic conditions and forecasts, our general business condition and the release of its financial reports. Additionally, if our common stock becomes delisted from Nasdaq for any reason, and is quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of our common stock may be more limited than if it was quoted or listed on Nasdaq or another national securities exchange. You may be unable to sell your shares of common stock unless a market can be established or sustained.

*Because we have no current plans to pay cash dividends on our common stock for the foreseeable future, you may not receive any return on investment unless you sell your common stock for a price greater than that which you paid for it.*

We intend to retain future earnings, if any, for future operations, expansion, and debt repayment and have no current plans to pay any cash dividends for the foreseeable future. The declaration, amount, and payment of any future dividends on shares of common stock will be at the sole discretion of our board of directors. Our board of directors may take into account general and economic conditions, our financial condition, and results of operations, our available cash and current and anticipated cash needs, capital requirements, contractual, legal, tax, and regulatory restrictions, implications on the payment of dividends by us to our stockholders or by our subsidiaries to us, and such other factors as our board of directors may deem relevant. In addition, our ability to pay dividends is limited by covenants of our existing debt agreements and may be limited by covenants of any future indebtedness we or our subsidiaries incur. As a result, you may not receive any return on an investment in our common stock unless you sell our common stock for a price greater than that which you paid for it.

*A small number of stockholders have significant influence over us and these stockholders' interests may not align with other stockholders.*

Prior to giving effect to this offering, HOVS LLC and HandsOn Fund 4 I, LLC and certain of their respective affiliates (collectively, the "HGM Group") beneficially own over 50% of our outstanding common stock. As long as the HGM Group owns or controls a significant percentage of outstanding voting power, it will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of

S-12

Table of Contents

our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. In addition, pursuant to the terms of the Director Nomination Agreement, the HGM Group (as well as Apollo Novitex Holdings, L.P.) have certain nomination rights with respect to our board of directors and consent rights over certain corporate actions.

Additionally, the HGM Group's interests may not align with the interests of our other stockholders. The HGM Group is in the business of making investments in companies and may acquire and hold interests in businesses that compete directly or indirectly with us. The HGM Group may also pursue acquisition opportunities that may be complementary to our business, and, as a result, those acquisition opportunities may not be available to us. Our certificate of incorporation provides that we renounce any interest or expectancy in the business opportunities of the HGM Group and the HGM Group does not have any obligation to offer us those opportunities unless presented to one of our directors or officers in his or her capacity as a director or officer.

Further, sales of a substantial number of shares of our common stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of stockholders intend to sell shares, could reduce the market price of our common stock.

*If securities or industry analysts do not publish or cease publishing research or reports about us, our business, or our market, or if they change their recommendations regarding our common stock adversely, the price and trading volume of our common stock could decline.*

The trading market for our common stock is influenced by the research and reports that industry or securities analysts may publish about us, our business, our market, or our competitors. If any of the analysts who may cover us change their recommendation regarding our common stock adversely, or provide more favorable relative recommendations about our competitors, the price of our common stock would likely decline. If any analyst who may cover us were to cease coverage of us or fail to regularly publish reports on us, we could lose visibility in the financial markets, which could cause our stock price or trading volume to decline.

*The price of our shares of common stock has been, and may continue to be, volatile. This may affect the ability of our investors to sell their shares, and the value of an investment in our shares of common stock may decline.*

Since the closing of the Business Combination, our shares of common stock traded as high as $8.94 per share and as low as $4.37 per share. Due to the volatility of the market for our common stock, the market price for our shares may be significantly affected by factors such as variations in quarterly and yearly operating results or changes in state, provincial or federal regulations affecting us and our industry. Furthermore, in recent years the stock market has experienced extreme price and volume fluctuations that are unrelated or disproportionate to the operating performance of the affected companies. Such broad market fluctuations may adversely affect the market price of our common stock.

*The conversion of our Series A Convertible Preferred Stock following a "fundamental change" could substantially dilute the value of shares held by existing holders of our common stock or result in a default under our existing indebtedness.*

The conversion of the Series A Convertible Preferred Stock following the occurrence of a "fundamental change," as defined in the Certificate of Designations, Preferences, Rights and Limitations of Series A Perpetual Convertible Preferred Stock of Exela ("Certificate of Designations"), including a delisting of our securities by a national securities exchange or a change of control of us, could result in substantial dilution in the value of the shares of the outstanding our common stock and the voting power represented thereby.

Upon a fundamental change, if we do not redeem the Series A Convertible Preferred Stock, the Certificate of Designations may provide for a decrease in the conversion price to $0.10 per share of our

S-13

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 256 of 1110　　PageID 1877

common stock if the price in respect of such fundamental change is at or below $0.10. After the fifth anniversary of the issue date, the maximum number of shares of our common stock issuable upon conversion will not exceed 85% of the total number of shares of our common stock outstanding on a fully-diluted basis. As a result, if we do not redeem the Series A Convertible Preferred Stock, the holders of Series A Convertible Preferred Stock could receive up to 85% of our common stock after exercising their conversion rights upon a fundamental change. In addition, upon such conversion, we may be in default of our outstanding indebtedness or be required to make an offer to repurchase our outstanding indebtedness. Furthermore, due to dilution that could result from the number of shares of our common stock that may be issuable, we may have difficulty raising funds through future equity offerings at an attractive price. As of April 5, 2018, 4,625,000 shares of our Series A Convertible Preferred Stock have been converted into 5,654,570 shares of common stock and 4,569,233 shares of Series A Convertible Preferred Stock remain outstanding.

*Our second amended and restated certificate of incorporation designates the Court of Chancery of the State of Delaware as the sole and exclusive forum for certain types of actions and proceedings that may be initiated by our stockholders, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, employees, or stockholders.*

Our second amended and restated certificate of incorporation provides that, subject to limited exceptions, the Court of Chancery of the State of Delaware will be the sole and exclusive forum for any (i) derivative action or proceeding brought on behalf of our Company, (ii) action asserting a claim of breach of a fiduciary duty owed by any director, officer, or other employee of our Company to the Company or the Company's stockholders, (iii) action asserting a claim against the Company or any director, officer, or other employee of the Company arising pursuant to any provision of the Delaware General Corporation Law (the "DGCL") or our second amended and restated certificate of incorporation or our bylaws, or (iv) action asserting a claim against the Company or any director, officer, or other employee of the Company governed by the internal affairs doctrine. Any person or entity purchasing or otherwise acquiring any interest in shares of our capital stock shall be deemed to have notice of and to have consented to the provisions of our amended and restated certificate of incorporation described above. This choice of forum provision may limit a stockholder's ability to bring a claim in a judicial forum that it finds favorable for disputes with us or our directors, officers, or other employees, which may discourage such lawsuits against us and our directors, officers and employees. Alternatively, if a court were to find these provisions of our second amended and restated certificate of incorporation inapplicable to, or unenforceable in respect of, one or more of the specified types of actions or proceedings, we may incur additional costs associated with resolving such matters in other jurisdictions, which could adversely affect our business and financial condition.

*Our second amended and restated certificate of incorporation includes provisions limiting the personal liability of our directors for breaches of fiduciary duty under the DGCL.*

Our second amended and restated certificate of incorporation contains a provision permitted under the DGCL relating to the liability of directors. This provision eliminates a director's personal liability to the fullest extent permitted by the DGCL for monetary damages resulting from a breach of fiduciary duty.

The principal effect of the limitation on liability provision is that a stockholder may be unable to prosecute an action for monetary damages against a director. The inclusion of this provision in our second amended and restated certificate of incorporation may discourage or deter stockholders or management from bringing a lawsuit against directors for a breach of their fiduciary duties, even though such an action, if successful, might otherwise have benefited us and our stockholders.

S-14

Supp.App. 0254

Table of Contents

## USE OF PROCEEDS

The selling stockholder will receive all of the net proceeds from the sale of shares of our common stock offered pursuant to this prospectus supplement. We will not receive any proceeds from the sale of shares being sold pursuant to this prospectus supplement, including from any exercise by the underwriters of their option to purchase additional shares. We will bear a portion of the expenses of the offering of the common stock by the selling stockholder, except that the selling stockholder will pay any applicable underwriting fees, discounts or commissions and certain transfer taxes and legal expenses on the sale of the common stock by the selling stockholder. See "Selling Stockholder."

S-15

Supp.App. 0255

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 258 of 1110    PageID 1879

**DIVIDEND POLICY**

We have not paid any cash dividends on shares of our common stock to date and do not intend to pay cash dividends in the foreseeable future. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition. The payment of any dividends is within the discretion of our board of directors. It is the present intention of the board of directors to retain all earnings, if any, for use in our business operations and, accordingly, the board of directors does not anticipate declaring any dividends in the foreseeable future.

S-16

Supp.App. 0256

## DESCRIPTION OF CAPITAL STOCK

*The following summary describes our capital stock and the material provisions of our second amended and restated certificate of incorporation (our "certificate of incorporation") and our amended and restated bylaws (our "bylaws") and the Delaware General Corporation Law. Because the following is only a summary, it does not contain all of the information that may be important to you. For a complete description, you should refer to our certificate of incorporation and bylaws, copies of which are on file with the SEC. See "Where You Can Find More Information."*

**General**

Our certificate of incorporation authorizes the issuance of 1,620,000,000 shares of capital stock, consisting of (i) 1,600,000,000 shares of common stock and (ii) 20,000,000 shares of preferred stock, par value $0.0001 per share. The outstanding shares of common stock are duly authorized, validly issued, fully paid and non-assessable. As of April 5, 2018, there were 152,565,218 shares of common stock outstanding, 4,569,233 shares of preferred stock outstanding and 35,000,000 warrants outstanding that were issued in connection with our initial public offering.

**Common Stock**

*Voting Power*

Except as otherwise required by law or as otherwise provided in any certificate of designation for any series of preferred stock, the holders of our common stock possess all voting power for the election of our directors and all other matters requiring stockholder action and will at all times vote together as one class on all matters submitted to a vote of our stockholders. Holders of our common stock are entitled to one vote per share on matters to be voted on by stockholders.

*Dividends*

Our stockholders are entitled to receive such dividends and other distributions, if any, as may be declared from time to time by the board of directors in its discretion out of funds legally available therefor and shall share equally on a per share basis in such dividends and distributions. We have not paid any cash dividends on shares of our common stock to date and do not intend to pay cash dividends. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition. The payment of any dividends is within the discretion of the board of directors.

*Liquidation, Dissolution and Winding Up*

In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding-up of Exela, the holders of our common stock are entitled to receive an equal amount per share of all of our assets of whatever kind available for distribution to stockholders, after the rights of the holders of the preferred stock have been satisfied.

*Preemptive or Other Rights*

Our stockholders have no preemptive or other subscription rights and there are no sinking fund, conversion, or redemption provisions applicable to our common stock.

*Election of Directors*

The board of directors is currently divided into three classes, Class A, Class B and Class C, with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. There is no cumulative voting with

S-17

Supp.App. 0257

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 260 of 1110    PageID 1881

respect to the election of directors, with the result that directors will be elected by a plurality of the votes cast at an annual meeting of stockholders by holders of our common stock.

**Preferred Stock**

Our certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series. The board of directors is authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. The board of directors is able, without stockholder approval, to issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of our common stock and could have anti-takeover effects. The ability of the board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of the Company or the removal of existing management.

In connection with the consummation of the Business Combination, we issued 9,194,233 shares of Series A Convertible Preferred Stock in a private placement. As of April 5, 2018, 4,625,000 shares of the Series A Convertible Preferred Stock were converted into common stock. The terms, rights, obligations and preferences of the Series A Preferred Stock are set forth in the Certificate of Designation, which has been filed with our certificate of incorporation with the Secretary of State of the State of Delaware following the closing of the Business Combination. For more information on the Series A Convertible Preferred Stock, see our Definitive Proxy Statement.

**The Director Nomination Agreements**

At the closing of the Business Combination, we entered into a Director Nomination Agreement with each of the HGM Group and Apollo Novitex Holdings, L.P. (each a "Seller"), which will remain in effect for so long as the applicable Seller (or Seller's affiliate) continues to beneficially own at least 5% of the then outstanding shares of our common stock (without giving effect to the exercise of any outstanding warrants to purchase our common stock). The Director Nomination Agreements will require that the individuals nominated for election as directors by our board of directors shall include a number of individuals selected by each of the Sellers such that, upon the election of each such individual, and each other individual nominated by or at the direction of our board of directors or a duly-authorized committee of the board, as a director of our company, the individuals selected by each Seller (or Seller's affiliate) shall be: for so long as the applicable Seller beneficially owns at least 35% of the then outstanding shares of our common stock (without giving effect to the exercise of any outstanding warrants to purchase our common stock), three directors; for so long as the applicable Seller beneficially owns at least 15%, but less than 35%, of the then outstanding shares of our common stock (without giving effect to the exercise of any outstanding warrants to purchase our common stock), two directors; and for so long as the applicable Seller (or Seller's affiliate) beneficially owns at least 5%, but less than 15%, of the then outstanding shares of our common stock (without giving effect to the exercise of any outstanding warrants to purchase our common stock), one director. In the case of a vacancy on our board of directors created by the removal or resignation of an individual selected for nomination by a Seller (or Seller's affiliate), the Director Nomination Agreements will require us to appoint another individual selected by the applicable Seller. The Director Nomination Agreements also provide for observation rights for each Seller (or Seller's Affiliate) to the extent that it has a right of nomination that it does not utilize.

In addition, the Director Nomination Agreements provide that for so long as a Seller continues to beneficially own at least 15% of the then outstanding shares of our common stock (without giving effect to the exercise of any outstanding warrants to purchase our common stock), we cannot, without the consent of such Seller, engage in certain related party transactions, adopt an equity incentive plan or amend the same to increase the number of securities that may be granted thereunder, issue certain equity securities, including with a fair market value of more than $100 million, amend our certificate of incorporation or

S-18

bylaws in a manner that adversely affects such Seller's rights under the Director Nomination Agreement or has a disproportionate impact on the interests of such Seller, enter into certain new lines of business, or increase or decrease the size of the board of directors or change the classes on which the members of the board of directors serve.

**Certain Anti-Takeover Provisions of Delaware Law**

*Staggered board of directors*

Our certificate of incorporation provides that the board of directors is classified into three classes of directors of approximately equal size. As a result, in most circumstances, a person can gain control of our board of directors only by successfully engaging in a proxy contest at two or more annual meetings.

*Special meeting of stockholders*

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of the board of directors, by the president or by the chairman or by the secretary at the request in writing of stockholders owning a majority of the issued and outstanding capital stock entitled to vote.

*Advance notice requirements for stockholder proposals and director nominations*

Our bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual meeting of stockholders must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be delivered to our principal executive offices not later than the close of business on the 60th day nor earlier than the close of business on the 90th day prior to the scheduled date of the annual meeting of stockholders. In the event that less than 70 days' notice or prior public disclosure of the date of the annual meeting of stockholders is given, a stockholder's notice shall be timely if delivered to our principal executive offices not later than the 10th day following the day on which public announcement of the date of our annual meeting of stockholders is first made or sent by us. Our bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude our stockholders from bringing matters before an annual meeting of stockholders or from making nominations for directors at an annual meeting of stockholders.

*Authorized but unissued shares*

Our authorized but unissued shares of common stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

*Section 203 Opt Out*

Pursuant to our certificate of incorporation, we have opted out of the provisions of Section 203 of the Delaware General Corporation Law regulating corporate takeovers. This section prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

S-19

Supp.App. 0259

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder.

A "business combination" includes a merger or sale of more than 10% of our assets.

However, the above provisions of Section 203 do not apply if:

- the board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by the board of directors and authorized at a meeting of our stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

We have opted out of the provisions of Section 203 of the Delaware General Corporation Law because we believe this statute could prohibit or delay mergers or other change in control attempts, and thus may discourage attempts to acquire us.

*Exclusive Forum Selection*

Our certificate of incorporation requires, to the fullest extent permitted by law, that derivative actions brought in our name, actions against directors, officers and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel. Although we believe this provision benefits us by providing increased consistency in the application of Delaware law in the types of lawsuits to which it applies, the provision may have the effect of discouraging lawsuits against our directors and officers.

**Transfer Agent**

Our transfer agent for our common stock is Continental Stock Transfer & Trust Company, 17 Battery Place, New York, New York 10004.

**Listing**

Our common stock is listed on the Nasdaq under the symbol "XELA."

S-20

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 263 of 1110    PageID 1884

Table of Contents

## SELLING STOCKHOLDER

The following table sets forth, as of the date of this prospectus supplement, the name of the selling stockholder offering shares under this prospectus supplement, and the aggregate number of shares of common stock that the selling stockholder is offering pursuant to this prospectus supplement. The percentages of shares of common stock owned by the selling stockholder are based on 152,565,218 shares of common stock that are outstanding as of April 5, 2018, determined in accordance with Rule 13d-3 under the Exchange Act. Selling stockholder information for each additional selling stockholder, if any, will be set forth by a prospectus supplement to the extent required prior to the time of any sale of such selling stockholder's shares pursuant to this prospectus supplement.

| Name of Selling Stockholder | Shares Beneficially Owned Immediately Prior to Offering | | Shares Offered Hereby | Shares Beneficially Owned Immediately After Offering | | Shares Beneficially Owned After Offering and Underwriters' Option to Purchase Additional Shares (if exercised in full) | |
|---|---|---|---|---|---|---|---|
| | Number | % | Number | Number | % | Number | % |
| Ex-Sigma 2 LLC[1] | 88,175,973 | 55.8% | 7,000,000 | 81,175,973 | 52.1% | 80,125,973 | 51.4% |

(1)  Share totals and ownership percentage include 3,263,473 shares of Common Stock issuable upon the conversion of 2,669,233 shares of Series A Preferred Stock, which shares are pledged to secure borrowings incurred by Ex-Sigma in connection with the Business Combination. Ex-Sigma 2 LLC, a Delaware limited liability company ("Ex-Sigma 2"), directly owns 84,912,500 shares of Common Stock and 2,669,233 shares of Series A Convertible Preferred Stock, which may be converted into 3,262,474 shares of Common Stock. Ex-Sigma LLC ("Ex-Sigma") is the sole equityholder of Ex-Sigma 2. HOVS LLC, a Delaware limited liability company ("HOVS"), HandsOnFund 4 I LLC, a Nevada limited liability company ("HOF 4"), HOV Capital III, LLC, a Nevada limited liability company ("HOV 3"), each directly own interests in Ex-Sigma. HOVS is a wholly-owned subsidiary of HOV Services Ltd., an Indian limited company ("HOV Services"). Adesi 234 LLC, a Nevada limited liability company ("Adesi"), and HOF 2 LLC, a Nevada limited liability company ("HOF 2"), together own a majority of the equity interests of HOV 3. HandsOn Global Management, LLC, a Delaware limited liability company ("HGM"), owns 1,250,000 shares of Common Stock. Mr. Par Chadha may be deemed to control HGM , Ex Sigma 2, Ex-Sigma, HOVS, HOF 4, HOV 3, Adesi, and HOF 2 LLC and each may be deemed to share beneficial ownership of the Common Shares. In connection with the Business Combination, HOVS, HOF 4 and certain of their affiliates entered into a Director Nomination Agreement with the Company pursuant to which HOVS, HOF 4 and certain of their affiliates are entitled to nominate a certain number of directors to the board of directors of the Company based on ownership thresholds in the Company. Mr. Par Chadha is currently Chairman of the board of directors of the Company. The principal business address of Ex-Sigma 2 and HGM is 8550 West Desert Inn Road, Suite 102-452, Las Vegas, Nevada 89117.

S-21

## MATERIAL U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK

The following is a summary of the material U.S. federal income and estate tax consequences to a non-U.S. holder (as defined below) of the purchase, ownership and disposition of our common stock sold pursuant to this offering as of the date hereof. Except where noted, this summary deals only with common stock that is held as a capital asset.

A "non-U.S. holder" means a person (other than a partnership) that is a beneficial owner of our common stock and that is not for U.S. federal income tax purposes any of the following:

- an individual citizen or resident of the United States;

- a corporation (or any other entity treated as a corporation for U.S. federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust if it (1) is subject to the primary supervision of a court within the United States and one or more United States persons have the authority to control all substantial decisions of the trust or (2) has a valid election in effect under applicable U.S. Treasury regulations to be treated as a United States person.

This summary is based upon provisions of the Internal Revenue Code of 1986, as amended (the "Code"), and U.S. Treasury regulations, administrative rulings and judicial decisions as of the date hereof, all of which are subject to change and to differing interpretations, possibly with retroactive effect. Any such change could affect the continuing validity of this discussion. No assurance can be given that the IRS would not assert, or that a court would not sustain a position contrary to any of the tax considerations described below. This summary does not address all aspects of U.S. federal income and estate taxes that may be relevant to non-U.S. holders in light of their particular circumstances. In addition, it does not represent a detailed description of the U.S. federal income tax consequences applicable to you if you are subject to special treatment under the U.S. federal income tax laws (including if you are a U.S. expatriate, a financial institution, an insurance company, a mutual fund, a pension plan, an S corporation, a broker-dealer, a trader in securities that elects mark-to-market treatment, a regulated investment company, a real estate investment trust, a trust, an estate, a "controlled foreign corporation," a "passive foreign investment company," a tax-exempt organization (including a private foundation), a person that holds our common stock as part of a "straddle," "hedge," "conversion," "synthetic security," "constructive ownership transaction," "constructive sale," or other integrated transaction for United States federal income tax purposes, a person subject to the alternative minimum tax provisions of the Code, a person who actually or constructively owns 5 percent or more of our common stock, a person who holds or receives our common stock pursuant to the exercise of an employee stock option or otherwise as compensation or a partnership or other pass-through entity for U.S. federal income tax purposes).

If a partnership (or other entity treated as a partnership for United States federal income tax purposes) holds our common stock, the tax treatment of a partner will generally depend upon the status of the partner and the activities of the partnership. If you are a partner of a partnership holding our common stock, you should consult your tax advisors.

This summary is limited to U.S. federal income and estate tax aspects and does not address the tax consequences under non-U.S., state or local tax laws or any other non-income tax laws (such as gift tax laws). It also does not consider the impact of the alternative minimum tax or the Medicare contribution tax on net investment income.

THIS DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. ACCORDINGLY, IF YOU ARE CONSIDERING THE PURCHASE OF OUR COMMON

S-22

Supp.App. 0262

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 265 of 1110    PageID 1886

STOCK, YOU SHOULD CONSULT YOUR TAX ADVISORS CONCERNING THE PARTICULAR U.S. FEDERAL INCOME AND ESTATE TAX CONSEQUENCES TO YOU OF THE PURCHASE, OWNERSHIP OR DISPOSITION OF OUR COMMON STOCK, AS WELL AS ANY OTHER APPLICABLE FEDERAL, STATE, LOCAL, NON-U.S. AND NON-INCOME TAX CONSEQUENCES.

### Dividends

As noted above in the section of this prospectus supplement entitled "Dividend Policy," we have no current plans to make distributions on our common stock. If this policy were to change, any distributions on our common stock will generally constitute dividends for U.S. federal income tax purposes to the extent paid out of our current or accumulated earnings and profits, as determined under U.S. federal income tax principles. Distributions in excess of our current or accumulated earnings and profits will generally constitute a return of capital and will first be applied against and reduce a holder's adjusted tax basis in the common stock, but not below zero (and, subject to the discussions below of backup withholding, FATCA and of the third bullet point under "—Gain on Disposition of Common Stock," to the extent such distribution does not exceed the adjusted tax basis such amount will generally not be subject to withholding). Distributions not treated as dividends and in excess of a holder's adjusted basis will generally be treated as capital gain subject to the rules discussed under "—Gain on Disposition of Common Stock."

Subject to the discussions below of backup withholding and FATCA, dividends paid to a non-U.S. holder of our common stock will generally be subject to withholding of U.S. federal income tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. However, dividends that are effectively connected with the conduct of a trade or business by the non-U.S. holder within the United States (and, if required by an applicable income tax treaty, are attributable to a U.S. permanent establishment of the non-U.S. holder) are not subject to withholding, provided certain certification and disclosure requirements are satisfied. Instead, such dividends are generally subject to U.S. federal income tax on a net income basis in the same manner as if the non-U.S. holder were a United States person as defined under the Code (subject to an exemption or reduction in such tax as may be provided by an applicable income tax treaty). Any such effectively connected dividends received by a foreign corporation may be subject to an additional "branch profits tax" at a 30% rate or such lower rate as may be specified by an applicable income tax treaty.

A non-U.S. holder of our common stock who wishes to claim the benefit of an applicable income tax treaty and avoid backup withholding, as discussed below, for dividends generally will be required (a) to complete the applicable Internal Revenue Service ("IRS") Form W-8BEN or form W-8BEN-E (as applicable) and certify under penalty of perjury that such holder is not a United States person as defined under the Code and is eligible for treaty benefits or (b) if our common stock is held through certain foreign intermediaries, to satisfy the relevant certification requirements of applicable U.S. Treasury regulations. Special certification and other requirements apply to certain holders that are pass-through entities rather than corporations or individuals.

A non-U.S. holder of our common stock eligible for a reduced rate of U.S. withholding tax pursuant to an income tax treaty may obtain a refund of any excess amounts withheld by timely filing an appropriate claim for refund with the IRS.

S-23

Supp.App. 0263

**Gain on Disposition of Common Stock**

Subject to the discussion of backup withholding and FATCA below, any gain realized on the sale, exchange, or other taxable disposition of our common stock generally will not be subject to U.S. federal income tax unless:

- the gain is effectively connected with a trade or business of the non-U.S. holder in the United States (and, if required by an applicable income tax treaty, is attributable to a U.S. permanent establishment of the non-U.S. holder);

- the non-U.S. holder is an individual who is present in the United States for 183 days or more in the taxable year of that disposition, and certain other conditions are met; or

- we are or have been a "United States real property holding corporation" for U.S. federal income tax purposes at any time within the shorter of the five-year period preceding the disposition or the non-U.S. holder's holding period for our common stock.

A non-U.S. holder described in the first bullet point immediately above will generally be subject to tax on the net gain derived from the sale or other disposition under regular graduated U.S. federal income tax rates applicable to such holder as if it were a United States person as defined under the Code. In addition, if a non-U.S. holder described in the first bullet point immediately above is a corporation for U.S. federal income tax purposes, it may be subject to the branch profits tax equal to 30% of its effectively connected earnings and profits (subject to adjustments) or at such lower rate as may be specified by an applicable income tax treaty.

An individual non-U.S. holder described in the second bullet point immediately above will generally be subject to a flat 30% (or such lower rate as may be specified by an applicable income tax treaty) tax on the gain derived from the sale or other disposition, which may be offset by U.S. source capital losses, even though the individual is not considered a resident of the United States, provided such non-U.S. holder has timely filed U.S. federal income tax returns with respect to such losses.

We believe we are not and do not anticipate becoming a "United States real property holding corporation" for U.S. federal income tax purposes. In the event we do become a "United States real property holding corporation," as long as our common stock is regularly traded on an established securities market, our common stock will be treated as "United States real property interests," subjecting gain to U.S. federal income tax, only with respect to a non-U.S. holder that actually or constructively holds more than 5% of our common stock at some time during the applicable period, but there can be no assurance that our common stock will be treated as regularly traded on an established securities market.

**Federal Estate Tax**

Common stock held by an individual non-U.S. holder at the time of death will be included in such holder's gross estate for U.S. federal estate tax purposes, unless an applicable estate tax treaty provides otherwise.

**Information Reporting and Backup Withholding**

Information reporting generally will apply to the amount of dividends paid to each non-U.S. holder and any tax withheld with respect to such dividends, regardless of whether withholding was required. Copies of the information returns reporting such dividends and withholding may also be made available to the tax authorities in the country in which the non-U.S. holder resides under the provisions of an applicable income tax treaty.

A non-U.S. holder will be subject to backup withholding for dividends paid to such holder unless such holder certifies under penalty of perjury that it is a non-U.S. holder (and the payor does not have actual

S-24

Supp.App. 0264

knowledge or reason to know that such holder is a United States person as defined under the Code), or such holder otherwise establishes an exemption.

Information reporting and, depending on the circumstances, backup withholding will apply to the proceeds of a sale or other disposition of our common stock within the United States or conducted through certain U.S.-related financial intermediaries, unless the beneficial owner certifies under penalty of perjury that it is a non-U.S. holder (and the payor does not have actual knowledge or reason to know that the beneficial owner is a United States person as defined under the Code), or such owner otherwise establishes an exemption.

Backup withholding is not an additional tax. Any amounts withheld under the backup withholding rules may be allowed as a refund or a credit against a non-U.S. holder's U.S. federal income tax liability provided the required information is timely furnished to the IRS.

**Additional Withholding Requirements**

Under Sections 1471 through 1474 of the Code (such Sections commonly referred to as "FATCA"), a 30% U.S. federal withholding tax applies to any dividends paid on our common stock, and, for a disposition of our common stock occurring after December 31, 2018, the gross proceeds from such disposition, in each case paid to (i) a "foreign financial institution" (as specifically defined in the Code) that does not provide sufficient documentation, typically on IRS Form W-8BEN-E, evidencing either (x) an exemption from FATCA or (y) its compliance (or deemed compliance) with FATCA (which may alternatively be in the form of compliance with an intergovernmental agreement with the United States) in a manner that avoids withholding, or (ii) a "non-financial foreign entity" (as specifically defined in the Code) that does not provide sufficient documentation, typically on IRS Form W-8BEN-E, evidencing either (x) an exemption from FATCA or (y) adequate information regarding certain substantial U.S. beneficial owners of such entity (if any). If a dividend payment is both subject to withholding under FATCA and subject to the withholding tax discussed above under "—Dividends," the withholding under FATCA may be credited against, and therefore reduce, such other withholding tax. An intergovernmental agreement between the United States and an applicable foreign country or future Treasury Regulations may modify these requirements. You should consult your own tax advisor regarding these requirements and whether they may be relevant to your ownership and disposition of our common stock.

S-25

Supp.App. 0265

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 268 of 1110    PageID 1889

## UNDERWRITERS (CONFLICT OF INTEREST)

Under the terms and subject to the conditions in an underwriting agreement dated the date of this prospectus supplement, the underwriters named below, for whom Morgan Stanley & Co. LLC and RBC Capital Markets, LLC are acting as representatives, have severally agreed to purchase, and the selling stockholder has agreed to sell to them the number of shares indicated below:

| Name | Number of Shares |
|---|---|
| Morgan Stanley & Co. LLC | 3,045,000 |
| RBC Capital Markets, LLC | 2,205,000 |
| Cantor Fitzgerald & Co. | 875,000 |
| Nomura Securities International, Inc. | 875,000 |
| Total: | 7,000,000 |

The underwriters and the representatives are collectively referred to as the "underwriters" and the "representatives," respectively. The underwriters are offering the shares of common stock subject to their acceptance of the shares from the selling stockholder and subject to prior sale. The underwriting agreement provides that the obligations of the several underwriters to pay for and accept delivery of the shares of common stock offered by this prospectus supplement are subject to the approval of certain legal matters by their counsel and to certain other conditions. The underwriters are obligated to take and pay for all of the shares of common stock offered by this prospectus supplement if any such shares are taken. However, the underwriters are not required to take or pay for the shares covered by the underwriters' option to purchase additional shares described below.

The underwriters initially propose to offer part of the shares of common stock directly to the public at the offering price listed on the cover page of this prospectus and part to certain dealers. After the initial offering of the shares of common stock, the offering price and other selling terms may from time to time be varied by the representatives.

The selling stockholder has granted to the underwriters an option, exercisable for 30 days from the date of this prospectus supplement, to purchase up to 1,050,000 additional shares of common stock at the public offering price listed on the cover page of this prospectus supplement, less underwriting discounts and commissions. The underwriters may exercise this option solely for the purpose of covering over-allotments, if any, made in connection with the offering of the shares of common stock offered by this prospectus. To the extent the option is exercised, each underwriter will become obligated, subject to certain conditions, to purchase about the same percentage of the additional shares of common stock as the number listed next to the underwriter's name in the preceding table bears to the total number of shares of common stock listed next to the names of all underwriters in the preceding table.

The following table shows the per share and total public offering price, underwriting discounts and commissions, and proceeds before expenses to the selling stockholder. These amounts are shown assuming both no exercise and full exercise of the underwriters' option to purchase up to an additional 1,050,000 shares of common stock.

| | Per Share | Total | |
|---|---|---|---|
| | | No Exercise | Full Exercise |
| Public offering price | $ 5.00 | $ 35,000,000 | $ 40,250,000 |
| Underwriting discounts and commissions to be paid by the selling stockholder: | $ 0.30621124 | $ 2,143,478.68 | $ 2,465,000.48 |
| Proceeds, before expenses, to selling stockholder | $ 4.69378876 | $ 32,856,521.32 | $ 37,784,999.52 |

S-26

Supp.App. 0266

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 269 of 1110    PageID 1890

Table of Contents

The estimated offering expenses payable by us, exclusive of the underwriting discounts and commissions, are approximately $745,000. We have agreed to reimburse the underwriters for expenses relating to clearance of this offering with the Financial Industry Regulatory Authority up to $12,000.

Our common stock is listed on Nasdaq under the symbol "XELA".

We and all directors and officers have agreed that, without the prior written consent of Morgan Stanley & Co. LLC on behalf of the underwriters, we and they will not, during the period ending 90 days after the date of this prospectus supplement (the "restricted period"):

- offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, lend or otherwise transfer or dispose of, directly or indirectly, any shares of common stock or any securities convertible into or exercisable or exchangeable for shares of common stock;

- file any registration statement with the Securities and Exchange Commission relating to the offering of any shares of common stock or any securities convertible into or exercisable or exchangeable for common stock or make any demand for or exercise any right with respect to, the registration of such securities; or

- enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of the common stock

whether any such transaction described above is to be settled by delivery of common stock or such other securities, in cash or otherwise. In addition, we and each such person agrees that, without the prior written consent of Morgan Stanley & Co. LLC on behalf of the underwriters, we or such other person will not, during the restricted period, make any demand for, or exercise any right with respect to, the registration of any shares of common stock or any security convertible into or exercisable or exchangeable for common stock.

The restrictions described in the immediately preceding paragraph do not apply to:

- the sale of shares to the underwriters; or

- the issuance by the Company of shares of common stock upon the exercise of an option or a warrant or the conversion of a security outstanding on the date of this prospectus supplement of which the underwriters have been advised in writing;

- transfers of shares of common stock or any security convertible into common stock as a bona fide gift, or distributions of shares of common stock or any security convertible into common stock to limited partners or stockholders of the undersigned; provided that in the case of any such transfer or distribution (i) each donee, distributee or transferee shall sign and deliver a lock-up letter in substantially the same form and (ii) no filing under Section 16(a) of the Exchange Act, reporting a reduction in beneficial ownership of shares of common stock, shall be required or shall be voluntarily made during the restricted period;

- transactions by any person other than us relating to shares of common stock or other securities acquired in open market transactions after the completion of the offering of the shares; provided that no filing under Section 16(a) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), is required or voluntarily made in connection with subsequent sales of the common stock or other securities acquired in such open market transactions; or

- the establishment of a trading plan pursuant to Rule 10b5-1 under the Exchange Act for the transfer of shares of common stock, provided that (i) such plan does not provide for the transfer of common stock during the restricted period and (ii) to the extent a public announcement or filing under the Exchange Act, if any, is required or voluntarily made regarding the establishment of such

S-27

Supp.App. 0267

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 270 of 1110     PageID 1891

plan, such announcement or filing shall include a statement to the effect that no transfer of common stock may be made under such plan during the restricted period.

The selling stockholder has agreed to enter into a similar letter agreement, however the restrictions in such agreement do not apply to sales by the selling stockholder of common stock to satisfy margin calls pursuant to margin loans in existence on the date of this prospectus, and further that such restrictions shall not apply if the selling stockholder ceases to hold 5% or more of the equity securities of the Company.

A certain other stockholder of the Company has also agreed to enter into a similar agreement to the selling stockholder, however the restrictions in such agreement additionally do not apply to shares acquired by such stockholder in a private placement with the Company on July 12, 2017. In addition, such restrictions shall further not apply to transfers of shares of common stock or any security convertible into common stock: to any trust or entity wholly-owned by one or more trusts for the direct or indirect benefit of (i) the stockholder or its stockholders, partners, members or beneficiaries or (ii) of any individual related to the stockholder or to the stockholders, partners, members or beneficiaries of the stockholder, by blood, marriage or adoption and not more remote than first cousin; by the stockholder to any of its wholly-owned subsidiaries, or to affiliates, stockholders, partners, members or beneficiaries of the stockholder; pursuant to any take-over bid, acquisition, sale or merger involving the Company, *provided* that any public announcement or public filing under Section 16(a) of the Exchange Act required to be made during the restricted period in connection with such transfers or dispositions shall clearly indicate in the footnotes thereto or comments section thereof that such transfer or disposition was made solely pursuant to the circumstances described in the applicable clause.

Morgan Stanley & Co. LLC, in its sole discretion, may release the common stock and other securities subject to the lock-up agreements described above in whole or in part at any time.

In order to facilitate the offering of the common stock, the underwriters may engage in transactions that stabilize, maintain or otherwise affect the price of the common stock. Specifically, the underwriters may sell more shares than they are obligated to purchase under the underwriting agreement, creating a short position. A short sale is covered if the short position is no greater than the number of shares available for purchase by the underwriters under the option. The underwriters can close out a covered short sale by exercising the option or purchasing shares in the open market. In determining the source of shares to close out a covered short sale, the underwriters will consider, among other things, the open market price of shares compared to the price available under the option. The underwriters may also sell shares in excess of the option, creating a naked short position. The underwriters must close out any naked short position by purchasing shares in the open market. A naked short position is more likely to be created if the underwriters are concerned that there may be downward pressure on the price of the common stock in the open market after pricing that could adversely affect investors who purchase in this offering. As an additional means of facilitating this offering, the underwriters may bid for, and purchase, shares of common stock in the open market to stabilize the price of the common stock. These activities may raise or maintain the market price of the common stock above independent market levels or prevent or retard a decline in the market price of the common stock. The underwriters are not required to engage in these activities and may end any of these activities at any time.

We, the selling stockholder and the underwriters have agreed to indemnify each other against certain liabilities, including liabilities under the Securities Act.

A prospectus supplement in electronic format may be made available on websites maintained by one or more underwriters participating in this offering. The representatives may agree to allocate a number of shares of common stock to underwriters for sale to their online brokerage account holders. Internet distributions will be allocated by the representatives to underwriters that may make Internet distributions on the same basis as other allocations.

S-28

Supp.App. 0268

The underwriters and their respective affiliates are full service financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, investment research, principal investment, hedging, financing and brokerage activities. Certain of the underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various financial advisory and investment banking services for us, for which they received or will receive customary fees and expenses.

In addition, in the ordinary course of their various business activities, the underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (including bank loans) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve our securities and instruments. The underwriters and their respective affiliates may also make investment recommendations or publish or express independent research views in respect of such securities or instruments and may at any time hold, or recommend to clients that they acquire, long or short positions in such securities and instruments.

The underwriters may offer and sell shares of common stock through one or more of their respective affiliates or selling agents.

We have been informed that on April 11, 2018, Morgan Stanley & Co. LLC, on behalf of the underwriters of this offering, purchased 483 shares of common stock at an average price of $4.9986 per share in stabilizing transactions in accordance with Regulation M.

## Conflict of Interest

An affiliate of Morgan Stanley & Co. LLC will receive certain of the proceeds to the selling stockholder in this offering in connection with the repayment by the selling stockholder of certain loans extended to the selling stockholder by such affiliate. As such, Morgan Stanley & Co. LLC and/or their affiliates will be receiving more than 5% of the net offering proceeds resulting in a "conflict of interest" pursuant to FINRA Rule 5121(f)(5)(C). Therefore, this offering will be conducted in accordance with FINRA Rule 5121, which requires that Morgan Stanley & Co. LLC, who has a conflict of interest, not make sales to discretionary accounts without the prior written consent of the account holder and that a qualified independent underwriter ("QIU"), as defined in Rule 5121, participates in the preparation of the registration statement of which this prospectus forms a part and performs its usual standard of due diligence with respect thereto. RBC Capital Markets, LLC has agreed to act as QIU for this offering.

## Selling Restrictions

### European Economic Area

In relation to each Member State of the European Economic Area which has implemented the Prospectus Directive (each, a "Relevant Member State") an offer to the public of any shares of our common stock may not be made in that Relevant Member State, except that an offer to the public in that Relevant Member State of any shares of our common stock may be made at any time under the following exemptions under the Prospectus Directive, if they have been implemented in that Relevant Member State:

(a)    to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)    to fewer than 100 or, if the Relevant Member State has implemented the relevant provision of the 2010 PD Amending Directive, 150, natural or legal persons (other than qualified investors as defined in the Prospectus Directive), as permitted under the Prospectus Directive, subject to obtaining the prior consent of the representatives for any such offer; or

S-29

Supp.App. 0269

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 272 of 1110    PageID 1893

Table of Contents

(c)    in any other circumstances falling within Article 3(2) of the Prospectus Directive, provided that no such offer of shares of our common stock shall result in a requirement for the publication by us or any underwriter of a prospectus pursuant to Article 3 of the Prospectus Directive.

For the purposes of this provision, the expression an "offer to the public" in relation to any shares of our common stock in any Relevant Member State means the communication in any form and by any means of sufficient information on the terms of the offer and any shares of our common stock to be offered so as to enable an investor to decide to purchase any shares of our common stock, as the same may be varied in that Member State by any measure implementing the Prospectus Directive in that Member State, the expression "Prospectus Directive" means Directive 2003/71/EC (and amendments thereto, including the 2010 PD Amending Directive, to the extent implemented in the Relevant Member State), and includes any relevant implementing measure in the Relevant Member State, and the expression "2010 PD Amending Directive" means Directive 2010/73/EU.

### United Kingdom

Each underwriter has represented and agreed that:

(a)    it has only communicated or caused to be communicated and will only communicate or cause to be communicated an invitation or inducement to engage in investment activity (within the meaning of Section 21 of the Financial Services and Markets Act 2000 ("FSMA") received by it in connection with the issue or sale of the shares of our common stock in circumstances in which Section 21(1) of the FSMA does not apply to us; and

(b)    it has complied and will comply with all applicable provisions of the FSMA with respect to anything done by it in relation to the shares of our common stock in, from or otherwise involving the United Kingdom.

### Canada

The shares of common stock may be sold only to purchasers purchasing, or deemed to be purchasing, as principal that are accredited investors, as defined in National Instrument 45-106 *Prospectus Exemptions* or subsection 73.3(1) of the *Securities Act* (Ontario), and are permitted clients, as defined in National Instrument 31-103 *Registration Requirements, Exemptions and Ongoing Registrant Obligations*. Any resale of the shares of common stock must be made in accordance with an exemption from, or in a transaction not subject to, the prospectus requirements of applicable securities laws.

Securities legislation in certain provinces or territories of Canada may provide a purchaser with remedies for rescission or damages if this prospectus supplement (including any amendment thereto) contains a misrepresentation, provided that the remedies for rescission or damages are exercised by the purchaser within the time limit prescribed by the securities legislation of the purchaser's province or territory. The purchaser should refer to any applicable provisions of the securities legislation of the purchaser's province or territory for particulars of these rights or consult with a legal advisor.

Pursuant to section 3A.3 (or, in the case of securities issued or guaranteed by the government of a non-Canadian jurisdiction, section 3A.4) of National Instrument 33-105 *Underwriting Conflicts* (**NI 33-105**), the underwriters are not required to comply with the disclosure requirements of NI 33-105 regarding underwriter conflicts of interest in connection with this offering.

### Hong Kong

The contents of this document have not been reviewed or approved by any regulatory authority in Hong Kong. This document does not constitute an offer or invitation to the public in Hong Kong to acquire shares. Accordingly, unless permitted by the securities laws of Hong Kong, no person may issue or have in its possession for the purposes of issue, this document or any advertisement, invitation or

S-30

Supp.App. 0270

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 273 of 1110    PageID 1894

document relating to the shares, whether in Hong Kong or elsewhere, which is directed at, or the contents of which are likely to be accessed or read by, the public in Hong Kong other than in relation to shares which are intended to be disposed of only to persons outside Hong Kong or only to "professional investors" (as such term is defined in the Securities and Futures Ordinance (Cap. 571, Laws of Hong Kong) ("SFO") and the subsidiary legislation made thereunder); or in circumstances which do not result in this document being a "prospectus" as defined in the Companies (Winding Up and Miscellaneous Provisions) Ordinance (Cap. 32, Laws of Hong Kong) ("CO"); or which do not constitute an offer or an invitation to the public for the purposes of the SFO or the CO. The offer of the shares is personal to the person to whom this document has been delivered, and a subscription for shares will only be accepted from such person. No person to whom a copy of this document is issued may issue, circulate or distribute this document in Hong Kong, or make or give a copy of this document to any other person. You are advised to exercise caution in relation to the offer. If you are in any doubt about any of the contents of this document, you should obtain independent professional advice.

**Singapore**

This prospectus has not been registered as a prospectus with the Monetary Authority of Singapore. Accordingly, this prospectus and any other document or material in connection with the offer or sale, or invitation for subscription or purchase, of the shares may not be circulated or distributed, nor may the shares be offered or sold, or be made the subject of an invitation for subscription or purchase, whether directly or indirectly, to persons in Singapore other than (i) to an institutional investor under Section 274 of the Securities and Futures Act, Chapter 289 of Singapore (the "SFA"), (ii) to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA or (iii) otherwise pursuant to, and in accordance with the conditions of, any other applicable provision of the SFA.

Where the shares are subscribed or purchased under Section 275 by a relevant person which is: (a) a corporation (which is not an accredited investor) the sole business of which is to hold investments and the entire share capital of which is owned by one or more individuals, each of whom is an accredited investor; or (b) a trust (where the trustee is not an accredited investor) whose sole purpose is to hold investments and each beneficiary is an accredited investor, shares, debentures and units of shares and debentures of that corporation or the beneficiaries' rights and interest in that trust shall not be transferable for six months after that corporation or that trust has acquired the shares under Section 275 except: (1) to an institutional investor under Section 274 of the SFA or to a relevant person, or any person pursuant to Section 275(1A), and in accordance with the conditions, specified in Section 275 of the SFA; (2) where no consideration is given for the transfer; or (3) by operation of law.

S-31

Supp.App. 0271

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 274 of 1110     PageID 1895

## LEGAL MATTERS

The validity of shares of our common stock offered by this prospectus supplement will be passed upon for us by Willkie Farr & Gallagher LLP, New York, New York. Certain legal matters in connection with the offering will be passed upon for the underwriters by Kirkland & Ellis LLP, New York, New York.

## EXPERTS

The consolidated financial statements of Exela Technologies, Inc. as of December 31, 2017 and 2016 and for each of the years in the three-year period ended December 31, 2017 have been incorporated by reference herein and in the registration statement in reliance upon the report of KPMG LLP, an independent registered public accounting firm, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

The financial statements of Quinpario Acquisition Corp. 2, incorporated in this prospectus supplement by reference to the Proxy Statement, as of December 31, 2016 and 2015 and for the years ended December 31, 2016 and 2015 and for the period from July 15, 2014 to December 31, 2014, have been so incorporated in reliance on the report of Marcum LLP, an independent registered public accounting firm given on the authority of said firm as experts in accounting and auditing.

The consolidated financial statements of SourceHOV Holdings, Inc., incorporated in this prospectus supplement by reference to the Proxy Statement, as of December 31, 2016 and 2015, and for each of the years in the three-year period ended December 31, 2016, have been so incorporated herein in reliance upon the report of KPMG LLP, independent registered public accounting firm and upon the authority of said firm as experts in accounting and auditing.

The audited historical financial statements of Novitex Holdings, Inc., incorporated in this prospectus supplement by reference to the Proxy Statement have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

S-32

Supp.App. 0272

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 275 of 1110    PageID 1896

## WHERE YOU CAN FIND MORE INFORMATION

We file reports and proxy statements with the SEC. These filings include our Annual Report on Form 10-K, Quarterly Reports on Form 10-Q, Current Reports on Form 8-K and proxy statements on Schedule 14A, as well as any amendments to those reports and proxy statements, and are available free of charge through our website as soon as reasonably practicable after we file them with, or furnish them to, the SEC. Once at www.exelatech.com, go to Investors & SEC Filings to locate copies of such reports and proxy statements. Our website and the information contained on, or that can be accessed through, the website will not be deemed to be incorporated by reference in, and are not considered part of, this prospectus supplement. You should not rely on any such information in making your decision whether to purchase our common stock. You may also read and copy materials that we file with the SEC at the SEC's Public Reference Room at 100 F Street, NE, Washington, DC 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. The SEC also maintains a website at www.sec.gov that contains reports, proxy and information statements and other information regarding us and other issuers that file electronically with the SEC.

We have filed with the SEC a registration statement on Form S-3 under the Securities Act relating to the shares of our common stock being offered by this prospectus supplement. This prospectus supplement and the related prospectus, which constitute part of the registration statement, do not contain all of the information set forth in the registration statement or the exhibits and schedules which are part of the registration statement. For further information about us and the common stock offered, see the registration statement and the exhibits and schedules thereto. Statements contained in this prospectus supplement regarding the contents of any contract or any other document to which reference is made are not necessarily complete, and, in each instance where a copy of a contract or other document has been filed as an exhibit to the registration statement, reference is made to the copy so filed, each of those statements being qualified in all respects by the reference.

## INCORPORATION BY REFERENCE

The SEC allows us to "incorporate by reference" into this prospectus supplement the information we file with the SEC in other documents, which means that we can disclose important information to you by referring you to those documents instead of having to repeat the information in this prospectus supplement. The information incorporated by reference is considered to be part of this prospectus supplement, and later information that we file with the SEC will automatically update and supersede such information. We incorporate by reference the documents listed below and any future information filed (rather than furnished) with the SEC under Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act between the date of this prospectus supplement and the date we terminate the offering, provided, however, that we are not incorporating any information furnished under Item 2.02 or Item 7.01 of any Current Report on Form 8-K:

- our Annual Report on Form 10-K for the year ended December 31, 2017, as filed with the SEC on March 16, 2018 as amended by Amendment No. 1 on Form 10-K/A filed with the SEC on April 10, 2018;

- our Current Reports on Form 8-K, as filed with the SEC on April 10, 2018;

- the financial statements of Quinpario Acquisition Corp. 2 as of December 31, 2016 and 2015 and for the years ended December 31, 2016 and 2015 and for the period from July 15, 2014 to December 31, 2014, (ii) the consolidated financial statements of SourceHOV Holdings, Inc. as of December 31, 2016 and 2015, and for each of the years in the three-year period ended December 31, 2016, (iii) the audited historical financial statements of Novitex Holdings, Inc. as of December 31, 2016 and 2015, and for each of the years in the three-year period ended December 31, 2016 and (iv) the unaudited pro forma condensed combined financial information as of and for the three months ended March 31, 2017 and as of and for the year ended December 31,

S-33

Supp.App. 0273

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 276 of 1110     PageID 1897

2016, each as included in our our Definitive Proxy Statement on Schedule 14A (our "Proxy Statement") filed with the SEC on June 26, 2017;

•       Exhibits 99.1 and 99.3 of our Current Report on Form 8-K/A as filed with the SEC on August 9, 2017; and

•       the description of our common stock contained in our registration statement on Form 8-A as filed with the SEC on December 15, 2014 (File No. 001-36788).

We will furnish without charge to you a copy of any or all of the documents incorporated by reference, including exhibits to these documents, upon written or oral request. Direct your written request to: Investor Relations, Exela Technologies, Inc., 2701 E. Grauwyler Rd., Irving, TX 75061, or contact Investor Relations at (972) 821-5808.

A statement contained in a document incorporated by reference into this prospectus supplement shall be deemed to be modified or superseded for purposes of this prospectus supplement to the extent that a statement contained in this prospectus supplement, any prospectus supplement or in any other subsequently filed document which is also incorporated in this prospectus supplement modifies or replaces such statement. Any statements so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this prospectus supplement.

S-34

Supp.App. 0274

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 277 of 1110     PageID 1898

Table of Contents

**Prospectus**

# Exela Technologies, Inc.

## 146,665,929 Shares of Common Stock

The selling stockholders named in this prospectus (the "Selling Stockholders") may offer and sell from time to time up to 146,665,929 shares of our common stock, par value $0.0001 per share ("Common Stock"), covered by this prospectus, which includes up to 139,092,623 shares of our Common Stock and 7,573,306 shares of our Common Stock that are issuable upon the conversion of 6,194,233 shares of Series A Perpetual Convertible Preferred Stock, par value $0.0001 ("Series A Convertible Preferred Stock"). The shares that may be offered and sold from time to time pursuant to this prospectus include (i) 80,600,000 shares of Common Stock issued to the sole stockholder of SourceHOV Holdings, Inc. ("SourceHOV") and 30,600,000 shares of Common Stock issued to the sole stockholder of Novitex Holdings, Inc. ("Novitex") pursuant to the Business Combination consummated under the Business Combination Agreement (as defined below), (ii) 21,700,265 shares of Common Stock issued in a private placement to certain investors in connection with the Business Combination, (iii) 7,573,306 shares of Common Stock issuable upon the conversion of 6,194,233 shares of Series A Convertible Preferred Stock issued in a private placement to certain investors in connection with the Business Combination, (iv) 3,667,803 shares of Common Stock previously issued upon conversion of the Company's Series A Convertible Preferred Stock and (v) 2,524,555 shares of Common Stock issued in a private placement to certain investors in respect of fees and other consideration in connection with the Business Combination.

On February 21, 2017, we entered into that certain Business Combination Agreement (as amended, the "Business Combination Agreement"), with Quinpario Merger Sub I, Inc. ("SourceHOV Merger Sub"), Quinpario Merger Sub II, Inc. ("Novitex Merger Sub"), SourceHOV, Novitex, HOVS LLC, HandsOn Fund 4 I, LLC and Novitex Parent, L.P. ("Novitex Parent"), as amended by that certain Consent, Waiver and Amendment, dated June 15, 2017, by and among Exela Technologies, Inc. ("Exela"), SourceHOV Merger Sub, Novitex Merger Sub, SourceHOV, Novitex, Novitex Parent, Ex-Sigma LLC, HOVS LLC and HandsOn Fund 4 I, LLC (the "Modification Agreement"). On July 12, 2017, pursuant to the terms of the Business Combination Agreement, SourceHOV Merger Sub merged with and into SourceHOV, with SourceHOV continuing as the surviving company and an indirect subsidiary of Exela, and Novitex Merger Sub merged with and into Novitex, with Novitex as the surviving company and an indirect subsidiary of Exela (collectively, the "Business Combination"). Upon consummation of the Business Combination, we changed our corporate name to "Exela Technologies, Inc." For more information on the Business Combination and Exela Technologies, Inc., see our Definitive Proxy Statement on Schedule 14A, filed with the SEC on June 26, 2017 and our Current Reports on Form 8-K, filed with the SEC on July 18, 2017.

We will not receive any proceeds from the sale of shares of Common Stock by the Selling Stockholders or by us pursuant to this prospectus. However, for certain shares registered pursuant to the Registration Rights Agreement (as defined below), we will pay certain expenses, other than any underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal fees, associated with the sale of shares pursuant to this prospectus.

Our registration of the securities covered by this prospectus does not mean that the Selling Stockholders will offer or sell any of the shares. The Selling Stockholders may sell the shares of Common Stock covered by this prospectus in a number of different ways and at varying prices, and may be subject to restrictions on their ability to sell. We provide more information about how the Selling Stockholders may sell the shares in the section entitled "Plan of Distribution."

Our Common Stock is traded on The Nasdaq Capital Market ("Nasdaq") under the symbol "XELA." On September 18, 2017, the last reported sales prices of the Common Stock was $5.05 per share.

We are an "emerging growth company," as that term is defined under the federal securities laws and, as such, are subject to certain reduced public company reporting requirements.

**See "Risk Factors" on page 2 to read about factors you should consider before investing in our securities.**

Supp.App. 0275

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 278 of 1110 PageID 1899

**Neither the Securities and Exchange Commission ("SEC") nor any state securities commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

**The date of this prospectus is October 2, 2017.**

Supp.App. 0276

## TABLE OF CONTENTS

| | |
|---|---:|
| About This Prospectus | i |
| Incorporation of Certain Information by Reference | i |
| Forward-Looking Statements | iii |
| Prospectus Summary | 1 |
| Risk Factors | 2 |
| Use of Proceeds | 3 |
| Selling Stockholders | 4 |
| Description of Capital Stock | 8 |
| Plan Of Distribution | 12 |
| Legal Matters | 15 |
| Experts | 15 |
| Where You Can Find More Information | 15 |

**Neither we nor the Selling Stockholders have authorized any dealer, salesperson or other person to give any information or to make any representation other than those contained or incorporated by reference in this prospectus and the accompanying supplement to this prospectus or any associated "free writing prospectus." In this prospectus, any reference to an applicable prospectus supplement may refer to a "free writing prospectus," unless the context otherwise requires. You must not rely upon any information or representation not contained or incorporated by reference in this prospectus or any accompanying prospectus supplement. This prospectus and any accompanying prospectus supplement do not constitute an offer to sell or the solicitation of an offer to buy any securities other than the registered securities to which they relate, nor do this prospectus and the accompanying prospectus supplement constitute an offer to sell or the solicitation of an offer to buy securities in any jurisdiction to any person to whom it is unlawful to make such offer or solicitation in such jurisdiction. You should not assume that the information contained in this prospectus and any accompanying prospectus supplement is accurate on any date subsequent to the date set forth on the front of the document.**

## ABOUT THIS PROSPECTUS

This prospectus is part of a registration statement on Form S-3 that we filed with the SEC using a "shelf" registration process. Under this shelf process, the Selling Stockholders may, from time to time, offer and sell shares of our Common Stock in one or more offerings.

We will not receive any proceeds from the sale of shares of Common Stock to be offered by the Selling Stockholders pursuant to this prospectus. However, for certain Selling Stockholders that are party to the Registration Rights Agreements, we will pay the expenses, other than underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses, associated with the sale of shares pursuant to this prospectus. To the extent appropriate, we and the Selling Stockholders, as applicable, will deliver a prospectus supplement with this prospectus to update the information contained in this prospectus. Any applicable prospectus supplement may also add, update or change information included in this prospectus. You should read both this prospectus and any applicable prospectus supplement, together with additional information described below under the captions "Where You Can Find More Information" and "Incorporation of Certain Information by Reference."

Unless the context indicates otherwise, the terms "Company," "we," "us" and "our" refer to Exela Technologies, Inc.

## INCORPORATION OF CERTAIN INFORMATION BY REFERENCE

The SEC allows us to "incorporate by reference" information into this prospectus, which means that we can disclose important information about us by referring you to another document filed

i

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 280 of 1110   PageID 1901

separately with the SEC. The information incorporated by reference is considered to be a part of this prospectus. This prospectus incorporates by reference the documents and reports listed below (other than portions of these documents that are either (1) described in paragraph (e) of Item 201 of Regulation S-K or paragraphs (d)(1)-(3) and (e)(5) of Item 407 of Regulation S-K promulgated by the SEC or (2) deemed to have been furnished and not filed in accordance with SEC rules, including Current Reports on Form 8-K furnished under Item 2.02 or Item 7.01 (including any financial statements or exhibits relating thereto furnished pursuant to Item 9.01), unless otherwise indicated therein:

- Our Annual Report on Form 10-K for the year ended December 31, 2016 (our "Annual Report") filed with the SEC on March 6, 2017;

- Our Quarterly Reports on Form 10-Q (our "Quarterly Reports") for the quarters ended March 31, 2017, filed with the SEC on May 10, 2017, and June 30, 2017, filed with the SEC on August 9, 2017;

- Our Current Reports on Form 8-K (our "Current Reports"), filed with the SEC on January 6, January 17, January 20, February 1, February 22, June 21, June 29, July 12, July 18, 2017, August 10, 2017 and September 13, 2017;

- Our Definitive Proxy Statement on Schedule 14A (our "Annual Meeting Definitive Proxy Statement") filed with the SEC on June 14, 2017;

- Our Definitive Proxy Statement on Schedule 14A (our "Definitive Proxy Statement") filed with the SEC on June 26, 2017; and

- The description of our Common Stock included in the Registration Statement on Form 8-A, filed with the SEC on December 15, 2014 (File No. 001-36788).

We also incorporate by reference the information contained in all other documents we file with the SEC pursuant to Sections 13(a), 13(c), 14 or 15(d) of the Exchange Act (other than portions of these documents that are either (1) described in paragraph (e) of Item 201 of Regulation S-K or paragraphs (d)(1)-(3) and (e)(5) of Item 407 of Regulation S-K promulgated by the SEC or (2) deemed to have been furnished and not filed in accordance with SEC rules, including Current Reports on Form 8-K furnished under Item 2.02 or Item 7.01 (including any financial statements or exhibits relating thereto furnished pursuant to Item 9.01, unless otherwise indicated therein) after the date of this prospectus and prior to the completion of the offering of all securities covered by this prospectus and any accompanying prospectus supplement. The information contained in any such document will be considered part of this prospectus from the date the document is filed with the SEC.

If you make a request for such information in writing or by telephone, we will provide you, without charge, a copy of any or all of the information incorporated by reference into this prospectus. Any such request should be directed to:

Exela Technologies, Inc.
2701 E. Grauwyler Rd.
Irving, TX 75061
(214) 740-6500

You should rely only on the information contained in, or incorporated by reference into, this prospectus, in any accompanying prospectus supplement or in any free writing prospectus filed by us with the SEC. We have not authorized anyone to provide you with different or additional information. We are not offering to sell or soliciting any offer to buy any securities in any jurisdiction where the offer or sale is not permitted. You should not assume that the information in this prospectus or in any document incorporated by reference is accurate as of any date other than the date on the front cover of the applicable document.

ii

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 281 of 1110    PageID 1902

## FORWARD-LOOKING STATEMENTS

This prospectus and any accompanying prospectus supplement and the documents incorporated herein or therein by reference include forward-looking statements within the meaning of Section 27A of the Securities Act and Section 21E of the Exchange Act. All statements other than statements of historical fact contained in this prospectus, including statements regarding our future results of operations and financial position, strategy and plans, and our expectations for future operations, are forward-looking statements. The words "anticipate," "estimate," "expect," "project," "plan," "intend," "believe," "may," "might," "will," "should," "can have," "likely," "continue," "design" and other words and terms of similar expressions, are intended to identify forward-looking statements.

We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our financial condition, results of operations, strategy, short-term and long-term business operations and objectives and financial needs.

Although we believe that the expectations reflected in our forward-looking statements are reasonable, actual results could differ from those expressed in our forward-looking statements. Our future financial position and results of operations, as well as any forward-looking statements are subject to change and inherent risks and uncertainties, including those described in the section entitled "Risk Factors" herein and in our Annual Report, Quarterly Reports and Definitive Proxy Statement, which are incorporated by reference into this prospectus, or any subsequently filed Annual Report or Quarterly Reports incorporated by reference into this prospectus. You should consider our forward-looking statements in light of a number of factors that may cause actual results to vary from our forward-looking statements including, but not limited to:

- the outcome of any legal proceedings that may be instituted against us, Novitex or SourceHOV related to the Business Combination and transactions contemplated thereby;

- our ability to maintain the listing of our Common Stock on Nasdaq following the Business Combination;

- the risk that the proposed Business Combination disrupts current plans and operations as a result of the announcement and consummation of the transactions described herein;

- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability to integrate the SourceHOV and Novitex businesses, and the ability of the combined business to grow and manage growth profitably;

- costs related to the Business Combination;

- changes in applicable laws or regulations;

- the possibility that we may be adversely affected by other economic, business, and/or competitive factors; and

- other risks and uncertainties, including those under "Risk Factors" in our other filings with the SEC.

You should not rely upon forward-looking statements as predictions of future events. In addition, neither we nor any other person assumes responsibility for the accuracy and completeness of any of these forward-looking statements. The forward-looking statements contained in this prospectus are made as of the date hereof, and we assume no obligation to update or supplement any forward-looking statements.

See "*Risk Factors*" herein and incorporated from our Annual Report, Quarterly Reports and Definitive Proxy Statement and other filings we make with the SEC for a more complete discussion of

<center>iii</center>

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 282 of 1110   PageID 1903

Table of Contents

the risks and uncertainties mentioned above and for a discussion of other risks and uncertainties. All forward-looking statements attributable to us are expressly qualified in their entirety by these cautionary statements as well as others made in this prospectus, our Annual Report, Quarterly Reports, Definitive Proxy Statement and hereafter in our other SEC filings and public communications. You should evaluate all forward-looking statements made by us in the context of these risks and uncertainties. Note that forward-looking statements speak only as of the date of this prospectus or, in the case of any accompanying prospectus supplement or documents incorporated by reference, the date of any such document. Except as required by applicable law, we do not undertake any obligation to publicly correct or update any forward-looking statement.

<div align="center">iv</div>

Supp.App. 0280

## PROSPECTUS SUMMARY

*The following summary highlights information contained elsewhere or incorporated by reference into this prospectus. It may not contain all the information that may be important to you. You should read this entire prospectus carefully, including the section titled "Risk Factors" and our historical consolidated financial statements and related notes incorporated by reference from our Annual Report, Quarterly Reports and Definitive Proxy Statement and other filings we have made with the SEC.*

Exela, formerly known as Quinpario Acquisition Corp. 2, was formed in July 2014 as a Delaware special purpose acquisition company for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving Exela and one or more businesses.

On February 21, 2017, Exela entered into that certain Business Combination Agreement (as amended, the "Business Combination Agreement"), with Quinpario Merger Sub I, Inc. ("SourceHOV Merger Sub"), Quinpario Merger Sub II, Inc. ("Novitex Merger Sub"), SourceHOV Holdings, Inc. ("SourceHOV"), Novitex Holdings, Inc. ("Novitex"), HOVS LLC, HandsOn Fund 4 I, LLC and Novitex Parent, L.P. ("Novitex Parent"), as amended by that certain Consent, Waiver and Amendment, dated June 15, 2017, by and among the Company, SourceHOV Merger Sub, Novitex Merger Sub, SourceHOV, Novitex, Novitex Parent, Ex-Sigma LLC, HOVS LLC and HandsOn Fund 4 I, LLC (the "Modification Agreement"). On July 12, 2017, pursuant to the terms of the Business Combination Agreement, SourceHOV Merger Sub merged with and into SourceHOV, with SourceHOV continuing as the surviving company and an indirect subsidiary of Exela, and Novitex Merger Sub merged with and into Novitex, with Novitex as the surviving company and an indirect subsidiary of Exela (collectively, the "Business Combination"). Upon consummation of the Business Combination, we changed our corporate name to "Exela Technologies, Inc." For more information on the Business Combination and Exela, see our Definitive Proxy Statement on Schedule 14A, filed with the SEC on June 26, 2017 and our Current Report on Form 8-K, filed with the SEC on July 18, 2017.

This prospectus relates to the resale by the selling stockholders named in this prospectus (the "Selling Stockholders") of up to 146,665,929 shares of our common stock, par value $0.0001 per share ("Common Stock"), covered by this prospectus, which includes up to 139,092,623 shares of our Common Stock and 7,573,306 shares of our Common Stock that are issuable upon the conversion of 6,194,233 shares of Series A Perpetual Convertible Preferred Stock, par value $0.0001 ("Series A Convertible Preferred Stock"). The shares that may be offered and sold from time to time pursuant to this prospectus include (i) 80,600,000 shares of Common Stock issued to the sole stockholder of SourceHOV and 30,600,000 shares of Common Stock issued to the sole stockholder of Novitex pursuant to the Business Combination consummated under the Business Combination Agreement, (ii) 21,700,265 shares of Common Stock issued in a private placement to certain investors in connection with the Business Combination, (iii) 7,573,306 shares of Common Stock issuable upon the conversion of 6,194,233 shares of Series A Convertible Preferred Stock issued in a private placement to certain investors in connection with the Business Combination, (iv) 3,667,803 shares of Common Stock previously issued upon conversion of the Company's Series A Convertible Preferred Stock and (v) 2,524,555 shares of Common Stock issued in a private placement to certain investors in respect of fees and other consideration in connection with the Business Combination.

We are registering the offer and sale of the shares to satisfy certain registration rights we have granted to the Selling Stockholders. See "Selling Stockholders." We will not receive any of the proceeds from the sale of the shares hereunder. See "Use of Proceeds."

Our Common Stock is traded on Nasdaq under the symbol "XELA". The mailing address of our principal executive office is 2701 E. Grauwyler Rd., Irving, TX 75061. We maintain a website at www.exelatech.com. **The information contained on our website is not intended to form a part of, or be incorporated by reference into, this prospectus.**

1

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 284 of 1110    PageID 1905

## RISK FACTORS

Our business is subject to uncertainties and risks. You should consider carefully all of the information set forth in any accompanying prospectus supplement and the documents incorporated by reference herein and therein, unless expressly provided otherwise, including the risk factors incorporated by reference from our Annual Report, Quarterly Reports, Definitive Proxy Statement and other filings we make with the SEC. The risks described in any document incorporated by reference herein are not the only ones we face, but are considered by us to be the most material. There may be other unknown or unpredictable economic, business, competitive, regulatory or other factors that could have material adverse effects on our future results. The market price of our Common Stock could decline if one or more of these risks or uncertainties actually occur, causing you to lose all or part of your investment in our Common Stock. See "Where You Can Find More Information" elsewhere in this prospectus.

2

Supp.App. 0282

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 285 of 1110    PageID 1906

## USE OF PROCEEDS

All of the shares of Common Stock offered by the Selling Stockholders, including any shares of Common Stock issuable upon conversion of the Series A Preferred Stock, pursuant to this prospectus will be sold by the Selling Stockholders for their respective accounts. We will not receive any of the proceeds from these sales.

For the Selling Stockholders that are party to the Registration Rights Agreement, which is more fully described below, the Selling Stockholders will pay any underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses incurred by such Selling Stockholders in disposing of the shares, and we will bear all other costs, fees and expenses incurred in effecting the registration of the shares covered by this prospectus, including, without limitation, all registration and filing fees, Nasdaq listing fees and fees and expenses of our counsel and our independent registered public accountants.

3

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 286 of 1110    PageID 1907

## SELLING STOCKHOLDERS

This prospectus relates to the resale by the Selling Stockholders from time to time of up to 146,665,929 shares of our Common Stock. The Selling Stockholders may from time to time offer and sell any or all of the Common Stock set forth below pursuant to this prospectus and any accompanying prospectus supplement. When we refer to the "Selling Stockholders" in this prospectus, we mean the persons listed in the table below, and the pledgees, donees, transferees, assignees, successors, designees and others who later come to hold any of the Selling Stockholders' interest in Common Stock other than through a public sale.

The following table sets forth, as of the date of this prospectus, the names of the Selling Stockholders, and the aggregate number of shares of Common Stock that the Selling Stockholders may offer pursuant to this prospectus, which includes any shares of our Common Stock that are issuable upon conversion of the Series A Convertible Preferred Stock. The percentages of shares of Common Stock owned by a particular holder are based on 149,967,151 shares of Common Stock that are outstanding as of September 1, 2017, determined in accordance with Rule 13d-3 under the Securities Exchange Act of 1934, as amended. The Series A Convertible Preferred Shares are not convertible within 6 months of the date of issuance, except in the case of a Fundamental Change (as defined in the Certificate of Designations, Preferences, Rights and Limitations of Series A Perpetual Convertible Preferred Stock of Exela).

We cannot advise you as to whether the Selling Stockholders will in fact sell any or all of such shares of Common Stock.

Selling Stockholder information for each additional Selling Stockholder, if any, will be set forth by prospectus supplement to the extent required prior to the time of any offer or sale of such Selling Stockholder's shares pursuant to this prospectus. Any prospectus supplement may add, update, substitute, or change the information contained in this prospectus, including the identity of each Selling

4

Supp.App. 0284

Stockholder and the number of shares registered on its behalf. A Selling Stockholder may sell or otherwise transfer all, some or none of such shares in this offering. See "Plan Of Distribution."

| Name of Beneficial Owner | Before the Offering | | Number of Shares Being Offered | After the Offering | |
|---|---|---|---|---|---|
| | Number of Shares | Percentage of Outstanding Common Stock | | Number of Shares | Percentage of Outstanding Common Stock |
| Apollo Novitex Holdings, L.P.(1) | 968,750 | * | 968,750 | — | — |
| Avenue PPF Opportunities Fund, L.P. | 55,000 | * | 55,000 | — | — |
| Avenue Special Opportunities Fund II, L.P. | 70,000 | * | 70,000 | — | — |
| Cantor Fitzgerald & Co.(2) | 387,203 | * | 387,203 | — | — |
| Credit Suisse Securities (USA) LLC(3) | 1,000,000 | * | 1,000,000 | — | — |
| Delos Investment Fund, LP(4) | 1,889,639 | 1.3% | 1,889,639 | — | — |
| Deutsche Bank Securities Inc.(5) | 625,000 | * | 625,000 | — | — |
| Ex-Sigma 2 LLC(6) | 88,175,973 | 57.5% | 88,175,973 | | |
| Greenlight Capital, Inc.(7) | 8,384,689 | 5.6% | 8,384,689 | — | — |
| Halcyon Solutions Master Fund LP(8) | 44,856 | * | 28,527 | 16,329 | * |
| HandsOn Global Management, LLC(9) | 1,250,000 | * | 1,250,000 | — | — |
| Harperbee, LLC | 125,000 | * | 125,000 | — | — |
| HCN LP(10) | 314,275 | * | 199,868 | 114,407 | * |
| KeySquare Capital Management LLC(11) | 1,833,939 | 1.2% | 1,833,939 | — | — |
| Laurion Capital Master Fund Ltd. (12) | 1,000,000 | * | 1,000,000 | — | — |
| Loomis Sayles Bond Fund | 159,286 | * | 159,286 | — | — |
| Loomis Sayles Strategic Income Fund | 122,857 | * | 122,857 | — | — |
| North Haven Credit Partners II L.P.(13) | 285,714 | * | 285,714 | — | — |
| Novitex Parent, L.P.(1) | 30,600,000 | 20.4% | 30,600,000 | — | — |
| RBC Capital Markets, LLC(14) | 250,000 | * | 250,000 | — | — |
| Rothschild Inc.(15) | 750,000 | * | 750,000 | — | — |
| Scoggin International Fund Ltd(16) | 2,058,783 | 1.4% | 1,880,212 | 178,571 | * |
| State of Connecticut | 3,571 | * | 3,571 | — | — |
| Sunrise Partners Limited Partnership | 2,378,300 | 1.6% | 400,000 | 1,978,300 | 1.3% |
| Third Point Loan LLC | 1,361,313 | * | 1,361,313 | — | — |
| Union Square Park Partners, LP(17) | 507,828 | * | 190,328 | 317,500 | * |
| Watermill Institutional Trading LLC | 625,000 | * | 625,000 | — | — |
| York Capital Management, L.P. (18) | 1,905,838 | 1.3% | 1,905,838 | — | — |
| York Multi-Strategy Master Fund, L.P. | 946,428 | * | 946,428 | — | — |
| York Select, L.P.(19) | 816,788 | * | 816,788 | — | — |
| York Select Investors Master Fund, L.P. | 137,067 | * | 137,067 | — | — |
| York Select Master Fund, L.P. | 237,933 | * | 237,933 | — | — |

*       Represents less than 1%

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 288 of 1110 PageID 1909

(1) Does not reflect the expected distribution (the "Distribution") by Novitex Parent (at a time to be determined) of its shares of Common Stock, 27,678,386 of which are to be distributed to Apollo Novitex Holdings, L.P. and the remainder of which are expected to be distributed to certain management personnel of Apollo Novitex Holdings L.P. (including Mr. Lipman) and other minority interest holders in Novitex Parent. Such recipients of shares of Common Stock in the Distribution will be Selling Stockholders and will be entitled to resell such shares of Common Stock pursuant to this prospectus. Novitex Parent GP, LLC is the general partner of Novitex Parent and Apollo Novitex Holdings, L.P. Apollo Management VII, L.P. is the manager of Novitex Parent GP, LLC. AIF VII Management, LLC is general partner of Apollo Management VII, L.P. Apollo Management, L.P. is the sole member-manager of AIF VII Management, LLC, and Apollo Management GP, LLC is the general partner of Apollo Management, L.P. Apollo Management Holdings, L.P. is the sole member-manager of Apollo Management GP, LLC. Apollo Management Holdings GP, LLC ("Management Holdings GP") is the general partner of Apollo Management Holdings, L.P. Leon Black, Joshua Harris and Marc Rowan are the managers, as well as executive officers, of Management Holdings GP, and as such may be deemed to have voting and dispositive

5

Supp.App. 0286

Table of Contents

control of the shares of Common Stock held by Novitex Parent and Apollo Novitex Holdings, L.P. The address of each of Novitex Parent, Apollo Novitex Holdings, L.P., Novitex Parent GP, LLC, Apollo Management VII, L.P., AIF VII Management, LLC, Apollo Management, L.P., Apollo Management GP, LLC, Apollo Management Holdings, L.P. and Management Holdings GP, and Messrs. Black, Harris and Rowan is 9 West 57th Street, 43rd Floor, New York, New York 10019.

(2)     Includes 152,828 shares of Common Stock issuable upon the conversion of 125,000 shares of Series A Preferred Stock. Cantor Fitzgerald & Co. served as underwriter in the initial public offering of Quinpario Acquisition Corp. 2 ("Quinpario") and as capital markets adviser in the Business Combination.

(3)     Credit Suisse Securities (USA) Inc., DBA Credit Suisse Securities (USA) LLC's address is 11 Madison Avenue, New York, NY 10010. Credit Suisse Securities (USA) LLC has sole voting and investment power over the shares. Credit Suisse acted as lead arranger and administrative agent on Novitex's senior secured credit facility and was a lender under Novitex's revolving credit facility. Credit Suisse also acted as M&A advisor to Novitex in conjunction with the Business Combination.

(4)     From October 31, 2014 until July 17, 2017, Matt Constantino, as representative of Delos Investment Fund, LP, served as a director of Source HOV.

(5)     Deutsche Bank acted as capital markets advisor to Quinpario in the Business Combination and received the shares for investment banking services.

(6)     Share totals and ownership percentage include 3,263,473 shares of Common Stock issuable upon the conversion of 2,669,233 shares of Series A Preferred Stock. Ex-Sigma 2 LLC, a Delaware limited liability company ("Ex-Sigma 2"), directly owns 84,912,500 shares of Common Stock and 2,669,233 shares of Series A Convertible Preferred Stock, which may be converted into 3,263,473 shares of Common Stock. Ex-Sigma LLC ("Ex-Sigma") is the sole equityholder of Ex-Sigma 2. HOVS LLC, a Delaware limited liability company ("HOVS"), HandsOnFund 4 I LLC, a Nevada limited liability company ("HOF 4"), HOV Capital III, LLC, a Nevada limited liability company ("HOV 3"), each directly own interests in Ex-Sigma. HOVS is a wholly-owned subsidiary of HOV Services Ltd., an Indian limited company ("HOV Services"). Adesi 234 LLC, a Nevada limited liability company ("Adesi"), and HOF 2 LLC, a Nevada limited liability company ("HOF 2"), together own a majority of the equity interests of HOV 3. HandsOn Global Management, LLC, a Delaware limited liability company ("HGM"), owns 1,250,000 shares of Common Stock. Mr. Par Chadha may be deemed to control HGM , Ex Sigma 2, Ex-Sigma, HOVS, HOF 4, HOV 3, Adesi, and HOF 2 LLC and each may be deemed to share beneficial ownership of the Common Shares. In connection with the Business Combination, HOVS, HOF 4 and certain of their affiliates entered into a Director Nomination Agreement with the Company pursuant to which HOVS, HOF 4 and certain of their affiliates are entitled to nominate a certain number of directors to the board of directors of the Company based on ownership thresholds in the Company. Mr. Par Chadha is currently Chairman of the board of directors of the Company. The principal business address of Ex-Sigma 2 and HGM is 8550 West Desert Inn Road, Suite 102-452, Las Vegas, Nevada 89117.

(7)     Greenlight Capital, Inc. ("Greenlight Inc.") is the investment manager for Greenlight Capital Qualified, L.P., Greenlight Capital, L.P. and Greenlight Capital Offshore Partners, and as such has voting and dispositive power over 1,481,978 shares of Common Stock held by Greenlight Capital Qualified, L.P., 262,409 shares of Common Stock held by Greenlight Capital, L.P., and 2,843,268 shares of Common Stock held by Greenlight Capital Offshore Partners. DME Advisors, LP ("DME Advisors") is the investment manager for Greenlight Reinsurance, Ltd., and as such has voting and dispositive power over 1,380,210 shares of Common Stock held by Greenlight Reinsurance, Ltd. DME Capital Management, LP ("DME Management") is the investment manager for Greenlight Capital (Gold), LP, and Greenlight Capital Offshore Master (Gold), Ltd., and as such has voting and dispositive power over 1,199,633 shares of Common Stock held by Greenlight Capital (Gold), LP and 1,217,191 shares of Common Stock held by Greenlight Capital Offshore Master (Gold), Ltd. DME Advisors GP, LLC ("DME GP") is the general partner of DME Advisors and DME Management, and as such has voting and dispositive power over the above-referenced 3,797,034 shares of Common Stock in the aggregate over which such entities have voting and dispositive power. David Einhorn is the principal of Greenlight Inc., DME Advisors, DME Management and DME GP, and as such has voting and dispositive power over the above-referenced 8,384,689 shares of Common Stock in the aggregate over which such entities have voting and dispositive power. Mr. Einhorn disclaims beneficial ownership of these shares, except to the

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 290 of 1110     PageID 1911

Supp.App. 0288

extent of any pecuniary interest therein. All references to shares of Common Stock issuable upon conversion of Series A Convertible Preferred Stock and to voting and dispositive power with respect to such shares of Common Stock assume that the Series A Convertible Preferred Stock is convertible as of the date of this prospectus.

(8)     Includes 22,906 shares of Common Stock issuable upon the conversion of 18,735 shares of Series A Preferred Stock

(9)     Ex-Sigma 2 LLC, a Delaware limited liability company ("Ex-Sigma 2"), directly owns 84,912,500 shares of Common Stock and 2,669,233 shares of Series A Convertible Preferred Stock, which may be converted into 3,263,473 shares of Common Stock. Ex-Sigma LLC ("Ex-Sigma") is the sole equityholder of Ex-Sigma 2. HOVS LLC, a Delaware limited liability company ("HOVS"), HandsOnFund 4 I LLC, a Nevada limited liability company ("HOF 4"), HOV Capital III, LLC, a Nevada limited liability company ("HOV 3"), each directly own interests in Ex-Sigma. HOVS is a wholly-owned subsidiary of HOV Services Ltd., an Indian limited company ("HOV Services"). Adesi 234 LLC, a Nevada limited liability company ("Adesi"), and HOF 2 LLC, a Nevada limited liability company ("HOF 2"), together own a majority of the equity interests of HOV 3. HandsOn Global Management, LLC, a Delaware limited liability company ("HGM"), owns 1,250,000 shares of Common Stock. Mr. Par Chadha may be deemed to control HGM , Ex Sigma 2, Ex-Sigma, HOVS, HOF 4, HOV 3, Adesi, and HOF 2 LLC and each may be deemed to share beneficial ownership of the Common Shares. In connection with the Business Combination, HOVS, HOF 4 and certain of their affiliates entered into a Director Nomination Agreement with the Company pursuant to which HOVS, HOF 4 and certain of their affiliates are entitled to nominate a certain number of directors to the board of directors of the Company based on ownership thresholds in the Company. Mr. Par Chadha is currently Chairman of the board of directors of the Company. The principal business address of Ex-Sigma 2 and HGM is 8550 West Desert Inn Road, Suite 102-452, Las Vegas, Nevada 89117.

(10)    Includes 160,488 shares of Common Stock issuable upon the conversion of 131,265 shares of Series A Preferred Stock

(11)    Share totals and ownership percentage include 1,833,939 shares of Common Stock issuable upon the conversion of 1,500,000 shares of Series A Preferred Stock

(12)    Laurion Capital Management LP, the investment manager of Laurion Capital Master Fund Ltd., has voting and investment power over the securities held by Laurion Capital Master Fund Ltd. Messrs. Benjamin A. Smith and Sheehan Maduraperuma are the managing members of Laurion Capital GP LLC, which is the general partner of Laurion Capital Management LP. Each of Laurion Capital Master Fund Ltd., Laurion Capital GP LLC, Benjamin A. Smith and Sheehan Maduraperuma disclaims beneficial ownership over these securities.

(13)    North Haven Credit Partners previously acquired certain second lien loans of SourceHOV.

(14)    RBC Capital Markets, LLC and/or its affiliates (including Royal Bank of Canada, together "RBC") has in the past and may in the future provide corporate and investment banking services to the Company (or its predecessor, Quinpario). During 2017, RBC Capital Markets, LLC and/or an affiliate thereof acted as a placement agent in connection with an equity financing by, and as a joint lead arranger, bookrunner and lender to, Quinpario, in each case in connection with the Business Combination. RBC has holdings under the Company's revolver and may, from time to time, own bonds of the Company. RBC Capital Markets, LLC also acted as financial advisor to Novitex in connection with the Business Combination.

(15)    Rothschild Inc. ("Rothschild") acted as financial advisor to SourceHOV in connection with the Business Combination and received the shares as consideration for its services. Rothschild has also provided financial advisory services from time to time to SourceHOV and its parent.

(16)    Share totals and ownership percentage include 764,141 shares of Common Stock issuable upon conversion of 625,000 shares of Series A Preferred Stock

(17)    Includes 152,828 shares of Common Stock issuable upon the conversion of 125,000 shares of Series A Preferred Stock

(18)    Share totals and ownership percentage include 855,838 shares of Common Stock issuable upon the conversion of 700,000 shares of Series A Preferred Stock

Supp.App. 0289

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 292 of 1110 PageID 1913

(19) Includes 366,788 shares of Common Stock issuable upon the conversion of 300,000 shares of Series A Preferred Stock

7

Supp.App. 0290

Table of Contents

## DESCRIPTION OF CAPITAL STOCK

*The following is a summary of our capital stock and provisions of our second amended and restated certificate of incorporation ("certificate of incorporation") and our amended and restated bylaws ("bylaws") and certain provisions of Delaware law. This summary does not purport to be complete and is qualified in its entirety by the provisions of our certificate of incorporation and our bylaws. Our certificate of incorporation and our bylaws are incorporated by reference and filed as exhibits to the registration statement of which this prospectus forms a part.*

**Authorized and Outstanding Stock**

Our certificate of incorporation authorizes the issuance of 1,620,000,000 shares of capital stock, consisting of (i) 1,600,000,000 shares of Common Stock and (ii) 20,000,000 shares of preferred stock, par value $0.0001 per share. The outstanding shares of Common Stock are duly authorized, validly issued, fully paid and non-assessable. As of September 1, 2017, there were 149,967,151 shares of Common Stock outstanding, 6,194,233 shares of preferred stock outstanding and 35,000,000 warrants outstanding that were issued in connection with our initial public offering. For more information about our warrants, see our Definitive Proxy Statement filed with the SEC on June 26, 2017.

***Common Stock***

*Voting Power*

Except as otherwise required by law or as otherwise provided in any certificate of designation for any series of preferred stock, the holders of our Common Stock possess all voting power for the election of our directors and all other matters requiring stockholder action and will at all times vote together as one class on all matters submitted to a vote of our stockholders. Holders of our Common Stock are entitled to one vote per share on matters to be voted on by stockholders.

*Dividends*

Our stockholders are entitled to receive such dividends and other distributions, if any, as may be declared from time to time by the board of directors in its discretion out of funds legally available therefor and shall share equally on a per share basis in such dividends and distributions.

*Liquidation, Dissolution and Winding Up*

In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding-up of the combined company, the holders of our Common Stock are entitled to receive an equal amount per share of all of our assets of whatever kind available for distribution to stockholders, after the rights of the holders of the preferred stock have been satisfied.

*Preemptive or Other Rights*

Our stockholders have no preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to our Common Stock.

*Election of Directors*

The board of directors is currently divided into three classes, Class A, Class B and Class C, with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. There is no

8

cumulative voting with respect to the election of directors, with the result that directors will be elected by a plurality of the votes cast at an annual meeting of stockholders by holders of our Common Stock.

### Preferred Stock

Our certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series. The board of directors is authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. The board of directors is able, without stockholder approval, to issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of our Common Stock and could have anti-takeover effects. The ability of the board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of the Company or the removal of existing management.

In connection with the consummation of the Business Combination, we issued 9,194,233 shares of Series A Convertible Preferred Stock in a private placement (all of which has already been subscribed). The terms, rights, obligations and preferences of the Series A Preferred Stock are set forth in the Certificate of Designations, Preferences, Rights and Limitations of Series A Perpetual Convertible Preferred Stock of Exela, which has been filed with our certificate of incorporation with the Secretary of State of the State of Delaware following the closing of the Business Combination. For more information on the Series A Convertible Preferred Stock, see our Definitive Proxy Statement.

### Dividends

We have not paid any cash dividends on shares of our Common Stock to date and do not intend to pay cash dividends. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition. The payment of any dividends will be within the discretion of the then board of directors.

### Certain Anti-Takeover Provisions of Delaware Law

#### Staggered board of directors

Our certificate of incorporation provides that the board of directors is classified into three classes of directors of approximately equal size. As a result, in most circumstances, a person can gain control of our board of directors only by successfully engaging in a proxy contest at two or more annual meetings.

#### Special meeting of stockholders

Our bylaws provide that special meetings of our stockholders may be called only by a majority vote of the board of directors, by the president or by the chairman or by the secretary at the request in writing of stockholders owning a majority of the issued and outstanding capital stock entitled to vote.

#### Advance notice requirements for stockholder proposals and director nominations

Our bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual meeting of stockholders must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be delivered to Exela's principal executive offices not later than the close of business on the 60th day nor earlier than the close of business on the 90th day prior to the scheduled date of the annual meeting of stockholders. In the event that less than 70 days' notice or prior public disclosure of the date of the annual meeting of stockholders is given, a stockholder's notice shall be timely if delivered to Exela's

9

Supp.App. 0292

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 295 of 1110    PageID 1916

principal executive offices not later than the 10th day following the day on which public announcement of the date of our annual meeting of stockholders is first made or sent by us. Exela's bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude Exela stockholders from bringing matters before an annual meeting of stockholders or from making nominations for directors at an annual meeting of stockholders.

*Authorized but unissued shares*

Exela's authorized but unissued shares of Common Stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved shares of Common Stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

*Section 203 Opt Out*

Pursuant to our certificate of incorporation, Exela has opted out of the provisions of Section 203 of the Delaware General Corporation Law regulating corporate takeovers. This section prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder. A "business combination" includes a merger or sale of more than 10% of our assets.

However, the above provisions of Section 203 do not apply if:

- the board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of Common Stock; or

- on or subsequent to the date of the transaction, the business combination is approved by the board of directors and authorized at a meeting of Exela stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Exela has opted out of the provisions of Section 203 of the Delaware General Corporation Law because it believes this statute could prohibit or delay mergers or other change in control attempts, and thus may discourage attempts to acquire it.

*Exclusive Forum Selection*

Our certificate of incorporation requires, to the fullest extent permitted by law, that derivative actions brought in Exela's name, actions against directors, officers and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel. Although Exela believes this provision benefits it by providing increased consistency in the application of Delaware law in the types of lawsuits

10

Supp.App. 0293

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 296 of 1110    PageID 1917

to which it applies, the provision may have the effect of discouraging lawsuits against Exela's directors and officers.

**Registration Rights**

At the closing of the Business Combination, we entered into the Amended and Restated Registration Rights Agreement (the "Registration Rights Agreement") with certain of the Selling Stockholders. Pursuant to the terms of the Registration Rights Agreement, the Selling Stockholders party thereto are bound by customary restrictions on the transfer of their Common Stock, including a restriction on transfer until six months following the date of the Registration Rights Agreement, except for certain permitted transfers and with respect to certain shares that are excluded from the transfer restrictions.

Upon the consummation of the Business Combination, certain Selling Stockholders and their permitted transferees are entitled to certain registration rights described in the Registration Rights Agreement. Under the Registration Rights Agreement, we will bear the expenses incurred in connection with the filing of any such registration statements, other than underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses, and the Selling Stockholders party to the Registration Rights Agreement will pay any underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses incurred by such Selling Stockholders in disposing of the shares.

At the closing of the Business Combination, we entered into subscription agreements and commitment agreements ("Subscription Agreements") with certain of the Selling Stockholders with respect to shares of Common Stock and Series A Convertible Preferred Stock issued in private placements. Under the terms of the Subscription Agreements, we agreed to file a shelf registration statement with the SEC within 15 calendar days of the closing of the Business Combination to register the shares of Common Stock issued in the private placement and shares of Common Stock to be issued upon conversion of the Series A Convertible Preferred Stock issued in the private placement. Certain other Selling Stockholders are entitled to registration rights under various fee agreements and other arrangements in connection with the Business Combination.

**Rule 144**

A person who has beneficially owned restricted shares of Common Stock for at least six months would be entitled to sell their shares provided that (1) such person is not deemed to have been one of Exela's affiliates at the time of, or at any time during the three months preceding, a sale and (2) Exela is subject to the Exchange Act periodic reporting requirements for at least three months before the sale. Persons who have beneficially owned restricted shares of Common Stock for at least six months but who are Exela's affiliates at the time of, or any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period a number of shares that does not exceed the greater of either of the following:

- 1% of the number of shares then outstanding; and

- the average weekly trading volume of the shares of Common Stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about Exela.

**Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell

11

company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As of September 1, 2017, we had 149,967,151 shares of Common Stock outstanding.

As of a date no later than July 12, 2017, the date of the consummation of the Business Combination, we are no longer a shell company, and so, once the conditions set forth in the exceptions listed above are satisfied, Rule 144 will become available for the resale of the above noted restricted securities so long as such conditions continue to be satisfied.

**Transfer Agent**

The transfer agent for our securities is Continental Stock Transfer & Trust Company, 17 Battery Place, New York, New York 10004.

**Quotation of Securities**

Our Common Stock is traded on Nasdaq under the symbol "XELA".

## PLAN OF DISTRIBUTION

The Selling Stockholders, which as used herein includes donees, pledgees, transferees, distributees or other successors-in-interest selling shares of our Common Stock or interests in shares of our Common Stock received after the date of this prospectus from the Selling Stockholders as a gift, pledge, partnership distribution or other transfer, may, from time to time, sell, transfer, distribute or otherwise dispose of certain of their shares of our Common Stock or interests in shares of our Common Stock on any stock exchange, market or trading facility on which the shares are traded or in private transactions. These dispositions may be at fixed prices, at prevailing market prices at the time of sale, at prices related to the prevailing market price, at varying prices determined at the time of sale, or at negotiated prices.

The Selling Stockholders may use any one or more of the following methods when disposing of shares or interests therein:

- ordinary brokerage transactions and transactions in which the broker-dealer solicits purchasers;

- one or more underwritten offerings;

- block trades in which the broker-dealer will attempt to sell the shares as agent, but may position and resell a portion of the block as principal to facilitate the transaction;

- purchases by a broker-dealer as principal and resale by the broker-dealer for its account;

- an exchange distribution in accordance with the rules of the applicable exchange;

- privately negotiated transactions;

12

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 298 of 1110    PageID 1919

Table of Contents

- internal distributions to their members, partners or shareholders;

- short sales effected after the date the registration statement of which this prospectus is a part is declared effective by the SEC;

- through the writing or settlement of options or other hedging transactions, whether through an options exchange or otherwise;

- in market transactions, including transactions on a national securities exchange or quotations service or over-the-counter market;

- directly to one or more purchasers;

- through agents;

- broker-dealers may agree with the Selling Stockholders to sell a specified number of such shares at a stipulated price per share; and

- a combination of any such methods of sale.

The Selling Stockholders may, from time to time, pledge or grant a security interest in some of the shares of our Common Stock owned by them and, if a Selling Stockholder defaults in the performance of its secured obligations, the pledgees or secured parties may offer and sell the shares of our Common Stock, from time to time, under this prospectus, or under an amendment or supplement to this prospectus amending the list of the Selling Stockholders to include the pledgee, transferee or other successors in interest as the Selling Stockholders under this prospectus. The Selling Stockholders also may transfer the shares of our Common Stock in other circumstances, in which case the transferees, pledgees or other successors in interest will be the selling beneficial owners for purposes of this prospectus.

In connection with the sale of our Common Stock or interests therein, the Selling Stockholders may enter into hedging transactions with broker-dealers or other financial institutions, which may in turn engage in short sales of our Common Stock in the course of hedging the positions they assume. The Selling Stockholders may also sell shares of our Common Stock short and deliver these securities to close out their short positions, or loan or pledge our Common Stock to broker-dealers that in turn may sell these securities. The Selling Stockholders may also enter into option or other transactions with broker-dealers or other financial institutions or the creation of one or more derivative securities which require the delivery to such broker-dealer or other financial Institution of shares offered by this prospectus, which shares such broker-dealer or other financial institution may resell pursuant to this prospectus (as supplemented or amended to reflect such transaction).

The aggregate proceeds to the Selling Stockholders from the sale of our Common Stock offered by them will be the purchase price of our Common Stock less discounts or commissions, if any. The Selling Stockholders reserve the right to accept and, together with their agents from time to time, to reject, in whole or in part, any proposed purchase of our Common Stock to be made directly or through agents. We will not receive any of the proceeds from any offering by the Selling Stockholders.

The Selling Stockholders also may in the future resell a portion of the shares of our Common Stock in open market transactions in reliance upon Rule 144 under the Securities Act, provided that they meet the criteria and conform to the requirements of that rule, or pursuant to other available exemptions from the registration requirements of the Securities Act.

The Selling Stockholders and any underwriters, broker-dealers or agents that participate in the sale of our Common Stock or interests therein may be "underwriters" within the meaning of Section 2(11) of the Securities Act. Any discounts, commissions, concessions or profit they earn on any resale of the shares of our Common Stock may be underwriting discounts and commissions under the Securities Act. If any Selling Stockholder is an "underwriter" within the meaning of Section 2(11) of the Securities

13

Supp.App. 0296

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 299 of 1110    PageID 1920

Table of Contents

Act, then the Selling Stockholder will be subject to the prospectus delivery requirements of the Securities Act. Underwriters and their controlling persons, dealers and agents may be entitled, under agreements entered into with us and the Selling Stockholders, to indemnification against and contribution toward specific civil liabilities, including liabilities under the Securities Act.

To the extent required, the shares of our Common Stock to be sold, the respective purchase prices and public offering prices, the names of any agents, dealer or underwriter, and any applicable discounts, commissions, concessions or other compensation with respect to a particular offer will be set forth in an accompanying prospectus supplement or, if appropriate, a post-effective amendment to the registration statement that includes this prospectus.

To facilitate the offering of the shares of our Common Stock offered by the Selling Stockholders, certain persons participating in the offering may engage in transactions that stabilize, maintain or otherwise affect the price of our Common Stock. This may include over-allotments or short sales, which involve the sale by persons participating in the offering of more shares than were sold to them. In these circumstances, these persons would cover such over-allotments or short positions by making purchases in the open market or by exercising their over-allotment option, if any. In addition, these persons may stabilize or maintain the price of our Common Stock by bidding for or purchasing shares in the open market or by imposing penalty bids, whereby selling concessions allowed to dealers participating in the offering may be reclaimed if shares sold by them are repurchased in connection with stabilization transactions. The effect of these transactions may be to stabilize or maintain the market price of our Common Stock at a level above that which might otherwise prevail in the open market. These transactions may be discontinued at any time.

Under the Registration Rights Agreement and the Subscription Agreements, we have agreed to indemnify the Selling Stockholders party thereto against certain liabilities that they may incur in connection with the sale of the securities registered hereunder, including liabilities under the Securities Act, and to contribute to payments that the Selling Stockholders may be required to make with respect thereto. In addition, for securities subject to the Registration Rights Agreement, we and the Selling Stockholders may agree to indemnify any underwriter, broker-dealer or agent against certain liabilities related to the selling of the securities, including liabilities arising under the Securities Act.

The securities offered hereby were originally issued to the Selling Stockholders pursuant to an exemption from the registration requirements of the Securities Act. We have agreed to maintain the effectiveness of this registration statement until all such securities have been sold under this registration statement or Rule 144 under the Securities Act or are no longer outstanding. For those securities subject to the Registration Rights Agreement, we have agreed to pay all expenses in connection with this offering, but not including underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses; however, the Selling Stockholders will pay, on a pro rata basis, any underwriting fees, discounts, selling commissions, stock transfer taxes and certain legal expenses relating to the offering. This summary of the terms of the Registration Rights Agreement and other statements relating thereto do not purport to be complete and is subject to, and qualified in its entirety by reference to, the full text of the Registration Rights Agreement, a copy of which has been filed as Exhibit 10.1 to this registration statement.

Selling Stockholders may use this prospectus in connection with resales of the Common Stock. This prospectus and any accompanying prospectus supplement will identify the Selling Stockholders, the terms of the Common Stock and any material relationships between us and the Selling Stockholders. Selling Stockholders may be deemed to be underwriters under the Securities Act in connection with the Common Stock they resell and any profits on the sales may be deemed to be underwriting discounts and commissions under the Securities Act. Unless otherwise set forth in a prospectus supplement, the Selling Stockholders will receive all the net proceeds from the resale of the Common Stock.

14

Supp.App. 0297

A Selling Stockholder that is an entity may elect to make an in-kind distribution of shares of common stock to its members, partners or shareholder pursuant to the registration statement of which this prospectus is a part by delivering a prospectus. To the extent that such members, partners or shareholders are not affiliates of ours, such members, partners or shareholders would thereby receive freely tradable shares of Common Stock pursuant to the distribution through a registration statement. Additionally, to the extent that entities, members, partners or shareholders are affiliates of ours received shares in the Distribution described in footnote (1) to the table under the heading "Selling Stockholders," such affiliates will also be Selling Stockholders and will be entitled to sell shares of Common Stock pursuant to this prospectus.

## LEGAL MATTERS

The validity of the shares of our Common Stock offered hereby will be passed upon for us by Willkie Farr & Gallagher LLP.

## EXPERTS

The financial statements incorporated in this prospectus by reference to the Annual Report for the year ended December 31, 2016 have been so incorporated in reliance on the report of Marcum LLP, an independent registered public accounting firm, given on the authority of said firm as experts in accounting and auditing.

The consolidated financial statements of SourceHOV Holdings, Inc. as December 31, 2016 and 2015, and for each of the years in the three-year period ended December 31, 2016, have been incorporated by reference herein in reliance upon the report of KPMG LLP, independent registered public accounting firm, incorporated by reference herein, and upon the authority of said firm as experts in accounting and auditing.

The audited historical financial statements of Novitex Holdings, Inc., incorporated in this prospectus by reference to the Definitive Proxy Statement have been so incorporated in reliance on the report of PricewaterhouseCoopers LLP, independent accountants, given on the authority of said firm as experts in auditing and accounting.

## WHERE YOU CAN FIND MORE INFORMATION

The Company files reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read Exela's SEC filings, including this prospectus, over the internet at the SEC's website at *http://www.sec.gov*. You may also read and copy any document the Company files with the SEC at the SEC public reference room located at 100 F Street, N.E., Room 1580 Washington, D.C., 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also obtain copies of the materials described above at prescribed rates by writing to the SEC, Public Reference Section, 100 F Street, N.E., Washington, D.C. 20549.

The registration statement containing this prospectus, including exhibits to the registration statement, provides additional information about us and the Common Stock offered under this prospectus. The registration statement can be read at the SEC website or at the SEC offices referenced above.

15

Supp.App. 0298

Table of Contents

# *7,000,000 Shares*



*Common Stock*

*Prospectus Supplement*

*Morgan Stanley*                    *RBC Capital Markets*

*Cantor*                                              *Nomura*

*The date of this prospectus supplement is April 11, 2018*

Supp.App. 0299

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 302 of 1110    PageID 1923

Supp.App. 0300

EX-99.1 3 a17-26228_1ex99d1.htm EX-99.1

**Exhibit 99.1**



**FOR IMMEDIATE RELEASE**

Contact: William Maina, ICR
E: ir@exelatech.com
W: investors.exelatech.com
T: 646-277-1236

### Exela Technologies Reports Third Quarter 2017 Results

*Third Quarter Revenue of $358.2 Million, up 12.2% Year-over-Year on a Pro Forma Basis*
*Third Quarter Further Adjusted EBITDA of $88.0 Million*
*Affirms 2017 Financial Outlook and Tightens the Revenue Range to $1,450 to $1,470 million*
*and Further Adjusted EBITDA to $350 to $370 million*
*On-Track to Deliver Business Combination Savings*
*Announces Share Buyback Program of up to 5 Million Shares of Common Stock*

**Irving, TX— (November 9, 2017)** — Exela Technologies, Inc. ("Exela" or the "Company") (NASDAQ: XELA), one of the largest global providers of transaction processing solutions and enterprise information management, today announced financial results for the third quarter ended September 30, 2017.

"We are pleased with our third quarter results which include solid revenue and EBITDA growth and free cash flow generation. The integration of SourceHOV and Novitex is essentially complete, and we are on track to achieve our merger synergy targets. Our leading end-to-end solutions and deep domain expertise position us well to continue expanding with our current customers and grow our client base. In addition, our strong cash flow provides us with significant financial flexibility to continue to invest in organic and inorganic growth initiatives," said Ronald Cogburn, Chief Executive Officer.

Financial information contained in this press release is presented Pro Forma for the previously announced business combination of Quinpario Acquisition Corp. 2, SourceHOV Holdings, Inc. ("SourceHOV") and Novitex Holdings, Inc. ("Novitex"), which closed on July 12, 2017. For more information, please refer to the reconciliation of reported to Pro Forma financial results contained in the Schedules of this release.

**Third Quarter 2017 Pro Forma Financial Highlights**

- **Revenue:** Total revenue for the quarter ended September 30, 2017 was $358.2 million, an increase of 12.2% from $319.1 million in the third quarter of 2016, and an increase of 2.3% from $350.0 million in the second quarter of 2017. Information & Transaction Processing Solutions revenue was $279.8 million in the third quarter of 2017. Healthcare Solutions revenue was $56.4 million. Legal and Loss Prevention Services revenue was $22.0 million.

- **Further Adjusted EBITDA:** Further Adjusted EBITDA for the quarter ended September 30, 2017 was $88.0 million, representing a Further Adjusted EBITDA margin of 24.6%, compared with Further Adjusted EBITDA of $80.0 million and 25.1% margin in the third quarter of 2016, and Further Adjusted EBITDA of $82.7 million and 23.6% margin in the second quarter of 2017.

- **Net Loss:** Net loss for the quarter ended September 30, 2017 was ($130.5) million compared with a net loss of ($16.7) million in the prior year's third quarter and a net loss of $(27.9) million in the second quarter of 2017.

- **Further Adjusted Free Cash Flow:** Further Adjusted Free Cash Flow for the quarter ended September 30, 2017 was $80.3 million, representing 91.2% of Further Adjusted EBITDA.

Supp.App. 0301

- **Balance Sheet and Liquidity:** At September 30, 2017, Exela's total liquidity was approximately $124 million and total debt was approximately $1.41 billion. The Company had cash of $46.6 million, of which $19.2 million is segregated for customer use and a $100 million revolving credit facility, which was undrawn, but net of $22.8 million in stand-by letters of credit, giving the Company $77.2 million at September 30, 2017 available for borrowing.

## Financial Outlook for fiscal 2017

- Total revenue is expected to be in the range of $1,450 million to $1,470 million.
- Further Adjusted EBITDA is expected to be in the range of $350 million to $370 million.
- Further Adjusted Free Cash Flow is expected to be in the range of $310 million to $320 million.

## Share Buyback Program

On November 8, 2017, the Company's Board of Directors authorized a share buyback program (the "Share Buyback Program"), pursuant to which the Company may, from time to time, purchase up to 5,000,000 shares of its common stock. Share repurchases may be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The decision as to whether to purchase any shares and the timing of purchases, if any, will be based on the price of the Company's common stock, general business and market conditions and other investment considerations and factors. The Share Buyback Program does not obligate the Company to purchase any shares and expires in 24 months. The Share Buyback Program may be terminated or amended by the Company's Board of Directors in its discretion at any time.

## Earnings Conference Call and Audio Webcast

Exela will host a conference call to discuss its third quarter 2017 financial results today at 5:00 p.m. ET. To access this call, dial 800-860-2442 or +1-412-858-4600. A replay of this conference call will be available through November 16, 2017 at 877-344-7529 or +1-412-317-0088 (international). The replay passcode is 10113583. A live webcast of this conference call will be available on the "Investors" page of the Company's website (www.exelatech.com). A supplemental slide presentation that accompanies this call and webcast can be found on the investor relations website (http://investors.exelatech.com/) and will remain available after the call. Exela has also posted additional historical financial information regarding SourceHOV Holdings, Inc. and Novitex Holdings, Inc. on a combined basis to its investor relations website, (http://investors.exelatech.com).

**About Exela:** Exela is one of the largest global providers of transaction processing solutions and enterprise information management. Exela integrates knowledge platforms and technology-enabled services, with proven processes and industry expertise to provide an end-to-end delivery model, turning data into outcomes. Exela's solutions combine multi-industry and industry-specific enterprise information management platforms (deployed on premise or in the cloud) with decades of experience. Exela manages data and automates mission-critical business processes to aid in digital transformation. Exela has made substantial investments in its own IP and industry leading secure operating centers so that it can meet the evolving needs of its clients and the markets they serve. Exela utilizes a secure, cloud enabled global delivery model to serve over 3,500 clients, including more than 60% of the Fortune® 100, across more than 50 countries. Exela provides solutions and services with approximately 22,000 employees at nearly 1,200 onsite client facilities and through approximately 150 delivery centers strategically located throughout the Americas, Europe, and Asia.

**About Non-GAAP Financial Measures:** This earnings release presents non-GAAP financial measures including EBITDA, Adjusted EBITDA, Further Adjusted EBITDA, Free Cash Flow, and Further Adjusted Free Cash Flow, each of which is a financial measure that is not prepared in accordance with U.S. generally accepted accounting principles ("GAAP"). The Company believes that these non-GAAP measures of

---

financial results provide useful information to management and investors regarding certain financial and business trends relating to the Company's financial condition and results of operations. The Company does not consider these non-GAAP measures in isolation or as an alternative to liquidity or financial measures determined in accordance with GAAP. A limitation of these non-GAAP financial measures is that they exclude significant expenses and income that are required by GAAP to be recorded in the Company's financial statements. In addition, they are subject to inherent limitations as they reflect the exercise of judgments by management about which expenses and income are excluded or included in determining these non-GAAP financial measures and therefore the basis of presentation for these measures may not be comparable to similarly-titled measures used by other companies. These non-GAAP measures should not be considered in isolation of, or as an alternative to, GAAP financial measures. For reconciliation of the comparable GAAP measures to these non-GAAP financial measures, see the schedules to this release. Optimization & restructuring expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12th 2017. All of these costs are variable and dependent upon the nature of the actions being

Supp.App. 0302

implemented and can vary significantly driven by business needs. Accordingly, due to that significant variability, we exclude these charges since we do not believe they truly reflect our past, current or future operating performance.

**Forward-Looking Statements:** Certain statements included in this press release are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under The Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "may", "should", "would", "plan", "intend", "anticipate", "believe", "estimate", "predict", "potential", "seem", "seek", "continue", "future", "will", "expect", "outlook" or other similar words, phrases or expressions. These forward-looking statements include statements regarding our industry, future events, the estimated or anticipated future results and benefits of the recently consummated transaction between Exela Technologies, Inc., SourceHOV Holdings, Inc., and Novitex Holdings, Inc. (including the related transactions, the "Business Combination"), future opportunities for the combined company, and other statements that are not historical facts. These statements are based on the current expectations of Exela management and are not predictions of actual performance. These statements are based on the current expectations of Exela management and are not predictions of actual performance. These statements are subject to a number of risks and uncertainties regarding Exela's businesses, and actual results may differ materially. These risks and uncertainties include, but are not limited to, changes in the business environment in which Exela operates and general financial, economic, regulatory and political conditions affecting the industries in which Exela operates; changes in taxes, governmental laws, and regulations; competitive product and pricing activity; failure to realize the anticipated benefits of the Business Combination, including as a result of a delay or difficulty in integrating the businesses of SourceHOV and Novitex or the inability to realize the expected amount and timing of cost savings and operating synergies of the Business Combination; and those factors discussed under the heading "Risk Factors" in Exela's Proxy Statement dated June 26, 2017 (the "Proxy Statement") filed with the Securities and Exchange Commission ("SEC"). In addition, forward-looking statements provide Exela's expectations, plans or forecasts of future events and views as of the date of this communication. Exela anticipates that subsequent events and developments will cause Exela's assessments to change. These forward-looking statements should not be relied upon as representing Exela's assessments as of any date subsequent to the date of this presentation.

Exela Technologies, Inc. and Subsidiaries
Schedule 1: Pro Forma Q3 2016 vs. Q3 2017 Financial Performance
(In millions of United States dollars)

| ($ in millions) | Pro Forma Q3 2016(1) | | Pro Forma Q3 2017 | | % Change |
|---|---|---|---|---|---|
| **Revenue** | | | | | |
| Solutions | $ | 230.2 | $ | 279.8 | |
| Healthcare Solutions | | 60.7 | | 56.4 | |
| Legal and Loss Prevention Services | | 28.3 | | 22.0 | |
| **Total Revenue** | **$** | **319.1** | **$** | **358.2** | *12.2%* |
| **Cost of Revenue (excluding D&A)** | **$** | **229.7** | **$** | **271.1** | |
| **Gross Profit** | **$** | **89.5** | **$** | **87.1** | |
| *Gross Margin* | | *28.0%* | | *24.3%* | |
| **SG&A (excluding D&A)** | **$** | **41.5** | **$** | **106.5** | |
| **Further Adjusted EBITDA(2)** | **$** | **80.0** | **$** | **88.0** | *10.0%* |
| *% Margin* | | *25.1%* | | *24.6%* | |

(1) *Financial results for Pro Forma Q3 2016 do not include contribution from the TransCentra acquisition which closed on September 28, 2016.*
(2) *For additional information refer to Further Adjusted EBITDA Reconciliations.*

Exela Technologies, Inc. and Subsidiaries
Schedule 2: Pro Forma YTD Q3 2016 vs. YTD Q3 2017 Financial Performance
(In millions of United States dollars)

| ($ in millions) | Pro Forma YTD Q3 2016(1) | Pro Forma YTD Q3 2017 | % Change |
|---|---|---|---|

Supp.App. 0303

**Revenue**

| | | | | | |
|---|---|---|---|---|---|
| Solutions | $ | 712.2 | $ | 829.5 | |
| Healthcare Solutions | | 189.0 | | 173.5 | |
| Legal and Loss Prevention Services | | 79.4 | | 66.9 | |
| **Total Revenue** | $ | **980.6** | $ | **1,070.0** | *9.1%* |
| **Cost of Revenue (excluding D&A)** | $ | **701.1** | $ | **790.0** | |
| **Gross Profit** | $ | **279.5** | $ | **280.0** | |
| *Gross Margin* | | *28.5%* | | *26.2%* | |
| **SG&A (excluding D&A)** | $ | **133.4** | $ | **207.4** | |
| | | | | | |
| **Further Adjusted EBITDA**(2) | $ | **265.9** | $ | **269.3** | *1.3%* |
| *% Margin* | | *27.1%* | | *25.2%* | |

(1)　*Financial results for Pro Forma YTD Q3 2016 do not include contribution from the TransCentra acquisition which closed on September 28, 2016.*

(2)　*For additional information refer to Further Adjusted EBITDA Reconciliations.*

---

Exela Technologies, Inc. and Subsidiaries
Schedule 3: Further Adjusted EBITDA Reconciliation — Q3 2016
(In millions of United States dollars)

| ($ in millions) | As Reported Q3 2016(1) | | Novitex Q3 2016 | | Pro Forma Q3 2016(1) | |
|---|---|---|---|---|---|---|
| **Net loss** | $ | **(11.8)** | $ | **(4.9)** | $ | **(16.7)** |
| Taxes | | (3.8) | | (3.3) | | (7.1) |
| Interest expense | | 27.4 | | 12.2 | | 39.6 |
| Depreciation and amortization | | 18.8 | | 10.3 | | 29.1 |
| **EBITDA** | $ | **30.6** | $ | **14.2** | $ | **44.8** |
| Loss on extinguishment of debt | | — | | — | | — |
| Optimization and restructuring expenses | | 4.9 | | (0.2) | | 4.7 |
| Transaction and integration costs | | 0.7 | | — | | 0.7 |
| Non-cash charges | | 1.8 | | — | | 1.8 |
| New contract setup | | — | | 2.0 | | 2.0 |
| Oversight and management fee | | 1.7 | | 0.4 | | 2.1 |
| **Adjusted EBITDA** | $ | **39.8** | $ | **16.4** | $ | **56.3** |
| Foreign exchange gains / losses | | 0.7 | | — | | 0.7 |
| Combined merger adjustments | | | | | | 23.0 |
| **Further Adjusted EBITDA** | | | | | $ | **80.0** |

(1)　*Financial results as reported for Q3 2016 and Pro Forma Q3 2016 do not include contribution from the TransCentra acquisition which closed on September 28, 2016.*

---

Exela Technologies, Inc. and Subsidiaries
Schedule 4: Further Adjusted EBITDA Reconciliation — Q3 2017
(In millions of United States dollars)

| ($ in millions) | As Reported Q3 2017 | | Novitex (Jul 1 – Jul 12)(1) | | Pro Forma Q3 2017 | |
|---|---|---|---|---|---|---|
| **Net loss** | $ | **(110.4)** | $ | **(20.1)** | $ | **(130.5)** |
| Taxes | | (37.0) | | 0.0 | | (37.0) |
| Interest expense | | 37.7 | | 0.6 | | 38.3 |
| Depreciation and amortization | | 28.1 | | 1.2 | | 29.2 |
| **EBITDA** | $ | **(81.7)** | $ | **(18.2)** | $ | **(100.0)** |

Supp.App. 0304

| | | | | |
|---|---|---|---|---|
| Loss on extinguishment of debt | 35.5 | | 17.5 | 53.0 |
| Optimization and restructuring expenses | 19.7 | | 1.2 | 20.9 |
| Transaction and integration costs | 77.3 | | 2.0 | 79.3 |
| Non-cash charges | 2.3 | | — | 2.3 |
| New contract setup | — | | — | — |
| Oversight and management fee | (0.0) | | 0.1 | 0.0 |
| **Adjusted EBITDA** | $ 53.0 | $ | 2.5 | $ 55.5 |
| Foreign exchange gains / losses | 0.7 | | — | 0.7 |
| Combined merger adjustments | | | | 31.8 |
| **Further Adjusted EBITDA** | | | | $ 88.0 |

(1) *Represents financial performance of Novitex for a 12 day period prior to the transaction closing date of July 12, 2017.*

---

Exela Technologies, Inc. and Subsidiaries
Schedule 5: Further Adjusted EBITDA Reconciliation — YTD Q3 2016
(In millions of United States dollars)

| ($ in millions) | As Reported YTD Q3 2016(1) | | Novitex YTD Q3 2016 | | Pro Forma YTD Q3 2016(1) |
|---|---|---|---|---|---|
| **Net loss** | $ (33.4) | $ | (13.9) | $ | (47.3) |
| Taxes | (10.0) | | (8.3) | | (18.2) |
| Interest expense | 81.7 | | 35.4 | | 117.1 |
| Depreciation and amortization | 58.5 | | 30.6 | | 89.1 |
| **EBITDA** | $ 96.8 | $ | 43.9 | $ | 140.6 |
| Gain on extinguishment of debt | — | | (2.3) | | (2.3) |
| Optimization and restructuring expenses | 14.4 | | 11.5 | | 25.9 |
| Transaction and integration costs | 1.9 | | (0.1) | | 1.8 |
| Non-cash charges | 6.9 | | 0.1 | | 7.0 |
| New contract setup | — | | 4.4 | | 4.4 |
| Oversight and management fee | 5.4 | | 0.9 | | 6.3 |
| **Adjusted EBITDA** | $ 125.4 | $ | 58.4 | $ | 183.8 |
| Foreign exchange gains / losses | 0.3 | | — | | 0.3 |
| Combined merger adjustments | | | | | 81.9 |
| **Further Adjusted EBITDA** | | | | $ | 265.9 |

(1) *Financial results as reported for YTD Q3 2016 and Pro Forma YTD Q3 2016 do not include contribution from the TransCentra acquisition which closed on September 28, 2016.*

---

Exela Technologies, Inc. and Subsidiaries
Schedule 6: Further Adjusted EBITDA Reconciliation — YTD Q3 2017
(In millions of United States dollars)

| ($ in millions) | As Reported YTD Q3 2017 | | Novitex (Jan 1 – Jul 12)(1) | | Pro Forma YTD Q3 2017 |
|---|---|---|---|---|---|
| **Net loss** | $ (145.6) | $ | (38.1) | $ | (183.8) |
| Taxes | (32.9) | | (6.9) | | (39.9) |
| Interest expense | 91.7 | | 24.9 | | 116.7 |
| Depreciation and amortization | 70.8 | | 20.6 | | 91.4 |
| **EBITDA** | $ (16.0) | $ | 0.5 | $ | (15.5) |
| Loss on extinguishment of debt | 35.5 | | 17.5 | | 53.0 |
| Optimization and restructuring expenses | 31.5 | | 5.4 | | 36.9 |
| Transaction and integration costs | 86.6 | | 10.0 | | 96.6 |
| Non-cash charges | 4.4 | | — | | 4.4 |

Supp.App. 0305

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 308 of 1110 PageID 1929

| | | | | | | |
|---|---|---|---|---|---|---|
| New contract setup | | | 2.0 | | | 2.0 |
| Oversight and management fee | | 4.1 | | 1.0 | | 5.1 |
| **Adjusted EBITDA** | $ | **146.1** | $ | **36.4** | $ | **182.5** |
| Foreign exchange gains / losses | | 3.0 | | 0.1 | | 3.1 |
| Combined merger adjustments | | | | | | 83.7 |
| **Further Adjusted EBITDA** | | | | | $ | **269.3** |

(1) *Represents financial performance of Novitex for a year-to-date period ending on the transaction closing date of July 12, 2017.*

Supp.App. 0306

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 309 of 1110    PageID 1930

# Exela Technologies' (XELA) CEO Ron Cogburn on Q3 2017 Results - Earnings Call Transcript

Nov. 11, 2017 9:44 PM ET**Exela Technologies, Inc. (XELA)**

Exela Technologies, Inc. (NASDAQ:XELA) Q3 2017 Earnings Conference Call November 9, 2017 5:00 PM ET

**Executives**

William Maina - IR, ICR

Ron Cogburn - CEO

Jim Reynolds - CFO

**Analysts**

Mike Reid - Cantor Fitzgerald

Bryan Bergin - Cowen

Arun Seshadri - Credit Suisse

John Borch - HSBC

Doug Rothschild - Scoggin Capital

Umesh Bhandary - Legal & General

Usman Tahir - P. Schoenfeld Asset Management

Supp.App. 0307

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 310 of 1110    PageID 1931

**Operator**

Good day and welcome to the Exela Technologies Third Quarter 2017 Results Conference Call and Webcast. All participants will be in listen-only mode. [Operator Instructions]. After today's presentation, there will be an opportunity to ask questions. [Operator Instructions]. Please note this event is being recorded.

I would now like to turn the conference over to William Maina, ICR. Please go ahead.

**William Maina**

Thank you. Good afternoon and welcome to the Exela Technologies third quarter 2017 conference call where we will be discussing our pro forma financial results for Exela's third quarter ended September 30, 2017. With us, in this call we begin with comments from Ron Cogburn, our Chief Executive Officer followed by Jim Reynolds, Chief Financial Officer. We will then turn the call over to questions.

A replay of this call will be available until November 16. Information to access the replay is issued on today's press release which is available on our website under the Investor Relations section. As a reminder, today's conference call is also being broadcast live via webcast.

Before we begin, I'd like to remind everyone that during today's call, we will be making forward-looking statement regarding future events and financial performance. These forward-looking statements are subject to known and unknown risks and uncertainties. Exela caution that these statements are not guarantees of future performance. All forward-looking statements made today reflect our current expectation only and we undertake no obligation to update any statements to reflect events that occur after this call. Please refer to the company's filings with the SEC for factors that could cause our actual results to differ materially from any forward-looking statements.

During the course of today's call, we will refer to certain non-GAAP financial measures. Reconciliations of non-GAAP to GAAP measures and certain additional information are also included in our press release and presentation.

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 311 of 1110    PageID 1932

The press release is posted on Exela's IR website. Please note there is also a presentation that accompanies this conference call and an investor factsheet which are also accessible in the IR section of our website.

With that, we will begin by turning the call over to CEO, our CEO, Ron Cogburn.

**Ron Cogburn**

Thanks Will. Good afternoon and thanks everyone for joining us today on our third quarter 2017 conference call. This was a solid quarter for Exela Technologies. We closed on the business combination of SourceHOV and Novitex just about four months ago and we are pleased with the significant progress that we've made in terms of the integration of these two companies and the attainment of merger-related cost savings.

Just as important, we are pleased with the momentum that the company is enjoying as the combined strength that's resonating well with existing clients and new prospects. We're executing well and making strong early progress against our strategic objectives. As a result, we are affirming our prior full-year 2017 guidance and tightening the range which Jim Reynolds will discuss later in the call.

Turning to a brief overview of our results, I would like to remind everyone that the financial results we will discuss today reflect pro forma combined company results of the business combination of SourceHOV and Novitex which closed on July 12, 2017.

So let's turn to Slide number 6. Overall we are pleased with our performance which reflects solid revenue growth, pro forma EBITDA, and free cash flow generation. Total pro forma revenue for the third quarter was $358.2 million, up 12.2% year-over-year and 2.3% sequentially. We generated further adjusted EBITDA of $88 million, up $8 million or 10% year-over-year. We generated further adjusted free cash flow of $80.3 million representing a conversion rate of 91.2%, and as we announced in our earnings press release today, our board has authorized a share buyback program of up to 5 million shares under the right market conditions over the next 24 months. The decision to initiate this program reflects our financial flexibility driven by our high cash flow conversion and commitment to deliver value to our shareholders.

Supp.App. 0309

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 312 of 1110    PageID 1933

I'm also pleased to report that we are on track to deliver the merger-related cost savings identified earlier this year and we continue to identify additional opportunities for cost savings in the business.

Now let's turn to Slide number 7. Year-to-date 2017 we have generated total revenue of $1.1 billion and further adjusted EBITDA of $269.3 million representing a 25.2% margin with available liquidity of approximately $124 million as of September 30, 2017.

Turning to Slide number 8. As I mentioned in our last earnings call, we believe Exela is uniquely positioned in the global business process outsourcing market given our ability to offer end-to-end multi-industry and industry specific technology enabled solutions which were built in our proprietary technology platforms and those enable our skilled knowledge workforce. We believe, we will continue to benefit from significant whitespace opportunity by leveraging our deeply embedded relationships with our clients to cross-sell our combined company solutions across our global footprint.

Exela is one of the largest global players in the high growth financial services and healthcare sectors serving the top 10 U.S. banks, nine of the top 10 U.S. insurance companies, and the top five healthcare payers.

As I mentioned in our Q2 call, we have significant traction in our go-to-market strategy as new opportunities emerge from our global client base, as a result of the combination. For example, we have recently had a couple of notable large financial and insurance customers approach us for proposal on additional services based on the combined company offerings. Likewise we've been able to propose to a large healthcare payer additional services leveraging our combined company strengths. We are very pleased with the traction that we are seeing in terms with increased opportunities and believe the combination has improved our ability to expand our existing relationships and increased our probability of wins.

Supp.App. 0310

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 313 of 1110 PageID 1934

Another important aspect of our strategy across all of the industries that we serve is our focus on digital transformation from the front office to the back office. Digital transformation is no longer discretionary for the enterprises that want to stay competitive and be leaders in their respective industries. This priority fits well with Exela's capabilities which help our clients drive digital transformation across their mission critical processes. We believe that our deep understanding of our clients businesses and their industries in their ability to leverage Big Data automation and Analytics Solutions such as our Rule 14 platform enables us to be that partner of choice for digital transformations in the industries we serve.

For example, Exela was recently asked on one of the largest U.S. healthcare payers to propose on expanded services related to business automation. This enterprise saw their solutions and our expertise as a result of their recognition as a combined company strength in digital transformation. Overall, we are seeing strong demand from our customers for digital solutions and we're encouraged by the growing number of digital related deals in our pipeline including front office automation, digital mailroom, and RPA.

Let's move to Slide number 9. And I would like to reiterate the large global footprint of Exela Technologies. We have a presence in over 50 countries with operations in 15 different countries for the clients that we serve. And while we are global, approximately 91% of our business mix is in the Americas. Moving forward, expanding with our clients into their global operations is a key priority of ours to capitalize on the significant whitespace opportunity for Exela Technologies.

Now turning to Slide number 10. I would like to conclude by reiterating how we plan to drive continued profitable growth into the future. We work with some of the largest companies in the world and we plan to expand our strong market position through a number of growth initiatives which leverage our technology enabled solutions, our deep domain expertise, our strong global employee base, and financial flexibility.

First, we continue to leverage our deeply embedded relationships as a trusted partner with our clients, to cross-sell our solutions throughout our global footprint, we see this as a significant growth opportunity.

Second, while we remain focused on driving the benefits of the combined company, we will also continue to seek tuck-in opportunities that are accretive and drive value creation in addition to organic revenue growth.

Supp.App. 0311

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 314 of 1110    PageID 1935

Third, we will continue to focus on delivering against our unified merger cost saving synergies and seek additional opportunity for cost efficiencies. As I mentioned earlier we're seeing good success executing against this initiative.

Four, we will enhance the client experience and increase operational leverage through our scale.

And finally, we plan to further emphasize our bundled service offerings and our single vendor solutions to offer the best ROI for our clients. We believe our ability to provide a single source solution is resonating with our clients.

In conclusion, we delivered a solid third quarter results driven by our strategy and execution. Our end-to-end solutions and our deep domain expertise position us well to continue expanding with our current customers and grow our client base. We've made strong progress with the integration of SourceHOV and Novitex and we are on track to deliver the identified cost savings. Our strong cash flow provides us with significant financial flexibility to continue to invest in our growth initiatives. Combined, we believe that these factors position us well for growth through the remainder of 2017 and beyond.

And now, I would like to turn the call over to Jim Reynolds, who will discuss our financial results in greater detail. Jim?

**Jim Reynolds**

Thanks Ron. I will now provide a review of our pro forma third quarter 2017 results. I'll then discuss our full-year 2017 guidance before opening the call up for questions.

Turning to Slide 14. As Ron mentioned, we delivered solid results for the third quarter. Total revenue for the third quarter was $358.2 million, an increase of 12.2% from $319.1 million in the third quarter of 2016 and up 2.3% from $350 million in the second quarter of 2017.

Supp.App. 0312

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 315 of 1110    PageID 1936

As a reminder, we report our revenue results across three segments. The first and our largest segment is Information and Transaction Processing Solutions or what we call ITPS. The second segment is Healthcare Solutions and includes a broad range of solutions for both payers and providers. Our third segment is Legal and Loss Prevention Services or LLPS which comprises of processing and administration of legal claims.

With respect to our segment revenue mix for the third quarter ITPS revenue was $279.8 million, an increase of 21.5% year-over-year and 3.5% on a sequential basis. The year-over-year increase in ITPS revenue was driven primarily by our acquisition of TransCentra which contributed $26.5 million of revenue growth in the quarter. The remaining approximate $23 million of net growth was driven by new client contracts and expansions with our existing clients as well as $1.5 million of positive foreign currency changes.

Healthcare Solutions revenue was $56.4 million compared with $60.7 million in the third quarter of 2016, and $58.1 million in the second quarter of 2017. On a year-over-year basis our healthcare segment was primarily impacted by higher revenue related to the increase in billings related to ICD 9, 10 Coding work in 2016. As we discussed on our last call, we expect the impact to the comps related to this ICD-10 rollout to get better in the next few quarters. On a sequential basis our healthcare revenue was impacted modestly by only $600,000 related to the coding work, and the remaining $1 million decline was related to quarterly seasonality.

Finally, our LLPS segment revenue was $22 million flat with the second quarter of 2017 and down approximately $6 million year-over-year. This decrease compared to the third quarter of 2016 was primarily due to the recognition of higher legal claims administration work related to a few large class action cases of approximately $4.7 million in Q3 of 2016 and $1.1 million related to the sale of Meridian, a small construction claim consulting practice which was divested up in the first quarter of 2017. As a reminder, our LLPS sentiment revenue can be lumpy and it is dependent upon when the class action cases go to settlement and when we perform the associated settlement work for those cases. We expect our LLPS revenue in the fourth quarter of 2017 to be similar to the third quarter of 2017.

Supp.App. 0313

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 316 of 1110    PageID 1937

Gross profit in the third quarter was $87.1 million compared with $89.5 million in the third quarter of 2016 and $92.9 million in the second quarter of 2017. Gross margin for the third quarter of 2017 was 24.3% versus 28% in the third quarter of 2016 and 26.6% in the second quarter of 2017. Our third quarter gross margins were impacted primarily by ramp up costs associated with new ITPS client contracts I mentioned, which were partially offset by revenue growth and merger-related cost initiatives.

As a reminder, new contracts tend to begin at lower margins. As new contracts or volumes ramp to full transaction volumes, margins expand. And the gross profit will also increase as we continue our cost transformation initiatives as part of this integration.

Further adjusted EBITDA for the third quarter of 2017 was $88 million, up 10% year-over-year and 6% on a sequential basis. Third quarter further adjusted EBITDA margin was 24.6% compared with 25.1% in the third quarter of 2016 and 23.7% in the second quarter of 2017. Our third quarter further adjusted EBITDA and margin performance primarily reflect the benefit of our revenue growth and merger-related cost savings initiatives, partially offset by the new client ramp up cost previously referenced.

Focusing for a moment on our merger-related cost synergies, we are on track to deliver our annual cost savings over the next 12 to 18 months. We continue to find more opportunities for our merger-related cost synergies.

Pro forma net loss for the third quarter of 2017 was $130.5 million compared with a net loss of $16.7 million in the third quarter of 2016 and $27.9 million loss in the second quarter of 2017. Please note that our third quarter 2017 net loss includes certain one-time non-recurring charges which include a $53 million loss on extinguishment of debt related to our refinancing, $20.9 million of optimization and restructuring charges, and $79.3 million of transaction costs related to the merger.

Supp.App. 0314

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 317 of 1110 PageID 1938

Now turning to Slide 16, we generated $80.3 million of further adjusted free cash flow in the third quarter of 2017. Year-to-date, we have generated approximately $243 million of further adjusted free cash flow representing 91.2% conversion of further adjusted EBITDA. We calculated adjusted free cash flow as further adjusted EBITDA less capital expenditures. Our strong free cash flow profile is due to our low intensity CapEx model. In the first nine months of 2017, our CapEx totalled $26.3 million or 2.5% of our year-to-date revenues benefiting from our historical investments.

Turning to the balance sheet, at September 30, our total liquidity was approximately $124 million and total debt was approximately $1.41 billion. We had cash of $46.6 million of which $19.2 million is segregated for customer use and $100 million revolving credit facility which was undrawn, but net of $22.8 million in standby letters of credit, giving the company $77.2 million at September 30 available for borrowings.

Before I move to guidance, I'd like to briefly review our strategic priorities with respect to capital allocation on Slide 17. Given our high cash conversion and low capital intensity model, we have significant financial flexibility to invest in both organic and inorganic growth initiatives, de-lever our balance sheet, and return capital to shareholders. We will continue to make the necessary investments in our growth initiatives; this will include investments to drive organic growth as well as actively evaluating M&A opportunities only if they are leverage accretive.

In addition, our focus is to continue to de-lever our balance sheet. Our long-term leverage target around three times, we think is appropriate for our business. Additionally, our board has an approved share buyback program of up to 5 million shares; the authorization is for 24 months and allows us to make purchases at our discretion based on market and other factors.

Finally, we will consider dividends to shareholders, once our leverage targets are achieved.

Supp.App. 0315

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 318 of 1110　　PageID 1939

Moving now to our full-year 2017 financial outlook. As I mentioned earlier, we're on track to deliver our identified business combination savings. We are affirming and tightening our prior financial outlook for pro forma revenue and further adjusted EBITDA. We currently expect 2017 pro forma revenue to be $1.45 billion to $1.47 billion and further adjusted EBITDA to be $350 million to $370 million. Further adjusted EBITDA includes approximately $100 million of company combined merger adjustments. Finally, we expect further adjusted free cash flow to be approximately $310 million to $320 million for the full-year of 2017.

In closing, I want to commend the entire global team at Exela for the great work they have done in integrating, driving revenue opportunities, and cost efficiencies across the business. Exela is well positioned within a large and growing industry serving a diversified client base and end markets with attractive growth opportunities. We have a strong financial model which generates solid cash flows giving us the ability to invest in our growth initiatives, de-lever over the long-term, and return capital to our shareholders.

With that, this concludes our remarks and operator, I would like to open up the call for questions.

**Question-and-Answer Session**

**Operator**

Thank you. We will now begin the question-and-answer session. [Operator Instructions].

Your first question comes from Joseph Foresi from Cantor Fitzgerald. Please go ahead.

**Mike Reid**

Hi guys, this is Mike Reid on for Joe. I was just wondering if you could walk us through maybe some detail on where you're seeing getting some of these cost synergies and a little detail on that, please.

**Jim Reynolds**

Supp.App. 0316

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 319 of 1110    PageID 1940

Sure. I think we've discussed historically the three buckets we look at headcount, facilities, and vendor. Obviously we went through a number of transactions in integration; these are typically the best areas where we find synergies. We as of September had executed a good portion of the headcount synergies and look to further improve the vendor and our facilities over the next 12 to 18 months.

**Mike Reid**

Okay. And then on the revenue side for potential revenue synergies, where are you kind of seeing some of these cross-selling opportunities?

**Ron Cogburn**

Yes, this is Ron. When we looked at the combination of the two companies, Novitex had a set of customers that were very complementary to what SourceHOV has. So at Exela we have customers that really have not had the benefit of the technology enabled services and solutions that we've offered previously at Source. So once we came together even before hand, we had inbound interest from many of those large multinationals to the extent that they said look if you're combined company would you propose on the transaction processing solutions that we do internally as well as maybe to Novitex core business let's say had whether it was mailroom, mailroom logistics, or print and production. So we've had many of those types of opportunities and that's what I talked about in my remarks our pipeline is rich with that type of opportunity at this moment.

**Operator**

Thank you. Your next question comes from Bryan Bergin from Cowen. Please go ahead.

**Bryan Bergin**

Hi guys, thank you. Just wanted to dig in a little bit on industry demand trends, can you comment what you are seeing trends and behaviour within your financial services and your healthcare clients, any change over the course of this year?

Supp.App. 0317

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 320 of 1110     PageID 1941

**Ron Cogburn**

Well as we commented before the move for digital transformation is really driving lots of the conversations we have with our customers whether they're in the healthcare payer, healthcare provider, financial services, or the banking industry, and really this has been sort of the cadence for the last year especially with the SourceHOV clients, many of the opportunities that we've talked with them about circle around this need for digital transformation and so that's really where we're seeing lots of our opportunity comes from.

**Bryan Bergin**

And is this driving a larger overall engagements for you and as you think about you're just going to have conversations around 2018 budgets, can you just give a sense on priorities around end conversations, currently you are having end conversations as far as scale of deals?

**Ron Cogburn**

Well let's talk about scale because it's really important when you think about what we pursue now is the enterprise opportunities at a different scale than we could before. Many of these I'll call it Fortune 100 companies have a risk model that says that we as a vendor cannot have more than 10% of our revenue as their business. So for us, when we were below a $1 billion, sometimes we saw that ceiling come into effect when we missed out on those enterprise deals.

Now trending towards, upwards of $1.05 billion, $1.04 billion, we get the opportunity now to look at much larger enterprise opportunities and frankly that's really what we've seen since we brought the businesses together in July and that's a lot of the inbound traffic is the larger enterprise deals.

**Operator**

Thank you. Your next question comes from Arun Seshadri from Credit Suisse. Please go ahead.

**Arun Seshadri**

Supp.App. 0318

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 321 of 1110    PageID 1942

Yes, hi, thanks for taking my questions. First I just wanted to ask in terms of adjusted EBITDA could you talk about what the pro forma compare was including TransCentra for last year that would be approximately $51 million last year.

**Jim Reynolds**

For which quarter I'm sorry.

**Arun Seshadri**

Just comparing the $55.3 million that you reported for Q3 of 2017 since that includes TransCentra I just wanted to compare it with the appropriate number for last year because I think the number that you disclosed the $56.3 million I don't think that includes TransCentra, so I just wanted to see; I think TransCentra was approximately $5 million.

**Jim Reynolds**

It was approximately $57 million to $58 million.

**Arun Seshadri**

Last year.

**Jim Reynolds**

Included and it's also in our fact sheet.

**Arun Seshadri**

Okay, understood. And then is there any way you could give us the I noticed you dropped the adjusted EBITDA guidance for this year, could you give us sort of where you expect this year's 2017 adjusted EBITDA to end up?

**Jim Reynolds**

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 322 of 1110    PageID 1943

So I think we gave a range of our further adjusted EBITDA of $350 million to $370 million which is consistent with what we went out with at the lower end of the range. Our original guidance was I believe $350 million to $390 million.

**Arun Seshadri**

But that was --

**Jim Reynolds**

So we adjusted EBITDA during the quarter as we get closer to year-end.

**Arun Seshadri**

But that was the further adjusted EBITDA. I think you had originally given us adjusted EBITDA guidance as well are you dropping that guidance.

**Jim Reynolds**

I think it will be consistent approximately within the range we gave earlier about $245 million to $260 million.

**Arun Seshadri**

Okay, understood. Last question from me is stock buyback; just wanted to understand I mean I don't think you've for this quarter just wanted to understand sort of the rationale stock buybacks given that you have a leverage target and it's only the first quarter out in terms of cash flow generation, I just wanted to understand why the stock buyback this early. Thanks.

**Jim Reynolds**

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 323 of 1110     PageID 1944

Sure. Well as you know the board has approved the buyback and it give us the ability over the next 24 months to buy up to 5 five million shares depending on market conditions. And we view that as another lever for us to use as part as we move forward with the company. Obviously we have employees that we could consider using that buyback for. So there is multiple things that the stock buyback will allow us to do. At this point it's not a -- it's a small amount compared to what it could be.

**Arun Seshadri**

Okay, understood. I'll get back in line. Thanks.

**Operator**

Thank you. Your next question comes from John Borch from HSBC. Please go ahead.

**John Borch**

Hi, thanks for taking my question. So the first one just ITPS was stronger quarter here organically. And I guess from your comments that seems to be a trend you think will continue but I just want to get your thoughts on the improvement there and how that's doing.

**Ron Cogburn**

So I mean if you think about our ITPS is our largest segment, we ran our financial services. And the banking, insurance it's a large industry right and that's where Novitex is into. So I think with our go-to-market strategy now we have the ability to improve the ITPS segment and achieve the growth similar to the industry as we look out, we see the opportunity because Novitex and Source coming together has created a great opportunity and a lot of opportunity in revenue synergies.

**John Borch**

Supp.App. 0321

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 324 of 1110    PageID 1945

Okay, thank you. And then the other one just a housekeeping question the debt was about $1.4 billion so other than that the term loan and the notes what debt was there?

**Jim Reynolds**

Yes, we have capital leases that are included in the calculation.

**John Borch**

Okay, great. Okay, thanks. So that's it for me.

**Operator**

Thank you. The next question comes from Jeremy Sipzner [ph] from South Pole [ph]. Please go ahead.

**Unidentified Analyst**

Hi guys. Thanks for taking my question. First one from me I'm looking at your cash flow statement here and I was under the impression that there was going to be $275 million of cash contributed to effect the deal. And I see proceeds from common stock and preferred of only $204 million and then cash from Quinpario of $27 million. Can you explain the shortfall to me?

**Jim Reynolds**

So part of the transaction, we raised the equivalent of the $275 million to get the transaction done with a combination of cash and stock.

**Unidentified Analyst**

Right. I guess I'm wondering where that is on the cash flow statement I thought would have seen something that's sounds to $275 million of cash coming in.

Supp.App. 0322

Case 3:20-cv-00691-D  Document 49-1  Filed 09/03/21  Page 325 of 1110  PageID 1946

**Jim Reynolds**

You know, as if you look on the equity statement there are also fees paid for stock which is the equivalent that gets us to the $275 million.

**Unidentified Analyst**

Got it. Okay. When do you guys think that further adjusted EBITDA will become on adjusted cash EBITDA how long will it take for that to happen.

**Jim Reynolds**

So obviously we'd like to have less adjustments, but as we look out as part of putting these businesses together and we believe we will start to convert and it's going to take us 12 to 18 months to get the further adjusted EBITDA moved into GAAP EBITDA.

**Unidentified Analyst**

Okay. And last one it looks like cash from operating activities was negative $28 million or so for the quarter. Can you kind of just give some color as to historically been pretty positive why was negative.

**Jim Reynolds**

Well, I think there were significant fees paid related to the transaction. So we expect that to turnaround in the coming quarters.

**Unidentified Analyst**

Okay, that's it for me. Thanks.

**Jim Reynolds**

Supp.App. 0323

Thank you.

**Operator**

Thank you. Your next question comes from Kristin [indiscernible] from Cowen Capital. Please go ahead.

**Unidentified Analyst**

Hey guys. Thanks for taking my question here. Can you hear me?

**Ron Cogburn**

Yes, thank you.

**Unidentified Analyst**

Yes, thanks for taking my question. Just happy to see some revenue growth here and was just hoping you could give a little bit more clarity around how much of that is actually coming from the cross-sell opportunities to win and expand the whitespace within current clients and sort of how that process is going.

**Jim Reynolds**

So I mean obviously we closed the merger on the 12 and that's when we brought the teams together July 12. So at this point there's been very little cross-sell that is actually generated revenue at this point in time. But as Ron discussed we see multiple opportunities in our meetings with our large clients.

**Unidentified Analyst**

Okay, great. And then I want to touch on the topic of the stock buyback. It's you're six times levered, the cost saves, aren't really rolling through yet and shouldn't you use cash to buyback bonds that are trading in the mid-to-low 90s and delever instead of buying back shares which adds leverage.

Supp.App. 0324

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 327 of 1110     PageID 1948

**Jim Reynolds**

I think this is another lever that the company has for the cash flow that we generate it's not the main lever obviously; we're focused on investing in the growth in the business. We see a lot of opportunity; we're in the right industries and combining the two companies we think it gives us greater opportunity and larger deal sizes. So I would say we're focusing on that.

The stock buyback is an important aspect as we look forward and consider approving an employee stock plan. So those types of things we have as different levers before. Obviously three times makes a lot of sense to us given we're public at this point in time. So I think we mentioned all four ways, we're looking at but obviously some make more sense earlier than others.

**Unidentified Analyst**

Right. So you're saying that so when would you expect to start buying back stock, I mean what sort of leverage ratio would you then believe that using cash to buy back stock is a good use of cash.

**Jim Reynolds**

So at this point we haven't set that specific lever stock is as to what makes sense but it is like I said another lever for us to pull and a potential use of the company to reward employees at some point in the future.

**Unidentified Analyst**

Okay. So until I mean until you actually see much more robust, non-adjusted, non-pro forma cash generation is this basically to offset the stock comp plan.

**Jim Reynolds**

Yes, I mean that is the plan, yes.

Supp.App. 0325

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 328 of 1110    PageID 1949

**Unidentified Analyst**

Okay, thanks for taking my questions.

**Ron Cogburn**

Thanks.

**Operator**

Thank you. Your next question comes from Doug Rothschild from Scoggin Capital. Please go ahead.

**Doug Rothschild**

Hey guys. Congratulations on another quarter of sequential revenue and EBITDA growth. Most of my questions have been asked but I want to talk on timing of the customer pipeline that seems to be building, how long do you think that will take to result in actual revenues.

**Jim Reynolds**

Typically these are long sales cycles. Especially at the enterprise level is not surprising that sometimes these take 12 to 14 months to get to the right conversation for a decision from one of these multinational especially the largest banks, the largest healthcare, the largest insurance companies. So we're excited about the growth in the pipeline the new opportunities that are at that enterprise level and we're hopeful we'll begin to see some of those come to fruition in 2018.

**Doug Rothschild**

Okay. And on the synergies you guys mentioned that you're uncovering new opportunities. You had originally given a range of synergies are you now possibly going to deal to hit closer to the high-end.

**Jim Reynolds**

Supp.App. 0326

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 329 of 1110     PageID 1950

So I think we're highly confident in the $37.5 million. We feel that's significant there's more I think we talked about $70 million. So we feel good of the $37.5 million we continue as we integrate into our technology through our platforms to find additional synergies.

**Doug Rothschild**

Okay. And lastly on the buyback I know a lot of people have been asking about it. I assume you saying it's just another lever that you guys will be opportunistic here. I don't think you're levered six times but I think it's probably closer to 3.5, 4 times but this is a plan to be opportunistic given the attractive levels that the stock is trading just so you have it as another lever; is that that how we should understand this.

**Jim Reynolds**

That's correct, Doug. It's another lever that the company has.

**Doug Rothschild**

Okay, all right. Thank you guys.

**Jim Reynolds**

Thank you.

**Ron Cogburn**

Thank you.

**Operator**

Thank you. Your next question comes from Elie Betito [ph] from [indiscernible] Capital. Please go ahead. Elie [ph] your line is now live. Your phone may be muted.

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 330 of 1110     PageID 1951

**Unidentified Analyst**

Can you hear me now?

**Operator**

Yes, please go ahead.

**Unidentified Analyst**

Okay, sorry that's on mute. Can you just talk about the Novitex revenue and gross margin if you have it looking out for the quarter?

**Jim Reynolds**

So revenue for the quarter was $154 million. And the gross margin I don't have that readily available but it's in our MD&A which should be posted shortly.

**Unidentified Analyst**

And if I'm looking at the gross margin decline sequentially and year-over-year, can you just share some of the drivers, I know you alluded in your customers but sequentially that shouldn't necessarily be leadership.

**Jim Reynolds**

So if you think about when we ramp up these large customer contracts there is a lot of costs that are duplicate associated with training people getting individuals up the speed, doing test runs, a lot of that we have to expect. So when you have large ramp-ups typically you get lower volumes in the beginning or no volume and then over the life of the contract, as you get to full volume you start to see the incremental margins and the expansion.

Supp.App. 0328

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 331 of 1110　　PageID 1952

And if you remember a number of these Novitex contracts while there margins were good, they were smaller than legacy SourceHOV because they have to use technology from third-parties. So as we continue to put our proprietary software in systems into these contracts, we'll pull out that incremental cost and will get margin expansion.

**Unidentified Analyst**

Okay, got it. And on cash noticed unrestricted cash is in the 20s. And I think in the original proxy it was $100 million of unrestricted cash and some other figures that's $77 million, can you just describe why the cash is materially lower?

**Jim Reynolds**

So obviously with the transaction, we incurred a significant amount of professional fees related to getting the deal flows. So that primarily drove the cash balances during the quarter. I mean we feel good, the amount of cash, the combined company generates was approximately 90.1%, 90.2% conversion to further adjusted EBITDA and as the EBITDA converts from adjusted to GAAP, obviously that will help out on cash flows.

**Unidentified Analyst**

Further Jim, there is transaction fees in the proxy already and is still netting out to about $100 million of cash. So what was higher and I guess what was higher in the fee loads from July 12 to now?

**Jim Reynolds**

So I think there were a number of factors, we can probably take it offline but what happened was is the interest rates moved from what we thought originally was causing increasing pause to get the deal done.

**Operator**

Thank you. Your next question comes from Umesh Bhandary from Legal & General. Please go ahead. Pardon me, Umesh Bhandary, your phone maybe muted, your line is now live into the call.

Supp.App. 0329

**Umesh Bhandary**

Hi thanks for taking my question. Guys you talked about some of this margin compression in the quarter is related to contract ramp-ups, can you quantify what the margin impact of the contract ramp-up is and when do you expect sort of about this negative impact of this contract ramp-up to subside?

**Jim Reynolds**

So I think I addressed that, if you look at how the contracts ramp, there was a significant uptick in revenue in the third quarter. Obviously we have a lot of costs associated with generating net revenue. That typically takes six to nine months to start to improve as we take out the do for credit note people and migrate systems so I think you'll start to see the margins change in 2018.

We have identified obviously a significant amount of synergies that we're working, the team is working hard on to drive the margins above what they were when we acquired Novitex.

**Umesh Bhandary**

Can you quantify what you mean by there is a lot of cost? How much is lot of cost?

**Jim Reynolds**

So if you think about it, there is costs associated with headcount, systems, facilities, as we consolidate the facilities and train employees and get them up to full production, those costs i.e. payroll, facility as we migrate and technology costs will start to decline. Now you have to think about it, you're going to improve the utilization as you start to get more volumes through these contracts.

**Operator**

Thank you. Your next question comes from Usman Tahir from P. Schoenfeld Asset Management. Please go ahead.

Supp.App. 0330

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 333 of 1110    PageID 1954

**Usman Tahir**

Hi thank you for taking the question. It seems like your fiscal 2017 guidance is implying $28 million to $48 million of revenue growth in Q4 on a year-over-year basis but just looking like what's driving that and obviously you've indicated that some new contracts are rolling in, so as this revenue comes in, in Q4, is there any substantial impact on margins?

**Ron Cogburn**

So I agree with Q4 we do have an incremental uptick in our revenue. I think we talked about earlier in the year the large local contract that we signed that started to go and ramp well. In addition, typically fourth quarter has seasonality that helps us drive additional top-line as industries and businesses try to use up their budgets so lot of things happen and get build in the fourth quarter. So we feel really good about the incremental revenue that's going to flow through the next few months.

**Usman Tahir**

So but when I think about seasonality that's usually sequential but you guys are guiding to 28 to 48 approximately on a year-over-year basis. So is this all like new revenues or debt like some of the spending that got pushed into Q4 and we have like some one-time pickup in Q4 that will probably roll off going into next year?

**Ron Cogburn**

No it's kind of a combination within healthcare, obviously summer months are usually a little slower, you start to get into open enrolments which help drive incremental volumes, people are trying to use up their HSRs. And in addition most people hit their deductibles by that time so they try and get into for their tests. So there are positive trends.

Supp.App. 0331

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 334 of 1110    PageID 1955

In addition, we have a small hardware business that typically has strong results in the fourth quarter incremental, there is software renewals in our solutions business, I think it rebuilds and are favorable, so there are lot of positive things that occur in the fourth quarter. In addition we have ramped up and continue to ramp up some large contracts which will continue to drive the revenue in Q4.

**Usman Tahir**

Ron could you maybe quantify like what these -- what the revenues are on an annual basis for these large contracts which are ramping up?

**Ron Cogburn**

We typically don't quantify those amounts.

**Usman Tahir**

Thanks.

**Ron Cogburn**

Thank you.

**Operator**

Thank you. This conference has now concluded. Thank you for attending today's presentation. You may now disconnect.

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 335 of 1110    PageID 1956

# Exela Technologies' (XELA) CEO Ron Cogburn on Q4 2017 Results - Earnings Call Transcript

Mar. 15, 2018 10:39 PM ET**Exela Technologies, Inc. (XELA)**

Exela Technologies, Inc. (NASDAQ:XELA) Q4 2017 Earnings Conference Call March 15, 2018 5:00 PM ET

## Executives

Jim Mathias - Vice President, IR

Ron Cogburn - CEO

Jim Reynolds - CFO

## Analysts

Mike Reid - Cantor Fitzgerald

Arun Seshadri - Credit Suisse

Bryan Bergin - Cowen

John Moore - HSBC

Brad Elliott - RBC

## Operator

Supp.App. 0333

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 336 of 1110     PageID 1957

Good afternoon, ladies and gentlemen. And welcome to the Exela Technologies Fourth Quarter and Year End 2017 Call. My name is Brian; I'll be your host operator on this call. After today's prepared remarks, we will conduct a question-and-answer session. [Operator Instructions] Please note today's event is being recorded.

I would now like to turn the meeting over to Jim Mathias, Vice President of Investor Relations. Please go ahead.

**Jim Mathias**

Thanks, Brian. Good afternoon and welcome to the Exela Technologies fourth quarter and year end 2017 conference call. Presenting on today's call are Ron Cogburn, our Chief Executive Officer; and Jim Reynolds, our Chief Financial Officer. Also on today's call are Shrikant Sortur, our Executive Vice President of Global Finance and Anubhav Verma, our Senior Vice President, Finance. Following prepared remarks made by Ron and Jim, we will take the questions.

Today's conference call is being broadcast live via webcast which is available on our Exela Investor Relations website.

A replay of this call will be available until March 22, 2018. Information to access the replay is listed on today's press release which is available on our website under the Investor section.

During today's call, Exela will make forward-looking statement regarding future events and financial performance. These forward-looking statements are subject to known and unknown risks and uncertainties, and are based on current expectations and assumptions. We undertake no obligations to update any statements to reflect the events that occur after this call. Please refer to the company's filings with the SEC for factors that could cause our actual results to differ materially from any forward-looking statements. Our 10-K includes risk factors that could cause our actual results to differ materially from the forward looking statement.

During the course of today's call, we will refer to certain non-GAAP financial measures. Reconciliations between GAAP and non- GAAP results we discuss on this call can be found on our Investor Relations page of our website. As a reminder, financial results discussed on today's call reflect pro forma combined to company's results for the business combination of SourceHOV and Novitex which closed on July 12, 2017.

Supp.App. 0334

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 337 of 1110    PageID 1958

Please note the results or presentation that accompanies this conference call and an investor fact sheet which are also accessible in the IR section of our website.

We will begin by turning the call over to CEO, Ron Cogburn.

**Ron Cogburn**

Thanks Jim. Good afternoon and thanks everyone for joining us today. Looking back on the year, the highlight is our formation of Exela into a standalone company trading on the NASDAQ. That was made possible by the hard working men and women whose dedication and determination rally to accomplish our goal. And equally important the trust the investment community placed in our team to deliver the committed results.

I want to cover few highlights for 2017. If you would turn to Slide 5, we will begin. I am particularly pleased that we achieved our full year 2017 guidance ranges for both pro forma revenue and adjusted EBITDA, a tremendous accomplishment. We finished the year with solid growth of 9% to $1.456 billion. Our further adjusted EBITDA was $347 million with a margin of 24%. We generated further adjusted free cash flow of $304 million which grew 2.9% with a conversion of 88%. Our CapEx which was 2.9% is low for our organization of our size and complexity.

Supp.App. 0335

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 338 of 1110     PageID 1959

Our Q4 revenue was $386 million which grew 9.6% year-over-year. 2017 was a remarkable year for our land and expand strategy yield impressive results including revenue from the top 100 customers which grew 14%. We now have six clients generating over $25 million in annual revenue and 197 clients between $1 million and $5 million in revenue. During the quarter, we added a number of new logos but I want to highlight a very significant win for Exela which is a five year agreement in which we will handle time sensitive correspondence for the administration of and employee benefit program, a benefit claims procession, business continuity services and management of the outbound communications. This win is notable for Exela as it was made possible by the reliance on our business combination and our Business Process Outsourcing or BPA automation excuse me and our proprietary technologies. From a graphical footprint perspective, we added presence in two new countries Norway and Poland. Let's turn to Slide 6. Embracing complexity and delivering simplicity, this is what we do every day. Momentum continues to build as we see large white space opportunities in growing industries.

We've been investing for growth; increasing awareness of Exela solutions in the market, accelerating investments in people within sales, marketing and strategy, as well invest as investing in our technologies. To this end, we have opened our first of many state-of-the-art innovation centers. These centers were designed to introduce the breadth of our capability to our current and prospective customers. We're also continuing to participate in the normal industry trade groups and shows. Total contract value as of January 1st, 2018 for contracts one in 2017 is $1.523 billion with renewal rates of 98%. Our customer concentration is low with our top customer at 6% of the total revenue. And the remaining top 10 customers at 19% of the total revenue. Our Business Process Automation platforms or BPA continue to drive value with a nearly 20% increase in the revenue per FTE from $56,0000 to $66,000 all while we decreased our employee base by 6% to 22,000.

Supp.App. 0336

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 339 of 1110     PageID 1960

Based on our solid 2017 results, as well as our outlook for 2018, we anticipate revenue growth of 4% to 6%. We are forecasting further adjusted EBITDA for 2018 to be between $330 million and $355 million and with a margin of 22% to 23%. As we accelerate our business into 2018, we believe we are well-positioned to drive long-term shareholder value. With all of our recent success in our BPA rollout and our transformation, we plan to revisit our outlook on our second quarter 2018 call in August of this year. Jim Reynolds will discuss our outlook for 2018 as well as the impact to the changes in the tax code a little later in the call.

Now let's turn to Slide 7. Our customers are global and we are well diversified across the industries we serve. We're among the largest global providers in the growing financial services and healthcare sectors, where we have a significant presence in the top US 10 banks, nine of the top U.S. insurance companies and the top five healthcare insurance payers. These industries represented approximately 60% of our pro forma revenue during 2017. While it is still early in 2018, we are seeing an increase in the enterprise opportunities that we mentioned last quarter. And although the sale cycles can take up to 14 months, a number of large financial and insurance customers have approached Exela requesting proposals for additional services featuring our business process automation.

Likewise, we've been able to propose to large healthcare payers and providers' additional services leveraging our combined strengths now. We are very pleased with the traction that we are seeing in terms of increased opportunities. And we believe the combination has improved our ability to expand our existing relationships and increase our probability of wins.

Supp.App. 0337

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 340 of 1110     PageID 1961

So let's turn to Slide 8 which is our Business Process Automation or BPA slide. Our technology is complex but our strategy and our results are simple. With our beginnings in the BPO industry, we have consistently met with success and applying technology to drive improves outcomes. Our primary focus in 2018 is continuing to bring our established business process automation solutions including robotics and cognitive automation to our clients allowing them to drive results in their own businesses. As the illustration points out Exela has been utilized business process automation and Robotic Process Automation or RTA for many years. Exela developed proprietary technology around cognitive automation roughly seven years ago. Evidence of their use internally to achieve greater efficiencies can be seen in our margin expansion over the past several years.

Our technology solutions are modular in nature and configured to seamlessly integrate with their clients pre-existing legacy enterprise software platforms. With the acquisition of Novitex, we gain the opportunity to expand our presence into the front office and apply our technology enabled suite of services there. We are actively pursuing and offering our automation technology to the customers and locations that came with that business combination.

We can pull forward our business process automation in the outcome resolutions to the front office and providing better customer and employee experience. To give an example of how we deploy Exela's business process automation to drive accuracy and efficiency, let's look at how we're deploying box for robots or underwriting support across the insurance industry. We work with one of our largest property and casualty insurers to map all of their repetitive time tasks that were being performed across one of their largest underwriting departments. We already had hundreds of on-site and off-site employees embedded throughout their organization helping support the underwriters by prepping all the data, so the experts had a clean package to review. My employees knew the process inside and out; it involved gathering data from many different systems, organizing what was important and comparing databases and documents to make sure it was all accurate.

Supp.App. 0338

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 341 of 1110    PageID 1962

They had to do all this manually though, logging in, logging out of the various systems, pulling up emails, PDFs, copy, pasting, checking completeness and consistency, and organizing all that support. By giving them our BPA suite, which includes RPA platform [EON], they're able to quickly configure specialized bots to repeatedly log in, extract, validate, run business rules and post the data with key flags and alerts. They can let the box do all the redundant tasks and they focus on the exceptions. The effect of this automation was it enabled the workers to focus on more complex tasks, and drastically increase the speed and a reduction in human error. To be clear, rather than spending time building this data packages, our solution allow them to spend time analyzing the data. Exela's automation making underwriters life both easier and far more productive. These are very exciting times for Exela.

Now let's move to Slide 9, which is our employee network. With our increased scale, we believe we are neatly in position to apply our business process automation solutions on a global basis. Additionally, we with our established physical presence at over 1,100 customer sites, we have a natural competitive differentiator as we continue to discuss our event expanded suite of services with those customers. This step makes us a more valuable embedded partner with our clients. Many of Exela's clients are multinational. Our global employee footprint is a key component of our ongoing success. With a global workforce we have a significant opportunity to expand into the growing operations of our clients. Development and management of our effective proprietary technology that addresses the daily changes faced by clients is an important part of our future growth strategy.

To that end, we employ approximately 2,000 IT and technology professionals globally devoting to building, implementing and managing our proprietary IT. Although our clients are global, over 90% of the revenue comes from the US. As a result and with our focus on applying technology-based solutions over half of our workforce is based here in North America.

Supp.App. 0339

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 342 of 1110    PageID 1963

Now let's turn to Slide 10. Building on what was an eventful and exciting 2017; here is our focus for 2018 driving long-term shareholder value. Let's start with the leverage of the BPA, our initiative and our goal was to expand our business model to include on-site and off-site locations. And to leverage our BPA leadership position as a first mover. So here's the update. We have 100 customers representing approximately 60% of our total revenue, that's up 14% this year. The next was to improve customer awareness. The initiative and goal that was to increase customer awareness and leverage our scale on our BPA.

Here's the update. We've opened to two Innovation Centers and we've accelerated investments in people and technology. Let's talk about the savings initiatives. What were our initiatives and goals to maintain focus on the delivering the identified savings. So here's the update. We delivered more than $40 million in 2017 for the cost saving initiatives. 2018 guidance includes assumptions of $40 million to $45 million in savings with remainder in 2019. And lastly, the accretive M&A, what were our initiatives and goals. Prudent to look at the opportunistic accretive tuck-in acquisitions as they come up. What's the update? We have financial flexibility that enables strategic and opportunistic actions.

We have a significant opportunity to vote to grow both organic and inorganic. We're investing in key areas within our business including technology and people to position us to provide additional value to our clients, which we believe will best position Exela for long-term sustainable growth, and to drive shareholder value. Come by and check out our technology and one of our innovation centers near you.

And now I would like to hand over the call to Jim Reynolds, who will discuss our financial results in greater detail. Jim?

**Jim Reynolds**

Supp.App. 0340

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 343 of 1110    PageID 1964

Thanks Ron. On Slide 13, we have an overview of the fourth quarter of 2017 financial results. And the following three sides, I'll be walking through the details. Let's turn to Slide 14. Revenues for the fourth quarter were $386.3 million, up 9.6%, compared with $352.5 million in Q4, 2016, and up 7.8% sequentially from Q3 of 2017. All of our reporting units grew on both a year-over-year and sequential basis. Information and Transaction Processing Solutions, IPPS revenue was $301.5 million and grew 11.2% year-over-year. IPPS segment also grew revenue sequentially 7.8%. The year-over-year increase in IPPS revenue was driven by increased volumes and expansion of services within existing customers.

Healthcare Solutions revenue was $60.1 million compared with $58.6 million in Q4, 2016, and up from $56.4 million in the third quarter of our 2017. Our Healthcare business growth came from existing customers and it grew sequentially from higher volume during open enrollment season. And finally, our Legal and Loss Prevention Services segment or LLPS, the segment revenue was $24.7 million, up approximately $2.1 million or 8% year-over-year, compared with Q4, 2016. We are pleased with the growth.

Now on Slide 15. We had a negative operating income of $51.2 million; this was driven by an impairment charge totaling $69.4 million. As we discussed, our legal business revenue has declined from its highs in 2014 and in Q4 of 2017, we took a goodwill impairment charge of $30.1 million related to this business in our LPPS business segment. In addition, we wrote off $39.3 million relating to certain legacy trade names that will be dropped as part of our global revamped branding initiatives to launch as one Exela.

On Slide 16, adjusted EBITDA for fourth quarter of 2017 was $62.7 million, representing a margin of 16.2% compared with $64.7 million in a margin of 18.4 % in the fourth quarter of 2016. The year-over-year decrease in fourth quarter 2017 was driven by higher ramp up costs associated with new IPPS client contracts, investment in the company's revenue growth initiatives, an incremental cost associated with operating as a public company.

Supp.App. 0341

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 344 of 1110     PageID 1965

Slide 17, this is a summary of the full year 2017 pro forma results which I can cover in more detail on the following few slides. As Ron mentioned, we achieved our full year 2017 guidance ranges for both pro forma revenue and adjusted EBITDA. Turning to Slide 18, revenues for the full year were $1.456 billion compared with $1.333 billion in fiscal year 2016, posting a 9.2% growth. IPPS revenue was $1.131 billion and grew15% year-over-year primarily by increased volumes and expansion of services within existing customers, and ramp up of new customer wins. Healthcare Solutions revenues was $233.6 million compared with $247.6 million in fiscal year 2016, down 5.6%.

We had growth in our existing payer business of $3.7 million but were offset by a decrease in demand from healthcare provider clients related to medical folding conversion of ICD9 to 10 that slowed down in mid fiscal year 2016.

And finally, our LPPS segment revenue was $91.6 million, down approximately 10% due to the sale of one small non-core asset in Q1 of 2017. Turning to Slide 19, for 2017, we had an operating loss of $102.1 million. This was driven by two main items. First, an impairment charge of $69.4 million we recorded in Q4 as I discussed a few slides back. And second, in fiscal year 2017 as part of the business combination we incurred one-time transaction costs totaling $99 million. For fiscal year 2017, our net loss of $242.4 million was also impacted by a one-time loss of $53 million related to the early extinguishment of the debt at the standalone entities as part of the business combination.

Now turn to Slide 20. Adjusted EBITDA for fiscal year 2017 was $245.2 million, representing an adjusted EBITDA margin of 16.8% compared with $248.5 million or 18.6% in fiscal year 2016. Further adjusted EBITDA was $346.8 million, a margin of 23.8% compared with $349.9 million or 26.2% margin. The year-over-year decrease in further adjusted EBITDA was primarily driven by higher ramp costs associated with new IPPS client contract, investments in the company's revenue growth initiatives, and higher public company costs offset by savings initiatives of which over $40 million were delivered in 2017. In addition, the dilution of the margins in 2017 compared to 2016 was primarily due to the acquisition of a lower margin business. The strategic vision of Exela is to transform the acquired business with BPA over the next 12 to 24 months.

Supp.App. 0342

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 345 of 1110 PageID 1966

Touching on synergies, we continue to be on track. The company continues to expand deployment of its Business Process Automation suite to deliver the plan execution of the $99.2 million of identified savings. This is detailed in the reconciliation to the further adjusted EBITDA which is in the appendix. Exela expects to have our further adjusted EBITDA converge to adjusted EBITDA as merger related savings continue to flow into our results. Approximately $40 million to $45 million of the savings will flow through in 2018 with the remaining during 2019.

Now turning to Slide 21. For the full year 2017, we had $304.4 million of further adjusted free cash flows, an increase of 2% year-over-year and representing an 88% conversion of further adjusted EBITDA. Our strong free cash flow profile is due to our low CapEx model. For the full year our 2017, CapEx totaled $42.4 million, 2.9% of our 2017 revenue.

Turning to the capital structure on Slide 22. At December 31st, our net leverage ratio was 3.88x. Total liquidity was a $141 million and total net debt was $1.345 billion. We had global cash and cash equivalents of $62 million of which $23 million is allocated to customers with the corresponding liability. We also have a $100 million revolving credit facility which was undrawn, but net of approximately $21 million in standby letters of credit, giving the company to borrow - the ability to borrow $79 million.

Also in the fourth quarter, we did enter into a standard three-year hedge on our first lien term loan given our view of the rising Treasury yields. We have swapped out the entire portion of our floating rate debt for a fixed 1.9275% rate floor which went into effect in January of 2018. We are also excited to mention that the Board approved a stock plan for employees for approximately8.3 million shares. It will be partially funded with the stock buyback program we announced this past fall. This will replace a portion of the cash variable compensation paid to employees. During the fourth quarter, we bought back 49,300 shares.

Supp.App. 0343

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 346 of 1110     PageID 1967

Before I close, I want to discuss our 2018 guidance. Please turn to Slide 23. Our 2018 guidance ranges are as follow. We expect revenue to be between $1.51 billion to $1.54 billion or 4% to 6% growth on a constant currency basis. We expect adjusted EBITDA in the range of $290 million to $310 million, translating into a growth of 18% to 26%, representing a 19% to 20% adjusted EBITDA margin for 2018. We expect further adjusted EBITDA in the range of $330 million to $355 million translating into 22% to 23% margin. In addition, for 2018 adjusted free cash flow conversion in the range of 87% to 89%. Our guidance includes delivering $40 million to $45 million in savings during 2018 with the remaining during 2019. During our second quarter call in August, we anticipate we will provide a mid-year update. Our longer-term guidance remains unchanged. Revenue growth on a constant currency basis in the range of 3% to 4% with further adjusted EBITDA margin guidance in the range of 22% to 23%.

Further adjusted free cash flow conversion is in the range of 87% to 89%. Before I open up the call to questions, I want to spend a minute on a recent tax reform and how it could impact our tax rate moving forward. The lower corporate tax rate will be a benefit for us. However, given the significant NOLs approximately $234 million that are not subject to 382 limitations, we will continue not to pay much in U.S. taxes until 2021 or 2022. Our effective tax rate will continue to beat the minimis as we still have to pay some foreign taxes less than $10 million a year for profitable international subsidiaries.

In closing, we had a solid 2017. We're executing against our plan that Ron discussed when we created Exela this year. We are continuing to make the right investments in our technology platforms, and elevating our position as an essential participant in our clients' value chain.

Thank you. With that, operator, I'd like to open up the call for questions.

**Question-and-Answer Session**

**Operator**

[Operator Instructions]

Supp.App. 0344

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 347 of 1110     PageID 1968

Our first question today comes from Joseph Foresi with Cantor Fitzgerald. Please go ahead.

**Mike Reid**

Hi, guys. This is Mike Reid on for Joe. We appreciate you taking the question. Could you tell us what's giving you the confidence in giving this year's guidance above your longer term financial objectives? And then if you could give us a little more detail on expectations by segments and maybe what kind of continued improvement you're looking for in healthcare and legal?

**Jim Reynolds**

Sure. This is Jim. Our revenue guidance is based on a bottoms-up analysis. We have over 90% visibility in revenue and have incorporated our total contracted revenue since January 1st. So we feel really good with our visibility. In addition, as Ron mentioned, in the fourth quarter we had a significant client win that is in the process of ramping up. That gives us further comfort in upping our long term or short term guidance range for 2018. We don't currently give no specific guidance on the growth within the segments but what I will say is as you know within our IPPS group, we're very strong in our financial services and banking customers. Those industries grow and expand into FinTech et cetera. We see that tailwind demand uplift also. So overall consistent what we've said historically we see the growth coming in our IPPS and healthcare. And then we expect our legal loss to be relatively - legal, loss and prevention services to be relatively flat.

**Mike Reid**

Okay, got it. I appreciate the color on that. And then on the margins, the adjusted EBITDA guidance suggests some pretty good expansion this year. And then it looks like in 4Q the operating income would have been around $18 million without the impairment charger, I guess close to 5%. Is this a reasonable expectation for operating margins in 2018? If there's no other potential unseen events such as impairment or could there be improvement there too?

**Jim Reynolds**

Supp.App. 0345

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 348 of 1110　　PageID 1969

So I think we don't give specific guidance on the operating level but we did have one-time charges that definitely impacted 2017. And we don't anticipate them being around at all in 2018. That the reason for the expansion as we discussed is we have implemented certain cost savings that will start to flow through as we projected in 2018 as a result of our work on the savings.

**Operator**

And the next question today comes from Arun Seshadri with Credit Suisse. Please go ahead

**Arun Seshadri**

Yes, Hi, Ron and Jim. Thanks for taking my questions. Just a couple of questions for me. First just wanted to understand for Q4 of 2017 just wanted to understand the sort of your revenue grew nicely on a year-over-year basis, but gross margin dollars did not. Just wanted to understand sort of the puts and takes for that and sort of maybe we can start there.

**Jim Reynolds**

So I think if you look at Q4, the margins were impacted by a few items that I discussed which were the public company costs, the ramp up of additional customers. We don't currently break out our gross margin. We view it as you really need to look at an operating level. If you look at some of our add backs in the quarter, our biz op were down significantly to approximately $11million during the fourth quarter. Also as part of Q4 we had previously some costs that could potentially be capitalized under accounting rules. We were not able to capitalize as much, so we took a little bit of it from that aspect. On go forward basis with the implementation of the incremental $40 million to $50 million of savings. We see our operating margins expanding.

**Arun Seshadri**

Got it. So basically some of those add backs are included - are in that cost of revenue which muddles which muddles the growth margin life.

Supp.App. 0346

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 349 of 1110     PageID 1970

**Jim Reynolds**

Okay, that is correct.

**Arun Seshadri**

Understood, and then as far as the guidance for the adjusted EBITDA guidance for 2018, is there any way you could give us the breakout of the various of the add backs within that. So in other words what would be the relevant sort of numbers or I guess the optimization and restructuring expenses? What are the consumption as well as transaction I mean I guess it shouldn't be much of transaction integration. And then finally just a sort of the breakout in terms of like the oversight management, new contract set up, any additional color you can add on those add backs.

**Jim Reynolds**

Sure. If you look at the Q4, obviously you saw our business add costs go down significantly from the third quarter. They were basically $11 million in Q4 versus close to $21 million in Q3. So as we look to 2018, we would expect less of those charges also for the year somewhere between $20 million to $25 million in biz op type charges. With respect to transaction fees, we had close to $97 million in Q3 related to the transaction. There were only $ 2 million that came through in Q4, 2017. So we don't anticipate large add backs from that area. And then with respect to the management fee, the fees those all went away as part of the combined merger. So those will be the minimis on a go-forward basis as there are no more management fees being paid by either company. So we see the adjustments decreasing significantly.

**Arun Seshadri**

Got it. So is there any way you could sort of break that down to what type of GAAP EBITDA, what kind of GAAP or cash EBITDA that would translate to, $290 million to $310 million.

**Jim Reynolds**

Supp.App. 0347

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 350 of 1110    PageID 1971

Yes. So at a high level we've given guidance of adjusted EBITDA between $290 million and $310 million with roughly $20 million to $25 million in biz op -

**Arun Seshadri**

So basically $20 million overall reductions so around 270-ish of GAAP EBITDA.

**Jim Reynolds**

That's correct.

**Arun Seshadri**

Got it. Understood. That's really good. And then finally I just wanted to ask in terms of the large contract I think Ron talked about is there any way you could give us the size and ramp and any sort of indication on margins relative to your current IPPS business. Thanks.

**Ron Cogburn**

No, thanks, Arun. We typically don't share that level of detail just discovering the highlights.

**Arun Seshadri**

Okay. Can I ask one more question then I must have missed what you said on HS growth for imply for 2018. I think you said IPPS expect strong growth, LLPS flattish. Could just repeat what you said on Henry Schein.

**Jim Reynolds**

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 351 of 1110    PageID 1972

Yes. So what I said is we see the growth, overall growth and expansion coming in IPPS and healthcare solutions and flat at legal, loss prevention services. We don't necessarily break it out but what I would tell you we feel very confident that health care will grow as the industry grows. If you remember we have some of the top payers and providers as part of our customer base. And as they expand and do track mergers and continue to grow their business, we will grow along with them.

**Operator**

Our next question today comes from Bryan Bergin with Cowen. Please go ahead.

**Bryan Bergin**

Hi, guys, thank you. I wanted to ask first just on US tax reform. Can you comment on US client spending behavior and have any notable changes that you can see here?

**Jim Reynolds**

Thanks for your question, Bryan. Currently, we have not seen any significant changes to the business from our US customers. I mean as you know we're well positioned in the US with over 11,000 employees here, about 90% of our revenue is in North America. And haven't seen really any significant impact thus far.

**Bryan Bergin**

Okay. Then can you talk about capital allocation priorities in 2018. And how should we think about M&A contributing to your long-term growth rates?

**Jim Reynolds**

Supp.App. 0349

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 352 of 1110    PageID 1973

So that's a good question. I think our capital allocation is consistent that we've laid out earlier in the year. And there's been no material changes from that. I think if you look at potential transactions we said that is a possibility down the road once we feel comfortable. There were a number of items we walk through. So at this point we have no change into that guidance.

**Bryan Bergin**

Okay and just last one here for me. Can you give us an update on your cross selling progress and particularly as you're aiming to drive more awareness of your offering across the client base?

**Ron Cogburn**

Yes, Bryan. This is Ron. That's a great question. And I think it has done a little bit, part of the strategy was to be able to take the message twofold. Number one, we picked up about 1,100 customer sites with the acquisition of Novitex, additional 400 customers are located there. And as we have begun to roll out our business process automation, we are helping to transform that existing business into more automated processes. Like the example I gave of the large property casualty insurer. We have been there for a number of years and we have literally hundreds of employees involved there. So to be able to add automation whether it's business process automation along with RPA or just pure business process automation. It creates a different conversation with those customers because now we're able to do things in a more automated way, a more efficient way with fewer errors. And it creates what I would call a more sticky relationship with those customers. So we have rolled out that thesis across all of those customers we picked up with that acquisition as well as our existing customer base. We're not waiting for renewals. We have an active-- we're actively engaged with all of our largest customers sharing with them the proposition of business process automation. What it can do for their business, and what we can do for them. So it's a very exciting time for us and we're seeing some early adoption. So very excited about it.

**Operator**

Our next question is from John Moore with HSBC. Please go ahead.

Supp.App. 0350

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 353 of 1110    PageID 1974

**John Moore**

Hi, guys. So in terms of contracts and signings are there any - is there anything new in terms of the types of contracts you're signing. And I guess on the big one even though in Q4 you don't want to describe too much about it, but is it in line with some of the other BPO transformation contracts you've done to date.

**Ron Cogburn**

So that's the right place to start, BPO transformation with business process automation. And I think I've talked a little bit about this in the in the fourth quarter we began to see, and what I would call an acceleration of the interest from our customers for enterprise conversations. So that's where we show the combination of the two businesses overlaid with the automation. And in doing that that allowed us to have that significant win along with others. And so as we look forward and I think I mentioned this in our - and my voice over, starting the first of this year we had about $105 billion of contracts won in 2017. A lot of which we saw in Q4 and it's a result of this strategy to be able to engage with a customer; to roll out a transformation from a BPO installed service and solutions to business process automation. And we're finding a lot of interest from our customers and as we focused on our largest customers, we saw a lot of interest from them early on.

**John Moore**

Great, and to date through the quarter the contracts that you got rolling early in the year, those transformations are all proceeding well in your model.

**Ron Cogburn**

These are long sales cycle. Remember, some of this takes up to six to nine months to do the assessment to understand and map all the processes and procedures within a customer. And then it may take another six months to implement. So we're optimistic. We have some pilots that are functioning and in place. Later this year I think we'll probably see some sort of movement with that.

Supp.App. 0351

**John Moore**

Okay. And then just in terms of the optimization and restructuring expenses, they did come down a lot in Q4 and you mentioned it's given a range of $20 million to $25 million for 2018. But as we think about it, is there a quarter in particular when they should drop off a lot or is it steady drop through 2018?

**Ron Cogburn**

We don't give any specific quarterly guidance on it. But we would expect it to tail off throughout 2018.

**Operator**

Our next question today is from Brad Elliott with RBC. Please go ahead.

**Brad Elliott**

Hey, guys. Just wanted to - just couple of things on - for the guidance you gave for 2018 then sort of the longer term guidance. Are there any thoughts on how the CapEx spent is going for those timeframes? Is it going to be consistent to what you've kind of said in the past at about three odd percent of top-line?

**Jim Reynolds**

Yes. We were maintaining the 3% CapEx as a percent of revenue.

**Brad Elliott**

Okay and then as far as on that on the shelf filing you did a few weeks ago, the universal shelf, can you kind of give us any sort of context on why that was done and sort of the timing that it was done now? And is it thought - should we think about that as more of the flexibility for - if you want to do and any sort of these tuck-in M&A is highlighted here or is that kind of be somewhat associated with the employee stocks program?

Supp.App. 0352

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 355 of 1110     PageID 1976

**Jim Reynolds**

So it's basically a housekeeping type item that we put in place to provide us with additional optionality for the future, flexibility really.

**Operator**

Our next question today comes from [Ana Portillo with Fortress]. Please go ahead.

**Unidentified Analyst**

Hey, guys. Thanks for the call. Can you talk a little more about the health care solution segment? I think you mentioned the revenue there year-over-year was a little softer due to less ICD10 conversions on the provider side. So can you tell us kind of what you're seeing in terms of areas of growth within that segment for 2018? That could maybe help to offset some of those tailwind that you've seen in the past couple of years. Thank you.

**Jim Reynolds**

Sure. I mean I think we're very well positioned within the healthcare, our healthcare segment. As I mentioned historically, there was a tail- off when they did the conversion back in late 2015 and 2016. There was a big boom in the payer of provider space for medical coding. We were able to fill that space and as the revenue came down from that it really caused majority of the decline in our healthcare solutions business. We're well-positioned, we're in the top four or five and insurance payers. And then we also have a large government entity in that space. So we feel we're well positioned typically in that space. The market is growing between 6% and 8%. We typically follow as our customers grow. So we feel good about our healthcare business.

**Operator**

This will conclude our question-and-answer session for the day. With that I'd like to turn the conference back over to Ron Cogburn for any closing remarks.

Supp.App. 0353

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 356 of 1110    PageID 1977

Ron Cogburn

Sure, thank you. And we really want to thank everybody for joining the call today. And we look forward to speaking again with you in the first quarter. And for those of you know us well, look for an invitation to come by and visit us at our Innovation Center in the city near you. Thanks a lot.

**Operator**

The conference has now concluded. Thank you very much for attending today's presentation. You may now disconnect your lines.

Supp.App. 0354

DEFM14A 1 a2232517zdefm14a.htm DEFM14A

Use these links to rapidly review the document
TABLE OF CONTENTS
INDEX TO CONSOLIDATED FINANCIAL STATEMENTS
TABLE OF CONTENTS
Table of Contents

Table of Contents

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

# SCHEDULE 14A

Proxy Statement Pursuant to Section 14(a) of
the Securities Exchange Act of 1934 (Amendment No. 3)

Filed by the Registrant ☒

Filed by a Party other than the Registrant ☐

Check the appropriate box:

☐   Preliminary Proxy Statement

☐   **Confidential, for Use of the Commission Only (as permitted by Rule 14a-6(e)(2))**

☒   Definitive Proxy Statement

☐   Definitive Additional Materials

☐   Soliciting Material under §240.14a-12

**QUINPARIO ACQUISITION CORP. 2**

(Name of Registrant as Specified In Its Charter)

(Name of Person(s) Filing Proxy Statement, if other than the Registrant)

Payment of Filing Fee (Check the appropriate box):

☐   No fee required.

☐   Fee computed on table below per Exchange Act Rules 14a-6(i)(1) and 0-11.
   (1)   Title of each class of securities to which transaction applies:

   (2)   Aggregate number of securities to which transaction applies:

   (3)   Per unit price or other underlying value of transaction computed pursuant to Exchange Act Rule 0-11 (set forth the amount on which the filing fee is calculated and state how it was determined):

   (4)   Proposed maximum aggregate value of transaction:

   (5)   Total fee paid:

☒   Fee paid previously with preliminary materials.

☐   Check box if any part of the fee is offset as provided by Exchange Act Rule 0-11(a)(2) and identify the filing for which the offsetting fee was paid previously. Identify the previous filing by registration statement number, or the Form or Schedule and the date of its filing.

   (1)   Amount Previously Paid:

   (2)   Form, Schedule or Registration Statement No.:

   (3)   Filing Party:

Supp.App. 0355

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 358 of 1110 PageID 1979

(4) Date Filed:

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 358 of 1110 PageID 1979

Supp.App. 0356

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 359 of 1110    PageID 1980

# QUINPARIO ACQUISITION CORP. 2

**12935 N. Forty Drive**
**Suite 201**
**St. Louis, Missouri 63141**

Dear Quinpario Acquisition Corp. 2 Stockholders:

You are cordially invited to attend a special meeting of the stockholders of Quinpario Acquisition Corp. 2 ("Quinpario" or the "Company") at 1:00 p.m., Eastern time, on July 11, 2017, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022 (the "Special Meeting").

At the Special Meeting, you will be asked to consider and vote upon a proposal (the "Business Combination Proposal") to approve a business combination agreement, as amended (the "Business Combination Agreement"), for the acquisition by us of Novitex Holdings, Inc. ("Novitex") and of SourceHOV Holdings, Inc. ("SourceHOV"). Pursuant to the Business Combination Agreement, (i) a wholly owned subsidiary of the Company will merge with and into Novitex, with Novitex surviving the merger, as a result of which Novitex's equity holders will be entitled to receive 30,600,000 shares of Quinpario Common Stock at the closing, and (ii) a wholly owned subsidiary of the Company will merge with and into SourceHOV, with SourceHOV surviving the merger, as a result of which a newly formed entity owned by SourceHOV's former equity holders will be entitled to receive 80,600,000 shares of Quinpario Common Stock at the closing. As further discussed in the accompanying proxy statement, in connection with the Business Combination, the cash held in our Trust Account, the anticipated proceeds from the sale of newly issued securities of Quinpario, which will consist of Quinpario Common Stock and Series A Convertible Preferred Stock, in a private placement and the proceeds of our debt financing will be used to refinance the existing debt of SourceHOV and Novitex, to pay fees and expenses related to the transaction and for general corporate purposes. We refer to the transactions contemplated by the Business Combination Agreement and the anticipated financing transactions collectively herein as the "Business Combination." A copy of the Business Combination Agreement is attached to the accompanying proxy statement as Annex A.

It is a condition to closing under the Business Combination Agreement that the sum of (a) the amount in our Trust Account at closing and (b) the proceeds of the PIPE Investment be at least $275.0 million. As of March 31, 2017, there was approximately $201.1 million remaining in our Trust Account, and we have secured committed funds in an amount equal to $275.5 million in the PIPE Investment (including in respect of those shares for which a waiver of redemption or conversion rights has been obtained). Pursuant to the terms of our certificate of incorporation, holders of Quinpario Common Stock will have the right to redeem their shares for their pro rata portion of the Trust Account in connection with the completion of the Business Combination. Each redemption of shares of Quinpario Common Stock by our public stockholders will decrease the amount in our Trust Account, requiring us to raise additional proceeds in the PIPE Investment to meet the $275.0 million minimum condition. In no event, however, will we consummate an initial business combination if such transaction would cause our net tangible assets to be less than $5,000,001. As a result of the commitments from the PIPE Investment (including in respect of those shares for which a waiver of redemption or conversion rights has been obtained), we expect to be able to meet the $275.0 million minimum condition.

Assuming that all Quinpario stockholders exercise their redemption rights, other than in respect of those shares for which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and we issue 21,694,015 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, which may be convertible into approximately 11,492,690 shares of Quinpario Common Stock, in the PIPE Investment and 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration, it is anticipated that, upon the closing of the Business Combination, a newly formed entity owned by the former equity holders of SourceHOV will own approximately 54.9%, Novitex Parent will own approximately 20.9%, current Quinpario stockholders (other than the Founders) will own approximately 2.8%, PIPE Investors will own approximately 14.2% and the Founders will own approximately 5.5% of the issued and outstanding shares of capital stock of the combined company.

Supp.App. 0357

Table of Contents

In addition to the Business Combination Proposal, you will also be asked to consider and vote upon proposals (a) to approve, for purposes of complying with applicable listing rules of The Nasdaq Stock Market ("Nasdaq"), the issuance of more than 20% of the issued and outstanding shares of Quinpario Common Stock pursuant to the Business Combination and the PIPE Investment (the "Nasdaq Proposal"), (b) to approve and adopt five separate amendments to the Company's current certificate of incorporation to (i) increase the Company's authorized capital stock (the "Authorized Capital Stock Proposal"), (ii) provide that certain provisions of the certificate of incorporation of the Company are subject to the Director Nomination Agreements, (iii) change the Company's corporate name from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc.," (iv) provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity (the "Corporate Opportunity Proposal") and (v) provide for certain additional changes our board of directors believes are necessary to adequately address the post-Business Combination needs of the Company (collectively, the "Certificate Proposals"), and (c) to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the Special Meeting, there are not sufficient votes to approve the Business Combination Proposal, the Nasdaq Proposal and the Certificate Proposals. A copy of our proposed second amended and restated certificate of incorporation, assuming the Certificate Proposals are adopted, is attached to the accompanying proxy statement as Annex B. Upon consummation of the Business Combination, we will also adopt the amended and restated bylaws, attached to the accompany proxy statement as Annex C.

Each of these proposals is more fully described in the accompanying proxy statement which each stockholder is encouraged to review carefully.

APPROVAL OF THE BUSINESS COMBINATION, THE NASDAQ PROPOSAL, THE AUTHORIZED CAPITAL STOCK PROPOSAL AND THE CORPORATE OPPORTUNITY PROPOSAL ARE CONDITIONS TO CLOSING THE BUSINESS COMBINATION. THE BUSINESS COMBINATION WILL NOT BE CONSUMMATED UNLESS WE RECEIVE THE APPROVAL OF OUR STOCKHOLDERS FOR THESE PROPOSALS (OTHER THAN THE CORPORATE OPPORTUNITY PROPOSAL, WHICH MAY BE WAIVED AS A CONDITION BY THE PARTIES TO THE BUSINESS COMBINATION AGREEMENT IF NOT APPROVED).

Our common stock, par value $0.0001 per share (the "Quinpario Common Stock"), units and warrants are currently listed on Nasdaq under the symbols "QPAC," "QPACU" and "QPACW," respectively. We have applied to continue the listing of our common stock on Nasdaq under the symbol "XELA" upon the closing of the Business Combination. Following the closing, we expect that our warrants will trade on Nasdaq under the symbol "XELAW"; our units may continue to trade on Nasdaq under the symbol "XELAU" or may be separated into the component securities and no longer trade as a separate security.

Pursuant to our current certificate of incorporation, in connection with seeking approval of the Business Combination Proposal, we are providing our public stockholders with the opportunity to redeem their shares of Quinpario Common Stock for cash equal to their pro rata share of the aggregate amount on deposit in the Trust Account which holds the remaining proceeds of our initial public offering (our "IPO") as of two business days prior to the consummation of the Business Combination (less taxes payable and any accrued interest that we may withdraw for working capital) upon the consummation of the Business Combination. For illustrative purposes, based on funds in the Trust Account of approximately $201.1 million on March 31, 2017, the estimated per share redemption price would have been approximately $10.00. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination Proposal**. Our current certificate of incorporation provides that a public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming his, her or its shares with respect to more than an aggregate of 15% of the public shares. Holders of our outstanding public warrants do not have redemption rights in connection with the Business Combination. The holders of shares of Quinpario Common Stock issued prior to our IPO (the "Founder Shares") have agreed to waive their redemption rights with respect to their

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 361 of 1110    PageID 1982

Founder Shares and any other shares they may hold in connection with the consummation of the Business Combination, and the Founder Shares will be excluded from the pro rata calculation used to determine the per-share redemption price. Currently, Quinpario Partners 2, LLC (our "Sponsor"), certain of its affiliates, a former partner of its affiliates, and our independent directors and officers own approximately 30.3% of the issued and outstanding shares of Quinpario Common Stock, consisting of all of the Founder Shares. Our Sponsor and other Founders have agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal.

We are providing this proxy statement and accompanying proxy card to our stockholders in connection with the solicitation of proxies to be voted at the Special Meeting and at any adjournments or postponements of the Special Meeting. **Whether or not you plan to attend the Special Meeting, we urge you to read this proxy statement carefully. Please pay particular attention to the section entitled "*Risk Factors.*"**

**After careful consideration, our board of directors has unanimously approved and adopted the Business Combination Agreement and unanimously recommends that our stockholders vote FOR all of the proposals presented to our stockholders. When you consider the board recommendation of these proposals, you should keep in mind that our directors and officers have interests in the Business Combination that may conflict with your interests as a stockholder. See the section entitled *"Proposal No. 1—Approval of the Business Combination—Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination."***

Approval of each of the Business Combination Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock that are present and entitled to vote at the Special Meeting. Approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock that are present and entitled to vote and actually cast a vote thereon at the Special Meeting. Approval of each of the Certificate Proposals requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock. Our board of directors has already approved the Business Combination, the Nasdaq Proposal, each of the Certificate Proposals and the other transactions contemplated by the foregoing.

**Your vote is very important. If you are a registered stockholder, please vote your shares as soon as possible using one of the following methods to ensure that your vote is counted, regardless of whether you expect to attend the Special Meeting in person: (1) call the toll-free number specified on the enclosed proxy card and follow the instructions when prompted, (2) access the Internet website specified on the enclosed proxy card and follow the instructions provided to you, or (3) complete, sign, date and return the enclosed proxy card in the postage-paid envelope provided. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. A failure to vote your shares is the equivalent of a vote "AGAINST" the Certificate Proposals but, assuming a quorum is otherwise validly established, will have no effect on the other proposals to be considered at the Special Meeting. Unless waived by the parties to the Business Combination Agreement, the closing of the Business Combination is conditioned upon the adoption and approval of the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal.**

If you sign, date and return your proxy card without indicating how you wish to vote, your proxy will be voted in favor of each of the proposals presented at the Special Meeting. If you fail to return your proxy card or fail to submit your proxy by telephone or over the internet, or fail to instruct your bank, broker or other nominee how to vote, and do not attend the Special Meeting in person, the effect will be that your shares will not be counted for purposes of determining whether a quorum is present at the Special Meeting and, if a quorum is present, will have the same effect as a vote against each of the Certificate Proposals but will have no effect on the other proposals. If you are a stockholder of record and you attend the Special Meeting and wish to vote in person, you may withdraw your proxy and vote in person.

Supp.App. 0359

TO EXERCISE YOUR REDEMPTION RIGHTS, YOU MUST (A) AFFIRMATIVELY VOTE EITHER FOR OR AGAINST THE BUSINESS COMBINATION PROPOSAL, (B) DEMAND THAT QUINPARIO REDEEM YOUR SHARES FOR A PRO RATA PORTION OF THE FUNDS HELD IN THE TRUST ACCOUNT NO LATER THAN THE CLOSE OF THE VOTE ON THE BUSINESS COMBINATION PROPOSAL AT THE SPECIAL MEETING, AND (C) TENDER YOUR SHARES TO QUINPARIO'S TRANSFER AGENT PRIOR TO THE VOTE AT SUCH MEETING. YOU MAY TENDER YOUR SHARES BY EITHER DELIVERING YOUR SHARE CERTIFICATE TO THE TRANSFER AGENT OR BY DELIVERING YOUR SHARES ELECTRONICALLY USING THE DEPOSITORY TRUST COMPANY'S DWAC (DEPOSIT WITHDRAWAL AT CUSTODIAN) SYSTEM. IF THE BUSINESS COMBINATION IS NOT COMPLETED, THEN THESE SHARES WILL NOT BE REDEEMED. IF YOU HOLD THE SHARES IN STREET NAME, YOU WILL NEED TO INSTRUCT THE ACCOUNT EXECUTIVE AT YOUR BANK OR BROKER TO WITHDRAW THE SHARES FROM YOUR ACCOUNT IN ORDER TO EXERCISE YOUR REDEMPTION RIGHTS.

On behalf of our board of directors, I thank you for your support and look forward to the successful completion of the Business Combination.

Sincerely,

June 26, 2017

D. John Srivisal
*President and Chief Executive Officer*

This proxy statement is dated June 26, 2017, and is first being mailed to stockholders of the Company on or about June 26, 2017.

NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES REGULATORY AGENCY HAS APPROVED OR DISAPPROVED THE TRANSACTIONS DESCRIBED IN THIS PROXY STATEMENT OR ANY OF THE SECURITIES TO BE ISSUED IN THE BUSINESS COMBINATION, PASSED UPON THE MERITS OR FAIRNESS OF THE BUSINESS COMBINATION OR RELATED TRANSACTIONS OR PASSED UPON THE ADEQUACY OR ACCURACY OF THE DISCLOSURE IN THIS PROXY STATEMENT. ANY REPRESENTATION TO THE CONTRARY CONSTITUTES A CRIMINAL OFFENSE.

Supp.App. 0360

# QUINPARIO ACQUISITION CORP. 2

**12935 N. Forty Drive**
**Suite 201**
**St. Louis, Missouri 63141**

---

**NOTICE OF SPECIAL MEETING**
**OF STOCKHOLDERS OF QUINPARIO ACQUISITION CORP. 2**

---

**To Be Held On July 11, 2017**

To the Stockholders of Quinpario Acquisition Corp. 2:

NOTICE IS HEREBY GIVEN that a special meeting of the stockholders (the "Special Meeting") of Quinpario Acquisition Corp. 2, a Delaware corporation ("Quinpario" or the "Company"), will be held at 1:00 p.m., Eastern time, on July 11, 2017, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022. You are cordially invited to attend the Special Meeting for the following purposes:

(1) *The Business Combination Proposal*—to consider and vote upon a proposal to approve and adopt the Business Combination Agreement, dated as of February 21, 2017, as it may be amended, by and among the Company, SourceHOV Merger Sub, Novitex Merger Sub, SourceHOV, Novitex and the Sellers (the "Business Combination Proposal");

(2) *The Nasdaq Proposal*—To consider and vote upon a proposal to approve, for purposes of complying with applicable Nasdaq listing rules, the issuance of more than 20% of the issued and outstanding shares of Quinpario Common Stock in connection with the Business Combination and the PIPE Investment (the "Nasdaq Proposal");

(3) *The Certificate Proposals*—to consider and vote upon five separate proposals to amend our current certificate of incorporation to (collectively, the "Certificate Proposals"):

- increase the Company's authorized capital stock (the "Authorized Capital Stock Proposal");

- provide that certain provisions of the certificate of incorporation of the Company are subject to the Director Nomination Agreements;

- change the Company's corporate name from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc.";

- provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity (the "Corporate Opportunity Proposal"); and

- provide for certain additional changes our board of directors believes are necessary to adequately address the post-Business Combination needs of the Company;

(4) *The Adjournment Proposal*—to consider and vote upon a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the Special Meeting, there are not sufficient votes to approve one or more proposals presented to stockholders for vote (the "Adjournment Proposal"); and

(5) to consider and transact such other procedural matters as may properly come before the Special Meeting or any adjournment or postponement thereof.

Only holders of record of Quinpario Common Stock at the close of business on May 31, 2017 are entitled to notice of the Special Meeting and to vote at the Special Meeting and any adjournments or postponements of the Special Meeting. A complete list of our stockholders of record entitled to vote at the Special Meeting will be available for ten days before the Special Meeting at our principal executive

---

Supp.App. 0361

Table of Contents

offices for inspection by stockholders during ordinary business hours for any purpose germane to the Special Meeting.

Pursuant to our amended and restated certificate of incorporation, we will provide our public stockholders with the opportunity to redeem their shares of Quinpario Common Stock for cash equal to their pro rata share of the aggregate amount on deposit in the Trust Account which holds the remaining proceeds of our IPO as of two business days prior to the consummation of the transactions contemplated by the Business Combination Agreement (less taxes payable and any accrued interest that we may withdraw for working capital) upon the closing of the transactions contemplated by the Business Combination Agreement. For illustrative purposes, based on funds in the Trust Account of approximately $201.1 million on March 31, 2017, the estimated per share redemption price would have been approximately $10.00. **Public stockholders may elect to redeem their shares even if they vote for the Business Combination Proposal**. Our current certificate of incorporation provides that a public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming his, her or its shares with respect to more than an aggregate of 15% of the public shares. The holders of the Founder Shares have agreed to waive their redemption rights with respect to their Founder Shares and any other shares they may hold in connection with the consummation of the Business Combination, and the Founder Shares will be excluded from the pro rata calculation used to determine the per-share redemption price. Currently, Quinpario Partners 2, LLC, which we refer to as our "Sponsor," certain of its affiliates and a former partner of its affiliates and our independent directors and officers own approximately 30.3% of the issued and outstanding shares of Quinpario Common Stock, consisting of all of the Founder Shares. Our Sponsor and other Founders have agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal.

The transactions contemplated by the Business Combination Agreement will be consummated only if a majority of the outstanding shares of Quinpario Common Stock present and entitled to vote at the Special Meeting are voted in favor of the Business Combination Proposal and the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal are approved.

Approval of each of the Business Combination Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock that are present and entitled to vote at the Special Meeting. Approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock that are present and entitled to vote and actually cast a vote thereon at the Special Meeting. Approval of each of the Certificate Proposals requires the affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock.

It is a condition to closing under the Business Combination Agreement that the sum of (a) the amount in our Trust Account at closing and (b) the proceeds of the PIPE Investment be at least $275.0 million. As of March 31, 2017, there was approximately $201.1 million remaining in our Trust Account, and we have secured committed funds in an amount equal to $275.5 million in the PIPE Investment (including in respect of those shares for which a waiver of redemption or conversion rights has been obtained). Pursuant to the terms of our certificate of incorporation, holders of Quinpario Common Stock will have the right to redeem their shares for their pro rata portion of the Trust Account in connection with the completion of the Business Combination. Each redemption of shares of Quinpario Common Stock by our public stockholders will decrease the amount in our Trust Account, requiring us to raise additional proceeds in the PIPE Investment to meet the $275.0 million minimum condition. In no event, however, will we consummate an initial business combination if such transaction would cause our net tangible assets to be less than $5,000,001. As a result of the commitments from the PIPE Investment (including in respect of those shares for which a waiver of redemption or conversion rights has been obtained), we expect to be able to meet the $275.0 million minimum condition.

Your attention is directed to the proxy statement accompanying this notice (including the annexes thereto) for a more complete description of the proposed business combination and related transactions

Supp.App. 0362

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 365 of 1110    PageID 1986

and each of our proposals. We encourage you to read this proxy statement carefully. If you have any questions or need assistance voting your shares, please call us at (314) 548-6200.

By Order of the Board of Directors,

June 26, 2017

D. John Srivisal
*President and Chief Executive Officer*

Supp.App. 0363

TABLE OF CONTENTS

| | Page |
|---|---|
| SUMMARY TERM SHEET | 1 |
| FREQUENTLY USED TERMS | 6 |
| TRADEMARKS, TRADE NAMES AND SERVICE MARKS | 9 |
| QUESTIONS AND ANSWERS ABOUT THE PROPOSALS FOR STOCKHOLDERS | 10 |
| SUMMARY OF THE PROXY STATEMENT | 22 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF QUINPARIO | 43 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF SOURCEHOV | 44 |
| SELECTED HISTORICAL FINANCIAL INFORMATION OF NOVITEX | 47 |
| SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 50 |
| COMPARATIVE SHARE INFORMATION | 53 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 55 |
| RISK FACTORS | 57 |
| UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION | 100 |
| SPECIAL MEETING OF QUINPARIO STOCKHOLDERS | 115 |
| PROPOSAL NO. 1—APPROVAL OF THE BUSINESS COMBINATION | 121 |
| Vote Required for Approval | 121 |
| The Business Combination Agreement | 121 |
| The Registration Rights Agreement | 144 |
| The Director Nomination Agreements | 145 |
| The Forfeiture Agreement | 146 |
| Background of the Business Combination | 146 |
| Quinpario's Board of Directors' Reasons for the Approval of the Business Combination | 155 |
| Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination | 163 |
| PIPE Investment | 164 |
| Fees and Other Consideration | 165 |
| New SourceHOV Financing Summary | 165 |
| Debt Financing | 166 |
| Board of Directors of Quinpario Following the Business Combination | 168 |
| The Certificate Proposals; Bylaws | 168 |
| Name | 168 |
| Redemption Rights | 168 |
| Potential Purchases of Public Shares | 169 |
| Appraisal Rights | 169 |
| Accounting Treatment | 169 |
| Material U.S. Federal Income Tax Considerations for Stockholders Exercising Redemption Rights | 170 |
| Regulatory Matters | 175 |
| Recommendation of the Board of Directors | 175 |
| PROPOSAL NO. 2—APPROVAL OF THE ISSUANCE OF MORE THAN 20% OF THE ISSUED AND OUTSTANDING SHARES OF QUINPARIO COMMON STOCK PURSUANT TO THE BUSINESS COMBINATION AND THE PIPE INVESTMENT | 176 |
| Why the Company Needs Stockholder Approval | 176 |
| Effect of Proposal on Current Stockholders | 176 |
| Vote Required for Approval | 177 |
| Recommendation of the Board of Directors | 177 |
| PROPOSAL NO. 3—APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION TO AUTHORIZE ADDITIONAL SHARES OF CAPITAL STOCK | 178 |

i

Supp.App. 0364

|  | Page |
|---|---|
| Reasons for the Amendments | 178 |
| Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation | 178 |
| Vote Required for Approval | 179 |
| Recommendation of the Board of Directors | 179 |
| PROPOSAL NO. 4—APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN PROVISIONS OF THE CERTIFICATE OF INCORPORATION ARE SUBJECT TO THE DIRECTOR NOMINATION AGREEMENTS | 180 |
| Reasons for the Amendments | 181 |
| Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation | 181 |
| Vote Required for Approval | 182 |
| Recommendation of the Board of Directors | 182 |
| PROPOSAL NO. 5—APPROVAL OF THE AMENDMENT TO THE CURRENT CERTIFICATE OF INCORPORATION TO CHANGE THE NAME OF THE COMPANY | 183 |
| Reasons for the Amendments | 183 |
| Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation | 183 |
| Vote Required for Approval | 183 |
| Recommendation of the Board of Directors | 183 |
| PROPOSAL NO. 6—APPROVAL OF AMENDMENTS TO THE CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN TRANSACTIONS ARE NOT 'CORPORATE OPPORTUNITIES' | 184 |
| Reasons for the Amendments | 184 |
| Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation | 184 |
| Vote Required for Approval | 187 |
| Recommendation of the Board of Directors | 187 |
| PROPOSAL NO. 7—APPROVAL OF ADDITIONAL AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION IN CONNECTION WITH THE BUSINESS COMBINATION | 188 |
| Reasons for the Amendments | 188 |
| Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation | 189 |
| Vote Required for Approval | 198 |
| Recommendation of the Board of Directors | 198 |
| PROPOSAL NO. 8—THE ADJOURNMENT PROPOSAL | 199 |
| Consequences if the Adjournment Proposal is Not Approved | 199 |
| Required Vote | 199 |
| Recommendation of the Board of Directors | 199 |
| INFORMATION ABOUT QUINPARIO | 200 |
| QUINPARIO MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 215 |
| INFORMATION ABOUT SOURCEHOV | 219 |
| SOURCEHOV MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 246 |
| INFORMATION ABOUT NOVITEX | 271 |
| NOVITEX MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS | 288 |
| MANAGEMENT AFTER THE BUSINESS COMBINATION | 307 |
| DESCRIPTION OF SECURITIES | 312 |
| BENEFICIAL OWNERSHIP OF SECURITIES | 325 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS | 329 |
| PRICE RANGE OF SECURITIES AND DIVIDENDS | 333 |

Supp.App. 0365

| | Page |
|---|---|
| INDEPENDENT PUBLIC ACCOUNTING FIRM | 334 |
| APPRAISAL RIGHTS | 334 |
| DELIVERY OF DOCUMENTS TO STOCKHOLDERS | 334 |
| TRANSFER AGENT AND REGISTRAR | 334 |
| WHERE YOU CAN FIND MORE INFORMATION | 335 |
| INDEX TO CONSOLIDATED FINANCIAL STATEMENTS | F-1 |
| ANNEX A—BUSINESS COMBINATION AGREEMENT | A-1 |
| ANNEX B—FORM OF SECOND AMENDED AND RESTATED CERTIFICATE OF INCORPORATION OF EXELA TECHNOLOGIES, INC. | B-1 |
| ANNEX C—FORM OF AMENDED AND RESTATED BYLAWS OF EXELA TECHNOLOGIES, INC. | C-1 |
| ANNEX D—FORM OF AMENDED AND RESTATED DIRECTOR NOMINATION AGREEMENT | D-1 |
| ANNEX E—FORM OF AMENDED AND RESTATED REGISTRATION RIGHTS AGREEMENT | E-1 |

iii

Supp.App. 0366

Table of Contents

## SUMMARY TERM SHEET

This Summary Term Sheet, together with the sections entitled "*Questions and Answers About the Proposals for Stockholders*" and "*Summary of the Proxy Statement*," summarize certain information contained in this proxy statement, but do not contain all of the information that is important to you. You should read carefully this entire proxy statement, including the attached annexes, for a more complete understanding of the matters to be considered at the Special Meeting. In addition, for definitions of terms commonly used throughout this proxy statement, including this Summary Term Sheet, see the section entitled "*Frequently Used Terms*."

- Quinpario is a blank check company formed on July 15, 2014 for the purpose of entering into a merger, stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. There currently are 28,848,601 shares of Quinpario Common Stock issued and outstanding, consisting of 20,098,601 shares originally sold as part of units in Quinpario's IPO (excluding 14,901,399 shares previously redeemed by public stockholders) and 8,750,000 Founder Shares that were issued to the Sponsor prior to Quinpario's IPO (which excludes 1,312,500 shares that were forfeited by the Sponsor after Quinpario's IPO), of which 495,090 shares were subsequently transferred to Quinpario's independent directors and to a former partner of Quinpario Partners. Certain of the Founder Shares are subject to a Forfeiture Agreement described in more detail below. In addition, there currently are 53,000,000 warrants of Quinpario outstanding, consisting of 35,000,000 public warrants originally sold as part of units in Quinpario's IPO and 18,000,000 Private Placement Warrants sold to the Sponsor in a private placement simultaneously with the consummation of Quinpario's IPO. Each warrant entitles its holder to purchase one-half of one share of Quinpario Common Stock at an exercise price of $5.75 per half share. The public warrants will become exercisable 30 days after the completion of Quinpario's initial business combination and expire at 5:00 p.m., New York time, five years after the completion of Quinpario's initial business combination or earlier upon redemption or liquidation. For the purposes of the Company's amended and restated certificate of incorporation and the warrant agreement governing the Company's outstanding warrants, the Business Combination constitutes a "business combination." Once the warrants become exercisable, Quinpario may redeem the outstanding public warrants at a price of $0.01 per warrant, if the last sale price of Quinpario Common Stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading day period ending on the third business day before Quinpario sends the notice of redemption to the public warrant holders. The Private Placement Warrants, however, are non-redeemable so long as they are held by the Sponsor or its permitted transferees. For more information about Quinpario and its securities, see the sections entitled "*Information About Quinpario*," "*Quinpario Management's Discussion and Analysis of Financial Condition and Results of Operations*" and "*Description of Securities*."

- SourceHOV is a leading provider of platform-based enterprise information management ("EIM") and transaction processing solutions ("TPS") primarily for the healthcare, banking and financial services, commercial, public sector and legal industries. SourceHOV's business model uses a strategic mix of technology and services to provide industry solutions and proprietary technology which incorporate data aggregation, exception handling, decisioning, and business process automation. For more information about SourceHOV, see the sections entitled "*Information About SourceHOV*" and "*SourceHOV Management's Discussion and Analysis of Financial Condition and Results of Operations*."

- Novitex is a North American provider of document management and digital business process services. Novitex enables businesses to streamline their internal and external communications and workflows by offering an integrated suite of services organized across two categories: Digital Services and Document Logistics. For more information about Novitex, see the sections entitled

1

---

Supp.App. 0367

"*Information About Novitex*" and "*Novitex Management's Discussion and Analysis of Financial Condition and Results of Operations.*"

- Subject to the terms of the Business Combination Agreement, the Business Combination will be funded through a combination of $1.35 billion in new debt financing, cash from Quinpario, rollover equity and cash on hand at closing, including from the proposed PIPE Investment. Equity holders of SourceHOV and Novitex are rolling over 100% of their current equity. As a result of the transaction, the former equity holders of SourceHOV and Novitex will collectively hold, directly or indirectly, a majority of the equity of the combined company. For more information about the Business Combination Agreement, please see the section entitled "*Proposal No. 1—Approval of the Business Combination—The Business Combination Agreement*."

- In addition, in connection with the execution of the Business Combination Agreement, certain of the Founders have agreed pursuant to an agreement with the Sellers (the "Forfeiture Agreement") to forfeit 716,429 shares of Quinpario Common Stock and 18,000,000 Private Placement Warrants issued to such Founders at the time of the IPO.

- It is anticipated that, upon completion of the Business Combination: (i) a newly formed entity owned by SourceHOV's former equity holders will own approximately 54.9% of the combined company; (ii) Novitex Parent will own approximately 20.9% of the combined company; (iii) the Company's public stockholders (other than the PIPE Investors) will retain an ownership interest of approximately 2.8% in the combined company; (iv) the PIPE Investors will own approximately 14.2% of the combined company (such that public stockholders, including PIPE Investors, will own approximately 17.1% of the combined company); and (v) the Founders will own approximately 5.5% of the combined company, after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement. These levels of ownership interest (a) assume that all shares are elected to be redeemed, other than those shares in respect of which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and that we have sold 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock and issued 835,626 shares in respect of waivers of redemptions or conversion rights, for approximately $242.1 million of gross proceeds (or savings from settled fees to advisors), in the PIPE Investment, and that we have issued 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration; and (b) do not take into account public warrants to purchase Quinpario Common Stock that will remain outstanding immediately following the Business Combination or the issuance of any shares upon completion of the Business Combination. Under the Forfeiture Agreement, which was amended and restated on June 15, 2017, the Founders have agreed to cancel the aggregate 18,000,000 Private Placement Warrants and certain Founder Shares held by them upon consummation of the Business Combination. However, of the Founder Shares held by the Sponsor, the Sponsor may retain 8,033,571 of such Founder Shares. In addition, three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the combined company will be different. For more information, please see the sections entitled "*Summary of the Proxy Statement—Impact of the Business Combination on the Company's Public Float*" and "*Unaudited Pro Forma Condensed Combined Financial Information.*"

- Quinpario's management and board of directors considered various factors in determining whether to approve the Business Combination Agreement and the transactions contemplated thereby, including the Business Combination, including the strong financial profiles and management teams of SourceHOV and Novitex, the attractive entry valuation of the Business Combination and the continued roles of Apollo and HGM Group following the closing. For more information about the decision-making process, see the section entitled "*Proposal No. 1—*

2

Supp.App. 0368

*Approval of the Business Combination—Quinpario's Board of Directors' Reasons for the Approval of the Business Combination*."

- Pursuant to Quinpario's current certificate of incorporation, in connection with the Business Combination, holders of Quinpario public shares may elect to have their Quinpario Common Stock redeemed for cash at the applicable redemption price per share calculated in accordance with the current certificate of incorporation. As of March 31, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises its redemption rights, then such holder will be exchanging its shares of the Quinpario Common Stock for cash and will no longer own shares of the combined company and will not participate in the future growth of the combined company, if any. Such a holder will be entitled to receive cash for its public shares only if it properly demands redemption and delivers its shares (either physically or electronically) to our transfer agent prior to the Special Meeting. Please see the section entitled "*Special Meeting of Quinpario Stockholders—Redemption Rights.*"

- In addition to voting on the proposal to adopt the Business Combination Agreement and approve the transactions contemplated thereunder, including the Business Combination, at the Special Meeting, the stockholders of the Company will be asked to vote on:

  - a proposal to approve, for purposes of complying with applicable Nasdaq Listing Rules, the issuance of more than 20% of the issued and outstanding shares of Quinpario Common Stock in connection with the Business Combination and the PIPE Investment, which we refer to as the "Nasdaq Proposal" (Proposal No. 2);

  - five separate proposals to approve and adopt amendments to the Company's current certificate of incorporation:

    - authorize an additional 1,465,000,000 shares of Quinpario Common Stock and an additional 19,000,000 shares of preferred stock, which we refer to as the "Authorized Capital Stock Proposal" (Proposal No. 3);

    - provide that certain provisions of the certificate of incorporation of the Company are subject to the Director Nomination Agreements (Proposal No. 4);

    - change the Company's corporate name from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc." (Proposal No. 5);

    - provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity, which we refer to as the "Corporate Opportunity Proposal" (Proposal No. 6);

    - provide for certain additional changes immediately after giving effect to the consummation of the Business Combination, including eliminating certain provisions specific to our status as a blank check company, providing that our directors are not personally liable to the Company or our stockholders for monetary damages for a breach of fiduciary duty, and certain indemnification provisions our board of directors believes are necessary to adequately address the needs of the combined company, subject to approval by our stockholders at the Special Meeting (Proposal No. 7); and

  - a proposal to adjourn the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that there are insufficient votes for, or otherwise in connection with, the approval of the Business Combination Proposal, the Nasdaq Proposal or the Certificate Proposals (Proposal No. 8).

3

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 372 of 1110    PageID 1993

Please see the sections entitled "*Proposal No. 1—Approval of the Business Combination,*" "*Proposal No. 2—Approval of the Issuance of More than 20% of the Issued and Outstanding Shares of Quinpario Common Stock Pursuant to the Business Combination and the PIPE Investment,*" "*Proposal No. 3—Approval of the Amendments to Current Certificate of Incorporation to Authorize Additional Shares of Capital Stock*," "*Proposal No. 4—Approval of the Amendments to Current Certificate of Incorporation to Provide that Certain Provisions of the Certificate of Incorporation are Subject to the Director Nomination Agreements*," "*Proposal No. 5—Approval of the Amendment to the Current Certificate of Incorporation to Change the Name of the Company*," "*Proposal No. 6—Approval of Amendments to the Current Certificate of Incorporation to Provide that Certain Transactions are not 'Corporate Opportunities*'," "*Proposal No. 7—Approval of Additional Amendments to Current Certificate of Incorporation in Connection with the Business Combination*" and "*Proposal No. 8—The Adjournment Proposal.*" The Business Combination Proposal is conditioned on the approval of the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal at the Special Meeting. Each of the Nasdaq Proposal and the Certificate Proposals is conditioned upon the approval of the Business Combination Proposal at the Special Meeting. Each of the proposals other than the Business Combination Proposal, the Nasdaq Proposal and the Certificate Proposals are not conditioned on the approval of any other proposal set forth in this proxy statement.

- Upon the closing of the Business Combination, we anticipate that our current directors will resign, that we will increase the size of our board of directors from seven to eight directors, and that the individuals set forth in the section "*Management After the Business Combination*" will be appointed to the board of directors and as executive officers of the Company, as applicable. An information statement has been prepared, filed with the SEC and transmitted to Quinpario stockholders with this proxy statement pursuant to Section 14(f) of the Exchange Act and Rule 14f-1 in connection with the change in composition of the board of directors of the combined company.

- Upon the closing of the Business Combination, it is anticipated that the combined company will adopt the amended and restated bylaws attached to this proxy statement as Annex C.

- Unless waived by the parties to the Business Combination Agreement, and subject to applicable law, the closing of the Business Combination is subject to a number of conditions set forth in the Business Combination Agreement including, among others, termination of the waiting period under the HSR Act and receipt of certain stockholder approvals contemplated by this proxy statement. For more information about the closing conditions to the Business Combination, please see the section entitled "*Proposal No. 1—Approval of the Business Combination—The Business Combination Agreement—Conditions to Closing of the Business Combination.*"

- The proposed Business Combination involves numerous risks. For more information about these risks, please see the section entitled "*Risk Factors.*"

- In considering the recommendation of our board of directors to vote for the proposals presented at the Special Meeting, including the Business Combination Proposal, you should be aware that, aside from their interests as stockholders, the Sponsor and certain members of our board of directors and officers have interests in the Business Combination that are different from, or in addition to, the interests of our stockholders generally. Our board of directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination and transaction agreements and in recommending to our stockholders that they vote in favor of the proposals presented at the Special Meeting, including the Business Combination Proposal. Stockholders should take these interests into account in deciding whether

4

Supp.App. 0370

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 373 of 1110    PageID 1994

to approve the proposals presented at the Special Meeting, including the Business Combination Proposal. These interests include, among other things:

- the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that if unrestricted and freely tradable these shares would be valued at approximately $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, we believe such shares have less value;

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

- the continued right of the Sponsor to hold Quinpario Common Stock;

- the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, have agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that the Sponsor and our officers and directors will lose their entire investment in us and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

- that, at the closing of the Business Combination we will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

5

Supp.App. 0371

Table of Contents

**FREQUENTLY USED TERMS**

"*Apollo*" means Apollo Global Management, LLC.

"*Authorized Capital Stock Proposal*" means the proposal to amend the current certificate of incorporation to authorize an additional 1,465,000,000 shares of Quinpario Common Stock and an additional 19,000,000 shares of preferred stock.

"*Business Combination*" means the transactions contemplated by the Business Combination Agreement, including (a) the mergers of (i) SourceHOV Merger Sub with and into SourceHOV, with SourceHOV surviving the merger; and (ii) Novitex Merger Sub with and into Novitex, with Novitex surviving the merger, and (b) the anticipated financing transactions in connection therewith.

"*Business Combination Agreement*" means that certain Business Combination Agreement, dated as of February 21, 2017, as amended, by and among the Company, Novitex Merger Sub, SourceHOV Merger Sub, SourceHOV, Novitex, and the Sellers.

"*Certificate Proposals*" means the proposal to approve and adopt five separate amendments to the current certificate of incorporation.

"*Code*" means the Internal Revenue Code of 1986, as amended.

"*Company*" or "*Quinpario*" means Quinpario Acquisition Corp. 2, a Delaware corporation.

"*Corporate Opportunity Proposal*" means the proposal to amend the current certificate of incorporation to provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity.

"*current certificate of incorporation*" means our amended and restated certificate of incorporation, dated January 15, 2015, as amended.

"*Debt Financing*" means the debt financing to be arranged by the Company in connection with the Business Combination.

"*DGCL*" means the General Corporation Law of the State of Delaware.

"*Exchange Act*" means the Securities Exchange Act of 1934, as amended.

"*Founder Shares*" means the aggregate 8,750,000 shares of Quinpario Common Stock that are currently owned by the Founders.

"*Founders*" means the Sponsor, Quinpario's independent directors and a former partner of Quinpario Partners.

"*GAAP*" means generally accepted accounting principles in the United States.

"*HGM Group*" means, collectively, HOVS LLC and HandsOn Fund 4 I, LLC and certain of their respective affiliates.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*IPO*" means the initial public offering of the Company, which closed on January 22, 2015.

"*Modification Agreement*" means that certain Consent, Waiver and Amendment to the Business Combination Agreement, dated as of June 15, 2017, by and among the Company, Novitex Merger Sub, SourceHOV Merger Sub, SourceHOV, Novitex, the Sellers and New SourceHOV LLC.

"*Morrow*" means Morrow Sodali, proxy solicitor to the Company.

"*Nasdaq*" means The Nasdaq Stock Market.

"*New SourceHOV Financing*" means the financing contemplated by those certain commitment letters as described under "New SourceHOV Financing Summary" under "*Proposal No. 1—Approval of the Business Combination*," which, depending on the number of shares of Quinpario Common Stock

6

Supp.App. 0372

redeemed prior to the Business Combination, may be drawn in an amount up to $57.5 million, which funds New SourceHOV LLC will use to participate in the PIPE Investment.

"*New SourceHOV LLC*" means Ex-Sigma LLC, a newly formed entity controlled by the HGM Group and owned by the SourceHOV equity holders.

"*Novitex*" means Novitex Holdings, Inc., a Delaware corporation, and its subsidiaries.

"*Novitex Merger Sub*" means Quinpario Merger Sub II, Inc., a Delaware corporation.

"*Novitex Parent*" means Novitex Parent, L.P., a Delaware limited partnership, which is owned and controlled by certain funds managed by affiliates of Apollo.

"*PIPE Investment*" means the sale or issuance of shares of newly issued securities of Quinpario, which will consist of Quinpario Common Stock and Series A Convertible Preferred Stock, in a private placement in connection with the Business Combination, which private placement includes (a) shares of Quinpario Common Stock that will be issued to certain investors and advisors that have agreed pursuant to commitment agreements to acquire and/or hold an aggregate of 3,342,500 shares of Quinpario Common Stock, not to exercise redemption or conversion rights with respect to such shares of Quinpario Common Stock prior to the closing of the Business Combination and not to resell, transfer, pledge or otherwise dispose of the Quinpario Common Stock prior to the closing of the Business Combination, in exchange for which such investors will receive 0.25 additional shares for each such purchased share they hold at the closing of the Business Combination (if such an investor is unable to acquire any one of the committed number of shares in the open market, such investor will subscribe for and purchase (or in the case of one advisor, be issued in respect of fees) 1.25 shares of Quinpario Common Stock for $8 per share), (b) shares of Quinpario Common Stock that will be issued in a private placement to certain advisors as compensation for their services either through a direct issuance of shares or through an advancement of such fees to purchase shares of Quinpario Common Stock and (c) shares of Quinpario Common Stock and Series A Convertible Preferred Stock that will be sold to investors in a private placement pursuant to subscription agreements.

"*PIPE Investors*" means one or more purchasers of securities of Quinpario, which may consist of Quinpario Common Stock or Series A Convertible Preferred Stock, in the PIPE Investment. For purposes of reporting the ownership of the combined company upon completion of the Business Combination, the "PIPE Investors" will (i) include each of New SourceHOV LLC and Apollo Novitex Holdings, L.P. and other current equity holders of SourceHOV to the extent of their respective participation in the PIPE Investment (and such PIPE Investment amounts will not be included in the respective ownership percentages of the former equityholders of Novitex and SourceHOV other than for purposes of the last 5 lines of the table on page 102 and the table on page 325 to the extent applicable therein) and (ii) not include holders of shares that have agreed pursuant to commitment agreements to acquire and/or hold an aggregate of 3,342,500 shares of Quinpario Common Stock to the extent of their ownership of such shares and shares issued in respect of such shares.

"*Preliminary Merger*" means that certain merger pursuant to which a new merger subsidiary will be merged with and into New SourceHOV LLC with the equity holders of SourceHOV receiving membership interests in New SourceHOV LLC.

"*Private Placement Warrants*" means the warrants held by the Sponsor that were issued to the Sponsor prior to our IPO, each of which is exercisable for one-half of one share of Quinpario Common Stock, in accordance with its terms.

"*public shares*" means shares of Quinpario Common Stock included in the units issued in the Company's IPO.

"*public warrants*" means the warrants included in the units issued in the Company's IPO, each of which is exercisable for one-half of one share of Quinpario Common Stock, in accordance with its terms.

7

Supp.App. 0373

"*Quinpario Common Stock*" means the common stock of the Company, par value $0.0001 per share.

"*Quinpario Partners*" means Quinpario Partners, LLC, the managing member of the Sponsor.

"*Restricted Stockholders*" means the Founders, the Sellers and New SourceHOV LLC.

"*SEC*" means the United States Securities and Exchange Commission.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Sellers*" means Novitex Parent and the HGM Group.

"*Series A Convertible Preferred Stock*" means the Series A Perpetual Convertible Preferred Stock of the Company, par value $0.0001, 9,400,000 shares of which are expected to be issued to certain investors in the PIPE Investment.

"*SourceHOV Merger Sub*" means Quinpario Merger Sub I, Inc., a Delaware corporation.

"*Special Meeting*" means the special meeting of the stockholders of the Company that is the subject of this proxy statement.

"*Sponsor*" means Quinpario Partners 2, LLC.

"*SourceHOV*" means SourceHOV Holdings, Inc., a Delaware corporation, and its subsidiaries.

"*Transfer Agent*" means Continental Stock Transfer & Trust Company.

"*Trust Account*" means the trust account of the Company that holds the proceeds from the Company's IPO.

8

Supp.App. 0374

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 377 of 1110    PageID 1998

## TRADEMARKS, TRADE NAMES AND SERVICE MARKS

This proxy statement includes certain trademarks, trade names and service marks which are protected under applicable intellectual property laws and are the property of SourceHOV or Novitex, as applicable. This proxy statement also contains trademarks, trade names and service marks of other companies, which are the property of their respective owners. Solely for convenience, trademarks and trade names referred to in this proxy statement may appear without the "®," "TM" or "SM" symbols, but such references are not intended to indicate, in any way, that SourceHOV or Novitex, as applicable, will not assert, to the fullest extent under applicable law, its rights or the right of the applicable licensor to these trademarks, trade names and service marks. The use or display of other parties' trademarks, trade names or service marks is not intended to imply, and such use or display should not be construed to imply, a relationship with, or endorsement or sponsorship of Quinpario, SourceHOV or Novitex by, these other parties.

9

Supp.App. 0375

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 378 of 1110    PageID 1999

**QUESTIONS AND ANSWERS ABOUT THE PROPOSALS**
**FOR STOCKHOLDERS**

*The following questions and answers briefly address some commonly asked questions about the proposals to be presented at the Special Meeting, including with respect to the proposed Business Combination. The following questions and answers may not include all the information that is important to Quinpario stockholders. Quinpario urges stockholders to read carefully this entire proxy statement, including the annexes and the other documents referred to herein. Unless otherwise specified, all share calculations assume that all Quinpario stockholders exercise their redemption rights (other than in respect of those shares for which a waiver of redemption or conversion rights has been obtained, which account for approximately $33.4 million) and that Quinpario sells 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock and issues 835,626 shares of Quinpario Common Stock in respect of waivers of redemptions or conversion rights in connection with the PIPE Investment, and issues 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration.*

**Q:**    **Why am I receiving this proxy statement?**

**A:**    Quinpario stockholders are being asked to consider and vote upon a proposal to approve and adopt the Business Combination Agreement, among other proposals. Quinpario has entered into the Business Combination Agreement that provides that (i) a wholly owned subsidiary of Quinpario will merge with and into SourceHOV, with SourceHOV surviving the merger, as a result of which New SourceHOV LLC, a newly formed entity controlled by the HGM Group and owned by SourceHOV's former equity holders will be entitled to receive 80,600,000 shares of Quinpario Common Stock at the closing, and (ii) a wholly owned subsidiary of Quinpario will merge with and into Novitex, with Novitex surviving the merger, as a result of which Novitex's equity holders will be entitled to receive 30,600,000 shares of Quinpario Common Stock at the closing. In connection with the Business Combination, the cash held in the Trust Account (after giving effect to any redemptions), the anticipated proceeds from the PIPE Investment and the proceeds of the Debt Financing will be used to refinance the existing debt of SourceHOV and Novitex, to pay fees and expenses related to the transaction and for general corporate purposes. The transactions contemplated by the Business Combination Agreement and the anticipated financing transactions collectively are referred to herein as the "Business Combination." A copy of the Business Combination Agreement is attached to the accompanying proxy statement as Annex A.

Quinpario Common Stock, units and warrants are currently listed on Nasdaq under the symbols "QPAC," "QPACU" and "QPACW," respectively. Quinpario has applied to continue the listing of Quinpario Common Stock on Nasdaq under the symbol "XELA" upon the closing of the Business Combination. Following the closing, it is expected that Quinpario warrants will trade on Nasdaq under the symbol "XELAW"; Quinpario units may continue to trade on Nasdaq under the symbol "XELAU" or may be separated into the component securities and no longer trade as a separate security.

This proxy statement and its annexes contain important information about the proposed Business Combination and the other matters to be acted upon at the Special Meeting. You should read this proxy statement and its annexes carefully and in their entirety.

**Your vote is important. You are encouraged to submit your proxy as soon as possible after carefully reviewing this proxy statement and its annexes.**

**Q:**    **What is being voted on?**

**A:**    Below are proposals on which Quinpario stockholders are being asked to vote.

10

Supp.App. 0376

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 379 of 1110    PageID 2000

1.  To approve and adopt the Business Combination Agreement (the "Business Combination Proposal");

2.  To approve, for purposes of complying with applicable Nasdaq Listing Rules, the issuance of more than 20% of the issued and outstanding shares of Quinpario Common Stock in connection with the Business Combination and the PIPE Investment (the "Nasdaq Proposal");

3.  To consider and vote upon five separate proposals to amend Quinpario's amended and restated certificate of incorporation to (collectively, the "Certificate Proposals"):

    •   authorize an additional 1,465,000,000 shares of Quinpario Common Stock and an additional 19,000,000 shares of preferred stock (the "Authorized Capital Stock Proposal");

    •   provide that certain provisions of the certificate of incorporation of the combined company are subject to the Director Nomination Agreements;

    •   change the Company's name to Exela Technologies, Inc.;

    •   providing that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity (the "Corporate Opportunity Proposal");

    •   to provide for certain additional changes the Quinpario board of directors believes are necessary to adequately address the post-Business Combination needs of the Company; and

4.  To approve the adjournment of the Special Meeting to a later date or dates, if necessary, to permit further solicitation and vote of proxies in the event that, based upon the tabulated vote at the time of the Special Meeting, there are not sufficient votes to approve one or more stockholder proposals presented at the Special Meeting (the "Adjournment Proposal"). The Adjournment Proposal will only be presented at the Special Meeting if there are not sufficient votes to approve one or more proposals presented to stockholders for vote.

**Q:  Are the proposals conditioned on one another?**

A:  The Business Combination Proposal is conditioned upon the approval of the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal. The Nasdaq Proposal and the Certificate Proposals are each conditioned on the approval of the Business Combination Proposal. The Adjournment Proposal does not require the approval of any other proposal to be effective. It is important for you to note that in the event that any of the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal or the Corporate Opportunity Proposal does not receive the requisite vote for approval, then Quinpario will, unless the relevant condition under the Business Combination Agreement is waived, not consummate the Business Combination. If Quinpario does not consummate the Business Combination and fails to complete an initial business combination by July 24, 2017, Quinpario's current certificate of incorporation requires it to dissolve and liquidate the Trust Account.

**Q:  Why is Quinpario proposing the Business Combination Proposal?**

A:  Under Quinpario's current certificate of incorporation, it must provide all holders of public shares with the opportunity to have their public shares redeemed upon the consummation of an initial business combination either in conjunction with a tender offer or in conjunction with a stockholder vote. For business and other reasons, Quinpario has elected to provide its stockholders with the opportunity to have their public shares redeemed in connection with a stockholder vote rather than a tender offer. Therefore, Quinpario is seeking to obtain the approval of the stockholders of the Business Combination Proposal in order to allow its public stockholders to effectuate redemptions of their public shares in connection with the closing of the Business Combination.

11

Table of Contents

**Q:** **What will happen in the Business Combination?**

**A:** At the closing of the Business Combination, (i) a wholly owned subsidiary of the Company will merge with and into SourceHOV, with SourceHOV surviving the merger, as a result of which New SourceHOV, LLC, a newly formed entity owned by SourceHOV's former equity holders will be entitled to receive 80,600,000 shares of Quinpario Common Stock at the closing, and (ii) a wholly owned subsidiary of the Company will merge with and into Novitex, with Novitex surviving the merger, as a result of which Novitex's equity holders will be entitled to receive 30,600,000 shares of Quinpario Common Stock at the closing. In connection with the Business Combination, the cash held in the Trust Account, the anticipated proceeds from the PIPE Investment and the proceeds of the Debt Financing will be used to refinance the existing debt of SourceHOV and Novitex, to pay fees and expenses related to the transaction and for general corporate purposes. A copy of the Business Combination Agreement is attached to the accompanying proxy statement as Annex A.

**Q:** **What equity stake will current Quinpario stockholders and former SourceHOV and Novitex stockholders hold in the Company after the closing of the Business Combination?**

**A:** It is anticipated that, upon completion of the Business Combination: (i) New SourceHOV LLC, a newly formed entity controlled by the HGM Group and owned by SourceHOV's former equity holders will own approximately 54.9% of the combined company; (ii) Novitex Parent will own approximately 20.9% of the combined company; (iii) the Company's public stockholders (other than the PIPE Investors) will retain an ownership interest of approximately 2.8% in the combined company; (iv) the PIPE Investors will own approximately 14.2% of the combined company (such that public stockholders, including PIPE Investors, will own approximately 17.1% of the combined company); and (v) the Founders will own approximately 5.5% of the combined company. These levels of ownership interest (a) assume that all shares are elected to be redeemed, other than those shares in respect of which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and that Quinpario has sold 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, which may be convertible into approximately 11,492,690 shares of Quinpario Common Stock, and issued 835,626 shares in respect of waivers of redemptions or conversion rights in the PIPE Investment, and 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration and (b) do not take into account public warrants to purchase Quinpario Common Stock that will remain outstanding immediately following the Business Combination or the issuance of any shares upon completion of the Business Combination. Under the Forfeiture Agreement, which was amended and restated on June 15, 2017, the Founders have agreed to cancel the aggregate 18,000,000 Private Placement Warrants and certain Founder Shares held by them upon consummation of the Business Combination. However, of the Founder Shares held by the Sponsor, the Sponsor may retain 8,033,571 of such Founder Shares. In addition, three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination. If the actual facts are different than these assumptions, the percentage ownership retained by Quinpario's existing stockholders in Quinpario will be different. If none of Quinpario's public stockholders exercise their redemption rights, the ownership interest in the combined company of Quinpario's public stockholders will increase and the ownership interest of the Sellers will decrease.

**Q:** **What conditions must be satisfied to complete the Business Combination?**

**A:** There are a number of closing conditions in the Business Combination Agreement, including that Quinpario stockholders have approved and adopted the Business Combination Agreement. For a summary of the conditions that must be satisfied or waived prior to completion of the Business Combination, see the section entitled *"Proposal No. 1—Approval of the Business Combination."*

12

Supp.App. 0378

**Q:**  **Will Quinpario obtain new financing in connection with the Business Combination?**

**A:**  Quinpario has obtained a commitment letter from a syndicate of lenders to provide debt financing to the combined company in the aggregate amount of approximately $1.35 billion (i) to repay certain existing indebtedness of SourceHOV and Novitex, (ii) to pay fees and expenses incurred in connection with the Business Combination, and (iii) for general corporate purposes. See the section entitled "*Proposal No. 1—Approval of the Business Combination—Debt Financing.*"

**Q:**  **Are there any arrangements to help ensure that the Company will have sufficient funds, together with the proceeds in its Trust Account and from the Debt Financing, to fund the total consideration for the Business Combination?**

**A:**  Yes. The Company has secured committed funds in an amount equal to $275.5 million. The Company has entered into subscription agreements with certain investors, pursuant to which the Company will issue securities of Quinpario, which will consist of Quinpario Common Stock and Series A Convertible Preferred Stock, for approximately $242.1 million in gross proceeds (or savings from settled fees to advisors) which will be used to refinance the existing debt of SourceHOV and Novitex, to pay fees and expenses related to the transaction and for general corporate purposes. Additionally, certain investors (including one advisor) have entered into commitment agreements whereby they have agreed to acquire and/or hold an aggregate of 3,342,500 shares of Quinpario Common Stock, not to exercise redemption or conversion rights with respect to such shares of Quinpario Common Stock prior to the closing of the Business Combination and not to resell, transfer, pledge or otherwise dispose of the Quinpario Common Stock prior to the closing of the Business Combination. As part of such committed funds in an amount equal to $275.5 million, the Company has entered into subscription agreements or commitment agreements with certain of its advisors pursuant to which the payment of an aggregate of $33.6 million fees owed to such advisors for their services will be settled either through settlement or investment of such fees in an aggregate amount of 3,440,625 issued shares of Quinpario Common Stock and 762,500 publicly traded shares in respect of which a waiver of redemption and/or conversion was obtained. In exchange for such investor's agreement to hold the shares and not exercise any redemption rights in respect of such shares, such investors will receive 0.25 additional shares for each such purchased share they hold at the closing of the Business Combination. In the event that such an investor is unable to acquire any one of the committed number of shares in the open market, such investor will subscribe for and purchase (or in the case of one advisor, be issued in respect of fees) 1.25 shares of Quinpario Common Stock for $8.00 per share. The PIPE Investment is to be consummated immediately prior to the closing of the Business Combination. See the section entitled "*Proposal No. 1—Approval of the Business Combination—PIPE Investment.*"

**Q:**  **Why is Quinpario proposing the Nasdaq Proposal?**

**A:**  Quinpario is proposing the Nasdaq Proposal in order to comply with Nasdaq Listing Rules 5635(a), (b) and (d), which require stockholder approval of certain transactions that result in the issuance of 20% or more of the outstanding voting power or shares of common stock outstanding before the issuance of stock or securities or a change of control of the issuer.

In connection with the Business Combination, the Company expects to issue: (i) approximately 111,200,000 shares of Quinpario Common Stock in the Business Combination, and (ii) 21,694,015 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, which may be convertible into approximately 11,492,690 shares of Quinpario Common Stock, in the PIPE Investment and 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration. Because Quinpario may issue 20% or more of the outstanding Quinpario Common Stock when considering together the Business Combination and the PIPE Investment

13

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 382 of 1110   PageID 2003

and because such transactions will cause a change of control of Quinpario, it is required to obtain stockholder approval of such issuance pursuant to Nasdaq Listing Rules 5635(a), (b) and (d). For more information, please see the section entitled "*Proposal No. 2—Approval of the Issuance of More than 20% of the Issued and Outstanding Shares of Quinpario Common Stock Pursuant to the Business Combination and the PIPE Investment*."

**Q:     Why is Quinpario proposing the Certificate Proposals?**

A:      The proposed certificate of incorporation that Quinpario is asking its stockholders to approve in connection with the Business Combination provides for an increase in the number of authorized shares of Quinpario Common Stock and certain additional changes the board of directors believes are necessary to adequately address the post-Business Combination needs of the Company. Approval of each of the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal is a condition to consummation of the Business Combination pursuant to the Business Combination Agreement. A copy of the proposed amended and restated certificate of incorporation, assuming adoption of the Certificate Proposals, is attached to this proxy statement as Annex B. In addition, upon consummation of the Business Combination, it is anticipated that the combined company will adopt the amended and restated bylaws attached to this proxy statement as Annex C.

**Q:     What happens if I sell my shares of Quinpario Common Stock before the Special Meeting?**

A:      The record date for the Special Meeting is earlier than the date of the Special Meeting. If you transfer your shares of Quinpario Common Stock after the record date, but before the Special Meeting, unless the transferee obtains from you a proxy to vote those shares, you will retain your right to vote at the Special Meeting. However, you will not be able to seek redemption of your shares because you will no longer be able to deliver them for cancellation upon consummation of the Business Combination. If you transfer your shares of Quinpario Common Stock prior to the record date, you will have no right to vote those shares at the Special Meeting or redeem those shares for a pro rata portion of the proceeds held in the Trust Account.

**Q:     What vote is required to approve the proposals presented at the Special Meeting?**

A:      The approval of each of the Business Combination Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote thereon at the Special Meeting. Accordingly, a Quinpario stockholder's failure to vote by proxy or to vote in person at the Special Meeting or the failure of a Quinpario stockholder who holds his or her shares in "street name" through a broker or other nominee to give voting instructions to such broker or other nominee (a "broker non-vote") will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Business Combination Proposal or the Adjournment Proposal. Abstentions will have the same effect as a vote "AGAINST" the Business Combination Proposal and the Adjournment Proposal.

The approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote and actually cast thereon at the Special Meeting. Accordingly, a Quinpario stockholder's abstention, broker non-vote or failure to vote by proxy or to vote in person at the Special Meeting will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Nasdaq Proposal.

The approval of each of the Certificate Proposals requires the affirmative vote of the holders of a majority of the outstanding shares of Quinpario Common Stock. Accordingly, a Quinpario stockholder's failure to vote by proxy or to vote in person at the Special Meeting, an abstention or a broker non-vote will have the same effect as a vote "AGAINST" the Certificate Proposals.

14

Supp.App. 0380

**Q:     May Quinpario or the Sponsor, Quinpario's directors, officers, advisors or their respective affiliates purchase shares in connection with the Business Combination?**

A:      In connection with the stockholder vote to approve the proposed Business Combination, the Sponsor, Quinpario's directors, officers, or advisors or their respective affiliates may privately negotiate transactions to purchase shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with a proxy solicitation pursuant to the proxy rules for a per share pro rata portion of the Trust Account. None of Quinpario's directors, officers or advisors or their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller. Such a purchase would include a contractual acknowledgement that such stockholder, although still the holder of Quinpario Common Stock as of the record date, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and could include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser. In the event that the Sponsor, Quinpario's directors, officers or advisors or their affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. Any such privately negotiated purchases may be effected at purchase prices that are in excess of the per share pro rata portion of the Trust Account.

**Q:     How many votes do I have?**

A:      Quinpario stockholders are entitled to one vote at the Special Meeting for each share of Quinpario Common Stock held of record as of the record date. As of the close of business on the record date, there were 28,848,601 outstanding shares of Quinpario Common Stock.

**Q:     What constitutes a quorum?**

A:      Holders of a majority in voting power of Quinpario Common Stock issued and outstanding and entitled to vote at the Special Meeting, present in person or represented by proxy, constitute a quorum. In the absence of a quorum, a majority of the stockholders, present in person or represented by proxy, will have power to adjourn the Special Meeting. As of the record date for the Special Meeting, 14,424,301 shares of Quinpario Common Stock would be required to achieve a quorum.

**Q:     How will Quinpario's directors and officers vote?**

A:      In connection with the IPO, Quinpario entered into agreements with each of the Founders pursuant to which each agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal. It is expected that the Founders will also vote in favor of the other Proposals to be voted on by Quinpario stockholders at the Special Meeting. None of the Founders has purchased any shares in or after the IPO and neither Quinpario nor the Sponsor and Quinpario's directors or officers have entered into agreements, and are not currently in negotiations, to purchase shares. Currently, the Founders own approximately 30.3% of the issued and outstanding shares of Quinpario Common Stock.

**Q:     What interests do Quinpario's current directors and officers have in the Business Combination?**

A:      Quinpario's directors and officers may have interests in the Business Combination that are different from, or in addition to or in conflict with, yours. These interests include:

•       the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

15

Supp.App. 0381

Table of Contents

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that if unrestricted and freely tradable these shares would be valued at $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, the Company believes such shares have less value;

- the fact that, pursuant to the Forfeiture Agreement, the Sponsor may retain 8,033,571 Founder Shares, and three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination.

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if the Company fails to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

- the continued right of the Sponsor to hold Quinpario Common Stock;

- the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

- if the Trust Account is liquidated, including in the event Quinpario is unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, Quinpario's former Chairman, each an affiliate of the Sponsor, have agreed to indemnify Quinpario to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which Quinpario has entered into an acquisition agreement or claims of any third party for services rendered or products sold to it, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of Quinpario's existing directors and officers and the continuation of such directors' and officers' liability insurance after the Business Combination;

- the fact that the Sponsor, officers and directors will lose their entire investment in Quinpario and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

- that, at the closing of the Business Combination Quinpario will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

These interests may influence Quinpario's directors in making their recommendation that you vote in favor of the approval of the Business Combination.

16

Supp.App. 0382

Table of Contents

**Q:**  **What happens if I vote against the Business Combination Proposal?**

**A:**  If the Business Combination Proposal is not approved and Quinpario does not consummate a business combination by July 24, 2017, its current certificate of incorporation requires it to dissolve and liquidate the Trust Account.

**Q:**  **Do I have redemption rights?**

**A:**  If you are a holder of public shares, you may redeem your public shares for cash equal to a pro rata share of the aggregate amount on deposit in the Trust Account which holds the remaining proceeds of Quinpario's IPO as of two business days prior to the consummation of the Business Combination (less taxes payable and any accrued interest that Quinpario may withdraw for working capital) upon the consummation of the Business Combination. Quinpario's current certificate of incorporation provides that a public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Securities Exchange Act of 1934, as amended), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the outstanding public shares. The Founders have agreed to waive their redemption rights with respect to any shares of Quinpario Common Stock they may hold in connection with the consummation of the Business Combination, and the Founder Shares will be excluded from the pro rata calculation used to determine the per share redemption price. For illustrative purposes, based on funds in the Trust Account of approximately $201.1 million on March 31, 2017, the estimated per share redemption price would have been approximately $10.00. Additionally, shares properly tendered for redemption will only be redeemed if the Business Combination is consummated; otherwise holders of such shares will only be entitled to a pro rata portion of the Trust Account (including interest but net of taxes payable and dissolution expenses) in connection with the liquidation of the Trust Account.

**Q:**  **Will how I vote affect my ability to exercise redemption rights?**

**A:**  No, however you may only exercise your redemption rights if you affirmatively vote your shares of Quinpario Common Stock for or against the Business Combination Proposal. The Business Combination Agreement may be approved by stockholders who will redeem their shares and no longer remain stockholders, leaving stockholders who choose not to redeem their shares holding shares in a company with a less liquid trading market, fewer stockholders, less cash and the potential inability to meet the listing standards of Nasdaq. Additionally, shares properly tendered for redemption will only be redeemed if the Business Combination is consummated.

**Q:**  **How do I exercise my redemption rights?**

**A:**  In order to exercise your redemption rights, you must, (a) affirmatively vote your shares of Quinpario Common Stock either for or against the Business Combination Proposal and (b) prior to 1:00 p.m., Eastern time, on July 11, 2017 (the date of the Special Meeting), (i) submit a written request to the Transfer Agent that Quinpario redeem your public shares for cash, and (ii) deliver your stock to the Transfer Agent physically or electronically through Depository Trust Company, or DTC. The address of Continental Stock Transfer & Trust Company, the Transfer Agent, is listed on page 19.

Any demand for redemption, once made, may be withdrawn at any time until the vote is taken with respect to the Business Combination. If you delivered your shares for redemption to the Transfer Agent and decide within the required timeframe not to exercise your redemption rights, you may request that the Transfer Agent return the shares (physically or electronically). You may make such request by contacting the Transfer Agent at the phone number or address listed on page 19.

17

Supp.App. 0383

**Q:**　　**What are the federal income tax consequences of exercising my redemption rights?**

**A:**　　The U.S. federal income tax consequences of exercising your redemption rights depend on the particular facts and circumstances. See the section entitled "*Proposal No. 1—Approval of the Business Combination—Material U.S. Federal Income Tax Considerations for Stockholders Exercising Redemption Rights*." Quinpario urges you to consult your tax advisor regarding the tax consequences of exercising your redemption rights.

**Q:**　　**If I am a Quinpario warrantholder, can I exercise redemption rights with respect to my warrants?**

**A:**　　No. The holders of Quinpario warrants have no redemption rights with respect to the warrants.

**Q:**　　**Do I have appraisal rights if I object to the proposed Business Combination?**

**A:**　　No. There are no appraisal rights available to holders of Quinpario Common Stock in connection with the Business Combination.

**Q:**　　**What happens to the funds held in the Trust Account upon consummation of the Business Combination?**

**A:**　　If the Business Combination is consummated, the funds held in the Trust Account will be released to (i) pay off existing indebtedness of SourceHOV and Novitex, (ii) pay Quinpario stockholders who properly exercise their redemption rights, (iii) pay all fees, costs and expenses (including regulatory fees, legal fees, accounting fees, printer fees, and other professional fees) that were incurred by the Company, Novitex Merger Sub, SourceHOV Merger Sub, New SourceHOV LLC, SourceHOV and Novitex in connection with the transactions contemplated by the Business Combination, other than certain fees and other consideration that will be satisfied through payment in shares of Quinpario Common Stock, as described in the section entitled "*Proposal No. 1—Approval of the Business Combination—PIPE Investment*," and (iv) pay unpaid taxes of the Company.

**Q:**　　**What happens if the Business Combination is not consummated or is terminated?**

**A:**　　There are certain circumstances under which the Business Combination Agreement may be terminated. See the section entitled "*Proposal No. 1—Approval of the Business Combination—The Business Combination Agreement*" for information regarding the parties' specific termination rights.

If, as a result of the termination of the Business Combination Agreement or otherwise, Quinpario is unable to complete the Business Combination or another business combination transaction by July 24, 2017, its current certificate of incorporation provides that it will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible, subject to lawfully available funds therefor, redeem 100% of the public shares in consideration of a per-share price, payable in cash, equal to the quotient obtained by dividing (A) the aggregate amount then on deposit in the Trust Account, including interest but net of taxes payable and dissolution expenses, by (B) the total number of then outstanding public shares, which redemption will completely extinguish rights of the public stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemptions, subject to the approval of the remaining stockholders and the board of directors in accordance with applicable law, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to Quinpario's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law.

Quinpario expects that the amount of any distribution its public stockholders will be entitled to receive upon its dissolution will be approximately the same as the amount they would have received if they had redeemed their shares in connection with the Business Combination, subject in

18

Supp.App. 0384

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 387 of 1110   PageID 2008

each case to Quinpario's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law. Holders of Founder Shares have waived any right to any liquidation distribution with respect to those shares.

In the event of liquidation, there will be no distribution with respect to Quinpario's outstanding warrants. Accordingly, the warrants will expire worthless.

**Q:**    **When is the Business Combination expected to be completed?**

**A:**    It is currently anticipated that the Business Combination will be consummated promptly following the Special Meeting, provided that all other conditions to the consummation of the Business Combination have been satisfied or waived. In any event, Quinpario expects the closing of the Business Combination to occur during the third quarter of 2017 and prior to July 24, 2017.

For a description of the conditions to the completion of the Business Combination, see the section entitled "*Proposal No. 1—Approval of the Business Combination.*"

**Q:**    **What do I need to do now?**

**A:**    You are urged to read carefully and consider the information contained in this proxy statement, including the annexes, and to consider how the Business Combination will affect you as a stockholder. You should then vote as soon as possible in accordance with the instructions provided in this proxy statement and on the enclosed proxy card or, if you hold your shares through a brokerage firm, bank or other nominee, on the voting instruction form provided by the broker, bank or nominee.

**Q:**    **How do I vote?**

**A:**    If you were a holder of record of Quinpario Common Stock on May 31, 2017, the record date for the Special Meeting, you may vote with respect to the applicable proposals in person at the Special Meeting or by (1) calling the toll-free number specified on the enclosed proxy card and following the instructions when prompted, (2) accessing the Internet website specified on the enclosed proxy card and following the instructions provided to you, or (3) completing, signing, dating and returning the enclosed proxy card in the postage-paid envelope provided. If you hold your shares in "street name," which means your shares are held of record by a broker, bank or other nominee, you should contact your broker, bank or nominee to ensure that votes related to the shares you beneficially own are properly counted. In this regard, you must provide the record holder of your shares with instructions on how to vote your shares or, if you wish to attend the Special Meeting and vote in person, obtain a proxy from your broker, bank or nominee.

**Q:**    **What will happen if I abstain from voting or fail to vote at the Special Meeting?**

**A:**    A properly executed proxy marked "ABSTAIN" with respect to a particular proposal will count as present for purposes of determining whether a quorum is present. Abstentions will have the same effect as a vote "AGAINST" the Business Combination Proposal and the Adjournment Proposal. A failure to vote in person or by proxy or an abstention will have the same effect as a vote "AGAINST" the Certificate Proposals. Abstentions will have no effect on any of the Nasdaq Proposal.

**Q:**    **What will happen if I sign and return my proxy card without indicating how I wish to vote?**

**A:**    Signed and dated proxies received by Quinpario without an indication of how the stockholder intends to vote on a proposal will be voted in favor of each proposal presented to the stockholders.

19

Supp.App. 0385

**Q:    If I am not going to attend the Special Meeting in person, should I return my proxy card instead?**

A:    Yes. Whether you plan to attend the Special Meeting or not, please read this entire proxy statement carefully, and vote your shares by one of the following methods: (1) call the toll-free number specified on the enclosed proxy card and follow the instructions when prompted, (2) access the Internet website specified on the enclosed proxy card and follow the instructions provided to you, or (3) complete, sign, date and return the enclosed proxy card in the postage-paid envelope provided.

**Q:    If my shares are held in "street name," will my broker, bank or nominee automatically vote my shares for me?**

A:    No. Under the rules of various national and regional securities exchanges, your broker, bank, or nominee cannot vote your shares with respect to non-discretionary matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank, or nominee. Quinpario believes the proposals presented to the stockholders will be considered non-discretionary and therefore your broker, bank, or nominee cannot vote your shares without your instruction. If you do not provide instructions with your proxy, your bank, broker, or other nominee may deliver a proxy card expressly indicating that it is NOT voting your shares; this indication that a bank, broker, or nominee is not voting your shares is referred to as a "broker non-vote." Broker non-votes will not be counted for the purpose of determining the existence of a quorum or for purposes of determining the number of votes cast at the Special Meeting. Your bank, broker, or other nominee can vote your shares only if you provide instructions on how to vote. You should instruct your broker to vote your shares in accordance with directions you provide.

**Q:    May I change my vote after I have mailed my signed proxy card?**

A:    Yes. You may change your vote by sending a later-dated, signed proxy card to Quinpario's President and Chief Executive Officer at the address listed below so that it is received by Quinpario's President and Chief Executive Officer prior to the Special Meeting, or attend the Special Meeting in person and vote. You also may revoke your proxy by sending a notice of revocation to Quinpario's President and Chief Executive Officer, which must be received by Quinpario's President and Chief Executive Officer prior to the Special Meeting.

**Q:    What should I do if I receive more than one set of voting materials?**

A:    You may receive more than one set of voting materials, including multiple copies of this proxy statement and multiple proxy cards or voting instruction cards. For example, if you hold your shares in more than one brokerage account, you will receive a separate voting instruction card for each brokerage account in which you hold shares. If you are a holder of record and your shares are registered in more than one name, you will receive more than one proxy card. Please complete, sign, date and return each proxy card and voting instruction card that you receive in order to cast your vote with respect to all of your shares.

**Q:    Who will solicit and pay the cost of soliciting proxies for the Special Meeting?**

A:    The Company will pay the cost of soliciting proxies for the Special Meeting. The Company has engaged Morrow to assist in the solicitation of proxies for the Special Meeting. The Company has agreed to pay Morrow a fee of $22,500, plus disbursements, and will reimburse Morrow for its reasonable out-of-pocket expenses and indemnify Morrow and its affiliates against certain claims, liabilities, losses, damages and expenses. The Company will also reimburse banks, brokers and other custodians, nominees and fiduciaries representing beneficial owners of shares of Quinpario Common Stock for their expenses in forwarding soliciting materials to beneficial owners of

20

Supp.App. 0386

Quinpario Common Stock and in obtaining voting instructions from those owners. Quinpario's directors and officers may also solicit proxies by telephone, by facsimile, by mail, on the Internet or in person. They will not be paid any additional amounts for soliciting proxies.

**Q:** **Is this Quinpario's annual meeting? Will I be voting on the election of directors at this meeting?**

**A:** This is not Quinpario's annual meeting and you will not be asked to elect directors at this Special Meeting. The Quinpario annual meeting of shareholders will take place on June 29, 2017 (the "Annual Meeting"), prior to the Special Meeting. If you are a shareholder of record as of May 31, 2017, you will receive two proxy cards, one for the Annual Meeting and one for the Special Meeting. It is very important that you return both proxy cards to ensure that your vote is represented at both the Annual Meeting and the Special Meeting. A definitive proxy statement for the Annual Meeting, along with other materials including the proxy card, will be sent to you in a separate mailing. Please refer to those separate materials for more information about the Annual Meeting and to vote on the election of directors.

**Q:** **Who can help answer my questions?**

**A:** If you have questions about the proposals or if you need additional copies of the proxy statement or the enclosed proxy card you should contact:

D. John Srivisal, President and Chief Executive Officer
Quinpario Acquisition Corp. 2
12935 N. Forty Drive, Suite 201,
St. Louis, Missouri 63141
Tel: (314) 548-6200
Email: djsrivisal@quinpario.com

You may also contact the proxy solicitor at:

Morrow Sodali LLC
470 West Avenue
Stamford, Connecticut 06902
Individuals, please call toll-free: (800) 662-5200
Banks and brokerage, please call: (203) 658-9400
Email: QPAC.info@morrowsodali.com

To obtain timely delivery, Quinpario stockholders must request the materials no later than five business days prior to the Special Meeting.

You may also obtain additional information about Quinpario from documents filed with the SEC by following the instructions in the section entitled "*Where You Can Find More Information.*"

If you intend to seek redemption of your public shares, you will need to send a letter demanding redemption and deliver your stock (either physically or electronically) to the Transfer Agent prior to the Special Meeting. If you have questions regarding the certification of your position or delivery of your stock, please contact:

Continental Stock Transfer & Trust Company
17 Battery Place
New York, New York 10004
Tel: (212) 845 3287
Attn: Mark Zimkind
E-mail: mzimkind@continentalstock.com

21

Supp.App. 0387

Table of Contents

## SUMMARY OF THE PROXY STATEMENT

*This summary highlights selected information from this proxy statement and may not contain all of the information that is important to you. To better understand the Business Combination and the proposals to be considered at the Special Meeting, you should read this entire proxy statement carefully, including the annexes. See also the section entitled "Where You Can Find More Information."*

*Unless otherwise specified, all share calculations (i) assume exercise of redemption rights by all the Company's public stockholders (other than in respect of those shares for which a waiver of redemption or conversion rights has been obtained, which account for approximately $33.4 million), (ii) do not include any shares of Quinpario Common Stock issuable upon the exercise of public warrants and (iii) assume the sale of 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock and the issuance of 835,626 shares in respect of waivers of redemptions or conversion rights in the PIPE Investment and the issuance of 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration.*

*Unless otherwise indicated or the context otherwise requires, references in this Summary of the Proxy Statement to "Exela," the "combined company," "we," "our," "us" and other similar terms refer to Exela Technologies, Inc. (as Quinpario will be renamed) and its consolidated subsidiaries, including SourceHOV and Novitex and each of their respective subsidiaries, after giving effect to the Business Combination. Unless otherwise indicated or the context otherwise requires, references to "pro forma" information gives pro forma effect to the Business Combination as if they had occurred on December 31, 2016 in the case of balance sheet data and January 1, 2016 in the case of statement of operations data.*

**Combined Business Summary**

*Business Overview*

The strategic combination of SourceHOV and Novitex will form Exela Technologies, Inc. ("Exela"), which will be one of the largest global providers of information and transaction processing solutions based on revenues. As part of the broader business process outsourcing ("BPO") industry, Exela's technology-enabled solutions allow multi-national organizations to address critical challenges resulting from the massive amounts of data obtained and created through their daily global operations. That data, and the supporting technology architecture, have become increasingly complex to manage as the volume, velocity, and variety continue to increase, requiring aggregation and integration across disparate parts of our clients' organizations. To effectively execute transactions and manage mission-critical processes, decisions need to be executed accurately, with rapid turn-around time, and often subject to various regulatory and compliance requirements. We believe our process expertise, information technology capabilities and operational insights enable our clients' organizations to more efficiently and effectively execute transactions, make decisions, drive revenue and profitability, and communicate critical information to their employees, customers, partners, and vendors. We believe this value proposition positions Exela to be a core operations and technology partner to our clients.

For the fiscal year ended December 31, 2016, we generated $1.3 billion of pro forma revenue, $(40.9) million of pro forma net loss, and $349.9 million of pro forma Adjusted EBITDA; of which approximately 90% of pro forma revenues are recurring in nature and supported by long-term client contracts. For the three months ended March 31, 2017, we generated $361.9 million of pro forma revenue and $(14.0) million of pro forma net loss. See "*Selected Unaudited Pro Forma Condensed Combined Financial Information—Non-GAAP Measures*."

Our solutions address the life cycle of transaction processing and enterprise information management, from enabling payment gateways and data exchanges across multiple systems, to matching inputs against contracts and handling exceptions, to ultimately depositing payments and distributing communications. As a leader in complex information processing, we specialize in transactions that

22

Supp.App. 0388

Table of Contents

require multiple layers of validation, supporting documentation processing, and reconciliation. Our suite of offerings combines platform modules across information management, payments, finance & accounting, legal & loss prevention, and unified communication services to provide both industry specific solutions, and solutions which span across multiple industries. Our pro forma revenue by end market for the fiscal year ended December 31, 2016 can be broken down as follows:



(1)     Based on total assets as of 12/31/2016.

(2)     Based on total revenue as of 12/31/2016.

(3)     Based on total revenue for respective 2016 fiscal year end.

At the foundation of our industry solution offerings, we use a combination of data-driven processes, technology, and human capital, delivered through integrated Enterprise Information Management ("EIM") and Transaction Processing Solutions ("TPS") platforms:

- Exela's proprietary EIM platforms facilitate the exchange, consolidation, organization, and analysis of large amounts of structured and unstructured data that are crucial to an enterprise's ability to effectively manage decisions, and enable the presentment of critical information through our unified communication services. These platforms can be hosted on client premises, within Exela's data centers, and / or in a cloud hosting and computing environment.

- Exela's TPS offerings then use the structured data output from our EIM platforms and apply industry and client specific rules-based data validation, management of exceptions, business automation, and outcome resolutions to complete transactions, client interactions, and other operational processes.

- Exela's model is to provide integrated EIM and TPS platforms as industry solutions, with reliable information workflows through data aggregation, seamless connectivity, and automated processes that significantly reduce cycle times and improve quality. As a result, we believe we can execute a wide range of business processes, across multiple industries that are deeply embedded in, and essential to, our clients' most critical organizational workflows.

23

Supp.App. 0389

Table of Contents



Exela seeks to develop long-term relationships with large, multi-national organizations that are information-intensive and require specialized processing or subject matter expertise. We offer solutions to highly regulated and information sensitive industries such as healthcare, banking and financial services, insurance, public sector, legal, and commercial. On a pro forma basis, we serve over 3,500 clients, including over 60% of the Fortune® 100.

We believe that our global presence benefits our clients with a balance of proximity, service, and cost to meet their needs. Exela uses a global delivery model to serve multi-national clients in over 50 countries, where we provide services from a network of over 1,200 onsite client facilities and approximately 150 delivery centers, strategically located throughout the Americas, Europe, and Asia. We believe our global delivery model uniquely positions us to offer multi-lingual capabilities, optimize logistical requirements, have access to a large employee pool, and provide a flexible "right-shoring" solution for our clients.

### Industry Overview

Overall, corporations have an increased propensity to outsource day-to-day business processes as enterprises look for opportunities to accelerate performance and innovation, reduce costs, and streamline or standardize their business processes, allowing them to increase focus on growth. As advances in automation and ongoing technological innovation further drive demand for process outsourcing, we believe companies increasingly seek a higher degree of efficiency, customization, connectivity, quality, and partnership from BPO solution providers.

We believe Exela is well positioned to capitalize on key secular trends driving growth in the BPO industry including (i) companies seeking to achieve industry-specific solutions and domain expertise to provide greater value, (ii) pressures on companies to enhance profitability and increase efficiency and reliability, (iii) outsourcing services seen as increasingly mission-critical as business processes become more complex, and (iv) high costs and risks associated with switching providers generally resulting in long-term strategic commitments from clients.

24

Supp.App. 0390

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 393 of 1110    PageID 2014

According to NelsonHall, the current market for BPO is estimated to be over $400 billion and is expected to grow at approximately 6% compounded annual growth rate ("CAGR") over the next four years. The two largest markets that Exela is focused on, healthcare and financial services, are projected to grow at approximately 7% and 5% CAGR, respectively, over the next four years. Additionally, over 70% of related services are performed in-house by enterprises, translating to an outsourced penetration rate of approximately 30%, providing a large untapped opportunity for BPO providers.



**Overview of Our Pro Forma Revenues**

Our business consists of the following three reportable segments:

*Information and Transaction Processing Solutions ("ITPS").* The ITPS segment is our largest segment, with $983 million of pro forma revenues for the fiscal year ended December 31, 2016 and $279 million of pro forma revenues for the three months ended March 31, 2017, representing 74% and 77% of Exela's pro forma revenues, respectively. ITPS provides industry solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and cross-border settlement; property and casualty insurance solutions for enrollments, claims processing, and communications; public sector solutions for income tax processing, benefits administration, and records management; multi-industry solutions for payment processing and reconciliation, integrated receivable and payables management, document logistics and location services, records management, and electronic storage of data / documents; and software, hardware, and maintenance related to information and transaction processing automation, among others. We generate ITPS revenues primarily from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services. A representative example of our ITPS Business-to-Business accounts payable management solution, which

25

Supp.App. 0391

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 394 of 1110    PageID 2015

Table of Contents

connects suppliers, buyers, and consumers via web-based portals, mail, fax, and mobile applications, is described below:

*Healthcare Solutions ("HS").*   The HS segment generated $248 million of pro forma revenues for the fiscal year ended December 31, 2016, and generated $59 million of pro forma revenues for the three months ended March 31, 2017, representing 19% and 16% of Exela's pro forma revenues, respectively. Our HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Our payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Our provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management. As a leader in complex claims processing, we specialize in transactions that require multiple layers of validation, supporting documentation processing, reconciliation, and management of exceptions. We generate HS revenues primarily from a transaction-based pricing model for the various types of volumes processed for healthcare payers and

26

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 395 of 1110   PageID 2016

Table of Contents

providers. A representative example of the HS solutions we offer to a leading healthcare insurance provider is noted in the following illustration:



*Legal & Loss Prevention Services ("LLPS").* The LLPS segment generated $102 million of pro forma revenues for the fiscal year ended December 31, 2016 and $23 million of pro forma revenues for the three months ended March 31, 2017, representing 8% and 6% of Exela's pro forma revenues, respectively. Our LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification, and outreach to claimants; and collection, analysis, and distribution of settlement funds. Additionally, we provide data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable. We generate LLPS revenues primarily based on time and materials pricing as well as through transactional services priced on a per item basis. A representative example of our LLPS solutions includes the claims management and distribution process that we facilitated as a part of the broader National Mortgage Settlement, a large joint state and federal consumer fraud settlement, the workflow of which is noted in the following illustration:

27

Supp.App. 0393

**Transaction Rationale**

The combination of SourceHOV and Novitex is highly strategic, and we expect several resulting benefits, including the following:

*Unlocking new growth channels through enhanced scale and brand awareness.* We believe that as clients across the industry move increasingly toward outsourcing more processes to fewer vendors, our breadth of service offerings and depth of domain expertise, combined with a strong delivery footprint, will continue to be a differentiating factor. As a result of this strategic combination, we expect Exela will improve its position as a leading, global scale EIM and TPS provider, delivering mission-critical, technology-enabled services to many of the world's largest enterprises. We intend to leverage our global scale to pursue client opportunities that are larger and more comprehensive in scope and increase our opportunity for sustainable long-term revenue growth. We believe Exela's global delivery network provides clients with a balance of proximity, service, and lower cost. For example, the proximity of delivery centers to clients is often critical in winning business in regulated industries such as healthcare, banking and financial services, and the public sector, where processing facilities are required to be adjacent to customer operations, utilize a local workforce, and comply with stringent regulations such as HIPAA, PCI, and NARA, among others.

We believe SourceHOV and Novitex have strong reputations in the market and that these will be further enhanced as we utilize best practices of each organization across sales, operations, technology, and human capital management to win and retain clients.

*Maximizing highly complementary solution offerings.* We believe the combination will transform Exela into a single-source global EIM and TPS company. Our combined scale and complementary services will position us to offer a comprehensive set of solutions across the EIM and TPS service continuum that will allow us to increase our client penetration and market share. SourceHOV has historically maintained industry leading solutions in both EIM and TPS, with particularly differentiated, industry-specific offerings in TPS that enable proprietary, scalable analytics to convert data into automated rules-based outcomes. Novitex has historically maintained industry leading, large scale infrastructure in the information acquisition and presentation phase of EIM. We intend to maximize each company's core competencies, for instance, targeting Novitex customers for which we can offer complementary add-on services expanding into SourceHOV's transaction processing solutions. For example, in areas where Novitex performs document logistics for insurance claims, invoices, customer interaction, and regulatory communications, we will aim to add SourceHOV's solutions for validation, decisioning, and payments to capture the full lifecycle of business processes.

*Reinforcing our leadership position in existing industries.* We believe the combination will give Exela a leading market position in EIM and TPS and expect to gain further market share within a highly attractive $400 billion market opportunity. Specifically, our focus on the healthcare and banking and financial services markets positions us well to benefit from a number of positive industry trends, including further outsourcing adoption as a means to drive efficiency and accelerate innovation, continued globalization and rapid industry and technological changes, and the need to provide a seamless and secure solution. Each of the companies have developed long track records with clients, and as a result, we believe we are deeply embedded in, and essential to, our clients' organizational workflows, creating strong customer loyalty. SourceHOV's and Novitex's track records of delivering high-quality, innovative solutions to clients will further improve our competitive position by combining their unique process expertise, information technology capabilities, and operational insights.

We will continue to focus our efforts on an industry-specific model that will allow us to deliver tailored solutions that will utilize our combined best practices across sales, operations, technology, and human capital management. As an example, we believe that we will enhance our relationships to be an even more strategic partner to our insurance clients by having our platforms and operations integrated across multiple departments from customer communications to claims processing and from accounts payable to accounts receivable management, with delivery across the globe.

Supp.App. 0394

*Further diversifying across clients, end-markets and geographies.*    We believe the combination reduces exposure to market risk and client concentration through diversification of client, end-markets and geographies. Exela will serve the top 10 U.S. banks and over 120 global banks, 9 of the top 10 U.S. insurance companies, the top 5 U.S. healthcare insurance payers and over 900 healthcare providers, 98% of the Am Law® 100, 4 of the top 5 world's largest retail chains, over 30 states and counties, and over 80 government entities. For the fiscal year ended December 31, 2016, SourceHOV's top 10 customers represented less than 25% of its revenues and the top customer represented less than 7% of revenues, and Novitex's top 10 customers represented less than 40% of its revenues and the top customer represented less than 8% of revenues. Pro forma for the combination, Exela will have over 220 clients contributing at least $1 million in annual Exela revenue. We will benefit from a global delivery model to serve customers in over 50 countries, where we provide services from a network of delivery centers strategically located throughout the Americas, Europe, and Asia.

*Increased revenue visibility, stronger margins and greater free cash flow generation.*    We have highly visible and recurring revenues which are underpinned by our deep relationships across over 3,500 clients and long-term contracts. The companies achieved pro forma Adjusted EBITDA margins of 24% for the fiscal year ended December 31, 2016 and expect to further benefit from increased scale, operating enhancement, and synergy realization. Additionally, we have an asset-lite operating model that is highly cash-generative, which is evidenced by our capital expenditures as a percentage of revenues totaling 3% for the fiscal year ended December 31, 2016. SourceHOV and Novitex have experienced net losses in recent years and the combined company will have substantial indebtedness. Therefore, we cannot assure you that the combined company will achieve the expected benefits of the Business Combination.

**Key Combined Business Strategies**

The key elements of our growth strategy are described below:

*Pursue meaningful revenue synergy opportunities:*    We believe we have a number of meaningful revenue synergy opportunities, including expanding the scope of our existing client relationships, pursuing new client opportunities, and utilizing our combined platform to develop new process capabilities and industry expertise.

- *Expand relationships with existing clients.*    We intend to aggressively pursue cross-sell and up-sell opportunities within our existing client base. With an installed base of over 3,500 clients, we believe we have meaningful opportunities to offer a bundled suite of services and be a "one-stop-shop" for our clients' information and transaction processing needs. The combined company sales force will continue to be organized on an industry basis and will be re-deployed to remove duplication, and utilize solutions and relationships to better serve our clients across all levels of their organizations. Our sales force will be incentivized to drive additional revenue opportunities across the combined client bases while also driving higher-margin bundled solutions. As an example, we plan to offer a full suite of healthcare-focused solutions by bundling enrollments, policy and plan management, claims processing, audit and recovery services, payment solutions, integrated accounts payable and receivable, medical records management, and unified communication services for payers and providers.

- *Pursue new client opportunities.*    We plan to continue to develop new long-term, strategic client relationships, especially where we have an opportunity to deliver a wide range of our capabilities and have a meaningful impact on our clients' business outcomes. For example, we plan to dedicate resources within the legal industry in order to pursue opportunities in e-discovery and contract management services.

- *Develop additional process capabilities and industry expertise.*    We will focus on developing additional process capabilities and market expertise for our core industries. We will continue to

29

Supp.App. 0395

Table of Contents

invest in technology and innovation that will accelerate the build-out of our portfolio of next-generation solutions, such as platform-based descriptive and predictive analytics services for processing flows of "Big Data" to help clients gain better insight into their processes and businesses. As an example, on behalf of our customers, we are deploying Big Data automation platforms to analyze individual consumer behavior and interaction patterns to identify opportunities for revenue enhancement and loss prevention, and configure optimal outreach campaigns to drive sales, loyalty, and profitability.

*Pursue meaningful cost synergy opportunities and accelerate long-term profitability.*    We have identified significant cost synergies, the majority of which will be actionable within 9 months of closing the transaction. Due to similar operating infrastructures between SourceHOV and Novitex, we believe we have opportunities across information technology, operations, facilities, and corporate functions to achieve over $70.3 million in total run-rate cost savings executable over the course of 2 years. We believe these cost savings are in the following categories:

- *Information Technology.*  We estimate cost savings of $10.5 million across consolidation of Information Technology ("IT") management, insourcing of third-party vendors, and savings related to consolidation of IT services and software license replacement with an in-house platform.

- *Operations.*  We estimate cost savings of $25.2 million from data entry offshoring, regional management rationalization, and consolidation of spend.

- *Facilities.*  We estimate $9.0 million of savings from lease and headcount savings resulting from facilities consolidation.

- *Corporate and Shared Services.*  We estimate cost savings of $25.6 million primarily across shared services, including the finance, accounting, legal, and human resources departments, in addition to vendor savings from consolidation of costs such as audit & tax, insurance, and enterprise resource planning ("ERP").

Additionally, we intend to further improve our margins through increased focus on operational best practices and cost efficiency through further process standardization, increasing use of automation, and increased focus on quality. Our strategy is that over time this will result in margin expansion and enhanced productivity. Although we believe we have opportunities to achieve over $70.3 million in total run-rate cost savings, we have conservatively assumed that $37.5 million are achieved.

*Capitalize on our enhanced scale and operating capacity.*    We intend to utilize Exela's increased global scale and brand recognition to strengthen our ability to bid on new opportunities. We plan to dedicate more resources to pursue whitespace coverage to expand our range of service offerings and pursue additional cross-selling opportunities. We will also look to use our increased scale and operations expertise to improve utilization of our assets. As an example, Novitex recently made approximately $45 million of investments to create and equip two Tier-III document processing and outsourcing centers in Windsor, Connecticut, and Austin, Texas, which Novitex refers to as its MegaCenters. We will pursue a strategy of consolidating smaller regional document processing centers to the MegaCenters which will increase efficiency through economies of scale. By driving utilization up from the current levels of approximately 30% to 60%, Exela will benefit from high flow through margins from increased revenues with minimal incremental investment.

Supp.App. 0396

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 399 of 1110 PageID 2020

**Parties to the Business Combination**

*Quinpario*

Quinpario is a Delaware special purpose acquisition company formed in July 2014 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving Quinpario and one or more businesses.

Quinpario's securities are traded on Nasdaq under the ticker symbols "QPAC," "QPACU" and "QPACW." We have applied to continue the listing of Quinpario Common Stock on Nasdaq under the symbol "XELA." Following the closing, we expect that our warrants will trade on Nasdaq under the symbol "XELAW"; our units may continue to trade on Nasdaq under the symbol "XELAU" or may be separated into the component securities and no longer trade as a separate security.

The mailing address of Quinpario's principal executive office is 12935 N. Forty Drive, Suite 201, St. Louis, Missouri 63141.

*SourceHOV Merger Sub*

SourceHOV Merger Sub, a Delaware corporation, is a wholly-owned subsidiary formed by us on February 17, 2017 to consummate the Business Combination. In the Business Combination, SourceHOV Merger Sub will merge with and into SourceHOV, with SourceHOV surviving the merger.

*Novitex Merger Sub*

Novitex Merger Sub, a Delaware corporation, is a wholly-owned subsidiary formed by us on February 17, 2017 to consummate the Business Combination. In the Business Combination, Novitex Merger Sub will merge with and into Novitex, with Novitex surviving the merger.

*SourceHOV*

SourceHOV is a leading provider of platform-based EIM and TPS primarily for the healthcare, banking and financial services, commercial, public sector, and legal industries. SourceHOV's business model uses a strategic mix of technology and services to provide industry solutions and proprietary technology which incorporate data aggregation, exception handling, decisioning, and business process automation.

SourceHOV's EIM and TPS solutions are focused in areas where it can utilize the scale of its platforms and address the full life cycle of its clients' business functions. SourceHOV's offerings are delivered across three business segments:

- *Information and Transaction Processing Solutions (56% of 2016 revenues).* Within its ITPS segment, SourceHOV provides industry solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and cross-border settlement; property and casualty insurance solutions for enrollments, claims processing, and communications; public sector solutions for income tax processing, benefits administration, records management; multi-industry solutions for payment processing and reconciliation, integrated receivable and payables management, document logistics and location services, records management, and electronic storage of data / documents; and software, hardware, and maintenance related to information and transaction processing automation, among others.

- *Healthcare Solutions (31% of 2016 revenues).* Within its HS segment, SourceHOV provides a number of solutions including revenue cycle solutions, integrated accounts payable and receivable, and information management for both the healthcare payer and provider markets. Its payer service offerings include claims processing, claims adjudication and audit services,

31

Supp.App. 0397

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 400 of 1110    PageID 2021

Table of Contents

enrollment processing and policy management, scheduling, and prescription management. Its provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management. As a leader in complex claims processing, SourceHOV specializes in transactions that require multiple layers of validation, supporting documentation processing, reconciliation, and management of exceptions.

- *Legal & Loss Prevention Services ("LLPS") (13% of 2016 revenues).* Within its LLPS segment, SourceHOV provides a number of solutions including processing of legal claims for class action and mass action settlement administrations, involving project management support, notification, and outreach to claimants; and collection, analysis, and distribution of settlement funds. Additionally, it provides data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable.

SourceHOV solutions benefit leading organizations in information-intensive businesses that have frequent access and distribution requirements, and require data analytics, specialized processing, or subject matter expertise. SourceHOV provides services from a network of approximately 120 delivery centers to clients in over 50 countries with approximately 16,000 employees as of March 31, 2017. Approximately 90% of SourceHOV's revenues are recurring in nature and supported by long-term client contracts. SourceHOV's largest client accounted for less than 7% of 2016 revenue, while its top 10 clients accounted for less than 25% of 2016 revenues with an average tenure of 13 years. SourceHOV generated $789.9 million in revenue, $(48.1) million in net loss, and $173.2 million in Adjusted EBITDA for the year ended December 31, 2016. Approximately 83% and 17% of 2016 revenues were generated in the Americas and Europe, respectively. For the three months ended March 31, 2017, SourceHOV generated $218.3 million in revenues, $(15.7) million in net loss, and $45.5 million in Adjusted EBITDA. See "*Selected Historical Financial Information of SourceHOV—Reconciliation of GAAP to non-GAAP Measures*."

***Novitex***

Novitex is a North American provider of document management and digital business process services. Novitex enables businesses to streamline their internal and external communications and workflows by offering an integrated suite of services organized across two categories: Digital Services and Document Logistics.

The Digital Services category combines technology-driven applications and platforms with Novitex's expertise and consists of the following:

- **Customer communications management** ("CCM")**:** the strategic management and improvement of outbound communications, including the creation, delivery, storage, and retrieval of communications;

- **Outbound, recurring document processing:** repetitive production work, such as statements, invoices, insurance policies, and other informational documents that contain content unique to each recipient;

- **Production business recovery services:** backup transactional print and mail services supporting clients' operations when an internal breakdown or a natural disaster disrupts the primary functions of such operations;

- **Business process automation:** the automation of complex business processes, such as mortgage processing and claims processing, beyond conventional data manipulation and record-keeping activities; and

Supp.App. 0398

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 401 of 1110    PageID 2022

Table of Contents

- **Managed print services** ("MPS")**:** the optimization of clients' onsite document output to decrease costs, reduce paper waste, and increase employee efficiency.

Novitex's Document Logistics services consist of delivery logistics, which includes presort services and shipping cost optimization, and staffing-based document management services, which includes mailroom management, document reproduction services ("reprographics") and hospitality solutions (such as staffing lobby hosts and providing hoteling support).

Through its integrated suite of Digital Service and Document Logistics offerings, which Novitex refers to as the Integrated Document Life Cycle™ (the "IDLC"), Novitex connects its clients' inbound and outbound communications in both physical and digital forms. Before the introduction of the IDLC, multiple stakeholders within client businesses would outsource fragmented pieces of the document life cycle to separate vendors. With the IDLC, these multiple stakeholders can outsource their document processing needs to a single provider, Novitex, creating a more efficient model for document processing services.

Novitex now provides many of its top clients with a combination of both Digital Services and Document Logistics as an integrated outsourced solution to their document-related needs. Novitex supports a large and diverse base of approximately 400 clients, consisting of Fortune® 500 companies, Am Law® 200 law firms and public sector organizations, with approximately 7,000 employees located across approximately 1,200 client sites and 32 offsite facilities as of March 31, 2017. In addition, Novitex benefits from a highly diversified client base that includes clients in highly regulated industries, such as banking, property and casualty insurance, healthcare, government, legal, technology, consumer, manufacturing, energy and universities. For the fiscal year ended December 31, 2016, Novitex generated $543.2 million in revenues, $(19.1) million in net loss, and $75.3 million in Adjusted EBITDA. For the three months ended March 31, 2017, Novitex generated $143.6 million in revenues, $(9.7) million in net loss, and $17.3 million in Adjusted EBITDA. See "*Selected Historical Financial Information of Novitex—Reconciliation of GAAP to non-GAAP Measures.*"

**Structure of the Business Combination**

The Business Combination Agreement provides for (i) the merger of SourceHOV Merger Sub with and into SourceHOV, as a result of which the separate corporate existence of SourceHOV Merger Sub will cease, with SourceHOV continuing as the surviving company and an indirect subsidiary of the Company, and (ii) the merger of Novitex Merger Sub with and into Novitex, as a result of which the separate corporate existence of Novitex Merger Sub will cease, with Novitex as the surviving company and an indirect subsidiary of the Company. Immediately prior to the Business Combination Agreement, SourceHOV will engage in a merger with an indirect wholly-owned subsidiary, as a result of which all of the equity in SourceHOV (other than shares as to which appraisal rights are perfected) will be converted into membership interests in New SourceHOV LLC (the "Preliminary Merger").

Supp.App. 0399

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 402 of 1110    PageID 2023

Table of Contents

The following diagrams illustrate (i) the transactions to be effectuated in the Business Combination and (ii) the structure of the combined company immediately following the Business Combination:



#### Consideration to Selling Equityholders in the Business Combination

Pursuant to the Business Combination Agreement, equity holders of SourceHOV and Novitex will be entitled to receive shares of Quinpario Common Stock in exchange for their current equity in SourceHOV and Novitex. Each share of SourceHOV common stock will be converted into the right to receive a number of shares of Quinpario Common Stock equal to 80,600,000 divided by the number of shares of SourceHOV common stock outstanding immediately prior to the effective time of the Business Combination, after giving effect to the Preliminary Merger. Each share of common stock of Novitex will be converted into the right to receive a number of shares of Quinpario Common Stock equal to 30,600,000 divided by the number of shares of Novitex common stock outstanding immediately prior to the effective time of the Business Combination. Cash will be paid in lieu of any fractional shares of Quinpario Common Stock. As a result of the Preliminary Merger, all of the merger consideration relating to the SourceHOV stockholders will initially be held by New SourceHOV LLC.

34

Supp.App. 0400

Table of Contents

Upon repayment of the New SourceHOV Financing, New SourceHOV LLC will distribute the Quinpario Common Stock to its equityholders.

**Redemption Rights**

Pursuant to the current certificate of incorporation, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share calculated in accordance with the current certificate of incorporation. As of March 31, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises its redemption rights, then such holder will be exchanging its shares of Quinpario Common Stock for cash and will no longer own shares of the Company. Such a holder will be entitled to receive cash for its public shares only if it (a) affirmatively votes its shares of Quinpario Common Stock for or against the Business Combination Proposal and (b) properly demands redemption and delivers its shares (either physically or electronically) to the Transfer Agent prior to the Special Meeting. See the section entitled "*Special Meeting of Quinpario Stockholders—Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash.

**PIPE Investment**

In connection with the Business Combination, the Company entered into subscription and commitment agreements with certain investors on June 15, 2017 to purchase or waive redemption rights in respect of shares of Quinpario Common Stock, with the PIPE Investment consisting of 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock sold and 835,626 shares of Quinpario Common Stock issued in respect of waivers of redemption or conversion rights, for an aggregate commitment amount of approximately $275.5 million from the PIPE Investment (including in respect of those shares for which a waiver of redemption or conversion rights has been obtained), subject to certain conditions, including the closing of the Business Combination.

The Quinpario Common Stock and Series A Convertible Preferred Stock to be issued pursuant to the subscription agreements will not be registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. The subscription and commitment agreements provide for registration rights for the PIPE Investors and certain of the agreements provide for remedies relating to delays or unavailability of a resale registration statement. These shares of Quinpario Common Stock are not subject to contractual restrictions on resale and may be sold at any time by such investors or advisors following the registration of such shares in accordance with the subscription or commitment agreements (or at any time following the Business Combination in the case of the publicly traded shares).

The subscription and commitment agreements will generally be terminated, and be of no further force and effect, upon the earlier to occur of (i) the termination of the Business Combination Agreement in accordance with its terms, (ii) the mutual written agreement of the parties thereto or (iii) if any of the conditions to the closing are not satisfied on or prior to the closing and which make the consummation fail to occur. See the section of this proxy statement captioned "*Proposal No. 1—Approval of the Business Combination—PIPE Investment*."

*Commitment Agreements*

In connection with the Business Combination, the Company has entered into commitment agreements with certain investors (including one advisor who has agreed to receive fees as a reimbursement for acquisitions of shares of Quinpario Common Stock). The commitment agreements require that such investors (i) acquire and/or hold by June 27, 2017, 3,342,500 shares of Quinpario Common Stock, in the aggregate, in the open market, (ii) hold such shares until the closing of the Business Combination, (iii) waive the exercise of any redemption rights in respect of such shares or

35

Supp.App. 0401

otherwise transfer or sell such shares prior to the closing date of the Business Combination and (iv) not resell, transfer, pledge or otherwise dispose of the Quinpario Common Stock prior to the closing of the Business Combination. In exchange for such investor's agreement to hold the shares and not exercise any redemption rights in respect of such shares, such investors will receive 0.25 additional shares for each such purchased share they hold on the date of closing of the Business Combination. In the event that such an investor is unable to acquire any one of the committed number of shares in the open market, such investor will subscribe for and purchase (or in the case of one advisor, be issued in respect of fees) 1.25 shares of Quinpario Common Stock as part of the PIPE Investment for $8.00 per share. See the section of this proxy statement captioned "*Proposal No. 1—Approval of the Business Combination—PIPE Investment—Commitment Agreements*."

**Debt Financing**

In connection with the entry into the Business Combination Agreement, Quinpario has entered into a commitment letter to provide for debt financing in an aggregate principal amount of up to $1.35 billion as well as a committed $100 million senior secured revolving facility, a portion of which will be available at closing (the "Debt Financing"). Quinpario has received firm commitments from a consortium of financial institutions to provide the Debt Financing, which includes the revolving credit facility. See the section of this proxy statement captioned "*Proposal No. 1—Approval of the Business Combination—Debt Financing*."

**Impact of the Business Combination on the Company's Public Float**

It is anticipated that, upon completion of the Business Combination: (i) New SourceHOV LLC, a newly formed entity controlled by the HGM Group and owned by SourceHOV's former equity holders, will own approximately 54.9% of the combined company; (ii) Novitex Parent will own approximately 20.9% of the combined company; (iii) the Company's public stockholders (other than the PIPE Investors) will retain an ownership interest of approximately 2.8% in the combined company; (iv) the PIPE Investors will own approximately 14.2% of the combined company (such that public stockholders, including PIPE Investors, will own approximately 17.1% of the combined company); and (v) the Founders will own approximately 5.5% of the combined company, after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement. These levels of ownership interest (a) assume that all shares are elected to be redeemed, other than those shares in respect of which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and the sale of 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock (which may be convertible into 11,492,690 shares of Quinpario Common Stock) and the issuance of 835,626 shares in respect of waivers of redemptions or conversion rights with respect to shares of Quinpario Common Stock in the PIPE Investment, for approximately $242.1 million of gross proceeds (or savings from settled fees to advisors), and the issuance of 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration; and (b) do not take into account public warrants to purchase Quinpario Common Stock that will remain outstanding immediately following the Business Combination or the issuance of any shares upon completion of the Business Combination. Under the Forfeiture Agreement, which was amended and restated on June 15, 2017, the Founders have agreed to cancel the aggregate 18,000,000 Private Placement Warrants and certain Founder Shares held by them upon consummation of the Business Combination. However, of the Founder Shares held by the Sponsor, the Sponsor may retain 8,033,571 of such Founder Shares. In addition, three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the combined company will be different.

36

Supp.App. 0402

Table of Contents

The following table illustrates the share ownership in the combined company based on these assumptions:

| | Share Ownership in Combined Company(1) |
|---|---|
| The Company's public stockholders | 2.8% |
| The PIPE Investors | 14.2% |
| Founders | 5.5% |
| Novitex Parent | 20.9% |
| New SourceHOV LLC | 54.9% |
| Fees and other consideration | 1.7% |
| | 100% |

(1)    Assumes that all stockholders elect to redeem shares, other than those shares in respect of which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and that Quinpario sells 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock and issues 835,626 shares of Quinpario Common Stock in respect of waivers of redemptions or conversion rights in the PIPE Investment and issues 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration, the minimum number of shares that would be required to satisfy the condition to the Business Combination that the sum of (a) the amount in our Trust Account at closing and (b) the proceeds of the PIPE Investment, be at least $275.0 million.

**Board of Directors of Quinpario Following the Business Combination**

Upon consummation of the Business Combination, we anticipate increasing the size of the combined company's board of directors from seven directors to eight directors, with each Class A director having a term that expires at the combined company's annual meeting of stockholders in 2018, each Class B director having a term that expires at the combined company's annual meeting of stockholders in 2019 and each Class C director having a term that expires at the combined company's annual meeting of stockholders in 2020, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death. Please see the section entitled "*Management After the Business Combination*" for additional information. An information statement has been prepared, filed with the SEC and transmitted to Quinpario stockholders with this proxy statement pursuant to Section 14(f) of the Exchange Act and Rule 14f-1 in connection with the change in composition of the board of directors of the combined company.

**The Certificate Proposals; Bylaws**

Upon the closing of the Business Combination, our current certificate of incorporation will be amended promptly to reflect the Certificate Proposals to:

•    authorize an additional 1,465,000,000 shares of Quinpario Common Stock and an additional 19,000,000 shares of preferred stock (Proposal No. 3);

•    provide that certain provisions of the certificate of incorporation of the Company are subject to the Director Nomination Agreements (Proposal No. 4);

•    change the Company's corporate name from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc." (Proposal No. 5);

37

- provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity (Proposal No. 6); and

- provide for certain additional changes immediately after giving effect to the consummation of the Business Combination, including eliminating certain provisions specific to our status as a blank check company, providing that our directors are not personally liable to the Company or our stockholders for monetary damages for a breach of fiduciary duty, and certain indemnification provisions our board of directors believes are necessary to adequately address the needs of the combined company, subject to approval by our stockholders at the Special Meeting (Proposal No. 7).

In addition, upon the closing of the Business Combination, it is anticipated that the combined company will adopt the amended and restated bylaws attached to this proxy statement as Annex C.

**Date, Time and Place of Special Meeting**

The Special Meeting will be held at 1:00 p.m., Eastern time, on July 11, 2017, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, or at such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals.

**Voting Power; Record Date**

Only Quinpario stockholders of record at the close of business on May 31, 2017, the record date for the Special Meeting, will be entitled to vote at the Special Meeting. You are entitled to one vote for each share of Quinpario Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. On the record date, there were 28,848,601 shares of Quinpario Common Stock outstanding and entitled to vote, of which 8,750,000 are held by the Founders.

**Proxy Solicitation**

Proxies may be solicited by mail. Quinpario has engaged Morrow to assist in the solicitation of proxies.

If a stockholder grants a proxy, it may still vote its shares in person if it revokes its proxy before the Special Meeting. A stockholder may also change its vote by submitting a later-dated proxy, as described in the section entitled "*Special Meeting of Quinpario Stockholders—Revoking Your Proxy*."

**Accounting Treatment**

The business combination will be accounted for as a business combination for which SourceHOV has been determined to be the accounting acquirer based on the following predominate factors:

- New SourceHOV LLC will have the largest portion of voting rights in the newly formed entity;

- the largest minority shareholder of the combined entity is a current SourceHOV shareholder;

- SourceHOV is the largest entity by revenue and by assets; and

- the management of the newly formed entity is expected to be primarily composed of the management of SourceHOV, with Par Chadha anticipated to serve as Executive Chairman, Ronald Cogburn to serve as Chief Executive Officer, Jim Reynolds to serve as Chief Financial Officer, Shrikant Sortur to serve as Senior Vice President, Global Finance, Suresh Yannamani to

38

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 407 of 1110   PageID 2028

serve as President, Americas and Mark Fairchild to serve as President, Europe, however other specific roles have yet to be determined.

Since SourceHOV is determined to be the accounting acquirer in the reverse merger with Quinpario, the accounting for the merger will be similar to that of a capital infusion, as the only pre-combination asset of the Company is cash held in trust. The assets and liabilities of the Company will be carried at historical cost and SourceHOV will not record any step-up in basis or any intangible assets or goodwill as a result of the merger with Quinpario. The acquisition of Novitex will be treated as a business combination under ASC 805 and will be accounted for using the acquisition method. SourceHOV will record the fair value of assets and liabilities acquired from Novitex.

### Appraisal Rights

Appraisal rights are not available to our stockholders in connection with the Business Combination.

### Regulatory Matters

Under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), and the rules and regulations promulgated thereunder, certain transactions, including the Business Combination, may not be consummated until, among other things, pre-merger notifications have been made and certain information has been furnished to the Federal Trade Commission and the Antitrust Division of the Department of Justice, and certain waiting period requirements have expired or been terminated. Certain necessary pre-merger notifications under the HSR Act were made on March 24, 2017 and the waiting period for such notifications was terminated on April 4, 2017. See the section of this proxy statement captioned "*Proposal No. 1—Approval of the Business Combination—Regulatory Matters*" for additional information.

### Quorum and Required Vote for Stockholder Proposals

A quorum of Quinpario stockholders is necessary to hold a valid meeting. A quorum will be present at the Special Meeting if a majority of Quinpario Common Stock outstanding and entitled to vote at the Special Meeting is represented in person or by proxy. Abstentions will count as present for the purposes of establishing a quorum, but broker non-votes will not be counted for purposes of establishing a quorum.

The approval of each of the Business Combination Proposal and the Adjournment Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote thereon at the Special Meeting. Accordingly, a Quinpario stockholder's failure to vote by proxy or to vote in person at the Special Meeting or the failure of a Quinpario stockholder who holds his or her shares in "street name" through a broker or other nominee to give voting instructions to such broker or other nominee (a "broker non-vote") will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Business Combination Proposal or the Adjournment Proposal. Abstentions will have the same effect as a vote "AGAINST" the Business Combination Proposal and the Adjournment Proposal.

The approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote and actually cast a vote thereon at the Special Meeting. Accordingly, a Quinpario stockholder's abstention, broker non-vote or failure to vote by proxy or to vote in person at the Special Meeting will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Nasdaq Proposal.

The approval of each of the Certificate Proposals requires the affirmative vote of the holders of a majority of the outstanding shares of Quinpario Common Stock. Accordingly, a Quinpario stockholder's

39

failure to vote by proxy or to vote in person at the Special Meeting, an abstention or a broker non-vote will have the same effect as a vote "AGAINST" the Certificate Proposals.

The Business Combination Proposal is conditioned on the approval of each of the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal. The Nasdaq Proposal and each of the Certificate Proposals are each conditioned on the approval of the Business Combination Proposal. The Adjournment Proposal does not require the approval of any other proposal to be effective. It is important for you to note that in the event that the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal or the Corporate Opportunity Proposal does not receive the requisite vote for approval, then we will, unless the relevant condition under the Business Combination Agreement is waived, not consummate the Business Combination. If we do not consummate the Business Combination and fail to complete an initial business combination by July 24, 2017, our current certificate of incorporation requires us to dissolve and liquidate our Trust Account.

**Recommendation to Quinpario Stockholders**

**Quinpario's board of directors believes that each of the Business Combination Proposal, the Nasdaq Proposal, each of the Certificate Proposals and the Adjournment Proposal to be presented at the Special Meeting is in the best interests of the Company and its stockholders and unanimously recommends that its stockholders vote "FOR" each of the proposals. In evaluating the Business Combination and making these determinations and this recommendation, the Quinpario board of directors consulted with Quinpario's senior management, Quinpario's financial and legal advisors and considered a number of factors. For more information see "*Proposal No. 1—Approval of the Business Combination—Quinpario's Board of Directors' Reasons for the Approval of the Business Combination*."**

**Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination**

When you consider the recommendation of the Quinpario board of directors in favor of approval of these proposals, you should keep in mind that its directors and officers have interests in the Business Combination that are different from or in addition to (and which may conflict with) your interests as a stockholder. These interests include, among other things:

- the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that, if unrestricted and freely tradable, these shares would be valued at $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, we believe such shares have less value;

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

- the continued right of the Sponsor to hold Quinpario Common Stock;

40

Supp.App. 0406

- the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, have agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that the Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

- that, at the closing of the Business Combination, we will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

**Conditions to Closing of the Business Combination**

The obligations of each party to consummate the transactions contemplated by the Business Combination Agreement, including the Business Combination, are subject to the satisfaction, or written waiver of each of the following conditions:

- all required waiting periods or approvals under the HSR Act and all applicable antitrust laws shall have expired, been received or terminated;

- no applicable law or injunction enacted, entered, promulgated, enforced or issued by any governmental authority or other legal restraint or prohibition preventing the consummation of the Business Combination shall be in effect;

- both the SourceHOV Merger and the Novitex Merger shall have been consummated substantially simultaneously;

- the approval of the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal shall have been obtained;

- the HGM Consent and the Novitex Consent (each as defined in the Business Combination Agreement) shall have been obtained, which condition has since been satisfied; and

- Quinpario shall have received financing on the terms provided for in the commitment letter between Quinpario, Royal Bank of Canada, RBC Capital Markets, LLC, Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, Natixis Securities Americas LLC, KKR Capital Markets LLC, and KKR Corporate Lending LLC.

41

Supp.App. 0407

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 410 of 1110    PageID 2031

Table of Contents

In addition, the obligations of Quinpario to effect the Business Combination are subject to fulfillment, on or prior to the closing date, of the following condition (which may be waived in writing by Quinpario):

- Quinpario shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) remaining after the closing.

In addition, the obligations of the Sellers, SourceHOV and Novitex to effect the Business Combination are subject to the condition (which may be waived by each Seller) that, after giving effect to (i) the redemptions each holder of Quinpario Common Stock is entitled to pursuant to Quinpario's current certificate of incorporation and (ii) the PIPE Investments, excluding amounts in the Trust Account which are part of the PIPE Investment, the amount in the Trust Account plus the total proceeds from the PIPE Investments available to Quinpario equals no less than $275,000,000 in cash.

For additional information regarding these and certain additional conditions to the completion of the Business Combination, see the section entitled "*Proposal No. 1—Approval of the Business Combination.*"

**Risk Factors**

In evaluating the proposals set forth in this proxy statement, you should carefully read this proxy statement, including the annexes, and especially consider the factors discussed in the section entitled "*Risk Factors.*"

Supp.App. 0408

Table of Contents

## SELECTED HISTORICAL FINANCIAL INFORMATION OF QUINPARIO

The following tables set forth selected historical financial information derived from Quinpario's (i) audited financial statements included elsewhere in this proxy statement as of December 31, 2016 and 2015, for the years ended December 31, 2016 and 2015, and for the period from July 15, 2014 (inception) to December 31, 2014, and (ii) unaudited financial statements included elsewhere in this proxy statement as of March 31, 2017 and for the three months ended March 31, 2017 and 2016. You should read the following selected financial information in conjunction with the section entitled "*Quinpario Management's Discussion and Analysis of Financial Condition and Results of Operations*" and Quinpario's financial statements and the related notes appearing elsewhere in this proxy statement.

| | Three Months Ended March 31, | | Year Ended December 31, | | Period from July 15, 2014 (Inception) to December 31, 2014(a) |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 | |
| **Statement of Operation Data:** | | | | | |
| Reimbursement of due diligence expenses | $ — | $ — | $ — | $ 500,000 | $ — |
| General and administrative costs | (642,155) | (354,634) | (1,128,167) | (1,027,734) | (53,338) |
| Loss from operations | (642,155) | (354,634) | (1,128,167) | (527,734) | (53,338) |
| Interest income | 255,604 | 295,722 | 1,185,130 | 155,807 | — |
| Net income (loss) attributable to common shares outstanding | (386,551) | (58,912) | 56,963 | (371,927) | (53,338) |
| Net income (loss) per common share outstanding basic and diluted | (0.04) | (0.01) | 0.01 | (0.04) | (0.01) |
| Weighted average number of common shares outstanding basic and diluted | 10,468,212 | 10,385,539 | 10,414,438 | 10,261,416 | 8,750,000 |

(a)    Quinpario was incorporated on July 15, 2014 and therefore is not presenting the information for any prior periods.

| | As of March 31, 2017 | As of December 31, | | |
|---|---|---|---|---|
| | | 2016 | 2015 | 2014 |
| **Balance Sheet Data:** | | | | |
| Cash | $ 296,311 | $ 120,382 | $ 881,923 | $ 1,273 |
| Investments held in Trust Account | 201,105,244 | 351,088,398 | 350,155,268 | — |
| Total Assets | 201,425,692 | 351,208,780 | 351,111,906 | 212,377 |
| Total Liabilities | 12,387,552 | 12,357,331 | 12,317,420 | 240,715 |
| Common stock subject to possible redemption | 184,038,137 | 333,851,446 | 333,794,485 | — |
| Total stockholders' equity (deficit), net | 5,000,003 | 5,000,003 | 5,000,001 | (28,338) |

43

Supp.App. 0409

Table of Contents

### SELECTED HISTORICAL FINANCIAL INFORMATION OF SOURCEHOV

The following table sets forth selected historical financial information derived from SourceHOV's (i) audited financial statements included elsewhere in this proxy statement as of December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014, (ii) audited financial statements as of December 31, 2014, 2013 and 2012 and for the years ended December 31, 2013 and 2012 not included in this proxy statement and (iii) unaudited financial statements included elsewhere in this proxy statement as of March 31, 2017 and 2016. You should read the following selected financial information in conjunction with the section entitled "*SourceHOV Management's Discussion and Analysis of Financial Condition and Results of Operations*" and SourceHOV's financial statements and the related notes appearing elsewhere in this proxy statement.

| | | | | | | 2013 | | |
| | Three Months Ended March 31, | | Year Ended December 31, | | | Successor Period from May 1 to December 31 | Predecessor Period from January 1 to April 30 | Year Ended December 31, 2012 |
| (in thousands, except share and per share data) | 2017 | 2016 | 2016 | 2015 | 2014 | | | |
|---|---|---|---|---|---|---|---|---|
| **Statements of Operations Information:** | | | | | | | | |
| Revenue | $ 218,260 | $ 199,690 | $ 789,926 | $ 805,232 | $ 650,918 | $ 449,569 | $ 229,619 | $ 595,176 |
| Cost of revenue (exclusive of depreciation and amortization) | 143,708 | 133,343 | 519,121 | 559,846 | 451,539 | 327,320 | 166,026 | 399,609 |
| **Gross Profit** | 74,552 | 66,347 | 270,805 | 245,386 | 199,379 | 122,249 | 63,593 | 195,567 |
| Selling, general and administrative expenses | 35,581 | 31,028 | 130,437 | 120,691 | 131,864 | 63,360 | 44,810 | 94,392 |
| Depreciation and amortization | 21,320 | 18,759 | 79,639 | 75,408 | 65,227 | 39,217 | 15,357 | 42,033 |
| Impairment of goodwill and other intangible assets | — | — | — | — | 154,454 | — | — | — |
| Related party expense | 2,385 | 2,335 | 10,493 | 8,977 | 19,080 | | 3,426 | 59,142 |
| **Operating Income (Loss)** | 15,266 | 14,225 | 50,236 | 40,310 | (171,246) | 19,672 | 3,426 | 59,142 |
| Other expense (income), net: | | | | | | | | |
| Interest expense, net | 26,219 | 27,400 | 109,414 | 108,779 | 48,045 | 24,659 | 17,428 | 53,586 |
| Loss on extinguishment of debt | — | — | — | — | 18,548 | | 24,889 | — |
| Sundry expense (income), net | 2,724 | (1,931) | 712 | 3,247 | (2,201) | | | — |
| **Net (Loss) Income Before Income Taxes** | (13,677) | (11,244) | (59,890) | (71,716) | (235,638) | (4,987) | (38,891) | 5,556 |
| Income tax benefit (expense) | (2,004) | 3,082 | 11,787 | 26,812 | 38,003 | 1,661 | 13,551 | (2,145) |
| **Net (Loss) Income** | (15,681) | (8,162) | (48,103) | (44,904) | (197,635) | (3,326) | (25,340) | 3,411 |
| (Loss) income per share: | | | | | | | | |
| Basic | (99.72) | (56.52) | (333.13) | (310.97) | (1,368.67) | (60.87) | (2.41) | 0.11 |
| Diluted | (99.72) | (56.52) | (333.13) | (310.97) | (1,368.67) | (60.87) | (2.41) | 0.11 |
| Weighted average number of shares outstanding: | | | | | | | | |
| Basic | 157,243 | 144,399 | 144,399 | 144,399 | 144,399 | 54,645 | 10,527,662 | 31,582,925 |
| Diluted | 157,243 | 144,399 | 144,399 | 144,399 | 144,399 | 54,645 | 10,527,662 | 31,582,925 |

44

Supp.App. 0410

| (in thousands) | As of March 31, 2017 | As of December 31, | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | 2016 | 2015 | 2014 | 2013 | | 2012 |
| | | | Successor | | | | Predecessor |
| **Balance Sheet Data:** | | | | | | | |
| Cash and cash equivalents | $ 15,916 | $ 8,361 | $ 16,619 | $ 22,667 | $ 17,412 | $ | 9,017 |
| Accounts receivable, net of allowance for doubtful accounts | 138,768 | 138,421 | 145,162 | 157,853 | 147,186 | | 132,092 |
| Working capital | (30,795) | (41,404) | 18,162 | 42,583 | 102,124 | | 71,196 |
| Total assets | 963,688 | 969,486 | 960,048 | 1,009,797 | 1,046,184 | | 625,305 |
| Long-term debt, net of current maturities | 971,154 | 983,502 | 975,142 | 952,071 | 501,962 | | 536,647 |
| Total liabilities | 1,296,289 | 1,309,387 | 1,251,537 | 1,266,169 | 729,092 | | 713,749 |
| Total stockholders' (deficit) equity | (332,601) | (339,901) | (291,489) | (256,372) | 317,092 | | (88,444) |

## Reconciliation of GAAP to non-GAAP Measures

SourceHOV's board of directors, management and investors use EBITDA and Adjusted EBITDA to assess its financial performance because it allows them to compare SourceHOV's operating performance on a consistent basis across periods by removing the effects of its capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization), and items outside the control of its management team. SourceHOV presents EBITDA and Adjusted EBITDA because it believes they provide useful information regarding the factors and trends affecting its business in addition to measures calculated under GAAP. SourceHOV defines EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. SourceHOV defines Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integrations costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

The following table presents a reconciliation of EBITDA and Adjusted EBITDA to SourceHOV's net income (loss) the most directly comparable GAAP measure for the periods presented:

| (in thousands) | Three Months Ended March 31, | | Year Ended December 31, | | | Successor Period from May 1 to December 31, 2013 | Predecessor Period from January 1 to April 30, 2013 | Year Ended December 31, 2012 |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2017 | 2016 | 2016 | 2015 | 2014 | | | |
| Net (loss) income | $ (15,681) | $ (8,162) | $ (48,103) | $ (44,904) | $ (197,635) | $ (3,326) | $ (25,340) | $ 3,411 |
| Income Tax (benefit) expense | 2,004 | (3,082) | (11,787) | (26,812) | (38,003) | (1,661) | (13,551) | 2,145 |
| Interest expense, net | 26,219 | 27,400 | 109,414 | 108,779 | 48,045 | 24,659 | 17,428 | 53,586 |
| Depreciation and amortization | 21,320 | 18,759 | 79,639 | 75,408 | 65,227 | 39,217 | 15,357 | 42,033 |
| EBITDA | 33,862 | 34,915 | 129,163 | 112,471 | (122,366) | 58,889 | (6,106) | 101,175 |
| Optimization and restructuring expenses(1) | 4,337 | 3,594 | 7,559 | 5,210 | 16,822 | 4,037 | 1,094 | 5,361 |
| Transaction and integration costs(2) | 5,066 | 487 | 18,848 | 18,466 | 35,606 | 750 | 11,317 | 4,175 |
| Non-cash equity compensation(3) | 310 | 1,992 | 7,085 | 8,122 | 6,104 | 6,000 | 458 | 438 |
| Other non-cash charges(4) | 75 | 135 | 471 | 1,881 | 1,420 | 1,436 | — | — |
| Loss (gain) on sale of assets(5) | (251) | — | 2,274 | 284 | 1,153 | 21 | 39 | (87) |
| Loss on extinguishment of debt(6) | — | — | — | — | 18,548 | — | 24,889 | |
| Impairment of intangible assets(7) | — | — | — | — | 16,600 | — | | |
| Impairment of goodwill(8) | — | — | — | — | 137,854 | — | | — |
| Management board fees and expenses(9) | 2,060 | 2,020 | 7,837 | 6,897 | 6,311 | 3,896 | 2,905 | 2,000 |
| Adjusted EBITDA | $ 45,459 | $ 43,143 | $ 173,237 | $ 153,331 | $ 118,052 | $ 75,029 | $ 34,596 | $ 113,062 |

(1)    Adjustment represents net salary and benefits associated with positions that were terminated, including severance, retention bonuses, and related fees and expenses. Additionally, the adjustment includes charges incurred by SourceHOV to terminate existing lease contracts as part of facility consolidation initiatives.

45

Supp.App. 0411

(2)    Represents costs incurred related to transactions and integration. Integration costs were mainly for training employees for a revised set of coding standards, which relates to outsourced medical coding services provided by Lexicode, a division of SourceHOV. Additionally, the adjustment includes system conversion and integration-related expenses related to running parallel systems.

(3)    Represents the non-cash charges related to restricted stock units granted by SourceHOV that vested during the year.

(4)    Represents fair value adjustments to deferred revenue and deferred rent accounts established as part of purchase accounting.

(5)    Represents losses on disposal of assets.

(6)    Represents loss on the early extinguishment of debt as a result of the refinancing of SourceHOV's credit agreement.

(7)    Represents impairment charges recorded for indefinite lived intangible assets. See *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* in the Notes to the SourceHOV Consolidated Financial Statements.

(8)    Represents impairment charges recorded for goodwill. See *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* in the Notes to the SourceHOV Consolidated Financial Statements.

(9)    Amount represents management fees paid to HGM and TransCentra's prior owner, Board of Directors fees and corresponding travel, and other expenses (e.g., rating agency fees, chargebacks) which are not expected to continue on a go-forward basis.

Supp.App. 0412

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 415 of 1110    PageID 2036

## SELECTED HISTORICAL FINANCIAL INFORMATION OF NOVITEX

The following table sets forth selected historical financial information derived from Novitex's (i) audited financial statements included elsewhere in this proxy statement as of December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014, (ii) unaudited financial statements as of December 31, 2014, 2013 and 2012 and for the years ended December 31, 2013 and 2012 not included in this proxy statement and (iii) unaudited financial statements included elsewhere in this proxy statement as of March 31, 2017 and for the three months ended March 31, 2017 and 2016. You should read the following selected financial information in conjunction with the section entitled "*Novitex Management's Discussion and Analysis of Financial Condition and Results of Operations*" and Novitex's financial statements and the related notes appearing elsewhere in this proxy statement.

| (in thousands, except per share data) | Three Months Ended March 31, 2017 | Three Months Ended March 31, 2016 | Year Ended December 31, 2016 | Year Ended December 31, 2015 | Year Ended December 31, 2014 | 2013(a) Successor Period from July 26 to December 31 | 2013(a) Predecessor Nine Months Ended September 30 | Year Ended December 31, 2012 |
|---|---|---|---|---|---|---|---|---|
| **Statement of Operations Data:** | | | | | | | | |
| Revenues | $ 143,600 | $ 136,779 | $ 543,163 | $ 575,744 | $ 624,860 | $ 187,522 | $ 524,080 | $ 731,170 |
| **Operating Expenses:** | | | | | | | | |
| Cost of revenues, exclusive of depreciation and amortization shown below | 118,165 | 109,379 | 437,977 | 468,811 | 503,313 | 149,621 | 422,367 | 573,627 |
| Selling, general and administrative, exclusive of depreciation and amortization shown below | 15,984 | 13,891 | 49,771 | 56,638 | 62,508 | 25,967 | 37,918 | 53,629 |
| Depreciation and amortization | 9,719 | 9,644 | 40,588 | 39,505 | 32,427 | 8,273 | 13,118 | 18,582 |
| Allocation of Costs from Pitney Bowes, Inc. | — | — | — | — | — | — | 24,858 | 28,549 |
| Restructuring | 334 | 91 | 141 | 666 | (948) | 8,020 | 529 | 4,490 |
| Affiliate Interest, net | — | — | — | — | — | — | — | 47,781 |
| Goodwill Impairment | — | — | — | — | — | — | 236,910 | — |
| Acquisition-related Costs | — | — | — | — | — | 22,345 | — | — |
| **Total Operating Expenses** | 144,202 | 133,005 | 528,477 | 565,620 | 597,300 | 214,226 | 735,700 | 726,658 |
| **Operating (Loss) Income** | (602) | 3,774 | 14,686 | 10,124 | 27,560 | (26,704) | (211,620) | 4,512 |
| **Other Expense (Income):** | | | | | | | | |
| Interest Expense, net | 12,106 | 11,560 | 47,928 | 46,482 | 38,270 | 7,853 | — | — |
| (Gain) loss on early extinguishment of debt | — | — | (2,307) | (2,636) | 5,962 | — | 35,777 | — |
| **(Loss) Income Before Income Taxes** | (12,708) | (7,786) | (30,935) | (33,722) | (16,672) | (34,557) | (247,397) | 4,512 |
| (Benefit from) Provision for Income Taxes | (3,008) | (3,084) | (11,805) | (12,321) | (2,306) | (10,474) | (38,936) | 965 |
| **Net (Loss) Income** | (9,700) | (4,702) | (19,130) | (21,401) | (14,366) | (24,083) | (208,461) | 3,547 |
| Foreign currency translation gain (loss) | 1 | 1,161 | 1,125 | (2,960) | (1,539) | (530) | (903) | 896 |
| **Comprehensive (Loss) Income** | $ (9,699) | $ (3,541) | $ (18,005) | $ (24,361) | $ (15,905) | $ (24,613) | $ (209,364) | $ 4,443 |
| Net (Loss) Per Share | $ (719) | $ (348) | $ (1,417) | $ (1,585) | $ (1,064) | $ (1,784) | (*) | (*) |

(a) Novitex was formed on July 26, 2013. On October 1, 2013, Novitex acquired Pitney Bowes Management Services ("PBMS") in exchange for aggregate cash consideration of approximately $392.3 million excluding transaction-related costs. The Financial Statements are presented for two periods: July 26, 2013 through December 31, 2013 ("Successor Period") and January 1, 2013 through September 30, 2013 ("Predecessor Period"). The Successor Period results of operations and cash flows, prior to the Acquisition on October 1, 2013, consist solely of acquisition-related costs.

47

Supp.App. 0413

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 416 of 1110    PageID 2037

(*)      Per share information not applicable to Predecessor Period.

| (in thousands) | As of March 31, 2017 | As of December 31, | | | | 2012 |
| | | 2016 | 2015 | 2014 | 2013 | |
| | | Successor | | | | Predecessor |
| **Balance Sheet Data:** | | | | | | |
| Cash and cash equivalents | $ 40,303 | $ 37,229 | $ 28,118 | $ 42,027 | $ 72,702 | $ 24,262 |
| Accounts receivable, less allowance for doubtful accounts | 90,464 | 87,143 | 106,008 | 105,764 | 133,324 | 148,897 |
| Working Capital | 20,045 | 28,732 | 47,168 | 87,320 | 104,069 | 106,022 |
| Total assets | 472,971 | 476,220 | 503,712 | 515,913 | 580,991 | 643,664 |
| Long-term debt(*) | 413,403 | 415,429 | 423,154 | 420,003 | 284,762 | 722,808 |
| Total liabilities | 569,288 | 562,943 | 573,029 | 561,356 | 484,212 | 858,507 |
| Total stockholder's equity (deficit) | (96,317) | (86,723) | (69,317) | (45,443) | 110,470 | (214,843) |

(*)      Information relating to deferred issuance costs of long term debt as of December 31, 2012 is not available.

**Reconciliation of GAAP to non-GAAP Measures**

EBITDA and Adjusted EBITDA, which are used by Novitex's management to measure performance and assess compliance with financial covenants under debt instruments, are not presented in accordance with GAAP. Novitex believes that EBITDA is useful to investors, as it is commonly used in the industry as a means of evaluating operating performance. Novitex does not intend for these non-GAAP financial measures to be a substitute for any GAAP financial information. Readers of this proxy statement should use these non-GAAP financial measures only in conjunction with the comparable GAAP financial measures. Since other companies may calculate EBITDA and Adjusted EBITDA differently than Novitex does, EBITDA and Adjusted EBITDA, as presented herein, may not be comparable to similarly titled measures reported by other companies.

Adjusted EBITDA is one of the primary measures management uses for planning and budgeting processes and to assess compliance with financial covenants under debt instruments, and to monitor and evaluate financial and operating results. In addition, Adjusted EBITDA is a factor in evaluating management's performance when determining incentive compensation.

48

Supp.App. 0414

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 417 of 1110    PageID 2038

The following table reconciles net loss to EBITDA and Adjusted EBITDA for the periods presented:

| ($ in thousands) | Three Months Ended March 31, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| | 2017 | 2016 | 2016 | 2015 | 2014 |
| **GAAP Net loss** | $ (9,700) | $ (4,702) | $ (19,130) | $ (21,401) | $ (14,366) |
| Interest expense, net | 12,106 | 11,560 | 47,928 | 46,482 | 38,270 |
| Depreciation and amortization | 9,719 | 9,644 | 40,588 | 39,505 | 32,427 |
| Benefit from income taxes | (3,008) | (3,084) | (11,805) | (12,321) | (2,306) |
| **Reported EBITDA** | $ 9,117 | $ 13,418 | $ 57,581 | $ 52,265 | $ 54,025 |
| **EBITDA Adjustments:** | | | | | |
| (Gain) loss on early extinguishment of debt(1) | — | — | (2,307) | (2,636) | 5,962 |
| Completed restructuring and cost reduction initiatives(2) | 1,543 | 6,653 | 12,832 | 19,928 | 11,463 |
| Transaction related costs(3) | 4,943 | — | — | — | — |
| Non-cash stock compensation and management fees(4) | 508 | 388 | 1,861 | 1,373 | 1,410 |
| New contract setup(5) | 1,139 | 878 | 5,289 | 2,582 | 2,690 |
| **Adjusted EBITDA** | $ 17,250 | $ 21,337 | $ 75,256 | $ 73,512 | $ 75,550 |

(1)    During the years ended December 31, 2016 and 2015, the company recognized a gain on the forgiveness of its Connecticut State Assistance Loan. During 2014, the company recognized a loss on the early extinguishment of debt as a result of the refinancing of its credit agreement. See *Note 9 —Long-Term Debt* in the Notes to the Novitex Consolidated Financial Statements.

(2)    Various costs incurred primarily for consolidation of nine regional document servicing centers into two MegaCenters, restructuring initiatives, and establishment of new technology platforms.

(3)    Professional fees and filing fees associated with the contemplated transaction.

(4)    Represents stock-based compensation expense (see *Note 11—Stock-Based Compensation Plans* in the Notes to the Novitex Consolidated Financial Statements), management fees and board of directors fees associated with company oversight.

(5)    Costs incurred during new contract and customer onboarding such as direct payroll, customer incentives, equipment set-up and other operating expenses.

The tax impact of the taxable adjustments for the three months ended March 31, 2017 and 2016 is $1.5 million and $3.1 million, respectively, and is based on the U.S. blended tax rate of 40.3%. The tax impact of the taxable adjustments for the year ended December 31, 2016 is $6.9 million and is based on the U.S. blended tax rate of 40.3%. The tax impact of the taxable adjustments for the year ended December 31, 2015 is $8.3 million and is based on the U.S. blended tax rate of 40.0%. The tax impact of the taxable adjustments for the year ended December 31, 2014 is $8.4 million and is based on the U.S. blended tax rate of 40.2%.

49

Supp.App. 0415

## SELECTED UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION

The following selected unaudited pro forma condensed combined financial data (the "selected pro forma data") gives effect to the transactions contemplated by the Business Combination and the other transactions described in the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*." The acquisition of SourceHOV and Novitex will be accounted for as a business combination using the acquisition method of accounting under the provisions of Accounting Standards Codification 805, "Business Combinations" ("ASC 805"). The selected unaudited pro forma condensed combined balance sheet data as of March 31, 2017 gives effect to the Business Combination as if it had occurred on March 31, 2017. The selected unaudited pro forma condensed combined statement of operations data for the three months ended March 31, 2017 and for the year ended December 31, 2016 gives effect to the Business Combination as if it had occurred on January 1, 2016.

The selected pro forma data have been derived from, and should be read in conjunction with, the more detailed unaudited pro forma condensed combined financial information (the "pro forma financial statements") of the combined company appearing elsewhere in this proxy statement and the accompanying notes to the pro forma financial statements. In addition, the pro forma financial statements were based on, and should be read in conjunction with, the historical consolidated financial statements and related notes of each of SourceHOV, Novitex and Quinpario for the applicable periods included in this proxy statement. The selected pro forma data have been presented for informational purposes only and are not necessarily indicative of what the combined company's financial position or results of operations actually would have been had the Business Combination been completed as of the dates indicated. In addition, the selected pro forma data do not purport to project the future financial position or operating results of the combined company. Also, as explained in more detail in the accompanying notes to the unaudited pro forma condensed combined financial statements, the preliminary fair values of assets acquired and liabilities assumed reflected in the selected pro forma data are subject to adjustment and may vary significantly from the fair values that will be recorded upon completion of the Business Combination.

|  | Pro Forma Combined |
|---|---|
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations** | |
| **Three Months Ended March 31, 2017 (in thousands, except share and per share information)** | |
| Revenue | $ 361,860 |
| Net income (loss) per share—basic and diluted | $ (0.11) |
| Weighted-average shares outstanding—basic and diluted | 146,794,640 |
| **Selected Unaudited Pro Forma Combined Balance Sheet Data as of March 31, 2017 (in thousands)** | |
| Total assets | $ 1,947,599 |
| Total liabilities | $ 1,849,281 |
| Total equity | $ 98,318 |
| **Selected Unaudited Pro Forma Condensed Combined Statement of Operations** | |
| **Year Ended December 31, 2016 (in thousands, except share and per share information)** | |
| Revenue | $ 1,333,089 |
| Net income per share—basic and diluted | $ (0.45) |
| Weighted-average shares outstanding—basic and diluted | 146,794,640 |

**Non-GAAP Measures**

Pro forma EBITDA and pro forma Adjusted EBITDA, which are important metrics used to measure performance of the combined company and which will be used by management of the combined company to measure performance in the future, are not presented in accordance with GAAP.

50

We believe that pro forma EBITDA is useful to investors, as it is commonly used in the industry as a means of evaluating operating performance and reflects the EBITDA of SourceHOV and Novitex on a combined basis. We do not intend for these non-GAAP financial measures to be a substitute for any GAAP financial information. Readers of this proxy statement should use these non-GAAP financial measures only in conjunction with the comparable GAAP financial measures. Since other companies may calculate EBITDA and Adjusted EBITDA differently than we do, pro forma EBITDA and pro forma Adjusted EBITDA, as presented herein, may not be comparable to similarly titled measures reported by other companies.

We believe these non-GAAP financial measures:

- reflect the ongoing business of the combined companies in a manner that allows for meaningful period-to-period comparison and analysis of trends in its business, as they exclude income and expense that are not reflective of ongoing operating results;

- provide useful information in understanding and evaluating the combined business' operating results and comparing financial results across periods; and

- provide a normalized view of the operating performance of the combined business by excluding items that are either noncash or infrequently occurring in nature.

Pro forma Adjusted EBITDA is one of the primary measures management of the combined company will use for planning and budgeting processes, and to monitor and evaluate financial and operating results. In addition, Adjusted EBITDA will be a factor in evaluating management's performance when determining incentive compensation.

Pro forma Adjusted EBITDA gives effect to historical acquisitions of SourceHOV, as if they had been included in the financial information of SourceHOV from the beginning of each period presented in the table below. See *Note 3—Business Combinations* to the Notes to the SourceHOV Consolidated Financial Statements.

| | Three Months Ended March 31, | | Year Ended December 31, | | |
|---|---|---|---|---|---|
| ($ in millions) | 2017 | 2016 | 2016 | 2015 | 2014 |
| **Adjusted EBITDA(1)** | $ 62.7 | $ 64.5 | $ 248.4 | $ 226.9 | $ 193.7 |
| **Pro forma Adjusted EBITDA(2)** | | | $ 349.9 | | |

(1)   The reconciliation of Adjusted EBITDA to Net Income may be found in "*SourceHOV Management's Discussion and Analysis of Financial Condition and Results of Operations—Other Financial Information (Non-GAAP Financial Measures)*" and "*Novitex Management's Discussion and Analysis of Financial Condition and Results of Operations—Other Financial Information (Non-GAAP Financial Measures)*."

51

Supp.App. 0417

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 420 of 1110    PageID 2041

(2)    The reconciliation of pro forma Net (loss) to pro forma Adjusted EBITDA includes:

| ($ in millions) | Q1 2017 | FY 2016 |
|---|---|---|
| **Pro forma Net (loss)** | $ (14.0) | $ (40.9) |
| Interest expense, net | 28.6 | 113.7 |
| Income tax (benefit) expense | 6.1 | (7.9) |
| Depreciation and amortization expense | 34.2 | 132.8 |
| Other EBITDA adjustments | 7.8 | 50.8 |
| **Adjusted EBITDA (see note 1 above)** | **62.7** | **248.4** |
| Acquisition adjustments | | 1.8 |
| SourceHOV actioned and in process restructuring | | 49.2 |
| Novitex actioned restructuring | | 13.0 |
| Combined company synergies(a) | | 37.5 |
| **Pro forma Adjusted EBITDA** | | **$ 349.9** |

(a)    Combined company synergies are discussed in greater detail in the section entitled "*Summary of the Proxy Statement—Key Combined Business Strategies.*"

52

Supp.App. 0418

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 421 of 1110    PageID 2042

## COMPARATIVE SHARE INFORMATION

The following table sets forth historical comparative share information for Quinpario, SourceHOV and Novitex and unaudited pro forma combined share information after giving effect to the Business Combination, assuming that all of the holders of public shares exercise their redemption rights, other than in respect of those shares for which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and the sale of 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock and the issuance of 835,626 shares of Quinpario Common Stock in respect of waivers of redemptions or conversion rights in the PIPE Investment and the issuance of 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration.

The historical information should be read in conjunction with "*Selected Historical Financial Information of Quinpario*," "*Selected Historical Financial Information of SourceHOV*" and "*Selected Historical Financial Information of Novitex*" included elsewhere in this proxy statement and the historical financial statements of Quinpario, SourceHOV and Novitex included elsewhere in this proxy statement. The unaudited pro forma combined share information is derived from, and should be read in conjunction with, the unaudited pro forma condensed combined financial information and related notes included elsewhere in this proxy statement. The unaudited pro forma combined share information does not purport to represent what the actual results of operations of Quinpario, SourceHOV and Novitex would have been had the Business Combination been completed or to project Quinpario, SourceHOV and Novitex's results of operations that may be achieved after the Business Combination. The unaudited pro forma book value per share information below does not purport to represent what the value of Quinpario, SourceHOV and Novitex would have been had the Business Combination been completed nor the book value per share for any future date or period.

| | Historical | | | Pro Forma Combined |
| --- | --- | --- | --- | --- |
| | Quinpario | Novitex | SourceHOV | |
| **As of and for the Three Months Ended March 31, 2017** *(Unaudited)* | | | | |
| Book value per share(1) | $ 0.17 | $ (7,134.59) | $ (2,115.20) | $ 0.16 |
| Number of shares outstanding | 28,848,601(2) | 13,500 | 157,243 | 146,794,640(3) |
| Basic net income (loss) per share | $ (0.04) | $ (718.52) | $ (99.72) | $ (0.11) |
| Diluted net income (loss) per share | $ (0.04) | $ (718.52) | $ (99.72) | $ (0.11) |
| Cash dividends per share | $ — | $ — | $ — | $ — |
| **As of and for the Year Ended December 31, 2016** | | | | |
| Book value per share(1) | $ 0.11 | $ (6,423.93) | $ (2,353.90) | N/A |
| Number of shares outstanding | 43,750,000(2) | 13,500 | 144,399 | 146,794,640(3) |
| Basic net income (loss) per share | $ 0.01 | $ (1,417.04) | $ (333.13) | $ (0.45) |
| Diluted net income (loss) per share | $ 0.01 | $ (1,417.04) | $ (333.13) | $ (0.45) |
| Cash dividends per share | $ — | $ — | $ — | $ — |

(1)     Book value per share = (Total Shareholders' Equity excluding Preferred Equity)/Total Outstanding Shares).

(2)     The number of shares outstanding includes shares subject to possible redemption.

(3)     Excludes shares of Quinpario Common Stock that will be issued upon conversion of Series A Convertible Preferred Stock that, subject to closing conditions, will be issued in the PIPE Investment.

53

Supp.App. 0419

**Sources and Uses for the Business Combination**

The following table summarizes the sources and uses for funding the Business Combination (all numbers in millions):

### Sources & Uses

| Sources | | | Uses | | |
|---|---|---|---|---|---|
| Committed Debt Financing | $ | 1,350 | Refinanced Debt | $ | 1,484 |
| Total cash equity | | 275 | Capital Lease and Other | | 62 |
| Capital Lease and Other | | 62 | SourceHOV Existing Equity Value | | 645 |
| SourceHOV Existing Equity Value | | 645 | Novitex Existing Equity Value | | 245 |
| Novitex Existing Equity Value | | 245 | Financing and Advisory Fees | | 90 |
| | | | New Cash to Balance Sheet | | 51 |
| **Total Sources** | $ | 2,577 | **Total Uses** | $ | 2,577 |

54

Supp.App. 0420

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 423 of 1110   PageID 2044

**CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS**

We make forward-looking statements in this proxy statement. These forward-looking statements relate to outlooks or expectations for earnings, revenues, expenses or other future financial or business performance, strategies or expectations, or the impact of legal or regulatory matters on business, results of operations or financial condition. Specifically, forward-looking statements may include statements relating to:

- the benefits of the Business Combination;

- the future financial performance of the Company following the Business Combination;

- changes in the market for Novitex or SourceHOV products and services;

- expansion plans and opportunities; and

- other statements preceded by, followed by or that include the words "estimate," "plan," "project," "forecast," "intend," "expect," "anticipate," "believe," "seek," "target" or similar expressions.

These forward-looking statements are based on information available to as of the date of this proxy statement, and current expectations, forecasts and assumptions, and involve a number of risks and uncertainties. Accordingly, forward-looking statements should not be relied upon as representing Quinpario's views as of any subsequent date, and we do not undertake any obligation to update forward-looking statements to reflect events or circumstances after the date they were made, whether as a result of new information, future events or otherwise, except as may be required under applicable securities laws.

You should not place undue reliance on these forward-looking statements in deciding how to grant your proxy or instruct how your vote should be cast or vote your shares on the proposals set forth in this proxy statement. As a result of a number of known and unknown risks and uncertainties, our actual results or performance may be materially different from those expressed or implied by these forward-looking statements. Some factors that could cause actual results to differ include:

- the occurrence of any event, change or other circumstances that could give rise to the termination of the Business Combination Agreement;

- the outcome of any legal proceedings that may be instituted against the Company, Novitex or SourceHOV following announcement of the proposed Business Combination and transactions contemplated thereby;

- the inability to complete the transactions contemplated by the proposed Business Combination due to the failure to obtain approval of the stockholders of the Company, the failure to obtain approval of the stockholders of Novitex, the failure to obtain approval of the stockholders of SourceHOV or other conditions to closing in the Business Combination Agreement;

- the ability to obtain or maintain the listing of Quinpario Common Stock on Nasdaq following the Business Combination;

- delays in obtaining, adverse conditions contained in, or the inability to obtain necessary regulatory approvals or complete regulatory reviews required to complete the transactions contemplated by the Business Combination Agreement;

- the risk that the proposed Business Combination disrupts current plans and operations as a result of the announcement and consummation of the transactions described herein;

- the ability to recognize the anticipated benefits of the Business Combination, which may be affected by, among other things, competition, the ability to integrate the SourceHOV and

55

Supp.App. 0421

Table of Contents

Novitex businesses, and the ability of the combined business to grow and manage growth profitably;

- costs related to the Business Combination;

- changes in applicable laws or regulations;

- the possibility that the Company, Novitex or SourceHOV may be adversely affected by other economic, business, and/or competitive factors; and

- other risks and uncertainties indicated in this proxy statement, including those under "*Risk Factors.*"

56

Table of Contents

**RISK FACTORS**

*In addition to the other information contained in this proxy statement, the following risks impact the business and operations of each of SourceHOV, Novitex and Quinpario. These risk factors are not exhaustive and all investors are encouraged to perform their own investigation with respect to the business, financial condition and prospects of each of SourceHOV, Novitex and Quinpario. Unless otherwise indicated or the context otherwise requires, references in this "Risk Factors" section to "Exela," the "combined company," "we," "our," "us" and other similar terms refer to Exela Technologies, Inc. and its consolidated subsidiaries, including SourceHOV and Novitex and each of their respective subsidiaries, after giving effect to the Business Combination.*

**Risks Related to SourceHOV's Business**

***SourceHOV's results of operations could be adversely affected by economic and political conditions, creating complex risks, many of which are beyond SourceHOV's control.***

SourceHOV's business depends on the continued demand for its services, and, if current global economic conditions continue or worsen, its business could be adversely affected by its clients' financial condition and the levels of business activity in those industries. SourceHOV and its customers are subject to global political, economic and market conditions, including inflation, interest rates, energy costs, the impact of natural disasters, military action and the threat of terrorism. In particular, SourceHOV currently derives, and is likely to continue to derive, a significant portion of its revenues from clients located in the United States. Any future decreases in the general level of economic activity, such as decreases in business and consumer spending and continued high unemployment rates, could result in a decrease in demand for its services, thus reducing its revenue. For example, SourceHOV's clients may decide to reduce or postpone their spending on the services it provides, and it may be forced to lower its prices. Other developments in response to economic events, such as consolidations, restructurings or reorganizations, particularly involving its clients, could also cause the demand for its services to decline, negatively affecting the amount of business that it is able to obtain. SourceHOV may not be able to predict the impact such conditions will have on the industries it serves and may be unable to plan effectively for or respond to such impact. In response to economic and market conditions, from time to time SourceHOV has undertaken initiatives to reduce its cost structure where appropriate, such as consolidation of resources to provide functional region-wide support to its Europe, Middle East Africa subsidiaries in a centralized fashion. These initiatives, as well as any future workforce and facilities reductions, may not be sufficient to meet current and future changes in economic and market conditions and allow SourceHOV to continue to achieve the growth rates expected. In addition, costs actually incurred in connection with SourceHOV's restructuring actions may be higher than its estimates of such costs and/or may not lead to the anticipated cost savings.

Any future disruptions or turbulence in the global credit markets may adversely affect SourceHOV's liquidity and financial condition, and the liquidity and financial condition of its clients. Such disruptions may limit its ability to access financing, increase the cost of financing needed to meet liquidity needs and affect the ability of its clients to use credit to purchase its services or to make timely payments to it, adversely affecting its financial condition and results of operations.

***SourceHOV's industry may be adversely impacted by a negative public reaction in the United States and elsewhere to providing certain of SourceHOV's services from outside the United States and recently proposed related legislation.***

SourceHOV has based its strategy of future growth on certain assumptions regarding its industry and future demand in the market for the provision of business process solutions in part using offshore resources. However, providing services from offshore locations is a politically sensitive topic in the United States and elsewhere, and many organizations and public figures have publicly expressed

57

Supp.App. 0423

Table of Contents

concern about a perceived association between offshore service providers and the loss of jobs in their home countries. In addition, there has been limited publicity about the negative experience of certain companies that provide their services offshore, particularly in India. The trend of providing business process solutions offshore may not continue and could reverse if companies elect to develop and perform their business processes internally or are discouraged from transferring these services to offshore service providers. Any slowdown or reversal of existing industry trends could negatively affect the amount of business that it is able to obtain or retain. See "—*The business process solutions industry is characterized by rapid technological change and SourceHOV may not be successful in addressing these changes*."

A variety of U.S. federal and state legislation has been proposed that, if enacted, could restrict or discourage U.S. companies from providing their services from outside the United States, including recently introduced proposals for providing tax and other economic incentives for companies that create jobs in the United States by reducing their reliance on offshore locations. Other state bills have proposed requiring offshore service providers to disclose their geographic locations, requiring notice to individuals whose personal information is disclosed to non-U.S. affiliates or subcontractors, requiring disclosures of companies' foreign outsourcing practices or restricting U.S. private sector companies that have government contracts, grants or guaranteed loan programs from providing their services. Because most of SourceHOV's clients are located in the United States, any expansion of existing laws or the enactment of new legislation that constrains SourceHOV's ability to provide its solutions from offshore or otherwise makes using its services unappealing or impractical for its clients could have a material and adverse effect on its business, results of operations, financial condition and cash flows. See also "—*Restrictions on entry visas may affect SourceHOV's ability to compete for and provide services to clients in the United States, which could have a material adverse effect on future revenues*."

**The services SourceHOV provides to clients in its public sector vertical may be subject to additional restrictions or limitations.**

SourceHOV's engagements with entities in the public sector, including educational institutions, may be subject to compliance with additional legislative or regulatory requirements. Certain state and local governments and agencies have adopted, or may in the future adopt, legislation or rules imposing additional requirements on services provided to the public sector, including restrictions as to where certain services can be performed or where certain data can be stored, even within the United States. Additionally, SourceHOV's employees who are staffed on certain public sector engagements may be subject to strict background checks or other certifications. These additional requirements may make it more difficult to staff large public sector engagements, require SourceHOV to turn down new engagements, affect SourceHOV's ability meet client expectations, deadlines or other specifications and otherwise increase SourceHOV's costs or decrease SourceHOV's revenues. Further, there can be no assurances that a public sector entity will not reallocate funding for SourceHOV's services or face funding shortages, either prior to or after SourceHOV has begun to perform its services, which could impact whether SourceHOV is fully compensated for its services and could have a material adverse effect on its business, results of operations, financial condition and cash flows.

**SourceHOV's government contracts are subject to termination rights, audits and investigations, which, if exercised, could negatively impact SourceHOV's reputation and reduce its ability to compete for new contracts.**

A significant portion of SourceHOV's revenues is derived from contracts with the U.S. federal government and its agencies and from contracts with foreign governments and their agencies. SourceHOV numbers over 80 government entities among its customers. Government entities typically finance projects through appropriated funds. While these projects are often planned and executed as multi-year projects, government entities usually reserve the right to change the scope of or terminate these projects for lack of approved funding and/or at their convenience. Changes in government or

58

Supp.App. 0424

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 427 of 1110 PageID 2048

Table of Contents

political developments, including budget deficits, shortfalls or uncertainties, government spending reductions (e.g., Congressional sequestration of funds under the Budget Control Act of 2016) or other debt or funding constraints, such as those recently experienced in the United States and Europe, could result in lower governmental sales and in SourceHOV's projects being reduced in price or scope or terminated altogether, which also could limit SourceHOV's recovery of incurred costs, reimbursable expenses and profits on work completed prior to the termination. Additionally, if the government discovers improper or illegal activities or contractual non-compliance (including improper billing), it may be subject to various civil and criminal penalties and administrative sanctions, which may include termination of contracts, forfeiture of profits, suspension of payments, fines and suspensions or debarment from doing business with the government. Any resulting penalties or sanctions could materially adversely affect SourceHOV's results of operations and financial condition. Moreover, government contracts are generally subject to audits and investigations by government agencies. If the government finds that it inappropriately charged any costs to a contract, the costs are not reimbursable or, if already reimbursed, the cost must be refunded to the government. Further, the negative publicity that could arise from any such penalties, sanctions or findings in such audits or investigations could have an adverse effect on SourceHOV's reputation in the industry and reduce SourceHOV's ability to compete for new contracts and could materially adversely affect SourceHOV's results of operations and financial condition.

***Events such as acts of war or terrorism, natural disasters, changes in law, or large losses could adversely affect SourceHOV's insurance coverage and insurance expense, resulting in an adverse effect on its profitability and financial condition.***

SourceHOV insures for certain property and casualty risks consisting primarily of comprehensive general liability, and auto liability. Insurance coverage is obtained for catastrophic property and casualty exposures as well as those risks required to be insured by law or contract. Although SourceHOV believes that its insurance coverage is reasonable, significant events such as acts of war and terrorism, economic conditions, judicial decisions, legislation, natural disasters and large losses could materially affect its insurance obligations and future expense.

***SourceHOV's executives, senior management team and other key personnel are critical to its continued success and the loss of such personnel could harm its business.***

SourceHOV's future success substantially depends on the continued service and performance of its executives, senior management team, as well as other key individuals in senior leadership positions. These personnel possess business and technical capabilities that are difficult to replace. SourceHOV does not maintain "key person" insurance covering any member of its executives or other personnel, and the employment contracts, non-competition and non-solicitation agreements it has entered into with some of these individuals may provide insufficient protection in the event of disputes. The loss of any of its key personnel, particularly to competitors, may adversely affect its ability to effectively manage its current operations or meet ongoing and future business challenges.

***If more stringent labor laws become applicable to SourceHOV or if a significant number of its employees unionize, its profitability may be adversely affected.***

India has stringent labor legislation that protects employee interests, including legislation that sets forth detailed procedures for dispute resolution and employee removal and legislation that imposes financial obligations on employers upon downsizing. Although it is currently exempt from some of these more burdensome labor laws under certain exceptions for providers of information technology-based business processes, there can be no assurance that such laws will not become applicable to SourceHOV in the future.

<div align="center">59</div>

Supp.App. 0425

Currently, a de minimis number of SourceHOV's employees belong to unions. However, this number may increase or its employees may in the future form unions. If an increased number of its employees at any of its operations centers join unions, SourceHOV may be required to raise wage levels or grant other benefits that could result in an increase in its compensation expenses, in which case its profitability may be adversely affected.

***SourceHOV's European employees are represented by unions or workers' councils or are employed subject to local laws that are less favorable to employers than the laws of the United States.***

As of December 31, 2016, SourceHOV had approximately 10,000 employees located in Europe and Asia. SourceHOV has workers' councils representing the employees of SourceHOV's France, Germany, Ireland and Sweden operations. Most of these European employees are employed in countries in which employment laws provide greater bargaining or other rights to employees than the laws of the U.S. Such employment rights require SourceHOV to work collaboratively with the legal representatives of the employees to effect any changes to labor arrangements. For example, most of SourceHOV's employees in Europe are represented by unions or workers' councils that must approve certain changes in conditions of employment, including salaries and benefits and staff changes, and may impede efforts to restructure SourceHOV's workforce. Although SourceHOV believes that it has a good working relationship with its employees, a strike, work stoppage or slowdown by its employees or significant dispute with its employees could result in a significant disruption of SourceHOV's operations or higher ongoing labor costs.

***SourceHOV's business process solutions often require long selling cycles and long implementation periods that may result in significant upfront expenses that may not be recovered.***

SourceHOV often faces long selling cycles to secure new contracts for its business process solutions. If it is successful in obtaining an engagement, the selling cycle is generally followed by a long implementation period during which SourceHOV plans its services in detail and demonstrates to the client its ability to successfully integrate its solutions with the client's internal operations. SourceHOV's clients may experience delays in obtaining internal approvals or delays associated with technology or system implementations which can further length the selling cycle or implementation period, and certain engagements may also require a ramping up period after implementation before it can commence providing its services. Even if SourceHOV succeeds in developing a relationship with a potential client and begin to discuss the services in detail, the potential client may choose a competitor or decide to retain the work in-house prior to the time a contract is signed. In addition, once a contract is signed, SourceHOV would not begin to receive revenue until completion of the implementation period and its solution is operational. The extended lengths of its selling cycles and implementation periods can result in the incurrence of significant upfront expenses that may never result in profits or may result in profits only after a significant period of time has elapsed, which may negatively impact its financial performance. For example, SourceHOV generally hires new employees to provide services in connection with certain large engagements once a new contract is signed. Accordingly, it may incur significant costs associated with these hires before it collects corresponding revenues. SourceHOV's inability to obtain contractual commitments after a selling cycle, maintain contractual commitments after the implementation period or limit expenses prior to the receipt of corresponding revenue may have a material adverse effect on its business, results of operations and financial condition.

***SourceHOV's business is dependent on continued interest in outsourcing.***

SourceHOV's business and growth depend in large part on continued interest in outsourced business process services. Outsourcing means that an entity contracts with a third party, such as SourceHOV, to provide business process services rather than perform such services in-house. There can be no assurance that this interest will continue, as organizations may elect to perform such services

60

Supp.App. 0426

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 429 of 1110    PageID 2050

themselves and/or the business process outsourcing industry could move to an as-a-service model, thereby eliminating traditional business process outsourcing tasks. A significant change in this interest in outsourcing could materially adversely affect its results of operations and financial condition. Additionally, there can be no assurance that its cross-selling efforts will cause clients to purchase additional services from it or adopt a single-source outsourcing approach.

*SourceHOV's client contracts contain certain termination provisions that could have an adverse effect on its business, results of operations and financial condition.*

Most of SourceHOV's client contracts may be terminated by its clients without cause and without any fee or penalty, with only limited notice. Any failure to meet a client's expectations, as well as factors beyond its control, including a client's financial condition, strategic priorities, mergers and acquisitions, could result in a cancellation or non-renewal of a contract or a decrease in business provided to it and cause its actual results to differ from its forecasts. SourceHOV may not be able to replace any client that elects to terminate or not renew its contract with SourceHOV, which would reduce its revenues.

*The business process solutions industry is characterized by rapid technological change and SourceHOV may not be successful in addressing these changes.*

The business process solutions industry is characterized by rapid technological change, evolving industry standards and changing client preferences. The success of its business depends, in part, upon its ability to develop technology and solutions that keep pace with changes in its industry and the industries of its clients. Although it has made, and will continue to make, significant investments in the research, design and development of new technology and its platforms-driven solutions, it may not be successful in addressing these changes on a timely basis or in marketing the changes it implements. In addition, products or technologies developed by others may render its services uncompetitive or obsolete. Failure to address these developments could have a material adverse effect on its business, results of operations and financial condition.

In addition, existing and potential clients are actively shifting their businesses away from paper-based environments to electronic environments with reduced needs for physical document management and processing. This shift may result in decreased demand for the physical document management services SourceHOV provides such that its business and revenues may become more reliant on technology-based services in electronic environments, which are typically provided at lower prices compared to physical document management services. Though it has solutions for clients seeking to make these types of transitions, a significant shift by its clients away from physical documents to non-paper based technologies, whether now existing or developed in the future, could adversely affect its business, results of operation and financial condition.

*Cybersecurity issues, vulnerabilities, and criminal activity resulting in a data or security breach could result in risks to SourceHOV's systems, networks, products, solutions and services resulting in liability or reputational damage.*

SourceHOV collects and retains large volumes of internal and customer data, including personally identifiable information, for business purposes, and its various information technology systems enter, process, summarize and report such data. SourceHOV also maintains personally identifiable information about its employees. Safeguarding customer, employee and SourceHOV data is a key priority for SourceHOV and its customers and employees have come to rely on SourceHOV for the protection of their personal information. Augmented vulnerabilities, threats and more sophisticated and targeted cyber-related attacks pose a risk to the security of SourceHOV and SourceHOV customers, partners, suppliers and third-party service providers, and to the confidentiality, availability and integrity of data owned by SourceHOV or its customers. SourceHOV uses its platforms and its related

61

Supp.App. 0427

Table of Contents

information technology networks and systems to process, transmit and store electronic information and, in providing its services, it also often manages, utilizes and stores sensitive or confidential client data both physically and electronically. Despite SourceHOV's efforts to protect sensitive, confidential or personal data or information, it may be vulnerable to material security breaches, theft, misplaced or lost data, programming errors, employee errors and/or malfeasance that could potentially lead to the compromising of sensitive, confidential or personal data or information, improper use of SourceHOV's systems, software solutions or networks, unauthorized access, use, disclosure, modification or destruction of information, defective products, production downtimes and operational disruptions. Despite protective measures, SourceHOV may not be successful in preventing security breaches which compromise the confidentiality and integrity of this data. While an attempt is made to mitigate these risks by employing a number of measures, including employee training, monitoring and testing, and maintenance of protective systems and contingency plans, SourceHOV is vulnerable to such threats. SourceHOV has access to sensitive, confidential or personal data or information in certain of its businesses that is subject to privacy and security laws, regulations or customer-imposed controls. The regulatory environment, as well as the requirements imposed on SourceHOV by the banking industry governing information, security and privacy laws is increasingly demanding. Maintaining compliance with applicable security and privacy regulations may increase SourceHOV's operating costs and/or adversely impact its ability to provide services to its customers. Furthermore, a compromised data system or the intentional, inadvertent or negligent release or disclosure of data could result in theft, loss, fraudulent or unlawful use of customer, employee or SourceHOV data which could harm SourceHOV's reputation or result in remedial and other costs, fines or lawsuits. In addition, a cyber-related attack could result in other negative consequences, including damage to SourceHOV's reputation or competitiveness, remediation or increased protection costs, litigation or regulatory action. Fraud, employee negligence, unauthorized access, including without limitation malfunctions, viruses and other events beyond its control, may lead to the misappropriation or unauthorized disclosure of sensitive or confidential information SourceHOV processes, stores and transmit large amounts of data, including personal information, for its customers, failure to prevent or mitigate data loss or other security breaches, including breaches of its vendors' technology and systems, could expose SourceHOV or its customers to a risk of loss or misuse of such information, adversely affect its operating results, result in litigation or potential liability for SourceHOV and otherwise harm its business. As a result, it may be subject to monetary damages, regulatory enforcement actions or fines under federal legislation, such as, the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act, as amended, as well as various states laws. Similarly, regulations such as the Health Information Technology for Economic and Clinical Health Act provisions of the American Recovery and Reinvestment Act of 2009 expand the obligations of "covered entities" and their business associates, including certain mandatory breach notification requirements. In addition to any legal liability, data or security breaches may lead to negative publicity, reputational damage and otherwise adversely affect its results of operations.

***SourceHOV relies, in some cases, on third-party hardware and software, which could cause errors or failures of its services.***

Although SourceHOV developed its platform-driven solutions internally, it relies, in some cases, on third-party hardware and software in connection with its service offerings which it either purchases or leases from national vendors. It is generally able to select from a number of competing hardware and software applications, but the complexity and unique specifications of the hardware or software makes design defects and software errors difficult to detect. Any errors or defects in third-party hardware or software incorporated into its service offerings, may result in a delay or loss of revenue, diversion of resources, damage to its reputation, the loss of the affected client, loss of future business, increased service costs or potential litigation claims against SourceHOV.

62

Supp.App. 0428

***Some of the work SourceHOV does involves greater risks than other types of claims processing or document management engagements.***

SourceHOV provides certain business process solutions for clients that, for financial, legal or other reasons, may present higher risks compared to other types of claims processing or document management engagements. Examples of higher risk engagements include, but are not limited to:

- class action and other legal distributions involving significant sums of money;

- economic analysis and expert testimony in high stakes legal matters; and

- engagements where SourceHOV receives or processes sensitive data, including personal consumer or private health information.

While SourceHOV attempts to identify higher risk engagements and clients and mitigate its exposure by taking certain preventive measures and, where necessary, turning down certain engagements, these efforts may be ineffective and an actual or alleged error or omission on its part, the part of its client or other third parties or possible fraudulent activity in one or more of these higher-risk engagements could result in the diversion of management resources, damage to its reputation, increased service costs or impaired market acceptance of its services, any of which could negatively impact its business and its financial condition.

***SourceHOV encounters professional conflicts of interest.***

SourceHOV encounters professional conflicts of interest, particularly in its provision of expert witness testimony in certain of its legal engagements. Although it has systems and procedures to identify potential conflicts of interest prior to accepting a new engagement, there is no guarantee that all potential conflicts of interest will be identified, and undetected conflicts may result in damage to its reputation and result in professional liability, which may adversely impact its business and results of operations. If it is unable to accept new engagements for any reason, including business and legal conflicts, SourceHOV's professionals may become underutilized or discontented, which may adversely affect its future revenues and results of operations, as well as its ability to retain these professionals.

***SourceHOV faces significant competition from U.S.-based and non-U.S.-based companies and from its clients who may elect to perform their business processes in-house.***

SourceHOV's industry is highly competitive, fragmented and subject to rapid change. It competes primarily against large multi-national information technology companies, focused BPO companies based in offshore locations, BPO divisions of information technology companies located in India, other BPO and consulting providers that focus on the legal sector and the in-house capabilities of its clients and potential clients. These competitors may include entrants from adjacent industries or entrants in geographic locations with lower costs than those in which it operates. SourceHOV believes that the principal competitive factors in its markets are breadth and depth of process expertise, knowledge of industries served, service quality, scalability of solutions, the ability to attract, train and retain qualified people, compliance rigor, global delivery capabilities, outcome-based pricing and sales and client management capabilities. Some of its competitors have greater financial, marketing, technological or other resources, larger client bases and more established reputations or brand awareness than it does. In addition, some of its competitors who do not have, or have limited, global delivery capabilities may expand their delivery centers to the countries in which it operates or increase their capacity in lower cost geographies, which could result in increased competition. Some of its competitors may also enter into strategic or commercial relationships among themselves or with larger, more established companies in order to benefit from increased scale and enhanced scope capabilities or enter into similar arrangements with potential clients. Further, SourceHOV expects competition to intensify in the future as more companies enter its markets and clients consolidate the services they require among fewer vendors. Increased competition, its inability to compete successfully against competitors, pricing

63

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 432 of 1110    PageID 2053

pressures or loss of market share could result in reduced operating margins, which could adversely affect its business, results of operations and financial condition.

***New, more stringent privacy and data security regulations may have a negative impact on SourceHOV's business.***

Any inability to adequately address privacy and security concerns could result in expenses and liability, and adverse impact on SourceHOV. Every country in which SourceHOV provides services has established its own data security and privacy legal framework and in many jurisdictions, enforcement actions and consequences for noncompliance are also rising. In Europe, for example, the Data Protection Directive, with each country enacting data protection legislation in accordance with European Union guidelines. Some of these countries, such as Canada, limit the transfer of information of their residents outside of the country, which may impact the way SourceHOV provides services in those locations. Other countries, such as China, limit the kind of information that may be processed inside the country. Personal privacy and data security are increasingly the focus of expanded regulation in Europe, and many other jurisdictions where SourceHOV provides services to its customers.

Industry groups impose self-regulatory standards that bind SourceHOV by their incorporation into the contracts SourceHOV executes. For example, should SourceHOV fail to be compliant with the Payment Card lndustry Data Security Standard, or PCI DSS, SourceHOV may be subject to fines and other penalties.

***SourceHOV's business could be materially and adversely affected if it does not protect its intellectual property or if its services are found to infringe on the intellectual property of others.***

SourceHOV's success depends in part on certain methodologies and practices it utilizes in developing and implementing applications and other proprietary intellectual property rights. In order to protect such rights, it relies upon a combination of nondisclosure and other contractual arrangements, as well as trade secret, copyright, trademark and patent laws. It also generally enters into confidentiality agreements with its employees, clients and potential clients and limit access to and distribution of its proprietary information. There can be no assurance that the laws, rules, regulations and treaties in effect in the United States, India and the other jurisdictions in which it operates and the contractual and other protective measures it takes, are adequate to protect it from misappropriation or unauthorized use of its intellectual property, or that such laws will not change. There can be no assurance that the resources invested by SourceHOV to protect its intellectual property will be sufficient or that its intellectual property portfolio will adequately deter misappropriation or improper use of its technology, and its intellectual property rights may not prevent competitors from independently developing or selling products and services similar to or duplicative of ours. SourceHOV may not be able to detect unauthorized use and take appropriate steps to enforce its rights, and any such steps may be costly and unsuccessful. Infringement by others of its intellectual property, including the costs of enforcing its intellectual property rights, may have a material adverse effect on its business, results of operations and financial condition. SourceHOV could also face competition in some countries where it has not invested in an intellectual property portfolio. If SourceHOV is not able to protect its intellectual property, the value of SourceHOV's brand and other intangible assets may be diminished, and SourceHOV's business may be adversely affected. Further, although SourceHOV believes that it is not infringing on the intellectual property rights of others, claims may nonetheless be successfully asserted against it in the future, and SourceHOV may be the target of enforcement of patents by third parties, including aggressive and opportunistic enforcement claims by non-practicing entities. Regardless of the merit of such claims, responding to infringement claims can be expensive and time-consuming. If SourceHOV is found to infringe any third-party rights, SourceHOV could be required to pay substantial damages or SourceHOV could be enjoined from offering some of its products and services. The costs of defending any such claims could be significant, and any successful claim may require it to modify its services. The value of, or SourceHOV's ability to use, SourceHOV's intellectual property

64

Supp.App. 0430

may also be negatively impacted by dependencies on third parties, such as SourceHOV's ability to obtain or renew on reasonable terms licenses that SourceHOV needs in the future, or SourceHOV's ability to secure or retain ownership or rights to use data in certain software analytics or services offerings. Any such circumstances may have a material adverse effect on its business, results of operations and financial condition.

***SourceHOV's services may be impacted by natural disasters and other disruptions.***

SourceHOV's ability to provide services may be impacted or disrupted as a result of natural disasters, technical disruptions, man-made events, and global health risks or pandemics, as well as the threat or perceived threat of any of these events in the United States or any of the locations in which it operates. A significant portion of its employees and key operations centers are located in India and the Philippines, with, particularly in India, limited diversification or redundancy. India and the Philippines are particularly susceptible to natural disasters, including typhoons, tsunamis, floods and earthquakes, and the Philippines is additionally susceptible to volcanic eruptions. Its operations in these locations, as well as certain other countries outside of the United States, are also at greater risk of disruptions in electricity, other public utilities or network services due to substandard infrastructure. Although all of its operations centers have disaster management plans, certain disaster management facilities, particularly in India, may not be adequate to protect against potential disruptions due to natural or other disasters. Damage, destruction or disruptions could make it difficult or impossible for employees to reach its business locations or otherwise interrupt its ability to provide its services. Sustained periods of interruption in its services could adversely affect its reputation and its relationships with its clients, cause it to incur substantial expenses and expose it to liability. Its insurance coverage may not be sufficient to cover all of its potential losses and its business, results of operation and financial condition could be adversely affected.

Any disruption related to SourceHOV's U.S. data centers due to any of the foregoing events may cause significant disruptions in its ability to provide its services to its clients and result in a material adverse effect on its reputation, results of operations and financial condition and its business, results of operations and financial condition could be adversely affected.

***SourceHOV generates a significant portion of its revenues from a small number of clients, and any loss of business from these clients could materially reduce its revenues.***

SourceHOV has derived, and believes that in the foreseeable future it will continue to derive, a significant portion of its revenues from a small number of clients. While it has no one client that accounts for more than 7% of its revenue, for each of the years ended December 31, 2016 and 2015, its ten largest clients accounted for less than 25% of its revenues.

SourceHOV's ability to maintain close relationships with these and other major clients is essential to the growth and profitability of its business. However, the volume of work performed for a specific client is likely to vary from year to year. A major client in one year may not provide the same level of revenues for it in any subsequent year and there can be no assurance that any client will extend or renew its contract with SourceHOV. The business process solutions it provides to its clients, and the revenues and net income from those services, may decline or vary as the type and quantity of services it provides change over time. Furthermore, its reliance on any individual client for a significant portion of its revenues may give that client a certain degree of pricing leverage against it when negotiating contracts and terms of service.

In addition, a number of factors other than SourceHOV's performance could cause the loss of or reduction in business or revenues from a client, and these factors are not predictable. For example, a client may decide to reduce spending on business process solutions from it due to a challenging economic environment or other factors, both internal and external, relating to its business. These factors may include corporate restructuring, pricing pressure, changes to its outsourcing strategy, switching to another BPO provider or returning work in-house or other changes in a client's prospects

65

Supp.App. 0431

or profitability. The loss of any of its major clients, or a significant decrease in the volume of work they give to it or the price at which SourceHOV is able to provide its services to them, could materially adversely affect its revenues and thus its results of operations.

***SourceHOV's revenues are highly dependent on a limited number of industries, and any decrease in demand for business process solutions in these industries could reduce its revenues and adversely affect its results of operations.***

A substantial portion of SourceHOV's revenues are derived from three specific industry-based verticals: ITPS, HS, and LLPS. Clients in ITPS accounted for 56% and 52% of its revenues in 2016 and 2015, respectively. Clients in HS accounted for 31% and 31% of its revenues in 2016 and 2015, respectively. Clients in LLPS accounted for 13% and 17% of its revenues in 2016 and 2015, respectively.

SourceHOV's success largely depends on continued demand for its services from clients in these verticals, and a downturn or reversal of the demand for business process solutions in any of these verticals, or the introduction of regulations that restrict or discourage companies from engaging its services, could materially adversely affect its business, financial condition and results of operations. For example, consolidation in any of these industries or combinations or mergers, particularly involving its clients, may decrease the potential number of clients for its services. SourceHOV has been affected by the worsening of economic conditions and significant consolidation in the financial services industry, and continuation of this trend may negatively affect its revenues and profitability.

***SourceHOV has a significant amount of intangible assets that could be materially impacted.***

Goodwill and other intangible assets that have indefinite useful lives are not amortized but rather are evaluated annually for impairment and more frequently if a triggering event occurs. The valuation of goodwill for impairment involves a high degree of judgment. Based on SourceHOV's estimates and assumptions underlying the valuation, impairment is determined by estimating the fair value of a reporting unit and comparing that value to the reporting unit's book value. If economic events occur that cause it to revise its estimates and assumptions used in determining the fair value of its goodwill, such revisions could result in an impairment charge that could have a material adverse impact on its financial statements during the period incurred.

***Material weaknesses have been identified in SourceHOV's internal control over financial reporting.***

In connection with the preparation of SourceHOV's financial statements for the year ended December 31, 2016, material weaknesses were identified in SourceHOV's internal controls over financial reporting that remain unremediated with respect to (i) deficiencies in the financial statement close process, including appropriate levels of review and (ii) the lack of formal policies and procedures and related controls related to the evaluation of goodwill for impairment and the supervision of specialists engaged to assist management in making the necessary fair value estimates involved in the impairment analysis.

If the material weaknesses are not remediated prior to the closing of the Business Combination or if additional material weaknesses are identified in the future, a material weakness may exist in internal control over financial reporting of SourceHOV subsequent to the closing of the Business Combination.

SourceHOV has begun taking measures and plans to take additional measures to remediate the underlying causes of the material weaknesses. SourceHOV plans to complete this remediation process as quickly as possible. However, SourceHOV cannot at this time estimate whether this remediation process will be complete prior to the closing of the Business Combination. If SourceHOV is unable to successfully remediate these material weaknesses prior to the closing of the Business Combination, SourceHOV could be unable to produce accurate and timely financial statements. Any failure to timely provide required financial information could materially and adversely impact SourceHOV.

66

Supp.App. 0432

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 435 of 1110    PageID 2056

Table of Contents

*SourceHOV derives significant revenue and profit from commercial and government contracts awarded through competitive bidding processes, including renewals, which can impose substantial costs on it, and it will not achieve revenue and profit objectives if it fails to accurately and effectively bid on such projects.*

Many of these contracts are extremely complex and require the investment of significant resources in order to prepare accurate bids and proposals. Competitive bidding imposes substantial costs and presents a number of risks, including: (i) the substantial cost and managerial time and effort that it spends to prepare bids and proposals for contracts that may or may not be awarded to SourceHOV; (ii) the need to estimate accurately the resources and costs that will be required to implement and service any contracts it is awarded, sometimes in advance of the final determination of their full scope and design; (iii) the expense and delay that may arise if its competitors protest or challenge awards made to it pursuant to competitive bidding and the risk that such protests or challenges could result in the requirement to resubmit bids and in the termination, reduction or modification of the awarded contracts; and (iv) the opportunity cost of not bidding on and winning other contracts it might otherwise pursue. If its competitors protest or challenge an award made to it on a government contract, the costs to defend such an award may be significant and could involve subsequent litigation that could take years to resolve.

*SourceHOV's profitability is dependent upon its ability to obtain adequate pricing for its services and to improve its cost structure.*

SourceHOV's success depends on its ability to obtain adequate pricing for its services. Depending on competitive market factors, future prices it obtains for its services may decline from previous levels. If it is unable to obtain adequate pricing for its services, it could materially adversely affect its results of operations and financial condition. In addition, its contracts are increasingly requiring tighter timelines for implementation as well as more stringent service level metrics. This makes the bidding process for new contracts much more difficult and requires it to adequately consider these requirements in the pricing of its services.

SourceHOV regularly reviews its operations with a view towards reducing its cost structure, including, without limitation, reducing its employee base, exiting certain businesses, improving process and system efficiencies and outsourcing some internal functions. SourceHOV from time to time engages in restructuring actions to reduce its cost structure. If it is unable to continue to maintain its cost base at or below the current level and maintain process and systems changes resulting from prior restructuring actions or to realize the expected cost reductions in the ongoing strategic transformation program, it could materially adversely affect its results of operations and financial condition.

In addition, in order to meet the service requirements of its customers, which often includes 24/7 service, and to optimize its employee cost base, including its back-office support, SourceHOV often locates its delivery service and back-office support centers in lower-cost locations, including several developing countries. Concentrating its centers in these locations presents a number of operational risks, many of which are beyond its control, including the risks of political instability, natural disasters, safety and security risks, labor disruptions, excessive employee turnover and rising labor rates. Additionally, a change in the political environment in the United States or the adoption and enforcement of legislation and regulations curbing the use of such centers outside of the United States could materially adversely affect its results of operations and financial condition. These risks could impair its ability to effectively provide services to its customers and keep its costs aligned to its associated revenues and market requirements.

SourceHOV's ability to sustain and improve profit margins is dependent on a number of factors, including its ability to continue to improve the cost efficiency of its operations through such programs as robotic process automation, to absorb the level of pricing pressures on its services through cost improvements and to successfully complete information technology initiatives. If any of these factors adversely materialize or if it is unable to achieve and maintain productivity improvements through

67

Supp.App. 0433

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 436 of 1110    PageID 2057

restructuring actions or information technology initiatives, its ability to offset labor cost inflation and competitive price pressures would be impaired, each of which could materially adversely affect its results of operations and financial condition.

***SourceHOV is subject to regular customer and third-party security reviews and failure to pass these may have an adverse impact on its operations.***

Many of SourceHOV's client contracts require that it maintain certain physical and/or information security standards, and, in certain cases, SourceHOV permits a client to audit its compliance with these contractual standards. Any failure to meet such standards or pass such audits may have a material adverse impact on its business. Further, clients from time to time may require stricter physical and/or information security than they negotiated in their contracts, and may condition continued volumes and business on the satisfaction of such additional requirements. Some of these requirements may be expensive to implement or maintain, and may not be factored into its contract pricing. Further, on an annual basis SourceHOV obtains third-party audits of certain of its locations in accordance with Statement on Standards for Attestation Engagements No. 16 (SSAE 16) put forth by the Auditing Standards Board (ASB) of the American Institute of Certified Public Accountants (AICPA). SSAE 16 is the current standard for reporting on controls at service organizations, and many of its clients expect that it will perform an annual SSAE 16 audit, and report to them the results. Negative findings in such an audit and/or the failure to adequately remediate in a timely fashion such negative findings may cause clients to terminate their contracts or otherwise have a material adverse effect on its reputation, results of operation and financial condition.

***Failure to adhere to the regulations that govern SourceHOV's business could have an adverse impact on its operations.***

SourceHOV's clients are often subject to regulations that may require that it comply with certain rules and regulations in performing services for them that would not otherwise apply to SourceHOV. U.S. federal laws and regulations that apply to certain portions of its business include the Gramm-Leach-Bliley Act, the Health Insurance Portability and Accountability Act of 1996, and the HITECH Act of 2009. It must also comply with applicable regulations relating to healthcare and other personal information that it processes as part of its services. Due to its global delivery model, SourceHOV is also subject to the burden and expense of complying with the laws and regulations of various jurisdictions and changes thereto which are beyond its control. In addition, its contracts with some of its clients require it to remain knowledgeable about and comply with a number of additional relevant consumer protection laws and other regulatory requirements. Failure to perform its services in a manner that complies with any such requirement could result in breaches of contracts with its clients. SourceHOV's failure to comply with any applicable laws and regulations could subject it to civil fines and criminal penalties.

***A significant portion of SourceHOV's assets and operations are located in India, the Philippines, China and Mexico, and it is subject to regulatory, economic and political uncertainties in those locations.***

A significant number of SourceHOV's operations centers are located in India, the Philippines and China and a majority of its assets and its professionals are located in those locations. SourceHOV intends to continue to develop and expand its facilities in these areas. Its financial performance may be adversely affected by general economic conditions and economic and fiscal policy in these countries, including changes in exchange rates and controls, interest rates and taxation policies, as well as social stability and political, economic or diplomatic developments affecting those countries in the future. These countries have experienced significant economic growth over the last several years, but face major challenges in sustaining that growth in the years ahead. These challenges include the need for substantial infrastructure development and improving access to healthcare and education. SourceHOV's ability to recruit, train and retain qualified employees, develop and operate its operations centers, and

68

attract and retain clients could be adversely affected if these countries do not successfully meet these challenges.

In the early 1990s, India experienced significant inflation, low growth in gross domestic product and shortages of foreign currency reserves. The Indian government, however, has exercised and continues to exercise significant influence over many aspects of the Indian economy. India's government has provided significant tax incentives and relaxed certain regulatory restrictions in order to encourage foreign investment in specified sectors of the economy, including the BPO industry. Certain of those programs, which have benefited SourceHOV, include tax holidays, liberalized import and export duties and preferential rules on foreign investment and repatriation. SourceHOV cannot assure you that liberalization policies will continue. Various factors, such as changes in the current federal government, could trigger significant changes in India's economic liberalization and deregulation policies and disrupt business and economic conditions in India generally and its business in particular.

The Philippines has experienced significant inflation, currency declines and shortages of foreign exchange. In addition, the Philippines has experienced and may continue to experience civil unrest, terrorism and political turmoil, resulting in temporary work stoppages and technology outages. These instabilities and any adverse changes in the political environment in the Philippines could increase its operational costs, increase its exposure to legal and business risks and make it more difficult for it to operate its business in the Philippines.

SourceHOV's business operations in China may be adversely affected by its current and future political environment. The Chinese government can exert substantial influence and control over the manner in which companies in China conduct business. Under the current government leadership, the government of China has been pursuing economic reform policies that encourage private economic activity and greater economic decentralization. There is no assurance, however, that the government of China will continue to pursue these policies, or that it will not significantly alter these policies from time to time without notice.

SourceHOV's ability to efficiently conduct its business activities in Mexico is subject to changes in government policy or shifts in political attitudes that are beyond its control. Government policy may change to discourage foreign investment, nationalization of industries may occur or other government limitations, restrictions or requirements not currently foreseen may be implemented. In addition, Mexico may experience political instability, which may result in outbreaks of civil unrest, drug-related violence, terrorist attacks or threats or acts of war in the affected areas, any of which could materially and adversely affect its business, prospects, financial condition and results of operations.

***Introduction of tax legislation and disputes with tax authorities may have an adverse effect on SourceHOV's operations and its overall tax rate.***

Governments in countries in which SourceHOV operates or provides services could enact new tax legislation that could have a material adverse effect on its overall effective tax rate. In addition, its ability to repatriate surplus earnings, if any, from its operations centers in a tax-efficient manner is dependent upon interpretations of local laws, possible changes in such laws and the renegotiation of existing double tax avoidance treaties. Changes to any of these may adversely affect its overall tax rate, which could have a material adverse effect on its business, results of operations and financial condition.

In addition, the transfer pricing regulations of the United States and certain foreign jurisdictions, including India, require that any cross-border transaction involving related parties be at an arm's-length price. Accordingly, SourceHOV bases its pricing between its foreign subsidiaries and related parties on a functional and economic analysis involving benchmarking against transactions among entities that are not related. However, the tax authorities have jurisdiction to review its transfer-pricing policy. If they conclude the policy was not applied appropriately, it may incur additional tax liability, including accrued interest and penalties. It has recently received an adverse order from the Indian Tax Tribunal over the application of some of its transfer pricing policies for the fiscal year ending March 31, 2007. This

69

Supp.App. 0435

Table of Contents

decision may be overturned only by appeal to India's Supreme Court. However, it is highly uncertain the matter would ultimately be decided in its favor. Based on the adverse Indian tax tribunal's decision, advice from its tax advisors, and the noted trend of Indian tax authorities aggressively pursuing higher transfer prices from multi-national companies, SourceHOV believes it is probable that it may experience future assessments of tax, penalty and interest in connection with its Indian transfer-pricing policy. Accordingly, reserves have been established on its balance sheet. However, these reserves may not be sufficient. As SourceHOV continues to expand its operations, it may be subject to similar liability/exposure in additional geographies/jurisdictions.

***Sales tax laws in the United States may change resulting in service providers having to collect sales taxes in states where the current laws do not require SourceHOV to do so. This could result in substantial tax liabilities.***

SourceHOV's United States subsidiaries collect and remit sales tax in states in which the subsidiaries have physical presence or in which SourceHOV believes sufficient nexus exists which obligates SourceHOV to collect sales tax. Other states may, from time to time, claim that SourceHOV has state-related activities constituting physical nexus to require such collection. Additionally, many other states seek to impose sales tax collection or reporting obligations on companies that sell goods to customers in their state, or directly to the state and its political subdivisions, regardless of physical presence. Such efforts by states have increased recently, as states seek to raise revenues without increasing the income tax burden on residents. SourceHOV relies on United States Supreme Court decisions which hold that, without Congressional authority, a state may not enforce a sales tax collection obligation on a company that has no physical presence in the state. SourceHOV cannot predict whether the nature or level of contacts it has with a particular state will be deemed enough to require SourceHOV to collect sales tax in that state nor can SourceHOV be assured that Congress or individual states will not approve legislation authorizing states to impose tax collection or reporting obligations on SourceHOV's activities. A successful assertion by one or more states that SourceHOV should collect sales tax could result in substantial tax liabilities related to past sales and would result in considerable administrative burdens and costs for SourceHOV.

***Restrictions on entry visas may affect SourceHOV's ability to compete for and provide services to clients in the United States, which could have a material adverse effect on future revenues.***

A significant number of SourceHOV's employees are foreign nationals, including from India, the Philippines and China. Certain members of its development team based in India travel to the United States on a regular basis to facilitate new project development, including the implementation of new contracts and to meet its U.S. clients. The ability of these employees to travel to the United States and other countries in which it does business depends on their ability to obtain the necessary visas and entry permits.

In response to political forces, terrorist attacks, the global economic downturn, public sentiments about the high unemployment rates in the United States and other events, U.S. immigration authorities have increased the level of scrutiny in granting visas and applicable immigration laws may be subject to legislative change and varying standards of application and enforcement. It cannot predict the political or economic events that could affect immigration laws or any restrictive impact those events could have on obtaining or monitoring entry visas for its professionals.

***Investors may have difficulty effecting service of process or enforcing judgments obtained in the United States against SourceHOV's non-U.S. subsidiaries.***

SourceHOV's significant operating subsidiaries are organized outside the United States. A portion of its assets are located in India, the Philippines, China, Mexico, and Canada. As a result, you may be unable to effect service of process upon its affiliates who reside in these jurisdictions. In addition, you

70

Supp.App. 0436

Table of Contents

may be unable to enforce against these persons outside the jurisdiction of their residence judgments obtained in U.S. courts, including judgments predicated solely upon U.S. federal securities laws.

***Currency fluctuations among the Euro, British Pound, Indian rupee, the Philippine Peso, the Mexican Peso, the Canadian Dollar, the Chinese Yuan and the U.S. Dollar could have a material adverse effect on SourceHOV's results of operations.***

SourceHOV operates internationally and as a result, is subject to risks associated with doing business globally, such as risks related to the differing legal, political and regulatory requirements and economic conditions of many jurisdictions. Risks inherent to operating internationally include changes in a country's economic or political conditions, in foreign currency exchange rates, regulatory requirements and enforcement of intellectual property rights.

The functional currencies of SourceHOV's businesses outside of the U.S. are the local currencies. Changes in exchange rates between these foreign currencies and the U.S. Dollar will affect the recorded levels of SourceHOV's assets, liabilities, net sales, cost of goods sold and operating margins and could result in exchange gains or losses. The primary foreign currencies to which SourceHOV has exposure are the European Union Euro, Swedish Krona, British Pound Sterling, and Indian rupees. Exchange rates between these currencies and the U.S. Dollar in recent years have fluctuated significantly and may do so in the future. The operating results and profitability may be affected by any volatility in currency exchange rates and the SourceHOV's ability to manage effectively currency transaction and translation risks. To the extent the U.S. dollar strengthens against foreign currencies, SourceHOV's foreign revenues and profits will be reduced when translated into U.S. dollars.

Although the vast majority of SourceHOV's revenues are denominated in U.S. dollars, a significant portion of its expenses are incurred and paid in Euros, British Pound Sterling, Swedish Krona, Indian rupees, and to a lesser extent in other currencies, including the Philippine Peso, the Mexican Peso, the Canadian dollar and the Chinese Yuan. SourceHOV reports its financial results in U.S. dollars. The exchange rate between the Indian rupee and the U.S. dollar has changed substantially in recent years and may fluctuate substantially in the future. Its results of operations may be adversely affected if such fluctuations continue, or increase, or other currencies fluctuate significantly against the U.S. dollar.

Although SourceHOV does not currently take steps to hedge its foreign currency exposures, should it choose in the future to implement a hedging strategy, there can be no assurance that its hedging strategy will be successful or that the hedging markets would have sufficient liquidity or depth to allow it to implement such a hedging strategy in a cost-effective manner. Further, the success of any potential hedging strategy could be impacted by any failure by the hedging counterparties to meet their contractual obligations.

***Damage to SourceHOV's facilities could impact its operations or financial condition.***

The performance of SourceHOV's services also depends upon facilities that house central computer operations or operating centers or in which it processes information, images, bills or statements. Significant damage to any of SourceHOV's operating facilities could interrupt the operations at those facilities and interfere with its ability to serve customers.

***Failure to comply with the U.S. Foreign Corrupt Practices Act, or the FCPA, economic and trade sanctions, regulations, and similar laws could subject SourceHOV to penalties and other adverse consequences.***

SourceHOV operates its business in several foreign countries with developing economies, where companies often engage in business practices that are prohibited by U.S. and other regulations applicable to SourceHOV. SourceHOV is subject to anti-corruption laws and regulations, including the FCPA, the U.K. Bribery Act and other laws that prohibit the making or offering of improper payments to foreign government officials and political figures, including antibribery provisions enforced by the Department of Justice and accounting provisions enforced by the SEC. These laws prohibit improper

71

Supp.App. 0437

Table of Contents

payments or offers of payments to foreign governments and their officials and political parties by the U.S. and other business entities for the purpose of obtaining or retaining business. SourceHOV has implemented policies to identify and address potentially impermissible transactions under such laws and regulations; however, there can be no assurance that all of SourceHOV's and its subsidiaries' employees, consultants, and agents, including those that may be based in or from countries where practices that violate U.S. or other laws may be customary, will not take actions in violation of SourceHOV's policies, for which it may be ultimately responsible.

SourceHOV is also subject to certain economic and trade sanctions programs that are administered by the Department of Treasury's Office of Foreign Assets Control, or OFAC, which prohibit or restrict transactions to or from or dealings with specified countries, their governments, and in certain circumstances, their nationals, and with individuals and entities that are specially-designated nationals of those countries, narcotics traffickers, and terrorists or terrorist organizations. SourceHOV's subsidiaries may be subject to additional foreign or local sanctions requirements in other relevant jurisdictions.

**Risks Related to Novitex's Business**

***Novitex faces significant competition and its failure to compete successfully could adversely affect its results of operations and financial condition.***

Novitex operates in an environment of significant competition, driven by rapid technological developments, changes in industry standards, and demands of customers to become more efficient. Novitex's competitors range from large international companies to relatively small firms. Some of the large international companies have significant financial resources and compete with Novitex to provide document processing services and/or business process services. Novitex competes primarily on the basis of technology, performance, price, quality, reliability, brand, distribution and customer service and support. Novitex's success in future performance is largely dependent upon its ability to compete successfully, to promptly and effectively react to changing technologies and customer expectations and to expand into additional market segments. To remain competitive, Novitex must develop services and applications; periodically enhance its existing offerings; remain cost efficient; and attract and retain key personnel and management. If Novitex is unable to compete successfully, Novitex could lose market share and important customers to its competitors and that could materially adversely affect its results of operations and financial condition.

***Decreasing demand for traditional printed and mailed communications may continue to adversely affect Novitex's business, depending on the extent to which its clients' and their customers' acceptance of electronic alternatives continues to grow.***

To the extent customers of Novitex's clients select electronic presentment and delivery of communications, the demand for Novitex's services for production and distribution of printed documents has decreased and could continue to decrease. Novitex provides electronic presentment and delivery solutions, but they are priced differently and require different capabilities than print-mail solutions. Clients may choose to perform electronic hosting and distribution of communications to customers internally or select electronic solution providers other than Novitex. Any of these developments could adversely affect Novitex's business and operating results.

***Trends or events affecting Novitex's clients or their industries could decrease the demand for Novitex's services and the loss of, reduction of business with, or less favorable terms with any of its significant customers could materially harm Novitex's business and results of operations.***

Novitex derives its revenues from the delivery of services to clients in the financial services, healthcare, legal, consumer and manufacturing, technology and energy, government and education and other industries. Demand for Novitex's services among companies in those industries could decline for many reasons. If demand for Novitex's services decreases or any of the industries it serves decline or

72

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 441 of 1110    PageID 2062

fail or consolidate, reducing the number of potential clients, Novitex's business and operating results could be adversely affected.

Events that adversely affect Novitex's clients' businesses, rates of growth or numbers of customers they serve could decrease demand for Novitex's services and the number of transactions it processes. Events that could adversely affect Novitex's clients' businesses include decreased demand for its customers' products and services, adverse conditions in its customers' markets or adverse economic conditions generally. Novitex may be unsuccessful in predicting the needs of changing industries and whether potential customers will accept its services. Novitex also may invest in technology or infrastructure for specific customers and not realize additional revenue from such investments. If trends or events do not occur as it expects, Novitex's business could be negatively impacted.

***A significant portion of Novitex's revenue is derived from a relatively limited number of large clients and any loss of, or decrease in sales to, these clients could harm Novitex's results of operations.***

A significant portion of Novitex's revenue is derived from a relatively limited number of large clients. Revenue from Novitex's top twenty clients accounted for approximately 50%, 44% and 41% of its revenue during the years ended December 31, 2016, 2015 and 2014, respectively, and approximately 57% of its revenue during the three months ended March 31, 2017.

Novitex's largest client accounted for approximately 7%, 4% and 4% of its revenue in 2016, 2015 and 2014, respectively, and approximately l5% of its revenue in the three months ended March 31, 2017. Novitex is likely to continue to experience ongoing client concentration, particularly if Novitex is successful in attracting large enterprise clients. Moreover, there may be a loss or reduction in business from one or more of Novitex's large clients. It is also possible that revenue from these clients, either individually or as a group, may not reach or exceed historical levels in any future period. The loss or significant reduction of business from Novitex's major clients would adversely affect its results of operations.

***If Novitex fails to successfully develop new service offerings, Novitex may be unable to retain current customers and gain new customers and its revenues would decline.***

The process of developing new services and solutions is inherently complex and uncertain. It requires accurate anticipation of customers' changing needs and emerging technological trends. Novitex must make long-term investments and commit significant resources before knowing whether these investments will eventually result in services that achieve customer acceptance and generate the revenues required to provide desired returns. If Novitex fails to accurately anticipate and meet its customers' needs through the development of new technologies and service offerings or if its new services are not widely accepted, Novitex could lose market share and customers to its competitors and that could materially adversely affect its results of operations and financial condition.

***Novitex's business could be adversely affected if Novitex is unsuccessful in managing the start-up of new contracts.***

In order for Novitex's business to continue its growth, Novitex must successfully manage the start-up of services related to new contracts. If a client is not satisfied with the quality of work performed by Novitex or a subcontractor, or with the type of services or solutions delivered, then Novitex could incur additional costs to address the situation, the profitability of that work might be impaired and the client's dissatisfaction with Novitex's services could damage its ability to obtain additional work from that client or obtain new work from other potential clients. In particular, clients who are not satisfied might seek to terminate existing contracts prior to their scheduled expiration date, which may result in Novitex's inability to fully recover is up-front investments. In addition, clients could direct future business to Novitex's competitors. Novitex could also trigger contractual credits to clients or a contractual default. Failure to properly transition new clients, properly budget transition costs or accurately estimate new contract operational costs could result in delays in Novitex's contract

73

Supp.App. 0439

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 442 of 1110    PageID 2063

performance, trigger service level penalties, or result in contract profit margins that do not meet Novitex's expectations or its historical profit margins.

***Novitex's business depends substantially on customers renewing their existing service agreements and/or expanding their use of its services. Any decline in Novitex's customer renewals and expansions or terminations would harm its future operating results.***

Novitex enters into service agreements with many of its customers that are generally one to five years in length. As a result, maintaining the renewal rate of its customer agreements is critical to Novitex's future success. Novitex cannot assure you that any of its customer agreements will be renewed as its customers have no obligation to renew their agreements for Novitex's services after the expiration of the initial term. Novitex cannot unilaterally extend the terms of its client contracts when they expire. Contracts can terminate during the term of agreement for various reasons, including through "termination for convenience" clauses in some contracts that enable clients to cancel by written notice. The loss of any customers that individually or collectively account for a significant amount of Novitex's revenues would have a material adverse effect on its results of operations or financial condition. If Novitex's renewal rates are lower than anticipated or decline for any reason, or if customers renew on terms less favorable to Novitex, Novitex's revenue may decrease and its profitability and gross margin may be harmed, which would have a material adverse effect on Novitex's business, results of operations and financial condition.

***If Novitex is unable to expand its enterprise client base, Novitex's revenue growth rate may be negatively impacted.***

As part of its growth strategy, Novitex seeks to attract new enterprise clients and expand relationships with existing enterprise and transactional clients. If Novitex is unable to attract new enterprise clients or expand its relationships with its existing enterprise and transactional clients, Novitex's ability to grow its business will be hindered.

***Consolidation in or among Novitex's customers and potential customers could result in a reduction of customers or reduction in use of Novitex's services.***

Mergers or acquisitions of or consolidations among Novitex's customers or between its customers and other entities could reduce the number of Novitex's customers and potential customers and result in the discontinuation or reduction in use of Novitex's services. This could adversely affect Novitex's revenues even if these events do not reduce the aggregate number of customers or the activities of the consolidated entities. Any of these developments could materially and adversely affect Novitex's business, financial condition, operating results and cash flows.

***A failure to adapt to technological changes to address the changing demands of customers may adversely impact Novitex's business.***

In order to grow and remain competitive, Novitex will need to continue to adapt to future changes in technology, enhance Novitex's existing offerings and introduce new offerings to address the changing demands of customers. If Novitex is unable to continue to exploit new and existing technologies to distinguish its services from those of its competitors or adapt to new distribution methods, Novitex's business may be adversely affected.

Technological developments and changing demands of customers may require additional investment in new equipment and technologies. Novitex must monitor changes in its customers' markets and develop new solutions to meet customers' needs. The development of such solutions may be costly and there is no assurance that these solutions will be accepted by customers. If Novitex is unable to adapt to technological changes on a timely basis or at an acceptable cost, customers' demand for Novitex's services may be adversely affected.

74

***The quality of Novitex's support and services offerings is important to its customers and, if Novitex fails to offer high quality support and services, customers may not buy Novitex's solutions and its revenue may decline.***

Novitex's customers generally depend on its service organization to resolve issues relating to the use of its solutions. A high level of support is critical for the successful marketing and sale of Novitex's solutions. If Novitex is unable to provide a level of support and service to meet or exceed the expectations of its customers, Novitex could experience:

- loss of customers and market share;

- a failure to attract new customers; and

- increased service and support costs and a diversion of resources.

Any of the above results would likely have a material adverse impact on Novitex's business, revenue, results of operations, financial condition and reputation.

***Operational errors in the performance of Novitex's services or contractual obligations could lead to liability for claims, client loss and result in reputational damage.***

The failure to properly perform Novitex's services or contractual obligations could result in its clients and/or certain of its subsidiaries being subjected to losses including fines or other sanctions by applicable regulatory authorities, and Novitex could be liable to parties who are financially harmed by those errors. In addition, such errors could cause Novitex to lose revenues, lose clients or damage its reputation.

***Novitex has substantial leverage, and future leverage could adversely affect the ability to raise capital or access other financing to fund Novitex's business operations and limit Novitex's ability to react to changes in the economy or its industry.***

Novitex has had a significant amount of indebtedness and following the completion of the business combination Novitex's operations will continue to have substantial leverage. Having a significant amount of leverage may have important consequences, including:

- requiring a substantial portion of cash flow from operations to be dedicated to the payment of principal and interest on indebtedness, thereby reducing the ability to use cash flow from Novitex's operations to fund operations, capital expenditures, and future business opportunities;

- limiting the ability to obtain additional financing for working capital, capital expenditures, product and service development, debt service requirements, acquisitions, and general corporate or other purposes including equipment financing at reasonable rates, which is vital to Novitex's business;

- increasing vulnerability to general economic and industry conditions;

- restricting the ability to make strategic acquisitions or requiring non-strategic divestitures;

- subjecting Novitex's operations to restrictive covenants that may limit operating flexibility; and

- placing Novitex's operations at a competitive disadvantage compared to competitors that are less highly leveraged.

Despite Novitex's significant leverage, the combined business may be able to incur significant additional amounts of debt, which could further exacerbate the risks associated with its significant leverage.

75

Supp.App. 0441

***Novitex's profitability is dependent upon its ability to obtain adequate pricing for its services and to improve its cost structure.***

Novitex's success depends on its ability to obtain adequate pricing for its services. Depending on competitive market factors, future prices Novitex obtains for its services may decline from previous levels. The average sales price for Novitex's solutions may decline for a variety of reasons, including competitive pricing pressures, discounts Novitex offers, new pricing models, a change in the mix of Novitex's solutions, anticipation of the introduction of new solutions or promotional programs. If Novitex is unable to obtain adequate pricing for its services, or effectively manage its costs in providing the services, it could materially adversely affect Novitex's results of operations and financial condition. In addition, Novitex's services contracts are increasingly requiring tighter timelines for implementation as well as more stringent service level metrics and measurable long term savings. This makes the bidding process for new contracts much more difficult and requires Novitex to adequately consider these requirements in the pricing of its services.

Novitex continually reviews its operations with a view towards reducing its cost structure, including reducing its employee base, improving process and system efficiencies and outsourcing some internal functions. Novitex from time to time engages in restructuring actions to reduce its cost structure. If Novitex is unable to continue to maintain its cost base at or below the current level and maintain process and systems changes resulting from prior restructuring actions, it could materially adversely affect Novitex's results of operations and financial condition.

Novitex's ability to sustain and improve profit margins is dependent on a number of factors, including its ability to continue to improve the cost efficiency of its operations through such programs as Lean Six Sigma, the level of pricing pressures on its services, the trend in post-sale revenue growth and Novitex's ability to successfully complete information technology initiatives. If any of these factors adversely materialize or if Novitex is unable to achieve and maintain productivity improvements through design efficiency, supplier cost improvements and information technology initiatives, Novitex's ability to offset labor cost inflation, potential materials cost increases and competitive price pressures would be impaired, all of which could materially adversely affect Novitex's results of operations and financial condition.

***Fluctuations in the costs of paper, ink, energy, by-products and other raw materials may adversely impact Novitex.***

Purchases of paper, ink, energy and other raw materials represent a large portion of Novitex's costs. Increases in the costs of these inputs may increase Novitex's costs and Novitex may not be able to pass these costs on to customers through higher prices. In addition, Novitex may not be able to resell waste paper and other print-related by-products or may be adversely impacted by decreases in the prices for these by-products. Increases in the cost of materials may adversely impact customers' demand for Novitex's printing and related services.

***Novitex is subject to government regulations concerning its hourly and other employees, including minimum wage, overtime, and health care laws.***

Novitex is subject to applicable rules and regulations relating to its relationship with its employees, including minimum wage and break requirements, health benefits, unemployment and sales taxes, overtime, and working conditions and immigration status. Legislated increases in the federal minimum wage and increases in additional labor cost components, such as employee benefit costs, workers' compensation insurance rates, compliance costs and fines, as well as the cost of litigation in connection with these regulations, would increase Novitex's labor costs. Unionizing and collective bargaining efforts have received increased attention nationwide in recent periods. Should Novitex's employees become represented by unions, Novitex would be obligated to bargain with those unions with respect to wages,

76

Supp.App. 0442

Table of Contents

hours, and other terms and conditions of employment, which is likely to increase its labor costs. Moreover, as part of the process of union organizing and collective bargaining, strikes and other work stoppages may occur, which would cause disruption to Novitex's business. Similarly, many employers nationally in similar environments have been subject to actions brought by governmental agencies and private individuals under wage-hour laws on a variety of claims, such as improper classification of workers as exempt from overtime pay requirements and failure to pay overtime wages properly, with such actions sometimes brought as class actions. These actions can result in material liabilities and expenses. Should Novitex be subject to employment litigation, such as actions involving wage-hour, overtime, break, and working time, it may distract Novitex's management from business matters and result in increased labor costs. If costs of labor increase significantly, Novitex's business, results of operations, and financial condition may be adversely affected.

### *Employee healthcare costs continue to increase.*

Novitex maintains a self-insured healthcare plan under which it generally shares the cost of health care with certain of its employees. Employee healthcare is a significant operating cost for Novitex, and these costs have been escalating well in excess of other inflationary trends over the past decade. If healthcare costs continue to increase, Novitex may not be willing or able to pass those costs on to employees.

### *Novitex self-insures health benefits and may be adversely impacted by unfavorable claims experience.*

Novitex is self-insured for its health benefits. If the number or severity of claims increases, or Novitex is required to accrue or pay additional amounts because the claims prove to be more severe than its original assessment, its operating results would be adversely affected. Novitex's future claims expense might exceed historical levels, which could reduce earnings. Novitex expects to periodically assess its self-insurance strategy. Novitex is required to periodically evaluate and adjust its claims reserves to reflect its experience. However, ultimate results may differ from Novitex's estimates, which could result in losses over its reserved amounts.

### *Novitex is exposed to risks related to potential adverse changes in currency exchange rates.*

Novitex is exposed to market risks resulting from changes in the currency exchange rates of the currencies in the countries in which it does business, primarily related to Novitex's Canadian operations. Although operating in local currencies may limit the impact of currency rate fluctuations on the operating results of Novitex's non-U.S. subsidiaries, fluctuations in such rates may affect the translation of these results into Novitex's consolidated financial statements. To the extent borrowings, sales, purchases, revenues and expenses or other transactions are not in the applicable local currency, Novitex may enter into foreign currency spot and forward contracts to hedge the currency risk. Management cannot be sure, however, that Novitex's efforts at hedging will be successful, and such efforts could, in certain circumstances, lead to losses.

### *Various events may cause Novitex's financial results to fluctuate from quarter-to-quarter or year-to-year. The nature of these events might inhibit Novitex's ability to anticipate and act in advance to counter them.*

Novitex may be unsuccessful in determining or controlling when and whether events occur that could cause varying financial results. Unfavorable results may occur that Novitex did not anticipate or take advance action to address. Novitex incurs significant costs to develop solutions used to service Novitex's existing and potential client operations. The timing of these expenses may fluctuate as new client contracts are signed or existing client contracts are renewed, causing Novitex's results to vary accordingly. Factors contributing to the variability of Novitex's results include increased costs of supplies, increased costs relating to existing and potential client operations, and hiring staff to develop new and existing solutions. The timing of Novitex's fees associated with new and existing client

77

Supp.App. 0443

Table of Contents

contracts, including changes in recognition as a result of changes in accounting principles, may also cause results to vary from period to period.

### *Novitex's future profitability is uncertain.*

Novitex's future profitability depends on, among other things, Novitex's ability to generate revenue in excess of its expenses. However, Novitex has significant and continuing fixed costs relating to the maintenance of its assets and business, including Novitex's substantial debt service requirements, which Novitex may not be able to reduce adequately to sustain its profitability if its revenue decreases. Novitex's profitability also may be impacted by non-cash charges such as stock-based compensation charges and potential impairment of goodwill, which will negatively affect Novitex's reported financial results. Even if Novitex achieves profitability on an annual basis, Novitex may not be able to achieve profitability on a quarterly basis. You should not consider prior revenue growth as indicative of Novitex's future performance. In fact, in future quarters Novitex may not have any revenue growth or Novitex's revenue could decline. Novitex may continue to incur significant losses in the future for a number of reasons, including the other risks described elsewhere in this proxy statement, and Novitex may encounter unforeseen expenses, difficulties, complications, delays and other unknown events.

### *Novitex may be unable to sustain positive cash flow.*

Novitex's ability to continue to generate positive cash flow depends on its ability to generate collections from sales in excess of its cash expenditures. Novitex's ability to generate and collect on sales can be negatively affected by many factors, including but not limited to:

- Novitex's inability to convince new customers to use its services or existing customers to renew their contracts or use additional services;

- the lengthening of Novitex's sales cycle;

- changes in Novitex's customer mix;

- a decision by any of Novitex's existing customers to cease or reduce using its services;

- failure of customers to pay Novitex's invoices on a timely basis or at all;

- a failure in the performance of Novitex's solutions or its internal controls that adversely affects its reputation or results in loss of business;

- the loss of market share to existing or new competitors;

- the failure to enter or succeed in new markets;

- regional or global economic conditions or regulations affecting perceived need for or value of Novitex's services; or

- Novitex's inability to develop new offerings, expand its offerings or drive adoption of its new offerings on a timely basis and thus potentially not meeting evolving market needs.

Novitex anticipates that it will incur increased sales and marketing and general and administrative expenses as it continues to diversify its business into new industries and geographic markets. Novitex's business will also require significant amounts of working capital to support its growth. Novitex may not achieve collections from sales to offset these anticipated expenditures sufficient to maintain positive future cash flow. In addition, Novitex may encounter unforeseen expenses, difficulties, complications, delays and other unknown events that cause Novitex's costs to exceed its expectations. An inability to generate positive cash flow may decrease Novitex's long-term viability.

78

Supp.App. 0444

Table of Contents

*A decline in expected profitability of Novitex could result in the impairment of assets, including goodwill, other long-lived assets and deferred tax assets.*

Novitex holds material amounts of goodwill, other long-lived assets and deferred tax assets on its balance sheet. A decline in expected profitability, particularly if there is a decline in the global economy, could call into question the recoverability of Novitex's related goodwill, other long-lived tangible and intangible assets or deferred tax assets and require the write down or write off these assets or, in the case of deferred tax assets, recognition of a valuation allowance through a charge to income. Such an occurrence could a material adverse effect on Novitex's consolidated results of operations, financial position and cash flows.

*Changes in the rules and regulations to which customers are subject may impact demand for Novitex's services.*

Many of Novitex's customers are subject to rules and regulations requiring certain printed or electronic communications, governing the form of such communications and protecting the privacy of consumers. Changes in these regulations may impact customers' business practices and could reduce demand for Novitex's services. Changes in such regulations could eliminate the need for certain types of communications altogether or such changes may impact the quantity or format of such communications.

*If Novitex is unable to collect for unbilled services, Novitex's results of operations, financial condition and cash flows could be adversely affected.*

The profitability of Novitex's large services contracts depends on Novitex's ability to successfully obtain payment from its clients of the amounts they owe it for work performed. Actual losses on client balances could differ from current estimates and, as a result, may require adjustment of Novitex's receivables for unbilled services. Macroeconomic conditions could result in financial difficulties, including limited access to the credit markets, insolvency or bankruptcy, for Novitex's clients and, as a result, could cause clients to delay payments to Novitex, request modifications to their payment arrangements that could increase Novitex's receivables balance, or default on their payment obligations to Novitex. Timely collection of client balances also depends on Novitex's ability to complete its contractual commitments (for example, achieve specified milestones in percentage-of-completion contracts) and bill and collect its contracted revenues. If Novitex is unable to meet its contractual requirements, Novitex might experience delays in collection of and/or be unable to collect its client balances, and if this occurs, Novitex's results of operations and cash flows could be adversely affected. In addition, if Novitex experiences an increase in the time to bill and collect for its services, Novitex's cash flows could be adversely affected.

*Because Novitex recognizes revenue for its services ratably over the term of its customer agreements, downturns or upturns in the value of signed contracts will not be fully and immediately reflected in Novitex's operating results.*

Novitex offers its services primarily through fixed commitment contracts and recognizes revenue ratably over the related service period, which typically ranges from three to five years. As a result, some portion of the revenue Novitex reports in each quarter is revenue from contracts entered into during prior quarters. Consequently, a decline in signed contracts in any quarter will not be fully and immediately reflected in the revenue for that quarter, but will instead negatively affect Novitex's revenue in future quarters. In addition, Novitex may be unable to adjust its cost structure to offset this reduced revenue. Similarly, revenue attributable to an increase in contracts signed in a particular quarter will not be fully and immediately recognized, as revenue from new or renewed contracts is recognized ratably over the applicable service period. Because Novitex incurs sales commissions at the time of sale, Novitex may not recognize revenues from some customers despite incurring considerable

79

Supp.App. 0445

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 448 of 1110    PageID 2069

expense related to Novitex's sales processes. Timing differences of this nature could cause Novitex's margins and profitability to fluctuate significantly from quarter to quarter.

***Novitex's ability to utilize income tax net operating loss carryforwards may be limited, which could adversely impact Novitex's results of operations.***

Novitex has substantial deferred tax assets related to net operating losses ("NOLs") for United States federal and state income tax purposes, which Novitex expects are available to offset future taxable income. However, Novitex's ability to utilize or realize the current carrying value of the NOLs may be impacted by certain events, such as changes in tax legislation or the interpretation thereof; insufficient future taxable income prior to expiration of the NOLs; annual limits imposed under Section 382 of the Code, or by state law; or as a result of a change in control. A change in control is generally defined as a cumulative change of 50% or more in the ownership positions of certain stockholders during a rolling three year period. It is presently anticipated that the proposed Business Combination will result in an ownership change of Novitex for purposes of Section 382 of the Code. The amount of the annual limitation on the amount of NOLs that may be used to offset future taxable income generally is equal to the value of the stock of the corporation immediately prior to the ownership change multiplied by the adjusted federal tax-exempt rate, set by the Internal Revenue Service. Limitations imposed on the ability to use NOLs to offset future taxable income could cause U.S. federal income taxes to be paid earlier than otherwise would be paid if such limitations were not in effect and could cause such NOLs to expire unused, in each case reducing or eliminating the benefit of such NOLs. Similar rules and limitations may apply for state income tax purposes. Additionally, uncertainty exists with respect to tax reform that could potentially be enacted by the new U.S. presidential administration and Congress that could have an impact on the Novitex's NOL. Any of these events or developments could limit Novitex's ability to utilize or realize the current carrying value of the NOLs and may adversely impact Novitex's results of operations.

***Changes in financial accounting standards or practices may cause adverse, unexpected financial reporting fluctuations and affect Novitex's reported financial results.***

A change in accounting standards or practices can have a significant effect on Novitex's reported results and may even affect its reporting of transactions completed before the change is effective. New accounting pronouncements and varying interpretations of existing accounting pronouncements have occurred and will occur in the future. Changes to existing rules or the questioning of current practices may adversely affect Novitex's reported financial results or the way in which it conduct its business.

***If Novitex is unable to maintain or expand its direct sales capabilities, it may not be able to generate anticipated revenues.***

Novitex's success depends in large part on its ability to attract, motivate and retain highly qualified personnel. Novitex relies primarily on its direct sales force to sell its services to new customers. Novitex's services and solutions require a sophisticated sales effort targeted at the senior management of its prospective customers. Novitex may not have the required processes, systems and discipline to execute on its sales and growth strategies. Novitex must expand its sales efforts to generate increased revenue from new customers. Failure to hire or retain qualified sales personnel will preclude Novitex from expanding its business and generating anticipated revenue. Competition for talented sales personnel is intense and there can be no assurance that Novitex will be able to retain its existing sales personnel or attract, assimilate or retain enough highly qualified sales personnel. Many of the companies with which Novitex competes for experienced personnel have greater resources than Novitex has. If any of Novitex's sales representatives or sales management personnel were to leave Novitex and join one of its competitors, Novitex may be unable to prevent those sales representatives from helping

80

Supp.App. 0446

Table of Contents

its competitors solicit business from Novitex's existing customers, which could adversely affect Novitex's revenue.

### If Novitex fails to develop its brand cost-effectively, Novitex's business may suffer.

Novitex believes that developing and maintaining awareness of the Novitex brand in a cost-effective manner is critical to achieving widespread acceptance of Novitex's existing and future services and is an important element in attracting new customers. Successful promotion of Novitex's brand will depend largely on the effectiveness of Novitex's marketing efforts and is ability to provide reliable and useful services at competitive prices. If Novitex fails to successfully promote and maintain its brand, or incur substantial expenses in unsuccessful attempts to promote and maintain its brand, Novitex may fail to attract enough new customers or retain its existing customers to the extent necessary to realize a sufficient return on its brand-building efforts, and Novitex's business could suffer.

### Security and privacy breaches may damage client relations and impact Novitex's business.

The secure and uninterrupted operation of Novitex's information technology systems is critical to its business. Novitex's services and systems may involve the storage, processing and transmission of sensitive data, including valuable intellectual property, other proprietary or confidential data, regulated data, and personal information of employees, customers and others. In the current environment there are numerous and evolving risks to cybersecurity and privacy, including criminal hackers, hacktivists, state-sponsored intrusions, industrial espionage, employee malfeasance, and human or technological error. Computer hackers and others routinely attempt to breach the security of technology products, services, and systems. The risk of such attacks to Novitex includes attempted breaches not only of its own services and systems, but also those of customers, contractors, business partners, vendors and other third parties. Successful breaches could result in, for example, unauthorized access to, disclosure, modification, misuse, loss, or destruction of company, customer, or other third-party data or systems; theft of sensitive, regulated, or confidential data including personal information and intellectual property; and system disruptions or denial of service. If Novitex is the victim of a significant data security breach, or if Novitex's clients perceive that it is unable to protect the security of their confidential information, Novitex could suffer harm to its reputation with clients, be exposed to liability, and incur significant remediation costs, which could have a material adverse effect on Novitex's business, financial position, and results of operations.

### Novitex relies on third-party software and hardware to support its system and services and Novitex's business and reputation could suffer if these third-party services fail to perform properly or are no longer available.

Novitex relies on hardware purchased or leased and software licensed from third parties to support its service offerings. This hardware and software may not continue to be available on commercially reasonable terms or at all. Any loss of the right to use any of this hardware or software could result in delays in the provisioning of Novitex's services, which could negatively affect its business until equivalent technology is either developed by Novitex or, if available, is identified, obtained and integrated. In addition, it is possible that Novitex's hardware vendors or the licensors of third-party software could increase the prices they charge, which could have a material adverse impact on Novitex's results of operations. Further, changing hardware vendors or software licensors could detract from management's ability to focus on the ongoing operations of Novitex's business or could cause delays in the operations of its business.

81

Supp.App. 0447

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 450 of 1110    PageID 2071

*Uncertain government budgets and shifting government priorities could delay contract awards and funding and adversely affect Novitex's ability to continue work under its government contracts. Additionally, federal procurement directives could result in Novitex's loss of work on current programs to small business set-asides and large multiple award contracts.*

Novitex's government business is subject to funding delays, terminations (including at the government's convenience), reductions, in-sourcing, extensions, and moratoriums associated with the government's budgeting and contracting process. The federal procurement environment is unpredictable and could adversely affect Novitex's ability to perform work under new and existing contracts. Novitex has experienced delays in contract awards and funding on its contracts in recent years that have adversely affected its ability to continue existing work and to replace expiring work. Additionally, Novitex's government business is subject to the risk that one or more of its potential contracts or contract extensions may be diverted by the contracting agency to a small or disadvantaged or minority-owned business pursuant to set-aside programs administered by the Small Business Administration, or may be bundled into large multiple award contracts for very large businesses. These risks can potentially have an adverse effect on Novitex's revenue growth and profit margins.

*If Novitex is unable to attract, engage, retain and integrate its executives and other key employees, Novitex may not be able to implement its business strategy.*

Novitex's success depends, in large part, on its ability to attract, engage, retain and integrate qualified executives and other key employees throughout all areas of its business. Identifying, developing internally or hiring externally, training and retaining highly-skilled managerial, technical, sales and services, finance and marketing personnel are critical to Novitex's future. Competition for experienced and qualified employees can be intense. In order to attract and retain executives and other key employees in a competitive marketplace, Novitex must continue to be able to provide a competitive compensation package with an attractive mix of cash, benefits and incentive compensation. In addition, Novitex may be unable to attract and retain key personnel on acceptable terms given the competition among companies for experienced management personnel. Failure to successfully hire executives and key employees or the loss of any executives and key employees could have a significant impact on Novitex's operations.

*Novitex may not be able to develop or implement new systems, procedures and controls that are required to support the continued growth in its operations.*

To manage its growth, Novitex must implement and maintain proper operational and financial controls and systems. Further, Novitex will need to manage its relationships with various clients and suppliers. Novitex cannot give any assurance that it will be able to develop and implement, on a timely basis, the systems, procedures and controls required to support the growth in Novitex's operations or effectively manage its relationships with various clients and suppliers. If Novitex is unable to manage its growth, its business, operating results and financial condition could be adversely affected.

*Catastrophic events may disrupt Novitex's business.*

A natural disaster, telecommunications failure, power outage, cyber-attack, war, terrorist attack, or other catastrophic event could cause Novitex to suffer system interruptions, reputational harm, delays in solution development, breaches of data security and loss of critical data. An event of this nature could also prevent Novitex from fulfilling customer orders or maintaining certain service level requirements. While Novitex has developed certain disaster recovery plans and maintain backup systems to reduce the potentially adverse effect of these types of events, a catastrophic event that results in the destruction or disruption of both of Novitex's MegaCenters or its critical business or information technology systems could severely affect Novitex's ability to conduct normal business operations and, as a result, Novitex's business, operating results and financial condition could be adversely affected.

82

Supp.App. 0448

***Damage to Novitex's facilities, including the MegaCenters, could impact Novitex's operations or financial condition.***

The performance of Novitex's services depends upon facilities that house central computer operations or operating centers or in which Novitex processes information, images, bills or statements. Significant damage to any of Novitex's operating facilities, including the MegaCenters, could interrupt the operations at those facilities and interfere with Novitex's ability to serve customers.

### Risks Related to Quinpario and the Business Combination

***Following the consummation of the Business Combination, the combined company's only significant asset will be ownership of 100% of Novitex and 100% of SourceHOV and such ownership may not be sufficient to pay dividends or make distributions or loans to enable the combined company to pay any dividends on Quinpario Common Stock or satisfy the combined company's other financial obligations.***

Following the consummation of the Business Combination, the combined company will have no direct operations and no significant assets other than the ownership of 100% of Novitex and 100% of SourceHOV. The combined company will depend on SourceHOV and Novitex for distributions, loans and other payments to generate the funds necessary to meet its financial obligations, including its expenses as a publicly traded company, and to pay any dividends with respect to Quinpario Common Stock. Legal and contractual restrictions in agreements governing the Debt Financing and future indebtedness of SourceHOV and Novitex, as well as the financial condition and operating requirements of SourceHOV and Novitex, may limit the combined company's ability to obtain cash from SourceHOV and Novitex. The earnings from, or other available assets of, SourceHOV and Novitex may not be sufficient to pay dividends or make distributions or loans to enable the combined company to pay any dividends on Quinpario Common Stock or satisfy its other financial obligations.

***The combined company may not be able to timely and effectively implement controls and procedures required by Section 404 of the Sarbanes-Oxley Act of 2002 that will be applicable to it after the Business Combination.***

Neither Novitex nor SourceHOV is currently subject to Section 404 of the Sarbanes-Oxley Act of 2002. However, following the Business Combination, the combined company will be required to provide management's attestation on internal controls commencing with the its annual report for the year ending December 31, 2017. The standards required for a public company under Section 404 of the Sarbanes-Oxley Act of 2002 are significantly more stringent than those required of either Novitex or SourceHOV as a privately-held company. Management may not be able to effectively and timely implement controls and procedures that adequately respond to the increased regulatory compliance and reporting requirements that will be applicable to the combined company after the Business Combination. If the combined company is not able to implement the additional requirements of Section 404 in a timely manner or with adequate compliance, it may not be able to assess whether its internal controls over financial reporting are effective, which may subject it to adverse regulatory consequences and could harm investor confidence and the market price of Quinpario Common Stock.

***Subsequent to the consummation of the Business Combination, the combined company may be required to take writedowns or write-offs, restructuring and impairment or other charges that could have a significant negative effect on its financial condition, results of operations and stock price, which could cause you to lose some or all of your investment.***

Although Quinpario has conducted due diligence on SourceHOV and Novitex, Quinpario cannot assure you that this diligence revealed all material issues that may be present in Novitex's and SourceHOV's businesses, that it would be possible to uncover all material issues through a customary amount of due diligence, or that factors outside of Quinpario's and each of Novitex's and SourceHOV's control will not later arise. As a result, the combined company may be forced to later write down or

83

Supp.App. 0449

Table of Contents

write off assets, restructure its operations, or incur impairment or other charges that could result in losses. Even if Quinpario's due diligence successfully identifies certain risks, unexpected risks may arise and previously known risks may materialize in a manner not consistent with its preliminary risk analysis. Even though these charges may be non-cash items and may not have an immediate impact on the combined company's liquidity, the fact that the combined company reports charges of this nature could contribute to negative market perceptions about the combined company or its securities. In addition, charges of this nature may cause the combined company to be unable to obtain future financing on favorable terms or at all.

### *The Founders have agreed to vote in favor of the Business Combination, regardless of how Quinpario's public stockholders vote.*

The Founders have agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal. As of the date hereof, the Founders own shares of Quinpario Common Stock equal to approximately 30.3% of the issued and outstanding shares of Quinpario Common Stock. Accordingly, it is more likely that the necessary stockholder approval will be received for the Business Combination than would be the case if the Founders agreed to vote any shares of Quinpario Common Stock owned by them in accordance with the majority of the votes cast by Quinpario's public stockholders.

### *Quinpario will incur significant transaction and transition costs in connection with the Business Combination.*

Quinpario has and expects to incur significant, non-recurring costs in connection with consummating the Business Combination and operating as a public company following the consummation of the Business Combination. All expenses incurred in connection with the Business Combination Agreement and the transactions contemplated thereby (including the Business Combination), including all legal, accounting, consulting, investment banking and other fees, expenses and costs, will be for the account of the party incurring such fees, expenses and costs.

Quinpario's transaction expenses as a result of the Business Combination are currently estimated to be approximately $90 million.

### *The unaudited pro forma condensed combined financial information included in this document may not be indicative of what our actual financial position or results of operations would have been.*

The unaudited pro forma condensed combined financial information in this proxy statement is presented for illustrative purposes only and is not necessarily indicative of what the combined company's actual financial position or results of operations would have been had the Business Combination been completed on the dates indicated. See the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*" for more information.

### *The financial statements of Quinpario included in this proxy statement do not take into account the consequences to Quinpario of a failure to complete a business combination by July 24, 2017.*

The financial statements of Quinpario included in this proxy statement have been prepared assuming that it would continue as a going concern. Quinpario is required to complete the Business Combination by July 24, 2017, unless it further amends its certificate of incorporation to extend the life of the company and certain other agreements it has entered into. The possibility of the Business Combination not being consummated raises doubt as to Quinpario's ability to complete an initial business combination prior to July 24, 2017, the date on which the Company is required to liquidate.

84

Supp.App. 0450

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 453 of 1110    PageID 2074

Table of Contents

***Quinpario may waive one or more of the conditions to the Business Combination.***

Quinpario may agree to waive, in whole or in part, one or more of the conditions to its obligations to complete the Business Combination, to the extent permitted by its current certificate of incorporation and bylaws and applicable laws. For example, it is a condition to Quinpario's obligations to close the Business Combination that there be no breach of either Novitex's or SourceHOV's representations and warranties as of the closing date. However, if Quinpario's board of directors determines that any such breach is not material to the business of Novitex or SourceHOV, as applicable, then it may elect to waive that condition and close the Business Combination. In deciding to waive one or more conditions to the Business Combination, Quinpario's directors have interests in and arising from the Business Combination that are different from or in addition to (and which may conflict with) the interests of the public stockholders. See "—*The Sponsor and Quinpario's directors and officers have interests which may be different from or in addition to (and which may conflict with) the interests of the public stockholders.*" Quinpario is not able to waive the condition that its stockholders approve the Business Combination and the Business Combination will not be consummated if it causes Quinpario to have net tangible assets of less than $5,000,001.

***If Quinpario is unable to complete an initial business combination, its public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against Quinpario that Quinpario Partners and Jeffry N. Quinn are unable to indemnify), and its warrants will expire worthless.***

If Quinpario is unable to complete an initial business combination, its public stockholders may receive only approximately $10.00 per share on the liquidation of the Trust Account (or less than $10.00 per share in certain circumstances where a third party brings a claim against Quinpario that Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, are unable to indemnify (as described below)), and its warrants will expire worthless.

***The HGM Group will have significant influence over the combined company after completion of the Business Combination.***

Upon completion of the Business Combination, the HGM Group will beneficially own approximately 58.7% of Quinpario Common Stock. See the section entitled "*Beneficial Ownership of Securities*." As long as the HGM Group owns or controls a significant percentage of outstanding voting power, it will have the ability to strongly influence all corporate actions requiring stockholder approval, including the election and removal of directors and the size of our board of directors, any amendment of our certificate of incorporation or bylaws, or the approval of any merger or other significant corporate transaction, including a sale of substantially all of our assets. In addition, pursuant to the terms of the Director Nomination Agreement, the HGM Group (as well as Novitex Parent) will have certain nomination rights with respect to the combined company's board of directors and consent rights over certain corporate actions of the combined company. See "*Proposal No. 1—Approval of the Business Combination—The Director Nomination Agreements.*"

Additionally, the HGM Group's interests may not align with the interests of the combined company's other stockholders. The HGM Group is in the business of making investments in companies and may acquire and hold interests in businesses that compete directly or indirectly with the combined company. The HGM Group may also pursue acquisition opportunities that may be complementary to the combined company's business, and, as a result, those acquisition opportunities may not be available to the combined company. In addition, upon approval of the Corporate Opportunity Proposal, the combined company's certificate of incorporation will provide that it renounces any interest or expectancy in the business opportunities of the HGM Group and it shall not have any obligation to offer the combined company those opportunities unless presented to one of the combined company's directors or officers in his or her capacity as a director or officer. See the section entitled "*Proposal*

85

Supp.App. 0451

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 454 of 1110    PageID 2075

*No. 6—Approval of Amendments to the Current Certificate of Incorporation to Provide that Certain Transactions are not 'Corporate Opportunities' " for additional information.*

***If third parties bring claims against Quinpario, the proceeds held in our Trust Account could be reduced and the per-share redemption amount received by stockholders may be less than $10.00 per share.***

Quinpario's placing of funds in the Trust Account may not protect those funds from third-party claims against Quinpario. Although Quinpario will seek to have all vendors, service providers (other than its independent auditors), prospective target businesses or other entities with which it does business execute agreements with it waiving any right, title, interest or claim of any kind in or to any monies held in the Trust Account for the benefit of its public stockholders, such parties may not execute such agreements, or even if they execute such agreements they may not be prevented from bringing claims against the Trust Account, including, but not limited to, fraudulent inducement, breach of fiduciary responsibility or other similar claims, as well as claims challenging the enforceability of the waiver, in each case in order to gain advantage with respect to a claim against Quinpario's assets, including the funds held in the Trust Account. If any third party refuses to execute an agreement waiving such claims to the monies held in the Trust Account, Quinpario's management will perform an analysis of the alternatives available to it and will only enter into an agreement with a third party that has not executed a waiver if management believes that such third party's engagement would be significantly more beneficial to Quinpario than any alternative.

Examples of possible instances where Quinpario may engage a third party that refuses to execute a waiver include the engagement of a third-party consultant whose particular expertise or skills are believed by management to be significantly superior to those of other consultants that would agree to execute a waiver or in cases where management is unable to find a service provider willing to execute a waiver. In addition, there is no guarantee that such entities will agree to waive any claims they may have in the future as a result of, or arising out of, any negotiations, contracts or agreements with Quinpario and will not seek recourse against the Trust Account for any reason. Upon redemption of the public shares, if we are unable to complete the Business Combination within the prescribed timeframe, or upon the exercise of a redemption right in connection with the Business Combination, Quinpario will be required to provide for payment of claims of creditors that were not waived that may be brought against it within the ten years following redemption. Accordingly, the per-share redemption amount received by public stockholders could be less than the $10.00 per share initially held in the Trust Account, due to claims of such creditors. Quinpario Partners and Jeffry N. Quinn have agreed that they will be liable to Quinpario if and to the extent any claims by a vendor for services rendered or products sold to it, or a prospective target business with which Quinpario has discussed entering into a transaction agreement, reduce the amount of funds in the Trust Account to below (i) $10.00 per public share or (ii) such lesser amount per public share held in the Trust Account as of the date of the liquidation of the Trust Account due to reductions in the value of the trust assets, in each case net of the interest which may be withdrawn to pay taxes and for working capital, except as to any claims by a third party who executed a waiver of any and all rights to seek access to the Trust Account and except as to any claims under Quinpario's indemnity of the underwriters of the IPO against certain liabilities, including liabilities under the Securities Act. Moreover, in the event that an executed waiver is deemed to be unenforceable against a third party, Quinpario Partners and Jeffry N. Quinn will not be responsible to the extent of any liability for such third-party claims. Quinpario has not independently verified whether Quinpario Partners and Jeffry N. Quinn have sufficient funds to satisfy the indemnity obligations as we have not required them to retain any assets to provide for their indemnification obligations, nor have we taken any further steps to ensure that they will be able to satisfy any indemnification obligations that arise.

86

Supp.App. 0452

***If, after Quinpario distributes the proceeds in the Trust Account to the public stockholders, Quinpario files a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, a bankruptcy court may seek to recover such proceeds, and the members of Quinpario's board of directors may be viewed as having breached their fiduciary duties to its creditors, thereby exposing the members of Quinpario's board of directors and Quinpario to claims of punitive damages.***

If, after Quinpario distributes the proceeds in the Trust Account to the public stockholders, it files a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by the public stockholders. In addition, Quinpario's board of directors may be viewed as having breached its fiduciary duty to Quinpario's creditors and/or having acted in bad faith, thereby exposing itself and Quinpario to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors.

***If, before distributing the proceeds in the Trust Account to the public stockholders, Quinpario files a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, the claims of creditors in such proceeding may have priority over the claims of the public stockholders and the per-share amount that would otherwise be received by the public stockholders in connection with Quinpario's liquidation may be reduced.***

If, before distributing the proceeds in the Trust Account to the public stockholders, Quinpario files a bankruptcy petition or an involuntary bankruptcy petition is filed against it that is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in Quinpario's bankruptcy estate and subject to the claims of third parties with priority over the claims of the public stockholders. To the extent any bankruptcy claims deplete the Trust Account, the per-share amount that would otherwise be received by the public stockholders in connection with Quinpario's liquidation may be reduced.

***Even if Quinpario consummates the Business Combination, there is no guarantee that the public warrants will ever be in the money, and they may expire worthless and the terms of the warrants may be amended.***

The exercise price for the warrants is $5.75 per half share of Quinpario Common Stock. There is no guarantee that the public warrants will ever be in the money prior to their expiration, and as such, the warrants may expire worthless.

In addition, the warrants were issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and Quinpario. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 65% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders. Accordingly, Quinpario may amend the terms of the warrants in a manner adverse to a holder if holders of at least 65% of the then outstanding public warrants approve of such amendment. Although Quinpario's ability to amend the terms of the warrants with the consent of at least 65% of the then outstanding public warrants is unlimited, examples of such amendments could be amendments to, among other things, increase the exercise price of the warrants, shorten the exercise period or decrease the number of shares of Quinpario Common Stock purchasable upon exercise of a warrant.

87

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 456 of 1110     PageID 2077

***The Sponsor and Quinpario's directors and officers have interests which may be different from or in addition to (and which may conflict with) the interests of the public stockholders.***

The Sponsor and Quinpario's directors and officers and their respective affiliates and associates have interests in and arising from the Business Combination that are different from or in addition to (and which may conflict with) the interests of the public stockholders, which may result in a conflict of interest. These interests include:

- the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that if unrestricted and freely tradable these shares would be valued at $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of approximately 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, we believe such shares have less value;

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if Quinpario fails to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

- the continued right of the Sponsor to hold Quinpario Common Stock;

- the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, have agreed to indemnify Quinpario to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which Quinpario has entered into an acquisition agreement or claims of any third party for services rendered or products sold to Quinpario, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

- the continued indemnification of Quinpario's existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that the Sponsor, and Quinpario's officers and directors will lose their entire investment in us and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

- that, at the closing of the Business Combination Quinpario will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

88

Supp.App. 0454

Table of Contents

***The Sponsor and Quinpario's directors and officers have a conflict of interest in determining to pursue the Business Combination, since they will not be eligible to be reimbursed for additional out-of-pocket expenses if the Business Combination is not completed.***

At the closing of a business combination (including the Business Combination), the Sponsor and Quinpario's directors and officers and their respective affiliates and associates, will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. These financial interests of the Sponsor and Quinpario's directors and officers may influence their motivation in identifying and selecting a target business combination and completing an initial business combination.

***A market for Quinpario's securities may not continue, which would adversely affect the liquidity and price of its securities.***

Following the Business Combination, the price of Quinpario's securities may fluctuate significantly due to the market's reaction to the Business Combination and general market and economic conditions. An active trading market for Quinpario's securities following the Business Combination may never develop or, if developed, it may not be sustained. In addition, the price of Quinpario's securities after the Business Combination can vary due to general economic conditions and forecasts, the combined company's general business condition and the release of its financial reports. Additionally, if Quinpario's securities are not listed on, or become delisted from, Nasdaq for any reason, and are quoted on the OTC Bulletin Board, an inter-dealer automated quotation system for equity securities that is not a national securities exchange, the liquidity and price of its securities may be more limited than if they were quoted or listed on Nasdaq or another national securities exchange. You may be unable to sell your securities unless a market can be established or sustained.

***Quinpario may not be able to comply with the continued listing standards of Nasdaq.***

Quinpario Common Stock, and Quinpario's units and warrants are currently listed on Nasdaq. Our continued eligibility for listing may depend on the number of Quinpario's shares that are redeemed. If, after the Business Combination, Nasdaq delists Quinpario Common Stock from trading on its exchange for failure to meet the listing standards, the combined company and its stockholders could face significant material adverse consequences including:

- a limited availability of market quotations for the combined company's securities;

- a determination that Quinpario Common Stock is a "penny stock" which will require brokers trading in Quinpario Common Stock to adhere to more stringent rules, possibly resulting in a reduced level of trading activity in the secondary trading market for Quinpario Common Stock;

- a limited amount of analyst coverage; and

- a decreased ability to issue additional securities or obtain additional financing in the future.

***Quinpario is not required to obtain and has not obtained an opinion from an independent investment banking or accounting firm, and no independent source has opined that the price Quinpario is paying for SourceHOV and Novitex is fair to Quinpario from a financial point of view.***

Quinpario is not required to obtain an opinion from an independent investment banking or accounting firm that the price it is paying to acquire SourceHOV and Novitex is fair to Quinpario from a financial point of view. In addition, the Sponsor does not have experience in acquiring companies in the management services industry. Quinpario's board of directors did not obtain a third-party valuation or fairness opinion in connection with their determination to approve the Business Combination with SourceHOV and Novitex. In analyzing the Business Combination, Quinpario's board of directors and management conducted due diligence on SourceHOV and Novitex and researched the industry in which

89

Supp.App. 0455

Table of Contents

each of SourceHOV and Novitex operates and concluded that the Business Combination was in the best interest of Quinpario's stockholders. Accordingly, investors will be relying solely on the judgment of Quinpario's board of directors in valuing each of Novitex's and SourceHOV's business, and Quinpario's board of directors may not have properly valued such businesses. The lack of a third-party valuation or fairness opinion may also lead an increased number of public stockholders to vote against the Business Combination or demand redemption of their shares, which could potentially impact Quinpario's ability to consummate the Business Combination. For more information about Quinpario's decision-making process, see the section entitled "*Proposal No. 1—Approval of the Business Combination—Quinpario's Board of Directors' Reasons for the Approval of the Business Combination.*"

***If the Business Combination's benefits do not meet the expectations of investors, stockholders or financial analysts, the market price of Quinpario's securities may decline.***

If the benefits of the Business Combination do not meet the expectations of investors or securities analysts, the market price of Quinpario's securities prior to the closing of the Business Combination may decline. The market value of Quinpario's securities at the time of the Business Combination may vary significantly from their prices on the date the Business Combination Agreement was executed, the date of this proxy statement, or the date on which the public stockholders vote on the Business Combination.

In addition, following the Business Combination, fluctuations in the price of Quinpario's securities could contribute to the loss of all or part of your investment. Prior to the Business Combination, there has not been a public market for Novitex's or SourceHOV's stock and trading in the shares of Quinpario Common Stock has not been active. Accordingly, the valuation ascribed to Novitex's, SourceHOV's and Quinpario's common stock in the Business Combination may not be indicative of the price that will prevail in the trading market following the Business Combination. If an active market for the combined company's securities develops and continues, the trading price of the combined company's securities following the Business Combination could be volatile and subject to wide fluctuations in response to various factors, some of which are beyond the combined company's control. Any of the factors listed below could have a material adverse effect on your investment in Quinpario's securities and Quinpario's securities may trade at prices significantly below the price you paid for them. In such circumstances, the trading price of Quinpario's securities may not recover and may experience a further decline.

Factors affecting the trading price of the combined company's securities following the Business Combination may include:

- actual or anticipated fluctuations in its quarterly financial results or the quarterly financial results of companies perceived to be similar to it;

- changes in the market's expectations about its operating results;

- success of competitors;

- its operating results failing to meet the expectation of securities analysts or investors in a particular period;

- changes in financial estimates and recommendations by securities analysts concerning the combined company or the market in general;

- operating and stock price performance of other companies that investors deem comparable to the combined company;

- its ability to market new and enhanced products on a timely basis;

- changes in laws and regulations affecting its business;

- commencement of, or involvement in, litigation involving the combined company;

90

Supp.App. 0456

- changes in the combined company's capital structure, such as future issuances of securities or the incurrence of additional debt;

- the volume of shares of Quinpario Common Stock available for public sale;

- any major change in the combined company's board of directors or management;

- sales of substantial amounts of Quinpario Common Stock by the combined company's directors, officers or significant stockholders or the perception that such sales could occur; and

- general economic and political conditions such as recessions, interest rates, fuel prices, international currency fluctuations and acts of war or terrorism.

Broad market and industry factors may materially harm the market price of the combined company's securities irrespective of its operating performance. The stock market in general and Nasdaq have experienced price and volume fluctuations that have often been unrelated or disproportionate to the operating performance of the particular companies affected. The trading prices and valuations of these stocks, and of the combined company's securities, may not be predictable. A loss of investor confidence in the market for retail stocks or the stocks of other companies which investors perceive to be similar to the combined company could depress its stock price regardless of its business, prospects, financial conditions or results of operations. A decline in the market price of the combined company's securities also could adversely affect its ability to issue additional securities and its ability to obtain additional financing in the future.

*Following the Business Combination, if securities or industry analysts do not publish or cease publishing research or reports about the combined company, its business, or its market, or if they change their recommendations regarding Quinpario Common Stock adversely, the price and trading volume of Quinpario Common Stock could decline.*

The trading market for Quinpario Common Stock will be influenced by the research and reports that industry or securities analysts may publish about the combined company, its business, its market, or its competitors. Securities and industry analysts do not currently publish research on Quinpario, and may never publish research on the combined company. If no securities or industry analysts commence coverage of the combined company, its stock price and trading volume would likely be negatively impacted. If any of the analysts who may cover the combined company change their recommendation regarding its stock adversely, or provide more favorable relative recommendations about its competitors, the price of Quinpario Common Stock would likely decline. If any analyst who may cover the combined company were to cease coverage of the combined company or fail to regularly publish reports on it, we could lose visibility in the financial markets, which could cause the combined company's stock price or trading volume to decline.

*Quinpario has not registered the shares of Quinpario Common Stock issuable upon exercise of the warrants under the Securities Act or states securities laws at this time, and such registration may not be in place when an investor desires to exercise warrants, thus precluding such investor from being able to exercise its warrants and causing such warrants to expire worthless.*

Quinpario has not registered the public shares issuable upon exercise of the warrants under the Securities Act or any state securities laws at this time. However, under the terms of the warrant agreement, Quinpario has agreed, as soon as practicable, but in no event later than the closing of an initial business combination, to use best efforts to file a post-effective amendment to Quinpario's registration statement on Form S-1 (No. 333-198988), or a new registration statement, under the Securities Act covering such shares and to cause such registration statement to be effective within 90 days of an initial business combination, and to maintain a current prospectus relating to the shares issuable upon exercise of the warrants, until the expiration of the warrants in accordance with the provisions of the warrant agreement. It is not certain that it will be possible to register the Quinpario

91

Supp.App. 0457

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 460 of 1110 PageID 2081

Common Stock if, for example, any facts or events arise which represent a fundamental change in the information set forth in the registration statement or prospectus, the financial statements contained or incorporated by reference therein are not current or correct or the SEC issues a stop order. Beginning on the 91st day after the closing of the initial business combination, if the shares issuable upon exercise of the warrants are not registered, or Quinpario has failed to maintain the effectiveness of such registration statement under the Securities Act, Quinpario would be required to permit holders to exercise their warrants on a cashless basis. However, no public warrant will be exercisable for cash, and Quinpario will not be obligated to issue any shares to holders seeking to exercise their warrants, unless the issuance of the shares upon such exercise is registered or qualified under the securities laws of the state of the exercising holder, unless an exemption is available. In no event will Quinpario be required to net cash settle any warrant. If the shares issuable upon exercise of the warrants are not qualified or exempt from qualification in the jurisdictions in which the holders of the warrants reside, the warrants may be deprived of any value, the market for the warrants may be limited and they may expire worthless if they cannot be sold. In such event, holders who acquired their warrants as part of a purchase of units will have paid the full unit purchase price solely for the shares of Quinpario Common Stock included in the units.

***A significant portion of our total outstanding shares are restricted from immediate resale but may be sold into the market in the near future. This could cause the market price of Quinpario Common Stock to drop significantly, even if the combined company's business is doing well.***

Sales of a substantial number of shares of Quinpario Common Stock in the public market could occur at any time. These sales, or the perception in the market that the holders of a large number of shares intend to sell shares, could reduce the market price of Quinpario Common Stock. After the Business Combination, the Founders will hold approximately 3.9% of the capital stock of the combined company. While the registration rights agreement restricts holders of Quinpario Common Stock from transferring any of such holder's Quinpario Common Stock until six months following the date of the consummation of the Business Combination without the Sponsor's prior written consent (except in certain circumstances), these shares may be sold after the expiration of the lock-up. In addition, an aggregate of 3,016,071 shares of Quinpario Common Stock held by the Founders after giving effect to the Forfeiture Agreement are exempt from the lock-up period and may be sold immediately upon consummation of the Business Combination. Quinpario intends to file a registration statement prior to the closing of the Business Combination to provide for the resale of such shares from time to time. No later than 45 days following the Business Combination, the combined company is also required to file a registration statement relating to the resale of all shares of Quinpario Common Stock held by the parties to a registration rights agreement to be entered into in connection with the closing of the Business Combination. As restrictions on resale end, the market price of Quinpario Common Stock could decline if the holders of currently restricted shares sell them or are perceived by the market as intending to sell them. See the section entitled "*Proposal No. 1—Approval of the Business Combination—The Registration Rights Agreement*" for additional information.

New SourceHOV LLC has committed to borrow up to $57.5 million pursuant to the New SourceHOV Financing and use such proceeds to participate in the PIPE Investment. The amount of the borrowing (and New SourceHOV LLC's corresponding PIPE Investment) will depend on the number of shares of Quinpario Common Stock redeemed prior to the Business Combination. If New SourceHOV LLC borrows the full amount of the New SourceHOV Financing, New SourceHOV LLC will pledge 2,875,000 shares of Series A Convertible Preferred Stock and 4,312,500 shares of Quinpario Common Stock it receives from its PIPE Investment as well as 80,600,000 shares of Quinpario Common Stock it receives from the Business Combination in order to secure the New SourceHOV Financing. In order to generate proceeds to repay the New SourceHOV Financing, New SourceHOV LLC will be permitted to immediately demand registration of the shares it receives as a result of the Business Combination and the PIPE Investment, and New SourceHOV LLC will not be

92

Supp.App. 0458

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 461 of 1110    PageID 2082

subject to any transfer restriction or lock-up with respect to any such shares used for such purpose. This may create more pressure on the sale of shares. In addition, the agreements for the New SourceHOV Financing provide certain collateral coverage requirements such that, if at any time the value of the pledged shares falls below certain minimum thresholds, New SourceHOV LLC may be required to immediately sell a number of pledged shares sufficient to prepay the loan in the amount of the collateral shortfall plus a specified margin. Sales of a substantial number of shares by New SourceHOV LLC in the public market or pursuant to a registered offering, or the perception that such sales could occur, could adversely affect the market price of Quinpario Common Stock.

***Warrants will become exercisable for Quinpario Common Stock, which would increase the number of shares eligible for future resale in the public market and result in dilution to the public stockholders.***

Quinpario issued 35,000,000 warrants to purchase shares of Quinpario Common Stock as part of the IPO and simultaneously with the commencement of the IPO on January 22, 2015, Quinpario also issued an aggregate of 18,000,000 private placement warrants to the Sponsor, each warrant exercisable to purchase one-half of one share of Quinpario Common Stock at $5.75 per half share. In addition, prior to consummating an initial business combination, nothing prevents Quinpario from issuing additional securities in a private placement so long as it does not issue any securities which participate in or are otherwise entitled in any manner to any of the proceeds in the Trust Account. To the extent such warrants are exercised, additional shares of Quinpario Common Stock will be issued, which will result in dilution to the then existing holders of Quinpario Common Stock and increase the number of shares eligible for resale in the public market. Sales of substantial numbers of such shares in the public market could adversely affect the market price of Quinpario Common Stock.

The Private Placement Warrants are identical to the warrants sold as part of the units issued in the IPO except that, so long as they are held by the Sponsor or its permitted transferees, (i) they will not be redeemable by Quinpario and (ii) they may, at the holder's option, be exercised by the holders on a cashless basis. The Sponsor also agreed not to transfer, assign or sell the Private Placement Warrants or the Quinpario Common Stock issuable upon exercise of such warrants (subject to certain exceptions) until 30 days after the completion of an initial business combination. Under the Forfeiture Agreement, the Founders have agreed to cancel the aggregate 18,000,000 Private Placement Warrants held by them upon the consummation of the Business Combination.

***The public stockholders may experience dilution as a consequence of, among other transactions, the issuance of Quinpario Common Stock and Series A Convertible Preferred Stock, which is convertible into shares of Quinpario Common Stock, in connection with the PIPE Investment. Having a minority share position may reduce the influence that our current stockholders have on the management of the combined company.***

It is anticipated that, upon completion of the Business Combination: (i) New SourceHOV LLC, a newly formed entity controlled by the HGM Group and owned by SourceHOV's former equity holders will own approximately 54.9% of the combined company; (ii) Novitex Parent will own approximately 20.9% of the combined company; (iii) the Company's public stockholders (other than the PIPE Investors) will retain an ownership interest of approximately 2.8% in the combined company; (iv) the PIPE Investors will own approximately 14.2% of the combined company (such that public stockholders, including PIPE Investors, will own approximately 17.1% of the combined company); and (v) the Founders will own approximately 5.5% of the combined company, after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement. These levels of ownership interest (a) assume that all shares are elected to be redeemed, other than those shares in respect of which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and that Quinpario has sold 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock (which may be convertible into approximately 11,492,690 shares of Quinpario Common Stock) and issued 835,626 shares of Quinpario Common Stock in respect of waivers of redemptions or conversion rights in the PIPE Investment, for approximately

93

Supp.App. 0459

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 462 of 1110    PageID 2083

$242.1 million of gross proceeds (or savings from settled fees to advisors), and issued 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration; and (b) do not take into account public warrants to purchase Quinpario Common Stock that will remain outstanding immediately following the Business Combination or the issuance of any shares upon completion of the Business Combination. Under the Forfeiture Agreement, which was amended and restated on June 15, 2017, the Founders have agreed to cancel the aggregate 18,000,000 Private Placement Warrants and certain Founder Shares held by them upon consummation of the Business Combination. However, of the Founder Shares held by the Sponsor, the Sponsor may retain 8,033,571 of such Founder Shares. In addition, three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination. If the actual facts are different than these assumptions, the percentage ownership retained by the Company's existing stockholders in the combined company will be different. Please see the section entitled "*Unaudited Pro Forma Condensed Combined Financial Information*" for further information. To the extent that any additional shares of Quinpario Common Stock or Series A Convertible Preferred Stock, which are convertible into shares of Quinpario Common Stock, are issued (a) in the PIPE Investment or (b) upon the exercise of public warrants, current stockholders may experience substantial dilution. Such dilution could, among other things, limit the ability of the current stockholders to influence management of the combined company through the election of directors following the Business Combination.

The nature or amount of the securities to be issued by Quinpario in the PIPE Investment may not be available to the Company at the time the definitive proxy statement is mailed to Quinpario's stockholders, and, as such, it may not may be available to Quinpario's stockholders at the time they decide whether to redeem their shares of Quinpario Common Stock or vote on the Business Combination.

***The conversion of Quinpario's Series A Convertible Preferred Stock following a "fundamental change" could substantially dilute the value of shares held by existing holders of Quinpario Common Stock or result in a default by Quinpario of its existing indebtedness.***

The conversion of the Series A Convertible Preferred Stock following the occurrence of a "fundamental change," as defined in the Certificate of Designations, including a delisting of Quinpario's securities by a national securities exchange or a change of control of Quinpario, could result in substantial dilution in the value of the shares of the outstanding Quinpario Common Stock and the voting power represented thereby.

Upon a fundamental change, if Quinpario does not redeem the Series A Convertible Preferred Stock, the Certificate of Designations may provide for a decrease in the conversion price to $0.10 per share of Quinpario Common Stock if the price in respect of such fundamental change is at or below $0.10. After the fifth anniversary of the issue date, the maximum number of shares of Quinpario Common Stock issuable upon conversion will not exceed 85% of the total number of shares of Quinpario Common Stock outstanding on a fully-diluted basis. As a result, if Quinpario does not redeem the Series A Convertible Preferred Stock, the holders of Series A Convertible Preferred Stock could receive up to 85% of the Quinpario Common Stock after exercising their conversion rights upon a fundamental change. In addition, upon such conversion, Quinpario may be in default of its outstanding indebtedness or be required to make an offer to repurchase its outstanding indebtedness. Furthermore, due to dilution that could result from the number of shares of Quinpario Common Stock that may be issuable, Quinpario may have difficulty raising funds through future equity offerings at an attractive price. See the section entitled "*Description of Securities Securities—Series A Convertible Preferred Stock*."

94

Supp.App. 0460

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 463 of 1110    PageID 2084

*Quinpario may redeem the unexpired warrants prior to their exercise at a time that is disadvantageous to warrant holders, thereby making their warrants worthless.*

Quinpario has the ability to redeem, in whole and not in part, the outstanding warrants at any time after they become exercisable and prior to their expiration, at a price of $0.01 per warrant, provided that (i) there is provided 30 days' prior written notice of redemption, (ii) the last reported sales price of Quinpario Common Stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading-day period ending on the third trading day prior to the date Quinpario sends the notice of redemption to the warrant holders and (iii) there is a current registration statement in effect with respect to the shares of common stock underlying such warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.. Redemption of the outstanding warrants could force holders (i) to exercise their warrants and pay the exercise price therefor at a time when it may be disadvantageous for them to do so, (ii) to sell the warrants at the then-current market price when holders might otherwise wish to continue to hold their warrants or (iii) to accept the nominal redemption price which, at the time the outstanding warrants are called for redemption, is likely to be substantially less than the market value of the warrants. None of the Private Placement Warrants will be redeemable by Quinpario so long as they are held by their initial purchasers or their permitted transferees.

*Anti-takeover provisions contained in Quinpario's certificate of incorporation and bylaws, as well as provisions of Delaware law, could impair a takeover attempt.*

Quinpario's current certificate of incorporation and bylaws contain, and if the Certificate Proposals are approved, will continue to contain, provisions that may discourage unsolicited takeover proposals that stockholders may consider to be in their best interests. Quinpario is also subject to anti-takeover provisions under Delaware law, which could delay or prevent a change of control. Together these provisions may make more difficult the removal of management and may discourage transactions that otherwise could involve payment of a premium over prevailing market prices for Quinpario's securities. These provisions include:

- a staggered board of directors providing for three classes of directors, which limits the ability of a stockholder or group to gain control of Quinpario's board of directors;

- no cumulative voting in the election of directors, which limits the ability of minority stockholders to elect director candidates;

- the right of Quinpario's board of directors to elect a director to fill any newly created directorship on the board of directors that results from an increase in the number of directors and any vacancy occurring in the board of directors, which prevents stockholders from being able to fill vacancies on Quinpario's board of directors;

- the ability of Quinpario's board of directors to determine whether to issue shares of preferred stock and to determine the price and other terms of those shares, including preferences and voting rights, without stockholder approval, which could be used to significantly dilute the ownership of a hostile acquirer;

- the requirement that a meeting of stockholders may only be called by a majority of the entire board of directors, the president, the chairman, or by the secretary at the request in writing of stockholders owning a majority in amount of the entire capital stock of Quinpario issued and outstanding and entitled to vote, which may delay the ability of the public stockholders to force consideration of a proposal or to take action, including the removal of directors;

- providing that directors may be removed prior to the expiration of their terms by stockholders only for cause and upon the affirmative vote of a majority of the voting power of all outstanding shares of Quinpario Common Stock;

95

Supp.App. 0461

- a requirement that changes or amendments to the certificate of incorporation or the bylaws that adversely affect the rights of a Seller under the Director Nomination Agreements or has a disproportionate impact on the interests of such Seller must be approved by such Seller; and

- advance notice procedures that public stockholders must comply with in order to nominate candidates to Quinpario's board of directors or to propose matters to be acted upon at a stockholders' meeting, which may discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of Quinpario.

***Activities taken by affiliates of Quinpario to purchase, directly or indirectly, public shares of Quinpario Common Stock will increase the likelihood of approval of the Business Combination Proposal and other proposals and may affect the market price of Quinpario's securities.***

The Sponsor, Quinpario's directors, officers and advisors or their respective affiliates may purchase shares of Quinpario Common Stock in privately negotiated transactions either prior to or following the consummation of the Business Combination. None of the Sponsor, Quinpario's directors, officers and advisors or their respective affiliates will make any such purchases when such parties are in possession of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Although none of the Sponsor, Quinpario's directors, officers and advisors or their respective affiliates currently anticipate paying any premium purchase price for such public shares, in the event such parties do, the payment of a premium may not be in the best interest of those stockholders not receiving any such additional consideration. There is no limit on the number of shares that could be acquired by the Sponsor, Quinpario's directors, officers and advisors or their respective affiliates, or the price such parties may pay.

If such transactions are effected, the consequence could be to cause the Business Combination to be approved in circumstances where such approval could not otherwise be obtained. Purchases of shares by the persons described above would allow them to exert more influence over the approval of the Business Combination Proposal and other proposals and would likely increase the chances that such proposals would be approved. If the market does not view the Business Combination positively, purchases of public shares may have the effect of counteracting the market's view, which would otherwise be reflected in a decline in the market price of Quinpario's securities. In addition, the termination of the support provided by these purchases may materially adversely affect the market price of Quinpario's securities.

As of the date of this proxy statement, no agreements with respect to the private purchase of public shares by Quinpario or the persons described above have been entered into with any such investor or holder. We will file a Current Report on Form 8-K with the SEC to disclose private arrangements entered into or significant private purchases made by any of the aforementioned persons that would affect the vote on the Business Combination Proposal or other proposals.

***Changes in laws or regulations, or a failure to comply with any laws and regulations, may adversely affect Quinpario's business, investments and results of operations.***

Quinpario is subject to laws, regulations and rules enacted by national, regional and local governments and Nasdaq. In particular, Quinpario is required to comply with certain SEC, Nasdaq and other legal or regulatory requirements. Compliance with, and monitoring of, applicable laws, regulations and rules may be difficult, time consuming and costly. Those laws, regulations and rules and their interpretation and application may also change from time to time and those changes could have a material adverse effect on Quinpario's business, investments and results of operations. In addition, a failure to comply with applicable laws, regulations and rules, as interpreted and applied, could have a material adverse effect on Quinpario's business and results of operations.

96

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 465 of 1110    PageID 2086

*The combined company may increase the range of solutions that it provides to its clients and its business and future prospects are difficult to evaluate.*

As part of its growth strategy, SourceHOV and Novitex each seek to enhance and update its respective service offerings on a continuing basis. In addition, each of SourceHOV and Novitex is exploring providing solutions outside the scope of its current service offerings. Should either decide to expand its service offerings, its results of operations may be negatively affected during any transition or growth period before such offerings achieve profitability or sufficient expertise in such offering. For example, it may need to expand its training of its existing employees or recruit new, specially-trained employees to provide these services, which could increase its costs of revenues disproportionately to the revenues generated by such services. Other challenges it may face include the diversion of its management's attention, attracting and retaining clients for such services, integrating any new services into its current suite of services and platforms and managing any resulting growth in its operations.

*The combined company may be subject to a variety of additional risks that may negatively impact our operations because SourceHOV has operations and opportunities outside of the United States.*

If Quinpario effects the Business Combination with SourceHOV, which has operations and opportunities outside of the United States, the combined company may be subject to special considerations and risks associated with companies operating in an international setting, including any of the following:

- costs and difficulties inherent in managing cross-border business operations;

- rules and regulations regarding currency redemption;

- complex corporate withholding taxes on individuals;

- tariffs and trade barriers;

- longer payment cycles;

- tax issues, such as tax law changes and variations in tax laws as compared to the United States;

- currency fluctuations and exchange controls;

- rates of inflation;

- challenges in collecting accounts receivable;

- cultural and language differences;

- employment regulations;

- crime, strikes, riots, civil disturbances, terrorist attacks and wars; and

- deterioration of political relations with the United States.

The combined company may not be able to adequately address these additional risks. If it is unable to do so, its operations might suffer, which may adversely impact its results of operations and financial condition.

**Risks Related to the Redemption**

*Pursuant to the Business Combination Agreement, Quinpario may not be able to consummate the Business Combination in the event redemptions exceed approximately $184.0 million.*

Quinpario's current certificate of incorporation does not provide a specified maximum redemption threshold, except that in no event will Quinpario consummate an initial business combination if such transaction would cause its net tangible assets to be less than $5,000,001 (such that we are not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. As a result, Quinpario may be

97

Supp.App. 0463

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 466 of 1110     PageID 2087

able to complete the Business Combination even though a substantial majority of our public stockholders do not agree with the transaction and have redeemed their shares or have entered into privately negotiated agreements to sell their shares to the Sponsor, Quinpario's directors, officers and advisors or their respective affiliates.

***If you or a "group" of stockholders of which you are a part are deemed to hold an aggregate of more than 15% of the Quinpario Common Stock issued in the IPO, you (or, if a member of such a group, all of the members of such group in the aggregate) will lose the ability to redeem all such shares in excess of 15% of the Quinpario Common Stock issued in the IPO.***

Our current certificate of incorporation provides that a public stockholder, together with any of his, her or its affiliates or any other person with whom it is acting in concert or as a "group" (as defined under Section 13 of the Exchange Act), will be restricted from redeeming in the aggregate his, her or its shares or, if part of such a group, the group's shares, in excess of 15% of the shares of Quinpario Common Stock included in the units sold in the IPO. We refer to such shares in excess of an aggregation of 15% or more of the shares sold in the IPO as "Unredeemable Shares." In order to determine whether a stockholder is acting in concert or as a group with another stockholder, Quinpario will require each public stockholder seeking to exercise redemption rights to certify to Quinpario whether such stockholder is acting in concert or as a group with any other stockholder. Such certifications, together with other public information relating to stock ownership available to Quinpario at that time, such as Section 13D, Section 13G and Section 16 filings under the Exchange Act, will be the sole basis on which Quinpario makes the above-referenced determination. Your inability to redeem any Unredeemable Shares will reduce your influence over Quinpario's ability to consummate the Business Combination and you could suffer a material loss on your investment in Quinpario if you sell Unredeemable Shares in open market transactions. Additionally, you will not receive redemption distributions with respect to the Unredeemable Shares if Quinpario consummates the Business Combination. As a result, you will continue to hold that number of shares aggregating to more than 15.0% of the shares sold in the IPO and, in order to dispose of such shares, would be required to sell your Quinpario Common Stock in open market transactions, potentially at a loss. Notwithstanding the foregoing, stockholders may challenge Quinpario's determination as to whether a stockholder is acting in concert or as a group with another stockholder in a court of competent jurisdiction.

***There is no guarantee that a stockholder's decision whether to redeem their shares for a pro rata portion of the Trust Account will put the stockholder in a better future economic position.***

Quinpario can give no assurance as to the price at which a stockholder may be able to sell its public shares in the future following the completion of the Business Combination or any alternative business combination. Certain events following the consummation of any initial business combination, including the Business Combination, may cause an increase in the share price of Quinpario Common Stock, and may result in a lower value realized now than a stockholder of Quinpario might realize in the future had the stockholder redeemed their shares. Similarly, if a stockholder does not redeem their shares, the stockholder will bear the risk of ownership of the public shares after the consummation of any initial business combination, and there can be no assurance that a stockholder can sell its shares in the future for a greater amount than the redemption price set forth in this proxy statement. A stockholder should consult the stockholder's tax and/or financial advisor for assistance on how this may affect his, her or its individual situation.

***If Quinpario's stockholders fail to comply with the redemption requirements specified in this proxy statement, they will not be entitled to redeem their shares of Quinpario Common Stock for a pro rata portion of the funds held in the Trust Account.***

In order to exercise their redemption rights, Quinpario's public stockholders are required to (a) affirmatively vote their shares of Quinpario Common Stock for or against the Business Combination

98

Supp.App. 0464

Table of Contents

Proposal and (b) submit a request in writing and deliver their stock (either physically or electronically) to the Transfer Agent at least two (2) business days prior to the Special Meeting. Stockholders electing to redeem their shares will receive their pro rata portion of the Trust Account less franchise and income taxes payable, calculated as of two (2) business days prior to the anticipated consummation of the Business Combination. See the section entitled "*Special Meeting of Quinpario Stockholders—Redemption Rights*" for additional information on how to exercise your redemption rights.

***Stockholders of Quinpario who wish to redeem their shares for a pro rata portion of the Trust Account must comply with specific requirements for redemption that may make it more difficult for them to exercise their redemption rights prior to the deadline.***

Public stockholders who wish to redeem their shares for a pro rata portion of the Trust Account must, among other things as fully described in the section entitled "*Special Meeting of Quinpario Stockholders—Redemption Rights*," tender their certificates to the Transfer Agent or deliver their shares to the Transfer Agent electronically through the DTC prior to the Special Meeting. In order to obtain a physical stock certificate, a stockholder's broker and/or clearing broker, DTC and the Transfer Agent will need to act to facilitate this request. It is Quinpario's understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the Transfer Agent. However, because Quinpario does not have any control over this process or over the brokers, which we refer to as "DTC," it may take significantly longer than two weeks to obtain a physical stock certificate. If it takes longer than anticipated to obtain a physical certificate, stockholders who wish to redeem their shares may be unable to obtain physical certificates by the deadline for exercising their redemption rights and thus will be unable to redeem their shares.

99

Supp.App. 0465

**UNAUDITED PRO FORMA CONDENSED COMBINED FINANCIAL INFORMATION**

The unaudited pro forma condensed combined financial information is prepared in accordance with Article 11 of Regulation S-X. The following unaudited pro forma condensed combined financial information presents the pro forma effects of the following transactions:

- the reverse acquisition between SourceHOV and Quinpario;

- the acquisition of Novitex;

- the issuance of Quinpario Common Stock and Series A Convertible Preferred Stock, which is convertible into Quinpario Common Stock, in the PIPE Investment; and

- the Debt Financing and extinguishment of existing debt ("Refinancing").

Quinpario (the "Company") was formed on July 15, 2014, and completed its initial public offering in January 2015 raising approximately $350,000,000. On January 19, 2017, Quinpario held a special meeting of its stockholders to vote on an amendment to Quinpario's amended and restated certificate of incorporation to extend the date by which Quinpario must consummate its initial business combination to July 24, 2017 (the "Extension Amendment"). At the meeting, Quinpario's stockholders approved the Extension Amendment, which extended the date by which Quinpario had to consummate an initial business combination to July 24, 2017. In connection with the extension, holders of 14,901,399 shares of Quinpario Common Stock exercised their right to convert such shares into a pro rata portion of the Trust Account as of January 19, 2017. As a result, following such redemptions, $201,543,292 remained in the Trust Account. As of March 31, 2017, $201,105,244 remained in the Trust Account. As a special purpose acquisition company ("SPAC"), the Company's purpose entails efforts to acquire one or more businesses through a merger, capital stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. Effective February 21, 2017, Quinpario, SourceHOV, and Novitex (the "Companies"), entered into an agreement pursuant to which Quinpario intends to issue shares in exchange for the equity and/or assets of the two aforementioned entities (the "Business Combination").

The following describes the two operating entities:

- SourceHOV is a global TPS and EIM leader, providing services and solutions for high-volume, mission-critical processes to over 3,000 customers and operates approximately 120 delivery centers across the Americas, Europe, and Asia, offering scalable technology platforms, hosted on premise and / or in a cloud hosting and computing environment, to a wide range of industries including financial services, healthcare, public sector, insurance, and legal.

- Novitex is a technology-based, managed services provider that offers a range of mail, print, communications and back office solutions. With a suite of offerings, Novitex manages and connects a document's full life cycle, breaking down operational silos to create more efficient, cost-effective workflows.

The Business Combination will be accounted for as a reverse merger for which SourceHOV has been determined to be the accounting acquirer based on the following predominate factors:

- New SourceHOV LLC will have the largest portion of voting rights in the newly formed entity;

- the largest minority shareholder of the combined entity is a current SourceHOV shareholder;

- the Board will have more individuals coming from SourceHOV than either the Company or Novitex; and

- SourceHOV is the largest entity by revenue and by assets.

100

Supp.App. 0466

Table of Contents

Other factors were considered but they were either indeterminate currently, for instance management composition (other than Par Chadha, who is anticipated to serve as Executive Chairman, Ronald Cogburn, who is anticipated to serve as Chief Executive Officer, Jim Reynolds, who is anticipated to serve as Chief Financial Officer, Shrikant Sortur, who is anticipated to serve as Senior Vice President, Global Finance, Suresh Yannamani, who is anticipated to serve as President, Americas and Mark Fairchild, who is anticipated to serve as President, Europe), or would not change the preponderance of factors indicating that SourceHOV was the accounting acquirer.

Since SourceHOV is determined to be the accounting acquirer in the reverse merger with Quinpario, the accounting for the merger will be similar to that of a capital infusion as the only pre-combination asset of the Company is cash held in the Trust Account. The assets and liabilities of the Company will be carried at historical cost and SourceHOV will not record any step-up in basis or any intangible assets or goodwill as a result of the merger with Quinpario. The acquisition of Novitex will be treated as a business combination under ASC 805 and will be accounted for using the acquisition method. SourceHOV will record the fair value of assets and liabilities acquired from Novitex.

Pursuant to the Business Combination Agreement, Quinpario shall acquire SourceHOV in exchange for 80,600,000 shares of common stock and Novitex in exchange for 30,600,000 shares of common stock.

Quinpario has not defined a maximum redemption threshold, however in no event will the Company redeem public shares in an amount that would cause net tangible assets to be less than $5,000,001 (such that the Company is not subject to the SEC's "penny stock" rules) or any greater net tangible asset or cash requirement which may be contained in the agreement relating to our initial business combination. However, the Business Combination Agreement stipulates that the acquired funds to consummate the merger must be no less than $275 million in cash.

The presentation below is based on the following assumptions. In connection with the Business Combination, the Company entered into subscription and commitment agreements with certain investors on June 15, 2017 to purchase or waive redemption rights in respect of shares of Quinpario Common Stock, which consist of 25,036,515 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, for an aggregate commitment amount of approximately $275.5 million, subject to certain conditions, including the closing of the Business Combination. See "*Proposal No. 1—Approval of the Business Combination.*" The pro forma financial information presented below regarding the total funds contributed by the Company to be $275.5 million, has been determined to be the most likely cash contribution at the close of the Business Combination. This is the only scenario reflected as the Business Combination Agreement mandates that the acquired funds to consummate the merger must be no less than $275 million in cash. In connection with the closing of the Business Combination, Quinpario will issue 20.9 million shares of Quinpario Common Stock at $8.00 per share and will issue 835,626 shares of common stock with respect of waivers of redemptions or conversion rights and 9.4 million shares of Series A Convertible Preferred Stock at $8.00 per share through the PIPE Investment and had 3.3 million shares held by current Quinpario shareholders pursuant to commitment agreements for a total of $275.5 million.

101

Supp.App. 0467

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 470 of 1110    PageID 2091

The following summarizes the merger consideration issuable in the Business Combination and Quinpario's common stock ownership subsequent to the Business Combination:

| Merger Consideration | Amounts | % |
|---|---|---|
| Share consideration—SourceHOV | $ 644,800,000 | 72.5% |
| Share consideration—Novitex | 244,800,000 | 27.5% |
| Total Share consideration | 889,600,000 | |
| **Total Merger Consideration** | $ 889,600,000 | |

| | Amounts | % |
|---|---|---|
| Closing merger shares—issuable to SourceHOV equity holders | 80,600,000 | 54.9% |
| Closing merger shares—issuable to Novitex equity holders | 30,600,000 | 20.9% |
| | **111,200,000** | 75.8% |
| **Closing total merger shares** | | |
| Net Founders shares of Quinpario | 8,033,571 | |
| Shares held by current Quinpario shareholders | 4,178,125 | |
| **Total Quinpario shares** | **12,211,696** | **8.3%** |
| Fees and other consideration | 2,524,555 | 1.7% |
| PIPE Investment common shares | 20,858,389 | 14.2% |
| **Total common shares** | **146,794,640** | **100.0%** |
| SourceHOV Equity Holders | 88,052,139 | 60.0% |
| Novitex Equity Holders | 31,568,750 | 21.5% |
| All other Equity Holders | 27,173,751 | 18.5% |
| | **146,794,640** | **100%** |
| **Total PIPE Investment preferred shares** | **9,400,000** | |

102

Supp.App. 0468

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 471 of 1110 PageID 2092

Table of Contents

**Quinpario Acquisition Corp 2**
**Unaudited Pro Forma Condensed Combined Balance Sheet**
**as of March 31, 2017**
**(in thousands)**

| | SourceHOV (Historical) | Quinpario Acquisition Corp. 2 (Historical) | Novitex (Historical) | Reclassifications (R) | Combined | Pro Forma Adjustments* | | PIPE Investment | | Refinancing | | Combined Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **ASSETS** | | | | | | | | | | | | |
| Current assets: | | | | | | | | | | | | |
| Cash and cash equivalents | $ 15,916 | $ 297 | $ 40,303 | $ — | $ 56,516 | $ 201,105 | PR(A) | $ 242,067 | PI(A) | $ 1,304,938 | RF(A) | $ 100,320 |
| | | | | | | (12,250) | PR(B) | | | $ (1,066,886) | RF(B) | |
| | | | | | | (7,748) | PR(C) | | | $ (422,369) | RF(C) | |
| | | | | | | (27,373) | PR(D) | | | | | |
| | | | | | | (167,680) | PR(N) | | | | | |
| | | | | | | — | | | | | | |
| Restricted Cash | 25,931 | — | — | — | 25,931 | — | | | | | | 25,931 |
| Accounts receivable, net of allowances for doubtful accounts | 138,768 | — | 90,464 | — | 229,232 | — | | | | | | 229,232 |
| Deferred income taxes | — | — | — | — | — | — | | | | | | — |
| Inventories, net | 11,818 | — | — | 1,605 | 13,423 | — | | | | | | 13,423 |
| Prepaid expenses and other current assets | 15,094 | 24 | 15,668 | (1,605) | 29,181 | (510) | PR(M) | | | | | 28,671 |
| Total current assets | 207,527 | 321 | 146,435 | — | 354,283 | (14,456) | | 242,067 | — | (184,317) | — | 397,577 |
| Property, plant and equipment, net | 77,397 | — | 63,302 | — | 140,699 | — | | | | | | 140,699 |
| Intangible assets, net | 288,903 | — | 114,607 | — | 403,510 | 302,743 | PR(E) | | | | | 706,253 |
| Goodwill | 370,869 | — | 144,830 | — | 515,699 | (303,209) | PR(E) | | | | | 677,857 |
| | | | | | | 111,295 | PR(F) | | | | | |
| | | | | | | 96,317 | PR(G) | | | | | |
| | | | | | | 244,800 | PR(H) | | | | | |
| | | | | | | 7,748 | PR(C) | | | | | |
| | | | | | | 4,697 | PR(I) | | | | | |
| | | | | | | 510 | PR(M) | | | | | |
| Cash and investments held in Trust Account | — | 201,105 | — | — | 201,105 | (201,105) | PR(A) | | | | | — |
| Deferred income tax assets | 9,019 | — | — | — | 9,019 | — | | | | | | 9,019 |
| Deferred charges and other assets | — | — | 3,797 | (3,797) | — | — | | | | | | — |
| Other non-current assets | 9,973 | — | — | 3,797 | 13,770 | (826) | PR(I) | | | 3,250 | RF(A) | 16,194 |
| Total assets | $ 963,688 | $ 201,426 | $ 472,971 | $ — | $ 1,638,085 | $ 248,514 | | $ 242,067 | | $ (181,067) | | $ 1,947,599 |
| **LIABILITIES AND EQUITY** | | | | | | | | | | | | |
| Current Liabilities | | | | | | | | | | | | |
| Accounts payable | 40,406 | — | 41,440 | — | 81,846 | — | | | | | | 81,846 |
| Accounts payable and accrued expenses | — | 138 | — | (138) | — | — | | | | | | — |
| Related Party payable | 5,654 | — | — | — | 5,654 | — | | | | | | 5,654 |
| Income tax payable | 1,825 | — | — | — | 1,825 | — | | | | | | 1,825 |
| Accrued Liabilities | 27,152 | — | 50,916 | (20,617) | 57,451 | (9,428) | PR(D) | | | | | 48,023 |
| Accrued compensation and benefits | 30,561 | — | — | 20,755 | 51,316 | — | | | | | | 51,316 |
| Customer deposits | 18,279 | — | — | 14,776 | 33,055 | (466) | PR(E) | | | | | 32,589 |
| Deferred revenue | 21,629 | — | — | — | 21,629 | — | | | | | | 21,629 |
| Obligation for claim payment | 25,931 | — | — | — | 25,931 | — | | | | | | 25,931 |
| Current portion of capital lease obligations | 5,899 | — | — | 9,643 | 15,542 | — | | | | | | 15,542 |
| Current portion of long-term debt | 60,986 | — | — | 19,258 | 70,601 | — | | | | 5,250 | RF(A) | 18,226 |
| | | | | (9,643) | | | | | | (50,000) | RF(B) | |

103

Supp.App. 0469

**Quinpario Acquisition Corp 2**
**Unaudited Pro Forma Condensed Combined Balance Sheet (Continued)**
**as of March 31, 2017**
**(in thousands)**

| | SourceHOV (Historical) | Quinpario Acquisition Corp. 2 (Historical) | Novitex (Historical) | Reclassifications (R) | Combined | Pro Forma Adjustments* | | PIPE Investment | | Refinancing | | Combined Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | (7,625) | RF(C) | |
| Short-term borrowings and current portion of long-term debt | — | — | 19,258 | (19,258) | — | — | | | | — | | — |
| Advanced billings and customer deposits | — | — | 14,776 | (14,776) | — | — | | | | — | | — |
| Total current liabilities | 238,322 | 138 | 126,390 | — | 364,850 | (9,894) | | — | | (52,375) | | 302,581 |
| Long-term debt, net of current maturities | 971,154 | — | 413,403 | (8,863) | 1,375,694 | 3,871 | PR(I) | | | 1,302,938 | RF(A) | 1,310,234 |
| | | | | | | | | | | (970,533) | RF(B) | |
| | | | | | | | | | | (401,736) | RF(C) | |
| Capital lease obligations, net of current maturities | 17,076 | — | — | 8,863 | 25,939 | — | | | | | | 25,939 |
| Pension liability | 28,612 | — | — | — | 28,612 | — | | | | | | 28,612 |
| Deferred income tax liabilities | 26,850 | — | 25,570 | — | 52,420 | 111,295 | PR(F) | | | | | 163,715 |
| Long-term income tax liability | 3,063 | — | — | — | 3,063 | — | | | | | | 3,063 |
| Long-term related party payable | — | — | — | — | — | — | | | | | | — |
| Deferred underwriters' fees | — | 12,250 | — | — | 12,250 | (12,250) | PR(B) | | | | | — |
| Other long-term liabilities | 11,212 | — | 3,925 | — | 15,137 | — | | | | | | 15,137 |
| Total liabilities | 1,296,289 | 12,388 | 569,288 | — | 1,877,965 | 93,022 | | — | | (121,706) | | 1,849,281 |
| Common stock subject to possible redemption | — | 184,038 | — | — | 184,038 | (184,038) | PR(J) | | | | | — |
| Stockholders' equity | | | | | | | | | | | | |
| Common stock | — | 1 | — | — | 1 | 8 | PR(K) | 4 | PI(A) | | | 16 |
| | | | | | | 2 | PR(J) | | | | | |
| | | | | | | 3 | PR(H) | | | | | |
| | | | | | | (2) | PR(N) | | | | | |
| Preferred stock | — | — | — | — | — | — | | 1 | PI(A) | — | | 1 |
| Additional paid-in capital | (36,851) | 5,754 | 1,290 | — | (29,807) | (8) | PR(K) | 262,258 | PI(A) | | | 491,553 |
| | | | | | | 184,036 | PR(J) | | | | | |
| | | | | | | 244,797 | PR(H) | | | | | |
| | | | | | | (1,290) | PR(G) | | | | | |
| | | | | | | (755) | PR(L) | | | | | |
| | | | | | | (167,678) | PR(N) | | | | | |
| Deferred equity compensation | 27,652 | — | — | — | 27,652 | — | | | | | | 27,652 |
| Accumulated deficit | (309,649) | (755) | (93,704) | — | (404,108) | 93,704 | PR(G) | (20,196) | PI(A) | (46,353) | RF(B) | (407,151) |
| | | | | | | (17,945) | PR(D) | | | (13,008) | RF(C) | |
| | | | | | | 755 | PR(L) | | | | | |
| Accumulated other comprehensive gains (loss): | | | | | | | | | | | | |
| Foreign currency translation adjustment | (1,133) | — | (3,903) | — | (5,036) | 3,903 | PR(G) | | | | | (1,133) |
| Unrealized pension actuarial losses, net of tax | (12,620) | — | — | — | (12,620) | | | | | | | (12,620) |
| Total accumulated other comprehensive loss | (13,753) | — | (3,903) | — | (17,656) | 3,903 | | — | | — | | (13,753) |
| Total stockholders' (deficit) equity | (332,601) | 5,000 | (96,317) | — | (423,918) | 339,530 | | 242,067 | | (59,361) | | 98,318 |
| Total liabilities and stockholders' (deficit) equity | $ 963,688 | $ 201,426 | $ 472,971 | $ — | $ 1,638,085 | $ 248,514 | | $ 242,067 | | $ (181,067) | | $ 1,947,599 |

104

Supp.App. 0470

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 473 of 1110   PageID 2094

**Quinpario Acquisition Corp 2**
**Unaudited Pro Forma Condensed Combined Statement of Operations**
**for the Three Months Ended March 31, 2017**
**(in thousands, except shares and per share data)**

| | Three Months Ended March 31, 2017 SourceHOV (Historical) | Three Months Ended March 31, 2017 Quinpario (Historical) | Three Months Ended March 31, 2017 Novitex (Historical) | Reclassifications (R) | Combined | Pro Forma Adjustments | | Refinancing | | Three Months Ended March 31, 2017 Combined Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 218,260 | $ — | $ 143,600 | $ — | $ 361,860 | $ — | | — | | $ 361,860 |
| Cost of sales and services (exclusive of depreciation and amortization) | 143,708 | — | 118,165 | — | 261,873 | (1,139) | PR(A) | | | 260,734 |
| **Gross profit** | **74,552** | **—** | **25,435** | **—** | **99,987** | **1,139** | | **—** | | **101,126** |
| Selling, general and administrative expenses | 35,581 | 642 | 15,984 | (188) | 52,019 | (9,742) | PR(F) | | | 42,277 |
| Depreciation and amortization expense | 21,320 | — | 9,719 | — | 31,039 | 3,139 | PR(B) | | | 34,178 |
| Related party expense | 2,385 | — | — | — | 2,573 | (188) | PR(C) | | | 885 |
| | | | | 188 | | (1,500) | PR(D) | | | |
| Restructuring | — | — | 334 | — | 334 | — | | | | 334 |
| **Operating income (loss)** | **15,266** | **(642)** | **(602)** | **—** | **14,022** | **9,430** | | **—** | | **23,452** |
| Other (income) expense | | | | | | | | | | |
| Interest expense, net | 26,219 | (256) | 12,106 | — | 38,069 | — | | (26,235) | RF(A) | 28,638 |
| | | | | | | | | (11,130) | RF(B) | |
| | | | | | | | | 27,934 | RF(C) | |
| Loss (gain) on extinguishment of debt | — | — | — | — | — | — | | | | — |
| Sundry, net | 2,724 | — | — | — | 2,724 | — | | | | 2,724 |
| Net (loss) income before income taxes | (13,677) | (386) | (12,708) | — | (26,771) | 9,430 | | 9,431 | | (7,910) |
| Income tax (expense) benefit | (2,004) | — | 3,008 | — | 1,004 | (3,526) | PR(E) | (3,528) | RF(D) | (6,050) |
| Net (loss) income | $ (15,681) | $ (386) | $ (9,700) | $ — | $ (25,767) | $ 5,904 | | $ 5,903 | | $ (13,960) |
| Net loss per ordinary share—basic and diluted | | | | | | | | | | $ (0.11) |
| Weighted average shares outstanding—basic and diluted | | | | | | | | | | 146,794,640 |

105

Supp.App. 0471

**Quinpario Acquisition Corp 2**
**Unaudited Pro Forma Condensed Combined Statement of Operations**
**for the Year Ended December 31, 2016**
**(in thousands, except share and per share data)**

| | Fiscal Year Ended December 31, 2016 SourceHOV (Historical) | Fiscal Year Ended December 31, 2016 Quinpario (Historical) | Fiscal Year Ended December 31, 2016 Novitex (Historical) | Reclassifications (R) | Combined | Pro Forma Adjustments | | Refinancing | | Fiscal Year Ended December 31, 2016 Combined Pro Forma |
|---|---|---|---|---|---|---|---|---|---|---|
| Revenues | $ 789,926 | $ — | $ 543,163 | $ — | $1,333,089 | $ — | | $ — | | $ 1,333,089 |
| Cost of sales and services (exclusive of depreciation and amortization) | 519,121 | — | 437,977 | | 957,098 | (5,289) | PR(A) | — | | 951,809 |
| **Gross profit** | **270,805** | **—** | **105,186** | | **375,991** | **5,289** | | **—** | | **381,280** |
| Selling, general and administrative expenses | 130,437 | 1,128 | 49,771 | (750) | 180,586 | | | — | | 180,586 |
| Depreciation and amortization expense | 79,639 | — | 40,588 | — | 120,227 | 12,608 | PR(B) | | | 132,835 |
| Related party expense | 10,493 | — | — | | 11,243 | (750) | PR(C) | | | 4,493 |
| | | | | 750 | | (6,000) | PR(D) | | | |
| Restructuring | — | — | 141 | | 141 | | | — | | 141 |
| **Operating income (loss)** | **50,236** | **(1,128)** | **14,686** | **—** | **63,794** | **(569)** | | **—** | | **63,225** |
| Other (income) expense | | | | | | | | | | |
| Interest expense, net | 109,414 | (1,185) | 47,928 | — | 156,157 | — | | (108,866) | RF(A) | 113,660 |
| | | | | | | | | (45,294) | RF(B) | |
| | | | | | | | | 111,663 | RF(C) | |
| Loss (gain) on extinguishment of debt | — | — | (2,307) | — | (2,307) | — | | — | | (2,307) |
| Sundry, net | 712 | — | — | — | 712 | — | | — | | 712 |
| Net income (loss) income before income taxes | (59,890) | 57 | (30,935) | — | (90,768) | (569) | | 42,497 | | (48,840) |
| Income tax benefit | 11,787 | — | 11,805 | — | 23,592 | 213 | PR(E) | (15,895) | RF(D) | 7,910 |
| Net income (loss) income | $ (48,103) | $ 57 | $ (19,130) | $ — | $ (67,176) | $ (356) | | $ 26,602 | | $ (40,930) |
| Net loss per ordinary share—basic and diluted | | | | | | | | | | $ (0.45) |
| Weighted average shares outstanding— basic and diluted | | | | | | | | | | 146,794,640 |

## 1. Basis of Presentation

The unaudited pro forma condensed combined statements of operations for the three months ended March 31, 2017 and the year ended December 31, 2016 gives pro forma effect to the Business Combination and the related proposed financing transactions as if they had occurred on January 1, 2016. The unaudited pro forma condensed combined balance sheet as of March 31, 2017 assumes that the Business Combination and the related proposed financing transactions were completed on March 31, 2017.

The unaudited pro forma condensed combined balance sheet as of March 31, 2017 has been prepared using the following:

- Quinpario's unaudited condensed consolidated interim balance sheet;

- SourceHOV's unaudited condensed consolidated balance sheet; and

- Novitex's unaudited condensed consolidated balance sheet.

The unaudited pro forma condensed combined statement of operations for the three months ended March 31, 2017 has been prepared using the following:

- Quinpario's unaudited condensed consolidated interim statement of operations;

- SourceHOV's unaudited condensed consolidated statement of operations; and

- Novitex's unaudited condensed consolidated statement of operations.

106

Supp.App. 0472

Table of Contents

The unaudited pro forma condensed combined statement of operations for the year ended December 31, 2016 has been prepared using the following:

- Quinpario's audited statement of operations;

- SourceHOV's audited consolidated statement of operations; and

- Novitex's audited consolidated statement of operations.

Since SourceHOV is determined to be the accounting acquirer in the merger with Novitex, the accounting for the this acquisitions is considered a business combination under Financial Accounting Standards Board's Accounting Standard Codification 805, "Business Combinations," ("ASC 805"), and will be accounted for using the acquisition method.

Under the acquisition method, the acquisition-date fair value of the gross consideration transferred to effect the Novitex business combination, as described in Note 5, is allocated to the assets acquired and liabilities assumed based on their estimated fair values. The Company has made significant estimates and assumptions in determining the preliminary allocation of the gross consideration transferred in the unaudited pro forma condensed combined financial statements. As the unaudited pro forma condensed combined financial statements have been prepared based on these preliminary estimates, the final amounts recorded may differ materially from the information presented.

Under ASC 805, acquisition-related costs such as advisory, legal, valuation, other professional fees in connection with the business combination are expensed. The Company expects to incur total acquisition-related costs of $90.0 million, which includes debt issuance costs of $45.1 million, deferred underwriters fees of $12.3 million, prepayment penalty on SourceHOV debt of $5.0 million and transaction costs of $27.6 million. The unaudited pro forma condensed combined financial statements do not give effect to any anticipated synergies, operating efficiencies or cost savings that may be associated with the business combination. Certain reclassification adjustments have been made in the unaudited pro forma condensed combined financial statements to conform the Novitex and Quinpario historical basis of presentation to that of SourceHOV's, where applicable.

The unaudited pro forma condensed combined statements of operations for the three months ended March 31, 2017 and the year ended December 31, 2016 exclude the following estimated amounts that are expected to have a one-time impact on the pro forma combined net income (loss) in the twelve months following the Business Combination:

| | (dollars in millions) |
|---|---|
| Costs associated with the extinguishment of SourceHOV debt of $1,066 million | $ 46.4 |
| Transaction costs | 27.6 |
| **Total** | **$ 74.0** |

The pro forma adjustments reflecting the consummation of the business combination are based on certain estimates and assumptions. The unaudited condensed pro forma adjustments may be revised as additional information becomes available. Therefore, it is likely that the actual adjustments will differ from the pro forma adjustments and it is possible the difference may be material. Quinpario believes that assumptions made provide a reasonable basis form presenting all of the significant effects of the business combination contemplated based on information available to Quinpario at the time and that the pro forma adjustments give appropriate effect to those assumptions and are properly applied in the pro forma financial information.

The unaudited pro forma condensed combined financial statements are not necessarily indicative of what the actual results of operations would have been had the business combination taken place on the date indicated, nor are they indicative of the future consolidated results of operations of the

107

Supp.App. 0473

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 476 of 1110    PageID 2097

combined company. They should be read in conjunction with the historical consolidated financial statements and notes thereto of the Companies.

The historical consolidated financial statements have been adjusted in the unaudited pro forma condensed combined financial information to give effect to pro forma events that are (1) directly attributable to the business combination, (2) factually supportable, and (3) with respect to the statement of operations, expected to have a continuing impact on the results of the combined company.

There were no significant intercompany balances or transactions between the Companies as of the date and for the period of these unaudited pro forma combined financial statements.

The pro forma combined consolidated provision for income taxes does not necessarily reflect the amounts that would have resulted had the Companies filed consolidated income tax returns during the period presented.

The pro forma basic and diluted earnings per share amounts presented in the unaudited pro forma condensed combined consolidated statements of operations are based upon the number of the Quinpario's shares outstanding, assuming the transaction occurred on January 1, 2016.

2.  **Accounting Policies**

Upon consummation of the Business Combination, SourceHOV will perform a comprehensive review of Novitex's accounting policies. As a result of the review, SourceHOV may identify differences between the accounting policies of the companies which, when conformed, could have a material impact on the combined financial statements. Based on its initial analysis, SourceHOV identified differences that would have an impact on the unaudited pro forma condensed combined financial information and recorded the necessary adjustments.

3.  **Adjustments to Unaudited Pro Forma Condensed Combined Balance Sheet (dollars in thousands, except shares)**

The pro forma adjustments included in the unaudited pro forma condensed combined balance sheet as of March 31, 2017 are as follows:

**Reclassifications (R)**

Represents reclassifications to conform the financial statement presentation of the Companies.

**Pro Forma Adjustments (PR)**

A.  Reflects the reclassification of $201.1 million of cash and cash equivalents held in the Quinpario trust account that become available for transaction consideration, transaction expenses, redemption of public shares and the operating activities of the Company following the Business Combination.

B.  Reflects the settlement of $12.3 million of deferred underwriters' fees.

C.  Represents cash of $7.7 million not contributed by Novitex to the Business Combination.

D.  Represents estimated transaction costs in consummating the Business Combination, net of merger related costs already incurred by SourceHOV, Novitex and Quinpario.

E.  Represents the fair value adjustment to Novitex intangible assets of $302.7 million and adjustment to advanced billings and customer deposits of approximately $0.5 million.

108

Supp.App. 0474

**F.** Represents the change in deferred taxes due to change in the fair value of assets and liabilities of Novitex. The tax rate of 37.4% is based upon a statutory tax rate which is SourceHOV's federal and state blended deferred tax rate.

**G.** To eliminate Novitex's historical equity.

**H.** Represents consideration transferred of 30.6 million closing merger shares issuable to Novitex equity holders.

**I.** Reflects the fair value adjustment to Novitex historical debt and revolver, the basis of which is the December 31, 2016 Novitex footnote 10 fair value of financial instruments.

**J.** Reflects the reclassification of Common stock subject to possible redemption.

**K.** Represents the re-capitalization of common stock of SourceHOV.

**L.** Elimination of Quinpario accumulated deficit.

**M.** Represents receivable of $0.5 million not contributed by Novitex Parent to the Business Combination.

**N.** Represents the redemption of Quinpario shares by the current Quinpario shareholders.

**PIPE Investment (PI)**

**A.** In connection with the closing of the Business Combination, Quinpario will issue 20.9 million shares and will issue 0.8 million shares in respect of waivers of redemptions or conversion rights of Quinpario Common Stock at $8.00 per share and 9.4 million shares of Series A Convertible Preferred Stock at $8.00 per share through the PIPE Investment, for an aggregate of $242.1 million. The preferred shares are assumed to be permanent equity.

**Refinancing (RF)**

**A.** Reflects the new debt facilities comprised of a senior secured term facility of $525.0 million, a senior secured bridge facility of $525.0 million and a senior unsecured bridge facility of $300.0 million net of debt issuance costs of $45.1 million. The revolving credit facility of $100.0 million will not be drawn upon until the consummation of the Business Combination.

| | Principal Outstanding | Effective Interest Rate | Deferred Financing Cost | Net Proceeds | Term | Current Portion of Long-Term Debt | Long-Term Debt |
|---|---|---|---|---|---|---|---|
| | | | (in thousands, except for interest rate and term) | | | | |
| Senior Secured Term Facility | $ 525,000 | 7.20% | $ 17,062 | $ 507,938 | 6 years | $ 5,250 | $ 519,750 |
| Revolving Credit Facility | $ 0 | 0.00% | $ 3,250 | $ (3,250) | 5 years | $ 0 | $ |
| Senior Secured Bridge Facility | $ 525,000 | 8.15% | $ 15,750 | $ 509,250 | 6 years | $ 0 | $ 525,000 |
| Senior Unsecured Bridge Facility | $ 300,000 | 11.14% | $ 9,000 | $ 291,000 | 7 years | $ 0 | $ 300,000 |
| | $ 1,350,000 | | $ 45,062 | $ 1,304,938 | | $ 5,250 | $ 1,344,750 |

Stated interest rates related to the new debt financing, subject to a LIBOR Floor of 1.0%, are as follows:

| | Stated Interest Rate: |
|---|---|
| Senior Secured Term Facility | LIBOR + 5.5% |
| Revolving Credit Facility | LIBOR + 5.5% |
| Senior Secured Bridge Facility | LIBOR + 6.5% |
| Senior Unsecured Bridge Facility | LIBOR + 9.5% |

109

Supp.App. 0475

For the Revolving Credit Facility, there is a fee of 0.5% on the unused portion.

> **B.** Reflects the payment of $1,061.9 million of SourceHOV debt, write off of unamortized deferred financing costs and OID costs of $41.4 million, and a prepayment penalty of $5.0 million.

> **C.** Reflects the payment of $422.4 million of Novitex debt.

**4.   Adjustments to Unaudited Pro Forma Condensed Combined Statement of Operations (dollars in thousands, except shares)**

The pro forma adjustments included in the unaudited pro forma condensed statements of operations for the three months ended March 31, 2017 and the year ended December 31, 2016 are as follows:

**Reclassifications (R)**

Represents reclassifications to conform the financial statement presentation of the Companies.

**Pro Forma Adjustments (PR)**

> **A.** Reflects elimination of expenses related to Novitex costs that would have been capitalized under SourceHOV's accounting policy. Capitalized costs were considered in the valuation of customer relationships and the corresponding amortization has been reflected in the intangible amortization adjustment.

> **B.** Reflects the elimination of Novitex historical intangibles amortization of $4.1 million and $16.3 million for the three months ended March 31, 2017 and the year ended December 31, 2016, respectively, as well as the amortization of Novitex identified intangibles of $7.2 million and $28.9 million for the three months ended March 31, 2017 and the year ended December 31, 2016, respectively.

> **C.** Represents the adjustment related to Novitex management fees which will no longer be incurred after the consummation of the Business Combination.

> **D.** Represents the adjustment related to SourceHOV management fees which will no longer be incurred after the consummation of the Business Combination.

> **E.** Reflects adjustment for tax provision at a SourceHOV statutory rate of 37.4% related to the pro forma adjustments. SourceHOV will perform a detailed analysis of the recoverability of its existing deferred tax assets as a result of the acquisition of Novitex and the related deferred tax liabilities to be recorded and may be able to reverse a portion of the valuation allowance currently reflected in its consolidated balance sheet.

> **F.** Reflects the elimination of one time transaction related expenses included in the historical statements.

**Refinancing (RF)**

> **A.** Reflects the elimination of SourceHOV historical interest expense.

> **B.** Reflects the elimination of Novitex historical interest expense.

> **C.** Represents interest expense net of amortized deferred financing costs and OID to be incurred related to the Refinancing.

For pro forma purposes, the interest expense adjustments have been calculated using the assumed weighted average interest rates. A sensitivity analysis on interest expense for the three months ended

110

Supp.App. 0476

March 31, 2017 and the year ended December 31, 2016 has been performed to assess the effect of a change of 0.125% of the hypothetical interest rate would have on the new senior secured term facilities and the new senior secured bridge facilities. As current LIBOR rates are below the LIBOR floor, the interest rate is not impacted by any changes that are below 1% LIBOR. A decrease in interest expense would not result in an overall lower interest expense based on the current LIBOR rate of .9982%. The increase in interest expense following the hypothetical change in the interest rate of 0.125% for the pro forma condensed combined statements of operations for the three months ended March 31, 2017 would be approximately $0.3 million. The increase in interest expense following the hypothetical change in the interest rate of 0.125% for the pro forma condensed combined statements of operations for the twelve months ended December 31, 2016 would be approximately $1.7 million.

| Interest Expense Assuming | Pro Forma Three Months Ended March 31, 2017 | |
|---|---|---|
| Increase of 0.125% | $ | 28,345 |

| Interest Expense Assuming | Pro Forma Year Ended December 31, 2016 | |
|---|---|---|
| Increase of 0.125% | $ | 113,308 |

The Company may incur debt under the new senior unsecured bridge facility up to $300 million. For every decrease of $10 million on the facility would change the financing structure resulting in a decrease in debt liabilities of $10 million, a decrease in the deferred financing costs of $300 thousand and the interest expense would decrease by approximately $872 thousand for the year ended December 31, 2016 and decrease by approximately $212 thousand for the three months ended March 31, 2017.

D. Reflects adjustment for tax provision adjustment at a statutory rate of 37.4% related to the Refinancing.

E. Reflects adjustment for tax provision at a SourceHOV statutory rate of 37.4% related to the pro forma adjustments. SourceHOV will perform a detailed analysis of the recoverability of its existing deferred tax assets as a result of the acquisition of Novitex and the related deferred tax liabilities to be recorded and may be able to reverse a portion of the valuation allowance currently reflected in its consolidated balance sheet.

*Earnings Per Share*—Pro forma earnings per common share are based on historical SourceHOV weighted average shares outstanding, adjusted to assume the shares estimated to be issued by SourceHOV for the Business Combination with Novitex were outstanding for the entire periods presented.

| Pro Forma Weighted Average Shares (Basic and Diluted) | |
|---|---|
| Closing merger shares—issuable to SourceHOV equity holders | 80,600,000 |
| Closing merger shares—issuable to Novitex equity holders | 30,600,000 |
| Net Founder shares | 8,033,571 |
| Remaining current Quinpario shareholders | 4,178,125 |
| Fees and other consideration | 2,524,555 |
| PIPE Investment common shares | 20,858,389 |
| **Pro Forma Weighted Average Shares (Basic and Diluted)** | 146,794,640 |

111

Supp.App. 0477

| Pro Forma Basic Loss Per Share (in thousands) | Three Months Ended March 31, 2017 | |
|---|---|---|
| Pro Forma Net Income (Loss) | $ | (13,960) |
| Cumulative dividend on preferred shares | $ | (2,075) |
| Loss attributable to common shareholders | $ | (16,035) |
| Basic Weighted Average Shares Outstanding | | 146,795 |
| **Pro Forma Basic and Diluted Loss Per Share** | $ | (0.11) |

| Pro Forma Basic Loss Per Share (in thousands) | Fiscal Year Ended December 31, 2016 | |
|---|---|---|
| Pro Forma Net Income (Loss) | $ | (40,930) |
| Cumulative dividend on preferred shares | $ | (7,807) |
| Beneficial conversion feature | | (16,741) |
| Loss attributable to common shareholders | $ | (65,478) |
| Basic Weighted Average Shares Outstanding | | 146,795 |
| **Pro Forma Basic and Diluted Loss Per Share** | $ | (0.45) |

**5.   Preliminary Purchase Price Allocation of the Novitex Merger**

Under the acquisition method of accounting, the identifiable assets acquired and liabilities assumed of Novitex are recorded at the acquisition date fair values and added to those of the Company. The pro forma adjustments are preliminary and based on estimates of the fair value and useful lives of the assets acquired and liabilities assumed and have been prepared to illustrate the estimated effect of the Business Combination. For everything other than 1) identified intangible assets, 2) goodwill, 3) advanced billings and customer deposits and 4) debt, the carrying value was assumed to equal fair value. The final determination of the purchase price allocation upon the closing of the Business Combination will be based on Novitex's net assets acquired as of that date and will depend on a number of factors, which cannot be predicted with any certainty at this time. The purchase price allocation may change materially based on the receipt of more detailed information. Therefore, the actual allocations will differ from the pro forma adjustments presented. The allocation is dependent upon certain valuation and other studies that have not yet been completed. Accordingly, the pro forma purchase price allocation is subject to further adjustment as additional information becomes available and as additional analyses and final valuations are completed. There can be no assurances that these additional analyses and final valuations will not result in significant changes to the estimates of fair value set forth below.

112

Supp.App. 0478

The following table sets forth a preliminary allocation of the estimated Novitex Merger Consideration to the identifiable tangible and intangible assets acquired and liabilities assumed of Novitex based on Novitex's March 31, 2017 balance sheet, with the excess recorded as goodwill:

|  | (in thousands) |
|---|---|
| Cash and cash equivalents | $ 32,555 |
| Accounts receivable | 90,464 |
| Prepaid expenses and other current assets | 15,158 |
| Total current assets | 138,177 |
| Property, plant and equipment | 63,302 |
| Identifiable intangible assets | 417,350 |
| Deferred charges and other assets | 2,971 |
| Total assets | 621,800 |
| Accounts payable | (41,440) |
| Accrued liabilities | (50,916) |
| Current portion of capital lease obligations | (9,643) |
| Short-term borrowings and current portion of long-term debt | (9,615) |
| Advanced billings and customer deposits | (14,310) |
| Total current liabilities | (125,924) |
| Long-term debt | (408,411) |
| Capital lease obligations, net of current maturities | (8,863) |
| Deferred taxes | (136,865) |
| Other noncurrent liabilities | (3,925) |
| Total liabilities | (683,988) |
| Net assets acquired (a) | (62,188) |
| Estimated purchase consideration (b) | 244,800 |
| **Estimated goodwill (b)–(a)** | **$ 306,988** |

The table below indicates the estimated fair value of each of the identifiable intangible assets and the related estimated useful life:

|  | Preliminary Estimated Asset Fair Value | Weighted Average Useful Life (Years) | Estimated Amortization Expense for Three Months Ended March 31, 2017 | Estimated Amortization Expense for Year Ended December 31, 2016 |
|---|---|---|---|---|
|  | (in thousands, except for useful life) |  |  |  |
| Customer relationships | $ 393,000 | 14 - 18 | 6,141 | $ 24,563 |
| Trademarks | 14,000 | 8 - 9 | 412 | 1,647 |
| Non-compete agreements | 9,000 | 2 - 5 | 642 | 2,571 |
| Internally developed software | 1,350 | 5 - 10 | 45 | 180 |
|  | 417,350 |  | $ 7,240 | $ 28,961 |
| Less: Net intangible assets as of March 31, 2017 reported on Novitex's historical financial statements | 114,607 |  |  |  |
| Pro forma adjustment | $ 302,743 |  |  |  |

113

Supp.App. 0479

Table of Contents

Preliminary identifiable intangible assets consist of anticipated intangibles derived from existing customer relationships, trademarks, non-compete agreements and internally developed software. The following summarizes the valuation methods used to estimate the fair value of the identifiable intangible assets:

| | |
|---|---|
| Customer relationships | Income Approach—Multi Period Excess Earnings Method |
| Trademarks | Income Approach—Relief from Royalty Method |
| Non-compete agreements | Income Approach—With and Without Method |
| Internally developed software | Cost Approach—Replacement Cost Method |

The amortization related to these amortizable identifiable intangible assets is reflected as a pro forma adjustment in the unaudited pro forma condensed combined statements of operations, as further described below. The identifiable intangible assets and related amortization are preliminary and are based on management's estimates after consideration of similar transactions. As discussed above, the amount that will ultimately be allocated to identifiable intangible assets and liabilities, and the related amount of amortization, may differ materially from this preliminary allocation. In addition, the periods the amortization impacts will ultimately be based upon the periods in which the associated economic benefits or detriments are expected to be derived or, where appropriate, based on the use of a straight-line method. Therefore, the amount of amortization following the closing of the Business Combination may differ significantly between periods based upon the final value assigned and amortization methodology used for each identifiable intangible asset.

The historical deferred financing fees and original issue discount costs of $17.7 million were not recognized as part of purchase accounting and therefore written off. The present fair value of Debt is consistent with the fair value within the historical financial statements of Novitex.

The following table summarizes the adjustments to deferred tax assets and liabilities resulting from pro forma fair value adjustments of acquired assets and assumed liabilities, based upon a global statutory tax rate of 37.4% which is SourceHOV's federal and state blended deferred tax rate. This estimate of deferred income tax assets and liabilities is preliminary and is subject to change based upon Novitex's final determination of the fair value of assets acquired and liabilities assumed by jurisdiction.

| | |
|---|---|
| **Adjustments to Deferred Tax Assets** | |
| Fair value adjustment to advanced billings and customer deposits | $ (174) |
| Write off of historical debt issuance costs and OID costs | (1,757) |
| **Adjustments to Deferred Tax Liabilities** | |
| Adjustment due to the fair value of intangible assets | $ 113,226 |

*Goodwill*—Approximately $307.0 million has been allocated to goodwill. Goodwill represents the excess of the gross consideration transferred over the fair value of the underlying net tangible and identifiable definite-lived intangible assets acquired.

In accordance with ASC Topic 350, Goodwill and Other Intangible Assets, goodwill will not be amortized, but instead will be tested for impairment at least annually or more frequently if certain indicators are present. In the event management determines that the value of goodwill has become impaired, an accounting charge for the amount of impairment during the quarter in which the determination is made may be recognized. Goodwill recognized is not expected to be deductible for tax purposes.

114

Supp.App. 0480

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 483 of 1110    PageID 2104

## SPECIAL MEETING OF QUINPARIO STOCKHOLDERS

**General**

We are furnishing this proxy statement to our stockholders as part of the solicitation of proxies by our board of directors for use at the Special Meeting to be held on July 11, 2017, and at any adjournment or postponement thereof. This proxy statement is first being furnished to our stockholders on or about June 26, 2017. This proxy statement provides you with information you need to know to be able to vote or instruct your vote to be cast at the Special Meeting, as applicable.

**Date, Time and Place of Special Meeting**

The Special Meeting of Quinpario will be held at 1:00 p.m., Eastern time, on July 11, 2017, at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, or such other date, time and place to which such meeting may be adjourned or postponed, to consider and vote upon the proposals.

**Voting Power; Record Date**

You will be entitled to vote or direct votes to be cast at the Special Meeting if you owned shares of Quinpario Common Stock at the close of business on May 31, 2017, which is the record date for the Special Meeting. You are entitled to one vote for each share of Quinpario Common Stock that you owned as of the close of business on the record date. If your shares are held in "street name" or are in a margin or similar account, you should contact your broker, bank or other nominee to ensure that votes related to the shares you beneficially own are properly counted. Quinpario warrants do not have voting rights. On the record date, there were 28,848,601 shares of Quinpario Common Stock outstanding, of which 20,098,601 are public shares and 8,750,000 are Founder Shares held by the Sponsor, independent directors and officers, which were acquired prior to our IPO.

**Vote of the Founders**

As of the record date for the Special Meeting, the Sponsor, independent directors, officers and a former partner of the managing member of the Sponsor owned an aggregate of approximately 30.3% of the outstanding shares of Quinpario Common Stock, consisting of 8,750,000 shares which were purchased prior to our IPO (excluding 1,312,500 shares that were forfeited by the Sponsor after the IPO). The Founders have not purchased any shares during or after the IPO.

The Founders have waived any redemption rights, including with respect to shares of Quinpario Common Stock purchased in the IPO or in the aftermarket, in connection with Business Combination. The Founder Shares have no redemption rights upon our liquidation and will be worthless if no business combination is effected by us prior to July 24, 2017. However, the Founders are entitled to redemption rights upon our liquidation distributions with respect to any public shares they may own.

In connection with the IPO, Quinpario and Deutsche Bank Securities Inc. and Cantor Fitzgerald & Co., the representative of the underwriters of the IPO, entered into agreements with each of the Founders pursuant to which the Founders agreed vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal.

**Quorum and Required Vote for Stockholder Proposals**

A quorum of our stockholders is necessary to hold a valid meeting. A quorum will be present at the Special Meeting if a majority of Quinpario Common Stock outstanding and entitled to vote at the Special Meeting is represented in person or by proxy. Abstentions will count as present for the purposes of establishing a quorum, but broker non-votes will not count as present for the purposes of establishing a quorum.

115

Supp.App. 0481

The approval of each of the Business Combination Proposal and the Adjournment Proposal requires the affirmative vote of the holders of a majority of the shares of Quinpario Common Stock present and entitled to vote at the Special Meeting. Accordingly, a Quinpario stockholder's failure to vote by proxy or to vote in person at the Special Meeting or the failure of a Quinpario stockholder who holds his or her shares in "street name" through a broker or other nominee to give voting instructions to such broker or nominee (a broker non-vote) will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Business Combination Proposal or the Adjournment Proposal. An abstention will have the same effect as a vote "AGAINST" the Business Combination Proposal and the Adjournment Proposal.

The approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote and actually cast a vote thereon at the Special Meeting. Accordingly, a Quinpario stockholder's abstention, broker non-vote or failure to vote by proxy or to vote in person at the Special Meeting will, assuming a valid quorum is established, have no effect on the outcome of any vote on the Nasdaq Proposal.

The approval of each of the Certificate Proposals requires the affirmative vote of the holders of a majority of the outstanding shares of Quinpario Common Stock. Accordingly, a Quinpario stockholder's failure to vote by proxy or to vote in person at the Special Meeting, an abstention or a broker non-vote will have the same effect as a vote "AGAINST" the Certificate Proposals.

No vote of the holders of any warrants issued by Company is necessary to approve the Business Combination Proposal, and we are not asking the warrant holders to vote on the Business Combination Proposal or any other proposal being considered at the Special Meeting.

**Recommendation to Quinpario Stockholders**

Our board of directors believes that each of the Business Combination Proposal, the Nasdaq Proposal, each of the Certificate Proposals and the Adjournment Proposal to be presented at the Special Meeting is in the best interests of, the Company and our stockholders and unanimously recommends that its stockholders vote "FOR" each of the proposals.

**Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination**

When you consider the recommendation of our board of directors in favor of approval of the Business Combination Proposal, you should keep in mind that our directors and officers have interests in the Business Combination that are different from, or in addition to, your interests as a stockholder. These interests include, among other things:

- the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that if unrestricted and freely tradable these shares would be valued at $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, we believe such shares have less value;

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement

116

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 485 of 1110     PageID 2106

Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

•     the continued right of the Sponsor to hold Quinpario Common Stock;

•     the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

•     if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, have agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

•     the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

•     the fact that the Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

•     that, at the closing of the Business Combination we will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

**Broker Non-Votes and Abstentions**

Under the rules of various national and regional securities exchanges your broker, bank or nominee cannot vote your shares or warrants with respect to non-discretionary matters unless you provide instructions on how to vote in accordance with the information and procedures provided to you by your broker, bank or nominee. We believe the proposals presented to our stockholders will be considered non-discretionary and therefore your broker, bank or nominee cannot vote your shares without your instruction. If you do not provide instructions with your proxy, your bank, broker or other nominee may deliver a proxy card expressly indicating that it is NOT voting your shares; this indication that a bank, broker or nominee is not voting your shares is referred to as a "broker non-vote."

Abstentions are considered present for the purposes of establishing a quorum but will have the same effect as a vote "AGAINST" the Business Combination Proposal and the Adjournment Proposal. Broker non-votes are not considered present for the purposes of establishing a quorum and will have no effect on the Business Combination Proposal, the Nasdaq Proposal and the Adjournment Proposal. Broker non-votes will have the same effect as a vote "AGAINST" the Certificate Proposals.

117

Supp.App. 0483

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 486 of 1110     PageID 2107

Table of Contents

**Voting Your Shares**

Each share of Quinpario Common Stock that you own in your name entitles you to one vote on each of the proposals. Your one or more proxy cards show the number of shares of Quinpario Common Stock that you own. There are several ways to vote your shares of Quinpario Common Stock:

- You can vote your shares by one of the following methods: (1) call the toll-free number specified on the enclosed proxy card and follow the instructions when prompted, (2) access the internet website specified on the enclosed proxy card and follow the instructions provided to you, or (3) complete, sign, date and return the enclosed proxy card in the postage-paid envelope provided. If you hold your shares in "street name" through a bank, broker or other nominee, you will need to follow the instructions provided to you by your bank, broker or other nominee to ensure that your shares are represented and voted at the Special Meeting. If you vote by proxy card, your "proxy," whose name is listed on the proxy card, will vote your shares as you instruct on the proxy card. If you sign and return the proxy card but do not give instructions on how to vote your shares, your shares of Quinpario Common Stock will be voted, as recommended by our board of directors: "FOR" the Business Combination Proposal, "FOR" the Nasdaq Proposal, "FOR" each of the Certificate Proposals and "FOR" the Adjournment Proposal.

- You can attend the Special Meeting and vote in person. You will be given a ballot when you arrive. However, if your shares of Quinpario Common Stock are held in the name of your broker, bank or other nominee, you must get a proxy from the broker, bank or other nominee. That is the only way we can be sure that the broker, bank or nominee has not already voted your shares of Quinpario Common Stock.

**Revoking Your Proxy**

If you give a proxy, you may revoke it at any time before the Special Meeting, or at such meeting by doing any one of the following:

- you may send another proxy card with a later date;

- you may notify D. John Srivisal, President and Chief Executive Officer by telephone at (314) 548-6200, by email at djsrivisal@quinpario.com, or by writing to c/o Quinpario Acquisition Corp. 2, 12935 N. Forty Drive, Suite 201, St. Louis, Missouri 63141 before the Special Meeting that you have revoked your proxy; or

- you may attend the Special Meeting, revoke your proxy, and vote in person, as indicated above.

**No Additional Matters May Be Presented at the Special Meeting**

The Special Meeting has been called only to consider the approval of the Business Combination Proposal, the Nasdaq Proposal, the Certificate Proposals and the Adjournment Proposal. Under our bylaws, other than procedural matters incident to the conduct of the meeting, no other matters may be considered at the Special Meeting if they are not included in the notice of the Special Meeting.

**Who Can Answer Your Questions About Voting Your Shares**

If you have any questions about how to vote or direct a vote in respect of your shares of Quinpario Common Stock, you may call Morrow, our proxy solicitor, at (800) 662-5200 (toll free), or banks and brokerage firms, please call collect: (203) 658-9400.

118

Supp.App. 0484

Table of Contents

**Redemption Rights**

Pursuant to our current certificate of incorporation, any holders of our public shares may demand that such shares be redeemed into a pro rata portion of the Trust Account (less taxes payable and any accrued interest that we may withdraw for working capital) calculated as of two business days prior to the consummation of the Business Combination. If demand is properly made and the Business Combination is consummated, these shares, immediately prior to Business Combination, will cease to be outstanding and will represent only the right to receive a pro rata share of the aggregate amount on deposit in the Trust Account which holds the remaining proceeds of our IPO as of two business days prior to the consummation of the Business Combination (less taxes payable and any accrued interest that we may withdraw for working capital) upon the consummation of the Business Combination. For illustrative purposes, based on funds in the Trust Account of approximately $201.1 million on March 31, 2017, the estimated per share redemption price would have been approximately $10.00.

In order to exercise your redemption rights, you must, (a) affirmatively vote your shares of Quinpario Common Stock for or against the Business Combination Proposal and (b) prior to the Special Meeting, both:

- Submit a request in writing that we redeem your public shares for cash to Continental Stock Transfer & Trust Company, our transfer agent, at the following address:

<div align="center">

Continental Stock Transfer & Trust Company
17 Battery Place
New York, New York 10004
Tel: (212) 845 3287
Attn: Mark Zimkind
E-mail: mzimkind@continentalstock.com

and

</div>

- Deliver your public shares either physically or electronically through DTC to our transfer agent. Stockholders seeking to exercise their redemption rights and opting to deliver physical certificates should allot sufficient time to obtain physical certificates from the transfer agent. It is our understanding that stockholders should generally allot at least two weeks to obtain physical certificates from the transfer agent. However, we do not have any control over this process and it may take longer than two weeks. Stockholders who hold their shares in street name will have to coordinate with their bank, broker or other nominee to have the shares certificated or delivered electronically. If you do not submit a written request and deliver your public shares as described above, your shares will not be redeemed.

Any demand for redemption, once made, may be withdrawn until the Special Meeting. If you delivered your shares for redemption to our transfer agent and decide within the required time frame not to exercise your redemption rights, you may request that our transfer agent return the shares (physically or electronically). You may make such request by contacting our transfer agent at the phone number or address listed above.

Prior to exercising redemption rights, stockholders should verify the market price of Quinpario Common Stock as they may receive higher proceeds from the sale of their Quinpario Common Stock in the public market than from exercising their redemption rights if the market price per share is higher than the redemption price. We cannot assure you that you will be able to sell your shares of Quinpario Common Stock in the open market, even if the market price per share is higher than the redemption price stated above, as there may not be sufficient liquidity in the Quinpario Common Stock when you wish to sell your shares.

<div align="center">119</div>

Supp.App. 0485

Table of Contents

If you exercise your redemption rights, your shares of Quinpario Common Stock will cease to be outstanding immediately prior to the Business Combination and will only represent the right to receive a pro rata share of the Trust Account. You will no longer own those shares. You will be entitled to receive cash for these shares only if you properly demand redemption.

If the Business Combination is not approved and we do not consummate an initial business combination by July 24, 2017, our current certificate of incorporation requires us to dissolve and liquidate and our warrants will expire worthless.

## Appraisal Rights

Appraisal rights are not available to holders of shares of Quinpario Common Stock in connection with the Business Combination.

## Proxy Solicitation Costs

The Company is soliciting proxies on behalf of its board of directors. This proxy solicitation is being made by mail, but also may be made by telephone or in person. The Company has engaged Morrow to assist in the solicitation of proxies for the Special Meeting. The Company and its directors and officers may also solicit proxies in person. The Company will ask banks, brokers and other institutions, nominees and fiduciaries to forward the proxy materials to their principals and to obtain their authority to execute proxies and voting instructions.

The Company will bear the entire cost of the proxy solicitation, including the preparation, assembly, printing, mailing and distribution of the proxy materials. The Company will pay Morrow a fee of $22,500, plus disbursements, reimburse Morrow for its reasonable out-of-pocket expenses and indemnify Morrow and its affiliates against certain claims, liabilities, losses, damages and expenses for their services as our proxy solicitor. The Company will reimburse brokerage firms and other custodians for their reasonable out-of-pocket expenses for forwarding the proxy materials to our stockholders. Directors and officers of the Company who solicit proxies will not be paid any additional compensation for soliciting proxies.

120

Supp.App. 0486

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 489 of 1110    PageID 2110

**PROPOSAL NO. 1—APPROVAL OF THE BUSINESS COMBINATION**

We are asking our stockholders to approve and adopt the Business Combination Agreement. Our stockholders should read carefully this proxy statement in its entirety for more detailed information concerning the Business Combination Agreement, which is attached to this proxy statement as Annex A. You are urged to read carefully the Business Combination Agreement in its entirety before voting on this proposal.

Because we are holding a stockholder vote on the Business Combination, our current certificate of incorporation provides that we may consummate the Business Combination only if it is approved by the affirmative vote of the holders of a majority of the shares of Quinpario Common Stock that are entitled to vote at the Special Meeting.

Approval of this proposal is a condition to the completion of the Business Combination. If the proposal is not approved, the Business Combination will not occur.

**Vote Required for Approval**

The Business Combination Agreement will be approved and adopted if the holders of at least a majority of the outstanding shares of Quinpario Common Stock present and entitled to vote at the Special Meeting vote "FOR" the Business Combination Proposal. Abstentions will have the same effect as a vote "AGAINST" the Business Combination Proposal. Broker non-votes or a failure to vote by proxy or in person at the Special Meeting will have no effect on the approval of this proposal. The Business Combination Proposal is conditioned on the approval of each of the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal. If the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal are not approved, this proposal will have no effect, even if approved by our stockholders.

As of the record date, the Founders beneficially owned 8,750,000 shares of Quinpario Common Stock entitled to vote at the Special Meeting. This represents approximately 30.3% of the total votes entitled to be cast at the Special Meeting. The Founders have agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal. The Founders have not purchased any public shares.

**The Business Combination Agreement**

*This subsection of the proxy statement describes the material provisions of the Business Combination Agreement, but does not purport to describe all of the terms of the Business Combination Agreement. The following summary is qualified in its entirety by reference to the complete text of the Business Combination Agreement, which is attached to this proxy statement as Annex A. You are urged to read the Business Combination Agreement in its entirety because it is the primary legal document that governs the Business Combination.*

*The Business Combination Agreement contains representations, warranties and covenants that the respective parties made to each other as of the date of the Business Combination Agreement or other specific dates. The assertions embodied in those representations, warranties and covenants were made for purposes of the contract among the respective parties and are subject to important qualifications and limitations agreed to by the parties in connection with negotiating the Business Combination Agreement. The representations, warranties and covenants in the Business Combination Agreement are also modified in important part by the underlying disclosure schedules of the various parties which are not filed publicly and which are subject to a contractual standard of materiality different from that generally applicable to stockholders and were used for the purpose of allocating risk among the parties rather than establishing matters as facts.*

121

Supp.App. 0487

*General Description of the Business Combination Agreement*

On February 21, 2017, Quinpario entered into the Business Combination Agreement with SourceHOV Merger Sub, Novitex Merger Sub, SourceHOV, Novitex, HOVS LLC, HandsOn Fund 4 I, LLC and Novitex Parent.

Subject to the terms of the Business Combination Agreement, the consideration for the Business Combination will be funded through a combination of $1.35 billion in new debt financing, cash from Quinpario, rollover equity and cash on hand at closing, including from the proposed PIPE Investment. Equity holders of SourceHOV and Novitex are rolling 100% of their current equity. As a result of the transaction, equity holders of SourceHOV and Novitex will collectively hold a majority of the equity of the combined company.

Pursuant to Quinpario's amended and restated certificate of incorporation, Quinpario will provide its stockholders with the opportunity to redeem their shares in conjunction with a stockholder vote on the transaction contemplated by the Business Combination Agreement, including the Business Combination.

*Structure of the Business Combination*

The Business Combination Agreement provides for (i) the merger of SourceHOV Merger Sub with and into SourceHOV (the "SourceHOV Merger"), as a result of which the separate corporate existence of SourceHOV Merger Sub will cease, with SourceHOV continuing as the surviving company and an indirect subsidiary of the Company (the "SourceHOV Surviving Company"), and (ii) the merger of Novitex Merger Sub with and into Novitex, (the "Novitex Surviving Company") (the "Novitex Merger," and together with the SourceHOV Merger, the "Mergers"), as a result of which the separate corporate existence of Novitex Merger Sub will cease, with Novitex as the surviving company and an indirect subsidiary of the Company.

*Consideration to Selling Equityholders in the Business Combination*

Equityholders of SourceHOV and Novitex are converting 100% of their current equity in SourceHOV and Novitex into shares of Quinpario Common Stock. The shares of common stock, par value $0.01 per share, in SourceHOV Merger Sub shall be converted into 100% of the fully paid and nonassessable shares of common stock, par value $0.01 per share of the SourceHOV Surviving Company. Each share of common stock of SourceHOV (other than any dissenting shares, shares held as treasury stock and shares held by Quinpario) shall be converted into the right to receive the SourceHOV Merger Consideration of a number of shares of Quinpario Common Stock equal to the quotient obtained by dividing 80,600,000 by the number of shares of SourceHOV common stock outstanding immediately prior to the effective time of the SourceHOV merger, after giving effect to the Preliminary Merger. The common stock of SourceHOV, when so converted, will no longer be outstanding and will automatically be canceled and shall cease to exist, and each holder of the common stock of SourceHOV immediately prior to the effective time of the SourceHOV Merger will cease to have any rights with respect thereto, except the right to receive the SourceHOV Merger Consideration and any cash in lieu of fractional shares of Quinpario Common Stock to be issued or paid in consideration therefor and any dividends or other distributions to which holders become entitled upon the delivery of a letter of transmittal as required in the Business Combination Agreement, and including all certificates representing shares of common stock of SourceHOV, without interest. The shares of common stock, par value $0.01 per share, in Novitex Merger Sub shall be converted into 100% of fully paid and nonassessable shares of common stock, par value $0.01 per share of the Novitex Surviving Company. Each share of common stock of Novitex (other than any shares held as treasury stock and shares held by Quinpario) will be converted into the right to receive the Novitex Merger Consideration of a number of shares of Quinpario Common Stock equal to the quotient obtained by

122

Supp.App. 0488

dividing 30,600,000 by the number of shares of Novitex common stock outstanding immediately prior to the effective time of the Novitex Merger. The Novitex common stock, when so converted, will no longer be outstanding and will automatically be canceled and will cease to exist, and each holder of Novitex common stock immediately prior to the effective time of the Novitex Merger will cease to have any rights with respect thereto, except the right to receive the Novitex Merger Consideration and any cash in lieu of fractional shares of Quinpario Common Stock to be issued or paid in consideration therefor, without interest.

In addition, the Founders have agreed to forfeit 716,429 shares of Quinpario Common Stock in the aggregate pursuant to the Forfeiture Agreement in connection with the Business Combination. See "—*The Forfeiture Agreement.*"

**Material Adverse Effect**

Under the Business Combination Agreement, certain representations and warranties of SourceHOV and Novitex are qualified in whole or in part by a material adverse effect standard for purposes of determining whether a breach of such representations and warranties has occurred. Pursuant to the Business Combination Agreement, a "Material Adverse Effect" means any event, change, development or effect that, individually or in the aggregate with all other events, changes, developments or effects, has had, or would reasonably be expected to have, a material adverse effect upon (a) the assets, liabilities, condition (financial or otherwise), the business or results of operations of SourceHOV and Novitex, taken as a whole, or (b) the ability of either SourceHOV or Novitex to consummate the transactions contemplated hereunder in accordance with the terms and subject to the conditions set forth herein; *provided* that the following shall not be taken into account in determining whether a "Material Adverse Effect" shall have occurred: (i) any national, international or any foreign or domestic regional economic, financial, social or political conditions (including changes therein) or events in general, including the results of any primary or general elections, (ii) changes in any financial, debt, credit, capital or banking markets or conditions (including any disruption thereof), (iii) changes in interest, currency or exchange rates or the price of any commodity, security or market index, (iv) changes in legal or regulatory conditions, including changes or proposed changes in law, GAAP or other accounting principles or requirements, or standards, interpretations or enforcement thereof, (v) changes that are generally applicable to the industries in which Novitex or SourceHOV operate or seasonal fluctuations in the businesses of SourceHOV and Novitex, (vi) any change in the market price or trading volume of any securities or indebtedness of either Novitex or SourceHOV or any of their respective affiliates, (it being understood that the underlying causes of such change may, if they are not otherwise excluded from the definition of Material Adverse Effect, be taken into account in determining whether a Material Adverse Effect has occurred), (vii) any change in, or failure of Novitex or SourceHOV to meet, or the publication of any report regarding, any internal or public projections, forecasts, budgets or estimates of or relating to Novitex or SourceHOV for any period, including with respect to revenue, earnings, cash flow or cash position (it being understood that the underlying causes of such decline or failure may, if they are not otherwise excluded from the definition of Material Adverse Effect, be taken into account in determining whether a Material Adverse Effect has occurred), (viii) the occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war, (ix) the existence, occurrence or continuation of any force majeure events, including any earthquakes, floods, hurricanes, tropical storms, fires or other natural disasters or any national, international or regional calamity, (x) any action arising from or relating to the Business Combination Agreement or the transactions contemplated by the Business Combination Agreement, (xi) the execution, announcement, performance or existence of the Business Combination Agreement, the identity of the parties thereto or any of their respective affiliates, representatives or financing sources, the taking or not taking of any action to the extent required by the Business Combination Agreement or the pendency or contemplated consummation of the transactions contemplated by the Business

123

Supp.App. 0489

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 492 of 1110     PageID 2113

Combination Agreement, including any actual or potential loss or impairment after the date of the Business Combination Agreement of any contract or any customer, supplier, landlord, partner, employee or other business relation due to any of the foregoing in this clause (it being understood that the factors giving rise to or contributing to any such adverse change under clause *(xi)* that are not otherwise excluded from the definition of "Material Adverse Effect" may be deemed to constitute, or be taken into account in determining whether there has been or would be reasonably likely to have been, a Material Adverse Effect), (xii) compliance by SourceHOV and Novitex with the terms of the Business Combination Agreement, including the failure to take any action restricted by the Business Combination Agreement (but excluding effects resulting from the closing), (xiii) any actions taken, or not taken, with the consent, waiver or at the request of Quinpario, Novitex Merger Sub or SourceHOV Merger Sub or any action taken to the extent expressly permitted by the Business Combination Agreement, (xiv) any actions taken by Quinpario, Novitex Merger Sub, SourceHOV Merger Sub or any of their respective affiliates or any of their respective representatives or financing sources after the date of the Business Combination Agreement, (xv) any matters disclosed in the disclosure schedules of SourceHOV and Novitex (the "Disclosure Schedules"), disclosed to Quinpario, Novitex Merger Sub or SourceHOV Merger Sub or any of their respective affiliates or representatives; *provided*, *however*, that with respect to each of clauses *(i)* through *(v)*, any event, development, occurrence, fact, condition, or change referred to above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such event, development, occurrence, fact, condition, or change has a disproportionate effect on Novitex or SourceHOV compared to other participants in the industries in which they primarily conducts their businesses.

### Closing and Effective Time of the Business Combination

The closing of the Business Combination is expected to take place at the offices of Akin Gump Strauss Hauer & Feld LLP on a date that is no later than the third business day following the satisfaction or waiver of the conditions described below under the subsection entitled "—*Conditions to Closing of the Business Combination*" or at such other time, date and place as may be mutually agreed upon in writing by the parties to the Business Combination Agreement. At the Closing, the Company shall repay, or cause to be repaid, on behalf of SourceHOV and Novitex, all obligations in respect of all funded indebtedness (with certain scheduled exceptions) of SourceHOV and Novitex.

### Conditions to Closing of the Business Combination

#### Conditions to Each Party's Obligations

The respective obligations of each party to consummate the transactions contemplated by the Business Combination Agreement, including the Business Combination, are subject to the satisfaction, or written waiver of each of the following conditions at or prior to the Closing:

- all required waiting periods or approvals under the HSR Act and all applicable antitrust laws shall have expired, been received or terminated;

- no applicable law or injunction enacted, entered, promulgated, enforced or issued by any governmental authority or other legal restraint or prohibition preventing the consummation of the Business Combination shall be in effect;

- both the SourceHOV Merger and the Novitex Merger shall have been consummated substantially simultaneously;

- the approval of the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal shall have been obtained;

- the HGM Consent and the Novitex Consent (each as defined in the Business Combination Agreement) shall have been obtained, which condition has since been satisfied; and

124

Supp.App. 0490

- Quinpario shall have received financing on the terms provided for in the commitment letter between Quinpario, Royal Bank of Canada, RBC Capital Markets, LLC, Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, Natixis, New York Branch, Natixis Securities Americas LLC, KKR Capital Markets LLC, and KKR Corporate Lending LLC (the "Commitment Letter").

*Conditions to Quinpario's Obligations*

The obligations of Quinpario, Novitex Merger Sub and SourceHOV Merger Sub to effect the Business Combination are subject to the satisfaction, or written waiver of each of the following conditions at or prior to the Closing:

- Certain of the representations and warranties of each Seller shall be true and correct in all respects as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of each of SourceHOV and Novitex shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect;

- The "Fundamental Representations" of each of SourceHOV and Novitex shall be true and correct in all respects (except in respect of certain representations and warranties, for errors which are de minimis in aggregate) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of each of SourceHOV and Novitex shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect;

- Each of SourceHOV and Novitex and each Seller shall have performed or complied in all material respects with all obligations and covenants required to be performed or complied with by such company or Seller prior to or at the time of the closing;

- From the date of the Business Combination Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event, circumstance, change, development or effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect; and

- Quinpario shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) remaining after the closing.

125

Supp.App. 0491

Table of Contents

*Conditions to the Sellers' and SourceHOV's and Novitex's Obligations*

The obligations of the Sellers and SourceHOV and Novitex to effect the Business Combination are subject to the satisfaction, or written waiver of each of the following conditions at or prior to the Closing:

- (i) Certain of the representations and warranties of Quinpario, Novitex Merger Sub and SourceHOV Merger Sub shall be true and correct in all respects (except in respect of the representations and warranties set forth in one of the representations and warranties, for errors which are de minimis in aggregate) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of Quinpario, Novitex Merger Sub and SourceHOV Merger Sub shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifier) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not have a material adverse effect on Quinpario, Novitex Merger Sub or SourceHOV Merger Sub;

- Each of Quinpario, Novitex Merger Sub and SourceHOV Merger Sub shall have performed or complied in all respects with all obligations and covenants required to be performed or complied with by it prior to or at the time of the closing; and

- At the closing date, after giving effect to (i) the redemptions each holder of Quinpario Common Stock is entitled to pursuant to Quinpario's amended and restated certificate of incorporation and bylaws and (ii) the PIPE Investment, the Trust Account plus the total proceeds from the PIPE Investment available to Quinpario shall equal in the aggregate no less than $275,000,000 in cash.

*Conditions to the HGM Group's and SourceHOV's Obligations*

The obligations of the HGM Group and SourceHOV to effect the Business Combination are subject to fulfillment, on or prior to the closing date, of each of the following conditions (any or all of which may be waived by the HGM Group or SourceHOV):

- Certain of the representations and warranties of Novitex Parent shall be true and correct in all respects as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified);

- (i) Certain of the representations and warranties of Novitex as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of Novitex shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect solely with respect to Novitex;

126

Supp.App. 0492

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 495 of 1110    PageID 2116

- Novitex and Novitex Parent shall have performed or complied in all material respects with all obligations and covenants required to be performed or complied with by each prior to or at the time of the closing; and

- From the date of the Business Combination Agreement, there shall not have occurred any Material Adverse Effect with respect to Novitex, nor shall any event, circumstance, change, development or effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect solely with respect to Novitex.

*Conditions to Novitex's and Novitex Parent's Obligations*

The obligations of Novitex and Novitex Parent to effect the Business Combination are subject to the satisfaction, or written waiver of each of the following conditions at or prior to the Closing:

- Certain of the representations and warranties of the HGM Group shall be true and correct in all respects as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified);

- (i) Certain of the representations and warranties of SourceHOV shall be true and correct in all respects as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of SourceHOV shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the closing date as though made on and as of the closing date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect solely with respect to SourceHOV;

- The HGM Group and SourceHOV shall have performed or complied in all material respects with all obligations and covenants required to be performed or complied with by each prior to or at the time of the closing; and

- From the date of the Business Combination Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event, circumstance, change, development or effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect.

*Representations and Warranties*

Under the Business Combination Agreement, the Sellers made customary representations and warranties relating to: standing, qualification and power; ownership; authority, execution and delivery, and enforceability; brokers' and finders' fees; no conflicts or consents; and litigation.

Under the Business Combination Agreement, each of Novitex and SourceHOV made customary representations and warranties about itself, respectively, relating to: standing, qualification and power; capitalization of the company and company's subsidiaries; authority, execution and delivery and enforceability; no conflict and consents; financial statements; absence of certain changes; compliance with law, permits; litigation; no undisclosed liabilities; taxes; intellectual property, privacy and cybersecurity; employee and employee benefits; labor; environmental matters; material contracts; related person transactions; real and personal property; insurance; brokers' and finders' fees; customers and suppliers; and company information; and no additional representations.

127

Supp.App. 0493

Under the Business Combination Agreement, Quinpario, Novitex Merger Sub and SourceHOV Merger Sub made customary representations and warranties relating to: standing, qualification and power; capitalization; authority, execution and delivery, and enforceability; no conflict and consents; litigation; SEC documents and financial statements; information supplied; Nasdaq stock market quotation; board approval and stockholder vote; investment company act; Trust Account; title to assets; securities laws matters; Quinpario's business investigation; disclaimer regarding projections and no knowledge of misrepresentation; financing; solvency; operations of Novitex Merger Sub and SourceHOV Merger Sub; brokers' and finders' fees; taxes; and no additional representations.

### Covenants of the Parties

#### Covenants of SourceHOV and Novitex

SourceHOV and Novitex each made certain covenants under the Business Combination Agreement, including, among others, the following:

- Subject to the written consent of all other parties to the Business Combination Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), as set forth in the applicable Disclosure Schedule, as expressly contemplated or permitted in the Business Combination Agreement or as required by applicable law or contract (in existence on the date of the Business Combination Agreement), SourceHOV and Novitex have each agreed to, prior to the earlier of (i) the effective time of the Business Combination or (ii) the termination of the Business Combination Agreement in accordance with its terms, conduct its business in the ordinary course and to use its reasonable best efforts to preserve its material organization and material permits, retain its current officers and key employees, and preserve its relationships with its key customers and suppliers;

- Subject to the written consent of all other parties to the Business Combination Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), as set forth in the applicable Disclosure Schedule, as expressly contemplated or permitted in the Business Combination Agreement or as required by applicable law or contract (in existence on the date of the Business Combination Agreement), prior to the earlier of (i) the effective time of the Business Combination or (ii) the termination of the Business Combination Agreement in accordance with its terms, SourceHOV and Novitex will not, and will not permit their respective subsidiaries (each of SourceHOV and Novitex and their respective subsidiaries, a "Company Group"), to:

  - except as required by changes in GAAP, change any member of the Company Group's methods of accounting in any manner that would have material impact on the Company Group respectively;

  - transfer, issue, sell or otherwise dispose of any shares of capital stock or any other equity interest of any member of the Company Group, grant options, warrants, calls or other rights to purchase or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any shares of the capital stock or other equity interests of any member of the Company Group;

  - effect any recapitalization, reclassification, stock split, stock combination, or like change in the capitalization of the Company Group;

  - make, set aside, declare or pay any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock or other equity interest in the Company Group, other than dividends and distributions by any member of the Company Group to another member of the Company Group;

128

Supp.App. 0494

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 497 of 1110    PageID 2118

- (A) incur, create or assume any indebtedness or guarantee any indebtedness of another person, issue or sell any debt securities (or warrants or other rights to acquire any debt securities) of any member of the Company Group (other than incurrence of Indebtedness under any of the Company Group's respective credit facilities entered into prior to the date of the Business Combination Agreement, including draws on the Company Group's revolving credit facility and other than loans, advances or capital contributions made by one member of the Company Group to another member of the Company Group) in excess of $500,000 individually or $5,000,000 in the aggregate (in each case, in excess of indebtedness paid off after the date of the Business Combination Agreement) other than indebtedness required to be incurred under any contract in existence on the date hereof or incurred in the ordinary course of business, or (B) make any loans, advances or capital contributions to, or investments in, any other person (other than loans, advances or capital contributions made by one member of the Company Group to another member of the Company Group);

- amend the certificate of incorporation or bylaws (or other comparable governing documents) of any member of the Company Group;

- grant any material encumbrances on any property or assets (whether tangible or intangible) of any member of the Company Group having an aggregate value in excess of $2,500,000, other than provided in the Business Combination Agreement;

- except in the ordinary course of the Company Group's business, (A) adopt, enter into, terminate or amend any benefit plan other than as required by applicable law or pursuant to the terms of any benefit plan in effect as of the date of the Business Combination Agreement, (B) recognize any union or employee representative for purposes of collective bargaining or negotiate or enter into any collective bargaining agreement, works council agreement, labor union contract, trade union agreement or other similar agreement or understanding with any union, works council, trade union or other labor organization other than as required by applicable law, (C) waive any restrictive covenant obligation of any director, officer, service provider or employee of any member of the Company Group, (D) pay or agree to pay to any director, officer or employee, consultant, agent or individual independent contractor, whether past or present, any pension, retirement allowance or other employee benefit not required by any existing benefit plan (or any arrangement that would be a benefit plan if in effect as of the date hereof), or (E) take any action to accelerate the vesting, funding or payment of any compensation or benefits under any benefit plans;

- (A) grant any increase in the compensation, incentives or benefits payable or to become payable to any person who is a director or executive officer of any member of the Company Group as of the date of the Business Combination Agreement, or (B) enter into any new, or materially amend any existing material employment or severance or termination agreement with any director or executive officer other than with respect to new hires;

- make, change or revoke any material tax election; file any material amendment to any income tax return; adopt or change any accounting method in respect of taxes; change any annual tax accounting period; enter into any material tax allocation agreement, tax sharing agreement or tax indemnity agreement, other than commercial contracts entered into in the ordinary course of business a primary purpose of which is not related to taxes with vendors, customers or landlords; enter into any closing agreement with respect to any tax; settle or compromise any claim, notice, audit report or assessment in respect of material taxes; apply for or enter into any ruling from any tax authority with respect to taxes; surrender any right to claim a material tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any material tax claim or assessment;

129

Supp.App. 0495

- except in the ordinary course of the Company Group's business, transfer, sell, lease or license to a third party, abandon, permit to lapse or expire, dedicate to the public, or otherwise dispose of, or agree to transfer, sell, lease or license to a third party, abandon, permit to lapse or expire, dedicate to public, or otherwise dispose of, any portion of the property or assets of any member of the Company Group, other than any sale, lease or disposition in the ordinary course of business or pursuant to agreements existing on the date of the Business Combination Agreement and set forth in the applicable Disclosure Schedule;

- (a) merge, consolidate, combine or amalgamate with any person, (b) purchase or otherwise acquire (whether by merging or consolidating with, purchasing any equity interest in or a substantial portion of the assets of, or by any other manner) any business or any corporation, partnership, association or other business organization or division thereof, or (c) purchase or otherwise acquire, or lease or license, any property or assets, other than (i) acquisitions of equipment or inventory in the ordinary course of business or (ii) transactions as to which the aggregate consideration paid or payable (A) in any individual transaction is not in excess of $2,500,000 or (B) in the aggregate is not in excess of $10,000,000;

- except in the ordinary course of the Company Group's business, enter into any joint venture with a third party;

- authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution;

- enter into, renew, modify or revise any contract with any related person of any member of the Company Group, other than contracts among members of the Company Group, or with any former or present director or officer of any member of the Company Group or with any affiliates of the foregoing persons (including the Company Group) or any other person covered under Item 404 of Regulation S-K under the Securities Act;

- except in the ordinary course of the Company Group's business, use its reasonable best efforts to maintain with financially responsible insurance companies insurance at least in such amounts and against at least such risk and losses as are consistent in all material respects with such entities' past practices;

- waive, release, assign, settle or compromise any action pending or threatened against any member of the Company Group or any of their respective directors or officers other than in the case of actions or claims either (A) (i) for an amount not greater than $500,000 individually (including any single or aggregated claims arising out of the same or similar facts, events or circumstances) or $1,000,000 in the aggregate (determined in each case net of insurance proceeds) and (ii) would not prohibit or materially restrict any member of the Company Group from operating its business substantially as currently conducted or anticipated to be conducted, except in the ordinary course of the Company Group's business, or (B) if the loss resulting from such waiver, release, assignment settlement or compromise is reimbursed or shall be reimbursed to any member of the Company Group by an insurance policy or pursuant to any other kind of contractual indemnification set forth in any other contract, in each case without the imposition of equitable relief on, or the admission of wrongdoing by any member of the Company Group or any of its officers or directors;

- except in the ordinary course of the Company Group's business, amend or modify in any manner materially adverse to any member of the Company Group any material contracts;

130

Supp.App. 0496

- except in the ordinary course of the Company Group's business, make or enter into any contract to make any capital expenditures in excess of $1,000,000 other than capital expenditures made in the ordinary course of the Company Group business if such capital expenditures are made to acquire equipment to satisfy requirements in contracts with customers;

- except in the ordinary course of the Company Group's business, manage its working capital (including the timing of collection of accounts receivable and of the payment of accounts payable and the management of inventory);

- engage in any activity that would result in a violation of certain laws related to international trade matters;

- conduct a mass termination or engage in any other activity that would trigger notice obligations or liability under the Worker Adjustment and Retraining Notification Act or any similar applicable law; or

- authorize, or commit or agree to take, any of the foregoing.

- From and after the date of the Business Combination Agreement until the earlier of the closing and the termination of the Business Combination Agreement in accordance with its terms, Novitex and SourceHOV shall, and shall cause their respective subsidiaries to, afford to the other parties to the Business Combination Agreement and their representatives reasonable access, upon reasonable advance notice, during normal business hours to all the senior management, properties, books, contracts, commitments, tax returns and records and, during such period, shall furnish as promptly as practicable to the other parties to the Business Combination Agreement any information concerning such company as the other parties to the Business Combination Agreement may reasonably request.

- SourceHOV and Novitex will promptly provide Quinpario with all information concerning each member of the Company Group and the management, operations and financial condition of each member of the Company Group, in each case, as reasonably requested by the Company for inclusion in this proxy statement and cause the officers and employees of each member of the Company Group to be reasonably available to the Company and its counsel in connection with drafting this proxy statement and responding in a timely manner to comments on this proxy statement from the SEC.

- As soon as reasonably practicable following the date of the Business Combination Agreement, but in no event later than 5 business days prior to the closing, Novitex will use commercially reasonable efforts to obtain waivers of any "parachute payments" (within the meaning of Section 280G of the Code and the regulations promulgated thereunder). Following the execution of the waivers, Novitex will solicit the approval of the stockholders of Novitex to the extent required under Section 280G(b)(5)(B) of the Code and will deliver to the Company and SourceHOV evidence of the solicitation of the vote.

- Effective upon and following the closing, the HGM Group, on its own behalf and on behalf of SourceHOV and each of their respective affiliates and representatives, will generally, irrevocably, unconditionally and completely release and forever discharge Novitex Parent, Novitex and each of their respective affiliates and each of their and their respective affiliates' respective related parties, and each of their respective successors and assigns and each of their respective related parties from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any of Novitex Parent or Novitex occurring prior to the closing of the Business Combination, except as otherwise contemplated by the Business Combination Agreement,

131

Supp.App. 0497

including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-closing actions or failures to act by the aforementioned released parties.

• Effective upon and following the closing, Novitex Parent, on its own behalf and on behalf of Novitex and each of their respective affiliates and representatives, will generally, irrevocably, unconditionally and completely release and forever discharge the HGM Group, SourceHOV and each of their respective affiliates and each of their and their respective affiliates' respective related parties, and each of their respective successors and assigns and each of their respective related parties from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any of the HGM Group or SourceHOV occurring prior to the closing of the Business Combination, except as otherwise contemplated by the Business Combination Agreement, including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-closing actions or failures to act by the aforementioned released parties.

*Covenants of Quinpario, the SourceHOV Surviving Company and the Novitex Surviving Company*

Quinpario made certain covenants under the Business Combination Agreement, including, among others, the following:

• Subject to the written consent of all parties to the Business Combination Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), as set forth in the applicable Disclosure Schedules, as expressly contemplated or permitted in the Business Combination Agreement or as required by applicable law or contract (in existence on the date of the Business Combination Agreement), prior to the earlier of (i) the effective time of the Business Combination and (ii) the termination of the Business Combination Agreement in accordance with its terms, Quinpario will not, and will not permit any subsidiary, to:

  • form any subsidiary;

  • issue any shares of capital stock or other equity interests or grant options, warrants, calls or other rights to purchase or otherwise acquire shares of the capital stock or other equity interests of Quinpario;

  • effect any recapitalization, reclassification, stock split or like change in the capitalization of the Quinpario or any subsidiary;

  • make, set aside, declare or pay any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock;

  • except for any indebtedness incurred in connection with the Debt Financing, incur any indebtedness or guarantee any indebtedness of another person, issue or sell any debt securities (or warrants or other rights to acquire any debt securities);

  • make any loans, advances or capital contributions to any other person;

  • amend its certificate of incorporation or bylaws (or other comparable governing documents);

  • grant any material encumbrances on any property or assets (whether tangible or intangible) of Quinpario;

  • (A) adopt, enter into, terminate or amend any benefit plan other than as required by applicable law or pursuant to the terms of any benefit plan in effect as of the date of the Business Combination Agreement or (B) increase the compensation of any person who is a director or executive officer of Quinpario;

132

Table of Contents

- except as required by changes in GAAP, change any of its methods of accounting in any manner;

- make, change or revoke any material tax election; file any material amendment to any income tax return; adopt or change any accounting method in respect of taxes; change any annual tax accounting period; enter into any material tax allocation agreement, tax sharing agreement or tax indemnity agreement, other than commercial contracts entered into in the ordinary course of business a primary purpose of which is not related to taxes with vendors, customers or landlords; enter into any closing agreement with respect to any tax; settle or compromise any claim, notice, audit report or assessment in respect of material taxes; apply for or enter into any ruling from any tax authority with respect to taxes; surrender any right to claim a material tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any material tax claim or assessment;

- purchase or otherwise acquire (whether by merger or otherwise), or lease or license, any property or assets;

- enter into any joint venture with a third party;

- except in the ordinary course of Quinpario's operations or as is reasonably necessary in connection with the transactions contemplated by the Business Combination Agreement, enter into, renew, modify or revise any contract;

- enter into any transactions with any of its affiliates;

- waive, release, assign, settle or compromise any material action pending or threatened against the Company or any of its directors or officers other than in the case of actions or claims either (i) for an amount not greater than $500,000 individually (including any single or aggregated claims arising out of the same or similar facts, events or circumstances) or $1,000,000 in the aggregate (determined in each case net of insurance proceeds) or (ii) if the loss resulting from such waiver, release, assignment settlement or compromise is reimbursed to Quinpario or one of its subsidiaries by an insurance policy, in each case without the imposition of equitable relief on, or the admission of wrongdoing by Quinpario or such subsidiary or any of its officers or directors;

- engage in any activity that would result in a violation of international trade control laws; or

- authorize or commit or agree to take, any of the foregoing.

- As of the closing date, Quinpario will, and will cause one of its subsidiaries to, continue to employ each person employed by SourceHOV, Novitex or any of their respective subsidiaries as of the closing date, including those on vacation, sick leave, maternity leave, military service, lay-off, disability or other approved leave of absence, and will provide such employees, from closing and until December 31, 2017, with compensation and benefits that are, at Quinpario's discretion, substantially similar in the aggregate to either (x) those provided to the employees immediately prior to the closing date, or (y) those provided to similarly situated employees of Quinpario and its subsidiaries from time to time after the closing. Quinpario will, and will cause one of its subsidiaries to, use commercially reasonable efforts to provide that each employee shall be immediately eligible to participate, without any waiting time, and service accrued by the employees during employment with any member of each Company Group or their predecessors prior to closing date shall be recognized for all purposes, except to the extent necessary to prevent duplication of benefits.

- Quinpario will not, and will cause their respective representatives not to, directly or indirectly, (i) enter into, solicit, initiate or continue any discussions or negotiations with, or knowingly encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with, any person or other entity

133

Supp.App. 0499

or group, concerning any business combination proposal, (ii) enter into any agreement regarding, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any person any information with respect to, or cooperate in any way that would otherwise reasonably be expected to lead to, any business combination proposal or (iii) commence, continue or renew any due diligence investigation regarding any business combination proposal. Quinpario will, and will cause each of its affiliates and their respective representatives to, immediately cease any and all existing discussions or negotiations with any person conducted heretofore with respect to any business combination proposal. If Quinpario, its affiliates or any of their respective representatives receives any inquiry or proposal with respect to a business combination proposal at any time prior to the closing, then Quinpario will promptly (and in no event later than 24 hours after it becomes aware of such inquiry or proposal) (A) advise the Sellers' representative orally and in writing of such inquiry or proposal (including the identity of the person making such inquiry or submitting such proposal, and the terms thereof) and (B) provide the Sellers' representative a copy of such inquiry or proposal, if in writing.

- Upon satisfaction or waiver of the conditions to closing and upon notice to the trustee of the Trust Account, Quinpario will (i) cause the documents, opinions and notices required to be delivered to the trustee of the Trust Account pursuant to the trust agreement governing the Trust Account to be so delivered and (ii) use its commercially reasonable efforts to cause such trustee to, and such trustee shall thereupon be obligated to (A) pay all amounts due and payable to redeeming Quinpario stockholders and (B) immediately thereafter, pay all remaining amounts then available in the Trust Account to Quinpario, subject to the Business Combination Agreement and the trust agreement, after which the Trust Account will be terminated, except as otherwise provided in the Business Combination Agreement.

- Quinpario will, as soon as reasonably practicable, duly call, give notice of, convene and hold the a stockholders meeting for the sole purpose of seeking the Parent Stockholder Approvals (as defined in the Business Combination Agreement). Quinpario shall use its reasonable best efforts to (i) cause this proxy statement to be mailed to its stockholders and to hold the stockholders meeting as soon as reasonably practicable after the earlier of (A) clearance by the SEC of this proxy statement and (B) the conclusion of any SEC review of this proxy statement (including the conclusion of the 10-day review period for preliminary proxy statements under Rule 14a-6(a) under the Exchange Act without receipt of any SEC comments) and (ii) solicit the Parent Stockholder Approvals. Quinpario shall, through its board of directors, recommend to its stockholders that they give the Parent Stockholder Approvals and shall include such recommendation in this proxy statement. However, if on a date for which the stockholders meeting is scheduled, Quinpario has not received proxies representing a sufficient number of shares of the Quinpario Common Stock to obtain the Parent Stockholder Approvals, whether or not a quorum is present, Quinpario shall have the right to make one or more successive postponements or adjournments of the stockholders meeting, provided that (excluding any adjournments or postponements required by applicable law) the stockholders meeting is not postponed or adjourned to a date that is more than 30 days after the date for which the stockholders meeting was originally scheduled (excluding any adjournments or postponements required by applicable law).

- Quinpario, as sole stockholder of Novitex Merger Sub and SourceHOV Merger Sub, will approve the Business Combination Agreement.

- Quinpario will take any other action (other than qualifying to do business in any jurisdiction in which it is not now so qualified) required to be taken under the Securities Act, the Exchange Act, any applicable state securities or "blue sky" laws and the rules and regulations thereunder in connection with the transactions contemplated by the Business Combination Agreement. In connection with this proxy statement, Quinpario will also file with the SEC financial and other information about the transactions contemplated by the Business Combination Agreement in

134

Supp.App. 0500

Table of Contents

accordance with applicable proxy solicitation rules set forth in Quinpario's certificate of incorporation and bylaws and the rules and regulations of the SEC and Nasdaq.

- Prior to closing, Quinpario will obtain irrevocable resignations from all current directors on the board of directors of Quinpario and will appoint the nominees of SourceHOV and Novitex Parent, in each case effective as of closing.

- Quinpario will use its reasonable best efforts to cause the shares of Quinpario Common Stock constituting the consideration for the SourceHOV Merger and the Novitex Merger to be approved for listing on Nasdaq as promptly as practicable following the issuance thereof, subject to official notice of issuance, prior to the closing. From the date of the Business Combination Agreement through the closing, Quinpario will keep current and timely file all of its public filings with the SEC and otherwise comply in all material respects with applicable securities laws, and, if Quinpario receives any written or, to the knowledge of Quinpario, oral notice from Nasdaq that Quinpario has failed, or would reasonably be expected to fail, to meet the Nasdaq listing requirements as of the closing or within six months thereafter for any reason, then Quinpario shall give prompt written notice of such Nasdaq notice to Novitex or SourceHOV, including a copy of any written notice received from Nasdaq or a summary of any oral notice received from Nasdaq.

- Prior to the closing, the Quinpario board of directors, or an appropriate committee of non-employee directors thereof, will adopt a resolution consistent with the interpretive guidance of the SEC so that the acquisition of Quinpario Common Stock, in each case, pursuant to the Business Combination Agreement, the PIPE Investment and the other transaction documents by any officer, director or shareholder (by reason of "director by deputization") of Novitex or SourceHOV or their subsidiaries who is expected to become a "covered person" of Quinpario for purposes of Section 16 of the Exchange Act and the rules and regulations thereunder will be an exempt transaction for purposes of Section 16 of the Exchange Act.

- Effective upon and following the closing, Quinpario, on its own behalf and on behalf of SourceHOV and Novitex and each of their respective affiliates and representatives, will generally, irrevocably, unconditionally and completely release and forever discharge each Seller, each of their respective affiliates and each of their and their respective affiliates' respective related parties, and each of their respective successors and assigns and each of their respective related parties from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any of Novitex or SourceHOV occurring prior to the closing of the Business Combination, except as otherwise contemplated by the Business Combination Agreement, including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-closing actions or failures to act by the aforementioned released parties.

- Prior to the Closing Date, Quinpario shall (i) form a new Delaware limited liability company that will be a wholly-owned Subsidiary ("Intermediate Co"), (ii) form a new Delaware corporation that will be a wholly-owned Subsidiary ("Co-Issuer"), (iii) contribute 100% of the equity interests of Co-Issuer to Intermediate Co, (iv) form a new Delaware limited liability company that will be a wholly-owned Subsidiary ("Parent LLC"), (v) contribute 100% of the equity interests of Intermediate Co to Parent LLC, (vi) contribute 100% of the equity interests of Novitex Merger Sub and SourceHOV Merger Sub to Intermediate Co, (vii) cause Intermediate Co (or any applicable board of directors or other governing body or committee of Intermediate Co, if necessary) to adopt and approve the Business Combination Agreement, the SourceHOV Merger, the Novitex Merger and the other transactions contemplated in the Business Combination Agreement as the sole shareholder of Novitex Merger Sub and SourceHOV Merger Sub, as of the Closing Date (the "Intermediate Co Consent") within 24 hours of the formation of Intermediate Co and (viii) not permit Intermediate Co to engage

135

in any business, incur any liabilities, acquire any assets or properties or enter into any contract other than the transactions contemplated by the Business Combination Agreement, including the transactions related to the Debt Financing. Intermediate Co, Co-Issuer and Parent LLC were formed on June 7, 2017.

- The HGM Group shall deliver the HGM Consent (as defined in the Business Combination Agreement) to Quinpario and Novitex Parent within two hours after the execution and delivery of the Business Combination Agreement. The HGM Group shall deliver the consent to the Modification Agreement within 2 hours of the execution of the Modification Agreement. Novitex Parent shall deliver the Novitex Consent to Quinpario and the HGM Group within two hours after the execution and delivery of the Business Combination Agreement. Quinpario shall deliver the Novitex Parent Consent and the SourceHOV Parent Consent to Sellers and the Companies within two hours after the execution and delivery of the Business Combination Agreement; the actions required by this covenant took place in accordance with the Business Combination Agreement prior to the date of this proxy statement.

- Quinpario will use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to enter into one or more subscription agreements on terms and conditions no less favorable those set forth in Exhibit E of the Business Combination Agreement and any material terms not provided for in Exhibit E of the Business Combination Agreement shall be subject to the approval of each of the Sellers, such approval not to be unreasonably withheld, conditioned or delayed. SourceHOV, Novitex and the Sellers shall cooperate and provide assistance and information as reasonably requested by Quinpario in connection with soliciting interest in, negotiating and entering into any subscription agreements. Quinpario will provide each Seller with a reasonable opportunity to review and comment on each subscription agreement prior to entering into such subscription agreement. Once any subscription agreement has been executed, Quinpario shall use commercially reasonable efforts to (i) satisfy in all material respects on a timely basis all conditions and covenants applicable to Quinpario in such subscription agreement and otherwise comply with its obligations thereunder, (ii) in the event that all conditions in such subscription agreement has been satisfied, consummate the transactions contemplated by such subscription agreement at or prior to closing and (iii) enforce its rights under such subscription agreement in the event that all conditions in such subscription agreement has been satisfied, to cause the applicable PIPE Investor(s) to contribute to Quinpario the applicable portion of the PIPE Investment set forth in such subscription agreements at or prior to the closing. Without limiting the generality of the foregoing, Quinpario shall give the Sellers prompt written notice: (A) of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could give rise to any breach or default) by Quinpario and, to the knowledge of Quinpario, any counterparty to any subscription agreement; (B) of the receipt of any written notice or other written communication from any party to any subscription agreement with respect to any actual, potential or claimed expiration, lapse, withdrawal, breach, default, termination or repudiation by any party to any subscription agreement or any provisions of any subscription agreement and (C) if the Company concludes that it does not expect to receive all or any portion of the PIPE Investment on the terms, in the manner or from the sources contemplated by the subscription agreements. The subscription agreements shall contain all of the conditions precedent to the obligations of the PIPE Investors to contribute to Quinpario the applicable portion of the PIPE Investment set forth in the subscription agreements on the terms therein. Quinpario will not enter into any amendments, supplements, side letters, contracts or any other arrangement with respect to the PIPE Investment without the prior written consent of each Seller. Pursuant to the Modification Agreement, each of Parent, Novitex Merger Sub, SourceHOV Merger Sub, SourceHOV and the Sellers agreed that they have entered into subscription agreements as of the date of the Modification Agreement on terms and conditions mutually agreed to by the parties.

136

Supp.App. 0502

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 505 of 1110     PageID 2126

*Covenants of the Sellers*

- As soon as practicable after the date of the Business Combination Agreement, the Sellers will cause SourceHOV and Novitex, as applicable, to submit to the United States Defense Security Service ("DSS") and, to the extent applicable, any other governmental authority, a notification of the transfer of ownership contemplated hereby, in accordance with the National Industrial Security Program Operating Manual (DoD 5220.22-M) ("NISPOM"), and any other applicable national or industrial security regulations (the "DSS Notification").

- Prior to the earlier of (i) the closing of the Business Combination and (ii) the termination of the Business Combination Agreement, the Sellers will not, and will cause SourceHOV and Novitex and their respective representatives not to, directly or indirectly, (i) enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with, any person or other entity or group, concerning any sale of any material assets of Novitex or SourceHOV or any of the outstanding SourceHOV and Novitex securities or any conversion, consolidation, liquidation, dissolution or similar transaction involving SourceHOV and Novitex, other than with Quinpario and its representatives, (ii) enter into any agreement regarding, continue or otherwise participate in any discussions regarding, or furnish to any person any information with respect to, or cooperate in any way that would otherwise reasonably be expected to lead to, any such alternative transaction or (iii) commence, continue or renew any due diligence investigation regarding any such alternative transaction. The Sellers will, and will cause their representatives, to immediately cease any and all existing discussions or negotiations with any person conducted heretofore with respect to any alternative transaction. If the Sellers, Novitex or SourceHOV, or any of their respective representatives receives any inquiry or proposal with respect to an alternative transaction at any time prior to the closing, then the Sellers shall promptly (and in no event later than 24 hours after the Sellers become aware of such inquiry or proposal) notify such person in writing that Sellers are subject to an exclusivity agreement with respect to the sale of SourceHOV and Novitex that prohibits them from considering such inquiry or proposal.

- At the closing, Apollo Novitex Holdings, L.P. will cause all agreements between it or any of its affiliates and any member of the Novitex Company Group, including the Apollo Consulting Agreement (as defined in the Business Combination Agreement), to be terminated without any further liability except that any fees and expenses which were accrued and unpaid pursuant to the terms of the Apollo Consulting Agreement through the closing date and the rights to indemnification set forth therein shall survive any such termination in accordance with their terms, except as set forth in the Disclosure Schedules or entered into in compliance with the Business Combination Agreement prior to the closing.

- At the closing, the HGM Group shall cause the SourceHOV Consulting Agreement (as defined in the Business Combination Agreement) and any other agreements between any member of the HGM Group or any affiliate of any member of the HGM Group other than certain contracts to be terminated without any further liability except that the party designated in writing by the HGM Group at least two business days prior to the closing shall be entitled to a $10,000,000 payment (such payment, the "Consulting Agreement Termination Fee"), any accrued and unpaid management fees and expenses and the rights to indemnification set forth therein. Quinpario and HGM Group entered into a subscription agreement in connection with the PIPE Investment, pursuant to which Quinpario and HGM Group agreed that the Consulting Agreement Termination Fee would be used by HGM Group to purchase shares of Quinpario Common Stock.

- At the closing, the members of the HGM Group shall cause the Restated Stockholder Agreement, dated as of April 30, 2013, as amended, among SourceHOV and the equity holders

137

Supp.App. 0503

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 506 of 1110 PageID 2127

Table of Contents

of SourceHOV to be terminated without any further liability or obligation in accordance with the terms hereof.

- Effective upon and following the closing, each Seller, on its own behalf and on behalf of each of their respective affiliates and representatives, will generally, irrevocably, unconditionally and completely release and forever discharge Quinpario, SourceHOV and Novitex, each of their respective affiliates and each of their and their respective affiliates' respective related parties, and each of their respective successors and assigns and each of their respective related parties from any disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any of Novitex or SourceHOV occurring prior to the closing of the Business Combination, except as otherwise contemplated by the Business Combination Agreement.

*Mutual Covenants*

- Quinpario, SourceHOV and Novitex will reasonably cooperate in matters regarding the publicity of the Business Combination and the creation and implementation of a communications plans.

- From the date of the Business Combination Agreement until closing, Quinpario, SourceHOV and Novitex will be subject to the terms and conditions of confidentiality agreements, and will remain subject to certain continuing obligations of confidentiality regarding disclosure and use of confidential information not related to Novitex or SourceHOV or their respective businesses.

- Each of the parties to the Business Combination Agreement and their respective affiliates will use all reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable law or otherwise to consummate and make effective the transactions contemplated by the Business Combination Agreement as promptly as practicable, including to obtain from any governmental authority with regulatory jurisdiction over enforcement of any applicable antitrust laws, all authorizations, consents, notifications, certifications, registrations, declarations and filings as are necessary for the consummation of the transactions contemplated by the Business Combination Agreement.

- All costs and expenses incurred in connection with the Business Combination Agreement and the Related Documents (as defined in the Business Combination Agreement) and the transactions contemplated therein shall be paid (i) in the case of SourceHOV and the HGM Group, by SourceHOV and (ii) in the case of Novitex and Apollo, by Novitex and (iii) in the case of Quinpario, by Quinpario other than as provided for below. Quinpario shall pay any and all filing fees required by governmental authorities, including with respect to permits required in connection with the execution and delivery of the Business Combination Agreement, the performance of the obligations thereunder, including filing, printer, mailing and printing fees in connection with this proxy statement or any other SEC filings and filings under the HSR Act or other antitrust laws or any filing, printer, mailing and printing fees as required in connection with the Financing (all of the foregoing, collectively, the "Transaction Costs"), in an aggregate amount not to exceed $250,000 (the "Cap"). SourceHOV, Novitex and Quinpario shall each be responsible for one-third of any Transaction Costs in excess of the Cap until Quinpario shall have paid in the aggregate $450,000 of Transaction Costs and from and after such time, SourceHOV and Novitex shall each be responsible for one-half of any remaining Transaction Costs incurred by Quinpario. To the extent Quinpario needs to remit payment in connection with any of the Transaction Costs for which the other parties are also responsible, SourceHOV and Novitex shall as promptly as practicable (but in no case more than five business days) following receipt of evidence of payment, reimburse Quinpario for their allocable share.

- The Company, the SourceHOV Surviving Company and the Novitex Surviving Company will, and will cause the members of each Company Group, to the fullest extent permitted under applicable law, indemnify and hold harmless (and advance funds in respect of each of the

138

Supp.App. 0504

Table of Contents

foregoing, following receipt of any undertakings required by applicable Law) each of the indemnified persons (as identified in the Business Combination Agreement to include directors and officers) against any liabilities, losses, penalties, fines, claims, damages, reasonable out-of-pocket costs or expenses in connection with any actual or threatened, in writing, action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred in such indemnified person's capacity as a director or officer of any member of the Company Group, or in such indemnified person's capacity as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request or for the benefit of any member of the Company Group, before the closing date, and will reasonably cooperate with the indemnified person in the defense of any such action.

- The Company will cause the SourceHOV Surviving Company and the Novitex Surviving Company, for a period of six years from the closing date, maintain and fully pay for directors' and officers' liability insurance covering (as direct beneficiaries) all indemnified persons, in each case of the type and with the amount of coverage no less favorable than those of the directors' and officers' liability insurance maintained as of the date of the Business Combination Agreement by, or for the benefit of, the Company Group, and with such other terms as are no less favorable than those in such policies, subject to the limitations provided in the Business Combination Agreement.

- The parties to the Business Combination Agreement will use their reasonable best efforts to make all pre-merger notification filings required under the HSR Act promptly. Subject to the confidentiality agreements, the parties to the Business Combination Agreement will coordinate and cooperate fully with each other and shall furnish to the other such necessary information and reasonable assistance as the other may reasonably request in connection with its preparation of any filings under the HSR Act. The parties to the Business Combination Agreement will each use its reasonable best efforts to respond to and comply with any request for information from any antitrust authority, including the Antitrust Division of the U.S. Department of Justice and the U.S. Federal Trade Commission and will use its reasonable best efforts to prevent the entry in any legal proceeding brought by an antitrust authority or any other governmental entity of an order that would prohibit, make unlawful or delay the consummation of the Business Combination. Notwithstanding the foregoing, no party nor any of its affiliates shall be required to (i) divest or hold separate, or enter into any licensing or similar arrangement with respect to, any assets or any portion of the business of any party or to otherwise propose, proffer or agree to any other requirement, obligation, condition or restriction on the conduct of the business of any party, or (ii) to litigate any suit, claim, action, investigation or proceeding challenging or seeking to restrain or prohibit the consummation of the transaction.

- SourceHOV and Novitex, and the Sellers will fully cooperate with Quinpario in preparing the DSS Notification, any other submissions to the United States Defense Security Service required by the National Industrial Security Program Operating Manual, and negotiating a Foreign Ownership Control or Influence mitigation arrangement with the United States Defense Security Service for the continuation of all necessary U.S. government facility security clearances. SourceHOV and Novitex, the Sellers and Quinpario shall use their commercially reasonable efforts to obtain such approvals, as promptly as practicable.

- Quinpario, SourceHOV and Novitex will use their commercially reasonable best efforts to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to arrange and obtain the Debt Financing on the terms and conditions described in the Commitment Letter and any related fee letter, subject to the limitations provided in the Business Combination Agreement.

139

Supp.App. 0505

Table of Contents

- If the Commitment Letter shall be terminated for any reason, or if any portion of the Debt Financing becomes unavailable on the terms and conditions (including any "flex" provisions) contemplated in the Commitment Letter, each of Quinpario, SourceHOV and Novitex will use their commercially reasonable best efforts to arrange for Quinpario to obtain alternative financing from alternative sources on terms and conditions not less favorable to Quinpario, or Novitex or SourceHOV than those set forth in the Commitment Letter and the related fee letter (including any "flex" provisions) and in an amount at least equal to the Debt Financing or such unavailable portion thereof, as the case may be, and to obtain a new financing commitment letter with respect to such alternate financing, which shall replace the existing Commitment Letter, a true and complete copy of which (together with any related fee or other letter) will be promptly provided to SourceHOV and Novitex.

- Quinpario, SourceHOV and Novitex will use their commercially reasonable best efforts to provide such cooperation as customary for financings of the type contemplated by the Commitment Letter, except as otherwise contemplated by the Business Combination Agreement.

- Quinpario, SourceHOV and Novitex will, and will cause its respective subsidiaries to, use commercially reasonable efforts to periodically update any information required to be provided in connection with the Debt Financing as may be necessary so that such required information is compliant. Quinpario agrees to (i) file all reports on Form 10-K and Form 10-Q and Form 8-K, to the extent required to include financial information pursuant to Item 9.01 thereof, and (ii) use commercially reasonable efforts to file all other Forms 8-K, in each case, required to be filed with the SEC pursuant to the Exchange Act prior to the closing in accordance with the time periods required by the Exchange Act. In addition, if, in connection with a marketing effort contemplated by the Debt Financing, Novitex or SourceHOV reasonably requests Quinpario to file a current report on Form 8-K pursuant to the Exchange Act that contains material non-public information with respect to Quinpario and its subsidiaries, which Novitex or SourceHOV reasonably determines to include in a customary offering memorandum for the Debt Financing, then, upon Quinpario's review of and reasonable satisfaction with such filing, Quinpario will file such current report on Form 8-K.

- Quinpario, SourceHOV and Novitex, SourceHOV Merger Sub and Novitex Merger Sub will use their reasonable best efforts to cause each of the Mergers to qualify as a "reorganization" under Section 368(a) of the Code and will not take any tax reporting position inconsistent with the treatment of each of the Mergers as such.

- Each Quinpario, SourceHOV and Novitex will use their commercially reasonable efforts to cause the lenders and any other persons providing the Debt Financing to fund on the closing date the Debt Financing required to consummate the transactions contemplated by the Business Combination Agreement and the other transactions contemplated by the Commitment Letter.

- Quinpario, SourceHOV and Novitex will use reasonable best efforts to jointly prepare and cause to be filed with the SEC as promptly as reasonably practicable a preliminary proxy statement and Quinpario, SourceHOV and Novitex will use their respective reasonable best efforts to file a definitive proxy statement to be sent to the stockholders of Quinpario, and Quinpario, SourceHOV and Novitex shall use their respective reasonable best efforts to have the proxy statement mailed to stockholders of Quinpario as promptly as reasonably practicable after such filing. Each of SourceHOV, Novitex and Quinpario will furnish all information concerning such person and its affiliates to the other, and provide such other assistance, as may be reasonably requested in connection with the preparation, filing and distribution of the proxy statement or any registration statement, and the proxy statement and any registration statement shall include all information reasonably requested by such other party to be included therein. Each of SourceHOV, Novitex and Quinpario will promptly notify the other upon the receipt of any comments from the SEC or any request from the SEC for amendments or supplements to the

140

Supp.App. 0506

proxy statement and shall provide the other with copies of all correspondence between it and its representatives, on the one hand, and the SEC, on the other hand. Each of SourceHOV, Novitex and Quinpario will use its reasonable best efforts to respond as promptly as reasonably practicable to any comments from the SEC with respect to the proxy statement. Prior to filing or mailing the proxy statement (or any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, each of SourceHOV, Novitex and Quinpario (i) shall provide the other an opportunity to review and comment on such document or response (including the proposed final version of such document or response), (ii) shall include in such document or response all comments reasonably proposed by the other and (iii) shall not file or mail such document or respond to the SEC prior to receiving the approval of the other, which approval shall not be unreasonably withheld, conditioned or delayed.

- If prior to the closing, any event occurs with respect to Quinpario, or any change occurs with respect to other information supplied by Quinpario for inclusion in the proxy statement, which is required to be described in an amendment of, or a supplement to, the proxy statement, Quinpario shall promptly notify SourceHOV and Novitex of such event, and SourceHOV, Novitex and Quinpario shall cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the proxy statement and, as required by law, in disseminating the information contained in such amendment or supplement to the Quinpario's stockholders, and Novitex's and SourceHOV's stockholders.

- If prior to the closing, any event occurs with respect to SourceHOV and Novitex, or any change occurs with respect to other information supplied by Novitex or SourceHOV for inclusion in the proxy statement, which is required to be described in an amendment of, or a supplement to, the proxy statement, Novitex or SourceHOV will promptly notify Quinpario of such event, and SourceHOV, Novitex and Quinpario will cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the proxy statement and, as required by law, in disseminating the information contained in such amendment or supplement to Quinpario's stockholders and Novitex's and SourceHOV's equity holders.

- Immediately following the date of the Business Combination Agreement, the equity holders of Novitex Parent and the HGM Group and Quinpario will all cooperate in good faith to identify three independent directors for inclusion in the proxy statement. If the parties cannot agree on all or any of the nominees prior to the filing of the preliminary proxy statement, the equity holders of Novitex Parent and the HGM Group shall jointly select the nominees and provide to Quinpario the names and biographies of such nominees for inclusion in the proxy statement.

- SourceHOV, Novitex and the Sellers acknowledge that they have read the final prospectus of the Company, dated January 15, 2015, and understand that Quinpario has established the Trust Account for the benefit of its public stockholders and that it may disburse monies from the Trust Account only (a) to its public stockholders in the event they elect to have their shares redeemed in accordance with Quinpario's governing documents and/or the liquidation of Quinpario, (b) to Quinpario after, or concurrently with, the consummation of a Business Combination, (c) to Quinpario in limited amounts for its operating expenses and tax obligations incurred in the ordinary course of business, (d) as repayment of loans and reimbursement of expenses to directors, officers and founding stockholders of Quinpario and (e) to third parties (e.g., professionals, printers, etc.) who have rendered services to Quinpario in connection with its operations and efforts to effect a Business Combination. All liabilities and obligations of Quinpario due and owing or incurred at or prior to the closing will be paid as and when due, including all amounts payable (x) to Quinpario's public stockholders in the event they elect to have their shares redeemed in accordance with Quinpario's governing documents and/or the liquidation of Quinpario, (y) to Quinpario after, or concurrently with, the consummation of a Business Combination, and (z) to Quinpario in limited amounts for its operating expenses and tax obligations incurred in the ordinary course of business. SourceHOV, Novitex and Sellers

141

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 510 of 1110 PageID 2131

further acknowledge that, if the transactions contemplated by the Business Combination Agreement (or, upon termination of the Business Combination Agreement, another business combination) are not consummated by July 24, 2017, Quinpario will be obligated to return to its stockholders the amounts being held in the Trust Account, unless such date is otherwise extended. Upon the closing, Quinpario shall cause the Trust Account to be disbursed to it and as otherwise contemplated by the Business Combination Agreement. Accordingly, SourceHOV, Novitex and Sellers, for each of themselves and their respective subsidiaries, affiliated entities, directors, officers, employees, stockholders, representatives, advisors and all other associates and affiliates, hereby waive all rights, title, interest or claim of any kind to collect from the Trust Account any monies that may be owed to them by Quinpario for any reason whatsoever, including to a breach of the Business Combination Agreement by Quinpario or any negotiations, agreements or understandings with Quinpario (whether in the past, present or future), and will not seek recourse against the Trust Account at any time for any reason whatsoever, in each case except as expressly contemplated by the Business Combination Agreement.

### Survival of Representations and Warranties; Indemnification

The representations and warranties of the parties contained in the Business Combination Agreement do not survive the closing, except:

- Novitex's and SourceHOV's representations and warranties regarding no additional representations will survive indefinitely; and

- Quinpario's representations and warranties regarding no additional representations will survive indefinitely.

The covenants and agreements contained in the Business Combination Agreement that by their terms do not contemplate performance after the closing shall not survive the closing.

### Termination

The Business Combination Agreement may be terminated and the Business Combination may be abandoned any time prior to the closing, as follows:

- by mutual written consent of the Sellers, SourceHOV, Novitex and Quinpario;

- by either Seller, SourceHOV, Novitex or Quinpario, if the closing has not occurred prior to July 24, 2017 (other than as a result of the terminating party's failure to comply with its obligations under the Business Combination Agreement such that certain closing conditions are not satisfied);

- by Quinpario, upon written notice to each Seller and Novitex and SourceHOV, if either Novitex or SourceHOV breaches or fails to perform in any material respect any of its representations, warranties or covenants set forth in the Business Combination Agreement and such breach or failure to perform (i) would give rise to the failure of a condition to each party's obligations or to Quinpario's obligations to complete the Business Combination, (ii) cannot be or has not been cured within 30 days following delivery by Quinpario of written notice to Novitex or SourceHOV or the applicable Seller, as applicable of such breach or failure to perform and (iii) has not been waived by Quinpario;

- by either Seller, upon written notice to Quinpario and the other Seller, if Quinpario breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in the Business Combination Agreement and such breach or failure to perform (i) would give rise to the failure of a condition to each party's obligations or to the Seller's obligations to complete the Business Combination, (ii) cannot be or has not been cured within 30 days following delivery

142

Supp.App. 0508

Table of Contents

by Novitex or SourceHOV or the applicable Seller, as applicable, of written notice to Quinpario of such breach or failure to perform and (iii) has not been waived by each Seller;

• by the HGM Group, upon written notice to Quinpario and Novitex Parent, if Novitex Parent or Novitex breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in the Business Combination Agreement and such breach or failure to perform (i) would give rise to the failure of a condition to each party's obligations or to the HGM Group's obligations to complete the Business Combination, (ii) cannot be or has not been cured within 30 days following delivery by the HGM Group of written notice to Quinpario and Novitex Parent of such breach or failure to perform and (iii) has not been waived by Sellers;

• by Novitex Parent, upon written notice to Quinpario and the HGM Group, if the HGM Group or SourceHOV breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in the Business Combination Agreement and such breach or failure to perform (i) would give rise to the failure of a condition to each party's obligations or to Novitex Parent's obligations to complete the Business Combination, (ii) cannot be or has not been cured within 30 days following delivery by Novitex Parent of written notice to Quinpario and the HGM Group of such breach or failure to perform and (iii) has not been waived by each Seller;

• by either Seller, Novitex or SourceHOV, upon written notice to the other parties, if the Intermediate Co Consent is not delivered to them within 24 hours after the formation of Intermediate Co;

• by either Seller, Novitex, SourceHOV or Quinpario, upon written notice to the other parties, if the Quinpario stockholders do not approve the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal at the Quinpario stockholders meeting; or

• by either Quinpario or either Seller if there shall be in effect a final non-appealable law or injunction preventing the consummation of the transactions contemplated by the Business Combination Agreement; *provided* that neither Quinpario nor Sellers shall have the right to terminate the Business Combination pursuant to this provision if any action of such party or failure of such party to perform or comply with its obligations under the Business Combination Agreement shall have caused such law or injunction and such action or failure to perform constitutes a breach of the Business Combination Agreement.

In the event of termination of the Business Combination Agreement, the Business Combination Agreement will become null and void and of no further force and effect, except for obligations relating to (i) brokers and finders fees, (ii) confidentiality, (iii) certain financing related provisions, (iv) certain expense related provisions, (v) publicity, (vi) exclusivity, (vii) no claim against the trust amount and (viii) miscellaneous provisions of the Business Combination Agreement, including those related to governing law. However, no such termination will relieve any party to the Business Combination Agreement from any liability resulting from any intentional breach of the Business Combination Agreement.

### *Specific Performance*

The parties have agreed that irreparable damage would occur in the event that any of the provisions of the Business Combination Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of the Business Combination Agreement and the Related Documents and to enforce specifically the terms and provisions of the Business Combination Agreement and the Related Documents. The Sellers, SourceHOV and Novitex are entitled to seek specific performance of Quinpario's obligation to comply with certain obligations relating to the Debt Financing, but in no event shall the Sellers, Novitex or SourceHOV be entitled to seek specific

143

Supp.App. 0509

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 512 of 1110    PageID 2133

Table of Contents

performance of Quinpario's obligations to consummate the transactions contemplated by the Business Combination Agreement in the event that the lenders under the Commitment Letter have declined to fund the Debt Financing (or if alternate financing is being used, pursuant to a new commitment letter) at the closing.

### *Limitation on Damages*

No party will be liable for any consequential damages, including loss of revenue, income or profits, loss in value of assets, punitive, speculative, treble, remote, special or indirect damages, or loss of business reputation or opportunity relating to the breach of the Business Combination Agreement (except, in each case, to the extent asserted against a party (other than a source of the Debt Financing) by a third party).

### *Amendments*

The Business Combination Agreement may be amended by the parties at any time before the closing of the Business Combination, by an instrument in writing signed on behalf of each party other than the members of the HGM Group and holders of a majority of the shares of SourceHOV common stock held by the members of the HGM Group. Certain amendments may not be made if the impact is adverse to any financing source of the Debt Financing without the consent of such financing source. On June 15, 2017, the Business Combination Agreement was amended in order to, among other things, reflect certain restructuring transactions to be effected by the HGM Group and SourceHOV, including the formation of New SourceHOV LLC, in connection with the New SourceHOV Financing.

### *Description of the Modification Agreement*

On June 15, 2017, the parties to the Business Combination Agreement, as well as New SourceHOV LLC, entered into the Modification Agreement in order to amend certain provisions of the Business Combination Agreement. Prior to the closing of the transactions contemplated by the Business Combination Agreement, SourceHOV will enter into certain preliminary transactions following which New SourceHOV LLC will be the sole stockholder of SourceHOV upon the closing of the SourceHOV Merger under the Business Combination Agreement and New SourceHOV LLC will receive 80,600,00 shares of Quinpario Common Stock. In addition, SourceHOV will enter into a commitment letter pursuant to which certain lenders will provide financing, the net proceeds of which will be used by New SourceHOV LLC to purchase securities as part of the PIPE Investment in an amount up to $57.5 million (the "New SourceHOV Financing"). As the New SourceHOV Financing is being undertaken to facilitate consummation of the Business Combination Agreement, SourceHOV has agreed to pay the fees and expenses associated with the incurrence of the New SourceHOV Financing and the Company will pay certain expenses associated with the conversion of restricted equity awards in SourceHOV becoming restricted equity awards in New SourceHOV LLC. In addition, the Registration Rights Agreement was modified to provide New SourceHOV LLC with certain registration rights in connection with its PIPE Investment and the New SourceHOV Financing.

### The Registration Rights Agreement

At the closing of the Business Combination, the Company will enter into the Registration Rights Agreement, substantially in the form attached to this proxy statement as Annex E, with the Restricted Stockholders. Pursuant to the terms of the Registration Rights Agreement, the Restricted Stockholders will be bound by customary restrictions on the transfer of their Restricted Stock, including a restriction on transfer until six months following the date of the Registration Rights Agreement, except for certain permitted transfers, including: (i) as a *bona fide* gift; (ii) to any trust or entity wholly owned by one or more trusts for the direct or indirect benefit of (A) the Restricted Stockholder or its stockholders, partners, members or beneficiaries or (B) of any individual related to such Restricted Stockholder or to the stockholders, partners, members or beneficiaries of such Restricted Stockholder, by blood, marriage

144

Supp.App. 0510

Table of Contents

or adoption and not more remote than first cousin; (iii) if a Restricted Stockholder is a corporation, limited liability company, partnership or trust, such Restricted Stockholder may Transfer Restricted Shares to any wholly-owned subsidiary thereof, or to the affiliates, stockholders, partners, members or beneficiaries of such Restricted Stockholder; (iv) pursuant to any take-over bid, acquisition, sale or merger involving the Company; or (v) with the prior written consent of the Company and each other Restricted Stockholder; provided that in the case of clauses (i) through (v) such distributes or transferees agree to be bound by the same restrictions on transfer. The transfer restrictions in the Registration Rights Agreement do not apply to 3,016,071 of the Founder Shares to be retained upon consummation of the Business Combination in accordance with the Forfeiture Agreement, which Founder Shares shall be freely tradable pursuant to a registration statement providing for the resale thereof to be filed by Quinpario prior to the closing date of the Business Combination. In addition, the transfer restrictions do not apply to any transfer made by New SourceHOV LLC for the purpose of generating proceeds to repay the New SourceHOV Financing.

Upon the consummation of the Business Combination, the Restricted Stockholders and their permitted transferees will be entitled to certain registration rights described in the Registration Rights Agreement. Among other things, pursuant to the Registration Rights Agreement, the Sellers will each be entitled to participate in five demand registrations, and all Restricted Stockholders will also have certain "piggyback" registration rights with respect to registration statements filed subsequent to the Business Combination. In addition, New SourceHOV LLC will have the right to request up to three demand registrations for the purpose of generating proceeds to repay the New SourceHOV Financing. We will bear the expenses incurred in connection with the filing of any such registration statements, other than underwriting discounts and selling commissions.

### The Director Nomination Agreements

At the closing of the Business Combination, the Company will enter into a Director Nomination Agreement with each of the Sellers, substantially in the form attached to this proxy statement as Annex D, which will remain in effect for so long as the applicable Seller (or Seller's affiliate) continues to beneficially own at least 5% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock). The Director Nomination Agreements will require that the individuals nominated for election as directors by our board of directors shall include a number of individuals selected by each of the Sellers such that, upon the election of each such individual, and each other individual nominated by or at the direction of our board of directors or a duly-authorized committee of the board, as a director of our company, the individuals selected by each Seller (or Seller's affiliate) shall be: for so long as the applicable Seller beneficially owns at least 35% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), three directors; for so long as the applicable Seller beneficially owns at least 15%, but less than 35%, of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), two directors; and for so long as the applicable Seller (or Seller's affiliate) beneficially owns at least 5%, but less than 15%, of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), one director. In the case of a vacancy on our board of directors created by the removal or resignation of an individual selected for nomination by a Seller (or Seller's affiliate), the Director Nomination Agreements will require us to appoint another individual selected by the applicable Seller. The Director Nomination Agreement also provides for observation rights for each Seller (or Seller's Affiliate) to the extent that it has a right of nomination that it does not utilize. See "—*Board of Directors of Quinpario Following the Business Combination*."

In addition, the Director Nomination Agreements will provide that for so long as a Seller continues to beneficially own at least 15% of the then outstanding shares of Quinpario Common Stock

145

Supp.App. 0511

Table of Contents

(without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), we cannot, without the consent of such Seller, engage in certain related party transactions, adopt an equity incentive plan or amend the same to increase the number of securities that may be granted thereunder, issue certain equity securities, including with a fair market value of more than $100 million, amend our certificate of incorporation or bylaws in a manner that adversely affects such Seller's rights under the Director Nomination Agreement or has a disproportionate impact on the interests of such Seller, enter into certain new lines of business, or increase or decrease the size of the board of directors or change the classes on which the members of the board of directors serve. See "*Description of Securities—Consent Rights.*"

**The Forfeiture Agreement**

In connection with the execution of the Business Combination Agreement, certain of the Founders entered into the Forfeiture Agreement with the Sellers and have agreed to forfeit certain Founder Shares and Private Placement Warrants pursuant thereto. The number of shares of Quinpario Common Stock subject to such forfeiture at the closing of the Business Combination will be determined by such Founders and the Sellers at that time pursuant to a formula set forth in the Forfeiture Agreement. The number of Founder Shares to be forfeited is 716,429 shares and the number of Private Placement Warrants to be forfeited is 18,000,000. However, of the Founder Shares held by the Sponsor, the Sponsor may retain 8,033,571 of such Founder Shares. In addition, three parties will receive an interest in 6,133,571 of such retained Founder Shares as consideration for their respective roles in facilitating the Business Combination.

**Background of the Business Combination**

Quinpario is a blank check company formed on July 15, 2014 for the purpose of entering into a merger, stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. The Business Combination was the result of an extensive search for a potential transaction utilizing the global network and investing and operating experience of Quinpario's management team and board of directors. The terms of the Business Combination were the result of extensive negotiations between the representatives of Quinpario, SourceHOV, Novitex, the HGM Group and Novitex Parent. Conversations on behalf of Novitex Parent were conducted with representatives of Apollo, a majority shareholder of Novitex Parent.

On January 22, 2015, Quinpario completed its IPO of 35 million units, with each unit consisting of one share of Quinpario Common Stock and one warrant entitling the holder to purchase one-half of one share of Quinpario Common Stock at a price of $5.75 per half share commencing 30 days after the completion of an initial business combination. Simultaneous with the consummation of the IPO, Quinpario consummated the private placement of 18,000,000 warrants at a price of $0.50 per Private Placement Warrant, generating total proceeds of $9 million, which were purchased by the Sponsor.

From the date of the IPO through the execution of the Business Combination Agreement on February 21, 2017, Quinpario considered a number of potential target companies and potential merger parties with the objective of consummating an acquisition. Representatives of Quinpario and Quinpario Partners, contacted and were contacted by a number of individuals and entities who offered to present ideas for acquisition opportunities, including financial advisors and companies within the specialty chemicals, performance materials, and other industries. Quinpario compiled and periodically updated a list of high priority potential target companies.

146

Supp.App. 0512

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 515 of 1110    PageID 2136

Table of Contents

During that period, representatives of Quinpario:

- considered and conducted analysis of over 100 potential acquisition targets;

- participated in in-person or telephonic discussions with representatives of approximately 45 potential acquisition targets (other than SourceHOV and Novitex);

- entered into non-disclosure agreements with approximately 32 potential acquisition targets (other than SourceHOV and Novitex) or their representatives; and

- submitted indications of interest, letters of intent or conducted diligence with respect to approximately 29 potential acquisition targets (other than SourceHOV and Novitex).

Also during that period, Quinpario's board of directors held at least 12 meetings to discuss Quinpario's efforts to find a business combination transaction, among other matters. In addition, the board members regularly received status updates on information related to potential acquisition targets from Quinpario's senior management.

The efforts of Quinpario to find a business combination transaction progressed to the point that beginning in January 2015 and continuing until July 2016, Quinpario was engaged in detailed discussions, due diligence and negotiations with a small subset of target businesses, most of which were in the specialty chemicals and performance materials industries. These targets included: (i) a manufacture of adhesives and sealants ("Company A"); (ii) a building products company ("Company B"); (iii) a European-based company with a portfolio of various specialty chemical, performance materials and commodity companies ("Company C"); (iv) a manufacturer of acrylics and styrenics ("Company D"); and (v) a resins and chemicals division of a public company ("Company E").

After conducting detailed diligence and engaging in extensive negotiations with the target over the course of three months in early 2015 as part of an auction process, Company A decided to pursue a transaction with an alternative bidder. Quinpario submitted a bid for Company B as part of an auction process; however, in November 2015, a key stockholder of Company B determined that it was not willing to sell to Quinpario due to issues involved in completing a deal with a special purpose acquisition company. In February 2016, after making a bid to purchase Company C, Quinpario ended its discussions with Company C because the proposed valuation reflected in the bid was not acceptable to the seller. Quinpario terminated discussions with Company D in April 2016 because of fundamental disagreements with respect to the valuation of Company D and corporate governance issues. Quinpario submitted a bid for Company E in June 2016, but Company E did not accept the bid because of its alternative options and its concerns regarding certainty and timing of closing.

While Quinpario initially planned to seek an acquisition in the specialty chemicals and performance materials industries, it was not precluded from pursuing a business combination outside of these industries. Because of Quinpario's perception that sellers' valuation expectations in the specialty chemicals and performance materials industries were inflated and not supported by the public market and because the January 2017 deadline for consummating its initial business combination was approaching, beginning in July 2016, Quinpario began to pursue a number of targets in other industries that it considered to be highly interesting. Other than SourceHOV and Novitex, these targets included: (i) a grouping of several high-end shopping malls ("Company F"); (ii) a provider of specialty chemicals and value-added technical services ("Company G"); (iii) the combination of three separate oilfield services companies ("Company H"); and (iv) a grouping of approximately 150 suburban office buildings ("Company I").

After spending six months in discussions regarding Company F, Quinpario terminated the discussions in November 2016 concluding that a transaction with Company F was not likely to materialize. In late December 2016, Company G ended its discussions with Quinpario about a potential transaction in order to pursue its alternative options. Also in late December 2016, Company H

147

Supp.App. 0513

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 516 of 1110    PageID 2137

informed Quinpario that it wanted to delay discussions with Quinpario until Quinpario extended the deadline in its certificate of incorporation to complete an initial business combination. Around the same time, Company I decided to pursue a standalone initial public offering rather than pursuing a transaction with Quinpario.

While it was evaluating the opportunities with Companies G, H and I, Quinpario had extensive conversations with its advisors with respect to the strategy and feasibility of obtaining an extension for the deadline to complete its initial business combination. Based on those discussions, Quinpario decided to seek a six-month extension for the deadline to complete its business combination.

On December 18, 2016, Quinpario's board of directors held a special telephonic meeting at which a representative of Graubard Miller, Quinpario's legal counsel on matters related to its status as a special purpose acquisition company, was present. The board of directors discussed with Quinpario's management and advisors an overview of the potential transactions with Companies G, H and I and the benefit of a six-month extension to consider additional business combination transactions. After an extensive discussion, the board of directors unanimously determined that it was in the best interests of Quinpario and its stockholders to extend the deadline to complete an initial business combination to July 24, 2017 (the "Extension"), to be effected by an amendment to its amended and restated certificate of incorporation to extend the date by which Quinpario must consummate its initial business combination to such date (the "Extension Amendment"), and to recommend to Quinpario's stockholders that they vote to adopt the Extension Amendment.

On December 19, 2016, Quinpario filed a preliminary proxy statement with the SEC, seeking stockholder approval of the Extension Amendment. After waiting the requisite period of time and having not received any comments from the SEC, Quinpario filed its definite proxy statement with the SEC with respect to the Extension Amendment on December 30, 2016.

On December 19, 2016, a representative of S&E Partners LLC, an entity whose principals had previously invested in business ventures involving affiliates of the Sponsor ("S&E"), called Mr. Quinn about introducing Quinpario to a target that was interested in a transaction with Quinpario. The representative informed Mr. Quinn that he would provide additional details about the potential transaction after Quinpario entered into a non-circumvention agreement with S&E. The non-circumvention agreement provided that, in exchange for the introduction by S&E, Quinpario would enter into the transaction with the proposed target company only if it involved S&E. Following negotiation, S&E and Quinpario executed the non-circumvention agreement on December 20, 2016. In addition, over the course of the following two weeks, representatives of the Sponsor and S&E and their respective counsel negotiated a finder's agreement, which was executed on January 5, 2017, which provided that an affiliate of S&E, Game Boy Partners, LLC ("Game Boy") would receive 2,500,000 Founder Shares from the Sponsor upon consummation of the Business Combination, and would be entitled to a portion of an additional 2,500,000 Founder Shares, unless such additional Founder Shares are forfeited pursuant to the Forfeiture Agreement. The terms of the finder's agreement are further reflected in the Forfeiture Agreement. For additional information on the Forfeiture Agreement, please see "—*The Forfeiture Agreement*." Neither S&E nor Game Boy (i) is or has been an affiliate (as defined in Rule 405 of the Securities Act) of any of SourceHOV, the HGM Group, Novitex or Novitex Parent or (ii) will have a role in the combined company other than as a stockholder.

On January 3, 2017, Messrs. Quinn and Srivisal had a telephone conference with representatives of Game Boy and Mainstreet Global Advisors Ltd. ("Mainstreet") to discuss the proposed transaction. The representatives of Game Boy explained that the opportunity was a three-party transaction for Quinpario to simultaneously acquire SourceHOV from the HGM Group and Novitex from Novitex Parent. The representatives of Game Boy informed Messrs. Quinn and Srivisal that Apollo, the largest shareholder of Novitex Parent, and the HGM Group had previously considered and held discussions about combining SourceHOV and Novitex by an all-cash acquisition of Novitex by SourceHOV and

148

both the HGM Group and Apollo had recognized the industrial logic and opportunities created by the combination of the companies. However, at the time they had determined that a cash acquisition of Novitex would require a significant additional equity infusion. As a result, a transaction with Quinpario was compelling to both Apollo and the HGM Group. Additionally, because Quinpario's stock was listed on Nasdaq, the combined company would expect benefits over a private company resulting from greater liquidity and access public markets for any further financing requirements. As a result, the representatives of Game Boy explained that the proposed transaction would combine the companies with stock consideration, with the equity holders of both SourceHOV and Novitex rolling all of their equity interests into equity of Quinpario, and allow the cash of Quinpario to further delever the combined company as compared to prior transactions.

Beginning later that day and continuing through the execution of the Business Combination Agreement, Quinpario began to receive information about SourceHOV, Novitex and the proposed transaction from Rothschild Inc., financial advisor to SourceHOV ("Rothschild"). In addition, during this period, Quinpario began to conduct preliminary diligence reviews of SourceHOV and Novitex, the industries in which they operate and comparable companies in the same sectors from publicly available sources and research companies.

On January 4, 2017, Mr. Quinn provided Quinpario's board of directors a summary on the potential transaction with SourceHOV and Novitex. From that time until the execution of the Business Combination Agreement, members of Quinpario's senior management team provided regular updates to Quinpario's board of directors and spoke with several of the directors informally about the proposed transaction.

On January 5, 2017, Messrs. Quinn and Srivisal had an introductory telephone conversation with a representative of Novitex Parent to discuss the proposed transaction. During that discussion, they agreed that Quinpario, SourceHOV and Novitex should enter into confidentiality agreements to facilitate the exchange of confidential information between the parties.

On January 6, 2017, Quinpario entered into confidentiality agreements with SourceHOV and Novitex. After the confidentiality agreements were executed, SourceHOV and Novitex began providing Quinpario with confidential information related to their businesses and the proposed combination of those businesses.

Between the signing of the confidentiality agreements and continuing through the execution of the Business Combination Agreement, Quinpario received confidential information about SourceHOV, Novitex and the proposed transaction and conducted business, financial, legal and accounting diligence of SourceHOV and Novitex. This included a review of information on each company's business operations, customer base, financial information, assets, liabilities and material contracts. Quinpario also received information on the rationale for combining SourceHOV and Novitex, provided information on pro forma financials and cost synergies and gave an overview of the combined company's business operations. Confidential information was made available to Quinpario by an online virtual data room.

In addition, during this period, Quinpario sent written materials to Novitex Parent, the HGM Group, SourceHOV and Novitex and their representatives explaining the process of a business acquisition conducted by a special purpose acquisition company such as Quinpario and detailing the timing and the requirements for such a transaction.

On January 9, 2017, the respective management teams of Quinpario, SourceHOV and Novitex met to make presentations to each other and each party's representatives in New York City at the offices of Kirkland & Ellis LLP, Quinpario's legal counsel ("Kirkland"). At the meeting, each management teams provided general background information about their company. In attendance on behalf of Quinpario were Messrs. Quinn and Srivisal, Paul J. Berra III, Chairman of the Board of Quinpario and a partner

149

Supp.App. 0515

in the Sponsor, and A. Craig Ivey, Vice President—Operations of Quinpario and a partner in the Sponsor, other members of senior management of Quinpario and representatives of Moelis & Co., financial advisor to Quinpario ("Moelis"), Game Boy and Mainstreet, Quinpario's underwriters from its IPO, Deutsche Bank Securities Inc. and Cantor Fitzgerald & Co., and Kirkland. In attendance on behalf of Novitex were John Visentin, Executive Chairman and Chief Executive Officer of Novitex, other members of senior management of Novitex, representatives of Novitex Parent, Credit Suisse, financial advisor to Novitex ("Credit Suisse"), and Akin Gump Strauss Hauer & Feld LLP, legal counsel to Novitex ("Akin Gump"). In attendance on behalf of SourceHOV were Ron Cogburn, Chief Executive Officer of SourceHOV, other members of senior management of SourceHOV, representatives of the HGM Group, Rothschild, Morgan Stanley & Co. LLC, financial advisor to SourceHOV, and Willkie Farr & Gallagher LLP, legal counsel to SourceHOV ("Willkie"). The parties discussed the businesses, operations and financial conditions of the companies as well as the growth prospects and financial synergies for a combined company and the proposed transaction.

At the management meeting, the parties discussed the Extension and the benefits for the proposed transaction if information about the proposed transaction could be disclosed to Quinpario's stockholders prior to the vote on the Extension Amendment. In light of the preliminary nature of the transaction negotiations, the parties discussed what information about the proposed transaction could be disclosed. The parties decided to work together to seek to enter into a non-binding letter of intent providing for terms of the proposed transaction within the next several days if they could agree on financial terms of the transaction.

Based on Quinpario's review of the materials it had been provided to date and the management meeting, Quinpario concluded that the combination of SourceHOV and Novitex had the potential for being a highly attractive target given the financial profile of the businesses, the current industry consolidation climate, the potential acquisition opportunities, the benefits of using Quinpario's available cash to reduce the combined company's debt leverage as compared to the combined company on a stand-alone basis and an array of cost saving opportunities that would result from the combination. As a result, Quinpario decided to submit a non-binding letter of intent to acquire both companies from Novitex Parent and the HGM Group.

On January 10, 2017, Quinpario sent a draft letter of intent to SourceHOV and Novitex that outlined the basic terms for a potential transaction. The letter of intent contained Quinpario's preliminary purchase price of $2.542 billion for both SourceHOV and Novitex, subject to Quinpario's continuing due diligence reviews and other customary conditions. The draft letter of intent also required that Novitex Parent and the HGM Group would agree to negotiate exclusively with Quinpario regarding any sales of Novitex or SourceHOV, respectively. Shortly thereafter, Mr. Berra sent Quinpario's board of directors a summary on the potential transaction, the letter of intent and the proposed process for the negotiation of the letter of intent.

Also on January 10, 2017, representatives of Quinpario, Novitex Parent, the HGM Group, SourceHOV, Novitex and Game Boy had a telephonic meeting in which they discussed the general process on how to proceed towards executing a letter of intent by the end of that week, the announcement of the letter of intent in advance of the vote on the Extension Amendment, high level diligence requests and the expectation of Quinpario's board of directors that they would meet the management teams of SourceHOV and Novitex prior to the board's final evaluation of the Business Combination.

On January 11, 2017, Credit Suisse sent Quinpario a revised letter of intent on behalf of SourceHOV and Novitex. The revised letter of intent contemplated a proposed total enterprise value of $3.1 billion on a fully-distributed basis and before an IPO discount of approximately 25%, or approximately $2.7 billion after such discount for both SourceHOV and Novitex. The revised letter of intent further provided that a condition to closing of the proposed transaction would provide that

150

Supp.App. 0516

Quinpario would have at least $225 million available to Quinpario, net of redemptions and any additional equity financing raised by Quinpario. In addition, the revised letter of intent required that Quinpario would not have any continuing right to indemnity or claims for breaches of representations, warranties or covenants of the parties following the closing, akin to the lack of survival of remedies for public company acquisition targets. The revised letter of intent further provided for a list of key transactions involving Quinpario in which Quinpario would not be permitted to engage after the closing without the consent of Novitex Parent and the HGM Group, including acquisitions, divestitures, financing transactions and certain governance changes. The revised letter of intent further reduced the Founder equity interests that would be retained by Quinpario Partners and Game Boy. Finally, the draft letter of intent also required that Quinpario would agree to negotiate exclusively with the HGM Group and Novitex Parent related to proposed business combination transactions.

Over the course of the next several days, representatives of Quinpario, SourceHOV, Novitex, Novitex Parent and the HGM Group continued to negotiate the terms of a potential business combination and the terms of the letter of intent. These negotiations addressed the valuations of the companies, the post-closing survival of remedies, the amount of Founder equity interests to be retained, the exclusivity obligations of the parties, the transactions to be subject to approval of the HGM Group and Novitex Parent, the public disclosure of the non-binding letter of intent and the other items raised by the HGM Group and Novitex Parent in the revised letter of intent provided on January 11, 2017. In particular, management of Quinpario believed that it was important for Quinpario's stockholders to have as much information as possible about options available to Quinpario in advance of the vote by Quinpario's stockholders on the Extension Amendment, which they believed would also increase the possibility that Quinpario would be able to execute a definitive agreement providing for a business combination to be presented to Quinpario's stockholders for consideration by them.

On January 13, 2017, following extensive negotiations among the parties and consultation with outside financial and legal advisors, Quinpario, Novitex, Novitex Parent, SourceHOV, the HGM Group and Quinpario Partners entered into a non-binding letter of intent providing for the terms contemplated by the Business Combination Agreement. The executed letter of intent provided for a total enterprise value of $3.1 billion on a fully-distributed basis and before an IPO discount of approximately 25%, or approximately $2.7 billion after such discount. In conjunction with the execution of the letter of intent, Novitex Parent delivered letters from Credit Suisse Securities (USA) LLC and Deutsche Bank Securities LLC in which they stated that they were highly confident that they would be able to assist Quinpario in raising the level of debt required to fund the transaction. Shortly thereafter, Mr. Berra sent Quinpario's board of directors an update on the execution of the letter of intent and the proposed schedule for announcement thereof.

Also on January 13, 2017, Quinpario, Quinpario Partners and the Sponsor entered into an agreement with Game Boy in which the parties agreed to the allocation of any Founder Shares the Sponsor retains under the terms of the letter of intent with SourceHOV and Novitex, the terms of which are reflected in the Forfeiture Agreement.

Later on January 13, 2017, Quinpario issued a press release announcing the execution of the non-binding letter of intent. The press release provided extensive information about the industry of the targets, without naming them or their sponsors, pro forma financial information, the proposed purchase price, the status of the financing for the transaction and the conditions for the completion of the transaction. In the press release, in light of the time needed to complete any transaction, in light of the Extension, Quinpario also announced that it would file proxy materials to seek stockholder approval to dissolve and liquidate Quinpario if it was unable to enter into a definitive agreement for an initial business combination by March 31, 2017. A similar press release was issued by Quinpario on January 17, 2017.

Supp.App. 0517

Later on January 13, 2017, Quinpario's board of directors received an update on the status of the proposed transaction, including the execution of the non-binding letter of intent, and the Extension.

Following the execution of the letter of intent, the parties continued to conduct due diligence reviews of the companies, including sending follow-up requests for additional information.

On January 18, 2017, representatives of Quinpario, SourceHOV, Novitex, Novitex Parent and the HGM Group had a telephonic meeting to discuss the process for conducting further due diligence, securing financing and negotiating and drafting the definitive transaction agreements. On the call, they agreed that counsel to Novitex would prepare the first draft of the definitive transaction agreements providing for the terms of the transaction consistent with the letter of intent.

On January 19, 2017, Quinpario held a special meeting of its stockholders to vote on the Extension Amendment. At the meeting, Quinpario's stockholders approved the Extension Amendment, which extended the date by which Quinpario had to consummate an initial business combination to July 24, 2017. In connection with the Extension, holders of 14,901,399 shares of Quinpario Common Stock exercised their right to redeem their shares for a pro rata portion of the Trust Account. As a result, following such redemptions, $201,543,292 remained in the Trust Account. Later on that day, Quinpario issued a press release announcing the approval of the Extension Amendment and the results of the redemptions.

Following the special meeting of Quinpario's stockholders and the related redemptions, Quinpario and its representatives began to contact numerous potential investors to gauge their interest in making an equity investment in Quinpario in connection with the proposed transaction. Quinpario, SourceHOV and Novitex determined that it would be preferable to get additional information on the terms of possible definitive commitments to provide additional equity investments in Quinpario prior to entering into the definitive agreements providing for the transaction to reduce uncertainty related to the terms or completion of the equity investment or the consummation of the transaction. Representatives of Quinpario, SourceHOV and Novitex participated in various discussions with potential investors.

In addition, the parties continued to seek to obtain definitive commitments to obtain debt financing for Quinpario in connection with the proposed transaction. On January 30, 2017, management of Quinpario participated in a webinar presentation that representatives of SourceHOV and Novitex made to several potential debt financing sources regarding SourceHOV, Novitex and the potential business combination. During this discussion, SourceHOV and Novitex provided summary information on their businesses, customers, historical and projected operating and financial metrics and general terms for a proposed transaction.

On January 23, 2017, representatives of Kirkland, Akin Gump and Willkie held a teleconference to discuss the terms of the definitive transaction agreements providing for the Business Combination that were being prepared. In particular, they discussed the structure of the proposed acquisition of SourceHOV and Novitex, the tax effects of the transaction, provisions required by Quinpario as a result of it being a special purpose acquisition company and the method by which governance arrangements would be determined.

On February 1, 2017, representatives of Quinpario, SourceHOV and Novitex and their counsel at Kirkland, Akin Gump and Willkie held a teleconference to discuss the process for drafting the proxy statement that would need to be filed in connection with the approvals for the Business Combination and the goal of expediting preparation of the proxy statement. In particular, the parties discussed the financial statements that would be required for the proxy statements and the process and timing for preparing the financial statements. These parties had regular teleconferences on the status of the preparation of the proxy statement on several other occasions prior to the execution of the Business Combination Agreement.

152

Supp.App. 0518

On February 2, 2017, representatives of Akin Gump and Willkie sent to representatives of Kirkland an initial draft of the Business Combination Agreement intending to incorporate the terms of the non-binding letter of intent. While the draft agreement was consistent with the letter of intent, certain provisions required further discussion and negotiation that were not fully addressed in the letter of intent. In particular, the draft agreement contemplated that Quinpario would have responsibility for obtaining the debt financing for the transaction rather than having such responsibility be shared. The draft agreement also contemplated that each party would bear its own transaction expenses to be incurred on a pre-closing basis in connection with the transaction. The draft agreement did not provide for the method by which Quinpario could obtain additional equity investments.

Also on February 2, 2017, management of Quinpario provided an update to Quinpario's board of directors regarding the status of Quinpario's various work streams with respect to the proposed transaction, including due diligence, debt and equity financing and drafting of the definitive transaction agreements. The board of directors received an update on the reports from external professionals that were being obtained by Quinpario and the business due diligence sessions that were scheduled to take place with senior management from each of the two target companies.

On February 10, 2017, following discussion of the draft agreements between the parties, representatives of Kirkland sent to representatives of Akin Gump and Willkie a revised version of the Business Combination Agreement. Among other changes, the revised version of the agreement sought to allocate responsibility for obtaining the debt financing among all parties, limit the amount of pre-closing transaction expenses that were required to be incurred by Quinpario and require SourceHOV and Novitex to agree to certain divestitures or other actions if necessary to obtain antitrust approvals for the transaction. In addition, the revised version of the agreement sought to preserve for Quinpario limited rights to post-closing remedies for breaches of certain fundamental representations.

On February 12, 2017, representatives of Kirkland, Akin Gump and Willkie held a teleconference to discuss certain key issues in the Business Combination Agreement, in particular the items referenced above, and methods to seek to resolve those items.

Following that teleconference and continuing until the evening of February 21, 2017 and culminating in the execution of the Business Combination Agreement on that evening, the parties and their respective counsel exchanged several drafts of the Business Combination Agreement and related definitive documentation and disclosure schedules and engaged in several negotiations of these documents. The outcome of these negotiations is reflected in the terms of the definitive agreements referenced herein.

On February 17, 2017, representatives of Quinpario, Novitex Parent and the HGM Group, together with their financial and legal advisors, held a teleconference to discuss the results of the preliminary meetings with potential equity investors. On the teleconference, the parties discussed that there were several potential investors that had expressed interest in participating in an equity financing transaction for the proposed transaction and were willing to perform more detailed due diligence on SourceHOV and Novitex and the proposed transaction. However, none of the potentially interested investors expressed an ability to complete their due diligence review and enter into definitive agreements providing for the equity financing within a period of time less than two weeks, to meet the parties' timing goals. The parties discussed that they expected to obtain debt financing commitments within the next week and expected to be able to finalize the negotiations of the definitive transaction agreements within approximately that time. Following separate discussion among the parties, they agreed to proceed with the transaction by planning to execute the Business Combination Agreement without definitive equity commitments for additional equity financing for the transaction in place at the time of signing. By doing so, they would be able to sign and announce the Business Combination Agreement and the definitive debt commitments more quickly and could seek to raise the equity

153

Supp.App. 0519

Table of Contents

financing after additional information about the companies and the proposed transaction was available in the proxy statement.

On February 18, 2017, representatives of Kirkland, Akin Gump and Willkie held a teleconference to discuss the key issues in the definitive transaction agreements that remained unresolved. In particular, during the discussion, they sought to negotiate the terms on which Quinpario could agree to terms of equity financing for the proposal transactions, the obligations of the respective parties to obtain the debt financing for the proposal transaction, the maximum amount of pre-closing transaction expenses that were required to be incurred by Quinpario, the method for selecting the directors of Quinpario following the closing and the events for which Novitex Parent and the HGM Group would be entitled to a consent right in a nomination agreement. During the discussion, they identified potential solutions for open items. Resolution for these items was reached in all material respects on a call the following day between Messrs. Quinn and Chadha.

On February 19, 2017, Quinpario's board of directors held a special meeting by teleconference. Representatives of each of Moelis and Kirkland attended the meeting. At the meeting, the senior management of Quinpario provided an update to Quinpario's board of directors regarding the final negotiations of the terms of the proposed transaction. For each item for which there was not final resolution, the potential alternative solutions were presented to the board of directors. A representative of Kirkland made a presentation on the fiduciary duties of the directors in the context of considering the proposed transaction. At the request of the board of directors, Messrs. Chadha and Cogburn made a presentation to the board of directors about SourceHOV and the benefits to SourceHOV of combining with Novitex through the proposed transaction. They were only in attendance during their presentation. Representatives of Moelis made a presentation of financial analyses of the consideration to be paid in the transaction. Quinpario's board of directors and its advisors also discussed the proposed transaction, the two target companies, the potential benefits of the proposal transaction, several reasons for entering into the proposed transaction, risks related to the proposed transaction, the absence of any alternative transactions that were known to Quinpario's board of directors and the proposed timeline for finalizing and announcing the proposed transaction. See "—*Quinpario's Board of Directors' Reasons for the Approval of the Business Combination*" for additional information related to the factors considered by Quinpario's board of directors in approving the Business Combination, subject to approval by Mr. Srivisal of any final changes to the agreement on the terms as described to the board of directors, and recommending that stockholders vote "FOR" the proposals to approve the Business Combination. Following discussion, Quinpario's board of directors unanimously determined that the Business Combination Proposal is in the best interests of Quinpario and its stockholders and recommended that its stockholders vote "FOR" the proposal.

On February 20, 2017, the parties continued to finalize the documentation providing for the transaction and the communications related to the announcement of the transaction.

On February 21, 2017, Quinpario, SourceHOV, Novitex and related parties executed the Business Combination Agreement and the related agreements.

Later in the day on February 21, 2017, Quinpario, SourceHOV and Novitex issued a press release announcing the execution of the Business Combination Agreement. On the morning of February 22, 2017, Quinpario filed a Current Report on Form 8-K with an investor presentation providing information on SourceHOV and Novitex and the proposed transaction.

On May 15, 2017, SourceHOV received demands for appraisal from purported holders of approximately 10,000 shares of SourceHOV common stock. Neither Quinpario nor SourceHOV has determined at this time whether any of such demands satisfy the requirements of Delaware law for perfecting appraisal rights. At any time within 60 days of the closing of the Business Combination, these dissenting shareholders have the right to withdraw their demand for appraisal rights and accept the SourceHOV Merger Consideration in accordance with the Business Combination Agreement.

154

Supp.App. 0520

On June 15, 2017, the parties executed the Modification Agreement as described under "*Proposal No. 1—Approval of the Business Combination*" in connection with structural changes necessary to facilitate the financing.

On June 15, 2017, Quinpario, SourceHOV and the underwriters of Quinpario's IPO entered into an agreement to assign Quinpario's obligations under the underwriting agreement between Quinpario, Deutsche Bank Securities Inc. and Cantor Fitzgerald & Co. to SourceHOV, and otherwise terminated the underwriting agreement.

On June 23, 2017, Quinpario received communication from a purported warrantholder asserting that the consummation of the transactions contemplated by the Business Combination Agreement requires an antidilution adjustment to the outstanding warrants under the terms of the applicable Warrant Agreement. Quinpario believes that such assertion is without merit and that consummation of the transactions contemplated by the Business Combination Agreement will not result in an antidilution adjustment to the outstanding warrants under the terms of the applicable Warrant Agreement.

**Quinpario's Board of Directors' Reasons for the Approval of the Business Combination**

The Quinpario board of directors (i) approved the Business Combination Agreement and related transaction agreements and the transactions contemplated thereby, (ii) determined that the Business Combination is in the best interests of Quinpario and its stockholders, and (iii) recommended that its stockholders approve and adopt the Business Combination.

In evaluating the Business Combination and making these determinations and this recommendation, the Quinpario board of directors consulted with Quinpario's senior management, Quinpario's financial and legal advisors and considered a number of factors.

The Quinpario board of directors and management also considered the general criteria and guidelines that Quinpario believed would be important in evaluating prospective target businesses as described in the prospectus for its IPO. The board of directors also considered that they could enter into a business combination with a target business that does not meet the criteria and guidelines. In the prospectus for its IPO, Quinpario stated that it intended to focus primarily on acquiring companies valued between $700 million and $2 billion of enterprise value and with the following criteria in relevant part:

- *Opportunities for Platform Growth:*  We will seek to acquire one or more businesses or assets that we can grow both organically and through acquisitions.

- *History of and Potential for Strong Free Cash Flow Generation:*  We will seek to acquire one or more businesses that have the potential to generate strong free cash flow (i.e., companies that typically generate cash in excess of that required to maintain or expand the business's asset base). We will focus on one or more businesses that have recurring revenue streams, low working capital and capital expenditure requirements.

- *Established Companies with Proven Track Records:*  We will seek to acquire established companies. We will typically focus on companies with a history of strong operating and financial results.

- *Experienced and Motivated Management Teams:*  We intend to seek to acquire businesses that have strong, experienced management teams with a substantial personal economic stake in the performance of the acquired business. We intend to focus on management teams with a proven track record of driving revenue growth, enhancing profitability and generating strong free cash flow.

- *Strong Competitive Industry Position:*  We will seek to acquire businesses focused on the specialty chemicals and performance materials industries that have strong fundamentals, although we will consider a business combination outside these industries if a business combination candidate is

155

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 524 of 1110    PageID 2145

Table of Contents

presented to us and we determine that such candidate encompasses strong fundamentals. The factors we will consider include growth prospects, competitive dynamics and position, level of consolidation, need for capital investment, potential for improvement and barriers to entry. We will focus on companies that have a leading or niche market position. We will analyze the strengths and weaknesses of target businesses relative to their competitors, focusing on technology, global positioning, product quality and services, customer loyalty, cost impediments associated with customers switching to competitors, intellectual property protection and brand positioning. We will seek to acquire one or more businesses that demonstrate advantages or have the potential to become advantaged when compared to their competitors, which may help to protect their market position and profitability.

In considering the Business Combination, the Quinpario board of directors determined that the Business Combination was an attractive business opportunity that met the vast majority of the criteria and guidelines above, although not weighted or in any order of significance.

In particular, the Quinpario board of directors considered the following factors:

- *The Target Companies and the Business Combination.* The Quinpario board of directors reviewed SourceHOV and Novitex and the proposed combination of the two companies and the desirability of an acquisition of the combined businesses. In particular, the Quinpario board of directors considered the following factors related to the target companies and the Business Combination:

  - *Combination of SourceHOV and Novitex.* The strategic combination of SourceHOV and Novitex will form Exela, one of the largest global providers of information and transaction processing solutions. Exela's technology-enabled solutions will allow multi-national organizations to address critical challenges resulting from the massive amounts of data obtained and created through their daily global operations. The combined company will have process expertise, information technology capabilities and operational insights, enable our clients' organization to more efficiently and effectively create, control, analyze and communicate critical information with customers, employees, partners, and vendors. This value proposition will allow the combined company to become a core operations and technology partner to its clients.

  - *Meaningful Opportunity for Synergies.* The combined company will have a number of meaningful revenue synergy opportunities, including expanding the scope of existing client relationships, pursuing new client opportunities and leveraging its combined platform to develop new process capabilities and vertical market expertise. The combined company has also identified significant cost synergies that are expected to be actionable immediately upon closing of the transaction. Due to similar operating infrastructures between SourceHOV and Novitex, the board considered that the combined company will have opportunities to achieve $70.3 million in cost savings through business process consolidation, corporate optimization and improving utilization rates across the combined asset base.

  - *Strong Revenue Growth Potential:* Exela has a strong market position and global scale within information and transaction processing services, with over 3,500 clients, including over 60% of Fortune® 100 companies. By leveraging its global delivery network of over 1,250 onsite client facilities and approximately 150 delivery centers located in 50 countries, Exela enjoys significant growth opportunities from expanding relationships with current clients, pursuing new client opportunities and developing additional process capabilities and vertical market expertise. Continued investments in new technology and innovation will accelerate the build out of its portfolio of next-generation solutions, such as platform-based descriptive and predictive analytics services for processing flows of "Big Data" to help clients better understand their processes and their businesses.

156

Supp.App. 0522

- *Experienced and Motivated Management Teams:* Both SourceHOV and Novitex management teams have a demonstrated track record of innovating client-centric technological solutions, growing revenues, realizing cost savings, improving margins and integrating strategic acquisitions. Key executives at the combined company have significant experience in the technology, financial services and transaction processing services industries. Moreover, these executives have worked cohesively for over a decade towards creating value for investors.

- *Attractive Industry and Strong Competitive Position:* Overall, there is an increased propensity to outsource business processes as enterprises are looking for opportunities to reduce costs and to streamline or standardize their business processes. Secular trends driving business process outsourcing growth include (i) companies seeking to processes and focus resources on core competencies, (ii) pressures to cut costs and turnaround time, (iii) advent of new technologies that are enabling outsourcing and (iv) prior customer experience from business process outsourcing. According to IDC, the current market for BPO is estimated to be over $180 billion and is expected to grow at ~5% CAGR over the next five years. Exela enjoys a competitive industry position as evidenced by its blue-chip customer base and profit margins among the highest within relevant peer groups.

- *Opportunities for Platform Growth:* As clients across the industry move increasingly toward outsourcing more processes to fewer vendors, Exela is well positioned to be a platform consolidator within a fragmented industry. Breadth of service offerings, depth of domain expertise, and a strong delivery footprint will continue to be Exela's differentiating factors and will offer the company a competitive advantage as it continues to acquire attractive businesses within the industry.

- *Financial Profile and Cash Generation:* Exela's financial profile is characterized by highly visible, recurring revenues, long-term contracts and demonstrated margin expansion in recent years. Exela's stable customer base, high cash generation, high cash flow conversion and asset-light operating model provide the company the ability efficiently grow and manage the business across the economic cycle.

- *Review of Financial Terms of Transaction; Attractive Entry Valuation.* The Quinpario board of directors considered that the implied purchase price multiple of SourceHOV and Novitex in the aggregate represented an attractive valuation for Quinpario stockholders as compared to comparable companies. In particular, the board of directors considered that, based on a synergy assumption of $37.5 million and not including revenue synergies, the acquisition of SourceHOV and Novitex on the terms set forth in the Business Combination represents a purchase price multiple of 7.2x fiscal year 2017 pro forma estimated Adjusted EBITDA. In connection with preliminary financial analyses presented by Moelis based on publicly available information, this implied valuation is below the mean (11.2x 2017 estimated Adjusted EBITDA) and median (11.9x 2017 estimated Adjusted EBITDA) of 22 selected publicly traded companies selected by the financial advisor to be comparable in certain respects to the combined company following the closing of the Business Combination and in the range of the low and high of the selected companies of 6.0x 2017 estimated Adjusted EBITDA and 16.5x 2017 estimated Adjusted EBITDA. Furthermore, the pro forma financial profile of Exela compared favorably to the financial profiles of the selected comparable companies; Exela's projected 2017E revenue growth of 4.7% is higher than the peer median revenue growth of 3.8% and peer mean of 4.1% (the low and high are –4.1% and 17.4%), while Exela's projected 2017 estimated pro forma Adjusted EBITDA margin of 25.2% is higher than the peer median of 23.9% and peer mean of 24.5% (the low and high are 7.6% and 47.5%). Financial and market data information on the selected comparable companies was obtained from Capital IQ as of February 17, 2017, and financial information on Exela was from management of SourceHOV and Novitex. None of the selected comparable companies has a business mix directly comparable to Exela. The selected

157

Supp.App. 0523

comparable companies, from transaction processing and corporate services, financial services technology and processing, multi-shore business process outsourcing, healthcare processing and services industries, were Cognizant Technology Solutions Corporation, Fidelity National Information Services, Inc., Fiserv, Inc., Wipro Limited, First Data Corporation, Vantiv Inc., Open Text Corporation, Broadridge Financial Solutions, Inc., Jack Henry & Associates Inc., Black Knight Financial Services Inc., Computershare Limited, Genpact Limited, Capita plc, DST Systems, Inc., CoreLogic Inc., Conduent Inc., ExlService Holdings, Inc., HMS Holdings Corp., WNS (Holdings) Limited, R.R. Donnelley & Sons Company, Equiniti Group plc and Solium Capital Inc. As a result, the Quinpario board of directors considered that the Business Combination presented excellent near-term value creation opportunity for Quinpario's stockholders.

- *Results of Review of Transactions; Lack of More Favorable Transaction Alternatives.* The Quinpario board of directors considered that it was not aware of any alternative transactions that would be reasonably likely to be more favorable to the Quinpario stockholders than the terms of the Business Combination. In particular, since the IPO, representatives of Quinpario had considered and conducted analysis of over 100 potential acquisition targets, participated in in-person or telephonic discussions with representatives of approximately 45 potential acquisition targets (other than SourceHOV and Novitex), entered into non-disclosure agreements with approximately 32 potential acquisition targets (other than SourceHOV and Novitex) or their representatives, and submitted indications of interest, letters of intent or conducted diligence with respect to approximately 29 potential acquisition targets (other than SourceHOV and Novitex). Despite these efforts, the board of directors was not aware of any transaction available to Quinpario that was more favorable than the Business Combination. In addition, the board of directors considered that the terms of the Business Combination had been negotiated on an arm's-length basis in light of each party's judgment about its ability to negotiate different or better terms. Based on the negotiations to date, the board of directors considered that it believed that the terms of the Business Combination Agreement and related agreements were the best terms to which SourceHOV and Novitex were reasonably likely to agree. See "—*Background of the Business Combination*" for more information on Quinpario's consideration of other transactions and the negotiations of the terms of the Business Combination. The Quinpario board of directors considered that, based on the terms of the letter of intent executed in connection with considering the Business Combination, the public commitment made by Quinpario to seek a vote on the redemption and liquidation of the company if a business combination agreement was not signed by March 31, 2017 and the terms of the Business Combination Agreement, Quinpario would not be able to present any business combination transaction to its stockholders for consideration other than the Business Combination. The Quinpario board of directors also considered that Quinpario could decide not to consummate an initial business combination and return to its stockholders their pro rata portion of the Trust Account, however, the Quinpario board of directors determined that, in light of the other factors considered by the board noted in this section, the Business Combination was more beneficial to Quinpario's stockholders than not consummating an initial business combination.

- *Continued Role by Apollo and HGM Group.* The Quinpario board of directors considered that neither Apollo nor the HGM Group would be receiving any material cash consideration in connection with the proposed transaction and, instead, would be receiving consideration in the form of Quinpario Common Stock. The Quinpario board of directors recognized this as a sign of confidence in the combined company following the transaction and the benefits to be realized by each company as a result of the transaction. In addition, the Quinpario board of directors considered that the combined company was expected to get considerable attention and expertise from both Apollo and the HGM Group, each of which was expected to hold a significant amount of shares of Quinpario Common Stock following the transaction and have representation

158

Supp.App. 0524

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 527 of 1110    PageID 2148

on the board of directors following the closing, which would serve to benefit holders of Quinpario Common Stock after the closing.

- *Results of Due Diligence.* The Quinpario board of directors considered the scope of the due diligence investigation conducted by Quinpario's senior management and outside advisors and evaluated the results thereof and information available to it related to SourceHOV and Novitex, including:

    - research on comparable companies and transactions within the transaction processing & corporate services, financial services technology and processing, multi-shore business process outsourcing, healthcare processing and services industries;

    - multiple meetings and calls with Novitex's management team regarding its operations and projections and the proposed transaction;

    - multiple meetings and calls with SourceHOV's management team regarding its operations and projections and the proposed transaction;

    - in-person visits to Novitex's site in Windsor, Connecticut, SourceHOV's site in Irving, Texas and a recently acquired TransCentra site in Irving, Texas;

    - review of materials related to SourceHOV and Novitex made available by each company, including material contracts, benefit plans, insurance policies, litigation information, financial statement, environmental matters, risk mitigation materials, and other legal diligence;

    - review of financial due diligence materials prepared by professional advisors, including quality of earnings reports and tax due diligence reports;

    - other financial, tax, legal, environmental and accounting diligence; and

    - review of possible synergies resulting from the potential transaction.

- *Terms of the Merger Agreement.* The Quinpario board of directors reviewed and considered the terms of the Business Combination Agreement and the related agreements, including the parties' respective representations, warranties and covenants, the conditions to their respective obligations to complete the transaction and their ability to terminate the agreement. See "—*The Business Combination Agreement*," "—*The Registration Rights Agreement*" and "—*The Director Nomination Agreements*" for detailed discussions of the terms and conditions of these agreements. In particular, the Quinpario board of directors considered the following:

    - *Conditions to the Completion; Likelihood of Closing.*   The Quinpario board of directors considered the reasonable likelihood of the completion of the Business Combination, including the parties' obligations to complete the transaction, the absence of significant required regulatory approvals (other than antitrust approvals) and the likelihood that the merger will be approved by requisite regulatory authorities and holders of Quinpario Common Stock.

    - *Shareholder Approval and Redemption.*   The Quinpario board of directors considered that, consistent with the terms of Quinpario's organizational materials and applicable law, Quinpario stockholders had the right under the agreement to consider and vote on the Business Combination and that the transaction would not be consummated if not approved by the Quinpario stockholders. In addition, the Quinpario board of directors considered that, consistent with the terms of Quinpario's organizational documents, each holder of Quinpario Common Stock would be entitled to exercise redemption rights in connection with considering the Business Combination, as a result being entitled to independently require a return of their initial investment. The Quinpario board of directors further

159

Supp.App. 0525

considered that the transaction did not require the approval of either the holders of Novitex equity securities or the holders of SourceHOV equity securities.

- *Terms of Proposed Financing.* The Quinpario board of directors considered that the parties would be required to use commercially reasonable efforts to obtain the proceeds of its financing for the Business Combination. The Quinpario board of directors also considered the terms of the financing commitments Quinpario was obtaining in connection with the Business Combination. For additional information on the financing, see "—*Debt Financing*" and "—*PIPE Investment*."

The Quinpario board of directors also identified and considered a number of countervailing factors and risks to Quinpario and its stockholders relating to the Business Combination, including the following:

- *Fixed Consideration; Possibility of Adverse Effects on Novitex or SourceHOV's Business.* The Quinpario board of directors considered that the consideration to be paid to the holders of equity securities of SourceHOV and Novitex is a fixed number of shares of Quinpario Common Stock, Quinpario stockholders could be adversely affected by a decrease in the financial performance or prospects of Novitex or SourceHOV prior to the closing without any ability to reduce the number of shares to be issued in the Business Combination and solely with the right to elect to not close the Business Combination if a material adverse effect occurs with respect to Novitex or SourceHOV. The Quinpario board of directors determined that this structure was appropriate and customary, in light of the fact that Quinpario stockholders would benefit from an increase in the financial performance or prospects of Novitex or SourceHOV during the pendency of the transaction without any increase in the number of shares of Quinpario Common Stock to be issued.

- *No Survival of Remedies for Breach of Representations, Warranties or Covenants of Novitex or SourceHOV.* The Quinpario board of directors considered that the terms of the Business Combination Agreement provide that Quinpario will not have any surviving remedies after the closing to recover for losses as a result of any inaccuracies or breaches of Novitex or SourceHOV's representations, warranties or covenants set forth in the agreement. As a result, Quinpario stockholders could be adversely affected by a decrease in the financial performance or worsening of financial condition of Novitex or SourceHOV prior to the closing, whether determined before or after the closing, without any ability to reduce the number of shares to be issued in the Business Combination or recover for the amount of any damages. The Quinpario board of directors determined that this structure was appropriate and customary, in light of the fact that several transactions include similar terms and the owners of SourceHOV and Novitex would continue to be equity holders in the combined company.

- *Potential Inability to Complete the Merger.* The Quinpario board of directors considered the possibility that the Business Combination may not be completed and the potential adverse consequences to Quinpario if the Business Combination is not completed, in particular the expenditure of time and resources in pursuit of the Business Combination and the loss of the opportunity to participate in the transaction. In particular, they considered the uncertainty related to the closing of the Business Combination primarily outside of the control of the parties to the transaction, including the need for antitrust approvals and the following:

  - *Proposed Debt Financing Transactions in Connection with the Business Combination.* The Quinpario board of directors considered that the Business Combination Agreement includes a financing condition so that the parties would be required to, or able to, complete the transaction if the funds from the Debt Financing are not available. We may not be able to complete the proposed financing transaction in connection with the Business Combination on terms that are acceptable to us, or at all. If the parties do not complete the proposed financing transaction described in this proxy statement, we will be required to obtain

160

Table of Contents

alternative financing in order to fund a portion of the cash consideration for the Business Combination. If we are unable do so on terms that are acceptable to us, or at all, we may not be able to complete the Business Combination, as completing the proposed acquisition financing is a condition to the Business Combination under the Business Combination Agreement. The Quinpario board of directors considered the Debt Financing commitments that had been obtained as a mitigating factor, as they had no reason to believe that the financing contemplated thereby would be not able to be completed. For additional information on the financing, see "—*Debt Financing.*"

- *Proposed Equity Financing Transactions and Possible Redemptions in Connection with the Business Combination*.   The Quinpario board of directors considered that the Business Combination Agreement includes a condition that, after giving effect to redemptions by holders of Quinpario Common Stock in connection with the Business Combination and the proceeds to be raised by the PIPE Investment, Quinpario's trust account plus the total proceeds from the PIPE Investment shall equal in the aggregate no less than $275 million in cash. As of the date hereof, without giving effect to any redemptions that may occur, the trust account has approximately $201 million and we have secured commitments equal to $275.5 million. As a result of the commitments from the PIPE Investment, we expect to be able to meet the $275 million minimum condition. The Quinpario board of directors considered the risk that some of the current public stockholders would decide to exercise their redemption rights, thereby depleting the amount of cash available in the trust account. Regardless of the amount of the redemptions, in order to satisfy this minimum cash condition, Quinpario will need to raise equity financing in an amount necessary. As of the date of the Business Combination Agreement, Quinpario had held several meetings with potential equity investors in the company but had not obtained any definitive agreements to provide the PIPE Investment. The board of directors concluded, however, that this risk was substantially mitigated because the board of directors believes the combined company will be able to obtain proceeds from the proposed acquisition financing.

- *Need for Shareholder Approval for Business Combination Proposal.*   The Quinpario board of directors considered the risk that some of the current public stockholders would vote against the Business Combination. The board of directors also considered the fact that public stockholders may vote for the Business Combination Proposal while also exercising their redemption rights mitigates any incentive for a public stockholder to vote against the Business Combination Proposal, especially to the extent that they hold public warrants which would be worthless if the Business Combination is not completed.

- *SourceHOV and Novitex Business Risks.*   The Quinpario board of directors considered that Quinpario stockholders would be subject to the execution risks associated with the combined company if they retained their shares of Quinpario Common Stock following the closing of the Business Combination, which were different from the risks related to holding shares of Quinpario Common Stock prior to the closing. In this regard, the Quinpario board of directors considered that there were risks associated with successful implementation of the combined company's long term business plan and strategy, the combined company realizing the anticipated benefits of the Business Combination on the timeline expected or at all and integration of SourceHOV and Novitex's businesses in an efficient manner. The Quinpario board of directors considered that the failure of any of these activities to be completed successfully may decrease the actual benefits of the Business Combination and that Quinpario stockholders would not fully realize these benefits to the extent that they expected to retain the shares of Quinpario Common Stock received following the completion of the Business Combination. For additional description of these risks, please see "*Risk Factors.*"

161

Supp.App. 0527

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 530 of 1110    PageID 2151

- *Post-Business Combination Corporate Governance; Terms of the Director Nomination Agreements.* The Quinpario board of directors considered the corporate governance provisions of the Business Combination Agreement, the Director Nomination Agreements and the post-closing certificate of incorporation and bylaws of Quinpario and the effect of those provisions on the governance of the company following the closing. In particular, they considered that each of Apollo and the HGM Group will have the right to designate directors to the board of directors of the combined company for as long as it holds a substantial amount of shares of the company and will have a right to approve or reject certain transactions involving the combined company. They also considered that the amended and restated bylaws will give the directors designated by Apollo and the HGM Group certain quorum rights with respect to director meetings. The Quinpario board of directors was aware that these rights are not generally available to stockholders of Quinpario, including stockholders that may hold a large number of shares, or directors of Quinpario, respectively, and are transferrable in certain cases by Apollo and the HGM Group. See "—*The Business Combination Agreement*" and "—*The Director Nomination Agreements*" for detailed discussions of the terms and conditions of these agreements.

- *Limitations of Review.* The Quinpario board of directors considered that they were not obtaining an opinion from an independent investment banking or accounting firm that the price Quinpario is paying to acquire SourceHOV and Novitex is fair to the company or its stockholders from a financial point of view. In addition, the senior management does not have experience in acquiring companies in the management services industry and reviewed only certain materials in connection with its due diligence review of SourceHOV and Novitex. Accordingly, the Quinpario board of directors considered that Quinpario may not have properly valued such business.

- *Interests of Quinpario's Directors and Executive Officers.* The Quinpario board of directors considered the potential additional or different interests of Quinpario's directors and executive officers, as described in the section entitled "—*Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination.*" However, Quinpario's board of directors concluded that the potentially disparate interests would be mitigated because (i) these interests were disclosed in the IPO prospectus and are included in this proxy statement, (ii) these disparate interests would exist with respect to a business combination with any target company and (iii) the minimum available cash condition of the Business Combination was structured so that the Business Combination may be completed even if public stockholders redeem a substantial portion of Quinpario Common Stock.

- *Other Risks.* The Quinpario board of directors considered the types and nature of the risks described under the section entitled "*Risk Factors.*"

Based on its review of the forgoing considerations, the Quinpario board of directors concluded that the potentially negative factors associated with the Business Combination were outweighed by the potential benefits that it expected Quinpario stockholders would receive as a result of the Business Combination.

The preceding discussion of the information and factors considered by the Quinpario board of directors is not intended to be exhaustive but includes the material factors considered by the Quinpario board of directors. In view of the complexity and wide variety of factors considered by the Quinpario board of directors in connection with its evaluation of the Business Combination, the Quinpario board of directors did not consider it practical to, nor did it attempt to, quantify, rank or otherwise assign relative weights to the different factors that it considered in reaching its decision. In addition, in considering the factors described above, individual members of the Quinpario board of directors may have given different weight to different factors. The Quinpario board of directors considered this information as a whole and overall considered the information and factors to be favorable to, and in support of, its determinations and recommendations.

162

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 531 of 1110    PageID 2152

This explanation of the Quinpario board of directors' reasons for the board of directors' approval of the Business Combination, and all other information presented in this section, is forward-looking in nature and, therefore, should be read in light of the factors discussed under "*Cautionary Note Regarding Forward-Looking Statements*."

**Certain Interests of Quinpario's Directors and Officers and Others in the Business Combination**

In considering the recommendation of our board of directors to vote for the Business Combination Proposal, you should be aware that aside from their interests as stockholders, the Sponsor and certain members of our board of directors and officers have interests in the Business Combination that are different from, or in addition to, the interests of our stockholders generally. Our board of directors was aware of and considered these interests, among other matters, in evaluating and negotiating the Business Combination and transaction agreements and in recommending to our stockholders that they vote in favor of the proposals presented at the Special Meeting, including the Business Combination Proposal. Stockholders should take these interests into account in deciding whether to approve the proposals presented at the Special Meeting, including the Business Combination Proposal. These interests include, among other things:

- the fact that the Founders have agreed not to redeem any of the Founder Shares in connection with a stockholder vote to approve a proposed initial business combination;

- the fact that the Sponsor paid an aggregate of $25,000 for the Founder Shares and such securities will have a significantly higher value at the time of the Business Combination, so that if unrestricted and freely tradable these shares would be valued at $80.3 million (valued at $10.00 per share and after giving effect to the cancellation of 716,429 Founder Shares pursuant to the Forfeiture Agreement) even though, given the restrictions on such shares, we believe such shares have less value;

- the fact that the Founders have agreed to waive their rights to liquidating distributions from the Trust Account with respect to their Founder Shares if we fail to complete an initial business combination by July 24, 2017;

- the fact that the Sponsor paid an aggregate of $9,000,000 for its 18,000,000 Private Placement Warrants to purchase shares of Quinpario Common Stock and that such Private Placement Warrants either (i) will be cancelled upon the consummation of the Business Combination pursuant to the Forfeiture Agreement or (ii) will expire worthless if a business combination is not consummated by July 24, 2017;

- the continued right of the Sponsor to hold Quinpario Common Stock;

- the fact that, at the option of the Sponsor, any amounts outstanding under any loan made by the Sponsor or an affiliate of the Sponsor to the Company in an aggregate amount up to $1,500,000, may be converted into warrants to purchase Quinpario Common Stock of the combined company;

- if the Trust Account is liquidated, including in the event we are unable to complete an initial business combination within the required time period, Quinpario Partners and Jeffry N. Quinn, our former Chairman, each an affiliate of the Sponsor, have agreed to indemnify us to ensure that the proceeds in the Trust Account are not reduced below $10.00 per public share, or such lesser per public share amount as is in the Trust Account on the liquidation date, by the claims of prospective target businesses with which we have entered into an acquisition agreement or claims of any third party for services rendered or products sold to us, but only if such a vendor or target business has not executed a waiver of any and all rights to seek access to the Trust Account;

163

Supp.App. 0529

Table of Contents

- the continued indemnification of our existing directors and officers and the continuation of our directors' and officers' liability insurance after the Business Combination;

- the fact that the Sponsor, officers and directors will lose their entire investment in us and will not be reimbursed for any further out-of-pocket expenses if an initial business combination is not consummated by July 24, 2017; and

- that, at the closing of the Business Combination we will enter into the Registration Rights Agreement with the Restricted Stockholders, which provides for registration rights to Restricted Stockholders and their permitted transferees.

**PIPE Investment**

In connection with the Business Combination, the Company entered into the subscription or commitment agreements with certain investors on June 15, 2017 to purchase or waive redemption rights in respect of shares of Quinpario Common Stock for an aggregate commitment amount of approximately $275.5 million, with the PIPE Investment consisting of 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock sold and 835,626 shares of Quinpario Common Stock issued in respect of waivers of redemptions or conversion rights. The shares of Quinpario Common Stock and Series A Convertible Preferred Stock to be sold in connection with the PIPE Investment will be issued at a price per share of $8.00. The closing of the PIPE Investment is subject to certain conditions, including the closing of the Business Combination.

The Quinpario Common Stock and Series A Convertible Preferred Stock to be issued pursuant to the subscription agreements will not be registered under the Securities Act in reliance upon the exemption provided in Section 4(a)(2) of the Securities Act and/or Regulation D promulgated thereunder. The conditions to completing the PIPE Investment under the subscription agreements include a condition that all conditions to the closing of the Business Combination shall have been satisfied or waived. The PIPE Investment is anticipated to close immediately prior to the Business Combination. The shares of Quinpario Common Stock to be received in the PIPE Investment will be subject to registration rights and Quinpario has agreed to use commercially reasonable efforts to file a registration statement with the SEC for resales of such shares within 15 days after completion of the Business Combination and certain of the agreements provide for remedies relating to delays or unavailability of a resale registration statement. These shares of Quinpario Common Stock are not subject to contractual restrictions on resale and may be sold at any time by such investors or advisors following the registration of such shares in accordance with the subscription or commitment agreements (or at any time following the Business Combination in the case of the publicly traded shares).

Apollo Novitex Holdings, L.P. and HGM Group are participants in the PIPE Investment. The Company and Apollo Novitex Holdings, L.P. have entered into a subscription agreement pursuant to which Apollo Novitex Holdings, L.P., will subscribe for and purchase shares of Quinpario Common Stock for $8.00 per share. Quinpario and members of the HGM Group have also entered into a subscription agreement, pursuant to which HGM Group will reinvest a consulting agreement termination fee received by it pursuant to the terms of the Business Combination Agreement in exchange for Quinpario Common Stock for $8.00 per share.

As part of the PIPE Investment, Quinpario entered into subscription and commitment agreements, each dated June 15, 2017, with certain of its advisors (the "Advisors"), pursuant to which the payment of an aggregate of $33.6 million of fees owed to such Advisors for their services will be settled either through settlement or investment of such fees (or, for one advisor, reimbursement of such fees in respect of prior purchases of publicly traded shares) in an aggregate amount of 3,440,625 newly issued shares of Quinpario Common Stock and 762,500 publicly traded shares in respect of which a waiver of redemption and/or conversion was obtained (the "Advisors Subscription Agreements").

164

Supp.App. 0530

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 533 of 1110     PageID 2154

The subscription and commitment agreements, including the Advisors Subscription Agreements, will be terminated, and be of no further force and effect, upon the earlier to occur of (i) the termination of the Business Combination Agreement in accordance with its terms, (ii) the mutual written agreement of the parties thereto or (iii) if any of the conditions to the closing are not satisfied on or prior to the closing and which make the consummation fail to occur. Certain of the subscription and commitment agreements have provisions whereby they will be terminated, and be of no further force and effect, if the closing of the Business Combination has not occurred by August 31, 2017.

*Commitment Agreements*

In connection with the Business Combination as part of the aggregate commitment amount of $275.5 million, the Company has entered into commitment agreements with certain investors (including one advisor who has agreed to receive fees as a reimbursement for acquisitions of shares of Quinpario Common Stock). The commitment agreements require that such investors (i) acquire and/or hold by June 27, 2017, 3,342,500 shares of Quinpario Common Stock, in the aggregate, in the open market, (ii) hold such shares until the closing of the Business Combination, (iii) waive the exercise of any redemption rights in respect of such shares or otherwise transfer or sell such shares prior to the closing date of the Business Combination and (iv) not resell, transfer, pledge or otherwise dispose of the Quinpario Common Stock prior to the closing of the Business Combination. In exchange for such investor's agreement to hold the shares and not exercise any redemption rights in respect of such shares, such investors will receive 0.25 additional shares for each such purchased share they hold on the date of closing of the Business Combination. In the event that such an investor is unable to acquire any one of the committed number of shares in the open market, such investor will subscribe for and purchase (or in the case of one advisor, be issued in respect of fees) 1.25 shares of Quinpario Common Stock as part of the PIPE Investment for $8.00 per share.

**Fees and Other Consideration**

Quinpario entered into agreements, each dated June 15, 2017, with certain advisors, pursuant to which the advisors received finders fees payable in shares in an aggregate amount equal to 125,000 shares of Quinpario Common Stock (at a valuation of $8.00 per share). Additionally, certain persons who are not affiliates of Quinpario received 1,578,126 shares of Quinpario Common Stock for no or de minimis consideration in connection with the transactions.

**New SourceHOV Financing Summary**

In connection with the financing of the Business Combination transaction, SourceHOV has entered into certain commitment letters with certain lenders in order to provide financing (the "New SourceHOV Financing"), the net proceeds of which will be used by a subsidiary of New SourceHOV LLC to purchase shares of Series A Convertible Preferred Stock and Quinpario Common Stock as part of the PIPE Investment in an amount up to $57.5 million. The amount of the New SourceHOV Financing (and New SourceHOV LLC's corresponding PIPE Investment) will depend on the number of shares of Quinpario Common Stock redeemed prior to the Business Combination. The New SourceHOV Financing is conditioned upon the consummation of the Business Combination concurrently with the closing of the New SourceHOV Financing and other conditions including, among other things, (i) the receipt of customary legal opinions, (ii) documentation and other information required under "know your customer" and anti-money laundering rules and regulations, (iii) corporate documents and officers' certifications, (iv) customary closing certificates, (v) all documents and instruments required for the creation and perfection of security interests in collateral, (vi) accuracy of representations of warranties in all material respects and (vii) delivery of a notice of borrowing. In addition, the borrower under the New SourceHOV Financing will be subject to certain customary affirmative and negative covenants.

165

Supp.App. 0531

**Debt Financing**

In connection with the entry into the Business Combination Agreement, Quinpario has entered into a commitment letter, as amended or modified from time to time, which we refer to as the "debt commitment letter," with Royal Bank of Canada, RBC Capital Markets, LLC, Credit Suisse AG, Cayman Islands Branch, Credit Suisse Securities (USA) LLC, Natixis, New York Branch, Natixis Securities Americas LLC, KKR Capital Markets LLC and KKR Corporate Lending LLC to provide a wholly-owned subsidiary of Quinpario (the "Borrower"), severally but not jointly, upon the terms and subject to the conditions set forth in the debt commitment letter, in the aggregate up to $1.35 billion in debt financing as well as a $100 million senior secured revolving facility (only a portion of which is available to be drawn at the closing of the Business Combination), consisting of the following:

- up to a $525 million senior secured term facility;

- a $100 million senior secured revolving facility;

- up to a $525 million senior secured bridge facility (less the amount of any senior secured notes issued as described below); and

- up to a $300 million senior unsecured bridge facility (less the amount of any senior unsecured notes issued as described below).

The debt commitment letter contemplates the following indicative interest rates for borrowings under the senior secured term facility and senior secured revolving facility: at the Borrower's option, either (1) an adjusted LIBOR, subject to a 1.00% floor in the case of term loans, or (2) a base rate, in each case plus an applicable margin. The indicative applicable margin contemplated by the debt commitment letter is 5.50% with respect to LIBOR borrowings and 4.50% with respect to base rate borrowings. The applicable margin for borrowings under the senior secured revolving credit facility may be subject to one or more step-downs based on leverage ratios to be agreed. The indicative interest rates for the bridge facilities contemplated in the debt commitment letter are (1) an adjusted LIBOR plus 6.50% for the senior secured bridge facility and (2) an adjusted LIBOR plus 9.50% for the senior unsecured bridge facility, in each case subject to a 1.00% LIBOR floor.

The debt commitment letter contemplates that the Borrower will, at its option, either (1) issue senior secured notes in a Rule 144A or other private placement yielding up to $525 million in aggregate gross cash proceeds and/or (2) if any or all of the senior secured notes are not issued on or prior to the closing date of the Business Combination and the proceeds thereof made available to the Borrower on the closing date of the Business Combination, borrow up to such unissued amount in the form of senior secured bridge loans under the senior secured bridge facility.

The debt commitment letter also contemplates that the Borrower will, at its option, either (1) issue senior unsecured notes in a Rule 144A or other private placement yielding up to $300 million in aggregate gross cash proceeds and/or (2) if any or all of the senior unsecured notes are not issued on or prior to the closing date of the Business Combination and the proceeds thereof made available to the Borrower on the closing date of the Business Combination, borrow up to such unissued amount in the form of senior unsecured bridge loans under the senior unsecured bridge facility.

The proceeds of the Debt Financing will be used (1) to repay certain existing indebtedness of SourceHOV and Novitex; (2) to pay fees and expenses incurred in connection with the Business Combination; and (3) for general corporate purposes.

The obligations of the debt commitment parties to provide the Debt Financing under the debt commitment letter are subject to a number of conditions, including (1) the execution and delivery of definitive documentation consistent with the terms of the debt commitment letter; (2) the simultaneous or substantially concurrent completion of the Business Combination in accordance with the Business Combination Agreement (without giving effect to any amendment, waiver, consent or other

166

Supp.App. 0532

Table of Contents

modification thereof by Quinpario that is materially adverse to the interests of the lenders (in their capacities as such) unless it is approved by the debt commitment parties); (3) the consummation of the equity contribution, prior to, or substantially simultaneously or concurrently with, the initial borrowings under the debt facilities; (4) since February 21, 2017, no Material Adverse Effect (as defined under the section of this proxy statement captioned "*Proposal No. 1—Approval of the Business Combination—The Business Combination Agreement*"); (5) delivery of certain audited, unaudited and pro forma financial statements; (6) as a condition to the availability of the senior secured bridge facility, the Borrower having used commercially reasonable efforts to afford the investment banks a marketing period of 15 consecutive calendar days (subject to certain blackout dates) following receipt of a preliminary prospectus, preliminary offering memorandum or preliminary private placement memorandum, which includes certain financial statements; (7) as a condition to the availability of the senior unsecured bridge facility, the Borrower having used commercially reasonable efforts to afford the investment banks a marketing period of 15 consecutive calendar days (subject to certain blackout dates) following receipt of a preliminary prospectus, preliminary offering memorandum or preliminary private placement memorandum, which includes certain financial statements; (8) as a condition to the availability of the senior secured term loan facility and the senior secured revolving facility, the Borrower having used commercially reasonable efforts to afford the arrangers a marketing period of 15 consecutive calendar days (subject to certain blackout dates) following receipt of a customary confidential information memorandum; (9) payment of all applicable invoiced fees and expenses; (10) the repayment of certain outstanding debt of SourceHOV and Novitex; (11) the receipt of documentation and other information about the borrower and guarantors required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations (including the PATRIOT Act); (12) the execution and delivery of guarantees by certain guarantors and the taking of certain actions necessary to establish and perfect a security interest in specified items of collateral; (13) the accuracy in all material respects of specified representations and warranties in the loan documents under which the Debt Financing will be provided and of certain representations and warranties in the Business Combination Agreement; and (14) delivery of certain customary closing documents.

The obligations of the debt commitment parties to provide the Debt Financing under the debt commitment letter will terminate at the earlier of (1) July 24, 2017; (2) the termination of the Business Combination Agreement without the consummation of the Business Combination having occurred; and (3) the consummation of the Business Combination without the use of the applicable debt financing.

Quinpario, SourceHOV and Novitex are required under the Business Combination Agreement to use their respective commercially reasonable efforts to take (or cause to be taken) all actions and do (or cause to be done) all things reasonably necessary, proper or advisable to arrange and obtain the financing on the terms and conditions contemplated by the debt commitment letter and any related fee letter. In the event the debt commitment letter is terminated or any portion of the Debt Financing becomes unavailable on the terms and conditions contemplated in the debt commitment letter and the related fee letter for any reason, Quinpario, SourceHOV and Novitex are required under the Business Combination Agreement to use their commercially reasonable efforts to arrange for Quinpario to obtain alternative financing from alternative sources on terms and conditions that are not less favorable to Quinpario, SourceHOV and Novitex than those set forth in the debt commitment letter and the related fee letter and in an amount at least equal to the Debt Financing or such unavailable portion thereof. As of the last practicable date before the printing of this proxy statement, the debt commitment letter remains in effect. Except as described in this proxy statement, there is no plan or arrangement regarding the refinancing or repayment of the Debt Financing. The documentation governing the Debt Financing contemplated by the debt commitment letter has not been finalized and, accordingly, the actual terms of the Debt Financing may differ from those described in this proxy statement.

167

Supp.App. 0533

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 536 of 1110    PageID 2157

**Board of Directors of Quinpario Following the Business Combination**

Upon consummation of the Business Combination, our board of directors anticipates increasing its initial size from seven directors to eight directors, with each Class A director having a term that expires at the combined company's annual meeting of stockholders in 2018, each Class B director having a term that expires at the combined company's annual meeting of stockholders in 2019 and each Class C director having a term that expires at the combined company's annual meeting of stockholders in 2020, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death. Please see the sections entitled "*Management After the Business Combination*" for additional information. An information statement has been prepared, filed with the SEC and transmitted to Quinpario stockholders with this proxy statement pursuant to Section 14(f) of the Exchange Act and Rule 14f-1 in connection with the change in composition of the board of directors of the combined company.

**The Certificate Proposals; Bylaws**

Upon the closing of the Business Combination, our current certificate of incorporation will be amended promptly to reflect the Certificate Proposals to:

- authorize an additional 1,465,000,000 shares of Quinpario Common Stock and an additional 19,000,000 shares of preferred stock;

- provide that certain provisions of the certificate of incorporation of the Company are subject to the Director Nomination Agreements;

- change the Company's corporate name from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc.";

- provide that certain transactions are not "corporate opportunities" and that certain persons, including the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity; and

- provide for certain additional changes, including eliminating certain provisions specific to our status as a blank check company, providing that our directors are not personally liable to the Company or our stockholders for monetary damages for a breach of fiduciary duty, and certain indemnification provisions our board of directors believes are necessary to adequately address the needs of the combined company, subject to approval by our stockholders at the Special Meeting.

In addition, upon the closing of the Business Combination, it is anticipated that the combined company will adopt the amended and restated bylaws attached to this proxy statement as Annex C.

**Name**

The name of the combined company after the Business Combination will be Exela Technologies, Inc.

**Redemption Rights**

Pursuant to our current certificate of incorporation, holders of public shares may elect to have their shares redeemed for cash at the applicable redemption price per share calculated in accordance with our amended and restated certificate of incorporation. As of March 31, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises his or her redemption rights, then such holder will be exchanging its shares of Quinpario Common Stock for cash and will no longer own shares of Quinpario. Such a holder will be entitled to receive cash for its public shares only if it (a) affirmatively votes its shares of Quinpario Common Stock for or against the Business Combination

168

Supp.App. 0534

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 537 of 1110    PageID 2158

Proposal and (b) properly demands redemption and delivers its shares (either physically or electronically) to the Transfer Agent prior to the Special Meeting. Additionally, shares properly tendered for redemption will only be redeemed if the Business Combination is consummated. See the section entitled "*Special Meeting of Quinpario Stockholders— Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash.

**Potential Purchases of Public Shares**

In connection with the stockholder vote to approve the proposed Business Combination, the Sponsor and Quinpario's directors or officers or their respective affiliates may privately negotiate transactions to purchase shares from stockholders who would have otherwise elected to have their shares redeemed in conjunction with a proxy solicitation pursuant to the proxy rules for a per-share pro rata portion of the Trust Account. None of our directors or officers or their respective affiliates will make any such purchases when they are in possession of any material non-public information not disclosed to the seller or during a restricted period under Regulation M under the Exchange Act. Such a purchase would include a contractual acknowledgement that such stockholder, although still the record holder of our shares, is no longer the beneficial owner thereof and therefore agrees not to exercise its redemption rights, and would include a contractual provision that directs such stockholder to vote such shares in a manner directed by the purchaser. In the event that the Sponsor or Quinpario's directors or officers or their respective affiliates purchase shares in privately negotiated transactions from public stockholders who have already elected to exercise their redemption rights, such selling stockholders would be required to revoke their prior elections to redeem their shares. Any such privately negotiated purchases may be effected at purchase prices that are in excess of the per-share pro rata portion of the Trust Account. The purpose of such purchases would be to increase the likelihood of obtaining stockholder approval of the Business Combination.

**Appraisal Rights**

There are no appraisal rights available to our stockholders in connection with the Business Combination.

**Accounting Treatment**

The business combination will be accounted for as a business combination for which SourceHOV has been determined to be the accounting acquirer based on the following predominate factors:

- SourceHOV will have the largest portion of voting rights in the newly formed entity;

- The largest minority shareholder of the combined entity is a current SourceHOV shareholder;

- SourceHOV is the largest entity by revenue and by assets; and

- The management of the newly formed entity is expected to be primarily composed of the management of SourceHOV, with Par Chadha anticipated to serve as Executive Chairman, Ronald Cogburn to serve as Chief Executive Officer, Jim Reynolds to serve as Chief Financial Officer, Shrikant Sortur to serve as Senior Vice President, Global Finance, Suresh Yannamani to serve as President, Americas and Mark Fairchild to serve as President, Europe, however other specific roles have yet to be determined.

Since SourceHOV is determined to be the accounting acquirer in the reverse merger with Quinpario, the accounting for the merger will be similar to that of a capital infusion as the only pre-combination asset of the Company is cash held in trust. The assets and liabilities of the Company will be carried at historical cost and SourceHOV will not record any step-up in basis or any intangible assets or goodwill as a result of the merger with Quinpario. The acquisition of Novitex will be treated

169

Supp.App. 0535

Table of Contents

as a business combination under ASC 805 and will be accounted for using the acquisition method. SourceHOV will record the fair value of assets and liabilities acquired from Novitex.

**Material U.S. Federal Income Tax Considerations for Stockholders Exercising Redemption Rights**

The following discussion is a summary of United States federal income tax considerations for beneficial owners of Quinpario Common Stock that elect to have their Quinpario Common Stock redeemed for cash if the acquisition is completed. This summary is based upon the Internal Revenue Code of 1986, as amended, which we refer to as the "Code," the regulations promulgated by the U.S. Treasury Department, current administrative interpretations and practices of the U.S. Internal Revenue Service, which we refer to as the "IRS," and judicial decisions, all as currently in effect and all of which are subject to differing interpretations or to change, possibly with retroactive effect. No assurance can be given that the IRS would not assert, or that a court would not sustain a position contrary to any of the tax considerations described below. This summary does not discuss all aspects of United States federal income taxation that may be relevant to particular investors in light of their particular circumstances, such as investors subject to special tax rules (e.g., financial institutions, insurance companies, mutual funds, pension plans, S corporations, broker-dealers, traders in securities that elect mark-to-market treatment, regulated investment companies, real estate investment trusts, trusts and estates, partnerships and their partners, and tax-exempt organizations (including private foundations)) and investors that hold Quinpario Common Stock as part of a "straddle," "hedge," "conversion," "synthetic security," "constructive ownership transaction," "constructive sale," or other integrated transaction for United States federal income tax purposes, investors subject to the alternative minimum tax provisions of the Code, U.S. Holders (as defined below) that have a functional currency other than the United States dollar, U.S. expatriates, investors that actually or constructively own 5 percent or more of Quinpario Common Stock, and Non-U.S. Holders (as defined below, and except as otherwise discussed below), all of whom may be subject to tax rules that differ materially from those summarized below. In addition, this summary does not discuss any state, local, or non-United States tax considerations, any non-income tax (such as gift or estate tax) considerations, alternative minimum tax or the Medicare tax. In addition, this summary is limited to investors that hold Quinpario Common Stock as "capital assets" (generally, property held for investment) under the Code.

If a partnership (including an entity or arrangement treated as a partnership for United States federal income tax purposes) holds Quinpario Common Stock, the tax treatment of a partner in such partnership will generally depend upon the status of the partner, the activities of the partnership and the partner and certain determinations made at the partner level. If you are a partner of a partnership holding Quinpario Common Stock, you are urged to consult your tax advisor regarding the tax consequences of a redemption.

While the issue is not free from doubt, the following discussion assumes that each share of Quinpario Common Stock and a warrant that compose a unit will be treated for U.S. federal income tax purposes as separate instruments and the unit itself will not be treated as an integrated instrument. No assurance can be given, however, that the IRS would not assert, or that a court would not sustain a contrary position. You are urged to consult your tax advisor concerning the U.S. federal, state, local and any foreign tax consequences of an investment in a unit (including alternative characterizations of a unit).

WE URGE HOLDERS OF QUINPARIO COMMON STOCK CONTEMPLATING EXERCISE OF THEIR REDEMPTION RIGHTS TO CONSULT THEIR TAX ADVISORS CONCERNING THE UNITED STATES FEDERAL, STATE, LOCAL, AND FOREIGN INCOME AND OTHER TAX CONSEQUENCES THEREOF.

170

Supp.App. 0536

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 539 of 1110    PageID 2160

Table of Contents

*U.S. Federal Income Tax Considerations to U.S. Holders*

This section is addressed to U.S. holders of Quinpario Common Stock that elect to have their Quinpario Common Stock redeemed for cash as described in the sections entitled "*—Redemption Rights*" and "*Special Meeting of Quinpario Stockholders—Redemption Rights*." For purposes of this discussion, a "U.S. Holder" is a beneficial owner of Quinpario Common Stock that so redeems its Quinpario Common Stock and is:

- an individual who is a United States citizen or resident of the United States;

- a corporation (including an entity treated as a corporation for United States federal income tax purposes) created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is includible in gross income for United States federal income tax purposes regardless of its source; or

- a trust (A) the administration of which is subject to the primary supervision of a United States court and which has one or more United States persons (within the meaning of the Code) who have the authority to control all substantial decisions of the trust or (B) that has in effect a valid election under applicable Treasury regulations to be treated as a United States person.

### *Redemption of Quinpario Common Stock*

In the event that a U.S. Holder's Quinpario Common Stock is redeemed pursuant to the redemption provisions described in the sections entitled "*—Redemption Rights*" and "*Special Meeting of Quinpario Stockholders—Redemption Rights*," the treatment of the transaction for U.S. federal income tax purposes will depend on whether the redemption qualifies as sale of the Quinpario Common Stock under Section 302 of the Code. Generally, whether the redemption qualifies for sale treatment will depend largely on the total number of shares of our stock treated as held by the U.S. Holder (including any stock constructively owned by the U.S. Holder as a result of owning warrants) relative to all of our shares treated as held by the U.S. Holder both before and after the redemption. The redemption of Quinpario Common Stock generally will be treated as a sale of the Quinpario Common Stock (rather than as a distribution) if the redemption (i) is "substantially disproportionate" with respect to the U.S. Holder, (ii) results in a "complete termination" of the U.S. Holder's interest in us or (iii) is "not essentially equivalent to a dividend" with respect to the U.S. Holder.

In determining whether any of the foregoing tests are satisfied, a U.S. Holder generally takes into account not only stock actually owned by the U.S. Holder, but also shares of our stock that are constructively owned by it. A U.S. Holder may constructively own, in addition to stock owned directly, stock owned by certain related individuals and entities in which the U.S. Holder has an interest or that have an interest in such U.S. Holder, as well as any stock the U.S. Holder has a right to acquire by exercise of an option, which would generally include Quinpario Common Stock which could be acquired pursuant to the exercise of the warrants. In order to meet the substantially disproportionate test, the percentage of our outstanding voting stock actually and constructively owned by the U.S. Holder immediately following the redemption of Quinpario Common Stock must, among other requirements, be less than 80% of the Quinpario Common Stock actually and constructively owned by the U.S. Holder immediately before the redemption. There will be a complete termination of a U.S. Holder's interest if either (i) all of the shares of our stock actually and constructively owned by the U.S. Holder are redeemed or (ii) all of the shares of our stock actually owned by the U.S. Holder are redeemed and the U.S. Holder is eligible to waive, and effectively waives in accordance with specific rules, the attribution of stock owned by certain family members and the U.S. Holder does not constructively own any other stock and certain other requirements are met. The redemption of the Quinpario Common Stock will not be essentially equivalent to a dividend if a U.S. Holder's conversion

171

Supp.App. 0537

Table of Contents

results in a "meaningful reduction" of the U.S. Holder's proportionate interest in us. Whether the redemption will result in a meaningful reduction in a U.S. Holder's proportionate interest in us will depend on the particular facts and circumstances. The IRS has indicated in a published ruling that even a small reduction in the proportionate interest of a small minority stockholder in a publicly held corporation who exercises no control over corporate affairs may constitute such a "meaningful reduction."

If none of the foregoing tests are satisfied, then the redemption will be treated as a distribution and the tax effects will be as described below under "—*U.S. Federal Income Tax Considerations to U.S. Holders—Taxation of Distributions*."

U.S. Holders of Quinpario Common Stock considering exercising their redemption rights are urged to consult their tax advisors to determine whether the redemption of their Quinpario Common Stock would be treated as a sale or as a distribution under the Code.

**Gain or Loss on Sale, Taxable Exchange, or Other Taxable Disposition of Quinpario Common Stock**

If the redemption qualifies as a sale of Quinpario Common Stock, a U.S. Holder must treat any gain or loss recognized upon a sale, taxable exchange or other taxable disposition of Quinpario Common Stock as capital gain or loss. Any such capital gain or loss will be long-term capital gain or loss if the U.S. Holder's holding period for the Quinpario Common Stock so disposed of exceeds one year. Generally, a U.S. Holder will recognize gain or loss in an amount equal to the difference between (i) the sum of cash and the fair market value of any property received in such disposition (or, if the Quinpario Common Stock is held as part of a unit at the time of the disposition, the portion of the amount realized on such disposition that is allocated to the Quinpario Common Stock based upon the then fair market values of the Quinpario Common Stock and the warrant included in the unit) and (ii) the U.S. Holder's adjusted tax basis in its Quinpario Common Stock so disposed of. A U.S. Holder's adjusted tax basis in its Quinpario Common Stock generally will equal the U.S. Holder's acquisition cost of the Quinpario Common Stock (which, if the Quinpario Common Stock was acquired as part of a unit, is the portion of the purchase price of the unit allocated to the share of Quinpario Common Stock or, or, if the Quinpario Common Stock was received upon exercise of a warrant the initial basis of the Quinpario Common Stock upon exercise of the warrant) less any prior distributions treated as a return of capital. Long-term capital gain realized by a non-corporate U.S. Holder generally will be taxable at a reduced rate. The deduction of capital losses is subject to limitations.

**Taxation of Distributions**

If the redemption does not qualify as a sale of Quinpario Common Stock, the U.S. Holder will be treated as receiving a distribution. In general, any distributions to U.S. Holders generally will constitute dividends for United States federal income tax purposes to the extent paid from our current or accumulated earnings and profits, as determined under United States federal income tax principles. Distributions in excess of current and accumulated earnings and profits will constitute a return of capital that will be applied against and reduce (but not below zero) the U.S. Holder's adjusted tax basis in the Quinpario Common Stock. Any remaining excess will be treated as gain realized on the sale or other disposition of the Quinpario Common Stock and will be treated as described above under "—*U.S. Federal Income Tax Considerations to U.S. Holders—Gain or Loss on Sale, Taxable Exchange, or Other Taxable Disposition of Quinpario Common Stock*." Dividends we pay to a U.S. Holder that is a taxable corporation generally will qualify for the dividends received deduction if the requisite holding period is satisfied. With certain exceptions, and provided certain holding period requirements are met, dividends we pay to a non-corporate U.S. Holder generally will constitute "qualified dividends" that will be taxable at a reduced rate.

172

Supp.App. 0538

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 541 of 1110    PageID 2162

*U.S. Federal Income Tax Considerations to Non-U.S. Holders*

This section is addressed to Non-U.S. holders (as defined below) of Quinpario Common Stock that elect to have their Quinpario Common Stock redeemed for cash as described in the sections entitled "—*Redemption Rights*" and "*Special Meeting of Quinpario Stockholders—Redemption Rights*." For purposes of this discussion, a "Non-U.S. Holder" is a beneficial owner of Quinpario Common Stock that so redeems its Quinpario Common Stock and is not a U.S. Holder.

### Redemption of Quinpario Common Stock

The characterization for United States federal income tax purposes of the redemption of a Non-U.S. Holder's Quinpario Common Stock pursuant to the redemption provisions described in the sections entitled "—*Redemption Rights*" and "*Special Meeting of Quinpario Stockholders—Redemption Rights*" generally will correspond to the United States federal income tax characterization of such a redemption of a U.S. Holder's Quinpario Common Stock, as described under "—*U.S. Federal Income Tax Considerations to U.S. Holders*."

Non-U.S. Holders of Quinpario Common Stock considering exercising their redemption rights should consult their tax advisors as to whether the redemption of their Quinpario Common Stock will be treated as a sale or as a distribution under the Code.

### Gain on Sale, Taxable Exchange or Other Taxable Disposition of Quinpario Common Stock

Subject to the discussion below under "—*Taxation of Quinpario Common Stock Held Through Foreign Accounts*," if the redemption qualifies as a sale of Quinpario Common Stock, a Non-U.S. Holder generally will not be subject to United States federal income or withholding tax in respect of gain recognized on a sale of its Quinpario Common Stock, unless:

- the gain is effectively connected with the conduct of a trade or business by the Non-U.S. Holder within the United States (and, under certain income tax treaties, is attributable to a United States permanent establishment or fixed base maintained by the Non-U.S. Holder), in which case the Non-U.S. Holder will generally be subject to the same treatment as a U.S. Holder with respect to the redemption, and a corporate Non-U.S. Holder may be subject to the branch profits tax at a 30% rate (or lower rate as may be specified by an applicable income tax treaty);

- the Non-U.S. Holder is an individual who is present in the United States for 183 days or more in the taxable year in which the redemption takes place and certain other conditions are met, in which case the Non-U.S. Holder will be subject to a 30% tax on the individual's net capital gain for the year; or

- we are or have been a "U.S. real property holding corporation" for United States federal income tax purposes at any time during the shorter of the five-year period ending on the date of disposition or the period that the Non-U.S. Holder held the Quinpario Common Stock, and, in the case where shares of Quinpario Common Stock are regularly traded on an established securities market, the Non-U.S. Holder has owned, directly or constructively, more than 5% of Quinpario Common Stock at any time within the shorter of the five-year period preceding the disposition or such Non-U.S. Holder's holding period for the shares of Quinpario Common Stock.

With respect to the third bullet point above, there can be no assurance that Quinpario Common Stock will be treated as regularly traded on an established securities market. Quinpario Acquisition Corp. 2 does not believe that it will be a "United States real property holding corporation" for U.S. federal income tax purposes.

173

Supp.App. 0539

*Taxation of Distributions*

If the redemption does not qualify as a sale of Quinpario Common Stock, the Non-U.S. Holder will be treated as receiving a distribution. Subject to the discussion below under "—*Taxation of Quinpario Common Stock Held Through Foreign Accounts*," in general, any distributions we make to a Non-U.S. Holder on shares of Quinpario Common Stock, to the extent paid out of our current or accumulated earnings and profits (as determined under United States federal income tax principles), will constitute dividends for U.S. federal income tax purposes and, provided such dividends are not effectively connected with the Non-U.S. Holder's conduct of a trade or business within the United States, the applicable withholding agent will be required to withhold tax from the gross amount of the dividend at a rate of 30%, unless such Non-U.S. Holder is eligible for a reduced rate of withholding tax under an applicable income tax treaty and provides proper certification of its eligibility for such reduced rate. Any distribution not constituting a dividend will be treated first as reducing (but not below zero) the Non-U.S. Holder's adjusted tax basis in its shares of Quinpario Common Stock (and, subject to the discussion below under "—*Taxation of Quinpario Common Stock Held Through Foreign Accounts*," and the third bullet point above under "—*U.S. Federal Income Tax Considerations to Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Quinpario Common Stock*," to the extent such distribution does not exceed the adjusted tax basis such amount will generally not be subject to withholding) and, to the extent such distribution exceeds the Non-U.S. Holder's adjusted tax basis, as gain realized from the sale or other disposition of Quinpario Common Stock, which will be treated as described above under "—*U.S. Federal Income Tax Considerations to Non-U.S. Holders—Gain on Sale, Taxable Exchange or Other Taxable Disposition of Quinpario Common Stock*." Dividends we pay to a Non-U.S. Holder that are effectively connected with such Non-U.S. Holder's conduct of a trade or business within the United States generally will not be subject to United States withholding tax, provided such Non-U.S. Holder complies with certain certification and disclosure requirements. Instead, such dividends generally will be subject to United States federal income tax, net of certain deductions, at the same graduated individual or corporate rates applicable to U.S. Holders (subject to an exemption or reduction in such tax as may be provided by an applicable income tax treaty). If the Non-U.S. Holder is a corporation, dividends that are effectively connected income may also be subject to a "branch profits tax" at a rate of 30% (or such lower rate as may be specified by an applicable income tax treaty).

*Taxation of Quinpario Common Stock Held Through Foreign Accounts*

A 30% withholding tax applies with respect to certain payments on, and, after December 31, 2018, gross proceeds from a sale or disposition of, Quinpario Common Stock, in each case if paid to a foreign financial institution or a non-financial foreign entity (including, in some cases, when such foreign financial institution or entity is acting as an intermediary), unless (i) in the case of a foreign financial institution, such institution enters into an agreement with the U.S. government to withhold on certain payments, and to collect and provide to the U.S. tax authorities substantial information regarding U.S. account holders of such institution (which includes certain equity and debt holders of such institution, as well as certain account holders that are foreign entities with U.S. owners), (ii) in the case of a non-financial foreign entity, such entity certifies that it does not have any substantial U.S. owners or provides the withholding agent with a certification identifying the direct and indirect substantial U.S. owners of the entity, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. Under certain circumstances, a holder might be eligible for refunds or credits of such taxes. An intergovernmental agreement between the United States and an applicable foreign country or future Treasury Regulations may modify these requirements. U.S. Holders and Non-U.S. Holders are encouraged to consult their tax advisors regarding the possible implications of such withholding tax.

<center>174</center>

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 543 of 1110    PageID 2164

**Regulatory Matters**

Under the Hart Scott Rodino Antitrust Improvements Act of 1976, as amended ("HSR Act"), and the rules and regulations promulgated thereunder, certain transactions, including the Business Combination, may not be consummated until, among other things, pre-merger notifications have been made and certain information has been furnished to the Federal Trade Commission ("FTC") and the Antitrust Division of the Department of Justice ("Antitrust Division"), and certain waiting period requirements have expired or been terminated. All necessary pre-merger notifications under the HSR Act were made on March 24, 2017 and the waiting period was terminated on April 4, 2017.

At any time before or after consummation of the Business Combination, notwithstanding termination of the waiting period under the HSR Act, the applicable competition authorities could take such action under applicable antitrust laws as each deems necessary or desirable in the public interest, including seeking to enjoin the consummation of the Business Combination. Private parties may also seek to take legal action under the antitrust laws under certain circumstances. We cannot assure you that the Antitrust Division, the FTC, any state attorney general, or any other government authority will not attempt to challenge the Business Combination on antitrust grounds, and, if such a challenge is made, we cannot assure you as to its result. None of the parties to the Business Combination are aware of any material regulatory approvals or actions that are required for completion of the Business Combination other than with respect to the HSR Act. Under the Business Combination Agreement, any additional regulatory approvals or actions that are required will be promptly sought. There can be no assurance, however, that any additional approvals or actions will be obtained.

**Recommendation of the Board of Directors**

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE BUSINESS COMBINATION PROPOSAL.**

175

Supp.App. 0541

**PROPOSAL NO. 2—APPROVAL OF THE ISSUANCE OF MORE THAN 20% OF THE ISSUED AND
OUTSTANDING SHARES OF QUINPARIO COMMON STOCK PURSUANT TO THE BUSINESS
COMBINATION AND THE PIPE INVESTMENT**

Assuming the Business Combination Proposal is approved, the consideration to be paid by Quinpario in connection with the Business Combination will consist of: (i) 80,600,000 shares of Quinpario Common Stock to be issued to New SourceHOV LLC, a newly formed entity controlled by the HGM Group and owned by SourceHOV's equity holders and (ii) 30,600,000 shares of Quinpario Common Stock to be issued to Novitex Parent. In addition, Quinpario intends to issue an anticipated 21,694,015 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, which are convertible into 11,492,690 shares of Quinpario Common Stock, in the PIPE Investment and 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration.

The terms of the Business Combination and the PIPE Investment are complex and only briefly summarized above. For further information, please see the full text of the Business Combination Agreement, which is attached to this proxy statement as Annex A. The discussion herein is qualified in its entirety by reference to the Business Combination Agreement.

**Why the Company Needs Stockholder Approval**

We are seeking stockholder approval in order to comply with Nasdaq Listing Rules 5635(a), (b) and (d).

Under Nasdaq Listing Rule 5635(a), stockholder approval is required prior to the issuance of securities in connection with the acquisition of another company if such securities are not issued in a public offering and (A) have, or will have upon issuance, voting power equal to or in excess of 20% of the voting power outstanding before the issuance of Quinpario Common Stock (or securities convertible into or exercisable for Quinpario Common Stock); or (B) the number of shares of Quinpario Common Stock to be issued is or will be equal to or in excess of 20% of the number of shares of Quinpario Common Stock outstanding before the issuance of the stock or securities. Collectively, the Company may issue 20% or more of our outstanding Quinpario Common Stock or 20% or more of the voting power, in each case outstanding before the issuance, pursuant to the issuance of Quinpario Common Stock in connection with the Business Combination and the PIPE Investment.

Under Nasdaq Listing Rule 5635(b), stockholder approval is required prior to the issuance of securities when the issuance will result in a change of control of the issuer, which will occur upon consummation of the Business Combination.

Under Nasdaq Listing Rule 5635(d), stockholder approval is required for a transaction other than a public offering involving the sale, issuance or potential issuance by an issuer of Quinpario Common Stock (or securities convertible into or exercisable for Quinpario Common Stock) at a price that is less than the greater of book or market value of the stock if the number of shares of Common Stock to be issued is or may be equal to 20% or more of the Quinpario Common Stock, or 20% or more of the voting power, outstanding before the issuance.

**Effect of Proposal on Current Stockholders**

If the Nasdaq Proposal is adopted and the Business Combination is consummated, (i) 111,200,000 shares of Quinpario Common Stock will be issued in connection with the Business Combination and (ii) we anticipate that 21,694,015 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock, which are convertible into 11,492,690 shares of Quinpario Common Stock, will be issued in the PIPE Investment and 2,524,555 shares of Quinpario Common Stock will be issued

176

Supp.App. 0542

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 545 of 1110    PageID 2166

in respect of fees and other consideration, which collectively represents approximately 500% of the 28,848,601 shares of Quinpario Common Stock outstanding on the date hereof. The issuance of such shares would result in significant dilution to our stockholders, and would afford our stockholders a smaller percentage interest in the voting power, liquidation value and aggregate book value of the Company.

**Vote Required for Approval**

The approval of the Nasdaq Proposal requires the affirmative vote of holders of a majority of the shares of Quinpario Common Stock present and entitled to vote and actually cast a vote thereon at the Special Meeting. Abstentions, broker non-votes and the failure to vote by proxy or in person at the Special Meeting will have no effect on the approval of this proposal. This proposal is conditioned upon the approval of the Business Combination Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal. If the Business Combination Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal are not approved, this proposal will have no effect, even if approved by our stockholders.

**Recommendation of the Board of Directors**

**OUR BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE ISSUANCE OF MORE THAN 20% OF THE ISSUED AND OUTSTANDING SHARES OF QUINPARIO COMMON STOCK PURSUANT TO THE BUSINESS COMBINATION AND THE PIPE INVESTMENT.**

177

Supp.App. 0543

**PROPOSAL NO. 3—APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF
INCORPORATION TO AUTHORIZE ADDITIONAL SHARES OF CAPITAL STOCK**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve an amendment to our current certificate of incorporation, which is, in the judgment of our board of directors, necessary to consummate the Business Combination and adequately address the needs of the combined company.

There currently are 28,848,601 shares of Quinpario Common Stock issued and outstanding, consisting of 20,098,601 shares originally sold as part of the units issued in our IPO and 8,750,000 Founder Shares that were issued to the Sponsor prior to our IPO and which are currently held by the Founders (which excludes 1,312,500 shares forfeited following the consummation of the IPO). There are currently no shares of Company preferred stock issued and outstanding. In connection with the Business Combination, Quinpario expects to issue: (i) an aggregate of 111,200,000 newly issued shares of Quinpario Common Stock to the equityholders of SourceHOV and Novitex, (ii) 21,694,015 shares of newly issued Quinpario Common Stock and 9,400,000 shares of newly issued Series A Convertible Preferred Stock, which are convertible into 11,492,690 shares of Quinpario Common Stock, in the PIPE Investment and (iii) 2,524,555 shares of Quinpario Common Stock in respect of fees and other consideration.

Following the closing of the Business Combination, the Sponsor has agreed to the cancellation of 716,429 of the Founder Shares held by it pursuant to the Forfeiture Agreement. In addition, following the Business Combination, there will be 35,000,000 public warrants outstanding originally sold as part of units in our IPO, which are convertible into shares of Quinpario Common Stock after expiration of any applicable lock-up period. For more information about shares of Common Stock which may be issued in the Business Combination, please see the section entitled "*Proposal No. 1—Approval of the Business Combination*" and for more information about our Common Stock, warrants and Founder Shares, please see the section entitled "*Description of Securities*."

The amendment would increase our total number of authorized shares of all classes of capital stock from 136,000,000 shares to 1,620,000,000 shares, which would consist of (i) 1,600,000,000 shares of Quinpario Common Stock and (ii) 20,000,000 shares of preferred stock.

**Reasons for the Amendments**

The amendment is intended to provide adequate authorized share capital to: (i) accommodate the issuance of shares of Quinpario Common Stock in the Business Combination and the sale of Quinpario Common Stock and Series A Convertible Preferred Stock in the PIPE Investment to be consummated in connection with the Business Combination, as well as reserving for issuance shares of Quinpario Common Stock pursuant to the future conversion of outstanding warrants into shares of Quinpario Common Stock; and (ii) to provide flexibility for future issuances of Quinpario Common Stock and preferred stock if determined by our board of directors to be in the best interests of the combined company without incurring the risk, delay and potential expense incident to obtaining stockholder approval for a particular issuance.

**Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation**

The following table sets forth a summary of the change proposed to be made between our current certificate of incorporation and the proposed certificate of incorporation. This summary is qualified by reference to the complete text of the proposed certificate of incorporation, a copy of which is attached

178

Supp.App. 0544

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 547 of 1110    PageID 2168

to this proxy statement as Annex B. All stockholders are encouraged to read the proposed certificate of incorporation in its entirety for a more complete description of its terms.

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE FOURTH** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |
| | The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 136,000,000 of which 135,000,000 shares shall be Common Stock of the par value of $.0001 per share and 1,000,000 shares shall be Preferred Stock of the par value of $.0001 per share. | The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 1,620,000,000 of which 1,600,000,000 shares shall be Common Stock of the par value of $.0001 per share and 20,000,000 shares shall be Preferred Stock of the par value of $.0001 per share. |

Approval of this proposal is a condition to the completion of the Business Combination. If the proposal is not approved, the Business Combination will not occur. This proposal is conditioned upon the approval and completion of the Business Combination, the Nasdaq Proposal and the Corporate Opportunity Proposal; if the Business Combination Proposal, the Nasdaq Proposal or the Corporate Opportunity Proposal are not approved, this proposal will have no effect, even if approved by Quinpario's stockholders.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock is required to approve the amendments to our current certificate of incorporation. Broker non-votes, abstentions or the failure to vote by proxy or in person at the Special Meeting will have the same effect as a vote "AGAINST" this proposal.

**Recommendation of the Board of Directors**

QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION TO AUTHORIZE ADDITIONAL SHARES OF CAPITAL STOCK.

179

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 548 of 1110    PageID 2169

**PROPOSAL NO. 4—APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN PROVISIONS OF THE CERTIFICATE OF INCORPORATION ARE SUBJECT TO THE DIRECTOR NOMINATION AGREEMENTS**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve an amendment to our current certificate of incorporation, which is, in the judgment of our board of directors, necessary to consummate the Business Combination and adequately address the needs of the combined company.

At the closing of the Business Combination, the combined company will enter into Director Nomination Agreements with each of Novitex Parent and the HGM Group, substantially in the form attached to this proxy statement as Annex D, which will remain in effect for so long as the applicable Seller continues to beneficially own at least 5% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock). The Director Nomination Agreements will require that the individuals nominated for election as directors by our board of directors shall include a number of individuals selected by each of the Sellers such that, upon the election of each such individual, and each other individual nominated by or at the direction of our board of directors or a duly-authorized committee of the board, as a director of our company, the individuals selected by each Seller shall be: for so long as the applicable Seller beneficially owns at least 35% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), three directors; for so long as the applicable Seller beneficially owns at least 15%, but less than 35%, of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), two directors; and for so long as the applicable Seller beneficially owns at least 5%, but less than 15%, of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), one director. In the case of a vacancy on our board of directors created by the removal or resignation of an individual selected for nomination by a Seller, the Director Nomination Agreements will require us to appoint another individual selected by the applicable Seller. See "*Proposal No. 1—Approval of the Business Combination—Board of Directors of Quinpario Following the Business Combination*."

In addition, the Director Nomination Agreements will provide that for so long as a Seller continues to beneficially own at least 15% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), we cannot, without the consent of such Seller, engage in certain related party transactions, adopt an equity incentive plan or amend the same to increase the number of securities that may be granted thereunder, issue certain equity securities, including with a fair market value of more than $100 million, amend our certificate of incorporation or bylaws in a manner that adversely affects such Seller's rights under the Director Nomination Agreement or has a disproportionate impact on the interests of such Seller, enter into certain new lines of business, or increase or decrease the size of the board of directors or change the classes on which the members of the board of directors serve. The Director Nomination Agreement also provides for observation rights for each Seller (or Seller's Affiliate) to the extent that it has a right of nomination that it does not utilize. See "*Description of Securities—Consent Rights.*"

This amendment would indicate that the terms of the combined company's certificate of incorporation are subject to the terms of each Director Nomination Agreement when such terms are in conflict.

180

Supp.App. 0546

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 549 of 1110    PageID 2170

**Reasons for the Amendments**

The amendment is intended to provide that in the event that the terms of the combined company's certificate of incorporation conflict with the rights granted to the Sellers in the Director Nomination Agreement.

**Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation**

The following table sets forth a summary of the change proposed to be made between our current certificate of incorporation and the proposed certificate of incorporation. This summary is qualified by reference to the complete text of the proposed certificate of incorporation, a copy of which is attached to this proxy statement as Annex B. All stockholders are encouraged to read the proposed certificate of incorporation in its entirety for a more complete description of its terms.

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE ELEVENTH** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |
| | There is no applicable language in the current certificate of incorporation. | The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate (including any Preferred Stock Designation), in the manner now or hereafter prescribed by this Second Amended and Restated Certificate and the GCL; and, except as set forth in this Article ELEVENTH, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article ELEVENTH. In the event that the provisions of this Second Amended and Restated Certificate and the nomination agreement between the Corporation and Apollo Novitex Holdings, L.P. and the nomination agreement between the Corporation and HOVS LLC, HOVS Capital II LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and Ex-Sigma LLC conflict, the provisions of such nomination agreements shall take precedence over this Second Amended and Restated Certificate. |

This proposal is conditioned upon the approval and completion of the Business Combination, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal; if the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and

181

Supp.App. 0547

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 550 of 1110    PageID 2171

the Corporate Opportunity Proposal are not approved, this proposal will have no effect, even if approved by Quinpario's stockholders. This proposal is not a condition to the closing of the Business Combination, and the Business Combination may be consummated even if this proposal is not approved.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock is required to approve the amendments to our current certificate of incorporation. Broker non-votes, abstentions or the failure to vote by proxy or in person at the Special Meeting will have the same effect as a vote "AGAINST" this proposal.

**Recommendation of the Board of Directors**

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN PROVISIONS OF THE CERTIFICATE OF INCORPORATION OF THE COMPANY ARE SUBJECT TO THE DIRECTOR NOMINATION AGREEMENTS.**

182

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 551 of 1110    PageID 2172

Table of Contents

## PROPOSAL NO. 5—APPROVAL OF THE AMENDMENT TO THE CURRENT CERTIFICATE OF INCORPORATION TO CHANGE THE NAME OF THE COMPANY

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve an amendment to our current certificate of incorporation, which is, in the judgment of our board of directors, necessary to consummate the Business Combination and adequately address the needs of the combined company.

This amendment would change the name of the combined company to Exela Technologies, Inc.

### Reasons for the Amendments

Prior to the Business Combination, the Company's name is Quinpario Acquisition Corp. 2. The board of directors believes the name of the combined company should reflect the operating business the combined company intends to undertake.

### Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation

The following table sets forth a summary of the change proposed to be made between our current certificate of incorporation and the proposed certificate of incorporation. This summary is qualified by reference to the complete text of the proposed certificate of incorporation, a copy of which is attached to this proxy statement as Annex B. All stockholders are encouraged to read the proposed certificate of incorporation in its entirety for a more complete description of its terms.

| | Current Certificate | Proposed Certificate |
| --- | --- | --- |
| **RECITALS** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |
| | 1. The name of the Corporation is "Quinpario Acquisition Corp. 2." | 1. The name of the Corporation is "Exela Technologies, Inc." |

This proposal is conditioned upon the approval and completion of the Business Combination, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal; if the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal are not approved, this proposal will have no effect, even if approved by Quinpario's stockholders. This proposal is not a condition to the closing of the Business Combination, and the Business Combination may be consummated even if this proposal is not approved.

### Vote Required for Approval

The affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock is required to approve the amendments to our current certificate of incorporation. Broker non-votes, abstentions or the failure to vote by proxy or in person at the Special Meeting will have the same effect as a vote "AGAINST" this proposal.

### Recommendation of the Board of Directors

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE AMENDMENT TO THE CURRENT CERTIFICATE OF INCORPORATION TO CHANGE THE NAME OF THE COMPANY.**

Supp.App. 0549

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 552 of 1110    PageID 2173

**PROPOSAL NO. 6—APPROVAL OF AMENDMENTS TO THE CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN TRANSACTIONS ARE NOT 'CORPORATE OPPORTUNITIES'**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve an amendment to our current certificate of incorporation, which is, in the judgment of our board of directors, necessary to consummate the Business Combination and adequately address the needs of the combined company.

This amendment provides that certain transactions are not "corporate opportunities" and that certain persons, including the directors of the combined company, the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity.

**Reasons for the Amendments**

The new Article TENTH of the proposed certificate of incorporation provides that certain transactions are not "corporate opportunities" and that certain persons, including the directors of the combined company, the Sellers and their affiliates, are not subject to the doctrine of corporate opportunity and do not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the combined company or any of its subsidiaries. The board of directors believes that this change is appropriate because the combined company could not undertake certain opportunities (such as those it is not financially, contractually or legally able to undertake) in any case, and neither the Sellers nor their affiliates should be restricted from investing in or operating similar businesses because the Sellers would be unwilling or unable to enter into the Business Combination without such assurances due to their activities as investors in a wide range of companies.

**Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation**

The following table sets forth a summary of the change proposed to be made between our current certificate of incorporation and the proposed certificate of incorporation. This summary is qualified by reference to the complete text of the proposed certificate of incorporation, a copy of which is attached

184

Supp.App. 0550

to this proxy statement as Annex B. All stockholders are encouraged to read the proposed certificate of incorporation in its entirety for a more complete description of its terms.

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE TENTH** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |
| | There is no applicable language in the current certificate of incorporation. | A. The doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or directors in circumstances where the application of any such doctrine to a corporate opportunity would conflict with any fiduciary duties or contractual obligations they may have as of the date of this Second Amended and Restated Certificate or in the future. In addition to the foregoing, the doctrine of corporate opportunity shall not apply to any other corporate opportunity with respect to any of the directors or officers of the Corporation unless such corporate opportunity is offered to such person solely in his or her capacity as a director or officer of the Corporation and such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue. |
| | | B. Without limiting the foregoing, to the extent permitted by applicable law, each of the stockholders and directors of the Corporation, their respective affiliates and all of their respective partners, principals, directors, officers, members, managers, equity holders and/or employees, including any of the foregoing who serve as officers or directors of the Corporation (other than the Corporation and its subsidiaries and other than directors that are employees of the Corporation or any of its subsidiaries) (each, an "*Exempted Person*") shall not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. To the fullest extent permitted by applicable law, the Corporation, on behalf of itself and its subsidiaries, renounces any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an opportunity to participate in, business opportunities that are from time to time available to the Exempted Persons, even if the opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each such Exempted Person shall have no duty to communicate or offer such business |

185

Supp.App. 0551

Table of Contents

| Current Certificate | Proposed Certificate |
|---|---|
| | opportunity to the Corporation (and there shall be no restriction on the Exempted Persons using the general knowledge and understanding of the industry in which the Corporation operates which it has gained as an Exempted Person in considering and pursuing such opportunities or in making investment, voting, monitoring, governance or other decisions relating to other entities or securities) and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or any of its subsidiaries or stockholders for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such Exempted Person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries, or uses such knowledge and understanding in the manner described herein, in each case, except as otherwise expressly provided in any agreement entered into between the Company and such Exempted Person. In addition to and notwithstanding the foregoing, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy. Any person or entity purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of the provisions of this Article TENTH.<br><br>C. Neither the alteration, amendment, addition to or repeal of this Article TENTH, nor the adoption of any provision of this Second Amended and Restated Certificate (including any Preferred Stock Designation) inconsistent with this Article TENTH, shall eliminate or reduce the effect of this Article TENTH in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this Article TENTH, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption. This Article TENTH shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Second Amended and Restated Certificate, the Bylaws or applicable law |

Approval of this proposal is a condition to the completion of the Business Combination. If the proposal is not approved, the Business Combination will not occur. This proposal is conditioned upon

186

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 555 of 1110    PageID 2176

the approval and completion of the Business Combination, the Nasdaq Proposal and the Authorized Capital Stock Proposal; if the Business Combination Proposal, the Nasdaq Proposal or the Authorized Capital Stock Proposal are not approved, this proposal will have no effect, even if approved by Quinpario's stockholders.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock is required to approve the amendments to our current certificate of incorporation. Broker non-votes, abstentions or the failure to vote by proxy or in person at the Special Meeting will have the same effect as a vote "AGAINST" this proposal.

**Recommendation of the Board of Directors**

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF AMENDMENTS TO THE CURRENT CERTIFICATE OF INCORPORATION TO PROVIDE THAT CERTAIN TRANSACTIONS ARE NOT 'CORPORATE OPPORTUNITIES'.**

187

Supp.App. 0553

**PROPOSAL NO. 7—APPROVAL OF ADDITIONAL AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION IN CONNECTION WITH THE BUSINESS COMBINATION**

Assuming the Business Combination Proposal is approved, our stockholders are also being asked to approve certain amendments to our current certificate of incorporation, which are, in the judgment of our board of directors, necessary to adequately address the needs of the combined company.

The additional amendments effect the following immediately after giving effect to the consummation of the Business Combination:

- Clarify that each share of common stock of the combined company shall be entitled vote for each such share on each matter properly submitted to the stockholders on which the holders of Common Stock are entitled to vote;

- Delete the reference to the incorporator of the company;

- Delete the provisions under the current ARTICLE SIXTH pertaining to matters of the company prior to an initial business combination;

- Provide that each director's liability to the combined company and its stockholders for monetary damages for breaches of fiduciary duties is limited in all instances to the extent permitted under the DGCL, including for (a) breaches of the duty of loyalty to the combined company, (b) for acts or omissions not in good faith or involving intentional misconduct or a knowing violation of law, (c) for unlawful payments of dividends or unlawful stock purchases or redemptions and (d) for any transaction from which the director derived an improper personal benefit, in each case, to the extent permitted by law;

- Provide that the rights to indemnification and advancement of expenses under current ARTICLE EIGHTH, paragraph B are contractual rights and inure to the benefit of the heirs, executors and administrators of each person indemnified thereunder, and clarifying changes to the paragraph;

- Provide that the combined company will be the indemnitor of first resort to those persons who are entitled to indemnification under the proposed certificate of incorporation; and

- Provide that any repeal or amendment to the amended indemnification provisions shall be prospective only;

**Reasons for the Amendments**

These additional amendments to the certificate of incorporation of the combined company and the reasons for each of them are:

- Amending Article FOURTH, paragraph B to clarify the intent of the current certificate of incorporation to state that the holders of common stock of the combined company will be entitled to one vote for each share of common stock held by such holder on all matters on which holders of common stock are entitled to vote.

- Delete current Article FIFTH to remove references to the sole incorporator as such provision is no longer operative.

- Delete current Article SIXTH to eliminate provisions specific to our status as a blank check company. This deletion is desirable because these provisions will serve no purpose following the Business Combination. For example, these proposed amendments remove the requirement to dissolve the Company and allow it to continue as a corporate entity with perpetual existence following consummation of the Business Combination. Perpetual existence is the usual period of existence for corporations, and the board of directors believes it is the most appropriate period

188

Supp.App. 0554

for the combined company following the Business Combination. In addition, certain other provisions in Article SIXTH of our current certificate of incorporation require that proceeds from the Company's IPO be held in the Trust Account until a business combination or liquidation of the Company has occurred. These provisions would restrict our ability to pursue the Business Combination with SourceHOV and Novitex and the related financings, among other things.

- Provide for changes to current Article EIGHTH to clarify the indemnification provisions in the current certificate of incorporation. The board of directors believes that these measures will help to ensure that the combined company will be able to attract and retain qualified directors, officers, employees and agents.

**Comparison of Current Certificate of Incorporation to Proposed Certificate of Incorporation**

The following table sets forth a summary of the change proposed to be made between our current certificate of incorporation and the proposed certificate of incorporation immediately after giving effect to the consummation of the Business Combination. This summary is qualified by reference to the complete text of the proposed certificate of incorporation, a copy of which is attached to this proxy statement as Annex B. All stockholders are encouraged to read the proposed certificate of incorporation in its entirety for a more complete description of its terms.

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE FOURTH** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |
| | B. Common Stock. Except as otherwise required by law or as otherwise provided in any Preferred Stock Designation, the holders of the Common Stock shall exclusively possess all voting power and each share of Common Stock shall have one vote. | B. Common Stock. Except as otherwise required by law or as otherwise provided in any Preferred Stock Designation, the holders of the Common Stock shall exclusively possess all voting power and each share of Common Stock shall have one vote for each such share on each matter properly submitted to the stockholders on which the holders of Common Stock are entitled to vote. |
| **ARTICLE FIFTH** | The current certificate of incorporation provides as follows:<br><br>The name and mailing address of the sole incorporator of the Corporation are as follows: | This section shall be deleted in its entirety. |

| Name | Address |
|---|---|
| Jeffrey M. Gallant | Graubard Miller<br>The Chrysler Building<br>405 Lexington Avenue<br>New York, New York 10174 |

189

Supp.App. 0555

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE SIXTH** | The current certificate of incorporation provides as follows: | This section shall be deleted in its entirety. |
| | The introduction and the following provisions (A) through (H) of this Article Sixth shall apply during the period commencing upon the filing of this Certificate of Incorporation and terminating upon the consummation of any "Business Combination" and may not be amended prior to the consummation of a Business Combination unless holders of at least 65% of the then outstanding Common Stock approve such amendment. If the Corporation seeks to amend such provisions prior to the consummation of a Business Combination, the Corporation will provide holders of IPO Shares (defined below) who do not approve of such amendment the opportunity to convert their IPO Shares into cash at the Conversion/Redemption Price (defined below); provided, however, that the calculation of such price shall be made as of the date which is two days prior to the record date for the meeting called in connection with any such vote. | |
| | A "Business Combination" shall mean any merger, capital stock exchange, asset, stock purchase, reorganization or other similar business combination involving the Corporation and one or more businesses or entities ("Target Business"). The "Target Business Acquisition Period" shall mean the period from the effectiveness of the registration statement on Form S-1 ("Registration Statement") filed with the Securities and Exchange Commission ("Commission") in connection with the Corporation's initial public offering ("IPO") up to and including the first to occur of (a) a Business Combination or (b) July 24, 2017 (the "Termination Date"). | |

190

Supp.App. 0556

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 559 of 1110   PageID 2180

| Current Certificate | Proposed Certificate |
|---|---|
| A. Prior to the consummation of any Business Combination, the Corporation shall either (i) submit such Business Combination to its stockholders for approval ("Proxy Solicitation") pursuant to the proxy rules promulgated under the Securities Exchange Act of 1934, as amended ("Exchange Act") or (ii) provide all holders of its Common Stock with the opportunity to sell their shares to the Corporation, effective upon consummation of such Business Combination, for cash through a tender offer ("Tender Offer") pursuant to the tender offer rules promulgated under the Exchange Act. | |
| B. If the Corporation engages in a Proxy Solicitation in connection with any proposed Business Combination, the Corporation will consummate such Business Combination only if a majority of the then outstanding shares of Common Stock present and entitled to vote at the meeting to approve the Business Combination are voted for the approval of such Business Combination. | |

191

Supp.App. 0557

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 560 of 1110    PageID 2181

Table of Contents

| Current Certificate | Proposed Certificate |
|---|---|
| C. In the event that a Business Combination is approved in accordance with the above paragraph (B) and is consummated by the Corporation, any holder of IPO Shares who voted on the proposal to approve such Business Combination, whether such holder voted in favor or against such Business Combination, may, contemporaneously with such vote, demand that the Corporation convert his IPO Shares into cash. If so demanded, the Corporation shall, promptly after consummation of the Business Combination, convert such shares into cash at a per share price equal to the quotient determined by dividing (i) the amount then held in the Trust Fund (as defined below) less any income taxes owed on such funds but not yet paid, calculated as of two business days prior to the consummation of the Business Combination, by (ii) the total number of IPO Shares then outstanding (such price being referred to as the "Conversion/Repurchase Price"). Notwithstanding the foregoing, a holder of IPO Shares, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (within the meaning of Section 13 (d)(3) of the Exchange Act) ("Group") with, will be restricted from demanding conversion with respect to more than 15% of the IPO Shares without the prior consent of the Corporation. Accordingly, all IPO Shares beneficially owned by such holder or any other person with whom such holder is acting in concert or as a Group with in excess of 15% or more of the IPO Shares will remain outstanding following consummation of such Business Combination in the name of the stockholder and not be converted. "Trust Fund" shall mean the trust account established by the Corporation at the consummation of its IPO and into which a certain amount of the net proceeds of the IPO and a simultaneous private placement is deposited, all as described in the Registration Statement. | |

192

Supp.App. 0558

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 561 of 1110    PageID 2182

| Current Certificate | Proposed Certificate |
|---|---|
| D. If the Corporation engages in a Tender Offer, the Corporation shall file tender offer documents with the Commission which will contain substantially the same financial and other information about the Business Combination as is required under the proxy rules promulgated under the Exchange Act and that would have been included in any proxy statement filed with the Commission in connection with a Proxy Solicitation, even if such information is not required under the tender offer rules promulgated under the Exchange Act. The per-share price at which the Corporation will repurchase the IPO Shares in any such Tender Offer shall be equal to the Conversion/Repurchase Price. The Corporation shall not purchase any shares of Common Stock other than IPO Shares in any such Tender Offer.<br><br>E. The Corporation will not consummate any Business Combination unless it has net tangible assets of at least $5,000,001 upon consummation of such Business Combination. | |

193

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 562 of 1110   PageID 2183

| Current Certificate | Proposed Certificate |
|---|---|

F. In the event that the Corporation does not consummate a Business Combination by the Termination Date, the Corporation shall (i) cease all operations except for the purposes of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter redeem 100% of the IPO Shares for cash at a redemption price per share equal to the amount then held in the Trust Account, including the interest earned thereon, less taxes payable, divided by the total number of IPO Shares then outstanding (which redemption will completely extinguish such holders' rights as stockholders, including the right to receive further liquidation distributions, if any), and (iii) as promptly as reasonably possible following such redemption, subject to approval of the Corporation's then stockholders and subject to the requirements of the GCL, including the adoption of a resolution by the Board pursuant to Section 275(a) of the GCL finding the dissolution of the Corporation advisable and the provision of such notices as are required by said Section 275(a) of the GCL, dissolve and liquidate the balance of the Corporation's net assets to its remaining stockholders, as part of the Corporation's plan of dissolution and liquidation, subject in cases of (ii) and (iii) above to the Corporation's obligations under the GCL to provide for claims of creditors and other requirements of applicable law.

G. A holder of IPO Shares shall be entitled to receive distributions from the Trust Fund only in the event (i) he demands conversion of his shares in accordance with paragraph C above in connection with any Proxy Solicitation, (ii) he sells his shares to the Corporation in accordance with paragraph D above in connection with any Tender Offer, (iii) that the Corporation has not consummated a Business Combination by the Termination Date or (iv) the Corporation seeks to amend the provisions of this Article Sixth prior to the consummation of a Business Combination. In no other circumstances shall a holder of IPO Shares have any right or interest of any kind in or to the Trust Fund.

194

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 563 of 1110    PageID 2184

| Current Certificate | Proposed Certificate |
| --- | --- |
| H. Prior to a Business Combination, the Board of Directors may not issue (i) any shares of Common Stock or any securities convertible into Common Stock; or (ii) any securities which participate in or are otherwise entitled in any manner to any of the proceeds in the Trust Fund or which vote as a class with the Common Stock on a Business Combination. | |

195

Supp.App. 0561

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 564 of 1110   PageID 2185

Table of Contents

| | Current Certificate | Proposed Certificate |
|---|---|---|
| **ARTICLE EIGHTH** | The current certificate of incorporation provides as follows: | This section shall be revised and restated in its entirety as follows: |

The current certificate of incorporation provides:

A. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the Corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the GCL, or (iv) for any transaction from which the director derived an improper personal benefit. If the GCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended. Any repeal or modification of this paragraph A by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation with respect to events occurring prior to the time of such repeal or modification.

B. The Corporation, to the full extent permitted by Section 145 of the GCL, as amended from time to time, shall indemnify all persons whom it may indemnify pursuant thereto. Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such officer or director may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized hereby.

The proposed certificate:

A. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the GCL as the same exists or may hereafter be amended. If the GCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended. Any repeal or modification of this paragraph A by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation with respect to events occurring prior to the time of such repeal or modification.

B. The Corporation, to the full extent permitted by Delaware law, as the same exists or may hereafter be amended from time to time, shall indemnify and hold harmless each person whom it may indemnify pursuant thereto. Expenses (including attorneys' fees) incurred by any such indemnified person in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such person may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized hereby. The rights to indemnification and advancement of expenses conferred by this paragraph B shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent of the Corporation and shall inure to the benefit of his or her heirs, executors and administrators.

196

Supp.App. 0562

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 565 of 1110    PageID 2186

| Current Certificate | Proposed Certificate |
|---|---|
| | C. The Corporation hereby acknowledges that an indemnitee may have certain rights to other indemnification, advancement of expenses and/or insurance (collectively, the "*Other Indemnitors*"). The Corporation hereby agrees that with respect to any and all losses arising by reason of the fact that such indemnitee is or was a director, officer, employee or agent of the Corporation or any subsidiary thereof, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, (i) that the Corporation is the indemnitor of first resort (i.e., its obligations to an indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee are secondary), (ii) that the Corporation shall be required to advance the full amount of expenses incurred by an indemnitee in accordance with this paragraph C and shall be liable for the full amount of all losses to the extent legally permitted and as required by the terms of this Second Amended and Restated Certificate of Incorporation (or any other agreement between the Corporation and an indemnitee), without regard to any rights an indemnitee may have against the Other Indemnitors, and, (iii) that the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of an indemnitee with respect to any claim for which such indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Corporation. The Corporation and each indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this paragraph C. |

197

Supp.App. 0563

| Current Certificate | Proposed Certificate |
|---|---|
| | D. Any repeal or amendment of this Article SIXTH by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Second Amended and Restated Certificate inconsistent with this Article SIXTH, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of or related to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision. |

This proposal is conditioned upon the approval and completion of the Business Combination, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal; if the Business Combination Proposal, the Nasdaq Proposal, the Authorized Capital Stock Proposal and the Corporate Opportunity Proposal are not approved or the Business Combination is not consummated, this proposal will have no effect, even if approved by Quinpario's stockholders. This proposal is not a condition to the closing of the Business Combination, and the Business Combination may be consummated even if this proposal is not approved.

**Vote Required for Approval**

The affirmative vote of holders of a majority of the outstanding shares of Quinpario Common Stock is required to approve the amendments to our current certificate of incorporation. Broker non-votes, abstentions or the failure to vote by proxy or in person at the Special Meeting will have the same effect as a vote "AGAINST" this proposal.

**Recommendation of the Board of Directors**

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT OUR STOCKHOLDERS VOTE "FOR" THE APPROVAL OF ADDITIONAL AMENDMENTS TO CURRENT CERTIFICATE OF INCORPORATION IN CONNECTION WITH THE BUSINESS COMBINATION.**

198

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 567 of 1110    PageID 2188

## PROPOSAL NO. 8—THE ADJOURNMENT PROPOSAL

The Adjournment Proposal, if adopted, will allow our board of directors to adjourn the Special Meeting to a later date or dates to permit further solicitation of proxies. The Adjournment Proposal will only be presented to our stockholders in the event, based on the tabulated votes, there are not sufficient votes at the time of the Special Meeting to approve one or more of the proposals presented at the Special Meeting. In no event will our board of directors adjourn the Special Meeting or consummate the Business Combination beyond the date by which it may properly do so under our current certificate of incorporation and Delaware law.

### Consequences if the Adjournment Proposal is Not Approved

If the Adjournment Proposal is not approved by our stockholders, our board of directors may not be able to adjourn the Special Meeting to a later date in the event, based on the tabulated votes, there are not sufficient votes at the time of the Special Meeting to approve the Business Combination Proposal.

### Required Vote

Adoption of the Adjournment Proposal requires the affirmative vote of a majority of the issued and outstanding shares of Quinpario Common Stock as of the record date represented in person or by proxy at the Special Meeting and entitled to vote thereon. Adoption of the Adjournment Proposal is not conditioned upon the adoption of any of the other proposals. Abstentions will have the same effect as a vote "AGAINST" this proposal. Broker non-votes or a failure to vote by proxy or in person at the Special Meeting will have no effect on the approval of this proposal.

### Recommendation of the Board of Directors

**QUINPARIO'S BOARD OF DIRECTORS UNANIMOUSLY RECOMMENDS THAT STOCKHOLDERS VOTE "FOR" THE APPROVAL OF THE ADJOURNMENT PROPOSAL.**

199

Supp.App. 0565

Table of Contents

## INFORMATION ABOUT QUINPARIO

*References in this section to the "Company," "us" or "we" refer to Quinpario Acquisition Corp. 2.*

**General**

We are a blank check company formed on July 15, 2014 for the purpose of entering into a merger, stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. On January 22, 2015, we closed our IPO of 35,000,000 units, with each unit consisting of one share of Quinpario Common Stock, par value $.0001 per share, and one warrant entitling the holder to purchase one-half of one share of common stock at a price of $5.75 per half share commencing 30 days after the completion of an initial business combination. Simultaneous with the consummation of the IPO, we consummated the private placement of 18,000,000 Private Placement Warrants at a price of $0.50 per warrant, generating total proceeds of $9,000,000. The Private Placement Warrants were purchased by the Sponsor, Quinpario Partners 2, LLC.

In January 2017, we held a special meeting of stockholders. At the meeting, our stockholders approved an amendment to our Amended and Restated Certificate of Incorporation to extend the date by which we had to consummate an initial business combination to July 24, 2017. In connection with the Extension, holders of 14,901,399 public shares exercised their right to convert such public shares into a pro rata portion of the Trust Account established in connection with our initial public offering. As a result, $201,543,292 remained in our Trust Account as of January 19, 2017.

**Effecting Our Initial Business Combination**

*Fair Market Value of Target Business*

Pursuant to Nasdaq listing rules, the target business or businesses that we acquire must collectively have a fair market value equal to at least 80% of the balance of the funds in the Trust Account (excluding deferred underwriting fees and taxes payable on the income earned on the Trust Account) at the time of the execution of a definitive agreement for our initial business combination, although we may acquire a target business whose fair market value significantly exceeds 80% of the Trust Account balance. Our board of directors determined that this test was met in connection with the proposed business combination with SourceHOV and Novitex.

*Stockholder Approval of Initial Business Combination*

We are seeking stockholder approval of the Business Combination at the Special Meeting, at which stockholders may seek to convert their shares, regardless of whether they vote for or against the Business Combination, into their pro rata share of the aggregate amount then on deposit in the Trust Account (net of taxes payable). We will consummate the Business Combination only if we have net tangible assets of at least $5,000,001 upon such consummation and a majority of the outstanding shares of Quinpario Common Stock voted are voted in favor of the Business Combination.

The Sponsor and our officers and directors have agreed (1) to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination and (2) not to convert any shares of Quinpario Common Stock in connection with the stockholder vote to approve the Business Combination.

None of our officers, directors, Sponsor or their respective affiliates has indicated any intention to purchase units or shares of Quinpario Common Stock from persons in the open market or in private transactions. However, if a significant number of stockholders vote, or indicate an intention to vote, against the Business Combination, our officers, directors, Sponsor or their respective affiliates could make such purchases in the open market or in private transactions in order to influence the vote.

200

Supp.App. 0566

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 569 of 1110    PageID 2190

Notwithstanding the foregoing, our officers, directors, Sponsor and their respective affiliates will not make purchases of shares of Quinpario Common Stock if the purchases would violate Section 9(a)(2) or Rule 10b-5 of the Exchange Act, which are rules designed to stop potential manipulation of a company's stock.

**Redemption Rights for Holders of Public Shares**

At the Special Meeting, any public stockholder, whether voting for or against the Business Combination, will be entitled to demand that his shares of Quinpario Common Stock be converted for a full pro rata portion of the amount then in the Trust Account (initially $10.00 per share, plus any pro rata interest earned on the funds held in the Trust Account and not previously released to us to pay our taxes or for working capital). As of March 31, 2017, this would have amounted to approximately $10.00 per share. If a holder exercises his or her redemption rights, then such holder will be exchanging its shares of Quinpario Common Stock for cash and will no longer own shares of Quinpario. Such a holder will be entitled to receive cash for its public shares only if it (a) affirmatively votes its shares of Quinpario Common Stock for or against the Business Combination Proposal and (b) properly demands redemption and delivers its shares (either physically or electronically) to the Transfer Agent prior to the Special Meeting. Additionally, shares properly tendered for redemption will only be redeemed if the Business Combination is consummated. See the section entitled "*Special Meeting of Quinpario Stockholders— Redemption Rights*" for the procedures to be followed if you wish to redeem your shares for cash.

The Sponsor, as well as our officers and directors, will not have redemption rights with respect to any shares of Quinpario Common Stock owned by them, directly or indirectly.

**Liquidation If No Business Combination**

Our current certificate of incorporation provides that if we do not complete a business combination by July 24, 2017, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares, at a per-share price, payable in cash, equal to the aggregate amount then on deposit in the Trust Account, including any interest but net of franchise taxes and income taxes payable with respect to interest earned on the Trust Account, divided by the number of then outstanding public shares, and (iii) as promptly as reasonably possible following such redemption as part of a single integrated transaction, dissolve and liquidate, subject to the approval of our remaining stockholders and our board of directors (who have contractually agreed to take such actions to effectuate such dissolution and liquidation), subject (in the case of (ii) and (iii) above) to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law.

Under the Delaware General Corporation Law, stockholders may be held liable for claims by third parties against a corporation to the extent of distributions received by them in a dissolution. The pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of 100% of our outstanding public shares in the event we do not complete our initial business combination within the required time period may be considered a liquidation distribution under Delaware law. If the corporation complies with certain procedures set forth in Section 280 of the Delaware General Corporation Law intended to ensure that it makes reasonable provision for all claims against it, including a 60-day notice period during which any third-party claims can be brought against the corporation, a 90-day period during which the corporation may reject any claims brought, and an additional 150-day waiting period before any liquidating distributions are made to stockholders, any liability of stockholders with respect to a liquidating distribution is limited to the lesser of such stockholder's pro rata share of the claim or the amount distributed to the stockholder, and any liability of the stockholder would be barred after the third anniversary of the dissolution.

201

Supp.App. 0567

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 570 of 1110    PageID 2191

Furthermore, if the pro rata portion of our Trust Account distributed to our public stockholders upon the redemption of 100% of our public shares in the event we do not complete our initial business combination within the required time period is not considered a liquidation distribution under Delaware law and such redemption distribution is deemed to be unlawful, then pursuant to Section 174 of the Delaware General Corporation Law, the statute of limitations for claims of creditors could then be six years after the unlawful redemption distribution, instead of three years, as in the case of a liquidation distribution. If we are unable to complete a business combination within the prescribed time frame, we will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares which redemption will completely extinguish public stockholders' rights as stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemption, subject to the approval of our remaining stockholders and our board of directors, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to our obligations under Delaware law to provide for claims of creditors and the requirements of other applicable law. Accordingly, it is our intention to redeem our public shares as soon as reasonably possible once we determine to liquidate and, therefore, we do not intend to comply with those procedures. As such, our stockholders could potentially be liable for any claims to the extent of distributions received by them (but no more) and any liability of our stockholders may extend well beyond the third anniversary of such date.

Because we will not be complying with Section 280 of the Delaware General Corporation Law, Section 281(b) of the Delaware General Corporation Law requires us to adopt a plan, based on facts known to us at such time that will provide for our payment of all existing and pending claims or claims that may be potentially brought against us within the subsequent 10 years. However, because we are a blank check company, rather than an operating company, and our operations will be limited to searching for prospective target businesses to acquire, the only likely claims to arise would be from our vendors (such as lawyers, investment bankers, etc.) or prospective target businesses.

We will seek to have all third parties (including any vendors or other entities we engage after our initial public offering) and any prospective target businesses enter into valid and enforceable agreements with us waiving any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account. As a result, the claims that could be made against us will be limited, thereby lessening the likelihood that any claim would result in any liability extending to the trust. We therefore believe that any necessary provision for creditors will be reduced and should not have a significant impact on our ability to distribute the funds in the Trust Account to our public stockholders. Nevertheless, there is no guarantee that vendors, service providers and prospective target businesses will execute such agreements. In the event that a potential contracted party was to refuse to execute such a waiver, we will execute an agreement with that entity only if our management first determines that we would be unable to obtain, on a reasonable basis, substantially similar services or opportunities from another entity willing to execute such a waiver. Examples of instances where we may engage a third party that refused to execute a waiver would be the engagement of a third-party consultant who cannot sign such an agreement due to regulatory restrictions, such as our auditors who are unable to sign due to independence requirements, or whose particular expertise or skills are believed by management to be superior to those of other consultants that would agree to execute a waiver or a situation in which management does not believe it would be able to find a provider of required services willing to provide the waiver. There is also no guarantee that, even if they execute such agreements with us, they will not seek recourse against the Trust Account. Quinpario Partners and Jeffry N. Quinn have agreed that they will be liable to pay debts and obligations to target businesses or vendors or other entities that are owed money by us for services rendered or contracted for or products sold to us. However, they may not be able to satisfy their indemnification obligations if they are required to so as we have not required them to retain any assets to provide for their indemnification obligations, nor have we taken any further steps to ensure that they will be able to satisfy any indemnification

202

Supp.App. 0568

obligations that arise. Additionally, the agreement entered into by Quinpario Partners and Mr. Quinn specifically provides that they will have no liability as to any claimed amounts owed to a target business or vendor or other entity who has executed an agreement with us waiving any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account. Moreover, they will not be liable to our public stockholders and instead will only have liability to us. As a result, if we liquidate, the per-share distribution from the Trust Account could be less than $10.00 due to claims or potential claims of creditors. We will distribute to all of our public stockholders, in proportion to their respective equity interests, an aggregate sum equal to the amount then held in the Trust Account, inclusive of any interest not previously released to us, plus any remaining net assets (subject to our obligations under Delaware law to provide for claims of creditors as described below).

We anticipate notifying the trustee of the Trust Account to begin liquidating such assets promptly after such date and anticipate it will take no more than 10 business days to effectuate such distribution. The Founders have waived their rights to participate in any liquidation distribution with respect to their Founder Shares. We will pay the costs of any subsequent liquidation from our remaining assets outside of the Trust Account. If such funds are insufficient, Quinpario Partners has agreed to pay the funds necessary to complete such liquidation (currently anticipated to be no more than approximately $15,000) and has agreed not to seek repayment of such expenses.

Our public stockholders shall be entitled to receive funds from the Trust Account only in the event of our failure to complete our initial business combination in the required time period or if the stockholders seek to have us redeem their respective shares of Quinpario Common Stock upon a business combination which is actually completed by us or upon an amendment to our current certificate of incorporation relating to stockholders' rights or pre-business combination activity (including the time within which we have to complete a business combination). In no other circumstances shall a stockholder have any right or interest of any kind to or in the Trust Account.

If we are forced to file a bankruptcy case or an involuntary bankruptcy case is filed against us which is not dismissed, the proceeds held in the Trust Account could be subject to applicable bankruptcy law, and may be included in our bankruptcy estate and subject to the claims of third parties with priority over the claims of our stockholders. To the extent any bankruptcy claims deplete the Trust Account, we may not be able to return to our public stockholders at least $10.00 per share.

If we are forced to file a bankruptcy case or an involuntary bankruptcy case is filed against us which is not dismissed, any distributions received by stockholders could be viewed under applicable debtor/creditor and/or bankruptcy laws as either a "preferential transfer" or a "fraudulent conveyance." As a result, a bankruptcy court could seek to recover all amounts received by our stockholders. Furthermore, liquidating the Trust Account may be viewed or interpreted as giving preference to our public stockholders over any potential creditors with respect to access to or distributions from our assets. Furthermore, our board may be viewed as having breached their fiduciary duties to our creditors and/or may have acted in bad faith, and thereby exposing itself and our company to claims of punitive damages, by paying public stockholders from the Trust Account prior to addressing the claims of creditors. Claims may be brought against us for these reasons.

**Limitation on Redemption Rights**

A public stockholder, together with any affiliate of his or any other person with whom he is acting in concert or as a "group" (as defined in Section 13(d)(3) of the Exchange Act) will be restricted from seeking redemption rights with respect to 15% or more of the shares of Quinpario Common Stock sold in our IPO. Accordingly, if you own more than 15% of the shares of Quinpario Common Stock sold in the IPO and the Business Combination is approved, you will not be able to seek redemption rights with respect to the full amount of your shares and may be forced to hold such additional shares of Quinpario Common Stock or sell them in the open market. Such a public stockholder would still be

203

Table of Contents

entitled to vote against the Business Combination with respect to all shares of Quinpario Common Stock owned by him or his affiliates. We believe this restriction has had the effect of preventing stockholders from accumulating large blocks of shares before the Special Meeting and attempt to use the redemption right as a means to force us or our management to purchase their shares at a substantial premium to the then current market price.

### Competition

If we succeed in effecting a business combination with SourceHOV and Novitex, there will be, in all likelihood, significant competition from their competitors. We cannot assure you that, subsequent to a business combination, we will have the resources or ability to compete effectively. Information regarding Novitex's and SourceHOV's competition will be set forth in the sections entitled "*Information About Novitex—Competition*" and "*Information About SourceHOV—Competition,*" respectively, herein.

### Employees

We have two executive officers, neither of whom is paid a salary by us. These individuals are not obligated to devote any specific number of hours to our matters and intend to devote only as much time as they deem necessary to our affairs. We do not intend to have any full time employees prior to the consummation of our initial business combination.

### Property

We currently maintain our principal executive offices at 12935 N. Forty Drive, Suite 201, St. Louis, Missouri 63141. The cost for this space is included in the $10,000 per-month fee Quinpario Partners, an affiliate of the Sponsor, charges us for general and administrative services. We believe, based on rents and fees for similar services in St. Louis, Missouri, that the fee charged by Quinpario Partners is at least as favorable as we could have obtained from an unaffiliated person. Upon consummation of the Business Combination, this arrangement would cease.

We consider our current office space, combined with the other office space otherwise available to our executive officers, adequate for our current operations.

### Legal Proceedings

None.

### Management

#### *Directors and Executive Officers*

Our current directors and executive officers are listed in the below table. We expect our current directors to be re-elected in our annual meeting, which will take place on June 29, 2017.

| Name | Age | Position |
|---|---|---|
| Paul J. Berra III | 48 | Chairman of the Board |
| D. John Srivisal | 38 | President and Chief Executive Officer |
| A. Craig Ivey | 59 | Vice President—Operations |
| Edgar G. Hotard | 73 | Director |
| W. Thomas Jagodinski | 60 | Director |
| Ilan Kaufthal | 69 | Director |
| Roberto Mendoza | 71 | Director |
| Dr. John Rutledge | 68 | Director |
| Shlomo Yanai | 64 | Director |

204

Supp.App. 0570

**Paul J. Berra III** is our Chairman of the Board and is also a partner in the Company's sponsor, Quinpario Partners 2 LLC, and in Quinpario Partners LLC, a privately owned investment and operating company focused on the specialty chemicals and performance materials sector, and serves as Chief Administrative Officer. He has served in such roles since July 2014 and July 2012, respectively. He is also a partner and Executive Vice President and General Counsel of The Quinn Group and has served in those roles since July 2012. Mr. Berra was previously Vice President, General Counsel and Secretary of Quinpario Acquisition Corp., ("Quinpario 1"), a former blank check company which raised $172.5 million in its initial public offering in August 2013 and consummated its initial business combination with Jason Partners Holdings Inc. in June 2014 in a transaction valued at approximately $670 million, and served in such positions from its inception in May 2013 until June 2014. Mr. Berra served as Senior Vice President, Legal and Governmental Affairs and General Counsel for Solutia Inc. from December 2009 until July 2012 when Solutia was sold to Eastman Chemical. Mr. Berra had global responsibility for the legal and governmental affair functions of Solutia. While serving as general counsel, Mr. Berra played an important role in the company's equity and debt offerings as well as several refinancings. Additionally, Mr. Berra provided the legal leadership and direction for several divestitures, acquisitions and business unit closures that were instrumental in reshaping Solutia's portfolio. Prior to December 2009, Mr. Berra also served as Solutia's Chief Administrative Officer where he had the additional global responsibility for human resources. During the economic downturn of 2008 and early 2009, Mr. Berra led a successful global reduction in force that significantly reduced costs. During Solutia's Chapter 11 reorganization, Mr. Berra served as the lead negotiator with the company's unionized workforce and the court appointed retiree committee wherein the parties agreed to a reduction of overall retiree post-employment benefits that reduced Solutia's OPEB liabilities by $115 million. Additionally, Mr. Berra led negotiations with the active unionized workforce whereby the unions agreed to benefit reductions that saved the company approximately $10 million annually. He served as Solutia's Vice President of Communications and Government Affairs beginning in 2006. Mr. Berra joined Solutia in June 2003 as Assistant General Counsel, Human Resources, and added government affairs responsibilities the following year. Prior to joining Solutia, Mr. Berra was Corporate Counsel at Premcor Inc., an independent oil refiner, where he handled all labor, employment and litigation matters and contributed to cost-saving initiatives that included a significant reduction-in-force. He also played a role in Premcor's acquisition and integration of the former Williams Company refinery in Memphis, Tennessee. Earlier, Mr. Berra practiced law with Lewis, Rice and Fingersh, a large regional general practice law firm, and at a small, boutique firm practicing exclusively in the areas of labor and employment law. Mr. Berra received a Bachelor of Arts degree in Political Science and Business Administration from Webster University and a Juris Doctor degree from the Saint Louis University School of Law.

Mr. Berra is well qualified to serve as Chairman of our board of directors due to his background in analyzing, reviewing and managing investments in companies in a variety of industries, as well as his experience in public company governance.

**D. John Srivisal** is our President and Chief Executive Officer, and has served in such roles since September 2014. He is also a partner in the Sponsor and in Quinpario Partners LLC, and has served in such roles since July 2014 and July 2012, respectively. Mr. Srivisal was previously Vice President and Chief Financial Officer of Quinpario 1 and served in such positions from its inception in May 2013 until its business combination with Jason Industries, Inc. in June 2014. From January 2009 to July 2012, Mr. Srivisal was Vice President, Transaction Execution for Solutia Inc. In that role Mr. Srivisal had global responsibility for merger, acquisition, divestiture and joint venture transactions. Mr. Srivisal served as the lead strategist, negotiator and decision-maker responsible for completing over 20 transactions that were critical to the transformation and reshaping of Solutia's portfolio of businesses. Before being named to this position in January 2009, Mr. Srivisal served as Solutia's Director of Planning and Coordination from June 2004. In this role Mr. Srivisal had chief of staff responsibilities for Mr. Quinn and played a leading role in managing the company's reorganization

205

Supp.App. 0571

Table of Contents

process and securing a global settlement with Solutia's various constituents that resulted in Solutia's emergence from bankruptcy. During his tenure at Solutia from June 2004 to July 2012, Mr. Srivisal also played a key role in Solutia's financing transactions, including Solutia's exit financing and relisting on the NYSE following its emergence from bankruptcy, various acquisition-related financings, and several equity and debt offerings and refinancings. Mr. Srivisal has over seventeen years of transaction experience that includes acting on behalf of Solutia as well as advising companies, creditors, financial sponsors and government entities in a variety of industries on recapitalizations, restructurings, financings, leveraged buyouts, mergers, acquisitions, divestitures and joint ventures. Before joining Solutia, Mr. Srivisal was a restructuring investment banker at Rothschild Inc. where he executed numerous in-court and out-of-court restructuring, financing and M&A transactions. He began his career in the mergers and acquisitions group at Peter J. Solomon Company. Mr. Srivisal graduated magna cum laude with a Bachelor of Science degree in Economics (concentration in Finance) and a minor in Mathematics from the Wharton School of the University of Pennsylvania.

*A. Craig Ivey* is our Vice President—Operations, and has served in such role since inception in July 2014. He is also a partner in the Sponsor and in Quinpario Partners LLC, and has served in such roles since July 2014 and July 2012, respectively. Mr. Ivey was previously Vice President—Operations of Quinpario 1 and served in such position from its inception in May 2013 until its business combination with Jason Industries, Inc. in June 2014. Mr. Ivey served as interim Chief Operating Officer for Jason Industries, Inc. from January 2016 to April 2016. Mr. Ivey was previously President and General Manager of the Performance Films Division for Solutia Inc. from August 2011 to July 2012. The Performance Films division is a leader in aftermarket window film with annual revenues of $300 million and operations in Europe, Asia and the Americas. As President and General Manager, Mr. Ivey had responsibility for all commercial, manufacturing, technology, and strategic aspects of the business. During his tenure at Performance Films, the division completed an acquisition of Southwall Technologies Inc. This synergistic acquisition was foundational in expanding the business' global manufacturing footprint and securing a world class technology base. Mr. Ivey joined Solutia at the company's inception in 1997 and possesses over 35 years of manufacturing, supply chain, business and leadership expertise. From March 2011, prior to being named as President and General Manager for Performance Films in August 2011, Mr. Ivey served as Vice President—Photovoltaics in Solutia's Advanced Interlayers division, in addition to his role (beginning in January 2010) as Vice President of Business Operations —Asia Pacific Region, based in Shanghai, where he was instrumental in growing Solutia's presence across Asian markets. While in Asia, he led the consolidation of regional headquarters and operations to Shanghai, providing the skills and staff to support a 20% year on year (2009-2011) increase in revenue and establishing the foundation for future growth. From January 2008 to January 2010 he served as Vice President—Supply Chain of the Nylon Division. In this role, Mr. Ivey led the development of a global supply chain network, establishing operations and providing service across four continents. Mr. Ivey also has an operations background and served as Plant Manager and Manufacturing Director for Solutia's largest production facility in Pensacola, Florida. While in this role, he led the transformation of the facility from a traditional fiber-based operation to an engineered resins platform, successfully implementing both process and cultural changes. The conversion of the manufacturing footprint to an engineered resin platform was fundamental in allowing Solutia's Nylon business to compete on a global scale. Mr. Ivey also has significant business integration experience, having led a number integration and divesture activities while at Solutia. Prior to joining Solutia, he served in various engineering and operations roles with Monsanto Company, Chevron Corporation and Olin Corporation. Mr. Ivey earned his Bachelor of Science degree in Chemical Engineering from Auburn University.

*Edgar G. Hotard* has served as a director since November 2014. Since June 2002, Mr. Hotard has also served as a Venture Partner at ARCH Venture Partners, a provider of seed / early stage venture capital for technology firms in life sciences, physical sciences and advanced materials. He also serves as a Senior Consultant to Warburg Pincus, a global private equity firm, a position he has held since

206

Supp.App. 0572

August 2013. Previously, Mr. Hotard served as an Operating Partner at HAO Capital, a private equity firm based in Beijing and Hong Kong, from November 2010 to December 2013, and as an advisor to the Asia practice of Monitor Group, a global strategy-consulting firm and as non-executive Chairman of Monitor Group (China), from June 2000 to November 2010. Prior to that, Mr. Hotard served as President and Chief Operating Officer of Praxair, Inc. ("Praxair") (NYSE:PX), a worldwide provider of industrial gases, including atmospheric, process and specialty gases, from July 1992 until his retirement in January 1999. In 1992, he co-led the spin-off of Praxair from Union Carbide Corporation (formerly NYSE:UK), a commodity and specialty chemical and polymers company, where he served as Corporate Vice President from July 1990 to July 1992. Since November 2006, Mr. Hotard has served as a member of the Board of Directors of Albany International Corp. (NYSE:AIN), a global advanced materials processing company serving the paper and aerospace industries, where he currently serves as Chairman of the Audit Committee and as a member of the Governance Committee. Mr. Hotard has also served as a member of the Board of Directors of Baosteel Metals, Ltd., a subsidiary of Baosteel Group Co. Ltd., since January 2013, and as a member of the Board of Directors of Jason Industries Inc., a global industrial manufacturing company operating in the agricultural, construction and industrial manufacturing sectors, since August 2013. Previously, he served as a member of the Board of Directors of various public companies, including: Global Industries Inc. (formerly NASDAQ:GLBL), a global offshore oil and gas engineering and construction service company, from 1999 to September 2011; Solutia Inc. (formerly NYSE:SOA), a performance materials specialty chemical manufacturer with global operations, from February 2011 to July 2012; and Shona Energy Company, Inc. (formerly TSX-V:SHO), an oil and natural gas exploration, development and production company, from July 2011 to December 2012. In addition, Mr. Hotard was a founding sponsor of the China Economic and Technology Alliance and a joint MBA program between Renmin University, Beijing, China, and the School of Management of the State University of Buffalo, New York.

Mr. Hotard is well qualified to serve as an independent director due to his background in the advanced materials processing and energy industries, his experience in public and private company governance and private equity, as well as his prior experience with Quinpario 1.

*W. Thomas Jagodinski* has served as a director since November 2014. Mr. Jagodinski has been a private investor since September 2007. Mr. Jagodinski has served as a member of the Board of Directors of Lindsay Corporation (NYSE:LNN), a global company focused on providing irrigation and infrastructure solutions, since July 2008 and currently serves as Chairman of the Audit Committee. He has also served as a member of the Board of Directors and as Audit Committee Chair of Centrus Energy Corp. (formerly known as USEC prior to its emergence from bankruptcy) (NYSE MKT:LEU), a supplier of enriched uranium fuel for international and domestic commercial nuclear power plants, since September 2014. Previously, Mr. Jagodinski was a member of the Board of Directors of Phosphate Holdings, Inc., a U.S. producer and marketer of DAP, the most common form of phosphate fertilizer, from May 2009 until June 2014, where he served as Chairman of Board. Additionally, from August 2013 through June 2014, he served as a member of the Board of Directors of Quinpario 1. Previously, Mr. Jagodinski served as a member of the Board of Directors of Solutia Inc. from March 2008 until July 2012. Prior to that, Mr. Jagodinski was President, Chief Executive Officer and Director of Delta and Pine Land Company ("D&PL") (formerly NYSE:DLP), a leader in the cotton seed industry, from September 2002 until the company was acquired in June 2007. From June 2002 until August 2002, he served as D&PL's Executive Vice President and from September 2000 until June 2002, he served as Senior Vice President, Chief Financial Officer, Treasurer and Assistant Secretary. Mr. Jagodinski was also D&PL's Vice President-Finance, Treasurer and Assistant Secretary from February 1993 until September 2000 and held various other financial positions at D&PL, from October 1991, when he joined the company, until February 1993. Prior to D&PL, Mr. Jagodinski held various positions in the audit division at Arthur Andersen from 1983 to 1991 and Senior Accountant at Price Waterhouse from 1978 to 1983. Mr. Jagodinski is a licensed Certified Public Accountant and a member

Supp.App. 0573

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 576 of 1110    PageID 2197

of the AICPA, TSCPA and was MSCPA. Mr. Jagodinski received a Bachelor of Business Administration degree (Accounting) from the University of Mississippi.

Mr. Jagodinski is well qualified to serve as an independent director due to his background in specialty chemicals and fertilizers, his experience in public and private company governance and accounting, including his service on an audit committee and a compensation committee, as well as his prior experience with Quinpario 1.

*Ilan Kaufthal* has served as a director since November 2014. Mr. Kaufthal is Chairman of East Wind Advisors, a specialized investment banking firm serving companies in the media, education, consumer/retail and information industries, and has held such position since May 2011. From July 2008 to July 2013, Mr. Kaufthal served as Senior Advisor at Irving Place Capital. Earlier in his career, he was Vice Chairman of Investment Banking at Bear Stearns & Co. from May 2000 to July 2008, Vice Chairman and Head of Mergers and Acquisitions at Schroder & Co. from February 1987 to May 2000, and SVP and CFO at NL Industries from May 1971 to February 1987. Mr. Kaufthal serves on the board of directors of the following public companies: Cambrex Corporation (NYSE:CBM), a supplier to the pharmaceutical industries, and Tronox Limited (NYSE:TROX), a fully integrated producer and marketer of titanium ore and titanium dioxide pigment. He previously served as a director of Quinpario 1. Mr. Kaufthal is a graduate of Columbia University and the New York University Graduate School of Business Administration.

Mr. Kaufthal is well qualified to serve as an independent director due to his background and his experience in public and private company governance and investment banking, as well as his prior experience with Quinpario 1.

*Roberto Mendoza* has served as a director since November 2014. Mr. Mendoza has served as a Senior Managing Director of Atlas Advisors LLC, an independent global investment banking firm, since March 2010. Previously, Mr. Mendoza co-founded Deming Mendoza & Co., LLC, a corporate finance advisory firm, and served as one of its partners from February 2009 to March 2010. Mr. Mendoza served as Non-Executive Chairman of Trinsum Group from February 2007 to November 2008. In January 2007, Trinsum Group was formed as a result of a merger of Marakon Associates and Integrated Finance Limited, a financial advisory company which Mr. Mendoza co-founded and of which he served as Chairman of the Board and Managing Director from 2002 to February 2007. He also served as Managing Director of Goldman Sachs from September 2000 to February 2001. From 1967 to 2000, Mr. Mendoza held positions at J.P. Morgan & Co. Inc., serving from 1990 to 2000 as director and Vice Chairman of the Board. Mr. Mendoza served as Chairman of Egg plc from May 2000 to February 2006, and as a director of Prudential plc from May 2000 to May 2007, of PartnerRe Ltd. from October 2009 to July 2016 and of PARIS RE Holdings Limited from January 2007 to September 2009. He currently serves as a director of Rocco Forte & Family Limited, Manpower Inc., BaoSteel Metal Co., Ltd. and The Western Union Company. Mr. Mendoza is a member of the Council on Foreign Relations. Mr. Mendoza holds a Bachelor of Arts degree from Yale and an Master of Business Administration degree (Baker Scholar) from the Harvard Business School.

Mr. Mendoza is well qualified to serve as an independent director due to his substantial experience in investment banking and financial services, as well as his international business experience and service on other public company boards.

*Dr. John Rutledge* has served as a director since November 2014. Dr. Rutledge is the founder of Rutledge Capital, a private equity investment firm that invests in U.S. middle market manufacturing, distribution, and service companies, and has served as its Chairman since 1990. Dr. Rutledge is also Chief Investment Strategist for Safanad SA Inc., an investment firm based in New York, since its inception in 2008. He also serves as Senior Research Professor at Claremont Graduate University since 2010, where he teaches economics and finance. Dr. Rutledge also serves as a CNBC Contributor since 2009. In addition, Dr. Rutledge is an Honorary Professor at the Chinese Academy of Sciences in

208

Supp.App. 0574

Beijing and Chief Advisor for Finance and Investment to the Governor of the Haidian District in Beijing and has served in those capacities since 2007 and 2008, respectively. He is a senior fellow at the Pacific Research Institute and the Heartland Institute. In addition to his many advisory and board roles, Dr. Rutledge wrote the Forbes' Business Strategy column from 1992 to 2002 and writes for Forbes.com and TheStreet.com. He also founded Claremont Economics Institute, an economic advisory business, in 1978 and served as its Chairman from January 1979 to 1991. Dr. Rutledge currently serves as a member of the Board of Directors of Jason Industries, Inc. (NASDAQ:JASN), a global industrial manufacturing company operating in the agricultural, construction and industrial manufacturing sectors, since August 2013. Dr. Rutledge has served as the director of a number of other companies, including: American Standard (formerly NYSE:ASD), a manufacturer of plumbing, air conditioning, and automotive products; Earle M. Jorgensen Company (formerly NYSE:JOR), the largest independent distributor of metal products in North America; Lazard Freres Funds, a mutual fund; CROM Corporation, a designer and manufacturer of pre-stressed concrete tanks; AdobeAir, a manufacturer of heating and cooling products; StairMaster, a manufacturer of fitness products; Fluidrive, a manufacturer of steerable, hydraulic axles for the agricultural and trucking industries; CST, a manufacturer of paper office products; Ellis Communications, an operator of television and radio companies; General Medical, a supplier of medical products; United Refrigeration, an operator of cold storage warehouses for the food industry; and Framed Picture Enterprise, a retailer in the framed art business. Dr. Rutledge was one of the principal architects of the Reagan economic plan in 1981 and was an adviser to the Bush White House on tax policy from 2001 to 2004. Dr. Rutledge began his career as a professor of economics at Tulane University and Claremont McKenna College. He holds a Bachelor of Arts degree from Lake Forest College and a Ph.D. from the University of Virginia.

Dr. Rutledge is well qualified to serve as an independent director due to his academic background as well as his experience in public and private company governance, as well as his prior experience with Quinpario 1.

*Shlomo Yanai* has served as a director since November 2014. Mr. Yanai is the Chairman of the Board of Directors of Protalix BioTherapeutics, Inc. since July 2014 and the Chairman of the Board of Cambrex Corporation (NYSE:CBM). Mr. Yanai served as President and Chief Executive Officer of Teva Pharmaceuticals from March 2007 until May 2012 and, prior to joining Teva, Mr. Yanai was President and Chief Executive Officer of Makhteshim-Agan Industries Ltd. from 2003 until 2006. Before that, he was a Major General in the Israel Defense Forces, where he served for 32 years, in various positions, the last two positions being Commanding Officer of the Southern Command and Head of the Division of Strategic Planning. Mr. Yanai was the head of the Israeli security delegation to the peace talks at Camp David, Shepherdstown and Wye River. He currently serves as a member of the Board of Governors of the Technion—Israel Institute of Technology of Haifa, Israel, as well as an honorary member of the Board of the Institute for Policy and Strategy of the Interdisciplinary Center (IDC), Herzliya, Israel. Mr. Yanai holds a bachelor's degree in political science and economics from Tel Aviv University, a master's degree in national resources management from George Washington University, and is a graduate of the Advanced Management Program of Harvard Business School and U.S. National War College (NDU). Mr. Yanai was the recipient of the Max Perlman Award for Excellence in Global Business Management from Tel Aviv University, Israel in 2005 and was awarded an honorary doctorate by Bar-Ilan University, Israel in 2012.

Mr. Yanai is well qualified to serve as an independent director due to his global operating experience in the life-science and pharmaceutical and agro-chemicals industry. He also brings a global perspective to the Board, incorporating his industry and Board leadership experience and his distinguished military service.

209

Supp.App. 0575

*Director Independence*

Nasdaq listing standards require that a majority of our board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of our board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director.

We currently have six "independent directors" as defined in the Nasdaq listing standards and applicable SEC rules, Messrs. Hotard, Jagodinski, Kaufthal, Mendoza and Yanai and Dr. Rutledge.

**Committees of the Board of Directors**

Quinpario currently has audit, nominating, and compensation committees. The composition and responsibilities of these committees are described below.

*Audit Committee*

Effective January 22, 2015, we established an audit committee of the board of directors, which consists of W. Thomas Jagodinski, Edgar G. Hotard and Dr. John Rutledge, each of whom is an independent director under the Nasdaq's listing standards. The audit committee's duties, which are specified in our Audit Committee Charter, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommend to the board whether the audited financial statements should be included in our Form 10-K;

- reviewing and discussing with management and the independent auditor the quarterly financial statements prior to the filing of our Form 10-Qs, including the results of the independent auditor's review of the quarterly financial statements;

- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;

- discussing with management major risk assessment and risk management policies;

- monitoring the independence of the independent auditor;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;

- reviewing and approving all related-party transactions;

- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;

- appointing or replacing the independent auditor;

- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and

210

Supp.App. 0576

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 579 of 1110   PageID 2200

- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee will at all times be composed exclusively of "independent directors" who are "financially literate" as defined under Nasdaq listing standards. Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, we must certify to Nasdaq that the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication. The board of directors has determined that W. Thomas Jagodinski qualifies as an "audit committee financial expert," as defined under rules and regulations of the SEC.

### Nominating Committee

Effective January 22, 2015, we have established a nominating committee of the board of directors, which consists of Edgar G. Hotard, Roberto Mendoza and Dr. John Rutledge, each of whom is an independent director under Nasdaq's listing standards. The nominating committee is responsible for overseeing the selection of persons to be nominated to serve on our board of directors. The nominating committee considers persons identified by its members, management, stockholders, investment bankers and others.

*Guidelines for selecting director nominees*

The guidelines for selecting nominees, which are specified in the Nominating Committee Charter, generally provide that the persons to be nominated:

- should have demonstrated notable or significant achievements in business, education or public service;

- should possess the requisite intelligence, education and experience to make a significant contribution to the board of directors and bring a range of skills, diverse perspectives and backgrounds to its deliberations; and

- should have the highest ethical standards, a strong sense of professionalism and intense dedication to serving the interests of the stockholders.

The nominating committee will consider a number of qualifications relating to management and leadership experience, background and integrity and professionalism in evaluating a person's candidacy for membership on the board of directors. The nominating committee may require certain skills or attributes, such as financial or accounting experience, to meet specific board needs that arise from time to time and will also consider the overall experience and makeup of its members to obtain a broad and diverse mix of board members. The nominating committee does not distinguish among nominees recommended by stockholders and other persons. Upon consummation of the Business Combination, the combined company will be subject to the terms of the Director Nomination Agreements.

### Compensation Committee

Effective as of January 22, 2015, we established a compensation committee of the board of directors, which consists of W. Thomas Jagodinski, Shlomo Yanai and Ilan Kaufthal, each of whom is an independent director under Nasdaq's listing standards. The compensation committee's duties, which are specified in our Compensation Committee Charter, include, but are not limited to:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, evaluating our Chief Executive Officer's performance in

211

Supp.App. 0577

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 580 of 1110    PageID 2201

light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer's based on such evaluation;

- reviewing and approving the compensation of all of our other executive officers;

- reviewing our executive compensation policies and plans;

- implementing and administering our incentive compensation equity-based remuneration plans;

- assisting management in complying with our proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our executive officers and employees;

- if required, producing a report on executive compensation to be included in our annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

Notwithstanding the foregoing, as indicated below, no compensation of any kind, including finders, consulting or other similar fees, will be paid to the Sponsor or officers or directors, or any of their respective affiliates, prior to, or in connection with the consummation of an initial business combination. Accordingly, it is likely that prior to the consummation of an initial business combination, the compensation committee will only be responsible for the review and recommendation of any compensation arrangements to be entered into in connection with such initial business combination.

### Code of Ethics and Committee Charters

On January 22, 2015, our board of directors adopted a code of ethics that applies to our executive officers, directors and employees. The code of ethics codifies the business and ethical principles that governs aspects of our business.

### Section 16(a) Beneficial Ownership Reporting Compliance

Section 16(a) of the Exchange Act requires our officers, directors and persons who own more than ten percent of a registered class of our equity securities to file reports of ownership and changes in ownership with the SEC. Officers, directors and ten percent stockholders are required by regulation to furnish us with copies of all Section 16(a) forms they file. Based solely on copies of such forms received or written representations from certain reporting persons that no Form 5s were required for those persons, we believe that, during the fiscal year ended December 31, 2016, all filing requirements applicable to our officers, directors and greater than ten percent beneficial owners were complied with.

### Committee Membership, Meetings and Attendance

Each of the audit committee, nominating committee and compensation committee of our board of directors is comprised entirely of independent directors.

From during the year ended December 31, 2016 our audit committee held three meetings, at which all members of the audit committee were present. Our nominating committee and compensation committee did not hold any meetings during this time. Our board of directors or a committee thereof acted by written consent four times in fiscal year 2016.

We encourage all of our directors to attend our annual meetings of stockholders. The annual meeting to be held on June 29, 2017 will be our first annual meeting, and we held a special meeting of stockholders on January 19, 2017.

212

Supp.App. 0578

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 581 of 1110    PageID 2202

**Limitation on Liability and Indemnification of Officers and Directors**

Our current amended and restated certificate of incorporation provides that our officers and directors will be indemnified by us to the fullest extent authorized by Delaware law, as it now exists or may in the future be amended. In addition, our current certificate of incorporation provides that our directors will not be personally liable for monetary damages to us for breaches of their fiduciary duty as directors, except for liability (i) for any breach of the director's duty of loyalty to us or our stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Delaware law, or (iv) for any transaction from which the director derived an improper personal benefit.

These provisions may discourage stockholders from bringing a lawsuit against our directors for breach of their fiduciary duty. These provisions also may have the effect of reducing the likelihood of derivative litigation against officers and directors, even though such an action, if successful, might otherwise benefit us and our stockholders. Furthermore, a stockholder's investment may be adversely affected to the extent we pay the costs of settlement and damage awards against officers and directors pursuant to these indemnification provisions.

We believe that these provisions are necessary to attract and retain talented and experienced officers and directors.

**Executive Compensation**

No executive officer has received any cash compensation for services rendered to us. Commencing on the date of our initial public offering through the acquisition of a target business, we will pay Quinpario Partners, an affiliate of the Sponsor, a fee of $10,000 per month for providing us with office space and certain office and secretarial services. However, this arrangement is solely for our benefit and is not intended to provide the Sponsor compensation. Other than the $10,000 per month administrative fee, no compensation of any kind, including finders, consulting or other similar fees, will be paid to sponsor or officers or directors, or any of their respective affiliates, prior to, or for any services they render in order to effectuate, the consummation of a business combination. However, such individuals will be reimbursed for any out-of-pocket expenses incurred in connection with activities on our behalf such as identifying potential target businesses and performing due diligence on suitable business combinations. There is no limit on the amount of these out-of-pocket expenses and there will be no review of the reasonableness of the expenses by anyone other than our board of directors and audit committee, which includes persons who may seek reimbursement, or a court of competent jurisdiction if such reimbursement is challenged.

**Compensation Committee Interlocks and Insider Participation**

None of our officers currently serves, and in the past year has not served, as a member of the board of directors or compensation committee of an entity that has one or more executive directors serving on our board of directors.

**Audit Committee Report**

The Company's audit committee reviewed with management and representatives of Marcum LLP ("Marcum"), our independent public accountants, the draft of the Annual Report on Form 10-K audited financial statements for the year ended December 31, 2016. The audit committee reviewed the requirements of the Audit Committee Charter previously adopted and the reports required to be disclosed to the audit committee. The audit committee also received the written disclosures and the letter from Marcum mandated by applicable requirements of the Public Company Accounting Oversight Board regarding the independent accountant's communications with the audit committee concerning independence, and discussed with Marcum its independence.

213

Supp.App. 0579

Table of Contents

Based on its review of all of the above and on discussions with management and the external auditor, the audit committee recommended to the board of directors that Quinpario's audited financial statements be included in the Annual Report on Form 10-K for the year ended December 31, 2016 for filing with the SEC.

Respectfully submitted,

W. Thomas Jagodinski
Edgar G. Hotard
Dr. John Rutledge

**Fees and Services**

The firm of Marcum LLP acts as our independent registered public accounting firm. The following is a summary of fees paid to Marcum LLP for services rendered.

**Audit Fees**

During the fiscal years ended December 31, 2016 and 2015, audit fees for our independent registered public accounting firm were $55,379 and $49,440, respectively.

**Audit-Related Fees**

During the fiscal years ended December 31, 2016 and 2015, audit-related fees for our independent registered public accounting firm were $0 and $0, respectively.

**Tax Fees**

During the fiscal years ended December 31, 2016 and 2015, fees for tax services for our independent registered public accounting firm were $2,369 and $2,060, respectively.

**All Other Fees**

During the fiscal years ended December 31, 2016 and 2015, fees for other services were $0 and $24,540, respectively.

**Audit Committee Approval**

Since our audit committee was not formed until January 22, 2015, the audit committee did not pre-approve all of the foregoing services although any services rendered prior to the formation of our audit committee were approved by our board of directors. However, in accordance with Section 10A(i) of the Exchange Act, before we engage our independent accountant to render audit or non-audit services on a going-forward basis, the engagement will be approved by our audit committee.

214

Supp.App. 0580

**QUINPARIO MANAGEMENT'S DISCUSSION AND ANALYSIS OF
FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*The following discussion and analysis should be read in conjunction with the consolidated financial statements and related notes of Quinpario included elsewhere in this report. This discussion contains forward-looking statements reflecting our current expectations, estimates and assumptions concerning events and financial trends that may affect our future operating results or financial position. Actual results and the timing of events may differ materially from those contained in these forward-looking statements due to a number of factors, including those discussed in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

*References to the "Company," "us" or "we" refer to Quinpario Acquisition Corp. 2. The following discussion and analysis of the Company's financial condition and results of operations should be read in conjunction with the condensed financial statements and the notes thereto contained elsewhere in this proxy statement. Certain information contained in the discussion and analysis set forth below includes forward-looking statements that involve risks and uncertainties.*

## Overview

We are a blank check company formed on July 15, 2014 for the purpose of entering into a merger, stock exchange, asset acquisition, stock purchase, recapitalization, reorganization or other similar business combination with one or more businesses or entities. On January 22, 2015, we closed our IPO of 35,000,000 units, with each unit consisting of one share of common stock, par value $.0001 per share, and one warrant entitling the holder to purchase one-half of one share of Quinpario Common Stock at a price of $5.75 per half share commencing 30 days after the completion of an initial business combination. Simultaneous with the consummation of the IPO, we consummated the private placement of 18,000,000 Private Placement Warrants at a price of $0.50 per warrant, generating total proceeds of $9,000,000. The Private Placement Warrants were purchased by the Sponsor, Quinpario Partners 2, LLC.

In January 2017, we held a special meeting of stockholders. At the meeting, our stockholders approved an amendment to our Amended and Restated Certificate of Incorporation to extend the date by which we had to consummate an initial business combination to July 24, 2017. In connection with the Extension, holders of 14,901,399 public shares exercised their right to convert such public shares into a pro rata portion of the Trust Account established in connection with our IPO. As a result, $201,543,292 remained in the Trust Account as of January 19, 2017.

## Results of Operations

We have not generated any revenues to date. Our entire activity from inception to the closing of the IPO on January 22, 2015 was in preparation for that event. Subsequent to the IPO, our activity has been limited to the evaluation of business combination candidates, and we will not be generating any operating revenues until the closing and completion of an initial business combination. We have, and expect to continue to generate small amounts of non-operating income in the form of interest income on cash and cash equivalents. Interest income is not expected to be significant in view of current low interest rates on risk-free investments (treasury securities). We expect to incur increased expenses as a result of being a public company (for legal, financial reporting, accounting and auditing compliance), as well as for due diligence expenses.

For the three months ended March 31, 2017 and 2016, we had a net loss of $386,551 and $58,912, respectively, which consisted of operating costs, offset by interest income of $255,604 and $295,722, respectively, on the funds held in the Trust Account. Our operating expenses principally consisted of expenses related to our public filings and listing and identification and due diligence related to a

215

Table of Contents

potential target business, and to general operating expenses including printing, insurance and office expenses.

Our net income for the twelve months ended December 31, 2016 was $56,963, which consisted of operating costs, offset by interest income of $1,185,130 on the funds held in the Trust Account.

Our net loss for the twelve months ended December 31, 2015 was $371,927, which consisted of operating costs, offset by interest income of $155,807 on the funds held in the Trust Account and $500,000 for the reimbursement of due diligence expenses that we incurred in connection with evaluating a potential business combination that did not materialize. For the period of July 15, 2014 (inception) through December 31, 2014, we had a net loss of $53,338. Our operating expenses principally consisted of expenses related to our public filings and listing and to general operating expenses including printing, insurance and office expenses. Until we consummate a business combination, we will have no operating revenues.

**Liquidity and Capital Resources**

Through March 31, 2017, our liquidity needs have been satisfied through receipt of $25,000 from the sale of shares to the Sponsor, loans and advances from Quinpario Partners, an affiliate of the Sponsor, totaling $325,370 and $1,380,830 of cash from the gross proceeds of the IPO. As of the date of this filing, all loans and advances have been repaid to Quinpario Partners from the net proceeds of the IPO and $1,064,000 of interest income has been withdrawn from the Trust Account to pay taxes and for working capital needs.

On January 22, 2015, we consummated our IPO of 35,000,000 units at a price of $10.00 per unit. Simultaneously with the consummation of our IPO, we consummated the private placement of 18,000,000 warrants to the Sponsor for $9,000,000. We received net proceeds from our IPO and the sale of the warrants to the Sponsor $351,380,830, net of the non-deferred portion of the underwriting commissions of $7,000,000, offering costs of $555,250 and other expenses of $63,920.

In January 2017, we held a special meeting of stockholders. At the meeting, our stockholders approved an amendment to our Amended and Restated Certificate of Incorporation to extend the date by which we had to consummate an initial business combination to July 24, 2017. For the 19,997,082 public shares that voted in favor of the amendment, such vote also constituted their consent for the Company to amend the Investment Management Trust Agreement to withdraw from the Trust Account any interest earned on the funds held in the Trust Account related to those shares, net of taxes payable, for the Company's working capital requirements. In connection with the Extension, holders of 14,901,399 public shares exercised their right to convert such public shares into a pro rata portion of the Trust Account established in connection with our IPO. As a result, $201,543,292 remained in the Trust Account as of January 19, 2017. In addition, 101,519 public shares were not voted and, for that reason, the Company cannot use the interest earned on those shares for the Company's working capital requirements. As a result, $1,018,002 of the funds that remain in the Trust Account are for the benefit of those public stockholders who did not vote on the Extension Amendment and will disburse such amount to such public stockholders if and when they present their shares for conversion. At March 31, 2017, there was $201,105,244 remaining in the Trust Account.

We believe the $296,311 in our working capital account on March 31, 2017, plus any additional interest earned on the funds held in the Trust Account that may be released to us, will be sufficient to meet our working capital needs, to pay any taxes that we may owe and to complete our initial business combination. The amounts in the Trust Account may be invested only in U.S. government treasury securities with a maturity of 180 days or less or in money market funds investing solely in U.S. Treasuries and meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act. The current low interest rate environment has made it more difficult for such investments to generate sufficient funds. As a result, we may need to seek additional capital to

216

Supp.App. 0582

Table of Contents

continue our operations. If additional capital is required, we intend to borrow sufficient funds from Quinpario Partners or the management team to operate until we close our initial business combination. Neither Quinpario Partners nor our management team is under any obligation to advance funds to us. Any loan would be evidenced by a non-interest bearing promissory note. Up to $1,500,000 of such notes may be convertible into additional warrants at a price of $0.50 per warrant of the post-business combination entity. Any such loans would be repaid only from funds held outside the Trust Account or from funds released to us upon completion of our initial business combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the Trust Account.

*Off-Balance Sheet Arrangements*

As of December 31, 2016 and March 31, 2017, we have no obligations, assets or liabilities which would be considered off-balance sheet arrangements. We do not participate in transactions that create relationships with unconsolidated entities or financial partnerships, often referred to as variable interest entities, which would have been established for the purpose of facilitating off-balance sheet arrangements.

*Contractual obligations*

We do not have any long-term debt, capital lease obligations, operating lease obligations or long-term liabilities other than a monthly fee of $10,000 payable to Quinpario Partners for office space, administrative services and secretarial support.

We began incurring these fees on January 15, 2015, the date our securities were first listed on Nasdaq and will terminate upon the earlier of (i) the consummation of a business combination or (ii) our liquidation.

**Critical Accounting Policies and Estimates**

The preparation of financial statements and related disclosures in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities, disclosure of contingent assets and liabilities at the date of the financial statements, and revenue and expenses during the periods reported. Actual results could materially differ from those estimates. We have identified the following as our critical accounting policies:

*Redeemable common stock*

All of the 35,000,000 shares of Quinpario Common Stock sold as part of the units in the IPO contained a redemption feature which allows for the redemption of such shares per our liquidation or tender offer / stockholder approval provisions. In accordance with ASC 480, redemption provisions not solely within the control of the Company require the security to be classified outside of permanent equity. Ordinary liquidation events, which involve the redemption and liquidation of all of the entity's equity instruments, are excluded from the provisions of ASC 480. Although the Company does not specify a maximum redemption threshold, the current certificate of incorporation provides that in no event will the Company consummated an initial business combination if such transaction would cause its net tangible assets (stockholders' equity) to be less than $5,000,001.

We recognize changes in redemption value immediately as they occur and will adjust the carrying value of the security to equal the redemption value at the end of each reporting period. Increases or decreases in the carrying amount of redeemable Quinpario Common Stock shall be affected by charges against paid-in capital.

217

Supp.App. 0583

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 586 of 1110     PageID 2207

Accordingly, at March 31, 2017, 18,392,883 of the 35,000,000 shares sold as part of the units in the IPO are classified outside of permanent equity at their redemption value. We expect the redemption price to be $10.00 per share of Quinpario Common Stock, without taking into account any interest earned on such funds. However, we may not be able to distribute such amounts as a result of claims of creditors which may take priority over the claims of public stockholders. On January 19, 2017, Quinpario held a special meeting of its stockholders to vote on the Extension Amendment. At the meeting, Quinpario's stockholders approved the Extension Amendment, which extended the date by which Quinpario had to consummate an initial business combination to July 24, 2017. In connection with the Extension, holders of 14,901,399 shares of Quinpario Common Stock exercised their right to convert such shares into a pro rata portion of the Trust Account. As a result, following such redemptions, $201,543,292 remained in the Trust Account. At March 31, 2017, there was $201,105,244 remaining in the Trust Account.

*Recent accounting pronouncements*

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's financial statements.

**Quantitative and Qualitative Disclosures About Market Risk**

Market risk is the sensitivity of income to changes in interest rates, foreign exchanges, commodity prices, equity prices and other market driven rates or prices. We are a blank check company incorporated on July 15, 2014 as a Delaware corporation and formed for the purpose of effecting a business combination with one or more businesses or entities. We are not presently engaged in and, if we do not consummate a suitable business combination prior to the prescribed liquidation date of the Trust Account, we may not engage in, any substantive commercial business. Accordingly, we are not and, until such time as we consummate a business combination, we will not be, exposed to significant risks associated with foreign exchange rates, commodity prices, equity prices or other market driven rates or prices. The net proceeds of our IPO held in the Trust Account may be invested by the trustee only in U.S. government treasury bills, notes or bonds with a maturity of 180 days or less or in money market funds investing solely in U.S. Treasuries and meeting certain conditions under Rule 2a-7 under the Investment Company Act. Given our limited risk in our exposure to government securities and money market funds, we do not view the interest rate risk to be significant.

218

Supp.App. 0584

**INFORMATION ABOUT SOURCEHOV**

*The following section describes the business and operations of SourceHOV.*

**Company Overview**

SourceHOV is a leading provider of platform-based enterprise information management ("EIM") and transaction processing solutions ("TPS") primarily for the healthcare, financial services, commercial, public sector, and legal industries. Within the broader business process outsourcing ("BPO") industry, SourceHOV's technology-enabled solutions allow multi-national organizations to globally address critical challenges resulting from the massive amounts of data obtained or created through their daily operations. These solutions address the life cycle of transaction processing and enterprise information management, from enabling payment gateways and data exchanges across multiple systems, to matching against contracts and handling exceptions, to ultimately depositing payments and distributing communications. As a leader in complex information processing, SourceHOV specializes in transactions that require multiple layers of validation, supporting documentation processing, and reconciliation. SourceHOV's suite of offerings combine platform modules across information management, payments, finance & accounting, legal & loss prevention, and unified communication services to provide both industry specific solutions, and solutions which span across multiple industries. A summary list of SourceHOV's industry solutions includes:

- *Healthcare:* Revenue cycle solutions, integrated accounts payable and receivable, and information management for both the healthcare payer and provider markets. Payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing, policy management, and scheduling and prescription management. Provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management.

- *Banking & Financial Services:* Payment processing and reconciliation, multi-network payment gateways, cross-border clearing and settlements, handling of sanctions, Know Your Customer ("KYC"), Anti-Money Laundering ("AML") and fraud detection, integrated accounts payable and receivable, and lending solutions for mortgages and auto loans.

- *P&C Insurance:* Insurance services including enrollments, claims processing, communications, policy management, integrated accounts payable and receivable, and audit services.

- *Public Sector:* Income tax return processing; benefits administration and records management along with fraud, waste, and abuse detection.

- *Legal:* Processing of legal claims for class action and mass action settlement administration, involving project management support, notification and outreach to claimants; and collection, analysis, and distribution of settlement funds.

- *Multi-Industry:* Finance and accounting ("F&A") and payment solutions for automation of integrated accounts payable and receivable, contract management and establishment of suppliers and buyers; eContent management, customer interaction management; and Big Data automation services for revenue enhancement and loss prevention, including targeted marketing and loyalty programs, incentive and pricing optimization modeling, and automated customized engagements for customer outreach.

At the foundation of its industry solution offerings, SourceHOV uses a combination of data-driven processes, technology, and human capital, delivered through integrated EIM and TPS platforms. SourceHOV's proprietary EIM platforms facilitate the exchange, consolidation, organization, and analysis of large amounts of structured and unstructured data generated by an enterprise that are crucial to its ability to effectively manage decisions, and enable presentment of critical information

219

Supp.App. 0585

through unified communication services. These platforms can be hosted on client premises, within SourceHOV's data centers, and / or in a cloud hosting and computing environment. SourceHOV's TPS offerings then use the structured data output from its EIM platforms and apply industry and client specific rules-based data validation, management of exceptions, business automation, and outcome resolutions to complete transactions, client interactions, and other operational processes. Through integrated EIM and TPS platforms, SourceHOV enables reliable information workflows through data aggregation, seamless connectivity, and automated processes that significantly reduce cycle times and improve quality. As a result, SourceHOV believes it can execute a wide range of the most critical business processes, across multiple industries that are deeply embedded in, and essential to, its clients' organizational workflows.

### Solutions and Segment Overview

SourceHOV's offerings are delivered across three business segments: ITPS, HS, and LLPS.

**FY 2016 Revenue by Segment**



*Information and Transaction Processing Solutions ($440 million of revenue in FY 2016)*

The ITPS segment provides a broad range of solutions and services designed to aid business in data aggregation, processing, decisioning, and distribution to customers primarily in the financial

220

Supp.App. 0586

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 589 of 1110 PageID 2210

Table of Contents

services, public sector, manufacturing, telecom, publishing, and retail industries. The ITPS segment provides the following solutions:

| | | |
|---|---|---|
| | *Enterprise information management* | • Data capture and classification (accounts payable and receivable, contracts, enrollments, communications, regulatory, tax, customer interactions, etc.)<br>• Workflow routing to relevant departments and ERP systems<br>• Archival / retrieval, dashboards, summarization |
| | *Origination, claim processing & servicing* | • Loan origination, application processing & servicing<br>• Property & casualty claims processing<br>• Benefits administration |
| | *Revenue enhancement & loss prevention* | • Incentive and pricing optimization modeling<br>• Targeted marketing & loyalty programs<br>• Automated customized engagements for customer outreach |
| | *Payment processing* | • Payment gateways<br>• Retail and wholesale remittance<br>• Card, check, and mobile deposit<br>• Currency and cross-border conversion |
| | *Expense management* | • Accounts payable processing and purchase requisition<br>• Travel & expense approvals<br>• Cash mapping, forecasting and management |
| | *Tax processing* | • Tax return processing (State Department of Revenue)<br>• LIFO inventory accounting<br>• Research and development tax credits<br>• §179D sustainability deductions cost segregation |
| | *Unified communication services* | • Electronic presentment, print & mail<br>• Billing and statements, regulatory notifications<br>• Secure messaging, voice, and chat |

In addition, ITPS sells proprietary software licenses and hardware technology along with information automation solutions. Software platforms offered include payment gateways, mortgage origination, electronic repository, exception processing, and workflow applications for banking and financial services, public sector, and other industries. Hardware solutions include a family of products supporting data aggregation and electronic presentment platforms, including high-speed, high-volume, multi-application document processing.

SourceHOV's ITPS solutions are focused on the following primary end-market verticals:

*Banking Solutions.* Solutions provided include loan origination and servicing, cross-border clearing and settlements, sanctions, KYC, AML and fraud detection, mobile banking platforms, and multi-network gateways.

Financial services companies are under intense pressure to constantly innovate their products and services in order to compete on a global stage that is subject to increasingly heavy regulation. As a result, financial services companies have turned to providers with the capacity to deliver full life cycle solutions across their front, middle, and back offices throughout the world. SourceHOV's ITPS offering enables financial services companies to increase availability of working capital, reduce turnaround times for application processes, increase regulatory compliance, and enhance consumer engagement.

<div align="center">221</div>

Supp.App. 0587

An example of a representative solution that SourceHOV provides for its financial services clients involves the loan application process. At the beginning of the application and enrollment life cycles, SourceHOV's EIM platforms combine and classify documents from different sources and in multiple media into a single, navigable structured data package that is then integrated into the wide variety of internal systems used by SourceHOV's clients. These platforms enable SourceHOV to efficiently and effectively manage multiple sources, varied input types and diverse structured data outputs at various locations and formats to accelerate the application and enrollment processes for its clients. Subsequently, SourceHOV's TPS solutions provide value-added, analytical and judgment-based processing to facilitate outcomes, including in the areas of mortgage and auto loan processing, accounts payable and receivable management, tax return processing, card and check processing, records management, and insurance policy enrollments. In the later stages of the application and enrollment life cycle, SourceHOV's TPS platform also provides communication services between its clients and their customers ranging from printing and mailing standard correspondence to the production, assembly, and distribution of larger informational and regulatory materials, as well as 24/7 live customer support. SourceHOV's primary proprietary application used for loan processing is Zuma™, a highly configurable loan origination and servicing solution that provides a managed environment to automate the complete mortgage life cycle, as detailed below:



SourceHOV serves major banking, insurance, automotive, and home mortgage clients in the financial services industry, including 9 of the top 10 U.S. banks and 7 of the top 10 U.S. insurance companies.

*F&A Solutions.*   Solutions provided include integrated accounts payable and receivable, expense management, supplier / buyer management, contract management, and journaling and reconciliation.

Companies around the world are faced with complex inter-company contracted relationships that span the entire organization. Many times, legacy technology systems and workflows may prohibit the efficient processing of orders within and outside an organization. SourceHOV's set of automation solutions provide the tools companies need to effectively manage their working capital cycles and improve the ease of communication across buyers, suppliers, and consumers.

<div align="center">222</div>

Supp.App. 0588

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 591 of 1110    PageID 2212

A representative example of SourceHOV's Business-to-Business accounts payable management solution, provided to a manufacturing client, involves the creation of a vendor portal to streamline their accounting function. Through its proprietary BancPay platform, SourceHOV created a customized solution that enables invoice submission and seamless connectivity with the client's existing SAP accounting system to automate portions of the accounts payable processing life cycle, from ingestion to authorization. SourceHOV facilitates the transitional period by supporting general ledger coding, invoice matching, account reconciliation, and other related processes. The enhanced reporting and tracking functionality of this solution provides full transparency to management at each step of the process. The solution, which connects suppliers, buyers, and consumers via a self-service, web-based portal, is illustrated below:



SourceHOV serves clients across multiple industries to efficiently solve their back-office needs, including 4 of the world's largest retail chains and over 50% of Fortune® 100 companies.

_Payment Solutions._    Solutions provided include retail and wholesale remittance processing, electronic bill payment and presentment, remote, mobile and paper payments, payment gateways and exception handling, and liquidity solutions.

Continued globalization and rapid industry and technology changes have revolutionized the payment industry. Companies from multiple industries are increasingly in need of innovative solutions that can seamlessly and securely solve their payment needs around the world with rapid turn-around-time. Driven by trends including mobile and remote data capture technologies and recent regulatory changes which eliminated the physical check requirement for settlement, a spotlight has been placed on the payment industry to provide solutions outside of the traditional banking world.

SourceHOV's proprietary solutions enable it to directly serve corporations with multi-channel payment gateways bypassing the need for clearing within banks. SourceHOV is able to provide a suite of technology-based solutions including remote data capture, which enables the ingestion of disparate feeds in addition to, but not limited to, the traditional physical lockbox and check consolidation, agile architecture to quickly incorporate new payment methods as they emerge (ex. PayPal, Apple Pay, credit card virtualization, phone pay), and handling / settling multiple payment standards (ACH, SEPA, GIRO, SWIFT, etc.) by regulated and unregulated entities. Through its financial services offerings, SourceHOV is able to add value for its clients through improved pricing as a payment solution provider

223

Supp.App. 0589

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 592 of 1110　　PageID 2213

with corporate clients and agency banks, increasing exception processing, capturing full stream of all payment methods, and serving as a single vendor solution for global delivery across multi-national corporations. Below are selected descriptions of payment solutions SourceHOV provides:



SourceHOV serves clients across multiple industries to solve their payment needs, including 5 of the top U.S. telecom companies and over 40 utility companies.

*Public Sector Solutions.*　Solutions provided for the public sector include tax return processing, benefits administration, fraud, waste and abuse detection, Big Data mining and analytics, and records management.

SourceHOV's public sector clients are facing increasing pressure to function more efficiently, so that they may serve their constituencies more quickly and at lower cost through web and mobile based applications. To address these challenges, public sector entities are turning to business process solutions providers for innovative, tech-enabled, outcome-based solutions to make their interactions with their constituents more efficient, faster, and more cost-effective. These business outcomes include digital transformation initiatives, improving turnaround times and accuracy of applications and filings, heightening constituent engagement, and reducing fraud, waste and abuse in benefit-based programs, among others.

An example of a representative solution that SourceHOV provides for its public sector clients includes tax return processing solutions for a State Department of Revenue. SourceHOV manages the front-end tax processing operation, which includes an online tax submission portal, physical and electronic mailroom, document preparation, data capture, rule validation, fraud, waste & abuse detection, non-filer detection, payment deposit, and tax-payer support. By leveraging its proprietary BoxOffice™ EIM platform, SourceHOV developed a tailored solution that significantly automated the processing of both tax returns and corresponding payments. As part of this solution, SourceHOV's analytics platform maintains thousands of business rules to validate the integrity of the tax filing, and the composition tool maintains all variations of tax forms to efficiently process any kind of filing. This approach transformed the department's tax return process, reducing processing time from 21 days to 4 days. Additionally, SourceHOV provides unified communication services to support management of inbound and outbound tax filing-related queries with support and automated chat responses.

224

Supp.App. 0590

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 593 of 1110   PageID 2214

SourceHOV has become a critical partner to its client and continues to pursue expansion opportunities. Below are selected descriptions of public sector solutions SourceHOV provides.

**Public Sector Solution Offerings**

| Revenue Management Solutions | First & Third-Party Collections | Enterprise Information Management | Big Data Analytics |
| Health & Human Services | Voice, Mobile & Online | Document & Content Mgmt Solutions | Loss Prevention Solutions |
| E-File | Mobile Capture/ Payment Solutions | Voice, Print & Mail Services | Data Breach Solutions |
| One Stop Business Portal (Tax, License, etc.) | Hardware / Software Solutions | Scanning Solutions | Tax Fraud Prevention Using Analytics |
| Citizen Services & Self Help Solutions | Ticket Processing | Dashboard / Visualization Reporting | Alerts & Notifications |
| Pension Processing | Medicaid & Vital Records | Financial / Lockbox Management | Program Modeling & Impact Analysis |

SourceHOV provides ITPS solutions to over 30 states and counties and over 80 government entities as well as educational institutions.

**Healthcare Solutions ($248 million of revenue in FY 2016)**

As a leader in complex claims processing, SourceHOV specializes in transactions that require multiple layers of validation, supporting documentation processing, reconciliation, and management of exceptions.

The healthcare industry remains under pressure to reduce overhead, address shortages in specialized skill sets, improve its services in terms of scope and delivery, and tackle numerous other challenges in the face of rising claim volumes, escalating costs, and changing regulatory environments. Healthcare organizations are looking for business process solutions to help address these challenges and allow them to focus on the task of providing high quality health services in a cost-effective manner.

225

Supp.App. 0591

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 594 of 1110    PageID 2215

The Healthcare Solutions segment provides the following solutions:

| | | |
|---|---|---|
| *Payer services* | • Enrollment processing and policy management<br>• Claims processing<br>• Claims adjudication and auditing<br>• Scheduling and prescription management<br>• Presentment of explanation of benefits and unified communication services (print and electronic)<br>• Integrated accounts payable and receivable | |
| *Provider services* | • Revenue cycle management<br>• Integrated accounts payable and receivable<br>• Health Information Management ("HIM") coding and consulting services<br>• Underpayment audit and recovery<br>  Medical records management (storage, archival & retrieval)<br>• Unified communication services | |

An example of a representative solution that SourceHOV provides for its healthcare clients involves the full life cycle integration of back office processes of both healthcare payers and providers. SourceHOV's life cycle solutions begin with patient and provider enrollment in the payer's health plan. During this origination of the provider-payer relationship, SourceHOV offers EIM solutions for the complex process management and verification of identities, entitlements, and qualifications. SourceHOV's EIM platform receives both physical and electronic claims and supporting documents, and enables providers to submit claims and documents directly to reduce the time and resources spent getting claims paid accurately. After claims are submitted, SourceHOV's EIM platform further classifies and verifies the data in compliance with the standards of the Health Insurance Portability and Accountability Act ("HIPAA"), and applies the provider-specific business rules that govern the workflow from an internal, growing library of rules. Subsequently, the deep integration of SourceHOV's TPS platforms embedded within healthcare clients' businesses allows SourceHOV to adjudicate claims and determine which claimants should be paid and in what amount. SourceHOV can also apply its analytics services to identify over- and under-payments and detect patterns of fraud on a proactive modeling, pre-payment or post-payment basis. At the conclusion of the life cycle, SourceHOV's TPS platform solutions offer final communications, payment processing, and medical records management. Serving both healthcare providers and payers results in a comprehensive view of their interactions that helps SourceHOV provide solutions that reduce the cost and complexity of those interactions by improving

226

Supp.App. 0592

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 595 of 1110    PageID 2216

communications, eliminating paper and mail, and reducing turnaround times. The following illustration summarizes the full life cycle solution SourceHOV provides:



SourceHOV's client base includes leading healthcare providers, health insurance companies, and government entities, including the top 5 healthcare insurance payers and deployments in over 900 healthcare providers.

### Legal & Loss Prevention Services ($102 million of revenue in FY 2016)

The Legal & Loss Prevention Services segment provides processing of legal claim settlement for class action and mass action lawsuits, including project management support, notification and outreach to claimants; collection and analysis of claimant information; administration and adjudication, and distribution of settlement funds. Through Kinsella Media, LLPS ("Kinsella") also offers specialty notification programs in consumer finance, antitrust, consumer fraud, and product liability litigation, as

227

Supp.App. 0593

Table of Contents

well as data and analytical services in the context of litigation consulting, economic and statistical analysis, and expert witness services.

| | | |
|---|---|---|
| | Legal claims settlement | • Notification of loss<br>• Compiling and managing claims databases<br>• Adjudications<br>• Distribution of settlement funds and tax reporting |
| | Legal notifications (Kinsella Media) | • Consumer finance<br>• Antitrust<br>• Securities<br>• Product liability |
| | Project management | • Administration and data management<br>• Print and electronic delivery of statements |
| | Litigation support | • Discovery services<br>• Case tracking tools<br>• Statistical analysis |
| | Expert witness services | • Consulting and testimony services<br>• Affidavits and declarations<br>• Supporting economic impact studies and market studies |
| | Accounts receivable management | • Credit reporting<br>• Pre-delinquency, third-party debt, and legal collections |

SourceHOV's legal claims administration services are provided through two brands, RUST Consulting ("RUST") and Kinsella. These brands have market leadership with experience in winning large and complex cases (such as the National Mortgage Settlement, a large joint state and federal consumer fraud settlement) with more than 5,600 projects and $20 billion in settlement assets distributed to date. RUST leverages its deep domain expertise to provide administration services around class action settlement as a neutral third party to distribute settlement funds to the affected class members. Kinsella provides advertising and media placement for notification of claimant eligibility. Upon the court directing the settlement administration, RUST creates multiple channels for claim form submission, including websites, call centers, and physical mail. SourceHOV's common platforms and delivery centers are leveraged to ingest claim forms and extract key data to process and adjudicate submissions in order to distribute settlement funds. SourceHOV platforms also provide plaintiffs and class members with current information and efficient, accurate, and auditable claims management. At each step, SourceHOV ensures that the administration of claims meets judicial requirements and industry best practices. The flexibility of platforms allows SourceHOV to promptly satisfy the requirements of judges and attorneys general, or respond to comments raised by the press and public opinion.

228

Supp.App. 0594

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 597 of 1110    PageID 2218

Table of Contents

A representative example of SourceHOV's LLPS solutions includes the claims management and distribution process it facilitated as part of the broader National Mortgage Settlement, the workflow of which is noted in the following illustration:



**Notification**
- Notices and Reminders to Potentially Eligible Claimants
- Processing and Management of Claimants' Contact Information
- Outreach Efforts to Drive Volume of Valid Claims
- Media Placements

**Claims Processing**
- Multi-channel Submission Portal
- Resolving "Borrower Status" Complications
- Curing Deficient Claims

**Claimant Support**
- Call Center, Email and Mail Support
- Live Service Support and 24/7 Interactive Voice Response Offering
- Pre-recorded Answers to FAQs

**Distribution**
- Initial Distribution of Funds
- Split Payments
- Tax Reconciliation

229

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 598 of 1110    PageID 2219

Table of Contents

*SourceHOV Ecosystem of Applications*

SourceHOV offers a broad range of proprietary, web- and mobile-based, modular platform applications that are paired with its industry-specific solutions to automate and extract business intelligence, execute transactions, enable decisioning, and accelerate its clients' digital transformation strategies.

*Transaction Processing Solutions*

*Delivering innovative industry solutions and specialized technology which incorporate data validation, exception management, business automation, and outcome resolutions*



*Enterprise Information Management*

*Providing proprietary analytic solutions to seamlessly aggregate, process, categorize, analyze, and present various sources of structured and unstructured data*

Supp.App. 0596

Supp.App. 0597

Table of Contents

*Enterprise Information Management Overview*

SourceHOV's EIM platforms provide the means to aggregate, enhance, summarize, and route its clients' data and documents for real-time business intelligence and secure archival and retrieval. The illustration below details selected EIM solutions:



*Unified Communication Services Overview*

SourceHOV's unified communication services provide intelligent communication and presentment for automated engagement and response through any media channel (SMS, Chat, Voice, Print, Email, and Mobile), including secure channels. The illustration below details selected solutions that that are integrated into SourceHOV's EIM platforms:



**Industry Overview**

Overall, corporations have an increased propensity to outsource day-to-day business processes as enterprises look for opportunities to accelerate performance and innovation, reduce costs, and streamline or standardize their business processes, allowing them to increase focus on growth. As advances in automation and ongoing technological innovation further drive demand for process outsourcing, SourceHOV believes companies increasingly seek a higher degree of efficiency, customization, connectivity, quality, and partnership from BPO solution providers.

231

Supp.App. 0598

Table of Contents

SourceHOV believes it is well positioned to capitalize on key secular trends driving growth in the BPO industry including (i) companies seeking to achieve industry-specific solutions and domain expertise to provide greater value, (ii) pressures on companies to enhance profitability and increase efficiency and reliability, (iii) outsourcing services seen as increasingly mission-critical as business processes become more complex, and (iv) high costs and risks associated with switching providers generally resulting in long-term strategic commitment from customers.

According to NelsonHall, the current market for BPO is estimated to be over $400 billion and is expected to grow at approximately 6% CAGR over the next four years. At present, as the industry verticals and markets served by BPO change, there is a greater willingness on the part of clients to shift a broader array of business processes, including more critical and complex processes such as TPS and EIM, to BPO providers. Currently, over 70% of related services are performed in-house by enterprises, translating to an outsourced penetration rate of approximately 30%, providing a large untapped opportunity for BPO providers. The global BPO market is generally divided into multiple end market segments including Financial Services, Healthcare, Manufacturing, Communication & Media, Public Sector, Retail, Travel, and Transportation. SourceHOV maintains leadership positions in the high-growth Financial Services and Healthcare end-markets, and believes it is well positioned to provide an increased number of solutions to multiple other industries including Commercial, Public Sector, and Legal. According to NelsonHall, Financial Services BPO and Healthcare BPO are expected to grow at approximately 5% CAGR and 7% CAGR, respectively, over the next four years.



**Global BPO Market Size and Growth**

**Company History**

SourceHOV has developed extensive industry specific knowledge through its experience developing solutions for its clients and building innovative industry solutions serving the world's largest enterprises. SourceHOV's transformation to a global multi-industry solution provider started in 2007 with the acquisition of Lason by HGM, becoming a leader in the information and transaction processing services industry. Subsequently, the combination with SourceCorp added significant scale and service offerings, and the acquisitions of BancTec and TransCentra added banking and payment services and expanded its international presence. SourceHOV's global delivery network, providing clients with a balance of proximity, service, and lower cost, coupled with a broad range of industry leading solutions, has enabled SourceHOV to become a critical partner to its clients. The acquisition of TransCentra would have contributed $102 million in revenue, $(1) million of net loss, and $4 million of capital expenditures to SourceHOV if it had been included in the financial information for the year ended December 31, 2016.

<div align="center">232</div>

Supp.App. 0599

**Technology**

SourceHOV provides technology-enabled services to its customers by leveraging its scalable and modular technology platforms. SourceHOV's platforms aim to enhance information management and workflow processes through automation and process optimization to minimize labor requirements. SourceHOV's decisioning engines have been built with years of deep domain expertise, incorporating hundreds of thousands of customer and industry specific rules which enable the most efficient and lowest cost preparation and decisioning of transactions.

SourceHOV's platform modules deliver innovative, full-cycle TPS and EIM solutions transforming data from information into outcomes. Its TPS offerings incorporate data validation, exception management, and outcome resolutions. The EIM platform provides the core data analytics and document management solutions needed for high-volume, mission-critical processes across the world's largest private and public organizations. The platforms incorporate both machine learning and rules-based analytics to facilitate processing, adjudication, and outcome generation, among other services. The technology platform's modular nature allows for customization of specific customer needs at a lower cost and over a shorter ramp time, and also enables SourceHOV to quickly and easily replicate these deployments for other customers, both strong competitive advantages relative to the competition. By leveraging its platforms, SourceHOV is able to reduce costs and turnaround time, while achieving higher levels of accuracy, thereby impacting its clients' operating margin and its ability to win and retain new business.

SourceHOV's technology platforms create the following competitive advantages:

*Replaces labor with technology in business processes.*    SourceHOV's technology platform strategy is designed to enable process improvement by significantly reducing the use of labor. By automating recognition and developing decision trees based upon learned outcomes, repetitive manual labor is reduced, enabling increased focus on new exception handling with highly skilled knowledge experts. By relying on technology instead of manpower, costs are reduced, turnaround time is improved, and accuracy is enhanced by limiting manual touch points and human error.

*Highly modular nature of platforms enables ease of customization.*    The features of SourceHOV's technology platforms are highly modular, allowing for superior deployment capabilities and quick customization. The modular characteristic of the platforms also allows for easy interfaces, and interactions with clients' in-house or third-party products, or SourceHOV's own platforms.

*Highly scalable proprietary technology platforms.*    SourceHOV's ability to scale by leveraging its technology platforms has proven to be a key driver of value. SourceHOV systems process over 100 million images per month, and have electronically archived over 1.5 petabytes of digital data to over 40 million online accounts. The modular nature of the platforms and infrastructure configuration facilitates the ability to increase scale with minimal investment.

*High level of integration with customer's technology systems and workflow processes.*    The breadth of integration with customer workflow processes makes the customer relationship extremely sticky as evidenced by SourceHOV's 97% renewal rate. Replacing either one or all of SourceHOV's modules is not only disruptive for the client's business through a transition period, which may take over a year, but also increases the risk of losing the process know-how embedded in the platforms which could be harmful to a client due to the mission-critical nature of the processes and the strict accuracy requirements surrounding payments, turn-around times, and federal regulation.

*Platforms' flexibility facilitates use of solutions across different industries.*    The technology platforms allow proven solutions for one customer to be used and adapted to new customers—even new industries—with little incremental investment and customization. The modularity of the platforms allows services to be provided more cost-effectively than discrete solutions built from scratch.

233

Supp.App. 0600

*Comprehensive depth and breadth of services.*    The integrated information and transaction processing nature of the technology platforms is a high value-add for SourceHOV's clients. With comprehensive industry solutions across different steps of the workflow process, clients can use SourceHOV to provide integrated services with global delivery as opposed to using multiple vendors throughout regional silos.

**Process Quality Assurance**

SourceHOV's process and quality assurance compliance capabilities are critical aspects of its operational success as it delivers service level agreements with accuracy requirements as high as 99.9999%. SourceHOV has an independent quality assurance team that monitors, analyzes, provides feedback, and reports on SourceHOV's process performance and compliance. Its quality assurance organization also focuses on managing its clients' business processes on an ongoing basis, spanning functions such as process management, customer quality, compliance monitoring and calibration, continual improvement programs, quality intelligence, and quality reporting. SourceHOV uses Six Sigma and LEAN methodologies to improve its quality across all of its standardized processes as well as statistical sampling and quality assurance methods for ongoing improvement of related processes maintained by SourceHOV's clients.

**Clients**

SourceHOV services over 3,000 customers across a variety of industries, including over 50% of the Fortune® 100. SourceHOV believes its clients are among the leading players in their respective industries, and many of them are recurring clients that have maintained long-term relationships with SourceHOV.

SourceHOV has successfully leveraged its relationships with clients to offer extended value chain services, creating stickier customer relationships and increasing overall margins. Large clients are increasingly turning to SourceHOV due to a demonstrated ability to work on large-scale projects, past performance and record of delivery, and deep domain expertise accumulated from years of experience in key verticals. As a result, SourceHOV's stable base of clients and sticky, long-term relationships lead to highly predictable revenues.

*Client and Industry Highlights*



SourceHOV maintains a strong mix of diversified clients with low customer concentration. No client accounts for more than 7% of 2016 revenue. SourceHOV's top 10 clients accounted for less than 25% of 2016 revenue and have been clients for an average of approximately 13 years, demonstrating both its excellent client service capabilities and its opportunity to increase existing client revenues through cross-sell and up-sell capabilities. In 2016, SourceHOV had 117 clients who contributed more than $1 million annually in SourceHOV revenue. Client renewal rate was 97% in 2016.

The diversity of SourceHOV's client base has contributed to the stability and predictability of its revenue streams and cash flows. SourceHOV has been able to effectively balance its client mix and reduce dependency on any single customer or vertical by penetrating a diverse set of end markets.

234

**Sales and Marketing**

SourceHOV's sales efforts are conducted through both nationally- and regionally-based sales teams with an industry focus. This focuses SourceHOV's sales team to better understand the prospective client's business needs and offer appropriate industry-specific solutions. SourceHOV's sales team consists of approximately 120 people based in the Americas, 39 people based in Europe, and 4 people based elsewhere around the world. SourceHOV focuses on acquiring new clients as well as increasing revenue from its current client base through increasing its scope of services, selling additional services to existing and new clients, and piloting new service offering content. SourceHOV has a rigorous cross-selling program to leverage capabilities across all of its functions.

The SourceHOV sales group works actively with its implementation team as the sales process moves closer to the prospective client's selection of a partner. The account manager or sales executive works with the service delivery team to define the scope, services, assumptions, and execution strategies for a proposed engagement, and to develop pricing with the finance team to incorporate into a sales proposal. The selling cycle varies depending on the industry and type of service required and generally ranges from six months to over a year.

As SourceHOV's relationship with a client grows, it becomes more knowledgeable about a client's business and processes, and consequently, its ability to identify opportunities to create value for the client typically increases. In particular, productivity benefits and greater business impact can often be achieved by focusing on processes that are upstream or downstream from the processes SourceHOV initially handles, or by applying its analytical and IT capabilities to re-engineer processes. In addition, clients often become more willing over time to turn over more complex and critical processes to SourceHOV as it successfully demonstrates these capabilities.

**Intellectual Property**

SourceHOV uses a combination of internally-developed proprietary platforms and applications as well as generally available third-party licensed software in connection with the business. Its intellectual property consists primarily of proprietary platforms and applications and the know-how of management and employees. SourceHOV considers its business processes and implementation methodologies to be confidential and proprietary and includes trade secrets that are important to its business. SourceHOV owns a variety of trademarks, which are either registered or applied for. SourceHOV regularly enters into nondisclosure agreements with clients, business partners, employees, and contractors that require confidential treatment of its information to establish, maintain, and enforce its intellectual property rights.

**Competition**

SourceHOV believes that the principal competitive factors in providing EIM and TPS solutions include proprietary platforms, industry specific knowledge, quality, reliability and security of service, and price. SourceHOV is uniquely positioned given its scale of operations, reputation as a trusted partner with deep domain expertise, innovative solutions, and highly integrated technology platforms that provide clients with end-to-end services addressing many aspects of their mission-critical operational processes. SourceHOV continues to integrate best practice delivery processes into its service-delivery capabilities to improve its quality and service levels and to increase operational efficiencies. The markets in which SourceHOV serves are competitive with both large and small businesses, as well as multi-national companies:

- Multi-national companies that provide EIM and TPS services, such as Fiserv, Jack Henry, First Data, FIS, Black Knight Financial, Open Text, Broadridge Financial Solutions, Computershare, DST Systems and Iron Mountain;

235

Table of Contents

- Multi-shore BPO companies, such as Genpact, Capita, Cognizant, Exlservice, Conduent, Wipro, and WNS; and

- Smaller, niche service providers in specific verticals or geographic markets.

**Regulation and Compliance**

SourceHOV handles, directly or indirectly through client contracts and business associate agreements, a significant amount of information, including personal and health-related information, which results in SourceHOV being subject to federal, state and local privacy laws, including the Gramm-Leach-Bliley Act, the Health Insurance Portability and Accountability Act of 1996 and the HITECH Act of 2009. Further, SourceHOV is subject to the local rules and regulations in the other countries in which it operates, including those relating to the handling of information. In addition, services in SourceHOV's legal vertical, though not directly regulated, must be provided in a manner consistent with the relevant legal framework. For example, SourceHOV's bankruptcy claims administration services must be provided in accordance with the requirements and deadlines of the United States Bankruptcy Code and Federal Rules of Civil Procedure. In addition, some of SourceHOV's clients are subject to regulatory oversight, which may result in SourceHOV being reviewed from time to time by such oversight bodies. Further, as a government contractor, SourceHOV is subject to associated regulations and requirements.

**Employees**

SourceHOV locates its operation centers in areas where the value proposition it offers is attractive to the employees in the area relative to other local opportunities, resulting in an engaged workforce that is able to make a meaningful global contribution from their local marketplace. To supplement the skills available in certain markets, SourceHOV offers its employees a focused set of training programs to increase their skills and leadership capabilities with the goal of creating a long term funnel of talent to support its continued growth. Additionally, SourceHOV's proprietary platforms enable rapid learning and facilitate knowledge transfer among employees, reducing training time.

As of March 31, 2017, SourceHOV had approximately 16,000 employees. Its employee count fluctuates from time to time based upon the timing and duration of its engagements.

**Properties**

SourceHOV has 117 operating facilities throughout the Americas, Europe, and Asia with an aggregate area of approximately 3.3 million square feet ("sq. ft."). SourceHOV also owns and leases a total of 14 non-operational facilities with an aggregate area of approximately 0.3 million square feet, which include dark facilities, sub-leased spaces, and regional sales and storage locations. Many of SourceHOV's operations facilities are equipped with fiber connectivity and have access to other power sources. Substantially all of SourceHOV's operations facilities are leased under long-term leases with varying expiration dates, except for the following owned locations: (i) three operations facilities in India with a combined building area of approximately 91,500 sq. ft., respectively, (ii) an operating facility in Georgiana, Alabama with an approximate building area of 20,000 sq. ft., (iii) an operating facility in Tallahassee, Florida consisting of four buildings with a combined building area of approximately 21,000 sq. ft., (iv) an operating facility in Upper Marlboro, Maryland with an approximate building area of 30,000 sq. ft., (v) an operating facility in Troy, Michigan that will serve as the Company's primary data center with an approximate building area of 66,000 sq. ft. and (vi) an operating facility in Egham, England with an approximate building area of 11,000 sq. ft.. SourceHOV also maintains an operating presence at approximately 4 customer sites. SourceHOV does not have the option under its present lease agreements to buy any of its leased properties.

SourceHOV's management believes that all of its properties and facilities are well maintained.

236

Supp.App. 0603

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 606 of 1110    PageID 2227

**Legal Proceedings**

SourceHOV is, from time to time, involved in certain legal proceedings, inquiries, claims and disputes, which arise in the ordinary course of business. Although SourceHOV's management cannot predict the outcomes of these matters, SourceHOV's management believes these actions will not have a material, adverse effect on SourceHOV's financial position, results of operations or cash flows.

**Management**

**Executive Officers and Directors**

The following table sets forth information regarding the individuals who serve as SourceHOV's executive officers and members of its Board of Directors (the "SourceHOV Board") as of May 19, 2017.

| Name | Age | Title |
|---|---|---|
| Par Chadha | 62 | Chairman |
| Jim Reynolds | 48 | Co-Chairman |
| Ronald Cogburn | 61 | Chief Executive Officer |
| Suresh Yannamani | 51 | President, Americas |
| Mark Fairchild | 57 | President, Europe |
| Shrikant Sortur | 44 | Senior Vice President, Global Finance |
| Sanjay Kulkarni | 48 | Chief Technology Officer |
| Srini Murali | 44 | Senior Vice President, Operations (Americas & APAC) |
| Vitalie Robu | 45 | Senior Vice President, Operations (EMEA) |

**Par Chadha** is the founder, Chief Executive Officer and Chief Investment Officer of HGM, a family office, formed in 2001, and the principal shareholder of SourceHOV. Mr. Chadha brings over 40 years of experience in building businesses in the Americas, Europe and Asia, including execution of mergers and acquisitions, integration of businesses and public offerings. Mr. Chadha has served as Chairman of SourceHOV since 2011, and was Chairman of Lason Inc. from 2007 to 2011 until its merger with SourceCorp, a predecessor company of SourceHOV. Since 2005, Mr. Chadha has served as a Director of HOV Services Limited, a company listed on the National Stock exchange of India, acting as its Chairman from 2009 to 2011. Mr. Chadha is co-founder and owner of Rule 14, LLC, a leading big data mining and automation company formed in 2011, and during his career, Mr. Chadha has founded or co-founded other technology companies in the fields of metro optical networks, systems-on-silicon and communications. Through HGM, Mr. Chadha previously participated in director and executive roles in joint ventures with major financial and investment institutions, including Apollo, as well as other portfolio companies of HGM, and currently holds and manages investments in evolving financial technology, health technology and communications industries. Mr. Chadha holds a B.S. in electrical engineering from Punjab Engineering College, India.

Quinpario believes that Mr. Chadha's significant experience in the public information technology and business services industry and his experience with mergers and integration of businesses make him well-qualified to serve as a director of the combined company.

**Jim Reynolds** has served as Co-Chairman of SourceHOV since 2014 and has served in management roles in companies that were predecessors to SourceHOV since 2001. Mr. Reynolds is also the Chief Operating Officer and a Partner at HGM, bringing over 25 years of industry experience to the team. Mr. Reynolds has held numerous executive management or senior advisory positions at SourceHOV and its related subsidiaries and predecessor companies, including serving as Chief Financial Officer for HOV Services, LLC from 2007 to 2011 and Vice President and Corporate Controller for Lason from 2001 to 2006. Mr. Reynolds was also Senior Manager in the Business

237

Advisory Services Practice at PricewaterhouseCoopers from 1990 to 2001. Mr. Reynolds is a C.P.A. and holds a B.S. in Accounting from Michigan State University.

Quinpario believes that Mr. Reynold's significant industry and management experience make him well-qualified to serve as a director of the combined company.

**Ron Cogburn** has served as Chief Executive Officer of SourceHOV since 2013 and has been part of companies that were predecessors to SourceHOV since 1993, bringing over 30 years of diversified experience in executive management, construction claims consulting, litigation support, program management project management, cost estimating, damages assessment and general building construction. Mr. Cogburn has also been the President of Meridian Consulting Group, LLC since January 1998 and a principal of HGM since 2003. Prior to his role as Chief Executive Officer, Mr. Cogburn was SourceHOV's President, KPO from March 2011 to July 2013. Prior to this role, Mr. Cogburn was the President of HOV Services, LLC from January 2005 to September 2007, providing executive leadership during the company's growth to its IPO on the India Stock Exchange in September 2006. Mr. Cogburn has a BSCE in Structural Design/Construction Management from Texas A&M University and is a registered Professional Engineer.

Quinpario believes that Mr. Cogburn's significant, diversified business experience in the combined company's industry make him well-qualified to serve as a director of the combined company.

**Suresh Yannamani** has served as President, Americas of SourceHOV since 2011, and has been a part of companies that were predecessors to SourceHOV since 1997. Mr. Yannamani oversees the region's sales and operations and plays a large part in scaling the transaction processing solutions practice and enterprise solution strategy for healthcare, financial services and commercial industries. Prior to his current role, Mr. Yannamani was President of HOV Services, LLC from 2007 to 2011, serving clients in the healthcare, financial services, insurance and commercial industries. Mr. Yannamani was the Executive Vice President of BPO services for Lason, which was subsequently acquired by HOV Services, LLC from 1997 to 2007. Mr. Yannamani also served in management roles at IBM from 1995 to 1997, managing the design, development, and implementation of financial management information systems for the Public Sector and worked for Coopers & Lybrand as a consultant in public audits from 1992 to 1994. Mr. Yannamani has a bachelor's degree in Chemistry from the University of London and holds an MBA from Eastern Michigan University.

**Mark Fairchild** has served as President, Europe, of SourceHOV since the merger of BancTec and SourceHOV in 2014, having served in management roles at BancTec since 1985. With more than 30 years of executive experience in the financial services industry, Mr. Fairchild specializes in global account management, transaction processing services, software solutions & hardware technology products. In 2005, Mr. Fairchild was appointed Chief Technology Officer of BancTec and was responsible for the company's software and hardware products, manufacturing and internal IT services until 2014. Prior to this role, Mr. Fairchild acted as Vice President for International Operations from 2001 to 2005 and VP of European Operations from 1998 to 2001. In his role as International Systems Director from 1991 to 1998, Mr. Fairchild led the European software teams, implementing payment platforms throughout the region. As Director of Engineering of BancTec from 1989 to 1991, Mr. Fairchild led the research and development team that introduced a new high-speed digital image processing system that formed the base of BancTec's ImageFIRST product portfolio. Mr. Fairchild joined BancTec as a Project Manager, a position he held from 1985 to 1986. He began his career as a software developer at British Aerospace, where he worked from 1981 to 1985. Mr. Fairchild graduated with honors from Manchester University with a bachelor's degree in aeronautical engineering and an MBA from London Business School.

**Shrikant Sortur** has served as Senior Vice President, Global Finance of SourceHOV since 2016. He is responsible for SourceHOV's finance and accounting groups, a role in which he leads financial operations, activities, plans and budgets. Mr. Sortur's career spans more than 19 years of varied

238

Supp.App. 0605

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 608 of 1110    PageID 2229

experience in financial management, accounting, reporting, and lean operations. Mr. Sortur has served in management roles in predecessor companies to SourceHOV since 2002. Prior to his current role, Mr. Sortur acted as Vice President of Finance from June 2015 to May 2016. Mr. Sortur acted as Director of Financial Planning and Analysis, TPS from January 2014 to June 2015. Prior to this role, Mr. Sortur was the Director of Financial Planning and Analysis, North America Operations from January 2012 to December 2013. Mr. Sortur acted as Controller for HOV Global from January 2009 to December 2011. Mr. Sortur was a Senior Accounting Manager for HOV Services, LLC / Lason, Inc. from May 2004 to December 2008 and worked for the SourceHOV group as a Manager, Finance & Accounts for Lason India Ltd. from December 2002 to May 2014. From March 1999 to December 2002, Mr. Sortur served as General Manager, Finance at SRM Technologies, a business solutions and technology provider specializing in software design and development, systems integration, web services, enterprise mobilization, and embedded solutions development. From June 1997 to February 1999, Mr. Sortur served as Junior Manager, Finance and Accounting for Steel Authority of India, a large state-owned steel making company based in New Delhi, India. Mr. Sortur graduated from Osmania University with a bachelor's degree in accounting and is a Certified Public Accountant (CPA), Chartered Accountant (CA), and Certified Management Accountant (CMA).

**Sanjay Kulkarni** has served as Chief Technology Officer of SourceHOV since September 2014, managing product development and delivery solutions across the organization. Mr. Kulkarni brings to the company 25 years of experience in IT and ITES across the healthcare, BFSI, and fintech verticals. Prior to his current role at SourceHOV, Mr. Kulkarni worked for Microsoft from March 2013 to October 2014 as a Program Leader, India, responsible for managing the development of products/solutions in the Recruit2Retire domain and Global Payroll on the Windows Azure platforms. From July 2008 to March 2013, Mr. Kulkarni worked for HOV Services, LLC and then SourceHOV as the SVP Technology in charge of delivery. During his time with Cognizant which spanned from February 2007 to July 2008, Mr. Kulkarni acted as Delivery Head—Healthcare, and was the single point of contact in Hyderabad. Prior to this, Mr. Kulkarni worked for GE Capital (Card Services) as a Senior Manager from February 2003 to February 2007, where he was responsible for delivery. Sanjay worked for United HealthCare as a Software Engineer in the New Technologies division from 1994 to 2003, where he managed product development and application delivery. Mr. Kulkarni holds a master's degree in computer science from the University of Texas and has his engineering degree from Nagpur, India. Mr. Kulkarni has also accomplished a General Management course from IIM Kolkata, India. Mr. Kulkarni was nominated as GECF Business Impact Award for 3 consecutive years 2004, 2005 and 2006 for providing solutions to improve the overall productivity of the operations team. Mr. Kulkarni is also 6s Six Sigma & HIPAA certified.

**Srini Murali** has served as Senior Vice President, Operations for the Americas and APAC regions for SourceHOV since 2014, creating global operating strategies, developing client relationships, and overseeing compliance. Mr. Murali has been a part of predecessor companies to SourceHOV since 1993. During his tenure, Mr. Murali has held analysis, product development, IT, and operational roles. In 2010, Mr. Murali took on a broader scope of responsibility as SourceHOV's Senior Vice President of Global Operations and IT, and subsequently was appointed to his current position in 2015. Mr. Murali has served in executive-level leadership roles at companies that were predecessors to SourceHOV since 2007, when he was appointed Vice President of IT and Technology. Prior to these management roles, Mr. Murali served as Director of Information Technology for Lason from August 2002 to April 2007, and an Application Development Manager for Lason from April 1998 to August 2002. Before joining Lason, Mr. Murali worked as a Systems Engineer for Vetri Systems from July 1996 to April 1998. Mr. Murali graduated with a bachelor's degree in mathematics and statistics from Loyola College, Chennai, and earned an MBA from Davenport University, Michigan.

**Vitalie Robu** has served as Senior Vice President, Operations for the European region of SourceHOV since 2014, and is responsible for operations, client relationship management, sourcing,

<div align="center">239</div>

Supp.App. 0606

risk control and compliance. Mr. Robu specializes in transaction processing services, technology products and software solutions and has more than 20 years of international and management experience in the private and public sectors. From May 2010 to August 2014, Mr. Robu held the position of President and Executive Director of Dataforce UK, a business process outsourcing and software provider which is part of SourceHOV. Prior to joining the SourceHOV group, Mr. Robu served as Manager of Investment and Insurance Products for Citibank EMEA in London from March 2007 to May 2010. Mr. Robu also served as a Senior Management Consultant with PricewaterhouseCoopers in Eastern Europe from 1994 to 1997, and as a diplomat for the Republic of Moldova at the United Nations headquarters in New York from 1997 to 2002. Mr. Robu holds an MBA from the International Institute for Management Development (IMD), Lausanne, Switzerland, a master's degree in international relations from National School of Political and Administrative Studies in Bucharest (Romania), as well as a master's degree in physics from the State University of Moldova.

## SourceHOV Executive Compensation

### Compensation of the SourceHOV Named Executive Officers

The following table sets forth information regarding the compensation awarded to, earned by, or paid to certain of SourceHOV's executive officers during the fiscal year ended December 31, 2016. As an emerging growth company, SourceHOV has opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies" as such term is defined in the rules promulgated under the Securities Act, which require compensation disclosure for its principal executive officer and its two other most highly compensated executive officers. Throughout this proxy statement, these three officers are referred to as SourceHOV's "named executive officers."

The compensation reported in this summary compensation table below is not necessarily indicative of how SourceHOV's named executive officers will be compensated in the future. SourceHOV expects that Quinpario will review, evaluate and modify its compensation framework as a result of the Business Combination and Quinpario's compensation program following the Business Combination could vary significantly from SourceHOV's historical practices.

### Summary Compensation Table

| Name and principal position | Year | Salary ($) | Stock Awards ($)(1) | Total ($) |
|---|---|---|---|---|
| Ronald C. Cogburn<br>Chief Executive Officer | 2016 | 325,000 | 120,000 | 445,000 |
| Mark Fairchild<br>President—Europe | 2016 | 400,000 | — | 400,000 |
| Suresh Yannamani<br>President—Americas | 2016 | 325,000 | 120,000 | 445,000 |

(1)    SourceHOV awarded 150 restricted stock units to each of Messrs. Cogburn and Yannamani on April 29, 2016, which vest in equal installments on the first three anniversaries of the vesting commencement date, or April 29, 2016. The amounts reported in this column represent the grant date fair value of the restricted stock units awarded to each of Messrs. Cogburn and Yannamani, determined in accordance with FASB ASC Topic 718, without any reduction in the grant date fair value of the awards for the possibility of service based forfeiture. For additional information relating to the assumptions made by SourceHOV in valuing these awards for 2016, see *Note 13—Equity-Based Compensation* in the Notes to the SourceHOV Consolidated Financial Statements.

240

Supp.App. 0607

**Narrative to Summary Compensation Table**

*Executive Employment Agreements*

Certain of the compensation paid to Mr. Fairchild reflected in the summary compensation table was provided pursuant to an employment agreement with SourceHOV's subsidiary, BancTec, Inc. Mr. Fairchild is a party to an employment agreement dated May 2007, with BancTec, Inc., which provides for an indefinite term. Pursuant to his employment agreement, Mr. Fairchild is entitled to an annual base salary, currently $400,000, and is eligible to earn a target annual bonus equal to up to 100% of his base salary.

SourceHOV has not entered into employment agreements with Mr. Cogburn or Mr. Yannamani. For a discussion of the severance pay and other benefits to be provided to SourceHOV's named executive officers in connection with a termination of employment and/or a change in control under arrangements with each of SourceHOV's named executive officers (including Mr. Fairchild's employment agreement), please see "—*Potential Payments Upon Termination or Change in Control*" below.

*Transaction Bonuses*

Subject to continued employment through the applicable payment date, each of Messrs. Cogburn, Fairchild and Yannamani will receive a transaction bonus payable in July 2017 in partial consideration for their efforts in connection with the Business Combination. The amount of the transaction bonuses for Messrs. Cogburn, Fairchild and Yannamani will be $350,000, $200,000 and $450,000, respectively. In the event that any of SourceHOV's named executive officers experiences a termination of employment by SourceHOV for "cause" or if he voluntarily resigns without "good reason," in each case, prior to June 30, 2018, SourceHOV will retain the right to require such named executive officer to repay all or any portion of his transaction bonus.

*Stock Plans, Health and Welfare Plans, and Retirement Plans*

*Stock Plan.*    SourceHOV currently provides grants of equity based awards to eligible service providers under its 2013 Long Term Incentive Plan, or the 2013 Plan. In April 29, 2016, SourceHOV granted restricted stock units to members of its management team, including to Messrs. Cogburn and Yannamani, under its 2013 Plan. The restricted stock units granted to SourceHOV's named executive officers vest in equal installments on each of the first three anniversaries of the grant date and are settled the earlier to occur of (i) the occurrence of a "change in control" of SourceHOV, and (ii) the fifth anniversary of the date of grant. For a summary of the principal features of SourceHOV's 2013 Plan, see "—*Additional Incentive Compensation Plans and Awards—Equity Incentive Plans*" below.

*Health and Welfare Plans.*    SourceHOV's named executive officers are eligible to participate in its employee benefit plans, including its medical, dental, vision, life, disability, health and dependent care flexible spending accounts and accidental death and dismemberment benefit plans, in each case on the same basis as all of its other employees.

*Retirement Plan.*    SourceHOV sponsors a retirement plan intended to qualify for favorable tax treatment under Section 401(a) of the Internal Revenue Code of 1986, as amended, or the Code, containing a cash or deferred feature that is intended to meet the requirements of Section 401(k) of the Code. Employees who have completed six months of service are generally eligible to participate in the plan. Participants may make pre-tax contributions to the plan from their eligible earnings up to the statutorily prescribed annual limit on pre-tax contributions under the Code. Participants who are 50 years of age or older may contribute additional amounts based on the statutory limits for catch-up contributions. All employee and employer contributions are allocated to each participant's individual account and are then invested in selected investment alternatives according to the participant's

241

directions. Pre-tax contributions by participants and contributions that SourceHOV makes to the plan and the income earned on those contributions are generally not taxable to participants until withdrawn, and all contributions are generally deductible by SourceHOV when made. Participant contributions are held in trust as required by law. No minimum benefit is provided under the plan. An employee is 100% vested in his or her pre-tax deferrals when contributed and any employer contributions ratably over four years. The plan provides for a discretionary employer matching contribution and, SourceHOV currently does not make any matching contributions to the plan and did not make any matching contributions with respect to the 2016 plan year.

**Outstanding Equity Awards at Fiscal Year End**

The following table sets forth outstanding equity awards to acquire shares of SourceHOV's common stock held by each of its named executive officers as of December 31, 2016.

| | | Stock awards | |
| Name | Grant date | Number of shares or units of stock that have not vested(4) | Market Value of shares or units of stock that have not vested ($)(5) |
| --- | --- | --- | --- |
| Ronald C. Cogburn | November 6, 2013(1) | 339 | 542,400 |
| Ronald C. Cogburn | April 30, 2015(2) | 713 | 1,140,800 |
| Ronald C. Cogburn | April 29, 2016(3) | 150 | 240,000 |
| Mark Fairchild | April 30, 2015(2) | 207 | 331,200 |
| Suresh Yannamani | November 6, 2013(1) | 339 | 542,400 |
| Suresh Yannamani | April 30, 2015(2) | 38 | 60,800 |
| Suresh Yannamani | April 29, 2016(3) | 150 | 240,000 |

(1)     Restricted stock units are subject to the following vesting schedule: one-fourth of the restricted stock units vest on each of the first four anniversaries of the vesting commencement date, or April 30, 2013. In addition, (i) 50% of the then unvested restricted stock units will vest upon the occurrence of a change in control, (ii) 25% of the unvested restricted stock units as of the change in control will vest on the first anniversary of such change in control, and (iii) the remaining 25% of the unvested restricted stock units as of the date of the change in control will vest upon the date that is 18 months immediately following such change in control. If the grantee's employment is terminated without cause (other than as a result of death or disability) following the occurrence of a change in control, all unvested restricted stock units will immediately vest.

(2)     Restricted stock units are subject to the following vesting schedule: one-fourth of the restricted stock units vest on each of the first four anniversaries of the vesting commencement date, or April 30, 2015. In addition, if the grantee's employment is terminated without cause (other than as a result of death or disability) following the occurrence of a change in control, all unvested restricted stock units will immediately vest.

(3)     Restricted stock units are subject to the following vesting schedule: one-third of the restricted stock units vest on each of the first three anniversaries of the vesting commencement date, or April 29, 2016. In addition, if the grantee's employment is terminated without cause (other than as a result of death or disability) following the occurrence of a change in control, all unvested restricted stock units will immediately vest.

(4)     The table below shows the aggregate number of vested restricted stock units held by each named executive officer of December 31, 2016.

242

Supp.App. 0609

(5)    Based on the fair value of SourceHOV's common shares on December 31, 2016.

| Name | Aggregate RSUs Vested as of December 31, 2016 (#) |
|---|---|
| Ronald C. Cogburn | 1,254 |
| Mark Fairchild | 68 |
| Suresh Yannamani | 1,029 |

**Potential Payments Upon Termination or Change in Control**

The following summaries describe the potential payments and benefits that SourceHOV would provide to its named executive officers in connection with a termination of employment and/or a change in control.

*Severance Benefits*

Mr. Fairchild's employment agreement provides for certain payments to be made in connection with certain terminations of service, as further described below. In addition, although SourceHOV has not entered into a written agreement providing Messrs. Cogburn or Yannamani severance benefits, upon a termination of Messrs. Cogburn or Yannamani's employment by SourceHOV without cause, each of Messrs. Cogburn and Yannamani would be entitled to severance benefits equal to continued payment of his base salary for a period of three weeks for each year of service with SourceHOV, up to a maximum of 16 weeks.

*Mark Fairchild.*    In the event that Mr. Fairchild's employment is terminated either by BancTec, Inc. without "cause" or by the him for "good reason," subject to the his execution of a release of claims, Mr. Fairchild would be entitled to: (i) one years' base salary and one times his target annual bonus; (ii) payment of the employee and employer portion of his COBRA premiums until the earlier of 18 months following such termination and when he is employed by an employer who offers welfare benefits; and (iii) immediate vesting of all outstanding equity awards. In the event Mr. Fairchild's employment is terminated either by BancTec, Inc. without "cause" at the request of any third party in connection with a "change in control" or by him for "good reason," within one year following a "change in control," in addition to the severance benefits described in the previous sentence, he would also be entitled to a pro-rated bonus for the year of termination.

In the event any payments paid pursuant Mr. Fairchild's employment agreement are subject to an excise tax under Section 4999 of the Code, or any similar tax that may be imposed, he is entitled to an additional gross-up payment such that the net amount retained by him equals the amount he would have been entitled to had no such tax been imposed on the payments. Following any termination of employment, Mr. Fairchild is subject to a non-solicit of employees and customers for a period of one-year following his termination.

*Vesting and Settlement of Outstanding Equity Awards*

Each of SourceHOV's named executive officers hold restricted stock units, the vesting and settlement of which will be accelerated in certain instances upon or following a change in control. With respect to the restricted stock units granted to each of Messrs. Cogburn and Yannamani on November 6, 2013, (i) 50% of the then unvested restricted stock units will vest upon the occurrence of a change in control, (ii) 25% of the unvested restricted stock units as of the change in control will vest on the first anniversary of such change in control, and (iii) the remaining 25% of the unvested restricted stock units as of the date of the change in control will vest upon the date that is 18 months immediately following such change in control. If the grantee's employment is terminated without cause (other than as a result of death or disability) following the occurrence of a change in control, all

243

Table of Contents

unvested restricted stock units will immediately vest. In addition, such restricted stock units will be settled on the earlier of (i) the occurrence of a change in control, and (ii) the fifth anniversary of the date of grant, provided, that following a change in control, each restricted stock unit that is not vested as of the date of the change in control will be settled on the date on which such restricted stock unit vests. In addition, restricted stock units that are settled following the occurrence of a change in control will be settled in cash, with a value determined based on the value received by the SourceHOV stockholders upon or following the consummation of the change in control.

All of the then unvested restricted stock units granted to each of Messrs. Cogburn, Fairchild and Yannamani on April 30, 2015 and to Messrs. Cogburn and Yannamani on April 29, 2016 will vest if, following the occurrence of a change in control, the grantee's employment is terminated without cause (other than as a result of death or disability). In addition, such restricted stock units will be settled on the earlier of (i) the occurrence of a change in control, and (ii) the fifth anniversary of the date of grant; provided, that, following a change in control, each restricted stock unit that is not vested as of the date of the change in control will be settled on the earlier to occur of (i) the date on which such restricted stock unit vests (disregarding any accelerated vesting on account of a termination without cause), and (ii) if the grantee's employment is terminated by SourceHOV without cause (other than as a result of the grantee's death or disability) within two years following the occurrence of such change in control, the date of such termination.

**Additional Incentive Compensation Plans and Awards**

*Equity Incentive Plans*

SourceHOV currently maintains the 2013 Plan pursuant to which SourceHOV may grant various forms of equity compensation to its service providers, including its officers, non-employee directors and consultants. SourceHOV historically granted restricted stock units to employees under the 2013 Plan. The principal features of the 2013 Plan are summarized below.

*2013 Equity Incentive Plan*

SourceHOV's board of directors approved the 2013 Plan in November 2013 and increased the share reserve in February 2014. Under SourceHOV's 2013 Plan, SourceHOV may grant non-qualified stock options, stock appreciation rights, and restricted stock and restricted stock unit awards.

There are 30,000 shares of SourceHOV's common stock reserved for issuance under the 2013 Plan. This number is subject to additional adjustment in the event of a stock dividend, stock split, or other change in SourceHOV's capitalization. As of March 24, 2017, restricted stock units representing the right to receive 24,456 shares of common stock were outstanding under the 2013 Plan. SourceHOV's compensation committee has had full power and authority to determine the terms of awards granted pursuant to the 2013 Plan, including, without limitation, which employees, directors and consultants will be granted restricted stock units and other awards and the number of shares of SourceHOV common stock subject to restricted stock units and other awards. SourceHOV's board of directors may amend or discontinue the 2013 Plan at any time and may amend or cancel any outstanding award. No such amendment may adversely affect the rights under any outstanding award without the holder's consent.

Upon completion of the Business Combination, each of the restricted stock units outstanding under the 2013 Plan will be assumed by New SourceHOV LLC and each of the shares underlying an outstanding restricted stock unit will be replaced with membership interests in New SourceHOV LLC.

244

Supp.App. 0611

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 614 of 1110    PageID 2235

**Director Remuneration**

**Director Compensation Policy**

For 2016, members of the SourceHOV board of directors received no cash compensation for services rendered. SourceHOV currently has no other formal arrangements under which its directors receive compensation for service to its board of directors or its committee.

**All Other Compensation**

SourceHOV reimburses its directors for reasonable and necessary out-of-pocket expenses incurred in attending board and committee meetings or performing other services for the company in their capacities as directors.

**Director Compensation**

The following table sets forth information concerning director compensation paid during the year ended December 31, 2016.

| Name | Fees earned or paid in cash ($) | Stock awards ($) | Option awards ($) | All Other compensation ($) | Total ($) |
|---|---|---|---|---|---|
| Par Chadha | — | — | — | — | — |
| Jim Reynolds | — | — | — | — | — |

245

Supp.App. 0612

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 615 of 1110    PageID 2236

**SOURCEHOV MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis together with "Selected Historical Financial Information of SourceHOV" and SourceHOV's consolidated financial statements and the related notes included elsewhere in this proxy statement. Among other things, those historical consolidated financial statements include more detailed information regarding the basis of presentation for the financial data than included in the following discussion. This discussion contains forward-looking statements about SourceHOV's business, operations and industry that involve risks and uncertainties, such as statements regarding SourceHOV's plans, objectives, expectations and intentions. SourceHOV's future results and financial condition may differ materially from those currently anticipated by SourceHOV as a result of the factors described in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

**Overview**

SourceHOV is a leading provider of platform-based enterprise information management and transaction processing solutions primarily for the healthcare, banking and financial services, commercial, public sector and legal industries. By leveraging specialized knowledge platforms that are powered by decades of expertise and customer-specific experience, SourceHOV's business model uses a strategic mix of technology and services to provide industry solutions and proprietary technology which incorporate data aggregation, exception handling, decisioning, and business process automation.

SourceHOV offers highly scalable technology platforms, hosted on-premise, within SourceHOV's data centers, and/or in a cloud hosting and computing environment, to a wide range of industries. Companies from more than 50 countries, including over 50% of the Fortune® 100, choose SourceHOV as their trusted technology and operations partner. Management believes its international presence benefits its clients with a balance of proximity, service, and cost to meet their needs. SourceHOV solutions benefit leading organizations in information-intensive businesses that have frequent access and distribution requirements, and require data analytics, specialized processing, or subject matter expertise. Approximately 90% of SourceHOV's revenues are recurring in nature and supported by long-term client contracts.

SourceHOV's business philosophy goes hand in hand with building long-term, collaborative relationships and providing superior business value to SourceHOV's clients while achieving results that exceed expectations.

**History**

SourceHOV's transformation to a global multi-industry solution provider started in 2007 with the acquisition of Lason by HandsOn Global Management, LLC ("HGM"), forming HOV Services, LLC ("HOVS"), a leader in the transaction processing services industry. Subsequently, SourceHOV was formed in April 2011 through the combination of SourceCorp, a Delaware limited liability company owned by Apollo, and HOVS, a Nevada limited liability company owned by HGM. Pursuant to the combination, HGM and Apollo contributed their respective equity into a new entity, SCH Services, Inc. ("SCH"), a Delaware corporation, in exchange for common stock in SCH, and SCH in turn contributed its new ownership in HOVS to its newly wholly-owned subsidiary SourceCorp. Concurrently with the combination, SCH changed its name to SourceHOV Holdings, Inc., and SourceCorp changed its name to SourceHOV LLC. In 2014, SourceHOV acquired BancTec Group ("BancTec"), a provider of transaction processing solutions to many of the world's largest commercial banks, governments, insurance companies and other large organizations. The acquisition provided SourceHOV with further international diversification and expansion of services into banking and payments.

246

Supp.App. 0613

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 616 of 1110    PageID 2237

Table of Contents

**Acquisition**

In 2016, SourceHOV further transformed into a multi-industry solution provider and acquired key technology through the acquisition of TransCentra, Inc. ("TransCentra"), a provider of integrated outsourced billing, remittance processing and imaging software and consulting services. The addition of TransCentra increased SourceHOV's footprint in the remittance transaction processing and presentment area, expanded its mobile banking offering and enabled significant cross-selling and up-selling opportunities. See *Note 1— Description of the Business* for additional information.

**SourceHOV's Segments**

SourceHOV's three reportable segments are Information & Transaction Processing Solutions ("ITPS"), Healthcare Solutions ("HS"), and Legal & Loss Prevention Services ("LLPS"). These segments are comprised of significant strategic business units that align SourceHOV's TPS and EIM products and services with how SourceHOV manages its business, approaches its key markets and interacts with its clients based on their respective industries.

**ITPS:**    SourceHOV's largest segment, ITPS, provides a wide range of solutions and services designed to aid businesses in information capture, processing, decisioning and distribution to customers primarily in the financial services, commercial, public sector and legal industries. SourceHOV's major customers include 9 of the top 10 U.S. banks, 7 of the top 10 U.S. insurance companies, 5 of the top U.S. telecom companies, over 40 utility companies, over 30 state and county departments, and over 80 government entities. SourceHOV's ITPS offerings enable companies to increase availability of working capital, reduce turnaround times for application processes, increase regulatory compliance and enhance consumer engagement.

**HS:**    HS operates and maintains a consulting and outsourcing business specializing in both the healthcare provider and payer markets. SourceHOV serves the top 5 healthcare insurance payers and over 900 healthcare providers.

**LLPS:**    SourceHOV's LLPS segment provides a broad and active array of legal services in connection with class action, bankruptcy labor, claims adjudication and employment and other legal matters. SourceHOV's client base consists of corporate counsel, government attorneys, and law firms.

**Revenues**

ITPS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services. HS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed for healthcare payers and providers. LLPS revenues are primarily based on time and materials pricing as well as through transactional services priced on a per item basis.

**People**

SourceHOV draws on the business and technical expertise of its talented and diverse global workforce to provide its clients with high-quality services. SourceHOV's business leaders bring a strong diversity of experience in SourceHOV's industry and a track record of successful performance and execution.

As of March 31, 2017, SourceHOV had approximately 16,000 employees globally, with 38% located in the United States and the remainder located primarily in Europe, India, the Philippines, Mexico, and China.

<div align="center">247</div>

Supp.App. 0614

Table of Contents

Labor costs associated with SourceHOV's employees represent the most significant costs of its business. SourceHOV incurred personnel costs of $95.6 million and $100.4 million for the three months ended March 31, 2017 and 2016. The majority of SourceHOV's personnel costs are variable and are incurred only while SourceHOV is providing its services.

**Facilities**

SourceHOV leases and owns numerous facilities worldwide with larger concentrations of space in Texas, Michigan, California, India, Mexico, the Philippines, and China. SourceHOV's owned and leased facilities house general offices, sales offices, service locations, and production facilities. The size of SourceHOV's active property portfolio as of March 31, 2017 was approximately 3.3 million square feet at an annual operating cost of approximately $26.5 million and comprised 110 leased properties and 7 owned properties. SourceHOV believes that its current facilities are suitable and adequate for its current businesses. Because of the interrelation of SourceHOV's business segments, each of the segments use substantially all of these properties at least in part.

As a result of implementing SourceHOV's strategic transformation program as well as various productivity initiatives, several leased and owned properties may become surplus over the next three years. SourceHOV is obligated to maintain its leased surplus properties through required contractual lease periods and plan to dispose of or sublease these properties.

**Key Performance Indicators**

SourceHOV uses a variety of operational and financial measures to assess its performance. Among the measures considered by management are the following:

- Revenue by segment;

- Gross Profit by segment;

- Gross Profit Margin;

- EBITDA; and

- Adjusted EBITDA.

*Revenue*

SourceHOV analyzes its revenue by comparing actual monthly revenue to internal projections and prior periods across its operating segments in order to assess performance, identify potential areas for improvement, and determine whether segments are meeting management's expectations.

*Gross Profit and Gross Profit Margin*

SourceHOV analyzes its gross profit by segment by comparing to monthly forecasts and prior periods.

*EBITDA and Adjusted EBITDA*

SourceHOV views EBITDA and Adjusted EBITDA as important indicators of performance. SourceHOV defines EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. SourceHOV defines Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integrations costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses. See "—*Other Financial Information (Non-GAAP Financial Measures)*" for more information and a reconciliation of EBITDA and Adjusted

248

Supp.App. 0615

Table of Contents

EBITDA to net income (loss), the most directly comparable financial measure calculated and presented in accordance with GAAP.

**Results of Operations**

**Three Months Ended March 31, 2017 compared to Three Months Ended March 31, 2016**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Revenue: | | |
| ITPS | $ 135,797 | $ 106,416 |
| HS | 59,078 | 67,407 |
| LLPS | 23,385 | 25,867 |
| Total Revenue | 218,260 | 199,690 |
| Cost of revenues: | | |
| ITPS | 91,599 | 72,181 |
| HS | 37,828 | 45,062 |
| LLPS | 14,281 | 16,100 |
| Total cost of revenues | 143,708 | 133,343 |
| Gross Profit | 74,552 | 66,347 |
| | | |
| Selling, general and administrative expenses | 35,581 | 31,028 |
| Depreciation and Amortization | 21,320 | 18,759 |
| Related party expenses | 2,385 | 2,335 |
| Operating Income | 15,266 | 14,225 |
| Interest expense, net | 26,219 | 27,400 |
| Sundry expense/(income), net | 2,724 | (1,931) |
| Net loss before taxes | (13,677) | (11,244) |
| Income tax (expense) benefit | (2,004) | 3,082 |
| Net loss | $ (15,681) | $ (8,162) |

*Revenue*

SourceHOV's revenue increased $18.6 million, or 9.3%, to $218.3 million for the three months ended March 31, 2017 compared to $199.7 million for the three months ended March 31, 2016. This increase was primarily related to the acquisition of TransCentra in 2016, which contributed to the increase in revenue of $29.4 million for ITPS. The increase was partially offset by a decrease in the HS segment of $8.3 million in and a decrease in the LLPS segment revenues of $2.5 million. For the three months ended March 31, 2017, SourceHOV's ITPS, HS, and LLPS segments constituted 62.2%, 27.1%, and 10.7% of its total revenue, respectively, compared to 53.2%, 33.8%, and 13.0%, respectively, for the three months ended March 31, 2016. The revenue changes by reporting segment was as follows:

ITPS—Revenues increased $29.4 million, or 27.6%, to $135.8 million for the three months ended March 31, 2017 compared to $106.4 million for the three months ended March 31, 2016. The increase was primarily attributable to the TransCentra acquisition that was completed in Q4 2016, which contributed approximately $34.0 million in revenue in Q1 2017. This increase was slightly offset by devaluation of GBP and EUR compared to USD as a result of BREXIT, as well as lower solutions and maintenance revenue resulting in decreases of $2.6 million and $1.8 million, respectively.

249

Supp.App. 0616

Table of Contents

HS—Revenues decreased $8.3 million, or 12.4%, to $59.1 million for the three months ended March 31, 2017 compared to $67.4 million for the three months ended March 31, 2016. The decrease was primarily attributable to a surge in demand from healthcare provider clients in early 2016 as a result of a change in regulatory coding requirements beginning in Q4 2015. SourceHOV has since experienced a normalization of overall demand as healthcare provider clients have reduced outsourcing of the service.

LLPS—Revenues decreased $2.5 million, or 9.6%, to $23.4 million for the three months ended March 31, 2017 compared to $25.9 million for the three months ended March 31, 2016. The decrease was primarily attributable to lower revenue from the legal claims administration services and a decline in the labor and employment services as a result of SourceHOV's efforts to optimize the employee base and improve utilization per FTE.

### Cost of Revenue

Cost of revenue increased $10.4 million, or 7.8%, to $143.7 million for the three months ended March 31, 2017 compared to $133.3 million for the three months ended March 31, 2016. The increase was primarily attributable to an increase in the ITPS segment of $19.4 million, offset by decreases in the HS and LLPS segments of $7.3 million and $1.8 million, respectively. The cost of revenue decrease by operating segment was as follows:

ITPS—Cost of revenue increased $19.4 million, or 26.9%, to $91.6 million for the three months ended March 31, 2017 compared to $72.2 million for the three months ended March 31, 2016. The increase was primarily attributable to the TransCentra acquisition, which contributed approximately $27.0 million along with a corresponding increase in revenue. The increase was partially offset by implementation of various cost savings initiatives by SourceHOV during the three months ended March 31, 2017, as well as decreases as a result of the decline in solutions and maintenance revenue, and devaluation of GBP and EUR compared to USD of $1.3 million and $1.9 million, respectively.

HS—Cost of revenue decreased $7.3 million, or 16.1%, to $37.8 million for the three months ended March 31, 2017 compared to $45.1 million for the three months ended March 31, 2016. The decrease was primarily attributable to normalization of demand for coding after the surge experienced by SourceHOV in early 2016 as a result of the increased healthcare coding requirements.

LLPS—Cost of revenue decreased $1.8 million, or 11.3%, to $14.3 million for the three months ended March 31, 2017 compared to $16.1 million for the three months ended March 31, 2016. The decrease was primarily attributable to a decrease in corresponding revenues from the legal claims administration and labor and employment offerings.

### Gross Profit

Gross profit increased $8.3 million, or 12.4%, to $74.6 million for the three months ended March 31, 2017 compared to $66.3 million for the three months ended March 31, 2016. For the three months ended March 31, 2017, gross margins for ITPS, HS, and LLPS were 32.5%, 36.0%, and 38.9%, respectively, compared to 32.2%, 33.1%, and 37.8%, respectively, for the three months ended March 31, 2016.

### Selling, General and Administrative Expenses

Selling, general, and administrative expenses increased $4.6 million, or 14.7%, to $35.6 million for the three months ended March 31, 2017 compared to $31.0 million for the three months ended March 31, 2016. The increase was primarily attributable to the acquisition of TransCentra in Q4 of 2016, which contributed $2.4 million in expense for the three months ended March 31, 2017, and expenses for professional fees related to the proposed business combination, which contributed

250

Supp.App. 0617

$6.1 million to the increase. The increases were partially offset by a gain on disposal of Meridian Consulting Group, LLC ("Meridian"), of approximately $0.3 million during the three months ended March 31, 2017. Additionally the increases were offset by a decrease of $1.7 million in compensation expense related to vested RSUs compared to the three months ended March 31, 2016, as well as cost saving initiatives implemented by management.

***Depreciation & Amortization***

Depreciation and amortization expense increased $2.5 million, or 13.7%, to $21.3 million for the three months ended March 31, 2017 compared to $18.8 million for the three months ended March 31, 2016. The increase was primarily attributable to higher balances of developed technology and outsource contract costs, resulting in higher amortization expense for the three months ended March 31, 2017 compared to the three months ended March 31, 2016.

***Related Party Expenses***

Related party expenses increased $0.1 million, or 2.1%, to $2.4 million for the three months ended March 31, 2017 compared to $2.3 million for the three months ended March 31, 2016.

***Interest Expense***

Interest expense decreased $1.2 million, or 4.3%, to $26.2 million for the three months ended March 31, 2017 compared to $27.4 million for the three months ended March 31, 2016.

***Sundry Expense/(Income)***

Sundry expense/(income) increased $4.6 million to $2.7 million expense for the three months ended March 31, 2017 compared to $1.9 million income for the three months ended March 31, 2016. The increase was attributable to foreign currency transaction losses associated with exchange rate fluctuations.

***Income Tax (Expense) Benefit***

SourceHOV had income tax expense of $2.0 million for the three months ended March 31, 2017 compared to an income tax benefit of $3.1 million for the three months ended March 31, 2016. The change in the income tax expense was primarily attributable to SourceHOV's change in judgment related to the realizability of certain deferred tax assets. The change in the effective tax rate for the three months ended March 31, 2017 resulted from the establishment of valuation allowance against certain domestic deferred tax assets that are not more-likely-than-not to be realized. Additionally, the three months ended March 31, 2016 included a nonrecurring tax benefit related to a true-up adjustment of SourceHOV's deferred tax liabilities.

***Net Loss***

Net loss increased $7.5 million to $15.7 million for the three months ended March 31, 2017 compared to $8.2 million for the three months ended March 31, 2016.

251

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 621 of 1110    PageID 2242

**Year Ended December 31, 2016 compared to Year Ended December 31, 2015**

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | 2016 | 2015 |
| Revenue: |  |  |
| ITPS | $ 439,924 | $ 421,409 |
| HS | 247,796 | 251,685 |
| LLPS | 102,206 | 132,138 |
| Total Revenue | 789,926 | 805,232 |
| Cost of revenues: |  |  |
| ITPS | 296,848 | 303,067 |
| HS | 158,800 | 174,380 |
| LLPS | 63,473 | 82,399 |
| Total cost of revenues | 519,121 | 559,846 |
| Gross Profit | 270,805 | 245,386 |
|  |  |  |
| Selling, general and administrative expenses | 130,437 | 120,691 |
| Depreciation and Amortization | 79,639 | 75,408 |
| Impairment of Goodwill and other Intangible Assets | — | — |
| Related party expenses | 10,493 | 8,977 |
| Operating Income | 50,236 | 40,310 |
| Interest expense | 109,414 | 108,779 |
| Loss on extinguishment of debt | — | — |
| Sundry expense, net | 712 | 3,247 |
| Net Income before taxes | (59,890) | (71,716) |
| Income tax benefit | 11,787 | 26,812 |
| Net loss | $ (48,103) | $ (44,904) |

*Revenue*

SourceHOV's revenue decreased $15.3 million, or 1.9%, to $789.9 million for the year ended December 31, 2016 compared to $805.2 million for the year ended December 31, 2015. This decrease is primarily related to a decrease in its LLPS segment revenues of $29.9 million. For the year ended December 31, 2016, SourceHOV's ITPS, HS, and LLPS segments constituted 55.7%, 31.4%, and 12.9% of its total revenue, respectively, compared to 52.3%, 31.3%, and 16.4%, respectively, for the year ended December 31, 2015. The revenue changes by reporting segment was as follows:

ITPS—Revenues increased $18.5 million, or 4.4%, to $439.9 million for the year ended December 31, 2016 compared to $421.4 million for the year ended December 31, 2015. The increase is primarily attributable to the acquisition of TransCentra in September 2016, which contributed approximately $33.3 million in revenue. The increase was partially offset by a decrease of $4.4 million in pass through revenue, a decrease of $3.9 million from shifts in customer volumes in the unified communication service lines, and a $7.5 million loss from foreign currency translation resulting from the devaluation of GBP and EUR against the USD due to the BREXIT.

HS—Revenues decreased $3.9 million, or 1.5%, to $247.8 million for the year ended December 31, 2016 compared to $251.7 million for the year ended December 31, 2015. The revenue change was primarily driven by a $9.7 million increase in revenue due to higher volumes from existing customers and the on-boarding of new customers. This was offset by an $11.4 million decline in a federal contract due to volume constraints resulting from a site consolidation project executed in mid-2016.

252

Supp.App. 0619

LLPS—Revenues decreased $29.9 million, or 22.7%, to $102.2 million for the year ended December 31, 2016 compared to $132.1 million for the year ended December 31, 2015. The decrease was primarily due to declines of $24.0 million in the legal claims administration services including the winding down of the OCC mortgage mega-case settlement. The legal claims administration market has shifted from major restitutions to fines and settlements from the regulatory authorities. The market remains steady with a supply of small settlements and cases in the absence of any mega-cases for settlement. The remaining decline was primarily attributable to the labor and employment practice as SourceHOV continues to right-size the employee base to improve utilization metrics per FTE and reduce fixed costs.

### Cost of Revenue

Cost of revenue decreased $40.7 million, or 7.3%, to $519.1 million for the year ended December 31, 2016 compared to $559.8 million for year ended December 31, 2015. The decrease was primarily attributable to decreases in the ITPS, HS and LLPS segments of $6.3 million, $15.6 and $18.9 million, respectively. The cost of revenue decrease by operating segment was as follows:

ITPS—Cost of revenue decreased $6.3 million, or 2.1%, to $296.8 million for the year ended December 31, 2016 compared to $303.1 million for year ended December 31, 2015. The decrease was primarily attributable to $27.8 million in cost saving initiatives on a customer basis implemented during the year for various service offerings, a decrease of $4.4 million in pass-through expenses and a decrease of $2.3 million in the unified communication service lines due to the shift in customer volumes. These decreases were significantly offset by an increase in cost of revenue of $27.2 million related to the acquisition of TransCentra in September 2016.

HS—Cost of revenue decreased $15.6 million, or 8.9%, to $158.8 million for the year ended December 31, 2016 compared to $174.4 million for year ended December 31, 2015. The decrease was primarily attributable to $13.6 million in cost saving initiatives implemented during the year for various service offerings and a $2.0 million decrease related to changes in revenue mix.

LLPS—Cost of revenue decreased $18.9 million, or 23.0%, to $63.5 million for the year ended December 31, 2016 compared to $82.4 million for year ended December 31, 2015. The decrease was primarily related to the changes in revenue mix. The cost of revenues declined by $11.8 million primarily led by lower revenue in the legal claims administration service lines including the winding down of the OCC mortgage settlement. The remaining cost of revenue decline of $5.6 million was driven by the labor and employment practice as it scaled down during the year.

### Gross Profit

Gross profit increased $25.4 million, or 10.4%, to $270.8 million for the year ended December 31, 2016 compared to $245.4 million for the year ended December 31, 2015. For the year ended December 31, 2016, gross margins for ITPS, HS, and LLPS were 32.5%, 35.9%, and 37.9%, respectively, compared to 28.1%, 30.7%, and 37.6%, respectively, for the year ended December 31, 2015.

### Selling, General and Administrative Expenses

Selling, general, and administrative expenses increased $9.7 million, or 8.1%, to $130.4 million for the year ended December 31, 2016 compared to $120.7 million for the year ended December 31, 2015. The increase was primarily due to increases in wages and professional fees.

253

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 623 of 1110    PageID 2244

*Depreciation & Amortization*

Depreciation and amortization expense increased $4.2 million, or 5.6%, to $79.6 million for the year ended December 31, 2016 compared to $75.4 million for the year ended December 31, 2015. The increase was primarily related to the write-off of outsourced contract costs during the year ended December 31, 2016.

*Related Party Expenses*

Related party expenses increased $1.5 million, or 16.9%, to $10.5 million for the year ended December 31, 2016 compared to $9.0 million for the year ended December 31, 2015.

*Interest Expense*

Interest expense increased $0.6 million, or 0.6%, to $109.4 million for the year ended December 31, 2016 compared to $108.8 million for the year ended December 31, 2015.

*Sundry Expense*

Sundry expense decreased by $2.5 million, or 78.1%, to $0.7 million for the year ended December 31, 2016 compared to $3.2 million for the year ended December 31, 2015. The decrease was mainly attributable to higher foreign currency transaction losses associated with exchange rate fluctuations during 2015.

*Income Tax Benefit*

Income tax benefit decreased $15.0 million to $11.8 million for the year ended December 31, 2016 compared to $26.8 million for the year ended December 31, 2015. The decrease was due to a decrease in the effective tax rate of 17% resulting from a partial valuation allowance being recorded against certain U.S. federal and state net operating loss carryforwards. At December 31, 2016, SourceHOV concluded it was not "more likely than not" that a portion of its net operating loss and tax credit carryforwards will be realized.

*Net Loss*

Net loss increased $3.2 million to $48.1 million for the year ended December 31, 2016 compared to $44.9 million for the year ended December 31, 2015.

254

**Year Ended December 31, 2015 compared to Year Ended December 31, 2014**

|  | Year Ended December 31, | |
|  | 2015 | 2014 |
|---|---|---|
| Revenue: | | |
|   ITPS | $ 421,409 | $ 292,185 |
|   HS | 251,685 | 218,485 |
|   LLPS | 132,138 | 140,248 |
| Total Revenue | 805,232 | 650,918 |
| Cost of revenues: | | |
|   ITPS | 303,067 | 210,216 |
|   HS | 174,380 | 157,547 |
|   LLPS | 82,399 | 83,776 |
| Total cost of revenues | 559,846 | 451,539 |
| Gross Profit | 245,386 | 199,379 |
| | | |
| Selling, general and administrative expenses | 120,691 | 131,864 |
| Depreciation and Amortization | 75,408 | 65,227 |
| Impairment of Goodwill and other Intangible Assets | — | 154,454 |
| Related party expenses | 8,977 | 19,080 |
| Operating Income | 40,310 | (171,246) |
| Interest expense | 108,779 | 48,045 |
| Loss on extinguishment of debt | — | 18,548 |
| Sundry expense (income), net | 3,247 | (2,201) |
| Net Income before taxes | (71,716) | (235,638) |
| Income tax benefit | 26,812 | 38,003 |
| Net loss | $ (44,904) | $ (197,635) |

*Revenue*

    SourceHOV's revenue increased $154.3 million, or 23.7%, to $805.2 million for the year ended December 31, 2015 compared to $650.9 million for the year ended December 31, 2014. This increase primarily related to an increase in its ITPS segment revenues of $129.2 million. For the year ended December 31, 2015, SourceHOV's ITPS, HS, and LLPS segments constituted 52.3%, 31.3%, and 16.4% of its total revenue, respectively, compared to 44.9%, 33.6%, and 21.5%, respectively, for the year ended December 31, 2014. The revenue change by reporting segment was as follows:

    ITPS—Revenues increased $129.2 million, or 44.2%, to $421.4 million for the year ended December 31, 2015 compared to $292.2 million for the year ended December 31, 2014. The increase is primarily attributable to $151.7 million in revenues for the full year of 2015 related to the acquisition of BancTec in October 2014. This increase was offset by declines of $16.0 million related to the loss of certain customer contracts, a decrease of $5.8 million in pass-through revenue and a decrease of $5.1 million in the unified communication service lines due to shift in customer volumes.

    HS—Revenues increased $33.2 million, or 15.2%, to $251.7 million for the year ended December 31, 2015 compared to $218.5 million for the year ended December 31, 2014. The increase is primarily attributable to revenues for the full year of 2015 related to the acquisition of BancTec in October 2014, which contributed approximately $10.0 million in revenue. The healthcare business further grew by $20.9 million due to increased volumes from SourceHOV's healthcare provider customers as the ICD 9 to ICD 10 (medical coding standards) conversion went effective as of

255

Supp.App. 0622

October 1, 2015. The healthcare payer customers also contributed a $6.7 million year-over-year growth due to higher volumes and on-boarding of new customers.

LLPS—Revenues decreased $8.1 million, or 5.8%, to $132.1 million for the year ended December 31, 2015 compared to $140.2 million for the year ended December 31, 2014. The decrease was primarily due to declines of $23.3 million in the legal claims settlement market including the winding down of the OCC mortgage mega settlement as compared to the prior year. The labor & employment practice also saw a decline of $4.7 million due to fewer cases won for expert testimony. This decrease was partially offset by $20.5 million in revenues for the full year of 2015 related to the acquisition of BancTec in October 2014.

### Cost of Revenue

Cost of revenue increased $108.3 million, or 24.0%, to $559.8 million for the year ended December 31, 2015 compared to $451.5 million for year ended December 31, 2014. The increase was primarily attributable to increases in the ITPS and HS segments of $92.9 million and $16.9 million, respectively, offset by a $1.4 million decrease in the LLPS segment. The cost of revenue change by operating segment was as follows:

ITPS—Cost of revenue increased $92.9 million, or 44.2%, to $303.1 million for the year ended December 31, 2015 compared to $210.2 million for year ended December 31, 2014. The increase in 2015 was mainly attributable to $111.9 million for the full year of 2015 related to the acquisition of BancTec in October 2014. This increase was partially offset by declines of $9.6 million related to the loss of certain customer contracts, a decrease of $5.8 million in pass-through expenses and a decrease of $3 million in the unified communication services lines due to a shift in customer volumes.

HS—Cost of revenue increased $16.9 million, or 10.7%, to $174.4 million for the year ended December 31, 2015 compared to $157.5 million for year ended December 31, 2014. The increase was attributable to $8.8 million for the full year of 2015 related to the acquisition of BancTec in October 2014, and $15.5 million was due to higher revenue from both the provider and payer customers.

LLPS—Cost of revenue decreased $1.4 million, or 1.6%, to $82.4 million for the year ended December 31, 2015 compared to $83.8 million for year ended December 31, 2014. The decrease was primarily due to declines of $13.9 million due to lower revenue in the legal claims processing business as compared to the prior year, and $2.8 million decline due to lower revenue from the labor and employment practice. This decrease was offset by $15.6 million cost of revenues for the full year of 2015 related to the acquisition of BancTec in October 2014.

### Gross Profit

Gross profit increased $46.0 million, or 23.1%, to $245.4 million for the year ended December 31, 2015 compared to $199.4 million for the year ended December 31, 2014. For the year ended December 31, 2015, gross margins for ITPS, HS, and LLPS were 28.1%, 30.7%, and 37.6%, respectively, compared to 28.1%, 27.9%, and 40.3%, respectively, for the year ended December 31, 2014.

### Selling, General and Administrative Expenses

Selling, general, and administrative expenses decreased $11.2 million, or 8.5%, to $120.7 million for the year ended December 31, 2015 compared to $131.9 million for the year ended December 31, 2014. The decrease in 2015 was primarily due to cost saving initiatives implemented after the acquisition of BancTec in October 2014, such as restructuring.

256

*Depreciation & Amortization*

Depreciation and amortization increased $10.2 million, or 15.6%, to $75.4 million for the year ended December 31, 2015 compared to $65.2 million for the year ended December 31, 2014. The increase in 2015 was primarily due to the BancTec acquisition.

*Impairment of Goodwill and Other Intangible Assets*

As a result of a decline in revenues after winding down of the OCC mortgage settlement in late 2014, SourceHOV determined there was a triggering event requiring an assessment of the recoverability of goodwill. This assessment resulted in an impairment charge of $137.9 million for goodwill, and $16.6 million related to indefinite lived intangible assets for the LLPS reporting unit. Refer to "*—Critical Accounting Policies and Estimates*" for additional detail and discussion.

*Related Party Expenses*

Related party expenses decreased $10.1 million, or 53.0%, to $9.0 million for the year ended December 31, 2015 compared to $19.1 million for the year ended December 31, 2014. The decrease was primarily attributable to cost saving initiatives implemented after the acquisition of BancTec in October 2014.

*Interest Expense*

Interest expense increased $60.8 million, or 126.4%, to $108.8 million for the year ended December 31, 2015 compared to $48.0 million for the year ended December 31, 2014. The increase was due to a full year of interest in 2015 compared to two months in 2014 for the new credit facilities entered into on October 31, 2014 in connection with the Reorganization.

*Loss on Extinguishment of Debt*

Loss on extinguishment of debt decreased $18.5 million for the year ended December 31, 2015 compared to the year ended December 31, 2014. The decrease was due to the loss on the extinguishment of previous credit facilities in connection with the Reorganization on October 31, 2014.

*Sundry Expense*

Sundry expense increased by $5.4 million, to $3.2 million for the year ended December 31, 2015 compared to $(2.2) million for the year ended December 31, 2014. The increase was mainly attributable to foreign currency transaction losses associated with exchange rate fluctuations during the year.

*Income Tax Benefit*

Income tax benefit decreased $11.2 million to $26.8 million for the year ended December 31, 2015 compared to $38.0 million for the year ended December 31, 2014. The decrease was due to SourceHOV recognizing a partial tax benefit in 2014 attributable to a non recurring impairment charge related to a tradename and goodwill.

*Net Loss*

Net Loss decreased $152.7 million to a loss of $44.9 million for the year ended December 31, 2015 compared to a loss of $197.6 million for the year ended December 31, 2014.

257

**Other Financial Information (Non-GAAP Financial Measures)**

SourceHOV views EBITDA and Adjusted EBITDA as important indicators of performance. SourceHOV defines EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. SourceHOV defines Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integrations costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

SourceHOV presents EBITDA and Adjusted EBITDA because it believes they provide useful information regarding the factors and trends affecting its business in addition to measures calculated under GAAP. Additionally, its credit agreement requires SourceHOV to comply with certain EBITDA related metrics. Refer to "—*Liquidity and Capital Resources—Credit Facility.*"

*Note Regarding Non-GAAP Financial Measures*

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. SourceHOV believes that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing its financial performance and results of operations as SourceHOV's board of directors, management and investors use EBITDA and Adjusted EBITDA to assess its financial performance because it allows them to compare SourceHOV's operating performance on a consistent basis across periods by removing the effects of its capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of its management team. Net income is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. SourceHOV's non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. You should not consider EBITDA and Adjusted EBITDA in isolation or as substitutes for an analysis of SourceHOV's results as reported under GAAP. Because EBITDA and Adjusted EBITDA may be defined differently by other companies in its industry, SourceHOV's definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

258

The following tables present a reconciliation of EBITDA and Adjusted EBITDA to SourceHOV's net loss the most directly comparable GAAP measure for the three months ended March 31, 2017 and 2016:

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Net Loss | $ (15,681) | $ (8,162) |
| Taxes | 2,004 | (3,082) |
| Interest Expense | 26,219 | 27,400 |
| Depreciation and Amortization | 21,320 | 18,759 |
| EBITDA | 33,862 | 34,915 |
| Optimization and Restructuring expenses(1) | 4,337 | 3,594 |
| Transaction and integration costs(2) | 5,066 | 487 |
| Non-cash equity compensation(3) | 310 | 1,992 |
| Other non-cash charges(4) | 75 | 135 |
| Non-cash gain on sale of Meridian(5) | (251) | — |
| Management, Board Fees and expenses(6) | 2,060 | 2,020 |
| Adjusted EBITDA | $ 45,459 | $ 43,143 |

(1)     Adjustment represents net salary and benefits associated with positions that were terminated, including severance, retention bonuses, and related fees and expenses. Additionally, the adjustment includes charges incurred by SourceHOV to terminate existing lease contracts as part of facility consolidation initiatives.

(2)     Represents costs incurred related to transactions and integration for completed or contemplated transactions during the period.

(3)     Represents the non-cash charges related to restricted stock units granted by SourceHOV that vested during the year.

(4)     Represents fair value adjustments to deferred revenue and deferred rent accounts established as part of purchase accounting.

(5)     Represents a non-cash gain recognized on the disposal of Meridian Consulting Group, LLC.

(6)     Amount represents management fees paid to HGM and TransCentra's prior owner, Board of Directors fees and corresponding travel, and other expenses (e.g., rating agency fees, chargebacks) which are not expected to continue on a go-forward basis.

**Three months ended March 31, 2017 compared to the Three Months ended March 31, 2016**

*EBITDA and Adjusted EBITDA*

EBITDA was $33.9 million for the three months ended March 31, 2017 compared to $34.9 million for the three months ended March 31, 2016. Adjusted EBITDA was $45.5 million for the three months ended March 31, 2017 compared to $43.1 million for the three months ended March 31, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the three months ended March 31, 2017 resulting from an increase in SG&A and income tax expense compared to the three months ended March 31, 2016. The increase in Adjusted EBITDA was primarily due to lower transaction costs incurred during the three months ended March 31, 2016.

259

The following tables present a reconciliation of EBITDA and Adjusted EBITDA to SourceHOV's net loss the most directly comparable GAAP measure for the years ended, December 31, 2016, 2015 and 2014:

| | Year Ended December 31, | | |
|---|---|---|---|
| | 2016 | 2015 | 2014 |
| Net Loss | $ (48,103) | $ (44,904) | $ (197,635) |
| Taxes | (11,787) | (26,812) | (38,003) |
| Interest Expense | 109,414 | 108,779 | 48,045 |
| Depreciation and Amortization | 79,639 | 75,408 | 65,227 |
| EBITDA | 129,163 | 112,471 | (122,366) |
| Optimization and Restructuring expenses(1) | 7,559 | 5,210 | 16,822 |
| Transaction and integration costs(2) | 18,848 | 18,466 | 35,606 |
| Non-cash equity compensation(3) | 7,085 | 8,122 | 6,104 |
| Other non-cash charges(4) | 471 | 1,881 | 1,420 |
| (Gain)/Loss on sale of assets(5) | 2,274 | 284 | 1,153 |
| Loss on debt extinguishment(6) | — | — | 18,548 |
| Impairment of intangible assets(7) | — | — | 16,600 |
| Impairment of Goodwill(8) | — | — | 137,854 |
| Management, Board Fees and expenses(9) | 7,837 | 6,897 | 6,311 |
| Adjusted EBITDA | $ 173,237 | $ 153,331 | $ 118,052 |

(1)     Adjustment represents net salary and benefits associated with positions that were terminated, including severance, retention bonuses, and related fees and expenses. Additionally, the adjustment includes charges incurred by SourceHOV to terminate existing lease contracts as part of facility consolidation initiatives.

(2)     Represents costs incurred related to transactions and integration. Integration costs were mainly for training employees for a revised set of coding standards, which relates to outsourced medical coding services provided by Lexicode, a division of SourceHOV. Additionally, the adjustment includes system conversion and integration-related expenses related to running parallel systems.

(3)     Represents the non-cash charges related to restricted stock units granted by SourceHOV that vested during the year.

(4)     Represents fair value adjustments to deferred revenue and deferred rent accounts established as part of purchase accounting.

(5)     Represents losses on disposal of assets.

(6)     Represents loss on the early extinguishment of debt as a result of the refinancing of SourceHOV's credit agreement.

(7)     Represents impairment charges recorded for indefinite lived intangible assets. See *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* in the Notes to the SourceHOV Consolidated Financial Statements for the year ended December 31, 2016 and as of December 31, 2016 filed with the SEC in Schedule 14A by Quinpario Acquisition Corp. 2 for additional information.

(8)     Represents impairment charges recorded for goodwill. See *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* in the Notes to the SourceHOV Consolidated Financial Statements for the year ended December 31, 2016 and as of

260

Supp.App. 0627

Table of Contents

December 31, 2016 filed with the SEC in Schedule 14A by Quinpario Acquisition Corp. 2 for additional information.

(9)    Amount represents management fees paid to HGM and TransCentra's prior owner, Board of Directors fees and corresponding travel, and other expenses (e.g., rating agency fees, chargebacks) which are not expected to continue on a go-forward basis.

**Year Ended December 31, 2016 compared to the Year Ended December 31, 2015**

*EBITDA and Adjusted EBITDA*

EBITDA was $129.2 million for the year ended December 31, 2016 compared to $112.5 million for the year ended December 31, 2015. Adjusted EBITDA was $173.2 million for the year ended December 31, 2016 compared to $153.3 million for the year ended December 31, 2015. The increase in EBITDA and Adjusted EBITDA resulted from an increase in gross profit, offset partially by an increase in SG&A expenses, as discussed above. Additionally, the increase was partially due to a decrease in the income tax benefit amount compared to 2015.

**Year Ended December 31, 2015 compared to the Year Ended December 31, 2014**

*EBITDA and Adjusted EBITDA*

EBITDA was $112.5 million for the year ended December 31, 2015 compared to $(122.4) million for the year ended December 31, 2014. Adjusted EBITDA was $153.3 million for the year ended December 31, 2015 compared to $118.1 million for the year ended December 31, 2014. The increase in EBITDA and Adjusted EBITDA resulted from an increase in revenues and gross profit, as well as the decrease in SG&A and related party expenses, as discussed above. Additionally, the increase in EBITDA is due to impairment of goodwill and other intangible assets recorded in 2014.

**Liquidity and Capital Resources**

**Overview**

SourceHOV's primary source of liquidity is principally cash generated from operating activities supplemented as necessary on a short-term basis by borrowings against SourceHOV's senior secured revolving credit facility. SourceHOV believes its current level of cash and short term financing capabilities along with future cash flows from operations are sufficient to meet the needs of the business.

SourceHOV currently expects to spend approximately $30.0 to $35.0 million on total capital expenditures over the next twelve months. SourceHOV believes that its operating cash flow and available borrowings under its credit facility will be sufficient to fund its operations for at least the next twelve months.

At March 31, 2017 and December 31, 2016, cash and cash equivalents totaled $15.9 million and $8.4 million, respectively. At March 31, 2017, SourceHOV was fully drawn under its credit facilities.

261

Supp.App. 0628

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 631 of 1110    PageID 2252

Table of Contents

**Cash Flows**

The following table summarizes SourceHOV's cash flows for the periods indicated:

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2017 | 2016 |
| Cash flow from operating activities | $ 4,230 | $ 17,299 |
| Cash flow used in investing activities | (4,181) | (7,554) |
| Cash flows (used in) provided by financing activities | 7,550 | (11,981) |
| Subtotal | 7,599 | (2,236) |
| Effect of exchange rates on cash | (44) | 321 |
| Net increase/(decrease) in cash | $ 7,555 | $ (1,915) |

**Analysis of Cash Flow Changes between the Three Months Ended March 31, 2017 and March 31, 2016**

Operating Activities—Net cash provided by operating activities was $4.2 million for the three months ended March 31, 2017, compared to $17.3 million for the three months ended March 31, 2016. The decrease of $13.1 million in cash from operating activities was primarily due to decreases in operating results, and timing of payments for accounts payable and accrued liabilities.

Investing Activities—Net cash used in investing activities was $4.2 million for the three months ended March 31, 2017, compared to $7.6 million for the three months ended March 31, 2016. The decrease of $3.4 million in cash flows used investing activities was primarily due to proceeds received from the sale of Meridian during the three months ended March 31, 2017.

Financing Activities—Net cash provided by financing activities was $7.6 million for the three months ended March 31, 2017, compared to $12.0 million used in financing activities for the three months ended March 31, 2016. The increase of $19.6 million in cash from financing activities was primarily due to contributions from shareholders of $20.5 million during the three months ended March 31, 2017, which was partially offset by principal payments towards long-term obligations.

**Credit Facility**

In connection with the Reorganization on October 31, 2014, SourceHOV obtained new credit facilities aggregating to $1,105.0 million.

*First and Second Lien Secured Term Loans*

The financing obtained as part of the Reorganization included a first lien secured term loan of $780.0 million due October 2019 and a second lien secured term loan of $250.0 million due April 2020. SourceHOV has the option to choose interest rates based on 1) base rate (as defined) or 2) the euro currency rate plus an applicable margin for each rate. Interest rates were 7.75% and 11.50% for the first and second lien secured term loans, respectively, as of March 31, 2017.

*Revolving Credit Facility and Swing Line Loans*

A first lien revolving credit facility of $75.0 million due October 2019 was also obtained as part of the Reorganization. As of March 31, 2017, the first lien revolving credit facility was fully drawn. The interest rate on the first lien revolving credit facility was 7.75% as of March 31, 2017.

SourceHOV's interest rate on the swing-line loans was 9.25% as of March 31, 2017. The swing-line loans are part of, and not in addition to, the revolving credit facility of $75.0 million. The liens are secured by the assets of SourceHOV.

262

As of March 31, 2017 and December 31, 2016, SourceHOV had outstanding irrevocable letters of credit totaling approximately $9.3 million and $9.3 million, respectively, under the revolving credit facility. As March 31, 2017, these letters of credit consisted of approximately $7.1 million related to security for SourceHOV's self-insured workers' compensation program and approximately $2.2 million for the landlord in Irving. Letter of credit commitment fees on commitments outstanding of 6.75% per annum are payable quarterly.

*TransCentra Term Loan, TransCentra Revolving Credit Facility and FTS Term Loan*

On September 28, 2016, SourceHOV assumed $25.0 million and $15.9 million in debt in connection with the acquisition of TransCentra and FTS, respectively. The TransCentra debt consists of a $20.0 million term loan due June 2021 and a $5.0 million revolving credit facility due June 2018. The term loan and revolving credit facility bear interest at LIBOR plus 5.56% and LIBOR plus 4.31%, respectively, per annum where LIBOR is currently .47%. The term loan is secured by all the assets of TransCentra. As of March 31, 2017, the TransCentra revolving credit facility was fully drawn. The FTS debt consists of a $15.9 million unsecured term loan due June 2018. The FTS debt bears interest at Base Rate plus 1.00% per annum where Base Rate is presently 3.75%. The FTS debt is guaranteed by SourceHOV.

**Contractual Obligations**

The table below provides estimates of the timing of future payments that SourceHOV is obligated to make based on agreements in place at March 31, 2017.

| | Payments Due by Period | | | | |
|---|---|---|---|---|---|
| | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years | Total |
| | | | (in millions) | | |
| Credit Facilities | $ 65.0 | $ 750.9 | $ 257.5 | — | $ 1,073.4 |
| Interest payments(1) | 93.9 | 159.4 | 3.2 | — | 256.5 |
| Capital lease obligations | 7.4 | 9.8 | 7.0 | 4.3 | 28.5 |
| Operating lease obligations | 29.1 | 36.4 | 16.2 | 7.3 | 89.0 |
| Pension related obligations(2) | 1.1 | — | — | — | 1.1 |
| Total | $ 196.5 | $ 956.5 | $ 283.9 | $ 11.6 | $ 1,448.5 |

(1)    For the variable rate debt assumed as part of the TransCentra acquisition, the interest payment calculation above assumes a 1% variable rate, plus the base rate amount.

(2)    We sponsor pension related obligations that require periodic cash distributions. In 2017, based on current actuarial calculations, we expect to make additional contributions of approximately $1.1 million to our worldwide pension related obligations. Contributions to our pension related obligations in subsequent years will depend on a number of factors, including the investment performance of plan assets and discount rates as well as potential legislative and plan changes.

**Quantitative and Qualitative Disclosure About Market Risk**

**Interest Rate Risk**

At March 31, 2017, SourceHOV had $1,032.1 million of debt outstanding, with a weighted average interest rate of 9%. Interest is calculated under the terms of SourceHOV's credit agreement based on the greatest of certain specified base rates plus an applicable margin that varies based on certain factors. Assuming no change in the amount outstanding, the impact on interest expense of a 1% increase or decrease in the assumed weighted average interest rate would be approximately $10.3 million per year. SourceHOV does not currently have or intend to enter into any derivative

263

Supp.App. 0630

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 633 of 1110    PageID 2254

Table of Contents

arrangements to protect against fluctuations in interest rates applicable to SourceHOV's outstanding indebtedness.

**Foreign Currency Risk**

SourceHOV is exposed to foreign currency risks that arise from normal business operations. These risks include transaction gains and losses associated with intercompany loans with foreign subsidiaries and transactions denominated in currencies other than a location's functional currency. Contracts are denominated in currencies of major industrial countries.

**Market Risk**

SourceHOV is exposed to market risks primarily from changes in interest rates and foreign currency exchange rates. SourceHOV does not use derivatives for trading purposes, to generate income or to engage in speculative activity.

**Critical Accounting Policies and Estimates**

The preparation of financial statements requires the use of judgments and estimates. SourceHOV's critical accounting policies are described below to provide a better understanding of how SourceHOV develops its assumptions and judgments about future events and related estimations and how they can impact its financial statements. A critical accounting estimate is one that requires subjective or complex estimates and assessments, and is fundamental to SourceHOV's results of operations. SourceHOV bases its estimates on historical experience and on various other assumptions they believe to be reasonable according to the current facts and circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. SourceHOV believes the current assumptions, judgments and estimates used to determine amounts reflected in its consolidated financial statements are appropriate, however, actual results may differ under different conditions. This discussion and analysis should be read in conjunction with SourceHOV's consolidated financial statements and related notes included in this document.

*Goodwill and other intangible assets:*    Goodwill and other intangible assets are initially recorded at their fair values. Goodwill represents the excess of the purchase price of acquisitions over the fair value of the net assets acquired. SourceHOV's goodwill at March 31, 2017 and December 31, 2016 was $370.9 million and $373.3 million, respectively. Goodwill and other intangible assets not subject to amortization are tested for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired. Intangible assets with finite useful lives are amortized either on a straight-line basis over the asset's estimated useful life or on a basis that reflects the pattern in which the economic benefits of the intangible assets are realized.

*Software capitalization:*    SourceHOV capitalizes certain costs incurred to develop commercial software products to be sold, leased or marketed after establishing technological feasibility. Amortization of capitalized software development costs is recorded at the greater of the amount computed using the ratio of current gross revenues for the product to total current and anticipated future gross revenues for that product or the straight-line basis over the remaining estimated economic life of the software, which SourceHOV has determined is four to eight years. SourceHOV is required to use its judgment in determining whether development costs meet the criteria for immediate expense or capitalization. Additionally, SourceHOV is required to use its judgment in the valuation of the unamortized capitalized software costs in determining whether the recorded value is recoverable based on estimated future product sales. SourceHOV considers various factors to project marketability and future revenues, including an assessment of alternative solutions or products, current and historical demand for the product, and anticipated changes in technology that may make the product obsolete.

Supp.App. 0631

SourceHOV also capitalizes costs to develop or purchase internal-use software. For internal-use software, the appropriate amortization period is based on estimates of SourceHOV's ability to utilize the software on an ongoing basis, which has been determined to be five years. To assess the recoverability of capitalized software costs, SourceHOV considers estimates of future revenue, costs and cash flows. A significant change in an estimate related to one or more software products could result in a material change to SourceHOV's results of operations.

*Outsourced contract costs:* In connection with services arrangements, SourceHOV incurs and capitalizes costs to originate long-term contracts. Certain initial direct costs of an arrangement are capitalized and amortized over the contractual service period of the arrangement to cost of services. SourceHOV regularly reviews costs to determine appropriateness for deferral in accordance with the relevant accounting guidance. Key estimates and assumptions that SourceHOV must make include projecting future cash flows in order to assess the recoverability of deferred costs. To assess recoverability, cash flows are projected over its remaining life and compared to the carrying amount of contract related assets, including the unamortized deferred cost balance. Such estimates require judgment and assumptions, which are based upon the professional knowledge and experience of SourceHOV personnel. A significant change in an estimate or assumption on one or more contracts could have a material effect on SourceHOV's results of operations.

*Impairment of goodwill, long-lived and other intangible assets:* Long-lived assets, such as property and equipment and finite-lived intangible assets, are evaluated for impairment whenever events or changes in circumstances indicate that their carrying value may not be recoverable. Recoverability is measured by a comparison of their carrying amount to the estimated undiscounted cash flows to be generated by those assets. If the undiscounted cash flows are less than the carrying amount, SourceHOV records impairment losses for the excess of the carrying value over the estimated fair value. Fair value is determined, in part, by the estimated cash flows to be generated by those assets. SourceHOV's cash flow estimates are based upon, among other things, historical results adjusted to reflect SourceHOV's best estimate of future market rates, and operating performance. Development of future cash flows also requires SourceHOV to make assumptions and to apply judgment, including timing of future expected cash flows, using the appropriate discount rates, and determining salvage values. The estimate of fair value represents SourceHOV's best estimates of these factors, and is subject to variability. Assets are generally grouped at the lowest level of identifiable cash flows, which is the reporting unit level for SourceHOV. Changes to SourceHOV's key assumptions related to future performance and other economic factors could adversely affect SourceHOV's impairment valuation.

SourceHOV tests its indefinite lived intangible assets on October 1st of each year, or more frequently if events or changes in circumstances indicate that the assets may be impaired. When performing the impairment test, SourceHOV has the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. A quantitative assessment requires comparison of fair value of the asset to its carrying value. SourceHOV utilizes the Income Approach, specifically the Relief-from-Royalty method, which has the basic tenet that a user of that intangible asset would have to make a stream of payments to the owner of the asset in return for the rights to use that asset. By acquiring the intangible asset, the user avoids these payments. Application of the indefinite lived intangible asset impairment test requires judgment, including determination of royalty rates, and projecting revenue attributable to the assets in order to determine fair value. During the year ended December 31, 2014, due to a decline in the LLPS reporting unit's revenues and operations as a result of the OCC mortgage settlement winding down, SourceHOV determined there was a triggering event requiring an impairment assessment of the carrying value, and recorded a $16.6 million impairment charge associated with the LLPS reporting unit's trade name. For the three months ended March 31, 2017, no impairment was recorded. During the years December 31, 2016 and 2015, no impairment was recorded as a result of the annual impairment test. The fair value of the LLPS trade name as of the

265

Supp.App. 0632

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 635 of 1110　　PageID 2256

annual impairment testing date in 2016 and 2015 was $14.7 million and $15.5 million, respectively, compared to the carrying value of $14.3 million at both dates.

SourceHOV conducts its annual goodwill impairment tests on October 1st of each year, or more frequently if indicators of impairment exist. When performing the annual impairment test, SourceHOV has the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. If a qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, SourceHOV would be required to perform a quantitative impairment test for goodwill. Goodwill is tested for impairment using a two-step process. In the first step, the fair value of each reporting unit is determined and compared to the reporting unit's carrying value, including goodwill. SourceHOV uses the Guideline Public Company Method of the Market Approach to determine the reporting unit fair value. SourceHOV estimates the fair value using a multiple of EBITDA for the reporting unit. Guideline companies are analyzed to determine the multiple to be applied. If the fair value of a reporting unit is less than its carrying value, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. If the implied fair value of goodwill at the reporting unit level is less than its carrying value, an impairment loss is recorded to the extent that the implied fair value of goodwill at the reporting unit is less than its carrying value. During the year ended December 31, 2014, due to a decline in the LLPS reporting unit's revenues and operations as a result of the OCC mortgage settlement winding down, SourceHOV determined there was a triggering event requiring an impairment assessment of goodwill. As a result of the analysis, SourceHOV recorded an impairment charge of $137.9 million for the LLPS reporting unit's goodwill. For the three months ended March 31, 2017, no impairment was recorded. Additionally, no impairment charges were recorded for the years ended December 31, 2015 and 2016. As of the annual impairment testing date in 2016, the fair values of the ITPS, HS, and LLPS reporting units exceeded the carrying value by 143.0%, 185.6%, and 13.9%, respectively.

Application of the goodwill impairment test requires judgment, including the identification of reporting units, allocation of assets and liabilities to reporting units, and determination of fair value. The determination of reporting unit fair value is sensitive to the amount of EBITDA generated by SourceHOV, as well as the EBITDA multiple used in the calculation. Unanticipated changes, including immaterial revisions, to these assumptions could result in a provision for impairment in a future period. Given the nature of these evaluations and their application to specific assets and time frames, it is not possible to reasonably quantify the impact of changes in these assumptions.

*Revenue:*　　Application of the various accounting principles in GAAP related to the measurement and recognition of revenue requires SourceHOV's to make judgments and estimates. Complex arrangements with nonstandard terms and conditions may require significant contract interpretation to determine the appropriate accounting. Refer to *Note 2 —Basis of Presentation and Summary of Significant Accounting Policies* for additional information regarding SourceHOV's revenue recognition policy.

If a contract involves the provision of a single element, revenue is generally recognized when the product or service is provided and the amount earned is not contingent upon any future event. Revenue from time and materials arrangements is recognized as the services are performed.

*Multiple element arrangements:*　　SourceHOV also enters into multiple element arrangements involving various combinations. The deliverables within these arrangements are evaluated at contract inception to determine whether they represent separate units of accounting, and if so, contract consideration is allocated to each deliverable based on relative selling price. With respect to

266

Supp.App. 0633

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 636 of 1110   PageID 2257

Table of Contents

arrangements including tangible products containing both software and non-software components that function together to deliver the product's essential functionality, the relative selling price is determined using vendor specific objective evidence ("VSOE") of fair value, third-party evidence or best estimate of selling price. For SourceHOV's multiple element arrangements that are comprised solely of software and software elements, revenue is allocated to the various elements based on VSOE of fair value and the residual method to allocate the arrangement consideration. Revenue is then recognized in accordance with the appropriate revenue recognition guidance applicable to the respective elements.

If the multiple element arrangements criteria are not met, the arrangement is accounted for as one unit of accounting which would result in revenue being recognized on a straight-line basis over the period of delivery or being deferred until the earlier of when such criteria are met or when the last element is delivered.

*Equity-based compensation:*   SourceHOV accounts for equity-based awards by measuring the awards at the grant date and recognizing the grant-date fair value as an expense over the service period, which is usually the vesting period. Since SourceHOV is not publicly traded, SourceHOV does not have a listed price with which to calculate fair value. SourceHOV has historically and consistently calculated fair value using the Enterprise Value ("EV") model. SourceHOV performs a comparable company analysis, and determines the enterprise multiple to apply based on guidelines public companies. The guideline public companies are selected based on revenue and/or revenue growth rates, market capitalization, profitability, industry, and other characteristics that are considered comparable to SourceHOV. SourceHOV analyzes the guideline public companies' enterprise multiples, defined as equity value to adjusted EBITDA, based on publicly available financial information. The calculated price per share is determined by dividing the enterprise value, which is the product of adjusted EBITDA and the selected enterprise multiple, less debt, by fully diluted shares.

Calculation of the enterprise value based on the EV model requires judgment in terms of determining comparable guideline public companies and enterprise multiples. SourceHOV management, using its professional judgment and experience in the industry, determines which guideline public companies have similar characteristics based on the aforementioned metrics and characteristics. Additionally, determination of the appropriate enterprise multiple to be applied requires judgment as guideline companies may have a range of enterprise multiples.

*Income Taxes:*   SourceHOV accounts for income taxes by using the asset and liability method. SourceHOV accounts for income taxes regarding uncertain tax positions and recognizes interest and penalties related to uncertain tax positions in income tax benefit/(expense) in the consolidated statements of operations.

Deferred income taxes are recognized on the tax consequences of temporary differences by applying enacted statutory tax rates applicable in future years to differences between the financial statement carrying amounts and the tax bases of existing assets and liabilities, as determined under tax laws and rates. A valuation allowance is provided when it is more likely than not that all or some portion of the deferred tax assets will not be realized. Due to numerous ownership changes, SourceHOV is subject to limitations on existing net operating losses under Section 382 of the Internal Revenue Code (the Code). In the event SourceHOV determines that it would be able to realize deferred tax assets that have valuation allowances established, an adjustment to the deferred tax assets would be recognized as component of income tax expense through continuing operations.

SourceHOV engages in transactions (such as acquisitions) in which the tax consequences may be subject to uncertainty and examination by the varying taxing authorities. Significant judgment is required by SourceHOV in assessing and estimating the tax consequences of these transactions. While SourceHOV's tax returns are prepared and based on its interpretation of tax laws and regulations, in the normal course of business the tax returns are subject to examination by the various taxing authorities. Such examinations may result in future assessments of additional tax, interest and penalties.

267

Supp.App. 0634

For purposes of SourceHOV's income tax provision, a tax benefit is not recognized if the tax position is not more likely than not to be sustained based solely on its technical merits. Considerable judgment is involved in determining which tax positions are more likely than not to be sustained.

*Business Combinations:*    SourceHOV allocates the total cost of an acquisition to the underlying assets based on their respective estimated fair values. Determination of fair values involves significant estimates and assumptions about highly subjective variables, including future cash flows, discount rates, and asset lives. SourceHOV's estimates of the fair values of assets and liabilities acquired are based upon assumptions believed to be reasonable and, when appropriate, include assistance from independent third-party valuation firms.

Because SourceHOV is primarily a services business, SourceHOV's acquisitions typically result in significant amounts of goodwill and other intangible assets. Fair value estimates and calculations for these acquisitions will affect the amount of amortization expense, or possible impairment related charges recognized in future periods. SourceHOV bases its fair value estimates on assumptions it believes are reasonable, but recognizes that the assumptions are inherently uncertain.

**Recently Adopted Accounting Pronouncements**

In January 2017, SourceHOV adopted Accounting Standards Update ("ASU") No. 2015-11, Inventory (Topic 330): Simplifying the Measurement of Inventory. This amendment replaced the method of measuring inventories at lower of cost or market with a lower of cost and net realizable value method. The adoption had no material impact on SourceHOV's financial position, results of operations and cash flows.

In January 2017, SourceHOV adopted ASU No. 2016-09, Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting (ASU 2016-09). The ASU changes how companies account for certain aspects of equity-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The standard requires that all tax effects related to share-based payments be recorded as income tax expense or benefit in the income statement at settlement or expiration and, accordingly, excess tax benefits and tax deficiencies be presented as operating activities in the statement of cash flows. Upon adoption of this standard, SourceHOV elected to continue its current practice of estimating expected forfeitures. The adoption had no material impact on SourceHOV's financial position, results of operations and cash flows.

**Recently Issued Accounting Pronouncements**

In May 2014, the Financial Accounting Standard Board (FASB) issued ASU No. 2014-09, Revenue from Contracts with Customers (Topic 606). Under the update, revenue will be recognized based on a five-step model. The core principle of the model is that revenue will be recognized when the transfer of promised goods or services to customers is made in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In July 2015, the FASB deferred the effective date by one year (ASU No. 2015-14). This ASU will now be effective for annual periods, and interim periods within those annual periods, beginning on or after December 15, 2017. Early adoption is permitted, but not before the original effective date of December 15, 2016. Since the issuance of the original standard, the FASB has issued several other subsequent updates including the following: (1) clarification of the implementation guidance on principal versus agent considerations (ASU 2016-08); (2) further guidance on identifying performance obligations in a contract as well as clarifications on the licensing implementation guidance (ASU 2016-10); (3) rescission of several SEC Staff Announcements that are codified in Topic 605 (ASU 2016-11); (4) additional guidance and practical expedients in response to identified implementation issues (ASU 2016-12); and (5) technical corrections and improvements (ASU 2016-20). The new standard will be effective for SourceHOV

Supp.App. 0635

beginning January 1, 2018. SourceHOV is currently evaluating the impact that adopting this ASU will have on its financial position, results of operations and cash flows.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (Topic 842)*. This Update increases transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The amendments in this Update are effective for fiscal years beginning after December 2015, 2018 and interim periods within those fiscal years and early application is permitted. SourceHOV is currently evaluating the impact that adopting this standard will have on its Consolidated Financial Statements.

In August 2016, the FASB issued ASU No. 2016-15, *Classification of Certain Cash Receipts and Cash Payments (Topic 230)*. The new guidance clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including debt prepayment or extinguishment costs, settlement of contingent consideration arising from a business combination, insurance settlement proceeds, and distributions from certain equity method investees. The new standard is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted. SourceHOV is currently evaluating the impact that adopting this standard will have on its Consolidated Financial Statements.

In October 2016, the FASB issued ASU No. 2016-16, *Income Taxes: Intra-Entity Transfers of Assets Other Than Inventory (Topic 740)*, which eliminates the current prohibition on immediate recognition of the current and deferred income tax effects of intra-entity transfers of assets other than inventory, with the intent of reducing complexity and diversity in practice. Under ASU 2016-16, entities must recognize the income tax consequences when the transfer occurs rather than deferring recognition. For public entities, ASU 2016-16 is effective for fiscal years, including interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted as of the beginning of a fiscal year (i.e. early adoption is permitted only in the first interim period). Entities must apply the guidance on a modified retrospective basis though a cumulative effect adjustment to retained earnings as of the beginning of the period of adoption. SourceHOV is currently evaluating the impact that adopting this standard will have on its consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows: Restricted Cash*. (ASC 230). The ASU addresses diversity in practice that exists in the classification and presentation of changes in restricted cash and require that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. The ASU is effective retrospectively for fiscal years and interim periods within those years beginning after December 15, 2017. SourceHOV is currently evaluating the impact that adopting this standard will have on its consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations: Clarifying the Definition of a Business* (Topic 805). The ASU clarifies the definition of a business and provides guidance on evaluating as to whether transactions should be accounted for as acquisitions (or disposals) of assets or business combinations. The definition clarification as outlined in this ASU affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The amendments of the ASU are effective for annual periods beginning after December 15, 2017, including interim periods within those annual periods. SourceHOV is currently evaluating the impact that adopting this standard will have on its Consolidated Financial Statements.

In January 2017, the FASB ASU No. 2017-04, Intangibles Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment, which eliminates Step 2 of the goodwill impairment test that had required a hypothetical purchase price allocation. Rather, entities should apply the same impairment assessment to all reporting units and recognize an impairment loss for the amount by which a reporting unit's carrying amount exceeds its fair value, without exceeding the total amount of goodwill allocated to that reporting unit. Entities will continue to have the option to perform a

269

Supp.App. 0636

Table of Contents

qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. ASU 2017-04 will be effective prospectively for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2019, or those beginning after January 1, 2017 if early adopted. SourceHOV is currently evaluating the impact that adopting this standard will have on its consolidated financial statements.

In March 2017, the FASB issued ASU No. 2017-07, Compensation Retirement Benefits (Topic 715); Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost. The amendments to this ASU require the service cost component of net periodic benefit cost be reported in the same income statement line or lines as other compensation costs for employees. The other components of net periodic benefit cost are required to be reported separately from service costs and outside a subtotal of income from operations. Only the service cost component is eligible for capitalization. The guidance is effective for annual periods beginning after December 15, 2017. The amendments should be applied retrospectively for the income statement presentations and prospectively for the capitalization of service costs. SourceHOV is currently evaluating the impact that adopting this standard will have on its consolidated financial statements.

**Internal Controls and Procedures**

SourceHOV is not currently required to comply with the SEC's rules implementing Section 404 of the Sarbanes Oxley Act of 2002, and is therefore not required to make a formal assessment of the effectiveness of SourceHOV's internal control over financial reporting for that purpose. Upon becoming a public company, SourceHOV will be required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which will require its management to certify financial and other information in its quarterly and annual reports and provide an annual management report on the effectiveness of SourceHOV's internal control over financial reporting.

**Off Balance Sheet Arrangements**

At March 31, 2017, SourceHOV had no material off balance sheet arrangements, except for operating leases. As such, SourceHOV is not materially exposed to any financing, liquidity, market or credit risk that could arise if SourceHOV had engaged in such financing arrangements.

270

Supp.App. 0637

**INFORMATION ABOUT NOVITEX**

*The following section describes the business and operations of Novitex.*

**Company Overview**

Novitex is a North American provider of document management and digital business process services. Novitex enables businesses to streamline their internal and external communications and workflows by offering an integrated suite of services organized across two categories: Digital Services and Document Logistics.

The Digital Services category combines technology-driven applications and platforms with Novitex's expertise and consists of the following:

- **Customer communications management** ("CCM"): the strategic management and improvement of outbound communications, including the creation, delivery, storage and retrieval of communications;

- **Outbound, recurring document processing:** repetitive production work, such as statements, invoices, insurance policies, and other informational documents that contain content unique to each recipient;

- **Production business recovery services:** backup transactional print and mail services supporting clients' operations when an internal breakdown or a natural disaster disrupts the primary functions of such operations;

- **Business process automation:** the automation of complex business processes, such as mortgage processing and claims processing, beyond conventional data manipulation and record-keeping activities; and

- **Managed print services** ("MPS"): the optimization of clients' onsite document output to decrease costs, reduce paper waste, and increase employee efficiency.

Novitex's Document Logistics services consist of delivery logistics, which includes presort services and shipping cost optimization, and staffing-based document management services, which includes mailroom management, document reproduction services ("reprographics"), and hospitality solutions (such as staffing lobby hosts and providing hoteling support).

Through its integrated suite of Digital Service and Document Logistics offerings, which Novitex refers to as the Integrated Document Life Cycle™ (the "IDLC"), Novitex connects its clients' inbound and outbound communications in both physical and digital forms. Before the introduction of the IDLC, multiple stakeholders within client businesses would outsource fragmented pieces of the document lifecycle to separate vendors. With the IDLC, these multiple stakeholders can outsource their document processing needs to a single provider, Novitex, creating a more efficient model for document processing services. Novitex helps minimize operational silos within many of its clients' businesses, creating more efficient, cost-effective workflows. Multiple service offerings can be bundled into a single client contract, which leverages shared supporting personnel, equipment, technology and workflows.

Novitex now provides many of its top clients with a combination of both Document Logistics and Digital Services as an integrated outsourced solution to their document-related needs. Novitex supports a large and diverse base of approximately 400 clients, consisting of Fortune® 500 companies, Am Law® 200 law firms and public sector organizations, with approximately 7,000 employees located across approximately 1,200 client sites and 32 offsite facilities as of March 31, 2017. In addition, Novitex benefits from a highly diversified client base that includes clients in highly regulated industries, such as banking, property and casualty insurance, healthcare, government, legal, technology, consumer, manufacturing, energy, and universities.

271

Table of Contents

**Industry**

*Summary Market Overview*

Novitex operates within the document outsourcing industry, which is part of the business process service industry. Novitex believes its addressable market size for the document outsourcing industry in the United States and Canada was approximately $31.4 billion in 2016.

Document outsourcing refers to a range of business communications services, including design, production, processing, mailing, electronic transmission and fulfillment of any type of printed or electronic document. In addition, document outsourcing includes multiple business processes that may be executed inside or outside a corporate enterprise, which are referred to as onsite or offsite services. Novitex is a single source provider and has the ability to support and integrate Document Logistics and Digital Services into an integrated solution.

Novitex believes there is a significant opportunity for document outsourcing solutions based on long-term market trends. These trends include:

- *Increasing demand for single-source outsourcing providers:* Ongoing competitive pressures and increasing demand for further productivity have motivated businesses to seek even more efficiencies from their outsourcing providers. Novitex believes that a single-source outsourcing model helps drive the additional efficiency enhancements businesses seek, thereby creating opportunities for Novitex.

- *Increasing demand for personalization:* Novitex's customers have come to expect more personalized, omni-channel communications from the institutions with whom they do business. Novitex expects more businesses to seek a comprehensive document outsourcing solution, providing a growth opportunity for Novitex.

- *Increasing use of automation:* According to the Association for Information and Image Management, many organizations are recognizing the need to improve their business processes and the benefits that result from process automation. Given this growing emphasis, Novitex has identified opportunities to reduce the amount of repetitive, manual labor required by Novitex's clients to deliver certain services by utilizing automation outsourced to Novitex.

- *Increasing regulatory-driven activity:* Regulatory conditions have created a challenging operating environment for many of Novitex's clients. In particular, legislation, such as the Gramm-Leach-Bliley Act and the Health Insurance Portability and Accountability Act, has imposed significant regulations on Novitex's clients in the financial services and healthcare industries. This increased regulatory activity provides Novitex with opportunities to provide additional services to impacted clients.

**History**

As discussed below, Novitex believes it is well positioned to provide document outsourcing solutions to clients that will meet the needs of their operations.

In October 2013, funds affiliated with Apollo Global Management, LLC ("Apollo") acquired Pitney Bowes Management Services, Inc. and its wholly owned subsidiaries and certain affiliates and divisions (collectively "PBMS") from Pitney Bowes, Inc. (the "2013 Acquisition"). Originally started as an internal division to support mail services in 1986, PBMS was incorporated as a separate corporate entity in 1989. Over time, PBMS made several tactical acquisitions to expand its Document Logistics. Prior to the 2013 Acquisition, PBMS primarily supported staffing-based document management offerings, such as mail services, reprographics and hospitality services, as well as certain business process automation services. PBMS was organized around geographic regions selling single point offerings without a distinct focus on comprehensive client specific outcomes.

272

Supp.App. 0639

Following the 2013 Acquisition, PBMS was rebranded as Novitex and expanded its Digital Services offerings. Through these expansions, Novitex has positioned itself as one of the few non-original equipment manufacturers in the document outsourcing industry, providing an end-to-end, integrated solution.

In 2014, Novitex introduced the IDLC to the marketplace. The IDLC is a proprietary framework designed to connect inbound and outbound communications in both physical and digital forms. To support its single-provider model, Novitex underwent a major transformation to effect this strategic marketplace repositioning and since 2013, Novitex has completed the following initiatives:

- **Expanded service offerings to support the IDLC:** To round out its portfolio, Novitex added new Digital Services that include cloud-based MPS and CCM. These new Digital Services require integration of Novitex systems with client technology infrastructure, which Novitex believes encourages customer retention and loyalty.

- **Developed proprietary application interfaces to support delivery of services:** Novitex enhanced its existing document logistics offerings by integrating technologies to improve service delivery. Examples include the development of a proprietary mobile application that optimizes and tracks the delivery of many onsite services, such as hoteling and mail delivery and Novitex's client-facing reporting and dashboard interface that syncs with its mobile application.

- **Restructured the business to focus on industry-specific expertise:** Novitex re-aligned service delivery and sales into an industry-focused model rather than a geographic model. Using an industry-focused model deepens Novitex's industry-specific subject matter expertise and enables the service delivery and sales teams to better understand clients' unique challenges. This allows Novitex to tailor its services based on client needs, industry trends and the regulatory environment applicable to these clients.

- **Improved operating capabilities:** Novitex made approximately $45 million of investments to create and equip two Tier-III document processing and outsourcing centers in Windsor, Connecticut, and Austin, Texas (which Novitex refers to as its MegaCenters) and consolidate smaller regional document processing centers to the MegaCenters. The MegaCenters enable Novitex to manage the full document lifecycle at a single location and include areas dedicated to transactional print, mail services, business recovery services, business process automation and MPS. Additionally, the centers provide high service availability by utilizing redundant power and networking interconnects. Certified by third-party assessors, the centers adhere to stringent security, processing integrity, confidentiality and privacy protocols as required by SSAE-16 SOC II Type 1 and ISO/IEC 27001:2013.

- **Enhanced Novitex's security program:** Digital Services engagements frequently involve managing sensitive client data. To support clients' rigorous security, privacy and regulatory compliance needs, Novitex established a data security team, which built a "Defense in Depth" strategy to protect physical and digital information across the enterprise. This strategy is based on the military principle that identifies and applies controls to all of the possible means by which data can be accessed. The data security team and third-party assessors conduct regular audits to test the integrity and effectiveness of Novitex's security program.

273

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 643 of 1110    PageID 2264

**Principal Services and Revenue Sources**



<u>*Document Logistics*</u>

*Mail Services*

Novitex operates and manages onsite and offsite mail centers to manage both inbound and outbound mail, including mail and package receipt, sorting, delivery and outbound processing. To proactively respond to the recent decline in First-Class mail volumes, Novitex has focused on growth areas, such as package management. According to the United States Postal Service ("USPS"), package volume increased approximately 23% from 2008 to 2013. To help clients efficiently and effectively manage the increase in package volumes, Novitex developed a proprietary mobile application that provides clients with visibility into a package's chain of custody.

Because Novitex's onsite mailroom employees work at the client's physical location, these employees often have firsthand access to other areas of the clients' businesses. This proximity has resulted in valuable insights which improve Novitex's ability to support the full document lifecycle for a client. By bundling mail with other onsite services, such as reprographics, Novitex can provide greater labor productivity gains and reduced costs compared to single and siloed point services by implementing shared resources and technology supported workflow solutions.

*Reprographics*

Through its Reprographics services, Novitex develops and implements copying and print management strategies and solutions that enable clients to produce and reproduce materials onsite, offsite at a Novitex facility or through a combination of the two based on need, capacity and preference, using a secure web-to-print portal. When Novitex provides onsite support, it builds tailored reprographics centers that utilize high performance production equipment to support client needs.

<p style="text-align:center">274</p>

Supp.App. 0641

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 644 of 1110    PageID 2265

Table of Contents

Offsite, at its MegaCenters and Document Solution Centers ("DSCs"), Novitex addresses the same reprographic needs at greater volumes and more efficiently.

*Hospitality Services*

Novitex has a portfolio of hospitality services that include outsourced administrative services, such as receptionists and virtual lobby hosts; conference room management; light facilities management; and hoteling support. Novitex utilizes a "cross-training" approach to prepare employees to perform multiple tasks and integrate services into client environments when temporary surges in workload and/or unexpected employee absences occur, which helps to minimize disruption and maintain the client workflows.

Novitex believes many firms are developing mobile workforce strategies, referred to as "hoteling," that require employees to make reservations to utilize workspaces when they are present at a client site. Novitex has invested in developing a staffing solution to address the new workforce demands created by hoteling and has created proprietary technology that helps optimizes the management of hoteling workspaces to improve the experience at client sites.

*Delivery Logistic Services*

In 2016, Novitex introduced a new suite of bundled services that are focused on reducing client shipping costs and delivery times. These services include package and delivery cost optimization, pre-sort services, end-to-end metrics and package fulfillment tracking. These services are typically offered in conjunction with Outbound Document Processing, which is described in the section below.

**Digital Services**

*Business Process Automation ("BPA")*

Novitex works with clients to digitize and automate their operations to improve speed, efficiency and accuracy. For example, Novitex helps clients in the financial services industry digitize and automate mortgage and claims processing. Novitex operations are designed to meet regulatory requirements for handling customer information and provide clients with auditable records. Novitex performs these services both offsite and onsite at client locations, depending on the needs of the client. Novitex supports BPA at its two MegaCenters when providing offsite BPA services.

*Customer Communications Management (CCM)*

Novitex offers custom CCM services to help automate the development, production and fulfillment of its clients' communications at one of Novitex's MegaCenters. Novitex's CCM offering supports its clients' high value customer communications, such as enrollment kits and insurance explanation of benefits, necessary for regulatory compliance or attracting and retaining their customers. With this offering, clients have the ability to:

- Use their customer information and demographics to automate the efficient creation of effective personalized communications;

- Support the development of compliant communications through template management and user permissions;

- Automate the approval process, enabling stakeholders to flag documents for non-compliance and employing administrator and time stamp approvals;

- Create a document audit trail, providing stakeholders with visibility and transparency into the document composition workflow; and

275

Supp.App. 0642

- Distribute "requests for proposal" to a list of pre-approved print vendors (including Novitex) to create a spot market for the customer's specific print needs and drive competitive pricing.

As part of these services, clients may outsource their procurement operations for these communications to Novitex. Novitex provides procurement and specialized category buyers and performs procurement, distribution and delivery services for client orders processed through the CCM platform.

*Outbound Document Processing*

Novitex helps optimize outbound processing for recurring production work, such as statements, annual notices and invoices, by utilizing its integrated suite of services, including transactional printing, mailpiece design, supply chain management, address verification and ePresentment.

To support the automation of personalizing documents, Novitex has invested in variable data print capabilities. One-to-one or personalized communications are becoming increasingly critical, as users prefer to do business with brands that use personal information to make the experience more relevant. Novitex can produce customized documents with data variables like name, address and trans-promotional messages that fit the needs, interests and preferences of Novitex's clients' individual customers. Novitex's equipment leverages built-in safeguards that help ensure each document addresses the correct recipient and to support compliance and data security requirements.

Novitex supports outbound document processing at its MegaCenters.

*MPS*

Novitex's independence as one of the few non-original equipment manufacturers providing MPS solutions enables it to more efficiently build an MPS solution encompassing all or some of the following services, depending on client need: printer fleet management, print policy development, consumables management, break/fix management, mobile workforce enablement, secure print management, help desk assistance and integration of related services, such as scan-to-print capabilities. To help optimize the delivery of an MPS solution, Novitex launched a cloud-based service automation platform in November 2014. Novitex believes that its application of the platform is unique and that, through the platform, Novitex has the ability to proactively respond to approximately 75% of printer-related support needs before end-users and client Help Desks are ever impacted. Additionally, Novitex can offer clients access to near-time reporting via the platform. This data provides visibility into Novitex's service performance and the client's print environment. As of March 31, 2017, Novitex managed approximately 8,700 printers across North America.

*Production Business Recovery Services*

Novitex provides temporary backup transactional print and mail services to clients when their primary functions are interrupted due to an internal or natural disaster. This offering is only used by a client in the event an emergency causes a disruption in a client's operations. Without this service, clients risk delaying the production and distribution of business-critical documents, which can adversely affect financial performance or regulatory compliance. Novitex's contingency specialists work with clients to develop, implement and test customized disaster recovery plans on a regular schedule. Novitex supports business recovery services at its MegaCenters.

**Research and Development**

Novitex's research and development activities relate primarily to the design, development and enhancement of its client-facing service solutions. Novitex expects to continue investing significant resources to maintain, enhance and extend the functionality of its proprietary systems and existing solutions, to develop new solutions in response to the needs of its clients, and to enhance the capabilities surrounding its infrastructure. Novitex works with its clients to determine the appropriate timing and approach to introducing technology or infrastructure changes to its solutions and services.

276

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 646 of 1110     PageID 2267

**Sales and Marketing**

As part of its transformation since the 2013 Acquisition, Novitex re-aligned its sales teams into an industry-focused model rather than a geographic model. Using an industry-focused model deepens Novitex's industry-specific subject matter expertise and enables the sales teams to better understand clients' unique challenges. This focus allows Novitex to tailor its services based on client needs, industry trends and the regulations applicable to these clients.

Novitex has a national business development organization and marketing team comprised of professionals with expertise in solution selling, along with industry-specific experience. Novitex also considers its onsite management teams to be a critical component of its sales and marketing organization because the nature of its onsite services allows Novitex to develop close relationships with clients and gain a deep understanding of client needs. Novitex believes that its onsite presence, along with its integrated, industry-specific approach, enables Novitex to effectively cross-sell and build upon existing services.

To support its strategy, Novitex deploys an industry-based marketing plan focused on certain buyers that include facilities, operations, compliance and information technology executives. Novitex's marketing activities vary from industry to industry depending on its market position, client and industry trends and the regulatory environment. Novitex's marketing team seeks to anticipate market trends and attempts to capture client insight to determine strategy for brand positioning, communication and product innovation. Key components include thought leadership, digital programs with consistent messaging, internal and external communications, client conferences, demand generation campaigns and collateral development.

As of March 31, 2017, Novitex employed approximately 90 individuals across North America as part of its sales and marketing force. Additionally, Novitex offers an opportunity for front line employees to be financially rewarded for driving additional revenue.

**Intellectual Property**

Novitex has developed, acquired or licensed the intellectual property used in its business operations, consisting of patents, proprietary trade secrets and know-how, trademarks and other licensed technology. Novitex believes that its intellectual property is, in the aggregate, material to Novitex's business and its competitive strength. However, Novitex does not believe that the expiration or termination of any individual license or that challenges to any specific patent or trademark would have a material impact on Novitex's business, financial condition or results of operations. In general, Novitex depends on its technological capabilities and the application of know-how, rather than patents and technology licenses, in the conduct of Novitex's various businesses.

Novitex's licensed intellectual properties are generally governed by written agreements of varying durations, including some with fixed terms that are subject to renewal based on mutual agreement. Generally, each agreement may be further extended and Novitex has historically been able to renew existing agreements before they expire. Novitex expects these and other similar agreements to be extended so long as it is mutually advantageous to both parties at the time of renewal.

Novitex's services are not generally dependent upon patent protection, although Novitex has selectively sought patent protection and has two U.S. patents pending. Novitex also claims a proprietary interest in certain of Novitex's software programs, methodologies and know-how. Novitex relies on a combination of confidentiality agreements with Novitex's clients, employees, consultants, subcontractors and other parties as well as other security measures, such as information access and distribution controls, to establish and protect Novitex's proprietary technology, information, processes and know-how that comprise Novitex's solutions. Novitex also has brands that have goodwill in the markets that Novitex serves and Novitex relies on trademarks to protect Novitex's related rights and has five

277

Supp.App. 0644

Table of Contents

U.S. registered trademarks, including its corporate name and for the IDLC, and two pending applications.

### Competition

Novitex is able to bundle offered services across the entire document lifecycle. Novitex believes that no other competitor has the same ability to support the full document lifecycle, making Novitex unique in the marketplace. Additionally, Novitex is one of the few non-original equipment manufacturers in the document outsourcing industry, which enables Novitex to provide impartial recommendations on how clients can optimize their onsite document output to reduce costs, produce less paper waste and increase employee efficiency. However, for each offering Novitex provides, it competes with a different set of providers. For instance, within its Document Logistics services, Novitex competes with facilities integrators; onsite staffing providers that support mail and reprographics operations and, in some instances, hospitality services; and procurement logistics providers. For CCM, one of Novitex's Digital Services, Novitex competes with software providers. For MPS, another Digital Service, Novitex primarily competes with original equipment manufacturers.

### Contracts

Approximately 37% of Novitex's revenue for the year ended December 31, 2016 was derived from its top 10 clients. Novitex derives most of its revenue by selling one or more services together under single, long-term contracts, many of which contain terms and conditions based on anticipated levels of utilization of Novitex's services. Initial contract terms are typically 3 to 5 years in length. As is often the case with outsourced service contracts, many of Novitex's contracts contain termination clauses for convenience, typically requiring three months' advance notice.

### Purchasing

Novitex's purchasing organization manages various third-party suppliers to provide a variety of supplies, components and services. Novitex has a robust portfolio of vendors, consisting of more than 400 businesses, including a core set of vendors it utilizes to deliver services. Novitex believes it has strong, long-term relationships with its suppliers and that it plays a significant role in its suppliers' route-to-market because Novitex helps them access a highly fragmented customer base. While a significant portion of Novitex's expenditures on third-party suppliers is directed to a limited number of suppliers, Novitex does not believe it is dependent on any one single supplier to operate. Novitex has not historically experienced shortages in services, components or products and Novitex believes that the available sources for materials, components, services and supplies are adequate.

### Seasonality of Business and Working Capital

Novitex generally does not experience seasonality, as approximately 75% of its revenues for the year ended December 31, 2016 were fee based as part of multi-year contracts.

### Regulation and Compliance

Novitex's operations and properties are subject to a number of federal, state, and local laws and regulations. Novitex receives, processes, transmits and stores information relating to identifiable individuals, both in its role as a service and technology provider and as an employer. As a result, Novitex is subject to numerous laws and regulations designed to protect individually identifiable information, including the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and the HIPAA regulations governing, among other things, the privacy, security and electronic transmission of individually identifiable health information. Other laws apply to Novitex's processing of individually identifiable information and these laws have been subject to frequent changes, and new legislation in this area may be enacted at any time. Changes to existing laws, introduction of new laws in this area, or failure to comply with existing laws that are applicable to Novitex may subject it to, among other

278

Supp.App. 0645

things, additional costs or changes to Novitex's business practices, liability for monetary damages, fines and/or criminal prosecution, unfavorable publicity, restrictions on Novitex's ability to obtain and process information and allegations by its customers and clients that Novitex has not performed its contractual obligations, any of which may have a material adverse effect on profitability and cash flow.

**Employees**

As of March 31, 2017, Novitex had approximately 7,000 total employees, which included approximately 6,350 full-time and 900 part-time employees. All of Novitex's employees are located in the United States and Canada. Novitex's employees are not unionized, and Novitex considers its relationships with its employees to be good. Approximately 97% of Novitex employees work in the service delivery organization with an average tenure of 6 years. These employees work mostly onsite at approximately 1,200 client locations.

**Geographic Footprint and Properties**

As of March 31, 2017, Novitex leased 32 sites across 14 states in the United States and two Canadian provinces, representing a property portfolio of approximately 510,000 square feet in the aggregate. Of the 32 leased sites, five sites are support offices; eleven sites are dedicated to multi-client operations; and 16 sites are dedicated to single clients. The diagram below sets forth Novitex's principal facilities.



Novitex believes that its existing facilities are adequate for its present level of operations.

**Legal Proceedings**

Thousands of people are employed by, or seek employment with, Novitex and its subsidiaries every year. In the ordinary course of business, disputes arise regarding hiring, termination, promotion and pay practices, including alleged discrimination and compliance with labor and employment laws. There are no material lawsuits involving Novitex regarding labor and employment or any other matters, and Novitex is not aware of any threatened lawsuits that would have a material adverse effect on the business.

279

Table of Contents

**Management**

The following table sets forth certain information regarding Novitex's executive officers and members of its board of directors as of May 4, 2017.

| Name | Age | Position |
|------|-----|----------|
| Giovanni Visentin | 54 | Executive Chairman and Chief Executive Officer |
| Irina Novoselsky | 32 | President |
| Robert G. Rooney | 59 | Chief Financial Officer |
| Joseph Trost | 60 | Chief Operating Officer |
| Theresa K. Mohan | 51 | General Counsel, Secretary and Chief Human Resources Officer |
| Christopher Edson | 32 | Director |
| Nathaniel J. Lipman | 52 | Director |
| Rubin J. McDougal | 59 | Director |
| Matthew H. Nord | 38 | Director |

*Giovanni Visentin* has served as Novitex's Executive Chairman and Chief Executive Officer since October 2013 when Mr. Visentin was appointed to lead Novitex following the acquisition of Pitney Bowes Management Services by Novitex. From 2011 to 2012, Mr. Visentin served as Executive Vice President and General Manager of Hewlett-Packard Company's enterprise services business, and in 2011, as Senior Vice President and General Manager of the Americas Region of Hewlett-Packard Company's enterprise services business. Before joining Hewlett-Packard Company, Mr. Visentin served as General Manager of Integrated Technology Services for North America for International Business Machines Corporation, a global technology firm, from August 2007 to January 2011 after having served in various other positions at International Business Machines Corporation since joining the company in 1984. Mr. Visentin also serves as Director and Chairman of the Board at Presidio, Inc. (formerly named Aegis Holdings, Inc.), a provider of IT solutions to the middle market in North America, and has been the Chairman of the Board of Presidio Holdings, Inc. since March 2015. Mr. Visentin received a Bachelor of Commerce degree from Concordia University.

*Irina Novoselsky* has acted as President of Novitex since November 2014, playing a vital role in transforming Novitex from a legacy document services business to one focused on digital services and technology. Since joining Novitex in October 2013, Novoselsky served as Head of Business Development from October 2013 to November 2014 and interim Chief Financial Officer from February 2014 to May 2014. Prior to Novitex, Ms. Novoselsky was an Investment Strategist for Dubin & Co. from September 2012 to March 2013, and an investment professional at Apollo in the Private Equity Group from August 2009 to August 2012. Before Apollo, she worked as a member of the M&A Group at Morgan Stanley from February 2007 to July 2009. Ms. Novoselsky is a member of the Young President's Organization, an invitation-only, global network of young chief executives. While at Novitex, she has been named Female Executive of the Year by Stevie® Award for Women in Business in 2014 and 2015. She graduated with a Bachelor of Science from the Stern School of Business at New York University.

*Robert G. Rooney* has served as Novitex's Chief Financial Officer since August 2015. Since 2009, Mr. Rooney has been an Independent Trustee for the Metropolitan West Mutual Fund Family and has served as its Audit Committee Chair since 2014. From 2001 to 2011, Mr. Rooney held senior management positions in Affinion Group Holdings, Inc. and its predecessor companies, including serving as the Chief Operating Officer and Executive Vice President from 2006 to 2011 and Executive Vice President and Interim Chief Financial Officer from 2005 to 2006. From 1999 to 2001, Mr. Rooney served as Senior Vice President and Chief Financial Officer of Sbarro, Inc. Prior to 1999, Mr. Rooney held Chief Financial Officer positions with several companies in the financial and entertainment sectors, including three years as Chief Financial Officer of Imagine Entertainment. From 1978 to 1986, he was employed as a certified public accountant with Ernst & Young. Mr. Rooney received a Bachelor of Science degree in Accounting from St. John's University.

280

Table of Contents

*Joseph Trost* has served as Novitex's Chief Operating Officer since October 2013, where he focuses on enhancing the customer experience and optimizing operational efficiency. Mr. Trost has more than 30 years of experience in sales, operations, solution design and development and business transformation at International Business Machines Corporation. Mr. Trost held various positions of increasing responsibility over the course of his career at International Business Machines Corporation, and most recently served as the Vice President for ITS Service Delivery from June. 2011. Mr. Trost is a Director of Presidio, Inc. (formerly named Aegis Holdings, Inc.), a provider of IT solutions to the middle market in North America and serves on its Audit Committee as well as the Innovation and Technology Committee. He graduated from Marist College and holds a Bachelor of Science degree in Business Administration.

*Theresa K. Mohan* has served as the General Counsel of Novitex since March 2015 and the Chief Human Resources Officer since September 2015. Prior to joining Novitex Ms. Mohan held several senior legal positions with IBM from September 1993 to March 2005, including as Regional Counsel from September 2011 to March 2015 and Senior Counsel from January 2005 to September 2011. Since May 2012, Ms. Mohan has served on the board of ShelterBox USA, a non-profit providing emergency shelter and vital supplies to support communities around the word overwhelmed by disaster and humanitarian crises. Ms. Mohan received a Bachelor of Arts in Political Science from College of the Holy Cross and a J.D. from Fordham Law.

*Christopher Edson* has served as a Director of Novitex since July 2013. Mr. Edson is a principal of Apollo, where he has been employed since 2008. From 2005 to 2008, Mr. Edson was a member of the Financial Institutions Investment Banking Group of Goldman Sachs in both New York and Chicago. Mr. Edson serves on several boards of directors, including Presidio, Inc. (formerly named Aegis Holdings, Inc.), MidCap Financial Holdings, LLC, Dakota Holdings, Inc. d/b/a Diamond Resorts International, and RegionalCare Hospital Partners Holdings, Inc. d/b/a RCCH Healthcare Partners. During the past five years, Mr. Edson has also served as a director of Athene Group, Ltd. from April 2010 to December 2012 and SourceHOV Holdings, Inc. from March 2011 to April 2013. Mr. Edson graduated with a Bachelor of Science in Finance from Indiana University.

*Nathaniel J. Lipman* has served as a Director of Novitex since October 2013. Since 1999, Mr. Lipman has held numerous executive management or senior advisory positions in Affinion Group Holdings, Inc., a public company that provides customer engagement and loyalty solutions, and/or its predecessors and subsidiaries, including serving as Chief Executive Officer from 2005 to 2012 and Executive Chairman of the board of directors from 2012 to November 2015. Since November 2015, Mr. Lipman has served as a consultant to Affinion Group Holdings, Inc. Since December 2015, Mr. Lipman has served as a Special Advisor to the Chairman of the Upside Travel Group, Inc., a business travel company, where he was a founding member of the Board of Managers. From 1996 to 1999, Mr. Lipman served as Senior Executive Vice President, Corporate Development and Strategic Planning for Planet Hollywood International, Inc., an entertainment and restaurant company. Prior to his tenure at Planet Hollywood, Mr. Lipman was Senior Vice President and General Counsel of House of Blues Entertainment, Inc., an entertainment and restaurant company, Senior Corporate Counsel at The Walt Disney Company, a diversified worldwide entertainment company, and a corporate associate at Skadden, Arps, Slate, Meagher and Flom, LLP. Mr. Lipman serves on the board of directors of Trusted Media Brands, Inc., Walker Innovations, Inc. and Redbox Automated Holdings, LLC. During the past five years, Mr. Lipman has also served as a director of EVERTEC, Inc. from September 2010 to April 2013 and Walker Digital Holdings, LLC from May 2013 to September 2013. Mr. Lipman also previously served as a director of Netmarket Group, Inc. Mr. Lipman received a Bachelor of Arts in Political Economy of Industrial Societies from the University of California, Berkeley and a J.D. from UCLA School of Law. Quinpario believes that Mr. Lipman's significant experience and numerous directorships make him well-qualified to serve as a director of the combined company.

*Rubin J. McDougal* has served as a Director of Novitex since October 2013. From 2009 to 2015, Mr. McDougal served as Chief Financial Officer of CEVA Group Plc. Mr. McDougal has over 29 years

281

Supp.App. 0648

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 651 of 1110    PageID 2272

of finance experience that includes operational finance, management and public company Chief Financial Officer roles. Prior to joining CEVA, Mr. McDougal had been Chief Financial Officer of CNH Global N.V. from 2006 to 2009. Prior to joining CNH Global N.V. in 2006, Mr. McDougal spent 23 years of his career within the Whirlpool Corporation in a variety of financial and strategic roles across the globe, culminating in a two-year position as Vice President Finance for the North American Region. Mr. McDougal earned a Bachelor of Arts degree, with a concentration in marketing, cum laude, from the University of Utah and an M.B.A. degree, with a concentration in Finance, from Western Michigan University.

*Matthew H. Nord* has served as a Director of Novitex since July 2013. Mr. Nord is a Senior Partner of Apollo, where he has been employed since 2003. From 2001 to 2003, Mr. Nord was a member of the Investment Banking division of Salomon Smith Barney Inc. Mr. Nord serves on the boards of directors of Presidio, Inc., The ADT Corporation, and RegionalCare Hospital Partners Holdings, Inc. Mr. Nord also serves on the Board of Trustees of Montefiore Health System and on the Board of Overseers of the University of Pennsylvania's School of Design. Mr. Nord graduated summa cum laude with a B.S. in Economics from the Wharton School of the University of Pennsylvania. Between his work at Apollo and his prior experience in investment banking, Mr. Nord has approximately 15 years of experience analyzing, financing and investing in public and private companies, which Quinpario believes makes him well-qualified to serve as a director of the combined company.

**Executive Compensation**

*2016 Summary Compensation Table*

The following table sets forth information regarding the compensation awarded to, earned by, or paid to certain of Novitex's executive officers during the fiscal year ended December 31, 2016. As an emerging growth company, Novitex has opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies" as such term is defined in the rules promulgated under the Securities Act, which require compensation disclosure for its principal executive officer and its two other most highly compensated executive officers. Throughout this proxy statement, these three officers are referred to as Novitex's "named executive officers."

The following table summarizes the total compensation for the named executive officers of Novitex Holdings, Inc., each of whom is identified in the following table, for services rendered during the fiscal year ended December 31, 2016.

| Name and principal position | Year | Salary ($) | Bonus ($)(1) | Stock Awards ($)(2) | All Other Compensation ($)(3) | Total ($) |
|---|---|---|---|---|---|---|
| Giovanni Visentin; Chief Executive Officer and Executive Chairman | 2016 | 800,000 | 1,000,001 | 140,500 | 19,042 | 1,959,543 |
| Joseph Trost; Chief Operating Officer | 2016 | 300,000 | 400,001 | 56,200 | 20,122 | 776,323 |
| Irina Novoselsky; President | 2016 | 300,000 | 300,001 | 42,150 | 34,232 | 676,383 |

(1) On July 15, 2016, retention bonuses of $1,000,001, $400,001 and $300,001 were paid to Mr. Visentin, Mr. Trost and Ms. Novoselsky, respectively.

(2) On April 1, 2016, 50,000, 20,000 and 15,000 new tranche E profits units of Novitex Parent were granted to Mr. Visentin, Mr. Trost and Ms. Novoselsky, respectively. The amounts in this column represent the aggregate grant date fair value of the new tranche E profits units issued to the named executive officers in accordance with FASB ASC Topic 718.

(3) In 2016, Novitex paid $12,500 in financial counseling services and $1,242 in life insurance premiums for Mr. Visentin. In 2016, Novitex paid $12,500 in financial counseling services and $2,322 in life insurance premiums for Mr. Trost. In 2016, the Company paid $12,500 in financial counseling services, $432 in life insurance premiums and $16,000 in dues for membership in the Young Presidents' Organization for Ms. Novoselsky. In addition, on August 19, 2016, Novitex Enterprise Solutions, Inc. made a matching contribution of $5,300 to each of Mr. Visentin, Mr. Trost and Ms. Novoselsky's 401(k) account with respect to

282

Supp.App. 0649

fiscal year 2015. Matching contributions under the 401(k) Plan for 2016 have not yet been made; however, matching contributions equal to 25% of the applicable executive's eligible deferrals have been accrued.

*Employment Agreements*

In connection with the commencement of their employment, Novitex Acquisition, LLC, an indirect wholly-owned subsidiary of Novitex Holdings, Inc., entered into an employment agreement with each of Mr. Visentin, Mr. Trost and Ms. Novoselsky, as described below.

**Giovanni Visentin.**   Novitex Acquisition, LLC entered into an employment agreement with Giovanni Visentin, effective October 11, 2013 and amended February 2, 2015, pursuant to which Mr. Visentin serves as the Chief Executive Officer and Executive Chairman. The initial term of the agreement will expire on December 31, 2018 and may be extended by mutual agreement of the parties at least ninety (90) days prior to the end of the initial term. Mr. Visentin's annual base salary is $800,000. He is eligible to receive an annual bonus with a target award equal to 125% of his annual base salary contingent upon the achievement of performance goals approved by the board of directors.

**Joseph Trost.**   Novitex Acquisition, LLC entered into an employment agreement with Joseph Trost, effective October 15, 2013 and amended February 2, 2015, pursuant to which Mr. Trost serves as the Chief Operating Officer. The initial term of the agreement will expire on December 31, 2018 and may be extended by mutual agreement of the parties at least ninety (90) days prior to the end of the initial term. Mr. Trost's annual base salary is $300,000. He is eligible to receive an annual bonus with a target award equal to 125% of his annual base salary contingent upon the achievement of performance goals approved by the board of directors.

**Irina Novoselsky.**   Novitex Acquisition, LLC entered into an employment agreement with Irina Novoselsky, effective October 17, 2013 and amended November 30, 2015, pursuant to which Ms. Novoselsky serves as the President. The initial term of the agreement will expire on December 31, 2018 and may be extended by mutual agreement of the parties at least ninety (90) days prior to the end of the initial term. Ms. Novoselsky's annual base salary is $300,000. She is eligible to receive an annual bonus with a target award equal to 100% of her annual base salary contingent upon the achievement of performance goals approved by the board of directors.

*Retention Agreements*

Novitex Enterprise Solutions, Inc., an indirect wholly-owned subsidiary of Novitex Holdings, Inc., entered into a retention agreement with each of Mr. Visentin, Mr. Trost and Ms. Novoselsky. Pursuant to the applicable retention agreement, each of Mr. Visentin, Mr. Trost and Ms. Novoselsky was entitled to receive a retention bonus of $1,000,001, $400,001 and $300,001, respectively, which was to be paid no later than September 30, 2016, subject to the executive's continued service through March 31, 2017. Should the executive voluntarily resign prior to March 31, 2017 or be terminated for "Cause" such executive must repay the net amount of the bonus within thirty (30) days after the last day of employment; provided, that, no such repayment is required if the executive's employment is terminated due to death or disability, by the executive for "Good Reason" or for any reason following a "Change of Control."

*Propriety Interest Protection Agreements*

Novitex Acquisition, LLC has entered into a propriety interest protection agreement with each of Mr. Visentin, Mr. Trost and Ms. Novoselsky. Pursuant to the applicable proprietary interest protection agreement, each of Mr. Visentin, Mr. Trost and Ms. Novoselsky is subject to an inventions assignment covenant during employment and a perpetual duty of confidentiality and non-disparagement. In addition, each such executive is subject to non-competition and non-solicitation restrictions which apply during the executive's employment and for 12 months (18 months in the case of Mr. Visentin) following termination of employment.

<div align="center">283</div>

Supp.App. 0650

*Profits Unit Award Agreements and Distribution Bonus Agreements*

Novitex Parent has entered into profits unit award agreements with each of Mr. Visentin, Mr. Trost and Ms. Novoselsky. Each such award is intended to constitute "Profits Interests" within the meaning of Revenue Procedure 93-27, 1993-2 C.B. 343 in Novitex Parent In general, the profits units are subject to certain vesting and forfeiture restrictions as set forth in the applicable award agreement and restrictions on transfer and repurchase provisions set forth in the Third Amended and Restated Limited Partnership Agreement of Novitex Parent.

**2013 Profits Unit Award Agreements.** Pursuant to a profits unit award agreement, dated October 11, 2013 and amended April 1, 2016, an aggregate of 333,334 profits units were granted to Mr. Visentin, including 100,000 tranche A profits units, 100,000 tranche B profits units, 66,667 tranche C profits units and 66,667 tranche D profits units. Pursuant to a profits unit award agreement, dated October 15, 2013 and amended April 1, 2016, an aggregate of 125,000 profits units were granted to Mr. Trost, including 37,500 tranche A profits units, 37,500 tranche B profits units, 25,000 tranche C profits units and 25,000 tranche D profits units. Pursuant to a profits unit award agreement, dated October 17, 2013 and amended April 1, 2016, an aggregate of 83,334 profits units were granted to Ms. Novoselsky, including 25,000 tranche A profits units, 25,000 tranche B profits units, 16,667 tranche C profits units and 16,667 tranche D profits units.

The profits units awarded in October 2013 vest as follows: (i) twenty percent (20%) of the tranche A profits units will vest on each of the first five anniversaries of October 1, 2013 and (ii) twenty percent (20%) of each of the tranche B, tranche C and tranche D profits units (the "performance units") vest ratably over a five-year period on the attainment of certain EBITDA targets, in each case, subject to the executive's continued employment on the vesting dates. If the EBITDA in a given calendar year does not equal or exceed the EBITDA target for a given tranche of performance units in the given calendar year, but the EBITDA in the subsequent calendar year equals or exceeds such EBITDA target, then the performance units which did not vest in the given calendar year will become vested as of the end of subsequent calendar year, subject to the executive's continued employment through the end of such subsequent calendar year. If the EBITDA in the given calendar year equals or exceeds the EBITDA target for a given tranche of performance units in the subsequent calendar year, then the subsequent year's EBITDA target for such tranche will be deemed to have been achieved and the units will be vested as of the end of the calendar year, subject to the executive's continued employment through the end of such calendar year.

Pursuant the Third Amended and Restated Limited Partnership Agreement of Novitex Parent, such profits units are generally subject to repurchase in the event that an executive's employment terminates. The repurchase price is generally equal to fair market value unless such termination is for "Cause" or without "Good Reason" prior to the fifth anniversary of the grant date in which case the repurchase price will generally be equal to zero.

**2015 and 2016 Profits Unit Award Agreements.** Pursuant to profits unit award agreements, dated March 2, 2015 and amended April 1, 2016, 125,000, 50,000 and 45,000 new tranche E profits units were awarded Mr. Visentin, Mr. Trost and Ms. Novoselsky, respectively. Pursuant to profits units award agreements, dated April 1, 2016, 50,000, 20,000 and 15,000 new tranche E profits units were awarded Mr. Visentin, Mr. Trost and Ms. Novoselsky, respectively. All such new tranche E profits units are fully vested.

In the event that an executive's employment is terminated for "Cause" or he or she resigns without "Good Reason" prior to February 1, 2018, Novitex Parent shall have the right to repurchase for no consideration the new tranche E profits units granted to the executive. Upon the executive's termination of employment for any other reason, Novitex Parent shall have the right to repurchase the new tranche E profits units at the fair market value of a corresponding number of profits units granted by Novitex Parent prior to February 11, 2015 (the "original profits units"). In addition, if the executive's employment is terminated prior to the earlier of (i) February 1, 2018, (ii) an Exit Event and

284

Table of Contents

(iii) the liquidation of Novitex Parent in accordance with the Third Amended and Restated Limited Partnership Agreement of Novitex Parent, the executive shall repay Novitex Parent an amount equal to any distribution the executive received with respect to such units, unless such termination is due to the executive's death or disability, is other than for "Cause" or due to "Good Reason."

*Distribution Bonus Agreements*

In connection with the new tranche E profits units grants in 2015 and 2016, Novitex Enterprise Solutions, Inc. entered into certain distribution bonus agreements with each of Mr. Visentin, Mr. Trost and Ms. Novoselsky, which would provide for certain cash bonus payments in connection with certain distributions in respect of such profits units. However, no such bonus payments will become due and payable, including in connection with the Business Combination.

*Treatment of Profits Unit Awards and Distribution Bonus Agreements in connection with the Business Combination*

Upon completion of the Business Combination, all of the profits units in Novitex Parent will become fully vested and subsequently terminated by Novitex Parent and holders of such profits units in Novitex Parent will receive cash or shares of Quinpario Common Stock with a value equal to the value of the profits units in Novitex Parent determined after giving effect to the Business Combination, in accordance with the provisions of the Third Amended and Restated Limited Partnership Agreement of Novitex Parent. Additionally, after giving effect to the Business Combination, the distribution bonus agreements will be terminated and be of no further force or effect.

*Outstanding Equity Awards at 2016 Fiscal Year-End*

The following table sets forth the outstanding equity awards for each of the named executive officers of Novitex Holdings, Inc. as of December 31, 2016.

| Named Executive Officer | Number of shares or units of stock that have not vested (#)(1) | Market value of shares or units of stock that have not vested ($)(2) |
|---|---|---|
| Giovanni Visentin | 206,668 | — |
| Joseph Trost | 77,500 | — |
| Irina Novoselsky | 51,668 | — |

(1)    Represents the number of unvested profits units held by each of the named executive officers as of December 31, 2016, which vest as described herein.

(2)    Represents the market value of the profits units granted to each of the named executive officers. These awards are intended to qualify as "Profits Interests" under Revenue Procedure 93-27. The value of the profits units is based on future events and distributions, which cannot be determined as of this time.

*Pension Benefits and Nonqualified Deferred Compensation*

Novitex Holdings, Inc. does not provide defined benefit pension benefits or non-qualified deferred compensation. The named executive officers are eligible to participate in the Novitex Enterprise Solutions Retirement Savings Plan, which is a defined contribution 401(k) profit sharing plan.

*Potential Payments upon Termination and a Change in Control*

**Employment Agreements.**    Pursuant to their applicable employment agreement, in the event that Mr. Visentin, Mr. Trost or Ms. Novoselsky's employment is terminated without "Cause" or he or she resigns for "Good Reason," contingent on his or her execution of a separation agreement and general release of claims, he or she will receive: (i) a lump sum severance payment equal to one (1) (one and

285

one-half (1.5) for Mr. Visentin) times the sum of (x) his or her annual base salary and (y) his or her target bonus amount, (ii) the pro-rata portion of his or her bonus for the fiscal year in which his or her employment terminates, based on actual results, and, for Mr. Visentin only, (iii) payment of his COBRA premiums for eighteen (18) months following the date of his termination of employment.

**2013 Profits Unit Award Agreements.** Pursuant to their applicable 2013 profits unit agreement, in general, upon a termination of employment, any unvested profits units held by an executive will be forfeited. In the event of a termination other than for "Cause" following the end of a calendar year and prior to the completion of the audited financial statements with respect to such calendar year, the unvested performance units for the prior calendar year, the current calendar year and the subsequent calendar year will remain outstanding until the completion of such audited financial statements and vest, if at all, based on the achievement of the EBITDA targets. In the event of a termination other than for "Cause" prior to the end of the calendar year, then (1) twenty percent (20%) of the tranche A profits units will vest on a pro rata basis and (2) a pro rata portion of the unvested performance units will vest based on the number of performance units equal to the total number of performance units which would have been eligible for vesting if such termination had not occurred, (i) will remain outstanding until the completion of the audited financial statements for the current calendar year and (ii) with respect to a given tranche for the prior calendar year, the current calendar year or any subsequent calendar year will become vested performance units if and to the extent that the EBITDA for the twelve-month period completed as of the end of the last calendar quarter immediately preceding the date of such termination equals or exceeds the EBITDA target for such tranche for the prior calendar year, the current calendar year or the subsequent calendar year.

If an "Exit Event" occurs during a calendar year, then (i) all unvested tranche A profits units will become vested and (ii) unvested performance units will become vested (with respect to a given tranche for the prior calendar year, current calendar year or the subsequent calendar year) if and to the extent that the EBITDA for the twelve-month period completed as of the end of the last calendar quarter immediately preceding the Exit Event equals or exceeds the EBITDA target for such tranche in the prior calendar year, the current calendar year or subsequent calendar year; provided, that the executive's employment is not terminated within forty-five (45) days prior to the consummation of such Exit Event. Any performance units that do not vest in connection with an Exit Event shall immediately be forfeited.

For purposes of the above, "Cause" means the executive's (i) commission of, conviction for, plea of guilty or *nolo contendere* to a felony or a crime involving moral turpitude, (ii) engaging in conduct that constitutes fraud, gross negligence or willful misconduct that results or would reasonably be expected to result in material harm to Novitex Acquisition, LLC or its business or reputation, or (iii) breach of any material terms of his or her employment, including his or her employment agreement, the proprietary interest protection agreement or the Third Amended and Restated Agreement of Limited Partnership of Novitex Parent, which results or would reasonably be expected to result in material harm to Novitex Acquisition, LLC or its business or reputation. The executive's employment shall not be terminated for "Cause" within the meaning of clause (iii) above unless the executive has been given written notice by Novitex Acquisition, LLC stating the basis for such termination and the executive is given a reasonable opportunity but in no event less than thirty (30) days to cure, to the extent curable, the neglect or conduct that is the basis of any such claim.

For purposes of the above, "Good Reason" means the executive's voluntary resignation after any of the following actions taken by Novitex Acquisition, LLC without the executive's written consent: (i) any material failure of Novitex Acquisition, LLC to fulfill its obligations under the executive's employment agreement, (ii) a material and adverse change to, or a material reduction of, executive's duties and responsibilities to, and for Mr. Visentin, title with, Novitex Acquisition, LLC or (iii) a reduction in executive's then current annual base salary (not including any diminution related to a broader compensation reduction that is not limited to the executive specifically (and for Mr. Trost and

286

Supp.App. 0653

Ms. Novoselsky, that applies to Mr. Visentin) and that is not more than 10% in the aggregate, which shall be subject to Mr. Visentin's consent); provided, that any such event shall not constitute Good Reason unless and until the executive shall have provided Novitex Acquisition, LLC with written notice thereof no later than thirty (30) days following the executive's knowledge of the initial occurrence of such event and Novitex Acquisition, LLC shall have failed to fully remedy such event within thirty (30) days of receipt of such notice.

**Director Compensation**

For 2016, the non-employee members of the board of directors of Novitex Holdings, Inc. received compensation in the forms of annual and meeting fees. The material terms of the non-employee directors' compensation arrangements are described below.

| Name(1) | Fees earned or paid in cash ($)(2) | Total ($) |
|---|---|---|
| Nathaniel Lipman | 64,000 | 64,000 |
| Rubin McDougal | 68,000 | 68,000 |
| Christopher Edson | — | — |
| Matthew Nord | — | — |

(1)     Messrs. Edson and Nord are employed by Apollo Global Management, LLC and do not receive any compensation solely for their services on the board of directors of Novitex Holdings, Inc.

(2)     Represents annual fees equal to $55,000 paid to each of Messrs. Lipman and McDougal, respectively, for their service on the board of directors of Novitex Holdings, Inc. and the audit committee and meeting fees equal to $9,000 and $13,000 paid to Messrs. Lipman and McDougal, respectively, in 2016.

*Director Fees*

Each of Messrs. Lipman and McDougal is entitled to the following fees for services as a director: (i) an annual fee of $50,000, payable in equal quarterly installments, (ii) $2,000 for each regular or special board or committee meeting attended in person and (iii) $1,000 for each regular or special board or committee meeting attended by teleconference.

In addition, as members of the audit committee of the board of directors of Novitex Holdings, Inc., each of Messrs. Lipman and McDougal is entitled to an annual fee of $5,000, payable in equal quarterly installments.

*Profits Unit Award Agreements*

Novitex Parent entered into profits unit award agreements with each of Messrs. Lipman and McDougal on October 15, 2013 and October 11, 2013, respectively. Pursuant to the profits unit award agreements, 15,000 tranche A profits units was awarded to each of Messrs. Lipman and McDougal. Each such award vested in equal installments over a three-year period from the date of grant and is currently fully vested.

287

**NOVITEX MANAGEMENT'S DISCUSSION AND ANALYSIS
OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis together with "Selected Historical Financial Information of Novitex" and Novitex's financial statements and the related notes included elsewhere in this proxy statement. Among other things, those historical financial statements include more detailed information regarding the basis of presentation for the financial data than included in the following discussion. This discussion contains forward-looking statements about Novitex's business, operations and industry that involve risks and uncertainties, such as statements regarding Novitex's plans, objectives, expectations and intentions. Novitex's future results and financial condition may differ materially from those currently anticipated by Novitex as a result of the factors described in the sections entitled "Risk Factors" and "Cautionary Note Regarding Forward-Looking Statements."*

**Introduction**

The following Management's Discussion and Analysis ("MD&A") is intended to facilitate an understanding of the consolidated financial results of Novitex Holdings, Inc. and its consolidated subsidiaries as of March 31, 2017 and 2016 and for the three months ended March 31, 2017 and 2016 and as of December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014.

This MD&A is provided as a supplement to, and should be read in conjunction with, Novitex's unaudited condensed consolidated financial statements as of March 31, 2017 and 2016 and for the three months ended March 31, 2017 and 2016 and Novitex's annual audited consolidated financial statements as of December 31, 2016 and 2015 and for the years ended December 31, 2016, 2015 and 2014. The following discussion and analysis of Novitex's financial condition and results of operations may contain forward-looking statements about our business, operations and industry that involve risks and uncertainties, such as statements regarding our plans, objectives, expectations and intentions. Novitex's future results and financial condition may differ materially from such statements.

The MD&A is organized as follows:

- *Overview.* This section provides a general description of Novitex's business, as well as recent developments that Novitex believes are important in understanding its results of operations and financial condition and in anticipating future trends.

- *Results of operations.* This section provides an analysis of Novitex's results of operations for the three months ended March 31, 2017 to March 31, 2016 and the years ended December 31, 2016 to 2015 and December 31, 2015 to 2014. This analysis is presented on a consolidated basis.

- *Financial condition, liquidity and capital resources.* This section provides an analysis of Novitex's cash flows for the three months ended March 31, 2017 and 2016 and the years ended December 31, 2016, 2015 and 2014, and Novitex's financial condition as of March 31, 2017 and December 31, 2016, as well as a discussion of its liquidity and capital resources.

- *Critical accounting policies.* This section discusses certain significant accounting policies considered to be important to Novitex's financial condition and results of operations and which require significant judgment and estimates on the part of management in their application. In addition, all of Novitex's significant accounting policies, including our critical accounting policies, are summarized in Note 2 to Novitex's audited consolidated financial statements as of December 31, 2016 included elsewhere in this proxy statement.

288

Supp.App. 0655

**Overview**

*Description of the Business*

Novitex is a leading provider of document management and digital business process services. Novitex provides customers a suite of Document Logistics and Digital Services offerings that support the IDLC ("Integrated Document Lifecycle") within the document outsourcing space. These offerings are aimed at creating customized integrated solutions to meet customer specific needs and requirements. Solutions may be supported by shared resources and workflows that significantly improve efficiency, reduce costs and facilitate regulatory compliance and they may be provided on client premises or on Novitex's premises or a combination of both.

Novitex benefits from a highly diversified client base, including highly regulated client industries, such as banking, property and casualty insurance, healthcare, government, legal, technology, consumer, manufacturing, energy and universities. For the three months ended March 31, 2017, one client accounted for 15% of Novitex's revenue. For the three month period ended March 31, 2016 and for the years ended December 31, 2016, 2015 and 2014, no single client generated in excess of 10% of the Company's revenues.

Novitex is organized into one business segment, Document Outsourcing Services, which offers Novitex's clients an integrated suite of Document Outsourcing Services organized across two categories:

- *Digital Services:*  These offerings include customer communications management, outbound document processing, production business recovery services, BPA and MPS.

- *Document Logistics*:  These offerings include mail services, reprographics, hospitality services and delivery logistics.

Digital Service engagements tend to require integration of Novitex's systems with client technology infrastructure, which Novitex believes encourages customer retention and loyalty.

*Business History*

In October 2013, funds affiliated with Apollo Global Management, LLC acquired Novitex's predecessor, Pitney Bowes Management Services, Inc. and its wholly owned subsidiaries and certain affiliates and divisions (collectively "PBMS") from Pitney Bowes, Inc. (the "2013 Acquisition"). Originally started as an internal division to support mail services in 1986, PBMS was incorporated as a separate corporate entity in 1989. Over time, PBMS made several tactical acquisitions to expand its Document Logistics beyond solely mail services.

Prior to the 2013 Acquisition, PBMS primarily supported staffing-based document management offerings, such as mail services, reprographics and hospitality services as well as certain business process automation services. PBMS was organized around geographic regions selling single point offerings without defined responsibility for individual client total results.

Following the 2013 Acquisition, PBMS was rebranded as Novitex and expanded its Digital Services offerings to position itself as one of the few non-original equipment manufacturers in the document outsourcing industry, providing an end-to-end, integrated solution.

Through its integrated suite of Digital Service and Document Logistics offerings which Novitex refers to as the Integrated Document Life Cycle™ ("IDLC"), Novitex connects its clients' inbound and outbound communications in both physical and digital forms. Before the introduction of the IDLC, multiple stakeholders within client businesses would outsource fragmented pieces of the document lifecycle to separate vendors. With the IDLC, these multiple stakeholders can outsource their document processing needs to a single-provider, creating a more efficient model for document processing services.

289

Supp.App. 0656

By integrating the full range of document processing services within the IDLC, Novitex helps minimize operational silos within its clients' businesses, creating more efficient, cost-effective workflows, which facilitates improved client productivity, helps clients mitigate risk and may help support compliance. Multiple service offerings can be bundled into single client contracts with shared supporting personnel, equipment, technology and workflows.

During 2014, 2015 and 2016 Novitex underwent a major transformation to effect this strategic marketplace repositioning including:

- standing the former division up as an independent company;

- reorganizing the business around industry verticals rather than geographic regions;

- refocusing its business development efforts to offer clients comprehensive integrated solutions using the IDLC rather than single point service offerings;

- investing in new cloud based technology capabilities, industry specific subject matter expertise, regulatory certifications and two MegaCenters;

- optimizing its workforce and benefit plans to serve clients more efficiently and cost effectively;

- consolidating regional print centers into the new MegaCenters;

- renegotiating supplier contracts and consolidating vendors; and

- aligning and incentivizing industry business development and service delivery leaders to jointly expand individual client revenues and margin contributions.

This multi-faceted transformation program was substantially completed by the end of 2016. A large portion of these costs were incremental in nature and were included in Cost of Revenues and Selling, General and Administrative costs and capital expenditures.

On February 22, 2017, Quinpario Acquisition Corp. (Nasdaq:QPAC), a publicly traded special purpose acquisition company, Novitex Holdings and SourceHOV, LLC entered into a definitive business combination agreement whereby the three entities will combine to create a global solutions provider for financial technology and business services. The parties expect the proposed transaction to close during the second quarter of 2017.

**Results of Operations**

*Supplemental Data*

The following table illustrates Novitex's progress in transitioning its revenue base to a higher mix of digital service revenues (in thousands):

| | Three Months Ended March 31, 2017 | % of total | Three Months Ended March 31, 2016 | % of total |
|---|---|---|---|---|
| Document logistics | $ 109,239 | 76.1% | $ 105,804 | 77.4% |
| Digital services | 34,361 | 23.9% | 30,975 | 22.6% |
| Total operating revenue, net | $ 143,600 | 100.0% | $ 136,779 | 100.0% |
| Digital services growth three months ended March 31, 2017 as compared to 2016 | $ 3,386 | 10.9% | | |

290

| | Year Ended December 31, | | | | | |
| | 2016 | % of total | 2015 | % of total | 2014 | % of total |
|---|---|---|---|---|---|---|
| Document logistics | $ 418,846 | 77.1% | $ 454,691 | 79.0% | $ 515,067 | 83.2% |
| Digital services | 124,317 | 22.9% | 121,053 | 21.0% | 103,830 | 16.8% |
| Total ongoing revenue | 543,163 | 100.0% | 575,744 | 100.0% | 618,897 | 100.0% |
| MSS revenue(1) | — | | — | | 5,963 | |
| Total operating revenues, net | $ 543,163 | | $ 575,744 | | $ 624,860 | |
| Digital services growth over 2014 | $ 20,487 | 19.7% | | | | |

(1)     On August 28, 2014, Novitex completed the sale of its membership interests in Novitex Marketing Services Solutions LLC ("MSS").

**Three Months Ended March 31, 2017 Compared to Three Months Ended March 31, 2016**

The following table summarizes Novitex's consolidated results of operations for the three months ended March 31, 2017 and 2016:

| (in thousands) | March 31, 2017 | March 31, 2016 | Increase (Decrease) | Percent Change |
|---|---|---|---|---|
| REVENUES | $ 143,600 | $ 136,779 | $ 6,821 | 5.0% |
| Operating expenses: | | | | |
| Cost of revenues, exclusive of depreciation and amortization shown below | 118,165 | 109,379 | 8,786 | 8.0% |
| Selling, general and administrative, exclusive of depreciation and amortization shown below | 15,984 | 13,891 | 2,093 | 15.1% |
| Depreciation and amortization | 9,719 | 9,644 | 75 | 0.8% |
| Restructuring | 334 | 91 | 243 | 267.0% |
| Total operating expenses | 144,202 | 133,005 | 11,197 | 8.4% |
| OPERATING (LOSS) INCOME | (602) | 3,774 | (4,376) | (116.0)% |
| Interest expense, net | (12,106) | (11,560) | (546) | 4.7% |
| Loss before income taxes | (12,708) | (7,786) | (4,922) | 63.2% |
| Benefit from income taxes | 3,008 | 3,084 | (76) | (2.5)% |
| CONSOLIDATED NET LOSS | (9,700) | (4,702) | (4,998) | 106.3% |
| Other comprehensive income: | | | | |
| Foreign currency translation gain | 1 | 1,161 | (1,160) | (99.9)% |
| CONSOLIDATED COMPREHENSIVE LOSS | $ (9,699) | $ (3,541) | $ (6,158) | 174% |

**Operations**

*Revenues:*    For the three months ended March 31, 2017, revenues were $143.6 million, an increase of $6.8 million, or 5.0%, as compared to $136.8 million for the three months ended March 31, 2016. The increase is primarily attributed to revenues from new clients and net additional services, fees and/or transaction volumes for existing clients of $17.9 million, partially offset by declines in revenues from client attrition of $10.2 million, of which $2.7 million related to client attrition within the federal government sector revenues.

*Cost of Revenues, Exclusive of Depreciation and Amortization:*    For the three months ended March 31, 2017, Cost of revenues, exclusive of depreciation and amortization, was $118.2 million, an

291

Supp.App. 0658

Table of Contents

increase of $8.8 million, or 8.0%, as compared to $109.4 million for the three months ended March 31, 2016. $15.1 million of the increase is primarily attributed to costs associated with increased revenues from new customers, costs for net additional services, fees and/or transaction volumes for existing clients and incremental equipment and personnel costs associated with the opening of Novitex's MegaCenter in Austin, TX, partially offset by decreased costs related to client attrition of $7.8 million, of which $2.5 million related to client attrition within the federal government sector.

*Selling, General and Administrative, Exclusive of Depreciation and Amortization:*    For the three months ended March 31, 2017, Selling, general and administrative, exclusive of depreciation and amortization, was $16.0 million, an increase of $2.1 million, or 15.1%, as compared to $13.9 million for the three months ended March 31, 2016. The increase is primarily attributable to transaction related professional fees of $4.9 million, partially offset by lower personnel-related costs of $1.8 million, primarily due to a decrease in bonus expense and lower professional fees of $0.5 million.

*Depreciation and Amortization:*    For the three months ended March 31, 2017, Depreciation and amortization, was $9.7 million, an increase of $0.1 million, or 0.8%, as compared to $9.6 million, for the three months ended March 31, 2016. The increase is primarily attributed to depreciation on machinery and equipment placed in service at Novitex's MegaCenter in Austin, TX.

*Interest expense, net:*    For the three months ended March 31, 2017, Interest expense, net was $12.1 million, an increase of $0.5 million, or 4.7%, as compared to $11.6 million, for the three months ended March 31, 2016. The increase is primarily attributable to the increase in interest rates on the balance of Novitex's First and Second Lien Credit Agreements and the amortization of deferred financing costs associated with the second amendment to the First and Second Lien Credit Agreements.

*Benefit from Income Taxes:*    For the three months ended March 31, 2017, Benefit from income taxes was $3.0 million, a decrease of $0.1 million, or 2.5%, as compared to $3.1 million for the three month period ended March 31, 2016. For the three months ended March 31, 2017, the effective tax rate on Novitex's loss before income taxes was 23.7% as compared to an effective rate of 39.6% on Novitex's loss before income taxes for the three month period ended March 31, 2016. The decrease in the effective rate is primarily attributable to an unfavorable adjustment related to non-deductible transaction losses and a change in the level and mix of earnings and losses in Novitex's taxable jurisdictions.

Supp.App. 0659

*Year Ended December 31, 2016 Compared to Year Ended December 31, 2015*

The following table summarizes Novitex's consolidated results of operations for the years ended December 31, 2016 and 2015:

| (in thousands) | Year Ended December 31, 2016 | Year Ended December 31, 2015 | Increase (Decrease) | % Change |
|---|---|---|---|---|
| NET OPERATING REVENUES | $ 543,163 | $ 575,744 | $ (32,581) | (5.7)% |
| Operating expenses: | | | | |
| Cost of revenues, exclusive of depreciation and amortization shown below | 437,977 | 468,811 | (30,834) | (6.6)% |
| Selling, general and administrative, exclusive of depreciation and amortization shown below | 49,771 | 56,638 | (6,867) | (12.1)% |
| Depreciation and amortization | 40,588 | 39,505 | 1,083 | 2.7% |
| Restructuring | 141 | 666 | (525) | (78.8)% |
| Total operating expenses | $ 528,477 | $ 565,620 | $ (37,143) | (6.6)% |
| OPERATING INCOME | 14,686 | 10,124 | 4,562 | 45.1% |
| Interest expense, net | 47,928 | 46,482 | 1,446 | 3.1% |
| Gain on early extinguishment of debt | (2,307) | (2,636) | 329 | (12.5)% |
| Loss before income taxes | (30,935) | (33,722) | 2,787 | (8.3)% |
| Benefit from income taxes | (11,805) | (12,321) | 516 | (4.2)% |
| CONSOLIDATED NET LOSS | (19,130) | (21,401) | 2,271 | (10.6)% |
| Other comprehensive income (loss): | | | | |
| Foreign currency translation gain (loss) | 1,125 | (2,960) | 4,085 | (138.0)% |
| CONSOLIDATED COMPREHENSIVE LOSS | $ (18,005) | $ (24,361) | $ 6,356 | (26)% |

## Operations

*Net Operating Revenues:*    For the year ended December 31, 2016, revenues were $543.2 million, a decrease of $32.6 million, or 5.7%, as compared to $575.7 million for the year ended December 31, 2015. The decline is primarily attributed to client attrition, of which $20.5 million related to the federal government sector revenues, reduction in services, fees and/or transaction volumes for existing clients, and a $1.0 million unfavorable revenue impact from a weaker Canadian currency, partially offset by new client signings and additional services provided to existing clients.

*Cost of Revenues, Exclusive of Depreciation and Amortization:*    For the year ended December 31, 2016, Cost of revenues, exclusive of depreciation and amortization, was $438.0 million, a decrease of $30.8 million, or 6.6%, as compared to $468.8 million for the year ended December 31, 2015. The decline is primarily attributed to lower revenues, of which $17.9 million related to declines in federal government sector costs, lower personnel related costs of $17.5 million, primarily as a result of lower headcount, and a $0.8 million favorable cost of revenues impact from a weaker Canadian currency, partially offset by increased costs incurred related to Novitex's ongoing business transformation initiatives of $2.1 million, and set-up costs to service new clients and additional services provided to existing clients of $4.7 million.

*Selling, General and Administrative, Exclusive of Depreciation and Amortization:*    For the year ended December 31, 2016, Selling, general and administrative, exclusive of depreciation and amortization, was $49.8 million, a decrease of $6.9 million, or 12.1%, as compared to $56.6 million for the year ended December 31, 2015. The decrease is primarily attributable to lower personnel-related costs of

293

Supp.App. 0660

$2.0 million, primarily due to reduced headcount, professional fees of $2.0 million and technology-related expenditures of $1.3 million.

*Depreciation and Amortization:*    For the year ended December 31, 2016, Depreciation and amortization, was $40.6 million, an increase of $1.1 million, or 2.7%, as compared to $39.5 million, for the year ended December 31, 2015. The increase is primarily attributed to depreciation on machinery and equipment placed in service at Novitex's MegaCenter in Austin, TX.

*Interest expense, net:*    For the year ended December 31, 2016, Interest expense, net was $47.9 million, an increase of $1.4 million, or 3.1%, as compared to $46.5 million, for the year ended December 31, 2015. The increase is primarily attributable to the incurrence of debt financing for capital assets put into service at Novitex's MegaCenters, offset by declines in the principal balance of Novitex's First Lien Debt.

*Benefit from Income Taxes:*    For the year ended December 31, 2016, Benefit from income taxes was $11.8 million, a decrease of $0.5 million, or 4.2%, as compared to $12.3 million for the year ended December 31, 2015. For the year ended December 31, 2016, the effective rate on Novitex's loss before income taxes was 38.2% as compared to an effective rate of 36.5% on Novitex's loss before income taxes for the year ended December 31, 2015.

**Year Ended December 31, 2015 Compared to Year Ended December 31, 2014**

The following table summarizes Novitex's consolidated results of operations for the years ended December 31, 2015 and 2014:

| (in thousands) | Year Ended December 31, 2015 | Year Ended December 31, 2014 | Increase (Decrease) | % Change |
|---|---|---|---|---|
| NET OPERATING REVENUES | $ 575,744 | $ 624,860 | $ (49,116) | (7.9)% |
| Operating expenses: | | | | |
| Cost of revenues, exclusive of depreciation and amortization shown below | 468,811 | 503,313 | (34,502) | (6.9)% |
| Selling, general and administrative, exclusive of depreciation and amortization shown below | 56,638 | 62,508 | (5,870) | (9.4)% |
| Depreciation and amortization | 39,505 | 32,427 | 7,078 | 21.8% |
| Restructuring | 666 | (948) | 1,614 | (170.3)% |
| Total operating expenses | $ 565,620 | $ 597,300 | $ (31,680) | (5.3)% |
| OPERATING INCOME | 10,124 | 27,560 | (17,436) | (63.3)% |
| Interest expense, net | 46,482 | 38,270 | 8,212 | 21.5% |
| Loss (Gain) on early extinguishment of debt | (2,636) | 5,962 | (8,598) | (144.2)% |
| Loss before income taxes | (33,722) | (16,672) | (17,050) | 102.3% |
| Benefit from income taxes | (12,321) | (2,306) | (10,015) | 434.3% |
| CONSOLIDATED NET LOSS | (21,401) | (14,366) | (7,035) | 49.0% |
| Other comprehensive loss: | | | | |
| Foreign currency translation loss | (2,960) | (1,539) | (1,421) | 92.3% |
| CONSOLIDATED COMPREHENSIVE LOSS | $ (24,361) | $ (15,905) | $ (8,456) | 53.2% |

**Operations**

*Net Operating Revenues:*    For the year ended December 31, 2015, revenues were $575.7 million, a decrease of $49.1 million, or 7.9%, as compared to $624.9 million for the year ended December 31,

294

Supp.App. 0661

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 664 of 1110     PageID 2285

2014. The absence of $5.9 million in revenues earned by an operating entity that was divested in the third quarter of 2014, and a $4.4 million unfavorable revenue impact from a weaker Canadian currency represented $10.3 million of the total decline. The remaining $38.9 million of the decline is primarily attributed to client attrition, of which $27.4 million related to declines in federal government sector revenues, reduction in services, fees and/or transaction volumes for existing clients, partially offset by new client signings and additional services provided to existing clients.

*Cost of Revenues, Exclusive of Depreciation and Amortization:* For the year ended December 31, 2015, Cost of revenues, exclusive of depreciation and amortization, was $468.8 million, a decrease of $34.5 million, or 6.9%, as compared to $503.3 million for the year ended December 31, 2014. The absence of $4.6 million in expenses incurred by an operating entity that was divested in the third quarter of 2014, and $3.5 million of foreign currency benefits from a weaker Canadian currency represented $8.1 million of the total decline. The remaining decline of $26.4 million is primarily attributed to lower revenues, of which $24.0 million related to the declines in federal government sector costs, lower personnel related costs of $11.6 million, primarily the result of lower headcount, and $8.8 million of amended equipment leases accounted for as capital that had previously been accounted for as operating leases within Cost of revenues, exclusive of depreciation and amortization in 2014, offset by increased costs incurred related to Novitex's ongoing business transformation initiatives of $6.1 million and increases in third-party direct costs of $11.4 million as a result of increased materials and supplies procured on behalf of customers.

*Selling, General and Administrative, Exclusive of Depreciation and Amortization:* For the year ended December 31, 2015, Selling, general and administrative, exclusive of depreciation and amortization, was $56.6 million, a decrease of $5.9 million, or 9.4%, as compared $62.5 million for the year ended December 31, 2014. The loss on sale of a business of $1.6 million, and the absence of the expenses incurred by this divested subsidiary of $1.3 million represented $2.9 million of the total decline. The remaining decline of $3.0 million is primarily attributed to lower personnel costs, the result of lower headcount.

*Depreciation and Amortization:* For the year ended December 31, 2015, Depreciation and amortization, was $39.5 million, an increase of $7.1 million, or 21.8%, as compared to $32.4 million, for the year ended December 31, 2014. The increase is primarily attributed to the depreciation on equipment classified as capital leases, depreciation of leasehold improvements at Novitex's print production facility in Windsor, CT, and higher amortization of intangibles in 2015 as a result of the assessment and reduction in the useful life of an intangible asset, effective October 1, 2014.

*Interest expense, net:* For the year ended December 31, 2015, Interest expense, net was $46.5 million, an increase of $8.2 million, or 21.4%, as compared to $38.3 million, for the year ended December 31, 2014. The increase in interest expense, net is primarily attributed to refinancing of Novitex's 2013 Credit Agreement in July 2014, interest on capital lease obligations that did not exist during the year ended December 31, 2014, and interest incurred for a loan with the State of Connecticut, partially offset by lower interest as a result of the repurchase of $7.0 million of Amended Second Lien Credit Agreement debt in May 2015.

*Benefit from Income Taxes:* For the year ended December 31, 2015, Benefit from income taxes was $12.3 million, an increase of $10.0 million, as compared to $2.3 million for the year ended December 31, 2014. For the year ended December 31, 2015, the effective rate on Novitex's loss before income taxes was 36.5% as compared to an effective rate of 13.8% on Novitex's loss before income taxes for the year ended December 31, 2014. The increase in the effective rate is primarily attributable to a change in the level and mix of earnings in Novitex's taxable jurisdictions, and an unfavorable effective rate impact of an adjustment made to the tax basis of certain fixed assets for the year ended December 31, 2014.

<div align="center">295</div>

Supp.App. 0662

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 665 of 1110    PageID 2286

**Liquidity and Capital Resources**

Novitex believes its existing cash and cash equivalents, cash generated from operations and borrowing under its credit facilities will be sufficient to support its working capital needs, capital asset purchases, outstanding commitments and other liquidity requirements associated with its existing operations over the next 12 months.

As of March 31, 2017, Novitex had total liquidity of $77.5 million, comprised of $40.3 million of cash and cash equivalents and $37.2 million available under its Revolving Credit Facility. As of March 31, 2017, Novitex maintained a $50.0 million revolving credit facility (including a sub facility for letters of credit of up to $15.0 million), of which $12.8 million of letters of credit were outstanding, thereby reducing available capacity under the Revolving Credit Facility to $37.2 million.

As of December 31, 2016, Novitex had total liquidity of $74.4 million, comprised of $37.2 million of cash and cash equivalents and $37.2 million available under its Revolving Credit Facility. As of December 31, 2016, Novitex maintained a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million), of which $12.8 million of letters of credit were outstanding, thereby reducing available capacity under the Revolving Credit Facility to $37.2 million.

As of December 31, 2015, Novitex had total liquidity of $63.5 million, comprised of $28.1 million of cash and cash equivalents and $35.4 million available under its Revolving Credit Facility. As of December 31, 2015, Novitex maintained a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million), of which $14.6 million of letters of credit were outstanding, thereby reducing available capacity under the Revolving Credit Facility to $35.4 million.

**Cash Flows**

| | Three Months Ended March 31, | | Change | |
| | 2017 | 2016 | Dollar | Percentage |
|---|---|---|---|---|
| Net cash provided by operating activities | $ 10,058 | $ 10,803 | $ (745) | (6.9)% |
| Net cash used in investing activities | (2,503) | (5,601) | 3,098 | (55.3)% |
| Net cash used in financing activities | (4,531) | (2,241) | (2,290) | 102.2% |
| Effect of exchange rate changes on cash and cash equivalents | 50 | 221 | (171) | (77.4)% |
| Change in cash and cash equivalents | $ 3,074 | $ 3,182 | $ (108) | (3.4)% |

***Three Months Ended March 31, 2017 Compared to March 31, 2016***

*Net cash provided by operating activities:*    For the three months ended March 31, 2017, net cash provided by operating activities was $10.1 million as compared to net cash provided by operating activities of $10.8 million for the three months ended March 31, 2016. The decrease is primarily due to an increase in the net loss of $5.0 million, partially offset by higher cash inflows from changes in operating assets and liabilities of $4.3 million. The increase in cash inflows from changes in operating assets and liabilities is primarily due to changes in accounts payable and accrued liabilities of $4.2 million, prepaid expenses and other current assets of $1.5 million and increases in advanced billings and customer deposits of $0.8 million, offset by decreases in cash inflows resulting from changes in accounts receivable of $1.5 million primarily as a result of increased revenues.

*Net cash used in investing activities:*    For the three months ended March 31, 2017, net cash used in investing activities was $2.5 million and related primarily to capital assets acquired for on-going business operations. For the three months ended March 31, 2016, net cash used in investing activities was $5.6 million and related primarily to Novitex's construction of its MegaCenters in Windsor, CT and Austin, TX.

296

Supp.App. 0663

Table of Contents

*Net cash used in financing activities:*    For the three months ended March 31, 2017, net cash used in financing activities was $4.5 million, and related primarily to debt repayments and payments on capital lease obligations. For the three months ended March 31, 2016, net cash used in financing activities was $2.2 million, and related primarily to debt repayments and payments on capital lease obligations offset by proceeds from cash financing for certain capital assets acquired for Novitex's MegaCenters.

|  | Year Ended December 31, | | | Change | |
|---|---|---|---|---|---|
|  | 2016 | 2015 | 2014 | 2016 | 2015 |
| Net cash provided by operating activities | $ 39,654 | $ 18,796 | $ 7,292 | $ 20,858 | $ 11,504 |
| Net cash used in investing activities | (14,709) | (18,802) | (7,933) | 4,093 | (10,869) |
| Net cash used in financing activities | (16,193) | (12,966) | (29,559) | (3,227) | 16,593 |
| Effect of exchange rate changes on cash and cash equivalents | 359 | (937) | (475) | 1,296 | (462) |
| Change in cash and cash equivalents | $ 9,111 | $ (13,909) | $ (30,675) | $ 23,020 | $ 16,766 |

**Year Ended December 31, 2016 Compared to Year Ended December 31, 2015**

*Net cash provided by operating activities:*    For the year ended December 31, 2016, net cash provided by operating activities was $39.7 million as compared to net cash provided by operating activities of $18.8 million for the year ended December 31, 2015. The increase is primarily due to higher cash inflows from changes in operating assets and liabilities of $18.0 million, an increase in non-cash items of $0.6 million, and a decrease in the net loss of $2.3 million. The increase in cash inflows from changes in operating assets and liabilities is primarily due to the decrease in accounts receivable of $21.0 million as a result of improved customer collections, and an increase in advanced billings and customer deposits of $9.1 million during the period, offset by decreases in cash inflows resulting from changes in prepaid expenses and other of $7.3 million and in accounts payable and accrued liabilities of $4.1 million.

*Net cash used in investing activities:*    For the year ended December 31, 2016, net cash used in investing activities was $14.7 million and related primarily to the construction of Novitex's MegaCenters in Windsor, CT and Austin, TX. For the year ended December 31, 2015, net cash used in investing activities was $18.8 million and related primarily to Novitex's construction of its MegaCenter in Windsor, CT.

*Net cash used in financing activities:*    For the year ended December 31, 2016, net cash used in financing activities was $16.2 million, and related primarily to debt repayments and payments on capital lease obligations offset by proceeds from cash financing for certain capital assets acquired for Novitex's MegaCenters. For the year ended December 31, 2015, net cash used in financing activities was $13.0 million, and related primarily to debt repayments and payments on capital lease obligations offset by proceeds from of a $5.0 million loan provided by the Department of Economic and Community Development in the State of Connecticut ("DECD").

**Year Ended December 31, 2015 Compared to Year Ended December 31, 2014**

*Net cash provided by operating activities:*    For the year ended December 31, 2015, net cash provided by operating activities was $18.8 million as compared to $7.3 million for the year ended December 31, 2014. The increase is primarily due to higher cash inflows from changes in operating assets and liabilities of $26.9 million, offset by a decrease in non-cash items of $8.3 million and an increase in the net loss of $7.0 million. The increase in cash inflows from changes in operating assets and liabilities is primarily due to an increase in cash inflows from changes in accounts payable and accrued liabilities of $43.2 million and prepaid expenses and other current assets of $12.6 million, offset by a decrease in cash inflows resulting from changes in accounts receivable of $27.0 million.

297

Supp.App. 0664

*Net cash used in investing activities:*    For the year ended December 31, 2015, net cash used in investing activities was $18.8 million and related primarily to Novitex's construction of MegaCenters in Windsor, CT and Austin, TX. For the year ended December 31, 2014, net cash used in investing activities was $7.9 million and related primarily to investments in Novitex's corporate headquarters.

*Net cash used in financing activities:*    For the year ended December 31, 2015, net cash used in financing activities was $13.0 million, and related primarily to debt repayments and payments on capital lease obligations, offset by proceeds of a loan from the State of Connecticut. For the year ended December 31, 2014, net cash used in financing activities was $29.6 million, and related primarily to a refinancing of Novitex's 2013 Credit Agreements, and a return of capital and distribution in excess of capital to the owner during the third quarter of 2014.

**Other Financial Information (Non-GAAP Financial Measures)**

EBITDA and Adjusted EBITDA, which are used by Novitex's management to measure performance and assess compliance with financial covenants under debt instruments, are not presented in accordance with GAAP. Novitex believes that EBITDA is useful to investors, as it is commonly used in the industry as a means of evaluating operating performance. Novitex does not intend for these non-GAAP financial measures to be a substitute for any GAAP financial information. Readers of this proxy statement should use these non-GAAP financial measures only in conjunction with the comparable GAAP financial measures. Since other companies may calculate EBITDA and Adjusted EBITDA differently than Novitex does, EBITDA and Adjusted EBITDA, as presented herein, may not be comparable to similarly titled measures reported by other companies.

Management believes these non-GAAP financial measures:

- assist investors in assessing Novitex's compliance with financial covenants under its debt instruments;

- reflect Novitex's ongoing business in a manner that allows for meaningful period-to-period comparison and analysis of trends in its business, as they exclude income and expense that are not reflective of ongoing operating results;

- provide useful information in understanding and evaluating Novitex's operating results and comparing financial results across periods; and

- provide a normalized view of Novitex's operating performance by excluding items that are either noncash or infrequently occurring in nature.

Adjusted EBITDA is one of the primary measures management uses for planning and budgeting processes and to assess compliance with financial covenants under debt instruments, and to monitor and evaluate financial and operating results. In addition, Adjusted EBITDA is a factor in evaluating management's performance when determining incentive compensation.

<div align="center">298</div>

Table of Contents

The following table reconciles net loss to EBITDA and Adjusted EBITDA for the periods presented:

| ($ in thousands) | Three Months Ended March 31, | | Year Ended December 31, | | |
| | 2017 | 2016 | 2016 | 2015 | 2014 |
|---|---|---|---|---|---|
| **GAAP Net loss** | $ (9,700) | $ (4,702) | $ (19,130) | $ (21,401) | $ (14,366) |
| Interest expense, net | 12,106 | 11,560 | 47,928 | 46,482 | 38,270 |
| Depreciation and amortization | 9,719 | 9,644 | 40,588 | 39,505 | 32,427 |
| Benefit from income taxes | (3,008) | (3,084) | (11,805) | (12,321) | (2,306) |
| **Reported EBITDA** | $ 9,117 | $ 13,418 | $ 57,581 | $ 52,265 | $ 54,025 |
| **EBITDA Adjustments:** | | | | | |
| (Gain) loss on early extinguishment of debt(1) | — | — | (2,307) | (2,636) | 5,962 |
| Completed restructuring and cost reduction initiatives(2) | 1,543 | 6,653 | 12,832 | 19,928 | 11,463 |
| Transaction related costs(3) | 4,943 | — | — | — | — |
| Non-cash stock compensation and management fees(4) | 508 | 388 | 1,861 | 1,373 | 1,410 |
| New contract setup(5) | 1,139 | 878 | 5,289 | 2,582 | 2,690 |
| **Adjusted EBITDA** | $ 17,250 | $ 21,337 | $ 75,256 | $ 73,512 | $ 75,550 |

(1)    During the years ended December 31, 2016 and 2015, the company recognized a gain on the forgiveness of its Connecticut State Assistance Loan. During 2014, the company recognized a loss on the early extinguishment of debt as a result of the refinancing of its credit agreement. See *Note 9—Long-Term Debt* in the Notes to the Novitex Consolidated Financial Statements.

(2)    Various costs incurred primarily for consolidation of nine regional document servicing centers into two MegaCenters, restructuring initiatives, and establishment of new technology platforms.

(3)    Professional fees and filing fees associated with the contemplated transaction.

(4)    Represents stock-based compensation expense (see *Note 11—Stock-Based Compensation Plans* in the Notes to the Novitex Consolidated Financial Statements), management fees and board of directors fees associated with company oversight.

(5)    Costs incurred during new contract and customer onboarding such as direct payroll, customer incentives, equipment set-up and other operating expenses.

The tax impact of the taxable adjustments for the three months ended March 31, 2017 and 2016 is $1.5 million and $3.1 million, respectively, and is based on the U.S. blended tax rate of 40.3%. The tax impact of the taxable adjustments for the year ended December 31, 2016 is $6.9 million and is based on the U.S. blended tax rate of 40.3%. The tax impact of the taxable adjustments for the year ended December 31, 2015 is $8.3 million and is based on the U.S. blended tax rate of 40.0%. The tax impact of the taxable adjustments for the year ended December 31, 2014 is $8.4 million and is based on the U.S. blended tax rate of 40.2%.

**Debt**

Novitex Acquisition, LLC ("Novitex Acquisition"), a subsidiary of Novitex, has a credit facility in the amount of $495.0 million that consists of (i) a $305.0 million Tranche A term loan facility with a final maturity of July 7, 2020, (ii) a $140.0 million Tranche B term loan facility with a final maturity of July 7, 2021 and (iii) a 50.0 million revolving line of credit facility (including a sub-facility for letters of credit up to 15.0 million maturing October 1, 2018.

299

Supp.App. 0666

As of March 31, 2017, Novitex Acquisition has outstanding debt of $289.4 million and $133.0 million under Tranche A and Tranche B, respectively, with a weighted average interest rate of 9.39%. There were no amounts outstanding under the revolving line of credit facility as of March 31, 2017.

As of December 31, 2016, Novitex Acquisition has outstanding debt of $291.3 million and $133.0 million under Tranche A and Tranche B, respectively, with a weighted average interest rate of 9.57%. There were no amounts outstanding under the revolving line of credit facility as of December 31, 2016. The future minimum principal payments for Novitex Acquisition's term debt as December 31, 2016 are as follows (in thousands):

| | |
|---|---:|
| 2017 | $ 7,625 |
| 2018 | 7,625 |
| 2019 | 7,625 |
| 2020 | 268,400 |
| 2021 | 133,000 |
| Total term debt | $ 424,275 |

**Other Debt**

In connection with an agreement between Novitex and a client for print and mail services, Novitex agreed to purchase equipment previously used by the client at its print and mailing services facilities for use at our MegaCenters in Windsor, CT and Austin, TX, under two separate asset transfer agreements. The purchase price of the equipment shall be paid in equal monthly interest free installments commencing June 30, 2017 and each month thereafter over sixty months.

As of March 31, 2017, Novitex completed the asset transfer under one of the asset transfer agreements. At March 31, 2017, Novitex recorded a note payable for the appraised value of the equipment transferred in the amount of $0.6 million with an imputed interest rate of 5.25% per annum. The note matures on May 31, 2022.

The transfer of assets under the second asset transfer agreement is expected to be completed prior to December 31, 2017.

During 2016, Novitex entered into a $3.0 million equipment financing arrangement with a commercial lender for the acquisition of equipment acquired for use at its MegaCenters in Windsor, CT and Austin, TX. The note matures on February 12, 2021, bears interest at a rate of 5.24% per annum, and is payable in equal monthly installments. The financing arrangement is collateralized by a pledge of the equipment financed.

During 2016, Novitex entered into a $5.8 million equipment financing arrangement with a commercial lender for the acquisition of equipment for use in its MegaCenters in Windsor, CT and Austin, TX. The note matures in March 2021, bears interest at a rate of 5.22% per annum, and is payable in equal monthly installments, with a balloon payment due at maturity of $1.9 million. The financing arrangement is collateralized by a pledge of the equipment financed.

During 2016, Novitex Acquisition financed the acquisition of a commercial insurance policy through a $0.9 million note payable to a financial services company. The note matures July 1, 2017, bears interest at a rate of 3.74% per annum, and is payable in equal monthly installments.

300

Supp.App. 0667

The future minimum principal payments for Novitex's other debt are as follows (in thousands):

| Year Ending December 31, | |
| --- | --- |
| 2017 | $ 2,168 |
| 2018 | 1,383 |
| 2019 | 1,457 |
| 2020 | 1,535 |
| 2021 | 2,143 |
| | $ 8,686 |

**Obligations under Capital Leases**

Novitex leases copiers, mailing equipment, duplicator and computer equipment in service at client sites under capital leases. As of December 31, 2016, future commitments for obligations under capital leases are as follows (in thousands):

| | |
| --- | --- |
| 2017 | $ 11,279 |
| 2018 | 6,968 |
| 2019 | 3,416 |
| 2020 | 666 |
| 2021 | 177 |
| Total minimum lease payments | 22,506 |
| Less: Amount representing interest | (2,354) |
| Present value of minimum lease payments | $ 20,152 |

Further information regarding Novitex's debt issuances and obligations under capital leases can be found in the Notes to the Audited Consolidated Financial Statements in Note 6 and the Notes to the Unaudited Condensed Financial Statements in Note 8.

**Contractual Obligations**

As of March 31, 2017, our contractual obligations and commitments primarily consist of our obligations under non-cancelable leases, First and Second lien amended term loans, notes payable on capital asset acquisitions and notes payable for financing of insurance coverage.

There have been no other material changes to our contractual obligations and commitments outside the ordinary course of business from those disclosed in our Audited Consolidated Financial Statements for the year ended December 31, 2016.

301

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 671 of 1110    PageID 2292

The following table presents certain payments due by Novitex under contractual obligations with minimum firm commitments as of December 31, 2016, and excludes amounts already recorded in the Consolidated Balance Sheet, except for term debt and obligations under capital lease (in thousands):

| | Payments Due in Less Than 1 Year | Payments Due in 1 - 3 Years | Payments Due in 3 - 5 Years | Payments Due in More Than 5 Years | Total |
|---|---|---|---|---|---|
| Long term debt | $ 9,793 | $ 18,090 | $ 405,078 | $ — | $ 432,961 |
| Obligations under capital lease | 11,279 | 10,384 | 843 | — | 22,506 |
| Operating leases | 12,631 | 14,717 | 9,241 | 7,051 | 43,640 |
| Other purchase commitments | 560 | 1,120 | 1,120 | — | 2,800 |
| Total | $ 34,263 | $ 44,311 | $ 416,282 | $ 7,051 | $ 501,907 |

## Operating Leases

Novitex leases space for office and certain services locations, as well as office equipment under operating lease agreements. As of December 31, 2016, future minimum lease payments under non-cancelable operating leases were $43.6 million.

## Off-Balance Sheet Arrangements

Novitex has not entered into any transactions with unconsolidated entities whereby Novitex has financial guarantees, subordinated retained interests, derivative instruments or other contingent arrangements that expose it to material continuing risks, contingent liabilities, or any other obligations under a variable interest in an unconsolidated entity that provides it with financing, liquidity, market risk or credit risk support, or engages in leasing, hedging, or research and development services on its behalf.

## Critical Accounting Policies and Estimates

In preparing its Consolidated Financial Statements and accounting for the underlying transactions and balances, Novitex applies various accounting policies. Senior management has discussed the development and selection of the critical accounting policies, estimates and related disclosures included herein with the Audit Committee of the Board of Directors. Novitex considers the policies discussed below as critical to understanding its Consolidated Financial Statements, as their application places the most significant demands on management's judgment, since financial reporting results rely on estimates of the effects of matters that are inherently uncertain. Changes in assumptions and estimates are reflected in the period in which they occur. The impact of such changes could be material to Novitex's results of operations and financial condition in any quarterly or annual period.

Specific risks associated with these critical accounting policies are discussed throughout the MD&A, where such policies affect Novitex's reported and expected financial results. For a detailed discussion of the application of these and other accounting policies, see *Note 2—Summary of Significant Accounting Policies* in the Notes to the Novitex Consolidated Financial Statements for the year ended December 31, 2016.

### *Revenue Recognition*

Application of the various accounting principles in generally accepted in the United States ("GAAP") related to the measurement and recognition of revenue requires Novitex to make judgments

302

Supp.App. 0669

and estimates. Complex arrangements with nonstandard terms and conditions may require significant contract interpretation to determine the appropriate accounting.

Novitex evaluates whether it is appropriate to record revenue on a gross basis when it is acting as a principal in the transaction or net of costs of revenues when Novitex is acting as an agent between a client and a vendor. Novitex considers a number of factors in determining whether it is acting as principal or agent, such as whether Novitex is the primary obligor to the client, has control over the pricing and maintains credit risk.

Service arrangements are typically one to five year contracts that comprise monthly service fees that are recognized as earned. Service revenues that are billed in advance are deferred and recognized on a straight-line basis over the service period. Novitex recognizes variable rate revenues, including fees derived from the utilization of document management-related equipment and production of print services, when such services are rendered. Reimbursable expenses are recognized as earned when incurred. Sales commissions determined to be incremental direct costs incurred related to the successful acquisition of new client revenues are deferred and amortized over the length of the initial contract period. Customer incentive payments are deferred and recognized over the longer of the initial contract period or the period the customer is expected to benefit from payment of these up-front fees.

Clients typically pay face value for postage purchased for use in Novitex's delivery of its services. Funds are either remitted to the United States Postal Service ("USPS") or pre-funded by Novitex and reimbursed by clients. Novitex does not recognize revenue for this postage, as it has concluded that it is acting as an agent on behalf of the USPS.

Novitex performs mail management services on behalf of certain clients, where Novitex is the primary obligor and assumes the risk associated with the cost of postage. In such instances, Novitex recognizes the cost of postage reimbursed by clients as revenues.

*Accounts Receivable, Allowances for Doubtful Accounts and Cash Discounts*

Accounts receivable risks are estimated and an allowance for doubtful accounts is established accordingly. The adequacy of the allowance is evaluated based on historical loss experience, aging of receivables, adverse situations that may affect a customer's ability to pay and prevailing economic conditions and adjustments are made to the allowance as necessary. This evaluation is inherently subjective and actual results may differ significantly from estimated reserves. Accounts deemed uncollectible are written off against the allowance after all collection efforts have been exhausted and management deems the account to be uncollectible. Management believes the accounts receivable credit risk is limited because of Novitex's large number of customers, customer geographic and industry diversification.

*Goodwill*

Goodwill is reviewed for impairment annually, or when events arise that could indicate that an impairment exists. Novitex tests for goodwill impairment using a two-step process. The first step compares the fair value of the reporting unit with the unit's carrying amount, including goodwill. When the carrying amount of the reporting unit is greater than fair value, the unit's goodwill may be impaired, and the second step must be completed to measure the amount of the goodwill impairment charge, if any. In the second step, the implied fair value of the reporting unit's goodwill is compared with the carrying amount of the unit's goodwill. If the carrying amount is greater than the implied fair value, the carrying amount of the goodwill must be written down to its implied fair value.

303

*Impairment of Long-lived Assets*

Long-lived assets, including identifiable intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the lowest level asset grouping may not be fully recoverable. The estimated future undiscounted cash flows are compared to the carrying amount. If the sum of the expected cash flows is less than the carrying amount, an impairment charge will be recorded for the amount by which the carrying amount exceeds the fair value of the asset. The fair value of the asset will be determined using probability weighted expected cash flow estimates, quoted market prices, when available, and appraisals, as appropriate. Cash flow estimates are derived from its short-term and long-term business plans and historical experience.

*Income Taxes*

In preparing its consolidated financial statements, Novitex is required to estimate its income taxes in each of the jurisdictions in which Novitex operates. This process involves management estimation of its actual current tax exposure and assessment of temporary differences resulting from differing treatment of items for tax and accounting purposes. These differences result in deferred tax assets and liabilities. Novitex must then assess the likelihood that its deferred tax assets will be recovered from future taxable income and, to the extent it believes that recovery is not likely, it must establish a valuation allowance. To the extent Novitex establishes a valuation allowance or increase this allowance in a period, it must include an expense within the tax provision in the consolidated statement of operations. Significant management judgment is required in determining its provision for income taxes, its deferred tax assets and liabilities and any valuation allowance recorded against its net deferred tax assets.

*Stock-Based Compensation*

Profit interest units ("PIUs") of Novitex Parent, the parent company of Novitex, have been awarded to employees and directors. Novitex is required to estimate the expected forfeiture rate and only recognize expense for those equity awards that are expected to vest. Forfeitures are estimated based on historical experience at the time of grant and revised, if necessary, in subsequent periods if actual forfeitures differ from those estimates. The fair value of each PIU award is estimated on the date of grant using the Monte Carlo or Black-Scholes option pricing model. The Black-Scholes model has several inputs, including the volatility in the price of the stock, the risk-free interest rate, the expected term of the option, the closing market price of the stock on the grant date and the exercise price. Novitex bases its estimates of its stock price volatility on third-party valuations; however, these estimates are neither predictive nor indicative of the future performance of its stock. For purposes of the calculation, Novitex assumed that no dividends would be paid during the life of the PIUs. The aggregate fair value of awards calculated using the Monte Carlo or Black-Scholes option pricing model is generally amortized on a straight-line basis over the requisite service period, and is recognized based on the proportionate amount of the requisite service period that has been rendered during each reporting period. The estimates utilized in the calculations involve inherent uncertainties and the application of management judgment.

The total stock-based compensation recorded in a given period is dependent upon the assumptions utilized. As a result, if other assumptions had been used, its recorded stock-based compensation expense could have been materially different from that reported. In addition, because some of the PIUs issued to employees vest upon the achievement of certain performance conditions or milestones, the total expense is uncertain.

304

Supp.App. 0671

*Translation of Non-U.S. Currency Amounts*

The functional currency of Novitex's foreign operations is the local currency, primarily the Canadian dollar. Assets and liabilities of subsidiaries operating outside the U.S. are translated at rates in effect at the end of the period and revenue and expenses are translated at average monthly rates during the period. Accumulated deficit/retained earnings and owner's deficit are translated at historical rates. Net deferred translation gains and losses are included as a component of accumulated other comprehensive loss. For the three months ended March 31, 2017 and 2016 and for the years ended December 31, 2016, 2015 and 2014, foreign currency transaction gains and losses were included in Selling, general and administrative, exclusive of depreciation and amortization, and were not material.

*Leases*

Novitex leases print production facilities, mailroom space, copy centers, office space, copier and duplication equipment, mailing equipment and computer equipment. Certain of the lease agreements include scheduled rent escalations during the initial lease term and/or during succeeding optional renewal periods. For Novitex's leases classified as operating leases, scheduled increases in rent expense are recognized on a straight-line basis over the lease term and those renewal periods that are reasonably assured. Certain of these lease agreements qualify for capital lease treatment which are classified within the appropriate categories of property and equipment, net with the corresponding liabilities reflected in long-term debt and current portion of long-term debt. Novitex accounts for these leases in accordance with Accounting Standards Codification Topic 840, *Leases*.

**Impact of Recently Issued Accounting Standards**

The impact of recently issued accounting standards is set forth in Note 2, Summary of Significant Accounting Policies, of the Notes to Consolidated Financial Statements for the year ended December 31, 2016 included in this proxy statement.

**Quantitative and Qualitative Disclosure about Market Risk**

Novitex is exposed to various market risks, such as currency exchange and interest rate fluctuation. Where necessary to minimize such risks Novitex may enter into financial derivative transactions. However, Novitex does not enter into derivatives or other financial instruments for trading or speculative purposes.

*Currency Risk*

Novitex conducts business throughout North America, including Canada. Although Novitex manages its businesses in such a way as to reduce a portion of the risks associated with operating internationally, changes in currency exchange rates may adversely impact Novitex's results of operations and financial position.

The results of operations and financial position of each of Novitex's operations are measured in their respective local (functional) currency. Business transactions denominated in currencies other than an operation's functional currency produce foreign exchange gains and losses, as a result of the re-measurement process, as described in ASC Topic. 830, *Foreign Currency Matters*. To the extent that Novitex's business activities create monetary assets or liabilities denominated in a non-local currency, changes in an entity's functional currency exchange rate versus each currency in which an entity transacts business have a varying impact on an entity's results of operations and financial position, as reported in functional currency terms. Therefore, for entities that transact business in multiple currencies, Novitex seeks to minimize the net amount of cash flows and balances denominated in non-local currencies. However, in the normal course of conducting Canadian business, some amount of non-local currency exposure will exist. Therefore, management monitors these exposures and may

305

Supp.App. 0672

Table of Contents

engage in business activities or execute transactions intended to mitigate the potential financial impact related to changes in the respective exchange rates.

Novitex's consolidated results of operations and financial position, as reported in U.S. Dollars, are also affected by changes in currency exchange rates. The results of operations of non-U.S. Dollar functional entities are translated into U.S. Dollars for consolidated reporting purposes each period at the average currency exchange rate experienced during the period. To the extent that the U.S. Dollar may appreciate or depreciate over time, the contribution of non-U.S. Dollar denominated results of operations to Novitex's U.S. Dollar reported consolidated earnings will vary accordingly. Therefore, changes in the various local currency exchange rates, as applied to the revenue and expenses of Novitex's non-U.S. Dollar operations may have a significant impact on its revenues and, to a lesser extent, consolidated net loss trends. In addition, a portion of Novitex's consolidated financial position is maintained at foreign locations and is denominated in functional currencies other than the U.S. Dollar. The non-U.S. Dollar denominated monetary assets and liabilities are translated into U.S. Dollars at each respective currency's exchange rate then in effect at the end of each reporting period. The financial impact of the translation process is reflected within the accumulated other comprehensive income (loss) component of stockholder's equity. Accordingly, the amounts shown in Novitex's consolidated stockholder's equity account will fluctuate depending upon the cumulative appreciation or depreciation of the U.S. Dollar versus each of the respective functional currencies in which Novitex conducts business. Novitex does not engage in activities solely intended to counteract the impact that changes in currency exchange rates may have upon Novitex's U.S. Dollar reported statement of financial condition nor does Novitex engages in currency transactions for speculative purposes.

Novitex's foreign currency exchange rate risk management efforts primarily focus upon operationally managing the net amount of non-functional currency denominated monetary assets and liabilities.

*Interest Rate Risk*

Novitex is exposed to the risk of rising interest rates to the extent that Novitex funds operations with long-term or variable-rate borrowings. At March 31, 2017, Novitex's $449 million in aggregate debt consisted of $422 million of floating rate debt and $27 million of fixed rate debt. At December 31, 2016, Novitex's $453 million of aggregate debt outstanding consisted of $424 million of floating-rate debt and $29 million of fixed-rate debt.

Pursuant to Novitex's interest rate risk management policy, it actively monitors and manages Novitex's fixed versus floating rate debt composition within a specified range. At March 31, 2017, fixed rate debt comprised approximately 6% of Novitex's total debt. Based on the amount of floating rate debt outstanding at March 31, 2017, a 1% rise in interest rates would result in approximately $4.2 million in incremental annual interest expense. At December 31, 2016, fixed rate debt comprised approximately 36% of Novitex's total debt. Based on the amount of floating-rate debt outstanding at December 31, 2016 a 1% rise in interest rates would result in approximately $3 million in incremental annual interest expense.

306

## MANAGEMENT AFTER THE BUSINESS COMBINATION

**Board of Directors**

Upon the closing of the Business Combination we anticipate that the current members of the Quinpario board of directors will resign, that the Company will increase the size of the board of directors from seven to eight directors. Pursuant to the Director Nomination Agreements, upon the closing of the Business Combination, the combined company will be required to nominate for election to the board of directors three individuals selected by the HGM Group and two individuals selected by Novitex Parent. An information statement has been prepared, filed with the SEC and transmitted to Quinpario stockholders with this proxy statement pursuant to Section 14(f) of the Exchange Act and Rule 14f-1 in connection with the change in composition of the board of directors of the combined company. The individuals set forth below will be appointed to the board of directors.

| Name | Age | Position |
|------|-----|----------|
| Matthew H. Nord | 38 | Director |
| Joshua M. Black | 30 | Director |
| Par Chadha | 62 | Director |
| Ronald Cogburn | 61 | Director |
| Jim Reynolds | 48 | Director |
| Nathaniel J. Lipman | 52 | Director |
| Gordon J. Coburn | 53 | Director |
| John H. Rexford | 60 | Director |

*Joshua M. Black* is a Principal of Apollo, where he has been employed since 2011. From 2010 to 2011, Mr. Black was a member of the Leveraged Finance Group of Goldman, Sachs & Co. From 2008 to 2010, Mr. Black was a member of the Financial Institutions Group within the Investment Banking Division of Goldman, Sachs & Co. Mr. Black has served as director of Environmental Solutions Worldwide, Inc., a public company, from January 2011 to March 2015. Mr. Black graduated from Princeton University in 2008 with a major in Religion. We believe Mr. Black's significant investment and financial expertise make him well-qualified to serve as a director of the combined company.

*Gordon J. Coburn* held numerous executive management positions in Cognizant Technology Solutions Corporation, a professional services company, from 1998 to 2016, including serving as President from 2012 to 2016, Chief Operating Officer from 2007 to 2012, Chief Financial Officer and Treasurer from 1998 to 2012, Executive Vice President from 2003 to 2006 and Senior Vice President from 1999 to 2003. Mr. Coburn has also served as a director of CEB Inc. from 2007 until its acquisition in April 2017, director of US2020 from 2013 to 2015, director of TechAmerica from 2009 to 2013, director of ICT Group, Inc. from 2005 until its acquisition in 2010 and director of Information Technology Association of America from 2005 to 2008. Mr. Coburn holds a Bachelor of Arts degree from Wesleyan University and a Master of Business Administration degree from the Amos Tuck School at Dartmouth College, where he serves as a member of its MBA Advisory Board. We believe that Mr. Coburn's experience as a director and as an officer of a major public information technology and business services firm make him well-qualified to serve as a director of the combined company.

*John H. Rexford* is the Managing Director of Ramona Park Consulting LLC, which he founded in 2016. Mr. Rexford has over 36 years of finance experience that includes serving as Global M&A Head from 2010 to 2015 at the Xerox Corporation and serving in various positions at Affiliated Computer Services, Inc. (which was acquired by the Xerox Corporation), including Chief Financial Officer from 2006 to 2007, Executive Vice President from 2001 to 2009 and Senior Vice President of Mergers and Acquisitions from 1996 to 2001. Mr. Rexford has also served as a director of Affiliated Computer Services, Inc. from 2006 to 2007. Mr. Rexford received a Bachelor of Business Administration from Southern Methodist University in 1979 and a MBA from SMU Cox School of Business in 1980. We

307

Supp.App. 0674

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 677 of 1110    PageID 2298

Table of Contents

believe that Mr. Rexford's prior experience give him an understanding of the business models, structures and attributes of the combined business, as well as the risks and operating environment of the combined company, which make him well-qualified to serve as a director of the combined company.

Biographical information for Messrs. Nord and Lipman is set forth under "*Information About Novitex—Management*." Biographical information for Messrs. Chadha, Cogburn and Reynolds is set forth under "*Information About SourceHOV—Management*."

### Executive Officers

Upon consummation of the Business Combination, it is anticipated that Par Chadha will serve as Executive Chairman of the combined company, Ronald Cogburn will serve as Chief Executive Officer of the combined company, Jim Reynolds will serve as Chief Financial Officer of the combined company, Shrikant Sortur will serve as Senior Vice President, Global Finance of the combined company, Suresh Yannamani will serve as President, Americas of the combined company and Mark Fairchild will serve as President, Europe of the combined company. The Company and the Sellers are in the process of identifying other individuals to serve as executive officers of the combined company.

Biographical information for Messrs. Chadha, Cogburn, Reynolds, Sortur, Yannamani and Fairchild is set forth under "*Information About SourceHOV—Management.*"

### Classified Board of Directors

Upon consummation of the Business Combination, our board of directors anticipates increasing its initial size from seven directors to eight directors, with each Class A director having a term that expires at the combined company's annual meeting of stockholders in 2018, each Class B director having a term that expires at the combined company's annual meeting of stockholders in 2019 and each Class C director having a term that expires at the combined company's annual meeting of stockholders in 2020, or in each case until their respective successors are duly elected and qualified, or until their earlier resignation, removal or death.

### Independence of the Board of Directors

Nasdaq listing standards require that a majority of the board of directors be independent. An "independent director" is defined generally as a person other than an officer or employee of the company or its subsidiaries or any other individual having a relationship which in the opinion of the board of directors, would interfere with the director's exercise of independent judgment in carrying out the responsibilities of a director.

We anticipate that the combined company will have five "independent directors" as defined in the Nasdaq listing standards and applicable SEC rules, Messrs. Lipman, Coburn, Rexford, Nord and Black. In addition, we anticipate that Messrs. Lipman, Coburn and Rexford will qualify as independent directors for the purpose of serving on the audit committee of the combined company under SEC rules.

### Committees of the Board of Directors

It is anticipated that the board of directors of the combined company will maintain an audit, nominating and compensation committee currently constituted by the board of directors of Quinpario and will readopt their respective charters. See "*Information About Quinpario—Management—Committees of the Board of Directors*" for more information. The responsibilities of these committees of the board of directors and their anticipated composition upon the Business Combination is as follows.

308

Supp.App. 0675

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 678 of 1110    PageID 2299

*Audit Committee*

Upon consummation of the Business Combination, it is anticipated that the board of directors of the combined company will maintain an audit committee. The audit committee's duties, which are specified in Quinpario's current audit committee charter, which will be readopted by the audit committee of the board of directors of the combined company in connection with the consummation of the Business Combination, include, but are not limited to:

- reviewing and discussing with management and the independent auditor the annual audited financial statements, and recommend to the board whether the audited financial statements should be included in our Form 10-K;

- reviewing and discussing with management and the independent auditor the quarterly financial statements prior to the filing of our Form 10-Qs, including the results of the independent auditor's review of the quarterly financial statements;

- discussing with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of our financial statements;

- discussing with management major risk assessment and risk management policies;

- monitoring the independence of the independent auditor;

- verifying the rotation of the lead (or coordinating) audit partner having primary responsibility for the audit and the audit partner responsible for reviewing the audit as required by law;

- reviewing and approving all related-party transactions;

- inquiring and discussing with management our compliance with applicable laws and regulations;

- pre-approving all audit services and permitted non-audit services to be performed by our independent auditor, including the fees and terms of the services to be performed;

- appointing or replacing the independent auditor;

- determining the compensation and oversight of the work of the independent auditor (including resolution of disagreements between management and the independent auditor regarding financial reporting) for the purpose of preparing or issuing an audit report or related work;

- establishing procedures for the receipt, retention and treatment of complaints received by us regarding accounting, internal accounting controls or reports which raise material issues regarding our financial statements or accounting policies; and

- approving reimbursement of expenses incurred by our management team in identifying potential target businesses.

The audit committee will at all times be composed exclusively of "independent directors" who are "financially literate" as defined under Nasdaq listing standards. Nasdaq listing standards define "financially literate" as being able to read and understand fundamental financial statements, including a company's balance sheet, income statement and cash flow statement.

In addition, we must certify to Nasdaq that the committee has, and will continue to have, at least one member who has past employment experience in finance or accounting, requisite professional certification in accounting, or other comparable experience or background that results in the individual's financial sophistication.

In connection with consummation of the Business Combination, our board of directors will identify one or more directors that are serving on the audit committee that satisfy the requirements for independence and financial literacy under the rules and regulations of Nasdaq and the SEC, that

309

Table of Contents

qualify as "audit committee financial experts" as defined under SEC rules and regulations and that satisfy the financial sophistication requirements of Nasdaq.

### Nominating Committee

Upon consummation of the Business Combination, it is anticipated that the board of directors of the combined company will maintain a nominating committee. The nominating committee is responsible for overseeing the selection of persons to be nominated to serve on our board of directors. The nominating committee considers persons identified by its members, management, stockholders, investment bankers and others.

### Guidelines for selecting director nominees

The guidelines for selecting nominees, which are specified in Quinpario's current nominating committee charter, which will be readopted by the nominating committee of the board of directors of the combined company in connection with the consummation of the Business Combination, generally provide that the persons to be nominated:

- should have demonstrated notable or significant achievements in business, education or public service;

- should possess the requisite intelligence, education and experience to make a significant contribution to the board of directors and bring a range of skills, diverse perspectives and backgrounds to its deliberations; and

- should have the highest ethical standards, a strong sense of professionalism and intense dedication to serving the interests of the stockholders.

The nominating committee will consider a number of qualifications relating to management and leadership experience, background and integrity and professionalism in evaluating a person's candidacy for membership on the board of directors. The nominating committee may require certain skills or attributes, such as financial or accounting experience, to meet specific board needs that arise from time to time and will also consider the overall experience and makeup of its members to obtain a broad and diverse mix of board members. The nominating committee does not distinguish among nominees recommended by stockholders and other persons. Upon the consummation of the Business Combination, the combined company will be subject to the terms of the Nomination Agreements. See the section entitled "*Proposal No. 1—Approval of the Business Combination—The Director Nomination Agreements*."

### Compensation Committee

Upon consummation of the Business Combination, it is anticipated that the board of directors of the combined company will maintain a compensation committee. The compensation committee's duties, which are specified in Quinpario's current compensation committee charter, which will be readopted by the compensation committee of the board of directors of the combined company in connection with the consummation of the Business Combination, include, but are not limited to:

- reviewing and approving on an annual basis the corporate goals and objectives relevant to our Chief Executive Officer's compensation, evaluating our Chief Executive Officer's performance in light of such goals and objectives and determining and approving the remuneration (if any) of our Chief Executive Officer based on such evaluation;

- reviewing and approving the compensation of all of our other executive officers;

- reviewing our executive compensation policies and plans;

310

Table of Contents

- implementing and administering our incentive compensation equity-based remuneration plans;

- assisting management in complying with our proxy statement and annual report disclosure requirements;

- approving all special perquisites, special cash payments and other special compensation and benefit arrangements for our executive officers and employees;

- if required, producing a report on executive compensation to be included in our annual proxy statement; and

- reviewing, evaluating and recommending changes, if appropriate, to the remuneration for directors.

**Code of Business Conduct and Ethics**

On January 22, 2015, the Quinpario board of directors adopted a code of ethics that applies to its executive officers, directors and employees. The code of ethics codifies the business and ethical principles that governs aspects of its business. It is anticipated that the board of directors of the combined company will readopt the code of ethics.

**Director Compensation**

Following the completion of the Business Combination, our compensation committee will determine the annual compensation to be paid to the members of the board of directors.

**Executive Compensation**

Following the closing of the Business Combination, the combined company intends to develop an executive compensation program that is designed to align compensation with the combined company's business objectives and the creation of stockholder value, while enabling the combined company to attract, motivate and retain individuals who contribute to the long-term success of the combined company. The executive compensation program may include an executive compensation plan for which the combined company would seek stockholder approval following the closing of the Business Combination.

Decisions on the executive compensation program will be made by the compensation committee of the board of directors.

311

Supp.App. 0678

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 681 of 1110    PageID 2302

Table of Contents

## DESCRIPTION OF SECURITIES

The following summary of the material terms of the combined company's securities following the Business Combination is not intended to be a complete summary of the rights and preferences of such securities. The full text of the proposed certificate of incorporation is attached to this proxy statement as Annex B. We urge you to read our proposed certificate of incorporation in its entirety for a complete description of the rights and preferences of the combined company's securities following the Business Combination.

### Authorized and Outstanding Stock

The proposed certificate of incorporation authorizes the issuance of 1,620,000,000 shares of capital stock, consisting of (i) 1,600,000,000 shares of Quinpario Common Stock and (ii) 20,000,000 shares of preferred stock, par value $0.0001 per share. The outstanding shares of Quinpario Common Stock are, and the shares of Quinpario Common Stock (or securities which may consist of or be convertible into shares of Quinpario Common Stock) issuable in connection with the Business Combination and the PIPE Investment will be, duly authorized, validly issued, fully paid and non-assessable. As of the record date for the Special Meeting, there were 28,848,601 shares of Quinpario Common Stock outstanding, held of record by eight holders, no shares of preferred stock outstanding and 53,000,000 warrants outstanding held of record by one holder. Such numbers do not include DTC participants or beneficial owners holding shares through nominee names.

### *Quinpario Common Stock*

The proposed certificate of incorporation provides that the Quinpario Common Stock will have identical rights, powers, preferences and privileges to the current Quinpario Common Stock.

### *Voting Power*

Except as otherwise required by law or as otherwise provided in any certificate of designation for any series of preferred stock, the holders of Quinpario Common Stock possess all voting power for the election of Quinpario's directors and all other matters requiring stockholder action and will at all times vote together as one class on all matters submitted to a vote of Quinpario stockholders. Holders of Quinpario Common Stock are entitled to one vote per share on matters to be voted on by stockholders.

### *Dividends*

Holders of Quinpario Common Stock will be entitled to receive such dividends and other distributions, if any, as may be declared from time to time by the board of directors in its discretion out of funds legally available therefor and shall share equally on a per share basis in such dividends and distributions.

### *Liquidation, Dissolution and Winding Up*

In the event of the voluntary or involuntary liquidation, dissolution, distribution of assets or winding-up of the combined company, the holders of the Quinpario Common Stock will be entitled to receive an equal amount per share of all of our assets of whatever kind available for distribution to stockholders, after the rights of the holders of the preferred stock have been satisfied.

### *Preemptive or Other Rights*

Quinpario stockholders have no preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to Quinpario Common Stock, other than the redemption

312

Supp.App. 0679

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 682 of 1110    PageID 2303

Table of Contents

provisions described in the section entitled "*Special Meeting of Quinpario Stockholders—Redemption Rights*," which will no longer apply after the completion of the Business Combination.

*Election of Directors*

The board of directors is currently divided into three classes, Class A, Class B and Class C, with only one class of directors being elected in each year and each class (except for those directors appointed prior to our first annual meeting of stockholders) serving a three-year term. There is no cumulative voting with respect to the election of directors, with the result that directions will be elected by a plurality of the votes cast at an annual meeting of stockholders by holders of Quinpario Common Stock.

### Quinpario Common Stock Prior to the Business Combination

Quinpario is providing stockholders with the opportunity to redeem their shares of Quinpario Common Stock upon the consummation of the Business Combination at a per-share price, payable in cash, equal to the aggregate amount on deposit in the Trust Account as of two business days prior to the closing of the Business Combination, including interest (which interest shall be net of taxes payable), divided by the number of then outstanding public shares, subject to the limitations described herein. The Founders have agreed to waive their redemption rights with respect to the Founder Shares and any public shares they may hold in connection with the consummation of the Business Combination.

Quinpario will consummate the Business Combination only if a majority of the outstanding shares of Quinpario Common Stock present and entitled to vote thereon at the Special Meeting are voted in favor of the Business Combination Proposal at the Special Meeting. However, the participation of the Sponsor, officers and directors, or their respective affiliates in privately negotiated transactions (as described in this proxy statement), if any, could result in the approval of the Business Combination even if a majority of the stockholders vote, or indicate their intention to vote, against the Business Combination.

The Founders have agreed to vote any shares of Quinpario Common Stock owned by them in favor of the Business Combination Proposal. As of the date of filing this proxy statement, the Founders do not currently hold any public shares. Public stockholders may elect to redeem their public shares whether they vote for or against the Business Combination.

If, as a result of the termination of the Business Combination Agreement or otherwise, Quinpario is unable to complete the Business Combination or another business combination transaction by July 24, 2017, the current certificate of incorporation provides that Quinpario will (i) cease all operations except for the purpose of winding up, (ii) as promptly as reasonably possible, subject to lawfully available funds therefor, redeem 100% of the public shares in consideration of a per-share price, payable in cash, equal to the quotient obtained by dividing (A) the aggregate amount then on deposit in the Trust Account, including interest but net of taxes payable and dissolution expenses, by (B) the total number of then outstanding public shares, which redemption will completely extinguish rights of the public stockholders (including the right to receive further liquidation distributions, if any), subject to applicable law, and (iii) as promptly as reasonably possible following such redemptions, subject to the approval of the remaining stockholders and the board of directors in accordance with applicable law, dissolve and liquidate, subject (in the case of (ii) and (iii) above) to Quinpario's obligations under the DGCL to provide for claims of creditors and other requirements of applicable law. The Founders have agreed to waive their redemption rights with respect to the Founder Shares (i) in connection with the consummation of a business combination, (ii) if Quinpario fails to consummate an initial business combination by July 24, 2017, (iii) in connection with an expired or unwithdrawn tender offer, and (iv) otherwise upon our liquidation or in the event the board of

313

Supp.App. 0680

Table of Contents

directors resolves to liquidate the Trust Account and ceases to pursue the consummation of a business combination prior to July 24, 2017. However, if the Founders or any of Quinpario's officers, directors or affiliates acquire public shares, they will be entitled to redemption rights with respect to such public shares if Quinpario fails to consummate an initial business combination within the required time period.

In the event of a liquidation, dissolution or winding up of the Company after an initial business combination, holders of Quinpario Common Stock are entitled to share ratably in all assets remaining available for distribution to them after payment of liabilities and after provision is made for each class of stock, if any, having preference over the Common Stock.

Quinpario stockholders have no preemptive or other subscription rights. There are no sinking fund provisions applicable to Quinpario Common Stock, except that upon the consummation of an initial business combination, subject to the limitations described herein, Quinpario will provide its stockholders with the opportunity to redeem their shares of Quinpario Common Stock for cash equal to their pro rata share of the aggregate amount on deposit in the Trust Account as of two business days prior to the closing of the Business Combination, including any amounts representing interest earned on the Trust Account, less any interest released to Quinpario for the payment of taxes.

*Preferred Stock*

The proposed certificate of incorporation provides that shares of preferred stock may be issued from time to time in one or more series. The board of directors is authorized to fix the voting rights, if any, designations, powers, preferences, the relative, participating, optional or other special rights and any qualifications, limitations and restrictions thereof, applicable to the shares of each series. The board of directors is able, without stockholder approval, to issue preferred stock with voting and other rights that could adversely affect the voting power and other rights of the holders of the Quinpario Common Stock and could have anti-takeover effects. The ability of the board of directors to issue preferred stock without stockholder approval could have the effect of delaying, deferring or preventing a change of control of Quinpario or the removal of existing management. Quinpario has no preferred stock outstanding at the date hereof.

**Series A Convertible Preferred Stock**

Quinpario intends to designate 11,500,000 shares as Series A Perpetual Convertible Preferred Stock ("Series A Convertible Preferred Stock") at the closing of the Business Combination, and issue 9,400,000 shares of Series A Convertible Preferred Stock in connection with the PIPE Investment for gross proceeds to us of approximately $75.2 million (all of which has already been subscribed). The terms, rights, obligations and preferences of the Series A Convertible Preferred Stock are set forth in the Certificate of Designations, Preferences, Rights and Limitations of Series A Perpetual Convertible Preferred Stock of Quinpario (the "Certificate of Designations"), which will be filed with the proposed charter with the Secretary of State of the State of Delaware upon the closing of the Business Combination and which is described below.

Under the Certificate of Designations, each share of Series A Convertible Preferred Stock will be convertible at the holder's option, at any time after the six month anniversary and prior to the third anniversary of the issue date, initially into 1.2226 shares of Quinpario Common Stock (assuming a conversion price of $8.80 per share and a third anniversary expected liquidation preference of $10.75911 per the below). Based on such assumed conversion rate, approximately 11,492,690 shares of Quinpario Common Stock would be issuable upon conversion of all of the shares of Series A Convertible Preferred Stock at the six month anniversary of the issue date. Prior to the third anniversary of the issue date, each share of Series A Convertible Preferred Stock will be convertible at the holder's option into shares of Quinpario Common Stock equal to the quotient of (i) $10.75911 (the

314

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 684 of 1110    PageID 2305

third anniversary expected liquidation preference); divided by (ii) the conversion price. From and after the third anniversary of the issue date, each share of Series A Convertible Preferred Stock will be convertible at the holder's option into shares of Quinpario Common Stock equal to the quotient of (i) the liquidation preference of $8.00 per share of Series A Convertible Preferred Stock, plus accrued dividends on the Series A Convertible Preferred Stock (as more fully described in the Certificate of Designations) (the "Liquidation Preference"); divided by (ii) the conversion price. The conversion price will be determined at the time of conversion and will be an amount equal to $8.00 divided by the conversion rate at the time of the conversion. The conversion rate will initially be 0.9090909 shares of Quinpario Common Stock and will be subject to specified adjustments as set forth in the Certificate of Designations.

Holders of the Series A Convertible Preferred Stock will be entitled to receive cumulative dividends at a rate per annum of 10% of the Liquidation Preference per share of Series A Convertible Preferred Stock, paid or accrued quarterly in arrears. From the issue date until the third anniversary of the issue date, the amount of all accrued but unpaid dividends on the Series A Convertible Preferred Stock will be added to the Liquidation Preference without any action by the Board. Following the third anniversary of the issue date, dividends on the Series A Convertible Preferred Stock will be accrued by adding to the Liquidation Preference or paid in cash (when, as and if declared by the Quinpario board of directors out of funds of Quinpario legally available for payment), or a combination thereof. In addition, holders of the Series A Convertible Preferred Stock will participate in any dividend or distribution of cash or other property paid in respect of the Quinpario Common stock (other than certain dividends or distributions that trigger an adjustment to the conversion rate, as described in the Certificate of Designations) pro rata with the holders of the Quinpario Common Stock, as if all shares of Series A Convertible Preferred Stock had been converted into Quinpario Common Stock immediately prior to the date on which such holders of the Quinpario Common Stock became entitled to such dividend or distribution.

Quinpario will have the right, at its option, to give notice of its election to cause all outstanding shares of the Series A Convertible Preferred Stock to be automatically converted into shares of Quinpario Common Stock at the then-effective conversion rate on or after such time that the Weighted Average Price (as defined in the Certificate of Designations) of Quinpario Common Stock equals or exceeds $24.00 for at least 5 consecutive trading days. In addition, Quinpario will have the option to redeem some or all of the outstanding shares of the Series A Convertible Preferred Stock at the Liquidation Preference as of the date of such redemption on or after the earlier of (i) certain Fundamental Changes (as defined in the Certificate of Designations) and (ii) the fifth anniversary of the issue date.

If Quinpario undergoes certain Fundamental Changes (as defined in the Certificate of Designations but including, among other things, certain change-in-control transactions, asset sales, liquidation events and delisting of Quinpario's securities by a national securities exchange), the Series A Convertible Preferred Stock may, within 15 days following the effective date of such Fundamental Change and at the election of the holder, be converted into Quinpario Common Stock at the applicable conversion rate as of such date (subject to certain adjustments). However, if Quinpario has not delivered a notice of redemption in accordance with the terms of the Certificate of Designations prior to the 5th day after the effective date of such Fundamental Change, then, from and after such 5th day after the effective date until the 15th day following the effective date, the Series A Convertible Preferred Stock may, at the election of the holder, be converted into a number of shares of Quinpario Common Stock equal to the greater of (A) the applicable conversion rate on the effective date of such Fundamental Change and (B) the quotient of (x) the Liquidation Preference, divided by (y) the greater of (1) the applicable holder stock price and (2) $0.10; provided, that, if such conversion takes place after the fifth anniversary of the issue date, the aggregate number of shares issuable upon such conversion of all shares of Series A Convertible Preferred Stock then outstanding will not exceed

315

Supp.App. 0682

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 685 of 1110    PageID 2306

Table of Contents

the lesser of (i) the difference between (A) the aggregate number of authorized shares at the time minus (B) the sum of the number of shares of Quinpario Common Stock outstanding at such time plus the number of shares of Quinpario Common Stock issuable upon conversion or exchange of debt, warrants or rights which are convertible into or exchangeable for shares of Quinpario Common Stock (other than the shares of Series A Convertible Preferred Stock) and (ii) 85% of the total number of outstanding shares of Quinpario Common Stock, where the "holder stock price" means, in the case of a Fundamental Change in which the holders of Quinpario Common Stock will receive only cash consideration, the price to be paid per share for such Fundamental Change and, in all other cases, the average closing sale price of the Quinpario Common Stock on the 20 consecutive trading days immediately preceding the effective date of the Fundamental Change (or such lesser number of trading days as shall follow the public announcement of such Fundamental Change).

Except as required by Delaware law, holders of the Series A Convertible Preferred Stock will have no voting rights except with respect to the approval of any material and adverse amendment to Quinpario's post-closing certificate of incorporation.

Quinpario will not be permitted to issue any shares of preferred stock that rank senior to, or pari passu with, such Series A Convertible Preferred Stock without the consent of the holders of such Series A Convertible Preferred Stock.

**Warrants**

*Public Warrants*

Each warrant entitles the registered holder to purchase one-half of one share of Quinpario Common Stock at a price of $5.75 per half share, subject to adjustment as discussed below, at any time commencing on the later of twelve months from the closing of the IPO or 30 days after the completion of an initial business combination. For example, if a warrant holder holds two warrants, such warrants will be exercisable for one share of the Quinpario Common Stock. Warrants must be exercised for a whole share. The warrants will expire five years after the completion of our initial business combination, at 5:00 p.m., New York City time, or earlier upon redemption or liquidation.

No public warrants will be exercisable for cash unless Quinpario has an effective and current registration statement covering the shares of Quinpario Common Stock issuable upon exercise of the warrants and a current prospectus relating to such shares of Quinpario Common Stock.

Quinpario has agreed that as soon as practicable, but in no event later than the closing date of an initial business combination, Quinpario will use its best efforts to file with the SEC a registration statement, for the registration, under the Securities Act, of the shares of Quinpario Common Stock issuable upon exercise of the warrants. Quinpario will use its best efforts to cause the same to become effective and to maintain the effectiveness of such registration statement, and a current prospectus relating thereto, until the expiration of the warrants in accordance with the provisions of the warrant agreement. Quinpario shall also use its best efforts to take such action as is necessary to qualify for sale, in those states in which the warrants were initially offered, the shares of Quinpario Common Stock issuable upon exercise of the warrants.

If any such post-effective amendment or registration statement has not been declared effective by the 90-day anniversary following the closing of an initial business combination, holders of the warrants shall have the right, during the period beginning on the 91st day after the closing of an initial business combination and ending upon such post-effective amendment or registration statement being declared effective by the SEC, and during any other period after such date of effectiveness when Quinpario has failed to maintain an effective registration statement covering the shares of Quinpario Common Stock issuable upon exercise of the warrants, to exercise such warrants on a "cashless basis." Quinpario shall provide the warrant agent with an opinion of our counsel (which shall be an outside law firm with

316

Supp.App. 0683

securities law experience) stating that (i) the issuance of shares of Quinpario Common Stock upon exercise of the warrants on a cashless basis not required to be registered under the Securities Act and (ii) the shares of Quinpario Common Stock issued upon such exercise will be freely tradable under U.S. federal securities laws by anyone who is not a Quinpario affiliate and, accordingly, will not be required to bear a restrictive legend.

Once the warrants become exercisable and until their expiration, Quinpario may call the public warrants for redemption:

- in whole and not in part;

- at a price of $0.01 per warrant;

- upon not less than 30 days' prior written notice of redemption to each warrant holder;

- if, and only if, the last reported sale price of the Class A Stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading day period ending on the third trading day prior to the date Quinpario sends the notice of redemption to the warrant holder; and

if, and only if, there is a current registration statement in effect with respect to the shares of common stock underlying such warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.

The right to exercise will be forfeited unless the warrants are exercised prior to the date specified in the notice of redemption. On and after the redemption date, a record holder of a warrant will have no further rights except to receive the redemption price for such holder's warrant upon surrender of such warrant. If the foregoing conditions are satisfied and Quinpario issues a notice of redemption of the warrants, each warrant holder will be entitled to exercise his, her or its warrant prior to the scheduled redemption date. The redemption criteria for the warrants have been established at a price which is intended to provide warrant holders a substantial premium to the initial exercise price and provide a sufficient differential between the then-prevailing share price and the warrant exercise price so that if the share price declines as a result of the redemption call, the redemption will not cause the share price to drop below the exercise price of the warrants. However, the price of the Quinpario Common Stock may fall below the $24.00 redemption trigger price as well as the $11.50 warrant exercise price (for whole shares) after the redemption notice is issued.

If Quinpario calls the warrants for redemption as described above, management will have the option to require any holder that wishes to exercise his, her or its warrant to do so on a "cashless basis." In determining whether to require all holders to exercise their warrants on a "cashless basis," management will consider, among other factors, our cash position, the number of warrants that are outstanding and the dilutive effect on Quinpario stockholders of issuing the maximum number of shares of Quinpario Common Stock issuable upon the exercise of the warrants. If management takes advantage of this option, all holders of warrants would pay the exercise price by surrendering their warrants for that number of shares of Quinpario Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Quinpario Common Stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Quinpario Common Stock for the ten trading days ending on the third trading day prior to the date on which the notice of redemption is sent to the holders of warrants. There will be no net cash settlement of the warrants under any circumstances.

If management takes advantage of this option, the notice of redemption will contain the information necessary to calculate the number of shares of Quinpario Common Stock to be received upon exercise of the warrants, including the fair market value in such case. Whether Quinpario will exercise the option to require all holders to exercise their warrants on a "cashless basis" will depend on

317

Supp.App. 0684

Table of Contents

a variety of factors including the price of Quinpario Common Stock at the time the warrants are called for redemption, Quinpario's cash needs at such time and concerns regarding dilutive stock issuances.

A holder of a warrant may notify Quinpario in writing in the event it elects to be subject to a requirement that such holder will not have the right to exercise such warrant, to the extent that after giving effect to such exercise, such person (together with such person's affiliates), to the warrant agent's actual knowledge, would beneficially own in excess of 9.8% (or such other amount as a holder may specify) of the shares of Quinpario Common Stock outstanding immediately after giving effect to such exercise. By written notice to Quinpario, the holder may from time to time increase or decrease percentage applicable to such holder to any other percentage specified in such notice. However, provided that any such increase will not be effective until the sixty-first day after such notice is delivered to Quinpario.

If the number of outstanding shares of Quinpario Common Stock is increased by a stock dividend payable in shares of Quinpario Common Stock, or by a split-up of shares of Quinpario Common Stock or other similar event, then, on the effective date of such stock dividend, split-up or similar event, the number of shares of Quinpario Common Stock issuable on exercise of each warrant will be increased in proportion to such increase in the outstanding shares of Quinpario Common Stock. A rights offering to holders of Quinpario Common Stock entitling holders to purchase shares of Quinpario Common Stock at a price less than the fair market value will be deemed a stock dividend of a number of shares of Quinpario Common Stock equal to the product of (i) the number of shares of Quinpario Common Stock actually sold in such rights offering (or issuable under any other equity securities sold in such rights offering that are convertible into or exercisable for Quinpario Common Stock) multiplied by (ii) one (1) minus the quotient of (x) the price per share of Quinpario Common Stock paid in such rights offering divided by (y) the fair market value. For these purposes (i) if the rights offering is for securities convertible into or exercisable for Quinpario Common Stock, in determining the price payable for Quinpario Common Stock, there will be taken into account any consideration received for such rights, as well as any additional amount payable upon exercise or conversion and (ii) fair market value means the volume weighted average price of Quinpario Common Stock as reported during the ten trading day period ending on the trading day prior to the first date on which the shares of Quinpario Common Stock trade on the applicable exchange or in the applicable market, regular way, without the right to receive such rights.

In addition, if Quinpario, at any time while the warrants are outstanding and unexpired, pays a dividend or make a distribution in cash, securities or other assets to the holders of Quinpario Common Stock on account of such shares of Quinpario Common Stock (or other shares of our capital stock into which the warrants are convertible), other than (a) as a stock dividend described above, (b) certain ordinary cash dividends, (c) to satisfy the conversion rights of the holders of Quinpario Common Stock in connection with a proposed initial business combination, (d) as a result of the repurchase of shares of Quinpario Common Stock by the Company in connection with an initial business combination or as otherwise permitted by the Investment Management Trust Agreement between Quinpario and the warrant agent or (e) in connection with Quinpario's liquidation and the distribution of its assets upon its failure to consummate a Business Combination, then the warrant exercise price will be decreased, effective immediately after the effective date of such event, by the amount of cash and the fair market value of any securities or other assets paid on each share of Quinpario Common Stock in respect of such event.

If the number of outstanding shares of Quinpario Common Stock is decreased by a consolidation, combination, reverse stock split or reclassification of shares of Quinpario Common Stock or other similar event, then, on the effective date of such consolidation, combination, reverse stock split, reclassification or similar event, the number of shares of Quinpario Common Stock issuable on exercise of each warrant will be decreased in proportion to such decrease in outstanding shares of Quinpario Common Stock.

318

Supp.App. 0685

Whenever the number of shares of Quinpario Common Stock purchasable upon the exercise of the warrants is adjusted, as described above, the warrant exercise price will be adjusted by multiplying the warrant exercise price immediately prior to such adjustment by a fraction (x) the numerator of which will be the number of shares of Quinpario Common Stock purchasable upon the exercise of the warrants immediately prior to such adjustment, and (y) the denominator of which will be the number of shares of Quinpario Common Stock so purchasable immediately thereafter.

In case of any reclassification or reorganization of the outstanding shares of Quinpario Common Stock (other than those described above or that solely affects the par value of such shares of Quinpario Common Stock), or in the case of any merger or consolidation of Quinpario with or into another corporation (other than a consolidation or merger in which Quinpario is the continuing corporation and that does not result in any reclassification or reorganization of the outstanding shares of Quinpario Common Stock), or in the case of any sale or conveyance to another corporation or entity of the assets or other property of Quinpario as an entirety or substantially as an entirety in connection with which Quinpario is dissolved, the holders of the warrants will thereafter have the right to purchase and receive, upon the basis and upon the terms and conditions specified in the warrants and in lieu of the shares of Quinpario Common Stock immediately theretofore purchasable and receivable upon the exercise of the rights represented thereby, the kind and amount of shares of stock or other securities or property (including cash) receivable upon such reclassification, reorganization, merger or consolidation, or upon a dissolution following any such sale or transfer, that the holder of the warrants would have received if such holder had exercised their warrants immediately prior to such event.

The warrants have been issued in registered form under a warrant agreement between Continental Stock Transfer & Trust Company, as warrant agent, and Quinpario. You should review a copy of the warrant agreement, which is filed as an exhibit to the registration statement pertaining to the IPO, for a complete description of the terms and conditions applicable to the warrants. The warrant agreement provides that the terms of the warrants may be amended without the consent of any holder to cure any ambiguity or correct any defective provision, but requires the approval by the holders of at least 65% of the then outstanding public warrants to make any change that adversely affects the interests of the registered holders of public warrants.

The warrants may be exercised upon surrender of the warrant on or prior to the expiration date at the offices of the warrant agent, with the subscription form as set forth in the warrant completed and executed as indicated, accompanied by full payment of the exercise price (or on a cashless basis, if applicable), by certified or official bank check payable to Quinpario, for the number of warrants being exercised. Notwithstanding the foregoing, in no event will Quinpario be required to net cash settle the Warrant exercise.

Warrants may be exercised only for a whole number of shares of Quinpario Common Stock. No fractional shares will be issued upon exercise of the warrants. If, by reason of any adjustment described above, the holder of any warrant would be entitled, upon the exercise of such warrant, to receive a fractional interest in a share, Quinpario shall, upon such exercise, round up to the nearest whole number the number of the shares of Quinpario Common Stock to be issued to the warrant holder.

*Private Placement Warrants*

The Sponsor purchased 18,000,000 warrants at a price of $0.50 per warrant for an aggregate purchase price of $9,000,000 in a private placement consummated simultaneously with the IPO. The Private Warrants (including the Quinpario Common Stock issuable upon exercise of the Private Warrants) are not be transferable, assignable or salable until 30 days after the completion of an initial business combination (except, among other limited exceptions, to Quinpario's officers and directors and other persons or entities affiliated with the Sponsor) and they will not be redeemable by Quinpario so long as they are held by the Sponsor or its permitted transferees. Otherwise, the Private Warrants have

319

Supp.App. 0686

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 689 of 1110    PageID 2310

terms and provisions that are identical to those of the public warrants. If the Private Warrants are held by holders other than the Sponsor or its permitted transferees, the Private Warrants will be redeemable by Quinpario and exercisable by the holders on the same basis as the public warrants. As long as Private Warrants are held by the initial purchasers or their affiliates and permitted transferees, such warrants are exercisable either for cash or on a cashless basis at the holder's option pursuant and are not redeemable by Quinpario.

If holders of the Private Warrants elect to exercise them on a cashless basis, they would pay the exercise price by surrendering his, her or its warrants for that number of shares of Quinpario Common Stock equal to the quotient obtained by dividing (x) the product of the number of shares of Quinpario Common Stock underlying the warrants, multiplied by the difference between the exercise price of the warrants and the "fair market value" (defined below) by (y) the fair market value. The "fair market value" shall mean the average reported last sale price of the Quinpario Common Stock for the ten trading days ending on the day prior to the Company's receipt of the applicable exercise notice.

**Registration Rights**

At the closing of the Business Combination, the combined company will enter into the Registration Rights Agreement, substantially in the form attached to this proxy statement as Annex E, with the Restricted Stockholders. Pursuant to the terms of the Registration Rights Agreement, the Restricted Stockholders will be bound by customary restrictions on the transfer of their Restricted Stock, including a restriction on transfer until six months following the date of the Registration Rights Agreement, except for certain permitted transfers, including: (i) as a *bona fide* gift; (ii) to any trust or entity wholly owned by one or more trusts for the direct or indirect benefit of (A) the Restricted Stockholder or its stockholders, partners, members or beneficiaries or (B) of any individual related to such Restricted Stockholder or to the stockholders, partners, members or beneficiaries of such Restricted Stockholder, by blood, marriage or adoption and not more remote than first cousin; (iii) if a Restricted Stockholder is a corporation, limited liability company, partnership or trust, such Restricted Stockholder may Transfer Restricted Shares to any wholly-owned subsidiary thereof, or to the affiliates, stockholders, partners, members or beneficiaries of such Restricted Stockholder; (iv) pursuant to any take-over bid, acquisition, sale or merger involving the combined company; or (v) with the prior written consent of the combined company and each other Restricted Stockholder; provided that in the case of clauses (i) through (v) such distributes or transferees agree to be bound by the same restrictions on transfer. The transfer restrictions in the Registration Rights Agreement do not apply to an aggregate of 3,016,071 shares of the Founder Shares to be retained upon consummation of the Business Combination in accordance with the Forfeiture Agreement, which Founder Shares shall be freely tradable pursuant to a registration statement providing for the resale thereof to be filed by Quinpario prior to the closing date of the Business Combination. In addition, the transfer restrictions do not apply to any transfer made by New SourceHOV LLC for the purpose of generating proceeds to repay the New SourceHOV Financing.

Upon the consummation of the Business Combination, the Restricted Stockholders and their permitted transferees will be entitled to certain registration rights described in the Registration Rights Agreement. Among other things, pursuant to the Registration Rights Agreement, the Sellers will each be entitled to participate in five demand registrations (with three additional demand registrations for New SourceHOV LLC for the purpose of generating proceeds to repay the PIPE Financing), and all Restricted Stockholders will also have certain "piggyback" registration rights with respect to registration statements filed subsequent to the Business Combination. We will bear the expenses incurred in connection with the filing of any such registration statements, other than underwriting discounts and selling commissions.

Supp.App. 0687

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 690 of 1110    PageID 2311

Table of Contents

**Consent Rights**

At the closing of the Business Combination, the combined company will enter into a Director Nomination Agreement with each of the Sellers, substantially in the form attached to this proxy statement as Annex D, that will provide that for so long as the applicable Seller continues to beneficially own at least 15% of the then outstanding shares of Quinpario Common Stock (without giving effect to the exercise of any outstanding warrants to purchase Quinpario Common Stock), we cannot, without the consent of the applicable Seller, engage in certain related party transactions, adopt an equity incentive plan or amend the same to increase the number of securities that may be granted thereunder, issue certain equity securities, including with a fair market value of more than $100 million, amend our certificate of incorporation or bylaws in a manner that adversely affects such Seller's rights under the Director Nomination Agreement or has a disproportionate impact on the interests of such Seller, enter into certain new lines of business, or increase or decrease the size of the board of directors or change the classes on which the members of the board of directors serve. See "*Proposal No. 1—Approval of the Business Combination—The Director Nomination Agreements.*"

**Dividends**

Quinpario has not paid any cash dividends on shares of Quinpario Common Stock to date and do not intend to pay cash dividends prior to the completion of an initial business combination. The payment of cash dividends in the future will be dependent upon our revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of an initial business combination. The payment of any dividends subsequent to an initial business combination will be within the discretion of the then board of directors. It is the present intention of the board of directors to retain all earnings, if any, for use in Quinpario's business operations and, accordingly, the board does not anticipate declaring any dividends in the foreseeable future.

**Certain Anti-Takeover Provisions of Delaware Law**

*Staggered board of directors*

Quinpario's current certificate of incorporation provides that the board of directors will be classified into three classes of directors of approximately equal size. As a result, in most circumstances, a person can gain control of our board only by successfully engaging in a proxy contest at two or more annual meetings.

*Special meeting of stockholders*

Quinpario's bylaws provide that special meetings of our stockholders may be called only by a majority vote of the board of directors, by the president or by the chairman or by the secretary at the request in writing of stockholders owning a majority of the issued and outstanding capital stock entitled to vote.

*Advance notice requirements for stockholder proposals and director nominations*

Quinpario's bylaws provide that stockholders seeking to bring business before an annual meeting of stockholders, or to nominate candidates for election as directors at an annual meeting of stockholders must provide timely notice of their intent in writing. To be timely, a stockholder's notice will need to be delivered to Quinpario's principal executive offices not later than the close of business on the 60th day nor earlier than the close of business on the 90th day prior to the scheduled date of the annual meeting of stockholders. In the event that less than 70 days' notice or prior public disclosure of the date of the annual meeting of stockholders is given, a stockholder's notice shall be timely if delivered to Quinpario's principal executive offices not later than the 10th day following the day on which public announcement of the date of our annual meeting of stockholders is first made or sent by us.

Supp.App. 0688

Quinpario's bylaws also specify certain requirements as to the form and content of a stockholders' meeting. These provisions may preclude Quinpario stockholders from bringing matters before an annual meeting of stockholders or from making nominations for directors at an annual meeting of stockholders.

*Authorized but unissued shares*

Quinpario's authorized but unissued shares of Quinpario Common Stock and preferred stock are available for future issuances without stockholder approval and could be utilized for a variety of corporate purposes, including future offerings to raise additional capital, acquisitions and employee benefit plans. The existence of authorized but unissued and unreserved shares of common stock and preferred stock could render more difficult or discourage an attempt to obtain control of us by means of a proxy contest, tender offer, merger or otherwise.

*Section 203 Opt Out*

Pursuant to the current of incorporation, Quinpario has opted out of the provisions of Section 203 of the Delaware General Corporation Law regulating corporate takeovers. This section prevents certain Delaware corporations, under certain circumstances, from engaging in a "business combination" with:

- a stockholder who owns 15% or more of our outstanding voting stock (otherwise known as an "interested stockholder");

- an affiliate of an interested stockholder; or

- an associate of an interested stockholder, for three years following the date that the stockholder became an interested stockholder. A "business combination" includes a merger or sale of more than 10% of our assets.

However, the above provisions of Section 203 do not apply if:

- the board of directors approves the transaction that made the stockholder an "interested stockholder," prior to the date of the transaction;

- after the completion of the transaction that resulted in the stockholder becoming an interested stockholder, that stockholder owned at least 85% of our voting stock outstanding at the time the transaction commenced, other than statutorily excluded shares of common stock; or

- on or subsequent to the date of the transaction, the business combination is approved by the board of directors and authorized at a meeting of Quinpario stockholders, and not by written consent, by an affirmative vote of at least two-thirds of the outstanding voting stock not owned by the interested stockholder.

Quinpario has opted out of the provisions of Section 203 of the Delaware General Corporation Law because it believes this statute could prohibit or delay mergers or other change in control attempts, and thus may discourage attempts to acquire it.

*Exclusive Forum Selection*

The current certificate of incorporation requires, to the fullest extent permitted by law, that derivative actions brought in Quinpario's name, actions against directors, officers and employees for breach of fiduciary duty and other similar actions may be brought only in the Court of Chancery in the State of Delaware and, if brought outside of Delaware, the stockholder bringing the suit will be deemed to have consented to service of process on such stockholder's counsel. Although Quinpario believes this provision benefits it by providing increased consistency in the application of Delaware law

322

Supp.App. 0689

in the types of lawsuits to which it applies, the provision may have the effect of discouraging lawsuits against Quinpario's directors and officers.

**Rule 144**

A person who has beneficially owned restricted shares of common stock for at least six months would be entitled to sell their shares provided that (1) such person is not deemed to have been one of Quinpario's affiliates at the time of, or at any time during the three months preceding, a sale and (2) Quinpario is subject to the Exchange Act periodic reporting requirements for at least three months before the sale. Persons who have beneficially owned restricted shares of common stock for at least six months but who are Quinpario's affiliates at the time of, or any time during the three months preceding, a sale, would be subject to additional restrictions, by which such person would be entitled to sell within any three-month period a number of shares that does not exceed the greater of either of the following:

- 1% of the number of shares then outstanding; and

- the average weekly trading volume of the shares of common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to the sale.

Sales under Rule 144 are also limited by manner of sale provisions and notice requirements and to the availability of current public information about Quinpario.

**Restrictions on the Use of Rule 144 by Shell Companies or Former Shell Companies**

Rule 144 is not available for the resale of securities initially issued by shell companies (other than business combination related shell companies) or issuers that have been at any time previously a shell company. However, Rule 144 also includes an important exception to this prohibition if the following conditions are met:

- the issuer of the securities that was formerly a shell company has ceased to be a shell company;

- the issuer of the securities is subject to the reporting requirements of Section 13 or 15(d) of the Exchange Act;

- the issuer of the securities has filed all Exchange Act reports and material required to be filed, as applicable, during the preceding 12 months (or such shorter period that the issuer was required to file such reports and materials), other than Form 8-K reports; and

- at least one year has elapsed from the time that the issuer filed current Form 10 type information with the SEC reflecting its status as an entity that is not a shell company.

As of the date of this proxy statement, Quinpario had 28,848,601 shares of Quinpario Common Stock outstanding. Of these shares, 20,098,601 shares sold in the IPO are freely tradable without restriction or further registration under the Securities Act, except for any shares purchased by one of Quinpario's affiliates within the meaning of Rule 144 under the Securities Act. All of the 8,750,000 Founder Shares owned by the Founders are restricted securities under Rule 144, in that they were issued in private transactions not involving a public offering. If the Business Combination is approved, the shares of Quinpario Common Stock issued (i) to the equityholders of SourceHOV and Novitex in the Business Combination and (ii) to the PIPE Investors in the PIPE Investment, will be restricted securities for purposes of Rule 144.

As of the date of this proxy statement, there are 53,000,000 warrants of the Company outstanding, consisting of 35,000,000 public warrants originally sold as part of the units issued in the IPO and 18,000,000 warrants that were sold by the Company to the Sponsor in a private sale prior to the Company's IPO. Each warrant is exercisable for one-half of one share of Quinpario Common Stock, in

323

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 693 of 1110    PageID 2314

accordance with the terms of the warrant agreement governing the warrants. 35,000,000 of these warrants are public warrants and are freely tradable. In addition, Quinpario will be obligated to file no later than the closing date of the Business Combination a registration statement under the Securities Act covering the 17,500,000 shares of Quinpario Common Stock that may be issued upon the exercise of the public warrants, and cause such registration statement to become effective and maintain the effectiveness of such registration statement until the expiration of the warrants.

We anticipate that following the consummation of the Business Combination, the combined company will no longer be a shell company, and so, once the conditions set forth in the exceptions listed above are satisfied, Rule 144 will become available for the resale of the above noted restricted securities.

**Transfer Agent and Warrant Agent**

The transfer agent for our securities and warrant agent for our warrants is Continental Stock Transfer & Trust Company, 17 Battery Place, New York, New York 10004.

**Quotation of Securities**

We have applied to continue the listing of Quinpario Common Stock on Nasdaq under the symbol "XELA." Following the closing, we expect that our warrants will trade on Nasdaq under the symbol "XELAW"; our units may continue to trade on Nasdaq under the symbol "XELAU" or may be separated into the component securities and no longer trade as a separate security.

324

Supp.App. 0691

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 694 of 1110    PageID 2315

## BENEFICIAL OWNERSHIP OF SECURITIES

The following table sets forth information known to the Company regarding (i) the actual beneficial ownership of Quinpario Common Stock as of the record date (pre-Business Combination) and (ii) expected beneficial ownership of Quinpario Common Stock immediately following consummation of the Business Combination (post-Business Combination), assuming all public shares are redeemed (other than those shares in respect of which a waiver of redemption or conversion rights has been obtained, which account for approximately $33.4 million) and all securities convertible into Quinpario Common Stock issued in the PIPE Investment have been so converted, by:

- each person who is, or is expected to be, the beneficial owner of more than five percent (5%) of the outstanding shares of our Common Stock;

- each of the Company's current officers and directors;

- each person who will become a named officer or director of the combined company; and

- all officers and directors of the Company, as a group, and of the combined company, as a group.

Beneficial ownership is determined according to the rules of the SEC, which generally provide that a person has beneficial ownership of a security if he, she or it possesses sole or shared voting or investment power over that security, including options and warrants that are currently exercisable or exercisable within 60 days.

The beneficial ownership of Quinpario Common Stock pre-Business Combination is based on 28,848,601 shares of Quinpario Common Stock (of which 20,098,601 are shares held by public stockholders and 8,750,000 are Founder Shares held by the Founders) issued and outstanding as of May 19, 2017.

The expected beneficial ownership of shares of Quinpario Common Stock post-Business Combination has been determined based upon the following:

- that all holders of public shares exercise their redemption rights, other than in respect of those shares for which a waiver of redemption or conversion rights has been obtained (which account for approximately $33.4 million), and we sell 20,858,389 shares of Quinpario Common Stock and 9,400,000 shares of Series A Convertible Preferred Stock (which is convertible into approximately 11,492,690 shares of Quinpario Common Stock) and issue 835,626 shares in respect of waivers of redemptions or conversion rights of Quinpario Common Stock in the PIPE Investment, including 4,312,500 shares of Quinpario Common Stock and 2,875,000 shares of Series A Convertible Preferred Stock issued to New SourceHOV LLC in the PIPE Investment using $57.5 million in proceeds from the New SourceHOV Financing;

- 2,524,555 shares of Quinpario Common Stock have been issued in respect of fees and other consideration;

- there will be an aggregate of 144,311,101 shares of Quinpario Common Stock (including Founder Shares) issued and outstanding at the closing of the Business Combination;

- 30,600,000 shares of Quinpario Common Stock have been issued to Novitex Parent;

- 80,600,000 shares of Quinpario Common Stock have been issued to New SourceHOV LLC, a newly formed entity owned by former equity holders of SourceHOV;

- 821,429 shares of Quinpario Common Stock have been issued to the lenders in the New SourceHOV Financing; and

- an estimated 716,429 Founder Shares have been cancelled by the Founders pursuant to the Forfeiture Agreement.

325

Supp.App. 0692

Unless otherwise indicated, Quinpario believes that all persons named in the table have sole voting and investment power with respect to all shares of Quinpario Common Stock beneficially owned by them. The following table does not reflect record of beneficial ownership of any shares of Quinpario Common Stock issuable upon exercise of public warrants or Private Placement Warrants as such securities are not exercisable or convertible within 60 days.

| Name and Address of Beneficial Owner(1) | Before the Business Combination | | After the Business Combination | |
|---|---|---|---|---|
| | Number of Shares | Percent of Class | Number of Shares | Percent of Class |
| Jeffry N. Quinn(2) | 8,254,910 | 28.6 | 7,538,481 | 5.1 |
| Paul J. Berra III | —(3) | — | —(3) | — |
| D. John Srivisal | —(3) | — | —(3) | — |
| A. Craig Ivey | —(3) | — | —(3) | — |
| Edgar G. Hotard | 50,000 | * | 50,000 | * |
| W. Thomas Jagodinski | 50,000 | * | 50,000 | * |
| Ilan Kaufthal | 50,000 | * | 50,000 | * |
| Roberto Mendoza | 50,000 | * | 50,000 | * |
| Dr. John Rutledge | 50,000 | * | 50,000 | * |
| Shlomo Yanai | 50,000 | * | 50,000 | * |
| Quinpario Partners 2, LLC | 8,254,910(3) | 28.6 | 7,538,481 | 5.1 |
| All current directors and executive officers as a group (9 individuals) | 8,554,910 | 29.7 | 7,838,481 | 5.3 |
| Matthew H. Nord(4) | — | — | — | — |
| Joshua M. Black(4) | — | — | — | — |
| Par Chadha(5) | — | — | 86,162,500 | 58.7 |
| Ronald Cogburn(6) | — | — | — | — |
| Jim Reynolds(7) | — | — | — | — |
| Nathaniel J. Lipman(8) | — | — | — | — |
| Gordon J. Coburn | — | — | — | — |
| John H. Rexford | — | — | — | — |
| Shrikant Sortur | — | — | — | — |
| Suresh Yannamani(9) | — | — | — | — |
| Mark Fairchild | — | — | — | — |
| All post-Business Combination directors and executive officers as a group (11 individuals) | — | — | 86,162,500 | 58.7 |
| BlueMountain Capital Management, LLC(10) | 3,450,000 | 12.0 | 3,450,000 | 2.4 |
| HGM Group(11) | — | — | 86,162,500 | 58.7 |
| Apollo Funds(12) | — | — | 31,568,750 | 21.5% |

\* Less than one percent

(1) Unless otherwise indicated, the business address of each of the individuals is c/o Quinpario Partners LLC, 12935 N. Forty Drive, Suite 201, St. Louis, MO 63141.

(2) Quinpario Partners is the managing member of the Sponsor. Jeffry N. Quinn, is the sole managing member of Quinpario Partners. Consequently, Mr. Quinn may be deemed the beneficial owner of the securities held by the Sponsor and has sole voting and dispositive control over such securities. Mr. Quinn disclaims beneficial ownership over any securities owned by the Sponsor in which he does not have any pecuniary interest.

(3) Does not include any shares indirectly owned by this individual as a result of his membership interest in the Sponsor.

(4) Messrs. Nord and Black are each affiliated with Apollo or its affiliated investment managers and advisors. Messrs. Nord and Black each disclaim beneficial ownership of the shares of Quinpario

326

Supp.App. 0693

Common Stock that will be issued to Novitex Parent in the Business Combination or to Apollo Novitex Holdings, L.P. pursuant to the PIPE Investment. The address of Messrs. Nord and Black is c/o Apollo Global Management, LLC, 9 West 57th Street, 43rd Floor, New York, New York 10019.

(5) The business address of Mr. Chadha is 8550 West Desert Inn Road, Suite 102-452, Las Vegas, Nevada 89117. Mr. Chadha is a member of the HGM Group and may be deemed to beneficially own the shares of Quinpario Common Stock and Series A Convertible Preferred Stock beneficially owned by the HGM Group under Rule 13d-3. See footnote 10 below. Mr. Chadha disclaims beneficial ownership of any such shares beneficially owned by the HGM Group, except to the extent of his pecuniary interest therein. As disclosed under "*Certain Relationships and Related Transactions—SourceHOV's Related Party Transactions*," New SourceHOV LLC will pledge all of the 80,600,000 shares of Quinpario Common Stock to be received as consideration in the merger as well as all of the Quinpario Common Stock and Series A Convertible Preferred Stock to be purchased in the PIPE Investment to secure the New SourceHOV Financing.

(6) Mr. Cogburn owns 110 shares in SourceHOV which will be converted into units in New SourceHOV LLC in connection with the Preliminary Merger. Since Mr. Cogburn will not have voting or dispositive power over any of the shares of Quinpario Common Stock held by New SourceHOV LLC, Mr. Cogburn will not have beneficial ownership under Rule 13d-3 of any shares of Quinpario Common Stock upon the closing of the Business Combination.

(7) Mr. Reynolds through his ownership of SoNino LLC owns 1,019 shares in SourceHOV which will be converted into units in New SourceHOV LLC in connection with the Preliminary Merger. Since Mr. Reynolds will not have voting or dispositive power over any of the shares of Quinpario Common Stock held by New SourceHOV LLC, Mr. Reynolds will not have beneficial ownership under Rule 13d-3 of any shares of Quinpario Common Stock upon the closing of the Business Combination.

(8) Beneficial ownership of Mr. Lipman does not include any shares of Quinpario Common Stock to be received by Novitex Parent upon consummation of the Business Combination which shares of Quinpario Common Stock are expected to be distributed by Novitex Parent (at a time to be determined) to holders of its equity interests (including Mr. Lipman). See note (12) below for additional information regarding the expected distribution by Novitex Parent following the Business Combination.

(9) Mr. Yannamani owns 1,129 shares in SourceHOV which will be converted into units in New SourceHOV LLC in connection with the Preliminary Merger. Since Mr. Yannamani will not have voting or dispositive power over any of the shares of Quinpario Common Stock held by New SourceHOV LLC, Mr. Yannamani will not have beneficial ownership under Rule 13d-3 of any shares of Quinpario Common Stock upon the closing of the Business Combination.

(10) The business address of BlueMountain Capital Management, LLC is 280 Park Avenue, 12th Floor, New York, NY 10017. Information derived from a Schedule 13G filed on February 6, 2015.

(11) The business address of the HGM Group is 8550 West Desert Inn Road, Suite 102-452, Las Vegas, Nevada 89117. Includes (i) 80,600,000 shares of Quinpario Common Stock issued to New SourceHOV LLC in the Business Combination, (ii) 4,312,500 shares of Quinpario Common Stock and 2,875,000 shares of Series A Convertible Preferred Stock purchased by New SourceHOV LLC in the PIPE Investment (the Series A Convertible Preferred Stock is not convertible within sixty (60) days and is therefore excluded from beneficial ownership) and (iii) 1,250,000 shares of Quinpario Common Stock received by the HGM Group as part of the PIPE Investment pursuant to the reinvestment of a consulting agreement termination fee, as described under "*Proposal No. 1—Approval of the Business Combination—PIPE Investment*." The HGM Group may be deemed to have the power to direct the voting and disposition of any shares of Quinpario Common Stock or Series A Convertible Preferred Stock owned by New SourceHOV LLC. The beneficial owners of the HGM Group include Par Chadha, HOVS LLC, HOVS Capital III LLC, Stern Capital Partners LLC, SunRaj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC and Sonino LLC, each of which may be deemed to beneficially own the shares of the Company owned

327

Table of Contents

by New SourceHOV LLC under Rule 13d-3. Each member of the HGM Group disclaims beneficial ownership of any shares of Common Stock owned by New SourceHOV LLC, except to the extent of its pecuniary interest therein. As disclosed under "*Certain Relationships and Related Transactions— SourceHOV's Related Party Transactions*," New SourceHOV LLC will pledge all of the 80,600,000 shares of Quinpario Common Stock to be received as consideration in the merger as well as all of the Quinpario Common Stock and Series A Convertible Preferred Stock to be purchased in the PIPE Investment to secure the New SourceHOV Financing. Mr. Chadha is a member of the HGM Group and may be deemed to beneficially own the shares of Quinpario Common Stock owned by the HGM Group under Rule 13d-3. Mr. Chadha disclaims beneficial ownership of any shares of Quinpario Common Stock owned by the HGM Group, except to the extent of his pecuniary interest therein.

(12)  Represents (i) 30,600,000 shares of Quinpario Common Stock issued to Novitex Parent in the Business Combination, and (ii) 968,750 shares of Quinpario Common Stock purchased by Apollo Novitex Holdings, L.P. in the PIPE Investment. The number of shares reported as beneficially owned following the Business Combination does not reflect the expected distribution by Novitex Parent (at a time to be determined) of the shares of Quinpario Common Stock it receives, the majority of which are expected to be distributed to Apollo Novitex Holdings, L.P. and the remainder of which are expected to be distributed to certain management personnel (including Mr. Lipman) and other minority interest holders in Novitex Parent. Novitex Parent GP, LLC is the general partner of Novitex Parent and Apollo Novitex Holdings, L.P. Apollo Management VII, L.P. is the manager of Novitex Parent GP, LLC. AIF VII Management, LLC is general partner of Apollo Management VII, L.P. Apollo Management, L.P. is the sole member-manager of AIF VII Management, LLC, and Apollo Management GP, LLC is the general partner of Apollo Management, L.P. Apollo Management Holdings, L.P. is the sole member-manager of Apollo Management GP, LLC. Apollo Management Holdings GP, LLC ("Management Holdings GP") is the general partner of Apollo Management Holdings, L.P. Leon Black, Joshua Harris and Marc Rowan are the managers, as well as executive officers, of Management Holdings GP, and as such may be deemed to have voting and dispositive control of the shares of Quinpario Common Stock held by Novitex Parent and Apollo Novitex Holdings, L.P. The address of each of Novitex Parent, Apollo Novitex Holdings, L.P., Novitex Parent GP, LLC, Apollo Management VII, L.P., AIF VII Management, LLC, Apollo Management, L.P., Apollo Management GP, LLC, Apollo Management Holdings, L.P. and Management Holdings GP, and Messrs. Black, Harris and Rowan is 9 West 57th Street, 43rd Floor, New York, New York 10019.

328

Supp.App. 0695

Table of Contents

## CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS

**Quinpario's Related Party Transactions**

In September 2014, the Sponsor purchased an aggregate of 10,062,500 shares of Quinpario Common Stock, for an aggregate purchase price of $25,000. The managing member of the Sponsor is Quinpario Partners, an entity affiliated with several of the Company's officers and directors. On November 10, 2014, the Sponsor transferred 300,000 Founder Shares to independent directors of the Company. The Founder Shares held by the Founders, which include the Sponsor, management team and directors, included an aggregate of up to 1,312,500 shares subject to forfeiture to the extent that the underwriters' over-allotment option was not exercised in full or in part, so that the Founders would collectively own 20.0% of our issued and outstanding shares after the IPO (assuming they did not purchase units in the IPO).

On January 22, 2015, the underwriters informed the Company that they were waiving their right to exercise any portion of their over-allotment option. As a result, the Sponsor forfeited an aggregate of 1,312,500 Founder Shares, leaving the Founders with an aggregate of 8,750,000 Founder Shares.

The Founders agreed with the underwriters of Quinpario's IPO pursuant to letter agreements not to transfer, assign or sell any of the Founder Shares (except to certain permitted transferees) until (1) with respect to 20% of the Founder Shares, the consummation of an initial business combination and (2) with respect to the remaining 80% of the Founder Shares, the earlier of one year after the date of the consummation of an initial business combination or if after 150 days after an initial business combination, the closing price of the Company's common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days within any 30-trading day period. Notwithstanding the foregoing, the foregoing transfer restrictions will be removed earlier if, after an initial business combination, the Company consummates a subsequent (i) liquidation, merger, stock exchange or other similar transaction which results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property or (ii) consolidation, merger or other change in the majority of the Company's management team. On June 15, 2017, the underwriters of Quinpario's IPO and certain of the Founders amended the letter agreements to provide that (i) an aggregate 3,016,071 Founder Shares would be freely tradable and exempt from any lock-up upon consummation of the Business Combination and (ii) the remainder of the retained Founder Shares would become freely tradable six months after the consummation of the Business Combination.

The Sponsor also purchased 18,000,000 private warrants for a total purchase price of $9,000,000 from the Company simultaneous to the closing of the IPO. Each private warrant entitles the holder to purchase one-half of one share of Quinpario Common Stock at $5.75 per half share. The private warrants are identical to the warrants included in the units sold in the IPO except the private warrants are non-redeemable and may be exercised on a cashless basis, in each case so long as they continue to be held by the initial purchasers or their permitted transferees. Additionally, the Sponsor agreed not to transfer, assign or sell any of the private warrants or underlying securities (except to the same permitted transferees as the Founder Shares and provided the transferees agree to the same terms and restrictions as the permitted transferees of the Founder Shares must agree to, each as described above) until 30 days after the completion of an initial business combination.

Quinpario Partners and Jeffry N. Quinn, the Company's former Chairman, have agreed that they will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by the Company for services rendered or contracted for or products sold to the Company, but they may not be able to satisfy their indemnification obligations if they are required to do so. Furthermore, they will have no liability under this indemnity as to any claimed amounts owed to a target business or vendor or other entity who has executed an agreement with the Company waiving any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account.

329

Supp.App. 0696

Pursuant to a registration rights agreement entered into on January 15, 2015 with the Company's Founders, the Company is required to register certain securities for sale under the Securities Act. The holders of a majority of these securities are entitled to make up to three demands that the Company register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to the consummation of an initial business combination. The Company will bear the expenses incurred in connection with the filing of any such registration statements. It is expected that the registration rights agreement will be terminated upon entry into the Registration Rights Agreement in connection with the consummation of the Business Combination. See "*Proposal No. 1—Approval of the Business Combination—The Registration Rights Agreement*."

Quinpario Partners has agreed that, commencing on January 15, 2015 through the earlier of the consummation of an initial business combination or the Company's liquidation, it will make available to the Company certain general and administrative services, including office space, utilities and administrative support, as the Company may require from time to time. The Company has agreed to pay Quinpario Partners $10,000 per month for these services. For the years ended December 31, 2016 and 2015, the Company paid $120,000 and $110,000, respectively, of expense pursuant to the administrative services agreement.

In November 2015, the Company reimbursed Quinpario Partners $38,522 for dues and subscriptions relating to systems that the Company utilizes in searching for a target business.

For a discussion of the relationships and related party transactions of Quinpario relating to its advisors, see the description of the Advisors Subscription Agreement under "*Proposal No. 1—Approval of the Business Combination—PIPE Investment*."

**SourceHOV's Related Party Transactions**

On April 31, 2013, HandsOn 3, LLC and SourceHOV, LLC entered into a consulting agreement (the "HGM Consulting Agreement") pursuant to which HandsOn 3, LLC provides consulting services to SourceHOV, LLC. The HGM Consulting Agreement was amended and restated on October 31, 2014. For these consulting services SourceHOV incurred annual consulting fees of $6.0 million, $6.0 million and $4.9 million for the years ended December 31, 2016, 2015 and 2014, respectively. SourceHOV additionally incurred an annual management fee to CVCI (as defined in the HGM Consulting Agreement) of $1.9 million for the year ended December 31, 2014.

SourceHOV was also responsible for travel expenses of HandsOn 3, LLC of $1.7 million, $0.8 million and $0.7 million for the years ended December 31, 2016, 2015 and 2014, respectively. In addition, SourceHOV was responsible for travel expenses CVCI of $0.05 million for the year ended December 31, 2014.

SourceHOV incurred a transaction fee to HandsOn 3, LLC of $10.4 million payable over four years in annual installments beginning on December 31, 2014. Further, SourceHOV incurred a transaction fee to CVCI of $1.3 million and incurred $4.5 million deferred redemption to CVCI payable over two years from December 31, 2014.

For a discussion of the relationships and related party transactions of SourceHOV relating to the Business Combination, including the New SourceHOV Financing, see the description of the Business Combination and the related proposed financing transactions under "*Proposal No. 1—Approval of the Business Combination*."

In connection with the financing of the Business Combination, New SourceHOV LLC has committed to fund up to $57.5 million of the PIPE Investment, with the amount of its PIPE Investment dependent on the number of shares of Quinpario Common Stock redeemed prior to the Business Combination. In connection therewith, New SourceHOV LLC has entered into the New SourceHOV Financing pursuant to which New SourceHOV LLC will borrow up to $57.5 million and pledge to the

330

Supp.App. 0697

Table of Contents

lenders thereunder 2,875,000 shares of Series A Convertible Preferred Stock and 4,312,500 shares of Quinpario Common Stock acquired by New SourceHOV LLC in the PIPE Investment and the 80,600,000 shares of Quinpario Common Stock acquired by New SourceHOV LLC in the Business Combination. As the New SourceHOV Financing is being undertaken to facilitate consummation of the Business Combination Agreement, SourceHOV has agreed to pay the fees and expenses associated with the incurrence of the New SourceHOV Financing, the Company has also agreed to pay certain fees and expenses associated therewith including the issuance of up to 821,429 shares of Quinpario Common Stock to the lenders thereunder, and the Company will pay certain expenses associated with the conversion of restricted equity awards in SourceHOV becoming restricted equity awards in New SourceHOV LLC.

### Real Estate

Certain subsidiaries of SourceHOV lease their operating facilities from previous owners of such subsidiaries who remained employees. These leases are for various lengths and annual amounts. The rental expense for these operating leases was $0, $0.1 million and $0.1 million in the aggregate for the years ended December 31, 2016, 2015 and 2014, respectively.

HOV RE, LLC, an affiliate through common interest held by certain shareholders, leases a property in Antioch, California to HOVG LLC (aka Bay Area Credit Service LLC) and HOV Services, Inc, pursuant to two lease agreements entered into on December 1, 2008 and September 1, 2010, respectively. The rental expense for these premises was $0.6 million, $0.2 million and $0.2 million for the years ended December 31, 2016, 2015 and 2014, respectively.

Pursuant to a tripartite lease agreement dated November 14, 2016, HOV Services Limited, as landlord, rents to BancTec TPS India Private Limited, as lessee, and TransCentra FTS Private Limited, as sub-lessee, a property in Vashi, Navi Mumbai, India.

### Services

Pursuant to two agreements between HOV Services Limited, an indirect shareholder of SourceHOV, and HOV Services, Inc., HOV Services Limited provides data capture and technology services to SourceHOV. The expense for these services was approximately $1.7 million, $1.4 million, and $1.3 million for the years ended December 31, 2016, 2015 and 2014, respectively.

SourceHOV licenses the use of trademark 'HOV' on a non-exclusive basis from HOF 2 LLC pursuant to a trademark license agreement dated April 29, 2011.

Pursuant to a master agreement dated January 1, 2015 between Rule 14, LLC and SourceHOV, SourceHOV incurred sales marketing fees of $0.5 million for the year ended December 31, 2016.

SourceHOV is party to ten master agreements with entities affiliated with HGM's ventures portfolio, each of which were entered into during 2015 and 2016. Each master agreement provides SourceHOV with free use of the technology in question and includes a reseller arrangement pursuant to which SourceHOV is entitled to sell these services to third parties. Any revenue earned by SourceHOV in such third-party sale is shared 75%/25% with each of HGM's venture affiliates in favor of SourceHOV. The brands Zuma, Athena, Peri, BancMate, Spring, Jet, Teletype, CourtQ and Rewardio are part of the HGM ventures portfolio. SourceHOV has the license to use and resell such brands, as described therein.

### Novitex's Related Party Transactions

On October 1, 2013, Novitex Acquisition, LLC, an indirect wholly-owned subsidiary of Novitex Holdings, Inc. (formerly known as Arsloane Acquisition, LLC) ("Novitex Acquisition"), entered into a consulting agreement with Apollo Management VII, L.P. ("Apollo Management"), an indirect wholly-owned subsidiary of Apollo. Pursuant to the consulting agreement, Apollo Management provides

Supp.App. 0698

Table of Contents

consulting services to Novitex Acquisition, including consulting on proposed financial transactions, acquisitions, investments and financial related matters. For these consulting services, Novitex Acquisition paid Apollo Management approximately $0.8 million for each of the years ended December 31, 2015 and 2014 and an annual fee of approximately $0.8 million has been accrued from the beginning of 2016.

On November 18, 2014, Novitex Enterprise Solutions, Inc., a wholly-owned subsidiary of Novitex ("Novitex Solutions"), entered into a master services agreement with Apollo Management Holdings, L.P. ("Apollo Holdings"), an indirect wholly-owned subsidiary of Apollo. Pursuant to this master services agreement, Novitex Solutions provides Apollo Holdings printer supplies and maintenance services, including toner maintenance, training, quarterly business review and printer procurement. Novitex recognized revenue from Apollo Holdings under this agreement of approximately $0.9 million, $3.0 million and $0.5 million for the years ended December 31, 2016, 2015 and 2014, respectively, and approximately $0.2 million from beginning of 2017 to the date of this proxy statement.

In February 2016, Novitex Solutions entered into a master services agreement with CEC Entertainment Concepts, L.P. ("CEC"), a wholly-owned subsidiary of CEC Entertainment, Inc., which is a subsidiary of Apollo. Pursuant to this master services agreement, Novitex Solutions provides print management services to CEC, including strategic account management, sourcing operations, supply chain management, mail services consulting, technology and reporting services. Novitex recognized revenue from CEC under this master services agreement of approximately $0.2 million for the year ended December 31, 2016, and accrued approximately $0.1 million from beginning of 2017 to the date of this proxy statement.

In April 2016, Novitex Solutions entered into a master services agreement with Presidio Networked Solutions Group, LLC ("Presidio Group"), a wholly-owned subsidiary of Presidio, Inc., a portion of which is owned by affiliates of Apollo. Pursuant to this master services agreement, Presidio Group provides Novitex Solutions with employees, subcontractors, and/or goods and services. Pursuant to this master services agreement, Novitex Solutions paid Presidio Group approximately $0.2 million and $0.1 million for the years ended December 31, 2016 and 2015, respectively, and accrued approximately $0.1 million from beginning of 2017 to the date of this proxy statement.

On January 18, 2017, Novitex Solutions entered into a master purchase and professional services agreement with Caesars Enterprise Services, LLC ("Caesars"), a portion of which is owned by an affiliate of Apollo. Pursuant to this master purchase and professional services agreement, Novitex Solutions provides managed print services to Caesars, including general equipment operation, supply management, support services and technical support. Novitex has recognized revenue from Caesars under this master purchase and professional services agreement of approximately $0.2 million from January 18, 2017, the date this agreement was entered into, to the date of this proxy statement.

On May 5, 2017, Novitex Solutions entered into a master services agreement with ADT LLC, a portion of which is owned by affiliates of Apollo. As of the date of this proxy statement, Novitex Solutions does not currently provide any services to ADT LLC and has not recognized any revenue from ADT LLC under the master services agreement.

For a discussion of the relationships and related party transactions of Novitex relating to the Business Combination, including Apollo's participation in the PIPE Investment, see the description of the Business Combination and the related proposed financing transactions under "*Proposal No. 1—Approval of the Business Combination*."

332

Supp.App. 0699

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 702 of 1110   PageID 2323

## PRICE RANGE OF SECURITIES AND DIVIDENDS

**Quinpario**

*Price Range of Quinpario Securities*

Quinpario's units, each of which consists of one share of Quinpario Common Stock and one warrant to purchase one-half of one share of Quinpario Common Stock, began trading on Nasdaq under the symbol "QPACU" on January 16, 2015. On March 5, 2015, Quinpario announced that holders of the units could elect to separately trade Quinpario Common Stock and the warrants included in the units, or to continue to trade the units without separating them. On March 9, 2015, Quinpario Common Stock and the warrants began trading on Nasdaq under the symbols "QPAC" and "QPACW," respectively. Each warrant entitles the holder to purchase one-half of one share of Quinpario Common Stock at a price of $5.75 per half share, subject to adjustments as described in Quinpario's final prospectus dated August 13, 2016, which was filed with the SEC. Warrants may only be exercised for a whole number of shares of Class A Stock and will become exercisable 30 days after the completion of an initial business combination. The warrants will expire five years after the completion of an initial business combination or earlier upon redemption or liquidation as described in Quinpario's final prospectus.

The following table sets forth, for the calendar quarter indicated, the high and low sales prices per unit, Quinpario Common Stock and warrants as reported on Nasdaq for the periods presented.

| | Units | | Common Stock | | Warrants | |
|---|---|---|---|---|---|---|
| | High | Low | High | Low | High | Low |
| 2017 | | | | | | |
| Second Quarter* | 10.50 | 10.20 | 10.03 | 9.93 | 0.55 | 0.29 |
| First Quarter | 10.76 | 10.12 | 10.10 | 9.93 | 0.62 | 0.17 |
| 2016 | | | | | | |
| Fourth Quarter | 10.05 | 10.17 | 9.90 | 9.95 | 0.20 | 0.10 |
| Third Quarter | 10.03 | 10.10 | 9.85 | 9.97 | 0.21 | 0.14 |
| Second Quarter | 9.91 | 10.05 | 9.75 | 9.90 | 0.24 | 0.16 |
| First Quarter | 9.78 | 9.93 | 9.85 | 9.66 | 0.24 | 0.14 |
| 2015 | | | | | | |
| Fourth Quarter | 10.28 | 9.69 | 12.68 | 8.96 | 0.35 | 0.13 |
| Third Quarter | 10.61 | 10.03 | 9.94 | 9.80 | 0.60 | 0.25 |
| Second Quarter | 10.45 | 10.11 | 9.95 | 9.70 | 0.60 | 0.29 |
| First Quarter | 10.33 | 9.51 | 12.00 | 8.00 | 1.17 | 0.25 |

\*      Through June 23, 2017

*Dividend Policy of Quinpario*

Quinpario has not paid any cash dividends on shares of Quinpario Common Stock to date and does not intend to pay cash dividends prior to the completion of an initial business combination. The payment of cash dividends in the future will be dependent upon Quinpario's revenues and earnings, if any, capital requirements and general financial condition subsequent to completion of a business combination. The payment of any dividends subsequent to a business combination will be within the discretion of the board of directors at such time. It is the present intention of the board of directors to retain all earnings, if any, for use in its business operations and, accordingly, the board of directors does not anticipate declaring any dividends in the foreseeable future. Further, if Quinpario incurs any indebtedness, its ability to declare dividends may be limited by restrictive covenants Quinpario may agree to in connection therewith.

333

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 703 of 1110   PageID 2324

**Novitex/SourceHOV**

Historical market price information regarding SourceHOV and Novitex is not provided because there is no public market for their equity securities. For information about distributions paid by SourceHOV and Novitex to their respective equityholders, please see the sections entitled "*SourceHOV Management's Discussion and Analysis of Financial Condition and Results of Operations—Liquidity and Capital Resources*." and "*Novitex Management's Discussion and Analysis of Financial Condition and Results of Operations —Liquidity and Capital Resources*."

## INDEPENDENT PUBLIC ACCOUNTING FIRM

Representatives of Quinpario's independent registered public accounting firm, Marcum LLP, will be present at the Special Meeting of the stockholders. The representatives will have the opportunity to make a statement if they so desire and they are expected to be available to respond to appropriate questions.

## APPRAISAL RIGHTS

**Quinpario stockholders do not have appraisal rights in connection with the Business Combination under Delaware law.**

## DELIVERY OF DOCUMENTS TO STOCKHOLDERS

Pursuant to the rules of the SEC, Quinpario and servicers that Quinpario employs to deliver communications to Quinpario stockholders are permitted to deliver to two or more stockholders sharing the same address a single copy of the proxy statement. Upon written or oral request, Quinpario will deliver a separate copy of the proxy statement to any stockholder at a shared address to which a single copy of the proxy statement was delivered and who wishes to receive separate copies in the future. Stockholders receiving multiple copies of the proxy statement may likewise request that Quinpario deliver single copies of the proxy statement in the future. Stockholders may notify Quinpario of their requests by writing Quinpario at its principal executive offices at 12935 N. Forty Drive, Suite 201, St. Louis, Missouri 63141, or calling at (314) 548-6200.

## TRANSFER AGENT AND REGISTRAR

The transfer agent for Quinpario's securities and warrant agent for Quinpario's warrants is Continental Stock Transfer & Trust Company.

334

Table of Contents

**WHERE YOU CAN FIND MORE INFORMATION**

The Company files reports, proxy statements and other information with the SEC as required by the Exchange Act. You can read Quinpario's SEC filings, including this proxy statement, over the internet at the SEC's website at *http://www.sec.gov*. You may also read and copy any document the Company files with the SEC at the SEC public reference room located at 100 F Street, N.E., Room 1580 Washington, D.C., 20549. You may obtain information on the operation of the Public Reference Room by calling the SEC at 1-800-SEC-0330. You may also obtain copies of the materials described above at prescribed rates by writing to the SEC, Public Reference Section, 100 F Street, N.E., Washington, D.C. 20549.

If you would like additional copies of this proxy statement or if you have questions about the Business Combination or the proposals to be presented at the Special Meeting, you should contact the Company by in writing at 12935 N. Forty Drive, Suite 201, St. Louis, Missouri 63141, or by telephone at (314) 548-6200.

You may also obtain these documents by requesting them in writing or by telephone from the Company's proxy solicitation agent at the following address and telephone number:

<div align="center">

Morrow Sodali LLC
470 West Avenue
Stamford, Connecticut 06902
Individuals, please call toll-free: (800) 662-5200
Banks and brokerage, please call: (203) 658-9400
Email: QPAC.info@morrowsodali.com

</div>

**If you are a stockholder of Quinpario and would like to request documents, please do so by July 5, 2017 to receive them before the Special Meeting.** If you request any documents from the Company, the Company will mail them to you by first class mail, or another equally prompt means.

All information contained in this proxy statement relating to Quinpario has been supplied by Quinpario, and all such information relating to SourceHOV and Novitex has been supplied by SourceHOV and Novitex, respectively. Information provided by either Quinpario, Novitex or SourceHOV does not constitute any representation, estimate or projection of any other party.

This document is a proxy statement of Quinpario for the Special Meeting of Quinpario stockholders. The Company has not authorized anyone to give any information or make any representation about the Business Combination, the Company, Novitex or SourceHOV that is different from, or in addition to, that contained in this proxy statement. Therefore, if anyone does give you information of this sort, you should not rely on it. The information contained in this document speaks only as of the date of this document unless the information specifically indicates that another date applies.

<div align="center">335</div>

Supp.App. 0702

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 705 of 1110    PageID 2326

INDEX TO CONSOLIDATED FINANCIAL STATEMENTS

**Audited Financial Statements for Quinpario Acquisition Corp. 2**

| | |
|---|---|
| Report of Independent Registered Public Accounting Firm | F-3 |
| Balance Sheets as of December 31, 2016 and 2015 | F-4 |
| Statements of Operations for the years ended December 31, 2016 and 2015 and for the Period from July 15, 2014 (Inception) to December 31, 2014 | F-5 |
| Statement of Changes in Stockholders' Equity (Deficit) for the Period from July 15, 2014 (Inception) to December 31, 2016 | F-6 |
| Statements of Cash Flows for the years ended December 31, 2016 and 2015 and for the Period from July 15, 2014 (Inception) to December 31, 2014 | F-7 |
| Notes to Financial Statements | F-8 |

**Unaudited Condensed Consolidated Interim Financial Statements for Quinpario Acquisition Corp. 2**

| | |
|---|---|
| Condensed Consolidated Interim Balance Sheets as of March 31, 2017 and December 31, 2016 | F-19 |
| Condensed Consolidated Interim Statements of Operations for the three months ended March 31, 2017 and 2016 | F-20 |
| Condensed Consolidated Interim Statements of Cash Flows for the three months ended March 31, 2017 and 2016 | F-21 |
| Notes to Unaudited Condensed Consolidated Interim Financial Statements | F-22 |

**Audited Consolidated Financial Statements for SourceHOV Holdings, Inc.**

| | |
|---|---|
| Independent Auditors' Report | F-31 |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | F-32 |
| Consolidated Statements of Operations for the years ended December 31, 2016, 2015 and 2014 | F-33 |
| Consolidated Comprehensive Loss for the years ended December 31, 2016, 2015 and 2014 | F-34 |
| Consolidated Statements of Stockholders' Deficit for the years ended December 31, 2016, 2015 and 2014 | F-35 |
| Consolidated Statements of Cash Flows for the years ended December 31, 2016, 2015 and 2014 | F-36 |
| Notes to the Consolidated Financial Statements | F-37 |

**Unaudited Condensed Consolidated Financial Statements for SourceHOV Holdings, Inc.**

| | |
|---|---|
| Condensed Consolidated Balance Sheets as of March 31, 2017 and December 31, 2016 | F-76 |
| Condensed Consolidated Statements of Operations for the three months ended March 31, 2017 and 2016 | F-77 |
| Condensed Consolidated Statements of Comprehensive Loss for the three months ended March 31, 2017 and 2016 | F-78 |
| Condensed Consolidated Statements of Stockholders' Deficit for the three months ended March 31, 2017 and 2016 | F-79 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2017 and 2016 | F-80 |
| Notes to the Condensed Consolidated Financial Statements | F-81 |

F-1

Supp.App. 0703

**Audited Consolidated Financial Statements for Novitex Holdings, Inc.**

| | |
|---|---|
| Report of Independent Auditors | F-98 |
| Consolidated Statements of Operations and Comprehensive Loss for the Years Ended December 31, 2016, 2015 and 2014 | F-99 |
| Consolidated Balance Sheets as of December 31, 2016 and 2015 | F-100 |
| Consolidated Statements of Cash Flows for the Years Ended December 31, 2016, 2015 and 2014 | F-101 |
| Consolidated Statements of Stockholder's Equity (Deficit) | F-102 |
| Notes to the Consolidated Financial Statements | F-103 |

**Unaudited Condensed Consolidated Financial Statements for Novitex Holdings, Inc.**

| | |
|---|---|
| Condensed Consolidated Statements of Operations and Comprehensive Loss for the three months ended March 31, 2017 and 2016 | F-130 |
| Condensed Consolidated Balance Sheets as of March 31, 2017 and December 31, 2016 | F-131 |
| Condensed Consolidated Statements of Cash Flows for the three months ended March 31, 2017 and 2016 | F-132 |
| Condensed Consolidated Statements of Stockholder's Deficit for the three months ended March 31, 2017 and 2016 | F-133 |
| Notes to the Condensed Consolidated Financial Statements | F-134 |

<div align="center">F-2</div>

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 707 of 1110     PageID 2328

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the Audit Committee of the
Board of Directors and Shareholders
of Quinpario Acquisition Corp. 2

We have audited the accompanying balance sheets of Quinpario Acquisition Corp. 2 (the "Company") as of December 31, 2016 and 2015, and the related statements of operations, changes in stockholders' equity and cash flows for the years ended December 31, 2016, 2015 and for the period from July 15, 2014 (inception) to December 31, 2014. These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these financial statements based on our audits.

We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States). Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. Our audit included consideration of internal control over financial reporting as a basis for designing audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the financial statements referred to above present fairly, in all material respects, the financial position of Quinpario Acquisition Corp. 2, as of December 31, 2016 and 2015, and the results of its operations and its cash flows for the years ended December 31, 2016, 2015 and the period from July 15, 2014 (inception) to December 31, 2014, in conformity with accounting principles generally accepted in the United States of America.

/s/ Marcum LLP
Marcum LLP
New York, NY
March 3, 2017

F-3

Supp.App. 0705

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 708 of 1110   PageID 2329

**QUINPARIO ACQUISITION CORP. 2**

**BALANCE SHEETS**

| | As of | |
| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| **ASSETS:** | | |
| Current asset: | | |
| Cash and cash equivalents | $ 120,382 | $ 881,923 |
| Prepaid insurance | — | 74,715 |
| Total current assets | 120,382 | 956,638 |
| Noncurrent assets: | | |
| Cash and investments held in Trust Account | 351,088,398 | 350,155,268 |
| Total assets | $ 351,208,780 | $ 351,111,906 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY:** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $ 107,331 | $ 67,420 |
| Total current liabilities | 107,331 | 67,420 |
| Deferred underwriters' fees | 12,250,000 | 12,250,000 |
| Total liabilities | 12,357,331 | 12,317,420 |
| | | |
| Commitments | | |
| Common stock subject to possible redemption; 33,281,648 and 33,364,647 shares (at redemption value), respectively | 333,851,446 | 333,794,485 |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | — | — |
| Common stock, $0.0001 par value; 135,000,000 shares authorized; 10,468,352 and 10,385,353 shares issued and outstanding at December 31, 2016 and 2015, respectively (which excludes 33,281,648 and 33,364,647 shares subject to possible redemption, respectively | 1,047 | 1,039 |
| Additional paid-in capital | 5,367,258 | 5,424,227 |
| Accumulated deficit | (368,302) | (425,265) |
| Total stockholders' equity | 5,000,003 | 5,000,001 |
| Total liabilities and stockholders' equity | $ 351,208,780 | $ 351,111,906 |

The accompanying notes are an integral part of these financial statements.

F-4

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 709 of 1110    PageID 2330

**QUINPARIO ACQUISITION CORP. 2**

**STATEMENTS OF OPERATIONS**

| | For the year ended December 31, 2016 | For the year ended December 31, 2015 | For the period from July 15, 2014 (inception) to December 31, 2014 |
|---|---|---|---|
| Reimbursement of due diligence expenses | $ — | $ 500,000 | $ — |
| General and administrative costs | (1,128,167) | (1,027,734) | (53,338) |
| Loss from operations | (1,128,167) | (527,734) | (53,338) |
| Interest income | 1,185,130 | 155,807 | — |
| Net income / (loss) | $ 56,963 | $ (371,927) | $ (53,338) |
| Weighted average number of common shares outstanding—basic and diluted(1) | 10,414,438 | 10,261,416 | 8,750,000 |
| Net income / (loss) per common share—basic and diluted | $ 0.01 | $ (0.04) | $ (0.01) |

(1)    The amount excludes an aggregate of 1,312,500 shares at December 31, 2014 that were forfeited in January 2015 by the Sponsor following notice from the underwriters that they were waiving their right to exercise any portion of their over-allotment option (see note 4).

The accompanying notes are an integral part of these financial statements.

F-5

Supp.App. 0707

**QUINPARIO ACQUISITION CORP. 2**

**STATEMENT OF CHANGES IN STOCKHOLDERS' EQUITY (DEFICIT)**

**For the Period from July 15, 2014 (Inception) to December 31, 2016**

| | Common Stock | | Additional Paid-in Capital | Accumulated Deficit | Total Stockholders' Equity (Deficit) |
| --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | |
| Sale of common stock issued to initial stockholder | 10,062,500 | $ 1,006 | $ 23,994 | $ — | $ 25,000 |
| Net Loss | — | — | — | (53,338) | (53,338) |
| Balance at December 31, 2014 | 10,062,500 | 1,006 | 23,994 | (53,338) | (28,338) |
| Proceeds from the sale of 35,000,000 units | 35,000,000 | 3,500 | 349,996,500 | — | 350,000,000 |
| Underwriters' discount and offering expenses | — | — | (19,805,250) | — | (19,805,250) |
| Proceeds from the sale of 18,000,000 warrants to Initial Stockholder | — | — | 9,000,000 | — | 9,000,000 |
| Forfeiture of 1,312,500 shares following notice that Underwriters waived their right to exercise overallotment option. | (1,312,500) | (131) | 131 | — | — |
| Proceeds subject to possible redemption of 33,364,647 shares at redemption value | (33,364,647) | (3,336) | (333,791,148) | — | (333,794,485) |
| Net loss | — | — | — | (371,927) | (371,927) |
| Balances at December 31, 2015 | 10,385,353 | $ 1,039 | $ 5,424,227 | $ (425,265) | $ 5,000,001 |
| Change in shares subject to possible redemption | 82,999 | 8 | (56,969) | — | (56,961) |
| Net Income | — | — | — | 56,963 | 56,963 |
| Balances at December 31, 2016 | 10,468,352 | 1,047 | 5,367,258 | (368,302) | 5,000,003 |

The accompanying notes are an integral part of these financial statements.

F-6

Supp.App. 0708

**QUINPARIO ACQUISITION CORP. 2**

**STATEMENTS OF CASH FLOWS**

| | For the year ended December 31, 2016 | For the year ended December 31, 2015 | For the Period from July 15, 2014 (inception) to December 31, 2014 |
|---|---|---|---|
| **Cash Flows from Operating Activities:** | | | |
| Net income (loss) | $        56,963 | $       (371,927) | $        (53,338) |
| Adjustments to reconcile net income (loss) to net cash used in operating activities: | | | |
| Interest income on restricted cash and equivalents held in trust | (1,185,130) | (155,807) | — |
| Changes in operation assets and liabilities: | | | |
| Prepaid insurance | 74,715 | (47,697) | (27,017) |
| Accounts payable and accrued expenses | 39,911 | 67,420 | — |
| **Net Cash Used in Operating Activities** | (1,013,541) | (508,011) | (80,355) |
| **Cash Flows from Investing Activities:** | | | |
| Proceeds deposited in trust account | — | (350,000,000) | — |
| Proceeds released from trust account | 252,000 | 539 | — |
| **Net Cash Provided by (Used in) Investing Activities** | 252,000 | (349,999,461) | — |
| **Cash Flows from Financing Activities:** | | | |
| Repayment of note payable to related party | — | (325,370) | — |
| Proceeds from issuance of common stock to initial stockholder | — | — | 25,000 |
| Payment of deferred offering costs | — | — | (184,087) |
| Proceeds from note payable to related party | — | 84,655 | 240,715 |
| Proceeds from initial public offering, net of costs | — | 342,628,838 | — |
| Proceeds from private placement | — | 9,000,000 | — |
| **Net Cash Provided by Financing Activities** | — | 351,388,123 | 81,628 |
| **Net (decrease) increase in cash and cash equivalents** | (761,541) | 880,651 | 1,273 |
| | | | |
| Cash and cash equivalents—beginning | 881,923 | 1,273 | — |
| **Cash and cash equivalents—ending** | $      120,382 | $       881,923 | $         1,273 |
| **Supplemental disclosure of noncash investing and financing activities:** | | | |
| Deferred underwriters' fees | $            — | $    12,250,000 | — |
| Ordinary shares subject to possible redemption related to public offering | — | 334,157,996 | |
| Change in value of shares subject to redemption | 56,961 | (363,511) | |

The accompanying notes are an integral part of these financial statements.

F-7

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 712 of 1110    PageID 2333

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements**

## 1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS

Quinpario Acquisition Corp. 2 ("us", "we", "Company" or "our") is a blank check company incorporated in Delaware on July 15, 2014. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities ("Business Combination"). All activity through December 31, 2016 relates to the Company's formation, initial public offering described below and search for a Business Combination. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

The registration statement for the Company's initial public offering ("Initial Public Offering") was declared effective on January 15, 2015. The Company consummated the Initial Public Offering of 35,000,000 units ("Units") at $10.00 per Unit on January 22, 2015, generating gross proceeds of $350,000,000, which is described in Note 3.

Simultaneously with the closing of the Initial Public Offering, the Company consummated the private placement of 18,000,000 warrants ("Private Placement Warrants") at a price of $0.50 per warrant to Quinpario Partners 2, LLC, the Company's sponsor ("Sponsor"), generating gross proceeds of $9,000,000, which is described in Note 3.

Transaction costs amounted to $19,805,250, consisting of $7,000,000 of underwriting fees, $12,250,000 of deferred underwriting fees (which are held in the Trust Account (defined below)), $555,250 of Initial Public Offering costs and $63,920 of other expenses incurred through January 22, 2015. In addition, $1,380,830 of cash was available to fund operations and held outside of the Trust Account on January 22, 2015.

Following the closing of the Initial Public Offering on January 22, 2015, an amount of $350,000,000 ($10.00 per Unit) from the net proceeds of the sale of the Units in the Initial Public Offering and the Private Placement Warrants was placed in a trust account ("Trust Account") and has been invested in U.S. treasury bills, notes or bonds with a maturity of 180 days or less or in an open ended investment company that holds itself out as a money market fund selected by the Company meeting the conditions of paragraphs (c)(2), (c)(3) and (c)(4) of Rule 2a-7 of the Investment Company Act of 1940 and that invests solely in U.S. treasuries, as determined by the Company. Such proceeds will continue to be held in such investments until the earlier of: (i) the consummation of a Business Combination or (ii) the distribution of the Trust Account as described below.

The Company's management has broad discretion with respect to the specific application of the net proceeds of its Initial Public Offering, although substantially all of the net proceeds of the Initial Public Offering are intended to be generally applied toward consummating a Business Combination. Furthermore, there is no assurance that the Company will be able to successfully affect a Business Combination.

On June 19, 2015, the Company received a $500,000 reimbursement for expenses that it incurred in connection with the due diligence of a potential business combination that did not materialize.

In January 2017, we held a special meeting of stockholders. At the meeting, our stockholders approved an amendment to our Amended and Restated Certificate of Incorporation to extend the date by which we had to consummate an initial business combination to July 24, 2017. For the 19,997,082 public shares that voted in favor of the amendment, such vote also constituted their consent for the Company to amend the Investment Management Trust Agreement to withdraw from the Trust Account

F-8

Supp.App. 0710

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 713 of 1110    PageID 2334

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS (Continued)**

any interest earned on the funds held in the Trust Account related to those shares, net of taxes payable, for the Company's working capital requirements. In connection with the extension, holders of 14,901,399 public shares exercised their right to convert such public shares into a pro rata portion of the trust account established in connection with our initial public offering. As a result, $201,543,292 remained in our trust account as of January 19, 2017. In addition, 101,519 public shares were not voted and, for that reason, the Company cannot use the interest earned on those shares for the Company's working capital requirements. As a result, $1,018,002 of the funds that remain in the Trust Account are for the benefit of those public stockholders who did not vote on the extension amendment and will disburse such amount to such public stockholders if and when they present their shares for conversion.

On February 21, 2017, the Company, entered into a Business Combination Agreement (the "Agreement") by and among the Company, Quinpario Merger Sub I, Inc., a Delaware corporation ("SourceHOV Merger Sub"), Quinpario Merger Sub II, Inc., a Delaware corporation ("Novitex Merger Sub" and, together with SourceHOV Merger Sub, the "Merger Subs"), Novitex Holdings, Inc., a Delaware corporation ("Novitex"), SourceHOV Holdings, Inc., a Delaware corporation ("SourceHOV"), Novitex Parent, L.P. ("Novitex Parent"), HOVS LLC and HandsOn Fund 4 I, LLC (collectively, the "HGM Group" and, together with Novitex Parent, each a "Seller" and collectively, the "Sellers"). Completion of the transaction is subject to amongst other requirements, the approval of the transaction by our stockholders. Accordingly, there can be no assurance that the proposed transaction will be consummated.

We will seek stockholder approval of our initial Business Combination at a meeting called for such purpose at which stockholders may seek to convert their shares, regardless of whether they vote for or against the proposed Business Combination, into their pro rata share of the aggregate amount then on deposit in the Trust Account (net of taxes payable). We will consummate our initial Business Combination only if we have net tangible assets of at least $5,000,001 upon such consummation and a majority of the outstanding shares of common stock voted are voted in favor of the Business Combination. Notwithstanding the foregoing, the Amended and Restated Certificate of Incorporation of the Company provides that a public stockholder, together with any affiliate or other person with whom such public stockholder is acting in concert or as a "group" (within the meaning of Section 13 of the Securities Act of 1934, as amended (the "Securities Act")), will be restricted from seeking redemption rights with respect to an aggregate of more than 15% of the public shares (but only with respect to the amount over 15% of the public shares).

The Company's Units, common stock and warrants are listed on the Nasdaq Capital Market ("NASDAQ"). Pursuant to the NASDAQ listing rules, the Company's initial Business Combination must be with a target business or businesses whose collective fair market value is at least equal to 80% of the balance in the Trust Account (excluding deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for such Business Combination, although this may entail simultaneous acquisitions of several target businesses. The Company determined this test was met in connection with the proposed transaction with the Sellers.

The Company will have until July 24, 2017 to consummate its initial Business Combination. If the Company is unable to consummate an initial Business Combination within such time period for whatever reason (such as if not enough holders approve of the proposed business combination or too many holders seek conversion of their shares), it will, as promptly as possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares for a pro rata portion of the

F-9

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS (Continued)**

funds held in the Trust Account and then seek to dissolve and liquidate. In such event, the warrants will expire worthless. The Company expects the redemption price to be $10.00 per share of common stock, without taking into account any interest earned on such funds. However, the Company may not be able to distribute such amounts as a result of claims of creditors which may take priority over the claims of public stockholders.

We believe the $120,382 in our working capital account on December 31, 2016, plus the $812,000, in total, of interest income that we withdrew from the Trust Account on January 6, 2017 and February 17, 2017 will be sufficient to meet our working capital needs, to pay any taxes that we may owe and to complete our initial business combination. The amounts in the Trust Account may be invested only in U.S. government treasury securities with a maturity of 180 days or less or in money market funds investing solely in U.S. Treasuries and meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act. The current low interest rate environment has made it more difficult for such investments to generate sufficient funds. As a result, we may need to seek additional capital to continue our operations. If additional capital is required, we intend to borrow sufficient funds from Quinpario Partners, LLC or the management team to operate until we close our initial business combination. Neither Quinpario Partners, LLC nor our management team is under any obligation to advance funds to us. Any loan would be evidenced by a non-interest bearing promissory note. Up to $1,500,000 of such notes may be convertible into additional Private Placement Warrants at a price of $0.50 per warrant of the post business combination entity. Any such loans would be repaid only from funds held outside the Trust Account or from funds released to us upon completion of our initial Business Combination. If we are unable to complete our initial business combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the Trust Account.

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of presentation**

The accompanying financial statements are presented in U.S. dollars in conformity with accounting principles generally accepted in the United States of America ("GAAP") and pursuant to the rules and regulations of the Securities and Exchange Commission ("SEC").

**Cash and marketable securities held in Trust Account**

The amounts held in the Trust Account represent substantially all of the proceeds of the Initial Public Offering and are classified as restricted assets since such amounts can only be used by the Company in connection with the consummation of a Business Combination. As of December 31, 2016, 2015 and 2014, cash and trading securities held in the Trust Account consisted of $351,085,907, $350,154,498 and $0, respectively, in United States Treasury Bills with an original maturity of three months or less and $2,491, $770 and $0 in cash at December 31, 2016, 2015 and 2014, respectively.

**Shares subject to possible redemption**

The Company accounts for its shares subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." Shares subject to mandatory redemption (if any) are classified as a liability instrument and measured at fair value. Conditionally redeemable shares (including shares that feature redemption

F-10

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within the Company's control) are classified as temporary equity. At all other times, shares are classified as stockholders' equity. The Company's shares feature certain redemption rights that are considered to be outside of the Company's control and subject to occurrence of uncertain future events. Accordingly, shares subject to possible redemption are presented as temporary equity, outside of the stockholders' equity section of the Company's balance sheet.

**Net income (loss) per common share**

The Company complies with accounting and disclosure requirements of the Financial Accounting Standards Board ("FASB") ASC 260, "Earnings Per Share." Net income (loss) per common share is computed by dividing net income (loss) applicable to common stockholders by the weighted average number of common shares outstanding for the period, which excludes an aggregate of 1,312,500 shares at December 31, 2014 that were forfeited by the Sponsor on January 22, 2015 following notice from the underwriters that they were waving their right to exercise any portion of their over-allotment option (see Note 4). The Company has not considered the effect of (i) warrants sold in the Initial Public Offering to purchase 17,500,000 shares of the Company and (ii) the Private Placement Warrants to purchase 9,000,000 shares of the Company, in the calculation of net income (loss) per share, since the exercise of the warrants is contingent on the occurrence of future events. 33,281,648, 33,364,647 and 0 shares subject to possible redemption at December 31, 2016, 2015 and 2014, respectively, were also excluded from the calculation of basic income (loss) per ordinary share since such shares, if redeemed, only participate in their pro rata share of the trust earnings. At December 31, 2016, 2015 and 2014, the Company did not have any other dilutive securities or other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company. As a result, diluted income (loss) per common share is the same as basic income (loss) per common share for the periods.

**Concentration of credit risk**

Financial instruments that potentially subject the Company to concentration of credit risk consist of cash accounts in a financial institution which, at times may exceed the federal depository insurance coverage of $250,000. The Company has not experienced losses on these accounts and since the Company maintains its cash accounts with major financial institutions, management believes the Company is not exposed to significant risks on such accounts.

**Fair value of financial instruments**

The fair value of the Company's assets and liabilities, which qualify as financial instruments under FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet, primarily due to their short-term nature.

**Use of estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

F-11

Supp.App. 0713

Table of Contents

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

**Deferred offering costs**

Deferred offering costs consist of professional and underwriting fees incurred through the balance sheet date that are directly related to the Initial Public Offering and that were charged to stockholders' equity upon the completion of the Initial Public Offering.

**Income taxes**

The Company complies with the accounting and reporting requirements of FASB ASC, 740, "Income Taxes," which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts, based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

There were no unrecognized tax benefits as of December 31, 2016. FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The Company recognizes accrued interest and penalties as income tax expense. No amounts were accrued for the payment of interest and penalties at December 31, 2016. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position.

The Company may be subject to potential examination by U.S. federal and state authorities in the areas of income taxes. These potential examinations may include questioning the timing and amount of deductions, the nexus of income among various tax jurisdictions and compliance with U.S. federal and state tax laws. The Company's management does not expect that the total amount of unrecognized tax benefits will materially change over the next twelve months. Federal and Missouri income tax returns for the years ended December 31, 2016, 2015 and 2014 are currently open to examination although no audits are ongoing.

**Recently issued accounting standards**

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's financial statements.

**3. INITIAL PUBLIC OFFERING**

On January 22, 2015, the Company sold 35,000,000 Units at $10.00 per Unit. Each Unit consists of one share of common stock and one warrant. Each warrant entitles the holder thereof to purchase one-half of one share of common stock at a price of $5.75 per half share. Warrants may be exercised only for a whole number of shares of common stock. No fractional shares will be issued upon exercise of the warrants. Each warrant will become exercisable 30 days after the completion of an initial Business Combination, and will expire five years after the completion of an initial Business

F-12

Supp.App. 0714

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 717 of 1110    PageID 2338

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

### 3. INITIAL PUBLIC OFFERING (Continued)

Combination, or earlier upon redemption. We may redeem the outstanding warrants (excluding the Private Placement Warrants), in whole and not in part, at a price of $0.01 per warrant:

- upon a minimum of 30 days' prior written notice of redemption,

- if, and only if, the last sales price of our shares of common stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading day period (the "30-day trading period") ending three business days before we send the notice of redemption, and

- if, and only if, there is a current registration statement in effect with respect to the shares of common stock underlying such warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis."

Simultaneously with the Initial Public Offering, the Sponsor purchased an aggregate of 18,000,000 Private Placement Warrants at a price of $0.50 per warrant ($9,000,000 in the aggregate) in a private placement. The proceeds from the purchase of the Private Placement Warrants were placed in the Trust Account.

The Private Placement Warrants are identical to the warrants included in the Units sold in the Initial Public Offering except the Private Placement Warrants will be non-redeemable and may be exercised on a cashless basis, at the holder's option, in each case so long as they continue to be held by the Sponsor or its permitted transferees. The purchaser has also agreed not to transfer, assign or sell any of the Private Placement Warrants or underlying securities (subject to certain exceptions) until 30 days after the completion of an initial Business Combination.

### 4. RELATED PARTY TRANSACTIONS

In September 2014, the Sponsor purchased an aggregate of 10,062,500 shares of our common stock (the "Insider Shares"), for an aggregate purchase price of $25,000. The managing member of the Sponsor is Quinpario Partners LLC ("Quinpario Partners"), an entity affiliated with several of our officers and directors. On November 10, 2014, the Sponsor transferred 300,000 Insider Shares to independent directors of the Company. The Insider Shares held by our initial stockholders, which include the Sponsor, management team and directors, included an aggregate of up to 1,312,500 shares subject to forfeiture to the extent that the underwriters' over-allotment option was not exercised in full or in part, so that our initial stockholders would collectively own 20.0% of our issued and outstanding shares after the Initial Public Offering (assuming they did not purchase units in the Initial Public Offering).

On January 22, 2015, the underwriters informed the Company that they were waiving their right to exercise any portion of their over-allotment option. As a result, the Sponsor forfeited an aggregate of 1,312,500 Insider Shares, leaving the initial stockholders with an aggregate of 8,750,000 Insider Shares. The Company has recorded the forfeited shares as treasury stock and simultaneously retired and cancelled the shares and charged additional paid-in capital.

The initial stockholders have agreed not to transfer, assign or sell any of the Insider Shares (except to certain permitted transferees) until (1) with respect to 20% of the Insider Shares, the consummation of an initial Business Combination and (2) with respect to the remaining 80% of the Insider Shares, the

F-13

Supp.App. 0715

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**4. RELATED PARTY TRANSACTIONS (Continued)**

earlier of one year after the date of the consummation of an initial Business Combination or if after 150 days after an initial Business Combination, the closing price of the Company's common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days within any 30-trading day period. Notwithstanding the foregoing, the foregoing transfer restrictions will be removed earlier if, after an initial Business Combination, the Company consummates a subsequent (i) liquidation, merger, stock exchange or other similar transaction which results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property or (ii) consolidation, merger or other change in the majority of the Company's management team.

Quinpario Partners had loaned and advanced to us a total of $325,370 which was used to pay operating expenses and costs associated with the Initial Public Offering. These loans and advances were non-interest bearing, unsecured and repaid at the consummation of the Initial Public Offering out of the proceeds of the Initial Public Offering.

Quinpario Partners and Jeffry N. Quinn, our former Chairman, have agreed that they will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by us for services rendered or contracted for or products sold to us, but they may not be able to satisfy their indemnification obligations if they are required to do so. Furthermore, they will have no liability under this indemnity as to any claimed amounts owed to a target business or vendor or other entity who has executed an agreement with us waiving any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account. Pursuant to a registration rights agreement entered into on January 15, 2015 with the Company's initial stockholders, the Company is required to register certain securities for sale under the Securities Act. The holders of a majority of these securities are entitled to make up to three demands that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of an initial Business Combination. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

Quinpario Partners has agreed that, commencing on January 15, 2015 through the earlier of our consummation of an initial Business Combination or our liquidation, it will make available to us certain general and administrative services, including office space, utilities and administrative support, as we may require from time to time. We have agreed to pay Quinpario Partners $10,000 per month for these services. For the years ended December 31, 2016 and 2015, the Company paid $120,000 and $110,000, respectively, of expense pursuant to the administrative services agreement.

In November 2015, the Company reimbursed Quinpario Partners $38,522 for dues and subscriptions relating to systems that the Company utilizes in searching for a target business.

**5. COMMITMENTS & CONTINGENCIES**

The underwriters are entitled to an underwriting discount of five and one-half percent (5.5%), of which two percent (2.0%), or $7,000,000, was paid in cash at the closing of the Initial Public Offering on January 22, 2015, and three and one-half percent (3.5%), or $12,250,000, has been deferred. The deferred fee will be payable in cash upon the closing of an initial Business Combination. The deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the

F-14

Supp.App. 0716

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

### 5. COMMITMENTS & CONTINGENCIES (Continued)

event that the Company completes the Business Combination, subject to the terms of the underwriting agreement. If an initial Business Combination is not consummated, the deferred fees will not be paid.

### 6. FAIR VALUE MEASUREMENTS

The Company has adopted FASB ASC 820 for its financial assets and liabilities that are re-measured and reported at fair value at each reporting period, and non-financial assets and liabilities that are re-measured and reported at fair value at least annually. The adoption of FASB ASC 820 did not have an impact on the Company's financial position or results of operations.

The following table presents information about the Company's assets that are measured at fair value on a recurring basis as of December 31, 2016 and 2015 and indicates the fair value hierarchy of the valuation techniques the Company utilized to determine such fair value. In general, fair values determined by Level 1 inputs utilize quoted prices (unadjusted) in active markets for identical assets or liabilities. Fair values determined by Level 2 inputs utilize data points that are observable such as quoted prices, interest rates and yield curves. Fair values determined by Level 3 inputs are unobservable data points for the asset, and includes situations where there is little, if any, market activity for the asset:

| Description | Balances, at December 31, 2016 | Quoted Prices in Active Markets (Level 1) |
|---|---|---|
| Assets: | | |
| U.S. Treasury Securities | $ 351,085,907 | $ 351,085,907 |
| Total | $ 351,085,907 | $ 351,085,907 |

| Description | Balances, at December 31, 2015 | Quoted Prices in Active Markets (Level 1) |
|---|---|---|
| Assets: | | |
| U.S. Treasury Securities | $ 350,154,498 | $ 350,154,498 |
| Total | $ 350,154,498 | $ 350,154,498 |

### 7. STOCKHOLDERS' EQUITY

*Common Stock*—The Company is authorized to issue 135,000,000 shares of common stock with a par value of $0.0001 per share. At December 31, 2016 and 2015, there were 10,468,352 and 10,385,353, respectively, common shares outstanding (which excludes 33,281,648 and 33,364,647, respectively, shares subject to possible redemption).

*Preferred Stock*—The Company is authorized to issue 1,000,000 shares of preferred stock in one or more series with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. At December 31, 2016 and 2015, the Company had not issued any preferred shares.

F-15

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 720 of 1110    PageID 2341

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**8. INCOME TAX**

The Company's net deferred tax assets are as follows:

| | As of December 31, 2016 | As of December 31, 2015 | As of December 31, 2014 |
|---|---|---|---|
| Deferred tax asset | | | |
| Net operating loss carryforward | $ 160,948 | $ 185,841 | $ 23,309 |
| Valuation allowance | (160,948) | (185,841) | (23,309) |
| Deferred tax asset, net of allowance | $ — | $ — | $ — |

The income tax provision (benefit) consists of the following:

| | For the year ended December 31, 2016 | For the year ended December 31, 2015 | For the Period from July 15, 2014 (Inception) to December 31, 2014 |
|---|---|---|---|
| Federal | | | |
| Current | $ — | $ — | $ — |
| Deferred | 19,937 | (130,174) | (18,668) |
| State | | | |
| Current | $ — | $ — | $ — |
| Deferred | 4,956 | (32,358) | (4,640) |
| Change in valuation allowance | (24,893) | 162,532 | 23,309 |
| Income tax provision (benefit) | $ — | $ — | $ — |

A reconciliation of the federal income tax rate to the Company's effective tax rate at December 31, 2016, 2015 and 2014 is as follows:

| | For the year ended December 31, 2016 | For the year ended December 31, 2015 | For the Period from July 15, 2014 (Inception) to December 31, 2014 |
|---|---|---|---|
| Statutory federal income tax rate | 35.00% | (35.00)% | (35.00)% |
| State taxes, net of federal tax benefit | 8.70% | (8.70)% | (8.70)% |
| Change in valuation allowance | (43.70)% | 43.70% | 43.70% |
| Income tax provision (benefit) | 0% | 0% | 0% |

As of December 31, 2016, the Company had U.S. federal and state net operating loss carryovers ("NOLs") of $368,302 available to offset future taxable income. These NOLs expire beginning January 1, 2035. In accordance with Section 382 of the Internal Revenue Code, deductibility of the Company's NOLs may be subject to an annual limitation in the event of a change in control as defined under the regulations.

F-16

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

**8. INCOME TAX (Continued)**

In assessing the realization of the deferred tax assets, management considers whether it is more likely than not that some portion of all of the deferred tax assets will not be realized. The ultimate realization of deferred tax assets is dependent upon the generation of future taxable income during the periods in which temporary differences representing net future deductible amounts become deductible. Management considers the scheduled reversal of deferred tax liabilities, projected future taxable income and tax planning strategies in making this assessment. After consideration of all of the information available, management believes that significant uncertainty exists with respect to future realization of the deferred tax assets and has therefore established a full valuation allowance.

**9. QUARTERLY FINANCIAL RESULTS (UNAUDITED)**

The following tables set forth certain unaudited quarterly results of operations of the Company. In the opinion of management, this information has been prepared on the same basis as the audited financial statements and all necessary adjustments, consisting only of normally recurring adjustments, have been included in the amounts stated below to present fairly the quarterly information when read in conjunction with the audited financial statements and related notes. The quarterly operating results are not necessarily indicative of future results of operations.

Summary of the quarterly results of operations for the year ended December 31, 2016

| | For the three months ended March 31, 2016 (Unaudited) | For the three months ended June 30, 2016 (Unaudited) | For the three months ended September 30, 2016 (Unaudited) | For the three months ended December 31, 2016 (Unaudited) |
|---|---|---|---|---|
| Revenue | $ — | $ — | $ — | $ — |
| Gross Profit | — | — | — | — |
| Net Income (Loss) attributable to common shares outstanding | (58,912) | 66,980 | 52,574 | (3,679) |
| Net Income (Loss) per common share outstanding, basic and diluted | $ (0.01) | $ 0.01 | $ 0.01 | $ (0.00) |

Summary of the quarterly results of operations for the year ended December 31, 2015

| | For the three months ended March 31, 2015 (Unaudited) | For the three months ended June 30, 2015 (Unaudited) | For the three months ended September 30, 2015 (Unaudited) | For the three months ended December 31, 2015 (Unaudited) |
|---|---|---|---|---|
| Revenue | $ — | $ — | $ — | $ — |
| Gross Profit | — | — | — | — |
| Net Income (Loss) attributable to common shares outstanding | (177,064) | 10,422 | (93,945) | (111,340) |
| Net Income (Loss) per common share outstanding, basic and diluted | $ (0.02) | $ 0.00 | $ (0.01) | $ (0.01) |

F-17

Supp.App. 0719

**Quinpario Acquisition Corp. 2**

**Notes to Financial Statements (Continued)**

## 9. QUARTERLY FINANCIAL RESULTS (UNAUDITED) (Continued)

Summary of the quarterly results of operations for the period from July 15, 2014 (inception) to December 31, 2014

| | For the period July 15, 2014 (inception) to September 30, 2014 (Unaudited) | For the three months ended December 31, 2014 (Unaudited) |
|---|---|---|
| Revenue | $ — | $ — |
| Gross Profit | — | — |
| Net Income (Loss) attributable to common shares outstanding | (24,442) | (28,896) |
| Net Income (Loss) per common share outstanding, basic and diluted | $ (0.00) | $ (0.00) |

## 10. SUBSEQUENT EVENTS

On January 5, 2017, the Company received a notice from the Listing Qualifications Department of The Nasdaq Stock Market ("Nasdaq") stating that the Company failed to hold an annual meeting of stockholders within 12 months after its fiscal year ended December 31, 2015, as required by Nasdaq Listing Rules 5620(a) and 5810(c)(2)(G). On February 21, 2017, the Company submitted to Nasdaq a plan to regain compliance pursuant to the procedures set forth in the Nasdaq Listing. While the plan is pending, the Company's securities will continue to trade on Nasdaq.

On February 21, 2017, we entered into a Business Combination Agreement (the "Agreement") with SourceHOV Merger Sub, Novitex Merger Sub, Novitex, SourceHOV, Novitex Parent, HOVS LLC and HandsOn Fund 4 I, LLC. The transaction will result in the formation of a market-leading business process outsourcing platform with expertise in financial technology, information services and data processing. Novitex, a North American provider of technology-driven managed services, is owned by certain funds managed by affiliates of Apollo Global Management, LLC (NYSE:APO). SourceHOV is majority owned by HandsOn Global Management, LLC and affiliates, and provides Transaction Processing Solutions and Enterprise Information Management solutions.

The Agreement provides for (i) the merger of SourceHOV Merger Sub with and into SourceHOV, as a result of which the separate corporate existence of SourceHOV Merger Sub ceases, with SourceHOV continuing as the surviving company and a subsidiary of the Company, and (ii) the merger of Novitex Merger Sub with and into Novitex, as a result of which the separate corporate existence of Novitex Merger Sub ceases, with Novitex as the surviving company and a subsidiary of the Company.

The proposed transaction is expected to be consummated in the second quarter of 2017, after the required approval by the Company's stockholders and the fulfillment of certain other conditions.

Management has approved the financial statements and performed an evaluation of subsequent events through the date the financial statements were issued. Except as disclosed above, management did not identify any recognized or non-recognized subsequent event that would have required adjustment or disclosure in the financial statements.

F-18

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 723 of 1110     PageID 2344

**QUINPARIO ACQUISITION CORP. 2**

**CONDENSED CONSOLIDATED INTERIM BALANCE SHEETS**

|  | As of | |
|---|---|---|
|  | March 31, 2017 (unaudited) | December 31, 2016 |
| **ASSETS:** | | |
| Current asset: | | |
| Cash and cash equivalents | $       296,311 | $       120,382 |
| Prepaid insurance | 24,137 | — |
| Total current assets | 320,448 | 120,382 |
| Cash and investments held in Trust Account | 201,105,244 | 351,088,398 |
| Total assets | $ 201,425,692 | $ 351,208,780 |
| **LIABILITIES AND STOCKHOLDERS' EQUITY:** | | |
| Current liabilities: | | |
| Accounts payable and accrued expenses | $       137,552 | $       107,331 |
| Deferred underwriters' fees | 12,250,000 | 12,250,000 |
| Total liabilities | 12,387,552 | 12,357,331 |
| Commitments | | |
| Common stock subject to possible redemption; 18,392,883 and 33,281,648 shares (at redemption value) at March 31, 2017 and December 31, 2016, respectively. | 184,038,137 | 333,851,446 |
| Stockholders' equity: | | |
| Preferred stock, $0.0001 par value; 1,000,000 shares authorized; none issued and outstanding | — | — |
| Common stock, $0.0001 par value; 135,000,000 shares authorized; 10,455,718 and 10,468,352 shares issued and outstanding at March 31, 2017 and December 31, 2016, respectively (which excludes 18,392,883 and 33,281,648 shares subject to possible redemption at March 31, 2017 and December 31, 2016, respectively). | 1,045 | 1,047 |
| Additional paid-in capital | 5,753,811 | 5,367,258 |
| Accumulated deficit | (754,853) | (368,302) |
| Total stockholders' equity | 5,000,003 | 5,000,003 |
| Total liabilities and stockholders' equity | $ 201,425,692 | $ 351,208,780 |

The accompanying notes are an integral part of these unaudited condensed consolidated interim financial statements.

F-19

**QUINPARIO ACQUISITION CORP. 2**

**CONDENSED CONSOLIDATED INTERIM STATEMENTS OF OPERATIONS**

**(Unaudited)**

|  | Three Months Ended March 31, 2017 | Three Months Ended March 31, 2016 |
|---|---|---|
| General and administrative costs | $ (642,155) | $ (354,634) |
| Loss from operations | (642,155) | (354,634) |
| Interest income | 255,604 | 295,722 |
| Net loss | $ (386,551) | $ (58,912) |
| Weighted average number of common shares outstanding—basic and diluted | 10,468,212 | 10,385,539 |
| Net loss per common share—basic and diluted | $ (0.04) | $ (0.01) |

The accompanying notes are an integral part of these unaudited condensed consolidated interim financial statements.

F-20

Supp.App. 0722

**QUINPARIO ACQUISITION CORP. 2**

**CONDENSED CONSOLIDATED INTERIM STATEMENTS OF CASH FLOWS**

**(Unaudited)**

|  | Three Months Ended March 31, 2017 | Three Months Ended March 31, 2016 |
|---|---|---|
| **Cash Flows from Operating Activities:** | | |
| Net loss | $ (386,551) | $ (58,912) |
| Adjustments to reconcile net loss to net cash used in operating activities: | | |
| Interest income on restricted cash and cash equivalents held in Trust Account | (255,604) | (115,722) |
| Changes in operating assets and liabilities: | | |
| Prepaid insurance | (24,137) | 18,679 |
| Accounts payable and accrued expenses | 30,221 | (2,715) |
| **Net Cash Used in Operating Activities** | (636,071) | (158,670) |
| **Cash Flows from Investing Activities:** | | |
| Proceeds released from Trust Account | 150,238,759 | — |
| **Net Cash Provided by Investing Activities** | 150,238,759 | — |
| **Cash Flows from Financing Activities:** | | |
| Redemption of common stock | (149,426,759) | — |
| **Net Cash Used in Financing Activities** | (149,426,759) | — |
| **Net increase (decrease) in cash and cash equivalents** | 175,929 | (158,670) |
| Cash and cash equivalents—beginning | 120,382 | 881,923 |
| **Cash and cash equivalents—ending** | $ 296,311 | $ 723,253 |
| **Supplemental disclosure of noncash investing and financing activities:** | | |
| Change in shares subject to possible redemption | $ 386,551 | $ 58,912 |

The accompanying notes are an integral part of these unaudited condensed consolidated interim financial statements.

F-21

Supp.App. 0723

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements**

**1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS**

Quinpario Acquisition Corp. 2 ("us", "we", "Company" or "our") is a blank check company incorporated in Delaware on July 15, 2014. The Company was formed for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses or entities ("Business Combination"). All activity through March 31, 2017 relates to the Company's formation, initial public offering described below, special meeting and search for a Business Combination. The Company is an early stage and emerging growth company and, as such, the Company is subject to all of the risks associated with early stage and emerging growth companies.

In connection with the execution of the Agreement (defined below), the Company formed two wholly-owned subsidiaries, Quinpario Merger Sub I, Inc. and Quinpario Merger Sub II, Inc., in Delaware on February 17, 2017.

On The registration statement for the Company's initial public offering ("Initial Public Offering") was declared effective on January 15, 2015. The Company consummated the Initial Public Offering of 35,000,000 units ("Units") at $10.00 per Unit on January 22, 2015, generating gross proceeds of $350,000,000, which is described in Note 3.

Simultaneously with the closing of the Initial Public Offering, the Company consummated the private placement of 18,000,000 warrants ("Private Placement Warrants") at a price of $0.50 per warrant to Quinpario Partners 2, LLC, the Company's sponsor ("Sponsor"), generating gross proceeds of $9,000,000, which is described in Note 3.

Transaction costs amounted to $19,805,250, consisting of $7,000,000 of underwriting fees, $12,250,000 of deferred underwriting fees (which are held in the Trust Account (defined below)), $555,250 of Initial Public Offering costs and $63,920 of other expenses incurred through January 22, 2015. In addition, $1,380,830 of cash was available to fund operations and held outside of the Trust Account on January 22, 2015.

Following the closing of the Initial Public Offering on January 22, 2015, an amount of $350,000,000 ($10.00 per Unit) from the net proceeds of the sale of the Units in the Initial Public Offering and the Private Placement Warrants was placed in a trust account ("Trust Account") and has been invested in U.S. treasury bills, notes or bonds with a maturity of 180 days or less or in an open ended investment company that holds itself out as a money market fund selected by the Company meeting the conditions of paragraph (d) of Rule 2a-7 of the Investment Company Act of 1940 and that invests solely in U.S. treasuries, as determined by the Company. Such proceeds will continue to be held in such investments until the earlier of: (i) the consummation of a Business Combination or (ii) the distribution of the Trust Account as described below.

In January 2017, we held a special meeting of stockholders at which our stockholders approved an amendment to our Amended and Restated Certificate of Incorporation to extend the date by which we had to consummate an initial business combination to July 24, 2017. 19,997,082 public shares were voted in favor of the amendment. Such vote also constituted their consent for the Company to amend the Investment Management Trust Agreement governing the Trust Account to withdraw from the Trust Account any interest earned on the funds held therein related to those shares, net of taxes payable, for the Company's working capital requirements. In connection with the extension, holders of 14,901,399 public shares exercised their right to convert such public shares into a pro rata portion of the Trust Account. As a result, $201,543,292 remained in the Trust Account as of January 19, 2017. In addition,

F-22

Supp.App. 0724

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 727 of 1110    PageID 2348

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS (Continued)**

101,519 public shares were not voted and, for that reason, the Company cannot use the interest earned on those shares for the Company's working capital requirements. As a result, $1,018,002 of the funds that remain in the Trust Account are for the benefit of those public stockholders who did not vote on the extension amendment and will disburse such amount and all additional interest earned on those funds from January 19, 2017 to such public stockholders if and when they present their shares for conversion. At March 31, 2017, there was $201,105,244 remaining in the Trust Account.

The Company's management has broad discretion with respect to the specific application of the net proceeds of its Initial Public Offering, although substantially all of the net proceeds of the Initial Public Offering are intended to be generally applied toward consummating a Business Combination. Furthermore, there is no assurance that the Company will be able to successfully affect a Business Combination.

On January 5, 2017, the Company received a notice from the Listing Qualifications Department of The Nasdaq Stock Market ("Nasdaq") stating that the Company failed to hold an annual meeting of stockholders within 12 months after its fiscal year ended December 31, 2015, as required by Nasdaq Listing Rules 5620(a) and 5810(c)(2)(G). On February 21, 2017, the Company submitted to Nasdaq a plan to regain compliance pursuant to the procedures set forth in the Nasdaq Listing. On March 7, 2017, Nasdaq granted the Company an extension until June 29, 2017 to regain compliance with the foregoing rules. The Company's securities will continue to trade on Nasdaq during this time period.

On February 21, 2017, the Company entered into a Business Combination Agreement (the "Agreement") by and among the Company, Quinpario Merger Sub I, Inc., a Delaware corporation ("SourceHOV Merger Sub"), Quinpario Merger Sub II, Inc., a Delaware corporation ("Novitex Merger Sub" and, together with SourceHOV Merger Sub, the "Merger Subs"), Novitex Holdings, Inc., a Delaware corporation ("Novitex"), SourceHOV Holdings, Inc., a Delaware corporation ("SourceHOV"), Novitex Parent, L.P. ("Novitex Parent"), HOVS LLC and HandsOn Fund 4 I, LLC (collectively, the "HGM Group" and, together with Novitex Parent, each a "Seller" and collectively, the "Sellers"). Completion of the transaction is subject to amongst other requirements, the approval of the transaction by our stockholders. Accordingly, there can be no assurance that the proposed transaction will be consummated. The purchase price is expected to be funded through a combination of $1.35 billion in new debt financing, cash from the Company, rollover equity and cash on hand at closing, including from equity financing. Shareholders of SourceHOV and Novitex are rolling 100% of the current equity, and will be the majority shareholders of the combined company. In addition, in connection with the execution of the Agreement, certain of the holders of Insider Shares and Private Placement Warrants (each as defined below) have agreed to forfeit certain of their shares and warrants at the closing of the Business Combination.

We will seek stockholder approval of our initial Business Combination at a meeting called for such purpose at which stockholders may seek to convert their shares, regardless of whether they vote for or against the proposed Business Combination, into their pro rata share of the aggregate amount then on deposit in the Trust Account (net of taxes payable). We will consummate our initial Business Combination only if we have net tangible assets of at least $5,000,001 upon such consummation and a majority of the outstanding shares of common stock voted are voted in favor of the Business Combination. Notwithstanding the foregoing, the Amended and Restated Certificate of Incorporation of the Company provides that a public stockholder, together with any affiliate or other person with whom such public stockholder is acting in concert or as a "group" (within the meaning of Section 13 of

F-23

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**1. DESCRIPTION OF ORGANIZATION AND BUSINESS OPERATIONS (Continued)**

the Securities Act of 1934, as amended (the "Securities Act")), will be restricted from seeking redemption rights with respect to an aggregate of more than 15% of the public shares (but only with respect to the amount over 15% of the public shares).

The proposed transaction is expected to be consummated in the second quarter of 2017, after the required approval by the Company's stockholders and the fulfillment of certain other conditions.

The Company's Units, common stock and warrants are listed on the Nasdaq Capital Market ("NASDAQ"). Pursuant to the NASDAQ listing rules, the Company's initial Business Combination must be with a target business or businesses whose collective fair market value is at least equal to 80% of the balance in the Trust Account (excluding deferred underwriting commissions and taxes payable) at the time of the execution of a definitive agreement for such Business Combination. The Company determined this test was met in connection with the proposed transaction with the Sellers.

The Company will have until July 24, 2017 to consummate its initial Business Combination. If the Company is unable to consummate an initial Business Combination within such time period for whatever reason (such as if not enough holders approve of the proposed business combination or too many holders seek conversion of their shares), it will, as promptly as possible but not more than ten business days thereafter, redeem 100% of the outstanding public shares for a pro rata portion of the funds held in the Trust Account and then seek to dissolve and liquidate. In such event, the warrants will expire worthless. The Company expects the redemption price to be $10.00 per share of common stock, without taking into account any interest earned on such funds. However, the Company may not be able to distribute such amounts as a result of claims of creditors which may take priority over the claims of public stockholders.

We believe the $296,311 in our working capital account on March 31, 2017, plus any additional interest earned on the funds held in the Trust Account that may be released to us, will be sufficient to meet our working capital needs, to pay any taxes that we may owe and to complete our initial Business Combination by July 24, 2017. We may need to seek additional capital to continue our operations. If additional capital is required, we intend to borrow sufficient funds from Quinpario Partners, LLC or the management team to operate until we close our initial Business Combination. Neither Quinpario Partners, LLC nor our management team is under any obligation to advance funds to us. Any loan would be evidenced by a non-interest bearing promissory note. Up to $1,500,000 of such notes may be convertible into additional Private Placement Warrants at a price of $0.50 per warrant of the post business combination entity. Any such loans would be repaid only from funds held outside the Trust Account or from funds released to us upon completion of our initial Business Combination. If we are unable to complete our initial Business Combination because we do not have sufficient funds available to us, we will be forced to cease operations and liquidate the Trust Account.

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of presentation**

The accompanying unaudited condensed consolidated interim financial statements are presented in U.S. dollars and have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP") for interim financial information and pursuant to the rules and regulations of the SEC. Accordingly, they do not include all of the information and footnotes required by GAAP for complete financial statements. In the opinion of management, all adjustments (consisting

F-24

Supp.App. 0726

Quinpario Acquisition Corp. 2

Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)

2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)

of normal accrual) considered for a fair presentation have been included. Operating results for the three months ended March 31, 2017 are not necessarily indicative of the results that may be expected for the year ending December 31, 2017. For further information refer to the financial statements and footnotes thereto included in the Company's Annual Report on Form 10-K for the year ended December 31, 2016, filed with the SEC on March 6, 2017.

Principles of Consolidation

The unaudited condensed consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries, Quinpario Merger Sub I, Inc. and Quinpario Merger Sub II, Inc. All significant intercompany balances and transactions have been eliminated in consolidation.

Cash and marketable securities held in Trust Account

The amounts held in the Trust Account represent substantially all of the proceeds of the Initial Public Offering, less redemptions in connection with the extension and less interest withdrawn to pay taxes and for working capital needs, and are classified as restricted assets since such amounts can only be used by the Company in connection with the consummation of a Business Combination. As of March 31, 2017 and December 31, 2016, cash and trading securities held in the Trust Account consisted of $201,104,101 and $351,085,907, respectively, in United States Treasury Bills with an original maturity of three months or less and $1,143 and $2,491 in cash at March 31, 2017 and December 31, 2016, respectively.

Shares subject to possible redemption

The Company accounts for its shares subject to possible redemption in accordance with the guidance in Accounting Standards Codification ("ASC") Topic 480 "Distinguishing Liabilities from Equity." Shares subject to mandatory redemption (if any) are classified as a liability instrument and measured at fair value. Conditionally redeemable shares (including shares that feature redemption rights that are either within the control of the holder or subject to redemption upon the occurrence of uncertain events not solely within the Company's control) are classified as temporary equity. At all other times, shares are classified as stockholders' equity. The Company's shares feature certain redemption rights that are considered to be outside of the Company's control and subject to occurrence of uncertain future events. Accordingly, at March 31, 2017 and December 31, 2016, shares subject to possible redemption are presented as temporary equity, outside of the stockholders' equity section of the Company's balance sheet.

Net income (loss) per common share

The Company complies with accounting and disclosure requirements of the Financial Accounting Standards Board ("FASB") ASC 260, "Earnings Per Share." Net income (loss) per common share is computed by dividing net income (loss) applicable to common stockholders by the weighted average number of common shares outstanding for the period. The Company has not considered the effect of (i) warrants sold in the Initial Public Offering to purchase 17,500,000 shares of the Company and (ii) the Private Placement Warrants to purchase 9,000,000 shares of the Company, in the calculation of net income (loss) per share, since the exercise of the warrants is contingent on the occurrence of future events. 18,392,883 and 33,347,737 shares subject to possible redemption at March 31, 2017 and

F-25

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

March 31, 2016, respectively, were also excluded from the calculation of basic income (loss) per common share since such shares, if redeemed, only participate in their pro rata share of earnings in the Trust Account. At March 31, 2017 and March 31, 2016, the Company did not have any other dilutive securities or other contracts that could, potentially, be exercised or converted into common stock and then share in the earnings of the Company. As a result, diluted income (loss) per common share is the same as basic income (loss) per common share for the periods.

**Concentration of credit risk**

Financial instruments that potentially subject the Company to concentration of credit risk consist of cash accounts in a financial institution which, at times may exceed the federal depository insurance coverage of $250,000. The Company has not experienced losses on these accounts and since the Company maintains its cash accounts with major financial institutions, management believes the Company is not exposed to significant risks on such accounts.

**Fair value of financial instruments**

The fair value of the Company's assets and liabilities, which qualify as financial instruments under FASB ASC 820, "Fair Value Measurements and Disclosures," approximates the carrying amounts represented in the balance sheet, primarily due to their short-term nature.

**Use of estimates**

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

**Income taxes**

The Company complies with the accounting and reporting requirements of FASB ASC, 740, "Income Taxes," which requires an asset and liability approach to financial accounting and reporting for income taxes. Deferred income tax assets and liabilities are computed for differences between the financial statement and tax bases of assets and liabilities that will result in future taxable or deductible amounts, based on enacted tax laws and rates applicable to the periods in which the differences are expected to affect taxable income. Valuation allowances are established, when necessary, to reduce deferred tax assets to the amount expected to be realized.

There were no unrecognized tax benefits as of March 31, 2017. FASB ASC 740 prescribes a recognition threshold and a measurement attribute for the financial statement recognition and measurement of tax positions taken or expected to be taken in a tax return. For those benefits to be recognized, a tax position must be more-likely-than-not to be sustained upon examination by taxing authorities. The Company recognizes accrued interest and penalties as income tax expense. No amounts were accrued for the payment of interest and penalties at March 31, 2017. The Company is currently not aware of any issues under review that could result in significant payments, accruals or material deviation from its position.

F-26

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

The Company may be subject to potential examination by U.S. federal and state authorities in the areas of income taxes. These potential examinations may include questioning the timing and amount of deductions, the nexus of income among various tax jurisdictions and compliance with U.S. federal and state tax laws. The Company's management does not expect that the total amount of unrecognized tax benefits will materially change over the next twelve months. Federal and Missouri income tax returns for the years ended December 31, 2016, 2015 and 2014 are currently open to examination although no audits are ongoing.

**Recently issued accounting standards**

Management does not believe that any recently issued, but not yet effective, accounting standards, if currently adopted, would have a material effect on the Company's financial statements.

**3. INITIAL PUBLIC OFFERING**

On January 22, 2015, the Company sold 35,000,000 Units at $10.00 per Unit. Each Unit consists of one share of common stock and one warrant. Each warrant entitles the holder thereof to purchase one-half of one share of common stock at a price of $5.75 per half share. Warrants may be exercised only for a whole number of shares of common stock. No fractional shares will be issued upon exercise of the warrants. Each warrant will become exercisable 30 days after the completion of an initial Business Combination and will expire five years after the completion of an initial Business Combination, or earlier upon redemption. We may redeem the outstanding warrants (excluding the Private Placement Warrants), in whole and not in part, at a price of $0.01 per warrant:

- upon a minimum of 30 days' prior written notice of redemption,

- if, and only if, the last sales price of our shares of common stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading day period (the "30-day trading period") ending three business days before we send the notice of redemption, and

- if, and only if, there is a current registration statement in effect with respect to the shares of common stock underlying such warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.

If we call the warrants for redemption as described above, our management will have the option to require all holders that wish to exercise warrants to do so on a "cashless basis."

Simultaneously with the Initial Public Offering, the Sponsor purchased an aggregate of 18,000,000 Private Placement Warrants at a price of $0.50 per warrant ($9,000,000 in the aggregate) in a private placement. The proceeds from the purchase of the Private Placement Warrants were placed in the Trust Account.

The Private Placement Warrants are identical to the warrants included in the Units sold in the Initial Public Offering except the Private Placement Warrants will be non-redeemable and may be exercised on a cashless basis, at the holder's option, in each case so long as they continue to be held by the Sponsor or its permitted transferees. The purchaser has also agreed not to transfer, assign or sell any of the Private Placement Warrants or underlying securities (subject to certain exceptions) until 30 days after the completion of an initial Business Combination.

F-27

Supp.App. 0729

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**4. RELATED PARTY TRANSACTIONS**

In September 2014, the Sponsor purchased an aggregate of 10,062,500 shares of our common stock (the "Insider Shares"), for an aggregate purchase price of $25,000. The managing member of the Sponsor is Quinpario Partners LLC ("Quinpario Partners"), an entity affiliated with several of our officers and directors. On November 10, 2014, the Sponsor transferred 300,000 Insider Shares to independent directors of the Company. The Insider Shares held by our initial stockholders, which include the Sponsor, management team and directors, included an aggregate of up to 1,312,500 shares subject to forfeiture to the extent that the underwriters' over-allotment option was not exercised in full or in part, so that our initial stockholders would collectively own 20.0% of our issued and outstanding shares after the Initial Public Offering (assuming they did not purchase units in the Initial Public Offering). On January 22, 2015, the underwriters informed the Company that they were waiving their right to exercise any portion of their over-allotment option. As a result, the Sponsor forfeited an aggregate of 1,312,500 Insider Shares, leaving the initial stockholders with an aggregate of 8,750,000 Insider Shares. The Company has recorded the forfeited shares as treasury stock and simultaneously retired and cancelled the shares and charged additional paid-in capital.

The initial stockholders have agreed not to transfer, assign or sell any of the Insider Shares (except to certain permitted transferees) until (1) with respect to 20% of the Insider Shares, the consummation of an initial Business Combination and (2) with respect to the remaining 80% of the Insider Shares, the earlier of one year after the date of the consummation of an initial Business Combination or if after 150 days after an initial Business Combination, the closing price of the Company's common stock equals or exceeds $12.00 per share (as adjusted for stock splits, stock dividends, reorganizations and recapitalizations) for any 20 trading days within any 30-trading day period. Notwithstanding the foregoing, the foregoing transfer restrictions will be removed earlier if, after an initial Business Combination, the Company consummates a subsequent (i) liquidation, merger, stock exchange or other similar transaction which results in all of the Company's stockholders having the right to exchange their shares of common stock for cash, securities or other property or (ii) consolidation, merger or other change in the majority of the Company's management team.

In order to meet our working capital needs following the consummation of the Initial Public Offering, our Sponsor, officers and directors and their respective affiliates may, but are not obligated to, loan us funds, from time to time or at any time, in whatever amount they deem reasonable in their sole discretion. Each loan would be evidenced by a non-interest bearing promissory note. The notes would either be paid upon consummation of an initial Business Combination, without interest, or, at the lender's discretion, up to $1,500,000 of the notes may be converted upon consummation of the Business Combination into additional Private Placement Warrants at a price of $0.50 per warrant. If we do not complete a Business Combination, the loans will not be repaid.

Quinpario Partners had loaned and advanced to us a total of $325,370 which was used to pay operating expenses and costs associated with the Initial Public Offering. These loans and advances were non-interest bearing, unsecured and repaid at the consummation of the Initial Public Offering out of the proceeds of the Initial Public Offering.

Quinpario Partners and Jeffry N. Quinn, our former Chairman, have agreed that they will be liable to ensure that the proceeds in the Trust Account are not reduced by the claims of target businesses or claims of vendors or other entities that are owed money by us for services rendered or contracted for or products sold to us, but they may not be able to satisfy their indemnification obligations if they are required to do so. Furthermore, they will have no liability under this indemnity as to any claimed

F-28

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 733 of 1110    PageID 2354

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**4. RELATED PARTY TRANSACTIONS (Continued)**

amounts owed to a target business or vendor or other entity who has executed an agreement with us waiving any right, title, interest or claim of any kind they may have in or to any monies held in the Trust Account.

Pursuant to a registration rights agreement entered into on January 15, 2015 with the Company's initial stockholders, the Company is required to register certain securities for sale under the Securities Act. The holders of a majority of these securities are entitled to make up to three demands that we register such securities. In addition, the holders have certain "piggy-back" registration rights with respect to registration statements filed subsequent to our consummation of an initial Business Combination. The Company will bear the expenses incurred in connection with the filing of any such registration statements.

Quinpario Partners has agreed that, commencing on January 15, 2015 through the earlier of our consummation of an initial Business Combination or our liquidation, it will make available to us certain general and administrative services, including office space, utilities and administrative support, as we may require from time to time. We have agreed to pay Quinpario Partners $10,000 per month for these services. Total expenses paid for the three months ended March 31, 2017 and March 31, 2016 was $30,000 and $30,000, respectively.

In November 2015, the Company reimbursed Quinpario Partners $38,522 for dues and subscriptions relating to systems that the Company utilizes in search for a target business.

**5. COMMITMENTS & CONTINGENCIES**

The underwriters are entitled to an underwriting discount of five and one-half percent (5.5%), of which two percent (2.0%), or $7,000,000, was paid in cash at the closing of the Initial Public Offering on January 22, 2015, and three and one-half percent (3.5%), or $12,250,000, has been deferred. The deferred fee will be payable in cash upon the closing of an initial Business Combination. The deferred fee will become payable to the underwriters from the amounts held in the Trust Account solely in the event that the Company completes the Business Combination, subject to the terms of the underwriting agreement. If an initial Business Combination is not consummated, the deferred fees will not be paid.

The Company has engaged two law firms to assist the Company with its legal matters in identifying, negotiating, and consummating a Business Combination, as well as assisting with other legal matters. In the event of a successful Business Combination, the amount of fees to be paid to the first law firm will be agreed upon between the Company and that law firm in light of all the facts and circumstances at that point in time. If a Business Combination does not occur, the Company will not be required to pay the first law firm the contingent fees. Management is unable to determine the amount of the legal fees to be paid to the first law firm at this time. In connection with the agreement with the second law firm, in the event of a successful Business Combination, the amount of fees to be paid will not be less than $100,000 and will be billed to the Company on a monthly basis. If a Business Combination does not occur, the Company will not be required to pay the minimum $100,000. As of March 31, 2017, the Company has paid the second law firm an aggregate of $10,992. There can be no assurance that the Company will complete a Business Combination.

In addition, in connection with the execution of the Business Combination Agreement, the Company engaged various financial and other advisors at customary rates and on customary terms and conditions to assist in negotiating and consummating the proposed transaction.

F-29

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 734 of 1110    PageID 2355

**Quinpario Acquisition Corp. 2**

**Notes to Unaudited Condensed Consolidated Interim Financial Statements (Continued)**

**6. STOCKHOLDERS' EQUITY**

*Common Stock*—The Company is authorized to issue 135,000,000 shares of common stock with a par value of $0.0001 per share. At March 31, 2017, there were 10,455,718 common shares outstanding (which excludes 18,392,883 shares subject to possible redemption) and at December 31, 2016 there were 10,468,352 common shares outstanding (which excludes 33,281,648 shares subject to possible redemption).

*Preferred Stock*—The Company is authorized to issue 1,000,000 shares of preferred stock in one or more series with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. At March 31, 2017 and December 31, 2016, the Company had not issued any preferred shares.

**7. SUBSEQUENT EVENTS**

Management has approved the financial statements and performed an evaluation of subsequent events through the date the financial statements were issued, noting no additional items which require adjustment or disclosure.

F-30

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 735 of 1110    PageID 2356

**Independent Auditors' Report**

The Board of Directors
SourceHOV Holdings, Inc.:

We have audited the accompanying consolidated balance sheets of SourceHOV Holdings, Inc. and subsidiaries as of December 31, 2016 and 2015, and the related consolidated statements of operations, comprehensive loss, stockholders' deficit, and cash flows for each of the years in the three-year period ended December 31, 2016. These consolidated financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on these consolidated financial statements based on our audits.

We conducted our audits in accordance with the auditing standards of the Public Company Accounting Oversight Board (United States) and in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit also includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements, assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of SourceHOV Holdings, Inc. and subsidiaries as of December 31, 2016 and 2015, and the results of their operations and their cash flows for each of the years in the three-year period ended December 31, 2016 in conformity with U.S. generally accepted accounting principles.

/s/ KPMG LLP

Dallas, Texas
April 3, 2017

F-31

Supp.App. 0733

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 736 of 1110    PageID 2357

**SourceHOV Holdings, Inc. and Subsidiaries**

**Consolidated Balance Sheets**

**As of December 31, 2016 and 2015**

**(in thousands of United States dollars except share and per share amounts)**

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 8,361 | $ 16,619 |
| Restricted cash | 25,892 | 22,403 |
| Accounts receivable, net of allowance for doubtful accounts of $3,200, respectively | 138,421 | 145,162 |
| Inventories, net | 11,195 | 13,742 |
| Prepaid expenses and other current assets | 12,202 | 11,514 |
| **Total current assets** | **196,071** | **209,440** |
| Property, plant and equipment, net | 81,600 | 78,303 |
| Goodwill | 373,291 | 359,459 |
| Intangible assets, net | 298,739 | 285,229 |
| Deferred income tax assets | 9,654 | 4,602 |
| Other noncurrent assets | 10,131 | 23,015 |
| **Total assets** | **$ 969,486** | **$ 960,048** |
| **Liabilities and Stockholders' Deficit** | | |
| **Liabilities** | | |
| Current liabilities | | |
| Accounts payable | $ 42,212 | $ 26,778 |
| Related party payables | 9,344 | 8,906 |
| Income tax payable | 1,031 | 624 |
| Accrued liabilities | 29,492 | 26,291 |
| Accrued compensation and benefits | 31,200 | 33,518 |
| Customer deposits | 18,729 | 8,307 |
| Deferred revenue | 17,235 | 14,189 |
| Obligation for claim payment | 25,892 | 22,403 |
| Current portion of capital lease obligations | 6,507 | 5,009 |
| Current portion of long-term debt | 55,833 | 45,253 |
| **Total current liabilities** | **237,475** | **191,278** |
| Long-term debt, net of current maturities | 983,502 | 975,142 |
| Capital lease obligations, net of current maturities | 18,439 | 14,606 |
| Pension liability | 28,712 | 19,415 |
| Deferred income tax liabilities | 26,223 | 34,764 |
| Long-term income tax liability | 3,063 | 3,388 |
| Long-term related party payable | — | 2,590 |
| Other long-term liabilities | 11,973 | 10,354 |
| **Total liabilities** | **1,309,387** | **1,251,537** |
| Commitment and Contingencies (Note 11) | | |
| **Stockholders' deficit** | | |
| Common stock, par value of $0.001 per share; 331,000 shares authorized; 144,399 shares issued and outstanding at December 31, 2016 and 2015; Preferred stock, par value of $0.01 per shares; 400,000 shares authorized and no shares issued or outstanding at December 31, 2016 and 2015 | — | — |
| Additional paid in capital | (57,389) | (57,389) |
| Equity-based compensation | 27,342 | 20,256 |
| Accumulated deficit | (293,968) | (245,865) |
| Accumulated other comprehensive loss: | | |
| Foreign currency translation adjustment | (3,547) | (3,415) |
| Unrealized pension actuarial losses, net of tax | (12,339) | (5,076) |
| Total accumulated other comprehensive loss | (15,886) | (8,491) |
| **Total stockholders' deficit** | **(339,901)** | **(291,489)** |
| **Total liabilities and stockholders' deficit** | **$ 969,486** | **$ 960,048** |

The accompanying notes are an integral part of these consolidated financial statements.

F-32

**SourceHOV Holdings, Inc. and Subsidiaries**

**Consolidated Statements of Operations**

**For the years ended December 31, 2016, 2015 and 2014**

**(in thousands of United States dollars except share and per share amounts)**

| | Years ended December 31, | | |
|---|---|---|---|
| | **2016** | **2015** | **2014** |
| Revenue | 789,926 | 805,232 | 650,918 |
| Cost of revenue (exclusive of depreciation and amortization) | 519,121 | 559,846 | 451,539 |
| **Gross profit** | **270,805** | **245,386** | **199,379** |
| Selling, general and administrative expenses | 130,437 | 120,691 | 131,864 |
| Depreciation and amortization | 79,639 | 75,408 | 65,227 |
| Impairment of goodwill and other intangible assets | — | — | 154,454 |
| Related party expense | 10,493 | 8,977 | 19,080 |
| **Operating income (loss)** | **50,236** | **40,310** | **(171,246)** |
| Other expense (income), net: | | | |
| Interest expense, net | 109,414 | 108,779 | 48,045 |
| Loss on extinguishment of debt | — | — | 18,548 |
| Sundry expense (income), net | 712 | 3,247 | (2,201) |
| **Net loss before income taxes** | **(59,890)** | **(71,716)** | **(235,638)** |
| Income tax benefit | 11,787 | 26,812 | 38,003 |
| **Net loss** | **$ (48,103)** | **$ (44,904)** | **$ (197,635)** |
| Net loss per share—basic and diluted | $ 333.13 | $ 310.97 | $ 1,368.67 |
| Shares used in computing basic net loss per share | 144,399 | 144,399 | 144,399 |

The accompanying notes are an integral part of these consolidated financial statements.

F-33

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 738 of 1110    PageID 2359

**SourceHOV Holdings, Inc. and Subsidiaries**

**Consolidated Statements of Comprehensive Loss**

**For the years ended December 31, 2016, 2015 and 2014**

**(in thousands of United States dollars)**

|  | Years ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2015 | 2014 |
| **Net Loss** | $ (48,103) | $ (44,904) | $ (197,635) |
| **Other comprehensive income (loss), net of tax** |  |  |  |
| Foreign currency translation adjustments | (132) | (1,990) | (223) |
| Unrealized plan amendment gains, net of tax | — | — | 193 |
| Unrealized pension actuarial (losses) gains, net of tax | (7,263) | 3,655 | (9,244) |
| **Comprehensive loss** | $ (55,498) | $ (43,239) | $ (206,909) |

The accompanying notes are an integral part of these consolidated financial statements.

F-34

**SourceHOV Holdings, Inc. and Subsidiaries**

**Consolidated Statements of Stockholders' Deficit**

**December 31, 2016, 2015 and 2014**

**(in thousands of United States dollars)**

| | Common Stock | | Preferred Stock Shares | | | | | Additional Paid in-Capital | Equity-Based Compensation | Accumulated Other Comprehensive Loss | | Accumulated Deficit | Total Stockholders' Deficit |
| | Shares | Amount | Series 1 | Series 2 | Series 3 | Series 4 | Amount | | | Cumulative Translation Adjustments | Pension Benefits | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Balances at January 1, 2014 | — $ | — | 81,968 | 101,967 | 132,130 | 13,545 | 320,542 $ | — $ | — $ | (124) $ | — $ | (3,326) $ | 317,092 |
| Net loss January 1 to December 31, 2014 | — | — | — | — | — | — | — | — | — | — | — | (197,635) | (197,635) |
| Equity-based compensation | — | — | — | — | — | — | — | — | 12,134 | — | — | — | 12,134 |
| Preferred shares converted to common shares | 79,611 | — | — | — | (66,065) | (13,545) | 36,958 | (36,958) | — | — | — | — | — |
| TRG redemption | — | — | (81,968) | (101,967) | (66,065) | — | (357,500) | — | — | — | — | — | (357,500) |
| Pangea opening equity (Note 1) | 64,788 | — | — | — | — | — | — | (20,431) | — | (1,078) | 320 | — | (21,189) |
| Foreign currency translation adjustment | — | — | — | — | — | — | — | — | — | (223) | — | — | (223) |
| Net realized plan amendment gains, net of tax | — | — | — | — | — | — | — | — | — | — | 193 | — | 193 |
| Net realized pension actuarial losses, net of tax | — | — | — | — | — | — | — | — | — | — | (9,244) | — | (9,244) |
| Balances at December 31, 2014 | 144,399 $ | — | — | — | — | — | — $ | (57,389) $ | 12,134 $ | (1,425) $ | (8,731) $ | (200,961) $ | (256,372) |
| Net loss January 1 to December 31, 2015 | — | — | — | — | — | — | — | — | — | — | — | (44,904) | (44,904) |
| Equity-based compensation | — | — | — | — | — | — | — | — | 8,122 | — | — | — | 8,122 |
| Foreign currency translation adjustment | — | — | — | — | — | — | — | — | — | (1,990) | — | — | (1,990) |
| Net realized pension actuarial gains, net of tax | — | — | — | — | — | — | — | — | — | — | 3,655 | — | 3,655 |
| Balances at December 31, 2015 | 144,399 $ | — | — | — | — | — | — $ | (57,389) $ | 20,256 $ | (3,415) $ | (5,076) $ | (245,865) $ | (291,489) |
| Net loss January 1 to December 31, 2016 | — | — | — | — | — | — | — | — | — | — | — | (48,103) | (48,103) |
| Equity-based compensation | — | — | — | — | — | — | — | — | 7,086 | — | — | — | 7,086 |
| Foreign currency translation adjustment | — | — | — | — | — | — | — | — | — | (132) | — | — | (132) |
| Net realized pension actuarial gains, net of tax | — | — | — | — | — | — | — | — | — | — | (7,263) | — | (7,263) |
| Balances at December 31, 2016 | 144,399 $ | — | — | — | — | — | — $ | (57,389) $ | 27,342 $ | (3,547) $ | (12,339) $ | (293,968) $ | (339,901) |

The accompanying notes are an integral part of these consolidated financial statements.

F-35

Supp.App. 0737

**SourceHOV Holdings, Inc. and Subsidiaries**

**Consolidated Statements of Cash Flows**

**(in thousands of United States dollar)**

| | Years ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net loss | $ (48,103) | $ (44,904) | $ (197,635) |
| Adjustments to reconcile net loss | | | |
| Depreciation and amortization | 79,639 | 75,408 | 65,227 |
| Original issue discount and debt issuance cost amortization | 13,684 | 12,974 | 5,573 |
| Loss on extinguishment of debt | — | — | 18,548 |
| Impairment of goodwill and other intangible assets | — | — | 154,454 |
| Provision (recovery) for doubtful accounts | 756 | 1,105 | (1,168) |
| Deferred income tax benefit | (15,729) | (27,177) | (37,918) |
| Share-based compensation expense | 7,086 | 8,122 | 12,134 |
| Foreign currency remeasurement | 193 | 150 | 379 |
| Loss on sale of property, plant and equipment | 2,245 | 632 | 869 |
| Change in operating assets and liabilities, net of effect from acquisitions | | | |
| Accounts receivable | 20,801 | 11,583 | 32,036 |
| Related party receivable | — | — | 777 |
| Prepaid expenses and other assets | 4,969 | 892 | (149) |
| Accounts payable and accrued liabilities | 5,544 | (28,644) | (19,082) |
| Related party payables | (2,427) | (2,703) | 13,728 |
| **Net cash provided by operating activities** | **68,658** | **7,438** | **47,773** |
| **Cash flows from investing activities** | | | |
| Purchase of property, plant and equipment | (7,926) | (10,669) | (10,250) |
| Additions to developed technology | — | — | (811) |
| Additions to internally developed software | (13,017) | (3,279) | (400) |
| Additions to outsourcing contract costs | (14,636) | (7,882) | (876) |
| Cash paid for TransCentra (Note 3) | — | (12,810) | — |
| Cash acquired in TransCentra acquisition (Note 3) | 3,351 | — | — |
| Proceeds from sale of property, plant and equipment | 626 | 208 | 118 |
| Cash acquired in the Reorganization (Note 1) | — | — | 8,477 |
| **Net cash used in investing activities** | **(31,602)** | **(34,432)** | **(3,742)** |
| **Cash flows from financing activities** | | | |
| Change in bank overdraft | (1,331) | 938 | 602 |
| Proceeds from financing obligations | 5,429 | 5,554 | — |
| TRG redemption | — | — | (353,000) |
| Proceeds from new credit facility | — | — | 1,006,100 |
| Retirement of previous credit facilities | — | — | (507,200) |
| Retirement of Pangea credit facilities | — | — | (144,520) |
| Cash paid for debt issuance costs | — | — | (36,448) |
| Other financing activities | — | — | (743) |
| Borrowings from revolver and swing-line loan | 53,700 | 157,400 | 24,600 |
| Repayments from revolver and swing line loan | (53,200) | (108,800) | (17,600) |
| Principal payments on long-term obligations | (47,853) | (33,474) | (10,447) |
| **Net cash (used in) provided by financing activities** | **(43,255)** | **21,618** | **(38,656)** |
| Effect of exchange rates on cash | (2,059) | (672) | (120) |
| **Net (decrease) increase in cash and cash equivalents** | **(8,258)** | **(6,048)** | **5,255** |
| Cash and cash equivalents | | | |
| Beginning of period | 16,619 | 22,667 | 17,412 |
| End of period | $ 8,361 | $ 16,619 | $ 22,667 |
| **Supplemental cash flow data:** | | | |
| Income tax payments, net of refunds received | $ 3,771 | $ 1,784 | $ 2,029 |
| Interest paid | 96,166 | 87,302 | 42,668 |
| **Noncash investing and financing activities:** | | | |
| Assets acquired through capital lease arrangements | 11,925 | 6,021 | 2,528 |
| Leasehold improvements funded by lessor | 5,186 | 665 | 81 |
| Accrued capital expenditures | $ 580 | $ 878 | $ 1,468 |

The accompanying notes are an integral part of these consolidated financial statements.

F-36

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements**

**(in thousands of United States dollars unless otherwise stated)**

**1. Description of the Business**

**Organization**

SourceHOV Holdings, Inc. and subsidiaries (collectively "the Company") is a holding company with no operations, which owns 100% of SourceHOV LLC and its wholly owned subsidiaries ("SourceHOV LLC"). The Company provides mission-critical information and transaction processing solutions services to clients across three major industry verticals. The Company manages information and document driven business processes and offers solutions and services to fulfill specialized knowledge-based processing and consulting requirements, enabling clients to concentrate on their core competencies.

The Company consists of the following segments:

- Information & Transaction Processing Solutions ("ITPS"). ITPS provides industry solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and interbank cross-border settlement; property and casualty insurance solutions for origination, enrollments, claims processing, and benefits administration communications; public sector solutions for income tax processing, benefits administration, and record management; multi-industry solutions for payment processing and reconciliation, integrated receivable and payables management, document logistics and location services, records management and electronic storage of data / documents; and software, hardware, professional services and maintenance related to information and transaction processing automation, among others.

- Healthcare Solutions ("HS"). HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management.

- Legal and Loss Prevention Services ("LLPS") Solutions. LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification and outreach to claimants, collection, analysis and distribution of settlement funds. Additionally, LLPS provides data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable.

**The Reorganization**

Prior to October 31, 2014, SourceHOV LLC was wholly owned by Solaris Holding Corporation ("Solaris"). On October 31, 2014, Solaris merged with SHC Merger Sub Inc. ("SHC"), a Delaware corporation ("First Merger"). Upon consummation of this First Merger, SHC ceased to exist and Solaris continued to be the sole surviving corporation of the First Merger. At this time, Solaris and SourceHOV Holdings, Inc. were merged, resulting in the common stock of Solaris becoming common stock of the Company. Immediately following the First Merger, the Company, BT Merger Sub Inc. ("BT") and Pangea Acquisitions, Inc. ("Pangea") merged ("Second Merger"). Upon consummation of the Second Merger, BT ceased to exist and Pangea became a wholly-owned subsidiary of the Company.

F-37

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 742 of 1110    PageID 2363

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**1. Description of the Business (Continued)**

As part of the transaction, the Company redeemed all preferred shares owned directly, or indirectly, by The Rohatyn Group ("TRG") for $357.5 million, of which $353.0 million was paid on October 31, 2014 and the remaining $4.5 million is payable over two years. All remaining preferred holders in the Company converted their preferred shares into common shares of the Company, resulting in a change of control from a collaborative group to one affiliated group of entities. Shareholders of Pangea received common shares of the Company in exchange for their Pangea shares. In addition, all existing debt facilities of Pangea and Solaris were refinanced as part of the reorganization (the "Reorganization"). Because Pangea was controlled by the same shareholders that now control the Company at the date of the Reorganization, the merger with Pangea was reflected at carrying value.

**The TransCentra Acquisition**

On September 28, 2016, SourceHOV LLC acquired TransCentra Inc. ("TransCentra"), a wholly-owned subsidiary of FTS Parent, Inc. ("FTS"), a Delaware corporation. TransCentra is an outsourced biller, outsourced payment processor, and a provider of insourced imaging and payment processing platforms and software. TransCentra's outsourced business operated through wholly-owned subsidiary Regulus Holding Inc. provides printing and payment processing to its customers. The outsourced business utilizes internally developed software to provide printing and remittance services to customers and is the predominant revenue contributor for TransCentra. TransCentra's insourced business operated through wholly-owned subsidiary J&B Software, Inc. provides imaging and payment processing software to customers who choose to process their own remittances. TransCentra was incorporated in the State of Delaware on May 12, 2011 as Columbus Acquisition Corporation, Inc. and changed its name to TransCentra, Inc. via an amended and restated certificate of incorporation in December 2011. The acquisition was accounted for as a business combination using the acquisition method of accounting. Refer to *Note 3—Business Combinations*.

**2. Basis of Presentation and Summary of Significant Accounting Policies**

**Principles of Consolidation**

The accompanying consolidated financial statements and related notes to the consolidated financial statements include the accounts of the Company and subsidiaries. Newly acquired subsidiaries have been included in the consolidated financial statements from the date of acquisition. In addition, the Company evaluates its relationships with other entities to identify whether they are variable interest entities as defined by Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 810-10, Consolidation and whether the Company is the primary beneficiary. Consolidation is required if both of these criteria are met. All intercompany accounts and transactions have been eliminated in consolidation.

**Use of Estimates**

The preparation of consolidated financial statements in conformity with United States ("U.S.") generally accepted accounting principles ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

F-38

Supp.App. 0740

Table of Contents

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

Key estimates and judgments relied upon in preparing these consolidated financial statements include revenue recognition for multiple element arrangements, allowance for doubtful accounts, income taxes, depreciation, amortization, employee benefits, equity-based compensation, contingencies, goodwill, intangible assets, fair value of assets and liabilities acquired in acquisitions, and liability valuations. The Company regularly assesses these estimates and records changes in estimates in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that the Company believes to be reasonable under the circumstances. Actual results could differ from those estimates.

**Cash and Cash Equivalents**

Cash and cash equivalents include cash deposited with financial institutions and liquid investments with original maturity dates equal to or less than three months. All bank deposits and money market accounts are considered cash and cash equivalents. The Company holds cash and cash equivalents at major financial institutions, which often exceed Federal Deposit Insurance Corporation insured limits. Historically, the Company has not experienced any losses due to such bank depository concentration.

**Restricted Cash**

As part of the Company's legal claims processing service, the Company holds cash for various settlement funds once the fund is in the wind down stage and claims have been paid. The cash is used to pay tax obligations and other liabilities of the settlement funds. The Company recorded an offsetting liability in obligation for claim payment in the accompanying consolidated balance sheets for the settlement funds received of $25.9 million and $22.4 million at December 31, 2016 and 2015, respectively. Of the total amount of settlement funds received, $17.1 million and $20.3 million were not subject to legal restrictions on use as of December 31, 2016 and 2015, respectively. TransCentra maintains a collateral certificate of deposit account required by its insurance carrier for unsettled workers' compensation claims. The Company records an offsetting liability in accrued compensation and benefits in the accompanying consolidated balance sheets.

**Accounts Receivable and Allowance for Doubtful Accounts**

Accounts receivable are carried at the original invoice amount less an estimate made for doubtful accounts. Revenue that has been earned but remains unbilled at the end of the period is recorded as a component of accounts receivable, net. The Company specifically analyzes accounts receivable and historical bad debts, customer credit-worthiness, current economic trends, and changes in customer payment terms and collection trends when evaluating the adequacy of its allowance for doubtful accounts. The Company writes off accounts receivable balances against the allowance for doubtful accounts, net of any amounts recorded in deferred revenue, when it becomes probable that the receivable will not be collected.

**Inventories**

Inventories are valued at the lower of cost or market and include the cost of raw materials, labor, factory overhead, and purchased subassemblies. Cost is determined using the first-in, first-out and weighted average methods.

F-39

Supp.App. 0741

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

At least quarterly, the Company evaluates the carrying amount of inventory based on the identification of excess and obsolete inventory. The Company's evaluation involves a multi factor approach incorporating the stratification of inventory by time held and by risk category, among other factors. The approach incorporates both recent historical information and management analysis of inventory usage. The Company's approach is intended to take into consideration potential excess and obsolescence caused by a decreasing installed base, engineering changes and changes in manufacturing demands. If any of the factors of the Company's estimate were to deteriorate, additional reserves may be required. The inventory reserve calculations are reviewed periodically and additional reserves are recorded as deemed necessary.

**Property, Plant and Equipment**

Property, plant, and equipment are recorded at cost less accumulated depreciation. Depreciation is computed using the straight-line method (which approximates the use of the assets) over the estimated useful lives of the assets. When these assets are sold or otherwise disposed of, the asset and related depreciation is relieved, and any gain or loss is included in the consolidated statements of operations for the period of sale or disposal. Leasehold improvements are amortized over the lease term or the useful life of the asset, whichever is shorter. Assets under capital leases are amortized over the lease term unless ownership is transferred by the end of the lease or there is a bargain purchase option, in which case assets are amortized normally on a straight-line basis over the useful life that would be assigned if the assets were owned. The amortization of these capital lease assets is recorded in depreciation expense in the consolidated statements of operations. Repair and maintenance costs are expensed as incurred.

**Intangible Assets**

*Customer Relationships*

Customer relationship intangible assets represent customer contracts and relationships obtained as part of acquired businesses. Customer relationship values are estimated by evaluating various factors including historical attrition rates, contractual provisions and customer growth rates, among others. The estimated average useful lives of customer relationships range from three to 16 years depending on facts and circumstances. These intangible assets are primarily amortized based on undiscounted cash flows. The Company evaluates the remaining useful life of intangible assets on an annual basis to determine whether events and circumstances warrant a revision to the remaining useful life.

*Trade Names*

The Company has determined that its trade name intangible assets are indefinite-lived assets and therefore are not subject to amortization. The Company's valuation of trade names at the reporting unit level utilizes the Relief-from-Royalty method that represents the present value of the future economic benefits generated by ownership of the trade names and approximates the amount that the Company would have to pay as a royalty to a third party to license such names.

F-40

Supp.App. 0742

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

*Trademarks*

The Company has determined that its trademark intangible assets resulting from the acquisition of TransCentra (See *Note 3—Business Combinations*) are definite-lived assets and therefore are subject to amortization. The Company amortizes trademarks on a straight-line basis over the estimated useful life, which is typically ten years.

*Developed Technology*

The Company has various developed technologies embedded in its technology platform. Developed technology is an integral asset to the Company in providing solutions to customers and is recorded as an intangible asset. The Company amortizes developed technology on a straight-line basis over the estimated useful life, which is typically five years.

*Capitalized Software Costs*

The Company capitalizes certain costs incurred to develop software products to be sold, leased or otherwise marketed after establishing technological feasibility in accordance with ASC section 985-20, Software—Costs of Software to Be Sold, Leased, or Marketed, and the Company capitalizes costs to develop or purchase internal-use software in accordance with ASC section 350-40, Intangibles—Goodwill and Other—Internal-Use Software. Significant estimates and assumptions include determining the appropriate period over which to amortize the capitalized costs based on estimated useful lives and estimating the marketability of the commercial software products and related future revenues. The Company amortizes capitalized software costs on a straight-line basis over the estimated useful life, which is typically five years.

*Outsourced Contract Costs*

Costs of outsourcing contracts, including costs incurred for bid and proposal activities, are generally expensed as incurred. However, certain costs incurred upon initiation of an outsourcing contract are deferred and expensed on a straight-line basis over the estimated contract life. These costs represent incremental external costs or certain specific internal costs that are directly related to the contract acquisition or transition activities and can be separated into two principal categories: contract commissions and transition/set-up costs. Examples of such capitalized costs include hourly labor and related fringe benefits and travel costs.

**Impairment of Long-Lived Assets**

The Company reviews the recoverability of its long-lived assets, including trade names, trademarks, customer relationships, developed technology, capitalized software costs, outsourced contract costs and property, plant and equipment, when events or changes in circumstances occur that indicate that the carrying value of the asset may not be recoverable. The assessment of possible impairment is based on our ability to recover the carrying value of the asset from the expected future pre-tax cash flows (undiscounted and without interest charges) of the related operations. If these cash flows are less than the carrying value of such asset, an impairment loss is recognized for the difference between estimated

F-41

Supp.App. 0743

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

fair value and carrying value. Our primary measure of fair value is based on discounted cash flows based in part on our financial results and our expectation of future performance.

The Company did not record any material impairment related to its property, plant, and equipment, customer relationships, developed technology, capitalized software, outsourced contract costs or trademarks for the years ended December 31, 2016, 2015, and 2014.

*Trade name impairment*

The Company experienced a decline in revenues for the LLPS reporting unit during the year ended December 31, 2014. The decline in revenues resulted from a loss of a major customer and the Company's inability to replace the revenues with new customers. The Company completed the analysis as of the annual impairment testing date of October 1, 2014, and determined that the carrying value of LLPS trade name exceeded the fair value, and recorded an impairment charge of $16.6 million. Fair value of the trade name was determined using the Relief-from-Royalty method of the Income Approach. The impairment charge resulted in a decrease to the carrying value of the LLPS trade name and is included within Impairment of goodwill and intangible assets in the consolidated statement of operations for the year ended December 31, 2014. The Company did not record any impairment related to its trade names for the years ended December 31, 2016 and 2015. Refer to *Note 7—Intangibles Assets and Goodwill.*

**Goodwill**

Goodwill represents the excess purchase price over tangible and intangible assets acquired less liabilities assumed arising from business combinations. Goodwill is generally allocated to reporting units based upon relative fair value (taking into consideration other factors such as synergies) when an acquired business is integrated into multiple reporting units. The Company's reporting units are at the operating segment level, which discrete financial information is prepared and regularly reviewed by management. When a business within a reporting unit is disposed of, goodwill is allocated to the disposed business using the relative fair value method.

The Company conducts its annual goodwill impairment tests on October 1st of each year, or more frequently if indicators of impairment exist. When performing the annual impairment test, the Company has the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. If a qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, the Company would be required to perform a quantitative impairment test for goodwill. Goodwill is tested for impairment using a two-step process at the reporting unit level. In the first step, the fair value of each reporting unit is determined and compared to the reporting unit's carrying value, including goodwill. If the fair value of a reporting unit is less than its carrying value, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. If the implied fair value of goodwill at the reporting unit level is less than its carrying value, an impairment loss is recorded to the extent that the implied fair value of

F-42

SourceHOV Holdings, Inc. and Subsidiaries

Notes to the Consolidated Financial Statements (Continued)

(in thousands of United States dollars unless otherwise stated)

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

goodwill at the reporting unit is less than its carrying value. The Company uses a market multiples approach to determine the reporting unit fair value. During the year ended December 31, 2014, due to a decline in revenues for the LLPS reporting unit, the Company recorded an impairment charge of $137.9 million. No impairment charges were recorded for the years ended December 31, 2015 and 2016. Refer to *Note 7—Intangibles Assets and Goodwill.*

**Benefit Plan Accruals**

The Company has defined benefit plans in the U.K. and Germany, under which participants earn a retirement benefit based upon a formula set forth in the plan. The Company records expense related to this plan using actuarially determined amounts that are calculated under the provisions of ASC 715, *Compensation—Retirement Benefits*. Key assumptions used in the actuarial valuations include the discount rate, the expected rate of return on plan assets and the rate of increase in future compensation levels. Refer to *Note 10—Employee Benefit Plans*.

**Leasing**

Leases are classified as capital leases whenever the terms of the lease transfer substantially all of the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets held under a capital lease are initially recognized as assets of the Company at their fair value at the inception of the lease, or if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the other long-term obligations in the consolidated balance sheets. Operating lease payments are initially recognized as an expense on a straight-line basis over the lease term, except where another systematic basis is more representative of the time pattern in which the economic benefits from the leased asset are consumed.

**Equity-Based Compensation**

Equity-based awards may be granted to certain employees, officers, directors, consultants and advisors of the Company. Compensation expense for equity-based awards is measured at the fair value of the awards at the grant date and recognized as compensation expense on a straight-line basis over the vesting period. The fair value of the awards on the grant date is determined using the Enterprise Value ("EV") model. Refer to *Note 13—Equity-Based Compensation*.

**Revenue Recognition**

The majority of the Company's revenues are comprised of: (1) ITPS, (2) HS offerings, (3) LLPS solutions, and (4) some combination thereof. Revenue is realized or realizable and earned when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable and collectability is probable. Delivery does not occur until services have been provided to the client, risk of loss has transferred to the client, and either client acceptance has been obtained, client acceptance provisions have lapsed, or the Company has objective evidence that the criteria specified in the client acceptance provisions have been satisfied. The sales price is not considered to be fixed or determinable until all contingencies related to the sale have been resolved.

F-43

Supp.App. 0745

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

ITPS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services. HS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed for healthcare payers and providers. LLPS revenues are primarily based on a time and materials pricing as well as through transactional services priced on a per item basis.

If a contract involves the provision of a single element, revenue is generally recognized when the product or service is provided and the amount earned is not contingent upon any future event. Revenue from time and materials arrangements is recognized as the services are performed.

The Company records deferred revenue when it receives payments or invoices in advance of the delivery of products or the performance of services. The deferred revenue is recognized into earnings when underlying performance obligations are achieved.

The Company includes reimbursements from clients, such as postage costs, in revenue, while the related costs are included in cost of revenue in the consolidated statement of operations.

*Multiple Element Arrangements*

Certain of the Company's revenue is generated from multiple element arrangements involving various combinations. The deliverables within these arrangements are evaluated at contract inception to determine whether they represent separate units of accounting, and if so, contract consideration is allocated to each deliverable based on relative selling price. The relative selling price of each deliverable within these arrangements is determined using vendor specific objective evidence ("VSOE") of fair value, third-party evidence or best estimate of selling price. Revenue is then recognized in accordance with the appropriate revenue recognition guidance applicable to the respective elements.

If the multiple element arrangements criteria are not met, the arrangement is accounted for as one unit of accounting which would result in revenue being recognized on a straight-line basis over the period of delivery or being deferred until the earlier of when such criteria are met or when the last element is delivered.

**Research and Development**

Research and development costs are expensed as incurred. Research and development costs expensed for the years ended December 31, 2016, 2015 and 2014 were $2.3 million, $1.7 million and $0.3 million, respectively.

**Advertising**

Advertising costs are expensed as incurred. Advertising expense for the years ended December 31, 2016, 2015 and 2014, were $1.1 million, $0.8 million and $0.7 million, respectively.

**Income Taxes**

The Company accounts for income taxes by using the asset and liability method. The Company files US consolidated income tax returns which will include the post-acquisition taxable income of Pangea's and TransCentra's US legal entities. The Company accounts for income taxes regarding uncertain tax positions and recognized interest and penalties related to uncertain tax positions in income tax benefit/ (expense) in the consolidated statements of operations.

F-44

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 749 of 1110    PageID 2370

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

Deferred income taxes are recognized on the tax consequences of temporary differences by applying enacted statutory tax rates applicable in future years to differences between the financial statement carrying amounts and the tax bases of existing assets and liabilities, as determined under tax laws and rates. A valuation allowance is provided when it is more likely than not that all or some portion of the deferred tax assets will not be realized. Due to numerous ownership changes, the Company is subject to limitations on existing net operating losses under Section 382 of the Internal Revenue Code (the Code). Accordingly, valuation allowances have been established against a portion of the net operating losses to reflect estimated Section 382 limitations. The Company also considered net operating losses not limited by Section 382. The Company did not consider future book income as a source of taxable income when assessing if a portion of the deferred tax assets are more likely than not to be realized. However, scheduling the reversal of existing deferred tax liabilities indicated that a portion of the deferred tax assets are likely to be realized. Therefore, valuation allowances were established against some, but not all, of the Company's deferred tax assets. In the event the Company determines that it would be able to realize deferred tax assets that have valuation allowances established, an adjustment to the deferred tax assets would be recognized as component of income tax expense through continuing operations.

The Company engages in transactions (i.e. acquisitions) in which the tax consequences may be subject to uncertainty and examination by the varying taxing authorities. Significant judgment is required by the Company in assessing and estimating the tax consequences of these transactions. While the Company's tax returns are prepared and based on the Company's interpretation of tax laws and regulations, in the normal course of business the tax returns are subject to examination by the various taxing authorities. Such examinations may result in future assessments of additional tax, interest and penalties. For purposes of the Company's income tax provision, a tax benefit is not recognized if the tax position is not more likely than not to be sustained based solely on its technical merits. Considerable judgment is involved in determining which tax positions are more likely than not to be sustained. Refer to *Note 9—Income Taxes* for further information.

**Loss Contingencies**

The Company reviews the status of each significant matter, if any, and assess its potential financial exposure considering all available information including, but not limited to, the impact of negotiations, settlements, rulings, advice of legal counsel and other updated information and events pertaining to a particular matter. If the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss. Significant judgment is required in both the determination of probability and the determination as to whether an exposure is reasonably estimable. Because of uncertainties related to loss contingencies, accruals are based only on the best information available at the time. As additional information becomes available, the Company reassesses the potential liability related to its pending claims and litigation, and may revise its estimates. These revisions in the estimates of the potential liabilities could have a material impact on the results of operations and financial position.

F-45

Supp.App. 0747

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

**Foreign Currency Translation**

The functional currency for the Company's production operations located in India, Philippines, China, and Mexico is the United States dollar. Included in other expense as "Sundry expense (income), net" in the consolidated statements of operations are net exchange losses of $0.7 million, net exchange losses of $3.2 million and net exchange gains of $2.2 million for the years ended December 31, 2016, December 31, 2015 and December 31, 2014, respectively.

The Company has determined all other international subsidiaries' functional currency is the local currency. These assets and liabilities are translated at exchange rates in effect at the balance sheet date while income and expense amounts are translated at average exchange rates during the period. The resulting foreign currency translation adjustments are disclosed as a separate component of other comprehensive income (loss).

**Business Combinations**

The Company includes the results of operations of the businesses acquired as of the respective dates of acquisition. The Company allocates the fair value of the purchase price of acquisitions to the assets acquired and liabilities assumed based on their estimated fair values. The excess of the fair value of the purchase price over the fair values of these identifiable assets and liabilities is recorded as goodwill.

**Fair Value Measurements**

The Company records the fair value of assets and liabilities in accordance with ASC 820, *Fair Value Measurement* ("ASC 820"). ASC 820 defines fair value as the price received to sell an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date and in the principal or most advantageous market for that asset or liability. The fair value should be calculated based on assumptions that market participants would use in pricing the asset or liability, not on assumptions specific to the entity.

In addition to defining fair value, ASC 820 expands the disclosure requirements around fair value and establishes a fair value hierarchy for valuation inputs. The hierarchy prioritizes the inputs into three levels based on the extent to which inputs used in measuring fair value are observable in the market. Each fair value measurement is reported in one of the three levels, which is determined by the lowest level input that is significant to the fair value measurement in its entirety. These levels are:

| | |
|---|---|
| Level 1— | quoted prices (unadjusted) in active markets for identical assets or liabilities. |
| Level 2— | quoted prices for similar assets and liabilities in active markets or inputs that are observable for the asset or liability, either directly or indirectly through market corroboration, for substantially the full term of the financial instrument. |
| Level 3— | unobservable inputs reflecting Management's own assumptions about the inputs used in pricing the asset or liability at fair value. |

Refer to *Note 12—Fair Value Measurement* for further discussion.

F-46

Supp.App. 0748

Table of Contents

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

**Recently Adopted Accounting Pronouncements**

In September 2015, the Financial Accounting Standards Board (FASB) issued Accounting Standards Update ("ASU") No. 2015-16, Business Combinations (ASC 740): *Simplifying the Accounting for Measurement-Period Adjustments*. The amendments in this ASU eliminate the requirement to retrospectively account for provisional amounts recognized in a business combination. The ASU is effective for fiscal years beginning after December 15, 2015, including interim periods within those fiscal years. The adoption did not have any impact on the Company's disclosure for business combinations nor financial position.

In November 2015, the FASB issued ASU No. 2015-17, Income Taxes (Topic 740): Balance Sheet Classification of Deferred Taxes ("ASU 2015-17"). The standard requires that deferred tax assets and liabilities be classified as noncurrent on the balance sheet rather than being separated into current and noncurrent. ASU 2015-17 is effective for fiscal years, and interim periods within those years, beginning after December 15, 2016. The new guidance does not change the existing requirement that prohibits offsetting deferred tax liabilities from one jurisdiction against deferred tax assets of another jurisdiction. Early adoption is permitted and the standard may be applied either retrospectively or on a prospective basis to all deferred tax assets and liabilities. The Company early adopted ASU 2015-17 during the fourth quarter of fiscal year 2016 on a retrospective basis. Upon adoption of ASU No. 2015-17, current deferred tax assets of approximately $9.8 million in the Company's December 31, 2015 consolidated balance sheet were reclassified as non-current.

**Recently Issued Accounting Pronouncements**

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers (ASC 606)*. Under the update, revenue will be recognized based on a five-step model. The core principle of the model is that revenue will be recognized when the transfer of promised goods or services to customers is made in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In July 2015, the FASB deferred the effective date by one year (ASU No. 2015-14). This ASU will now be effective for annual periods, and interim periods within those annual periods, beginning on or after December 15, 2017. Early adoption is permitted, but not before the original effective date of December 15, 2016. Since the issuance of the original standard, the FASB has issued several other subsequent updates including the following: 1) clarification of the implementation guidance on principal versus agent considerations (ASU 2016-08); 2) further guidance on identifying performance obligations in a contract as well as clarifications on the licensing implementation guidance (ASU 2016-10); 3) rescission of several SEC Staff Announcements that are codified in ASC 605 (ASU 2016-11); 4) additional guidance and practical expedients in response to identified implementation issues (ASU 2016-12); and 5) technical corrections and improvements (ASU 2016-20). The new standard will be effective for us beginning January 1, 2018. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (842)*. This ASU increases transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The amendments in this ASU are effective for fiscal years beginning after December 31, 2018 and interim periods within those

F-47

Table of Contents

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

fiscal years and early application is permitted. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (ASC 718)*: Improvements to Employee Share-Based Payment Accounting (ASU 2016-09). The ASU changes how companies account for certain aspects of equity-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The amendments in this ASU are effective for reporting periods beginning after December 15, 2016. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Classification of Certain Cash Receipts and Cash Payments (ASC 230)*. The ASU clarifies the classification of certain cash receipts and cash payments in the statement of cash flows, including debt prepayment or extinguishment costs, settlement of contingent consideration arising from a business combination, insurance settlement proceeds, and distributions from certain equity method investees. The ASU is effective for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. Early adoption is permitted. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows: Restricted Cash*. (ASC 230). The ASU addresses diversity in practice that exists in the classification and presentation of changes in restricted cash and requires that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. The ASU is effective retrospectively for fiscal years and interim periods within those years beginning after December 15, 2017. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations: Clarifying the Definition of a Business* (ASC 805). The ASU clarifies the definition of a business and provides guidance on evaluating as to whether transactions should be accounted for as acquisitions (or disposals) of assets or business combinations. The definition clarification as outlined in this ASU affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The amendments of the ASU are effective for annual periods beginning after December 15, 2017, including interim periods within those annual periods. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued ASU 2017-04, *Intangibles—Goodwill and Other (ASC 350)*. The ASU simplifies the measurement of goodwill impairment by removing step 2 of the goodwill impairment test, which requires the determination of the fair value of individual assets and liabilities of a reporting unit. The ASU requires goodwill impairment to be measured as the amount by which a reporting unit's carrying value exceeds its fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. The amendments should be applied on a prospective basis. The ASU is effective for fiscal years beginning after December 15, 2019 with early adoption permitted for interim or annual goodwill impairment tests performed after January 1, 2017.

F-48

Supp.App. 0750

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

**Concentration of Credit Risk**

**Credit Risk**

Financial instruments that potentially subject the Company to concentration of credit risk consist primarily of cash and cash equivalents and trade receivables. The Company maintains its cash and cash equivalents and certain other financial instruments with highly rated financial institutions and limits the amount of credit exposure with any one financial institution. From time to time, the Company assesses the credit worthiness of its customers. Credit risk on trade receivables is minimized because of the large number of entities comprising the Company's client base and their dispersion across many industries and geographic areas. The Company generally has not experienced any material losses related to receivables from any individual customer or groups of customers. The Company does not require collateral. Due to these factors, no additional credit risk beyond amounts provided for collection losses is believed by management to be probable in the Company's accounts receivable, net. The Company does not have any significant customers that account for 10% or more of the total consolidated revenues.

**Operations**

A portion of the Company's labor and operations is situated outside of the United States in India and other locations. The carrying value of long-lived assets that are situated outside of the United States is approximately $26.3 million and $21.8 million as of December 31, 2016 and 2015, respectively.

**3. Business Combinations**

*TransCentra Acquisition*

On July 27, 2015, the Company made a strategic payment of $12.8 million that provided it with the option to acquire TransCentra, a US-based provider of billing, remittance processing and processing software and consulting solutions primarily in the financial services, insurance, utilities, healthcare and telecom industries. On September 28, 2016, the Company exercised this option and acquired all of the outstanding shares of privately held FTS, which owns 100% of TransCentra. The acquisition extends the Company's reach in the billing, payment and software services market primarily in the financial services, insurance, utilities, healthcare and telecom industries. The acquisition was accounted for as a business combination. The acquired assets and assumed liabilities were recorded at their estimated fair values. The Company expects to realize revenue synergies, leverage and expand the existing TransCentra sales channels, and utilize the existing workforce. The Company also anticipates opportunities for growth through the ability to leverage additional future services and capabilities. These factors, among others, contributed to a purchase price in excess of the estimated fair value of TransCentra's identifiable net liabilities assumed, and as a result, the Company has recorded goodwill in connection with this acquisition. The Company engaged a third-party valuation firm to aid management in its analyses of the fair value of the acquired business. All estimates, key assumptions, and forecasts were either provided by or reviewed by the Company. While the Company chooses to

F-49

Supp.App. 0751

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**3. Business Combinations (Continued)**

utilize a third-party valuation firm, the fair value analyses and related valuations represent the conclusions of management and not the conclusions or statements of any third party.

The purchase price allocation for the TransCentra business combination is preliminary and subject to change within the respective measurement period which will not extend beyond one year from the acquisition date. Measurement period adjustments will be recognized in the reporting period in which the adjustment amounts are determined.

The following table summarizes the consideration paid for TransCentra and the preliminary fair value of the assets acquired and liabilities assumed at the acquisition date on September 28, 2016:

| | |
|---|---:|
| Cash and equivalents | $ 3,351 |
| Restricted cash | 175 |
| Accounts receivable | 16,790 |
| Inventories | 387 |
| Prepaid expenses | 3,215 |
| Other current assets | 2,306 |
| Property, plant and equipment, net | 4,412 |
| Goodwill | 13,558 |
| Intangible assets | 37,590 |
| Other noncurrent assets | 567 |
| Total identifiable assets acquired | $ 82,351 |
| Accounts payable | 10,214 |
| Affiliate payable | 275 |
| Income tax payable | 11 |
| Accrued liabilities | 5,415 |
| Accrued compensation and benefits | 1,420 |
| Customer deposits | 3,446 |
| Deferred revenue | 3,369 |
| Current portion of capital lease obligations | 236 |
| Current portion of long-term debt | 11,000 |
| Deferred tax liability | 3,527 |
| Other non-current liabilities | 500 |
| Capital lease obligations, net of current maturities | 217 |
| Long-term debt | 29,911 |
| Total liabilities assumed | 69,541 |
| Cash consideration | 12,810 |
| | $ 82,351 |

The identifiable intangible assets include customer relationships, developed software, and trademarks. Customer relationships were valued using the Income Approach, specifically the

F-50

Supp.App. 0752

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**3. Business Combinations (Continued)**

Multi-Period Excess Earnings method. Developed software and trademarks were valued using the Income Approach, specifically the Relief-from-Royalty method.

| | Weighted Average Useful Life (in Years) | Fair value |
|---|---|---|
| Customer relationships | 8.2 | $ 28,640 |
| Developed technology | 7.4 | 3,580 |
| Trademark | 10.0 | 5,370 |
| | | $ 37,590 |

The tax deductible goodwill from the acquisition was $32.4 million, which was carried over from the tax basis of the seller. Since the acquisition date of September 28, 2016, $33.3 million of revenue and $1.5 million of net income are included in consolidated revenues and net loss, respectively, for TransCentra. These results are included in the ITPS segment.

Following are the supplemental consolidated results of the Company on an unaudited pro forma basis, as if the acquisition had been consummated on January 1, 2015:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Pro forma revenues | $ 891,596 | $ 957,098 |
| Pro forma net loss | (48,470) | (55,578) |
| Pro forma basic loss per share | $ (335.67) | $ (384.89) |

These pro forma results were based on estimates and assumptions, which the Company believe are reasonable. They are not the results that would have been realized had the Company been a combined company during the periods presented and are not necessarily indicative of our consolidated results of operations in future periods. The pro forma results include adjustments primarily related to purchase accounting adjustments. Acquisition costs and other non-recurring charges incurred are included in the earliest period presented.

**4. Accounts Receivable**

Accounts receivable, net consist of the following:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Billed receivables | $ 116,148 | $ 120,768 |
| Unbilled receivables | 20,982 | 22,306 |
| Other | 4,510 | 5,252 |
| Less: Allowance for doubtful accounts | (3,219) | (3,164) |
| | $ 138,421 | $ 145,162 |

F-51

Supp.App. 0753

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 756 of 1110    PageID 2377

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**4. Accounts Receivable (Continued)**

Unbilled receivables represent balances recognized as revenue that have not been billed to the customer. The Company's allowance for doubtful accounts is based on a policy developed by historical experience and management judgment. Adjustments to the allowance for doubtful accounts may occur based on market conditions or specific client circumstances.

**5. Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Prepaids | $ 10,906 | $ 10,013 |
| Deposits | 1,296 | 1,501 |
| | $ 12,202 | $ 11,514 |

**6. Property, Plant and Equipment, Net**

Property, plant, and equipment, which include assets recorded under capital leases, are stated at cost less accumulated depreciation and amortization, and consist of the following:

| | Estimated Useful Lives (in Years) | December 31, | |
| --- | --- | --- | --- |
| | | 2016 | 2015 |
| Land | N/A | $ 7,637 | $ 7,904 |
| Buildings and improvements | 7 - 40 | 16,989 | 12,893 |
| Leasehold improvements | Lesser of the useful life or lease term | 31,342 | 25,381 |
| Vehicles | 5 - 7 | 784 | 812 |
| Machinery and equipment | 5 - 15 | 23,297 | 21,093 |
| Computer equipment and software | 3 - 8 | 98,544 | 88,977 |
| Furniture and fixtures | 5 - 15 | 5,007 | 4,935 |
| | | 183,600 | 161,995 |
| Less: Accumulated depreciation and amortization | | (102,000) | (83,692) |
| Property, plant and equipment, net | | $ 81,600 | $ 78,303 |

Depreciation expense related to property, plant and equipment was $22.8 million, $27.4 million and $24.0 million for the years ended December 31, 2016, 2015 and 2014, respectively.

As of December 31, 2016 and 2015, equipment held under capital leases had a gross cost of $29.8 million and $27.5 million, respectively. Accumulated amortization of equipment held under capital leases as of December 31, 2016 and 2015 was $13.2 million and $14.7 million, respectively. Amortization of assets held under capital leases is included within depreciation expense.

F-52

Supp.App. 0754

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**7. Intangibles Assets and Goodwill**

**Intangibles**

Intangible assets are stated at cost or acquisition-date fair value less accumulated amortization and consists of the following:

|  | December 31, 2016 | | |
|  | Gross Carrying Amount(a) | Accumulated Amortization | Intangible Asset, net |
|---|---|---|---|
| Customer relationships | $ 274,643 | $ (100,172) | $ 174,471 |
| Outsource contract costs | 27,619 | (7,378) | 20,241 |
| Developed technology | 89,076 | (59,539) | 29,537 |
| Internally developed software | 16,742 | (858) | 15,884 |
| Trademarks | 5,370 | (134) | 5,236 |
| Trade names(b) | 53,370 | — | 53,370 |
|  | $ 466,820 | $ (168,081) | $ 298,739 |

|  | December 31, 2015 | | |
|  | Gross Carrying Amount | Accumulated Amortization | Intangible Asset, net |
|---|---|---|---|
| Customer relationships | $ 246,003 | $ (70,110) | $ 175,893 |
| Outsource contract costs | 12,984 | (3,690) | 9,294 |
| Developed technology | 85,497 | (42,160) | 43,337 |
| Internally developed software | 3,678 | (343) | 3,335 |
| Trade names(b) | 53,370 | — | 53,370 |
|  | $ 401,532 | $ (116,303) | $ 285,229 |

(a)     Amounts include intangibles acquired in the TransCentra acquisition. See *Note 3—Business Combinations*.

(b)     Trade names are indefinite-lived assets and therefore are not amortizable.

Aggregate amortization expense related to intangibles was $56.8 million, $48.0 million and $41.3 million for the years ended December 31, 2016, 2015 and 2014, respectively.

Estimated intangibles amortization expense for the next five years and thereafter consists of the following as follows:

|  | Estimated Amortization Expense |
|---|---|
| 2017 | $ 61,902 |
| 2018 | 50,361 |
| 2019 | 31,861 |
| 2020 | 23,824 |
| 2021 | 22,229 |
| Thereafter | 55,192 |
|  | $ 245,369 |

F-53

Supp.App. 0755

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 758 of 1110     PageID 2379

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**7. Intangibles Assets and Goodwill (Continued)**

**Goodwill**

Goodwill by reporting segment consists of the following:

| | Goodwill | Additions | Currency translation adjustments | Impairment | Goodwill |
|---|---|---|---|---|---|
| ITPS | $ 85,022 | $ 61,131(a) | $ — | $ — | $ 146,153 |
| HS | 86,786 | — | — | — | 86,786 |
| LLPS | 264,950 | — | 15 | (137,854)(c) | 127,111 |
| **Balance as of January 1, 2015** | $ 436,758 | $ 61,131 | $ 15 | $ (137,854) | $ 360,050 |
| ITPS | 146,153 | | (591) | — | 145,562 |
| HS | 86,786 | — | — | — | 86,786 |
| LLPS | 127,111 | — | — | — | 127,111 |
| **Balance as of December 31, 2015** | $ 360,050 | $ — | $ (591) | $ — | $ 359,459 |
| ITPS | 145,562 | 13,558(b) | 274 | — | 159,394 |
| HS | 86,786 | — | — | — | 86,786 |
| LLPS | 127,111 | — | — | — | 127,111 |
| **Balance as of December 31, 2016** | $ 359,459 | $ 13,558 | $ 274 | $ — | $ 373,291 |

(a)    Refer to *Note 1—Description of Business* for details of the reorganization with Pangea.

(b)    Refer to *Note 3—Business Combinations* for details of the acquisition of TransCentra.

(c)    The carrying amount of goodwill for all periods presented was net of accumulated impairment of $137.9 million recorded during the year ended December 31, 2014. Refer to *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* for details of the impairment of goodwill.

**8. Long-Term Debt and Credit Facilities**

Long-term obligations, net of original issue discounts and debt issuance costs, consist of the following:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| First lien revolving credit facility(a) | $ 63,337 | $ 62,039 |
| First lien secured term loan(b) | 687,884 | 717,233 |
| Second lien secured term loan(c) | 236,344 | 233,309 |
| TransCentra revolving credit facility | 5,000 | — |
| TransCentra term loan | 19,250 | — |
| FTS unsecured term loan | 15,911 | — |
| Other(d) | 11,609 | 7,814 |
| Total debt | 1,039,335 | 1,020,395 |
| Less: Current portion of long-term debt | (55,833) | (45,253) |
| Long-term debt, net of current maturities | $ 983,502 | $ 975,142 |

(a)    Net of unamortized debt issuance costs of $2.3 million and $3.1 million as of December 31, 2016 and 2015, respectively.

F-54

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**8. Long-Term Debt and Credit Facilities (Continued)**

(b)   Net of unamortized original issue discount and debt issuance costs of $14.6 million and $14.2 million and $19.4 million and $19.0 million as of December 31, 2016 and 2015, respectively.

(c)   Net of unamortized original issue discount and debt issuance costs of $7.3 million and $6.3 million and $9.0 million and $7.7 million as of December 31, 2016 and 2015, respectively.

(d)   Other debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company.

**Credit Facilities**

In connection with the Reorganization on October 31, 2014, the Company obtained new credit facilities aggregating to $1,105.0 million and used the proceeds to extinguish its previous credit facilities, pay related acquisition costs, pay former majority shareholders and retire Pangea credit facilities. The Company incurred an $18.6 million loss on the extinguishment of debt.

*First and Second Lien Secured Term Loans*

The financing obtained as part of the Reorganization included a first lien secured term loan of $780.0 million due October 2019 and a second lien secured term loan of $250.0 million due April 2020. The Company has the option to choose interest rates based on the 1) base rate (as defined), subject to a floor of 2.0% per annum, or 2) the Eurocurrency rate, subject to a floor of 1.0% per annum, plus an applicable margin for each rate, respectively. The Company's interest rates were 7.75% and 11.50% for the first and second lien secured term loans, respectively, as of December 31, 2016.

*Revolving Credit Facility and Swing Line Loans*

A first lien revolving credit facility of $75.0 million due October 2019 was also obtained as part of the Reorganization. The Company borrowed $9.5 million from the revolver on October 31, 2014 as part of effecting the Reorganization. As of December 31, 2016, the first lien revolving credit facility was fully drawn based on the outstanding balance under the credit facility and outstanding letters of credit of $9.3 million. The Company's interest rate on the first lien revolving credit facility was 7.75% as of December 31, 2016.

The Company's interest rate on the swing-line loans was 9.5% as of December 31, 2016. The swing-line loans are part of, and not in addition to, the revolving credit facility of $75.0 million. The assets of the Company secure the liens. The swing-line loans outstanding balance of $0.5 million and $4.1 million at December 31, 2016 and 2015, respectively, is included in the outstanding balance of $63.3 million and $62.0 million of the first lien revolving credit facility at December 31, 2016 and 2015, respectively.

As of December 31, 2016 and 2015, the Company had outstanding irrevocable letters of credit totaling approximately $9.3 million and $9.8 million, respectively, under the revolving credit facility. As December 31, 2016, these letters of credit consisted of approximately $7.1 million related to security for the Company's self-insured workers' compensation program and approximately $2.2 million for the

F-55

Supp.App. 0757

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**8. Long-Term Debt and Credit Facilities (Continued)**

landlord in Irving, a reduction of $0.6 million and increase of $0.1 million, respectively, compared to the prior year as of December 31, 2015. Letter of credit commitment fees on commitments outstanding of 6.75% per annum are payable quarterly.

*TransCentra Term Loan, TransCentra Revolving Credit Facility and FTS Term Loan*

On September 28, 2016, the Company assumed $25.0 million and $15.9 million in debt in connection with the acquisition of TransCentra and FTS, respectively (*Note 3— Business Combinations*). The TransCentra debt consists of a $20.0 million term loan due June 2021 and a $5.0 million revolving credit facility due June 2018. The term loan and revolving credit facility bear interest at LIBOR plus 5.56%, subject to a LIBOR floor of 6.00%, and LIBOR plus 4.31%, subject to a LIBOR floor of 4.75%, respectively, per annum where LIBOR is currently 0.77%. All the assets of TransCentra secure the term loan. As of December 31, 2016, the TransCentra revolving credit facility was fully drawn. The FTS debt consists of a $15.9 million unsecured term loan due June 2018. The FTS debt bears interest at Base Rate plus 1.00% per annum where Base Rate is presently 3.75%. The FTS debt is guaranteed by the Company.

*Debt Issuance Costs*

The October 31, 2014 credit facilities were issued at a discount of $35.4 million and the Company incurred debt issuance costs of $37.4 million. Both the original issue discount and debt issuance costs are amortized to interest expense over the remaining periods to maturity using the effective interest rate. The credit facilities and TransCentra term loan contain a number of covenants that, among other things, restrict, subject to certain exceptions, the Company's ability to incur additional indebtedness, create liens on assets, pay dividends or other distributions, engage in certain transactions with affiliates, make investments, sell assets, engage in mergers or consolidations, and precludes the Company from exceeding leverage and fixed charge coverage ratios, as individual defined. Additionally, the covenants of the credit facilities require a percentage of annual excess cash flow, as defined in the agreement, to be used to pay down the term loans beginning with the period ending December 31, 2015.

As of December 31, 2016, maturities of long-term debt are as follows:

|  | Maturity |
|---|---:|
| 2017 | $ 55,833 |
| 2018 | 60,565 |
| 2019 | 708,785 |
| 2020 | 254,865 |
| 2021 | 3,947 |
| Total long-term debt | 1,083,995 |
| Less: Unamortized discount and debt issuance costs | (44,660) |
|  | $ 1,039,335 |

F-56

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 761 of 1110    PageID 2382

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**9. Income Taxes**

The Company provides for income taxes using an asset and liability approach, under which deferred income taxes are provided based upon enacted tax laws and rates applicable to periods in which the taxes become payable.

For financial reporting purposes, income/ (loss) before income taxes includes the following components:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| United States | $ (71,171) | $ (79,054) | $ (241,701) |
| Foreign | 11,281 | 7,338 | 6,063 |
| | $ (59,890) | $ (71,716) | $ (235,638) |

The provision for federal, state, and foreign income taxes consists of the following:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| **Federal** | | | |
| Current | $ — | $ (63) | $ (396) |
| Deferred | (8,961) | (27,931) | (36,311) |
| **State** | | | |
| Current | 830 | 1,203 | 919 |
| Deferred | (2,740) | (2,696) | (1,765) |
| **Foreign** | | | |
| Current | 3,112 | (774) | (608) |
| Deferred | (4,028) | 3,449 | 158 |
| Income tax benefit | $ (11,787) | $ (26,812) | $ (38,003) |

The differences between income taxes expected by applying the U.S. federal statutory tax rate of 35% and the amount of income taxes provided are as follows:

| | Year ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Tax at statutory rate | $ (20,962) | $ (25,101) | $ (82,473) |
| **Add (deduct)** | | | |
| State income taxes | 1,483 | 905 | (3,611) |
| Foreign income taxes | (1,356) | 2,654 | (3,635) |
| Tax credits | (505) | (550) | (695) |
| Return to provision | (2,613) | 2,395 | 2,106 |
| Permanent book to tax expenses | 4,405 | (172) | 408 |
| Goodwill impairment | — | | 49,977 |
| Unremitted earnings | 1,686 | | |
| Unrecognized tax benefits | — | (63) | (396) |
| State valuation allowance | (3,665) | (846) | (12) |
| Federal valuation allowance | 14,070 | (3,486) | 589 |
| International valuation allowance | (4,330) | (2,548) | (261) |
| Benefits from income taxes | $ (11,787) | $ (26,812) | $ (38,003) |

Included in the 2014 pretax loss was $138 million of impairment related to goodwill. With the exception of an insignificant amount, the Company has no tax basis in the goodwill and accordingly is not recognizing a tax benefit on the nondeductible portion.

F-57

Supp.App. 0759

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**9. Income Taxes (Continued)**

The components of deferred income tax liabilities and assets are as follows:

|  | Year ended December 31, | |
|---|---:|---:|
|  | **2016** | **2015** |
| **Deferred income tax liabilities:** | | |
| Book over tax basis of intangible assets | $ (112,024) | $ (108,404) |
| Book over tax basis of fixed assets | — | (3,263) |
| Deferred income | — | (1,089) |
| Unremitted foreign earnings | (1,686) | — |
| Other, net | (7,781) | (6,071) |
| Total deferred income tax liabilities | $ (121,491) | $ (118,827) |
| | | |
| **Deferred income tax assets:** | | |
| Allowance for doubtful accounts and receivable adjustments | $ 2,112 | $ 1,889 |
| Tax over book basis of intangible assets | 3,010 | 3,116 |
| Tax over book basis of fixed assets | 595 | — |
| Inventory | 3,076 | 3,572 |
| Accrued liabilities | 9,554 | 9,294 |
| Tax credit carryforwards | 4,469 | 4,542 |
| Net operating loss carryforwards | 227,757 | 198,829 |
| Tax deductible goodwill | 6,806 | — |
| Other, net | 18,364 | 15,181 |
| Total deferred income tax assets | $ 275,743 | $ 236,423 |
| | | |
| Valuation allowance | (170,821) | (147,758) |
| Total net deferred income tax liabilities | $ (16,569) | $ (30,162) |

Gross deferred tax assets were reduced by valuation allowances. Approximately $141 million and $6 million of the valuation allowance relates to federal and state limitations on the utilization of net operating losses due to numerous changes in ownership. The remaining $23 million of the valuation allowance relates to net operating losses that are not realizable. As a result of the Company's cumulative history of losses in the US and certain other foreign jurisdictions, the Company is unable to use forecasted income to support the realizability of net operating loss assets. Consequently, the Company is only able to net operating loss assets to the extent that net deferred tax liabilities reverse prior to the expiration of the net operating losses. The net change during the year in the total valuation allowance balance was an increase of $23 million related to the increase in net operating loss assets during the year and the change in net deferred tax liabilities available to support the realizability of such assets. Of this amount, $6.2 million, net, was recognized to Continuing Operations and $16.9 million was recorded to goodwill in connection with the TransCentra acquisition. The current year increase was partially offset by a reversal of valuation allowance of net operating loss carryforwards in a German subsidiary.

Section 382 of the Internal Revenue Code of 1986, as amended (the Code), limits the amount of U.S. tax attributes (net operating loss and tax credit carryforwards) following a change in ownership. The Company has determined that an ownership change occurred under Section 382 on April 3, 2014 and October 31, 2014 for the Pangea group and on October 31, 2014 for the SourceHOV Holdings group. The Section 382 limit that applied to the historic SourceHOV LLC group is greater than the net

F-58

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**9. Income Taxes (Continued)**

operating losses and tax credits generated in the predecessor periods. Therefore, no additional valuation allowances were established relating to Section 382 limitations other than the pre-2011 Section 382 limitations that applied. The Section 382 limitations significantly limit the pre-acquisition Pangea net operating losses. Accordingly, upon the October 31, 2014 change in control, most of the historic Pangea federal net operating losses were limited and a valuation allowance has been established against the related deferred tax asset. Following the filing of the October 31, 2014, Pangea federal tax returns and further Section 382 analysis, management finalized the amount of the limitation and as a result, approximately $3.5 million of the valuation allowance was released. Management has concluded that the U.S. tax attributes after Section 382 limitations were applied are more likely than not to be realized. With regard to Pangea's foreign subsidiaries, it was determined that most deferred tax assets are not likely to be realized and valuation allowances have been established.

Included in deferred tax assets are federal, foreign and state net operating loss carryforwards, federal general business credit carryforwards and state tax credit carryforwards due to expire beginning in 2017 through 2036. As of December 31, 2016, the Company has federal and state income tax net operating loss (NOL) carryforwards of $587 million and $290 million, which will expire at various dates from 2017 through 2036. Such NOL carryforwards expire as follows:

|  | Federal NOL | State and Local NOL |
|---|---|---|
| 2017 - 2020 | $ 114,969 | $ 31,485 |
| 2021 - 2025 | 80,880 | 79,355 |
| 2026 - 2036 | 390,747 | 179,186 |
|  | $ 586,596 | $ 290,026 |

As of December 31, 2016, the Company has foreign net operating loss carryforwards of $31 million, $7 million of which were generated by BancTec Holding N.V. and BancTec B.V., and will expire at various dates from 2017 through 2025, and the rest of which can be carried forward indefinitely.

Since the 2014 Reorganization did not result in a new tax basis of assets and liabilities for the Company, some of the goodwill continues to be deductible over the remaining amortization period for tax purposes. At December 31, 2016, approximately $43.8 million of the Company goodwill is tax deductible, $11.4 million of which is carried over from the 2014 Reorganization. Additionally, the Company has tax deductible goodwill of $32.4 million in connection with the TransCentra acquisition. This amount was related to the tax basis carried over from the seller.

The Company adopted the provision of accounting for uncertainty in income taxes in the Topic of the ASC 740. ASC 740 clarifies the accounting for uncertain tax positions in the Company's financial statements and prescribes a recognition threshold and measurement attribute for financial statement disclosure of tax positions taken or expected to be taken on tax returns. The total amount of unrecognized tax benefits, including interest and penalties, at December 31, 2016 is $1.0 million, and if recognized $0.5 million would benefit the effective tax rate. Total accrued interest and penalties recorded on the Consolidated Balance Sheet were $2.6 million and $2.6 million at December 31, 2016 and 2015, respectively. The total amount of interest and penalties recognized in the Consolidated Statement of Operations at December 31, 2016 was $0 million. The Company does not anticipate a significant change in the amount of unrecognized tax benefits during 2017.

F-59

Supp.App. 0761

Table of Contents

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**9. Income Taxes (Continued)**

The following is a tabular reconciliation of the total amounts of unrecognized tax benefits:

|  | Year ended December 31, | | |
|---|---|---|---|
|  | 2016 | 2015 | 2014 |
| **Unrecognized Tax Benefits—January 1** | $ 1,287 | $ 2,760 | $ 4,834 |
| Gross increases—tax positions in prior period |  |  |  |
| Gross decreases—tax positions in prior period | (31) | (916) | (1,529) |
| Gross increases—tax positions in current period | 45 | 70 | 387 |
| Settlement | (103) | (110) | (726) |
| Lapse of statute of limitations | (199) | (517) | (206) |
| **Unrecognized Tax Benefits—December 31** | $ 999 | $ 1,287 | $ 2,760 |

The Company files income tax returns in the U.S. and various state and foreign jurisdictions. The statute of limitations for U.S. purposes is open for tax years ending on or after December 31, 2012, However, NOLs generated in years prior to 2012 and utilized in future periods may be subject to examination by U.S. tax authorities. State jurisdictions that remain subject to examination are not considered significant. The Company has significant foreign operations in India and Europe. The Company may be subject to examination by the India tax authorities for tax periods ending on or after March 31, 2010.

The Company currently does not repatriate earnings from its European foreign subsidiaries. U.S. income and foreign withholding taxes have not been recorded on the European foreign subsidiaries aggregating approximately $44.6 million at December 31, 2016. The Company believes the determination of the amount of the unrecognized deferred U.S. income tax liability with respect to such earnings is not practicable. Historically, the Company did not indefinitely reinvest earnings in China. Additionally, as of December 31, 2016, the Company determined that approximately $4.8 million of undistributed net earnings related to certain foreign subsidiaries in India, Mexico, Canada and Philippines will no longer be indefinitely reinvested. Accordingly, the Company recognized a $1.68 million deferred tax liability related to the incremental U.S. tax that would be realized on such income.

**10. Employee Benefit Plans**

**German Pension Plan**

The Company's subsidiary in Germany provides pension benefits to retirees. Employees eligible for participation includes all employees who started working for the Company prior to September 30, 1987 and have finished a qualifying period of at least 10 years. The Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

**U.K. Pension Plan**

The Company's subsidiary in the United Kingdom provides pension benefits to retirees and eligible dependents. Employees eligible for participation included all full-time regular employees who were more than three years from retirement prior to October 2001. A retirement pension or a lump-sum payment may be paid dependent upon length of service at the mandatory retirement age. The

F-60

Supp.App. 0762

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

**Funded Status**

The change in benefit obligations, the change in the fair value of the plan assets and the funded status of the Company's pension plans (except for the German pension plan which is unfunded) and the amounts recognized in the Company's consolidated financial statements are as follows:

|  | Year ended December 31, | |
|---|---|---|
|  | 2016 | 2015 |
| Change in Benefit Obligation: | | |
| Benefit obligation at beginning of period | $ 76,569 | $ 83,444 |
| Service cost | 11 | 736 |
| Interest cost | 2,667 | 2,926 |
| Plan participants' contributions | — | 310 |
| Actuarial loss | 19,330 | (5,527) |
| Plan curtailment | — | (258) |
| Benefits paid | (2,042) | (1,182) |
| Foreign-exchange rate changes | (14,215) | (3,880) |
| Benefit obligation at end of year | $ 82,320 | $ 76,569 |
| Change in Plan Assets: | | |
| Fair value of plan assets at beginning of period | $ 55,909 | $ 55,133 |
| Actual return on plan assets | 6,790 | 2,157 |
| Employer contributions | 1,770 | 2,184 |
| Plan participants' contributions | — | 310 |
| Benefits paid | (2,031) | (1,175) |
| Foreign-exchange rate changes | (9,900) | (2,700) |
| Fair value of plan assets at end of year | 52,538 | 55,909 |
| Funded status at end of year | $ (29,782) | $ (20,660) |
| Net amount recognized in the Consolidated Balance Sheets: | | |
| Accrued compensation and benefits(a) | $ (1,479) | (1,467) |
| Pension liability(b) | $ (28,303) | $ (19,193) |
| Amounts recognized in accumulated other comprehensive loss consist of: | | |
| Net actuarial loss | (12,339) | (5,076) |
| Net plan amendment gain | | |
| Prior service cost | | |
| Net amount recognized in accumulated other comprehensive loss | $ (12,339) | $ (5,076) |
| Plans with underfunded or non-funded accumulated benefit obligation: | | |
| Aggregate projected benefit obligation | $ 82,320 | $ 76,569 |
| Aggregate accumulated benefit obligation | $ 82,320 | $ 76,569 |
| Aggregate fair value of plan assets | $ 52,538 | $ 55,909 |

(a) Germany pension represents only a portion of the accrued compensation and benefits balance in the face of the consolidated balance sheet.

(b) Consolidated balance of $28,712 and $19,415 includes UK pension of $28,303 and $19,193, respectively, and minimum regulatory benefit for a Philippines legal entity.

F-61

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

For the years ended December 31, 2016 and 2015, the Company recorded actuarial losses of $12.34 million and $5.08 million, respectively, which is net of a deferred tax benefit of $2.5 million and $1.5 million, respectively.

**Amounts in Accumulated Other Comprehensive Loss Expected to be Recognized in Net Periodic Benefit Costs in 2017**

The liability recorded on the Company's consolidated balance sheets representing the net unfunded status of this plan is different than the cumulative expense recognized for this plan. The difference relates to losses that are deferred and that will be amortized into periodic benefit costs in future periods. These unamortized amounts are recorded in Accumulated Other Comprehensive Loss in the consolidated balance sheets.

As of December 31, 2016, the estimated pre-tax amount that will be amortized from accumulated other comprehensive loss into net periodic benefit cost over the next year will be net actuarial loss of $2.0 million and prior service cost of ($0.1) million.

**Pension and Postretirement Expense**

The components of the net periodic benefit cost are as follows:

|  | Year ended December 31, | | |
|  | 2016 | 2015 | 2014 |
|---|---|---|---|
| Service cost | $ 11 | $ 735 | $ 124 |
| Interest cost | 2,667 | 2,926 | 592 |
| Expected return on plan assets | (2,623) | (2,696) | (542) |
| Curtailment recognized | — | (258) | — |
| Amortization: | — | — | — |
| Amortization of prior service cost | (141) | (159) | (29) |
| Amortization of net (gain) loss | 891 | 1,426 | 104 |
| Net periodic benefit cost | $ 805 | $ 1,974 | $ 249 |

**Valuation**

The Company uses the corridor approach and projected unit credit method in the valuation of its defined benefit plans for the UK and Germany, respectively. The corridor approach defers all actuarial gains and losses resulting from variances between actual results and economic estimates or actuarial assumptions. For defined benefit pension plan, these unrecognized gains and losses are amortized when the net gains and losses exceed 10% of the greater of the market-related value of plan assets or the projected benefit obligation at the beginning of the year. The amount in excess of the corridor is amortized over 15 years. Similarly, the Company used the Projected Unit Credit Method for the German Plan, and evaluated the assumptions used to derive the related benefit obligations consisting primarily of financial and demographic assumptions including commencement of employment, biometric decrement tables, retirement age, staff turnover. The projected unit credit method determines the present value of the Company's defined benefit obligations and related service costs by taking into

F-62

Supp.App. 0764

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

account each period of service as giving rise to an additional unit of benefit entitlement and measures each unit separately in building up the final obligation. Benefit is attributed to periods of service using the plan's benefit formula, unless an employee's service in later years will lead to a materially higher of benefit than in earlier years, in which case a straight-line basis is used.

The following tables set forth the principal weighted-average assumptions used to determine benefit obligation and net periodic benefit costs:

|  | December 31, | | | |
|  | 2016 | 2015 | 2016 | 2015 |
|  | UK | | Germany | |
| Weighted-average assumptions used to determine benefit obligations: | | | | |
| Discount rate | 2.70% | 3.90% | 2.45% | 2.00% |
| Rate of compensation increase | N/A | N/A | 1.00% | 1.00% |
| | | | | |
| Weighted-average assumptions used to determine net periodic benefit cost: | | | | |
| Discount rate | 3.90% | 3.60% | N/A | N/A |
| Expected asset return | 5.15% | 4.91% | N/A | N/A |
| Rate of compensation increase | N/A | 2.00% | N/A | N/A |

The Germany plan is an unfunded plan and therefore has no plan assets. The expected rate of return assumptions for plan assets relates solely to the UK plan and are based mainly on historical performance achieved over a long period of time (15 to 20 years) encompassing many business and economic cycles. Adjustments, upward and downward, may be made to those historical returns to reflect future capital market expectations; these expectations are typically derived from expert advice from the investment community and surveys of peer company assumptions.

The Company assumed a weighted average expected long-term rate of return on plan assets for the overall scheme of 5.15%. The Company's expected rate of return for equities is derived by applying an equity risk premium to the expected yield on the fixed-interest 15-year U.K. government gilts. The Company evaluated a number of indicators including prevailing market valuations and conditions, corporate earnings expectations, and the estimates of long-term economic growth and inflations to derive the equity risk premium. The expected return on the gilts and corporate bonds typically reflect market conditions at the balance sheet date, and the nature of the bond holdings.

The discount rate assumption was developed considering the current yield on an investment grade non-gilt index with an adjustment to the yield to match the average duration of the index with the average duration of the plan's liabilities. The index utilized reflected the market's yield requirements for these types of investments.

The inflation rate assumption was developed considering the difference in yields between a long-term government stocks index and a long-term index-linked stocks index. This difference was modified to consider the depression of the yield on index-linked stocks due to the shortage of supply and high demand, the premium for inflation above the expectation built into the yield on fixed-interest stocks and the UK government's target rate for inflation (CPI) at 2.2%.The assumptions used are the

F-63

Supp.App. 0765

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

best estimates chosen from a range of possible actuarial assumptions which, due to the time scale covered, may not necessarily be borne out in practice.

**Plan Assets**

The investment objective for the plan is to earn, over moving fifteen to twenty year periods, the long-term expected rate of return, net of investment fees and transaction costs, to satisfy the benefit obligations of the plan, while at the same time maintaining sufficient liquidity to pay benefit obligations and proper expenses, and meet any other cash needs, in the short-to medium-term.

The Company's investment policy related to the defined benefit plan is to continue to maintain investments in government gilts and highly rated bonds as a means to reduce the overall risk of assets held in the fund. No specific targeted allocation percentages have been set by category, but are at the direction and discretion of the plan trustees. During 2016 and 2015, all contributions made to the fund were in these categories.

The weighted average allocation of plan assets by asset category is as follows:

|  | December 31, | | |
|---|---|---|---|
|  | 2016 | 2015 | 2014 |
| Domestic and overseas equities | 42.0% | 41.0% | 40.0% |
| UK government and corporate bonds | 21.0% | 20.0% | 22.0% |
| Diversified growth fund | 37.0% | 39.0% | 38.0% |
| Total | 100.0% | 100.0% | 100.0% |

The following tables set forth, by category and within the fair value hierarchy, the fair value of the Company's pension assets at December 31, 2016 and 2015:

|  | December 31, 2016 | | | |
|---|---|---|---|---|
|  | Total | Level 1 | Level 2 | Level 3 |
| Asset Category: |  |  |  |  |
| Cash | $ 315 | $ 315 | $ — | $ — |
| Equities: |  |  |  |  |
| Domestic | 13,171 | 13,171 | — | — |
| Overseas | 8,781 | 8,781 | — | — |
| Fixed Income Securities: |  |  |  |  |
| UK Gilts | 10,962 | 10,962 | — | — |
| Other investments: |  |  |  |  |
| Diversified growth fund | 19,309 | 19,309 | — | — |
| Total fair value | $ 52,538 | $ 52,538 | $ — | $ — |

F-64

Supp.App. 0766

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 769 of 1110    PageID 2390

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

| | December 31, 2015 | | | |
| | Total | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|
| Asset Category: | | | | |
| Cash | $ 129 | $ 129 | $ — | $ — |
| Equities: | | | | |
|   Domestic | 13,702 | 13,702 | — | — |
|   Overseas | 9,134 | 9,134 | — | — |
| Fixed Income Securities: | | | | |
|   UK government | 11,248 | 11,248 | — | — |
|   Corporate bonds | — | | — | — |
| Other investments: | | | | |
|   Diversified growth fund | 21,696 | 21,696 | — | — |
| Total fair value | $ 55,909 | $ 55,909 | $ — | $ — |

The plan assets for the UK are categorized as follows, as applicable:

Level 1: Any asset for which a unit price is available and used without adjustment, cash balances, etc.

Level 2: Any asset for which the amount disclosed is based on market data, for example a fair value measurement based on a present value technique (where all calculation inputs are based on data).

Level 3: Other assets. For example, any asset value with a fair value adjustment made not based on available indices or data.

**Employer Contributions**

The Company's funding is based on governmental requirements and differs from those methods used to recognize pension expense. The Company expects to contribute $1.7 million to the pension plans during 2017, based on current plan provisions.

F-65

Supp.App. 0767

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**10. Employee Benefit Plans (Continued)**

**Estimated Future Benefit Payments**

The estimated future pension benefit payments expected to be paid to plan participants are as follows:

| Year ended December 31, | Estimated Benefit Payments |
|---|---|
| 2017 | $ 914 |
| 2018 | 1,028 |
| 2019 | 1,245 |
| 2020 | 1,441 |
| 2021 | 1,588 |
| 2022 - 2026 | 10,987 |
| Total | $ 17,203 |

**Executive Deferred Compensation Plan**

The Company has individual arrangements with seven former executives in the U.S. which provide for fixed payments to be made to each individual beginning at age 65 and continuing for 20 years. This is an unfunded plan with payments to be made from operating cash of the Company. The weighted average discount rate used as of December 31, 2016 was 4.25%. Benefit payments of $0.3 million and $0.3 million were made during the years ended December 31, 2016 and December 31, 2015, respectively. The expense for the years ended December 31, 2016, December 31, 2015 and the two months ended December 31, 2014 was $0.7 million, $0.3 million and $0.1 million, respectively. The balance of this obligation is $4 million and $3.6 million as of December 31, 2016 and December 31, 2015, respectively and is classified in Other Liabilities in the accompanying consolidated balance sheets. Benefit payments expected to be paid to plan participants in 2017 are $0.3 million.

**Defined Contribution Plans**

The Company provides defined contribution plans for the benefit of eligible employees and their beneficiaries. The Company's defined contribution plans are limited and immaterial.

F-66

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 771 of 1110    PageID 2392

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

## 11. Commitments and Contingencies

**Lease Commitments**

The Company leases various office buildings, machinery, equipment, and vehicles. Future minimum lease payments under capital leases, included in long-term obligations, and non-cancelable operating leases at December 31, 2016 are as follows:

| | Capital Leases | Operating Lease | Total |
|---|---|---|---|
| 2017 | $ 6,830 | $ 30,783 | $ 37,613 |
| 2018 | 5,486 | 23,615 | 29,101 |
| 2019 | 4,459 | 14,930 | 19,389 |
| 2020 | 3,460 | 10,604 | 14,064 |
| 2021 | 4,127 | 5,917 | 10,044 |
| Thereafter | 6,571 | 7,651 | 14,222 |
| Total Minimum Lease Payments | $ 30,933 | $ 93,500 | $ 124,433 |
| Less: Amounts Representing Interest | (5,987) | | |
| Total Net Minimum Lease Payments | 24,946 | | |
| Less: Current portion of obligations under capital leases | (6,507) | | |
| Long-term portion of obligations under capital leases | $ 18,439 | | |

Rent expense for all operating leases was $36.7 million, $30.7 million and $26.1 million for the years ended December 31, 2016, 2015 and 2014, respectively.

**Litigation**

The Company is, from time to time, involved in certain legal proceedings, inquiries, claims and disputes, which arise in the ordinary course of business. Although management cannot predict the outcomes of these matters, management does not believe these actions will have a material, adverse effect on the Company's consolidated balance sheets, consolidated statements of operations or consolidated statements of cash flows.

**Contract-Related Contingencies**

The Company has certain contingent liabilities that arise in the ordinary course of providing services to its customers. These contingencies are generally the result of contracts that require the Company to comply with certain performance measurements or the delivery of certain services by a specified deadline. The Company believes the liability, if any, incurred under these contract provisions will not have a material adverse effect on the Company's consolidated balance sheets, consolidated statements of operations or consolidated statements of cash flows.

From time to time the Company's services agreements will include provisions whereby the Company will indemnify the customer for certain matters (by way of example, the Company might be subject to certain limitations and requirements provided that if the services sold infringe upon a third-party's intellectual property rights, the Company might indemnify the customer against such associated liability or provide alternative remedies). The scope of such indemnification provisions vary and the Company has not recorded any liability associated with such indemnification. The estimated fair value of these indemnification clauses is minimal.

F-67

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**11. Commitments and Contingencies (Continued)**

The Company has certain contingent liabilities related to prior acquisitions. The Company adjusts these liabilities to fair value at each reporting period. As of December 31, 2015, the Company had a liability of $0.8 million related to the 2012 acquisition of GTESS Corporation. There was no remaining liability related to this acquisition as of December 31, 2016. In addition, the Company had a $0.7 million liability related to Handson Global Management's ("HGM") acquisition of Banctec, Inc. as of December 31, 2016 and 2015, respectively. The fair value is determined using an earn out method based on the agreement terms. This fair value measurement represents a Level 3 measurement as it is based on significant inputs not observable in the market. Significant judgment is employed in determining the appropriateness of these assumptions.

**12. Fair Value Measurement**

**Assets and Liabilities Measured at Fair Value on a Non-Recurring Basis**

The carrying amount of assets and liabilities including cash and cash equivalents, accounts receivable and accounts payable approximated their fair value as of December 31, 2016 and 2015 due to the relative short maturity of these instruments. Management estimates the fair values of the first and second lien debt at approximately 98.5% and 97.0%, respectively, of the respective principal balance outstanding as of December 31, 2016. The carrying value approximates the fair value for the long-term debt related to TransCentra and the other debt. TransCentra's debt was recently issued in 2016 and represents the most updated rates that would be offered for similar debt maturities. Other debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company and as such, the cost incurred would approximate fair value. Property and equipment, intangible assets, and goodwill, are not required to be re-measured to fair value on a recurring basis. These assets are evaluated for impairment if certain triggering events occur. If such evaluation indicates that impairment exists, the respective asset is written down to its fair value. Refer to *Note 2—Basis of Presentation and Summary of Significant Accounting Policies*.

The Company determined the fair value of its long-term debt using Level 2 inputs including the recent issue of the debt, December 2016 trades of the Company's debt on an inactive market, the Company's credit rating, and the current risk-free rate. The Company's contingent liabilities related to prior acquisitions are re-measured each period and represent a Level 2 measurement as it is based on using an earn out method based on the agreement terms.

The following table provides the carrying amounts and estimated fair values of the Company's financial instruments as of December 31, 2016 and 2015:

| As of December 31, 2016 | Carrying Amount | Fair Value | Fair Value Measurements | | |
| --- | --- | --- | --- | --- | --- |
| | | | Level 1 | Level 2 | Level 3 |
| Recurring and nonrecurring assets and liabilities: | | | | | |
| Acquisition contingent liability | $ 721 | $ 721 | $ — | $ — | $ 721 |
| Long-term debt | 983,502 | 1,009,913 | — | 1,009,913 | |
| | $ 984,223 | $ 1,010,634 | $ — | $ 1,009,913 | $ 721 |

F-68

Supp.App. 0770

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**12. Fair Value Measurement (Continued)**

| | | | Fair Value Measurements | | |
|---|---|---|---|---|---|
| As of December 31, 2015 | Carrying Amount | Fair Value | Level 1 | Level 2 | Level 3 |
| Recurring and nonrecurring assets and liabilities: | | | | | |
| Acquisition contingent liability | $ 1,513 | $ 1,513 | $ — | $ — | $ 1,513 |
| Long-term debt | 975,142 | $ 905,111 | — | 905,111 | — |
| | $ 976,655 | $ 906,624 | $ — | $ 905,111 | $ 1,513 |

The significant unobservable inputs used in the fair value of the Company's acquisition contingent liabilities are the discount rate, growth assumptions, and revenue thresholds. Significant increases (decreases) in the discount rate would have resulted in a lower (higher) fair value measurement. Significant increases (decreases) in the forecasted financial information would have resulted in a higher (lower) fair value measurement. For all significant unobservable inputs used in the fair value measurement of the Level 3 liabilities, a change in one of the inputs would not necessarily result in a directionally similar change in the other based on the current level of billings.

The following table reconciles the beginning and ending balances of net assets and liabilities classified as Level 3 for which a reconciliation is required:

| | December 31, | |
|---|---|---|
| | 2016 | 2015 |
| Balance as of January 1, | $ 1,513 | $ 1,712 |
| Payments/Reductions | (792) | (199) |
| Balance as of December 31, | $ 721 | $ 1,513 |

**13. Equity-Based Compensation**

Under the Company's 2013 Long Term Incentive Plan ("2013 Plan"), the Board of Directors may grant equity-based awards to certain employees, officers, directors, consultants and advisors of the Company. Compensation expense for equity-based awards is measured at the fair value on the grant date and recognized as compensation expense on a straight-line basis over the vesting period.

**Stock Options**

No stock options were granted under the 2013 Plan.

**Restricted Stock Units**

On March 5, 2014, the Company's Board of Directors approved the issuance of 16,204 restricted stock units to certain employees of the Company pursuant to the 2013 Long Term Incentive Plan. Subject to continuous employment with the Company, one-third of the restricted stock units vest on March 15, 2014, one-third of the units vest on March 15, 2015, and the remaining units vest on March 15, 2016. All unvested restricted stock units will vest upon the occurrence of a change in control as defined in the 2013 Plan. Upon vesting, the restricted stock units are settled with the issuance of one common share for each restricted stock unit. A portion of the restricted stock units settled and accrued

F-69

Supp.App. 0771

SourceHOV Holdings, Inc. and Subsidiaries

Notes to the Consolidated Financial Statements (Continued)

(in thousands of United States dollars unless otherwise stated)

**13. Equity-Based Compensation (Continued)**

bonus liability of $6.0 million included in accrued compensation and benefits at December 31, 2013. During 2014, 8,253 restricted stock units were forfeited by four awardees. The Company recognized compensation expense of $1.1 million, $4.4 million and $7.8 million for the years ended December 31, 2016, 2015 and 2014, respectively.

On March 5, 2014, the Company's Board of Directors approved the issuance of 6,260 restricted stock units to certain employees of the Company pursuant to the 2013 Plan. Subject to continuous employment with the Company, the restricted stock units will vest on December 31, 2017. The Company shall settle each vested restricted stock unit with the issuance of one common share for each restricted stock unit. During 2014, 700 restricted stock units were forfeited by an awardee. The Company recognized compensation expense of $2.1 million, $2.1 million and $1.8 million for the years ended December 31, 2016, 2015 and 2014, respectively.

On March 5, 2014, the Company's Board of Directors approved the issuance of 3,876 restricted stock units to certain employees of the Company pursuant to the 2013 Plan. Subject to continuous employment with the Company, one-quarter of the restricted stock units vest on April 30, 2014, one-quarter of the units vest on April 30, 2015, one-quarter of the units vest on April 30, 2016 and the remaining units vest on April 30, 2017. Upon a change of control as defined in the 2013 Plan, all unvested RSUs will vest. The Company shall settle each vested restricted stock unit with the issuance of one common share for each restricted stock unit on the earlier of the occurrence of a change of control as defined in the 2013 Plan and the fifth anniversary of the date of grant. During 2015, 485 restricted stock units were forfeited by two awardees, respectively. The Company recognized compensation expense of $1.3 million, $1.3 million and $2.6 million for the years ended December 31, 2016, 2015 and 2014, respectively.

On March 5, 2014, the Company's Board of Directors approved the issuance of 650 restricted stock units to certain employees of the Company pursuant to the 2013 Plan. Subject to continuous employment with the Company, one-quarter of the restricted stock units vest on March 1, 2015, one-quarter of the units vest on March 1, 2016, one-quarter of the units will vest on March 1, 2017 and the remaining units vest on March 1, 2018. Upon a change of control as defined in the 2013 Plan, all unvested RSUs will vest. The Company shall settle each vested restricted stock unit with the issuance of one common share for each restricted stock unit on the earlier of the occurrence of a change in control as defined in the 2013 Plan and the fifth anniversary of the date of grant. In 2014, all 650 restricted stock units were forfeited by the awardees resulting in no stock expense being recognized.

On April 30, 2015, the Company's Board of Directors approved the issuance of 2,700 restricted stock units to certain employees of the Company pursuant to the 2013 Plan. Subject to continuous employment with the Company, one-quarter of the restricted stock units vest on April 30, 2016, one-quarter of the units vest on April 30, 2017, one-quarter of the units will vest on April 30, 2018 and the remaining units vest on April 30, 2019. Upon a change of control as defined in the 2013 Plan, all unvested RSUs will vest. The Company shall settle each vested restricted stock unit with the issuance of one common share for each restricted stock unit on the earlier of the occurrence of a change in control as defined in the 2013 Plan and the fifth anniversary of the date of grant. During 2016, 250 restricted stock units were forfeited by one awardee. The Company recognized compensation expense of $0.5 million and $0.3 million for the years ended December 31, 2016 and 2015, respectively.

F-70

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**13. Equity-Based Compensation (Continued)**

On April 29, 2016, the Company's Board of Directors approved the issuance of 6,375 restricted stock units to certain employees of the Company pursuant to the 2013 Plan. Subject to continuous employment with the Company, one-third of the restricted stock units vest on April 29, 2017, one-third of the units vest on April 29, 2018, and the remaining units vest on April 29, 2019. Upon a change of control as defined in the 2013 Plan, all unvested RSUs will vest. The Company shall settle each vested restricted stock unit with the issuance of one common share for each restricted stock unit on the earlier of the occurrence of a change in control as defined in the 2013 Plan and the fourth anniversary of the date of grant. The fair value of the awards on the grant date was estimated based on the estimated enterprise value of the Company, determined under a market approach. The Company determined the enterprise value by performing a guideline public company analysis, and determining multiples to apply based on guideline public companies' enterprise value ratios, in accordance with the Guideline Public Company Method. The enterprise value was reduced by outstanding debt to determine the fair value of the Company's equity, which was adjusted for discounts attributable to lack of control and marketability. The Company determined that the grant date fair value per unit was $1,600 for grants in fiscal 2016. The Company recognized compensation expense of $2.1 million for the year ended December 31, 2016.

The Company recognized total stock compensation expense of $7.1 million for the year ended December 31, 2016.

A summary of the status of restricted stock units as of December 31, 2016 and 2015, and the changes during the years then ended is presented as follows:

| | Number of Shares | Weighted Remaining Contractual Life (Years) | Aggregate Intrinsic Value ($) |
|---|---|---|---|
| Nonvested as of January 1, 2015 | 10,122 | 2.07 | $ 1,666 |
| Shares granted | 2,700 | — | — |
| Shares forfeited | (485) | — | — |
| Shares vested | (5,036) | — | — |
| Nonvested as of December 31, 2015 | 7,301 | 2.13 | 1,587 |
| Shares granted | 6,375 | — | — |
| Shares forfeited | (250) | — | — |
| Shares vested | (4,539) | — | — |
| Nonvested as of December 31, 2016 | 8,887 | 2.01 | $ 1,567 |

As of December 31, 2016, there was approximately $13.1 million of total unrecognized compensation expense related to restricted stock of which will be recognized over the respective service period, approximately 2.01 years. As of December 31, 2016, there were 25,727 restricted stock units outstanding, of which 8,887 was unvested. As of December 31, 2015, there were 19,602 restricted stock units outstanding, of which 7,301 was unvested.

F-71

Supp.App. 0773

Table of Contents

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**14. Related-Party Transactions**

*Leasing Transactions*

Certain operating companies lease their operating facilities from previous owners of the businesses who remained as employees. These leases are for various lengths and annual amounts. No rental expense was incurred for the year ended December 31, 2016 for these operating leases. For the years ended December 31, 2015 and 2014, the Company incurred $0.1 million and $0.1 million in rental expenses for these operating leases respectively.

In addition, certain operating companies lease their operating facilities from HOV RE, LLC an affiliate through common interest held by certain shareholders. The rental expense for these operating leases was $0.6 million, $0.2 million and $0.2 million for the years ended December 31, 2016, 2015 and 2014.

*Relationship with HandsOn Global Management*

The Company incurred an annual management fee to HGM of $6.0 million, $6.0 million and $4.9 million for the years ended December 31, 2016, 2015 and 2014, respectively. The Company incurred an annual management fee to TRG of $1.9 million for the year ended December 31, 2014.

The Company incurred travel expenses to HGM of $1.7 million, $0.8 million, and $0.7 million for the years ended December 31, 2016, 2015 and 2014, respectively. In addition, the Company incurred travel expenses to TRG of $0.05 million for the year ended December 31, 2014.

The Company incurred a transaction fee to HGM of $10.4 million for the year ended December 31, 2014. The $10.4 million transaction fee to HGM is payable over four years in annual installments. In addition, the Company incurred a transaction fee to TRG of $1.3 million and incurred $4.5 million in deferred redemption to TRG payable over two years for the year ended December 31, 2014.

The Company incurred marketing fees to Rule 14 of $0.5 million for the year ended December 31, 2016.

*Relationship with Dataforce Group, LLC*

The Company provides collection letter and insurance billing services to subsidiaries of Dataforce Group, LLC (formerly HOV Global LLC), which was an affiliate through common interest held by certain shareholders prior to the Reorganization. As of October 31, 2014, Dataforce Group, LLC is a subsidiary of the Company. The revenue recognized for these services was approximately $2.2 million for the year ended December 31, 2014 and is included in revenue in the consolidated statements of operations. All intercompany revenues and expenses after October 31, 2014 have been eliminated in the consolidated statements of operations.

Prior to the Reorganization, subsidiaries of Dataforce Group, LLC (formerly HOV Global LLC), an affiliate through common interest held by certain shareholders, provided the Company voice and support services, helpdesk and data conversion services. As of October 31, 2014 subsidiaries of Dataforce Group, LLC are now subsidiaries of the Company and expenses are eliminated in the consolidated statement of operations. The expense recognized for these services prior to the

F-72

Supp.App. 0774

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**14. Related-Party Transactions (Continued)**

Reorganization was approximately $0.1 million for the year ended December 31, 2014 and is included in cost of revenue in the consolidated statements of operations.

*Relationship with HOV Services, Ltd.*

HOV Services, Ltd. provides the Company data capture and technology services. HOV Services, Ltd owns shareholding interests in HOV Services, LLC. The expense recognized for these services was approximately $1.7 million, $1.4 million and $1.3 million for the years ended December 31, 2016, December 31, 2015, and December 31, 2014 and is included in cost of revenue in the consolidated statements of operations.

The Company licenses the use of the trademark "HOV" on a nonexclusive basis from an affiliate through common interest held by certain shareholders.

*Payable Balances with Affiliates*

Payable balances with affiliates as of December 31, 2016 and 2015 are as follows:

|  | December 31, | |
| --- | --- | --- |
|  | 2016 | 2015 |
| HOV Services, Ltd | $ (352) | $ (378) |
| Rule 14 | (134) | — |
| HGM | (8,858) | (11,118) |
|  | $ (9,344) | $ (11,496) |

**15. Segment and Geographic Area Information**

The Company's operating segments are significant strategic business units that align its products and services with how it manages its business, approach the markets and interacts with its clients.

The Company is organized into three segments: ITPS, HS, and LLPS.

**ITPS:**   Our ITPS segment provides a wide range of solutions and services designed to aid businesses in information capture, processing, decisioning and distribution to customers primarily in the financial services, commercial, public sector and legal industries.

**HS:**   Our HS segment operates and maintains a consulting and outsourcing business specializing in both the healthcare provider and payer markets.

**LLPS:**   Our LLPS segment provides a broad and active array of legal services in connection with class action, bankruptcy labor, claims adjudication and employment and other legal matters.

The chief operating decision maker reviews operating segment revenue and gross profit. The Company does not allocate SG&A, depreciation and amortization, interest expense and sundry, net. The Company manages assets on a total company basis, not by operating segment, and therefore asset

F-73

Supp.App. 0775

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**15. Segment and Geographic Area Information (Continued)**

information and capital expenditures by operating segments are not presented. The Company does not have any significant customers that account for 10% or more of total consolidated revenues.

| | Year ended December 31, 2016 | | | |
| | ITPS | HS | LLPS | Total |
|---|---|---|---|---|
| Revenue | 439,924 | 247,796 | 102,206 | 789,926 |
| Cost of revenue | 296,848 | 158,800 | 63,473 | 519,121 |
| **Gross profit** | 143,076 | 88,996 | 38,733 | 270,805 |
| Selling, general and administrative expenses | | | | 130,437 |
| Depreciation and amortization | | | | 79,639 |
| Related party expense | | | | 10,493 |
| Interest expense, net | | | | 109,414 |
| Sundry expense, net | | | | 712 |
| **Net loss before income taxes** | | | | $ (59,890) |

| | Year December 31, 2015 | | | |
| | ITPS | HS | LLPS | Total |
|---|---|---|---|---|
| Revenue | 421,409 | 251,685 | 132,138 | 805,232 |
| Cost of revenue | 303,067 | 174,380 | 82,399 | 559,846 |
| **Gross profit** | 118,342 | 77,305 | 49,739 | 245,386 |
| Selling, general and administrative expenses | | | | 120,691 |
| Depreciation and amortization | | | | 75,408 |
| Related party expense | | | | 8,977 |
| Interest expense, net | | | | 108,779 |
| Sundry expense, net | | | | 3,247 |
| **Net loss before income taxes** | | | | $ (71,716) |

| | Year December 31, 2014 | | | |
| | ITPS | HS | LLPS | Total |
|---|---|---|---|---|
| Revenue | 292,185 | 218,485 | 140,248 | 650,918 |
| Cost of revenue | 210,216 | 157,547 | 83,776 | 451,539 |
| **Gross profit** | 81,969 | 60,938 | 56,472 | 199,379 |
| Selling, general and administrative expenses | | | | 131,864 |
| Depreciation and amortization | | | | 65,227 |
| Impairment of goodwill and other intangible assets | | | | 154,454 |
| Related party expense | | | | 19,080 |
| Interest expense, net | | | | 48,045 |
| Loss on extinguishment of debt | | | | 18,548 |
| Sundry income, net | | | | (2,201) |
| **Net loss before income taxes** | | | | $ (235,638) |

F-74

Supp.App. 0776

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**15. Segment and Geographic Area Information (Continued)**

The following table presents revenues by principal geographic area where the Company's customers are located for the years ended December 31, 2016, 2015 and 2014:

| | Years ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| United States | $ 654,565 | $ 664,795 | $ 619,446 |
| Europe | 131,303 | 136,711 | 27,879 |
| Other | 4,058 | 3,726 | 3,593 |
| Total Consolidated Revenue | $ 789,926 | $ 805,232 | $ 650,918 |

**16. Subsequent Events**

Through February 14, 2017, the Company received capital contributions of approximately $20.5 million.

On February 22, 2017, Quinpario Acquisition Corp. (Nasdaq:QPAC), a publicly traded special purpose acquisition company, Novitex Holdings and SourceHOV, INC entered into a definitive business combination agreement whereby the three entities will combine to create a global solutions provider for financial technology and business services. The parties expect the proposed transaction to close during the second quarter of 2017. After the transaction is consummated, the Company would no longer incur an annual management fee to HGM.

The Company performed its subsequent event procedures through April 3, 2017, the date these consolidated financial statements were made available for issuance.

F-75

Supp.App. 0777

**SourceHOV Holdings, Inc. and Subsidiaries**

**Condensed Consolidated Balance Sheets**

**As of March 31, 2017 and December 31, 2016**

**(in thousands of United States dollars, except share and per share amounts)**

| | March 31, 2017 (Unaudited) | December 31, 2016 |
|---|---|---|
| **Assets** | | |
| Current assets | | |
| Cash and cash equivalents | $ 15,916 | $ 8,361 |
| Restricted cash | 25,931 | 25,892 |
| Accounts receivable, net of allowance for doubtful accounts of $3,271 and $3,219, respectively | 138,768 | 138,421 |
| Inventories, net | 11,818 | 11,195 |
| Prepaid expenses and other current assets | 15,094 | 12,202 |
| **Total current assets** | **207,527** | **196,071** |
| Property, plant and equipment, net | 77,397 | 81,600 |
| Goodwill | 370,869 | 373,291 |
| Intangible assets, net | 288,903 | 298,739 |
| Deferred income tax assets | 9,019 | 9,654 |
| Other noncurrent assets | 9,973 | 10,131 |
| **Total assets** | **$ 963,688** | **$ 969,486** |
| **Liabilities and Stockholders' Deficit** | | |
| **Liabilities** | | |
| Current liabilities | | |
| Accounts payable | $ 40,406 | $ 42,212 |
| Related party payables | 5,654 | 9,344 |
| Income tax payable | 1,825 | 1,031 |
| Accrued liabilities | 27,152 | 29,492 |
| Accrued compensation and benefits | 30,561 | 31,200 |
| Customer deposits | 18,279 | 18,729 |
| Deferred revenue | 21,629 | 17,235 |
| Obligation for claim payment | 25,931 | 25,892 |
| Current portion of capital lease obligations | 5,899 | 6,507 |
| Current portion of long-term debt | 60,986 | 55,833 |
| **Total current liabilities** | **238,322** | **237,475** |
| Long-term debt, net of current maturities | 971,154 | 983,502 |
| Capital lease obligations, net of current maturities | 17,076 | 18,439 |
| Pension liability | 28,612 | 28,712 |
| Deferred income tax liabilities | 26,850 | 26,223 |
| Long-term income tax liability | 3,063 | 3,063 |
| Other long-term liabilities | 11,212 | 11,973 |
| **Total liabilities** | **1,296,289** | **1,309,387** |
| Commitment and Contingencies (Note 10) | | |
| **Stockholders' deficit** | | |
| Common stock, par value of $0.001 per share; 331,000 shares authorized; 144,399 and 157,243 shares issued and outstanding at December 31, 2016 and March 31, 2017, respectively; Preferred stock, par value of $0.01 per shares; 400,000 shares authorized and no shares issued or outstanding at December 31, 2016 and March 31, 2017 | — | — |
| Additional paid in capital | (36,851) | (57,389) |
| Equity-based compensation | 27,652 | 27,342 |
| Accumulated deficit | (309,649) | (293,968) |
| Accumulated other comprehensive loss: | | |
| Foreign currency translation adjustment | (1,133) | (3,547) |
| Unrealized pension actuarial losses, net of tax | (12,620) | (12,339) |
| Total accumulated other comprehensive loss | (13,753) | (15,886) |
| **Total stockholders' deficit** | **(332,601)** | **(339,901)** |
| **Total liabilities and stockholders' deficit** | **$ 963,688** | **$ 969,486** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

F-76

Supp.App. 0778

**SourceHOV Holdings, Inc. and Subsidiaries**

**Condensed Consolidated Statements of Operations**

**For the Three Months Ended March 31, 2017 and 2016**

**(in thousands of United States dollars, except share and per share amounts)**

**(Unaudited)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Revenue | 218,260 | 199,690 |
| Cost of revenue (exclusive of depreciation and amortization) | 143,708 | 133,343 |
| **Gross profit** | **74,552** | **66,347** |
| Selling, general and administrative expenses | 35,581 | 31,028 |
| Depreciation and amortization | 21,320 | 18,759 |
| Related party expense | 2,385 | 2,335 |
| **Operating income** | **15,266** | **14,225** |
| Other expense (income), net: | | |
| Interest expense, net | 26,219 | 27,400 |
| Sundry expense (income), net | 2,724 | (1,931) |
| **Net loss before income taxes** | **(13,677)** | **(11,244)** |
| Income tax (expense) benefit | (2,004) | 3,082 |
| **Net loss** | **$ (15,681)** | **$ (8,162)** |
| Net loss per share—basic and diluted | $ (99.72) | $ (56.52) |
| Shares used in computing basic and diluted net loss per share | 157,243 | 144,399 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

F-77

Supp.App. 0779

**SourceHOV Holdings, Inc. and Subsidiaries**

**Condensed Consolidated Statements of Comprehensive Loss**

**For the Three Months ended March 31, 2017 and 2016**

**(in thousands of United States dollars)**

**(Unaudited)**

|  | Three months ended March 31, | |
|  | 2017 | 2016 |
|---|---|---|
| **Net Loss** | $ (15,681) | $ (8,162) |
| **Other comprehensive income (loss), net of tax** | | |
| Foreign currency translation adjustments | 2,414 | 2,011 |
| Unrealized pension actuarial (losses) gains, net of tax | (281) | 109 |
| **Comprehensive loss** | $ (13,548) | $ (6,042) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

F-78

**SourceHOV Holdings, Inc. and Subsidiaries**

**Condensed Consolidated Statements of Stockholders' Deficit**

**For the Three Months Ended March 31, 2017 and 2016**

**(in thousands of United States dollars, except per share data)**

**(Unaudited)**

| | Common Stock | | Additional Paid-In Capital | Equity-Based Compensation | Accumulated Other Comprehensive Loss | | Accumulated Deficit | Total Stockholders' Deficit |
| | Shares | Amount | | | Cumulative Translation Adjustments | Pension Benefits | | |
|---|---|---|---|---|---|---|---|---|
| Balances at December 31, 2015 | 144,399 | $ — | $ (57,389) | $ 20,256 | $ (3,415) | $ (5,076) | $ (245,865) | $ (291,489) |
| Net loss January 1 to March 31, 2016 | — | — | — | — | — | — | (8,162) | (8,162) |
| Equity-based compensation | — | — | — | 1,992 | — | — | | 1,992 |
| Foreign currency translation adjustment | — | — | — | — | 2,011 | — | — | 2,011 |
| Net realized pension actuarial gains, net of tax | — | — | — | — | — | 109 | — | 109 |
| Balances at March 31, 2016 | 144,399 | $ — | $ (57,389) | $ 22,248 | $ (1,404) | $ (4,967) | $ (254,027) | $ (295,539) |

| | Common Stock | | Additional Paid-In Capital | Equity-Based Compensation | Accumulated Other Comprehensive Loss | | Accumulated Deficit | Total Stockholders' Deficit |
| | Shares | Amount | | | Cumulative Translation Adjustments | Pension Benefits | | |
|---|---|---|---|---|---|---|---|---|
| Balances at December 31, 2016 | 144,399 | $ — | $ (57,389) | $ 27,342 | $ (3,547) | $ (12,339) | $ (293,968) | $ (339,901) |
| Net loss January 1 to March 31, 2017 | — | — | — | — | — | — | (15,681) | (15,681) |
| Equity-based compensation | — | — | — | 310 | — | — | — | 310 |
| Foreign currency translation adjustment | — | — | — | — | 2,414 | — | — | 2,414 |
| Contribution from Shareholders | 12,844 | — | 20,538 | — | — | — | — | 20,538 |
| Net realized pension actuarial gains, net of tax | — | — | — | — | — | (281) | — | (281) |
| Balances at March 31, 2017 | 157,243 | $ — | $ (36,851) | $ 27,652 | $ (1,133) | $ (12,620) | $ (309,649) | $ (332,601) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

F-79

Supp.App. 0781

**SourceHOV Holdings, Inc. and Subsidiaries**

**Condensed Consolidated Statements of Cash Flows**

**For the Three Months ended March 31, 2017 and 2016**

**(in thousands of United States dollars)**

**(Unaudited)**

| | Three Months ended March 31, | |
|---|---|---|
| | 2017 | 2016 |
| **Cash flows from operating activities** | | |
| Net loss | $ (15,681) | $ (8,162) |
| Adjustments to reconcile net loss | | |
| Depreciation and amortization | 21,320 | 18,759 |
| Original issue discount and debt issuance cost amortization | 3,474 | 3,343 |
| Provision (recovery) for doubtful accounts | 79 | (706) |
| Deferred income tax benefit (expense) | 627 | (3,436) |
| Share-based compensation expense | 310 | 1,992 |
| Foreign currency remeasurement | 687 | 193 |
| Gain on sale of Meridian | (251) | — |
| Loss on sale of property, plant and equipment | 272 | 16 |
| Change in operating assets and liabilities, net of effect from acquisitions: | | |
| Accounts receivable | (1,086) | (1,135) |
| Prepaid expenses and other assets | (3,720) | (3,617) |
| Accounts payable and accrued liabilities | 1,889 | 10,069 |
| Related party payables | (3,690) | (17) |
| **Net cash provided by operating activities** | **4,230** | **17,299** |
| **Cash flows from investing activities** | | |
| Purchases of property, plant and equipment, net | (2,045) | (1,833) |
| Additions to internally developed software | (2,528) | (2,471) |
| Additions to outsourcing contract costs | (3,989) | (3,250) |
| Proceeds from sale of Meridian | 4,381 | — |
| **Net cash used in investing activities** | **(4,181)** | **(7,554)** |
| **Cash flows from financing activities** | | |
| Change in bank overdraft | (210) | (1,541) |
| Proceeds from financing obligations | 3,008 | 4,231 |
| Contribution from Shareholders | 20,538 | — |
| Borrowings from revolver and swing-line loan | 38,500 | 18,500 |
| Repayments on revolver and swing line loan | (38,500) | (21,600) |
| Principal payments on long-term obligations | (15,786) | (11,571) |
| **Net cash provided (used in) by financing activities** | **7,550** | **(11,981)** |
| Effect of exchange rates on cash | (44) | 321 |
| **Net increase (decrease) in cash and cash equivalents** | **7,555** | **(1,915)** |
| Cash and cash equivalents | | |
| Beginning of period | 8,361 | 16,619 |
| End of period | $ 15,916 | $ 14,704 |
| **Supplemental cash flow data:** | | |
| Income tax (refund) payments, net of refunds received | $ (12) | $ 579 |
| Interest paid | 30,844 | 32,536 |
| **Noncash investing and financing activities:** | | |
| Assets acquired through capital lease arrangements | 68 | 1,360 |
| Accrued capital expenditures | $ 98 | $ 1,069 |

The accompanying notes are an integral part of these condensed consolidated financial statements.

F-80

Supp.App. 0782

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 785 of 1110    PageID 2406

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

## 1. Description of the Business

### Organization

SourceHOV Holdings, Inc. and subsidiaries (collectively "the Company") is a holding company with no operations, which owns 100% of SourceHOV LLC and its wholly owned subsidiaries ("SourceHOV LLC"). The Company provides mission-critical information and transaction processing solutions services to clients across three major industry verticals. The Company manages information and document driven business processes and offers solutions and services to fulfill specialized knowledge-based processing and consulting requirements, enabling clients to concentrate on their core competencies.

The Company consists of the following segments:

- Information & Transaction Processing Solutions ("ITPS"). ITPS provides industry solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and interbankcross-border settlement; property and casualty insurance solutions for origination, enrollments, claims processing, and benefits administration communications; public sector solutions for income tax processing, benefits administration, and record management; multi-industry solutions for payment processing and reconciliation, integrated receivable and payables management, document logistics and location services, records management and electronic storage of data / documents; and software, hardware, professional services and maintenance related to information and transaction processing automation, among others.

- Healthcare Solutions ("HS"). HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Provider service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management.

- Legal and Loss Prevention Services ("LLPS") Solutions. LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification and outreach to claimants, collection, analysis and distribution of settlement funds. Additionally, LLPS provides data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable.

### The Reorganization

Prior to October 31, 2014, SourceHOV LLC was wholly owned by Solaris Holding Corporation ("Solaris"). On October 31, 2014, Solaris merged with SHC Merger Sub Inc. ("SHC"), a Delaware corporation ("First Merger"). Upon consummation of this First Merger, SHC ceased to exist and Solaris continued to be the sole surviving corporation of the First Merger. At this time, Solaris and SourceHOV Holdings, Inc. were merged, resulting in the common stock of Solaris becoming common stock of the Company. Immediately following the First Merger, the Company, BT Merger Sub Inc.

F-81

Supp.App. 0783

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**1. Description of the Business (Continued)**

("BT") and Pangea Acquisitions, Inc. ("Pangea") merged ("Second Merger"). Upon consummation of the Second Merger, BT ceased to exist and Pangea became a wholly-owned subsidiary of the Company. As part of the transaction, the Company redeemed all preferred shares owned directly, or indirectly, by The Rohatyn Group ("TRG") for $357.5 million, of which $353.0 million was paid on October 31, 2014 and the remaining $4.5 million is payable over two years. All remaining preferred holders in the Company converted their preferred shares into common shares of the Company, resulting in a change of control from a collaborative group to one affiliated group of entities. Shareholders of Pangea received common shares of the Company in exchange for their Pangea shares. In addition, all existing debt facilities of Pangea and Solaris were refinanced as part of the reorganization (the "Reorganization"). Because Pangea was controlled by the same shareholders that now control the Company at the date of the Reorganization, the merger with Pangea was reflected at carrying value.

**The TransCentra Acquisition**

On September 28, 2016, SourceHOV LLC acquired TransCentra Inc. ("TransCentra"), a wholly-owned subsidiary of FTS Parent, Inc. ("FTS"), a Delaware corporation. TransCentra is an outsourced biller, outsourced payment processor, and a provider of insourced imaging and payment processing platforms and software. TransCentra's outsourced business operated through wholly-owned subsidiary Regulus Holding Inc. provides printing and payment processing to its customers. The outsourced business utilizes internally developed software to provide printing and remittance services to customers and is the predominant revenue contributor for TransCentra. TransCentra's insourced business operated through wholly-owned subsidiary J&B Software, Inc. provides imaging and payment processing software to customers who choose to process their own remittances. TransCentra was incorporated in the State of Delaware on May 12, 2011 as Columbus Acquisition Corporation, Inc. and changed its name to TransCentra, Inc. via an amended and restated certificate of incorporation in December 2011. The acquisition was accounted for as a business combination using the acquisition method of accounting.

**Disposal of Meridian Consulting Group, LLC**

On March 17, 2017, the Company sold certain assets and liabilities of Meridian Consulting Group, LLC (Meridian) business, a legal entity included in the LLPS segment, for $5.0 million to J.S. Held LLC, a Delaware limited liability company. Management concluded Meridian was providing no added benefit to the LLPS segment, resulting in a reorganization disposal of Meridian. The Company received net cash proceeds of $4.4 million. The transaction was accounted for as a sale of a business for accounting purposes. The Company recognized a gain of $0.3 million (net of a goodwill adjustment of $2.7 million) reported as part of Selling, general and administrative expenses in the condensed consolidated statement of operations.

**2. Basis of Presentation and Summary of Significant Accounting Policies**

**Unaudited Interim Financial Statements**

The accompanying unaudited condensed consolidated financial statements have been prepared on the same basis as the audited consolidated financial statements and reflect all adjustments that, in the

F-82

Supp.App. 0784

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 787 of 1110    PageID 2408

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

opinion of the Company, are necessary for a fair presentation of the results for the periods presented in accordance with accounting principles generally accepted in the United States of America (US GAAP) for interim financial reporting. No material changes have been made to the Company's accounting policies from those that were disclosed in the Company's audited financial statements for the year ended December 31, 2016.

The condensed consolidated financial statements and accompanying notes do not contain certain information included in the annual consolidated financial statements and accompanying notes of the Company. These interim consolidated financial statements should read in conjunction with the December 31, 2016 audited financial statements and related notes.

**Principles of Consolidation**

The accompanying consolidated financial statements and related notes to the consolidated financial statements include the accounts of the Company and subsidiaries. Newly acquired subsidiaries have been included in the consolidated financial statements from the date of acquisition. In addition, the Company evaluates its relationships with other entities to identify whether they are variable interest entities as defined by Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 810-10, Consolidation and whether the Company is the primary beneficiary. Consolidation is required if both of these criteria are met. All intercompany accounts and transactions have been eliminated in consolidation.

**Use of Estimates**

The preparation of consolidated financial statements in conformity with United States ("U.S.") generally accepted accounting principles ("U.S. GAAP") requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

Key estimates and judgments relied upon in preparing these consolidated financial statements include revenue recognition for multiple element arrangements, allowance for doubtful accounts, income taxes, depreciation, amortization, employee benefits, equity-based compensation, contingencies, goodwill, intangible assets, fair value of assets and liabilities acquired in acquisitions, and liability valuations. The Company regularly assesses these estimates and records changes in estimates in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that the Company believes to be reasonable under the circumstances. Actual results could differ from those estimates.

**Revenue Recognition**

The majority of the Company's revenues are comprised of: (1) ITPS, (2) HS offerings, (3) LLPS solutions, and (4) some combination thereof. Revenue is realized or realizable and earned when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable and collectability is probable. Delivery does not occur until services have been provided

F-83

Supp.App. 0785

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

to the client, risk of loss has transferred to the client, and either client acceptance has been obtained, client acceptance provisions have lapsed, or the Company has objective evidence that the criteria specified in the client acceptance provisions have been satisfied. The sales price is not considered to be fixed or determinable until all contingencies related to the sale have been resolved.

ITPS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services. HS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed for healthcare payers and providers. LLPS revenues are primarily based on a time and materials pricing as well as through transactional services priced on a per item basis.

If a contract involves the provision of a single element, revenue is generally recognized when the product or service is provided and the amount earned is not contingent upon any future event. Revenue from time and materials arrangements is recognized as the services are performed.

The Company records deferred revenue when it receives payments or invoices in advance of the delivery of products or the performance of services. The deferred revenue is recognized into earnings when underlying performance obligations are achieved.

The Company includes reimbursements from clients, such as postage costs, in revenue, while the related costs are included in cost of revenue in the consolidated statement of operations.

*Multiple Element Arrangements*

Certain of the Company's revenue is generated from multiple element arrangements involving various combinations. The deliverables within these arrangements are evaluated at contract inception to determine whether they represent separate units of accounting, and if so, contract consideration is allocated to each deliverable based on relative selling price. The relative selling price of each deliverable within these arrangements is determined using vendor specific objective evidence ("VSOE") of fair value, third-party evidence or best estimate of selling price. Revenue is then recognized in accordance with the appropriate revenue recognition guidance applicable to the respective elements.

If the multiple element arrangements criteria are not met, the arrangement is accounted for as one unit of accounting which would result in revenue being recognized on a straight-line basis over the period of delivery or being deferred until the earlier of when such criteria are met or when the last element is delivered.

**Recently Adopted Accounting Pronouncements**

Effective January 1, 2017, the Company adopted Accounting Standards Update ("ASU") No. 2015-11, *Inventory (Topic 330): Simplifying the Measurement of Inventory*. This amendment replaced the method of measuring inventories at lower of cost or market with a lower of cost and net realizable value method. The adoption had no material impact on the Company's financial position, results of operations and cash flows.

F-84

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

Effective January 1, 2017, the Company adopted ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting (ASU 2016-09)*. The ASU changes how companies account for certain aspects of equity-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The standard requires that all tax effects related to share-based payments be recorded as income tax expense or benefit in the income statement at settlement or expiration and, accordingly, excess tax benefits and tax deficiencies be presented as operating activities in the statement of cash flows. Upon adoption of this standard, the Company elected to continue its current practice of estimating expected forfeitures. The adoption had no material impact on the Company's financial position, results of operations and cash flows.

**Recently Issued Accounting Pronouncements**

In May 2014, the Financial Accounting Standards Board ("FASB") issued ASU No. 2014-09, *Revenue from Contracts with Customers (ASC 606)*. Under the update, revenue will be recognized based on a five-step model. The core principle of the model is that revenue will be recognized when the transfer of promised goods or services to customers is made in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In July 2015, the FASB deferred the effective date by one year (ASU No. 2015-14). This ASU will now be effective for annual periods, and interim periods within those annual periods, beginning on or after December 15, 2017. Early adoption is permitted, but not before the original effective date of December 15, 2016. Since the issuance of the original standard, the FASB has issued several other subsequent updates including the following: 1) clarification of the implementation guidance on principal versus agent considerations (ASU 2016-08); 2) further guidance on identifying performance obligations in a contract as well as clarifications on the licensing implementation guidance (ASU 2016-10); 3) rescission of several SEC Staff Announcements that are codified in ASC 605 (ASU 2016-11); 4) additional guidance and practical expedients in response to identified implementation issues (ASU 2016-12); and 5) technical corrections and improvements (ASU 2016-20). The new standard will be effective for us beginning January 1, 2018. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In February 2016, the FASB issued ASU No. 2016-02, *Leases (842)*. This ASU increases transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The amendments in this ASU are effective for fiscal years beginning after December 31, 2018 and interim periods within those fiscal years and early application is permitted. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments (Topic 230)*, which adds or clarifies guidance on the presentation and classification of eight specific types of cash receipts and cash payments in the statement of cash flows such as debt prepayment or extinguishment costs, settlement of contingent consideration arising from a business combination, insurance settlement proceeds, and distributions from certain equity method investees, with the intent of reducing diversity in practice. For public

F-85

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

entities, ASU 2016-15 is effective for fiscal years, including interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted. Entities must apply the guidance retrospectively to all periods presented unless retrospective application is impracticable. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In October 2016, the FASB issued ASU No. 2016-16, *Income Taxes: Intra-Entity Transfers of Assets Other Than Inventory (Topic 740)*, which eliminates the current prohibition on immediate recognition of the current and deferred income tax effects of intra-entity transfers of assets other than inventory, with the intent of reducing complexity and diversity in practice. Under ASU 2016-16, entities must recognize the income tax consequences when the transfer occurs rather than deferring recognition. For public entities, ASU 2016-16 is effective for fiscal years, including interim periods within those fiscal years, beginning after December 15, 2017, with early adoption permitted as of the beginning of a fiscal year (i.e., early adoption is permitted only in the first interim period). Entities must apply the guidance on a modified retrospective basis though a cumulative effect adjustment to retained earnings as of the beginning of the period of adoption. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In November 2016, the FASB issued ASU No. 2016-18, *Statement of Cash Flows: Restricted Cash* (Topic 230). The ASU addresses diversity in practice that exists in the classification and presentation of changes in restricted cash and requires that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. The ASU is effective retrospectively for fiscal years and interim periods within those years beginning after December 15, 2017. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued ASU No. 2017-01, *Business Combinations: Clarifying the Definition of a Business (Topic 805)*. The ASU clarifies the definition of a business and provides guidance on evaluating as to whether transactions should be accounted for as acquisitions (or disposals) of assets or business combinations. The definition clarification as outlined in this ASU affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The amendments of the ASU are effective for annual periods beginning after December 15, 2017, including interim periods within those annual periods. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued Accounting Standards Update ("ASU") No. 2017-04, *Intangibles Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*, which eliminates Step 2 of the goodwill impairment test that had required a hypothetical purchase price allocation. Rather, entities should apply the same impairment assessment to all reporting units and recognize an impairment loss for the amount by which a reporting unit's carrying amount exceeds its fair value, without exceeding the total amount of goodwill allocated to that reporting unit. Entities will continue to have the option to perform a qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. ASU 2017-04 will be effective prospectively for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2019, or those beginning after January 1, 2017 if early

F-86

Supp.App. 0788

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**2. Basis of Presentation and Summary of Significant Accounting Policies (Continued)**

adopted. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

In March 2017, the FASB issued ASU No. 2017-07, *Compensation Retirement Benefits (Topic 715); Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost*. The amendments to this ASU require the service cost component of net periodic benefit cost be reported in the same income statement line or lines as other compensation costs for employees. The other components of net periodic benefit cost are required to be reported separately from service costs and outside a subtotal of income from operations. Only the service cost component is eligible for capitalization. The guidance is effective for annual periods beginning after December 15, 2017. The amendments should be applied retrospectively for the income statement presentations and prospectively for the capitalization of service costs. The Company is currently evaluating the impact that adopting this standard will have on the consolidated financial statements.

**3. Accounts Receivable**

Accounts receivable, net consist of the following:

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Billed receivables | $ 112,833 | $ 116,148 |
| Unbilled receivables | 25,059 | 20,982 |
| Other | 4,147 | 4,510 |
| Less: Allowance for doubtful accounts | (3,271) | (3,219) |
|  | $ 138,768 | $ 138,421 |

Unbilled receivables represent balances recognized as revenue that have not been billed to the customer. The Company's allowance for doubtful accounts is based on a policy developed by historical experience and management judgment. Adjustments to the allowance for doubtful accounts may occur based on market conditions or specific client circumstances.

**4. Prepaid Expenses and Other Current Assets**

Prepaid expenses and other current assets consist of the following:

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Prepaids | $ 13,832 | $ 10,906 |
| Deposits | 1,262 | 1,296 |
|  | $ 15,094 | $ 12,202 |

F-87

Supp.App. 0789

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**5. Property, Plant and Equipment, Net**

Property, plant, and equipment, which include assets recorded under capital leases, are stated at cost less accumulated depreciation and amortization, and consist of the following:

| | Estimated Useful Lives (in Years) | March 31, 2017 | December 31, 2016 |
|---|---|---|---|
| Land | N/A | $ 7,744 | $ 7,637 |
| Buildings and improvements | 7 - 40 | 17,070 | 16,989 |
| Leasehold improvements | Lesser of the useful life or lease term | 32,315 | 31,342 |
| Vehicles | 5 - 7 | 713 | 784 |
| Machinery and equipment | 5 - 15 | 23,834 | 23,297 |
| Computer equipment and software | 3 - 8 | 98,894 | 98,544 |
| Furniture and fixtures | 5 - 15 | 4,811 | 5,007 |
| | | **185,381** | **183,600** |
| Less: Accumulated depreciation and amortization | | (107,984) | (102,000) |
| Property, plant and equipment, net | | $ **77,397** | $ **81,600** |

**6. Intangibles Assets and Goodwill**

**Intangibles**

Intangible assets are stated at cost or acquisition-date fair value less accumulated amortization and consists of the following:

| | March 31, 2017 | | |
|---|---|---|---|
| | Gross Carrying Amount(a) | Accumulated Amortization | Intangible Asset, net |
| Customer relationships | 274,643 | (108,080) | $ 166,563 |
| Outsource contract costs | 31,855 | (9,743) | 22,112 |
| Developed technology | 89,076 | (63,977) | 25,099 |
| Internally developed software | 19,270 | (1,712) | 17,558 |
| Trademarks | 5,370 | (269) | 5,101 |
| Trade names | 52,470 | — | 52,470 |
| | $ **472,684** | $ **(183,781)** | $ **288,903** |

F-88

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**6. Intangibles Assets and Goodwill (Continued)**

| | December 31, 2016 | | |
| --- | --- | --- | --- |
| | Gross Carrying Amount | Accumulated Amortization | Intangible Asset, net |
| Customer relationships | $ 274,643 | $ (100,172) | $ 174,471 |
| Outsource contract costs | 27,619 | (7,378) | 20,241 |
| Developed technology | 89,076 | (59,539) | 29,537 |
| Internally developed software | 16,742 | (858) | 15,884 |
| Trademarks | 5,370 | (134) | 5,236 |
| Trade names | 53,370 | — | 53,370 |
| | $ 466,820 | $ (168,081) | $ 298,739 |

**Goodwill**

Goodwill by reporting segment consists of the following:

| | Goodwill | Additions | Reductions | Currency translation adjustments | Goodwill |
| --- | --- | --- | --- | --- | --- |
| ITPS | $ 145,562 | $ 13,558 | $ — | $ 274 | $ 159,394 |
| HS | 86,786 | — | — | — | 86,786 |
| LLPS | 127,111 | — | — | — | 127,111(a) |
| **Balance as of December 31, 2016** | $ 359,459 | $ 13,558 | $ — | $ 274 | $ 373,291 |
| ITPS | 159,394 | — | | 299 | 159,693 |
| HS | 86,786 | — | — | | 86,786 |
| LLPS | 127,111 | — | (2,721)(b) | — | 124,390(a) |
| **Balance as of March 31, 2017** | $ 373,291 | $ — | $ (2,721) | $ 299 | $ 370,869 |

(a) The carrying amount of goodwill for all periods presented is net of accumulated impairment losses of $137.9 million.

(b) The reduction in goodwill is due to the sale of Meridian. Refer to Note 1.

F-89

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**7. Long-Term Debt and Credit Facilities**

| | March 31, 2017 | December 31, 2016 |
|---|---|---|
| First lien revolving credit facility(a) | $ 63,537 | $ 63,337 |
| First lien secured term loan(b) | 680,546 | 687,884 |
| Second lien secured term loan(c) | 237,156 | 236,344 |
| Transcentra revolving credit facility | 5,000 | 5,000 |
| Transcentra term loan | 18,500 | 19,250 |
| FTS unsecured term loan | 15,911 | 15,911 |
| Other(d) | 11,490 | 11,609 |
| Total debt | 1,032,140 | 1,039,335 |
| Less: Current portion of long-term debt | (60,986) | (55,833) |
| Long-term debt, net of current maturities | $ 971,154 | $ 983,502 |

(a)     Net of unamortized debt issuance costs of $2.1 million and $2.3 million as of March 31, 2017 and December 31 2016, respectively.

(b)     Net of unamortized original issue discount and debt issance costs of $13.3 million and $13.0 million and $14.6 million and $14.2 million as of March 31, 2017 and December 31 2016, respectively.

(c)     Net of unamortized original issue discount and debt issance costs of $6.9 million and $6.0 million and $7.3 million and $6.3 million as of March 31, 2017 and December 31 2016, respectively.

(d)     Other debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company.

**Credit Facilities**

As of both March 31, 2017 and December 31, 2016, the Company had outstanding irrevocable letters of credit totaling approximately $9.3 million under the revolving credit facility. As of March 31, 2017, these letters of credit consisted of approximately $7.1 million related to security for the Company's self-insured workers' compensation program and approximately $2.2 million for the landlord in Irving.

**8. Income Taxes**

The Company applies an estimated annual effective tax rate ("ETR") approach for calculating a tax provision for interim periods, as required under GAAP. The Company recorded an income tax expense of $2.0 million and an income tax benefit of $3.1 million for the three months ended March 31, 2017 and 2016, respectively.

F-90

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**8. Income Taxes (Continued)**

For the three months ended March 31, 2017, the Company's ETR of (14.65%) differed from the expected U.S. statutory tax rate of 35.0%, and was primarily impacted by permanent tax adjustments, Meridian goodwill impairment, foreign operations, and a valuation allowance against certain domestic deferred tax assets that are not more-likely-than-not to be realized.

For the three months ended March 31, 2016, the Company's ETR of 27.41% differed from the expected U.S. statutory tax rate of 35.0%, and was impacted by permanent tax adjustments, foreign operations, and a valuation allowance against certain domestic and foreign deferred tax assets that are not more-likely-than-not to be realized.

As of March 31, 2017, there were no material changes to either the nature or the amounts of the uncertain tax positions previously determined for the year ended December 31, 2016.

**9. Employee Benefit Plans**

**German Pension Plan**

The Company's subsidiary in Germany provides pension benefits to retirees. Employees eligible for participation includes all employees who started working for the Company prior to September 30, 1987 and have finished a qualifying period of at least 10 years. The Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

**U.K. Pension Plan**

The Company's subsidiary in the United Kingdom provides pension benefits to retirees and eligible dependents. Employees eligible for participation included all full-time regular employees who were more than three years from retirement prior to October 2001. A retirement pension or a lump-sum payment may be paid dependent upon length of service at the mandatory retirement age. The Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

The Germany plan is an unfunded plan and therefore has no plan assets. The expected rate of return assumptions for plan assets relate solely to the UK plan and are based mainly on historical performance achieved over a long period of time (15 to 20 years) encompassing many business and economic cycles. The Company assumed a weighted average expected long-term rate on plan assets for the overall scheme of 5.15%.

**Tax Effect on Accumulated Other Comprehensive Loss**

As of March 31, 2017 and December 31, 2016, the Company recorded actuarial losses of $12.6 million and $12.3 million in accumulated other comprehensive loss on the condensed consolidated balance sheets, respectively, which is net of a deferred tax benefit of $2.9 million and $2.5 million, respectively.

F-91

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**9. Employee Benefit Plans (Continued)**

**Pension and Postretirement Expense**

The components of the net periodic benefit cost are as follows:

|  | Three Months ended March 31, | |
|  | 2017 | 2016 |
| --- | --- | --- |
| Service cost | $ 2 | $ 3 |
| Interest cost | 553 | 667 |
| Expected return on plan assets | (577) | (656) |
| Amortization: | | |
| Amortization of prior service cost | (32) | (35) |
| Amortization of net loss | 500 | 223 |
| Net periodic benefit cost | $ 446 | $ 202 |

**Employer Contributions**

The Company's funding is based on governmental requirements and differs from those methods used to recognize pension expense. The Company made contributions of $0.6 million to its pension plans during both the first three months ended March 31, 2017 and 2016. The Company expects to contribute $1.1 million to the pension plans during the remainder of 2017, based on current plan provisions.

**Executive Deferred Compensation Plan**

The Company has individual arrangements with seven former executive in the U.S. which provide for fixed payments to be made to each individual beginning at age 65 and continuing for 20 years. This is an unfunded plan with payments to be from operating cash of the Company. Benefit payments of $0.1 million were made during both the three months ended March 31, 2017 and 2016. There was no expense for the three months ended March 31, 2017, and the expense for the three months ended March 31, 2016 was $0.2 million. Benefit payments expected to be paid to plan participants during the remainder of 2017 are $0.2 million.

**10. Fair Value Measurement**

**Assets and Liabilities Measured at Fair Value on a Non-Recurring Basis**

The carrying amount of assets and liabilities including cash and cash equivalents, accounts receivable and accounts payable approximated their fair value as of March 31, 2017 and December 31, 2016 due to the relative short maturity of these instruments. Management estimates the fair values of the first and second lien debt at approximately 97% and 98% respectively, of the respective principal balance outstanding as of March 31, 2017. The carrying value approximates the fair value for the long-term debt related to TransCentra and the other debt. TransCentra's debt was recently issued in 2016 and represents the most updated rates that would be offered for similar debt maturities. Other

F-92

Supp.App. 0794

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**10. Fair Value Measurement (Continued)**

debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company and as such, the cost incurred would approximate fair value. Property and equipment, intangible assets, and goodwill, are not required to be re-measured to fair value on a recurring basis. These assets are evaluated for impairment if certain triggering events occur. If such evaluation indicates that impairment exists, the respective asset is written down to its fair value.

The Company determined the fair value of its long-term debt using Level 2 inputs including the recent issue of the debt, March 2017 trades of the Company's debt on an inactive market, the Company's credit rating, and the current risk-free rate. The Company's contingent liabilities related to prior acquisitions are re-measured each period and represent a Level 2 measurement as it is based on using an earn out method based on the agreement terms.

The following table provides the carrying amounts and estimated fair values of the Company's financial instruments as of March 31, 2017 and December 31, 2016:

| As of March 31, 2017 | Carrying Amount | Fair Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| Recurring and nonrecurring assets and liabilities: | | | | | |
| Acquisition contingent liability | $ 721 | $ 721 | $ — | $ — | $ 721 |
| Long-term debt | 971,154 | 986,409 | — | 986,409 | — |
| | $ 971,875 | $ 987,130 | $ — | $ 986,409 | $ 721 |

| As of December 31, 2016 | Carrying Amount | Fair Value | Level 1 | Level 2 | Level 3 |
|---|---|---|---|---|---|
| Recurring and nonrecurring assets and liabilities: | | | | | |
| Acquisition contingent liability | $ 721 | $ 721 | $ — | $ — | $ 721 |
| Long-term debt | 983,502 | $ 1,009,913 | — | 1,009,913 | |
| | $ 984,223 | $ 1,010,634 | $ — | $ 1,009,913 | $ 721 |

The significant unobservable inputs used in the fair value of the Company's acquisition contingent liabilities are the discount rate, growth assumptions, and revenue thresholds. Significant increases (decreases) in the discount rate would have resulted in a lower (higher) fair value measurement. Significant increases (decreases) in the forecasted financial information would have resulted in a higher (lower) fair value measurement. For all significant unobservable inputs used in the fair value measurement of the Level 3 liabilities, a change in one of the inputs would not necessarily result in a directionally similar change in the other based on the current level of billings.

F-93

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**10. Fair Value Measurement (Continued)**

The following table reconciles the beginning and ending balances of net assets and liabilities classified as Level 3 for which a reconciliation is required:

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Balance as of January 1, | $ 721 | $ 1,513 |
| Payments/Reductions | — | (792) |
| Balance as of December 31, | $ 721 | $ 721 |

**11. Equity-Based Compensation**

Under the Company's 2013 Long Term Incentive Plan ("2013 Plan"), the Board of Directors may grant equity-based awards to certain employees, officers, directors, consultants and advisors of the Company. Compensation expense for equity-based awards is measured at the fair value on the grant date and recognized as compensation expense on a straight-line basis over the vesting period.

**Stock Options**

No stock options were granted under the 2013 Plan.

**Restricted Stock Units**

RSUs granted to employees contain service requirements that must be met for the shares to vest. Stock awards granted to non-employee directors as part of the compensation for service on the Board are unrestricted on the grant date. No RSUs were granted in the first three months of 2017.

During the three months ended March 31, 2017 and 2016, $0.3 million and $2.0 million, respectively, were charged to compensation expense for stock incentive plans.

During the three months ended March 31, 2017 and 2016, no shares were issued.

**12. Related-Party Transactions**

*Leasing Transactions*

Certain operating companies lease their operating facilities from previous owners of the businesses who remained as employees. These leases are for various lengths and annual amounts. No rental expense was incurred for the three months ended March 31, 2017 and 2016 for these operating leases.

In addition, certain operating companies lease their operating facilities from HOV RE, LLC an affiliate through common interest held by certain shareholders. The rental expense for these operating leases was $0.2 million for both the three months ended March 31, 2017 and 2016.

F-94

Supp.App. 0796

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**12. Related-Party Transactions (Continued)**

*Relationship with HandsOn Global Management*

The Company incurred management fees to HGM of $1.5 million for both the three months ended March 31, 2017 and 2016.

The Company incurred travel expenses to HGM of $0.2 million for both the three months ended March 31, 2017 and 2016.

The Company incurred marketing fees to Rule 14 of $0.09 million and $0.07 million for the three months ended March 31, 2017 and 2016, respectively.

*Relationship with HOV Services, Ltd.*

HOV Services, Ltd. provides the Company data capture and technology services. HOV Services, Ltd owns shareholding interests in HOV Services, LLC. The expense recognized for these services was approximately $0.4 million and $0.4 million for the three months ended March 31, 2017 and 2016 and is included in cost of revenue in the consolidated statements of operations.

The Company licenses the use of the trademark "HOV" on a nonexclusive basis from an affiliate through common interest held by certain shareholders.

*Payable Balances with Affiliates*

Payable balances with affiliates as of March 31, 2017 and December 31, 2016 are as follows:

|  | March 31, 2017 | | December 31, 2016 |
|---|---|---|---|
| HOV Services, Ltd | $ 457 | $ | 352 |
| Rule 14 | 219 | | 134 |
| HGM | 4,978 | | 8,858 |
|  | $ 5,654 | $ | 9,344 |

**13. Segment and Geographic Area Information**

The Company's operating segments are significant strategic business units that align its products and services with how it manages its business, approach the markets and interacts with its clients. The Company is organized into three segments: ITPS, HS, and LLPS.

**ITPS:** Our ITPS segment provides a wide range of solutions and services designed to aid businesses in information capture, processing, decisioning and distribution to customers primarily in the financial services, commercial, public sector and legal industries.

**HS:** Our HS segment operates and maintains a consulting and outsourcing business specializing in both the healthcare provider and payer markets.

F-95

Supp.App. 0797

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**13. Segment and Geographic Area Information (Continued)**

　　**LLPS:**　Our LLPS segment provides a broad and active array of legal services in connection with class action, bankruptcy labor, claims adjudication and employment and other legal matters.

　　The chief operating decision maker reviews operating segment revenue and gross profit. The Company does not allocate SG&A, depreciation and amortization, interest expense and sundry, net. The Company manages assets on a total company basis, not by operating segment, and therefore asset information and capital expenditures by operating segments are not presented.

| | Three months ended March 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | ITPS | HS | LLPS | Total |
| Revenue | 135,797 | 59,078 | 23,385 | 218,260 |
| Cost of revenue | 91,599 | 37,828 | 14,281 | 143,708 |
| **Gross profit** | 44,198 | 21,250 | 9,104 | 74,552 |
| Selling, general and administrative expenses | | | | 35,581 |
| Depreciation and amortization | | | | 21,320 |
| Related party expense | | | | 2,385 |
| Interest expense, net | | | | 26,219 |
| Sundry expense, net | | | | 2,724 |
| **Net loss before income taxes** | | | | $  (13,677) |

| | Three months ended March 31, 2016 | | | |
| --- | --- | --- | --- | --- |
| | ITPS | HS | LLPS | Total |
| Revenue | 106,416 | 67,407 | 25,867 | 199,690 |
| Cost of revenue | 72,181 | 45,062 | 16,100 | 133,343 |
| **Gross profit** | 34,235 | 22,345 | 9,767 | 66,347 |
| Selling, general and administrative expenses | | | | 31,028 |
| Depreciation and amortization | | | | 18,759 |
| Related party expense | | | | 2,335 |
| Interest expense, net | | | | 27,400 |
| Sundry expense, net | | | | (1,931) |
| **Net loss before income taxes** | | | | $  (11,244) |

F-96

**SourceHOV Holdings, Inc. and Subsidiaries**

**Notes to the Condensed Consolidated Financial Statements (Continued)**

**(in thousands of United States dollars unless otherwise stated)**

**(Unaudited)**

**13. Segment and Geographic Area Information (Continued)**

The following table presents revenues by principal geographic area where the Company's customers are located for the three months ended March 31, 2017 and 2016:

| | Three months ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| United States | $ 188,810 | $ 167,560 |
| Europe | 28,300 | 31,270 |
| Other | 1,150 | 860 |
| Total Consolidated Revenue | $ 218,260 | $ 199,690 |

**14. Subsequent Events**

The Company performed its subsequent event procedures through May 09, 2017, the date these consolidated financial statements were made available for issuance.

F-97

Supp.App. 0799



**Report of Independent Auditors**

To the Board of Directors of Novitex Holdings, Inc.

We have audited the accompanying consolidated financial statements of Novitex Holdings, Inc. and its subsidiaries, which comprise the consolidated balance sheets as of December 31, 2016 and December 31, 2015, and the related consolidated statements of operations and comprehensive loss, of stockholder's equity, and of cash flows for each of the three years ended December 31, 2016.

*Management's Responsibility for the Consolidated Financial Statements*

Management is responsible for the preparation and fair presentation of the consolidated financial statements in accordance with accounting principles generally accepted in the United States of America; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of consolidated financial statements that are free from material misstatement, whether due to fraud or error.

*Auditors' Responsibility*

Our responsibility is to express an opinion on the consolidated financial statements based on our audits. We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the consolidated financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the consolidated financial statements. The procedures selected depend on our judgment, including the assessment of the risks of material misstatement of the consolidated financial statements, whether due to fraud or error. In making those risk assessments, we consider internal control relevant to the Company's preparation and fair presentation of the consolidated financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinion.

*Opinion*

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of Novitex Holdings, Inc. and its subsidiaries as of December 31, 2016 and December 31, 2015 and the results of their operations and cash flows for each of the three years ended December 31, 2016 in accordance with accounting principles generally accepted in the United States of America.

**/s/ PricewaterhouseCoopers LLP**
**Stamford, Connecticut**
**March 23, 2017**

F-98

**NOVITEX HOLDINGS, INC.**

**CONSOLIDATED STATEMENTS OF OPERATIONS AND COMPREHENSIVE LOSS**

**(in thousands, except share and per share data)**

| | Years Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Revenues | $ 543,163 | $ 575,744 | $ 624,860 |
| Operating expenses: | | | |
|   Cost of revenues, exclusive of depreciation and amortization shown below | 437,977 | 468,811 | 503,313 |
|   Selling, general and administrative, exclusive of depreciation and amortization shown below | 49,771 | 56,638 | 62,508 |
|   Depreciation and amortization | 40,588 | 39,505 | 32,427 |
|   Restructuring | 141 | 666 | (948) |
| Total operating expenses | 528,477 | 565,620 | 597,300 |
| Operating income | 14,686 | 10,124 | 27,560 |
| Interest expense, net | 47,928 | 46,482 | 38,270 |
| (Gain) loss on early extinguishment of debt | (2,307) | (2,636) | 5,962 |
| Loss before income taxes | (30,935) | (33,722) | (16,672) |
| Benefit from income taxes | (11,805) | (12,321) | (2,306) |
| Net loss | (19,130) | (21,401) | (14,366) |
| Other comprehensive income (loss): | | | |
| Foreign currency translation income (loss) | 1,125 | (2,960) | (1,539) |
| Comprehensive loss | $ (18,005) | $ (24,361) | $ (15,905) |
| **Net Loss Per Share** | | | |
| Basic and diluted | $ (1,417) | $ (1,585) | $ (1,064) |
| **Weighted Average Shares Outstanding** | | | |
| Basic and diluted | 13,500 | 13,500 | 13,500 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-99

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 804 of 1110    PageID 2425

**NOVITEX HOLDINGS, INC.**

**CONSOLIDATED BALANCE SHEETS**

**(in thousands, except share data)**

| | December 31, | |
| --- | ---: | ---: |
| | **2016** | **2015** |
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 37,229 | $ 28,118 |
| Accounts receivable, less allowance for doubtful accounts of $357 and $777, respectively | 87,143 | 106,008 |
| Prepaid expenses and other current assets | 18,958 | 18,091 |
| Total current assets | 143,330 | 152,217 |
| Property and equipment, net | 65,456 | 67,819 |
| Identifiable intangible assets, net | 118,664 | 134,886 |
| Goodwill | 144,830 | 144,830 |
| Deferred charges and other assets | 3,940 | 3,960 |
| Total assets | $ 476,220 | $ 503,712 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 42,208 | $ 38,755 |
| Accrued liabilities | 41,706 | 43,106 |
| Short-term borrowings and current portion of long-term debt | 19,641 | 19,808 |
| Advanced billings and customer deposits | 11,043 | 3,380 |
| Total current liabilities | 114,598 | 105,049 |
| | | |
| Long-term debt | 415,429 | 423,154 |
| Deferred taxes | 28,710 | 40,759 |
| Other noncurrent liabilities | 4,206 | 4,067 |
| Total liabilities | 562,943 | 573,029 |
| | | |
| Commitments and contingencies (Note 13) | | |
| | | |
| Preferred shares, $0.001 par value, authorized 5,000 shares; none issued | — | — |
| Common shares, $0.001 par value, authorized 30,000 shares; 13,500 and 13,500 issued and outstanding at December 31, 2016 and 2015, respectively | — | — |
| Additional paid-in capital | 1,185 | 586 |
| Accumulated deficit | (84,004) | (64,874) |
| Accumulated other comprehensive loss | (3,904) | (5,029) |
| Total stockholder's equity (deficit) | (86,723) | (69,317) |
| Total liabilities and stockholder's equity | $ 476,220 | $ 503,712 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-100

Supp.App. 0802

**NOVITEX HOLDINGS, INC.**

**CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in thousands)**

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Cash flows from operating activities: | | | |
| Net loss | $ (19,130) | $ (21,401) | $ (14,366) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | | |
| Depreciation and amortization | 40,588 | 39,505 | 32,427 |
| Amortization of debt-related costs | 3,885 | 4,288 | 3,517 |
| Amortization of unfavorable contract liability | (1,009) | (924) | (1,465) |
| (Gain) loss on extinguishment of debt | (2,500) | (2,636) | 4,807 |
| Loss on disposal of business | — | — | 1,558 |
| Provision for doubtful accounts | 194 | 996 | 574 |
| Stock-based compensation | 599 | 487 | 546 |
| Deferred taxes | (11,543) | (12,128) | (4,060) |
| Changes in assets and liabilities: | | | |
| Accounts receivable | 18,825 | (2,151) | 24,860 |
| Prepaid expenses and other current assets | 143 | 7,469 | (5,168) |
| Deferred charges and other assets | 805 | (778) | 1,069 |
| Deferred financing fees | (3,552) | — | — |
| Accounts payable and accrued liabilities | 3,365 | 7,496 | (35,723) |
| Advanced billings and customer deposits | 7,660 | (1,461) | (1,907) |
| Other noncurrent liabilities and other | 1,324 | 34 | 623 |
| Net cash provided by operating activities | 39,654 | 18,796 | 7,292 |
| Cash flows from investing activities: | | | |
| Investment in property and equipment | (15,915) | (18,802) | (8,356) |
| Proceeds from disposal of property and equipment | 1,206 | — | 423 |
| Net cash used in investing activities | (14,709) | (18,802) | (7,933) |
| Cash flows from financing activities: | | | |
| Proceeds from debt financing | 2,427 | 5,000 | 114,756 |
| Repayments of short-term borrowings and debt | (10,591) | (12,401) | (1,838) |
| Payment of obligations under capital leases | (8,029) | (5,565) | (924) |
| Debt issuance costs | — | — | (1,003) |
| Distribution of capital to stockholder | — | — | (135,530) |
| Distribution in excess of capital | — | — | (5,020) |
| Net cash used in financing activities | (16,193) | (12,966) | (29,559) |
| Effect of exchange rate changes on cash and cash equivalents | 359 | (937) | (475) |
| Increase (decrease) in cash and cash equivalents | 9,111 | (13,909) | (30,675) |
| Cash and cash equivalents at beginning of period | 28,118 | 42,027 | 72,702 |
| Cash and cash equivalents at end of period | $ 37,229 | $ 28,118 | $ 42,027 |
| *Cash paid for (refunded for) Interest and income taxes* | | | |
| Interest paid | 42,888 | 41,820 | 32,476 |
| Income taxes refunded | (1,566) | — | — |
| Income taxes paid | 90 | 1,883 | 3,436 |
| *Non-cash Investing and Financing Activities* | | | |
| Investments in property and equipment financed through debt | 6,449 | 1,601 | — |
| Investments in property and equipment financed through capital leases | 4,950 | 23,761 | 6,967 |
| Insurance policy financed through a note payable | 902 | 2,398 | — |
| Investments in property and equipment acquired but not paid | 1,236 | 3,903 | 1,078 |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-101

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 806 of 1110    PageID 2427

**NOVITEX HOLDINGS, INC.**

**CONSOLIDATED STATEMENTS OF STOCKHOLDER'S EQUITY (DEFICIT)**

**(in thousands, except share data)**

| | Common Shares | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholder's Equity (Deficit) |
| --- | --- | --- | --- | --- | --- | --- |
| | Shares | Amount | | | | |
| Balance at January 1, 2014 | 13,500 | $ — | $ 135,083 | $ (24,087) | $ (530) | $ 110,466 |
| Net loss | — | — | — | (14,366) | — | (14,366) |
| Foreign currency translation adjustment | — | — | — | — | (1,539) | (1,539) |
| Return of capital to stockholder | — | — | (135,530) | — | — | (135,530) |
| Distribution in excess of capital to owner | — | — | — | (5,020) | — | (5,020) |
| Stock-based compensation | — | — | 546 | | — | 546 |
| Balance at December 31, 2014 | 13,500 | — | 99 | (43,473) | (2,069) | (45,443) |
| Net loss | — | — | — | (21,401) | — | (21,401) |
| Foreign currency translation adjustment | — | — | — | — | (2,960) | (2,960) |
| Stock-based compensation | — | — | 487 | — | — | 487 |
| Balance at December 31, 2015 | 13,500 | — | 586 | (64,874) | (5,029) | (69,317) |
| Net loss | — | — | — | (19,130) | — | (19,130) |
| Foreign currency translation adjustment | — | — | — | — | 1,125 | 1,125 |
| Stock-based compensation | — | — | 599 | — | — | 599 |
| Balance at December 31, 2016 | 13,500 | $ — | $ 1,185 | $ (84,004) | $ (3,904) | $ (86,723) |

The accompanying notes are an integral part of these Consolidated Financial Statements.

F-102

Supp.App. 0804

Case 3:20-cv-00691-D  Document 49-1  Filed 09/03/21  Page 807 of 1110  PageID 2428

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS**

**1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION**

*Description of Business and the Acquisition*

Novitex Holdings, Inc. ("Novitex" or the "Company") together with its subsidiaries, is a North American provider of document management and digital business process services, and is controlled by investment funds associated with Apollo Global Management, LLC (collectively, "Apollo"), and was formed on July 26, 2013. Through its outsourcing solutions, Novitex enables businesses to streamline their internal and external communications and workflows. On October 1, 2013 ("Acquisition Date"), Novitex Acquisition LLC ("Novitex Acquisition"), a subsidiary of Novitex, acquired Pitney Bowes Management Services, Inc. and its wholly-owned direct and indirect subsidiaries, and certain affiliates and divisions (collectively "PBMS") from Pitney Bowes Inc. ("PBI") ("2013 Acquisition").

*Basis of Presentation*

The consolidated financial statements and accompanying notes are presented as of December 31, 2016 and 2015 and for the years then ended December 31, 2016, 2015 and 2014, and are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). For all periods, all intercompany accounts and transactions have been eliminated.

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses and accompanying disclosures, including the disclosure of loss contingencies. These estimates and assumptions are based on management's best knowledge of current events, historical experience and other information available when the financial statements are prepared. These estimates include, but are not limited to, allowance for doubtful accounts, goodwill and identifiable intangible asset impairment review, useful lives of long-lived assets, including identifiable intangible assets, stock-based compensation, restructuring charges, accrued workers' compensation costs, deferred tax asset valuation allowances, uncertain tax positions, and contingent liabilities. Actual results may differ from those estimates and assumptions.

*Cash and Cash Equivalents*

Cash equivalents include short-term, liquid investments with maturities of three months or less at the date of purchase.

*Accounts Receivable and Allowance for Doubtful Accounts*

Accounts receivable risks are estimated and an allowance for doubtful accounts is established accordingly. The adequacy of the allowance is evaluated based on historical loss experience, aging of receivables, adverse situations that may affect a customer's ability to pay and prevailing economic conditions and adjustments are made to the allowance as necessary. This evaluation is inherently subjective and actual results may differ significantly from estimated reserves. Accounts deemed uncollectible are written off against the allowance after all collection efforts have been exhausted and management deems the account to be uncollectible. Management believes the accounts receivable credit risk is limited because of the Company's large number of customers, customer geographic and industry diversification.

F-103

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 808 of 1110   PageID 2429

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

*Property and Equipment*

Property and equipment are stated at cost and depreciated principally using the straight-line method over their estimated useful lives, which are three to ten years for mailing, copier, duplicator, office equipment and furniture and fixtures; and three years for computer equipment and capitalized software. Major improvements which add to the productive capacity or extend the life of an asset are capitalized while repairs and maintenance are charged to expense as incurred. Leasehold improvements are amortized over the shorter of the estimated useful life or the remaining lease term. Equipment acquired under capital leases is depreciated over the shorter of the estimated useful life or the underlying lease term or the term of the customer contract.

Fully depreciated assets are retained in fixed assets and accumulated depreciation until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amounts, less proceeds from disposal, are included in earnings.

*Capitalized Interest*

The interest cost associated with major development and construction projects is capitalized and included in the cost of the project. Interest capitalization ceases once a project is substantially complete or no longer undergoing construction activities to prepare it for its intended use. When no debt is specifically identified as being incurred in connection with a construction project, the Company capitalizes interest on amounts expended on the project at the Company's weighted average cost of borrowed money. For the years ended December 31, 2016, 2015 and 2014, the Company recorded capitalized interest costs of $0.1 million, $0.1 million and $0, respectively.

*Business Combinations, Goodwill and Identifiable Intangible Assets*

Business combinations are accounted for using the acquisition method of accounting which requires that the assets acquired and liabilities assumed be recorded at the date of acquisition at their respective fair values. The fair value of intangible assets is estimated using a cost, market or income approach, as appropriate. Goodwill represents the excess of the purchase price over the estimated fair values of net tangible and identifiable intangible assets acquired.

*Impairment of Long-lived Assets*

Long-lived assets, including identifiable intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the lowest level asset grouping may not be fully recoverable. The estimated future undiscounted cash flows are compared to the carrying amount. If the sum of the expected cash flows is less than the carrying amount, an impairment charge will be recorded for the amount by which the carrying amount exceeds the fair value of the asset. The fair value of the asset will be determined using probability weighted expected cash flow estimates, quoted market prices, when available, and appraisals, as appropriate. Cash flow estimates are derived from short-term and long-term business plans and historical experience.

*Goodwill*

Goodwill is tested annually for impairment, during the fourth quarter, or sooner when circumstances indicate an impairment may exist at the reporting unit level, using a two-step approach.

F-104

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 809 of 1110   PageID 2430

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In the first step, the fair value of the reporting unit is determined and compared to the reporting unit's carrying amount, including goodwill. If the fair value of the reporting unit is less than its carrying amount, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. The implied fair value of the reporting unit's goodwill is then compared to the actual carrying amount of goodwill. If the implied fair value of goodwill is less than the carrying amount of goodwill, an impairment loss is recognized for the difference.

*Revenue Recognition*

The Company evaluates whether it is appropriate to record revenue on a gross basis when it is acting as a principal in the transaction or net of costs of revenues when the Company is acting as an agent between a client and a vendor. The Company considers a number of factors in determining whether it is acting as principal or agent, such as whether the Company is the primary obligor to the client, has control over the pricing and maintains credit risk.

Service arrangements are typically one to five year contracts that contain monthly service fees that are recognized as earned. Service revenues billed in advance are deferred and recognized on a straight-line basis over the service period. The Company recognizes variable rate revenues, including fees derived from the utilization of document management-related equipment and production of print services, when such services are rendered. Reimbursable expenses are recognized as earned when incurred. Sales commissions determined to be incremental direct costs incurred related to the successful acquisition of new client revenues are deferred and amortized over the length of the initial contract period. Customer incentive payments are deferred and recognized over the longer of the initial contract period or the period the customer is expected to benefit from payment of these up-front fees.

Clients typically pay face value for postage purchased for use in the Company's delivery of its services. Funds are either remitted to the United States Postal Service ("USPS") or pre-funded by the Company and reimbursed by clients. The Company does not recognize revenue for this postage, as it has concluded that it is acting as an agent on behalf of the USPS.

The Company performs mail management services on behalf of certain clients, where the Company is the primary obligor and assumes the risk associated with the cost of postage. In such instances, the Company recognizes the cost of postage reimbursed by clients as revenues.

*Income Taxes*

The Company accounts for income taxes in accordance with the ASC No. 740, *"Accounting for Income Taxes"*. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax bases of assets and liabilities, applying enacted tax rates in effect for the year in which the Company expects the differences will reverse. Based on the evaluation of available evidence, the Company recognizes future tax benefits, such as net operating loss carry-forwards, to the extent that it believes it is more likely than not it will realize these benefits. The Company regularly assesses the likelihood that it will be able to recover its deferred tax assets and reflect any changes to

F-105

Supp.App. 0807

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 810 of 1110    PageID 2431

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

its estimate of the amount it is more likely than not to realize in the valuation allowance, with a corresponding adjustment to earnings.

*Earnings (Loss) Per Share*

Basic net earnings (loss) per common share is computed by dividing net earnings (loss) applicable to common stockholders by the weighted-average number of common shares outstanding during the period. Diluted net earnings (loss) per common share is determined using the weighted-average number of common shares outstanding during the period, adjusted for the dilutive effect of common share equivalents, consisting of shares that might be issued upon exercise of common share options. In periods where losses are reported, the weighted-average number of common shares outstanding excludes common share equivalents, because their inclusion would be anti-dilutive.

The calculations of earnings (loss) per share (in thousands, except share and per share data) are computed as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Numerator: | | | |
| Net loss attributable to Common Stockholder for basic and diluted earnings per share | $ (19,130) | $ (21,401) | $ (14,366) |
| Denominator: | | | |
| Weighted-average Common Shares outstanding during the period | 13,500 | 13,500 | 13,500 |
| Denominator for basic and diluted loss per share | 13,500 | 13,500 | 13,500 |
| Basic and diluted loss per share | $ (1,417) | $ (1,585) | $ (1,064) |

*Translation of Non-U.S. Currency Amounts*

The functional currency of the Company's foreign operations is the local currency, primarily the Canadian dollar. Assets and liabilities of subsidiaries operating outside the U.S. are translated at rates in effect at the end of the period and revenue and expenses are translated at average monthly rates during the period. Accumulated deficit is translated at historical rates. Net deferred translation gains and losses are included as a component of accumulated other comprehensive loss. For the years ended December 31, 2016, 2015, and 2014, foreign currency transaction gains and losses were included in Selling, general and administrative, exclusive of depreciation and amortization, and were less than $0.1 million for all the periods presented.

*Leases*

The Company leases print production facilities, mailroom space, copy centers, office space, copier and duplication equipment, mailing equipment and computer equipment. Certain of the lease agreements include scheduled rent escalations during the initial lease term and/or during succeeding optional renewal periods. For the Company's leases classified as operating leases, scheduled increases in rent expense are recognized on a straight-line basis over the lease term and those renewal periods that are reasonably assured. Certain of these lease agreements qualify for capital lease treatment which

F-106

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

are classified within the appropriate categories of property and equipment, net with the corresponding liabilities reflected in long-term debt and current portion of long-term debt. The Company accounts for these leases in accordance with ASC No. 840, *"Leases"*. (See Notes 4 and 9)

*Capitalization of Labor*

The Company invests in the development and implementation of solutions designed to produce and increase revenues, and to create efficiency and productivity, such as software development and the establishment of digital document outsourcing centers. The Company accounts for the internal labor associated with the development, testing, and implementation for these associated projects in accordance with the applicable accounting standards relating to capitalizing labor and depreciates capitalized labor costs over the estimated useful life of the associated asset.

*Recent Accounting Pronouncements*

In January 2017, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") 2017-04, *Intangibles—Goodwill and Other (Topic 350)*, which simplifies the subsequent measurement of goodwill by removing the second step of the two-step impairment test. The amendment requires an entity to perform its annual, or interim goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount. An impairment charge should be recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. A public business entity that is an SEC filer should adopt the amendments in this Update for its annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. A public business entity that is not an SEC filer should adopt the amendments in this Update for its annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2020. All other entities, including not-for-profit entities, that are adopting the amendments in this Update should do so for their annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2021. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is unable to assess the impact, if any, that ASU 2017-04 will have on its consolidated financial statements.

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*, which addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows. ASU No. 2016-15 is effective for public business entities for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. For all other entities, the amendments are effective for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. Early adoption is permitted, including adoption in an interim period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. The Company has not yet determined the impact, if any, that ASU No. 2016-15 will have on its consolidated financial statements.

F-107

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses: Measurement of Credit Losses on Financial Instruments*, which requires that entities use a current expected credit loss model which is a new impairment model based on expected losses rather than incurred losses. Under this model, an entity would recognize an impairment allowance equal to its current estimate of all contractual cash flows that the entity does not expect to collect from financial assets measured at amortized cost. The entity's estimate would consider relevant information about past events, current conditions and reasonable and supportable forecasts that affect the collectability of the reported amount. For public business entities that are U.S. Securities and Exchange Commission (SEC) filers, the amendments in ASU No. 2016-13 are effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. For all other public business entities, the amendments in this Update are effective for fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. For all other entities, the amendments in ASU No. 2016-13 are effective for fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. All entities may adopt the amendments in this Update earlier as of the fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company has not yet determined the impact, if any, that ASU No. 2016-13 will have on its consolidated financial statements and related disclosures.

In May 2016, the FASB issued ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients*, which amends narrow aspects of Topic 606, including guidance on assessing collectability, non-cash consideration, contract modifications and completed contracts at transition, and the presentation of sales and other similar taxes collected from customers. The amendments in ASU 2016-12 affect the guidance in ASU No. 2014-19, Revenue from Contracts with Customers (Topic 606), which is not yet effective. The effective date and transition requirements for the amendments in this Update are the same as the effective date and transition requirements for Topic 606 (and any other Topic amended by Update 2014-09). ASU No. 2015-14, Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date, defers the effective date of ASU No. 2014-09 by one year. The Company is currently assessing the method of adoption and the expected impact that ASU No. 2016-12 will have its consolidated financial statements and related disclosures.

In April 2016, the FASB issued ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing*. The amendments in this update clarify the following two aspects: identifying performance obligations and clarifying the licensing implementation guidance. The amendments in ASU No. 2016-10 affect the guidance in ASU No. 2014,09, Revenue from Contracts with Customers (Topic 606), which is not yet effective. The effective date and transition requirements for the amendments in ASU No. 2016-10 are the same as the effective date and transition requirements in Topic 606 (and any other Topic amended by ASU No. 2014-09). ASU No. 2015-14, Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date, defers the effective date of Update 2014-09 by one year. The Company is currently assessing the impact that ASU 2016-10 will have on its consolidated financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. ASU No. 2016-09 simplifies several aspects of the accounting for employee share-based payment transactions for entities, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as

F-108

Supp.App. 0810

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

classification of tax benefits in the statement of cash flows. For public business entities, the amendments are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. For all other entities, the amendments are effective for annual periods beginning after December 15, 2017, and interim periods within annual periods beginning after December 15, 2018. Early adoption is permitted for any entity in any interim or annual period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. The Company is currently assessing the impact, if any, that ASU No. 2016-09 will have on its consolidated financial statements, but does not expect that this ASU will have a material impact on its consolidated financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal Versus Agent Considerations (Reporting Revenue Gross Versus Net)*. ASU No. 2016-08 is intended to improve the implementation guidance on principal versus agent considerations. ASU No. 2016-08 affects the guidance in ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, which is not yet effective. The effective date and transition requirements for ASU 2016-08 are the same as the effective date and transition requirements of ASU No. 2014-09. ASU No. 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date*, defers the effective date of ASU No. 2014-09 by one year. The Company is currently assessing the impact, if any, that ASU No. 2016-09 will have on its consolidated financial statements, but does not expect that this ASU will have a material impact on its consolidated financial statements and related disclosures.

In February 2016, the FASB issued ASU No. 2016-02, *Leases*, which requires all lessees to recognize a right-of-use asset and a lease liability for substantially all leases, other than leases that meet the definition of a short-term lease. For public business entities, ASU No. 2016-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. For all other business entities, ASU No. 2016-02 is effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. Early application of the amendments in this Update is permitted for all entities. The Company is currently assessing the impact that ASU No. 2016-02 will have on its consolidated financial statements and disclosures.

In November 2015, the FASB issued ASU No. 2015-17, *Balance Sheet Classification of Deferred Taxes*, which requires that all deferred tax assets and liabilities, along with any related valuation allowance, be classified as noncurrent on the balance sheet. As a result, each jurisdiction will now only have one net noncurrent deferred tax asset or liability. ASU No. 2015-17 does not change the existing requirement that only permits offsetting within a jurisdiction. For public business entities, ASU No. 2015-17 is effective for financial statements issued for annual periods beginning after December 15, 2016, and interim periods within those annual periods. For all other entities, ASU No. 2015-17 is effective for financial statements issued for annual periods beginning after December 15, 2017, and interim periods within annual periods beginning after December 15, 2018. Earlier application is permitted for all entities as of the beginning of an interim or annual reporting period. The Company elected to early adopt ASU No. 2015-17, effective October 1, 2015, which resulted in the reclassification of deferred tax assets of approximately $1.5 million to long term deferred tax liability as of December 31, 2015.

In August 2015, the FASB issued ASU No. 2015-15, *Presentation and Subsequent Measurement of Debt Issuance Costs Associated with Line-of-Credit Arrangements*, which clarifies the Securities and

F-109

Supp.App. 0811

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 814 of 1110    PageID 2435

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

Exchange Commission ("SEC") staff's position on presenting and measuring debt issuance costs incurred in connection with line-of-credit arrangements. The SEC staff has announced that it would "not object to an entity deferring and presenting debt issuance costs as an asset and subsequently amortizing the deferred debt issuance costs ratably over the term of the line-of-credit arrangement." The Company elected to early adopt ASU No. 2015-15, effective October 1, 2015, which had no effect on the Company's consolidated financial statements and related disclosures.

In April 2015, the FASB issued ASU No. 2015-05, *Customer's Accounting for Fees Paid in a Cloud Computing Arrangement*, which provides guidance on fees paid by an entity in a cloud computing arrangement and whether an arrangement includes a license to the underlying software. For public business entities, ASU No. 2015-05 was effective for annual periods, including interim periods within those annual periods, beginning after December 15, 2015. For all other entities, ASU No. 2015-05 is effective for annual periods beginning after December 15, 2015, and interim periods in annual periods beginning after December 15, 2016. Early adoption is permitted for all entities. The Company elected to early adopt ASU No. 2015-05, which did not have an impact on the Company's consolidated financial statements and related disclosures.

In April 2015, the FASB issued ASU No. 2015-03, *Simplifying the Presentation of Debt Issuance Costs*, which requires debt issuance costs to be presented in the balance sheet as a direct deduction from the associated debt liability. For public business entities, ASU No. 2015-03 was effective for financial statements issued for fiscal years beginning after December 15, 2015, and interim periods within those fiscal years. For all other entities, ASU No. 2015-03 is effective for financial statements issued for fiscal years beginning after December 15, 2015, and interim periods within fiscal years beginning after December 15, 2016. Early adoption of the amendments in this Update is permitted for financial statements that have not been previously issued. The Company elected to early adopt ASU No. 2015-03, effective October 1, 2015, which resulted in the reclassification of debt issuance costs of $0.7 million as of December 31, 2015.

In August 2014, the FASB issued ASU No. 2014-15, *Disclosure of Uncertainties about an Entity's Ability to Continue as a Going Concern*, which requires management to evaluate whether there are conditions or events that raise substantial doubt about the ability of a company to continue as a going concern for one year from the date the financial statements are issued or within one year after the date that the financial statements are available to be issued when applicable, and further provides management guidance regarding its responsibility to disclose the ability of a company to continue as a going concern in the notes to the financial statements. For all entities, the new requirements are effective for annual periods ending after December 15, 2016, and interim periods within annual periods beginning after December 15, 2016. Early application is permitted. The Company adopted ASU No. 2014-5, which did not have an impact on the Company's consolidated financial statements and related disclosures.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*, which requires companies to recognize revenue for the transfer of goods and services to customers in amounts that reflect the consideration the company expects to receive in exchange for those goods and services. ASU No. 2014-09, as subsequently amended, will also result in enhanced disclosures about revenue. For public business entities, ASU No. 2014-09 is effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Early application is permitted for fiscal periods beginning after December 15, 2016. For all other entities, ASU No. 2014-09

F-110

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 815 of 1110    PageID 2436

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

is effective for annual reporting periods beginning after December 15, 2018, and interim periods within annual periods beginning after December 15, 2019. A nonpublic entity may elect to apply this guidance earlier, however, only as of the following: (1) an annual reporting period beginning after December 15, 2016, including interim periods within that reporting period (public entity effective date), (2) an annual reporting period beginning after December 15, 2016, and interim periods within annual periods beginning after December 15, 2017, (3) an annual reporting period beginning after December 15, 2017, including interim periods within that reporting period. The Company is assessing the impact the adoption of ASU No. 2014-09 will have on its consolidated financial statements and related disclosures.

**3. PREPAID EXPENSES AND OTHER CURRENT ASSETS**

As of December 31, 2016 and 2015, Prepaid expenses and other current assets consisted of the following (in thousands):

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Prepaid postage | $ 4,791 | $ 2,567 |
| Prepaid insurance | 2,128 | 2,167 |
| Income taxes receivable | 1,111 | 1,795 |
| Prepaid equipment maintenance | 425 | 1,582 |
| Supplies, toner and paper inventory | 1,447 | 1,308 |
| Prepaid medical premiums | 414 | 1,045 |
| Prepaid equipment and facilities rentals | 792 | 1,038 |
| Receivable from parent | 510 | 510 |
| Prepaid compensation | 620 | 963 |
| Other prepaid and current assets | 6,720 | 5,116 |
| Total prepaid expenses and other current assets | $ 18,958 | $ 18,091 |

**4. PROPERTY AND EQUIPMENT, NET**

As of December 31, 2016 and 2015, Property and equipment, net consisted of the following (in thousands):

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Copier and duplicator equipment | $ 33,646 | $ 31,610 |
| Mailing equipment | 29,290 | 29,352 |
| Computer equipment and software | 21,986 | 17,157 |
| Leasehold improvements | 21,468 | 16,087 |
| Plant equipment | 9,589 | 6,642 |
| Office equipment, furniture and fixtures | 6,204 | 5,717 |
|  | 122,183 | 106,565 |
| Accumulated depreciation and amortization | (56,727) | (38,746) |
| Total property and equipment, net | $ 65,456 | $ 67,819 |

F-111

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 816 of 1110    PageID 2437

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**4. PROPERTY AND EQUIPMENT, NET (Continued)**

As of December 31, 2016 and 2015, property and equipment, net acquired under capital leases consisted of the following (in thousands):

|  | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Copier and duplicator equipment | $ 26,034 | $ 24,983 |
| Mailing equipment | 4,761 | 4,249 |
| Office equipment, furniture, fixtures, and other | 2,796 | 1,407 |
|  | 33,591 | 30,639 |
| Accumulated depreciation and amortization | (15,245) | (7,702) |
| Total Property and equipment, net | $ 18,346 | $ 22,937 |

For the years ended December 31, 2016, 2015, and 2014 depreciation and amortization expense was $24.2 million, $23.1 million and $18.7 million, respectively.

**5. IDENTIFIABLE INTANGIBLE ASSETS, NET**

As of December 31, 2016 and 2015, identifiable intangible assets, net consisted of the following (in thousands):

|  | December 31, 2016 | | | |
|---|---|---|---|---|
|  | Useful Life (in years) | Gross Value | Accumulated Amortization | Net Carrying Amount |
| Customer Relationships | 11 | $ 158,093 | $ (42,929) | $ 115,164 |
| Non-compete agreement | 5 | 10,000 | (6,500) | 3,500 |
|  |  | $ 168,093 | $ (49,429) | $ 118,664 |

|  | December 31, 2015 | | | |
|---|---|---|---|---|
|  | Useful Life (in years) | Gross Value | Accumulated Amortization | Net Carrying Amount |
| Customer Relationships | 11 | $ 157,882 | $ (28,496) | $ 129,386 |
| Non-compete agreement | 5 | 10,000 | (4,500) | 5,500 |
|  |  | $ 167,882 | $ (32,996) | $ 134,886 |

F-112

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 817 of 1110　　PageID 2438

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**5. IDENTIFIABLE INTANGIBLE ASSETS, NET (Continued)**

As of December 31, 2016, future amortization expense related to these intangible assets are as follows (in thousands):

| Years ending December 31, | |
|---|---:|
| 2017 | $ 16,353 |
| 2018 | 15,853 |
| 2019 | 14,353 |
| 2020 | 14,353 |
| 2021 | 14,353 |
| Thereafter | 43,399 |
| | $ 118,664 |

Actual future amortization expense may differ from the amounts above due to, among other things, future acquisitions, impairments, accelerated amortization or fluctuations in foreign currency exchange rates. Amortization expense for each of the years ended December 31, 2016, 2015, and 2014 was $16.4 million, $16.4 million, and $13.7 million, respectively.

**6. GOODWILL**

The Company performs its annual goodwill impairment assessment during the fourth quarter of its fiscal year, or earlier if events or circumstances warrant a reassessment. As of the date of its last assessment, and through December 31, 2016, the Company concluded that no impairment of its goodwill existed.

**7. ACCRUED LIABILITIES**

As of December 31, 2016 and 2015, Accrued liabilities consisted of the following (in thousands):

| | December 31, 2016 | December 31, 2015 |
|---|---:|---:|
| Accrued Payroll and benefits | $ 15,629 | $ 18,754 |
| Accrued interest | 10,441 | 10,038 |
| Equipment rental and maintenance accruals | 7,113 | 6,427 |
| Non-income taxes payable | 4,432 | 4,416 |
| Other | 4,091 | 2,711 |
| Restructuring reserve | — | 760 |
| Total Accrued liabilities | $ 41,706 | $ 43,106 |

**8. INCOME TAXES**

*Effective Tax Rate*

For the years ended December 31, 2016, 2015, and 2014, the Benefit from income taxes was $11.8 million, or 38.2%, $12.3 million, or 36.5%, and $2.3 million, or 13.8%, respectively.

F-113

Supp.App. 0815

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8. INCOME TAXES (Continued)**

A summary of domestic and foreign (loss) income before income taxes is as follows (in thousands):

| | Years Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Domestic | $ (29,840) | $ (30,586) | $ (19,154) |
| Non U.S. | (1,095) | (3,136) | 2,482 |
| Loss before income taxes | $ (30,935) | $ (33,722) | $ (16,672) |

For the years ended December 31, 2016, 2015, and 2014, the Benefit from income taxes consisted of the following (in thousands):

| | Years Ended December 31, | | |
| | 2016 | 2015 | 2014 |
|---|---|---|---|
| Current: | | | |
| State | $ 246 | $ 275 | $ (114) |
| Non U.S. | (495) | (483) | 1,763 |
| Total current (benefit) expense | (249) | (208) | 1,649 |
| Deferred: | | | |
| Federal | (10,249) | (10,824) | (4,193) |
| State | (1,128) | (1,251) | 391 |
| Non U.S. | (179) | (38) | (153) |
| Total deferred benefit | (11,556) | (12,113) | (3,955) |
| Benefit from income taxes | $ (11,805) | $ (12,321) | $ (2,306) |

Deferred income taxes reflect the net tax effect of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

The Company has not provided for deferred income taxes on the excess of financial reporting over the tax basis of investments in certain foreign subsidiaries, since these amounts are considered to be indefinitely reinvested. As of December 31, 2016, the unrecognized deferred tax liability associated with its undistributed net earnings of foreign subsidiaries of $2.2 million, for which deferred taxes have not been provided was $0.7 million.

F-114

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 819 of 1110    PageID 2440

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8. INCOME TAXES (Continued)**

As of December 31, 2016 and 2015, a summary of deferred income tax assets and liabilities is as follows (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2016 | 2015 |
| Deferred tax assets: | | |
| Tax loss carryforwards | $ 33,459 | $ 26,069 |
| Amortizable transaction costs | 1,956 | 2,163 |
| Other, net | 3,177 | 4,545 |
| Deferred tax assets before valuation allowance | 38,592 | 32,777 |
| Less: valuation allowance | (363) | (362) |
| | $ 38,229 | $ 32,415 |
| Deferred tax liabilities | | |
| Property and equipment | $ (2,617) | $ (6,114) |
| Identifiable intangible assets | (64,322) | (67,060) |
| | $ (66,939) | $ (73,174) |
| Net deferred tax liabilities | $ (28,710) | $ (40,759) |

The Company assesses the available positive and negative evidence to estimate if sufficient taxable income will be generated to realize existing deferred tax assets. As of December 31, 2016, the Company has U.S. Federal, state and non-U.S. NOLs of $28.8 million, $4.3 million and $0.4 million, respectively. The U.S. and state net operating losses begin to expire on December 31, 2033 and December 31, 2018, respectively. The non-U.S. NOLs have an indefinite carry-forward life.

For the years ended December 31, 2016, 2015 and 2014, a summary of the difference between the Company's effective income tax rate and the U.S. statutory income tax rate is as follows:

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2016 | 2015 | 2014 |
| Tax benefit at U.S. statutory income tax rate | 35.0% | 35.0% | 35.0% |
| State income tax, net of federal income tax | 4.1% | 3.7% | 0.4% |
| Foreign rate differential | (0.3)% | (0.9)% | 2.5% |
| Profits units expense | (0.7)% | (0.5)% | (1.2)% |
| Other | 0.1% | 0.7% | (0.5)% |
| Adjustment to fixed assets acquired | 0.0% | (0.5)% | (18.8)% |
| Adjustment to intangibles acquired | 0.0% | (0.5)% | (1.7)% |
| Adjustment to Canadian Payable | 0.0% | (0.5)% | (1.9)% |
| Effective income tax rate | 38.2% | 36.5% | 13.8% |

F-115

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**8. INCOME TAXES (Continued)**

*Unrecognized Tax Benefits*

In many cases, unrecognized tax benefits are related to tax years that remain subject to examination by the relevant taxing authorities. By virtue of previously filed separate company and consolidated tax returns with PBI, the Company is and will continue to be routinely under audit by federal, state, local and foreign taxing authorities. These audits include questioning the timing and the amount of deductions and the allocation of income among various tax jurisdictions. Income taxes payable include amounts considered sufficient to pay assessments that may result from examination of prior year returns; however, the amount paid upon resolution of issues raised may differ from the amount provided. Differences between the reserves for uncertain tax positions and the amounts owed by the Company are recorded in the period they become known. Under a tax agreement executed by the Company and PBI as part of the 2013 Acquisition, PBI agreed to assume certain tax liabilities and related interest and penalties for periods before the 2013 Acquisition.

*Uncertain Tax Positions*

The Company recognizes a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. As of December 31, 2016 and December 31, 2015, the Company had no provision recorded for uncertain tax positions.

For U.S. federal income tax purposes, the 2012 through 2015 income tax years remain subject to examination. In addition, for Canadian income tax purposes, the 2012 through 2015 income tax years remain subject to examination. No significant state or other foreign income tax examinations are in process.

**9. LONG-TERM DEBT**

As of December 31, 2016 and 2015, Long-term debt consisted of the following (in thousands):

| | December 31, 2016 | | | |
|---|---|---|---|---|
| | Gross Carrying Amount | Original Issue Discount | Deferred Financing Costs | Net Carrying Amount |
| First lien amended term loan | $ 291,275 | $ (7,764) | $ (2,367) | $ 281,144 |
| Second lien amended term loan | 133,000 | (6,790) | (1,097) | 125,113 |
| Obligations under capital leases | 20,152 | — | — | 20,152 |
| Notes payable for capital asset acquisitions | 7,895 | — | (25) | 7,870 |
| Notes payable for financing of insurance coverage | 791 | — | | 791 |
| | $ 453,113 | $ (14,554) | $ (3,489) | 435,070 |
| Less: Current portion of Long-term debt | | | | (19,641) |
| Total Long-term debt | | | | $ 415,429 |

F-116

Supp.App. 0818

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 821 of 1110    PageID 2442

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

| | December 31, 2015 | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Original Issue Discount | Deferred Financing Costs | Net Carrying Amount |
| First lien amended term loan | $  298,900 | $  (9,982) | $  (484) | $  288,434 |
| Second lien amended term loan | 133,000 | (8,298) | (219) | 124,483 |
| Obligations under capital leases | 24,105 | — | — | 24,105 |
| Connecticut State Assistance Loan | 2,500 | — | — | 2,500 |
| Notes payable for capital asset acquisitions | 1,569 | — | — | 1,569 |
| Note Payable for financing of insurance coverage | 1,871 | — | — | 1,871 |
| | $  461,945 | $  (18,280) | $  (703) | 442,962 |
| Less: Current portion of Long-term debt | | | | (19,808) |
| Total Long-term debt | | | | $  423,154 |

*Amended First and Second Lien Credit Agreements*

Novitex Acquisition, LLC ("Novitex Acquisition"), a subsidiary of the Company, Credit Suisse AG, Cayman Islands Branch, as a lender and administrative and collateral agent, and certain other agents, lenders, and financial institutions were parties to a credit agreement (the "2013 Credit Agreement") that was amended on July 7, 2014. The 2013 Credit Agreement provided for aggregate credit facilities of $365.0 million that consisted of (i) a $215.0 million Tranche A term loan facility with a final maturity of October 1, 2019 ("First Lien Credit Agreement"), (ii) a $100.0 million Tranche B term loan facility with a final maturity of October 1, 2020 ("Second Lien Credit Agreement") and (iii) a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million) (the "Revolving Credit Facility") maturing October 1, 2018. Proceeds of these term loans ($301.4 million, net of $13.6 million of original issue discount costs) together with equity funding of $135.0 million were used to finance the 2013 Acquisition and other acquisition-related and financing requirements.

On July 7, 2014, Novitex Acquisition completed a refinancing of its 2013 Credit Agreement ("Amended 2013 Credit Agreement"). Upon conclusion of the refinancing, the Amended 2013 Credit Agreement provides for aggregate credit facilities of $495.0 million that consists of (i) a $305.0 million Tranche A term loan facility with a final maturity of July 7, 2020 ("Amended First Lien Credit Agreement"), (ii) a $140.0 million Tranche B term loan facility with a final maturity of July 7, 2021 ("Amended Second Lien Credit Agreement") and (iii) a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million) maturing October 1, 2018. Interest rates were unchanged. Net proceeds from the refinancing, comprised of $114.0 million, net of $17.6 million of original issue discount costs, plus cash on hand, were used to repay the then outstanding borrowings under the 2013 Credit Agreement, and to distribute $140.6 million to the stockholder of the Company.

On May 22, 2015, Novitex Acquisition repurchased $7.0 million of debt (par value) outstanding under its Amended Second Lien Credit Agreement at a discount, which resulted in a purchase price of $6.5 million. As a result of this repurchase, the Company recognized a gain on early extinguishment of debt of $0.1 million, net of a proportionate write-off of unamortized original issue discount and debt issuance costs for the year ended December 31, 2015.

F-117

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 822 of 1110    PageID 2443

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

*Second Amendment to First and Second Lien Credit Agreements*

On July 26, 2016, Novitex Acquisition entered into a Second Amendment to its 2013 Amended Credit Agreements ("Second Amendment"). As a result of the Second Amendment, certain financial terms and conditions were modified, including a 0.50% increase to the applicable margins on Novitex Acquisition's outstanding borrowings under the 2013 Amended Credit Agreements, and revisions to certain financial maintenance covenants and to permitted indebtedness (as defined in the 2013 Amended Credit Agreements). Gross borrowings outstanding under the Second Amendment remained unchanged. In conjunction with the Second Amendment, Novitex Acquisition incurred $3.7 million in financing fees, of which $3.6 million is reflected as a reduction of the associated debt, and $0.1 million is included in Selling, general and administrative, exclusive of depreciation and amortization for the year ended December 31, 2016.

The original issue discount is being amortized over the respective terms of the Amended First Lien Credit Agreement and Amended Second Lien Credit Agreement.

The floating rates of interest on borrowings under the Amended 2013 Credit Agreement are a function of a margin plus LIBOR or the Alternative Borrowing Rate, subject to certain definitions and floors. Novitex Acquisition can elect various tenors of each respective rate upon each successive renewal event. With respect to the Revolving Credit Facility, the margin is adjustable based upon Novitex Acquisition's senior secured leverage ratio (as defined in the Amended 2013 Credit Agreement); the margin is fixed with respect to the Amended First Lien Credit Agreement and the Amended Second Lien Credit Agreement. Interest payments are payable on the first day of each quarter during the term of the agreement. As of December 31, 2016, the interest rates on the Amended First Lien and Amended Second Lien borrowings were 8.50% and 12.75%, respectively. As of December 31, 2015, the interest rates on the Amended First Lien and Amended Second Lien borrowings were 8.00% and 12.25%, respectively.

As of December 31, 2016 and 2015, Novitex Acquisition had no cash borrowings outstanding under its Revolving Credit Facility. As of December 31, 2016 Novitex Acquisition had $12.8 million of letters of credit outstanding, under its sub-facility, which reduced available capacity under the Revolving Credit Facility to $37.2 million. As of December 31, 2016, the interest rates on the committed and uncommitted borrowings under the Revolving Credit Facility were 6.75% and 0.50%, respectively.

As of December 31, 2015, Novitex Acquisition had $14.6 million of letters of credit outstanding, under its sub-facility, which reduced available capacity under the Revolving Credit Facility to $35.4 million. As of December 31, 2015, the interest rates on the committed and uncommitted borrowings under the Revolving Credit Facility were 6.25% and 0.50%, respectively.

Guarantee and Covenants Under Amended First Lien and Amended Second Lien Agreements are as follows:

Novitex Acquisition, including its wholly-owned domestic subsidiaries, subject to certain exceptions, are guarantors under the Amended 2013 Credit Agreement and Second Amendment. The obligations of Novitex Holdings, along with the obligations of these guarantors are also collateralized by a pledge of substantially all assets of the aforementioned parties.

Novitex Acquisition and its wholly-owned domestic subsidiaries are subject to covenants in the Amended 2013 Credit Agreement and the Second Amendment, including those restricting the

F-118

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 823 of 1110    PageID 2444

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

incurrence of additional indebtedness (including guarantees of indebtedness), additional liens, mergers and consolidations, the disposition or acquisition of property, the payment of dividends, transactions with affiliates and the making of certain investments, in each case subject to numerous conditions, exceptions and thresholds. The financial covenants are limited to maintaining a senior secured leverage ratio for both the Amended First Lien and Amended Second Lien Agreements (5.50 to 1:00) with which Novitex Acquisition was in compliance at December 31, 2016.

In accordance with the Second Amendment, the financial covenants provide for the reduction of the senior secured leverage ratio at periodic intervals until the maturity of the Amended 2013 Credit Agreement. Over a period of 15 months from the balance sheet date, our debt covenant leverage ratio will decrease as follows:

- from (5.5 to 1:00) to (5.25 to 1:00) for both the Amended First Lien and Amended Second Lien Agreements for the period ending June 30, 2017; and

- further decrease to (4.0 to 1:00) for the Amended First Lien and to (4.5 to 1:00) for the Amended Second Lien for the period from July 1, 2017 to March 31, 2018.

Based on management's estimates, which include savings from various cost reduction initiatives implemented in the first quarter of 2017, the Company expects that Novitex Acquisition will continue to be in compliance with the aforementioned leverage ratios. Management continues to seek additional revenue and cost optimization opportunities that are expected to generate continued profitable growth.

In the event Novitex Acquisition is unable to comply with its debt covenants, the Company may be required to obtain additional funds from other sources, seek other sources of capital or pursue additional amendments to its debt covenants. Because the Amended First Lien and Amended Second Lien Agreements currently provide sufficient liquidity and Novitex Acquisition expects to remain in compliance with its covenants, Novitex Acquisition has no formal commitments for funding future needs or amending covenants at this time. Any additional financing or covenant amendments during the next twelve months, if required, may not be available to Novitex Acquisition on acceptable terms, or at all.

*Connecticut State Assistance Loan Agreement*

In March 2015, Novitex Enterprise Solutions, Inc. ("NES"), a subsidiary of the Company, entered into an Assistance Agreement ("Assistance Agreement") with the State of Connecticut Department of Economic and Community Development ("DECD"). Under the terms of the Assistance Agreement, the DECD provided a 10-year, $5.0 million, 2% simple interest loan ("Assistance Loan") to fund the construction of NES's corporate offices in Stamford, CT and the East MegaCenter in Windsor, CT. The Assistance Loan was secured by a lien on certain identified assets of NES, which was subordinate to the liens of Novitex Acquisition's senior lenders under the Amended 2013 Credit Agreement. There were no required payments for interest or principal during the first two years. Interest only payments were required during years three through five, and payments of interest and principal were required in years six through maturity. Under the terms of the Assistance Loan, $2.5 million of the principal was forgivable prior to the second anniversary if NES achieved certain employment and compensation thresholds for employees physically working in the State of Connecticut. Additionally, the principal on the Assistance Loan was forgivable in full, if NES achieved certain employment and compensation thresholds for employees physically working in the State of Connecticut prior to the fourth anniversary

F-119

Supp.App. 0821

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 824 of 1110 PageID 2445

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

of the Assistance Agreement, and if NES maintained such thresholds for a period of twelve months thereafter. The Assistance Agreement further provides that NES will not relocate its corporate headquarters or its MegaCenter in Windsor, CT to a location outside of the State of Connecticut prior to the tenth anniversary of the Assistance Agreement unless NES pays to the State of Connecticut 7.5% of the funding received pursuant to the Assistance Agreement, as liquidated damages.

On November 28, 2015, the DECD notified NES that it had satisfactorily complied with the terms of the Assistance Agreement related to forgiveness of $2.5 million of principal under the Assistance Loan. Accordingly, for the year ended December 31, 2015, the Company recognized a gain on extinguishment of this debt of $2.5 million.

On June 30, 2016, the DECD notified NES that it had satisfactorily complied with the terms of the Assistance Agreement related to forgiveness of the remaining $2.5 million of principal under the Assistance Loan. Accordingly, for the year ended December 31, 2016, the Company recognized a gain on extinguishment of this debt, net of transaction costs, of $2.3 million.

*Note Payable for 2015 Acquisition of Capital Assets*

During the year ended December 31, 2015, the Company financed the acquisition of certain equipment for use in its MegaCenter in Windsor, CT through a $1.6 million note payable to a financial services company ("2015 Capital Asset Acquisition Note Payable"). The note was due to mature on July 1, 2016, bears interest at a rate of 5.25% per annum, and was payable in equal monthly installments, with a balloon payment of $1.5 million due upon maturity. The note was collateralized by a pledge of the equipment financed, and was included in Short-term borrowings and current portion of long-term debt as of December 31, 2015. On March 9, 2016, this note was extinguished as part of a $5.8 million equipment financing arrangement entered into with a commercial bank. The extinguishment of this note did not result in a gain or loss on extinguishment of debt as the early repayment amount was equal to the carrying amount of the debt refinanced. (See Notes Payable for 2016 Acquisition of Capital Asset)

*Notes Payable for 2016 Acquisitions of Capital Assets*

On February 11, 2016, the Company entered into a $3.0 million equipment financing arrangement with a commercial lender for the payment of certain acquired equipment for use at its MegaCenters in Windsor, CT and Austin, TX, which had been purchased during the year ended December 31, 2015. The note matures on February 12, 2021, bears interest at a rate of 5.24% per annum, and is payable in equal monthly installments. The financing arrangement is collateralized by a pledge of the equipment financed.

On March 9, 2016, the Company entered into a $5.8 million equipment financing arrangement with a commercial lender for the refinancing of the 2015 Capital Asset Acquisition Note Payable and for the 2016 acquisition of certain capital assets for use in its MegaCenters in Windsor, CT and Austin, TX. This financing arrangement, executed with a financial services company, matures on March 11, 2021, bears interest at a rate of 5.22% per annum, and is payable in equal monthly installments, with a balloon payment due at maturity of $1.9 million. The financing arrangement is collateralized by a pledge of the equipment financed.

<p align="center">F-120</p>

Supp.App. 0822

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

_Sale Leaseback Transaction_

During August 2016, the Company sold, and subsequently, leased back certain capital assets in service at its MegaCenter in Austin, TX. The sale consisted primarily of plant and computer equipment, furniture and fixtures. The Company received net proceeds of $1.2 million in connection with the sale. The carrying amount of the property sold was $1.0 million, which resulted in a deferred gain of $0.2 million, which will be amortized over the thirty-six-month lease term, commencing January 1, 2017. As of December 31, 2016, the deferred gain is presented in Property and Equipment, Net in the consolidated balance sheet.

_Financing of Commercial Insurance Policy_

During November 2016, the Company financed the acquisition of a commercial insurance policy through a $0.9 million note payable to a financial services company. The note matures July 1st 2017, bears interest at a rate of 3.74% per annum, and is payable in equal monthly installments. As of December 31, 2016 this note is included in Short-term borrowings and current portion of long-term debt.

During December 2015, the Company financed the acquisition of a commercial insurance policy through a $2.4 million note payable to a financial services company. The note bears interest at a rate of 3.24% per annum, and was payable in equal monthly installments. As of December 31, 2015, this note was included in Short-term borrowings and current portion of long-term debt. The note matured on July 1, 2016.

As of December 31, 2016, the required principal repayments of long-term debt for each of the five succeeding fiscal years are as follows (in thousands):

| Years ending December 31, | | |
|---|---|---:|
| 2017 | $ | 9,793 |
| 2018 | | 9,008 |
| 2019 | | 9,082 |
| 2020 | | 269,935 |
| 2021 | | 135,143 |
| | $ | 432,961 |

_Obligations under Capital Leases_

Effective, January 1, 2015, the Company modified the terms of a number of operating leases for copiers, mailing equipment, duplicator and computer equipment in service at various client sites. As a result of these modifications, certain leases were reassessed for operating versus capital treatment, and accordingly classified as capital leases. During the years ended December 31, 2016 and 2015, the Company entered into new leases, which were classified as capital leases and amended the terms of a certain number of existing leases, which were classified as capital leases.

F-121

Supp.App. 0823

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**9. LONG-TERM DEBT (Continued)**

As of December 31, 2016, future commitments for obligations under capital leases are as follows (in thousands):

| Years ending December 31, | |
|---|---:|
| 2017 | $ 11,279 |
| 2018 | 6,968 |
| 2019 | 3,416 |
| 2020 | 666 |
| 2021 | 177 |
| Total minimum lease payments | $ 22,506 |
| Less: Amount representing interest | $ (2,354) |
| Present value of minimum lease payments | $ 20,152 |

The table has been corrected as the future commitments for obligations under capital leases for each year originally presented in the previously issued consolidated financial statements incorrectly excluded interest payments. The Company does not believe the impact to the previously issued consolidated financial statements was material.

**10. FAIR VALUE OF FINANCIAL INSTRUMENTS**

Fair value is a market-based measure considered from the perspective of a market participant rather than an entity-specific measure. An entity is required to classify certain assets and liabilities measured at fair value based on the following fair value hierarchy that prioritizes the inputs used to measure fair value:

*Level 1*—Unadjusted quoted prices in active markets for identical assets and liabilities.

*Level 2*—Quoted prices for identical assets and liabilities in markets that are not active, quoted prices for similar assets and liabilities in active markets or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3*—Unobservable inputs that are supported by little or no market activity, may be derived from internally developed methodologies based on the Company's best estimate of fair value and that are significant to the fair value of the asset or liability.

Certain financial instruments are carried at cost in the consolidated balance sheets, which approximates fair value due to their short-term, highly liquid nature. The carrying amounts of cash and cash equivalents, accounts receivable, accounts payable and short-term borrowings approximate fair value because of the short-term nature of such instruments.

The Second Amended First lien term loan, Second Amended Second lien term loan, Connecticut State Assistance Loan, and the notes payable for capital asset acquisitions (collectively "Level 2 Debt") are classified within Level 2 as their valuation requires quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active and/or model-based valuation techniques for which all significant inputs are observable in the market or can be

F-122

Supp.App. 0824

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 827 of 1110    PageID 2448

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**10. FAIR VALUE OF FINANCIAL INSTRUMENTS (Continued)**

corroborated by observable market data. A third-party service provider assists the Company with compiling market prices that are used to value the Level 2 Debt.

At least annually, management determines if the current valuation techniques used in the fair value measurements are still appropriate. There were no changes in the valuation techniques during the years ended December 31, 2016, 2015 and 2014.

*Financial Instruments Not Recorded at Fair Value*

The following table presents the carrying amount and fair values of long-term debt not recorded at fair value in the consolidated balance sheets as of December 31, 2016 and 2015 (in thousands):

| | December 31, 2016 | | December 31, 2015 | |
|---|---|---|---|---|
| | Fair Value Level 2 | Carrying Amount | Fair Value Level 2 | Carrying Amount |
| Amended First lien term loan | $ 289,933 | $ 281,144 | $ 279,472 | $ 288,434 |
| Amended Second Lien term loan | 127,015 | 125,113 | 121,695 | 124,483 |
| Note Payable for capital asset acquisition | 7,613 | 7,870 | 1,569 | 1,569 |
| Note payable for financing of insurance coverage | 791 | 791 | 1,871 | 1,871 |
| Connecticut State Assistance Loan | — | — | 2,500 | 2,500 |

**11. STOCK-BASED COMPENSATION PLANS**

Profits Interest Units ("PIUs") of Novitex Parent, L.P. ("Novitex Parent"), the parent of the Company, have been awarded to employees and non-employees for their services. The PIUs bear economic characteristics similar to options to purchase shares of common stock. The PIUs awarded to employees are accounted for pursuant to the provisions of ASC Topic 718, *"Compensation—Stock Compensation".* The fair value of each PIU award is estimated on the date of grant using the applicable valuation models.

The PIUs are issued for no consideration and are divided into tranches A, B, C, D, E and E-2. The vesting of PIUs is subject to continued employment and the passage of time as follows:

- Tranche A vests in 20% increments on each of the first five anniversaries of the grant date.

- Tranche B, C and D vest based on the attainment of specified performance targets measured over the first five years following the grant date.

- Tranche E vested immediately upon issuance of the associated PIUs.

- Tranche E-2 vests over a period of twenty-two months from date of issuance (see below).

If the performance targets are not met in any given year, the PIUs for such year remain unvested until, if in a subsequent year, the specific target for the preceding year is achieved at which time the preceding year's PIUs will become vested, provided the recipient has not experienced a termination of services prior to the last day of the following year. If the performance targets for a subsequent calendar year are achieved in the current calendar year, then the PIUs for the current calendar year and the subsequent calendar year will become vested as of the end of current calendar year, provided that the recipient has not experienced a termination of service prior to the end of the current calendar year.

F-123

Supp.App. 0825

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11. STOCK-BASED COMPENSATION PLANS (Continued)**

Additionally, the terms of the PIUs provide for an acceleration of vesting if there is a change in control of the Company.

*Modification of PIUs Plan*

In December 2015, the Board of Directors approved a modification to the service and performance conditions related to PIUs previously granted to eight senior executives and two directors. The service conditions for Tranche A PIUs issued to certain executives employed by NES were modified to provide for a revised vesting date from the date of grant to the Acquisition Date or if later, the executive's date of hire. The performance conditions for the Tranches B, C, and D PIUs were modified, including the immediate vesting of 20% of the vested value of these tranches, as well as for a revision of the performance conditions related to future performance periods. The aforementioned modifications were formalized in agreements with the unit holders on April 1, 2016. As a result of these modifications, the Company recorded a one-time stock compensation expense included in Selling, general and administrative expenses, exclusive of depreciation and amortization, of $0.1 million for the year ended December 31, 2016.

*Issuance of PIUs*

On April 1, 2016, certain employees of NES received grants of PIUs of Novitex Parent. These PIUs were classified as Tranche E-2 and require the unit holder to remain employed with the Company through January 31, 2018. At the grant date, these 155,000 PIUs were valued at $1.69/unit for purposes of recognizing share-based compensation.

As of December 31, 2016, the maximum aggregate number of PIUs may be granted is 2,122,500 units, of which 922,163 units remained available for grant, 1,170,337 units had been granted to employees and 30,000 had been granted to non-employees.

The following table sets forth the changes in non-vested units outstanding:

| | Number of PIUs | | Weighted Average Grant Date Fair Value |
|---|---|---|---|
| Unvested as of December 31, 2015 | 578,002 | $ | 2.45 |
| Granted | 155,000 | $ | 1.69 |
| Vested | (203,841) | $ | 3.05 |
| Unvested as of December 31, 2016 | 529,161 | $ | 3.33 |

For the year ended December 31, 2016, the Company recognized $0.6 million of compensation expense related to the service period requirements of Tranches A and E-2, respectively, with the expectation that the Company will achieve the performance target established for Tranche B, and the accelerated vesting of Tranches C and D as a result of plan modification, effective April 2016.

For the year ended December 31, 2015, the Company recorded $0.5 million of compensation expense related to the service period requirement of Tranche A, the expectation that the Company will achieve the performance target established for Tranche B, and all of the expense related to Tranche E.

F-124

Supp.App. 0826

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**11. STOCK-BASED COMPENSATION PLANS (Continued)**

For the year ended December 31, 2014 the Company recorded $0.5 million of compensation expense related to Tranche A and the expectation that the Company will achieve the performance target established for Tranche B.

As of December 31, 2016, there was approximately $0.5 million of unrecognized compensation expense related to service-based (Tranches A and E-2) PIUs, and performance-based PIUs for which the performance target had been deemed probable of achievement (Tranche B). Unrecognized expense for these PIUs will be recorded in future periods as compensation expense as the PIUs vest over the period from the date of grant with a remaining weighted average period of approximately 1.7 years. The unrecognized expense of approximately $0.4 million for the performance-based PIUs for which the performance target has not been deemed probable of achievement (Tranches C and D) will be recorded when the achievement of the performance target becomes probable and the related service period has been fulfilled.

The outstanding PIUs are privately held and there is no established public trading market for the interests. The Company followed guidelines set forth in the American Institute of Certified Public Accountants ("AICPA") Practice Aid Valuation of Privately-Held Company Equity Securities Issued as Compensation (the "AICPA Practice Aid"). The Company used Level A, as defined by the AICPA Practice Aid, to determine the fair value of the units.

The following table summarizes the assumptions and option pricing method used to estimate the fair values of the each PIU as of the grant date:

| | December 31, 2016 | December 31, 2015 |
|---|---|---|
| Option pricing method | Black-Scholes | Monte Carlo |
| Type of PIUs | Tranche E-2 | Tranche E |
| Risk free interest rate | 0.86% | 1.3% |
| Dividend yield | 0.0% | 0.0% |
| Volatility factor | 75.0% | 70.0% |

**12. RESTRUCTURING CHARGES**

In 2016 and 2015, the Company restructured certain operations to rationalize, integrate and align the resources of the Company. The purpose of the restructuring was to lower costs and accelerate efforts to improve operational efficiencies. The restructuring program, comprised primarily of workforce reductions, was completed in 2016.

A summary of the restructuring charges recognized for the years ended December 31, 2016, 2015 and 2014 are as follows (in thousands):

| | Severance and benefit costs | Other Exit Costs | Total |
|---|---|---|---|
| Amounts, net of reversals incurred in | | | |
| 2014 | $ (1,491) | $ 543 | $ (948) |
| 2015 | 666 | — | 666 |
| 2016 | 141 | — | 141 |

F-125

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**12. RESTRUCTURING CHARGES (Continued)**

The following table sets forth the changes in the Restructuring reserve (in thousands):

| | | |
|---|---:|---:|
| Balance at December 31, 2014 | $ | 915 |
| Provision | | 914 |
| Excess provision not required | | (248) |
| Cash payments and other usage | | (821) |
| Balance at December 31, 2015 | $ | 760 |
| Provision | | 141 |
| Cash payments and other usage | | (901) |
| Balance at December 31, 2016 | $ | — |

**13. SEGMENT INFORMATION**

The Company has determined that it conducts operations in one business segment, Document Outsourcing Services, which offers its clients an integrated suite of services organized across document logistics and digital services. A significant portion of its operations, assets and customers are located in the United States. No single customer generates in excess of 10% of the Company's revenues.

Revenues earned outside of the United States, primarily in Canada, for the years ended December 31, 2016, 2015 and 2014 were approximately 4%, 5%, and 6% of total revenues, respectively. Long-lived assets outside the United States, primarily in Canada, were $5.7 million, and $6.4 million as of December 31, 2016 and 2015, respectively.

**14. COMMITMENTS AND CONTINGENCIES**

The Company is involved in a variety of claims, suits, investigations and proceedings that arise from time to time in the ordinary course of its business, including actions with respect to contracts, intellectual property, taxation, employment, benefits, securities, personal injuries and other matters. The results of these proceedings in the ordinary course of business are not expected to have a material adverse effect on the Company's consolidated financial position or results of operations.

The Company records provisions for estimated losses in circumstances where a loss is probable and the amount or range of possible amounts of the loss is estimable. Legal costs are expensed as incurred.

F-126

Supp.App. 0828

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**14. COMMITMENTS AND CONTINGENCIES (Continued)**

*Lease Commitments*

The Company leases space for its MegaCenters, office and certain service locations, as well as office equipment under operating lease agreements. Future minimum lease payments under non-cancelable operating leases as of December 31, 2016 are as follows (in thousands):

| Years ending December 31, | |
|---|---|
| 2017 | $ 12,631 |
| 2018 | 8,536 |
| 2019 | 6,181 |
| 2020 | 5,239 |
| 2021 | 4,002 |
| Thereafter | 7,051 |
| | $ 43,640 |

Operating rent expense for the years ended December 31, 2016, 2015, and 2014 was $13.1 million, $15.3 million, and $27.8 million, respectively.

*Commitment to Purchase Capital Equipment*

In association with a service agreement executed with a client, the Company agreed to purchase from this client certain machinery and equipment for approximately $2.8 million in 2017. The terms of the purchase require the Company to pay to this client in sixty equal monthly installments on an interest-free basis commencing June 30, 2017.

**15. RELATED PARTY TRANSACTIONS**

*Management Fees*

On October 1, 2013, the Company entered into a management fee agreement with Apollo under which Apollo and its affiliates provide certain management consulting services to the Company on an ongoing basis. The Company is required to pay Apollo an annual management fee for these services amounting to the greater of $750,000 or 1% of earnings before income taxes, depreciation and amortization, plus out-of-pocket costs payable annually. In connection with this agreement, included in Selling, general and administrative expenses, exclusive of depreciation and amortization, for the years ended December 31, 2016, 2015, and 2014 was $0.8 million.

*Affiliated Party Transactions*

For the years ended December 31, 2016, 2015, and 2014 there were related party revenues of $0.9 million, $3.0 million, $0.5 million, respectively, for services rendered to Apollo affiliated companies. For the years ended December 31, 2016, 2015, and 2014, $0.9 million, $1.2 million, $0.2 million, respectively, in payments were received from Apollo affiliated companies. As of December 31, 2016 and 2015, the Company had $0.1 million and $0.1 million, respectively, in outstanding accounts receivable from Apollo affiliated companies.

For the years ended December 31, 2016, 2015 and 2014 there were related party expenses of $0.2 million, $0.1 million and $0, respectively for services provided by an Apollo affiliated company. As

F-127

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 832 of 1110    PageID 2453

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**15. RELATED PARTY TRANSACTIONS (Continued)**

of December 31, 2016 and 2015, the Company had no outstanding accounts payable owed to this Apollo affiliated company.

As of December 31, 2015, certain Apollo affiliated companies were divested by Apollo, and as such, are no longer classified as related parties.

*Receivable from Novitex Parent*

During the year ended December 31, 2015, the Company advanced $0.5 million to Novitex Parent for the purchase of certain capital units and vested PIUs of Novitex Parent from former executives of the Company. The Company has the intent and the ability to collect this receivable from Novitex Parent. As of December 31, 2016 and 2015, the aggregate consideration advanced to Novitex Parent that are due on demand is included in Prepaid expenses and other current assets in the Consolidated Balance Sheets.

**16. STOCKHOLDER'S EQUITY**

*Common Shares*

The Company is authorized to issue 30,000 Common Shares, par value $.001 per share. The holders of the Common Shares have no conversion, preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to the Common Shares.

*Preferred Stock*

The Company is authorized to issue 5,000 preferred shares with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. There are no issued and outstanding preferred shares as of December 31, 2016 and 2015.

**17. DEFINED CONTRIBUTION PLAN**

Employees of the Company that meet the eligibility requirements may participate in the Novitex Enterprise Solutions Retirement Savings Plan ("Savings Plan") an employer sponsored benefit plan qualified under Section 401(k) of the Internal Revenue Code. Under the terms of Savings Plan, employees not defined in the Savings Plan as highly compensated may contribute from 1-50% of their eligible pay up to the statutory limit, while employees defined as highly compensated may only contribute up to 6% of their eligible pay up to the statutory limit. After one year of service, the Company may provide a discretionary matching contribution, subject to certain statutory limitations, which is payable to the Savings Plan in the subsequent year. These matching contributions (if any) become fully vested after three years of service. As of December 31, 2016 and 2015, $1.3 million and $2.2 million, respectively, related to the Company's matching contribution is included in accrued liabilities. The Company expects to fund its voluntary 2016 matching contribution no later than September 30, 2017. For the years ended December 31, 2016, 2015, and 2014 matching contribution expense directly attributable to the Company's employees was $1.3 million, $2.3 million, and $2.6 million respectively.

F-128

Supp.App. 0830

**NOVITEX HOLDINGS, INC.**

**NOTES TO THE CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**18. SALE OF MSS**

On August 28, 2014, the Company completed the sale of its membership interests in Novitex Marketing Services Solutions LLC ("MSS") for aggregate consideration of $1.9 million, which included $1.6 million in cash and $0.3 million in credits for future services to be provided by MSS to the Company. In connection with the sale, the Company transferred certain cash balances and corresponding liabilities for co-op advertising advances received from customers, which reduced the cash proceeds by $1.2 million. The decision to sell MSS was driven by the determination that its product offerings did not align with the Company's overall strategic direction. As a result of the sale transaction, for the year ended December 31, 2014, the Company recognized a pre-tax loss of $1.6 million, which is included in Selling, general and administrative expenses, exclusive of depreciation and amortization. The Company early adopted and applied the guidance under ASU No. 2014-08, *Reporting Discontinued Operations and Disclosures of Disposals of Commitments of an Entity*, to this sale transaction, and as such, it was not classified as a discontinued operation.

**19. SUBSEQUENT EVENTS**

On February 22, 2017, Quinpario Acquisition Corp. (Nasdaq:QPAC), a publicly traded special purpose acquisition company, Novitex Holdings and SourceHOV, LLC entered into a definitive business combination agreement whereby the three entities will combine to create global solutions provider for financial technology and business services. The parties expect the proposed transaction to close during the second quarter of 2017.

The Company performed its subsequent event procedures through March 23, 2017, the date these consolidated financial statements were made available for issuance.

F-129

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 834 of 1110 PageID 2455

**NOVITEX HOLDINGS, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
AND COMPREHENSIVE LOSS**

**(in thousands, except share and per share data)**

**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | ---: | ---: |
| | 2017 | 2016 |
| Revenues | $ 143,600 | $ 136,779 |
| Operating expenses: | | |
|    Cost of revenues, exclusive of depreciation and amortization shown below | 118,165 | 109,379 |
|    Selling, general and administrative, exclusive of depreciation and amortization shown below | 15,984 | 13,891 |
|    Depreciation and amortization | 9,719 | 9,644 |
|    Restructuring | 334 | 91 |
| Total operating expenses | 144,202 | 133,005 |
| Operating (loss) income | (602) | 3,774 |
| Interest expense, net | (12,106) | (11,560) |
| Loss before income taxes | (12,708) | (7,786) |
| Benefit from income taxes | 3,008 | 3,084 |
| Net loss | (9,700) | (4,702) |
| Other comprehensive income: | | |
| Foreign currency translation income | 1 | 1,161 |
| Comprehensive loss | $ (9,699) | $ (3,541) |
| **Net Loss Per Share** | | |
|    Basic and diluted | $ (719) | $ (348) |
| **Weighted Average Shares Outstanding** | | |
|    Basic and diluted | 13,500 | 13,500 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-130

Supp.App. 0832

**NOVITEX HOLDINGS, INC.**

**CONDENSED CONSOLIDATED BALANCE SHEETS**

**(in thousands, except share data)**

| | March 31, 2017 (unaudited) | December 31, 2016 (unaudited) |
|---|---|---|
| **ASSETS** | | |
| Current assets: | | |
| Cash and cash equivalents | $ 40,303 | $ 37,229 |
| Accounts receivable, less allowance for doubtful accounts of $421 and $357, respectively | 90,464 | 87,143 |
| Prepaid expenses and other current assets | 15,668 | 18,958 |
| Total current assets | 146,435 | 143,330 |
| Property and equipment, net | 63,302 | 65,456 |
| Identifiable intangible assets, net | 114,607 | 118,664 |
| Goodwill | 144,830 | 144,830 |
| Deferred charges and other assets | 3,797 | 3,940 |
| Total assets | $ 472,971 | $ 476,220 |
| **LIABILITIES AND STOCKHOLDER'S EQUITY** | | |
| Current liabilities: | | |
| Accounts payable | $ 41,440 | $ 42,208 |
| Accrued liabilities | 50,916 | 41,706 |
| Short-term borrowings and current portion of long-term debt | 19,258 | 19,641 |
| Advanced billings and customer deposits | 14,776 | 11,043 |
| Total current liabilities | 126,390 | 114,598 |
| Long-term debt | 413,403 | 415,429 |
| Deferred taxes | 25,570 | 28,710 |
| Other noncurrent liabilities | 3,925 | 4,206 |
| Total liabilities | 569,288 | 562,943 |
| Commitments and contingencies (Note 12) | | |
| Preferred shares, $0.01 par value, authorized 5,000 shares; none issued | — | — |
| Common shares, $0.01 par value, authorized 30,000 shares; 13,500 and 13,500 issued and outstanding at March 31, 2017 and December 31, 2016, respectively | — | — |
| Additional paid-in capital | 1,290 | 1,185 |
| Accumulated deficit | (93,704) | (84,004) |
| Accumulated other comprehensive loss | (3,903) | (3,904) |
| Total stockholder's equity (deficit) | (96,317) | (86,723) |
| Total liabilities and stockholder's equity | $ 472,971 | $ 476,220 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-131

Supp.App. 0833

**NOVITEX HOLDINGS, INC.**

**CONDENSED CONSOLIDATED STATEMENTS OF CASH FLOWS**

**(in thousands)**

**(UNAUDITED)**

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Cash flows from operating activities: | | |
| Net loss | $ (9,700) | $ (4,702) |
| Adjustments to reconcile net loss to net cash provided by operating activities: | | |
| Depreciation and amortization | 9,719 | 9,644 |
| Amortization of debt-related costs | 1,069 | 1,037 |
| Amortization of unfavorable contract liability | (205) | (21) |
| Allowance for (recovery of) doubtful accounts | 76 | (45) |
| Stock-based compensation | 105 | 159 |
| Deferred taxes | (3,153) | (3,116) |
| Changes in assets and liabilities: | | |
| Accounts receivable | (3,366) | (1,835) |
| Prepaid expenses and other current assets | 3,119 | 1,613 |
| Deferred charges and other assets | 238 | 416 |
| Accounts payable and accrued liabilities | 8,566 | 4,397 |
| Advanced billings and customer deposits | 3,732 | 2,965 |
| Other noncurrent liabilities and other | (142) | 291 |
| Net cash provided by operating activities | 10,058 | 10,803 |
| Cash flows from investing activities: | | |
| Investment in property and equipment | (2,503) | (5,601) |
| Net cash used in investing activities | (2,503) | (5,601) |
| Cash flows from financing activities: | | |
| Proceeds from debt financing | — | 2,427 |
| Repayments of short-term borrowings and debt | (2,393) | (2,748) |
| Payment of obligations under capital leases | (2,138) | (1,920) |
| Net cash used in financing activities | (4,531) | (2,241) |
| Effect of exchange rate changes on cash and cash equivalents | 50 | 221 |
| Increase in cash and cash equivalents | 3,074 | 3,182 |
| Cash and cash equivalents at beginning of period | 37,229 | 28,118 |
| Cash and cash equivalents at end of period | $ 40,303 | $ 31,300 |
| *Non-cash Investing and Financing Activities* | | |
| Investments in property and equipment financed through debt | $ 586 | $ 6,449 |
| Investments in property and equipment financed through capital leases | $ 677 | $ 1,429 |
| Investments in property and equipment acquired but not paid | $ 1,162 | $ 2,325 |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-132

Supp.App. 0834

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 837 of 1110    PageID 2458

Table of Contents

**NOVITEX HOLDINGS, INC.**

**CONSOLIDATED STATEMENT OF STOCKHOLDER'S DEFICIT**

**(in thousands, except share data)**

**(UNAUDITED)**

| | Common Shares | | Additional Paid-in Capital | Accumulated Deficit | Accumulated Other Comprehensive Loss | Total Stockholder's (Deficit) |
|---|---|---|---|---|---|---|
| | Shares | Amount | | | | |
| Balance at January 1, 2017 | 13,500 | $ — | $ 1,185 | $ (84,004) | $ (3,904) | $ (86,723) |
| Net loss | — | — | — | (9,700) | — | (9,700) |
| Foreign currency translation adjustment | — | — | — | — | 1 | 1 |
| Stock-based compensation | — | — | 105 | — | — | 105 |
| Balance at March 31, 2017 | 13,500 | $ — | $ 1,290 | $ (93,704) | $ (3,903) | $ (96,317) |

The accompanying notes are an integral part of these Condensed Consolidated Financial Statements.

F-133

Supp.App. 0835

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS**

**MARCH 31, 2017**

**(UNAUDITED)**

## 1. DESCRIPTION OF BUSINESS AND BASIS OF PRESENTATION

*Description of Business and the Acquisition*

Novitex Holdings, Inc. ("Novitex" or the "Company") together with its subsidiaries, is a North American provider of document management and digital business process services, and is controlled by investment funds associated with Apollo Global Management, LLC (collectively, "Apollo"), and was formed on July 26, 2013. Through its outsourcing solutions, Novitex enables businesses to streamline their internal and external communications and workflows. On October 1, 2013 ("Acquisition Date"), Novitex Acquisition LLC ("Novitex Acquisition"), a subsidiary of Novitex, acquired Pitney Bowes Management Services, Inc. and its wholly-owned direct and indirect subsidiaries, and certain affiliates and divisions (collectively "PBMS") from Pitney Bowes Inc. ("PBI") ("2013 Acquisition").

*Basis of Presentation*

The condensed consolidated financial statements are presented as of March 31, 2017 and December 31, 2016, and for the three month periods ended March 31, 2017 and 2016 ("2017 Financial Statements"). The condensed consolidated financial statements and accompanying notes are prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP"). For all periods, all intercompany accounts and transactions have been eliminated.

The year-end condensed consolidated balance sheet data was derived from audited consolidated financial statements, but does not include all disclosures required by GAAP. Certain information and note disclosures normally included in the Company's annual financial statements prepared in accordance with GAAP have been condensed or omitted. These 2017 Financial Statements should be read in conjunction with the Company's consolidated financial statements as of December 31, 2016 and for the year then ended. The unaudited interim condensed consolidated financial statements presented herein reflect all normal adjustments that are, in the opinion of management, necessary for a fair statement of the financial position, results of operations and cash flows for the periods presented. The Company is responsible for the unaudited interim condensed consolidated financial statements included in this report. The results of any interim period are not necessarily indicative of the results for the full year.

On February 22, 2017, Quinpario Acquisition Corp. (Nasdaq:QPAC), a publicly traded special purpose acquisition company, Novitex Holdings and SourceHOV, LLC entered into a definitive business combination agreement whereby the three entities will combine to create global solutions provider for financial technology and business services. The parties expect the proposed transaction to close during the second quarter of 2017.

## 2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES

*Use of Estimates*

The preparation of financial statements in conformity with GAAP requires the use of estimates and assumptions that affect the reported amounts of assets, liabilities, revenues, expenses and accompanying disclosures, including the disclosure of loss contingencies. These estimates and assumptions are based on management's best knowledge of current events, historical experience and

F-134

Table of Contents

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

other information available when the financial statements are prepared. These estimates include, but are not limited to, allowance for doubtful accounts, goodwill and identifiable intangible asset impairment review, useful lives of long-lived assets, including identifiable intangible assets, stock-based compensation, restructuring charges, accrued workers' compensation costs, deferred tax asset valuation allowances, uncertain tax positions, and contingent liabilities. Actual results may differ from those estimates and assumptions.

*Cash and Cash Equivalents*

Cash equivalents include short-term, liquid investments with maturities of three months or less at the date of purchase.

*Accounts Receivable and Allowance for Doubtful Accounts*

Accounts receivable risks are estimated and an allowance for doubtful accounts is established accordingly. The adequacy of the allowance is evaluated based on historical loss experience, aging of receivables, adverse situations that may affect a customer's ability to pay and prevailing economic conditions and adjustments are made to the allowance as necessary. This evaluation is inherently subjective and actual results may differ significantly from estimated reserves. Accounts deemed uncollectible are written off against the allowance after all collection efforts have been exhausted and management deems the account to be uncollectible. Management believes the accounts receivable credit risk is limited because of the Company's large number of customers, customer geographic and industry diversification.

*Property and Equipment*

Property and equipment are stated at cost and depreciated principally using the straight-line method over their estimated useful lives, which are three to ten years for mailing, copier, duplicator, office equipment and furniture and fixtures; and three years for computer equipment and capitalized software. Major improvements which add to the productive capacity or extend the life of an asset are capitalized while repairs and maintenance are charged to expense as incurred. Leasehold improvements are amortized over the shorter of the estimated useful life or the remaining lease term. Equipment acquired under capital leases is depreciated over the shorter of the estimated useful life or the underlying lease term or the term of the customer contract.

Fully depreciated assets are retained in fixed assets and accumulated depreciation until they are removed from service. In the case of disposals, assets and related accumulated depreciation are removed from the accounts and the net amounts, less proceeds from disposal, are included in earnings.

*Business Combinations, Goodwill and Identifiable Intangible Assets*

Business combinations are accounted for using the acquisition method of accounting which requires that the assets acquired and liabilities assumed be recorded at the date of acquisition at their respective fair values. The fair value of intangible assets is estimated using a cost, market or income

F-135

Supp.App. 0837

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 840 of 1110    PageID 2461

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

approach, as appropriate. Goodwill represents the excess of the purchase price over the estimated fair values of net tangible and identifiable intangible assets acquired.

*Impairment of Long-lived Assets*

Long-lived assets, including identifiable intangible assets, are reviewed for impairment whenever events or changes in circumstances indicate that the carrying amount of the lowest level asset grouping may not be fully recoverable. The estimated future undiscounted cash flows are compared to the carrying amount. If the sum of the expected cash flows is less than the carrying amount, an impairment charge will be recorded for the amount by which the carrying amount exceeds the fair value of the asset.

The fair value of the asset will be determined using probability weighted expected cash flow estimates, quoted market prices, when available, and appraisals, as appropriate. Cash flow estimates are derived from short-term and long-term business plans and historical experience.

*Goodwill*

Goodwill is tested annually for impairment, during the fourth quarter, or sooner when circumstances indicate an impairment may exist at the reporting unit level, using a two-step approach. In the first step, the fair value of the reporting unit is determined and compared to the reporting unit's carrying amount, including goodwill. If the fair value of the reporting unit is less than its carrying amount, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. The implied fair value of the reporting unit's goodwill is then compared to the actual carrying amount of goodwill. If the implied fair value of goodwill is less than the carrying amount of goodwill, an impairment loss is recognized for the difference.

*Revenue Recognition*

The Company evaluates whether it is appropriate to record revenue on a gross basis when it is acting as a principal in the transaction or net of costs of revenues when the Company is acting as an agent between a client and a vendor. The Company considers a number of factors in determining whether it is acting as principal or agent, such as whether the Company is the primary obligor to the client, has control over the pricing and maintains credit risk.

Service arrangements are typically one to five year contracts that contain monthly service fees that are recognized as earned. Service revenues billed in advance are deferred and recognized on a straight-line basis over the service period. The Company recognizes variable rate revenues, including fees derived from the utilization of document management-related equipment and production of print services, when such services are rendered. Reimbursable expenses are recognized as earned when incurred. Sales commissions determined to be incremental direct costs incurred related to the successful

F-136

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 841 of 1110     PageID 2462

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

acquisition of new client revenues are deferred and amortized over the length of the initial contract period. Customer incentive payments are deferred and recognized over the longer of the initial contract period or the period the customer is expected to benefit from payment of these up-front fees.

Clients typically pay face value for postage purchased for use in the Company's delivery of its services. Funds are either remitted to the United States Postal Service ("USPS") or pre-funded by the Company and reimbursed by clients. The Company does not recognize revenue for this postage, as it has concluded that it is acting as an agent on behalf of the USPS.

The Company performs mail management services on behalf of certain clients, where the Company is the primary obligor and assumes the risk associated with the cost of postage. In such instances, the Company recognizes the cost of postage reimbursed by clients as revenues.

*Income Taxes*

The Company accounts for income taxes in accordance with the ASC No. 740, *"Accounting for Income Taxes"*. Deferred tax assets and liabilities are determined based on differences between the financial reporting and tax bases of assets and liabilities, applying enacted tax rates in effect for the year in which the Company expects the differences will reverse. Based on the evaluation of available evidence, the Company recognizes future tax benefits, such as net operating loss carry-forwards, to the extent that it believes it is more likely than not it will realize these benefits. The Company regularly assesses the likelihood that it will be able to recover its deferred tax assets and reflect any changes to its estimate of the amount it is more likely than not to realize in the valuation allowance, with a corresponding adjustment to earnings.

*Earnings (Loss) Per Share*

Basic net earnings (loss) per common share is computed by dividing net earnings (loss) applicable to common stockholders by the weighted-average number of common shares outstanding during the period. Diluted net earnings (loss) per common share is determined using the weighted-average number of common shares outstanding during the period, adjusted for the dilutive effect of common share equivalents, consisting of shares that might be issued upon exercise of common share options. In periods where losses are reported, the weighted-average number of common shares outstanding excludes common share equivalents, because their inclusion would be anti-dilutive.

*Translation of Non-U.S. Currency Amounts*

The functional currency of the Company's foreign operations is the local currency, primarily the Canadian dollar. Assets and liabilities of subsidiaries operating outside the U.S. are translated at rates in effect at the end of the period and revenue and expenses are translated at average monthly rates during the period.

Accumulated deficit is translated at historical rates. Net deferred translation gains and losses are included as a component of accumulated other comprehensive loss. For the three months ended March 31, 2017 and 2016, foreign currency transaction gains and losses, net were included in Selling,

F-137

Supp.App. 0839

Table of Contents

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

general and administrative, exclusive of depreciation and amortization, and were less than $0.1 million and $0.1 million, respectively.

*Leases*

The Company leases print production facilities, mailroom space, copy centers, office space, copier and duplication equipment, mailing equipment and computer equipment. Certain of the lease agreements include scheduled rent escalations during the initial lease term and/or during succeeding optional renewal periods. For the Company's leases classified as operating leases, scheduled increases in rent expense are recognized on a straight-line basis over the lease term and those renewal periods that are reasonably assured. Certain of these lease agreements qualify for capital lease treatment which are classified within the appropriate categories of property and equipment, net with the corresponding liabilities reflected in long-term debt and current portion of long-term debt. The Company accounts for these leases in accordance with ASC No. 840, *"Leases."* (See Note 4)

*Capitalization of Labor*

The Company invests in the development and implementation of solutions designed to produce and increase revenues, and to create efficiency and productivity, such as software development and the establishment of digital document outsourcing centers. The Company accounts for the internal labor associated with the development, testing, and implementation for these associated projects in accordance with the applicable accounting standards relating to capitalizing labor and depreciates capitalized labor costs over the estimated useful life of the associated asset.

*Recent Accounting Pronouncements*

In January 2017, the Financial Accounting Standards Board ("FASB") issued Accounting Standard Update ("ASU") 2017-04, *Intangibles—Goodwill and Other (Topic 350)*, which simplifies the subsequent measurement of goodwill by removing the second step of the two-step impairment test. The amendment requires an entity to perform its annual, or interim goodwill impairment test by comparing the fair value of a reporting unit with its carrying amount. An impairment charge should be recognized for the amount by which the carrying amount exceeds the reporting unit's fair value; however, the loss recognized should not exceed the total amount of goodwill allocated to that reporting unit. An entity still has the option to perform the qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. A public business entity that is a U.S. Securities and Exchange Commission (SEC) filer should adopt the amendments in this ASU for its annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2019. A public business entity that is not an SEC filer should adopt the amendments in this ASU for its annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2020. All other entities, including not-for-profit entities that are adopting the amendments in this ASU should do so for their annual or any interim goodwill impairment tests in fiscal years beginning after December 15, 2021. Early adoption is permitted for interim or annual goodwill impairment tests performed on testing dates after January 1, 2017. The Company is unable to assess the impact, if any, that ASU 2017-04 will have on its consolidated financial statements.

F-138

Supp.App. 0840

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 843 of 1110    PageID 2464

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In August 2016, the FASB issued ASU No. 2016-15, *Statement of Cash Flows (Topic 230): Classification of Certain Cash Receipts and Cash Payments*, which addresses eight specific cash flow issues with the objective of reducing the existing diversity in practice in how certain cash receipts and cash payments are presented and classified in the statement of cash flows. ASU No. 2016-15 is effective for public business entities for fiscal years beginning after December 15, 2017, and interim periods within those fiscal years. For all other entities, the amendments are effective for fiscal years beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019.

Early adoption is permitted, including adoption in an interim period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. The Company has not yet determined the impact, if any, that ASU No. 2016-15 will have on its consolidated financial statements.

In June 2016, the FASB issued ASU No. 2016-13, *Financial Instruments—Credit Losses: Measurement of Credit Losses on Financial Instruments*, which requires that entities use a current expected credit loss model which is a new impairment model based on expected losses rather than incurred losses. Under this model, an entity would recognize an impairment allowance equal to its current estimate of all contractual cash flows that the entity does not expect to collect from financial assets measured at amortized cost. The entity's estimate would consider relevant information about past events, current conditions and reasonable and supportable forecasts that affect the collectability of the reported amount. For public business entities that are SEC filers, the amendments in ASU No. 2016-13 are effective for fiscal years beginning after December 15, 2019, including interim periods within those fiscal years. For all other public business entities, the amendments in this ASU are effective for fiscal years beginning after December 15, 2020, including interim periods within those fiscal years. For all other entities, the amendments in ASU No. 2016-13 are effective for fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. All entities may adopt the amendments in this ASU earlier as of the fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. The Company has not yet determined the impact, if any, that ASU No. 2016-13 will have on its consolidated financial statements and related disclosures.

In May 2016, the FASB issued ASU No. 2016-12, *Revenue from Contracts with Customers (Topic 606): Narrow-Scope Improvements and Practical Expedients*, which amends narrow aspects of Topic 606, including guidance on assessing collectability, non-cash consideration, contract modifications and completed contracts at transition, and the presentation of sales and other similar taxes collected from customers. The amendments in ASU 2016-12 affect the guidance in ASU No. 2014-19, *Revenue from Contracts with Customers* (Topic 606), which is not yet effective. The effective date and transition requirements for the amendments in this ASU are the same as the effective date and transition requirements for Topic 606 (and any other Topic amended by ASU 2014-09). ASU No. 2015-14, *Revenue from Contracts with Customers* (Topic 606): Deferral of the Effective Date, defers the effective date of ASU No. 2014-09 by one year. The Company is currently assessing the method of adoption and the expected impact that ASU No. 2016-12 will have its consolidated financial statements and related disclosures.

F-139

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

In April 2016, the FASB issued ASU No. 2016-10, *Revenue from Contracts with Customers (Topic 606): Identifying Performance Obligations and Licensing*. The amendments in this ASU clarify the following two aspects: identifying performance obligations and clarifying the licensing implementation guidance. The amendments in ASU No. 2016-10 affect the guidance in ASU No. 2014-09, *Revenue from Contracts with Customers* (Topic 606), which is not yet effective.

The effective date and transition requirements for the amendments in ASU No. 2016-10 are the same as the effective date and transition requirements in Topic 606 (and any other Topic amended by ASU No. 2014-09). ASU No. 2015-14, *Revenue from Contracts with Customers* (Topic 606): Deferral of the Effective Date, defers the effective date of ASU 2014-09 by one year. The Company is currently assessing the impact that ASU 2016-10 will have on its consolidated financial statements and related disclosures.

In March 2016, the FASB issued ASU No. 2016-09, *Compensation—Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting*. ASU No. 2016-09 simplifies several aspects of the accounting for employee share-based payment transactions for entities, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification of tax benefits in the statement of cash flows. For public business entities, the amendments are effective for annual periods beginning after December 15, 2016, and interim periods within those annual periods. For all other entities, the amendments are effective for annual periods beginning after December 15, 2017, and interim periods within annual periods beginning after December 15, 2018. Early adoption is permitted for any entity in any interim or annual period. If an entity early adopts the amendments in an interim period, any adjustments should be reflected as of the beginning of the fiscal year that includes that interim period. An entity that elects early adoption must adopt all of the amendments in the same period. On January 1, 2017 the Company adopted ASU No. 2016-09. There has been no material impact on the Company's condensed consolidated financial statements for the three month period ended March 31, 2017.

In March 2016, the FASB issued ASU No. 2016-08, *Revenue from Contracts with Customers (Topic 606): Principal Versus Agent Considerations (Reporting Revenue Gross Versus Net)*. ASU No. 2016-08 is intended to improve the implementation guidance on principal versus agent considerations. ASU No. 2016-08 affects the guidance in ASU No. 2014-09, *Revenue from Contracts with Customers (Topic 606)*, which is not yet effective. The effective date and transition requirements for ASU 2016-08 are the same as the effective date and transition requirements of ASU No. 2014-09. ASU No. 2015-14, *Revenue from Contracts with Customers (Topic 606): Deferral of the Effective Date*, defers the effective date of ASU No. 2014-09 by one year. The Company is currently assessing the impact, if any, that ASU No. 2016-09 will have on its consolidated financial statements, but does not expect that this ASU will have a material impact on its consolidated financial statements and related disclosures.

In February 2016, the FASB issued ASU No. 2016-02, *Leases*, which requires all lessees to recognize a right-of-use asset and a lease liability for substantially all leases, other than leases that meet the definition of a short-term lease. For public business entities, ASU No. 2016-02 is effective for fiscal years beginning after December 15, 2018, including interim periods within those fiscal years. For all other business entities, ASU No. 2016-02 is effective for fiscal years beginning after December 15, 2019,

F-140

Supp.App. 0842

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 845 of 1110    PageID 2466

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**2. SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES (Continued)**

and interim periods within fiscal years beginning after December 15, 2020. Early application of the amendments in this ASU is permitted for all entities. The Company is currently assessing the impact that ASU No. 2016-02 will have on its consolidated financial statements and disclosures.

In May 2014, the FASB issued ASU No. 2014-09, *Revenue from Contracts with Customers*, which requires companies to recognize revenue for the transfer of goods and services to customers in amounts that reflect the consideration the company expects to receive in exchange for those goods and services. ASU No. 2014-09, as subsequently amended, will also result in enhanced disclosures about revenue. For public business entities, ASU No. 2014-09 is effective for annual reporting periods beginning after December 15, 2017, including interim periods within that reporting period. Early application is permitted for fiscal periods beginning after December 15, 2016. For all other entities, ASU No. 2014-09 is effective for annual reporting periods beginning after December 15, 2018, and interim periods within annual periods beginning after December 15, 2019.

A nonpublic entity may elect to apply this guidance earlier, however, only as of the following: (1) an annual reporting period beginning after December 15, 2016, including interim periods within that reporting period (public entity effective date), (2) an annual reporting period beginning after December 15, 2016, and interim periods within annual periods beginning after December 15, 2017, (3) an annual reporting period beginning after December 15, 2017, including interim periods within that reporting period. The Company is assessing the impact the adoption of ASU No. 2014-09 will have on its consolidated financial statements and related disclosures.

**3. PREPAID EXPENSES AND OTHER CURRENT ASSETS**

As of March 31, 2017 and December 31, 2016, prepaid expenses and other current assets consisted of the following (in thousands):

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Prepaid postage | $ 2,525 | $ 4,791 |
| Prepaid insurance | 1,565 | 2,128 |
| Income taxes receivable | 999 | 1,111 |
| Prepaid equipment maintenance | 781 | 425 |
| Supplies, toner and paper inventory | 1,605 | 1,447 |
| Prepaid medical premiums | 555 | 414 |
| Prepaid equipment and facilities rentals | 839 | 792 |
| Receivable from parent | 510 | 510 |
| Prepaid compensation | — | 620 |
| Other prepaid and current assets | 6,289 | 6,720 |
| Total prepaid expenses and other current assets | $ 15,668 | $ 18,958 |

F-141

Supp.App. 0843

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

## 4. PROPERTY AND EQUIPMENT, NET

As of March 31, 2017 and December 31, 2016, Property and equipment, net consisted of the following (in thousands):

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Copier and duplicator equipment | $ 34,261 | $ 33,646 |
| Mailing equipment | 29,175 | 29,290 |
| Computer equipment and software | 21,193 | 21,986 |
| Leasehold improvements | 21,531 | 21,468 |
| Plant equipment | 10,248 | 9,589 |
| Office equipment, furniture and fixtures | 6,129 | 6,204 |
|  | 122,537 | 122,183 |
| Accumulated depreciation and amortization | (59,235) | (56,727) |
| Total property and equipment, net | $ 63,302 | $ 65,456 |

As of March 31, 2017 and December 31, 2016, Property and equipment, net acquired under capital leases consisted of the following (in thousands):

|  | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Copier and duplicator equipment | $ 27,267 | $ 26,034 |
| Mailing equipment | 4,730 | 4,761 |
| Office equipment, furniture, fixtures, and other | 1,658 | 2,796 |
|  | 33,655 | 33,591 |
| Accumulated depreciation and amortization | (17,052) | (15,245) |
| Property and equipment, net acquired under capital leases | $ 16,603 | $ 18,346 |

For the three months ended March 31, 2017 and 2016 depreciation and amortization expense related to property and equipment was $5.6 million and $5.5 million, respectively

## 5. IDENTIFIABLE INTANGIBLE ASSETS, NET

As of March 31, 2017 and December 31, 2016, Identifiable Intangible assets, net consisted of the following (in thousands):

|  | March 31, 2017 | | |
|---|---|---|---|
|  | Useful Life (in years) | Gross Value | Accumulated Amortization | Net Carrying Amount |
| Customer Relationships | 11 | $ 158,153 | $ (46,546) | $ 111,607 |
| Non-compete agreement | 5 | 10,000 | (7,000) | 3,000 |
|  |  | $ 168,153 | $ (53,546) | $ 114,607 |

F-142

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**5. IDENTIFIABLE INTANGIBLE ASSETS, NET (Continued)**

| | Useful Life (in years) | December 31, 2016 Gross Value | Accumulated Amortization | Net Carrying Amount |
|---|---|---|---|---|
| Customer Relationships | 11 | $ 158,093 | $ (42,929) | $ 115,164 |
| Non-compete agreement | 5 | 10,000 | (6,500) | 3,500 |
| | | $ 168,093 | $ (49,429) | $ 118,664 |

For the three months ended March 31, 2017 and 2016 amortization expense related to identifiable intangible assets was $4.1 million and $4.1 million, respectively.

As of March 31, 2017, future amortization expense related to these intangible assets are as follows (in thousands):

| Years ending December 31, | |
|---|---|
| 2017 (nine months) | 12,279 |
| 2018 | 15,872 |
| 2019 | 14,372 |
| 2020 | 14,372 |
| 2021 | 14,372 |
| Thereafter | 43,340 |
| | $ 114,607 |

**6. ACCRUED LIABILITIES**

As of March 31, 2017 and December 31, 2016, Accrued liabilities consisted of the following (in thousands):

| | March 31, 2017 | December 31, 2016 |
|---|---|---|
| Accrued payroll and benefits | $ 20,755 | $ 15,629 |
| Accrued interest | 10,255 | 10,441 |
| Equipment rental and maintenance accruals | 6,258 | 7,113 |
| Accrued transaction related professional fees | 4,760 | — |
| Non-income taxes payable | 4,720 | 4,432 |
| Other | 3,887 | 4,091 |
| Restructuring reserve | 281 | — |
| Total accrued liabilities | $ 50,916 | $ 41,706 |

F-143

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 848 of 1110    PageID 2469

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

## 7. INCOME TAXES

The Company's quarterly benefit from income taxes is measured using an estimated annual effective tax rate, adjusted for discrete items within the period presented. The comparison of the Company's effective tax rate between periods can be impacted by the level and mix of earnings and losses by tax jurisdiction and the amount of permanent book-to-tax differences.

*Effective Tax Rate*

For the three months ended March 31, 2017 and 2016, the income tax benefit was $3.0 million, or 23.7% and $3.1 million, or 39.6%, respectively. The decrease in the effective rate is primarily attributable to an unfavorable adjustment related to non-deductible transaction losses and a change in the level and mix of earnings and losses in the Company's taxable jurisdictions.

*Uncertain Tax Positions*

The Company recognizes a tax benefit from an uncertain tax position only if it is more likely than not that the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. As of March 31, 2017 and December 31, 2016, the Company has no liability recorded for uncertain tax positions. For U.S. federal, state and Canadian income tax purposes, the 2013 through 2015 income tax years remain subject to examination. No significant state or other foreign income tax examinations are in process.

## 8. LONG-TERM DEBT

As of March 31, 2017 and December 31, 2016, Long-term debt consisted of the following (in thousands):

| | March 31, 2017 | | | |
| --- | --- | --- | --- | --- |
| | Gross Carrying Amount | Original Issue Discount | Deferred Financing Costs | Net Carrying Amount |
| First lien amended term loan | $ 289,369 | $ (7,209) | $ (2,198) | $ 279,962 |
| Second lien amended term loan | 133,000 | (6,412) | (1,036) | 125,552 |
| Obligations under capital leases | 18,506 | — | — | 18,506 |
| Notes payable for capital asset acquisitions | 8,073 | — | (24) | 8,049 |
| Notes payable for financing of insurance coverage | 592 | — | — | 592 |
| | $ 449,540 | $ (13,621) | $ (3,258) | 432,661 |
| Less: Current portion of Long-term debt | | | | (19,258) |
| Total Long term debt | | | | $ 413,403 |

F-144

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**8. LONG-TERM DEBT (Continued)**

|  | December 31, 2016 | | | |
|  | Gross Carrying Amount | Original Issue Discount | Deferred Financing Costs | Net Carrying Amount |
| --- | --- | --- | --- | --- |
| First lien amended term loan | $ 291,275 | $ (7,764) | $ (2,367) | $ 281,144 |
| Second lien amended term loan | 133,000 | (6,790) | (1,097) | 125,113 |
| Obligations under capital leases | 20,152 | — | — | 20,152 |
| Notes payable for capital asset acquisitions | 7,895 | — | (25) | 7,870 |
| Notes payable for financing of insurance coverage | 791 | — | — | 791 |
|  | $ 453,113 | $ (14,554) | $ (3,489) | 435,070 |
| Less: Current portion of Long-term debt |  |  |  | (19,641) |
| Total Long term debt |  |  |  | $ 415,429 |

*Amended First and Second Lien Credit Agreements*

Novitex Acquisition, LLC ("Novitex Acquisition"), a subsidiary of the Company, Credit Suisse AG, Cayman Islands Branch, as a lender and administrative and collateral agent, and certain other agents, lenders, and financial institutions were parties to a credit agreement (the "2013 Credit Agreement") that was amended on July 7, 2014. The 2013 Credit Agreement provided for aggregate credit facilities of $365.0 million that consisted of (i) a $215.0 million Tranche A term loan facility with a final maturity of October 1, 2019 ("First Lien Credit Agreement"), (ii) a $100.0 million Tranche B term loan facility with a final maturity of October 1, 2020 ("Second Lien Credit Agreement") and (iii) a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million) (the "Revolving Credit Facility") maturing October 1, 2018. Proceeds of these term loans ($301.4 million, net of $13.6 million of original issue discount costs) together with equity funding of $135.0 million were used to finance the 2013 Acquisition and other acquisition-related and financing requirements.

On July 7, 2014, Novitex Acquisition completed a refinancing of its 2013 Credit Agreement ("Amended 2013 Credit Agreement"). Upon conclusion of the refinancing, the Amended 2013 Credit Agreement provides for aggregate credit facilities of $495.0 million that consists of (i) a $305.0 million Tranche A term loan facility with a final maturity of July 7, 2020 ("Amended First Lien Credit Agreement"), (ii) a $140.0 million Tranche B term loan facility with a final maturity of July 7, 2021 ("Amended Second Lien Credit Agreement") and (iii) a $50.0 million revolving credit facility (including a sub-facility for letters of credit of up to $15.0 million) maturing October 1, 2018. Interest rates were unchanged. Net proceeds from the refinancing, comprised of $114.0 million, net of $17.6 million of original issue discount costs, plus cash on hand, were used to repay the then outstanding borrowings under the 2013 Credit Agreement, and to distribute $140.6 million to the stockholder of the Company.

On May 22, 2015, Novitex Acquisition repurchased $7.0 million of debt (par value) outstanding under its Amended Second Lien Credit Agreement at a discount, which resulted in a purchase price of $6.5 million. As a result of this repurchase, the Company recognized a gain on early extinguishment of debt of $0.1 million, net of a proportionate write-off of unamortized original issue discount and debt issuance costs for the year ended December 31, 2015.

F-145

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**8. LONG-TERM DEBT (Continued)**

*Second Amendment to First and Second Lien Credit Agreements*

On July 26, 2016, Novitex Acquisition entered into a Second Amendment to its 2013 Amended Credit Agreements ("Second Amendment"). As a result of the Second Amendment, certain financial terms and conditions were modified, including a 0.50% increase to the applicable margins on Novitex Acquisition's outstanding borrowings under the 2013 Amended Credit Agreements, and revisions to certain financial maintenance covenants and to permitted indebtedness (as defined in the 2013 Amended Credit Agreements). Gross borrowings outstanding under the Second Amendment remained unchanged. In conjunction with the Second Amendment, Novitex Acquisition incurred $3.7 million in financing fees, of which $3.6 million is reflected as a reduction of the associated debt, and $0.1 million is included in Selling, general and administrative, exclusive of depreciation and amortization for the year ended December 31, 2016.

The original issue discount is being amortized over the respective terms of the Amended First Lien Credit Agreement and Amended Second Lien Credit Agreement.

The floating rates of interest on borrowings under the Amended 2013 Credit Agreement are a function of a margin plus LIBOR or the Alternative Borrowing Rate, subject to certain definitions and floors. The Company can elect various tenors of each respective rate upon each successive renewal event. With respect to the Revolving Credit Facility, the margin is adjustable based upon the Company's senior secured leverage ratio (as defined in the Amended 2013 Credit Agreement); the margin is fixed with respect to the Amended First Lien Credit Agreement and the Amended Second Lien Credit Agreement. Interest payments are payable on the first day of each quarter during the term of the agreement. As of March 31, 2017 the interest rates on the Amended First Lien and Amended Second Lien borrowings were 8.07% and 12.32%, respectively. As of December 31, 2016 the interest rates on the Amended First Lien and Amended Second Lien borrowings were 8% and 12.25%, respectively.

As of March 31, 2017 and December 31, 2016, Novitex Acquisition had no cash borrowings outstanding under its Revolving Credit Facility. As of March 31, 2017 and December 31, 2016 Novitex Acquisition had $12.8 million of letters of credit outstanding, under its sub-facility, which reduced available capacity under the Revolving Credit Facility to $37.2 million. As of both March 31, 2017 and December 31, 2016, the interest rates on the committed and uncommitted borrowings under the Revolving Credit Facility were 6.75% and 0.50%, respectively.

Guarantee and Covenants under Amended First Lien and Amended Second Lien Agreements are as follows:

Novitex Acquisition, including its wholly-owned domestic subsidiaries, subject to certain exceptions, are guarantors under the Amended 2013 Credit Agreement and Second Amendment. The obligations of Novitex Holdings, along with the obligations of these guarantors are also collateralized by a pledge of substantially all assets of the aforementioned parties.

Novitex Acquisition and its wholly-owned domestic subsidiaries are subject to covenants in the Amended 2013 Credit Agreement and the Second Amendment, including those restricting the incurrence of additional indebtedness (including guarantees of indebtedness), additional liens, mergers

F-146

Supp.App. 0848

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**8. LONG-TERM DEBT (Continued)**

and consolidations, the disposition or acquisition of property, the payment of dividends, transactions with affiliates and the making of certain investments, in each case subject to numerous conditions, exceptions and thresholds. The financial covenants are limited to maintaining a senior secured leverage ratio for both the Amended First Lien and Amended Second Lien Agreements (5.50 to 1:00) with which Novitex Acquisition was in compliance at March 31, 2017.

In accordance with the Second Amendment, the financial covenants provide for the reduction of the senior secured leverage ratio at periodic intervals until the maturity of the Amended 2013 Credit Agreement. Over a period of 12 months from the balance sheet date, our debt covenant leverage ratio will decrease as follows:

- from (5.5 to 1:00) to (5.25 to 1:00) for both the Amended First Lien and Amended Second Lien Agreements for the period ending June 30, 2017; and

- further decrease to (4.0 to 1:00) for the Amended First Lien and to (4.5 to 1:00) for the Amended Second Lien for the period from January 1, 2018 to March 31, 2018.

Based on management's estimates, which include savings from various cost reduction initiatives implemented in the first quarter of 2017, the Company expects that Novitex Acquisition will continue to be in compliance with the aforementioned leverage ratios. Management continues to seek additional revenue and cost optimization opportunities that are expected to generate continued profitable growth.

In the event Novitex Acquisition is unable to comply with its debt covenants, the Company may be required to obtain additional funds from other sources, seek other sources of capital or pursue additional amendments to its debt covenants.

Because the Amended First Lien and Amended Second Lien Agreements currently provide sufficient liquidity and Novitex Acquisition expects to remain in compliance with its covenants, Novitex Acquisition has no formal commitments for funding future needs or amending covenants at this time. Any additional financing or covenant amendments during the next twelve months, if required, may not be available to Novitex Acquisition on acceptable terms, or at all.

*Note Payable for 2015 Acquisition of Capital Assets*

During the year ended December 31, 2015, the Company financed the acquisition of certain equipment for use in its MegaCenter in Windsor, CT through a $1.6 million note payable to a financial services company ("2015 Capital Asset Acquisition Note Payable"). The note was due to mature on July 1, 2016, bears interest at a rate of 5.25% per annum, and was payable in equal monthly installments, with a balloon payment of $1.5 million due upon maturity. The note was collateralized by a pledge of the equipment financed. On March 9, 2016, this note was extinguished as part of a $5.8 million equipment financing arrangement entered into with a commercial bank. The extinguishment of this note did not result in a gain or loss on extinguishment of debt as the early repayment amount was equal to the carrying amount of the debt refinanced. (See Notes Payable for Capital Asset Acquisitions below)

F-147

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**8. LONG-TERM DEBT (Continued)**

*Notes Payable for Capital Asset Acquisitions*

On February 11, 2016, the Company entered into a $3.0 million equipment financing arrangement with a commercial bank for the payment for certain acquired equipment for use at its MegaCenters in Windsor, CT and Austin, TX, which had been purchased during the year ended December 31, 2015. The note matures on February 12, 2021, bears interest at a rate of 5.24% per annum, and is payable in equal monthly installments. The financing arrangement is collateralized by a pledge of the equipment financed.

On March 9, 2016, the Company entered into a $5.8 million equipment financing arrangement with a commercial bank for the refinancing of the 2015 Capital Asset Acquisition Note Payable and for the 2016 acquisition of certain capital assets for use in its MegaCenters in Windsor, CT and Austin, TX. This financing arrangement, executed with a financial services company, matures in March 2021, bears interest at a rate of 5.22% per annum, and is payable in equal monthly installments, with a balloon payment due at maturity of $1.9 million. The financing arrangement is collateralized by a pledge of the equipment financed.

In connection with an agreement between the Company and a client for print and mail services, the Company agreed to purchase equipment previously used by the client at its print and mailing services facilities for use at the Company's MegaCenters in Windsor, CT and Austin, TX, under two separate asset transfer agreements. The purchase price of the equipment shall be paid in equal monthly interest free installments commencing June 30, 2017 and each month thereafter over sixty months.

As of March 31, 2017, the Company completed the asset transfer under one of the asset transfer agreements. At March 31, 2017, the Company recorded a note payable for the appraised value of the equipment transferred in the amount of $0.6 million with an imputed interest rate of 5.25% per annum. The note matures on May 31, 2022.

The transfer of assets under the second asset transfer agreement is expected to be completed prior to December 31, 2017.

*Sale Leaseback Transaction*

During August 2016, the Company sold, and subsequently, leased back certain capital assets in service at its MegaCenter in Austin, TX. The sale consisted primarily of plant and computer equipment, furniture and fixtures. The Company received net proceeds of $1.2 million in connection with the sale. The carrying amount of the property sold was $1.0 million, which resulted in a deferred gain of $0.2 million, which will be amortized over the thirty six month lease term, commencing January 1, 2017. As of March 31, 2017 and December 31, 2016, the deferred gain is presented in Property and Equipment, net in the consolidated balance sheet.

*Financing of Commercial Insurance Policy*

During November 2016, the Company financed the acquisition of a commercial insurance policy through a $0.9 million note payable to a financial services company. The note matures July 2017, bears interest at a rate of 3.74% per annum, and is payable in equal monthly installments. As of March 31, 2017 and December 31, 2016 this note is included in Short-term borrowings and current portion of long-term debt.

F-148

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 853 of 1110 PageID 2474

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

## 9. FAIR VALUE OF FINANCIAL INSTRUMENTS

Fair value is a market-based measure considered from the perspective of a market participant rather than an entity-specific measure. An entity is required to classify certain assets and liabilities measured at fair value based on the following fair value hierarchy that prioritizes the inputs used to measure fair value:

*Level 1*—Unadjusted quoted prices in active markets for identical assets and liabilities.

*Level 2*—Quoted prices for identical assets and liabilities in markets that are not active, quoted prices for similar assets and liabilities in active markets or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

*Level 3*—Unobservable inputs that are supported by little or no market activity, may be derived from internally developed methodologies based on the Company's best estimate of fair value and that are significant to the fair value of the asset or liability.

Certain financial instruments are carried at cost in the consolidated balance sheets, which approximates fair value due to their short-term, highly liquid nature. The carrying amounts of cash and cash equivalents, accounts receivable, accounts payable and short-term borrowings approximate fair value because of the short-term nature of such instruments.

The Second Amended First lien term loan, Second Amended Second lien term loan, Connecticut State Assistance Loan, and the notes payable for capital asset acquisitions (collectively "Level 2 Debt") are classified within Level 2 as their valuation requires quoted prices for similar instruments in active markets, quoted prices for identical or similar instruments in markets that are not active and/or model-based valuation techniques for which all significant inputs are observable in the market or can be corroborated by observable market data. A third-party service provider assists the Company with compiling market prices that are used to value the Level 2 Debt.

At least annually, management determines if the current valuation techniques used in the fair value measurements are still appropriate. There were no changes in the valuation techniques during the three months period ended March 31, 2017 or for the year ended December 31, 2016.

*Financial Instruments Not Recorded at Fair Value*

The following table presents the carrying amount and fair values of long-term debt not recorded at fair value in the consolidated balance sheets as of December 31, 2016 and 2015 (in thousands):

|  | March 31, 2017 | | December 31, 2016 | |
| --- | --- | --- | --- | --- |
|  | Fair Value Level 2 | Carrying Amount | Fair Value Level 2 | Carrying Amount |
| First Amended lien term loan | $ 282,537 | $ 279,962 | $ 289,933 | $ 281,144 |
| Second Amended lien term loan | 127,015 | 125,552 | 127,015 | 125,113 |
| Note Payable for capital asset acquisition | 7,882 | 8,049 | 7,613 | 7,870 |
| Note payable for financing of insurance coverage | 592 | 592 | 791 | 791 |

F-149

Supp.App. 0851

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 854 of 1110    PageID 2475

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

## 10. RESTRUCTURING CHARGES

The Company recorded restructuring charges during the three months ended March 31, 2017 related to programs that commenced in 2017 and aimed at lowering its costs and accelerating efforts to improve operational efficiencies.

The following table sets forth the changes in the restructuring reserve for the three month periods ending March 31, 2017 and 2016 (in thousands):

| | | | |
|---|---|---|---|
| Balance at January 1, 2017 | $ — | Balance at January 1, 2016 | $ 760 |
| Provision | 334 | Provision | 91 |
| Cash payments and other usage | (53) | Cash payments and other usage | (701) |
| Balance at March 31, 2017 | $ 281 | Balance at March 31, 2016 | $ 150 |

As of March 31, 2017, the restructuring reserve consisted of $0.3 million in estimated severance and benefit costs. Accrued restructuring costs as of March 31, 2017 are expected to be paid during the year ending December 31, 2017.

## 11. SEGMENT INFORMATION

The Company has determined that it conducts operations in one business segment, Document Outsourcing Services, which offers its clients an integrated suite of services organized across document logistics and digital services. A significant portion of its operations, assets and customers are located in the United States. For the three month period ended March 31, 2017, one customer accounted for 15% of the Company's revenue. For the three month period ended March 31, 2016, no single customer generated in excess of 10% of the Company's revenues.

Revenues earned outside of the United States, primarily in Canada, for the three months ended March 31, 2017 and 2016 were approximately 3.9% and 4.2% of total revenues, respectively. Long-lived assets outside the United States, primarily in Canada, were $5.3 million and $5.7 million as of March 31, 2017 and December 31, 2016, respectively.

## 12. COMMITMENTS AND CONTINGENCIES

The Company is involved in a variety of claims, suits, investigations and proceedings that arise from time to time in the ordinary course of its business, including actions with respect to contracts, intellectual property, taxation, employment, benefits, personal injuries and other matters. The results of these proceedings in the ordinary course of business are not expected to have a material adverse effect on the Company's consolidated financial position or results of operations.

The Company records provisions for estimated losses in circumstances where a loss is probable and the amount or range of possible amounts of the loss may be estimated.

## 13. RELATED PARTY TRANSACTIONS

*Management Fees*

On October 1, 2013, the Company entered into a management fee agreement with Apollo under which Apollo and its affiliates provide certain management consulting services to the Company on an

F-150

**NOVITEX HOLDINGS, INC.**

**NOTES TO CONDENSED CONSOLIDATED FINANCIAL STATEMENTS (Continued)**

**MARCH 31, 2017**

**(UNAUDITED)**

**13. RELATED PARTY TRANSACTIONS (Continued)**

ongoing basis. The Company is required to pay Apollo an annual management fee for these services amounting to the greater of $750,000 or 1% of earnings before income taxes, depreciation and amortization, plus out-of-pocket costs payable annually.

In connection with this agreement, included in Selling, general and administrative expenses, exclusive of depreciation and amortization, for the three months ended March 31, 2017 and 2016, was $0.2 million and $0.2 million, respectively.

*Affiliated Party Transactions*

For the three months ended March 31, 2017 and 2016 there were related party revenues of $0.4 million and $0.2 million, respectively, for services rendered to Apollo affiliated companies. For the three months ended March 31, 2017 and 2016, $-0- million and $0.2 million, respectively, in payments were received from Apollo affiliated companies. As of March 31, 2017 and December 31, 2016, the Company had $0.4 million and $0.1 million, respectively, in outstanding accounts receivable from Apollo affiliated companies.

*Receivable from Novitex Parent*

During the year ended December 31, 2015, the Company advanced $0.5 million to Novitex Parent, the parent company of Novitex, for the purchase of certain capital units and vested Profit Interest Units ("PIUs") of Novitex Parent from former executives of the Company. The Company has the intent and the ability to collect this receivable from Novitex Parent. As of March 31, 2017 and December 31, 2016, the aggregate consideration advanced to Novitex Parent that are due on demand is included in prepaid expenses and other current assets in the unaudited condensed consolidated balance sheets.

**14. STOCKHOLDER'S EQUITY**

*Common Shares*

The Company is authorized to issue 30,000 Common Shares, par value $0.01 per share. The holders of the Common Shares have no conversion, preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to the Common Shares.

*Preferred Stock*

The Company is authorized to issue 5,000 preferred shares with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. There are no issued and outstanding preferred shares as of March 31, 2017 and December 31, 2016.

**15. SUBSEQUENT EVENTS**

The Company performed its subsequent event procedures up through May 10, 2017, the date these condensed consolidated financial statements were made available for issuance.

F-151

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 856 of 1110    PageID 2477

**Annex A**

**BUSINESS COMBINATION AGREEMENT**

**among**

**QUINPARIO ACQUISITION CORP. 2,**

**QUINPARIO MERGER SUB I, INC.,**

**QUINPARIO MERGER SUB II, INC.,**

**NOVITEX HOLDINGS, INC.,**

**SOURCEHOV HOLDINGS, INC.,**

**NOVITEX PARENT, L.P.,**

**HOVS LLC, and**

**HANDSON FUND 4 I, LLC,**

**February 21, 2017**

Supp.App. 0854

**TABLE OF CONTENTS**

|  |  | Page |
|---|---|---|
| **ARTICLE I** MERGERS |  | A-3 |
| 1.1 | **The Mergers** | A-3 |
| 1.2 | **Effective Time of the Mergers** | A-3 |
| 1.3 | **Effects of the Mergers** | A-3 |
| 1.4 | **Certificate of Incorporation; Bylaws; Officers and Directors of Surviving Companies** | A-3 |
| 1.5 | **Taking of Necessary Actions; Further Assurances** | A-4 |
|  |  |  |
| **ARTICLE II** PAYMENT OF PURCHASE PRICE; EFFECT OF MERGERS ON CAPITAL STOCK OF THE COMPANIES AND MERGER SUBS |  | A-4 |
| 2.1 | **Effect on Capital Stock** | A-4 |
| 2.2 | **Delivery of Merger Consideration** | A-6 |
| 2.3 | **Treatment of Company Equity Awards** | A-8 |
|  |  |  |
| **ARTICLE III** CLOSING |  | A-9 |
| 3.1 | **The Closing** | A-9 |
| 3.2 | **Closing Deliverables** | A-9 |
|  |  |  |
| **ARTICLE IV** REPRESENTATIONS AND WARRANTIES OF SELLERS |  | A-10 |
| 4.1 | **Standing; Qualification and Power** | A-11 |
| 4.2 | **Ownership** | A-11 |
| 4.3 | **Authority; Execution and Delivery; Enforceability** | A-11 |
| 4.4 | **Brokers' and Finders' Fees** | A-11 |
| 4.5 | **No Conflict; Consents** | A-12 |
| 4.6 | **Litigation** | A-12 |
|  |  |  |
| **ARTICLE V** REPRESENTATIONS AND WARRANTIES OF THE COMPANIES |  | A-12 |
| 5.1 | **Standing; Qualification and Power** | A-12 |
| 5.2 | **Capitalization of the Company and the Company Subsidiaries** | A-13 |
| 5.3 | **Authority; Execution and Delivery; Enforceability** | A-14 |
| 5.4 | **No Conflict; Consents** | A-14 |
| 5.5 | **Financial Statements** | A-15 |
| 5.6 | **Absence of Certain Changes** | A-16 |
| 5.7 | **Compliance with Law; Permits** | A-16 |
| 5.8 | **Litigation** | A-17 |
| 5.9 | **No Undisclosed Liabilities** | A-17 |
| 5.10 | **Taxes** | A-17 |
| 5.11 | **Intellectual Property; Privacy; Cybersecurity** | A-18 |
| 5.12 | **Employees and Employee Benefits** | A-19 |
| 5.13 | **Labor** | A-21 |
| 5.14 | **Environmental Matters** | A-21 |
| 5.15 | **Material Contracts** | A-22 |
| 5.16 | **Related Person Transactions** | A-23 |
| 5.17 | **Real and Personal Property** | A-24 |
| 5.18 | **Insurance** | A-25 |
| 5.19 | **Brokers' and Finders' Fees** | A-25 |
| 5.20 | **Customers and Suppliers** | A-25 |
| 5.21 | **Company Information** | A-25 |
| 5.22 | **No Additional Representations** | A-26 |

A-i

|  |  | Page |
|---|---|---|
| **ARTICLE VI** REPRESENTATIONS AND WARRANTIES OF PARENT AND MERGER SUB | | A-26 |
| **6.1** | **Standing; Qualification and Power of Parent, Novitex Merger Sub and SourceHOV Merger Sub** | A-27 |
| **6.2** | **Capitalization of Parent** | A-27 |
| **6.3** | **Authority; Execution and Delivery; Enforceability** | A-28 |
| **6.4** | **No Conflict; Consents** | A-28 |
| **6.5** | **Litigation** | A-29 |
| **6.6** | **SEC Documents; Financial Statements** | A-29 |
| **6.7** | **Information Supplied** | A-30 |
| **6.8** | **NASDAQ Stock Market Quotation** | A-30 |
| **6.9** | **Board Approval; Stockholder Vote** | A-30 |
| **6.10** | **Investment Company Act** | A-31 |
| **6.11** | **Trust Account** | A-31 |
| **6.12** | **Title to Assets** | A-31 |
| **6.13** | **Securities Laws Matters** | A-31 |
| **6.14** | **Parent's Business Investigation; Disclaimer Regarding Projections; No Knowledge of Misrepresentation** | A-32 |
| **6.15** | **Financing** | A-32 |
| **6.16** | **Solvency** | A-33 |
| **6.17** | **Operations of Novitex Merger Sub and SourceHOV Merger Sub** | A-33 |
| **6.18** | **Brokers' and Finders' Fees** | A-33 |
| **6.19** | **Taxes** | A-33 |
| **6.20** | **No Additional Representations** | A-34 |
|  |  |  |
| **ARTICLE VII** COVENANTS | | A-34 |
| **7.1** | **Conduct of Business Prior to Closing** | A-34 |
| **7.2** | **Access to Information** | A-39 |
| **7.3** | **Confidentiality** | A-39 |
| **7.4** | **Efforts to Consummate; Consents and Filings** | A-40 |
| **7.5** | **Financing** | A-41 |
| **7.6** | **Financing Cooperation** | A-43 |
| **7.7** | **Expenses; Transfer Taxes** | A-45 |
| **7.8** | **Tax-Free Reorganization** | A-46 |
| **7.9** | **Publicity** | A-46 |
| **7.10** | **Directors' and Officers' Indemnification and Insurance** | A-47 |
| **7.11** | **Employee Matters** | A-49 |
| **7.12** | **280G Shareholder Vote** | A-49 |
| **7.13** | **Control of Operations.** | A-50 |
| **7.14** | **Exclusivity** | A-50 |
| **7.15** | **Trust Account** | A-51 |
| **7.16** | **Proxy Statement; SEC Filings** | A-52 |
| **7.17** | **Listing of Parent Common Stock** | A-54 |
| **7.18** | **Section 16 of the Exchange Act** | A-54 |
| **7.19** | **Notification of Certain Matters** | A-54 |
| **7.20** | **Affiliate Agreements** | A-55 |
| **7.21** | **Release** | A-55 |
| **7.22** | **Intermediate Co; SourceHOV Shareholder Meeting; Consent Actions** | A-56 |
| **7.23** | **No Claim Against Trust Amount** | A-57 |
| **7.24** | **Subscription Agreements** | A-58 |

A-ii

|  |  | Page |
|---|---|---|
| **ARTICLE VIII** CONDITIONS PRECEDENT |  | A-58 |
| **8.1** | **Conditions to Each Party's Obligations** | A-58 |
| **8.2** | **Conditions to Obligations of Parent, Novitex Merger Sub and SourceHOV Merger Sub** | A-59 |
| **8.3** | **Conditions to the Obligations of the Sellers and the Companies** | A-60 |
| **8.4** | **Conditions to the Obligations of the HGM Group and SourceHOV** | A-60 |
| **8.5** | **Conditions to the Obligations of Novitex and Novitex Parent** | A-61 |
| **8.6** | **Frustration of Closing Conditions** | A-62 |
|  |  |  |
| **ARTICLE IX** TERMINATION |  | A-62 |
| **9.1** | **Termination** | A-62 |
| **9.2** | **Effect of Termination** | A-63 |
|  |  |  |
| **ARTICLE X** GENERAL PROVISIONS |  | A-64 |
| **10.1** | **Survival of Representations and Warranties** | A-64 |
| **10.2** | **Notices** | A-64 |
| **10.3** | **Severability** | A-66 |
| **10.4** | **Specific Performance** | A-67 |
| **10.5** | **Entire Agreement** | A-67 |
| **10.6** | **Assignment** | A-67 |
| **10.7** | **No Third-Party Beneficiaries** | A-67 |
| **10.8** | **Amendment** | A-67 |
| **10.9** | **Waiver** | A-68 |
| **10.10** | **Governing Law; Jurisdiction** | A-68 |
| **10.11** | **Waiver of Jury Trial** | A-69 |
| **10.12** | **Recourse** | A-69 |
| **10.13** | **Limitation on Damages** | A-70 |
| **10.14** | **Disclosure Schedules** | A-70 |
| **10.15** | **Interpretation** | A-71 |
| **10.16** | **No Presumption Against Drafting Party** | A-71 |
| **10.17** | **Company and Principal Stockholder Privilege** | A-71 |
| **10.18** | **Execution of Agreement** | A-72 |

**EXHIBITS**

Exhibit A     Nomination Agreement

Exhibit B     Registration Rights Agreement

Exhibit C     Parent Amended and Restated Certificate of Incorporation

Exhibit D     Parent Amended and Restated Bylaws

Exhibit E     Subscription Agreement Material Terms

A-iii

Supp.App. 0857

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 860 of 1110    PageID 2481

Table of Contents

**BUSINESS COMBINATION AGREEMENT**, dated as of February 21, 2017 (together with all Schedules and Exhibits attached hereto, this "*Agreement*"), among Quinpario Acquisition Corp. 2, a Delaware corporation ("*Parent*"), Quinpario Merger Sub I, Inc., a Delaware corporation ("*SourceHOV Merger Sub*"), Quinpario Merger Sub II, Inc., a Delaware corporation ("*Novitex Merger Sub*" and, each of the SourceHOV Merger Sub and the Novitex Merger Sub, a "*Merger Sub*"), Novitex Holdings, Inc., a Delaware corporation ("*Novitex*"), SourceHOV Holdings, Inc., a Delaware corporation ("*SourceHOV*" and, together with Novitex, each a "*Company*" and collectively, the "*Companies*"), Novitex Parent, L.P. ("*Novitex Parent*"), HOVS LLC and HandsOn Fund 4 I, LLC (collectively, the "*HGM Group*" and, together with Novitex Parent, each a "*Seller*" and collectively, the "*Sellers*").

WHEREAS, the board of directors of Parent has determined that it is fair to, advisable and in the bests interests of its public stockholders to enter into this Agreement and consummate the transactions contemplated thereby;

WHEREAS, the respective boards of directors of each of Parent, SourceHOV Merger Sub and SourceHOV have each duly approved (a) this Agreement, (b) the proposed merger (the "*SourceHOV Merger*") of SourceHOV Merger Sub with and into SourceHOV in accordance with, and subject to, the terms and conditions set forth in this Agreement and the General Corporation Law of the State of Delaware (the "*DGCL*") and (c) the other transactions contemplated by this Agreement;

WHEREAS, the respective boards of directors of SourceHOV Merger Sub and SourceHOV have each (a) determined that it is fair to, advisable to and in the best interests of SourceHOV Merger Sub and SourceHOV, respectively, to enter into this Agreement and consummate the SourceHOV Merger and the other transactions contemplated by this Agreement, (b) directed that the adoption of this Agreement be submitted to a vote of their respective stockholders and (c) resolved and agreed to recommend to their respective stockholders that they vote in favor of the approval and adoption of this Agreement and the transactions contemplated hereby including the SourceHOV Merger, in each case on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, as a condition to the consummation of the transactions contemplated by this Agreement and in accordance with the terms hereof, Parent shall provide an opportunity to its stockholders to have their Parent Common Stock redeemed for the consideration, and on the terms and subject to the conditions and limitations, set forth in this Agreement and Parent's Amended and Restated Certificate of Incorporation and Bylaws in conjunction with, *inter alia*, obtaining approval from the stockholders of Parent for the Business Combination;

WHEREAS, in connection with the transactions contemplated by this Agreement, Parent intends to seek to, in accordance with *Section 7.24* hereof, enter into subscription agreements (the "*Subscription Agreements*") with certain third party investors (the "*PIPE Investors*") pursuant to which the PIPE Investors will commit to make a private investment in public equity in the form of Parent Common Stock (the "*PIPE Investment*") up to an aggregate amount of $350,000,000 (after giving effect to the balance in the Trust Account (exclusive of expenses) less the redemptions each holder of Parent Common Stock is entitled to pursuant to Parent's Amended and Restated Certificate of Incorporation and the Parent's Bylaws).

WHEREAS, the affirmative consent of the HGM Group is the only consent required from the holders of equity interests of SourceHOV in connection with the SourceHOV Merger and the transactions contemplated by this Agreement;

WHEREAS, immediately following execution of this Agreement, on the date of this Agreement, the HGM Group will execute and deliver to Parent, SourceHOV Merger Sub, Novitex Merger Sub, Novitex and Novitex Parent a written consent (the "*HGM Consent*"), pursuant to which, among other things, the HGM Group will act by written consent in favor of the adoption of this Agreement, the approval of the SourceHOV Merger and the other transactions contemplated by this Agreement thereby waiving any and all rights under the DGCL or otherwise to assert dissenters' rights or demand appraisal of its shares of SourceHOV Common Stock (as defined herein) in connection with the SourceHOV Merger;

Supp.App. 0858

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 861 of 1110    PageID 2482

WHEREAS, immediately following execution of this Agreement, on the date of this Agreement, Parent, as the sole stockholder of SourceHOV Merger Sub as the date hereof, will duly adopt this Agreement and approve the SourceHOV Merger and the transactions contemplated hereby (the "*SourceHOV Parent Consent*");

WHEREAS, Novitex Parent owns all of the issued and outstanding equity interests of Novitex, par value $0.01 per share, (the "*Novitex Common Stock*");

WHEREAS, the respective boards of directors of each of Parent, Novitex Merger Sub and Novitex have each duly approved (a) this Agreement, (b) the proposed merger (the "*Novitex Merger*") of Novitex Merger Sub with and into Novitex in accordance with, and subject to, the terms and conditions set forth in this Agreement and the DGCL and (c) the other transactions contemplated by this Agreement;

WHEREAS, the respective boards of directors of Novitex Merger Sub and Novitex have each (a) determined that it is fair to, advisable to and in the best interests of Novitex Merger Sub and Novitex, respectively, to enter into this Agreement and consummate the Novitex Merger and the other transactions contemplated by this Agreement, (b) directed that the adoption of this Agreement be submitted for approval by their respective stockholders and (c) resolved and agreed to recommend to their respective stockholders that they vote in favor of the approval and adoption of this Agreement and the transactions contemplated hereby including the Novitex Merger, in each case on the terms and subject to the conditions set forth in this Agreement;

WHEREAS, the consent of Novitex Parent is the only consent required in connection with the Novitex Merger and the transactions contemplated by this Agreement;

WHEREAS, immediately following execution of this Agreement, Novitex Parent will execute and deliver to Parent, Novitex Merger Sub, the HGM Group and SourceHOV a written consent (the "*Novitex Consent*"), pursuant to which, among other things, Novitex Parent will act by written consent in favor of adoption of this Agreement, approval of the Novitex Merger and waive any and all rights under the DGCL or otherwise to assert dissenters' rights or demand appraisal of its shares of Novitex Common Stock in connection with the Novitex Merger;

WHEREAS, immediately following execution of this Agreement, on the date of this Agreement, Parent, as the sole stockholder of Novitex Merger Sub as the date hereof, will duly adopt this Agreement and approve the Novitex Merger and the transactions contemplated hereby (the "*Novitex Parent Consent*");

WHEREAS, the SourceHOV Merger shall occur substantially concurrently with the Novitex Merger and conditionally upon on the occurrence of each other;

WHEREAS, at the Closing, Parent intends to enter into two nomination agreements, one of which shall be with Apollo Novitex Holdings, L.P., parent of Novitex Parent and the other with the HGM Group, each of which shall be in substantially the form set forth in *Exhibit A* (the "*Nomination Agreement*");

WHEREAS, at the Closing, Parent and certain of its equity holders, including Apollo Novitex Holdings, L.P., the HGM Group and the holders of shares of Parent Common Stock as of the date of this Agreement who are parties to an existing registration rights agreement in respect of the shares of Parent Common Stock held by such holders intend to enter into a registration rights agreement in substantially the form set forth in *Exhibit B* (the "*Registration Rights Agreement*"); and

WHEREAS, simultaneously herewith, Parent, Quinpario Partners, LLC, Quinpario Partners 2, LLC, Game Boy Partners, LLC, Novitex, SourceHOV, Novitex Parent and the HGM Group are entering into that certain Forfeiture Agreement pursuant to which certain shareholders of Parent will forfeit a number of shares of Parent Common Stock and Parent Warrants (the "*Forfeiture Agreement*").

A-2

Supp.App. 0859

**NOW, THEREFORE**, in consideration of the benefits to be derived from this Agreement, the SourceHOV Certificate of Merger and the Novitex Certificate of Merger and the representations, warranties, covenants, agreements and conditions set forth herein and in the SourceHOV Certificate of Merger and the Novitex Certificate of Merger, the parties hereto hereby agree as follows:

## ARTICLE I

## MERGERS

**1.1    The Mergers**

(a)    At the SourceHOV Effective Time (as defined herein) and in accordance with, and subject to, the terms and conditions set forth in this Agreement, the SourceHOV Certificate of Merger and the DGCL, SourceHOV Merger Sub shall be merged with and into SourceHOV and the separate corporate existence of SourceHOV Merger Sub shall cease, and SourceHOV shall continue its corporate existence under the DGCL as the surviving company in the SourceHOV Merger (hereinafter referred to as the "*SourceHOV Surviving Company*").

(b)    At the Novitex Effective Time (as defined herein) and in accordance with, and subject to, the terms and conditions set forth in this Agreement, the Novitex Certificate of Merger and the DGCL, Novitex Merger Sub shall be merged with and into Novitex and the separate corporate existence of Novitex Merger Sub shall cease, and Novitex shall continue its corporate existence under the DGCL as the surviving company in the Novitex Merger (hereinafter referred to as the "*Novitex Surviving Company*").

**1.2    Effective Time of the Mergers**

(a)    The SourceHOV Merger shall become effective on the Closing Date upon the filing by SourceHOV of the SourceHOV Certificate of Merger with the Secretary of State of the State of Delaware (or at such later time as may be agreed upon by each Company and SourceHOV Merger Sub and set forth in the SourceHOV Certificate of Merger). The SourceHOV Certificate of Merger shall be executed and delivered in the manner provided under the DGCL. The time when the SourceHOV Merger shall become effective is referred to herein as the "*SourceHOV Effective Time*."

(b)    The Novitex Merger shall become effective on the Closing Date upon the filing by Novitex of the Novitex Certificate of Merger with the Secretary of State of the State of Delaware (or at such later time as may be agreed upon by each Company and Novitex Merger Sub and set forth in the Novitex Certificate of Merger). The Novitex Certificate of Merger shall be executed and delivered in the manner provided under the DGCL. The time when the Novitex Merger shall become effective is referred to herein as the "*Novitex Effective Time*."

**1.3    Effects of the Mergers**

(a)    The SourceHOV Merger shall have the effects set forth in the DGCL, this Agreement and the SourceHOV Certificate of Merger. The name of the SourceHOV Surviving Company shall be "SourceHOV Holdings, Inc." at the SourceHOV Effective Time.

(b)    The Novitex Merger shall have the effects set forth in the DGCL, this Agreement and the Novitex Certificate of Merger. The name of the Novitex Surviving Company shall be "Novitex Holdings, Inc." at the Novitex Effective Time.

**1.4    Certificate of Incorporation; Bylaws; Officers and Directors of Surviving Companies**

(a)    At the SourceHOV Effective Time, (a) the certificate of incorporation of SourceHOV shall be the certificate of incorporation of the SourceHOV Surviving Company until altered, amended or repealed as provided therein and by applicable Law, (b) the bylaws of SourceHOV shall become the bylaws of the SourceHOV Surviving Company, unless and until altered, amended or repealed as

A-3

provided in the DGCL, the SourceHOV Surviving Company's certificate of incorporation or such bylaws, or by applicable Law, (c) the officers of SourceHOV immediately prior to the SourceHOV Effective Time shall become the officers of the SourceHOV Surviving Company, unless and until removed or until their terms of office shall have expired in accordance with the DGCL or the SourceHOV Surviving Company's certificate of incorporation or bylaws, as applicable, and (d) the directors of SourceHOV Merger Sub immediately prior to the SourceHOV Effective Time shall become the directors of the SourceHOV Surviving Company, unless and until removed or until their terms of office shall have expired in accordance with applicable Law or the SourceHOV Surviving Company's certificate of incorporation or bylaws, as applicable.

(b)  At the Novitex Effective Time, (a) the certificate of incorporation of Novitex shall be the certificate of incorporation of the Novitex Surviving Company until altered, amended or repealed as provided therein and by applicable Law, (b) the bylaws of Novitex shall become the bylaws of the Novitex Surviving Company, unless and until altered, amended or repealed as provided in the DGCL, the Novitex Surviving Company's certificate of incorporation or such bylaws, or by applicable Law, (c) the officers of Novitex immediately prior to the Novitex Effective Time shall become the officers of the Novitex Surviving Company, unless and until removed or until their terms of office shall have expired in accordance with the DGCL or the Novitex Surviving Company's certificate of incorporation or bylaws, as applicable, and (d) the directors of Novitex Merger Sub immediately prior to the Novitex Effective Time shall become the directors of the Novitex Surviving Company, unless and until removed or until their terms of office shall have expired in accordance with applicable Law or the Novitex Surviving Company's certificate of incorporation or bylaws, as applicable.

**1.5    Taking of Necessary Actions; Further Assurances**

(a)  Prior to the SourceHOV Effective Time, and subject to the terms and conditions set forth in this Agreement, Parent, SourceHOV Merger Sub, SourceHOV and the HGM Group shall take or cause to be taken all such actions as may be necessary or appropriate in order to effectuate, as expeditiously as reasonably practicable, the SourceHOV Merger.

(b)  Prior to the Novitex Effective Time, and subject to the terms and conditions set forth in this Agreement, Parent, Novitex Merger Sub, Novitex and Novitex Parent shall take or cause to be taken all such actions as may be necessary or appropriate in order to effectuate, as expeditiously as reasonably practicable, the Novitex Merger.

## ARTICLE II

### PAYMENT OF PURCHASE PRICE; EFFECT OF MERGERS ON CAPITAL STOCK OF THE COMPANIES AND MERGER SUBS

**2.1    Effect on Capital Stock**

(a)  At the SourceHOV Effective Time, by virtue of the SourceHOV Merger and without any action on the part of SourceHOV, Parent or any Subsidiary, SourceHOV Merger Sub or the holders of any SourceHOV Common Stock (as defined herein) or SourceHOV Merger Sub Common Stock (as defined herein):

(i)  *Conversion of SourceHOV Merger Sub Common Stock.*   The shares of common stock, par value $0.01 per share, in SourceHOV Merger Sub (the "***SourceHOV Merger Sub Common Stock***") issued and outstanding immediately prior to the SourceHOV Effective Time shall be converted into 100% of fully paid and nonassessable shares of common stock, par value $0.01 per share of the SourceHOV Surviving Company with the same rights, powers and privileges as the shares so converted and shall constitute the only outstanding shares of capital stock of the SourceHOV Surviving Company. From and after the SourceHOV Effective Time, any and all certificates representing shares of SourceHOV Merger Sub Common Stock shall be deemed for all purposes

A-4

Supp.App. 0861

to represent the number of shares of common stock of the SourceHOV Surviving Company into which such number of shares were converted into ratably in accordance with the immediately preceding sentence.

    (ii)    *Cancellation of Treasury Stock and Parent-Owned Stock.*    All shares of common stock, par value $0.001 per share, in SourceHOV (the "**SourceHOV Common Stock**") that are owned by SourceHOV as treasury stock and each share of SourceHOV Common Stock that is owned by Parent or SourceHOV Merger Sub immediately prior to the SourceHOV Effective Time shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and no consideration shall be delivered in exchange therefor.

    (iii)    *Conversion of SourceHOV Common Stock.*    Each share of SourceHOV Common Stock issued and outstanding immediately prior to the SourceHOV Effective Time (excluding SourceHOV Dissenting Shares and shares to be canceled in accordance with *Section 2.1(a)(ii)*) shall be converted into the right to receive the SourceHOV Merger Consideration. The SourceHOV Common Stock, when so converted, shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of SourceHOV Common Stock immediately prior to the SourceHOV Effective Time shall cease to have any rights with respect thereto, except the right to receive the SourceHOV Merger Consideration and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor and any dividends or other distributions to which holders become entitled upon the delivery of a Letter of Transmittal (including all certificates representing shares of SourceHOV Common Stock), without interest. Notwithstanding the foregoing, if, between the date of this Agreement and the SourceHOV Effective Time, the outstanding shares of Parent Common Stock or SourceHOV Common Stock shall have been changed into a different number of shares or a different class, by reason of any equity dividend, subdivision, reclassification, recapitalization, split, combination, consolidation or exchange of shares, or any similar event shall have occurred, then any number or amount contained herein which is based upon the number of shares of Parent Common Stock or SourceHOV Common Stock, as the case may be, will be appropriately adjusted to provide to Parent and the holders of SourceHOV Common Stock the same economic effect as contemplated by this Agreement prior to such event; *provided*, *however*, that this sentence shall not be construed to permit Parent or SourceHOV to take any action with respect to its securities that is prohibited by the terms and conditions of this Agreement.

  (b)    At the Novitex Effective Time, by virtue of the Novitex Merger and without any action on the part of Novitex, Parent or any Subsidiary, Novitex Merger Sub or the holders of any Novitex Common Stock (as defined herein) or Novitex Merger Sub Common Stock (as defined herein):

    (i)    *Conversion of Novitex Merger Sub Common Stock.*    The shares of common stock, par value $0.01 per share, in Novitex Merger Sub (the "**Novitex Merger Sub Common Stock**") issued and outstanding immediately prior to the Novitex Effective Time shall be converted into 100% of fully paid and nonassessable shares of common stock, par value $0.01 per share of the Novitex Surviving Company with the same rights, powers and privileges as the shares so converted and shall constitute the only outstanding shares of capital stock of the Novitex Surviving Company. From and after the Novitex Effective Time, any and all certificates representing shares of Novitex Merger Sub Common Stock shall be deemed for all purposes to represent the number of shares of common stock of the Novitex Surviving Company into which such number of shares were converted into ratably in accordance with the immediately preceding sentence.

    (ii)    *Cancellation of Treasury Stock and Parent-Owned Stock.*    All shares of Novitex Common Stock that are owned by Novitex as treasury stock and each share of Novitex Common Stock that is owned by Parent or Novitex Merger Sub immediately prior to the Novitex Effective Time shall

<div align="center">A-5</div>

Supp.App. 0862

Table of Contents

no longer be outstanding and shall automatically be canceled and shall cease to exist, and no consideration shall be delivered in exchange therefor.

(iii)    *Conversion of Novitex Common Stock.*    Each share of Novitex Common Stock issued and outstanding immediately prior to the Novitex Effective Time (excluding shares to be canceled in accordance with *Section 2.1(b)(ii)*) shall be converted into the right to receive the Novitex Merger Consideration. The Novitex Common Stock, when so converted, shall no longer be outstanding and shall automatically be canceled and shall cease to exist, and each holder of Novitex Common Stock immediately prior to the Novitex Effective Time shall cease to have any rights with respect thereto, except the right to receive the Novitex Merger Consideration and any cash in lieu of fractional shares of Parent Common Stock to be issued or paid in consideration therefor (including all certificates representing shares of Novitex Common Stock), without interest. Notwithstanding the foregoing, if, between the date of this Agreement and the Novitex Effective Time, the outstanding shares of Parent Common Stock or Novitex Common Stock shall have been changed into a different number of shares or a different class, by reason of any equity dividend, subdivision, reclassification, recapitalization, split, combination, consolidation or exchange of shares, or any similar event shall have occurred, then any number or amount contained herein which is based upon the number of shares of Parent Common Stock or Novitex Common Stock, as the case may be, will be appropriately adjusted to provide to Parent and the holders of Novitex Common Stock the same economic effect as contemplated by this Agreement prior to such event; *provided*, *however*, that this sentence shall not be construed to permit Parent or Novitex to take any action with respect to its securities that is prohibited by the terms and conditions of this Agreement.

(c)    Notwithstanding anything in this Agreement to the contrary, any SourceHOV Common Stock issued and outstanding immediately prior to the SourceHOV Effective Time that are held by any holder who has not voted in favor of the SourceHOV Merger or consented thereto in writing and who is entitled to demand and properly demands appraisal of such Shares pursuant to Section 262 of the DGCL ("*SourceHOV Dissenting Shares*") shall not be converted into the right to receive consideration set forth in *Section 2.1(a)(iii)* above, unless and until such holder shall have failed to perfect, or shall have effectively withdrawn or lost, such holder's right to appraisal under the DGCL. The holders of SourceHOV Dissenting Shares shall be entitled to receive payment of the fair value of such SourceHOV Dissenting Shares in accordance with the provisions of Section 262 of the DGCL. If any such holder fails to perfect such appraisal right in accordance with the DGCL or withdraws or otherwise loses any such right to appraisal, each such Share of such holder shall thereupon be converted into and become exchangeable only for the right to receive from the SourceHOV Surviving Company, as of the later of the SourceHOV Effective Time and the time that such right to appraisal has been irrevocably lost, withdrawn or expired, the SourceHOV Merger Consideration, without any interest thereon. At the SourceHOV Effective Time, any holder of SourceHOV Dissenting Shares shall cease to have any rights with respect thereto, except the rights provided in Section 262 of the DGCL and as provided in the previous sentence. The Company shall not, except with the prior written consent of Parent, make any payment with respect to any demands for appraisals or compromise, offer to settle or settle, or otherwise make any binding agreement regarding, any such demands.

**2.2    Delivery of Merger Consideration**

(a)    *Letter of Transmittal.*    As promptly as reasonably practicable after the SourceHOV Effective Time, Parent shall cause to be mailed to each holder of record of SourceHOV Common Stock a letter of transmittal in customary form (which shall have customary representations and warranties as to title, authorization, execution and delivery and a customary release consistent with *Section 7.21(b)* and shall specify that delivery shall be effected, and risk of loss and title to the SourceHOV Common Stock shall pass, only upon delivery of the SourceHOV Common Stock to Parent (including all certificates representing shares of SourceHOV Common Stock) and shall be in such form as Parent may specify,

A-6

Supp.App. 0863

subject to SourceHOV's reasonable approval, prior to the SourceHOV Effective Time) (the "**Letter of Transmittal**") together with instructions thereto. Each holder of record of SourceHOV Common Stock receiving SourceHOV Merger Consideration who is not a party to the Registration Rights Agreement shall have the right to elect in its Letter of Transmittal to be treated as a "Holder" and "Third Party Holder" under the Registration Rights Agreement and, if such election is made, shall be deemed to have consented to Section 14(b) of the Registration Rights Agreement.

(b)   *Merger Consideration Received in Connection with Exchange.*   Upon the receipt of a Letter of Transmittal (including all certificates representing shares of SourceHOV Common Stock), duly, completely and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by Parent, the holder of such shares of SourceHOV Common Stock shall be entitled to receive in exchange therefor (A) the SourceHOV Merger Consideration into which such SourceHOV Common Stock have been converted pursuant to *Section 2.1(a)(iii)* and (B) any cash in lieu of fractional shares which the holder has the right to receive pursuant to *Section 2.2(e)* and in respect of any dividends or other distributions which the holder has the right to receive pursuant to *Section 2.2(c)*. Until surrendered as contemplated by this *Section 2.2(b)* , each share of SourceHOV Common Stock (excluding SourceHOV Dissenting Shares and shares to be canceled in accordance with *Section 2.1(a)(ii)*) shall be deemed at any time from and after the SourceHOV Effective Time to represent only the right to receive upon such surrender the SourceHOV Merger Consideration which the holders of shares of SourceHOV Common Stock were entitled to receive in respect of such shares pursuant to this *Section 2.2(b)* (and cash in lieu of fractional shares pursuant to *Section 2.2(e)* and in respect of any dividends or other distributions pursuant to *Section 2.2(c)*).

(c)   *Treatment of Unissued Shares.*   No dividends or other distributions declared or made with respect to Parent Common Stock with a record date after the SourceHOV Effective Time shall be paid with respect to the shares of Parent Common Stock issuable to a former holder of SourceHOV Common Stock, and no cash payment in lieu of fractional shares shall be paid to any such holder pursuant to *Section 2.2(e)* , until the delivery of a Letter of Transmittal in accordance with this *Article II*. Subject to escheat, Tax or other applicable Law, following such delivery of a Letter of Transmittal (including all certificates representing shares of SourceHOV Common Stock), there shall be paid to the holder of the certificate representing whole shares of Parent Common Stock issued in exchange therefor, without interest, (i) at the time of such surrender, the amount of any cash payable in lieu of a fractional share of Parent Common Stock to which such holder is entitled pursuant to *Section 2.2(e)* and the amount of dividends or other distributions with a record date after the SourceHOV Effective Time theretofore paid with respect to such whole shares of Parent Common Stock and (ii) at the appropriate payment date, the amount of dividends or other distributions with a record date after the SourceHOV Effective Time but prior to such surrender and a payment date subsequent to such surrender payable with respect to such whole shares of Parent Common Stock.

(d)   *No Further Ownership Rights.*

(i)   The shares of Parent Common Stock issued and cash paid in accordance with the terms of this *Article II* upon conversion of any shares of SourceHOV Common Stock (including any cash paid pursuant to *Section 2.2(e)(i)*) shall be deemed to have been issued and paid in full satisfaction of all rights pertaining to such shares of SourceHOV Common Stock. From and after the SourceHOV Effective Time, there shall be no further registration of transfers on the stock transfer books of the SourceHOV Surviving Company of SourceHOV Common Stock that were outstanding immediately prior to the SourceHOV Effective Time. If, after the SourceHOV Effective Time, any certificate formerly representing shares of SourceHOV Common Stock (excluding the SourceHOV Dissenting Shares) are presented for any reason, they shall be canceled and exchanged as provided in this *Article II*.

A-7

(ii) The shares of Parent Common Stock issued and cash paid in accordance with the terms of this *Article II* upon conversion of any shares of Novitex Common Stock (including any cash paid pursuant to *Section 2.2(e)(ii)*) shall be deemed to have been issued and paid in full satisfaction of all rights pertaining to such shares of Novitex Common Stock. From and after the Novitex Effective Time, there shall be no further registration of transfers on the stock transfer books of the Novitex Surviving Company of Novitex Common Stock that were outstanding immediately prior to the Novitex Effective Time. If, after the Novitex Effective Time, any certificate formerly representing shares of Novitex Common Stock are presented for any reason, they shall be canceled and exchanged as provided in this *Article II*.

(e) *No Fractional Shares.*

(i) No certificates or scrip representing fractional shares of Parent Common Stock shall be issued upon the conversion of SourceHOV Common Stock pursuant to *Section 2.1(a)(iii)*. Notwithstanding any other provision of this Agreement, each holder of SourceHOV Common Stock converted pursuant to the SourceHOV Merger who would otherwise have been entitled to receive a fraction of a share of Parent Common Stock (after taking into account all SourceHOV Common Stock exchanged by such holder) shall receive, in lieu thereof, cash (without interest) in an amount equal to such fractional amount multiplied by the last reported sale price of Parent Common Stock on the NASDAQ Stock Market (the "*NASDAQ*") (as reported in The Wall Street Journal or, if not reported therein, in another authoritative source mutually selected by Parent and SourceHOV) on the last complete trading day prior to the date of the SourceHOV Effective Time.

(ii) No certificates or scrip representing fractional shares of Parent Common Stock shall be issued upon the conversion of Novitex Common Stock pursuant to *Section 2.1(b)(iii)*. Notwithstanding any other provision of this Agreement, each holder of Novitex Common Stock converted pursuant to the Novitex Merger who would otherwise have been entitled to receive a fraction of a share of Parent Common Stock (after taking into account all Novitex Common Stock exchanged by such holder) shall receive, in lieu thereof, cash (without interest) in an amount equal to such fractional amount multiplied by the last reported sale price of Parent Common Stock on the NASDAQ (as reported in The Wall Street Journal or, if not reported therein, in another authoritative source mutually selected by Parent and Novitex) on the last complete trading day prior to the date of the Novitex Effective Time.

(f) *Withholding Rights.* Each of Parent, SourceHOV Merger Sub, Novitex Merger Sub, Novitex and SourceHOV shall be entitled to deduct and withhold from amounts otherwise payable pursuant to this Agreement any amounts required to be deducted and withheld with respect to the making of such payment under applicable Tax Law or under any other applicable Law. Amounts so withheld and paid over to the appropriate Governmental Authority shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction or withholding was made.

**2.3 Treatment of Company Equity Awards**

(a) *SourceHOV RSU Awards.* Each SourceHOV RSU Award, whether vested or unvested, that is outstanding immediately prior to the SourceHOV Effective Time shall, as of the SourceHOV Effective Time, automatically and without any action on the part of the holder thereof, be assumed by Parent and converted into a Parent RSU Award covering the number of shares of Parent Common Stock equal to the SourceHOV Merger Consideration for each share of SourceHOV Common Stock that would have been received if such SourceHOV RSU Award had been settled in shares of SourceHOV Common Stock immediately prior to the SourceHOV Effective Time. Each such share of Parent Common Stock shall be subject to, the same terms and conditions (including the applicable time-vesting and/or performance-vesting conditions) as applied to the corresponding SourceHOV RSU Award immediately prior to the SourceHOV Effective Time.

A-8

Supp.App. 0865

(b) *SourceHOV Actions*. Prior to the SourceHOV Effective Time, the board of directors of SourceHOV (or, if appropriate, any committee thereof administering the SourceHOV Stock Plan) shall take all actions necessary to effect the foregoing provisions of this *Section 2.3*.

(c) *Parent Actions*. Parent shall file with the SEC, as soon as reasonably practicable but in no event earlier than sixty (60) Business Days following the Closing, a registration statement on Form S-8, relating to the shares of Parent Common Stock issuable with respect to the SourceHOV RSU Awards assumed by Parent in accordance with this *Section 2.3* and shall take all actions necessary to ensure that such registration statement remains effective at all times thereafter in which any SourceHOV RSU Award, as converted pursuant to this *Section 2.3*, remains outstanding.

## ARTICLE III

## CLOSING

### 3.1 The Closing

The closing (the "***Closing***") of the transactions contemplated by this Agreement, as applicable, shall take place at the offices of Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, New York 10036 on a date that is no later than three (3) Business Days after all of the conditions precedent set forth in *Article VIII* have been satisfied or waived (other than those conditions which by their terms are intended to be satisfied at the Closing, but subject to the satisfaction or, to the extent permissible under applicable Law and the terms of this Agreement, waiver of those conditions), or such other date as may be mutually agreed upon by the parties (the "***Closing Date***"). On the Closing Date, (a) SourceHOV shall execute the SourceHOV Certificate of Merger, and file the SourceHOV Certificate of Merger with the Secretary of State of the State of Delaware pursuant to *Section 1.2* hereof in accordance with the DGCL and (b) Novitex shall execute the Novitex Certificate of Merger, and file the Novitex Certificate of Merger with the Secretary of State of the State of Delaware pursuant to *Section 1.2* hereof in accordance with the DGCL.

### 3.2 Closing Deliverables

(a) At the Closing, each of the HGM Group and/or SourceHOV, as applicable, shall deliver or cause to be delivered to Parent, the Merger Subs, Novitex and Novitex Parent, as applicable:

(i) a counterpart to each Related Document to which it is to be a party, duly executed by a duly authorized representative of such Person;

(ii) a certificate, executed by an executive officer of SourceHOV and dated as of the Closing Date, stating that the conditions specified in *Section 8.5(a)- (c)* have been satisfied; and

(iii) a certificate or certificates in compliance with Treasury Regulation Section 1.1445-2, establishing that the transactions contemplated by this Agreement are exempt from withholding under Section 1445 of the Code.

(b) At the Closing, each of Novitex Parent and/or Novitex, as applicable, shall deliver or cause to be delivered to Parent, the Merger Subs, SourceHOV and the HGM Group, as applicable:

(i) a counterpart to each Related Document to which it is to be a party, duly executed by a duly authorized representative of such Person;

(ii) a certificate, executed by an executive officer of Novitex and dated as of the Closing Date, stating that the conditions specified in *Section 8.4(a)-(c)* have been satisfied; and

(iii) a certificate or certificates in compliance with Treasury Regulation Section 1.1445-2, establishing that the transactions contemplated by this Agreement are exempt from withholding under Section 1445 of the Code.

A-9

(c)    At the Closing, Parent, Intermediate Co, SourceHOV Merger Sub and/or Novitex Merger Sub, as applicable, shall deliver or cause to be delivered:

(i)    to Novitex Parent, the aggregate Novitex Merger Consideration into which its Novitex Common Stock has been converted pursuant to *Section 2.1(b)(iii)* and any cash in lieu of fractional shares which the holder has the right to receive pursuant to *Section 2.2(e)* if it has delivered its share certificates duly endorsed for transfer or a stock power in lieu thereof;

(ii)    to each holder of SourceHOV Common Stock that has delivered a Letter of Transmittal (including all certificates representing shares of SourceHOV Common Stock), duly, completely and validly executed in accordance with the instructions thereto, and such other documents as may reasonably be required by Parent, at least two (2) Business Days prior to the SourceHOV Effective Time, the aggregate SourceHOV Merger Consideration into which its SourceHOV Common Stock has been converted pursuant to *Section 2.1(a)(iii)* and any cash in lieu of fractional shares which the holder has the right to receive pursuant to *Section 2.2(e)*;

(iii)    to each party designated in writing (with wire information) at least two (2) Business Days prior to the Closing, by the HGM Group, the Consulting Agreement Termination Fee;

(iv)    to each Seller, a certified copy of the Amended and Restated Certificate of Incorporation of Parent in substantially the form set forth in *Exhibit C*, as filed with the Secretary of State of the State of Delaware on the Closing Date (the "***Parent Amended and Restated Certificate of Incorporation***");

(v)    to each Seller, a certified copy of the Amended and Restated Bylaws of Parent in substantially the form set forth in *Exhibit D*, as adopted by the board of directors of Parent on the Closing Date (the "***Parent Amended and Restated Bylaws***");

(vi)    to each Seller, a counterpart to each Related Document to which it is to be a party, duly executed and delivered by a duly authorized representative of such Person;

(vii)    to each Seller, a counterpart to the Registration Rights Agreement, duly executed and delivered by Quinpario Partners 2, LLC, Edgar G. Hotard, W. Thomas Jagodinski, Ilan Kaufthal, Roberto Mendoza, Dr. John Rutledge and Shlomo Yanai; and

(viii)    to each Seller, a certificate, executed by an executive officer of Parent, Novitex Merger Sub and SourceHOV Merger Sub and dated as of the Closing Date, stating that the conditions specified in *Section 8.3(a)* and *Section 8.3(b)* have been satisfied.

(d)    Except for the Indebtedness set forth in Section 3.2(d) of the Parent Disclosure Schedules, at the Closing, Parent shall repay, or cause to be repaid, on behalf of the Novitex Company Group and the SourceHOV Company Group, all obligations in respect of all Funded Indebtedness of the Novitex Company Group and the SourceHOV Company Group, by wire transfer of immediately available funds as directed by the holders of such Indebtedness, and Novitex and SourceHOV shall deliver to Parent all appropriate payoff letters (in a form reasonably acceptable to Parent) and make arrangements to deliver UCC-3 termination statements or similar documents evidencing the termination of all Encumbrances of the assets of the Novitex Company Group and the SourceHOV Company Group held by the lenders of such Indebtedness.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF SELLERS

Except as set forth in each of the Seller Disclosure Schedules, (x) Novitex Parent hereby represents and warrants to the HGM Group, SourceHOV, Parent, Novitex Merger Sub and SourceHOV Merger Sub as of the date hereof and, on the occurrence of the Closing, as of the Closing Date as follows

A-10

Supp.App. 0867

solely in respect of Novitex Parent and (y) the HGM Group hereby represents and warrants jointly, and not severally, to Novitex Parent, Novitex, Parent, Novitex Merger Sub and SourceHOV Merger Sub as follows solely in respect of the HGM Group, as applicable, as of the date hereof and, on the occurrence of the Closing, as of the Closing Date:

**4.1    Standing; Qualification and Power**

(a)    Seller is duly organized, validly existing and in good standing (or has the equivalent status) under the laws of the jurisdiction of its organization, with all power and authority necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on its business as currently conducted, in each case, in all material respects.

(b)    Seller is qualified or licensed to do business in each jurisdiction in which ownership of its property or assets or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not prevent or materially impair or delay Seller's performance of its obligations hereunder.

**4.2    Ownership**

Seller has good, valid and marketable title to the Company's equity interests owned (beneficially and of record) by it as set forth in the recitals to this Agreement free and clear of all Encumbrances. Assuming Parent has the requisite power and authority to be the lawful owner of the Purchased Equity, at the Closing, good, valid and marketable title to the Purchased Equity will pass to Parent, free and clear of all Encumbrances, other than those acts arising from Parent, Novitex Merger Sub, SourceHOV Merger Sub or their respective Affiliates. Other than this Agreement and except as set forth in Section 4.2 of the applicable Seller Disclosure Schedules, the equity interests of the Company are not subject to any voting trust agreement or other Contract.

**4.3    Authority; Execution and Delivery; Enforceability**

Seller has all requisite corporate power and authority to execute and deliver this Agreement and each of the Related Documents to which it will be a party and to consummate the transactions contemplated hereby and thereby. The execution and delivery by Seller of this Agreement has been and, in the case of the Related Documents to which it will be a party, will be when delivered, and the consummation of the transactions contemplated hereby has been and the consummation of the transactions contemplated by the Related Documents to which it will be a party will be when delivered, duly authorized by all requisite action of Seller. This Agreement has been, and upon its execution and delivery, each of the Related Documents to which Seller will be a party will be, duly and validly executed and delivered by Seller and, assuming this Agreement and the Related Documents have been duly authorized, executed and delivered by the other parties hereto or thereto, as applicable, this Agreement constitutes, and upon its execution and delivery each of the Related Documents to which Seller will be a party will constitute, a valid and binding obligation of such Seller, enforceable against it in accordance with its terms, in each case subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar Laws affecting creditors' rights and remedies generally and subject to general principles of equity (regardless of whether enforceability is considered in a proceeding at law or equity) (collectively, the "***Enforceability Exceptions***").

**4.4    Brokers' and Finders' Fees**

Except as set forth in Section 4.4 of the Seller Disclosure Schedules, Seller has not employed, nor is it subject to any valid claim of liability or obligation to, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission in connection therewith.

A-11

Supp.App. 0868

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 871 of 1110    PageID 2492

**4.5    No Conflict; Consents**

(a)    The execution, delivery and performance of this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, will not (i) violate any provision of the certificate of incorporation or bylaws (or other comparable governing documents) of Seller, (ii) result in a violation or breach of, or constitute (with or without the giving of notice or, the lapse of time or both) a default (or give rise to any right of termination or cancellation of obligations) under, any material Contract to which Seller is a party or by which any of their respective properties or assets are bound or (iii) assuming that all Approvals have been obtained and all filings, registrations and notifications have been made, each as contemplated by *Section 4.5(b)*, *Section 5.4(b)* and/or *Section 6.4(b)*, violate any Law applicable to Seller or by which any of their respective properties or assets are bound, other than, in the case of clauses (ii) and (iii) above, any such violations, breaches, defaults or rights of termination or cancellation of obligations which would not, individually or in the aggregate, materially impair or delay Seller's ability to consummate the transactions contemplated hereby.

(b)    The execution, delivery and performance of this Agreement by Seller, and the consummation by Seller of the transactions contemplated hereby, will not require any waiver, authorization or other Permit of, or filing or registration with or notification to, any Governmental Authority, other than (i) compliance with all applicable Antitrust Laws, (ii) as may be required as a result of any facts or circumstances related to the Company Group, and (iii) such Approvals, filings, registrations or notifications which, if not made or obtained, would not, individually or in the aggregate, materially impair or delay Seller's ability to consummate the transactions contemplated hereby.

**4.6    Litigation**

As of the date of this Agreement, (i) there are no Actions pending or, to the knowledge of Seller, threatened against Seller which, and (ii) Seller is not subject to any outstanding orders, writs, judgments, injunctions, decrees or awards that, if not complied with, in either case, would prevent or materially delay the Closing.

<center>

**ARTICLE V**

**REPRESENTATIONS AND WARRANTIES OF THE COMPANIES**

</center>

Except as set forth in each of the Company Disclosure Schedules, (x) Novitex hereby represents and warrants to the HGM Group, SourceHOV, Parent, Novitex Merger Sub and SourceHOV Merger Sub, as of the date hereof and, on the occurrence of the Closing, as of the Closing Date as follows solely in respect of Novitex and the Novitex Company Group and (y) SourceHOV hereby represents and warrants to Novitex Parent, Novitex, Parent, Novitex Merger Sub and SourceHOV Merger Sub as of the date hereof and, on the occurrence of the Closing, as of the Closing Date as follows solely in respect of SourceHOV and the SourceHOV Company Group.

**5.1    Standing; Qualification and Power**

(a)    The Company is duly organized, validly existing and in good standing (or has the equivalent status) under the laws of the jurisdiction of its organization, with all power and authority necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on the Businesses, as applicable, in each case, in all material respects. Each member of the Company Group is duly organized and validly existing under the laws of the jurisdiction of its organization, with all power and authority necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on the Businesses, as applicable, in all material respects.

(b)    Each member of the Company Group is in good standing (or has the equivalent status) under the laws of the jurisdiction of its organization, in all material respects. Each member of the Company Group is qualified or licensed to do business in each jurisdiction in which ownership of its property or

<center>A-12</center>

Supp.App. 0869

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 872 of 1110    PageID 2493

assets or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not, individually or in the aggregate, have a Material Adverse Effect. True and complete copies of the certificate of formation, operating agreement, certificate of incorporation and bylaws (or other comparable governing documents), as applicable, of each member of the Company Group, as in effect as of the date of this Agreement, have been heretofore made available to the other parties to this Agreement.

**5.2    Capitalization of the Company and the Company Subsidiaries**

(a)    Section 5.2(a) of the Company Disclosure Schedules sets forth, as of the date of this Agreement, the number of authorized equity interests of each class of equity interests of the Company, the number of issued and outstanding equity interests of each class of equity interests of the Company, the record owners thereof and number of equity interests of each class owned by each such record owner, and in the case of incentive equity awards outstanding as of the date hereof, on an individual by individual and grant by grant basis, the date of grant, number of awards granted and exercise price (if applicable), and treatment in connection with the transactions contemplated by this Agreement.

(b)    All issued and outstanding equity interests of each member of the Company Group have been duly authorized and validly issued, are fully paid and nonassessable, were not issued in violation of any preemptive rights and at Closing will be free and clear of all Encumbrances except, in the case of any member of the Company Group other than the Company, for Permitted Encumbrances.

(c)    Except as set forth in Section 5.2(c) of the Company Disclosure Schedules, as of the date of this Agreement, there are no outstanding (i) securities convertible into or exchangeable for the capital stock of the Company, (ii) options, stock appreciation rights, phantom stock, warrants, calls or other rights to purchase or subscribe for capital stock of the Company or (iii) Contracts of any kind to which the Company is subject or bound requiring the issuance after the date of this Agreement of (A) any capital stock of the Company, (B) any convertible or exchangeable security of the type referred to in clause (i) or (C) any options, stock appreciation rights, phantom stock, warrants, calls or rights of the type referred to in clause (ii). Since September 30, 2016, Novitex Acquisition, LLC has not made, set aside, declared or paid any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock or other equity interest.

(d)    Except as set forth in Section 5.2(d) of the Company Disclosure Schedules, there are no voting trusts, proxies, stockholder, partnership or other Contracts with a stockholder of any member of the Company Group, investors' rights Contracts, right of first refusal or co-sale Contract, or registration rights Contracts or other agreements or understandings to which any member of the Company Group is bound with respect to voting of any shares of capital stock or any other equity interest of any member of the Company Group.

(e)    Section 5.2(e) of the Company Disclosure Schedules sets forth, as of the date of this Agreement, a true and complete list of the Company Subsidiaries and, with respect to those Company Subsidiaries that are not wholly owned, the authorized and the issued and outstanding capital stock or other equity interests, as the case may be, of the Company Subsidiaries. Except as set forth in Section 5.2(e) of the Company Disclosure Schedules, there are no outstanding (i) securities convertible into or exchangeable for the capital stock or other ownership interests of any of the Company Subsidiaries, (ii) options, stock appreciation rights, phantom stock, warrants, calls or other rights to purchase or subscribe for capital stock or other ownership interests of any of the Company Subsidiaries or (iii) Contracts of any kind by which any member of the Company Group is subject or bound requiring the issuance after the date of this Agreement of (A) any capital stock or any other ownership interests of any of the Company Subsidiaries, (B) any convertible or exchangeable security of the type referred to in clause (i) or (C) any options, stock appreciation rights, phantom stock, warrants, calls or rights of the type referred to in clause (ii).

A-13

Supp.App. 0870

Table of Contents

(f)    Except for the Company's direct and indirect interests in its respective Company Subsidiaries, no member of the Company Group owns, directly or indirectly, any interest or investment in the form of equity in, and no member of the Company Group is subject to any obligation or requirement to provide for or make any investment in, any Person.

(g)    Except as set forth in Section 5.2(g) of the Company Disclosure Schedules, no member of the Company Group is the subject of any bankruptcy, dissolution, liquidation, reorganization or similar proceeding.

(h)    Section 5.2(h) of the Company Disclosure Schedules sets forth a true and complete summary of the identity of any obligor and/or guarantor and the principal amount and maturity of each such instrument, as of the close of business on February 17, 2017, of all Indebtedness of any member of the Company Group.

### 5.3   Authority; Execution and Delivery; Enforceability

The Company has all requisite corporate power and authority to execute and deliver this Agreement and each of the Related Documents to which it will be a party and to consummate the transactions contemplated hereby and thereby. Subject to (a) the receipt of the HGM Consent, in the case of the HGM Group and SourceHOV, and (b) the receipt of the Novitex Consent, in the case of Novitex Parent and Novitex, the execution and delivery by the Company of this Agreement has been and, in the case of the Related Documents to which it will be a party, will be when delivered, and the consummation of the transactions contemplated hereby has been and the consummation of the transactions contemplated by the Related Documents to which it will be a party will be when delivered, duly authorized by all requisite action of the Company and its equity holders. This Agreement has been, and upon its execution and delivery, each of the Related Documents to which the Company will be a party will be, duly and validly executed and delivered by the Company and, assuming this Agreement and the Related Documents have been duly authorized, executed and delivered by the other parties hereto or thereto, as applicable, this Agreement constitutes, and upon its execution and delivery each of the Related Documents to which the Company will be a party will constitute, a valid and binding obligation of the Company, enforceable against it in accordance with its terms, in each case subject to the Enforceability Exceptions.

### 5.4   No Conflict; Consents

(a)    Except as set forth in Section 5.4(a) of the Company Disclosure Schedules, the execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated hereby, will not (i) violate any material provision of the certificate of formation, operating agreement, certificate of incorporation or bylaws (or other comparable governing documents), as applicable, of any member of the Company Group, (ii) result in a material violation or breach of, or constitute (with or without the giving of notice, the lapse of time or both) a material default (or give rise to any right of termination or cancellation of obligations) under, any Material Contract to which any member of the Company Group is a party or by which any of its properties or assets are bound or (iii) assuming that all Approvals have been obtained and all filings, registrations and notifications have been made, each as contemplated by *Section 4.5(b)*, *Section 5.4(b)* and/or *Section 6.4(b)*, materially violate any Law applicable to any member of the Company Group or by which any of its properties or assets are bound.

(b)    Except as set forth in Section 5.4(b) of the Company Disclosure Schedules, the execution, delivery and performance of this Agreement by the Company, and the consummation by the Company of the transactions contemplated hereby, will not require any material waiver, material authorization or other material Permit of, or filing or registration with or notification to, any Governmental Authority, other than (i) compliance with all applicable Antitrust Laws, (ii) the filing of the SourceHOV Certificate of Merger, in the case of SourceHOV and the HGM Group, and the Novitex Certificate of

A-14

Merger, in the case of Novitex Parent and Novitex, with, and the acceptance for record thereof by, the Secretary of State of the State of Delaware, and (iii) as may be required as a result of any facts or circumstances related to Parent, Novitex Merger Sub or SourceHOV Merger Sub.

**5.5 Financial Statements**

(a) Section 5.5(a) of the Company Disclosure Schedules contains true and complete copies of (i) the audited consolidated balance sheet of (A) Novitex Acquisition, LLC and its respective Company Subsidiaries in the case of Novitex Parent and Novitex and (B) SourceHOV LLC and its respective Company Subsidiaries in the case of SourceHOV and the HGM Group, each as of December 31, 2014 and 2015, and the related audited consolidated statements of income, stockholders' equity and cash flows for the years ended December 31, 2014 and 2015 (the "Annual Financial Statements") and (ii) the unaudited consolidated balance sheet of (A) Novitex Acquisition, LLC and its respective Company Subsidiaries in the case of Novitex Parent and Novitex and (B) SourceHOV LLC and its respective Company Subsidiaries in the case of SourceHOV and the HGM Group, each as of September 30, 2016, and the related unaudited consolidated statements of income, stockholders' equity and cash flows for the three and nine months ended September 30, 2015 and 2016 (together with the Annual Financial Statements, the "Financial Statements"). Except as otherwise indicated in the Financial Statements (including the notes thereto) or as set forth in Section 5.5(a) of the Company Disclosure Schedules, the Financial Statements have been based upon the books and records of the Company and the Company Group, have been prepared in accordance with GAAP consistently applied during the periods involved and fairly present, in all material respects, the consolidated financial condition and the results of operations and cash flows of the Company and its respective Company Subsidiaries, taken as a whole, as of the dates and for the periods indicated therein. Novitex is a holding company with no material business, operations or liabilities. SourceHOV is a holding company with no material business, operations or liabilities. Novitex Acquisition, LLC is a wholly owned subsidiary of Novitex Intermediate, LLC, which in turn is a wholly owned subsidiary of Novitex Holdings, Inc. SourceHOV LLC is a wholly owned subsidiary of SourceHOV. During the periods presented, (i) Novitex Intermediate, LLC had no material operations other than holding its one asset, equity in Novitex Acquisition, LLC, and Novitex Holdings, Inc. had no material operations other than holding its one asset, equity in Novitex Intermediate, LLC, as well as cash and a receivable from Novitex Parent in the amount of $510,000 and (ii) SourceHOV had no material operations other than holding its one asset, equity in SourceHOV, LLC.

(b) The books of account and other financial records of the Company Group have been kept accurately in all material respects in the ordinary course operation of the Business, the transactions entered therein represent bona fide transactions, and the revenues, expenses, assets and liabilities of the Company Group have been properly recorded therein in all material respects. The Company has established and maintains a system of internal accounting controls which is intended to provide, in all material respects, reasonable assurance: (i) that transactions, receipts and expenditures of the Company Group are being executed and made only in accordance with appropriate authorizations of management of the Company, (ii) that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP and to maintain accountability for assets, (iii) regarding prevention or timely detection of unauthorized acquisition, use or disposition of the assets of the Company Group, and (iv) that accounts, notes and other receivables and inventory are recorded accurately.

(c) Section 5.5(c) of the Company Disclosure Schedules describes all of the Indebtedness of the Company Group, including the aggregate principal and interest owed in respect thereof, and the aggregate cash and cash equivalents of the Company Group that can be used without restriction and without the payment of any Taxes, fees or expenses, in each case, as of the close of business on February 17, 2017.

A-15

Supp.App. 0872

Table of Contents

**5.6    Absence of Certain Changes**

Except as set forth in Section 5.6 of the Company Disclosure Schedules, as contemplated by this Agreement or any of the Related Documents, since September 30, 2016, (a) the Business of each member of the Company Group has been conducted in accordance with the ordinary course of business consistent with past practices in all material respects, (b) each member of the Company Group has not taken or omitted to take any action that, if taken following the date hereof and prior to the Closing Date, would require the consent of Parent pursuant to *Sections 7.1(b)(i)*, *7.1(b)(ii)*, *7.1(b)(iii)*, *7.1(b)(v)* , *7.1(b)(ix)*, *7.1(b)(xi)*, *7.1(b)(xii)*, *7.1(b)(xiv)* , and *7.1(b)(xx)* (in each case, subject to the exceptions contained therein) and (c) there have not been any changes, developments or events that, individually or in the aggregate, has or have had a Material Adverse Effect. Since September 30, 2016, Novitex Acquisition, LLC has not made, set aside, declared or paid any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock or other equity interest.

**5.7    Compliance with Law; Permits**

(a)    Each member of the Company Group is, and since the Lookback Date, has been, in compliance in all material respects with all Laws applicable to each member of the Company Group, the Owned Real Property, the Company Leases and the Real Property Leases except as set forth in Section 5.7(a) of the Company Disclosure Schedules. Since the Lookback Date and to the date of this Agreement, no member of the Company Group has received written notice from any Governmental Authority alleging any material violation or violations under any applicable Law except as set forth in Section 5.7(a) of the Company Disclosure Schedules.

(b)    Except as set forth in Section 5.7(b) of the Company Disclosure Schedules, the Company Group has all material Permits required under applicable Laws for the operation of such Business and the use of the Owned Real Property, and is in material compliance with the terms of such Permits.

(c)    Each member of the Company Group has been, since the Lookback Date, in compliance with applicable Laws related to (u) anti-corruption or anti-bribery, including the U.S. Foreign Corrupt Practices Act of 1977, 15 U.S.C. §§ 78dd-1, et seq., as amended, the UK Bribery Act 2010, as amended, and any other equivalent or comparable Laws of other countries; (v) economic sanctions administered, enacted or enforced by any Sanctions Authority (collectively, "***Sanctions Laws***"); (w) export controls, including the U.S. Export Administration Regulations, 15 C.F.R. §§ 730, et seq., as amended, and any other equivalent or comparable Laws of other countries (collectively, "***Export Control Laws***"); (x) anti-money laundering, including the Money Laundering Control Act of 1986, 18 U.S.C. §§ 1956, 1957, as amended, and any other equivalent or comparable Laws of other countries; (y) anti-boycott, as administered by the U.S. Department of Commerce; and (z) importation of goods, including Laws administered by the U.S. Customs and Border Protection, Title 19 of the U.S.C. and C.F.R., and any other equivalent or comparable Laws of other countries (collectively, "***International Trade Control Laws***").

(d)    None of the members of the Company Group, nor any director or officer, nor, to the Knowledge of the Company, any employee, or agent of the Company Group, is or is acting under the direction of, on behalf of or for the benefit of a Person that (i) is the subject of Sanctions or identified on any sanctions or similar lists administered by a Sanctions Authority, including but not limited to the U.S. Department of the Treasury's Specially Designated Nationals List, the U.S. Department of Commerce's Denied Persons List and Entity List, the U.S. Department of State's Debarred List, HM Treasury's Consolidated List of Financial Sanctions Targets and the Investment Bank List, or any similar list enforced by any other relevant Sanctions Authority, as amended from time to time, or any Person owned or controlled by any of the foregoing (collectively, "***Prohibited Party***"); (ii) is the target of any Sanctions Laws; (iii) is located, organized or resident in a country or territory that is, or whose government is, the target of comprehensive trade sanctions under Sanctions Laws, including, as of the date of this Agreement, Crimea, Cuba, Iran, North Korea, Sudan and Syria; (iv) is an officer or

A-16

Supp.App. 0873

employee of any Governmental Authority or public international organization, or officer of a political party or candidate for political office; (v) since the Lookback Date, has participated in any transaction involving a Prohibited Party, or a Person who is the target of any Sanctions Laws, or any country or territory that was during such period or is, or whose government was during such period or is, the target of comprehensive trade sanctions under Sanctions Laws; (vi) to the Knowledge of the Company, has exported (including deemed exportation) or re-exported, directly or indirectly, any commodity, software, technology, or services in violation of any applicable Export Control Laws; or (vii) to the Knowledge of the Company, has participated in any transaction in violation of or connected with any purpose prohibited by any applicable International Trade Control Laws, including support for international terrorism and nuclear, chemical, or biological weapons proliferation.

## 5.8 Litigation

Except as set forth in Section 5.8 of the Company Disclosure Schedules, as of the date of this Agreement, there is no Action pending or, to the Knowledge of the Company, threatened in writing against any member of the Company Group that (i) involves a claim in excess of $250,000, (ii) involves a claim for an unspecified amount which would, if adversely determined, be reasonably likely to materially impact the Company's Business, (iii) seeks injunctive relief, which would, if granted, be reasonably likely to materially impact the Company's Business or (iv) is reasonably likely to impair the ability of the Company to perform its obligations under this Agreement. Except as set forth in Section 5.8 of the Company Disclosure Schedules, there are no material outstanding writs, judgments, injunctions, decrees, settlement agreements or similar orders by which any of the members the Company Group or any of its assets or properties are bound.

## 5.9 No Undisclosed Liabilities

Except as set forth in each of the Financial Statements (or the notes thereto) or as set forth in Section 5.9 of the Company Disclosure Schedules, no member of the Company Group has any material Indebtedness, obligations or liabilities of any kind (whether accrued, absolute, contingent or otherwise, and whether due or to become due) which is of a nature required by GAAP to be reflected in a balance sheet, which is not accrued or reserved against in the September 30, 2016 balance sheet (or the notes thereto) included in each of the Financial Statements, other than (i) liabilities or obligations otherwise specifically disclosed in this Agreement or in such of the Company Disclosure Schedules hereto, (ii) liabilities and obligations arising under this Agreement and any Related Document or the performance by the Company of its obligations in accordance with the terms of this Agreement and any Related Document, (iii) liabilities or obligations incurred since September 30, 2016 in the ordinary course of such Business, (iv) liabilities arising from any action specifically permitted under the exceptions to the covenants set forth in *Section 7.1(b)* and (v) liabilities or obligations that have been discharged or paid in full in the ordinary course of Business.

## 5.10 Taxes

Except as set forth in Section 5.10 of the Company Disclosure Schedules, (i) all material Tax Returns required to be filed by or on behalf of any member of the Company Group have been duly and timely filed with the appropriate Tax Authority (after giving effect to any valid extensions of time in which to make such filings); (ii) such Tax Returns were true and complete in all material respects when filed; (iii) all amounts shown on such Tax Returns as due, and all other material Taxes that have become due and payable by any member of the Company Group, have been fully and timely paid; (iv) no member of the Company Group has waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency; (v) each of the members of the Company Group has complied with all applicable Laws relating to the collection or withholding of material Taxes; (vi) no member of the Company Group has been a member of a combined, consolidated, affiliated or unitary group for Tax filing purposes (other than a group the common parent of which was SourceHOV or Novitex, as applicable); (vii) no member of the Company

A-17

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 877 of 1110    PageID 2498

Group is a party to any Tax allocation or sharing agreement (other than any agreement (A) that does not primarily relate to Taxes and (B) for which the Tax liability is not material); (viii) to the Knowledge of the Company, no claim has been made in writing by any Tax Authority in a jurisdiction in which the members of the Company Group do not file Tax Returns that any such person is or may be subject to taxation by that jurisdiction; (ix) no audit or other proceeding by any Tax Authority with respect to material Taxes owed by any member of the Company Group is pending and no Tax Authority has given written notice of any intention to commence an audit or other proceeding or assert any deficiency or claim for additional Taxes against any member of the Company Group; (x) no member of the Company Group has engaged in any "listed transaction" as defined in Treasury Regulations Section 1.6011-4(b)(2); and (xi) the Company is not and has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code at any time during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

**5.11    Intellectual Property; Privacy; Cybersecurity**

(a)    Section 5.11(a) of the Company Disclosure Schedules sets forth a true and complete list, as of the date of this Agreement, of (i) all material Intellectual Property that is owned by or exclusively licensed to any member of the Company Group that is registered or the subject of a pending application for registration ("***Owned Intellectual Property***"); (ii) each Contract material to such Business, pursuant to which any member of the Company Group uses or has the right to use any Licensed Intellectual Property (excluding licenses for commercial "shrink wrap," "click through," "browse wrap" or other off-the-shelf software that has not been modified or customized); and (iii) each Contract material to such Business, pursuant to which any member of the Company Group licenses or sublicenses any Owned Intellectual Property and/or Licensed Intellectual Property to third parties. The Owned Intellectual Property is valid and enforceable.

(b)    One or more members of the Company Group own or have a valid and enforceable license to use all material Intellectual Property that is used in or necessary for the conduct of the Business. One or more members of the Company Group (i) own all right, title and interest in and to the Owned Intellectual Property, free and clear of all Encumbrances (other than Permitted Encumbrances and non-exclusive licenses and other non-exclusive arrangements entered into in the ordinary course of such Business), and (ii) have the valid and enforceable right to use the Licensed Intellectual Property.

(c)    Except as set forth in Section 5.11(c) of the Company Disclosure Schedules, (i) the operation of the Business, as currently conducted, does not, directly or indirectly, infringe, misappropriate or otherwise violate the Intellectual Property Rights of any third party in any material respect; (ii) no member of the Company Group has received any written communication from any Person alleging a member of the Company Group directly or indirectly, infringes, misappropriates or otherwise violates the Intellectual Property Rights of any such Person in any material respect; (iii) there is no material Action pending or threatened in writing against any member of the Company Group alleging that a member of the Company Group is, directly or indirectly, infringing, misappropriating or otherwise violating any Intellectual Property Rights of any Person; (iv) there is no Action pending or threatened in writing by any member of the Company Group alleging that a third party has, directly or indirectly, infringed, misappropriated or otherwise violated any Intellectual Property Rights of a member of the Company Group in any material respect; and (v) to the Knowledge of the Company, no Person is infringing upon, misappropriating or otherwise violating any Intellectual Property owned by any member of the Company Group and that is material to the Business.

(d)    Each member of the Company Group has established and implemented, and is operating in material compliance with, policies, programs and procedures that are commercially reasonable and consistent with reasonable industry practices, including administrative, technical and physical safeguards, to protect the confidentiality and security of Sensitive Data in their possession, custody or control against unauthorized access, use, modification, disclosure or other misuse, including maintaining

A-18

Supp.App. 0875

Table of Contents

security controls for all information technology systems, including computer hardware, software and networks (collectively, the "***Company Computer Systems***") that are intended to safeguard the Company Computer Systems against the risk of business disruption arising from attacks (including virus, worm and denial-of-service attacks), unauthorized activities or access of any employee, hackers or any other person. To the Knowledge of the Company, since the Lookback Date, the Company Computer Systems have not suffered any material failure. The Company has remedied any material privacy or data security issues raised in any privacy or data security audits of its businesses (including third party audits of the Company Computer Systems).

(e)    The Company Group has in place a privacy policy (the "***Privacy Policy***") regarding the collection and use of personally identifiable customer information.

(i)    The Company Group is, and since the Lookback Date, has been, in material compliance with all applicable Laws regarding the collection, use, dissemination, storage and protection of personally identifiable customer or employee information ("***Personal Information***") and with the Company Group's Privacy Policy.

(ii)    Except as set forth in Section 5.11(e)(ii) of the Company Disclosure Schedules, since the Lookback Date, there has been no material unauthorized access or use of Personal Information stored by any member of the Company Group.

(iii)    The Company Group has commercially reasonable security measures in place intended to protect Personal Information stored in their computer systems from unlawful access or use by any third party or any other use by a third party that would materially violate the Privacy Policy.

(iv)    No material Actions are pending or, to the Knowledge of the Company, threatened in writing against any member of the Company Group relating to the collection, use, dissemination, storage and protection of Personal Information.

**5.12    Employees and Employee Benefits**

(a)    Section 5.12(a) of the Company Disclosure Schedules contains a correct and complete list, as of the date of this Agreement, of all material Benefit Plans.

(b)    With respect to each material Benefit Plan, if applicable, the Company has made available to the other parties to this Agreement, true and complete copies of (i) the plan document, including any related trust document, insurance contract or other funding arrangement, and all amendments thereto, (ii) the most recent summary plan description, or (iii) the most recent annual audited financial statements and opinion and (iv) if the Benefit Plan is intended to qualify under Section 401(a) of the Code, the most recent determination or opinion letter received from the Internal Revenue Service (the "***IRS***").

(c)    No member of the Company Group nor any ERISA Affiliate thereof has any liability with respect to (i) any employee benefit plan subject to Section 412 or 4971 of the Code or Title IV or Section 302 of ERISA, (ii) a "multiple employer plan" as defined in Section 413(c) of the Code, (iii) a "multiple employer welfare arrangement" within the meaning of Section 3(40) of ERISA, or (iv) a "multiemployer plan" as defined in Section 3(37) of ERISA. For purposes hereof, "***ERISA Affiliate***" shall mean any trade or business (whether or not incorporated) that, together with any member of the Company Group, is treated as a single-employer under Section 414 of the Code.

(d)    Each Benefit Plan is in compliance with ERISA, the Code and other applicable Law in all material respects. With respect to each Benefit Plan that is intended to qualify under Section 401(a) of the Code (i) a favorable determination letter has been issued by the IRS with respect to such qualification, (ii) its related trust has been determined to be exempt from taxation under Section 501(a) of the Code and (iii) except as would not result in material liability to the Company Group, no event

A-19

Supp.App. 0876

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 879 of 1110    PageID 2500

has occurred since the date of such qualification or exemption that would materially and adversely affect such qualification or exemption.

(e)    No Benefit Plan provides health, medical, life insurance or death benefits to current or former employees of any member of the Company Group beyond their retirement or other termination of service, other than coverage mandated by the COBRA or Section 4980B of the Code, or any similar state group health plan continuation Law, the cost of which is fully paid by such current or former employees or their dependents.

(f)    With respect to any Benefit Plan, no material Actions (other than routine claims for benefits in the ordinary course) are pending, or to the Knowledge of the Company, threatened against any Benefit Plan, the assets of any of the trusts under such plans or the plan sponsor or administrator, or against any fiduciary of any Benefit Plan with respect to the operation thereof. Except as set forth in Section 5.12(f) of the Company Disclosure Schedules, to the Knowledge of the Company, no Benefit Plan is presently under audit or examination (nor has written notice been received of a potential audit or examination) by any Governmental Authority.

(g)    The consummation of the transaction contemplated hereby (either alone or in conjunction with any other event) will not give rise to the payment of any amount that would not be deductible by Parent, any member of the Company Group or any of their respective Subsidiaries or Affiliates by reason of Section 280G of the Code or any amount that could, individually or in combination with any other such payment, constitute an "excess parachute payment", as defined in Section 280G(b)(1) of the Code.

(h)    Each arrangement subject to Section 409A of the Code (if any) is in compliance in all respects therewith such that no material Taxes or interest will be due and owing after the Closing in respect of such arrangement failing to be in compliance therewith.

(i)    No member of the Company Group has any obligations to gross-up or reimburse any individual for any tax or related interest or penalties incurred by such individual, including under Section 409A or 4999 of the Code or otherwise.

(j)    Except as set forth in Section 5.12(j) of the Company Disclosure Schedules or this Agreement, the execution and delivery of this Agreement and the consummation of the transactions contemplated by this Agreement will not (either alone or in combination with another event) (i) result in any payment or benefit from any member of the Company Group becoming due, or increase the amount of any compensation due, to any current or former director, officer, employee or consultant of any member of the Company Group, (ii) increase any benefits otherwise payable under any Benefit Plan or (iii) result in the acceleration of the time of payment or vesting or funding of any compensation or benefits from any member of the Company Group to any current or former director, officer, employee or consultant of any member of the Company Group.

(k)    (i) Each material Benefit Plan that is not subject to United States Law maintained primarily in respect of any current or former director, officer, employee or consultant of any member of the Company Group who is located outside the United States (a "**_Foreign Benefit Plan_**") has been established, maintained and administered in all material respects in accordance with its terms and applicable Laws, and if intended to qualify for special tax treatment, meets all the requirements for such treatment; (ii) all employer and employee contributions to each material Foreign Benefit Plan required by its terms or by applicable Law have been made or, if applicable, accrued in accordance with generally accepted accounting practices in the applicable jurisdiction and any other payments (including insurance premiums) otherwise due in respect of a material Foreign Benefit Plan have been paid in full; (iii) the fair market value of the assets of each funded material Foreign Benefit Plan, the liability of each insurer for any material Foreign Benefit Plan funded through insurance or the book reserve established for any material Foreign Benefit Plan, together with any accrued contributions, is

A-20

sufficient to procure or provide for the accrued benefit obligations, as of the date of this Agreement, with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Foreign Benefit Plan, and no transaction contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; and (iv) each material Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable regulatory authorities.

### 5.13 Labor

(a)  As of the date of this Agreement, except as set forth in Section 5.13(a) of the Company Disclosure Schedules, no member of the Company Group is a party to or bound by any collective bargaining agreements, works council agreements, labor union contracts, trade union agreements or other similar agreements or understandings with any union, works council, trade union or other labor organization.

(b)  Since the Lookback Date, except as set forth in Section 5.13(b) of the Company Disclosure Schedules, (i) to the Knowledge of the Company, no labor organization or group of employees of any member of the Company Group has sought to organize any employees for the purposes of collective bargaining, made a demand for recognition or certification, sought to bargain collectively with any member of the Company Group, or filed a petition for recognition with any Governmental Authority, (ii) there is no material unfair labor practice charge or complaint pending before any applicable Governmental Authority relating to any member of the Company Group or an employee thereof, and (iii) there has not been any strike, lockout, picketing, leafleting, sit-in, boycott, work stoppage or similar form of organized labor disruption at any member of the Company Group, and no such activity is currently ongoing or, to the Knowledge of the Company, threatened, in each case, that is material to the operation of such Business.

(c)  Since the Lookback Date, except as set forth in Section 5.13(c) of the Company Disclosure Schedules, (i) each member of the Company Group has been in compliance with all applicable Laws relating to labor or employment in all material respects, including all applicable Laws relating to the payment of wages, hours worked, collective bargaining, labor relations, reductions in force, equal employment opportunities, affirmative action, working conditions, employment discrimination, harassment, civil rights, occupational safety and health, disability, employee benefits, workers' compensation, immigration, disability, family and medical leave, and the collection and payment of withholding or social security taxes, (ii) no member of the Company Group has incurred any material liability under the Worker Adjustment and Retraining Notification Act or any similar state or local layoff notice Law that remains unsatisfied, and (iii) each member of the Company Group has materially complied with all applicable Laws in all material respects governing the classification of workers as exempt or nonexempt, independent contractors, consultants, volunteers, subcontractors, temporary employees, leased employees, seasonal employees, or other contingent workers, and each member of the Company Group has fully and accurately reported in all material respects all payments to all independent contractors and other contingent workers on IRS Form 1099 or as otherwise required by applicable Law.

### 5.14 Environmental Matters

(a)  Except as set forth in Section 5.14(a) of the Company Disclosure Schedules: (i) each member of the Company Group is, and, since the Lookback Date, has been, in compliance in all material respects with applicable Law relating to (x) pollution, contamination, protection, remediation or reclamation of the environment or natural resources, (y) emissions, discharges, disseminations, Releases or threatened Releases of Hazardous Substances into the environment, including air (indoor or outdoor), surface water, groundwater, soil or land surface or subsurface or (z) the management, manufacture, processing, labeling, distribution, use, treatment, storage, disposal, transport, recycling or

A-21

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 881 of 1110     PageID 2502

handling of, or exposure to, Hazardous Substances (collectively, "***Environmental Laws***"); (ii) the Company Group possesses, and, to the extent applicable, has filed timely applications to renew, all material Permits required under Environmental Laws necessary for its operations, and such operations are in compliance with applicable Permits in all material respects; (iii) no material Action arising under or pursuant to Environmental Laws is pending, or to the Knowledge of the Company, threatened in writing, against any member of the Company Group, and there are no material outstanding writs, judgments, injunctions, decrees, settlement agreements or similar orders arising under or pursuant to Environmental Laws by which any member of the Company Group or any of its assets or properties are bound; and (iv) there has been no material Release or threatened Release of any Hazardous Substances at, on, under, from or through any property currently or formerly owned, leased, occupied or operated by any member of the Company Group or any of their predecessors in interest or, to the Knowledge of the Company, any other location.

(b)   The Company has made available to other parties to this Agreement all environmental assessments, audits and other material environmental documents relating to any member of the Company Group, any property currently or formerly owned, leased, occupied or operated by any member of the Company Group, or the Business, in each case, to the extent such materials are in the possession, custody or control of any member of the Company Group.

**5.15   Material Contracts**

(a)   Section 5.15 of the Company Disclosure Schedules sets forth a list of all of the following Contracts (x) to which any member of the Company Group is a party as of the date of this Agreement or (y) by which any member of the Company Group or any of their respective properties or assets are bound as of the date of this Agreement (in each case, except as provided under clause (vi), other than any Benefit Plan) (collectively, the "***Material Contracts***"):

(i)   Contracts containing a covenant limiting the right of any member of the Company Group to engage in any line of business in any geographic area or to compete with any Person that materially limits such Business, taken as a whole;

(ii)   Contracts under which any member of the Company Group has borrowed any money or incurred any Indebtedness from, or issued any note, bond, debenture or other evidence of Indebtedness to, or continuing indemnification or other contingent payment obligations to, any Person (other than any member of the Company Group), in any such case which the outstanding balance or amount, individually, is in excess of $5,000,000;

(iii)   Contracts that require the future acquisition from another Person or future disposition to another Person of assets, properties or capital stock or other equity interest of another Person and other Contracts that relate to an acquisition or similar transaction which contain "earn-out" or other continuing obligations with respect to any member of the Company Group, in any such case, that would reasonably be expected to result in payments in excess of $2,000,000 after the date of this Agreement or any merger or business combination with respect to any member of the Company Group (other than the mergers contemplated to take place pursuant to this Agreement and other than purchases of equipment and inventory in the ordinary course of the Company Group Business);

(iv)   Contracts relating to the formation, creation, operation, management or control of any partnership, limited liability company, joint venture, strategic alliance or similar Contract with a third party;

(v)   all Contracts (excluding statements of work under any master Contract) for the provision of services in the year ended December 31, 2016 to the Business's 20 largest customers by revenue recognized in such year;

A-22

Table of Contents

(vi)  Contracts for the employment of, or the provision of services by, any officer, individual employee or other natural Person on a full time, part-time or other basis providing annual compensation in excess of $300,000, except for contracts which are terminable upon notice of 60 days or less without penalty other than severance or other obligations required pursuant to any Benefit Plan;

(vii)  all Contracts pursuant to which the Company received or paid more than $5,000,000 in any twelve month period commencing January 1, 2016, other than any such Contracts with customers or clients and other than Contracts relating to Indebtedness;

(viii)  all Contracts requiring or providing for any capital expenditure in excess of $1,000,000 other than capital expenditures made in the ordinary course of the Company Group's Business if such capital expenditures are made to acquire equipment to satisfy requirements in Contracts with customers;

(ix)  material interest rate, currency, or other hedging Contracts; and

(x)  any settlement, conciliation or similar Contract entered into by any member of the Company Group providing for payment by any member of the Company Group in excess of $1,000,000 in the last twelve months.

(b)  The Company has made available to other parties to this Agreement, true and complete copies of all Material Contracts, including any amendments thereto. Each Material Contract is, subject to the Enforceability Exceptions, a valid and binding agreement of the applicable member of the Company Group in all material respects. As of the date of this Agreement, no member of the Company Group or, to the Knowledge of the Company, any other party thereto, is in material breach or default under any such Material Contract.

**5.16    Related Person Transactions**

(a)  Except as set forth in Section 5.16(a) of the Company Disclosure Schedules and any transaction among the Company Group, no Related Person:

(i)  has engaged in any transaction with the Company or any member of the Company Group during the twelve month period ending on the date of this Agreement;

(ii)  is a party to any Contract with the Company or any member of the Company Group (or operates under or otherwise receives the benefit of any such Contract);

(iii)  owns directly or indirectly (other than through any equity interest in the Company or any of its respective Stockholders) in whole or in part, or has any other direct or indirect interest (other than through any equity interest in the Company or any of its respective Stockholders) in, any tangible property that any member of the Company Group owns or leases; or

(iv)  has outstanding any Indebtedness to or from any member of the Company Group.

(b)  Except as set forth in Section 5.16(b) of the Company Disclosure Schedules, all agreements and other relationships between any member of the Company Group, on the one hand, and any of its Related Persons or Affiliates (other than the other members of the Company Group), on the other hand, are conducted on terms and conditions that approximate those terms and conditions had such arrangements been negotiated on an arm's-length basis. Except for the Apollo Consulting Agreement and the SourceHOV Consulting Agreement, there are no agreements or other relationships between (i) any member of the Novitex Company Group, on the one hand, and Apollo Global Management, LLC or its affiliated investment funds, alternative investment vehicles or related management or advising entities, on the other hand or (ii) any member of the SourceHOV Company Group, on the one hand, and HGM or its affiliated investment funds, alternative investment vehicles or related management or advising entities, on the other hand.

A-23

**5.17    Real and Personal Property**

(a)    Section 5.17(a)(i) of the Company Disclosure Schedules sets forth, as of the date of this Agreement, a true and complete list of all real property owned by any member of the Company Group (the "***Owned Real Property***"). The applicable member of the Company Group has good and marketable title in fee simple to such Owned Real Property, free and clear of all Encumbrances other than Permitted Encumbrances. The Company has made available to the other parties to this Agreement true and complete copies of (i) the most recent surveys and title policies with respect to all Owned Real Properties in the Company's possession, and (ii) all leases, subleases, licenses and other Contracts under which any member of the Company Group is the landlord, sublandlord or licensor, which affect the use and occupancy of and access to any portion of such Owned Real Property (collectively, "***Company Leases***"), all of which are set forth in Section 5.17(a)(ii) of the Company Disclosure Schedules.

(b)    Each Company Lease to which any member of the Company Group is a party is, subject to the Enforceability Exceptions, in full force and effect and is a valid and binding agreement of the applicable member of the Company Group.

(c)    As of the date of this Agreement, no portion of the Owned Real Property is subject to and pending, and to the Knowledge of the Company there is no threatened, condemnation proceeding (or any consensual agreement in lieu thereof) rezoning application or proceeding or other Action. None of the improvements located on the Owned Real Property are located outside of the boundary lines of such Owned Real Property, contravene any setback requirement, zoning ordinance or other administrative regulation (whether or not permitted because of prior non-conforming use), encroach on any easement or violate any restrictive covenant or any provision of any Law, plant or deed restriction. There are no options, first refusal, first offer or first opportunity rights or other similar rights with respect to any portion of the Owned Real Property. All material components (including plumbing, foundations, roofs, HVAC systems, electrical systems, gas or other fuel systems and security systems and any ancillary components related thereto) that are part of the improvements located on the Owned Real Property are in good condition and repair and are sufficient for the ordinary course operation of the Company Group's Business. To the Knowledge of the Company, there is no existing condition affecting any improvements located on the Owned Real Property that requires, or is reasonably anticipated to require, any repair, renovation, upgrade or retrofitting in excess of $50,000. The existing utilities supplied to the improvements located on the Owned Real Property are sufficient for the ordinary course operation of the Company Group's Business. There are no facts or conditions affecting any of the improvements located on the Owned Real Property which, individually or in the aggregate, interfere or are reasonably likely to interfere in any material respect with the use or occupancy of the improvements located on the Owned Real Property or any portion thereof in the conduct of the Business in the Ordinary Course of Business.

(d)    Section 5.17(d) of the Company Disclosure Schedules sets forth, as of the date of this Agreement, a true and complete list of all material leases, subleases, licenses and other occupancy agreements to which any member of the Company Group is a party as lessee, sublessee, licensee or occupant as of the date of this Agreement (the "***Real Property Leases***"). The applicable member of the Company Group has a valid leasehold estate in all real property occupied pursuant to the Real Property Leases, free and clear of all Encumbrances, other than Permitted Encumbrances. Each Real Property Lease to which any member of the Company Group is a party is, subject to the Enforceability Exceptions, in full force and effect and is a valid and binding agreement of the applicable member of the Company Group.

(e)    No member of the Company Group, or to the Knowledge of the Company, any other person or party thereto, is in breach or default, in any material respect, under any of the Company Leases or the Real Property Leases, and to the Knowledge of the Company, there has not occurred any event that with the lapse of time or the giving of notice or both would constitute such a breach or default under any of the Company Leases or the Real Property Leases.

A-24

Table of Contents

(f)    The Company has made available to the other parties to this Agreement true and complete copies of all such Company Leases and Real Property Leases (including all modifications and amendments thereto and guaranties and renewals thereof), and none of the Company Leases or Real Property Leases has been modified in any material respect, except to the extent that such modifications are disclosed by the copies of same made available by the Company to the other parties to this Agreement.

(g)    The applicable member of the Company Group has good and marketable title to, or holds a valid leasehold interest in, or a valid license to use, all of the assets and personal property used by such member of the Company Group in the operation of its respective Business and which are material to such member of the Company Group, free and clear of any Encumbrances (other than Permitted Encumbrances).

**5.18    Insurance**

Section 5.18 of the Company Disclosure Schedules contains a list of all material insurance policies, including historic, occurrence-based policies, covering such Company Group in effect at the date of this Agreement. With respect to each material insurance policy covering the Company Group, (a) the insurance policy is in full force and effect and all and all premiums with respect thereto covering all periods up to the Closing will have been paid on the Closing Date, and (b) as of the date of this Agreement, no member of the Company Group has received written notice of cancellation, termination, material reduction in coverage or disallowance of any insurance policy that is held by, or for the benefit of, any member of the Company Group.

**5.19    Brokers' and Finders' Fees**

Except as set forth in Section 5.19 of the Company Disclosure Schedules, no member of the Company Group has employed, nor is any member of the Company Group subject to any valid claim of liability or obligation to, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement.

**5.20    Customers and Suppliers**

Schedule 5.20 of the Company Disclosure Schedules sets forth a list of the twenty (20) largest customers and the twenty (20) largest suppliers of the Company and the members of the Company Group as measured by the dollar amount of purchases or recognized revenue therefrom or thereby, for the Company's fiscal year ending December 31, 2016, showing the approximate total sales by the Company and the members of the Company Group to each such customer and the approximate total purchases or revenue recognition by the Company and the members of the Company Group from each such supplier, during each such period. No such supplier or customer listed on Section 5.20 of the Company Disclosure Schedules has on or prior to the date of this Agreement (i) delivered to the Company a written notice that it is terminating its relationship with the Company Group or (ii) to the Knowledge of the Company, become insolvent or subject to bankruptcy proceedings.

**5.21    Company Information**

The information relating to the Company and the members of the Company Group which is provided to Parent for inclusion in the Proxy Statement or any registration statement, will not at the date the Proxy Statement is first mailed to Parent's Stockholders or at the time of the Parent Stockholders Meeting contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements therein, in light of the circumstances in which they are made, not misleading (subject to the qualifications and limitations set forth in the materials provided by the Company or the members of the Company Group that is included in the Proxy Statement or any registration statement). Notwithstanding the foregoing, the Company makes no representation, warranty or covenant with respect to (a) statements made or incorporated by reference therein based on

A-25

Supp.App. 0882

Table of Contents

information supplied by Parent for inclusion or incorporation by reference in the Proxy Statement or any registration statement or (b) any projections or forecasts included in the Proxy Statement or any registration statement.

**5.22   No Additional Representations**

NEITHER THE COMPANY NOR ANY OF ITS RESPECTIVE AFFILIATES NOR ANY OF THEIR RESPECTIVE REPRESENTATIVES IS MAKING ANY WRITTEN OR ORAL REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER WITH RESPECT TO ANY MEMBER OF THE COMPANY GROUP, INCLUDING ANY OF THE ASSETS, RIGHTS OR PROPERTIES OF ANY MEMBER OF THE COMPANY GROUP AND INCLUDING THE PHYSICAL OR ENVIRONMENTAL CONDITION OF ANY PAST OR CURRENT PROPERTY OR FACILITY OF ANY MEMBER OF THE COMPANY GROUP, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS *ARTICLE V* OF THIS AGREEMENT, AND EXCEPT AS SET FORTH EXPRESSLY IN THIS *ARTICLE V*, THE CONDITION OF THE ASSETS, PROPERTIES AND RIGHTS OF THE MEMBERS OF THE COMPANY GROUP SHALL BE "AS IS," "WHERE IS" AND "WITH ALL FAULTS.".

THE COMPANY DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY THE COMPANY OR ANY OTHER MEMBER OF THE COMPANY GROUP OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR OR THEIR AFFILIATES' RESPECTIVE REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS *ARTICLE V*, THE COMPANY (ON BEHALF OF ITSELF AND THE OTHER MEMBERS OF THE COMPANY GROUP) HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING, IN THE CONFIDENTIAL INFORMATION MEMORANDUM OR OTHERWISE) TO PARENT, APOLLO, THE HGM GROUP, THE COMPANIES, NOVITEX MERGER SUB AND/OR SOURCEHOV MERGER SUB OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO PARENT, APOLLO, THE HGM GROUP, THE COMPANIES, NOVITEX MERGER SUB AND/OR SOURCEHOV MERGER SUB BY ANY REPRESENTATIVE OF THE COMPANY, ANY OTHER MEMBER OF THE COMPANY GROUP OR ANY OF THEIR RESPECTIVE AFFILIATES). NOTWITHSTANDING ANYTHING SET FORTH IN THIS AGREEMENT TO THE CONTRARY, NO MEMBER OF THE COMPANY GROUP MAKES ANY REPRESENTATIONS OR WARRANTIES TO PARENT, APOLLO, THE HGM GROUP , THE COMPANIES, NOVITEX MERGER SUB AND/OR SOURCEHOV MERGER SUB REGARDING ANY PROJECTIONS OR THE FUTURE OR PROBABLE PROFITABILITY, SUCCESS, BUSINESS, OPPORTUNITIES, RELATIONSHIPS AND OPERATIONS OF THE COMPANY AND/OR ANY OTHER MEMBER OF THE COMPANY GROUP.

# ARTICLE VI

## REPRESENTATIONS AND WARRANTIES
## OF PARENT AND MERGER SUB

Except as set forth in the Parent Disclosure Schedules, Parent, Novitex Merger Sub and SourceHOV Merger Sub, jointly and severally, hereby represent and warrant to the Sellers and the

A-26

Table of Contents

Companies, as of the date hereof and, on the occurrence of the Closing, as of the Closing Date, as follows:

**6.1   Standing; Qualification and Power of Parent, Novitex Merger Sub and SourceHOV Merger Sub**

Each of Parent and any of its Subsidiaries is duly organized, validly existing and in good standing (or has the equivalent status) under the laws of the jurisdiction of its organization, with all power and authority necessary to own, lease or operate the properties and assets owned, leased or operated by it and to carry on its business as currently conducted, except where the failure to be so validly existing and in good standing (in such jurisdictions where such status is recognized) or to have such power or authority would not, individually or in the aggregate, have a material adverse effect on Parent and any of its Subsidiaries or prevent or materially impair or delay Parent's and any of its Subsidiaries' ability to consummate the transactions contemplated hereby. Each of Parent and any of its Subsidiaries is qualified or licensed to do business in each jurisdiction in which ownership of its property or assets or the conduct of its business requires such qualification or license, except where the failure to be so qualified or licensed would not, individually or in the aggregate, have a material adverse effect on Parent, Novitex Merger Sub and SourceHOV Merger Sub or prevent or materially impair or delay Parent's and any of its Subsidiaries' performance of their obligations hereunder.

**6.2   Capitalization of Parent**

(a)   As of the date hereof, the authorized capital stock of Parent consists of (i) 135,000,000 shares of common stock, par value $0.0001 (the "*Parent Common Stock*") and (ii) 1,000,000 shares of preferred stock, par value $0.0001. Section 6.2(a) of the Parent Disclosure Schedules sets forth, as of the date hereof, the number of issued and outstanding shares of capital stock of Parent, and the record owners of more than 5% of such outstanding shares as of the date thereof. All issued and outstanding shares of capital stock of Parent have been duly authorized and validly issued, are fully paid and nonassessable and were not issued in violation of any preemptive rights.

(b)   As of the date hereof, Parent has issued and outstanding 53,000,000 warrants that entitle the holder thereof to purchase one half of a share of Parent Common Stock at an exercise price of $5.75 (the "*Parent Warrants*") on the terms and conditions set forth in applicable warrant agreement. Immediately following the Closing, Parent will have 35,000,000 Parent Warrants issued and outstanding. As of February 17, 2017, Parent has 28,848,601 shares of Parent Common Stock outstanding. Immediately prior to the execution of the Forfeiture Agreement, Quinpario Partners 2, LLC and its Affiliates are the beneficial owners of 8,750,000 shares of Parent Common Stock and 18,000,000 Parent Warrants and no other equity of Parent.

(c)   Except for the Parent Warrants as of the date of this Agreement, there are no outstanding (i) securities convertible into or exchangeable for the capital stock of Parent, (ii) options, warrants, calls or other rights to purchase or subscribe for capital stock of Parent or (iii) contracts of any kind to which Parent is subject or bound requiring the issuance after the date of this Agreement of (A) any capital stock of Parent, (B) any convertible or exchangeable security of the type referred to in clause (i) or (C) any options, warrants, calls or rights of the type referred to in clause (ii).

(d)   Except as set forth on Section 6.2(d) of the Parent Disclosure Schedules, there are no voting trusts, proxies or other agreements or understandings to which Parent is bound with respect to voting of any shares of capital stock or any other equity interest of Parent.

(e)   Section 6.2(e) of the Parent Disclosure Schedules sets forth a true and complete summary of the identity of any obligor and/or guarantor and the principal amount and maturity of each such instrument, as of the close of business on the date immediately preceding the date of this Agreement, of all Indebtedness of Parent.

A-27

Table of Contents

(f)　The SourceHOV Merger Consideration and the Novitex Merger Consideration, when issued in accordance with the terms of this Agreement and the Related Documents, as applicable, shall be duly authorized, validly issued, fully paid and non-assessable, issued to the Sellers and the other holders of the Purchased Equity, free and clear of all Encumbrances.

**6.3　Authority; Execution and Delivery; Enforceability**

Each of Parent and any of its Subsidiaries has all requisite power and authority to execute and deliver this Agreement and each of the Related Documents to which it will be a party and subject to the receipt of the Parent Stockholder Approval, to consummate the transactions contemplated hereby and thereby. Subject to the receipt of the Parent Stockholder Approval, the HGM Consent and the Novitex Parent Consent and the Intermediate Co Consent, the execution and delivery of this Agreement have been and, in the case of the Related Documents to which it will be a party will be when delivered, and the consummation of the transactions contemplated hereby has been and the consummation of the transactions contemplated by the Related Documents to which it will be a party, will be when delivered, duly authorized by all requisite action by Parent and any of its Subsidiaries. The affirmative vote of Parent and Intermediate Co is the only vote of the holders of any of the shares of capital stock of Novitex Merger Sub and SourceHOV Merger Sub necessary in connection with the consummation of the SourceHOV Merger and the Novitex Merger, and such vote will have been duly and validly obtained by virtue of the SourceHOV Parent Consent and the Novitex Parent Consent delivered on the date of this Agreement by Parent, who is the sole shareholder of Novitex Merger Sub and SourceHOV as of the date of this Agreement, and the Intermediate Co Consent delivered prior to the Closing Date by Intermediate Co, who will be the sole shareholder of Novitex Merger Sub and SourceHOV as of the Closing Date. This Agreement has been, and upon its execution and delivery each of the Related Documents to which Parent or any of its Subsidiaries will be a party will be, duly and validly executed and delivered by each of Parent and any of its Subsidiaries and, assuming this Agreement and the Related Documents have been duly authorized, executed and delivered by the other parties hereto or thereto, as applicable, this Agreement constitutes, and upon its execution and delivery each of the Related Documents to which Parent and any of its Subsidiaries will be a party will constitute, a valid and binding obligation of each of Parent and any of its Subsidiaries enforceable against it in accordance with their respective terms, in each case subject to the Enforceability Exceptions.

**6.4　No Conflict; Consents**

(a)　The execution, delivery and performance of this Agreement by Parent and any of its Subsidiaries, and the consummation by Parent and any of its Subsidiaries of the transactions contemplated hereby, will not (i) violate any provision of the certificate of incorporation or bylaws (or other comparable governing documents) of Parent or any of its Subsidiaries, (ii) result in a violation or breach of, or constitute (with or without the giving of notice or, the lapse of time or both) a default (or give rise to any right of termination or cancellation of obligations) under, any Contract to which Parent or any of its Subsidiaries is a party or by which any of their respective properties or assets are bound or (iii) assuming that all Approvals have been obtained and all filings, registrations and notifications have been made, each as contemplated by *Section 4.5(b)*, *Section 5.4(b)* and/or *Section 6.4(b)*, violate any Law applicable to Parent or any of its Subsidiaries or by which any of their respective properties or assets are bound, other than, in the case of clauses (ii) and (iii) above, any such violations, breaches, defaults or rights of termination or cancellation of obligations which would not, individually or in the aggregate, have a material adverse effect on Parent and any of its Subsidiaries or prevent or materially impair or delay Parent's and any of its Subsidiaries' ability to consummate the transactions contemplated hereby.

(b)　The execution, delivery and performance of this Agreement by Parent and any of its Subsidiaries, and the consummation by Parent and any of its Subsidiaries of the transactions

A-28

Supp.App. 0885

Table of Contents

contemplated hereby, will not require any waiver, authorization or other Permit of, or filing or registration with or notification to, any Governmental Authority, other than (i) compliance with all applicable Antitrust Laws, (ii) filings required by the Securities and Exchange Commission, (iii) as may be required as a result of any facts or circumstances related to the Company Group, and (iv) such Approvals, filings, registrations or notifications which, if not made or obtained, would not, individually or in the aggregate, have a material adverse effect on Parent and any of its Subsidiaries and prevent or materially impair or delay Parent's and any of its Subsidiaries' ability to consummate the transactions contemplated hereby.

(c)    Neither Parent nor any of its Subsidiaries owns interests in any Person or is aware of any facts or circumstances (including any possible other transaction pending or under consideration by Parent or any of its Affiliates) which (i) reasonably could be expected to prohibit or materially impair or delay the ability of Parent and any of its Subsidiaries to obtain the consents, authorizations, orders or approvals of the applicable Governmental Antitrust Authorities without any structural or conduct relief or (ii) could cause a Governmental Antitrust Authority to seek to prohibit or materially delay consummation of the SourceHOV Merger and the Novitex Merger or impose a condition or conditions that could, individually or in the aggregate, have a Material Adverse Effect.

### 6.5    Litigation

Except as set forth on Section 6.5 of the Parent Disclosure Schedules and except with respect to any investigation under the HSR Act or applicable Antitrust Laws relating to the transactions contemplated hereby, there are no Actions pending or, to the Knowledge of Parent, threatened in writing, and there are no outstanding orders, writs, judgments, injunctions, decrees or awards by which Parent, any of its Subsidiaries or any of their respective Affiliates or any of their or their Affiliates' respective assets or properties, are bound.

### 6.6    SEC Documents; Financial Statements

(a)    Parent has filed all forms, reports, schedules, statements and other documents, including any exhibits thereto, required to be filed or furnished by Parent with the SEC under the Exchange Act or the Securities Act since Parent's incorporation to the date of this Agreement, together with any amendments, restatements or supplements thereto (all of the foregoing filed prior to the date of this Agreement, the "*Parent SEC Reports*"), and will have filed all such forms, reports, schedules, statements and other documents required to be filed subsequent to the date of this Agreement through the Closing Date (the "*Additional Parent SEC Reports*"). All Parent SEC Reports, Additional Parent SEC Reports, any correspondence from or to the SEC or NASDAQ (other than such correspondence in connection with the initial public offering of Parent or the annual meeting) and all certifications and statements required by (i) Rule 13a-14 or 15d-14 under the Exchange Act, or (ii) 18 U.S.C. § 1350 (Section 906) of the Sarbanes-Oxley Act with respect to any of the foregoing (collectively, the "*Certifications*") are available on EDGAR in full without redaction. Parent has heretofore furnished to the Sellers true and correct copies of all amendments and modifications that have not been filed by Parent with the SEC to all agreements, documents and other instruments that previously had been filed by Parent with the SEC and are currently in effect. The Parent SEC Reports were, and the Additional Parent SEC Reports will be, prepared in all material respects in accordance with the requirements of the Securities Act, the Exchange Act and the Sarbanes-Oxley Act, as the case may be, and the rules and regulations thereunder. The Parent SEC Reports did not, and the Additional Parent SEC Reports will not, at the time they were or are filed, as the case may be, with the SEC contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements made therein, in the light of the circumstances under which they were made, not misleading. The Certifications are each true and correct in all material respects. Parent maintains disclosure controls and procedures required by Rule 13a-15(e) or 15d-15(e) under the Exchange Act. Each director and executive officer of Parent has filed with the SEC on a timely basis

A-29

Supp.App. 0886

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 889 of 1110    PageID 2510

all statements required with respect to Parent by Section 16(a) of the Exchange Act and the rules and regulations thereunder. As used in this *Section 6.6(a)*, the term "file" shall be broadly construed to include any manner in which a document or information is furnished, supplied or otherwise made available to the SEC or NASDAQ. To the Knowledge of Parent, there are no material unresolved comments received from the SEC staff with respect to the Parent SEC Reports on or prior to the date hereof. To the Knowledge of Parent, none of the Parent SEC Reports filed on or prior to the date hereof is subject to ongoing SEC review or investigation.

(b)   The financial statements and notes contained or incorporated by reference in the Parent SEC Reports fairly present, and the financial statements and notes to be contained in or to be incorporated by reference in the Additional Parent SEC Reports will fairly present, in all material respects, the financial condition and the results of operations, changes in stockholders' equity and cash flows of Parent as at the respective dates of, and for the periods referred to, in such financial statements, all in accordance with (i) GAAP and (ii) Regulation S-X or Regulation S-K, as applicable, subject, in the case of interim financial statements, to normal recurring year-end adjustments (the effect of which will not, individually or in the aggregate, be material) and the omission of notes to the extent permitted by Regulation S-X or Regulation S-K, as applicable. Parent has no off-balance sheet arrangements that are not disclosed in the Parent SEC Reports. No financial statements other than those of Parent are required by GAAP to be included in the consolidated financial statements of Parent.

### 6.7   Information Supplied

None of the information supplied or to be supplied by Parent for inclusion or incorporation by reference in the Proxy Statement will, at the date the Proxy Statement is first mailed to Parent's stockholders or at the time of the Parent Stockholders Meeting, contain any untrue statement of a material fact or omit to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they are made, not misleading. Notwithstanding the foregoing, Parent makes no representation, warranty or covenant with respect to (a) statements made or incorporated by reference therein based on information supplied by the Sellers for inclusion or incorporation by reference in the Proxy Statement or (b) any projections or forecasts included in the Proxy Statement.

### 6.8   NASDAQ Stock Market Quotation

The issued and outstanding shares of Parent Common Stock are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NASDAQ under the symbol "QPAC". The issued and outstanding Parent Warrants are registered pursuant to Section 12(b) of the Exchange Act and are listed for trading on the NASDAQ under the symbol "QPACW". Except as set forth in Section 6.8 of the Parent Disclosure Schedules, Parent is in compliance with the NASDAQ Listing Rules and there is no action or proceeding pending or, to the Knowledge of Parent, threatened against Parent by the NASDAQ or the SEC with respect to any intention by such entity to deregister the Parent Common Stock or Parent Warrants or terminate the listing of Parent on the NASDAQ. None of Parent or any of its Affiliates has taken any action in an attempt to terminate the registration of the Parent Common Stock or the Parent Warrants under the Exchange Act.

### 6.9   Board Approval; Stockholder Vote

The board of directors of Parent (including any required committee or subgroup of the board of directors of Parent) has, as of the date of this Agreement, unanimously (a) approved and declared the advisability of this Agreement, the Related Documents and the consummation of the transactions contemplated hereby, and (b) determined that the consummation of the transactions contemplated hereby is in the best interest of the stockholders of Parent. Other than the Parent Stockholder Approval and the Intermediate Co Consent, no other corporate proceedings on the part of Parent are necessary to approve the consummation of the transactions contemplated hereby.

A-30

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 890 of 1110    PageID 2511

**6.10    Investment Company Act**

Parent is not, and following the Closing will continue not to be, an "investment company" or a Person directly or indirectly "controlled" by or acting on behalf of an "investment company", in each case within the meaning of the Investment Company Act. Parent constitutes an "emerging growth company" within the meaning of the JOBS Act.

**6.11    Trust Account**

(a)    As of the date hereof, Parent has at least $200,988,000 in the account established by Parent for the benefit of its public stockholders (the "*Trust Account*"), with such funds invested in United States Government securities or money market funds meeting certain conditions under Rule 2a-7 promulgated under the Investment Company Act and held in trust by Continental Stock Transfer & Trust Company (the "*Trustee*") pursuant to the Investment Management Trust Agreement, dated as of January 15, 2015, by and between Parent and the Trustee, as amended on January 19, 2017 (the "*Trust Agreement*").

(b)    The Trust Agreement, to the Knowledge of Parent with respect to the Trustee, has not been amended or modified, is valid and in full force and effect and is enforceable in accordance with its terms, except as limited by the Enforceability Exceptions. There are no separate agreements, side letters or other agreements or understandings (whether written or unwritten, express or implied) (i) between Parent and the Trustee that would cause the description of the Trust Agreement in the Parent SEC Reports to be inaccurate in any material respect or (ii) to the Knowledge of Parent, that would entitle any Person (other than stockholders of Parent holding Parent Common Stock sold in Parent's initial public offering who shall have elected to redeem their shares of Parent Common Stock pursuant to the certificate of incorporation of Parent) to any portion of the proceeds in the Trust Account. Prior to the Closing, none of the funds held in the Trust Account may be released except (A) to pay income and franchise taxes from any interest income earned in the Trust Account and (B) for working capital requirements and (C) to redeem Parent Common Stock in accordance with the provisions of the certificate of incorporation of Parent. There are no Actions pending or, to the Knowledge of Parent, threatened with respect to the Trust Account.

**6.12    Title to Assets**

Subject to the restrictions on use of the Trust Account set forth in the Trust Agreement, Parent owns good and marketable title to, or holds a valid leasehold interest in, or a valid license to use, all of the assets used by Parent in the operation of its business and which are material to Parent, free and clear of any Encumbrances (other than Permitted Encumbrances).

**6.13    Securities Laws Matters**

Parent acknowledges that the Purchased Equity being acquired pursuant to this Agreement and the Related Documents have not been registered under the Securities Act or under any state or foreign securities Laws. Parent is acquiring the Purchased Equity for its own account solely for investment purposes and not with a view to any public resale or other distribution thereof, except in compliance with applicable securities Laws. Parent acknowledges that the Purchased Equity will not be registered under the Securities Act or any applicable state or foreign securities Laws and that the Purchased Equity may not be transferred or sold except pursuant to the registration provisions of the Securities Act or applicable foreign securities Laws or pursuant to an applicable exemption therefrom and pursuant to state or foreign securities Laws, as applicable. Parent has sufficient knowledge and experience in financial and business matters so as to be capable of evaluating the merits and risks of its investment in the Purchased Equity and is capable of bearing the economic risks of such investment. Parent is an "*accredited investor*" as defined in Rule 501(a) of Regulation D promulgated under the Securities Act.

A-31

Supp.App. 0888

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 891 of 1110    PageID 2512

**6.14    Parent's Business Investigation; Disclaimer Regarding Projections; No Knowledge of Misrepresentation**

(a)    Parent has conducted such investigations of the Company Group and the Business as it has deemed necessary in order to make an informed decision concerning the transactions contemplated hereby. Parent has reviewed all of the documents, records, reports and other materials made available prior to 11:59 pm EST on February 20, 2017 in the electronic data rooms maintained on Intralinks for "Project Komodo" and "Project Lincoln" (the "***Data Rooms***"). For the purpose of conducting these investigations, Parent has employed the services of its own Representatives. In all matters affecting the condition of the properties and assets and the contents of the documents, records, reports or other materials in connection with the transactions contemplated hereby, Parent is relying upon the advice and opinion offered by its own Representatives and the representations and warranties set forth in *Article V*. Without limiting the foregoing, each party disclaims reliance on any representations and warranties except as expressly set forth in this Agreement and the Related Documents. Neither the Companies nor any of its Affiliates shall have or be subject to any liability to Parent or any other Person resulting from the distribution to Parent, or Parent's use of, any such information, including any information, documents or material made available to the other parties to this Agreement and their Representatives in the Data Rooms (virtual or otherwise), confidential information memorandum, management presentation or in any other form in expectation of the transactions contemplated hereby.

(b)    Except as and to the limited extent expressly set forth in *Article V*, each of Parent and any of its Subsidiaries acknowledges and agrees that no member of the Company Group or any other Person is making or has made, and that none of them shall have liability in respect of, any written or oral representation or warranty, express or implied, of any nature whatsoever, with respect to any member of the Company Group, or any of their respective assets, rights or properties, including as to (i) merchantability or fitness for any particular use or purpose, (ii) the operation of the Company Group's business by Parent after the Closing in any manner or (iii) the probable success or profitability of the business of the Company Group after the Closing, and each of Parent and any of its Subsidiaries specifically disclaims that it is relying on or has relied on any such representation or warranty as an inducement to enter into this Agreement or otherwise.

(c)    In connection with Parent's investigation of the Company Group and the Business, Parent has received from the Companies and/or its respective Affiliates and their respective Representatives certain projections and other forecasts, including projected financial statements, cash flow items, certain business plan information and other data related to the Company Group and/or such Business. Parent acknowledges that (i) there are uncertainties inherent in attempting to make such projections, forecasts and plans and, accordingly, is not relying on them, (ii) Parent is familiar with such uncertainties and is taking full responsibility for making its own evaluation of the adequacy and accuracy of all projections, forecasts and plans so furnished to it and (iii) Parent shall have no claim against anyone with respect to any of the foregoing. Accordingly, Parent acknowledges that neither the Companies nor any of its respective Affiliates nor any of its or their respective Representatives has made any representation or warranty with respect to such projections or other forecasts or plans.

**6.15    Financing**

(a)    Parent has delivered to the Company true and complete copies of the executed commitment letter, dated as of the date of this Agreement, among Parent, Royal Bank of Canada, RBC Capital Markets, LLC, Credit Suisse AG, Cayman Islands Branch, and Credit Suisse Securities (USA) LLC (the "***Commitment Letter***"), pursuant to which the counterparties thereto have committed, subject to the terms and conditions thereof, to lend to Parent or any of its Subsidiaries the amounts set forth therein for the purpose of funding the transactions contemplated by this Agreement (together with the debt securities contemplated by the Commitment Letter to be issued for the purpose of funding the transactions contemplated by this Agreement) (the "***Financing***"). Parent has also delivered, to each of

A-32

Supp.App. 0889

Table of Contents

the other parties to this Agreement, a true and complete copy of any fee letter to which it is a party in connection with the Commitment Letter (any such fee letter, a "*Fee Letter*"). Parent has also delivered, to each of the other parties to this Agreement, a true and complete copy of any engagement letter to which it is a party in connection with the Commitment Letter (any such engagement letter, a "*Engagement Letter*").

(b)   There are no side letters or other Contracts or arrangements related to the Financing to which Parent or any of its Subsidiaries is a party other than the Commitment Letter and the Fee Letters (other than customary engagement letters and fee credit letters a copy of which have been delivered to the Company). None of the Commitment Letter or the Fee Letters has been amended or modified, no such amendment or modification is contemplated, and the respective commitments set forth in the Commitment Letters have not been withdrawn or rescinded in any respect.

(c)   The Commitment Letter is in full force and effect and are the valid, binding and enforceable obligations of Parent and, to the Knowledge of Parent, the other parties thereto, subject in each case to the Enforceability Exceptions, and do not contain any material misrepresentation by Parent or any of its Subsidiaries. To the Knowledge of Parent, there are no conditions precedent or other contingencies related to the funding of the full amount of the Financing (including any "flex" provisions), other than as set forth in the Commitment Letter and any related Fee Letter to which Parent or any of its Subsidiaries is a party. Parent has fully paid, or caused to be fully paid, any and all commitment or other fees which are due and payable on or prior to the date of this Agreement pursuant to the terms of the Commitment Letter and any related Fee Letter to which Parent or any of its Subsidiaries is a party and will pay (in accordance with *Section 7.7*) all additional fees under the Commitment Letter and the Fee Letter as they become due.

**6.16   Solvency**

None of Parent or any of its Subsidiaries is entering into this Agreement or the transactions contemplated hereby with the actual intent to hinder, delay or defraud either present or future creditors. Each of Parent, the SourceHOV Surviving Company, the Novitex Surviving Company and each Company Group shall be Solvent following the Closing, immediately after giving effect to the transactions contemplated by this Agreement.

**6.17   Operations of Novitex Merger Sub and SourceHOV Merger Sub**

Since the date of its incorporation, each of Novitex Merger Sub and SourceHOV Merger Sub has not engaged in any activities other than as contemplated by this Agreement.

**6.18   Brokers' and Finders' Fees**

Except as set forth in Section 6.18 of the Parent Disclosure Schedule, neither Parent nor any of its Subsidiaries has employed, nor is either of them subject to any valid claim of liability or obligation to, any broker, finder, consultant or other intermediary in connection with the transactions contemplated by this Agreement who might be entitled to a fee or commission in connection therewith.

**6.19   Taxes**

Except as set forth in Section 6.19 of the Parent Disclosure Schedules, (i) all material Tax Returns required to be filed by or on behalf of any member of Parent and its Subsidiaries have been duly and timely filed with the appropriate Tax Authority (after giving effect to any valid extensions of time in which to make such filings); (ii) such Tax Returns were true and complete in all material respects when filed; (iii) and all amounts shown on such Tax Returns as due, and all other material Taxes that have become due and payable by Parent and its Subsidiaries, have been fully and timely paid; (iv) neither Parent nor any of its Subsidiaries has waived any statute of limitations in respect of material Taxes or agreed to any extension of time with respect to any material Tax assessment or deficiency; (v) each of Parent and its Subsidiaries has complied with all applicable Laws relating to the collection or

A-33

Supp.App. 0890

withholding of material Taxes; (vi) neither Parent nor any of its Subsidiaries has been a member of a combined, consolidated, affiliated or unitary group for Tax filing purposes (other than a group the common parent of which was Parent); (vii) neither Parent nor any of its Subsidiaries is a party to any Tax allocation or sharing agreement (other than an agreement (A) that does not primarily relate to Taxes and (B) for which the Tax liability is not material); (viii) to the Knowledge of Parent, no claim has been made in writing by any Tax Authority in a jurisdiction in which Parent or any of its Subsidiaries do not file Tax Returns that any such person is or may be subject to taxation by that jurisdiction; (ix) no audit or other proceeding by any Tax Authority with respect to material Taxes owed by Parent or any of its Subsidiaries is pending and no Tax Authority has given written notice of any intention to commence an audit or other proceeding or assert any deficiency or claim for additional Taxes against any member of the Company Group; (x) neither Parent nor any of its Subsidiaries has engaged in any "listed transaction" as defined in Treasury Regulations Section 1.6011-4(b)(2); and (xi) Parent is not and has not been a "United States real property holding corporation" within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(1)(A)(ii) of the Code.

### 6.20 No Additional Representations

NONE OF PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB OR ANY OF THEIR AFFILIATES IS MAKING ANY WRITTEN OR ORAL REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, OF ANY NATURE WHATSOEVER, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN THIS *Article VI*. EACH OF PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB AND THEIR AFFILIATES DISCLAIMS ANY OTHER REPRESENTATIONS OR WARRANTIES, WHETHER MADE BY PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB OR ANY OF THEIR RESPECTIVE AFFILIATES OR ANY OF THEIR OR THEIR AFFILIATES' RESPECTIVE REPRESENTATIVES. EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES SET FORTH IN THIS *Article VI*, EACH OF PARENT, NOVITEX MERGER SUB AND SOURCEHOV MERGER SUB (ON BEHALF OF THEMSELVES AND THEIR RESPECTIVE AFFILIATES) HEREBY DISCLAIMS ALL LIABILITY AND RESPONSIBILITY FOR ANY REPRESENTATION, WARRANTY, PROJECTION, FORECAST, STATEMENT OR INFORMATION MADE, COMMUNICATED OR FURNISHED (ORALLY OR IN WRITING) TO THE SELLERS, THE COMPANY OR ANY OF THEIR RESPECTIVE AFFILIATES OR REPRESENTATIVES (INCLUDING ANY OPINION, INFORMATION, PROJECTION OR ADVICE THAT MAY HAVE BEEN OR MAY BE PROVIDED TO THE COMPANY OR ANY MEMBER OF THE COMPANY GROUP BY ANY REPRESENTATIVE OF PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB OR ANY OF THEIR RESPECTIVE AFFILIATES). NOTWITHSTANDING ANYTHING SET FORTH IN THIS AGREEMENT TO THE CONTRARY, NONE OF PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB OR ANY OF THEIR AFFILIATES MAKES ANY REPRESENTATIONS OR WARRANTIES TO THE SELLERS, THE COMPANY OR ANY MEMBER OF THE COMPANY GROUP REGARDING ANY PROJECTIONS OR THE FUTURE OR PROBABLE PROFITABILITY, SUCCESS, BUSINESS, OPPORTUNITIES, RELATIONSHIPS AND OPERATIONS OF PARENT, NOVITEX MERGER SUB, SOURCEHOV MERGER SUB OR ANY OF THEIR AFFILIATES.

## ARTICLE VII

## COVENANTS

### 7.1 Conduct of Business Prior to Closing

(a) Except (i) with the written consent of the other parties to this Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), (ii) as set forth in Section 7.1(a) of the

A-34

Company Disclosure Schedules, (iii) as otherwise expressly contemplated or permitted by the terms of this Agreement or (iv) as required by any applicable Law or any Contract (in existence on the date hereof), from the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms, (A) Novitex shall, and shall cause the other members of the Novitex Company Group to, conduct its Business in the ordinary course and shall use reasonable best efforts to preserve intact their business organization and material Permits, retain its current officers and key employees, and preserve its relationships with its key customers and suppliers and (B) SourceHOV shall, and shall cause the other members of the SourceHOV Company Group to conduct its Business in the ordinary course and shall use reasonable best efforts to preserve intact their business organization and material Permits, retain its current officers and key employees and preserve its relationships with its key customers and suppliers.

(b)  Without limiting the generality of *Section 7.1*, from the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms, except (w) with the written consent of the other parties to this Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), (x) as set forth in Section 7.1(b) of the Company Disclosure Schedules, (y) as otherwise contemplated or permitted by the terms of this Agreement or (z) as required by applicable Law or any Contract (in existence on the date hereof), (A) Novitex shall not, and shall not permit the other members of the Novitex Company Group and (B) SourceHOV shall not, and shall not permit the other members of the SourceHOV Company Group, to:

(i)  transfer, issue, sell or dispose of any shares of capital stock or other equity interests of any member of the Company Group, grant options, warrants, calls or other rights to purchase or repurchase, redeem or otherwise acquire, or offer to repurchase, redeem or otherwise acquire, any shares of the capital stock or other equity interests of any member of the Company Group;

(ii)  effect any recapitalization, reclassification, stock split, stock combination or like change in the capitalization of the Company Group;

(iii)  make, set aside, declare or pay any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock or other equity interest in the Company Group, other than dividends and distributions by any member of the Company Group to another member of the Company Group;

(iv)  (A) incur, create or assume any Indebtedness or guarantee any Indebtedness of another Person, issue or sell any debt securities (or warrants or other rights to acquire any debt securities) of any member of the Company Group (other than incurrence of Indebtedness under any of the Company Group's respective credit facilities entered into prior to the date of this Agreement, including draws on the Company Group's revolving credit facility and other than loans, advances or capital contributions made by one member of the Company Group to another member of the Company Group) in excess of $500,000 individually or $5,000,000 in the aggregate (in each case, in excess of Indebtedness paid off after the date of this Agreement) other than Indebtedness required to be incurred under any Contract in existence on the date hereof or incurred in the ordinary course of business, or (B) make any loans, advances or capital contributions to, or investments in, any other Person (other than loans, advances or capital contributions made by one member of the Company Group to another member of the Company Group);

(v)  amend the certificate of incorporation or bylaws (or other comparable governing documents) of any member of the Company Group;

(vi)  grant any material Encumbrances on any property or assets (whether tangible or intangible) of any member of the Company Group having an aggregate value in excess of $2,500,000, other than Permitted Encumbrances;

A-35

(vii)  except in the ordinary course of the Company Group's Business, (A) adopt, enter into, terminate or amend any Benefit Plan other than as required by applicable law or pursuant to the terms of any Benefit Plan in effect as of the date of this Agreement, (B) recognize any union or employee representative for purposes of collective bargaining or negotiate or enter into any collective bargaining agreement, works council agreement, labor union contract, trade union agreement or other similar agreement or understanding with any union, works council, trade union or other labor organization other than as required by applicable law, (C) waive any restrictive covenant obligation of any director, officer, service provider or employee of any member of the Company Group, (D) pay or agree to pay to any director, officer or employee, consultant, agent or individual independent contractor, whether past or present, any pension, retirement allowance or other employee benefit not required by any existing benefit plan (or any arrangement that would be a benefit plan if in effect as of the date hereof), or (E) take any action to accelerate the vesting, funding or payment of any compensation or benefits under any Benefit Plans;

(viii)  (A) grant any increase in the compensation, incentives or benefits payable or to become payable to any Person who is a director or executive officer of any member of the Company Group as of the date of this Agreement, or (B) enter into any new, or materially amend any existing material employment or severance or termination agreement with any director or executive officer other than with respect to new hires,

(ix)  except as required by changes in GAAP, change any member of the Company Group's methods of accounting in any manner that would have a material impact on the Company Group;

(x)  make, change or revoke any material Tax election; file any material amendment to any income Tax Return; adopt or change any accounting method in respect of Taxes; change any annual Tax accounting period; enter into any material Tax allocation agreement, Tax sharing agreement or Tax indemnity agreement, other than commercial contracts entered into in the ordinary course of business a primary purpose of which is not related to Taxes with vendors, customers or landlords; enter into any closing agreement with respect to any Tax; settle or compromise any claim, notice, audit report or assessment in respect of material Taxes; apply for or enter into any ruling from any Tax authority with respect to Taxes; surrender any right to claim a material Tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any material Tax claim or assessment;

(xi)  except in the ordinary course of the Company Group's Business, transfer, sell, lease or license to a third party, abandon, permit to lapse or expire, dedicate to the public, or otherwise dispose of, or agree to transfer, sell, lease or license to a third party, abandon, permit to lapse or expire, dedicate to public, or otherwise dispose of, any portion of the property or assets of any member of the Company Group, other than any sale, lease or disposition in the ordinary course of business or pursuant to agreements existing on the date hereof and set forth on Section 7.1(b)(xi) of the Company Disclosure Schedules;

(xii)  (a) merge, consolidate, combine or amalgamate with any Person, (b) purchase or otherwise acquire (whether by merging or consolidating with, purchasing any equity interest in or a substantial portion of the assets of, or by any other manner) any business or any corporation, partnership, association or other business organization or division thereof, or (c) purchase or otherwise acquire, or lease or license, any property or assets, other than (i) acquisitions of equipment or inventory in the ordinary course of business or (ii) transactions as to which the aggregate consideration paid or payable (A) in any individual transaction is not in excess of $2,500,000 or (B) in the aggregate is not in excess of $10,000,000;

(xiii)  except in the ordinary course of the Company Group's Business, enter into any joint venture with a third party;

A-36

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 896 of 1110    PageID 2517

(xiv)  authorize, recommend, propose or announce an intention to adopt a plan of complete or partial liquidation or dissolution;

(xv)  enter into, renew, modify or revise any Contract with any Related Person of any member of the Company Group, other than Contracts among members of the Company Group, or with any former or present director or officer of any member of the Company Group or with any Affiliates of the foregoing Persons (including the Company Group) or any other Person covered under Item 404 of Regulation S-K under the Securities Act;

(xvi)  except in the ordinary course of the Company Group's Business, use its reasonable best efforts to maintain with financially responsible insurance companies insurance at least in such amounts and against at least such risk and losses as are consistent in all material respects with such entities' past practices;

(xvii)  waive, release, assign, settle or compromise any Action pending or threatened against any member of the Company Group or any of their respective directors or officers other than in the case of Actions or claims either (A) (i) for an amount not greater than $500,000 individually (including any single or aggregated claims arising out of the same or similar facts, events or circumstances) or $1,000,000 in the aggregate (determined in each case net of insurance proceeds) and (ii) would not prohibit or materially restrict any member of the Company Group from operating its business substantially as currently conducted or anticipated to be conducted, except in the ordinary course of the Company Group's Business, or (B) if the loss resulting from such waiver, release, assignment settlement or compromise is reimbursed or shall be reimbursed to any member of the Company Group by an insurance policy or pursuant to any other kind of contractual indemnification set forth in any other Contract, in each case without the imposition of equitable relief on, or the admission of wrongdoing by any member of the Company Group or any of its officers or directors;

(xviii)  except in the ordinary course of the Company Group's Business, amend or modify in any manner materially adverse to any member of the Company Group any Material Contracts;

(xix)  except in the ordinary course of the Company Group's Business, make or enter into any contract to make any capital expenditures in excess of $1,000,000 other than capital expenditures made in the ordinary course of the Company Group Business if such capital expenditures are made to acquire equipment to satisfy requirements in Contracts with customers;

(xx)  except in the ordinary course of the Company Group's Business, manage its working capital (including the timing of collection of accounts receivable and of the payment of accounts payable and the management of inventory);

(xxi)  engage in any activity that would result in a violation of International Trade Control Laws;

(xxii)  conduct a mass termination or engage in any other activity that would trigger notice obligations or liability under the Worker Adjustment and Retraining Notification Act or any similar applicable Law; or

(xxiii)  authorize, or commit or agree to take, any of the foregoing actions.

(c)  From the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms, except (i) with the written consent of the other parties to this Agreement (which consent shall not be unreasonably withheld, conditioned or delayed), (ii) as set forth in Section 7.1(c) of the Parent Disclosure Schedules, (iii) as otherwise contemplated or permitted by

A-37

Supp.App. 0894

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 897 of 1110    PageID 2518

the terms of this Agreement or (iv) as required by Law or any Contract, Parent shall not, and shall not permit any Subsidiary to:

(i)  form any Subsidiary;

(ii)  issue any shares of capital stock or other equity interests or grant options, warrants, calls or other rights to purchase or otherwise acquire shares of the capital stock or other equity interests of Parent;

(iii)  effect any recapitalization, reclassification, stock split or like change in the capitalization of Parent or any Subsidiary;

(iv)  make, set aside, declare or pay any dividend or distribution payable in cash, stock, property or otherwise with respect to any of its capital stock;

(v)  except for any Indebtedness incurred in connection with the Financing, incur any Indebtedness or guarantee any Indebtedness of another Person, issue or sell any debt securities (or warrants or other rights to acquire any debt securities)

(vi)  make any loans, advances or capital contributions to any other Person;

(vii)  amend its certificate of incorporation or bylaws (or other comparable governing documents);

(viii)  grant any material Encumbrances on any property or assets (whether tangible or intangible) of Parent;

(ix)  (A) adopt, enter into, terminate or amend any Benefit Plan other than as required by applicable law or pursuant to the terms of any Benefit Plan in effect as of the date of this Agreement or (B) increase the compensation of any Person who is a director or executive officer of Parent;

(x)  except as required by changes in GAAP, change any of its methods of accounting in any manner;

(xi)  make, change or revoke any material Tax election; file any material amendment to any income Tax Return; adopt or change any accounting method in respect of Taxes; change any annual Tax accounting period; enter into any material Tax allocation agreement, Tax sharing agreement or Tax indemnity agreement, other than commercial contracts entered into in the ordinary course of business a primary purpose of which is not related to Taxes with vendors, customers or landlords; enter into any closing agreement with respect to any Tax; settle or compromise any claim, notice, audit report or assessment in respect of material Taxes; apply for or enter into any ruling from any Tax authority with respect to Taxes; surrender any right to claim a material Tax refund; or consent to any extension or waiver of the statute of limitations period applicable to any material Tax claim or assessment;

(xii)  purchase or otherwise acquire (whether by merger or otherwise), or lease or license, any property or assets;

(xiii)  enter into any joint venture with a third party;

(xiv)  except in the ordinary course of Parent's operations or as is reasonably necessary in connection with the transactions contemplated hereby, enter into, renew, modify or revise any Contract;

(xv)  enter into any transactions with any of its Affiliate;

(xvi)  waive, release, assign, settle or compromise any material Action pending or threatened against Parent or any of its directors or officers other than in the case of Actions or claims either

A-38

Supp.App. 0895

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 898 of 1110    PageID 2519

(i) for an amount not greater than $500,000 individually (including any single or aggregated claims arising out of the same or similar facts, events or circumstances) or $1,000,000 in the aggregate (determined in each case net of insurance proceeds) or (ii) if the loss resulting from such waiver, release, assignment settlement or compromise is reimbursed to any member of the Company Group by an insurance policy, in each case without the imposition of equitable relief on, or the admission of wrongdoing by any member of the Company Group or any of its officers or directors;

(xvii)  engage in any activity that would result in a violation of International Trade Control Laws; or

(xviii)  authorize, or commit or agree to take, any of the foregoing actions.

**7.2    Access to Information**

From and after the date of this Agreement until the earlier of the Closing and the termination of this Agreement in accordance with its terms, each Company shall, and shall cause the members of its Company Group to, afford to the other parties to this Agreement and their Representatives reasonable access, upon reasonable advance notice, during normal business hours to all the senior management, properties, books, Contracts, commitments, Tax returns and records of such Company Group and, during such period, shall furnish as promptly as practicable to the other parties to this Agreement any information concerning such Company Group as the other parties to this Agreement may reasonably request; *provided, however*, that (i) such access or furnishing of information shall be conducted during normal business hours, under the supervision of such Company's personnel, and in such a manner as to not unreasonably disrupt the normal operations of such Company Group, (ii) neither the Companies nor any member of each Company Group is under any obligation to disclose to the other parties to this Agreement or their Representatives any information the disclosure of which is restricted by a Contract in effect as of the date of this Agreement or applicable Law or would result in the waiver of any attorney-client, work product or other applicable privilege and (iii) no party to this Agreement shall conduct any environmental sampling or analysis, including of the nature commonly referred to as a "Phase II Environmental Assessment"; *provided, further*, that each Company may designate certain portions of such information as being provided on an outside-counsel basis only. All information provided pursuant to this *Section 7.2* shall remain subject in all respects to the Confidentiality Agreements.

**7.3    Confidentiality**

(a)  Parent acknowledges that the information being provided to it or any of its Affiliates or any of its or its Affiliates' Representatives in connection with the consummation of the transactions contemplated hereby is being provided subject to the terms of (i) a confidentiality agreement dated as of January 6, 2017 between Parent and Novitex and (ii) a confidentiality agreement dated as of January 6, 2017 between Parent and SourceHOV (the "***Parent Confidentiality Agreements***"). Parent acknowledges that it is, and shall remain until the Closing, subject to the terms of the Parent Confidentiality Agreements, which are incorporated herein by reference. If this Agreement is, for any reason, terminated prior to the Closing, the Parent Confidentiality Agreements shall continue in full force and effect in accordance with its terms.

(b)  SourceHOV acknowledges that the information being provided to it or any of its Affiliates or any of its or its Affiliates' Representatives in connection with the consummation of the transactions contemplated hereby is being provided subject to the terms of a confidentiality agreement dated as of November 7, 2016 between SourceHOV Holdings, Inc. and Novitex (the "***Novitex Confidentiality Agreement***"). SourceHOV acknowledges that it is, and shall remain until the Closing, subject to the terms of the Novitex Confidentiality Agreement, which are incorporated herein by reference. If this Agreement is, for any reason, terminated prior to the Closing, the Novitex Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

A-39

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 899 of 1110　　PageID 2520

(c)　Novitex acknowledges that the information being provided to it or any of its Affiliates or any of its or its Affiliates' Representatives in connection with the consummation of the transactions contemplated hereby is being provided subject to the terms of a confidentiality agreement dated as of January 23, 2017 between SourceHOV and Novitex (the "*SourceHOV Confidentiality Agreement*"). Novitex acknowledges that it is, and shall remain until the Closing, subject to the terms of the SourceHOV Confidentiality Agreement, which are incorporated herein by reference. If this Agreement is, for any reason, terminated prior to the Closing, the SourceHOV Confidentiality Agreement shall continue in full force and effect in accordance with its terms.

(d)　Effective upon, and only upon, the Closing, the confidentiality obligations under each of the Confidentiality Agreements shall terminate except with respect to the provisions regarding disclosure and use of confidential information not related to the Company Group or such Business, which shall continue indefinitely.

**7.4　Efforts to Consummate; Consents and Filings**

(a)　Each of the parties and their respective Affiliates shall use all reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by this Agreement as promptly as practicable, including to (i) obtain from any Governmental Authority with regulatory jurisdiction over enforcement of any applicable Antitrust Laws ("*Governmental Antitrust Authority*"), all Approvals as are necessary for the consummation of the transactions contemplated by this Agreement and (ii) promptly (and, with respect to the HSR Act, in no event later than twenty (20) Business Days after the date hereof) make all necessary filings (and if required under applicable Law, drafts thereof), and thereafter make any other required submissions, with respect to the transactions contemplated by this Agreement required under the HSR Act or any other applicable Antitrust Law.

(b)　Without limiting the generality of the parties' undertaking pursuant to *Section 7.4(a)*, each party agrees to use its reasonable best efforts and to take any and all steps necessary to avoid or eliminate each and every impediment under any Antitrust Law that may be asserted by any Governmental Antitrust Authority or any other party so as to enable the parties hereto to expeditiously close the transactions contemplated by this Agreement no later than the Outside Date. Each party hereto shall use reasonable best efforts to resolve such objections, if any, as may be asserted by any Governmental Antitrust Authority with respect to the transactions contemplated hereby. In connection therewith, if any administrative or judicial action or proceeding is instituted (or threatened to be instituted) challenging such transactions, and if, by mutual agreement, the parties hereto decide that litigation is in their best interests, each party shall cooperate and use reasonable best efforts vigorously to contest and resist any such action or proceeding and to have vacated, lifted, reversed, or overturned any Order that is in effect and that prohibits, prevents, or restricts consummation of such transactions. Notwithstanding the foregoing, no party nor any of its Affiliates shall be required to (i) divest or hold separate, or enter into any licensing or similar arrangement with respect to, any assets or any portion of the business of any party or to otherwise propose, proffer or agree to any other requirement, obligation, condition or restriction on the conduct of the business of any party, or (ii) to litigate any suit, claim, action, investigation or proceeding challenging or seeking to restrain or prohibit the consummation of the transaction.

(c)　As soon as practicable after the date of this Agreement, the Sellers shall cause the Companies, as applicable, to submit to the United States Defense Security Service ("*DSS*") and, to the extent applicable, any other Governmental Authority, a notification of the transfer of ownership contemplated hereby in accordance with the National Industrial Security Program Operating Manual (DoD 5220.22-M) ("*NISPOM*"), and any other applicable national or industrial security regulations (the "*DSS Notification*"). The Companies and the Sellers shall fully cooperate with Parent in preparing the

A-40

Supp.App. 0897

DSS Notification, any other submissions to DSS required by the NISPOM, and negotiating a Foreign Ownership Control or Influence mitigation arrangement with DSS for the continuation of all necessary U.S. government facility security clearances (the "**DSS Approval**"). The Companies, the Sellers and Parent shall use their commercially reasonable efforts to obtain the DSS Approval, as promptly as practicable.

(d)　Each of the parties shall promptly notify the other parties of any substantive communication it or any of its Affiliates receives from any Governmental Antitrust Authority and of any substantive communication received or given in connection with any proceeding by a private party relating to the matters that are the subject of this Agreement, and consult each other party prior to any substantive communication with any Governmental Antitrust Authority to permit the other parties to review in advance any proposed communication by such party to any Governmental Antitrust Authority. No party to this Agreement shall agree to participate in any substantive meeting with any Governmental Antitrust Authority in respect of any filings, investigation or other inquiry (including in connection with any proceeding by a private party) unless it consults with the other parties in advance and, to the extent permitted by such Governmental Antitrust Authority, gives the other parties the opportunity to attend and participate at such meeting. Subject to the Confidentiality Agreement, the parties will coordinate and cooperate fully with each other in exchanging such information and providing such assistance as the other parties may reasonably request in connection with the foregoing and in seeking early termination of any applicable waiting periods, including under the HSR Act. Subject to each of the Confidentiality Agreements, the parties will provide each other with copies of all correspondence, filings (except for Item 4(c) and 4(d) documents) or communications between them or any of their Representatives, on the one hand, and any Governmental Antitrust Authority or members of its staff, on the other hand, with respect to this Agreement and the transactions contemplated hereby.

(e)　During the period from the date of this Agreement and continuing until the earlier of the Closing and the termination of this Agreement pursuant to *Article IX* in accordance with its terms, except with the prior written consent of each Company, neither (a) Parent and its Affiliates, (b) the HGM Group, nor (c) Novitex Parent shall do anything, including entering into any transaction (or making any antitrust or competition law filing in connection with such transaction), that could reasonably be expected to prevent or delay any filings or Approvals required under the HSR Act or other applicable Antitrust Laws.

**7.5　Financing**

(a)　Subject to the terms and conditions set forth in this Agreement, each of Parent and each Company shall use its commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable to arrange and obtain the Financing on the terms and conditions described in the Commitment Letter and any related Fee Letter (it being understood that (x) the assistance of Novitex shall be limited to the Novitex Company Group and matters related thereto, (y) the assistance of SourceHOV shall be limited to the SourceHOV Company Group and matters related thereto and (z) the assistance of Parent shall be limited to Parent, Novitex Merger Sub and SourceHOV Merger Sub and matters related thereto), and (iii) Parent shall not (x) permit any amendment or modification to be made to, (y) permit any waiver of any provision or remedy under, or (z) provide any consent under the Commitment Letter or any related Fee Letter, in each case, without the consent of each of SourceHOV and Novitex.

(b)　(i) Each party specified below, as applicable, shall use its commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things reasonably necessary, proper or advisable (i) to, with respect to Parent, maintain in effect the Commitment Letter in accordance with the terms and subject to the conditions thereof, (ii) to, with respect to the Company, negotiate, and with respect to Parent, enter into, all definitive agreements with respect to the Financing contemplated by the Commitment Letter on the terms and conditions (including any "flex" provisions)

A-41

Supp.App. 0898

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 901 of 1110    PageID 2522

Table of Contents

set forth in the Commitment Letter and any related Fee Letter, (iii) to, with respect to each of Parent and the Company, satisfy on a timely basis all conditions in such definitive agreements that are applicable to such party or that are within such party's control and, with respect to Parent, consummate the Financing at or prior to the Closing (including, if necessary, any "flex" provisions), (iv) to, with respect to Parent, comply with Parent's obligations under the Commitment Letter and any related Fee Letter and each definitive agreement with respect thereto, and, to, with respect to Company, assist Parent in meeting such obligations, (v) to, with respect to each of Parent and the Company, timely assist in the preparation of the necessary offering circulars, private placement memoranda or other offering documents or marketing materials with respect to the Financing. Each of Parent and the Company shall allow the other parties to fully participate in the negotiation of the Financing and shall keep the other parties reasonably informed on a current basis and in reasonable detail of the status of its efforts to arrange the Financing and provide to the other parties copies of all definitive documents related to the Financing to the extent it receives them. Notwithstanding anything to the contrary set forth herein, Parent's obligations under this *Section 7.5* and *Section 7.6* shall be limited to those actions reasonably requested by the Company, and Parent shall not take any substantive action in connection with the Financing, including those set forth in the preceding sentence, except at the written request of each Company. Notwithstanding anything to the contrary in this Agreement, Novitex Parent, with the written consent of the HGM Group, shall have the right to direct Parent to enter into any amendments or modifications to the Commitment Letter and the Fee Letter (and any related engagement letter and fee credit letters) so long as such amendments or modifications would not (x) impose new or additional conditions, or otherwise expand, amend or modify any of the conditions, to the receipt of the Financing, (y) reduce the amount of cash proceeds from the Financing in a manner that would reasonably be expected to prevent or materially impair or delay the ability of Parent to consummate the transactions contemplated hereby or (z) impose any additional obligations or expand the scope of any existing obligations on Parent or expand or add any representations or covenants made by or applicable to Parent, including without limitation, with respect to the payment of any fees, reimbursement of expenses and provision of any indemnities, in each case prior to the Closing Date; *provided* that consent of Parent shall be required (which consent shall not be unreasonably withheld, conditioned or delayed) for any amendment to the Financing terms that results in the reduction of the total amount of Financing other than a reduction in accordance with the terms thereof or the terms of this Agreement. Each party shall give the other party prompt written notice of the receipt by such party of any written notice from any Person with respect to any breach, termination or repudiation by any party to any Commitment Letter, Fee Letter or any other definitive document related to the Financing.

(c)   Each of Parent and the Companies shall use its commercially reasonable efforts to cause the lenders and any other Persons providing Financing to fund on the Closing Date the Financing required to consummate the transactions contemplated by this Agreement and the other transactions contemplated by the Commitment Letter.

(d)   If the Commitment Letter shall be terminated for any reason, or if any portion of the Financing becomes unavailable on the terms and conditions (including any "flex" provisions) contemplated in the Commitment Letter, each of Parent and each Company shall use its commercially reasonable efforts to arrange for Parent to obtain alternative financing from alternative sources on terms and conditions not less favorable to Parent or the Companies than those set forth in the Commitment Letter and the related Fee Letter (including any "flex" provisions) and in an amount at least equal to the Financing or such unavailable portion thereof, as the case may be (the "***Alternate Financing***"), and to obtain a new financing commitment letter with respect to such Alternate Financing (the "***New Commitment Letter***"), which shall replace the existing Commitment Letter, a true and complete copy of which (together with any related fee or other letter) shall be promptly provided to the Company; *provided* that, (i) if the parties proceed with the Alternate Financing, they shall be subject to the same obligations as set forth in this *Section 7.5* and (ii) Parent's obligations to obtain alternative financing under this clause (d) shall be limited to those actions reasonably requested in

A-42

writing by the Company. In the event any New Commitment Letter is obtained, (x) any reference in this Agreement to the "Financing" shall mean the financing contemplated by the Commitment Letter as modified pursuant to clause (y) below, (y) any reference in this Agreement to the "Commitment Letter" shall be deemed to include the Commitment Letter that is not superseded by a New Commitment Letter at the time in question and any New Commitment Letter to the extent then in effect and (z) any reference in this Agreement to "Fee Letter" shall be deemed to include any fee or other letter relating to the Commitment Letters that are not superseded by a New Commitment Letter at the time in question and any New Commitment Letter to the extent then in effect.

**7.6    Financing Cooperation**

(a)   Prior to the Closing, each of Parent and the Company shall, and shall cause each of its respective Subsidiaries to use commercially reasonable efforts to provide such cooperation as is customary for financings of the type contemplated by the Commitment Letter and/or Engagement Letter and as is reasonably necessary in connection with arranging and obtaining the Financing (it being understood that (i) the cooperation of Novitex shall be limited to the Novitex Company Group and matters related thereto, (ii) the cooperation of SourceHOV shall be limited to the SourceHOV Company Group and matters related thereto, and (iii) the cooperation of Parent shall be limited to Parent, Novitex Merger Sub and SourceHOV Merger Sub and matters related thereto), including:

(i)   reasonably assisting with the preparation of a confidential information memorandum or similar offering document for the Financing and customary rating agency presentations;

(ii)   furnishing to the sources of Financing as promptly as practicable all financial information required to be made available pursuant to Section 3 (Syndication) and Exhibit E, clauses (3), (4), (5) and (6) of the Commitment Letter;

(iii)   using commercially reasonable efforts to obtain accountants' comfort letters, consents, legal opinions, surveys and title insurance, as reasonably requested by the sources of Financing;

(iv)   taking all commercially reasonable actions necessary to (A) permit the prospective lenders involved in the Financing to evaluate such Company Group's current assets, cash management and accounting systems, policies and procedures relating thereto for the purpose of establishing collateral arrangements to the extent customary and reasonable and (B) establish bank and other accounts and blocked account agreements and lock box arrangements to the extent necessary in connection with the Financing;

(v)   assisting in preparation for and participation upon reasonable advance notice in a reasonable number of meetings and calls, drafting sessions, rating agency presentations, road shows and due diligence sessions (including accounting due diligence sessions) and sessions with prospective lenders, investors and ratings agencies, and assisting in obtaining ratings as contemplated by the Financing;

(vi)   assisting the Financing Sources in the preparation of (A) offering documents, private placement memoranda, bank information memoranda, prospectuses and similar marketing documents for any of the Financing, including the execution and delivery of customary representation letters in connection with bank information memoranda authorizing the distribution of information to prospective lenders and identifying any portion of such information that constitutes material, nonpublic information regarding Parent, the Company or any of their respective Subsidiaries or their respective securities, provided that any such letter executed by Parent shall contain knowledge qualifiers with respect to information regarding the Company or their respective Subsidiaries, and (B) customary materials for rating agency presentations;

(vii)   as promptly as reasonably practicable (A) furnishing the Financing Sources and their respective Representatives with the applicable Required Information and (B) inform the parties

A-43

hereto if the chief executive officer, chief financial officer, treasurer or controller of Parent or the Company or any member of the Company Board shall have actual knowledge of any facts as a result of which a restatement of any financial statements comprising a portion of the applicable Required Information in order for such financial statements to comply with GAAP is probable;

(viii)  providing customary representations in connection with the preparation of financial statements and other financial data of Parent, the Company and their respective Subsidiaries and requesting accountants' consents in connection with the use of such Person's financial statements in offering documents, prospectuses, Current Reports on Form 8-K and other documents to be filed with the SEC, if necessary;

(ix)  using commercially reasonable efforts in connection with the preparation of pro forma financial information and financial statements to the extent required by SEC rules and regulations or necessary or reasonably required by the Financing Sources to be included in any offering documents; provided that neither the Company nor any of its subsidiaries or Representatives shall be responsible in any manner for information relating to (A) the proposed debt and equity capitalization that is required for such pro forma financial information or assumed interest rates, dividends (if any) and fees and expenses relating to such debt and equity capitalization or (B) any post-Closing or pro forma cost savings, synergies, capitalization, ownership or other pro forma adjustments desired to be incorporated into any information used in connection with the Financing;

(x)  executing and delivering (effective as of (but not before)) the Closing any credit agreements, indentures, pledge and security documents, other definitive financing documents, or other certificates, or documents as may be reasonably requested by the Financing Sources, including a certificate of the chief financial officer of the borrower or issuer of such Financing with respect to solvency matters in the form set forth as an annex to the Financing Commitments) and otherwise facilitating the pledging of collateral (including (x) cooperation in connection with efforts to obtain environmental assessments and title insurance) and (y) using commercially reasonable efforts to procure customary (e.g., local counsel) legal opinions;

(xi)  to the extent the same become necessary or advisable in connection with the Financing, obtaining waivers, consents, estoppels and approvals from other parties to material leases, encumbrances and Contracts relating to each member of any Company Group (including by arranging discussions among Parent, each Company and the Financing Sources and their respective Representatives with other parties to such material leases, encumbrances and Contracts as of the Closing);

(xii)  taking all corporate actions, subject to the occurrence of the Closing that are necessary or customary to permit the consummation of the Financing; and

(xiii)  providing at least five (5) Business Days prior to the Closing Date all documentation and other information required by applicable "know your customer" and anti-money laundering rules and regulations including the USA PATRIOT Act to the extent reasonably requested at least eight (8) Business Days prior to the anticipated Closing Date;

*provided* that (1) nothing herein shall require such cooperation to the extent it would require the Company or Parent or its respective Affiliates to waive or amend any terms of this Agreement or any other Contract to which any of them is a party or to agree to pay any fees, reimburse any expenses or, with respect to the Company, give any indemnities prior to the Closing, or to incur any liabilities or, with respect to the Company, give any indemnities, that are effective prior to the Closing, (2) nothing herein shall require such cooperation from the Company or its Affiliates to the extent it would, in the Company's reasonable judgment, unreasonably interfere with the ongoing operations of the Company or its respective Affiliates, (3) no action, liability or obligation of the Company or its respective

A-44

Affiliates under any certificate, agreement, arrangement, document or instrument relating to the Financing shall be effective until the Closing, (4) neither the Companies nor any of its respective Affiliates shall be required to issue any offering documents, private placement memoranda, bank information memoranda, prospectuses and similar documents required in relation to the Financing, but such documents shall contain disclosure and financial statements reflecting the Company as an obligor following the Closing and the Companies shall prepare such documents and (5) notwithstanding anything to the contrary in this Section *7.6*, neither the Companies nor any of its respective Affiliates shall be required prior to the Closing to undertake any obligation or execute any definitive financing documents, including any credit or other agreements, pledge or security documents, or other certificates, legal opinions or documents in connection with the Financing. Each of Parent and the Company and its respective Representatives shall be given a reasonable opportunity to review and comment on any financing documents and any materials that are to be presented during any lender syndication or roadshow meetings conducted in connection with the Financing, and each of Parent and each Company shall give due consideration to all reasonable additions, deletions or changes suggested by the Company or Parent and its respective Representatives.

(b)  All information provided by the Company or any of its respective Affiliates or any of their respective Representatives pursuant to this *Section 7.5(a)* shall be kept confidential in accordance with each of the Confidentiality Agreements, except that Parent shall be permitted to disclose such information to the parties to the Commitment Letter and to any other sources of the Financing, rating agencies and prospective lenders during syndication of the Financing subject to the sources of Financings, ratings agencies and prospective lenders entering into confidentiality undertakings with respect to such information on terms reasonably acceptable to the Company (it being understood that the confidentiality undertakings in the Commitment Letter are acceptable to the Company).

(c)  Except for the representations and warranties of the Company set forth in *Article V* of this Agreement, the Company shall not have any liability to Parent, Novitex Merger Sub or SourceHOV Merger Sub in respect of any financial statements, other financial information or data or other information provided pursuant to this *Section 7.5(a)*.

(d)  The Company hereby consents to the use of each member of the Company Group's logos in connection with the marketing of the Financing; provided that such logos are used solely in a manner that is not intended to or reasonably likely to harm or disparage any member of the Company Group or the reputation or goodwill of any member of the Company Group.

(e)  Each of Parent and the Company shall, and shall cause its respective Subsidiaries to, use commercially reasonable efforts to periodically update any Required Information as may be necessary so that such Required Information is Compliant. Parent agrees to (i) file all reports on Form 10-K and Form 10-Q and Form 8-K, to the extent required to include financial information pursuant to Item 9.01 thereof, and (ii) use commercially reasonable efforts to file all other Forms 8-K, in each case, required to be filed with the SEC pursuant to the Exchange Act prior to the Closing Date in accordance with the time periods required by the Exchange Act. In addition, if, in connection with a marketing effort contemplated by the Financing, the Company reasonably requests Parent to file a Current Report on Form 8-K pursuant to the Exchange Act that contains material non-public information with respect to Parent and its Subsidiaries, which the Company reasonably determines to include in a customary offering memorandum for the Financing, then, upon Parent's review of and reasonable satisfaction with such filing, Parent shall file such Current Report on Form 8-K.

**7.7  Expenses; Transfer Taxes**

(a)  All costs and expenses incurred in connection with this Agreement and the Related Documents and the transactions contemplated hereby and thereby shall be paid (i) in the case of SourceHOV and the HGM Group, by SourceHOV and (ii) in the case of Novitex and Apollo, by Novitex and (iii) in the case of Parent, by Parent other than as provided for below. Parent shall pay any

A-45

Supp.App. 0902

Table of Contents

and all filing fees required by Governmental Authorities, including with respect to Permits required in connection with the execution and delivery of this Agreement, the performance of the obligations hereunder and the consummation of the transactions contemplated hereby, including filing, printer, mailing and printing fees in connection with the Proxy or any other SEC filings and filings under the HSR Act or other Antitrust Laws or any filing, printer, mailing and printing fees as required in connection with the Financing (all of the foregoing, collectively, the "*Transaction Costs*"), in an aggregate amount not to exceed $250,000 (the "*Cap*"). SourceHOV, Novitex and Parent shall each be responsible for one-third ($^1$/3) of any Transaction Costs in excess of the Cap until Parent shall have paid in the aggregate $450,000 of Transaction Costs and from and after such time, Novitex and SourceHOV shall each be responsible for one-half ($^1$/2) of any remaining Transaction Costs incurred by Parent. To the extent Parent needs to remit payment in connection with any of the Transaction Costs for which the other parties are also responsible, Novitex and SourceHOV shall as promptly as practicable (but in no case more than five (5) Business Days) following receipt of evidence of payment, reimburse Parent for their allocable share.

(b)   All transfer, documentary, sales, use, registration, value-added and other similar Taxes (including all applicable real estate transfer Taxes and real property transfer gains Taxes and including any filing and recording fees) and related amounts (including any penalties, interest and additions to Tax) incurred in connection with this Agreement, the Related Documents, the SourceHOV Merger, the Novitex Merger and the other transactions contemplated hereby and thereby ("*Transfer Taxes*") shall be paid by Novitex and SourceHOV as incurred. Each party shall use commercially reasonable efforts to avail itself of any available exemptions from any such Transfer Taxes, and to cooperate with the other parties in providing any information and documentation that may be necessary to obtain such exemptions.

### 7.8   Tax-Free Reorganization

(a)   Parent, the Companies and Merger Sub shall use their respective reasonable best efforts to cause each of the SourceHOV Merger and the Novitex Merger to qualify, and agree not to, and not to permit or cause any affiliate or any subsidiary to, take any actions or cause any action to be taken that would reasonably be expected to prevent the SourceHOV Merger or the Novitex Merger from qualifying, as a "reorganization" under Section 368(a) of the Code.

(b)   This Agreement is intended to constitute, and the parties hereto hereby adopt this Agreement as, a "plan of reorganization" within the meaning of Treasury Regulation Sections 1.368-2(g) and 1.368-3(a). Parent, the Companies and Merger Sub shall treat, and shall not take any tax reporting position inconsistent with the treatment of, each of the SourceHOV Merger and the Novitex Merger as a "reorganization" within the meaning of Section 368(a) of the Code for U.S. federal, state and other relevant Tax purposes, unless otherwise required pursuant to a "determination" within the meaning of Section 1313(a) of the Code.

### 7.9   Publicity

The Sellers and Parent shall reasonably cooperate to (i) prepare and make a public announcement regarding the transactions contemplated by this Agreement on the date hereof and (ii) create and implement a communications plan regarding the transactions contemplated hereby (the "*Communications Plan*") promptly following the date hereof. Notwithstanding the foregoing, none of the Parties will make any public announcement or issue any public communication regarding this Agreement, the Related Documents or the transactions contemplated hereby or any matter related to the foregoing, without the prior written consent of the Sellers, in the case of a public announcement by Parent, or Parent, in the case of a public announcement by the Sellers (such consents, in either case, not to be unreasonably withheld, conditioned or delayed), except (A) if such announcement or other communication is required by applicable Law, in which case the disclosing Party shall, to the extent permitted by applicable Law, first allow such other Parties to review such announcement or

A-46

Supp.App. 0903

communication and the opportunity to comment thereon and the disclosing Party shall consider such comments in good faith, (B) in the case of the Sellers, Parent and their respective Affiliates, if such announcement or other communication is made in connection with fundraising or other investment related activities and is made to such Person's direct and indirect investors or potential investors or financing sources subject to an obligation of confidentiality, (C) to the extent provided for in the Communications Plan, internal announcements to employees of the Companies, (D) to the extent such announcements or other communications contain only information previously disclosed in a public statement, press release or other communication previously approved in accordance with this *Section 7.9*, and (E) announcements and communications to Governmental Authorities in connection with filings or Permits relating to the transactions contemplated hereby required to be made under this Agreement.

**7.10    Directors' and Officers' Indemnification and Insurance**

(a)    All rights to indemnification, exculpation and advancement existing in favor of the current or former directors, officers, employees and agents of any member of the Company Group or Parent and each Person who served at the request of the Company as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise (the "**D&O Indemnified Persons**"), as provided in the certificate of incorporation, articles of organization, bylaws or similar constituent documents of any member of the Company Group in effect on the date of this Agreement, or in any indemnification agreement or arrangement as in effect as of the date of this Agreement with respect to matters occurring prior to or at the Closing, shall survive the consummation of the SourceHOV Merger, the Novitex Merger and the transactions contemplated hereby and shall continue in full force and effect and that any member of the Company Group will perform and discharge such member of the Company Group's respective obligations to provide such indemnity and exculpation from and after the Closing for a period of six years or until the settlement or final adjudication of any Action commenced during such period. Parent shall cause the certificate of incorporation and bylaws of Novitex Merger Sub, SourceHOV Merger Sub, the Novitex Surviving Company and the SourceHOV Surviving Company to contain provisions with respect to indemnification, exculpation and advancement of the D&O Indemnified Persons no less favorable to the D&O Indemnified Persons than set forth in the Company's certificate of incorporation and bylaws (or other comparable governing documents), as in effect on the date of this Agreement, which provisions shall not be amended, repealed or otherwise modified after the Closing in any manner that would adversely affect the rights of any D&O Indemnified Person thereunder except as is required under applicable Law. From and after the Closing, Parent shall assume, guarantee and stand surety for, and shall cause the SourceHOV Surviving Company, the Novitex Surviving Company and the members of each Company Group to honor, in accordance with their respective terms, each of the covenants contained in this *Section 7.10*.

(b)    From and following the Closing Date, each of Parent, the SourceHOV Surviving Company and the Novitex Surviving Company shall, and shall cause the members of each Company Group to, to the fullest extent permitted under applicable Law, indemnify and hold harmless (and advance funds in respect of each of the foregoing, following receipt of any undertakings required by applicable Law) each of the D&O Indemnified Persons against any liabilities, losses, penalties, fines, claims, damages, reasonable out-of-pocket costs or expenses in connection with any actual or threatened, in writing, Action, arising out of, relating to or in connection with any action or omission occurring or alleged to have occurred in such D&O Indemnified Person's capacity as a director or officer of any member of the Company Group, or in such D&O Indemnified Person's capacity as a director, officer, member, trustee or fiduciary of another corporation, partnership, joint venture, trust, pension or other employee benefit plan or enterprise at the request or for the benefit of any member of the Company Group, before the Closing Date (including acts or omissions in connection with such persons serving as an officer, director or other fiduciary in any entity if such service was at the request or for the benefit of

A-47

Supp.App. 0904

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 907 of 1110    PageID 2528

any member of the Company Group). In the event of any such Action, Parent, the SourceHOV Surviving Company, the Novitex Surviving Company and the members of the Company Group, as applicable, shall reasonably cooperate with the D&O Indemnified Person in the defense of any Action; *provided* that none of Parent, the SourceHOV Surviving Company, the Novitex Surviving Company and the members of the Company Group shall be liable for any settlement effected without its prior written consent. Each of Parent and the Companies hereby acknowledges that certain D&O Indemnified Persons may have rights to indemnification and advancement of expenses provided by a former stockholder of the Company or its respective Affiliates (each, a "***Former Stockholder Indemnitor***") (directly or through insurance obtained by any such entity). Each of Parent and the Companies hereby agrees and acknowledges that (i) it is the indemnitor of first resort with respect to the D&O Indemnified Persons and (ii) it shall be required to advance the full amount of expenses incurred by the D&O Indemnified Persons, as required by Law, the terms of the SourceHOV Surviving Company's and the Novitex Surviving Company's organizational documents, an agreement, vote of stockholders or disinterested directors, or otherwise, without regard to any rights the D&O Indemnified Persons may have against any Former Stockholder Indemnitors and (iii) to the extent permitted by Law, it irrevocably waives, relinquishes and releases the Former Stockholder Indemnitors from any and all claims for contribution, subrogation or any other recovery of any kind in respect thereof. Each of Parent and the Companies further agrees no advancement or payment by any Former Stockholder Indemnitor with respect to any claim for which the D&O Indemnified Persons have sought indemnification pursuant hereto shall affect the foregoing and such Former Stockholder Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of the D&O Indemnified Persons against the SourceHOV Surviving Company, the Novitex Surviving Company and Parent.

(c)   For a period of six years from the Closing Date, Parent shall cause the SourceHOV Surviving Company and the Novitex Surviving Company to, and the SourceHOV Surviving Company and the Novitex Surviving Company shall, maintain and fully pay for directors' and officers' liability insurance covering (as direct beneficiaries) all D&O Indemnified Persons, in each case of the type and with the amount of coverage no less favorable than those of the directors' and officers' liability insurance maintained as of the date of this Agreement by, or for the benefit of, the Company Group (the "***Current Policies***"), and with such other terms as are no less favorable than those in the Current Policies; *provided*, *however*, that (i) in no event shall the SourceHOV Surviving Company and the Novitex Surviving Company be obligated to pay annual premiums greater than 300% of such premiums paid or payable as of the date of this Agreement and (ii) if the annual premium for such coverage and amount of insurance would exceed 300% of such current annual rate, the SourceHOV Surviving Company and the Novitex Surviving Company shall provide the maximum coverage which shall then be available at an annual premium not exceeding 300% of such rate. Parent shall cause the SourceHOV Surviving Company and the Novitex Surviving Company to, and the SourceHOV Surviving Company and the Novitex Surviving Company shall, maintain any such directors' and officers' liability insurance in full force and effect for its full term, and honor all obligations thereunder (including the payment of any applicable premiums).

(d)   If Parent, SourceHOV Surviving Company or the Novitex Surviving Company or any of their respective successors or assigns (i) shall consolidate with or merge into any other Person and shall not be the continuing or surviving corporation or entity of such consolidation or merger or (ii) shall transfer all or substantially all of its properties and assets to any Person, then, and in each such case, proper provisions shall be made so that the successors and assigns of Parent, SourceHOV Surviving Company or the Novitex Surviving Company, as the case may be, shall assume all of the obligations of Parent, SourceHOV Surviving Company or the Novitex Surviving Company, as applicable, set forth in this *Section 7.10*.

A-48

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 908 of 1110    PageID 2529

(e)    The provisions of this *Section 7.10* shall survive the Closing and are (i) intended to be for the benefit of, and will be enforceable by, each D&O Indemnified Person, and each D&O Indemnified Person's heirs, legatees, representatives, successors and assigns, and shall be binding on all successors and assigns of Parent, Novitex Merger Sub, SourceHOV Merger Sub, the Novitex Surviving Company and the SourceHOV Surviving Company and may not be terminated or amended in any manner adverse to such D&O Indemnified Person without its prior written consent and (ii) in addition to, and not in substitution for, any other rights to indemnification or contribution that any such Person may have by Contract or otherwise.

**7.11    Employee Matters**

(a)    As of the Closing Date, Parent shall, or shall cause one of its Subsidiaries to, continue to employ each Person employed by the Company or any of its respective Company Subsidiaries as of the Closing Date, including those on vacation, sick leave, maternity leave, military service, lay-off, disability or other approved leave of absence (such employees, collectively, the "***Company Group Employees***"). Parent agrees that, effective as of the Closing Date and until December 31, 2017, Parent shall provide the Company Group Employees with compensation and benefits (excluding equity and equity based compensation, retiree medical, life insurance and other post-employment benefits, nonqualified deferred compensation and defined benefit pension plans) that are, at Parent's discretion, substantially similar in the aggregate to either (x) those provided to the Company Group Employees immediately prior to the Closing Date, or (y) those provided to similarly situated employees of Parent and its Subsidiaries from time to time after the Closing.

(b)    With respect to any employee benefits that are provided to the Company Group Employees under employee benefits plans of Parent or its Subsidiaries ("***Parent Plans***"), Parent shall, or shall cause its Subsidiaries to, use commercially reasonable efforts to provide that each Company Employee shall be immediately eligible to participate, without any waiting time, and service accrued by the Company Group Employees during employment with any member of each Company Group or their predecessors prior to Closing Date shall be recognized for all purposes, except to the extent necessary to prevent duplication of benefits. With respect to any medical, dental or other welfare benefits that are provided at any time to the Company Group Employees under Parent Plans, Parent shall, or shall cause its Subsidiaries to, use commercially reasonable efforts to provide that any applicable pre-existing condition exclusions and actively-at-work requirements (except to the extent not satisfied under the comparable Benefit Plan as of such time) shall be waived, and any expenses incurred before such time under the comparable Benefit Plan shall be taken into account under such Parent Plan for purposes of satisfying applicable deductible, coinsurance and maximum out-of-pocket provisions.

(c)    Nothing herein shall (i) be construed to establish or be treated as an amendment or modification of any Benefit Plan, (ii) alter or limit Parent's ability to amend, modify or interpret or terminate any Benefit Plan at any time in accordance with the terms of such plan and applicable Law or (iii) give any third party, including any Company Group Employee, any right to rely upon or demand or enforce the provisions of this *Section 7.11*.

**7.12    280G Shareholder Vote**

To the extent necessary to avoid the application of Section 280G of the Code and the applicable final Treasury regulations and rulings thereunder, as soon as reasonably practicable following the date of this Agreement, but in no event later than five (5) Business Days prior to the Closing Date, Novitex shall (i) use commercially reasonable efforts to obtain waivers from each Person who has a right to any payments and/or benefits as a result of or in connection with the transactions contemplated by this Agreement that would reasonably be expected to constitute "parachute payments" within the meaning of Section 280G of the Code and as to which such Person waives his or her rights to some or all of such payments and/or benefits (the "***Waived 280G Benefits***") applicable to such Person so that all remaining payments and/or benefits applicable to such Person shall not be deemed to be "excess

A-49

Supp.App. 0906

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 909 of 1110    PageID 2530

Table of Contents

parachute payments" (within the meaning of Section 280G of the Code), and (ii) following the execution of the waivers described in clause (i), as applicable, solicit the approval of the stockholders of Novitex to the extent required under Section 280G(b)(5)(B) of the Code of any Waived 280G Benefits pursuant to a vote intended to meet the requirements of Section 280G(b)(5)(B) of the Code and the regulations thereunder. Prior to the Closing Date, Novitex shall deliver to Parent and SourceHOV evidence that a vote of the stockholders of Novitex was solicited in accordance with the foregoing provisions of this *Section 7.12* and that either (A) the requisite number of votes were obtained with respect to the Waived 280G Benefits (the "*280G Approval*") and, as a consequence, the Waived 280G Benefits shall be made or provided, or (B) that the 280G Approval was not obtained and, as a consequence, the Waived 280G Benefits shall not be made or provided. Novitex shall provide Parent, SourceHOV and each of their respective representatives, with a copy of such waiver and disclosure statement at least ten (10) Business Days prior to, delivery to the "disqualified individuals" and the stockholders of Novitex of such waiver and disclosure statement, respectively, and Novitex shall reflect in such disclosure statement and waiver any changes reasonably requested by Parent, SourceHOV or their respective representatives. As soon as practicable following the date hereof and no later than fifteen (15) Business Days prior to the Closing, Novitex shall provide Parent and SourceHOV with the calculations and related documentation required to determine whether the vote described in this *Section 7.12* is necessary in order to avoid the imposition of Taxes under Section 4999 of the Code.

**7.13    Control of Operations.**

(a)    Nothing contained in this Agreement shall give Parent, Novitex Merger Sub or SourceHOV Merger Sub, directly or indirectly, the right to control or direct any of either Company Group's operations prior to the Closing.

(b)    Nothing contained in this Agreement shall give the HGM Group or SourceHOV, directly or indirectly, the right to control or direct any member of the Novitex Company Group's operations prior to the Closing.

(c)    Nothing contained in this Agreement shall give Novitex Parent or Novitex, directly or indirectly, the right to control or direct any member of the SourceHOV Company Group's operations prior to the Closing.

(d)    Prior to the Closing, each Company Group shall exercise, consistent with the terms and conditions set forth in this Agreement, complete control and supervision over its operations.

**7.14    Exclusivity**

(a)    From the date of this Agreement and ending on the earlier of (i) the Closing and (ii) the termination of this Agreement (the "*Interim Period*"), the Sellers shall not, and shall cause the Companies and their respective Representatives not to, directly or indirectly, (i) enter into, solicit, initiate or continue any discussions or negotiations with, or encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with, any Person or other entity or group, concerning any sale of any material assets of the Companies or any of the outstanding Common Stock or any conversion, consolidation, liquidation, dissolution or similar transaction involving the Companies other than with Parent and its Representatives (an "*Alternative Transaction*"), (ii) enter into any agreement regarding, continue or otherwise participate in any discussions regarding, or furnish to any Person any information with respect to, or cooperate in any way that would otherwise reasonably be expected to lead to, any Alternative Transaction or (iii) commence, continue or renew any due diligence investigation regarding any Alternative Transaction; *provided* that the execution, delivery and performance of this Agreement and the Related Documents and the consummation of the transactions contemplated hereby shall not be deemed a violation of this *Section 7.14*. The Sellers shall, and shall cause their respective Affiliates and respective Representatives to, immediately cease any and all existing discussions or negotiations

A-50

with any Person conducted heretofore with respect to any Alternative Transaction. If the Sellers, the Companies or any of their respective Representatives receives any inquiry or proposal with respect to an Alternative Transaction at any time prior to the Closing, then the Sellers shall promptly (and in no event later than 24 hours after the Sellers become aware of such inquiry or proposal) notify such Person in writing that Sellers are subject to an exclusivity agreement with respect to the sale of the Companies that prohibits them from considering such inquiry or proposal. Without limiting the foregoing, the Parties agree that any violation of the restrictions set forth in this *Section 7.14(a)* by any of the Sellers or their respective Affiliates or Representatives shall be deemed to be a breach of this *Section 7.14(a)* by the Sellers.

(b)  Parent shall not, and shall cause its Affiliates and their respective Representatives not to, directly or indirectly, (i) enter into, solicit, initiate or continue any discussions or negotiations with, or knowingly encourage or respond to any inquiries or proposals by, or participate in any negotiations with, or provide any information to, or otherwise cooperate in any way with, any Person or other entity or group, concerning any Business Combination Proposal, (ii) enter into any agreement regarding, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any Person any information with respect to, or cooperate in any way that would otherwise reasonably be expected to lead to, any Business Combination Proposal or (iii) commence, continue or renew any due diligence investigation regarding any Business Combination Proposal. Parent shall, and shall cause each of its Affiliates and their respective Representatives to, immediately cease any and all existing discussions or negotiations with any Person conducted heretofore with respect to any Business Combination Proposal. If Parent, its Affiliates or any of their respective Representatives receives any inquiry or proposal with respect to a Business Combination Proposal at any time prior to the Closing, then Parent shall promptly (and in no event later than 24 hours after Parent becomes aware of such inquiry or proposal) (A) advise the Sellers' Representative orally and in writing of such inquiry or proposal (including the identity of the Person making such inquiry or submitting such proposal, and the terms thereof) and (B) provide the Sellers' Representative a copy of such inquiry or proposal, if in writing. Without limiting the foregoing, the Parties agree that any violation of the restrictions set forth in this *Section 7.14(b)* by any of Parent or its Affiliates or their respective Representatives shall be deemed to be a breach of this *Section 7.14(b)* by Parent.

(c)  Prior to Closing, the Sellers shall require the prompt destruction or return of any confidential information provided to any third party in connection with an Alternative Transaction and shall refrain from waiving or modifying any rights under any confidentiality or standstill agreement relating to an Alternative Transaction.

**7.15  Trust Account**

Upon satisfaction or waiver of the conditions set forth in *Article VIII* and provision of notice thereof to the Trustee (which notice Parent shall provide to the Trustee in accordance with the terms of the Trust Agreement), (a) in accordance with and pursuant to the Trust Agreement, at the Closing, Parent (i) shall cause the documents, opinions and notices required to be delivered to the Trustee pursuant to the Trust Agreement to be so delivered and (ii) shall use its commercially reasonable efforts to cause the Trustee to, and the Trustee shall thereupon be obligated to (A) pay as and when due all amounts payable to stockholders of Parent holding shares of the Parent Common Stock sold in Parent's initial public offering who shall have previously validly elected to redeem their shares of Parent Common Stock pursuant to Parent's Amended and Restated Certificate of Incorporation, and (B) immediately thereafter, pay all remaining amounts then available in the Trust Account to Parent for immediate use, subject to this Agreement and the Trust Agreement and (b) thereafter, the Trust Account shall terminate, except as otherwise provided therein.

A-51

Supp.App. 0908

**7.16   Proxy Statement; SEC Filings**

(a)   Parent and the Companies shall use reasonable best efforts to jointly prepare and cause to be filed with the SEC as promptly as reasonably practicable (and in any event use reasonable best efforts to do so as soon as practicable following the availability of each Company's financial statements for the year ended December 31, 2014, 2015 and 2016) a preliminary proxy statement and Parent and the Companies shall use their respective reasonable best efforts to file a definitive proxy statement to be sent to the stockholders of Parent relating to the Parent Stockholders Meeting (together with any amendments or supplements thereto, the "*Proxy Statement*"), and Parent and the Companies shall use their respective reasonable best efforts to have the Proxy Statement mailed to stockholders of Parent as promptly as reasonably practicable after such filing. The Proxy Statement shall comply as to form and substance with the applicable requirements of the Exchange Act and the rules and regulations thereunder. Each of the Companies and Parent shall furnish all information concerning such Person and its Affiliates to the other, and provide such other assistance, as may be reasonably requested in connection with the preparation, filing and distribution of the Proxy Statement or any registration statement, and the Proxy Statement and any registration statement shall include all information reasonably requested by such other party to be included therein. Each of the Companies and Parent shall promptly notify the other upon the receipt of any comments from the SEC or any request from the SEC for amendments or supplements to the Proxy Statement and shall provide the other with copies of all correspondence between it and its Representatives, on the one hand, and the SEC, on the other hand. Each of the Companies and Parent shall use its reasonable best efforts to respond as promptly as reasonably practicable to any comments from the SEC with respect to the Proxy Statement. If the Proxy Statement has not been mailed as of May 15, 2017, the Companies shall, as soon as reasonably practicable following May 15, 2017, provide the unaudited SAS-100 reviewed consolidated balance sheet of each Company and its respective Company Subsidiaries as of March 31, 2017, and the related unaudited consolidated statements of income, stockholders' equity and cash flows for the three months ended March 31, 2016 and 2017. Notwithstanding the foregoing, prior to filing or mailing the Proxy Statement (or any amendment or supplement thereto) or responding to any comments of the SEC with respect thereto, each of the Companies and Parent (i) shall provide the other an opportunity to review and comment on such document or response (including the proposed final version of such document or response), (ii) shall include in such document or response all comments reasonably proposed by the other and (iii) shall not file or mail such document or respond to the SEC prior to receiving the approval of the other, which approval shall not be unreasonably withheld, conditioned or delayed. Each of the Companies and Parent shall advise the other, promptly after receipt of notice thereof, of the expiration of the waiting period in Rule 14a-6(a) under the Exchange Act, if the SEC does not review the Proxy Statement, or the receipt of any oral or written notification of the completion of review of the Proxy Statement by the SEC, the issuance of any stop order relating thereto or the suspension of the qualification of the SourceHOV Merger Consideration or the Novitex Merger Consideration for offering or sale in any jurisdiction, and each of the Companies and Parent shall use its reasonable best efforts to have any such stop order or suspension lifted, reversed or otherwise terminated. Parent shall also take any other action (other than qualifying to do business in any jurisdiction in which it is not now so qualified) required to be taken under the Securities Act, the Exchange Act, any applicable state securities or "blue sky" laws and the rules and regulations thereunder in connection with the transactions contemplated hereby. In connection with the Proxy Statement, Parent will also file with the SEC financial and other information about the transactions contemplated by this Agreement in accordance with applicable proxy solicitation rules set forth in Parent's certificate of incorporation and bylaws and the rules and regulations of the SEC and NASDAQ.

(b)   Each Company agrees to promptly provide Parent with all information concerning each member of the Company Group and the management, operations and financial condition of each member of the Company Group, in each case, reasonably requested by Parent for inclusion in the

A-52

Supp.App. 0909

Proxy Statement. Each Company shall cause the officers and employees of each member of the Company Group to be reasonably available to Parent and its counsel in connection with the drafting of the Proxy Statement and responding in a timely manner to comments on the Proxy Statement from the SEC.

(c) If prior to the Closing, any event occurs with respect to Parent, or any change occurs with respect to other information supplied by Parent for inclusion in the Proxy Statement, which is required to be described in an amendment of, or a supplement to, the Proxy Statement, Parent shall promptly notify the Companies of such event, and the Companies and Parent shall cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Proxy Statement and, as required by Law, in disseminating the information contained in such amendment or supplement to Parent's stockholders and the Companies' stockholders. Nothing in this *Section 7.16(c)* shall limit the obligations of any party under *Section 7.16(a)*.

(d) If prior to the Closing, any event occurs with respect to any member of the Company Group, or any change occurs with respect to other information supplied by the Companies for inclusion in the Proxy Statement, which is required to be described in an amendment of, or a supplement to, the Proxy Statement, the Companies shall promptly notify Parent of such event, and the Companies and Parent shall cooperate in the prompt filing with the SEC of any necessary amendment or supplement to the Proxy Statement and, as required by Law, in disseminating the information contained in such amendment or supplement to Parent's stockholders and the Companies' equity holders. Nothing in this *Section 7.16(d)* shall limit the obligations of any party under *Section 7.16(a)*.

(e) Parent shall, as soon as reasonably practicable following the date of this Agreement, duly call, give notice of, convene and hold the Parent Stockholders Meeting for the sole purpose of seeking the Parent Stockholder Approvals. Parent shall use its reasonable best efforts to (i) cause the Proxy Statement to be mailed to Parent's stockholders and to hold the Parent Stockholders Meeting as soon as reasonably practicable after the earlier of (A) clearance by the SEC of the Proxy Statement and (B) the conclusion of any SEC review of the Proxy Statement (including the conclusion of the 10-day review period for preliminary proxy statements under Rule 14a-6(a) under the Exchange Act without receipt of any SEC comments) and (ii) solicit the Parent Stockholder Approvals. Parent shall, through the board of directors of Parent, recommend to its stockholders that they give the Parent Stockholder Approvals and shall include such recommendation in the Proxy Statement. Notwithstanding the foregoing provisions of this *Section 7.16(e)*, if on a date for which the Parent Stockholders Meeting is scheduled, Parent has not received proxies representing a sufficient number of shares of Parent Common Stock to obtain the Parent Stockholder Approvals, whether or not a quorum is present, Parent shall have the right to make one or more successive postponements or adjournments of the Parent Stockholders Meeting, provided that (excluding any adjournments or postponements required by applicable Law) the Parent Stockholders Meeting is not postponed or adjourned to a date that is more than 30 days after the date for which the Parent Stockholders Meeting was originally scheduled (excluding any adjournments or postponements required by applicable Law).

(f) Parent, as sole stockholder of Novitex Merger Sub and SourceHOV Merger Sub, shall approve this Agreement.

(g) As promptly as practicable following the date hereof, Novitex and SourceHOV shall provide to Parent, respectively, the names and biographies of two (2) directors nominated by the shareholders of Novitex Parent and the three (3) directors nominated by the HGM Group (the "***Non-Independent Nominees***"). Immediately following the date hereof, the shareholders of Novitex Parent, the HGM Group and Parent shall all cooperate in good faith to identify three (3) independent directors for inclusion in the Proxy Statement (the "***Independent Nominees***" and together with the Non-Independent Nominees, the "***Nominees***"). If the parties cannot agree on all or any of the Independent Nominees prior to the filing of the preliminary Proxy Statement, the shareholders of

A-53

Novitex Parent and the HGM Group shall jointly select the Independent Nominees and provide to Parent the names and biographies of such Independent Nominees for inclusion in the Proxy Statement. Prior to the Closing, Parent shall obtain irrevocable resignations from all current directors on the board of directors of Parent and shall appoint the Nominees, in each case effective as of the Closing.

(h)   Notwithstanding any other provision of this Section 7.16, the parties hereto acknowledge that Parent intends to file with the SEC as soon as practicable following the date hereof one or more registration statements to provide for the resale from time to time of (i) an aggregate of 20% of the number of Retained Shares, as defined in the Forfeiture Agreement, held by certain Affiliates of Parent and related parties and (ii) an aggregate of 17,500,000 Parent Common Shares issuable upon the exercise of an aggregate of 35,000,000 Parent Warrants to be outstanding at Closing; provided that Parent shall not request effectiveness of such registration statement prior to the Closing. The Companies shall use best efforts to provide all information required to prepare, or is customarily included in, such registration statements in accordance with their form(s) as promptly as practicable, but in any event to allow filing on or before the Closing Date. The provisions of Section 7.16(a) (other than the first two sentences thereof) are hereby incorporated by reference, *mutatis mutandis*, replacing the term "Proxy Statement" with "registration statements."

### 7.17   Listing of Parent Common Stock

Parent will use its reasonable best efforts to cause the shares of Parent Common Stock constituting the SourceHOV Merger Consideration and the Novitex Merger Consideration to be approved for listing on the NASDAQ as promptly as practicable following the issuance thereof, subject to official notice of issuance, prior to the Closing. During the Interim Period, Parent shall use its reasonable best efforts to remain listed as a public company on the NASDAQ. During the Interim Period, Parent will keep current and timely file all of its public filings with the SEC and otherwise comply in all material respects with applicable securities Laws. During the Interim Period, if Parent receives any written or, to the Knowledge of Parent, oral notice from NASDAQ that Parent has failed, or would reasonably be expected to fail, to meet the NASDAQ listing requirements as of the Closing or within six months thereafter for any reason, then Parent shall give prompt written notice of such NASDAQ notice to the Company, including a copy of any written notice received from NASDAQ or a summary of any oral notice received from NASDAQ.

### 7.18   Section 16 of the Exchange Act

Prior to the Closing, the board of directors of Parent, or an appropriate committee of non-employee directors thereof, shall adopt a resolution consistent with the interpretive guidance of the SEC so that the acquisition of Parent Common Stock, in each case, pursuant to this Agreement and the Related Documents by any officer, director or shareholder (by reason of "director by deputization") of the Companies who is expected to become a "covered person" of Parent for purposes of Section 16 of the Exchange Act and the rules and regulations thereunder ("**Section 16**") shall be an exempt transaction for purposes of Section 16.

### 7.19   Notification of Certain Matters

During the Interim Period, each of the parties shall give prompt notice to the other parties if such party or its Affiliates: (a) fails to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it or its Affiliates hereunder in any material respect; (b) receives any notice or other communication in writing from any third party (including any Governmental Authority) alleging (i) that the consent, approval, waiver or filing of such third party is or may be required in connection with the transactions contemplated by this Agreement or (ii) any non-compliance with any Law by such party or its Affiliates; (c) receives any notice or other communication from any Governmental Authority in connection with the transactions contemplated by this Agreement; (d) discovers any fact or circumstance that, or becomes aware of the occurrence or non-occurrence of

A-54

Supp.App. 0911

any event the occurrence or non-occurrence of which, would reasonably be expected to cause or result in any of the conditions set forth in *Article VIII* not being satisfied or the satisfaction of those conditions being materially delayed; or (e) becomes aware of the commencement or threat, in writing, of any Action against such Party or any of its Affiliates, or any of their respective properties or assets, or, to the Knowledge of such Party, any officer, director, partner, member or manager, in his, her or its capacity as such, of such Party or of its Affiliates with respect to the consummation of the transactions contemplated by this Agreement. No such notice shall constitute an acknowledgement or admission by the party providing the notice regarding whether or not any of the conditions to the Closing have been satisfied or in determining whether or not any of the representations, warranties or covenants contained in this Agreement have been breached.

**7.20    Affiliate Agreements**

(a)    At the Closing, Apollo shall cause all agreements between Apollo or any Affiliate of Apollo and any member of the Novitex Company Group, including the Apollo Consulting Agreement other than those Contracts set forth on Section 7.20(a) of the Company Disclosure Schedules or entered into in compliance with *Section 7.1(b)* prior to the Closing, to be terminated without any further liability except that any fees and expenses which were accrued and unpaid pursuant to the terms of the Apollo Consulting Agreement through the Closing Date and the rights to indemnification set forth therein shall survive any such termination in accordance with their terms.

(b)    At the Closing, HGM shall cause the SourceHOV Consulting Agreement and any other agreements between any member of the HGM Group or any Affiliate of any member of the HGM Group other than those Contracts set forth on Section 7.20(b) of the Company Disclosure Schedules or entered into in compliance with *Section 7.1(b)* prior to the Closing, to be terminated without any further liability except that the party designated in writing (including wire information) by the HGM Group at least two (2) Business Days prior to the Closing shall be entitled to a payment pursuant to *Section 3.2(c)(iii)* equal to $10,000,000 (the "***Consulting Agreement Termination Fee***") in connection therewith, any accrued and unpaid management fees and expenses and the rights to indemnification set forth therein shall survive any such termination in accordance with their terms.

(c)    At the Closing, the members of the HGM Group shall cause the Restated Stockholder Agreement, dated as of April 30, 2013, as amended by Amendment No. 1, dated October 31, 2014, and Amendment No, 2, dated February 26, 2015, among SourceHOV and the holders of SourceHOV Common Stock to be terminated without any further liability or obligation in accordance with the terms hereof.

**7.21    Release**

(a)    Effective upon and following the Closing, Parent, on its own behalf and on behalf of the Company and each of their respective Affiliates and Representatives, generally, irrevocably, unconditionally and completely releases and forever discharges each Seller, each of their respective Affiliates and each of their and their respective Affiliates' respective Related Parties, and each of their respective successors and assigns and each of their respective Related Parties (collectively, the "***Seller Released Parties***") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any Company occurring prior to the Closing Date (other than as contemplated by this Agreement), including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-Closing actions or failures to act by the Seller Released Parties; *provided*, *however*, that nothing in this *Section 7.21* shall release the Seller Released Parties from their obligations under this Agreement or the other Related Documents.

(b)    Effective upon and following the Closing, each Seller, on its own behalf and on behalf of each of their respective Affiliates and Representatives, generally, irrevocably, unconditionally and completely

A-55

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 915 of 1110    PageID 2536

Table of Contents

releases and forever discharges Parent and the Company, each of their respective Affiliates and each of their and their respective Affiliates' respective Related Parties, and each of their respective successors and assigns and each of their respective Related Parties (collectively, the "*Parent Released Parties*") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning any Company occurring prior to the Closing Date (other than as contemplated by this Agreement, including with respect to *Section 7.10* hereof); *provided*, *however*, that nothing in this *Section 7.21* shall release the Parent Released Parties from (i) obligations under this Agreement or the Related Documents, (ii) obligations under any agreement set forth on Section 7.20(a) and Section 7.20(b) of the Company Disclosure Schedules, (iii) with respect to any right to indemnification or exculpation under any agreements or organizational documents of each Company, (iv) with respect to any right to repayment in connection with those agreements set forth on Section 7.21(b) of the Parent Disclosure Schedules, or (v) with respect to any salary, bonuses, vacation pay or employee benefits accrued pursuant to a Benefit Plan in effect as of the date of this Agreement or any expense reimbursement pursuant to a policy of the Companies in effect as of the date of this Agreement and consistent with past practice.

(c)   Effective upon and following the Closing, the HGM Group, on its own behalf and on behalf of SourceHOV and each of their respective Affiliates and Representatives, generally, irrevocably, unconditionally and completely releases and forever discharges Novitex Parent, Novitex, each of their respective Affiliates and each of their and their respective Affiliates' respective Related Parties, and each of their respective successors and assigns and each of their respective Related Parties (collectively, the "*Novitex Released Parties*") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning Novitex Parent or Novitex occurring prior to the Closing Date (other than as contemplated by this Agreement), including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-Closing actions or failures to act by the Novitex Released Parties; *provided*, *however*, that nothing in this *Section 7.21* shall release the Novitex Released Parties from their obligations under (i) this Agreement or the other Related Documents or (ii) under any agreement set forth on Section 7.20(b) of the Company Disclosure Schedules.

(d)   Effective upon and following the Closing, Novitex Parent, on its own behalf and on behalf of Novitex and each of their respective Affiliates and Representatives, generally, irrevocably, unconditionally and completely releases and forever discharges the HGM Group, SourceHOV, each of their respective Affiliates and each of their and their respective Affiliates' respective Related Parties, and each of their respective successors and assigns and each of their respective Related Parties (collectively, the "*SourceHOV Released Parties*") from all disputes, claims, losses, controversies, demands, rights, liabilities, actions and causes of action of every kind and nature, whether known or unknown, arising from any matter concerning the HGM Group or SourceHOV occurring prior to the Closing Date (other than as contemplated by this Agreement), including for controlling equityholder liability or breach of any fiduciary duty relating to any pre-Closing actions or failures to act by the SourceHOV Released Parties; *provided*, *however*, that nothing in this *Section 7.21* shall release the SourceHOV Released Parties from their obligations under (i) this Agreement or the other Related Documents or (ii) under any agreement set forth on Section 7.20(a) of the Company Disclosure Schedules.

**7.22   Intermediate Co; SourceHOV Shareholder Meeting; Consent Actions**

(a)   Prior to the Closing Date, Parent shall (i) form a new Delaware limited liability company that will be a wholly-owned Subsidiary ("*Intermediate Co*"), (ii) form a new Delaware corporation that will be a wholly-owned Subsidiary ("*Co-Issuer*"), (iii) contribute 100% of the equity interests of Co-Issuer to Intermediate Co, (iv) form a new Delaware limited liability company that will be a wholly-owned Subsidiary ("*Parent LLC*"), (v) contribute 100% of the equity interests of Intermediate Co to Parent LLC, (vi) contribute 100% of the equity interests of Novitex Merger Sub and SourceHOV Merger Sub to Intermediate Co, (vii) cause Intermediate Co (or any applicable board of directors or

A-56

Table of Contents

other governing body or committee of Intermediate Co, if necessary) to adopt and approve this Agreement, the SourceHOV Merger, the Novitex Merger and the other transactions contemplated hereto as the sole shareholder of Novitex Merger Sub and SourceHOV Merger Sub, as of the Closing Date (the "**Intermediate Co Consent**") within 24 hours of the formation of Intermediate Co and (viii) not permit Intermediate Co to engage in any business, incur any liabilities, acquire any assets or properties or enter into any Contract other than the transactions contemplated by this Agreement, including the transactions related to the Financing.

(b)    The HGM Group shall deliver the HGM Consent to Parent and Novitex Parent within 2 hours after the execution and delivery of this Agreement.

(c)    Novitex Parent shall deliver the Novitex Consent to Parent and the HGM Group within 2 hours after the execution and delivery of this Agreement.

(d)    Parent shall deliver the Novitex Parent Consent and the SourceHOV Parent Consent to Sellers and the Companies within 2 hours after the execution and delivery of this Agreement.

**7.23    No Claim Against Trust Amount**

Notwithstanding anything else in this Agreement, the Companies and Sellers acknowledge that they have read the Prospectus and understand that Parent has established the Trust Account for the benefit of Parent's public stockholders and that Parent may disburse monies from the Trust Account only (a) to Parent's public stockholders in the event they elect to have their shares redeemed in accordance with Parent's governing documents and/or the liquidation of Parent, (b) to Parent after, or concurrently with, the consummation of a Business Combination, (c) to Parent in limited amounts for its operating expenses and tax obligations incurred in the ordinary course of business, (d) as repayment of loans and reimbursement of expenses to directors, officers and founding stockholders of Parent and (e) to third parties (e.g., professionals, printers, etc.) who have rendered services to Parent in connection with its operations and efforts to effect a Business Combination. All liabilities and obligations of Parent due and owing or incurred at or prior to the Closing shall be paid as and when due, including all amounts payable (x) to Parent's public stockholders in the event they elect to have their shares redeemed in accordance with Parent's governing documents and/or the liquidation of Parent, (y) to Parent after, or concurrently with, the consummation of a Business Combination, and (z) to Parent in limited amounts for its operating expenses and tax obligations incurred in the ordinary course of business. The Companies and Sellers further acknowledge that, if the transactions contemplated by this Agreement (or, upon termination of this Agreement, another Business Combination) are not consummated by July 24, 2017, Parent will be obligated to return to its stockholders the amounts being held in the Trust Account, unless such date is otherwise extended. Upon the Closing, Parent shall cause the Trust Account to be disbursed to Parent and as otherwise contemplated by this Agreement. Accordingly, the Companies and Sellers, for each of themselves and their respective subsidiaries, affiliated entities, directors, officers, employees, stockholders, representatives, advisors and all other associates and Affiliates, hereby waive all rights, title, interest or claim of any kind to collect from the Trust Account any monies that may be owed to them by Parent for any reason whatsoever, including to a breach of this Agreement by Parent or any negotiations, agreements or understandings with Parent (whether in the past, present or future), and will not seek recourse against the Trust Account at any time for any reason whatsoever, in each case except as expressly contemplated by this Agreement. This paragraph will survive the termination of this Agreement for any reason.

A-57

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 917 of 1110    PageID 2538

**7.24    Subscription Agreements**

Parent shall use commercially reasonable efforts to take, or cause to be taken, all actions and do, or cause to be done, all things necessary, proper or advisable to enter into one or more Subscription Agreements on terms and conditions no less favorable those set forth in *Exhibit E* (the "***Subscription Agreement Material Terms***") and any material terms not provided for in *Exhibit E* shall be subject to the approval of each of the Sellers, such approval not to be unreasonably withheld, conditioned or delayed. The Companies and Sellers shall cooperate and provide assistance and information as reasonably requested by Parent in connection with soliciting interest in, negotiating and entering into any Subscription Agreements. Parent shall provide each Seller with a reasonable opportunity to review and comment on each Subscription Agreement prior to entering into such Subscription Agreement. Once any Subscription Agreement has been executed, Parent shall use commercially reasonable efforts to (i) satisfy in all material respects on a timely basis all conditions and covenants applicable to Parent in such Subscription Agreement and otherwise comply with its obligations thereunder, (ii) in the event that all conditions in such Subscription Agreement has been satisfied, consummate the transactions contemplated by such Subscription Agreement at or prior to Closing and (iii) enforce its rights under such Subscription Agreement in the event that all conditions in such Subscription Agreement has been satisfied, to cause the applicable PIPE Investor(s) to contribute to Parent the applicable portion of the PIPE Investment set forth in such Subscription Agreements at or prior to the Closing. Without limiting the generality of the foregoing, Parent shall give the Sellers prompt written notice: (A) of any breach or default (or any event or circumstance that, with or without notice, lapse of time or both, could give rise to any breach or default) by Parent and, to the Knowledge of Parent, any counterparty to any Subscription Agreement; (B) of the receipt of any written notice or other written communication from any party to any Subscription Agreement with respect to any actual, potential or claimed expiration, lapse, withdrawal, breach, default, termination or repudiation by any party to any Subscription Agreement or any provisions of any Subscription Agreement and (C) if Parent concludes that it does not expect to receive all or any portion of the PIPE Investment on the terms, in the manner or from the sources contemplated by the Subscription Agreements. The Subscription Agreements shall contain all of the conditions precedent to the obligations of the PIPE Investors to contribute to Parent the applicable portion of the PIPE Investment set forth in the Subscription Agreements on the terms therein. Parent shall not enter into any amendments, supplements, side letters, Contracts or any other arrangement with respect to the PIPE Investments without the prior written consent of each Seller.

## ARTICLE VIII

## CONDITIONS PRECEDENT

**8.1    Conditions to Each Party's Obligations**

The respective obligations of each party to effect the SourceHOV Merger, the Novitex Merger, and the other transactions contemplated hereby are subject to the satisfaction or written waiver, in whole or in part, to the extent such conditions can be waived (to the extent permitted by applicable Law) at or prior to the Closing of the following conditions:

(a)    *Regulatory Approvals.*    All required waiting periods or approvals applicable to this Agreement and the transactions contemplated hereby under the HSR Act and all applicable Antitrust Laws shall have expired, been received or terminated and the approvals set forth in Section 8.1(a) of the Company Disclosure Schedules shall have been obtained.

(b)    *No Injunctions or Restraints.*    No applicable Law or injunction enacted, entered, promulgated, enforced or issued by any Governmental Authority or other legal restraint or prohibition preventing the consummation of the transactions contemplated hereby shall be in effect.

A-58

(c) *The SourceHOV Merger and the Novitex Merger.*    Both the SourceHOV Merger and the Novitex Merger shall have been consummated substantially simultaneously pursuant to the terms of this Agreement and the Related Documents.

(d) *Parent Stockholder Approvals.*    The Parent Required Stockholder Approvals shall have been obtained.

(e) *HGM Consent.*    The HGM Consent shall have been obtained.

(f) *Novitex Consent.*    The Novitex Consent shall have been obtained.

(g) *Financing.*    Parent shall have received the Financing on the terms provided for in the Commitment Letter or any Alternate Financing.

**8.2   Conditions to Obligations of Parent, Novitex Merger Sub and SourceHOV Merger Sub**

The obligations of Parent, Novitex Merger Sub and SourceHOV Merger Sub to consummate the SourceHOV Merger, the Novitex Merger, and the other transactions contemplated hereby are subject to the satisfaction (or written waiver by Parent, in whole or in part, to the extent such conditions can be waived) at or prior to the Closing of the following conditions:

(a) *Representations and Warranties of the Sellers.*    (i) The representations and warranties of each Seller set forth in *Sections 4.1(a)*, *4.2*, and *4.3* shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of each Company set forth in *Article IV* of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(b) *Representations and Warranties of the Companies.*    (i) The Fundamental Representations shall be true and correct in all respects (except in respect of the representations and warranties set forth in *Section 5.2(a)-(c)*, for errors which are de minimis in aggregate) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of each Company set forth in *Article V* of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect.

(c) *Performance of Obligations of the Company.*    Each Company and Seller shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by such Company or Seller prior to or at the time of the Closing.

(d) *No Material Adverse Effect.*    From the date of this Agreement, there shall not have occurred any Material Adverse Effect, nor shall any event, circumstance, change, development or

A-59

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 919 of 1110 PageID 2540

effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect.

(e) *Net Tangible Assets.* Parent shall have at least $5,000,001 of net tangible assets (as determined in accordance with Rule 3a51-1(g)(1) of the Exchange Act) remaining after the Closing.

## 8.3 Conditions to the Obligations of the Sellers and the Companies

The obligations of the Sellers and the Companies to consummate the SourceHOV Merger, the Novitex Merger and the transactions contemplated hereby are subject to the satisfaction (or written waiver by each Seller, in whole or in part, to the extent such conditions can be waived) at or prior to the Closing of the following conditions:

(a) *Representations and Warranties of Parent, Novitex Merger Sub and SourceHOV Merger Sub.* (i) The representations and warranties of Parent, Novitex Merger Sub and SourceHOV Merger Sub set forth in *Sections 6.1*, *6.2*, and *6.3* shall be true and correct in all respects (except in respect of the representations and warranties set forth in *Section 6.2*, for errors which are de minimis in aggregate) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of Parent, Novitex Merger Sub and SourceHOV Merger Sub set forth in *ARTICLE VI* of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or similar qualifier) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not have a material adverse effect on Parent, Novitex Merger Sub or SourceHOV Merger Sub.

(b) *Performance of Obligations of Parent, Novitex Merger Sub and SourceHOV Merger Sub.* Each of Parent, Novitex Merger Sub and SourceHOV Merger Sub shall have performed or complied in all respects with all obligations and covenants required by this Agreement to be performed or complied with by it prior to or at the time of the Closing.

(c) *Trust Account and Proceeds.* At the Closing Date, after giving effect to (i) the redemptions each holder of Parent Common Stock is entitled to pursuant to Parent's Amended and Restated Certificate of Incorporation and Parent's Bylaws and (ii) the PIPE Investments, the Trust Account plus the total proceeds from the PIPE Investments available to Parent shall equal in the aggregate no less than $275,000,000 in cash.

## 8.4 Conditions to the Obligations of the HGM Group and SourceHOV

The obligations of the HGM Group and SourceHOV to consummate the SourceHOV Merger and the transactions contemplated hereby are subject to the satisfaction (or written waiver by the HGM Group and/or SourceHOV, as applicable, in whole or in part, to the extent such conditions can be waived) at or prior to the Closing of the following conditions:

(a) *Representations and Warranties of Novitex Parent.* The representations and warranties of Novitex Parent set forth in *Sections 4.1(a)*, *4.2*, and *4.3* shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified).

(b) *Representations and Warranties of Novitex.* (i) The representations and warranties of Novitex set forth in *Sections 5.1(a)*, *5.2(a)-(c)*, *5.3* and *5.6(c)* (except that "the date of this

A-60

Supp.App. 0917

Table of Contents

Agreement" shall be replaced with "the Closing Date" for purposes of *Section 5.6(c)*) shall be true and correct in all respects (except in respect of the representations and warranties set forth in *Section 5.2(a)-(c)*, for errors which are de minimis in aggregate) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of Novitex set forth in *Article V* of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect solely with respect to Novitex.

(c)    *Performance of Obligations.*    Novitex and Novitex Parent shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Company prior to or at the time of the Closing.

(d)    *No Material Adverse Effect.*    From the date of this Agreement, there shall not have occurred any Material Adverse Effect with respect to Novitex, nor shall any event, circumstance, change, development or effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect solely with respect to Novitex.

**8.5    Conditions to the Obligations of Novitex and Novitex Parent**

The obligations of the Novitex and Novitex Parent to consummate the Novitex Merger and the transactions contemplated hereby are subject to the satisfaction (or written waiver by Novitex Parent and/or Novitex, as applicable, in whole or in part, to the extent such conditions can be waived) at or prior to the Closing of the following conditions:

(a)    *Representations and Warranties of the HGM Group.*    The representations and warranties of the HGM Group set forth in *Sections 4.1(a)*, *4.2*, and *4.3* shall be true and correct in all respects as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified).

(b)    *Representations and Warranties of SourceHOV.*    (i) The representations and warranties of SourceHOV set forth in *Sections 5.1(a)*, *5.2(a)-(c)*, *5.3* and *5.6(c)* (except that "the date of this Agreement" shall be replaced with "the Closing Date" for purposes of *Section 5.6(c)*) shall be true and correct in all respects (except in respect of the representations and warranties set forth in *Section 5.2(a)-(c)*, for errors which are de minimis in aggregate) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified) and (ii) the other representations and warranties of SourceHOV set forth in *Article V* of this Agreement shall be true and correct (without giving effect to any limitation as to "materiality" or "Material Adverse Effect" or similar qualifier) as of the Closing Date as though made on and as of the Closing Date (other than any representation or warranty that expressly relates to a specific date, which representation and warranty shall be so true and correct on the date so specified), except in the case of this clause (ii), where the failure of such representations and warranties to be so true and correct would not, individually or in the aggregate, have a Material Adverse Effect solely with respect to SourceHOV.

A-61

Supp.App. 0918

Table of Contents

(c)  *Performance of Obligations.*    The HGM Group and SourceHOV shall have performed or complied in all material respects with all obligations and covenants required by this Agreement to be performed or complied with by the Company prior to or at the time of the Closing.

(d)  *No Material Adverse Effect.*    From the date of this Agreement, there shall not have occurred any Material Adverse Effect with respect to SourceHOV, nor shall any event, circumstance, change, development or effect have occurred that, individually or in the aggregate, with or without the lapse of time, would reasonably be expected to result in a Material Adverse Effect solely with respect to SourceHOV.

**8.6    Frustration of Closing Conditions**

Neither Parent, Novitex Merger Sub, SourceHOV Merger Sub, the Sellers nor the Companies may rely on the failure of any condition set forth in this *Article VIII* to be satisfied if such failure was caused by such party's failure to act in good faith or to use its reasonable best efforts to cause the Closing to occur, as required by *Section 7.4*.

<div align="center">

**ARTICLE IX**

**TERMINATION**

</div>

**9.1    Termination**

(a)  This Agreement may be terminated and the transactions contemplated by this Agreement abandoned at any time prior to the Closing:

(i)  by mutual written consent of the Sellers, the Companies and Parent;

(ii)  by either Seller, the Companies or Parent, if the Closing does not occur prior to July 24, 2017 (the "***Outside Date***") (other than as a result of the terminating party's failure to comply with its obligations under this Agreement which has resulted in the failure to satisfy a condition set forth in *Article VIII*);

(iii)  by Parent, upon written notice to each Company and each Seller, if any Company breaches or fails to perform in any material respect any of its representations, warranties or covenants set forth in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in *Section 8.1* or *Section 8.2*, (B) cannot be or has not been cured within 30 days following delivery by Parent of written notice to the Company or Seller, as applicable of such breach or failure to perform and (C) has not been waived by Parent;

(iv)  by either Seller, upon written notice to Parent and the other Seller, if Parent breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in *Section 8.1* or *Section 8.3*, (B) cannot be or has not been cured within 30 days following delivery by the Company or Seller, as applicable, of written notice to Parent of such breach or failure to perform and (C) has not been waived by each Seller;

(v)  by the HGM Group, upon written notice to Parent and Novitex Parent, if Novitex Parent or Novitex breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in this Agreement and such breach or failure to perform (A) would give rise to the failure of a condition set forth in *Section 8.1* or *Section 8.4*, (B) cannot be or has not been cured within 30 days following delivery by the HGM Group of written notice to Parent and Novitex Parent of such breach or failure to perform and (C) has not been waived by Sellers;

(vi)  by Novitex Parent, upon written notice to Parent and the HGM Group, if the HGM Group or SourceHOV breaches or fails to perform in any respect any of its representations, warranties or covenants set forth in this Agreement and such breach or failure to perform

<div align="center">

A-62

</div>

Supp.App. 0919

(A) would give rise to the failure of a condition set forth in *Section 8.1* or *Section 8.5*, (B) cannot be or has not been cured within 30 days following delivery by Novitex Parent of written notice to Parent and the HGM Group of such breach or failure to perform and (C) has not been waived by each Seller;

(vii)  by either Parent or either Seller if there shall be in effect a final non-appealable Law or injunction preventing the consummation of the transactions contemplated hereby; *provided* that neither Parent nor Sellers shall have the right to terminate this Agreement pursuant to this *Section 9.1(a)(vii)* if any action of such party or failure of such party to perform or comply with its obligations under this Agreement shall have caused such Law or injunction and such action or failure to perform constitutes a breach of this Agreement;

(viii)  by Parent or Novitex Parent if the HGM Consent is not delivered to them within 2 hours after the execution and delivery of this Agreement; or

(ix)  by Parent or the HGM Group if the Novitex Consent is not delivered to them within 2 hours after the execution and delivery of this Agreement; or

(x)  by any Seller or any Company if (i) the SourceHOV Parent Consent and the Novitex Parent Consent is not delivered to them within 2 hours after the execution and delivery of this Agreement and (ii) the Intermediate Co Consent is not delivered to them within 24 hours after the formation of Intermediate Co; or

(xi)  by either Seller, the Companies or Parent, upon written notice to the other parties, if Parent Required Stockholder Approvals are not granted at the Parent Stockholders Meeting.

(b)  In the event of termination by the Companies or Parent pursuant to this *Section 9.1*, written notice thereof shall forthwith be given to the other parties and the transactions contemplated by this Agreement shall be abandoned, without further action by any party. If the transactions contemplated by this Agreement are abandoned as provided herein:

(i)  Parent, Novitex Merger Sub and SourceHOV Merger Sub shall, and shall cause their respective Representatives and financing sources to, return to the Company all Evaluation Material received from or on behalf of any member of the Company Group relating to the Business or the transactions contemplated hereby and any copies thereof, whether so obtained before or after the execution hereof; and

(ii)  Notwithstanding the return of any Evaluation Material in accordance with *Section 9.1(b)(i)*, all Evaluation Material received by Parent, Novitex Merger Sub, SourceHOV Merger Sub and their respective Representatives shall continue to be treated in accordance with each of the Confidentiality Agreements, which shall remain in full force and effect notwithstanding the termination of this Agreement.

**9.2    Effect of Termination**

If this Agreement is terminated and the transactions contemplated hereby are abandoned as described in *Section 9.1*, this Agreement shall become null and void and of no further force and effect, except for the provisions of this *Section 9.2* and *Sections 4.4*, *5.19*, *6.18*, *7.3*, *7.6(b)*, *7.7(a)*, *7.9*, *7.14(b)*, *7.23*, *Article X* and any corresponding definitions set forth in *Annex I*. Nothing in this *Section 9.2* shall be deemed to release any party from any liability for any Intentional Breach by such party of the terms and provisions of this Agreement prior to such termination.

A-63

# ARTICLE X

## GENERAL PROVISIONS

**10.1    Survival of Representations and Warranties**

Except for the representations and warranties and acknowledgments in *Section 5.22* and *Section 6.20*, the representations and warranties and the covenants to be performed at or prior to the Closing, in each case, set forth in this Agreement, any Related Document or in any document delivered in connection herewith or therewith shall terminate and be of no further force and effect from and after the Closing and no party shall have any liability with respect thereto from and after the Closing.

**10.2    Notices**

All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, facsimile, electronic mail or postage prepaid mail (registered or certified) or nationally recognized overnight courier service and shall be deemed given when so delivered by hand, facsimile or electronic mail, or if mailed, three days after mailing (one Business Day in the case of overnight courier service), as follows:

(a)    if to Parent, Novitex Merger Sub or SourceHOV Merger Sub or, following the Closing, to the Companies, to:

    Quinpario Acquisition Corp. 2
    12935 N. Forty Drive, Suite 201
    St. Louis, MO 63141
    Facsimile:    (775) 206-7966
    Email    djsrivisal@quinpario.com
    Attention:    D. John Srivisal

    with copies to:

    Kirkland & Ellis LLP
    601 Lexington Avenue
    New York, NY 10022
    Facsimile:    (212) 446-6460
    Email:    william.sorabella@kirkland.com
        christian.nagler@kirkland.com
        claire.james@kirkland.com
    Attention:    William B. Sorabella
        Christian O. Nagler
        Claire E. James

(b)    if, prior to the Closing, to Novitex Parent, to:

    Novitex Parent, L.P.
    c/o Apollo Management VII, L.P.
    9 West 57th Street, 43rd Floor
    New York, New York 10019
    Facsimile:    (646) 607-0591
    Email:    nord@apollolp.com
    Attention:    Matthew Nord

A-64

Supp.App. 0921

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 924 of 1110　　PageID 2545

with copies to:

Novitex Parent, L.P.
c/o Apollo Management VII, L.P.
9 West 57th Street, 43rd Floor
New York, New York 10019
Facsimile:　　(212) 515-3264
Email:　　　　lmedley@apollolp.com
Attention:　　Laurie Medley
　　　　　　　General Counsel


and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Facsimile:　　(212) 872-1002
Email:　　　　aweinstein@akingump.com
Attention:　　Adam K. Weinstein

(c)　if, prior to the Closing, to Novitex, to:

Novitex Holdings, Inc.
300 First Stamford Place
Second Floor West
Stamford, CT 06902
Email:　　　　John.Visentin@novitex.com
Attention:　　John Visentin
　　　　　　　Executive Chairman & Chief Executive Officer

with copies to:

Novitex Holdings, Inc.
300 First Stamford Place
Second Floor West
Stamford, CT 06902
Email:　　　　Theresa.Mohan@novitex.com
Attention:　　General Counsel

Novitex Parent, L.P.
c/o Apollo Management VII, L.P.
9 West 57th Street, 43rd Floor
New York, New York 10019
Facsimile:　　(646) 607-0591
Email:　　　　nord@apollolp.com
Attention:　　Matthew Nord

Novitex Parent, L.P.
c/o Apollo Management VII, L.P.
9 West 57th Street, 43rd Floor
New York, New York 10019
Facsimile:　　(212) 515-3264
Email　　　　 lmedley@apollolp.com
Attention:　　Laurie Medley
　　　　　　　General Counsel

A-65

and

Akin Gump Strauss Hauer & Feld LLP
One Bryant Park
New York, New York 10036
Facsimile:    (212) 872-1002
Email:       aweinstein@akingump.com
Attention:    Adam K. Weinstein

(d)   if, prior to the Closing, to the HGM Group or SourceHOV, to:

SourceHOV Holdings, Inc.
2701 E. Grauwyler Road
Irving, TX 75061
Email:       ronald.cogburn@sourcehov.com
Attention:    Ronald Cogburn

with copies to:

HandsOn Global Management, LLC
3003 Pennsylvania Avenue
Santa Monica, CA 90404
Email:       pchadha@hgmfund.com
Attention:    Par Chadha
          Chief Executive Officer

and

Willkie Farr & Gallagher LLP
787 7th Ave
New York, NY 10019
Facsimile:    (212) 728 8111
Email:       mlefkort@willkie.com
Attention:    Maurice Lefkort

**10.3**    **Severability**

It is the desire and intent of the parties hereto that the provisions of this Agreement be enforced to the fullest extent permissible under the Laws and public policies applied in each jurisdiction in which enforcement is sought. Accordingly, if any particular provision of this Agreement shall be adjudicated by a court of competent jurisdiction to be invalid, prohibited or unenforceable for any reason, such provision, as to such jurisdiction, shall be ineffective, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction. Notwithstanding the foregoing, if such provision could be more narrowly drawn so as not to be invalid, prohibited or unenforceable in such jurisdiction, it shall, as to such jurisdiction, be so narrowly drawn, without invalidating the remaining provisions of this Agreement or affecting the validity or enforceability of such provision in any other jurisdiction.

**10.4     Specific Performance**

The parties agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached. It is accordingly agreed that the parties shall be entitled to seek an injunction or injunctions to prevent breaches of this Agreement and the Related Documents and to enforce specifically the terms and provisions of this Agreement and the Related Documents. Notwithstanding anything herein to the contrary, the parties acknowledge and agree that each of the Sellers and the Companies shall be entitled to seek specific performance of Parent's obligation to comply with *Section 7.5*, but in no event shall the Sellers nor the Companies be entitled to seek specific performance of Parent's obligations to consummate the transactions contemplated hereby in the event that the lenders under the Commitment Letter have declined to fund the Financing (or if Alternate Financing is being used, pursuant to the New Commitment Letter) at the Closing.

**10.5     Entire Agreement**

This Agreement, the Related Documents and the Confidentiality Agreements (including the Exhibits and Schedules hereto and thereto) contain the entire agreement and understanding between the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings relating to such subject matter. No party shall be liable or bound to any other party in any manner by any representations, warranties or covenants relating to such subject matter except as specifically set forth herein or in the Related Documents or the Confidentiality Agreements.

**10.6     Assignment**

This Agreement and the rights and obligations hereunder shall not be assignable or transferable by any of the parties hereto, in whole or in part (including by operation of law in connection with a merger or consolidation or conversion of Parent, Novitex Merger Sub or SourceHOV Merger Sub), without the prior written consent of each of the other parties hereto, which any such party may withhold in its absolute discretion.

**10.7     No Third-Party Beneficiaries**

Except as set forth in the last sentence of this *Section 10.7*, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing in this Agreement expressed or implied shall give or be construed to give to any Person, other than the parties hereto and such successors and permitted assigns, any legal or equitable rights under this Agreement. Notwithstanding anything to the contrary set forth in this Agreement, (a) each of the Related Parties shall be a third-party beneficiary of the provisions set forth in *Section 10.12*, (b) each of the Companies' Affiliates, and each of their respective directors, officers, stockholders, partners, members, and employees and their heirs, successors and permitted assigns, each in their capacity as such, shall be a third-party beneficiary of the provisions set forth in *Section 7.6(b)*, (c) if the SourceHOV Merger or the Novitex Merger is consummated, (i) each of the D&O Indemnified Parties shall be a third-party beneficiary of the provisions set forth in *Section 7.10* and (ii) the Sellers' and the Companies' Representatives shall be third-party beneficiaries of the last sentence of *Section 7.7(a)* and (d) the Financing Sources contemplated hereby shall be made third-party beneficiaries as to *Section 10.4*, this *Section 10.7*, *Section 10.8*, *Section 10.10*, *Section 10.11* and *Section 10.12(d)* .

**10.8     Amendment**

This Agreement may be amended by the parties to this Agreement at any time before the Closing, by an instrument in writing signed on behalf of each party other than the members of the HGM Group and holders of a majority of the shares of SourceHOV Common Stock held by the members of the HGM Group for and any purported amendment, modification or supplement by any of the parties in any manner that does not comply with this *Section 10.8* shall be void and of no force and effect.

A-67

Notwithstanding anything to the contrary contained herein, *Section 10.4*, *Section 10.7*, this *Section 10.8*, *Section 10.10*, *Section 10.11* and *Section 10.12 (d)* (and the related definitions and other provisions of this Agreement to the extent a modification or waiver thereof would serve to modify the substance or provisions of such sections) may not be amended, waived or otherwise modified in a manner that impacts or is adverse in any respect to any Financing Source of the Financing without the prior written consent of such Financing Source.

**10.9    Waiver**

No provision of this Agreement may be waived unless such waiver is in writing and signed by the party or parties against whom such waiver is to be effective. No failure or delay of any party in exercising any right or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such right or power, or any course of conduct, preclude any other or further exercise thereof or the exercise of any other right or power. The rights and remedies of the parties hereunder are cumulative and are not exclusive of any rights or remedies that they would otherwise have hereunder.

**10.10    Governing Law; Jurisdiction**

(a)    This Agreement and all disputes, claims or controversies relating to, arising out of, or in connection with this Agreement shall be governed by and construed in accordance with the internal Laws of the State of Delaware applicable to contracts executed in and to be performed in that State. Notwithstanding anything herein to the contrary, the parties hereto agree that any claim, controversy or dispute any kind or nature (whether based upon contract, tort or otherwise) involving a Financing Source that is in any way related to this Agreement, the SourceHOV Merger, the Novitex Merger or any of the transactions contemplated by this Agreement, including but not limited to any dispute arising out of or relating in any way to the Debt Financing shall be governed by, and construed in accordance with, the laws of the State of New York without regard to conflict of law principles (other than sections 5-1401 and 5-1402 of the New York General Obligations Law).

(b)    Each party irrevocably agrees that any Action arising out of or relating to this Agreement brought by the other party or its successors or assigns shall be brought and determined in the Court of Chancery of the State of Delaware (or, solely if such courts decline jurisdiction, in any federal court located in the State of Delaware), and each party hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Agreement and the transactions contemplated hereby. Each party agrees not to commence any Action relating thereto except in the courts described above in Delaware, other than actions in any court of competent jurisdiction to enforce any judgment, decree or award rendered by any such court in Delaware as described herein. Each party further agrees that notice as provided herein shall constitute sufficient service of process and each party further waives any argument that such service is insufficient. Each party hereby irrevocably and unconditionally waives, and agrees not to assert, by way of motion or as a defense, counterclaim or otherwise, in any Action arising out of or relating to this Agreement or the transactions contemplated hereby, (i) any claim that it is not personally subject to the jurisdiction of the courts in Delaware as described herein for any reason, (ii) that it or its property is exempt or immune from the jurisdiction of any such court or from any legal process commenced in such courts (whether through service of notice, attachment prior to judgment, attachment in aid of execution of judgment, execution of judgment or otherwise) and (iii) that (A) the Action in any such court is brought in an inconvenient forum, (B) the venue of such Action is improper or (C) this Agreement, or the subject matter hereof, may not be enforced in or by such courts. Each party agrees that a final, non-appealable judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by Law. Notwithstanding anything herein to the contrary, each of the parties hereto (a) agrees that it will not bring or support any action, cause of

A-68

Supp.App. 0925

action, claim, cross-claim or third-party claim of any kind or description, whether in Law or in equity, whether in contract or in tort or otherwise, against the Financing Sources and their Related Parties or Representatives in any way relating to this Agreement or any of the SourceHOV Merger, the Novitex Merger or any other transaction contemplated by this Agreement, including, but not limited to, any dispute arising out of or relating in any way to the Debt Financing or the performance thereof or the transactions contemplated hereby, in any forum other than exclusively in the Supreme Court of the State of New York, County of New York, or, if under applicable law exclusive jurisdiction is vested in the federal courts, the United States District Court for the Southern District of New York (and appellate courts thereof) (b) submits for itself and its property with respect to any such action to the exclusive jurisdiction of such courts, (c) agrees that service of process, summons, notice or document by registered mail addressed to it at its address provided in *Section 10.2* shall be effective service of process against it for any such action brought in any such court, (d) waives and hereby irrevocably waives, to the fullest extent permitted by law, any objection which it may now or hereafter have to the laying of venue of, and the defense of an inconvenient forum to the maintenance of, any such action in any such court and (e) agrees that a final judgment in any such action shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

**10.11    Waiver of Jury Trial**

EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT (INCLUDING ANY SUCH ACTION, PROCEEDING OR COUNTERCLAIM AGAINST ANY FINANCING SOURCE). EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS *SECTION 10.11*.

**10.12    Recourse**

(a)   For the avoidance of doubt, neither Novitex Parent nor Novitex shall have any liability or obligation for any breach of this Agreement by the HGM Group or SourceHOV or any breach of any representation or warranty to the extent that such representation or warranty relates to the HGM Group, SourceHOV or any member of the SourceHOV Company Group.

(b)   For the avoidance of doubt, neither the HGM Group nor SourceHOV shall have any liability or obligation for any breach of this Agreement by Novitex Parent or Novitex or any breach of any representation or warranty to the extent that such representation or warranty relates to Novitex Parent, Novitex or any member of the Novitex Company Group.

(c)   All Actions, obligations or losses (whether in Contract, in tort, in Law or in equity, or granted by statute whether by or though attempted piercing of the corporate, limited partnership or limited liability company veil) that may be based upon, in respect of, arise under, out or by reason of, be connected with, or relate in any manner to (i) this Agreement, (ii) the negotiation, execution or performance of this Agreement (including any representation or warranty made in connection with, or as inducement to, this Agreement), (iii) any breach or violation of this Agreement and (iv) any failure of the SourceHOV Merger, the Novitex Merger or any other transaction contemplated by this

A-69

Supp.App. 0926

Agreement to be consummated (including the Financing), in each case, may be made only against (and are those solely of) the Persons that are expressly identified as parties to this Agreement. In furtherance and not in limitation of the foregoing, and notwithstanding anything that may be expressed or implied in this Agreement, and notwithstanding the fact that certain of the parties may be partnerships or limited liability companies, each party hereto covenants, agrees and acknowledges that no recourse under this Agreement, any Related Document or any documents or instruments delivered in connection with this Agreement or any Related Document shall be had against any party's Affiliates or any of such party's or such parties Affiliates' former, current or future direct or indirect equity holders, controlling persons, stockholders, directors, officers, employees, agents, members, managers, general or limited partners or assignees (each a "**Related Party**" and collectively, the "**Related Parties**"), in each case other than the parties hereto and each of their respective successors and permitted assignees under this Agreement (and, in the case of any Related Document, the applicable parties thereto and each of their respective successors and permitted assigns), whether in Contract, tort, by the enforcement of any assessment or by any legal or equitable proceeding, or by virtue of any applicable Law, it being expressly agreed and acknowledged that no personal liability whatsoever shall attach to, be imposed on or otherwise be incurred by any of the Related Parties, as such, for any obligation or liability of any party under this Agreement or any documents or instruments delivered in connection herewith for any claim based on, in respect of or by reason of such obligations or liabilities or their creation; *provided*, *however*, that nothing in this *Section 10.12* shall relieve or otherwise limit the liability of any party hereto or any of their respective successors or permitted assigns for any breach or violation of its obligations under such agreements, documents or instruments.

(d)   Notwithstanding anything to the contrary contained herein, no party (other than Parent, SourceHOV Merger Sub and Novitex Merger Sub) shall have any rights or claims against any Financing Source in connection with this Agreement, the SourceHOV Merger, the Novitex Merger, the Debt Financing or the transactions contemplated hereby or thereby, and no Financing Source shall have any rights or claims against any Seller Related Party (other than Parent, SourceHOV Merger Sub and Novitex Merger Sub) in connection with this Agreement, the SourceHOV Merger, the Novitex Merger, the Debt Financing or the transactions contemplated hereby or thereby, whether at law or equity, in contract, in tort or otherwise; provided that, following consummation of the SourceHOV Merger and the Novitex Merger, the foregoing will not limit the rights of the parties to the Debt Financing under any Commitment Letter related thereto. In addition, in no event will any Financing Source be liable for consequential, special, exemplary, punitive or indirect damages (including any loss of profits, business or anticipated savings) or damages of a tortuous nature.

## 10.13   Limitation on Damages

No party shall be liable for any consequential damages, including loss of revenue, income or profits, loss in value of assets, punitive, speculative, treble, remote, special or indirect damages, or loss of business reputation or opportunity relating to the breach of this Agreement (except, in each case, to the extent asserted against a party (other than a Financing Source) by a third party).

## 10.14   Disclosure Schedules

The information set forth in this Agreement and the Disclosure Schedules attached hereto is disclosed solely for purposes of this Agreement, and no information set forth herein or therein shall be deemed to be an admission by any party hereto to any Person (including any other party) of any matter whatsoever (including any violation of Law or breach of Contract). Notwithstanding any provision of this Agreement or anything to the contrary contained in the Disclosure Schedules, the information and disclosures contained in any section or subsection of the Disclosure Schedules shall be deemed to be disclosed with respect to, and qualify, any representation or warranty of any Seller or any member of the Company Group to which the relevance of such information and disclosure is reasonably apparent. The fact that any item of information is disclosed in any section or subsection of the Disclosure

A-70

Supp.App. 0927

Schedules shall not be construed to mean that such information is required to be disclosed by this Agreement or is material to or outside the ordinary course of the business of any Seller or any member of the Company Group. Such information and the dollar thresholds set forth herein and therein shall not be used as a basis for interpreting the terms "material" or "Material Adverse Effect" or other similar qualifier in this Agreement. In addition, matters reflected in any section or subsection of the Disclosure Schedules are not necessarily limited to matters required by this Agreement to be reflected in the Disclosure Schedules. Such additional matters are set forth for informational purposes only and do not necessarily include other matters of a similar nature.

**10.15    Interpretation**

The headings set forth in this Agreement, in any Exhibit or Disclosure Schedule hereto and in the table of contents to this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement. Except when the context requires otherwise, any reference in this Agreement to any Article, Section, clause, Schedule or Exhibit shall be to the Articles, Sections and clauses of, and Schedules and Exhibits to, this Agreement. The words "include," "includes" and "including" are deemed to be followed by the phrase "without limitation" and the term "dollar" or "$" means lawful currency of the United States. Reference to any Person includes such Person's successors and assigns to the extent such successors and assigns are permitted by the terms of any applicable agreement, and reference to a Person in a particular capacity excludes such Person in any other capacity or individually. Reference to any agreement (including this Agreement), document or instrument means such agreement, document or instrument as amended or modified and in effect from time to time in accordance with the terms thereof and, if applicable, the terms hereof. Reference to any Law means such Law as amended, modified, codified, replaced or re-enacted, in whole or in part, including rules, regulations, enforcement procedures and any interpretations promulgated thereunder, all as in effect on the date of this Agreement. Any reference to the masculine, feminine or neuter gender shall include such other genders and any reference to the singular or plural shall include the other, in each case unless the context otherwise requires. All Exhibits and Disclosure Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. When a reference is made in this Agreement to a Section, Exhibit or Disclosure Schedule, such reference shall be to a Section of, or an Exhibit or Disclosure Schedule to, this Agreement unless otherwise indicated. The words "made available" and words of similar import refer to materials posted to the Data Room no later than 11:59 pm EST on February 20, 2017.

**10.16    No Presumption Against Drafting Party**

Each of the parties acknowledges that it has been represented by counsel in connection with this Agreement and the transactions contemplated hereby. Accordingly, any rule of law or any legal decision that would require interpretation of any claimed ambiguities in this Agreement against the drafting party has no application and is expressly waived.

**10.17    Company and Principal Stockholder Privilege**

Novitex has advised Parent and the HGM Group that Akin Gump Strauss Hauer & Feld LLP has represented both Novitex and Novitex Parent with respect to the transactions contemplated hereby and SourceHOV has advised Parent and Novitex Parent that Willkie Farr & Gallagher LLP has represented both SourceHOV and the HGM Group with respect to the transactions contemplated hereby. In light of the foregoing and subject to the following sentence, the parties agree that any attorney-client privilege, attorney work-product protection and reasonable expectation of client confidence attaching as a result of Akin Gump Strauss Hauer & Feld LLP's representation of Novitex or Novitex Parent with respect to the negotiation, documentation and consummation of the transactions contemplated hereby and Willkie Farr & Gallagher LLP's representation of SourceHOV and the HGM Group with respect to the negotiation, documentation and consummation of the transactions contemplated hereby, and all information and documents covered by such privilege or protection and all communications between

A-71

Supp.App. 0928

Table of Contents

and documents exchanged by Novitex or SourceHOV, as applicable, on the one hand, and Novitex Parent or the HGM Group, as applicable, or any of its respective officers or shareholders, on the other hand, with respect to the transactions contemplated hereby shall belong to and be controlled by Novitex Parent or the HGM Group, as applicable, and may be waived only by Novitex Parent or the HGM Group, as applicable, and not Novitex or SourceHOV, as applicable, and shall not pass to or be claimed or used by Parent, the SourceHOV Surviving Company, the Novitex Surviving Company or any of their respective Affiliates after the Closing. Notwithstanding the foregoing, such attorney-client privilege, attorney work-product protection and client confidence shall also belong to and also be controlled by Novitex or SourceHOV, as applicable, (and not heretofore waived by Novitex or SourceHOV) and shall be deemed passed to and claimed by the SourceHOV Surviving Company and the Novitex Surviving Company after the Closing to the extent any such attorney-client privilege, attorney work-product protection or client confidence is required to be waived or otherwise required to be similarly released by any Governmental Authority, under applicable Laws or pursuant to any orders, decrees, writs, injunctions, judgments, stipulations, determinations or awards entered by or with any Governmental Authority or any arbitration panel, tribunal or arbitrator, and, in any such case, no member of each Company Group shall be in breach or violation of any provision of this Agreement or any Related Documents for providing any information, documents, communications or client confidences to any Governmental Authority in response to, and subject to the requirement limitation in, the foregoing. In addition, notwithstanding anything set forth in the foregoing provisions of this *Section 10.17* to the contrary, in the event that after the Closing a dispute arises between Parent, SourceHOV Surviving Company or Novitex Surviving Company, on the one hand, and a third party to this Agreement, on the other hand, SourceHOV Surviving Company or Novitex Surviving Company, as the case may be, may assert the attorney-client privilege to prevent disclosure of any such attorney-client privilege, attorney work-product protection or client confidence to such third party.

**10.18    Execution of Agreement**

This Agreement may be executed in one or more counterparts, all of which shall be considered one and the same agreement, and shall become effective when one or more such counterparts have been signed by each of the parties and delivered to the other party. Facsimile or electronic mail transmission of counterpart signatures to this Agreement shall be acceptable and binding.

\* \* \* \*

A-72

Supp.App. 0929

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Agreement and Plan of Merger as of the date first written above.

**QUINPARIO ACQUISITION CORP. 2**

By:　/s/ D. JOHN SRIVISAL
　　　————————————————————

　　　Name:　D. John Srivisal
　　　Title:　*President and Chief Executive Officer*

**QUINPARIO MERGER SUB I, INC.**

By:　/s/ A. CRAIG IVEY
　　　————————————————————

　　　Name:　A. Craig Ivey
　　　Title:　*President*

**QUINPARIO MERGER SUB II, INC.**

By:　/s/ A. CRAIG IVEY
　　　————————————————————

　　　Name:　A. Craig Ivey
　　　Title:　*President*

**NOVITEX HOLDINGS, INC.**

By:　/s/ GIOVANNI VISENTIN
　　　————————————————————

　　　Name:　Giovanni Visentin
　　　Title:　*Executive Chairman and Chief Executive Officer*

**SOURCEHOV HOLDINGS, INC.**

By:　/s/ JAMES REYNOLDS
　　　————————————————————

　　　Name:　James Reynolds
　　　Title:　*Authorized Signer*

*[Signature Page to Business Combination Agreement]*

A-73

Supp.App. 0930

**NOVITEX PARENT, L.P.**

By:     /s/ GIOVANNI VISENTIN
_____

Name:    Giovanni Visentin
Title:    *Executive Chairman and Chief Executive Officer*

**HOVS LLC**

By:     /s/ JAMES REYNOLDS
_____

Name:    James Reynolds
Title:    *Manager*

**HANDSON FUND 4 I, LLC**
By HandsOn 3, LLC its member

By:     /s/ PAR CHADHA
_____

Name:    Par Chadha
Title:    *Manager*

*[Signature Page to Business Combination Agreement]*

A-74

Supp.App. 0931

**ANNEX I**

**DEFINITIONS**

Capitalized terms used but not defined in this Agreement have the respective meanings assigned to such terms below.

"***280G Approval***" has the meaning set forth in *Section 7.12*.

"***Action***" means any action, claim, complaint, petition, suit, investigation, litigation, arbitration or other proceeding whether civil or criminal, at law or in equity by or before any Governmental Authority or arbitrator.

"***Additional Parent SEC Reports***" has the meaning set forth in *Section 6.6(a)*.

"***Affiliate***" means, with respect to a specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such first Person; *provided*, *however*, that Apollo Global Management, LLC and HandsOn Global Management, LLC, its affiliated investment funds or alternative investment vehicles and its and their affiliates (excluding members of any Company Group but including other portfolio companies) shall be not be deemed to be Affiliates of any member of either Company Group.

"***Agreement***" has the meaning set forth in the preamble.

"***Alternate Financing***" has the meaning set forth in *Section 7.5(d)*.

"***Alternative Transaction***" has the meaning set forth in *Section 7.14(a)*.

"***Annual Financial Statements***" has the meaning set forth in *Section 5.5(a)*.

"***Antitrust Laws***" means the Sherman Act, as amended, the Clayton Act, as amended, the Federal Trade Commission Act, as amended, all applicable foreign antitrust Laws and all other applicable Laws issued by a Governmental Authority that are designed or intended to prohibit, restrict or regulate actions having the purpose or effect of monopolization or restraint of trade or lessening of competition through merger or acquisition.

"***Apollo***" means Apollo Novitex Holdings, L.P., a Delaware limited partnership.

"***Apollo Consulting Agreement***" means that certain Consulting Agreement, dated as of October 1, 2013, by and among ARSloane Acquisition, LLC and Apollo Management VII, L.P., a Delaware limited partnership, as amended, modified or supplemented from time to time.

"***Approval***" means any consent, approval, authorization, waiver or Permit, or expiration of applicable waiting period.

"***Benefit Plans***" means each "employee benefit plan" within the meaning of Section 3(3) of the Employee Retirement Income Security Act of 1974 ("***ERISA***"), and each stock purchase, stock option, equity-based, severance, employment, change-of-control, transaction or retention, bonus, incentive, deferred compensation and other benefit plan, agreement, program, policy or commitment, whether or not subject to ERISA, (i) under which any current or former director, officer, employee or consultant of any member of the Company Group has any right to benefits from any member of the Company Group and (ii) which is maintained, sponsored or contributed to by any member of the Company Group or to which any member of the Company Group has any liability or makes or is required to make contributions with respect to such directors, officers, employees or consultants.

"***Business Combination***" means any merger, capital stock exchange, asset, stock purchase, reorganization or other similar business combination involving Parent and one or more businesses or entities.

A-I-1

Supp.App. 0932

"**_Business Combination Proposal_**" means any offer, inquiry, proposal or indication of interest, written or oral (whether binding or non-binding and other than an offer, inquiry, proposal or indication of interest with respect to Parent), relating to a Business Combination.

"**_Business Day_**" means any day other than (i) any Saturday or Sunday or (ii) any other day on which banks located in New York, New York are required or authorized by Law to be closed for business.

"**_Businesses_**" means, collectively the Novitex Business and the SourceHOV Business; *provided* that (i) for purposes of the representations and warranties made by the HGM Group and/or SourceHOV in *Article IV* and *Article V* and the covenants of the HGM Group and/or SourceHOV in *Sections 7.1* and *7.1(b)*, the term Business shall mean the SourceHOV Business and (ii) for purposes of the representations and warranties made by Novitex and/or Novitex Parent in *Article IV* and *Article V* and the covenants of Novitex and/or Novitex Parent in *Sections 7.1(a)* and *7.1(b)*, the term Business shall mean the Novitex Business.

"**_Cap_**" has the meaning set forth in *Section 7.7*.

"**_Certifications_**" has the meaning set forth in *Section 6.6(a)*.

"**_Closing_**" has the meaning set forth in *Section 3.1*.

"**_Closing Date_**" has the meaning set forth in *Section 3.1*.

"**_Co-Issuer_**" has the meaning set forth in *Section 7.22(a)*.

"**_Code_**" means the Internal Revenue Code of 1986, as amended, and the rules and regulations promulgated thereunder.

"**_Commitment Letter_**" has the meaning set forth in *Section 6.15(a)*.

"**_Communications Plan_**" has the meaning set forth in *Section 7.9*.

"**_Company_**" and "**_Companies_**" has the meaning set forth in the preamble; *provided* that (i) for purposes of the representations and warranties made by the HGM Group and/or SourceHOV in *Article IV* and *Article V* (and the related definitions) and the covenants of the HGM Group and/or SourceHOV in *Sections 7.1* and *7.1(b)* (and the related definitions), the term Company shall mean SourceHOV and (ii) for purposes of the representations and warranties made by Novitex and/or Novitex Parent in *Article IV* and *Article V* (and the related definitions) and the covenants of Novitex and/or Novitex Parent in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Company shall mean Novitex.

"**_Company Board_**" means the board of directors of the Company.

"**_Company Computer Systems_**" has the meaning set forth in *Section 5.11(d)*.

"**_Company Disclosure Schedules_**" means Novitex Disclosure Schedules and the SourceHOV Disclosure Schedules.

"**_Company Group_**" means, collectively, the Novitex Company Group and the SourceHOV Company Group; *provided* that (i) for purposes of the representations and warranties made by the HGM Group and/or SourceHOV in *Article IV* and *Article V* (and the related definitions) and the covenants of the HGM Group and/or SourceHOV in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Company Group shall mean the SourceHOV Company Group and (ii) for purposes of the representations and warranties made by Novitex and/or Novitex Parent in *Article IV* and *Article V* (and the related definitions) and the covenants of Novitex and/or Novitex Parent in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Company Group shall mean the Novitex Company Group.

"**_Company Group Employees_**" has the meaning set forth in *Section 7.11(a)*.

A-I-2

Supp.App. 0933

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 936 of 1110    PageID 2557

"*Company Lease*" has the meaning set forth in *Section 5.17(a)*.

"*Company Subsidiaries*" means the Novitex Subsidiaries and the SourceHOV Subsidiaries; *provided* that (i) for purposes of the representations and warranties made by the HGM Group and/or SourceHOV in *Article IV* and *Article V* (and the related definitions) and the covenants of the HGM Group and/or SourceHOV in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Company Subsidiaries shall mean the Subsidiaries of SourceHOV and (ii) for purposes of the representations and warranties made by Novitex and/or Novitex Parent in *Article IV* and *Article V* (and the related definitions) and the covenants of Novitex and/or Novitex Parent in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Company Subsidiaries shall mean the Subsidiaries of Novitex.

"*Compliant*" means, with respect to the applicable Required Information, that (i) such Required Information does not contain any untrue statement of a material fact regarding Parent, either Company and their subsidiaries, as applicable, or omit to state any material fact regarding Parent, either Company and their subsidiaries, as applicable, necessary in order to make such Required Information not materially misleading under the circumstances, (ii) such Required Information complies in all material respects with all applicable requirements of Regulation S-K and Regulation S-X under the Securities Act for a registered public offering of debt securities on Form S-1 (other than such provisions for which compliance is not customary in a Rule 144A offering of debt securities) and (iii) the financial statements and other financial information included in such Required Information would not be deemed stale or otherwise be unusable under customary practices for offerings and private placements of high yield debt securities under Rule 144A promulgated under the Securities Act and are sufficient to permit the applicable independent accountants to issue comfort letters to the applicable Financing Sources, including as to customary negative assurances and change period.

"*Confidentiality Agreements*" means, collectively, the Parent Confidentiality Agreements, the Novitex Confidentiality Agreement and the SourceHOV Confidentiality Agreement.

"*Consulting Agreement Termination Fee*" has the meaning set forth in *Section 7.20(b)*.

"*Contract*" means any written or enforceable oral contract, agreement, license, sublicense, lease, use or occupancy agreement, sublease, sales order, purchase order, credit agreement, indenture, mortgage, note, bond or warrant (including all amendments, supplements and modifications thereto), except any common law contracts with employees of any member of each Company Group.

"*control*" means (including, with correlative meanings, "*controlled by*" and "*under common control with*"), with respect to any Person, the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities, by Contract or otherwise.

"*Current Policies*" has the meaning set forth in *Section 7.10(c)*.

"*D&O Indemnified Persons*" has the meaning set forth in *Section 7.10(a)*.

"*Data Rooms*" has the meaning set forth in *Section 6.14(a)*.

"*Debt Financing*" has the meaning set forth in the definition of "Financing Sources."

"*DGCL*" has the meaning set forth in the recitals.

"*Disclosure Schedules*" means each of the Novitex Disclosure Schedules, the Novitex Parent Disclosure Schedules, the SourceHOV Disclosure Schedules, the HGM Group Disclosure Schedules and Parent Disclosure Schedules.

"*DSS*" has the meaning set forth in *Section 7.4(c)*.

"*DSS Approval*" has the meaning set forth in *Section 7.4(c)*.

A-I-3

"**DSS Notification**" has the meaning set forth in *Section 7.4(c)*.

"**Encumbrance**" means any lien, encumbrance, security interest, pledge, mortgage, easement, right-of-way, deed of trust, hypothecation or restriction on transfer of title or voting, whether imposed by Contract, understanding, Law, equity or otherwise, except for any restrictions on transfer generally arising under any applicable federal or state securities Laws.

"**Enforceability Exceptions**" has the meaning set forth in *Section 4.3*.

"**Environmental Laws**" has the meaning set forth in *Section 5.14*.

"**ERISA**" has the meaning set forth in the definition of "Financing Sources."

"**ERISA Affiliate**" has the meaning set forth in *Section 5.12(c)*.

"**Evaluation Material**" has the meaning set forth in the Confidentiality Agreements.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

"**Exhibits**" means the exhibits to this Agreement.

"**Export Control Laws**" has the meaning set forth in *Section 5.7(c)*.

"**Fee Letter**" has the meaning set forth in *Section 6.15(a)*.

"**Financial Statements**" has the meaning set forth in *Section 5.5(a)*.

"**Financing**" has the meaning set forth in *Section 6.15(a)*.

"**Financing Source**" means the agents, arrangers, bookrunners, lenders, initial purchasers and other entities that have committed to provide or arrange or otherwise have entered or will enter into agreements in connection with all or any part of the debt financing contemplated by the Commitment Letter (including the debt securities contemplated thereby) or any other financing (other than any Pipe Investment) in connection with the transactions contemplated hereby (the "**Debt Financing**"), including the parties to any joinder agreements, purchase agreements, indentures or credit agreements entered into in connection therewith, together with their respective affiliates and their and their respective affiliates' officers, directors, employees, partners, trustees, shareholders, controlling persons, agents and representatives and their respective successors and assigns.

"**Foreign Benefit Plan**" has the meaning set forth in *Section 5.12(k)*.

"**Forfeiture Agreement**" has the meaning set forth in the recitals.

"**Former Stockholder Indemnitor**" has the meaning set forth in *Section 7.10(b)*.

"**Fundamental Representations**" means the representations and warranties contained in *Section 5.1(a)* (*Standing; Qualification and Power*), *Section 5.2(a)-(c)* (*Capitalization of the Company and the Company Subsidiaries*) and *Section 5.3* (*Authority; Execution and Delivery; Enforceability*).

"**Funded Indebtedness**" means the aggregate principal amount of, and accrued and unpaid interest on, (a) the Indebtedness evidenced by instruments and agreements set forth in *Section I(a)* of the Company Disclosure Schedules and (b) any other Indebtedness, in each case, for borrowed money of any member of the company Group in each case outstanding as of immediately prior to the Closing. For the avoidance of doubt, Funded Indebtedness shall not include any guarantees, letters of credit or other similar contingent obligations.

"**GAAP**" means generally accepted accounting principles in the United States, as in effect from time to time.

"**Governmental Antitrust Authority**" has the meaning set forth in *Section 7.4(a)*.

<div align="center">A-I-4</div>

"*Governmental Authority*" means any supranational, federal, state, provincial, local, county or municipal government, governmental, regulatory or administrative agency, department, court, commission, board, bureau or other authority or instrumentality, domestic or foreign.

"*Hazardous Substances*" means (i) any substance that is listed classified or regulated under any Environmental Laws as a pollutant or contaminant or as hazardous or toxic, (ii) any petroleum product or by-product, asbestos-containing material, lead-containing paint, polychlorinated biphenyls, radioactive material or radon or (iii) any other substance that may give rise to liability under any Environmental Laws.

"*HGM Consent*" has the meaning set forth in the recitals.

"*HGM Disclosure Schedules*" means the disclosure schedules of HGM delivered to Parent in connection with this Agreement.

"*HGM Group*" has the meaning set forth in the preamble.

"*HSR Act*" means the Hart-Scott-Rodino Antitrust Improvements Act of 1976, as amended.

"*Indebtedness*" means, with respect to any Person, without duplication, (a) all indebtedness of such Person, whether or not contingent, for borrowed money, (b) all obligations of such Person evidenced by notes, bonds, debentures or other similar debt instruments, (c) all obligations of such Person as lessee under leases that have been or should be, in accordance with GAAP, recorded as capital leases, (d) all obligations, contingent or otherwise, of such Person under bankers acceptance, letters of credit or similar arrangements to the extent drawn as of the Closing Date, (e) all Indebtedness of others referred to in clauses (a) through (d) above guaranteed by such Person through an agreement (i) to pay or purchase such Indebtedness or to advance or supply funds for the payment or purchase of such Indebtedness or (ii) otherwise to guarantee a creditor against loss and (f) all Indebtedness referred to in clauses (a) through (e) above secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Encumbrance on property (including account and contract rights) owned by such person, even though such Person has not assumed or become liable for payment of such Indebtedness; *provided*, that Indebtedness shall not include capital leases or financing incurred in the ordinary course of the Business if such leases or financing was or is incurred to acquire equipment to satisfy requirements in Contracts with customers.

"*Independent Nominees*" has the meaning set forth in *Section 7.16(g)*.

"*Intellectual Property*" means intellectual property rights arising anywhere in the world, including, but not limited to: (i) trademarks, trade names, service marks, trade dress, logos, domain names and all registrations of and applications to register any of the foregoing, including the goodwill symbolized thereby or associated therewith; (ii) patents, patent applications, invention disclosures, and all reissues, divisional, renewals, extensions, provisionals, continuations and continuations-in-part thereof; (iii) copyright rights and moral rights in original works of authorship, and copyright registrations and applications therefor; (iv) rights in proprietary computer software, programs and applications, including source code, object code, firmware and middleware; (v) rights in data and databases; (vi) rights of publicity; (vii) proprietary and confidential know-how and trade secrets; and (viii) the right to recover for damages and profits for past and future infringement of any part of the foregoing.

"*Intentional Breach*" means a breach which has resulted from either (a) fraud or (b) a deliberate act or failure to act with actual knowledge that the act or failure to act constituted or would result in a breach.

"*Interim Period*" has the meaning set forth in *Section 7.14(a)*.

"*Intermediate Co*" has the meaning set forth in *Section 7.22*.

"*Intermediate Co Consent*" has the meaning set forth in *Section 7.22*.

A-I-5

Supp.App. 0936

"*International Trade Control Laws*" has the meaning set forth in *Section 5.7(c)*.

"*Investment Company Act*" means the Investment Company Act of 1940, as amended.

"*IRS*" has the meaning set forth in *Section 5.12(b)*.

"*JOBS Act*" means the U.S. Jumpstart Our Business Startups Act of 2012, as amended.

"*Knowledge of Parent*" means the actual knowledge of D. John Srivisal, Craig Ivey and Paul Berra, none of whom shall have any personal liability or obligations of inquiry or investigation regarding such knowledge.

"*Knowledge of the Company*" means, (i) with respect to Novitex, the actual knowledge of Giovanni Visentin, Bob Rooney and Irina Novoselsky and (ii) with respect to SourceHOV, the actual knowledge of Ronald Cogburn, Armando Tirado and Shrikant Sortur, none of whom shall have any personal liability or obligations of inquiry or investigation regarding such knowledge.

"*Law*" means any law (including common law), statute, ordinance, rule, regulation, order, writ, judgment, injunction, decree or other binding directive issued, enacted, promulgated, entered into, agreed or imposed by any Governmental Authority.

"*Letter of Transmittal*" has the meaning set forth in *Section 2.2(a)*.

"*Licensed Intellectual Property*" means all material Intellectual Property related to the Business that is owned by a third party and licensed or sublicensed by any member of each Company Group.

"*Lookback Date*" means January 1, 2014.

"*Material Adverse Effect*" means any event, change, development or effect that, individually or in the aggregate with all other events, changes, developments or effects, has had, or would reasonably be expected to have, a material adverse effect upon (a) the assets, liabilities, condition (financial or otherwise), the business or results of operations of the Company Group, taken as a whole, or (b) the ability of the Company to consummate the transactions contemplated hereunder in accordance with the terms and subject to the conditions set forth herein; *provided* that the following shall not be taken into account in determining whether a "Material Adverse Effect" shall have occurred: (i) any national, international or any foreign or domestic regional economic, financial, social or political conditions (including changes therein) or events in general, including the results of any primary or general elections, (ii) changes in any financial, debt, credit, capital or banking markets or conditions (including any disruption thereof), (iii) changes in interest, currency or exchange rates or the price of any commodity, security or market index, (iv) changes in legal or regulatory conditions, including changes or proposed changes in Law, GAAP or other accounting principles or requirements, or standards, interpretations or enforcement thereof, (v) changes that are generally applicable to the industries in which the Company Group operates or seasonal fluctuations in the Businesses, (vi) any change in the market price or trading volume of any securities or indebtedness of any member of the Company Group or any of their respective Affiliates (it being understood that the underlying causes of such change may, if they are not otherwise excluded from the definition of Material Adverse Effect, be taken into account in determining whether a Material Adverse Effect has occurred), (vii) any change in, or failure of the Company Group to meet, or the publication of any report regarding, any internal or public projections, forecasts, budgets or estimates of or relating to the Company Group for any period, including with respect to revenue, earnings, cash flow or cash position (it being understood that the underlying causes of such decline or failure may, if they are not otherwise excluded from the definition of Material Adverse Effect, be taken into account in determining whether a Material Adverse Effect has occurred), (viii) the occurrence, escalation, outbreak or worsening of any hostilities, war, police action, acts of terrorism or military conflicts, whether or not pursuant to the declaration of an emergency or war, (ix) the existence, occurrence or continuation of any force majeure events, including any earthquakes, floods, hurricanes, tropical storms, fires or other natural disasters or any national,

A-I-6

Supp.App. 0937

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 940 of 1110    PageID 2561

international or regional calamity, (x) any Action arising from or relating to this Agreement or the transactions contemplated by this Agreement, (xi) the execution, announcement, performance or existence of this Agreement, the identity of the parties hereto or any of their respective Affiliates, Representatives or financing sources, the taking or not taking of any action to the extent required by this Agreement or the pendency or contemplated consummation of the transactions contemplated by this Agreement, including any actual or potential loss or impairment after the date of this Agreement of any Contract or any Customer, supplier, landlord, partner, employee or other business relation due to any of the foregoing in this clause (it being understood that the factors giving rise to or contributing to any such adverse change under clause *(xi)* that are not otherwise excluded from the definition of "Material Adverse Effect" may be deemed to constitute, or be taken into account in determining whether there has been or would be reasonably likely to have been, a Material Adverse Effect), (xii) compliance by the Company Group with the terms of this Agreement, including the failure to take any action restricted by this Agreement (but excluding effects resulting from the Closing), (xiii) any actions taken, or not taken, with the consent, waiver or at the request of Parent, Novitex Merger Sub or SourceHOV Merger Sub or any action taken to the extent expressly permitted by this Agreement, (xiv) any actions taken by Parent, Novitex Merger Sub, SourceHOV Merger Sub or any of their respective Affiliates or any of their respective Representatives or financing sources after the date of this Agreement, (xv) any matters disclosed in the Disclosure Schedules, disclosed to Parent, Novitex Merger Sub or SourceHOV Merger Sub or any of their respective Affiliates or Representatives; *provided*, *however*, that with respect to each of clauses *(i)* through *(v)*, any event, development, occurrence, fact, condition, or change referred to above shall be taken into account in determining whether a Material Adverse Effect has occurred or would reasonably be expected to occur to the extent that such event, development, occurrence, fact, condition, or change has a disproportionate effect on the Company Group compared to other participants in the industries in which the Company Group primarily conducts its business.

"*Material Contract*" has the meaning set forth in *Section 5.15(a)*.

"*Merger Sub*" has the meaning set forth in the preamble.

"*NASDAQ*" has the meaning set forth in *Section 2.2(e)*.

"*New Commitment Letter*" has the meaning set forth in *Section 7.5(d)*.

"*NISPOM*" has the meaning set forth in *Section 7.4(c)*.

"*Nomination Agreement*" has the meaning set forth in the Recitals to this Agreement.

"*Nominees*" has the meaning set forth in *Section 7.16(g)*.

"*Non-Independent Nominees*" has the meaning set forth in *Section 7.16(g)* .

"*Novitex*" has the meaning set forth in the preamble.

"*Novitex Business*" means the business and operations of the Novitex Company Group, as currently conducted or for which there are future plans for it to be conducted.

"*Novitex Certificate of Merger*" means a certificate of merger with respect to the Novitex Merger.

"*Novitex Common Stock*" has the meaning set forth in the recitals.

"*Novitex Company Group*" means Novitex and Novitex's Subsidiaries.

"*Novitex Confidentiality Agreement*" has the meaning set forth in *Section 7.3(b)*.

"*Novitex Consent*" has the meaning set forth in the recitals.

"*Novitex Disclosure Schedules*" means the disclosure schedules of Novitex delivered to Parent in connection with this Agreement.

A-I-7

Supp.App. 0938

"*Novitex Effective Time*" has the meaning set forth in *Section 1.2(b)*.

"*Novitex Merger*" has the meaning set forth in the recitals.

"*Novitex Merger Consideration*" means a number of shares of Parent Common Stock equal to the quotient obtained by dividing 30,600,000 by the number of shares of Novitex Common Stock outstanding immediately prior to the Novitex Effective Time.

"*Novitex Merger Sub*" has the meaning set forth in the recitals.

"*Novitex Merger Sub Common Stock*" has the meaning set forth in *Section 2.1(b)(i)*.

"*Novitex Parent*" has the meaning set forth in the preamble.

"*Novitex Parent Consent*" has the meaning set forth in the recitals.

"*Novitex Parent Disclosure Schedules*" means the disclosure schedules of Novitex Parent delivered to Parent in connection with this Agreement.

"*Novitex Released Parties*" has the meaning set forth in *Section 7.21(c)*.

"*Novitex Surviving Company*" has the meaning set forth in *Section 1.1(b)*.

"*Order*" means any writ, award, determination, settlement, stipulation, injunction, judgment, decree, order, ruling, subpoena, notice of violation or verdict or other decision issued, promulgated or entered by or with any Governmental Authority of competent jurisdiction, in each case whether preliminary or final.

"*Outside Date*" has the meaning set forth in *Section 9.1(a)(ii)*.

"*Owned Intellectual Property*" has the meaning set forth in *Section 5.11(a)*.

"*Owned Real Property*" has the meaning set forth in *Section 5.17(a)*.

"*Parent*" has the meaning set forth in the preamble.

"*Parent Amended and Restated Bylaws*" has the meaning set forth in *Section 3.2(c)(v)*.

"*Parent Amended and Restated Certificate of Incorporation*" has the meaning set forth in *Section 3.2(c)(iv)*.

"*Parent Common Stock*" has the meaning set forth in *Section 6.2(a)*.

"*Parent Confidentiality Agreements*" has the meaning set forth in *Section 7.3(a)*.

"*Parent Disclosure Schedules*" means the disclosure schedules of Parent delivered to the Company in connection with this Agreement.

"*Parent LLC*" has the meaning set forth in *Section 7.22(a)*.

"*Parent Plans*" has the meaning set forth in *Section 7.11(b)*.

"*Parent Released Parties*" has the meaning set forth in *Section 7.21(b)*.

"*Parent Required Stockholder Approvals*" means the Parent Stockholder Approvals set forth in clauses (i), (ii) and (iii) of the definition thereof, but in the case of clause (iii), solely to the extent related to the amendments to Parent's Certificate of Incorporation to (A) increase the number of authorized shares of Parent Common Stock and (B) adopt a policy on corporate opportunities.

"*Parent RSU Award*" means any award of restricted stock units corresponding to shares of Parent Common Stock, which award is subject to restrictions based on performance or continuing service.

"*Parent SEC Reports*" has the meaning set forth in *Section 6.6(a)*.

A-I-8

"*Parent Stockholder Approvals*" means the approval by the affirmative vote of the holders of the requisite number of shares of Parent Common Stock, whether in person or by proxy at the Parent Stockholders Meeting (or any adjournment thereof) necessary to approve , as required by the certificate of incorporation of Parent in effect on the date hereof, Rule 5635(a) of the NASDAQ Listing Rules or other applicable Law, (i) the issuance by Parent of shares of Parent Common Stock in connection with the SourceHOV Merger and the Novitex Merger, (ii) the approval of this Agreement and transactions contemplated hereby, (iii) the amendments to Parent's Amended and Restated Certificate of Incorporation contemplated by the Amended and Restated Certificate of Incorporation, and (iv) the new Long Term Incentive Plan on terms and conditions reasonably acceptable to Parent and the Companies.

"*Parent Stockholders Meeting*" means a duly held meeting of Parent's stockholders for the purpose of the approval of the SourceHOV Merger, the Novitex Merger, and the transactions contemplated hereby.

"*Parent Warrants*" has the meaning set forth in *Section 6.2(b)*.

"*Permit*" means any permit, license, approval, consent, registration, variance, certification, endorsement or qualification granted by or obtained from any Governmental Authority pursuant to Law.

"*Permitted Encumbrances*" means (i) those Encumbrances set forth in *Section I(c)* of the Company Disclosure Schedules, (ii) those Encumbrances reflected in reserved against or otherwise disclosed on the Financial Statements, (iii) mechanics', carriers', workmen's, repairmen's or other similar Encumbrances arising or incurred in the ordinary course of such Business or which not yet delinquent or are being contested in good faith by appropriate filings, (iv) Encumbrances arising in connection with financing incurred in the ordinary course of the Business to acquire equipment acquired to satisfy requirements in Contracts with customers, original purchase price conditional sales contracts and equipment leases and financing with third parties entered into in the ordinary course of such Business, (v) statutory liens for Taxes, assessments and other governmental charges that are not due and payable or that may thereafter be paid without penalty or that are being contested in good faith by appropriate proceedings, (vi) all Encumbrances created by, arising under, or existing as a result of any Law, (vii) all rights reserved to or vested in any Governmental Authority to control or regulate any asset or property in any manner and all Laws applicable to assets or properties, (viii) Encumbrances that do not, individually or in the aggregate, materially impair such Business or the continued use or operation of the assets of the Company Group as currently used or operated, (ix) easements, covenants, rights-of-way and other similar restrictions of record that do not, or would not reasonably be expected to, materially interfere any member of the Company Group's present uses or occupancy of the subject real property, (x) any conditions that may be shown by a current, accurate survey or physical inspection of any parcel of real property owned or leased by any member of the Company Group made prior to Closing, (xi) zoning, building, code, land use and other similar restrictions which are imposed by any Governmental Authority having jurisdiction over such real property and which are not violated by the current occupancy of such real property or the operation of the businesses of the Company Group, which, individually or in the aggregate, do not materially impair the continued use, operation of and access to any parcel of real property owned or leased by any member of the Company Group in such Business, (xii) Encumbrances which have been insured against by owner or leasehold title insurance policies benefitting any member of the Company Group owning or leasing the parcel of real property, (xiii) Encumbrances securing rental payments under capital leases, (xiv) to the extent terminated in connection with the Closing, Encumbrances securing payment, or other obligations, of any member of the Company Group with respect to Funded Indebtedness and (xv) other Encumbrances arising in the ordinary course of the Business and not incurred in connection with the borrowing of money that are not, individually or in the aggregate, material to the Company Group.

<div align="center">A-I-9</div>

Table of Contents

"*Person*" means and includes any domestic or foreign individual, partnership, corporation, limited liability company, group, association, joint stock company, trust, estate, joint venture, unincorporated organization or any other form of business or professional entity or Governmental Authority (or any department, agency or political subdivision thereof).

"*Personal Information*" has the meaning set forth in *Section 5.11(e)(i)*.

"*PIPE Investment*" has the meaning set forth in the recitals.

"*PIPE Investors*" has the meaning set forth in the recitals.

"*Privacy Policy*" has the meaning set forth in *Section 5.11(e)*.

"*Prohibited Party*" has the meaning set forth in *Section 5.7(d)*.

"*Prospectus*" means that certain final prospectus of Parent, dated January 15, 2015, prepared, filed and made available to the public in accordance with applicable securities law, rules and regulations.

"*Proxy Statement*" has the meaning set forth in *Section 7.16(a)*.

"*Purchased Equity*" means the Novitex Common Stock and the SourceHOV Common Stock.

"*Real Property Lease*" has the meaning set forth in *Section 5.17(d)*.

"*Registration Rights Agreement*" has the meaning set forth in the Recitals to this Agreement.

"*Related Documents*" means the SourceHOV Certificate of Merger, the Novitex Certificate of Merger, the Nomination Agreements, the Registration Rights Agreement, the Parent Amended and Restated Certificate of Incorporation, the Parent Amended and Restated Bylaws, the Forfeiture Agreement and such other agreements and documents contemplated by this Agreement, as amended, modified or supplemented from time to time.

"*Related Party*" and "*Related Parties*" has the meaning set forth in *Section 10.12(c)*.

"*Related Person*" means (i) any Affiliate of any member of either Company Group, (ii) any Person that beneficially owns at least 10% of the outstanding equity interests of either Company, or (iii) any parent, child, sibling or spouse who resides with, or is a dependent of, any Person described in clauses (i)-(ii) hereunder.

"*Release*" means any release, pumping, pouring, emptying, injecting, escaping, leaching, migrating, dumping, seepage, spill, leak, flow, discharge, disposal or emission.

"*Representatives*" means, with respect to any Person, such Person's directors, managers, officers, employees, agents and advisors (including accountants, consultants, investment bankers, legal counsel and other experts) and other representatives.

"*Required Information*" means all financial statements, financial data, audit reports and other information regarding Parent, each Company and their subsidiaries, as applicable, of the type required by Regulation S-X and Regulation S-K under the Securities Act for a registered public offering of debt securities on Form S-1, but limited to the type and form customarily included in private placements of debt securities under Rule 144A of the Securities Act and subject to exceptions customary for a Rule 144A offering involving high yield debt securities, including that such information shall not be required to include financial statements or information required by Rules 3-10 or 3-16 of Regulation S-X, Compensation and Discussion Analysis otherwise required by Regulation S-K Item 402(b) or other information customarily excluded from a Rule 144A offering memorandum, to consummate the offering(s) of debt securities contemplated by the Commitment Letter, assuming that such offering(s) were consummated at the same time during the fiscal year as such offering(s) of debt securities will be made or as otherwise necessary in order to assist in receiving customary "comfort"

A-I-10

Supp.App. 0941

Table of Contents

(including as to "negative assurance" comfort and change period) from the applicable independent accountants in connection with the offering(s) of debt securities contemplated by the Financing.

"*Right*" means any rights, title, interest or benefit of whatever kind or nature.

"*Sanction*" means any sanction administered or enforced by the Sanctions Laws.

"*Sanctions Authority*" means the United States of America (including U.S. Department of Treasury's Office of Foreign Assets Control, Department of State and the Bureau of Industry and Security of the Department of Commerce), Her Majesty's Treasury of the United Kingdom, the Council of the European Union, and the United Nations or its Security Council.

"*Sanctions Laws*" has the meaning set forth in *Section 5.7(c)*.

"*Schedules*" means the schedules to this Agreement, including the Disclosure Schedules.

"*SEC*" means the Securities and Exchange Commission.

"*Section 16*" has the meaning set forth in *Section 7.18*.

"*Securities Act*" means the Securities Act of 1933, as amended.

"*Seller*" and "*Sellers*" has the meaning set forth in the preamble; *provided* that (i) for purposes of the representations and warranties made by the HGM Group and/or SourceHOV in *Article IV* and *Article V* (and the related definitions) and the covenants of the HGM Group and/or SourceHOV in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Seller shall mean the HGM Group and (ii) for purposes of the representations and warranties made by Novitex and/or Novitex Parent in *Article IV* and *Article V* (and the related definitions) and the covenants of Novitex and/or Novitex Parent in *Sections 7.1(a)* and *7.1(b)* (and the related definitions), the term Seller shall mean Novitex Parent.

"*Seller Disclosure Schedules*" means the Novitex Parent Disclosure Schedules and the HGM Disclosure Schedules.

"*Seller Released Parties*" has the meaning set forth in *Section 7.21(a)*.

"*Sensitive Data*" means all confidential information, classified information, proprietary information, trade secrets and any other information protected by Law or Contract that is collected, maintained, stored, transmitted, used, disclosed or otherwise processed by or for the business of each member of the Company Group, including any classified information released or disclosed in connection with Contracts under the National Industrial Security Program, and any information about an individual that either contains data elements that identify the individual or with respect to which there is a reasonable basis to believe the information can be used to identify the individual.

"*Shares*" means shares of Purchased Equity.

"*Solvent*" means, as of any date of determination and with regard to any Person, that (i) the sum of the assets of such Person and its Subsidiaries, on a consolidated basis, at a fair valuation exceeds their liabilities, including contingent, subordinated, unmatured, unliquidated and disputed liabilities, of such Person and its Subsidiaries, on a consolidated basis, (ii) the present fair saleable value of the assets of such Person and its Subsidiaries, on a consolidated basis, is not less than the amount that will be required to pay the probable liability of such Person and its Subsidiaries, on a consolidated basis, on their debts and liabilities as they become absolute and matured, (iii) such Person and its Subsidiaries, on a consolidated basis, have sufficient capital and liquidity with which to conduct their businesses and such Person and its Subsidiaries, on a consolidated basis, are not engaged in business or a transaction, and are not about to engage in business or a transaction, for which such Person's and its Subsidiaries' assets, on a consolidated basis, would constitute unreasonably small capital and (iv) such Person and its Subsidiaries, on a consolidated basis, have not incurred and does not plan to incur debts or liabilities

A-I-11

beyond its ability to pay such debts as they mature or otherwise become due. For purposes of this definition, "*debt*" means any liability on a claim, and "*claim*" means (x) a right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured or unsecured or (y) a right to an equitable remedy for breach of performance to the extent such breach gives rise to a payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured. With respect to any such contingent liabilities, such liabilities shall be computed at the amount which, in light of all the facts and circumstances existing at the time, represents the amount which can reasonably be expected to become an actual or matured liability (irrespective of whether such contingent liabilities meet the criteria for accrual under Statement of Financial Accounting Standard No. 5).

"*SourceHOV*" has the meaning set forth in the preamble.

"*SourceHOV Business*" means the business and operations of the SourceHOV Company Group, as currently conducted or for which there are future plans for it to be conducted.

"*SourceHOV Certificate of Merger*" means a certificate of merger with respect to the SourceHOV Merger.

"*SourceHOV Common Stock*" has the meaning set forth in *Section 2.1(a)(ii)*.

"*SourceHOV Company Group*" means SourceHOV and SourceHOV's Subsidiaries.

"*SourceHOV Confidentiality Agreement*" has the meaning set forth in *Section 7.3(c)*.

"*SourceHOV Consulting Agreement*" means, collectively, (i) the Consulting Agreement, dated April 30, 2013, between SourceHOV and Solaris Investment L.P., (ii) Consulting Agreement, dated April 30, 2013, between SourceHOV and a designee of HandsOn3, LLC and (iii) the Consulting Agreement, dated July 27, 2015, between TransCentra, Inc. and HandsOn Global Management, LLC.

"*SourceHOV Disclosure Schedules*" means the disclosure schedules of SourceHOV delivered to Parent in connection with this Agreement.

"*SourceHOV Dissenting Shares*" has the meaning set forth in *Section 2.1(c)*.

"*SourceHOV Effective Time*" has the meaning set forth in *Section 1.2(a)*.

"*SourceHOV Merger*" has the meaning set forth in the recitals.

"*SourceHOV Merger Consideration*" means a number of shares of Parent Common Stock equal to the quotient obtained by dividing 80,600,000 by the number of shares of SourceHOV Common Stock outstanding immediately prior to the SourceHOV Effective Time assuming the settlement (in shares of SourceHOV Common Stock) of all SourceHOV RSU Awards outstanding, whether vested or unvested, immediately prior to the SourceHOV Effective Time.

"*SourceHOV Merger Sub Common Stock*" has the meaning set forth in *Section 2.1(a)(i)*.

"*SourceHOV Parent Consent*" has the meaning set forth in the recitals.

"*SourceHOV Released Parties*" has the meaning set forth in *Section 7.21(d)*.

"*SourceHOV RSU Award*" means any award of restricted stock units corresponding to shares of SourceHOV Common Stock, which award is subject to restrictions based on performance or continuing service.

"*SourceHOV Stock Plan*" means the Solaris Holding Corporation 2013 Long Term Incentive Plan, as amended, modified or supplemented from time to time, and any successor plan thereto.

"*SourceHOV Surviving Company*" has the meaning set forth in *Section 1.1(a)*.

A-I-12

Supp.App. 0943

"**Stockholder**" means any Person who holds Shares of the Company immediately prior to the Effective Time.

"**Subscription Agreement Material Terms**" has the meaning set forth in *Section 7.24*.

"**Subscription Agreements**" has the meaning set forth in the recitals.

"**Subsidiary**" or "**Subsidiaries**" means, with respect to any Person, any other Person, of which an amount of the voting securities, other voting ownership or voting partnership interests of which is sufficient to elect at least a majority of its board of directors or other governing body (or, if there are no such voting interests, 50% or more of the equity interests of which) is owned directly or indirectly by such first Person. For the purposes hereof, the term Subsidiary shall include all Subsidiaries of such Subsidiary.

"**Tax**" or "**Taxes**" means, with respect to any Person, all taxes, customs, tariffs, imposts, levies, duties, fees or other like assessments or charges of any kind imposed by a Governmental Authority including any income, gross income, franchise, gross receipts, sales, use, ad valorem, transfer, real property, franchise, license, withholding, payroll, employment or windfall profits taxes, alternative or add-in minimum taxes or other tax of any kind whatsoever, together with any interest and any penalties, additions to tax or additional amounts imposed by any Tax Authority on such Person, whether disputed or not.

"**Tax Authority**" means any Governmental Authority or any quasi-governmental or private body having jurisdiction over the assessment, determination, collection or imposition of any Tax.

"**Tax Returns**" means any returns, reports, certificates, forms or similar statements or documents (including any related or supporting information or schedules attached thereto and any information returns, amended Tax returns, claims for refund or declaration of estimated Tax) required or permitted to be supplied to, or filed with, a Tax Authority in connection with the determination, assessment or collection of any Tax or the administration of any Laws relating to any Tax.

"**Transaction Costs**" has the meaning set forth in *Section 7.7*.

"**Transfer Taxes**" has the meaning set forth in *Section 7.7(b)*.

"**Treasury Regulations**" means the permanent and temporary income tax regulations promulgated under the Code, as may be amended from time to time (including corresponding provisions of successor Treasury Regulations).

"**Trust Account**" has the meaning set forth in *Section 6.11(a)*.

"**Trust Agreement**" has the meaning set forth in *Section 6.11(a)*.

"**Trustee**" has the meaning set forth in *Section 6.11(a)*.

"**Waived 280G Benefits**" has the meaning set forth in *Section 7.12*.

A-I-13

Supp.App. 0944

Table of Contents

**CONSENT, WAIVER AND AMENDMENT**

This CONSENT, WAIVER AND AMENDMENT (this "*Modification Agreement*"), dated as of June 15, 2017, is entered into by and among Quinpario Acquisition Corp. 2, a Delaware corporation ("*Parent*"), Quinpario Merger Sub I, Inc., a Delaware corporation ("*SourceHOV Merger Sub*"), Quinpario Merger Sub II, Inc., a Delaware corporation ("*Novitex Merger Sub*" and, each of the SourceHOV Merger Sub and the Novitex Merger Sub, a "*Merger Sub*"), Novitex Holdings, Inc., a Delaware corporation ("*Novitex*"), SourceHOV Holdings, Inc., a Delaware corporation ("*SourceHOV*" and, together with Novitex, each a "*Company*" and collectively, the "*Companies*"), Novitex Parent, L.P. ("*Novitex Parent*"), Ex-Sigma LLC, a Delaware limited liability company ("*New LLC*"), HOVS LLC and HandsOn Fund 4 I, LLC (collectively, the "*HGM Group*" and together with Parent, SourceHOV Merger Sub, Novitex Merger Sub, Novitex, and SourceHOV, the "*Parties*"). Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Business Combination Agreement (as defined below).

WHEREAS, Parent, SourceHOV Merger Sub, Novitex Merger Sub, Novitex, SourceHOV, Novitex Parent and the HGM Group, have entered into that certain Business Combination Agreement, dated as of February 21, 2017 (the "*Business Combination Agreement*");

WHEREAS, concurrently herewith, Novitex Parent and SourceHOV have entered into that certain commitment letter, dated the date hereof, attached hereto as *Exhibit F* (the "*Loan Commitment Letter*"), pursuant to which the lenders named therein have committed to provide financing (the "*PIPE Financing*"), the net proceeds of which will be used to purchase shares of Parent Common Stock as part of the PIPE Investment concurrently with the closing of the transactions contemplated by the Business Combination Agreement;

WHEREAS, in connection with the PIPE Financing and immediately prior to the closing of the transactions contemplated by the Business Combination Agreement, SourceHOV contemplates entering into the reorganization transactions set forth on *Exhibit G* hereto (the "*Preliminary Merger*" and together with the PIPE Financing, the "*Preliminary Transactions*");

WHEREAS, following the Preliminary Merger, New LLC will own all of the outstanding shares of SourceHOV Common Stock and all SourceHOV RSU Awards shall become equivalent awards at New LLC (the "*New LLC RSU Awards*") and, upon the closing of the SourceHOV Merger under the Business Combination Agreement, New LLC will be issued 80,600,000 shares of Parent Common Stock;

WHEREAS, following the consummation of the transactions contemplated by the Business Combination Agreement, it is intended that the members of New LLC who hold membership interests in New LLC will, upon their receipt of shares of Parent Common Stock as a result of any distribution by New LLC, be entitled to the same rights set forth in the Registration Rights Agreement as if such members were original "Holders" thereunder; and

WHEREAS, the Parties desire to amend the Business Combination Agreement and waive certain provisions of the Business Combination Agreement in accordance with Section 10.8 and Section 10.9 of the Business Combination Agreement as set forth herein.

NOW, THEREFORE, in consideration of the foregoing premises and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree as follows:

**Section 1.    Consent, Waiver and Amendment.**

(a)   Each of the Parties hereby agrees and consents to the Preliminary Transactions and waives any breach or violation by any Party as a result of any action taken by such Party or its Affiliates, on, prior to or after the date hereof, in furtherance of such Preliminary Transactions; provided, that each of Novitex Parent and Parent and their Representatives shall be given the opportunity to review and

A-I-14

Supp.App. 0945

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 948 of 1110    PageID 2569

comment on any and all agreements, arrangements, certificates or other documents entered into in order to effect the Preliminary Transactions and SourceHOV and the HGM Group will incorporate any such comments reasonably proposed by Novitex Parent and/or Parent. Each of the Parties acknowledges and agrees that (i) New LLC will own all of the outstanding shares of SourceHOV Common Stock immediately prior to the closing of the transactions contemplated by the Business Combination Agreement and, upon consummation of the Preliminary Transactions and the closing of the SourceHOV Merger under the Business Combination Agreement, will receive 80,600,000 shares of Parent Common Stock in consideration of the SourceHOV Merger and (ii) except as expressly amended or modified by this Modification Agreement, all of the representations, warranties, covenants and other agreements set forth in the Business Combination Agreement shall continue in full force and effect.

(b)    Each of the Parties and their respective Affiliates shall use all reasonable best efforts to take, or cause to be taken, all appropriate action to do, or cause to be done, all things necessary, proper or advisable under applicable Law or otherwise to consummate and make effective the transactions contemplated by the Business Combination Agreement, after giving effect to this Modification Agreement, as promptly as practicable, including to promptly make any necessary filings and submissions required under the HSR Act as a result of the Preliminary Transactions, which filings and submissions shall be subject to Section 7.4 of the Business Combination Agreement. For the avoidance of doubt, the Preliminary Transactions shall be deemed to be "transactions contemplated by the Business Combination Agreement" including for purposes of the closing condition set forth in Section 8.1(a) of the Business Combination Agreement and all documents, agreements and certificates entered into in order to effect the Preliminary Transactions shall be deemed Related Documents.

(c)    Within two (2) hours after the execution and delivery of this Modification Agreement, the HGM Group will execute and deliver to Parent, SourceHOV Merger Sub, Novitex Merger Sub, Novitex and Novitex Parent a written consent pursuant to which, among other things, the HGM Group will act by written consent in favor of the adoption of this Modification Agreement and the Business Combination Agreement (as modified by the Modification Agreement), the approval of the Preliminary Transactions and the other transactions contemplated by the Business Combination Agreement thereby waiving any and all rights under the DGCL or otherwise to assert dissenters' rights or demand appraisal of its shares of SourceHOV Common Stock (as defined herein) in connection with the Preliminary Merger.

(d)    Exhibit A of the Business Combination Agreement is amended and restated in the form attached as *Exhibit A* hereto.

(e)    Exhibit B of the Business Combination Agreement is amended and restated in the form attached as *Exhibit B* hereto.

(f)    Exhibit C of the Business Combination Agreement is amended and restated in the form attached as *Exhibit C* hereto.

(g)    Exhibit D of the Business Combination Agreement is amended and restated in the form attached as *Exhibit D* hereto.

(h)    The Parties acknowledge and agree that the resolution contemplated by Section 7.18 of the Business Combination Agreement will cover the acquisition by any officer, director or shareholder (by "director by deputization") of the Companies of (i) any shares of Parent Common Stock issued in the PIPE Investment and (ii) any shares of Parent Common Stock issued in lieu of cash for the payment of fees and expenses contemplated by Section 7.7 of the Business Combination Agreement.

(i)    Notwithstanding anything to the contrary in the Business Combination Agreement, including Section 7.24 thereof, the Parties have entered into Subscription Agreements as of the date hereof on terms and conditions mutually agreed upon by the Parties. The Parties further acknowledge and agree

A-I-15

Supp.App. 0946

that the Preferred Stock to be issued in connection with the PIPE Investment shall be issued pursuant to the terms set forth in that certain Certificate of Designations, Rights and Limitations of Series A Perpetual Convertible Preferred Stock attached hereto as *Exhibit H*. In addition, in the event of a foreclosure by the lenders providing the PIPE Financing on any shares of Preferred Stock pledged to secure such PIPE Financing, Parent hereby waives the six month limitation on the voluntary conversion of such Preferred Stock such that the lenders may immediately voluntarily convert such shares of Preferred Stock into Parent Common Stock.

**Section 2.   Specific Amendments.**   Without limiting Section 1, the following provisions of the Business Combination Agreement are amended as set forth below:

(a)   *Section 2.1(c).*   Section 2.1(c) is amended and restated as follows:

*(c)   Notwithstanding anything in this Agreement to the contrary, any SourceHOV Common Stock issued and outstanding immediately prior to the Preliminary Merger that is held by any holder who has not voted in favor of the Preliminary Merger or consented thereto in writing and who is entitled to demand and properly demands appraisal of such SourceHOV Common Stock pursuant to Section 262 of the DGCL ("**SourceHOV Dissenting Shares**") shall not be converted into the right to receive membership interests in New LLC, unless and until such holder shall have failed to perfect, or shall have effectively withdrawn or lost, such holder's right to appraisal under the DGCL. The holders of SourceHOV Dissenting Shares shall be entitled to receive payment of the fair value of such SourceHOV Dissenting Shares in accordance with the provisions of Section 262 of the DGCL. The SourceHOV Merger Consideration shall be reduced by a number of shares equal to the product of (i) a fraction, the numerator of which is the number of SourceHOV Dissenting Shares, and the denominator of which is the number of shares of SourceHOV Common Stock outstanding immediately prior to the Preliminary Merger assuming the settlement (in shares of SourceHOV Common Stock) of all SourceHOV RSU Awards outstanding, whether vested or unvested, immediately prior to the Preliminary Merger, and (ii) 80,600,000. If any such holder fails to perfect such appraisal right in accordance with the DGCL or withdraws or otherwise loses any such right to appraisal, each such share of SourceHOV Common Stock shall thereupon be converted into and become exchangeable only for the right to receive from New LLC, as of the later of the time that such right to appraisal has been irrevocably lost, withdrawn or expired, consideration payable in the Preliminary Merger, without any interest thereon, and the SourceHOV Merger Consideration shall be recalculated as if such shares were not SourceHOV Dissenting Shares. At the effective time of the Preliminary Merger, any holder of SourceHOV Dissenting Shares shall cease to have any rights with respect thereto, except the rights provided in Section 262 of the DGCL and as provided in the previous sentence. SourceHOV shall not, except with the prior written consent of Parent, make any payment with respect to any demands for appraisals or compromise, offer to settle or settle, or otherwise make any binding agreement regarding, any such demands. Except pursuant to Section 2.2(a) or in connection with any prepayment of the PIPE Financing as required pursuant to the collateral coverage requirements thereof, HGM Group shall not permit New LLC to transfer, sell or otherwise dispose of the SourceHOV Dissenting Shares unless and until the holders thereof shall have failed to perfect, or shall have effectively withdrawn or lost, such holder's right to appraisal under the DGCL and the SourceHOV Merger Consideration shall have been recalculated.*

(b)   *Section 2.2.*   Section 2.2 (a) through (c) are amended and restated as follows:

*(a)   At the SourceHOV Effective Time, Parent shall deliver the SourceHOV Merger Consideration to New LLC without any deduction with respect to SourceHOV Dissenting Shares. If it is subsequently determined that there should have been a reduction in the SourceHOV Merger Consideration as a result of Section 2.1(c), then upon the repayment in full of the PIPE Financing, New LLC shall return the excess shares to Parent.*

*(b)   Intentionally omitted.*

*(c)   Intentionally omitted.*

A-I-16

Supp.App. 0947

(c) *Section 2.3(a).* Section 2.3(a) is amended and restated as follows:

(a) *SourceHOV RSU Awards.* Each SourceHOV RSU Award, whether vested or unvested, that is outstanding immediately prior to the Preliminary Merger shall, upon the effectiveness of the Preliminary Merger, automatically and without any action on the part of the holder thereof, be assumed by New LLC and converted into a New LLC RSU Award covering an equal equity interest in New LLC as it previously covered in SourceHOV. Each such equity interest in New LLC shall be subject to the same terms and conditions (including the applicable time-vesting and/or performance-vesting conditions) as applied to the corresponding SourceHOV RSU Award immediately prior to the effectiveness of the Preliminary Merger. Parent shall promptly reimburse New LLC for the cost of administering the New LLC RSU Awards including any tax liability arising out of the New LLC RSU Awards.

(d) *Section 3.2(c)(ii).* Section 3.2(c)(ii) is amended and restated as follows:

(ii) to New LLC, the aggregate SourceHOV Merger Consideration into which its SourceHOV Common Stock has been converted pursuant to Section 2.1(a)(iii) and any cash in lieu of fractional shares which the holder has the right to receive pursuant to Section 2.2(e) if it has delivered its share certificates duly endorsed for transfer or a stock power in lieu thereof;

(e) *Section 7.5 and 7.6.* Sections 7.5 and 7.6 shall apply mutatis mutandis to the PIPE Financing.

(f) *Section 7.7(c).* A new Section 7.7(c) is added to the Business Combination Agreement as follows:

(c) In consideration of the purchase of Parent Common Stock with the proceeds of the PIPE Financing, following the Closing, SourceHOV shall reimburse New LLC for any and all reasonable fees, costs and expenses related to the incurrence of the PIPE Financing, and shall provide such reimbursement for all reasonable fees, costs and expenses related to the maintenance of the PIPE Financing, except, in each case, for principal, interest and original issue discount.

(g) *Section 7.16(h).* The first sentence of Section 7.16(h) is amended and restated as follows:

(h) Notwithstanding any other provision of this Section 7.16, the parties hereto acknowledge that Parent intends to file with the SEC as soon as practicable following the date hereof one or more registration statements to provide for the resale from time to time of (i) an aggregate of 3,016,071 of the Retained Shares, as defined in the Forfeiture Agreement, held by certain Affiliates of Parent and related parties and (ii) an aggregate of 17,500,000 Parent Common Shares issuable upon the exercise of an aggregate of 35,000,000 Parent Warrants to be outstanding at Closing; provided that Parent shall not request effectiveness of such registration statement prior to the Closing.

(h) *Section 7.25.* A new Section 7.25 is added to the Business Combination Agreement as follows:

Upon the repayment in full of the PIPE Financing, New LLC shall promptly distribute all shares of Parent Common Stock held thereby to the holders of membership interests of New LLC (other than any shares held by New LLC in respect of any SourceHOV Dissenting Shares or shares underlying any then unvested New LLC RSU Awards).

(i) *Section 8.1(c).* Section 8.1(c) is amended and restated as follows:

(c) *The SourceHOV Merger and the Novitex Merger.* The Preliminary Merger shall have been consummated immediately prior to the SourceHOV Merger and the Novitex Merger. Both the SourceHOV Merger and the Novitex Merger shall have been consummated substantially simultaneously pursuant to the terms of this Agreement and the Related Documents.

A-I-17

Table of Contents

(j)   *Definition of SourceHOV Merger Consideration.*    The definition of the term "SourceHOV Merger Consideration" is amended and restated as follows:

"**SourceHOV Merger Consideration**" *means a number of shares of Parent Common Stock equal to the quotient obtained by dividing 80,600,000 by the number of shares of SourceHOV Common Stock outstanding immediately prior to the SourceHOV Effective Time after giving effect to the Preliminary Merger.*

(k)   *Definition of HGM Group.*    The definition of the term "HGM Group" is amended and restated as follows:

"**HGM Group**" *means HOVS LLC and HandsOn Fund 4 I, LLC and, immediately upon consummation of the Preliminary Merger, New LLC.*

**Section 3.    Full Force and Effect.**    From and after the date hereof, all references in the Business Combination Agreement to "this Agreement," "hereof" or words of similar import shall mean the Business Combination Agreement as amended and modified by this Modification Agreement. Except as expressly set forth herein, the Business Combination Agreement shall remain in full force and effect on the terms and conditions set forth therein.

**Section 4.    Miscellaneous.**    All terms and provisions contained in Article 10 of the Business Combination Agreement are incorporated herein by reference to the same extent as if expressly set forth herein.

*[signature page follows.]*

A-I-18

IN WITNESS WHEREOF, the parties have executed and delivered this Consent, Waiver and Amendment as of the day and year first written above.

**QUINPARIO ACQUISITION CORP. 2**

By: /s/ D. JOHN SRIVISAL

Name: D. John Srivisal
Title: President and Chief Executive Officer

**QUINPARIO MERGER SUB I, INC.**

By: /s/ A. CRAIG IVEY

Name: A. Craig Ivey
Title: President

**QUINPARIO MERGER SUB II, INC.**

By: /s/ A. CRAIG IVEY

Name: A. Craig Ivey
Title: President

**NOVITEX HOLDINGS, INC.**

By: /s/ GIOVANNI VISENTIN

Name: Giovanni Visentin
Title: Executive Chairman and Chief Executive Officer

**SOURCEHOV HOLDINGS, INC.**

By: /s/ JAMES REYNOLDS

Name: James Reynolds
Title: Co-Chairman

*[Signature Page to Consent, Waiver and Amendment]*

A-I-19

**NOVITEX PARENT, L.P.**

By: /s/ GIOVANNI VISENTIN
_____

Name: Giovanni Visentin
Title: Executive Chairman and Chief Executive Officer

**HOVS LLC**

By: /s/ JAMES REYNOLDS
_____

Name: James Reynolds
Title: Authorized Signer

**HANDSON FUND 4 I, LLC**

By: /s/ PAR CHADHA
_____

Name: Par Chadha
Title: Manager

**EX-SIGMA, LLC**

By: /s/ JAMES REYNOLDS
_____

Name: James Reynolds
Title: Authorized Signer

*[Signature Page to Consent, Waiver and Amendment]*

A-I-20

Exhibit A

**Nomination Agreement**

A-I-21

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 955 of 1110    PageID 2576

**Exhibit B**

**Registration Rights Agreement**

A-I-22

Supp.App. 0953

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 956 of 1110     PageID 2577

**Exhibit C**

**Parent Amended and Restated Certificate of Incorporation**

A-I-23

Supp.App. 0954

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 957 of 1110    PageID 2578

**Exhibit D**

**Parent Amended and Restated Bylaws**

A-I-24

Supp.App. 0955

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 958 of 1110 PageID 2579

**Exhibit F**

**Loan Commitment Letter**

A-I-25

Supp.App. 0956

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 959 of 1110    PageID 2580

**Exhibit G**

**Preliminary Merger**

- SourceHOV will form New LLC as a new wholly-owned limited liability company.

- New LLC will form a new wholly-owned corporate subsidiary referred to as "***Grandchild Merger Sub***."

- Grandchild Merger Sub will be merged with and into SourceHOV, resulting in:

  - The stockholders of SourceHOV receiving all of the outstanding membership interests in New LLC;

  - The SourceHOV RSU Awards being converted into New LLC RSU Awards; and

  - SourceHOV becoming a wholly-owned subsidiary of New LLC.

A-I-26

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 960 of 1110   PageID 2581

**Exhibit H**

**Certificate of Designations**

A-I-27

Supp.App. 0958

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 961 of 1110    PageID 2582

**Annex B**

**SECOND AMENDED AND RESTATED**

**CERTIFICATE OF INCORPORATION**

**OF**

**Exela Technologies, Inc.**

---

**Pursuant to Section 245 of the**
**Delaware General Corporation Law**

---

Exela Technologies, Inc., a corporation existing under the laws of the State of Delaware (the "Corporation"), by its Chief Executive Officer, hereby certifies as follows:

1.    The name of the Corporation is "Exela Technologies, Inc."

2.    The Corporation's Certificate of Incorporation was filed in the office of the Secretary of State of the State of Delaware on July 15, 2014 and the Amended and Restated Certificate of Incorporation was filed in the office of the Secretary of State of the State of Delaware on January 15, 2015, as amended on January 19, 2017 (the "*Certificate of Incorporation*").

3.    This Second Amended Restated Certificate of Incorporation restates, integrates and amends the Certificate of Incorporation of the Corporation.

4.    This Second Amended and Restated Certificate of Incorporation was duly adopted by joint written consent of the directors and stockholders of the Corporation in accordance with the applicable provisions of Sections 141(f), 228, 242 and 245 of the General Corporation Law of the State of Delaware ("*GCL*").

5.    The text of the Certificate of Incorporation of the Corporation is hereby amended and restated to read in full as follows:

FIRST:  The name of the corporation is Exela Technologies, Inc. (hereinafter sometimes referred to as the "*Corporation*").

SECOND:  The registered office of the Corporation is to be located at 615 S. DuPont Hwy., Kent County, Dover, Delaware. The name of its registered agent at that address is National Corporate Research, Ltd.

THIRD:  The purpose of the Corporation shall be to engage in any lawful act or activity for which corporations may be organized under the GCL.

FOURTH:  The total number of shares of all classes of capital stock which the Corporation shall have authority to issue is 1,620,000,000 of which 1,600,000,000 shares shall be Common Stock of the par value of $.0001 per share and 20,000,000 shares shall be Preferred Stock of the par value of $.0001 per share.

A.    *Preferred Stock.*    The Board of Directors of the Corporation (the "*Board*") is expressly granted authority to issue shares of the Preferred Stock, in one or more series, and to fix for each such series such voting powers, full or limited, and such designations, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof as shall be stated and expressed in the resolution or resolutions adopted by the Board providing for the issue of such series and included in a certificate of designation (a "*Preferred Stock Designation*") and as may be permitted by the GCL. The number of authorized shares of Preferred Stock may be increased or decreased (but not below the number of shares thereof then outstanding) by

B-1

Supp.App. 0959

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 962 of 1110    PageID 2583

the affirmative vote of the holders of a majority of the voting power of all of the then outstanding shares of the capital stock of the Corporation entitled to vote generally in the election of directors, voting together as a single class, without a separate vote of the holders of the Preferred Stock, or any series thereof, unless a vote of any such holders is required pursuant to any Preferred Stock Designation.

B.    *Common Stock.*    Except as otherwise required by law or as otherwise provided in any Preferred Stock Designation, the holders of the Common Stock shall exclusively possess all voting power and each share of Common Stock shall have one vote for each such share on each matter properly submitted to the stockholders on which the holders of Common Stock are entitled to vote.

FIFTH:  The following provisions are inserted for the management of the business and for the conduct of the affairs of the Corporation, and for further definition, limitation and regulation of the powers of the Corporation and of its directors and stockholders:

A.    Election of directors need not be by ballot unless the by-laws of the Corporation so provide.

B.    The Board shall be divided into three classes: Class A, Class B and Class C. The number of directors in each class shall be as nearly equal as possible. At the first election of directors by the incorporator, the incorporator shall elect a Class C director for a term expiring at the Corporation's third Annual Meeting of Stockholders. The Class C director shall then appoint additional Class A, Class B and Class C directors, as necessary. The directors in Class A shall be elected for a term expiring at the first Annual Meeting of Stockholders, the directors in Class B shall be elected for a term expiring at the second Annual Meeting of Stockholders and the directors in Class C shall be elected for a term expiring at the third Annual Meeting of Stockholders. Commencing at the first Annual Meeting of Stockholders, and at each annual meeting thereafter, directors elected to succeed those directors whose terms expire shall be elected for a term of office to expire at the third succeeding annual meeting of stockholders after their election. Except as the GCL may otherwise require, in the interim between annual meetings of stockholders or special meetings of stockholders called for the election of directors and/or the removal of one or more directors and the filling of any vacancy in that connection, newly created directorships and any vacancies in the Board, including unfilled vacancies resulting from the removal of directors for cause, may be filled by the vote of a majority of the remaining directors then in office, although less than a quorum (as defined in the Corporation's by-laws), or by the sole remaining director. All directors shall hold office until the expiration of their respective terms of office and until their successors shall have been elected and qualified. A director elected to fill a vacancy resulting from the death, resignation or removal of a director shall serve for the remainder of the full term of the director whose death, resignation or removal shall have created such vacancy and until his successor shall have been elected and qualified.

C.    The Board shall have the power, without the assent or vote of the stockholders, to make, alter, amend, change, add to or repeal the by-laws of the Corporation as provided in the by-laws of the Corporation.

D.    The directors in their discretion may submit any contract or act for approval or ratification at any annual meeting of the stockholders or at any meeting of the stockholders called for the purpose of considering any such act or contract, and any contract or act that shall be approved or be ratified by the vote of the holders of a majority of the stock of the Corporation which is represented in person or by proxy at such meeting and entitled to vote thereat (provided that a lawful quorum of stockholders

B-2

Supp.App. 0960

be there represented in person or by proxy) shall be as valid and binding upon the Corporation and upon all the stockholders as though it had been approved or ratified by every stockholder of the Corporation, whether or not the contract or act would otherwise be open to legal attack because of directors' interests, or for any other reason.

E.    In addition to the powers and authorities hereinbefore or by statute expressly conferred upon them, the directors are hereby empowered to exercise all such powers and do all such acts and things as may be exercised or done by the Corporation; subject, nevertheless, to the provisions of the statutes of Delaware, of this Second Amended and Restated Certificate of Incorporation, and to any by-laws from time to time made by the stockholders; provided, however, that no by-law so made shall invalidate any prior act of the directors which would have been valid if such by-law had not been made.

SIXTH:  A. A director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except to the extent such exemption from liability or limitation thereof is not permitted under the GCL as the same exists or may hereafter be amended. If the GCL is amended to authorize corporate action further eliminating or limiting the personal liability of directors, then the liability of a director of the Corporation shall be eliminated or limited to the fullest extent permitted by the GCL, as so amended. Any repeal or modification of this paragraph A by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation with respect to events occurring prior to the time of such repeal or modification.

B.    The Corporation, to the full extent permitted by Delaware law, as the same exists or may hereafter be amended from time to time, shall indemnify and hold harmless each person whom it may indemnify pursuant thereto. Expenses (including attorneys' fees) incurred by any such indemnified person in defending any civil, criminal, administrative, or investigative action, suit or proceeding for which such person may be entitled to indemnification hereunder shall be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such person to repay such amount if it shall ultimately be determined that such person is not entitled to be indemnified by the Corporation as authorized hereby. The rights to indemnification and advancement of expenses conferred by this paragraph B shall be contract rights and such rights shall continue as to an indemnitee who has ceased to be a director, officer, employee or agent of the Corporation and shall inure to the benefit of his or her heirs, executors and administrators.

C.    The Corporation hereby acknowledges that an indemnitee may have certain rights to other indemnification, advancement of expenses and/or insurance (collectively, the "*Other Indemnitors*"). The Corporation hereby agrees that with respect to any and all losses arising by reason of the fact that such indemnitee is or was a director, officer, employee or agent of the Corporation or any subsidiary thereof, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, (i) that the Corporation is the indemnitor of first resort (i.e., its obligations to an indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee are secondary), (ii) that the Corporation shall be required to advance the full amount of expenses incurred by an indemnitee in accordance with this paragraph C and shall be liable for the full amount of all losses to the extent legally permitted and as required by the terms of this Second Amended and Restated Certificate of Incorporation (or any other agreement between the Corporation and an indemnitee), without regard to any rights an indemnitee may have

B-3

Supp.App. 0961

against the Other Indemnitors, and, (iii) that the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of an indemnitee with respect to any claim for which such indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Corporation. The Corporation and each indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this paragraph C.

D.    Any repeal or amendment of this Article SIXTH by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of this Second Amended and Restated Certificate inconsistent with this Article SIXTH, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of or related to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

SEVENTH:  Whenever a compromise or arrangement is proposed between this Corporation and its creditors or any class of them and/or between this Corporation and its stockholders or any class of them, any court of equitable jurisdiction within the State of Delaware may, on the application in a summary way of this Corporation or of any creditor or stockholder thereof or on the application of any receiver or receivers appointed for this Corporation under Section 291 of Title 8 of the Delaware Code or on the application of trustees in dissolution or of any receiver or receivers appointed for this Corporation under Section 279 of Title 8 of the Delaware Code order a meeting of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, to be summoned in such manner as the said court directs. If a majority in number representing three fourths in value of the creditors or class of creditors, and/or of the stockholders or class of stockholders of this Corporation, as the case may be, agree to any compromise or arrangement and to any reorganization of this Corporation as a consequence of such compromise or arrangement, the said compromise or arrangement and the said reorganization shall, if sanctioned by the court to which the said application has been made, be binding on all the creditors or class of creditors, and/or on all the stockholders or class of stockholders, of this Corporation, as the case may be, and also on this Corporation.

EIGHTH: A. Unless the Corporation consents in writing to the selection of an alternative forum, the Court of Chancery of the State of Delaware shall be the sole and exclusive forum for any stockholder (including a beneficial owner) to bring (i) any derivative action or proceeding brought on behalf of the Corporation, (ii) any action asserting a claim of breach of a fiduciary duty owed by any director, officer or other employee of the Corporation to the Corporation or the Corporation's stockholders, (iii) any action asserting a claim against the Corporation, its directors, officers or employees arising pursuant to any provision of the GCL or this Second Amended and Restated Certificate of Incorporation or the Corporation's by-laws, or (iv) any action asserting a claim against the Corporation, its directors, officers or employees governed by the internal affairs doctrine, except for, as to each of (i) through (iv) above, any claim as to which the Court of Chancery determines that there is an

B-4

Supp.App. 0962

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 965 of 1110    PageID 2586

indispensable party not subject to the jurisdiction of the Court of Chancery (and the indispensable party does not consent to the personal jurisdiction of the Court of Chancery within ten days following such determination), which is vested in the exclusive jurisdiction of a court or forum other than the Court of Chancery, or for which the Court of Chancery does not have subject matter jurisdiction.

B. If any action the subject matter of which is within the scope of paragraph A immediately above is filed in a court other than a court located within the State of Delaware (a "*Foreign Action*") in the name of any stockholder, such stockholder shall be deemed to have consented to (i) the personal jurisdiction of the state and federal courts located within the State of Delaware in connection with any action brought in any such court to enforce paragraph A immediately above (an "*FSC Enforcement Action*") and (ii) having service of process made upon such stockholder in any such FSC Enforcement Action by service upon such stockholder's counsel in the Foreign Action as agent for such stockholder.

C. If any provision or provisions of this Article EIGHTH shall be held to be invalid, illegal or unenforceable as applied to any person or entity or circumstance for any reason whatsoever, then, to the fullest extent permitted by law, the validity, legality and enforceability of such provisions in any other circumstance and of the remaining provisions of this Article EIGHTH (including, without limitation, each portion of any sentence of this Article EIGHTH containing any such provision held to be invalid, illegal or unenforceable that is not itself held to be invalid, illegal or unenforceable) and the application of such provision to other persons or entities and circumstances shall not in any way be affected or impaired thereby. Any person or entity purchasing or otherwise acquiring any interest in shares of capital stock of the Corporation shall be deemed to have notice of and consented to the provisions of this Article EIGHTH.

NINTH: The Corporation elects not to be governed by Section 203 of the GCL.

TENTH: A. The doctrine of corporate opportunity, or any other analogous doctrine, shall not apply with respect to the Corporation or any of its officers or directors in circumstances where the application of any such doctrine to a corporate opportunity would conflict with any fiduciary duties or contractual obligations they may have as of the date of this Second Amended and Restated Certificate or in the future. In addition to the foregoing, the doctrine of corporate opportunity shall not apply to any other corporate opportunity with respect to any of the directors or officers of the Corporation unless such corporate opportunity is offered to such person solely in his or her capacity as a director or officer of the Corporation and such opportunity is one the Corporation is legally and contractually permitted to undertake and would otherwise be reasonable for the Corporation to pursue.

B. Without limiting the foregoing, to the extent permitted by applicable law, each of the stockholders and directors of the Corporation, their respective affiliates and all of their respective partners, principals, directors, officers, members, managers, equity holders and/or employees, including any of the foregoing who serve as officers or directors of the Corporation (other than the Corporation and its subsidiaries and other than directors that are employees of the Corporation or any of its subsidiaries) (each, an "*Exempted Person*") shall not have any fiduciary duty to refrain from engaging directly or indirectly in the same or similar business activities or lines of business as the Corporation or any of its subsidiaries, except as otherwise expressly provided in any agreement entered into between the Corporation and such Exempted Person. To the fullest extent permitted by applicable law, the Corporation, on behalf of itself and its subsidiaries, renounces any interest or expectancy of the Corporation and its subsidiaries in, or in being offered an

B-5

opportunity to participate in, business opportunities that are from time to time available to the Exempted Persons, even if the opportunity is one that the Corporation or its subsidiaries might reasonably be deemed to have pursued or had the ability or desire to pursue if granted the opportunity to do so, and each such Exempted Person shall have no duty to communicate or offer such business opportunity to the Corporation (and there shall be no restriction on the Exempted Persons using the general knowledge and understanding of the industry in which the Corporation operates which it has gained as an Exempted Person in considering and pursuing such opportunities or in making investment, voting, monitoring, governance or other decisions relating to other entities or securities) and, to the fullest extent permitted by applicable law, shall not be liable to the Corporation or any of its subsidiaries or stockholders for breach of any fiduciary or other duty, as a director or officer or otherwise, by reason of the fact that such Exempted Person pursues or acquires such business opportunity, directs such business opportunity to another person or fails to present such business opportunity, or information regarding such business opportunity, to the Corporation or its subsidiaries, or uses such knowledge and understanding in the manner described herein, in each case, except as otherwise expressly provided in any agreement entered into between the Company and such Exempted Person. In addition to and notwithstanding the foregoing, a corporate opportunity shall not be deemed to belong to the Corporation if it is a business opportunity that the Corporation is not financially able or contractually permitted or legally able to undertake, or that is, from its nature, not in the line of the Corporation's business or is of no practical advantage to it or that is one in which the Corporation has no interest or reasonable expectancy. Any person or entity purchasing or otherwise acquiring any interest in any shares of stock of the Corporation shall be deemed to have notice of the provisions of this Article TENTH.

C.   Neither the alteration, amendment, addition to or repeal of this Article TENTH, nor the adoption of any provision of this Second Amended and Restated Certificate (including any Preferred Stock Designation) inconsistent with this Article TENTH, shall eliminate or reduce the effect of this Article TENTH in respect of any business opportunity first identified or any other matter occurring, or any cause of action, suit or claim that, but for this Article TENTH, would accrue or arise, prior to such alteration, amendment, addition, repeal or adoption. This Article TENTH shall not limit any protections or defenses available to, or indemnification or advancement rights of, any director or officer of the Corporation under this Second Amended and Restated Certificate, the Bylaws or applicable law

ELEVENTH:  The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Second Amended and Restated Certificate (including any Preferred Stock Designation), in the manner now or hereafter prescribed by this Second Amended and Restated Certificate and the GCL; and, except as set forth in this Article ELEVENTH, all rights, preferences and privileges herein conferred upon stockholders, directors or any other persons by and pursuant to this Second Amended and Restated Certificate in its present form or as hereafter amended are granted subject to the right reserved in this Article ELEVENTH. In the event that the provisions of this Second Amended and Restated Certificate and the nomination agreement between the Corporation and Apollo Novitex Holdings, L.P. and the nomination agreement between the Corporation and HOVS LLC, HOVS Capital II LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and Ex-Sigma LLC conflict, the provisions of the such nomination agreements shall take precedence over this Second Amended and Restated Certificate.

B-6

Table of Contents

IN WITNESS WHEREOF, the Corporation has caused this Second Amended and Restated Certificate of Incorporation to be signed by [   •   ], its [   •   ], as of the [   •   ]$^{th}$ day of [   •   ], 2017.

<div style="text-align:center">_____</div>

<div style="text-align:center">[OFFICER], [TITLE]</div>

<div style="text-align:center">B-7</div>

**CERTIFICATE OF DESIGNATIONS,**

**PREFERENCES, RIGHTS AND LIMITATIONS**

**OF**

**SERIES A PERPETUAL CONVERTIBLE PREFERRED STOCK**

**OF**

**EXELA TECHNOLOGIES, INC.**

**(formerly known as Quinpario Acquisition Corp. 2)**

Pursuant to Section 151 of the

General Corporation Law of the State of Delaware

EXELA TECHNOLOGIES, INC. (formerly known as Quinpario Acquisition Corp. 2), a Delaware corporation (the "**Company**"), certifies that pursuant to the authority contained in Article Fourth of its Second Amended and Restated Certificate of Incorporation, as amended (the "**Second Amended and Restated Certificate of Incorporation**"), and in accordance with the provisions of Section 151 of the General Corporation Law of the State of Delaware (the "**DGCL**"), the Board of the Company has adopted the following resolution on [  •  ] 2017, creating a series of preferred stock, par value $0.0001 per share, of the Company designated as Series A Perpetual Convertible Preferred Stock, which resolution remains in full force and effect on the date hereof:

RESOLVED, that a series of preferred stock, par value $0.0001 per share, of the Company be, and hereby is, created, and that the designation and number of shares thereof and the voting powers, preferences and relative, participating, optional or other special rights and such qualifications, limitations or restrictions thereof are as follows:

**(1)** *Designation and Amount; Ranking*.

(a)   There shall be created from the 20,000,000 shares of preferred stock, par value $0.0001 per share, of the Company authorized to be issued pursuant to the Second Amended and Restated Certificate of Incorporation, a series of preferred stock, designated as "Series A Perpetual Convertible Preferred Stock", par value $0.0001 per share (the "**Preferred Stock**"), and the authorized number of shares of Preferred Stock shall be 11,500,000 shares of Preferred Stock that are purchased or otherwise acquired by the Company, or that are converted into shares of Common Stock, shall be cancelled and shall revert to authorized but unissued shares of Preferred Stock.

(b)   The Preferred Stock, with respect to dividend rights and rights upon the liquidation, winding-up or dissolution of the Company, ranks: (i) senior to all Junior Stock; (ii) on a parity with all Parity Stock; and (iii) junior to all Senior Stock, in each case as provided more fully herein.

**(2)** *Definitions*.   As used herein, the following terms shall have the following meanings:

(a)   "**Affiliate**" shall have the meaning ascribed to it, on the date hereof, under Rule 144 of the Securities Act.

(b)   "**Agent Members**" shall have the meaning specified in Section 15(a).

(c)   "**Apollo**" means Apollo Novitex Holdings, L.P., a Delaware limited partnership.

(d)   "**Applicable Conversion Rate**" shall have the meaning specified in Section 8(a).

(e)   "**Approved Stock Plan**" shall mean any employee benefit plan which has been approved by the Board and the Company's stockholders, pursuant to which the Company's securities may be issued to any employee, officer, consultant or director for services provided to the Company.

B-8

Supp.App. 0966

(f)    "**Bloomberg**" shall mean Bloomberg Financial Markets.

(g)    "**Board**" shall mean the Board of Directors of the Company or, with respect to any action to be taken by the Board of Directors, any committee of the Board of Directors duly authorized to take such action, except that for purposes of the definition of "Fundamental Change," the Board shall refer to the full Board of Directors.

(h)    "**Business Day**" shall mean any day other than a Saturday, Sunday or other day on which the Federal Reserve Bank of New York is authorized or required by law or executive order to close or be closed.

(i)    "**Capital Stock**" shall mean, for any entity, any and all shares, interests, rights to purchase, warrants, options, participations or other equivalents of or interests in (however designated) stock issued by that entity.

(j)    "**Certificated Notice of Conversion**" shall have the meaning specified in Section 8(b)(ii)(A).

(k)    "**close of business**" shall mean 5:00 p.m. (New York City time).

(l)    "**Closing Sale Price**" of the Common Stock on any date shall mean the closing sale price per share (or if no closing sale price is reported, the average of the closing bid and ask prices or, if more than one in either case, the average of the average closing bid and the average closing ask prices) of the Common Stock on such date as reported on The Nasdaq Stock Market or, if the Common Stock is not listed on The Nasdaq Stock Market, on the principal other national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not listed on a national or regional securities exchange, on the principal other market on which the Common Stock is then listed, quoted or admitted for trading. In the absence of such a quotation, the Closing Sale Price shall be the average of the mid-point of the last bid and ask prices for the Common Stock on the relevant date from each of at least three nationally recognized independent investment banking firms selected by the Company for this purpose.

(m)    "**Common Stock**" shall mean the common stock, par value $0.0001 per share, of the Company, subject to Section 8(i).

(n)    "**Conversion Agent**" shall have the meaning set forth in Section 14(a).

(o)    "**Conversion Date**" shall have the meaning specified in Section 8(b).

(p)    "**Conversion Instruction**" shall have the meaning specified in Section 8(b)(i).

(q)    "**Conversion Price**" means, as to any Conversion Date, $8.00 divided by the Conversion Rate on such Conversion Date.

(r)    "**Conversion Rate**" shall mean 0.9090909 shares of Common Stock, as adjusted from time to time as specified in Section 8(e).

(s)    "**Convertible Securities**" shall mean any stock or securities (other than Options) directly or indirectly convertible into or exercisable or exchangeable for shares of Common Stock, including the Company's warrants.

(t)    "**Depositary**" shall have the meaning specified in Section 15(a).

(u)    "**Dividend Payment Date**" shall mean March 15, June 15, September 15 and December 15 of each year, commencing on the first such date after the date of the first issuance of the Preferred Stock.

(v)    "**Dividend Rate**" shall mean the rate per annum of 10% of the Liquidation Preference per share of Preferred Stock.

B-9

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 970 of 1110     PageID 2591

Table of Contents

(w)  "**Dividend Record Date**" shall mean, with respect to any Dividend Payment Date, the February 15, May 15, August 15 or November 15, as the case may be, immediately preceding such Dividend Payment Date.

(x)  "**Dividends**" shall have the meaning specified in Section 3(a).

(y)  "**DTC**" means The Depository Trust Corporation.

(z)  "**Effective Date**" shall mean the date on which a Fundamental Change event occurs or becomes effective, except that, as used in Section 8(e), Effective Date shall mean the first date on which the shares of the Common Stock trade on the applicable exchange or market, regular way, reflecting the relevant share split or share combination, as applicable.

(aa)  "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

(bb)  "**Excluded Securities**" shall mean any Common Stock issued or issuable (i) in connection with any Approved Stock Plan; (ii) upon conversion or redemption of the Preferred Stock; (iii) upon exercise of any Options or Convertible Securities which are outstanding on the Issue Date or which are exercised after an adjustment in accordance with Section 8 was previously made in respect of such Options or Convertible Securities; (iv) pursuant to any merger, joint venture, partnership, share exchange, business combination or similar transaction or any other direct or indirect acquisition by the Company with parties that are not Affiliates, whereby the Common Stock comprises, in whole or in part, the consideration paid by the Company in such transaction, provided such transaction was approved by the Board; or (v) upon the issuance of any shares of Common Stock or warrants to acquire only shares of Common Stock issued to non-Affiliate banks, equipment lessors or other lending institutions, or to real property lessors, in each case, in connection with a debt financing, equipment leasing or real property leasing transaction, provided such transaction was approved by the Board and that such Common Stock issued under this clause (v) does not exceed 7% of the then current issued and outstanding Common Stock.

(cc)  "**Ex-Date**," when used with respect to any issuance, dividend or distribution on the Common Stock, shall mean the first date on which the Common Stock trades on the applicable exchange or in the applicable market, regular way, without the right to receive such issuance, dividend or distribution from the Company or, if applicable, from the seller of the Common Stock on such exchange or market (in the form of due bills or otherwise) as determined by such exchange or market.

(dd)  "**Fundamental Change**" shall be deemed to have occurred at any time after the Preferred Stock is originally issued if any of the following occurs:

(i)  a "person" or "group" within the meaning of Section 13(d) of the Exchange Act, other than any of the Company or any of its Affiliates or Subsidiaries, and the employee benefit plans of the Company and its Subsidiaries, files a Schedule 13D or any other schedule, form or report under the Exchange Act disclosing that such "person" or "group" has become the direct or indirect "beneficial owner," as defined in Rule 13d-3 under the Exchange Act, of more than 50% of the voting power in the aggregate of all classes of Capital Stock then outstanding entitled to vote generally in elections of the Board; *provided*, *however*, that (x) any such beneficial ownership by Apollo (together with its Affiliates) and the HGM Group shall not be a Fundamental Change pursuant to this clause (i) and (y) the right to acquire Capital Stock (so long as such person does not have the right to direct the voting of the Capital Stock subject to such right) or any veto power in connection with the acquisition or disposition of Capital Stock will not cause a party to be a "beneficial owner";

(ii)  any sale, lease or other transfer in one transaction or a series of transactions of all or substantially all of the consolidated assets of the Company and its Subsidiaries, taken as a whole,

B-10

Supp.App. 0968

including pursuant to a merger transaction, to any Person (other than one of the Company's Subsidiaries); or

(iii) the stockholders of the Company approve any plan or proposal for the liquidation or dissolution of the Company; or

(iv) the Common Stock ceases to be listed or quoted on listed or quoted on any of the New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors).

*provided*, *however*, that a transaction or transactions described in clause (i) or (ii) above shall not constitute a Fundamental Change, if at least 90% of the consideration received or to be received by the common stockholders of the Company, excluding cash payments for fractional shares and cash payments made pursuant to dissenters' appraisal rights, in connection with such transaction or transactions consists of shares of common stock that are listed or quoted on any of the New York Stock Exchange, The NASDAQ Global Select Market or The NASDAQ Global Market (or any of their respective successors) or will be so listed or quoted immediately following such transaction or transactions, and, as a result of such transaction or transactions, the Preferred Stock becomes convertible into such consideration pursuant to the terms hereof.

(ee) "**Fundamental Change Notice**" shall have the meaning specified in Section 7(a).

(ff) "**Global Preferred Share**" shall have the meaning specified in Section 15(a).

(gg) "**Global Shares Legend**" shall have the meaning specified in Section 15(a).

(hh) "**HGM Group**" means HOVS LLC, HOVS Capital III LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and Ex-Sigma, LLC, and their respective Affiliates from time to time.

(ii) "**Holder**" or "**holder**" shall mean a holder of record of the Preferred Stock.

(jj) "**Holder Stock Price**" shall have the meaning specified in Section 7(b).

(kk) "**Issue Date**" shall mean [　　　　　　], 2017, the original date of issuance of the Preferred Stock.

(ll) "**Junior Stock**" shall mean Common Stock and any class of Capital Stock or series of preferred stock established after the Issue Date, the terms of which expressly provide that such class or series will rank junior to the Preferred Stock as to dividend rights and rights upon the liquidation, winding-up or dissolution of the Company.

(mm) "**Liquidation Preference**" shall mean $8.00 per share of Preferred Stock plus any Dividends on the Preferred Stock accrued pursuant to Sections 4 and 5 prior to and as of the most recent Dividend Payment Date plus all accrued and unpaid dividends on the Preferred Stock since the latest Dividend Payment Date.

(nn) "**Mandatory Conversion Date**" shall have the meaning specified in Section 9(b).

(oo) "**Mandatory Conversion Price**" shall have the meaning specified in Section 9(a).

(pp) "**Notice of Conversion**" shall mean, as applicable, a Conversion Instruction or a Certificated Notice of Conversion.

(qq) "**Officer**" shall mean the Chief Executive Officer, the President, any Vice President, the Treasurer, any Assistant Treasurer, the Secretary or any Assistant Secretary of the Company.

(rr) "**open of business**" shall mean 9:00 a.m. (New York City time).

B-11

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 972 of 1110    PageID 2593

(ss) "**Options**" shall mean any rights, warrants or options to subscribe for or purchase shares of Common Stock or Convertible Securities.

(tt) "**Outstanding**" shall mean, when used with respect to Preferred Stock, as of any date of determination, all Preferred Stock theretofore authenticated and delivered under this Certificate of Designation, except shares of Preferred Stock as to which any property deliverable upon conversion thereof has been delivered and required to be cancelled pursuant to Sections 7, 8 or 9.

(uu) "**Parity Stock**" shall mean any class of Capital Stock or series of preferred stock established after the Issue Date, the terms of which expressly provide that such class or series will rank on a parity with the Preferred Stock as to dividend rights, and/or rights upon the liquidation, winding-up or dissolution of the Company and/or voting rights.

(vv) "**Paying Agent**" shall have the meaning set forth in Section 14(a).

(ww) "**Person**" shall mean any individual, corporation, general partnership, limited partnership, limited liability partnership, joint venture, association, joint-stock company, trust, limited liability company, unincorporated organization or government or any agency or political subdivision thereof.

(xx) "**Record Date**" shall mean, with respect to any dividend, distribution or other transaction or event in which the holders of the Common Stock or the Preferred Stock (or other applicable security) have the right to receive any cash, securities or other property or in which the Common Stock or the Preferred Stock (or such other security) is exchanged for or converted into any combination of cash, securities or other property, the date fixed for determination of holders of the Common Stock or the Preferred Stock (or such other security) entitled to receive such cash, securities or other property (whether such date is fixed by the Board, statute, contract or otherwise).

(yy) "**Redemption Date**" shall mean a date that is fixed for redemption of the Preferred Stock by the Company in accordance with Section 10.

(zz) "**Redemption Notice**" shall have the meaning specified in Section 10(b)(ii).

(aaa) "**Redemption Price**" shall have the meaning specified in Section 10(a).

(bbb) "**Reference Property**" shall have the meaning specified in Section 8(i)(v).

(ccc) "**Registrar**" shall have the meaning set forth in Section 12.

(ddd) "**Reorganization Event**" shall have the meaning specified in Section 8(i)(v).

(eee) "**Resale Restriction Termination Date**" shall have the meaning specified in Section 13(a).

(fff) "**Restricted Securities**" shall have the meaning specified in Section 13(a).

(ggg) "**Rule 144**" shall mean Rule 144 as promulgated under the Securities Act.

(hhh) "**SEC**" or "**Commission**" shall mean the Securities and Exchange Commission.

(iii) "**Securities Act**" shall mean the Securities Act of 1933, as amended.

(jjj) "**Senior Stock**" shall mean any class of the Company's Capital Stock or series of preferred stock established after the Issue Date, the terms of which expressly provide that such class or series will rank senior to the Preferred Stock as to dividend rights and/or rights upon the liquidation, winding-up or dissolution of the Company.

(kkk) "**Subsidiary**" shall mean, with respect to any Person, any corporation, association, partnership or other business entity of which more than 50% of the total voting power of shares of Capital Stock or other interests (including partnership interests) entitled (without regard to the occurrence of any contingency) to vote in the election of directors, managers, general partners or

B-12

Supp.App. 0970

trustees thereof is at the time owned or controlled, directly or indirectly, by (i) such Person; (ii) such Person and one or more Subsidiaries of such Person; or (iii) one or more Subsidiaries of such Person.

(lll) "**Third Anniversary Expected Liquidation Preference**" shall mean $10.75911.

(mmm) "**Trading Day**" shall mean a day during which trading in the Common Stock generally occurs on The Nasdaq Stock Market or, if the Common Stock is not listed on The Nasdaq Stock Market, on the principal other national or regional securities exchange on which the Common Stock is then listed or, if the Common Stock is not listed on a national or regional securities exchange, on the principal other market on which the Common Stock is then listed or admitted for trading. If the Common Stock is not so listed or traded, Trading Day means a Business Day.

(nnn) "**Transfer Agent**" shall have the meaning set forth in Section 12.

(ooo) "**Weighted Average Price**" shall mean for any security as of any Trading Day, the per share volume-weighted average price for such security as displayed under the heading "Bloomberg VWAP" on Bloomberg page Ticker <XELA> VWAP (or its equivalent successor if such page is not available) in respect of the period from 9:30:01 a.m. to 4:00:00 p.m., New York City time, on such Trading Day or, if no weighted average price is reported for such security by Bloomberg for such hours, the average of the highest closing bid price and the lowest closing ask price of any of the market makers for such security as reported in the OTC Link or "pink sheets" by OTC Markets Group Inc. (formerly Pink OTC Markets Inc.). If the Weighted Average Price cannot be calculated for a security on a particular date on any of the foregoing bases, the Weighted Average Price of such security on such date shall be the fair market value as mutually determined by the Company and a majority of the Holders. All such determinations are to be appropriately adjusted for any stock dividend, stock split, stock combination, reclassification or similar transaction, or Ex-Date in respect thereof, occurring during the applicable calculation period.

**(3)**    *Dividends*.

(a)    Holders of shares of Preferred Stock shall be entitled to receive cumulative dividends at the Dividend Rate ("**Dividends**"). Dividends on the Preferred Stock shall be paid or accrue quarterly in arrears at the Dividend Rate. From the Issue Date until the third anniversary of the Issue Date, the amount of all accrued but unpaid Dividends on the Preferred Stock will be added to the Liquidation Preference on each Dividend Payment Date without any action by the Board. After the third anniversary of the Issue Date, Dividends on the Preferred Stock will be accrued by adding to the Liquidation Preference or paid in cash (when, as and if declared by the Board out of funds of the Company legally available for payment) or a combination thereof pursuant to Section 4. For the avoidance of doubt, unless prohibited by applicable law, notwithstanding anything contained herein to the contrary, dividends on the Preferred Stock shall accrue for all fiscal periods during which the Preferred Stock is outstanding, regardless of whether the Company has earnings in any such period, whether there are funds legally available for the payment of such Dividends and whether or not such Dividends are authorized or declared. Dividends on the Preferred Stock shall be payable in arrears on each Dividend Payment Date to the holders of record of Preferred Stock as they appear on the Company's stock register at the close of business on the relevant Dividend Record Date. Dividends on the Preferred Stock payable for any period less than a full quarterly Dividend period (based upon the number of days elapsed during the period) shall be computed on the basis of a 360-day year consisting of twelve 30-day months.

(b)    Holders of shares of Preferred Stock shall participate in any dividend or distribution paid in cash or other property in respect of the Common Stock (other than a dividend or distribution giving rise to an adjustment of the Conversion Rate under Section 8(e)), pro-rata with the holders of the Company's Common Stock as if all shares of Preferred Stock then Outstanding had been converted

B-13

Table of Contents

into Common Stock pursuant to Section 8 immediately prior to the date on which holders of Common Stock became entitled to such dividend or distribution.

(c)   If any Dividend Payment Date with respect to the Preferred Stock falls on a day that is not a Business Day, the required payment will be on the next succeeding Business Day and no interest or dividends on such payment will accrue or accumulate as the case may be, in respect of the delay.

(d)   The holders of shares of Preferred Stock at the close of business on a Dividend Record Date shall be entitled to receive the dividend payment on those shares on the corresponding Dividend Payment Date notwithstanding the Company's default in payment of the dividend due on such Dividend Payment Date. In the case of conversion of shares of Preferred Stock pursuant to Sections 7, 8 and 9 following the close of business on a Dividend Record Date but prior to the corresponding Dividend Payment Date, the holders of such shares shall not be entitled to receive the corresponding dividend payment on the Preferred Stock following conversion (it being understood that the value thereof is included in the conversion terms set forth in Sections 7, 8 and 9).

(e)   Except as provided in Section 8 and as otherwise set forth herein, the Company shall make no payment or allowance for unpaid dividends, whether or not in arrears, on converted shares of Preferred Stock or for dividends on the shares of Common Stock issued upon conversion.

**(4)**   *Method of Payment of Dividends*.

(a)   Subject to the restrictions set forth herein, from the Issue Date until the third anniversary of the Issue Date, the amount of all accrued but unpaid Dividends on the Preferred Stock shall be added to the Liquidation Preference on each Dividend Payment Date. Subject to the restrictions set forth herein, after the third anniversary of the Issue Date, the Company may elect to: (i) pay any Dividend on the Preferred Stock in cash (when, as and if declared by the Board out of funds of the Company legally available for payment); (ii) accrue any Dividend on the Preferred Stock by adding the amount of all accrued but unpaid Dividends on the Preferred Stock to the Liquidation Preference; or (iii) through any combination of clauses (i) and (ii) in accordance with Section 4(b).

(b)   After the third anniversary of the Issue Date, the Company shall make each Dividend payment on the Preferred Stock by adding the amount of all accrued but unpaid Dividends on the Preferred Stock as set forth above on the Dividend Payment Date, except to the extent the Company elects to make all or any portion of such payment in cash on or prior to the applicable Dividend Payment Date, in which case, the amount the accrued but unpaid Dividends on the Preferred Stock that is added to the Liquidation Preference shall be reduced on a dollar-for-dollar basis by the amount of any such cash payment.

**(5)**   *Voting*.   The shares of Preferred Stock shall have no voting rights except as set forth in this Section 5 or otherwise required by Delaware law. So long as any shares of Preferred Stock remain Outstanding, unless a greater percentage shall then be required by law, the Company shall not, without the affirmative vote or consent of the Holders of at least a majority of the shares of Preferred Stock Outstanding at the time, voting together as a single class with all series of Parity Stock upon which similar voting rights have been conferred and are exercisable, given in person or by proxy, either in writing or at a meeting, amend, alter or repeal the provisions of the Second Amended and Restated Certificate of Incorporation, whether by merger, consolidation or otherwise, so as to materially and adversely affect any right, preference, privilege or voting powers of the shares of Preferred Stock; *provided*, that any increase in the amount of authorized preferred stock (including, without limitation, additional Preferred Stock) or the creation or issuance of any additional shares of Preferred Stock or other series of preferred stock, or any increase in the amount of authorized shares of such series, of Parity and Senior Stock but not Junior Stock, shall be deemed to materially and adversely affect the rights, preferences, privileges or voting powers of Holders of shares of Preferred Stock specified herein.

B-14

Supp.App. 0972

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 975 of 1110    PageID 2596

**(6)** *Liquidation Rights*.

(a)   In the event of any liquidation, winding-up or dissolution of the Company, whether voluntary or involuntary, each Holder of shares of Preferred Stock shall be entitled to receive and to be paid out of the assets of the Company available for distribution to its stockholders an amount per share for each share of Preferred Stock held by them equal to the greater of (i), the Liquidation Preference to the date fixed for liquidation, winding-up or dissolution or (ii) such amount per share as would have been payable in respect of such share of Preferred Stock as converted had all shares of Preferred Stock then Outstanding been converted into Common Stock pursuant to Section 8 immediately prior to (and on the date fixed for) liquidation, winding-up or dissolution of the Corporation, in preference to the holders of, and before any payment or distribution is made on, any Junior Stock, including, without limitation, the Common Stock.

(b)   Neither the sale (for cash, shares of stock, securities or other consideration) of all or substantially all the assets or business of the Company (other than in connection with the liquidation, winding-up or dissolution of the Company) nor the merger or consolidation of the Company into or with any other Person shall be deemed to be a liquidation, winding-up or dissolution, voluntary or involuntary, for the purposes of this Section 6.

(c)   After the payment to the Holders of the shares of Preferred Stock of full preferential amounts provided for in this Section 6, the Holders of Preferred Stock as such shall have no right or claim to any of the remaining assets of the Company.

(d)   In the event the assets of the Company available for distribution to the Holders of shares of Preferred Stock and holders of shares of Parity Stock upon any liquidation, winding-up or dissolution of the Company, whether voluntary or involuntary, shall be insufficient to pay in full all amounts to which such Holders are entitled pursuant to this Section 6, no such distribution shall be made on account of any shares of Parity Stock upon such liquidation, dissolution or winding-up unless proportionate distributable amounts shall be paid on account of the shares of Preferred Stock, equally and ratably, in proportion to the full distributable amounts for which holders of all Preferred Stock and of any Parity Stock are entitled upon such liquidation, winding-up or dissolution.

**(7)** *Conversion Upon a Fundamental Change*.

(a)   The Company must give notice (a "**Fundamental Change Notice**") of each Fundamental Change to all Holders of the Preferred Stock no later than 10 Business Days prior to the anticipated Effective Date (determined in good faith by the Board) of the Fundamental Change or, if not practicable because the Company is unaware of the Fundamental Change, as soon as reasonably practicable but in any event no later than 1 Business Day after the Company becomes aware of such Fundamental Change.

(b)   Within 15 days following the Effective Date of such Fundamental Change, each Outstanding share of the Preferred Stock shall, at the election of the Holder thereof pursuant to the delivery of a Notice of Conversion, be converted into a number of shares of Common Stock equal to the Applicable Conversion Rate on the Effective Date of such Fundamental Change; provided that if the Company has not delivered a notice of redemption in accordance with Section 10(b)(i), prior to the 5th day after the Effective Date of the Fundamental Change, then, from and after such 5th day after the Effective Date until the 15th day following the Effective Date, each Outstanding share of the Preferred Stock shall, at the election of the Holder thereof pursuant to the delivery of a Notice of Conversion, be converted into a number of shares of Common Stock equal to the greater of (A) the Applicable Conversion Rate on the Effective Date of such Fundamental Change and (B) the quotient of (x) the Liquidation Preference, *divided by* (y) the greater of (1) the applicable Holder Stock Price and (2) $0.10; provided, that, the aggregate number of shares issuable upon such conversion of all shares of Preferred Stock then Outstanding will not exceed the lesser of (i) difference between (x) the aggregate

B-15

Supp.App. 0973

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 976 of 1110    PageID 2597

number of authorized shares at the time minus (y) the sum of the number of shares of Common Stock outstanding at such time plus the number of shares of Common Stock issuable upon conversion or exchange of debt, warrants or rights which are convertible into or exchangeable for shares of Common Stock (other than the shares of Preferred Stock) and (ii) 80% of the total number of outstanding shares of Common Stock. Notwithstanding the foregoing, if the shares of Common Stock are converted into or exchanged for cash, securities or other property in connection with a Fundamental Change, then the shares of Preferred Stock shall be convertible into the cash, securities or other property that the holder would have received had it converted its shares of Preferred Stock in accordance with this Section 7 immediately prior to the Record Date for such Fundamental Change. As used herein, "**Holder Stock Price**" means (i) in the case of a Fundamental Change in which the Holders of Common Stock will receive only cash consideration, the price to be paid (or deemed paid) per share of Common Stock in such transaction and (ii) in all other cases, the average Closing Sale Price of the Common Stock on the 20 consecutive Trading Days immediately preceding the Effective Date of the Fundamental Change (or, such lesser number of Trading Days as shall follow the public announcement of such transaction).

(c)   The Fundamental Change Notice shall be given by first-class mail to each record holder of shares of Preferred Stock, at such Holder's address as the same appears on the books of the Company. Each such notice shall state (i) the anticipated Effective Date and (ii) that dividends on the Preferred Stock to be converted will cease to accrue on the date immediately preceding the Effective Date of the Fundamental Change.

(d)   Whenever any provision of this Certificate of Designations requires the Company to calculate the Weighted Average Price or Closing Sale Price for purposes of a Fundamental Change over a span of multiple days, the Board shall make appropriate adjustments to account for any adjustment to the Conversion Rate that becomes effective, or any event requiring an adjustment to the Conversion Rate where the Ex-Date of the event occurs, at any time during the period when such Weighted Average Prices or Closing Sale Prices are to be calculated.

**(8)**   *Conversion*.

(a)   Each Holder of Preferred Stock shall have the right at any time after the six month anniversary of the Issue Date, at its option, to convert, subject to the terms and provisions of this Section 8, any or all of such Holder's shares of Preferred Stock into Common Stock at a conversion rate equal to the quotient of (i) prior to the third anniversary of the Issue Date, the Third Anniversary Expected Liquidation Preference and, from and after the third anniversary of the Issue Date, the Liquidation Preference; *divided by* (ii) the Conversion Price on the applicable Conversion Date (as to any Conversion Date, the "**Applicable Conversion Rate**") per share of Preferred Stock (subject to the limitations set forth in Section 11). Upon conversion of any share of Preferred Stock, the Company shall deliver to the converting Holder, in respect of the number of shares of Preferred Stock being converted, a number of shares of Common Stock equal to the Applicable Conversion Rate multiplied by the number of shares of Preferred Stock being converted, together with a cash payment in lieu of any fractional share of Common Stock in accordance with Section 11, on the third Business Day immediately following the relevant Conversion Date.

(b)   Before any Holder shall be entitled to convert a share of Preferred Stock as set forth above, such Holder who:

(i)   holds a beneficial interest in a Global Preferred Share must deliver to DTC the appropriate instruction form for conversion pursuant to DTC's conversion program (a "**Conversion Instruction**") and, if required, pay all transfer or similar taxes or duties, if any; or

<div align="center">B-16</div>

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 977 of 1110　　PageID 2598

    (ii)  holds Preferred Stock in definitive, certificated form must:

        (A)  manually sign and deliver an irrevocable notice to the office of the Conversion Agent as set forth in the Form of Certificated Notice of Conversion (or a facsimile thereof) in the form included in *Exhibit A* hereto (a "**Certificated Notice of Conversion**") and state in writing therein the number of shares of Preferred Stock to be converted and the name or names (with addresses) in which such Holder wishes the certificate or certificates for any shares of Common Stock, if any, to be delivered and registered;

        (B)  surrender such shares of Preferred Stock, at the office of the Conversion Agent;

        (C)  if required, furnish appropriate endorsements and transfer documents; and

        (D)  if required, pay all transfer or similar taxes or duties, if any.

The Conversion Agent shall notify the Company of any pending conversion pursuant to this Section 8 on the Conversion Date for such conversion. The date on which a Holder complies with the procedures in this clause (b) is the "**Conversion Date**." If more than one share of Preferred Stock shall be surrendered for conversion at one time by the same Holder, the number of shares of Common Stock to be delivered upon conversion of such shares of Preferred Stock shall be computed on the basis of the aggregate number of shares of Preferred Stock so surrendered.

    (c)  With respect to any conversion of shares of Preferred Stock:

        (i)  if there shall have been surrendered certificate or certificates, as the case may be, representing a greater number of shares of Preferred Stock than the number of shares of Preferred Stock to be converted, the Company shall execute and the Registrar shall countersign and deliver to such Holder or such Holder's designee, at the expense of the Company, new certificate or certificates, as the case may be, representing the number of shares of Preferred Stock that shall not have been converted; and

        (ii)  if the shares of Preferred Stock converted are held in book-entry form through the facilities of the Depositary, promptly following the relevant Conversion Date, the Company shall cause the Transfer Agent and Registrar to reduce the number of shares of Preferred Stock represented by the global certificate by making a notation on Schedule I attached to the relevant Global Preferred Share.

    (d)  Immediately prior to the close of business on the Conversion Date with respect to a conversion, a converting Holder of Preferred Stock shall be deemed to be the holder of record of the Common Stock issuable upon conversion of such Holder's Preferred Stock notwithstanding that the share register of the Company shall then be closed or that certificates representing such Common Stock, if any, shall not then be actually delivered to such Holder. On the date of any conversion, all rights with respect to the shares of Preferred Stock so converted, including the rights, if any, to receive notices, will terminate, excepting only the rights of holders thereof to (i) receive certificates for the number of whole shares of Common Stock, if any, into which such shares of Preferred Stock have been converted (with a cash payment in lieu of any fractional share of Common Stock in accordance with Section 11) and (ii) exercise the rights to which they are thereafter entitled as holders of Common Stock, if any.

<div align="center">B-17</div>

Table of Contents

(e)   The Conversion Rate shall be adjusted, without duplication, upon the occurrence of any of the following events:

(i)   If the Company exclusively issues shares of Common Stock as a dividend or distribution on all or substantially all shares of its Common Stock, or if the Company effects a share split, subdivision, combination, reverse split or reclassification of the outstanding shares of Common Stock into a greater or smaller number of shares, the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_1}{OS_0}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on Ex-Date for such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split, subdivision, combination, reverse split or reclassification, as the case may be; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on the Ex-Date for such dividend or distribution, or immediately after the open of business on the Effective Date of such share split, subdivision, combination, reverse split or reclassification, as the case may be; |
| $OS_0$ | = | the number of shares of Common Stock outstanding immediately prior to the open of business on the Ex-Date for such dividend or distribution, or immediately prior to the open of business on the Effective Date of such share split, subdivision, combination, reverse split or reclassification, as the case may be; and |
| $OS_1$ | = | the number of shares of Common Stock outstanding immediately after giving effect to such dividend or distribution, or such share split, subdivision, combination, reverse split or reclassification, as the case may be. |

Any adjustment made under this Section 8(e)(i) shall become effective immediately after the open of business on the Ex-Date for such dividend or distribution, or immediately after the open of business on the Effective Date for such share split, subdivision, combination, reverse split or reclassification, as the case may be. If any dividend or distribution or share split, subdivision, combination, reverse split or reclassification of the type described in this Section 8(e)(i) is declared but not so paid or made, the Conversion Rate shall be immediately readjusted, effective as of the date the Board determines not to pay such dividend or distribution or make such share split, subdivision, combination, reverse split or reclassification, to the Conversion Rate that would then be in effect if such dividend or distribution or share split, subdivision, combination, reverse split or reclassification had not been declared or announced, as the case may be.

B-18

Supp.App. 0976

Table of Contents

(ii)   If the Company distributes to all or substantially all holders of its Common Stock any rights, options or warrants entitling them, for a period expiring not more than 60 days immediately following the announcement date of such distribution, to purchase or subscribe for shares of its Common Stock at a price per share that is less than the average of the Closing Sale Prices of the Common Stock over the 20 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date of such distribution, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{OS_0 + X}{OS_0 + Y}$$

where,

| | | |
|---|---|---|
| $CR_0$ | = | the Conversion Rate in effect immediately prior to the open of business on the Ex-Date for such distribution; |
| $CR_1$ | = | the Conversion Rate in effect immediately after the open of business on the Ex-Date for such distribution; |
| $OS_0$ | = | the number of shares of Common Stock outstanding immediately prior to the open of business on the Ex-Date for such distribution; |
| $X$ | = | the total number of shares of Common Stock issuable pursuant to such rights, options or warrants; and |
| $Y$ | = | the number of shares of Common Stock equal to the aggregate price payable to exercise such rights, options or warrants, divided by the average of the Closing Sale Prices of the Common Stock over the 20 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date of such distribution. |

Any adjustment made under this Section 8(e)(ii) shall be made successively whenever any such rights, options or warrants are distributed and shall become effective immediately after the open of business on the Ex-Date for such distribution. To the extent that shares of Common Stock are not delivered after the expiration, redemption, termination or repurchase of such rights, options or warrants, the Conversion Rate shall be readjusted, effective as of the date of such expiration, redemption, termination or repurchase, to the Conversion Rate that would then be in effect had the increase with respect to the distribution of such rights, options or warrants been made on the basis of delivery of only the number of shares of Common Stock actually delivered. If such rights, options or warrants are not so distributed, the Conversion Rate shall be adjusted, effective as of the date the Board determines not to make such distribution, to be the Conversion Rate that would then be in effect if such Record Date for such distribution had not occurred. If such rights, options or warrants are (i) not exercisable, (ii) deemed to be transferred with such shares of Common Stock or (iii) are issued in respect of future issuances of Common Stock until the occurrence of certain triggering events, then the Conversion Rate shall not be adjusted until the triggering events occur.

For purposes of this Section 8(e)(ii), in determining whether any rights, options or warrants entitle the holders to subscribe for or purchase shares of Common Stock at less than such average of the Closing Sale Prices of the Common Stock for the 20 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date of such distribution, and in determining the aggregate offering price of such shares of Common Stock, there shall be taken into account any consideration received by the Company for such rights, options or warrants and

B-19

Supp.App. 0977

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 980 of 1110    PageID 2601

Table of Contents

any amount payable on exercise or conversion thereof, the value of such consideration, if other than cash, to be determined by the Board.

(iii)  If the Company distributes shares of its Capital Stock or rights, options or warrants to acquire its Capital Stock or other securities, to all or substantially all holders of Common Stock, excluding dividends, distributions or issuances as to which an adjustment was effected pursuant to Section 8(e)(i) or Section 8(e)(ii) and excluding shares of Common Stock or rights or warrants to subscribe for or other equity securities in respect of Common Stock (any of such shares of Capital Stock, or rights, options or warrants to acquire Capital Stock or other securities, the "**Distributed Securities**"), then the Conversion Rate shall be adjusted based on the following formula:

$$CR_1 = CR_0 \times \frac{SP_0}{SP_0 - FMV}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the open of business on the Ex-Date for such distribution;

$CR_1$ = the Conversion Rate in effect immediately after the open of business on the Ex-Date for such distribution;

$SP_0$ = the average of the Closing Sale Prices of the Common Stock over the 20 consecutive Trading Day period ending on, and including, the Trading Day immediately preceding the Ex-Date for such distribution; and

FMV = the fair market value as of immediately prior to the open of business on the Ex-Date for such distribution (as determined by the Board) of the Distributed Securities (including the amount of cash per share) divided by the number of outstanding shares of the Common Stock as of immediately prior to the open of business on the Ex-Date assuming the exercise or conversion of all Options and Convertible Securities.

Any adjustment made under the portion of this Section 8(e)(iii) above shall become effective immediately after the open of business on the Ex-Date for such distribution. If such distribution is not so paid or made, the Conversion Rate shall be adjusted, effective as of the date the Board determines not to pay the distribution, to be the Conversion Rate that would then be in effect if such distribution had not been declared.

B-20

Supp.App. 0978

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 981 of 1110    PageID 2602

(iv) If the Company or any of its Subsidiaries makes a payment in respect of a tender offer or exchange offer for the Common Stock and the cash and value of any other consideration included in the payment per share of the Common Stock exceeds the average of the Closing Sale Price of the Common Stock over the 20 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the last date on which tenders or exchanges may be made pursuant to such tender or exchange offer, the Conversion Rate shall be increased based on the following formula:

$$CR_1 = CR_0 \times \frac{AC + (SP_1 \times OS_1)}{OS_0 \times SP_1}$$

where,

$CR_0$ = the Conversion Rate in effect immediately prior to the close of business on the last Trading Day of the 20 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

$CR_1$ = the Conversion Rate in effect immediately after the close of business on the last Trading Day of the 20 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires;

$AC$ = the aggregate value of all cash and any other consideration (as determined by the Board) paid or payable for shares of Common Stock purchased in such tender or exchange offer;

$OS_0$ = the number of shares of Common Stock outstanding immediately prior to the expiration of the tender or exchange offer (prior to giving effect to the purchase of all shares of Common Stock accepted for purchase or exchange in such tender or exchange offer);

$OS_1$ = the number of shares of Common Stock outstanding immediately after the expiration of the tender or exchange offer (after giving effect to the purchase of all shares of Common Stock accepted for purchase or exchange in such tender or exchange offer); and

$SP_1$ = the average of the Closing Sale Prices of the Common Stock over the 20 consecutive Trading Day period commencing on, and including, the Trading Day next succeeding the date such tender or exchange offer expires.

The increase to the Conversion Rate under this Section 8(e)(iv) shall occur at the close of business on the 20th Trading Day immediately following, and including, the Trading Day next succeeding the date such tender or exchange offer expires; *provided* that, for purposes of determining the Conversion Rate, in respect of any conversion during the 20 Trading Days immediately following, and including, the Trading Day next succeeding the date that any such tender or exchange offer expires, references within this Section 8(e)(iv) to 20 consecutive Trading Days shall be deemed to be replaced with such lesser number of consecutive Trading Days as have elapsed between the date such tender or exchange offer expires and the relevant Conversion Date.

In the event that the Company or one of its Subsidiaries is obligated to purchase shares of Common Stock pursuant to any such tender offer or exchange offer, but the Company or such Subsidiary is permanently prevented by applicable law from effecting any such purchases, or all such purchases are rescinded, then the Conversion Rate shall be readjusted to be such Conversion Rate that would then be in effect if such tender offer or exchange offer had not been made. For

B-21

Supp.App. 0979

the purposes of this subsection (iv), the term "tender offer" is used as such term is used in the Exchange Act and the term "exchange offer" means an exchange offer that constitutes a tender offer.

      (v)   All calculations and other determinations under this Section 8(e) shall be made by the Company and shall be made to the nearest one-ten thousandth (1/10,000th) of a share. Notwithstanding anything herein to the contrary, no adjustment under this Section 8(e) shall be made to the Conversion Rate unless such adjustment would result in a change of at least 1% in the Conversion Rate then in effect. Any lesser adjustment shall be carried forward and shall be made at the time of and together with the next subsequent adjustment, if any, which, together with any adjustment or adjustments so carried forward, shall amount to a change of at least 1% in such Conversion Rate.

      (vi)   For purposes of this Section 8(e), the number of shares of Common Stock at any time outstanding shall not include shares held in the treasury of the Company so long as the Company does not pay any dividend or make any distribution on shares of Common Stock held in the treasury of the Company, but shall include shares issuable in respect of scrip certificates issued in lieu of fractions of shares of Common Stock.

    (f)   Notwithstanding anything to the contrary in Section 8(e), no adjustment to the Conversion Rate shall be made with respect to any transaction described in Section 8(e) (i) through Section 8(e)(iv) if the Company makes provision for each Holder of the Preferred Stock to participate in such transaction, at the same time as holders of the Common Stock, without conversion, as if such Holder held a number of shares of Common Stock equal to the Conversion Rate in effect on the Record Date or Effective Date, as the case may be, for such transaction, multiplied by the number of shares of Preferred Stock held by such Holder.

    (g)   Notwithstanding anything to the contrary herein, no adjustment to the Conversion Rate shall be made pursuant to this Section 8 in respect of the issuance of any Excluded Securities.

    (h)   Upon any adjustment in the Conversion Rate, the Company shall deliver to each Holder, as promptly as practicable, a certificate signed by an authorized officer of the Company, setting forth in reasonable detail the event requiring the adjustment and the method by which such adjustment was calculated and specifying the increased Conversion Rate then in effect following such adjustment.

    (i)   In the case of:

      (i)   any recapitalization, reclassification or change of the Common Stock (other than changes resulting from a subdivision or combination),

      (ii)   any consolidation, merger or combination involving the Company,

      (iii)   any sale, lease or other transfer to a third party of the consolidated assets of the Company and the Company's Subsidiaries substantially as an entirety, or

      (iv)   any statutory share exchange,

as a result of the events specified in (i), (ii), (iii) or (iv) in which the Common Stock is converted into, or exchanged for, stock, other securities, other property or assets (including cash or any combination thereof) (any such transaction or event, a "**Reorganization Event**"), then, at and after the effective time of such Reorganization Event, the right to convert each share of Preferred Stock shall be changed into a right to convert such share into the kind and amount of shares of stock, other securities or other property or assets (including cash or any combination thereof) that a holder of a number of shares of Common Stock equal to the Conversion Rate immediately prior to such Reorganization Event would have owned or been entitled to receive upon such Reorganization Event (such stock, securities or other property or assets, the "**Reference Property**").

<div align="center">B-22</div>

Table of Contents

If the Reorganization Event causes the Common Stock to be converted into, or exchanged for, the right to receive more than a single type of consideration (determined based in part upon any form of stockholder election), then the Reference Property into which the Preferred Stock will be convertible shall be deemed to be the weighted average of the types and amounts of consideration received by the holders of Common Stock that affirmatively make such an election. The Company shall notify Holders of such weighted average as soon as practicable after such determination is made. None of the foregoing provisions shall affect the right of a Holder of Preferred Stock to convert its Preferred Stock into shares of Common Stock as set forth in Section 8(a) prior to the effective time of such Reorganization Event. Notwithstanding Section 8(e), no adjustment to the Conversion Rate shall be made for any Reorganization Event to the extent stock, securities or other property or assets become the Reference Property receivable upon conversion of Preferred Stock.

The Company shall provide, by amendment hereto effective upon any such Reorganization Event, for anti-dilution and other adjustments that shall be as nearly equivalent as is possible to the adjustments provided for in this Section 8. The provisions of this Section 8 shall apply to successive Reorganization Events.

In this Certificate of Designations, if the Common Stock has been replaced by Reference Property as a result of any such Reorganization Event, references to the Common Stock are intended to refer, as nearly equivalent as possible, to such Reference Property.

(j)    The Company shall at all times reserve and keep available for issuance upon the conversion of the Preferred Stock a number of its authorized but unissued shares of Common Stock equal to the aggregate Conversion Rate on the Issue Date, and shall take all action required to increase the authorized number of shares of Common Stock if at any time there shall be insufficient unissued shares of Common Stock to permit such reservation or to permit the conversion of all Outstanding shares of Preferred Stock or the payment or partial payment of dividends declared on Preferred Stock that are payable in Common Stock.

(k)    For the avoidance of doubt, the Company shall not be required to pay any tax which may be payable in respect of any transfer involved in the issuance and delivery of any such certificate in a name other than that of the holder of the shares of the relevant Preferred Stock and the Company shall not be required to issue or deliver such certificate unless or until the Person or Persons requesting the issuance or delivery thereof shall have paid to the Company the amount of such tax or shall have established to the reasonable satisfaction of the Company that such tax has been paid.

(l)    Notwithstanding Sections 8(e)(ii) and 8(e)(iii), if the Company has a rights plan (including, without limitation, the distribution of rights pursuant thereto to all holders of the Common Stock) in effect while any shares of Preferred Stock remain Outstanding, Holders of Preferred Stock will receive, upon conversion of Preferred Stock, in addition to the Common Stock to which a Holder is entitled, a corresponding number of rights in accordance with the rights plan. If, prior to any conversion, such rights have separated from the shares of Common Stock in accordance with the provisions of the applicable rights plan so that Holders of Preferred Stock would not be entitled to receive any rights in respect of the Common Stock delivered upon conversion of Preferred Stock, the Conversion Rate will be adjusted at the time of separation, as if the Company had distributed to all holders of its Common Stock, shares of Capital Stock, evidences of indebtedness, assets, securities, property, rights, options or warrants as described in Section 8(e)(iii) above, subject to readjustment in the event of the expiration, termination or redemption of such rights.

**(9)    *Mandatory Conversion*.**

(a)    From and after the time that the Weighted Average Price of the Common Stock equals or exceeds $24.00 (the "**Mandatory Conversion Price**") for at least 5 consecutive Trading Days, the

B-23

Supp.App. 0981

Company shall have the right, at its option and subject to the terms and conditions set forth in this Section 9, to give notice of its election to cause all Outstanding shares of Preferred Stock to be automatically converted into that number of whole shares of Common Stock for each share of Preferred Stock equal to the Applicable Conversion Rate in effect on the Mandatory Conversion Date (subject to the limitations set forth in Section 11), with cash in lieu of any fractional share pursuant to Section 11. For purposes of this Section 9(a), the Mandatory Conversion Price shall be adjusted proportionally in the event of any stock split, stock dividend, issuance of rights, options or warrants or other event that would result (or, but for Section 8(f), would have resulted) in an adjustment to the Conversion Price, upon an adjustment to the Conversion Rate pursuant to Section 8(e).

(b)   To exercise any mandatory conversion right described in Sections 9(a), the Company must issue a press release for publication on the Dow Jones News Service or Bloomberg Business News (or if either such service is not available, another broadly disseminated news or press release service selected by the Company) prior to the open of business on the tenth Trading Day following any date on which the condition described in Section 9(a) is met, announcing such a mandatory conversion. The Company shall also give notice by mail or by publication (with subsequent prompt notice by mail) to the Holders of the Preferred Stock (not later than 3 Business Days after the date of the press release) of the mandatory conversion announcing the Company's intention to convert the Preferred Stock. The conversion date will be a date selected by the Company (the "**Mandatory Conversion Date**") and will be no fewer than 15 Trading Days, nor more than 20 Trading Days, after the date on which the Company issues the press release described in this Section 9(b). Upon conversion of any Preferred Stock pursuant to this Section 9, the Company shall deliver to the applicable Holder the applicable number of shares of Common Stock, together with any applicable cash payment in lieu of any fractional share of Common Stock, on the 3rd Business Day immediately following the relevant Mandatory Conversion Date.

(c)   In addition to any information required by applicable law or regulation, the press release and notice of a mandatory conversion described in Section 9(b) shall state, as appropriate: (i) the Mandatory Conversion Date; (ii) the number of shares of Common Stock to be issued upon conversion of each share of Preferred Stock; and (iii) that dividends on the Preferred Stock to be converted will cease to accrue on the Mandatory Conversion Date.

(d)   On and after the Mandatory Conversion Date, dividends shall cease to accrue on the Preferred Stock called for a mandatory conversion pursuant to Section 9(a) and all rights of Holders of such Preferred Stock shall terminate except for the right to receive the whole shares of Common Stock issuable upon conversion thereof with a cash payment in lieu of any fractional share of Common Stock in accordance with Section 11. The full amount of any dividend payment with respect to the Preferred Stock called for a mandatory conversion pursuant to Section 9(a) on a date during the period beginning at the close of business on any Dividend Record Date and ending on the close of business on the corresponding Dividend Payment Date shall be included in the Liquidation Preference amount used to calculate the Applicable Conversion Rate for such mandatory conversion and shall not be payable on such Dividend Payment Date to the record holder of such share at the close of business on such Dividend Record Date if such share has been converted after such Dividend Record Date and prior to such Dividend Payment Date.

**(10)   *Optional Redemption.*   ** Shares of Preferred Stock may be redeemable by the Company in accordance with this Section 10.

(a)   The Company may not redeem any shares of Preferred Stock prior to the earlier of (i) a Fundamental Change (without giving effect to the second proviso which is set forth at the end of the definition) and (ii) the fifth anniversary of the Issue Date. On or after the earlier of (i) a Fundamental Change (without giving effect to the second proviso which is set forth at the end of the definition) and (ii) the fifth anniversary of the Issue Date, the Company shall have the option to redeem some or all

B-24

the shares of Preferred Stock at the Liquidation Preference as of the Redemption Date (the "**Redemption Price**").

(b)   In the event the Company elects to redeem shares of Preferred Stock, the Company shall:

(i)   send a written notice to the Registrar and Transfer Agent of the Redemption Date, stating the number of shares to be redeemed and the Redemption Price, at least 15 Trading Days before the Redemption Date (unless a shorter period shall be satisfactory to the Registrar and Transfer Agent);

(ii)   instruct DTC to notify its participants holding Preferred Stock, or, if the Preferred Stock is in certificated form, send a written notice (the "**Redemption Notice**") by first class mail to each holder of record of the Preferred Stock at such holder's registered address, not fewer than 10 Trading Days nor more than 90 calendar days prior to the Redemption Date stating:

(A)   the Redemption Date;

(B)   the Redemption Price;

(C)   the name and address of the Paying Agent and Conversion Agent;

(D)   that shares of Preferred Stock called for redemption may be converted at any time before 5:00 p.m., New York City time, on the Business Day immediately preceding the Redemption Date;

(E)   that holders who want to convert shares of Preferred Stock must satisfy the requirements set forth in Section 8;

(F)   that shares of Preferred Stock called for redemption must be surrendered to the Paying Agent to collect the Redemption Price;

(G)   if fewer than all the outstanding shares of Preferred Stock are to be redeemed by the Company, the number of shares to be redeemed;

(H)   that, unless the Company defaults in making payment of such Redemption Price, dividends in respect of the shares of Preferred Stock called for redemption will cease to accrue on and after the Redemption Date;

(I)   the CUSIP number of the Preferred Stock; and

(J)   any other information the Company wishes to present; and

(iii)   publish the information set forth in Section 10(b)(ii) once in a daily newspaper printed in the English language and of general circulation in the Borough of Manhattan, The City of New York, issue a press release containing such information and publish such information on the Company's website.

(c)   If the Company gives notice of redemption, then, by 12:00 p.m. (New York City time), on the Redemption Date, to the extent sufficient funds are legally available, the Company shall, with respect to:

(i)   shares of Preferred Stock held by DTC or its nominees, deposit or cause to be deposited, irrevocably with DTC cash sufficient to pay the Redemption Price and shall give DTC irrevocable instructions and authority to pay the Redemption Price to holders of such shares of Preferred Stock; and

(ii)   shares of the Preferred Stock held in certificated form, deposit or cause to be deposited, irrevocably with the Paying Agent cash sufficient to pay the Redemption Price and shall give the Paying Agent irrevocable instructions and authority to pay the Redemption Price to holders of

B-25

Supp.App. 0983

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 986 of 1110    PageID 2607

such shares of Preferred Stock upon surrender to the Paying Agent of their certificates evidencing their shares of Preferred Stock.

(d)   If on the Redemption Date, DTC or the Paying Agent, as applicable, holds cash sufficient to pay the Redemption Price for the shares of Preferred Stock delivered for redemption as set forth herein, dividends shall cease to accrue as of the Redemption Date on those shares of the Preferred Stock called for redemption and all rights of holders of such shares shall terminate, except for the right to receive the Redemption Price pursuant to this Section 10.

(e)   Payment of the Redemption Price for shares of Preferred Stock is conditioned upon book-entry transfer or physical delivery of certificates representing the Preferred Stock, together with any necessary endorsements, to the Paying Agent, or to the Paying Agent's account at DTC, at any time after delivery of the Redemption Notice.

(f)   Payment of the Redemption Price for shares of Preferred Stock shall be made (i) if book-entry transfer or physical delivery of the Preferred Stock has been made by or on the Redemption Date, on the Redemption Date, or (ii) if book-entry transfer or physical delivery of the Preferred Stock has not been made by or on the Redemption Date, at the time of such transfer or delivery.

(g)   If the Redemption Date falls after a Record Date for the payment of dividends declared on the Preferred Stock before the open of business on the Dividend Payment Date corresponding to that Record Date, holders of the shares of Convertible Preferred Stock at the close of business on that Record Date shall be entitled to receive the dividend payable on those shares on the corresponding Dividend Payment Date. The price payable on such Redemption Date will include only the Redemption Price, but will not include any amount in respect of dividends on the Preferred Stock declared and payable on such corresponding Dividend Payment Date.

(h)   If fewer than all the outstanding shares of Preferred Stock are to be redeemed, the number of shares to be redeemed shall be determined by the Board and the shares to be redeemed shall be selected on a pro rata basis (with any fractional shares being rounded to the nearest whole share), by lot or any other method as may be determined by the Board, in its discretion, to be fair and appropriate.

(i)   Upon surrender of a certificate or certificates representing shares of the Preferred Stock that is or are redeemed in part, the Company shall execute, and the Transfer Agent shall authenticate and deliver to the holder, a new certificate or certificates representing shares of the Preferred Stock in an amount equal to the unredeemed portion of the shares of Preferred Stock surrendered for partial redemption.

**(11)**   *No Fractional Shares*.   No fractional shares of Common Stock or securities representing fractional shares of Common Stock shall be delivered upon conversion, whether voluntary or mandatory, of the Preferred Stock. Instead, the Company will make a cash payment to each Holder that would otherwise be entitled to a fractional share based on the Closing Sale Price of the Common Stock on the relevant Conversion Date; *provided*, *however*, that the Company may round such fractional share up to the next highest whole number of shares in lieu of making such cash payment.

**(12)**   *Transfer Agent and Registrar.*   The duly appointed transfer agent (the "**Transfer Agent**") and Registrar (the "**Registrar**") for the Preferred Stock shall be [          ]. The Company may, in its sole discretion, remove the Transfer Agent in accordance with the agreement between the Company and the Transfer Agent; *provided* that the Company shall appoint a successor transfer agent who shall accept such appointment prior to the effectiveness of such removal. For the avoidance of doubt, the Company shall notify the Registrar in writing upon the Company's or any of its Affiliates' purchases or sales of Preferred Stock.

<div align="center">B-26</div>

Supp.App. 0984

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 987 of 1110    PageID 2608

(13)  *Certificates; Restrictions on Transfer*.

(a)  If physical certificates are issued, then the Company shall, upon written request of a Holder, issue certificates in definitive form representing the shares of Preferred Stock held by such Holder. Every share of Preferred Stock that bears or is required under this Section 13(a) to bear the legend set forth in Section 13(b) (together with any Common Stock issued upon conversion of the Preferred Stock that is required to bear the legend set forth in Section 13(b), collectively "**Restricted Securities**") shall be subject to the restrictions on transfer set forth in Section 13(b) and this Section 13(a) (including the legend set forth below), unless such restrictions on transfer shall be eliminated or otherwise waived by written consent of the Company, and the Holder of each such Restricted Security, by such Holder's acceptance thereof, agrees to be bound by all such restrictions on transfer. As used in this Section 13(a) and in Section 13(b), the term "transfer" encompasses any sale, pledge, transfer or other disposition whatsoever of any Restricted Security.

Until the later of (i) the date on which such shares of Preferred Stock may be transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or sold pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company in writing with written notice thereof to the Transfer Agent), and (ii) such later date, if any, as may be required by applicable law (the "**Resale Restriction Termination Date**"), any certificate evidencing such Preferred Stock (and all securities issued in exchange therefor or substitution thereof, other than Common Stock, if any, issued upon conversion thereof, which shall bear the legend set forth in Section 13(b), if applicable) shall bear a legend in substantially the following form:

THESE SHARES OF PREFERRED STOCK AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THESE SHARES OF PREFERRED STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THESE SHARES OF PREFERRED STOCK NOR THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SHARE OF PREFERRED STOCK NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING:

BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

1.  REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR AN "ACCREDITED INVESTOR" (WITHIN THE MEANING OF RULE 501(A) UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

2.  AGREES FOR THE BENEFIT OF EXELA TECHNOLOGIES, INC. (FORMERLY KNOWN AS QUINPARIO ACQUISITION CORP. 2) (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO OR AS MAY OTHERWISE BE REQUIRED BY APPLICABLE LAW, EXCEPT:

    (A)  TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, OR

B-27

Supp.App. 0985

(B)     PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)     TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)     PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

No transfer of any Preferred Stock prior to the Resale Restriction Termination Date will be registered by the Registrar (and shall not be effective) unless the applicable box on the Form of Assignment and Transfer attached hereto as *Exhibit B* has been checked (it being understood that the checking of such box shall not substitute for satisfaction of any other applicable transfer restrictions).

Subject to the delivery of such legal opinions, certifications or other evidence as may reasonably be required by the Company, any share of Preferred Stock (or security issued in exchange or substitution therefor) as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of such Preferred Stock for exchange to the Registrar, be exchanged for a new share or shares of Preferred Stock, of like aggregate number of shares of Preferred Stock, which shall not bear the restrictive legend required by this Section 13(a) and shall not be assigned a restricted CUSIP number.

(b)   Until the Resale Restriction Termination Date, any stock certificate representing Common Stock issued upon conversion of Preferred Stock shall bear a legend in substantially the following form (unless such Common Stock has been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or such Common Stock has been issued upon conversion of shares of Preferred Stock that have been transferred pursuant to a registration statement that has become or been declared effective under the Securities Act and that continues to be effective at the time of such transfer, or pursuant to the exemption from registration provided by Rule 144 or any similar provision then in force under the Securities Act, or unless otherwise agreed by the Company with written notice thereof to the Transfer Agent):

THESE SHARES OF COMMON STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THESE SHARES OF COMMON STOCK NOR ANY

B-28

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 989 of 1110   PageID 2610

INTEREST OR PARTICIPATION HEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING:

BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

1. REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR AN "ACCREDITED INVESTOR" (WITHIN THE MEANING OF RULE 501(A) UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

2. AGREES FOR THE BENEFIT OF EXELA TECHNOLOGIES, INC. (FORMERLY KNOWN AS QUINPARIO ACQUISITION CORP. 2) (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO OR AS MAY OTHERWISE BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A) TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, OR

(B) PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR

(C) TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D) PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

Subject to the delivery of such legal opinions, certifications or other evidence as may reasonably be required by the Company, any such Common Stock as to which such restrictions on transfer shall have expired in accordance with their terms may, upon surrender of the certificates representing such shares of Common Stock for exchange in accordance with the procedures of the Transfer Agent, be exchanged for a new certificate or certificates for a like aggregate number of shares of Common Stock, which shall not bear the restrictive legend required by this Section 13(b). After the Resale Restriction Termination Date, any Common Stock issued upon conversion of the Preferred Stock shall be issued without the restrictions contained in this Section. Until the Resale Restriction Termination Date, no transfer of any Common Stock issued upon conversion of Preferred Stock will be registered by the Registrar (and shall not be effective) unless the applicable box on the Form of Assignment and Transfer attached hereto as *Exhibit B* has been checked (it being understood that the checking of such box shall not substitute for satisfaction of any other applicable transfer restrictions).

(c) The Preferred Stock shall initially be issued with a restricted CUSIP number.

B-29

**(14)** *Paying Agent and Conversion Agent*.

(a)   The Company shall maintain in the United States (i) an office or agency where Preferred Stock may be presented for payment (the "**Paying Agent**") and (ii) an office or agency where, in accordance with the terms hereof, Preferred Stock may be presented for conversion (the "**Conversion Agent**"). The Transfer Agent may act as Paying Agent and Conversion Agent, unless another Paying Agent or Conversion Agent is appointed by the Company. The Company may appoint the Registrar, the Paying Agent and the Conversion Agent and may appoint one or more additional paying agents and one or more additional conversion agents in such other locations as it shall determine. The term "Paying Agent" includes any additional paying agent and the term "Conversion Agent" includes any additional conversion agent. The Company may change any Paying Agent or Conversion Agent without prior notice to any Holder. The Company shall notify the Registrar of the name and address of any Paying Agent or Conversion Agent appointed by the Company. If the Company fails to appoint or maintain another entity as Paying Agent or Conversion Agent, the Registrar shall act as such or the Company or any of its Affiliates shall act as Paying Agent, Registrar or Conversion Agent.

(b)   Payments due on the Preferred Stock shall be payable at the office or agency of the Company maintained for such purpose in The City of New York and at any other office or agency maintained by the Company for such purpose. Payments of cash shall be payable by United States dollar check drawn on, or wire transfer (*provided*, that appropriate wire instructions have been received by the Registrar at least 15 days prior to the applicable date of payment) to a U.S. dollar account maintained by the Holder with, a bank located in New York City; *provided* that at the option of the Company, payment of cash dividends may be made by check mailed to the address of the Person entitled thereto as such address shall appear in the Preferred Stock register.

**(15)** *Form*.

(a)   The Preferred Stock shall be issued in the form of one or more permanent global shares of Preferred Stock in definitive, fully registered form eligible for book-entry settlement with the global legend (the "**Global Shares Legend**") as set forth on the form of Preferred Stock certificate attached hereto as *Exhibit C* (each, a "**Global Preferred Share**"), which is hereby incorporated in and expressly made part of this Certificate of Designations. The Global Preferred Shares may have notations, legends or endorsements required by law, stock exchange rules, agreements to which the Company is subject, if any, or usage (*provided*, that any such notation, legend or endorsement is in a form acceptable to the Company). The Global Preferred Shares shall be deposited on behalf of the Holders represented thereby with the Registrar, at its New York office as custodian for DTC (the "**Depositary**"), and registered in the name of the Depositary or a nominee of the Depositary, duly executed by the Company and countersigned and registered by the Registrar as hereinafter provided. The aggregate number of shares represented by each Global Preferred Share may from time to time be increased or decreased by adjustments made on the records of the Registrar and the Depositary or its nominee as hereinafter provided.

This Section 15(a) shall apply only to a Global Preferred Share deposited with or on behalf of the Depositary. The Company shall execute and the Registrar shall, in accordance with this Section 15(a), countersign and deliver any Global Preferred Shares that (i) shall be registered in the name of Cede & Co. or other nominee of the Depositary and (ii) shall be delivered by the Registrar to Cede & Co. or pursuant to instructions received from Cede & Co. or held by the Registrar as custodian for the Depositary pursuant to an agreement between the Depositary and the Registrar. Members of, or participants in, the Depositary ("**Agent Members**") shall have no rights under this Certificate of Designations with respect to any Global Preferred Share held on their behalf by the Depositary or by the Registrar as the custodian of the Depositary, or under such Global Preferred Share, and the Depositary may be treated by the Company, the Registrar and any agent of the Company or the Registrar as the absolute owner of such Global Preferred Share for all purposes

B-30

Supp.App. 0988

whatsoever. Notwithstanding the foregoing, nothing herein shall prevent the Company, the Registrar or any agent of the Company or the Registrar from giving effect to any written certification, proxy or other authorization furnished by the Depositary or impair, as between the Depositary and its Agent Members, the operation of customary practices of the Depositary governing the exercise of the rights of a holder of a beneficial interest in any Global Preferred Share. The Holder of the Global Preferred Shares may grant proxies or otherwise authorize any Person to take any action that a Holder is entitled to take pursuant to the Global Preferred Shares, this Certificate of Designations or the Charter.

Owners of beneficial interests in Global Preferred Shares shall not be entitled to receive physical delivery of certificated shares of Preferred Stock, unless (x) the Depositary notifies the Company that it is unwilling or unable to continue as Depositary for the Global Preferred Shares and the Company does not appoint a qualified replacement for the Depositary within 90 days or (y) the Depositary ceases to be a "clearing agency" registered under the Exchange Act and the Company does not appoint a qualified replacement for the Depositary within 90 days. In any such case, the Global Preferred Shares shall be exchanged in whole for definitive stock certificates that are not issued in global form, with the same terms and of an equal aggregate Liquidation Preference, and such definitive stock certificates shall be registered in the name or names of the Person or Persons specified by the Depositary in a written instrument to the Registrar.

(b) *Signature.* Two Officers permitted by applicable law shall sign each Global Preferred Share for the Company, in accordance with the Company's Bylaws and applicable law, by manual or facsimile signature. If an Officer whose signature is on a Global Preferred Share no longer holds that office at the time the Registrar countersigned such Global Preferred Share, such Global Preferred Share shall be valid nevertheless. A Global Preferred Share shall not be valid until an authorized signatory of the Registrar manually countersigns such Global Preferred Share. Each Global Preferred Share shall be dated the date of its countersignature. The foregoing paragraph shall likewise apply to any certificate representing shares of Preferred Stock."

**(16)** *Other Provisions*.

(a) With respect to any notice to a Holder of shares of Preferred Stock required to be provided hereunder, neither failure to mail such notice, nor any defect therein or in the mailing thereof, to any particular Holder shall affect the sufficiency of the notice or the validity of the proceedings referred to in such notice with respect to the other Holders or affect the legality or validity of any distribution, rights, warrant, reclassification, consolidation, merger, conveyance, transfer, dissolution, liquidation or winding-up, or the vote upon any such action. Any notice which was mailed in the manner herein provided shall be conclusively presumed to have been duly given whether or not the Holder receives the notice.

(b) Shares of Preferred Stock that have been issued and reacquired in any manner, including shares of Preferred Stock that are purchased or exchanged or converted, shall (upon compliance with any applicable provisions of the laws of Delaware) have the status of authorized but unissued shares of preferred stock of the Company undesignated as to series and may be designated or redesignated and issued or reissued, as the case may be, as part of any series of preferred stock of the Company; provided that any issuance of such shares as Preferred Stock must be in compliance with the terms hereof.

(c) The shares of Preferred Stock shall be issuable only in whole shares.

(d) If any applicable law requires the deduction or withholding of any tax from any payment or deemed dividend to a Holder on its Preferred Stock, the Company or an applicable withholding agent may withhold such tax on cash dividends, shares of Preferred Stock, Common Stock or sale proceeds paid, subsequently paid or credited with respect to such Holder or his successors and assigns.

<div align="center">B-31</div>

Supp.App. 0989

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 992 of 1110    PageID 2613

(e)  All notice periods referred to herein shall commence on the date of the mailing of the applicable notice that initiates such notice period. Notice to any Holder shall be given to the registered address set forth in the Company's records for such Holder.

(f)   To the extent lawful to do so, the Company shall provide the Holders prior written notice of (i) any dividend or distribution to be made to the holders of Common Stock and any other event as a result of which the Conversion Rate would be adjusted pursuant to Section 8(e) and (ii) any Reorganization Event, with such notice to be made no later than the notice thereof provided to all holders of Common Stock of the Company or, if earlier, 10 Business Days prior to the Ex-Date therefor.

(g)  Any payment required to be made hereunder on any day that is not a Business Day shall be made on the next succeeding Business Day and no interest or dividends on such payment will accrue or accumulate, as the case may be, in respect of such delay.

(h)  Holders of Preferred Stock shall not be entitled to any preemptive rights to acquire additional capital stock of the Company.

[*Signature page follows*]

B-32

IN WITNESS WHEREOF, the undersigned has executed this Certificate of Designations as of [   •   ], 2017.

**EXELA TECHNOLOGIES, INC.**

By: _____

Name:
Title:

*SIGNATURE PAGE TO CERTIFICATE OF DESIGNATIONS, PREFERENCES, RIGHTS
AND LIMITATIONS (SERIES A PERPETUAL CONVERTIBLE PREFERRED STOCK)—EXELA
TECHNOLOGIES, INC. (FORMERLY KNOWN AS
QUINPARIO ACQUISITION CORP. 2)*

B-33

Supp.App. 0991

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 994 of 1110    PageID 2615

**EXHIBIT A**

[FORM OF NOTICE OF CONVERSION]

(To be executed by the registered holder in order to convert the Preferred Stock)

The undersigned hereby irrevocably elects to convert (the "**Conversion**") shares of Series A Perpetual Convertible Preferred Stock (the "**Preferred Stock**") of Exela Technologies, Inc. (the "**Company**"), represented by stock certificate

No(s). _____

(the "**Preferred Stock Certificate(s)**"), into shares of common stock (the "**Common Stock**") of the Company according to the conditions of the Certificate of Designation, Preferences and Rights of the Preferred Stock (the "**Certificate of Designation**"). A copy of each Preferred Stock Certificate(s) are attached hereto (or evidence of loss, theft or destruction thereof).

Capitalized terms used but not defined herein shall have the meanings ascribed thereto in or pursuant to the Certificate of Designation.

Number of shares of Preferred Stock to be converted: _____

Number of shares of Common Stock beneficially owned prior to Conversion (excluding shares issuable upon conversion of the Preferred Stock): _____

Name or Names (with addresses) in which the certificate or certificate for any shares of Common Stock to be issued are to be registered(1): _____

_____

_____

Signature: _____

Name of registered holder: _____

Fax No.: _____

Telephone No.: _____

_____

(1)    The Company is not required to issue shares of Common Stock until you, if required, furnish appropriate endorsements and transfer documents.

B-34

Supp.App. 0992

**EXHIBIT B**

[FORM OF ASSIGNMENT AND TRANSFER]

FOR VALUE RECEIVED, the undersigned assigns and transfers the shares of Preferred Stock/Common Stock evidenced hereby to:

_____

_____

(Insert assignee's social security or tax identification number)

_____

(Insert address and zip code of assignee)

and irrevocably appoints:

_____

_____

agent to transfer the shares of Preferred Stock/Common Stock evidenced hereby on the books of the Transfer Agent. The agent may substitute another to act for him or her.

In connection with any transfer of the within share of Preferred Stock/Common Stock occurring prior to the Resale Restriction Termination Date, as defined in the Certificate of Designation, the undersigned confirms that such Preferred Stock/Common Stock is being transferred:

☐    To Exela Technologies, Inc. or a Subsidiary thereof; or

☐    Pursuant to a registration statement that has become or been declared effective under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144A under the Securities Act of 1933, as amended; or

☐    Pursuant to and in compliance with Rule 144 under the Securities Act of 1933, as amended, or any other available exemption from the registration requirements of the Securities Act of 1933, as amended.

Date:        _____

Signature:   _____

(Sign exactly as your name appears on the other side of this Preferred Stock/Common Stock)

Signature Guarantee:    _____    (2)

_____

(2)    Signature must be guaranteed by an "eligible guarantor institution" that is a bank, stockbroker, savings and loan association or credit union meeting the requirements of the Transfer Agent, which requirements include membership or participation in the Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Transfer Agent in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.)

B-35

Supp.App. 0993

Table of Contents

**EXHIBIT C**

**[FORM OF PREFERRED STOCK CERTIFICATE]**

**FACE OF SECURITY**

[THIS GLOBAL CERTIFICATE IS HELD BY THE DEPOSITARY (AS DEFINED IN THE CERTIFICATE OF DESIGNATIONS GOVERNING THIS CERTIFICATE) OR ITS NOMINEE IN CUSTODY FOR THE BENEFIT OF THE BENEFICIAL OWNERS HEREOF, AND IS NOT TRANSFERABLE TO ANY PERSON UNDER ANY CIRCUMSTANCES EXCEPT THAT (1) THIS GLOBAL CERTIFICATE MAY BE DELIVERED TO THE TRANSFER AGENT FOR CANCELLATION PURSUANT TO SECTION 13 OF THE CERTIFICATE OF DESIGNATIONS AND (2) THIS GLOBAL CERTIFICATE MAY BE TRANSFERRED TO A SUCCESSOR DEPOSITARY IN ACCORDANCE WITH THE CERTIFICATE OF DESIGNATIONS.

UNLESS AND UNTIL IT IS EXCHANGED IN WHOLE OR IN PART FOR SERIES A PERPETUAL CONVERTIBLE PREFERRED STOCK IN CERTIFICATED FORM, THIS CERTIFICATE MAY NOT BE TRANSFERRED EXCEPT AS A WHOLE BY THE DEPOSITARY TO A NOMINEE OF THE DEPOSITARY OR BY A NOMINEE OF THE DEPOSITARY TO THE DEPOSITARY OR ANOTHER NOMINEE OF THE DEPOSITARY OR BY THE DEPOSITARY OR ANY SUCH NOMINEE TO A SUCCESSOR DEPOSITARY OR A NOMINEE OF SUCH SUCCESSOR DEPOSITARY. UNLESS THIS CERTIFICATE IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITARY TRUST COMPANY (55 WATER STREET, NEW YORK, NEW YORK) ("DTC") TO THE CORPORATION OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE OR PAYMENT, AND ANY CERTIFICATE ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR SUCH OTHER NAME AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO., OR SUCH OTHER ENTITY AS MAY BE REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC) ANY TRANSFER, PLEDGE OR OTHER USE HEREOF FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.](1)

THIS SHARE OF PREFERRED STOCK AND THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SHARE OF PREFERRED STOCK HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), OR ANY STATE SECURITIES LAWS. NEITHER THIS SHARE OF PREFERRED STOCK NOR THE COMMON STOCK ISSUABLE UPON CONVERSION OF THIS SHARE OF PREFERRED STOCK NOR ANY INTEREST OR PARTICIPATION HEREIN OR THEREIN MAY BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT IN ACCORDANCE WITH THE FOLLOWING:

BY ITS ACQUISITION HEREOF OR OF A BENEFICIAL INTEREST HEREIN, THE ACQUIRER:

1.  REPRESENTS THAT IT AND ANY ACCOUNT FOR WHICH IT IS ACTING IS A "QUALIFIED INSTITUTIONAL BUYER" (WITHIN THE MEANING OF RULE 144A UNDER THE SECURITIES ACT) OR AN "ACCREDITED INVESTOR" (WITHIN THE MEANING OF RULE 501(A) UNDER THE SECURITIES ACT) AND THAT IT EXERCISES SOLE INVESTMENT DISCRETION WITH RESPECT TO EACH SUCH ACCOUNT, AND

2.  AGREES FOR THE BENEFIT OF EXELA TECHNOLOGIES, INC. (FORMERLY KNOWN AS QUINPARIO ACQUISITION CORP. 2) (THE "COMPANY") THAT IT WILL NOT OFFER, SELL, PLEDGE OR OTHERWISE TRANSFER THIS SECURITY OR ANY

---

(1)     Insert if a global security.

B-36

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 997 of 1110   PageID 2618

Table of Contents

BENEFICIAL INTEREST HEREIN PRIOR TO THE DATE THAT IS PERMITTED BY RULE 144 UNDER THE SECURITIES ACT OR ANY SUCCESSOR PROVISION THERETO OR AS MAY OTHERWISE BE REQUIRED BY APPLICABLE LAW, EXCEPT:

(A)   TO THE COMPANY OR ANY OF ITS SUBSIDIARIES, OR

(B)   PURSUANT TO A REGISTRATION STATEMENT THAT HAS BEEN DECLARED EFFECTIVE UNDER THE SECURITIES ACT, OR

(C)   TO A QUALIFIED INSTITUTIONAL BUYER IN COMPLIANCE WITH RULE 144A UNDER THE SECURITIES ACT, OR

(D)   PURSUANT TO AN EXEMPTION FROM REGISTRATION PROVIDED BY RULE 144 UNDER THE SECURITIES ACT OR ANY OTHER AVAILABLE EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

PRIOR TO THE REGISTRATION OF ANY TRANSFER IN ACCORDANCE WITH CLAUSE (2)(D) ABOVE, THE COMPANY AND THE TRANSFER AGENT RESERVE THE RIGHT TO REQUIRE THE DELIVERY OF SUCH LEGAL OPINIONS, CERTIFICATIONS OR OTHER EVIDENCE AS MAY REASONABLY BE REQUIRED IN ORDER TO DETERMINE THAT THE PROPOSED TRANSFER IS BEING MADE IN COMPLIANCE WITH THE SECURITIES ACT AND APPLICABLE STATE SECURITIES LAWS. NO REPRESENTATION IS MADE AS TO THE AVAILABILITY OF ANY EXEMPTION FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT.

B-37

Certificate Number [　　　]

Number of Shares of
Series A Preferred Stock [　　　]

CUSIP No.: [　　　]
ISIN No. [　　　]

**Series A Perpetual Convertible Preferred Stock**
**(par value $0.0001 per share)**
**(initial liquidation preference $8 per share)**
**OF**
**EXELA TECHNOLOGIES, INC.**

**(formerly known as Quinpario Acquisition Corp. 2)**

EXELA TECHNOLOGIES, INC. (formerly known as Quinpario Acquisition Corp. 2), a Delaware corporation (the "*Corporation*"), hereby certifies that [Cede & Co.] or registered assigns (the "Holder") is the registered owner of fully paid and non-assessable shares of preferred stock of the Corporation designated the "Series A Perpetual Convertible Preferred Stock," par value $0.0001 per share and liquidation preference $[　●　] per share (the "*Series A Preferred Stock*"). The shares of Series A Preferred Stock are transferable on the books and records of the Registrar, in person or by a duly authorized attorney, upon surrender of this certificate duly endorsed and in proper form for transfer. The designation, rights, privileges, restrictions, preferences and other terms and provisions of the Series A Preferred Stock represented hereby are issued and shall in all respects be subject to the provisions of the Certificate of Designations of the Corporation, dated [　●　], 2017, as the same may be amended from time to time in accordance with its terms (the "*Certificate of Designations*"). Capitalized terms used herein but not defined shall have the respective meanings given them in the Certificate of Designations. The Corporation will provide a copy of the Certificate of Designations to a Holder without charge upon written request to the Corporation at its principal place of business.

Reference is hereby made to select provisions of the Series A Preferred Stock set forth on the reverse hereof, and to the Certificate of Designations, which select provisions and the Certificate of Designations shall for all purposes have the same effect as if set forth at this place.

Upon receipt of this certificate, the Holder is bound by the Certificate of Designations and is entitled to the benefits thereunder.

Unless the Transfer Agent's Certificate of Authentication hereon has been properly executed, the shares of Series A Preferred Stock evidenced hereby shall not be entitled to any benefit under the Certificate of Designations or be valid or obligatory for any purpose.

IN WITNESS WHEREOF, Exela Technologies, Inc. has executed this Certificate of Designations as of the date set forth below.

EXELA TECHNOLOGIES, INC.

By: _____

Name:
Title:

Dated: _____

B-38

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 999 of 1110     PageID 2620

**TRANSFER AGENT'S CERTIFICATE OF AUTHENTICATION**

This is one of the certificates representing shares of Preferred Stock referred to in the within mentioned Certificate of Designations.

Continental Stock Transfer & Trust Company,
as Transfer Agent

By: _____

    Name:
    Title:

Dated: _____

B-39

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1000 of 1110    PageID 2621

Table of Contents

**REVERSE OF SECURITY**

**EXELA TECHNOLOGIES, INC.**

**(formerly known as Quinpario Acquisition Corp. 2)**

**Series A Perpetual Convertible Preferred Stock**

Dividends on each share of Series A Perpetual Convertible Preferred Stock shall be payable at a rate per annum set forth on the face hereof or as provided in the Certificate of Designations.

The shares of Series A Perpetual Convertible Preferred Stock shall be redeemable as provided in the Certificate of Designations. The Series A Perpetual Convertible Preferred Stock shall be convertible into the Corporation's Common Stock in the manner and according to the terms set forth in the Certificate of Designations.

As required under Delaware law, the Corporation shall furnish to any Holder upon request and without charge, a full summary statement of the designations, voting rights preferences, limitations and special rights of the shares of each class or series authorized to be issued by the Corporation so far as they have been fixed and determined.

B-40

Supp.App. 0998

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 1001 of 1110 PageID 2622

**ASSIGNMENT**

FOR VALUE RECEIVED, the undersigned assigns and transfers the shares of Series A Perpetual Convertible Preferred Stock evidenced hereby to:

_____

_____

(Insert assignee's social security or tax identification number)

_____

(Insert address and zip code of assignee)

_____

_____

and irrevocably appoints:

_____

agent to transfer the shares of Series A Perpetual Convertible Preferred Stock evidenced hereby on the books of the Transfer Agent and Registrar. The agent may substitute another to act for him or her.

Date: _____

Signature: _____

(Sign exactly as your name appears on the other side of this certificate for Series A Perpetual Convertible Preferred Stock)

Signature Guarantee: _____

(1)

_____

(1) Signature must be guaranteed by an "eligible guarantor institution" (i.e., a bank, stockbroker, savings and loan association or credit union) meeting the requirements of the Registrar, which requirements include membership or participation in the Securities Transfer Agents Medallion Program ("STAMP") or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for, STAMP, all in accordance with the Securities Exchange Act of 1934, as amended.

B-41

Supp.App. 0999

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1002 of 1110    PageID 2623

**NOTICE OF CONVERSION**

**(To be Executed by the Registered Holder**
**in Order to Convert the Series A Perpetual Convertible Preferred Stock)**

The undersigned hereby irrevocably elects to convert (the "*Conversion*")          shares of Series A Perpetual Convertible Preferred Stock (the "*Series A Preferred Stock*"), represented by stock certificate No(s).          the "*Series A Preferred Stock Certificates*"), into shares of common stock, par value $0.0001 per share ("*Common Stock*"), of Exela Technologies, Inc. (the "*Corporation*") according to the conditions of the Certificate of Designations establishing the terms of the Series A Preferred Stock (the "*Certificate of Designations*"), as of the date written below. If shares are to be issued in the name of a person other than the undersigned, the undersigned will pay all transfer taxes payable with respect thereto and is delivering herewith such certificates (unless it can be established that no such taxes are payable). No fee will be charged to the holder for any conversion, except for transfer taxes, if any. A copy of each Series A Preferred Stock Certificate is attached hereto (or evidence of loss, theft or destruction thereof).

The Corporation is not required to issue shares of Common Stock (i) unless the conditions for conversion of the Series A Preferred Stock set forth in Section 8 of the Certificate of Designations have been satisfied and (ii) until the original Series A Preferred Stock Certificate(s) (or evidence of loss, theft or destruction thereof) to be converted are received by the Corporation or its Transfer Agent. If the foregoing conditions have been satisfied, the Corporation shall issue and deliver shares of Common Stock to an overnight courier not later than two Business Days following receipt of the original Series A Preferred Stock Certificate(s) to be converted.

Capitalized terms used but not defined herein shall have the meanings ascribed thereto in or pursuant to the Certificate of Designations.

Date of Conversion: _____

Applicable Conversion Rate: _____

Number of Shares of Series A Perpetual Convertible Preferred Stock to be Converted: _____

Number of Shares of Common Stock to be Issued: _____

Signature: _____

Name: _____

Address(2): _____

Fax No.: _____

_____

(2)      Address where shares of Common Stock and any other payments or certificates shall be sent by the Corporation.

B-42

Supp.App. 1000

SCHEDULE A

**SCHEDULE OF EXCHANGES FOR GLOBAL SECURITY**

The initial number of shares of Series A Perpetual Convertible Preferred Stock represented by this Global Preferred Share shall be                    . The following exchanges of a part of this Global Preferred Share have been made:

| Date of Exchange | Amount of decrease in number of shares represented by this Global Preferred Share | Amount of increase in number of shares represented by this Global Preferred Share | Number of shares represented by this Global Preferred Share following such decrease or increase | Signature of authorized officer of Registrar |
|---|---|---|---|---|

B-43

**Annex C**

## AMENDED AND RESTATED
## BY LAWS

### OF

### Exela Technologies, Inc.

### ARTICLE I

### OFFICES

1.1  *Registered Office.*   The registered office of Exela Technologies, Inc. (the "Corporation") in the State of Delaware shall be established and maintained at 615 S. DuPont Highway, Kent County, Dover, Delaware and National Corporate Research, Ltd. shall be the registered agent of the corporation in charge thereof.

1.2  *Other Offices.*   The Corporation may also have offices at such other places both within and without the State of Delaware as the board of directors of the Corporation (the "Board of Directors") may from time to time determine or the business of the Corporation may require.

### ARTICLE II
### MEETINGS OF STOCKHOLDERS

2.1  *Place of Meetings.*   All meetings of the stockholders shall be held at such time and place, either within or without the State of Delaware, as shall be designated from time to time by the Board of Directors and stated in the notice of the meeting or in a duly executed waiver of notice thereof; provided that the Board may in its sole discretion determine that the meeting shall not be held at any place, but may instead be held solely by means of remote communication pursuant to Section 2.13.

2.2  *Annual Meetings.*   The annual meeting of stockholders shall be held on such date and at such time as may be fixed by the Board of Directors and stated in the notice of the meeting, for the purpose of electing directors and for the transaction of only such other business as is properly brought before the meeting in accordance with these Amended and Restated Bylaws (the "Bylaws").

Written notice of an annual meeting stating the place, date and hour of the meeting, shall be given to each stockholder entitled to vote at such meeting not less than ten (10) nor more than sixty (60) days before the date of the annual meeting.

To be properly brought before the annual meeting, business must be either (i) specified in the notice of annual meeting (or any supplement or amendment thereto) given by or at the direction of the Board of Directors, (ii) otherwise brought before the annual meeting by or at the direction of the Board of Directors, or (iii) otherwise properly brought before the annual meeting by a stockholder who is a stockholder of record on the date of the giving of the notice and on the record date for the determination of stockholders entitled to vote at such annual meeting and who complies with the notice procedures in this Section 2.2. In addition to any other applicable requirements, for business to be properly brought before an annual meeting by a stockholder, the stockholder must have given timely notice thereof in writing to the Secretary of the Corporation. To be timely, a stockholder's notice must be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90) days prior to the meeting; provided, however, that in the event that less than seventy (70) days notice or prior public disclosure of the date of the annual meeting is given or made to stockholders, notice by a stockholder, to be timely, must be received no later than the close of business on the tenth (10th) day following the day on which such notice of the date of the annual meeting was mailed or such public disclosure was made, whichever first occurs. A stockholder's notice to the Secretary shall set forth (a) as to each matter the stockholder proposes to

C-1

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 1005 of 1110 PageID 2626

Table of Contents

bring before the annual meeting (i) a brief description of the business desired to be brought before the annual meeting (including the text of any resolutions proposed for consideration and in the event such business includes a proposal to amend these Bylaws, the language of the proposed amendment) and the reasons for conducting such business at the annual meeting, and (ii) any material interest of the stockholder in such business, and (b) as to the stockholder giving the notice (i) the name and record address of the stockholder and (ii) the class, series and number of shares of capital stock of the Corporation which are beneficially owned by the stockholder. Notwithstanding anything in these Bylaws to the contrary, no business shall be conducted at the annual meeting except in accordance with the procedures set forth in this Article II, Section 2. The officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the annual meeting that business was not properly brought before the annual meeting in accordance with the provisions of this Article II, Section 2, and if such officer should so determine, such officer shall so declare to the annual meeting and any such business not properly brought before the meeting shall not be transacted.

2.3    *Special Meetings.*    Special meetings of the stockholders, for any purpose or purposes, unless otherwise prescribed by statute or by the Second Amended and Restated Certificate of Incorporation of the Corporation (the "Certificate of Incorporation"), may only be called by a majority of the entire Board of Directors, or the President or the Chairman, and shall be called by the Secretary at the request in writing of stockholders owning a majority in amount of the entire capital stock of the corporation issued and outstanding and entitled to vote. Without limiting the foregoing, upon the request of (a) HOVS LLC, HOVS Capital II LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and Ex-Sigma LLC (collectively, the "HGM Group") (or its affiliate or assignee) so long as it (or its affiliate or assignee) has the right to nominate at least one director of the Board in accordance with the nomination agreement between the HGM Group and the Corporation or (b) Apollo Novitex Holdings, L.P. ("Apollo") (or its affiliate or assignee) so long as it (or its affiliate or assignee) has the right to nominate at least one director of the Board in accordance with the nomination agreement between Apollo and the Corporation (collectively with the nomination agreement between the HGM Group and the Corporation, (collectively, the "Nomination Agreements"), the Chairman or the President shall call a special meeting of stockholders. Such request shall state the purpose or purposes of the proposed meeting.

Unless otherwise provided by law, written notice of a special meeting of stockholders, stating the time, place and purpose or purposes thereof, shall be given to each stockholder entitled to vote at such meeting, not less than ten (10) or more than sixty (60) days before the date fixed for the meeting. Business transacted at any special meeting of stockholders shall be limited to the purposes stated in the notice.

2.4    *Quorum.*    The holders of a majority of the capital stock issued and outstanding and entitled to vote thereat present in person or represented by proxy, shall constitute a quorum at all meetings of the stockholders for the transaction of business except as otherwise provided by statute or by the Certificate of Incorporation. If, however, such quorum shall not be present or represented at any meeting of the stockholders, the holders of a majority of the votes entitled to be cast by the stockholders entitled to vote thereat, present in person or represented by proxy, shall have power to adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present or represented. At such adjourned meeting at which a quorum shall be present or represented, any business may be transacted which might have been transacted at the meeting as originally noticed. If the adjournment is for more than thirty (30) days, or if after the adjournment a new record date is fixed for the adjourned meeting, a notice of the adjourned meeting shall be given to each stockholder entitled to vote at the meeting.

2.5    *Organization.*    The Chairman of the Board of Directors shall act as chairman of meetings of the stockholders. The Board of Directors may designate any other officer or director of the Corporation to act as chairman of any meeting in the absence of the Chairman of the Board of

C-2

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1006 of 1110    PageID 2627

Directors, and the Board of Directors may further provide for determining who shall act as chairman of any stockholders meeting in the absence of the Chairman of the Board of Directors and such designee.

The Secretary of the Corporation shall act as secretary of all meetings of the stockholders, but in the absence of the Secretary the presiding officer may appoint any other person to act as secretary of any meeting.

2.6    *Voting.*    Unless otherwise required by law, the Certificate of Incorporation, the Nomination Agreements or these Bylaws, any question (other than the election of directors) brought before any meeting of stockholders shall be decided by the vote of the holders of a majority of the stock represented and entitled to vote thereat. At all meetings of stockholders for the election of directors, a plurality of the votes cast shall be sufficient to elect. Each stockholder represented at a meeting of stockholders shall be entitled to cast one vote for each share of the capital stock entitled to vote thereat held by such stockholder, unless otherwise provided by the Certificate of Incorporation. Each stockholder entitled to vote at a meeting of stockholders or to express consent or dissent to corporate action in writing without a meeting may authorize any person or persons to act for him by proxy. All proxies shall be executed in writing and shall be filed with the Secretary of the Corporation not later than the day on which exercised. No proxy shall be voted or acted upon after three (3) years from its date, unless the proxy provides for a longer period. The Board of Directors, in its discretion, or the officer of the Corporation presiding at a meeting of stockholders, in his discretion, may require that any votes cast at such meeting shall be cast by written ballot.

2.7    *Action of Shareholders Without Meeting.*    Any action required or permitted to be taken by the stockholders of the Corporation must be effected by a duly called annual or special meeting of such holders and may not be effected by written consent of the stockholders.

2.8    *Voting List.*    The officer who has charge of the stock ledger of the corporation shall prepare and make, at least ten (10) days before every meeting of stockholders, a complete list of the stockholders entitled to vote at the meeting, arranged in alphabetical order, showing the address of each stockholder and the number of shares registered in the name of each stockholder. Such list shall be open to the examination of any stockholder, for any purpose germane to the meeting, during ordinary business hours, for a period of at least ten (10) days prior to the election, either at a place within the city, town or village where the election is to be held, which place shall be specified in the notice of the meeting, or, if not specified, at the place where said meeting is to be held. The list shall be produced and kept at the time and place of election during the whole time thereof, and may be inspected by any stockholder of the Corporation who is present. In the event that the Corporation determines to make the list available on an electronic network, the Corporation will take reasonable steps to ensure that such information is available only to stockholders of the Corporation.

2.9    *Stock Ledger.*    The stock ledger of the Corporation shall be the only evidence as to who are the stockholders entitled to examine the stock ledger, the list required by Section 8 of this Article II or the books of the Corporation, or to vote in person or by proxy at any meeting of stockholders.

2.10    *Adjournment.*    Any meeting of the stockholders, including one at which directors are to be elected, may be adjourned for such periods as the presiding officer of the meeting or the stockholders present in person or by proxy and entitled to vote shall direct.

2.11    *Ratification.*    Any transaction questioned in any stockholders' derivative suit, or any other suit to enforce alleged rights of the Corporation or any of its stockholders, on the ground of lack of authority, defective or irregular execution, adverse interest of any director, officer or stockholder, nondisclosure, miscomputation or the application of improper principles or practices of accounting may be approved, ratified and confirmed before or after judgment by the Board of Directors or by the holders of Common Stock and, if so approved, ratified or confirmed, shall have the same force and

C-3

Supp.App. 1004

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1007 of 1110    PageID 2628

Table of Contents

effect as if the questioned transaction had been originally duly authorized, and said approval, ratification or confirmation shall be binding upon the Corporation and all of its stockholders and shall constitute a bar to any claim or execution of any judgment in respect of such questioned transaction.

2.12    *Inspectors.*    The election of directors and any other vote by ballot at any meeting of the stockholders shall be supervised by at least one inspector. Such inspectors shall be appointed by the Board of Directors in advance of the meeting. If the inspector so appointed shall refuse to serve or shall not be present, such appointment shall be made by the officer presiding at the meeting.

2.13    *Meetings by Means of Conference Telephone.*    Stockholders may participate in a meeting of the stockholders by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

### ARTICLE III
### DIRECTORS

3.1    *Powers; Number; Qualifications.*    The business and affairs of the Corporation shall be managed by or under the direction of the Board of Directors, except as may be otherwise provided by law or in the Certificate of Incorporation. Subject to the terms and conditions in the Nomination Agreements, the number of directors which shall constitute the Board of Directors shall be not less than one (1) nor more than eight (8). Subject to the terms and conditions in the Nomination Agreements, the exact number of directors shall be fixed from time to time, within the limits specified in this Article III Section 1 or in the Certificate of Incorporation, by the Board of Directors. Directors need not be stockholders of the Corporation. The Board may be divided into Classes as more fully described in the Certificate of Incorporation.

3.2    *Election; Term of Office; Resignation; Removal; Vacancies.*    Subject to the terms and conditions in the Nomination Agreements, each director shall hold office until the next annual meeting of stockholders at which his Class stands for election or until such director's earlier resignation, removal from office, death or incapacity. Unless otherwise provided in the Certificate of Incorporation and the Nomination Agreements, vacancies and newly created directorships resulting from any increase in the authorized number of directors or from any other cause may be filled by a majority of the directors then in office, although less than a quorum, or by a sole remaining director and each director so chosen shall hold office until the next election of the class for which such director shall have been chosen, and until his successor shall be elected and qualified, or until such director's earlier resignation, removal from office, death or incapacity.

3.3    *Nominations.*    Nominations of persons for election to the Board of Directors of the Corporation at a meeting of stockholders of the Corporation may be made at such meeting by or at the direction of the Board of Directors, by any committee or persons appointed by the Board of Directors or by any stockholder of the Corporation entitled to vote for the election of directors at the meeting who is a stockholder of record on the date of the giving of the notice and on the record date for the determination of stockholders entitled to vote at such annual meeting and who complies with the notice procedures set forth in this Article III, Section 3. Such nominations by any stockholder shall be made pursuant to timely notice in writing to the Secretary of the Corporation. To be timely, a stockholder's notice shall be delivered to or mailed and received at the principal executive offices of the Corporation not less than sixty (60) days nor more than ninety (90) days prior to the meeting; provided however, that in the event that less than seventy (70) days notice or prior public disclosure of the date of the meeting is given or made to stockholders, notice by the stockholder, to be timely, must be received no later than the close of business on the tenth (10th) day following the day on which such notice of the date of the meeting was mailed or such public disclosure was made, whichever first occurs. Such stockholder's notice to the Secretary shall set forth (i) as to each person whom the stockholder

C-4

Supp.App. 1005

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1008 of 1110    PageID 2629

proposes to nominate for election or reelection as a director, (a) the name, age, business address and residence address of the person, (b) the principal occupation or employment of the person, (c) the class and number of shares of capital stock of the Corporation which are beneficially owned by the person, and (d) any other information relating to the person that is required to be disclosed in solicitations for proxies for election of directors pursuant to the Rules and Regulations of the Securities and Exchange Commission under Section 14 of the Securities Exchange Act of 1934, as amended, and (ii) as to the stockholder giving the notice (a) the name and record address of the stockholder and (b) the class and number of shares of capital stock of the Corporation which are beneficially owned by the stockholder. The Corporation may require any proposed nominee to furnish such other information as may reasonably be required by the Corporation to determine the eligibility of such proposed nominee to serve as a director of the Corporation. No person shall be eligible for election as a director of the Corporation unless nominated in accordance with the procedures set forth herein. The officer of the Corporation presiding at an annual meeting shall, if the facts warrant, determine and declare to the meeting that a nomination was not made in accordance with the foregoing procedure, and if he should so determine, he shall so declare to the meeting and the defective nomination shall be disregarded.

3.4    *Meetings.*    The Board of Directors of the Corporation may hold meetings, both regular and special, either within or without the State of Delaware. The first meeting of each newly elected Board of Directors shall be held immediately after and at the same place as the meeting of the stockholders at which it is elected and no notice of such meeting shall be necessary to the newly elected directors in order to legally constitute the meeting, provided a quorum shall be present. Regular meetings of the Board of Directors may be held without notice at such time and place as shall from time to time be determined by the Board of Directors. Special meetings of the Board of Directors may be called by the President (including upon the written request of at least two directors then in office) or a majority of the entire Board of Directors. Notice thereof stating the place, date and hour of the meeting shall be given to each director either by mail not less than seventy-two (72) hours before the date of the meeting, by telephone, facsimile, telegram or e-mail on forty-eight (48) hours notice.

3.5    *Quorum.*    Except as may be otherwise specifically provided by law, the Certificate of Incorporation or these Bylaws, at all meetings of the Board of Directors or any committee thereof, a majority of the entire Board of Directors or such committee, as the case may be, and at least one director nominated by each of the HGM Group (or its affiliate or assignee) (so long as it has the right to nominate a director in accordance with the applicable Nomination Agreement) and Apollo (so long as it has the right to nominate a director in accordance with the applicable Nomination Agreement) shall constitute a quorum for the transaction of business and the act of a majority of the directors present at any meeting at which there is a quorum shall be the act of the Board of Directors. Notwithstanding the foregoing, if either a director nominated by Apollo (or its affiliate or assignee) or a director nominated by the HGM Group (or its affiliate or assignee) has informed the Corporation in writing that it will not attend a specific meeting and that it consents to a quorum without its presence, the presence of such person shall not be required to constitute a quorum at such meeting; provided, however, if a quorum shall not be present at the adjourned meeting because either no director nominated by Apollo (or its affiliate or assignee) or a member of the HGM Group (or its affiliate or assignee) is present, in person or by proxy and the directors nominated by Apollo (or its affiliate or assignee) and the HGM Group (or its affiliate or assignee) have received written notice of the time and place of the adjourned meeting in accordance with Section 3.4, such person's presence shall not be required at the adjourned meeting to constitute a quorum at such adjourned meeting. If a quorum shall not be present at any meeting of the Board of Directors or of any committee thereof, a majority of the directors present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

3.6    *Organization of Meetings.*    The Board of Directors shall elect one of its members to be Chairman of the Board of Directors. The Chairman of the Board of Directors shall lead the Board of

C-5

Supp.App. 1006

Table of Contents

Directors in fulfilling its responsibilities as set forth in these By-Laws, including its responsibility to oversee the performance of the Corporation, and shall determine the agenda and perform all other duties and exercise all other powers which are or from time to time may be delegated to him or her by the Board of Directors.

Meetings of the Board of Directors shall be presided over by the Chairman of the Board of Directors, or in his or her absence, by the President, or in the absence of the Chairman of the Board of Directors and the President by such other person as the Board of Directors may designate or the members present may select.

3.7 *Actions of Board of Directors Without Meeting.* Unless otherwise restricted by the Certificate of Incorporation or these Bylaws, any action required or permitted to be taken at any meeting of the Board of Directors or of any committee thereof may be taken without a meeting, if all members of the Board of Directors or of such committee, as the case may be, consent thereto in writing or by electronic transmission, and the writing or writings or electronic transmission or transmissions are filled with the minutes of proceedings of the Board of Directors or committee.

3.8 *Removal of Directors by Stockholders.* The entire Board of Directors or any individual Director may be removed from office with or without cause by a majority vote of the holders of the outstanding shares then entitled to vote at an election of directors. Notwithstanding the foregoing, if the Corporation's board is classified stockholders may effect such removal only for cause. Subject to the terms and conditions of the Nomination Agreements, in case the Board of Directors or any one or more Directors be so removed, new Directors may be elected at the same time for the unexpired portion of the full term of the Director or Directors so removed.

3.9 *Resignations.* Any Director may resign at any time by submitting his written resignation to the Board of Directors or Secretary of the Corporation. Such resignation shall take effect at the time of its receipt by the Corporation unless another time be fixed in the resignation, in which case it shall become effective at the time so fixed. The acceptance of a resignation shall not be required to make it effective.

3.10 *Committees.* Subject to the terms and conditions of the Nomination Agreements, the Board of Directors may designate one or more committees, each committee to consist of one or more of the directors of the Corporation. Subject to the terms and conditions of the Nomination Agreements, in the absence or disqualification of a member of a committee, the member or members thereof present at any meeting and not disqualified from voting, whether or not he or they constitute a quorum, may unanimously appoint another member of the Board of Directors to act at the meeting in the place of any such absent or disqualified member. Any such committee, to the extent provided by law and in the resolution of the Board of Directors establishing such committee, shall have and may exercise all the powers and authority of the Board of Directors in the management of the business and affairs of the Corporation, and may authorize the seal of the Corporation to be affixed to all papers which may require it; but no such committee shall have the power or authority in reference to amending the Certificate of Incorporation, adopting an agreement of merger or consolidation, recommending to the stockholders the sale, lease or exchange of all or substantially all of the Corporation's property and assets, recommending to the stockholders a dissolution of the Corporation or a revocation of a dissolution or amending the Bylaws of the Corporation; and, unless the resolution expressly so provides, no such committee shall have the power or authority to declare a dividend or to authorize the issuance of stock or to adopt a certificate of ownership and merger. Each committee shall keep regular minutes of its meetings and report the same to the Board of Directors when required.

3.11 *Compensation.* The directors may be paid their reasonable, documented out-of-pocket expenses, if any, of attendance at each meeting of the Board of Directors and may be paid a fixed amount (in cash or other form of consideration) for attendance at each meeting of the Board of Directors or a stated salary as director and any other meetings or events attended on behalf of the Corporation at the Corporation's request. No such payment shall preclude any director from serving the Corporation in any other capacity and receiving compensation therefor. Members of special or standing committees may be allowed like compensation for attending committee meetings.

C-6

Supp.App. 1007

Table of Contents

Table of Contents

3.12  *Interested Directors*.   No contract or transaction between the Corporation and one or more of its directors or officers, or between the Corporation and any other corporation, partnership, association, or other organization in which one or more of its directors or officers are directors or officers, or have a financial interest, shall be void or voidable solely for this reason, or solely because the director or officer is present at or participates in the meeting of the Board of Directors or committee thereof which authorizes the contract or transaction, or solely because his or their votes are counted for such purpose, if (i) the material facts as to his or their relationship or interest and as to the contract or transaction are disclosed or are known to the Board of Directors or the committee, and the Board of Directors or committee in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum; or (ii) the material facts as to his or their relationship or interest and as to the contract or transaction are disclosed or are known to the stockholders entitled to vote thereon, and the contract or transaction is specifically approved in good faith by vote of the stockholders; or (iii) the contract or transaction is fair as to the Corporation as of the time it is authorized, approved or ratified, by the Board of Directors, a committee thereof or the stockholders. Common or interested directors may be counted in determining the presence of a quorum at a meeting of the Board of Directors or of a committee which authorizes the contract or transaction.

3.13  *Meetings by Means of Conference Telephone*.   Members of the Board of Directors or any committee designed by the Board of Directors may participate in a meeting of the Board of Directors or of a committee of the Board of Directors by means of conference telephone or similar communications equipment by means of which all persons participating in the meeting can hear each other, and participation in a meeting pursuant to this subsection shall constitute presence in person at such meeting.

## ARTICLE IV
## OFFICERS

4.1  *General*.   The officers of the Corporation shall be elected by the Board of Directors and may consist of: a Chairman of the Board, Vice Chairman of the Board, Chief Executive Officer, President, Chief Financial Officer, Secretary and Treasurer. The Board of Directors, in its discretion, may also elect one or more Vice Presidents (including Executive Vice Presidents and Senior Vice Presidents), Assistant Secretaries, Assistant Treasurers, a Controller and such other officers as in the judgment of the Board of Directors may be necessary or desirable. Any number of offices may be held by the same person and more than one person may hold the same office, unless otherwise prohibited by law, the Certificate of Incorporation or these Bylaws. The officers of the Corporation need not be stockholders of the Corporation, nor need such officers be directors of the Corporation.

4.2  *Election*.   The Board of Directors at its first meeting held after each annual meeting of stockholders shall elect the officers of the Corporation who shall hold their offices for such terms and shall exercise such powers and perform such duties as shall be determined from time to time by the Board of Directors; and all officers of the Corporation shall hold office until their successors are chosen and qualified, or until their earlier resignation or removal. Except as otherwise provided in this Article IV, any officer elected by the Board of Directors may be removed at any time by the affirmative vote of a majority of the Board of Directors. Any vacancy occurring in any office of the Corporation shall be filled by the Board of Directors. The salaries of all officers who are directors of the Corporation shall be fixed by the Board of Directors.

4.3  *Voting Securities Owned by the Corporation*.   Powers of attorney, proxies, waivers of notice of meeting, consents and other instruments relating to securities owned by the Corporation may be executed in the name of and on behalf of the Corporation by the President or any Vice President, and any such officer may, in the name and on behalf of the Corporation, take all such action as any such officer may deem advisable to vote in person or by proxy at any meeting of security holders of any

C-7

corporation in which the Corporation may own securities and at any such meeting shall possess and may exercise any and all rights and powers incident to the ownership of such securities and which, as the owner thereof, the Corporation might have exercised and possessed if present. The Board of Directors may, by resolution, from time to time confer like powers upon any other person or persons.

4.4    *Chief Executive Officer*.    Subject to the provisions of these Bylaws and to the direction of the Board of Directors, the Chief Executive Officer shall have ultimate authority for decisions relating to the general management and control of the affairs and business of the Corporation and shall perform such other duties and exercise such other powers which are or from time to time may be delegated to him or her by the Board of Directors or these Bylaws, all in accordance with basic policies as established by and subject to the oversight of the Board of Directors.

4.5    *President*.    At the request of the Chief Executive Officer, or in the absence of the Chief Executive Officer, or in the event of his or her inability or refusal to act, the President shall perform the duties of the Chief Executive Officer, and when so acting, shall have all the powers of and be subject to all the restrictions upon such office. The President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe.

4.6    *Chief Financial Officer*.    The Chief Financial Officer shall have general supervision, direction and control of the financial affairs of the Corporation and shall perform such other duties and exercise such other powers which are or from time to time may be delegated to him or her by the Board of Directors or these Bylaws, all in accordance with basic policies as established by and subject to the oversight of the Board of Directors. In the absence of a named Treasurer, the Chief Financial Officer shall also have the powers and duties of the Treasurer as hereinafter set forth and shall be authorized and empowered to sign as Treasurer in any case where such officer's signature is required.

4.7    *Vice Presidents*.    At the request of the President or in the absence of the President, or in the event of his or her inability or refusal to act, the Vice President or the Vice Presidents if there is more than one (in the order designated by the Board of Directors) shall perform the duties of the President, and when so acting, shall have all the powers of and be subject to all the restrictions upon such office. Each Vice President shall perform such other duties and have such other powers as the Board of Directors from time to time may prescribe. If there be no Vice President, the Board of Directors shall designate the officer of the Corporation who, in the absence of the President or in the event of the inability or refusal of such officer to act, shall perform the duties of such office, and when so acting, shall have all the powers of and be subject to all the restrictions upon such office.

4.8    *Secretary*.    The Secretary shall attend all meetings of the Board of Directors and all meetings of stockholders and record all the proceedings thereat in a book or books to be kept for that purpose; the Secretary shall also perform like duties for the standing committees when required. The Secretary shall give, or cause to be given, notice of all meetings of the stockholders and special meetings of the Board of Directors, and shall perform such other duties as may be prescribed by the Board of Directors or the President, under whose supervision the Secretary shall be. If the Secretary shall be unable or shall refuse to cause to be given notice of all meetings of the stockholders and special meetings of the Board of Directors, then any Assistant Secretary shall perform such actions. If there be no Assistant Secretary, then the Board of Directors or the President may choose another officer to cause such notice to be given. The Secretary shall have custody of the seal of the Corporation and the Secretary or any Assistant Secretary, if there be one, shall have authority to affix the same to any instrument requiring it and when so affixed, it may be attested by the signature of the Secretary or by the signature of any such Assistant Secretary. The Board of Directors may give general authority to any other officer to affix the seal of the Corporation and to attest the affixing by his signature. The Secretary shall see that all books, reports, statements, certificates and other documents and records required by law to be kept or filed are properly kept or filed, as the case may be.

C-8

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1012 of 1110    PageID 2633

4.9    *Treasurer*.    The Treasurer shall have the custody of the corporate funds and securities and shall keep full and accurate accounts of receipts and disbursements in books belonging to the Corporation and shall deposit all moneys and other valuable effects in the name and to the credit of the Corporation in such depositories as may be designated by the Board of Directors. The Treasurer shall disburse the funds of the Corporation as may be ordered by the Board of Directors, taking proper vouchers for such disbursements, and shall render to the President and the Board of Directors, at its regular meetings, or when the Board of Directors so requires, an account of all his transactions as Treasurer and of the financial condition of the Corporation. If required by the Board of Directors, the Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the Corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Corporation.

4.10    *Assistant Secretaries*.    Except as may be otherwise provided in these Bylaws, Assistant Secretaries, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Secretary, and in the absence of the Secretary or in the event of his disability or refusal to act, shall perform the duties of the Secretary, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Secretary.

4.11    *Assistant Treasurers.*    Assistant Treasurers, if there be any, shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors, the President, any Vice President, if there be one, or the Treasurer, and in the absence of the Treasurer or in the event of his disability or refusal to act, shall perform the duties of the Treasurer, and when so acting, shall have all the powers of and be subject to all the restrictions upon the Treasurer. If required by the Board of Directors, an Assistant Treasurer shall give the Corporation a bond in such sum and with such surety or sureties as shall be satisfactory to the Board of Directors for the faithful performance of the duties of his office and for the restoration to the Corporation, in case of his death, resignation, retirement or removal from office, of all books, papers, vouchers, money and other property of whatever kind in his possession or under his control belonging to the Corporation.

4.12    *Controller*.    The Controller shall establish and maintain the accounting records of the Corporation in accordance with generally accepted accounting principles applied on a consistent basis, maintain proper internal control of the assets of the Corporation and shall perform such other duties as the Board of Directors, the President or any Vice President of the Corporation may prescribe.

4.13    *Other Officers*.    Such other officers as the Board of Directors may choose shall perform such duties and have such powers as from time to time may be assigned to them by the Board of Directors. The Board of Directors may delegate to any other officer of the Corporation the power to choose such other officers and to prescribe their respective duties and powers.

4.14    *Vacancies*.    The Board of Directors shall have the power to fill any vacancies in any office occurring from whatever reason.

4.15    *Resignations*.    Any officer may resign at any time by submitting his written resignation to the Corporation. Such resignation shall take effect at the time of its receipt by the Corporation, unless another time be fixed in the resignation, in which case it shall become effective at the time so fixed. The acceptance of a resignation shall not be required to make it effective.

4.16    *Removal*.    Subject to the provisions of any employment agreement approved by the Board of Directors, any officer of the Corporation may be removed at any time, with or without cause, by the Board of Directors.

<div align="center">C-9</div>

Supp.App. 1010

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1013 of 1110    PageID 2634

## ARTICLE V
## CAPITAL STOCK

5.1  *Form of Certificates*.   The shares of stock in the Corporation shall be represented by certificates, provided that the Board of Directors may provide by resolution or resolutions that some or all of any or all classes or series of the Corporation's stock shall be in uncertificated form. Stock certificates shall be in such forms as the Board of Directors may prescribe and signed by the Chairman of the Board, President or a Vice President and by the Treasurer or an Assistant Treasurer, or the Secretary or an Assistant Secretary of the Corporation.

5.2  *Signatures*.   Any or all of the signatures on a stock certificate may be a facsimile, including, but not limited to, signatures of officers of the Corporation and countersignatures of a transfer agent or registrar. In case an officer, transfer agent or registrar who has signed or whose facsimile signature has been placed upon a certificate shall have ceased to be such officer, transfer agent or registrar before such certificate is issued, it may be issued by the Corporation with the same effect as if such person were such officer, transfer agent or registrar at the date of issue.

5.3  *Lost Certificates*.   The Board of Directors may direct a new stock certificate or certificates to be issued in place of any stock certificate or certificates theretofore issued by the Corporation alleged to have been lost, stolen or destroyed, upon the making of an affidavit of that fact by the person claiming the certificate of stock to be lost, stolen or destroyed. When authorizing such issue of a new stock certificate, the Board of Directors may, in its discretion and as a condition precedent to the issuance thereof, require the owner of such lost, stolen or destroyed certificate, or his legal representative, to advertise the same in such manner as the Board of Directors shall require and/or to give the Corporation a bond in such sum as it may direct as indemnity against any claim that may be made against the Corporation with respect to the certificate alleged to have been lost, stolen or destroyed.

5.4  *Transfers*.   Stock of the Corporation shall be transferable in the manner prescribed by law and in these Bylaws. Transfers of certificated stock shall be made on the books of the Corporation only by the person named in the certificate or by such person's attorney lawfully constituted in writing and upon the surrender of the certificate therefor, which shall be canceled before a new certificate shall be issued. Transfers of uncertificated stock shall be made on the books of the Corporation only by the person then registered on the books of the Corporation as the owner of such shares or by such person's attorney lawfully constituted in writing and written instruction to the Corporation containing such information as the Corporation or its agents may prescribe. No transfer of uncertificated stock shall be valid as against the Corporation for any purpose until it shall have been entered in the stock records of the Corporation by an entry showing from and to whom transferred. The Corporation shall have no duty to inquire into adverse claims with respect to any stock transfer unless (a) the Corporation has received a written notification of an adverse claim at a time and in a manner which affords the Corporation a reasonable opportunity to act on it prior to the issuance of a new, reissued or re-registered share certificate, in the case of certificated stock, or entry in the stock record books of the Corporation, in the case of uncertificated stock, and the notification identifies the claimant, the registered owner and the issue of which the share or shares is a part and provides an address for communications directed to the claimant; or (b) the Corporation has required and obtained, with respect to a fiduciary, a copy of a will, trust, indenture, articles of co-partnership, Bylaws or other controlling instruments, for a purpose other than to obtain appropriate evidence of the appointment or incumbency of the fiduciary, and such documents indicate, upon reasonable inspection, the existence of an adverse claim. The Corporation may discharge any duty of inquiry by any reasonable means, including notifying an adverse claimant by registered or certified mail at the address furnished by him or, if there be no such address, at his residence or regular place of business that the security has been presented for registration of transfer by a named person, and that the transfer will be registered unless within thirty days from the date of mailing the notification, either (a) an appropriate restraining order,

C-10

_____

Supp.App. 1011

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1014 of 1110    PageID 2635

injunction or other process issues from a court of competent jurisdiction; or (b) an indemnity bond, sufficient in the Corporation's judgment to protect the Corporation and any transfer agent, registrar or other agent of the Corporation involved from any loss which it or they may suffer by complying with the adverse claim, is filed with the Corporation.

5.5   *Fixing Record Date*.   In order that the Corporation may determine the stockholders entitled to notice or to vote at any meeting of stockholders or any adjournment thereof, or to express consent to corporate action in writing without a meeting, or entitled to receive payment of any dividend or other distribution or allotment of any rights, or entitled to exercise any rights in respect of any change, conversion or exchange of stock or for the purpose of any other lawful action, the Board of Directors may fix a record date, which record date shall not precede the date upon which the resolution fixing the record is adopted by the Board of Directors, and which record date shall not be more than sixty (60) nor less than ten (10) days before the date of such meeting, nor more than ten (10) days after the date upon which the resolution fixing the record date of action with a meeting is adopted by the Board of Directors, nor more than sixty (60) days prior to any other action. If no record date is fixed:

(a)   The record date for determining stockholders entitled to notice of or to vote at a meeting of stockholders shall be at the close of business on the day next preceding the day on which notice is given, or, if notice is waived, at the close of business on the day next preceding the day on which the meeting is held.

(b)   The record date for determining stockholders entitled to express consent to corporate action in writing without a meeting, when no prior action by the Board of Directors is necessary, shall be the first date on which a signed written consent is delivered to the Corporation.

(c)   The record date for determining stockholders for any other purpose shall be at the close of business on the day on which the Board of Directors adopts the resolution relating thereto.

A determination of stockholders of record entitled to notice of or to vote at a meeting of stockholders shall apply to any adjournment of the meeting; provided, however, that the Board of Directors may fix a new record date for the adjourned meeting.

5.6   *Registered Stockholders*.   Prior to due presentment for transfer of any share or shares, the Corporation shall treat the registered owner thereof as the person exclusively entitled to vote, to receive notifications and to all other benefits of ownership with respect to such share or shares, and shall not be bound to recognize any equitable or other claim to or interest in such share or shares on the part of any other person, whether or not it shall have express or other notice thereof, except as otherwise provided by the laws of the State Delaware.

<div style="text-align:center">

**ARTICLE VI**
**NOTICES**

</div>

6.1   *Form of Notice*.   Notices to directors and stockholders other than notices to directors of special meetings of the board of Directors which may be given by any means stated in Article III, Section 4, shall be in writing and delivered personally or mailed to the directors or stockholders at their addresses appearing on the books of the corporation. Notice by mail shall be deemed to be given at the time when the same shall be mailed. Subject to the rules of any applicable stock exchange, notice to stockholders and directors may also be given by telegram or email. If delivered by email, such notice shall be deemed to be given when the email is sent by the originator. The time stamp on the sent email shall act as proof of service.

6.2   *Waiver of Notice*.   Whenever any notice is required to be given under the provisions of law or the Certificate of Incorporation or by these Bylaws of the Corporation, a written waiver, signed by the person or persons entitled to notice, whether before or after the time stated therein, shall be deemed

<div style="text-align:center">C-11</div>

Supp.App. 1012

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1015 of 1110    PageID 2636

Table of Contents

equivalent to notice. Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends a meeting for the express purpose of objecting, at the beginning of the meeting, to the transaction of any business because the meeting is not lawfully called or convened. Neither the business to be transacted at, nor the purpose of, any regular, or special meeting of the stockholders, Directors, or members of a committee of Directors need be specified in any written waiver of notice unless so required by the Certificate of Incorporation.

## ARTICLE VII
### INDEMNIFICATION OF DIRECTORS AND OFFICERS

7.1    The Corporation shall indemnify any person who was or is a party or is threatened to be made a party to any threatened, pending or completed action, suit or proceeding, whether civil, criminal, administrative or investigative (other than an action by or in the right of the Corporation) by reason of the fact that he is or was a director, officer, employee or agent of the Corporation or any subsidiary thereof, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, against expenses (including attorneys' fees), judgments, fines and amounts paid in settlement actually and reasonably incurred by him in connection with such action, suit or proceeding. The termination of any action, suit or proceeding by judgment, order, settlement, conviction, or upon a plea of nolo contendere or its equivalent, shall not, of itself, create a presumption that the person did not act in good faith and in a manner which he reasonably believed to be in or not opposed to the best interests of the Corporation, and, with respect to any criminal action or proceeding, had reasonable cause to believe that his conduct was unlawful.

7.2    To the extent that a director, officer, employee or agent of the Corporation has been successful on the merits or otherwise in defense of any action, suit or proceeding referred to in Section 1 of this Article, or in defense of any claim, issue or matter therein, he shall be indemnified against expenses (including attorneys' fees) actually and reasonably incurred by him or her in connection therewith.

7.3    The Corporation hereby acknowledges that an indemnitee may have certain rights to other indemnification, advancement of expenses and/or insurance (collectively, the "Other Indemnitors"). The Corporation hereby agrees that with respect to any and all losses arising by reason of the fact that such indemnitee is or was a director, officer, employee or agent of the Corporation or any subsidiary thereof, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another corporation, partnership, joint venture, trust or other enterprise, (i) that the Corporation is the indemnitor of first resort (i.e., its obligations to an indemnitee are primary and any obligation of the Other Indemnitors to advance expenses or to provide indemnification for the same expenses or liabilities incurred by such indemnitee are secondary), (ii) that the Corporation shall be required to advance the full amount of expenses incurred by an indemnitee in accordance with this Article VII and shall be liable for the full amount of all losses to the extent legally permitted and as required by the terms of the Certificate of Incorporation and the Bylaws (or any other agreement between the Corporation and an indemnitee), without regard to any rights an indemnitee may have against the Other Indemnitors, and, (iii) that the Corporation irrevocably waives, relinquishes and releases the Other Indemnitors from any and all claims against the Other Indemnitors for contribution, subrogation or any other recovery of any kind in respect thereof. The Corporation further agrees that no advancement or payment by the Other Indemnitors on behalf of an indemnitee with respect to any claim for which such indemnitee has sought indemnification from the Corporation shall affect the foregoing and the Other Indemnitors shall have a right of contribution and/or be subrogated to the extent of such advancement or payment to all of the rights of recovery of such indemnitee against the Corporation. The Corporation and each indemnitee agree that the Other Indemnitors are express third party beneficiaries of the terms of this Article VII.

C-12

Supp.App. 1013

7.4   Expenses (including attorneys' fees) incurred by an officer or director in defending any civil, criminal, administrative or investigative action, suit or proceeding may be paid by the Corporation in advance of the final disposition of such action, suit or proceeding upon receipt of an undertaking by or on behalf of such director or officer to repay such amount if it shall ultimately be determined that he is not entitled to be indemnified by the Corporation as authorized in this Section. Such expenses (including attorneys' fees) incurred by other employees and agents may be so paid upon such terms and conditions, if any, as the Board of Directors deems appropriate.

7.5   Any repeal or amendment of this Article VII by the stockholders of the Corporation or by changes in law, or the adoption of any other provision of the Amended and Restated Certificate and the Bylaws inconsistent with this Article VII, shall, unless otherwise required by law, be prospective only (except to the extent such amendment or change in law permits the Corporation to provide broader indemnification rights on a retroactive basis than permitted prior thereto), and shall not in any way diminish or adversely affect any right or protection existing at the time of such repeal or amendment or adoption of such inconsistent provision in respect of any proceeding (regardless of when such proceeding is first threatened, commenced or completed) arising out of or related to any act or omission occurring prior to such repeal or amendment or adoption of such inconsistent provision.

7.6   The indemnification and advancement of expenses provided by, or granted pursuant to the other sections of this Article shall not be deemed exclusive of any other rights to which those seeking indemnification or advancement of expenses may be entitled under any bylaw, agreement, vote of stockholders or disinterested directors or otherwise, both as to action in his official capacity and as to action in another capacity while holding such office.

7.7   The Corporation shall have power to purchase and maintain insurance on behalf of any person who is or was a director, officer, employee or agent of the Corporation, or is or was serving at the request of the Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise against any liability asserted against him and incurred by him in any such capacity, or arising out of his status as such, whether or not the Corporation would have the power to indemnify him against such liability under the provisions of this Article.

7.8   For purposes of this Article, references to "the Corporation" shall include, in addition to the resulting Corporation, any constituent Corporation (including any constituent of a constituent) absorbed in a consolidation or merger which, if its separate existence had continued, would have had power and authority to indemnify its directors, officers, and employees or agents, so that any person who is or was a director, officer employee or agent of such constituent Corporation, or is or was serving at the request of such constituent Corporation as a director, officer, employee or agent of another Corporation, partnership, joint venture, trust or other enterprise, shall stand in the same position under this Article with respect to the resulting or surviving Corporation as he would have with respect to such constituent Corporation of its separate existence had continued.

7.9   For purposes of this Article, references to "other enterprises" shall include employee benefit plans; references to "fines" shall include any excise taxes assessed on a person with respect to any employee benefit plan; and references to "serving at the request of the Corporation" shall include any service as a director, officer, employee or agent of the Corporation which imposes duties on, or involves services by, such director, officer, employee, or agent with respect to an employee benefit plan, its participants or beneficiaries; and a person who acted in good faith and in a manner he reasonably believed to be in the interest of the participants and beneficiaries of an employee benefit plan shall be deemed to have acted in a manner "not opposed to the best interests of the Corporation" as referred to in this Article.

7.10 The indemnification and advancement of expenses provided by, or granted pursuant to, this Article shall, unless otherwise provided when authorized or ratified, continue as to a person who has

C-13

Supp.App. 1014

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1017 of 1110    PageID 2638

ceased to be a director, officer, employee or agent and shall inure to the benefit of the heirs, executors and administrators of such a person.

7.11 No director or officer of the Corporation shall be personally liable to the Corporation or to any stockholder of the Corporation for monetary damages for breach of fiduciary duty as a director or officer to the fullest extent permitted by law.

## ARTICLE VIII
## GENERAL PROVISIONS

8.1  *Reliance on Books and Records*.   Each Director, each member of any committee designated by the Board of Directors, and each officer of the Corporation, shall, in the performance of his duties, be fully protected in relying in good faith upon the books of account or other records of the Corporation, including reports made to the Corporation by any of its officers, by an independent certified public accountant, or by an appraiser selected with reasonable care.

8.2  *Maintenance and Inspection of Records*.   The Corporation shall, either at its principal executive office or at such place or places as designated by the Board of Directors, keep a record of its stockholders listing their names and addresses and the number and class of shares held by each stockholder, a copy of these by-laws, as may be amended to date, minute books, accounting books and other records.

Any such records maintained by the Corporation may be kept on, or by means of, or be in the form of, any information storage device or method, provided that the records so kept can be converted into clearly legible paper form within a reasonable time. The Corporation shall so convert any records so kept upon the request of any person entitled to inspect such records pursuant to the provisions of the Delaware General Corporation Law. When records are kept in such manner, a clearly legible paper form produced from or by means of the information storage device or method shall be admissible in evidence, and accepted for all other purposes, to the same extent as an original paper form accurately portrays the record.

Any stockholder of record, in person or by attorney or other agent, shall, upon written demand under oath stating the purpose thereof, have the right during the usual hours for business to inspect for any proper purpose the Corporation's stock ledger, a list of its stockholders, and its other books and records and to make copies or extracts therefrom. A proper purpose shall mean a purpose reasonably related to such person's interest as a stockholder. In every instance where an attorney or other agent is the person who seeks the right to inspection, the demand under oath shall be accompanied by a power of attorney or such other writing that authorizes the attorney or other agent to so act on behalf of the stockholder. The demand under oath shall be directed to the Corporation at its registered office in Delaware or at its principal executive office.

8.3  *Inspection by Directors*.   Any director shall have the right to examine the Corporation's stock ledger, a list of its stockholders, and its other books and records for a purpose reasonably related to his or her position as a director.

8.4  *Dividends*.   Subject to the provisions of the Certificate of Incorporation, if any, dividends upon the capital stock of the Corporation may be declared by the Board of Directors at any regular or special meeting, pursuant to law. Dividends may be paid in cash, in property, or in shares of the capital stock, subject to the provisions of the Certificate of Incorporation. Before payment of any dividend, there may be set aside out of any funds of the Corporation available for dividends such sum or sums as the Directors from time to time, in their absolute discretion, think proper as a reserve or reserves to meet contingencies, or for equalizing dividends, or for repairing or maintaining any property of the Corporation, or for such other purpose as the Directors shall think conducive to the interest of the

C-14

Corporation, and the Directors may modify or abolish any such reserve in the manner in which it was created.

8.5    *Checks*.    All checks or demands for money and notes of the Corporation shall be signed by such officer or officers or such other persons as the Board of Directors may from time to time designate.

8.6    *Fiscal Year*.    The fiscal year of the Corporation shall be as determined by the Board of Directors. If the Board of Directors shall fail to do so, the President shall fix the fiscal year.

8.7    *Seal*.    The corporate seal shall have inscribed thereon the name of the Corporation, the year of its organization and the words "Corporate Seal, Delaware". The seal may be used by causing it or a facsimile thereof to be impressed or affixed or in any manner reproduced.

8.8    *Amendments*.    Subject to the terms and conditions of the Nomination Agreements, the original or other Bylaws may be adopted, amended or repealed by the stockholders entitled to vote thereon at any regular or special meeting or, if the Certificate of Incorporation so provides, by the Board of Directors. The fact that such power has been so conferred upon the Board of Directors shall not divest the stockholders of the power nor limit their power to adopt, amend or repeal Bylaws.

8.9    *Interpretation of Bylaws*.    All words, terms and provisions of these Bylaws shall be interpreted and defined by and in accordance with the General Corporation Law of the State of Delaware, as amended, and as amended from time to time hereafter. In the event that the provisions of these Bylaws and the Nomination Agreements conflict, the provisions of the Nomination Agreements shall take precedence over these Bylaws.

C-15

Supp.App. 1016

Table of Contents

**Annex D**

**EXELA TECHNOLOGIES, INC.**

**DIRECTOR NOMINATION AGREEMENT**

This Director Nomination Agreement (this "*Agreement*") is made as of **[                    ], 2017**, between Exela Technologies, Inc., a Delaware corporation (the "*Company*"), and the stockholder[s](1) party hereto (the "*Stockholder[s]*"). Unless otherwise specified herein, all of the capitalized terms used herein are defined in *Section 3* hereof.

**WHEREAS**, the Company has agreed to permit the Stockholder[s] who, together with [their] [its] Affiliates, Beneficially Own [      ]% of the issued and outstanding shares of common stock, par value, $0.0001 per share, of the Company (the "*Common Stock*"), at the Effective Time to designate up to [three](2) [two](3) persons for nomination for election to the board of directors of the Company (the "*Board*") on the terms and conditions set forth herein.

**NOW, THEREFORE**, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties to this Agreement hereby agree as follows:

Section 1.    *Board of Directors.*

(a)    Subject to the terms and conditions of this Agreement, from and after the Effective Time and until a Termination Event (as defined below) shall have occurred, the Stockholder[s] holding a majority of the Stockholder[s] Shares shall have the right to designate up to [three (3)] [two (2)] persons to be appointed or nominated, as the case may be, for election to the Board (including any successor, each, a "*Nominee*") by giving written notice to the Company not later than ten (10) days after receiving notice of the date of the applicable meeting of stockholders or equityholders provided to the Stockholder[s]; *provided*, *however,* the initial Nominees shall be appointed as set forth in Section 1(b).

(b)    The Company shall take all necessary and desirable actions within its control such that, as of the Effective Time, (i) [three (3)] [two (2)] existing Directors resign or are removed from the Board, (ii) [          ] shall be appointed as a Class [C] Director with a term ending at the 2020 Annual Meeting of Stockholders, [          ] shall be appointed as a Class [B] Director with a term ending at the 2019 Annual Meeting of Stockholders and [[          ] shall be appointed as a Class [A] Director with a term ending at the 2018 Annual Meeting of Stockholders](4) and (iii) the size of the Board is set at eight (8) Directors.

(c)    Subject to the terms and conditions of this Agreement, from and after the Effective Time and until a Termination Event shall have occurred, the Company will, as promptly as practicable, take all necessary and desirable actions within its control (including, without limitation, calling special meetings of the Board and the stockholders and recommending, supporting and soliciting proxies), so that:

---

(1)    HGM.

(2)    HGM.

(3)    Apollo

(4)    HGM Only.

D-1

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 1020 of 1110     PageID 2641

(i) [for so long as the Stockholders (together with their Affiliates and permitted assignees) Beneficially Own a number of shares of Common Stock equal to or greater than 35% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis), the Stockholders holding a majority of the Stockholder[s] Shares or their permitted assignees, as applicable, shall have the right to nominate, in the aggregate, a number of Nominees equal to three (3) less the number of Stockholder Directors who are not up for election;](5)

(ii) for so long as the Stockholder[s] (together with [their] [its] Affiliates and permitted assignees) Beneficially Own a number of shares of Common Stock equal to or greater than 15% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis) [but fewer than 35%](6) of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis), the Stockholder[s] holding a majority of the Stockholder[s] Shares or [their] [its] permitted assignees, as applicable, shall have the right to nominate, in the aggregate, a number of Nominees equal to two (2) less the number of Stockholder Directors who are not up for election; and

(iii) for so long as the Stockholder[s] (together with [their] [its] Affiliates and permitted assignees) Beneficially Own[s] a number of shares of Common Stock equal to or greater than 5% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis) but fewer than 15% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis), the Stockholder[s] holding a majority of the Stockholder[s] Shares or [their] [its] permitted assignees, as applicable, shall have the right to nominate, in the aggregate, a number of Nominees equal to one (1) less the number of Stockholder Directors who are not up for election.

(d) The Company shall take all actions necessary to ensure that: (i) the applicable Nominees are included in the Board's slate of nominees to the stockholders of the Company for each election of Directors; and (ii) each applicable Nominee up for election is included in the proxy statement prepared by management of the Company in connection with soliciting proxies for every meeting of the stockholders of the Company called with respect to the election of members of the Board, and at every adjournment or postponement thereof, and on every action or approval by written consent of the stockholders of the Company or the Board with respect to the election of members of the Board.

(e) If a vacancy occurs because of the death, disability, disqualification, resignation, or removal of a Stockholder Director or for any other reason, the Stockholder[s] holding a majority of the Stockholder[s] Shares shall be entitled to designate such person's successor, and the Company will, within ten (10) days of such designation, take all necessary and desirable actions within its control such that such vacancy shall be filled with such successor Nominee. Notwithstanding anything to the contrary, the director position for such Stockholder Director shall not be filled pending such designation and appointment, unless the Stockholder[s] fail[s] to designate such Nominee for more than fifteen (15) days, after which the Company may appoint a successor Director until the Stockholder[s] make[s] such designation.

(f) If a Nominee is not elected because of such Nominee's death, disability, disqualification, withdrawal as a nominee or for any other reason, the Stockholder[s] holding a majority of the Stockholder[s] Shares shall be entitled to designate promptly another Nominee and the Company will take all necessary and desirable actions within its control such that the director position for which such Nominee was nominated shall not be filled pending such designation or the size of the

---

(5)    HGM Only.

(6)    HGM Only.

D-2

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1021 of 1110    PageID 2642

Table of Contents

Board shall be increased by one and such vacancy shall be filled with such successor Nominee within ten (10) days of such designation. Notwithstanding anything to the contrary, the director position for which such Nominee was nominated shall not be filled pending such designation and appointment, unless the Stockholder[s] fail[s] to designate such Nominee for more than thirty (30) days, after which the Company may appoint a successor nominee who may serve as a director if duly elected until the Stockholder[s] make[s] such designation.

(g)    The Company shall pay the reasonable, documented out-of-pocket expenses incurred by each Stockholder Director in connection with his or her services provided to or on behalf of the Company, including attending meetings or events attended explicitly on behalf of the Company at the Company's request.

(h)    In accordance with the Company's Bylaws, the Board may from time to time by resolution establish and maintain one or more committees of the Board, each committee to consist of one or more Directors. To the extent feasible, the Company shall notify the Stockholder[s] in writing of any new committee of the Board to be established at least fifteen (15) days prior to the effective establishment of such committee. If requested by the Stockholder[s] holding a majority of the Stockholder[s] Shares, the Company shall take all necessary steps to cause at least one Stockholder Director as requested by Stockholder[s] to be appointed as a member of each such committee of the Board unless such designation would violate any legal restriction on such committee's composition or the rules and regulations of any applicable exchange on which the Company's securities may be listed.

(i)    The Company shall (i) purchase directors' and officers' liability insurance in an amount determined by the Board to be reasonable and customary and (ii) for so long as any Director to the Board nominated pursuant to the terms of this Agreement serves as a Director of the Company, maintain such coverage with respect to such Director; *provided* that upon removal or resignation of such Director for any reason, the Company shall take all actions reasonably necessary to extend such directors' and officers' liability insurance coverage for a period of not less than six (6) years from any such event in respect of any act or omission occurring at or prior to such event.

(j)    For so long as any Stockholder Director serves as a Director of the Company, the Company shall not amend, alter or repeal any right to indemnification or exculpation covering or benefiting any Director nominated pursuant to this Agreement as and to the extent consistent with applicable law, including but not limited to Article Sixth of the Second Amended and Restated Certificate of Incorporation of the Company and Article VII of the Amended and Restated Bylaws of the Company (whether such right is contained in the Second Amended and Restated Certificate of Incorporation, Amended and Restated Bylaws or another document) (except to the extent such amendment or alteration permits the Company to provide broader indemnification or exculpation rights on a retroactive basis than permitted prior thereto).

(k)    Notwithstanding anything herein to the contrary, if the Stockholder[s] [has][have] the right to designate one or more Nominees and either has not exercised such right or such Nominee has not been elected as a Stockholder Director, then the Stockholder[s] holding a majority of the Stockholder[s] Shares may elect at such time in [its] [their] sole discretion to designate one Board observer (regardless of how many rights to designate such Stockholder[s] [has] [have]) (each, a "***Board Observer***") to attend and participate in all meetings of the Board or any committees thereof, in a non-voting capacity by the giving of written notice to the Company of such election ("***Observation Election***"). In connection therewith, the Company shall simultaneously give such Board Observer copies of all notices, consents, minutes and other materials, financial or otherwise, which the Company provides to the Board, provided, however, that if the Board Observer does not, upon the request of the Company, before attending any meetings of the Board, execute and

<div align="center">D-3</div>

Supp.App. 1019

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 1022 of 1110 PageID 2643

deliver to the Company an agreement to abide by all Company policies applicable to members of the Board and a confidentiality agreement reasonably acceptable to the Company, the Board Observer may be excluded from access to any material or meeting or portion thereof if the Board determines in good faith that such exclusion is reasonably necessary to protect highly confidential proprietary information of the Company or confidential proprietary information of third parties that the Company is required to hold in confidence, or for other similar reasons. The Stockholder[s] holding a majority of the Stockholder[s] Shares may revoke any such Observation Election at any time upon written notice to the Company after which the Stockholder[s] shall be entitled to designate a replacement Board Observer.

(l) The Nominees and any nominees designated by [the HGM Group] [Apollo] (as defined in the Director Nomination Agreement, dated as of the Effective Time, among the members of [the HGM Group] [Apollo] and the Company may, but do not need to qualify as "independent" pursuant to listing standards of the Nasdaq stock market ("*NASDAQ*"). All other directors of the Board other than the Chief Executive Officer of the Company shall qualify as "independent" pursuant to listing standards of NASDAQ.

Section 2. *Negative Covenants/Actions Requiring Special Approval.*

(a) *Actions Requiring Special Approval.* Without the prior approval of the Stockholder[s] holding a majority of the Stockholder[s] Shares, from and after the Effective Time until such time as when the Stockholder[s] (together with [their] [its] Affiliates and permitted assignees) cease[s] to Beneficially Own a number of shares of Common Stock equal to or greater than 15% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis), the Company shall not, and shall cause each of its subsidiaries not to, take or omit to take, as applicable, or agree to take or omit to take, as applicable, directly or indirectly, any of the actions enumerated in the following clauses (i) through (x) (the "*Consent Actions*"):

(i) any engagement by the Company or any subsidiary of the Company, directly or indirectly, in one or a series of related transactions with (1) any Affiliate of the Company, (2) any member of [the HGM Group] [Apollo] or any of their respective Affiliates, (3) any Person that Beneficially Owns at least 10% of the issued and outstanding Common Stock or any of such Person's Affiliates, or (4) any parent, child, sibling or spouse who resides with, or is a dependent of, any Person described in the foregoing clauses (1)-(3), in each case other than (i) those transactions set forth on Schedule 2(a) or (ii) transactions entered into on arm's-length terms that are approved in accordance with the Company's "Related Party Policy" or such successor policy; provided, however, that in respect of a transaction pursuant to clause (ii) herein involving aggregate consideration in excess of $10 million, the Company will deliver an opinion to the Board as to the fairness to the Company or such subsidiary issued by an accounting, appraisal or investment banking firm of national standing;

(ii) adopting any equity incentive plan other than such plan approved by all parties as of the Effective Time or amending such equity incentive plan to increase the number of securities that may be granted under such plan;

(iii) any issuance of equity of the Company or any subsidiary of the Company, including any options, warrants or other securities convertible or exchangeable for any equity securities other than (A) equity securities issued pursuant to an approved equity incentive plan, (B) equity securities with a fair market value of $100 million or less (or rights, options or warrants to purchase such equity securities) issued solely in consideration for the acquisition (by merger or otherwise) of assets of, or equity interests in, another entity or (C) equity securities (or rights, options or warrants to purchase equity securities) issued to lenders, equipment lessors, other financing sources or vendors who have provided the Company with

D-4

financing or services, as applicable; provided, that such arrangements are approved by the majority vote of the Board;

(iv)  any amendment to the Certificate of Incorporation, Bylaws or any other organizational documents of the Company or any subsidiary of the Company that either (x) adversely affects Stockholder's rights under this agreement or (y) has a disproportionate impact on the interests of the Stockholder;

(v)  entrance into any line of business or a change in an existing line of business that is unrelated to any line of business conducted by the Company or any subsidiary of the Company as of the Effective Time; or

(vi)  an increase or decrease in the size of the Board (other than in compliance with the obligations of this Agreement) or a change to the classes on which the Board members serve.

Notwithstanding the foregoing, in the event that the Company has requested in writing (consistent with Section 6) the prior approval of the Stockholder[s] to take an action set forth in this Section 2(a), and the Stockholder[s] have not responded within ten (10) business days after receiving such request, the Stockholder[s] shall be deemed to have provided their prior approval for purposes of this Section 2(a).

Section 3.    *Definitions.*

"*Affiliate*" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with, such first Person.

"*Agreement*" has the meaning set forth in the preamble.

["*Apollo*" means Apollo Novitex Holdings, L.P.]

"*Beneficially Own*" has the meaning ascribed to it in Section 13(d) of the Securities Exchange Act of 1934, as amended.

"*Board*" has the meaning set forth in recitals.

"*Board Observer*" has the meaning set forth in Section 1(k).

"*Business Combination Agreement*" means that certain Business Combination Agreement, dated as of February 21, 2017, among Quinpario Acquisition Corp. 2, Quinpario Merger Sub I, Inc., Quinpario Merger Sub II, Inc., Novitex Holdings, Inc., SourceHOV Holdings, Inc., Novitex Parent, L.P., HOVS LLC and HandsOn Fund 4 I, LLC, as amended or modified from time to time.

"*Business Day*" means any day that is not a Saturday, Sunday, legal holiday or other day on which commercial banks in New York, New York are authorized or required by applicable law to close.

"*Bylaws*" means the Company's Bylaws, as in effect on the date hereof, as the same may be amended from time to time.

"*Certificate of Incorporation*" means the Company's Certificate of Incorporation, as in effect on the date hereof, as the same may be amended from time to time.

"*Common Stock*" has the meaning set forth in the recitals.

"*Company*" has the meaning set forth in the preamble.

"*Director*" means a member of the Board until such individual's death, disability, disqualification, resignation, or removal.

D-5

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1024 of 1110    PageID 2645

"**Effective Time**" means the [SourceHOV Effective Time][Novitex Effective Time] (as defined in the Business Combination Agreement).

["**HGM Group**" means, collectively, HOVS LLC, HOVS Capital III LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and Ex-Sigma LLC.]

"**NASDAQ**" has the meaning set forth in *Section 1(l)*.

"**Nominee**" has the meaning set forth in *Section 1(a)*.

"**Observation Election**" has the meaning set forth in Section 1(k).

"**Person**" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a governmental entity or any department, agency or political subdivision thereof.

"**Stockholder[s]**" has the meaning set forth in the preamble.

"**Stockholder Director**" means an individual elected to the Board that has been nominated by the Stockholder[s] pursuant to this Agreement.

"**Stockholder[s] Shares**" means the number of shares of Common Stock held by the Stockholder[s] (as such number of shares may be equitably adjusted or exchanged pursuant to *Section 7*).

"**Termination Event**" has the meaning set forth in *Section 17*.

"**Transfer**" means any sale, transfer, assignment or other disposition of (whether with or without consideration and whether voluntary or involuntary or by operation of law) of Common Stock.

Section 4.    *Assignment; Benefit of Parties; Transfer.*    No party may assign this Agreement or any of its rights or obligations hereunder and any assignment hereof will be null and void except that the Stockholder[s] who is entitled to designate any Nominees hereunder may assign, in whole, but not in part, this Agreement as part of a transfer of its Common Stock and provided that the assignee executes a joinder agreement pursuant to which such assignee agrees to be bound by the terms hereof as a Stockholder hereunder. This Agreement shall be binding upon and shall inure to the benefit of the parties hereto and their respective successors, legal representatives and assignees for the uses and purposes set forth and referred to herein. Nothing herein contained shall confer or is intended to confer on any third party or entity that is not a party to this Agreement any rights under this Agreement.

Section 5.    *Remedies.*    The Company and the Stockholder[s] shall be entitled to enforce their rights under this Agreement specifically, to recover damages by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that a breach of this Agreement would cause irreparable harm and money damages would not be an adequate remedy for any such breach and that, in addition to other rights and remedies hereunder, the Company and the Stockholder[s] shall be entitled to specific performance and/or injunctive or other equitable relief (without posting a bond or other security) from any court of law or equity of competent jurisdiction in order to enforce or prevent any violation of the provisions of this Agreement.

Section 6.    *Notices.*    Any notice provided for in this Agreement shall be in writing and shall be either personally delivered, or mailed first class mail (postage prepaid, return receipt requested) or sent by reputable overnight courier service (charges prepaid) to the Company at the addresses set forth below and to the Stockholder[s] at the addresses set forth in the Registration Rights Agreement, dated as of the Effective Time, among the Company and the stockholders party thereto. Notices shall be deemed to have been given hereunder when delivered personally, three days after deposit in the U.S. mail and one day after deposit with a reputable overnight courier service.

Supp.App. 1022

Table of Contents

[Combined Company]
12935 N. Forty Drive, Suite 201
St. Louis, MO 63141
Telephone: (314) 548-6200
Facsimile: (775) 206-7966
Email: djsrivisal@quinpario.com
Attention: D. John Srivisal

Section 7.    *Adjustments.*    If, and as often as, there are any changes in the Common Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made in the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Common Stock as so changed.

Section 8.    *No Strict Construction.*    The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their mutual intent, and no rule of strict construction shall be applied against any party.

Section 9.    *No Third-Party Beneficiaries.*    Nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or give to, any person or entity other than the parties hereto and their respective successors and assigns any remedy or claim under or by reason of this Agreement or any terms, covenants or conditions hereof, and all of the terms, covenants, conditions, promises and agreements contained in this Agreement shall be for the sole and exclusive benefit of the parties hereto and their respective successors and assigns.

Section 10.    *Further Assurances.*    Each of the parties hereby agrees that it will hereafter execute and deliver any further document, agreement, instruments of assignment, transfer or conveyance as may be necessary or desirable to effectuate the purposes hereof.

Section 11.    *Counterparts.*    This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format, each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

Section 12.    *Governing Law.*    All issues and questions concerning the construction, validity, interpretation and enforceability of this Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of Delaware, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the laws of any jurisdiction other than the State of Delaware.

Section 13.    *Mutual Waiver of Jury Trial.*    The parties hereto hereby irrevocably waive any and all rights to trial by jury in any legal proceeding arising out of or related to this Agreement. Any action or proceeding whatsoever between the parties hereto relating to this Agreement shall be tried in a court of competent jurisdiction by a judge sitting without a jury.

Section 14.    *Complete Agreement; Inconsistent Agreements.*    This Agreement represents the complete agreement between the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings between the parties.

Section 15.    *Severability.*    In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall

D-7

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 1026 of 1110     PageID 2647

endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

Section 16.    *Amendment and Waiver*.    Except as otherwise provided herein, no modification, amendment or waiver of any provision of this Agreement shall be effective against the Company or the Stockholder[s] unless such modification is approved in writing by the Company and the Stockholder[s] holding a majority of the Stockholder[s] Shares. The failure of any party to enforce any of the provisions of this Agreement shall in no way be construed as a waiver of such provisions and shall not affect the right of such party thereafter to enforce each and every provision of this Agreement in accordance with its terms.

Section 17.    *Termination*.    Notwithstanding anything to the contrary contained herein, if the Stockholder[s] (together with [their] [its] Affiliates and permitted assignees) cease[s] to Beneficially Own a number of shares of Common Stock equal to or greater than 5% of the total number of shares of Common Stock issued and outstanding (on a non-fully diluted basis) ("***Termination Event***"), then this Agreement shall expire and terminate automatically; provided, however, that *Sections 1(g), (i), (j) and (k) and 3-16* shall survive the termination of this Agreement.

**[SIGNATURE PAGES FOLLOW]**

D-8

**Schedule 2(a)**

1.    Master Agreement (and corresponding schedules) between Rule 14, LLC and SourceHOV, LLC dated January 1, 2015

2.    Master Agreement (and corresponding schedules) between Athena LLC and SourceHOV, LLC dated September 6, 2015

3.    Master Agreement (and corresponding schedules) between Peri Technologies LLC and SourceHOV, LLC, dated October 28, 2015

4.    Master Agreement (and corresponding schedules) between Teletype LLC and SourceHOV, LLC, dated November 30, 2015

5.    Master Agreement (and corresponding schedules) between BNCM8 LLC and SourceHOV, LLC, dated April 12, 2016

6.    Master Agreement (and corresponding schedules) between Zuma Technologies LLC and SourceHOV, LLC, dated January 30, 2016

7.    Master Agreement (and corresponding schedules) between RDH Technologies LLC and SourceHOV, LLC, dated December 15, 2016

8.    Master Agreement (and corresponding schedules) between JET Technologies LLC and SourceHOV, LLC, dated December 2, 2015

9.    Master Agreement (and corresponding schedules) between Go Speak Up LLC and SourceHOV, LLC, dated December 2, 2015

10.   Master Agreement (and corresponding schedules) between Spring Health LLC and SourceHOV, LLC, November 24, 2015

11.   Lease agreement between HOVG, LLC (aka Bay Area Credit Service LLC) and HOVRe LLC in connection with the lease of a facility in Antioch, CA, dated December 1, 2008

12.   Affiliate lease agreement for rental property occupied by Banc Tec India Private Ltd. on SB Road in Pune, India

13.   HOV Services, Ltd. providing IT services to HOV Services, Inc., dated July 1, 2016.

14.   HOV Services, Ltd. providing Firefly services to HOV Services, Inc., dated July 1, 2016

15.   HOVS LLC Services Limited providing certain software support and consultancy services for HOVS LLC, effective from July 1, 2016.

16.   HOV Services Limited providing certain data conversion services and software support and consultancy services for Source HOV, LLC, effective from July 1, 2016.

17.   Trademark License Agreement, dated April 29, 2011, by and between HOF 2 LLC and SourceHOV

18.   Agreement between HOVG, LLC (aka Bay Area Credit Service LLC) and HOV Services Limited in connection with software and IT support and maintenance dated October 15, 2013 and related work orders effective from July 2016.

19.   Master Agreement between Rule 14, LLC and DFG2, LLC dated January 8, 2014

20.   The Tripartite Agreement between HOV Services Limited, BancTec TPS India Private Limited, and TransCentra FTS Private Limited, dated November 14, 2016

21.   Lease and License Agreement between HOV Services Limited and BancTec TPS India Private Limited, dated October 27, 2015

D-9

Supp.App. 1025

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the day and year first above written.

<div align="center">

**Company:**

**EXELA TECHNOLOGIES, INC.**

By: _____

Name:
Title:

</div>

<div align="center">D-10</div>

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1029 of 1110    PageID 2650

Table of Contents

**Stockholder[s]:**

[                         ]

By: _____

Name:
Title:

D-11

Supp.App. 1027

**Annex E**

**AMENDED & RESTATED REGISTRATION RIGHTS AGREEMENT**

**by and among**

**EXELA TECHNOLOGIES, INC.**

**and**

**THE HOLDERS**

**Dated as of [    ], 2017**

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1031 of 1110    PageID 2652

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| 1. | Definitions | | E-1 |
| 2. | Shelf Registrations | | E-5 |
| 3. | Demand Registrations | | E-7 |
| 4. | Piggyback Takedowns | | E-9 |
| 5. | Priority | | E-9 |
| 6. | Suspension Period | | E-10 |
| 7. | Holdback Agreements | | E-11 |
| 8. | Company Undertakings | | E-12 |
| 9. | Registration Expenses | | E-17 |
| 10. | Indemnification; Contribution | | E-17 |
| 11. | Participation in Underwritten Offering/Sale of Registrable Securities | | E-20 |
| 12. | Rule 144 | | E-20 |
| 13. | Private Placement | | E-20 |
| 14. | Transfer of Registration Rights | | E-20 |
| 15. | Amendment, Modification and Waivers; Further Assurances | | E-21 |
| 16. | Miscellaneous | | E-21 |

Supp.App. 1029

**AMENDED & RESTATED REGISTRATION RIGHTS AGREEMENT**

THIS AMENDED & RESTATED REGISTRATION RIGHTS AGREEMENT (this "***Agreement***") is made as of [         ], 2017 (the "***Effective Date***") by and among Exela Technologies, Inc., a Delaware corporation (the "***Company***"), and the parties identified as "***Holders***" set forth on *Schedule 1* hereto and any parties identified on the signature page of any joinder agreements executed and delivered pursuant to *Section 14* hereof (each a "***Holder***" and, collectively, the "***Holders***"). Capitalized terms used but not otherwise defined herein are defined in *Section 1* hereof.

**RECITALS:**

**WHEREAS**, reference is hereby made to that certain Business Combination Agreement, dated as of [        ], 2017, as it may hereafter be amended or supplemented (the "***Business Combination Agreement***"), among the Company (f/k/a Quinpario Acquisition Corp. 2), a Delaware corporation, [ • ], a Delaware corporation, Novitex Holdings, Inc., a Delaware corporation, SourceHOV LLC, a Delaware limited liability company, Apollo Novitex Holdings, L.P. ("***Apollo***") and the members of the HGM Group;

**WHEREAS**, the Company and the investors party thereto are parties to that certain Registration Rights Agreement, dated as of January 15, 2015 (the "***QPAC Registration Rights Agreement***");

**WHEREAS**, Novitex Holdings, Inc. and the holders party thereto are parties to that certain Registration Rights Agreement, dated as of October 11, 2013 (the "***Novitex Registration Rights Agreement***"); and

**WHEREAS**, the Holders and the Company desire to enter into this Agreement to provide the Holders with certain rights relating to the registration of the Common Stock held by them as of the Effective Date and to amend and restate the Novitex Registration Rights Agreement and to replace the QPAC Registration Rights Agreement.

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and each of the Holders hereby agree as follows:

1. **Definitions.**

"***Affiliate***" of any particular Person means any other Person directly or indirectly controlling, controlled by or under common control with such Person. Notwithstanding the foregoing, with respect to Apollo, the term "Affiliate" shall include any investment fund, the sole owner of which is or, if not the sole owner, the primary investment managers of which are Apollo Management VII, L.P., Apollo Global Management, LLC, or their respective Affiliates (including their respective successors and Subsidiaries, but excluding their respective portfolio companies).

"***Agreement***" has the meaning specified in the first paragraph hereof.

"***Apollo***" has the meaning set forth in the recitals.

"***Apollo Demand Holders***" means, subject to *Section 3(g)* and *Section 14*, Apollo.

"***Automatic Shelf Registration Statement***" means an "automatic shelf registration statement" as defined in Rule 405 promulgated under the Securities Act.

"***beneficially own***", "***beneficial ownership***" and any similar phrase as such terms are used in Rule 13d-3 and Rule 13d-5 promulgated under the Exchange Act, except that in calculating the beneficial ownership of any Holder, such Holder shall be deemed to have beneficial ownership of all securities that such Holder has the right to acquire, whether such right is currently exercisable or is exercisable only upon the occurrence of a subsequent condition.

E-1

Supp.App. 1030

"**Board**" means the Board of Directors of the Company.

"**Business Combination Agreement**" has the meaning set forth in the recitals.

"**Business Day**" means any day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by applicable law or executive order to close.

"**Commission**" means the United States Securities and Exchange Commission or any successor governmental agency.

"**Common Stock**" means the shares of common stock, par value $[0.0001] per share, of the Company.

"**Company**" has the meaning specified in the first paragraph hereof.

"**Company Demand Registration Notice**" has the meaning specified in *Section 3(b)*.

"**Company Shelf Takedown Notice**" has the meaning specified in *Section 2(d)*.

"**control**" (including the terms "*controlling*," "*controlled by*" and "*under common control with*") means, unless otherwise noted, the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting shares, by contract, or otherwise.

"**Counsel to the Holders**" means, with respect to any offering of Registrable Securities hereunder, one firm of counsel, plus any local or foreign counsel, selected by the Holders of a majority of the Registrable Securities requested to be included in such offering and acceptable to the Apollo Demand Holders and the HGM Demand Holders.

"**Demand Holder**" shall mean any of (i) the Apollo Demand Holders and (ii) the HGM Demand Holders.

"**Demand Registration**" has the meaning specified in *Section 3(a)*.

"**Demand Registration Notice**" has the meaning specified in *Section 3(b)*.

"**Demand Shelf Takedown Notice**" has the meaning specified in *Section 2(d)*.

"**Disclosure Package**" means, with respect to any offering of securities, (i) the preliminary Prospectus, (ii) the price to the public and the number of securities included in the offering; (iii) each Free Writing Prospectus and (iv) all other information that is deemed, under Rule 159 promulgated under the Securities Act, to have been conveyed to purchasers of securities at the time of sale of such securities (including a contract of sale).

"**Effective Date**" has the meaning specified in the first paragraph hereof.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended from time to time.

"**FINRA**" means the Financial Industry Regulatory Authority.

"**Forfeiture Agreement**" has the meaning ascribed to such term in the Business Combination Agreement.

"**Form S-1 Shelf**" has the meaning specified in *Section 2(a)*.

"**Form S-3 Shelf**" has the meaning specified in *Section 2(a)*.

"**Founder Shares**" has the meaning specified in *Section 7(a)*.

"**Free Writing Prospectus**" means any "free writing prospectus" as defined in Rule 405 promulgated under the Securities Act.

E-2

---

Supp.App. 1031

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 1034 of 1110　　PageID 2655

"*HGM*" has the meaning set forth in the recitals.

"*HGM Demand Holders*" means, subject to *Section 3(g)* and *Section 14*, the HGM Group.

"*HGM Group*" means, collectively, HOVS LLC, HOVS Capital III LLC, Stern Capital LLC, Sunraj LLC, Pidgin Associates LLC, HandsOn Fund 4 I, LLC, Sonino LLC and New LLC.

"*Holder*" and "*Holders*" have the meanings given to those terms in the first paragraph hereof; *provided* that Third Party Holders shall not be considered Holders for purposes of Sections 2(c), 2(d) or 3.

"*Holder Free Writing Prospectus*" means each Free Writing Prospectus prepared by or on behalf of the relevant Holder or used or referred to by such Holder in connection with the offering of Registrable Securities.

"*Lock-Up Period*" has the meaning specified in *Section 7(b)*.

"*Long-Form Registration*" has the meaning specified in *Section 3(a)*.

"*Losses*" has the meaning specified in *Section 10(a)*.

"*NASDAQ*" means the NASDAQ Stock Market.

"*New LLC*" has the meaning ascribed to such term in the Business Combination Agreement and, in connection with the PIPE Financing or otherwise as the context so requires, shall also include [         ], the special purpose vehicle that is a wholly-owned subsidiary of New LLC and the borrower under the PIPE Financing and which will hold the PIPE Financing Collateral Shares as of the closing of the PIPE Financing.

"*Novitex Registration Rights Agreement*" has the meaning set forth in the recitals.

"*Person*" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a governmental entity or any department, agency or political subdivision thereof or any other entity.

"*Piggyback Registration*" has the meaning specified in *Section 4(a)*.

"*Piggyback Takedown*" has the meaning specified in *Section 4(a)*.

"*PIPE Financing*" means the financing pursuant to that certain commitment letter among the lenders party thereto and SourceHOV, dated the date hereof, the net proceeds of which will be used to purchase shares of Common Stock and Preferred Stock as part of the PIPE Investment (as defined in the Business Combination Agreement) concurrently with the closing of the transactions contemplated by the Business Combination Agreement.

"*PIPE Financing Collateral Shares*" means the shares of Common Stock and Preferred Stock that will be collateral for the PIPE Financing, including any PIPE Financing Shares and any shares of Common Stock issued or exchanged pursuant to the Business Combination Agreement.

"*PIPE Financing Shares*" means the shares of Common Stock and Preferred Stock issued to New LLC as part of the PIPE Investment (as defined in the Business Combination Agreement).

"*Preferred Stock*" means the preferred stock of the Company to be issued as part of the PIPE Investment (as defined in the Business Combination Agreement).

"*Prospectus*" means the prospectus used in connection with a Registration Statement.

"*QPAC Founders*" means Edgar G. Hotard, W. Thomas Jagodinski, Ilan Kaufthal, Roberto Mendoza, Dr. John Rutledge and Shlomo Yanai.

"*QPAC Holders*" means Quinpario Partners 2, LLC and, subject to *Section 14*, its assignees.

E-3

Table of Contents

"**QPAC Registration Rights Agreement**" has the meaning set forth in the recitals.

"**Registrable Securities**" means at any time any shares of Common Stock held or beneficially owned by any Holder, including any Common Stock issued or exchanged pursuant to the Business Combination Agreement, and any PIPE Financing Shares; *provided*, *however*, that as to any Registrable Securities, such securities shall cease to constitute Registrable Securities upon the earliest to occur of: (x) the date on which such securities are disposed of pursuant to an effective registration statement under the Securities Act; (y) the date on which such securities are disposed of pursuant to Rule 144 (or any successor provision) promulgated under the Securities Act; and (z) the date on which such securities cease to be outstanding.

"**Registration Expenses**" means all expenses (other than underwriting discounts and commissions) arising from or incident to the registration of Registrable Securities in compliance with this Agreement, including:

(i)  stock exchange, Commission, FINRA and other registration and filing fees,

(ii)  all fees and expenses incurred in connection with complying with any securities or blue sky laws (including fees, charges and disbursements of counsel in connection with blue sky qualifications of the Registrable Securities),

(iii)  all printing, messenger and delivery expenses,

(iv)  the fees, charges and disbursements of counsel to the Company and of its independent public accountants and any other accounting and legal fees, charges and expenses incurred by the Company (including any expenses arising from any special audits or "*comfort letters*" required in connection with or incident to any sale of Registrable Securities pursuant to a registration),

(v)  the fees and expenses incurred in connection with the listing of the Registrable Securities on NASDAQ (or any other national securities exchange),

(vi)  the fees and expenses incurred in connection with any "*road show*" for underwritten offerings, including travel expenses, and

(vii)  reasonable and documented out-of-pocket fees, charges and disbursements of Counsel to the Holders, including, for the avoidance of doubt, any expenses of Counsel to the Holders in connection with the filing or amendment of any Registration Statement, Prospectus or Free Writing Prospectus hereunder;

Provided that, in no instance shall Registration Expenses include Selling Expenses.

"**Registration Statement**" means any registration statement filed hereunder or in connection with a Piggyback Takedown.

"**Requesting Holder**" has the meaning specified in *Section 3(a)*.

"**Restricted Shares**" has the meaning specified in *Section 7(a)*.

"**Securities Act**" means the Securities Act of 1933, as amended from time to time.

"**Selling Expenses**" means the underwriting fees, discounts, selling commissions and stock transfer taxes applicable to all Registrable Securities registered by the Holders and legal expenses not included within the definition of Registration Expenses.

"**Shelf**" has the meaning specified in *Section 2(a)*.

"**Shelf Registration**" means a registration of securities pursuant to a registration statement filed with the Commission in accordance with and pursuant to Rule 415 promulgated under the Securities Act (or any successor rule then in effect).

E-4

---

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1036 of 1110    PageID 2657

"**Shelf Takedown**" means either an Underwritten Shelf Takedown or a Piggyback Takedown.

"**Short-Form Registration**" has the meaning specified in *Section 3(a)*.

"**Subsequent Shelf Registration**" has the meaning specified in *Section 2(b)*.

"**Suspension Period**" has the meaning specified in *Section 6(a)*.

"**Transfer**" has the meaning specified in *Section 7(a)*.

"**Third Party Holders**" means the Holders (including any Person who receives the SourceHOV Merger Consideration (as defined in the Business Combination Agreement) and who elects to be treated as a Holder and Third Party Holder hereunder pursuant to its Letter of Transmittal) other than Quinpario Partners 2, LLC, members of the HGM Group, Apollo and, subject to Section 14, their respective assignees (provided that, in connection with any distribution of shares of Common Stock or Preferred Stock by New LLC to the holders of membership interests of New LLC as contemplated by Section 14, such assignees: (i) who are members of the HGM Group shall be deemed to be Holders; and (ii) who are not members of the HGM Group shall have the right to elect to be Third Party Holders.)

"**Underwritten Block Trade**" means an Underwritten Shelf Takedown by means of an underwritten block trade or similar transaction or other transaction with a two-day (or shorter) marketing period.

"**Underwritten Shelf Takedown**" has the meaning specified in *Section 2(c)*.

"**Well-Known Seasoned Issuer**" means a "*well-known seasoned issuer*" as defined in Rule 405 promulgated under the Securities Act and which (i) is a "*well-known seasoned issuer*" under paragraph (1)(i)(A) of such definition or (ii) is a "*well-known seasoned issuer*" under paragraph (1)(i)(B) of such definition and is also eligible to register a primary offering of its securities relying on General Instruction I.B.1 of Form S-3 or Form F-3 under the Securities Act.

2.    **Shelf Registrations.**

(a)    *Filing.*    The Company shall file as promptly as practicable, and in no event later than 45 days after the Effective Date, a Registration Statement for a Shelf Registration on Form S-3 (the "**Form S-3 Shelf**") or, if the Company is ineligible to use a Form S-3 Shelf, a Registration Statement for a Shelf Registration on Form S-1 (the "**Form S-1 Shelf,**" and together with the Form S-3 Shelf (and any Subsequent Shelf Registration), the "**Shelf**") covering the resale of the Registrable Securities on a delayed or continuous basis. The Company shall use reasonable best efforts to cause the Shelf to become effective as soon as practicable after such filing. The Shelf shall provide for the resale of Registrable Securities from time to time, and pursuant to any method or combination of methods legally available to, and requested by, the Holders. The Company shall maintain the Shelf in accordance with the terms hereof, and shall prepare and file with the Commission such amendments, including post-effective amendments, and supplements as may be necessary to keep such Shelf effective and in compliance with the provisions of the Securities Act until such time as there are no longer any Registrable Securities. In the event the Company files a Form S-1 Shelf, the Company shall use its reasonable best efforts to convert the Form S-1 Shelf (and any Subsequent Shelf Registration) to a Form S-3 Shelf as soon as practicable after the Company is eligible to use Form S-3.

(b)    *Subsequent Shelf Registration.*    If any Shelf ceases to be effective under the Securities Act for any reason at any time while Registrable Securities are still outstanding, the Company shall use its commercially reasonable efforts to as promptly as is reasonably practicable cause such Shelf to again become effective under the Securities Act (including obtaining the prompt withdrawal of any order suspending the effectiveness of such Shelf), and shall use its commercially reasonable efforts to as promptly as is reasonably practicable amend such Shelf in a manner reasonably expected to result in the withdrawal of any order suspending the effectiveness of such Shelf or file an additional registration

E-5

statement as a Shelf Registration (a "**Subsequent Shelf Registration**") registering the resale from time to time by the Holders thereof of all securities that are Registrable Securities as of the time of such filing. If a Subsequent Shelf Registration is filed, the Company shall use its commercially reasonable efforts to (i) cause such Subsequent Shelf Registration to become effective under the Securities Act as promptly as is reasonably practicable after the filing thereof (it being agreed that the Subsequent Shelf Registration shall be an Automatic Shelf Registration Statement if the Company is a Well-Known Seasoned Issuer) and (ii) keep such Subsequent Shelf Registration continuously effective and usable until there are no longer any Registrable Securities. Any such Subsequent Shelf Registration shall be on Form S-3 to the extent that the Company is eligible to use such form. Otherwise, such Subsequent Shelf Registration shall be on another appropriate form and shall provide for the registration of such Registrable Securities for resale by the Holders in accordance with any reasonable method of distribution elected by the Demand Holders and the QPAC Holders. Notwithstanding the foregoing, the Company shall not be required to file a Subsequent Shelf Registration if (i) the aggregate amount of Registrable Securities represents less than 5% of the then outstanding Common Stock and (ii) the Company is ineligible to use a Form S-3 Shelf; *provided* that the Company shall be required to file a Subsequent Shelf Registration if it thereafter becomes eligible to use a Form S-3 Shelf.

(c)    *Requests for Underwritten Shelf Takedowns.*    At any time and from time to time after the Shelf has been declared effective by the Commission, any Apollo Demand Holder or HGM Demand Holder may request to sell all or any portion of their Registrable Securities in an underwritten offering that is registered pursuant to the Shelf (each, an "**Underwritten Shelf Takedown**").

(d)    *Demand Notices.*    All requests for Underwritten Shelf Takedowns shall be made by giving written notice to the Company (the "**Demand Shelf Takedown Notice**"). Each Demand Shelf Takedown Notice shall specify the approximate number of Registrable Securities proposed to be sold in the Underwritten Shelf Takedown and the expected price range (net of underwriting discounts and commissions) of such Underwritten Shelf Takedown. Within three days after receipt of any Demand Shelf Takedown Notice (except with respect to an Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing), the Company shall give written notice of such requested Underwritten Shelf Takedown to all other Holders of Registrable Securities (the "**Company Shelf Takedown Notice**") and, subject to the provisions of *Section* 5 below, shall include in such Underwritten Shelf Takedown all Registrable Securities with respect to which the Company has received written requests for inclusion therein within ten days after sending the Company Shelf Takedown Notice.

(e)    *Selection of Underwriters.*    Apollo and the HGM Group, acting together, (or the HGM Group, acting alone, with respect to an Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing) shall have the right to select the investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the Company's prior approval which shall not be unreasonably withheld, conditioned or delayed.

(f)    *Other Registration Rights.*    The Company represents and warrants that it is not a party to, or otherwise subject to, any other agreement granting registration rights to any other Person with respect to any securities of the Company, including securities convertible, exercisable or exchangeable into or for shares of any equity securities of the Company, except for (i) the provisions of Section 7.16(h) of the Business Combination Agreement, (ii) that certain Warrant Agreement, dated January 15, 2015, between the Company and Continental Stock Transfer & Trust Company, providing for the registration of the resale of an aggregate of 17,500,000 shares of Common Stock issuable upon the exercise of an aggregate of 35,000,000 warrants to purchase Common Stock, each warrant entitling the holder thereof to purchase one-half of one share of Common Stock and (iii) registration rights pursuant to those

E-6

Supp.App. 1035

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1038 of 1110    PageID 2659

certain Subscription Agreements, dated [            ], 2017, by and between the Company and [            ].(1) Without the prior written consent of Apollo and the HGM Group, the Company will not grant to any holder or prospective holder of any securities of the Company registration rights with respect to such securities which are senior to or otherwise conflict in any material respect with the rights granted pursuant to this Agreement.

3.    **Demand Registrations.**

(a)    *Requests for Registration.*    At any time after the Effective Date, any Demand Holder (in such capacity, the "***Requesting Holder***") may request (i) registration under the Securities Act of all or any portion of the Registrable Securities held by such Requesting Holder on Form S-3 or any similar short-form registration (a "***Short-Form Registration***"), if available, and (ii) registration under the Securities Act of all or any portion of the Registrable Securities held by such Requesting Holder on Form S-1 or similar long-form registration (a "***Long-Form Registration***") if Short-Form Registration is not available (any registration under this *Section 3(a)*, a "***Demand Registration***"); *provided* that, in the case of a Demand Registration, such Demand Holder will be entitled to make such demand only if the total offering price of the Registrable Securities to be sold in such offering (including piggyback shares and before deduction of underwriting discounts) is reasonably expected to exceed, in the aggregate, $25,000,000 (or in the case of the HGM Group, the remaining balance of the PIPE Financing if lower). Any Requesting Holder may request that any offering conducted under a Long-Form Registration or a Short-Form Registration be underwritten.

(b)    *Demand Registration Notices.*    All requests for Demand Registrations shall be made by giving written notice to the Company (the "***Demand Registration Notice***"). Each Demand Registration Notice shall specify (i) whether such Demand Registration shall be an underwritten offering, (ii) the approximate number of Registrable Securities proposed to be sold in the Demand Registration and (iii) the expected price range (net of underwriting discounts and commissions) of such Demand Registration. Within five days after receipt of any Demand Registration Notice (except with respect to an Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing), the Company shall give written notice of such requested Demand Registration to all other Holders of Registrable Securities (the "***Company Demand Registration Notice***") and, subject to the provisions of *Section* 5 below, shall include in such Demand Registration all Registrable Securities with respect to which the Company has received written requests for inclusion therein within 10 days after sending the Company Demand Registration Notice.

(c)    *Demand Registration Effectiveness.*    A registration shall not count as one of the permitted Demand Registrations until both (i) it has become effective (unless such Demand Registration has not become effective due solely to the fault of the Demand Holder requesting such registration) and (ii) the Demand Holder initially requesting such registration is able to register and sell pursuant to such registration at least 80% of the Registrable Securities requested to be included in such registration either at the time of the registration or within 90 days thereafter; *provided* that a Demand Registration which is withdrawn at the sole request of the Demand Holder who demanded such Demand Registration will count as a Demand Registration unless the Company is reimbursed by such Demand Holder for all reasonable out-of-pocket expenses incurred by the Company in connection with such registration, including reasonable attorney and accounting fees.

(d)    *Short-Form Registrations.*    Demand Registrations shall be Short-Form Registrations whenever the Company is permitted to use an applicable short form. The Company shall use its reasonable best efforts to make Short-Form Registrations on Form S-3 (or any successor form) available for the sale of Registrable Securities.

---

(1)    NTD: To reference any registration rights agreement, or registration rights contained in a subscription agreement or similar agreement, entered into in connection with a PIPE.

E-7

Supp.App. 1036

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 1039 of 1110     PageID 2660

(e)    *Restrictions on Demand Registrations*.

   (i)    Except in connection with any Demand Registration made by the HGM Demand Holders for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing, the Company shall not be obligated to effect (a) any Long-Form Registration within 90 days or (b) any Short-Form Registration within 45 days, in each case, after the effective date of a previous Demand Registration or a previous registration in which the Holders of Registrable Securities were given piggyback rights pursuant to *Section 4* of this Agreement and in which such Holders were able to register and sell at least 80% of the number of Registrable Securities requested to be included therein. In addition, except in connection with any Demand Registration made by the HGM Demand Holders for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing, the Company shall not be obligated to effect any Demand Registration during the period starting with the date that is 60 days prior to the Board's good faith estimate of the date of filing of, and ending on the date that is 120 days (unless the underwriting agreement requires a longer period of time) after the effective date of, a Company initiated registration statement, *provided* that the Company is actively employing in good faith all commercially reasonable efforts to cause such registration to become effective, and *provided further* that the aggregate number of days that any one or more Demand Registrations are suspended or delayed by operation of this *Section 3(e)(i)* shall not exceed 120 days in any 12-month period. In the event of any such suspension or delay, the Holder of Registrable Securities initially requesting a Demand Registration that is suspended by operation of this *Section 3(e)(i)* shall be entitled to withdraw such request and, if such request is withdrawn, such Demand Registration shall not count as one of the permitted Demand Registrations hereunder, and, notwithstanding the proviso in *Section 3(c)*, the Company shall pay all Registration Expenses in connection with such registration.

   (ii)    The Apollo Demand Holders and the HGM Demand Holders shall each be entitled to request up to five Demand Registrations. In addition, the HGM Demand Holders shall be entitled to request up to three Demand Registrations for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing.

(f)    *Selection of Underwriters*.    The Holders of a majority of the Registrable Securities requested to be included in a Demand Registration which is an underwritten offering (or the HGM Group, acting alone, with respect to an Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing) shall have the right to select the investment banker(s) and manager(s) to administer the offering (which shall consist of one or more reputable nationally recognized investment banks), subject to the approval of the Company, the Apollo Demand Holders and the HGM Demand Holders (except with respect to an Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing), which shall not be unreasonably withheld, conditioned or delayed.

(g)    *Transfer of Demand Rights*.    The rights of a Holder under this *Section 3* may be transferred, assigned or otherwise conveyed in whole or in part, to any transferee or assignee, including any distribution of shares of Common Stock or Preferred Stock by New LLC to the holders of membership interests of New LLC, (other than a transfer pursuant to a registration statement or under Rule 144 promulgated under the Securities Act) who, following such transfer, assignment or conveyance, holds at least [20]% of the outstanding Common Stock held by such Holder as of the Effective Date, *provided* that the requirements of *Section 14* are satisfied. For the avoidance of doubt, any transferee of an Apollo Demand Holder or HGM Demand Holder shall be deemed to be an Apollo Demand Holder or HGM Demand Holder, as applicable, for all purposes of this Agreement (provided that, in connection

E-8

Supp.App. 1037

with any distribution of shares of Common Stock or Preferred Stock by New LLC to the holders of membership interests of New LLC as contemplated by Section 14, such transferees shall only be an HGM Demand Holder if they are members of the HGM Group or otherwise designated as an HGM Demand Holder by New LLC). In the case of any such assignment, the applicable Demand Holder shall inform the Company how many remaining Demand Registrations the transferee shall have, which shall not exceed the maximum number set forth in *Section 3(e)(ii)*.

4. **Piggyback Takedowns.**

(a) *Right to Piggyback.*    Whenever the Company proposes to register any of its securities (whether or not following a request by a Demand Holder), including a registration pursuant to any registration rights agreement not prohibited by this agreement (a "***Piggyback Registration***"), or proposes to offer any Common Stock pursuant to a registration statement in an underwritten offering of Common Stock under the Securities Act (whether or not following a request by a Demand Holder) (together with a Piggyback Registration, a "***Piggyback Takedown***"), the Company shall give prompt written notice to all Holders of Registrable Securities of its intention to effect such Piggyback Takedown. In the case of a Piggyback Takedown that is an underwritten offering under a shelf registration statement, such notice shall be given not less than ten Business Days prior to the expected date of commencement of marketing efforts for such Piggyback Takedown. In the case of a Piggyback Takedown that is an underwritten offering under a registration statement that is not a shelf registration statement, such notice shall be given not less than ten Business Days prior to the expected date of filing of such registration statement. The Company shall, subject to the provisions of *Section 5* below, include in such Piggyback Takedown, as applicable, all Registrable Securities with respect to which the Company has received written requests for inclusion therein within five Business Days after sending the Company's notice. Notwithstanding anything to the contrary contained herein, (i) the Company may determine not to proceed with any Piggyback Takedown upon written notice to the Holders of Registrable Securities requesting to include their Registrable Securities in such Piggyback Takedown; *provided*, *however*, that nothing in this clause (i) shall impair the right of any Demand Holder to request that such registration be effected pursuant to *Section 2* or *Section 3*; (ii) any Holder of Registrable Securities may withdraw its request for inclusion by giving written notice to the Company of its intention to withdraw that registration; *provided*, *however*, that the withdrawal shall be irrevocable and after making the withdrawal, a Holder shall no longer have any right to include its Registrable Securities in that Piggyback Takedown; and (iii) the provisions of this Section 4 shall not apply to any Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing.

(b) *Selection of Underwriters.*    If any Piggyback Takedown is an underwritten offering, the Company will have the sole right to select the investment banker(s) and manager(s), acceptable to the Apollo Demand Holder and the HGM Demand Holders, for the offering.

5. **Priority.**

(a) *Priority on Primary Offerings and Offerings Initiated by Holders of Other Registration Rights.*    If the Company determines, after consultation with the Apollo Demand Holders, the HGM Demand Holders and the managing underwriter in any underwritten Piggyback Takedown that was not initiated by a Demand Holder pursuant to this Agreement, that less than all of the Registrable Securities requested to be included in such underwritten offering can be sold in an orderly manner within a price range acceptable to the Company or the holders of the Company's securities demanding such Piggyback Takedown pursuant to a registration rights agreement not prohibited by this agreement, as applicable, after consultation with the Apollo Demand Holders and the HGM Demand Holders, then the Company shall include in such underwritten Piggyback Registration the number which can be so sold in the following order of priority:

(i) *first*, the securities the Company proposes to sell;

E-9

Supp.App. 1038

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 1041 of 1110　　PageID 2662

(ii) *second*, the Registrable Securities requested to be included in such Piggyback Registration by New LLC for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing; and

(iii) *third*, the other Registrable Securities requested to be included in such Piggyback Registration by the Apollo Demand Holders, the HGM Demand Holders, the QPAC Holders, the Third Party Holders and the holders entitled to participate in such Piggyback Takedown pursuant to a registration rights agreement not prohibited by this agreement, *pro rata* on the basis of the number of shares of Common Stock owned by such Holders; and

(iv) *fourth*, other securities requested to be included in such underwritten Piggyback Takedown.

(b) *Priority on Offerings Initiated by Demand Holders.* If the Holders of a majority of the Registrable Securities requested to be included in any underwritten offering initiated by a Demand Holder pursuant to this Agreement determine, after consultation with the Company and the managing underwriter in such offering, that less than all of the Registrable Securities requested to be included in such underwritten offering can be sold in an orderly manner within a price range acceptable to such Holders, then the Company shall include in such underwritten offering the number which can be so sold in the following order of priority:

(i) *first*, the Registrable Securities requested to be included in accordance with this Agreement by New LLC for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing;

(ii) *second*, the Registrable Securities requested to be included in accordance with this Agreement by the Apollo Demand Holders, the HGM Demand Holders, the QPAC Holders, the Third Party Holders and the holders entitled to participate in such Piggyback Takedown pursuant to a registration rights agreement not prohibited by this agreement, *pro rata* on the basis of the number of shares of Common Stock owned by such Holders;

(iii) *third*, the securities the Company proposes to sell; and

(iv) *fourth*, other securities requested to be included in such underwritten offering.

**6.　Suspension Period.**

(a) *Suspension Period.* Notwithstanding any provision of this Agreement to the contrary, if the Board determines in good faith that the registration and distribution of Registrable Securities (i) would reasonably be expected to materially impede, delay or interfere with, or require premature disclosure of, any material financing, offering, acquisition, merger, corporate reorganization, segment reclassification or discontinuance of operations that is required to be reflected in pro forma or restated financial statements that amends historical financial statement of the Company, or other significant transaction or any negotiations, discussions or pending proposals with respect thereto, involving the Company or any of its subsidiaries, or (ii) would require disclosure of non-public material information, the disclosure of which would reasonably be expected to materially and adversely affect the Company, the Company shall be entitled to suspend, for not more than 60 days (a "***Suspension Period***"), the use of any Registration Statement or Prospectus and shall not be required to amend or supplement the Registration Statement, any related Prospectus or any document incorporated therein by reference; *provided* that a Suspension Period may not suspend more than [30 days] with respect to the use of any Registration Statement or Prospectus for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing. The Company promptly will give written notice of any such Suspension Period to each Person that has securities registered on a Registration Statement filed hereunder.

E-10

(b)  *Limitations on Suspension Periods.*  Notwithstanding anything contained in this *Section 6* to the contrary, the Company shall not be entitled to more than two Suspension Periods in any 12-month period.

**7.  Holdback Agreements.**

(a)  During the period commencing on the Effective Date and continuing until the calendar date that is six months following the Effective Date, no Holder shall offer, sell, contract to sell, pledge, grant any option to purchase, make any short sale or otherwise dispose of or distribute ("*Transfer*") any shares of Common Stock or any securities convertible into, exercisable for, exchangeable for Common Stock, whether now owned or hereinafter acquired but excluding in all cases any PIPE Financing Shares, owned directly by the Holder (including securities held as a custodian) or with respect to which the Holder has beneficial ownership within the rules and regulations of the Commission (collectively, the "*Restricted Shares*"), except in the event the underwriters managing any Shelf Takedown or other underwritten public equity offering by the Company otherwise agree by written consent or pursuant to a Transfer permitted by *Section 7(c)*. The foregoing restriction is expressly agreed to preclude each Holder from engaging in any hedging or other transaction which is designed to or which reasonably could be expected to lead to or result in a sale or disposition of the Restricted Shares even if such Restricted Shares would be disposed of by someone other than such Holder. Such prohibited hedging or other transactions include any short sale or any purchase, sale or grant of any right (including any put or call option) with respect to any of the Restricted Shares of the applicable Holder or with respect to any security that includes, relates to, or derives any significant part of its value from such Restricted Shares. Notwithstanding any other provision to the contrary, the restrictions set forth in this *Section 7(a)* shall not apply to (i) an aggregate of 3,016,071 shares of Common Stock held by the QPAC Holders and the QPAC Founders, as designated by the QPAC Holders pursuant to the Forfeiture Agreement, which may be offered, sold, pledged or otherwise disposed of as of the Effective Date (the "*Founder Shares*"), (ii) any person who ceases to be employed by Novitex after the date of the Business Combination Agreement or (iii) any person who was a director of Novitex prior to the Closing (as defined in the Business Combination Agreement) and is or was not a director of the Company at or subsequent to the Closing.

(b)  *Holders of Registrable Securities.*  In connection with any Shelf Takedown or other underwritten public offering of equity securities by the Company (for the avoidance of doubt, excluding any Underwritten Block Trade for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing), subject to *Section 7(c)*, no Holder of more than 5% of the equity securities of the Company, or any securities convertible into or exchangeable or exercisable for such securities, shall Transfer any Restricted Shares (other than those Registrable Securities included in such registration pursuant to this Agreement), without the prior written consent of the Company, during the seven days prior to and the 90-day period beginning on the date of pricing of such Shelf Takedown or other underwritten public offering (the "*Lock-Up Period*"), except in the event the underwriters managing the Shelf Takedown or other underwritten public equity offering by the Company otherwise agree by written consent or pursuant to a Transfer permitted by *Section 7(c)*. Each such Holder agrees to execute a lock-up agreement in favor of the Company's underwriters to such effect (in each case on substantially the same terms and conditions as all such Holders) and, in any event, that the Company's underwriters in any relevant Shelf Takedown or other underwritten public offering shall be third party beneficiaries of this *Section 7(b)*; *provided* that each such Holder shall only be required to execute such lock-up if the directors and executive officers of the Company have executed a lock-up on terms at least as restrictive with respect to the relevant Shelf Takedown or other underwritten public offering. The provisions of this *Section 7(b)* will no longer apply to a Holder once such Holder ceases to hold Registrable Securities or 5% or less of the equity securities of the Company.

E-11

Supp.App. 1040

(c)   *Permitted Transfers.*    Notwithstanding anything to the contrary set forth in this *Section 7*, a Holder may Transfer Restricted Shares (i) as a *bona fide* gift; (ii) to any trust or entity wholly owned by one or more trusts for the direct or indirect benefit of (A) the Holder or its stockholders, partners, members or beneficiaries or (B) of any individual related to such Holder or to the stockholders, partners, members or beneficiaries of such Holder, by blood, marriage or adoption and not more remote than first cousin; (iii) if a Holder is a corporation, limited liability company, partnership or trust, such Holder may Transfer Restricted Shares to any wholly-owned subsidiary thereof, or to the Affiliates, stockholders, partners, members or beneficiaries of such Holder; (iv) pursuant to any take-over bid, acquisition, sale or merger involving the Company; (v) with the prior written consent of the Company and each other Holder; provided that in each case such distributees or transferees agree to be bound by the restrictions set forth in this *Section 7*. In addition, notwithstanding anything to the contrary set forth in this *Section 7*, a Holder may Transfer shares of Common Stock pursuant to (1) any pledge made by New LLC in connection with the PIPE Financing, (2) any Transfer made by New LLC in connection with a default under the PIPE Financing, (3) any Transfer by New LLC for the purpose of generating proceeds to repay the PIPE Financing or for the purpose of satisfying any collateral maintenance requirement pursuant to the PIPE Financing, or (4) any distribution of shares of Common Stock or Preferred Stock by New LLC to the holders of membership interests of New LLC upon repayment of the PIPE Financing, *provided* that the requirements of *Section 14* are satisfied in connection with such distribution.

(d)   *The Company.*    In connection with any Shelf Takedown, the Company shall not effect any public sale or distribution of its equity securities, or any securities convertible into or exchangeable or exercisable for such securities (except pursuant to registrations on Form S-8 or Form S-4 under the Securities Act), during the seven days prior to and the 90-day period beginning on the date of pricing of such Shelf Takedown or such other period provided in the underwriting, placement or similar agreement executed in connection with such Shelf Takedown.

**8.    Company Undertakings.**

Whenever Registrable Securities are registered pursuant to this Agreement, the Company shall use its commercially reasonable efforts to effect the registration and the sale of such Registrable Securities as soon as reasonably practicable in accordance with the intended method of disposition thereof and pursuant thereto the Company shall as expeditiously as possible:

(a)   before filing a Registration Statement or Prospectus or any amendments or supplements thereto, at the Company's expense, furnish to the Holders whose securities are covered by the Registration Statement copies of all such documents, other than documents that are incorporated by reference, proposed to be filed and such other documents reasonably requested by such Holders, which documents shall be subject to the review and comment of the counsel to such Holders;

(b)   notify each Holder of Registrable Securities of the effectiveness of each Registration Statement and prepare and file with the Commission such amendments and supplements to such Registration Statement and the Prospectus used in connection therewith as may be necessary to keep such Registration Statement effective for a period ending on the date on which all Registrable Securities have been sold under such Registration Statement or have otherwise ceased to be Registrable Securities, and comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement;

(c)   furnish to each seller of Registrable Securities, and the managing underwriters, without charge, such number of copies of the applicable Registration Statement, each amendment and supplement thereto, the Prospectus included in such Registration Statement (including each

E-12

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1044 of 1110    PageID 2665

preliminary Prospectus, final Prospectus, and any other Prospectus (including any Prospectus filed under Rule 424, Rule 430A or Rule 430B promulgated under the Securities Act and any "*issuer free writing prospectus*" as such term is defined under Rule 433 promulgated under the Securities Act)), all exhibits and other documents filed therewith and such other documents as such seller or such managing underwriters may reasonably request including in order to facilitate the disposition of the Registrable Securities owned by such seller, and upon request, a copy of any and all transmittal letters or other correspondence to or received from, the Commission or any other governmental authority relating to such offer;

(d)   use its commercially reasonable efforts (i) to register or qualify such Registrable Securities under such other securities or blue sky laws of such jurisdictions as any seller reasonably requests, (ii) to keep such registration or qualification in effect for so long as such Registration Statement remains in effect, and (iii) to do any and all other acts and things which may be reasonably necessary or advisable to enable such seller to consummate the disposition in such jurisdictions of the Registrable Securities owned by such seller (*provided* that the Company shall not be required to (A) qualify generally to do business in any jurisdiction where it would not otherwise be required to qualify but for this subsection, (B) subject itself to taxation in any such jurisdiction or (C) consent to general service of process in any such jurisdiction);

(e)   notify each seller of such Registrable Securities, Counsel to the Holders and the managing underwriters: (i) at any time when a Prospectus relating to the applicable Registration Statement is required to be delivered under the Securities Act, (A) upon discovery that, or upon the happening of any event as a result of which, such Registration Statement, or the Prospectus or Free Writing Prospectus relating to such Registration Statement, or any document incorporated or deemed to be incorporated therein by reference contains an untrue statement of a material fact or omits any fact necessary to make the statements in the Registration Statement or the Prospectus or Free Writing Prospectus relating thereto not misleading or otherwise requires the making of any changes in such Registration Statement, Prospectus, Free Writing Prospectus or document, and, at the request of any such seller and subject to *Section 6(a)* hereof, the Company shall promptly prepare a supplement or amendment to such Prospectus or Free Writing Prospectus, furnish a reasonable number of copies of such supplement or amendment to each seller of such Registrable Securities, Counsel to the Holders and the managing underwriters and file such supplement or amendment with the Commission so that, as thereafter delivered to the purchasers of such Registrable Securities, such Prospectus or Free Writing Prospectus as so amended or supplemented shall not contain an untrue statement of a material fact or omit to state any fact necessary to make the statements therein not misleading, (B) as soon as the Company becomes aware of any comments or inquiries by the Commission or any requests by the Commission or any Federal or state governmental authority for amendments or supplements to a Registration Statement or related Prospectus or Free Writing Prospectus covering Registrable Securities or for additional information relating thereto, (C) as soon as the Company becomes aware of the issuance or threatened issuance by the Commission of any stop order suspending or threatening to suspend the effectiveness of a Registration Statement covering the Registrable Securities or (D) of the receipt by the Company of any notification with respect to the suspension of the qualification or exemption from qualification of any Registrable Security for sale in any jurisdiction, or the initiation or threatening of any proceeding for such purpose; (ii) when each Registration Statement or any amendment thereto has been filed with the Commission and when each Registration Statement or the related Prospectus or Free Writing Prospectus or any Prospectus supplement or any post effective amendment thereto has become effective; and (iii) if at any time the Company has reason to believe that the representations and warranties of the Company contained in any agreement contemplated by *Section 8(h)* below relating to any applicable offering cease to be true and correct.

E-13

(f)     use its best efforts to cause all such Registrable Securities (i) to be listed on the NASDAQ Global Select Market (or such other NASDAQ market on which shares of then Common Stock are then listed), (ii) if the Common Stock is not then listed on NASDAQ, to, as promptly as practicable, and in no event later than the six month anniversary of the Closing (as defined in the Business Combination Agreement), be listed on NASDAQ, the New York Stock Exchange or another national securities exchange, and (iii) to be registered with or approved by such other governmental agencies or authorities as may be necessary to enable the sellers thereof to consummate the disposition of the Registrable Securities;

(g)     provide and cause to be maintained a transfer agent and registrar for all such Registrable Securities from and after the effective date of the applicable Registration Statement;

(h)     enter into and perform under such customary agreements (including underwriting agreements in customary form, including customary representations and warranties and provisions with respect to indemnification and contribution) and take all such other actions as the Holders of a majority of the Registrable Securities included in such Shelf Takedown or the underwriters, if any, reasonably request in order to expedite or facilitate the disposition of such Registrable Securities (including effecting a stock split, a combination of shares, or other recapitalization) and provide reasonable cooperation, including causing appropriate officers to attend and participate in "*road shows*" and analyst or investor presentations and such other selling or other informational meetings organized by the underwriters, if any, to the extent reasonably requested by the lead or managing underwriters, with all out of pocket costs and expenses incurred by the Company or such officers in connection with such attendance and participation to be paid by the Company;

(i)     for a reasonable period prior to the filing of any Registration Statement or the commencement of marketing efforts for a Shelf Takedown, as applicable, pursuant to this Agreement, make available for inspection and copying by any Holder of Registrable Securities, Counsel to the Holders, any underwriter participating in any disposition pursuant to such Registration Statement or Shelf Takedown, as applicable, and any other attorney, accountant or other agent retained by any such Holder or underwriter, all financial and other records and pertinent corporate documents of the Company, and cause the Company's officers, directors, employees and independent accountants to supply all information and participate in any due diligence sessions reasonably requested by any such Holder, underwriter, attorney, accountant or agent in connection with such Registration Statement or Shelf Takedown, as applicable, *provided* that recipients of such financial and other records and pertinent corporate documents agree in writing to keep the confidentiality thereof pursuant to a written agreement reasonably acceptable to the Company and the applicable underwriter (which shall contain customary exceptions thereto);

(j)     permit any Holder of Registrable Securities, Counsel to the Holders, any underwriter participating in any disposition pursuant to a Registration Statement, and any other attorney, accountant or other agent retained by such Holder of Registrable Securities or underwriter, to participate (including, but not limited to, reviewing, commenting on and attending all meetings) in the preparation of such Registration Statement and any Prospectus supplements relating to a Shelf Takedown, if applicable;

(k)     in the event of the issuance or threatened issuance of any stop order suspending the effectiveness of a Registration Statement, or of any order suspending or preventing the use of any related Prospectus or suspending the qualification of any Common Stock included in such Registration Statement for sale in any jurisdiction, the Company shall use its commercially reasonable efforts promptly to (i) prevent the issuance of any such stop order, and in the event of such issuance, to obtain the withdrawal of such order and (ii) obtain the withdrawal of any order suspending or preventing the use of any related Prospectus or Free Writing Prospectus or

E-14

Supp.App. 1043

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1046 of 1110    PageID 2667

suspending qualification of any Registrable Securities included in such Registration Statement for sale in any jurisdiction at the earliest practicable date;

(l)   obtain and furnish to each such Holder of Registrable Securities, including Registrable Securities in a Shelf Takedown or underwritten offering, a signed counterpart of (i) a customary cold comfort and bring down letter from the Company's independent public accountants, (ii) a customary legal opinion of counsel to the Company addressed to the relevant underwriters and/or such Holders of Registrable Securities, in each case in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters and/or Holders of a majority of the Registrable Securities included in such Shelf Takedown reasonably request, (iii) a negative assurances letter of counsel to the Company in customary form and covering such matters of the type customarily covered by such letters as the managing underwriters and/or Holders of a majority of the Registrable Securities included in such Shelf Takedown reasonably request, and (iv) customary certificates executed by authorized officers of the Company as may be requested by any Holder or any underwriter of such Registrable Securities included in such Shelf Takedown;

(m)   with respect to each Free Writing Prospectus or other materials to be included in the Disclosure Package, ensure that no Registrable Securities be sold "*by means of*" (as defined in Rule 159A(b) promulgated under the Securities Act) such Free Writing Prospectus or other materials without the prior written consent of a majority of the Holders of the Registrable Securities that are being sold pursuant to such Free Writing Prospectus, which Free Writing Prospectuses or other materials shall be subject to the review of Counsel to the Holders; *provided*, *however*, the Company shall not be responsible or liable for any breach by a Holder that has not obtained the prior written consent of the Company pursuant to *Section 16(l)*;

(n)   provide or maintain a CUSIP number for the Registrable Securities prior to the effective date of the first Registration Statement including Registrable Securities;

(o)   promptly notify in writing the Holders, the sales or placement agent, if any, therefor and the managing underwriters of the securities being sold, (i) when such Registration Statement or related Prospectus or Free Writing Prospectus or any Prospectus amendment or supplement or post-effective amendment has been filed, and, with respect to any such Registration Statement or any post-effective amendment, when the same has become effective and (ii) of any written comments by the Commission and by the blue sky or securities commissioner or regulator of any state with respect thereto;

(p)   (i) prepare and file with the Commission such amendments and supplements to each Registration Statement as (A) reasonably requested by any Holder (to the extent such request related to information relating to such Holder) or (B) may be necessary to comply with the provisions of the Securities Act, including post-effective amendments to each Registration Statement as may be necessary to keep such Registration Statement continuously effective for the applicable time period required hereunder, and if applicable, file any Registration Statements pursuant to Rule 462(b) promulgated under the Securities Act; (ii) cause the related Prospectus to be supplemented by any required Prospectus supplement, and as so supplemented to be filed pursuant to Rule 424 (or any similar provisions then in force) promulgated under the Securities Act; (iii) comply with the provisions of the Securities Act and the Exchange Act and any applicable securities exchange or other recognized trading market with respect to the disposition of all securities covered by such Registration Statement during such period in accordance with the intended methods of disposition by the sellers thereof set forth in such Registration Statement as so amended or in such Prospectus as so supplemented; (iv) provide additional information related to each Registration Statement as requested by, and obtain any required approval necessary from, the Commission or any Federal or state governmental authority; and (v) respond promptly to any comments received from the Commission and request acceleration of effectiveness promptly after

E-15

Supp.App. 1044

it learns that the Commission will not review the Registration Statement or after it has satisfied comments received from the Commission;

(q)   cooperate with each Holder of Registrable Securities and each underwriter participating in the disposition of such Registrable Securities and underwriters' counsel in connection with any filings required to be made with FINRA, including using commercially reasonable efforts to obtain FINRA's pre-clearance and pre-approval of the Registration Statement and applicable Prospectus upon filing with the Commission;

(r)   within the deadlines specified by the Securities Act, make all required filing fee payments in respect of any Registration Statement or Prospectus used under this Agreement (and any offering covered thereby);

(s)   if requested by any participating Holder of Registrable Securities or the managing underwriters, promptly include in a Prospectus supplement or amendment such information as the Holder or managing underwriters may reasonably request, including in order to permit the intended method of distribution of such securities, and make all required filings of such Prospectus supplement or such amendment as soon as reasonably practicable after the Company has received such request;

(t)   in the case of certificated Registrable Securities, cooperate with the participating Holders of Registrable Securities and the managing underwriters to facilitate the timely preparation and delivery of certificates (not bearing any legends) representing Registrable Securities to be sold after receiving written representations from each participating Holder that the Registrable Securities represented by the certificates so delivered by such Holder will be transferred in accordance with the Registration Statement, and enable such Registrable Securities to be in such denominations and registered in such names as the Holders or managing underwriters may reasonably request at least two Business Days prior to any sale of Registrable Securities;

(u)   pay the fees of the Company's transfer agent and any reasonable, documented legal fees of outside counsel to the Company to provide an opinion to the effect that such transfer is permitted under the Securities Act and applicable state laws (or if outside counsel to the Company is unwilling or unavailable to provide such opinion, the reasonable, documented legal fees of one outside counsel to the Holders to provide such opinion) to effectuate the transfer of Registrable Securities from Holders to other Persons, as permitted by *Section 7(c)*; *provided*, in each case, that such Holders shall provide such certificates and other documentation as the Company shall reasonably request in connection with such opinions and transfers;

(v)   if the registration statement referred to in Section 7.16(h) of the Business Combination Agreement has not been declared effective as of the Effective Date, use reasonable best efforts to cause such registration statement to become effective as soon as practicable after the Effective Date, and to use reasonable best efforts to cause such registration statement to remain effective; *provided, however*, that the obligations contained in this *Section 8(v)* shall terminate upon the earliest to occur of: (x) the date on which the securities included on such registration statement are disposed of pursuant to an effective registration statement under the Securities Act; (y) the date on which such securities are disposed of pursuant to Rule 144 (or any successor provision) promulgated under the Securities Act; and (z) the date on which such securities cease to be outstanding; and

(w)   use its commercially reasonable efforts to take all other actions necessary to effect the registration and sale of the Registrable Securities contemplated hereby.

E-16

9. **Registration Expenses.**

All Registration Expenses shall be borne by the Company. For the avoidance of doubt, subject to the proviso in *Section 3(c)* of this Agreement, all Registration Expenses in connection with any registration initiated as a Demand Registration shall be borne by the Company regardless of whether or not such registration has become effective and whether or not such registration has counted as one of the permitted Long-Form Registrations pursuant to *Section 3(c)* of this Agreement. All Selling Expenses relating to Registrable Securities registered shall be borne by the selling Holders of such Registrable Securities *pro rata* on the basis of the number of Registrable Securities sold.

10. **Indemnification; Contribution.**

(a) *Indemnification by the Company.* The Company agrees to indemnify and hold harmless each Holder of Registrable Securities, the Affiliates, directors, officers, employees, members, managers and agents of each such Holder and each Person who controls any such Holder within the meaning of either the Securities Act or the Exchange Act, to the fullest extent permitted by applicable law, from and against any losses, claims, expenses, damages and liabilities or whatever kind (including legal or other expenses reasonably incurred in connection with investigating, preparing or defending same and the cost of enforcing any right to indemnification hereunder) (collectively, "**Losses**") to which they or any of them may become subject insofar as such Losses (or actions in respect thereof) arise out of or are based upon (i) any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or the Disclosure Package, or any preliminary, final or summary Prospectus or Free Writing Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading or (ii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other federal law, any state or foreign securities law, or any rule or regulation promulgated under of the foregoing laws, relating to the offer or sale of the Registrable Securities, and in any such case, the Company agrees to reimburse each such indemnified party, as incurred, for any legal or other expenses reasonably incurred by them in connection with investigating, preparing or defending any such Loss, claim, damage, liability, action or investigation (whether or not the indemnified party is a party to any proceeding); *provided*, *however*, that the Company will not be liable in any case to the extent that any such Loss arises out of or is based upon any such untrue statement or alleged untrue statement or omission or alleged omission made therein in reliance upon and in conformity with written information relating to such Holder furnished to the Company by or on behalf of any such Holder specifically for inclusion therein, including any notice and questionnaire. This indemnity agreement will be in addition to any liability which the Company may otherwise have.

(b) *Indemnification by the Holders.* Each Holder severally (and not jointly) agrees to indemnify and hold harmless the Company and each of its Affiliates, directors, employees, members, managers and agents and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act, to the fullest extent permitted by applicable law, from and against any and all Losses to which they or any of them may become subject insofar as such Losses arise out of or are based upon any untrue statement or alleged untrue statement of a material fact contained in a Registration Statement as originally filed or in any amendment thereof, or in the Disclosure Package or any Holder Free Writing Prospectus, preliminary, final or summary Prospectus included in any such Registration Statement, or in any amendment thereof or supplement thereto, or arise out of or are based upon the omission or alleged omission to state therein a material fact required to be stated therein or necessary to make the statements therein not misleading, to the extent, but only to the extent, that any such untrue statement or alleged untrue statement or omission or alleged omission is contained in any written information relating to such Holder furnished to the Company by or on behalf of such Holder specifically for inclusion therein; *provided*, *however*, that the total amount to be

E-17

Supp.App. 1046

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1049 of 1110    PageID 2670

indemnified by such Holder pursuant to this *Section 10(b)* shall be limited to the net proceeds (after deducting underwriters' discounts and commissions) received by such Holder in the offering to which such Registration Statement or Prospectus relates; *provided*, *further*, that a Holder shall not be liable in any case to the extent that prior to the filing of any such Registration Statement or Disclosure Package, or any amendment thereof or supplement thereto, such Holder has furnished in writing to the Company, information expressly for use in, and within a reasonable period of time prior to the effectiveness of such Registration Statement or Disclosure Package, or any amendment thereof or supplement thereto which corrected or made not misleading information previously provided to the Company. This indemnity agreement will be in addition to any liability which any such Holder may otherwise have.

(c)    *Conduct of Indemnification Proceedings.*    Promptly after receipt by an indemnified party under this *Section 10* of notice of the commencement of any action, such indemnified party will, if a claim in respect thereof is to be made against the indemnifying party under this *Section 10*, notify the indemnifying party in writing of the commencement thereof; but the failure so to notify the indemnifying party (i) will not relieve the indemnifying party from liability under *Section 10(a)* or *Section 10(b)* above unless and to the extent such action and such failure results in material prejudice to the indemnifying party and forfeiture by the indemnifying party of substantial rights and defenses; and (ii) will not, in any event, relieve the indemnifying party from any obligations to any indemnified party other than the indemnification obligation provided in *Section 10(a)* or *Section 10(b)* above. The indemnifying party shall be entitled to participate therein and, to the extent that it shall wish, jointly with any other indemnifying party similarly notified, to assume the defense thereof, with counsel satisfactory to such indemnified party (who shall not, except with the consent of the indemnified party, be counsel to the indemnifying party), and, except as provided in the next sentence, after notice from the indemnifying party to such indemnified party of its election to so assume the defense thereof, the indemnifying party shall not be liable to such indemnified party for any legal expenses of other counsel or any other expenses subsequently incurred by such indemnified party in connection with the defense thereof other than reasonable costs of investigation. Notwithstanding the indemnifying party's rights in the prior sentence, the indemnified party shall have the right to employ one firm of separate counsel (and one local counsel), and the indemnifying party shall bear the reasonable, documented fees, costs and expenses of such separate counsel if:

(i)  the use of counsel chosen by the indemnifying party to represent the indemnified party would present such counsel with an actual or potential conflict of interest;

(ii)  the actual or potential defendants in, or targets of, any such action include both the indemnified party and the indemnifying party and the indemnified party shall have reasonably concluded that there may be legal defenses available to it and/or other indemnified parties which are different from or additional to those available to the indemnifying party;

(iii)  the indemnifying party shall not have employed counsel satisfactory to the indemnified party to represent the indemnified party within 10 days after notice of the institution of such action or such earlier time as may be necessary to pursue appropriate defenses, rights, and remedies; or

(iv)  the indemnifying party shall authorize the indemnified party to employ separate counsel at the expense of the indemnifying party.

No indemnifying party shall, in connection with any one action or separate but substantially similar or related actions in the same jurisdiction arising out of the same general circumstances or allegations, be liable for the fees and expenses of more than one separate firm of attorneys (in addition to any local counsel) for all indemnified parties. An indemnifying party shall not be liable under this *Section 10* to any indemnified party regarding any settlement or compromise or consent to the entry of any judgment with respect to any pending or threatened claim, action, suit or proceeding in respect of which

E-18

Table of Contents

indemnification or contribution may be sought hereunder (whether or not the indemnified parties are actual or potential parties to such claim or action) unless such settlement, compromise or consent is consented to by such indemnifying party, which consent shall not be unreasonably withheld. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each indemnified party, consent to entry of any judgment or enter into any settlement or compromise that (x) does not include as an unconditional term thereof the giving by the claimant or plaintiff therein, to such indemnified party, of a full and final release from all liability in respect to such claim or litigation or (y) includes a statement as to, or an admission of, fault, culpability or a failure to act by or on behalf of such indemnified party.

(d)    *Contribution.*

(i)  In the event that the indemnity provided in *Section 10(a)* or *Section 10(b)* above is unavailable to or insufficient to hold harmless an indemnified party for any reason, then each applicable indemnifying party agrees to contribute to the aggregate Losses to which such indemnifying party may be subject in such proportion as is appropriate to reflect the relative benefits received by the indemnifying party on the one hand and by the indemnified party on the other from the offering of the Common Stock. If, however, the allocation provided by the immediately preceding sentence is not permitted by applicable law, then each indemnifying party shall contribute to such amount paid or payable by such indemnified party in such proportion as is appropriate to reflect not only such relative benefits but also the relative fault of the indemnifying party on the one hand and the indemnified party on the other in connection with the statements or omissions which resulted in such Losses (or actions in respect thereof), as well as any other relevant equitable considerations. The relative fault shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission or alleged omission to state a material fact relates to information supplied by the indemnifying party on the one hand or the indemnified party on the other and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such statement or omission.

(ii)  The parties agree that it would not be just and equitable if contribution pursuant to this *Section 10(d)* were determined by *pro rata* allocation (even if the Holders of Registrable Securities or any agents or underwriters or all of them were treated as one entity for such purpose) or by any other method of allocation which does not take account of the equitable considerations referred to above in this *Section 10(d)*. The amount paid or payable by an indemnified party as a result of the Losses (or actions in respect thereof) referred to above in this *Section 10(d)* shall be deemed to include any legal or other expenses reasonably incurred by such indemnified party in connection with investigating, preparing or defending any such action or claim.

(iii)  For purposes of this *Section 10*, each Person who controls any Holder of Registrable Securities, agent or underwriter within the meaning of either the Securities Act or the Exchange Act and each director, officer, employee and agent of any such Holder, agent or underwriter shall have the same rights to contribution as such Holder, agent or underwriter, and each Person who controls the Company within the meaning of either the Securities Act or the Exchange Act and each officer and director of the Company shall have the same rights to contribution as the Company, subject in each case to the applicable terms and conditions of this *Section 10(d)*.

(e)    The provisions of this *Section 10* will remain in full force and effect, regardless of any investigation made by or on behalf of any Holder of Registrable Securities or the Company or any of the officers, directors or controlling Persons referred to in this *Section 10* hereof, and will survive the transfer of Registrable Securities.

(f)    To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under *Section 10* to the fullest extent permitted by law; *provided*, *however*,

E-19

Supp.App. 1048

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1051 of 1110    PageID 2672

that: (i) no Person involved in the sale of Registrable Securities which Person is guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) in connection with such sale shall be entitled to contribution from any Person involved in such sale of Registrable Securities who was not guilty of fraudulent misrepresentation; and (ii) contribution by any seller of Registrable Securities shall be limited in amount to the net amount of proceeds received by such seller from the sale of such Registrable Securities pursuant to such Shelf Registration.

**11. Participation in Underwritten Offering/Sale of Registrable Securities.**

(a) No Person may participate in any underwritten offering hereunder unless such Person (i) agrees to enter into an underwriting agreement in customary form and provide the representations and warranties, and indemnities to the underwriters and the Company and to sell such Person's securities on the basis provided in any such underwriting agreement and (ii) completes and executes all questionnaires, powers of attorney, indemnities, underwriting agreements and other documents reasonably required under the terms of such underwriting arrangements; *provided* that no Holder of Registrable Securities included in any underwritten offering shall be required to make any representations or warranties to the Company or the underwriters (other than representations and warranties regarding (A) such Holder's ownership of its Registrable Securities to be sold or transferred free and clear of liens, (B) such Holder's power and authority to effect, and lack of conflicts in effecting, such transfer and (C) such matters pertaining to compliance with securities laws as may be reasonably requested) or to undertake any indemnification obligations to the Company, except as otherwise provided in *Section 10(b)* hereof, or to the underwriters, except to the extent of the indemnification being given to the Company and its controlling persons in *Section 10(b)* hereof.

(b) Each Holder agrees that, upon receipt of any notice contemplated in *Section 6(a)*, such Holder will promptly discontinue the disposition of its Registrable Securities pursuant to the applicable Registration Statement.

**12. Rule 144.**

With a view to making available to the Holders of Registrable Securities the benefits of Rule 144 promulgated under the Securities Act, the Company covenants that it will (a) make available information necessary to comply with Rule 144, if available with respect to resales of the Registrable Securities under the Securities Act, at all times, and (b) take such further action as such Holder may reasonably request, all to the extent required from time to time to enable such Holder to sell Registrable Securities without registration under the Securities Act within the limitation of the exemptions provided by Rule 144 promulgated under the Securities Act (if available with respect to resales of the Registrable Securities), as such rule may be amended from time to time. Upon the reasonable request of any Holder of Registrable Securities, the Company will deliver to such Holder a written statement as to whether it has complied with such information requirements, and, if not, the specific reasons for non-compliance.

**13. Private Placement**

Except for *Section 7(a)* and *Section 7(b)*, the Company agrees that nothing in this Agreement shall prohibit the Holders, at any time and from time to time, from selling or otherwise transferring Registrable Securities pursuant to a private placement or other transaction which is not registered pursuant to the Securities Act. To the extent requested by a Holder, the Company shall take all reasonable steps to assist and cooperate with such Holder to facilitate such sale or transfer, including providing reasonable due diligence access to potential purchasers.

**14. Transfer of Registration Rights.**

The rights of a Holder hereunder may be transferred, assigned, or otherwise conveyed on a *pro rata* basis in connection with any transfer, assignment, or other conveyance of Registrable Securities to

E-20

Supp.App. 1049

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 1052 of 1110   PageID 2673

any transferee or assignee, including any distribution of shares of Common Stock or Preferred Stock by New LLC to the holders of membership interests of New LLC, (other than a transfer pursuant to a registration statement or under Rule 144 promulgated under the Securities Act, and except with respect to transfers of Demand Registration rights which may be transferred in whole and not in part as provided in *Section 3(g)*); *provided* that all of the following additional conditions are satisfied with respect to any transfer, assignment or conveyance of rights hereunder: (a) such transfer or assignment is effected in accordance with applicable securities laws; (b) such transferee or assignee agrees in writing to become subject to the terms of this Agreement by executing a joinder or similar document; and (c) the Company is given written notice by such Holder of such transfer or assignment, stating the name and address of the transferee or assignee, identifying the Registrable Securities with respect to which such rights are being transferred or assigned and specifying whether or not the Demand Registration rights pursuant to *Section 3* have been assigned. Any transfer, assignment or other conveyance of the rights of a Holder in breach of this Agreement shall be void and of no effect. For the avoidance of doubt, nothing in this Agreement shall prohibit the assignment of any rights hereunder by New LLC to a lender in connection with the PIPE Financing.

**15.    Amendment, Modification and Waivers; Further Assurances.**

(a)    *Amendment.*    This Agreement may be amended with the consent of the Company and the Company may take any action herein prohibited, or omit to perform any act herein required to be performed by it, only if the Company shall have obtained the written consent of each of the Apollo Demand Holders, the HGM Demand Holders and the QPAC Holders to such amendment, action or omission to act; *provided* that no such amendment, action or omission that adversely affects, alters or changes the rights of any Holder in a manner disproportionate to other similarly situated Holders shall be effective against such Holder without the prior written consent of such Holder.

(b)    *Consents and Actions of Demand Holders.*    Subject to *Section 3(g)* , if any action or consent is requested of the Apollo Demand Holders or the HGM Demand Holders, such action may be taken and any such consent shall be deemed granted if and only if holders of a majority of the Registrable Securities held by the Apollo Demand Holders and holders of a majority of the Registrable Securities held by the HGM Demand Holders s take such action or grant such consent. Notwithstanding the foregoing, any Apollo Demand Holder or HGM Demand Holder may request a Demand Registration, in accordance with the terms of *Section 3(a)*.

(c)    *Effect of Waiver.*    No waiver of any terms or conditions of this Agreement shall operate as a waiver of any other breach of such terms and conditions or any other term or condition, nor shall any failure to enforce any provision hereof operate as a waiver of such provision or of any other provision hereof. No written waiver hereunder, unless it by its own terms explicitly provides to the contrary, shall be construed to effect a continuing waiver of the provisions being waived and no such waiver in any instance shall constitute a waiver in any other instance or for any other purpose or impair the right of the party against whom such waiver is claimed in all other instances or for all other purposes to require full compliance with such provision. The failure of any party to enforce any provision of this Agreement shall not be construed as a waiver of such provision and shall not affect the right of such party thereafter to enforce each provision of this Agreement in accordance with its terms.

(d)    *Further Assurances.*    Each of the parties hereto shall execute all such further instruments and documents and take all such further action as any other party hereto may reasonably require in order to effectuate the terms and purposes of this Agreement.

**16.    Miscellaneous.**

(a)    *Adjustments.*    If, and as often as, there are any changes in the Common Stock by way of stock split, stock dividend, combination or reclassification, or through merger, consolidation, reorganization, recapitalization or sale, or by any other means, appropriate adjustment shall be made in

E-21

Supp.App. 1050

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1053 of 1110    PageID 2674

the provisions of this Agreement, as may be required, so that the rights, privileges, duties and obligations hereunder shall continue with respect to the Common Stock as so changed.

(b)  *Successors and Assigns.*    All covenants and agreements in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and assigns of the parties hereto (including any trustee in bankruptcy) whether so expressed or not. In addition, whether or not any express assignment has been made, the provisions of this Agreement which are for the benefit of purchasers or Holders of Registrable Securities are also for the benefit of, and enforceable by, any subsequent Holder of Registrable Securities. No assignment or delegation of this Agreement by the Company, or any of the Company's rights, interests or obligations hereunder, shall be effective against any Holder without the prior written consent of such Holder.

(c)  *Remedies; Specific Performance.*    Any Person having rights under any provision of this Agreement shall be entitled to enforce such rights specifically, to recover damages caused by reason of any breach of any provision of this Agreement and to exercise all other rights existing in their favor. The parties hereto agree and acknowledge that money damages would not be an adequate remedy for any breach of the provisions of this Agreement and that any party may in its sole discretion apply to any court of law or equity of competent jurisdiction for specific performance and/or injunctive relief (without posting any bond or other security) in order to enforce or prevent violation of the provisions of this Agreement and shall not be required to prove irreparable injury to such party or that such party does not have an adequate remedy at law with respect to any breach of this Agreement (each of which elements the parties admit). The parties hereto further agree and acknowledge that each and every obligation applicable to it contained in this Agreement shall be specifically enforceable against it and hereby waives and agrees not to assert any defenses against an action for specific performance of their respective obligations hereunder. All rights and remedies existing under this Agreement are cumulative to, and not exclusive of, any rights or remedies available under this Agreement or otherwise.

(d)  *Notices.*    All notices or other communications required or permitted to be given hereunder shall be in writing and shall be delivered by hand, facsimile, electronic mail or postage prepaid mail (registered or certified) or nationally recognized overnight courier service and shall be deemed given when so delivered by hand, facsimile or electronic mail, or if mailed, three days after mailing (one Business Day in the case of overnight courier service), and shall be given to such party at the address or facsimile number specified for such party on *Schedule I* hereto. If any time period for giving notice or taking action hereunder expires on a day which is a Saturday, Sunday or legal holiday in the State of New York or the jurisdiction in which the Company's principal office is located, the time period shall automatically be extended to the Business Day immediately following such Saturday, Sunday or legal holiday.

(e)  *No Inconsistent Agreements.*    The Company shall not hereafter enter into any agreement with respect to its securities which is inconsistent with or violates the rights granted to the Holders of Registrable Securities in this Agreement.

(f)  *Counterparts.*    This Agreement may be executed in one or more counterparts, and may be delivered by means of facsimile or electronic transmission in portable document format, each of which shall be deemed to be an original and shall be binding upon the party who executed the same, but all of such counterparts shall constitute the same agreement.

(g)  *Descriptive Headings; Interpretation; No Strict Construction.*    The descriptive headings of this Agreement are inserted for convenience only and do not constitute a substantive part of this Agreement. Whenever required by the context, any pronoun used in this Agreement shall include the corresponding masculine, feminine or neuter forms, and the singular forms of nouns, pronouns, and verbs shall include the plural and vice versa. Reference to any agreement, document, or instrument means such agreement, document, or instrument as amended or otherwise modified from time to time in accordance with the terms thereof, and, if applicable, hereof. The words "*include*," "*includes*" or

E-22

Supp.App. 1051

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1054 of 1110    PageID 2675

"*including*" in this Agreement shall be deemed to be followed by "*without limitation*." The use of the words "*or*," "*either*" or "*any*" shall not be exclusive. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto, and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. All references to laws, rules, regulations and forms in this Agreement shall be deemed to be references to such laws, rules, regulations and forms, as amended from time to time or, to the extent replaced, the comparable successor thereto in effect at the time. All references to agencies, self-regulatory organizations or governmental entities in this Agreement shall be deemed to be references to the comparable successors thereto from time to time.

(h)    *Delivery by Facsimile and Electronic Means.*    This Agreement, the agreements referred to herein, and each other agreement or instrument entered into in connection herewith or therewith or contemplated hereby or thereby, and any amendments hereto or thereto, to the extent signed and delivered by means of a facsimile machine or other electronic means, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such agreement or instrument, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such agreement or instrument shall raise the use of a facsimile machine or other electronic means to deliver a signature or the fact that any signature or agreement or instrument was transmitted or communicated through the use of a facsimile machine or other electronic means as a defense to the formation or enforceability of a contract and each such party forever waives any such defense.

(i)    *Arm's Length Agreement.*    Each of the parties to this Agreement agrees and acknowledges that this Agreement has been negotiated in good faith, at arm's length, and not by any means prohibited by law.

(j)    *Sophisticated Parties; Advice of Counsel.*    Each of the parties to this Agreement specifically acknowledges that (i) it is a knowledgeable, informed, sophisticated Person capable of understanding and evaluating the provisions set forth in this Agreement and (ii) it has been fully advised and represented by legal counsel of its own independent selection and has relied wholly upon its independent judgment and the advice of such counsel in negotiating and entering into this Agreement.

(k)    *Attorneys' Fees.*    In the event of litigation or other proceedings in connection with or related to this Agreement, the prevailing party in such litigation or proceeding shall be entitled to reimbursement from the opposing party of all reasonable expenses, including reasonable attorneys' fees and expenses of investigation in connection with such litigation or proceeding.

(l)    *FWP Consent.*    No Holder shall use a Holder Free Writing Prospectus without the prior written consent of the Company, which consent shall not be unreasonably withheld.

(m)    *Notification of Status.*    Each Holder shall provide written notice to the Company within ten Business Days from the first day on which the Holder no longer holds Registrable Securities.

(n)    *Governing Law.*    This Agreement and the exhibits and schedules hereto shall be governed by, and construed in accordance with, the laws of the State of New York, without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of New York or any other jurisdiction) to the extent such rules or provisions would cause the application of the laws of any jurisdiction other than the State of New York.

(o)    *Submission to Jurisdiction.*    Any action, suit or proceeding seeking to enforce any provision of, or based on any matter arising out of or in connection with, this Agreement or the transactions contemplated hereby must be brought and determined in the Supreme Court of the State of New York (or, solely if such courts decline jurisdiction, in United States District Court for the Southern District

E-23

Supp.App. 1052

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 1055 of 1110 PageID 2676

of New York), and each party hereby irrevocably submits to the exclusive jurisdiction of the aforesaid courts for itself and with respect to its property, generally and unconditionally, in any such action, suit or proceeding and irrevocably waives, to the fullest extent permitted by law, any objection that it may now or hereafter have to the laying of the venue of any such, action, suit or proceeding in any such court or that any such action, suit or proceeding brought in any such court has been brought in an inconvenient forum.

(p) *Waiver of Jury Trial.* EACH PARTY ACKNOWLEDGES AND AGREES THAT ANY CONTROVERSY WHICH MAY ARISE UNDER THIS AGREEMENT IS LIKELY TO INVOLVE COMPLICATED AND DIFFICULT ISSUES, AND THEREFORE IT HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LITIGATION DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, (B) IT UNDERSTANDS AND HAS CONSIDERED THE IMPLICATIONS OF SUCH WAIVER, (C) IT MAKES SUCH WAIVER VOLUNTARILY AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVER AND CERTIFICATIONS IN THIS SECTION 16(p).

(q) *Complete Agreement.* This Agreement and any certificates, documents, instruments and writings that are delivered pursuant hereto, represent the complete agreement between the parties hereto as to all matters covered hereby, and supersedes any prior agreements or understandings among the parties.

(r) *Severability.* In the event any one or more of the provisions contained in this Agreement should be held invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby (it being understood that the invalidity of a particular provision in a particular jurisdiction shall not in and of itself affect the validity of such provision in any other jurisdiction). The parties shall endeavor in good-faith negotiations to replace the invalid, illegal or unenforceable provisions with valid provisions the economic effect of which comes as close as possible to that of the invalid, illegal or unenforceable provisions.

(s) *Termination.* The obligations of any Holder and of the Company with respect to such Holder, other than those obligations contained in *Section 10*, shall terminate as soon as both (i) such Holder no longer holds any Registrable Securities and (ii) such Holder is no longer an Affiliate of the Company or otherwise subject to the volume limitations set forth in Rule 144(e) promulgated under the Securities Act or any successor provision.

(t) *Amendment and Restatement.* The QPAC Registration Rights Agreement is hereby terminated and shall be of no further force and effect and this Agreement shall amend and restate in full the Novitex Registration Rights Agreement.

* * * * *

E-24

Table of Contents

IN WITNESS WHEREOF, the parties hereto have executed this Amended and Restated Registration Rights Agreement as of the date first written above.

<div align="center">

EXELA TECHNOLOGIES, INC.

By: _____

Name:
Title:

</div>

*Signature Page for Amended and Restated Registration Rights Agreement*

<div align="center">

E-25

</div>

Supp.App. 1054

**HOLDERS**

**[Name]**

By:

        _____

        Name:
        Title:

        Address:
        Facsimile:

*Signature Page for Amended and Restated Registration Rights Agreement*

E-26

**Schedule I**

**List of Holders (as of [          ])(2)**

| Name | Address for Notice | Shares of Common Stock |
|---|---|---|
| Apollo Novitex Holdings, L.P. | Apollo Novitex Holdings, L.P. c/o Apollo Management VII, L.P. 9 West 57th Street, 43rd Floor New York, New York 10019 Telephone: (212) 515-3200 Facsimile: (212) 515-3264 Email: lmedley@apollolp.com Attention: Laurie Medley, General Counsel<br><br>With a copy to: Akin Gump Strauss Hauer & Feld LLP One Bryant Park New York, New York 10036 Telephone: (212) 872-8112 Facsimile: (212) 872-1002 Email: aweinstein@akingump.com Attention: Adam K. Weinstein | |
| Novitex Parent L.P. | Apollo Novitex Holdings, L.P. c/o Apollo Management VII, L.P. 9 West 57th Street, 43rd Floor New York, New York 10019 Telephone: (212) 515-3200 Facsimile: (212) 515-3264 Email: lmedley@apollolp.com Attention: Laurie Medley, General Counsel<br><br>With a copy to: Akin Gump Strauss Hauer & Feld LLP One Bryant Park New York, New York 10036 Telephone: (212) 872-8112 Facsimile: (212) 872-1002 Email: aweinstein@akingump.com Attention: Adam K. Weinstein | |
| Giovanni Visentin Joseph Trost Irina Novoselsky Michele Tierney Ken Bechard John Garippa Tatiana Koleva Erik Mengwall Theresa Mohan Robert Rooney | | |

---

(2)    NTD: To be updated/confirmed.

E-27

| Name | Address for Notice | Shares of Common Stock |
|---|---|---|
| Anthony Dupree | | |
| Rubin McDougal | | |
| Nathaniel Lipman | | |
| HOVS LLC | | |
| HOVS Capital III LLC | | |
| Stern Capital LLC | | |
| Sunraj LLC | | |
| Pidgin Associates LLC | | |
| HandsOn Fund 4 I, LLC | | |
| Sonino LLC | | |
| Ex-Sigma LLC | | |
| [SPV subsidiary of Ex-Sigma LLC] | | |
| Quinpario Partners 2, LLC | | |
| Edgar G. Hotard | | |
| W. Thomas Jagodinski | | |
| Ilan Kaufthal | | |
| Roberto Mendoza | | |
| Dr. John Rutledge | | |
| Shlomo Yanai | | |

E-28

**Quinpario Acquisition Corp. 2**
**12935 N. Forty Drive, Suite 201**
**St. Louis, MO 63141**

**SPECIAL MEETING OF STOCKHOLDERS JULY 11, 2017**
**YOUR VOTE IS IMPORTANT**

**QUINPARIO ACQUISITION CORP. 2**

**THIS PROXY IS SOLICITED BY THE BOARD OF DIRECTORS**
**FOR THE SPECIAL MEETING OF STOCKHOLDERS TO BE HELD ON JULY 11, 2017**

**P**
**R**
**O**
**X**
**Y**

The undersigned, revoking any previous proxies relating to these shares, hereby acknowledges receipt of the Notice and Proxy Statement, dated June 26, 2017, in connection with the Special Meeting to be held at 1:00 p.m. Eastern Time on July 11, 2017 at the offices of Kirkland & Ellis LLP, located at 601 Lexington Avenue, New York, New York 10022, and hereby appoints Paul J. Berra III and D. John Srivisal, and each of them (with full power to act alone), the attorneys and proxies of the undersigned, with power of substitution to each, to vote all shares of the common stock of Quinpario Acquisition Corp. 2 (the "Company") registered in the name provided, which the undersigned is entitled to vote at the Special Meeting of Stockholders, and at any adjournments thereof, with all the powers the undersigned would have if personally present. Without limiting the general authorization hereby given, said proxies are, and each of them is, instructed to vote or act as follows on the proposals set forth in this Proxy Statement.

**C**
**A**
**R**
**D**

**THIS PROXY, WHEN EXECUTED, WILL BE VOTED IN THE MANNER DIRECTED HEREIN. IF NO DIRECTION IS MADE, THIS PROXY WILL BE VOTED "FOR" PROPOSALS 1, 2, 3, 4, 5, 6, 7 AND 8.**

Important Notice Regarding the Availability of Proxy Materials for the Special Meeting of Stockholders to be held on July 11, 2017: This notice of meeting and the accompanying proxy statement are available at http://www.cstproxy.com/quinparioacquisitioncorpII/sm2017.

**(Continued and to be marked, dated and signed on reverse side)**

Supp.App. 1058

Please mark vote as indicated in this example [X]

**THE BOARD OF DIRECTORS RECOMMENDS A VOTE "FOR" PROPOSALS 1, 2, 3, 4, 5, 6, 7 AND 8.**

(1) **The Business Combination Proposal** — Subject to approval of Proposal No. 2, Proposal No. 3 and Proposal No. 6, to consider and vote upon a proposal to approve and adopt the Business Combination Agreement, dated as of February 21, 2017, as it may be amended (the "Business Combination Agreement"), by and among the Company, Quinpario Merger Sub I, Inc., Quinpario Merger Sub II, Inc., Novitex Holdings, Inc., SourceHOV Holdings, Inc. Novitex Parent, L.P. and HOVS LLC and HandsOn Fund 4 I, LLC and certain of their respective affiliates, and the transactions contemplated thereby (the "Business Combination").  FOR ☐  AGAINST ☐  ABSTAIN ☐

• **Intention to Exercise Redemption Rights** If you intend to exercise your redemption rights please check this box. Checking this box, however, is not sufficient to exercise your redemption rights. You must comply with the procedures set forth in the definitive proxy statement under the heading "2017 Special Meeting of Quinpario Stockholders—Redemption Rights."  REDEMPTION RIGHTS ☐

• **Shareholder Certification** I hereby certify that I am not acting in concert, or as a "group" (as defined in Section 13(d)(3) of the Securities Exchange Act of 1934, as amended), with any other stockholder with respect to the shares of common stock of the Company owned by me in connection with the proposed Business Combination.  SHAREHOLDER CERTIFICATION ☐

(2) **The Nasdaq Proposal** — Subject to approval of Proposal No. 1, to consider and act upon a proposal to approve, for purposes of complying with applicable Nasdaq listing rules, the issuance of more than 20% of the issued and outstanding shares of Quinpario Common Stock pursuant to the Business Combination and the PIPE Investment.  FOR ☐  AGAINST ☐  ABSTAIN ☐

**The Certificate Proposals (Proposals 3, 4, 5, 6 and 7)**

(3) **Proposal 3** — Subject to approval of Proposal No. 1, to consider and act upon a proposed amendment to the Company's amended and restated certificate of incorporation to authorize an additional 205,000,000 shares of Quinpario Common Stock and an additional 9,000,000 shares of preferred stock.  FOR ☐  AGAINST ☐  ABSTAIN ☐

(4) **Proposal 4** — To consider and act upon a proposed amendment to the Company's amended and restated certificate of incorporation to provide that certain provisions of the certificate of incorporation are subject to the Director Nomination Agreements.  FOR ☐  AGAINST ☐  ABSTAIN ☐

(5) **Proposal 5** — To consider and act upon a proposed amendment to the Company's amended and restated certificate of incorporation to change the name of the Company from "Quinpario Acquisition Corp. 2" to "Exela Technologies, Inc."  FOR ☐  AGAINST ☐  ABSTAIN ☐

(6) **Proposal 6** — Subject to approval of Proposal No. 1, to consider and act upon a proposed amendment to the Company's amended and restated certificate of incorporation to provide that certain transactions are not "corporate opportunities."  FOR ☐  AGAINST ☐  ABSTAIN ☐

(7) **Proposal 7** — To consider and vote upon proposed amendments to the Company's amended and restated certificate of incorporation, including the deletion of provisions pertaining to the Company prior to its initial business combination, which are, in the judgment of our board of directors, necessary to adequately address the needs of the combined company.  FOR ☐  AGAINST ☐  ABSTAIN ☐

(8) **The Adjournment Proposal** — To consider and vote upon a proposal to adjourn the Special Meeting of Stockholders to a later date or dates, if necessary, to permit further solicitation and vote of proxies if, based upon the tabulated vote at the time of the Special Meeting, there are not sufficient votes to approve one or more proposals at the Special Meeting.  FOR ☐  AGAINST ☐  ABSTAIN ☐

Dated:_____, 2017

_____
(Signature)

_____
(Signature if held Jointly)

Signature should agree with name printed hereon. If stock is held in the name of more than one person, EACH joint owner should sign. Executors, administrators, trustees, guardians, and attorneys should indicate the capacity in which they sign. Attorneys should submit powers of attorney.

**PLEASE SIGN, DATE AND RETURN THE PROXY IN THE ENVELOPE ENCLOSED TO CONTINENTAL STOCK TRANSFER & TRUST COMPANY. THIS PROXY WILL BE VOTED IN THE MANNER DIRECTED HEREIN BY THE UNDERSIGNED STOCKHOLDER. IF NO DIRECTION IS MADE, THIS PROXY WILL BE VOTED "FOR" THE PROPOSAL SET FORTH IN PROPOSALS 1 THROUGH 8 AND WILL GRANT DISCRETIONARY AUTHORITY TO VOTE UPON SUCH OTHER MATTERS AS MAY PROPERLY COME BEFORE THE MEETING OR ANY ADJOURNMENTS THEREOF. THIS PROXY WILL REVOKE ALL PRIOR PROXIES SIGNED BY YOU.**

Supp.App. 1059

Supp.App. 1060

 

| | | Search ratings, research, analysts, and more... | |

TRENDING　　　REPORTS　　　SECTORS & REGIONS　　　RATINGS & ASSESSMENTS　　　TOOLS & DATA　　　EVENTS & TRAINING

## MOODY'S
### INVESTORS SERVICE

🖨 Print　　📄 Export PDF

### Rating Action: Moody's downgrades Exela's ratings (CFR to Caa1); outlook is negative

22 May 2019

New York, May 22, 2019 -- Moody's Investors Service ("Moody's") downgraded Exela Intermediate LLC's (Exela) ratings, including its Corporate Family Rating to Caa1 from B3, the instrument ratings on the company's senior secured first lien credit facilities and senior secured first lien notes to Caa1 from B3, and its Speculative Grade Liquidity Rating to SGL-4 from SGL-3. At the same time, Moody's affirmed Exela's Caa1-PD Probability of Default Rating. The outlook is negative.

"Exela's restructuring charges consist mostly of headcount that it expects to cut as it transitions to more technology-based BPA service offerings," according to Harold Steiner, Moody's lead analyst for Exela. "We believe these are normal operating expenses necessary to provide its service, and that the competitive nature of the industry itself will erode most of the benefit received from reducing costs through the technology implementation," added Steiner.

The downgrades reflects Moody's view that the investments needed to transition to business process automation (BPA) services and competitive industry pricing will sustain negative free cash flow, pressure on earnings and weak liquidity. The rating actions follow Exela's weak first quarter operating results. Moody's believes the acceleration of the company's organic revenue declines and growing restructuring and optimization charges reflect the operating pressures.

Moody's downgraded the liquidity rating to SGL-4 because of persistent negative free cash flow including a use of approximately $50 million in the first quarter. Moody's projects EBITDA of approximately $200 million after deducting restructuring and optimization charges will barely cover the company's sizeable fixed charges, which consist of $155 million of debt service and $40 million of capital spending needs.

Moody's took the following rating actions:

Downgrades:

..Issuer: Exela Intermediate LLC

.... Corporate Family Rating, Downgraded to Caa1 from B3

.... Speculative Grade Liquidity Rating, Downgraded to SGL-4 from SGL-3

....Gtd Senior Secured First Lien Term Loan, Downgraded to Caa1 (LGD3) from B3 (LGD3)

....Gtd Senior Secured First Lien Revolving Credit Facility, Downgraded to Caa1 (LGD3) from B3 (LGD3)

....Senior Secured First Lien Notes, Downgraded to Caa1 (LGD3) from B3 (LGD3)

Affirmations:

..Issuer: Exela Intermediate LLC

.... Probability of Default Rating, Affirmed Caa1-PD

Outlook Actions:

..Issuer: Exela Intermediate LLC

....Outlook, Changed To Negative From Stable

RATINGS RATIONALE

Exela's Caa1 CFR reflects the company's limited scale in an intensely competitive industry, its persistently poor earnings quality, high leverage and weak liquidity. Exela is limited in scale relative to many of its peers in the business process outsourcing (BPO) industry and faces continuous pricing pressure in its core business. The company is attempting to transition more into providing digitally-enabled BPA services. Unfortunately, so is its typically larger, better-capitalized peer set. As such, Moody's expects revenue and earnings growth to remain limited to the low-single digits in 2019. Moody's also expects poor earnings quality to persist with restructuring and optimization charges necessary to transition to BPA. Liquidity will therefore remain weak while leverage will remain high, rendering the capital structure increasingly untenable and elevating the risk of default. Nevertheless, Exela still garners some ratings support from the contracted nature of its revenue base and ongoing shift by clients to outsource certain processes to reduce costs and increase operating flexibility.

The affirmation of the Caa1-PD PDR reflects Moody's expectation for an average family recovery in the event of a default as opposed to its previous expectation for an above average family recovery.

The negative outlook reflects Moody's view that revenue will only grow in the low-single digits in 2019 while EBITDA after deducing restructuring and optimization costs will exhibit flat to slightly positive growth. As such, revolver borrowings are expected to grow as free cash flow remains negative in the $20 to $30 million range.

The ratings could be downgraded should revenue, earnings, or liquidity deteriorate further. Additionally, an increasing likelihood of a preemptive balance sheet restructuring, such as a distressed exchange, or a deterioration in creditors' recovery prospects could result in a downgrade.

The ratings could be upgraded should Exela successfully grow its organic revenues while improving earnings quality and maintaining adequate liquidity such that the company comfortably generates sustained positive free cash flow.

The principal methodology used in these ratings was Business and Consumer Service Industry published in October 2016. Please see the Rating Methodologies page on www.moodys.com for a copy of this methodology.

Exela Intermediate LLC is a global, location-agnostic provider of business process automation services. The company is publicly traded (NASDAQ: XELA) and generated 2018 revenue of approximately $1.6 billion.

REGULATORY DISCLOSURES

For ratings issued on a program, series or category/class of debt, this announcement provides certain regulatory disclosures in relation to each rating of a subsequently issued bond or note of the same series or category/class of debt or pursuant to a program for which the ratings are derived exclusively from existing ratings in accordance with Moody's rating practices. For ratings issued on a support provider, this announcement provides certain regulatory disclosures in relation to the credit rating action on the support provider and in relation to each particular credit rating action for securities that derive their credit ratings from the support provider's credit rating. For provisional ratings, this announcement provides certain regulatory disclosures in relation to the provisional rating assigned, and in relation to a definitive rating that may be assigned subsequent to the final issuance of the debt, in each case where the transaction structure and terms have not

### Related Issuers

Exela Intermediate LLC

### Related Research

🔒Credit Opinion: Exela Intermediate LLC: Update to credit analysis: increasingly untenable capital structure with weak liquidity and high leverage

Announcement of Periodic Review: Moody's announces completion of a periodic review of ratings of Exela Intermediate LLC

Announcement of Periodic Review: Moody's announces completion of a periodic review of ratings of Exela Intermediate LLC

🔒Issuer Comment: Exela Intermediate LLC: Exela's pay-down of revolver borrowing from new AR facility is credit positive but fundamental challenges remain

Rating Action: Moody's downgrades Exela's ratings to Caa3; outlook remains negative

Supp.App. 1061

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 1064 of 1110　　PageID 2685

changed, although the assignment of the definitive rating in a manner that would have affected the rating. For further information, please see the ratings tab on the issuer/entity page for the respective issuer on www.moodys.com.

For any affected securities or rated entities receiving direct credit support from the primary entity(ies) of this credit rating action, and whose ratings may change as a result of this credit rating action, the associated regulatory disclosures will be those of the guarantor entity. Exceptions to this approach exist for the following disclosures, if applicable to jurisdiction: Ancillary Services, Disclosure to rated entity, Disclosure from rated entity.

Regulatory disclosures contained in this press release apply to the credit rating and, if applicable, the related rating outlook or rating review.

Please see www.moodys.com for any updates on changes to the lead rating analyst and to the Moody's legal entity that has issued the rating.

Please see the ratings tab on the issuer/entity page on www.moodys.com for additional regulatory disclosures for each credit rating.

Harold Steiner, CFA
Analyst
Corporate Finance Group
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

John E. Puchalla, CFA
Associate Managing Director
Corporate Finance Group
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

Releasing Office:
Moody's Investors Service, Inc.
250 Greenwich Street
New York, NY 10007
U.S.A.
JOURNALISTS: 1 212 553 0376
Client Service: 1 212 553 1653

**MOODY'S
INVESTORS SERVICE**

© 2021 Moody's Corporation, Moody's Investors Service, Inc., Moody's Analytics, Inc. and/or their licensors and affiliates (collectively, "MOODY'S"). All rights reserved.

CREDIT RATINGS ISSUED BY MOODY'S CREDIT RATINGS AFFILIATES ARE THEIR CURRENT OPINIONS OF THE RELATIVE FUTURE CREDIT RISK OF ENTITIES, CREDIT COMMITMENTS, OR DEBT OR DEBT-LIKE SECURITIES, AND MATERIALS, PRODUCTS, SERVICES AND INFORMATION PUBLISHED BY MOODY'S (COLLECTIVELY, "PUBLICATIONS") MAY INCLUDE SUCH CURRENT OPINIONS. MOODY'S DEFINES CREDIT RISK AS THE RISK THAT AN ENTITY MAY NOT MEET ITS CONTRACTUAL FINANCIAL OBLIGATIONS AS THEY COME DUE AND ANY ESTIMATED FINANCIAL LOSS IN THE EVENT OF DEFAULT OR IMPAIRMENT. SEE APPLICABLE MOODY'S RATING SYMBOLS AND DEFINITIONS PUBLICATION FOR INFORMATION ON THE TYPES OF CONTRACTUAL FINANCIAL OBLIGATIONS ADDRESSED BY MOODY'S CREDIT RATINGS. CREDIT RATINGS DO NOT ADDRESS ANY OTHER RISK, INCLUDING BUT NOT LIMITED TO: LIQUIDITY RISK, MARKET VALUE RISK, OR PRICE VOLATILITY. CREDIT RATINGS, NON-CREDIT ASSESSMENTS ("ASSESSMENTS"), AND OTHER OPINIONS INCLUDED IN MOODY'S PUBLICATIONS ARE NOT STATEMENTS OF CURRENT OR HISTORICAL FACT. MOODY'S PUBLICATIONS MAY ALSO INCLUDE QUANTITATIVE MODEL-BASED ESTIMATES OF CREDIT RISK AND RELATED OPINIONS OR COMMENTARY PUBLISHED BY MOODY'S ANALYTICS, INC. AND/OR ITS AFFILIATES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT CONSTITUTE OR PROVIDE INVESTMENT OR FINANCIAL ADVICE, AND MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT AND DO NOT PROVIDE RECOMMENDATIONS TO PURCHASE, SELL, OR HOLD PARTICULAR SECURITIES. MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS DO NOT COMMENT ON THE SUITABILITY OF AN INVESTMENT FOR ANY PARTICULAR INVESTOR. MOODY'S ISSUES ITS CREDIT RATINGS, ASSESSMENTS AND OTHER OPINIONS AND PUBLISHES ITS PUBLICATIONS WITH THE EXPECTATION AND UNDERSTANDING THAT EACH INVESTOR WILL, WITH DUE CARE, MAKE ITS OWN STUDY AND EVALUATION OF EACH SECURITY THAT IS UNDER CONSIDERATION FOR PURCHASE, HOLDING, OR SALE.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS, AND PUBLICATIONS ARE NOT INTENDED FOR USE BY RETAIL INVESTORS AND IT WOULD BE RECKLESS AND INAPPROPRIATE FOR RETAIL INVESTORS TO USE MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS OR PUBLICATIONS WHEN MAKING AN INVESTMENT DECISION. IF IN DOUBT YOU SHOULD CONTACT YOUR FINANCIAL OR OTHER PROFESSIONAL ADVISER.

ALL INFORMATION CONTAINED HEREIN IS PROTECTED BY LAW, INCLUDING BUT NOT LIMITED TO, COPYRIGHT LAW, AND NONE OF SUCH INFORMATION MAY BE COPIED OR OTHERWISE REPRODUCED, REPACKAGED, FURTHER TRANSMITTED, TRANSFERRED, DISSEMINATED, REDISTRIBUTED OR RESOLD, OR STORED FOR SUBSEQUENT USE FOR ANY SUCH PURPOSE, IN WHOLE OR IN PART, IN ANY FORM OR MANNER OR BY ANY MEANS WHATSOEVER, BY ANY PERSON WITHOUT MOODY'S PRIOR WRITTEN CONSENT.

MOODY'S CREDIT RATINGS, ASSESSMENTS, OTHER OPINIONS AND PUBLICATIONS ARE NOT INTENDED FOR USE BY ANY PERSON AS A BENCHMARK AS THAT TERM IS DEFINED FOR REGULATORY PURPOSES AND MUST NOT BE USED IN ANY WAY THAT COULD RESULT IN THEM BEING CONSIDERED A BENCHMARK.

All information contained herein is obtained by MOODY'S from sources believed by it to be accurate and reliable. Because of the possibility of human or mechanical error as well as other factors, however, all information contained herein is provided "AS IS" without warranty of any kind. MOODY'S adopts all necessary measures so that the information it uses in assigning a credit rating is of sufficient quality and from sources MOODY'S considers to be reliable including, when appropriate, independent third-party sources. However, MOODY'S is not an auditor and cannot in every instance independently verify or validate information received in the rating process or in preparing its Publications.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability to any person or entity for any indirect, special, consequential, or incidental losses or damages whatsoever arising from or in connection with the information contained herein or the use of or inability to use any such information, even if MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers is advised in advance of the possibility of such losses or damages, including but not limited to: (a) any loss of present or prospective profits or (b) any loss or damage arising where the relevant financial instrument is not the subject of a particular credit rating assigned by MOODY'S.

To the extent permitted by law, MOODY'S and its directors, officers, employees, agents, representatives, licensors and suppliers disclaim liability for any direct or compensatory losses or damages caused to any person or entity, including but not limited to by any negligence (but excluding fraud, willful misconduct or any other type of liability that, for the avoidance of doubt, by law cannot be excluded) on the part of, or any contingency within or beyond the control of, MOODY'S or any of its directors, officers, employees, agents, representatives, licensors or suppliers, arising from or in connection with the information contained herein or the use of or inability to use any such information.

NO WARRANTY, EXPRESS OR IMPLIED, AS TO THE ACCURACY, TIMELINESS, COMPLETENESS, MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE OF ANY CREDIT RATING, ASSESSMENT, OTHER OPINION OR INFORMATION IS GIVEN OR MADE BY MOODY'S IN ANY FORM OR MANNER WHATSOEVER.

Moody's Investors Service, Inc., a wholly-owned credit rating agency subsidiary of Moody's Corporation ("MCO"), hereby discloses that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by Moody's Investors Service, Inc. have, prior to assignment of any credit rating, agreed to pay to Moody's Investors Service, Inc. for credit ratings opinions and services rendered by it fees ranging from $1,000 to approximately $5,000,000. MCO and Moody's Investors Service also maintain policies and procedures to address the independence of Moody's Investors Service credit ratings and credit rating processes. Information regarding certain affiliations that may exist between directors of MCO and rated entities, and between entities who hold credit ratings from Moody's Investors Service and have also publicly reported to the SEC an ownership interest in MCO of more than 5%, is posted annually at www.moodys.com under the heading "Investor Relations — Corporate Governance — Director and Shareholder Affiliation Policy."

Additional terms for Australia only: Any publication into Australia of this document is pursuant to the Australian Financial Services License of MOODY'S affiliate, Moody's Investors Service Pty Limited ABN 61 003 399 657AFSL 336969 and/or Moody's Analytics Australia Pty Ltd ABN 94 105 136 972 AFSL 383569 (as applicable). This document is intended to be provided only to "wholesale clients" within the meaning of section 761G of the Corporations Act 2001. By continuing to access this document from within Australia, you represent to MOODY'S that you are, or are accessing the document as a

Supp.App. 1062

Case 3:20-cv-00691-D　　Document 49-1　　Filed 09/03/21　　Page 1065 of 1110　　PageID 2686

representative of a "wholesale client" and that neither you nor the entity you represent will directly or indirectly disseminate this document or its contents to "retail clients" within the meaning of section 761G of the Corporations Act 2001. MOODY'S credit rating is an opinion as to the creditworthiness of a debt obligation of the issuer, not on the equity securities of the issuer or any form of security that is available to retail investors.

Additional terms for Japan only: Moody's Japan K.K. ("MJKK") is a wholly-owned credit rating agency subsidiary of Moody's Group Japan G.K., which is wholly-owned by Moody's Overseas Holdings Inc., a wholly-owned subsidiary of MCO. Moody's SF Japan K.K. ("MSFJ") is a wholly-owned credit rating agency subsidiary of MJKK. MSFJ is not a Nationally Recognized Statistical Rating Organization ("NRSRO"). Therefore, credit ratings assigned by MSFJ are Non-NRSRO Credit Ratings. Non-NRSRO Credit Ratings are assigned by an entity that is not a NRSRO and, consequently, the rated obligation will not qualify for certain types of treatment under U.S. laws. MJKK and MSFJ are credit rating agencies registered with the Japan Financial Services Agency and their registration numbers are FSA Commissioner (Ratings) No. 2 and 3 respectively.

MJKK or MSFJ (as applicable) hereby disclose that most issuers of debt securities (including corporate and municipal bonds, debentures, notes and commercial paper) and preferred stock rated by MJKK or MSFJ (as applicable) have, prior to assignment of any credit rating, agreed to pay to MJKK or MSFJ (as applicable) for credit ratings opinions and services rendered by it fees ranging from JPY125,000 to approximately JPY550,000,000.

MJKK and MSFJ also maintain policies and procedures to address Japanese regulatory requirements.

**GRITY HOTLINE**

**NET:**

dys.ethicspoint.com

**E FROM THE UNITED STATES:**

30-MDYS (1-866-330-6397)

**E FROM OUTSIDE THE UNITED STATES:**

T Direct Dial Access® code for
n.

prompt, dial 866-330-MDYS
397).

**TERMS & CONDITIONS**

Terms of Use

Privacy Policy

Proprietary Rights

Regulatory Affairs

Moody's Code of Professional Conduct

Cookie Settings

**CONTACT US**

Careers

Help & Support

Contact Us

Submit a Complaint

**EXPLORE**

Investor Relations

MoodysAnalytics.com

Economy.com

Sitemap

**CONNECT**

@MoodysInvSvc

Moody's Corporation

The Moody's Foundatior

REGIONAL SITES: Global

nvestors Service, Inc., Moody's Analytics, Inc. and/or their affiliates and licensors. All rights reserved.

Supp.App. 1063

10-Q 1 a17-20676_110q.htm 10-Q
Table of Contents

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

**(Mark One)**

☒ **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended September 30, 2017

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from            to

Commission File Number: 001-36788

# EXELA TECHNOLOGIES, INC.
(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **47-1347291** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification Number) |
| **2701 E. Grauwyler Rd. Irving, TX** | **75061** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: **(214) 740-6500**

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒    No ☐

Indicate by check mark whether the registrant has submitted electronically and posted on its corporate Website, if any, every Interactive Date File required to be submitted and posted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒    No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company or an emerging growth company. See definitions of "large accelerated filer", "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☒ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☐ |
| (Do not check if a smaller reporting company) | | Emerging growth company | ☒ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐  No ☒

As of November 8, 2017 there were 150,578,451 shares of common stock of the Company issued and outstanding.

SUPP. APP.  1064

Table of Contents

Exela Technologies, Inc.

Form 10-Q

For the quarterly period ended September 30, 2017

**TABLE OF CONTENTS**

**PART I—FINANCIAL INFORMATION**

| | |
|---|---|
| Item 1. Financial Statements | 3 |
| Condensed Consolidated Financial Statements | |
| Condensed Consolidated Balance Sheets as of September 30, 2017 and December 31, 2016 | 3 |
| Condensed Consolidated Statements of Operations for the three and nine months ended September 30, 2017 and 2016 | 4 |
| Condensed Consolidated Statements of Comprehensive Loss for the three and nine months ended September 30, 2017 and 2016 | 5 |
| Condensed Consolidated Statements of Stockholders' Equity (Deficit) for the nine months ended September 30, 2017 and 2016 | 6 |
| Condensed Consolidated Statements of Cash Flows for the nine months ended September 30, 2017 and 2016 | 7 |
| **Notes to the Condensed Consolidated Financial Statements** | 8 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 37 |
| Item 3. Quantitative and Qualitative Disclosures about Market Risk | 57 |
| Item 4. Controls and Procedures | 57 |

**PART II — OTHER INFORMATION**

| | |
|---|---|
| Item 1. Legal Proceedings | 58 |
| Item 1A. Risk Factors | 58 |
| Item 2. Unregistered Sales of Equity Securities and Use of Proceeds | 58 |
| Item 3. Defaults Upon Senior Securities | 58 |
| Item 4. Mine Safety Disclosures | 58 |
| Item 5. Other Information | 58 |

---

Table of Contents

**PART I—FINANCIAL INFORMATION**

**Item 1. Financial Statements.**

**Exela Technologies, Inc. and Subsidiaries**
**Condensed Consolidated Balance Sheets**
**As of September 30, 2017 and December 31, 2016**
*(in thousands of United States dollars except share and per share amounts)*

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | (Unaudited) | |
| **Assets** | | |
| Current assets | | |

SUPP. APP. 1065

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1068 of 1110    PageID 2689

| | | | |
|---|---|---|---|
| Cash and cash equivalents | $ | 27,368 | $ | 8,561 |
| Restricted cash | | 37,315 | | 25,892 |
| Accounts receivable, net of allowance for doubtful accounts of $3,942 and $3,219 respectively | | 227,704 | | 138,421 |
| Inventories, net | | 13,634 | | 11,195 |
| Prepaid expenses and other current assets | | 24,263 | | 12,202 |
| **Total current assets** | | **330,284** | | **196,071** |
| Property, plant and equipment, net | | 133,617 | | 81,600 |
| Goodwill | | 776,010 | | 373,291 |
| Intangible assets, net | | 514,873 | | 298,739 |
| Deferred income tax assets | | 7,880 | | 9,654 |
| Other noncurrent assets | | 15,573 | | 10,131 |
| **Total assets** | $ | **1,778,237** | $ | **969,486** |

**Liabilities and Stockholders' Equity (Deficit)**

**Liabilities**

Current liabilities

| | | | |
|---|---|---|---|
| Accounts payable | $ | 82,676 | $ | 42,212 |
| Related party payables | | 14,474 | | 9,344 |
| Income tax payable | | 770 | | 1,031 |
| Accrued liabilities | | 75,259 | | 29,492 |
| Accrued compensation and benefits | | 52,955 | | 31,200 |
| Customer deposits | | 34,268 | | 18,729 |
| Deferred revenue | | 17,633 | | 17,235 |
| Obligation for claim payment | | 37,315 | | 25,892 |
| Current portion of capital lease obligations | | 15,246 | | 6,507 |
| Current portion of long-term debt | | 18,662 | | 55,833 |
| **Total current liabilities** | | **349,258** | | **237,475** |
| Long-term debt, net of current maturities | | 1,278,306 | | 983,502 |
| Capital lease obligations, net of current maturities | | 25,242 | | 18,439 |
| Pension liability | | 29,717 | | 28,712 |
| Deferred income tax liabilities | | 35,124 | | 26,223 |
| Long-term income tax liability | | 3,063 | | 3,063 |
| Other long-term liabilities | | 15,811 | | 11,973 |
| **Total liabilities** | | **1,736,521** | | **1,309,387** |

Commitment and Contingencies

**Stockholders' equity (deficit)**

| | | | |
|---|---|---|---|
| Common stock, par value of $0.0001 per share; 1,600,000,000 shares authorized; 150,578,451 shares issued and outstanding at September 30, 2017 and 64,024,557 shares issued and outstanding at December 31, 2016; | | 15 | | — |
| Preferred stock, par value of $0.0001 per share; 20,000,000 shares authorized and 6,194,233 shares issued and outstanding at September 30, 2017 and no shares issued or outstanding at December 31, 2016 | | 1 | | — |
| Additional paid in capital | | 482,018 | | (57,389) |
| Equity-based compensation | | 31,788 | | 27,342 |
| Accumulated deficit | | (455,976) | | (293,968) |
| Accumulated other comprehensive loss: | | | | |
| Foreign currency translation adjustment | | (2,291) | | (3,547) |
| Unrealized pension actuarial losses, net of tax | | (13,839) | | (12,339) |
| Total accumulated other comprehensive loss | | (16,130) | | (15,886) |
| **Total stockholders' equity (deficit)** | | **41,716** | | **(339,901)** |
| **Total liabilities and stockholders' equity (deficit)** | $ | **1,778,237** | $ | **969,486** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

3

**Exela Technologies, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Operations**
**For the Three and Nine Months ended September 30, 2017 and 2016**
*(in thousands of United States dollars except share and per share amounts)*
(Unaudited)

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |

SUPP. APP. 1066

Case 3:20-cv-00691-D     Document 49-1     Filed 09/03/21     Page 1069 of 1110     PageID 2690

| | | | |
|---|---|---|---|
| Revenue | $ 338,393 | $ 186,373 | $ 766,035 | $ 577,527 |
| Cost of revenue (exclusive of depreciation and amortization) | 255,116 | 121,780 | 539,242 | 377,700 |
| **Gross profit** | **83,277** | **64,593** | **226,793** | **199,827** |
| Selling, general and administrative expenses | 102,048 | 30,829 | 172,626 | 95,385 |
| Depreciation and amortization | 28,052 | 18,761 | 70,779 | 58,463 |
| Related party expense | 26,892 | 2,448 | 31,733 | 7,372 |
| **Operating (loss) income** | **(73,715)** | **12,555** | **(48,345)** | **38,607** |
| Other expense (income), net: | | | | |
| Interest expense, net | 37,652 | 27,399 | 91,740 | 81,712 |
| Loss on extinguishment of debt | 35,512 | — | 35,512 | — |
| Sundry expense (income), net | 563 | 711 | 2,960 | 283 |
| **Net loss before income taxes** | **(147,442)** | **(15,555)** | **(178,557)** | **(43,388)** |
| Income tax benefit | 37,002 | 3,757 | 32,924 | 9,969 |
| **Net loss** | **$ (110,440)** | **$ (11,798)** | **$ (145,633)** | **$ (33,419)** |
| Dividend equivalent on Series A Preferred Stock related to beneficial conversion feature | (16,375) | — | (16,375) | — |
| Cumulative dividends for Series A Preferred Stock | (1,225) | — | (1,225) | — |
| **Net loss attributable to common stockholders** | **$ (128,040)** | **$ (11,798)** | **$ (163,233)** | **$ (33,419)** |
| **Earnings per share:** | | | | |
| Basic and diluted | $ (0.92) | $ (0.18) | $ (1.76) | $ (0.52) |

The accompanying notes are an integral part of these condensed consolidated financial statements.

4

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Comprehensive Loss**
**For the Three Months and Nine Months ended September 30, 2017 and 2016**
*(in thousands of United States dollars except share and per share amounts)*
(Unaudited)

| | Three months ended September 30, | | Nine months ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net loss | $ (110,440) | $ (11,798) | $ (145,633) | $ (33,419) |
| **Other comprehensive loss, net of tax** | | | | |
| Foreign currency translation adjustments | 233 | 222 | 1,256 | 1,955 |
| Unrealized pension actuarial (losses) gains, net of tax | (536) | 109 | (1,500) | 469 |
| **Total other comprehensive loss, net of tax** | **$ (110,743)** | **$ (11,467)** | **$ (145,877)** | **$ (30,995)** |

The accompanying notes are an integral part of these condensed consolidated financial statements.

5

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Stockholders' Equity (Deficit)**
**For the Nine Months ended September 30, 2017 and 2016**
*(in thousands of United States dollars except share and per share amounts)*
(Unaudited)

| | Common Stock | | Preferred Stock | | Additional Paid in Capital | Equity-Based Compensation | Accumulated Other Comprehensive Loss Foreign Currency Translation Adjustment | Unrealized Pension Actuarial Losses, net of tax | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | | |
| Balances at December 31, 2015 (as previously reported) | 144,400 | $ — | — | $ — | $ (57,389) | $ 20,256 | $ (3,415) | $ (5,076) | $ (245,865) | $ (291,489) |
| Conversion of shares | 63,880,157 | 6 | — | — | (6) | — | — | — | — | — |
| Balances at December 31, | 64,024,557 | $ 6 | — | $ — | $ (57,395) | $ 20,256 | $ (3,415) | $ (5,076) | $ (245,865) | $ (291,489) |

SUPP. APP. 1067

**2015, effect of reverse acquisition (refer to Note 2)**

| | Common Stock Shares | Amount | Preferred Stock Shares | Amount | Additional Paid in Capital | Equity-Based Compensation | Foreign Currency Translation Adjustment | Unrealized Pension Actuarial Losses, net of tax | Accumulated Deficit | Total Stockholders' Equity |
|---|---|---|---|---|---|---|---|---|---|---|
| Net loss January 1 to September 30, 2016 | | | | | | | | | (33,419) | (33,419) |
| Equity-based compensation | | | | | | 5,422 | | | | 5,422 |
| Foreign currency translation adjustment | | | | | | | 1,955 | | | 1,955 |
| Net realized pension actuarial gains, net of tax | | | | | | | | 469 | | 469 |
| **Balances at September 30, 2016** | **64,024,557** | **$ 6** | **—** | **$ —** | **$ (57,395)** | **$ 25,678** | **$ (1,460)** | **$ (4,607)** | **$ (279,284)** | **$ (317,062)** |

|  | Common Stock | | Preferred Stock | | Additional | Equity-Based | Accumulated Other Comprehensive Loss | | Accumulated | Total Stockholders' |
|---|---|---|---|---|---|---|---|---|---|---|
|  | | | | | | | Foreign Currency Translation | Unrealized Pension Actuarial Losses, | | |
|  | Shares | Amount | Shares | Amount | Paid in Capital | Compensation | Adjustment | net of tax | Deficit | Equity |
| **Balances at December 31, 2016 (as previously reported)** | **144,400** | **$ —** | **—** | **$ —** | **$ (57,389)** | **$ 27,342** | **$ (3,547)** | **$ (12,339)** | **$ (293,968)** | **$ (339,901)** |
| Conversion of shares | 63,880,157 | 6 | — | — | (6) | — | — | — | — | — |
| **Balances at December 31, 2016, effect of reverse acquisition (refer to Note 2)** | **64,024,557** | **$ 6** | **—** | **$ —** | **$ (57,395)** | **$ 27,342** | **$ (3,547)** | **$ (12,339)** | **$ (293,968)** | **$ (339,901)** |
| Net loss January 1 to September 30, 2017 | | | | | | | | | (145,633) | (145,633) |
| Equity-based compensation | | | | | | 4,446 | | | | 4,446 |
| Foreign currency translation adjustment | | | | | | | 1,256 | | | 1,256 |
| Net realized pension actuarial gains, net of tax | | | | | | | | (1,500) | | (1,500) |
| Merger recapitalization | 16,575,443 | 2 | | | 20,546 | | | | | 20,548 |
| Shares issued to acquire Novitex (refer to Note 3) | 30,600,000 | 3 | | | 244,797 | | | | | 244,800 |
| Issuance\Conversion of Quinpario shares | 12,093,331 | 1 | | | 22,358 | | | | | 22,359 |
| Sale of common shares at July 12, 2017 | 18,757,942 | 3 | | | 130,860 | | | | | 130,863 |
| Issuance of Series A Preferred Stock | — | — | 9,194,233 | 1 | 73,553 | | | | | 73,554 |
| Shares issued for advisory services and underwriting fees | 3,609,375 | — | | | 28,573 | | | | | 28,573 |
| Conversion of Series A Preferred Stock to common shares | 3,667,803 | — | (3,000,000) | — | — | | | | | — |
| Shares issued for HandsOn Global Management contract termination fee | 1,250,000 | | | | 10,000 | | | | | 10,000 |
| Equity issuance expenses | | | | | (7,649) | | | | | (7,649) |
| Adjustment for beneficial conversion feature | | | | | 16,375 | | | | (16,375) | — |

SUPP. APP. 1068

of Series A
Preferred Stock
(refer to Note 2)

| Balances at September 30, 2017 | 150,578,451 | $ | 15 | 6,194,233 | $ | 1 | $ | 482,018 | $ | 31,788 | $ | (2,291) | $ | (13,839) | $ (455,976) | $ | 41,716 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|

The accompanying notes are an integral part of these condensed consolidated financial statements.

6

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Condensed Consolidated Statements of Cash Flows**
**For the Nine Months ended September 30, 2017 and 2016**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

| | Nine Months ended September 30, | |
|---|---|---|
| | 2017 | 2016 |
| **Cash flows from operating activities** | | |
| Net loss | $ (145,633) | $ (33,419) |
| Adjustments to reconcile net loss | | |
| Depreciation and amortization | 70,779 | 58,463 |
| Fees paid in stock | 23,875 | — |
| HGM contract termination fee paid in stock | 10,000 | — |
| Original issue discount and debt issuance cost amortization | 9,684 | 10,183 |
| Loss on extinguishment of debt | 35,512 | — |
| Provision (recovery) for doubtful accounts | 451 | (372) |
| Deferred income tax benefit (expense) | (37,186) | (9,092) |
| Share-based compensation expense | 4,446 | 5,422 |
| Foreign currency remeasurement | 777 | 172 |
| Gain on sale of Meridian | (588) | — |
| Loss on sale of property, plant and equipment | 508 | 1,242 |
| Change in operating assets and liabilities, net of effect from acquisitions: | | |
| Accounts receivable | (2,784) | 12,732 |
| Related party receivable | — | (1,089) |
| Prepaid expenses and other assets | 189 | (3,807) |
| Accounts payable and accrued liabilities | 37,316 | 4,227 |
| Related party payables | 4,936 | (1,345) |
| **Net cash provided by operating activities** | **12,282** | **43,317** |
| **Cash flows from investing activities** | | |
| Purchases of property, plant and equipment | (7,001) | (4,971) |
| Additions to internally developed software | (6,348) | (7,207) |
| Additions to outsourcing contract costs | (8,574) | (11,015) |
| Cash acquired in Transcentra acquisition | — | 3,351 |
| Proceeds from sale of Meridian | 4,582 | — |
| Cash acquired in Quinpario reverse merger | 91 | — |
| Cash paid in Novitex acquisition, net of cash received | (423,428) | — |
| Proceeds from sale of property, plant and equipment | 11 | 625 |
| **Net cash used in by investing activities** | **(440,667)** | **(19,217)** |
| **Cash flows from financing activities** | | |
| Change in bank overdraft | (210) | (1,541) |
| Proceeds from issuance of common and preferred stock | 204,417 | — |
| Cash received from Quinpario | 27,031 | — |
| Proceeds from financing obligations | 3,040 | 4,801 |
| Contribution from Shareholders | 20,548 | — |
| Proceeds from new credit facility | 1,320,500 | — |
| Retirement of previous credit facilities | (1,055,736) | — |
| Cash paid for debt issuance costs and debt discounts | (39,837) | — |
| Cash paid for equity issue costs | (149) | — |
| Borrowings from revolver and swing-line loan | 72,600 | 53,200 |
| Repayments on revolver and swing line loan | (72,500) | (53,200) |
| Principal payments on long-term obligations | (32,647) | (35,247) |
| **Net cash provided by (used in) financing activities** | **447,057** | **(31,987)** |
| Effect of exchange rates on cash | 335 | (239) |

SUPP. APP. 1069

|  |  |  |  |  |
|---|---|---|---|---|
| Net increase (decrease) in cash and cash equivalents |  | 19,007 |  | (8,126) |
| Cash and cash equivalents |  |  |  |  |
| Beginning of period |  | 8,361 |  | 16,619 |
| End of period | $ | 27,368 | $ | 8,493 |
| **Supplemental cash flow data:** |  |  |  |  |
| Income tax payments, net of refunds received | $ | 2,673 | $ | 2,798 |
| Interest paid |  | 60,347 |  | 79,828 |
| **Noncash investing and financing activities:** |  |  |  |  |
| Assets acquired through capital lease arrangements | $ | 2,080 | $ | 5,632 |
| Leasehold improvements funded by lessor |  | 74 |  | 1,016 |
| Issuance of common stock as consideration for Novitex |  | 244,800 |  | — |
| Accrued capital expenditures |  | 3,512 |  | 412 |
| Dividend equivalent on Series A Preferred Stock | $ | 16,375 | $ | — |
| Liability assumed of Quinpario |  | 4,672 |  | — |

The accompanying notes are an integral part of these condensed consolidated financial statements.

7

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

## 1.    Description of the Business

Exela Technologies, Inc. (the "Company" or "Exela") is a global provider of transaction processing solutions, enterprise information management, document management and digital business process services. The Company provides mission-critical information and transaction processing solutions services to clients across three major industry verticals: (1) Information & Transaction Processing, (2) Healthcare Solutions, and (3) Legal and Loss Prevention Services. The Company manages information and document driven business processes and offers solutions and services to fulfill specialized knowledge-based processing and consulting requirements, enabling clients to concentrate on their core competencies. Through its outsourcing solutions, the Company enables businesses to streamline their internal and external communications and workflows.

The Company was originally incorporated in Delaware on July 15, 2014 as a special purpose acquisition company under the name Quinpario Acquisition Corp 2 ("Quinpario") for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination involving Quinpario and one or more businesses or entities. On July 12, 2017 (the "Closing"), the Company consummated its business combination with SourceHOV Holdings, Inc. ("SourceHOV") and Novitex Holdings, Inc. ("Novitex") pursuant to the Business Combination Agreement and Consent, Waiver and Amendment to the Business Combination Agreement, dated February 21, 2017 and June 15, 2017, respectively (the "Business Combination"). In connection with the Closing, the Company changed its name from Quinpario Acquisition Corp 2 to Exela Technologies, Inc. Unless the context otherwise requires, the "Company" refers to the combined company and its subsidiaries following the Business Combination, "Quinpario" refers to the Company prior to the closing of the Business Combination, "SourceHOV" refers to SourceHOV prior to the Business Combination and "Novitex" refers to Novitex prior to the Business Combination. Refer to Note 3 for further discussion of the Business Combination.

## 2.    Basis of Presentation and Summary of Significant Accounting Policies

The following is a summary of the significant accounting policies consistently applied in the preparation of the accompanying consolidated financial statements.

**Basis of Presentation**

The accompanying unaudited condensed consolidated financial statements have been prepared in accordance with generally accepted accounting principles in the United States ("U.S. GAAP") for interim financial information and in accordance with the rules and regulations of the Securities and Exchange Commission ("SEC"). Accordingly, they do not include all of the information and footnotes required by U.S. GAAP for complete financial statements. The unaudited condensed consolidated financial statements reflect all normal and recurring adjustments that are, in the opinion of the Company's management, necessary for the fair presentation of the results of operations for the interim periods. Operating results for the three and nine months ended September 30, 2017 are not necessarily indicative of the results that may be expected for the year ending December 31, 2017. These interim financial statements should be read in conjunction with SourceHOV's audited financial statements for the year ended December 31, 2016 included in the Proxy Statement of the Company filed with the SEC on June 26, 2017, as amended and supplemented.

8

SUPP. APP.  1070

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

The Business Combination has been accounted for as a reverse merger in accordance with U.S. GAAP. For accounting purposes, SourceHOV was deemed to be the accounting acquirer, Quinpario was the legal acquirer, and Novitex is considered the acquired company. In conjunction with the Business Combination, outstanding shares of SourceHOV were converted into common stock of the Company, par value $0.0001 per share, shown as a recapitalization, and the net assets of Quinpario were acquired at historical cost, with no goodwill or other intangible assets recorded. The consolidated assets, liabilities and results of operations prior to the Closing of the Business Combination (for the quarters ended September 30, 2017 and 2016 and the year ended December 31, 2016) are those of SourceHOV, and Quinpario's assets and liabilities, which include net cash from the trust of $27.0 million and accrued fees payable of $4.8 million, and results of operations are consolidated with SourceHOV beginning on the Closing. The shares and corresponding capital amounts and earnings per share available to common stockholders, prior to the Business Combination, have been retroactively restated as shares reflecting the exchange ratio established in the Business Combination. The presented financial information for the quarter ended September 30, 2017 includes the financial information and activities for SourceHOV for the period July 1, 2017 to September 30, 2017 (92 days) as well as the financial information and activities of Novitex for the period July 13, 2017 to September 30, 2017 (80 days).

**Principles of Consolidation**

The unaudited condensed consolidated financial statements include the accounts of the Company and its wholly-owned subsidiaries. All significant intercompany balances and transactions have been eliminated in consolidation. In addition, the Company evaluates its relationships with other entities to identify whether they are variable interest entities as defined by the Financial Accounting Standards Board ("FASB") Accounting Standards Codification ("ASC") 810-10, *Consolidation* and whether the Company is the primary beneficiary. Consolidation is required if both of these criteria are met.

**Use of Estimates**

The preparation of consolidated financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period.

Key estimates and judgments relied upon in preparing these consolidated financial statements include revenue recognition for multiple element arrangements, allowance for doubtful accounts, income taxes, depreciation, amortization, employee benefits, stock-based compensation, contingencies, goodwill, intangible assets, fair value of assets and liabilities acquired in acquisitions, and liability valuations. The Company regularly assesses these estimates and records changes in estimates in the period in which they become known. The Company bases its estimates on historical experience and various other assumptions that the Company believes to be reasonable under the circumstances. Actual results could differ from those estimates.

9

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Segment Reporting**

The Company consists of the following three segments:

1.  *Information & Transaction Processing Solutions ("ITPS").* ITPS provides industry solutions for banking and financial services, including lending solutions for mortgages and auto loans, and banking solutions for clearing, anti-money laundering, sanctions, and interbank cross-border settlement; property and casualty insurance solutions for origination, enrollments, claims processing, and benefits administration communications; public sector solutions for income tax processing, benefits administration, and record management; multi-industry solutions for payment processing and reconciliation, integrated receivables and payables management, document logistics and location services, records management and electronic storage of data, documents; and software, hardware, professional services and maintenance related to information and transaction processing automation, among others.

2.  *Healthcare Solutions ("HS").* HS offerings include revenue cycle solutions, integrated accounts payable and accounts receivable, and information management for both the healthcare payer and provider markets. Payer service offerings include claims processing, claims adjudication and auditing services, enrollment processing and policy management, and scheduling and prescription management. Provider

SUPP. APP.  1071

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1074 of 1110    PageID 2695

service offerings include medical coding and insurance claim generation, underpayment audit and recovery, and medical records management.

3.  *Legal and Loss Prevention Services ("LLPS").* LLPS solutions include processing of legal claims for class action and mass action settlement administrations, involving project management support, notification and outreach to claimants, collection, analysis and distribution of settlement funds. Additionally, LLPS provides data and analytical services in the context of litigation consulting, economic and statistical analysis, expert witness services, and revenue recovery services for delinquent accounts receivable.

**Restricted Cash**

As part of the Company's legal claims processing service, the Company holds cash for various settlement funds once the fund is in the wind down stage and claims have been paid. The cash is used to pay tax obligations and other liabilities of the settlement funds. The Company recorded an offsetting liability in obligation for claim payment in the consolidated balance sheets for the settlement funds received of $37.3 million and $25.9 million at September 30, 2017 and December 31, 2016, respectively. Of the total amount of settlement funds received, $19.2 million and $17.1 million were not subject to legal restrictions on use as of September 30, 2017 and December 31, 2016, respectively. The Company also maintains a collateral certificate of deposit account required by its insurance carrier for unsettled workers' compensation claims. The Company records an offsetting liability in accrued compensation and benefits for these claims in the consolidated balance sheets.

**Intangible Assets**

*Customer Relationships*

Customer relationship intangible assets represent customer contracts and relationships obtained as part of acquired businesses. Customer relationship values are estimated by evaluating various factors including historical attrition rates, contractual provisions and customer growth rates, among others. The estimated average useful lives of customer relationships range from three to 16 years depending on the facts and circumstances. These intangible assets are primarily amortized based on undiscounted cash flows. The Company evaluates the remaining useful life of intangible assets on an annual basis to determine whether events and circumstances warrant a revision to the remaining useful life.

10

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

*Trade Names*

The Company has determined that its trade name intangible assets are indefinite-lived assets and therefore are not subject to amortization. The Company's valuation of trade names at the reporting unit level utilizes the Relief-from-Royalty method that represents the present value of the future economic benefits generated by ownership of the trade names and approximates the amount that the Company would have to pay as a royalty to a third party to license such names.

*Trademarks*

The Company has determined that its trademark intangible assets resulting from acquisitions are definite-lived assets and therefore are subject to amortization. The Company amortizes trademarks on a straight-line basis over the estimated useful life, which is typically ten years. The Novitex trademarks acquired in connection with the Business Combination have an estimated useful life of 9.5 years.

*Developed Technology*

The Company has various developed technologies embedded in its technology platform. Developed technology is an integral asset to the Company in providing solutions to customers and is recorded as an intangible asset. The Company amortizes developed technology on a straight-line basis over its estimated useful life, which is typically five years. Exela acquired internally developed software in the Business Combination called Connect Platform. Connect Platform has an estimated useful life of 5 years.

*Capitalized Software Costs*

The Company capitalizes certain costs incurred to develop software products to be sold, leased or otherwise marketed after establishing technological feasibility in accordance with ASC section 985-20, Software—Costs of Software to Be Sold, Leased, or Marketed, and the Company capitalizes costs to develop or purchase internal-use software in accordance with ASC section 350-40, Intangibles—Goodwill and Other— Internal-Use Software. Significant estimates and assumptions include determining the appropriate period over which to amortize the capitalized costs based on estimated useful lives and estimating the marketability of the commercial software products and related future revenues. The Company amortizes capitalized software costs on a straight-line basis over the estimated useful life, which is typically five years.

SUPP. APP. 1072

*Outsourced Contract Costs*

Costs of outsourcing contracts, including costs incurred for bid and proposal activities, are generally expensed as incurred. However, certain costs incurred upon initiation of an outsourcing contract are deferred and expensed on a straight-line basis over the estimated contract life. These costs represent incremental external costs or certain specific internal costs that are directly related to the contract acquisition or transition activities and can be separated into two principal categories: contract commissions and transition/set-up costs. Examples of such capitalized costs include hourly labor and related fringe benefits and travel costs.

*Non-compete agreements*

The Company acquired certain non-compete agreements in connection with the Business Combination. These were related to four Novitex executives that were terminated following the acquisition. The Company has determined that the agreements have a definite useful life of one year.

11

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Property, Plant and Equipment**

Property, plant, and equipment are recorded at cost less accumulated depreciation. Depreciation is computed using the straight-line method (which approximates the use of the assets) over the estimated useful lives of the assets. When any of these assets are sold or otherwise disposed of, the asset and related depreciation is relieved, and any gain or loss is included in the consolidated statements of operations for the period of sale or disposal. Leasehold improvements are amortized over the lease term or the useful life of the asset, whichever is shorter. Assets under capital leases are amortized over the lease term unless ownership is transferred by the end of the lease or there is a bargain purchase option, in which case assets are amortized normally on a straight-line basis over the useful life that would be assigned if the assets were owned. The amortization of these capital lease assets is recorded in depreciation expense in the consolidated statements of operations. Repair and maintenance costs are expensed as incurred.

**Leases**

Leases are classified as capital leases whenever the terms of the lease transfer substantially all of the risks and rewards of ownership to the lessee. All other leases are classified as operating leases. Assets held under a capital lease are initially recognized as assets of the Company at their fair value at the inception of the lease, or if lower, at the present value of the minimum lease payments. The corresponding liability to the lessor is included in the other long-term obligations in the consolidated balance sheets. Operating lease payments are initially recognized as an expense on a straight-line basis over the lease term, except where another systematic basis is more representative of the time pattern in which the economic benefits from the leased asset are consumed.

**Stock-Based Compensation**

The Company accounts for stock based compensation in accordance with ASC 718, "Compensation- Stock Compensation" ("ASC 718"); ASC 718 requires generally that all equity awards be accounted for at their "fair value." This fair value is measured at the fair value of value of the awards at the grant date and recognized as compensation expense on a straight-line basis over the vesting period. The fair value of the awards on the grant date is determined using the Enterprise Value model. The expense resulting from share-based payments is recorded in general and administrative expense in the accompanying consolidated statements of operations. Refer to *Note 13 - Stock-Based Compensation.*

**Revenue Recognition**

The majority of the Company's revenues are comprised of: (1) ITPS, (2) HS offerings, (3) LLPS solutions, or (4) some combination thereof. Revenue is realized or realizable and earned when persuasive evidence of an arrangement exists, delivery has occurred, the sales price is fixed or determinable and collectability is probable. Delivery does not occur until services have been provided to the client, risk of loss has transferred to the client, and either client acceptance has been obtained, client acceptance provisions have lapsed, or the Company has objective evidence that the criteria specified in the client acceptance provisions have been satisfied. The sales price is not considered to be fixed or determinable until all contingencies related to the sale have been resolved.

ITPS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services. HS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed for healthcare payers and providers. LLPS revenues are primarily based on time and materials pricing as well as through transactional services priced on a per item basis.

SUPP. APP.  1073

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

If a contract involves the provision of a single element, revenue is generally recognized when the product or service is provided and the amount earned is not contingent upon any future event. Revenue from time and materials arrangements is recognized as the services are performed.

Service arrangements are typically one to five year contracts that contain monthly service fees that are recognized as earned. Service revenues billed in advance are deferred and recognized on a straight-line basis over the service period. The Company recognizes variable rate revenues, including fees derived from the utilization of document management-related equipment and production of print services, when such services are rendered. Reimbursable expenses are recognized as earned when incurred. Sales commissions determined to be incremental direct costs incurred related to the successful acquisition of new client revenues are deferred and amortized over the length of the initial contract period. Customer incentive payments are deferred and recognized over the longer of the initial contract period or the period the customer is expected to benefit from payment of these up-front fees.

The Company records deferred revenue when it receives payments or invoices in advance of the delivery of products or the performance of services. The deferred revenue is recognized as earnings when underlying performance obligations are achieved.

The Company includes reimbursements from clients, such as postage costs, in revenue, while the related costs are included in cost of revenue in the consolidated statement of operations.

*Multiple Element Arrangements*

Certain of the Company's revenue is generated from multiple element arrangements involving various combinations. The deliverables within these arrangements are evaluated at contract inception to determine whether they represent separate units of accounting, and if so, contract consideration is allocated to each deliverable based on relative selling price. The relative selling price of each deliverable within these arrangements is determined using vendor specific objective evidence of fair value, third-party evidence or best estimate of selling price. Revenue is then recognized in accordance with the appropriate revenue recognition guidance applicable to the respective elements.

If the multiple element arrangements criteria are not met, the arrangement is accounted for as one unit of accounting which would result in revenue being recognized on a straight-line basis over the period of delivery or being deferred until the earlier of when such criteria are met or when the last element is delivered.

**Beneficial Conversion Feature**

The issuance of the Company's Series A Perpetual Convertible Preferred Stock, par value $0.0001 per share (the "Series A Preferred Stock") generated a beneficial conversion feature, which arises when a debt or equity security is issued with an embedded conversion option that is beneficial to the investor or in the money at inception because the conversion option has an effective strike price that is less than the market price of the underlying stock at the commitment date. The Company recognized the beneficial conversion feature by allocating the intrinsic value of the conversion option, which is the number of shares of common stock available upon conversion multiplied by the difference between the effective conversion price per share and the fair value of common stock per share on the commitment date, to additional paid-in capital, resulting in a discount on the Series A Preferred Stock. As a result of the occurrence of events meeting the definition of a "Fundamental Change" as defined in the Certificate of Designations, Preferences, Rights and Limitations of Series A Perpetual Convertible Preferred Stock of the Company during the period, the Company recognized the entire dividend equivalent of $16.4 million as of September 30, 2017.

13

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Net Loss per Share**

Earnings per share ("EPS") is computed by dividing net loss available to common stockholders by the weighted average number of shares of common stock outstanding during the period, excluding the effects of any potentially dilutive securities. Diluted EPS gives effect to the potential dilution that could occur if securities or other contracts to issue common stock were exercised or converted into common stock, using the more

SUPP. APP. 1074

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1077 of 1110    PageID 2698

dilutive of the two-class method or if-converted method in periods of earnings. The two-class method is an earnings allocation method that determines earnings per share for common shares and participating securities. As the Company experienced net losses for the periods presented, the impact of participating Series A Preferred Stock was calculated based on the if-converted method. Diluted EPS excludes all dilutive potential of shares of common stock if their effect is anti-dilutive.

For the three and nine months ended September 30, 2017, shares of the Company's Series A Preferred Stock, if converted would have resulted in an additional 7,573,066 shares of common stock outstanding, but were not included in the computation of diluted loss per share as their effects were anti-dilutive.

The Company has not considered the effect of 35,000,000 warrants sold in the Quinpario Initial Public Offering ("IPO") in the calculation of net income (loss) per share. Warrants are considered anti-dilutive and excluded when the exercise price exceeds the average market value of the Company's common stock price during the applicable period.

The components of basic and diluted EPS are as follows:

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|  | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Net loss attributable to common stockholders (A) | $ (128,040) | $ (11,798) | $ (163,233) | $ (33,419) |
| Weighted average common shares outstanding - basic and diluted (B) | 138,895,681 | 64,024,557 | 92,512,729 | 64,024,557 |
| **Earnings Per Share:** | | | | |
| Basic and diluted (A/B) | $ (0.92) | $ (0.18) | $ (1.76) | $ (0.52) |

**Recently Adopted Accounting Pronouncements**

Effective January 1, 2017, the Company adopted Accounting Standards Update ("ASU") no. 2015-11, *Inventory (Topic 330): Simplifying the Measurement of Inventory*. This amendment replaced the method of measuring inventories at lower of cost or market with a lower of cost and net realizable value method. The adoption had no material impact on the Company's financial position, results of operations and cash flows.

Effective January 1, 2017, the Company adopted ASU no. 2016-09, *Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting (ASU 2016-09)*. The ASU changes how companies account for certain aspects of equity-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The standard requires that all tax effects related to share-based payments be recorded as income tax expense or benefit in the income statement at settlement or expiration and, accordingly, excess tax benefits and tax deficiencies be presented as operating activities in the statement of cash flows. Upon adoption of this standard, the Company elected to continue its current practice of estimating expected forfeitures. The adoption had no material impact on the Company's financial position, results of operations and cash flows.

14

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Recently Issued Accounting Pronouncements**

In May 2014, the FASB issued ASU no. 2014-09, *Revenue from Contracts with Customers (ASC 606)*. Under the update, revenue will be recognized based on a five-step model. The core principle of the model is that revenue will be recognized when the transfer of promised goods or services to customers is made in an amount that reflects the consideration to which the entity expects to be entitled in exchange for those goods or services. In July 2015, the FASB deferred the effective date by one year (ASU no. 2015-14). This ASU will be effective beginning after December 15, 2017, and interim periods within annual periods beginning after December 15, 2018. Earlier application is permitted only as of annual reporting periods beginning after December 15, 2016, including interim reporting periods within that reporting period. Since the issuance of the original standard, the FASB has issued several other subsequent updates including the following: 1) clarification of the implementation guidance on principal versus agent considerations (ASU 2016-08); 2) further guidance on identifying performance obligations in a contract as well as clarifications on the licensing implementation guidance (ASU 2016-10); 3) rescission of several SEC Staff Announcements that are codified in ASC 605 (ASU 2016-11); 4) additional guidance and practical expedients in response to identified implementation issues (ASU 2016-12); and 5) technical corrections and improvements (ASU 2016-20). The new standard will be effective for us beginning January 1, 2018. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In February 2016, the FASB issued ASU no. 2016-02, *Leases (842)*. This ASU increases transparency and comparability among organizations by recognizing lease assets and lease liabilities on the balance sheet and disclosing key information about leasing arrangements. The amendments in this ASU are effective for fiscal years beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In June 2016, the FASB issued ASU no. 2016-13, *Financial Instruments — Credit Losses (Topic 326): Measurement of Credit Losses on Financial Instruments,* to replace the incurred loss impairment methodology under current U.S. GAAP with a methodology that reflects expected credit losses and requires consideration of a broader range of reasonable and supportable information to inform credit loss estimates. The Company will be required to use a forward-looking expected credit loss model for accounts receivables, loans, and other financial instruments. Credit losses relating to available-for-sale debt securities will also be recorded through an allowance for credit losses rather than as a reduction in the amortized cost basis of the securities. The standard will be effective for fiscal years beginning after December 15, 2020, and interim periods within fiscal years beginning after December 15, 2021. Adoption of the standard will be applied using a modified retrospective approach through a cumulative-effect adjustment to retained earnings as of the effective date. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In August 2016, the FASB issued ASU no. 2016-15, *Statement of Cash Flows: Classification of Certain Cash Receipts and Cash Payments (Topic 230)*, which adds or clarifies guidance on the presentation and classification of eight specific types of cash receipts and cash payments in the statement of cash flows such as debt prepayment or extinguishment costs, settlement of contingent consideration arising from a business combination, insurance settlement proceeds, and distributions from certain equity method investees, with the intent of reducing diversity in practice. For public entities, ASU 2016-15 is effective for fiscal years, including interim periods within those fiscal years, beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. Entities must apply the guidance retrospectively to all periods presented unless retrospective application is impracticable. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

15

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

In October 2016, the FASB issued ASU no. 2016-16*, Income Taxes: Intra-Entity Transfers of Assets Other Than Inventory (Topic 740)*, which eliminates the current prohibition on immediate recognition of the current and deferred income tax effects of intra-entity transfers of assets other than inventory, with the intent of reducing complexity and diversity in practice. Under ASU 2016-16, entities must recognize the income tax consequences when the transfer occurs rather than deferring recognition. For public entities, ASU 2016-16 is effective for fiscal years, including interim periods within those fiscal years, beginning after December 15, 2018, and interim reporting periods within annual periods beginning after December 15, 2019, with early adoption permitted as of the beginning of a fiscal year (i.e., early adoption is permitted only in the first interim period). Entities must apply the guidance on a modified retrospective basis though a cumulative effect adjustment to retained earnings as of the beginning of the period of adoption.  The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In November 2016, the FASB issued ASU no. 2016-18, *Statement of Cash Flows: Restricted Cash* (Topic 230). The ASU addresses diversity in practice that exists in the classification and presentation of changes in restricted cash and requires that a statement of cash flows explain the change during the period in the total of cash, cash equivalents, and amounts generally described as restricted cash or restricted cash equivalents. The ASU is effective beginning after December 15, 2018, and interim periods within fiscal years beginning after December 15, 2019. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued ASU no. 2017-01, *Business Combinations: Clarifying the Definition of a Business (Topic 805).* The ASU clarifies the definition of a business and provides guidance on evaluating as to whether transactions should be accounted for as acquisitions (or disposals) of assets or business combinations. The definition clarification as outlined in this ASU affects many areas of accounting including acquisitions, disposals, goodwill, and consolidation. The amendments of the ASU are effective for annual periods beginning after December 15, 2018, and interim periods within annual periods beginning after December 15, 2019. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In January 2017, the FASB issued ASU no. 2017-04, *Intangibles  Goodwill and Other (Topic 350): Simplifying the Test for Goodwill Impairment*, which eliminates Step 2 of the goodwill impairment test that had required a hypothetical purchase price allocation. Rather, entities should apply the same impairment assessment to all reporting units and recognize an impairment loss for the amount by which a reporting unit's carrying amount exceeds its fair value, without exceeding the total amount of goodwill allocated to that reporting unit. Entities will continue to have the option to perform a qualitative assessment for a reporting unit to determine if the quantitative impairment test is necessary. ASU 2017-04 will be effective prospectively for annual or interim goodwill impairment tests in fiscal years beginning after December 15, 2021, or those beginning after January 1, 2017 if early adopted. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In March 2017, the FASB issued ASU no. 2017-07, *Compensation  Retirement Benefits (Topic 715): Improving the Presentation of Net Periodic Pension Cost and Net Periodic Postretirement Benefit Cost*. The amendments to this ASU require the service cost component of net periodic benefit cost be reported in the same income statement line or lines as other compensation costs for employees. The other components of net periodic benefit cost are required to be reported separately from service costs and outside a subtotal of income from operations. Only the service cost component is

SUPP. APP.  1076

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1079 of 1110    PageID 2700

eligible for capitalization. The guidance is effective for annual periods beginning after December 15, 2018, and interim periods within annual periods beginning after December 15, 2019. The amendments should be applied retrospectively for the income statement presentations and prospectively for the capitalization of

16

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

service costs. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In May 2017, the FASB issued ASU no. 2017-09, *Compensation — Stock Compensation (Topic 718): Scope of Modification Accounting.* The amendments in ASU 2017-09 provide guidance about which changes to the terms or conditions of a share-based payment award require an entity to apply modification accounting in Topic 718. ASU 2017-09 is effective for fiscal years beginning after December 15, 2017 with early adoption permitted. The amendments in this update will be applied on a prospective basis to an award modified on or after the adoption date. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

In July 2017, the FASB issued ASU 2017-11, *Earnings Per Share (Topic 260), Distinguishing Liabilities from Equity (Topic 480) and Derivatives and Hedging (Topic 815): I. Accounting for Certain Financial Instruments with Down Round Features; II. Replacement of the Indefinite Deferral for Mandatorily Redeemable Financial Instruments of Certain Nonpublic Entities and Certain Mandatorily Redeemable Noncontrolling Interests with a Scope Exception.* Part I of this update addresses the complexity of accounting for certain financial instruments with down round features. Down round features are features of certain equity-linked instruments (or embedded features) that result in the strike price being reduced on the basis of the pricing of future equity offerings. Current accounting guidance creates cost and complexity for entities that issue financial instruments (such as warrants and convertible instruments) with down round features that require fair value measurement of the entire instrument or conversion option. Part II of this update addresses the difficulty of navigating *Topic 480, Distinguishing Liabilities from Equity*, because of the existence of extensive pending content in the FASB Accounting Standards Codification. This pending content is the result of the indefinite deferral of accounting requirements about mandatorily redeemable financial instruments of certain nonpublic entities and certain mandatorily redeemable noncontrolling interests. The amendments in Part II of this update do not have an accounting effect. This ASU is effective for fiscal years, and interim periods within those years, beginning after December 15, 2019, and interim periods within fiscal years beginning after December 15, 2020. The Company is currently in the early stages of evaluating the impact that adopting this standard will have on the consolidated financial statements.

3.    **Business Combination**

On July 12, 2017, the Company consummated its business combination with SourceHOV and Novitex pursuant to the Business Combination Agreement and Consent, Waiver and Amendment to the Business Combination Agreement, dated February 21, 2017 and June 15, 2017, respectively. In connection with the Business Combination, the Company acquired debt facilities and issued notes totaling $1.4 billion (refer to Note 9 — Long Term Debt).  Proceeds from the acquired debt were used to refinance the existing debt of SourceHOV, settle the outstanding debt of Novitex, and pay fees and expenses incurred in connection with the Business Combination. Immediately following the Business Combination, there were 146,910,648 shares of common stock, 9,194,233 shares of Series A Preferred Stock, and 35,000,000 warrants outstanding. Refer to Note 14 — Stockholders' Equity.

Under ASC 805, *Business Combinations*, SourceHOV was deemed the accounting acquirer based on the following predominate factors: its former owners have the largest portion of voting rights in the Company, the Board and Management has more individuals coming from SourceHOV than either Quinpario or Novitex, SourceHOV was the largest entity by revenue and by assets, and the headquarters was moved to the SourceHOV headquarters location.

17

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

The Company acquired 100% of the equity of Novitex pursuant to the Business Combination Agreement by issuing 30,600,000 shares of common stock of Exela to Novitex Parent, L.P., the sole stockholder of Novitex. Total value of equity for the transaction was $244.8 million. Additionally, as noted, the Company used proceeds from acquired debt to settle the outstanding debt of Novitex in the amount of $420.5 million, and pay transaction

SUPP. APP.  1077

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1080 of 1110    PageID 2701

related costs and interest on behalf of Novitex in the amount of $10.5 million and $1.6 million, respectively, which was accounted for as part of consideration.

The acquired assets and assumed liabilities of Novitex were recorded at their estimated fair values.  The purchase price allocation for the Novitex business combination is preliminary and subject to change within the respective measurement period which will not extend beyond one year from the acquisition date. Measurement period adjustments will be recognized in the reporting period in which the adjustment amounts are determined.

The following table summarizes the consideration paid for Novitex and the preliminary fair value of the assets acquired and liabilities assumed at the acquisition date on July 12, 2017:

| **Assets acquired:** | | |
|---|---|---|
| Cash and equivalents | $ | 8,428 |
| Accounts receivable | | 87,474 |
| Inventory | | 1,245 |
| Prepaid expenses & other | | 13,974 |
| Property, plant and equipment, net | | 60,657 |
| Identifiable intangible Assets, net | | 251,060 |
| Deferred charges and other assets | | 2,723 |
| Other noncurrent assets | | 93 |
| Goodwill | | 405,141 |
| Total identifiable assets acquired | $ | 830,795 |
| **Liabilities Assumed:** | | |
| Accounts payable | | (29,444) |
| Short-term borrowings and current portion of LT debt | | (11,335) |
| Accrued liabilities | | (30,432) |
| Advanced billings and customer deposits | | (18,926) |
| Long term debt | | (15,704) |
| Deferred taxes | | (46,072) |
| Other liabilities | | (2,226) |
| Total liabilities assumed | $ | (154,139) |
| Total Consideration | $ | 676,656 |

18

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

The identifiable intangible assets include customer relationships, non-compete agreements, internally developed software, and trademarks and trade names. Customer relationships and non-compete agreements were valued using the Income Approach, specifically the Multi-Period Excess Earnings method. Trademarks and trade names were valued using the Income Approach, specifically the Relief-from-Royalty method. Internally developed software was valued based on costs incurred related to Connect Platform. All of these intangibles acquired represent a Level 3 measurement as they are based on unobservable inputs reflecting the Company's management's own assumptions about the inputs used in pricing the asset or liability at fair value.

| | Weighted Average Useful Life (in years) | | Fair value |
|---|---|---|---|
| Trademark and trade name - Novitex | 9.5 | $ | 18,000 |
| Customer relationships | 16.0 | | 230,000 |
| Internally devleoped software - Connect Platform | 5.0 | | 1,710 |
| Non-compete agreements | 1.0 | | 1,350 |
| | | $ | 251,060 |

As of September 30, 2017, the weighted-average useful life of total identifiable intangible assets acquired in the Business Combination, excluding goodwill, is 15.4 years.

The Company expects to realize revenue synergies, leverage, brand awareness, stronger margins, greater free cash flow generation, and expand the existing Novitex sales channels, and utilize the existing workforce. The Company also anticipates opportunities for growth through the ability to leverage additional future services and capabilities. These factors, among others, contributed to a purchase price in excess of the estimated fair value of Novitex's identifiable net assets assumed, and as a result, the Company has recorded goodwill in connection with this acquisition. The Company engaged a third party valuation firm to aid management in its analyses of the fair value of the assets and liabilities. All estimates, key assumptions, and forecasts were either provided by or reviewed by the Company. Approximately $14.0 million of the goodwill recorded was tax

SUPP. APP.  1078

Table of Contents

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1081 of 1110    PageID 2702

deductible, which was carried over from the tax basis of the seller. Since the acquisition date of July 12, 2017, $134.4 million of revenue and $5.0 million of net loss are included in consolidated revenues and net loss, respectively, for Novitex. These results are included in the ITPS segment.

*Transaction Costs*

The Company, incurred approximately $69.3 million in advisory, legal, accounting and management fees in conjunction with the Business Combination as of September 30, 2017. Additionally, $7.6 million was incurred related to equity issuance costs and $40.9 million was incurred in debt issuance costs.

*Restructuring Charges*

In February 2017, management performed a strategic review of human resources at Novitex for the purpose of assessing the business need for their employment and for the purpose of quantifying the synergies resulting from the acquisition. As a result, in July 2017, the Company communicated the termination of certain executives and non-executive Novitex employees.

The Company determined that costs associated with termination benefits should be accounted for separately from the acquisition, as a post-combination expense of the combined entity because the expense was incurred for the benefit of the combined entity. The Company recorded severance expense in the amount of $4.6 million related to the impacted executives and $0.1 million related to other terminations in the statement of operations for the three months ended September 30, 2017.

<center>19</center>

---

Table of Contents

<center>

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

</center>

The Company does not expect to incur additional charges for these terminations in future periods. Severance charges associated with the terminations were included in Selling, general and administrative expenses on the consolidated statement of operations and were included in the ITPS segment. Of the total amount of restructuring charges, $2.1 million was shown as a liability as of September 30, 2017, which is included within Accrued compensation and benefits on the Condensed Consolidated Balance Sheets.

*Pro-Forma Information*

Following are the supplemental consolidated results of the Company on an unaudited pro forma basis, as if the acquisition had been consummated on January 1, 2016 for three months and nine months ended September 30, 2017 and 2016:

| | Three months ended September 30, | | | | Nine months ended September 30, | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | 2017 | | 2016 | | 2017 | | 2016 | |
| Net Revenue | $ | 358,166 | $ | 350,784 | $ | 1,069,992 | $ | 1,082,299 |
| Net Loss | | (47,098) | | (24,460) | | (64,304) | | (107,772) |

These pro forma results were based on estimates and assumptions, which the Company believes are reasonable. They are not the results that would have been realized had the Company been a combined company during the periods presented and are not necessarily indicative of consolidated results of operations in future periods. The pro forma results include adjustments primarily related to purchase accounting adjustments. Acquisition costs and other non-recurring charges incurred are included in the earliest period presented.

Additionally, the pro forma results are inclusive of the acquisition of TransCentra by SourceHOV for the three and nine month periods ended September 30, 2016. These pro forma results were based on estimates and assumptions, which the Company believes are reasonable. They are not the results that would have been realized had the Company been a combined company during the periods presented and are not necessarily indicative of the Company's consolidated results of operations in future periods.

**4.   Accounts Receivable**

Accounts receivable, net consist of the following:

| | September 30, 2017 | | December 31, 2016 | |
| --- | --- | --- | --- | --- |
| Billed receivables | $ | 195,437 | $ | 116,148 |
| Unbilled receivables | | 31,341 | | 20,982 |
| Other | | 4,868 | | 4,510 |
| Less: Allowance for doubtful accounts | | (3,942) | | (3,219) |
| | $ | 227,704 | $ | 138,421 |

SUPP. APP. 1079

Unbilled receivables represent balances recognized as revenue that have not been billed to the customer. The Company's allowance for doubtful accounts is based on a policy developed by historical experience and management judgment. Adjustments to the allowance for doubtful accounts may occur based on market conditions or specific client circumstances.

20

Table of Contents

## Exela Technologies, Inc. and Subsidiaries
### Notes to the Condensed Consolidated Financial Statements
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

### 5.    Prepaid Expenses and Other Current Assets

Prepaid expenses and other current assets consist of the following:

|  | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Prepaids | $ 22,923 | $ 10,906 |
| Deposits | 1,340 | 1,296 |
|  | $ 24,263 | $ 12,202 |

### 6.    Property, Plant and Equipment, Net

Property, plant, and equipment, which include assets recorded under capital leases, are stated at cost less accumulated depreciation and amortization, and consist of the following:

|  | Estimated Useful Lives (in Years) | September 30, 2017 | December 31, 2016 |
|---|---|---|---|
| Land | N/A | $ 7,744 | $ 7,637 |
| Buildings and improvements | 7 - 40 | 18,450 | 16,989 |
| Leasehold improvements | Lesser of the useful life or lease term | 48,243 | 31,342 |
| Vehicles | 5 - 7 | 792 | 784 |
| Machinery and equipment | 5 - 15 | 62,242 | 23,297 |
| Computer equipment and software | 3 - 8 | 112,490 | 98,544 |
| Furniture and fixtures | 5 - 15 | 6,993 | 5,007 |
|  |  | 256,954 | 183,600 |
| Less: Accumulated depreciation and amortization |  | (123,337) | (102,000) |
| Property, plant and equipment, net |  | $ 133,617 | $ 81,600 |

21

Table of Contents

## Exela Technologies, Inc. and Subsidiaries
### Notes to the Condensed Consolidated Financial Statements
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

### 7.    Intangibles Assets and Goodwill

**Intangibles**

Intangible assets are stated at cost or acquisition-date fair value less accumulated amortization and consist of the following:

|  | September 30, 2017 | | |
|---|---|---|---|
|  | Gross Carrying Amount (a) | Accumulated Amortization | Intangible Asset, net |
| Customer relationships | 504,643 | (125,803) | $ 378,840 |
| Developed technology | 89,076 | (72,806) | 16,270 |
| Trade names | 52,470 | — | 52,470 |

SUPP. APP. 1080

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1083 of 1110  PageID 2704

| | Gross Carrying Amount | Accumulated Amortization | Intangible Asset, net |
|---|---|---|---|
| Outsource contract costs | 37,144 | (15,020) | 22,124 |
| Internally developed software | 24,799 | (3,159) | 21,640 |
| Trademarks | 23,370 | (898) | 22,472 |
| Non-compete agreements | 1,350 | (293) | 1,057 |
| | $ 732,852 | $ (217,979) | $ 514,873 |

| | December 31, 2016 | | |
|---|---|---|---|
| | Gross Carrying Amount | Accumulated Amortization | Intangible Asset, net |
| Customer relationships | $ 274,643 | $ (100,172) | $ 174,471 |
| Developed technology | 89,076 | (59,539) | 29,537 |
| Trade names | 53,370 | — | 53,370 |
| Outsource contract costs | 27,619 | (7,378) | 20,241 |
| Internally developed software | 16,742 | (858) | 15,884 |
| Trademarks | 5,370 | (134) | 5,236 |
| | $ 466,820 | $ (168,081) | $ 298,739 |

(a) Amounts include intangibles acquired in the Business Combination. Refer to Note 3.

22

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Goodwill**

Goodwill by reporting segment consists of the following:

| | Goodwill | Additions | Reductions | Currency translation adjustments | Goodwill |
|---|---|---|---|---|---|
| ITPS | $ 145,562 | $ 13,558 | $ — | $ 274 | $ 159,394 |
| HS | 86,786 | — | — | — | 86,786 |
| LLPS | 127,111 | — | — | — | 127,111(a) |
| **Balance as of December 31, 2016** | $ 359,459 | $ 13,558 | $ — | $ 274 | $ 373,291 |
| ITPS | 159,394 | 405,141(c) | | 299 | 564,834 |
| HS | 86,786 | | | | 86,786 |
| LLPS | 127,111 | — | (2,721)(b) | — | 124,390(a) |
| **Balance as of September 30, 2017** | $ 373,291 | $ 405,141 | $ (2,721) | $ 299 | $ 776,010 |

(a) The carrying amount of goodwill for all periods presented is net of accumulated impairment losses of $137.9 million.
(b) The reduction in goodwill is due to the sale of Meridian in Q1 2017.
(c) Addition to goodwill is due to the Novitex acquisition. Refer to Note 3.

The Company recorded $405.1 million of goodwill as a result of the allocation of the purchase price between assets acquired and liabilities assumed in the Business Combination. Of the total amount of goodwill recorded, $46.1 million of goodwill is associated with deferred tax liabilities recorded in connection with amortizable intangible assets acquired in the Business Combination.

**8. Accrued Liabilities and Other Long-Term Liabilities**

Accrued liabilities consist of the following:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| Accrued taxes (exclusive of income taxes) | $ 7,521 | $ 3,309 |
| Accrued lease exit obligations | 2,474 | 3,949 |
| Accrued professional and legal fees | 12,821 | 8,289 |
| Deferred rent | 1,136 | 989 |
| Accrued interest | 30,405 | 8,459 |
| Accrued transaction costs | 19,250 | 2,750 |

SUPP. APP. 1081

Other accruals                                          1,652            1,747

                                                   $    75,259      $    29,492

23

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

Other Long-term liabilities consist of the following:

|                                   | September 30, 2017 | | December 31, 2016 | |
|-----------------------------------|------:|---|------:|---|
| Deferred revenue                  | $ | 447 | $ | 235 |
| Deferred rent                     |   | 7,383 |   | 6,110 |
| Accrued lease exit obligations    |   | 1,667 |   | 672 |
| Accrued compensation expense      |   | 2,980 |   | 3,783 |
| Other                             |   | 3,334 |   | 1,173 |
|                                   | $ | 15,811 | $ | 11,973 |

## 9.    Long-Term Debt and Credit Facilities

### Senior Credit Facilities

On July 12, 2017, the Company entered into a First Lien Credit Agreement with Royal Bank of Canada, Credit Suisse AG, Cayman Islands Branch, Natixis, New York Branch and KKR Corporate Lending LLC (the "Credit Agreement") providing Exela Intermediate LLC, a wholly owned subsidiary of the Company, upon the terms and subject to the conditions set forth in the Credit Agreement, (i) a $350.0 million senior secured term loan maturing July 12, 2023 with an original issue discount ("OID") of $7.0 million, and (ii) a $100.0 million senior secured revolving facility maturing July 12, 2022, none of which is currently drawn.

The Credit Agreement provides for the following interest rates for borrowings under the senior secured term facility and senior secured revolving facility: at the Company's option, either (1) an adjusted LIBOR, subject to a 1.0% floor in the case of term loans, or (2) a base rate, in each case plus an applicable margin. The initial applicable margin for the senior secured term facility is 7.5% with respect to LIBOR borrowings and 6.5% with respect to base rate borrowings. The initial applicable margin for the senior secured revolving facility is 7.0% with respect to LIBOR borrowings and 6.0% with respect to base rate borrowings. The applicable margin for borrowings under the senior secured revolving facility is subject to step-downs based on leverage ratios. The senior secured term loan is subject to amortization payments, commencing on the last day of the first full fiscal quarter of the Company following the closing date, of 0.63% of the aggregate principal amount for each of the first eight payments and 1.3% of the aggregate principal amount for payments thereafter, with any balance due at maturity.

### Senior Secured Notes

On July 12, 2017, the Company issued $1.0 billion in aggregate principal amount of 10.0% First Priority Senior Secured Notes due 2023 with an OID of $22.5 million (the "Notes").  The Notes are guaranteed by certain subsidiaries of the Company. The Notes bear interest at a rate of 10.0% per year.  The Company pays interest on the Notes on January 15 and July 15 of each year, commencing on January 15, 2018.  The Notes will mature on July 15, 2023.

24

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

### Debt Refinancing

Upon the closing of the Business Combination on July 12, 2017, the $1,050.7 million outstanding balance of SourceHOV related debt facilities and the $420.5 million outstanding balance of Novitex related debt facilities were paid off using proceeds from the Credit Agreement and issuance of the Notes.

SUPP. APP.  1082

Case 3:20-cv-00691-D   Document 49-1   Filed 09/03/21   Page 1085 of 1110   PageID 2706

In accordance with ASC 470 — *Debt — Modifications and Extinguishments,* as a result of certain lenders that participated in SourceHOV's debt structure prior to the refinancing and the Company's debt structure after the refinancing, it was determined that a portion of the refinancing of SourceHOV's first lien secured term loan and second lien secured term loan ("Original SourceHOV Term Loans") would be accounted for as a debt modification, and the remaining would be accounted for as an extinguishment. The Company incurred $28.9 million in debt issuance costs related to the new secured term loan, of which $2.8 million was third party costs. The Company expensed $1.1 million of costs related to the modified debt and capitalized the remaining $27.8 million. The Company wrote off $30.5 million of the unamortized issuance costs and discounts associated with the retirement of SourceHOV's credit facilities. The Company retained approximately $3.3 million and $3.5 million of debt issuance costs and debt discounts, respectively, associated with the modified portion of the Original SourceHOV Term Loans that will be amortized over the term of the new term loan, which are presented on the balance sheet as a contra-debt liability. The Company incurred a $5.0 million prepayment penalty related to the Original SourceHOV Term Loans that was recorded as a loss on extinguishment of debt.

The proceeds of the new debt financing were also used to pay fees and expenses incurred in connection with the Business Combination and for general corporate purposes.

25

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

**Long-Term Debt Outstanding**

As of September 30, 2017 and December 31, 2016, the following long-term debt instruments were outstanding:

|  | September 30, 2017 | December 31, 2016 |
| --- | ---: | ---: |
| First lien revolving credit facility (a) | $          — | $          63,337 |
| First lien secured term loan (b) | — | 687,884 |
| Second lien secured term loan (c) | — | 236,344 |
| Transcentra revolving credit facility | — | 5,000 |
| Transcentra term loan | — | 19,250 |
| FTS unsecured term loan | — | 15,911 |
| Other (d) | 18,104 | 11,609 |
| First lien credit agreement (e) | 309,540 | — |
| Senior secured notes (f) | 969,324 | — |
| Senior secured revolving credit facility (g) | — | — |
| Total debt | 1,296,968 | 1,039,335 |
| Less: Current portion of long-term debt | (18,662) | (55,833) |
| Long-term debt, net of current maturities | $          1,278,306 | $          983,502 |

(a) Net of unamortized debt issuance costs of $2.3 million as of December 31, 2016
(b) Net of unamortized original issue discount and debt issuance costs of $14.6 million and $14.2 million as of December 31, 2016
(c) Net of unamortized original issue discount and debt issuance costs of $7.3 million and $6.3 million as of December 31, 2016
(d) Other debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company
(e) Net of unamortized original issue discount and debt issuance costs of $10.2 million and $30.2 million as of September 30, 2017
(f) Net of unamortized original issue discount and debt issuance costs of $21.9 million and $8.8 million as of September 30, 2017
(g) Debt issuance costs of $3.0 million were capitalized as an asset and will be amortized ratably over the term of the facility. Debt issuance costs are included in Other Non Current Assets on the balance sheet.

**Credit Facilities**

As of September 30, 2017 and December 31, 2016, the Company had outstanding irrevocable letters of credit totaling approximately $22.8 million and $9.3 million, respectively, under a revolving credit facility.

26

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**

SUPP. APP.  1083

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1086 of 1110    PageID 2707

**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

## 10. Income Taxes

The Company applies an estimated annual effective tax rate ("ETR") approach for calculating a tax provision for interim periods, as required under U.S. GAAP. The Company recorded an income tax benefit of $37.0 million and an income tax benefit of $3.8 million for the three months ended September 30, 2017 and 2016, respectively. The Company recorded an income tax benefit of $32.9 million and an income tax benefit of $10.0 million for the nine months ended September 30, 2017 and 2016, respectively.

The Company's actual effective tax rate of 25.12% and 18.44% for the three and nine months ended September 30, 2017, respectively, differed from the expected U.S. statutory tax rate of 35.0%. The Company's tax rate includes the tax effects related to the decrease of valuation allowance on a portion of the Company's U.S. net operating loss ("NOL") carryforwards. In connection with the acquisition of Novitex, the Company recognized an $11.5 million income tax benefit from the reversal of a portion of the Company's U.S. federal and state valuation allowance on deferred tax assets. The Company determined that a portion of its pre-existing deferred tax assets are more-likely-than-not to be realized by the combined entity and a portion of the valuation allowance should be decreased. However, based on tax law ordering rules, the reduction of valuation allowance on the Company's pre-existing deferred tax assets was partially offset by an increase in valuation allowance on current year losses that are not more-likely-than-not to be realized.

The Company's ETR of 23.29% and 22.98% for the three months and nine months ended September 30, 2016, respectively, differed from the expected U.S. statutory tax rate of 35.0%, and was impacted by permanent tax adjustments, foreign operations, FIN48 liability release due to statute of limitation expiration, and a valuation allowance against certain domestic and foreign deferred tax assets that are not more-likely-than-not to be realized.

As of September 30, 2017, there were no material changes to either the nature or the amounts of the uncertain tax positions previously determined for the year ended December 31, 2016.

## 11. Employee Benefit Plans

### German Pension Plan

The Company's subsidiary in Germany provides pension benefits to retirees. Employees eligible for participation include all employees who started working for the Company prior to September 30, 1987 and have finished a qualifying period of at least 10 years. The Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

### U.K. Pension Plan

The Company's subsidiary in the United Kingdom provides pension benefits to retirees and eligible dependents. Employees eligible for participation included all full-time regular employees who were more than three years from retirement prior to October 2001. A retirement pension or a lump-sum payment may be paid dependent upon length of service at the mandatory retirement age. The Company accrues the cost of these benefits over the service lives of the covered employees based on an actuarial calculation. The Company uses a December 31 measurement date for this plan.

The German pension plan is an unfunded plan and therefore has no plan assets. The expected rate of return assumptions for plan assets relate solely to the UK plan and are based mainly on historical performance achieved over a long period of time (15 to 20 years) encompassing many business and economic cycles. The Company assumed a weighted average expected long-term rate on plan assets for the overall scheme of 5.16%.

27

[Table of Contents](#)

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

### Tax Effect on Accumulated Other Comprehensive Loss

As of September 30, 2017 and December 31, 2016, the Company recorded actuarial losses of $13.8 million and $12.3 million in accumulated other comprehensive loss on the condensed consolidated balance sheets, respectively, which is net of a deferred tax benefit of $2.2 million and $2.5 million, respectively.

### Pension and Post Retirement Expense

SUPP. APP.  1084

The components of the net periodic benefit cost are as follows:

| | Three Months ended September 30, | | Nine Months ended September 30, | |
| | 2017 | 2016 | 2017 | 2016 |
|---|---|---|---|---|
| Service cost | $ 2 | $ 3 | $ 6 | $ 9 |
| Interest cost | 585 | 667 | 1,708 | 2,001 |
| Expected return on plan assets | (610) | (656) | (1,782) | (1,968) |
| Amortization: | | | | |
| Amortization of prior service cost | (34) | (35) | (99) | (105) |
| Amortization of net loss | 529 | 223 | 1,546 | 669 |
| Net periodic benefit cost | $ 472 | $ 202 | $ 1,379 | $ 606 |

## Employer Contributions

The Company's funding of employer contributions is based on governmental requirements and differs from those methods used to recognize pension expense. The Company made contributions of $2.3 million and $2.0 million to its pension plans during the nine months ended September 30, 2017 and 2016, respectively. The Company has fully funded the pension plans for 2017 based on current plan provisions.

## Executive Deferred Compensation Plan

The Company has individual arrangements with seven former executives in the U.S. which provide for fixed payments to be made to each individual beginning at age 65 and continuing for 20 years. This is an unfunded plan with payments to be made from operating cash of the Company. Benefit payments of $0.1 million were made for both three months ended September 30, 2017 and 2016, respectively. Benefit payments of $0.2 million were made during both nine months ended September 30, 2017 and 2016, respectively. There was an expense of $0.2 million and $0.5 million for the three months ended September 30, 2017 and 2016, respectively. The benefit for the nine months ended September 30, 2017 was $0.3 million with a corresponding expense for the nine months ended September 30, 2016 of $0.7 million. Benefit payments expected to be paid to plan participants during the remainder of 2017 are $0.1 million.

## 12. Commitments and Contingencies

### Appraisal Demand

On September 21, 2017, former stockholders of our wholly-owned subsidiary SourceHOV, who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Business Combination Transaction, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). At this early stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action.

28

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

## 13. Fair Value Measurement

### Assets and Liabilities Measured at Fair Value on a Non-Recurring Basis

The carrying amount of assets and liabilities including cash and cash equivalents, accounts receivable and accounts payable approximated their fair value as of September 30, 2017 and December 31, 2016 due to the relative short maturity of these instruments. Management estimates the fair values of the secured term loan and secured notes at approximately 98.6% and 98.3% respectively, of the respective principal balance outstanding as of September 30, 2017. The carrying value approximates the fair value for the long-term debt. The Company acquired $11.7 million of other long term debt from Novitex (refer to Note 3), which primarily relates to the financing of equipment. Other debt represents the Company's outstanding loan balances associated with various hardware and software purchases along with loans entered into by subsidiaries of the Company and as such, the cost incurred would approximate fair value. Property and equipment, intangible assets, capital lease obligations, and goodwill are not required to

SUPP. APP. 1085

Case 3:20-cv-00691-D Document 49-1 Filed 09/03/21 Page 1088 of 1110 PageID 2709

be re-measured to fair value on a recurring basis. These assets are evaluated for impairment if certain triggering events occur. If such evaluation indicates that impairment exists, the respective asset is written down to its fair value.

The Company determined the fair value of its long-term debt using Level 2 inputs including the recent issue of the debt, the Company's credit rating, and the current risk-free rate. The Company's contingent liabilities related to prior acquisitions are re-measured each period and represent a Level 2 measurement as it is based on using an earn out method based on the agreement terms.

The following table provides the carrying amounts and estimated fair values of the Company's financial instruments as of September 30, 2017 and December 31, 2016:

| As of September 30, 2017 | Carrying Amount | | Fair Value | | Fair Value Measurements | | | | | |
| | | | | | Level 1 | | Level 2 | | Level 3 | |
| Recurring and nonrecurring assets and liabilities: | | | | | | | | | | |
| Acquisition contingent liability | $ | 721 | $ | 721 | $ | — | $ | — | $ | 721 |
| Long-term debt | | 1,278,306 | | 1,327,130 | | — | | 1,327,130 | | — |
| | $ | 1,279,027 | $ | 1,327,851 | $ | — | $ | 1,327,130 | $ | 721 |

| As of December 31, 2016 | Carrying Amount | | Fair Value | | Fair Value Measurements | | | | | |
| | | | | | Level 1 | | Level 2 | | Level 3 | |
| Recurring and nonrecurring assets and liabilities: | | | | | | | | | | |
| Acquisition contingent liability | $ | 721 | $ | 721 | $ | — | $ | — | $ | 721 |
| Long-term debt | | 983,502 | $ | 1,009,913 | | — | | 1,009,913 | | |
| | $ | 984,223 | $ | 1,010,634 | $ | — | $ | 1,009,913 | $ | 721 |

<div align="center">29</div>

<div align="center">Table of Contents</div>

<div align="center">

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

</div>

The significant unobservable inputs used in the fair value of the Company's acquisition contingent liabilities are the discount rate, growth assumptions, and revenue thresholds. Significant increases (decreases) in the discount rate would have resulted in a lower (higher) fair value measurement. Significant increases (decreases) in the forecasted financial information would have resulted in a higher (lower) fair value measurement. For all significant unobservable inputs used in the fair value measurement of the Level 3 liabilities, a change in one of the inputs would not necessarily result in a directionally similar change in the other based on the current level of billings.

The following table reconciles the beginning and ending balances of net assets and liabilities classified as Level 3 for which a reconciliation is required:

| | | |
|---|---|---:|
| Balance as of January 1, 2016 | $ | 1,513 |
| Payments/Reductions | | (792) |
| Balance as of December 31, 2016 | $ | 721 |
| Payments/Reductions | | — |
| Balance as of September 30, 2017 | $ | 721 |

**14. Stock-Based Compensation**

At Closing, SourceHOV had 24,535 restricted stock units ("RSUs") outstanding under its 2013 Long Term Incentive Plan ("2013 Plan"). Simultaneous with the Closing, the 2013 Plan, as well as all vested and unvested RSUs under the 2013 Plan, were assumed by Ex-Sigma, LLC ("Ex-Sigma"), an entity formed by the former SourceHOV equity holders, which is also the Company's principal stockholder. In accordance with U.S. GAAP, the Company will continue to incur compensation expense related to the 9,880 unvested RSUs on a straight line basis until fully vested, as the recipients of the RSUs are employees of the Company. The Company incurred total compensation expense of $2.2 million and $4.4 million related to these awards for the three and nine months ended September 30, 2017, respectively.

The Company has not approved any incentive plans to grant awards of stock options, stock appreciation rights, restricted stock, restricted stock units, other stock-based awards and performance awards as of September 30, 2017.

*Awards to Non-employees*

At Closing, the Company issued 3,609,375 shares of common stock to advisors who are not affiliates of the Company at the Closing in exchange for services provided. The shares issued were fully vested at the Closing. The Company records equity instruments issued to non-employees as

SUPP. APP. 1086

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1089 of 1110    PageID 2710

expense at the fair value. For the three months ended September 30, 2017, the Company recorded expense related to these non-employee advisors of $28.6 million in Selling, general and administrative expense, based on the fair value of $8.00 per share.

<div align="center">30</div>

---

Table of Contents

<div align="center">

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

</div>

## 15. Stockholders' Equity

The following description summarizes the material terms and provisions of the securities that the Company has authorized.

*Common Stock*

The Company is authorized to issue 1,600,000,000 shares of common stock. At Closing, the Company had 146,910,648 shares of common stock outstanding, of which: a) 80,600,000 shares were issued to Ex-Sigma, b) 30,600,000 shares were issued to the sole shareholder of Novitex, c) 12,093,331 shares were issued to the stockholders of Quinpario who did not redeem their shares, d) 3,609,375 shares were issued to certain third party advisors involved in the Business Combination, and e) 16,358,389 shares were issued to holders as part of a secondary offering at $8.00 per share with an additional 2,399,553 bonus shares issued. Certain shareholders of Quinpario were offered 25% common stock bonuses if they executed conversion agreements within a specified time limit. Seven Quinpario shareholders returned the agreements and were awarded 841,876 additional shares.  As of September 30, 2017, there were no additional issuances of common stock other than the conversion of 3,000,000 shares of Series A Preferred Stock being converted into 3,667,803 shares of common stock. As of September 30, 2017, there were 150,578,451 shares of common stock issued and outstanding.

Except as otherwise required by law or as otherwise provided in any certificate of designation for any series of preferred stock, the holders of Exela common stock possess all voting power for the election of Exela's directors and all other matters requiring stockholder action and will at all times vote together as one class on all matters submitted to a vote of Exela stockholders. Holders of Exela common stock are entitled to one vote per share on matters to be voted on by stockholders.  Holders of Exela common stock will be entitled to receive such dividends and other distributions, if any, as may be declared from time to time by the board of directors in its discretion out of funds legally available therefor and shall share equally on a per share basis in such dividends and distributions. The holders of the common stock have no conversion, preemptive or other subscription rights and there are no sinking fund or redemption provisions applicable to the common stock.

*Preferred Stock*

The Company is authorized to issue 20,000,000 shares of Series A Preferred Stock with such designations, voting and other rights and preferences as may be determined from time to time by the Board of Directors. At the Closing, the Company issued 9,194,233 shares of Series A Preferred Stock. Refer to Note 3 for additional details about the Business Combination. The par value of the Series A Preferred Stock is $0.0001 per share. Each share of Series A Preferred Stock will be convertible at the holder's option, at any time after the six month anniversary and prior to the third anniversary of the issue date, initially into 1.2226 shares of Exela common stock (assuming a conversion price of $8.80 per share and a third anniversary expected liquidation preference of $10.75911 per the below). Due to  a Fundamental Change that occurred on August 1, 2017 as described in the beneficial conversion feature section of Note 2, preferred stockholders were able to convert their shares prior to the six month anniversary. Based on such assumed conversion rate, approximately 11,240,869 shares of Exela common stock would be issuable upon conversion of all of the shares of Series A Preferred Stock at the six month anniversary of the issue date.  As 3,000,000 shares of Series A Preferred Stock converted into 3,667,803 shares of common stock upon the occurrence of a fundamental change, as of September 30, 2017, an additional 7,573,066 shares of common stock as issuable upon conversion of the remaining 6,194,233 shares of Series A Preferred Stock.

<div align="center">31</div>

---

Table of Contents

<div align="center">

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

</div>

Holders of the Series A Preferred Stock are entitled to receive cumulative dividends at a rate per annum of 10% of the Liquidation Preference per share of Series A Preferred Stock. From the issue date until the third anniversary of the issue date, the amount of all accrued but unpaid dividends on the Series A Preferred Stock will be added to the Liquidation Preference without any action by the Company's Board of Directors.

SUPP. APP.  1087

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1090 of 1110    PageID 2711

Following the third anniversary of the issue date, dividends on the Series A Preferred Stock will be accrued by adding to the Liquidation Preference or paid in cash, or a combination thereof. In addition, holders of the Series A Preferred Stock will participate in any dividend or distribution of cash or other property paid in respect of the common stock pro rata with the holders of the common stock, as if all shares of Series A Preferred Stock had been converted into common stock immediately prior to the date on which such holders of the common stock became entitled to such dividend or distribution.

*Warrants*

At September 30, 2017, there were a total of 35,000,000 warrants outstanding. As part of its IPO, Quinpario had issued 35,000,000 units including one share of common stock and one warrant. The warrants are traded on the OTC Bulletin Board as of September 30, 2017.

Each warrant entitles the holder to purchase one-half of one share of common stock at a price of $5.75 per half share ($11.50 per whole share). Warrants may be exercised only for a whole number of shares of common stock. No fractional shares will be issued upon exercise of the warrants. Each warrant is currently exercisable and will expire July 12, 2022 (five years after the completion of the Business Combination), or earlier upon redemption.

The Company may call the warrants for redemption at a price of $0.01 per warrant upon a minimum of 30 days' prior written notice of redemption, if, and only if, the last sales price of our shares of common stock equals or exceeds $24.00 per share for any 20 trading days within a 30 trading day period (the "30-day trading period") ending three business days before we send the notice of redemption, and if, and only if, there is a current registration statement in effect with respect to the shares of common stock underlying such warrants commencing five business days prior to the 30-day trading period and continuing each day thereafter until the date of redemption.

### 16. Related-Party Transactions

*Leasing Transactions*

Certain operating companies lease their operating facilities from HOV RE, LLC an affiliate through common interest held by certain shareholders. The rental expense for these operating leases was $0.2 million for both the three months ended September 30, 2017 and 2016, and $0.5 million for both the nine months ended September 30, 2017 and 2016.

*Consulting Agreement*

The Company receives services from Oakana Holdings, Inc. The Company and Oakana Holdings, Inc. are related through a family relationship between certain shareholders and the president of Oakana Holdings, Inc. The expense recognized for these services was approximately $0.1 million for both the three and nine months ended September 30, 2017, respectively.

32

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

*Relationship with HandsOn Global Management*

The Company incurred management fees to HandsOn Global Management ("HGM"), SourceHOV's former owner, of $3.0 million and $1.5 million for the three months ended September 30, 2017 and 2016, respectively, and $6.0 million and $4.5 million for the nine months ended September 30, 2017 and 2016, respectively. The contract with HGM was terminated upon consummation of the Business Combination, and no fees were payable after July 12, 2017.

The Company incurred no reimbursable travel expenses to HGM for the three months ended September 30, 2017 and $0.2 million for the three months ended September 30, 2016, and $0.5 million and $0.8 million for the nine months ended September 30, 2017 and 2016, respectively.

The Company incurred marketing fees to Rule 14, LLC, a portfolio company of HGM, of $0.1 million for both the three months ended September 30, 2017 and 2016, and $0.3 million for both the nine months ended September 30, 2017 and 2016, respectively.

The Company incurred contract cancellation and advising fees to HGM of $23.0 million, $10 million of which was paid by the issuance of 1,250,000 shares of common stock, for the three months ended September 30, 2017, relating to the Business Combination.

*Relationship with HOV Services, Ltd.*

HOV Services, Ltd., a former shareholder of SourceHOV who currently owns equity interest in the Company through Ex-Sigma, provides the Company data capture and technology services.

SUPP. APP. 1088

The expense recognized for these services was approximately $0.4 million for both the three months ended September 30, 2017 and 2016, respectively, and $1.3 million for both the nine months ended September 30, 2017 and 2016, respectively and is included in cost of revenue in the consolidated statements of operations.

*Relationship with Apollo Global Management, LLC*

The Company provides services to and receives services from certain Apollo affiliated companies. Funds managed by Apollo Global Management, LLC have the right to designate two of the Company's directors. For both the three and nine months ended September 30, 2017 there were related party expenses of $0.2 million for services received from an Apollo affiliated company with a common Apollo designated director.

33

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

*Receivable and Payable Balances with Affiliates*

Receivable and Payable balances with affiliates as of September 30, 2017 and December 31, 2016 are as follows:

| | September 30, 2017 | December 31, 2016 |
|---|---|---|
| | Payables | Payables |
| HOV Services, Ltd | $ 463 | $ 352 |
| Rule 14 | 44 | 134 |
| HGM | 13,516 | 8,858 |
| Presidio | 451 | — |
| | $ 14,474 | $ 9,344 |

**17.   Segment and Geographic Area Information**

The Company's operating segments are significant strategic business units that align its products and services with how it manages its business, approach the markets and interacts with its clients. The Company is organized into three segments: ITPS, HS, and LLPS.

**ITPS:** The ITPS segment provides a wide range of solutions and services designed to aid businesses in information capture, processing, decisioning and distribution to customers primarily in the financial services, commercial, public sector and legal industries.

**HS:** The HS segment operates and maintains a consulting and outsourcing business specializing in both the healthcare provider and payer markets.

**LLPS:** The LLPS segment provides a broad and active array of legal services in connection with class action, bankruptcy labor, claims adjudication and employment and other legal matters.

The chief operating decision maker reviews operating segment revenue and gross profit. The Company does not allocate Selling, general and administrative expenses, depreciation and amortization, interest expense and sundry, net. The Company manages assets on a total company basis, not by operating segment, and therefore asset information and capital expenditures by operating segments are not presented.

34

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

| | Three months ended September 30, 2017 | | | |
|---|---|---|---|---|
| | ITPS | HS | LLPS | Total |
| Revenue | 260,019 | 56,405 | 21,969 | 338,393 |
| Cost of revenue | 204,602 | 37,451 | 13,063 | 255,116 |
| **Gross profit** | 55,417 | 18,954 | 8,906 | 83,277 |
| Selling, general and administrative expenses | | | | 102,048 |

SUPP. APP.  1089

| | |
|---|---:|
| Depreciation and amortization | 28,052 |
| Related party expense | 26,892 |
| Interest expense, net | 37,652 |
| Loss on extinguishment of debt | 35,512 |
| Sundry expense, net | 563 |
| **Net loss before income taxes** | **$ (147,442)** |

|  | Three months ended September 30, 2016 | | | |
|---|---:|---:|---:|---:|
| | ITPS | HS | LLPS | Total |
| Revenue | 97,402 | 60,657 | 28,314 | 186,373 |
| Cost of revenue | 66,704 | 38,729 | 16,347 | 121,780 |
| **Gross profit** | 30,698 | 21,928 | 11,967 | 64,593 |
| Selling, general and administrative expenses | | | | 30,829 |
| Depreciation and amortization | | | | 18,761 |
| Related party expense | | | | 2,448 |
| Interest expense, net | | | | 27,399 |
| Loss on extinguishment of debt | | | | — |
| Sundry expense, net | | | | 711 |
| **Net loss before income taxes** | | | | **$ (15,555)** |

|  | Nine months ended September 30, 2017 | | | |
|---|---:|---:|---:|---:|
| | ITPS | HS | LLPS | Total |
| Revenue | 525,557 | 173,548 | 66,930 | 766,035 |
| Cost of revenue | 385,447 | 113,152 | 40,643 | 539,242 |
| **Gross profit** | 140,110 | 60,396 | 26,287 | 226,793 |
| Selling, general and administrative expenses | | | | 172,626 |
| Depreciation and amortization | | | | 70,779 |
| Related party expense | | | | 31,733 |
| Interest expense, net | | | | 91,740 |
| Loss on extinguishment of debt | | | | 35,512 |
| Sundry expense, net | | | | 2,960 |
| **Net loss before income taxes** | | | | **$ (178,557)** |

35

Table of Contents

**Exela Technologies, Inc. and Subsidiaries**
**Notes to the Condensed Consolidated Financial Statements**
*(in thousands of United States dollars except share and per share amounts)*
*(Unaudited)*

|  | Nine months ended September 30, 2016 | | | |
|---|---:|---:|---:|---:|
| | ITPS | HS | LLPS | Total |
| Revenue | 309,112 | 189,046 | 79,369 | 577,527 |
| Cost of revenue | 208,614 | 120,700 | 48,386 | 377,700 |
| **Gross profit** | 100,498 | 68,346 | 30,983 | 199,827 |
| Selling, general and administrative expenses | | | | 95,385 |
| Depreciation and amortization | | | | 58,463 |
| Related party expense | | | | 7,372 |
| Interest expense, net | | | | 81,712 |
| Loss on extinguishment of debt | | | | — |
| Sundry expense, net | | | | 283 |
| **Net loss before income taxes** | | | | **$ (43,388)** |

The following table presents revenues by principal geographic area where the Company's customers are located for the three and nine months ended September 30, 2017 and 2016:

|  | Three months ended September 30, | | Nine months ended September 30, | |
|---|---:|---:|---:|---:|
| | 2017 | 2016 | 2017 | 2016 |
| United States | $ 302,129 | $ 153,563 | $ 668,153 | $ 477,742 |
| Europe | 30,305 | 31,710 | 89,736 | 96,826 |
| Other | 5,959 | 1,100 | 8,146 | 2,959 |
| Total Consolidated Revenue | $ 338,393 | $ 186,373 | $ 766,035 | $ 577,527 |

**18. Subsequent Events**

SUPP. APP. 1090

In order to hedge against interest rate fluctuations with respect to term loan borrowings under the Credit Agreement, the Company entered into a standard three year, one-month LIBOR interest rate hedging contract with a notional amount of $347.8 million, which is the remaining principal balance of the term loan. The hedge contract will swap out the floating rate interest risk related to the LIBOR with a fixed interest rate of 1.9275% and will go into effect starting January 12, 2018.

On November 8, 2017, the Company's Board of Directors authorized a share buyback program (the "Share Buyback Program"), pursuant to which the Company may, from time to time, purchase up to 5,000,000 shares of its common stock. Share repurchases may be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The decision as to whether to purchase any shares and the timing of purchases, if any, will be based on the price of the Company's common stock, general business and market conditions and other investment considerations and factors.  The Share Buyback Program does not obligate the Company to purchase any shares and expires in 24 months. The Share Buyback Program may be terminated or amended by the Company's Board of Directors in its discretion at any time.

The Company performed its subsequent event procedures through November 9, 2017, the date these consolidated financial statements were made available for issuance.

<div align="center">36</div>

Table of Contents

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations.**

You should read the following discussion and analysis together with our consolidated financial statements and the related notes included elsewhere in this Form 10-Q. Among other things, the condensed consolidated financial statements include more detailed information regarding the basis of presentation for the financial data than included in the following discussion.

*Forward Looking Statements*

*Certain statements included in this Management's Discussion and Analysis of Financial Condition and Results of Operations are not historical facts but are forward-looking statements for purposes of the safe harbor provisions under The Private Securities Litigation Reform Act of 1995. Forward-looking statements generally are accompanied by words such as "may", "should", "would", "plan", "intend", "anticipate", "believe", "estimate", "predict", "potential", "seem", "seek", "continue", "future", "will", "expect", "outlook" or other similar words, phrases or expressions. These forward-looking statements include statements regarding our industry, future events, the estimated or anticipated future results and benefits of the recently consummated Business Combination, future opportunities for the combined company, and other statements that are not historical facts. These statements are based on the current expectations of Exela management and are not predictions of actual performance. These statements are subject to a number of risks and uncertainties regarding Exela's businesses, and actual results may differ materially. These risks and uncertainties include, but are not limited to, changes in the business environment in which Exela operates and general financial, economic, regulatory and political conditions affecting the industries in which Exela operates; changes in taxes, governmental laws, and regulations; competitive product and pricing activity; failure to realize the anticipated benefits of the Business Combination, including as a result of a delay or difficulty in integrating the businesses of SourceHOV and Novitex or the inability to realize the expected amount and timing of cost savings and operating synergies of the Business Combination; and those factors discussed under the heading "Risk Factors" in Exela's Proxy Statement dated June 26, 2017 (the "Proxy Statement") filed with the Securities and Exchange Commission ("SEC").  In addition, forward-looking statements provide Exela's expectations, plans or forecasts of future events and views as of the date of this report. Exela anticipates that subsequent events and developments will cause Exela's assessments to change. These forward-looking statements should not be relied upon as representing Exela's assessments as of any date subsequent to the date of this report.*

**Overview**

We are a global provider of transaction processing solutions, enterprise information management, document management and digital business process services. Our technology-enabled solutions allow multi-national organizations to address critical challenges resulting from the massive amounts of data obtained and created through their daily global operations. Our solutions address the life cycle of transaction processing and enterprise information management, from enabling payment gateways and data exchanges across multiple systems, to matching inputs against contracts and handling exceptions, to ultimately depositing payments and distributing communications. We believe our process expertise, information technology capabilities and operational insights enable our clients' organizations to more efficiently and effectively execute transactions, make decisions, drive revenue and profitability, and communicate critical information to their employees, customers, partners, and vendors.

**History**

We are a former blank check company that completed our initial public offering on January 22, 2015. In July 2017, Exela Technologies, Inc. ("Exela"), formerly known as Quinpario Acquisition Corp. 2 ("Quinpario"), completed its acquisition of SourceHOV, Inc. ("SourceHOV") and Novitex Holdings, Inc. ("Novitex") pursuant to the business combination agreement dated February 21, 2017  ("Business Combination"). In conjunction with the completion of the Business Combination, Quinpario was renamed as Exela Technologies, Inc.

SUPP. APP.  1091

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1094 of 1110    PageID 2715

The Business Combination was accounted for as a reverse merger for which SourceHOV was determined to be the accounting acquirer. Outstanding shares of SourceHOV were converted into our common shares, presented as a recapitalization, and the net assets of Quinpario were acquired at historical cost, with no goodwill or other intangible assets recorded. The acquisition of Novitex was treated as a business combination under ASC 805 and was accounted for using the acquisition method. The strategic combination of SourceHOV and Novitex formed Exela, which is one of the largest global providers of information processing solutions based on revenues.

<div align="center">37</div>

Table of Contents

## Basis of Presentation

This analysis is presented on a consolidated basis. In addition, a brief description is provided of significant transactions and events that have an impact on the comparability of the results being analyzed. Due to our specific situation, the presented financial information for the three and nine month periods ended September 30, 2017 is only partially comparable to the financial information for the three and nine month periods ended September 30, 2016. Since SourceHOV was deemed the accounting acquirer in the Business Combination consummated on July 12, 2017, the presented financial information for the three and nine month periods ended September 30, 2016 reflects the financial information and activities of SourceHOV only. The presented financial information for the quarter ended September 30, 2017 includes the financial information and activities for SourceHOV for the period July 1, 2017 to September 30, 2017 (92 days) as well as the financial information and activities of Novitex for the period July 13, 2017 to September 30, 2017 (80 days). This lack of comparability needs to be taken into account when reading the discussion and analysis of our results of operations and cash flows. Furthermore, the presented financial information for the three and nine month periods ended September 30, 2017 also contains other one-time costs that are directly associated with the Business Combination, such as professional fees, to support the our new and complex legal, tax, statutory and reporting requirements following the Business Combination.

## Our Segments

Our three reportable segments are Information & Transaction Processing Solutions ("ITPS"), Healthcare Solutions ("HS"), and Legal & Loss Prevention Services ("LLPS"). These segments are comprised of significant strategic business units that align our TPS and EIM products and services with how we manage our business, approaches our key markets and interacts with our clients based on their respective industries.

**ITPS**: Our largest segment, ITPS, provides a wide range of solutions and services designed to aid businesses in information capture, processing, decisioning and distribution to customers primarily in the financial services, commercial, public sector and legal industries. Our major customers include 9 of the top 10 U.S. banks, 7 of the top 10 U.S. insurance companies, 5 of the top U.S. telecom companies, over 40 utility companies, over 30 state and county departments, and over 80 government entities. Our ITPS offerings enable companies to increase availability of working capital, reduce turnaround times for application processes, increase regulatory compliance and enhance consumer engagement.

**HS**: HS operates and maintains a consulting and outsourcing business specializing in both the healthcare provider and payer markets. We serve the top 5 healthcare insurance payers and over 900 healthcare providers.

**LLPS**: Our LLPS segment provides a broad and active array of support services in connection with class action, bankruptcy labor, claims adjudication and employment and other legal matters. Our client base consists of corporate counsel, government attorneys, and law firms.

## Acquisitions

In July 2017, we completed the Business Combination. SourceHOV was deemed to be the accounting acquirer, and is a leading provider of platform-based enterprise information management and transaction processing solutions primarily for the healthcare, banking and financial services, commercial, public sector and legal industries. Through the acquisition of SourceHOV and Novitex, we expect to realize revenue synergies, leverage brand awareness, strengthen margins, generate greater free cash flow, expand the existing Novitex sales channels, and increase utilization of the existing workforce. We anticipate opportunities for growth through the ability to leverage additional future services and capabilities.

Prior to the Business Combination, SourceHOV transformed into a multi-industry solution provider and acquired key technology through the acquisition of TransCentra, Inc. ("TransCentra"), a provider of integrated outsourced billing, remittance processing and imaging software and consulting services. The addition of TransCentra increased SourceHOV's footprint in the remittance transaction processing and presentment area, expanded its mobile banking offering and enabled significant cross-selling and up-selling opportunities.

<div align="center">38</div>

Table of Contents

## Revenues

ITPS revenues are primarily generated from a transaction-based pricing model for the various types of volumes processed, licensing and maintenance fees for technology sales, and a mix of fixed management fee and transactional revenue for document logistics and location services.

<div align="right">SUPP. APP. 1092</div>

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1095 of 1110    PageID 2716

HS revenues are primarily generated from a transaction-based pricing model for the various types of ventures processed for healthcare payers and providers. LLPS revenues are primarily based on time and materials pricing as well as through transactional services priced on a per item basis.

## People

We draw on the business and technical expertise of our talented and diverse global workforce to provide our clients with high-quality services. Our business leaders bring a strong diversity of experience in our industry and a track record of successful performance and execution.

As of September 30, 2017, we had approximately 22,100 employees globally, with 56% located in the United States and the remainder located primarily in Europe, India, the Philippines, Mexico, and China.

Labor costs associated with our employees represent the most significant costs of our business. We incurred personnel costs of $168.0 million and $87.0 million for the three months ended September 30, 2017 and 2016, respectively, and $360.0 million and $275.0 million for the nine months ended September 30, 2017 and 2016, respectively. The majority of our personnel costs are variable and are incurred only while we are providing its services.

## Facilities

We lease and own numerous facilities worldwide with larger concentrations of space in Texas, Michigan, Connecticut, California, India, Mexico, the Philippines, and China. Our owned and leased facilities house general offices, sales offices, service locations, and production facilities.

The size of our active property portfolio as of September 30, 2017 was approximately 3.7 million square feet at an annual operating cost of approximately $32.0 million and comprised 136 leased properties and 7 owned properties..

We believe that our current facilities are suitable and adequate for our current businesses. Because of the interrelation of our business segments, each of the segments use substantially all of these properties at least in part.

## Key Performance Indicators

We use a variety of operational and financial measures to assess our performance. Among the measures considered by our management are the following:

- Revenue by segment;

- Gross Profit by segment;

- Gross Profit Margin by segment;

- EBITDA; and

- Adjusted EBITDA.

39

Table of Contents

### *Revenue*

We analyze our revenue by comparing actual monthly revenue to internal projections and prior periods across our operating segments in order to assess performance, identify potential areas for improvement, and determine whether our segments are meeting management's expectations.

### *Gross Profit and Gross Profit Margin*

We analyze our gross profit by segment by comparing to prior periods.

### *EBITDA and Adjusted EBITDA*

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integrations costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses. See "—Other Financial Information (Non-GAAP Financial Measures)" for more information and a reconciliation of EBITDA and Adjusted EBITDA to net loss, the most directly comparable financial measure calculated and presented in accordance with GAAP.

## Results of Operations

SUPP. APP. 1093

**Three Months Ended September 30, 2017 compared to Three Months Ended September 30, 2016**

| | Three Months ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Revenue: | | |
| ITPS | $ 260,019 | $ 97,402 |
| HS | 56,405 | 60,657 |
| LLPS | 21,969 | 28,314 |
| Total revenue | 338,393 | 186,373 |
| Cost of revenues: | | |
| ITPS | 204,602 | 66,704 |
| HS | 37,451 | 38,729 |
| LLPS | 13,063 | 16,347 |
| Total cost of revenues | 255,116 | 121,780 |
| Gross profit | 83,277 | 64,593 |
| | | |
| Selling, general and administrative expenses | 102,048 | 30,829 |
| Depreciation and amortization | 28,052 | 18,761 |
| Related party expenses | 26,892 | 2,448 |
| Operating income | (73,715) | 12,555 |
| Interest expense, net | 37,652 | 27,399 |
| Loss on extinguishment of debt | 35,512 | — |
| Sundry expense/(income), net | 563 | 711 |
| Net loss before taxes | (147,442) | (15,555) |
| Income tax (expense) benefit | 37,002 | 3,757 |
| Net loss | (110,440) | (11,798) |

*Revenue*

Our revenue increased $152.0 million, or 81.6%, to $338.4 million for the three months ended September 30, 2017 compared to $186.4 million for the three months ended September 30, 2016. This increase was primarily related to an increase in the ITPS segment revenues of $162.6 million, which was primarily attributable to the acquisition of

<center>40</center>

Table of Contents

TransCentra in late 2016 and Novitex in 2017. The increase was partially offset by a decrease in revenues in the HS segment and LLPS segment of $4.3 million and $6.3 million, respectively. Our ITPS, HS, and LLPS segments constituted 76.8%, 16.7%, and 6.5% of total revenue, respectively, for the three months ended September 30, 2017, compared to 52.3%, 32.5%, and 15.2%, respectively, for the three months ended September 30, 2016. The revenue changes by reporting segment were as follows:

ITPS—Revenues increased $162.6 million, or 167.0%, to $260.0 million for the three months ended September 30, 2017 compared to $97.4 million for the three months ended September 30, 2016. The increase was primarily attributable to the acquisition of Novitex that was completed in mid-2017 which contributed $134.4 million, or 82.7% of the increase. Additionally, the TransCentra acquisition that was completed in late 2016 contributed $26.5 million, or 16.3% of the increase. The remainder of the increase of approximately $1.5 million was driven by the appreciation of British Pounds ("GBP") and Euros ("EUR") compared to USD.

HS— Revenues decreased $4.3 million, or 7.0%, to $56.4 million for the three months ended September 30, 2017 compared to $60.7 million for the three months ended September 30, 2016. The decrease was primarily attributable to a surge in demand from healthcare provider clients in first three quarters of 2016 as a result of a change in regulatory coding requirements, resulting in a decline in revenue of $3.3 million for the three months ended September 30, 2017 compared to the three months ended September 30, 2016. We have since experienced a normalization of demand as healthcare provider clients have reduced outsourcing of the service.

LLPS— Revenues decreased $6.3 million, or 22.4%, to $22.0 million for the three months ended September 30, 2017 compared to $28.3 million for the three months ended September 30, 2016. The decrease was primarily attributable to lower revenue from the legal claims administration services of $4.7 million, along with a decrease of $1.2 million attributable to Meridian Consulting Group, LLC which was sold in Q1 2017.

*Cost of Revenue*

Cost of revenue increased $133.3 million, or 109.5%, to $255.1 million for the three months ended September 30, 2017 compared to $121.8 million for the three months ended September 30, 2016. The increase was attributable to an increase in the cost of revenue in the ITPS segment of

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1097 of 1110    PageID 2718

$137.9 million, partially offset by decreases in the HS and LLPS segments of $1.2 million and $3.2 million, respectively. The cost of revenue decrease by operating segment was as follows:

ITPS—Cost of revenue increased $137.9 million, or 206.7%, to $204.6 million for the three months ended September 30, 2017 compared to $66.7 million for the three months ended September 30, 2016. The increase was primarily attributable to the acquisition of Novitex, which contributed approximately $114.6 million, or 83.1% of the increase.  The acquisition of TransCentra contributed approximately $21.3 million, or 15.4% of the increase. The remainder of the increase was primarily driven by the appreciation of GBP and EUR against the USD.

HS—Cost of revenue decreased $1.2 million, or 3.3%, to $37.5 million for the three months ended September 30, 2017 compared to $38.7 million for the three months ended September 30, 2016. The decrease was primarily driven by lower revenue in the healthcare provider business as described above.

LLPS—Cost of revenue decreased $3.2 million, or 20.1%, to $13.1 million for the three months ended September 30, 2017 compared to $16.3 million for the three months ended September 30, 2016. The decrease was primarily attributable to a decrease in corresponding revenues from the legal claims administration of $2.1 million, along with a decrease of $0.8 million attributable to Meridian Consulting Group, LLC which was sold in Q1 2017.

### Gross Profit

Gross profit increased $18.7 million, or 28.9%, to $83.3 million for the three months ended September 30, 2017 compared to $64.6 million for the three months ended September 30, 2016. For the three months ended September 30, 2017, gross margins for ITPS, HS, and LLPS were 21.3%, 33.6%, and 40.5%, respectively, compared to 31.5%, 36.2%, and 42.3%, respectively, for the three months ended September 30, 2016.

41

Table of Contents

### Selling, General and Administrative Expenses

Selling, general, and administrative expenses increased $71.2 million, or 231.0%, to $102.0 million for the three months ended September 30, 2017 compared to $30.8 million for the three months ended September 30, 2016. The increase was primarily attributable to the acquisitions of Novitex and TransCentra, which contributed $16.0 million and $1.9 million, respectively, in expense for the three months ended September 30, 2017.  Additionally, the increase is attributable to expenses for professional and advisory fees related to the Business Combination, which contributed $51.3 million in expense for the three months ended September 30, 2017.

### Depreciation & Amortization

Depreciation and amortization expense increased $9.3 million, or 49.5%, to $28.1 million for the three months ended September 30, 2017 compared to $18.8 million for the three months ended September 30, 2016. The increase was primarily attributable to higher balances of customer relationships, developed technology, and outsource contract costs, resulting in higher amortization expense for the three months ended September 30, 2017 compared to the three months ended September 30, 2016.

### Related Party Expenses

Related party expenses increased $24.5 million to $26.9 million for the three months ended September 30, 2017 compared to $2.4 million for the three months ended September 30, 2016. The increase was primarily attributable to contract termination and advising fees as a result of the Business Combination.

### Interest Expense

Interest expense increased $10.3 million, or 37.4%, to $37.7 million for the three months ended September 30, 2017 compared to $27.4 million for the three months ended September 30, 2016. The increase was primarily attributable to the issuance of new debt in conjunction with the Business Combination.

### Loss on Extinguishment of Debt

Loss on extinguishment of debt increased $35.5 million for the three months ended September 30, 2017 compared to the three months ended September 30, 2016 due to the restructuring of the debt as a result of the Business Combination.

### Sundry Expense/(Income)

Sundry expense decreased $0.1 million to $0.6 million expense for the three months ended September 30, 2017 compared to $0.7 million expense for the three months ended September 30, 2016. The decrease was attributable to foreign currency transaction losses associated with exchange rate fluctuations.

SUPP. APP.  1095

*Income Tax (Expense) Benefit*

We had income tax benefit of $37.0 million for the three months ended September 30, 2017 compared to an income tax benefit of $3.8 million for the three months ended September 30, 2016. The change in the income tax benefit was primarily attributable to the reversal of $11.5 million of our beginning of the year U.S. federal and state valuation allowance on deferred tax assets that are more likely-than-not to be realized, in connection with the acquisition of Novitex. The impact of this reduction of valuation allowance on our effective tax rate for the three months ended September 30, 2017 was partially offset by an increase in valuation allowance on the current year losses that are not more-likely-than-not to be realized and nondeductible transaction costs.

*Net Loss*

Net loss increased $98.6 million to $110.4 million for the three months ended September 30, 2017 compared to $11.8 million for the three months ended September 30, 2016 as a result of the above.

<div align="center">42</div>

Table of Contents

**Nine Months Ended September 30, 2017 compared to Nine Months Ended September 30, 2016**

| | Nine Months ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Revenue: | | |
| ITPS | $ 525,557 | $ 309,112 |
| HS | 173,548 | 189,046 |
| LLPS | 66,930 | 79,369 |
| Total revenue | 766,035 | 577,527 |
| Cost of revenues: | | |
| ITPS | 385,447 | 208,614 |
| HS | 113,152 | 120,700 |
| LLPS | 40,643 | 48,386 |
| Total cost of revenues | 539,242 | 377,700 |
| Gross profit | 226,793 | 199,827 |
| | | |
| Selling, general and administrative expenses | 172,626 | 95,385 |
| Depreciation and amortization | 70,779 | 58,463 |
| Related party expenses | 31,733 | 7,372 |
| Operating income | (48,345) | 38,607 |
| Interest expense, net | 91,740 | 81,712 |
| Loss on extinguishment of debt | 35,512 | — |
| Sundry expense/(income), net | 2,960 | 283 |
| Net loss before taxes | (178,557) | (43,388) |
| Income tax (expense) benefit | 32,924 | 9,969 |
| Net loss | (145,633) | (33,419) |

*Revenue*

Our revenue increased $188.5 million, or 32.6%, to $766.0 million for the nine months ended September 30, 2017 compared to $577.5 million for the nine months ended September 30, 2016. This increase was primarily related to an increase in the ITPS segment revenues of $216.5 million, which was partially attributable to the acquisitions of TransCentra in late 2016 and Novitex in 2017. The increase was partially offset by a decrease in the HS and LLPS segments of $15.5 million and $12.5 million, respectively. For the nine months ended September 30, 2017, our ITPS, HS, and LLPS segments constituted 68.6%, 22.7%, and 8.7% of total revenue, respectively, compared to 53.6%, 32.7%, and 13.7%, respectively, for the nine months ended September 30, 2016. The revenue changes by reporting segment were as follows:

ITPS—Revenues increased $216.5 million, or 70.0%, to $525.6 million for the nine months ended September 30, 2017 compared to $309.1 million for the nine months ended September 30, 2016. The increase was primarily attributable to the acquisition of Novitex, which contributed $134.4 million, or 62.1% of the increase. Additionally, the acquisition of TransCentra that was completed in late 2016 contributed $94.1 million, or 43.5% of the increase. The increase was partially offset by devaluation of GBP and EUR compared to USD, resulting in a decrease of $3.4 million. Additionally, the increase was further offset by a decrease in revenue from the hardware business and revenue from the European business of $3.6 million and $3.7 million, respectively.

HS— Revenues decreased $15.5 million, or 8.2%, to $173.5 million for the nine months ended September 30, 2017 compared to $189.0 million for the nine months ended September 30, 2016. The decrease was primarily attributable to a surge in demand from healthcare provider clients in early 2016 as a result of a change in regulatory

SUPP. APP.  1096

Table of Contents

coding requirements beginning in the fourth quarter of 2015, resulting in a decline in revenue of $16.6 million for the nine months ended September 30, 2017 compared to the nine months ended September 30, 2016. We have since experienced a normalization of demand as healthcare provider clients have reduced outsourcing of the service.  The decrease was partially offset by an increase in revenues of $3.2 million from the Payer business during the period.

LLPS— Revenues decreased $12.5 million, or 15.7%, to $66.9 million for the nine months ended September 30, 2017 compared to $79.4 million for the nine months ended September 30, 2016. The decrease was primarily attributable to lower revenue from the legal claims administration services of $8.2 million, lower revenue from ERS of $2.0 million, along with a lower revenues attributable to the sale of Meridian Consulting Group, LLC of approximately $3.2 million during the nine months ended September 30, 2017, compared to the nine months ended September 30, 2016 as it was sold in Q1 2017.

### Cost of Revenue

Cost of revenue increased $161.5 million, or 42.8%, to $539.2 million for the nine months ended September 30, 2017 compared to $377.7 million for the nine months ended September 30, 2016. The increase was primarily attributable to an increase in the ITPS segment of $176.8 million, offset by decreases in the HS and LLPS segments of $7.5 million and $7.8 million, respectively. The cost of revenue decrease by operating segment was as follows:

ITPS—Cost of revenue increased $176.8 million, or 84.8%, to $385.4 million for the nine months ended September 30, 2017 compared to $208.6 million for the nine months ended September 30, 2016. The increase was primarily attributable to the acquisition of Novitex, which contributed $114.6 million, or 64.8% of the increase.  The acquisition of TransCentra contributed approximately $75.4 million, or 42.6% of the increase. The increase was partially offset by decreases as a result of the decline in hardware services revenue, and devaluation of GBP and EUR compared to USD of $1.6 million and $2.6 million, respectively. Additionally, the increase was further offset by various cost savings initiatives implemented during the nine months ended September 30, 2017.

HS—Cost of revenue decreased $7.5 million, or 6.3%, to $113.2 million for the nine months ended September 30, 2017 compared to $120.7 million for the nine months ended September 30, 2016. The decrease was primarily attributable to normalization of demand for coding during the nine months ended September 30, 2017 after the surge we experienced in early 2016 as a result of the increased healthcare coding requirements, resulting in a decrease of $4.3 million, along with an associated decrease in revenue. The decrease was partially offset by an increase of $1.6 million due to higher revenues from the Payer business during the nine months ended September 30, 2017. Additionally, the increase was further offset by various cost savings initiatives implemented during the nine months ended September 30, 2017.

LLPS—Cost of revenue decreased $7.8 million, or 16.0%, to $40.6 million for the nine months ended September 30, 2017 compared to $48.4 million for the nine months ended September 30, 2016. The decrease was primarily attributable to a decrease in revenues from the legal claims administration of $3.8 million, $0.5 million due to lower revenues from ERS, along with a decrease of $0.7 million as a result of the sale of Meridian Consulting Group, LLC. Additionally, the increase was further offset by various cost savings initiatives implemented during the nine months ended September 30, 2017.

### Gross Profit

Gross profit increased $27.0 million, or 13.5%, to $226.8 million for the nine months ended September 30, 2017 compared to $199.8 million for the nine months ended September 30, 2016. For the nine months ended September 30, 2017, gross margins for ITPS, HS, and LLPS were 26.7%, 34.8%, and 39.3%, respectively, compared to 32.5%, 36.2%, and 39.0%, respectively, for the nine months ended September 30, 2016.

### Selling, General and Administrative Expenses

Selling, general, and administrative expenses increased $77.2 million, or 81.0%, to $172.6 million for the nine months ended September 30, 2017 compared to $95.4 million for the nine months ended September 30, 2016. The increase was primarily attributable to the acquisitions of Novitex and TransCentra, which contributed $16.0 million and $6.4 million, respectively, in expense for the nine months ended September 30, 2017. Additionally, the increase is attributable to expenses for professional fees related to the Business Combination, which contributed $61.0 million

Table of Contents

in expense for the nine months ended September 30, 2017. The increases were partially offset by a decrease due to cost saving initiatives we implemented, including reduced medical insurance expenditures and administrative wages.

### Depreciation & Amortization

SUPP. APP.  1097

Depreciation and amortization expense increased $12.3 million, or 21.1%, to $70.8 million for the nine months ended September 30, 2017 compared to $58.5 million for the nine months ended September 30, 2016. The increase was primarily attributable to higher balances of customer relationships, developed technology, and outsource contract costs, resulting in higher amortization expense for the nine months ended September 30, 2017 compared to the nine months ended September 30, 2016.

### Related Party Expenses

Related party expenses increased $24.3 million to $31.7 million for the nine months ended September 30, 2017 compared to $7.4 million for the nine months ended September 30, 2016. The increase was primarily attributable to contract termination and advising fees as a result of the Business Combination.

### Interest Expense

Interest expense increased $10.0 million, or 12.3%, to $91.7 million for the nine months ended September 30, 2017 compared to $81.7 million for the nine months ended September 30, 2016. The increase was primarily attributable to the issuance of new debt in conjunction with the Business Combination.

### Loss on Extinguishment of Debt

Loss on extinguishment of debt increased $35.5 million for the nine months ended September 30, 2017 compared to the nine months ended September 30, 2016 due to the restructuring of the debt as a result of the Business Combination.

### Sundry Expense/(Income)

Sundry expense increased $2.7 million to $3.0 million expense for the nine months ended September 30, 2017 compared to $0.3 million expense for the nine months ended September 30, 2016. The increase was attributable to foreign currency transaction losses associated with exchange rate fluctuations.

### Income Tax (Expense) Benefit

We had income tax benefit of $32.9 million for the nine months ended September 30, 2017 compared to an income tax benefit of $10.0 million for the nine months ended September 30, 2016. The change in the income tax benefit was partially attributable to the reversal of $11.5 million of our U.S. federal and state valuation allowance on deferred tax assets that are more likely-than-not to be realized, in connection with the acquisition of Novitex. The impact of this reduction of valuation allowance on our effective tax rate for the three months ended September 30, 2017 was partially offset by an increase in valuation allowance on the current year losses that are not more-likely-than-not to be realized and nondeductible transaction costs.

### Net Loss

Net loss increased $112.2 million to $145.6 million for the nine months ended September 30, 2017 compared to $33.4 million for the nine months ended September 30, 2016 as a result of the above.

### Other Financial Information (Non-GAAP Financial Measures)

We view EBITDA and Adjusted EBITDA as important indicators of performance. We define EBITDA as net income, plus taxes, interest expense, and depreciation and amortization. We define Adjusted EBITDA as EBITDA plus optimization and restructuring charges, including severance and retention expenses; transaction and integrations

45

Table of Contents

costs; other non-cash charges, including non-cash compensation, (gain) or loss from sale or disposal of assets, and impairment charges; and management fees and expenses.

We present EBITDA and Adjusted EBITDA because we believe they provide useful information regarding the factors and trends affecting its business in addition to measures calculated under GAAP. Additionally, our credit agreement requires us to comply with certain EBITDA related metrics. Refer to "—Liquidity and Capital Resources—Credit Facility."

### Note Regarding Non-GAAP Financial Measures

EBITDA and Adjusted EBITDA are not financial measures presented in accordance with GAAP. We believe that the presentation of these non-GAAP financial measures will provide useful information to investors in assessing our financial performance and results of operations as our board of directors and management use EBITDA and Adjusted EBITDA to assess our financial performance, because it allows them to compare our

SUPP. APP.  1098

operating performance on a consistent basis across periods by removing the effects of our capital structure (such as varying levels of interest expense), asset base (such as depreciation and amortization) and items outside the control of our management team. Net loss is the GAAP measure most directly comparable to EBITDA and Adjusted EBITDA. Our non-GAAP financial measures should not be considered as alternatives to the most directly comparable GAAP financial measure. Each of these non-GAAP financial measures has important limitations as analytical tools because they exclude some but not all items that affect the most directly comparable GAAP financial measures. You should not consider EBITDA and Adjusted EBITDA in isolation or as substitutes for an analysis of our results as reported under GAAP. Because EBITDA and Adjusted EBITDA may be defined differently by other companies in our industry, our definitions of these non-GAAP financial measures may not be comparable to similarly titled measures of other companies, thereby diminishing their utility.

The following tables present a reconciliation of EBITDA and Adjusted EBITDA to our net loss, the most directly comparable GAAP measure, for the three and nine months ended September 30, 2017 and 2016:

**Three months ended September 30, 2017 compared to the Three Months ended September 30, 2016**

| | Three months ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Net Loss | $ (110,440) | $ (11,798) |
| Taxes | (37,002) | (3,757) |
| Interest Expense | 37,652 | 27,399 |
| Depreciation and Amortization | 28,052 | 18,761 |
| EBITDA | (81,738) | 30,605 |
| Optimization and Restructuring expenses (1) | 19,702 | 4,929 |
| Transaction and integration costs (2) | 77,321 | 702 |
| Non-cash equity compensation (3) | 2,230 | 1,715 |
| Other non-cash charges (4) | 364 | 75 |
| Loss on sale of of assets (5) | — | 56 |
| Gain on sale of Meridian (6) | (337) | — |
| Management, Board Fees and expenses (7) | — | 1,737 |
| Loss on extinguishment of debt | 35,512 | — |
| Adjusted EBITDA | 53,054 | 39,819 |

(1)   Adjustment represents net salary and benefits associated with positions that were terminated, including severance, retention bonuses, and related fees and expenses.  Additionally, the adjustment includes charges incurred by us to terminate existing lease contracts as part of facility consolidation initiatives.

(2)   Represents costs incurred related to transactions and integration for completed or contemplated transactions during the period. For the three months ended September 30, 2017, only transaction costs were incurred.

(3)   Represents the non-cash charges related to restricted stock units granted by Ex-Sigma, LLC to our employees that vested during the year.

46

Table of Contents

(4)   Represents fair value adjustments to deferred revenue and deferred rent accounts established as part of purchase accounting.
(5)   Represents a loss recognized on the disposal of property, plant and equipment and other assets.
(6)   Represents a gain recognized on the disposal of Meridian Consulting Group, LLC.
(7)   Amount represents management fees paid to HGM and TransCentra's prior owner, Board of Directors fees and corresponding travel, and other expenses (e.g., rating agency fees, chargebacks) which are not expected to continue on a go-forward basis.

*EBITDA and Adjusted EBITDA*

EBITDA was ($81.7) million for the three months ended September 30, 2017 compared to $30.6 million for the three months ended September 30, 2016. Adjusted EBITDA was $53.1 million for the three months ended September 30, 2017 compared to $39.8 million for the three months ended September 30, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the three months ended September 30, 2017 resulting from increase in SG&A and related party expense, and loss on extinguishment of debt compared to the three months ended September 30, 2016. The increase in Adjusted EBITDA was primarily due higher overall gross profit for the three months ended September 30, 2017 compared to the three months ended September 30, 2016, along with lower recurring expenses as part of on-going operations.

**Nine months ended September 30, 2017 compared to the Nine Months ended September 30, 2016**

| | Nine months ended September 30, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Net Loss | $ (145,633) | $ (33,419) |
| Taxes | (32,924) | (9,969) |

SUPP. APP.  1099

| | | |
|---|---:|---:|
| Interest Expense | 91,746 | 81,712 |
| Depreciation and Amortization | 70,779 | 58,463 |
| EBITDA | (16,038) | 96,787 |
| Optimization and Restructuring expenses (1) | 31,535 | 14,358 |
| Transaction and integration costs (2) | 86,561 | 1,923 |
| Non-cash equity compensation (3) | 4,446 | 5,422 |
| Other non-cash charges (4) | 514 | 293 |
| Loss on sale of assets (5) | 18 | 1,243 |
| Gain on sale of Meridian (6) | (588) | — |
| Management, Board Fees and expenses (7) | 4,153 | 5,418 |
| Loss on extinguishment of debt | 35,512 | — |
| Adjusted EBITDA | 146,113 | 125,444 |

(1)  Adjustment represents net salary and benefits associated with positions that were terminated, including severance, retention bonuses, and related fees and expenses.  Additionally, the adjustment includes charges incurred by us to terminate existing lease contracts as part of facility consolidation initiatives.

(2)  Represents costs incurred related to transactions and integration for completed or contemplated transactions during the period. For the nine months ended September 30, 2017, only transaction costs were incurred.

(3)  Represents the non-cash charges related to restricted stock units granted by Ex-Sigma, LLC to our employees that vested during the year.

(4)  Represents fair value adjustments to deferred revenue and deferred rent accounts established as part of purchase accounting.

(5)  Represents a loss recognized on the disposal of property, plant and equipment and other assets.

(6)  Represents a gain recognized on the disposal of Meridian Consulting Group, LLC.

(7)  Amount represents management fees paid to HGM and TransCentra's prior owner, Board of Directors fees and corresponding travel, and other expenses (e.g., rating agency fees, chargebacks) which are not expected to continue on a go-forward basis.

47

Table of Contents

***EBITDA and Adjusted EBITDA***

EBITDA was ($16.0) million for the nine months ended September 30, 2017 compared to $96.8 million for the nine months ended September 30, 2016. Adjusted EBITDA was $146.1 million for the nine months ended September 30, 2017 compared to $125.4 million for the nine months ended September 30, 2016. The decrease in EBITDA was primarily due to a higher net loss amount for the nine months ended September 30, 2017 resulting from an increase in SG&A, related party expense, and loss on extinguishment of debt compared to the nine months ended September 30, 2016. The increase in Adjusted EBITDA was primarily due higher overall gross profit for the three months ended September 30, 2017 compared to the three months ended September 30, 2016, along with lower recurring expenses as part of on-going operations due to various cost savings initiative implemented during the period.

**Liquidity and Capital Resources**

**Overview**

Our primary source of liquidity is principally cash generated from operating activities supplemented as necessary on a short-term basis by borrowings against our senior secured revolving credit facility. We believe our current level of cash and short term financing capabilities along with future cash flows from operations are sufficient to meet the needs of the business.

We currently expect to spend approximately $40.0 to $45.0 million on total capital expenditures over the next twelve months. We believe that our operating cash flow and available borrowings under our credit facility will be sufficient to fund our operations for at least the next twelve months.

At September 30, 2017, cash and cash equivalents totaled $27.4 million and we had availability of $77.2 million under our senior secured revolving credit facility.

In connection with the Business Combination, we acquired debt facilities and issued notes totaling $1.4 billion. Proceeds from the acquired debt were used to refinance the existing debt of SourceHOV, settle the outstanding debt facilities for Novitex, and pay fees and expenses incurred in connection with the Business Combination. We entered in to a Credit Agreement with a $350.0 million senior secured term loan, a $100.0 million senior secured revolving facility, and $1.0 billion in Senior Secured Notes. The $100.0 million revolver remained undrawn at the time of compilation of this report.

**Cash Flows**

The following table summarizes our cash flows for the periods indicated:

SUPP. APP.  1100

| | Nine months ended September | |
| | 2017 | 2016 |
|---|---|---|
| Cash flow from operating activities | $ 12,282 | $ 43,317 |
| Cash flow used in investing activities | (440,667) | (19,217) |
| Cash flows (used in) provided by financing activities | 447,057 | (31,987) |
| Subtotal | 18,672 | (7,887) |
| Effect of exchange rates on cash | 335 | (239) |
| Net increase/(decrease) in cash | 19,007 | (8,126) |

**Analysis of Cash Flow Changes between the Nine Months Ended September 30, 2017 and September 30, 2016**

Operating Activities—Net cash provided by operating activities was $12.3 million for the nine months ended September 30, 2017, compared to $43.3 million for the nine months ended September 30, 2016. The decrease of $31.0 million in cash flow from operating activities was primarily due to decreases in operating results, and timing of payments for accounts receivable and accounts payable and accrued liabilities.

Investing Activities— Net cash used in investing activities was $440.7 million for the nine months ended September 30, 2017, compared to $19.2 million for the nine months ended September 30, 2016. The increase of $421.5 million in cash used in investing activities was primarily due to cash paid to acquire Novitex, partially offset by

48

Table of Contents

proceeds received from the sale of Meridian during the nine months ended September 30, 2017, as well as higher additions to intangible assets during the nine months ended September 30, 2016.

Financing Activities— Net cash provided by financing activities was $447.1 million for the nine months ended September 30, 2017, compared to cash used in financing activities of $32.0 million for the nine months ended September 30, 2016. The increase of $479.1 million in cash provided by financing activities was primarily due to proceeds from issuance of stock in the amount of $231.4 million, as well as proceeds from a new credit facility of $1,320.5 million during the nine months ended September 30, 2017, which was partially offset by the retirement of the previous credit facilities of $1,055.7 million.

**Indebtedness**

As noted, in connection with the Business Combination on July 12, 2017, we acquired debt facilities and issued notes totaling $1.4 billion in principal. Proceeds from the indebtedness were used to pay off credit facilities existing immediately before the Business Combination.

*Senior Credit Facilities*

The financing obtained as part of the Business Combination included a first lien senior secured term loan of $350.0 million due July 2023 and a senior secured revolving credit facility of $100.0 million due July 2022. As of September 30, 2017, none of the revolving credit facility was drawn. We have the option to choose interest rates based on 1) base rate (as defined) or 2) an adjusted LIBOR subject to a 1.0% floor in the case of the term loans plus an applicable margin for each rate. Interest rates were 8.8% and 8.3% for the first lien senior secured term loan and senior revolving credit facility, respectively, as of September 30, 2017.

*Senior Secured Notes*

Senior secured notes of $1.0 billion due July 2023 were also issued as part of the Business Combination. The notes bear interest at a rate of 10.0% per year. We pay interest on the notes on January 15 and July 15 of each year, commencing on January 15, 2018. The notes are guaranteed by subsidiary guarantors pursuant to a supplemental indenture.

*Letters of Credit*

As of September 30, 2017 and December 31, 2016, we had outstanding irrevocable letters of credit totaling approximately $22.8 million and $9.3 million, respectively, under the revolving credit facility.

**Contractual Obligations**

The table below provides estimates of the timing of future payments that we are obligated to make based on agreements in place at September 30, 2017.

| | Payments Due by Period | | | | |
| | Less than 1 Year | 1 - 3 Years | 3 - 5 Years | More than 5 Years | Total |
|---|---|---|---|---|---|
| | | | (in millions) | | |
| Credit Facilities | 8.8 | 26.2 | 35.0 | 1,280.0 | 1,350.0 |
| Interest payments | 132.6 | 262.4 | 256.3 | 98.4 | 749.7 |

SUPP. APP. 1101

| | | | | | |
|---|---|---|---|---|---|
| Capital lease obligations | 18.5 | 19.4 | 7.9 | 3.5 | 49.3 |
| Operating lease obligations | 34.8 | 46.0 | 26.4 | 14.0 | 121.2 |
| Other Obligations | 12.1 | 3.2 | 2.8 | 0.0 | 18.1 |
| Total | 206.8 | 357.2 | 328.4 | 1,395.9 | 2,288.3 |

**Potential Future Transactions**

We may, from time to time explore and evaluate possible strategic transactions, which may include joint ventures, as well as business combinations or the acquisition or disposition of assets. In order to pursue certain of these opportunities, additional funds will likely be required. Subject to applicable contractual restrictions, to obtain such financing, we may seek to use cash on hand, borrowings under our revolving credit facility, or we may seek to raise additional debt or equity financing through private placements or through underwritten offerings. There can be no assurance that we will enter into additional strategic transactions or alliances, nor do we know if we will be able to obtain the necessary financing for transactions that require additional funds on favorable terms, if at all. In addition, certain of our shareholders have the right to demand underwritten offerings of our common stock. We are exploring, and may from time to time in the future explore, with certain of those shareholders the possibility of an underwritten public offering of our common shares held by those shareholders. There can be no assurance as to whether or when an offering may be commenced or completed, or as to the actual size or terms of the offering.

On November 8, 2017, the Company's Board of Directors authorized a share buyback program (the "Share Buyback Program"), pursuant to which the Company may, from time to time, purchase up to 5,000,000 shares of its common stock. Share repurchases may be executed through various means, including, without limitation, open market transactions, privately negotiated transactions or otherwise. The decision as to whether to purchase any shares and the timing of purchases, if any, will be based on the price of the Company's common stock, general business and market conditions and other investment considerations and factors. The Share Buyback Program does not obligate the Company to purchase any shares and expires in 24 months. The Share Buyback Program may be terminated or amended by the Company's Board of Directors in its discretion at any time.

<div align="center">49</div>

Table of Contents

**Quantitative and Qualitative Disclosure About Market Risk**

**Interest Rate Risk**

At September 30, 2017, we had $1,350.0 million of debt outstanding, with a weighted average interest rate of 9.7%. Interest is calculated under the terms of our credit agreement based on the greatest of certain specified base rates plus an applicable margin that varies based on certain factors. Assuming no change in the amount outstanding, the impact on interest expense of a 1% increase or decrease in the assumed weighted average interest rate would be approximately $13.5 million per year. In order to hedge against interest rate fluctuations with respect to term loan borrowings under the Credit Agreement, in November 2017, we entered into a standard three year, one-month LIBOR interest rate hedging contract with a notional amount of $347.8 million, which is the remaining principal balance of the term loan. The hedge contract will swap out the floating rate interest risk related to the LIBOR with a fixed interest rate of 1.9275% and will go into effect starting January 12, 2018.

**Foreign Currency Risk**

We are exposed to foreign currency risks that arise from normal business operations. These risks include transaction gains and losses associated with intercompany loans with foreign subsidiaries and transactions denominated in currencies other than a location's functional currency. Contracts are denominated in currencies of major industrial countries.

**Market Risk**

We are exposed to market risks primarily from changes in interest rates and foreign currency exchange rates. We do not use derivatives for trading purposes, to generate income or to engage in speculative activity.

**Critical Accounting Policies and Estimates**

The preparation of financial statements requires the use of judgments and estimates. Our critical accounting policies are described below to provide a better understanding of how we develop our assumptions and judgments about future events and related estimations and how they can impact our financial statements. A critical accounting estimate is one that requires subjective or complex estimates and assessments, and is fundamental to our results of operations. We base our estimates on historical experience and on various other assumptions we believe to be reasonable according to the current facts and circumstances, the results of which form the basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. We believe the current assumptions, judgments and estimates used to determine amounts reflected in our consolidated financial statements are appropriate, however, actual results may differ under different conditions. This discussion and analysis should be read in conjunction with our consolidated financial statements and related notes included in this document.

*Goodwill and other intangible assets*: Goodwill and other intangible assets are initially recorded at their fair values. Goodwill represents the excess of the purchase price of acquisitions over the fair value of the net assets acquired. Our goodwill at September 30, 2017 and December 31,

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1105 of 1110    PageID 2726

2016 was $776.0 million and $575.3 million, respectively. Goodwill and other intangible assets not subject to amortization are tested for impairment annually or more frequently if events or changes in circumstances indicate that the asset might be impaired. Intangible assets with finite useful lives are amortized either on a straight-line basis over the asset's estimated useful life or on a basis that reflects the pattern in which the economic benefits of the intangible assets are realized.

*Software capitalization*: We capitalize certain costs incurred to develop commercial software products to be sold, leased or marketed after establishing technological feasibility. Amortization of capitalized software development costs is recorded at the greater of the amount computed using the ratio of current gross revenues for the product to total current and anticipated future gross revenues for that product or the straight-line basis over the remaining estimated economic life of the software, which we have determined is four to eight years. We are required to use our judgment in determining whether development costs meet the criteria for immediate expense or capitalization. Additionally, we are required to use our judgment in the valuation of the unamortized capitalized software costs in determining whether the recorded value is recoverable based on estimated future product sales. We consider various factors to project

50

Table of Contents

marketability and future revenues, including an assessment of alternative solutions or products, current and historical demand for the product, and anticipated changes in technology that may make the product obsolete.

We also capitalize costs to develop or purchase internal-use software. For internal-use software, the appropriate amortization period is based on estimates of our ability to utilize the software on an ongoing basis, which has been determined to be five years. To assess the recoverability of capitalized software costs, we consider estimates of future revenue, costs and cash flows. A significant change in an estimate related to one or more software products could result in a material change to our results of operations.

*Outsourced contract costs*: In connection with services arrangements, we incur and capitalizes costs to originate long-term contracts. Certain initial direct costs of an arrangement are capitalized and amortized over the contractual service period of the arrangement to cost of services. We regularly review costs to determine appropriateness for deferral in accordance with the relevant accounting guidance. Key estimates and assumptions that we must make include projecting future cash flows in order to assess the recoverability of deferred costs. To assess recoverability, cash flows are projected over the remaining life and compared to the carrying amount of contract related assets, including the unamortized deferred cost balance. Such estimates require judgment and assumptions, which are based upon the professional knowledge and experience of our personnel. A significant change in an estimate or assumption on one or more contracts could have a material effect on our results of operations.

*Impairment of goodwill, long-lived and other intangible assets*: Long-lived assets, such as property and equipment and finite-lived intangible assets, are evaluated for impairment whenever events or changes in circumstances indicate that their carrying value may not be recoverable. Recoverability is measured by a comparison of their carrying amount to the estimated undiscounted cash flows to be generated by those assets. If the undiscounted cash flows are less than the carrying amount, we record impairment losses for the excess of the carrying value over the estimated fair value. Fair value is determined, in part, by the estimated cash flows to be generated by those assets. Our cash flow estimates are based upon, among other things, historical results adjusted to reflect our best estimate of future market rates, and operating performance. Development of future cash flows also requires us to make assumptions and to apply judgment, including timing of future expected cash flows, using the appropriate discount rates, and determining salvage values. The estimate of fair value represents our best estimates of these factors, and is subject to variability. Assets are generally grouped at the lowest level of identifiable cash flows, which is the reporting unit level for us. Changes to our key assumptions related to future performance and other economic factors could adversely affect our impairment valuation.

We test our indefinite lived intangible assets on October 1st of each year, or more frequently if events or changes in circumstances indicate that the assets may be impaired. When performing the impairment test, we have the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. A quantitative assessment requires comparison of fair value of the asset to its carrying value. We utilize the Income Approach, specifically the Relief-from-Royalty method, which has the basic tenet that a user of that intangible asset would have to make a stream of payments to the owner of the asset in return for the rights to use that asset. By acquiring the intangible asset, the user avoids these payments. Application of the indefinite lived intangible asset impairment test requires judgment, including determination of royalty rates, and projecting revenue attributable to the assets in order to determine fair value. For the three months and nine ended September 30, 2017, no impairment was recorded.

We conduct our annual goodwill impairment tests on October 1st of each year, or more frequently if indicators of impairment exist. When performing the annual impairment test, we have the option of performing a qualitative or quantitative assessment to determine if an impairment has occurred. If a qualitative assessment indicates that it is more likely than not that the fair value of a reporting unit is less than its carrying amount, we would be required to perform a quantitative impairment test for goodwill. Goodwill is tested for impairment using a two-step process. In the first step, the fair value of each reporting unit is determined and compared to the reporting unit's carrying value, including goodwill. We use the Guideline Public Company Method of the Market Approach to determine the reporting unit fair value. We estimate the fair value using a multiple of EBITDA for the reporting unit. Guideline companies are analyzed to determine the multiple to be applied. If the fair value of a reporting unit is less than its carrying value, the second step of the goodwill impairment test is performed to measure the amount of impairment, if any. In the second step, the fair value of the reporting unit is allocated to the assets and liabilities of the reporting unit as if it had been acquired in a business combination and the purchase price was equivalent to the fair value of the reporting unit. The excess of the fair value of the reporting unit over the amounts assigned to its assets and liabilities is referred to as the implied fair value of goodwill. If the implied fair value of goodwill at the reporting unit level is less than its carrying value, an

SUPP. APP. 1103

Table of Contents

impairment loss is recorded to the extent that the implied fair value of goodwill at the reporting unit is less than its carrying value. For the three and nine months ended September 30, 2017, no impairment was recorded.

Application of the goodwill impairment test requires judgment, including the identification of reporting units, allocation of assets and liabilities to reporting units, and determination of fair value. The determination of reporting unit fair value is sensitive to the amount of EBITDA generated by us, as well as the EBITDA multiple used in the calculation. Unanticipated changes, including immaterial revisions, to these assumptions could result in a provision for impairment in a future period. Given the nature of these evaluations and their application to specific assets and time frames, it is not possible to reasonably quantify the impact of changes in these assumptions.

*Revenue*: Application of the various accounting principles in GAAP related to the measurement and recognition of revenue requires us to make judgments and estimates. Complex arrangements with nonstandard terms and conditions may require significant contract interpretation to determine the appropriate accounting. Refer to *Note 2—Basis of Presentation and Summary of Significant Accounting Policies* for additional information regarding our revenue recognition policy.

If a contract involves the provision of a single element, revenue is generally recognized when the product or service is provided and the amount earned is not contingent upon any future event. Revenue from time and materials arrangements is recognized as the services are performed.

*Multiple element arrangements*

We also enter into multiple element arrangements involving various combinations. The deliverables within these arrangements are evaluated at contract inception to determine whether they represent separate units of accounting, and if so, contract consideration is allocated to each deliverable based on relative selling price. With respect to arrangements including tangible products containing both software and non-software components that function together to deliver the product's essential functionality, the relative selling price is determined using vendor specific objective evidence ("VSOE") of fair value, third-party evidence or best estimate of selling price. For our multiple element arrangements that are comprised solely of software and software elements, revenue is allocated to the various elements based on VSOE of fair value and the residual method to allocate the arrangement consideration. Revenue is then recognized in accordance with the appropriate revenue recognition guidance applicable to the respective elements.

If the multiple element arrangements criteria are not met, the arrangement is accounted for as one unit of accounting which would result in revenue being recognized on a straight-line basis over the period of delivery or being deferred until the earlier of when such criteria are met or when the last element is delivered.

*Equity-based compensation*: We account for equity-based awards by measuring the awards at the grant date and recognizing the grant-date fair value as an expense over the service period, which is usually the vesting period. We have historically and consistently calculated fair value using the Enterprise Value ("EV") model. We perform a comparable company analysis, and determine the enterprise multiple to apply based on guideline public companies. The guideline public companies are selected based on revenue and/or revenue growth rates, market capitalization, profitability, industry, and other characteristics that are considered comparable to us. We analyze the guideline public companies' enterprise multiples, defined as equity value to adjusted EBITDA, based on publicly available financial information. The calculated price per share is determined by dividing the enterprise value, which is the product of adjusted EBITDA and the selected enterprise multiple, less debt, by fully diluted shares.

Calculation of the enterprise value based on the EV model requires judgment in terms of determining comparable guideline public companies and enterprise multiples. Our management, using its professional judgment and experience in the industry, determines which guideline public companies have similar characteristics based on the aforementioned metrics and characteristics. Additionally, determination of the appropriate enterprise multiple to be applied requires judgment as guideline companies may have a range of enterprise multiples.

*Income Taxes*: We account for income taxes by using the asset and liability method. We account for income taxes regarding uncertain tax positions and recognize interest and penalties related to uncertain tax positions in income tax benefit/(expense) in the consolidated statements of operations.

52

Table of Contents

Deferred income taxes are recognized on the tax consequences of temporary differences by applying enacted statutory tax rates applicable in future years to differences between the financial statement carrying amounts and the tax bases of existing assets and liabilities, as determined under tax laws and rates. A valuation allowance is provided when it is more likely than not that all or some portion of the deferred tax assets will not be realized. Due to numerous ownership changes, we are subject to limitations on existing net operating losses under Section 382 of the Internal Revenue Code (the Code). In the event we determine that we would be able to realize deferred tax assets that have valuation allowances established, an adjustment to the deferred tax assets would be recognized as component of income tax expense through continuing operations.

SUPP. APP. 1104

We engage in transactions (such as acquisitions) in which the tax consequences may be subject to uncertainty and examination by the varying taxing authorities. Significant judgment is required by us in assessing and estimating the tax consequences of these transactions. While our tax returns are prepared and based on our interpretation of tax laws and regulations, in the normal course of business the tax returns are subject to examination by the various taxing authorities. Such examinations may result in future assessments of additional tax, interest and penalties. For purposes of our income tax provision, a tax benefit is not recognized if the tax position is not more likely than not to be sustained based solely on its technical merits. Considerable judgment is involved in determining which tax positions are more likely than not to be sustained.

_Business Combinations:_  We allocate the total cost of an acquisition to the underlying assets based on their respective estimated fair values. Determination of fair values involves significant estimates and assumptions about highly subjective variables, including future cash flows, discount rates, and asset lives.  The estimates of the fair values of assets and liabilities acquired are based upon assumptions believed to be reasonable and, when appropriate, include assistance from independent third-party valuation firms.

Because we are primarily a services business, our acquisitions typically result in significant amounts of goodwill and other intangible assets. Fair value estimates and calculations for these acquisitions will affect the amount of amortization expense, or possible impairment related charges recognized in future periods. We base our fair value estimates on assumptions we believe are reasonable, but recognize that the assumptions are inherently uncertain.

**JOBS Act**

On April 5, 2012, the JOBS Act was signed into law. The JOBS Act contains provisions that, among other things, relax certain reporting requirements for qualifying public companies. We have previously elected to delay the adoption of new or revised accounting standards, and as a result, we may not comply with new or revised accounting standards on the relevant dates on which adoption of such standards is required for non-emerging growth companies. As a result, our financial statements may not be comparable to companies that comply with new or revised accounting pronouncements as of public company effective dates. If we were to subsequently elect instead to comply with these public company effective dates, such election would be irrevocable pursuant to Section 107 of the JOBS Act.

**Recently Adopted Accounting Pronouncements**

Effective January 1, 2017, we adopted Accounting Standards Update ("ASU") no. 2015-11, Inventory (Topic 330): Simplifying the Measurement of Inventory. This amendment replaced the method of measuring inventories at lower of cost or market with a lower of cost and net realizable value method. The adoption had no material impact on our financial position, results of operations and cash flows.

Effective January 1, 2017, we adopted ASU no. 2016-09, _Compensation - Stock Compensation (Topic 718): Improvements to Employee Share-Based Payment Accounting (ASU 2016-09)_. The ASU changes how companies account for certain aspects of equity-based payment awards to employees, including the accounting for income taxes, forfeitures, and statutory tax withholding requirements, as well as classification in the statement of cash flows. The standard requires that all tax effects related to share-based payments be recorded as income tax expense or benefit in the income statement at settlement or expiration and, accordingly, excess tax benefits and tax deficiencies be presented as operating activities in the statement of cash flows. Upon adoption of this standard, we elected to continue our current practice of estimating expected forfeitures. The adoption had no material impact on our financial position, results of operations and cash flows.

53

Table of Contents

**Off Balance Sheet Arrangements**

At September 30, 2017, we had no material off balance sheet arrangements, except for operating leases. As such, we are not materially exposed to any financing, liquidity, market or credit risk that could arise if we had engaged in such financing arrangements. Our operating leases are composed of various office and industrial buildings, machinery, equipment, and vehicles. As of September 30, 2017, our total future minimum leases payments under non-cancelable operating leases were $121.2 million.

54

Table of Contents

**Item 3. Quantitative and Qualitative Disclosures about Market Risk.**

Information related to quantitative and qualitative disclosures regarding market risk is set forth in Management's Discussion and Analysis of Financial Condition and Results of Operations under Item 2 above.  Such information is incorporated by reference herein.

**Item 4. Controls and Procedures.**

SUPP. APP.  1105

Case 3:20-cv-00691-D    Document 49-1    Filed 09/03/21    Page 1108 of 1110    PageID 2729

We are not currently required to comply with the SEC's rules implementing Section 404(b) of the Sarbanes-Oxley Act of 2002, and we are therefore not required to make a formal assessment of the effectiveness of our internal control over financial reporting for that purpose. However, we are required to comply with the SEC's rules implementing Section 302 of the Sarbanes-Oxley Act of 2002, which require our management to certify financial and other information in its quarterly and annual reports and provide an annual management report on the effectiveness of our disclosure controls and procedures.

<div align="center">55</div>

Table of Contents

<div align="center">

**PART II — OTHER INFORMATION**

</div>

**Item 1. Legal Proceedings.**

*Appraisal Demand*

On September 21, 2017, former stockholders of our wholly-owned subsidiary SourceHOV Holdings, Inc. ("Source HOV"), who allege combined ownership of 10,304 shares of SourceHOV common stock, filed a petition for appraisal pursuant to 8 Del. C. § 262 in the Delaware Court of Chancery, captioned Manichaean Capital, LLC, et al. v. SourceHOV Holdings, Inc., C.A. No. 2017-0673-JRS (the "Appraisal Action"). The Appraisal Action arises out of the Business Combination Transaction, which gave rise to appraisal rights pursuant to 8 Del. C. § 262. In the Appraisal Action, the petitioners seek, among other things, a determination of the fair value of their shares at the time of the Business Combination; an order that SourceHOV pay that value to the petitioners, together with interest at the statutory rate; and an award of costs, attorneys' fees, and other expenses.

On October 12, 2017, SourceHOV filed its answer to the petition and a verified list pursuant to 8 Del. C. § 262(f). At this early stage of the litigation, the Company is unable to predict the outcome of the Appraisal Action or estimate any loss or range of loss that may arise from the Appraisal Action. Pursuant to the terms of the Business Combination Agreement, if such appraisal rights are perfected, a corresponding portion of shares of our common stock issued to Ex-Sigma, LLC, our principal shareholder, will be forfeited at such time as the PIPE Financing (as defined in the Consent, Waiver and Amendment dated June 15, 2017) is repaid. The Company intends to vigorously defend against the Appraisal Action.

*Other*

We are involved in various other legal proceedings that have arisen in the normal course of business. While the ultimate results of these matters cannot be predicted with certainty, we do not expect them to have a material adverse effect on our Consolidated Financial Statements.

**Item 1A. Risk Factors.**

As a result of the closing of the Business Combination on July 12, 2017 all of the risk factors previously disclosed in Part I, Item 1A of our Annual Report on Form 10-K for the fiscal year ended December 31, 2016 no longer apply. Risk factors relating to our business following the Business Combination may be found in our definitive proxy statement, as filed with the Securities and Exchange Commission on June 26, 2017.

**Item 2. Unregistered Sales of Equity Securities and Use of Proceeds.**

(*a*) *Sales of Unregistered Securities*

For a description of certain sales of unregistered securities, please see the Company's Form 8-K, dated July 12, 2017.

During the quarter ended September 30, 2017, a holder of 3,000,000 shares of our Series A Preferred Stock converted such Series A Preferred Stock into 3,667,803 shares of our common stock pursuant to the conversion provisions of the Series A Preferred Stock.

(*b*) *Use of Proceeds from the Initial Public Offering.*

See Item (c) below.

(*c*) *Issuer Purchases of Equity Securities*

On July 12, 2017, in connection with the closing of the Business Combination, we redeemed a total of 16,646,342 shares of our common stock pursuant to the terms of our certificate of incorporation, resulting in a total cash payment from the Company's trust account to redeeming stockholders of $166,463,420.

| Period | Total Number of Shares Purchased | Average Price Paid Per Share | Total Number of Shares Purchased as Part of Publicly Announced Plans or Programs | Maximum Number of Shares that May Yet be Purchased Under Plans or Programs |
|---|---|---|---|---|
| July 12, 2017 | 16,646,342 | $ 10.00 | N/A | N/A |

<div align="right">SUPP. APP. 1106</div>

**Item 3. Defaults Upon Senior Securities.**

None.

**Item 4. Mine Safety Disclosures.**

Not applicable.

**Item 5. Other Information.**

None.

<div align="center">56</div>

---

Table of Contents

**Item 6. Exhibits.**

| Exhibit Number | Description |
|---|---|
| 3.1 (1) | Restated Certificate of Incorporation, dated July 12, 2017 |
| 3.2 (1) | Amended and Restated Bylaws, dated July 12, 2017 |
| 31.1* | Certification of the Principal Executive Officer required by Rule 13a-14(a) and Rule 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes Oxley Act of 2002. |
| 31.2* | Certification of the Principal Financial and Accounting Officer required by Rule 13a-14(a) and Rule 15d-14(a) under the Securities Exchange Act of 1934, as amended, as adopted pursuant to Section 302 of the Sarbanes Oxley Act of 2002. |
| 32.1* | Certification of the Principal Executive Officer required by 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002. |
| 32.2** | Certification of the Principal Financial and Accounting Officer required by 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes Oxley Act of 2002. |
| 101.INS* | XBRL Instance Document |
| 101.SCH* | XBRL Taxonomy Extension Schema Document |
| 101.CAL* | XBRL Taxonomy Extension Calculation Linkbase Document |
| 101.DEF* | XBRL Taxonomy Extension Definition Linkbase Document |
| 101.LAB* | XBRL Taxonomy Extension Labels Linkbase Document |
| 101.PRE* | XBRL Taxonomy Extension Presentation Linkbase Document |

---

(1) Incorporated by reference to the Registrant's Current Report on Form 8-K, filed July 18, 2017.

\* Filed herewith

\*\* Furnished herewith

<div align="center">57</div>

---

Table of Contents

<div align="center">

**SIGNATURES**

</div>

Pursuant to the requirements of the Section 13 or 15 or 15(d) of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized on the 9th day of November, 2017.

EXELA TECHNOLOGIES, INC.

By:   /s/ Ronald Cogburn
Ronald Cogburn
Chief Executive Officer (Principal Executive Officer)

By:   /s/ James G. Reynolds
James G. Reynolds
Chief Financial Officer (Principal Financial and Accounting Officer)

SUPP. APP.  1107

SUPP. APP.  1108