## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated,<br><br>        Plaintiff,<br><br>  v.<br><br>EXELA TECHNOLOGIES, INC., RONALD COGBURN, and JAMES G. REYNOLDS,<br><br>        Defendants. | Case No. 3:20-cv-00691-D<br><br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS SECOND AMENDED COMPLAINT** |

731690.1

**TABLE OF CONTENTS**

I.     INTRODUCTION ............................................................................................... 1

II.    SUMMARY OF FACTS ..................................................................................... 3

       A.    Exela is Formed in a Merger that Prompts the Appraisal Action .......................... 3

       B.    During the Class Period, Defendants Had Estimates Of (But Did Not Disclose) the
             Liability Exela Faced In the Appraisal Action ...................................................... 4

       C.    Despite Acknowledging the Appraisal Liability was Exela's, Defendants Further
             Obfuscate and Refuse to Pay the Judgment ........................................................... 6

       D.    Defendants Abuse So-Called "O&R Addbacks" to Improve the Appearance of
             Exela's Post-Merger Performance ......................................................................... 7

       E.    Defendants Tout Exela's Supposed 90% Revenue Visibility, Conceal that 20% of
             the Company's Revenue Was Actually Unpredictable and Non-Recurring ........... 8

       F.    Exela Eventually Announces the Restatement; Its Stock Price Never Recovers ... 8

III.   ARGUMENT ...................................................................................................... 9

       A.    Legal Standards & the Philosophy of Full Disclosure .......................................... 9

       B.    The SAC States a Claim Relating to the Appraisal Action ................................. 10

             1.    Defendants' Failure to Record Estimated Liability for the Appraisal Action,
                   In Violation of GAAP and Exela's Policy, Supports Scienter .................. 11

             2.    Exela's Claim that it Could Not Estimate Even a "Range of Loss" that "May"
                   Arise from the Appraisal Action Was Contradicted by Information in
                   Defendants' Possession, and Further Ran Afoul of Clear GAAP Rules ......... 13

             3.    Chadha's "Disagreement" Does Not Negate Scienter ............................. 16

       C.    The SAC States a Claim Based on the Overstatement of Exela's Adjusted EBITDA. 18

             1.    As Demonstrated by the Restatement, Exela's Adjusted EBITDA Figures
                   Reported During the Class Period Were Admittedly False and Misleading . 18

             2.    Defendants Misrepresented the Nature and Content of the O&R Addbacks .. 19

             3.    Defendants' Violation of SEC Rules Supports Scienter .......................... 21

             4.    Defendants' Abuse of Addbacks Was Pervasive and Longstanding Conduct
                   Beginning at SourceHOV that Continued at Exela ................................... 22

i

D.   The SAC States a Claim Based on Misrepresentations of Exela's Revenue Visibility.. ................................................................................................................................ 23

E.   Insider Stock Sales and Weak Internal Controls Further Support Scienter .......... 24

    1.   Chadha's $32.83 Million in Class Period Stock Sales.............................. 24

    2.   Exela's Internal Control Failures ............................................................. 25

IV.   CONCLUSION.................................................................................................................. 25

731690.1

## TABLE OF AUTHORITIES

<u>CASES</u>

*Batwin v. Occam Networks, Inc.*,
2008 WL 2676364 (C.D. Cal. July 1, 2008)..................................................................... 24

*Crutchfield v. Match Grp., Inc.*,
2021 WL 1167578 (N.D. Tex. Mar. 26, 2021) ................................................................. 10

*Dorsey v. Portfolio Equities, Inc.*,
540 F.3d 333 (5th Cir. 2008) ........................................................................................... 18

*Fund v. Integrated Elec. Servs. Inc.*,
497 F.3d 546 (5th Cir. 2007) ........................................................................................... 25

*Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*,
514 F. Supp. 3d 942 (S.D. Tex. 2021) ............................................................................. 16

*Haack v. Max Internet Commc'ns,Inc.*,
2002 WL 511514 (N.D. Tex. Apr. 2, 2002) ..................................................................... 13

*Hall v. The Child. Place Retail Stores. Inc.*,
580 F. Supp. 2d 212 (S.D.N.Y. 2008)............................................................................... 25

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*,
381 F. Supp. 2d 192 (S.D.N.Y. 2004)............................................................................... 18

*In re ArthroCare Corp. Sec. Litig.*,
726 F. Supp. 2d 696 (W.D. Tex. 2010).............................................................. 13, 16, 18, 24

*In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*,
324 F. Supp. 2d 474 (S.D.N.Y. 2004)............................................................................... 18

*In re Cannavest Corp. Sec. Litig.*,
307 F. Supp. 3d 222 (S.D.N.Y. 2018)............................................................................... 25

*In re Cardinal Health Inc. Sec. Litigations*,
426 F. Supp. 2d 688 (S.D. Ohio 2006) ............................................................................ 21

*In re Crossroads Systems, Inc. Sec. Litig.*,
2001 WL 1401211 (W.D. Tex. Aug. 15, 2001)................................................................. 25

*In re Enron Corp. Sec. Litig.*,
2004 WL 764663 (S.D. Tex. Mar. 31, 2004)..................................................................... 22

*In re Enron Corp. Sec., Deriv. & ERISA Litig.*,
   235 F. Supp. 2d 549 (S.D. Tex. 2002) ..................................................................... 9

*In re Fleming Cos., Inc. Sec. & Deriv. Litig.*,
   2004 WL 5278716 (E.D. Tex. June 16, 2004)................................................... 13, 16

*In re Guilford Mills, Inc. Sec. Litig.*,
   1999 WL 33248953 (S.D.N.Y. July 21, 1999) ......................................................... 24

*In re Landry's Seafood Rest., Inc.*,
   2001 WL 34115784 (S.D. Tex. Feb. 20, 2001) ........................................................ 14

*In re Medicis Pharm. Corp. Sec. Litig.*,
   2010 WL 3154863 (D. Ariz. Aug. 9, 2010)................................................... 13, 14, 22

*In re OSG Sec. Litig.*,
   12 F. Supp. 3d 622 (S.D.N.Y. 2014)....................................................................... 25

*In re Paincare Holdings Sec. Litig.*,
   541 F. Supp. 2d 1283 (M.D. Fla. 2008) ................................................................. 24

*In re SeeBeyond Techs. Corp. Sec. Litig.*,
   266 F. Supp. 2d 1150 (C.D. Cal. 2003) ................................................................. 24

*In re Silver Wheaton Corp. Sec. Litig.*,
   2016 WL 3226004 (C.D. Cal. June 6, 2016) .......................................................... 15

*In re SourceCorp Securities Litigation*,
   2006 WL 8439544 (N.D. Tex. June 6, 2006) .......................................................... 15

*In re Suprema Specialties, Inc. Sec. Litig.*,
   438 F.3d 256 (3d Cir. 2006)................................................................................. 24

*In re Triton Energy Ltd. Secs. Litig.*,
   2001 WL 872019 (E.D. Tex. Mar. 30, 2001) .......................................................... 15

*In re UTStarcom, Inc. Sec. Litig.*,
   617 F. Supp. 2d 964 (N.D. Cal. 2009) .............................................................. 24, 25

*In re Veeco Instruments, Inc. Sec. Litig.*,
   235 F.R.D. 220 (S.D.N.Y. 2006) ........................................................................... 25

*Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*,
   620 F.3d 137 (2d Cir. 2010).................................................................................. 24

iv

731690.1

*Ironworkers Local 580 v. Linn Energy, LLC*,
29 F. Supp. 3d 400 (S.D.N.Y. 2014).................................................................... 20, 21

*Jones v. Cain*,
600 F.3d 527 (5th Cir. 2010) ....................................................................... 10

*Kaltman v. Key Energy Servs., Inc.*,
447 F. Supp. 2d 648 (W.D. Tex. 2006).................................................................. 13

*Lormand v. US Unwired, Inc.*,
565 F.3d 228 (5th Cir. 2009) ..................................................................... 9, 10

*Manichaean Cap. LLC v. SourceHOV Holdings, Inc.,*
2020 WL 496606 (Del. Ch. Jan. 30, 2020)............................................................ *passim*

*Manichaean Cap. LLC v. SourceHOV Holdings, Inc.*,
251 A.3d 694 (Del. Ch. May 29, 2021) ........................................................ 4, 6, 7, 11

*McNamara v. Bre-X Minerals Ltd.*,
57 F. Supp. 2d 396 (E.D. Tex. 1999).................................................................. 22

*McNamara v. Bre-X Minerals Ltd.*,
197 F. Supp. 2d 622 (E.D. Tex. 2001).............................................................. 10, 14

*Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*,
164 F. Supp. 3d 568 (S.D.N.Y. 2016).................................................................. 18

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)........................................................................ 14

*Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*,
575 U.S. 175 (2015).............................................................................. 20

*Owens v. Jastrow*,
789 F.3d 529 (5th Cir. 2015) ...................................................................... 12

*Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline L.P.*,
777 F. App'x 726 (5th Cir. 2019) ................................................................... 20

*Richman v. Goldman Sachs Grp., Inc.*,
868 F. Supp. 2d 261 (S.D.N.Y. 2012)................................................................. 10

*Rubinstein v. Collins*,
20 F.3d 160 (5th Cir. 1994) ....................................................................... 24

731690.1

*S.E.C. v. Kelly*,
   663 F. Supp. 2d 276 (S.D.N.Y. 2009)........................................................................ 18

*Schleicher v. Wendt*,
   529 F. Supp. 2d 959 (S.D. Ind. 2007) ...................................................................... 13

*Silsby v. Icahn*,
   17 F. Supp. 3d 348 (S.D.N.Y. 2014)......................................................................... 12

*Singh v. 21Vianet Group, Inc.*,
   2017 WL 4322483 (E.D. Tex. Sept. 13, 2017) ........................................................ 22

*Spitzberg v. Houston Am. Energy Corp.*,
   758 F.3d 676 (5th Cir. 2014) ............................................................................. 17, 20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)......................................................................................... 9, 10

*Wu Winfred Huang v. EZCORP, Inc.*,
   259 F. Supp. 3d 563 (W.D. Tex. 2017)...................................................................... 15

STATUTES

8 Del. C. § 262 ................................................................................................. 4, 11, 12

RULES

Fed. R. Civ. P. 12(b)(6)......................................................................................... 9

REGULATIONS

17 C.F.R. § 229.10 ................................................................................................. 7, 21

17 C.F.R. § 229.10(e)(1)(ii)(B)............................................................................... 7, 21

17 C.F.R. § 244.100 .................................................................................................. 7

vi

731690.1

## I.    INTRODUCTION

Plaintiffs allege that Defendants misled Exela's investors with scienter in three ways during the Class Period:[1] (1) in violation of its own stated policy and GAAP, Exela failed to accrue a liability in connection with the Appraisal Action, even though the liability was probable and reasonably estimable—and, in fact, *had* been estimated by Exela and its experts—and further falsely claimed that "the Company" could not even *estimate* the "loss or range of loss that *may* arise" from that action; (2) Defendants inflated Exela's reported adjusted EBITDA by adding back ordinary business expenses mischaracterized as "non-routine" costs, enabling Exela to achieve its 2018 EBITDA guidance; and (3) Defendants falsely assured that Exela had "90% visibility on revenue" because "approximately 90% is recurring in nature and supported by long-term customer contracts" when, in fact, Defendants knew (and later admitted) that about 20% of revenue was made up of highly unpredictable and non-recurring pass-through billing for postage costs.

This multi-faceted fraud pumped Exela's stock price up to a Class Period high of $7.30 (market cap of *$1.1 billion*) on September 1, 2018. ¶13. The price then plummeted over a series of partial disclosures as the truth of Defendants' misrepresentations and omissions was revealed, to a mere $0.15 per share (market cap of just *$21.8 million*) by the time the nature and extent of Defendants' fraud was fully revealed. *Id*.; ¶¶187-225. The price has never recovered.

In previously dismissing Plaintiffs' complaint (Dkt. No. 43, the "Order"), the Court held that while Exela's later Restatement to account for the Appraisal Action was sufficient to allege falsity (*id*. at 20), scienter was lacking because "the mere fact that Exela's *expert* estimated Exela's liability does not permit the court to draw the reasonable inference that, at the time of the relevant

---

[1] "Defendants" are Exela Technologies, Inc. ("Exela" or the "Company"); Chairman, Par Chadha; CEO, Ronald Cogburn; and CFO, James G. Reynolds. The Class Period is March 16, 2018 through March 16, 2020. ¶1. Unless otherwise noted, "¶__" citations herein are to the Second Amended Complaint (Dkt. No. 44, the "SAC"), and all emphasis is added and internal citations are omitted.

1

SEC filings, any *defendant* was able to estimate any loss or range of loss that might actually arise from the Appraisal Action," or that "or that any defendant knew or should have known in what amount the Chancery Court would enter a judgment against Exela." *Id*. at 16-17 (emphasis in original), 21-22; *id*., at 15 n.10. Unsurprisingly, Defendants rely on these arguments throughout their motion. But Plaintiffs need not allege that the Individual Defendants *personally* could estimate the loss, that Defendants *agreed* with their expert, or that they could *predict* the amount the Chancery Court *ultimately* would award where Defendants: (i) violated GAAP and Exela's stated policy when they failed to accrue the liability that was both "probable" and "reasonably estimated", and (ii) further falsely told investors that "the Company" could not even *estimate* a "range of loss" that "may" arise. The SAC alleges that Exela *could* estimate the liability or range of liability, relying on its agents it *in fact did* estimate the liability, and concealed it from investors because Defendants did not want to reveal the extent of the liability owed. That alleges scienter.

Moreover, Chadha's purported "disagreement" with Exela's expert (MTD at 9-10, 22-23; Order at 17, 22) fails to negate scienter. As an initial matter, any such "disagreement" does not change the fact that Exela *indeed had* numerous reasonable estimates of the liability, and under GAAP, Exela was clearly required to accrue *at least* the lowest estimated of the liability. Moreover, the "disagreement" itself was wholly incredible. Chadha should not be allowed to hide behind his malfeasance (dressed up as "disagreement") in the Appraisal Action to avoid liability to the shareholders he defrauded any longer. The facts show that *with reasonable estimates of the liability in hand*, rather than accrue the liability or disclose the estimated range of loss *as required by Exela's stated policy and by GAAP*, Defendants recklessly or intentionally concealed it and misled investors. Nothing Defendants say gives rise to a *more* compelling inference to negate that.

The SAC also adds detail on how Defendants misleadingly used inflated expense addbacks

2

731690.1

to overstate Exela's adjusted EBITDA in violation of applicable SEC accounting rules, as well as facts from which the Court can infer that Defendants' misleading addback practices that began at SourceHOV continued at Exela. That adjusted EBITDA is a non-GAAP metric does not insulate Defendants from liability. Non-GAAP metrics can be used to "distort the truth, conceal, fabricate or inflate the actual performance and financial condition of a given company, confuse investors, and even perpetuate outright fraud." ¶108. The SAC alleges that is exactly what Defendants did.

Finally, the SAC remedies the deficiencies the Court noted regarding the revenue visibility claims (Order at 35) because it alleges facts to show that Defendants *did* track postage revenue every quarter during the Class Period, including that tracking postage was required under GAAP, ASC 606 (which applies to variable payments, such as Exela's postage revenue). ¶¶173-75.

This is not a frivolous strike suit that the PSLRA was intended to curtail. Exela's investors were actually and substantially harmed by Defendants' misrepresentations and omissions. Plaintiffs allege how they were misled with the requisite level of specificity, and they should be able to proceed with their claims. Defendants' motion should be denied in its entirety.

## II.    SUMMARY OF FACTS

### A.    Exela is Formed in a Merger that Prompts the Appraisal Action

Exela was formed in July 2017 by the merger of SourceHOV, Novitex, and a special purpose acquisition company (the "Merger"). ¶¶42, 70. Before and after the Merger, the Individual Defendants controlled and operated SourceHOV. ¶¶132-35. Chadha and Reynolds were the only members of SourceHOV's board, and Cogburn was its CEO. ¶¶31-35, 79 n.6, 98. After the Merger, Exela owned 100% of SourceHOV, which became a wholly-owned subsidiary of Exela. ¶44.

In the Merger Proxy Statement, signed by Chadha and Reynolds, SourceHOV was valued at about $645 million ($4,102 per share). ¶75. A SourceHOV minority shareholder, Manichaean,

3

731690.1

felt that its shares were undervalued and thus, in lieu of participating in the Merger, petitioned the Delaware Court of Chancery for an appraisal under 8 Del. C. § 262 in September 2017 (the "Appraisal Action"). ¶¶74-75. Following a June 2019 trial, the Chancery Court found that the fair value of SourceHOV at the time of the Merger was $4,591 per share.[2] With costs and interest, the Chancery Court entered judgment against SourceHOV of $57.7 million on March 26, 2020.[3]

### B.    During the Class Period, Defendants Had Estimates Of (But Did Not Disclose) the Liability Exela Faced In the Appraisal Action

Exela's Class Period Form 10-Ks stated: "[i]f the *potential loss* from any claim or legal proceeding is considered *probable* and the amount can be *reasonably estimated*, the Company accrues a liability for the estimated loss." ¶¶245, 295. This policy is a reflection of GAAP rules on loss contingencies, as set forth in Account Standards Codification Rule 450 ("ASC 450").[4]

Relying on experts, Defendants reasonably estimated the value of SourceHOV—*i.e.*, the basis for the liability that could arise from the Appraisal Action—on a number of occasions. Chadha testified that at his direction, Rothschild estimated SourceHOV's value in February 2017 and in January 2018 (which Chadha directed be "backdated" to July 2017). ¶¶79, 81. And both Exela and Manichaean engaged experts to submit valuations in the Appraisal Action.[5]

Defendants' expert initially valued SourceHOV at $286.4 million ($1,723 per share) in his December 2018 report. ¶95. Manichaean's expert valued SourceHOV at $798.7 million ($5,079

---

[2] *Manichaean Cap. LLC v. SourceHOV Holdings, Inc. ("Manichaean I")*, 2020 WL 496606, *19-*20 (Del. Ch. Jan. 30, 2020).

[3] *Manichaean Cap. LLC v. SourceHOV Holdings, Inc. ("Manichaean II")*, 251 A.3d 694, 703 (Del. Ch. May 29, 2021).

[4] Wolke Decl. Ex. 1 (ASC 450 sections). The Financial Accounting Standards Board's ("FASB") ASC rules are the official codification of Generally Accepted Accounting Principles ("GAAP").

[5] *Manichaean I*, 2020 WL 496606, at *1 ("the parties rely on traditional valuation methodologies, *as presented by their experts*" and the "experts agree that a discounted cash flow analysis ('DCF') is the most reliable tool to determine SourceHOV's fair value"); *id.* at *20 (noting "**Respondent engaged an expert to opine on the most accurate revenue projections for SourceHOV**.").

4

per share) in his February 7, 2019 report. ¶97. Defendants' expert revised his figure up to $468.1

million ($2,817 per share) on February 14, 2019. *Id*.; *Manichaean I*, 2020 WL 496606 at *1, *10.

The Chancery Court noted that at trial, SourceHOV took yet another position (contrary to its

expert) of $1,633 per share, driven by "its zeal to reach a desired litigation outcome," that was

based on a valuation method that was rejected by *both* parties' experts. *Id*. at *19-*20.[6]

The below chart reflects the various valuation estimates prepared at the direction of, or

otherwise available to, Defendants prior to making the challenged statements and omissions:

| Date | SourceHOV Value | Per Share Value | Number of Shares | Source and Citations | Liability to Manichaean[7] |
|---|---|---|---|---|---|
| 02/2017 | $931 million | $5,920 | 157,243 | Rothschild valuation provided to Chadha and Reynolds. ¶¶87, 97 | $61 million |
| 6/26/2017 | $645 million[8] | $4,102 | 157,243 | Final Proxy Statement signed by Chadha and Reynolds. ¶¶75, 93 | $42.2 million |
| 1/5/2018 | $675 million | $4,293 | 157,243 | Rothschild "Backdated Valuation" requested by and provided to Chadha. ¶¶79, 81, 87, 97 | $44.2 million |
| 2/7/2019 | $798.7 million | $5,079 | 157,255[9] | Manichaean expert report in Appraisal Action. ¶97 | $52.3 million |
| 2/14/2019 | $468.1 million | $2,817 | 166,221 | Jarrell revised opinion in the Appraisal Action. ¶95 | $29 million |

The SAC alleges that Defendants were keenly aware of these estimates. As SourceHOV's

CEO, Chairman, and Co-Chair, respectively, Cogburn, Chadha, and Reynolds were closely

involved in the Appraisal Action. ¶¶77-82, 87-98, 127-27, 132-35, 282. And Chadha, aided by his

---

[6] The Chancery Court noted that "Chadha was the centerpiece of Respondent's effort to paint the picture of a company in trouble in order to lay foundation for its argument that SourceHOV's fair value was substantially south of Manichaean's fair value" and rejected that effort as not credible. *Manichaean I*, 2020 WL 496606 at *20-21.

[7] Based on Manichaean's ownership of 10,304 shares. ¶73.

[8] *See* Proxy Statement, Defs.' Supp. App. at 420. Elsewhere in the Proxy Statement, Defendants listed the SourceHOV equity at $644.8 million (or approximately $4,100 per share). *Id*. at 468.

[9] The total shares used by the experts varied slightly from the Proxy Statement, with Manichaean's figure more closely aligning with the Proxy Statement. Jarrell's figure was higher because he included 8,887 Restricted Stock Units (further diluting per share value) while Manichaean's expert excluded them because their vesting was speculative. *Manichaean I*, 2020 WL 496606 at *26.

5

son-in-law (an *Exela* EVP), orchestrated the Backdated Valuation in January 2018. ¶¶79-82, 87.

As the Chancery Court observed, the extent of Exela's exposure "became all too clear as the appraisal petitioners developed evidence, including expert valuation evidence, that the fair value of SourceHOV [] was exponentially greater than the price paid in the Merger." *Manichaean II*, 251 A.3d at 709. Still, Exela failed to accrue the estimated liability and claimed it was "unable to . . . estimate any loss or range of loss that may arise from the Appraisal Action." ¶¶180-82.

## C.    Despite Acknowledging the Appraisal Liability was Exela's, Defendants Further Obfuscate and Refuse to Pay the Judgment

The Merger provided that if a stockholder sought appraisal, his SourceHOV equity interests would be sent to Exela. In other words, while SourceHOV was the named respondent, any liability from the Appraisal Action was *Exela's*.[10] But while Defendants recognized the Appraisal Action as *Exela's* liability (¶21), Exela refused to pay the judgment and engaged in even more chicanery to avoid it.[11] This "highly unusual circumstance" forced Manichaean to file a complaint against Exela to enforce the judgment in July 2020 (the "Veil Piercing Action"). *Manichaean II*, 251 A.3d at 699-700. The Chancery Court found SourceHOV and Exela, and the Individual Defendants' actions on behalf of the entities, to be one in the same due to the shared control and lack of corporate formalities between the entities. *Manichaean II*, 251 A.3d at 699-700.[12]

---

[10] *Manichaean II*, 251 A.3d at 705 ("in appraisal actions, it is the acquirer [Exela], not the target [SourceHOV], who is 'the real party in interest on the respondent's side of the case.'").

[11] "On January 10, 2020…Exela, through its subsidiaries, entered into a $160 million accounts receivable securitization facility" that "permitted value once held by the SourceHOV Subsidiaries to be held by Exela's indirect subsidiary, ***allowing a diversion of funds around SourceHOV Holdings and directly into the coffers of Exela***." *Manichaean II*, 251 A.3d at 704; *id.* at 708.

This financing agreement set $65 million as the threshold judgment in the Appraisal Action that would constitute an event of default of that agreement, further demonstrating that Defendants were capable of reasonably estimating the liability Exela faced. ¶¶185-86.

[12] Among the supporting factors, the Chancery Court noted that "all of the Exela entities, including SourceHOV Holdings and the SourceHOV Subsidiaries, have overlapping personnel and directors and share the same offices; many of the SourceHOV Subsidiaries do not have updated

6

### D.    Defendants Abuse So-Called "O&R Addbacks" to Improve the Appearance of Exela's Post-Merger Performance

During the Class Period, Defendants told investors that Exela's adjusted EBITDA was an "important indicator[] of performance" and would "provide useful information to investors in assessing our financial performance and results of operations." ¶¶5, 109. As a non-GAAP metric, adjusted EBITDA is governed by SEC rules Regulation S-K ("Reg S-K") and Regulation G ("Reg G"), both of which prohibit adjusting a non-GAAP measure with offsets characterized as "infrequent" or "unusual" when "the nature of the charge . . . is such that it is reasonably likely to recur within two years or there was a similar charge or gain within the prior two years."[13]

Defendants also claimed that adjusted EBITDA—which added back supposedly "non-routine" optimization and restructuring ("O&R") charges—would "converge" with EBITDA as Exela realized cost savings from the Merger. ¶¶5, 160, 162, 164. In short, non-routine Merger-related expenses added back to EBITDA were supposed to go down after the Merger.

Defendants' pattern of inflating EBITDA add-backs to improve the appearance of performance dates back to their time at SourceHOV. The SAC adds significant detail regarding Defendants' practices at both companies, and their disregard of corporate formalities (as detailed in the Veil Piercing Action) supports Plaintiffs' allegations that Defendants' conduct of overstating addbacks continued at Exela. ¶¶112-139. The addbacks were significant: in 2018, O&R addbacks accounted for about 24% of Exela's reported adjusted EBITDA. ¶233.

---

corporate registrations; the entities have failed to maintain accurate or complete corporate records; Exela must give its approval before SourceHOV Holdings can pay debts; and all Exela-related entities have been collectively referred to as one Exela-controlled enterprise in SEC filings." *Manichaean II*, 251 A.3d at 716. The same facts are independently alleged here. ¶¶132-152.

[13] 17 C.F.R. § 229.10(e)(1)(ii)(B); Item 10(e) of Reg S-K (17 C.F.R. § 229.10); and Reg G (17 C.F.R. § 244.100 *et seq*.) are complimentary rules intended to protect against misleading use of non-GAAP metrics and they are substantively similar on EBITDA addbacks. ¶103. Reg G applies to *any* disclosure of material information including a non-GAAP metric, while Reg S-K applies to non-GAAP metrics filed with the SEC.

731690.1

### E.    Defendants Tout Exela's Supposed 90% Revenue Visibility, Conceal that 20% of the Company's Revenue Was Actually Unpredictable and Non-Recurring

Visibility was another key metric for investors. ¶¶169-70. In initiating coverage with a "buy" rating, RBC Capital Markets cited Exela's purported 90% revenue visibility. ¶170. Exela concealed, however, that a whopping **_20%_** of revenue was derived from unpredictable, non-recurring, and low margin postage billing. ¶¶12, 179. And when Exela was eventually forced to admit the volatility of postage revenue, blaming it for a guidance downgrade in 2019, Defendants conceded that postage was something they had been "historically" bad at predicting. ¶¶217-18.

The SAC clarifies that Defendants indeed tracked Exela's postage revenue throughout the Class Period because, among other reasons, they had to under GAAP. ¶¶173-75. Specifically, ASC 606 required Exela to estimate variable consideration (such as postage revenue). ¶174. To estimate the consideration derived from postage, Defendants would have had to track it. The SAC also alleges that Exela tracked postage based on Exela's own accounting. Customers paid Exela in advance for postage, which Exela booked on its balance sheet as an asset, then once Exela mailed an item, it recorded the postage advance as revenue—it had to be tracked. ¶175.

### F.    Exela Eventually Announces the Restatement; Its Stock Price Never Recovers

On March 16, 2020, Exela announced that its 2019 10-K would be delayed because it had to "restate certain of its historical financial statements." ¶222. On March 17, 2020, Exela filed a Form 8-K disclosing the Chancery Court's January 30, 2020 order in the Appraisal Action and admitting, for the first time, that the "liability should have been recorded in 2017." ¶¶223-24.[14]

On June 9, 2020 Exela filed its 2019 10-K, including the restated results for 2017, 2018, and Q1-Q3 2019 (the "Restatement"). ¶227. The Restatement admitted that the failure to record

---

[14] Following these disclosures, Exela's stock fell to $0.15 per share on March 18, 2020, and it never recovered. ¶225. After hovering below the $1 minimum NASDAQ requirement for months, Exela did a 1-for-3 reverse stock split in January 2021 to avoid delisting. ¶¶226, 237-38.

731690.1

the estimated Appraisal Action liability in 2017 caused a $37.8 million understatement of liability in 2017, $40.6 million in 2018, and $43.1 million in 2019. ¶21. The failure also "resulted in $2.4 million, $2.9 million and $1.2 million understatement of loss for the nine months ended September 30, 2019 and for the years ended December 31, 2018 and 2017, respectively." *Id*. It also confirmed that Exela's EBITDA addbacks were inflated—2018 O&R addbacks of $68.2 million were inflated by $14 million (or 20%)—and had enabled Exela to achieve its 2018 EBITDA guidance. ¶233. Finally, the Restatement identified numerous internal control weaknesses, including a "***risk assessment process [that] failed to identify and assess risks of misstatement, including fraud risks***, to ensure controls were designed and implemented to respond to those risks[.]" ¶236.

## III.   <u>ARGUMENT</u>

### A.   Legal Standards & the Philosophy of Full Disclosure

In assessing a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must accept all allegations as true, construe them in the light most favorable to Plaintiffs, and draw all reasonable inferences in favor of Plaintiffs. *Lormand v. US Unwired, Inc.*, 565 F.3d 228, 232 (5th Cir. 2009).

Defendants' motion also should be assessed in light of the purpose of the Exchange Act "'to substitute a ***philosophy of full disclosure*** for the philosophy of *caveat emptor* and thus to achieve a ***high standard of business ethics*** in the securities industry.'" *In re Enron Corp. Sec., Deriv. & ERISA Litig.*, 235 F. Supp. 2d 549, 569 (S.D. Tex. 2002). "The PSLRA is a mechanism for winnowing out suits that lack a requisite level of specificity. ***It was not meant to let business and management run amuck to the detriment of shareholders***." *Id.* at 593; *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007) ("*Tellabs I*") (PSLRA meant to prevent securities suits from being "employed abusively to impose substantial costs on companies and individuals whose conduct conforms to the law" while enshrining the principle that "private actions to enforce

9

federal antifraud securities laws are an essential supplement" to government action).

Defendants contest only falsity and scienter, thus waiving their right to challenge other elements of §10(b). *See Jones v. Cain*, 600 F.3d 527, 541 (5th Cir. 2010). A statement or omission is materially misleading if it would alter the "total mix" of information available and "if there is a substantial likelihood a reasonable shareholder would consider it important" to the investment decision. *McNamara v. Bre-X Minerals Ltd.*, 197 F. Supp. 2d 622, 631 (E.D. Tex. 2001). Regarding scienter, the inference need not be "irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences." *Tellabs I*, 551 U.S. at 324. Scienter is strong if a reasonable person would deem it "cogent and at least as compelling as any opposing inference of nonfraudulent intent.'" *Id*. at 252. If equally compelling inferences are shown, "a tie favors the plaintiff." *Id*. at 254. On required elements, the SAC has the requisite specificity to state a claim.

**B.    The SAC States a Claim Relating to the Appraisal Action**

Plaintiffs allege that Defendants misled Exela investors regarding the Appraisal Action in two ways: (i) Exela failed to record the estimated liability when the Appraisal Action was filed; and (ii) Defendants' claims that "the Company" could not estimate a "range of loss" that "may" arise from the action were demonstrably false when the statements were made. Plaintiffs do not allege that Defendants failed to disclose the *existence* of the Appraisal Action, the risk of an adverse outcome, or otherwise misrepresented their confidence in their ability to prevail.[15]

---

[15] This case is thus distinguishable from *Crutchfield v. Match Grp., Inc.*, 2021 WL 1167578, *14 (N.D. Tex. Mar. 26, 2021), where statements that "the FTC's investigation and lawsuit [were] 'without merit' and that Match would 'defend vigorously against them'" were not actionable because they were statements of "opinion that [are] generally not actionable as a misstatement of fact." Similarly distinguishable is *Richman v. Goldman Sachs Grp., Inc.*, 868 F. Supp. 2d 261, 273 (S.D.N.Y. 2012), which held that "defendants [a]re not bound to predict . . . 'likely' outcome of the investigations." *See* MTD at 21, n.62; Order at 15, n.11. Here by contrast, Plaintiffs challenge material omissions and misstatements of existing *facts* relating to the Appraisal Action, not mere opinions about the perceived merits, or ability to predict the outcome of, that action.

731690.1

The Court previously held, and Defendants do not contest, that based on the Restatement "plaintiffs have plausibly pleaded that the financial information that Exela reported during the Class Period was materially false or misleading because it did not include liability related to the Appraisal Action." Order at 20, n. 13. However, the Court held that Plaintiffs failed to allege that "any defendant knew, or was severely reckless in not knowing, that Exela's accounting practices with respect to the Appraisal Action were in error." Order at 21. The SAC remedies that.

### 1. Defendants' Failure to Record Estimated Liability for the Appraisal Action, In Violation of GAAP and Exela's Policy, Supports Scienter

The SAC makes clear that the failure to record the liability violated Exela's stated policy, which required that "[i]f the potential loss from any claim or legal proceeding is considered probable and the amount can be reasonably estimated, the Company accrues a liability for the estimated loss." ¶¶245, 295. Moreover, this policy is required to comply with GAAP, ASC 450.[16]

Both factors clearly existed here. First, that Exela would suffer a loss in the Appraisal Action was more than *probable*. It was certain. As the Chancery Court observed, "Exela knew that SourceHOV Holdings would be required to pay a judgment of some amount, at the latest, when Plaintiffs sent their appraisal demand in September 2017." ¶99; *Manichaean II*, 251 A.3d at 709. This is based *not* on Exela's belated admission that it should have recorded the liability when the action was filed (*see* MTD at 11), it is drawn from the mechanics of an appraisal demand itself, which provides stockholders with only two options when presented with a merger: (i) participate or (ii) dissent and seek appraisal. *Manichaean II*, 251 A. 3d at 699, 709; 8 Del. C. §262. Manichaean did the latter. Unless SourceHOV was actually worthless—which, Chadha's incredible testimony notwithstanding (*see* Sec. III.B3, *infra*), it was not—it is undisputed from day

---

[16] Under ASC 450-20-25-2, "An ***estimated loss*** from a loss contingency ***shall*** be accrued" if it is both (a) "probable" that a liability has been incurred, and (b) "The amount of loss can be reasonably estimated." *See* Wolke Decl. Ex. 1.

11

one of the Appraisal Action that Exela would have to pay. Given their involvement in the Appraisal Action (Sec. II.B, *supra*), the SAC alleges a strong inference that Defendants knew this.

Second, the SAC alleges that Exela's potential liability could be "reasonably estimated" because it *in fact had been estimated* by Defendants through their agents. When Defendants filed Exela's 2017 10-K on March 16, 2018, they had *in hand* at least three SourceHOV valuation estimates (and, thus, could estimate Exela's liability), including two estimates that Exela and Chadha obtained from Rothschild as well as the Merger price set in the Proxy Statement itself. ¶¶75, 79, 81, 87, 93, 97. And when Defendants filed Exela's 2018 10-K on March 20, 2019, they had at least two additional estimates of SourceHOV's value (and Exela's liability), as produced by the parties' experts in the Appraisal Action. ¶¶95, 97; p. 5, *supra* (chart).[17] It can be inferred that Defendants deemed the estimates to be *reasonable* when they were used in the Merger Proxy Statement and/or submitted in the Appraisal Action, for example. And it matters not that there was variation among the estimates; GAAP required, *at a minimum*, accrual of the lowest estimate.[18]

But even though the liability *clearly* was both "probable" and capable of being "reasonably estimated," Defendants failed to record it. ¶¶240, 296.[19] A strong inference of scienter underlies that omission based on the relative simplicity with which Defendants *could* have recorded an estimate of the liability (which Exela had *in hand* at the time), and because Defendants violated

---

[17] This case is thus distinguishable from *Owens v. Jastrow*, 789 F.3d 529, 540-41 (5th Cir. 2015) and *Silsby v. Icahn*, 17 F. Supp. 3d 348, 367 (S.D.N.Y. 2014) (MTD at 21, n.62), both of which found that information became available to the defendants only *after* challenged statements were made.

[18] An amount is "reasonably estimated" under 450-20-25-2(b) where "***information available indicates that the estimated amount of loss is within a range of amounts***[.]" ASC 450-20-25-5. Where "the reasonably estimable loss is a range," the issuer must accrue "the amount that appears to be a better estimate than any other estimate" or, at a minimum, the "the minimum amount in the range." ASC-450-20-05-5; *see also* ASC 450-20-30-1 (reiterating that when no one estimate is "better" than another, then "***the minimum amount in the range shall be accrued***.").

[19] Plaintiffs do not allege, as Defendants suggest (MTD at 8-9), that it was "simple" to initially prepare (or for their experts and advisers to prepare) the SourceHOV valuation estimates. Rather, Plaintiffs allege that "simplicity" arises from the fact that the valuations already existed.

12

731690.1

Exela's own policy and a clear GAAP rule on contingent losses, necessitating the Restatement.[20]

Finally, the ability to *predict* what amount the Chancery Court would ultimately award (MTD at 9; Order at 17) is not the test for recording a contingent liability under either Exela's policy or GAAP. Nor do Plaintiffs need to allege "that Defendants knew SourceHOV *had no chance of prevailing* in the Appraisal Action" (MTD at 22). The words "potential," "probable," and "estimated" in both ASC 450 and Exela's policy confirm that some uncertainty is fully contemplated.[21] All that is necessary to require recording the liability is that it is "probable" and can be "reasonably estimated." The SAC clearly alleges that Defendants knew it was both.

> **2.    Exela's Claim that it Could Not Estimate Even a "Range of Loss" that "May" Arise from the Appraisal Action Was Contradicted by Information in Defendants' Possession, and Further Ran Afoul of Clear GAAP Rules**

ASC 450 requires that additional disclosure "shall be made" on a loss contingency if (a) no liability is accrued, or (b) exposure to loss exists in excess of the amount already accrued. ASC 450-20-50-3. Because Exela accrued no liability, it was required to comply with these disclosure requirements which "shall include" a description of "the nature of the contingency" ***and*** "[a]n estimate of the possible loss or range of loss or a statement that such an estimate cannot be made."

---

[20] *See In re ArthroCare Corp. Sec. Litig.*, 726 F. Supp. 2d 696, 722 (W.D. Tex. 2010) ("the relative simplicity of the issues" that led to a restatement "significantly" contributed to scienter); *Haack v. Max Internet Commc'ns,Inc.*, 2002 WL 511514, at *7 (N.D. Tex. Apr. 2, 2002) ("specific and detailed allegations about the defendants' violations of GAAP" supported scienter); *Kaltman v. Key Energy Servs., Inc.*, 447 F. Supp. 2d 648, 664 (W.D. Tex. 2006) (restatement "adds weight to the scienter calculus"); *In re Fleming Cos., Inc. Sec. & Deriv. Litig.*, 2004 WL 5278716, at *37 (E.D. Tex. June 16, 2004) ("a restatement can tip the scales in favor of a finding of scienter"); *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 971 (S.D. Ind. 2007) (violation of company's own accounting policies supports scienter); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) (scienter alleged where "the accounting violation was not particularly great in magnitude, but where the relevant violation was relatively straightforward or obvious").

[21] *See* ASC 450-20-25-3 (rules are not so rigid as to require "virtual certainty before a loss is accrued."). GAAP even provides an example of what to do in the context of "Litigation Open to Considerable Interpretation," which makes abundantly clear that the minimum amount of probable liability must be accrued, and requires further disclosure "of the additional exposure to loss if there is a reasonable possibility that additional amounts will be paid." ASC 450-20-55-18:21.

13

*Id*. Defendants complied with the first part of that requirement (the description), but they clearly

violated the second (providing an estimated range). To the contrary, Defendants claimed that Exela

was "unable to…estimate any loss or range of loss that may arise from the Appraisal Action."[22]

The SAC is replete with allegations that all Defendants were well aware of SourceHOV's

valuation estimates (and, thus, the estimated range of loss Exela faced) *long* before they claimed

that "the Company" could not even estimate a potential "range of loss" that "may" arise from the

Appraisal Action. Prior to filing the 2017 Form 10-K on March 16, 2018, Exela had two Rothschild

estimates and knew the Merger price itself, resulting in a range of liability of about $42.2 to $61

million. ¶¶75, 79, 81, 87, 93, 97. Prior to the 2018 Form 10-K on March 20, 2019, Exela further

had the experts' valuations in the Appraisal Action, with an estimated range of liability of $29

million[23] to $52.3 million. ¶¶95, 97; p. 5, *supra* (chart). Defendants need not have "adopted"

Manichaean's estimate (MTD at 9) to disclose the estimated "range of loss" for Exela, particularly

because the *range* would reasonably include Manichaean's estimate.

The inference of scienter underlying Defendants' misrepresentation is strong here, where

Defendants "knew facts or had access to information suggesting that their public statements were

not accurate."[24] That inference is further strengthened because Exela's financial statements

---

[22] Defendants made this false claim in Exela's 2017 10-K (¶244), 2018 10-K (¶297), and in every 10-Q filed during the Class Period. While Defendants may argue that Exela's statement that it was "unable" to "estimate any loss or range of loss" satisfied the rule, it did not—and, in fact, it supports Defendants' scienter in violating the rule because the statement was demonstrably false.

[23] Defendants cite Jarrell's original valuation of $286.4 million ($1,723 per share) and complain that Plaintiffs provide "no particularized allegation for why he later increased it by 63%." MTD at 9-10. But where this information is particularly within Defendants' control, any lack of "particularization" does not cut against scienter, *McNamara*, 197 F. Supp. 2d at 672, especially where Defendants had Jarrell's updated valuation well before they filed Exela's 2018 10-K on March 20, 2019. Moreover, Jarrell testified as to the reason for his change. *Manichaean I*, 2020 WL 496606, *15 (noting that Jarrell "reached this final determination…after incorporating input from Meinhart and adopting portions of Meinhart's expert opinion that he found persuasive.").

[24] *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000); *In re Landry's Seafood Rest., Inc.*, 2001 WL 34115784, at *14 (S.D. Tex. Feb. 20, 2001) (same).

14

repeated GAAP's "loss or range of loss" language almost *ver batim*, suggesting that Defendants were keenly aware of the disclosure requirement—and flouted it anyway.[25]

Defendants cannot be allowed to hide behind the fact that Exela's retained consultant (Rothschild) and expert (Jarrell) calculated the SourceHOV valuation estimates, as opposed to the Individual Defendants doing so personally. MTD at 9; Order at 17. Whether the individuals—or their agents acting at Chadha's direction and on Exela's behalf—prepared a valuation is irrelevant to Defendants' knowledge of information and their disclosure obligations.[26] Moreover, the "absence of any allegation that Exela's outside auditor objected to Exela's prior accounting treatment of the SourceHOV litigation" (MTD at 25, n.71) does not negate scienter.[27] Defendants' so-called auditor defense ignores that Chadha himself—per his own admissions—misled Exela's auditors as to SourceHOV's value. ¶¶91-93. The Court should reject Defendants' attempt to avoid liability by disclaiming knowledge of information provided to them by the very experts they retained for the Merger and Appraisal Action, while hiding behind a different agent not alleged to have had any specific knowledge about the issue.

---

[25] *Wu Winfred Huang v. EZCORP, Inc.*, 259 F. Supp. 3d 563, 576 (W.D. Tex. 2017) (alleged knowledge of GAAP violation supported scienter); *In re SourceCorp Securities Litigation*, 2006 WL 8439544, *5 (N.D. Tex. June 6, 2006) (scienter alleged where defendant "knew that SourceCorp was publishing materially false information, or that he was severely reckless in providing such false information"); *In re Triton Energy Ltd. Secs. Litig.*, 2001 WL 872019, at *11 (E.D. Tex. Mar. 30, 2001) ("context of the misapplication or restatement" can support scienter).

[26] Chadha, Reynolds, and Cogburn all signed Exela's 2017 and 2018 10-Ks falsely stating that "***the Company***"—not any *individual*—"is unable . . . to estimate any loss or range of loss that ***may*** arise from the Appraisal Action." The *Company* explicitly relied on its expert to estimate SourceHOV's value for it, and *the Company*—including Chadha and Reynolds as SourceHOV's only board members and Cogburn as its CEO—knew what those estimates were. Moreover, Chadha *did* participate in SourceHOV's valuation estimates, he was involved in formulating SourceHOV's projections in connection with the Merger (¶90), and he discussed SourceHOV's valuation with Jarrell in the Appraisal Action. ¶94. Chadha also personally orchestrated (and knew the result of) the Backdated Valuation he obtained from Rothschild in January 2018. ¶¶86-87, 97.

[27] *In re Silver Wheaton Corp. Sec. Litig.*, 2016 WL 3226004, at *11 (C.D. Cal. June 6, 2016) (many courts have sustained securities claims "even when the defendants obtained 'clean' audit opinions from their independent auditors and [] never restated their financial statements") (collecting cases).

15

Finally, in addition to the affirmative duty under ASC 450, Exela had a duty to disclose the range of potential liability faced in the Appraisal Action once it spoke on the topic.[28] Defendants' failure not only to provide such a disclosure—but further falsely stating that such a disclosure was not even possible—supports a strong inference of scienter. Of course, the estimated *amount* of liability faced would have been the core information investors would want to know about the Appraisal Action. The most compelling inference is that with Exela already struggling in its nascent stages as a public company, Defendants delayed disclosure for as long as they could, recklessly or intentionally omitting liability estimates because to reveal the truth would have highlighted the material liability Exela was facing at a critical time.

### 3.      Chadha's "Disagreement" Does Not Negate Scienter

Whether any individual "disagreed" with Exela's expert's valuation (MTD at 9-10, 23) is irrelevant to whether *the Company* was capable of *reasonably* estimating the liability during the Class Period—which it was. In signing the Proxy Statement, Chadha and Reynolds attested to a SourceHOV valuation of $4,101 per share at the time of the Merger,[29] and they are charged with knowledge of that information in the SEC filing they signed.[30] Moreover, *the Company* relied on its agent and expert to reasonably estimate SourceHOV's value on its behalf in the Appraisal Action, which he did at $2,817 per share. And it was *the Company's* duty to record the estimated

---

[28] Whenever a defendant "voluntarily chooses to speak publicly, he or she has a duty to tell the whole truth," and must disclose material, adverse facts that affect the validity or plausibility of his statement." *Georgia Firefighters' Pension Fund v. Anadarko Petroleum Corp.*, 514 F. Supp. 3d 942, 956 (S.D. Tex. 2021) (citing *ArthroCare*, 726 F. Supp. 2d at 712).

[29] Defendants simultaneously argue that their disclosure valuing SourceHOV at $644.8 million in the Proxy Statement negates scienter (MTD at 11, n.41, 23) and that the Proxy price was irrelevant to the Appraisal Action (MTD at 11). Defendants cannot have it both ways, particularly where they told investors during the Class Period that they could not estimate even a range of liability. Moreover, Defendants' own argument disclaiming the reliability of the Proxy price infers that the most reliable estimates available were those provided by the parties' experts in the litigation, which figures Defendants concealed from Exela's investors during the Class Period.

[30] *Fleming*, 2004 WL 5278716, *13.

16

731690.1

liability. Even if Defendants *hoped* for a more favorable outcome based on Chadha's disagreement, that disagreement does not render the liability incapable of being "reasonably estimated."[31]

Moreover, the mere fact of the disagreement *at least* establishes Chadha's actual knowledge of the existence and amount of Exela's expert valuation estimates, and thus puts truth to the lie that the liability could not even be *estimated*. Further, Chadha's self-serving, litigation-driven "disagreement" with Jarrell regarding SourceHOV's valuation is not credible in light of his own actions at the time of the Merger, including: signing the Proxy Statement valuing SourceHOV at $645 million (¶93); obtaining comfort letters to support the Merger confirming the "financial soundness" of SourceHOV (¶148); and pledging his SourceHOV shares as collateral to obtain crucial financing for the Merger (¶359). Chadha's credibility is further undermined by his conduct during the Appraisal Action, including: his orchestration of the Backdated Valuation in an attempt to lessen Exela's liability (¶81); the fact that he tried to conceal it (¶82); and his testimony that SourceHOV was worthless prior to the Merger (¶¶91, 97). He certainly did not claim that the shares were worthless (or even worth *less*) at the time of the Merger (¶359).[32] He either lied at the time of the Merger that the shares had substantial value, or he lied during the Appraisal Action when he claimed they had little to no value. Either way, Chadha's purported "disagreement" was not credible,[33] and it certainly does not excuse Defendants' reckless failure to comply with Exela's

---

[31] *Cf. Spitzberg v. Houston Am. Energy Corp.*, 758 F.3d 676, 686 (5th Cir. 2014) ("Whether [defendants] actually believed that oil could be found . . . is irrelevant to whether [they] were severely reckless when they allegedly misled investors regarding previous geological testing").

[32] For these reasons, among others, the Chancery Court rejected Chadha's testimony as "lack[ing] credibility" and "not believable." *Manichaean I*, 2020 WL 496606, *19-*21. If, however, *this* Court credits Chadha's "disagreement" with his expert and his testimony that SourceHOV was worthless (as would be required to conclude that a loss in that action was "not probable") or worth so much less than all other expert estimates (as to render *them* unreliable), then that would only portend another troublesome result for Defendants: they lied to Exela shareholders about SourceHOV's value and, by extension, the financial condition of Exela itself.

[33] *Even if* the "disagreement" over the liability *were* credible, GAAP required Exela to record at least the lowest estimated amount, or to disclose the range of loss. *See* Secs. III.B.1-2 *supra*.

17

own policy and GAAP, or otherwise support a *more compelling* inference of non-culpability.[34]

### C.    The SAC States a Claim Based on the Overstatement of Exela's Adjusted EBITDA

#### 1.    As Demonstrated by the Restatement, Exela's Adjusted EBITDA Figures Reported During the Class Period Were Admittedly False and Misleading

Just as the Restatement alleges falsity with respect to Defendants' failure to record the Appraisal Action liability (*see* Sec. II.B, *supra*), it is also sufficient to allege falsity as to the adjusted EBITDA figures and O&R expense addbacks that Exela later restated. The Restatement revealed that Exela's adjusted EBITDA was misleadingly inflated in 2017[35] and 2018. Adjusted EBITDA was originally reported to be $283.8 million for 2018 and was reduced to $276.2 million. ¶233. O&R addbacks of $68.2 million in 2018 were reduced to $54.2 million (over 20%). *Id.* Significantly, the Restatement revealed that absent the inflated addbacks, Exela would have missed its adjusted EBITDA guidance for 2018. *Id.* This sufficient to allege falsity[36] and scienter.[37]

Moreover, Defendants knew that Exela's adjusted EBITDA was an important accounting metric that investors relied upon (¶5), they knew that the EBITDA addbacks related directly to Exela's core business operations, and they knew, or were reckless in not knowing that inflated addbacks materially misrepresented Exela's true earnings.[38]

---

[34] *Menaldi v. Och-Ziff Cap. Mgmt. Grp. LLC*, 164 F. Supp. 3d 568, 585 (S.D.N.Y. 2016) (defendants "reckless in opting to misrepresent their exposure to civil and criminal liability."). Finally, Chadha's orchestration of the Backdated Valuation and Exela's avoidance of the Appraisal Action judgment (including diverting funds, *see* Sec. II.C) further supports the inference that Defendants obfuscated and misled investors regarding the liability faced during the Class Period.

[35] Exela's 2017 10-K reported adjusted EBITDA for the part of the year after Exela went public at $208.8 million. ¶165. The Restatement reduced the figure to $203.9 million.

[36] *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 285 (S.D.N.Y. 2009) ("a restatement issues only when errors are material"); Order at 20, n.13 (citing *ArthroCare*, 726 F .Supp. 2d at 710 and *In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 486 (S.D.N.Y. 2004)).

[37] *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004).

[38] *Atlas Air*, 324 F. Supp. 2d at 491 (scienter alleged regarding failure to timely record impairment of planes because "acquiring and hiring cargo planes" were "activities that constitute[d] the core operations of [the company]"); *Dorsey v. Portfolio Equities, Inc.*, 540 F.3d 333, 342 (5th Cir. 2008) (scienter strong where alleged misrepresented information was important to health of company).

18

### 2. Defendants Misrepresented the Nature and Content of the O&R Addbacks

Plaintiffs need not allege that Exela promised the O&R costs "would never recur" (MTD at 4, 17) for the practice to be misleading. The repetition of the charges alone did not render them misleading (although that shows they violated accounting rules (*see* Sec. III.C.3, *infra*)); rather, Defendants' characterization of the addbacks as including only "non-routine" costs "outside the control of our management team"[39] was recklessly misleading because they were anything but.

The SAC makes clear that the bulk of the supposed non-routine costs actually related to "headcount," which Exela did not disclose until May 9, 2019. ¶¶204-05. The SAC also alleges that headcount-related expenses were both routine and squarely within management's control. ¶¶159, 203. In fact, early in the Class Period, Reynolds admitted that headcount was within Defendants' control.[40] In addition, the SAC alleges that Exela was in the business of acquiring other businesses. ¶¶112-16; *Manichaean I*, 2020 WL 496606, at *3.[41] Defendants argue that this does not render O&R addbacks improper (MTD at 5), but they ignore SEC guidance that "restructuring, integration and deal costs" incurred by a company "whose operations included large, frequent and seemingly routine acquisitions of other businesses or entities" should not be added back because such costs "appeared to be recurring and usual in the ordinary course of business." ¶¶106-07.

In its Order, the Court observed that addbacks are not necessarily misleading "as long as the public is told exactly what the company is doing" (Order at 42), but Exela's investors were ***not*** told "exactly what [Exela was] doing." Investors were *not* told that Exela regularly added back

---

[39] ¶¶252, 260, 263, 272, 284, 302, 313, 320.

[40] ¶257 (explaining that Exela was "focus[ed] on [] EBITDA," Reynolds claimed to be "highly confident [about] ***things we control***" including "***within the headcount area***.").

[41] Plaintiffs do not allege that "the continued occurrence of optimization and restructuring charges [] automatically transform[s] them into ordinary or routine operating expenses." Order at 40-41. Rather, Plaintiffs allege that the O&R charges ***were*** ordinary or routine, because Exela was in the business of acquiring companies. ¶¶112-116.

19

routine expenses that were core to Exela's very business. That investors were misled on this point is underscored by analysts' reactions as they started to discern that Exela's addbacks included routine business expenses. For example, when Moody's downgraded Exela on May 22, 2019, it cautioned that the Company's O&R expenses appeared to consist largely of "normal operating expenses necessary to provide its service." ¶¶17, 210, 337.

Nor can Defendants escape liability by recasting Exela's adjusted EBITDA as mere opinions. MTD at 20, n.59. Financial statements—including adjusted EBITDA—are presented as *facts* to investors, not opinions. Moreover, Defendants' insertion of the word "believe" into their oft-repeated statement that "we exclude these charges since we do not believe they truly reflect our past, current or future operating performance" does not transform Defendants' statements about what the addbacks were into inactionable opinions.[42] To the contrary, it further underscores how Defendants misled investors regarding the expenses as, supposedly, not indicative of "operating performance"—when that is precisely what a large portion of the addbacks were.

Finally, while investors could see the O&R line item continued from quarter to quarter (MTD at 4-5; Order at 44), they did not know that the underlying expenses added back were largely routine business expenses relating to headcount. By Defendants' own descriptions (at least prior to May 9, 2019), reasonable investors would have believed that the expenses underlying the O&R line item related to discrete/one-time transaction expenses, not routine "headcount" expenses.[43]

---

[42] *Police & Fire Ret. Sys. of City of Detroit v. Plains All Am. Pipeline L.P.*, 777 F. App'x 726, 730 (5th Cir. 2019) ("The Supreme Court…rejected the argument that opinion phrases, such as 'we believe' or 'we think' categorically disqualified a statement from being actionable, stating 'those magic words can preface nearly any conclusion and the resulting statements, as we have shown, remain perfectly capable of misleading investors.'") (quoting *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund,* 575 U.S. 175, 193 (2015)).

[43] *See Spitzberg*, 758 F.3d at 689-92 (whether term of art was recklessly misleading was a factual question inappropriate for resolution at the pleading stage). This is also why *Ironworkers Local 580 v. Linn Energy, LLC*, 29 F. Supp. 3d 400 (S.D.N.Y. 2014), which did not have a restatement

20

### 3.    Defendants' Violation of SEC Rules Supports Scienter

As the SAC alleges, non-GAAP financial measures "can become tools to distort the truth, … and even perpetuate outright fraud." ¶108. Thus, while there is "no uniform GAAP rule" for EBITDA addbacks (Order at 42-43; MTD at 16), SEC rules Reg S-K (Item 10(e)) and Reg G clearly apply. These rules do not just apply to expenses identified as "non-recurring," they apply to expenses identified as "infrequent or unusual," and they prohibit registrants from adding back such expenses to EBITDA if they were "reasonably likely to recur within two years or there was a similar charge [] within the prior two years." ¶¶103, 107; 17 C.F.R. §229.10(e)(1)(ii)(B). Exela knew the O&R addbacks were routine and ongoing, but presented them as "non-routine" and added them back to EBITDA anyway. *Id*. The SEC's 2016 guidance makes clear this is misleading. ¶105.

Whether Reg G "provide[s] an independent basis for liability under Rule 10b-5" (MTD at 16) is not the salient question, and that argument certainly does not raise *a more compelling* inference that Defendants *did not* act recklessly.[44] Rather, the question is whether all of the facts— *including* the Restatement, the violation of Reg S-K and Reg G, and the fact that inflated addbacks enabled Exela to reach its 2018 adjusted EBITDA guidance—support a strong inference that adjusted EBITDA was recklessly overstated. The SAC alleges that they do.[45]

---

and was decided before the SEC's 2016 guidance, does not apply. In *Linn*, the plaintiffs alleged an omission theory that "financial statements were misleading in that they failed to disclose that adjusted EBITDA excluded the cost of settled put options." *Id*. at 414. Here, Exela *affirmatively misrepresented* O&R costs as "nonroutine" when, in fact, the SAC alleges that a substantial part of the addbacks, particularly relating to "headcount," were entirely routine.

[44] The SEC has made clear that Reg G indeed may "give rise to a violation of Section 10(b) or Rule 10b-5 thereunder." 2003 WL 192073 at *4822, n. 36; ¶108, n.12. And as the Court noted, "district courts within this circuit have found similar rules violations to constitute actionable 10(b) claims." Order at 39, n.24 (citing cases).

[45] *In re Cardinal Health Inc. Sec. Litigations*, 426 F. Supp. 2d 688, 723 n.48 (S.D. Ohio 2006) (pervasive "excessive special charges" that contributed to restatement supported scienter).

21

### 4. Defendants' Abuse of Addbacks Was Pervasive and Longstanding Conduct Beginning at SourceHOV that Continued at Exela

The Appraisal Action revealed that in the periods just before the Merger, expense addbacks accounted for more than 25% of SourceHOV's adjusted EBITDA. ¶126. During the Class Period, addbacks accounted for 20% to 24% of Exela's adjusted EBITDA. ¶233. Moreover, bankers from Morgan Stanley, Goldman Sachs, and even SourceHOV's own expert witness (all of whom had non-public financial information) communicated to SourceHOV executives—*i.e.*, the Individual Defendants here—that the EBITDA addbacks were problematic. ¶¶124-131, 352.[46]

While the Court previously held that SourceHOV's adjusted EBITDA practices were separate from Exela's (Order at 49-50), the SAC remedies that disconnect. *See* ¶¶132-52 (alleging a lack of corporate formalities and that the same executives, including the Individual Defendants, had control over and directed the same practices at both entities).[47] Thus, after numerous financial experts conveyed concerns over inflated addbacks, and where the Individual Defendants knew or recklessly continued that misleading practice at Exela, the pervasiveness and consistent directionality of inflated addbacks over a sustained period further strengthens scienter.[48]

---

[46] In February 2017, a non-public Morgan Stanley email cautioned that SourceHOV's adjusted EBITDA was "inflated with less than credible adjustments." ¶¶126, 129. The addbacks were so "egregious" the bankers "put their pencils down." ¶126. According to testimony by Jarrell in the Appraisal Action, Chadha conceded at his deposition that SourceHOV's use of adjusted EBITDA materially improved the *appearance* of its performance, stating words to the effect of "if cash EBITDA had been that big" they would not have needed to do the Merger. ¶126.

[47] Defendants complain that the findings in the Veil Piercing Action cannot be considered when assessing whether they continued the conduct at Exela (MTD at 11-12, 23), but they ignore that the Chancery Court had also completed a trial on the underlying issues, including the propriety of the addbacks and the lack of corporate formalities, and the SAC draws upon that record and alleges independent facts, including that Exela's financials incorporated SourceHOV. Moreover Exela can be charged with knowledge of the conduct of its subsidiary. *In re Enron Corp. Sec. Litig.*, 2004 WL 764663, at *4 (S.D. Tex. Mar. 31, 2004); *McNamara v. Bre-X Minerals Ltd.*, 57 F. Supp. 2d 396, 427-28 (E.D. Tex. 1999).

[48] *Singh v. 21Vianet Group, Inc.*, 2017 WL 4322483, *3 (E.D. Tex. Sept. 13, 2017) (scienter alleged based on a "repeated pattern of round-tripping revenue"); *In re Medicis Pharm. Corp. Sec. Litig.*, 2010 WL 3154863, at *5 (D. Ariz. Aug. 9, 2010) ("where...[an accounting] mistake is pervasive over a long period of time, the inference of scienter may be much stronger").

22

731690.1

**D.**     **The SAC States a Claim Based on Misrepresentations of Exela's Revenue Visibility**

Plaintiffs allege that Defendants misled investors by claiming that Exela had 90% revenue visibility due to auto-renewing customer contracts (*e.g.*, ¶¶12, 166-69, 171), when in fact, roughly 20% of Exela's revenue stemmed from unpredictable and non-recurring postage charges (¶212). The SAC cures the Court's prior finding that Plaintiffs failed to allege that "defendants knew or must have been aware, *on or prior to March 19, 2019*, that at least 20% of Exela's revenue in 2018 and 2019 came from (or would come from) postage, that postage revenue was completely unpredictable, and that Exela therefore did not actually have 90% revenue visibility." Order at 35.

First, the SAC makes clear that Defendants tracked postage revenue prior to March 2019. Under ASC 606, Exela was required to track postage as a variable revenue component.[49] The SAC also alleges that Exela *had* to track postage at all times during the Class Period as a component of customer deposits paid in advance, which were first booked on Exela's balance sheet (including in 2017) and then recorded as revenue when postage was completed. ¶¶175-76 (in 2018, for example, postage contributed 19.5% of Exela's revenue).[50] Logically, by booking customer deposits as an asset, had Exela *not* tracked postage, its balance sheet would not have balanced.

Moreover, Plaintiffs need not allege that postage revenue was "completely unpredictable"

---

[49] ASC 606 required Exela to track "the consideration promised in a contract [which] includes a variable amount"—such as postage—and further required that the entity *shall estimate the amount of consideration* to which the entity will be entitled in exchange for transferring the promised goods or services to a customer." ¶174 (quoting ASC 606-10-32-5). ASC 606 guidance further instructs that "[r]egardless of the form of viability or its complexity, once variable consideration is identified, an entity is required under ASC 606-10-32-8 to estimate the amount of variable consideration" to determine the value of the contract. *Id*. Thus, to estimate the consideration derived from postage, as was required by GAAP, Defendants would have had to track it.

[50] Defendants argue that statements about Exela's "customer margins" and guidance are not actionable due to, *inter alia*, the PSLRA safe harbor (MTD at 18-19), but the SAC does not allege that Exela's financial guidance or statements about customer margins, alone, were misleading. To the extent Defendants argue that the safe harbor extends to their visibility statements, those statements were presented as current or historical statements of fact that are not subject to the safe harbor. ¶167 ("[w]e *have* over 90% visibility"); ¶168 ("90% *is* recurring").

23

(MTD at 6, 17; Order at 35) to render Defendants' assurances about 90% revenue visibility misleading, especially where Defendants themselves admitted that postage was "really not predictable" and "**something we haven't been very good at predicting historically**." ¶¶19, 211, 217-18. While "historically" may be vague as to how long Exela had been tracking (and failing at predicting) postage revenue, it is less so in the context of the SAC's allegations that Exela was required to track it under ASC 606 and by virtue of the way Exela booked postage advances. These facts are sufficient to allege that Defendants were tracking postage revenue and knew its substantial proportion of Exela's overall revenue since the start of the Class Period.[51]

E.      **Insider Stock Sales and Weak Internal Controls Further Support Scienter**

1.      **Chadha's $32.83 Million in Class Period Stock Sales**

"Insider trading in suspicious amounts or at suspicious times, is, of course, presumptively probative of bad faith and scienter." *Rubinstein v. Collins*, 20 F.3d 160, 169 (5th Cir. 1994). Scienter is stronger still where, as here, a company is forced to restate its financials as a result of the violations. *In re UTStarcom, Inc. Sec. Litig.*, 617 F. Supp. 2d 964, 976 (N.D. Cal. 2009). The timing, price, and amount of Chadha's sales support scienter. On April 16, 2018, Chadha sold over 7 million shares (around 9% of his holdings) at $4.69/share, grossing $32.83 million.[52] He made this sale—his first and only ever sale of Exela stock—three months *after* he orchestrated the

---

[51] *Iowa Pub. Emps.' Ret. Sys. v. MF Global, Ltd.*, 620 F.3d 137, 143, n.13 (2d Cir. 2010) ("Depending on the problem, its existence [when Defendants first admitted it] may support an inference that it was present six months earlier."). In addition, Reynold's evasive responses to questions about visibility (¶¶172-73), his status as an experienced CPA, and his May 2020 resignation (after 20 years of service but just a few months after the Restatement (¶134)), all further support scienter. *In re Paincare Holdings Sec. Litig.*, 541 F. Supp. 2d 1283, 1293 (M.D. Fla. 2008) (experience and accounting background of CFO supported scienter); *ArthroCare*, 726 F. Supp. 2d at 725 (timing of CFO resignation suggested it was related to restatement and supported scienter).

[52] *In re Guilford Mills, Inc. Sec. Litig.*, 1999 WL 33248953, at *5 (S.D.N.Y. July 21, 1999) (sale of 10% supported scienter); *Batwin v. Occam Networks, Inc.*, 2008 WL 2676364, at *14-15 (C.D. Cal. July 1, 2008) (7%); *In re SeeBeyond Techs. Corp. Sec. Litig.*, 266 F. Supp. 2d 1150, 1168-69 (C.D. Cal. 2003) (7.6%); *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 278 (3d Cir. 2006) (scienter supported where sales netted defendant more than four times his salary).

24

Backdated Valuation, and *before* the first partial disclosure alleged in this case.[53] That Chadha made the sale to pay off a margin loan he obtained to effect the Merger does not *negate* scienter (MTD at 2-3), it supports it. Chadha pledged his shares as collateral to Ex-Sigma 2 (an entity Defendants created to hold the shares) to secure the loan, which was critical to the Merger. ¶359. The sale had to be made to pay off the loan for Chadha's entity; either way, Chadha benefitted.[54]

### 2.   Exela's Internal Control Failures

Courts commonly hold that weak internal controls will support an inference of scienter,[55] and Defendants' escalating internal control failures add to scienter here. ¶¶293, 355 (2018 control failures); ¶¶22, 361 (2019 control failures add warning of "fraud risks"). Defendants argue that scienter is negated because Exela "disclosed its internal control weaknesses" (MTD at 13), but they falsely claimed *at the time* that the control deficiencies identified in the 2018 10-K would not impact Exela's financials. ¶293 (Reynolds insisted "we have no issues within our numbers"). Moreover, Defendants failed to remedy the weaknesses identified in 2018, resulting in the control failures worsening in 2019 and ultimately necessitating the Restatement. This supports scienter.

## IV.   **CONCLUSION**

For the foregoing reasons, Defendants' motion should be denied.

---

[53] *In re Crossroads Systems, Inc. Sec. Litig.*, 2001 WL 1401211, at *4 (W.D. Tex. Aug. 15, 2001); This case is distinguishable from *Central Laborers' Pens. Fund v. Integrated Elec. Servs. Inc.*, 497 F.3d 546, 553 (5th Cir. 2007) (MTD 3, n.10), which held that insider trading **alone** cannot allege scienter. Plaintiffs do not rely on Chadha's sales alone. Moreover, in *Cent. Laborers'*, the plaintiff failed "to link the misstatements with the bases for inferring scienter." 497 F.3d at 555. Here, the SAC links the timing of the misstatements with Chadha's sales. ¶356. Finally, the nearly $33 million Chadha reaped dwarfs the $1.44 million earned by the insider in *Central Laborers'*.

[54] The margin loan required Ex-Sigma to hold its Exela stock as security until the loan was repaid. Reynolds and Chadha were Ex-Sigma's sole managers, and Ex-Sigma's operating agreement gave them "full discretion to decide when, and whether, to repay" the loan. 2020 WL 496606, *8.

[55] *In re Cannavest Corp. Sec. Litig.,* 307 F. Supp. 3d 222, 245 (S.D.N.Y. 2018); *In re OSG Sec. Litig.*, 12 F. Supp. 3d 622, 633 (S.D.N.Y. 2014) ("A lack of adequate internal controls may support the inference of scienter."); *Hall v. The Child. Place Retail Stores. Inc.*, 580 F. Supp. 2d 212, 233 (S.D.N.Y. 2008); *In re Veeco Instruments, Inc. Sec. Litig.*, 235 F.R.D. 220, 232 (S.D.N.Y. 2006); *UTStarcom*, 617 F. Supp. 2d at 975 (scienter strong where control problems went unremedied).

731690.1

Dated: October 13, 2021

Respectfully submitted,

**GLANCY PRONGAY & MURRAY LLP**


By:  *s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: info@glancylaw.com

*Counsel for Lead Plaintiffs Insur Shamgunov and Elena Shamgunova*

Joe Kendall
Texas Bar No. 11260700
KENDALL LAW GROUP, PLLC
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: 214-744-3000
Facsimile: 214-744-3015
Email: jkendall@kendalllawgroup.com

*Liaison Counsel for Lead Plaintiffs Insur Shamgunov and Elena Shamgunova*

26

731690.1

## PROOF OF SERVICE BY ELECTRONIC POSTING

I, the undersigned say:

I am not a party to the above case and am over eighteen years old. On October 13, 2021, I served true and correct copies of the foregoing document, by posting the document electronically to the ECF website of the United States District Court for the Northern District of Texas, for receipt electronically by the parties listed on the Court's Service List.

I affirm under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on October 13, 2021.

*s/ Kara M. Wolke*
Kara M. Wolke

27

731690.1