IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

BO SHEN, et al.,                          §
                                          §
                    Plaintiffs,           §
                                          §  Civil Action No. 3:20-CV-0691-D
VS.                                       §
                                          §
EXELA TECHNOLOGIES, INC., et al.,         §
                                          §
                    Defendants.           §

MEMORANDUM OPINION
AND ORDER

        In this putative class action alleging claims for securities fraud and control person

liability under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"),

15 U.S.C. §§ 78j(b) and 78t(a), and Securities and Exchange Commission ("SEC") Rule 10b-

5 ("Rule 10b-5"), 17 C.F.R. § 240.10b-5, promulgated thereunder, defendants move to

dismiss under Fed. R. Civ. P. 9(b) and 12(b)(6) and the Private Securities Litigation Reform

Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4, on the grounds that plaintiffs have failed to

adequately plead a material misrepresentation or omission by the defendants and scienter.

Concluding that plaintiffs have satisfied the heightened pleading requirements of Rules 9(b)

and 12(b)(6) and the PSLRA concerning at least one theory of liability, the court denies the

motion.

I

        The general background facts and procedural history of this case are set out in the

court's prior memorandum opinion and order and need not be repeated.  *See Shen v. Exela*

*Techs., Inc.* (*Shen I*), 2021 WL 2589584, at *1-3 (N.D. Tex. June 24, 2021) (Fitzwater, J.). Because the parties are familiar with the record and the contents of the briefing, the court will confine its discussion to what is necessary for the parties to understand this decision.[1]   In *Shen I* plaintiffs relied on four theories to plead a plausible securities fraud claim.   They now assert three.   Like their prior complaint, their current second amended complaint ("SAC") rests on the theory that defendants misrepresented Exela's revenue "by telling investors that Exela had 90% visibility into its revenue"—i.e., that 90% of the company's revenue was predictable— "because [the revenue] was recurring in nature due to long-term or auto-renewal customer contracts."   SAC ¶ 10.   These representations were misleading, according to the SAC, "because approximately 20% of Exela's revenue came from billing customers for pass-through postage costs, which Defendants later admitted was inconsistent and highly unpredictable."   *Id.*; *see also id.* ¶ 12 ("Defendants misled investors about the predictability of Exela's revenue, often stating that 90% of the Company's revenue was predictable when Defendants later admitted that approximately 20% of its revenue was unpredictable, nonrecurring, low margin postage revenue."); *id.* ¶ 166 ("Throughout the Class Period, Defendants repeatedly assured investors that the Company had over 90% visibility in revenue.").

---

[1]Under § 205(a)(5) of the E-Government Act of 2002 and the definition of "written opinion" adopted by the Judicial Conference of the United States, this is a "written opinion[] issued by the court" because it "sets forth a reasoned explanation for [the] court's decision." It has been written, however, primarily for the parties, to decide issues presented in this case, and not for publication in an official reporter, and should be understood accordingly.

In *Shen I* the court rejected plaintiffs' 90% revenue visibility theory based on their failure to adequately plead scienter. *Shen I*, 2021 WL 2589584, at *14.[2] In sum, the court noted that plaintiffs relied on misrepresentations made between March 2018 and March 2019, but they failed to plead any specific facts establishing that, at the time defendants represented that Exela had 90% revenue visibility, defendants knew that approximately 20% of Exela's revenue for 2018 and 2019 came from unpredictable postage and postage handling. *Id*. And the court rejected plaintiffs' other reasons for maintaining that they had adequately pleaded scienter with respect to the 90% revenue visibility representations. *Id*. at *14-16.

Although in *Shen I* the court granted defendants' motion to dismiss, it also granted plaintiffs leave to replead. Plaintiffs have amended their complaint via the SAC, and defendants move anew to dismiss under Rules 9(b) and 12(b)(6) and the PSLRA. The court has heard oral argument.

II

> The elements of a private securities fraud claim based on violations of 15 U.S.C. § 78j(b) and [Rule 10b-5] are: (1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.

---

[2]The court assumed *arguendo* that defendants' visibility statements were not forward-looking statements protected by the PSLRA's safe harbor and that defendants' visibility statements constituted misrepresentations of material fact. *Shen I*, 2021 WL 2589584, at *14. In the present memorandum opinion and order, the court concludes that defendants' visibility statements are neither protected under the PSLRA safe harbor as forward-looking statements nor are statements protected by the "bespeaks caution" doctrine. *See infra note* 3.

*Spitzberg v. Hous. Am. Energy Corp.*, 758 F.3d 676, 683 (5th Cir. 2014) (internal quotation marks omitted) (quoting *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S.Ct. 2179, 2184 (2011)).

Because plaintiffs bring a private lawsuit for securities fraud under the Exchange Act and Rule 10b-5, they must comply with the PSLRA and "conform the allegations in their [second amended] complaint to the heightened pleading requirements set forth at 15 U.S.C. § 78u–4." *Spitzberg*, 758 F.3d at 679.

> [T]he PSLRA heightened the pleading standards for private claims of securities fraud "in two ways." That is, plaintiffs must also, first, allege with particularity why each one of defendants' representations or omissions was "misleading" under 15 U.S.C. § 78u-4(b)(1) and, second, allege with particularity those facts giving rise to a "strong inference" that the defendant acted with the required state of mind under 15 U.S.C. § 78u-4(b)(2).

*Id.* at 683 (citing *Ind. Elec. Workers' Pension Tr. Fund IBEW v. Shaw Grp., Inc.*, 537 F.3d 527, 532-33 (5th Cir. 2008)).

To qualify as "strong," "an inference of scienter must be more than merely plausible or reasonable—it must be cogent and at least as compelling as any opposing inference of nonfraudulent intent." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 314 (2007).

"In this circuit, the required state of mind for scienter is an intent to deceive, manipulate, or defraud or severe recklessness." *Spitzberg*, 758 F.3d at 684 (internal quotation marks and brackets omitted).

> Severe recklessness is limited to those highly unreasonable omissions or misrepresentations that involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers which is either known to the defendant or is so obvious that the defendant must have been aware of it.

*Id.* (brackets omitted) (quoting *Ind. Elec. Workers'*, 537 F.3d at 533).

In deciding defendants' motion to dismiss, the court "must, as with any motion to dismiss for failure to plead a claim on which relief can be granted, accept all factual allegations in the complaint as true." *Tellabs*, 551 U.S. at 322. This is so even though "[a]t later stages of these proceedings . . . additional evidence . . . may confirm or undermine" the allegations contained in plaintiffs' SAC. *Spitzberg*, 758 F.3d at 684-85.

In their motion to dismiss, defendants challenge the first and second elements of plaintiffs' securities fraud claim, asserting that plaintiffs have again failed to plead particularized facts showing an actionable misstatement or supporting a strong inference of scienter. And defendants' counsel confirmed at oral argument that defendants' present motion to dismiss challenges only the first two elements.[3] The court will therefore address

---

[3]Defendants counsel noted that defendants continue to rely on the PSLRA safe harbor and the "bespeaks caution" doctrine. This reliance is misplaced.

The PSLRA's safe harbor provisions apply to "any forward-looking statement," 15 U.S.C. § 78u-5(c)(1), which the statute defines to include projections, plans, or statements of future economic performance, *id.* § 78u5(i)(1). Defendants' alleged visibility statements are not forward-looking predictions. For example, the SAC alleges that Exela's CFO James G. Reynolds ("Reynolds") stated during a March 15, 2018 earnings call: "[w]e have over 90% visibility in revenue." SAC ¶ 167 (bold font and emphasis omitted); *see also id.* ¶ 241 (2017 Form 10-K statement that "approximately 90% is recurring" (bold font and emphasis omitted)). This statement, made in the present tense, expresses the degree of visibility that

only the first and second elements that plaintiffs must satisfy to proceed past the pleading stage.

III

The first element obligates plaintiffs to plead with particularity what each of defendants' misrepresentations or omissions was and why each was misleading. The SAC alleges that defendants made the 90% visibility misrepresentation, or similar statements, in the following instances, which the court accepts as true at this stage of the case.[4]

---

Exela *currently* had, as of March 15, 2018, based on its historical performance. *See, e.g., In re BP p.l.c. Secs. Litig.*, 852 F.Supp.2d 767, 799-800 (S.D. Tex. 2012) ("While tense is not determinative on whether a statement is forward-looking, it is a relevant consideration." (citation omitted)). Defendants' other alleged visibility statements similarly rely on present and historical facts. *See, e.g.,* SAC ¶ 170 (alleging that defendant Ronald Cogburn ("Cogburn"), Exela's CEO, stated during a May 10, 2018 earnings call: "[w]e have a high degree of revenue visibility,"); *id.* ¶ 171 (alleging that Reynolds stated during the May 10, 2018 earnings call: "[s]o we have good visibility into our revenue, typically just over 90% at any point in time," (bold font and emphasis omitted)). "Statements describing past or present conditions are not forward-looking statements that trigger the PSLRA's safe harbor." *Carlton v. Cannon*, 184 F.Supp.3d 428, 468 (S.D. Tex. 2016) (citing cases); *see also Spitzberg*, 758 F.3d at 692 (5th Cir. 2014) ("[W]e join [several other circuits] in concluding that a 'mixed present/future statement is not entitled to the safe harbor with respect to the part of the statement that refers to the present.'" (citation omitted)). Accordingly, defendants' alleged visibility statements are not shielded under the PSLRA's safe harbor provisions.

Nor are these statements protected by the "bespeaks caution" doctrine, which protects optimistic projections accompanied by appropriate cautionary language. *See In re Secs. Litig. BMC Software, Inc.*, 183 F.Supp.2d 860, 895 (S.D. Tex. 2001). The court has already concluded that defendants' alleged visibility statements are not forward-looking statements. In any event, defendants have not pointed to any specific cautionary language that accompanied these statements. *See* Ds. Br. 19-20 & n.59 (arguing that defendants' statements were qualified with words like "I believe" or "I think," but failing to point the court to any cautionary language that specifically related to Exela's visibility statements).

[4]For purposes of this decision, the court for convenience will refer to plaintiffs' claim as based on misrepresentations rather than on misrepresentations and omissions. But the

- 6 -

In Exela's Annual Report for the year ended December 31, 2017, SEC Form 10-K, filed March 16, 2018, Exela stated: "For the fiscal year ended December 31, 2017, we generated $1,152.3 million of revenue of which approximately 90% is recurring in nature and supported by long-term customer contracts." SAC ¶ 241 (bold font and emphasis omitted); *see id*. ¶ 166 (quoting same statement). The Form 10-K also stated that Exela's "stable base of customers and sticky, long-term relationships lead to highly predictable revenues." *Id.* ¶ 242 (bold font and emphasis omitted). This and other statements recounted in ¶¶ 239-241 of the SAC were materially false and/or misleading when made and/or omitted material facts necessary to make the statement not misleading, because: 90% of Exela's revenue was not predictable or recurring; rather, as defendants admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and the concealment of which misrepresented the stability of Exela's revenue sources, as well as its actual and potential margin and revenue growth. *Id.* ¶ 243.

Shortly thereafter, on April 13, 2018, Exela filed a Prospectus Supplement to its Prospectus dated October 2, 2017. In it, Exela offered equity securities on behalf of Ex-Sigma 2, LLC for 7 million shares of Exela common stock. The Prospectus stated: "we generated $1,152.3 million of revenue of which approximately 90% is recurring in nature and

---

misrepresentations based on 90% revenue visibility are alleged to be such because they omit material information. *See, e.g.,* Ps. Br. 8 ("Exela concealed, however, that a whopping 20% of revenue was derived from unpredictable, nonrecurring, and low margin postage billing." (bold font and emphasis omitted)).

supported by long-term customer contracts." *Id.* ¶ 249 (bold font and emphasis omitted).

This statement was materially false and/or misleading and/or omitted material facts necessary

to make the statement not misleading, because: 90% of Exela's revenue was not predictable

or recurring; rather, as defendants later admitted, approximately 20% of Exela's revenue was

nonrecurring, historically unpredictable, low margin revenue derived from billing pass-

through postage costs; and the concealment of which misrepresented the stability of Exela's

revenue sources, as well as its actual and potential margin and revenue growth. *Id.* ¶ 250.

On May 10, 2018 Exela issued a press release and filed a Form 8-K, signed by James

G. Reynolds ("Reynolds"), Exela's CFO, reporting Exela's 1Q 2018 financial results. SAC

¶ 251.  During the earnings call held the same day, defendant Ronald Cogburn ("Cogburn"),

Exela's CEO, stated: "[w]e have a high degree of revenue visibility. . . .  The level of

visibility gives us confidence in our ability to accurately forecast the trajectory of our

business, going forward.  We also have a high renewal rate on strategic accounts, over 95%."

*Id.* ¶ 255 (ellipses in original); *see also id*. ¶ 170 (quoting same statement).

In the same call, defendant Reynolds stated that 90% visibility and 95% renewal rates

gave Exela confidence to raise guidance.  *Id*. ¶ 256.  Responding to an analyst's question,

Reynolds stated: "If you think about our business and our contracts, they're long-term in

nature, right?  They're typically three to five years, and we have over 95% renewal rates.  So

we have good visibility into our revenue, typically just over 90% at any point in time." *Id.*

(bold font and emphasis omitted); *see also id*. ¶ 171 (quoting same statement).

Responding to another analyst, who asked, "what was the impact of postage in the

numbers?" *id*. ¶ 257 (bold font and emphasis omitted), Reynolds said: "And then with respect to your comment on postage, we don't really break out postage separately. We follow U.S. GAAP revenue. We just adopted the 606, which drives the accounting for our revenue." *Id*.; *see also id*. ¶ 172 [SAC ¶ 172 (quoting same statement).

These and other statements recounted in ¶¶ 255-257 of the SAC were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: 90% of Exela's revenue was not predictable or recurring; rather, as defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and the concealment of which misrepresented the stability of Exela's revenue sources, as well as its actual and potential margin and revenue growth. *Id*. ¶ 258.

On November 8, 2018 Exela filed a Form 8-K and press release, signed by Reynolds, reporting Exela's 3Q'18 results. SAC ¶ 270. In an earnings call held the same day, Reynolds responded as follows to an analyst's question about Exela's adjusted EBITDA and margins: "Our business, as you know, we have 90% visibility into our revenue. These are long-term contracts, other than the LLPS segment, which is a little lumpy. So we have really good visibility into our revenue and our contracts." *Id*. ¶ 279 (bold font and emphasis omitted).

The statements in ¶ 279 were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: 90% of Exela's revenue was not predictable or recurring; rather, as defendants later admitted, approximately

20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and the concealment of which misrepresented the stability of Exela's revenue sources, as well as its actual and potential margin and revenue growth.  *Id*. ¶ 280.

On March 18, 2019 Exela issued a press release reporting its fourth quarter and full year 2018 financial results.  During the earnings call held the same day, an analyst commented that Exela's guidance was "very, very strong" and that "EBITDA guidance seem[ed] above [the analyst's firm's] numbers," and requested "the level of confidence [Exela has] in achieving that guidance.  *Id.* ¶ 290 (bold font and emphasis omitted); *see id*. ¶ 197 (quoting same statement).  Reynolds responded: "As we've discussed historically, we typically have about 90% visibility into the next 12 months."  *Id*. ¶ 290 (bold font and emphasis omitted).

"In response to [another analyst's] inquiry questioning Exela's growth rate, Defendant Reynolds again cited '90% visibility on the top line' [*i.e.*, revenue] in expressing confidence in the Company's guidance and assured that the Company was being 'conservative.'"  *Id.* ¶ 291 (second brackets in original).  Reynolds added that "we have great visibility into the revenue and feel pretty good," *id.*, and that Exela would "rather come out feeling good with that 90% visibility on the top line, *id.*

The statements in ¶¶ 290-291 of the SAC were materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because: (i) 90% of Exela's revenue was not predictable or recurring; rather, as defendants later admitted,

approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs; and the concealment of which misrepresented the stability of Exela's revenue sources, as well as its actual and potential margin and revenue growth.  *Id.* ¶ 292.

Exela's 2018 Form 10-K also touted the company's purportedly predictable revenue. SAC ¶ 299.  That statement was materially false and/or misleading and/or omitted material facts necessary to make the statement not misleading, because a material percentage of Exela's revenue was not highly predictable or recurring; rather, as defendants later admitted, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs through which Exela would have very little visibility; and the concealment of which misrepresented the stability of Exela's revenue sources, as well as its actual and potential margin and revenue growth.  *Id.* ¶ 300.

On August 8, 2019 defendants pivoted.  They admitted that nonrecurring, low margin postage revenue—which Exela reported under the balance sheet line item "customer deposits"—was actually *unpredictable*.  *Id.* ¶ 12.  After markets closed, Exela reduced its 2019 revenue guidance citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, partially revealing that Exela had a substantial amount of unpredictable, nonrecurring low margin revenue.  *Id.* ¶ 18.  In an earnings call that day, Cogburn cited, among other factors, "the unpredictable nature of our postage revenue" as a reason for revising 2019 revenue guidance and adjusted EBITDA guidance.  *Id.* ¶ 212.

Following this news, Exela's stock fell $1.17 per share, or 48%, to close at $1.28 per share on August 9, 2019, on heavy volume. *Id.* ¶ 18.

Three months later, on November 12, 2019, the revenue picture had not improved. After markets closed, Exela further reduced its 2019 guidance, again citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18. This further revealed the extent to which Exela's revenue consisted of unpredictable low margin revenue, rather than revenue that was "recurring in nature and supported by long-term customer contracts." *Id.* ¶ 19. Reynolds referred, in part, to "the continued unpredictable nature of our revenue from postage." *Id.* ¶ 217 (bold font and emphasis omitted). Responding to an analyst's question, Reynolds said: "The first question is really about the postage and pass-through costs. It is low-margin business. It's just really not predictable for us. And when that postage comes through, it will fluctuate significantly between quarters. That's something we haven't been very good at predicting historically, so we're working on improving that." *Id.* ¶ 218 (bold font and emphasis omitted). Following this news, Exela's stock fell $0.25 per share, or about 42%, to close at $0.35 per share on November 13, 2019 on heavy volume. *Id.* ¶ 19.

Ultimately, investors would learn that Exela's revenue was not, and could not have been, as predictable as claimed because a material amount of Exela's revenue—roughly 20% depending on the time frame—was pass-through revenue from postage, which defendants later admitted was historically unpredictable. *Id.* ¶ 179.

On March 16, 2020 Exela announced that it had postponed its earnings release and

- 12 -

conference call due to the delayed filing of its Form 10-K for the year ended December 31, 2019, and the need to restate certain of its historical financial statements. *Id.* ¶ 222. On June 9, 2020 Exela filed its Form 10-K for 2019 containing restated financial results (the "Restatement"). *Id.* ¶ 227. In the Restatement, Exela revealed its revenues attributable to postage and postage handling and the LMCE for 2019 and 2018, which together accounted for $338.1 million and $277.4 million, respectively. These revenues—which Exela described as unpredictable—amounted to more than 21% of the company's restated 2018 revenue, and approximately 18% of its 2019 revenue, refuting the company's assertions throughout the class period that it had visibility into over 90% of its revenue. *Id.* ¶ 234.

Based on the foregoing allegations in the SAC, the court concludes that plaintiffs have satisfied their obligation to plead with particularity what each of defendants' misrepresentations was and why each was misleading.

## IV

To satisfy the second requirement—scienter—plaintiffs must allege with particularity the facts giving rise to a strong inference that defendants acted with the required state of mind.

## A

A "strong" inference is more than one that is merely plausible or reasonable: it is cogent and at least as compelling as any opposing inference of nonfraudulent intent.

The required state of mind for scienter includes "severe recklessness." But "severe recklessness" is limited to those highly unreasonable omissions or misrepresentations that

involve not merely simple or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and that present a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the defendant must have been aware of it.

B

In *Shen I* plaintiffs' 90% revenue visibility-based claim foundered on the scienter requirement. *Shen I*, 2021 WL 2589584, at \*14 (holding that "plaintiffs have not pleaded specific facts establishing a strong inference of scienter with respect to [the 90% revenue visibility] statements."); *id.* ("But plaintiffs do not plead any specific facts establishing that, *at the time defendants represented that Exela had 90% revenue visibility* (i.e., before March 2019), defendants knew that approximately 20% of Exela's revenue for 2018 and 2019 came from unpredictable postage and postage handling. (emphasis in original)). The court explained that defendants' statements on August 8, 2019 and November 12, 2019 in connection with lowering revenue guidance in light of the unpredictable and fluctuating nature of postage revenue would support the reasonable inference that defendants knew, at least as of those dates, that postage revenue was unpredictable. *Id.* at \*15. But the court reasoned that these statements would not permit the reasonable inference that defendants knew or must have been aware, on or prior to March 19, 2019, that at least 20% of Exela's revenue in 2018 and 2019 came from (or would come from) postage, that postage revenue was completely unpredictable, and that Exela therefore did not actually have 90% revenue visibility. *Id.*

The court also rejected plaintiffs' reliance on Reynolds' statement during a May 2018 earnings call that Exela really did not break out postage separately, followed U.S. GAAP revenue, and just adopted 606, which drove the accounting for Exela revenue. *Id.* Plaintiffs contended that Reynolds' response was evasive and strong evidence of scienter. The court disagreed, concluding that it could only draw the reasonable inference from Reynolds' statement that, as of May 2018, Exela did not separately account for postage revenue; the statement did not permit the reasonable inference that Reynolds then knew that postage revenue was completely unpredictable or that at least 20% of Exela's revenue for that year would come from this unpredictable source. *Id.*

The court also declined to accept plaintiffs' reliance on Reynolds' August 8, 2019 answer to a question about whether Exela reported revenue ex-postage in the second quarter of 2019. *Id.* Plaintiffs maintained that Reynolds' response that Exela did not do that supported scienter because, when Reynolds gave this answer, postage contributed 20% to Exela's full year 2018 revenue, and Reynolds, as CFO, knew this. The court once again concluded that plaintiffs had not plausibly alleged that Reynolds knew at the time he represented 90% revenue visibility that postage revenue was completely unpredictable, that unpredictable postage contributed 20% to Exela's full year 2018 revenue, or that, as a result of this unpredictable revenue source, Exela did not actually have 90% revenue visibility. *Id.* The court noted that Reynolds had specifically stated in May 2018 that the company did not break out postage separately, and his status as CFO was alone insufficient to plead a strong inference of scienter. *Id.*

- 15 -

The court declined to accept plaintiffs' next contention: that Reynolds' admission on November 12, 2019 that Exela had not been very good at predicting postage "historically" showed that Reynolds historically monitored postage revenue. *Id.* at *16. While recognizing that this statement suggested that defendants "historically" monitored postage revenue, the court concluded that "historically" was a vague term, and nothing in Reynolds' statement supported the inference that Exela was monitoring postage revenue on March 19, 2019 (or earlier), or that Reynolds knew or was severely reckless in not knowing, in March 2019, that Exela was not very good at predicting postage revenue. *Id.*

The court rejected plaintiffs' contention that scienter could be inferred from the fact that Reynolds concealed the extent of postage revenue and its impact on Exela's visibility when he thought the information did not look good for Exela, but disclosed it when he needed a scapegoat for Exela's deteriorating EBITDA margins. *Id.* The court reasoned that plaintiffs' argument that defendants' motivation for disclosing postage's contribution to revenue in August 2019 was because Reynolds needed a scapegoat for Exela's deteriorating EBITDA margins was not pleaded and was purely speculative. *Id.* Moreover, this fact would not permit the inference that, at the time Reynolds represented that Exela had 90% revenue visibility, he knew or was severely reckless in not knowing that Exela's postage revenue was completely unpredictable, that 20% of Exela's revenue came from postage, and that Exela did not actually have 90% revenue visibility. *Id.*

Finally, the court declined to credit plaintiffs' contention that they had sufficiently alleged Cogburn's scienter based on his participation in many earnings calls throughout the

class period, including the March 2019 earnings call, his touting Exela's "strong visibility," and his preparing projections and forecasts for Exela. *Id.* The court reasoned that none of these alleged facts permitted the reasonable inference that Cogburn knew or should have known, during or before the March 2019 earnings call, that Exela did not have 90% revenue visibility or that approximately 20% of Exela's revenue for 2018 and 2019 came from completely unpredictable postage and postage handling.

C

In their SAC, plaintiffs have added support for the scienter element of each of their theories. The court has considered these new allegations in tandem with the ones carried forward from plaintiffs' prior amended complaint. This holistic approach is required by circuit precedent.

> In addition to accepting all of the factual allegations in the complaint as true, courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry is whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard.

*Lormand v. US Unwired Inc.*, 565 F.3d 228, 251 (5th Cir. 2009) (citations omitted).

Considering the SAC as a whole, the court holds that plaintiffs have pleaded with the required degree of particularity that defendants acted at least with severe recklessness when misrepresenting that Exela had 90% revenue visibility, and that the inference of fraud is

cogent and at least as compelling as any opposing inference of nonfraudulent intent.

The SAC has remedied the timing problem identified in *Shen I* by bolstering the allegations about what defendants knew and when they knew it. In other words, plaintiffs now adequately plead that, when defendants represented that Exela had 90% revenue visibility, they knew that approximately 20% of Exela's revenue for 2018 and 2019 came from unpredictable postage and postage handling.

According to the SAC, Exela tracked postage revenue separately. This is established by Reynolds' admission that Exela followed Accounting Standards Codification ("ASC") 606 of the Financial Accounting Standards Board, because ASC 606 effectively requires as much, and by Exela's Form 10-K for the year ended 2018, which explicitly admitted that Exela tracked postage revenue in accordance with ASC 606.

A line item for "customer deposits"—which included postage[5]—appeared on Exela's balance sheet. The "customer deposits" line item was included on every quarterly filing beginning in the third quarter of 2017 and in every Form 10-K since Exela has been public. All quarterly filings were signed by defendants Cogburn, Parvinder Chadha (Exela's Board Chair), and Reynolds. Exela was, by its own admission, tracking postage by the third quarter of 2017 and every reporting period since. "Logically, by booking customer deposits as an

_____

[5]According to Exela's Form 10-K for the year ended 2018, "[c]ustomer deposits consist primarily of amounts received from customers in advance for postage. The majority of the amounts recorded as of December 31, 2017 were used to pay for postage with the corresponding postage revenue being recognized during the year ended December 31, 2018." SAC ¶ 175 (bold font and emphasis omitted).

asset, had Exela *not* tracked postage, its balance sheet would not have balanced." Ps. Br. 23.

According to a chart in the SAC, the postage contribution to total revenue for the class period ranged from a low of 17.0% to a high of 20.1%. The SAC adequately pleads that defendants were aware of this when they represented that Exela had 90% visibility into its revenue.

With the timing deficiency remedied, the court now evaluates whether all of the facts alleged, taken collectively, give rise to a strong plausible inference of scienter. According to the SAC, beginning on March 16, 2018 (within one year of Exela's becoming a public company) and continuing through March 18, 2019, defendants consistently represented to investors that Exela had highly predictable, recurring revenues, supported by long-term customer contracts, with visibility in the order of 90%. In truth, according to the SAC, approximately 20% of Exela's revenue was nonrecurring, historically unpredictable, low margin revenue derived from billing pass-through postage costs.

Within months of the last visibility-based misrepresentation that the SAC alleges (March 18, 2019), defendants were acknowledging that postage revenue was actually *unpredictable*. On August 8, 2019 defendants admitted the lack of predictability of nonrecurring, low margin postage revenue, which Exela reported under the balance sheet line item "customer deposits." SAC ¶ 12. After markets closed, Exela reduced its 2019 revenue guidance, citing unpredictable postage revenue as one reason. *Id.* ¶ 18. And Cogburn cited the unpredictable nature of postage revenue as a reason for revising 2019 revenue guidance and adjusted EBITDA guidance. *Id.* ¶ 212.

The SAC adequately pleads that it was highly unreasonable for defendants to misrepresent Exela's revenue visibility in this way. This is demonstrated at least by the fact that, when Exela lowered its revenue guidance, it did so in part because of what it acknowledged was the unpredictable and fluctuating nature of postage revenue. And when restating its financials, it described postage revenue as unpredictable. There is no apparent reason discernable from the SAC why postage revenue would be a predictable component of highly visible revenue from March 16, 2018 to March 18, 2019, only to become unpredictable just months later.

So, too, has the SAC adequately alleged that defendants' conduct presented a danger of misleading buyers or sellers that was so obvious that defendants must have been aware of it. Accurate projected revenue figures do matter to publicly-traded companies, like Exela, and their shareholders. The companies give public guidance about their anticipated revenues and guide lower, when necessary. Their CEOs and CFOs often explain in earnings calls why their companies have confidence in the predictability of their projected revenues. Public companies rely on projected revenues to forecast, not only anticipated revenues, but to forecast the trajectory of their entire businesses. According to the SAC, Exela's CEO Cogburn said as much in a May 10, 2018 earnings call. He stated that reliance on this "high degree of revenue visibility" gave Exela confidence in its ability to accurately forecast, not just the revenue component of its business, but the trajectory of its entire business, going forward. *See* SAC ¶ 255.

Misrepresenting that Exela had 90% revenue visibility therefore presented a danger

of misleading buyers or sellers of Exela stock that was so obvious that defendants must have been aware of it.  The SAC adequately pleads scienter in support of this theory for plaintiffs' securities fraud claim.

V

Because the court holds that plaintiffs have pleaded a plausible Exchange Act and Rule 10b-5 claim based on the theory of 90% revenue visibility, it does not reach, and expresses no view about, whether plaintiffs have rectified the deficiencies in their other theories, which the court rejected in *Shen I*.[6]  Nor, of course, does the court suggest a view about whether plaintiffs can or cannot prevail at the summary judgment stage or at trial.

*   *   *

Defendants' September 3, 2021 motion to dismiss plaintiffs' second amended complaint is denied.

**SO ORDERED**.

January 21, 2022.

_____
SIDNEY A. FITZWATER
SENIOR JUDGE

---

[6]*See, e.g., KDH Consulting Grp. LLC v. Iterative Cap. Mgmt. L.P.*, 528 F.Supp.3d 192, 203 n.6 (S.D.N.Y. 2021) (holding that "[a]lthough KDH raises a number of misrepresentations or omissions made before it invested in January 2018, KDH need only allege at least one actionable misstatement to survive a motion to dismiss on this cause of action.").

- 21 -