IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

```
BO SHEN, et al.,              (  3:20-CV-0691-D
           Plaintiff,         (
                              (
                              (
VERSUS                        (  DALLAS, TEXAS
                              (
                              (
                              (
EXELA TECHNOLOGIES,           (
INC., et al.,                 (
           Defendant.         (   JANUARY 19, 2022
```

TRANSCRIPT OF MOTION HEARING

BEFORE THE HONORABLE SIDNEY A. FITZWATER

UNITED STATES DISTRICT JUDGE

A P P E A R A N C E S:

```
   FOR THE PLAINTIFF:     KARA M. WOLKE
                          Glancy Prongay & Murray LLP
                          1925 Century Park East
                          Suite 2100
                          Los Angeles, CA 90067
                          310-201-9150
                          Fax: 310-201-9160
                          Email: kwolke@glancylaw.com
```

```
FOR THE DEFENDANT:     PETER A. STOKES
                       Norton Rose Fulbright US LLP
                       98 San Jacinto Blvd
                       Suite 1100
                       Austin, TX 78701-4255
                       512-536-5287




       COURT REPORTER:     PAMELA J. WILSON, RMR, CRR
                           pam_wilson@txnd.uscourts.gov
                           1100 Commerce Street, Room 1535
                           Dallas, Texas 75242
                           214.662.1557


    Proceedings reported by mechanical stenography,

transcript produced by computer.
```

MOTION HEARING - JANUARY 19, 2022

P R O C E E D I N G S

THE COURT:  At this time the court will hear oral argument on the motion to dismiss the second amended complaint in Bo Shen and others versus Exela Technologies, Incorporated.

Before we begin, let me cover some housekeeping matters.

First of all, I hope we don't have any technical difficulties, but if we do I will adjust the time to ensure that each side has its 30 minutes as intended.  And if for some reason you begin having technical difficulties, for example, there's a sound issue, you can just wave your hand and hopefully one of us here in the courtroom in Dallas will note that.

Also, the clerk is going to be giving audible time warnings that you've requested and I have told her that in doing that she should feel free to interrupt you or interrupt me so that we can keep track of where we are in the time.

I thank counsel for their flexibility and the need to change the hearing to a video.  COVID situation here in Dallas is fluid and we're now changing our hearings, at least for the next week or so, to video.

So with those housekeeping instruction out of the way, at this time I'm ready to hear from counsel for the defendants.

MR. STOKES:  Thank you, Your Honor.

This is Peter Stokes, Norton Rose Fulbright representing all defendants in this matter.

I would like to start with the appraisal action and restatement related claims before moving to the stock sale allegation, the adjusted EBITDA and add-back claims, the visibility statements and the governance disclosures.

With respect to the appraisal action, in the second amended complaint, the plaintiffs' theory as I understand it is that defendants acted fraudulently or recklessly because Exela did not disclose a range of liability potential in connection with the appraisal action and because it was supposedly required to accrue the minimum of that range.

There are many, many problems with that argument.

Number 1, the plaintiffs appear to concede that there was a wide range of valuations that were tossed back and forth in the appraisal action and they're cited in the complaint.  The plaintiffs themselves concede on the face of the pleading that the potential liability was -- was all over the map based on the submissions in the appraisal action.

Number 2, plaintiffs never pled with particularity what the minimum actually should be, which is striking in a case where the argument is that the defendants acted so recklessly by not disclosing at the so-called minimum that they were fraudulent.

In paragraph 86 of the second amended complaint plaintiffs say, "The other bookend, the minimum liability, was what Exela argued Manichaean's interest in SourceHOV's equity value was worth, plus costs and interest.  That amount was informed in part by Dr. Greg Jarrell, Exela's agent, who the Company retained to calculate the value.  Moreover, as Chadha's above-quoted testimony reveals, he was further aware of Rothschild's estimates of SourceHOV's equity value, both in its initial valuation in 2017 and the backdated valuation in 2018."

That second sentence is striking to us, Your Honor. They say the minimum was informed in part by Dr. Jarrell's estimate.  They don't say with particularity what minimum Exela should have recognized in this paragraph, and we don't believe they allege that anywhere with particularity in the complaint.

This is a PSLRA case where they are required to plead specific facts supporting a strong inference that the failure to recognize a specific number here was so reckless and egregious as to equate to fraud.  The fact that they don't even allege what the minimum is with particularity, Your Honor, we believe the court could dismiss this claim on this ground alone, but there are many, many others.

The plaintiffs again admit in the complaint that the underlying 2017 transaction was a complex transaction - this

is paragraph 71 of the second amended complaint - with -- with investment bankers on both sides.  They don't dispute that in the appraisal action the Delaware court is required to take into account the operative legality of the company. It's not simply a rogue decision between competing projections but it has to be a holistic analysis of the operative reality of the company.

In the plaintiffs' own words in the second amended complaint they describe the operative reality as "being in" -- as "being in dire financial straits" and looking for a financial lifeline.  They depict a company with more debt than assets.  And these allegations are in paragraphs 52, 59, 65 and 66.

The plaintiffs also cite Mr. Chadha's - 91 and 92 of the second amended complaint - belief that the company was worth nothing at the time and that its profitable revenue was declining.  And there are no particularized allegations contradicting that.

In fact, the allegations from plaintiffs that the company was in dire condition, that supports a reasonable belief by the defendants that -- that the company was not worth anything, that -- that they had a realistic possibility of prevailing.  And as a court faulted the plaintiffs in the prior opinion for not alleging specific facts showing that the defendants' litigation decision and the appraisal action

was "indefensible," the plaintiffs have again failed to allege such facts and they have actually alleged facts contradicting any such inference.

The plaintiff also -- in paragraph 94, they quote testimony from SourceHOV's expert in the appraisal action where the expert himself confirmed that he was concerned about "the reasonableness" of SourceHOV's projections and their "achievability," and he remarked that "the capital expenditures seemed to be very low relative to the depreciation."

So there is allegation after allegation in plaintiff's own pleading that substantiates the conclusion that the court previously reached, which is that the allegations simply do not demonstrate that the position taken in the appraisal action was legally indefensible.

The plaintiffs cite the decision last year in the Manichaean versus Exela veil-piercing decision 251 A.3d 694, but that case doesn't cite a specific minimum liability number either.  And it's a very different analysis as to whether for -- essentially fraudulent transfer or veil-piercing circumstances, you know, was the company aware of facts suggesting that -- that a judgment could be taken against it that would support an inference that the money flowing out of the subsidiary was done to evade a possible judgment.  It was a very different analysis under a much

lower pleading standard.

And what did the court cite in that case as -- as evidence supporting such -- such a potential judgment?

The court cited on page 708 Exela's own form 10-K disclosure in March 16th, 2018, about the appraisal action. The court acknowledged that Exela itself disclosed the risk of a significant loss associated with the appraisal action. The court also noted Exela was on notice of the appraisal action itself, the service of the demand.  Well, that was also publicly disclosed, Your Honor.  This was not a small claims action in -- in secret court.  It was a -- a -- in Delaware Chancery Court by one of Exela's largest shareholders.  It was depicted as a serious matter.  And, again, the defendants did not make any -- any strident boasts in that action, they -- they made a very sober disclosure.

The decision also highlights the Catch-22 decision that I alluded to at the prior hearing, Your Honor, where it -- it would be harmful to create precedent requiring companies, essentially, to confess a minimum liability number in uncertain situations like this.  The court in Delaware cited the company's own 10-K disclosures back at the company as evidence against it in that proceeding.  And that -- that is how litigation works.  That's what would happen if they had put a minimum number down.  It would not be a -- it would be an unworkable precedent and a precedent that conflicts with

the law of this circuit to hold companies responsible for fraud based on -- on the kind of disclosure at issue here.

In footnote 62 of our opening brief we cite a number of cases in the Fifth Circuit and across the country for the proposition that these types of claims where you have a publicly disclosed proceeding, or effort of some kind, that they're not viable absent extreme facts that have not been pled here.

I think Judge Lindsay's opinion in the Schiller case, Your Honor, was quite -- that was about a 20-year old case, 2002 West Law 2018 411, at page 14, but it was quite omniscient in interpreting and anticipating how the Fifth Circuit was going to go on these is.  In that case the plaintiff said the company should have immediately recognized an impairment because it filed a $45 million arbitration claim.  And Judge Lindsay concluded, well, the company may have not taken the impairment but they disclosed the arbitration claim and that weighs heavily against any inference that they were trying to defraud.

In the Flaherty and Crumine, also cited in footnote 62 of our opening brief, pages 210 to 212, the company made a disclosure about the likelihood of a future dividend.  This occurred in a stock buyback where they were buying back shareholders' stock and then a week after the buyback closed they more than tripled the dividend and the stock price went

up and shareholders sued arguing they were shortchanged.  In that case the company made a similar disclosure.  They made a disclosure that the dividend was under review, that they could not predict the likelihood or timing of a possible change in the dividend, even though it happened a week after the offering closed and it was a very sizable increase.  And, again, the court looked at it under review, assuming that that was a misleading statement, making the assumption that that was a misleading statement.  The court found that the fact that the company said the dividend was under review weighed against an inference of scienter; and, moreover, that forcing companies to overdisclose in this circumstance would have a harmful effect, because these are uncertain future events and if they overpromised they could get in trouble going the other way and if they underpromised they could get in trouble that way, and so a middle ground was appropriate. I think that picks up on the same theme here, where you're talking about a litigation disclosure.  I submit that the same kind of middle ground approach is exactly what the defendants did in this case.  Even if they could be faulted after the fact, it comes nowhere close to supporting a strong inference of fraud.

In the Owens companies --

THE COURT:  Mr. Stokes -- Mr. Stokes, I want to make sure you don't run out of time.  Let me get some

questions out of the way to make sure you're able to answer them so I can hear opposing counsel's view on them.

First of all, are you challenging the second amended complaint as to any elements other than the first and second of the six element test, that is, anything other than lack of a material misrepresentation or scienter?

MR. STOKES:  We are arguing -- that's correct, Your Honor, with a caveat that we have also argued the safe harbor and bespeaks caution doctrine.  That is interrelated with whether the statements are actually false and misleading I think, but we are not raising a loss causation challenge at this time, Your Honor.

We are focusing our challenge, as before, on whether it's an actionably misleading statement and whether there's scienter.

THE COURT:  All right.  That's clear to me.

Regarding the 90 percent visibility claim, in my prior opinion I held that the plaintiffs had not adequately pleaded a strong inference of scienter because they had not specifically pleaded that the defendants knew or must have been aware before March 19, 2019, that approximately 20 percent of revenue came from unpredictable postage and postage handling.

Why is it that the second amended complaint, which adds a variety of allegations, is still insufficient regarding the

90 percent visibility claim?

MR. STOKES:   The plaintiffs -- the new allegations, Your Honor, only further substantiate the court's conclusion. And I specifically refer to paragraph 176 where the postage revenue is listed for 2018 and 2019.  And on its face, through the first quarter of 2019, the postage appears to be quiet constant and visible.  In the first half of 2019 there was postage revenue of $156 million.  And then in the third and fourth quarter it was 76 and 77, which totals about 153 million.  So it was almost perfectly constant during that period.  And then for the first quarter of 2019 it was again $75.5 million.  So very, very similar, and certainly at least 90 percent similar to what happened in 2018.

So the plaintiffs have not pleaded any new particularized facts that contradict the statement that as of March of 2019 there was 90 percent visibility.  And, in fact, the chart that they have placed into the pleadings simply substantiates what the defendant says.

At a minimum, under a severe recklessness standard, if that disclosure can be faulted based on this chart, it is certainly not at a level that even approaches severe recklessness or fraudulent intent.  And so we submit that the allegations that they have added to the complaint on this issue only further gave the defendants a reasonable basis for making the statements that were made and they certainly don't

contradict it to such an extent that it rises to the level of fraud.

Again, also, this is pass-through revenue, as previously noted. And I don't think the allegation on that has changed. And so just from a conceptual standpoint it doesn't -- it's not cogent or compelling that a company is going to defraud investors about something that has no impact on the bottom line. These were pass-through postage charges.

THE CLERK: Five minutes remain.

MR. STOKES: So that's -- so we don't think that's a viable claim on the 90 percent.

I'll pause if the court has any other questions before I --

THE COURT: You said it had no impact on the bottom line. My understanding from the pleading is that it had an impact on the top line, that this actually impacted the revenue reporting of Exela. Do you disagree with that?

MR. STOKES: Postage revenue counts as revenue, and the company disclosed that it was included in revenue, but that doesn't -- that doesn't support the subsequent inference that this disclosure was of such a nature that it rises to the level of fraud, and that's what they have to plead.

Again, the company said this was pass-through revenue, so it wasn't something that was going to be determinative on earnings. And I submit, Your Honor, earnings is -- is

ultimately the most important metric, it's how much money the shareholders are going to make, what the future cash flow is. It's far more -- if the company is going to commit fraud intentionally, or recklessly, it would much more likely be along the lines of earnings, because that is -- that's what drives the stock price ultimately.

But even if we assume that revenue was -- was material and important, the company still disclosed that -- they didn't say a hundred percent.  They said 90 percent.  And they said from a -- that the numbers the plaintiffs have pleaded demonstrate -- they affirmatively demonstrate that postage revenue until the first quarter of 2019 was visible. And it was only after the first quarter.  The second quarter, third quarter and fourth court have lower numbers.  The statements we're looking at are from the first quarter of 2019.  And up until that point their experience was it was constant.  It was very constant and it only dropped off in the second quarter.  And once it dropped off the company disclosed that revenue was down.  There were disclosures about lowering their guidance and so forth.

THE COURT:  Okay.  Final question then.

Why would it matter?

Why would you guide downward if it doesn't matter and it's just pass-through?

MR. STOKES:  Because revenue and earnings, as Your

Honor pointed out, are the two numbers that when you have a quarterly announcement that those numbers are -- are part of the heading of the document.  There's always guidance on revenue.  There's always guidance on earnings.  And so those are numbers the company wants to be as transparent as possible each quarter.

I think this undercuts any inference of fraud, because they wanted the market to understand what the revenue was going to be and what earnings was going to be.

And while we don't believe --

THE CLERK:  Two minutes remain.

MR. STOKES:  I'm sorry?

THE CLERK:  Two minutes remain.

MR. STOKES:  Two minutes.

Okay.  I'm sorry.

So the court, so there is not -- we believe the company was trying to be transparent, that's why they made the disclosures they did, that's why they updated the guidance as they did, and we don't think there's any -- any strong inference of fraud on -- on this claim.

With respect to -- I think I've covered -- on -- the Owens versus Jastrow case, Your Honor, where we're talking about scienter generally, that case involved a similar claim that they didn't accrue a liability, they don't write down their entire $1.6 million mortgage-backed portfolio.  The

court in part said that was a complex determination and it was -- it was something -- the red flags were public information. And here the information pointed to in the Manichaean decision were public. The disclosure of the appraisal action and the 10-K disclosure, as well as the proxy disclosure from earlier with the equity value, that was all public. And there's no strong inference of the scienter from public red flags.

THE LAW CLERK: One minute.

MR. STOKES: With respect to the EBITDA and the guidance issues, again, the company disclosed that BizOp operational and structural expense would continue -- would occur in subsequent quarters. They disclosed that those charges continued to be incurred. As with the prior opinion they did not -- there was not any -- any -- there's no cogent inference the company tried to mislead the market on those issues. They disclosed the governance issues as well. The stock sale was 10 percent of xSigma's disclosures. Southwind and many other cases hold those kinds of percentages are important towards fraud.

THE CLERK: Time.

THE COURT: Thank you, Mr. Stokes.

You've reserved some time for rebuttal.

MS. WOLKE: Good morning, Your Honor.

Karen Wolke appearing on behalf of the plaintiffs.

Your Honor, the second amended complaint in this case has been narrowed to focus on three categories of false statements.  First it's the misrepresentations and omissions relating to the appraisal action; second, it's defendant's misleading expense add-backs to adjusted EBITDA, which defendants misleadingly characterized as including only nonroutine expenses; and third, it's defendant's misleading claims about the 90 percent visibility which the defendants repeatedly touted to engender confidence in Exela as revenue guidance.

Your Honor, this case doesn't involve any statements about -- about guidance itself being misleading or other future forward-looking statements.  So there's no safe harbor at issue here.  These are all statements about present facts.

And, Your Honor, investors in this case were materially harmed by these false statements.  They had the impact of artificially inflating Exela's stock to reach its all-time high of $7.30 in September of 2018, which dwindled down to a mere .16 cents per share by the time the fraud was fully revealed.  And the stock has never recovered.

Your Honor, the misstatement is sufficient to allege falsity with respect to the first categories that I just outlined, that is the failure to accrue the 2018 appraisal liability and the misleading overstatement of expense add-backs and adjusted EBITDA.  So really the only question

on those two categories is scienter, and that's whether the second amended complaint alleges enough facts to give rise to a strong inference, which need only be at least as compelling as any opposing inference raised by defendants, that the defendants were at least extremely reckless with respect to the misreported and omitted information.  And plaintiffs submit that the second amended complaint does just that.

I would like to briefly address each category in turn, beginning with the appraisal action.

The second amended complaint clarifies that there's two issues with respect to the appraisal action.  First, it's the -- the failure -- the accounting failure to accrue the liability, which the restatement admitted resulted in a roughly $40 million understatement of liability in 2017, 2018, and 2019.  And so defendants don't even really challenge falsity with respect to that.

The second aspect of the misleading statement related to the appraisal liability was the further false claim that Exela could not even estimate a range of the potential liability faced.  And I just want to remind the court of exactly what the defendants said here.  In the 2017 and 2018 10-Ks, which were signed by Chadha, Cogburn, and Reynolds, the defendants claimed, "The company is unable to predict the outcome of the appraisal action" -- which plaintiffs would stipulate was true.  But they went on further to state -- "or

estimate any loss or range of loss that may arise from the appraisal action."

They said that they couldn't even estimate the amounts at issue, and that was false.  It was patently false.  The company could estimate it and did estimate it by its -- directing its agents to do so, a number of times, both prior to and during the class period.

Now, in Your Honor's prior order on the motion to dismiss you held that the first amended complaint failed to specifically allege the various valuations at issue or the individual defendants' knowledge of those values.  And I think the second amended complaint remedies that by detailing the various estimates at issue in the chart set forth at page 5.  And the second amended complaint further details facts that shows defendants' knowledge of them.  I'd like to hit some of those real quick.

First, showing that defendants had knowledge of the various SourceHOV valuation estimates at issue is that Chadha, Reynolds, and Cogburn were all intimately involved in both the merger and charter.

Chadha and Reynolds were the only members of the board.  Cogburn was its CEO.

Chadha asked Rothschild's to prepare an opinion that was prepared by Rothschild's and provided to the SourceHov board of directors.  That's only Chadha and Reynolds.

Chadha and Reynolds signed 2017.

Chadha orchestrated the backdated valuation along with another Exela executive vice president in January of 2018. Testimony that we were able to later discern from the appraisal action showed that Chadha discussed the valuations with Exela's expert, Professor Jarrell, at the time Professor Jarrell was doing his expert work in 2018.

Chadha, Reynolds, and Cogburn all were deposed on the topic of SourceHov's appraisal action in the fall of 2018. And Chadha and Reynolds testified in trial in that action 2018.  And Reynolds signed in January of 2018 -- I'm sorry, January of 2020, and estimated the liability at $65 million.

On these facts, Your Honor, this plethora of facts, it's simply not credible, let alone more compelling, to conclude that Chadha, Reynolds, and Cogburn weren't aware of the various valuation estimates and thus the range of potential liability that Exela faced in the appraisal litigation.

Moreover, defendants allege that the investing public was aware of all of these facts because the appraisal litigation itself was public, but that's not true, Your Honor.  The investing public at the time were not privy to Chadha's discussions with Jarrell.  The investing public at the time were not privy to the backdating of the valuation. They were not privy to these other valuation estimates.  The only thing that the public knew was the proxy price itself.

So having demonstrated defendants' knowledge of the various appraisal estimates, I'd like to walk the court through the numerous facts that support defendant's recklessness in failing to accrue the estimated liability and in further -- further falsely claiming that no range of liability could even be estimated. And first is that the violation of GAAP rule ASE 450 and Exela's own stated position on recording contingent liabilities. Now, what the second amended complaint does that the first amended complaint failed to do is it clarifies that the defendant's duty to accrue the liability was rooted in Exela's own policy. There's courts around the country that hold that violation of a company's own accounting policies and violations of GAAP can add to the inference of scienter. And to be clear, we don't think that GAAP violations alone allege scienter, but this is something that certainly informs the scienter inquiry. What Exela's policy said here was that if a potential loss, not -- not certain and not absolute, if a potential loss from a claim or legal proceeding is considered probable and the amount can be reasonably estimated, the company accrues liability for the estimated loss. And this is a recitation of what's required for GAAP 450 that says that an estimated loss or loss contingency shall be accrued if it's both probable and capable of being reasonably estimated. And under GAAP an amount is capable of being

reasonably estimated if there's information available, and this is a quote from ASC 450, "If there's information available that indicates that the estimated amount of loss is within a range of amounts."

So what we have here, Your Honor, at the time the 2017 10-K was filed in March of 2018, the defendants had available to them reliable information that suggested a range of amounts of estimated liability. And that range was $42.2 million, which would have been the proxy price up to $61 million, which would have been based on the valuation that Rothschild provided premerger.

By the time of the 2018 10-K the defendants had further information available to them regarding the -- the range of liability at issue and this now includes all of the expert's work in connection with the appraisal litigation. So at the time of the 2018 10-K they knew that the range was at least 29 to $61 million.

And despite all of the defendants' protestations about uncertainty, and it being complicated, and they couldn't predict the outcome, the outcome is never what was at issue when it comes down to the disclosure obligated -- obligations. Defendant's acknowledge that recording a loss was probable and their ability to estimate a range was the only thing at issue.

And under the defendant's argument a company would never

be required to record a contingent liability in connection with pending litigation, and that can't be the result under ASC 450, otherwise, there would be no reason for ASC 450 to exist.  And that certainly is not the result under Exela's own stated policy of when it would accrue a loss related to pending litigation.

And, Your Honor, there's even specific SEC guidance on this very issue of "litigation open to considerable interpretation," and that instructs at least the minimum amount of the liability shall be accrued with the description of the amount of liability reasonably faced above that amount.  And so, Your Honor, the defendant's easily could have done this and they chose not to.

Mr. Stokes just argued, and it's through the briefing, that the plaintiffs' failure to allege the precise lowest amount that should have been accrued is fatal, but, Your Honor, that does not defeat fraud with particularity here. Plaintiffs don't necessarily at this prediscovery stage of the litigation have every single estimate that was available to defendants during the class periods.  The defendants may have had more estimates.  What matters here for purposes of disclosure at the time is that we have alleged more than enough facts to show that defendants had available to them reasonable estimates of the potential range of liability faced.  And because they did, defendants were required to

record their best estimate of that contingent liability under Exela's own policy and under ASC 450.

And the defendants alternatively argue that this GAAP violation without more is actionable.  As I said, we are not resting on the GAAP violation alone.  There is much more than a technical accounting mistake here.

The second amended complaint details facts showing at least defendant Chadha's actual wrongdoing with respect to the potential liability faced.  The failure to record the estimated liability, and defendant's further false claim that they were unable to estimate even a range in this case.  And some of those facts include the fact that he orchestrated the backdated valuation to appear as if it was created before the merger in an attempt to lower the estimated liability.  And, now, while this wasn't a lie told to Exela's public investors, it certainly is something more that demonstrates Chadha's willingness to intentionally mislead his investors, whether public or private, as to the potential liability faced.  It further demonstrates his ability to, through Exela's agents, obtain estimates of the potential liability faced.

Second is Chadha's found lack of candor and credibility in the SourceHOV valuation trial.  The fact that he obfuscated facts about his role in the backdated valuation and testified that SourceHov was worthless at the time of the

merger further supports wrongdoing.

Finally, Exela's willful evadement of the judgment after the appraisal action judgment was handed down.  Even after they knew the liability they -- they refused to acknowledge it.

All of these facts support the inference that Exela's failure to record the liability here was not a mere technical mistake.  It was either extremely reckless or it was intentional.

Defendants raise other arguments about distinguishing between the value of SourceHOV's shares and the estimated liability faced in the appraisal action, but that's a definition without a difference, Your Honor.  SourceHOV's estimated per share value or range of values was the estimated liability or range of liability that Exela faced to pay Manichaean for its shares in that action.

Notably, in this regard the defendant seemed to finally concede that they did have access to their bankers' and various experts' valuations of SourceHOV, but instead they tried to distinguish the valuations from the estimated liability by again arguing that they didn't know what the Chancery Court would ultimately do.

But, again, any visibility argument that the defendants might make or their inability to predict the outcome of that action is not the focus.  Their ability to estimate a range

of potential liability faced is the focus.  For these same reasons their arguments that plaintiffs ignore the "operative reality" of SourceHOV also fail.  The operative reality faced was baked into the various valuation estimates that formed the range of estimates available to defendants at the time, including those prepared by defendants own agents.  Exactly where within that range the -- the Chancery Court might ultimately have fallen, again, is irrelevant to the disclosure obligations during the class period.

And, moreover, defendants keep bringing up Chadha's self-serving testimony that SourceHOV was worth zero.  That was thoroughly rejected as incredible in the Chancery Court. Importantly here, Your Honor, if Chadha truly believed that his testimony was true and SourceHov was worth zero at the time of the merger, then the proximate valuation telling public investors that SourceHov was valued at $645 million was false.  They can't have it both ways and use Chadha's chronic misrepresentation about SourceHov's value to evade liability to their public investors here.

Respectfully, Your Honor, nothing about Chadha's conduct in the appraisal litigation can give rise to a more credible or more compelling interest of nonfraudulent intent here.

Real quick, on the absence of the approval by the outside auditors undercut scienter, but the record here indicates no such actual approval by KPMG to -- to not accrue

the liability.  KPMG's opinions are only as reliable as the information Exela gives it.  And where Exela was telling investors they could not estimate a range of liability, there's no reason to believe from the record that we have that they gave those valuations to KPMG and KPMG blessed their exclusion.  Exactly what and when defendants told KPMG is something  that will be born out in discovery, but for purposes of this motion, based on these facts, the so-called auditor defense does not negate scienter.

On the topic of the stock sales, I would submit that Chadha having sold 33 -- approximately 33 million in stock three months before he orchestrated the backdated valuation and only six months before the first partial disclosure lowered the stock price in this case is suspicious -- suspicious trading activity.  The -- the defendants -- it was his first and only sale by the way.  Defendants provide what they claim is an opposing inference because the sale was made to pay off a loan that was required to complete the merger, but even under that explanation, scienter is not defeated, it's supported.  Chadha had full disclosure of whether and when to make that sale.  That's detailed at note 55 of our opposition.  And even if it was to pay off the -- the -- the loan, he had every incentive to maximize the sales proceeds at an inflated sales price.

And, again, the stock sale relates to scienter not only

on the appraisal action but on all the plaintiffs' claims. But taken together these facts surrounding the appraisal at least allege a tie on defendant's scienter. And the ultimate determination of whether it gives rise to liability under 10(b) should be made to assure the benefit of full disclosure.

Unless Your Honor has questions of me I'd like to move on to statements regarding the add-backs and adjusted EBITDA.

THE COURT: Could we skip over, and go to the 90 percent visibility, take that, and then you can go back to the EBITDA?

MS. WOLKE: Sure. On the 90 percent Mr. Stokes posted to that chart and said, look, the postage revenue was consistent, but that doesn't show what Exela had estimated or predicted the postage rate to be during those quarters. We don't know that. What we do know is Reynolds said it was highly unpredictable. And he said this in November of 2019. He admitted that Exela hadn't been good at predicting postage revenue historically.

And we also know that May of 2018 was when the company implemented ASC 606, which required the company to -- to estimate and track postage revenue as variable consideration. So we've got a period of about 20 months where we can show based on these facts that the company was indeed tracking postage revenue, because it had to be, because it said it was

following 606.  And we have Reynolds' November 2019 admission that Exela had not been good at doing this historically.

Based on these facts a strong inference arises that the time period he was referring to is the time period between around May of 2018 when he says they started estimating and tracking it and November of 2019 when he admitted we haven't been good at estimating this historically.  And so investors knew the amount of the postage contribution to revenue but they did not know what defendants knew about it, that it was unpredictable revenue to the company.

And regarding Mr. Stokes' argument that pass-through revenue has no impact, it clearly had an impact.  They cited it as the reason, I think two quarters in a row, maybe more, for revenue guidance misses and for -- for reducing the company's revenue.  On these facts I think that now that we've shown, indeed, that the company was estimating and tracking postage revenue throughout the class period, and based on Reynolds' own admission that they were historically not able to predict it, that we've alleged a claim on the 90 percent revenue visibility estimates.

THE COURT:  As you know, the Supreme Court in Tellabs said that motive is not -- the absence of motive allegations are not fatal but they can be relevant.  Would you help me in what your view is of the motive of Exela to misrepresent this visibility number?

MS. WOLKE:  Sure.  They wanted to engender confidence in the revenue guidance that they were putting out there, a young public company.  And analysts routinely picked up on this as -- as a positive factor.  They cited this supposed 90 percent revenue visibility in -- in -- in setting their price targets and in having confidence in the company's guidance claims.  So there was certainly motive here and it was certainly something that was relevant to investors.

THE COURT:  And you indicated I think in the second amended complaint that the postage was being listed as an asset under customer deposits; is that correct?

MS. WOLKE:  Right.

THE COURT:  Okay.  And what do you contend Exela should have been saying rather than 90 percent visibility?

If you were running them, what do you think should be said?

MS. WOLKE:  Well, they should have made no specific claim about the revenue visibility, if postage - which was obviously such a large percentage of revenue, 17 to 20 percent of revenue during the class period - was highly unpredictable, or if they had said something like we have 80 percent revenue predictability, then I don't think we would have a claim.  But they didn't.  They claimed 90 percent revenue predictability.  That was material to analyst investors and it was untrue.

THE COURT:  Would you come back to this argument that Mr. Stokes made that this really doesn't matter because it's a pass-through cost?

Would you respond to that again so I can make note of that?

MS. WOLKE:  Yeah.  Sure.  It clearly mattered, Your Honor.  They -- the company cited the unpredictable postage revenue two quarters in a row, in August 9th of 2019 and then November 12th of 2019, as the reason -- as the reason for the company's revenue guidance and miss and for the company having to reduce its revenue guidance going forward.  So -- so clearly the postage revenue was a material issue to the company and to its investors.

THE COURT:  One final question I have and then you can move on.

I was trying to understand how the class period was determined in relation to the visibility claim.  The class period seems to end at the time that Exela announced the postponement of its earnings release and 10-K and then goes back two years from that, but there are some revelations in terms of guidance of unpredictable postage revenue and so forth earlier than that.  So I'm trying to understand how the class period is set up.

MS. WOLKE:  Sure.  And those -- those disclosures about the unpredictable nature of postage and its impact on

the company's revenue would be partial corrective disclosures, right?  So it -- it wouldn't -- it wouldn't cut off the claim relating to postage revenue, when I think the first partial corrective disclosure relating to postage was August 9, 2019 and that caused a nearly 50 percent stock price drop occurred after that guidance reduction citing unpredictability.  The company admitted more about postage on November 12th, 2019.

THE COURT:  All right.  Thank you.  You've answered my question.

Go ahead -- go ahead with the rest of your argument.

MS. WOLKE:  Okay.  So -- so now trying to hit quickly on the -- the misleading expense add-back to adjusted EBITDA, and as we know EBITDA is an earnings metrics and as Mr. Stokes conceded in his argument, earnings is highly important to investors and it's something, especially an adjusted EBITDA metrics like this, that is more prone to manipulation, because investors care.

And on the first time around Your Honor said in the order, the order on the motion to dismiss, something that undercut scienter on this was the fact that investors knew that the ONR add-backs were recurring.  The second amended complaint clarifies what investors didn't know that the ONR add-backs are routine.  So it clarifies the nature of the expense add-backs related to head quantity, which defendant

Reynolds said early in the class period in the context of discussing a different topic that head quantity was something that they were confident in their ability to control.  That's at paragraph 257 of our complaint.

Scienter -- so -- first of all, falsity is alleged with respect to these claims by virtue of the restatement.  The 2018 ONR add-backs were admittedly inflated, as was the 2018 adjusted EBITDA.

THE CLERK:  Two minutes remain.

MS. WOLKE:  Thank you.

I failed to make clear to Your Honor in the last hearing, so I want to hit this point, when the improper expense add-backs were removed in the restatement for 2018, Exela missed its adjusted EBITDA guidance.  It had given guidance in a range of 280 to 290 million.  The reported adjusted was 283.9 million, at the low end of that guidance.  And then after the -- the -- the inflated add-backs were removed and the inflated add-backs were inflated by at least 20 percent, the -- the restated 2018 adjusted EBITDA was reduced to 276.2 million, reflecting that the company would have missed its guidance had it not improperly inflated adjusted EBITDA through the use of adding back routine business expense like head quantity.

And another fact that I want to hit for Your Honor on this topic is Exela admitted in its 2019 belated 10-K to --

to -- ineffective internal controls relating to accounting for operating expense and unusual transactions. And this is at paragraph 361. In that 10-K the company stated that it did not have effective controls over financial reporting, including with respect to operating expenses and significant unusual transactions. And significant unusual transactions is what adjusted EBITDA was supposed to include. This plausibly alleges that Exela is admitting it's in own internal control weakness disclosure at the end of the class period that it did not have effective controls here.

Thank you, Your Honor.

THE COURT: Thank you, counsel.

Mr. Stokes, rebuttal?

MR. STOKES: Thank you, Your Honor.

With respect to the visibility argument, again, the 90 percent statement was not a statement solely about postage revenue but was about the overall customer revenue for Exela. And so plaintiffs have again failed to plead specific facts that the amount of any variability and postage revenue would strike the overall visibility down materially below 90 percent. There's still no specificity around that issue.

The plaintiffs' argument for why the defendants acted with scienter on that claim is that the defendants collectively tracked postage revenue, again, in paragraph 176. But, again, there's no specific allegation that any

specific defendant received information at any specific time contradicting what they -- what they said.

And in paragraph 176, again, in real time, the company's own public disclosures laid out what the -- what the revenue was each quarter and confirmed that it was -- it was stable, even -- even on the postage piece it was stable.  So there's still no particularity showing that this was -- this made even the 90 percent statement false, let alone fraudulent.  I think the concession if this was an 80 percent as opposed to 90 percent statement there would be no claim, we submit, Your Honor, that that really does play into scienter if that's the nature of the argument that it was -- it's that kind of a differential.  We submit that just doesn't rise to the extreme recklessness level that the Fifth Circuit has consistently required for scienter.

Similarly with respect to the EBITDA add-backs, Ms. Wolke, as I understand, said that the previous -- the disclosures didn't conceal that statements were recurring, but the issue is they were supposedly routine and not recurring.  We believe, again, for the reasons in the briefs that these -- the add-backs were expressly disclosed and it was never concealed that there would be additional add-backs and that staffing issues are exactly the sort of thing that you would expect to see in connection with an acquisition, that integrating companies involves staffing issues.  There's

no inherent reason it can't be taken out of EBITDA.

But, regardless, the company disclosed that there were charges each quarter. They made clear that the charges were -- were not guaranteed not to occur. Again, I submit when you're thinking scienter, Your Honor, the difference between routine and recurring as based on the facts of this case simply do not rise to that extreme recklessness level of scienter.

With respect to the appraisal action, again, the plaintiffs have conflated alleged knowledge of -- of different forecasts or different projections that were submitted with knowledge of what is the actual -- the outcome would be. Again, there's a difference. Operative reality is something that the court is required to consider in Delaware. And the plaintiffs plead themselves facts that substantiate Mr. Chadha's testimony that he believed the company was not worth anything at the time. And this is not -- again, when you look at the objective facts and the accounting aspect of this, it all weighs against a strong inference of scienter.

Ms. Wolke mentioned the auditor case and the fact that the auditor approved the financials, and she disputes that that should be relevant here. I disagree, Your Honor, because the appraisal action was disclosed in the very 10-Ks that the auditors passed upon. That was part of the disclosures in those 10-Ks. So on the public record that's

part of this case.  That disclosure was something that's in the very 10-K that the auditors had access to.  It wasn't some secret expense that's off the books that the management didn't tell the auditors about.

So we think the -- that the fact that there's no specific allegation that the auditors were deceived about this or regarding the accounting aspect of this really sets this case apart.

With respect to the -- the weight of the -- the Manichaean opinion, I would cite to the court the Fifth Circuit's recent decision in the Alaska -- the Alaska airlines -- I'm sorry, the Alaska versus Azar case.  It's footnote 17 of our reply on page 4, 768 of appendix at 180 to 189.  In that case the company had a big restatement and the company's own audit committee issued a report that just shredded the accounting practices of the company and found that there were improper, inappropriate, accounting practices, and even that was held to be insufficient by the Fifth Circuit to support a strong inference of scienter.

Here the plaintiffs are relying on an opinion that addressed a very different issue under a different pleading standard without particularized facts regarding the defendant's understandings of the accounting implications.

And, again, the difference between -- Ms. Wolke conceded that -- that the outcome -- at the start of her argument that

the outcome was not reasonably predictable but, again, fault the company for not disclosing the range. But there's just no particularity with respect to what the defendants individually knew about the accounting ramifications of that decision.

And there's also no allegation that -- that the difference in this restatement was so eye-poppingly large compared to the total liabilities of the company that an inference can be drawn of scienter based simply from the restatement or the fact that people can disagree allegedly about the accounting.

In the appendix we filed with our opening motion previously, ECF 28-2, at page 820, and it goes on for 20 pages, this is where the company published what the restatement effect was. And the effect on the total liabilities of the company, it -- they recognize an additional $49 million in liabilities but they -- they already had 1.907 million dollars in -- billion -- I'm sorry, billion dollars in total liabilities before the restatement and that only increased it to $1.956663 billion. So it was a very small change --

THE CLERK:  Two minutes.

MR. STOKES:  Am I out of time?

THE CLERK:  Two minutes remains.

MR. STOKES:  This is not a case where the size and

scope of the restatement contribute to an inference of scienter. The effects were very modest. And, again, in the Owens v. Jastrow Companies and the Azar case I just cited, I submit the size, the scope, the circumstances surrounding those restatements were far more indicative of scienter than what we have here, which is based primarily on a public lawsuit that the company expressly disclosed. Plaintiffs simply don't cite any case in the Fifth Circuit that has found scienter on facts even close to those in this case.

THE CLERK:    One minute remains.

MR. STOKES:    The types of cases where companies allegedly didn't accrue a liability as soon as they should have, those cases are very, very difficult. And the plaintiffs here have simply not pled particularized facts to support a cogent and compelling claim.

So we submit that across the board on these allegations the same considerations that led to the court's prior decision apply here with equal force and that the court should deny further leave to amend. The plaintiffs do not have a case and they -- again, we believe that this -- this litigation should be brought to a conclusion. There is no strong inference of scienter in this case. The company disclosed the lawsuit, they disclosed the add-backs, they disclosed the customer revenue in paragraph 176.

THE CLERK:    Time.

MR. STOKES:  And there's no fraud or scienter. Thank you, Your Honor.

THE COURT:  Thank you, Mr. Stokes.

I believe, as I did at the end of the last hearing, I asked counsel to remain on the line after I left the courtroom to ensure that the court reporter does not have any questions of you, so counsel if you don't mind just standing by and seeing if the court reporter has any questions.  And once you complete that, again you can terminate your linkup to the call.

I thank counsel once again for their arguments and for their flexibility in our need to conduct this by video.

Thank you very much, counsel.

At this time the court will stand in recess.

(End of proceedings.)

INDEX - MOTION HEARING

ORAL ARGUMENT                                              Page   Line

MR.  STOKES................................................ 4      1

MS.  WOLKE ................................................ 16     24

MR.  STOKES................................................ 34     14

< Dates >
August 9, 2019 32: 5
August 9th 31: 8
JANUARY 19, 2022 1: 16, 3: 1
January, 2022 41: 24
March 16th 8: 5
March 19 11: 21
November 2019 29: 1
$1.6 15: 25
$1.956663 38: 20
$156 12: 8
$40 18: 14
$42.2 22: 8
$45 9: 15
$49 38: 17
$61 22: 9, 22: 17
$645 26: 16
$65 20: 12
$7.30 17: 18
$75.5 12: 12
.16 17: 19

< 1 >
1 4: 15, 41: 4
1.907 38: 18
10 16: 18
10(b 28: 5
10-K 8: 4, 8: 21, 16: 5, 22: 6, 22: 12, 22: 16, 31: 19, 33: 25, 34: 3, 37: 2
10-ks 18: 22, 36: 23, 36: 25
1100 2: 4, 2: 33
12th 31: 9, 32: 8
14 9: 11, 41: 8
153 12: 9
1535 2: 33
16 41: 6
17 30: 19, 37: 13
176 12: 4, 34: 25, 35: 3, 39: 24
180 37: 13

189 37: 14
1925 1: 30

< 2 >
2 4: 21
20 11: 21, 28: 23, 30: 19, 33: 19, 38: 13
20-CV-0691-D 1: 6
20-year 9: 10
2002 9: 11
2017 5: 9, 5: 25, 18: 14, 18: 21, 20: 1, 22: 5
2018 5: 10, 8: 5, 9: 11, 12: 5, 12: 13, 17: 18, 17: 23, 18: 15, 18: 21, 20: 3, 20: 7, 20: 9, 20: 11, 22: 6, 22: 12, 22: 16, 28: 20, 29: 5, 33: 7, 33: 13, 33: 19
2019 11: 21, 12: 5, 12: 6, 12: 7, 12: 11, 12: 16, 14: 12, 14: 16, 18: 15, 28: 17, 29: 6, 31: 8, 31: 9, 32: 8, 33: 25
2020 20: 12
210 9: 21
2100 1: 31
212 9: 21
214.662.1557 2: 35
24 41: 6
251 7: 17
257 33: 4
25th 41: 24
276.2 33: 20
28-2 38: 13
280 33: 15
283.9 33: 16
29 22: 17

290 33: 15

< 3 >
3 1: 6
30 3: 10
310-201-9150 1: 33
310-201-9160 1: 34
310.770.3874 42: 13
33 27: 11
34 41: 8
361 34: 3

< 4 >
4 37: 13, 41: 4
411 9: 11
450 21: 7, 21: 22, 22: 2, 23: 3, 24: 2

< 5 >
5 19: 14
50 32: 5
512-536-5287 2: 6
512.466.9001 42: 12
52 6: 12
55 27: 21
59 6: 12

< 6 >
606 28: 21, 29: 1
62 9: 3, 9: 20
65 6: 13
66 6: 13
694 7: 17

< 7 >
708 8: 4
71 6: 1
75242 2: 34
76 12: 9

768 37: 13
77 12: 9
78701-4255 2: 5

< 8 >
80 30: 21, 35: 9
820 38: 13
86 5: 1

< 9 >
90 11: 17, 12: 1, 12: 13, 12: 16, 13: 11, 14: 9, 17: 8, 28: 9, 28: 12, 29: 19, 30: 5, 30: 14, 30: 23, 34: 15, 34: 20, 35: 8, 35: 10
90067 1: 32
91 6: 14
92 6: 14
94 7: 4
98 2: 3

< A >
A. 1: 21, 2: 1
A.3d 7: 17
ability 22: 23, 24: 19, 25: 25, 33: 3
able 11: 1, 20: 4, 29: 19
above 23: 11
above-quoted 5: 7
absence 26: 23, 29: 22
absent 9: 7
absolute 21: 18
access 25: 18, 37: 2
account 6: 4
accounting 18: 12, 21: 13, 24: 6, 34: 1, 36: 18, 37: 7,

37:16, 37:17,
37:23, 38:4,
38:11
accrue 4:13,
15:24, 17:23,
18:12, 21:4,
21:11, 23:5,
26:25, 39:12
accrued 21:23,
23:10, 23:16
accrues 21:21
achievability
7:8
acknowledge
22:22, 25:4
acknowledged
8:6
acquisition
35:24
across 9:4,
39:16
acted 4:10,
4:23, 34:22
action 4:4,
4:8, 4:12,
4:17, 4:20,
6:3, 6:25, 7:5,
7:15, 8:5, 8:7,
8:9, 8:11,
8:15, 16:5,
17:4, 18:9,
18:11, 18:24,
20:5, 20:9,
20:10, 25:3,
25:12, 25:16,
25:25, 28:1,
36:9, 36:23
action. 19:2
actionable 24:4
actionably
11:14
activity 27:15
actual 24:8,
26:25, 36:12
actually 4:22,
7:2, 11:10,
13:16
add 21:14
add-back 4:6,
32:13

add-backs 17:5,
17:25, 28:8,
32:22, 32:24,
32:25, 33:7,
33:13, 33:17,
33:18, 35:16,
35:21, 35:22,
39:23
added 12:23
adding 33:22
additional
35:22, 38:17
address 18:8
addressed 37:21
adds 11:24
adequately
11:18
adjust 3:9
adjusted 4:6,
17:5, 17:25,
28:8, 32:13,
32:17, 33:8,
33:14, 33:16,
33:19, 33:22,
34:7
admission 29:1,
29:18
admit 5:24
admitted 18:13,
28:18, 29:6,
32:7, 33:25
admittedly 33:7
admitting 34:8
affirmatively
14:11
agent 5:5
agents 19:6,
24:20, 26:6
ahead 32:11
airlines 37:12
al 1:6, 1:15
Alaska 37:11,
37:12
all-time 17:17
allegation 4:6,
7:11, 13:4,
34:25, 37:6,
38:6
allegations
6:12, 6:17,

6:19, 7:13,
11:25, 12:2,
12:23, 29:23,
39:16
allege 5:15,
5:21, 7:2,
17:21, 19:10,
20:18, 21:15,
23:15, 28:3
alleged 7:2,
23:22, 29:19,
33:5, 36:10
allegedly
38:10, 39:12
alleges 18:2,
34:8
alleging 6:24
alluded 8:17
almost 12:10
alone 5:23,
20:14, 21:15,
24:5, 35:8
already 38:18
alternatively
24:3
amend 39:19
amended 3:4,
4:9, 5:1, 6:1,
6:8, 6:15,
11:3, 11:24,
17:1, 18:2,
18:7, 18:10,
19:9, 19:12,
19:14, 21:9,
24:7, 30:10,
32:22
amount 5:4,
21:20, 21:25,
22:3, 23:10,
23:11, 23:12,
23:16, 29:8,
34:19
amounts 19:3,
22:8
amounts. 22:4
analysis 6:6,
7:19, 7:25
analyst 30:24
analysts 30:3
Angeles 1:32

announced 31:18
announcement
15:2
answer 11:1
answered 32:9
anticipating
9:12
apart 37:8
appear 4:15,
24:13
appearing 16:25
appears 12:6
appendix 37:13,
38:12
apply 39:18
appraisal 4:4,
4:8, 4:12,
4:17, 4:20,
6:3, 6:25, 7:5,
7:14, 8:5, 8:7,
8:8, 16:5,
17:4, 17:23,
18:9, 18:11,
18:18, 18:24,
19:2, 20:5,
20:9, 20:17,
20:19, 21:2,
22:15, 25:3,
25:12, 26:21,
28:1, 28:2,
36:9, 36:23
approach 10:19
approaches
12:21
appropriate
10:16
approval 26:23,
26:25
approved 36:21
approximately
11:21, 27:11
arbitration
9:15, 9:18
argue 24:3
argued 5:3,
11:8, 23:14
arguing 10:1,
11:7, 25:21
ARGUMENT 3:4,
4:14, 4:23,

22:25, 25:23,
29:11, 31:1,
32:11, 32:15,
34:15, 34:22,
35:12, 37:25,
41:2
arguments
25:10, 26:2,
40:11
arise 19:1
arises 29:3
around 21:12,
29:5, 32:19,
34:21
artificially
17:17
ASC 22:2, 23:3,
24:2, 28:21
ASE 21:7
aspect 18:17,
36:18, 37:7
asset 30:11
assets 6:12
associated 8:7
assume 14:7
assuming 10:7
assumption 10:8
assure 28:5
attempt 24:14
audible 3:15
audit 37:15
auditor 27:9,
36:20, 36:21
auditors 26:24,
36:24, 37:2,
37:4, 37:6
Austin 2:5
available 22:1,
22:3, 22:6,
22:13, 23:19,
23:23, 26:5
aware 5:7,
7:21, 11:21,
20:15, 20:19
Azar 37:12,
39:3


< B >
back 4:16,

8:21, 9:23,
28:10, 31:1,
31:20, 33:22
backdated 5:9,
20:2, 24:13,
24:24, 27:12
backdating
20:23
baked 26:4
bankers 6:2,
25:18
Based 4:20,
9:2, 12:20,
22:10, 27:8,
28:24, 29:3,
29:18, 36:6,
38:9, 39:6
basis 12:24
begin 3:7, 3:11
beginning 18:9
behalf 16:25
belated 33:25
belief 6:15,
6:21
believe 5:15,
5:22, 15:10,
15:16, 27:4,
35:20, 39:20,
40:4
believed 26:13,
36:16
below 34:20
benefit 28:5
bespeaks 11:9
best 24:1
big 37:14
billion 38:18,
38:19, 38:20
Bizop 16:11
blessed 27:5
Blvd 2:3
Bo 1:6, 3:5
board 19:21,
19:24, 39:16
boasts 8:14
bookend 5:2
books 37:3
born 27:7
bottom 13:7,
13:14

brief 9:3, 9:21
briefing 23:14
briefly 18:8
briefs 35:20
bringing 26:10
brought 39:21
business 33:23
buyback 9:23,
9:24
buying 9:23


< C >
CA 1:32
calculate 5:6
call 40:10
candor 24:22
capable 21:24,
21:25
capital 7:8
care 32:18
case 4:22,
5:17, 7:18,
8:2, 9:9, 9:10,
9:13, 10:2,
10:20, 15:22,
15:23, 17:1,
17:11, 17:15,
24:11, 27:14,
36:7, 36:20,
37:1, 37:8,
37:12, 37:14,
38:25, 39:3,
39:8, 39:9,
39:20, 39:22
cases 9:4,
16:19, 39:11,
39:13
cash 14:2
Catch-22 8:16
categories
17:2, 17:22,
18:1
category 18:8
causation 11:11
caused 32:5
caution 11:9
caveat 11:8
cents 17:19
Century 1:30

CEO 19:22
certain 21:18
certainly
12:12, 12:21,
12:25, 21:16,
23:4, 24:16,
30:7, 30:8
certify 41:14,
41:19
Chadha 5:7,
6:14, 18:22,
19:19, 19:21,
19:23, 19:25,
20:1, 20:2,
20:5, 20:8,
20:10, 20:15,
20:22, 24:8,
24:17, 24:22,
26:10, 26:13,
26:17, 26:20,
27:11, 27:20,
36:16
challenge
11:11, 11:13,
18:16
challenging
11:3
Chancery 8:12,
25:22, 26:7,
26:12
change 3:20,
10:5, 38:21
changed 13:4
changing 3:21
characterized
17:6
charges 13:8,
16:14, 36:3
chart 12:17,
12:20, 19:13,
28:13
charter 19:20
chose 23:13
chronic 26:18
Circuit 9:1,
9:4, 9:13,
35:14, 37:11,
37:19, 39:8
circumstance
10:12

circumstances 7:21, 39:4
cite 6:14, 7:16, 7:18, 8:2, 9:3, 37:10, 39:8
cited 4:17, 8:4, 8:20, 9:20, 29:12, 30:4, 31:7, 39:3
citing 32:6
claim 5:22, 9:16, 9:18, 11:17, 12:1, 13:11, 15:20, 15:23, 18:18, 21:19, 24:10, 27:17, 29:19, 30:18, 30:23, 31:17, 32:3, 34:23, 35:10, 39:15
claimed 18:23, 30:23
claiming 21:5
claims 4:5, 4:6, 8:11, 9:5, 17:8, 28:1, 30:7, 33:6
clarifies 18:10, 21:10, 32:23, 32:24
class 19:7, 23:20, 26:9, 29:17, 30:20, 31:16, 31:17, 31:23, 33:1, 34:9
clear 11:16, 21:15, 33:11, 36:3
clearly 29:12, 31:6, 31:12
CLERK 3:15, 13:9, 15:11, 15:13, 16:9, 16:21, 33:9, 38:22, 38:24, 39:10, 39:25

close 10:21, 39:9
closed 9:24, 10:6
Cogburn 18:22, 19:19, 19:22, 20:8, 20:15
cogent 13:6, 16:15, 39:15
collectively 34:24
comes 10:21, 22:21
Commerce 2:33
commit 14:3
committee 37:15
Companies 8:18, 9:1, 10:12, 10:23, 35:25, 39:3, 39:11
compared 38:8
compelling 13:6, 18:3, 20:14, 26:22, 39:15
competing 6:5
complaint 3:5, 4:9, 4:18, 5:1, 5:16, 5:24, 6:1, 6:9, 6:15, 11:4, 11:24, 12:23, 17:1, 18:2, 18:7, 18:10, 19:9, 19:12, 19:14, 21:9, 21:10, 24:7, 30:10, 32:23, 33:4
complete 27:18, 40:9
complex 5:25, 16:1
complicated 22:19
comply 41:19
computer 2:40
conceal 35:18
concealed 35:22
concede 4:15, 4:18, 25:18

conceded 32:15, 37:24
conceptual 13:5
concerned 7:6
concession 35:9
conclude 20:14
concluded 9:16
conclusion 7:12, 12:3, 39:21
condition 6:20
conduct 26:20, 40:12
Conference 41:21
confess 8:19
confidence 17:9, 30:2, 30:6
confident 33:3
confirmed 7:6, 35:5
conflated 36:10
conflicts 8:25
connection 4:12, 22:15, 23:1, 35:24
consider 36:14
considerable 23:8
consideration 28:22
considerations 39:17
considered 21:19
consistent 28:14
consistently 35:15
constant 12:7, 12:10, 14:17
contend 30:13
context 33:1
contingency 21:23
contingent 21:8, 23:1, 24:1
continue 16:12

continued 16:14
contradict 12:15, 13:1
contradicting 6:18, 7:3, 35:2
contribute 39:1
contribution 29:8
control 33:3, 34:9
controls 34:1, 34:4, 34:10
correct 11:7, 30:11
corrective 32:1, 32:4
cost 31:3
costs 5:4
counsel 3:19, 3:24, 11:2, 34:12, 40:5, 40:7, 40:11, 40:13
country 9:4, 21:12
counts 13:18
courtroom 3:13, 40:6
courts 21:12
cover 3:7
covered 15:21
COVID 3:20
create 8:18
created 24:13
credibility 24:22
credible 20:14, 26:21
CRR 2:31, 42:4
Crumine 9:20
CSR 41:14
customer 30:11, 34:17, 39:24
cut 32:2

< D >
Dallas 1:3, 1:10, 2:34, 3:13, 3:21,

42:7
day 41:24
debt 6:11
deceived 37:6
decision 6:5,
6:25, 7:16,
7:17, 8:16,
16:4, 37:11,
38:5, 39:18
declining 6:17
defeat 23:17
defeated 27:19
Defendant 1:16,
2:1, 12:18,
17:4, 17:7,
21:3, 21:10,
22:22, 22:25,
23:12, 24:8,
24:10, 25:17,
28:3, 32:25,
35:1, 37:23
defense 27:9
definition
25:13
defraud 9:19,
13:6
Delaware 6:3,
8:12, 8:20,
36:14
demand 8:9
demonstrate
7:14, 14:11
demonstrated
21:1
demonstrates
24:16, 24:19
deny 39:19
depict 6:11
depicted 8:13
deposed 20:8
deposits 30:11
depreciation.
7:10
describe 6:9
description
23:10
despite 22:18
detailed 27:21
detailing 19:12
details 19:14,

24:7
determination
16:1, 28:4
determinative
13:24
determined
31:17
difference
25:13, 36:5,
36:13, 37:24,
38:7
different 7:19,
7:25, 33:2,
36:11, 37:21
differential
35:13
difficult 39:13
difficulties
3:9, 3:11
dire 6:10, 6:20
directing 19:6
directors 19:25
disagree 13:17,
36:22, 38:10
discern 20:4
disclose 4:11
disclosed 8:6,
8:10, 9:6,
9:17, 13:19,
14:8, 14:19,
16:11, 16:13,
16:17, 35:21,
36:2, 36:23,
39:7, 39:23,
39:24
disclosing
4:24, 38:2
disclosure 8:5,
8:15, 9:2,
9:22, 10:2,
10:3, 10:18,
12:20, 13:21,
16:4, 16:5,
16:6, 22:21,
23:22, 26:9,
27:13, 27:20,
28:6, 32:4,
34:9, 37:1
disclosures
4:7, 8:21,

14:19, 15:18,
16:18, 31:24,
32:2, 35:4,
35:18, 36:25
discovery 27:7
discussed 20:5
discussing 33:2
discussions
20:22
dismiss 3:4,
5:22, 19:9,
32:20
dispute 6:2
disputes 36:21
distinguish
25:20
distinguishing
25:10
District 1:1,
1:2, 1:22, 42:6
dividend 9:22,
9:25, 10:3,
10:5, 10:10
Division 1:3,
42:7
doctrine 11:9
document 15:3
doing 3:17,
20:7, 29:2
dollars 38:18,
38:19
done 7:24,
23:13
down 8:24,
14:19, 15:24,
17:18, 22:21,
25:3, 34:20
downward 14:23
drawn 38:9
drives 14:6
drop 32:6
dropped 14:17,
14:18
during 12:10,
19:7, 23:20,
26:9, 28:15,
30:20
duty 21:11
dwindled 17:18

< E >
earlier 16:6,
31:22
early 33:1
earnings 13:25,
14:5, 14:25,
15:4, 15:9,
31:19, 32:14,
32:15
easily 23:12
East 1:30
EBITDA 4:6,
16:10, 17:5,
17:25, 28:8,
28:11, 32:14,
32:17, 33:8,
33:14, 33:19,
33:22, 34:7,
35:16, 36:1
ECF 38:13
effect 10:13,
38:15
effective 34:4,
34:10
effects 39:2
effort 9:6
egregious 5:20
either 7:19,
25:8
element 11:5
elements 11:4
Email 1:35
End 31:18,
33:16, 34:9,
40:4, 40:15
engender 17:9,
30:1
enough 18:2,
23:23
ensure 3:9,
40:6
entire 15:25
entitled 41:16
equal 39:18
equate 5:20
equity 5:4,
5:8, 16:6
especially
32:16

essentially 7:20, 8:19
estimate 5:13, 18:19, 19:1, 19:3, 19:5, 22:23, 23:19, 24:1, 24:11, 25:25, 27:3, 28:22
estimated 20:12, 21:4, 21:6, 21:20, 21:21, 21:23, 21:25, 22:1, 22:3, 22:8, 24:10, 24:14, 25:11, 25:14, 25:15, 25:20, 28:14
estimates 5:8, 19:13, 19:18, 20:16, 20:24, 21:2, 23:21, 23:24, 24:20, 26:4, 26:5, 29:20
estimating 29:5, 29:7, 29:16
et 1:6, 1:15
evade 7:24, 26:18
evadement 25:2
events 10:14
evidence 8:3, 8:22
Exactly 10:19, 18:21, 26:6, 27:6, 35:23
example 3:12
exclusion 27:6
executive 20:3
Exela 1:14, 3:5, 4:11, 5:3, 5:5, 5:14, 7:17, 8:4, 8:6, 8:8, 8:12, 13:17, 17:9, 17:17, 18:19, 20:3, 20:6,

20:17, 21:7, 21:11, 21:17, 23:4, 24:2, 24:15, 24:20, 25:2, 25:6, 25:15, 27:2, 28:14, 28:18, 29:2, 29:24, 30:13, 31:18, 33:14, 33:25, 34:8, 34:17
exist 23:4
expect 35:24
expenditures 7:9
expense 16:12, 17:5, 17:24, 32:13, 32:25, 33:13, 33:23, 34:2, 37:3
expenses 17:7, 34:5
experience 14:16
expert 7:5, 7:6, 20:6, 20:7, 22:14
experts 25:19
explanation 27:19
expressly 35:21, 39:7
extent 13:1
extreme 9:7, 35:14, 36:7
extremely 18:5, 25:8
eye-poppingly 38:7


< F >
face 4:18, 12:5
faced 18:20, 20:17, 23:11, 23:25, 24:9, 24:19, 24:21, 25:12, 25:15, 26:1, 26:3
fact 5:20,

6:19, 10:10, 10:21, 12:16, 24:12, 24:23, 32:21, 33:24, 36:20, 37:5, 38:10
factor 30:4
facts 5:18, 6:24, 7:2, 7:22, 9:7, 12:15, 17:14, 18:2, 19:14, 20:13, 20:19, 21:3, 23:23, 24:7, 24:12, 24:24, 25:6, 27:8, 28:2, 28:24, 29:3, 29:15, 34:18, 36:6, 36:15, 36:18, 37:22, 39:9, 39:14
fail 26:3
failed 7:1, 19:9, 21:10, 33:11, 34:18
failing 21:4
failure 5:18, 17:23, 18:12, 23:15, 24:9, 25:7
fall 20:9
fallen 26:8
false 11:10, 17:2, 17:16, 18:18, 19:4, 24:10, 26:17, 35:8
falsely 21:5
falsity 17:22, 18:16, 33:5
far 14:3, 39:5
fatal 23:16, 29:23
fault 38:1
faulted 6:23, 10:20, 12:20
Fax 1:34
feel 3:17
fees 41:19

Fifth 9:4, 9:12, 35:14, 37:10, 37:19, 39:8
filed 9:15, 22:6, 38:12
Final 14:21, 31:14
Finally 25:2, 25:17
financial 6:10, 6:11, 34:4
financials 36:21
First 3:8, 11:3, 11:4, 12:6, 12:7, 12:11, 14:12, 14:13, 14:15, 17:3, 17:22, 18:11, 19:9, 19:17, 21:6, 21:9, 27:13, 27:16, 32:4, 32:19, 33:5
FITZWATER 1:21
Five 13:9
flags 16:2, 16:8
Flaherty 9:20
flexibility 3:19, 40:12
flow 14:2
flowing 7:24
fluid 3:21
focus 17:2, 25:25, 26:1
focusing 11:13
following 29:1
footnote 9:3, 9:20, 37:13
force 39:18
forcing 10:12
forecasts 36:11
foregoing 41:14, 41:16
form 8:4
format 41:19
formed 26:4
forth 4:17,

14:20, 19:13, 31:22
forward 31:11
forward-looking 17:13
found 10:9, 24:22, 37:16, 39:9
fourth 12:9, 14:14
fraud 5:20, 9:2, 10:22, 13:2, 13:22, 14:3, 15:7, 15:20, 16:20, 17:19, 23:17, 40:1
fraudulent 4:25, 7:20, 12:22, 35:8
fraudulently 4:10
free 3:17
Fulbright 2:2, 4:2
full 27:20, 28:5
fully 17:19
future 9:22, 10:13, 14:2, 17:13

< G >
GAAP 21:7, 21:14, 21:15, 21:22, 21:25, 24:3, 24:5
gave 12:24, 27:5
generally 15:23
give 18:2, 26:21
given 33:14
gives 27:2, 28:4
giving 3:15
Glancy 1:29
governance 4:7, 16:17

Greg 5:5
ground 5:23, 10:16, 10:19
guaranteed 36:4
guidance 14:20, 15:3, 15:4, 15:18, 16:11, 17:10, 17:12, 23:7, 29:14, 30:2, 30:7, 31:10, 31:11, 31:21, 32:6, 33:14, 33:15, 33:16, 33:21
guide 14:23


< H >
half 12:7
hand 3:12
handed 25:3
handling 11:23
happen 8:23
happened 10:5, 12:13
harbor 11:8, 17:13
harmed 17:16
harmful 8:18, 10:13
head 32:25, 33:2, 33:23
heading 15:3
hear 3:3, 3:24, 11:2
HEARING 1:20, 3:1, 3:20, 8:17, 33:12, 40:4, 41:1
hearings 3:21
heavily 9:18
held 11:18, 19:9, 37:18
help 29:24
high 17:18
highlights 8:16
highly 28:17, 30:20, 32:15
historically 28:19, 29:2,

29:7, 29:18
hit 19:15, 32:12, 33:12, 33:24
hold 9:1, 16:19, 21:12
holistic 6:6
Honor 4:1, 5:11, 5:22, 8:10, 8:17, 9:10, 11:8, 11:12, 12:3, 13:25, 15:1, 15:22, 16:24, 17:1, 17:11, 17:15, 17:21, 19:8, 20:13, 20:21, 22:5, 23:7, 23:12, 23:17, 25:13, 26:13, 26:20, 28:7, 31:7, 32:19, 33:11, 33:24, 34:11, 34:14, 35:11, 36:5, 36:22, 40:2
HONORABLE 1:21
hope 3:8
hopefully 3:13
housekeeping 3:7, 3:23
hundred 14:9


< I >
ignore 26:2
immediately 9:14
impact 13:7, 13:14, 13:16, 17:16, 29:12, 31:25
impacted 13:16
impairment 9:15, 9:17
implemented 28:21
implications 37:23

important 14:1, 14:8, 16:20, 32:16
Importantly 26:13
improper 33:12, 37:17
improperly 33:21
inability 25:24
inappropriate 37:17
INC. 1:15
incentive 27:23
include 24:12, 34:7
included 13:19
includes 22:14
including 17:6, 26:6, 34:5
Incorporated 3:6
increase 10:6
increased 38:20
incredible 26:12
incurred 16:14
indefensible 7:1, 7:15
INDEX 41:1
indicated 30:9
indicates 22:3, 26:25
indicative 39:5
individual 19:11
individually 38:4
ineffective 34:1
inference 5:18, 7:3, 7:23, 9:19, 10:11, 10:22, 11:19, 13:20, 15:7, 15:20, 16:7, 16:16, 18:3, 18:4, 21:14, 25:6, 27:17, 29:3, 36:19,

37: 19,  38: 9,
39: 1,  39: 22
inflated 27: 24,
33: 7,  33: 17,
33: 18,  33: 21
inflating 17: 17
information
16: 3,  18: 6,
22: 1,  22: 2,
22: 7,  22: 13,
27: 2,  35: 1
informed 5: 5,
5: 12
informs 21: 16
inherent 36: 1
initial 5: 9
inquiry 21: 17
instead 25: 19
instruction
3: 23
instructs 23: 9
insufficient
11: 25,  37: 18
integrating
35: 25
intended 3: 10
intent 12: 22,
26: 22
intentional
25: 9
intentionally
14: 4,  24: 17
interest 5: 3,
5: 4,  26: 22
internal 34: 1,
34: 9
interpretation
23: 9
interpreting
9: 12
interrelated
11: 9
interrupt 3: 17
intimately
19: 19
investing
20: 18,  20: 21,
20: 22
investment 6: 2
investors 13: 7,

17: 15,  24: 16,
24: 17,  26: 16,
26: 19,  27: 3,
29: 7,  30: 8,
30: 25,  31: 13,
32: 16,  32: 18,
32: 21,  32: 23
involve 17: 11
involved 15: 23,
19: 19
involves 35: 25
irrelevant 26: 8
issue 3: 12,
9: 2,  12: 24,
17: 14,  19: 4,
19: 10,  19: 13,
19: 18,  22: 14,
22: 20,  22: 24,
23: 8,  31: 12,
34: 21,  35: 19,
37: 21
issued 37: 15
issues 16: 11,
16: 17,  18: 11,
35: 23,  35: 25
itself 8: 6,
8: 9,  17: 12,
20: 20,  20: 25

< J >
J.  2: 31,  41: 14,
42: 2,  42: 4
Jacinto 2: 3
January 20: 3,
20: 11,  20: 12
Jarrell 5: 5,
5: 12,  20: 6,
20: 7,  20: 22
Jastrow 15: 22,
39: 3
Judge 1: 22,
9: 9,  9: 16
judgment 7: 22,
7: 25,  8: 3,
25: 2,  25: 3
Judicial 41: 20

< K >

KARA 1: 28
Karen 16: 25
keep 3: 18,
26: 10
kind 9: 2,  9: 6,
10: 19,  35: 12
kinds 16: 19
knowledge
19: 11,  19: 15,
19: 17,  21: 1,
36: 10,  36: 12
KPMG 26: 25,
27: 1,  27: 5,
27: 6
kwolke@glancyla
w.com 1: 35


< L >
lack 11: 5,
24: 22
laid 35: 4
large 30: 19,
38: 7
largest 8: 12
last 7: 16,
33: 11,  40: 4
later 20: 4
LAW 9: 1,  9: 11,
16: 9
lawsuit 39: 7,
39: 23
least 3: 21,
12: 12,  18: 3,
18: 5,  22: 16,
23: 9,  24: 8,
28: 3,  33: 18
leave 39: 19
led 39: 17
left 40: 5
legal 21: 19
legality 6: 4
legally 7: 15
level 12: 21,
13: 1,  13: 22,
35: 14,  36: 7
liabilities
21: 8,  38: 8,
38: 16,  38: 17,
38: 19

liability 4: 11,
4: 19,  5: 2,
7: 18,  8: 19,
15: 24,  17: 24,
18: 13,  18: 14,
18: 18,  18: 20,
20: 12,  20: 17,
21: 4,  21: 6,
21: 11,  21: 21,
22: 8,  22: 14,
23: 1,  23: 10,
23: 11,  23: 24,
24: 1,  24: 9,
24: 10,  24: 14,
24: 18,  24: 20,
25: 4,  25: 7,
25: 12,  25: 15,
25: 21,  26: 1,
26: 19,  27: 1,
27: 3,  28: 4,
39: 12
lie 24: 15
lifeline 6: 11
likelihood
9: 22,  10: 4
likely 14: 4
Lindsay 9: 9,
9: 16
Line 13: 8,
13: 15,  13: 16,
40: 5,  41: 2
lines 14: 5
linkup 40: 9
listed 12: 5,
30: 10
litigation
6: 25,  8: 23,
10: 18,  20: 17,
20: 20,  22: 15,
23: 2,  23: 6,
23: 8,  23: 19,
26: 21,  39: 21
LLP 1: 29,  2: 2
loan 27: 18,
27: 23
look 28: 13,
36: 18
looked 10: 7
looking 6: 10,
14: 15

Los 1:32
loss 8:7,
11:11, 19:1,
21:18, 21:19,
21:21, 21:23,
22:3, 22:22,
23:5
low 7:9, 33:16
lower 8:1,
14:14, 24:14
lowered 27:14
lowering 14:20
lowest 23:15


< M >
M. 1:28
management 37:3
Manichaean 5:3,
7:17, 16:4,
25:16, 37:10
manipulation
32:18
map 4:20
March 12:16,
22:6
market 15:8,
16:16
material 11:6,
14:7, 30:24,
31:12
materially
17:15, 34:20
matter 4:3,
8:13, 14:22,
14:23, 31:2,
41:16
mattered 31:6
matters 3:7,
23:21
maximize 27:23
mechanical 2:39
members 19:21
mentioned 36:20
mere 17:19,
25:7
merger 19:20,
24:14, 25:1,
26:15, 27:18
metric 14:1

metrics 32:14,
32:17
middle 10:16,
10:19
million 9:15,
12:8, 12:10,
12:12, 15:25,
18:14, 20:12,
22:9, 22:10,
22:17, 26:16,
27:11, 33:15,
33:16, 33:20,
38:17, 38:18
mind 40:7
minimum 4:13,
4:22, 4:24,
5:2, 5:12,
5:13, 5:21,
7:18, 8:19,
8:24, 12:19,
23:9
minute 16:9,
39:10
minutes 3:10,
13:9, 15:11,
15:13, 15:14,
33:9, 38:22,
38:24
mislead 16:16,
24:17
misleading
10:8, 10:9,
11:10, 11:14,
17:5, 17:7,
17:12, 17:24,
18:17, 32:13
misleadingly
17:6
misreported
18:6
misrepresent
29:25
misrepresentati
on 11:6, 26:18
misrepresentati
ons 17:3
missed 33:14,
33:21
misses 29:14
misstatement

17:21
mistake 24:6,
25:8
modest 39:2
money 7:23,
14:1
months 27:12,
27:13, 28:23
morning 16:24
mortgage-backed
15:25
MOTION 1:20,
3:1, 3:4, 19:8,
27:8, 32:20,
38:12, 41:1
motive 29:22,
29:24, 30:7
move 28:7,
31:15
moving 4:5
MR. STOKES
34:14, 38:23,
38:25, 39:11,
40:1
MS 16:24,
28:12, 30:1,
30:12, 30:17,
31:6, 31:24,
32:12, 33:10,
35:17, 36:20,
37:24, 41:6
Murray 1:29


< N >
narrowed 17:2
nature 13:21,
31:25, 32:24,
35:12
nearly 32:5
necessarily
23:18
need 3:19,
18:3, 40:12
negate 27:9
new 12:2, 12:14
next 3:22
nonfraudulent
26:22
nonroutine 17:7

Northern 1:2,
42:6
Norton 2:2, 4:2
Notably 25:17
note 3:14,
27:21, 31:4
noted 8:8, 13:4
nothing 6:16,
26:20
notice 8:8
November 28:17,
29:6, 31:9,
32:8
nowhere 10:21
Number 4:15,
4:21, 5:19,
7:19, 8:19,
8:24, 9:3,
19:6, 29:25
numbers 14:10,
14:14, 15:1,
15:2, 15:5
numerous 21:3


< O >
obfuscated
24:24
objective 36:18
obligated 22:21
obligations
22:22, 26:9
obtain 24:20
obviously 30:19
occur 16:13,
36:4
occurred 9:23,
32:6
offering 10:6
Official 42:5
Okay 14:21,
15:15, 30:13,
32:12
old 9:10
omissions 17:3
omitted 18:6
omniscient 9:12
once 14:18,
40:9, 40:11
One 3:13, 8:12,

16:9,  31:14,
39:10
ONR 32:22,
32:23,  33:7
open 23:8
opening 9:3,
9:21,  38:12
operating 34:2,
34:5
operational
16:12
Operative 6:4,
6:7,  6:9,  26:2,
26:3,  36:13
opinion 6:24,
9:9,  11:18,
16:14,  19:23,
37:10,  37:20
opinions 27:1
opposed 35:9
opposing 11:2,
18:4,  27:17
opposition
27:22
ORAL 3:3,  41:2
orchestrated
20:2,  24:12,
27:12
order 19:8,
32:20
others 3:5,
5:23
otherwise 23:3
outcome 18:24,
22:20,  25:24,
36:12,  37:25,
38:1
outlined 17:23
outside 26:24
overall 34:17,
34:20
overdisclose
10:12
overpromised
10:14
overstatement
17:24
Owens 10:23,
15:22,  39:3
own 6:8,  7:12,

8:4,  8:21,
21:7,  21:11,
21:13,  23:5,
24:2,  26:6,
29:18,  34:8,
35:4,  37:15


< P >
Page 8:4,  9:11,
19:13,  37:13,
38:13,  41:2
pages 9:21,
38:14
pam_wilson@txnd
.uscourts.gov
2:32
PAMELA 2:31,
41:14,  42:4
paragraph 5:1,
5:14,  6:1,  7:4,
12:4,  33:4,
34:3,  34:24,
35:3,  39:24
paragraphs 6:12
Park 1:30
part 5:5,  5:12,
15:2,  16:1,
36:24,  37:1
partial 27:13,
32:1,  32:4
particularity
4:21,  5:13,
5:15,  5:21,
23:17,  35:7,
38:3
particularized
6:17,  12:15,
37:22,  39:14
pass-through
13:3,  13:8,
13:23,  14:24,
29:11,  31:3
passed 36:24
patently 19:4
pause 13:12
pay 25:16,
27:18,  27:22
pending 23:2,
23:6

people 38:10
per 17:19,
25:14
percent 11:17,
11:22,  12:1,
12:13,  12:16,
13:11,  14:9,
16:18,  17:8,
28:10,  28:12,
29:20,  30:5,
30:14,  30:20,
30:22,  30:23,
32:5,  33:19,
34:16,  34:21,
35:8,  35:9,
35:10
percentage
30:19
percentages
16:19
perfectly 12:10
period 12:11,
19:7,  26:9,
28:23,  29:4,
29:17,  30:20,
31:16,  31:18,
31:23,  33:1,
34:10
periods 23:20
Peter 2:1,  4:2
picked 30:3
picks 10:17
piece 35:6
placed 12:17
PLAINTIFF 1:7,
1:28,  7:4,
7:11,  9:14
Plaintiffs 4:9,
4:15,  4:18,
4:21,  5:2,
5:24,  6:8,
6:14,  6:19,
6:23,  7:1,
7:16,  11:18,
12:2,  12:14,
14:10,  16:25,
18:6,  18:24,
23:15,  23:18,
26:2,  28:1,
34:18,  34:22,

36:10,  36:15,
37:20,  39:7,
39:14,  39:19
plausibly 34:8
play 35:11
plead 5:17,
13:22,  34:18,
36:15
pleaded 11:18,
11:20,  12:14,
14:11
pleading 4:19,
7:12,  8:1,
13:15,  37:21
pleadings 12:17
pled 4:21,  9:8,
39:14
plethora 20:13
plus 5:4
point 14:16,
33:12
pointed 15:1,
16:3
policies 21:13
policy 21:12,
21:17,  23:5,
24:2
portfolio 15:25
position 7:14,
21:8
positive 30:4
possibility
6:22
possible 7:24,
10:4,  15:6
Postage 11:22,
11:23,  12:4,
12:6,  12:8,
13:8,  13:18,
14:12,  28:13,
28:15,  28:18,
28:22,  28:25,
29:8,  29:17,
30:10,  30:18,
31:7,  31:12,
31:21,  31:25,
32:3,  32:4,
32:7,  34:16,
34:19,  34:24,
35:6

posted 28:13
postponement 31:19
potential 4:11, 4:19, 8:3, 18:19, 20:16, 21:18, 21:19, 23:24, 24:9, 24:18, 24:20, 26:1
practices 37:16, 37:18
precedent 8:18, 8:25
precise 23:15
predict 10:4, 18:23, 22:20, 25:24, 29:19
predictability 30:22, 30:24
predictable 38:1
predicted 28:15
predicting 28:18
prediscovery 23:18
premerger 22:11
prepare 19:23
prepared 19:24, 26:6
prescribed 41:20
present 17:14
president 20:3
prevailing 6:23
previous 35:17
previously 7:13, 13:3, 38:13
price 9:25, 14:6, 20:25, 22:9, 27:14, 27:24, 30:6, 32:6
primarily 39:6
prior 6:24, 8:17, 11:17, 16:14, 19:6, 19:8, 39:17

private 24:18
privy 20:21, 20:23, 20:24
probable 21:20, 21:24, 22:23
problems 4:14
proceeding 8:22, 9:6, 21:19
Proceedings 2:39, 41:15
proceedings. 40:15
proceeds 27:23
produced 2:40
Professor 20:6
profitable 6:16
projections 6:6, 7:7, 36:11
prone 32:17
Prongay 1:29
proposition 9:5
protestations 22:18
provide 27:16
provided 19:24, 22:11
proximate 26:15
proxy 16:6, 20:25, 22:9
PSLRA 5:17
public 16:2, 16:4, 16:7, 16:8, 20:18, 20:20, 20:21, 20:22, 20:25, 24:15, 24:18, 26:16, 26:19, 30:3, 35:4, 36:25, 39:6
publicly 8:10, 9:6
published 38:14
purposes 23:21, 27:8
put 8:24
putting 30:2


< Q >

quantity 32:25, 33:2, 33:23
quarter 12:6, 12:9, 12:11, 14:12, 14:13, 14:14, 14:15, 14:18, 15:6, 35:5, 36:3
quarterly 15:2
quarters 16:13, 28:15, 29:13, 31:8
question 14:21, 17:25, 31:14, 32:10
questions 11:1, 13:12, 28:7, 40:7, 40:8
quick 19:16, 26:23
quickly 32:13
quiet 12:7
quite 9:10, 9:11
quote 7:4, 22:2


< R >

raise 25:10
raised 18:4
raising 11:11
ramifications 38:4
range 4:11, 4:13, 4:16, 18:19, 19:1, 20:16, 21:5, 22:4, 22:7, 22:8, 22:13, 22:16, 22:23, 23:24, 24:11, 25:14, 25:15, 25:25, 26:5, 26:7, 27:3, 33:15, 38:2
rate 28:15
rather 30:14
reach 17:17
reached 7:13
ready 3:24

Real 19:16, 26:23
realistic 6:22
reality 6:7, 6:9, 26:3, 36:13
really 17:25, 18:15, 31:2, 35:11, 37:7
realtime 35:3
reason 3:11, 23:3, 27:4, 29:13, 31:9, 36:1
reasonable 6:20, 12:24, 23:24
reasonableness 7:7
reasonably 21:20, 21:24, 22:1, 23:11, 38:1
reasons 26:2, 35:20
rebuttal 16:23, 34:13
received 35:1
recent 37:11
recess 40:14
recitation 21:22
reckless 5:19, 18:5, 25:8
recklessly 4:10, 4:23, 14:4
recklessness 12:19, 12:22, 21:4, 35:14, 36:7
recognize 5:19, 38:16
recognized 5:14, 9:14
record 23:1, 24:1, 24:9, 25:7, 26:24, 27:4, 36:25, 41:15

recording 21:8, 22:22
recovered 17:20
recurring 32:22, 35:18, 35:20, 36:6
red 16:2, 16:8
reduce 31:11
reduced 33:20
reducing 29:14
reduction 32:6
refer 12:4
referring 29:4
reflecting 33:20
refused 25:4
regard 25:17
Regarding 11:17, 11:25, 22:13, 28:8, 29:11, 37:7, 37:22
regardless 36:2
rejected 26:12
related 4:5, 18:17, 23:5, 32:25
relates 27:25
relating 17:4, 32:3, 32:4, 34:1
relation 31:17
relative 7:9
release 31:19
relevant 29:23, 30:8, 36:22
reliable 22:7, 27:1
relying 37:20
remain 13:9, 15:11, 15:13, 33:9, 40:5
remains 38:24, 39:10
remarked 7:8
remedies 19:12
remind 18:20
removed 33:13, 33:18
repeatedly 17:9

reply 37:13
report 37:15
reported 2:39, 33:15
Reporter 2:31, 40:6, 40:8, 42:5
reporting 13:17, 34:4
representing 4:2
requested 3:16
required 4:13, 5:17, 6:3, 21:22, 23:1, 23:25, 27:18, 28:21, 35:15, 36:14
requiring 8:18
reserved 16:23
respect 4:8, 15:21, 16:10, 17:22, 18:5, 18:11, 18:16, 24:8, 33:6, 34:5, 34:15, 35:16, 36:9, 37:9, 38:3
Respectfully 26:20
respond 31:4
responsible 9:1
rest 32:11
restated 33:19
restatement 4:5, 18:13, 33:6, 33:13, 37:14, 38:7, 38:10, 38:15, 38:19, 39:1
restatements 39:5
resting 24:5
result 23:2, 23:4
resulted 18:13
retained 5:6
revealed 17:20
reveals 5:7
revelations

31:20
review 10:3, 10:7, 10:10
Reynolds 18:22, 19:19, 19:21, 19:25, 20:1, 20:8, 20:10, 20:11, 20:15, 28:16, 29:1, 29:18, 33:1
rise 18:2, 26:21, 28:4, 35:13, 36:7
rises 13:1, 13:21
risk 8:6
RMR 2:31, 42:4
rogue 6:5
role 24:24
Room 2:33
rooted 21:11
Rose 2:2, 4:2
Rothschild 5:8, 19:23, 19:24, 22:11
roughly 18:14
routine 32:24, 33:22, 35:19, 36:6
routinely 30:3
row 29:13, 31:8
rule 21:7
run 10:25
running 30:15


< S >
s/pamela 42:2
safe 11:8, 17:13
sale 4:5, 16:18, 27:16, 27:17, 27:21, 27:25
sales 27:10, 27:23, 27:24
San 2:3
saying 30:14
says 12:18, 21:22, 29:5

Schiller 9:9
Scienter 10:11, 11:6, 11:15, 11:19, 15:23, 16:7, 18:1, 21:14, 21:16, 21:17, 26:24, 27:9, 27:19, 27:25, 28:3, 32:21, 33:5, 34:23, 35:11, 35:15, 36:5, 36:8, 36:19, 37:19, 38:9, 39:2, 39:5, 39:9, 39:22, 40:1
scope 39:1, 39:4
SEC 23:7
Second 3:4, 4:8, 5:1, 5:11, 6:1, 6:8, 6:15, 11:3, 11:4, 11:24, 14:13, 14:18, 17:1, 17:4, 18:2, 18:7, 18:10, 18:17, 19:12, 19:14, 21:9, 24:7, 24:22, 30:9, 32:22
secret 8:11, 37:3
seeing 40:8
seemed 7:9, 25:17
seems 31:18
self-serving 26:11
sentence 5:11
September 17:18
serious 8:13
service 8:9
set 19:13, 31:23
sets 37:7
setting 30:5
severe 12:19, 12:21

shall 21:23, 23:10
share 17:19, 25:14
shareholders 8:13, 9:24, 10:1, 14:2
shares 25:11, 25:16
Shen 1:6, 3:5
shortchanged 10:1
show 23:23, 28:14, 28:23
showed 20:5
showing 6:24, 19:17, 24:7, 35:7
shown 29:16
shows 19:15
shredded 37:16
side 3:10
sides 6:2
SIDNEY 1:21
signed 18:22, 20:1, 20:11
significant 8:7, 34:5, 34:6
similar 10:2, 12:12, 12:13, 15:23
Similarly 35:16
simply 6:5, 7:13, 12:17, 20:14, 36:7, 38:9, 39:8, 39:14
single 23:19
situation 3:20
situations 8:20
six 11:5, 27:13
sizable 10:6
size 38:25, 39:4
skip 28:9
small 8:10, 38:21
so-called 4:24, 27:8
sober 8:15

sold 27:11
solely 34:16
soon 39:12
sorry 15:12, 15:15, 20:11, 37:12, 38:18
sort 35:23
sound 3:12
Sourcehov 5:3, 5:8, 7:5, 7:7, 19:18, 19:24, 20:9, 24:23, 24:25, 25:11, 25:13, 25:19, 26:3, 26:11, 26:14, 26:16, 26:18
Southwind 16:18
specific 5:18, 5:19, 6:24, 7:18, 23:7, 30:17, 34:18, 34:25, 35:1, 37:6
specifically 11:20, 12:4, 19:10
specificity 34:21
stable 35:5, 35:6
staffing 35:23, 35:25
stage 23:18
stand 40:14
standard 8:1, 12:19, 37:22
standing 40:7
standpoint 13:5
start 4:4, 37:25
started 29:5
state 18:25
stated 21:7, 23:5, 34:3
statement 10:8, 10:9, 11:14, 12:15, 18:17, 34:16, 35:8, 35:10

statements 4:7, 11:10, 12:25, 14:15, 17:3, 17:11, 17:13, 17:14, 17:16, 28:8, 35:18
States 1:1, 1:22, 41:21
stenography 2:39
stipulate 18:25
stock 4:5, 9:23, 9:24, 9:25, 14:6, 16:18, 17:17, 17:20, 27:10, 27:11, 27:14, 27:25, 32:5
Stokes 2:1, 4:1, 4:2, 10:24, 11:7, 12:2, 13:10, 13:18, 14:25, 15:12, 15:14, 16:10, 16:22, 23:14, 28:12, 29:11, 31:2, 32:15, 34:13, 40:3, 41:4, 41:8, 42:12
straits 6:10
Street 2:33
strident 8:14
strike 34:20
striking 4:22, 5:11
strong 5:18, 10:21, 11:19, 15:19, 16:7, 18:3, 29:3, 36:19, 37:19, 39:22
structural 16:12
submissions 4:20
submit 10:18, 12:22, 13:25, 18:7, 27:10, 35:10, 35:13,

36:4, 39:4, 39:16
submitted 36:12
subsequent 13:20, 16:13
subsidiary 7:24
substantiate 12:3, 36:15
substantiates 7:12, 12:18
sued 10:1
sufficient 17:21
suggested 22:7
suggesting 7:22
Suite 1:31, 2:4
support 7:23, 13:20, 21:3, 25:6, 37:19, 39:15
supported 27:20
supporting 5:18, 8:3, 10:21
supports 6:20, 25:1
supposed 30:5, 34:7
supposedly 4:13, 35:19
Supreme 29:21
surrounding 28:2, 39:4
suspicious 27:14, 27:15


< T >
targets 30:6
technical 3:8, 3:11, 24:6, 25:7
Technologies 1:14, 3:5
Tellabs 29:22
terminate 40:9
terms 31:21
test 11:5
testified 20:10, 24:25

Testimony 5: 7, 7: 5, 20: 4, 26: 11, 26: 14, 36: 16
Texas 1: 2, 1: 10, 2: 34, 42: 6
theme 10: 17
themselves 4: 18, 36: 15
theory 4: 9
thinking 36: 5
third 12: 8, 14: 14, 17: 7
thoroughly 26: 12
though 10: 5
three 17: 2, 27: 12
throughout 29: 17
tie 28: 3
timing 10: 4
together 28: 2
top 13: 16
topic 20: 9, 27: 10, 33: 2, 33: 25
tossed 4: 16
total 38: 8, 38: 15, 38: 19
totals 12: 9
touted 17: 9
towards 16: 20
track 3: 18, 28: 22
tracked 34: 24
tracking 28: 24, 29: 6, 29: 17
trading 27: 15
transaction 5: 25
transactions 34: 2, 34: 6
TRANSCRIPT 1: 20, 2: 40, 41: 15, 41: 19
transfer 7: 20
transparent 15: 5, 15: 17

trial 20: 10, 24: 23
tried 16: 16, 25: 20
tripled 9: 25
trouble 10: 14, 10: 16
true 18: 25, 20: 20, 26: 14
truly 26: 13
trying 9: 19, 15: 17, 31: 16, 31: 22, 32: 12
turn 18: 8
Two 15: 1, 15: 11, 15: 13, 15: 14, 18: 1, 18: 10, 29: 13, 31: 8, 31: 20, 33: 9, 38: 22, 38: 24
TX 2: 5
types 9: 5, 39: 11


< U >
ultimate 28: 3
ultimately 14: 1, 14: 6, 25: 22, 26: 8
unable 18: 23, 24: 11
uncertain 8: 20, 10: 13
uncertainty 22: 19
undercut 26: 24, 32: 21
undercuts 15: 7
underlying 5: 25
underpromised 10: 15
understand 4: 9, 15: 8, 31: 16, 31: 22, 35: 17
understanding 13: 15
understandings 37: 23

understatement 18: 14
United 1: 1, 1: 22, 41: 21
Unless 28: 7
unpredictabilit y 32: 7
unpredictable 11: 22, 28: 17, 29: 10, 30: 21, 31: 7, 31: 21, 31: 25
until 14: 12, 14: 16
untrue 30: 25
unusual 34: 2, 34: 6
unworkable 8: 25
updated 15: 18


< V >
v. 39: 3
valuation 5: 9, 19: 18, 20: 2, 20: 16, 20: 23, 20: 24, 22: 10, 24: 13, 24: 23, 24: 24, 26: 4, 26: 15, 27: 12
valuations 4: 16, 19: 10, 20: 5, 25: 19, 25: 20, 27: 5
value 5: 4, 5: 6, 5: 8, 16: 6, 25: 11, 25: 14, 26: 18
valued 26: 16
values 19: 11, 25: 14
variability 34: 19
variable 28: 22
variety 11: 25
various 19: 10, 19: 13, 19: 18, 20: 16, 21: 2, 25: 19, 26: 4
veil-piercing

7: 17, 7: 21
VERSUS 1: 10, 3: 5, 7: 17, 15: 22, 37: 12
viable 9: 7, 13: 11
vice 20: 3
video 3: 20, 3: 22, 40: 12
view 11: 2, 29: 24
violation 21: 7, 21: 13, 24: 4, 24: 5
violations 21: 14, 21: 15
virtue 33: 6
visibility 4: 7, 11: 17, 12: 1, 12: 16, 17: 8, 25: 23, 28: 10, 29: 20, 29: 25, 30: 5, 30: 14, 30: 18, 31: 17, 34: 15, 34: 20
visible 12: 7, 14: 12


< W >
walk 21: 2
wanted 15: 8, 30: 1
wants 15: 5
warnings 3: 16
wave 3: 12
ways 26: 17
weakness 34: 9
week 3: 22, 9: 24, 10: 5
weighed 10: 11
weighs 9: 18, 36: 19
weight 37: 9
West 9: 11
whether 7: 20, 11: 10, 11: 13, 11: 14, 18: 1, 24: 18, 27: 20, 28: 4

wide 4:16
will 3:3, 3:9,
3:13, 27:7,
40:14
willful 25:2
willingness
24:17
WILSON 2:31,
41:14, 42:2,
42:4
within 22:4,
26:7
without 24:4,
25:13, 37:22
Wolke 1:28,
16:24, 16:25,
28:12, 30:1,
30:12, 30:17,
31:6, 31:24,
32:12, 33:10,
35:17, 36:20,
37:24, 41:6,
42:13
words 6:8
work 20:7,
22:15
works 8:23
worth 5:4,
6:15, 6:22,
26:11, 26:14,
36:17
worthless 24:25
write 15:24
wrongdoing
24:8, 25:1


< X >
xsigma 16:18


< Y >
year 7:16
years 31:20
young 30:3


< Z >
zero 26:11,
26:14

C E R T I F I C A T I O N

I, PAMELA J. WILSON, CSR, certify that the foregoing is a transcript from the record of the proceedings in the foregoing entitled matter.

I further certify that the transcript fees format comply with those prescribed by the Court and the Judicial Conference of the United States.

This the 25th day of January, 2022.

s/Pamela J. Wilson
_____
PAMELA J. WILSON, RMR, CRR
Official Court Reporter
The Northern District of Texas
    Dallas Division