**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, <br><br>                Plaintiffs, <br><br>      v. <br><br> EXELA TECHNOLOGIES, INC., RONALD COGBURN, JAMES G. REYNOLDS, and PAR CHADHA <br><br>                Defendants. | Case No. 3:20-cv-00691-D |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF
<u>CLASS REPRESENTATIVE AND CLASS COUNSEL</u>**

**TABLE OF CONTENTS**

I.    PRELIMINARY STATEMENT ...................................................................................... 1

II.   SUMMARY OF THE ALLEGATIONS ....................................................................... 2

    A.    Exela Misrepresented The True and Ongoing Expenses Of Its Business Through the Manipulation of "Adjusted EBITDA" ........................................................................ 2

    B.    Defendants Misrepresented The Nature And Composition of Exela's Revenue.... 4

    C.    Misrepresentation and Omission of the Appraisal Liability .................................... 5

    D.    When The Truth Was Revealed, Exela's Stock Got Decimated ............................ 5

III.  APPLICABLE STANDARDS FAVOR CLASS CERTIFICATION HERE..................... 7

IV.   The Class Is Ascertainable And The Requirements Of Rule 23(a) Are Met...................... 9

    A.    Plaintiff Satisfies Rule 23(a)(1): Numerosity ......................................................... 9

    B.    Plaintiff Satisfies Rule 23(a)(2): Commonality ...................................................... 10

    C.    Plaintiff Satisfies Rule 23(a)(3): Typicality............................................................. 11

    D.    Plaintiff Satisfies Rule 23(a)(3): Adequacy ........................................................... 12

V.    RULE 23(b)(3) PREDOMINANCE AND SUPERIORITY ARE MET .......................... 14

    A.    Common Questions of Law and Fact Predominate ............................................... 14

    B.    Plaintiff is Entitled to a Presumption of Reliance Under *Basic* ............................ 15

        1.    NASDAQ Listed, Exela Is Presumed To Trade In An Efficient Market.. 16

        2.    Market Efficiency Factors Indicate Market Efficiency Here.................... 17

    C.    Damages Can Be Determined By A Class-Wide Methodology ........................... 23

    D.    The Same Common Issues Predominate As To The § 20(a) Claims.................... 24

    E.    A Class Action Is Superior To Other Litigation Methods ................................... 24

VI.   CONCLUSION............................................................................................................ 25

i

# TABLE OF AUTHORITIES

CASES

*Abboud v. Agentra, LLC*,
2020 WL 5526557 (N.D. Tex. Sept. 14, 2020) ........................................................................ 10

*Amchem Prods., Inc. v. Windsor*,
521 U.S. 591 (1997) .......................................................................................................... 7, 14, 15

*Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*,
133 S.Ct. 1184 (2013) ................................................................................................................ 8, 15

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ................................................................................................................ 15, 23

*Brown v. Kelly*,
609 F.3d 467 (2d Cir. 2010) ........................................................................................................ 14

*Buettgen v. Harless*,
2011 WL 1938130 (N.D. Tex. May 19, 2011) ...................................................................... 14, 25

*Cammer v. Bloom*,
711 F. Supp. 1264 (D.N.J. 1989) .................................................................................... 17, 18, 19, 20

*Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*,
310 F.R.D. 69 (S.D.N.Y. 2015) ................................................................................................ 16, 20

*Equity Invs. v. Allegiance Telecom, Inc.*,
487 F.3d 261 (5th Cir.2007) .......................................................................................................... 8

*Erica P. John Fund, Inc. v. Halliburton Co.*,
131 S. Ct. 2179 (2011) ................................................................................................................ 8, 15

*Erica P. John Fund, Inc. v. Halliburton Co.*,
718 F.3d 423 (5th Cir. 2013) ....................................................................................................... 14

*Forbush v. J.C. Penney Co.*,
994 F.2d 1101 (5th Cir.1993) ...................................................................................................... 10

*Gen. Tel. Co. of Sw. v. Falcon*,
457 U.S. 147 (1982) ..................................................................................................................... 11

*Hackler v. Tolteca Enterprises, Inc.*,
2019 WL 7759523 (W.D. Tex. Sept. 9, 2019) .............................................................................. 8

ii

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   131 S. Ct. 2179 (2011) .................................................................................... 8, 15, 21

*Halliburton v. Erica P. John Fund, Inc.*,
   134 S. Ct. 2398 (2014) .................................................................................... 9, 15, 21

*Henry v. Cash Today, Inc.*,
   199 F.R.D. 566 (S.D. Tex. 2000) .......................................................................... 25

*Hodges v. Akeena Solar, Inc.*,
   274 F.R.D. 259 (N.D. Cal. 2011) ......................................................................... 16

*In re Accredo Health, Inc. Sec. Litig.*,
   2006 WL 1716910 (W.D. Tenn. Apr. 19, 2006) ...................................................... 16

*In re Anadarko Petroleum Corp. Sec. Litig.*,
   2022 WL 4544235 (S.D. Tex. Sept. 28, 2022) ................................................... 11, 22

*In re Arthrocare Corp. Sec. Litig.*,
   2011 WL 13175766 (W.D. Tex. Aug. 30, 2011) ................................................. 11, 23

*In re Barrick Gold Sec. Litig.*,
   314 F.R.D. 91 (S.D.N.Y. 2016) ........................................................................... 23

*In re Blech Sec. Litig.*,
   187 F.R.D. 97 (S.D.N.Y. 1999) ........................................................................... 25

*In re Deepwater Horizon,*
   785 F.3d 1003 (5th Cir. 2015) ............................................................................. 13

*In re Dell Inc. Sec. Litig.*,
   2010 WL 2371834 (W.D. Tex. June 11, 2010) ........................................................ 11

*In re DVI Inc. Sec. Litig.*,
   249 F.R.D. 196 (E.D. Penn. 2008) ........................................................................ 18

*In re DVI, Inc. Sec. Litig.*,
   639 F.3d 623 (3d Cir. 2011) ................................................................................ 16

*In re Dynegy, Inc., Sec. Litig.*,
   226 F.R.D. 263 (S.D. Tex. 2005) ....................................................................... 9, 12

*In re Elec. Data Sys. Corp. Sec. Litig.*,
   226 F.R.D. 559 (E.D. Tex. 2005) ....................................................................... 9, 10

iii

*In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*,
    529 F. Supp. 2d 644 (S.D. Tex. 2006) ................................................................. 8

*In re First RepublicBank Sec. Litig.*,
    1989 WL 108795 (N.D. Tex. Aug. 1, 1989) ......................................................... 24

*In re HealthSouth Corp. Sec. Litig.*,
    257 F.R.D. 260 (N.D. Ala. 2009) ........................................................................ 16

*In re Initial Public Offering Sec. Litig.*,
    544 F. Supp. 2d 277 (S.D.N.Y. 2008) ................................................................. 16

*In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*,
    2013 WL 396117 (D.N.J. Jan. 30, 2013) ............................................................. 24

*In re Nature's Sunshine Prod's., Sec. Litig.*,
    251 F.R.D. 656 (D. Utah 2008) ........................................................................... 18

*In re Netbank, Inc. Sec. Litig.*,
    259 F.R.D. 656 (N.D. Ga. 2009) .......................................................................... 22

*In re NII Holdings, Inc. Sec. Litig.*,
    311 F.R.D. 401 (E.D. Va. 2015) ........................................................................... 22

*In re Winstar Commc'ns Sec. Litig.*,
    290 F.R.D. 437 (S.D.N.Y. 2013) .................................................................... 18, 19

*In re Xcelera.com Sec. Litig.*,
    430 F.3d 503 (1st Cir. 2005) ................................................................................ 18

*James v. City of Dallas*,
    254 F.3d 551 (5th Cir. 2001) ................................................................................ 9

*KB Partners I, L.P. v. Barbier*,
    2013 WL 2443217 (W.D. Tex. June 4, 2013) ...................................................... 13

*Keasler v. Natural Gas Pipeline Co.*,
    84 F.R.D. 364 (E.D. Tex. 1979) ........................................................................... 24

*Krogman v. Sterritt*,
    202 F.R.D. 467 (N.D. Tex. 2001) .................................................................... 17, 22

*Lehocky v. Tidel Technologies, Inc.*,
    220 F.R.D. 491 (S.D. Tex. 2004) ..................................................................... 12, 17

*Lightbourn v. Cnty. of El Paso*,
118 F.3d 421 (5th Cir. 1997) ................................................................................. 10

*Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*,
762 F.3d 1248 (11th Cir. 2014) ............................................................................. 12

*Longden v. Sunderman*,
123 F.R.D. 547 (N.D. Tex. 1988) .......................................................................... 25

*Ludlow v. BP, P.L.C.*,
800 F.3d 674 (5th Cir. 2015) ................................................................................. 15

*Lumen v. Anderson*,
280 F.R.D. 451 (W.D. Mo. 2012) .......................................................................... 16

*Malriat v. Quantumscape Corp.*,
2022 WL 17974629 (N.D. Cal. Dec. 19, 2022) ...................................................... 20

*Manichaean Capital, LLC v. SourceHOV Holdings, Inc.*,
2020 WL 496606 (Del. Ch. Jan. 30, 2020) .............................................................. 5

*Marcus v. J.C. Penney Co., Inc.*,
2016 WL 8604331 (E.D. Tex. Aug. 29, 2016) .................................................. 11, 12

*McIntire v. China MediaExpress Holdings, Inc.*,
38 F. Supp. 3d 415 (S.D.N.Y. 2014) ..................................................................... 22

*Miller v. Mackey Int'l Inc.*,
452 F.2d 424 (5th Cir. 1971) ................................................................................... 8

*Monroe Cnty. Employees' Ret. Sys. v. S. Co.*,
332 F.R.D. 370 (N.D. Ga. 2019) ........................................................................... 13

*Prause v. TechnipFMC, PLC*,
2020 WL 3549686 (S.D. Tex. Mar. 9, 2020) ............................................. 9, 13, 24, 25

*Ramirez v. J.C. Penney Corp., Inc.*,
2017 WL 6462355 (E.D. Tex. Nov. 30, 2017) ....................................................... 12

*Rooney v. EZCORP, Inc.*,
330 F.R.D. 439 (W.D. Tex. 2019) ................................................................... *passim*

*Rougier v. Applied Optoelectronics, Inc.*,
2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ....................................................... 10

*Smilovits v. First Solar, Inc.*,
    295 F.R.D. 423 (D. Ariz. 2013) ................................................................................. 16

*Spegele v. USAA Life Ins. Co.*,
    336 F.R.D. 537 (W.D. Tex. 2020) ............................................................................ 11

*Stirman v. Exxon Corp.*,
    280 F.3d 554 (5th Cir. 2002) .................................................................................... 12

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007) ................................................................................................... 7

*Todd v. STAAR Surgical Co.*,
    2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ................................................... 16, 18, 19

*Torres v. S.G.E. Mgmt., L.L.C.*,
    838 F.3d 629 (5th Cir. 2016) ...................................................................................... 8

*Unger v. Amedisys, Inc.*,
    401 F.3d 316 (5th Cir. 2005) .................................................................................... 17

*Vine v. PLS Fin. Servs., Inc.*,
    331 F.R.D. 325 (E.D. Tex. 2019)........................................................................... 8, 10

*Zeidman v. J. Ray McDermott & Co., Inc.*,
    651 F.2d 1030 (5th Cir. 1981) ................................................................................... 9

RULES

Fed. R. Civ. P. 23 ............................................................................................................ *passim*

vi

Lead Plaintiff Insur Shamgunov ("Plaintiff" and proposed "Class Representative") submits this memorandum in support of his motion for class certification under Fed. R. Civ. P. 23, seeking: (i) certification of a class consisting of all persons and entities that purchased or otherwise acquired the securities of Exela Technologies, Inc. ("Exela" or "the Company") between March 16, 2018 and March 16, 2020, inclusive, and were damaged thereby (the "Class"); (ii) the appointment of Plaintiff as Class Representative; and (iii) the appointment of Glancy Prongay & Murray LLP ("GPM") as Class Counsel and The Kendall Law Group, LLP ("Kendall Firm") as Local Counsel.

## I.  PRELIMINARY STATEMENT

This action asserts claims on behalf of a putative class under §§ 10(b) and 20(a) of the Securities Exchange Act of 1934, and Rule 10b-5 promulgated thereunder, against Defendants Exela, James G. Reynolds ("Reynolds"), Exela's Chief Financial Officer ("CFO") between July 2017 and the end of the Class Period, Ronald Cogburn ("Cogburn"), Exela's Chief Executive Officer ("CEO") throughout the Class Period, and Parvinder Chadha ("Chadha"), Chair of the Board of Directors for Exela throughout the Class Period (collectively, "Defendants").

Now, pursuant to Fed. R. Civ. P. 23, Plaintiff seeks certification of the following Class:

> All persons and entities that purchased or otherwise acquired publicly traded securities of Exela Technologies, Inc. ("Exela") during the period March 16, 2018 and March 16, 2020, both dates inclusive (the "Class Period"), and were damaged thereby.[1]

Class certification is appropriate here as the proposed Class satisfies all requirements under Fed. R. Civ. P. 23. The Class numbers in the thousands and are geographically dispersed, satisfying the numerosity requirement. Moreover, the nature of the proposed Class Representative's injuries,

---

[1] Excluded from the Class are: (i) Defendants; (ii) current and former officers, employees, and directors of Exela; (iii) blood relatives and household members of any person excluded under (i) or (ii); and (iv) any entities affiliated with, controlled by, or more than 10% owned by, any person or entity excluded under (i) through (iii); and (v) the legal representatives, heirs, successors, or assigns of any person or entity excluded under (i) through (iv).

which resulted from Defendants' common course of conduct, are identical to that of the proposed Class, satisfying the commonality, typicality, and adequacy requirements of Rule 23(a)(2)-(4).

This action also satisfies Rule 23(b)(3)'s requirements of predominance and superiority. Each element of Plaintiff's § 10(b) and § 20(a) claims is susceptible to Class-wide proof based on common facts. Specifically, the Class is entitled to a presumption of reliance based on the "fraud-on-the-market" doctrine because Exela's stock traded in an efficient market. Exela securities were actively traded on the NASDAQ Global Select Market ("NASDAQ") during the Class Period, which creates a presumption of an efficient market. The presumption of reliance is also supported by the Expert Report of Dr. Adam Werner ("Werner Report"),[2] demonstrating that Exela's securities traded in an efficient market during the Class Period. Thus, any potential individual questions of reliance do not predominate, and the calculation of damages is susceptible to a Class-wide methodology. Finally, a class action is a superior means of litigating the Class members' claims because it is easily manageable, provides redress to investors who would otherwise be unable to pursue individual claims, and least taxes judicial resources.

In sum, for the reasons discussed below, Plaintiff respectfully requests that his Motion for Class Certification be granted in its entirety.

## II.   SUMMARY OF THE ALLEGATIONS[3]

### A.   Exela Misrepresented The True and Ongoing Expenses Of Its Business Through the Manipulation of "Adjusted EBITDA"

Exela is a business process automation ("BPA") provider. It was formed by the merger of SourceHOV and Novitex in July 2017 ("the Merger"). ¶70. Exela's securities trade on the NASDAQ under the ticker symbol "XELA." ¶30.

---

[2] The Report of Dr. Werner is Exhibit A to the Declaration of Kara Wolke ("Wolke Decl.").

[3] In this section, "¶_" citations are to the Second Amended Class Action Complaint. Dkt. No. 44.

Following the Merger, Defendants sought to drive revenue and margin growth by: expanding Exela's services within its existing customer base; winning larger contracts given its increased scale; leveraging BPA; and realizing cost savings from merger synergies. ¶¶4-5.

During the Class Period, Exela reported a non-GAAP financial metric, "adjusted EBITDA," which Defendants told investors was an "important indicator[] of performance" and would "provide useful information to investors in assessing our financial performance and results of operations." ¶¶5, 109. Defendants told investors that Exela's adjusted EBITDA, which added back supposedly "non-routine" charges to EBITDA, would "converge" with EBITDA as the Company realized cost savings from the Merger by consolidating operations. ¶¶5, 160. In other words, non-routine expenses were supposed to disappear after the Merger—otherwise they would not have been characterized as non-routine, nor added back to EBITDA.

When announcing its third quarter 2017 results on November 9, 2017, Exela included a reconciliation table between EBITDA and Adjusted EBITDA. ¶6. An explanation above that reconciliation table explained, "[o]ptimization & restructuring ["O&R"] expenses and merger adjustments are primarily related to the implementation of strategic actions and initiatives related to the business combination completed on July 12th, 2017." *Id.* In the same press release, the Company also told investors that "[t]he integration of SourceHOV and Novitex is essentially complete, and we are on track to achieve our merger synergy targets." *Id.*

The Class Period begins on March 16, 2018, when Exela filed its form 10-K for the year ended 2017. ¶239. In it, the Company misrepresented: (1) the nature of its revenue as being recurring and stable when it was not; (2) its Adjusted EBITDA as only excluding nonroutine expenses outside management's control; and (3) the liability it carried on its balance sheet related to pending litigation (discussed *infra*). ¶¶239-248.

3

Similarly, in announcing its first quarter 2018 results on May 11, 2018, Exela explained that "[a]djusted EBITDA and Further Adjusted EBITDA also seek to remove the effects of integration and related costs to achieve the savings, any expected reduction in operating expenses due to the business combination, asset base (such as depreciation and amortization) and other similar *non-routine items outside the control of our management team*." ¶¶7, 161.

In short, Defendants led investors to believe that O&R expenses were non-routine and/or aberrant expenses that management could not control—not ongoing and/or routine operating expenses within management's control. ¶8. Indeed, applicable accounting rules provide that certain one-time or non-recurring expenses can be added back to EBITDA to help investors assess what a normalized period of operations would look like absent such expenses. But that wasn't what Exela did. Exela added back O&R expenses to adjusted EBITDA even though such expenses continued *every single quarter*. ¶9. As the Restatement ultimately revealed, Exela misleadingly included substantial amounts of normal operating expenses as addbacks to adjusted EBITDA. ¶¶9, 156, 233. Moreover, this misleading accounting enabled Exela to achieve its 2018 annual guidance, and masked the true state of the Company's financial performance during the Class Period. ¶¶9, 156, 233.

**B.     Defendants Misrepresented The Nature And Composition of Exela's Revenue**

While adjusted EBITDA pertains to earnings, or the bottom line of the Income Statement, Defendants also made misrepresentations about revenue, or the top line of the Income Statement. Defendants did so by telling investors that Exela had 90% visibility into its revenue—because the revenue was supposedly recurring in nature due to long-term or auto-renewal customer contracts. ¶¶10, 166, 167, 177,197. This characterization of revenue was misleading because around 20% of Exela's revenue came from billing customers for passthrough postage costs, which was inconsistent and highly unpredictable, as Defendants later admitted. ¶10.

4

## C.      Misrepresentation and Omission of the Appraisal Liability

Defendants also made false or misleading statements about Exela's ability to estimate a liability in connection with an action brought by a group of minority shareholders of SourceHOV who sued for appraisal rights under Delaware law arising from the Merger.[4] As Exela's restatement would reveal, the Appraisal Action liability should have been recorded years earlier than it was. ¶¶222-25. In that Appraisal Action, the Delaware Court of Chancery found that Exela's Chair, Chadha—the former SourceHOV Chair—"lacked credibility," was "simply not believable" and "not at all forthright." 2020 WL 496606, at *19, *21.

## D.      When The Truth Was Revealed, Exela's Stock Got Decimated

Plaintiffs allege that the truth of Defendants' misrepresentations was revealed, and the undisclosed risks materialized, through a series of partial disclosures during the Class Period.

The first alleged partial corrective disclosure came after market close on November 8, 2018, when Exela announced its third quarter 2018 results and lowered its 2018 adjusted EBITDA guidance by approximately $18 million. ¶14. Among other things, Defendants disclosed that O&R addbacks had increased by 49.2% over 2Q'18 (from $13 million to $19.4 million), thus partially revealing that Exela's O&R addbacks were not non-routine costs.[5] ¶14. On this news, Exela's stock fell $0.96 per share, or 15.4%, to close at $5.28 on November 9, 2018. ¶14.

Then, after market close on March 18, 2019, Exela announced its fourth quarter and fiscal year 2018 results and reported that it believed it hit its "high watermark" of O&R expenses in 2018, but

---

[4] See *Manichaean Capital, LLC et al. v. SourceHOV Holdings, Inc. et al.*, Case No. 2017-0673-JRS (Del. Chancery) ("Appraisal Action"); *Manichaean Capital, LLC v. SourceHOV Holdings, Inc.,* 2020 WL 496606 (Del. Ch. Jan. 30, 2020), *reconsideration denied*, 2020 WL 1166067 (Del. Ch. Mar. 11, 2020), *and judgment entered*, 2020 WL1511189 (Del. Ch. March 26, 2020).

[5] Exela's subsequent Restatement would reveal that these reported adjusted EBITDA figures were misleadingly inflated. ¶¶165, 233

that such costs would continue and only "gradually" decline, despite seven straight quarters of incurring such (supposedly non-routine) costs. ¶¶15, 195. Defendants also disclosed that $14.2 million of the $21.2 million in fourth quarter 2018 O&R expenses related to headcount–thus partially revealing that Defendants prior categorization of such costs as being "outside the control of management" was patently false. ¶¶15, 195. Defendants also revealed "that the Company's disclosure controls and procedures were not [expected to be] effective." ¶15. Following this news, Exela's stock fell $0.21 per share, or 5.3%, to close at $3.73 per share on March 19, 2019 on heavy volume. The stock continued to fall on the following day by an additional $0.23 per share, or 6.2% to close at $3.50 per share on March 20, 2019. ¶15.

On May 9, 2019, the Company announced Q1 2019 results, which revealed that O&R addbacks again increased for the quarter by 78% over Q1 2018 (from $14.5m to $25.8m), thus further partially revealing that Exela's O&R addbacks were not non-routine costs that would decline over time to enable Exela's adjusted EBITDA to converge with traditional EBITDA. ¶¶16, 202-04. Following this news, Exela's stock fell 5.0%, to close at $3.21 on May 10, 2019. ¶16.

On May 22, 2019, Moody's announced that it downgraded Exela's debt rating from Caa1 from B3. Moody's lead analyst, Harold Steiner, was quoted as saying, "Exela's restructuring charges consist mostly of headcount that it expects to cut as it transitions to more technology-based BPA service offerings*… We believe these are normal operating expenses necessary to provide its service*…" ¶17, 210. In response to this news, which constituted an additional partial materialization of the risk of Defendants' misleading adjusted EBITDA accounting practices and further revealed that Exela's O&R expenses were merely ordinary operating expenses, Exela's stock fell $1.03 per share, or 35%, to close at $1.91 per share on May 23, 2019. ¶17.

On August 8, 2019, Exela reduced its 2019 revenue guidance, citing in part unpredictable postage revenue, partially revealing that the Company had extensive unpredictable nonrecurring low margin revenue, contrary to earlier representations about purportedly having highly predictable recurring revenue. ¶¶18, 217-220. Following this news, Exela's stock fell $1.17 per share, or 48%, to close at $1.28 per share on August 9, 2019. ¶18.

On November 12, 2019, Exela further reduced its 2019 revenue guidance, again citing unpredictable postage revenue and the continued impact of the low margin contract exited in 3Q'18, further revealing how much the Company's revenue consisted of unpredictable low margin revenue, rather than revenue that was "recurring in nature and supported by long-term customer contracts." ¶19. Following this news, Exela's stock fell $0.25 per share, or about 42%, to close at $0.35 per share on November 13, 2019 on heavy volume.

Finally, on March 16, 2020, Exela announced that it would delay filing its 2019 annual report and would restate its financial results for 2017, 2018, and the first three quarters of 2019. ¶20. After market close on March 17, 2020, the Company issued a press release announcing various accounting errors that had been made, including failing to record a liability related to the Appraisal Action since 2017, revealing that the Company had misrepresented its overall financial condition for years. ¶20. In response, Exela's stock fell $0.05 per share on heavy volume, to close at $0.15 per share on March 18, 2020. ¶20.

## III.   APPLICABLE STANDARDS FAVOR CLASS CERTIFICATION HERE

The Supreme Court has long recognized that securities fraud claims are well-suited as class actions. *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997) (noting predominance of common issues "is a test readily met in certain cases alleging…securities fraud").[6]

---

[6] *See also Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 313-14 (2007) ("This Court has long recognized that meritorious private actions to enforce federal antifraud securities laws are an

To be certified, a proposed class must satisfy the four prerequisites of Rule 23(a)—numerosity, commonality, typicality, and adequacy—as well as one subpart of Rule 23(b). *See Vine v. PLS Fin. Servs., Inc.,* 331 F.R.D. 325, 329-330 (E.D. Tex. 2019), *aff'd,* 807 F. App'x 320 (5th Cir. 2020) (class certification granted in a case involving violations of the Texas Deceptive Trade Practices Consumer Protection Act); *Torres v. S.G.E. Mgmt., L.L.C.*, 838 F.3d 629, 635 (5th Cir. 2016) (*en banc*). Rule 23 is "'a remedial rule which should be construed liberally to permit class actions, especially in the context of securities fraud suits, where the class action device can prove effective in deterring illegal activity.'" *In re Enron Corp. Sec. Deriv. & "ERISA" Litig.*, 529 F. Supp. 2d 644, 670 (S.D. Tex. 2006). Under Rule 23(b)(3), a plaintiff must establish "that 'the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.'" *Amgen*, 133 S. Ct. at 1191.

The merits of a class's claims are not at issue on a motion for class certification: "the question is not whether the plaintiff or plaintiffs . . . will prevail on the merits, but rather whether the requirements of Rule 23 are met." *Hackler v. Tolteca Enterprises, Inc.*, 2019 WL 7759523, n.2 (W.D. Tex. Sept. 9, 2019) (quoting *Miller v. Mackey Int'l Inc.*, 452 F.2d 424, 427 (5th Cir. 1971)). Indeed, as the Supreme Court held in *Halliburton I*, Plaintiffs need not prove loss causation at the class certification stage. *Erica P. John Fund, Inc. v. Halliburton Co.*, 131 S. Ct. 2179 (2011) ("*Halliburton I*") (overruling *Oscar Priv. Equity Invs. v. Allegiance Telecom, Inc.*, 487 F.3d 261, 269 (5th Cir.2007)). "Nothing in 'Basic or its logic' [ ] justif[ies] the Fifth Circuit's requirement that securities fraud

---

essential supplement to criminal prosecutions and civil enforcement"); *Halliburton I*, 563 U.S. at 2186-87 (vacating denial of class certification); *Amgen Inc. v. Connecticut Ret. Plans & Tr. Funds*, 133 S.Ct. 1184, 1194-1196 (2013) (affirming certification).

8

plaintiffs prove loss causation at the class certification stage." *Halliburton v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014) ("*Halliburton II*").

## IV.    The Class Is Ascertainable And The Requirements Of Rule 23(a) Are Met

Fed. R. Civ. P. 23(a) provides four requisite elements for class certification:

(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of those of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.

### A.    Plaintiff Satisfies Rule 23(a)(1): Numerosity

Rule 23(a)(1) is satisfied when a class is "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). A "plaintiff need not show the precise number of persons in the class to satisfy the requirement that joinder is impracticable where such a conclusion is clear from reasonable estimates." *In re Dynegy, Inc., Sec. Litig.*, 226 F.R.D. 263, 268 (S.D. Tex. 2005); *see also Rooney v. EZCORP, Inc.*, 330 F.R.D. 439, 445 (W.D. Tex. 2019) (granting class certification, noting, "although the exact number of class members is unknown" because the company had more than 50 million shares outstanding during the Class Period, and the average weekly trading volume was approximately 2.7 million shares). Instead, a reasonable estimate of the number of class members satisfies numerosity. *James v. City of Dallas*, 254 F.3d 551, 570 (5th Cir. 2001). Moreover, it is generally presumed that Rule 23(a)(1) has been met in securities suits. *Zeidman v. J. Ray McDermott & Co., Inc.*, 651 F.2d 1030, 1039 (5th Cir. 1981).[7]

The proposed Class here consists of purchasers Exela's publicly-traded securities during the

---

[7] *See also, In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (E.D. Tex. 2005) ("Any class composed of buyers and sellers of a nationally traded security during a period in which hundreds or thousands or millions of shares of the security were traded is necessarily so numerous that joinder of all members is impracticable"); *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *2 (S.D. Tex. Mar. 9, 2020) (class certification granted in securities case).

Class Period. While the exact number of Class members is presently unknown, Exela had around 150.9 million shares of common stock outstanding during the Class Period. Werner Report ¶105. Moreover, the average weekly trading volume during the Class Period was approximately 1.57 million shares. Werner Report ¶26, n.32. These facts establish numerosity.

### B.    Plaintiff Satisfies Rule 23(a)(2): Commonality

Rule 23(a)(2) is satisfied when "there are questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). The "commonality" threshold is low. *See Vine v. PLS Fin. Servs.*, *Inc.,* 331 F.R.D. 325, 332 (E.D. Tex. 2019), *aff'd*, 807 F. App'x 320 (5th Cir. 2020) (class certification granted in fraud case); *Forbush v. J.C. Penney Co.*, 994 F.2d 1101, 1106 (5th Cir.1993) (similar). Commonality is satisfied "when there is at least one issue, the resolution of which will affect all or a significant number of the putative class members." *Abboud v. Agentra, LLC*, 2020 WL 5526557, at *3 (N.D. Tex. Sept. 14, 2020); *cf. Lightbourn v. Cnty. of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997) (stating that commonality was met in a discrimination case where the issues included whether the defendant violated anti-discrimination statutes by failing to direct local election officials to enforce the statutes). In securities fraud cases, commonality is satisfied when claims are based on defendants' uniform misrepresentations to the investing public in SEC filings and press releases, these material misrepresentations and omissions artificially inflated the market price of company securities, and injured each class member who purchased the inflated securities. *Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303 (S.D. Tex. Nov. 13, 2019), *report and recommendation adopted*, 2019 WL 7020349 (S.D. Tex. Dec. 20, 2019) (class certification granted in a § 10(b) case) (citing *In re Elec. Data Sys. Corp. Sec. Litig.*, 226 F.R.D. 559, 564 (S.D. Tex. 2005)).

Plaintiff meets this standard as all Class members were injured similarly and the allegations in the SAC raise numerous common questions, including:

- whether Defendants' statements or omissions violated the Exchange Act;

- whether Defendants' statements and omissions were misleading;

- whether and to what extent the market price of Exela's securities was artificially inflated during the Class Period due to Defendants' misrepresentations and omissions;

- whether Defendants acted with scienter; and

- whether the members of the Class have sustained damages as a result of the alleged misconduct, and, if so, the proper measure thereof.

Accordingly, commonality has been established here because all Class members' claims depend on answers to the common questions above. *See In re Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *3 (S.D. Tex. Sept. 28, 2022) (granting class certification and holding that commonality existed where common evidence would answer the common legal questions); *In re Arthrocare Corp. Sec. Litig.*, 2011 WL 13175766, at *7 (W.D. Tex. Aug. 30, 2011) (similar).

### C.    Plaintiff Satisfies Rule 23(a)(3): Typicality

Rule 23(a)(3) is satisfied when the claims of the representative parties are "typical" of those of the class. Fed. R. Civ. P. 23(a)(3). "Like the test for commonality, the test for typicality, is not demanding."[8] *Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at *3 (E.D. Tex. Aug. 29, 2016), *report and recommendation adopted*, 2017 WL 907996 (E.D. Tex. Mar. 8, 2017) (securities case granting class certification "[b]ecause the Fund and the Class members both allege that the same misrepresentations and omissions caused the same result (artificially inflating the value of securities), [and thus] the Fund's claims are typical of the claims of the Class members.").[9] "Typicality is satisfied when the named plaintiffs' claims for relief arise from the same common nucleus of operative facts as the claims of absent class members." *In re Dell Inc. Sec. Litig.*, 2010 WL 2371834, at *4 (W.D. Tex.

---

[8] The Supreme Court has recognized that the "commonality and typicality requirements of Rule 23(a) tend to merge." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982).

[9] *See also Spegele v. USAA Life Ins. Co.*, 336 F.R.D. 537, 552 (W.D. Tex. 2020) (class certification granted in case involving breach of contract and conversion).

11

June 11, 2010) *aff'd, appeal dism'd sub nom. Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632 (5th Cir. 2012) (class certification granted in securities case).[10] "If the claims arise from a similar course of conduct and share the same legal theory, factual differences will not defeat typicality.'" *Marcus v. J.C. Penney Co., Inc.*, 2016 WL 8604331, at \*4 (citation omitted). Rule 23 does not require the lead plaintiff to be identically situated with all class members. *See Stirman v. Exxon Corp.*, 280 F.3d 554, 562 (5th Cir. 2002).

Here, Plaintiff's claims and legal theories are typical of the Class. As with the other members of the Class, Plaintiff's claims are based on the alleged artificial inflation of the price of Exela securities as a result of Defendants' alleged misrepresentations and omissions. Plaintiff also is alleged to have suffered the same theory of damages as other putative Class members when the truth about Exela's fraud was revealed. Wolke Decl. Ex. B (Declaration Dr. Insur Shamgunov ("Shamgunov Decl.")); ¶¶326-345.[11] Therefore, the typicality requirement is satisfied. *Dynegy*, 226 F.R.D. at 287-88 (typicality satisfied based on defendants' "conduct that would have injured all members of the putative class").

### D.    Plaintiff Satisfies Rule 23(a)(3): Adequacy

Rule 23(a) requires that "the class representatives . . . fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Adequacy examines the 'zeal and competence' of counsel and

---

[10] *See also Ramirez v. J.C. Penney Corp., Inc.*, 2017 WL 6462355, at \*2 (E.D. Tex. Nov. 30, 2017), *report and recommendation adopted*, 2017 WL 6453012 (E.D. Tex. Dec. 18, 2017).

[11] That Plaintiff bought more stock after a partial corrective disclosure does not defeat typicality. *See Loc. 703, I.B. of T. Grocery & Food Emps. Welfare Fund v. Regions Fin. Corp.*, 762 F.3d 1248, 1260 (11th Cir. 2014) ("Neither are we persuaded by Regions's argument that District 9's post-disclosure purchases render it atypical. We agree with our colleagues from the Fifth Circuit that 'reliance on the integrity of the market prior to disclosure of alleged fraud (*i.e.* during the class period) is unlikely to be defeated by post-disclosure reliance on the integrity of the market.'"); *Lehocky v. Tidel Technologies, Inc.*, 220 F.R.D. 491, 501–02 (S.D. Tex. 2004) (buying stock after negative announcements during the class period. . . do not destroy typicality").

12

the willingness and ability of the plaintiff to take an active role in controlling the litigation. *Prause v. TechnipFMC, PLC*, 2020 WL 3549686, at *4 (S.D. Tex. Mar. 9, 2020); *KB Partners I, L.P. v. Barbier*, 2013 WL 2443217, at *11 (W.D. Tex. June 4, 2013) (citing cases). Two factors inform adequacy of a proposed class representative: (1) whether he or she is "part of the class and possess the same interest and suffer the same injury as the class members"; and (2) whether he or she has any interests antagonistic to the class. *In re Deepwater Horizon,* 785 F.3d 1003, 1015 (5th Cir. 2015).

Here, Plaintiff's interests are entirely aligned with those of the Class. Plaintiff's claims rely on the same wrongful conduct that gives rise to the claims of the Class: Plaintiff and all members of the proposed Class purchased Exela stock at artificially inflated prices as a result of the same alleged misrepresentations and omissions disseminated to the public by Defendants. Shamgunov Decl. ¶¶2-3. Moreover, Plaintiff has no interests that conflict with the Class. *Cf. Monroe Cnty. Employees' Ret. Sys. v. S. Co*., 332 F.R.D. 370, 379 (N.D. Ga. 2019) ("the conflict must be fundamental, which goes to the specific issues in controversy."). Just as the members of the Class he seeks to represent, Plaintiff has a strong interest in proving that the alleged statements were materially misleading, made with scienter, and damaged Exela investors.

Plaintiff has also demonstrated a commitment to vigorously prosecute this action on behalf of absent Class members. Plaintiff has actively supervised and monitored this case since its inception by communicating and working with Lead Counsel, resulting in (i) his appointment as Lead Plaintiff; (ii) the drafting of two comprehensive amended complaints and briefing on two motions to dismiss those complaints, (iii) the defeat of Defendants' second motion to dismiss; (iv) the completion of substantial discovery in furtherance of Plaintiff's and proposed Class Counsel's efforts to prove the alleged Class-wide claims; and (v) the instant motion to certify the Class and serve as Class Representative. Shamgunov Decl. ¶¶5-6. Additionally, Plaintiff has agreed to make himself available for deposition,

has produced documents, and has responded to written discovery requests, including interrogatories. *Id.* ¶7. Thus, Plaintiff is adequate. *See, e.g.*, *Buettgen v. Harless*, 2011 WL 1938130, at \*5 (N.D. Tex. May 19, 2011) (proposed class representatives were adequate because they were kept informed of the progress of the lawsuit; were producing documents; and one of two proposed representatives had been deposed).

Lead Counsel have extensive experience in the field of securities litigation, and their vigorous pursuit of the Class's interests has already been demonstrated by their advancement of the Class's claims before this Court. *See* Wolke Decl. Ex. C (firm résumé). For these reasons, and because Lead Counsel have devoted substantial time and resources to the litigation,[12] and will continue to do so, Lead Counsel also satisfies the considerations of Rule 23(g) and should be appointed Class Counsel.[13]

## V.      RULE 23(b)(3) PREDOMINANCE AND SUPERIORITY ARE MET

### A.      Common Questions of Law and Fact Predominate

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem*, 521 U.S. at 623. "[T]he predominance requirement is met if the plaintiff can establish that the issues in the class action that are subject to generalized proof, and thus applicable to the class as a whole, . . . predominate over those issues that are subject only to individualized proof." *Brown v. Kelly*, 609 F.3d 467, 483 (2d Cir. 2010); *Erica P. John Fund, Inc. v. Halliburton Co.*, 718 F.3d 423, 431 (5th Cir. 2013) (predominance inquiry asks

---

[12] Lead Counsel have performed substantial work and have committed substantial resources to litigating this action, including researching and drafting two substantial amended complaints, defeating a motion to dismiss, conducting substantial discovery, retaining relevant experts, and drafting the instant motion.

[13] *Buettgen*, 2011 WL 1938130, at \*10 (appointing firm as class counsel where it "has substantial experience in class actions in general and securities class actions in particular. The firm has demonstrated its knowledge of securities law and its willingness to expend resources to properly pursue this action.").

"not whether the plaintiffs will fail or succeed, but whether they will fail or succeed *together*.") *vacated on other grounds*, 134 S. Ct. 2398 (2014).   "Predominance is a test readily met in certain cases alleging securities fraud." *Amchem*, 521 U.S. at 625. In cases under §10(b) of the Exchange Act and SEC Rule 10b-5, the elements of falsity, materiality, scienter, and loss causation are subject to class-wide proof.[14] Thus, "[w]hether common questions of law or fact predominate in a securities fraud action often turns on the element of reliance." *See Halliburton I*, 131 S. Ct at 2184-85. And here, class-wide reliance is presumed under the *Basic* fraud-on-the-market presumption. *Basic*, 485 U.S. at 224.

### B.       Plaintiff is Entitled to a Presumption of Reliance Under *Basic*

Under the *Basic* fraud-on-the-market doctrine, a proposed class representative may:

> satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation.

*Halliburton II*, 134 S. Ct. at 2417. To invoke this presumption, a plaintiff must show: "(1) that the alleged misrepresentations were publicly known, (2) that they were material, (3) that the stock traded in an efficient market, and (4) that the plaintiff traded the stock between the time the misrepresentations were made and when the truth was revealed." *Id.* at 2408.

Here, there is no dispute that the alleged misrepresentations were publicly issued, nor that Plaintiff bought Exela securities during the Class Period after such alleged misrepresentations were made, but before the revelation of the full truth the misrepresentations.[15] As discussed below, the final requirement, that Exela's securities trade in an efficient market, is supported by Dr. Werner's Report (§ V, ¶¶14-110) and substantial case law (*see* § V.B.1 *infra*).

---

[14] *See, e.g.*, *Amgen*, 133 S. Ct. at 1190 (materiality "is question common to all members of the class"); *Basic Inc. v. Levinson*, 485 U.S. 224, 241 (1988) (reliance); *Halliburton I*, 131 S. Ct. 2185-86 (loss causation); *Ludlow v. BP, P.L.C.*, 800 F.3d 674, 687 (5th Cir. 2015) (damages).
[15] *See* Dkt No. 9 (Ex. A attached thereto) (Shamgunov Certification).

### 1. NASDAQ Listed, Exela Is Presumed To Trade In An Efficient Market

Courts across the country, including in the Fifth Circuit, have concluded that if a stock is listed on NASDAQ, as Exela is, then there is a rebuttable presumption that such stock trades in an efficient market. *E.g.*, *EZCORP*, 330 F.R.D. at 448-449 (noting that defendants likely did not contest that EZCORP's stock trades in an efficient market because the stock traded on the NASDAQ, "one of the largest markets in the world"); *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *10 (C.D. Cal. Jan. 5, 2017) ("there is a presumption that stocks traded on the NASDAQ are efficient"); *Lumen v. Anderson*, 280 F.R.D. 451, 459 (W.D. Mo. 2012) ("It would be remarkable for a court to conclude NASDAQ is not an efficient market—which is why securities traded on NASDAQ are often presumed to be traded on an efficient market.").[16] Thus, market efficiency may be presumed here.

At the very least, NASDAQ listing strongly supports market efficiency. *In re Initial Public Offering Sec. Litig.*, 544 F. Supp. 2d 277, 296 n.133 (S.D.N.Y. 2008) ("the federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency"); *In re Accredo Health, Inc. Sec. Litig.*, 2006 WL 1716910, at *8 (W.D. Tenn. Apr. 19, 2006) ("the overwhelming case authority holds that securities listed on the NASDAQ trade in an efficient market"); *Smilovits v. First Solar, Inc.*, 295 F.R.D. 423, 431 (D. Ariz. 2013) ("[T]he Court concludes that the trading of First Solar stock on NASDAQ--a major, well-developed stock exchange--weighs in favor of finding market efficiency.").

---

[16] See also *In re DVI, Inc. Sec. Litig.*, 639 F.3d at 634 ("the listing of a security on a major exchange such as the NYSE or the NASDAQ weighs in favor of a finding of market efficiency"), *abrogated on other grounds by Amgen*, 133 S. Ct. at 1184; *Carpenters Pension Tr. Fund of St. Louis v. Barclays PLC*, 310 F.R.D. 69, 81 (S.D.N.Y. 2015) (listing on the NYSE or NASDAQ is a "good indicator of efficiency"); *Hodges v. Akeena Solar, Inc.*, 274 F.R.D. 259, 269 (N.D. Cal. 2011) (same); *In re HealthSouth Corp. Sec. Litig.*, 257 F.R.D. 260, 281 (N.D. Ala. 2009) (similar).

### 2.    Market Efficiency Factors Indicate Market Efficiency Here

Neither the Supreme Court nor the Fifth Circuit has adopted a formal test for market efficiency. *Unger v. Amedisys, Inc.*, 401 F.3d 316, 324 (5th Cir. 2005); *see also EZCORP,* at 439, n.7.  District courts in this Circuit and elsewhere, however, routinely consider the non-exhaustive factors derived from *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) and *Krogman v. Sterritt*, 202 F.R.D. 467, 478 (N.D. Tex. 2001), in determining whether a security trades in an efficient market:

> (1) the average weekly trading volume expressed as a percentage of total outstanding shares; (2) the number of securities analysts following and reporting on the stock; (3) the extent to which market makers and arbitrageurs trade in the stock; (4) the company's eligibility to file SEC registration Form S-3 (as opposed to Form S-1 or S-2); (5) the existence of empirical facts "showing a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price"; (6) the company's market capitalization; (7) the bid-ask spread for stock sales; and (8) float, the stock's trading volume without counting insider-owned stock.

*Unger*, 401 F.3d at 323 (citing *Cammer*, 711 F. Supp. at 1286-87, *Krogman*, 202 F.R.D. at 478).

Here, each factor demonstrates that Exela stock traded in an efficient market.

**1. Exela Stock had a High Weekly Trading Volume**. During the Class Period, Exela's stock had average weekly trading volume of 1.57 million shares. Werner Report ¶26, n.32. That average volume translates to 1.04% of outstanding Exela shares—above the 1% threshold set by *Cammer* as creating a "substantial presumption" of market efficiency. *See Cammer*, 711 F. Supp. 2d at 1286; *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 508 (S.D. Tex. 2004) ("there is a substantial presumption of an efficient market if the securities' average weekly trading volume is 1% or more of the total outstanding shares."). Moreover, when comparing Exela's trading turnover to its float, the figure rose to 4.6%, or more than double the 2.0% turnover which creates a "strong presumption" of market efficiency under *Cammer*. Werner Report ¶27. Thus, the first *Cammer* factor, Exela's weekly trading volume, supports a "strong" *and* "substantial" presumption of an efficient market.

17

**2. Exela's Analyst Coverage Supports Efficiency.** Substantial analyst coverage on a security "supports a finding of market efficiency because it permits an inference that financial statements relating to a security are closely watched by investment professionals, who in turn inject their views on the company and the security into the market." *In re Winstar Commc'ns Sec. Litig.*, 290 F.R.D. 437, 446 (S.D.N.Y. 2013). Courts also consider the extent of analyst coverage in connection with related factors, including the amount of news coverage on a company and the degree of institutional ownership.[17]

Here, at least four analysts published reports on Exela during the Class Period, issuing at least 40 reports on the Company during that timeframe. Werner Report ¶29, n.36. This analyst coverage included major firms such as Morgan Stanley, Cantor Fitzgerald, and RBC Capital Markets. *Id.* This level of analyst coverage tracks the level of coverage found by courts to support a finding of efficiency. *See, e.g.*, *Cammer*, 711 F. Supp. at 1283 n.30 (publication of 15 research reports by an undisclosed number of analysts over roughly one-year period supported efficiency); *In re DVI Inc. Sec. Litig.*, 249 F.R.D. 196, 209-10 (E.D. Penn. 2008) (three analysts covering stock supported efficiency); *In re Nature's Sunshine Prod's., Sec. Litig.*, 251 F.R.D. 656, 662-63 (D. Utah 2008) (four analysts supported efficiency).

---

[17] *E.g.*, *In re Xcelera.com Sec. Litig.*, 430 F.3d 503, 514-15 (1st Cir. 2005) (affirming district court's determination of market efficiency, where just *one* analyst followed the company's stock and issued only one report during a 16-month class period, but information was widely distributed through other sources, including news articles, press releases, SEC filings, and institutional investors invested in the stock); *Todd*, 2017 WL 821662, at *7 (ownership of company's stock by major institutions bolstered the second *Cammer* factor).

Information about Exela was also disseminated to the market through a variety of other means, including buy-side analysts at major institutions,[18] news articles,[19] press releases, SEC filings, public investor presentations, credit rating agencies (*e.g.*, Werner Report  ¶¶29-31), and conference calls attended by major Wall Street firms. *See* Werner Report ¶¶29-31. These facts further support the conclusion that Exela's financial performance was "closely watched by investment professionals," whose views were rapidly incorporated into the stock price. *Winstar*, 290 F.R.D. at 446. Thus, the second *Cammer* factor supports a finding of market efficiency.

**3. The Number Of Market Makers For Exela Stock Supports Efficiency.** "The existence of market makers and arbitrageurs would ensure completion of the market mechanism; these individuals would react swiftly to company news and reported financial results by buying or selling stock and driving it to a changed price level." *Cammer*, 711 F. Supp. at 1286-87. As noted above, stocks listed on NASDAQ — a modern market that uses a centralized computer system to match orders and provide quotes on a continuous and public basis—are presumed to be efficient. *See* § V.B.1 *supra*. Even so, there were 90 market makers for Exela's NASDAQ-listed stock, (Werner Report ¶34), which exceeds—by more than eightfold—the eleven market makers *Cammer* found sufficient for promoting market efficiency.[20] Therefore, the third *Cammer* factor supports market efficiency.

---

[18] At least 133 major institutions owned Exela stock during the Class Period. Werner Report ¶36. This implies that significant buy-side analysis was likely available to institutional investors and bolsters the conclusion that Exela's stock traded in an efficient market. *See* Werner Report ¶¶35-37; *Todd*, 2017 WL 821662, at *7 (finding of efficiency strengthened where 122 major institutions owned company's stock during class period).

[19] Over 233 articles were published about Exela during the Class Period. Werner Report ¶31.

[20] *See Cammer*, 711 F. Supp. at 1283 n.30 (noting stock at issue had eleven market makers); *see also id.* at 1293 ("'Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.'") (quotation omitted).

4.   **Exela Was Eligible To, And Did, File Form S-3s.** A company must meet certain float ($75 million) and other requirements to be eligible for Form S-3 registration, which allows companies to file a shortened form with the SEC to raise additional capital. Werner Report ¶¶38-40. Eligibility to file a Form S-3 registration statement is relevant to market efficiency because Form S-3 registration is "'predicated on the Commission's belief that the market operates efficiently for these companies.'" *Cammer*, 711 F. Supp. at 1284. Exela met the important eligibility criteria for filing Form S-3 before and during the Class Period. Werner Report. ¶¶38-43. Thus, the fourth *Cammer* factor supports market efficiency.

5.   **Exela's Stock Price Reacted To New, Company-Specific Information.** The fifth *Cammer* factor examines whether empirical evidence demonstrates "a cause and effect relationship between unexpected corporate events or financial releases and an immediate response in the stock price." *Cammer*, 711 F. Supp. at 1287. This factor is widely understood to provide direct evidence of market efficiency, but is not *necessary* to show efficiency, especially where, as here, the showing on the other *Cammer* factors indicating efficiency is strong. *Carpenters*, 310 F.R.D. at 83 (citing First, Second, Third, Fourth, Fifth, and Eleventh Circuit cases holding that the fifth *Cammer* factor is unnecessary). Indeed, "[r]equiring a plaintiff to submit proof of market reactions–and to do so with an event study–ignores Supreme Court precedent as well as practical considerations." *Carpenters*, 310 F.R.D. at 84; *Malriat v. Quantumscape Corp.*, 2022 WL 17974629, at *13 (N.D. Cal. Dec. 19, 2022) ("Plaintiffs may prove market efficiency without satisfying the cause-and-effect factor, which suggests that even if this factor undisputedly favored defendants, plaintiffs still may be entitled to the fraud on the market presumption") (collecting cases, quotations omitted).

Still, while not required, Dr. Werner's Report provides evidence that supports this factor. By performing an event study analyzing Exela's share price movements, Dr. Werner shows that Exela's

20

share price responded to new, Company-specific news during the Class Period. Werner Report ¶¶44-98; Exs. 8-10; *cf. Halliburton II*, 134 S. Ct. at 2415 (event studies are "regression analyses that seek to show that the market price of the defendant's stock tends to respond to pertinent publicly reported events"). As explained in Dr. Werner's Report, the event study and other analyses he performed here identified a cause-and-effect relationship between the release of new, Exela-specific information and the corresponding movement in Exela's stock price. *Id*. ¶¶44-98. Dr. Werner's event study identified seven event dates identified where important, relevant, and material Company-specific information was disclosed during the Class Period. ¶53. He then used a market model to determine how much of the Company's stock price return on each event date was driven by that company-specific information rather than general market and/or industry factors. Dr. Werner determined that the event dates were linked to statistically significant abnormal returns, which reflects market efficiency. *Id.* ¶¶62-83.

Dr. Werner's Report also demonstrates the cause-and-effect relationship by comparing Exela's share price movements on "news days" against the movement that would have been expected based on analysis of a Market Index and an Industry Index. *Id.* ¶¶84-97. As explained in Dr. Werner's Report, 20.49% of the news dates analyzed saw stock price movements that were statistically significant at the 95% level, compared to 4.72% of the trading days with little to no news. *Id*. ¶¶94-96. The difference between these two percentages is statistically significant at the 99% level, providing additional strong direct evidence of a cause-and-effect relationship between Exela-specific news and its Common Stock price movements. *Id*. ¶97. Accordingly, the fifth *Cammer* factor supports a finding of market efficiency.

**6. Exela Had A Sufficiently Large Market Cap To Support Efficiency.** "Market capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in

more highly capitalized corporations." *Krogman*, 202 F.R.D. at 478. During the Class Period, the aggregate market capitalization ("market cap") of Exela's common stock averaged $489 million, larger than 53% of public companies within the market composite during the Class Period. Werner Report ¶¶102-103. This supports efficiency. *In re Netbank, Inc. Sec. Litig.*, 259 F.R.D. 656, 672 (N.D. Ga. 2009) (52 percentile market cap weighed towards efficiency). Moreover, Exela's market cap was big enough to attract analyst *and* news coverage, and gain attention of many investors (*see* §§ V.B.2 (2-5) *supra*)—further establishing market efficiency. *McIntire v. China MediaExpress Holdings, Inc.*, 38 F. Supp. 3d 415, 433 (S.D.N.Y. 2014) (market cap ranging between $292 and $585 million pointed to market efficiency).

      **7.   Exela's Public Float**. While not a *Cammer* factor, courts also consider public float—the percentage of shares held by the public, rather than insiders and affiliates—in assessing market efficiency. *Anadarko Petroleum Corp. Sec. Litig.*, 2022 WL 4544235, at *6. Exela's public float of 111.1 million, or 22.6% of shares outstanding, neither indicates market efficiency nor undermines it. *See* Werner Report ¶¶41, 104-106. Because all other factors indicate efficiency, a finding of efficiency is appropriate here. *In re NII Holdings, Inc. Sec. Litig.*, 311 F.R.D. 401, 413 (E.D. Va. 2015) ("even if [one] *Cammer* factor were considered weak, the evidence offered in support of the other *Cammer* factors as well as the non-Cammer factors is more than sufficient to demonstrate by a preponderance of the evidence that the stock[ ] [ ] at issue traded in an efficient market.").[21]

      **8.      Exela Had A Narrow Bid-Ask Spread**. Evidence of a small spread between bid and ask prices also supports market efficiency.[22] *E.g.*, *Krogman*, 202 F.R.D. at 474, 478; *Anadarko*

---

[21]Public float is not a *Cammer* factor, so all *Cammer* factors still point towards efficiency here.

[22] The bid-ask spread is the difference between the price at which market makers are offering to buy/sell the security. The bid-ask spread will tend to be narrow for actively traded securities where information is readily available. Moreover, a narrow bid-ask spread makes trading in the security less costly for investors. Werner Report. ¶107.

*Petroleum*, 2022 WL 4544235, at \*6. During the Class Period, the average bid-ask spread for Exela common stock was 0.53%--which is below the average bid-ask spread of an index approximating the overall stock market, further supporting efficiency. Werner Report ¶¶107-110.

In sum, Exela's stock was efficient throughout the Class Period. The Class is thus entitled to a presumption that each member relied on the alleged false and misleading statements at issue. *Basic*, 485 U.S. at 247. Therefore, there is no requirement for individual proof of reliance and common issues will predominate: this action should proceed as a class. *Id.*

### C. Damages Can Be Determined By A Class-Wide Methodology

Courts routinely find that damages in securities cases present common questions because they can be calculated by measuring the price impact of company-specific information alleged to be a corrective disclosure on a class-wide basis. *See EZCORP,* 330 F.R.D. at 450-451 (holding that Plaintiffs and their expert report adequately articulated how alleged damages could be calculated on a class-wide basis); *see also In re Barrick Gold Sec. Litig.*, 314 F.R.D. 91, 106 (S.D.N.Y. 2016) (damages issues did not defeat predominance because calculation of damages called for the application of a damages model across the entire class).[23]

Here, damages can be readily calculated on a class-wide basis using the same kind of generally accepted event study methodology. Werner Report ¶¶112-114. Using such an event study, the artificial inflation caused by false statements and omissions can be measured on a class-wide basis by analyzing the change in the stock price caused by a corrective disclosure. *Id.* Once the daily levels of price inflation have been calculated throughout the Class Period, a Class member's actual trading activity

---

[23] *See also Arthrocare*, 2011 WL 13175766, at \*8 ("Although class members will have to separately establish how much ArthroCare stock they owned, when they owned it, and the damages they suffered, the common questions identified above can be fairly said to predominate over the individual questions.").

in the security can be used to mechanically calculate damages on an individual basis. *Id.*; *In re First RepublicBank Sec. Litig.*, 1989 WL 108795, at \*7, n.18 (N.D. Tex. Aug. 1, 1989) ("Differences among class members' damages is inherent in securities litigation, but do not render individual questions predominate nor defeat class action treatment."); *see also EZCORP,* at 451. Because this methodology tracks the class-wide theory of liability[24] and allows class-wide damages measurement, common issues predominate.

###### D. The Same Common Issues Predominate As To The § 20(a) Claims

Plaintiff's showing above that the § 10(b) claim meets the reliance presumption likewise shows that Plaintiff's claim under § 20(a) is also satisfied. *In re Merck & Co., Inc. Sec., Deriv. & "ERISA" Litig.*, 2013 WL 396117, at \*13 (D.N.J. Jan. 30, 2013) (finding that the same predominance analysis applies to § 20(a) claims as for Rule 10b-5 violations).

###### E. A Class Action Is Superior To Other Litigation Methods

A class action is a superior method for resolving the claims here because it will provide the most fair and efficient method of adjudication. Courts in this Circuit recognize the efficiency of class actions for redressing injuries to large groups harmed by a common set of operative facts. *See, e.g.*, *Prause*, 2020 WL 3549686, at \*7 (class certification granted in securities case); *Keasler v. Natural Gas Pipeline Co.*, 84 F.R.D. 364, 368 (E.D. Tex. 1979) ("It is desirable that securities fraud cases involving a large number of plaintiffs with small individual claims proceed as class actions."); *Longden v. Sunderman*, 123 F.R.D. 547, 551 (N.D. Tex. 1988) (same).[25]

---

[24] Plaintiff's theory of liability is that Defendants' materially false and misleading statements and omissions artificially inflated the price of Exela's common stock, that Class members then relied on the inflated market price in purchasing that stock, and were then damaged when the truth was disclosed and the artificial stock price inflation dissipated.

[25] Superiority is also found when each class member's interest in the litigation is less than the anticipated cost of litigating individually. *Henry v. Cash Today, Inc.*, 199 F.R.D. 566, 573 (S.D. Tex.

> In considering superiority under Rule 23(b)(3), courts analyze four factors:
>
> A) the class members' interests in individually controlling the prosecution . . . of separate actions; B) the extent and nature of any litigation concerning the controversy already begun by . . . class members; C) the desirability…of concentrating the litigation of the claims in the particular forum; and D) the likely difficulties to be encountered in managing a class action.

Fed. R. Civ. P. 23(b)(3). These factors all support class certification here.

There is no indication that members of the proposed Class would prefer to prosecute their claims individually, and Lead Counsel are unaware of any other cases involving the same claims. The fraud here, like "[m]ost violations of the federal securities laws . . . inflict[s] economic injury on large numbers of geographically dispersed persons such that the cost of pursuing individual litigation to seek recovery is often not feasible." *In re Blech Sec. Litig.*, 187 F.R.D. 97, 107 (S.D.N.Y. 1999); *Buettgen*, 2011 WL 1938130, at \*9; *EZCORP,* at 451-452. Finally, securities class actions generally raise no unusual manageability issues. *See, e.g.*, *Buettgen*, 2011 WL 1938130, at \*9. Thus, a class action is the superior method for the efficient adjudication of the Class's claims.

## VI.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court grant his motion.

///

///

///

///

///

///

---

2000); *cf. Prause,* 2020 WL 3549686, at \*7 ("given the number of plaintiffs with small claims, concentrating the litigation in this Court promotes judicial efficiency and economy").

Dated: April 14, 2023

**GLANCY PRONGAY & MURRAY LLP**


By:  *Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
Raymond D. Sulentic (*pro hac vice*)
1925 Century Park East, Suite 2100
Los Angeles, CA 90067
Telephone: (310) 201-9150
Facsimile: (310) 201-9160
Email: kwolke@glancylaw.com
Email: rsulentic@glancylaw.com


*Lead Counsel for the Class*


Joe Kendall (Texas Bar No. 11260700)
**KENDALL LAW GROUP, PLLC**
3811 Turtle Creek Blvd., Suite 1450
Dallas, Texas 75219
Telephone: (214) 744-3000
Facsimile: (214) 744-3015
Email: jkendall@kendalllawgroup.com


*Local Counsel for the Class*

26

## PROOF OF SERVICE

I hereby certify that on this 14th day of April, 2023, a true and correct copy of the foregoing

document was served via CM/ECF to the parties registered on the Court's CM/ECF system.

*s/ Kara M. Wolke*
Kara M. Wolke

27