**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | |
|---|---|
| BO SHEN, Individually and on Behalf of All Others Similarly Situated, | |
| Plaintiffs, | Case No. 3:20-CV-00691-D |
| v. | |
| EXELA TECHNOLOGIES, INC., RONALD COGBURN, JAMES G. REYNOLDS, and PAR CHADA | **CLASS ACTION** |
| Defendants. | |

**LEAD COUNSEL'S: (I) MOTION FOR AN AWARD OF ATTORNEYS' FEES AND REIMBURSEMENT OF LITIGATION EXPENSES; AND (II) MEMORANDUM OF LAW IN SUPPORT THEREOF**

**TABLE OF CONTENTS**

I.     INTRODUCTION ........................................................................................................ 1

II.    SUMMARY OF FACTUAL AND PROCEDURAL HISTORY ....................................... 5

III.   PLAINTIFF'S COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND .................................................. 5

IV.    THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER BOTH THE PERCENTAGE METHOD AND THE LODESTAR METHOD ...................................... 6

       A.    The Court Should Apply The Percentage Method .................................................... 7

       B.    An Award Of 33⅓% Is Appropriate Under The Percentage Method .................... 8

       C.    The Requested Fee Is Appropriate Even Under The Lodestar Method ................. 9

V.     THE *JOHNSON* FACTORS CONFIRM THE REASONABLENESS OF THE REQUESTED FEE ..................................................................................................... 12

       A.    The Time And Labor Required ............................................................................. 12

       B.    Novelty And Difficulty Of The Issues .................................................................. 15

       C.    The Skill Required To Perform The Legal Service Adequately And The Experience, Reputation, And Ability Of The Attorneys ....................................... 17

       D.    The Preclusion Of Other Employment .................................................................. 18

       E.    The Customary Fee For Similar Work In The Community ................................... 19

       F.    Whether The Fee Is Fixed Or Contingent ............................................................. 19

       G.    Time Limitations/Nature And Length Of Attorney-Client Relationship .............. 20

       H.    The Amount Involved And The Results Obtained ................................................ 20

       I.    The Undesirability Of The Case ........................................................................... 21

       J.    Awards In Similar Cases ...................................................................................... 23

VI.    LEAD COUNSEL'S EXPENSES SHOULD BE REIMBURSED ................................. 23

VII.   LEAD PLAINTIFF SHOULD BE GRANTED A PSLRA AWARD ............................. 24

VIII.  CONCLUSION ......................................................................................................... 25

i

# TABLE OF AUTHORITIES

CASES

*Alaska Elec. Pension Fund v. Flowserve Corp.*,
572 F.3d 221 (5th Cir. 2009) ...................................................................................... 22

*Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*,
2019 WL 387409 (S.D. Tex. Jan. 30, 2019) .......................................................... 8, 9

*Anixter v. Home-Stake Prod. Co.*,
77 F.3d 1215 (10th Cir. 1996) ...................................................................................... 3

*Backman v. Polaroid Corp.*,
910 F.2d 10 (1st Cir. 1990) ........................................................................................ 22

*Barton v. Drummond Co.*,
636 F.2d 978 (5th Cir. 1981) ........................................................................................ 5

*Bell v. Pension Comm. of ATH Holding Co., LLC*,
2019 WL 4193376 (S.D. Ind. Sept. 4, 2019) .............................................................. 5

*Blum v. Stenson*,
465 U.S. 886 (1984) ...................................................................................................... 7

*Boeing Co. v. Van Gemert*,
444 U.S. 472 (1980) .................................................................................................. 5, 7

*Buettgen v. Harless*,
2013 WL 12303194 (N.D. Tex. Nov. 13, 2013) ................................................... 19, 21

*Burford v. Cargill, Inc.*,
2012 WL 5471985 (W.D. La. Nov. 8, 2012) ......................................... 8, 11, 18, 19

*Celeste Neely v. Intrusion Inc.*,
2022 WL 17736350 (E.D. Tex. Dec. 16, 2022) ................................................... 16, 21

*City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*,
2015 WL 965696 (W.D. La. Mar. 3, 2015) ........................................... 8, 15, 16, 17

*Clark v. Lomas & Nettleton Fin. Corp.*,
79 F.R.D. 641 (N.D. Tex. 1978) ................................................................................ 15

*Dura Pharms., Inc., v. Broudo*,
544 U.S. 336 (2005) .................................................................................................... 21

*Erica P. John Fund, Inc. v. Halliburton Co.*,
   2018 WL 1942227 (N.D. Tex. Apr. 25, 2018) ..................................................... *passim*

*Garza v. Sporting Goods Props., Inc.*,
   1996 WL 56247 (W.D. Tex. Feb. 6, 1996) .............................................................. 19

*Glickenhaus & Co. v. Household Int'l, Inc.*,
   787 F.3d 408 (7th Cir. 2015) .................................................................................. 3

*Goldberger v. Integrated Res., Inc.*,
   209 F.3d 43 (2d Cir. 2000) .................................................................................... 16

*Goldstein v. MCI Worldcom*,
   340 F.3d 238 (5th Cir. 2003) ................................................................................ 22

*Gross v. GFI Grp., Inc.*,
   784 F. App'x. 27 (2d Cir. 2019) ........................................................................... 16

*Guevoura Fund Ltd. v. Sillerman*,
   2019 WL 6889901 (S.D.N.Y. Dec. 18, 2019) ...................................................... 24

*Hefler v. Wells Fargo & Co.*,
   2018 WL 6619983 (N.D. Cal. Dec. 18, 2018) ......................................................... 2

*IBEW v. Int'l Game Tech., Inc.*,
   2012 WL 5199742 (D. Nev. Oct. 19, 2012) .......................................................... 21

*In re Apple Computer Sec. Litig.*,
   1991 WL 238298 (N.D. Cal. Sept. 6, 1991) ............................................................ 3

*In re Arthrocare Corp. Sec. Litig.*,
   2012 WL 12951371 (W.D. Tex. June 4, 2012) ........................................................ 8

*In re BankAtlantic Bancorp, Inc. Sec. Litig.*,
   2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) .................................................... 3, 20

*In re Cendant Corp. Litig*,
   264 F.3d 201 (3d Cir. 2001) .................................................................................. 16

*In re Dell Inc.*,
   2010 WL 2371834 (W.D. Tex. June 11, 2010) ................................................ 20, 21

*In re Enron Corp. Secs., Derivative & ERISA Litig.*,
   586 F. Supp. 2d 732 (S.D. Tex. 2008) ............................................................. 10, 11

iii

*In re EZCORP, Inc. Sec. Litig.*,
2019 WL 6649017 (W.D. Tex. Dec. 6, 2019) ................................................................ 9

*In re Facebook, Inc. IPO Sec. & Derivative Litig.*,
2015 WL 6971424 (S.D.N.Y. Nov. 9, 2015) ................................................................ 14

*In re Flag Telecom Holdings, Ltd. Securities Litig.*,
574 F.3d 29 (2d Cir. 2009) ........................................................................................... 21

*In re Forterra Inc. Sec. Litig.*,
2020 WL 4727070 (N.D. Tex. Aug. 12, 2020) ................................................... 9, 11, 17

*In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*,
851 F. Supp. 2d 1040 (S.D. Tex. 2012) ....................................................................... 10

*In re Heelys, Inc. Derivative Litig.*,
2009 WL 10704478 (N.D. Tex. Nov. 17, 2009) ........................................................ 4, 11

*In re Lease Oil Antitrust Litig.*,
186 F.R.D. 403 (S.D. Tex. 1999) ................................................................................. 19

*In re Marsh & McLennan Cos., Inc. Sec. Litig.*,
2009 WL 5178546 (S.D.N.Y. Dec. 23, 2009) .............................................................. 25

*In re OCA, Inc. Sec. & Derivative Litig.*,
2009 WL 512081 (E.D. La. Mar. 2, 2009) ................................................................... 15

*In re Ocean Power Tech., Inc., Sec. Litig.*,
2016 WL 6778218 (D.N.J. Nov. 15, 2016) .................................................................... 3

*In re Rite Aid Corp. Sec. Litig.*,
396 F.3d 294 (3d Cir. 2005) ......................................................................................... 10

*In re Signet Jewelers Ltd. Sec. Litig.*,
2020 WL 4196468 (S.D.N.Y. July 21, 2020) ............................................................... 25

*In re Vivendi Universal, S.A. Sec. Litig.*,
765 F. Supp. 2d 512 (S.D.N.Y. 2011) ............................................................................ 3

*In re Waste Mgmt., Inc. Sec Litig.*,
2002 WL 35644013 (S.D. Tex. May 10, 2002) ............................................................ 17

*In re Xcel Energy, Inc. Sec., Derivative & "ERISA" Litig.*,
364 F. Supp. 2d 980 (D. Minn. 2005) .......................................................................... 25

*Jenkins v. Trustmark Nat'l. Bank*,
   300 F.R.D. 291 (S.D. Miss. 2014) .................................................................. 6, 8

*Johnson v. Georgia Highway Express*,
   488 F.2d 714 (5th Cir. 1974) ........................................................................... 6

*Jones v. Diamond*,
   636 F.2d 1364 (5th Cir. 1981) ....................................................................... 19

*Kemp v. Unum Life Ins. Co. of Am.*,
   2015 WL 8526689 (E.D. La. Dec. 11, 2015) .................................................. 9

*Klein v. O'Neal, Inc.*,
   705 F. Supp. 2d 632 (N.D. Tex. 2010) ..................................................... 19, 25

*Leach v. NBC Universal Media, LLC*,
   2017 WL 10435878 (S.D.N.Y. Aug. 24, 2017) ............................................ 18

*Maher v. Zapata Corp.*,
   714 F.2d 436 (5th Cir. 1983) ......................................................................... 15

*Miller v. Glob. Geophysical Servs., Inc.*,
   2016 WL 11645372 (S.D. Tex. Jan. 14, 2016) ............................................... 9

*Missouri v. Jenkins*,
   491 U.S. 274 (1989) ....................................................................................... 10

*Parmelee v. Santander Consumer USA Holdings Inc.*,
   2019 WL 2352837 (N.D. Tex. June 3, 2019) ................................................. 9

*Robbins v. Koger Props., Inc.*,
   116 F.3d 1441 (11th Cir. 1997) ...................................................................... 3

*Roussel v. Brinker Int'l, Inc.*,
   2010 WL 1881898 (S.D. Tex. Jan. 13, 2010) ............................................... 20

*Schwartz v. TXU Corp.*,
   2005 WL 3148350 (N.D. Tex. Nov. 8, 2005) .......................................... *passim*

*Shaw v. Toshiba Am. Info. Sys., Inc.*,
   91 F. Supp. 2d 942 (E.D. Tex. 2000) .............................................................. 7

*Shen v. Exela Techs., Inc.*,
   2021 WL 2589584 (N.D. Tex. June 24, 2021) ........................................ *passim*

*Shen v. Exela Techs., Inc.*,
2022 WL 198402 (N.D. Tex. Jan. 21, 2022) .............................................................. 13, 14, 20

*Silverman v. Motorola Sols., Inc.*,
739 F.3d 956 (7th Cir. 2013) ................................................................................................ 3

*Singh v. 21Vianet Grp., Inc.*,
2018 WL 6427721 (E.D. Tex. Dec. 7, 2018)............................................................................ 9

*Sprague v. Ticonic Nat'l Bank*,
307 U.S. 161 (1939)............................................................................................................... 7

*Tellabs, Inc. v. Makor Issues & Rights. Ltd.*,
551 U.S. 308 (2007)............................................................................................................... 6

*Trs. v. Greenough*,
105 U.S. 527 (1881)............................................................................................................... 7

*Union Asset Mgmt. Holding A.G. v. Dell, Inc.*,
669 F.3d 632 (5th Cir. 2012) ..................................................................................... 6, 7, 8, 12

*Varljen v. H.J. Meyers & Co., Inc.*,
2000 WL 1683656 (S.D.N.Y. Nov. 8, 2000)........................................................................ 24

*Vassallo v. Goodman Networks, Inc.*,
2016 WL 6037847 (E.D. Tex. Oct. 14, 2016) .................................................................... 8, 9

*Williams v. Go Frac, LLC*,
2017 WL 3699350 (E.D. Tex. Apr. 26, 2017)................................................................... 9, 24

*Yedlowski v. Roka Bioscience, Inc.*,
2016 WL 6661336 (D.N.J. Nov. 10, 2016) ......................................................................... 19

## STATUTES

15 U.S.C. § 78u-4(a)(4) ............................................................................................................ 1, 24

15 U.S.C. § 78u-4(a)(6) .................................................................................................................. 7

## REGULATIONS

17 C.F.R. § 240.10b-5........................................................................................................................ 15

Pursuant to the Court's August 21, 2023, Order Preliminarily Approving Settlement and Providing for Notice (ECF No. 94), Lead Counsel, on behalf of all Plaintiff's Counsel, respectfully submit this Motion and Memorandum of Law in support of an award of attorneys' fees and reimbursement of Litigation Expenses.[1]  Defendants take no position on this Motion.

## I.    INTRODUCTION

Plaintiff's Counsel have succeeded in obtaining a $5,000,000 non-reversionary, all cash settlement (the "Settlement") for the benefit of the Settlement Class in the above-captioned action (the "Action").  This is an outstanding result in the face of substantial risks that was the result of Plaintiff's Counsel's vigorous, persistent, and skilled efforts.  Plaintiff's Counsel now respectfully move this Court for an award of attorneys' fees in the amount of 33⅓% of the Settlement Fund (*i.e.*, $1,666,666, plus interest earned thereon), and reimbursement of $385,978.11 in Litigation Expenses.  The Litigation Expenses consist of $360,978.11 in out-of-pocket costs incurred by Plaintiff's Counsel while prosecuting the Action, and a $25,000 award to Court-appointed lead plaintiff Insur Shamgunov ("Lead Plaintiff" or "Mr. Shamgunov") for reimbursement of the reasonable costs (including the cost of time spent) incurred in prosecuting the Action on behalf of the Settlement Class pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u-4(a)(4).

---

[1] Plaintiff's Counsel consists of Lead Counsel, Glancy Prongay & Murray LLP ("GPM"), and Liaison Counsel, The Kendall Law Group, PLLC ("Kendall Law Group").  Unless otherwise noted, capitalized terms have the meanings set forth in the Stipulation and Agreement of Settlement dated July 27, 2023.  (ECF No. 91, Ex. 2) ("Stipulation") or the concurrently filed Declaration of Kara M. Wolke in Support of: (I) Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("Wolke Declaration").  The Wolke Declaration is attached as Exhibit 1 to the Appendix in Support of: (I) Lead Plaintiff's Unopposed Motion for Final Approval of Class Action Settlement and Plan of Allocation; and (II) Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses ("App.").

As detailed below and in the accompanying Wolke Declaration, the Settlement represents an excellent recovery for the Settlement Class. In the absence of the Settlement, the litigation would likely have continued for many years, through class certification, fact discovery, expert discovery, summary judgment, trial, and likely appeals. Lead Plaintiff and his counsel faced substantial obstacles in proving liability and damages, yet nevertheless reached a timely and substantial resolution for the Settlement Class.

Achieving the Settlement was not easy. Defendants were represented by highly skilled litigators, and Plaintiff's Counsel faced numerous hurdles and risks from the outset, including the PSLRA's heightened pleading standards and automatic stay of discovery, the complex nature of the claims at issue, which hinged in large part on highly subjective and technical accounting standards, the high cost of experts and investigators needed to litigate a complex securities fraud case, and a substantial risk of non-payment. These are not idle risks. *See Schwartz v. TXU Corp.*, 2005 WL 3148350, at *32 (N.D. Tex. Nov. 8, 2005) ("the risk of no recovery in complex [securities] cases of this type is very real."); *Hefler v. Wells Fargo & Co.*, 2018 WL 6619983, at *13 (N.D. Cal. Dec. 18, 2018) ("Plaintiffs' Counsel faced substantial risks in pursuing this litigation, given the inherent uncertainties of trying securities fraud cases and the demanding pleading standards of the PLSRA.").[2] As a result, a significant number of cases—like this one— are dismissed at the outset.[3] *See Shen v. Exela Techs., Inc.*, 2021 WL 2589584 (N.D. Tex. June

---

[2] Unless otherwise noted, all internal citations and quotations have been omitted and emphasis has been added.

[3] *See* App., Ex. 5 (excerpt from Janeen McIntosh, Svetlana Starykh, and Edward Flores, *Recent Trends in Securities Class Action Litigation: 2022 Full-Year Review* (NERA Jan. 24, 2023) ("NERA Report") at p. 11 (Fig. 11) (finding motion to dismissed filed in 96% of securities class action lawsuits, with a decision reached in 73% of the cases, and stating that "[a]mong the cases where a decision was reached, 61% were granted (with or without prejudice) and only 20% were denied.").

24, 2021) ("*Shen I*") (dismissing the Action); *see also In re Xcel Energy, Inc. Sec., Derivative &*
*"ERISA" Litig.*, 364 F. Supp. 2d 980, 1003 (D. Minn. 2005) ("The court needs to look no further
than its own order dismissing the shareholder … litigation to assess the risks involved.").

Nor do the risks end at the pleading stage.  Even when a plaintiff is successful at trial,
payment is far from guaranteed.  *See Robbins v. Koger Props., Inc.*, 116 F.3d 1441 (11th Cir.
1997) (jury verdict of $81 million for plaintiffs against an accounting firm reversed on appeal on
loss causation grounds and judgment entered for defendant); *In re BankAtlantic Bancorp, Inc.*
*Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting judgment as a matter of law
for defendants after jury returned verdict for plaintiffs), *aff'd sub nom.*, *Hubbard v. BankAtlantic*
*Bancorp, Inc.*, 688 F.3d 713 (11th Cir. 2012).[4]  There was, therefore, a strong possibility that the
case would yield little or no recovery after many years of costly litigation.  *See Silverman v.*
*Motorola Sols., Inc.*, 739 F.3d 956, 958 (7th Cir. 2013) (observing that "Defendants prevail
outright in many securities suits."); *In re Ocean Power Tech., Inc., Sec. Litig.*, 2016 WL
6778218, at *28 (D.N.J. Nov. 15, 2016)  ("The risk of non-payment is especially high in
securities class actions, as they are notably difficult and notoriously uncertain.").

Despite facing long odds, Plaintiff's Counsel vigorously pursued this case for
approximately three and a half years—working 6,637.45 hours and advancing $360,978.11 in

---

[4] *See also Glickenhaus & Co. v. Household Int'l, Inc.*, 787 F.3d 408 (7th Cir. 2015) (reversing
jury verdict awarding investors $2.46 billion on loss causation and damages grounds, and
remanding for new trial on these issues), *reh'g denied* (July 1, 2015); *Anixter v. Home-Stake*
*Prod. Co.*, 77 F.3d 1215, 1235 (10th Cir. 1996) (overturning securities-fraud class-action jury
verdict for plaintiffs in case filed in 1973 and tried in 1988 on the basis of 1994 Supreme Court
opinion); *In re Vivendi Universal, S.A. Sec. Litig.*, 765 F. Supp. 2d 512, 533 (S.D.N.Y. 2011),
*aff'd*, 838 F.3d 223 (2d Cir. 2016) (after jury verdict for plaintiff, court significantly reduced
scope of class by amending class definition to exclude purchasers of ordinary shares); *In re*
*Apple Computer Sec. Litig.*, 1991 WL 238298, at *1-2 (N.D. Cal. Sept. 6, 1991) ($100 million
jury verdict vacated on post-trial motions).

3

out-of-pocket expenses, all on a fully continent basis. *See* App., Ex. 1 at ¶¶80 & 93; *see also* § V.A., *infra* (summarizing work performed by Plaintiff's Counsel).  As compensation for their significant efforts and achievements on behalf of the Settlement Class, Plaintiff's Counsel respectfully request a fee award in the amount of 33⅓% of the Settlement Fund.  The requested fee is consistent with fee awards in comparable class action settlements, whether considered as a percentage of the Settlement or in relation to Plaintiff's Counsel's lodestar.   Indeed, the requested fee represents a negative (or fractional) multiplier of 0.42 on Plaintiff's Counsel's lodestar, which itself is a strong indication of the reasonableness of the requested fee.  *See In re Heelys, Inc. Derivative Litig.*, 2009 WL 10704478, at *11 (N.D. Tex. Nov. 17, 2009) ("Because the Fees and Expenses Award results in a negative multiplier as compared to the actual time and labor undertaken by Derivative Plaintiffs' Counsel in the Derivative Action, the Fees and Expenses Award is demonstrably reasonable.").

Plaintiff's Counsel also seek reimbursement of $360,978.11 in out-of-pocket litigation expenses incurred in prosecuting the Action.  *See* App., Ex. 1 at ¶¶92-98.  This amount is below the $430,000 limit on Litigation Expenses disclosed in the Notice—which, by definition, included a PSLRA award to Lead Plaintiff.  The expenses are reasonable in amount and were necessarily incurred in the successful prosecution of the Action.  Accordingly, they should be approved.

Finally, Plaintiff's Counsel respectfully requests a PSLRA award in the amount of $25,000 to compensate Lead Plaintiff for the time and effort he expended on behalf of the Settlement Class.  Among other things, Mr. Shamgunov reviewed the pleadings and briefs filed in the Action, as well as court orders; regularly communicated with Lead Counsel about the litigation and the strengths and weaknesses of the case; produced documents, responded to

written discovery (including interrogatories) and sat for a deposition; was involved in settlement negotiations; and, after extensive discussions with Lead Counsel, authorized settlement of the case.  *See* App., Ex. 8 (Declaration of Insur Shamgunov ("Shamgunov Decl.")) at 5.  But for his "commitment to pursuing these claims, the successful recovery for the Class would not have been possible."  *Bell v. Pension Comm. of ATH Holding Co., LLC*, 2019 WL 4193376, at *6 (S.D. Ind. Sept. 4, 2019).

For all the reasons set forth herein, and in the Wolke Declaration, Lead Counsel respectfully requests that the Court award attorneys' fees of 33⅓% of the Settlement Fund, approve reimbursement of $360,978.11 in out-of-pocket litigation expenses, and grant Mr. Shamgunov a PSLRA award in the aggregate amount of $25,000.

## II.    SUMMARY OF FACTUAL AND PROCEDURAL HISTORY

The Wolke Declaration is an integral part of this submission and, for the sake of brevity, the Court is respectfully referred to it for a detailed description of, inter alia: the factual background and procedural history of the Action, and the nature of the claims asserted (App., Ex 1 ¶¶6, 12-34); the negotiations leading to the Settlement (*id.* at ¶¶35-40); the risks and uncertainties of continued litigation (*id.* at ¶¶42-53); and the terms of the Plan of Allocation of the Net Settlement Fund.  *Id.* at ¶¶66-74.

## III.   PLAINTIFF'S COUNSEL ARE ENTITLED TO AN AWARD OF ATTORNEYS' FEES FROM THE COMMON FUND

The Supreme Court and the Fifth Circuit have consistently recognized that a "litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980); *accord Barton v. Drummond Co.*, 636 F.2d 978, 982 (5th Cir. 1981) ("[I]t is well settled that the common benefit or common fund equitable doctrine allows for the

assessment of attorneys' fees against a common fund created by the attorneys' efforts.").

Courts also have recognized that in addition to providing just compensation, awards of attorneys' fees from a common fund serve to encourage skilled counsel to represent those who seek redress for damages inflicted on classes of persons and to discourage future misconduct of a similar nature. *See Jenkins v. Trustmark Nat'l. Bank*, 300 F.R.D. 291, 306-07 (S.D. Miss. 2014) ("The doctrine serves the twin goals of removing a potential financial obstacle to a plaintiff's pursuit of a claim on behalf of a class and of equitably distributing the fees and costs of successful litigation among all who gained from the named plaintiff's efforts."). The Supreme Court has emphasized that private securities cases such as this one are "an indispensable tool with which defrauded investors can recover their losses—a matter crucial to the integrity of domestic capital markets." *Tellabs, Inc. v. Makor Issues & Rights. Ltd.*, 551 U.S. 308, 320 n.4 (2007). Thus, common-fund fee awards of the type requested here encourage meritorious class actions, and promote private enforcement of, and compliance with, the securities laws.

## IV.   THE REQUESTED ATTORNEYS' FEES ARE REASONABLE UNDER BOTH THE PERCENTAGE METHOD AND THE LODESTAR METHOD

"In common fund cases, courts typically use one of two methods for calculating attorneys' fees: (1) the percentage method, in which the court awards fees as a reasonable percentage of the common fund; or (2) the lodestar method, in which the court computes fees by multiplying the number of hours reasonably expended on the litigation by a reasonable hourly rate and, in its discretion, applying an upward or downward multiplier." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 642-43 (5th Cir. 2012) ("*Union Asset Mgmt.*"). The Fifth Circuit affords "district courts the flexibility to choose between the percentage and lodestar methods," with their analyses under either approach informed by the factors set forth in *Johnson v. Georgia Highway Express*, 488 F.2d 714, 717-19 (5th Cir. 1974), *overruled on other grounds*

*by Blanchard v. Bergeron*, 489 U.S. 87 (1989). *Id.* at 644.

### A.      The Court Should Apply The Percentage Method

While the Court may apply either the percentage method or the lodestar method, the percentage method is generally preferred.  The Supreme Court has consistently held that where a common fund has been created for the benefit of a class as a result of counsel's efforts, the award of counsel's fee should be determined on a percentage-of-the-fund basis. *See, e.g., Trs. v. Greenough*, 105 U.S. 527, 532 (1881); *Sprague v. Ticonic Nat'l Bank*, 307 U.S. 161, 166-67 (1939); *Boeing*, 444 U.S. at 478-79.  And, as the Supreme Court declared in *Blum v. Stenson*, "under the common fund doctrine … a reasonable fee is based on a percentage of the fund bestowed on the class." 465 U.S. 886, 900 n.16 (1984).

The Fifth Circuit also has endorsed the percentage method, noting that "district courts in this Circuit regularly use the percentage method blended with a *Johnson* reasonableness check, and for some it is the preferred method." *Union Asset Mgmt.*, 669 F.3d at 643-44; *see also Shaw v. Toshiba Am. Info. Sys., Inc.*, 91 F. Supp. 2d 942, 964 (E.D. Tex. 2000) (percentage method superior to lodestar method).  The percentage method "allows for easy computation" and "aligns the interests of class counsel with those of the class members."  *Union Asset Mgmt.*, 669 F.3d at 643.  Conversely, "[t]he lodestar method voraciously consumes enormous judicial resources, unnecessarily complicates already complex litigation, and inaccurately reflects the value of services performed." *Shaw*, 91 F. Supp. 2d at 964.

A percentage-of-the-fund fee award is also consistent with the PSLRA, which provides that, "[t]otal attorneys' fees and expenses awarded by the court to counsel for the plaintiff class shall not exceed a reasonable percentage of the amount" recovered for the class.  15 U.S.C. § 78u-4(a)(6).  Thus, "[a]s the Fifth Circuit noted, there is 'near-universal adoption of the percentage method in securities cases,' at least in part because it is explicitly contemplated by the

7

[PSLRA.]" *In re Arthrocare Corp. Sec. Litig.*, 2012 WL 12951371, at *4 (W.D. Tex. June 4, 2012) quoting *Union Asset Mgmt.*, 669 F.3d at 643; *see also Erica P. John Fund, Inc. v. Halliburton Co.*, 2018 WL 1942227, at *8 (N.D. Tex. Apr. 25, 2018) ("*Halliburton*") ("The PSL[R]A expressly contemplates the percentage method … ."). Accordingly, the Court should apply the percentage method.

> **B.    An Award Of 33⅓% Is Appropriate Under The Percentage Method**

Under the percentage method, the Court "first determines the actual monetary value conferred to the class by the settlement" and then "applies a benchmark percentage to this value." *Vassallo v. Goodman Networks, Inc.*, 2016 WL 6037847, at *3-4 (E.D. Tex. Oct. 14, 2016). After setting the benchmark, the Court applies the *Johnson* factors "to determine whether the percentage should be adjusted upward or downward." *Id*. at *4. Here, the Settlement is an all-cash, non-reversionary settlement. Thus, the monetary value conferred to the Settlement Class is $5.0 million.

While there is no set rule on what is a reasonable "benchmark" percentage, "a review of analogous precedent indicates that an award of one-third of the common fund is reasonable and typical" in the Fifth Circuit. *Burford v. Cargill, Inc.*, 2012 WL 5471985, at *5 (W.D. La. Nov. 8, 2012); *see also Al's Pals Pet Care v. Woodforest Nat'l Bank, NA*, 2019 WL 387409, at *4 (S.D. Tex. Jan. 30, 2019) ("The fee represents one-third of the $15 million settlement fund, which is an oft-awarded percentage in common fund class action settlements in this Circuit"); *Halliburton*, 2018 WL 1942227, at *12 (considering *Johnson* factors and holding that 33⅓% contingency was "reasonable and fair."); *City of Omaha Police & Fire Ret. Sys. v. LHC Grp.*, 2015 WL 965696, at *4 (W.D. La. Mar. 3, 2015) (33⅓% contingency "is common in this geographic area" and "has been approved in other common fund cases"); *Jenkins*, 300 F.R.D. at 307 ("it is not unusual for district courts in the Fifth Circuit to award percentages of approximately one third").

8

Accordingly, an "attorney fee award of 1/3 of the total settlement fund falls within the range of awards granted by courts within the Fifth Circuit and is a reasonable benchmark." *Kemp v. Unum Life Ins. Co. of Am.*, 2015 WL 8526689, at *9 (E.D. La. Dec. 11, 2015).

Indeed, courts in the Fifth Circuit routinely grant fee awards in the amount of one-third (or more) of common fund settlements.  *See, e.g.*, *In re Forterra Inc. Sec. Litig.*, 2020 WL 4727070, at *1 (N.D. Tex. Aug. 12, 2020) (awarding 33⅓% of the $5.5 million settlement fund); *Miller v. Glob. Geophysical Servs., Inc.*, 2016 WL 11645372, at *1 (S.D. Tex. Jan. 14, 2016) (awarding 33⅓% of the $5.3 million settlement fund); *Parmelee v. Santander Consumer USA Holdings Inc.*, 2019 WL 2352837, at *2 (N.D. Tex. June 3, 2019) (awarding 33⅓% of the $9.5 million settlement fund); *Singh v. 21Vianet Grp., Inc.*, 2018 WL 6427721, at *2 (E.D. Tex. Dec. 7, 2018) (awarding 33.3% of the $9 million settlement fund); *Halliburton*, 2018 WL 1942227, at *12 (awarding 33⅓% of $100 million settlement fund and stating "[c]ompared to other common fund cases in this Circuit, Class Counsel is not asking for an unusually large or high fee."); *Al's Pals*, 2019 WL 387409, at *4 (awarding one-third of a $15 million settlement fund); *In re EZCORP, Inc. Sec. Litig.*, 2019 WL 6649017, at *1 (W.D. Tex. Dec. 6, 2019) (awarding 33% of a $4.875 million settlement fund); *Williams v. Go Frac, LLC*, 2017 WL 3699350, at *2–3 (E.D. Tex. Apr. 26, 2017) (awarding 35% of the $5.782 million gross settlement fund, finding the requested fees and expenses to be "fair and reasonable").[5]

### C.    The Requested Fee Is Appropriate Even Under The Lodestar Method

The requested fee is also reasonable when considering counsel's lodestar.  Courts in this Circuit often perform a lodestar analysis ***solely*** as a cross-check to confirm that the requested percentage fee is reasonable.  *Vassallo*, 2016 WL 6037847, at *3.  In so doing, courts recognize that the lodestar cross-check should not displace a district court's primary reliance on the

---

[5] *See also* App., Ex. 6 (collecting Fifth Circuit cases with 33% or higher fee awards).

percentage method and that courts "may rely on summaries submitted by the attorneys and need not review actual billing records." *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 306-07 (3d Cir. 2005); *Halliburton*, 2018 WL 1942227, at *8-*9 ("The lodestar cross-check is usually applied 'to avoid windfall fees' . . . [D]istrict courts need not scrutinize counsel's billing records with the thoroughness required were the lodestar method applied by itself."). In this case, the lodestar method—whether used directly or as a cross-check on the percentage method—confirms the reasonableness of the requested fee.

"Under [the lodestar] method, the court takes the recorded hours worked by the attorneys and multiplies them by a reasonable hourly rate," then applies a multiplier upward or downward. *Halliburton*, 2018 WL 1942227, at *8. at *13. Here, Plaintiff's Counsel each submitted a declaration that includes a schedule identifying the lodestar of each firm (by individual, position, billing rate, and hours billed). *See* App., Ex. 3-A (GPM lodestar chart); *id.*, Ex. 4-A (Kendall Law Group lodestar chart). The cumulative time expended by Plaintiff's Counsel is 6,637.45 hours. *See* App., Ex. 1 at ¶80. Based on current hourly rates, the resulting lodestar for the services is $4,057,596.00. *See Id.*[6]

"An attorney's requested hourly rate is *prima facie* reasonable when he requests that the lodestar be computed at his or her customary billing rate, the rate is within the range of prevailing market rates and the rate is not contested." *In re Heartland Payment Sys., Inc. Customer Data Sec. Breach Litig.*, 851 F. Supp. 2d 1040, 1087 (S.D. Tex. 2012). Here, Plaintiff's Counsel's hourly rates range from $850-1,100 for partners, to $410-700 for associates and staff attorneys, which are reasonable. App., Ex. 1 at ¶79. Indeed, Plaintiff's Counsel's rates

---

[6] *See also In re Enron Corp. Secs., Derivative & ERISA Litig.*, 586 F. Supp. 2d 732, 779 (S.D. Tex. 2008) (noting that courts use current rather historic rates to "compensate for delay in receiving fees.") (citing *Missouri v. Jenkins*, 491 U.S. 274, 283-84 (1989)); *Halliburton*, 2018 WL 1942227, at *13 (calculating rates using class counsels' firms' current rates).

have been accepted by this and other courts in this Circuit in the context of a lodestar cross-check (*see In re: RCI Hospitality Holdings, Inc. Sec. Litig.*, No. 19-cv-01841, ECF No. 81 (S.D. Tex. Aug 12, 2022) (App., Ex. 9) (GPM served as one of Lead Counsel and Kendall Law Group served as Liaison Counsel); *In re Forterra.*, 2020 WL 4727070, at *1-*2 (GPM served as Lead Counsel and Kendall Law Group served as Liaison Counsel)).  They are also consistent with the rates charged by other firms engaged in plaintiffs-side securities litigation, as well as defense counsel engaged in complex litigation (*see* App., Ex. 7 (chart reflecting billable rates of defense firms and plaintiffs-side securities litigation firms)), including defense counsel in this Action. *See id*. at p.163 (reflecting Norton Rose Fulbright US LLP's attorney rates ranging from $355 - $1,350 per hour).

Based on Plaintiff's Counsel's hourly rates, the requested fee equates to a fractional (or "negative") multiplier of 0.42—*i.e.*, the requested fee is **less than** Plaintiff's Counsel's lodestar. App., Ex. 1 at ¶80.  Courts have routinely recognized that a fractional multiplier strongly supports a finding that the fee award is reasonable. *See Halliburton*, 2018 WL 1942227, at *13 ("Because there is a strong presumption that the lodestar represents a reasonable fee . . ., the fact that Class Counsel seeks an award less than the lodestar supports finding that the fee award is reasonable."); *In re Heelys*, 2009 WL 10704478, at *11.  This is because **positive** multipliers of "1 to 4 [are] typically approved by courts within [the Fifth] circuit" in complex contingency fee litigation such as this.  *Burford*, 2012 WL 5471985, at *6 n.1; *see also In re Enron*, 586 F. Supp. 2d at 751 n.20, 752 (awarding percentage fee equal to a multiple of 5.2 times lodestar, and stating that "[m]ultiples from one to four are frequently awarded in common fund cases when the lodestar method is applied").  Accordingly, the requested fee is also reasonable under the lodestar method.

11

## V.   THE *JOHNSON* FACTORS CONFIRM THE REASONABLENESS OF THE REQUESTED FEE

In *Johnson*, the Fifth Circuit stated that district courts should consider several factors in setting a fee award.  The twelve *Johnson* factors are:

> (1) the time and labor required; (2) the novelty and difficulty of the issues; (3) the skill required to perform the legal service adequately; (4) the preclusion of other employment by the attorney because he accepted this case; (5) the customary fee for similar work in the community; (6) whether the fee is fixed or contingent; (7) time limitations imposed by the client or the circumstances; (8) the amount involved and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the undesirability of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases.

*Union Asset Mgmt.*, 669 F.3d at 642 n.25.  "The relevance of each of the *Johnson* factors will vary in any particular case, and, rather than requiring a rigid application of each factor, the Fifth Circuit has left it to the lower court's discretion to apply those factors in view of the circumstances of a particular case."  *Schwartz*, 2005 WL 3148350, at *28 (N.D. Tex. Nov. 8, 2005).  As demonstrated below, the relevant *Johnson* factors weigh in favor of the requested fee.

### A.   The Time And Labor Required

The time and effort required by Plaintiff's Counsel to effectively prosecute this Action and achieve the Settlement establish that the requested fee is justified.  As detailed in the Wolke Declaration, Plaintiff's Counsel litigated the Action for approximately three and a half years.  App., Ex 1 at ¶¶12-13.  In the course of the litigation, Plaintiff's Counsel, among other things:

- moved for the appointment of Lead Plaintiffs[7] and Lead and Liaison Counsel pursuant to the PSLRA;

- conducted an extensive investigation of the claims asserted in the Action, which included, among other things: (1) reviewing and analyzing (a) Exela Technologies, Inc.'s ("Exela") SEC filings, (b) public reports, blog posts, research reports prepared by securities and financial analysts, and news

---

[7] On December 20, 2022, one of the lead Plaintiff, Elena Shamgunova, voluntarily dismissed her claim.  ECF Nos. 69-70.  Following her December 20, 2022, voluntary dismissal, Mr. Shamgunov served as the sole lead plaintiff.

articles related to Exela, (c) investor call transcripts, and (d) other litigation and publicly available material concerning Exela; (2) retaining and working with a private investigator who conducted an investigation that involved, *inter alia*, locating and interviewing former employees and other sources of potentially relevant information; and (3) consultation with experts in the fields of accounting, loss causation, and damages;

- utilized the comprehensive investigation and additional research to draft and file the the 98-page (371-paragraph) Amended Class Action Complaint (the "Amended Complaint"), which asserted violations of the Securities Exchange Act of 1934 ("Exchange Act");

- researched, drafted, and filed an opposition to Defendants' motion to dismiss the Amended Complaint, and engaged in in-person oral argument on the motion, after which the Court granted Defendants' motion (*see Shen I*, 2021 WL 2589584);

- conducted additional investigation and analysis, and then filed the 118-page (394-paragraph) Second Amended Complaint ("Complaint" or "SAC");

- researched, drafted, and filed an opposition to Defendants' motion to dismiss the SAC, and engaged in virtual oral argument on the motion, after which the Court denied Defendants' motion to dismiss in its entirety. *See Shen v. Exela Techs., Inc.*, 2022 WL 198402 (N.D. Tex. Jan. 21, 2022) ("*Shen II*");

- engaged in substantial discovery, which entailed, *inter alia*: (1) exchanging initial disclosures; (2) negotiating a protective order and ESI protocol, both of which were subsequently entered by the Court; (3) serving and responding to document requests and interrogatories; (4) identifying and issuing subpoenas to relevant third parties; (5) deposing Exela's Chief Accounting Officer ("CAO") and Chief Executive Officer ("CEO"); (6) defending Lead Plaintiff's deposition; and (7) conducting a targeted review and analysis of the 2.24 million pages of documents produced by Exela;

- engaged in an unsuccessful mediation process overseen by a highly experienced third-party mediator, Jed Melnick, Esq., of JAMS, which involved an exchange of written submissions concerning the facts of the case, liability and damages, and a full-day virtual mediation session;

- filed a motion for class certification, which included, *inter alia*, an expert report by Dr. Adam Werner on the efficiency of the market for Exela's common stock;

- defended Dr. Werner at his deposition;

- engaged in months of follow-up negotiations with Mr. Melnick and Defendants' Counsel following the unsuccessful mediation that ultimately resulted in a mediator's recommendation to the settle the Action for $5.0 million;

- worked with a consulting damages expert to craft a plan of allocation that

treats Lead Plaintiff and all other members of the proposed Settlement Class fairly;

- prepared the initial draft, and negotiated the terms, of the Stipulation (including the exhibits thereto) and the Supplemental Agreement;

- drafted the preliminary approval motion and supporting papers;

- worked with the Court appointed Claims Administrator to provide notice to the Settlement Class;

-  drafted and filed the Emergency Motion to Enforce Settlement; and

- drafted the final approval motion and supporting papers. *Id*. at 8.

The efforts required to complete these tasks, as well as others, were extensive and represented an immense risk, given the contingency-based nature of Plaintiff's Counsel's representation. *Id*. at ¶¶84-87. To date, Plaintiff's Counsel have spent over 6,637.45 hours litigating this case and have incurred $360,978.11 in unreimbursed litigation expenses. *Id*. at ¶¶80-81, & 93. These numbers reflect Plaintiff's Counsel's commitment to vigorously pursuing this Action for the benefit of Lead Plaintiff and the Settlement Class.

Furthermore, additional hours and resources will necessarily be expended assisting Settlement Class Members with their Proof of Claim forms, responding to Settlement Class Members' inquiries, shepherding the claims process to conclusion, and filing a distribution motion. No additional compensation will be sought for this work. Accordingly, this factor supports approval of the requested attorney fees. *See In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 2015 WL 6971424, at \*10 (S.D.N.Y. Nov. 9, 2015) ("Considering that the work in this matter is not yet concluded for Plaintiffs' counsel who will necessarily need to oversee the claims process, respond to inquiries, and assist Class Members in submitting their Proof[s] of Claim[], the time and labor expended by counsel in this matter support a conclusion that a 33% fee award in this matter is reasonable.").

14

### B. Novelty And Difficulty Of The Issues

The second *Johnson* factor also favors granting Lead Counsel's request for attorneys' fees. Courts have repeatedly recognized that securities litigation is "notoriously difficult and unpredictable" (*Maher v. Zapata Corp.*, 714 F.2d 436, 455 (5th Cir. 1983)), and that "a securities case, by its very nature, is a complex animal." *Clark v. Lomas & Nettleton Fin. Corp.*, 79 F.R.D. 641, 654 (N.D. Tex. 1978), *vacated on other grounds*, 625 F.2d 49 (5th Cir. 1980). This is especially true in the Fifth Circuit. *See Schwartz*, 2005 WL 3148350, at *32 (finding approximately 90% of Fifth Circuit PSLRA pleading decisions have upheld dismissal of complaints and recognizing case was risky when lead counsel accepted retention); *In re OCA, Inc. Sec. & Derivative Litig.*, 2009 WL 512081, at *21 (E.D. La. Mar. 2, 2009) ("Fifth Circuit decisions on causation, pleading and proof at the class certification stage make PSLRA claims particularly difficult in this circuit.").

This case was no different.[8] *See City of Omaha*, 2015 WL 965696, at *6 ("The Amended Complaint asserts claims for securities fraud under §§ 10(b), 20(a) and 20A of the Securities and Exchange Act of 1934 and Rule 10b–5, 17 C.F.R. § 240.10b-5, which is a highly technical and complicated area of the law."). Although Lead Plaintiff believed that the allegations of the SAC would ultimately translate into a strong case, Lead Plaintiff was also keenly aware he faced numerous hurdles to ***proving*** liability and damages. As detailed in the Wolke Declaration (App., Ex 1 at ¶¶46-51) and the Final Approval Motion (pp. 10-13, 17-18), Defendants raised credible arguments challenging scienter, and loss causation. In fact, when the Court denied Defendants' second motion for dismissal in *Shen II*, the Court only explicitly ruled for Lead Plaintiffs on one

---

[8] Indeed, one of Lead Plaintiff's theories rested on unsettled law in the Fifth Circuit: whether a violation of Regulation S-K can operate as a proper predicate act to support a § 10(b) claim. *See Shen I*, 2021 WL 2589584, at *17 ("the Fifth Circuit has not held that Regulation S-K can even be the predicate for a § 10(b) claim.").

of their three theories—that related to Exela's revenue visibility. *See id*. at *9 ("the Court expresses no view about whether plaintiffs have rectified the deficiencies in their other theories, which the court rejected in *Shen I*."). Had Defendants proved the revenue visibility statements were immaterial or made without scienter, it could prove fatal to Plaintiffs' claims. *See Gross v. GFI Grp., Inc.*, 784 F. App'x. 27, 29 (2d Cir. 2019) (affirming summary judgment on alternative ground that Defendant's "statement did not, as a matter of law, amount to a material misrepresentation or omission actionable under section 10(b)," despite the trial court finding the statement actionable twice).

Moreover, even if Lead Plaintiff proved liability on the remaining statements, Defendants' disaggregation arguments regarding loss causation and damages posed a significant threat that the total recoverable class-wide damages could be substantially reduced. *See In re Cendant Corp. Litig*, 264 F.3d 201, 239 (3d Cir. 2001) ("[E]stablishing damages at trial would lead to a 'battle of experts' with each side presenting its figures to the jury and with no guarantee whom the jury would believe."). That risk was particularly acute here, given Lead Plaintiff would have to demonstrate that it was the revelation that Defendants ***lacked visibility*** into Exela's revenue that caused the drop in Exela's share price, not ***the reduction in revenue guidance itself*** (or any other bad news revealed at the time). *See Celeste Neely v. Intrusion Inc.*, 2022 WL 17736350, at *6 (E.D. Tex. Dec. 16, 2022) (weighing towards settlement was the court's consideration that "it is likely that Intrusion would vigorously dispute the connection between its alleged wrongdoing and the drop in its stock price.").

While Plaintiff's Counsel believe that they would have ultimately been able to overcome Defendants' arguments, there can be no question that this Action was difficult, complex, and fraught with risk from the outset. *See Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 55 (2d

16

Cir. 2000) ("It is well-established that litigation risk must be measured as of when the case is filed."); *In re Waste Mgmt., Inc. Sec Litig.*, 2002 WL 35644013, at *28 (S.D. Tex. May 10, 2002) ("These risks must be assessed as they existed at the inception of the litigation, and not in light of the settlement achieved in the end."). Despite these risks, Plaintiff's Counsel accepted the challenge and obtained an excellent result for the Settlement Class. Success in the face of these obstacles strongly supports the requested fee. *See City of Omaha,* 2015 WL 965696, at *6 ("Given the inherent difficulty involved in securities class actions and the special difficulty of bringing those cases in the Fifth Circuit, the Court finds that consideration of this factor warrants a substantial fee.").

### C.    The Skill Required To Perform The Legal Service Adequately And The Experience, Reputation, And Ability Of The Attorneys

The third and ninth *Johnson* factors—the skill required and the experience, reputation, and ability of the attorneys—also support the requested fee. As demonstrated by their respective firm resumes, Plaintiff's Counsel have many years of experience in complex civil litigation, particularly in the litigation of shareholder suits and other class actions. *See* App., Ex. 3-C (GPM firm resumé); App., Ex. 4-B (Kendall Law Group resumé). Plaintiff's Counsel's experience allowed them to skillfully investigate and plead the case despite the PSLRA's heightened pleading standard and automatic stay of discovery, identify the complex issues involved in this case, formulate strategies to prosecute it effectively, and to ultimately secure a favorable outcome for the Settlement Class. *See Schwartz*, 2005 WL 3148350, at *30 (this factor weighs in favor of approval where despite the PSLRA restrictions, due counsel's "diligent efforts . . . and their skill and reputations" they "were able to negotiate a very favorable" settlement). Plaintiff's Counsel submit that the Settlement is a direct result of their skilled work, perseverance and experience. *See In re Forterra*, 2020 WL 4727070, at *2 ("Plaintiffs' Counsel [GPM and

17

the Kendall Law Group] have conducted the litigation and achieved the Settlement with skill, perseverance and diligent advocacy.").

Courts have also recognized that the quality of the opposition faced by plaintiff's counsel should be taken into consideration when assessing the quality of counsel's performance. *See Schwartz*, 2005 WL 3148350, at *30 ("The ability of plaintiffs' counsel to obtain such a favorable settlement for the Class in the face of such formidable legal opposition confirms the superior quality of their representation"). Here, Defendants were represented by experienced, aggressive, and highly-skilled counsel from Norton Rose Fulbright US LLP—a prestigious and well-respected defense firm—that vigorously and ably defended the Action. Accordingly, these factors also support the requested fee.

### D.    The Preclusion Of Other Employment

Plaintiff's Counsel spent over 6,637.45 hours litigating this case on behalf of Lead Plaintiff and the Settlement Class, and additional time will be spent seeing it through distribution. *See* App., Ex. 1 at ¶¶80-81). This is time counsel could have devoted to other potentially more lucrative matters. This is evident from the fact that, as discussed above, the requested fee results in a fractional multiplier. Consequently, this factor further supports the requested fee. *See Burford*, 2012 WL 5471985, at *3 ("while this case did not preclude [Class Counsel] from accepting other work, they were often times precluded from working on other cases due to the demands of the instant matter. . . . This factor weighs in favor of a substantial fee award.").[9]

---

[9] *See also Leach v. NBC Universal Media, LLC*, 2017 WL 10435878 at ¶49 (S.D.N.Y. Aug. 24, 2017) ("The fact that Class Counsel's fee award will not only compensate them for time and effort already expended, but for the time that they will be required to spend administering the settlement going forward, also supports their fee request.").

18

E.    **The Customary Fee For Similar Work In The Community**

As discussed above, the 33⅓% requested fee is well within the range of customary fees. *See Garza v. Sporting Goods Props., Inc.*, 1996 WL 56247, at *31 (W.D. Tex. Feb. 6, 1996) ("33 ⅓% to 40% is the customary contingency fee range."); *Burford*, 2012 WL 5471985, at *3 (customary contingency fee "ranges from 33 1/3% to 50%"); *In re Lease Oil Antitrust Litig. (No. II)*, 186 F.R.D. 403, 445 (S.D. Tex. 1999) ("Class counsel and experts both reported to the Court that it is customary in large, complex commercial litigation for contingency fees to be set at 33 to 40%.").

F.    **Whether The Fee Is Fixed Or Contingent**

The contingent nature of the fee requested by counsel—and the substantial risk posed by the litigation—also weigh in favor of awarding the requested fee. *See Yedlowski v. Roka Bioscience, Inc.*, 2016 WL 6661336, at *21 (D.N.J. Nov. 10, 2016) ("The risk of non-payment is especially high in securities class actions, as they are notably difficult and notoriously uncertain."). For approximately three and half years, Plaintiff's Counsel undertook this case on a *fully* contingent basis, carrying the substantial out-of-pocket costs of litigation, and accepting the risk of not being paid for their services or reimbursed for their costs. As the Fifth Circuit has stated, "[l]awyers who are to be compensated only in the event of victory expect and are entitled to be paid more when successful than those who are assured of compensation regardless of result." *Jones v. Diamond*, 636 F.2d 1364, 1382 (5th Cir. 1981), *overruled on other grounds by Int'l Woodworkers of Am., AFL-CIO & its Local No. 5-376 v. Champion Int'l Corp.*, 790 F.2d 1174 (5th Cir. 1986). Thus, "[t]he contingent nature of the fee favors an increase in the typical benchmark percentage." *Klein v. O'Neal, Inc.*, 705 F. Supp. 2d 632, 678 (N.D. Tex. 2010) (Fitzwater, J.); *Buettgen v. Harless*, 2013 WL 12303194, at *3 (N.D. Tex. Nov. 13, 2013) ("the contingent nature of the litigation supports the requested percentage.").

19

### G.      Time Limitations/Nature And Length Of Attorney-Client Relationship

"[T]hese factors are inapplicable to this case, and are therefore neutral." *In re Dell Inc.*, 2010 WL 2371834, at *18 (W.D. Tex. June 11, 2010).

### H.      The Amount Involved And The Results Obtained

Another *Johnson* factor is the "overall degree of success achieved."  *Roussel v. Brinker Int'l, Inc.*, 2010 WL 1881898, at *3 (S.D. Tex. Jan. 13, 2010), *aff'd*, 441 F. App'x 222 (5th Cir. 2011).

Here, Lead Plaintiff's consulting damages expert estimates that *if* Lead Plaintiff had *fully prevailed* on his Exchange Act claims at both summary judgment and after a jury trial, *if* the Court certified the same class period as the Settlement Class Period, and *if* the Court and jury accepted Lead Plaintiff's damages theory—*i.e.*, Lead Plaintiff's *best case scenario*—the total *maximum* damages would be approximately $68 million.  Thus, the $5,000,000 Settlement Amount represents approximately 7.4% of the total *maximum* damages *potentially* available in this Action.  However, if only the damages that pertained to Exela's revenue visibility statements (*i.e.*, the statements the Court ruled were actionable in *Shen II*, 2022 WL 198402) were considered, the *maximum* recoverable damages would drop to $38.1 million.  Under such a scenario, a $5,000,000 recovery equates to 13.1% of total potential damages.  And, as discussed in section V.B *supra*, even these reduced damages estimates were not without risk, as Defendants had very real disaggregation arguments that could have substantially reduced damages, if not eliminated them.  *Cf. In re BankAtlantic Bancorp, Inc. Sec. Litig.*, 2011 WL 1585605 (S.D. Fla. Apr. 25, 2011) (granting defendants' motion for judgment as a matter of law following plaintiffs' verdict based on plaintiffs' expert's failure to disaggregate certain negative

20

information).[10]

A recovery of 7.4-13.1% of maximum recoverable damages is well-within the range of reasonableness. *Cf. Celeste Neely*, 2022 WL 17736350, at *7 (approving $3.25 million settlement, noting "while the high end of the class's potential recovery was $42.7 million, the low end of the class's potential recovery was $0.00—with the balance of probabilities weighing in favor of recovery closer to the low end than to the high end."); *see also IBEW v. Int'l Game Tech., Inc.*, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (approving securities class action settlement where recovery was 3.5% of maximum damages and noting "this amount is within the median recovery in securities class actions settled in the last few years"). It is also **well above** the 3.8% - 5.2% median percentage recovery of total damages in securities class actions settlements with similar potential damages. *See* App., Ex. 5 (NERA Report, at 17, Fig. 18 (median recovery for securities class actions that settled between December 2011 and December 2022 was 3.8% for cases with estimated damages between $50-$99 million, and 5.2% for those with estimated damages of $20-$49 million)).

## I.        The Undesirability Of The Case

The tenth *Johnson* factor, undesirability of the case, also supports the fee requested here. Securities class action have been recognized as "undesirable" due to the elevated risk of litigating under the PSLRA, formidable opposition, high out-of-pocket costs, and the distinct possibility of no recovery. *See Harless*, 2013 WL 12303194, at *13; *see also In re Dell Inc.*, 2010 WL 2371834, at *19 (W.D. Tex. June 11, 2010) ("Class action cases often carry with them elevated risks, a requirement of lengthy investigation through informal discovery, and a

---

[10] *See also In re Flag Telecom Holdings, Ltd. Securities Litig.*, 574 F.3d 29, 36 (2d Cir. 2009) ("to establish loss causation, *Dura* requires plaintiffs to disaggregate those losses caused by changed economic circumstances, 'changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events,' from disclosures of the truth behind the alleged misstatements." quoting *Dura Pharms., Inc., v. Broudo*, 544 U.S. 336, 343 (2005)).

possibility of no recovery, all of which speak to the undesirability of such a case.").

This case was no exception, and the risk of no recovery after many years of hard-fought litigation was very real. *See, e.g.*, *Shen I*, 2021 WL 2589584, at \*21 (***dismissing this Action***); *see also Goldstein v. MCI Worldcom,* 340 F.3d 238 (5th Cir. 2003) (affirming dismissal with prejudice of securities fraud class action against Bernard Ebbers and Worldcom involving a massive securities fraud with a $685 million write-off of accounts receivable, for which Ebbers was later convicted); *Backman v. Polaroid Corp.*, 910 F.2d 10 (1st Cir. 1990) (where the class won a substantial jury verdict and motion for judgment n.o.v. was denied; on appeal, the judgment was reversed and the case was dismissed – after 11 years of litigation). Indeed, as the Fifth Circuit has recognized, "[t]o be successful, a securities class-action plaintiff must thread the eye of a needle made smaller and smaller over the years by judicial decree and congressional action." *Alaska Elec. Pension Fund v. Flowserve Corp.*, 572 F.3d 221, 235 (5th Cir. 2009).

When Plaintiff's Counsel undertook representation of Lead Plaintiffs and the putative class in this Action, it was with the knowledge that they would have to spend substantial time and resources—and face significant risks—without any assurance of compensation. In addition, one of the main allegations in this case centered on Defendants seeking to avoid payment to the Appraisal Petitioners in the Appraisal Action. ECF Nos. 26 at ¶¶74-79, and 44 at ¶¶11, 99, 139-141, 152. This signaled a potential collectability risk. And, by the end of the case, it appeared such risks were materializing: Plaintiff's Counsel had to draft an Emergency Motion to Enforce Settlement. ECF Nos. 95-99. The factual underpinnings of the Action and relevant motion practice make clear at virtually no point in this case was payment ever certain, and, as indicated by the Court's earlier dismissal of the case and the substantially negative multiplier, this case was anything but a slam dunk. Consequently, this factor militates in favor of the requested fee.

22

*See Halliburton*, 2018 WL 1942227, at *12 ("[T]he risk of non-recovery and undertaking expensive litigation against well-financed corporate defendants on a contingent fee has been held to make a case undesirable, warranting a higher fee." (cleaned up)).

### J.   Awards In Similar Cases

As discussed above and shown in Exhibit 6 to the Appendix (collecting cases), the requested fee of 33⅓% is consistent with awards granted in class action cases. Hence, this factor further supports the requested fee award.

In sum, all of the applicable *Johnson* factors support Lead Counsel's request for attorneys' fees of 33⅓% of the Settlement Fund.

## VI.   LEAD COUNSEL'S EXPENSES SHOULD BE REIMBURSED

"Expenses and administrative costs expended by class counsel are recoverable from a common fund in a class action settlement." *Halliburton*, 2018 WL 1942227, at *14. Here, Lead Counsel expended $360,978.11 in out-of-pocket costs, which are divided into categories and itemized in the declaration submitted by GPM.[11]   App., Ex. 3-B.   These expenses are documented, based on the books and records maintained by GPM, and reflect the reasonable and necessary costs of prosecuting this litigation. They include, among other things, costs for: (a) experts in accounting, market efficiency, and loss causation/damages; (b) deposition transcripts; (c) online legal research; (d) mediation; (e) online document review; (f) travel and lodging; (g) court filing fees; (h) service of process; and (i) investigators. *See id.* Courts routinely permit the reimbursement of similar expenses. *Halliburton*, 2018 WL 1942227, at *14; *Schwartz*, 2005 WL 3148350, at *34 (N.D. Tex. Nov. 8, 2005) (approving reimbursement of "expert fees, transportation, meals and lodging, in-house and outsourced photocopying, computerized and on-line research, court reporting fees and deposition transcripts, telephone and facsimile, overnight

---

[11] The Kendall Law Group is not seeking reimbursement of expenses. App., Ex. 4, ¶7.

23

courier service, statutory notice publication, purchase of special materials, postage, messengers, and other services." (cleaned up)).

Additionally, the Notice informed potential Settlement Class Members that Lead Counsel would seek reimbursement of Litigation Expenses up to $430,000 (including an award to Lead Plaintiff of up to $25,000 (App. Ex. 2-B (Notice) at ¶77), and, to date, no objection to the expense application has been filed. The requested expenses should, therefore, be awarded. *See Williams v. Go Frac, LLC*, 2017 WL 3699350, at \*2–3 (E.D. Tex. April 26, 2017) (awarding expenses in the absence of objections).

## VII.    LEAD PLAINTIFF SHOULD BE GRANTED A PSLRA AWARD

In connection with the request for reimbursement of Litigation Expenses, Lead Counsel also respectfully requests a PSLRA award to Lead Plaintiff in the amount of $25,000 for time spent prosecuting the Action. 15 U.S.C. § 78u-4(a)(4). "Court[s] have found that the PSLRA permits courts to award lead plaintiffs in federal securities actions reimbursement for their time devoted to participating in and directing the litigation on behalf of the class." *Guevoura Fund Ltd. v. Sillerman*, 2019 WL 6889901, at \*22 (S.D.N.Y. Dec. 18, 2019). Reimbursement of such costs is allowed because it "encourages participation of plaintiffs in the active supervision of their counsel." *Varljen v. H.J. Meyers & Co., Inc.*, 2000 WL 1683656, at \*5 n.2 (S.D.N.Y. Nov. 8, 2000).

Here, following co-lead plaintiff Elena Shamgunova's December 20, 2022, voluntarily dismissal of her claim, Mr. Shamgunov served as the sole lead plaintiff. ECF Nos. 69-70. Mr. Shamgunov conservatively estimates that in his capacity as a lead plaintiff he dedicated 73 hours to the successful prosecution of this Action by, among other things: (a) producing his trading records to Lead Counsel; (b) moving to be appointed as one of the lead plaintiffs in this Action; (c) regularly communicating with GPM attorneys regarding the posture and progress of the case;

24

(d) reviewing all significant pleadings and briefs filed in the Action; (e) reviewing the Court's orders and discussing them with Lead Counsel; (f) providing documents, and written responses and objections to Defendants' requests for the production of documents; (g) responding to interrogatories; (h) preparing for deposition and being deposed; (i) moving for class certification; (j) consulting with GPM attorneys regarding the settlement negotiations; and (k) evaluating and approving the proposed Settlement.   *See* App., Ex. 8 (Shamgunov Declaration), at ¶¶4-6, 12).

These are "precisely the types of activities that support awarding reimbursement of expenses to class representatives." *In re Marsh & McLennan Cos., Inc. Sec. Litig.*, 2009 WL 5178546, at *21 (S.D.N.Y. Dec. 23, 2009).  Accordingly, Lead Counsel respectfully request that the Court grant Lead Plaintiff reimbursement of his "reasonable costs and expenses incurred in managing this litigation and representing the Class." *Id*. (awarding $214,657 to two institutional lead plaintiffs pursuant to PSLRA); *Klein*, 705 F.Supp.2d 632 (awarding $75,000 to each class representative).[12]

## VIII.  CONCLUSION

For the foregoing reasons, Lead Counsel respectfully requests the Court grant the Motion.[13]

---

[12] *See also KB Partners I, LP v. Pain Therapeutics, Inc.*, No. 1:11-cv-01034-SS, ECF No. 273 at ¶6 (W.D. Tex. Dec. 16, 2016) (PSLRA award of $38,500) (App., Ex. 10); *Zacharia v. Straight Path Communications, Inc.*, No. 2:15-cv-08051-JMV-MF, ECF No. 90 at ¶6 (D.N.J. Sept. 7, 2018) (PSLRA award of $30,000) (App., Ex. 11); *In re Virgin Mobile USA IPO Litig.*, No. 07-cv-5619 (SDW), ECF No. 146 at ¶19 (D.N.J. Dec. 8, 2010) (PSLRA awards to co-lead plaintiffs of $29,370, $29,205, $30,000, and $25,245 respectively, for a combined total of $113,820) (App., Ex. 12); *In re Signet Jewelers Ltd. Sec. Litig.*, 2020 WL 4196468, at *24 (S.D.N.Y. July 21, 2020) (collecting cases and awarding $25,410 to lead plaintiff); *In re Xcel Energy*, 364 F. Supp. 2d at 1000 ($100,000 collectively awarded to lead plaintiff group as reimbursement).

[13] A proposed Order will be submitted with Lead Counsel's reply papers after the deadline for objecting to the motion has passed.

25

DATED: November 2, 2023

**GLANCY PRONGAY & MURRAY LLP**

By:  *s/ Kara M. Wolke*
Kara M. Wolke (*pro hac vice*)
kwolke@glancylaw.com
Joseph D. Cohen (*pro hac vice*)
jcohen@glancylaw.com
Raymond D. Sulentic (*pro hac vice*)
rsulentic@glancylaw.com
1925 Century Park East, Suite 2100
Los Angeles, California 90067
Telephone: (310) 201-9150

*Lead Counsel for Lead Plaintiff and the Proposed Settlement Class*

**KENDALL LAW GROUP, PLLC**
Joe Kendall
Texas Bar No. 11260700
jkendall@kendalllawgroup.com
3232 McKinney Ave., Suite 700
Dallas, Texas 75204
Telephone: (214) 744-3000

*Local Counsel for Lead Plaintiff and the Proposed Settlement Class*

**<u>CERTIFICATE OF CONFERENCE</u>**

On October 31, 2023, the Parties met and conferred concerning the finalization of Lead Counsel's Motion for an Award of Attorneys' Fees and Reimbursement of Litigation Expenses. Defendants confirmed that they take no position on this Motion.

/s/ *Kara M. Wolke*
Kara M. Wolke

## CERTIFICATE OF SERVICE

I hereby certify that on the 2nd day of November, 2023, a true and correct copy of the foregoing document was served by CM/ECF to the parties registered to the Court's CM/ECF system.

/s/ Kara M. Wolke
Kara M. Wolke (admitted *pro hac vice*)